**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS SIERRA, | ) | |
| | ) | Case No. |
| *Plaintiff*, | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| REYNALDO GUEVARA, ERNEST | ) | |
| HALVORSEN, ANTHONY WOJCIK, JOHN | ) | |
| McMURRAY, GEORGE FIGUEROA, | ) | |
| EDWARD MINGEY, ROBERT BIEBEL, | ) | |
| FRANCIS CAPPITELLI, UNKNOWN | ) | |
| EMPLOYEES OF THE CITY OF | ) | |
| CHICAGO, and the CITY OF CHICAGO, | ) | |
| Illinois, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| *Defendants*. | ) | |

## COMPLAINT

NOW COMES Plaintiff, THOMAS SIERRA, by his attorneys LOEVY & LOEVY, and complaining of Defendants REYNALDO GUEVARA, ERNEST HALVORSEN, ANTHONY WOJCIK, JOHN McMURRAY, GEORGE FIGUEROA, EDWARD MINGEY, ROBERT BIEBEL, FRANCIS CAPPITELLI, UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO, and the CITY OF CHICAGO, Illinois, states as follows:

### INTRODUCTION

1.      Plaintiff Thomas Sierra was just 19 years old when he was arrested, prosecuted, and wrongly convicted of the 1995 shooting murder of Noel Andujar. He spent the next 22 years behind bars for a crime he did not commit.

2.      Plaintiff had nothing to do with the murder. At all times since Defendants first accused him of the crime, Plaintiff has maintained his innocence.

3.      There was not one piece of physical evidence connecting Plaintiff to the Andujar murder. He had never been convicted of a crime and had no history of violence. He had no motive to commit the crime. In fact, there was never any reason to think he had any involvement.

4.      Plaintiff's arrest, prosecution, and conviction were based entirely on false evidence manufactured by notorious Chicago Police Detective Reynaldo Guevara and the other Defendants. Included among that false evidence were two fabricated eyewitness identifications.

5.      In order to secure Plaintiff's wrongful prosecution and conviction, the Defendants also suppressed evidence that would have shown Plaintiff was innocent, as well as evidence that could have been used to undermine the testimony of State's witnesses, including the testimony of Defendants themselves.

6.      In court proceedings after Plaintiff's wrongful conviction, Defendant Guevara pleaded his Fifth Amendment right not to incriminate himself in response to questions about his misconduct as a police officer, and specifically about his misconduct during the investigation of the Andujar murder. By way of example, when asked about whether he took steps to frame Plaintiff for the Andujar murder, Defendant Guevara chose to invoke his Fifth Amendment right to remain silent.

7.      In 2017, Cook County Judge James Obbish found that Defendant Guevara had told "bald face lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

8.      Shortly thereafter, the Cook County State's Attorneys conducted a new investigation of Plaintiff's case. On January 9, 2018, the Cook County State's Attorney moved to vacate Plaintiff's conviction and dropped all charges against him. After more than 22 years of wrongful incarceration, Plaintiff was finally exonerated.

9.      Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

10.      This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

11.      This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

12.      Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction. In addition, many if not all of the Defendants reside in this judicial district.

## PARTIES

13.      Plaintiff Thomas Sierra spent more than 22 years wrongly incarcerated for a murder that he did not commit.

14.      At all times relevant to the events described in this Complaint, Defendants Reynaldo Guevara, Ernest Halvorsen, Anthony Wojcik, John McMurray, George Figueroa, and other unknown law enforcement officers were police officers in the Chicago Police Department.

15.      At all times relevant to the events described in this Complaint, Defendants Edward Mingey, Robert Biebel, Francis Cappitelli, and other unknown law enforcement officers supervised the officers in the preceding paragraph. These Defendants participated in the

misconduct alleged in this Complaint and also facilitated, condoned, approved, and turned a blind eye to misconduct of the Defendants whom they supervised.

16.     The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Defendants. Each of the Defendants named in this Complaint acted during their investigation of the Andujar murder as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is additionally responsible for the policies and practices of the Chicago Police Department.

17.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his individual capacity unless otherwise noted.

## FACTS

### The Crime

18.     On the night of May 23, 1995, Noel Andujar was shot and killed while riding in a car in the roundabout near 2600 N. Kedzie Avenue in Chicago's Logan Square neighborhood.

