**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS SIERRA, | ) | |
| | ) | Case No. 18 CV 3029 |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| REYNALDO GUEVARA, JOANN | ) | Judge John Z. Lee |
| HALVORSEN as SPECIAL REPRESENTATIVE | ) | Magistrate Judge David Weisman |
| FOR THE ESTATE OF ERNEST HALVORSEN, | ) | |
| ANTHONY WOJCIK, JOHN McMURRAY, | ) | |
| GEORGE FIGUEROA, | ) | |
| EDWARD MINGEY, ROBERT BIEBEL, | ) | |
| FRANCIS CAPPITELLI, UNKNOWN | ) | **JURY TRIAL DEMANDED** |
| EMPLOYEES OF THE CITY OF | ) | |
| CHICAGO, and the CITY OF CHICAGO, | ) | |
| Illinois, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**DEFENDANTS JOANN HALVORSEN, as SPECIAL REPRESENTATIVE FOR THE
ESTATE OF ERNEST HALVORSEN, ANTHONY WOJCIK, JOHN McMURRAY,
GEORGE FIGUEROA, EDWARD MINGEY, AND ROBERT BIEBEL ANSWERS
AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT[1]**

Defendants, JoAnn Halvorsen, as Special Representative for Ernest Halvorsen, deceased

("Defendant Halvorsen"), Anthony Wojcik, John McMurray, George Figueroa, Edward Mingey,

and Robert Biebel ("Answering Defendants"), by and through their attorneys, THE SOTOS

LAW FIRM, P.C., and for their Answer to Plaintiff's Complaint, states the following:

**INTRODUCTION**

1.     Plaintiff Thomas Sierra was just 19 years old when he was arrested, prosecuted,

---

[1] Answering Defendants make no response on behalf of deceased former Chicago Police Employee
Francis Cappitelli and any unknown employees of the City of Chicago.

and wrongly convicted of the 1995 shooting murder of Noel Andujar. He spent the next 22 years

behind bars for a crime he did not commit.

**ANSWER:** Answering Defendants admit that Plaintiff was 19 years old when he was arrested for the 1995 shooting murder of Noel Andujar and that Plaintiff was later convicted of that crime.   Answering Defendants admit, on information and belief, that Plaintiff was incarcerated for the murder of Noel Andujar. Answering Defendants lack knowledge or information sufficient to admit or deny the amount of time Plaintiff was incarcerated.   Answering Defendants, on information and belief, deny the remaining allegations in this paragraph.

2.     Plaintiff had nothing to do with the murder. At all times since Defendants first

accused him of the crime, Plaintiff has maintained his innocence.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny whether Plaintiff has at all times maintained his innocence regarding the murder of Noel Andujar.   Answering Defendants, on information and belief, deny the remaining allegations in this paragraph.

3.     There was not one piece of physical evidence connecting Plaintiff to the Andujar

murder. He had never been convicted of a crime and had no history of violence. He had no

motive to commit the crime. In fact, there was never any reason to think he had any involvement.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations regarding the physical evidence.   Answering Defendants, on information and belief, deny the remaining allegations in this paragraph.

4.     Plaintiff's arrest, prosecution, and conviction were based entirely on false

evidence manufactured by notorious Chicago Police Detective Reynaldo Guevara and the other

Defendants. Included among that false evidence were two fabricated eyewitness identifications.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and on information and belief, deny the remaining allegations in this paragraph.

5.     In order to secure Plaintiff's wrongful prosecution and conviction, the Defendants

also suppressed evidence that would have shown Plaintiff was innocent, as well as evidence that

could have been used to undermine the testimony of State's witnesses, including the testimony of

Defendants themselves.

**ANSWER:**   Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information to admit or deny the remaining allegations in this paragraph.

6.      In court proceedings after Plaintiff's wrongful conviction, Defendant Guevara pleaded his Fifth Amendment right not to incriminate himself in response to questions about his misconduct as a police officer, and specifically about his misconduct during the investigation of the Andujar murder. By way of example, when asked about whether he took steps to frame Plaintiff for the Andujar murder, Defendant Guevara chose to invoke his Fifth Amendment right to remain silent.

**ANSWER:**   Answering Defendants admit, on information and belief, that in some court proceedings Defendant Guevara has on advice of his counsel invoked his Fifth Amendment right not to answer questions regarding allegations of misconduct. Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

7.      In 2017, Cook County Judge James Obbish found that Defendant Guevara had told "bald face lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

**ANSWER:**   Answering Defendants, on information and belief, admit that in 2017 Judge James Obbish did state the quoted excerpts with regard to the testimony of Defendant Guevara regarding a specific matter.   Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

8.      Shortly thereafter, the Cook County State's Attorneys conducted a new investigation of Plaintiff's case. On January 9, 2018, the Cook County State's Attorney moved to vacate Plaintiff's conviction and dropped all charges against him. After more than 22 years of wrongful incarceration, Plaintiff was finally exonerated.

**ANSWER:**    Answering Defendants admit, on information and belief, that Plaintiff was incarcerated for the murder of Noel Andujar and that on January 9, 2018 the Cook County State's Attorney's office *nolle prosequi* the underlying criminal charges. Answering Defendants lack knowledge or information sufficient to admit or deny the amount of time Plaintiff was incarcerated.   Answering Defendants deny any allegations of misconduct by them, and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

9.    Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of the Defendants' misconduct.

**ANSWER:**    Answer Defendants admit that Plaintiff is seeking a monetary award based on his allegations of misconduct and deny the remaining allegations in this paragraph as they pertain to them.   Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

## JURISDICTION AND VENUE

10.    This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' and Mr. Halvorsen's tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

**ANSWER:**    Answering Defendants admit that Plaintiff has brought this lawsuit pursuant to 41 U.S.C. §1983 and Illinois Law and makes allegations of tortious conduct and deprivation of his constitutional rights.   Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

11.    This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

**ANSWER:**    Answering Defendants admit this Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

12.    Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction. In

4

addition, many if not all of the Defendants reside in this judicial district.

**ANSWER:**     Answering Defendants admit venue is proper under 28 U.S.C. § 1391(b). Answering Defendants lack knowledge or information to admit or deny the allegation regarding where Plaintiff resides. Answering Defendants deny any allegations of misconduct pertaining to them and that Dickinson resides in this jurisdictional district, and on, information and belief, admit the remaining allegations in this paragraph.

## PARTIES

13.     Plaintiff Thomas Sierra spent more than 22 years wrongly incarcerated for a

murder that he did not commit.

**ANSWER:**     Answering Defendants admit, on information and belief, that Plaintiff was incarcerated for the murder of Noel Andujar. Answering Defendants lack knowledge or information sufficient to admit or deny the amount of time plaintiff was incarcerated.   Answering Defendants, on information and belief, deny the remaining allegations in this paragraph.

14.     At all times relevant to the events described in this Complaint, Defendants

Reynaldo Guevara, Anthony Wojcik, John McMurray, George Figueroa, and other unknown law

enforcement officers, as well as deceased officer Ernest Halvorsen were police officers in the

Chicago Police Department. The collective "Defendants" includes Mr. Halvorsen.

**ANSWER:**     Answering Defendants deny the allegations of misconduct in this paragraph to the extent that they pertain to them. Answering Defendants admit that Reynaldo Guevara, Ernest Halvorsen, Anthony Wojcik, John McMurray, George Figueroa were employed by the City of Chicago's Police Department at all relevant times to Plaintiff's Complaint, and lack knowledge or information sufficient to admit or deny the remaining allegations.

15.     JoAnn Halvorsen, the Special Representative for Ernest Halvorsen, deceased, is

named as a Defendant in her capacity as Special Representative of Ernest Halvorsen, as successor in

interest and to defend this action on behalf of Defendant Ernest Halvorsen.

