IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  | No. 18 C 3029 |
|---|---|
| **Thomas Sierra**, | Hon. John Z. Lee, District Judge |
| Plaintiff, | |
| v. | Hon. M. David Weisman, Magistrate Judge |
| **Reynaldo Guevara** et al., | **Plaintiff's Supplement to Rule 72 Objections Regarding Documents Related to the *Klipfel* Litigation** |
| Defendants. | |

# Exhibit 2

**Deposition Transcript of William Dorsch,
*Reyes v. Guevara*, 18 C 1028 (N.D. Ill.) &
*Solache v. Guevara*, 18 C 2312 (N.D. Ill.),
June 11, 2021**

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   ARTURO DELEON-REYES,          )
                                   )
 4                 Plaintiff,      )
                                   )
 5           vs.                   )    No. 18 CV 01028
                                   )
 6   REYNALDO GUEVARA, et al.,     )
                                   )
 7                 Defendants.     )
     ------------------------- )
 8   GABRIEL SOLACHE,              )
                                   )
 9                 Plaintiff,      )
                                   )
10           vs.                   )    No. 18 CV 02312
                                   )
11   REYNALDO GUEVARA, et al.,     )
                                   )
12                 Defendants.     )

13           The deposition of WILLIAM DORSCH, taken

14   pursuant to the Federal Rules of Civil Procedure,

15   before Katie K. Elliott, Certified Shorthand

16   Reporter No. 084-004537, via Zoom Video

17   Teleconference, on Friday, June 11, 2021,

18   commencing at 9:12 a.m., CST, pursuant to notice.

19           APPEARANCES:

20              LOEVY & LOEVY, by
                MR. SEAN C. STARR
21              (311 North Aberdeen Street, Third Floor
                 Chicago, Illinois  60607
22               312.243.5900
                 sean@loevy.com)
23                  appeared on behalf of the plaintiff
                    Arturo Deleon-Reyes;

24
```

AR-L 149727

```
 1          APPEARANCES:  (Cont'd)

 2            PEOPLE'S LAW OFFICE, by
              MS. JAN SUSLER
 3            (1180 North Milwaukee Avenue, Third Floor
               Chicago, Illinois  60622
 4             773.235.0070
               jsusler@peopleslawoffice.com)
 5                appeared on behalf of the plaintiff
                  Gabriel Solache;
 6
              LEINENWEBER BARONI & DAFFADA, LLC, by
 7            MS. MEGAN K. McGRATH
              (120 North LaSalle Street, Suite 2000
 8             Chicago, Illinois  60603
               866.786.3705
 9             mkm@ilesq.com)
                  appeared on behalf of the defendant
10                Reynaldo Guevara;

11          COOK COUNTY STATE'S ATTORNEY'S OFFICE, by
            MR. SHAYL WILSON
12          (Richard J. Daley Center
             50 West Washington Street, Room 500
13           Chicago, Illinois  60602
             312.603.5440
14           shayl.wilson@cookcountyil.gov)
                appeared on behalf of the Cook County
15                defendants;

16            THE SOTOS LAW FIRM, PC, by
              MS. CAROLINE P. GOLDEN
17            (141 West Jackson Boulevard, Suite 1240A
               Chicago, Illinois  60604
18             630.735.3300
               cgolden@jsotoslaw.com)
19                appeared on behalf of the individual
                  police officer defendants;
20
              ROCK FUSCO & CONNELLY, LLC
21            MS. EILEEN E. ROSEN and
              MS. JESS ZEHNER
22            (321 North Clark Street, Suite 2200
               Chicago, Illinois  60654
23             312.494.1000
               erosen@rfclaw.com)
24                appeared on behalf of the defendant
                  City of Chicago;
```

AR-L 149728

1        APPEARANCES:  (Cont'd)

2            REITER BURNS, LLP, by
             MR. DANIEL BURNS
3            (311 Wacker Drive, Suite 5200
              Chicago, Illinois  60606
4             312.982.0900
              dburns@reiterburns.com)
5               appeared on behalf of the defendant
              David Navarro.

6

         ALSO PRESENT:

7

             Ms. Rachel Szymanski, Exhibit Technician,
8                 Urlaub Bowen & Associates.

9                *   *   *   *   *   *   *

10                     I N D E X

11
   Witness:                                    Page
12
         WILLIAM DORSCH
13
             Examination by:
14
             Ms. McGrath.................     4
15

16                   E X H I B I T S

17  No.   Description                 Marked/Referenced

18    2  LinkedIn of Deponent...................  19

19
               (Exhibit attached/scanned.)
20

21                     - - -

22

23

24