19.     Andujar was sitting in the back seat of a car driven by Jose Melendez. Alberto Rodriguez was a front seat passenger in that car. Andujar, Melendez, and Rodriguez were members of the Latin King street gang.

20.     As they pulled up to a stoplight at the entrance to the roundabout, a Buick with tinted windows pulled up in the lane to the left of them.

21.     As the cars began to move again, a person sitting in the passenger seat of the Buick opened the door, reached a handgun around the door frame, and began shooting repeatedly at the car in which Melendez, Rodriguez, and Andujar were riding.

22.     Andjuar was struck in the head and killed.

23.     Melendez and Rodriguez sped off and shortly thereafter stopped and flagged down a police officer to help them.

24.     Melendez and Rodriguez were the only eyewitness to the Andujar shooting.

**The Initial Description of the Perpetrator by Melendez and Rodriguez**

25.     At the scene, Melendez and Rodriguez described the incident and attempted to describe the shooter.

26.     A number of factors prevented Melendez and Rodriguez from viewing the shooter during the incident. It was nighttime. The Buick had tinted windows that were rolled up throughout the incident. The shooter wore a hood. The shooter's car was behind both Melendez and Rodriguez as they waited at the stoplight, so that neither had a good vantage point to view the shooter. The shooter's car was also to the left, and so Rodriguez's view was further obstructed by Melendez sitting in the driver's seat. Moreover, as the cars began to move and the shooting began, Melendez, Rodriguez, and Andujar all ducked for cover.

27.     As a result, neither Melendez nor Rodriguez got a good look at the shooter, and neither Melendez nor Rodriguez could identify him.

28.     When they were interviewed by Chicago Police patrol officers minutes after the shooting, the only thing that Melendez and Rodriguez could say about the shooter was that he was a male Latino. They could not provide the shooter's approximate height, weight, age, eye color, hair color, complexion, or any other identifying feature.

29.     The only other piece of information that Melendez and Rodriguez could provide to police was that occupants of the shooter's car had made hand gestures indicating that they belonged to the Spanish Cobras street gang, a rival gang to the Latin Kings.

**A Second Description and the Failed Photo Identification Procedure**

30.     At the police station on the evening of the shooting, Melendez and Rodriguez spoke with Defendants McMurray and Wojcik.

31.     Either Melendez or Rodriguez added three additional details to the description of the shooter. Namely, one or the other of them stated that the shooter was 18 to 22 years old, had a lighter complexion, and had black hair that was pushed back during the shooting.

32.     Defendants McMurray and Wojcik showed Melendez and Rodriguez albums containing hundreds of photographs of known Spanish Cobras.

33.     Melendez and Rodriguez studied the photographs in detail for many hours on the night of the shooting.

34.     Neither Melendez nor Rodriguez could make any identification. Each told Defendants McMurray and Wojcik that they could not make an identification.

**Guevara and Halverson Join the Investigation and Pull A Suspect Out of Thin Air**

35.     On May 24, 1995, Defendants Guevara, Halvorsen, and the remainder of the individual police officer Defendants were assigned to the Andujar investigation.

36.     At the time that these Defendants joined the investigation, there were no leads at all about who the shooter might have been.

37.     Immediately upon joining the investigation, Defendant Guevara decided on a suspect.

38.     According to Defendant Guevara, he had seen a Buick matching the description of the car used in the Andujar shooting three days before the crime, on May 20, 1995, while he had been investigating the unrelated murder of a man named Ruben Gonzalez.

39.     Defendant Guevara claimed that when he saw this Buick—before the Andujar shooting had occurred, and thus before he would have had any reason to be on the lookout for such a car—he had asked the mother of Gonzalez the identity of the men riding in the Buick.

40.     According to Defendant Guevara, Gonzalez's mother had given him the nickname Junito.

41.     Defendants then purportedly connected the nickname Junito to Plaintiff.

42.     Based on this story, Plaintiff became Defendants' suspect in the Andujar murder.

43.     Defendants never had any other reason to suspect Plaintiff in the Andujar murder.

44.     In fact, Defendants' story about the Buick seen by Guevara and the resulting connection between Plaintiff and in the Andujar murder was completely fabricated.