**ANSWER:**     Answering Defendants admit the allegations in this paragraph.

16.     At all times relevant to the events described in this Complaint, Defendants Edward Mingey, Robert Biebel, Francis Cappitelli, and other unknown law enforcement officers supervised the officers in the preceding paragraph. These Defendants participated in the misconduct alleged in this Complaint and also facilitated, condoned, approved, and turned a blind eye to misconduct of the Defendants whom they supervised.

**ANSWER:**     Answering Defendants admit, on information and belief, that Edward Mingey, Robert Biebel and Francis Cappitelli were assigned as supervisors, and at times, did supervise the officers in paragraph 14, and lack knowledge or information sufficient to admit or deny the allegations regarding other unknown officers. Answering Defendants deny the allegations of misconduct in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

17.     The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Defendants. Each of the Defendants named in this Complaint acted during their investigation of the Andujar murder as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is additionally responsible for the policies and practices of the Chicago Police Department.

**ANSWER:**     Answering Defendants admit the City of Chicago is an Illinois municipal corporation and, that at all relevant times, the named Individual Defendants were agents and employees of the City of Chicago. Answering Defendants further admit, on information and belief, the City of Chicago could be liable for torts committed by its employees under the doctrine of *respondeat superior* and is also responsible for the policies and practices of the Chicago Police Department. Answering Defendants further deny they committed a tort during their investigation of the Andujar murder, and lack knowledge or information sufficient to admit or deny the remaining allegations.

18.     Each and every individual Defendant, known and unknown, and Mr. Halvorsen, acted under color of law and within the scope of his employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his individual capacity unless otherwise

noted.

**ANSWER:**     Answering Defendants admit the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

## FACTS
### The Crime

19.     On the night of May 23, 1995, Noel Andujar was shot and killed while riding in a

car in the roundabout near 2600 N. Kedzie Avenue in Chicago's Logan Square neighborhood.

**ANSWER:**     Answering Defendants, on information and belief, admit the allegations in this paragraph.

20.     Andujar was sitting in the back seat of a car driven by Jose Melendez. Alberto

Rodriguez was a front seat passenger in that car. Andujar, Melendez, and Rodriguez were

members of the Latin King street gang.

**ANSWER:**     Answering Defendants, on information and belief, admit the allegations in this paragraph.

21.     As they pulled up to a stoplight at the entrance to the roundabout, a Buick with

tinted windows pulled up in the lane to the left of them.

**ANSWER:**     Answering Defendants, on information and belief, admit a Buick with lightly tinted windows pulled up on the left-hand side of the victim's vehicle at the stop light at Logan and Milwaukee, and lack knowledge or information sufficient to admit or deny the remaining allegations

22.     As the cars began to move again, a person sitting in the passenger seat of the

Buick opened the door, reached a handgun around the door frame, and began shooting repeatedly

at the car in which Melendez, Rodriguez, and Andujar were riding.

**ANSWER:**     Answering Defendants, on information and belief, admit the allegations in this paragraph.

23.     Andujar was struck in the head and killed.

**ANSWER:**     Answering Defendants admit the allegations in this paragraph.

7

24.     Melendez and Rodriguez sped off and shortly thereafter stopped and flagged down a police officer to help them.

**ANSWER:**     Answering Defendants, on information and belief, admit the allegations in this paragraph.

25.     Melendez and Rodriguez were the only eyewitness to the Andujar shooting.

**ANSWER:**     Answering Defendants, on information and belief, deny the allegations in this paragraph.

**The Initial Description of the Perpetrator by Melendez and Rodriguez**

26.     At the scene, Melendez and Rodriguez described the incident and attempted to describe the shooter.

**ANSWER:**     Answering Defendants, on information and belief, admit that Melendez and Rodriguez gave a brief description of the incident, the offender, the offender's vehicle, as well as the other occupants in the offender's vehicle.   Answering Defendants deny the remaining allegations in this paragraph.

27.     A number of factors prevented Melendez and Rodriguez from viewing the shooter during the incident. It was nighttime. The Buick had tinted windows that were rolled up throughout the incident. The shooter wore a hood. The shooter's car was behind both Melendez and Rodriguez as they waited at the stoplight, so that neither had a good vantage point to view the shooter. The shooter's car was also to the left, and so Rodriguez's view was further obstructed by Melendez sitting in the driver's seat. Moreover, as the cars began to move and the shooting began, Melendez, Rodriguez, and Andujar all ducked for cover.

**ANSWER:**     Answering Defendants, on information and belief, deny the allegations in this paragraph.

28.     As a result, neither Melendez nor Rodriguez got a good look at the shooter, and neither Melendez nor Rodriguez could identify him.

**ANSWER:**     Answering Defendants, on information and belief, deny the allegations in this paragraph.

8

29.     When they were interviewed by Chicago Police patrol officers minutes after the shooting, the only thing that Melendez and Rodriguez could say about the shooter was that he was a male Latino. They could not provide the shooter's approximate height, weight, age, eye color, hair color, complexion, or any other identifying feature.

**ANSWER:**     Answering Defendants, on information and belief, admit that Melendez and Rodriguez gave a brief description of the incident, the offender, the offender's vehicle, as well as the other occupants in the offender's vehicle soon after the fatal shooting of their friend so that the initial police officers on the scene could issue a flash message.   Answering Defendants deny the remaining allegations in this paragraph.

30.     The only other piece of information that Melendez and Rodriguez could provide to police was that occupants of the shooter's car had made hand gestures indicating that they belonged to the Spanish Cobras street gang, a rival gang to the Latin Kings.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph.

### A Second Description and the Failed Photo Identification Procedure

31.     At the police station on the evening of the shooting, Melendez and Rodriguez spoke with Defendants McMurray and Wojcik.

**ANSWER:**     Answering Defendants admit the allegations in this paragraph.

32.     Either Melendez or Rodriguez added three additional details to the description of the shooter. Namely, one or the other of them stated that the shooter was 18 to 22 years old, had a lighter complexion, and had black hair that was pushed back during the shooting.

**ANSWER:**     Answering Defendants admit that during additional questioning on the night of the murder, Melendez and Rodriguez conveyed additional details of the incident which included, but was not limited to, that the shooter was 18 to 22 years old, had a lighter complexion, and had black hair that was pushed back during the shooting.   Answering Defendants deny the remaining allegations in this paragraph.

9

33.     Defendants McMurray and Wojcik showed Melendez and Rodriguez albums containing hundreds of photographs of known Spanish Cobras.

**ANSWER:**     Answering Defendants admit that McMurray and Wojcik did have Melendez and Rodriguez view available photobooks containing several hundred photos of members of Spanish Cobra affiliated gangs.

34.     Melendez and Rodriguez studied the photographs in detail for many hours on the night of the shooting.

**ANSWER:**     Answering Defendants admit that both Melendez and Rodriguez viewed the photographs on the night of the shooting, and lack knowledge or information sufficient to admit or deny the remaining allegations.

35.     Neither Melendez nor Rodriguez could make any identification. Each told Defendants McMurray and Wojcik that they could not make an identification.

**ANSWER:**     Answering Defendants admit that Melendez and Rodriguez did not make any identification from the photos of members of Spanish Cobra affiliated gangs and indicated to McMurray and Wojcik that they did not make an identification from those photos.   Answering Defendants deny the remaining allegations in this paragraph.

**Guevara and Halverson Join the Investigation and Pull A Suspect Out of Thin Air**

36.     On May 24, 1995, Defendants Guevara, Halvorsen, and the remainder of the individual police officer Defendants were assigned to the Andujar investigation.

**ANSWER:**     Answering Defendants admit that on May 24, 2995, Defendants Guevara and Halvorsen were assigned to the Andujar investigation and deny the remaining allegations in this paragraph.

37.     At the time that these Defendants joined the investigation, there were no leads at all about who the shooter might have been.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph.

38.     Immediately upon joining the investigation, Defendant Guevara decided on a suspect.

10

**ANSWER:**     Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

39.     According to Defendant Guevara, he had seen a Buick matching the description of the car used in the Andujar shooting three days before the crime, on May 20, 1995, while he had been investigating the unrelated murder of a man named Ruben Gonzalez.