```
 1                      (Witness sworn.)
 2                      WILLIAM DORSCH
 3  called as a witness herein, having been first duly
 4  sworn, was examined and testified as follows:
 5                      EXAMINATION
 6  BY MS. McGRATH:
 7       Q.    I'd say good morning, Mr. Dorsch,
 8  because it's morning here, but I'm not sure if it's
 9  morning where you are.
10       A.    Right.  It's getting towards evening
11  now, yes.
12       Q.    Getting towards evening.
13                 Before we get started officially,
14  where are you calling us in from?
15       A.    Well, I'm in my home in -- this home is
16  in Bulgaria, Sapareva Banya is the city.  But we
17  also have a home in Greece, so we're splitting our
18  time.
19       Q.    Excellent.
20       MS. McGRATH:  Well, before we go into all the
21  details, we'll just have everybody else who's here
22  on the call identify themselves for the record.
23                 My name is Megan McGrath.  I
24  represent defendant Guevara in this matter.
```

AR-L 149730

 1                 Now if the other attorneys could

 2  please identify themselves.

 3        MR. STARR:  Good morning, Mr. Dorsch.  My

 4  name is Sean Starr.  I work for Loevy & Loevy, and

 5  I represent the plaintiff Arturo Deleon-Reyes in

 6  this case.

 7        MS. SUSLER:  Good morning, Mr. Dorsch.  My

 8  name is Jan Susler.  I'm with the People's Law

 9  Office, and I represent the plaintiff Gabriel

10  Solache in this matter.

11        MS. ROSEN:  Good morning, Mr. Dorsch.  Eileen

12  Rosen on behalf of defendant City of Chicago.

13                 Can you tell me what time it is

14  where you are?

15        THE WITNESS:  It is now about 12 minutes

16  after 5:00.

17        MS. ROSEN:  Have you been informed before we

18  get started that this deposition could take four,

19  five, six, seven hours?

20        THE WITNESS:  No.

21        MS. ROSEN:  Okay.  Well, that's a

22  possibility.  I'm not sure how long it's going to

23  take to get the questions asked that we have of

24  you, so obviously I am a little concerned about the

1  fact that it's 5:00 p.m. for you.

2              No one told us exactly where you

3  were or that we would have this time issue, so we

4  will do our best to get through this efficiently.

5              But I'm just going to put everybody

6  on notice that, No. 1, it would have been helpful

7  if we'd have been given a heads-up about the fact

8  that it's after 5:00 o'clock for this witness, and

9  so that we could have arranged the schedule

10 appropriately.

11      THE WITNESS:  I would have appreciated that.

12 It's Friday evening.

13      MS. ROSEN:  Yeah, I understand 100 percent.

14 We the defendants had no idea.

15              So we will do our best to get it

16 done, but it's possible, because I certainly don't

17 want you testifying until midnight your time, that

18 we might have to suspend the deposition and

19 continue it for another day.

20              And I have to say, quite frankly,

21 with three weeks left of discovery in this case,

22 which is a hard deadline, I'm a little disappointed

23 that neither plaintiffs' counsel informed us of the

24 fact that this witness would be in a time zone that

AR-L 149732

1  would make him start testifying at 5:00 p.m.

2      THE WITNESS:  You should also be aware that

3  because I'm in my home here that I have family that

4  might be coming through here every now and then as

5  I'm sitting in the kitchen, especially my

6  granddaughter.

7      MS. ROSEN:  No worries.  That's happened

8  across the board in these cases during these times,

9  so that's not a problem at all.

10             I don't think everybody's gone on

11  the record, so we can go ahead and do that.

12      MS. GOLDEN:  Good morning, good after -- good

13  evening, Mr. Dorsch.  My name is Caroline Golden,

14  and I represent the individual defendant police

15  officers in the Solache and Reyes cases.

16      MR. WILSON:  Good evening, Mr. Dorsch.  My

17  name is Shayl Wilson.  I'm from the Cook County

18  State's Attorney's Office.  I represent the

19  defendants Cook County, Brualdi, O'Malley, Varga,

20  and Wehrle.

21      MR. BURNS:  Good evening.  Dan Burns on

22  behalf of defendant David Navarro.

23      THE WITNESS:  Okay.

24      MS. ZEHNER:  Jessica Zehner on behalf of

 1  defendant City of Chicago.

 2  BY MS. McGRATH:

 3      Q.    Okay.  Mr. Dorsch, you mentioned before

 4  we got on the record that you are currently living

 5  in -- you're currently right now in a city in

 6  Bulgaria?

 7      A.    Yes.

 8      Q.    Could you -- what is the name of the

 9  city again, and could you please spell it?

10      A.    It's Sapareva Banya:  S-a-p-a-r-e-v-a,

11  B-a-n-y-a.

12      Q.    And how long -- and you're currently

13  living in this city, correct?

14      A.    I intend to be living here and in

15  Greece for the rest of my god given life, yes.

16      Q.    When did you first move to Bulgaria?

17      A.    I moved permanently out here on

18  April 24th, but I've been coming here for 17 years.

19      Q.    How about -- you mentioned Greece.

20            Also is Greece --

21      A.    Yes.

22      Q.    -- your permanent residence, or is that

23  more of a different --

24      A.    It's seasonal, depending on the seasons

 1  of the year.  Like Florida, Chicago, you know.

 2       Q.    Got you.

 3             And you said you've been going to

 4  this town in Hungary for 17 years?

 5       A.    No, not Hungary.  Bulgaria.

 6       Q.    Oh, Bulgaria, I'm sorry.

 7       A.    Yeah, for 17 years.

 8       Q.    Did you have family there?

 9       A.    My wife is from there.  We have homes

10  and business ventures here.

11       Q.    What sort of businesses do you have

12  there?

13       A.    Rental properties.

14       Q.    For like tourist type?

15       A.    Tourists, yeah.  It's a big tourist

16  area.  It's a very big tourist area.

17       Q.    What other sort of work do you do there?

18       A.    I'm retired.

19       Q.    Okay.

20       A.    I'm just writing a lot.

21       Q.    What are you writing?

22       A.    Things of interest to me.

23       Q.    What are those?

24       A.    Whatever's of interest to me.

AR-L 149735

1          Q.    Could you give us examples?

2          A.    My life.

3          Q.    Is that connected in any way to your

4    previous employment with the police department?

5          A.    That's part of my life, yes.

6          Q.    Which portions of your -- I know that

7    like in looking up some of your previous, for lack

8    of a better term, sort of media work that you've

9    done, you -- I've recently listened to a podcast

10   you took part in last year regarding your

11   investigation with the John Wayne Gacy matter.

12         A.    Yes.  You're referring to the Devil in

13   Disguise?

14         Q.    Yes, I am.

15         A.    But I wasn't a party to it.  They just

16   took interviews of me.

17         Q.    Right.  Yeah, that was the documentary

18   that was on Peacock?

19         A.    Peacock, yes.

20         Q.    And I want to ask about that.

21               Was that something -- when was the

22   time of the interviews that you gave for that

23   specific documentary?

24         A.    I think we're going all the way back to

 1  about 2012, 2013.

 2              But I declined participation.  They

 3  wanted me to do much more, and I declined.

 4       Q.    Why is that?

 5       A.    Just wanted to keep some things to

 6  myself.

 7       Q.    Things to yourself about your

 8  involvement with the Gacy investigation?

 9       A.    About my life.

10       Q.    Around that same time when prior to

11  the -- and I wasn't actually referring to the -- I

12  did see the Peacock documentary.

13              But before that, there was a podcast

14  that you had been interviewed on.  I believe it was

15  a gentleman named Ed Opperman's podcast, the

16  Opperman report?

17       A.    Yes, several years ago.

18       Q.    You also -- there was one you did in

19  2020 as well?  In October of 2020?

20       A.    I don't remember which one.  I've done

21  several.

22       Q.    Okay.  Because that comes up for today,

23  because you didn't just talk about Mr. Gacy in that

24  podcast.  You also talked about the topic that

1  we're here to talk about today, which is Detective

2  Guevara.

3       A.    Okay.

4       Q.    And are you -- other than that podcast

5  episode, have you given any statements in the media

6  regarding Detective Guevara that you can recall?

7       A.    To the media, no.

8       Q.    And by "media," I mean, not just --

9  like the podcast as an example.

10      A.    Right.

11      Q.    Any sort of lobbying, for lack of a

12  better term --

13      A.    Well, podcasts, television, radio, no.

14      Q.    No, okay.

15            And on the topic of statements

16 about, you know, prior to this deposition, had you

17 spoken to any other law enforcement agencies other

18 than the police department, Chicago Police

19 Department, about Detective Guevara and the topics

20 you're going to be discussing today?

21      A.    No.

22      Q.    Did you ever have any sort of

23 appointment to discuss with the FBI?

24      A.    I did.  I made both parties, Sotos Law

AR-L 149738

 1  Firm aware of it and I think attorneys from Loevy,

 2  that I had personally gone to the FBI on my own

 3  uninvited to meet with them.

 4        Q.    And was it regarding Detective Guevara?

 5        A.    Yes.

 6        Q.    And when was that?

 7        A.    I believe it was in June of 2018.  All

 8  my records of that stuff is in the container ship

 9  that I found out today is going to be arriving here

10  in about a week, and then I have to unload all my

11  records and personal property and set up my office.

12        Q.    You said you went to the FBI on your

13  own in June of 2016 -- 20 --

14        A.    I believe it was 2018.

15        Q.    18?

16        A.    I believe it was 2018.  I have the name

17  of the investigator that I met with, but it would

18  be in that file.

19        Q.    Okay.  So when you get that

20  documentation, could you provide it to us?

21        A.    Sure.

22        Q.    Thank you.  Have you --

23        A.    I'm sure you can probably acquire it

24  yourselves from them.

AR-L 149739

1    Q.    Sure.  But if you have it, it would be,

2 you know, an easier step.

3    A.    Sure.

4    Q.    As you know, sometimes it's hard to get

5 documents, right?

6    A.    Okay, yes.

7    Q.    Do you maintain any business in --

8 let's get small first -- in Chicago?

9    A.    No.

10    Q.    Anything in the United States at all?

11    A.    No.

12    Q.    So your -- so Northern Lights

13 Investigative Services is no longer?

14    A.    I did not renew the license, and I

15 haven't done anything for over a year, I would

16 imagine.

17    Q.    Okay.

18    A.    Had many inquiries, but I turned them

19 all down.

20    Q.    Got you.

21          What sorts of inquiries?

22    A.    Homicide cases.

23    Q.    When you say -- is there a specific, I

24 hate to say it, like geographical area where you

AR-L 149740

 1  get requests from?  Like is it mostly Chicagoland

 2  area?  Is it --

 3       A.    It's mostly Chicago area.

 4       Q.    And what types of requests were being

 5  made?

 6       A.    Some coming from inmates stating their

 7  innocence, families of inmates, innocence projects,

 8  attorneys, that area.  You know, that's it.

 9       Q.    When was the last time -- prior to

10  leaving the country, what was the last time you'd

11  worked on one of your cases for Northern Lights

12  Investigative Services?

13       A.    Probably a year ago, less than a year

14  ago.

15       Q.    And what was that case?

16       A.    I had several.  These were people or

17  attorneys were contacting me over work I had

18  previously done.

19       Q.    Okay.

20       A.    But was just going back over the

21  information from when I was working on them, okay?

22             But some of the cases that they

23  asked about was Carlos Sandino [phonetic], which

24  is -- it's a Guevara case, Guevara Halvorsen &

1  Company; and Oscar Flores, which is another one;

2  Juan Rodriguez, which was I think an Area Two

3  homicide case; and Seneca Smith, which was an Area

4  Five case.

5            Those investigations, like Smith was

6  like five years ago.  They were just attorneys just

7  contacting me because they're involved.

8        MR. STARR:  And, Megan, I want to say on the

9  record that I think that it's important to note for

10  the witness and for the record that if Mr. Dorsch

11  has done investigative work on cases that there is

12  a privilege that he potentially could violate if he

13  goes into any details of his investigative work,

14  and I would instruct the witness even in regards to

15  any work that he did, to refrain from even naming

16  the cases.  I know he just did a couple there, but

17  I don't know what that work is and I don't know who

18  he did that for.

19            But you know, there is -- there's a

20  privilege that he has with the attorneys that he

21  worked for, and I would recommend that he maintain

22  that privilege.

23        THE WITNESS:  I understand and agree.

24        MS. McGRATH:  So noted.

AR-L 149742

 1  BY MS. McGRATH:

 2       Q.    And this was information that was

 3  provided, so we're going to go forward with that.

 4             Now that you've -- are you intending

 5  to maintain any of this type of work, any type of

 6  this contact while you're overseas now?

 7       A.    With cases, no.

 8       Q.    Okay.  When was last time you testified

 9  regarding defendant Guevara?

10       A.    Oh, boy.  Maybe three years.  I'm not

11  even sure.

12             I know one of the last times I

13  testified it might been Jacques Rivera.  It might

14  have been.  I'm not sure, because I testified in

15  federal court.

16       Q.    You also testified in the

17  Almadovar/Negron matter in 2015?  Do you recall

18  that?

19       A.    I recall, yes.

20                 (Reporter clarification.)

21  BY MS. McGRATH:

22       Q.    So since you were relocated out of the

23  country, I was going to ask also, because when you

24  gave your -- in the podcast it came up, the

1  podcaster, for lack of a better term, referenced

2  your website.  And since it's not operational, you

3  know, since you mentioned that you're not in

4  business anymore, obviously that website has gone

5  down, there's nothing to find there.

6              But he also -- that your LinkedIn

7  also came up in the interview, and that site is

8  still up and active, but --

9       A.    But I don't -- I don't use LinkedIn.

10      Q.    Okay.  That was the next question:  Do

11  you use it?

12      A.    Yeah.

13      Q.    Do you know, and do you have any idea

14  when the last time it might have been updated?

15      A.    No idea.

16      Q.    So you yourself don't do any --

17      A.    No.  It was never of interest to me for

18  my needs.  It wasn't there.

19      Q.    Because your needs, you would get

20  business more through like word of mouth?

21      A.    I -- yes, right.

22      Q.    But it does say on the LinkedIn here,

23  and I was going to ask a couple questions about

24  what is on your LinkedIn page.  And you have a

AR-L 149744

1  copy --

2       A.    On the LinkedIn?

3       Q.    Yeah.  And we have a copy of it at --

4       MS. McGRATH:  If we could look up Exhibit 2,

5  Rachel?  Just want to blow that up a little bit.

6       THE WITNESS:  I still can't read it.

7       MS. McGRATH:  Okay.  Blow it up a little bit

8  more.

9       THE WITNESS:  I just went to an eye clinic

10  two days ago, so ...

11  BY MS. McGRATH:

12       Q.    Okay.

13       A.    I can read it now.

14       Q.    Okay.  And just about some of the job

15  titles and descriptions you have in here, it says

16  that you're currently working for Northwestern

17  University Wrongful Conviction Center.

18                  When did that relationship cease?

19       A.    When did it cease?

20       Q.    Yes.

21                  Did it cease?

22       A.    Well, I don't think they've made any

23  inquiries of me to do anything for several years.

24       Q.    Can you estimate when the last work you

 1  did with them was?

 2      A.    I was moving away from the work because

 3  I've got other interests, and so I was planning my

 4  move.  So I wasn't taking cases really from them,

 5  and actually they weren't even offering anymore.  I

 6  kind of got the opinion that -- impression that

 7  they had sort of slowed down, and I wasn't pushing

 8  for work.  I had enough.

 9      Q.    And you said you were moving on to

10  other interests?

11      A.    Yeah.  I was getting -- planning to

12  leave for several years.

13      Q.    Okay.  And when it says, other

14  Innocence Projects throughout the United States.

15      A.    Well, I had worked for several other

16  innocence projects on exonerations, yes.

17      Q.    And one of those is on your site, it's

18  the Chicago Innocence Project?

19      A.    If it's there, it's there.  I don't

20  know.  But I had a --

21      Q.    Well, that's what --

22      A.    I did --

23      Q.    What do you recall about working with

24  them?

AR-L 149746

1      A.    I don't recall.  I don't recall.  But I

2  know there was something or a couple things, but I

3  don't remember who it was.  I think some people

4  from Loevy are involved with that, I think I'm not

5  sure.

6      MR. STARR:  Can we let the witness finish

7  answering before you ask the second question.  He

8  was in the middle of an answer.

9  BY MS. McGRATH:

10      Q.    Regarding the Chicago Innocence

11  Project, you said that you think that some

12  attorneys from Loevy & Loevy are involved with the

13  innocence project?

14      A.    I mean, I never met with them at

15  Chicago Innocence Project.  If I had, I don't have

16  a recall.  I couldn't tell you what case or cases

17  there were, but they -- it was something I did and

18  I can't remember.

19      Q.    The other innocence projects throughout

20  the United States, you talked -- I can see from

21  your previous testimony that you had worked in

22  Wisconsin on the Wisconsin Innocence Project?

23      A.    I did.

24      Q.    And when was the last time you had any

AR-L 149747

 1  contact with Wisconsin?

 2       A.    I only worked the one case.  That would

 3  have been Evan Zimmerman.

 4       Q.    What other innocence projects

 5  throughout the United States?

 6       A.    There was something I did for New York.

 7  I don't know which part of New York it was.  It was

 8  years ago.  Washington, somebody in Indiana.  But

 9  those were all years ago.  I don't have any

10  recollection.

11       Q.    Washington state or Washington DC?

12       A.    State.

13             And I may be wrong about that.  I

14  just remember it was out west.  It might have been

15  Oregon or -- I can't be certain.

16       Q.    What do you recall doing for New York

17  innocence -- whatever New York --

18       A.    I don't recall. I don't recall

19  anymore.  It was minimal.

20       Q.    Do you have any recollection about the

21  work in either of these three states?

22       MR. STARR:  Again, I would instruct the

23  witness not to invade any work product privilege or

24  attorney privilege.

AR-L 149748

1 | BY MS. McGRATH:

2 |     Q.    What you can describe.

3 |     A.    I can't describe anything.

4 |     MS. GOLDEN:  Sean, are you representing him?

5 |     MR. STARR:  No.

6 |               Did you call me John?  My name is

7 | Sean.

8 |     MS. GOLDEN:  I think there's some audio

9 | problem.

10 |     MR. STARR:  Okay.  I thought you knew my

11 | name, Carrie, yes.  And no, I'm not representing

12 | him.

13 |     MS. GOLDEN:  I think I do.

14 |               I'm not sure you should be

15 | instructing him not to answer any questions, but I

16 | get your point.  I just wanted to know if you're

17 | representing him is all.

18 |     MR. STARR:  And I did instruct him.  I think

19 | it's fair to remind him that there's a privilege

20 | that attaches to some of the work that he did and

21 | that he doesn't want to invade that privilege.

22 |     MS. GOLDEN:  That's fair.  I just wanted to

23 | know if you represented him, and you have reminded

24 | him, so we'll just see what happens.

AR-L 149749

 1          MR. STARR:  We shall.

 2    BY MS. McGRATH:

 3          Q.    And again, obviously, Mr. Dorsch, we're

 4    not -- we're asking for basic information.  Not

 5    anything that would invade any of the conversations

 6    you may have had with attorneys you were working

 7    with.

 8                    When you said -- it said on your

 9    LinkedIn profile that you had been retained by the

10    University of Wisconsin law school, was that in an

11    instructor capacity or in some sort

12    of investigation --

13          A.    I was an instructor in Wisconsin.  I

14    was an instructor for police recruits.  But you're

15    referring only to the Zimmerman case.  That's the

16    only thing I did for the innocence project in

17    Wisconsin.

18          Q.    And that's connected to the law school?

19          A.    I brought the Zimmerman case to the law

20    school, and in conjunction with them worked the

21    case.

22          Q.    Okay.  It says you were retained by the

23    University of Wisconsin law school.

24                    Did you receive payment from

AR-L 149750

 1  Wisconsin law school?

 2       A.    No.

 3       Q.    And was the Zimmerman project the only

 4  project you worked on with the University of

 5  Wisconsin law school?

 6       A.    Yes.

 7       Q.    The New York University law school, it

 8  says you were also retained by the New York

 9  University law school.

10            What sort of work were you retained

11  to do for the New York University Law School?

12       A.    The best I remember, it was a homicide

13  case that they were doing from either Indiana or

14  Ohio.  I don't recall anymore.

15       Q.    You don't remember approximately when

16  that was?

17       A.    Seven years ago.

18       Q.    And what sort of -- without giving

19  detail, if you can without giving too much detail,

20  do you recall what sort of work it was you were

21  doing for them?

22       A.    It would have been case review.

23       Q.    At one point it says you were retained

24  by the Illinois State Appellate Defender's Office?

AR-L 149751

1       A.      I have been on several occasions.

2       Q.      When was the last time, if you recall?

3       A.      Six years ago maybe.

4       Q.      And what sort of work were you retained

5  to do by them?

6       A.      Again, homicide cases that were under

7  review.

8       Q.      Do you recall any of the details of

9  what sort of actual work you were -- not

10 necessarily facts of investigation but what sort of

11 work you were doing?  Was it witness -- locating

12 witnesses or work like that?

13      A.      Yes.  General investigative work that

14 involved reviewing the case, finding witnesses, and

15 so forth.

16      Q.      Was that similar to what you were doing

17 for the Cook County Public Defender's Office, or

18 was there something different with the Cook County

19 Public Defender's Office?

20      A.      No.  I had been retained by Cook County

21 Public Defender's Office also.

22      Q.      And for the same type of work?

23      A.      Yes.

24      Q.      Was it the same type of work you were

AR-L 149752

 1  retained to do for other well-known criminal

 2  defense attorneys?

 3      A.   Yes.

 4      Q.   Who were some of those well-known

 5  criminal defense attorneys?

 6      A.   Let's see.  I went through a whole host

 7  of them.  I'm trying to forget a lot of them now.

 8               Jennifer Bonjean.

 9      Q.   Okay.

10      A.   Many of the people from Northwestern.

11  I'm trying to think.  It's been a while.  Like I

12  say, I put it aside actually several years ago,

13  (audio interruption) myself from it.

14               (Reporter clarification.)

15      THE WITNESS:  Meaning that I wasn't really

16  pursuing any cases anymore.

17  BY MS. McGRATH:

18      Q.   I'm sorry.  I didn't -- I didn't catch

19  that.  You weren't --

20      A.   I wasn't pursuing cases.

21      Q.   You weren't pursuing, okay.

22               Do you recall -- can you give a

23  number of how many cases you worked on with

24  Ms. Bonjean?

AR-L 149753

1      A.    How many cases I've worked on since

2  when?

3      Q.    With Ms. Bonjean just total.

4      A.    I --

5      Q.    If you can estimate.

6      A.    Estimation, six, seven.

7      Q.    And looking at the -- it says below

8  that, listed among your cases of the following.

9            Was Ms. Bonjean the attorney you

10 worked with on the Stanley Wrice matter?

11     MR. STARR:  You know, again, I think that

12 those questions about what cases he worked on for

13 which attorneys is potentially work product

14 privilege.

15     MS. ROSEN:  How would you know that, Sean?

16 He should know that.

17     MR. STARR:  He's not an attorney, Eileen.

18 That's why I'm making the objection.

19     MS. McGRATH:  Sean, to clarify, I'm looking

20 at the public record on Mr. Dorsch's LinkedIn page.

21            And on one line, he has that he

22 worked with well-known attorneys; I asked who.

23            On another line, it says one of the

24 cases he worked on was Stanley Wrice; so I asked

1  the connection of -- is that one.  And that's it.

2  That was the only question that was asked.

3       MR. STARR:  I have --

4       MS. McGRATH:  That's all I'm going to ask.

5       MR. STARR:  I have no idea what you're

6  looking at.  It's not on the screen.  I don't see

7  it on the screen.

8       MS. McGRATH:  If it rolls up, we need to go

9  back up to the very top.

10      MR. STARR:  My point is is that he has worked

11  on investigations with attorneys and his work

12  product with those attorneys, including I believe

13  the names of the cases in some situations, are

14  privileged.

15           So I don't know what cases he worked

16  on with Ms. Bonjean, but she's not here to

17  represent her privilege.  And so, you know, I'm

18  again reminding the witness that he shouldn't be

19  invading the work product privilege.

20      MS. ROSEN:  Well, his LinkedIn page lists the

21  cases.  They are on the screen now.  He has listed

22  the cases.

23           So a question about, is that the

24  attorney you worked with on a particular case, is

AR-L 149755

1  fair game.

2       MR. STARR:  That's your opinion, Eileen.  I

3  don't see the -- on the LinkedIn page, I don't see

4  it saying that he worked with Jenny Bonjean on a

5  particular case.

6              And so I'm just -- all I'm doing is

7  objecting potentially under work product privilege

8  and reminding the witness that he has a privilege

9  that he needs to think seriously about maintaining.

10      MS. ROSEN:  Can you explain to me what the

11 work product privilege is as it relates to he has a

12 listing on a public website that says he worked on

13 a case named Stanley Wrice.  And what is the --

14 what is the work product implicated by the question

15 of, Is that a case you worked on for Ms. Bonjean?

16      MR. STARR:  I don't know because it's not my

17 case, so I don't know exactly what the work product

18 privilege is.  I'm just reminding him that he

19 potentially has a privilege that he should not

20 invade.

21      MS. ROSEN:  Well, I'm going to object to you

22 advising him in this way, but we can move forward.

23 We all know that Jennifer Bonjean had the Stanley

24 Wrice case, so we can move on.

1  BY MS. McGRATH:

2       Q.    And just to clarify, you mentioned a

3  moment ago that you have not updated this

4  information on this page in a number of years.

5       A.    Correct.

6       Q.    I just want to make sure I'm clear on

7  that.

8             It lists here, it says that you have

9  a few -- some of the -- among the cases listed,

10 just to -- Evan Zimmerman was the case that you

11 worked in in Wisconsin, correct?

12      A.    Yes.

13      Q.    You mentioned before, okay.

14            Obviously we know Wrice and Rivera

15 were here.

16            Terrence Ligon, where did that case

17 take place?

18      A.    That was -- I was retained by Cook

19 County Public Defender's Office in that case and

20 paid by them.

21      Q.    Did you work with any other -- did you

22 work with any attorneys?  Other attorneys on the

23 case outside of the State's Attorney's office?  Any

24 private attorneys?

AR-L 149757

 1        A.    There was Steve Greenberg was the

 2   attorney on that case and another one, but I don't

 3   remember.

 4        Q.    Was it Mike Walsh?

 5        A.    Yes.

 6        Q.    Prior to the Terrence Ligon matter, had

 7   you worked with Steve Greenberg on any other cases?

 8        A.    Prior to that?

 9        Q.    Yes.

10        A.    I don't believe so.

11        Q.    Was Steve Greenberg an attorney you

12   regularly worked with?

13        A.    No.

14        Q.    I'm not sure if I'm pronouncing this --

15   Brian Dugan?  Is it Doo-gan or Dug-in?

16        A.    Doo-gan.

17        Q.    Where did that case take place?

18        A.    I believe it was a Kane County case.

19        Q.    And did you work with attorneys on

20   Mr. Dugan's side or -- or actually, was that a

21   criminal case?

22        A.    Yeah, it was a very well-known murder

23   of a young girl many years ago.  It was after

24   sentencing.  They'd already been in prison for

AR-L 149758

 1  years.

 2        Q.    Mr. Dugan had?

 3        A.    Yes, him and another person.  I don't

 4  remember the name.

 5        Q.    And you're involvement in that case,

 6  was that involving -- I'm sorry -- you said that

 7  was a post -- you did post-conviction work on that

 8  case?  Is that --

 9        A.    Yes.

10        Q.    -- what you -- okay.

11              Troy Kindt, what was that case?

12        A.    Yes.  That was another one, I don't

13  know if it was Kane County or what's the other

14  county next to us?  DuPage?  I don't know if it was

15  DuPage.  I think it was DuPage County.

16        Q.    And what work -- what did you do on

17  that case?

18        A.    It was a homicide investigation.  He

19  was going to trial for -- accused of a murder.

20        Q.    I'm sorry.  I didn't catch that end.

21        A.    He was accused of a murder that

22  happened in DuPage County, and he was found not

23  guilty at trial.

24        Q.    Jason Patterson?

 1        A.    I don't recall.

 2        Q.    We know these other two.

 3              Scott Isaacson, where did that case

 4  take place?

 5        A.    That's a Wisconsin case but nothing to

 6  do with the innocence projects.

 7        Q.    What type of case was it?

 8        A.    He was accused of being involved in the

 9  death of his wife.

10        Q.    Approximately when did that case happen

11  if you recall?

12        A.    Probably around 1999, 2000.

13        Q.    And you say he was accused of murdering

14  his wife, so --

15        A.    Well, no.

16        Q.    Or what was that?

17        A.    Again, I don't know.  I think he was

18  found not guilty in that case.  I don't recall.  He

19  wasn't accused of murder.  It was -- she died, but

20  he was not accused of murder.

21        Q.    So like a questionable death type

22  matter, or -- is that a good way to describe it?

23        MR. STARR:  Objection --

24        THE WITNESS:  A drug overdose.

AR-L 149760

1  BY MS. McGRATH:

2        Q.    Got you.

3              Fedell Caffey, where did that case

4  take place?

5        A.    The appellate defender's office.

6        Q.    Illinois?

7        A.    Yes.

8        Q.    And what sort of obviously

9  non-privileged information do you recall about that

10 case?

11       A.    He was in prison for accused of murder

12 and cutting the pregnant -- the baby out of a

13 pregnant woman's womb and other people were

14 involved.

15       Q.    Where in Illinois did that take place?

16       A.    I think that might have been DuPage

17 also, but I'm not sure.

18       Q.    And Steven Susnika, where did that case

19 take place?

20       A.    That was Aurora.  It was out of Aurora,

21 so I guess that's DuPage?

22       Q.    I don't know.

23       A.    He was involved -- it was gang related

24 mass arrest of gang members.

1        MS. McGRATH:  If we could scroll down to the

2   Northwestern section.  Yeah, right here.  Thank you.

3   BY MS. McGRATH:

4        Q.    And it kind of got cut off

5   unfortunately, but it's just a problem with the way

6   the website is -- printing the website was the

7   problem.

8               Can you think of any cases that we

9   haven't -- and by cases, I just mean names, that we

10  haven't already mentioned on your web on this page

11  previously that you were involved in with the

12  Center For Wrongful Convictions?

13       MR. STARR:  Again, it's potentially

14  privileged work product information for him to

15  reveal the names he worked on, and they're not here

16  to represent that privilege.

17               I will remind the witness that he

18  should not invade any work product privilege.

19       MS. GOLDEN:  Sean, that's the fourth time

20  you've reminded him.  And only he knows, not you,

21  as you've just stated whether or not these things

22  have already been made public in some other format.

23               So I get your point, but I don't

24  think you need to constantly remind him, because

AR-L 149762

 1  you don't have the information upon which to know

 2  whether or not it's been disclosed in some other

 3  context.

 4         MR. STARR:  Carrie, and I don't know if he

 5  has that information either.  If he worked on a

 6  case that has not been made public, how does he

 7  necessarily know one way or the other?

 8         MS. GOLDEN:  But he might actually know, so I

 9  don't --

10         MR. STARR:  And he might not know.  And so --

11  and he's not an attorney, I don't believe, and so

12  it's important -- because Northwestern and other

13  attorneys he worked for are not present for this

14  deposition, it's important to remind him that work

15  he's done on cases, including potentially name of

16  cases, is potentially privileged work product

17  information that he should not be disclosing.

18         MS. ROSEN:  And you have reminded him

19  repeatedly.  This is a person who has been doing

20  this work for 20 years, and I think he has a

21  general understanding of what work product

22  privilege is and what cases he's worked on and what

23  cases have become public.

24                    And you have reminded him over and

 1  over again.  It is -- we have not even been at this

 2  for an hour, and you've reminded him four times.  I

 3  think he understands it.

 4        MS. SUSLER:  I'm just going to insert here

 5  that the defense has expressed some concern about

 6  the amount of time this deposition may run.  There

 7  have now been three different lawyers in the

 8  defense countering Mr. Starr's objections.

 9              I think we can be a little more

10  efficient and have maybe one of the defense counsel

11  being the one responsible for chiming in, and let's

12  move on, because as you said, you're concerned

13  about time.

14        MS. GOLDEN:  So you can -- okay, so you are

15  going to chime in for Sean, but I can't chime in

16  because Eileen spoke?  That's unprecedented.

17        MR. STARR:  I think that's a bizarre

18  characterization and overuse of the word

19  unprecedented.

20              But I don't need Ms. Susler to chime

21  in.  But her point is is that there's three

22  different attorneys arguing with me about my

23  objection and my reminding the witness of work

24  product privilege.

1            You know, you made a bunch of

2   statements, Ms. Rosen, about what you think

3   Mr. Dorsch knows and what he doesn't know.  Maybe

4   you know better than I do.

5            But I don't know what he knows and

6   what he doesn't know, and I'm instructing him to

7   not invade any work product privilege, and I will

8   continue to do so when I think it's prudent.

9        MS. McGRATH:  Are you through?

10       MR. STARR:  Yeah.  I'm done talking for right

11  now if that's what your question is, yeah.

12       MS. McGRATH:  That's my question, yes.  Thank

13  you.

14       MR. STARR:  I mean, I stopped talking.

15       MS. McGRATH:  I don't want to step over

16  anybody.

17  BY MS. McGRATH:

18       Q.    Mr. Dorsch, do you recall a matter

19  involving Jason Strong that you may have worked on

20  with the -- maybe with Northwestern?

21       A.    I do.  I remember -- I remember the

22  name.

23       Q.    Okay.  And that was a matter involving

24  work you did regarding -- I believe it was a

1  witness with some of the Northwestern students?  Do

2  you recall that?

3       A.    I'm not going to answer any questions

4  relating to Jason Strong's case.

5       Q.    Okay.  You're not going to answer any

6  questions relating to the work you did on the Jason

7  Strong case?

8       A.    Correct.

9       Q.    Mr. Strong, though, he was exonerated,

10 correct?

11      A.    I'm not going to answer any questions

12 about it.

13      Q.    Okay.  Let's talk -- I guess I'm

14 curious because I would think Mr. -- you know,

15 because one of the -- the Strong matter was listed,

16 and there was a -- it was an exoneration, so I'm

17 kind of curious why the reluctance to talk about it.

18      A.    It was a very long time ago.  I

19 wouldn't want to make a mistake, and therefore I'm

20 not going to answer any questions.

21      Q.    And that was back in like 2013

22 approximately?  That far back?

23      A.    I don't recall.

24      Q.    And you don't recall that there was any

1  kind of complaint about the work that was done in

2  that case?

3         A.    No, I don't recall.

4         Q.    You don't recall, okay.

5               And I want to make sure I understand

6  like kind of time line questions, because there's

7  been -- you mentioned it's kind of hard to --

8  sometimes you don't recall things.

9               You retired from the police

10  department in 1994; is that correct?

11         A.    Yes.

12         Q.    How many years total did you work with

13  CPD if you recall?

14         A.    I came on in 1970, so 24 years.

15         Q.    And just do like -- can you just do a

16  brief history of your career with CPD?  Which --

17  like assignments?

18         A.    You want -- you're asking me for me to

19  give the history of my career?

20         Q.    Yeah, well, just your assignments.

21         A.    Okay.  Academy graduate in 1971;

22  assigned to the 20th District, worked tactical

23  unit; was brought over to the 19th District to work

24  over there; then I was brought over to the 13th

AR-L 149767

1  District to work over there; then I went to gang

2  crimes; and back to the 20th District; and then a

3  detective in 1987; and retired in '94.

4        Q.    And when you retired in '94, did you --

5  like you've given -- you mentioned earlier that

6  there's been different testimony in this case that

7  you've given in other cases.

8              When you retired in 1994, did you

9  stay in Chicago, or did you leave town?

10       A.    I moved to Wisconsin.

11       Q.    And whereabouts in Wisconsin?

12       A.    In the Hayward, Wisconsin, area, which

13 is Sawyer County.

14       Q.    And when you moved -- when you moved up

15 there, did you do police work up there, or were you

16 retired?

17       A.    I retired.  I built my own home and

18 then became bored and volunteered to work

19 occasionally with the sheriff's office.

20       Q.    How much time do you think like -- when

21 you said you got bored, like can you give us an

22 estimation of like when it is that you started

23 working with the Sawyer County Sheriff's Office?

24       A.    When?

AR-L 149768

1      Q.    Yeah, if you just --

2      A.    That's the question?

3      Q.    Yeah.

4      A.    Maybe 1997.

5      Q.    Okay.  And you said you worked for them

6  part-time?

7      A.    Oh, yeah.  It was on a need-be basis.

8  If they needed somebody, they would call me.  But

9  very little.  I worked very little, it wasn't for

10  me, and I left.

11     Q.    You said you worked very little, but

12  you -- like while you were there, you did a murder

13  investigation, right?

14     A.    Yes, I did.

15     Q.    And it was because like all the other

16  detectives were on vacation so they needed help?

17     A.    Yes.

18     Q.    But they didn't really appreciate the

19  work you did on that, did they?

20     A.    Who's "they"?

21     Q.    The police department, the Sawyer.

22     MR. STARR:  Form, foundation objection.

23     THE WITNESS:  They didn't appreciate it?

24

 1  BY MS. McGRATH:

 2       Q.    Well, wasn't the -- the police chief

 3  was kind of pissed off that you came in and took

 4  over, right?

 5       MR. STARR:  Form, foundation.

 6       THE WITNESS:  Okay.  You want me to answer?

 7  BY MS. McGRATH:

 8       Q.    Yeah.

 9       A.    He was on vacation at the time in

10  homicide.

11       Q.    But you came in -- so you came in and

12  took it over.

13       A.    I was asked to come in.

14       Q.    But then you -- and you mentioned a

15  minute ago that you quit working for them.

16       A.    Yes.

17       Q.    Who was -- in Sawyer County in the

18  sheriff's office, who is Gary Gillis?

19       A.    Who?

20       Q.    Gary Gillis?

21       A.    Oh, "Gillard"?  He was sort of an

22  inside policeman who was afraid to go outside.

23       Q.    You mean like he was the guy that

24  worked the desk or ...

AR-L 149770

1      A.    Yeah.  Not that I have anything against

2  that.  It's a need.

3      Q.    He was -- well, he was -- so he was

4  pretty lazy.  He stayed in.

5      A.    I don't know.  I only probably worked

6  there maybe 10, 11 shifts in my entire time of

7  involvement.

8      Q.    10, 11 total shifts in Sawyer?

9      A.    Yeah.  I wasn't too enthused about it.

10 Kind of boring.

11     Q.    Other than working for the sheriff's

12 office in Sawyer County, was there anything else

13 you did?

14     A.    Well, as -- I had to get certified to

15 work for Sawyer County.  They sent me to take

16 classes in Eau Claire with the State of Wisconsin.

17 And when I got done, they offered me a job teaching

18 the classes.

19     Q.    And where -- where were you teaching

20 the classes?

21     A.    Mostly through Rice Lake, Wisconsin,

22 and other areas where needed.

23     Q.    Was Rice Lake a city or a town?

24     A.    City.

AR-L 149771

1          Q.    And again, is this in Sawyer County?

2          A.    No, that's not in Sawyer County, but it

3   was through the University of Wisconsin at the

4   facility where we did the teaching.

5          Q.    And did you start -- you started

6   your -- the Northern Lights Investigative Services

7   up in Wisconsin, correct?

8          A.    Right.

9          Q.    And was that in about 1996?

10         A.    Yes.  Well, it was after I left the

11  police -- decided that police work wasn't for me.

12         Q.    Got you.

13               And you eventually though came back

14  to Chicago in about 2003; is that accurate?

15         A.    Probably.

16         Q.    So when you -- when did you start

17  working for IFPC worldwide?

18         A.    Shortly after I came back, I was

19  contacted by my old homicide boss Jim Fruin, who

20  asked me if I would come and work for him at his

21  investigative company.

22         MS. ROSEN:  I'm sorry.  What was the name you

23  said?  I didn't hear it.

24         THE WITNESS:  It's IFPC.

AR-L 149772

 1        MS. ROSEN:  Did you name your old boss?  I

 2 thought you said a name, but maybe I just misheard.

 3        THE WITNESS:  Jim Fruin, F-r-u-i-n.

 4        MS. ROSEN:  Thank you.

 5 BY MS. McGRATH:

 6        Q.   And you worked there as a private

 7 detective, right, IFPC?

 8        A.   Yes.

 9        Q.   Would that have been in June of 1998?

10        A.   (No audible response.)

11             I answered that.  Is there another

12 question?

13        Q.   Well, I asked:  Would that have been in

14 June of 1998?  I didn't hear --

15        A.   I said yes.

16        Q.   So you were still though in Wisconsin

17 when you took that position?

18        A.   I had come back to help my son set up

19 his new apartment as he was starting the police

20 academy, and -- when they contacted me and asked me

21 if I wanted to work for Jim, when he contacted me.

22        Q.   So were you maintaining a home in both

23 places --

24        A.   Yes.

AR-L 149773

 1       Q.    -- from 98 to 2003?

 2       A.    Yes.

 3       Q.    And what sort of work did you do with

 4  IFPC?

 5       A.    Mostly criminal.  Some surveillance.

 6       Q.    And was that -- I mean, the title was

 7  Worldwide, but was the work you were doing mostly

 8  in the Chicago area, or how would you describe it?

 9       A.    Well, he does work outside of the

10  country, but what I was doing was all local.

11       Q.    Now, had you -- oh, that was weird

12  feedback.

13             Was the work you did with IFPC how

14  you got connected with the BGA, or was that

15  separate?

16       A.    That was separate.

17       Q.    How did you get connected with the BGA?

18       A.    They reached out to me.

19       Q.    Do you recall approximately when that

20  was?

21       A.    It was about the same time I came back

22  to Chicago.

23       Q.    So '98 approximately or --

24       A.    No, I think that was '03.  Wait, no,

AR-L 149774

 1  excuse me.  That was before, yeah.  It was in '98,

 2  '98.

 3       Q.    And you said that -- I think I read

 4  somewhere previously that the BGA reached out to

 5  you regarding Palatine's investigation of the

 6  Brown's Chicken shooting?

 7       A.    That's correct.

 8       Q.    And was that like something solo you

 9  did on your own, an investigation of that, or were

10  you working with people?

11       A.    No, there was no investigation by

12  myself.  I was only asked to meet with them.

13       Q.    You were only asked to what?  I'm sorry?

14       A.    They asked me if I'd be willing to meet

15  with them because the Better Government Association

16  had done their own investigation, and they wanted

17  to ask me questions.

18       Q.    Had you done any work with the BGA

19  prior to that?

20       A.    No.

21       Q.    Did you do anything else with the BGA

22  after Palatine?

23       A.    No.

24             No, I take that -- I'll take that

1  back, because they became involved in the Gacy

2  investigation.

3       Q.    That was my next question, okay.

4             And you were working with IFPC when

5  you were doing a lot of your work on the Gacy

6  investigation; is that correct?

7       A.    Yes.  That's what the -- with the

8  approval of Jim Fruin and company.

9       Q.    Right.

10            Because that looked pretty good for

11  your company -- his company, right, if you guys

12  were able to get --

13      A.    He thought so.  He bought jackets and

14  everything with his name on them.

15      Q.    Jackets from the company?

16      A.    Yeah.

17      Q.    How long were you at IFPC?

18      A.    I left I think in January of the

19  following year.

20      Q.    '99?

21      A.    Yes.

22      Q.    And did that have anything to do

23  with -- I don't know how to phrase this -- but

24  anything to do with sort of disappointment in the

AR-L 149776

1  way the work on the Gacy investigation was being

2  received?

3      A.    After personally being threatened

4  numerous times by ranking members of the Chicago

5  Police Department making threats to me, making

6  threats against my two sons, telling me that I have

7  two sons on the job, one is in the academy, and he

8  can be gone today, and the other one who's only

9  been on a couple years, we'll put a brick on him

10  and he'll never go anywhere, that was part of it.

11      Q.    And this was all about the work you

12  were doing on Gacy.

13      A.    Yes.

14      Q.    Who were those supervisors?

15      A.    Well, it all came back to Jim Fruin,

16  because he was having meetings with the City of

17  Chicago State's Attorney Office and the police

18  department, they were all meeting.  I was not

19  involved in the meetings.

20      Q.    So how were you getting this

21  information?

22      A.    Through Jim Fruin and Rocky Rinaldi,

23  who had been a sergeant working for Jim Fruin who

24  also was working for IFPC.

AR-L 149777

 1        Q.    And did they -- who did they say made

 2   these threats against you and your son?

 3        A.    Yeah, I remember vividly.  Mr. Radke,

 4   who was a deputy chief I believe at the time, who

 5   had also been Mayor Daley's -- on Mayor Daley's

 6   bodyguard detail before he got all these

 7   promotions.

 8              Usually it was -- I was told by

 9   Fruin that it would be Radke that called, and it

10   was all about saying that the police department did

11   not want to find any more bodies.  The City of

12   Chicago had enough bodies, and we didn't want

13   anymore.  So the threats were evident.

14        Q.    And these were again threats that your

15   supervisor at IFP was -- I'm sorry -- at IFPC were

16   relating that he had received from this Radke

17   gentleman?

18        A.    Well, he was the instigator.  He wanted

19   me to do it with Gacy.  All I had was suspicion

20   about something that happened.  Then he took it to

21   the police department.  But then when he told

22   Fruin --

23        Q.    Who took it?  Fruin?

24        A.    And then when he was told -- when he

AR-L 149778

1  was told that people in the City of Chicago

2  government did not want more bodies, he backed away

3  per their request, and I was left hanging.  That's

4  how your city works.

5        Q.    You were left hanging at --

6        A.    Meaning that Fruin --

7        Q.    -- your job at IFPC?

8        A.    Yeah.  Hanging, that Fruin who

9  instigated everything and wanted me to do it, gave

10 me the time to do it, and made -- he was the one

11 that made the meetings with the City of Chicago and

12 gave the information.  And only when he was told

13 that they didn't want to find more bodies, then he

14 backed away, and I was left to hold the bag for

15 everything.

16       Q.    When you say "hold the bag for

17 everything," what --

18       A.    Meaning that they were saying it was no

19 truth to the location or the evidence that I had.

20 Basically saying that it was a waste of time, and

21 it was because of me that it was done.

22       Q.    And was that information that was

23 being -- like who was saying that?

24       A.    It was all kinds of newspaper articles,

AR-L 149779

1  dear.  I got them all --

2       Q.    Well, I'm familiar with that as well,

3  but I'm just asking you who.  Who did you recall

4  saying that --

5       A.    Who was --

6       Q.    -- at CPD?

7       A.    -- telling me this?

8       Q.    Yes.  Like who -- not just who was

9  telling you.  Who was -- again I just want to make

10 sure I'm clear on this.

11            Your testimony earlier was that you

12 were getting this information from Jim Fruin, and

13 he was attributing everything to Radke --

14      A.    Radke.

15      Q.    -- at CPD.

16      A.    Right.

17      Q.    Was there anyone else at CPD that

18 things were being attributed to that you heard?

19      A.    Well, I heard from Jim Fruin's wife who

20 called me, told me to beware.

21      Q.    Okay.  Jim Fruin's -- does she work for

22 CPD?

23      A.    No.  She was just his wife.  She called

24 me after Jim Fruin told her to call me, because he

AR-L 149780

1  had just left a meeting with the State's Attorney

2  Office, the Chicago Police Department, and the Cook

3  County Sheriff's, and to warn me that things were

4  not going to go well; that Jim Fruin and company

5  were not going to be mentioned anymore in this

6  investigation, and it was going to be hung on me.

7        Q.    And this was -- again, this was a

8  meeting that Jim Fruin described to you.

9        A.    No.  She called me from the --

10       Q.    Oh, his wife --

11       A.    -- and told me about the meeting, yeah.

12 There were many meetings that hay had.

13       Q.    Right.  Do you recall giving an

14 interview in approximately 2011 to a gentleman

15 named Chris Maloney who was doing some research

16 about the Gacy matter?

17       A.    Chris Maloney came to my house.  He was

18 a young man who was going through school and wanted

19 to talk to me about Gacy.  It was a project he was

20 working on.

21       Q.    And did that project ever get published?

22       A.    Yeah.  He got it published a couple

23 years later I think through the Huffington Post.

24       Q.    And he also had his own -- did he also

1  have his own website called Shadow Report?

2       A.    I recall that he did.

3       Q.    And he had -- he reported the

4  information that you were just telling us about,

5  Fruin and the meeting, in that article that -- and

6  again, because I've read the research.  I just want

7  to make sure I'm clear.

8                 You weren't at that meeting.  This

9  was Fruin telling you the results of those meetings.

10      A.    Which meeting are we talking about?

11      Q.    We're talking about the meeting with

12  CPD and Radke and some other supervisors, but you

13  weren't --

14      A.    I can't -- I can't be specific to the

15  meetings.  There were numerous meetings they had.

16      Q.    Were you in any of the meetings?

17      A.    I had two meetings that were arranged

18  through Jim Fruin and with the Chicago Police

19  Department and the State's Attorney Office.  They

20  wanted me to come to Area Five to talk to them

21  there.

22                 And I said, I won't go there because

23  I'm retired, and if I go there, people are going to

24  start asking why.  And I suggested we have the

AR-L 149782

1  meetings at Jim Fruin's offices, and that's what we

2  did.

3       Q.    So you personally had two meetings with

4  people from CPD?

5       A.    Yes.

6       Q.    Do you recall who was there?

7       A.    Two detectives Dickinson and

8  Rutherford.  Sergeant -- he's deceased now.  Oh,

9  god, I can't -- the commander of Area Five at the

10 time after I had retired.  Or not retired -- it

11 wasn't him, the commander.  It was whoever was in

12 charge of violent crimes.

13             Cappitelli was the sergeant.  IFPC

14 was there -- well, no, that's not true.  The first

15 meeting, they detained the Better Government

16 Association downstairs, so they were not able to be

17 present at the meeting.  They did not want them to