**Defendants Fabricate Eyewitness Identifications To Implicate Plaintiff In the Crime**

45.     Having decided on a suspect, Defendants worked to manufacture evidence implicating Plaintiff in the crime.

46.     On May 30, 1995, nearly a week later, Defendants brought Melendez and Rodriguez back to detective division Area Five to participate in identification procedures.

47.     On the same day, Defendants arrested Plaintiff without a warrant and without probable cause and held him at Area Five. At all times that he was at Area Five and at all times thereafter, Plaintiff strenuously denied being involved in any crime.

48.     Nonetheless, Defendants moved forward with identification procedures designed to cause an identification of Plaintiff. When they conducted these identification procedures, Defendants had no intention of accurately identifying the Andujar shooter. Instead, they rigged the identification procedures with the sole purpose of framing Plaintiff.

49.     Defendants conducted these identification procedures despite knowing that neither Melendez nor Rodriguez could identify the person who had shot Andujar.

50.     Defendants knew this because both Melendez and Rodriguez told them that they could not identify the shooter before the identification procedures took place.

51.     In addition, Defendants conducted these identification procedures despite knowing that the shooter had been a Spanish Cobra and that Plaintiff was not a Spanish Cobra.

52.     Defendants manipulated the identification procedures so that Melendez and Rodriguez would select Plaintiff.

53.     Defendants first performed a photo identification procedure and then a live lineup procedure with both Melendez and Rodriguez.

54.     During the photo identification procedures, Defendants showed Rodriguez and Melendez a group of photographs that included Plaintiff's photograph.

55.     Defendants pointed out Plaintiff's photo to Rodriguez and Melendez and told them that he was the person responsible for the crime.

56.     Rodriguez and Melendez selected Plaintiff's photo as the Andujar shooter only after Defendants told them to do so.

57.     After Defendants showed them Plaintiff's photo, Defendants showed Rodriguez and Melendez a live lineup in which Plaintiff stood.

58.     Plaintiff was brought into the lineup room after all of the individuals who were serving as fillers in the lineup.

59.     Plaintiff was put into the empty chair in the lineup.

60.     Defendants indicated to Rodriguez and Melendez that Plaintiff, the person they had viewed in the photo identification procedures, was the person who they should select from the live lineup.

61.     Rodriguez and Melendez then identified Plaintiff as the Andjuar shooter in the live lineup.

62.     Following the lineup, Defendants wrote police reports that falsely recounted the lineup procedures that they had performed. These reports falsely made it appear that Rodriguez and Melendez had selected Plaintiff as the perpetrator during legitimate identification procedures.

**Defendants Fabricate An Identification of the Buick**

63.     According to Defendants, on May 30, 1995, they also pulled over a Buick fitting the description of the one that Defendant Guevara claimed he had seen in the days before the Andujar murder.

64.     Defendants had this Buick brought to the Area Five parking lot.

65.     Defendants did not treat the driver of this Buick as a suspect in the Andujar murder.

66.     Instead, Defendants took Rodriguez and Melendez to view the car in the parking lot of the police station.

67.     Defendants asked Rodriguez and Melendez whether the Buick was the one used during the shooting.

68.     Both Rodriguez and Melendez told Defendants that the Buick was not the car used during the shooting of Andujar.

69.     Defendants knew that Rodriguez's and Melendez's statements were correct, because they had made up the story about the Buick.

70.     In addition, the Buick that Defendants brought to the Area Five parking lot did not match the description of the car provided by Rodriguez and Melendez on the night of the crime. Among other things, it did not have tinted windows.

71.     But Defendants did not make any record of or report the fact that Rodriguez and Melendez had told them that the Buick in the Area Five parking lot was not the car used in the shootings.

72.     Instead, Defendants falsely reported that Rodriguez and Melendez had identified the Buick as the car used in the shooting.

73.     This fabricated evidence was used to confirm Defendant Guevara's fabricated story that gave Defendants the purported reason to suspect Plaintiff of the crime in the first place.

**Defendants Suppress Their Investigative Misconduct**

74.     The false police reports described above were approved by Defendants Mingey, Biebel, and Cappitelli.

75.     The false police reports were used to cover up evidence of Defendants' misconduct. They were provided to state prosecutors and became a basis for charging and prosecuting Plaintiff.