**ANSWER:**     Answering Defendants, on information and belief, admit that Defendant Guevara had seen a Buick matching the description of the car used in the Andujar shooting three days before the crime, on May 20, 1995, while he had been investigating the murder of a man named Ruben Gonzalez. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations.

40.     Defendant Guevara claimed that when he saw this Buick—before the Andujar shooting had occurred, and thus before he would have had any reason to be on the lookout for such a car—he had asked the mother of Gonzalez the identity of the men riding in the Buick.

**ANSWER:**     Answering Defendants, on information and belief, admit that Defendant Guevara stated he saw the Buick before the murder of Andujar had occurred and asked the mother of Gonzalez to identify the men riding in the Buick.   Answering Defendants, on information and belief, deny the remaining allegations in this paragraph.

41.     According to Defendant Guevara, Gonzalez's mother had given him the nickname Junito.

**ANSWER:**     Answering Defendants, on information and belief, admit that Gonzalez's mother identified one of the individuals in the Buick as "Junito," and lack knowledge or information sufficient to admit or deny the remaining allegations.

42.     Defendants then purportedly connected the nickname Junito to Plaintiff.

**ANSWER:**     Answering Defendants admit that the nickname "Junito" was connected to Plaintiff.   Answering Defendants deny the remaining allegations in this paragraph.

43.     Based on this story, Plaintiff became Defendants' suspect in the Andujar murder.

**ANSWER:**     Answering Defendants admit that based on Plaintiff being possibly linked to the Buick involved in the murder, Plaintiff's possible involvement was investigated. Answering Defendants, on information and belief, deny the remaining allegations

in this paragraph.

44.     Defendants never had any other reason to suspect Plaintiff in the Andujar murder.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

45.     In fact, Defendants' story about the Buick seen by Guevara and the resulting

connection between Plaintiff and in the Andujar murder was completely fabricated.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

**Defendants Fabricate Eyewitness Identifications To Implicate Plaintiff In the Crime**

46.     Having decided on a suspect, Defendants worked to manufacture evidence

implicating Plaintiff in the crime.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

47.     On May 30, 1995, nearly a week later, Defendants brought Melendez and

Rodriguez back to detective division Area Five to participate in identification procedures.

**ANSWER:**     Answering Defendants admit that Melendez and Rodriguez were called and asked to come to Area 5 on May 30, 1995 and they both viewed a lineup and deny the remaining allegations in this paragraph.

48.     On the same day, Defendants arrested Plaintiff without a warrant and without

probable cause and held him at Area Five. At all times that he was at Area Five and at all times

thereafter, Plaintiff strenuously denied being involved in any crime.

**ANSWER:**     Answering Defendants admit that on May 30, 1995 Plaintiff was brought into Area 5 without a warrant for his arrest by Defendant Figueroa and later arrested. Answering Defendants further admit that Plaintiff denied his involvement in the murder of Andujar.   Answering Defendants lack knowledge or information sufficient to admit or deny the allegations regarding how Plaintiff denied his involvement and deny the remaining allegations in this paragraph.

12

49.     Nonetheless, Defendants moved forward with identification procedures designed to cause an identification of Plaintiff. When they conducted these identification procedures, Defendants had no intention of accurately identifying the Andujar shooter. Instead, they rigged the identification procedures with the sole purpose of framing Plaintiff.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

50.     Defendants conducted these identification procedures despite knowing that neither Melendez nor Rodriguez could identify the person who had shot Andujar.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

51.     Defendants knew this because both Melendez and Rodriguez told them that they could not identify the shooter before the identification procedures took place.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

52.     In addition, Defendants conducted these identification procedures despite knowing that the shooter had been a Spanish Cobra and that Plaintiff was not a Spanish Cobra.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

53.     Defendants manipulated the identification procedures so that Melendez and Rodriguez would select Plaintiff.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

54.     Defendants first performed a photo identification procedure and then a live lineup procedure with both Melendez and Rodriguez.

**ANSWER:**     Answering Defendants admit that certain Defendants conducted photo arrays with both eyewitnesses prior to certain Defendants conducting live line-ups with the same eyewitnesses and deny the remaining allegations in this paragraph.

55.     During the photo identification procedures, Defendants showed Rodriguez and Melendez a group of photographs that included Plaintiff's photograph.

**ANSWER:**     Answering Defendants admit that some, but not all named Defendants, were involved in the photo arrays conducted with Rodriguez and Melendez and further admit that a group of photos were used that included Plaintiff's photograph. Answering Defendants deny the remaining allegations in this paragraph.

56.     Defendants pointed out Plaintiff's photo to Rodriguez and Melendez and told them that he was the person responsible for the crime.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

57.     Rodriguez and Melendez selected Plaintiff's photo as the Andujar shooter only after Defendants told them to do so.

**ANSWER:**     Answering Defendants admit that both eyewitnesses identified Plaintiff as the Andujar shooter.   Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

58.     After Defendants showed them Plaintiff's photo, Defendants showed Rodriguez and Melendez a live lineup in which Plaintiff stood.

**ANSWER:**     Answering Defendants admit that some of the named Defendants conducted live lineups and they took place after photo array identifications.   Answering Defendants deny the remaining allegations in this paragraph.

59.     Plaintiff was brought into the lineup room after all of the individuals who were serving as fillers in the lineup.

14

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations.

60.    Plaintiff was put into the empty chair in the lineup.

**ANSWER:**    Answering Defendants admit that Plaintiff was seated during the line-up, and lack knowledge or information sufficient to admit or deny the remaining allegations.

61.    Defendants indicated to Rodriguez and Melendez that Plaintiff, the person they had viewed in the photo identification procedures, was the person who they should select from the live lineup.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

62.    Rodriguez and Melendez then identified Plaintiff as the Andujar shooter in the live lineup.

**ANSWER:**    Answering Defendants admit that both Rodriguez and Melendez identified Plaintiff as the shooter of Andujar in live lineups and deny the remaining allegations in this paragraph.

63.    Following the lineup, Defendants wrote police reports that falsely recounted the lineup procedures that they had performed. These reports falsely made it appear that Rodriguez and Melendez had selected Plaintiff as the perpetrator during legitimate identification procedures.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

### Defendants Fabricate An Identification of the Buick

64.    According to Defendants, on May 30, 1995, they also pulled over a Buick fitting the description of the one that Defendant Guevara claimed he had seen in the days before the Andujar murder.

15

**ANSWER:** Answering Defendants admit that Defendant McMurray was present on May 30, 1995 when the Buick fitting the description of the one that Det. Guervara stated he saw and that witnesses to the Andujar murder described was pulled over. Answering Defendants deny the remaining allegations in this paragraph.

65. Defendants had this Buick brought to the Area Five parking lot.

**ANSWER:** Answering Defendants admit that Defendant McMurray brought the Buick to the Area Five parking lot and deny the remaining allegations in this paragraph.

66. Defendants did not treat the driver of this Buick as a suspect in the Andujar

murder.

**ANSWER:** To the extent that Plaintiff is alleging that there was no investigation of the driver of the vehicle, Answering Defendants deny the allegations. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

67. Instead, Defendants took Rodriguez and Melendez to view the car in the parking

lot of the police station.

**ANSWER:** Answering Defendants admit certain Defendants took Rodriguez and Melendez to view cars in the parking lot of the police station and deny the remaining allegations in this paragraph.

68. Defendants asked Rodriguez and Melendez whether the Buick was the one used

during the shooting.

**ANSWER:** Answering Defendants admit certain Defendants took Rodriguez and Melendez to view cars in the parking lot of the police station and deny the remaining allegations in this paragraph.

69. Both Rodriguez and Melendez told Defendants that the Buick was not the car

used during the shooting of Andujar.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

70. Defendants knew that Rodriguez's and Melendez's statements were correct,

because they had made up the story about the Buick.