18 be witness to what was said at the meeting.

19      Q.    Who did not want them?

20      A.    The City of Chicago.

21      Q.    Who from the City made that decision?

22      A.    I don't know.  They had their meetings.

23      MR. STARR:  Objection, foundation.

24

1  BY MS. McGRATH:

2        Q.    But the meeting you recall that you

3  were present at at the -- I'm sorry.  Was it at the

4  BGA, or was it at the --

5        A.    It was IFPC offices.  The first meeting

6  was there, and it was supposed to be Better

7  Government Association, myself, Jim Fruin and

8  company, because they were most enthusiastically

9  involved, and Area Five.  And there was no state's

10  attorneys at the time, and the meeting was

11  basically run by Sergeant Cappitelli.

12                And the first question out of his

13  mouth was, Bill, are you going to name people in

14  the police department?  And what is the agenda of

15  the Better Government Association?

16        Q.    That's what Cappitelli said to you at

17  that meeting?

18        A.    Yes.

19        Q.    And you mentioned -- you also said that

20  Detectives Rutherford and Dickinson were there?

21        A.    Correct.

22        Q.    Did they say anything?

23        A.    No.  They told me they were told not to

24  talk to me.

1        Q.    When did they tell you that?

2        A.    Before the meeting.

3        Q.    Before the meeting?

4        A.    Uh-hmm.

5        Q.    Which one of them told you that?

6        A.    I don't recall.

7        Q.    Did they tell you -- did they tell you

8   why?

9        A.    They said they didn't know what was

10  going on, but that's what they were told.

11       Q.    And did they say who told them that?

12       A.    No.

13       Q.    Other than Dickinson, Rutherford, and

14  Cappitelli, do you remember any other police

15  officer -- anyone from CPD being at that meeting?

16       A.    I think there was a Barganski?  I think

17  he might have been the lieutenant that was there.

18  There were no state's attorney there for that

19  meeting.  Nobody from the sheriff's department

20  there for that meeting.  Only Chicago police.

21             And I think the commander -- no, the

22  commander from Area Five wasn't.

23       Q.    Not there.

24       A.    I don't think so.

AR-L 149785

1        Q.    And you mentioned a moment ago that

2   there was a second meeting?

3        A.    Yes.  Scheduled a second meeting and

4   then it was canceled, and then it was rescheduled.

5        Q.    And were these same officers -- first

6   of all, did that same meeting -- did that meeting

7   take place at the same place?

8        A.    Yes.

9        Q.    And were the same officers present?

10       A.    Yes.  And then there was Anna

11  Demacopoulos, who was the state's attorney.  She

12  ran the meeting when she was there.

13       Q.    CPD wise, you said it was Dickinson,

14  Rutherford, and Sergeant Cappitelli again?

15       A.    Uh-hmm.

16       Q.    Did they say anything?

17       A.    And Barganski was there also.

18       Q.    Barganski?  Can you spell that name?

19       A.    I believe it was B-a-r-g-a-n-s-k-i.

20       Q.    Did any of these officers say anything

21  to you at that meeting?

22       A.    That was Anna Demacopoulos.  She ran it.

23       Q.    Did you have any further meetings with

24  CPD regarding the Gacy matter after this second

AR-L 149786

1  meeting?

2       A.    No, I didn't.

3       Q.    And just time line wise, was this I

4  think late in 1998 would you estimate?

5       A.    It was in '98.  I believe that's when

6  the reported search was.

7       Q.    The what?  I'm sorry?

8       A.    The reported search of the Miami

9  addresses in October or November of '98.

10      THE WITNESS:  Could you get me a glass of

11  water, hon.

12                   (Brief interruption.)

13      MS. McGRATH:  Mr. Dorsch, you want to take a

14  five-minute break so you can have some water?

15      THE WITNESS:  Okay, fine, thank you.

16      MS. McGRATH:  Let's do that.

17      THE WITNESS:  I'll stay connected while we

18  take a break.

19      MS. McGRATH:  You can mute yourself though.

20                   (Brief recess.)

21  BY MS. McGRATH:

22      Q.    Mr. Dorsch, we're going back to the

23  meeting you had while you were working with IFPC

24  with people from the police department.

1              That was involving some of the work

2    you had been doing with IFPC about John Wayne Gacy,

3    correct?

4         A.    Yes.

5         Q.    And just -- you know, I think I watched

6    the documentary the other day, so I'm thinking

7    about it.  But maybe just to be clear for people

8    who haven't seen the documentary yet, this was

9    about the property at Miami and Elston?

10        A.    That's correct.

11        Q.    Is that correct?

12              And that was a property that --

13   where Mr. Gacy's mother had lived at one time?

14        A.    Yes.

15        Q.    And is it correct that like when you

16   lived in the area when you were younger you had

17   encounters with the John Wayne Gacy?

18        A.    I had dinner at his house.

19        Q.    Right.  Met his wife?

20        A.    His second wife Carole.

21        Q.    His second wife, okay.

22              And again, you'd had sort of a late

23   night encounter where you saw him with a shovel,

24   correct?

1         A.    Yes.  Widely reported.

2         Q.    Right.  And so the meeting -- was the

3  meeting then with the police department that we

4  were talking about in 1998 part of a process to

5  investigate that property?

6         A.    Yes.  But Gacy had nothing to do with

7  my leaving the department in '94.

8         Q.    Well, but we're talking more about --

9         A.    Yeah.

10        Q.    We're back to talking about the --

11        A.    But just so it's clear, I didn't leave

12 because of Gacy.  I left because of Guevara.

13        Q.    Oh, you left because of Guevara.

14        A.    I left because of Guevara.  As soon as

15 I hit fifty, I left.

16        Q.    Oh, and it was because of Guevara that

17 you left.

18        A.    I didn't want to be a part of it.

19        Q.    Okay.  So it wasn't because all of

20 these officers turned on you about Gacy and left

21 you holding the bag, as you said a moment ago.

22        A.    Gacy wasn't until '98, and that was

23 four years after I had retired and had been -- Gacy

24 was based merely on suspicion, not fact.  So I

1  was -- would have been totally satisfied if no

2  bodies were found.

3       Q.    Well, you've been asked questions --

4  you mentioned a moment ago that you've testified

5  you think nine times --

6       A.    Maybe more.

7       Q.    -- about Mr. Guevara?

8       A.    Maybe more.

9       Q.    Maybe more.

10           And you've been asked in those

11  testimony, whether it was in court or whether it

12  was a deposition, about why you left the police

13  department, weren't you?

14       MR. STARR:  Objection to form.

15  BY MS. McGRATH:

16       Q.    Do you recall that?

17       A.    Pardon?  Do I recall that?

18       Q.    Do you recall that?

19       A.    I don't recall it, but I think it

20  probably was an obvious question.

21       Q.    And do you recall saying, for example,

22  when you were testifying in 2013 in the

23  Serrano/Montanez matter about your retirement; that

24  it was because of Guevara?

AR-L 149790

1        A.    That's what it was, so if that's

2   what -- yeah.

3        Q.    But did you testify --

4        A.    That's why.

5        Q.    -- to that?

6        A.    Yeah, I -- that's why I left.  I could

7   have stayed another 13 years.

8        Q.    Did you testify to that?

9        A.    I don't know if I testified to it at

10  that case hearing or at any of the case hearings.

11  I don't have a recollection of the multitude of

12  questions that were asked of me.

13       Q.    Oh, so if no one explicitly said to

14  you, Did you leave because of Detective Guevara,

15  you wouldn't have volunteered that information?  Is

16  that what you're saying?

17       MR. STARR:  Object to form.

18       THE WITNESS:  I don't know.

19       MS. SUSLER:  Objection, form.  If you have

20  something that you want to show him, I think that

21  would be a more fair approach.

22       MS. McGRATH:  I'm just trying to clarify this

23  new information.

24       THE WITNESS:  I don't know what you're

AR-L 149791

1  stating is new.  I know what was in my head, but I
2  don't know what was asked of me.
3  BY MS. McGRATH:
4        Q.    Okay.  We can check that.  But I want
5  to go back, before I lose track of where we were,
6  about your work with IFPC because you -- some of
7  the names that you mentioned in there are people
8  that we're talking about in this case.
9               You had a -- because you mentioned
10  about the work you had been doing with Gacy.  And
11  just to clarify, that work was involving the -- was
12  related to the property at Miami -- on Miami and
13  Elston where you had seen him previously.
14        MR. STARR:  Objection.
15        MS. SUSLER:  Objection, asked and answered.
16        MR. STARR:  Join.  And objection to form.
17  BY MS. McGRATH:
18        Q.    Is that correct?
19        A.    Can you repeat?
20        Q.    It was regarding a property that you
21  were aware that Gacy had a connection to at Miami
22  and Elston.  That was -- just to clarify, that was
23  the meeting that you had when you were at IFPC.
24        MR. STARR:  Form.

AR-L 149792

 1          THE WITNESS:  Yes.

 2          MR. STARR:  Asked and answered.

 3  BY MS. McGRATH:

 4     Q.    Is that correct?

 5     A.    I answered.  I previously answered.

 6     Q.    Right.  And we're just trying to --

 7  again because we're changing subjects a little bit.

 8              And the meetings you had had with

 9  people from the police department, that was related

10  to possibly investigating that property for --

11     A.    Yes.

12     Q.    -- additional bodies, correct?

13     A.    Yes, yes.

14     Q.    And you'd said in the first meeting

15  that you had with -- I believe you had mentioned it

16  was Sergeant Cappitelli.

17              What do you recall that Sergeant

18  Cappitelli said to you at that first meeting?

19          MR. STARR:  Objection, form, asked and

20  answered.

21          THE WITNESS:  Previously stated.

22  BY MS. McGRATH:

23     Q.    And that was?

24     A.    Are you going to name names?

AR-L 149793

1          Q.    And what did you understand that to

2    mean?

3          A.    Police officers.  Because I'd been

4    talking about Gacy for -- since 1978 since the day

5    he got arrested.

6          Q.    And when you said he was going to talk

7    about police officers, did you think that was

8    officers who had ignored the information you had

9    given them in '78?

10         A.    That's what I thought.

11         Q.    Okay.  What else did Cappitelli say to

12   you?

13         A.    What is the agenda of the Better

14   Government Association?

15         Q.    And what did you understand the agenda

16   to be?

17         A.    It had been made clear to me that they

18   said they were interested and willing to assist in

19   any way possible.

20         Q.    And what was the response -- was that

21   what you told Cappitelli --

22         A.    Yes.

23         Q.    -- in response to it?

24               And what was the response you got to

1   that?

2        A.    Well, he later had a meeting with them

3   downstairs because they were not allowed to come

4   up.  They were detained downstairs when they were

5   supposed to be part of the meeting.

6        Q.    When you said who had -- Sergeant

7   Cappitelli went down and had a meeting with the BGA?

8        A.    After we had the meeting upstairs,

9   which was not attended by the Better Government

10  Association, which had been invited to the meeting,

11  they then went downstairs and did talk to the BGA.

12       Q.    Were you part of that meeting?

13       A.    No.

14       Q.    What else do you recall Sergeant

15  Cappitelli saying to you at that first meeting?

16       A.    I don't recall.  It was probably just a

17  generalization.  I remember I came in with a --

18  like I said, since 1978, after Gacy got arrested, I

19  was telling the story about having dinner at Gacy's

20  house and my encounter with him, and knowing he

21  took care of the building, and seeing him with a

22  shovel late one morning, early one morning.

23                 And I had probably told that story

24  from 1978 up until the time that we're having this

1  meeting so many times to so many people.

2              You know, when somebody unusual

3  comes into your life and something happens, you

4  don't forget things like that.

5      Q.    But were you -- that meeting

6  downstairs, that was just Cappitelli and the guys

7  from the BGA?

8      A.    Right.

9              Well, he also called a gentleman

10 that ran the scan of the property and talked to him

11 on the phone, and he was out east.

12     Q.    Cappitelli called that person?

13     A.    Yeah, right.

14     Q.    Do you remember the name of the guy who

15 ran the scan?

16     A.    He did the scan for us before we took

17 it to the police department, and he did the scan

18 for the police department.

19              And I got a beautiful two-page

20 letter from him after the second scan of the

21 property which said by him that the police did not

22 want to find any bodies.  He said there was enough

23 evidence there that should have sent a trained

24 detective running to a hardwood store for a shovel.

AR-L 149796

1  And they dug not where he told them to dig.

2        Q.    That's what the guy from out east --

3        A.    The letter says --

4        Q.    -- said.

5        A.    -- yes.

6        Q.    And you saw this in a letter.

7        A.    I have the letter.

8        MS. ROSEN:  Mr. Dorsch, could I ask you to

9  allow Ms. McGrath to finish her question before you

10 start answering so that you're not stepping over

11 one another, because it's hard to get the full

12 question and the full answer.  Thank you.

13 BY MS. McGRATH:

14       Q.    You testified earlier about a second

15 meeting that you had at CPD on this -- with CPD on

16 this same topic, correct?

17       A.    The second meeting was held because the

18 State's Attorney's Office was brought in.

19       Q.    And that meeting -- was that meeting

20 again at IFPC?

21       A.    Yes.

22       Q.    And do you recall anything -- if

23 anything was said by Sergeant Cappitelli at that

24 meeting?

AR-L 149797

1        A.      It was run by Anna Demacopoulos.

2        Q.      And she was in the State's Attorney's

3   Office?

4        A.      Before she became a judge, yes.

5        Q.      But what -- do you recall any

6   conversations with people from CPD, the gentleman

7   from CPD at that meeting, or was Anna Demacopoulos

8   running the whole show?

9        A.      I believe she ran the whole show.  I

10  remember how it started.

11       Q.      Did you have any further conversations

12  with Sergeant Cappitelli about this concept you

13  mentioned earlier about not wanting to find any

14  bodies?

15       A.      I didn't talk to Cappitelli.  He talked

16  to Fruin and Rocky Rinaldi at the meetings and in

17  phone calls.

18       Q.      So you personally didn't have

19  conversations with --

20       A.      No.

21       Q.      -- Sergeant Cappitelli about that?

22       A.      No.

23       Q.      What did you personally have

24  conversations with Sergeant Cappitelli about

AR-L 149798

1  related to the Gacy issues?

2       A.    At the first meeting, first meeting, I

3  presented the -- like a three-page -- as if you

4  were going to write a search warrant.  Even though

5  it was something that was widely known within the

6  police department that I'd been talking about for

7  so many years about dinner at Gacy's house and

8  seeing him with a shovel, I presented it all in

9  written form.

10      Q.    But again, like he asked you those

11  questions.  I'm just trying -- was there any

12  follow-up at that second meeting from Sergeant

13  Capitelli on those questions he had previously

14  asked you?

15      A.    I don't believe so.

16      Q.    Do you recall any further conversation

17  with either Sergeant Capitelli or anyone else from

18  CPD related to this Gacy matter after the second

19  meeting?

20      A.    Yes.

21      Q.    Who?

22      A.    Detective Rutherford.

23      Q.    When was that?

24      A.    Same day of the second meeting.  And

1  again, he and his partner had told me they could

2  not talk to me.  And then later after the meeting,

3  he called me on the phone and said he wanted to

4  meet with me.

5       Q.    About what, did he say?

6       A.    That's my question.  I said, Why?  You

7  weren't supposed to talk to me.  Why would you want

8  to meet with me?

9             He says, Well, if you're intending

10 to do something with this.

11            I said, Do something with it, what?

12 I said, I'm presenting it as evidence for you to

13 make a decision not me.  I'm not -- I don't have

14 power.

15            And then he said he wanted to meet

16 with me.

17            And I said, Listen, I smell a rat.

18 I don't have any intention of meeting with you.

19      Q.    That was my -- did you meet -- did you

20 meet with anyone from --

21      A.    No.

22      Q.    -- the police department?

23      A.    No.

24      Q.    No.

1              Did you stop working with IFPC

2  completely in 1999 or just on matters related to

3  your Gacy investigation?

4        A.    No.  I -- like I said, the search was

5  October/November.  It was a Christmas party for

6  IFPC.

7              And then in January, Jim Fruin came

8  to me and said, Bill, I think we're going to have

9  to part our ways.  I'm sorry what happened to you,

10  but I couldn't control it.  It was out of my hands,

11  and I regret what happened to you, but I don't

12  think it's a place where you and I can work

13  together.

14        Q.    What happened to you?

15        A.    I left.

16        Q.    No.  You -- to follow up, I'm sorry,

17  when Mr. Fruin said, what happened to you, what was

18  he talking about?

19        A.    He knew of the threats.  He was

20  presenting them to me.  He was the one that took

21  the story to the newspaper, and then --

22        Q.    Mr. Fruin was the one --

23        A.    -- later his wife called me.

24        Q.    -- who took the story to the newspaper?

1          A.     Yeah.

2          Q.     Which newspapers did the story appear

3    in?

4          A.     What was his name?  Again, I'm saying

5    we're talking about Gacy when it had nothing to do

6    with me leaving, but if you want to continue on

7    that, I will.

8                 I can't remember his name.  He was a

9    reporter -- he was a reporter for, I don't know,

10   the Sun Times.  He had a son on the police

11   department also.

12                And I had endeavored to -- I had the

13   meetings at Area Five -- not -- at Jim Fruin's

14   office because I didn't want to meet at Area Five

15   because I wanted to keep it a secret, because I

16   thought if there's nothing at the building on

17   Miami, why make it miserable for the land owners,

18   for one.  We want to get their cooperation.  You

19   don't want to make it public.  And if there's

20   nothing there, you just walk away and said, We did

21   our job.  And if there's something there, you did

22   your job.  Okay?

23                And I had wanted to keep it quiet.

24   I didn't -- that's why we had the meetings at the

AR-L 149802

1  IFPC, and then I come into work --

2       Q.    Mr. Dorsch --

3       A.    Pardon?

4       Q.    I want to -- because I appreciate what

5  you said earlier, so I want to recognize that.

6  More a question I'm just trying to figure out is

7  time line with your work because --

8       MS. SUSLER:  Can I ask, I appreciate that

9  we're on Zoom and sometimes there's a lag, but I

10 feel like you're interrupting his answers to ask

11 another question.  If you could just try to be sure

12 that he's finished his answer before you ask the

13 next question, I think that would make a better

14 record.  Thank you so much.

15      MS. McGRATH:  Thank you, Ms. Susler.

16      THE WITNESS:  Yeah.  I was going to continue

17 to say that after trying to make it private and

18 unknown, I came into work only to find Jim

19 Fruin sitting -- Tim O'Brien I believe was the name

20 of the reporter, okay?

21             And he was in the office with Jim

22 Fruin talking.  The door was closed, which was

23 unusual.  And I knew right away what was going on.

24             And then after about an hour, he

AR-L 149803

1  came out with O'Brien, who I'd never met before,

2  introduced him to me, told me he was a reporter,

3  and he asked me to meet with O'Brien and give him

4  details.

5              And I told him, Why should I?  You

6  already told him everything.  And after all -- and

7  you had told me you were going to keep it quiet.

8  BY MS. McGRATH:

9      Q.    And this was all in 1999?

10     A.    '98.  Before the dig, before the

11 reported dig.

12     Q.    Got you.

13              After you left IFPC Worldwide, did

14 you go back up to Wisconsin exclusively?

15     A.    Yeah, I had enough of Chicago.  I mean,

16 I'd been burned by people that at one time I

17 thought were friends and were -- I believe they

18 would have been interested in pursuing what was

19 owing to me suspicion, and I understood that you

20 just can't dig up a property based on suspicion,

21 but I knew you had to have the police department

22 involved.

23     Q.    So you went back up to Wisconsin --

24     A.    To Wisconsin.

1        Q.     -- pretty much full-time in '99, you'd

2   say?

3        A.     Yeah.

4        Q.     And were you -- pretty much was your

5   exclusive work then with the Northern Lights

6   Investigative Services or were you still --

7        A.     Right.  Then I --

8        Q.     -- doing work with --

9        A.     I got my own private detective license

10  in Wisconsin and right away started getting cases

11  up there.

12       Q.     And that -- again, that was -- was that

13  with northern -- your business with Northern Lights

14  Investigative Services?

15       A.     Yes.

16       Q.     But you came back to Chicago full-time

17  in 2003, right?

18       A.     Yes.

19       Q.     Is that correct?

20       A.     Yes.

21       Q.     And you were -- but you're still --

22  your main source of employment then was also

23  Northern Lights Investigative Services.

24       A.     Well, besides the pension I had, yes.

1        Q.    And through your work with -- was it

2   through your work with Northern Lights

3   Investigative Services that you happened to meet

4   Jane Raley?

5        A.    Yes.

6        Q.    And was that in about 2010, 2011?

7        A.    Right, I brought a case to her.

8        Q.    And was that the Escovera case?

9        A.    No.  Matthew Echevarria.

10       Q.    Echevarria.

11             And what was the nature of that case?

12       A.    He was convicted of a homicide that

13   occurred in Area Five after I had retired.

14       Q.    And you brought her that case

15   because -- just can you tell us for the record,

16   Jane Raley was working at the Center For Wrongful

17   Convictions at this time, correct?

18       A.    Correct.

19       Q.    And did you -- did she take on the

20   Echevarria case?

21       A.    No.

22       Q.    Now, did you -- I think I read

23   previously that you had met her at a gathering

24   maybe in 2011.  And is that when the Echevarria

1  case came up, or did you meet with her separately

2  to propose the case?

3       A.    Oh, I met with her -- the Echevarria

4  case came up before that.

5       Q.    Okay.  And did anything come up in that

6  meeting with -- when you were bringing the

7  Echevarria case to her, did anything come up about

8  other cases she was working on that you might have

9  known about?

10      A.    Yeah.  She listened to me about the

11 Echevarria case, and we talked about that.  And on

12 conclusion of that, before I left, she asked me if

13 I knew Detective Guevara.

14      Q.    And what did she -- what -- and you

15 said that you had obviously.

16      A.    I said yes, I worked with him at Area

17 Five.

18      Q.    And then what did she tell you?

19      A.    Would you be willing to talk to me

20 about a particular case?

21      Q.    And which case was that?

22      A.    She mentioned it by name.  I didn't

23 recognize the name, but it was Jacques Rivera was

24 the case she was talking about.  And she said that

 1  I had been involved in that case.

 2      Q.    And how had you been --

 3      A.    And I said --

 4      Q.    Go ahead.

 5      A.    I didn't have any recall.  She said,

 6  Can I present that case for you to look at?

 7      Q.    And did you set up to meet with her to

 8  look at it?

 9      A.    No.  We continued the meeting, and I

10  did it at that time.

11      Q.    And did that then start your working

12  relationship with that clinic, with the wrongful --

13  clinic of wrongful convictions?

14      A.    Did it start -- is that where I started

15  working?

16      Q.    Is that -- yeah, that was my question.

17            Was that when you started working

18  with them?

19      A.    I don't know.  I mean, my first case

20  that I did for them was Jason Strong, but I don't

21  know --

22      Q.    Okay.

23      A.    -- what came first.

24      Q.    Whether the Rivera matter --

1       A.    I mean, Jason Strong was their case, so

2  that's when I worked with them.

3       Q.    Okay.  So when you told Ms. Raley that

4  you knew Ray Guevara, that was about an incident

5  that you previously testified about, correct?

6       A.    Yes.

7       MR. STARR:  Objection, form.

8  BY MS. McGRATH:

9       Q.    And I know you've testified about this

10 previously, but we'd like to ask you to do that

11 again here today.  You've been identified to do

12 that again today.

13             Do you recall -- and like

14 approximately when you had this incident with

15 Detective Guevara?

16      A.    Well, that was the most difficult --

17      MS. SUSLER:  Objection, form.

18      THE WITNESS:  -- part.

19      MR. STARR:  Foundation.

20 BY MS. McGRATH:

21      Q.    You can go ahead.

22      A.    Pardon?

23      Q.    You can continue your answer.

24      A.    Repeat please.

AR-L 149809

1      Q.    Just can you give -- there's the

2 incident that you're going to talk to us about with

3 Ray Guevara just --

4      A.    Oh, the --

5      Q.    -- by way of time line like when --

6      A.    Well, it was difficult.  I don't know

7 that we even discussed the time when I met with

8 Jane Raley.  It was just my retelling of the

9 occurrence, but I don't think that we mentioned

10 dates, okay?

11              And that was difficult for me

12 because it happened so many years before that I had

13 a hard time knowing exactly when or who I was

14 working with at the time.

15      Q.    And now --

16      MS. ROSEN:  I'm going to ask once again --

17 sorry, Megan -- once again because of the lag and

18 just because of the nature of these depositions,

19 if, Mr. Dorsch, you could just pause for half a

20 second before you start answering Ms. McGrath's

21 question.

22      THE WITNESS:  Okay.

23      MS. ROSEN:  And then I'm going to ask

24 Ms. McGrath to do the same thing.  Because you guys

1  are talking over one another, and I think the court

2  reporter's having difficulty.  And she's shaking

3  her head, so if you guys just take a second and a

4  breath, that would help.  Thank you.

5       THE WITNESS:  You got it.

6       MS. McGRATH:  I'm sorry, Katie.

7  BY MS. McGRATH:

8       Q.   Mr. Dorsch, I appreciate what you're

9  saying about the time being a difficult question

10 with this case.

11            But as you sit here today,

12 approximately when do you think this incident with

13 Detective Guevara occurred?

14      A.   Well, I know that it would be about a

15 month, month and a half later that he was

16 meritoriously promoted to detective.

17      Q.   And --

18      A.   And I --

19      Q.   Go ahead.

20      A.   I haven't seen his promotion, the

21 dates, but I believe it would have been -- I always

22 said '89 or '90.  I think more likely it was in '90.

23      Q.   It was '90.

24      A.   '90?

1          Q.    Okay.  And you say that because your

2    recollection of when this incident occurred --

3    we'll say Ray -- he wasn't a detective yet.  You

4    recall him being a gang crime specialist at that

5    time?

6          A.    Yes, he was in gang crimes.

7          Q.    What -- just maybe briefly and then

8    we'll talk in some more detail.  But what was the

9    impetus of this beginning anyway, of this encounter

10   or incident with Detective -- let's just say with

11   Ray?

12         A.    Well, it was similar to Jacques Rivera,

13   the same way.

14               I'm the detective.  I'm in Area Five

15   violent crimes.  Guevara is in gang crimes.  When

16   he had witnesses involving a homicide and he needed

17   additional work, like lineups, he wasn't to do that

18   in gang crimes.  He would have to come into the

19   area and involve detectives at the area, and we

20   would do the lineups.

21               That's why he came in in Jacques

22   Rivera's case, and that's why I got assigned to

23   that case.  And likewise in the case I'm talking

24   about, same thing.

AR-L 149812

1          He comes in with witnesses, says

2  they have information.  We have an offender, we

3  have a car, and we need to get the offender and

4  then we'll have a lineup.  So similar.

5      Q.   So for the sake of clarity, let's

6  try -- and I know this has been referred to in

7  other -- different kinds of names.

8          Separate from the Rivera incident --

9  and we're not -- let's not conflate what happened

10  in that case with the incident that happened in

11  1990 that you're talking about here.

12          So on that case, and your

13  recollection was that Detective Guevara -- well,

14  Ray Guevara came to you with two witnesses from a

15  still open homicide.

16      A.   Yes.

17      MR. STARR:  Objection, form, mischaracterizes

18  prior testimony.  You can answer.

19      THE WITNESS:  Yes.

20  BY MS. McGRATH:

21      Q.   And that homicide had been opened for

22  about two or three months, you said?

23      A.   I've said it was a month, month and a

24  half, two months.  It's -- but I know it was open

AR-L 149813

 1  for some time.
 2       Q.    And I think you've said previously that
 3  you kept yourself very informed on all of the
 4  incidents that were outstand -- the homicides that
 5  occurred in the area.  So you remembered the
 6  details of that incident.
 7               And it involved two -- a man and a
 8  woman, a boy and a girl in a car, who were then --
 9  who were shot at by someone in another car.  Just
10  broadly, correct?
11       MS. SUSLER:  Objection, form.
12  BY MS. McGRATH:
13       Q.    Is that sort of a broad brush of --
14       A.    Well, I tried to be aware of homicide
15  cases that occurred even if I wasn't assigned.
16       Q.    Yeah.
17       A.    And I had recollection only -- I wasn't
18  assigned to the case in question.  I only recall
19  that there was an early morning shooting.  There
20  was a viaduct.  Exact north/south street, I don't
21  know because I never was at the crime scene.  I
22  wasn't assigned the case, so I probably wasn't
23  working.
24               And I remember it was a male victim

1  who had a relative, a young like 14, 15-year-old

2  relative, I believe like a niece, who was in the

3  car with him.  And when the shooting happened, all

4  she could tell the police was it was a large white

5  car.

6          Q.    And you recall that the -- maybe the

7  incident had happened -- the incident itself, the

8  underlying incident, that happened perhaps in the

9  early spring or summertime?

10          A.    I always thought -- because I remember

11  going a day after the shooting, not having been at

12  the homicide scene, but taking a ride by.  I

13  thought it was a very warm day that I had gone.  So

14  I thought I -- I've always related it to a holiday.

15  So whatever -- I think, what comes second?  Not

16  Mother's Day.  I think Easter comes after it, I

17  think.

18          Q.    It depends on the year.

19          A.    I'm not sure.  I'm not sure anymore.

20  But it would have been the latter of the two

21  because it was warm.

22          Q.    Got you.

23          A.    And that was my only recollection to

24  when.

1      Q.    Okay.  And you said this a moment ago,

2  but I just want to make sure I understand.

3              You weren't assigned to this case,

4  but you went and visited the scene after the fact.

5      A.    Yeah, which was custom for me.

6      Q.    Because you wanted to make sure that

7  you were up on all of the --

8      A.    Well, because all I did was homicides

9  or police shootings.

10     Q.    Right.  So you -- again, so you wanted

11 to make sure --

12     A.    Right.

13     Q.    -- that you were informed on

14 everything.

15     A.    I also kept aware of robberies, because

16 often robberies would become a homicide, so -- but

17 usually I didn't go to the scene of the robberies.

18     Q.    Right.  But murder homicides, those

19 were kind of a bigger deal, correct?

20     A.    Yeah.

21     Q.    Now, do you recall your partner at the

22 time that this incident occurred?

23     A.    That's been hard.  That's been hard to

24 do, because I had several partners.  And sometimes

1  your partners off, you got another partner with you.

2        Q.    So --

3        A.    I know I wasn't alone.

4        Q.    Right.

5        A.    But I believe at the time -- I believe

6  at that time in my career in Area Five that my

7  steady partner I thought was John Boyle, okay?  But

8  like I say, you could come into work and your

9  partner's off or he's in court, and you work with

10 somebody else.

11       Q.    Who were some of the other people that

12 you would have worked with?

13       A.    Pakowski [phonetic].  Oh, god.  I'm

14 forgetting a lot of their names, I've been gone so

15 long.

16       Q.    How about Bill Johnston?

17       A.    Bill Johnston, I didn't work with Bill

18 Johnston until later.  I know I kind of wondered if

19 he was the guy at first, but I think once I focused

20 on the '89/'90 time, I wasn't working with him at

21 that time.  I think I started with him maybe later

22 in '90 or maybe '91, '92.

23       Q.    So if this incident had happened in

24 '90, Bill Johnston could have been your partner?

1      A.    I don't -- he could have been a partner

2  on that day because he was working the same hours

3  as I was, but that he was my regular partner, I

4  don't think so.

5      Q.    Okay.  And for this open homicide, Ray

6  Guevara got involved because he brought witnesses

7  to the station to participate in -- at that time it

8  was a photo array?

9      A.    Pardon now?  Was it what?

10      Q.    It was a photo array?  That's what you

11  had to assist with?

12      A.    Eventually.  Eventually became a photo

13  array.

14            But we started out with two teenage

15  witnesses who lived in Humboldt Park.  That's how

16  he came in.  And that's what -- he first went to my

17  supervisor Ed Mingey and told him.  And then they

18  came out and told me what he had, and that we

19  should pick it up from there.

20      Q.    And you said there was the two

21  witnesses from Humboldt Park.

22            Was there anyone else with them?

23      A.    Yes.

24      Q.    Who was with them?

1        A.     It was an older Hispanic person.

2   Maybe -- I'd say the kids were 14, 15 maybe.  And

3   very early 20s, I believe, and his -- I vividly

4   remembered him.  I've come to know him now a lot

5   better.

6        Q.     How's that?

7        A.     He admits that he was there.  He told

8   me he was with Guevara, Miedzianowski, Galligan,

9   and Gawrys when they paid the witnesses to make the

10  identification.

11       Q.     What was this gentleman's name?

12       A.     It's -- Sam was his nickname.  And what

13  is his real name?  Again, I don't have my file, but

14  he told me things -- this is stuff after I last

15  testified.  He sought me out.

16       Q.     When did he do this?

17       A.     It was at one of those -- I went to a

18  meeting.  I had been asked many times to go to the

19  innocence group meeting, this Hispanic group, but I

20  always declined because of the fact that I was

21  still testifying.

22              And after so many times I testified,

23  I kind of -- I asked at Northwestern, Do you think

24  you're going to be using me anymore, and they said

1  no.  And I think maybe it was Loevy's office that

2  said no.

3              And so I thought, okay, I'll go to

4  the meeting.  And I don't think it was the first

5  meeting I went to, but it was one of the early

6  meetings I went to, and I didn't go to many.

7              I was talking to the people there

8  about this incident.  And a gentleman in the back

9  of the room who I had never met before suddenly

10 spoke up and said, Mr. Dorsch, you're correct about

11 everything you said.

12             And I said, I am?  I said, Do you

13 know about this case?

14             And he says, Yes, I do.

15             And I started walking --

16     Q.    And again --

17     A.    Pardon?

18     Q.    Again, this person was named Sam, you

19 said?

20     A.    Well, that was his nickname.

21             It's -- is it Perez?  Sam Perez?

22             He's testified in cases.

23     Q.    Sure.

24     A.    Like I said, if I had my records here,

1  I could go over it.  But I talked to him about two

2  years ago at this meeting.

3                    And as I was walking to him, I said,

4  Do you know Guevara; he said yes.

5                    I said, Do you know Galligan; he

6  said yes.

7                    And I said, Do you know Sergeant

8  Mingey; he said yes.

9                    And I said, Do you know a guy named

10 Sammy?

11                   And he said, Yes, I'm Sam.

12                   And then we sat down and had a very

13 long conversation.

14      Q.    Did you record it?

15      A.    No.

16      Q.    Did you take notes afterwards?

17      A.    No.  But I met with him several times.

18      Q.    Before you left for Europe?

19      A.    Oh, yeah.

20      MS. ROSEN:  Megan, can we take a quick break?

21      MS. McGRATH:  I was just going to say, yeah.

22 I wanted to get that information and then we're

23 going to take a break.

24      MS. ROSEN:  Thanks.

 1        MR. STARR:  How much time do you need?

 2        MS. ROSEN:  If we could get 10 minutes,

 3  please.

 4        MS. McGRATH:  10 minutes, please.

 5        THE WITNESS:  We're taking a break?

 6        MS. ROSEN:  We are taking a break, 10 minutes.

 7                    (Recess taken.)

 8  BY MS. McGRATH:

 9        Q.    Mr. Dorsch, you were telling us before

10  we took our break about meetings you would have

11  with -- I think you said the gentleman's name was

12  Sam Perez?

13        A.    Correct.

14        MR. STARR:  Megan, can I just note for the

15  record that we just took a 20-minute break and

16  earlier we took a 10-minute break, and the

17  deposition's been going for two and a half hours.

18  We've already taken 30 minutes of break time.  I

19  just want to make it on the record, because defense

20  counsel has voiced concerns about the timing.  I

21  think that's a relevant thing to note.

22                    Sorry to interrupt your exam.

23        MS. McGRATH:  Thank you for noting.

24

1  BY MS. McGRATH:

2       Q.    Again, Mr. Dorsch, you said it was --

3  you had met with Sam Perez.  When was that?

4       A.    It was at a Sunday meeting of the

5  innocence group that gathers on Belmont Avenue,

6  I guess monthly.  But it's probably two years ago,

7  maybe a little less.  It was after I was done

8  testifying in cases.

9       Q.    Done testifying in?

10      A.    In Guevara cases.

11      Q.    And how many times have you attended

12  those meetings?

13      A.    Maybe four.

14      Q.    What was the last time?

15      A.    Well, the pandemic has been going on,

16  so probably a year and a half.

17      Q.    There haven't been any like Zoom

18  fill-ins during the pandemic for the meetings?

19      A.    No.

20            Oh, they had, but I didn't attend

21  them.

22      Q.    Did you have any -- who have you talked

23  to about the conversation you had with the

24  information Mr. Perez gave you?  Who have you told

1  about that conversation?

2      A.    Family, friends.

3      Q.    Have you told anyone from Loevy & Loevy?

4      A.    No.

5      Q.    How about anyone from the People's Law

6  Office?  From Ms. Susler's office?

7      A.    No.

8      Q.    Any conversation with Ms. Bonjean about

9  it?

10     A.    You know, I've talked to her, but I

11 don't know.

12     Q.    So you might have talked to Ms. Bonjean

13 about this?

14     A.    Possible, because she's had Guevara

15 cases, but I don't know.  I have talked to her in

16 the last couple years about other cases but not

17 working them because of the pandemic situation.

18     Q.    I'm sorry.  I missed the --

19     A.    Because of the virus situation, I

20 wasn't actively able to go out and interview people

21 and things like that.

22     Q.    Okay.  How many times did you meet with

23 Mr. Perez?

24     A.    At least two, maybe three.

1          Q.    And that's in-person meetings?

2          A.    Yes.

3          Q.    How about telephone or Zoom, anything

4    like that, with Mr. Perez?

5          A.    I think I had phone conversations to

6    set up the meeting.

7          Q.    But no like phone conference type

8    communication.

9          MR. STARR:  Form.

10          THE WITNESS:  No.

11    BY MS. McGRATH:

12          Q.    When was the last time you spoke to him?

13          A.    Like I say, probably a year and a half

14    ago.

15          Q.    How about people you met -- people you

16    met at that meeting, at the innocence group

17    meetings?  What sort -- who have you met at those

18    meetings?  Can you name any individuals you've met?

19          A.    Well, Esther Hernandez and her husband

20    are the ones who organize it.  And sometimes some

21    exonerees would be there, but I don't recall.

22          Q.    Anyone you recall talking to?

23          A.    Is Nelson Rodriguez one?  I mean, this

24    is prior to -- you know, I mean, at the meeting but

 1  just meeting because I had nothing to do with them.

 2              I think Jacques Rivera would have

 3  been at one meeting.  That's about it.

 4       Q.    Outside of these meetings, have you had

 5  any communication with, for example, Esther

 6  Hernandez?

 7       A.    Yes.

 8       Q.    How often?

 9       A.    In all the time that I've known her,

10  maybe eight times.

11       Q.    And when did this communication with

12  her start?  Was this when you started going to

13  these meetings?

14       A.    Yes.  I didn't know her, never talked

15  to her, didn't know who was involved.  I didn't

16  want to go because I was testifying previously.

17       Q.    When was the last time you spoke to

18  Esther Hernandez?

19       A.    Six months ago.

20       Q.    And you'd communicate with her over the

21  phone and ...

22       A.    I've met her in person and over the

23  phone.

24       Q.    Have you ever -- have you spoken to

AR-L 149826

1  Jacques Rivera outside of the meetings?

2        A.    Yes.

3        Q.    How often?

4        A.    Since the last time I was at a meeting?

5        Q.    Have you talked to him outside of the

6  meetings?

7        A.    Yes.  I said yes.

8        Q.    And you said it was after -- the last

9  time was after the last meeting.

10       A.    Since the last meeting, I've maybe

11  talked to him twice.

12       Q.    And would that be over the phone or in

13  person?

14       A.    Both.

15       Q.    How about Nelson Rodriguez?  Have you

16  had communications with him after the meetings?

17       A.    I think once, but it was casual.  I

18  didn't know he was going to be where I was going to

19  be, and I just happened to bump into him.

20       Q.    And that was in Chicago?

21       A.    Yes.

22       Q.    Do you recall any of the names of

23  anyone else that you met at these meetings?

24       A.    No.  They were family of people

AR-L 149827

1  concerned, and their stories were not something I

2  knew anything about.

3              Mrs. Echevarria was there about the

4  Matthew Echevarria case.  I remember --

5      Q.    Oh, okay --

6      A.    -- her being there.

7      Q.    -- the previous case?

8      A.    She was there, yeah.

9      Q.    And you said -- is it -- Sam Perez

10 invited you to this meeting, correct?

11     A.    No, no.

12     Q.    No?

13     A.    No.  I didn't know -- I didn't know the

14 name Sam Perez.  I had a name of Sam that I'd been

15 stuck in my head all these years because of a

16 person that came in with Guevara and Gawrys and the

17 two kids, the older Hispanic man.

18             It was Mingey that told me his name

19 was Sammy but never gave me the last name.

20     Q.    So you asked permission to go to this

21 meeting from Northwestern you said?

22     MR. STARR:  Objection --

23     THE WITNESS:  No.

24     MR. STARR:  -- mischaracterizes previous

 1  testimony.

 2  BY MS. McGRATH:

 3       Q.    You said you felt you could go because

 4  you were done testifying?

 5       A.    Yeah.

 6       Q.    Did you let -- and you let Northwestern

 7  know that you were doing that.

 8       A.    No.  I merely asked them if they

 9  thought they were going to be needing me anymore.

10  I didn't know what their involvement was in the

11  Guevara cases anymore.  I didn't know what any

12  attorneys' involvement was in any of the cases.

13       Q.    Now, before -- we talked previously

14  that you had testified in the Guevara cases that

15  there was a case file that we've been testifying

16  about.  Is it the case involving Jose Jimenez?

17       A.    Yes, I remember that case.

18       MS. SUSLER:  Objection to form.

19       MR. STARR:  Objection, form, mischaracterizes

20  previous testimony.

21  BY MS. McGRATH:

22       Q.    How many people have you -- how many

23  people have you shown that file to?  The Jimenez

24  file?

AR-L 149829

1       A.      The file was shown to me by Karen

2  Ranos.  She approached me at Northwestern when I

3  was there for something.

4       MS. ROSEN:  What was the name?  I'm sorry.  I

5  just didn't hear that.

6  BY MS. McGRATH:

7       Q.      Yeah, I missed that.

8                Karen who?

9       A.      You said Jimenez.

10      MS. ROSEN:  Right.  You said the name Karen

11  somebody from Northwestern.

12      THE WITNESS:  Oh, Karen Ranos, who is now

13  deceased.  She took over after Jane Raley.

14  BY MS. McGRATH:

15      Q.      Karen -- can you spell the last name?

16      A.      R-a-n-o-s.

17      Q.      And Karen Ranos gave you the file.

18      A.      She approached me and said, Bill, I

19  think this is a case you've been talking about, and

20  she showed it to me, I looked at it, and I quickly

21  said, No, it's similar, but it is not the case,

22  because the case I'm talking about, Guevara was in

23  gang crimes, not a detective.

24      Q.      Sure.

1              Other than Karen Ranos, who else

2    have you shown that file to?

3         A.    I haven't shown the file.

4                   Oh, can I change that?

5         Q.    Yeah.

6         A.    Later, I showed it to Sammy.  It was at

7    our last meeting.  Because he and I were to meet,

8    and I brought the file to the meeting because he

9    said he had never seen that file, never seen it.

10   He had been talked to about it, but he had never

11   seen the file.

12                  So I asked him to please look at the

13   file, read the file, and tell me if this is the

14   case you were talking about, that he's talking --

15        Q.    Can --

16        A.    -- about.

17        Q.    Well, just real quick because I want to

18   make sure I understand where everything is.

19        MR. STARR:  Megan, again he wasn't done with

20   his answer, and you interrupted him.  Can you

21   please let him finish his answers?

22   BY MS. McGRATH:

23        Q.    I'm sorry.  I paused.  I thought you

24   were done.

AR-L 149831

1      A.    Okay.  I wanted to meet with Sam

2  because he said he had never seen the file.  And I

3  was aware because I had gotten a copy from FOIA of

4  the Jimenez case, and I realized that there was

5  more than just the difference that Guevara was in

6  gangs and not a detective in the case I'm talking

7  about.  And there was a difference in the number of

8  witnesses and ages of witnesses and race of

9  witnesses.

10             The Jimenez case had three

11  witnesses:  One of them was a male black, the other

12  two were Hispanics, and two of them were older than

13  teenagers.

14             And when I asked Sammy to look at

15  the file and to look at the witnesses in

16  particular, he said, This is not the case.

17             And I said, How do you know that?

18             He said, Because one of the

19  witnesses was my cousin.  I paid him -- he said,

20  no, I was there when Miedzianowski paid him.

21  Guevara was there, Gawrys was there, Galligan was

22  there, and Miedzianowski was there, and they --

23      Q.    But again, this is what Sam told you.

24      A.    Yes.

 1          MS. GOLDEN:  Wait, can we -- can I have that

 2   last answer read back, please?

 3                          (The record was read as follows:

 4                            A. Okay.  I wanted to meet
                              with Sam because he said he had
 5                            never seen the file.  And I was
                              aware because I had gotten a
 6                            copy from FOIA of the Jimenez
                              case, and I realized that there
 7                            was more than just the
                              difference that Guevara was in
 8                            gangs and not a detective in
                              the case I'm talking about.
 9                            And there was a difference in
                              the number of witnesses and
10                            ages of witnesses and race of
                              witnesses.  The Jimenez case
11                            had three witnesses:  One of
                              them was a male black, the
12                            other two were Hispanics, and
                              two of them were older than
13                            teenagers.  And when I asked
                              Sammy to look at the file and
14                            to look at the witnesses in
                              particular, he said, This is
15                            not the case.  And I said, How
                              do you know that?  He said,
16                            Because one of the witnesses
                              was my cousin.  I paid him --
17                            he said, no, I was there when
                              Miedzianowski paid him.
18                            Guevara was there, Gawrys was
                              there, Galligan was there, and
19                            Miedzianowski was there.)

20          MS. GOLDEN:  Okay, that was a lot.  Can you

21   read that last sentence back?

22                          (The record was read as follows:

23                            A. Guevara was there, Gawrys
                              was there, Galligan was there,
24                            and Miedzianowski was there)

AR-L 149833

1  BY MS. McGRATH:

2      Q.    And this was -- this is a copy of the

3  Jimenez file that you got via FOIA?

4      A.    I think it was FOIA.

5      Q.    So this is not the file you got from

6  Northwestern?

7      A.    It could have been.  I don't know if

8  they gave me a copy or I asked for a copy, but I

9  had a copy.  I had copies of many files that I

10  asked for through FOIA.

11      Q.    And other than Sammy, who have you

12  shown that file to?

13      MR. STARR:  Objection --

14      THE WITNESS:  Well, the file was shown to me

15  many times.

16  BY MS. McGRATH:

17      Q.    Correct, but you have a copy of it.

18          Who else have you shown it to?

19      A.    Well, other than Sammy, nobody.

20      THE REPORTER:  I apologize.  This is the

21  court reporter.

22          Mr. Starr, I see your mic going on

23  and off, but I don't hear you.  If you're

24  objecting, I can't hear you.

 1        MR. STARR:  Thanks for letting me know.  I

 2   did make an asked and answered objection to those

 3   two questions.  I believe they were the same

 4   question both times.

 5        MS. McGRATH:  I need a quick sec.  I need to

 6   take a break.

 7        MR. STARR:  How much time do you need?

 8        MS. SUSLER:  I can't hear anybody.

 9        MR. STARR:  She said five minutes.  I can

10   read her lips.

11        MS. SUSLER:  Okay, thanks.

12                  (Brief recess.)

13   BY MS. McGRATH:

14        Q.   Mr. Dorsch, you had testified a minute

15   ago about being approached by Sammy at the -- I

16   guess we're calling it the innocence meetings that

17   you talked about previously.

18             Where was your first face-to-face

19   meeting with him?

20        A.   There.

21        Q.   At that center?

22        A.   Yeah.  I didn't know who he was.  I

23   asked, Do you know Sammy?

24             And he said, Yes, I'm Sammy.

1      Q.    And then that was -- after that
2  meeting, when did you meet with him next?
3      A.    Then we talked at that meeting and then
4  we had a -- wait a second.  I think there was --
5  maybe there was only two meetings.
6                He made me aware at that meeting
7  when he said that I was right about what I was
8  talking about, and he told me the two witnesses
9  were -- one of them was his young cousin and that.
10                And then a subsequent time when I
11  had the Jimenez case, I noticed that there were
12  three witnesses, and none of them appeared to be
13  the young Hispanics that I had talked about.  And
14  that's why I wanted a second meeting.  And it was
15  at that time where I asked him to look at the
16  Jimenez case.
17      Q.    And do you recall when that second
18  meeting was?
19      A.    Maybe two, two and a half years ago
20  already.
21      Q.    And you invited him to meet with you?
22      A.    Yeah, I asked him.  I asked him to meet
23  with me.
24      Q.    Was anyone else there?

AR-L 149836