76.     In addition, Defendants gave false statements to state prosecutors and provided false testimony at Plaintiff's criminal trial, and in those statements as well they made it appear that Rodriguez and Melendez had legitimately selected Plaintiff as Andujar's killer.

77.     At all times, Defendants suppressed the true circumstances of their manipulative identification procedures and their interactions with Melendez and Rodriguez.

10

78. Defendants did not disclose their misconduct to Plaintiff or his attorneys.

79. At all times, Defendants Mingey, Biebel, and Cappitelli were aware of the Defendants' misconduct and their fabrication of a case against Plaintiff. These supervisors nevertheless intentionally ignored the Defendants' misconduct, and decided to make Plaintiff liable for a crime he did not commit, rather than directing the officers to find the person who had actually committed the crime. In addition, the supervisors of the Defendants explicitly authorized their investigative misconduct.

80. In addition, on information and belief, the Defendants suppressed and destroyed additional evidence still unknown to Plaintiff, which would also have shown Plaintiff's innocence.

**Policy and Practice of Wrongly Convicting Innocent Persons In Violation of Due Process**

81. The Chicago Police Department is responsible by virtue of its official policies for scores of miscarriages of justice like that inflicted upon Plaintiff.

82. Since 1986, no fewer than 70 cases have come to light in which Chicago police officers have fabricated false evidence or have suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they not commit.

83. These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including: (1) fabricating eyewitness identifications; (2) fabricating witness statements; (3) concealing exculpatory evidence; (4) manipulating witnesses in order to influence their testimony; and (5) using other tactics to secure the arrest, prosecution and conviction of a person without probable cause and without regard to the person's actual guilt or innocence.

84.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent persons, knowing full well that those statements were false. As a matter of widespread practice, members of the Chicago Police Department, including the Defendants in this action, contrived false witness narratives that were fed to vulnerable witnesses, who then adopted those narratives as their own for the purpose of wrongly convicting an innocent person. In addition, Chicago Police Department Offices routinely fabricated and manipulated identification procedures to procure identifications of individuals that they knew to be inaccurate. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

85.     The municipal policy and practice described in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, *inter alia*, that Chicago police detectives would feed information to witnesses and coach them through court-reported and handwritten statements, coerce witnesses into sticking to a detective's theory of the case, physically abuse witnesses, and work together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

86.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed

to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation, rather than being maintained as part of the official file.

87.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

88.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, Nos. 87 C 2536, 88 C 1127 (N.D. Ill.).

89.     The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Andujar murder and investigation at issue here.

90.     In addition, a set of clandestine street files related to Area Five homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. City of Chicago*, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

91.     The policy and practice of suppressing exculpatory or impeaching material evidence was alive and well at the time of the investigation into the Andujar murder, including in the Area Five Detective Division.

92.     The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police Detectives recommended charging an innocent person

with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

93.     Prior to and during the period in which Plaintiff was falsely charged and convicted with the Andujar murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

94.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

95.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

96.     This includes Defendants in this case. By way of example, Defendants Guevara and Halvorsen have a long history of engaging in the kind of investigative misconduct that occurred in this case, including coercing confessions, manipulating witnesses, fabricating evidence, and concealing evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which Guevara and Halvorsen have engaged in serious investigative misconduct, including many cases in which they have obtained false identifications, manipulated and coerced suspects and witnesses, and fabricated and concealed evidence, as they did in this case. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

97.     The City of Chicago and the Chicago Police Department also failed in the years prior to Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.      The conduct of live lineup, photographic, and other identification procedures.

b.      The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

c.      The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

d.      The risks of wrongful conviction and the steps police officers should take to minimize risks.

e.      The risks of engaging in tunnel vision during investigation.

f.      The need for full disclosure, candor, and openness on the part of all officers who

participate in the police disciplinary process, both as witnesses and as accused

officers, and the need to report misconduct committed by fellow officers.

98.     The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago Police Officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

99.     The City's failure to train, supervise, and discipline its officers, including Defendants Guevara, Halvorsen, and the other Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

100.    The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken to remedy Plaintiff's ongoing injuries.

101.    The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Defendant Guevara's History of Framing Innocent People**

102.    As a result of the policies and practices of the Chicago Police Department, described above, Defendant Guevara has framed dozens of other innocent men over the span of two decades. Like Plaintiff, these men have all lodged independent accusations of similar misconduct against him.