16

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

71.    In addition, the Buick that Defendants brought to the Area Five parking lot did not match the description of the car provided by Rodriguez and Melendez on the night of the crime. Among other things, it did not have tinted windows.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph.

72.    But Defendants did not make any record of or report the fact that Rodriguez and Melendez had told them that the Buick in the Area Five parking lot was not the car used in the shootings.

**ANSWER:**    Answering Defendants admit that there is not a report or record as alleged in this paragraph.   Answering Defendants deny the remaining allegations as they pertain to them and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

73.    Instead, Defendants falsely reported that Rodriguez and Melendez had identified the Buick as the car used in the shooting.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

74.    This fabricated evidence was used to confirm Defendant Guevara's fabricated story that gave Defendants the purported reason to suspect Plaintiff of the crime in the first place.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

**Defendants Suppress Their Investigative Misconduct**

75.    The false police reports described above were approved by Defendants Mingey, Biebel, and Cappitelli.

**ANSWER:** Answering Defendants deny the allegations of "false reports" as it pertains to them and further deny, on information and belief, that Cappitelli approved any of the described reports. Answering Defendants admit that both Defendants Mingey and Biebel did sign reports regarding the underlying criminal investigation. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations.

76. The false police reports were used to cover up evidence of Defendants'

misconduct. They were provided to state prosecutors and became a basis for charging and

prosecuting Plaintiff.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

77. In addition, Defendants gave false statements to state prosecutors and provided

false testimony at Plaintiff's criminal trial, and in those statements as well they made it appear

that Rodriguez and Melendez had legitimately selected Plaintiff as Andujar's killer.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

78. At all times, Defendants suppressed the true circumstances of their manipulative

identification procedures and their interactions with Melendez and Rodriguez.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

79. Defendants did not disclose their misconduct to Plaintiff or his attorneys.

**ANSWER:** Answering Defendants deny they engaged in any misconduct and therefore, deny the allegations in this paragraph. Answering Defendants lack sufficient knowledge or information to admit or deny the remaining allegations.

80. At all times, Defendants Mingey, Biebel, and Cappitelli were aware of the

Defendants' misconduct and their fabrication of a case against Plaintiff. These supervisors

nevertheless intentionally ignored the Defendants' misconduct and decided to make Plaintiff

18

liable for a crime he did not commit, rather than directing the officers to find the person who had actually committed the crime. In addition, the supervisors of the Defendants explicitly authorized their investigative misconduct.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

81. In addition, on information and belief, the Defendants suppressed and destroyed additional evidence still unknown to Plaintiff, which would also have shown Plaintiff's innocence.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

**Policy and Practice of Wrongly Convicting Innocent Persons In Violation of Due Process**

82. The Chicago Police Department is responsible by virtue of its official policies for scores of miscarriages of justice like that inflicted upon Plaintiff.

**ANSWER:** To the extent that these allegations are directed against them, Answering Defendants deny the allegations in this paragraph, and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

83. Since 1986, no fewer than 70 cases have come to light in which Chicago police officers have fabricated false evidence or have suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they not commit.

**ANSWER:** To the extent that these allegations are directed against them, Answering Defendants deny the allegations in this paragraph, and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

84. These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including: (1) fabricating eyewitness

19

identifications; (2) fabricating witness statements; (3) concealing exculpatory evidence; (4) manipulating witnesses in order to influence their testimony; and (5) using other tactics to secure the arrest, prosecution and conviction of a person without probable cause and without regard to the person's actual guilt or innocence.

**ANSWER:**   Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

85.   At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent persons, knowing full well that those statements were false. As a matter of widespread practice, members of the Chicago Police Department, including the Defendants in this action, contrived false witness narratives that were fed to vulnerable witnesses, who then adopted those narratives as their own for the purpose of wrongly convicting an innocent person. In addition, Chicago Police Department Offices routinely fabricated and manipulated identification procedures to procure identifications of individuals that they knew to be inaccurate. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

**ANSWER:**   Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

86.   The municipal policy and practice described in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, *inter alia*, that Chicago police

detectives would feed information to witnesses and coach them through court-reported and handwritten statements, coerce witnesses into sticking to a detective's theory of the case, physically abuse witnesses, and work together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

87.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation, rather than being maintained as part of the official file.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

88.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

89.      The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter*

*alia*, *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, Nos. 87 C 2536, 88 C 1127 (N.D. Ill.).

**ANSWER:** To the extent that these allegations are directed against them, Answering Defendants deny the allegations in this paragraph, and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

90. The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Andujar murder and investigation at issue here.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

91. In addition, a set of clandestine street files related to Area Five homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. City of Chicago*, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

92. The policy and practice of suppressing exculpatory or impeaching material evidence was alive and well at the time of the investigation into the Andujar murder, including in the Area Five Detective Division.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

93. The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his

misconduct in any of those cases.

**ANSWER:**     To the extent that these allegations are directed against them, Answering Defendants deny the allegations in this paragraph, and lack knowledge or information to admit or deny the remaining allegations in this paragraph.

94.     Prior to and during the period in which Plaintiff was falsely charged and convicted with the Andujar murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

95.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

**ANSWER:**     To the extent that these allegations are directed against them, Answering Defendants deny the allegations in this paragraph, and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

96.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to

23

believe that they may violate the civil rights of members of the public and cause innocent

persons to be charged with serious crimes without fear of adverse consequences. As a result of

these policies and practices of the City of Chicago, members of the Chicago Police Department

act with impunity when they violate the constitutional and civil rights of citizens.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

97.     This includes Defendants in this case. By way of example, Defendants Guevara

and Halvorsen have a long history of engaging in the kind of investigative misconduct that

occurred in this case, including coercing confessions, manipulating witnesses, fabricating

evidence, and concealing evidence in the course of maliciously prosecuting innocent persons.

There are dozens of known cases in which Guevara and Halvorsen have engaged in serious

investigative misconduct, including many cases in which they have obtained false identifications,

manipulated and coerced suspects and witnesses, and fabricated and concealed evidence, as they

did in this case. They engaged in such misconduct because they had no reason to fear that the

City of Chicago and its Police Department would ever discipline them for doing so.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

98.     The City of Chicago and the Chicago Police Department also failed in the years

prior to Plaintiff's wrongful charging and conviction to provide adequate training to Chicago

Police Detectives and other officers in any of the following areas, among others:

misconduct committed by fellow officers.

a.      The conduct of live lineup, photographic, and other identification procedures.

b.      The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been

identified in order to ensure that the evidence is made part of the criminal proceeding.

c.     The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

d.     The risks of wrongful conviction and the steps police officers should take to minimize risks.

e.     The risks of engaging in tunnel vision during investigation

f.     The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

99.     The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago Police Officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

**ANSWER:**     To the extent that these allegations are directed against them, Answering Defendants deny the allegations in this paragraph, and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

100.     The City's failure to train, supervise, and discipline its officers, including Defendants Guevara, Halvorsen, and the other Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

101.     The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken to remedy Plaintiff's ongoing injuries.

**ANSWER:**     To the extent that these allegations are directed against them, Answering Defendants deny the allegations in this paragraph, and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

102.     The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**ANSWER:**     To the extent that these allegations are directed against them, Answering Defendants deny the allegations in this paragraph, and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

**Defendant Guevara's History of Framing Innocent People**

103.     As a result of the policies and practices of the Chicago Police Department, described above, Defendant Guevara has framed dozens of other innocent men over the span of two decades. Like Plaintiff, these men have all lodged independent accusations of similar misconduct against him.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

104.     As of the filing of this complaint, 17 men have had their convictions thrown out as a result of Defendant Guevara's misconduct. Those men served hundreds of years in prison for crimes they did not commit. In addition to Plaintiff, the other 16 men are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William

Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Arturo De Leon

Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, and Ricardo Rodriguez.