```
 1        A.     No.  I met him at a Dunkin' Donuts on --
 2        Q.     That was my next question.
 3        A.     -- okay, Irving Park near Harlem.
 4        Q.     And those are the only two times you
 5   recall meeting with him in person.
 6        A.     Yes.
 7        Q.     And other than you said earlier that
 8   you had phone communications to set up the second
 9   meeting?
10        A.     Yes.
11        Q.     Did you have any other phone
12   conversations with him?
13        A.     Not that I recall.
14        Q.     What's Sammy's phone number?
15        A.     I have no idea.
16        Q.     Is it still on your phone?
17        A.     Pardon?
18        Q.     Is it possibly still on your phone?
19        A.     I have a different phone because I
20   moved to Europe.
21        Q.     Got you.
22               Have you been in touch with him
23   since you rid of that phone?
24        A.     I didn't get rid of the phone until I
```

AR-L 149837

1  got here, so that would be April 25th I got here.

2  I left the 24th, arrived the 25th.

3              But like I said, that meeting with

4  him was year and a half, two years before.

5      Q.   And you hadn't had any subsequent

6  communication with him after --

7      A.   Not that I recall.  Not that I recall.

8              I tell you, I'm starting -- my

9  battery is going to be giving me a warning soon.  I

10  can plug it in, but it is getting rather late here.

11     Q.   Got you.

12     A.   It's 8:00 o'clock already.

13     Q.   Well, let's talk then -- we had started

14  talking about the incident that you recall and just

15  some of the -- I think when we talked a bit about

16  who was your partner at that time.  And you'd said

17  that Guevara and -- was it his partner at that

18  time --

19     MR. STARR:  Objection to form.

20  BY MS. McGRATH:

21     Q.   -- brought these two witnesses?

22     A.   Guevara and Gawrys were partners from

23  gang crimes.  They came in with the two juvenile

24  witnesses.

1          Q.    And was there anyone else with them?

2          A.    Yes, as I said previously.  The person

3    that --

4                      (Simultaneous cross-talk.)

5          THE WITNESS:  -- that Mingey identified him

6    to me, and Mingey always talked to me and mentioned

7    him by the name of Sammy.

8          MS. ROSEN:  I'm sorry.  You broke up.  Can

9    the court reporter read back that answer?

10         THE REPORTER:  Sure.  I didn't include the

11   interruptions.

12                      (The record was read as follows:

13                       A. Yes, as I said previously.

14                       The person that -- that Mingey

15                       identified him to me, and

16                       Mingey always talked to me and

17                       mentioned him by the name of

18                       Sammy.)

19         MS. ROSEN:  Thank you.

20   BY MS. McGRATH:

21         Q.    You said Mingey always talked to you.

22               What do you mean by that?

23         MR. STARR:  Objection, form.

24         THE WITNESS:  Want me to answer?

1  BY MS. McGRATH:

2          Q.    Yeah, that's --

3          A.    Okay.  Well, even after I retired and

4  when I came back to Chicago, not knowing that there

5  were going to be cases that I was going to be

6  needed to testify, I would meet with Ed Mingey

7  occasionally because he had gotten a really good

8  job after leaving the police department as the

9  chief -- oh, not even chief -- he was the only

10  investigator in the State of Illinois for

11  racetracks.  And he was working downtown, so I

12  would meet with him for coffee.

13                  And Eddie would always openly talk

14  to me about the case I talk about.  He always

15  called it the umbrella case.

16          Q.    Oh, that's right.

17                  And the umbrella case, you know,

18  focusing back on that, he -- let's go through the

19  steps of the -- kind of let's leave the other guy

20  that came in with him and focus on the two

21  witnesses that Detective Guevara and -- Guevara and

22  Gawrys brought in that day.

23                  Can you describe your encounter with

24  the first young man?

AR-L 149840

1      A.    Well, it starts before that.  I mean, I
2 had a conversation, encounter.
3               When I was told by Mingey to take
4 over the case, I was told that Guevara and Gawrys
5 had found these two young boys who said that they
6 were witness to the murder that happened on the
7 street some months, month and a half, two months
8 prior.  And they were close enough to the scene of
9 the shooting, it occurred like I said around 2:00,
10 3:00 in the morning, that they were able to write
11 down the license plate number of the offender's
12 vehicle on a piece of paper.
13               And when Guevara then stopped them
14 the night that we're talking about, they still had
15 the piece of paper with the license plate number in
16 their possession.  And I told --
17      Q.    And they brought that piece of paper to
18 you guys?
19      A.    Well, Guevara gave it to me.
20      Q.    And what did you do with it?
21      A.    He got it from -- I immediately
22 questioned Mingey.  I says, Are you serious?  I
23 says, I can understand finding two teenage kids in
24 the summertime out on the street in Humboldt Park,

1  but when you tell me that they witnessed a

2  homicide, were close enough to the car, and they

3  had paper and pen or pencil and wrote down the

4  license plate number and didn't tell anybody about

5  it until Guevara encounters them tonight, and they

6  still have it?  You really want me to believe that?

7              And he said, Go with it.

8        Q.    And you took that paper, and you went

9  and ran it --

10       A.    We ran the license plate, ran the

11  license plate number, and it did come back to large

12  white car to a young man living in the neighborhood

13  of Humboldt Park.

14       Q.    So what did you have him do next?

15       A.    We ran a record check on him and found

16  out that he had had one arrest, and it was for a

17  gun.  It was for a UUW, which meant to me that he's

18  got a photo on file at headquarters.

19            So I instructed Guevara and his

20  partner Gawrys to go to headquarters and get the

21  file and the photo of this individual and return

22  with it.  And I kept the two boys with me and he

23  left.  And as he left, the person who I later

24  learned is Sammy walked out with them, all right.

AR-L 149842

 1   And --

 2        Q.    And Guevara and Gawrys came back with

 3   the picture that you requested?

 4        A.    Right.  And then --

 5        MR. STARR:  Megan --

 6   BY MS. McGRATH:

 7        Q.    And then you used that -- and then you

 8   used that in a photo array?

 9        MR. STARR:  Megan, you just interrupted him

10   twice.  Can you let him answer the question when

11   you ask the question?

12        THE WITNESS:  When they left, they returned

13   with the photo.  I organized the photo array,

14   putting in maybe five other photos similar to the

15   subject.

16              My -- the object of my ongoing -- my

17   battery is running low, guys.  I can change

18   locations, go inside, and plug in.  But I want to

19   ask you again, it's Friday night, and it's getting

20   dark here and it's a good night to be out on the

21   street.

22        MS. McGRATH:  Well, we're getting to the last

23   part -- my last part of this, but so if you would

24   go plug in your phone, that would be great.

AR-L 149843

1          THE WITNESS:  I'm going to plug it in.  I got

2    to change locations.

3                         (Brief pause.)

4          THE WITNESS:  Can you hear me?  Because I can

5    continue if you guys are ready.

6          MS. McGRATH:  We can hear you.

7          MS. ROSEN:  Before we go on, I have a

8    question, how much longer are you prepared to sit

9    because Ms. McGrath is not the only one that's

10   going to have questions, so ...

11         MS. McGRATH:  Right.

12         THE WITNESS:  How long am I prepared to sit?

13         MS. ROSEN:  Yeah.  I'm just saying that

14   once -- I don't know how much longer Ms. McGrath

15   has precisely, but when she's done, other attorneys

16   will have questions.  And I can imagine --

17         THE WITNESS:  I understand.

18         MS. ROSEN:  -- that we have at least -- my

19   best guess, knowing what's left to be covered, is

20   there's probably two hours left.

21         MS. McGRATH:  Yeah.

22         THE WITNESS:  I can only tell you I didn't

23   expect it to go this long.  My wife is waiting for

24   me to go meet with friends.

1       MS. ROSEN:  I appreciate that.  And we didn't

2   have -- as I said at the beginning of this

3   deposition, we had no idea where you were located

4   or what your time zone is so, and we're happy to

5   accommodate you.

6                And as I said at the beginning, we

7   don't want to inconvenience you, but we have to get

8   the questions done.

9                So you tell us what your cut off

10  time is, and then --

11      THE WITNESS:  All right.  It's now 8:12.  How

12  about if we cut it at 9:00 o'clock.

13      MS. ROSEN:  That's fine.

14      THE WITNESS:  That's 45 minutes.

15      MS. ROSEN:  Okay.  And with the understanding

16  that we're probably going to have to call you back

17  for another hour or two at some other time.

18      MS. McGRATH:  Yeah.

19      THE WITNESS:  Very good.

20      MS. McGRATH:  Thank you.

21      THE WITNESS:  So I should continue?

22      MS. ROSEN:  Yeah.

23  BY MS. McGRATH:

24      Q.   Well, let's -- we've gotten to the

AR-L 149845

1  process of Detective Guevara coming back with the

2  photo, and you setting up the photo array.

3        A.    Right.

4        Q.    And then one of the boy witnesses came

5  in to observe the photo array?

6        A.    Well, I put together -- I put together

7  a photo array, we went into the largest of the

8  interview rooms, and I explained to each boy --

9  each of the boys that we're going to look at some

10  photos.  It's possible that the offender is not in

11  the group of photos, so don't feel like you have to

12  pick somebody out.  I only want you to make an

13  identification if you're certain.

14              I then asked Gawrys and the one boy

15  to step to the corner away from the table.  I

16  walked over to the table, I spread out the photos.

17              I asked the other young boy to come

18  up, and Guevara came right up with him.  I had no

19  problem with that.  And I asked him to look at the

20  photos.  And some time past, and I can only say I'm

21  estimating, because I'd say 45 seconds, maybe a

22  minute.  I wasn't rushing the kid because sometimes

23  people need more time, and it's his job to pick it

24  out.

1              And then suddenly Guevara reaches

2  out unexpectedly and puts his finger right on the

3  photo, and in doing so, the kid says, Yep, that's

4  him.

5              And I said, Whoa, whoa, wait a

6  minute here.  I said, Guevara, you and him get out.

7              And I mixed up the photos, and I

8  asked the second boy to come up, and he looked at

9  the photos and could not identify anybody.

10     Q.    Did you have a conversation then with

11  the first kid by himself?

12     A.    Not by himself.  With Guevara.

13              And I said, What is going on.  I

14  said, Guevara, you know, why did you do that?  You

15  know, he's supposed to make the identification.

16              And the kid is saying, Oh, no,

17  that's him, but he may have looked a little

18  different.  Maybe the hair.  I don't know what it

19  was, but I was going to pick him out.

20              All right.  So I had to call felony

21  review.  They came down, or a person came down.  I

22  don't remember if it was male, female.  Apprised

23  them that we had two people look at the photo

24  arrays, and one person picked him out and one

1  didn't.

2              And I've been asked this before:

3  Did I tell that person from felony review what had

4  happened?  And I don't think I did, because in my

5  mind, I didn't know why it was done.  It was

6  stupid, and I didn't want to ruin Guevara's career,

7  even though I had other encounters with him prior

8  where I was suspicious, but I didn't know what he

9  was about.  So I didn't want to name him at that

10  time and cause problems for being stupid, okay?

11             But now I had a deal with it.  But I

12  also knew that the photo array was step one.  I

13  knew I was going to have to have a physical lineup.

14     Q.    You said you had other encounters where

15  you were suspicious?

16     A.    Yeah, there were other cases with

17  Guevara.

18             Listen, you don't walk into -- I've

19  done enough homicide investigations.  You don't

20  walk into the room with your suspect and 15 minutes

21  later come out with a confession, you know?

22     Q.    And when did that happen?

23     A.    It happened too many times.  It

24  happened --

1        Q.     When did it --

2        A.     -- too many times --

3        Q.     -- happen with you?

4        A.     -- with Guevara.

5        Q.     When did it happen with you?

6        A.     Where I saw it?

7        Q.     Yes.

8        A.     Where I saw that happen?

9        Q.     Yes.

10       A.     Numerous times, yeah, when I was there.

11  I can't tell you the dates.  I can't tell you the

12  dates.  I was working same hours as he was and same

13  days mostly.

14       Q.     So just sort of generally suspicious

15  type --

16       MR. STARR:  Form --

17       THE WITNESS:  Yeah, it was cases where there

18  weren't any leads or and suddenly he comes in with

19  people when he's in gang crimes and he's got

20  witnesses that nobody knew about.  And that he's

21  picking up this person and he's getting a

22  confession.

23              I'm not prior -- I'm not in the room

24  when he's getting the confession.  But I know how

1  hard I worked to try to get a written statement

2  confession from people.

3              That I know --

4  BY MS. McGRATH:

5      Q.    You said a minute ago -- hang on -- you

6  said a minute ago that you said to Guevara and the

7  young man that -- you said some -- you had said

8  something to him about your discomfort with the

9  photo?

10     A.    Yeah.  With the way the identification

11 was.

12              To me, it was Guevara making the

13 identification, not the kid.  But the kid is now

14 telling me, Well, wait a minute, you know, I was

15 going to pick him out.

16     Q.    And what did Guevara say?

17     A.    Nothing.  I --

18     Q.    And you didn't -- and you didn't say

19 anything about this to felony review because you

20 said at the time it may have been a

21 misunderstanding.

22     MS. SUSLER:  Megan, can I just ask that you

23 not interrupt the witness when he's not done with

24 his answer.  Thanks so much.

1          MR. STARR:  And I'll join that.  But I'll
2   also object to the form of that question and say
3   that it mischaracterizes his prior testimony.
4          THE WITNESS:  Yeah.  I did mention that I
5   wasn't intent on -- even though you have suspicion,
6   it's like everything else.  You've got to have
7   some -- I had nothing more than that.  And why did
8   you do it?  It was stupid, okay?
9                   I'd never had that happen to me,
10  before or after, by another detective or any
11  policeman.  You know, but it muddled the waters.
12  Now I'm left to deal with this.
13                  And so I didn't mention it to
14  state's attorney, but I sure did mention it, I
15  know, to Mingey.  But I don't know that I mentioned
16  it to Mingey that night, because I think maybe
17  Mingey was gone.  But I know the second night,
18  Mingey was there because he went with me and my
19  partner, who I believe was Boyle, to pick up the
20  person who owned the car.
21  BY MS. McGRATH:
22     Q.    This was the next day.
23     A.    The next day.  Because we knew we had
24  to have a real lineup with the suspect, even though

AR-L 149851

1  we had one witness who says, That's him, and one

2  who can't pick him out.

3                    So the next day, we have the lineup,

4  all right?

5      Q.    And you went and picked up the -- we'll

6  call it the suspect.

7      A.    Right.

8      Q.    With your partner and with Sergeant

9  Mingey.

10     A.    Right.

11     Q.    And you said -- and you had to go to

12 his house?  Is that how that happened?

13     A.    It was an apartment, apartment.  And I

14 remember the white car -- the white car with the

15 license plate number was parked on the street.  I

16 don't remember the street address.  I don't

17 remember the street.

18                    I remember we all -- the three of us

19 went to the -- rang the doorbell.  The young man

20 comes to the door.  He was dressed in dress pants,

21 a white shirt, I think he had a tie on.

22                    And Mingey says he was holding an

23 umbrella.  I don't remember that.  That's why he

24 always called it, The boy with the umbrella.  But I

AR-L 149852

1   never remembered an umbrella.

2                   But we told him we needed to talk to

3   him.  He invited us into the house, or apartment.

4   And we went in, and there at the dining room table,

5   I'll vividly recall, that he had his college

6   textbooks on the table and a bunch of bills and a

7   checkbook, and he had been writing out his bills to

8   pay his bills, okay?

9                   But I got an identification I got to

10  deal with.  So we told him we needed to bring him

11  in because his car, his license plate number was

12  given, he might be involved in an incident.  He

13  said fine, and he came in with us.

14                  And then we have Guevara --

15      Q.   Well, just one quick second.  There was

16  a little pause there, but I want to make sure I'm

17  following you on the time line here.

18                  So you and your partner and Sergeant

19  Mingey brought him back to the station for a live

20  lineup?

21      A.   Right.

22                  But we never brought the car.  We

23  left the car parked.

24      Q.   Okay.  And --

AR-L 149853

1       A.    And I say that because that's different

2   than in the Jimenez case.

3               In the Jimenez case, they said they

4   brought it in, they towed it, that it was

5   identified by one of the boys.

6               None of that happened.

7       Q.    Okay.  Who brought the boys back to the

8   station for the lineup?

9       A.    Yeah.  In hindsight, that was possibly

10  a big mistake, because it was Guevara and Gawrys

11  that brought them back.  We needed them brought

12  back.

13              Who called gangs to ask them to come

14  back, I don't know.  I know I didn't.  Could it

15  have been my partner?  Could it have been Mingey?

16  I don't know.

17              But it was Guevara and Gawrys that

18  brought them back.  This time, that older -- older

19  person did not come with them.

20      Q.    And the -- the boys then participated

21  in a live lineup, correct?

22      A.    In a live lineup.  And now of course

23  the boy that had selected the picture that Guevara

24  pointed to, or put his finger on, was able to pick

AR-L 149854

1 | him out of the lineup.

2 |              The other boy who couldn't identify

3 | anybody at the photo array could not pick out

4 | anybody in the lineup.

5 |      Q.    And so then since you had an

6 | identification you called felony review.

7 |      A.    Right.

8 |      Q.    Now, when -- and so felony review then

9 | came to the station.

10 |      A.    Right.  I don't know if it was a male

11 | or a female.  I don't recall.

12 |      Q.    And what did you tell felony review

13 | about the lineup process?

14 |      A.    That we ran the photo array.  We had an

15 | identification from one, not two.  We ran the

16 | lineup, and he picked out one.  And one person

17 | picked him out and one didn't, and felony review

18 | said, Charge him.

19 |      Q.    Did you say anything to any -- you

20 | didn't say anything though to felony review about

21 | the earlier --

22 |      A.    Again --

23 |      Q.    -- photo --

24 |      A.    Again, like the first day, I don't

AR-L 149855

 1 │ think I did.  I don't think I did, because I did

 2 │ not know -- like I said, even though I had seen

 3 │ things that I was questioning in my mind from prior

 4 │ occurrences, this -- it was suspicion.  I mean,

 5 │ it's stupidity to do it.  Why would you do it?  All

 6 │ right?

 7 │            But I did talk to Mingey about it.

 8 │ I talked to other people about it after that.

 9 │      Q.    Who else?

10 │      A.    Because --

11 │      MS. GOLDEN:  Can I just -- hold on.

12 │            Mr. Dorsch, I think Megan -- not

13 │ this last question but the question before that

14 │ where there was a very long answer, you didn't

15 │ finish your question.  So the record isn't going to

16 │ reflect your complete question.

17 │            Because, Mr. Dorsch, I think you

18 │ need to give her just a second --

19 │      THE WITNESS:  I'm sorry, I'm sorry.

20 │      MS. GOLDEN:  -- before you answer so that we

21 │ have -- so the court reporter can type down what

22 │ she's asking you before you give the answer.

23 │            So can you -- can the court reporter

24 │ read back not the last question but the one before

 1  that and see if we got it.

 2                      (The record was read as follows:

 3                       Q. Did you say anything to

 4                      any -- you didn't say anything

 5                      though to felony review about

 6                      the earlier -- )

 7       MS. GOLDEN:  So, Megan, would you mind

 8  finishing the -- or do what you like.  I just

 9  didn't think that that -- I thought your question

10  was cut off.

11       MS. McGRATH:  That's okay.  Thank you.

12  BY MS. McGRATH:

13       Q.    But again, yeah, I think you started

14  answering that you didn't -- there was no

15  conversation with felony review about the day --

16  the lineup or the photo array the day before, right?

17       A.    Right.

18       Q.    And then you started -- after -- so

19  felony review approved the charges, and you guys

20  started doing paperwork, I believe.

21                  Is that when the suspect's father

22  showed up?

23       A.    Yes.  We had taken him down to the

24  lockup after an arrest report was made out, and we

AR-L 149857

1  returned to our office to begin writing out the

2  reports.

3              And at that time the gentleman came

4  in and said he was the father of the person that we

5  brought in and asked why he was there.

6              And he said -- we said, Well, he's

7  here because his car, and he had been identified in

8  a shooting homicide that happened at Humboldt Park.

9              And with that, the father almost

10 collapsed to the floor, going to his knees, or at

11 least one knee.  I don't -- strike that.  I don't

12 know how far he went, but he almost -- he collapsed

13 somewhat.

14             And he said to us, No, you're wrong.

15 He's a good boy.  He wouldn't do that.  He works --

16                  (Phone interruption.)

17     THE WITNESS:  He works and he goes to school,

18 okay?

19             I says, Excuse me, sir.  He does

20 have a gun arrest.

21             And he says, Yeah, but did you ask

22 him about that?

23             I said, No, I didn't, but I know he

24 had a gun arrest.

1            And so he says, Would you please

2   talk to him about that?  It's really something

3   really stupid.

4            And I said, Okay, sit here.

5            And I went down I believe with my

6   partner, talked to the -- pulled him out of the

7   lockup or talked to him through the lockup and

8   asked him about the incident.  And we had the case

9   report, and asked him about that incident.

10           And he said, Well, it was really

11  something dumb that I did.  He said, I was driving

12  through the alley -- an alley near my house.  It

13  was daytime.  And as I was driving, I saw a handgun

14  laying in the middle of the alley.  I stopped the

15  car, I got out, I picked up the gun, and

16  immediately I could see it was a revolver.  The

17  metal frame was broken, and it was not loaded, he

18  said.  But I did something really stupid.  I threw

19  it in the trunk of my car.  I drove out of the

20  alley.  I went about a block, and a uniformed car

21  stopped me and found the gun.

22           And that was consistent with the

23  report.

24           So I went back upstairs --

AR-L 149859

1  BY MS. McGRATH:

2       Q.    And just to make sure -- because,

3  again, I'm sorry to interrupt.  I just want to make

4  sure I'm following.

5             This was -- this is what his father

6  told you?

7       A.    No, this is what he's telling me, the

8  kid when we went --

9       Q.    You went back and --

10      A.    The father said, Would you talk to him

11  about that?

12            And then we went down to the lockup

13  to talk to him, and that's what the kid told us,

14  all right?

15      Q.    All right.

16      A.    And so, I mean, I already had a kid

17  meet me at the door dressed in dress pants, a white

18  shirt, and I think a tie, who's doing his -- paying

19  his bills, and he's got his textbooks.  He's

20  working at a drugstore, okay?

21      Q.    It was Walgreens, right?

22      A.    Yeah, on Irving near Milwaukee.

23      Q.    And he was doing homework so he was in

24  school.

AR-L 149860

1          A.    He was going to either DePaul or Loyola

2    at night.  I don't remember which one.

3          Q.    So he's a college student, okay.

4          A.    Right.  So he did not fit this profile,

5    okay?  And now he's got this gun in his car and,

6    you know, you're suspect about that.  But now when

7    he's explaining it as it was, and it was an

8    inoperable gun with a broken frame and unloaded,

9    okay?  So he's telling the truth about the weapon,

10   okay?

11         Q.    So then you --

12         A.    So go back up to meet with the father

13   again and tell the father we spoke to him.

14               And he says, What do I do?  And I

15   said -- he says, Should I get an attorney?

16               I says, No, I wouldn't do that yet,

17   sir.  Why don't you do this.  Just go to court

18   tomorrow, to Branch 66 down at 26th Street, and see

19   what happens there.

20               And he left.

21               Now, Guevara, Gawrys, and the two

22   boys are already gone before the father came in,

23   okay?

24         Q.    Right.

AR-L 149861

1      A.    So I told my partner, Listen, we're

2  going to go pick up those two kids tomorrow without

3  Guevara and Gawrys.  And we've got to bring them to

4  Branch 66 for the grand jury anyway.

5                So we went out and we picked up each

6  boy.  One, talked to him, put it on him that I

7  don't feel good about this thing, it really stinks,

8  I don't like the identification of what's going on

9  here.  And same with the second boy.

10                And both boys said, We were paid.

11  We don't know nothing about the homicide.

12      Q.    Both boys said they were paid.

13      A.    Both boys said they were paid.

14      Q.    Who did they say paid them?

15      A.    They didn't give me the name.  I don't

16  know that they knew the name.  I don't know

17  that they knew the name of any of the policemen,

18  okay?  And I didn't know at that time that one of

19  them was going to be a cousin of Sammy.

20                But Sammy told me later it was

21  Miedzianowski who said, We need to put a case on

22  this guy.  And that --

23      Q.    So Sam -- wait, this is something Sammy

24  told you --

1        A.    Oh, yeah.

2        Q.    -- two years ago?  Two years ago he

3   told you this.

4        A.    Yeah.  At the meetings, the two

5   meetings.  We went the first time, and then more in

6   detail the second meeting.

7        Q.    But before Sammy told you this, the

8   boys -- in your memory, those boys didn't -- didn't

9   tell you -- didn't tell you who paid them?  Or did

10  they tell you it was the guy that came with them --

11       MR. STARR:  Objection to foundation.

12       THE WITNESS:  They said they were paid by the

13  police.

14       MS. McGRATH:  Excuse me?

15       THE WITNESS:  They were --

16       MR. STARR:  My objection was to form and

17  foundation.  I didn't mean to talk over the witness.

18       THE WITNESS:  Okay.  Again, they said they

19  were paid to make an identification.  I don't think

20  they knew who the names of the policemen were,

21  okay?  And so I didn't go further with that.

22               But I took the two boys, after

23  learning that, right to Branch 66 and presented to

24  the state's attorney there that these boys had told

AR-L 149863

1  us that they knew nothing about the homicide, that

2  the police had stopped them and told them they

3  needed them to make this identification, and paid

4  them.  And later --

5  BY MS. McGRATH:

6       Q.    So it was the police that paid them?

7       A.    Yes.

8       Q.    Not this third --

9       A.    No, yes.

10      Q.    -- person that they didn't know?

11      A.    Right.  But the third person --

12      Q.    You previously --

13      A.    -- Sammy --

14      Q.    -- said when you testified about

15  this that it was --

16      MS. ROSEN:  You guys are talking over one

17  another again.  So if we could just pause when we

18  ask the question and when we get the answer.  Thank

19  you.

20      MS. GOLDEN:  Does the court reporter have

21  what he just said?

22      THE REPORTER:  (Nodding.)

23      MS. ROSEN:  No.

24      MS. McGRATH:  Katie, what was the last thing

AR-L 149864

1  you had?

2       MS. ROSEN:  Mr. Dorsch, can you just repeat

3  what you were just saying.

4       THE WITNESS:  I'll try to recall it as

5  specific as I can.

6                  That the boys did not know the names

7  of the police officer, but it was not the third

8  person that you're referring to.  I learned about

9  it, who paid, from Sammy, when Sammy said that

10 Miedzianowski said they needed to find witnesses to

11 put a case on this guy.

12                 And Sammy said, Well, my cousin

13 lives right there by this homicide.  Let's go talk

14 to him.

15                 And when they went to talk to him,

16 his cousin was with a friend of his, and they paid

17 both boys to come in and make the identification.

18                 Sammy said, That's where it all went

19 wrong.  He says, because the boys didn't know the

20 person they wanted him to pick -- them to pick out,

21 and they did not get a chance to see the photo

22 because I took the photo as soon as Guevara got

23 there.  In the lineup and the photo array, they

24 didn't know who they were supposed to pick out,

AR-L 149865

1   according to Sammy.

2   BY MS. McGRATH:

3       Q.    So the boys told you and the state's

4   attorney that the police paid them off.

5       A.    Yes.

6       Q.    And they told you -- and they told you

7   that that day when that happened.

8       A.    At Branch 66, it's the next morning.

9       Q.    Right.

10      A.    Okay.  Branch 66 there, whoever was

11  going to handle the case, gave them all the facts.

12            And he said, Do you want to charge

13  the two juveniles with lying to the police?

14            And I said, No, because I spent

15  enough ridiculous time in juvenile court where

16  nothing is done.  I just want to save an innocent

17  kid from going to jail.

18      Q.    All right.  I get all of that.

19            But the boys told you that night

20  that it was the police who paid them off?

21      A.    Yes.

22      MR. STARR:  Objection, asked and answered.

23  BY MS. McGRATH:

24      Q.    And you told that to the state's

 1 | attorney.

 2 |        MR. STARR:  Objection --

 3 |        THE WITNESS:  I told him at 66, yes.

 4 | BY MS. McGRATH:

 5 |        Q.    But you didn't tell the state's

 6 | attorney about what you had seen Guevara do the day

 7 | before.

 8 |        MR. STARR:  Asked and answered.

 9 | BY MS. McGRATH:

10 |        Q.    That day.

11 |        MR. STARR:  Same objection.

12 |        THE WITNESS:  I don't recall.

13 | BY MS. McGRATH:

14 |        Q.    Okay.  So when the boys told you that

15 | the police told them to pick that guy, like, what

16 | did you do to figure out which police did that?

17 |        A.    I didn't know.

18 |        MR. STARR:  Objection --

19 |        THE WITNESS:  I didn't know.

20 | BY MS. McGRATH:

21 |        Q.    They didn't know?

22 |        A.    They didn't know the names, and I

23 | didn't know who am I going to pick out of the four.

24 |        Q.    What sort of questions did you ask them

 1  to identify?

 2       A.    I don't recall.  I don't recall.  I

 3  might have known how much money they were paid at

 4  the time, but I no longer recall.  I may have asked

 5  them even who it was, but I know they didn't know

 6  the names.

 7       Q.    Okay.  But you told the state's

 8  attorney, who you don't remember, that --

 9       A.    I don't know --

10       Q.    -- what you're saying the police paid

11  them off?

12       MR. STARR:  Objection, asked and answered.

13       THE WITNESS:  Yes.

14  BY MS. McGRATH:

15       Q.    And what did the state's attorney say

16  about that?

17       A.    He asked, like I said, Do you want to

18  charge the two boys with lying to the police and

19  creating this problem basically?

20            And I said, No, I don't.  I spent a

21  lot of time in felony report, wasted time where

22  nothing is done.  I just want to make sure this kid

23  doesn't get put into the system and go to jail for

24  something he didn't do.