103.    As of the filing of this complaint, 17 men have had their convictions thrown out as a result of Defendant Guevara's misconduct. Those men served hundreds of years in prison for crimes they did not commit. In addition to Plaintiff, the other 16 men are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Arturo De Leon Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, and Ricardo Rodriguez.

104.    Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, and using abusive tactics, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara has engaged in serious investigative misconduct.

105.    Given this extensive history of misconduct and the City of Chicago's failure to meaningfully discipline Guevara and others, it is apparent that Guevara engaged in such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his conduct.

106.    Repeatedly, Defendant Guevara has also invoked his Fifth Amendment right not to answer any questions about allegations that he manipulated dozens of witnesses to provide false identifications because truthful responses could subject him to criminal liability, including every single instance of misconduct detailed below.

107.    Examples of Defendant Guevara's misconduct include:

a.      Bill Dorsch is a former Chicago police detective. While serving with the Chicago

Police Department, Dorsch was assigned to investigate a murder. Several months

after the murder occurred, Defendant Guevara brought two juveniles to the police

station who purportedly had witnessed a shooting and had recorded the license

place of the shooter. Based on the information provided, Detective Dorsch created

a photo array for the juveniles to attempt to identify the shooter. While the first

juvenile was viewing the photo array, and before he identified any of the

photographs, Defendant Guevara pointed to the suspect's photo and told the

juvenile "that's him." The juvenile then agreed with Guevara, saying that was the

person who had committed the shooting. Dorsch then directed Defendant Guevara

to leave the room and had the other juvenile view the same photo array, and he

was unable to make any identification. Based on the first juvenile's identification,

the suspect was charged with murder. Subsequently, Dorsch spoke to the two

juveniles without Defendant Guevara being present. The juveniles admitted that

they had been paid to falsely claim that the suspect was the person responsible for

the shooting. After prosecutors spoke to the two juveniles, the suspect was

released.

b.      Defendant Guevara's activities have drawn the interest of federal law enforcement

officers. In 2001, the FBI authored a special report detailing the criminal activity

of Chicago Police Officer Joseph Miedzianowski and his associates, including

Defendant Guevara. The report details that Defendant Guevara, while acting in

his capacity as a police officer, would apprehend drug and gun dealers and then

allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c.   In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer.

d.   In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

e.   Juan Johnson was later exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

f.   In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz that if he did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

g.   In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not.

h.   In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the Grand Jury by threatening

19

Rosario that if he did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

i.   In 1991, Defendant Guevara physically coerced sixteen year-old David Velazquez into making a false identification and giving false testimony by taking him to a rival gang's territory, beating him while chained to a wall at Area Five, and threatening to "get you for anything I can" if he did not talk. All of the false details of Velazquez's statement were provided by Guevara.

j.   In 1993, Defendant Guevara coerced an identification from Carl Richmond by threatening Richmond that he could make his life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

k.   In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained him to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila told Guevara that he did not do it, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses had previously told the police that they had not been able to see the shooter.

l.  In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely claimed that Colon had committed murder, but later came forward to bring Defendant Guevara's misconduct to light.

m.  In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the grand jury by threatening Diaz that if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

n.  In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

o.  In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand" saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

p.  In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragosa was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

q.  In 1996, Defendant Guevara coerced Maria Rivera into making a false identification of a man in a lineup by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution later abandoned murder charges against the individual whom Rivera falsely identified in the lineup.

r.  In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification. Guevara detained Ruiz repeatedly over the course of a 10-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

s.  In 1997, Defendant Guevara withheld physical evidence and failed to disclose the exculpatory statements of witness Ruth Atonetty to Ariel Gomez. Gomez was accused of firing multiple shots from a car into a crowd. Ruth Atonetty told Guevara that she heard multiple shots coming from within the crowd, not from Gomez's vehicle. Guevara continued to pressure her to change her account, and when she would not, he told her he "had other witnesses" and "didn't need her." As a result, Ariel Gomez did not have access to key *Brady* material at his trial.