**ANSWER:**  Answering Defendants deny the allegations in this paragraph as they pertain to them.  Answering Defendants admit, on information and belief, that the 17 men identified above have had convictions overturned, and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

105.    Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, and using abusive tactics, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara has engaged in serious investigative misconduct.

**ANSWER:**  Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information to admit or deny the remaining allegations.

106.    Given this extensive history of misconduct and the City of Chicago's failure to meaningfully discipline Guevara and others, it is apparent that Guevara engaged in such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his conduct.

**ANSWER:**  To the extent that these allegations are directed against them, Answering Defendants deny the allegations in this paragraph, and lack knowledge or information to admit or deny the remaining allegations in this paragraph.

107.    Repeatedly, Defendant Guevara has also invoked his Fifth Amendment right not to answer any questions about allegations that he manipulated dozens of witnesses to provide false identifications because truthful responses could subject him to criminal liability, including

27

every single instance of misconduct detailed below.

**ANSWER:**     To the extent that these allegations are directed against them, Answering Defendants deny the allegations in this paragraph. Answering Defendants, on information and belief, admit that in some court proceedings Defendant Guevara has on advice of his counsel invoked his Fifth Amendment right not to answer questions regarding allegations of misconduct, and lack knowledge or information to admit or deny the remaining allegations in this paragraph.

108.   Examples of Defendant Guevara's misconduct include:

a.     Bill Dorsch is a former Chicago police detective. While serving with the Chicago Police Department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant Guevara brought two juveniles to the police station who purportedly had witnessed a shooting and had recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles to attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "that's him." The juvenile then agreed with Guevara, saying that was the person who had committed the shooting. Dorsch then directed Defendant Guevara to leave the room and had the other juvenile view the same photo array, and he was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles without Defendant Guevara being present. The juveniles admitted that they had been paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

b.     Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c.     In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer.

d.     In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

28

e.  Juan Johnson was later exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

f.  In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz that if he did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

g.  In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not.

h.  In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the Grand Jury by threatening Rosario that if he did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

i.  In 1991, Defendant Guevara physically coerced sixteen year-old David Velazquez into making a false identification and giving false testimony by taking him to a rival gang's territory, beating him while chained to a wall at Area Five, and threatening to "get you for anything I can" if he did not talk. All of the false details of Velazquez's statement were provided by Guevara.

j.  In 1993, Defendant Guevara coerced an identification from Carl Richmond by threatening Richmond that he could make his life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

k.  In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained him to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila told Guevara that he did not do it, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses had previously told the police that they had not been able to see the shooter.

l.  In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely claimed that Colon had committed murder, but later came forward to bring Defendant Guevara's misconduct to light.

29

m.   In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the grand jury by threatening Diaz that if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

n.   In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

o.   In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand" saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

p.   In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragosa was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

q.   In 1996, Defendant Guevara coerced Maria Rivera into making a false identification of a man in a lineup by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution later abandoned murder charges against the individual whom Rivera falsely identified in the lineup.

r.   In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification. Guevara detained Ruiz repeatedly over the course of a 10-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

s.   In 1997, Defendant Guevara withheld physical evidence and failed to disclose the exculpatory statements of witness Ruth Atonetty to Ariel Gomez. Gomez was accused of firing multiple shots from a car into a crowd. Ruth Atonetty told

30

Guevara that she heard multiple shots coming from within the crowd, not from Gomez's vehicle. Guevara continued to pressure her to change her account, and when she would not, he told her he "had other witnesses" and "didn't need her." As a result, Ariel Gomez did not have access to key *Brady* material at his trial.

t. In 1988, Defendant Guevara used suggestive tactics to force 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of murder. Lopez had told Defendant Guevara that Rivera was not the shooter. In 2011, Lopez testified at an evidentiary hearing that he had never been able to identify Rivera as the murderer. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges against Rivera, who was granted a certificate of innocence.

u. Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim of that shooting identified Jacques Rivera as his shooter before he died. Defendant Guevara claimed that the identification was made at a time that the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him.

v. In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses. She then conferred with Guevara, even though the Court had ordered all witnesses excluded from the courtroom to prevent collusion among the witnesses.

w. In 2011, the first district granted Tony Gonzalez a post-conviction hearing on the basis that Defendant Guevara conducted an unduly suggestive lineup wherein he concocted an array in which Gonzalez's photo was the only one that stood out from the rest in a photo array.

x. In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Office of Professional Standards.

y. In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and two children, and left the home in shambles. Lloyd filed a complaint with the Office of Professional Standards the next day.

z. In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where

31

he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claim of a beating by the police. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action on Hunt's claim of excessive detention against the City of Chicago.

aa. In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister Anna during a search of their home, during which the officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch" and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

bb. In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied knowing the people Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

cc. In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him and hit him in the head. Garcia filed a complaint with the Office of Professional Standards. Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as he was treated at the hospital for lacerations to the head. After an investigation into the incident, Office of Professional Standards found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

dd. In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights during an interrogation. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claim that he had been beaten while in police custody.

ee. In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with the Office of Professional Standards. Office of Professional

Standards sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

ff.    In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime he knew nothing about.

gg.    In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed he would serve seven years in prison whereas if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if he signed a statement he could go home.

hh.    In 1991, Defendant Guevara coerced a false confession from Daniel Rodriguez through the use of threats and intimidation. While en route to the police station, Guevara threatened to harm Rodriguez's family if he did not cooperate. Once at Area Five, Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by Guevara's partner, Defendant Halvorsen in the chest and torso. Guevara provided details of the crime to Rodriguez to include in Rodriguez's false confession.

ii.    In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

jj.    In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if he did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

kk.    In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of a two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement he could not read.

ll.    In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying and repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

mm.    In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that if he did not confess he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores's statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of *Miranda*.

nn.    In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room. Dembski, a Polish National who did not speak English, was interrogated by Guevara without *Miranda* warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

oo.    In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

pp.    In 1998, Defendants Guevara repeatedly pulled Adriana Mejia's hair and struck here once on the back of her neck while she was interrogated.

qq.    In 1998, Defendant Guevara repeatedly threatened and beat Arturo Reyes in order to coerce Reyes into giving an incriminating statement. After two days of isolation and interrogation, Reyes provided a false statement.

rr.    In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so that the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

**ANSWER:**    To the extent that these allegations are directed against them, Answering Defendants deny the allegations in this paragraph, and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

109.    As these instances of misconduct demonstrate, the Defendants engaged in the

misconduct set forth in this Complaint because they knew that the City of Chicago and its Police

Department tolerated and condoned such conduct.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to
them, and lack knowledge or information sufficient to admit or deny the
remaining allegations in this paragraph.

### Plaintiff's Wrongful Conviction and Imprisonment

110.    As a result of the Defendants' misconduct and based on the false evidence

described in this Complaint, Plaintiff was arrested, prosecuted, and convicted of murder.

**ANSWER:**    Answering Defendants admit that Plaintiff was arrested, prosecuted and convicted
of murder. Answering Defendants deny the remaining allegations in this
paragraph as they pertain to them, and lack knowledge or information sufficient to
admit or deny the remaining allegations.

111.    Apart from Defendants' own false testimony, the testimony of Rodriguez and

Melendez was the only evidence presented against Plaintiff at trial.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to
them, and lack knowledge or information sufficient to admit or deny the
remaining allegations.

112.    In a letter to the judge after his conviction Plaintiff wrote, "I haven't killed

anyone nor was I a participant in this crime."

**ANSWER:**    Answering Defendants lack knowledge or information sufficient to admit or deny
the allegations in this paragraph.

113.    Plaintiff was sentenced to 45 years in prison.

**ANSWER:**    Answering Defendants, on information and belief, admit the allegations in this
paragraph.

114.    Without Defendants' fabrication, manufacture, and suppression of evidence,

Plaintiff never would have been arrested, prosecuted, or convicted.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to

them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

115. At no point in time between 1995 and the present day has there been any credible evidence giving rise to probable cause to suspect Plaintiff of the murder of Noel Andujar.