```
 1       Q.    Right.
 2       A.    And the state's attorney told me, okay,
 3  we'll get him released from Branch 66 today.
 4       Q.    Right.  But what about the part of the
 5  police being behind this?  Like --
 6       MR. STARR:  Objection, form.
 7  BY MS. McGRATH:
 8       Q.    -- what did the state's attorney say
 9  about that?
10       MR. STARR:  Form.
11       THE WITNESS:  Nothing.
12  BY MS. McGRATH:
13       Q.    Just let it sit that the boys had been
14  paid by the police?
15       MR. STARR:  Form.
16       THE WITNESS:  Yeah.
17  BY MS. McGRATH:
18       Q.    You don't recall the state's attorney
19  saying anything about that.
20       MR. STARR:  Asked and answered.
21       THE WITNESS:  No.
22                      (Brief interruption.)
23  BY MS. McGRATH:
24       Q.    Okay.  I guess I'm -- you weren't
```

1  curious who paid them off?

2        A.    Yes, I am, but that's what I took back

3  to my office.

4        Q.    Okay.  But you didn't -- but you had

5  the boys right there.

6        A.    I didn't know which of the four was --

7  Guevara did the bad photo ID.  That I can tell you

8  about, and that's what I said, okay?

9              Or I don't know if I -- you know, I

10  don't really know if I told even the state's

11  attorney about the photo ID.  I must have.

12              But the important thing was I just

13  had the two boys tell me this new information that

14  they were paid.  That was the thing that was going

15  to get an innocent guy out.

16        Q.    Right, I get all that.

17        A.    Right.

18        Q.    And that took place.

19              My question though was the

20  identity -- getting information about the identity

21  of the police officers who the boys said were

22  behind this.  You said they didn't know --

23        A.    I was --

24        Q.    -- but what -- what sorts of questions --