t.  In 1988, Defendant Guevara used suggestive tactics to force 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of murder. Lopez had told Defendant Guevara that Rivera was not the shooter. In 2011, Lopez testified at an evidentiary hearing that he had never been able to identify Rivera as the murderer. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges against Rivera, who was granted a certificate of innocence.

u.  Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim of that shooting identified Jacques Rivera as his shooter before he died. Defendant Guevara claimed that the identification was made at a time that the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him.

v.  In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses. She then conferred with Guevara, even though the Court had ordered all witnesses excluded from the courtroom to prevent collusion among the witnesses.

w.  In 2011, the first district granted Tony Gonzalez a post-conviction hearing on the basis that Defendant Guevara conducted an unduly suggestive lineup wherein he concocted an array in which Gonzalez's photo was the only one that stood out from the rest in a photo array.

23

x.    In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Office of Professional Standards.

y.    In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and two children, and left the home in shambles. Lloyd filed a complaint with the Office of Professional Standards the next day.

z.    In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claim of a beating by the police. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action on Hunt's claim of excessive detention against the City of Chicago.

aa.   In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister Anna during a search of their home, during

which the officers did not identify themselves as police. Guevara repeatedly

slapped Graciela, called her a "bitch" and pulled her hair. As a result of this

incident, Graciela's arm was put in a sling and she spent one week in the hospital.

bb.    In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo

Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When

Munoz denied knowing the people Guevara was asking about, Guevara repeatedly

hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory

where he allowed rival gang members to spit on Munoz and beat Munoz about the

head.

cc.    In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the

face several times, kicked him and hit him in the head. Garcia filed a complaint

with the Office of Professional Standards. Although Guevara denied the charges,

Garcia's complaints were corroborated by physical evidence, as he was treated at

the hospital for lacerations to the head. After an investigation into the incident,

Office of Professional Standards found that Guevara had lied about the incident

and recommended that Guevara be suspended for two days.

dd.    In 1986, Defendant Guevara and two other officers coerced a confession from

Daniel Pena by beating him about the face and ribs with their hands and about the

groin and thighs with flashlights during an interrogation. Pena was taken to see a

doctor where he complained about being beaten by the police. The doctor found

bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family

members corroborated Pena's claim that he had been beaten while in police

custody.

ee.  In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with the Office of Professional Standards. Office of Professional Standards sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

ff.  In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime he knew nothing about.

gg.  In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed he would serve seven years in prison whereas if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if he signed a statement he could go home.

hh.  In 1991, Defendant Guevara coerced a false confession from Daniel Rodriguez through the use of threats and intimidation. While en route to the police station, Guevara threatened to harm Rodriguez's family if he did not cooperate. Once at Area Five, Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by Guevara's partner, Defendant Halvorsen in the chest and

torso. Guevara provided details of the crime to Rodriguez to include in Rodriguez's false confession.

ii. In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

jj. In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if he did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

kk. In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of a two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement he could not read.

ll. In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying and repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

mm. In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that if he did not confess he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores's statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of *Miranda*.

nn. In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room. Dembski, a Polish National who did not speak English, was interrogated by Guevara without *Miranda* warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

oo. In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

pp. In 1998, Defendants Guevara repeatedly pulled Adriana Mejia's hair and struck here once on the back of her neck while she was interrogated.

qq. In 1998, Defendant Guevara repeatedly threatened and beat Arturo Reyes in order to coerce Reyes into giving an incriminating statement. After two days of isolation and interrogation, Reyes provided a false statement.

rr. In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so that the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

108. As these instances of misconduct demonstrate, the Defendants engaged in the misconduct set forth in this Complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

## Plaintiff's Wrongful Conviction and Imprisonment

109. As a result of the Defendants' misconduct and based on the false evidence described in this Complaint, Plaintiff was arrested, prosecuted, and convicted of murder.

110. Apart from Defendants' own false testimony, the testimony of Rodriguez and Melendez was the only evidence presented against Plaintiff at trial.

111. In a letter to the judge after his conviction Plaintiff wrote, "I haven't killed anyone nor was I a participant in this crime."

112.     Plaintiff was sentenced to 45 years in prison.

113.     Without Defendants' fabrication, manufacture, and suppression of evidence, Plaintiff never would have been arrested, prosecuted, or convicted.