**ANSWER:** Answering Defendants, on information and belief, deny the allegations in this paragraph.

116. Plaintiff was 19 years old when he was wrongly arrested. He spent more than 22 years of his life imprisoned for a crime he did not commit.

**ANSWER:** Answering Defendants admit that Plaintiff was 19 years old when he was arrested on the underlying incident and further admit that Plaintiff was imprisoned for the underlying crime. Answering Defendants lack knowledge or information sufficient to admit or deny the allegations regarding the amount of time plaintiff was incarcerated. Answering Defendants, on information and belief, deny the remaining allegations in this paragraph.

117. Plaintiff's whole life was turned upside down without any warning. His young adulthood was entirely consumed by the horror of his wrongful imprisonment.

**ANSWER:** Answering Defendants, on information and belief, deny that Plaintiff's imprisonment was wrongful, and lack knowledge or information to admit or deny the remaining allegations.

118. Shortly before Plaintiff was wrongly arrested, he learned that he was expecting a daughter. Because of the Defendants' misconduct, Plaintiff was not present for his daughter's birth, her entire childhood, and her entire young adulthood. In short, Plaintiff lost his chance to raise his daughter. It has had a profound impact on Plaintiff's life and on his relationship with his daughter.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

119. In addition, because of the Defendants' misconduct, Plaintiff was taken away from and missed out on the lives of his siblings and other family and friends as well. He returned

36

home to relationships changed or lost to decades of wrongful incarceration.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

120. Plaintiff was robbed of his young adulthood and his formative years; he was deprived of opportunities to gain an education, to engage in meaningful labor, to develop a career, and to pursue his interests and passions. Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

121. During his more than 22 years of wrongful imprisonment, Plaintiff was detained in harsh and dangerous conditions in maximum-security prisons. Among many other severe harms, Plaintiff was attacked and was the victim of attempted stabbings, and he was degraded and strip searched regularly.

**ANSWER:** Answering Defendants admit, on information and belief, that Plaintiff was incarcerated for the murder of Noel Andujar. Answering Defendants lack knowledge or information sufficient to admit or deny the allegations regarding the amount of time he was incarcerated. Answering Defendants, on information and belief, deny that Plaintiff's imprisonment was wrongful, and lack knowledge or information sufficient to admit or deny the remaining allegations.

122. Plaintiff never knew whether the truth would come out or whether he would ever be exonerated.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

123. In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and

psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects. Plaintiff has been branded a murderer. He has suffered profound reputational harm as a result.

**ANSWER:** Answering Defendants, on information and belief, deny that Plaintiff's imprisonment was unlawful. Answering Defendants deny the allegations of misconduct in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

### Plaintiff's Exoneration

124. Plaintiff fought hard to prove his innocence. He filed a post-conviction petition *pro se* in the Circuit Court of Cook County.

**ANSWER:** Answering Defendants lack knowledge or information to admit or deny the allegations in this paragraph.

125. In court proceedings after Plaintiff's wrongful conviction, Defendant Guevara pleaded his Fifth Amendment right not to incriminate himself in response to questions about his misconduct as a Chicago Police officer, and specifically about his misconduct during the investigation of the Andujar murder and Plaintiff's criminal case.

**ANSWER:** Answering Defendants, on information and belief, admit that Defendant Guevara has, in some court proceedings, on advice of his counsel invoked his Fifth Amendment right not to answer questions regarding allegations of misconduct after Plaintiff's conviction on the underlying crime. Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information to admit or deny the remaining allegations.

126. For instance, in 2013, Defendant Guevara invoked his right to remain silent when he was asked specifically whether he had told Melendez to identify Plaintiff during the investigation of the Andujar homicide.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.

38

127.    In a 2017 proceeding, Cook County Judge James Obbish found that Defendant Guevara had told "bald face lies" during his court testimony and had "eliminated any possibility of being considered a credible witness in any proceeding."

**ANSWER:**    Answering Defendant, on information and belief, admit that in 2017 Judge James Obbish did state the quoted excerpts with regard to the testimony of defendant Guevara in a specific matter.   Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

128.    In 2017 and early 2018, the Cook County State's Attorney's office conducted a new investigation of the Andujar case.

**ANSWER:**    Answering Defendants lack knowledge or information to admit or deny the allegations in this paragraph.

129.    The Cook County State's Attorney's investigation was part of an ongoing review of Defendant Guevara's cases.

**ANSWER:**    Answering Defendants lack knowledge or information to admit or deny the allegations in this paragraph.

130.    On January 9, 2018, the Cook County State's Attorney moved to vacate Plaintiff's conviction and dropped all of the charges against him.

**ANSWER:**    Answering Defendants, on information and belief, admit that on January 9, 2018 the Cook County State's Attorney's office *nolle prosequi* and vacated the underlying criminal charges. Answering Defendants deny any allegations of misconduct by them, and lack knowledge or information to admit or deny the remaining allegations in this paragraph.

131.    At the time of his exoneration, Plaintiff had been fighting the false charges against him for more than half of his life.

**ANSWER:**    Answering Defendants deny the allegations of "exoneration," and lack knowledge or information to admit or deny the remaining allegations in this paragraph.

## COUNT I
### 42 U.S.C. § 1983 – Due Process
### (Fourteenth Amendments)

132.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**     Answering Defendants hereby reincorporate and reassert their answers to paragraphs of this complaint as though fully set forth herein.

133.     As described in detail above, the Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

134.     In the manner described more fully above, Defendants fabricated and manufactured evidence and solicited false evidence—including false identifications, false witness statements, and false witness testimony that they knew to be false and perjured—from Rodriguez and Melendez, and fabricated police reports falsely implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

135.     Defendants also procured supposed eyewitness identifications and a supposed identification of a vehicle implicating Plaintiff in the crime, by using unduly suggestive identification techniques during photo identifications and during a live lineup. Defendants knew that these identifications were false and unreliable, but they caused them to be used during Plaintiff's criminal trial.

40

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

136. In addition, Defendants deliberately withheld exculpatory evidence from Plaintiff, including evidence that they had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

137. In addition, based upon information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

138. The Defendants' misconduct directly resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

139. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:** Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

140. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and

suffering, forced and involuntary prison labor, and other grievous and continuing injuries and

damages as set forth above.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

141. The misconduct described in this Count was undertaken pursuant to the policies

and practices of the City of Chicago and the Chicago Police Department, in the manner more

fully described below in Count V.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

WHEREFORE, Answering Defendants and JoAnn Halvorsen, as Special Representative

to the Estate of Ernest Halvorsen, deceased, request judgment in their favor and against Plaintiff,

costs of suit and attorneys' fees, and such other relief as the court deems appropriate.

## COUNT II
## 42 U.S.C. § 1983 – Unlawful Detention
## (Fourth Amendment)

142. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:** Answering Defendants hereby reincorporate and reassert their answers to paragraphs of this complaint as though fully set forth herein.

143. In the manner described more fully above, the Defendants caused Plaintiff to be

detained and imprisoned without probable cause.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

144. The misconduct described in this Count was undertaken by the Defendants under

color of law and within the scope of their employment.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to

42

them, and lack knowledge or information sufficient to admit or deny the
remaining allegations.

145.     The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally, with malice, or with reckless indifference to the rights of others.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to
them, and lack knowledge or information sufficient to admit or deny the
remaining allegations.

146.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered

loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and

suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to
them, and lack knowledge or information sufficient to admit or deny the
remaining allegations.

147.     The misconduct described in this Count was undertaken pursuant to the policies

and practices of the City of Chicago and the Chicago Police Department, in the manner more

fully described below in Count V.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to
them, and lack knowledge or information sufficient to admit or deny the
remaining allegations.