```
 1        A.     Okay.

 2        Q.     -- did you ask them to try and get that

 3   information?

 4        A.     If they don't know, they don't know.

 5   But here --

 6        Q.     So you just didn't ask any questions at

 7   all.

 8        A.     Here -- here's where it goes.  It's the

 9   police department is sort of like the military, all

10   right?  When something happens in your unit, you

11   take it to your supervisor.  Then it becomes his

12   job to move it further.

13               Now, I did that.  When I dropped the

14   two boys off at their homes, and by the time I

15   returned to Area Five, the whole office staff,

16   bosses, Sergeant Mingey and -- I can't say Sergeant

17   Mingey, I don't know.  I don't even recall anymore

18   who it was who was out there.

19               But whoever the daytime supervisors

20   were and the commander were waiting for us.  They

21   had already been alerted by the State's Attorney

22   Office that we had this guy released or asked to

23   have him released, okay?

24        Q.     So you --
```

1        A.    And the first words -- go ahead.

2        Q.    Well, I was just -- I want to make sure

3   I understand.

4              So you yourself, your understanding

5   was that you could not do any investigation into

6   the bribery that just occurred because it had to

7   come from someone above you?

8        MR. STARR:  Objection to form --

9        THE WITNESS:  Yes.

10       MR. STARR:  -- foundation, mischaracterizes

11  his testimony.

12  BY MS. McGRATH:

13       Q.    Okay.  And then when you got back after

14  all this happened, there were supervisors there.

15       A.    Uh-hmm.

16       Q.    And just like who -- I know you

17  testified to this before.

18              So Mingey was not there was your

19  recollection.

20       A.    I don't think he was, because this was

21  on daytime and he would have been working nights.

22       Q.    And you have -- you testified before,

23  but just again, you don't have any recollection of

24  who were the supervisors waiting for --

1       A.   You know, I have some recollection, but

2  I've never wanted to give it just in case I'm

3  wrong, and then I look like I don't know what I'm

4  talking about.  So I'd rather say I can't be sure,

5  okay?

6               But what I got -- when I came back,

7  one of the supervisors -- it could have been the

8  commander, could have been the violent crimes

9  commander, the lieutenant.

10              But one of them said, Dorsch, what

11  the fuck are you doing?  We're never going to solve

12  this case.

13              And I'll never forget it.

14              And I said, So you want me to put an

15  innocent kid in jail for something he didn't do?

16              And then I was told and my partner

17  was told, Sit down and do not write any reports.

18              And then some time passed and

19  they -- somebody came back out, I'm not exactly

20  sure which sergeant it was, but we were told, This

21  is the way it is.  You're not going to write any

22  reports.  You got a CB number on this homicide.

23  We're going to be able to classify this cleared

24  open, or cleared close.  I don't know what they

AR-L 149873

1  said.

2               It should have been cleared open,

3  because there were more than one people in the car,

4  okay?  But it is not --

5       Q.    But you know what --

6       A.    Go ahead.

7       Q.    No, because I want to make sure I'm

8  kind of like following the --

9       A.    Yeah.  This doesn't happen every day in

10 my life either, okay?

11      Q.    Oh, I imagine.  That's kind of why I'm --

12      A.    Yeah.

13      Q.    -- trying to figure out the hesitance

14 of trying to identify who really blew up your

15 investigation.

16      MS. SUSLER:  Objection, form.

17 BY MS. McGRATH:

18      Q.    It wasn't you.  It was some other

19 officer.

20      MS. SUSLER:  Objection, form.

21      MR. STARR:  I'm not even sure what that

22 question is.

23      THE WITNESS:  My responsibility was to alert

24 my supervisor.  It's his job to move it further.

1  It would have been him.  It would have been

2  improper for me to call Guevara's boss.

3  BY MS. McGRATH:

4       Q.    I didn't ask about that.

5             So you'd asked -- but you can't

6  recall who you told about in the detective

7  division, and you can't recall who told you

8  specifically the case is blown.  Don't do any paper

9  on it anymore.

10      MR. STARR:  Asked and answered.

11  BY MS. McGRATH:

12      Q.    Because now that it's --

13      A.    If you would have asked me a month

14  later and not in 2021, I would have had a better

15  chance telling you a month after.

16      Q.    Got you.

17            But because it's been so long, you

18  can't --

19      A.    And I've handled so many cases myself.

20      Q.    Right.

21      A.    And continue -- continue to do it.

22      Q.    Right.

23            So this didn't stand out as much to

24  have you remember it.

1        A.    Oh, the event as it occurred --

2        MR. STARR:  Objection to form.

3        THE WITNESS:  -- will never go away.

4              You know, when bad things happen in

5  your life or unusual things happen in your life,

6  you tend to have a better chance of remembering

7  details, okay?

8  BY MS. McGRATH:

9        Q.    Right, exactly.

10       A.    But when it comes to remembering names,

11 dates, times, that's difficult.  Like I said --

12       Q.    Those are --

13       A.    -- I couldn't -- at first -- when it

14 first came into question, I couldn't be sure what

15 date it was yet, what year it was, or who I was

16 working with.  But I'll never forgot the events as

17 they unfolded.

18       Q.    But you can't remember who's doing

19 these events is what I'm trying to --

20       MR. STARR:  Objection --

21 BY MS. McGRATH:

22       Q.    -- to clarify.

23       MR. STARR:  Objection to form, asked and

24 answered, mischaracterizes his testimony.

1      THE WITNESS:  You know, a little over a month

2   ago, I was on an airplane flying across the ocean,

3   and the pilot announced his name.  He was

4   responsible for my life during that flight.  I

5   heard his name, but I no longer recall and probably

6   could never identify him, even though it was only a

7   little over a month ago.  All right?

8   BY MS. McGRATH:

9      Q.    Right.

10     A.    I'm trying to tell you honestly that

11   the events occurred the way they did, but I don't

12   want to make a mistake and have what happened fall

13   apart because I made a misstatement.

14      THE WITNESS:  Maria?

15      MS. McGRATH:  Are you okay?

16      THE WITNESS:  New question.

17      MS. McGRATH:  No, I saw you turn to --

18      THE WITNESS:  Oh, I was trying to get my

19   wife's attention, but she's out of the room.

20      MS. McGRATH:  All right.

21   BY MS. McGRATH:

22      Q.    Now, there have been -- you're

23   obviously aware, and we talked about this earlier a

24   moment ago, about the Jose Jimenez file that you

 1  represented during the -- in the lead up to the

 2  Juan Rivera trial.

 3        MR. STARR:  Objection, form.

 4  BY MS. McGRATH:

 5        Q.    If you recall that.

 6        A.    No.

 7        Q.    It was the case you were -- I think you

 8  were originally given -- were you given it from

 9  someone at Northwestern?  I thought it was Karen

10  Daniel that was --

11        A.    No, it was -- I'm sorry.  Did I say

12  Karen Ranos?

13        Q.    Yes, you did.  That's why I was kind of

14  confused.

15        A.    Okay.  Karen Daniel, I'm sorry.

16        Q.    Okay.  So now I know who we're talking

17  about, great.

18              And you were given that file because

19  the -- because of the similarities between that

20  incident, that crime, and the story that you've

21  just told us about the boys and Detective Guevara.

22        MS. SUSLER:  Objection, form and

23  characterization of the term "you were given."

24        THE WITNESS:  Okay.  What happened was Karen

1  Daniel came to me with a file that she told me that

2  had been given to her because the police had found

3  it in a search and told her, This must be the file

4  that Dorsch has been talking about.

5            And she said, I think this is the

6  case.

7            And I looked at it, and I said,

8  Karen, there are similarities here.  It's a street

9  shooting in Humboldt Park at night, car to car,

10  gang related.  Yeah, there's a similarity not only

11  to that case but to other cases.  I says, But the

12  one big difference that tells me it's not the case

13  is because Guevara was in gang crimes.  He was not

14  a detective as it is in the Jimenez case.

15            And I've never wavered.

16  BY MS. McGRATH:

17      Q.    Oh, I -- that's not the question.

18            But the Jimenez file, let's talk a

19  little bit about some of the similarities.  Because

20  the shooting, the way it happened in the Jimenez

21  file, was just like the case you described where

22  it's a car-to-car shooting, right?  Someone reached

23  through a car and killed a guy sitting in another

24  car as they're going past, correct?

 1           MR. STARR:  Objection, form.

 2           THE WITNESS:  I wasn't the primary

 3    investigator on it, and there would be details I

 4    don't have.

 5    BY MS. McGRATH:

 6           Q.    But the overall was it was a shoot --

 7           A.    Car to car.

 8           Q.    It was a --

 9           A.    Car to car.

10           Q.    -- car-to-car shooting.

11           A.    Yes.

12           Q.    And there was a younger female

13    passenger in both cars who was not shot.

14           MR. STARR:  Form, foundation, calls for

15    speculation.

16           THE WITNESS:  Yes, there was a younger girl,

17    relative, I believe about 14, and that's that.

18    BY MS. McGRATH:

19           Q.    And but in the Jimenez file that you

20    were given, the girl was not a relative and she was

21    17?  That was the big difference?

22           A.    She was older, yes, yes.

23           MR. STARR:  Object to form, foundation, calls

24    for speculation, mischaracterizes prior testimony.

AR-L 149880

1   BY MS. McGRATH:

2        Q.    And both of -- regardless of age, like

3   both of these female passengers weren't in the --

4   left the city, left -- in one case left the country

5   after --

6        A.    Yeah.  And the case --

7        Q.    -- these incidents happened, correct?

8        A.    The case I'm talking about from what we

9   understood from relatives from trying to contact

10  the witness, she had already returned to Puerto

11  Rico.

12       MR. STARR:  Belated objection to form,

13  foundation, calls for speculation, mischaracterizes

14  prior testimony.

15            And, Mr. Dorsch, I know it's late

16  here, but if you could let me get my objections in,

17  I would appreciate it.  Thank you.

18  BY MS. McGRATH:

19       Q.    And in the Jimenez file, the girl

20  passenger left the state.  She moved to

21  Philadelphia after the incident and couldn't -- was

22  only interviewed once and couldn't be interviewed

23  for any -- couldn't be interviewed again because

24  she had moved out of the area, correct?

AR-L 149881

1        MR. STARR:  Form, foundation, calls for

2   speculation, mischaracterizes prior testimony.

3        THE WITNESS:  I have no knowledge --

4   BY MS. McGRATH:

5        Q.    Do you recall that in the Jimenez file?

6        A.    I have no knowledge other than what I

7   read because I didn't interview her.

8        Q.    But there's -- but there's

9   documentation in that file that that's what

10  happened with the female passenger.

11       MR. STARR:  Same objection.

12       THE WITNESS:  Yes.  That's what I recall.

13       MS. McGRATH:  Sean, are you done?

14       THE WITNESS:  That's what I recall.

15       MS. McGRATH:  Is there an objection out there?

16       MR. STARR:  I said same objections, yeah.

17  I'm sorry if you didn't hear that.

18       MS. McGRATH:  I didn't want to step on

19  anybody.

20  BY MS. McGRATH:

21       Q.    But, Mr. Dorsch, that is factually

22  accurate, correct?

23       A.    I believe that's in the report.

24       Q.    Right.

1              And it's also in the report in the

2    Jimenez file that two younger men came to the

3    station with information about that shooting a few

4    months later.

5         A.    That's not what it says in the Jimenez

6    case.

7         MR. STARR:  Same objections.

8    BY MS. McGRATH:

9         Q.    What is the difference?

10        A.    Jimenez case has got three witnesses.

11   One is a male black, the other two are Hispanic.

12   Two of them are older than teenagers.  And the male

13   black is never in the station in the case I'm

14   talking about.  He didn't exist.

15        Q.    Right.

16              And then the Jimenez file, the male

17   black came in with the two Hispanic witnesses.

18        A.    Yes, yes.

19        MR. STARR:  Form, foundation.

20   BY MS. McGRATH:

21        Q.    So that's the difference of the

22   number --

23        A.    Wait, no, you're wrong.  The Jimenez

24   case, the male black comes in with one of the two

1  Latinos.  The other one was not located and was not

2  present.

3      Q.    Got you.

4            So it was two witnesses that came in.

5      A.    Right.  In the Jimenez case.

6      Q.    In the Jimenez case, right.

7            And in your case that you remember,

8  it was also two witnesses.

9      A.    So it would be somewhat similar, except

10 the race is wrong, the ages are wrong.

11     Q.    Okay.

12     A.    And well ...

13     Q.    But that's why we're discussing this.

14 We're discussing the similarities and differences.

15     MR. STARR:  I'm just going to make an

16 objection to you asking him questions about his

17 file --

18            (Brief interruption.)

19     MR. STARR:  I'm going to make an objection to

20 you asking repeated questions about this file

21 without showing him the file, and then also

22 mischaracterizing what he says about the file and

23 asking him the same question about the file

24 repeatedly hoping to get a different answer.

AR-L 149884

1          MS. McGRATH:  Mr. Dorsch, is your wife -- I

2    know you said you wanted to have a stop at

3    5:00 o'clock your time.  Do you --

4          THE WITNESS:  Yeah.  We've been planning to

5    meet with friends at 7:30.

6          MS. McGRATH:  Sure.

7          THE WITNESS:  Okay.  And it's an hour and a

8    half past that.  It's 9 o'clock in a few minutes.

9                    (Brief interruption.)

10          THE WITNESS:  She's hungry.

11          MS. McGRATH:  As Ms. Rosen said previously,

12   there was a miscommunication about the timing of

13   this, and we planned that we would have more time.

14   I'll ask the other defense counsel because I still

15   have more questions to ask, so I'm -- I don't want

16   to get continued on something and just have to stop

17   in 5 minutes.

18          MR. STARR:  I think that we agreed -- Eileen

19   and the witness discussed this on the record, and I

20   believe they agreed that we would suspend the dep

21   at 1:00 o'clock our time and then resume at another

22   time that's convenient for the witness.

23          MS. ROSEN:  Right.

24          MR. STARR:  That's what was stated on the

AR-L 149885

1  record.

2        MS. McGRATH:  I just want to make sure we're

3  in agreement with that because I don't want to

4  misstate.

5        MS. ROSEN:  I think that's exactly what we

6  talked about, so there's 6 minutes left.

7              Are you -- are you finishing up a

8  topic and want to move on, or -- it's your call,

9  Megan.  If you have 6 minutes of time, fill it.  If

10 not ...

11       MS. McGRATH:  Okay.

12       MS. ROSEN:  So we have 5 more minutes,

13 Mr. Dorsch, based on the 9:00 o'clock hard stop,

14 unless that's changed for you with your wife

15 yelling at you.

16       MS. McGRATH:  That's why I was curious when

17 your wife came in --

18       MS. ROSEN:  If your wife is yelling at you in

19 the background and you want to end it right now, we

20 can do that too.

21       MS. McGRATH:  That's what I was asking.

22       THE WITNESS:  I'm trying to save my marriage

23 here.

24       MS. ROSEN:  Sure.  We're perfectly content to

 1  break at this point to save your marriage.

 2          MS. McGRATH:  Exactly.  That's why I wanted

 3  to make sure we're all on the same page.

 4          THE WITNESS:  Okay.  I will be available the

 5  next time, but we will have to talk about that

 6  because we're planning a trip for a week to Turkey,

 7  and we haven't picked out the exact date, but we'll

 8  be going.  So I want to make sure it works for both

 9  of us, okay?

10          MS. ROSEN:  The only issue is that we have a

11  discovery cutoff in this case of June 30th, so we

12  need to find a way to get this done before then.

13          THE COURT:  Maybe next week sometime?  Later

14  in the week?

15          MS. ROSEN:  The issue unfortunately is that --

16                  (Brief interruption.)

17          MS. ROSEN:  We don't have your contact

18  information, only plaintiffs' attorney does.  So

19  maybe they'll share that -- the email address with

20  you, and we can communicate with you by email to

21  pick a date that's convenient for everybody.

22                  Is that all right with you if they

23  share your email address with us?

24                  Yes?  I didn't hear you.

1        THE WITNESS:  I said yes.

2        MS. ROSEN:  Okay, fine.  So we'll do that and

3   let you go so that you can save your marriage.

4        MS. McGRATH:  Have a wonderful evening.

5        THE WITNESS:  Bye all.

6        MS. ROSEN:  Thanks everyone.

7        MR. STARR:  Before we go off the record, can

8   I just state, Eileen, I'm fine with reconvening

9   this at a time if we could make it work that's

10  convenient.

11             I did inform you that he was

12  traveling.  I didn't know exactly where he would

13  be, so you know, I'm sorry about the

14  miscommunication.  I didn't know there was a hard

15  stop to his deposition.

16       MS. ROSEN:  Okay.  You set it up, so I mean,

17  like if I'm not saying that -- we can let him go.

18             Mr. Dorsch, you can go.

19       MR. STARR:  Right, no.  All I'm saying is I

20  did send an email saying that he was traveling.  I

21  didn't know exactly where he was going to be.  He

22  said he was available on two dates.  I gave you the

23  two dates.  We picked this one.  I didn't know that

24  there was going to be an issue with him needing to

 1  stop at a certain time.

 2        MS. ROSEN:  Okay.  We'll accept your

 3  representation on that, although I will say that as

 4  the person scheduling the dep and knowing there's a

 5  seven-hour limit, it would seem to make sense that

 6  you might discuss that with the witness, but I

 7  guess we all operate differently.

 8        MR. STARR:  I'm not going to get into my

 9  communications with the witness, but you know, I

10  definitely -- I understand there's a seven hour --

11                    (Brief interruption.)

12                    (Discussion off the record.)

13        MR. STARR:  So what I was saying is I'm not

14  going to discuss my communications with the

15  witness, but I certainly understand that there's

16  seven hours, and it was my understanding that he

17  was available.

18        MS. GOLDEN:  Can I ask a question?  Do you,

19  Sean or Jan, up to now have any intention of -- do

20  you also intend to ask questions?

21        MR. STARR:  I may have like a clarification.

22  I think I wrote down one clarification question I

23  know I want to ask.  But other than that, I don't

24  think I'm going to need a lot of time.

AR-L 149889

 1          MS. GOLDEN:  Jan?

 2          MS. SUSLER:  I'm not planning to at this

 3   point.  Hopefully I won't have to, but I'll

 4   obviously reserve the right to do that if I need to.

 5          MR. STARR:  Same.  It depends on what gets

 6   asked in the next session.

 7          MS. ROSEN:  Just so we have an idea for

 8   planning.

 9          MS. GOLDEN:  Yeah.  We just want to make sure

10   we're clear on things.

11          MS. SUSLER:  And defendants, you're saying

12   you're going to need an hour or two?

13          MS. GOLDEN:  I have more than I thought I

14   would have, so I'm going to have to think it

15   through.  I can't -- we'd have to talk to figure

16   out how much time.

17          MS. SUSLER:  Okay.  I was asking because it

18   makes sense to take that into account when we're

19   planning, how much time.

20          MS. McGRATH:  Absolutely.

21          MS. ROSEN:  We will talk.

22          MS. McGRATH:  That's why I asked you about

23   times, yeah.

24          MS. ROSEN:  We'll talk and reach out.

AR-L 149890

1  Unfortunately, I cannot do next week.  I'm

2  traveling next week.  So it's going to have to be

3  when I get back, which is the week of whatever that

4  is now, the 20th.

5                  And you know, obviously we have a

6  lot of scheduled, so we'll just have to take a hard

7  look at the schedule.  And obviously the earlier we

8  start for him makes sense, the better, right?

9  Because for him it's evening.

10                  So with that in mind, we might be

11  able to fit him in somewhere for the few hours that

12  we're going to have.  You know, that two or three

13  or one or three or whatever it is.

14                  So we'll talk, and then we'll

15  communicate with you guys, and then come up with

16  some thoughts about when to do it.

17        MS. GOLDEN:  Katie, before you go -- we can

18  do it off the record, but I want to give you the

19  names of the officers that I represent.

20                          (The proceedings adjourned at

21                           12:59 p.m., sine die.)

22

23

24

1

2                        REPORTER'S CERTIFICATE

3        I, Katie K. Elliott, do hereby certify that
   WILLIAM DORSCH was duly sworn by me to testify the
4  whole truth, that the foregoing deposition was
   recorded stenographically by me and was reduced to
5  computerized transcript under my direction, and
   that the said deposition constitutes a true record
6  of the testimony given by said witness.

7        I further certify that I am not a relative
   or employee or attorney or counsel of any of the
8  parties, or a relative or employee of such attorney
   or counsel, or financially interested directly or
9  indirectly in this action.

10       IN WITNESS WHEREOF, I have hereunto set my
   hand and affixed my seal of office at Chicago,
11 Illinois, this 15th day of June 2021.

12

13  _____
                Illinois CSR No. 084-004537
14

15

16

17

18

19

20

21

22

23

24

**Exhibits**

**2 Dorsch 061121-2** 19:4

**0**

**03** 48:24

**1**

**1** 6:6
**10** 45:6,8 96:2,4,6
**10-minute** 96:16
**100** 6:13
**11** 45:6,8
**12** 5:15
**12:59** 165:21
**13** 65:7
**13th** 41:24
**14** 89:1 93:2 154:17
**15** 93:2 122:20
**15-year-old** 89:1
**17** 8:18 9:4,7 154:21
**18** 13:15
**1970** 41:14
**1971** 41:21
**1978** 68:4 69:18,24
**1987** 42:3
**1990** 87:11
**1994** 41:10 42:8
**1996** 46:9
**1997** 43:4
**1998** 47:9,14 61:4 63:4
**1999** 34:12 75:2 78:9
**19th** 41:23
**1:00** 159:21

**2**

**2** 19:4

**20** 13:13 37:20
**20-minute** 96:15
**2000** 34:12
**2003** 46:14 48:1 79:17
**2010** 80:6
**2011** 55:14 80:6,24
**2012** 11:1
**2013** 11:1 40:21 64:22
**2015** 17:17
**2016** 13:13
**2018** 13:7,14,16
**2020** 11:19
**2021** 149:14
**20s** 93:3
**20th** 41:22 42:2 165:4
**24** 41:14
**24th** 8:18 112:2
**25th** 112:1,2
**26th** 135:18
**2:00** 115:9

**3**

**30** 96:18
**30th** 161:11
**3:00** 115:10

**4**

**45** 119:14 120:21

**5**

**5** 159:17 160:12
**5:00** 5:16 6:1,8 7:1 159:3

**6**

**6** 160:6,9
**66** 135:18 136:4 137:23 140:8,10 141:3 143:3

**7**

**78** 68:9
**7:30** 159:5

**8**

**89** 85:22
**89/'90** 91:20
**8:00** 112:12
**8:12** 119:11

**9**

**9** 159:8
**90** 85:22,23,24 91:22,24
**91** 91:22
**92** 91:22
**94** 42:3,4 63:7
**98** 48:1,23 49:1,2 61:5,9 63:22 78:10
**99** 50:20 79:1
**9:00** 119:12 160:13

**A**

**Absolutely** 164:20
**academy** 41:21 47:20 51:7
**accept** 163:2
**accommodate** 119:5
**account** 164:18
**accurate** 46:14 156:22
**accused** 33:19,21 34:8,13,19,20 35:11
**acquire** 13:23
**active** 18:8
**actively** 98:20
**actual** 26:9
**additional** 67:12 86:17
**address** 126:16 161:19,23
**addresses** 61:9

**adjourned** 165:20

**admits** 93:7

**advising** 30:22

**afraid** 44:22

**age** 155:2

**agencies** 12:17

**agenda** 58:14 68:13,15

**ages** 106:8 107:10 158:10

**agree** 16:23

**agreed** 159:18,20

**agreement** 160:3

**ahead** 7:11 82:4 83:21 85:19 146:1 148:6

**airplane** 151:2

**alert** 148:23

**alerted** 145:21

**alley** 133:12,14,20

**allowed** 69:3

**Almadovar/negron** 17:17

**amount** 38:6

**Anna** 60:10,22 72:1,7

**announced** 151:3

**answering** 21:7 71:10 84:20 131:14

**answers** 77:10 105:21

**anymore** 18:4 20:5 22:19 25:14 27:16 52:13 55:5 89:19 93:24 103:9,11 145:17 149:9

**apartment** 47:19 126:13 127:3

**apologize** 108:20

**appeared** 110:12

**appellate** 25:24 35:5

**appointment** 12:23

**appreciated** 6:11

**Apprised** 121:22

**approach** 65:21

**approached** 104:2,18 109:15

**appropriately** 6:10

**approval** 50:8

**approved** 131:19

**approximately** 25:15 34:10 40:22 48:19,23 55:14 83:14 85:12

**April** 8:18 112:1

**area** 9:16 14:24 15:2,3,8 16:2,3 42:12 48:8 56:20 57:9 58:9 59:22 62:16 76:13,14 80:13 81:16 86:14, 19 88:5 91:6 145:15 155:24

**areas** 45:22

**arguing** 38:22

**arranged** 6:9 56:17

**array** 92:8,10,13 117:8,13 120:2,5, 7 122:12 129:3,14 131:16 139:23

**arrays** 121:24

**arrest** 35:24 116:16 131:24 132:20,24

**arrested** 68:5 69:18

**arrived** 112:2

**arriving** 13:9

**article** 56:5

**articles** 53:24

**Arturo** 5:5

**assigned** 41:22 86:22 88:15,18,22 90:3

**assignments** 41:17,20

**assist** 68:18 92:11

**Association** 49:15 57:16 58:7,15 68:14 69:10

**attaches** 23:20

**attend** 97:20

**attended** 69:9 97:11

**attention** 151:19

**attorney** 22:24 28:9,17 29:24 32:2, 11 37:11 51:17 55:1 56:19 59:18 60:11 125:14 135:15 137:24 140:4 141:1,6 142:8,15 143:2,8,18 144:11 145:21 161:18

**Attorney's** 7:18 31:23 71:18 72:2

**attorneys** 5:1 13:1 15:8,17 16:6, 20 21:12 24:6 27:2,5 28:13,22 29:11,12 31:22,24 32:19 37:13 38:22 58:10 118:15

**attorneys'** 103:12

**attributed** 54:18

**attributing** 54:13

**audible** 47:10

**audio** 23:8 27:13

**Aurora** 35:20

**Avenue** 97:5

**aware** 7:2 13:1 66:21 88:14 90:15 106:3 107:5 110:6 151:23

---