114.     At no point in time between 1995 and the present day has there been any credible evidence giving rise to probable cause to suspect Plaintiff of the murder of Noel Andujar.

115.     Plaintiff was 19 years old when he was wrongly arrested. He spent more than 22 years of his life imprisoned for a crime he did not commit.

116.     Plaintiff's whole life was turned upside down without any warning. His young adulthood was entirely consumed by the horror of his wrongful imprisonment.

117.     Shortly before Plaintiff was wrongly arrested, he learned that he was expecting a daughter. Because of the Defendants' misconduct, Plaintiff was not present for his daughter's birth, her entire childhood, and her entire young adulthood. In short, Plaintiff lost his chance to raise his daughter. It has had a profound impact on Plaintiff's life and on his relationship with his daughter.

118.     In addition, because of the Defendants' misconduct, Plaintiff was taken away from and missed out on the lives of his siblings and other family and friends as well. He returned home to relationships changed or lost to decades of wrongful incarceration.

119.     Plaintiff was robbed of his young adulthood and his formative years; he was deprived of opportunities to gain an education, to engage in meaningful labor, to develop a career, and to pursue his interests and passions. Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

120.    During his more than 22 years of wrongful imprisonment, Plaintiff was detained in harsh and dangerous conditions in maximum-security prisons. Among many other severe harms, Plaintiff was attacked and was the victim of attempted stabbings, and he was degraded and strip searched regularly.

121.    Plaintiff never knew whether the truth would come out or whether he would ever be exonerated.

122.    In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects. Plaintiff has been branded a murderer. He has suffered profound reputational harm as a result.

### Plaintiff's Exoneration

123.    Plaintiff fought hard to prove his innocence. He filed a post-conviction petition *pro se* in the Circuit Court of Cook County.

124.    In court proceedings after Plaintiff's wrongful conviction, Defendant Guevara pleaded his Fifth Amendment right not to incriminate himself in response to questions about his misconduct as a Chicago Police officer, and specifically about his misconduct during the investigation of the Andujar murder and Plaintiff's criminal case.

125.    For instance, in 2013, Defendant Guevara invoked his right to remain silent when he was asked specifically whether he had told Melendez to identify Plaintiff during the investigation of the Andujar homicide.

126.    In a 2017 proceeding, Cook County Judge James Obbish found that Defendant Guevara had told "bald face lies" during his court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

127.    In 2017 and early 2018, the Cook County State's Attorney's office conducted a new investigation of the Andujar case.

128.    The Cook County State's Attorney's investigation was part of an ongoing review of Defendant Guevara's cases.

129.    On January 9, 2018, the Cook County State's Attorney moved to vacate Plaintiff's conviction and dropped all of the charges against him.

130.    At the time of his exoneration, Plaintiff had been fighting the false charges against him for more than half of his life.

### COUNT I
### 42 U.S.C. § 1983 – Due Process
### (Fourteenth Amendments)

131.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

132.    As described in detail above, the Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

133.    In the manner described more fully above, Defendants fabricated and manufactured evidence and solicited false evidence—including false identifications, false witness statements, and false witness testimony that they knew to be false and perjured—from Rodriguez and Melendez, and fabricated police reports falsely implicating Plaintiff in the crime,

obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence

that they knew to be false when it was used against Plaintiff during his criminal case.

134.    Defendants also procured supposed eyewitness identifications and a supposed

identification of a vehicle implicating Plaintiff in the crime, by using unduly suggestive

identification techniques during photo identifications and during a live lineup. Defendants knew

that these identifications were false and unreliable, but they caused them to be used during

Plaintiff's criminal trial.

135.    In addition, Defendants deliberately withheld exculpatory evidence from Plaintiff,

including evidence that they had manufactured false identifications of Plaintiff, thereby

misleading and misdirecting the criminal prosecution of Plaintiff.

136.    In addition, based upon information and belief, the Defendants concealed,

fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

137.    The Defendants' misconduct directly resulted in the unjust and wrongful criminal

prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying

his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this

misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

138.    The misconduct described in this Count was objectively unreasonable, was

undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

139.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered

loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and

suffering, forced and involuntary prison labor, and other grievous and continuing injuries and

damages as set forth above.