WHEREFORE, Answering Defendants and JoAnn Halvorsen, as Special Representative

to the Estate of Ernest Halvorsen, deceased, request judgment in their favor and against Plaintiff,

costs of suit and attorneys' fees, and such other relief as the court deems appropriate.

## COUNT III
## 42 U.S.C. § 1983 – Failure to Intervene

148.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**     Answering Defendants hereby reincorporate and reassert their answers to
paragraphs of this complaint as though fully set forth herein.

43

149.     In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

150.     As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

151.     The misconduct described in this Count was objectively unreasonable, was undertaken and committed intentionally.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

152.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

153.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

WHEREFORE, Answering Defendants and JoAnn Halvorsen, as Special Representative to the Estate of Ernest Halvorsen, deceased, request judgment in their favor and against Plaintiff, costs of suit and attorneys' fees, and such other relief as the court deems appropriate.

## COUNT IV
## 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

154.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**     Answering Defendants hereby reincorporate and reassert their answers to paragraphs of this complaint as though fully set forth herein.

155.     In the manner described more fully above, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Plaintiff for the Andujar homicide, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

156.     In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

157. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

45

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

158.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

159.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

160.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

WHEREFORE, Answering Defendants and JoAnn Halvorsen, as Special Representative to the Estate of Ernest Halvorsen, deceased, request judgment in their favor and against Plaintiff, costs of suit and attorneys' fees, and such other relief as the court deems appropriate.

## COUNT V
### 42 U.S.C. § 1983 – Policy and Practice Claim Against the City of Chicago

Count V of Plaintiff's Complaint is not directed at Answering Defendants, and therefore

they answer Count V only to the extent the allegations herein are adopted and re-alleged in other

counts of Plaintiff's Complaint.

        161.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**    Answering Defendants hereby reincorporate and reassert their answers to
paragraphs of this complaint as though fully set forth herein.

        162.    As described in detail above, the City of Chicago is liable for the violation of

Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices,

and customs of the City of Chicago, as well as by the actions of policy-making officials for the

City of Chicago.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph directed against
them and that they acted pursuant to the policies, practices, and customs alleged
in this paragraph.   Answering Defendants lack knowledge or information
sufficient to admit or deny the remaining allegations.

        163.    At all times relevant to the events described in this Complaint and for a period of

time prior and subsequent thereto, the City Chicago failed to promulgate proper or adequate

rules, regulations, policies, and procedures for: conducting photographic and live lineup

procedures by officers and agents of the Chicago Police Department and City of Chicago; the

conduct of interrogations and questioning of criminal suspects; the collection, documentation,

preservation, testing, and disclosure of evidence; the writing of police reports and taking of

investigative notes; obtaining statements and testimony from witnesses; and maintenance of

investigative files and disclosure of those files in criminal proceedings. In addition or

alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations,

policies, and procedures for the training and supervision of officers and agents of the Chicago

Police Department and the City of Chicago, with respect to these subjects.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph directed against
them and that they acted pursuant to the policies, practices, and customs alleged

in this paragraph. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations.

164. These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

**ANSWER:** Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations.

165. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

**ANSWER:** Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations.

166. Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were denied due process, including but not limited to one or more of the following: (1) suspects were selected during identification procedures by eyewitnesses who had been told by police what suspect to identify; (2) suspects were shown suggestive photo arrays; (3) suspects were showing suggestive live lineups; (4) identification procedures were not accurately documented; and (5) supervisors with knowledge of permissible

and impermissible identification techniques did not properly supervise or discipline police officers and employees such that the fabricated and improper identifications continued unchecked.

**ANSWER:** Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations.

167. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

**ANSWER:** Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations.

168. These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

49

**ANSWER:**     Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph.   Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations.

169.     The above widespread practices and customs, so well settled as to constitute *de facto* policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph.   Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations.

170.     As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

171.     In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph.   Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations.

172.     Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth

above in engaging in the misconduct described in this Count.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph directed against them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph.   Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations.

## COUNT VI
## State Law Claim – Malicious Prosecution

173.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**     Answering Defendants hereby reincorporate and reassert their answers to paragraphs of this complaint as though fully set forth herein.

174.    In the manner described above, the Defendants, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

175.    In so doing, the Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

176.    The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in January 2018.

**ANSWER:**     Answering Defendants, on information and belief, admit that on January 9, 2018 the Cook County State's Attorney's office *nolle prosequi* and vacated the underlying criminal charges.   Answering Defendants, on information and belief,

51

deny that the proceedings were terminated in a manner indicative of innocence, and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

177.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

178.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**    Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

WHEREFORE, Answering Defendants and JoAnn Halvorsen, as Special Representative to the Estate of Ernest Halvorsen, deceased, request judgment in their favor and against Plaintiff, costs of suit and attorneys' fees, and such other relief as the court deems appropriate.

## COUNT VII
## State Law Claim – Intentional Infliction of Emotional Distress

179.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**    Answering Defendants hereby reincorporate and reassert their answers to paragraphs of this complaint as though fully set forth herein.

180.    The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

181. As a result of the Defendants' misconduct described in this Count, Plaintiff

suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional

pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

WHEREFORE, Answering Defendants and JoAnn Halvorsen, as Special Representative

to the Estate of Ernest Halvorsen, deceased, request judgment in their favor and against Plaintiff,

costs of suit and attorneys' fees, and such other relief as the court deems appropriate.

### COUNT VIII State Law Willful and Wanton Conduct

182. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:** Answering Defendants hereby reincorporate and reassert their answers to paragraphs of this complaint as though fully set forth herein.

183. At all times relevant to this complaint the Defendant Officers had a duty to refrain

from willful and wanton conduct in connection with the Andujar murder investigation.

**ANSWER:** Answering Defendants admit that there was a duty to refrain from willful and wanton conduct and deny that they breached such a duty or that Plaintiff has correctly alleged this duty. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations.

184. Notwithstanding that duty, the Defendant Officers acted willfully and wantonly

through a course of conduct that showed an utter indifference to, or conscious disregard of,

Plaintiff's rights.

**ANSWER:** Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

185.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

WHEREFORE, Answering Defendants and JoAnn Halvorsen, as Special Representative to the Estate of Ernest Halvorsen, deceased, request judgment in their favor and against Plaintiff, costs of suit and attorneys' fees, and such other relief as the court deems appropriate.

## COUNT IX
### State Law Claim – Civil Conspiracy

186.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**     Answering Defendants hereby reincorporate and reassert their answers to paragraphs of this complaint as though fully set forth herein.

187.     As described more fully in the preceding paragraphs, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the remaining allegations.

188.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to them, and lack knowledge or information sufficient to admit or deny the

remaining allegations.

189.     The violations of Illinois law described in this complaint, including Defendants'

malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were

accomplished by Defendants' conspiracy.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to
them, and lack knowledge or information sufficient to admit or deny the
remaining allegations.

190.     The misconduct described in this Count was objectively unreasonable, was

undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to
them, and lack knowledge or information sufficient to admit or deny the
remaining allegations.

191.     As a result of the Defendants' misconduct described in this Count, Plaintiff

suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional

pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**     Answering Defendants deny the allegations in this paragraph as they pertain to
them, and lack knowledge or information sufficient to admit or deny the
remaining allegations.

WHEREFORE, Answering Defendants and JoAnn Halvorsen, as Special Representative

to the Estate of Ernest Halvorsen, deceased, request judgment in their favor and against Plaintiff,

costs of suit and attorneys' fees, and such other relief as the court deems appropriate.

## COUNT X
### State Law Claim – *Respondeat Superior*

Count X of Plaintiff's Complaint is not directed at Answering Defendants, and

therefore they answer Count X only to the extent the allegations herein are adopted and

re-alleged in other counts of Plaintiff's Complaint.

192.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**    Answering Defendants hereby reincorporate and reassert their answers to paragraphs of this complaint as though fully set forth herein.