**B**

**B-A-N-Y-A** 8:11

**B-A-R-G-A-N-S-K-I** 60:19

**baby** 35:12

**back** 10:24 15:20 29:9 40:21,22 42:2 46:13,18 47:18 48:21 50:1 51:15 61:22 63:10 66:5 78:14,23 79:16 94:8 107:2,21 113:9 114:4, 18 116:11 117:2 119:16 120:1 127:19 128:7,11,12,14,18 130:24 133:24 134:9 135:12 144:2 146:13 147:6,19 165:3

**backed** 53:2,14

**background** 160:19

**bad** 144:7 150:4

**bag** 53:14,16 63:21

**Banya** 4:16 8:10

**Barganski** 59:16 60:17,18

**based** 63:24 78:20 160:13

**basic** 24:4

**basically** 53:20 58:11 142:19

**basis** 43:7

**battery** 112:9 117:17

**beautiful** 70:19

**begin** 132:1

**beginning** 86:9 119:2,6

**behalf** 5:12 7:22,24

**Belated** 155:12

**Belmont** 97:5

**beware** 54:20

**BGA** 48:14,17 49:4,18,21 58:4 69:7,11 70:7

**big** 9:15,16 128:10 153:12 154:21

**bigger** 90:19

**Bill** 58:13 75:8 91:16,17,24 104:18

**bills** 127:6,7,8 134:19

**bit** 19:5,7 67:7 112:15 153:19

**bizarre** 38:17

**black** 106:11 107:11 157:11,13,17, 24

**blew** 148:14

**block** 133:20

**blow** 19:5,7

**blown** 149:8

**board** 7:8

**bodies** 52:11,12 53:2,13 64:2 67:12 70:22 72:14

**bodyguard** 52:6

**Bonjean** 27:8,24 28:3,9 29:16 30:4,15,23 98:8,12

**bored** 42:18,21

**boring** 45:10

**boss** 46:19 47:1 149:2

**bosses** 145:16

**bought** 50:13

**boy** 17:10 88:8 120:4,8,14,17 121:8 126:24 128:23 129:2 132:15 136:6,9

**Boyle** 91:7 125:19

**boys** 115:5 116:22 120:9 128:5,7, 20 135:22 136:10,12,13 137:8,22, 24 139:6,17,19 140:3,19 141:14 142:18 143:13 144:5,13,21 145:14 152:21

**Branch** 135:18 136:4 137:23 140:8,10 143:3

**break** 61:14,18 95:20,23 96:5,6,10, 15,16,18 109:6 161:1

**breath** 85:4

**Brian** 32:15

**bribery** 146:6

**brick** 51:9

**briefly** 86:7

**bring** 127:10 136:3

**bringing** 81:6

**broad** 88:13

**broadly** 88:10

**broke** 113:8

**broken** 133:17 135:8

**brought** 24:19 41:23,24 71:18 80:7,14 92:6 105:8 112:17 114:22 115:17 127:19,22 128:4,7,11,18 132:5

**Brown's** 49:6

**Brualdi** 7:19

**brush** 88:13

**building** 69:21 76:16

**built** 42:17

**Bulgaria** 4:16 8:6,16 9:5,6

**bump** 101:19

**bunch** 39:1 127:6

**burned** 78:16

**Burns** 7:21

**business** 9:10 14:7 18:4,20 79:13

**businesses** 9:11

**Bye** 162:5

---

**C**

**Caffey** 35:3

**call** 4:22 23:6 43:8 54:24 119:16 121:20 126:6 149:2 160:8

**called** 4:3 52:9 54:20,23 55:9 56:1 70:9,12 74:3 75:23 114:15 126:24 128:13 129:6

**calling** 4:14 109:16

**calls** 72:17 154:14,23 155:13 156:1

**canceled** 60:4

**capacity** 24:11

**Cappitelli** 57:13 58:11,16 59:14 60:14 67:16,18 68:11,21 69:7,15 70:6,12 71:23 72:12,15,21,24 73:13,17

**car** 87:3 88:8,9 89:3,5 116:2,12 125:20 126:14 127:11,22,23 132:7 133:15,19,20 135:5 148:3 153:9,

23,24 154:7,9

**car-to-car** 153:22 154:10

**care** 69:21

**career** 41:16,19 91:6 122:6

**Carlos** 15:23

**Carole** 62:20

**Caroline** 7:13

**Carrie** 23:11 37:4

**cars** 154:13

**case** 5:6 6:21 15:15,24 16:3,4 21:16 22:2 24:15,19,21 25:13,22 26:14 29:24 30:5,13,15,17,24 31:10,16,19,23 32:2,17,18,21 33:5, 8,11,17 34:3,5,7,10,18 35:3,10,18 37:6 40:4,7 41:2 42:6 65:10 66:8 80:7,8,11,14,20 81:1,2,4,7,11,20, 21,24 82:1,6,19 83:1 85:10 86:22, 23 87:10,12 88:18,22 90:3 94:13 102:4,7 103:15,16,17 104:19,21,22 105:14 106:4,6,10,16 107:6,8,10, 15 110:11,16 114:14,15,17 115:4 128:2,3 133:8 136:21 139:11 140:11 147:2,12 149:8 152:7 153:6,11,12,14,21 155:4,6,8 157:6, 10,13,24 158:5,6,7 161:11

**cases** 7:8,15 14:22 15:11,22 16:11,16 17:7 20:4 21:16 26:6 27:16,20,23 28:1,8,12,24 29:13,15, 21,22 31:9 32:7 36:8,9 37:15,16, 22,23 42:7 79:10 81:8 88:15 94:22 97:8,10 98:15,16 103:11,12,14 114:5 122:16 123:17 149:19 153:11

**casual** 101:17

**catch** 27:18 33:20

**CB** 147:22

**cease** 19:18,19,21

**center** 19:17 36:12 80:16 109:21

**certified** 45:14

**chance** 139:21 149:15 150:6

**change** 105:4 117:17 118:2

**changed** 160:14

**changing** 67:7

**characterization** 38:18 152:23

**charge** 57:12 129:18 140:12 142:18

charges 131:19

check 66:4 116:15

checkbook 127:7

Chicago 5:12 8:1 9:1 12:18 14:8
15:3 20:18 21:10,15 42:9 46:14
48:8,22 51:4,17 52:12 53:1,11 55:2
56:18 57:20 59:20 78:15 79:16
101:20 114:4

Chicagoland 15:1

Chicken 49:6

chief 44:2 52:4 114:9

chime 38:15,20

chiming 38:11

Chris 55:15,17

Christmas 75:5

city 4:16 5:12 8:1,5,9,13 45:23,24
51:16 52:11 53:1,4,11 57:20,21
155:4

Claire 45:16

clarification 17:20 27:14 163:21,
22

clarify 28:19 31:2 65:22 66:11,22
150:22

clarity 87:5

classes 45:16,18,20

classify 147:23

clear 31:6 54:10 56:7 62:7 63:11
68:17 164:10

cleared 147:23,24 148:2

clinic 19:9 82:12,13

close 115:8 116:2 147:24

closed 77:22

coffee 114:12

collapsed 132:10,12

college 127:5 135:3

commander 57:9,11 59:21,22
145:20 147:8,9

communicate 100:20 161:20
165:15

communication 99:8 100:5,11
112:6

communications 101:16 111:8
163:9,14

company 16:1 46:21 50:8,11,15
55:4 58:8

complaint 41:1

complete 130:16

completely 75:2

concept 72:12

concern 38:5

concerned 5:24 38:12 102:1

concerns 96:20

conclusion 81:12

conference 99:7

confession 122:21 123:22,24
124:2

conflate 87:9

confused 152:14

conjunction 24:20

connected 10:3 24:18 48:14,17
61:17

connection 29:1 66:21

consistent 133:22

constantly 36:24

contact 17:6 22:1 155:9 161:17

contacted 46:19 47:20,21

contacting 15:17 16:7

container 13:8

content 160:24

context 37:3

continue 6:19 39:8 76:6 77:16
83:23 118:5 119:21 149:21

continued 82:9 159:16

control 75:10

convenient 159:22 161:21 162:10

conversation 73:16 95:13 97:23
98:1,8 115:2 121:10 131:15

conversations 24:5 72:6,11,19,
24 99:5 111:12

convicted 80:12

Conviction 19:17

convictions 36:12 80:17 82:13

Cook 7:17,19 26:17,18,20 31:18
55:2

cooperation 76:18

copies 108:9

copy 19:1,3 106:3 107:6 108:2,8,9,
17

corner 120:15

correct 8:13 31:5,11 40:8,10 41:10
46:7 49:7 50:6 58:21 62:3,10,11,
15,24 66:18 67:4,12 71:16 79:19
80:17,18 83:5 88:10 90:19 94:10
96:13 102:10 108:17 128:21
153:24 155:7,24 156:22

counsel 6:23 38:10 96:20 159:14

countering 38:8

country 15:10 17:23 48:10 155:4

county 7:17,19 26:17,18,20 31:19
32:18 33:13,14,15,22 42:13,23
44:17 45:12,15 46:1,2 55:3

couple 16:16 18:23 21:2 51:9
55:22 98:16

court 17:15 64:11 85:1 91:9
108:21 113:9 130:21,23 135:17
138:20 140:15 161:13

cousin 106:19 107:16 110:9
136:19 139:12,16

covered 118:19

CPD 41:13,16 54:6,15,17,22 56:12
57:4 59:15 60:13,24 71:15 72:6,7
73:18

creating 142:19

crime 86:4 88:21 152:20

crimes 42:2 57:12 86:6,15,18
104:23 112:23 123:19 147:8
153:13

criminal 27:1,5 32:21 48:5

cross-talk 113:4

curious 40:14,17 144:1 160:16

custom 90:5

cut 36:4 119:9,12 131:10

cutoff 161:11

cutting 35:12

D

Daley's 52:5

**Dan** 7:21

**Daniel** 152:10,15 153:1

**dark** 117:20

**date** 150:15 161:7,21

**dates** 84:10 85:21 123:11,12 150:11 162:22,23

**David** 7:22

**day** 6:19 62:6 68:4 73:24 89:11,13, 16 92:2 114:22 125:22,23 126:3 129:24 131:15,16 140:7 141:6,10 148:9

**days** 19:10 123:13

**daytime** 133:13 145:19 146:21

**DC** 22:11

**deadline** 6:22

**deal** 90:19 122:11 125:12 127:10

**dear** 54:1

**death** 34:9,21

**deceased** 57:8 104:13

**decided** 46:11

**decision** 57:21 74:13

**declined** 11:2,3 93:20

**defendant** 4:24 5:12 7:14,22 8:1 17:9

**defendants** 6:14 7:19 164:11

**defender's** 25:24 26:17,19,21 31:19 35:5

**defense** 27:2,5 38:5,8,10 96:19 159:14

**Deleon-reyes** 5:5

**Demacopoulos** 60:11,22 72:1,7

**dep** 159:20 163:4

**department** 10:4 12:18,19 41:10 43:21 51:5,18 52:10,21 55:2 56:19 58:14 59:19 61:24 63:3,7 64:13 67:9 70:17,18 73:6 74:22 76:11 78:21 114:8 145:9

**Depaul** 135:1

**depending** 8:24

**depends** 89:18 164:5

**deposition** 5:18 6:18 12:16 37:14 38:6 64:12 119:3 162:15

**deposition's** 96:17

**depositions** 84:18

**deputy** 52:4

**describe** 23:2,3 34:22 48:8 114:23

**descriptions** 19:15

**desk** 44:24

**detail** 25:19 52:6 86:8 137:6

**details** 4:21 16:13 26:8 78:4 88:6 150:7 154:3

**detained** 57:15 69:4

**detective** 12:1,6,19 13:4 42:3 47:7 65:14 70:24 73:22 79:9 81:13 83:15 85:13,16 86:3,10,14 87:13 104:23 106:6 107:8 114:21 120:1 125:10 149:6 152:21 153:14

**detectives** 43:16 57:7 58:20 86:19

**Devil** 10:12

**Dickinson** 57:7 58:20 59:13 60:13

**die** 165:21

**died** 34:19

**difference** 106:5,7 107:7,9 153:12 154:21 157:9,21

**differences** 158:14

**differently** 163:7

**difficult** 83:16 84:6,11 85:9 150:11

**difficulty** 85:2

**dig** 71:1 78:10,11,20

**dining** 127:4

**dinner** 62:18 69:19 73:7

**disappointed** 6:22

**disappointment** 50:24

**disclosed** 37:2

**disclosing** 37:17

**discomfort** 124:8

**discovery** 6:21 161:11

**discuss** 12:23 163:6,14

**discussed** 84:7 159:19

**discussing** 12:20 158:13,14

**discussion** 163:12

**Disguise** 10:13

**District** 41:22,23 42:1,2

**division** 149:7

**documentary** 10:17,23 11:12 62:6,8

**documentation** 13:20 156:9

**documents** 14:5

**Donuts** 111:1

**Doo-gan** 32:15,16

**door** 77:22 126:20 134:17

**doorbell** 126:19

**Dorsch** 4:2,7 5:3,7,11 7:13,16 8:3 16:10 24:3 39:3,18 61:13,22 71:8 77:2 84:19 85:8 94:10 96:9 97:2 109:14 130:12,17 139:2 147:10 153:4 155:15 156:21 159:1 160:13 162:18

**Dorsch's** 28:20

**downstairs** 57:16 69:3,4,11 70:6

**downtown** 114:11

**dress** 126:20 134:17

**dressed** 126:20 134:17

**driving** 133:11,13

**dropped** 145:13

**drove** 133:19

**drug** 34:24

**drugstore** 134:20

**dug** 71:1

**Dug-in** 32:15

**Dugan** 32:15 33:2

**Dugan's** 32:20

**duly** 4:3

**dumb** 133:11

**Dunkin'** 111:1

**Dupage** 33:14,15,22 35:16,21

**E**

**earlier** 42:5 54:11 71:14 72:13 77:5 96:16 111:7 129:21 131:6 151:23 165:7

**early** 69:22 88:19 89:9 93:3 94:5

**easier** 14:2

**east** 70:11 71:2

**Easter** 89:16

**Eau** 45:16

**Echevarria** 80:9,10,20,24 81:3,7, 11 102:3,4

**Ed** 11:15 92:17 114:6

**Eddie** 114:13

**efficient** 38:10

**efficiently** 6:4

**Eileen** 5:11 28:17 30:2 38:16 159:18 162:8

**Elston** 62:9 66:13,22

**email** 161:19,20,23 162:20

**employment** 10:4 79:22

**encounter** 62:23 69:20 86:9 114:23 115:2

**encounters** 62:17 116:5 122:7,14

**end** 33:20 160:19

**endeavored** 76:12

**enforcement** 12:17

**enthused** 45:9

**enthusiastically** 58:8

**entire** 45:6

**episode** 12:5

**Escovera** 80:8

**Esther** 99:19 100:5,18

**estimate** 19:24 28:5 61:4

**estimating** 120:21

**estimation** 28:6 42:22

**Europe** 95:18 111:20

**Evan** 22:3 31:10

**evening** 4:10,12 6:12 7:13,16,21 162:4 165:9

**event** 150:1

**events** 150:16,19 151:11

**eventually** 46:13 92:12

**everybody's** 7:10

**evidence** 53:19 70:23 74:12

**evident** 52:13

**exact** 88:20 161:7

**exam** 96:22

**EXAMINATION** 4:5

**examined** 4:4

**examples** 10:1

**Excellent** 4:19

**exclusive** 79:5

**exclusively** 78:14

**excuse** 49:1 132:19 137:14

**Exhibit** 19:4

**exist** 157:14

**exonerated** 40:9

**exoneration** 40:16

**exonerations** 20:16

**exonerees** 99:21

**expect** 118:23

**explain** 30:10

**explained** 120:8

**explaining** 135:7

**explicitly** 65:13

**expressed** 38:5

**eye** 19:9

---

**F**

---

**F-R-U-I-N** 47:3

**face-to-face** 109:18

**facility** 46:4

**fact** 6:1,7,24 63:24 90:4 93:20

**facts** 26:10 140:11

**factually** 156:21

**fair** 23:19,22 30:1 65:21

**fall** 151:12

**familiar** 54:2

**families** 15:7

**family** 7:3 9:8 98:2 101:24

**father** 131:21 132:4,9 134:5,10 135:12,13,22

**FBI** 12:23 13:2,12

**Fedell** 35:3

**federal** 17:15

**feedback** 48:12

**feel** 77:10 120:11 136:7

**felony** 121:20 122:3 124:19 129:6, 8,12,17,20 131:5,15,19 142:21

**felt** 103:3

**female** 121:22 129:11 154:12 155:3 156:10

**fifty** 63:15

**figure** 77:6 141:16 148:13 164:15

**file** 13:18 93:13 103:15,23,24 104:1,17 105:2,3,8,9,11,13 106:2, 15 107:5,13 108:3,5,12,14 116:18, 21 151:24 152:18 153:1,3,18,21 154:19 155:19 156:5,9 157:2,16 158:17,20,21,22,23

**files** 108:9

**fill** 160:9

**fill-ins** 97:18

**find** 18:5 52:11 53:13 70:22 72:13 77:18 139:10 161:12

**finding** 26:14 115:23

**fine** 61:15 119:13 127:13 162:2,8

**finger** 121:2 128:24

**finish** 21:6 71:9 105:21 130:15

**finished** 77:12

**finishing** 131:8 160:7

**Firm** 13:1

**fit** 135:4 165:11

**five-minute** 61:14

**flight** 151:4

**floor** 132:10

**Flores** 16:1

**Florida** 9:1

**flying** 151:2

**focus** 114:20

**focused** 91:19

**focusing** 114:18

**FOIA** 106:3 107:6 108:3,4,10

**follow** 75:16

**follow-up** 73:12

**forget** 27:7 70:4 147:13

**forgetting** 91:14

**forgot** 150:16

**form** 43:22 44:5 64:14 65:17,19 66:16,24 67:19 73:9 83:7,17 87:17 88:11 99:9 103:18,19 112:19 113:23 123:16 125:2 137:16 143:6, 10,15 146:8 148:16,20 150:2,23 152:3,22 154:1,14,23 155:12 156:1 157:19

**format** 36:22

**forward** 17:3 30:22

**found** 13:9 33:22 34:18 64:2 115:5 116:15 133:21 153:2

**foundation** 43:22 44:5 57:23 83:19 137:11,17 146:10 154:14,23 155:13 156:1 157:19

**fourth** 36:19

**frame** 133:17 135:8

**frankly** 6:20

**Friday** 6:12 117:19

**friend** 139:16

**friends** 78:17 98:2 118:24 159:5

**Fruin** 46:19 47:3 50:8 51:15,22,23 52:9,22,23 53:6,8 54:12,24 55:4,8 56:5,9,18 58:7 72:16 75:7,17,22 77:19,22

**Fruin's** 54:19,21 57:1 76:13

**fuck** 147:11

**full** 71:11,12

**full-time** 79:1,16

_____

G

**Gabriel** 5:9

**Gacy** 10:11 11:8,23 50:1,5 51:1,12 52:19 55:16,19 60:24 62:2,17 63:6, 12,20,22,23 66:10,21 68:4 69:18 73:1,18 75:3 76:5

**Gacy's** 62:13 69:19 73:7

**Galligan** 93:8 95:5 106:21 107:18, 23

**game** 30:1

**gang** 35:23,24 42:1 86:4,6,15,18 104:23 112:23 123:19 153:10,13

**gangs** 106:6 107:8 128:13

**Gary** 44:18,20

**gathering** 80:23

**gathers** 97:5

**gave** 10:22 17:24 53:9,12 97:24 102:19 104:17 108:8 115:19 140:11 162:22

**Gawrys** 93:9 102:16 106:21 107:18,23 112:22 114:22 115:4 116:20 117:2 120:14 128:10,17 135:21 136:3

**general** 26:13 37:21

**generalization** 69:17

**generally** 123:14

**gentleman** 11:15 52:17 55:14 70:9 72:6 94:8 132:3

**gentleman's** 93:11 96:11

**geographical** 14:24

**get all** 140:18 144:16

**Gillard** 44:21

**Gillis** 44:18,20

**girl** 32:23 88:8 154:16,20 155:19

**give** 10:1 27:22 41:19 42:21 78:3 84:1 130:18,22 136:15 147:2 165:18

**giving** 25:18,19 55:13 112:9

**glass** 61:10

**god** 8:15 57:9 91:13

**Golden** 7:12,13 23:4,8,13,22 36:19 37:8 38:14 107:1,20 130:11,20 131:7 138:20 163:18 164:1,9,13 165:17

**good** 4:7 5:3,7,11 7:12,16,21 34:22 50:10 114:7 117:20 119:19 132:15 136:7

**government** 49:15 53:2 57:15 58:7,15 68:14 69:9

**graduate** 41:21

**grand** 136:4

**granddaughter** 7:6

**great** 117:24 152:17

**Greece** 4:17 8:15,19,20

**Greenberg** 32:1,7,11

**group** 93:19 97:5 99:16 120:11

**guess** 35:21 40:13 97:6 109:16 118:19 143:24 163:7

**Guevara** 4:24 12:2,6,19 13:4 15:24 17:9 63:12,13,14,16 64:7,24 65:14 81:13 83:4,15 84:3 85:13 86:15 87:13,14 92:6 93:8 95:4 97:10 98:14 102:16 103:11,14 104:22 106:5,21 107:7,18,23 112:17,22 114:21 115:4,13,19 116:5,19 117:2 120:1,18 121:1,6, 12,14 122:17 123:4 124:6,12,16 127:14 128:10,17,23 135:21 136:3 139:22 141:6 144:7 152:21 153:13

**Guevara's** 122:6 149:2

**guilty** 33:23 34:18

**gun** 116:17 132:20,24 133:15,21 135:5,8

**guy** 44:23 70:14 71:2 91:19 95:9 114:19 136:22 137:10 139:11 141:15 144:15 145:22 153:23

**guys** 50:11 70:6 84:24 85:3 115:18 117:17 118:5 131:19 138:16 165:15

_____

H

**hair** 121:18

**half** 84:19 85:15 87:24 96:17 97:16 99:13 110:19 112:4 115:7 159:8

**Halvorsen** 15:24

**handgun** 133:13

**handle** 140:11

**handled** 149:19

**hands** 75:10

**hang** 124:5

**hanging** 53:3,5,8

**happen** 34:10 122:22 123:3,5,8 125:9 148:9 150:4,5

**happened** 7:7 33:22 52:20 75:9, 11,14,17 80:3 84:12 87:9,10 89:3, 7,8 91:23 101:19 115:6 122:4,23, 24 126:12 128:6 132:8 140:7 146:14 151:12 152:24 153:20

155:7 156:10

**happy** 119:4

**hard** 6:22 14:4 41:7 71:11 84:13 90:23 124:1 160:13 162:14 165:6

**hardwood** 70:24

**Harlem** 111:3

**hate** 14:24

**hay** 55:12

**Hayward** 42:12

**he'll** 51:10

**head** 66:1 85:3 102:15

**headquarters** 116:18,20

**heads-up** 6:7

**hear** 46:23 47:14 104:5 108:23,24 109:8 118:4,6 156:17 161:24

**heard** 54:18,19 151:5

**hearing** 65:10

**hearings** 65:10

**held** 71:17

**helpful** 6:6

**Hernandez** 99:19 100:6,18

**hesitance** 148:13

**hindsight** 128:9

**Hispanic** 93:1,19 102:17 157:11, 17

**Hispanics** 106:12 107:12 110:13

**history** 41:16,19

**hit** 63:15

**hold** 53:14,16 130:11

**holding** 63:21 126:22

**holiday** 89:14

**home** 4:15,17 7:3 42:17 47:22

**homes** 9:9 145:14

**homework** 134:23

**homicide** 14:22 16:3 25:12 26:6 33:18 44:10 46:19 80:12 86:16 87:15,21 88:14 89:12 90:16 92:5 116:2 122:19 132:8 136:11 138:1 139:13 147:22

**homicides** 88:4 90:8,18

**hon** 61:11

**honestly** 151:10

**hoping** 158:24

**host** 27:6

**hour** 38:2 77:24 119:17 159:7 163:10 164:12

**hours** 5:19 92:2 96:17 118:20 123:12 163:16 165:11

**house** 55:17 62:18 69:20 73:7 126:12 127:3 133:12

**How's** 93:6

**Huffington** 55:23

**Humboldt** 92:15,21 115:24 116:13 132:8 153:9

**hung** 55:6

**Hungary** 9:4,5

**hungry** 159:10

**husband** 99:19

———————————

**I**

**ID** 144:7,11

**idea** 6:14 18:13,15 29:5 111:15 119:3 164:7

**identification** 93:10 120:13 121:15 124:10,13 127:9 129:6,15 136:8 137:19 138:3 139:17

**identified** 83:11 113:5,15 128:5 132:7

**identify** 4:22 5:2 121:9 129:2 142:1 148:14 151:6

**identity** 144:20

**IFP** 52:15

**IFPC** 46:17,24 47:7 48:4,13 50:4, 17 51:24 52:15 53:7 57:13 58:5 61:23 62:2 66:6,23 71:20 75:1,6 77:1 78:13

**Illinois** 25:24 35:6,15 114:10

**imagine** 14:16 118:16 148:11

**immediately** 115:21 133:16

**impetus** 86:9

**implicated** 30:14

**important** 16:9 37:12,14 144:12

**impression** 20:6

**improper** 149:2

**in-person** 99:1

**incident** 83:4,14 84:2 85:12 86:2, 10 87:8,10 88:6 89:7,8 90:22 91:23 94:8 112:14 127:12 133:8,9 152:20 155:21

**incidents** 88:4 155:7

**include** 113:10

**including** 29:12 37:15

**inconvenience** 119:7

**Indiana** 22:8 25:13

**individual** 7:14 116:21

**individuals** 99:18

**inform** 162:11

**information** 15:21 17:2 24:4 31:4 35:9 36:14 37:1,5,17 51:21 53:12, 22 54:12 56:4 65:15,23 68:8 87:2 95:22 97:24 144:13,20 145:3 157:3 161:18

**informed** 5:17 6:23 88:3 90:13

**inmates** 15:6,7

**innocence** 15:7 20:14,16,18 21:10,13,15,19,22 22:4,17 24:16 34:6 93:19 97:5 99:16 109:16

**innocent** 140:16 144:15 147:15

**inoperable** 135:8

**inquiries** 14:18,21 19:23

**insert** 38:4

**inside** 44:22 117:18

**instigated** 53:9

**instigator** 52:18

**instruct** 16:14 22:22 23:18

**instructed** 116:19

**instructing** 23:15 39:6

**instructor** 24:11,13,14

**intend** 8:14 163:20

**intending** 17:4 74:9

**intent** 125:5

**intention** 74:18 163:19

**interest** 9:22,24 18:17

**interested** 68:18 78:18

**interests** 20:3,10

**interrupt** 96:22 124:23 134:3

**interrupted** 105:20 117:9

**interrupting** 77:10

**interruption** 27:13 61:12 132:16 143:22 158:18 159:9 161:16 163:11

**interruptions** 113:11

**interview** 18:7 55:14 98:20 120:8 156:7

**interviewed** 11:14 155:22,23

**interviews** 10:16,22

**introduced** 78:2

**invade** 22:23 23:21 24:5 30:20 36:18 39:7

**invading** 29:19

**investigate** 63:5

**investigating** 67:10

**investigation** 10:11 11:8 24:12 26:10 33:18 43:13 49:5,9,11,16 50:2,6 51:1 55:6 75:3 146:5 148:15

**investigations** 16:5 29:11 122:19

**investigative** 14:13 15:12 16:11, 13 26:13 46:6,21 79:6,14,23 80:3

**investigator** 13:17 114:10 154:3

**invited** 69:10 102:10 110:21 127:3

**involve** 86:19

**involved** 16:7 21:4,12 26:14 34:8 35:14,23 36:11 50:1 51:19 58:9 78:22 82:1 88:7 92:6 100:15 127:12

**involvement** 11:8 33:5 45:7 103:10,12

**involving** 33:6 39:19,23 62:1 66:11 86:16 103:16

**Irving** 111:3 134:22

**Isaacson** 34:3

**issue** 6:3 161:10,15 162:24

**issues** 73:1

---

**J**

**jackets** 50:13,15

**Jacques** 17:13 81:23 86:12,21 100:2 101:1

**jail** 140:17 142:23 147:15

**Jan** 5:8 163:19 164:1

**Jane** 80:4,16 84:8 104:13

**January** 50:18 75:7

**Jason** 33:24 39:19 40:4,6 82:20 83:1

**Jennifer** 27:8 30:23

**Jenny** 30:4

**Jessica** 7:24

**Jim** 46:19 47:3,21 50:8 51:15,22, 23 54:12,19,21,24 55:4,8 56:18 57:1 58:7 75:7 76:13 77:18,21

**Jimenez** 103:16,23 104:9 106:4,10 107:6,10 108:3 110:11,16 128:2,3 151:24 153:14,18,20 154:19 155:19 156:5 157:2,5,10,16,23 158:5,6

**job** 19:14 45:17 51:7 53:7 76:21,22 114:8 120:23 145:12 148:24

**John** 10:11 23:6 62:2,17 91:7

**Johnston** 91:16,17,18,24

**join** 66:16 125:1

**Jose** 103:16 151:24

**Juan** 16:2 152:2

**judge** 72:4

**June** 13:7,13 47:9,14 161:11

**jury** 136:4

**juvenile** 112:23 140:15

**juveniles** 140:13

---

**K**

**Kane** 32:18 33:13

**Karen** 104:1,8,10,12,15,17 105:1 152:9,12,15,24 153:8

**Katie** 85:6 138:24 165:17

**kid** 120:22 121:3,11,16 124:13 134:8,13,16 140:17 142:22 147:15

**kids** 93:2 102:17 115:23 136:2

**killed** 153:23

**kind** 20:6 36:4 40:17 41:1,6,7 44:3 45:10 90:19 91:18 93:23 114:19 148:8,11 152:13

**kinds** 53:24 87:7

**Kindt** 33:11

**kitchen** 7:5

**knee** 132:11

**knees** 132:10

**knew** 23:10 75:19 77:23 78:21 81:13 83:4 102:2 122:12,13 123:20 125:23 136:16,17 137:20 138:1

**knowing** 69:20 84:13 114:4 118:19 163:4

**knowledge** 156:3,6

---

**L**

**lack** 10:7 12:11 18:1

**lag** 77:9 84:17

**Lake** 45:21,23

**land** 76:17

**large** 89:4 116:11

**largest** 120:7

**late** 61:4 62:22 69:22 112:10 155:15

**Latinos** 158:1

**law** 5:8 12:17,24 24:10,18,19,23 25:1,5,7,9,11 98:5

**lawyers** 38:7

**laying** 133:14

**lazy** 45:4

**lead** 152:1

**leads** 123:18

**learned** 116:24 139:8

**learning** 137:23

**leave** 20:12 42:9 63:11 65:14 114:19

**leaving** 15:10 63:7 76:6 114:8

**left** 6:21 43:10 46:10 50:18 53:3,5, 14 55:1 63:12,13,14,15,17,20

64:12 65:6 75:15 78:13 81:12 95:18 112:2 116:23 117:12 118:19,20 125:12 127:23 135:20 155:4,20 160:6

**letter** 70:20 71:3,6,7

**letting** 109:1

**license** 14:14 79:9 115:11,15 116:4,10,11 126:15 127:11

**lieutenant** 59:17 147:9

**life** 8:15 10:2,5 11:9 70:3 148:10 150:5 151:4

**Lights** 14:12 15:11 46:6 79:5,13,23 80:2

**Ligon** 31:16 32:6

**likewise** 86:23

**limit** 163:5

**lineup** 87:4 122:13 125:24 126:3 127:20 128:8,21,22 129:1,4,13,16 131:16 139:23

**lineups** 86:17,20

**Linkedin** 18:6,9,22,24 19:2 24:9 28:20 29:20 30:3

**lips** 109:10

**listed** 28:8 29:21 31:9 40:15

**Listen** 74:17 122:18 136:1

**listened** 10:9 81:10

**listing** 30:12

**lists** 29:20 31:8

**live** 127:19 128:21,22

**lived** 62:13,16 92:15

**lives** 139:13

**living** 8:4,13,14 116:12

**loaded** 133:17

**lobbying** 12:11

**local** 48:10

**located** 119:3 158:1

**locating** 26:11

**location** 53:19

**locations** 117:18 118:2

**lockup** 131:24 133:7 134:12

**Loevy** 5:4 13:1 21:4,12 98:3

**Loevy's** 94:1

**long** 5:22 8:12 40:18 50:17 91:15 95:13 118:12,23 130:14 149:17

**longer** 14:13 118:8,14 142:4 151:5

**looked** 50:10 104:20 121:8,17 153:7

**lose** 66:5

**lot** 9:20 27:7 50:5 91:14 93:4 107:20 142:21 163:24 165:6

**low** 117:17

**Loyola** 135:1

**lying** 140:13 142:18

---

**M**

**made** 12:24 15:5 19:22 36:22 37:6 39:1 52:1 53:10,11 57:21 68:17 110:6 131:24 151:13

**main** 79:22

**maintain** 14:7 16:21 17:5

**maintaining** 30:9 47:22

**make** 7:1 31:6 40:19 41:5 54:9 56:7 74:13 76:17,19 77:13,17 90:2,6,11 93:9 96:19 105:18 109:2 120:12 121:15 127:16 134:2,3 137:19 138:3 139:17 142:22 146:2 148:7 151:12 158:15,19 160:2 161:3,8 162:9 163:5 164:9

**makes** 164:18 165:8

**making** 28:18 51:5 124:12

**male** 88:24 106:11 107:11 121:22 129:10 157:11,12,16,24

**Maloney** 55:15,17

**man** 55:18 88:7 102:17 114:24 116:12 124:7 126:19

**Maria** 151:14

**marriage** 160:22 161:1 162:3

**mass** 35:24

**matter** 4:24 5:10 10:11 17:17 28:10 32:6 34:22 39:18,23 40:15 55:16 60:24 64:23 73:18 82:24

**matters** 75:2

**Matthew** 80:9 102:4

**Mayor** 52:5

**Mcgrath** 4:6,20,23 8:2 16:24 17:1, 21 19:4,7,11 21:9 23:1 24:2 27:17 28:19 29:4,8 31:1 35:1 36:1,3 39:9, 12,15,17 44:1,7 47:5 58:1 61:13, 16,19,21 64:15 65:22 66:3,17 67:3, 22 71:9,13 77:15 78:8 83:8,20 84:24 85:6,7 87:20 88:12 95:21 96:4,8,23 97:1 99:11 103:2,21 104:6,14 105:22 108:1,16 109:5,13 112:20 113:20 114:1 117:6,22 118:6,9,11,14,21 119:18,20,23 124:4 125:21 131:11,12 134:1 137:14 138:5,24 140:2,23 141:4,9, 13,20 142:14 143:7,12,17,23 146:12 148:17 149:3,11 150:8,21 151:8,15,17,20,21 152:4 153:16 154:5,18 155:1,18 156:4,13,15,18, 20 157:8,20 159:1,6,11 160:2,11, 16,21 161:2 162:4 164:20,22

**Mcgrath's** 84:20

**Meaning** 27:15 53:6,18

**meant** 116:17

**media** 10:8 12:5,7,8

**meet** 13:3 49:12,14 74:4,8,15,19, 20 76:14 78:3 80:3 81:1 82:7 98:22 105:7 106:1 107:4 110:2,21,22 114:6,12 118:24 134:17 135:12 159:5

**meeting** 51:18 55:1,8,11 56:5,8, 10,11 57:15,17,18 58:2,5,10,17 59:2,3,15,19,20 60:2,3,6,12,21 61:1,23 63:2,3 66:23 67:14,18 69:2,5,7,8,10,12,15 70:1,5 71:15, 17,19,24 72:7 73:2,12,19,24 74:2, 18 81:6 82:9 93:18,19 94:4,5 95:2 97:4 99:6,16,24 100:1,3 101:4,9,10 102:10,21 105:7,8 109:19 110:2,3, 6,14,18 111:5,9 112:3 137:6

**meetings** 51:16,19 53:11 55:12 56:9,15,16,17 57:1,3,22 60:23 67:8 72:16 76:13,24 94:6 96:10 97:12, 18 99:1,17,18 100:4,13 101:1,6,16, 23 109:16 110:5 137:4,5

**Megan** 4:23 16:8 84:17 95:20 96:14 105:19 117:5,9 124:22 130:12 131:7 160:9

**members** 35:24 51:4

**memory** 137:8

**men** 157:2

**mention** 125:4,13,14

**mentioned** 8:3,19 18:3 31:2,13

36:10 41:7 42:5 44:14 55:5 58:19