33

140.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT II
### 42 U.S.C. § 1983 – Unlawful Detention
### (Fourth Amendment)

141.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

142.     In the manner described more fully above, the Defendants caused Plaintiff to be detained and imprisoned without probable cause.

143.     The misconduct described in this Count was undertaken by the Defendants under color of law and within the scope of their employment.

144.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, or with reckless indifference to the rights of others.

145.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

146.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT III
### 42 U.S.C. § 1983 – Failure to Intervene

147.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

148.     In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

34

149.     As a result of the Defendants' failure to intervene to prevent the violation of

Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress.

These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm

but failed to do so.

150.     The misconduct described in this Count was objectively unreasonable, was

undertaken and committed intentionally.

151.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered

loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and

suffering, and other grievous and continuing injuries and damages as set forth above.

152.     The misconduct described in this Count was undertaken pursuant to the policies

and practices of the City of Chicago and the Chicago Police Department, in the manner more

fully described below in Count V.

### COUNT IV
### 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

153.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

154.     In the manner described more fully above, the Defendant Officers, acting in

concert with other co-conspirators, known and unknown, reached an agreement among

themselves to fabricate evidence and to detain, prosecute, and convict Plaintiff for the Andujar

homicide, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his

constitutional rights.

155.     In so doing, these co-conspirators conspired to accomplish an unlawful purpose

by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one

another from liability for depriving Plaintiff of these rights.

156.     In furtherance of their conspiracy, each of these co-conspirators committed

overt acts and were otherwise willful participants in joint activity

157.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

158.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

159.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**COUNT V**
**42 U.S.C. § 1983 – Policy and Practice Claim Against the City of Chicago**

160.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

161.    As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

162.    At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of

investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

163.     These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

164.     In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

165.     Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were denied due process, including but not limited to one or more of the following: (1) suspects were selected during identification procedures by eyewitnesses who had been told by police what suspect to identify; (2) suspects were shown suggestive photo arrays; (3) suspects were showing suggestive live lineups; (4) identification procedures were not accurately documented; and (5) supervisors with knowledge of permissible and impermissible identification techniques did not properly supervise or discipline police

officers and employees such that the fabricated and improper identifications continued unchecked.

166. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

167. These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

168. The above widespread practices and customs, so well settled as to constitute *de facto* policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

169. As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

170.     In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

171.     Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**COUNT VI**
**State Law Claim – Malicious Prosecution**

172.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

173.     In the manner described above, the Defendants, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

174.     In so doing, the Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

175.     The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in January 2018.

176.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

177.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII
### State Law Claim – Intentional Infliction of Emotional Distress

178.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

179.    The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

180.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII
### State Law Willful and Wanton Conduct

181.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

182.    At all times relevant to this complaint the Defendant Officers had a duty to refrain from willful and wanton conduct in connection with the Andujar murder investigation.

183.    Notwithstanding that duty, the Defendant Officers acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

184.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
### State Law Claim – Civil Conspiracy

185.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

186.    As described more fully in the preceding paragraphs, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

187.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

188.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

189.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

190.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
### State Law Claim – *Respondeat Superior*

191.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

192.    While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

193.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XI
### State Law Claim – Indemnification Pursuant to 745 ILCS 10/9-102

194.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

195.    Illinois statute (745 ILCS 10/9-102) provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

196.    The Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

197.    The City of Chicago is responsible to pay any judgment entered against the Defendants. Plaintiff therefore demands judgment against Defendant City of Chicago, in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest.

WHEREFORE, Plaintiff THOMAS SIERRA, respectfully requests that this Court enter a judgment in his favor and against Defendants REYNALDO GUEVARA, ERNEST HALVORSEN, ANTHONY WOJCIK, JOHN McMURRAY, GEORGE FIGUEROA, EDWARD MINGEY, ROBERT BIEBEL, FRANCIS CAPPITELLI, UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO, and the CITY OF CHICAGO, Illinois, awarding compensatory damages, attorneys' fees and costs against each Defendant, and, because they acted willfully, wantonly, and/or maliciously, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, THOMAS SIERRA, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**THOMAS SIERRA**

BY:   /s/ Steven Art
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Anand Swaminathan
Steven Art
Joshua Tepfer
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
steve@loevy.com