193.    While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

**ANSWER:**    Answering Defendants admit that they were employees of the Chicago Police Department acting at all relevant times within the scope of their employment. Answering Defendants deny the allegations of misconduct in this paragraph as they pertain to them, and lack knowledge or information to admit or deny the remaining allegations.

194.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

**ANSWER:**    Answering Defendants deny they committed any torts and deny that this is a correct or complete statement of the law.

## COUNT XI
## State Law Claim – Indemnification Pursuant to 745 ILCS 10/9-102

Count XI of Plaintiff's Complaint is not directed at Answering Defendants, and therefore they answer Count XI only to the extent the allegations herein are adopted and re-alleged in other counts of Plaintiff's Complaint.

195.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**    Answering Defendants hereby reincorporate and reassert their answers to paragraphs of this complaint as though fully set forth herein.

196.    Illinois statute (745 ILCS 10/9-102) provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

**ANSWER:**    Answering Defendants deny that this is a correct or complete statement of the law.

197.    The Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

**ANSWER:**    Answering Defendants admit the individual defendants were employees of the Chicago Police Department and, on information and belief, acted within the scope of their employment at all relevant times to Plaintiff's complaint.   Answering Defendants deny the allegations of misconduct in this paragraph as they pertain to them, and lack knowledge or information to admit or deny the remaining allegations.

198.    The City of Chicago is responsible to pay any judgment entered against the Defendants. Plaintiff therefore demands judgment against Defendant City of Chicago, in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest.

**ANSWER:**    Answering Defendants deny the allegations of misconduct in this paragraph as they pertain to them and deny that this is a correct or complete statement of the law.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Answering Defendants were government officials, namely police officers, who perform discretionary functions. At all times material to the events alleged in Plaintiff's Complaint, a reasonable police officer objectively viewing the facts and circumstances that confronted Answering Defendants, could have believed their actions to be lawful, in light of clearly established law and the information that Answering Defendants possessed.   Answering Defendants are therefore entitled to qualified immunity on Plaintiff's federal claims.

**Second Affirmative Defense**

The Answering defendants are absolutely immune from civil liability for their testimony given in judicial proceedings in Plaintiff's underlying criminal case, *Rehberg v. Paulk*, 566 U.S. 356 (2012); *Briscoe v. LaHue*, 460 U.S. 325 (1983); *Jurgensen v. Haslinger*, 295 Ill.App.3d 139 (1998), and for claims that they suborned or conspired to commit perjury. *See House v. Belford*, 956 F.2d 711, 720-21 (7th Cir. 1992).

**Third Affirmative Defense**

Plaintiff's claim under Illinois law for intentional infliction of emotional distress (Count VII) is barred by the one-year statute of limitations under the Illinois Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/8-101 because it was not filed within one year after it accrued.

**Fourth Affirmative Defense**

Under the Illinois Tort Immunity Act, Answering Defendants are not liable for any of the state law claims alleged because a public employee is not liable for his or her acts or omissions in the execution or enforcement of any law, unless such acts or omissions constitute willful and wanton conduct, and none of their acts or omissions in the execution or enforcement of any law constituted willful and wanton conduct.  745 ILCS 10/2-202.

**Fifth Affirmative Defense**

As to Plaintiff's state law claims, Answering Defendants are not liable for any claims alleged because their decisions regarding the investigation and/or the arrest of Plaintiff were decisions that involved the determination of policy and the exercise of discretion for which they are immune from liability.  745 ILCS 10/2-201.

**Sixth Affirmative Defense**

As to Plaintiff's state law claims, Answering Defendants are not liable for any claims alleged because a public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless he acts maliciously and without probable cause. 745 ILCS 10/2-208.

**Seventh Affirmative Defense**

As to Plaintiff's state law claims, Answering Defendants are not liable for any claims alleged claims because a public employee, as such and acting within the scope of his employment, is not liable for an injury caused by the act or omission of another person.   745 ILCS 10/2-204.

**Eighth Affirmative Defense**

Plaintiff's claims as alleged in his Complaint are barred in whole or in part by the applicable statute of limitations.

**Ninth Affirmative Defense**

As to the state law claim of Intentional Infliction of Emotional Distress, punitive damages cannot be awarded for this claim under Illinois law. *Knierim v. Izzo*, 22 Ill. 2d 73 (1961).

**Tenth Affirmative Defense**

Plaintiff has a duty to mitigate his damages, and any damages awarded to Plaintiff would be required to be reduced by any amount by which the damages could have been lessened by Plaintiff's failure to take reasonable action to minimize those damages.

### Eleventh Affirmative Defense

As to Plaintiff's state law claim of Willful and Wanton Conduct (Count VIII), that claim fails because under Illinois law there is no separate, independent tort of willful and wanton conduct. *Krywin v. Chicago Transit Authority*, 238 Ill.2d 215, 235 (2010).

### Twelfth Affirmative Defense

As to Plaintiff's Fourth Amendment claim for unlawful detention, that claim is barred by the applicable statute of limitations as it accrued once Plaintiff's detention ceased. *Manuel v. City of Joliet, Ill.*, 903 F.3d 667, 669 (7th Cir. 2018); *Lewis v. City of Chicago*, 914 F.3d 472, 478 (2019).

WHEREFORE, Defendants Anthony Wojcik, John McMurray, George Figueroa, Edward Mingey, Robert Biebel, and JoAnn Halvorsen, as Special Representative to the Estate of Ernest Halvorsen, deceased, respectfully request that this Court enter judgment in their favor and against Plaintiff, that the action be dismissed with prejudice, and that costs be assessed against Plaintiff.

### JURY DEMAND

Defendants, Anthony Wojcik, John McMurray, George Figueroa, Edward Mingey, Robert Biebel, and JoAnn Halvorsen, as Special Representative to the Estate of Ernest Halvorsen, deceased, hereby demand a trial by jury.

Dated: May 13, 2020            /s/ Josh M. Engquist
                                   JOSH M. ENGQUIST, Attorney No. 06242849
                                   Special Assistant Corporation Counsel

                                   James G. Sotos
                                   Jeffrey N. Given
                                   Josh M. Engquist
                                   Jeffrey R. Kivetz
                                   **THE SOTOS LAW FIRM, P.C.**
                                   141 W. Jackson, Suite 1240A
                                   Chicago, Illinois 60604
                                   Tel: (630) 735-3300
                                   jengquist@jsotoslaw.com
                                   *One of the Attorneys for Officer Defendants*

61

## CERTIFICATE OF SERVICE

I certify under penalty of perjury, pursuant to 28 U.S.C.A. § 1746, that on May 13, 2020, I electronically filed the **Defendants JoAnn Halvorsen, Anthony Wojcik, John McMurray, George Figueroa, Edward Mingey and Robert Biebel's Answers and Affirmative Defenses to Plaintiff's Amended Complaint** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants listed in the below service list:

***Plaintiff's Attorneys***
Jon I Loevy
Anand Swaminathan
Joshua A. Tepfer
Steven E. Art
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
312-243-5900
jon@loevy.com
anand@loevy.com
josh@loevy.com
steve@loevy.com

***Attorneys for City of Chicago***
Eileen E. Rosen
Stacy A. Benjamin
Catherine M. Barber
Theresa B. Carney
Austin G. Rahe
ROCK FUSCO & CONNELLY
321 N. Clark St., Ste. 2200
Chicago, IL 60654
312-494-100
erosen@rfclaw.com
sbenjamin@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com
arahe@rfclaw.com

***Attorneys for Defendant Guevara:***
James V. Daffada
Thomas M. Leinenweber
Kevin E. Zibolski
Justin L. Leinenweber
Leinenweber Baroni & Daffada,
120 N. LaSalle St., Suite 2000
Chicago, IL 60602
(312) 663-3003
jim@ilesq.com
thomas@ilesq.com
kevin@ilesq.com
justin@ilesq.com

/s/ Josh M. Engquist
JOSH M. ENGQUIST