60:1 64:4 66:7,9 67:15 72:13 81:22
84:9 113:6,17 125:15

**meritoriously** 85:16

**met** 13:17 21:14 62:19 78:1 80:23
81:3 84:7 94:9 95:17 97:3 99:15,
16,17,18 100:22 101:23 111:1

**metal** 133:17

**Miami** 61:8 62:9 66:12,21 76:17

**mic** 108:22

**middle** 21:8 133:14

**midnight** 6:17

**Miedzianowski** 93:8 106:20,22
107:17,19,24 136:21 139:10

**Mike** 32:4

**military** 145:9

**Milwaukee** 134:22

**mind** 122:5 130:3 131:7 165:10

**Mingey** 92:17 95:8 102:18 113:5,6,
14,16,21 114:6 115:3,22 125:15,
16,17,18 126:9,22 127:19 128:15
130:7 145:16,17 146:18

**minimal** 22:19

**minute** 44:15 109:14 120:22 121:6
124:5,6,14

**minutes** 5:15 96:2,4,6,18 109:9
119:14 122:20 159:8,17 160:6,9,12

**mischaracterizes** 87:17 102:24
103:19 125:3 146:10 150:24
154:24 155:13 156:2

**mischaracterizing** 158:22

**miscommunication** 159:12
162:14

**miserable** 76:17

**misheard** 47:2

**missed** 98:18 104:7

**misstate** 160:4

**misstatement** 151:13

**mistake** 40:19 128:10 151:12

**misunderstanding** 124:21

**mixed** 121:7

**moment** 31:3 60:1 63:21 64:4 90:1
151:24

**money** 142:3

**month** 85:15 87:23 115:7 149:13,
15 151:1,7

**monthly** 97:6

**months** 87:22,24 100:19 115:7
157:4

**morning** 4:7,8,9 5:3,7,11 7:12
69:22 88:19 115:10 140:8

**mother** 62:13

**Mother's** 89:16

**mouth** 18:20 58:13

**move** 8:16 20:4 30:22,24 38:12
145:12 148:24 160:8

**moved** 8:17 42:10,14 111:20
155:20,24

**moving** 20:2,9

**muddled** 125:11

**multitude** 65:11

**murder** 32:22 33:19,21 34:19,20
35:11 43:12 90:18 115:6

**murdering** 34:13

**mute** 61:19

---

**N**

**named** 11:15 30:13 55:15 94:18
95:9

**names** 29:13 36:9,15 66:7 67:24
87:7 91:14 101:22 137:20 139:6
141:22 142:6 150:10 165:19

**naming** 16:15

**nature** 80:11 84:18

**Navarro** 7:22

**necessarily** 26:10 37:7

**need-be** 43:7

**needed** 43:8,16 45:22 86:16 114:6
127:2,10 128:11 138:3 139:10

**needing** 103:9 162:24

**neighborhood** 116:12

**Nelson** 99:23 101:15

**newspaper** 53:24 75:21,24

**newspapers** 76:2

**nickname** 93:12 94:20

**niece** 89:2

**night** 62:23 115:14 117:19,20
125:16,17 135:2 140:19 153:9

**nights** 146:21

**Nodding** 138:22

**non-privileged** 35:9

**north/south** 88:20

**northern** 14:12 15:11 46:6 79:5,
13,23 80:2

**Northwestern** 19:16 27:10 36:2
37:12 39:20 40:1 93:23 102:21
103:6 104:2,11 108:6 152:9

**note** 16:9 96:14,21

**noted** 16:24

**notes** 95:16

**notice** 6:6

**noticed** 110:11

**noting** 96:23

**November** 61:9

**number** 27:23 31:4 106:7 107:9
111:14 115:11,15 116:4,11 126:15
127:11 147:22 157:22

**numerous** 51:4 56:15 123:10

---

**O**

**O'BRIEN** 77:19 78:1,3

**O'MALLEY** 7:19

**object** 30:21 65:17 117:16 125:2
154:23

**objecting** 30:7 108:24

**objection** 28:18 34:23 38:23 43:22
57:23 64:14 65:19 66:14,15,16
67:19 83:7,17 87:17 88:11 102:22
103:18,19 108:13 109:2 112:19
113:23 137:11,16 140:22 141:2,11,
18 142:12 143:6 146:8 148:16,20
150:2,20,23 152:3,22 154:1 155:12
156:11,15 158:16,19

**objections** 38:8 155:16 156:16
157:7

**observe** 120:5

**obvious** 64:20

**occasionally** 42:19 114:7

**occasions** 26:1

**occurred** 80:13 85:13 86:2 88:5, 15 90:22 115:9 146:6 150:1 151:11

**occurrence** 84:9

**occurrences** 130:4

**ocean** 151:2

**October** 11:19 61:9

**October/november** 75:5

**offender** 87:2,3 120:10

**offender's** 115:11

**offered** 45:17

**offering** 20:5

**office** 5:9 7:18 13:11 25:24 26:17, 19,21 31:19,23 35:5 42:19,23 44:18 45:12 51:17 55:2 56:19 71:18 72:3 76:14 77:21 94:1 98:6 132:1 144:3 145:15,22

**officer** 59:15 139:7 148:19

**officers** 7:15 60:5,9,20 63:20 68:3, 7,8 144:21 165:19

**offices** 57:1 58:5

**officially** 4:13

**Ohio** 25:14

**older** 93:1 102:17 106:12 107:12 128:18 154:22 157:12

**ongoing** 117:16

**open** 87:15,24 92:5 147:24 148:2

**opened** 87:21

**openly** 114:13

**operate** 163:7

**operational** 18:2

**opinion** 20:6 30:2

**Opperman** 11:16

**Opperman's** 11:15

**Oregon** 22:15

**organize** 99:20

**organized** 117:13

**originally** 152:8

**Oscar** 16:1

**outstand** 88:4

**overdose** 34:24

**overseas** 17:6

**overuse** 38:18

**owing** 78:19

**owned** 125:20

**owners** 76:17

---

**P**

**p.m.** 6:1 7:1 165:21

**paid** 31:20 93:9 106:19,20 107:16, 17 136:10,12,13,14 137:9,12,19 138:3,6 139:9,16 140:4,20 142:3, 10 143:14 144:1,14

**Pakowski** 91:13

**Palatine** 49:22

**Palatine's** 49:5

**pandemic** 97:15,18 98:17

**pants** 126:20 134:17

**paper** 115:12,15,17 116:3,8 149:8

**paperwork** 131:20

**Pardon** 64:17 77:3 83:22 92:9 94:17 111:17

**Park** 92:15,21 111:3 115:24 116:13 132:8 153:9

**parked** 126:15 127:23

**part** 10:5,10 22:7 51:10 63:4,18 69:5,12 75:9 83:18 117:23 143:4

**part-time** 43:6

**participate** 92:7

**participated** 128:20

**participation** 11:2

**parties** 12:24

**partner** 74:1 90:21 91:1,7,24 92:1, 3 112:16,17 116:20 125:19 126:8 127:18 128:15 133:6 136:1 147:16

**partner's** 91:9

**partners** 90:24 91:1 112:22

**party** 10:15 75:5

**passed** 147:18

**passenger** 154:13 155:20 156:10

**passengers** 155:3

**past** 120:20 153:24 159:8

**Patterson** 33:24

**pause** 84:19 118:3 127:16 138:17

**paused** 105:23

**pay** 127:8

**paying** 134:18

**payment** 24:24

**Peacock** 10:18,19 11:12

**pen** 116:3

**pencil** 116:3

**pension** 79:24

**people** 15:16 21:3 27:10 35:13 49:10 53:1 56:23 57:4 58:13 61:24 62:7 66:7 67:9 70:1 72:6 78:16 91:11 94:7 98:20 99:15 101:24 103:22,23 120:23 121:23 123:19 124:2 130:8 148:3

**People's** 5:8 98:5

**percent** 6:13

**Perez** 94:21 96:12 97:3,24 98:23 99:4 102:9,14

**perfectly** 160:24

**permanent** 8:22

**permanently** 8:17

**permission** 102:20

**person** 33:3 37:19 70:12 93:1 94:18 100:22 101:13 102:16 111:5 113:2,14 116:23 121:21,24 122:3 123:21 125:20 128:19 129:16 132:4 138:10,11 139:8,20 163:4

**personal** 13:11

**personally** 13:2 51:3 57:3 72:18, 23

**Philadelphia** 155:21

**phone** 70:11 72:17 74:3 99:5,7 100:21,23 101:12 111:8,11,14,16, 18,19,23,24 117:24 132:16

**phonetic** 15:23 91:13

**photo** 92:8,10,12 116:18,21 117:8, 13 120:2,5,7 121:3,23 122:12 124:9 129:3,14,23 131:16 139:21, 22,23 144:7,11

**photos** 117:14 120:10,11,16,20
121:7,9

**phrase** 50:23

**physical** 122:13

**pick** 92:19 120:12,23 121:19
124:15 125:19 126:2 128:24 129:3
136:2 139:20,24 141:15,23 161:21

**picked** 121:24 126:5 129:16,17
133:15 136:5 161:7 162:23

**picking** 123:21

**picture** 117:3 128:23

**piece** 115:12,15,17

**pilot** 151:3

**pissed** 44:3

**place** 31:17 32:17 34:4 35:4,15,19
60:7 75:12 144:18

**places** 47:23

**plaintiff** 5:5,9

**plaintiffs'** 6:23 161:18

**planned** 159:13

**planning** 20:3,11 159:4 161:6
164:2,8,19

**plate** 115:11,15 116:4,10,11
126:15 127:11

**plug** 112:10 117:18,24 118:1

**podcast** 10:9 11:13,15,24 12:4,9
17:24

**podcaster** 18:1

**podcasts** 12:13

**point** 23:16 25:23 29:10 36:23
38:21 161:1 164:3

**pointed** 128:24

**police** 7:14 10:4 12:18 24:14 41:9
42:15 43:21 44:2 46:11 47:19 51:5,
17 52:10,21 55:2 56:18 58:14
59:14,20 61:24 63:3 64:12 67:9
68:3,7 70:17,18,21 73:6 74:22
76:10 78:21 89:4 90:9 114:8
137:13 138:2,6 139:7 140:4,13,20
141:15,16 142:10,18 143:5,14
144:21 145:9 153:2

**policeman** 44:22 125:11

**policemen** 136:17 137:20

**portions** 10:6

**position** 47:17

**possession** 115:16

**possibility** 5:22

**possibly** 67:10 111:18 128:9

**post** 33:7 55:23

**post-conviction** 33:7

**potentially** 16:12 28:13 30:7,19
36:13 37:15,16

**power** 74:14

**precisely** 118:15

**pregnant** 35:12,13

**prepared** 118:8,12

**present** 37:13 57:17 58:3 60:9
82:6 158:2

**presented** 73:3,8 137:23

**presenting** 74:12 75:20

**pretty** 45:4 50:10 79:1,4

**previous** 10:4,7 21:21 102:7,24
103:20

**previously** 15:18 36:11 49:4
66:13 67:5,21 73:13 80:23 83:5,10
88:2 100:16 103:13 109:17 113:2,
13 138:12 159:11

**primary** 154:2

**printing** 36:6

**prior** 11:10 12:16 15:9 32:6,8
49:19 87:18 99:24 115:8 122:7
123:23 125:3 130:3 154:24 155:14
156:2

**prison** 32:24 35:11

**private** 31:24 47:6 77:17 79:9

**privilege** 16:12,20,22 22:23,24
23:19,21 28:14 29:17,19 30:7,8,11,
18,19 36:16,18 37:22 38:24 39:7

**privileged** 29:14 36:14 37:16

**problem** 7:9 23:9 36:5,7 120:19
142:19

**problems** 122:10

**proceedings** 165:20

**process** 63:4 120:1 129:13

**product** 22:23 28:13 29:12,19
30:7,11,14,17 36:14,18 37:16,21
38:24 39:7

**profile** 24:9 135:4

**project** 20:18 21:11,13,15,22
24:16 25:3,4 55:19,21

**projects** 15:7 20:14,16 21:19 22:4
34:6

**promoted** 85:16

**promotion** 85:20

**promotions** 52:7

**pronouncing** 32:14

**properties** 9:13

**property** 13:11 62:9,12 63:5
66:12,20 67:10 70:10,21 78:20

**propose** 81:2

**provide** 13:20

**provided** 17:3

**prudent** 39:8

**public** 26:17,19,21 28:20 30:12
31:19 36:22 37:6,23 76:19

**published** 55:21,22

**Puerto** 155:10

**pulled** 133:6

**pursuing** 27:16,20,21 78:18

**pushing** 20:7

**put** 6:5 27:12 51:9 120:6 128:24
136:6,21 139:11 142:23 147:14

**puts** 121:2

**putting** 117:14

---

**Q**

---

**question** 18:10 21:7 29:2,23 30:14
39:11,12 43:2 47:12 50:3 58:12
64:20 71:9,12 74:6 77:6,11,13
82:16 84:21 85:9 88:18 109:4
111:2 117:10,11 118:8 125:2
130:13,15,16,24 131:9 138:18
144:19 148:22 150:14 151:16
153:17 158:23 163:18,22

**questionable** 34:21

**questioned** 115:22

**questioning** 130:3

**questions** 5:23 18:23 23:15 28:12
40:3,6,11,20 41:6 49:17 64:3 65:12
73:11,13 109:3 118:10,16 119:8

141:24 144:24 145:6 158:16,20
159:15 163:20

**quick** 95:20 105:17 109:5 127:15

**quickly** 104:20

**quiet** 76:23 78:7

**quit** 44:15

---

**R**

---

**R-A-N-O-S** 104:16

**race** 106:8 107:10 158:10

**racetracks** 114:11

**Rachel** 19:5

**radio** 12:13

**Radke** 52:3,9,16 54:13,14 56:12

**Raley** 80:4,16 83:3 84:8 104:13

**ran** 60:12,22 70:10,15 72:9 116:9,
10,15 129:14,15

**rang** 126:19

**ranking** 51:4

**Ranos** 104:2,12,17 105:1 152:12

**rat** 74:17

**Ray** 83:4 84:3 86:3,11 87:14 92:5

**reach** 164:24

**reached** 48:18 49:4 153:22

**reaches** 121:1

**read** 19:6,13 49:3 56:6 80:22
105:13 107:2,3,21,22 109:10
113:9,12 130:24 131:2 156:7

**ready** 118:5

**real** 93:13 105:17 125:24

**realized** 106:4 107:6

**recall** 12:6 17:17,19 20:23 21:1,16
22:16,18 25:14,20 26:2,8 27:22
34:1,11,18 35:9 39:18 40:2,23,24
41:3,4,8,13 48:19 54:3 55:13 56:2
57:6 58:2 59:6 64:16,17,18,19,21
67:17 69:14,16 71:22 72:5 73:16
82:5 83:13 86:4 88:18 89:6 90:21
99:21,22 101:22 110:17 111:5,13
112:7,14 127:5 129:11 139:4
141:12 142:2,4 143:18 145:17
149:6,7 151:5 152:5 156:5,12,14

**receive** 24:24

**received** 51:2 52:16

**recently** 10:9

**recess** 61:20 96:7 109:12

**recognize** 77:5 81:23

**recollection** 22:10,20 65:11 86:2
87:13 88:17 89:23 146:19,23 147:1

**recommend** 16:21

**reconvening** 162:8

**record** 4:22 7:11 8:4 16:9,10 28:20
77:14 80:15 95:14 96:15,19 107:3,
22 113:12 116:15 130:15 131:2
159:19 160:1 162:7 163:12 165:18

**records** 13:8,11 94:24

**recruits** 24:14

**referenced** 18:1

**referred** 87:6

**referring** 10:12 11:11 24:15 139:8

**reflect** 130:16

**refrain** 16:15

**regret** 75:11

**regular** 92:3

**regularly** 32:12

**related** 35:23 66:12 67:9 73:1,18
75:2 89:14 153:10

**relates** 30:11

**relating** 40:4,6 52:16

**relationship** 19:18 82:12

**relative** 89:1,2 154:17,20

**relatives** 155:9

**released** 143:3 145:22,23

**relevant** 96:21

**relocated** 17:22

**reluctance** 40:17

**remember** 11:20 21:3,18 22:14
25:12,15 32:3 33:4 39:21 52:3
59:14 69:17 70:14 72:10 76:8
88:24 89:10 102:4 103:17 121:22
126:14,16,17,18,23 135:2 142:8
149:24 150:18 158:7

**remembered** 88:5 93:4 127:1

**remembering** 150:6,10

**remind** 23:19 36:17,24 37:14

**reminded** 23:23 36:20 37:18,24
38:2

**reminding** 29:18 30:8,18 38:23

**renew** 14:14

**Rental** 9:13

**repeat** 66:19 83:24 139:2

**repeated** 158:20

**repeatedly** 37:19 158:24

**report** 11:16 56:1 131:24 133:9,23
142:21 156:23 157:1

**reported** 56:3 61:6,8 63:1 78:11

**reporter** 17:20 27:14 76:9 77:20
78:2 108:20,21 113:9,10 130:21,23
138:20,22

**reporter's** 85:2

**reports** 132:2 147:17,22

**represent** 4:24 5:5,9 7:14,18
29:17 36:16 165:19

**representation** 163:3

**represented** 23:23 152:1

**representing** 23:4,11,17

**request** 53:3

**requested** 117:3

**requests** 15:1,4

**rescheduled** 60:4

**research** 55:15 56:6

**reserve** 164:4

**residence** 8:22

**response** 47:10 68:20,23,24

**responsibility** 148:23

**responsible** 38:11 151:4

**rest** 8:15

**results** 56:9

**resume** 159:21

**retained** 24:9,22 25:8,10,23 26:4,
20 27:1 31:18

**retelling** 84:8

**retired** 9:18 41:9 42:3,4,8,16,17
56:23 57:10 63:23 80:13 114:3

**retirement** 64:23

**return** 116:21

**returned** 117:12 132:1 145:15
155:10

**reveal** 36:15

**review** 25:22 26:7 121:21 122:3
124:19 129:6,8,12,17,20 131:5,15,
19

**reviewing** 26:14

**revolver** 133:16

**Reyes** 7:15

**Rice** 45:21,23

**Rico** 155:11

**rid** 111:23,24

**ride** 89:12

**ridiculous** 140:15

**Rinaldi** 51:22 72:16

**Rivera** 17:13 31:14 81:23 82:24
86:12 87:8 100:2 101:1 152:2

**Rivera's** 86:22

**robberies** 90:15,16,17

**Rocky** 51:22 72:16

**Rodriguez** 16:2 99:23 101:15

**rolls** 29:8

**room** 94:9 122:20 123:23 127:4
151:19

**rooms** 120:8

**Rosen** 5:11,12,17,21 6:13 7:7
28:15 29:20 30:10,21 37:18 39:2
46:22 47:1,4 71:8 84:16,23 95:20,
24 96:2,6 104:4,10 113:8,19 118:7,
13,18 119:1,13,15,22 138:16,23
139:2 159:11,23 160:5,12,18,24
161:10,15,17 162:2,6,16 163:2
164:7,21,24

**ruin** 122:6

**run** 38:6 58:11 72:1

**running** 70:24 72:8 117:17

**rushing** 120:22

**Rutherford** 57:8 58:20 59:13
60:14 73:22

**S**

**S-A-P-A-R-E-V-A** 8:10

**sake** 87:5

**Sam** 93:12 94:18,21 95:11 96:12
97:3 102:9,14 106:1,23 107:4
136:23

**Sammy** 95:10 102:19 105:6
106:14 107:13 108:11,19 109:15,
23,24 113:7,18 116:24 136:19,20,
23 137:7 138:13 139:9,12,18 140:1

**Sammy's** 111:14

**Sandino** 15:23

**Sapareva** 4:16 8:10

**sat** 95:12

**satisfied** 64:1

**save** 140:16 160:22 161:1 162:3

**Sawyer** 42:13,23 43:21 44:17
45:8,12,15 46:1,2

**scan** 70:10,15,16,17,20

**scene** 88:21 89:12 90:4,17 115:8

**schedule** 6:9 165:7

**scheduled** 60:3 165:6

**scheduling** 163:4

**school** 24:10,18,20,23 25:1,5,7,9,
11 55:18 132:17 134:24

**Scott** 34:3

**screen** 29:6,7,21

**scroll** 36:1

**Sean** 5:4 23:4,7 28:15,19 36:19
38:15 156:13 163:19

**search** 61:6,8 73:4 75:4 153:3

**seasonal** 8:24

**seasons** 8:24

**sec** 109:5

**seconds** 120:21

**secret** 76:15

**section** 36:2

**selected** 128:23

**send** 162:20

**Seneca** 16:3

**sense** 163:5 164:18 165:8

**sentence** 107:21

**sentencing** 32:24

**separate** 48:15,16 87:8

**separately** 81:1

**sergeant** 51:23 57:8,13 58:11
60:14 67:16,17 69:6,14 71:23
72:12,21,24 73:12,17 95:7 126:8
127:18 145:16 147:20

**Serrano/montanez** 64:23

**Services** 14:13 15:12 46:6 79:6,
14,23 80:3

**session** 164:6

**set** 13:11 47:18 82:7 99:6 111:8
162:16

**setting** 120:2

**seven-hour** 163:5

**Shadow** 56:1

**shaking** 85:2

**share** 161:19,23

**Shayl** 7:17

**sheriff's** 42:19,23 44:18 45:11
55:3 59:19

**shifts** 45:6,8

**ship** 13:8

**shirt** 126:21 134:18

**shoot** 154:6

**shooting** 49:6 88:19 89:3,11 115:9
132:8 153:9,20,22 154:10 157:3

**shootings** 90:9

**Shortly** 46:18

**shot** 88:9 154:13

**shovel** 62:23 69:22 70:24 73:8

**show** 65:20 72:8,9

**showed** 104:20 105:6 131:22

**showing** 158:21

**shown** 103:23 104:1 105:2,3
108:12,14,18

**side** 32:20

**similar** 26:16 86:12 87:4 104:21

117:14 158:9

similarities 152:19 153:8,19 158:14

similarity 153:10

simultaneous 113:4

sine 165:21

sir 132:19 135:17

sit 85:11 118:8,12 133:4 143:13 147:17

site 18:7 20:17

sitting 7:5 77:19 153:23

situation 98:17,19

situations 29:13

slowed 20:7

small 14:8

smell 74:17

Smith 16:3,5

Solache 5:10 7:15

solo 49:8

solve 147:11

son 47:18 52:2 76:10

sons 51:6,7

sort 9:11,17 10:8 12:11,22 20:7 24:11 25:10,18,20 26:4,9,10 35:8 44:21 48:3 50:24 62:22 88:13 99:17 123:14 141:24 145:9

sorts 14:21 144:24

Sotos 12:24

sought 93:15

source 79:22

specialist 86:4

specific 10:23 14:23 56:14 139:5

specifically 149:8

speculation 154:15,24 155:13 156:2

spell 8:9 60:18 104:15

spent 140:14 142:20

splitting 4:17

spoke 38:16 94:10 99:12 100:17 135:13

spoken 12:17 100:24

spread 120:16

spring 89:9

staff 145:15

stand 149:23

Stanley 28:10,24 30:13,23

Starr 5:3,4 16:8 21:6 22:22 23:5, 10,18 24:1 28:11,17 29:3,5,10 30:2,16 34:23 36:13 37:4,10 38:17 39:10,14 43:22 44:5 57:23 64:14 65:17 66:14,16,24 67:2,19 83:7,19 87:17 96:1,14 99:9 102:22,24 103:19 105:19 108:13,22 109:1,7,9 112:19 113:23 117:5,9 123:16 125:1 137:11,16 140:22 141:2,8, 11,18 142:12 143:6,10,15,20 146:8,10 148:21 149:10 150:2,20, 23 152:3 154:1,14,23 155:12 156:1,11,16 157:7,19 158:15,19 159:18,24 162:7,19 163:8,13,21 164:5

Starr's 38:8

start 7:1 46:5,16 56:24 71:10 82:11,14 84:20 100:12 165:8

started 4:13 5:18 42:22 46:5 72:10 79:10 82:14,17 91:21 92:14 94:15 100:12 112:13 131:13,18,20

starting 47:19 112:8

starts 115:1

state 22:11,12 25:24 45:16 114:10 155:20 162:8

state's 7:18 31:23 51:17 55:1 56:19 58:9 59:18 60:11 71:18 72:2 125:14 137:24 140:3,24 141:5 142:7,15 143:2,8,18 144:10 145:21

stated 36:21 67:21 159:24

statement 124:1

statements 12:5,15 39:2

states 14:10 20:14 21:20 22:5,21

stating 15:6 66:1

station 92:7 127:19 128:8 129:9 157:3,13

stay 42:9 61:17

stayed 45:4 65:7

steady 91:7

step 14:2 39:15 120:15 122:12 156:18

stepping 71:10

steps 114:19

Steve 32:1,7,11

Steven 35:18

stinks 136:7

stop 75:1 159:2,16 160:13 162:15 163:1

stopped 39:14 115:13 133:14,21 138:2

store 70:24

stories 102:1

story 69:19,23 75:21,24 76:2 152:20

street 88:20 115:7,24 117:21 126:15,16,17 135:18 153:8

strike 132:11

Strong 39:19 40:7,9,15 82:20 83:1

Strong's 40:4

stuck 102:15

student 135:3

students 40:1

stuff 13:8 93:14

stupid 122:6,10 125:8 133:3,18

stupidity 130:5

subject 117:15

subjects 67:7

subsequent 110:10 112:5

suddenly 94:9 121:1 123:18

suggested 56:24

summertime 89:9 115:24

Sun 76:10

Sunday 97:4

supervisor 52:15 92:17 145:11 148:24

supervisors 51:14 56:12 145:19 146:14,24 147:7

supposed 58:6 69:5 74:7 121:15 139:24

surveillance 48:5

AR-L 149908

**Susler** 5:7,8 38:4,20 65:19 66:15 77:8,15 83:17 88:11 103:18 109:8, 11 124:22 148:16,20 152:22 164:2, 11,17

**Susler's** 98:6

**Susnika** 35:18

**suspect** 122:20 125:24 126:6 135:6

**suspect's** 131:21

**suspend** 6:18 159:20

**suspicion** 52:19 63:24 78:19,20 125:5 130:4

**suspicious** 122:8,15 123:14

**sworn** 4:1,4

**system** 142:23

――――――――――――― T ―――――――――――――

**table** 120:15,16 127:4,6

**tactical** 41:22

**taking** 20:4 89:12 96:5,6

**talk** 11:23 12:1 40:13,17 55:19 56:20 58:24 68:6 69:11 72:15 74:2, 7 81:19 84:2 86:8 112:13 114:13, 14 127:2 130:7 133:2 134:10,13 137:17 139:13,15 153:18 161:5 164:15,21,24 165:14

**talked** 11:24 21:20 70:10 72:15 81:11 95:1 97:22 98:10,12,15 100:14 101:5,11 103:13 105:10 109:17 110:3,13 112:15 113:6,16, 21 130:8 133:6,7 136:6 151:23 160:6

**talking** 39:10,14 56:10,11 63:4,8, 10 66:8 68:4 73:6 75:18 76:5 77:22 81:24 85:1 86:23 87:11 94:7 99:22 104:19,22 105:14 106:6 107:8 110:8 112:14 115:14 138:16 147:4 152:16 153:4 155:8 157:14

**teaching** 45:17,19 46:4

**teenage** 92:14 115:23

**teenagers** 106:13 107:13 157:12

**telephone** 99:3

**television** 12:13

**telling** 51:6 54:7,9 56:4,9 69:19 96:9 124:14 134:7 135:9 149:15

**tells** 153:12

**tend** 150:6

**term** 10:8 12:12 18:1 152:23

**Terrence** 31:16 32:6

**testified** 4:4 17:8,13,14,16 64:4 65:9 71:14 83:5,9 93:15,22 94:22 103:14 109:14 138:14 146:17,22

**testify** 65:3,8 114:6

**testifying** 6:17 7:1 64:22 93:21 97:8,9 100:16 103:4,15

**testimony** 21:21 42:6 54:11 64:11 87:18 103:1,20 125:3 146:11 150:24 154:24 155:14 156:2

**textbooks** 127:6 134:19

**thing** 24:16 84:24 86:24 96:21 136:7 138:24 144:12,14

**things** 9:22 11:5,7 21:2 36:21 41:8 54:18 55:3 70:4 93:14 98:21 130:3 150:4,5 164:10

**thinking** 62:6

**thought** 23:10 47:2 50:13 68:10 76:16 78:17 89:10,13,14 91:7 94:3 103:9 105:23 131:9 152:9 164:13

**thoughts** 165:16

**threatened** 51:3

**threats** 51:5,6 52:2,13,14 75:19

**three-page** 73:3

**threw** 133:18

**tie** 126:21 134:18

**Tim** 77:19

**time** 4:18 5:13 6:3,17,24 10:22 11:10 15:9,10 17:8 18:14 21:24 26:2 36:19 38:6,13 40:18 41:6 42:20 44:9 45:6 48:21 52:4 53:10, 20 57:10 58:10 61:3 62:13 69:24 77:7 78:16 80:17 82:10 84:5,7,13, 14 85:9 86:5 88:1 90:22 91:5,6,20, 21 92:7 96:1,18 97:14 99:12 100:9, 17 101:4,9 109:7 110:10,15 112:16,18 119:4,10,17 120:20,23 122:10 124:20 127:17 128:18 132:3 136:18 137:5 140:15 142:4, 21 145:14 147:18 159:3,13,21,22 160:9 161:5 162:9 163:1,24 164:16,19

**times** 7:8 17:12 38:2 51:4 64:5 70:1 76:10 93:18,22 95:17 97:11

98:22 100:10 108:15 109:4 111:4 122:23 123:2,10 150:11 164:23

**timing** 96:20 159:12

**title** 48:6

**titles** 19:15

**today** 11:22 12:1,20 13:9 51:8 83:11,12 85:11 143:3

**told** 6:2 52:8,21,24 53:1,12 54:20, 24 55:11 58:23 59:5,10,11 68:21 69:23 71:1 74:1 78:2,5,6,7 83:3 92:17,18 93:7,14 97:24 98:3 102:18 106:23 110:8 115:3,4,16 127:2,10 134:6,13 136:1,20,24 137:3,7,24 138:2 140:3,6,19,24 141:3,14,15 142:7 143:2 144:10 147:16,17,20 149:6,7 152:21 153:1,3

**tomorrow** 135:18 136:2

**tonight** 116:5

**top** 29:9

**topic** 11:24 12:15 71:16 160:8

**topics** 12:19

**total** 28:3 41:12 45:8

**totally** 64:1

**touch** 111:22

**tourist** 9:14,15,16

**Tourists** 9:15

**towed** 128:4

**town** 9:4 42:9 45:23

**track** 66:5

**trained** 70:23

**traveling** 162:12,20 165:2

**trial** 33:19,23 152:2

**trip** 161:6

**Troy** 33:11

**true** 57:14

**trunk** 133:19

**truth** 53:19 135:9

**Turkey** 161:6

**turn** 151:17

**turned** 14:18 63:20

**two-page** 70:19

**type** 9:14 17:5 26:22,24 34:7,21
   99:7 123:15 130:21

**types** 15:4

---

**U**

**Uh-hmm** 59:4 60:15 146:15

**umbrella** 114:15,17 126:23,24
   127:1

**underlying** 89:8

**understand** 6:13 16:23 41:5 68:1,
   15 90:2 105:18 115:23 118:17
   146:3 163:10,15

**understanding** 37:21 119:15
   146:4 163:16

**understands** 38:3

**understood** 78:19 155:9

**unexpectedly** 121:2

**unfolded** 150:17

**uniformed** 133:20

**uninvited** 13:3

**unit** 41:23 145:10

**United** 14:10 20:14 21:20 22:5

**University** 19:17 24:10,23 25:4,7,
   9,11 46:3

**unknown** 77:18

**unload** 13:10

**unloaded** 135:8

**unprecedented** 38:16,19

**unusual** 70:2 77:23 150:5

**updated** 18:14 31:3

**upstairs** 69:8 133:24

**UUW** 116:17

---

**V**

**vacation** 43:16 44:9

**Varga** 7:19

**vehicle** 115:12

**ventures** 9:10

**viaduct** 88:20

**victim** 88:24

**violate** 16:12

**violent** 57:12 86:15 147:8

**virus** 98:19

**visited** 90:4

**vividly** 52:3 93:3 127:5

**voiced** 96:20

**volunteered** 42:18 65:15

---

**W**

**wait** 48:24 107:1 110:4 121:5
   124:14 136:23 157:23

**waiting** 118:23 145:20 146:24

**Walgreens** 134:21

**walk** 76:20 122:18,20

**walked** 116:24 120:16

**walking** 94:15 95:3

**Walsh** 32:4

**wanted** 11:3,5 23:16,22 47:21
   49:16 52:18 53:9 55:18 56:20 74:3,
   15 76:15,23 90:6,10 95:22 106:1
   107:4 110:14 139:20 147:2 159:2
   161:2

**wanting** 72:13

**warm** 89:13,21

**warn** 55:3

**warning** 112:9

**warrant** 73:4

**Washington** 22:8,11

**waste** 53:20

**wasted** 142:21

**watched** 62:5

**water** 61:11,14

**waters** 125:11

**wavered** 153:15

**Wayne** 10:11 62:2,17

**ways** 75:9

**weapon** 135:9

**web** 36:10

**website** 18:2,4 30:12 36:6 56:1

**week** 13:10 161:6,13,14 165:1,2,3

**weeks** 6:21

**Wehrle** 7:20

**weird** 48:11

**well-known** 27:1,4 28:22 32:22

**west** 22:14

**Whatever's** 9:24

**whereabouts** 42:11

**white** 89:4 116:12 126:14,21
   134:17

**whoa** 121:5

**whosever** 140:10

**widely** 63:1 73:5

**wife** 9:9 34:9,14 54:19,23 55:10
   62:19,20,21 75:23 118:23 159:1
   160:14,17,18

**wife's** 151:19

**WILLIAM** 4:2

**Wilson** 7:16,17

**Wisconsin** 21:22 22:1 24:10,13,
   17,23 25:1,5 31:11 34:5 42:10,11,
   12 45:16,21 46:3,7 47:16 78:14,23,
   24 79:10

**wise** 60:13 61:3

**witnessed** 116:1

**witnesses** 26:12,14 86:16 87:1,14
   92:6,15,21 93:9 106:8,9,11,15,19
   107:9,10,11,14,16 110:8,12
   112:21,24 114:21 120:4 123:20
   139:10 157:10,17 158:4,8

**woman** 88:8

**woman's** 35:13

**womb** 35:13

**wondered** 91:18

**wonderful** 162:4

**word** 18:20 38:18

**words** 146:1

**work** 5:4 9:17 10:8 15:17 16:11,13,
   15,17 17:5 19:24 20:2,8 22:21,23
   23:20 25:10,20 26:4,9,11,12,13,22,
   24 28:13 29:11,19 30:7,11,14,17
   31:21,22 32:19 33:7,16 36:14,18
   37:14,16,20,21 38:23 39:7,24 40:6
   41:1,12,23 42:1,15,18 43:19 45:15

46:11,20 47:21 48:3,7,9,13 49:18
50:5 51:1,11 54:21 62:1 66:6,10,11
75:12 77:1,7,18 79:5,8 80:1,2
86:17 91:8,9,17 162:9

**worked**  15:11 16:21 20:15 21:21
22:2 24:20 25:4 27:23 28:1,10,12,
22,24 29:10,15,24 30:4,12,15
31:11 32:7,12 36:15 37:5,13,22
39:19 41:22 43:5,9,11 44:24 45:5
47:6 81:16 83:2 91:12 124:1

**working**  15:21 19:16 20:23 24:6
42:23 44:15 45:11 46:17 49:10
50:4 51:23,24 55:20 61:23 75:1
80:16 81:8 82:11,15,17 84:14
88:23 91:20 92:2 98:17 114:11
123:12 134:20 146:21 150:16

**works**  53:4 132:15,17 161:8

**worldwide**  46:17 48:7 78:13

**worries**  7:7

**Wrice**  28:10,24 30:13,24 31:14

**write**  73:4 115:10 147:17,21

**writing**  9:20,21 127:7 132:1

**written**  73:9 124:1

**wrong**  22:13 132:14 139:19 147:3
157:23 158:10

**wrongful**  19:17 36:12 80:16 82:12,
13

**wrote**  116:3 163:22

Y

**year**  9:1 10:10 14:15 15:13 50:19
89:18 97:16 99:13 112:4 150:15

**years**  8:18 9:4,7 11:17 16:6 17:10
19:23 20:12 22:8,9 25:17 26:3
27:12 31:4 32:23 33:1 37:20 41:12,
14 51:9 55:23 63:23 65:7 73:7
84:12 95:2 97:6 98:16 102:15
110:19 112:4 137:2

**yelling**  160:15,18

**York**  22:6,7,16,17 25:7,8,11

**young**  32:23 55:18 89:1 110:9,13
114:24 115:5 116:12 120:17 124:7
126:19

**younger**  62:16 154:12,16 157:2

Z

**Zehner**  7:24

**Zimmerman**  22:3 24:15,19 25:3
31:10

**zone**  6:24 119:4

**Zoom**  77:9 97:17 99:3