IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | No. 18 C 3029 |
|---|---|
| **Thomas Sierra**, | Hon. John Z. Lee, District Judge |
| Plaintiff, | |
| v. | Hon. M. David Weisman, Magistrate Judge |
| **Reynaldo Guevara** et al., | **Plaintiff's Supplement to Rule 72 Objections Regarding Documents Related to the *Klipfel* Litigation** |
| Defendants. | |

# Exhibit 4

**Deposition Transcript of George Figueroa,
*Sierra v. Guevara*, 18 C 3029 (N.D. Ill.),
June 17, 2021**

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

# CASE NO. 1:18-CV-03029

# THOMAS SIERRA

# V.

# REYNALDO GUEVARA, ET AL.

## DEPONENT:

## GEORGE FIGUEROA

## DATE:

## June 17, 2021



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856  |  502.589.2273

www.kentuckianareporters.com

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF ILLINOIS

3    EASTERN DIVISION

4    CASE NO. 1:18-CV-03029

5

6    THOMAS SIERRA,

7    Plaintiff

8

9    V.

10

11    REYNALDO GUEVARA, ET AL.,

12    Defendants

13

14

15

16

17

18

19

20

21

22

23    DEPONENT:  GEORGE FIGUEROA

24    DATE:      JUNE 17, 2021

25    REPORTER:  ARIA EDWARDS

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

```
 1                    APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, THOMAS SIERRA:

 4   Anand Swaminathan

 5   Loevy & Loevy

 6   311 North Aberdeen

 7   Third Floor

 8   Chicago, Illinois 60607

 9   Telephone No.: (312) 243-5900

10   E-mail: anand@loevy.com

11   (Appeared via videoconference)

12

13   ON BEHALF OF THE DEFENDANTS, ALL OTHER OFFICERS OTHER

14   THAN REYNALDO GUEVARA:

15   Jeffrey R. Kivetz

16   The Sotos Law Firm P.C.

17   141 West Jackson Boulevard

18   Suite 1240A

19   Chicago, Illinois 60604

20   Telephone No.: (630) 735-3300

21   Facsimile No.: (630) 773-0980

22   E-mail: jkivetz@jsotolaw.com

23   (Appeared via videoconference)

24

25
```

Page 3

```
 1              APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANTS, CITY OF CHICAGO:

 4   Austin Rahe

 5   Rock Fusco & Connelly, LLC

 6   321 North Clark Street

 7   Chicago, Illinois 60654

 8   Telephone No.: (312) 494-1000

 9   E-mail: arahe@rfclaw.com

10   (Appeared via videoconference)

11

12   ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:

13   Michael Schalka

14   Leinenweber Baroni & Daffada, LLC

15   1150 Wilmette Avenue

16   Suite E

17   Wilmette, Illinois 60091

18   Telephone No.: (866) 786-3705

19   Facsimile No.: (800) 896-2193

20   (Appeared via videoconference)

21

22

23

24

25
```

Page 4

```
 1                      INDEX

 2                                                      Page

 3   PROCEEDINGS                                          7

 4   DIRECT EXAMINATION BY MR. SWAMINATHAN                8

 5   CROSS EXAMINATION BY MR. KIVETZ                    355

 6   REDIRECT EXAMINATION BY MR. SWAMINATHAN            360

 7   RECROSS EXAMINATION BY MR. KIVETZ                  361

 8   FURTHER DIRECT EXAMINATION BY MR.                  362

 9   SWAMINATHAN

10   FURTHER CROSS EXAMINATION BY MR. KIVETZ            362

11

12                     EXHIBITS

13   Exhibit                                            Page

14     A     Arrest Report Bates Stamp                  201

15           RFC-Sierra 000001-000002

16     B     Supplementary Report Bates                 231

17           Stamp RFC-Sierra 000017-000019

18     C     Arrest Report Bates Stamp                  232

19           RFC-Sierra 000161

20     D     Report Bates Stamp RFC-Sierra              262

21           000005-000005.1

22     E     Arrest Report Bates Stamp                  276

23           RFC-Sierra 005509

24     F     Supplementary Report Bates                 286

25           Stamp RFC-Sierra 000022-000029
```

Page 5

```
 1              EXHIBITS (CONTINUED)

 2   Exhibit                                            Page

 3     G     Photos                                     300

 4     H     Photos                                     301

 5     I     Supplementary Report Bates Stamp           309

 6           RFC-Sierra 004900-004901

 7     J     Supplementary Report Bates                 317

 8           Stamp RFC-Sierra 004904-004907

 9     K     Jose Melendez Arrest Report                327

10     L     Supplementary Report Bates                 328

11           Stamp RFC-Sierra 004986-004998

12     M     Photos of Car Bates Stamp Sierra           327

13           002845-002857

14     N     Photos Bates Stamp RFC-Sierra              328

15           000062-000070

16     O     Answers to Interrogatories                 329

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

STIPULATION

1
2
3  The video deposition of GEORGE FIGUEROA was taken at
4  KENTUCKIANA REPORTERS LLC, 730 WEST MAIN STREET,
5  LOUISVILLE, KENTUCKY 40202, via videoconference in which
6  all participants attended remotely, on THURSDAY, the
7  17TH day of JUNE, 2021 at approximately 11:09 a.m. EST;
8  said deposition was taken pursuant to the FEDERAL Rules
9  of Civil Procedure. The oath in this matter was sworn
10 remotely pursuant to FRCP 30.
11
12
13 It is agreed that ARIA EDWARDS, being a Notary Public
14 and Court Reporter for the State of INDIANA, may swear
15 the witness and that the reading and signing of the
16 completed transcript by the witness is not waived.
17
18
19
20
21
22
23
24
25

Page 7

PROCEEDINGS

1
2
3        COURT REPORTER: My name is Aria Edwards. I'm
4  the video technician and court reporter today.
5  Today is 17th day of June, 2021. The time is
6  11:09 a.m. Eastern Standard Time. We're convened by
7  videoconference to take the deposition of
8  George Figuero --
9        THE WITNESS: Figueroa.
10       COURT REPORTER: Figueroa. We're con -- in the
11 matter of Thomas Sierra and Reynaldo Guevara et al.
12       pending in the United States District Court for
13 the Northern District of Illinois, Eastern division,
14 case number 118-CV-03029. Will everyone but the
15 witness please state your appearance, how you're
16 attending, and the location you're attending from,
17 starting with the plaintiff's counsel?
18       MR. SWAMINATHAN: Anand Swaminathan from
19 Loevy & Loevy for plaintiff Thomas Sierra.
20       MR. KIVETZ: Good morning. This is
21 Jeffrey Kivetz from the Sotos Law Firm on behalf of
22 the defendant, George Figuero, from Chicago,
23 Illinois.
24       MR. RAHE: This is Austin Rahe for defendant
25 City of Chicago. I'm attending from the

Page 8

1  Chicagoland area.
2        MR. SCHALKA: This is Michael Schalka for
3  defendant Guevara. I'm also just north of the city.
4        COURT REPORTER: Do all parties agree that the
5  witness, is fact, Mr. Figueroa?
6        THE WITNESS: I'm sorry?
7        COURT REPORTER: Do all parties agree --
8        MR. SWAMINATHAN: Yes.
9        MR. KIVETZ: Yes.
10       COURT REPORTER: Mr. Figueroa, will you please
11 raise your right hand? Do you solemnly swear or
12 affirm that the testimony you are about to give will
13 be the truth, the whole truth, and nothing but the
14 truth?
15       THE WITNESS: I do.
16       COURT REPORTER: All right. Thank you. You
17 may begin.
18                 DIRECT EXAMINATION
19 BY MR. SWAMINATHAN:
20     Q    All right. Mr. Figueroa, would it be
21 appropriate to refer to you as Mr. Figueroa? Is that a
22 respectful way to talk to you, sir?
23     A    That's fine.
24     Q    Okay. Please state and spell your name for
25 the record.

Page 9

1     A    First name of George, last name of Figueroa F,
2  like in Frank -- I-G-U-E-R-O-A.
3     Q    Are you currently employed?
4     A    No, sir. I'm retired.
5     Q    And what was the last job you held?
6     A    I was a detective in Chicago Police
7  Department.
8     Q    When did you leave that position?
9     A    March 5, 2014.
10    Q    And when did you begin in the
11 Chicago Police Department?
12    A    The 19th of October 1976.
13    Q    And did you indicate the last rank you held
14 within the Chicago Police Department was detective?
15    A    Yes.
16    Q    Subsequent to leaving the Chicago Police
17 Department, have you had any sources of income?
18    A    I work a part-time job now and then.
19    Q    And what part-time jobs have you worked since
20 leaving Chicago Police Department?
21    A    It's a security company. They provide
22 security for medical personnel or social workers
23 whenever they have to go into neighborhoods where they
24 feel unsafe.
25    Q    You continue to do that work?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 6 of 132 PageID #:7596
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

10..13

Page 10

```
1    A    I'm sorry?
2    Q    You continue to do that work today?
3    A    Occasionally, yes.
4    Q    Okay.  Are you collecting a pension from the
5    Chicago Police Department?
6    A    Yes.
7    Q    Are you collecting any other pensions?
8    A    No.
9    Q    Do you have any other sources of income
10   currently other than your part-time work?
11   A    No.
12   Q    During the time you worked in the
13   Chicago Police Department, did you have any other
14   sources of income outside of your police department
15   salary?
16   A    No.
17   Q    Okay.  While you were at the Chicago Police
18   Department, what was the first position you held
19   beginning in 1976?
20   A    I was a patrol officer in the 13th District.
21   Q    What was the next position you held?
22   A    I was a patrol officer in the 14th District.
23   Q    When did you move to the 14th District?
24   A    In January of 1980 -- 1978.
25   Q    And then what was your next position?
```

Page 11

```
1    A    From there, I went to Gang Crimes North.
2    Q    What year was that?
3    A    I don't recall.  I believe it was 1982, but
4    I'm not certain.
5    Q    And then how long did you -- what was your
6    position in Gang Crimes North?
7    A    I was a police officer.
8    Q    And what were the gang -- police officers
9    working in Gang Crimes North called?  In other words,
10   you were a pat -- were you still a patrol officer?
11   A    Yes.
12   Q    Okay.  And you were detailed to the
13   Gang Crimes North unit?
14   A    I was assigned there, yes.
15   Q    Okay.  And then what was the next position you
16   held?
17        MR. KIVETZ:  Not --
18        MR. SWAMINATHAN:  I'm sorry.  Go ahead, Jeff.
19        MR. KIVETZ:  I don't what to do but I can't
20   hear.
21        MR. SWAMINATHAN:  We can't hear you now, Jeff.
22   Sorry.
23        MR. KIVETZ:  Speaker or something.  It's hard
24   for me to hear you across from him --
25        MR. SWAMINATHAN:  And I can't hear you right
```

Page 12

```
1    now.  I mean, do we need to try to -- do we have
2    another -- a computer or something else we can bring
3    in?
4         MR. KIVETZ:  It's not the computer.  It's the
5    Zoom conference call that is not allowing us to log
6    in.  It's gargled, and I have to call in.  I think
7    what we need to do is get a new Zoom link.  Probably
8    that will resolve it.
9         MR. SWAMINATHAN:  Can we ask the court
10   reporter?  Madam Court Reporter, can you have a new
11   link sent from the company and try that?
12        COURT REPORTER:  Yes.  Let me -- is everyone
13   okay with us going off record?
14        MR. SWAMINATHAN:  Yes.
15        (OFF THE RECORD)
16        COURT REPORTER:  We are on record.  It is
17   11:33 a.m. Eastern Standard Time.
18        MR. KIVETZ:  I think that's all.  You can be
19   asking questions now.
20        MR. SWAMINATHAN:  Okay.
21   BY MR. SWAMINATHAN:
22   Q    All right.  Mr. Figueroa, what was your
23   next -- after a position as a police officer in Gang
24   Crimes North beginning in approximately 1982, what was
25   your next position?
```

Page 13

```
1    A    I was still in Gang Crimes North, but I was
2    promoted to gang specialist.
3    Q    When were you promoted to gang specialist?
4    A    I don't remember the month, but it was
5    approximately 1987, 1988, right up in there somewhere.
6    Q    Okay.  And where were -- when you were in
7    Gang Crimes North, where were you based out of?
8    A    Belmont and Western.
9    Q    During the time you worked in
10   Gang Crimes North, did that ever change?
11   A    I'm sorry?
12   Q    Did that ever change during the time you
13   worked at the Gang Crimes North?
14   A    We were there until the unit was officially
15   broken up.
16   Q    When was that?
17   A    About 1999, right give or -- about 1999, 2000
18   in there somewhere.
19   Q    Okay.  But why was the unit broken up?
20   A    The department decided that they wanted to
21   separate the tactical part of the unit and the
22   intelligence part of the unit.
23   Q    And so where did the tactical part of the unit
24   go?
25   A    Homan Square.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 7 of 132 PageID #:7597
The Deposition of GEORGE FIGUEROA, taken June 17, 2021

14..17

Page 14

1    Q    And with --
2    A    I'm sorry. Did you say the tactical -- the --
3    Q    The tactical side of the unit.
4    A    They spread them out all over the city.
5    Q    With what title or rank?
6    A    Police officers.
7    Q    Did they become detectives?
8    A    I'm sorry?
9         MR. KIVETZ: Objection. Form.
10   Q    Did they become detectives?
11        MR. KIVETZ: Objection. Form. Foundation.
12   A    They were -- they were police officers, and
13   they were there until they were moved somewhere else or
14   became promoted, you know.
15   Q    Okay. And so were there gang specialists who
16   were moving over -- who were working in the tactical
17   units within Gangs who were moving out to other areas?
18   A    All the gang specialists work -- didn't work
19   with the tactical, you know, they were in those units.
20   They were sent to Homan -- Homan Square -- well, first,
21   they were at Maxwell Street and then eventually
22   Homan Square.
23   Q    So the gang specialists went to Maxwell Street
24   and then Homan Square?
25   A    That's correct.

Page 15

1    Q    And what were they -- and were they still --
2    were they still gang specialists?
3    A    Yes.
4    Q    And there was not one central gang unit?
5         MR. KIVETZ: Objection. Form. Foundation.
6    A    We were all -- all the citywide gang
7    specialists, we were all in the same building, if that's
8    what you're asking.
9    Q    And what unit -- what was the name of that
10   unit they worked out of?
11   A    Gang Intelligence.
12   Q    Okay. You had become a Gang Crimes North,
13   gang specialist in approximately '97 -- 1987 to 1988.
14   What was your next position?
15   A    Gang specialists, after the unit was broke
16   up -- broken up, they decided to -- to break up Gang
17   Intelligence, and they sent us to the different
18   detective divisions. I went to Area Five.
19   Q    When was that?
20   A    Around 2000.
21   Q    This is -- so this is around the same time as
22   the Gang Crimes North being disbanded?
23   A    Gangs Crime North was disbanded in a --
24   disbanded in about 1999, '98 -- I'm sorry, '99, I think
25   it was.

Page 16

1    Q    So when Gang Crimes was disbanded in 1999, did
2    you go over to Maxwell Street as a gang specialist?
3    A    Yes.
4    Q    And then from Maxwell Street as a gang
5    specialist, you then became a gang specialist working
6    out of Area Five in 2000; is that right?
7    A    Before that, we went to Homan Square. From
8    Maxwell Street to Homan Square.
9    Q    Okay. So you weren't at Maxwell Street for
10   very long?
11   A    No.
12   Q    You cut out there.
13   A    No. We weren't there long.
14   Q    Okay. And then to Homan Square, you became --
15   you moved to being a gang specialist at Area Five in
16   about 2000; is that right?
17   A    Thereabouts. Yeah.
18   Q    Okay. So in that role, you were essentially a
19   gang specialist detailed out to work with Area Five
20   detectives; is that right?
21   A    They -- they sent us -- they made us -- they
22   got rid of our rank, made us detectives. And then from
23   there, we went to different areas in the city, I went to
24   Area Five.
25   Q    So in 2000, you became a detective?

Page 17

1    A    A little bit after that.
2    Q    When did you become a detective.
3    A    Probably 2001, right up in there. I'm not
4    sure the dates.
5    Q    So there's a period of time you were working
6    in Area Five before you became a gang specialist --
7    before you became a detective; is that right?
8    A    No. They made us detectives first, then we
9    went to the different detective divisions.
10   Q    Got it. What detective unit did you work out
11   of? Did you work with Property Crime, Robbery,
12   Violent Crimes? Give me in that sense.
13   A    Violent Crimes. And then there was, like, a
14   subsection of the aggravated battery team. They had the
15   guys who were gang specialists were put together on a
16   unit that had -- that did nothing but the aggravated
17   battery, and the shootings, and things like that.
18   Q    Did that include homicides?
19   A    If the victim eventually died, then it was
20   turned over to the homicide people.
21   Q    And would you work those cases?
22        MR. KIVETZ: Objection.
23   A    Occasionally, I would help them out if they
24   needed information on trying to get people identified.
25   But other than that, the homicide cases were ha -- were

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 8 of 132 PageID #:7598
The Deposition of GEORGE FIGUEROA, taken June 17, 2021
18..21

Page 18

1  handled by Homicide detectives.
2      Q    For any period of your -- and so once you
3  became a detective working out of Area Five in 2000,
4  have you had any subsequent positions with the police
5  department before your retirement?
6      A    It's now -- for a while I worked in a fugitive
7  apprehensions from Area Five.  And then from there I
8  went to -- they formed a new gang intelligence unit, and
9  that's where I ended my career.
10     Q    And still with the role of detective?
11     A    Yes.
12     Q    When did you go to the gang intelligence unit?
13     A    I couldn't give you the exact date.  It was
14  some time in the 2000s.  I couldn't tell you exactly.  I
15  don't remember.
16     Q    In what way did your role change once you went
17  to the gang intelligence unit?
18     A    We weren't assigned cases then.  It was -- it
19  was really essentially back to intelligence and
20  preparing invest -- preparing long-term investigations.
21     Q    Do you have any period of time during your
22  career when you worked a desk job rather than being out
23  in the field?
24     A    No.
25     Q    You speak Spanish?

Page 19

1      A    Yes.
2      Q    You speak fluent Spanish?
3      A    Yes.
4      Q    What is your -- what is your national origin
5  or area place of descent?
6      A    I was born here, but my parents are Puerto
7  Rican.
8      Q    And were you born in Chicago?
9      A    I was born in New York City.  I grew up in New
10 York City.
11     Q    And when did you move to Chicago?
12     A    1964.
13     Q    Did you say '54 or '64?
14     A    I was born in 1951 not 1851.  1964, my family
15 moved here.
16     Q    And did you -- where in the City of Chicago
17 did you live when you were growing up?
18     A    The North Side.
19     Q    What period of time did you live on the North
20 Side?
21     A    I've essentially lived in North Side since
22 1964.  Different addresses but the North Side.
23     Q    And I'm not asking you for your addresses. Did
24 you -- have you -- and you still currently live on the
25 North Side?

Page 20

1      A    Yes, sir.
2      Q    Did you live for periods of time in
3  neighborhoods in which you -- neighborhoods that you
4  policed?
5          MR. KIVETZ:  Objection.  Form.
6      A    No.  Not really.
7      Q    Do you have any children?
8      A    Yes.
9      Q    How many?
10     A    Three.
11     Q    Are they all grown up?
12     A    Yes.
13     Q    All right.  Let me just -- let me make this
14 first.  Have you given a deposition before?
15     A    Yes.
16     Q    How many times?
17     A    Once, I believe.
18     Q    How long ago was that?
19     A    Well, had to be 30 years ago, at least.
20     Q    Was it in the context of your work as a police
21 officer?
22     A    Yes.
23     Q    Were you a defendant?  Was it a lawsuit
24 against you?
25     A    Yes.

Page 21

1      Q    What was the allegations against you in that
2  lawsuit?
3      A    This is -- no.  Violation of civil rights.
4      Q    And what was it alleged that you did to
5  violate civil rights?
6      A    I punched the guy who was -- stabbed my
7  partner.
8      Q    And what happened with that lawsuit?
9      A    I think it was dismissed because it was based
10 on race.  And the person suing me he was African
11 American, and my wife is African American, and once he
12 found that out, they just tossed the case.
13     Q    And have you ever been sued in any other
14 instances, as a Chicago police officer?
15     A    One other time in about 1981 I want to say.
16     Q    Did you give a -- did you give a deposition in
17 that case?
18     A    No.
19     Q    Any other times you're aware of that you were
20 sued as a Chicago police officer?
21     A    I -- I can't recall any other time.
22     Q    Any instances in which a lawsuit against you
23 resulted in any payment by settlement or verdict?
24     A    The -- the first time that I was sued.  1981.
25     Q    The case had involved --



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1    A    I believe --
2    Q    Go ahead.
3    A    I believe they settled it with the city in the
4  middle of the trial.
5    Q    Okay.  And that's the case in which you
6  allegedly punched someone who had stabbed your partner;
7  is that right?
8         MR. KIVETZ:  Objection.  Form.  Misstates the
9  testimony.
10   A    No.  That's a different case.
11   Q    Okay.  The case in which some settlement was
12 made, what were the allegations in that case?
13   A    Excessive force.
14   Q    And what was it alleged that you had done?
15   A    It said that all of us, there were six of us,
16 I believe.  Beat these two -- two guys.
17   Q    Do you remember the name of those two guys?
18   A    They were I think Croatian names.  Vujacic, I
19 believe were their names.  Two -- two brothers.
20   Q    And it was alleged that you and -- at that
21 time were you a patrol officer or a Gang Crimes officer?
22   A    I was in patrol, 14th District.
23   Q    You were in the 14th District.  Okay.  Who are
24 the other people who were accused with you?
25   A    Robert Paxton was my partner.  And frankly, I

Page 23

1  don't remember the names of the other four guys.  It was
2  a long time ago and I really didn't know them very well.
3    Q    In that case, did you make any -- did you
4  physically make contact with the individual who accused
5  you?
6         MR. KIVETZ:  Objection.  Form.
7    A    Certainly, yes.
8    Q    And what did you do?
9    A    Well, he punched me and I punched him back.
10   Q    Anything else --
11   A    I mean --
12   Q    Go ahead.
13   A    I'm sorry?
14   Q    Anything else that you did?
15   A    No.  This -- they were -- they were alleging
16 excessive force.  He was beating his wife.  I
17 interfered.  he punched me, and I punched him back.  And
18 then his friends all got into it.
19   Q    And then did your fellow officers also
20 participate in the physical altercation that took place?
21   A    Yes.
22         MR. KIVETZ:  Objection.  Form.
23   Q    Did any of the other police officers strike
24 anyone?
25         MR. KIVETZ:  Objection.  Form.  Foundation.

Page 24

1  Speculative.
2    A    Probably.  We called for help because there
3  were people storming out of the tavern.  And we were
4  surrounded and getting beaten, and so we called for
5  help.  And so they came and helped us.
6         COURT REPORTER:  I'm sorry to interrupt.
7  Mr. Kivetz, I'm sorry, do you mind speaking up a
8  little bit?
9         MR. KIVETZ:  I'm basically screaming, trying
10 already, so I can't.  I'm -- this is as good as it's
11 going to get.
12        COURT REPORTER:  Okay.
13        MR. KIVETZ:  I'm trying to remain calm.  It's
14 frustrating that we're here.
15 BY MR. SWAMINATHAN:
16   Q    All right.  Let me go through the -- talk
17 about the ground rules that -- well -- strike that.  Let
18 me just ask you one other question related to giving
19 sworn testimony.  Other than the deposition that you've
20 given, have you testified at -- have you testified at
21 trial in a civil case?
22   A    Just that one.
23   Q    In the case --
24   A    One that I --
25   Q    In the case that settled, you had testified at

Page 25

1  trial; is that right?
2    A    No.  I didn't testify.  I was there.  I was
3  about to testify, but they decided to settle before they
4  got to me.  But there was a tr --
5    Q    Okay.  And I assume you've testified many
6  times in criminal court as a police officer?
7    A    Yes.
8    Q    Fair to say hundreds of times?
9    A    Fair to say, yes.
10   Q    And you have -- you were placed under oath
11 each of those instances in which you testified in court,
12 correct?
13   A    I'm sorry?
14   Q    You were placed under oath in each of those
15 instances when you testified in criminal court, correct?
16   A    Yes.
17   Q    And so you understand what it means to be
18 under oath, correct?
19   A    I do.
20   Q    Okay.  Let me talk a little bit more about the
21 ground rules for the deposition.  This is obviously a
22 question-and-answer session.  I'm asking you questions.
23 The court reporter is -- you are answering the questions
24 and the court reporter is writing down our questions and
25 answers.  So it's important that we not speak at the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 10 of 132 PageID #:7600
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021
26..29

Page 26

1 same time. So make sure I finish my question before you
2 answer. You understand that?
3    A    Yes.
4    Q    If I have cut you off before you've finished
5 your answer, you -- please let me know. If I thought
6 you were done, let me know, and I'll let you finish your
7 answer, okay?
8    A    Okay.
9    Q    Similarly, as I indicated, please wait for me
10 to finish my question. There will be times where you
11 know exactly where I'm going with my question. Make
12 sure you let me finish the question before you answer,
13 okay?
14    A    Okay.
15    Q    No nods or "uh-huhs." We need verbal answers
16 so the court reporter can take those down, okay?
17    A    Okay.
18    Q    All right. If you need to take a break at any
19 point, let me know, and we'll take a break, fair?
20    A    Fair.
21    Q    If I ask you a question and you don't
22 understand it, please let me know, and I'll rephrase the
23 question, fair?
24    A    Okay.
25    Q    Similarly, if you answer my question, I'll

Page 27

1 assume you understood my question, also fair?
2    A    Yes.
3    Q    Okay. If you need to take a break at any
4 point, just let us know.
5    A    I will.
6    Q    This is a "yes" or "no" question, so listen
7 carefully. Are you taking any medications that would
8 prevent you from being able to understand my questions
9 and to answer them truthfully today?
10    A    No.
11    Q    Do you have any medical conditions that would
12 prevent you from being able to understand my questions
13 and answer them truthfully today?
14    A    No.
15    Q    During the time you worked as a Gang Crimes
16 officer, did you have any nicknames?
17    A    Some of the local gang members who I dealt
18 with on a consistent basis, a lot of them couldn't
19 pronounce my name, so they would just say "Figgy."
20    Q    Any other nicknames that the guys in the
21 neighborhood had for you?
22    A    No. Not that I'm aware of.
23    Q    When you were working as a Gang Crimes officer
24 out of area -- strike that. When you were working as a
25 Gang Crimes officer in 1995, which is the year of

Page 28

1 the investigation that's in question in this lawsuit.
2 Well -- strike that. Let me just lay a little bit more
3 groundwork. You understand that you're here for a
4 deposition today because you've been sued in a case
5 brought by Thomas Sierra, correct?
6    A    Correct.
7    Q    Okay. And you understand that that has to do
8 with his ultimate conviction for the shooting of a man
9 named Noel Andujar?
10    A    Yes.
11    Q    And if I refer to the "Andujar homicide
12 investigation" or the "Andujar investigation," you
13 understand what I'm speaking about?
14    A    Yes.
15    Q    You understand that I'm referring to the
16 homicide investigation that took place in or around
17 May of 1995?
18    A    Yes.
19    Q    Okay. In 1995, what shifts did you work?
20    A    In 1995?
21    Q    Yes.
22    A    You'll have to give me a specific date,
23 because I -- I couldn't honestly tell you because we
24 changed our shifts often.
25    Q    Okay. So in -- during the time that you

Page 29

1 worked as a gang specialist, were -- you indicated that
2 you worked different shifts at different times; is that
3 right?
4    A    Yes.
5    Q    And it changed regularly?
6    A    It changed regularly, yes.
7    Q    As a gang specialist, would you work -- would
8 gang specialists work sort of the typical first shift,
9 second shift, third shift schedule that others work?
10    MR. KIVETZ: Objection. Hold on. Objection.
11 Form.
12    A    Generally, it was two shifts.
13    Q    What were the two shifts?
14    A    Something like 9:00 to 5:30 and 6:00 to 1:00
15 in the morning. Something like that, I don't -- I'm not
16 sure I remember exactly.
17    Q    So there was a day shift and an evening shift;
18 is that right?
19    A    That's correct.
20    Q    And then there was none of the gang
21 specialists worked nights; is that right?
22    MR. KIVETZ: Objection. Form. Foundation.
23    A    It -- it would depend on the circumstances.
24 Sometimes we would have to change shifts or alter our
25 hours depending on the investigation that we were doing.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 11 of 132 PageID #:7601
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
30..33

Page 30

1    Q    And so sometimes you would work -- instead of
2  working one of the regular shifts, the day shift or the
3  evening shift, you might end up working odd hours, given
4  the nature of a specific investigation; is that right?
5    A    That's correct.
6    Q    So in the year 1995, can you say for any
7  given -- any point in time, what shifts you were working
8  at any point in time in 1995?
9    A    I couldn't tell you.  I don't know.
10   Q    Okay.  Can you say for any period of time that
11 you were working as a gang specialist, say, "I know that
12 for this particular period of time, I was working this
13 particular shift"?
14       MR. KIVETZ:  Objection.  Form.  Foundation.
15   A    I -- I couldn't honestly tell you; it was
16 26 years ago.
17   Q    And if you wanted -- so if I ask you what
18 hours you were working in May of 1995, could you tell
19 me?
20   A    No.
21   Q    Could you tell me generally?
22   A    The only way of being able to tell you would
23 be if I made a report that day where I would have to put
24 the times.  That's about it.
25   Q    And all that would tell you is that you were

Page 31

1  working at that particular time at which you submitted
2  the report; is that correct?
3        MR. KIVETZ:  Objection.  Form.  Foundation.
4  Speculative.
5    A    That's correct.
6    Q    And it wouldn't tell you what hours you were
7  working either earlier than that or after than that; is
8  that correct?
9        MR. KIVETZ:  Same objection.
10   A    Not necessarily.
11   Q    Okay.  Were there documents that you'd fill in
12 on a daily basis indicating what hours you worked?
13       MR. KIVETZ:  Objection.  Foundation.
14   A    I don't think so.
15   Q    As a gang specialist, would you fill out any
16 kind of timecard or sheet indicating what hours you'd
17 worked on any given day?
18       MR. KIVETZ:  Same objection.
19   A    No.  We did not.
20   Q    When you were working as a gang specialist,
21 would you typically work with a partner or by yourself?
22       MR. KIVETZ:  Objection.  Foundation.
23   A    It depends.
24   Q    Depends on what?
25   A    It depends on, if my partner was off, or my

Page 32

1  partner was working on something that was different from
2  what I was working on.
3    Q    Did you always have an assigned partner and
4  that it may not be that any given day you were working
5  with the assigned partner, but you had somebody who was
6  your assigned partner?
7        MR. KIVETZ:  Objection.  Foundation.
8    A    In general, we had a partner that we were
9  assigned to, but that didn't mean that we were always
10 together.
11   Q    Who were your assigned partners during the
12 time you were a gang specialist?
13       MR. KIVETZ:  Same objection.
14   A    Too many to mention.  I worked with
15 Gerry Flavin, Jerry Shields.  That's pretty much --
16 pretty much it.
17   Q    Okay.  So you didn't have very many different
18 assigned partners, your assigned partners really were
19 those two guys?
20   A    Yeah.  Mostly.
21   Q    Okay.  Anybody else you recall working with
22 who was an assigned partner to you?
23       MR. KIVETZ:  Objection.  Form.  Foundation.
24   A    We were on a team.  So any given day I could
25 be working with someone else.

Page 33

1    Q    And when you say you "were on a team," who
2  would be the members of a team?
3        MR. KIVETZ:  Objection.  Form.  Foundation.
4    A    Most of the gang specialists were divided up
5  into teams headed by a sergeant.
6    Q    And how many gang specialists would be on each
7  team?
8        MR. KIVETZ:  Same objection.
9    A    It varied.
10   Q    So what were the -- what was the range in
11 terms of the number of gang specialists that would be on
12 a team?
13   A    Pr --
14       MR. KIVETZ:  Hold on.  Objection.  Form.
15 Foundation.
16   A    Probably seven to ten guys.
17   Q    And were their assignments different?  Was it
18 split up by areas of the city or anything like that?
19       MR. KIVETZ:  Same objection.
20   A    Yes.
21   Q    Okay.  And then -- so each team was focused on
22 a particular area of gang crime -- of sort of an area in
23 the North Side of Chicago; is that right?
24       MR. KIVETZ:  Objection.  Form.  Foundation.
25 Speculative.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 12 of 132 PageID #:7602
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

34..37

Page 34

1    A    That's the way it was designed, but it didn't
2 always work out that way.  Sometimes investigations
3 would take you to other parts of the city.
4    Q    What were the different area -- when you were
5 a gang crimes specialist working out of Gang Crimes
6 North, were there multiple different teams that you
7 worked on?  Or were -- would you stay on one team for
8 most of your time there?
9         MR. KIVETZ:  Same objection.
10   A    I stayed on one team.
11   Q    Who was your sergeant on that team?
12        MR. KIVETZ:  Same objection.
13   A    Edmond Stack.
14   Q    Did you have any other sergeants when you were
15 on that team?
16   A    After he retired, I worked for a variety of
17 different sergeants.
18   Q    You say for a variety of different sergeants?
19   A    After Sergeant Stack retired, I worked for a
20 couple of different other sergeants.
21   Q    Who were they?
22   A    Oh, James Washburn, Eldon Urbikas,
23 Kerry Williams. I -- I can't recall anybody else.
24   Q    And what was the area that your team was
25 focused on or assigned to?

Page 35

1         MR. KIVETZ:  Objection.  Form.  Foundation.
2    A    Generally, it was Area Five.
3    Q    And who were the other -- who were the other
4 members of that team in 1995?
5    A    People came in and out of the team.  Some
6 people got promoted.  Some people retired.  I -- I -- I
7 could sit here all day and remember just a couple of
8 names.  John Galligan, Joe Miedzianowski.  I'm sure
9 that's what you're referring to.
10   Q    I missed what you said.  I didn't catch what
11 you said there.
12   A    John Galligan and Joseph Miedzianowski were
13 two.  We worked together on the same team for many
14 years.  I'm sure those are the ones you're referring to.
15 Eldon Urbikas was one.  I can't remember their names --
16 the rest of the names.
17   Q    Anyone else you remember working on the same
18 team as you?
19   A    I'm sorry?
20        MR. KIVETZ:  In 1995, again, or not?
21        MR. SWAMINATHAN:  Yeah.  Yeah.  No.  Let's --
22 strike that.
23 BY MR. SWAMINATHAN:
24   Q    So in 1995, you -- is it the case that you --
25 that on your team were Galligan, Miedzianowski, and

Page 36

1 Vicus [sic]?
2    A    And who?
3    Q    Did you say Vicus was the third person?
4    A    No.
5    Q    What was the third name you said?
6    A    Oh, Urbikas, U-R-B-I --
7    Q    Spell it for us, please.
8    A    I'm sorry?
9    Q    Can you spell that for us?
10   A    U, like, the union, R-B-I-K-S [sic].
11   Q    Okay.  Other than that -- so did you work with
12 Galligan, Miedzianowski, and Urbikas on the same team in
13 1995?
14   A    I believe I did.
15   Q    Okay.  Is there anybody else that you recall
16 working with on the same team in 1990 -- as being part
17 of that team in 1995?
18   A    Off the top of my head, I couldn't remember.  I
19 can't remember.
20   Q    Putting aside 1995, during the time you were a
21 gang crime specialist working out of Gang Crimes North,
22 are there -- is there anybody else who worked with you
23 on your team?
24        MR. KIVETZ:  Objection.  Form.
25   A    On -- on that day I was working with

Page 37

1 Gerry Flavin.
2    Q    Flavin would have been on the same team as
3 you, and Shields would have also been on the same team
4 as you, correct?
5    A    Shields didn't come until later.
6    Q    So there was a period of time when Flavin was
7 on the same team as you, correct?
8    A    Yes.
9    Q    And then there was a period of time when
10 Shields was on the same team as you; correct?
11   A    That was late -- that was later on when we
12 were detectives at Area Five.
13   Q    Okay.  Anyone else who you recall being on the
14 same team as you during the time you were a gang
15 specialist out of Gang Crimes North?
16   A    Off the top of my head, I can't remember
17 anybody else.  Kind of -- we had people coming in and
18 leaving, so I really don't recall.
19   Q    Have you seen the lawsuit that was filed in
20 this case?
21   A    I'm sorry?
22   Q    Have you seen a copy of the lawsuit that was
23 filed in this case?
24   A    The log?  No.
25   Q    No.  No.  I'll say it again.  Have you seen a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 13 of 132 PageID #:7603
The Deposition of GEORGE FIGUEROA, taken on June 15, 2021

38..41

Page 38

1  copy of the lawsuit that was filed in this case?
2       A    Yes.
3       Q    And in that -- that's a -- there was a
4  complaint that identifies a number of individuals who
5  are being sued, including yourself, correct?
6       A    Correct.
7       Q    And you saw that there were a number of
8  detectives that were sued in this case, in addition to
9  yourself, correct?
10      A    Correct.
11      Q    Did you work with any of those detectives on
12  the same team during the time you were a gang specialist
13  out of Gang Crimes North?
14           MR. KIVETZ:  Objection.  Form.  Foundation.
15  Speculative.
16      A    No.  I did not.
17      Q    One of the individuals who is a detective sued
18  in this case is Ernest Halvorsen.  Did you ever work
19  with him as a gang specialist?
20      A    No.
21           MR. KIVETZ:  Objection.  Form.  George, just a
22  reminder, we didn't get to that instruction.
23           THE WITNESS:  Yeah.
24           MR. KIVETZ:  You have to wait for me to make my
25  objection --

Page 39

1            THE WITNESS:  Okay.
2            MR. KIVETZ:  -- and then you go ahead.  So that
3  way we're not all talking over each other, okay?
4            THE WITNESS:  Sounds good.
5            MR. KIVETZ:  Thank you.
6  BY MR. SWAMINATHAN:
7       Q    Did you ever work with Reynaldo Guevara on the
8  same team as a gang specialist?
9            MR. KIVETZ:  Objection.  Form.
10      A    No.
11      Q    During the time that you were a gang
12  specialist, would your team work with other gang
13  specialist teams?
14           MR. KIVETZ:  Objection.  Form.  Foundation.
15      A    Did you ask me if I've worked with other gang
16  specialists?
17      Q    Yes.  Would your team -- strike that.  Let me
18  clarify the question.  In other words, you indicated
19  that there were -- you definitely worked regularly with
20  people who were part of your same team, correct?
21      A    Correct.
22      Q    And you indicated that there were other gang
23  specialist teams, correct?
24      A    Yes.
25      Q    And so would you also work with gang

Page 40

1  specialists who were members of other teams?
2            MR. KIVETZ:  Objection.  Form.  Foundation.
3  Speculative.
4       A    Not really.  No.
5       Q    Okay.  Did you have any interactions with
6  Detective Guevara during the time that he was a gang
7  specialist?
8            MR. KIVETZ:  Objection.  Form.  Foundation.
9       A    No.
10      Q    Did you ever overlap as a gang specialist with
11  Detective Guevara as far as you're aware?
12           MR. KIVETZ:  Objection.  Foundation.
13      A    You know, I'm not 100 percent certain.  But I
14  may have.
15      Q    Okay.  But even to the -- even if you
16  overlapped, you did not work with him on particular
17  cases, or investigations, or intelligence; is that
18  right?
19           MR. KIVETZ:  Objection.  Form.
20      A    No.  I did not.
21      Q    I've asked you some questions about your work
22  with other gang specialists.  Let me ask you about your
23  work with detectives.  As a gang specialist working out
24  of Gang Crimes North, would you work with detectives as
25  part of your work?

Page 41

1            MR. KIVETZ:  Objection.  Form.
2       A    No.  Never as partners.
3       Q    Would you assist detectives in their work?
4       A    I would assist certain detectives if they
5  asked for my help.  Yes.
6       Q    And would you -- would gang specialists ever
7  be assigned to work with detectives or detective units?
8            MR. KIVETZ:  Objection.  Form.  Foundation.
9  Speculative.
10      A    No.
11      Q    Was there a period of time in which
12  Mr. Miedzianowski was detailed to work with Area Five
13  violent crime?
14           MR. KIVETZ:  Objection.  Form.  Foundation.
15  Speculative.
16      A    He may have been, but I -- I don't know for
17  sure.
18      Q    Okay.  So fair to say you were never assigned
19  to work -- you were never detailed out to work with a
20  detective unit; is that correct?
21           MR. KIVETZ:  Objection.  Form.
22      A    I was at Area Three.
23      Q    When was that?
24      A    That was sometime in the '90s, early 2000s I
25  want to say.  I was there for, like, three months.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 14 of 132 PageID #:7604
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021
42..45

Page 42

1    Q    And so what was your role during that period?
2    A    Essentially assisting detectives in
3  identifying gang members, gang friends, things like
4  that.
5    Q    And so during that period, did you work out of
6  Area Three?
7    A    Yes.
8    Q    And during that period, did you have a desk at
9  Area Three?
10   A    Did I have a what?
11   Q    A desk at Area Three.
12        MR. KIVETZ:  Objection.  Form.
13   A    No.
14   Q    And which detective unit did you work with?
15   A    Area Three detectives.
16   Q    Did that include Violent Crimes?
17   A    Yes.
18   Q    Did it include other units within the
19  detective division or just Violent Crimes?
20   A    Violent Crimes were the only ones that ever
21  asked for my help with anything.
22   Q    And during that period, would you go out with
23  detectives on investigations when you were detailed out
24  of Area Three?
25        MR. KIVETZ:  Objection.  Form.

Page 43

1    A    Occasionally.
2    Q    And during that period, would you participate
3  in Homicide and other Violent Crimes investigations?
4    A    Occasionally.
5    Q    And then, is it your understanding that your
6  experience being detailed out to Area Three for a period
7  of time was not unusual.  And that it was common to have
8  gang -- gang specialists get detailed out to work with
9  Violent Crimes units out of the areas?
10        MR. KIVETZ:  Objection.  Form.  Foundation.
11  Speculative.
12   A    For a time they -- they did that after they
13  broke up the Gangs unit.
14   Q    They broke up the Gangs unit in '99, you said,
15  right?
16   A    Thereabouts.
17   Q    So when you were detailed out to Area Three,
18  was that after they had broken up the gang unit?
19   A    Yes.
20   Q    Was there any period of time in the '90s when
21  you were detailed out to any -- to work with any
22  detective unit?
23        MR. KIVETZ:  You -- he was coughing.  I -- and
24   I didn't catch your question.
25   Q    Was there any period of time in the '90s

Page 44

1  before the gang unit was broken up that you were
2  detailed out to work with any detectives out of areas?
3        MR. KIVETZ:  Objection.  Form.  Foundation.
4    A    No.
5    Q    Do you know if any other gang specialists
6  were?
7        MR. KIVETZ:  Objection.  Form.  Foundation.
8  Speculative.
9    A    Not that I'm aware of.
10   Q    In what ways -- during the time you were a
11  gang specialist in the '90s, in what ways would you
12  assist detectives in homicide investigations?
13   A    Generally speaking, it would be in identifying
14  gang offenders.
15   Q    What else?
16   A    Well, that was the main thing.  But also
17  assisting in trying to locate witnesses.  When
18  someone -- when they were able to identify someone in a
19  homicide, for example, we would try to locate them.
20   Q    What else?
21   A    That was pretty much our duties.
22   Q    Would you assist in identification procedures?
23        MR. KIVETZ:  Objection.  Form.  Speculative.
24   A    Would you repeat the question, please?
25   Q    Yeah.  As a gang specialist, could you assist

Page 45

1  homicide investigations by -- would you assist homicide
2  investigations by conducting identification procedures?
3        MR. KIVETZ:  Objection.  Form.  Foundation.
4    A    Yes.
5    Q    What types of identification procedures would
6  you perform to assist homicide investigation?
7        MR. KIVETZ:  Same objection.
8    A    If they had a nickname, or if they had a
9  description, or perhaps if they were shouting gang
10  slogans, things like that.
11   Q    And then in those instances, would you conduct
12  an identification procedure?
13        MR. KIVETZ:  Objection.  Form.
14   A    What do you mean by "identification
15  procedure"?
16   Q    Yes.  So when I use that term, what -- does
17  that term have a meaning to you?
18   A    "Identification procedures"?  No.  But if
19  you're asking if we assisted in trying to identify
20  offenders, yes.
21   Q    Okay.  So let me ask.  Would you ever show
22  gang books to the witnesses?
23        MR. KIVETZ:  Objection.  Form.  Foundation.
24   A    Occasionally.
25   Q    And so one of the things you could do as a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 15 of 132 PageID #:7605
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021
46..49

Page 46

1  gang specialist to assist homicide investigations is to
2  show gang books to witnesses, correct?
3      A    Sometimes.
4      MR. KIVETZ:  Same objection.
5      A    Sometimes.
6      Q    Would you also conduct photo arrays in
7  assistance with homicide investigations?
8      MR. KIVETZ:  Objection.  Form.  Foundation.
9      A    Occasionally.
10     Q    Would you also conduct lineups -- live lineups
11 in assistance of homicide investigation?
12     MR. KIVETZ:  Objection.  Form.  Foundation.
13     A    Never.
14     Q    That was exclusively conducted by detectives?
15     MR. KIVETZ:  Objection.  Form.  Foundation.
16 Speculative.
17     A    That's correct.
18     Q    And would you ever -- even if a detective was
19 conducting a live lineup, would you ever participate in
20 those lineups?
21     MR. KIVETZ:  Objection.  Form.  Foundation.
22     A    Well, my participation was limited to pretty
23 much just being there for the identification.  But other
24 than that, they conducted the lineups.
25     Q    When you say, "being there," you mean being

Page 47

1  there in the room with the detectives and the witness
2  when they were doing a lineup?
3      A    Sometimes.
4      Q    And what was the purpose of having you there
5  as a gang specialist?
6      MR. KIVETZ:  Objection.  Form.  Foundation.
7  Speculative.
8      A    In case I had a question about the
9  identification.  Things like that.
10     Q    But what were the kind of questions you might
11 have during the course of an identification procedure
12 being conducted by detectives?
13     MR. KIVETZ:  Objection.  Form.  Foundation.
14 Speculative.
15     A    For example, if the person they picked out had
16 a beard, I would ask them, for example, if at the time
17 that they committed a crime, if he did not have a beard.
18 Or did they have a different hair color, things like
19 that.  We wanted to make sure the identification was
20 right.
21     Q    You -- and you indicated that you would help
22 locate witnesses to assist homicide investigations; is
23 that right?
24     A    If needed, yes.
25     Q    And also help to locate suspects?

Page 48

1      A    If -- if that -- if they needed that I did
2  that also.
3      Q    And would you assist homicide investigations
4  by interviewing witnesses?
5      A    Not independently of the detective, if that's
6  what you're asking.
7      Q    That is what I'm asking, so you're saying you
8  would participate in interviews of witnesses, but only
9  with the presence of a detective; is that right?
10     MR. KIVETZ:  Objection.  Form.  Foundation.
11 Misstates his testimony.
12     A    Right.  They were in charge of the case, so
13 independently I wouldn't interview anybody.  But
14 sometimes they would ask me to be present for the
15 interview, especially if the inter -- interview was to
16 try to identify the offender or other witnesses.
17     Q    Why would they want you there for that?
18     MR. KIVETZ:  Objection.  Form.  Speculative.
19     Q    Are you asking me why they would want me
20 there?
21     A    Yes.
22     MR. KIVETZ:  Same objection.
23     A    Sometimes it was to translate.  Sometimes it
24 was to ask questions that perhaps pertain to gangs that
25 were not familiar to the detective.

Page 49

1      Q    And so would you sometimes participate in the
2  questioning of the witness?
3      A    Yes.
4      Q    And what about interviewing suspects, would
5  you do that in assistance of homicide investigations?
6      MR. KIVETZ:  Objection.  Form.  Speculative.
7      A    Seldom.
8      Q    Okay.  So -- okay -- strike that.  So you
9  would do it sometimes but not very often; is that right?
10     A    Ultimately, almost never.  Because it's their
11 case, they have the facts, so I wouldn't know what to
12 ask the suspect.
13     Q    Well, would you serve as a translator in those
14 interrogations of suspects?
15     MR. KIVETZ:  Objection.  Form.  Foundation.
16     A    Occasionally.
17     Q    And if you were -- and if they were
18 interrogating a suspect where there were some
19 significant gang-related issues, would they sometimes
20 ask your assistance in those interrogations?
21     MR. KIVETZ:  Objection.  Form.  Foundation.
22 Speculative.
23     A    Well, that was also a rarity.
24     Q    You indicated that there were incidences --
25 one of the things you do to assist in homicide



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 16 of 132 PageID #:7606
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021

50..53

Page 50

1  investigations was to help the detectives by locating
2  suspects for arrest, correct?
3      A   Yes.
4      Q   How would that request be communicated to you?
5          MR. KIVETZ:  Objection.  Form.  Speculative.
6  Foundation.
7      A   Generally, verbally or through a supervisor.
8      Q   When you say, "through a supervisor," what do
9  you mean?
10     A   Perhaps the -- the commander or watch
11 commander of a -- of a detective division would call our
12 unit and say, "We need some help with this particular
13 gang or that particular gang."  And whatever gang crime
14 specialist is familiar with that gang would be asked to
15 go to the different areas and assist them in some way.
16 Generally identification.
17     Q   Was it common for you to go over to the
18 Area Five Violent Crimes unit?
19         MR. KIVETZ:  Objection.  Form.
20     A   Yes.
21     Q   Was it common for you to be over there working
22 with detectives?
23         MR. KIVETZ:  Objection.  Form.
24     A   Yes.
25     Q   What is it common for detectives from the

Page 51

1  Violent Crimes unit to be over at Belmont and Western
2  working with gang specialists?
3          MR. KIVETZ:  Objection.  Form.  Foundation.
4  Speculative.
5      A   I don't -- I don't recall ever seeing
6  detectives coming down to Gangs.
7      Q   Okay.  So gang specialists would go over to
8  the areas, but it was -- you never saw detectives --
9  strike that.  Let me ask a better question.  You never
10 saw detectives over at the Gang offices of Belmont and
11 Western, correct?
12         MR. KIVETZ:  Objection.  Form.
13     A   Well, there were -- Belmont and Western,
14 besides our office the Area Three detectives were right
15 upstairs.  So sometimes they would come down with a
16 witness to look at books.
17     Q   So sometimes you'd have Area Three detectives
18 who were coming down to look at books in the Gang
19 offices?
20     A   With witnesses, yes.
21     Q   Okay.  And then would you also have detectives
22 from other areas, like, Area Five coming to Belmont and
23 Western to have witnesses look at books?
24         MR. KIVETZ:  Objection.  Foundation.
25  Speculative.

Page 52

1      A   That was a rarity.
2      Q   Why is that?
3          MR. KIVETZ:  Objection.  Form.  Speculative.
4      A   Because it's -- Area Five and Belmont and
5  Western are quite a distance away.  And bringing
6  witnesses and victims was -- could be a problem
7  sometimes.
8      Q   And so if Area Five detectives wanted to
9  conduct a gang book procedure, how would they do that?
10         MR. KIVETZ:  Objection.  Form.  Speculative.
11 Incomplete hypothetical.
12     A   You would take the books up to Area Five or
13 sometimes you would visit them at their homes.
14     Q   Okay.  So when you assisted Area Five Homicide
15 detectives by showing gang books, it would typically be
16 to take it over to the witness's location or to take it
17 to Area Five; is that right?
18         MR. KIVETZ:  Same objection.
19     A   Well, it -- it was the same objective.  To --
20 to get the books to witnesses and victims for
21 identification purposes.
22     Q   Did -- would detect -- strike that.  Would you
23 conduct gang book procedures in assistance of homicide
24 investigations without the presence of detectives?
25         MR. KIVETZ:  Objection.  Form.  Foundation.

Page 53

1      A   Sometimes, but never inde -- but never
2  independently of the detectives.  In other words, I
3  wouldn't take it upon -- none of us would take it upon
4  ourselves to do that unless the detective knew about it
5  and was okay with it.
6      Q   Okay.  So there will be times when you would
7  conduct a gang book identification procedure on your own
8  but only after running it by the detectives; is that
9  right?
10     A   That's correct.
11     Q   Okay.  And would you conduct a photo ar --
12 strike that.  As a gang specialist, would you conduct
13 photo array procedures without the presence of a
14 detective in homicide cases?
15         MR. KIVETZ:  Objection.  Form.  Foundation.
16 Speculative.
17     A   Only if they asked us to.
18     Q   So that would occur sometimes, and it would
19 only be in the instances where you would run it by the
20 detectives first; is that right?
21         MR. KIVETZ:  Same objection.
22     A   Well, it's -- it's their case.  They run it
23 past us.  It's not where we run it past to them.
24     Q   So you would sometimes do photo array
25 procedures on your own as a gang specialist where the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 17 of 132 PageID #:7607
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021

54..57

Page 54

1  detective asked you to; is that right?
2       MR. KIVETZ: Same objection.
3    A   That's correct.
4    Q   Okay. And when you conducted -- well --
5  strike that. And where would you get photos that you
6  would use for photo array procedures?
7       MR. KIVETZ: Objection. Form. Foundation.
8    A   They were CPD photos in graphic arts or from a
9  computer.
10   Q   So were they like arrest photos or mug shots?
11   A   Yes.
12      MR. KIVETZ: Hold on.
13   A   I'm sorry.
14      MR. KIVETZ: Objection. Form. Foundation.
15   A   Yes.
16   Q   And what about the photos that were in the
17 gang books? Were those also arrest photos or mug shots?
18      MR. KIVETZ: Same objection.
19   A   Yes.
20   Q   As -- do the gang specialists have access to a
21 Polaroid camera?
22      MR. KIVETZ: Objection. Speculative.
23   A   Generally, there was -- there would be one in
24 the office, yeah.
25   Q   And would that be used to take photos of

Page 55

1  witnesses and suspects?
2       MR. KIVETZ: Objection. Form. Foundation.
3  Speculative.
4    A   I don't know about witnesses. But for
5  example, if you had someone in there who -- there was no
6  mugshot available and he was a suspect -- he or she were
7  suspects, then yeah, occasionally they would take photos
8  of that person and put it in an array.
9    Q   Okay. So the Polaroid -- strike that. So let
10 me ask a better question. What were the ways in which
11 the Polaroid camera at the Gang offices was used?
12      -   MR. KIVETZ: Yeah. You broke up.
13   Q   I'll ask it again. What was the Polaroid
14 camera at the Gang offices used for?
15      MR. KIVETZ: Objection. Speculative.
16   A   To take pictures of people who perhaps their
17 mug shots were not available. If they were suspects and
18 needed to be identified, the photo was taken, put it in
19 an array to show witnesses or victims.
20   Q   Any other uses of the Polaroid camera that
21 you're aware of among gang specialists?
22      MR. KIVETZ: Same objection.
23   A   Not that I'm aware of.
24   Q   Would you keep photos of gang members --
25 strike that. Would you keep Polaroid photos of gang

Page 56

1  members in the Gang offices?
2       MR. KIVETZ: Objection. Foundation.
3    A   Yes.
4    Q   And where would those Polaroid photos come
5  from?
6    A   Where would they what?
7    Q   Where would those Polaroid photos come from?
8    A   Come --
9       MR. KIVETZ: Objection. Form. Foundation.
10 Speculative.
11   A   Come from?
12   Q   Yes.
13   A   When -- when the photos were taken, they would
14 be put in -- in mugshot books.
15   Q   And are those the same thing as the gang
16 books?
17   A   Yes.
18   Q   Okay. So the gang books, were they populated
19 with Polaroid photos or with arrest photos?
20      MR. KIVETZ: Objection. Form. Foundation.
21 Speculative.
22   A   Both.
23   Q   When you had -- when you made arrests, would
24 you take photos of individuals who were identified as
25 gang members to include in those photo books?

Page 57

1       MR. KIVETZ: Objection. Form. Foundation.
2    A   It depended.
3    Q   Would gang specialists keep photos, Polaroid
4  photos, that they kept of their own outside of what was
5  in the gang books?
6       MR. KIVETZ: Objection. Form. Foundation.
7  Speculative.
8    A   It -- it depends on the individual gang
9  specialist.
10   Q   Did you keep any photos outside of what was in
11 the gang books?
12   A   Yes.
13      MR. KIVETZ: Objection. Foundation.
14   Q   Did you keep photos of known gang members?
15      MR. KIVETZ: Objection. Foundation.
16   A   Yes.
17   Q   Did you keep photos of anyone other than known
18 gang members?
19      MR. KIVETZ: Objection. Foundation.
20   A   You asking if I'm -- if I would keep photos of
21 people who were not gang members?
22   Q   Yes.
23   A   No.
24      MR. KIVETZ: Objection.
25   A   No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 18 of 132 PageID #:7608
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

58..61

Page 58

1    Q    And what was your purpose in keeping photos
2 outside of what was in the gang books?
3    A    My photos were generally updated photos of the
4 ones that were already in gang books.  Some of the
5 photos were of people who were not yet in the gang books
6 because that was -- they weren't always maintained
7 properly.  And also --
8    Q    Go ahead.
9    A    for --
10        MR. KIVETZ:  Go ahead.
11    A    -- for the people who were afraid to go into
12 police stations to look at photos, it was convenient for
13 them.
14    Q    What are the -- what purposes did you have for
15 the -- for keeping those photos?
16    A    Convenience.
17    Q    And in what ways would you use those photos to
18 assist -- strike that.  Would you use those photos to
19 assist in investigations?
20    A    Only if called upon.
21    Q    And in what ways -- well -- strike that.  Were
22 you sometimes called upon to use those photos to assist
23 in investigations?
24        MR. KIVETZ:  Objection.  Foundation.
25    A    Yes.

Page 59

1    Q    And in what ways would you use them then to
2 assist in investigations?
3        MR. KIVETZ:  Same objection.
4    A    If the detectives would offer a nickname in
5 one of their investigations, things like that, or a
6 description.  Or if they had, you know, victims or
7 witnesses that were a little skittish about coming into
8 the police station, I -- I would visit them.  And it was
9 more convenient than going into the police station,
10 getting the gang books and, you know, schlepping them
11 back and forth.
12    Q    And where did you keep the photos that you had
13 of your own?
14    A    In the trunk of my car.
15    Q    Approximately how many photos would you keep
16 with you during the time you were a gang specialist?
17    A    Well, I kept -- I kept them all together and
18 there were several gangs, so hundreds.
19    Q    And did you keep them sort of in your own gang
20 books, like, organized by gang?
21    A    They were organized by gangs, but they were
22 not in books.  They were just a stack of pictures.
23    Q    And did you -- during the time you were a gang
24 specialist, did you have a specialty or focus on
25 particular gang?

Page 60

1    A    Several.
2    Q    Which gang?
3    A    The Imperial Gangsters were my most -- they're
4 the ones who kept me the busiest.  I also had a section
5 of the Cobras, section of the OAs, the Latin Lovers, and
6 the Disciples.
7    Q    "Disciples" is Gangster Disciples ?  Or
8 Maniac Latin Disciples?
9    A    Maniac Latin Disciples or YLO Disciples.
10    Q    OAs is Orquestra Albany?
11    A    Yes.
12    Q    And "Cobra" is the Spanish Cobras?
13    A    Spanish Cobras and YLO Cobras.
14    Q    YLO Cobras were different than YLO Disciples?
15    A    Yes.
16    Q    Any other gangs that you specialized in?
17    A    Those -- those five were pretty much it.
18    Q    And would you keep loose photos of your own of
19 members of all of those gangs?  The IGs, the Cobras, the
20 OAs, the Latin Lovers, and the Disciples.
21        MR. KIVETZ:  Objection.  Form.
22    A    Yeah.  I -- I kept them separate from each
23 other.
24    Q    But you would have photos -- you'd have photos
25 of members of each of those gangs, correct?

Page 61

1    A    Yes.  As many as I could identify.
2    Q    And then what information would you keep --
3 strike that.  Would you write anything down on those
4 photos?
5        MR. KIVETZ:  Objection.  Foundation.
6    A    Other than occasionally a nickname that may
7 not appear on an arrest report but that I learned later
8 on.  That's about it.
9    Q    Other than nicknames, anything else that you'd
10 write on the photos?
11    A    Maybe if they had a new tattoo or a scar.
12 Other than that, no.
13    Q    Would you write their real name?
14    A    I'm sorry?
15    Q    Would you write their real names?
16    A    Well, their -- well, the real names would
17 be -- well.  Okay.  I'm dating myself.  But on the
18 original color photos you would get from graphic arts,
19 all you would have would be their IR number.
20 Occasionally I would write their -- not "occasionally,"
21 I would write their names on the back because I -- I had
22 my photos in alphabetical order.
23    Q    So are you saying you did write their names on
24 each of the photos?
25        MR. KIVETZ:  Objection.  Foundation.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1      A    The ones that I got from graphic arts. Because
2  in those days they had no names on them. They had just
3  the -- the IR number. So I would write their names on
4  the back.
5      Q    Okay. And then the Polaroids -- and then you
6  also kept Polaroids that you had taken yourself in your
7  collection, correct?
8      A    Occasionally.
9      Q    And what would you write on those?
10         MR. KIVETZ: Objection. Foundation.
11     A    Names, date of birth, IR numbers.
12     Q    So was it the same information that was on
13 both the photos that came from graphic arts and the
14 Polaroids?
15         MR. KIVETZ: Objection. Form. Foundation.
16     A    Yes. Basic information.
17     Q    And so for all of the photos that you kept in
18 your collection, you would write out the individual's
19 full real name?
20         MR. KIVETZ: Objection misstates the testimony.
21     A    The name as I knew them. Often times they had
22 many aliases.
23     Q    Okay. So that's -- so then for each of the
24 photos that you had in your collection, you would have
25 some name written down for them; is that correct?

Page 63

1          MR. KIVETZ: Objection. Form. Foundation.
2      A    The names that they said were their names are
3  the names that would be on the photos.
4      Q    And those were typically nicknames or street
5  names, correct?
6          MR. KIVETZ: Objection. Form. Foundation.
7  Speculative.
8      A    If I knew their nicknames or their aliases, I
9  would write that down also.
10     Q    When they would give you their names, would
11 they typically give you their real names, or their
12 nicknames or aliases?
13         MR. KIVETZ: Objection. Form. Foundation.
14 Speculative.
15     A    I'd ask them what -- if I've never seen them
16 before and I'd ask them what their names were, I'd have
17 to go along with that.
18     Q    So it would be whatever name they gave you?
19     A    Yes.
20         MR. KIVETZ: Objection. Form. Foundation.
21 Speculative.
22     Q    And then the name that they would give you,
23 was it your understanding that was their real name or
24 that was that -- was their street name or nickname?
25         MR. KIVETZ: Objection. Speculative.

Page 64

1  Foundation.
2      A    If I didn't know the person, whatever name
3  they gave me is what I would go with.
4      Q    And what would they typically give you, a real
5  name, or a street name?
6          MR. KIVETZ: Objection. Form. Speculative.
7  Foundation.
8      A    It depends on the individual.
9      Q    And when you -- if you went through the
10 collection of photos that you had, would you have --
11 would you find that in many of the cases, the only name
12 you had on there was a nickname or street name?
13         MR. KIVETZ: Objection. Form. Foundation.
14 Speculative.
15     A    The -- the nicknames weren't how I -- how I
16 arranged them. I arranged them by the -- what they said
17 was given names. Sometimes you find out later on that
18 that wasn't their real name. So when you find out the
19 real names, then you -- you change it.
20     Q    You cross it out and write in real name?
21         MR. KIVETZ: Objection. Form. Foundation.
22 Speculative.
23     A    Correct.
24     Q    Okay. Did you have any of those photos in
25 which you didn't have any real name, you only had

Page 65

1  nicknames?
2          MR. KIVETZ: Objection. Form. Foundation.
3  Speculative.
4      A    No. I always had someone's name on it.
5      Q    Okay. And then --
6      A    Nicknames came later.
7      Q    Okay. So then for everyone, you had some real
8  name for them, and it could be their actual real name or
9  their alias, correct?
10         MR. KIVETZ: Objection. Form. Foundation.
11 Speculative.
12     A    Correct.
13     Q    And then for some of them, you also had
14 nicknames; is that correct?
15         MR. KIVETZ: Same objection.
16     A    I'd have nicknames, but not without real
17 name -- without their given names.
18     Q    And that's what I'm asking. In addition to
19 whatever name they -- real name they gave you, for some
20 of those photos, you would also have nicknames, correct?
21         MR. KIVETZ: Same objection.
22     A    Correct.
23     Q    Okay. And then in addition to that, what
24 other information would you have on those photos?
25         MR. KIVETZ: Objection. Form. Foundation.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 20 of 132 PageID #:7610
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

66..69

Page 66

1    Speculative.
2        A    Date of birth, IR numbers, things like that.
3        Q    Anything else?
4        A    No.
5        Q    And for those -- that set of collection of
6    photos that you had, approximately what percentage of
7    those did you have nicknames for the individuals?
8        MR. KIVETZ: Objection. Form. Foundation.
9    Speculative.
10       A    Probably at least half because gang members
11   generally have nicknames.
12       Q    Okay. And then what if -- do you still have
13   that collection of photos?
14       A    No.
15       Q    What did you do with it?
16       A    In the garbage. Or actually, I threw them in
17   the furnace.
18       Q    When did you do that?
19       A    Right after I retired.
20       Q    And why you do that?
21       A    I didn't need them anymore.
22       Q    And did you, in your experience, did other
23   gang specialists have a similar practice to you of
24   keeping some collection of photos that they would use
25   for their personal use?

Page 67

1        MR. KIVETZ: Objection. Foundation.
2    Speculative.
3        A    I couldn't say. I don't know.
4        Q    Do you know of any other gang specialists who
5    had the same practice as you.
6        MR. KIVETZ: Objection. Foundation.
7    Speculative.
8        A    Would have the same what?
9        Q    Practice as you of keeping some set of photos
10   for their own use.
11       A    I --
12       MR. KIVETZ: Same objection.
13       A    I -- I couldn't say.
14       Q    All right. We talked about the re -- idea
15   that gang crime specialists would assist in arrests, and
16   you indicated that they -- that assistance -- the
17   request would usually come through a supervisor or
18   verbally; is that right?
19       A    Usually.
20       Q    Okay. And what were other ways in which that
21   information could be communicated to you?
22       A    You mean as far as assisting the detectives?
23       Q    That's right.
24       A    They would call you personally or they would
25   call your supervisor or your commander, and that's

Page 68

1    essentially how you would get involved.
2        Q    Okay. Would -- do you know, what a "stop
3    order" is?
4        A    Yes.
5        Q    What is a "stop order"?
6        A    It's essentially a warrant, except that it's
7    not -- if the person doesn't appear before a judge, the
8    person appears before the detective division that issued
9    it.
10       Q    In other words, the detective division issues
11   a request for a particular individual to be stopped,
12   correct?
13       MR. KIVETZ: Objection. Form. Misstated
14   testimony.
15       A    Well, stopped and taken into the detective
16   division.
17       Q    Okay. And so were stop orders one method by
18   which detectives communicated requests to have
19   individuals arrested?
20       MR. KIVETZ: Objection. Form. Speculative.
21       A    Stop orders had nothing to do with gang
22   specialists. Different detectives had stop orders where
23   there was Property Crimes, or Violent Crimes, or Sex
24   Crimes, you know.
25       Q    So putting aside gang specialists or their

Page 69

1    relationship with gang specialists, I just want to
2    understand -- the stop orders, were they a mechanism for
3    detectives to communicate a request to have somebody
4    arrested?
5        MR. KIVETZ: Objection. Form. Speculative.
6    Foundation.
7        A    Yeah. But it -- it was for any officer who
8    stopped that person. Sometimes that person was under
9    arrest, and the stop order would pop up, and you'd have
10   to notify the detective.
11       Q    I see. So the stop order was there to
12   indicate that if the -- to somebody, "Hey, if you stop
13   this person, there's a detective who wants to talk to
14   them"; is that right?
15       A    That was the -- yeah. That was the general
16   idea, yeah.
17       Q    So would the stop orders go out and so that
18   all the other officers would know, "Hey, there's a
19   detective who has this, wants this person to be
20   arrested," or was it something that was just, hey, when
21   you arrest somebody for whatever reason, you look
22   at this thing to check whether there's a stop order. How
23   did it work?
24       MR. KIVETZ: Objection. Form. Foundation.
25       A    Generally, if you name check somebody, it



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 21 of 132 PageID #:7611
The Deposition of GEORGE FIGUEROA, taken on June 11, 2021

70..73

Page 70

1  would pop up on a computer, or the squad operator would
2  tell you "There is a stop order for this person."
3      Q    So the way it worked practically was that
4  if -- when an officer was going out and they were
5  talking to people or had some interaction with someone,
6  they might name, check that person, and that's when
7  they'd find out that the detective wanted to talk to
8  that person.
9           MR. KIVETZ: Objection. Form. Speculative.
10     A    Yes.
11     Q    Okay. And who -- and was it your
12  understanding that patrol officers would do that name
13  checking to see if there was a stop order on somebody?
14          MR. KIVETZ: Objection. Form. Foundation and
15  speculative.
16     A    Stop order or a warrant. Generally warrant
17  was why they would get name checked to see if that
18  person had a warrant or a legitimate driver's license,
19  things like that.
20     Q    And what were the circum -- and -- strike
21  that. Would gang specialists also check to see if there
22  were stop orders out for individuals that they were
23  interacting with?
24          MR. KIVETZ: Objection. Form. Foundation and
25  speculative.

Page 71

1      A    Gang specialists would -- would run name
2  checks on people, if they were warned -- if they were
3  wanted on warrants. If the stop order, you know, came
4  up on the -- on the computer then, yeah, then they would
5  be -- but it wasn't specifically for stop orders. It
6  was specifically for warrants.
7      Q    I missed that last part. They wouldn't
8  specifically what?
9      A    When someone is name checked, it is
10  specifically to see if they have a warrant, you know,
11  they miss court or whatever. But they weren't stopped
12  specifically to see if there were stop orders. They was
13  or they weren't -- their names weren't run specifically
14  for stop orders. It was run for anything.
15     Q    Understood. So what -- I guess what I want to
16  understand is, what -- did the detectives -- strike
17  that. Did gang specialists have access to the name
18  check information about whether somebody had a stop
19  order on them.
20          MR. KIVETZ: Objection. Foundation.
21     A    They would run the names on -- on police radio
22  or a computer, whichever.
23     Q    So detectives would do name checks, correct?
24          MR. KIVETZ: Objection. Foundation.
25          MR. SWAMINATHAN: Strike that. I think I asked

Page 72

1  the wrong question. I'm sorry, Jeff. I didn't mean
2  to cut you off. I strike that question.
3          MR. KIVETZ: You strike that question?
4  BY MR. SWAMINATHAN:
5      Q    Detectives would -- strike that. Gang
6  specialists would run name checks, correct?
7          MR. KIVETZ: Objection. Speculation.
8      A    It wasn't exclusive to gang specialists, but,
9  yeah, they would run name checks just like a patrol
10  officer would.
11     Q    Got it. And when gang specialists ran name
12  checks, if some -- if that individual had a warrant out
13  for their arrest, the gang specialists would know that,
14  correct?
15          MR. KIVETZ: Objection. Foundation.
16  Speculative.
17     A    Yes. You have to place them under arrest,
18  yeah.
19     Q    Okay. And if the gang specialists ran name
20  checks and there was -- they would see if there was a
21  stop order out for that person, correct?
22          MR. KIVETZ: Same objection.
23     A    Yes.
24     Q    And where there was a warrant for that person,
25  they would arrest them, correct?

Page 73

1          MR. KIVETZ: Objection. Form. Foundation.
2  Speculative.
3      A    All stop orders weren't necessarily arrests.
4      Q    Yeah. And that -- let me clarify again. So
5  listen carefully. In the case of warrants, when the
6  gang specialists ran the name check, they would have --
7  they would then -- they would then arrest that person if
8  they -- if there was a warrant in that person's name,
9  correct?
10          MR. KIVETZ: Objection. Form. Foundation.
11  Speculative.
12     A    Yes. If there was a warrant -- legitimate
13  warrant, yes.
14     Q    Okay. And if there was a stop order for that
15  person, what would the gang specialists do?
16          MR. KIVETZ: Objection. Form. Foundation.
17  Speculative.
18     A    Okay. If there was a -- a stop order -- what
19  was the rest of that question?
20     Q    What would the gang specialists do?
21          MR. KIVETZ: Same objection.
22     A    Gang specialists or patrol officers would take
23  that person into custody if the stop order dictated
24  that.
25     Q    And so the stop order could indicate that the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 22 of 132 PageID #:7612
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

74..77

Page 74

1  person is subject to arrest. And in some instances
2  would indicate that they were not subject to arrest?
3          MR. KIVETZ: Objection. Form. Foundation.
4  Speculative.
5      A   Sometimes the -- the person wasn't to be
6  arrested, it was to document when and where they were
7  stopped, for what reason they were stopped. The
8  detective may want to kind of keep tabs on somebody.
9  Sometimes it doesn't come from the detective. Sometimes
10 it comes from probation department or something like
11 that.
12     Q   Could gang specialists put stop orders on
13 individuals?
14     A   No.
15         MR. KIVETZ: Objection. Foundation.
16     Q   So I want to make sure I understand this
17 correctly. In some instances, the stop order that you
18 might see as a gang specialist would indicate that you
19 were to arrest the person and bring them to the
20 detectives, correct?
21         MR. KIVETZ: Objection. Form. Foundation.
22     A   Correct.
23     Q   And in some other instances, it might
24 indicate -- strike that. In some instances, a stop
25 order for an individual put in place by a detective

Page 75

1  might indicate that, "Hey, we want to talk to this
2  person, but they would have to come in voluntarily,"
3  that they can't be arrested; is that true?
4          MR. KIVETZ: Objection. Form. Foundation.
5  Speculative.
6      A   That's correct.
7      Q   And then in other instances, there could be a
8  stop order put in place by a detective or an individual
9  in which it simply said, "Hey, just let me know if you
10 happen to talk to this individual and where you talk to
11 them," that kind of thing; is that true?
12         MR. KIVETZ: Objection. Form. Foundation.
13 Speculative.
14     A   Yes.
15     Q   Okay. And was one of the ways in which
16 detectives would communicate a desire to have an
17 individual be arrested by putting in place a stop order.
18         MR. KIVETZ: Objection. Form. Speculative.
19     A   I'm not sure I understand the question.
20     Q   Yeah. In other words, you indicated that the
21 detective can put in place in a stop -- and put in place
22 a stop order to instruct any officers, patrol officers
23 or gang specialists that, "Hey, if you talk to this
24 person, arrest them, because I want to -- I need them
25 for purposes of an investigation." So far, you're with

Page 76

1  me?
2      A   Yeah. That's -- yeah. That's essentially
3  the -- the purpose of the stop order. Correct.
4      Q   And so was it common in your experience for
5  detectives who wanted somebody arrested, to put in place
6  a stop order to try to get that person arrested?
7          MR. KIVETZ: Objection. Form. Foundation.
8  Speculative.
9      A   Yes. If the detective reached the point in
10 their investigation that "I need to speak to this guy,"
11 and they can't find him, they'll issue a stop order.
12     Q   Okay. And was it your experience that once
13 detectives determined that they needed to speak to
14 someone, that they would immediately put in place a stop
15 order, in case somebody happened to be going out to talk
16 to that very person?
17         MR. KIVETZ: Objection. Form. Foundation.
18 Speculative. It's an incomplete hypothetical.
19     A   I -- I couldn't tell you why detectives got
20 stop orders on people for what reason, you know. Maybe
21 they reached the -- a point where they can't find this
22 person. I don't know.
23     Q   And when -- would you agree with me that stop
24 orders were one of the methods by which detectives
25 communicated that they had an individual that they

Page 77

1  wanted arrested and brought in?
2          MR. KIVETZ: Objection. Asked and answered.
3  Foundation. Speculative.
4      A   Communicated to who? I don't understand what
5  you are saying.
6      Q   Right. Yeah. To gang specialists, patrol
7  officers, or anyone else.
8          MR. KIVETZ: The same objection.
9      A   Yeah. To any -- any police officer.
10     Q   Okay. So stop orders were one of the ways
11 that detectives communicated to gang specialists, patrol
12 officers, or anyone else that "This is somebody who we
13 need arrested for purposes of our investigation,"
14 correct?
15         MR. KIVETZ: Objection. Form. Foundation.
16 Speculative.
17     A   Correct.
18     Q   Okay. And when the stop order would -- strike
19 that. Where a stop order was put in place to indicate
20 that somebody was to be arrested, there would have to be
21 probable cause for that arrest, correct.
22         MR. KIVETZ: Objection. Form. Foundation.
23 Speculative.
24     A   Yes.
25     Q   And there would have to be probable cause for

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 23 of 132 PageID #:7613
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021
78..81

Page 78

1   arrest any time you went out to arrest somebody as a
2   gang crime specialist or any other officer, correct?
3           MR. KIVETZ: Objection. Form.
4       A   Yes. Sure. Sure. Absolutely.
5       Q   When you would go out to conduct arrests in
6   homicide cases, would you ever go out on your own or
7   there always be a detective with you?
8           MR. KIVETZ: Objection. Form. Foundation.
9       Speculative.
10      A   Generally, when a detective, for example, is
11  going to arrest someone for a homicide at a specific
12  address, he's going to take people with him, whether
13  they're patrol officers, or gang specialists, or other
14  detectives.
15      Q   And that's just a matter of safety.
16          MR. KIVETZ: Objection. Form.
17      A   A matter of what?
18      Q   Safety?
19      A   Safety, sure.
20      Q   Any other reasons that detectives would
21  typically take somebody else with them? In other words,
22  a patrol officer, or a gang specialist?
23      A   No. Just safety.
24      Q   Okay. And was it -- would the detectives in
25  homicide cases ever have the gang specialists go out and

Page 79

1   make the arrests on their own?
2           MR. KIVETZ: Objection. Form. Foundation.
3       Speculative.
4       A   You know, it -- it depends on the detective.
5       Q   So in other words, sometimes you would be
6   asked to go make an arrest without the detective
7   participating in the arrest; is that fair?
8           MR. KIVETZ: Same objection.
9       A   Yeah. It's -- it's, like I said, it's --
10  it's -- it depends on the detective.
11      Q   So there was no requirement that if as a gang
12  specialist, if you were going to make an arrest in
13  assistance of a homicide investigation, that you had to
14  have the detective there.
15          MR. KIVETZ: Objection. Form.
16      A   No. As -- as long as the detective knew what
17  you were doing, yes. It's not necessary -- necessary
18  for them to -- to be there.
19      Q   Okay. And as a gang specialist, if you were
20  requested to go out and arrest someone, would you be
21  provided with information about what -- you know, what
22  the basis was to arrest this individual?
23          MR. KIVETZ: I'm sorry. You've got to repeat
24      that question.
25      Q   Yeah. I mean, let me ask you this way. You

Page 80

1   indicated that detectives would communicate to you
2   either directly or through a supervisor that they needed
3   a particular person arrested. With me so far?
4       A   Yes.
5       Q   Okay. What information would be communicated
6   to you at that point for you go out and make an arrest?
7           MR. KIVETZ: Objection. Form. Foundation.
8       Speculative.
9       A   As far as --
10          MR. KIVETZ: Incomplete hypothetical.
11      A   As far as the facts of the case, that
12  generally wasn't communicated to us. Generally, they'd
13  say, "Go find so-and-so, he is supposed to be at this
14  address or that address or at this restaurant," where --
15  wherever that person may be. That's generally the only
16  information we would need, and a photo.
17      Q   Who would provide the photo?
18          MR. KIVETZ: Objection. Form. Foundation.
19      Speculative.
20      A   The detective, or we would get it off the
21  computer if we had the right information.
22      Q   And there would -- I think you indicated,
23  there would have to be -- have been probable cause for
24  you to go out and make that arrest, correct?
25          MR. KIVETZ: Objection. Foundation.

Page 81

1       A   We would go by the detective's word --
2       Q   Okay. So if --
3       A   -- that there is probable cause.
4       Q   What -- would you get any information from the
5   detective about what that probable cause was for you to
6   go make an arrest?
7           MR. KIVETZ: Objection. Form. Foundation.
8       Speculative. Incomplete hypothetical.
9       A   No. Because they're ultimately responsible
10  for the investigation. So -- I -- I'm not sure they're
11  going to sit and tell us the whole investigation just to
12  go out and -- and grab someone. We took it on their --
13  on their word that this person was wanted for a
14  legitimate reason.
15      Q   So in those -- but ultimately you're going out
16  and you're taking the risk of arresting a person on the
17  assumption that there's probable cause for that person's
18  arrest, correct?
19      A   Correct.
20      Q   And you face potential liability if you arrest
21  somebody without probable cause, correct?
22          MR. KIVETZ: Objection. Form. Foundation.
23      Speculative.
24      A   Yeah.
25      Q   So -- but as a gang specialist, you didn't

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 24 of 132 PageID #:7614
The Deposition of GEORGE FIGUEROA, taken on June 15, 2021

82..85

Page 82

1  ever get information from them about why it was that
2  there was probable cause to justify you going and
3  arresting the person?
4      MR. KIVETZ: Objection. Form. Foundation.
5  Speculative. Incomplete hypothetical. Misstates
6  his testimony.
7      A   If a detective said, "I've got this homicide
8  case," for example, it could be another case on
9  something. "This person has been identified or DNA
10 points to this person. We need you to help us find him.
11 Or he's staying here, would you go get him?" That was
12 pretty much sufficient.
13 BY MR. SWAMINATHAN:
14     Q   But in saying --
15     MR. KIVETZ: Anand, can you hold on for just a
16 second? You're -- I'm not saying that you're doing
17 this purposely, but you're shaking your head as in,
18 like, "Yes, he's giving the right answer," when he's
19 providing an answer. I'm not saying that you're
20 doing it purposely, some people tend to do it. I'd
21 just appreciate it if you'd try to refrain from
22 doing it while we continue the deposition.
23     MR. SWAMINATHAN: I will try. I mean, I'm not
24 doing it in any pattern or any other kind of way.
25 It's my natural way I react and to the witness --

Page 83

1      MR. KIVETZ: It's --
2      MR. SWAMINATHAN: It's impulse.
3      MR. KIVETZ: Yeah. We just wouldn't be shaking
4  our head this way, you know, if we didn't like his
5  answer. So it appears to me when you're doing it,
6  and I'm not saying purposely, that you're
7  appreciating his answer, you're affirming his answer
8  in some form or fashion. And that's my objection.
9  So if you could, just please try to refrain it. I
10 guess that it might be a tendency. But if we could,
11 just -- I'd appreciate if you'd try to stop.
12     MR. SWAMINATHAN: I'll try.
13 BY MR. SWAMINATHAN:
14     Q   But I'll also say to the witness, you should
15 take no instruction or direction from my -- the way I
16 move my head when I ask questions and listen to the
17 answers. Do you understand, sir?
18     A   Yeah. Actually, I'm trying not to look at
19 you, but yeah.
20     Q   Fair enough. Even better. There's no reason
21 for you to look at me when you can merely listen to my
22 words.
23     MR. KIVETZ: And then can we get a break coming
24 up soon, please?
25     MR. SWAMINATHAN: Yes. Why don't we do it

Page 84

1  right now?
2      MR. KIVETZ: Okay.
3      MR. SWAMINATHAN: Thank you.
4      COURT REPORTER: All right. Is everyone okay
5  with me going off record?
6      MR. KIVETZ: Yeah.
7      MR. KIVETZ: Yeah.
8      (OFF THE RECORD)
9      COURT REPORTER: On record at 1:07 p.m. Eastern
10 Standard Time.
11 BY MR. SWAMINATHAN:
12     Q   Excuse me. All right. Fair to say, in your
13 various positions as a Chicago police officer, it was
14 important for you to have an understanding of what might
15 constitute probable cause to arrest someone, correct?
16     A   Yes.
17     Q   Okay. If somebody was identified in a live
18 lineup procedure, would that constitute probable cause
19 to arrest?
20     MR. KIVETZ: Objection. Form. Incomplete.
21 Speculative. Incomplete hypothetical.
22     A   If it were me -- if I were in charge of that
23 case, then, yes.
24     Q   And let's just focus on homicide
25 investigations just so that it's specific to the facts

Page 85

1  of this case, okay? If an individual was identified as
2  the perpetrator in a live lineup in a homicide case,
3  that would constitute probable cause to arrest, correct?
4      MR. KIVETZ: Objection. Form. Foundation.
5  Speculative. Incomplete hypothetical.
6      A   Yes.
7      Q   If an offender was identified -- strike that.
8  If a witness identified an individual as the offender in
9  a homicide investigation in a photo array procedure,
10 that would constitute probable cause to arrest, correct?
11     MR. KIVETZ: Same objection.
12     A   Yes.
13     Q   And if an individual in a homicide
14 investigation identified an individual as an offender
15 out of a photo book identification procedure in a
16 homicide investigation, would that constitute probable
17 cause to arrest?
18     MR. KIVETZ: Same objection.
19     A   Yes.
20     Q   If a suspect were identified by a witness in a
21 gang book procedure, could a stop order be put in place?
22     MR. KIVETZ: Objection. Form. Foundation.
23 Speculative. Incomplete hypothetical.
24     A   Could a stop order what?
25     Q   Be put in place for that individual?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 25 of 132 PageID #:7615
The Deposition of GEORGE FIGUEROA, taken on June 12, 2021
86..89

Page 86

1          MR. KIVETZ:  Same objection.
2     A    It -- it depends on the lead investigator.
3     **Q    So if a photo identification -- strike that.**
4  **If a gang book identification procedure resulted in the**
5  **identification of a suspect, a detective could put out a**
6  **stop order for that individual's arrest; is that fair?**
7          MR. KIVETZ:  Objection.  Form.  Foundation.
8  Speculative.  Incomplete hypothetical.
9     A    That would be a reason that they would do
10 that, yes.
11    **Q    Okay.  That was a circumstance that would**
12 **happen sometimes in your experience, correct?**
13         MR. KIVETZ:  Same objection.
14    A    Yes.
15    **Q    And similarly, if a suspect were identified by**
16 **a witness in a photo array procedure, a detective could**
17 **put a stop order out for that person -- for that suspect**
18 **be arrested, correct?**
19         MR. KIVETZ:  Same objection.
20    A    Hypothetically, yes.
21    **Q    And that was also a common use of stop orders**
22 **in your experience; is that fair?**
23         MR. KIVETZ:  Same objection.
24    A    You mean photo identifications?  Yes.
25    **Q    And putting in place a stop order for the**

Page 87

1  arrest of an individual who was identified in a photo
2  procedure?
3          MR. KIVETZ:  Objection.  Form.  Foundation.
4  Speculative.  Incomplete hypothetical.
5     A    Yes.
6     **Q    When a gang book identification procedure that**
7  **you conducted led to the identification of a suspect,**
8  **would you try to go out right away to arrest the**
9  **suspect?**
10         MR. KIVETZ:  Objection.  Form.  Foundation.
11 Speculative.  Incomplete hypothetical.
12    A    Not necessarily.
13    **Q    Why not?**
14         MR. KIVETZ:  Same objection.
15    A    Because if it -- just because someone says
16 that so-and-so did the murder, that detective would have
17 to really try to corroborate that identification with
18 witnesses, with everyone.  People lie all the time.  So
19 it -- it depends on the detective and what information
20 they have.
21    **Q    So if -- when there was an identification of a**
22 **suspect in a gang book -- from a gang book, is it your**
23 **testimony that the detectives would not seek to have**
24 **that person arrested immediately; is that correct?**
25         MR. KIVETZ:  Objection.  Form.  Foundation.

Page 88

1  Speculative.  Incomplete hypothetical.  Misstates
2  his testimony.
3     A    It depends on the detective and what
4  information they have.
5  BY MR. SWAMINATHAN:
6     **Q    If the detective had nothing other than the**
7  **probable cause based on the gang book identification**
8  **procedure, would they typically go out to try to get**
9  **that person arrested and brought in for his follow up?**
10         MR. KIVETZ:  Objection.  Form.  Foundation.
11 Speculative.  Incomplete hypothetical.
12    A    It depends on the individual detective.  Some
13 detectives, maybe.  Some detective -- other detectives,
14 maybe not.
15    **Q    Okay.  And so what were the circumstances in**
16 **which detectives who now had probable cause to arrest a**
17 **murder suspect based on a gang book identification**
18 **procedure waited before having that individual arrested?**
19         MR. KIVETZ:  Objection.  Form.  Foundation.
20 Speculative.  Incomplete hypothetical.
21    A    You know, whoever the lead detective is has
22 their own strategy for doing things.  They may want to
23 wait a while until there's more corroboration.  Or they
24 may have enough corroboration just with the
25 identification.  I -- I couldn't speak for them.

Page 89

1     **Q    When you were a Homicide -- there would have**
2  **been a time when you were a detective, correct?**
3          MR. KIVETZ:  You broke up.
4     **Q    There was a period of time in your career when**
5  **you were a detective, correct?**
6     A    Yes.  I -- I retired as a detective.  I can't
7  hear you.
8          MR. SWAMINATHAN:  He's cutting out a little
9     bit.
10         MR. KIVETZ:  You're cutting out from our end
11 too.
12         COURT REPORTER:  Yes.
13         MR. SWAMINATHAN:  And I'm -- let's see.
14         MR. KIVETZ:  You're completely --
15         MR. SWAMINATHAN:  It's cutting out both.  It
16 says "unstable."  So give me one minute.  Let me try
17 to fix my connection issue quickly.  Can you hear me
18 now?
19         MR. KIVETZ:  Yes.
20         MR. SWAMINATHAN:  All right.  Let's just go off
21 the record for a minute.  Let me try to fix my
22 connection issue.  Give me one minute.  Let me see
23 if there are other devices.  I can get off the
24 Internet here.  I'll be right back.
25         COURT REPORTER:  Is everyone okay with going

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 26 of 132 PageID #:7616
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021

90..93

Page 90

1    off the record?
2        MR. KIVETZ:  Yeah.
3        (OFF THE RECORD)
4        COURT REPORTER:  On record at 1:16 p.m. Eastern
5    Standard.
6    BY MR. SWAMINATHAN:
7        Q    That -- during the time -- there was a period
8    of time when you were a detective, correct, sir?
9        A    I retired as a detective, yes.
10       Q    And when you were a detective, would you
11   conduct gang book procedures and photo array procedures?
12       A    Yes.
13       Q    And when you would have a positive
14   identification of your suspect in those cases, what was
15   your typical practice?
16       MR. KIVETZ:  Objection.  Form.  Foundation.
17   Speculative.
18       A    It all -- it all depends.  It depends on
19   the -- the case, it depends on witnesses, it depends
20   on -- on other things.  Sometimes if you have three or
21   four people that pick the same guy out, you can be
22   reasonably certain that these individuals aren't lying.
23   So I needed to try to go out and find this person, and
24   talk to them.
25       Q    And you'd try to do that as soon as possible

Page 91

1    in those instances, correct?
2        MR. KIVETZ:  Objection.  Form.  Foundation.
3    Speculative.  Incomplete hypothetical.
4        A    Well, you know, early in the -- early in
5    the -- in the investigations, these guys know what they
6    did.  So they're going to try to leave town or they're
7    going to try to manufacture an alibi, so sometimes speed
8    is of the essence.  Other times you can kind of bide
9    your time until you are able to build a better case.
10       Q    Would you agree it was common to -- after
11   doing a photo identification procedure, either by gang
12   book or by photo array, a common next step was to then
13   have that individual brought in for a live lineup
14   procedure, correct?
15       MR. KIVETZ:  Objection.  Form.  Foundation.
16   Speculative.  Incomplete hypothetical.
17       A    Sometimes it's necessary, sometimes it's not.
18       Q    Would you agree that it was the common
19   practice when there was a photo identification to
20   subsequently do a live lineup identification?
21       MR. KIVETZ:  Objection.  Form.  Foundation.
22   Speculative.  Incomplete hypothetical.
23       A    It -- it depends on the situation.  Sometimes
24   a person is picked out of a pho -- out of a photo book
25   because they know that person.  And so picking the

Page 92

1    person out of the pho -- out of a photo array is for the
2    benefit of the detective.  So if they already know that
3    person, somebody had gone to school with or even a
4    relative, then they're really -- a lineup would just not
5    really be necessary.  It all depends on the
6    circumstances.
7        Q    That's a good point.  And so let me ask a
8    better question.  In instances where you had a witness
9    make an identification of a stranger in a photo
10   procedure, would you agree with me the typical practice
11   in the Chicago Police Department was to then have that
12   suspect brought in to be viewed in a live lineup?
13       MR. KIVETZ:  Objection.  Form.  Foundation.
14   Speculative.  Incomplete hypothetical.
15       A    That -- yeah.  That happens more often than
16   not, yes.
17       Q    Okay.  And in fact, it would be very rare to
18   have an instance where a witness makes an identification
19   of a stranger in a homicide case and then the witness --
20   the suspect is not brought in for a subsequent live
21   lineup.  Do you agree with that?
22       MR. KIVETZ:  Objection.  Form.  Foundation.
23   Speculative.  Incomplete hypothetical.
24       A    It -- it could happen,.  But generally
25   speaking, the state's attorneys require a lineup.

Page 93

1        Q    That's right.  And -- strike that.  So --
2    yeah.  Would you agree with me that a common next step
3    in homicide investigations, after a photo
4    identification, was to have the suspect brought in for a
5    live lineup in stranger ID cases?
6        MR. KIVETZ:  Objection.  Form.  Foundation.
7    Speculative.  Incomplete hypothetical.
8        A    Yes.  That's common.
9        Q    And in instances where that is what was -- in
10   instances where detectives intended as their next step
11   to now see if the witness can make a live lineup
12   identification, would the detectives typically try to
13   have that individual brought in as soon as possible for
14   that procedure?
15       MR. KIVETZ:  Objection.  Form.  Foundation.
16   Speculative.  Incomplete hypothetical.
17       A    You know, I can't speak for other detectives,
18   but that's -- I would.  That's what I would do.
19       Q    Okay.  When you were a detective, if you were
20   going to conduct a live lineup procedure after you had a
21   photo ident -- a positive photo identification, would
22   you agree with me you'd do that as soon as possible
23   because the person on the loose is a potential criminal?
24       MR. KIVETZ:  Objection.  Form.  Foundation.
25   Speculative.  Argumentative.  Incomplete



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 27 of 132 PageID #:7617
The Deposition of GEORGE FIGUEROA, taken on June 4, 2021
94..97

Page 94

1  hypothetical.
2      A    Well, I did it mostly because I wanted my
3  witnesses -- my victims to not change their mind about
4  cooperating while they were still in a cooperative mood.
5  That's why I preferred to have the lineups ASAP.
6      Q    So your typical practice as a detective was to
7  try to do the lineups as soon as possible after the
8  photo identification procedure, while the individual was
9  still cooperative, correct?
10         MR. KIVETZ: Objection. Form. Foundation.
11     Speculative. Misstates the testimony.
12     A    Yes.
13     Q    And while you still knew where the witness
14  was, because sometimes the witnesses move around on you,
15  fair?
16         MR. KIVETZ: Objection. Form. Foundation.
17     Speculative. Incomplete hypothetical.
18     A    Yes.
19     Q    Okay. And was it your experience during the
20  time that you were a detective that that was also the
21  common practice of other detectives you worked with, was
22  to try to do the live lineup procedure as soon as
23  possible after a positive ID in a photo array, because
24  you've got an individual who is in your hands and is
25  cooperative currently?

Page 95

1          MR. KIVETZ: Objection. Form. Foundation.
2      Speculative. Incomplete hypothetical.
3      A    You know, I -- everybody had their own way of
4  doing things, so I -- I can't honestly say -- I mean,
5  there wasn't a strict policy as to when you have a photo
6  lineup. This was up to the detective there, how they
7  viewed the case.
8      Q    Okay. Where -- you were assisting Homicide
9  detectives during the time you were a gang specialist.
10  We talked about the fact that you would assist them in
11  some instances in gang book identification procedures
12  and photo array procedures. With me so far?
13         MR. KIVETZ: Objection. Form.
14     A    Could you ask me the question again, please?
15     Q    Yeah. Up -- put -- I'll put aside my preface,
16  I'll just ask you the question. Did you find during the
17  time that you were working as a gang specialist
18  assisting Homicide detectives, that the Homicide
19  detectives you worked with had the similar practice to
20  you of bringing in their witnesses to view live lineups
21  as soon as possible, after a positive identification in
22  a photo array?
23         MR. KIVETZ: Objection. Form. Foundation.
24     Speculative. Incomplete hypothetical.
25     A    Well, I'll agree that that was their intention

Page 96

1  to try to have the lineups as soon as possible. But
2  like I said earlier, sometimes victims are -- someone
3  talked to them and they're afraid and they stopped
4  cooperating, so you want to -- you want to get these IDs
5  as quickly as possible.
6      Q    Okay. And that's true of both for -- after a
7  gang -- a positive identification from a gang book
8  procedure, and from a photo array procedure, typically
9  they'd want to get the witness in as soon as possible to
10  be your live lineup, fair?
11         MR. KIVETZ: Objection. Form. Foundation.
12     Speculative. Incomplete hypothetical.
13     A    Fair.
14     Q    And in homicide cases if you were asked to
15  make an arrest of a murder suspect, as a gang specialist
16  did you treat that as a high priority?
17         MR. KIVETZ: Objection. Form. Foundation.
18     Speculative. Incomplete.
19     A    Yes.
20     Q    If you got a request from a Homicide detective
21  to make an arrest of a potential murder suspect, would
22  you try to act on that immediately?
23         MR. KIVETZ: Objection. Form. Foundation.
24     Speculative. Incomplete hypothetical.
25     A    Generally, yes.

Page 97

1      Q    Why would you try to act on that immediately?
2          MR. KIVETZ: Same objection.
3      A    Oh, any number of reasons. One could be
4  before a witness has changed their minds about
5  cooperating. Or if there's a -- sometimes there's the
6  urgency, (coughs) excuse me, if the person is thought to
7  be trying to leave town. Other circumstances where
8  perhaps they thought this person may be on some kind of
9  a revenge mission and trying to harm other people. It's
10  any number of reasons, but it's a high priority, yes.
11     Q    Okay. And in your experience was it also a
12  high priority for the other gang specialists that you
13  worked with?
14         MR. KIVETZ: Objection. Form. Foundation.
15     Speculative. Incomplete hypothetical.
16     A    Yes.
17     Q    And in your experience it -- and in your
18  experience, was it a high priority for the detectives
19  that you worked with?
20         MR. KIVETZ: Objection. Form. Foundation.
21     Speculative. Incomplete hypothetical.
22     A    Yes.
23     Q    Would you ever deliberately wait a number of
24  days before trying to apprehend a suspected murderer
25  after a photo or gang book identification procedure?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 28 of 132 PageID #:7618
The Deposition of GEORGE FIGUEROA, taken on June 11, 2021
98..101

Page 98

1    MR. KIVETZ: Objection. Form. Foundation.
2    Speculative. Incomplete hypothetical.
3    A    Well, as a gang specialist, like I said
4    earlier, the detective handling the case is the one
5    calling the shots.  They may decide that they don't want
6    to try to take this person into custody until they have
7    a maybe a more solid case.  You know, just because
8    someone said so-and-so killed so-and-so, that's not
9    necessarily good enough reason to arrest so-and-so.
10   **Q    In other words, are you saying that someone**
11   **says so-and-so did it might constitute probable cause,**
12   **but you may still want to wait before you arrest the**
13   **person?**
14   MR. KIVETZ: Objection. Form. Foundation.
15   Speculative and hypothetical.
16   A    Exactly.
17   **Q    Okay.  And that would -- and what are the sort**
18   **of circu -- what are the sort of circumstances in which**
19   **you'd want to wait?  Is it where there was contradictory**
20   **information about whether that person was involved?**
21   MR. KIVETZ: Objection. Form. Foundation.
22   Speculative. Incomplete hypothetical.
23   A    That -- that may be, you know, that may be a
24   reason.  Another reason may be that the person -- the
25   investigation may be -- or the identification may be

Page 99

1    shaky.  Another reason may be that the witness might be
2    someone that you view as untrustworthy or may be picking
3    the wrong person on purpose to protect someone else. Any
4    number of reasons, you know, you have to be careful when
5    you take someone into custody and try to charge them
6    with murder.
7    **Q    So those -- what you just identified are all**
8    **reasons that you might wait to take somebody into**
9    **custody, even after there was probable cause based on a**
10   **gang book or a photo array identification, correct?**
11   A    Well, the --
12   MR. KIVETZ: Objection. Form.
13   A    Like I said earlier.  It -- just because
14   someone identifies someone from the photo array, doesn't
15   necessarily mean that it's probable cause.  It -- you
16   know, you have to kind of get an idea of what your
17   witness is like.  You know, does your witness have a
18   reason to lie?  You know -- that's all I'm saying.
19   **Q    An identification in a photo array may not**
20   **constitute probable cause where the identification is**
21   **shaky, as you said, correct?**
22   MR. KIVETZ: Objection. Form. Foundation.
23   Speculative. Incomplete hypothetical.
24   A    A state attorney might say, "Well, that's not
25   good enough," or detectives may not think that that's a

Page 100

1    strong enough reason to do it. So any number of reasons.
2    **Q    And is it also --**
3    A    Detectives got to be careful.
4    **Q    Go ahead.**
5    A    No.  Like I said, that's, you know,
6    detectives, you know, want to be careful as to taking
7    someone into custody.  Because you're -- even if you
8    think the -- the case is strong, you're -- you're taking
9    a chance to -- to harm yourself or someone else by
10   taking, you know, you're taking a -- a math --
11   mathematically you're taking a chance of getting hurt or
12   hurting someone when you arrest somebody.
13   **Q    And I want to just make sure I understand**
14   **correctly.  In an instance where you have a positive**
15   **identification in a photo array, is it the case that in**
16   **some instances that would not constitute probable cause**
17   **to arrest, if you had some concerns about the**
18   **trustworthiness of the witness making the**
19   **identification?**
20   A    Yeah.
21   MR. KIVETZ: Objection. Form. Foundation.
22   Speculative. Incomplete hypothetical.
23   A    Yeah.  If -- if, you know, the officer has
24   to -- the detective who's working a case wants to be
25   sure that they can trust the identification.  That's

Page 101

1    essentially it.
2    **Q    So I think what -- if I understand correctly,**
3    **there is sometime -- a photo array procedure that**
4    **results in a positive identification of a suspect,**
5    **sometimes can constitute probable cause to arrest,**
6    **correct?**
7    MR. KIVETZ: Objection. Form. Foundation.
8    Speculative.
9    A    Sometimes.
10   **Q    And sometimes it would be insufficient for**
11   **probable cause to arrest, correct?**
12   MR. KIVETZ: Objection. Form. Foundation.
13   Speculative. Incomplete hypothetical.
14   A    Sometimes.
15   **Q    And instances in which the positive**
16   **identification in a photo array procedure may be**
17   **insufficient probable cause to arrest, include if the**
18   **detective feels that the witness is untrustworthy, or**
19   **their identification was tentative or shaky; is that**
20   **true?**
21   MR. KIVETZ: Objection. Form. Foundation.
22   Speculative. Incomplete hypothetical.
23   A    Yeah.  The detective has to make that
24   determination.  If -- if they feel in their heart of
25   hearts that this is a legitimate -- that it's a good

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 29 of 132 PageID #:7619
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021
102..105

Page 102

1    identification and there -- there are no flaws, then
2    that's probable cause for them.  Other detectives may
3    want a little more information before they go -- you
4    know, depending on the detective of the case, the
5    circumstances, the witnesses, the victims.
6         Q    Okay.  And in the instances where the
7    detective doesn't feel that the positive identification
8    in a photo array is sufficient probable cause to arrest,
9    I think we've established that in those instances you
10   may not go out and arrest the person.  You're going to
11   do some follow up investigation, correct?
12        MR. KIVETZ: Objection. Form. Foundation.
13   Speculative.  Incomplete hypothetical.
14        A    Correct.
15        Q    And in the instances where a detective feels
16   that the identification of their suspect in a photo
17   array procedure is strong and constitutes probable cause
18   to arrest, in those instances, the detective would
19   typically have the suspect arrested quickly, correct?
20        MR. KIVETZ: Objection. Form. Foundation.
21   Speculative.  Incomplete hypothetical.
22        A    Correct.
23        Q    And they would do that for the reasons we've
24   talked about, because you've got a potential killer on
25   the loose, because you got a cooperative witness right

Page 103

1    now, and that you don't want that to change, fair?
2         MR. KIVETZ: Objection. Form. Foundation.
3    Speculative.  Incomplete hypothetical.
4         A    That's fair.
5         Q    Okay.  And is it fair to say that in your
6    experience witnesses or victims sometimes change their
7    mind about whether they want to be cooperative with
8    detectives?
9         MR. KIVETZ: Objection. Form. Foundation.
10   Speculative.  Incomplete hypothetical.
11        A    That's correct.
12        Q    Okay.  In this case, are you aware of any stop
13   order that was put in place with regard to Thomas
14   Sierra?
15        MR. KIVETZ: Objection. Form. Foundation.
16        A    No.
17        Q    In your experience, once he had been
18   identified, if he had been identified in any photo array
19   procedure, or in a gang book identification procedure,
20   would you expect there to have been a stop order put in
21   place?
22        MR. KIVETZ: Objection. Form. Foundation.
23   Speculative.  Incomplete hypothetical.
24        A    No.  Unless they mentioned it, I wouldn't
25   think about it one way or the other.

Page 104

1         Q    Okay.  You assume that there would have been
2    one in a case like this?
3         MR. KIVETZ: Objection. Form. Foundation.
4    Speculative.  Misstates the testimony.  Incomplete
5    hypothetical.
6         A    I didn't -- I'd go by the word of the
7    detective that this person was wanted, whether there was
8    a stop order or not.  Generally stop orders aren't
9    issued right away.  They're issued just like warrants --
10   until you've -- you've exhausted all other means of
11   trying to take this person into custody.
12   BY MR. SWAMINATHAN:
13        Q    In your experience -- well -- strike that.  In
14   this case, do you recall any conversations that you had
15   with the detectives requesting you to make an arrest?
16   Like, do you have a personal memory of any conversations
17   you had with detectives requesting that you make an
18   arrest?
19        MR. KIVETZ: Objection. Form.
20        A    No.
21        Q    Who were the lead detectives on the -- in the
22   Andujar investigation?
23        MR. KIVETZ: Objection. Form. Foundation.
24   Speculative.
25        A    I believe they were Halvorsen and Guevara.

Page 105

1         Q    And you assisted the detectives on the Andujar
2    homicide investigation, correct?
3         MR. KIVETZ: Objection. Form.
4         A    I assisted only in taking Thomas Sierra into
5    custody.
6         Q    That was on May 30th, according to the
7    reports, correct?
8         MR. KIVETZ: Objection. Form. Foundation.
9         A    Yes.
10        Q    So you assisted the detectives by taking
11   Thomas Sierra into custody on May 30th, correct?
12        A    Say that again, please?
13        Q    You assisted by -- the detectives by taking
14   Thomas Sierra into custody on May 30th, correct?
15        MR. KIVETZ: Objection. Form. Foundation.
16        A    Correct.
17        Q    And other than your participation in the
18   investigation on May 30th, did you have any other
19   involvement in the Andujar homicide investigation?
20        MR. KIVETZ: Objection. Form.
21        A    No.
22        Q    Okay.  So -- and the reports documenting your
23   act -- the actions that you took on May 30th are the --
24   is the only participation you had in the investigation;
25   is that correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 30 of 132 PageID #:7620
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
106..109

Page 106

1    MR. KIVETZ: Objection. Form. Foundation.
2    Misstates the evidence.
3    A    That's correct.
4    Q    And other than assisting the Homicide
5    detectives on April 30th, did you have any other
6    involvement in the homicide investigation?
7    MR. KIVETZ: No. No. Objection. You said
8    April 30th, just so you know.
9    Q    I'm sorry. I'm sorry. Let me ask it again. I
10   may have asked you this, so I apologize if I'm asking it
11   again. I don't remember what my prior question was. So
12   let me ask it again. And let me ask it properly. And I
13   will sustain -- I will note an objection to asked and
14   answered, because I'm not sure if I asked this, but I
15   want to make sure I have.
16   A    Okay.
17   Q    Did you have any participation in the Andujar
18   homicide investigation other than on May 30, 1995?
19   MR. KIVETZ: Objection. Form. Foundation.
20   Just for the record.
21   A    The only other connection was when they asked
22   me about the nicknames. Other than that, taking Thomas
23   Sierra into custody on the 30th was the only
24   participation I had in this.
25   Q    Okay. Now, when you assisted detectives on --

Page 107

1    oh, strike that. When you ass -- would assist
2    detectives in homicide investigation as a gang
3    specialist, would you have access to the detectives'
4    reports?
5    MR. KIVETZ: Objection. Form. Foundation.
6    Speculative.
7    A    No.
8    Q    Would you ever be given an opportunity to
9    review their reports in a homicide investigation?
10   MR. KIVETZ: Objection. Form. Speculative.
11   A    I'm sure if I needed to, I would have gotten a
12   copy of it. But I didn't need it. And so I never -- I
13   never did.
14   Q    And you're saying in the Andujar case, you
15   didn't get any copies of any documents, is that right,
16   from the detectives?
17   A    No.
18   MR. KIVETZ: Objection. Form.
19   Q    Okay. And let me ask a more general question.
20   When you assisted Homicide detectives as a gang
21   specialist, not unique to the Andujar case, would you be
22   given access to reports from the Homicide detectives'
23   files?
24   MR. KIVETZ: Objection. Form. Foundation. At
25   -- at any time?

Page 108

1    MR. SWAMINATHAN: Yeah. I just mean as gang
2    -- as a gang specialist, would you be given copies
3    of the detectives' reports in homicide cases?
4    MR. KIVETZ: At -- at any time in the
5    investigation?
6    Q    Yeah. As a gang specialist, yes.
7    MR. KIVETZ: Objection. Form. Foundation.
8    A    No. There's no need for that.
9    BY MR. SWAMINATHAN:
10   Q    Yeah. But as a gang specialist assisting
11   Homicide detectives in their investigations, would you
12   be given access to their notes?
13   MR. KIVETZ: Objection. Form. Foundation.
14   Speculative.
15   A    No.
16   Q    As a gang specialist assisting Homicide
17   detectives, in your experience, would the Homicide
18   detectives take notes?
19   MR. KIVETZ: Objection. Form. Foundation.
20   Speculative. Incomplete hypothetical.
21   A    I -- I assume they took notes.
22   Q    In your experience, you -- would you agree
23   with me that when you assisted Homicide detectives, you
24   often saw them taking notes, correct?
25   MR. KIVETZ: Objection. Form. Foundation.

Page 109

1    Speculative. Incomplete hypothetical.
2    A    Often, but not always.
3    Q    And when they would take -- when they would
4    conduct interviews of witnesses or suspects, would you
5    agree with me you commonly saw them taking notes during
6    those interviews and interrogations, correct?
7    MR. KIVETZ: Objection. Form. Foundation.
8    Speculative. Incomplete hypothetical.
9    A    Well, like I said, some -- most of the time
10   they would, but lots of time they wouldn't.
11   Q    Do you know any detectives who had a practice
12   of simply never taking notes?
13   MR. KIVETZ: Objection. Form. Foundation.
14   A    It depends on the detective.
15   Q    Yeah. So were there any dete -- I mean, would
16   you agree with -- strike that. Would you agree with the
17   statement that every detective you ever worked with or
18   assisted, that they took notes for the things they did
19   during the course of their investigations? Or would you
20   say, "Well, there's some detectives I work with who I
21   could say, that guy just simply never took notes, ever"?
22   MR. KIVETZ: Objection. Form. Foundation.
23   Speculative.
24   A    All detectives at one time or another took
25   notes or did not take notes. It just depends on them.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 31 of 132 PageID #:7621
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
110..113

Page 110

1    Q    And would you agree with me -- you can say
2  affirmatively that you know of a number of detectives
3  who would take notes of things that they did during the
4  course of homicide investigations?
5        MR. KIVETZ:  Objection.  Form.  Foundation.
6  Speculative.
7    A    Yes.
8    Q    Can you identify any detective that you worked
9  with on homicide investigations who had the practice of
10  never taking notes?
11       MR. KIVETZ:  Objection.  Form.  Foundation.
12  Speculative.  Incomplete hypothetical.
13   A    I never said that they never took notes.  I
14  said that sometimes they do and sometimes they don't.
15   Q    Okay.
16   A    All detectives -- yeah.  All detectives take
17  notes.
18   Q    That's my question.  All detectives --
19       MR. KIVETZ:  Whoa, whoa, whoa, whoa.  We're
20  going --
21   Q    Oh, I'm sorry.  Go ahead.  Go ahead.  Sorry.
22  Go ahead.  You can go ahead.  I didn't mean to cut you
23  off.
24   A    All -- all detectives take notes.  Some
25  detectives don't always take notes.  But they all do it

Page 111

1  at one point or another.
2    Q    Got it.  As a gang specialist, did you take
3  notes?
4    A    No.
5    Q    Did you ever take notes as a gang specialist?
6        MR. KIVETZ:  Objection.  Form.  Speculative.
7  Foundation.
8    A    Only as far as scratch paper, writing down
9  names and addresses of people that are going to be
10  interviewed.
11   Q    And where would you write that down?
12   A    Scratch --
13       MR. KIVETZ:  Objection.  Form.  Foundation.
14   A    On whatever scratch paper was available.
15   Q    Did you have any special forms that you would
16  use to take notes as a gang specialist?
17       MR. KIVETZ:  Objection.  Form.  Foundation.
18   A    If you're referring to GPRs, they were used
19  mainly as scratch paper.
20   Q    You're saying gang specialists would use GPRs
21  as scrap paper?
22   A    That's what --
23       MR. KIVETZ:  Objection.  Form.  Foundation.
24  Speculative.
25   A    That's essentially what GPRs are, those --

Page 112

1  those forms just to write information down.
2    Q    And so the --
3    A    If I'm going to interview you, I -- I'm -- I'm
4  sorry.  If I was going to interview you, I could take a
5  GPR, write your information down, and hand it to the
6  detective who is going to interview you.
7    Q    As a gang specialist, did you use the GPR
8  forms then?
9        MR. KIVETZ:  Objection.  Form.  Foundation.
10  Speculative.
11   A    Occasionally.  Well, it -- it's always
12  available.
13   Q    And if you didn't have the GPR forms
14  available, you'd use whatever paper that you had; is
15  that fair?
16   A    That's -- that's accurate.
17       MR. KIVETZ:  I'm sorry.
18   Q    Did you --
19       MR. KIVETZ:  Objection.  Form.  Foundation.
20  Speculative.
21   Q    As a gang specialist, did you keep any kind of
22  notepad or a legal pad with you or notebook?
23       MR. KIVETZ:  Objection.  Form.  Foundation.
24   A    Just scratch paper.
25   Q    And did you --

Page 113

1    A    I mean, we didn't --
2    Q    Go ahead.
3    A    Oh, go on.
4    Q    Go ahead.  Go ahead.  I'm sorry.
5    A    No.  Just -- just a scratch paper to write,
6  you know, people's information down or things that I
7  have to remember, things like that.
8    Q    If you spoke -- if you were assisting a
9  detective in a homicide investigation, would you
10  sometimes write down something that they were asking you
11  to do?
12       MR. KIVETZ:  Objection.  Form.  Foundation.
13  Speculative.
14   A    Yeah.  Sometimes it's like making out a to-do.
15  List things like that.
16   Q    And if detectives were asking you to assist in
17  a homicide investigation, you might take notes on some
18  of the things they're asking you to do and what you need
19  to do to accomplish it, fair?
20       MR. KIVETZ:  Objection.  Form.  Foundation.
21  Speculative.
22   A    Well, if they asked me to perform a specific
23  task or to do this or that, I might make a list so I
24  don't forget.  But they didn't tell me how to do it,
25  they just asked me to do it.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 114

1    Q    Okay.  And then when you would take notes on
2  things detectives were asking you to do to assist them
3  in homicide cases, what would you do with those notes
4  when you were done?
5         MR. KIVETZ: Objection.  Form.  Foundation.
6  Speculative.  Incomplete hypothetical.
7    A    If they weren't needed, they would probably be
8  just thrown into the trash.
9    Q    Would you ever turn them over to the
10  detectives?
11        MR. KIVETZ: Objection.  Form.  Foundation.
12  Speculative.  Incomplete hypothetical.
13    A    Not a to-do list.  If -- if there was
14  information on a particular person, you know, then yeah.
15    Q    And were -- so what was kind of -- what are
16  the kind of notes -- so let me make sure I understand.
17  What are the kind of notes that you would turn over to a
18  detective as a gang specialist?
19        MR. KIVETZ: Objection.  Form.  Foundation.
20  Speculative.  Incomplete hypothetical.
21    A    Generally, names of witnesses or names of
22  people that they want to interview, things like that.
23    Q    And as a gang specialist, when you assisted in
24  homicide investigations, would you write reports?
25        MR. KIVETZ: Objection.  Form.  Foundation.

Page 115

1  Speculative.
2    A    If -- if called upon.
3    Q    What were the circumstances in which you would
4  write a report in a homicide investigation?
5         MR. KIVETZ: Objection.  Form.  Foundation.
6  Speculative.
7    A    Sometimes a supervisor or a detective would
8  ask me to make out a supplementary report explaining
9  what I did in this investigation.
10    Q    So is it the case that you would only write
11  reports in homicide cases when you were specifically
12  asked to do so?
13         MR. KIVETZ: Objection.  Form.  Foundation.
14  Speculative.  Incomplete hypothetical.
15    A    That's correct.
16    Q    And where that request just made by a Homicide
17  detective, correct?
18         MR. KIVETZ: Same objection.
19    A    Homicide detective or a supervisor.
20    Q    When you wrote reports and -- strike that.
21  Would you also write reports -- putting aside homicide
22  investigations, would you have to also write reports of
23  your own as a gang specialist?
24         MR. KIVETZ: Objection.  Form.
25    A    What -- I -- I don't -- what kind of reports

Page 116

1  are you referring to?
2    Q    Any kind of reports.  Any kind of, you know,
3  so -- strike that.  So let's do it this way.  You
4  indicated that as a gang specialist you might take, you
5  know, sort of random notes on things here and there. But
6  those aren't reports, fair?
7    A    No.  That's just scratch paper.
8    Q    Okay.  Were there any official reports that
9  you would write up or type up?
10         MR. KIVETZ: Objection.  Form.  Foundation.
11    A    Well, once or -- once or twice a year, we
12  would have to make out a -- a form telling them, you
13  know, about the trends in the gang and things like that.
14  Who's in charge now -- who's in charge, in the
15  penitentiary, things like that.  Do research on your
16  gang.  That's about it.
17    Q    And what was that report called?
18    A    Intelligence report.
19    Q    Did you have to fill out a daily activity
20  worksheet?
21         MR. KIVETZ: Objection.  Form.  Foundation.
22    A    No.
23    Q    Did you fill any kind of report on a daily
24  basis indicating what your activities were that day?
25         MR. KIVETZ: Objection.  Form.  Foundation.

Page 117

1    A    Only if called upon.
2    Q    And how oft -- was it regular for you to be
3  called upon to do that or no?
4    A    No.
5         MR. KIVETZ: Objection.  Form.  Foundation.
6  Speculative.  You guys have got to wait for my
7  objection.
8    Q    What's a "humper report"?
9         MR. KIVETZ: Objection.  Form.  Foundation.
10    A    What's a what report?
11    Q    "Humper report"?  Are you familiar with that
12  term?
13    A    Oh.
14         MR. KIVETZ: Objection.  Form.
15    A    Yeah.  A humper -- that -- that's not
16  exclusive to Gangs.  Generally speaking, usually beat
17  cars and the tac units use that.  Essentially it's a --
18  it's a form that you fill out saying what you did that
19  day, how many tickets you wrote, how many people you
20  arrested, how many jobs you had, things like that.
21    Q    Did you fill out a --
22    A    How -- yeah.
23    Q    Go ahead.
24    A    So that's what it's called.  It's slang.
25  Essentially it's an activity report.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 33 of 132 PageID #:7623
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
118..121

Page 118

1      Q      Did you fill out a humper or activity report
2  as a gang specialist?
3             MR. KIVETZ: Objection. Form.
4      A      Nope.
5      Q      Would you fill -- would you type up type up
6  supplementary reports as a gang specialist?
7             MR. KIVETZ: Objection. Foundation.
8      A      Supple -- you mean supplementary reports on
9  particular cases?
10     Q      Correct.
11     A      When called upon.
12     Q      Okay.  And that's the example we talked about,
13 where a detective or a supervisor ask you to write a
14 supplementary report, correct?
15     A      Correct.
16     Q      Okay.  And then other than the -- are there
17 any other kind of supplementary reports that you would
18 write that weren't specific to an investigation?
19            MR. KIVETZ: Objection. Form.
20     A      You can only write supplementaries if there's
21 an ID number connected to a case.  Other than that, no.
22     Q      Okay.  And would you write reports -- back
23 when you were a patrol officer, did you also write
24 reports as a patrol officer?
25     A      Certainly.

Page 119

1      Q      And as a detective, you certainly wrote
2  reports, correct?
3      A      Generally, they were supplementary reports.
4      Q      And when you wrote reports as a detective --
5  you went through detective school; is that correct?
6      A      Yes.
7      Q      And did you get a training in detective school
8  about the importance of report writing?
9             MR. KIVETZ: Objection. Form. Foundation.
10     A      Report writing was -- you were given
11 instruction in report writing at the police academy.
12     Q      You got training on the importance of report
13 writing as early -- starting in the police academy; is
14 that right?
15            MR. KIVETZ: Objection. Form. Foundation.
16     A      That's right.
17     Q      And would you agree with me that the
18 importance of report writing was reiterated when you
19 were in detective school?
20            MR. KIVETZ: Objection. Form. Foundation.
21     A      Well, I mean, you know, they stressed the
22 importance of -- of supplementary reports, if that's
23 what you're asking.
24     Q      And were you trained that it was important to
25 write thorough and accurate reports as a detective?

Page 120

1             MR. KIVETZ: Objection. Form. Foundation.
2  Speculative.
3      A      Detective or a beat car, yes.
4      Q      And in all of your positions, as a Chicago
5  police officer, you were trained that it was important
6  for you to write thorough and accurate reports; is that
7  correct?
8             MR. KIVETZ: Objection. Form. Foundation.
9  Speculative.
10     A      Accuracy and thoroughness, yes.
11     Q      And was it your practice to try to be as
12 thorough and accurate as possible when you wrote reports
13 during the entirety of your career as a Chicago police
14 officer?
15            MR. KIVETZ: Objection. Form. Foundation.
16 Speculative.
17     A      That's correct.
18     Q      Would you ever -- what were the types of
19 things you would do to help you write your reports
20 thoroughly and accurately?
21            MR. KIVETZ: Objection. Form. Speculative.
22     A      Talking to victims and witnesses, essentially.
23     Q      And then what would you -- what steps would
24 you take to assist you in writing thorough and accurate
25 reports about those investigative steps that you were

Page 121

1  taking?
2             MR. KIVETZ: Objection. Form.
3      A      Taking notes, if that's what you're asking.
4  Sure.
5      Q      So you'd use notes to assist you in writing
6  thorough and accurate reports; is that fair?
7      A      I'm sorry?
8      Q      You would use your -- you'd use notes to
9  assist you in writing through an accurate reports,
10 correct?
11            MR. KIVETZ: Objection. Form. Speculative.
12     A      Yeah.  If -- if I needed to, yes.
13     Q      And to write thorough and accurate reports,
14 would you also try to write those reports as soon as
15 possible after the investigative steps you took so it
16 was still fresh in your memory?
17            MR. KIVETZ: Objection. Form. Foundation.
18 Speculative.
19     A      That's a personal choice.  I liked doing them
20 right away while it was still fresh in my mind.
21     Q      That was one of the --
22     A      But it was --
23     Q      -- techniques --
24     A      But it --
25     Q      Oh, go ahead.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 34 of 132 PageID #:7624
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
122..125

Page 122

1    A    That -- that was just --
2    Q    Go ahead.
3    A    But it's not necessary.
4    Q    And so I want to put aside questions about
5  policies, I'm just asking you just about your practices,
6  okay?  Was it your practice to write your reports right
7  away to assist you in ensuring that they were thorough
8  and accurate?
9         MR. KIVETZ:  Objection.  Form.  Foundation.
10   Speculative.
11   A    Yes.
12   Q    And was it your practice to review your
13 reports to ensure that they were thorough and accurate
14 before submitting them?
15        MR. KIVETZ:  Objection.  Form.  Foundation.
16   Speculative.
17   A    I would proofread them, yes.
18   Q    And when you would proofread them, was one of
19 the things you were doing to check them, to make sure
20 that the reports were thorough and accurate?
21        MR. KIVETZ:  Objection.  Form.  Foundation.
22   Speculative and incomplete hypothetical.
23   A    Well, yeah.  Sometimes you're tired and you
24 missed a typo or something like that, but yeah,
25 essentially you just want to make sure that the facts

Page 123

1  are correct.
2    Q    Okay.  And was it the expectation of your
3  supervisors that the facts that you put down in a report
4  are thorough and accurate?
5         MR. KIVETZ:  Objection.  Form.  Foundation.
6    Speculative.
7    A    Yes.
8    Q    And that was true when you were a patrol
9  officer, a gang specialist, and a detective, correct?
10        MR. KIVETZ:  Objection.  Form.  Foundation.
11   Speculative.  Anand, we're going to have to take
12   like a little lunch break when you get to a --
13        MR. SWAMINATHAN:  Yeah.  In a few minutes.
14   Yeah.  In a few minutes?  Maybe five minutes, let's
15   say?
16        MR. KIVETZ:  Yep.  Sure.
17        MR. SWAMINATHAN:  Can you read back the last
18   question?  Sorry.
19        COURT REPORTER:  Yes.  One moment.
20        MR. SWAMINATHAN:  And I can just ask the
21   question again.  I think I know what it is.
22        (REPORTER PLAYS BACK REQUESTED TESTIMONY)
23        MR. KIVETZ:  Objection.  Form.  Foundation.
24   Speculative.
25 BY MR. SWAMINATHAN:

Page 124

1    Q    Go ahead.
2    A    I am sorry.  Ask me the question again,
3  please.
4    Q    Yeah.  Let me ask you again.  I previously
5  asked you if the expectation of your supervisors was
6  that you write thorough and accurate re -- strike that.
7  What was the expectation of your supervisors that the
8  factual information included in your report was thorough
9  and accurate and you had indicated, "yes."  So I -- my
10 final question was, was that expectation of your
11 supervisors true as a detective, a gang specialist, and
12 a patrol officer?
13        MR. KIVETZ:  Objection.  Form.  Foundation.
14   Speculative.
15   A    Yes.
16   Q    Okay.  Now, we talked about some of the
17 different types of reports that you would write as a
18 gang specialist.  Would you write arrest reports as part
19 of your work as a gang specialist?
20   A    Yes.
21   Q    And did you keep -- strike that.  The reports
22 that you would write as a gang specialist, would those
23 be kept in the Gang offices?
24        MR. KIVETZ:  Objection.  Form.  Foundation.
25   Assumes facts not in evidence.

Page 125

1    A    The -- the Gang office really didn't keep
2  records of the -- the arrests that we made.  Generally
3  speaking, the arrests we made, the reports went to, once
4  they were signed, they went to the records division and
5  maybe copies to Area Five, depending on the arrest -- on
6  the case.
7    Q    And in the Gang offices, would they keep any
8  kind of arrest file or incident file?
9         MR. KIVETZ:  Objection.  Form.  Foundation.
10   Speculative and misstates the records.
11   A    In our -- in our office, they had kind of a --
12 a running log that had very little information on it to,
13 you know, to keep up with the arrests and stuff that --
14 there weren't really any facts.  For example, if you
15 locked somebody up for murder, it's just the charge
16 murder, and I saw him, I took him into custody, turned
17 him over to Area Five, that's it.  No facts, no nothing.
18   Q    If you made an arrest in that case, you'd fill
19 out an arrest report, correct?
20        MR. KIVETZ:  Objection.  Form.  Speculative.
21   A    Yes.
22   Q    And then would a copy of that arrest report
23 would go to the detective's homicide file, sounds like
24 you're saying; is that right?
25   A    Generally, yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 35 of 132 PageID #:7625
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
126..129

Page 126

1    Q    And would a copy of that arrest report be kept
2  in the Gang offices?
3         MR. KIVETZ: Objection. Form. Foundation.
4    Speculative.
5    A    I don't think so. I don't remember that.
6    Q    Okay. And for the arrest reports, I'm talking
7  about those reports that have a bunch of little boxes on
8  them with specific information you have to fill in. We
9  talking about the same thing?
10        MR. KIVETZ: Objection. Form.
11   A    We only had the one kind of arrest reports.
12 There were all the same.
13   Q    Okay. It was basically a template?
14   A    Yes. Some -- some boxes you check off. Yes.
15   Q    It -- it -- it was basically a template that
16 you filled in for the arrest reports, correct?
17   A    Yes. Sort of, yes.
18   Q    And did you typically type those?
19        MR. KIVETZ: Objection. Form. Foundation.
20   A    I did.
21   Q    Was there a typewriter at the Gang offices?
22        MR. KIVETZ: Objection. Form. Foundation.
23   A    Yes.
24   Q    And then did you try to be thorough and
25 accurate in filling out your arrest reports?

Page 127

1    A    Yes.
2    Q    And would you just --
3         MR. KIVETZ: Objection. Form. Foundation.
4    Q    And just like all the other reports that you
5  would write as a police officer, were you trained to be
6  thorough and accurate in filling out arrest reports?
7         MR. KIVETZ: Objection. Form. Foundation.
8    Speculative.
9    A    Yes.
10   Q    And an arrest report is important because it
11 identifies who is being arrested and when they're
12 arrested, correct?
13        MR. KIVETZ: Objection. Speculative.
14   A    Correct.
15   Q    And it contains a section identifying the
16 basis for taking somebody into arrest, correct?
17   A    Yes.
18   Q    And so it has a section that explains the
19 probable cause for arresting a person, correct?
20   A    Correct.
21   Q    And would you be thorough and accurate in
22 filling out that section about what evidence provided
23 probable cause to place a person under arrest?
24        MR. KIVETZ: Objection. Form. Foundation.
25   Speculative.

Page 128

1    A    Yeah. Generally speaking, you're justifying
2  the arrest in that narrative -- narrative.
3    Q    And would you ever deliberately omit
4  information supporting probable cause?
5         MR. KIVETZ: Objection. Form. Foundation.
6    Speculative.
7    A    No.
8    Q    Do you know whether a warrant was ever
9  obtained for Thomas Sierra's arrest on May 30th?
10        MR. KIVETZ: Objection. Foundation.
11   A    I do not know.
12   Q    If you had time to get a warrant, would it
13 have been appropriate -- well -- strike that. In what
14 circumstances would you secure a warrant before making
15 an arrest?
16        MR. KIVETZ: Objection. Form. Foundation.
17   Speculative. Incomplete hypothetical.
18   A    It depends on the detectives, because they
19 have to run it past state's attorneys.
20   Q    But it sounds like there's a lot of
21 circumstances where detectives could make arrests of
22 suspects without needing a warrant, correct?
23        MR. KIVETZ: Objection. Form. Foundation.
24   Speculative. Incomplete hypothetical.
25   A    Yeah. Different situations. If you -- a

Page 129

1  police officer or a detective or anybody saw a crime
2  being committed on the street, you know, you arrest the
3  person then. There would be no need for a warrant.
4  Things like that.
5    Q    But in, like, homicide cases where some crime
6  has already happened, you're investigating it in the
7  days and weeks afterwards. What are the circumstances in
8  which a detective can make an arrest without a warrant
9  versus needing a warrant?
10        MR. KIVETZ: Objection. Form. Foundation.
11   Speculative. Incomplete hypothetical.
12   A    I think you would have to ask the state's
13 attorney that, more than a -- a police officer. Police
14 officers are trained to make arrests when they see a
15 crime committed.
16   Q    When you were a detective, would you always
17 get permission from the state's attorney before having
18 somebody arrested?
19        MR. KIVETZ: Objection. Form. Foundation.
20   Speculative. Incomplete hypothetical.
21   A    It -- it -- it depends -- it depends on the
22 circumstances.
23   Q    You would agree with me that it was common for
24 Homicide detectives to make requests for an individual
25 to be arrested without getting permission from a state's

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 36 of 132 PageID #:7626
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021
130..133

Page 130

1  attorney first?
2       MR. KIVETZ: Objection. Form. Foundation.
3  Speculative. Incomplete hypothetical.
4       A    In murders, I don't know how common is -- how
5  common that is. I couldn't honestly tell you.
6       Q    When you were a detective, would you sometimes
7  have somebody arrested as part of your investigation
8  without getting permission from a state's attorney
9  first?
10      MR. KIVETZ: Objection. Form. Foundation.
11 Speculative. Incomplete hypothetical.
12      A    Certainly.
13      Q    Okay. And what are the circumstances in which
14 you were permitted to get -- have a person arrested
15 without getting approval from state's attorney first?
16      MR. KIVETZ: Objection. Form. Foundation.
17 Speculative. Incomplete hypothetical.
18      A    If I had someone in custody, and I'm
19 interviewing them and they confess, there would be no --
20 be no need to get a warrant. The person is in your
21 custody. Things like that.
22      Q    Okay. And if you had a circumstance where
23 somebody is not in your custody, and you now learn
24 information that gives you probable cause to arrest
25 them, could you go out and have that person arrested, or

Page 131

1  would you need to get permission from a state's attorney
2  first?
3       MR. KIVETZ: Objection. Form. Foundation.
4  Speculative. Incomplete hypothetical.
5       A    It -- it depends. On -- on a misdemeanor, no,
6  I wouldn't even -- you wouldn't even call a state's
7  attorney.
8       Q    Okay. On a homicide case, I want to focus on
9  homicide cases or felony cases in general. Could you
10 make an are -- could you have an arrest made of somebody
11 out on the street for whom you have probable cause
12 without getting permission from a state's attorney?
13      MR. KIVETZ: Objection. Form. Foundation.
14 Speculative. Incomplete hypothetical.
15      A    I can't say. I've never been a Homicide
16 detective.
17      Q    What about in felony cases, non-homicide,
18 felony cases? Could you get somebody arrested where you
19 had probable cause without having a state's attorney
20 approval?
21      A    Again, no -- no --
22      MR. KIVETZ: Now, wait for my objection.
23 Objection. Form. Foundation. Speculative.
24 Incomplete hypothetical. You're doing great.
25      A    If the person is walking down the street or,

Page 132

1  you know, he hangs at a particular street corner, then
2  no, I would not call a state's attorney to ask for a
3  warrant.
4  BY MR. SWAMINATHAN:
5       Q    The last question on this line, then we can
6  take a break. What training were you given about what
7  were the circum -- where you had probable cause -- so --
8  strike that. Let me ask it -- let me try it again. In
9  the circumstances where, as a detective, you had
10 probable cause to arrest somebody, what training were
11 you given about what circumstances would require you to
12 get a warrant versus what circumstances it would not be
13 required you get a warrant?
14      A    Again --
15      MR. KIVETZ: Objection. Form. Foundation.
16 Speculative. Incomplete hypothetical.
17      A    Again, it depends on the case, it depends on
18 the circumstances, it depends on whether the person was
19 inside someplace or outside, that you had them on view,
20 if someone else had -- there are all, you know, all
21 kinds of different scenarios.
22
23      Q    Okay. Sitting here today, based on your
24 memory, are you able to name any facts that gave
25 probable cause to arrest Sierra -- Thomas Sierra on

Page 133

1  May 30?
2       MR. KIVETZ: Objection. Form.
3       A    Nothing that I witnessed or investigated. I
4  was told by Area Five, "If you see him, he's been
5  identified as a -- an "offender in a homicide. If you
6  see him bring him to us.?
7       Q    Okay.
8       A    "Arrest him and bring him to us." So that's
9  what I did.
10      Q    Okay. So and sitting here today, do you have
11 any memory of -- any of the information that was
12 communicated to you that caused you to go out to arrest
13 him? A personal memory outside of documents?
14      A    Outside of what?
15      Q    Outside of documents.
16      A    I never saw any documents. This -- they
17 called me. They knew that I knew him. And asked me to
18 take him to custody, if and when I should see him.
19      Q    And as you sit here today, do you have any
20 personal memory in your head, of back in 1995, "Here's
21 the probable cause that existed for me to go out and
22 make an arrest."
23      MR. KIVETZ: Objection. Form.
24      A    Not -- not personal. I relied on the
25 information that I got from the detectives who were

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 37 of 132 PageID #:7627
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
134..137

Page 134

1 investigating the case.
2    Q    And if I ask you what probable cause of arrest
3 existed to justify the arrest of Thomas Sierra on May
4 30th, would you have to look at documents to be able to
5 answer that question?
6        MR. KIVETZ: Objection. Form.
7    A    The only documents that I would have to rely
8 on would be on the detective's reports.
9    Q    Okay. And if you wanted to identify what
10 probable cause existed to justify the arrest of Thomas
11 Sierra, would you have to look at the arrest report to
12 identify what probable cause there was?
13        MR. KIVETZ: Objection. Form. Misstates his
14 testimony.
15    A    I wrote an arrest report based on the
16 information that I had from the detectives. That's all
17 the information I had.
18    Q    Okay. So and if I ask you today what
19 information supported probable cause, would you be able
20 to say any from memory? Or would you say, "Hey, it's
21 whatever is written in my arrest report, I don't
22 remember it personally"?
23        MR. KIVETZ: Objection. Form. Misstates his
24 testimony.
25    A    I would do it from just -- I was told by

Page 135

1 someone in Area Five that he was wanted, take him into
2 custody when you see him. It's what I did. That was
3 it.
4    Q    Okay. And -- okay. Okay. And in the arrest
5 report, you identify the basis -- you identify what the
6 probable cause was to arrest him. Do you have any
7 method -- do you have any memory of why you put that
8 information down in the arrest report?
9        MR. KIVETZ: Objection. Form. Foundation.
10    A    Well, I put it down. I don't remember exactly
11 what the wording was in the arrest report. I left that
12 blank, because I didn't want it to conflict with
13 anything the detectives might put in their report. But
14 essentially I knew him to be wanted and I saw him and
15 took him into custody.
16    Q    Is the information you filled into the arrest
17 report based on the information the detectives gave you?
18        MR. KIVETZ: Objection. Form. Foundation.
19 Speculative.
20    A    Correct. Correct.
21    Q    Okay. And sitting here today, do you have any
22 reason to dispute the bases for probable cause that you
23 wrote into the arrest report based on the information
24 the detectives gave you?
25    A    Dispute? You mean as opposed to what the

Page 136

1 detectives wrote, the actual writing?
2    Q    No. As in -- when you look at the arrest
3 report that -- you signed an arrest report in this case,
4 right?
5    A    I didn't, no.
6    Q    Did you sign any -- you did not sign any
7 arrest report in this case?
8        MR. KIVETZ: Objection. Form. Foundation.
9    A    I did not.
10    Q    Okay.
11        MR. SWAMINATHAN: You want to take a break now,
12 Jeff?
13        MR. KIVETZ: Sure.
14        COURT REPORTER: All right. Is everyone okay
15 with going off record?
16        MR. SWAMINATHAN: Yes.
17        MR. KIVETZ: Fine.
18        COURT REPORTER: All right. We're off record
19 at 2:10 p.m. Eastern Standard Time.
20        (OFF THE RECORD)
21        COURT REPORTER: All right. On record at 2:32
22 p.m. Eastern Standard.
23 BY MR. SWAMINATHAN:
24    Q    Okay. Mr. Figueroa, did you get a chance to
25 have some lunch?

Page 137

1    A    Yes.
2    Q    Ready to proceed?
3    A    I'm ready.
4    Q    Okay. I asked you about your shifts during
5 the time you were a gang specialist. I want to ask
6 you -- instead of about the hours of the day that you
7 worked, I want to ask you about what days of the week
8 you worked. Was there any regular schedule for you in
9 terms of the days of week that you worked?
10    A    In '95?
11    Q    In 1995. Thank you.
12    A    Sometimes they fluctuated. I couldn't
13 honestly tell you.
14    Q    Could you say for any point in time in 1995
15 what days of the week you typically worked?
16        MR. KIVETZ: Objection. Foundation.
17    A    I couldn't tell you. I don't know. I don't
18 remember.
19    Q    For a gang specialist, was there generally,
20 like, a, you know, five on, two off; six on, three off;
21 any kind of schedule like that typically?
22        MR. KIVETZ: Objection. Form.
23    A    It -- it varied.
24    Q    Was there any typical schedule -- what was,
25 like, the normal schedule from which you might have

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 38 of 132 PageID #:7628
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021
138..141

Page 138

1    variances?  Was it certain number of days on and then
2    certain numbers of days off?
3         A    I could have been in a day off group.  I could
4    have been Friday, Saturday off or Sunday, Monday --
5    Sunday, Monday off.  I couldn't tell you.  It -- it
6    varied.
7         Q    Was it typically five days on, two days off?
8         MR. KIVETZ:  Objection.  Form.  Foundation.
9    Speculative.
10        A    If you had a day off, it was -- it was usually
11   six -- six days working, two days off.
12        Q    Okay.  And then which two days of the week you
13   had off, it would change from week to week; is that
14   right?
15        A    Right.
16        MR. KIVETZ:  Objection.  Form.
17        Q    So could you say for -- in -- for any point in
18   1995, what days off group you were in?
19        A    I couldn't tell you.  I don't remember.
20        Q    Could you say for any point in 1995 whether
21   you worked weekends or not?
22        A    I worked some weekends like everybody else.
23        Q    And what particular weekends you worked in
24   1995 you could possibly say, correct?
25        A    I couldn't tell you what weekends off was last

Page 139

1    year, no.
2         Q    We talked about the -- the documents or -- or
3    files that were kept in the Gang offices.  I have a
4    couple other questions about that.  If you wanted to
5    identify what individuals were members of a particular
6    gang, what resources were available to you in the Gang
7    offices to do that?
8         A    In 1995?
9         Q    In 1995.  Thank you.
10        A    Normally, I would just talk to them on -- I
11   would talk to them on the street, looking at arrest
12   reports, case reports, things like that.
13        Q    Well, did they keep anything in the Gang
14   offices that identified all of the individuals that were
15   members of a particular gang?
16        A    Not a particular gang, but there were arrest
17   cards that you could look at.
18        Q    And were the arrest cards organized by gang?
19        A    Alphabetical order.  And -- and of course, the
20   gang's photo books that we were talking about earlier.
21        Q    Okay.  So if you wanted to -- so it's a one
22   set of documents that existed that identified a whole
23   bunch of individuals who were members of a single gang
24   was the gang photo book.  That's one place you could
25   look, correct?

Page 140

1         A    Correct.
2         Q    And if you wanted -- what -- other than the
3    gang photo book, what other compilations were there of
4    individuals who were all members of a single gang?
5         A    Well, there were no computers then.  So
6    essentially, you'd have to be out on the street and just
7    talk to people.
8         Q    Okay.  And then you listed -- and then another
9    compilation you had available to you was your personal
10   set of photos outside of the gang book that you
11   organized by gang, correct?
12        A    Correct.
13        Q    Okay.  But that wasn't something available to
14   everybody in the Gang office, correct?
15        A    The -- they were available if they approached
16   me and asked me to look.  Yeah.
17        Q    Okay.
18        A    Other than that, no.
19        Q    Okay.  And then if you wanted to identi -- if
20   you had a specific individual and you wanted to find out
21   what gang they were a member of, what resources did you
22   have available to you?
23        A    I would look up -- I looked at -- in the card
24   file to see if his name appeared in there.  Or I would
25   go specifically to whatever gang specialist was assigned

Page 141

1    to that gang and see if they knew them.  Sometimes,
2    especially in warm weather and they're wearing T-shirts,
3    you could see tattoos.
4         Q    And when you say you'd go to the "card file,"
5    are you referring to the -- a collection of arrest
6    cards?
7         A    Correct.
8         Q    And what are arrest cards?
9         A    It -- it's a record of people who are arrested
10   by the gang unit.  It has basic information.
11        Q    And it -- was the arrest card the same thing
12   as an arrest report or something different?
13        A    Similar in that it has basic information.
14   Name, address, date of birth, height, weight, tattoos,
15   things like that.
16        Q    And is it -- was it, like, an index card,
17   like, a small piece of paper in the size -- about the
18   size of an index card?
19        A    No.  It's actually -- actually a little bit
20   larger than that.
21        Q    Was it the size of a typical piece of printer
22   paper, eight-and-a-half by 11?
23        A    No.  Smaller than that.
24        Q    Okay.  All right.  And then who filled in the
25   arrest cards?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 39 of 132 PageID #:7629
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
142..145

Page 142

1          MR. KIVETZ: Objection. Form.
2      A    The arresting officers.
3      Q    And so when -- and when -- so whenever
4  somebody was arrested, would an arrest card be created?
5          MR. KIVETZ: Objection. Form. Foundation.
6  Speculative.
7      A    Yes.
8      Q    And for -- if an individual was arrested
9  multiple times, would there be multiple arrest cards for
10  that individual?
11          MR. KIVETZ: Objection. Form.
12      A    Possibly.
13      Q    And then the arrest cards, would they
14  contain -- the arrest cards would contain information
15  of -- strike that.  What information was on the arrest
16  cards?
17      A    Well, like I said earlier, basic information.
18  Names, addresses, nicknames, tattoos, scars, things like
19  that.
20      Q    Anything else?
21      A    Just pertinent gang information, no
22  narratives.
23      Q    Were there photos on those arrest cards?
24      A    No.
25      Q    And were they organized by each individual's

Page 143

1  real name?
2          MR. KIVETZ: Objection. Form. Speculative.
3      A    Or the name given.
4      Q    But in other words, not nicknames but whatever
5  real name -- whatever name they gave, whether it was
6  their real name or their alias, correct?
7      A    That's correct.
8      Q    Okay.  And what -- so would it be fair to say
9  there were probably many thousands -- or -- thousands of
10  arrest cards in that card file?
11          MR. KIVETZ: Objection. Form. Speculative.
12      A    Probably.  Yes.
13      Q    And I think you said they were in order of
14  each individual's -- the name that they had given,
15  either real name or alias, correct?
16      A    Alphabetical order, yes.
17      Q    Okay.  If you wanted to identify what gang a
18  particular individual was in, other than the arrest
19  cards in the card file, was there any other resources
20  available to you?
21      A    Essentially --
22          MR. KIVETZ: Objection. Speculative.
23      A    Essentially, talking to the individual person.
24      Q    If you wanted to identify what nicknames a
25  particular person had, what resources were available to

Page 144

1  you?
2          MR. KIVETZ: Objection. Form. Speculative.
3      A    Talking to the individual, talking to his
4  friends, talking to his family, talking to civilians who
5  live in the neighborhood.  Things like that.
6      Q    Were there any resources kept at the office?
7  And I understand you can ask people questions and do
8  some investigation.  But I'm asking in terms of
9  resources that would be kept at the office for you to
10  access, that's what I'm focused on.  Does that make
11  sense?
12          MR. KIVETZ: Objection. Form.
13      A    I understand the question.  Just the arrest
14  cards.
15      Q    Okay.  So to the extent you wanted to find out
16  what nicknames a particular person had, you'd have to
17  look at the arrest card; is that right?
18      A    Yes.
19      Q    And the information in the arrest cards comes
20  from the arrest reports; is that correct?
21          MR. KIVETZ: Objection. Form. Speculative.
22      A    Yes.
23      Q    And who collects the information from the
24  arrest reports to put it into the gang car -- into the
25  arrest card?  Is it gang specialists?

Page 145

1          MR. KIVETZ: Objection. Form. Foundation.
2      A    No.  People that worked in the -- in the -- in
3  the office, the inside people.
4      Q    So each time you'd make an arrest and have an
5  arrest report that you wrote, a copy would be handed
6  over to the person in the office who would make -- who
7  would fill out an arrest card based on the arrest
8  report; is that right?
9          MR. KIVETZ: Objection. Form. Speculative.
10      A    Generally speaking, the arresting officers
11  made the arrest cards and then turn them in.
12      Q    The arresting -- and so the arresting officer
13  could be a gang specialist, correct?
14      A    Yes.
15      Q    And so if the arresting officer was a gang
16  specialist, it was that same gang spe -- so the same
17  person -- strike that.  If a gang specialist made an
18  arrest, they would fill out an arrest report, and they
19  would also fill out the arrest card with the same
20  information, correct?
21          MR. KIVETZ: Objection. Form. Speculative.
22      A    Could be a gang specialist, could be a
23  tactical officer, could be, you know, anybody who's
24  working, yeah.
25      Q    So whoever in the gang unit made the arrest

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 40 of 132 PageID #:7630
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021
146..149

Page 146

1  would fill out the arrest report and the arrest card,
2  correct?
3      A    Correct.
4          MR. KIVETZ: Objection. Form.
5      Q    Okay. And then if you had arrests made by
6  patrol officers, would an arrest card be created?
7          MR. KIVETZ: Objection. Form.
8      A    No. Not unless they worked in the gang unit.
9      Q    Okay. So the arrest cards were based on
10 all -- were based on the arrests that were made by
11 somebody in the gang unit, correct?
12         MR. KIVETZ: Objection. Form.
13     A    Correct.
14     Q    Okay. And would there be information kept on
15 the arrest cards that was different than the information
16 that was in the arrest reports?
17         MR. KIVETZ: Objection. Form. Speculative.
18     A    I doubt it.
19     Q    In other words, they both came from the same
20 source. I mean, the arrest cards were based on what was
21 in the arrest report, fair?
22         MR. KIVETZ: Objection. Form. Speculative.
23     A    Yes.
24     Q    Okay. Now, if you had a -- instead of taking
25 a person's name to find out what their nicknames were,

Page 147

1  what if you wanted to go the other way? If you wanted
2  to start with a nickname and then get what their real
3  name was? What resources were available to you in terms
4  of files, records, cards, that kind of thing?
5          MR. KIVETZ: Objection. Form.
6      A    You're asking me if the unit had a nicknames
7  file. I -- I don't recall.
8      Q    Was there any period of time in which you
9  believe the unit had a nickname file?
10     A    If -- I couldn't tell if they had one or not
11 because I never used it.
12     Q    Okay. So you're not aware of there being any
13 nickname file while you were in -- a gang specialist in
14 Gang Crimes North; is that correct?
15     A    That's correct.
16     Q    Okay. And you've never used any nickname file
17 while you were a gang specialist, correct?
18     A    I kept a nickname file.
19     Q    Well -- so let me ask first. You're not --
20 you never used any Gang Crimes North nickname file while
21 you were a gang specialist; is that correct?
22     A    I don't recall ever using one, no.
23     Q    Okay. And then you said you kept a nickname
24 file. What was your nickname file?
25     A    It was a nickname file of everybody who was in

Page 148

1  the Imperial Gangsters.
2      Q    And did you keep any nickname files for
3  anything other than Imperial Gangsters?
4      A    No.
5      Q    And why only Imperial Gangsters?
6      A    They -- of all the gangs that I was assigned
7  to, they were my most active.
8      Q    What does that mean "most active"?
9      A    They -- I was approached to get information on
10 them more than the other gangs that I was assigned to.
11     Q    And then how did you keep your Imperial
12 Gangster nickname file?
13     A    Index cards.
14     Q    And where did you keep that file?
15     A    Trunk of my car.
16     Q    So in the trunk of your car you had your own
17 collection of photos, and you had your own collection of
18 index cards constituting a nickname file; is that
19 correct?
20     A    Correct.
21     Q    What else did you keep in your trunk?
22     A    That was it. That's all I needed.
23     Q    Your index cards, what information was on each
24 index card?
25     A    Under the nickname, I would have the person's

Page 149

1  name and/or aliases and their IR numbers.
2      Q    Anything else?
3      A    That was it.
4      Q    And how were they organized?
5      A    The nicknames were in alphabetical order.
6      Q    If you wanted to identify what indi -- what
7  nickname was associated with a particular individual,
8  any other resources you had available to you other than
9  your personal nickname file on index cards in your
10 trunk?
11         MR. KIVETZ: Objection. Speculative.
12     A    Just word of mouth.
13     Q    In other words, just talking to other gang
14 specialists and people on the street?
15     A    No. Other -- other gang members and civilians
16 on the street.
17     Q    If you wanted to identify what car was driven
18 by a particular gang member, did you have any resources
19 available to you in terms of files, records or otherwise
20 in the gang --
21     A    No.
22     Q    -- records?
23     A    I did not.
24     Q    Did you keep any personal files or records to
25 keep track of what cars were driven by what gang



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 41 of 132 PageID #:7631
The Deposition of GEORGE FIGUEROA, taken on June 11, 2021
150..153

Page 150

1  members?
2      A    No.
3      Q    Why not?
4          MR. KIVETZ: Objection. Form.
5      A    It's --
6          MR. KIVETZ:  Speculative.
7      A    A guy could have several cars.  He could be
8  driving his girlfriend's car, his mother's car, his
9  friend's car.  For me, I didn't think it was worthwhile.
10     Q    Did -- would you agree with me that a lot of
11 shootings that were happening in the '90s were taking
12 place from vehicles?
13         MR. KIVETZ: Objection. Form. Speculative.
14     A    Yeah.  That's right.  That's how you did drive
15 by shootings, sure.
16     Q    And so it would have been useful if you could
17 know what, you know, if you had a description of a
18 vehicle who drove a vehicle with that description; do
19 you agree?
20         MR. KIVETZ: Objection. Form. Speculative.
21     A    It would be helpful to know who was driving
22 that vehicle that day.  That doesn't mean that they
23 would be driving -- that doesn't mean it was their
24 regular car, could have been a rental car, could have
25 been a friend's car, a relative's car.  It could have

Page 151

1  been anything.
2      Q    But if you knew whose car it was, would you
3  say that that's usually a helpful lead in homicide -- in
4  the investigations, or was that just not helpful in
5  these cases?
6      A    It -- it --
7          MR. KIVETZ: Objection. Form. Speculative.
8      A    It -- it would be helpful if that person drove
9  that same car and no one else did, you know.  But people
10 would borrow each other's cars or steal cars, or it --
11 for me, it just wasn't that helpful.
12     Q    In other words, cars were being -- cars were
13 being traded, or borrowed, or used by others far too
14 often for you to find it useful.  Is that what you're
15 saying?
16     A    That's exactly what I'm saying.
17     Q    Okay.  Would guys trade cars a lot in those
18 days?
19     A    They would borrow each other's cars.
20     Q    And would guys buy and sell cars pretty
21 regularly in those days, the guys that -- who were in
22 gangs that you were dealing with?
23         MR. KIVETZ: Objection. Form. Speculative.
24     A    Yeah.
25     Q    If the car was used in a crime would guys

Page 152

1  often trade it or sell it afterward?
2      A    They'd get rid of it one way or the other.
3  Sell, trade, lend.
4      Q    The fact that cars changed hands a lot in
5  those days, did you find that that made it not all that
6  useful for you to have an identification of what car may
7  have been driven by a particular person at a particular
8  time?
9      A    Yeah.  That's what I said a little while ago,
10 I didn't -- for me it wasn't helpful.
11     Q    Okay.  All right.  Let me ask you about -- let
12 me ask you about your preparation for today's
13 deposition.  What did you do to prepare for today's
14 deposition?
15     A    I read reports that I had prepared.
16     Q    Other than reviewing reports that you
17 prepared, did you do anything else?
18     A    Spoke to my attorneys.  That's pretty much it.
19     Q    How many reports did you look at that you
20 prepared in preparation for today's deposition?
21     A    Well, first and foremost, I looked at the --
22 the original arrest report that I made and then there
23 were a couple of others that someone else made.
24     Q    Other than the arrest report that you made and
25 a couple others that others made, anything else that you

Page 153

1  looked at?
2      A    My supplementary report and transcript from
3  my -- my testimony at Tom Sierra's trial.
4      Q    Anything else?
5      A    No.
6      Q    Okay.  Did you look at any deposition
7  transcripts?
8      A    No.
9      Q    Did you review any handwritten notes or GPRS?
10     A    No.
11     Q    Did you review any witness statements?
12     A    No.
13     Q    Did you review any photographs?
14     A    No.
15     Q    Did you view any documents from the Ruben
16 Gonzalez murder investigation?
17     A    No.
18     Q    Other than your criminal trial testimony, did
19 you review any other testimony?
20     A    No.
21     Q    Have you ever kept any kind of personal file
22 relating to the Andujar murder investigation?
23     A    No.
24     Q    Have you ever kept any kind of personal file
25 relating to the Ruben Gonzalez murder investigation?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 42 of 132 PageID #:7632
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
154..157

Page 154

1          MR. KIVETZ:  Objection.  Form.  Foundation.
2      A    No.  I did not.
3      Q    In terms of -- have we betwe -- so you've
4  identified an arrest report that you wrote, an arrest
5  report that somebody else wrote, and a supplementary
6  report that you wrote.  Any other police records that
7  you looked at?
8      A    No.
9      Q    So is it your understanding that you looked at
10 three total police reports in preparation for today's
11 deposition?
12     A    Four.
13     Q    What was the fourth report?
14     A    Two arrest reports that were written by
15 someone other than myself, my original arrest report,
16 and my supplementary report.
17     Q    And were the arrest reports that were written
18 by others, were they related to the arrest of
19 Thomas Sierra?
20     A    Yes.
21     Q    And were they both related to the arrest of
22 Thomas Sierra on May 30th?
23     A    Yes.
24     Q    Okay.  And other than the four police reports
25 that you reviewed and the transcript from your testimony

Page 155

1  at Thomas Sierra's trial, any other documents that you
2  reviewed in preparation for today's deposition?
3      A    None.
4      Q    And did you meet with counsel in preparation
5  for today's deposition?
6      A    Yes.
7      Q    How many times?
8      A    Including today, twice.  Well, I -- twice
9  this -- this week.
10     Q    And once today, correct?
11     A    Yes.
12     Q    How long did you meet with counsel today?
13     A    10 minutes.
14     Q    And then when was the last time you met with
15 counsel before that?
16     A    Monday.
17     Q    How --
18     A    On Monday.
19     Q    -- much -- how long did you meet with counsel
20 on Monday?
21     A    Seven hours, perhaps?  I don't recall.
22     Q    And then did you meet with counsel at any
23 point prior to Monday?
24     A    About three years ago.
25     Q    How long did you meet with counsel, three

Page 156

1  years ago.
2      A    I think one day, maybe two, I'm not sure.
3      Q    So you met with counsel for one to two days,
4  three years ago; is that correct?
5      A    Yes.
6      Q    And when you say "counsel," are we referring
7  to indi -- lawyers from the Sotos Law Firm?
8      A    Yes.
9      Q    Were all three of your meetings today, on
10 Monday, and approximately three years ago with the
11 attorneys from the Sotos Law Firm?
12     A    Yes.
13     Q    Did anybody else attend the meeting -- well --
14 strike that.  Did Mr. Kivetz attend the meeting with you
15 today?
16     A    Yes.
17     Q    Did anyone else?
18     A    What was that?
19     Q    Did Mr. Kivetz attend the meeting with you on
20 Monday?
21     A    Yes.
22     Q    Did anyone else?
23     A    His partner.
24     Q    And who is that?
25     A    Josh Engquist.

Page 157

1      Q    Anyone else?
2      A    No.  That's it.
3      Q    Did Mr. Kivetz attend the meeting three years
4  ago?
5      A    Yes.
6      Q    Anyone else?
7      A    Josh Engquist.
8      Q    Anyone else?
9          MR. KIVETZ: Any other attorney?
10     A    Yeah.  You asking about any other attorneys?
11     Q    Just start with any other attorneys?
12     A    No.  I think it was just the three of us.
13     Q    Any non -- anyone who attended that meeting,
14 attorney, or non-attorney other than yourself, Mr.
15 Kivetz, and Mr. Engquist?
16     A    Other officers involved in this civil suit.
17     Q    Is it your understanding that all of the non-
18 attorneys who attended that meeting other than yourself
19 were individuals sued in this lawsuit?
20     A    Those were the only ones that were present.
21     Q    Did you review documents in that meeting?
22     A    I believe so but I'm not 100 percent sure.
23     Q    Was Reynaldo Guevara in attendance at that
24 meeting?
25     A    No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 43 of 132 PageID #:7633
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
158..161

Page 158

1    Q    Was Ernest Halvorsen in attendance at that
2 meeting?
3    A    I hope not.  He's dead.
4    Q    Was Ed Mingey in attendance at that meeting?
5    A    No.
6    Q    What other officers attended that meeting?
7    A    Sergeant Biebel.  The other detective, I'm not
8 certain of his name. It might be McMurtry.  And
9 Tony Wojcik.  I don't recall anybody else.
10    Q    McMurray, does that sound right?
11    A    I think that was his name.
12    Q    Detective McMurray, he attended the meeting.
13 Did you know Mr. Biebel before you attended that meeting
14 with him?
15    A    Yes.
16    Q    You knew -- or did you know him to be a
17 sergeant over Violent Crimes detectives?
18    A    Yes.
19    Q    Had you had interactions with him as a Chicago
20 police officer?
21    A    Yes.
22    Q    And what was your opinion of him as a police
23 officer?
24         MR. KIVETZ:  Objection.  Form.
25    A    I believe he was a great guy.

Page 159

1    Q    And what about Detective McMurray, had you had
2 prior interactions with him?
3    A    Very little, just "hi" and "goodbye."
4    Q    Did you have any opinion about him as a
5 Chicago police officer?
6         MR. KIVETZ:  Objection.  Form.
7    A    No.  Not at all.  I barely -- really don't
8 know the man.
9    Q    And what about Wojcik?  Had you had prior
10 interactions with Wojcik?
11    A    Yes.
12    Q    And what was your opinion of him as a police
13 officer?
14         MR. KIVETZ:  Objection.  Form.
15    A    Another guy -- I respected him as a police
16 officer and as a detective.
17    Q    All right.  And what -- tell me what documents
18 you recall reviewing in that meeting three years ago?
19    A    I couldn't tell you specifically.  I'm
20 assuming that they were copies of the case report -- or
21 case reports.
22    Q    Okay.  And so you -- did you review a number
23 of those documents in case reports from the case in that
24 meeting?
25    A    Back then, yes.

Page 160

1    Q    And did you discuss those documents among
2 yourselves?  I don't want -- I don't want the contents
3 of any communications.  I just want to know, did you
4 discuss the contents of those documents in that meeting
5 with counsel and the other defendants?
6    A    Probably.
7    Q    During that meeting, did you discuss your
8 memories of the Andujar investigation?
9         MR. KIVETZ:  You know, I'm going to object.  I
10    think you have gone too far, and I am objecting.  I
11    should have, quite frankly, objected to the previous
12    one.  I missed it.  So I'm going to object to that
13    attorney work product and that their chief
14 BY MR. SWAMINATHAN:
15    Q    Okay.  And he's instructing you not to answer,
16 you understand, Mr. Figueroa?
17    A    Yes.
18    Q    Okay.  You indicated -- if I understand
19 correctly that meeting lasted at least a full day and
20 into potentially into a second day; is that correct?
21    A    Yes.
22    Q    Okay.  And then were you given copies of
23 documents to take home with you after that meeting?
24    A    I don't recall.
25    Q    Have you had any doc -- have you had a chance

Page 161

1 to review the investigative file, the entire
2 investigation file for the Andujar homicide
3 investigation?
4    A    Yes.
5    Q    And when did you review that entire
6 investigation file?
7    A    It was e-mailed to me probably a couple of
8 months ago.
9    Q    And did you review it?
10    A    Yes.
11    Q    How many times did you review the file then?
12    A    Probably twice.
13    Q    And did it contain the same set of documents
14 that you reviewed in your meeting approximately three
15 years ago?
16    A    Yes.
17    Q    And then after reviewing the entire file
18 twice, when is the next time that you reviewed the
19 investigative file?
20    A    I haven't since then.
21    Q    Okay.  Were you provided with a copy of the
22 Ruben Gonzalez investigation file?
23         MR. KIVETZ:  Objection.  Foundation.
24    A    I don't believe I was.  But I -- I couldn't
25 say for sure.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 44 of 132 PageID #:7634
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

162..165

Page 162

1    Q    Okay.  Did you review any files or documents
2  related to a homicide investigation other than the
3  Andujar investigation for purposes of this deposition?
4    A    I don't believe I was, no.
5    Q    In addition to the investigative file for the
6  Andujar case, were you provided with the permanent
7  retention file for the Andujar investigation?
8        MR. KIVETZ:  Objection to foundation.
9    A    The what file?
10   Q    The permanent retention file or records
11 division file?
12   A    No.  All I -- all I recall getting was the
13 file on that particular case, that's it.
14   Q    Other than the investigator file for the
15 Andujar homicide investigation, were there any other
16 documents that were e-mailed to you?
17   A    No.
18   Q    And then you indicated that on Monday of this
19 week, you had a meeting with counsel that lasted seven
20 hours.  What documents did you review in that meeting?
21   A    The documents that I prepared.
22   Q    That's the four reports that we talked about
23 earlier?
24   A    Well, the original arrest report and my
25 supplementary report.

Page 163

1    Q    And did you read any other documents in that
2  meeting?
3    A    The transcript from my testimony at Tommy
4  Sierra's trial.
5    Q    Anything else you reviewed in that meeting?
6    A    No.
7    Q    And did you have a copy of those same
8  documents available to you even after your meeting when
9  you went home?
10   A    Yes.
11   Q    And did you review those materials again after
12 that meeting?
13   A    Yes.
14   Q    And did you review those documents again in
15 preparation for today's deposition?
16   A    Yes.
17   Q    How many times have you looked at the reports
18 that you prepared in the Andujar case?
19   A    I can tell you exactly four times.
20   Q    Okay.  And how many times have you reviewed
21 the entire investigative file before today's deposition?
22   A    A couple of months ago, just that.  Probably a
23 couple of times.
24   Q    Okay.  And then the additional reports that
25 were not prepared by you, that you reviewed, how many

Page 164

1  times did you review those documents?
2    A    Same thing.  A couple of times.
3    Q    When you first found out you were being sued
4  in this case, did you review any documents related to
5  the underlying investigation at that time?
6        MR. KIVETZ:  Objection.  Form.  Foundation.
7    A    No.
8    Q    When you found out you're being sued in this
9  case, did you talk to any other police officers or
10 former police officers?
11   A    No.
12       MR. KIVETZ:  Objection.  Form.
13   A    Just the -- just FLT.
14   Q    Did you talk to any of the other defendants in
15 this case once you found out you were being sued?
16   A    No.
17       MR. KIVETZ:  Objection.  Form.  Foundation.
18   A    No.  Because I -- I have very little contact
19 with anyone from when I was a police officer.
20   Q    Okay.  Okay.  When you found out about -- when
21 you saw the lawsuit identifying you as a defendant in
22 this case, you read that lawsuit, correct?
23   A    Yes.
24   Q    And did you have any -- strike that.  When you
25 reviewed that lawsuit, you understood that you were

Page 165

1  being sued related to your conduct in the Andujar
2  homicide investigation, correct?
3        MR. KIVETZ:  Objection.  Form.
4    A    Yes.
5    Q    And did you have a memory of the Andujar
6  homicide investigation at that point?
7    A    Not immediately.
8    Q    So when you -- if somebody had just said
9  the -- before you saw the lawsuit, if somebody had just
10 said, "Andujar homicide investigation," you would not
11 have known what they were talking about, correct?
12       MR. KIVETZ:  Objection.  Form.  Speculative.
13   A    That's correct.
14   Q    And once you reviewed the lawsuit, did it
15 cause you to have some memories about your -- the
16 investigation?
17   A    Eventually, some vague memories.
18   Q    When did you eventually have vague memories?
19   A    I read it a couple of times trying to remember
20 what this was about.  And I think I kind of pretty much
21 figured it out.  But you have to keep in mind throughout
22 my career, before this arrest and after that arrest,
23 I've had many similar arrests of that type.  So it took
24 me a while to figure it out.
25   Q    And when you say, "figure it out," are you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 45 of 132 PageID #:7635
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
166..169

Page 166

1 saying you now have a specific memory in your mind or
2 you can, like, picture in your head certain actions that
3 you took in this investigation?
4    A    Sure.
5    Q    And when did -- what did you review that
6 caused you to remember this particular investigation as
7 opposed to any of the other cases in which you made
8 arrests and assisted in investigations?
9    A    And I just had to think -- I just had -- it
10 took me a while, but I just had to think and -- sit and
11 think about it and try to figure out what
12 specifically -- or specifically what case this was
13 about. And I just kind of narrowed it down to that.
14 But I had lots of cases like this.
15    Q    Is it hard to keep track of which this case is
16 versus the other cases that were very similar?
17         MR. KIVETZ: Objection. Form. Speculative.
18    A    When you have very little information, yeah,
19 makes it a little more difficult.
20    Q    And did you -- in order to try to have a -- to
21 try to jog your memory about this particular case, did
22 you review documents to help you do that?
23    A    I -- I don't have any records of any of my
24 cases while I was -- when I was a police officer. So
25 all I had was the paperwork that was -- when I was

Page 167

1 served with the papers. That's pretty much it.
2    Q    So after you were served with papers at some
3 time -- at some point you were provided with the
4 investigative file from this case, correct?
5    A    Eventually. When I met with my attorneys is
6 when I saw the file.
7    Q    Okay. And when you saw the file -- at the
8 point that you saw the file on the case, which was the
9 first time you were seeing any underlying documents from
10 the police investigation, correct?
11    A    That was -- yeah. Pretty much the first time,
12 yes.
13    Q    Okay. So before you saw the actual underlying
14 police file, what specific memories did you have about
15 this investigation?
16    A    Other than I arrested Thomas Sierra, that was
17 pretty much it.
18    Q    Okay. And when you say, "I arrested
19 Thomas Sierra," as a memory you had, are you saying that
20 you can -- you have a specific memory now that you've
21 thought about it about who Thomas Sierra is and the fact
22 that you went to arrest him?
23    A    Yeah. That's pretty much the way it is. And
24 once I'm through with a case I move on.
25    Q    Do you have a specific memory of what

Page 168

1 Thomas Sierra looks like today?
2    A    Sure.
3    Q    Do you have a specific memory of -- if you saw
4 Thomas Sierra walking on the street today, would you
5 recognize him?
6    A    Absolutely.
7    Q    And do you have -- and did you have that
8 memory of him when you first read about this case?
9    A    Yes. Yes. Well, yes and no. I remembered
10 the name. I couldn't put a face with the name yet at
11 that point.
12    Q    And then when did you put a face to the name?
13    A    When I saw the file.
14    Q    And when you saw the file, then -- you saw a
15 picture of him in the file; is that right?
16    A    Right.
17    Q    And then when you saw his picture, you -- the
18 picture looked familiar to you; is that correct?
19    A    That's correct.
20    Q    Okay. And that's what caused you to now be
21 able to say that you remember Thomas -- what
22 Thomas Sierra look like?
23    A    I -- I remember the circumstances before I saw
24 the -- the pictures.
25    Q    And when you say that you, "remember the

Page 169

1 circumstances," did you remember any of the
2 circumstances of the underlying crime?
3    A    Only that it was a homicide.
4    Q    Anything else that you remembered about the
5 circumstances of the crime other than that it was a
6 homicide?
7    A    No.
8    Q    Anything that you remembered about your arrest
9 of Thomas Sierra other than the fact that you arrested
10 Thomas Sierra?
11         MR. KIVETZ: Objection. Form.
12    A    Only that I was technically off duty. I was
13 on my way home. My partner and I -- from court. And we
14 saw him on a street corner with some guys and that's
15 when we approached him.
16    Q    Is that fact contained in any documents that
17 you reviewed?
18    A    It was supposed to be on the arrest report.
19 But I left that out because I didn't know -- I didn't
20 want to conflict anything with the supplementary -- I
21 didn't want to writing anything down that would conflict
22 with anything on the detective's supplementary report.
23    Q    And why would there be anything that conflicts
24 with the detective's supplementary report?
25         MR. KIVETZ: Obj - hold on. Objection. Form.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 46 of 132 PageID #:7636
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
170..173

Page 170

1  Foundation. Speculative.
2      A   I knew nothing about the investigation. So I
3  didn't talk to him about the case. I just said, "Some
4  detectives want to talk to you." That's my policy. I
5  don't -- I don't really put anything down on an arrest
6  report that may conflict with someone else's report
7  unless I'm doing that report.
8      Q   So when you filled out the arrest report, you
9  wanted to make sure that whatever you were writing down
10 would not conflict with things that the detectives might
11 be writing down about the investigation; is that right?
12     A   That's correct.
13         MR. KIVETZ: Objection. Form. Foundation.
14     Q   And what -- and your concern was that if you
15 wrote down the circumstances in which you came to arrest
16 Thomas Sierra that that might conflict with what the
17 detectives wrote, is that right?
18         MR. KIVETZ: Objection. Form. Foundation.
19 Speculative.
20     A   Well, that and the fact that I'm off duty on
21 my own time, I want to get home. I just pretty much
22 left that blank.
23     Q   Now, when you say, "I left that blank," what
24 are you referring to?
25     A   The narrative.

Page 171

1      Q   When you arrested Thomas Sierra, did -- does
2  it indicate in any documents that you reviewed that you
3  went to arrest him when you were off duty, on your way
4  home from court?
5          MR. KIVETZ: Objection. Form. Foundation. The
6      record speaks for itself.
7      A   No.
8      Q   So that's a fact that you have a specific
9  memory of in your brain today; is that correct?
10     A   Yes.
11     Q   Independent of any documents, correct?
12     A   That's correct.
13     Q   Is there anything else that you have a
14 specific memory of in your mind related to the Andujar
15 investigation, other than the fact that you arrested
16 Thomas Sierra on your way home from court?
17     A   No. I -- I didn't participate in the
18 investigation.
19     Q   Is there anything else related to the Andujar
20 investigation that you have any memory of that's not
21 written in any documents that you've seen so far in this
22 case?
23     A   No. Not really.
24     Q   When you say, "not really," is there anything?
25     A   Well, they asked about the -- Halvorsen --

Page 172

1  Halvorsen and Guevara asked me about the nicknames. But
2  that really -- you know, that was it.
3      Q   But you have a specific memory about that?
4      A   I have a specific memory about somebody asking
5  me. I'm assuming it was Halvorsen and Guevara because
6  it's wri -- it's in the supplementary report.
7      Q   Okay. When you -- is the first time that you
8  had any memory of the idea that they asked you about
9  nicknames when you saw that written in their report?
10     A   Essentially, yes.
11     Q   Okay. So you saw that written down and then
12 you remembered, "Okay. I guess they asked me about
13 nicknames"?
14         MR. KIVETZ: Objection. Form.
15         MR. SWAMINATHAN: Strike that. I'll ask a
16     different question. Let me -- I'll strike that last
17     one. I'll ask him a different question.
18 BY MR. SWAMINATHAN:
19     Q   When you saw that there was a report
20 indicating that they asked you about nicknames, that's
21 when you first remembered that that had occurred; is
22 that correct?
23     A   Maybe "remembered" isn't the right word. I
24 assumed. Because that used to happened to me all the
25 time. I don't remember a specific conversation.

Page 173

1      Q   Okay. And before you looked at that report,
2  you couldn't say, "I remember that in the Andujar
3  investigation, somebody asked me about nicknames"; is
4  that fair?
5          MR. KIVETZ: Objection. Form.
6      A   That's -- yeah, that's true.
7      Q   Okay.
8      A   I don't remember the conversation. But it --
9  apparently, it -- it occurred, from the report.
10     Q   Okay. And your understanding that that
11 occurred is based exclusively on your review of the
12 document, fair?
13         MR. KIVETZ: Objection. Form. Misstates the
14     testimony and
15     A   Fair.
16     Q   Anything else that you recall doing as related
17 to the Andujar homicide investigation?
18     A   No. Not at all.
19     Q   Do you have a specific memory about where --
20 at what time of day it was that you arrested
21 Thomas Sierra?
22     A   I just know it was during the daytime, because
23 my partner and I were coming home from court.
24     Q   And if you wanted to identify what time that
25 occurred, would you be able to say anything from memory

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 47 of 132 PageID #:7637
The Deposition of GEORGE FIGUEROA, taken on June 11, 2021
174..177

Page 174

1  or would you have to rely on documents?
2        MR. KIVETZ: Objection. Form. He has already
3     testified to it.
4     A    I -- I'd have to look at a document.
5     Q    And if I asked you where that arrest occurred,
6  would you have any -- would you be able to answer that
7  based on your memory or would you have to rely on
8  documents?
9        MR. KIVETZ: Objection. Form.
10    A    That I could do from memory. It was at
11 St. Louis and Dickens. That's where they always hung
12 out.
13    Q    That's where who hung out?
14       MR. KIVETZ: Where they always hung out.
15    Q    And when you say "they," are you referring
16 to -- you're referring to who?
17    A    Members of the Imperial Gangsters.
18    Q    And so is it your specific memory that he was
19 arrested in the area where the Imperial Gangsters would
20 hang out?
21    A    That's correct.
22    Q    And so you have a specific memory that he was
23 not arrested at work?
24    A    I didn't even know he was employed.
25    Q    You have a specific memory that he was not

Page 175

1  arrested at home?
2        MR. KIVETZ: Objection. Form. Misstates his
3     testimony.
4     A    No. I -- my partner and I arrested him -- On
5  our way home from court, he decided to take a one block
6  detour just to check to see who was out there. And
7  there he was, on the street.
8     Q    Do you know how it was that you came to be
9  looking for Thomas Sierra on that particular day?
10    A    Well, I -- like I put down someplace, that
11 area -- someone in Area Five told us that he was
12 identified as the offender in a homicide.
13    Q    And then -- and so that fact is based on your
14 memory or based on the documents that you reviewed?
15    A    Both.
16    Q    Do you have a specific memory of somebody from
17 Area Five telling you to please arrest Thomas Sierra?
18    A    Yes.
19    Q    And what -- other than the fact that
20 somebody -- so who told you that?
21    A    Don't recall.
22    Q    What did they say to you?
23    A    That Tommy Sierra was a -- photo identified as
24 an offender in a homicide.
25    Q    When did they say it to you?

Page 176

1     A    Clearly, some time before the arrest. I
2  couldn't tell you how -- how -- how many days before
3  that.
4     Q    Where were you when it -- when that happened?
5     A    Where was I when I was notified?
6     Q    Yeah.
7     A    I don't know.
8     Q    How were you notified?
9     A    It could have been by telephone. It could
10 have been verbally. I don't recall.
11    Q    Okay. Who was with you when you were
12 identify -- when you were notified?
13    A    I don't know.
14    Q    Do you remember any of the specific words that
15 were said to you on that call or that conversation?
16    A    No. Essentially -- essentially it was, "He's
17 been photo identified. Junito has been photo identified
18 as an offender in a homicide. When you see him, arrest
19 him."
20    Q    Okay. Were you provided any information --
21 strike that. And then once you got that information,
22 how long was it before you went to go arrest him?
23    A    Again, I --
24       MR. KIVETZ: Objection. Form. Foundation.
25    A    Again, I don't remember how many days before I

Page 177

1  arrested him, I got that -- I received that information.
2  I just don't recall.
3     Q    Did you get that information on the same day
4  or on an earlier day?
5        MR. KIVETZ: Objection. He just answered the
6     question. Form. Foundation.
7     A    It wasn't the same day that I arrested him. I
8  was in court with Gerry, with my partner.
9     Q    So you got the request to arrest him prior to
10 May 30th; is that correct?
11    A    Yes.
12    Q    And you know that from memory?
13    A    Well, that is common sense. I was in court
14 that day so I wouldn't have had contact with anybody at
15 work.
16    Q    Okay. Are there any documents that indicate
17 that you were in court that day that you've reviewed?
18    A    No.
19    Q    And so are you relying on the fact that you
20 were in court that day as to the reason why it must have
21 been before May 30th?
22       MR. KIVETZ: Objection. Form.
23    A    It was my day off so there would have been no
24 reason for me to be on the street looking for
25 Tommy Sierra.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 48 of 132 PageID #:7638
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021
178..181

Page 178

1  Q   What was your day off?

2  A   The 30th was my day off.  And in fact --

3  Q   How do you know -- go ahead.  Sorry, go ahead.
4  Sorry.

5  A   And in fact, the 31st was also my day off.

6  Q   How do you know that those two days were your
7  days off?

8  A   So I wasn't -- I didn't work that night.

9  Q   How do you know?

10  A   In other words -- well, because once I took
11  him into custody and made out my supplementary report I
12  went home.

13  Q   So when I asked you if you could identify what
14  days you were working at any point in 1995, you
15  indicated you could not, correct?

16  MR. KIVETZ:  Objection.  Misstates his
17  testimony.

18  A   You -- you asked me how -- if I had certain
19  days off that I was off every week.  And I told you that
20  those days are varied.

21  Q   So you --

22  A   And that day I know I was off --

23  MR. KIVETZ:  Let him finish.

24  A   -- that day I know that I was off.  I was
25  coming home from court.  Gerry and I were coming home

Page 179

1  from court.  I was dropping him off at his car.  We saw
2  him a block -- we turned a block out of the way to get
3  back to Belmont and Western, and there he was standing
4  at the street corner.  But I didn't work that night.
5  Otherwise I would have been staying at Area Five and
6  seeing this whole thing through.

7  Q   So are you saying that you would have been at
8  Area Five and seen this thing through based on your
9  normal practices?

10  MR. KIVETZ:  Objection.  Form.  Misstates the
11  testimony.

12  A   If I -- had I been working that day, they
13  would have -- then I wouldn't be going home.  I'd be at
14  work.

15  Q   All right.  And how do you know you didn't go
16  into work that day after arresting him?

17  MR. KIVETZ:  Objection.  Asked and answered.
18  Just provide them that.

19  A   My supplementary that's dated June 1st would
20  have been written that night.

21  Q   Okay.  So your June 1st supplement being
22  written on a subsequent day is an indication to you that
23  you must not have been working on the 30th; is that
24  correct?

25  A   The 30th or the 31st.

Page 180

1  Q   Okay.  Because otherwise you would have
2  written it on the same day?

3  A   The same day, exactly.

4  Q   Okay.  Now, what -- because you did go to
5  court on the 30th and arrest somebody and bring them to
6  Area Five on the 30th, why couldn't you write a report
7  on that day?

8  A   Because there was no -- first of all, I wasn't
9  asked to write a report on that day.  I was asked to
10  write a report on the day that I wrote it.  I wouldn't
11  have taken it upon myself to add to the case -- to the
12  case file unless I'm instructed to by a supervisor or
13  the detectives who are working the case.

14  Q   So, do you have a specific memory that you
15  were not asked to do it -- to not write an arrest report
16  on May 30th, but that you were asked to write a report
17  on June 1st?

18  A   It -- not a specific memory.  But the reason
19  that it had to be, was because I wouldn't have taken it
20  upon myself to make out a supplementary report unless I
21  was asked to do so.

22  Q   Okay.  So the reason you're saying you know
23  you weren't asked until June 1st rather than May 30th is
24  not based on your memory but based on your assumption,
25  based on your typical practices; is that right?

Page 181

1  A   That's correct.

2  Q   And the reason -- and the fact that you were
3  not at Area Five after Thomas Sierra's arrest is not
4  based on your specific memory but based on your
5  assumption, based on your practices; is that correct?

6  MR. KIVETZ:  Objection.  Form.  Misstates his
7  testimony.

8  A   Yes.  The fact that I didn't stick around --
9  just in terms of I believe that I was off that day, and
10  I was off the next day.

11  Q   Okay.  And what is the document that indicates
12  that you were off on May 30th and May 31st?

13  A   You know, you'd have to petition the police
14  department to tell you what my days off were on that
15  day, 26 years ago.

16  Q   What were your -- what days did you take off
17  the following week?

18  A   I couldn't tell you.  I don't know, probably
19  counting six days -- six days from there and then two.
20  Two days off.

21  Q   That's what you assume but you don't -- you
22  can't say for sure?

23  A   Not from memory, no.

24  Q   And what days were you off the week before?

25  A   Probably six days before that.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 49 of 132 PageID #:7639
The Deposition of GEORGE FICURANO, taken on June 13, 2021
182..185

Page 182

1   Q   And that's an assumption --
2   A   So in other -- in other -- in other words, so
3   in oth -- just subtract six days from the date of
4   arrest.
5   Q   And so that's your assumption not based on
6   memory?
7   A   Exactly.
8   Q   But with regard to May 30th and May 31st, it
9   is not an assumption.  It is your specific memory.  Do I
10  have your testimony right?
11  A   I'm assuming I was off those days.  Had I not
12  been off those days, the case report would have been
13  dated differently.
14  Q   Okay.  All right.  So it's an assumption based
15  on your review of the records, not your specific memory,
16  correct?
17  A   Correct.
18  Q   Okay.  Do you recall anything about what you
19  said to Thomas Sierra and what Thomas Sierra said to you
20  when you arrested him?
21  A   Tommy Sierra said what to me?
22  Q   Do you have any memory of what Thomas Sierra
23  said to you or what you said to him when you arrested
24  him?
25  A   Yeah.  I said to him that some detectives at

Page 183

1   Area Five wanted to speak to him.  And he came along
2   without a problem.
3   Q   Anything else that you remember about that
4   interaction?
5   A   No.
6   Q   Anything else that he said -- anything that he
7   said to you that you remember?
8   A   If he said something to me I don't recall what
9   it was.
10  Q   Do you recall what he was wearing?
11  A   No.
12  Q   Do you recall what you were wearing?
13  A   Probably a shirt and tie.
14  Q   Do you recall anybody who was with him that
15  day?
16  A   You mean on the street corner?
17  Q   Yeah.  When he was arrested, who else was
18  there?
19  A   I don't know.  I don't recall.
20  Q   Do you recall if anybody else was there with
21  him?
22  A   Yeah.  He was standing on a street corner with
23  other guys.
24  Q   Can you name any of the people who were there
25  with him?

Page 184

1   A   No.  Just like I said 30 seconds ago, no.  I
2   don't recall their names or who they were.
3   Q   Your partner Flavin was there when you
4   arrested him, correct?
5   A   That's correct.
6   Q   What other police officers were there when you
7   arrested him?
8   A   Just when we called for a transport vehicle.
9   Just -- I just remember the -- the driver driving the
10  transport vehicle.
11  Q   Anyone else?
12  A   No.
13  Q   Do you have a --
14  A   No other officers.
15  Q   -- specific name?  Go ahead.
16  A   No.  No other officers, if that's what you're
17  asking.
18  Q   Yeah.  Did any --
19  A   To my --
20  Q   I'll ask it again so it's clear.  Were there
21  any other officers who participated in the arrest of
22  Thomas Sierra other than yourself and Mr. Flavin, and
23  then the transport officer when they arrived?
24      MR. KIVETZ:  Objection.  Form.
25  A   No.  No other officers.

Page 185

1   Q   Do you have a specific memory of calling the
2   transport officer?
3   A   Sure.  We had a police radio.
4   Q   And do you have a specific memory of putting
5   Thomas Sierra into the transport vehicle?
6   A   They put him in the transport vehicle.
7   Q   And did you -- why didn't you just take
8   Thomas Sierra to the station yourself?
9   A   It's pretty much policy that you put them in
10  a -- in a transport vehicle because they have, like, a
11  cage.  I didn't -- I didn't have a cage.  I just had an
12  unmarked squad car.
13  Q   Okay.  And was he under arrest?
14  A   Yeah.
15  Q   And he was handcuffed?
16  A   I didn't cuff him, so I can't tell you what
17  they -- what they did.
18  Q   Did Flavin cuff him?
19  A   No.
20  Q   But do you assume the transport officer cuffed
21  him?
22  A   Yes.
23  Q   And that was --
24  A   I assume he cuffed him or whatever his policy
25  was.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 202-4 Filed: 07/05/21 Page 50 of 132 PageID #:7640
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
186..189

Page 186

1    Q    The practice would have been for Thomas Sierra
2  to have been placed -- to have been handcuffed pursuant
3  to arrest at that time, correct?
4        MR. KIVETZ: Objection. Form. Speculative.
5    A    Correct. That would be the normal policy.
6    Q    Okay. And do you have any reason to believe
7  that that policy was not followed in this instance?
8        MR. KIVETZ: Objection. Form. Foundation.
9    A    I don't recall one way or the other.
10   Q    Did you have any interactions with Hector
11 Montanez related to this Andujar homicide investigation?
12   A    No.
13       MR. KIVETZ: Objection. Form. Foundation.
14   Q    Do you --
15   A    No. No. I did not.
16   Q    -- have any memory of Hector Montanez?
17       MR. KIVETZ: Objection. Form. Foundation.
18   A    I know who he is. But as far as this
19 investigation is concerned, no.
20   Q    Do you have any memory of him being involved
21 in any way in the Andujar homicide case or the
22 investigation?
23       MR. KIVETZ: Objection. Form. Foundation.
24   A    No firsthand knowledge.
25   Q    Had you -- had his name ever come up in terms

Page 187

1  of somebody who was on your radar with regard to the
2  Andujar homicide investigation?
3        MR. KIVETZ: Objection. Form. Foundation.
4    A    Eventually, after the -- after he was taken
5  into custody I believe.
6    Q    After what?
7    A    After he was taken into custody, I believe, is
8  when I found out that he may have possibly been
9  involved.
10   Q    And how did you find that out?
11   A    Word of mouth.
12   Q    And you have specific memory of this or you're
13 assuming?
14   A    No. I have a specific memory of somebody
15 mentioning it to me.
16   Q    And this was after the investigation had
17 closed or while it was still going on?
18       MR. KIVETZ: Objection. Form. Speculative.
19 Foundation.
20   A    I don't know how soon after he was taken into
21 custody. I couldn't honest -- I couldn't honestly
22 tell you. I don't know.
23   Q    So at some point you learned that Hector
24 Montanez had been arrested; is that correct? Related to
25 the Andujar case?

Page 188

1        MR. KIVETZ: Objection. Form. Foundation.
2  Misstates his testimony.
3    A    That's correct.
4    Q    Okay. And what other than the fact he'd been
5  taken into custody and arrested, what other information
6  did you learn about Hector Montanez's potential
7  involvement in this investigation?
8    A    None.
9    Q    Did you learn that he had been interrogated or
10 interviewed?
11       MR. KIVETZ: Objection. Form. Foundation.
12 Speculative.
13   A    No. I don't recall that.
14   Q    Did you learn anything about what his
15 involvement in the underlying crime or investigation
16 might have been?
17       MR. KIVETZ: Objection. Form. Foundation.
18 Speculative.
19   A    I don't recall that.
20   Q    When you say you learned about Hector
21 Montanez's arrest through word of mouth, was it word of
22 mouth through other police officers or word of mouth
23 through guys in the street?
24       MR. KIVETZ: Objection. Form. Foundation.
25 Speculative.

Page 189

1    A    I assume police, but I -- I have no specific
2  recollection.
3    Q    Did you learn about anybody else's arrest
4  related to the Andujar homicide investigation?
5        MR. KIVETZ: Objection. Form. Foundation.
6  Misstates testimony.
7    A    No.
8    Q    Did you have any interaction -- other than
9  your interaction with Thomas Sierra upon his arrest on
10 May 30th, did you have any other interactions with
11 Thomas Sierra related to Andujar homicide investigation?
12   A    Not at all.
13   Q    Did you have any other interactions with
14 Thomas Sierra ever after his arrest on May 30th?
15   A    No.
16   Q    Did you have any other interactions with
17 Hector Montanez ever after his arrest around the time of
18 May 30th?
19       MR. KIVETZ: Objection. Form. Foundation.
20 Misstates testimony.
21   A    No. Not at all.
22   Q    Did you have any conversations with a witness
23 named Lucy Montalvo in the Andujar homicide
24 investigation?
25       MR. KIVETZ: Objection. Form. Foundation.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 51 of 132 PageID #:7641
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
190..193

Page 190

```
 1    A    Not knowing -- not knowingly, no.
 2    Q    So you have no memory of having any
 3  interactions with Lucy Montalvo, correct?
 4    A    Correct.
 5         MR. KIVETZ: Same objection.
 6    Q    Did you have any interactions with an
 7  eyewitness, Jose Melendez, in the Andujar shooting case?
 8         MR. KIVETZ: Objection. Form. Foundation.
 9    A    I do not.
10    Q    Did you have, you know, any memory of Jose
11  Melendez or Macho Melendez from the Latin Kings and his
12  potential -- his involvement as a witness in the Andujar
13  case?
14         MR. KIVETZ: Objection. Form. Foundation.
15    A    I do not have any memory of that, no.
16    Q    Do you know who that is?
17    A    No.
18    Q    Did you have any interactions with Alberto
19  Rodriguez, a witness in the Andujar homicide
20  investigation?
21         MR. KIVETZ: Objection. Form. Foundation.
22    A    No.
23    Q    Did you have any -- strike that.  Do you have
24  any memory of having any interactions with a witness
25  named Alberto Rodriguez in the Andujar homicide case?
```

Page 191

```
 1         MR. KIVETZ: Objection. Form. Foundation.
 2    A    No.  Not at all.
 3    Q    Do you have any independent memory of your
 4  interactions with other police officers during the
 5  homicide investigation other than -- well -- strike
 6  that.  You have a memory you told us about, about you
 7  and Flavin arresting Thomas Sierra, correct?
 8    A    Yes.
 9    Q    Other than that -- so -- strike that.  So
10  other than what you and Flavin did in arresting Thomas
11  Sierra, do you have any personal memory of your
12  interactions with other police officers during the
13  investigation?
14         MR. KIVETZ: Objection. Form. Foundation.
15         Misstates his testimony and is speculative.
16    A    If you ask me if I had conversations with
17  anybody concerning this case, I probably mentioned it to
18  my sergeant.  But Gerry and I took him into custody, but
19  other than that I don't -- say -- I really didn't have
20  any specifics.
21    Q    Do you have any specific memory of any
22  conversations you had with Reynaldo Guevara as part of
23  the Andujar homicide investigation?
24         MR. KIVETZ: Objection. Form. Foundation.
25    A    Do you mean following his arrest?
```

Page 192

```
 1    Q    Before or after.  Well, let's start with --
 2  let's start with -- let's start with after his arrest.
 3  Do you have any specific memories in your mind outside
 4  of -- relying on documents -- related to any
 5  interactions with Reynaldo Guevara after Thomas's
 6  arrest?
 7    A    No.
 8         MR. KIVETZ: Objection. Form. Foundation.
 9    Q    And do you have any specific memories that are
10  not dependent on documents about interactions with
11  Reynaldo Guevara before Thomas's arrest?
12         MR. KIVETZ: Objection. Form. Foundation.
13    A    Like I said, I don't remember having any
14  conversations with him or Halvorsen.  But apparently, he
15  must have asked me about these two nicknames.  And the
16  only reason I know that was from reading the
17  supplementary report.  But I -- I don't remember the
18  conversation.
19    Q    Okay.  And you don't -- I'll ask the same
20  question with regard to Halvorsen.  You don't have a --
21  you don't remember the conversation that you had with
22  Ernest Halvorsen related to the Andujar homicide
23  investigation, correct?
24    A    That's correct.
25    Q    And you don't remember any conversations that
```

Page 193

```
 1  you had with Tony Wojcik during the Andujar homicide
 2  investigation, correct?
 3         MR. KIVETZ: Objection. Form. Foundation.
 4         Misstates the record.
 5    A    Correct.
 6    Q    You don't remember any conversations you had
 7  with Detective McMurray during the Andujar homicide
 8  investigation, correct?
 9         MR. KIVETZ: Objection. Form. Foundation.
10         Misstates the record.
11    A    That's correct.
12    Q    You don't recall any conversations that you
13  had with Sergeant Biebel during the Andujar homicide
14  investigation, correct?
15         MR. KIVETZ: Objection. Form. Foundation.
16         Misstates the record.
17    A    Correct.
18    Q    You don't have any memory of any conversations
19  with Sergeant Capitelli during the Andujar homicide
20  investigation, correct?
21         MR. KIVETZ: Objection. Form. Foundation.
22         Misstates the record.
23    A    Correct.
24    Q    You don't have any memory of any conversations
25  with Sergeant Mingey during the Andujar homicide
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 52 of 132 PageID #:7642
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
194..197

Page 194

1  investigation, correct?
2        MR. KIVETZ: Objection. Form. Foundation.
3        COURT REPORTER: I'm sorry --
4    A    That's correct.
5        COURT REPORTER: -- Mr. Kivetz, you cut out on
6  your last part of your objection.
7        MR. KIVETZ: Objection. Form. Foundation.
8  Misstates the record.
9    A    And the answer to your question is, that's
10  correct.
11  BY MR. SWAMINATHAN:
12   Q    And the last one is, do you have any memory of
13  any conversations you had with Reynaldo Guevara during
14  the Andujar homicide investigation?
15        MR. KIVETZ: Objection. Form. Foundation.
16  Misstates the record.
17   A    No. I don't.
18   Q    Do you have a -- oh, sorry. Do you have any
19  memory of any conversations you had with any prosecutors
20  during the Andujar homicide investigation?
21   A    With any who?
22   Q    Prosecutors.
23   A    Just -- I guess -- I don't even remember
24  testifying at his trial, but apparently I did. So I
25  must have.

Page 195

1    Q    Okay. And that was going to be my next
2  question whether you had any memory of testifying in the
3  trial.
4    A    Apparently, I did, but I don't have any memory
5  of it.
6    Q    Do you have any memory of -- strike that. Did
7  you have any meetings with prosecutors in preparation
8  for trial?
9        MR. KIVETZ: Objection. Form. Foundation.
10   A    I -- I don't recall.
11   Q    Okay. You don't recall one way or the other
12  whether you did; is that right?
13   A    That's correct.
14        MR. KIVETZ: Same objection.
15   Q    Did you have --
16   A    That's correct.
17   Q    Did you assist at all in locating witnesses to
18  come to trial in the Andujar ca -- in the Thomas Sierra
19  prosecution?
20        MR. KIVETZ: Objection. Form. Foundation.
21  Misstates the evidence.
22   A    I don't believe I did.
23   Q    Is that based on memory, or is that your
24  assumption?
25   A    Both.

Page 196

1        MR. KIVETZ: Same objection.
2        THE WITNESS: Sorry.
3        MR. KIVETZ: Go ahead.
4    A    Both.
5  BY MR. SWAMINATHAN:
6    Q    Did you go to the crime scene as part of the
7  Andujar homicide investigation?
8        MR. KIVETZ: Objection. Form. Foundation.
9  Misstates the evidence.
10   A    I did not.
11   Q    Did you participate in any lineup procedures?
12        MR. KIVETZ: Same objection.
13   A    I did not.
14   Q    Did you participate in any gang book
15  procedures?
16        MR. KIVETZ: Same objection.
17   A    Did I participate in what?
18   Q    Any gang book procedures, gang book
19  identification procedures?
20   A    No. No.
21   Q    Did you participate in any photo array
22  identification procedures?
23        MR. KIVETZ: Objection. Form. Foundation.
24   A    I did not.
25   Q    Did you participate in any interviews or

Page 197

1  interrogations of witnesses or suspects?
2        MR. KIVETZ: Objection. Form. Foundation.
3  Misstates the evidence.
4    A    I -- I did not.
5    Q    Do you know one way or the other whether you
6  ever learned anything about the facts of the underlying
7  crime as part of your involvement in the investigation?
8        MR. KIVETZ: Objection. Form. Foundation.
9    A    Not at the time, no.
10   Q    Do you have any independent recollection as
11  you sit here today about how su -- Thomas Sierra became
12  a suspect?
13   A    Only that he was picked out in a photo array.
14  That's the -- the only information I had.
15   Q    Now -- are you saying you have independent
16  memory of that now, or you're saying that's based on
17  your review of the documents?
18   A    Based on the paperwork. And when I was told
19  by Area Five that he was identified in a photo array.
20  Other than that, no.
21   Q    Any independent recollection of any
22  evidence -- strike that. Any independent recollection
23  of what the understanding was of a motive for the
24  shooting of Noel Andujar?
25        MR. KIVETZ: Objection. Form. Foundation.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 53 of 132 PageID #:7643
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
198..201

Page 198

1    Speculative.
2        A    No.
3        Q    Do you have any independent recollection of
4    the investigation of the murder of Ruben Gonzalez that
5    occurred a few days before the shooting of Noel Andujar?
6             MR. KIVETZ: Objection. Form. Foundation. And
7        misstates the evidence.
8        A    I do not.
9        Q    Is the name Ruben Gonzalez familiar to you?
10            MR. KIVETZ: Objection. Form.
11       A    It does not.
12       Q    Is the name of Ruben Gonzalez -- strike that.
13   Is the name Jose E. Melendez, also known as "Kool-Aid,"
14   familiar to you?
15            MR. KIVETZ: Objection. Form. Foundation.
16       A    It is not.
17       Q    Do you have any recollection of being involved
18   in the arrest of a person named Jose "Kool-Aid"
19   Melendez?
20            MR. KIVETZ: Objection. Form. Foundation.
21       Misstates the evidence in record.
22       A    I do not.
23       Q    Do you have any recollection of having any
24   conversations with Reynaldo Guevara related to the
25   shooting of Ruben Gonzalez?

Page 199

1        A    No. I do not.
2        Q    Okay. And do you have any independent reco --
3    do you have any memory or recollection of ever having
4    any interactions with a person named Jose E. Melendez?
5             MR. KIVETZ: Objection. Form. Foundation.
6        A    No. I do not.
7        Q    Can you say one way or the other whether Jose
8    E. Melendez was subjected to any physical abuse at the
9    time of his arrest in the Ruben Gonzalez case?
10            MR. KIVETZ: Objection. Form. Foundation.
11       Speculative. Misstates the evidence in the record.
12       A    I do not.
13       Q    Okay. Why don't take a quick break here?
14   We've been going another good chunk. I could use the
15   restroom.
16       A    Sure.
17            MR. SWAMINATHAN: Five minutes?
18            MR. KIVETZ: Yes.
19            MR. SWAMINATHAN: Perfect.
20            COURT REPORTER: We're off record.
21            (OFF THE RECORD)
22            COURT REPORTER: We are on record. It is 3:55
23       p.m. Eastern Standard.
24   BY MR. SWAMINATHAN:
25       Q    Okay. Sir, do you know what -- strike that.

Page 200

1    How did you come to be assigned to assist in the Andujar
2    homicide investigation?
3             MR. KIVETZ: Objection. Form. Foundation.
4        A    I assume it's because they knew that I was the
5    Imperial Gang's gang specialist. And since this
6    involved the Imperial Gangsters, I -- I'm sure they
7    assumed that I might be able to help with
8    identification.
9        Q    Do you have any memory of how you came to be
10   assigned to the Andujar homicide investigation?
11            MR. KIVETZ: Objection. Form. Foundation.
12       A    Not specific memory, no.
13       Q    Do you know if you were contacted directly by
14   the Homicide detectives or through a supervisor?
15            MR. KIVETZ: Objection. Form. Foundation.
16       A    I -- I don't recall specifically.
17       Q    Do you know when you were first assigned to
18   the Andujar homicide investigation based on memory?
19       A    Other than it was obviously before he was
20   arrested, I -- I couldn't tell you how many -- how much
21   time there was between the time I was notified and the
22   arrest.
23       Q    Okay. Can you say anything about whether it
24   was days, hours, weeks?

Page 201

1             MR. KIVETZ: Objection. Form. Foundation.
2        A    I'm sure it wasn't weeks. And I -- I'm
3    going -- I'm just guessing -- just --
4             MR. KIVETZ: Nobody wants you to guess.
5        A    You know --
6             MR. SWAMINATHAN: That's fair.
7        A    -- couldn't have been that long.
8        Q    And so if I understand your testimony
9    correctly, in terms of your ability to identify when you
10   were assigned to the investigation based on memory, you
11   could say it was hours or days, but it was -- but it was
12   not weeks; is that fair?
13            MR. KIVETZ: Objection. Form. Foundation.
14       A    That's fair.
15       Q    Okay. Now, with regard to -- let's see. I
16   already asked you this. Do you recall which specific
17   detective asked you to arrest Thomas Sierra?
18            MR. KIVETZ: Objection. Asked and answered.
19       A    I do not.
20       Q    When you went to arrest Thomas Sierra, was it
21   your understanding that there was probable cause for his
22   arrest?
23            MR. KIVETZ: Objection. Form. Foundation.
24       Asked and answered.
25       A    That's how I understood it.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 202-4 Filed: 07/05/21 Page 54 of 132 PageID #:7644
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
202..205

Page 202

1    Q    And when you -- whatever your understanding
2  was about the basis for probable cause for his arrest,
3  was that information provided to you by others?
4         MR. KIVETZ:  Objection.  Form.  Foundation.
5    Asked and answered.
6    A    I honestly don't remember how we obtained that
7  information.
8    Q    So you didn't have any independent involvement
9  in the investigative steps that would have resulted in
10 probable cause; is that fair?
11   A    That -- that's very fair.
12   Q    Okay.  So whatever the pro -- basis for
13 probable cause was, it was information provided to you
14 by one of the detectives or others, correct?
15   A    Correct.
16   Q    Okay.  All right.  Let's take a look at our
17 first exhibit here.  I am showing you a document we're
18 going to mark as Exhibit A.  It's an arrest report for
19 Thomas Sierra.  This one is RFC 1.
20         (EXHIBIT A MARKED FOR IDENTIFICATION)
21         MR. KIVETZ:  Just one second.  No.  I might
22 give you that exhibit.
23         THE WITNESS:  Okay.
24         MR. KIVETZ:  One sec.  Can you see the screen?
25   Are you -- or --

Page 203

1         THE WITNESS:  Yeah.  I can -- I can see the
2    screen.
3  BY MR. SWAMINATHAN:
4    Q    I can make it bigger.
5    A    I can get pretty close.  Yeah.  Yeah.  That's
6  much -- much better.
7    Q    And if you want me to make it bigger, I can
8  make it bigger too.  Better?
9    A    No.  That -- that's -- that's good.  That's
10 okay.  The way you had it before was fine.
11   Q    This is better?
12   A    Yeah.  That's -- that's good.  Yeah.
13   Q    Okay.  All right, sir.  I'm showing you a
14 document marked exhibit -- we'll mark as Exhibit A.  It's
15 RFC Sierra 1 through 2.
16   A    Okay.
17   Q    This is a two-page arrest report.  Would you
18 agree with that, sir?
19   A    Yes.
20   Q    Look like a typical arrest report that you
21 would see during your time as a Chicago police officer?
22         MR. KIVETZ:  Objection.  Form.  Go ahead.
23   A    Yeah.  It's typical, yeah.
24   Q    Okay.  A type of document that you would often
25 fill out yourself as a Chicago police officer, correct?

Page 204

1    A    Yes.
2    Q    Fair to say you've seen hundreds of these?
3    A    At least, yes.
4    Q    Okay.  And in fact, this arrest report is the
5  ki -- same kind of document that you and other gang
6  specialists would use to create arrest cards that you
7  would keep at the Gang offices, correct?
8         MR. KIVETZ:  Objection.  Form.  Foundation.
9    A    Yes.
10   Q    Okay.  And this particular arrest report is
11 for Thomas Sierra, correct?
12   A    Yes.  That one is, yes.
13   Q    Okay.  And there's a signature just below the
14 middle on the left side.  Is that your signature?
15   A    It is not my signature.
16   Q    Okay.  And is that -- your name is written
17 there as, "GCSP G. Figueroa."  Would you agree with
18 that?
19   A    Yes.
20   Q    Okay.  That's a reference to you, gang crime
21 specialist George Figueroa, correct?
22   A    Correct.
23   Q    Okay.  And then next to your name is the name,
24 "GCSP G. Flavin."  What is that?
25   A    That was my partner at the time, Gerry Flavin.

Page 205

1    Q    Okay.  Is that his signature there above his
2  name?
3    A    No.  That's the sergeant's signature.
4    Q    Okay.  And who's -- and what sergeant's
5  signature is that?
6         MR. KIVETZ:  Objection.  Form.  Foundation.
7    A    If I'm reading it correctly, it looks like
8  Sergeant Mingey.
9    Q    Okay.  Now, there is a -- next to your name,
10 there's a beat number written, 6474.  Was that your beat
11 number at the time?
12   A    Yes.  It was.
13   Q    Okay.  And then what are -- the subsequent two
14 numbers are 8 and 7.  What are those a reference to?
15   A    I can't see that small print right above it.
16   Q    Let me expand that.
17   A    Let's see.
18   Q    You can't really rea --
19   A    Well, the 7 --
20   Q    Go ahead.
21   A    The -- oh, I -- I -- I know what this is.  The
22 8 is furlough, when I would be on furlough.  I'm
23 assuming that's for court case purposes.  And the DOG
24 stands for "Day Off Group."  So apparently I was in day
25 off group 7.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 55 of 132 PageID #:7645
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
206..209

Page 206

1    Q    And what does that mean to be in -- now that
2 you know that you were in day off group -- were you in
3 day off group 7 at that time?
4         MR. KIVETZ:  Objection.  Form.  Foundation.
5    A    According to the case report, I was.
6    Q    Okay.  And if you were in day off group 7,
7 what does that indicate to you about what days of the
8 week you would have been on?
9         MR. KIVETZ:  Objection.  Form.  Foundation.
10   A    Well, I -- I would need a calendar for that
11 particular year so I could look at the month.  But in
12 those days -- I don't know what they do now, but in
13 those days, everyone was assigned to a day off group.  If
14 you were in day off group 7 -- and again, you'd have to
15 look at a -- at a -- at a map.  It's -- it's hard to
16 explain otherwise.  But it means that you would work --
17 each -- each day, had two day off groups for people to
18 be off.  You -- you would have, like, 1 and 2, then 2
19 and 3, and then 3 and 4.  Every day had two numbers if
20 you got to the weekends.  So on that day, I was -- I
21 assume I was in group 7, which means I would have been
22 off that day and the following day.
23   Q    Okay.  At -- that part is the part that we
24 indicated was based on your memory of not -- your
25 assumption based on the idea that you would not have

Page 207

1 worked that day -- you would have filled out the report
2 on June 1st, correct?
3    A    Yeah.  Probably -- yeah.  I --
4         MR. KIVETZ:  Objection.  Form.
5    A    Yeah.  Probably not.
6    Q    Okay.  Now, with day off group 7, does that
7 mean that day -- Monday would mean day off group 1 and 2
8 would be off on Monday?
9         MR. KIVETZ:  Objection.  Form.  Misstates the
10 testimony.
11   A    If -- if it's -- if --
12        MR. KIVETZ:  It assumes facts not in record.
13   A    It -- it all depends on -- Mondays would --
14 would be different day off groups every week.  So in
15 other words, your day -- your days off fluctuated.  You
16 wouldn't have -- just because you were off Monday and
17 Tuesday this week doesn't mean you would be off Monday,
18 Tuesday next week.  You'd be off Tuesday, Wednesday, and
19 the following week, Wednesday, Thursday until your
20 weekends come up.
21   Q    Okay.  And then what does "Furlough 8" mean?
22   A    Furloughs were divided into 28 days in those
23 days.  So except for February, you know, months didn't
24 have 28 days, so if you're entitled to 28 days off it
25 would probably be one month leading into another.  It's

Page 208

1 hard to explain.  But day off group a -- 8 furlough, 8
2 furlough probably means it's a spring or summer
3 furlough.  Based on the calendar, you know.
4    Q    All right.  All right.  Now, on this document,
5 there's a signature above your name, and you indicated
6 that that's not your signature, correct?
7    A    That's correct.  That is not my signature.
8    Q    Okay.  And you agree with me that it looks
9 like somebody has written G. Figueroa, correct?
10   A    It had to be.  It wasn't me.
11   Q    Okay.  Who -- do you know who wrote it?
12   A    I have no idea.
13   Q    Okay.  And then below your name is another
14 signature that looks like it ends with a star 134.  Do
15 you know whose signature that is?
16   A    I do not.  It's probably the watch commander
17 downstairs in the 25th District --
18   Q    Okay.
19   A    -- who approves the arrest reports.
20   Q    Okay.  The star number that's written next to
21 you -- above your name, next to the signature that was
22 not written by you, says "16867."  Do you see that?
23   A    Yes.
24   Q    Whose --
25   A    That's my star number.

Page 209

1    Q    Is that your -- is that your star number?
2    A    That was my star number back in the day, yeah.
3    Q    Did you give approval to somebody to sign your
4 name to this report?
5    A    I did not.
6    Q    Okay.  Who filled in this report?
7    A    I -- I couldn't tell you since it's
8 typewritten.  I -- I couldn't honestly tell you who that
9 was.
10   Q    Do you have any idea who filled in this
11 report?
12   A    I do not.
13   Q    Okay.  Did you fill in any of the information
14 in this report?
15   A    Not at all.
16   Q    All right.  And how do you know that you did
17 not fill in any of the information in this report?
18        MR. KIVETZ:  Objection.  Form and foundation.
19   A    Because there's a copy of the arrest report
20 that I made out.
21   Q    And is that on the same -- on a similar form
22 to this one?
23   A    Yes.
24   Q    Okay.  Now, the information in this report --
25 well -- strike that.  The fact that there's an arrest

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 56 of 132 PageID #:7646
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021
210..213

Page 210

1 report here with your name as the first arresting
2 officer and with your signature without your approval to
3 sign for you, is that surprising to you?
4     MR. KIVETZ: Objection. Form. Foundation.
5     A   It's surprising because I didn't even know
6 that existed.
7     Q   Okay. And was it -- would you typically allow
8 other people to just sign your name without your
9 permission?
10    A   Not without my permission.
11    Q   Have you ever allowed somebody to sign your
12 name without your permission on a report?
13    A   Never.
14    Q   Would you ever allow someone to sign your name
15 whenever they wanted to without your permission?
16    MR. KIVETZ: Objection. Form. Foundation.
17    A   Not without my permission.
18    Q   Okay. Would it be fair to say that you would
19 sometimes allow your partner to sign your name with your
20 permission?
21    A   With my permission.
22    Q   Okay. And in those instances, would you
23 review the document before you gave them permission to
24 sign it for you?
25    A   I would have to know what was on the document

Page 211

1 before I would give them permission.
2     Q   Okay. And so you would do -- so you would
3 give permission only after you were comfortable that the
4 person signing it was putting information that you
5 believed accurately reflected your involvement; is that
6 fair?
7     A   That's very fair.
8     Q   Okay. And looking at this report -- strike
9 that. Did Mr. Flavin sign your name to this report?
10    MR. KIVETZ: Objection. Form. Foundation.
11    A   No. We were in the same day off group. No.
12    Q   So you can say that this report was not signed
13 by you, and it was not signed by Flavin on your behalf;
14 is that true?
15    MR. KIVETZ: Objection. Form. Foundation.
16    Speculative.
17    A   I would say that, yes.
18    Q   Okay. Now, is the -- you indicated that
19 this -- is it your understanding that this report was
20 written and signed at a time when you were not working?
21    MR. KIVETZ: Objection. Form. Foundation.
22    Speculative.
23    A   I would say that, yes.
24    Q   And what is your basis for saying that it was
25 written -- signed at a time when you were not working?

Page 212

1     A   It's a -- I'm sorry. Repeat that, please.
2     Q   What is your basis for saying that it was
3 written and signed at a time that you were not working?
4     A   Because I'm certain I was off the day of the
5 arrest and the following day. Plus the way the -- the
6 GCSP is put on the case report is not the way -- or
7 rather on the arrest report, is not the way that I did
8 it. GCP means Gang Crime specialist. Specialist is --
9 the "P" would be a small "P," that's the way that I did
10 it. Apparently, somebody else does it -- does it
11 differently, but the fact that it says -- that all the
12 four letters are capitalized, I'll tell you right now,
13 that's not the way I've -- I've -- I've never done it
14 that way. The -- the -- the second -- it's, like,
15 capitalizing the first two letters of one word. It
16 would be the first -- you know, the first letter would
17 be capitalized, the second letter would be a small,
18 whatever.
19    Q   Is there anything on this report that gives
20 you an indication of who wrote -- who filled it out and
21 put your name on it?
22    A   Oh, I -- I couldn't tell you.
23    MR. KIVETZ: Objection. Form. Speculative.
24    A   I -- I couldn't say because it -- it's
25 typewritten.

Page 213

1     Q   All right. Now, if you look on this document,
2 there's a comp -- a victim complainant listed at -- in
3 box 39, do you see that?
4     A   Yes.
5     Q   And who's listed there?
6     A   "Detective Guevara."
7     Q   And what does that indicate to you in -- in
8 terms of interpreting an arrest report based on your
9 experience?
10    MR. KIVETZ: Objection. Form. Foundation.
11    Speculative.
12    A   That he signed the complaints.
13    Q   Signed what complaints?
14    A   The Homicide complaints.
15    Q   Okay. Does that -- is that an indication to
16 you at all that he's the person who filled in this
17 report?
18    MR. KIVETZ: Objection. Form. Foundation.
19    Speculative.
20    A   I have no way of knowing. He could have been.
21 There are six names on there, other than my partner and
22 I. I couldn't tell -- you know, people's -- partners
23 split up paperwork, so I couldn't honestly tell you.
24    Q   Why is box 39 not filled in with the name of
25 Noel Andujar, the victim in the case?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 57 of 132 PageID #:7647
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
214..217

Page 214

1      MR. KIVETZ: Objection. Form. Foundation.
2  Speculative.
3      A    He's -- he's the victim, not the complainant.
4  Obviously, he can't sign complaints.
5      Q    When you would fill in arrest reports in an
6  instance like this, would you have put in Noel Andujar
7  in that box 39?
8      MR. KIVETZ: Objection. Misstates his
9  testimony. Form. Foundation. Speculative.
10     A    I -- I might have.
11     Q    Okay. So it would have been common to put you
12 in that box, on an arrest report in this instance, to
13 put in the name of the actual victim, Noel Andujar,
14 correct?
15     MR. KIVETZ: Objection. Misstates the
16 testimony. Form. Foundation. Speculative.
17     A    Yeah. Some -- some people would, yeah.
18     Q    And would it have been your practice to put it
19 Noel Andujar in that box if it was your arrest report?
20     MR. KIVETZ: Same objection. Form. Foundation.
21 Speculative.
22     A    If I -- no. I was never a Homicide detective,
23 so I don't know exactly what their procedures are. I
24 would assume that since it's a homicide -- and like I
25 said, this is just a guess on my part -- that the

Page 215

1  detective would put his name on there because he'd be
2  the one signing the complaints.
3      Q    Does it bother you to see that this has been
4  signed in your name without your permission?
5      MR. KIVETZ: Objection. Form. Foundation.
6  Speculative.
7      A    It bothers me because it's a surprise. I --
8  until this civil suit, you know -- until I was notified
9  of the civil suit, I didn't realize that these other
10 arrest reports were -- you know, that they existed.
11     Q    Did you have any other instances in your
12 career as a Chicago police officer when someone signed
13 your name to a report without your permission?
14     MR. KIVETZ: Objection. Form. Foundation.
15 Speculative.
16     A    Not knowingly.
17     Q    What do you mean by that?
18     A    To my knowledge --
19     MR. KIVETZ: Objection. Form and speculative.
20     A    To my knowledge, that's never happened. I've
21 had people sign complaints for me, but with my
22 permission or at my instruction.
23     Q    If I understand your testimony correctly,
24 you're not aware of a single instance in your career
25 when somebody signed your name to a report without your

Page 216

1  permission; is that correct?
2      MR. KIVETZ: Objection. Form. Speculative.
3  Foundation.
4      A    That's correct.
5      Q    Now, the document list you as the first
6  arresting officer. Were you the first arresting
7  officer?
8      A    I was the first in that I spotted Tommy
9  Sierra. My partner didn't know him.
10     Q    Okay. Now, I understand that you didn't fill
11 in this report. Is any of the in -- so looking at the
12 first arresting officer, despite the fact that you
13 didn't fill in this report, it's not false to say that
14 you were the first arresting officer, correct?
15     A    I -- could you just give me that question
16 again?
17     Q    Yeah. Sorry. So you didn't fill in this box
18 saying that you were the first arresting officer, but
19 you were in fact the first arresting officer, correct?
20     A    Yes. When I made out my arrest report, I was
21 in box number 1.
22     Q    Okay.
23     A    All of this was typed in by someone else.
24     Q    Okay. Now, the rest of the information that's
25 typed in here, I understand that you've indicated you

Page 217

1  didn't type any of that information in, correct?
2      A    That's correct.
3      Q    Is any of the information inaccurate or false?
4      MR. KIVETZ: Objection. Form. Foundation.
5  Speculative.
6      A    Again, I did -- I took -- I didn't take any
7  part in the investigation, so I don't know. I assume
8  that what's written there is the truth. But I did -- I
9  didn't take part in investigation, so I can't say.
10     Q    Okay. So your -- you have a concern that this
11 document was signed without your permission, but you
12 don't have a concern that there's information put into
13 this document that's false; is that right?
14     MR. KIVETZ: Objection. Form. Foundation.
15     A    I'm assuming that it's not false. But I am
16 frankly not happy that someone wrote their name in
17 there -- wrote my name in there without mentioning it to
18 me.
19     Q    Okay. Do you have any basis to dispute any of
20 the information that's written into this report, other
21 than your -- you know, the existence of your signature
22 without permission?
23     A    I do not.
24     Q    And based on your experience with arrest
25 reports, does this arrest report identify the time at



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 58 of 132 PageID #:7648
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021
218..221

Page 218

1   which Thomas Sierra was arrested?
2       A    He was take -- let's see.  The time of arrest
3   says, what, 3:30 or something?
4       Q    Okay.  Where's --
5       A    Where the --
6       Q    Is that better?
7       A    No.  Not really.  Because your -- your -- the
8   box, or whatever, had your face on there, I couldn't --
9       Q    He --
10      A    Here.  Is -- is that better?
11      Q    The time of arrest could have --
12      A    Okay.  Some detectives prefer to use the time
13  of arrest --
14          MR. KIVETZ: Hold on.  It's blocked.  It's
15      blocked by --
16          MR. SWAMINATHAN:  Okay.  What's the best place
17      for me to put this here?
18          MR. KIVETZ:  Okay.  All right.  Can you see it
19      now.  Yeah.
20      A    Time of arrest was -- charges approved at
21  3:30.  So the time of arrest -- well, let's see.  It
22  says time of arrest is -- is 3:30 in the afternoon.
23  BY MR. SWAMINATHAN:
24      Q    Okay.  So this -- and where are you -- where
25  are you looking to see that the time that Thomas Sierra

Page 219

1   was arrested was 3:30?
2       A    Box number 29.
3       Q    Okay.  And what was the date of
4   Thomas Sierra's arrest based on this arrest report?
5       A    30 May, '95.
6       Q    And is that also based on the information in
7   box 29?
8       A    Yes.
9       Q    Okay.  And it lists a beat of arrest as 1411.
10  Did you know who that is?
11      A    Like, the beat -- that's not the arresting
12  beat.  That's the beat that he was arrested on.  And in
13  fact, that beat is wrong.  The beat that he was arrested
14  on was 1413.
15      Q    What does that mean, "The beat that he was
16  arrested on"?
17      A    All districts are -- are divided up into
18  beats.  In other words, say he -- all right.  He was
19  arrested at Dickens and Spaulding.  Well, three blocks
20  north of there is a different beat.  Follow me?
21      Q    I see.  So for -- so the beat of arrest tells
22  you basically what area of --
23      A    The location.
24      Q    -- the district he was in upon -- at the time
25  of his arrest?

Page 220

1       A    Exactly.  The -- the -- the part of the
2   district.  The area of the district that he was in.
3       Q    Okay.  And the area where the IGs would hang
4   out, what beat was that in?
5       A    Mostly 1413, but 1411 also.  But --
6       Q    So are you saying that this --
7       A    -- that was 14 --
8       Q    Go ahead.  Sorry.
9       A    But 1413 is primarily their -- where they hang
10  out.
11      Q    And your -- based on your memory of where it
12  was that you arrested Thomas Sierra, was that in beat
13  1413?
14      A    Yes.
15          MR. KIVETZ:  Objection.  Form.
16      Q    So that information --
17      A    Yeah.
18      Q    -- on this arrest report would be incorrect
19  regarding the 1411; is that correct?
20      A    That's correct.
21      Q    Now, if Thomas Sierra had been arrested at his
22  residence, 3532 West Dickens, what would have been the
23  beat of arrest?
24      A    1413.
25      Q    Okay.  And when you went out to arrest Thomas

Page 221

1   Sierra, did you know where he lived?
2       A    His -- his home address?
3          MR. KIVETZ:  Objection.  Form.
4       Q    Yes.
5          MR. KIVETZ:  Foundation.  Speculative.
6       A    I did not.
7       Q    Okay.  And this report indicates the time that
8   Thomas Sierra was transported after his arrest, correct?
9       A    I don't know how accurate it is, but I don't
10  remember exactly the time.
11      Q    Okay.  So it indicates -- does box 30 indicate
12  the time that he was arrested -- or transported upon his
13  arrest?
14      A    There's -- there's a black box covering it.  I
15  can't see what that says.
16      Q    Okay.  Here.  Let me see if I can move it.
17      A    You know what, if you lower it a bit I can get
18  it.
19      Q    Oh.  Here, I'll lower it like this, is this
20  better?
21      A    Yeah.  Yeah.  It shows that he was arrested at
22  3:30, but I honestly don't remember what time.  I just
23  know it was during the daytime.
24      Q    Okay.  So that's not inconsistent with your
25  memory; is that right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 59 of 132 PageID #:7649
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
222..225

Page 222

1     A    Well, it -- it's not inconsistent in that I
2  don't remember what time of the day it was.  I just know
3  it was daytime.
4     Q    Do you have any reason to dispute the
5  information in this arrest report that Thomas Sierra was
6  arrested on May 30, 1995, at 3:30 p.m.?
7     A    I know it was the 30th of May, but I could not
8  tell you what time of the day it was.  It was just
9  during the day.
10    Q    Okay.  But let me ask my question again.  Do
11 you have any basis or reason to dispute what -- this
12 report's information that he was arrested at 3:30 p.m.
13           on May 30th?
14           MR. KIVETZ:  Objection.  Form.  Foundation.
15    A    I can't dispute it because I don't remember
16 exactly what time he was --
17    Q    Okay.
18    A    -- arrested, I should say.
19    Q    Okay.  Any information about when he was
20 transported in box 30, is that meant to indicate when
21 the transport car had come to take him?
22    A    Yes.
23    Q    Okay.  And is the address of arrest identified
24 on this document?
25    A    Yes.  That would be box number -- looks like

Page 223

1  number -- box number 25.
2     Q    Okay.  Do you see that right now?
3     A    Yes.
4     Q    And what does it identify as the address at
5  which he was arrested?
6     A    3510 West Dickens.
7     Q    And is -- what is at 3510 West Dickens?
8     A    It's just a bunch of houses.
9     Q    Is that the area where the IGs typically hung
10 out?
11           MR. KIVETZ:  Objection.  Form.  Foundation.
12    A    Yes.
13    Q    Okay.  So what are the cross streets there?
14    A    Dickens and St. Louis.
15           MR. KIVETZ:  Anand, I need a bathroom break,
16 when you get a chance, please.
17           MR. SWAMINATHAN:  We can do it right now.
18           MR. KIVETZ:  Okay.
19           COURT REPORTER:  Is everyone okay with me going
20 off record?
21           MR. SWAMINATHAN:  Yes.
22           COURT REPORTER:  We are off record.
23           (OFF THE RECORD)
24           COURT REPORTER:  We are on record at 4:34 p.m.
25 Eastern Standard.

Page 224

1  BY MR. SWAMINATHAN:
2     Q    Okay.  We were looking at the document marked
3  Exhibit A, which is a Chicago Police Department Arrest
4  Report.  A couple of other questions about this
5  document, sir.  For the victim comp -- under the "victim
6  complainant," next to Detective Guevara's name, it lists
7  an address of 5555 West Grand Avenue.  That's Area Five,
8  correct?
9     A    Correct.
10    Q    And then it lists a telephone number of
11 746-8282.  That's the phone number for Area Five,
12 correct?
13    A    I believe it -- I believe it is, yes.
14    Q    Okay.  And then this document, next to your
15 signature, there's a box that indicates, "I do solemnly,
16 sincerely, and truly declare and affirm that the facts
17 stated herein are accurate to the best of my knowledge."
18 Do you see that?
19    A    Yes.
20    Q    And so as a police officer, when you would
21 sign an arrest report, you were actually swearing to the
22 information in the police report, correct?
23    A    Correct.
24    Q    And that makes arrest reports unique, right?
25 Unlike -- other reports do not get sworn by a police

Page 225

1  officer, correct?
2           MR. KIVETZ:  Objection.  Form.  Foundation.
3  Speculative.
4     A    Correct.
5     Q    Okay.  And the reason it was important for the
6  arrest reports to be sworn is because they contained a
7  sworn statement about what the basis was to justify the
8  arrest of an individual, correct?
9           MR. KIVETZ:  Objection.  Form.  Foundation.
10 Speculative.
11    A    Correct.
12    Q    Okay.  Now the report identifies arresting
13 officers, and it lists Halvorsen, Guevara, Wojcik,
14 McMurray, Rodriguez, and Wiora.  Do you see that?
15    A    Yes.
16    Q    Is that information accurate in terms of
17 identifying those individuals as arresting officers?
18    A    You know, other than Halvorsen and Guevara, I
19 don't -- I can't say specifically how the others were
20 involved in this investigation.
21    Q    Would you agree with me that Wojcik, McMurray,
22 Rodriguez, and Wiora were not there when Thomas Sierra
23 was arrested?
24    A    No.  It was just my partner and I.
25    Q    Okay.  And would you agree with me that



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 60 of 132 PageID #:7650
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
226..229

Page 226

1  Halvorsen and Guevara were not there when Thomas Sierra
2  was arrested?
3      A   I would agree.
4      Q   Okay.  And because they were not there when he
5  was arrest -- if -- none of those -- if none of those
6  six people were there when Thomas Sierra was arrested,
7  why are they listed as arresting officers?
8          MR. KIVETZ: Objection.  Form.
9      A   I -- you would have to ask them.  I couldn't
10 tell you.
11     Q   In your view, is that information inaccurate?
12         MR. KIVETZ: Objection.  Form.
13     A   I -- I have no way of knowing because I don't
14 know what -- how they're a part of the investigation.  I
15 don't know.  I -- I was not part of the investigation.
16 So, I don't know what part they played.
17     Q   On an arrest report where you identify the
18 arresting officers, was it your practice to identify
19 only the individuals who actually participated in the
20 act of arresting the individual?
21     A   You know, every case is different, so I -- I
22 couldn't tell you.  Certainly not this case.
23     Q   Were there circumstances when you would
24 identify individuals as being arresting officers who did
25 not participate in the arrest?

Page 227

1      A   If you're talking about physically
2  participating in the arrest, that's -- it's -- it's --
3  it's hard to say.
4      Q   Okay.
5      A   Because some -- if for -- for example, if you
6  hit somebody's house with a search warrant, if only two
7  people go in, I -- I'm sorry, with an arrest warrant --
8  if two people go in to physically make the arrest, the
9  others outside would probably, since they're part of the
10 arrest team, would appear on there.  So I couldn't
11 honestly tell you how other names got on there.
12     Q   Would you agree with me that -- strike that.
13 Was it your practice to only list as arresting officers,
14 individuals who were physically present at the location
15 or time of arrest?
16         MR. KIVETZ: Objection.  Form.  Foundation.
17 Misstates the testimony.
18     A   It depends on the situation.  I -- I can't --
19 I couldn't honestly tell you what others are going to
20 say or do on their arrest reports.
21     Q   I'm only asking about your practice.  Your
22 practice was if you went into a -- on a search warrant,
23 for example, you might identify the individuals -- both
24 the individuals who went inside and physically arrested
25 the person, but also other individuals who were

Page 228

1  physically on location to participate in the process,
2  right?
3      A   Everybody --
4          MR. KIVETZ: Objection.  Form.  Foundation.
5  Speculative.  Misstates the testimony.
6      A   As far as I'm concerned, everybody on the
7  arrest team would be on the arrest report, whether they
8  were inside the house or not.
9      Q   Now, if -- in -- was it in your practice, if
10 there were individuals who were not participating in the
11 physical arrest or on location, would you list them as
12 arresting officers?
13         MR. KIVETZ: Objection.  Form.  Foundation.
14 Speculative.
15     A   You're -- you're asking me to speculate on
16 something that I -- you know, when I wasn't there.  I
17 wouldn't because I can't account for somebody else's
18 actions.  I would just put down on paper whoever was
19 there.
20     Q   Okay.  Okay.  So the -- would you agree with
21 me that this report identifying those six individuals as
22 arresting officers who were not at the location when Mr.
23 Sierra was arrested, that information is inconsistent
24 with your practices, correct?
25         MR. KIVETZ: Objection.  Form.  Foundation.

Page 229

1  Speculative.  Complete hypothetical.  Misstates his
2  testimony.
3      A   My practices have nothing to do with this.  I
4  didn't make out this arrest report.
5  BY MR. SWAMINATHAN:
6      Q   But I mean, I won't argue with you.  I mean, I
7  know the reports that your name and signature are there,
8  which are not -- which I know you didn't fill in.  But
9  that's the reason I'm asking.  Because obviously there
10 is -- this document reflects -- this document suggests
11 that you identified these individuals as being -- as
12 participating in an arrest.  And I want to be clear that
13 you would not have identified these individuals as
14 participating in the arrest if you had actually prepared
15 this; is that right?
16         MR. KIVETZ: Objection.  Form.  Foundation.
17 Misstates the testimony he gave.
18     A   Had this been my arrest report, as far as I'm
19 concerned, they weren't there, I wouldn't have put them
20 down.  But that doesn't mean that they don't deserve to
21 be on there.  Since I didn't prepare it, whoever did
22 obviously had knowledge that I didn't.
23     Q   Okay.  Now this -- there's a narrative section
24 on this report that also was not filled in by you,
25 correct?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 61 of 132 PageID #:7651
The Deposition of GEORGE FICARO, taken on June 17, 2021
230..233

Page 230

1    A    Correct.
2    Q    Okay.  And what information is to be
3  included -- the narrative section is to include
4  information that is the basis for probable cause,
5  correct?
6    A    Yes.
7    Q    Okay.  And it's that information -- that
8  critical information then that's sworn in the subsequent
9  section where you say, I do solemnly and sincerely, and
10  truly declare, and so on, correct?
11    A    Correct.
12    Q    Do you have any reason to dispute the
13  information that's written into this narrative section?
14    MR. KIVETZ: Objection.  Form.  Foundation.
15  Speculative.
16    A    I have no -- really very little knowledge of
17  the investigation, so I have no reason to dispute that.
18    Q    Okay.  Now do you have any reason to dispute
19  the accuracy of the information contained in the
20  narrative section?
21    A    I do not.
22    Q    Okay.  And was it your practice to include
23  whatever probable cause information you had in your
24  narrative for your arrest reports?
25    A    Yes.

Page 231

1    Q    Okay.  Now, as you -- strike that.  As you sit
2  here today, are you aware of any other probable cause
3  that existed other than what's written in this
4  narrative?
5    A    I do not.
6    Q    Now, if you look -- would you -- was it your
7  practice ever to exclude facts giving rise to probable
8  because in the narrative section of your arrest reports?
9    A    I'm sorry, would you repeat the question?
10    Q    Yeah.  Was it your practice to ever exclude
11  facts giving rise to probable cause in your arrest
12  reports?
13    MR. KIVETZ: Objection.  Form.  Foundation.
14  Speculative.
15    A    To exclude facts?
16    Q    Yes.
17    A    No.
18    MR. SWAMINATHAN: Did you get the answer,
19  ma'am?  Did you get the answer, Madam Court
20  Reporter?
21    COURT REPORTER: Yes.  I did.
22  BY MR. SWAMINATHAN:
23    Q    And in reading this report, would it be fair
24  to read -- in reading -- strike that.  In reading this
25  report, the narrative section identifies the facts that

Page 232

1  supported probable cause for the arrest at 3:30 p.m. on
2  May 30th, correct?
3    MR. KIVETZ: Objection.  Form.  Foundation.
4    A    Yes.
5    Q    Okay.  And the narrative section should not
6  include facts to justify the probable cause for arrest
7  that are later learned after the arrest, correct?
8    MR. KIVETZ: Objection.  Form.  Foundation.
9  Misstates the report.  And speculative.
10    A    The narrative's supposed to contain facts that
11  are known up until that point.
12    Q    Okay.  Up until the point of arrest?
13    A    Yes.
14    Q    Okay.
15    MR. KIVETZ: Same objection.
16    Q    Let's turn to -- I'm showing you a document
17  we'll mark as Exhibit B.  It's RFC Sierra 17 through
18  19, and it's identified as a Supplementary Report.  All
19  right.  Sir, is this a document you reviewed in
20  preparation for today's deposition?
21    (EXHIBIT B MARKED FOR IDENTIFICATION)
22    A    Yes.
23    Q    Okay.  And can you see it currently?
24    A    Yeah.  Somewhat.
25    Q    Okay.  And I'm showing you the second page of

Page 233

1  this document and then the third page of this document.
2  Do you see that?
3    A    Yes.
4    Q    Okay.  Now, is this -- what is -- how would
5  you characterize this document?
6    A    It's a supplementary report to a homicide
7  case.
8    Q    Okay.  And is this a supplementary report that
9  you prepared?
10    A    Yes.  It is.
11    Q    Okay.  Is this a report -- well -- strike
12  that.  Does this report contain your signature?
13    A    Yes.  It does.
14    Q    Okay.  And before I ask you about that
15  document, let me just come back to one other.  I want to
16  ask you about this document, which we'll mark as
17  Exhibit C.  This is RFC Sierra 161.  Are you familiar
18  with this arrest report?
19    (EXHIBIT C MARKED FOR IDENTIFICATION)
20    A    Yes.
21    Q    And what is this arrest report?
22    A    It's an arrest report for Thomas Sierra.
23    Q    Did you prepare this arrest report?
24    A    I did not.
25    Q    Did you sign this arrest report?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 62 of 132 PageID #:7652
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
234..237

Page 234

1    A    I did not.
2    Q    Is it your understanding that this is a
3 partial version of the Exhibit A arrest report that we
4 looked at just a little bit ago?
5    A    Yes.
6    Q    Okay.  And looking at Exhibit C, does it
7 provide you with any more information about who --
8 well -- strike that.  Let me first ask you, would you
9 agree with me that somebody has signed your name to
10 Exhibit C without your permission?
11   A    I wouldn't say without my permission, but
12 that's not my signature.
13   Q    Okay.  Do you know who it is?  Are you -- is
14 there anything from looking at Exhibit C that indicates
15 to you who signed your name to this report and filled it
16 in?
17   A    I have no idea.
18   Q    All right.  Now other than those two
19 versions of the arrest report, and this supplementary
20 report, that is Exhibit B, are there any other reports
21 that you prepared in this case?
22   A    Other than those two, no.
23   Q    Okay.  So this -- but when you say, "other
24 than those two," let me be clear.  There's two arrest
25 reports that we just looked at, Exhibit A and Exhibit C,

Page 235

1 that had your name and signature on them, but that were
2 not prepared by you, correct?
3    A    Correct.
4    Q    And then we are looking now at Exhibit B,
5 which is a supplementary report that was prepared by
6 you, correct?
7    A    Correct.
8    Q    And then are there any other reports other
9 than this one that we're actually prepared by you?
10   A    An original arrest report.
11   Q    Okay.  And that original arrest report, did
12 you review it as part of the investigative file?
13   A    Apparently.
14   Q    Okay.  Now looking at Exhibit B, is that your
15 signature at the bottom?
16   A    Yes.  It is.
17   Q    Okay.  And next to that, right above your
18 signature, is your name as the reporting officer,
19 correct?
20   A    Yes.
21   Q    Okay.  And the other recording officer's
22 identified as Mr. Flavin, correct?
23   A    Correct.
24   Q    And is that his signature?
25   A    That's me signing for him.

Page 236

1    Q    Okay.  And that -- the -- and this was
2 signed -- signed off on by your sergeant, Sergeant
3 Stack, correct?
4    A    Correct.
5    Q    Okay.  All right.  And the information typed
6 into this report was typed by whom?
7    A    I typed it.
8    Q    Okay.  Did you have any specific memory of
9 typing this, or is that your assumption based on the
10 fact that you're identified as the first reporting
11 officer?
12   A    On -- based on assumption.
13   Q    Okay.  And when did you fill in this report?
14   A    June 1st.
15   Q    One second.  I'm sorry, one second.
16 Okay.  Sorry.  My apologies.  All right.  Now, when did
17 you write this supplementary report that is Exhibit C?
18   A    It's dated June 1st, so at 9:00, so that's
19 probably right when I wrote it.
20   Q    So that -- where it lists "Date This Report
21 Submitted," that would reflect the time that you were
22 writing the report and submitted it?
23   A    Yes.
24   Q    And I guess the question is, would the --
25 would 9:00 p.m. -- or 21:00 reflect the time that you

Page 237

1 wrote the report, or that you submitted it to your
2 sergeant for approval?
3         MR. KIVETZ:  Objection.  Form.  Foundation.
4 Speculative.
5    A    That's when I wrote it.
6    Q    Okay.  So you wrote the report on June 1.  And
7 would you agree with me this report is documenting
8 investigative -- essentially, it's documenting your
9 arrest of Thomas Sierra, correct?
10   A    Correct.
11   Q    And it's documenting your involvement in the
12 investigation on May 30th, correct?
13   A    Correct.
14   Q    Okay.  So the document indicates that on
15 May 30th you -- the undersigned officers, took into
16 custody the above subject.  What is "KNA"?
17   A    "Now Known As."
18   Q    Okay.  So the first sentence -- we're looking
19 at, page 3 of this Exhibit C, your supplementary report
20 Bates stamped RFC Sierra 19.  So on May 30th of 1995,
21 you, within this report the first sentence of the
22 narrative, indicates that you arrested Thomas Sierra,
23 correct?
24   A    Correct.
25   Q    Okay.  And the report indicates in the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 63 of 132 PageID #:7653
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
238..241

Page 238

1  narrative section that on May 30th, you were asked to
2  locate and arrest Thomas Sierra, correct?
3      A    Yes.
4      Q    And indicates that on May 30th, you actually
5  went out and made the arrest, of course, correct?
6      A    Correct.
7      Q    And indicates that earlier on May 30th, before
8  the arrest, you were asked to identify Lil Hec -- asked
9  to identify Junito, correct?
10         MR. KIVETZ: Objection. Form. Misstates the
11     report.
12     Q    Go ahead.
13     A    So what's specifically the question?
14     Q    The question is this document -- the narrative
15  here indicates that on May 30th, you did some work to
16  assist the detectives in identifying who Junito was,
17  correct?
18         MR. KIVETZ: Objection. Misstates the
19     testimony in this report.
20     A    Says that "I was made aware that a subject
21  known as Junito of the Imperial Gangsters, was wanted.
22  The undersigned officers know the subject from prior
23  encounters. When it was determined that he was, in
24  fact, the subject in question, he was observed on the
25  street by the undersigned. He was made aware of the

Page 239

1  circumstance and voluntarily accompanied the undersigned
2  officers to Area Five." That's pretty much what
3  happened.
4      Q    Okay. And that's what's written in the
5  narrative section documenting your actions on May 30th,
6  correct?
7          MR. KIVETZ: Objection. Objection. Misstates
8      the record. Misstates the report. Misstates the
9      testimony.
10 BY MR. SWAMINATHAN:
11     Q    Go ahead. Go ahead.
12         MR. KIVETZ: You can answer.
13     A    What's -- what exactly is the question?
14     Q    The question is just -- well, I get -- if I
15  understand correctly, we've agreed that this is a report
16  you wrote on June 1st documenting investigative actions
17  that you took in supporting this case on May 30th,
18  correct?
19         MR. KIVETZ: You just wait for the question,
20     before you answer it, okay? One second, please.
21     All right. Objection. Form. Foundation. Misstates
22     the report. Misstates the evidence.
23     A    Yes.
24 BY MR. SWAMINATHAN:
25     Q    Okay. And so this narrative section, I think

Page 240

1  we've identified, identifies each of the things that you
2  did on May 30th in support of the Andujar investigation,
3  correct?
4          MR. KIVETZ: Objection. Objection. Form.
5      Foundation. Misstates the testimony. Misstates the
6      record.
7      A    Correct.
8  BY MR. SWAMINATHAN:
9      Q    Okay. And one of the things that you did on
10  May 30, 1995, in addition to arresting Thomas Sierra, is
11  help the detectives identify who Junito was, correct?
12         MR. KIVETZ: Hold on a second. His glasses
13     just --
14     A    That's all right. Ask me the question again,
15  please.
16     Q    And one of the things that this narrative
17  section identifies you doing on May 30, 1995, in
18  addition to arresting Thomas Sierra, is helping the
19  detectives identify who Junito was, correct?
20         MR. KIVETZ: Objection. Misstates his
21     testimony. Misstates the event.
22     A    Correct.
23     Q    Okay. Now, how were you able to make the
24  connection between Junito and Thomas Sierra?
25     A    I knew that to be his nickname.

Page 241

1      Q    And how did you -- so you knew that from
2  memory?
3      A    Yes.
4      Q    Okay. And so in other words, on May 30, 1995,
5  if somebody said to you "Who is Junito," you were able
6  to say off the top of your head, "I know who Junito to
7  be Thomas Sierra"; is that right?
8          MR. KIVETZ: Objection. Form. Foundation.
9      Speculative. Incomplete hypothetical. Misstates
10     the record. Okay.
11 BY MR. SWAMINATHAN:
12     Q    And is he --
13     A    Yes.
14         MR. SWAMINATHAN: Okay. Madam Court Reporter,
15     did you get the answer?
16         COURT REPORTER: Yes.
17 BY MR. SWAMINATHAN:
18     Q    And do you have a specific memory of what
19  actions you took on May 30th to make that connection
20  between Thomas Sierra and Junito, or are you assuming
21  that you would have just known from memory?
22         MR. KIVETZ: Objection. Form. Foundation.
23     Speculative. Misstates the record.
24     A    When I was approached and asked about
25  Junito -- and it wasn't on that day -- I told them "This

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 64 of 132 PageID #:7654
The Deposition of GEORGE FIGUEROA, taken on June 15, 2021
242..245

Page 242

1  is the Junito that I know who's Imperial Gangster."
2  Sometime after that, I understand that he was identified
3  and if I saw him, to place him into custody, which I did
4  on the 30th of May.
5      Q   Okay.  So first, the connection between Thomas
6  Sierra and Junito, do you have a specific memory of how
7  you made the connection?  That you did it by mental --
8  that by -- you did it mentally or that you looked and
9  documents, do you have any specific memory in your head
10  about how that went down.
11     A   I knew him personally.
12     Q   Okay.
13     A   And I knew that to be his nickname.
14     Q   Did he have any other nicknames?
15     A   I think maybe Junior.  But essentially Junito.
16     Q   Okay.  Now, would you agree with me that one
17  of Thomas Sierra's nicknames was the -- strike that.
18  Would you agree with me that Thomas Sierra went by the
19  nickname Junior?
20         MR. KIVETZ:  Objection.  Form.  Speculative.
21     A   Yeah.  He could.  Junior and Junito, yeah.
22     Q   And would you agree with me that Tom -- Thomas
23  Sierra was commonly referred to as Junior by other
24  people in the neighborhood?
25     A   No.  I would not.

Page 243

1      Q   Why do you say that?
2      A   Because everybody -- everybody that I know of
3  called him Junito.
4      Q   Okay.  And did you have -- the fact that
5  Thomas Sierra -- strike that.  Your statement that
6  Thomas Sierra was -- went by, the nickname Junito, was
7  that written down anywhere?
8      A   I happened to know it.  But I -- it -- it may
9  have been written on a -- on a nickname card or
10  something.
11     Q   So you just happened to remember it.
12     A   But I just happened to remember it.
13     Q   I'm sorry.  Would it have been in your
14  collection of nicknames that you kept in your trunk?
15         MR. KIVETZ:  Objection.  Form.  Speculative.
16  Foundation.
17     A   Probably.
18     Q   Okay.  Did you check that trunk containing a
19  list of nicknames when you connected Thomas Sierra to
20  Junito, or you don't remember?
21     A   I don't remember, no.
22     Q   So it's possible you looked at the collection
23  of nicknames that you had on arrest cards to make that
24  connection; is that true?
25         MR. KIVETZ:  Objection.  Form.  Foundation.

Page 244

1  Speculative.
2      A   No.  It -- I have no specific memory of
3  checking the nickname files.  I have no memory of -- of
4  even - (coughs) excuse me.  Well, the bottom line is
5  when I was asked about Junito, I do recall saying, "I
6  know he's" -- he's just someone that I saw every day,
7  and I didn't even have to look it up.
8      Q   So I guess the question that I want -- I
9  think -- I -- if I understand your testimony correctly,
10  what you're saying is you can say that you know for a
11  fact that you did not refer back to the nickname cards
12  in your trunk; is that correct?
13     A   What I'm --
14         MR. KIVETZ:  Objection.  Form.  Misstates his
15  testimony.
16     A   What I'm saying is that I probably didn't,
17  because I knew him to be Thomas Sierra.  That was the
18  only "Junito" over there.
19     Q   "Probably did not," meaning it's possible that
20  you just don't remember; is that right?
21         MR. KIVETZ:  Objection.  Misstates his
22  testimony.
23     A   I remember knowing him by name.  So I would
24  not have to have checked a nickname for him.
25     Q   And if you had checked the nickname file, it's

Page 245

1  your belief that it would have said "Thomas Sierra known
2  as Junito"?
3         MR. KIVETZ:  Objection.  Form.  Foundation.
4  Misstates his testimony.
5      A   That's correct.
6      Q   Okay.  And the nickname file that we're
7  talking about is the personal collection you had,
8  correct?
9      A   Yes.
10         MR. KIVETZ:  Object to form.
11     A   Yes.
12     Q   On index cards, correct?
13     A   Yes.
14     Q   Okay.  And if you had wanted to go to the --
15  did you look at any of the resources at the Gang Crimes
16  office with regard to any connection between
17  Thomas Sierra and any nicknames?
18     A   I did an --
19         MR. KIVETZ:  Objection.  Form.  Foundation.
20  Speculative.
21     A   I did not.
22     Q   Okay.  And if you had, do you expect that
23  youwould have seen an arrest card indicating Thomas
24  Sierra being connected to the name Junito?
25         MR. KIVETZ:  Objection.  Form.  Foundation.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 65 of 132 PageID #:7655
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
246..249

Page 246

1    Speculative.
2        A    I wouldn't know one way or the other because I
3    don't believe I've ever arrested Junito.
4        Q    Well, if he had been previously arrested,
5    would you expect that one of his prior arrests usually
6    indicate individuals' nicknames, correct?
7        MR. KIVETZ: Objection. Form. Foundation.
8    Speculative.
9        A    Right. But in order for that to appear in a
10   gang card, in Gang Crimes, he would have had to have
11   been -- (coughs) excuse me -- arrested by someone in
12   Gang Crimes.
13       Q    Okay. And if he'd been arrested previously by
14   someone in Gang Crimes, then you would expect to see his
15   nickname of Junito on an arrest report and on an arrest
16   card, correct?
17       A    Not an arrest report. On an arrest card.
18       Q    Sorry. Okay. So you would expect -- if
19   Thomas Sierra had been previously arrested by Gang
20   Crimes officers, you'd expect to see his nickname on
21   a -- nickname Junito on an arrest card. Do I have that
22   right?
23       A    Yes.
24       Q    Okay. And I think we've previously
25   established that the information in the arrest cards

Page 247

1    is -- comes from the information in the same arrest
2    reports filled in by those gang specialists, correct?
3        MR. KIVETZ: Objection. Form. Foundation.
4    Speculative.
5        A    Correct.
6        Q    So the same gang specialist that would have
7    put "Thomas Sierra connected to Junito" on the arrest
8    card, would have also put that information in the arrest
9    report. Do you agree with me?
10       MR. KIVETZ: Objection. Form. Foundation.
11   Speculative.
12       A    Prob -- you know, probably. Maybe the person
13   who made out the arrest report, his partner would have
14   made the arrest card. So I -- I can't say.
15       Q    Okay. But you would typically expect that's
16   the case, right? That's probably what would have
17   happened since the same gang specialists are putting the
18   information into both reports, right? Both the arrest
19   report and the arrest card.
20       MR. KIVETZ: Objection. Form. Foundation.
21   Speculative.
22       A    Yes.
23       Q    In the course of your review of the documents
24   in the Andujar homicide file, have you seen any
25   documents that indicate that -- any documents that

Page 248

1    contain information connecting Thomas Sierra to the
2    nickname "Junito" prior to his arrest on May 30, 1995?
3        MR. KIVETZ: Objection. Form. Foundation.
4        A    I -- I wasn't looking for an arrest card with
5    his name on it. So I -- I have no way of knowing if
6    there was one in there or not.
7        Q    Have you seen any arrest cards that indicate
8    that Thomas Sierra has a nickname "Junito"?
9        MR. KIVETZ: Objection. Form. Foundation.
10       A    I -- I don't recall seeing one, no.
11       Q    Have you seen any arrest reports that have the
12   nickname "Junito" associated with Thomas Sierra?
13       MR. KIVETZ: Objection. Form. Foundation.
14       A    I don't recall, no.
15       Q    Have you seen any document at all in the
16   Andujar homicide investigation file that connects
17   Thomas Sierra to the nickname "Junito" prior to his
18   arrest?
19       MR. KIVETZ: Objection. Form. Foundation.
20       A    No.
21       Q    Okay. Now, we talked about the fact that you
22   have no memory about when it is that you spoke to
23   Guevara and Halvorsen about Thomas Sierra and the
24   nickname "Junito," correct?
25       MR. KIVETZ: Objection. Form. Foundation.

Page 249

1    Misstates the testimony.
2        A    Correct.
3        Q    Okay. And so when you say that connecting
4    Thomas Sierra to "Junito" happened earlier than May 30th
5    of 1995, that's based on your review of documents,
6    correct?
7        A    I'm sorry, can you repeat the question,
8    please?
9        Q    Yeah. When -- I think you indicated a little
10   bit earlier that you believe that the connection between
11   Thomas Sierra and "Junito" was made earlier than
12   May 30, 1995. Is that what you said?
13       A    Yes. It has to be, yes.
14       Q    Okay. And so you say, "it had to be," that's
15   not based on your memory, it's based on your review of
16   documents, correct?
17       A    Well, it's based on the fact that that's how
18   he was identified by his nickname.
19       Q    But I think this nick -- strike that. What
20   I'm trying get clear about is the connection between
21   Thomas Sierra and "Junito" is a connection that you
22   helped the detectives make, correct?
23       A    Correct.
24       Q    And you don't have a specific memory about
25   when you helped them make the connection, correct?



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 66 of 132 PageID #:7656
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
250..253

Page 250

```
 1    A   I do not.
 2    Q   Okay.  And so any information you have about
 3  when that connection was made, be it May 30th, or
 4  May 29th, or 28th, or 27th, none of that is based on
 5  your memory, it's based on your review of documents,
 6  correct?
 7        MR. KIVETZ:  Objection.  Or earlier than
 8  May 26th and May 25th, and May 24th.
 9    A   That's correct.
10    Q   Okay.  And as you sit here today, do you have
11  an understanding of when it is that that connection was
12  made based on your review of documents?
13    A   I do not recall, no.
14    Q   Okay.  You indicated that you knew Thomas --
15  this document indicates that you knew Thomas Sierra from
16  "prior encounters," correct?
17    A   That's correct.
18    Q   What were the prior encounters from which you
19  knew Thomas Sierra?
20    A   I pulled up -- whenever I would see suspected
21  gang members, I would pull up and talk to them -- start
22  talking to them, start getting information, names,
23  nicknames, and so on and so forth.
24    Q   And so when you refer to prior encounters,
25  what you're referring to here are just instances in
```

Page 251

```
 1  which you might have chatted with him on the street when
 2  he was out with other serial gangsters?
 3    A   Right.  I chatted with him, I'm sure on more
 4  than one occasion, like I did with the others.
 5    Q   Do you have any specific memory of any of
 6  those encounters with him?
 7    A   Not after 26 years, I don't, no.
 8    Q   And do you agree with me, if I understand
 9  correctly, your prior encounters you're referring to in
10  your report are not any instances in which you were
11  involved in the arrest of Thomas Sierra; is that
12  correct?
13        MR. KIVETZ:  Objection.  Form.
14    A   You have to give me that question again.
15    Q   Would you agree with me that your reference to
16  prior encounters with Thomas Sierra in this report is
17  not a reference to interactions you had with him during
18  the course of any arrests, correct?
19        MR. KIVETZ:  Objection.  Form.  Foundation.
20    A   Correct.
21    Q   All right.  This document indicates that
22  once -- I'm sorry.  The document indicates that you --
23  "he was observed on the street by the undersigned,"
24  referring to you and Flavin, correct?
25    A   Yeah.
```

Page 252

```
 1    Q   And so once you went out to arrest them, would
 2  you agree with me you had a -- you were able to arrest
 3  him pretty quickly?
 4    A   That's correct.
 5    Q   Would you agree with me, you didn't have any
 6  problem finding Thomas Sierra?
 7    A   Did I have any --
 8        MR. KIVETZ:  Objection.  Form.
 9    A   Did I have any problems what?
10    Q   Finding Thomas Sierra.
11    A   It was just happenstance.  We happened to be
12  driving on a street where he was.
13    Q   But you found him right where you expected to
14  find him; is that right?
15        MR. KIVETZ:  Objection.  Form.  Foundation.
16  Speculative.
17    A   Yes.  That's right.
18    Q   And you found him on the first try, correct?
19        MR. KIVETZ:  Objection.  Form.  Foundation.
20    A   It was the first try that day.
21    Q   Do you have any idea if you made any attempts
22  to find him earlier than that?
23        MR. KIVETZ:  Objection.  Form.  Foundation.
24    A   I can only guess that I probably did.
25    Q   That's a pure -- that's a guess, you're
```

Page 253

```
 1  saying?
 2    A   Yeah.  I'm guessing that I probably tried to
 3  find him before that occasion.
 4    Q   You have no memory of that, correct?
 5    A   No.
 6    Q   And you've seen no document that indicates
 7  that you tried earlier than May 30th, correct?
 8    A   Correct.
 9        MR. KIVETZ:  Objection.  Form.  Foundation.
10    Q   And you previously indicated that when you
11  found Thomas Sierra, he was placed under arrest,
12  correct?
13    A   Yes.
14    Q   Okay.  Now, it indicates here in this
15  document, in the last sentence it indicates, "He
16  voluntarily accompanied the undersigned officers to Area
17  Five violent times -- crimes for further investigation."
18  Do you see that?
19    A   Yes.
20    Q   Is that an indication then that he was not
21  placed under arrest?
22        MR. KIVETZ:  Objection.  Form.
23    A   It was -- it was my intention to place him
24  under arrest.
25    Q   And he was placed under arrest, you told me,
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 67 of 132 PageID #:7657
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
254..257

Page 254

1  correct?
2      A    Yes.
3      Q    And he was placed under arrest some time
4  during that day, correct?
5          MR. KIVETZ: Objection. Form.
6      A    He was placed under arrest on that day, yes.
7      Q    Okay. In other words, during the daytime, you
8  said you didn't know what time it was, but it was
9  daytime, correct?
10     A    Correct.
11     Q    And the time on the prior arrest record of
12  3:30 seemed consistent with your memory that it was
13  during the daytime, correct?
14     A    It could be, I'm not certain.
15     Q    Okay. If Thomas Sierra had not -- so why did
16  you write that he voluntarily accompanied you if he was
17  placed under arrest?
18     A    Well, I explained to him why I was talking to
19  him and why I was looking for him. He said -- and I
20  told some detectives from Area Five I wanted to speak to
21  him. And he said, "Okay." And had he said, "Well, I'm
22  not going," then I would have told him he was under
23  arrest.
24     Q    So either way, he was under arrest, fair?
25     A    Yes. It's fair to say he was not free to go.

Page 255

1      Q    Okay. Now, looking back at page 2 of this
2  document. This is RFC 18. This identifies an incident
3  number 95-GI-0624, do you see that?
4      A    Yes.
5      Q    What is an incident number?
6      A    It's something that was exclusive to our unit
7  that they -- they keep records, or they kept records
8  of -- of case reports that we ourselves initiated.
9      Q    So there would be some file containing
10  information about your arrest in the Gang Crimes office?
11         MR. KIVETZ: Objection. Form and foundation.
12  Speculative.
13     A    There would have been essentially a copy of
14  the arrest report and the supplementary report that I --
15  I prepared.
16     Q    Anything else that would be associated with
17  the incident number 95-GI-0624?
18     A    Right. Nothing on the -- nothing on -- other
19  than the reports that I prepared.
20     Q    Okay. This document identifies a series of
21  arresting officers that you filled in, correct?
22     A    Yes.
23     Q    Who do you identify as the arresting officer
24  in this case?
25     A    Myself, my partner, Halvorsen, Guevara,

Page 256

1  Rodriguez, and Wiora.
2      Q    Since Halvorsen, Guevara, Rodriguez and Wiora
3  were not at all present when you arrested Thomas Sierra,
4  why did you list them as arresting officers?
5      A    When I called to get the information, that's
6  the list of the arresting officers that they gave me.
7      Q    When you called who to get what information?
8      A    Area Five.
9      Q    And why did you call Area Five?
10     A    For example, to get the time of arrest, you
11  know, or what they put down on paper may be different.
12  In other words, if I take somebody into custody at noon,
13  they may not officially want to place him under arrest
14  until say 10:00 that night when the state's attorney
15  gave them the authority to -- to charge him.
16     Q    What is -- so when did you make this call to
17  Area Five?
18         MR. KIVETZ: Objection. Form. Foundation.
19     A    Some time on that day after -- probably after
20  5:00.
21     Q    When you say on what day? May 30th or
22  June 1st?
23     A    June 1st, the day I made the report.
24     Q    So as you're writing the report, you make a
25  call to fill in the information here?

Page 257

1      A    Yeah. To get pertinent information. Like,
2  for example, the CD number and things like that.
3      Q    Okay. So all the information on page 2 of
4  this report came to you from Area Five?
5      A    Yes.
6          MR. KIVETZ: Objection. Form. Foundation.
7  Speculative.
8      Q    And who in Area Five provided you the
9  information that went on page 2 of this report?
10         MR. KIVETZ: Objection. Form. Foundation.
11  Speculative.
12     A    I have no idea. I don't remember.
13     Q    Would -- was it one of the detectives, do you
14  believe?
15         MR. KIVETZ: Objection. Form. Foundation.
16     A    I couldn't tell you, they read it off whatever
17  arrest report they had up there.
18     Q    So they just read it off to you, and then you
19  just filled it in; is that right?
20         MR. KIVETZ: Objection. Form. Foundation.
21     A    That's correct.
22     Q    And the information on page 3, that's
23  information that you wrote yourself, not based on a
24  phone call with Area Five, correct?
25     A    Correct.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 68 of 132 PageID #:7658
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
258..261

Page 258

1    Q    And so you listed arresting officers based on
2  what they told -- Area Five told you to put in, correct?
3         MR. KIVETZ: Objection. Form. Foundation.
4    Speculative.
5    A    Correct.
6    Q    And you put in assisting officers based on the
7  information they told you to put in, correct?
8    A    Yes.
9    Q    And did you -- in the arrest info, what is
10 identified as the time of arrest on this document?
11   A    It says -- whoever I spoke to said
12 23:00 hours, which would have been 11:00 that night or
13 the night of --
14   Q    So when you spoke -- so when you spoke to
15 someone at Area Five, they told you to put down the time
16 of arrest as 11:00 p.m., correct?
17        MR. KIVETZ: Objection. Form. Foundation.
18   Speculative.
19   A    Yes.
20   Q    Okay.  And would you agree with me the time of
21 arrest that they told you to put down was different than
22 time of arrest contained in the arrest report we looked
23 at as Exhibit A?
24        MR. KIVETZ: Objection. Form. Foundation.
25   A    Yes.

Page 259

1    Q    Okay.  And as you sit here today, can you
2  identify which of those is the correct time of arrest?
3    A    I couldn't honestly tell you because I don't
4  know when the state's attorney charged them.  So I
5  don't -- I don't -- I don't have any firsthand
6  knowledge.
7    Q    Well, what does the time the state's attorney
8  charge him would have to do with the time that he was
9  arrested?
10        MR. KIVETZ: Objection. Form. Foundation.
11   Speculative.
12   A    You know, different detectives in different
13 areas have different ways of doing things.  They'll put
14 down the time of arrest to coincide with the time that
15 the charges were approved.  Others will put down the
16 time that he was taken into custody.  So, you know, I
17 have to go along with that.
18   Q    So your practice was to put down as the time
19 of arrest the time that you took somebody in you -- at
20 the time that you actually arrested them or took them
21 into custody, correct?
22   A    My preference has nothing to do with it.  I
23 have -- I'll take the information down that's on their
24 arrest report.
25   Q    So according to Area Five detective division,

Page 260

1  the time of arrest for Thomas Sierra was 11:00 p.m. on
2  May 30th, correct?
3         MR. KIVETZ: Objection. Form. Foundation.
4    Speculative.
5    A    Correct.
6    Q    And is that an indication that as of
7  May 30th -- until 11:00 p.m. on May 30, 1995, they
8  didn't have probable cause to arrest Thomas Sierra?
9         MR. KIVETZ: Objection. Form. Foundation.
10   Misstates the previous testimony.
11   A    I couldn't say.
12   Q    Okay.  Now, let's take a look at -- sorry. And
13 just to be clear, on page 2 of this report where it
14 lists the time of arrest, it also -- it identifies the
15 location of arrest as 5555 West Grand, which is Area
16 Five, correct?
17   A    Yes.
18   Q    Okay.  And in the evidence inventory section,
19 it identifies none, meaning you were not identifying any
20 evidence or inventory to accompany this report; is that
21 correct?
22   A    That's correct.
23   Q    Okay.  And if you had an arrest card or an
24 index card containing -- connecting Thomas Sierra to the
25 nickname "Junito," you could have included that as

Page 261

1  evidence or inventory in this case, correct?
2    A    If I inventoried it for one reason or another,
3  then yes.  It would appear on there.
4    Q    And you could have made a copy that could have
5  been inventoried, correct?
6    A    Made a copy of what?
7         MR. KIVETZ: Objection. Form. Speculative.
8    Q    If there was an --
9         MR. SWAMINATHAN: I'm sorry.  Go ahead.
10   Q    If there was a copy of -- strike that.  If
11 there was an arrest card or an index card in your
12 personal collection that connected the name "Thomas
13 Sierra" to the nickname "Junito," you could have made a
14 copy of that and included it to be inventoried, correct?
15        MR. KIVETZ: Objection. Form. Foundation.
16   Speculative.  Incomplete hypothetical.
17   A    If I were asked to inventory it, I would have
18 been -- inventoried the original.
19   Q    And nobody asked you the inventory it?
20        MR. KIVETZ: Objection. Form. Foundation.
21   Speculative.
22   A    That's correct.
23   Q    And you never did inventory any document
24 making a connection between Thomas Sierra and the
25 nickname "Junito," correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 69 of 132 PageID #:7659
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
262..265

Page 262

1      MR. KIVETZ: Objection. Form. Foundation.
2      A    No. I never did.
3      Q    All right. Now, page 3, you agree with me
4  that is your signature at the bottom of the page?
5      A    Yes. It is.
6      Q    During your conversation with -- strike that.
7  During your interactions with Detective Guevara, did you
8  look at any photos?
9      MR. KIVETZ: Objection. Form. Foundation.
10  Speculative.
11      A    Did I look at any photos? No. I did not.
12      Q    Okay. Did he show you any photos?
13      MR. KIVETZ: Objection. Form. At what point
14  time are you talking about?
15      MR. SWAMINATHAN: On May 30th.
16      MR. KIVETZ: Okay. Objection. Form.
17  Foundation. Speculative.
18      A    No. I never saw Detective Guevara on the
19  30th.
20  BY MR. SWAMINATHAN:
21      Q    You're saying you didn't see him on the 30th
22  based on your memory about who you were -- that you
23  would have been off that day, correct?
24      A    Correct.
25      MR. SWAMINATHAN: Okay. Now, looking at --

Page 263

1  let's see here. How are you guys doing? Do you
2  need a quick break, or are you good?
3      THE WITNESS: I'm good.
4      MR. KIVETZ: How much time do we have, Aria?
5      COURT REPORTER: We just hit exactly five
6  hours.
7      MR. KIVETZ: Does that include the time from
8  the beginning -- or start of the other --
9      COURT REPORTER: Yes. It does.
10      MR. KIVETZ: -- the other video, I guess? It
11  does?
12      COURT REPORTER: It does.
13  BY MR. SWAMINATHAN:
14      Q    Okay. Let's take a look at this document,
15  which we'll mark as Exhibit D. This is RFC 5 through
16  6. This is RFC 5 through 5.1 is how it's Bates labeled.
17  This is a General Offense Case Report from the Chicago
18  police for the Noel Andujar investigation, correct, sir?
19      (EXHIBIT D MARKED FOR IDENTIFICATION)
20      A    It -- it appears so.
21      Q    And this is one of the documents you saw when
22  you reviewed the investigative file in this case,
23  correct?
24      A    Correct.
25      Q    Okay. Did you review it in your meeting with

Page 264

1  counsel in preparation for this deposition?
2      A    I'm sure I did at some point. I don't recall.
3      Q    Okay. And this -- a General Offense Case
4  Report is in a document you're well familiar with,
5  correct?
6      A    Yes.
7      Q    Okay. And it documents information taken down
8  by the beat cops who arrive at the crime scene that
9  they're able to gather, correct?
10      A    Yes.
11      Q    Okay. And looking at this General Offense
12  Case Report, does it provide any indication to you that
13  you were ever at the crime scene in this case?
14      A    No. I think I would've remembered this, no.
15  But -- no.
16      Q    Okay. When -- would you agree with me this
17  document indicates that the beat cops gathered some
18  information from the witnesses, being Jose Melendez and
19  Alberto Rodriguez?
20      A    Yeah. The report does indicate that, yes.
21      Q    Okay. And they gathered some information from
22  Mr. Melendez and Mr. Rodriguez about -- containing the
23  description that they were able to get from those two
24  individuals of the offender, correct?
25      MR. KIVETZ: The -- objection. The report

Page 265

1  speaks for itself. Foundation. You can answer.
2      A    Yeah. It's -- it's -- it's just a -- a
3  regular case report wit -- listing witnesses and the
4  victim.
5      Q    Okay. And in the section that I've
6  highlighted where it says "offender," then it identifies
7  number 1 NFD and number 2 NFD, that's where the beat
8  cops document what information the witnesses gave them
9  about their description of the offenders, correct?
10      MR. KIVETZ: Objection. Form. Foundation. The
11  report speaks for itself.
12      A    Yes.
13      Q    Okay. And in -- what does NFD stand for?
14      MR. KIVETZ: Objection. Form. Foundation. The
15  report speaks for itself.
16      A    No Further Description.
17      Q    Okay. So this indicates that Mr. Melendez and
18  Mr. Rodriguez were able to provide a very limited
19  description of the perpetrators; is that fair?
20      MR. KIVETZ: Objection. Form. Foundation. The
21  report speaks for itself.
22      A    It appears that way.
23      Q    And the only information Mr. Melendez and
24  Mr. Rodriguez were able to provide in the form of a
25  description was that the perpetrators were male

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 70 of 132 PageID #:7660
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021
266..269

Page 266

1   Hispanics, correct?
2           MR. KIVETZ:  Objection.  Form.  Foundation. The
3       reports speaks for itself.
4       A    Yeah.  If that's what it says in the report,
5   then that's -- that it, yes.
6       Q    That's what it means, right?  M4 is male,
7   white, Hispanics?
8           MR. KIVETZ:  Objection.  Form.  Foundation. The
9       report speaks for itself.
10      A    Yes.  It does.
11      Q    Does this report provide any other descriptive
12  information about the suspects other than that they were
13  male, white, Hispanics?
14          MR. KIVETZ:  Objection.  Form.  Foundation. The
15      report speaks for itself.
16      A    That's how it appears.
17      Q    Okay.  And then looking -- this report also
18  provides a section for a description of the
19  perpetrator's vehicle, correct?
20      A    Yes.
21      Q    Okay.  And under the -- in the property
22  section in box number 72, there's some information
23  provided and -- about a description of the vehicle
24  involved in -- the offender's vehicle, correct?
25      A    Yes.

Page 267

1       Q    Okay.  And what information was provided by
2   the witnesses, Melendez and Rodriguez, regarding the
3   offender's vehicle?
4           MR. KIVETZ:  Objection.  Form.  Foundation. As
5       to the box that you're highlighting?
6           MR. SWAMINATHAN:  Yes.  In box 72.
7           MR. KIVETZ:  Okay.  Objection.  Form.
8       Foundation.  The reports speaks for itself.  And let
9       the record reflect he's highlighted box 72.
10      A    It's -- just says "Buick."  Everything else is
11  unknown.
12  BY MR. SWAMINATHAN:
13      Q    And it indicates the color as being dark blue,
14  it appears?  Is that how you read it?
15          MR. KIVETZ:  Same objection.
16      A    Yeah.  That's what it looks like.
17      Q    Okay.  And then if you look in the narrative
18  section, it indicates that "The passengers was accosted
19  by a dark blue or black Park Avenue Buick, plates
20  unknown, with spoke wheels and tinted windows."  Do you
21  see that?
22      A    Yes.
23      Q    Okay.  So that was the further description
24  that they were able to provide about the offender
25  vehicle, correct?

Page 268

1           MR. KIVETZ:  Objection.  Form.  Foundation. The
2       reports speaks for itself.
3       A    It appears so.
4       Q    Okay.  Not seeing that description, are you --
5   is that car familiar to you?
6       A    No.
7       Q    Does that -- back in 1995, would that have
8   been a sufficient description for you to identify who
9   drove that car, a dark blue or black Park Avenue Buick
10  with spoke wheels and twi -- and tinted windows?
11          MR. KIVETZ:  Objection.  Form.  Foundation.
12      Speculative.  Incomplete hypothetical.
13      A    Probably not.
14      Q    Okay.  And why would that have probably not
15  been sufficient information for you to connect a car to
16  an individual?
17          MR. KIVETZ:  Same objection.
18      A    Because that could fit any number of cars.
19      Q    Buick Park Avenues were quite popular in that
20  time among people who lived in that -- in those
21  neighborhoods, correct?
22          MR. KIVETZ:  Objection.  Form.  Foundation.
23      Speculative.
24      A    I couldn't say.  It's just -- it was just not
25  a very specific description.  There's lots of Buicks.

Page 269

1       Q    Okay.  And there's lots of Buick Park Avenues,
2   correct?
3           MR. KIVETZ:  Objection.  Form.  Foundation.
4       A    I -- I guess so, yes.
5       Q    And there were a lot of dark blue or black
6   colored cars that were being driven in those
7   neighborhoods, correct?
8           MR. KIVETZ:  Objection.  Form.  Foundation.
9       Speculative.  Incomplete hypothetical.
10      A    There were a lot of cars looking a lot of
11  different ways, you know, in -- in that area so I -- I
12  couldn't tell you.
13      Q    And there were a lot of cars in that area with
14  spoke wheels and tinted windows, fair?
15          MR. KIVETZ:  Objection.  Form.  Foundation.
16      Speculative.
17      A    There were a lot of tinted windows.  There
18  were a lot of spoke, fancy wheels, you know.  But
19  that's -- that's everywhere.
20      Q    Okay.  All right.  Then it indicates on this
21  report some information on the right side where -- it
22  provides some information about gang related
23  affiliation.  Do you see that?  And I've highlighted box
24  59.
25      A    Yes.  Yes.  I do.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 71 of 132 PageID #:7661
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

270..273

Page 270

1    Q    And what information is collected in box 59?
2        MR. KIVETZ: Objection. Form. Foundation. The
3    reports speaks for itself.
4    A    It has -- you raised it a little bit, but it
5    says, "Spanish Cobras."
6    Q    Spanish Cobras were identified as the
7    offender -- the offenders were identified as being
8    Spanish Cobras, correct?
9        MR. KIVETZ: Same objection.
10   A    That's what the case report says. Yes.
11   Q    Okay. And the victims were identified as
12   being Latin Kings, correct?
13   A    Yes.
14   Q    Okay. And if you look at page 2 of the
15   report, it says that "They opened fire on Melendez's
16   vehicle after first representing the Spanish Cobra
17   street gang." Do you see that?
18   A    Yes.
19   Q    Okay. And so, fair reading of this report is
20   that the beat officers learned that the individuals who
21   were the perpetrators had represented the Spanish
22   Cobras, and thus had identified the Spanish Cobras as
23   being the offenders?
24       MR. KIVETZ: Objection. Form. Foundation. The
25   reports speaks for itself.

Page 271

1    A    Yes.
2    Q    Anything improper or unusual about that?
3        MR. KIVETZ: Objection. Form. Foundation.
4    A    About what, the description?
5    Q    About --
6    A    Is that what you're talking about?
7    Q    Is there anything unusual about identifying
8    the offenders as being possible Spanish Cobras based on
9    the fact that they had represented the Spanish Cobras
10   before shooting?
11       MR. KIVETZ: Objection. Form. Foundation.
12   Speculative.
13   A    There's nothing unusual about gang members
14   representing their gang when they commit a crime.
15   Q    Okay. So it was common for gang members to
16   represent their gang before committing a crime, correct?
17   A    Correct.
18       MR. KIVETZ: Same objection.
19   Q    And sometimes part of the purpose was to
20   represent the power of your gang when committing a
21   shooting, correct?
22       MR. KIVETZ: Objection. Form. Foundation.
23   Speculative.
24   A    Correct.
25   Q    And sometimes -- often gang members would want

Page 272

1    other people to know that they were the ones who
2    committed the crime, correct?
3        MR. KIVETZ: Objection. Form. Foundation.
4    Speculative.
5    A    Sometimes. That's correct.
6    Q    Okay. And -- so it would be fair to say,
7    based on this general offense case report, that Spanish
8    Cobras -- the involvement of Spanish Cobras was one lead
9    in this case?
10       MR. KIVETZ: Objection. Form. Foundation.
11   Speculative. Report speaks for itself.
12   A    It would appear.
13   Q    And from your review of this report as a gang
14   specialist and specialist on Imperial Gangsters, was
15   there anything in this General Offense Case Report that
16   points at all towards the Imperial Gangsters as
17   offenders?
18       MR. KIVETZ: Objection. Form. Foundation.
19   Speculative.
20   A    No.
21   Q    Okay. The fact that the victims in this case
22   were Latin Kings, does that provide any indication about
23   who the offenders might have been in this case?
24   A    No.
25   Q    The fact --

Page 273

1    A    Other than --
2    Q    Oh, I'm sorry. Go ahead.
3    A    Other than it would be a gang, probably,
4    that's opposed to the Latin King.
5    Q    And what gangs were opposed to the Latin Kings
6    in 1995 at that time?
7    A    Lots of them.
8    Q    Who were some of the gangs that were opposed
9    to Latin Kings at that time?
10   A    Imperial Gangsters, Maniac Latin Disciples,
11   YLO Disciples, OAs, Latin Lovers, Spanish Cobras, YLO
12   Cobras, Black Gangster Disciples, several others.
13   Q    So the idea that Spanish Cobras might have
14   been the perpetrators shooting at Latin King victims
15   would have been consistent with the gang rivalries at
16   that time; is that fair?
17   A    That's fair.
18   Q    Okay. Now the fact that the shooting occurred
19   in an area near the Logan Square Monument, that area was
20   controlled by the Orquestra Albany gang, correct?
21       MR. KIVETZ: Objection. Form. Foundation.
22   A    Yes.
23   Q    Does that provide any indication to you about
24   who -- what gang might have been responsible for this
25   crime?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 72 of 132 PageID #:7662
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
274..277

Page 274

1    MR. KIVETZ: Same objection.
2    A    You could say that it's a clue, yes.
3    Q    And what potential gangs would be the
4 potential perpetrators if this shooting occurred in the
5 area of the Orquestra Albany gang?
6    MR. KIVETZ: Same objection.
7    A    It could -- it -- just because it happened
8 where the OAs had their territory doesn't necessarily
9 mean that it was OAs.
10   Q    Doesn't necessarily mean that it was OAs who
11 what? Who committed the crime?
12   A    Committed this crime.
13   Q    Okay.
14   A    Yeah.
15   Q    The fact that it took place in an area
16 controlled by OAs, does it provide -- does that provide
17 any indication that rivals of the OAs may have committed
18 the crime?
19   MR. KIVETZ: Objection. Form. Foundation.
20 Speculative.
21   A    That's also a possibility.
22   Q    Okay. And who are some of the gangs who were
23 rivals of the OAs at that time?
24   MR. KIVETZ: Objection. Form. Foundation.
25 Speculative.

Page 275

1    A    Latin Kings, Insane Unknowns, just -- and
2 there are several others, Vice Lords.
3    Q    Would you agree with me the Insane -- strike
4 that. Would you agree with me the Imperial Gangsters
5 were not rivals of the Orquestra Albany gang at that
6 time, in 1995?
7    A    No. I wouldn't agree with you. The Imperial
8 Gangsters were seemingly at war with everybody.
9    Q    And what about the Spanish Cobras, were they
10 riv -- were they in a rivalry with the Orquestra Albany
11 gang at that time in 1995?
12   A    No.
13   Q    Okay. Now the Imperial Gangsters, can you
14 identify with -- is it your position that in 1995 at the
15 time of this crime, the Imperial Gangsters were at war
16 with every single other street gang?
17   MR. KIVETZ: Objection. Form. Foundation.
18 Misstates the testimony.
19   A    One of their -- one of their slogans was "the
20 Imperial Gangsters at war with the world." So they --
21 they -- they just about feuded with everybody.
22   Q    Now, the Imperial Gangsters, had they had any
23 recent beefs or, you know, shootings of Imperial
24 Gangsters by OAs at the time of this crime? Or any OAs
25 that they had recently shot at the time of this crime?

Page 276

1    MR. KIVETZ: Objection. Form. Foundation.
2    A    I can't recall.
3    Q    Can you recall any shootings of -- that
4 involved OAs and IGs around the time of this crime?
5    MR. KIVETZ: Same objection.
6    A    I can't off the top of my head, no.
7    Q    If there had been any shootings involving IGs
8 and OAs around the time of this crime, that would be the
9 kind of information that you might have been able to
10 provide to the detectives to assist them in trying to
11 solve this crime, correct?
12   MR. KIVETZ: Objection. Form. Foundation.
13 Speculative.
14   A    Yes.
15   Q    Okay. And you didn't see any indication in
16 the file that you had provided any such information to
17 the detectives in this case, correct?
18   MR. KIVETZ: Objection. Form. Foundation.
19   A    Apparently not.
20   Q    Okay. And if there had been recent shootings
21 between the Imperial Gangsters and Latin Kings, that's
22 the type of information you could have potentially
23 provided to the detectives in this case, correct?
24   MR. KIVETZ: Objection. Form. Foundation.
25 Speculative.

Page 277

1    A    If -- if I had that information. But this is
2 26 years ago, I don't know who was at war. I don't
3 remember who was at war with who then.
4    Q    Okay. Would you agree with me you don't --
5 there weren't any documents that you reviewed that
6 indicate that you shared any information about any
7 recent rivalry or shooting between the Imperial
8 Gangsters and Latin Kings?
9    A    No. I don't believe there are.
10   MR. SWAMINATHAN: Okay. Let me take another
11 quick five-minute break, I'm going to go to the
12 bathroom.
13   MR. KIVETZ: Okay. Are we still trying to be
14 done by 5:00, or no way?
15   MR. SWAMINATHAN: 5:00 is not happening, but
16 I'll definitely be done by 6:00 for you, Jeff. And
17 I'll try to -- I'll go as fast as I can, I'd like
18 you to be home for your kids.
19   COURT REPORTER: Okay. We're off record.
20   (OFF THE RECORD)
21   COURT REPORTER: On record at 5:49 p.m. Eastern
22 Standard.
23 BY MR. SWAMINATHAN:
24   Q    Okay. I'm showing you a document, we'll mark
25 as Exhibit E. It's Sierra 5509. This is a document

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 73 of 132 PageID #:7663
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021
278..281

Page 278

1  you reviewed in preparation for today's deposition,
2  correct, sir?
3       (EXHIBIT E MARKED FOR IDENTIFICATION)
4    A   Yes.
5    Q   Okay.  And is this arrest report something
6  that you filled out?
7    A   Yes.  It is.
8    Q   Okay.  And how do you know --
9    A   Most --
10   Q   Okay.
11   A   Mo -- most of it.
12   Q   Okay.  What portion of this did you not fill
13 out?
14   A   Arresting detectives.
15   Q   And how do you know that was filled in by
16 somebody else?
17   A   Because I -- I wouldn't have put that in
18 there.
19   Q   Okay.  So it's your understanding that you
20 filled in much of this report and somebody else filled
21 in the arresting detectives?
22   A   Correct.
23   Q   And so where it says Detective Guevara,
24 Halvorsen, McMurray, and Wojcik, your testimony is
25 somebody else typed that in; is that correct?

Page 279

1       MR. KIVETZ:  Objection.  Form.
2    A   Yes.
3    Q   And do you know who it is that typed that in?
4    A   Not a clue.
5    Q   And is your basis for saying that you didn't
6  fill that in the fact that you -- that's not what your
7  practice would have been?
8    A   That's correct.
9    Q   Okay.  Your name is listed as the first
10 arresting officer, correct?
11   A   Yes.
12   Q   And your star number is listed on this
13 document, correct?
14   A   Yes.
15   Q   But you didn't sign it; is that right?
16   A   Yes.
17   Q   Why not?
18   A   I was in a hurry to get out of there.  I'm on
19 my own time and I wanted to get home.
20   Q   That's your assumption --
21   A   It was just --
22   Q   Go ahead, sir.
23   A   It was just -- it was just an oversight.
24 That's all it was.
25   Q   Okay.  So it's not -- and that -- your

Page 280

1  testimony about the reason you didn't sign it, that's
2  not based on your memory, that's your assumption,
3  correct?
4    A   Yeah.
5       MR. KIVETZ:  Objection.  Form.
6    Q   And it was your typical practice to sign
7  arrest reports that you filled in, correct?
8    A   Yes.
9    Q   Okay.  And it was your typical practice of
10 your partner, Flavin, to also fill in -- to sign the
11 arrest reports that he participated -- where he was
12 listed, correct?
13      MR. KIVETZ:  Objection.  Form.  Speculation.
14    Foundation.
15    A   If he were in box number 1, then yes, he would
16 sign.
17   Q   Okay.
18   A   But generally speaking, the person in box
19 number 1 signs.
20   Q   Okay.  And this document indicates, "Person
21 Investigative Unit" noted in box 36, do you see that?
22   A   Let's see.  Sergeant -- Sergeant Biebel, yes.
23   Q   And so what is that -- what is identified --
24 what is the "Person Investigative Unit Notified"
25 intended to signify?

Page 281

1    A   Essentially -- since this is an Area Five
2  case, essentially when you bring in someone under
3  arrest, you have to notify someone, whether it's a
4  supervisor or whoever is working the desk, to let them
5  know that the arrestee is in one of the rooms.
6    Q   Okay.  Is there anything on this document that
7  indicates when you wrote this arrest report?
8    A   No.  It doesn't look like it.
9    Q   Okay.  Typically, there should be some indi --
10 information indicating when -- strike that.  Your
11 typical practice where you filled out arrest reports was
12 to include some information about when you were writing
13 and submitting the report, correct?
14      MR. KIVETZ:  Objection.  Form.  Foundation.
15    Speculative.
16    A   Yeah.  Normally.  Yes.
17   Q   Okay.  And as you sit here today, do you have
18 any memory from which you can explain why it is you
19 didn't do that in this case?
20   A   Well, I think I mentioned earlier different,
21 detectives have different ways of doing things.  The
22 same thing with the areas.  Sometimes the areas want you
23 to put down for time of arrest, the time that the
24 charges were approved by state's attorney.  That's why
25 you just leave that blank.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 74 of 132 PageID #:7664
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
282..285

Page 282

1  Q   Now, the -- well, I'm just asking you about
2  the -- well, strike that.  So looking at the date of
3  arrest, you're noting that you didn't include a time of
4  arrest, correct?
5  A   Does it say that?  It just says -- as far as
6  date of arrest, it just says 30 May, and the time I left
7  blank.
8  Q   Okay.  And that was --
9  A   That was number -- go on.
10  Q   Go ahead.
11  A   Box number 29.
12  Q   Okay.  In box number 29, where it asks for the
13  time of arrest, you left that blank, correct?
14  A   Correct.
15  Q   Okay.  And are you saying the reason you left
16  that blank -- are you saying you deliberately left that
17  blank because the detectives had different ways of
18  filling that in?
19      MR. KIVETZ: Objection. Form. Foundation.
20  Speculative.
21  A   Yeah.  Depending on whoever the detective is
22  or whatever area you're in, they like to leave that
23  blank so that they can put in the time of arrest, the
24  time the charges are approved.
25  Q   So your practice, whenever you filled in

Page 283

1  arrest reports for detectives was to leave the date of
2  arrest blank; is that right?
3      MR. KIVETZ: Objection. Form.
4  A   Right.
5  Q   Okay.  And if we look at other arrest reports
6  that you've filled in in homicide cases, we will find
7  that the date of arrest you'll leave a blank for the
8  time; is that right?
9      MR. KIVETZ: Objection. Form. Foundation.
10  Speculative.
11  A   You're asking me something that happened many,
12  many years ago.  I couldn't tell you.
13  Q   Well, that's why -- that's what I'm really
14  trying to understand.  Is it the case that you're
15  assuming that that might be why you left it blank or
16  that there really -- you can say with some degree of
17  certainty that the reason you left it blank is because
18  the detectives wanted you to?  That's what I'm trying to
19  understand.
20  A   Yes.
21      MR. KIVETZ: Objection. Form. Foundation.
22  Speculative.
23  A   Yeah.  I deliberately left that blank,
24  correct.
25  Q   And you have a specific memory of that?

Page 284

1  A   It was just my policy because I don't have all
2  the information, so I can't fill in information that I
3  don't have.
4  Q   And looking at the narrative section, you
5  didn't --
6  A   I'm -- I'm looking at it, yes.
7  Q   Would you agree with me you didn't list any
8  facts supporting probable cause in the narrative
9  section, correct?
10  A   I'm sorry, repeat that, please.
11  Q   You didn't list any facts supporting probable
12  cause in the narrative section, correct?
13  A   That's correct.
14  Q   Okay.  And as you sit here today, do you know
15  whether you'd been told any of the facts supporting
16  probable cause when you went out to make the arrest?
17  A   I had very little --
18      MR. KIVETZ: Objection. Form. Foundation.
19  A   I had very little information as to the facts
20  of the case.
21  Q   Okay.  So at the time you want to make the
22  arrest, you just knew that then you needed to go arrest
23  this man?  You hadn't been given the basis for probable
24  cause; is that right?
25      MR. KIVETZ: No. Objection. Form. Misstates

Page 285

1  the previous testimony.  You can answer.
2  A   I was told, and I've said this before, I was
3  told that he had been identified as an offender via a
4  photo array.
5  Q   And that's a specific memory that you have
6  today; is that right?
7  A   Yes.
8  Q   Of a conversation with a detective, but you
9  can't -- you don't know which detective, correct?
10  A   Right.  I don't recall if it was one of the
11  detectives who were handling the case or someone else
12  from Area Five.  I couldn't honestly tell you.
13  Q   Okay.  And why did you leave that information
14  out of the narrative?
15      MR. KIVETZ: Objection. Form. Foundation
16  Speculative.
17  A   This is an arrest report, though I haven't
18  mentioned this before.  This is just an arrest report
19  with very little information you clip it on the door so
20  that they know he's there and who he is and why he's
21  there.  As far as the narrative is concerned, putting
22  him down because I was told by an unknown detective that
23  he was wanted, that he was picked in a murder -- picked
24  up for a murder.  I don't want that to interfere with
25  whatever they put down on paper.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 75 of 132 PageID #:7665
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021
286..289

Page 286

1    Q    So you were filling this in on May 30th
2  itself, the date of arrest, correct?
3    A    Yes.
4    Q    And you were -- were you filling in at
5  Area Five?
6    A    Yes.
7    Q    And were you using a typewriter at Area Five?
8    A    Yes.
9    Q    Okay.  And so you had -- after you arrested
10 Thomas Sierra, you also came back to Area Five; is that
11 correct?
12   A    Correct.
13   Q    Okay.  And that's when you then prepared this
14 arrest report, correct?
15   A    Yes.
16   Q    And the -- strike that.  If you had been told
17 that Thomas Sierra had been identified from a photo
18 array, that's exactly the type of information you would
19 typically include in the narrative section of your
20 arrest reports.  Do you agree with that?
21   A    Yes.
22        MR. KIVETZ:  Objection.  Form.
23   Q    Okay.
24        COURT REPORTER:  I'm sorry, Mr. Kivetz, I
25 missed what you -- your objection.

Page 287

1        MR. KIVETZ:  Objection.  Form.
2  BY MR. SWAMINATHAN:
3    Q    Okay.  I think I asked you earlier if you had
4  any memory of the detectives showing you any photographs
5  in this case, correct?
6    A    You did ask me that, yes.
7    Q    And you indicated that you didn't have any
8  memory of the detectives ever showing you any
9  photographs, correct?
10   A    That's correct.
11   Q    Okay.  And do you have any memory of you
12 showing the detectives any photographs?
13   A    I do not.
14   Q    Okay.  Would you agree with me that -- well,
15 strike that.  Showing you a document we'll mark as
16 Exhibit F.  This is RFC 22 through 29.  And this is a
17 supplementary report dated May 30, 1995 at 11:00 p.m.
18        prepared by what looks like Halvorsen.  Do you
19 agree with that?
20        (EXHIBIT F MARKED FOR IDENTIFICATION)
21   A    I agree with the Halvorsen part, yes.
22   Q    And this is obviously not your -- this
23 is not a document that you prepared, correct?
24   A    Correct.
25   Q    Okay.  Did you review this document in

Page 288

1  preparation for today's deposition?
2    A    Not -- not this particular document.  No.
3    Q    Okay.  Then let's do this.  This document
4  iden -- I'm looking at page 2 of the document, it lists
5  with a witness being Hector Montanez.  Do you see that?
6    A    Yeah.  I do.  It was the back.
7    Q    Okay.
8    A    Yeah.
9    Q    Do you have any recollection of speaking with
10 Hector Montanez at any point when you were at Area Five?
11        MR. KIVETZ:  Objection.  Form.  Foundation.
12   Misstates the record.
13   A    I do not.
14   Q    Do you believe that you spoke to Hector
15 Montanez at any point related to this investigation?
16        MR. KIVETZ:  Same objection.
17   A    I don't -- I don't recall speaking to him at
18 all.
19   Q    Okay.  This document indicates time of arrest.
20 Do you see that?
21        MR. KIVETZ:  I'm sorry, where -- where are you?
22        MR. SWAMINATHAN:  I'm looking at paragraph 2 in
23 the middle of the -- just above the middle of the
24 page.
25        MR. KIVETZ:  Okay.  And you're talking about

Page 289

1  the time of arrest for Thomas Sierra?
2        MR. SWAMINATHAN:  That's correct.
3        MR. KIVETZ:  Sir, do you see that?
4    A    Yeah.  I see it.
5  BY MR. SWAMINATHAN:
6    Q    Do you have any reason to dispute of this
7  document's indication that Thomas Sierra was arrested on
8  May 30, 1995, at 3:30 p.m.?
9    A    No.  I have no problem with it.
10   Q    Okay.  Did you know a woman named
11 Esther Reyes?
12   A    No.  I didn't.
13   Q    It indicates that she lived at 3501 -- I'm
14 looking at page 3 here in the first paragraph.  It
15 indicates that she lived at 3501 West Belden.  Is that
16 an address that's familiar to you at all?
17   A    The neighborhood is familiar, but not that
18 particular address.
19   Q    Okay.  When you see -- and it listed, "Black
20 colored '86 to '88 Buick Park Avenue, four-door with
21 wire wheel covers."  Does that description of a car
22 provide any link to you to any specific individuals or
23 members of any particular gang?
24        MR. KIVETZ:  Objection.  Form.  Foundation.
25   A    No.  It is does not.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 76 of 132 PageID #:7666
The Deposition of GEORGE FIGUEROA, taken on June 11, 2021
290..293

Page 290

1    Q    Okay.  Are you looking at the beginning of
2  paragra -- of page 4, the first paragraph?
3    A    Yeah.  I see it.
4    Q    It indicates the reporting detectives
5  contacted you, Figueroa, and requested your assistance
6  in identifying who "Lil Hector" and "Junito" were.  Do
7  you see that?
8    A    I see that.
9    Q    Okay.  Now, the re -- the supplementary report
10  that you filled out does not contain any indication that
11  you assisted the detectives in identifying Lil Hector.
12  Would you agree with me?
13    A    Yes.
14    Q    Do you have any memory of assisting the
15  detectives at identifying Lil Hector?
16        MR. KIVETZ:  Objection.  Form.
17    A    Other than them asking me the nicknames,
18  that's all I recall.
19    Q    Well, you said that you have a memory of them
20  asking you the nickname "Junito."  Do you have any
21  memory of them asking you the nickname "Lil Hector"?
22        MR. KIVETZ:  Objection.  He said nicknames.
23  Misstates testimony.
24    A    They asked me, did I know "Lil Hector" and
25  "Junito."  And I told them, "I know two guys named

Page 291

1  Lil Hector and Junito, and these are their real names."
2    Q    Okay.  So when you had a specific memory about
3  them asking you about Junito, you also have a specific
4  memory about them asking you about Lil Hector; is that
5  right?
6    A    That's correct.
7    Q    Okay.  And do you know Hector Montanez to go
8  by the nickname, Lil Hector?
9    A    I know him to be, yes.
10    Q    Did he have any other nickname?
11    A    Not that I can remember now.
12    Q    Okay.  And if his nickname was "Lil Hector,"
13  would you expect that that would have been documented on
14  arrest reports and arrest cards?
15        MR. KIVETZ:  Objection.  Form.  Foundation.
16  Speculative.
17    A    Yeah.  It might be.
18    Q    And you expect you'd find it on the index card
19  that you kept in your trunk?
20        MR. KIVETZ:  Objection.  Form.  Foundation.
21  Speculative.
22    A    I -- I probably did have them in my nickname
23  file.
24    Q    It says that you showed photos of
25  Hector Montanez and Thomas Sierra to the reporting

Page 292

1  detectives.  Do you see that?
2    A    Yeah.  I saw that.
3    Q    Okay.  And you agree with -- I think we just
4  established, you don't have any memory of that
5  happening, correct?
6    A    That's correct.
7    Q    Okay.  And then it says, "the reporting" de --
8  dire -- "detectives recognized these two individuals as
9  being the persons they had seen in the black
10  Buick Park Avenue at the home of Esther Reyes."  You
11  don't have any memory of Guevara or Halvorsen ever
12  saying that to you, correct?
13    A    That's correct.
14    Q    You don't have any memory of any conversation
15  about a woman named Esther Reyes, correct?
16    A    That's correct.
17    Q    And would you agree with me you never said
18  anything to Reynaldo Guevara or Ernest Halvorsen
19  indicating that Hector Montanez drove a black Buick Park
20  Avenue, correct?
21        MR. KIVETZ:  Objection.  Form.  Foundation.
22    A    That's correct.
23    Q    Okay.  The next paragraph begins with a
24  sentence that says, "On 25 May '95 at 19:00 hours,
25  reporting detectives went to the home of eyewitness

Page 293

1  Alberto Rodriguez at 2717 North Hoyne."  Do you see
2  that?
3    A    Yes.  I do.
4    Q    And it indicates that he viewed a photo array
5  at that time, correct?
6        MR. KIVETZ:  Take your time.
7    A    Yes.  I see that.
8    Q    Okay.  Did you participate in that photo
9  array?
10    A    I don't recall participating in that.  No.
11    Q    Did you go to the home of Alberto Rodriguez?
12    A    I don't recall.  I don't -- I don't believe I
13  did.
14    Q    Did you provide the photos that were used for
15  the photo array?
16        MR. KIVETZ:  Objection.  Form.  Foundation.
17    A    I don't recall one way or the other.
18    Q    Okay.  So it's possible you provided the photo
19  used for the photo array?
20    A    I'm sorry, what?
21    Q    It's possible that you provided the photos
22  that were used for the photo array?
23        MR. KIVETZ:  Objection.  Form.  Foundation.
24    A    It's possible, but I don't have any real
25  memory of -- of doing that.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 77 of 132 PageID #:7667
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
294..297

Page 294

1    Q    Is it possible you went to the home of
2  Alberto Rodriguez and participated in the photo array?
3    A    No.  It's unlikely.
4    Q    Because you have no --
5    A    There would have been no --
6    Q    Go ahead.
7    A    There would have been no reason for me to go
8  with them.  I gave them the -- the two nicknames.
9    Q    And you had -- and you have no memory of any
10  such -- of participating in any photo array; do you
11  agree?
12    A    I have no memory of that.  That's correct.
13    Q    And this document indicates that Guevara and
14  Halvorsen went to the home of Alberto Rodriguez on
15  May 25, 1995.  Do you have any ability to say from your
16  memory whether that's a correct date and time or not?
17    A    I have no way of knowing that.
18    Q    Okay.  Let's see.  Now, when you participated
19  in a photo array in your -- during your time as a gang
20  specialist, would you have those photos inventoried
21  after a positive identification?
22        MR. KIVETZ:  Objection.  Form.  Foundation.
23    Speculative.  Incomplete hypothetical.
24    A    Yes.  The original photos, yes.
25    Q    Okay.  And whatever original photos you used

Page 295

1  for the photo array, would you have those inventoried on
2  that same shift?
3        MR. KIVETZ:  Objection.  Form.  Foundation.
4    Speculative.  Incomplete hypothetical.
5    A    Yes.
6    Q    Okay.  Would you ever wait a week before
7  inventorying the photos you used in a photo array?
8        MR. KIVETZ:  Objection.  Form.  Foundation.
9    Speculative.  Incomplete hypothetical.
10    A    No.
11    Q    Looking at page 5 of this report, it indicates
12  that gang specialist Rodriguez and Wiora observed the
13  black Buick Park Avenue of Hector Montanez driving down
14  the street and they stopped the car and determined that
15  the driver was Jose Melendez.  Let me pause there for a
16  second and ask you, did you participate in any arrest --
17  well -- strike that.  Did you participate in any effort
18  to locate the black Buick Park Avenue?
19        MR. KIVETZ:  Objection.  Form.  Foundation.
20    A    I did not.
21    Q    Okay.  It indicates at the end of this
22  report -- at the end of that paragraph that, "The
23  reporting detectives asked eyewitnesses Jose Melendez
24  and Alberto Rodriguez to walk through this parking lot
25  and see if the car involved in the shooting of Noel

Page 296

1  Andujar was present."  Did you participate in any car
2  identification procedure in the Andujar case?
3        MR. KIVETZ:  Objection.  Form.  Foundation.
4    A    No.  I did not.
5    Q    Okay.  Now, Thomas Sierra -- going back to
6  page 4.  If Thomas Sierra had been positively identified
7  on May 12 -- May 25, 1995 in a photo array by Alberto
8  Rodriguez, do you expect that he would have been
9  arrested shortly thereafter?
10        MR. KIVETZ:  Objection.  Form.  Foundation.
11    Speculative.
12    A    Had -- had I known then -- I -- I started
13  looking for him as soon as I was made aware that he was
14  picked out in photo array, and I don't recall when that
15  was.
16    Q    Okay.  And if he'd been identified in a photo
17  array on May 25, 1995, you expect that somebody would
18  have reached out to you as early as May 25, 1995, to
19  start looking for him?
20        MR. KIVETZ:  Objection.  Form.  Foundation.
21    Speculative.
22    A    You know, whenever I was notified, that
23  doesn't mean that that was the day that they were
24  identified.  I couldn't honestly tell you.  In other
25  words, if they were ide -- if they were identified in

Page 297

1  25th, that doesn't mean that I was told on the 25th that
2  he was wanted.  They could have told me the 28th.  I
3  don't know.
4    Q    Was Hector Montanez ever a confidential
5  informant as far as you know?
6        MR. KIVETZ:  Objection.  Form.  Foundation.
7    A    Not as far as I know.
8    Q    Was Hector Montanez ever somebody who was a
9  cooperator with a gang specialist or detectives?
10        MR. KIVETZ:  Objection.  Form.  Foundation.
11    A    I don't recall anything like that.
12    Q    Was Hector -- did Hector Montanez, have any
13  rank in the Imperial Gangsters?
14        MR. KIVETZ:  Objection.  Form.  Foundation.
15    A    Only that he had been an Imperial Gangster for
16  a long time and the rank that -- or the prestige that
17  goes with that.  Other than that, nothing official that
18  I can recall.
19    Q    And what about Thomas Sierra, did he have any
20  rank in the Imperial Gangsters?
21        MR. KIVETZ:  Objection.  Form.  Foundation.
22    A    I don't recall.
23    Q    You have no reason -- do you have any reason
24  to suggest that Thomas Sierra had any seniority or high
25  rank in the Imperial Gangsters?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 78 of 132 PageID #:7668
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021
298..301

Page 298

1          MR. KIVETZ: Objection. Form. Foundation.
2     A    I do not.
3     Q    Would you agree with me that if Thomas Sierra
4  had any kind of significant rank in the Imperial
5  Gangsters, that's something that you would have noted?
6          MR. KIVETZ: Objection. Form.
7     Speculative.
8     A    I would agree with that.
9     Q    Okay. And you didn't know any such thing with
10 regard to Thomas Sierra, correct?
11         MR. KIVETZ: Objection. Form. Foundation.
12    Speculative.
13    A    I'm not aware of any rank that he had at all.
14 I couldn't say for sure because I don't remember.
15    Q    Okay. A couple of this quick questions here.
16 Alberto Rodriguez -- I can turn off the screen here.
17 Alberto Rodriguez gave a statement to -- strike that.
18 There's a handwritten statement prepared by assistant
19 state's attorneys signed by Alberto Rodriguez. Did you
20 have any involvement in the preparation of that
21 handwritten statement?
22         MR. KIVETZ: Objection. Form. Foundation.
23    A    I did not.
24    Q    Assistant state's attorneys prepared a
25 handwritten statement that was signed by

Page 299

1  Hector Montanez. Did you have any involvement in the
2  preparation of that handwritten statement?
3     A    No. I did not.
4     Q    Assistant state's attorneys prepared a
5  handwritten statement signed by Jose Melendez. Did you
6  have any involvement in that handwritten statement?
7     A    No. I did not.
8     Q    Assistant state's attorneys prepared a
9  handwritten statement signed by Lucy Montalvo. Did you
10 have any involvement in the preparation of that
11 statement?
12    A    I did not.
13    Q    Okay. And you had no involvement in any
14 lineups that -- you have no knowledge of any lineups
15 that took place in the end of homicide investigation,
16 correct?
17         MR. KIVETZ: Objection. Form.
18    A    That's correct.
19    Q    Okay. I asked you previously about the Ruben
20 Gonzalez homicide which took place on May 20, 1995, and
21 you indicated that you haven't reviewed any documents
22 related to that case, correct?
23    A    Correct.
24    Q    And sitting here at this moment, you don't
25 have any memory of that homicide or your involvement in

Page 300

1  it; is that correct?
2     A    I do not.
3     Q    Okay. If I ask you to tell me everything you
4  can possibly remember about a shooting on May 20, 1995,
5  is there anything you could tell me?
6     A    I can tell you I don't remember it.
7     Q    Okay. Okay. Show you a document we'll mark
8  as Exhibit G. This is a -- are you seeing Sierra 5886
9  at the bottom of the page, sir?
10         (EXHIBIT G MARKED FOR IDENTIFICATION)
11    A    Yes.
12    Q    Okay. This is a series of photos, Bates stamp
13 Sierra 5886 through 5891. Do you recognize any of these
14 photos?
15    A    I recognize the people -- some of the people
16 in it.
17    Q    Which individuals do you recognize?
18    A    Well, that's Tommy Sierra there.
19    Q    Okay. And do you recognize this individual?
20    A    I do not.
21    Q    Do you recognize this individual?
22    A    Yeah. That's -- his nickname was "Snoopy."
23    Q    And what gang was he affiliated with?
24    A    The Imperial Gangsters.
25    Q    Do you know what gang this person in picture

Page 301

1  number 2 was affiliated with?
2     A    I do not.
3     Q    Do you recognize the person in picture
4  number 4?
5     A    I do not.
6     Q    Do you know what gang he was affiliated with?
7     A    No. I don't.
8     Q    Do you recognize the person in picture
9  number 5?
10    A    No. I don't.
11    Q    Do you know what gang the person in picture
12 number 5 was affiliated with?
13    A    No. I do not.
14    Q    And picture number 6, do you agree with me is
15 Thomas Sierra again?
16    A    Yes.
17    Q    Did you have any involvement in the
18 compilation or collection of these photos?
19         MR. KIVETZ: Objection. Form. Foundation.
20    Speculative. Misstates the evidence.
21    A    No. I did not.
22    Q    Okay. Let's take a look at a document we'll
23 mark as Exhibit H. This is Sierra 2997 through 3008,
24 and beginning with -- let me first ask you this. Looking
25 at this set of photos, I'm just going to leafing -- I'm

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 79 of 132 PageID #:7669
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021
302..305

Page 302

1  leafing through them here, do you have any memory of
2  being involved in the creat -- in the compilation or
3  collection of this set of photos?
4           (EXHIBIT H MARKED FOR IDENTIFICATION)
5      A   I don't.
6      Q   The Cleared Closed report that we looked at
7  just a few moments ago indicated that you had shown some
8  photos to Mr. Guevara and Mr. Halvorsen.  Can you
9  identify between these two sets of photos that's in
10  Exhibit G and Exhibit H, which photos you would have
11  shown to Mr. Guevara and Mr. Halvorsen?
12          MR. KIVETZ: Objection.  Form.
13     A   I would have show -- I would have shown Thomas
14  Sierra and Hector Montanez and Snoopy in there.  They -
15  his photo is there too.  I would have shown that.
16     Q   Why would you have shown them Snoopy's photo?
17          MR. KIVETZ:  Hold on, the record's not clear.
18  You're talking about in the exhibit that we're
19  currently looking at?
20     A   Yes.
21          MR. SWAMINATHAN:  Yes.  So let me ask to be
22  clear again, I guess the first question is --
23  (phone ringing) good over there?
24          MR. KIVETZ:  We're good.
25  BY MR. SWAMINATHAN:

Page 303

1      Q   Okay.  So the first question is, based on your
2  memory, can you say whether you showed photos from
3  Exhibit G or Exhibit H to Mr. Guevara and Mr. Halvorsen?
4          MR. KIVETZ: Objection.  Form.  Compound.
5  Misstates the evidence.
6      A   If -- if you ask me about this group of photos
7  that are up here, there are three photos there that were
8  my photos.  So I must have given them to Guevara and
9  Halvorsen.
10     Q   Now, how do you know that they are your
11  photos?
12     A   That is my handwriting back there.
13     Q   Okay.  So let's start with this first.  On
14  page 1, is that your handwriting?
15     A   No.
16     Q   Is any of the handwriting here yours?
17     A   I'm sorry?
18     Q   Is any of the handwriting on this page yours?
19     A   No.  Not at all.
20     Q   And do you see the name "Juan Sepulveda" and
21  the nickname "Roach"?
22     A   No.
23     Q   Is that somebody who you're familiar with?
24     A   No.
25     Q   And it indicates S/C.  Do you understand that

Page 304

1  to be a reference to Spanish Cobras?
2      A   Yes.
3      Q   And looking at page 2, this would be a picture
4  of the individual that was identified as "Roach" or
5  "Juan Sepulveda," does he look familiar to you?
6      A   No.
7      Q   Okay.  Taking a look at page 3, it says
8  "Mercedes Ruiz," is that your handwriting?
9      A   No.
10     Q   Is that a person who's familiar to you?
11     A   Not by name.
12     Q   Can you say what gang he may be a member of?
13     A   I have no idea.
14     Q   Is any of the handwriting on page 5 yours?
15     A   That's my handwriting.
16     Q   Which of the things on here are your
17  handwriting?
18     A   The things written in magic marker.
19  "Sierra IG's," that's my handwriting.
20     Q   Okay.  And so you believe -- this is what --
21  this is a picture that you had; is that right?
22     A   It -- it would, yeah.  It -- it had to be
23  because that's my handwriting.
24     Q   And was this one of the pictures that you kept
25  in your personal collection of photos?

Page 305

1      A   Yes.
2      Q   Would it come from a gang book at the
3  Gang Crimes offices?
4      A   No.
5      Q   And how do you know it came from your personal
6  collection?
7      A   Because I would mark the names and the gangs
8  behind the photo.
9      Q   Okay.  And where that --
10     A   The front of the photos there -- the front of
11  the photos doesn't contain that information.
12     Q   If you look at the bottom, it says "1A," does
13  that provide any information to you of significance?
14     A   No.
15     Q   Okay.  And page 6 shows a picture of
16  Thomas Sierra, correct?
17     A   Correct.
18     Q   Is it your understanding that this is a photo
19  that you provided to Guevara and Halvorsen?
20     A   I have no memory of that, but I must have
21  because that's my handwriting.
22     Q   Looking at page 7, is that your handwriting?
23     A   No.
24     Q   Okay.  Do you agree with me it indicates that
25  this is a photo of Hector Montanez?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 80 of 132 PageID #:7670
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
306..309

Page 306

1    A    I have to see the photo. That's Hector
2 Montanez, yeah.
3    Q    Okay. And page 9 indicates it is Jose Flores.
4 Is there any handwriting here that's yours?
5    A    That's my handwriting, yes.
6    Q    All of the -- all of the things in black
7 marker, "Jose Flores," "(INDICATING)," and "Snoopy,"
8 that's your handwriting?
9    A    That's correct.
10    Q    Do this come from your personal collection of
11 photos?
12    A    Yes.
13    Q    Okay. And is this a picture of Jose Flores
14 aka "Snoopy"?
15    A    Yes. It is.
16    Q    Okay. And so did you provide this picture to
17 Guevara and Halvorsen?
18    A    I must have, but I have no memory of it.
19    Q    Okay. And you agree with me when we looked at
20 Exhibit G, the other set of photos, it also included a
21 photo of Snoopy, correct?
22    A    Of Snoopy?
23    Q    Yes.
24    A    Yeah. That's him there.
25    Q    Okay. Do you know why you provided them with

Page 307

1 a picture of Snoopy?
2    A    I don't know.
3    Q    Is it your understanding that Snoopy was
4 somebody who was a potential suspect in this case?
5    MR. KIVETZ: Objection. Form. Foundation.
6 Speculative.
7    A    I'm not aware of it.
8    Q    Do you know one way or the other whether
9 Snoopy was a suspect in this case?
10    MR. KIVETZ: Objection. Form. Foundation.
11 Speculative.
12    A    I'm not aware of it one way or the other. That
13 may have been a filler.
14    Q    Okay. Looking at the next photo, page 11
15 identifies an Alan Martinez. Is any of this handwriting
16 yours?
17    A    No.
18    Q    And it indicates that he's a "Cobra." That's
19 the reference to Spanish Cobras, correct?
20    A    Yes.
21    Q    And do you recognize the person in -- on
22 page 12, who -- Alan Martinez?
23    A    I do not.
24    Q    Okay. Does it appear to you that this set of
25 photos consists of IGs and Spanish Cobras?

Page 308

1    A    The IGs --
2    MR. KIVETZ: Objection. Form. The photos
3 speak for themselves.
4    A    The IGs I recognize, I don't recognize the
5 others.
6    Q    Okay. You didn't have as much knowledge of
7 the Spanish Cobras, correct?
8    A    No.
9    Q    Is that correct or not correct?
10    A    No. It's -- it's correct. I didn't have
11 knowledge of them, mu -- much knowledge.
12    Q    Okay. So it's your understanding that the
13 photo in Exhibit H is of a series of photos you provided
14 to the detectives? What about the photo on Exhibit G?
15 I'll go back to that now. Do you know whether that this
16 is a photo that you provided to the detectives? It's
17 Exhibit G --
18    MR. KIVETZ: Objection.
19    -- on page 1.
20    MR. KIVETZ: Objection. I think this misstates
21 his previous testimony. You can go ahead and
22 answer.
23    A    I did not provide that photo.
24 BY MR. SWAMINATHAN:
25    Q    How do you know that?

Page 309

1    A    Because I didn't have that photo.
2    Q    And how do you know you didn't have that
3 photo?
4    A    Because I know I had the other photo, the one
5 that I showed you. The one -- yeah. The original one
6 with my handwriting, that one I must have provided.
7    Q    Is it possible --
8    A    This photo --
9    Q    Go ahead, sorry.
10    A    This photo, really until recently, I've never
11 seen it before.
12    Q    Did you have -- is it possible you had more
13 than one photo of Thomas Sierra.
14    MR. KIVETZ: Objection. Form.
15    A    No. It's not really possible because -- I
16 mean, there would be no reason to have doubles of the
17 same -- of the same person. You want to have the most
18 recent photos.
19    Q    Okay. Take a look at a document I'm going to
20 mark as Exhibit I. This is RFC Sierra 4900 to 4901.
21 I'm going to zoom in a little bit. This is a
22 supplementary report related to a shooting that took
23 place on
24 May 20, 1995 of an individual named Ruben Gonzalez. Do
25 you see that, sir?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 81 of 132 PageID #:7671
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
310..313

Page 310

1      (EXHIBIT I MARKED FOR IDENTIFICATION)

2      A    Yes.

3      Q    Okay.  This is not a report that you reviewed

4   in preparation for today's deposition, correct?

5      A    Correct.

6      Q    Okay.  This is a report prepared by Mr.

7   Halvorsen and Mr. Guevara.  I want to give you an

8   opportunity to read the investigation section here on

9   page 1.  Please let me know when you're done doing that.

10      A    Okay.  I see it.

11      Q    Okay.  Let's take a look at page 2.  I want

12   you to go ahead and read page 2 as well.  You tell me

13   when you're done.

14      A    Slow down.  Okay.

15      Q    As you've had a chance to review this

16   document, does it refresh your memory at all about any

17   involvement you had in the Ruben Gonzalez homicide

18   investigation?

19         MR. KIVETZ: Objection. Form. Foundation.

20      A    No.  It does not.

21      Q    Does it cause any memories to come to your

22   mind about any role you played that is documented in

23   this report?

24         MR. KIVETZ: Objection. Form. Foundation.

25      A    No.  It really doesn't.

Page 311

1      Q    Okay.  Looking at page 1 of this report.  It

2   indicates that, "The reporting detectives contacted gang

3   specialist George Figueroa and arranged a meeting with

4   Patrolman Ron Malczyk 14th District, gang specialist

5   Figueroa and the reporting detectives."  Do you see

6   that, sir?

7      A    Yes.  I do.

8      Q    Do you have -- so this document, you agree

9   with me, indicates that you arranged a meeting between

10   the detectives and Mr. -- and Patrolman Malczyk,

11   correct?

12         MR. KIVETZ: Objection. Form. Foundation.

13      Misstates the evidence.

14      A    That's what it says, but I have no memory of

15   that.

16      Q    Okay.  And to the extent you did do that,

17   would you have reached -- after speaking with the

18   detectives, you would have had some conversation with

19   Malczyk to set up a meeting, correct?

20         MR. KIVETZ: Objection. Form. Foundation.

21      Misstates the report.

22      A    Yes.

23      Q    And another way to put it, if you had been

24   asked to arrange a meeting by the detectives with a

25   Patrolman Malczyk, what would you have done?

Page 312

1         MR. KIVETZ: Objection. Form. Foundation.

2      Speculative.

3      A    What do you mean, what would I have done?

4      Q    Yeah.  What would you -- once you've got a

5   call from the detective saying, "Hey, set up a meeting

6   for us with the Patrolman Malczyk," what would you have

7   done to make that happen?

8         MR. KIVETZ: Objection. Form. Foundation.

9      Speculative.  Incomplete hypothetical.

10      A    I would have gotten on the police radio and

11   call them over -- call them over the air and figured out

12   a spot to meet.

13      Q    Okay.  Do you -- and do you have any memory of

14   where that meeting took place?

15         MR. KIVETZ: Objection. Form. Foundation.

16      A    Not a clue.

17      Q    Okay.  Do you -- strike that.  Do you know

18   which of the reporting detectives was present for that

19   meeting?

20         MR. KIVETZ: Objection. Form. Foundation.

21      A    I don't remember the meeting.  I don't even

22   know much -- so, much less who was there.

23      Q    Would you agree that sometimes in the reports,

24   when it lists reporting detectives and there's more than

25   one, that doesn't always mean that all of those

Page 313

1   reporting detectives participated in whatever is

2   documented?  Would you agree with that or is that not

3   true?

4         MR. KIVETZ: Objection. Form. Foundation.

5      Speculation.

6      A    You know, I honestly couldn't -- I honestly

7   couldn't say it.  I mean, if he's going to write an

8   accurate -- if someone's going to write an accurate

9   report, they're going to put down everybody that was at

10   that meeting.

11      Q    Okay.  Do you have that -- as you sit here

12   today, do you know why the detectives would have needed

13   your help to arrange a meeting or interview with the

14   patrolman?

15         MR. KIVETZ: Objection. Form. Foundation.

16      Speculative.

17      A    Because if the Imperial Gangsters were

18   involved in some way and they needed identification,

19   they would have called our office.  Our office would

20   have referred them to me.  So I could show -- so I could

21   show photos.  That was pretty common.

22      Q    Okay.  So your understanding is the reason you

23   would have been involved with is to the extent they

24   wanted to be able to show photos to Mr. Malczyk; is that

25   right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 82 of 132 PageID #:7672
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

314..317

Page 314

1     MR. KIVETZ: Objection. Form. Foundation.
2  Speculative.
3     A    Possibly photos and because I was pretty
4  familiar with the Imperial Gangsters.
5     Q    Okay. And if the detectives had just wanted
6  to talk to Malczyk, they could have arranged that
7  themselves. Do you agree with that?
8     A    Yes.
9     MR. KIVETZ: Objection. Form. Foundation.
10 Speculative.
11    Q    Looking at page 2 of the report, it indicates
12 that, "A car pulled up going west on Fullerton and
13 stopped at the accident scene. The car was silver-
14 colored and looked like an early '80s Chevrolet Monte
15 Carlo or similar car." Do you see that, sir?
16    A    Yes. I do.
17    Q    Is -- from that description, does that provide
18 you with information from which you could figure out
19 what the Imperial Gangsters might have been involved?
20    MR. KIVETZ: Objection. Form. Foundation.
21 Speculative.
22    A    No. It doesn't.
23    Q    Does that description give you any leads or
24 hints about what Imperial Gangsters may have driven such
25 a car?

Page 315

1     MR. KIVETZ: Same objection.
2     A    No. It does not.
3     Q    Okay. And why not?
4     MR. KIVETZ: Same objection.
5     A    Why not?
6     Q    Yeah.
7     A    I didn't -- I didn't keep records of what the
8  Imperial Gangsters were driving because that changed
9  from day to day.
10    Q    Okay.
11    A    Information like that, really doesn't help me.
12    Q    It indicates here that, "The two Imperial
13 Gangsters stated that the victim had been shot by the
14 OAs who were driving a large dark Buick." Do you see
15 that?
16    A    Yes.
17    Q    "Always driving a large, dark Buick," does
18 that give you any hints on who those individuals might
19 have been?
20    MR. KIVETZ: Objection. Form. Foundation.
21 Speculative.
22    A    No. It is not.
23    Q    Okay. Do you have any recollection of any of
24 this conversation in which Malczyk is purportedly
25 telling the reporting detectives that he spoke to two

Page 316

1  Imperial Gangsters who stated that the victim had been
2  shot by the OAs and were driving a large dark Buick?
3     MR. KIVETZ: Objection. Form. Foundation.
4     A    No. I don't.
5     Q    Okay. And it indicates here that Malczyk was
6  shown photos of Imperial Gangsters by you. Do you have
7  any memory of that?
8     A    I really don't.
9     Q    Do you know what photos would you have shown
10 to Officer Malczyk?
11    A    Impe --
12    MR. KIVETZ: Objection. Form. Foundation.
13 Speculative.
14    A    Imperial Gangsters photos.
15    Q    Would they have been photos from Imperial
16 Gangsters gang books?
17    MR. KIVETZ: Objection. Form. Foundation.
18 Speculative.
19    A    They would have been my -- my personal photos.
20    Q    And do you know what would -- strike that.
21 Would your -- from your personal collection of photos,
22 did you consider that to be a pretty comprehensive set
23 of photos of Imperial Gangsters?
24    MR. KIVETZ: Objection. Form. Foundation.
25 Speculative.

Page 317

1     A    Yes. I -- I was pretty fastidious about
2  keeping accurate photos and records and things.
3     Q    Would the collection of photos that you showed
4  to Officer Malczyk have included a photo of Thomas
5  Sierra?
6     MR. KIVETZ: Objection. Form. Foundation.
7  Speculative.
8     A    If -- if -- if he saw all my photos, then yes.
9     Q    And would it have included a photo of Hector
10 Montanez?
11    MR. KIVETZ: Objection. Form. Foundation.
12 Speculative.
13    A    Again, if he saw all my photos, then, yes, it
14 would have included them.
15    Q    All right. So with regard to those -- that
16 top section discussing the interview with Mr. Malczyk
17 and photos being shown to Mr. Malczyk, would you agree
18 with me you have no memory of those things happening,
19 correct?
20    A    I absolutely do not.
21    Q    Okay. Now, looking at the bottom, there's a
22 paragraph that talks about the detective speaking
23 with -- the reporting detective speaking with the
24 Detective Bongiorno. Did you participate in any
25 conversation with Detective Bongiorno as far as you're

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 83 of 132 PageID #:7673
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
318..321

Page 318

1  aware?

2     A    No.

3     Q    Objection. Form. Foundation. Speculative.

4     A    No. I don't have any memory of that.

5     Q    Okay. Let's take a look at the document we'll

6  mark as Exhibit J. This is Bates stamped RFC Sierra

7  4904 through 4907. And this is a supplementary report

8  prepared by Detective Woitowich --

9            (EXHIBIT J MARKED FOR IDENTIFICATION)

10    A    Woitowich.

11    Q    Woitowich, sorry say it again?

12    A    I think it's -- if it's the same name I'm

13  thinking of, it's Woitowich.

14    Q    Woitowich, okay. And Detective Graf, do you

15  see that?

16    A    Yes.

17    Q    Okay. And this was submitted on May 20th of

18  '95. It looks like at 12:00 p.m. This is not a

19  document you reviewed in preparation for today's

20  deposition, correct?

21    A    No. I've never -- I haven't seen this.

22    Q    Okay. Do you know Detectives Woitowich and

23  Graf?

24    A    I know Graf, and Woitowich is deceased.

25    Q    Okay. Were they individuals who you had some

Page 319

1  interactions with while you were a gang specialist?

2            MR. KIVETZ: Objection. Form. Foundation.

3     A    Yes. They both work in Gangs North for a

4  while.

5     Q    Oh, so they previously worked in Gangs North

6  before being detectives?

7     A    Yes.

8     Q    Did you know them to be good detectives?

9            MR. KIVETZ: Objection. Form. Foundation.

10  Speculative.

11    A    Yes.

12    Q    Do you know them to be good gang specialists?

13           MR. KIVETZ: Same objection.

14    A    They were not gang specialists.

15    Q    I'm sorry, what was their role in Gangs?

16    A    They were patrol officers. They worked on the

17  tactical side.

18    Q    Do you know them to be good patrol officers

19  when they were working in the gang unit?

20    A    Yes.

21    Q    Okay. Did you find them in their work as

22  patrol officers and as detectives to be thorough and

23  accurate?

24           MR. KIVETZ: Objection. Form. Foundation.

25  Speculative.

Page 320

1     A    Known to be what?

2     Q    Did you find them to be thorough and accurate?

3  Or did you find them to be guys who would sometimes be

4  sloppy?

5     A    Well, I never worked with them individually. I

6  just knew them because we were in the same unit. I have

7  no reason to think they were anything other than good

8  police officers.

9     Q    Okay. So this is -- it indicates a number of

10  individuals who were assigned to the investigation and

11  I'll -- just to keep things moving on I'll keep going,

12  but you tell me if you want me to go back, if you want

13  to go back and read through this stuff in order to

14  answer my questions, which I'm happy to do. It lists on

15  page 3 -- one second, sorry. It lists here on page 3, a

16  series of investigative steps that were done. And I

17  don't intend to ask you about the mass -- vast majority

18  of this, but you're welcome to read it if you'd like. I

19  don't intend to ask you anything on page 3, but let me

20  know when you're done, having a chance reading it.

21           COURT REPORTER: Mr. Kivetz, if you don't mind

22      just speaking up. Kind of sounds like you are kind

23      of far away from the speaker.

24           MR. KIVETZ: Okay.

25           COURT REPORTER: Thank you.

Page 321

1     A    Okay.

2  BY MR. SWAMINATHAN:

3     Q    And looking at page 4, it indicates that the

4  Detective Woitowich and Graf spoke with Police Officer

5  Malczyk. Do you see that?

6     A    Yes.

7     Q    Okay. Read that section and let me know when

8  you're done doing that.

9     A    Okay.

10    Q    Right. After you've' had a chance to review

11  that section. Do you have any reason to believe or

12  recollection that you participated in an initial

13  interview of Police Officer Malczyk on May 20th of '95?

14    A    I don't recall the meeting or any kind of

15  interview with the Officer Malczyk.

16    Q    And this report does not indicate that you

17  participated in this May 20th meeting with Malczyk,

18  fair?

19           MR. KIVETZ: Objection. Form. Report speaks

20      for itself.

21    A    No. It does not.

22    Q    Okay. And this report indicates that Malczyk

23  told the detectives about a silver-colored vehicle which

24  was parked by the victim's vehicle containing two male

25  white Hispanics, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 322

1  A  Yes.
2     MR. KIVETZ: Objection. Form. The report
3  speaks for itself.
4  Q  And it indicates that they were -- sorry to
5  ahead, go ahead, Jeff.
6     MR. KIVETZ: Objection. Form. Foundation. The
7  report speaks for itself.
8  Q  And it indicates that he recognized them to be
9  members of the Imperial Street Gang. So the information
10  in that second paragraph, would you agree with me, is
11  pretty consistent with the information that is
12  documented in the Exhibit I that we just looked at a
13  moment ago, in terms of the interview of Detective
14  Malczyk; correct?
15     MR. KIVETZ: Objection. Form. Foundation. If
16  you know.
17  A  I can't -- I can't say for sure.
18  Q  Okay. Let's look at the next paragraph in
19  Exhibit J. It indicates here that when Malczyk spoke
20  with Woitowich and Graf that the silver-colored vehicle
21  returned to the scene and that Malczyk told them to
22  remain, but the silver-colored vehicle pulled off before
23  Malczyk could talk to them. Do you see that?
24  A  Yes.
25  Q  Okay. So according to this report, I think

Page 323

1  we -- you'll agree with me what Woitowich and Graf
2  learned from Malczyk was that he wasn't able to get any
3  information from the Imperial Gangsters in the silver
4  car, fair?
5     MR. KIVETZ: Objection. Form. Foundation.
6  Speculative. The report speaks for itself.
7  A  Yeah. It -- it would appear that to be the
8  case.
9  Q  Okay. Now, looking at -- going back to
10  Exhibit I, which was three days later, May 23, 1995.
11  Malczyk purportedly tells Guevara and Halvorsen that the
12  IGs in the silver-colored car told Malczyk that the
13  victim had been shot by the OAs who were driving a large
14  dark Buick. Would you agree with me that contradicts
15  the information in the May 20th report by Wo --
16  Woitowich, and Graf?
17     MR. KIVETZ: Objection. Form. Foundation.
18  Speculative. The report speaks for itself If you
19  know. Do you understand the question?
20  A  Yeah. It appears that way, but I can't say
21  for sure.
22  BY MR. SWAMINATHAN:
23  Q  And in your experience working with patrol
24  officers, if they had a conversation with witnesses at
25  the scene of a shooting give a description of the car

Page 324

1  and the gang involved, would they share that information
2  with detectives?
3     MR. KIVETZ: Objection. Form. Foundation.
4  Speculative. Incomplete hypothetical.
5  A  Some officers would, and I think some officers
6  would not.
7  Q  And why do you say some officers -- some
8  patrol officers would not share information about a lead
9  about the potential vehicle involved and the gang
10  involved?
11     MR. KIVETZ: Objection. Form. Foundation.
12  Speculative. Incomplete hypothetical.
13  A  Some, you know, some -- some police officers
14  are better than others. It's the only way I can explain
15  it.
16  Q  And do you have any experience or knowledge of
17  Mr. Malczyk?
18  A  I know who he is. We're not -- we're not
19  friends.
20  Q  Do you have any reason to believe that he was
21  -- that he would have withheld information from
22  Detective Woitowich and Graf about if he'd had a
23  conversation with the Imperial Gangsters in a silver
24  car?
25     MR. KIVETZ: Objection. Form. Foundation.

Page 325

1  Speculative.
2  A  You know, I -- I -- I could honestly tell you.
3  I -- I don't know. I've never worked with him.
4  Q  Okay. So you agree that you have no reason to
5  believe he would have deliberately withheld information
6  from those detectives. Do you agree with that?
7     MR. KIVETZ: Objection. Form. Foundation.
8  Speculative.
9  A  I would -- you know, I have no reason to
10  believe one way or the other --
11  Q  Okay.
12  A  -- how he handled that.
13  Q  And if Malczyk had told information to
14  Detective Woitowich about the Imperial Gangsters, saying
15  that the perpetrators were always in a large dark Buick,
16  do you have any reason to believe that the detectives
17  would have deliberately omitted that information from
18  their scene sum?
19     MR. KIVETZ: Objection. Form. Foundation.
20  Speculative.
21  A  No. I don't think there would be any reason
22  for them to -- I -- I thought they were good detectives.
23  I have no reason to believe that they would deliberately
24  omit any kind of information.
25  Q  Do you have any explanation for how Malczyk



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 85 of 132 PageID #:7675
THE DEPOSITION OF GEORGE FIGUEROA taken on June 17, 2021
326..329

Page 326

1  came to speak to Detective Guevara and suddenly his
2  story changed about what happened with the Imperial
3  Gangsters in the silver car?
4       MR. KIVETZ: Objection. Form. Foundation.
5  Speculative.
6       A  I have no idea.
7       Q  Do you have any idea which is the true story
8  between the -- what is documented by Detective Guevara
9  and Halvorsen versus what's documented by Woitowich and
10 Graf?
11      MR. KIVETZ: Objection. Form. Foundation.
12 Speculative. Argumentative.
13      A  I have no idea. It's been a long time.
14      Q  Detective Guevara has asserted his Fifth
15 Amendment rights about whether he made up his interview
16 of Malczyk. Are you aware of that?
17      MR. KIVETZ: Objection. Form. Foundation.
18      A  I am not.
19      Q  Do you have any opinion one way or the other
20 about whether Detective Guevara made up this interview
21 with Malczyk documented in Exhibit I?
22      MR. KIVETZ: Objection. Form. Foundation.
23 Speculative.
24      A  I -- I have not a clue.
25      Q  Okay. Are you familiar with the name

Page 327

1  Jorge Mulero, an individual with that name?
2       A  Off the top of my head, no.
3       Q  I'm showing you a document we'll mark as
4  Exhibit K. This is an arrest report of Jose E. Melendez
5  in the Ruben Gonzalez case. Is there any reason to
6  believe you had any involvement in the arrest of
7  Jose E. Melendez?
8       (EXHIBIT K MARKED FOR IDENTIFICATION)
9       MR. KIVETZ: Objection. Form. Foundation.
10 Speculative. Give him a minute to review the
11 report.
12      A  This doesn't ring a bell.
13      Q  Okay. Have you had a chance to review that
14 arrest report? Does it refresh your memory at all about
15 Ruben Gonzalez's case and your involvement in it at all?
16      A  No. I read the report. It's just -- none of
17 that rings a bell.
18      Q  The reports that I've shown you so far are
19 related to the Ruben Gonzalez case, Exhibit I, J, and
20 now K. Do they refresh your memory at all about the
21 Ruben Gonzalez case?
22      A  Not at all.
23      Q  I'm just going to ask you the same question
24 about Exhibit, I think, L, which is RFC Sierra 4986 to
25 4998. This is what appears to be a Cleared Closed

Page 328

1  Report in that case. Is it on your screen? Let's see
2  here. Do you see it now?
3       (EXHIBIT L MARKED FOR IDENTIFICATION)
4       A  Yeah. I see the front of it, yeah.
5       Q  Okay. This is a Cleared Closed -- this is a
6  report, talking about the report by Guevara and
7  Halvorsen dated June 9th 1995. And I'm going to give
8  you a chance to read through it, and I -- and my
9  question is just whether after reading it, it causes you
10 to have any recollection of your involvement in the
11 Ruben Gonzalez homicide investigation, okay? You just
12 tell me when to turn.
13      A  Okay. They say that he has no gang
14 involvement. Okay. All right. Okay. Okay. All
15 right.
16      Q  Have you had a chance to review Exhibit L, the
17 Closing Supplementary Report in the Gonzalez case? Does
18 it cause you to have any memories about that homicide
19 investigation?
20      A  Not in the least.
21      Q  I'm showing you a document we'll mark as
22 Exhibit M. This is RFC Sierra 2845 through 2857. Do
23 you recognize -- let's turn to page 8. Let me rotate
24 this. Do you recognize the vehicle depicted on page 8
25 of this report?

Page 329

1       (EXHIBIT M MARKED FOR IDENTIFICATION)
2       A  I do not.
3       Q  And looking at pages 10, 11 -- sorry, pages
4  11, 12, and 13, do you recognize the vehicle depicted on
5  those pages of this exhibit?
6       A  No. I don't.
7       Q  Looking at Exhibit N, which is RFC Sierra 62
8  through 70. Do you recognize this vehicle?
9       (EXHIBIT N MARKED FOR IDENTIFICATION)
10      MR. KIVETZ: Objection. Form. Foundation.
11      A  No. I do not.
12      Q  Okay. I'm showing you a document we'll mark
13 as Exhibit O, and these are Defendant George Figueroa
14 Answers to Plaintiff's First Set of Interrogatories. All
15 right. Do you recall filling out some answers to
16 interrogatory, sir?
17      (EXHIBIT O MARKED FOR IDENTIFICATION)
18      A  Yes.
19      Q  And is that your page on -- is that your
20 signature on page 14 as the attestation?
21      A  Yes. It is.
22      Q  Did you review this document before signing
23 it?
24      A  Yes.
25      Q  Question number 5 asks you, "Do you contend



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 86 of 132 PageID #:7676
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

330..333

Page 330

1 that Plaintiff Thomas Sierra murdered Noel Andujar? If
2 so, please provide the complete factual basis for your
3 contention." And you indicate in this response,
4 "Defendant Figueroa states that he was not present when
5 Noel Andujar was shot, and that he does not have
6 personal knowledge of whether plaintiff murdered
7 Noel Andujar." Do you see that?
8     A   Yes. I do.
9     Q   Okay. Fair to say that you do not know
10 whether or not Thomas Sierra, in fact, killed
11 Noel Andujar?
12    A   That's fair to say.
13    Q   Okay. And that you understand that
14 Thomas Sierra was exonerated for that crime, correct?
15        MR. KIVETZ: Objection. Form. Foundation.
16    A   Yeah. I'm aware of that now.
17    Q   And do you know what the evidence was that
18 formed the basis for his conviction being thrown out?
19        MR. KIVETZ: Objection. Form. Foundation.
20    A   I do not.
21    Q   And as you sit here today, do you have any
22 opinion one way or the other about whether Thomas Sierra
23 committed that crime?
24        MR. KIVETZ: Objection. Form. Foundation.
25    Speculative. False related conclusion.

Page 331

1     A   I do not.
2     Q   Okay. Looking at paragraph 7 -- question
3 number 7, it concerns punitive damages.
4         MR. SWAMINATHAN: Jeff, I think we have a -- my
5     recollection is that we have a stipulation on
6     punitive damages. Can you remind me if that's right
7     or whether I should ask questions on this?
8         MR. KIVETZ: We have our general agreement that
9     I struck with STAR (phonetic) at some point in time.
10        MR. SWAMINATHAN: Say that again, sorry.
11        MR. KIVETZ: We have a general agreement on
12    holding off punitive damage discovery, and that will
13    be the general practice between us until -- unless
14    something changes.
15        MR. SWAMINATHAN: Okay. Right.
16 BY MR. SWAMINATHAN:
17    Q   All right. Last topic that I want to talk to
18 you about is your experiences with Detective
19 Reynaldo Guevara. First, let me ask you, what is
20 that -- do you have an opinion about Detective Reynaldo
21 Guevara as a Gang Crimes officer or as a detective?
22        MR. KIVETZ: Objection. Form. Foundation.
23    Speculative.
24    A   I don't have an opinion one way or the other.
25 I don't -- we -- you know, we didn't know each -- each

Page 332

1 other socially. We never worked on the same team or the
2 same, you know Occasionally he would come to me, like in
3 this case, to try to get somebody identified. But that
4 was the extent of it.
5     Q   And did he -- would he have contacted you
6 directly knowing that you were the specialist in
7 Imperial Gangsters, or would he have reached out through
8 supervisors, and they would have led him to you?
9         MR. KIVETZ: Objection. Form. Foundation.
10    Speculative.
11    A   Generally, his supervisor would contact my
12 supervisor or my unit. That's how those meetings
13 occurred.
14    Q   So did you -- is it fair to say you don't have
15 an opinion one way or the other about Detective Guevara
16 as an investigator?
17    A   That's correct.
18    Q   Do you have an opinion one way or the other
19 about Detective Halvorsen as an investigator?
20    A   I didn't really have much contact with him
21 either.
22    Q   Okay. Are you aware of the various
23 allegations of misconduct against Detective Guevara?
24        MR. KIVETZ: Objection. Form and foundation.
25    A   Yeah. I do now, yes.

Page 333

1     Q   You've seen that information in the news?
2     A   Yes.
3     Q   Had you heard any rumors about that during the
4 time that you were a Chicago police officer?
5         MR. KIVETZ: Objection. Form and foundation.
6     Speculative.
7     A   No. And I don't believe anybody did, to be
8 honest with you.
9     Q   Do you have -- upon seeing the various news
10 articles about the allegations of misconduct against
11 Detective Guevara, do you have any opinion one way or
12 the other about those allegations of misconduct?
13        MR. KIVETZ: Objection. Form. Foundation.
14    Speculative.
15    A   No. I don't.
16    Q   You indicated that you had been on a team with
17 Joseph Miedzianowski for a period of time, correct?
18    A   Yes.
19    Q   How long were you and Joe Miedzianowski
20 working in the same -- as gang specialists at the same
21 team?
22    A   Well, it's hard -- it's hard to say because we
23 worked in Gangs together on the same team for a number
24 of years. And then after, he made gang specialists, I
25 made gang specialist. So gosh, it's -- I'm going to say

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 87 of 132 PageID #:7677
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
334..337

Page 334

1   about 16 years, that he was taken into custody in '98,
2   and I went to Gangs in '90 -- '82 he was already there.
3       Q    Okay.  So you'd worked with him for about
4   15 to 16 years in Gang Crimes?
5           MR. KIVETZ:  Objection.  Form.
6       A    Yes.
7       Q    Did he have a nickname in the streets?
8           MR. KIVETZ:  Objection.  Form and foundation.
9       A    A nickname?
10      Q    Yeah.
11      A    No.  Not that I'm aware of.  Not that I'm
12  aware of.
13      Q    Did you ever hear people refer to him as
14  "Joe Blow"?
15          MR. KIVETZ:  Objection.  Form.  Foundation.
16  Speculative.
17      A    Not until just now, this minute.
18      Q    Did you have an opinion of Joe Miedzianowski
19  as a gang specialist?
20          MR. KIVETZ:  Objection.  Form.  Foundation.
21  Speculative.
22      A    I thought he had remarkable instincts.
23      Q    Anything else you thought about him as it
24  comes to this -- him as a gang specialist?
25      A    That he was exceptionally bright, spoke a

Page 335

1   couple -- spoke a couple of languages and that's pretty
2   much it.  Very knowledgeable.
3       Q    And why do you say he had "good instincts"?
4       A    You know, he just seemed to know, you know,
5   his -- his gangs very well.
6       Q    And did you eventually come to learn that he
7   had been operating a criminal enterprise out of the gang
8   crime offices?
9           MR. KIVETZ:  Objection.  Form and foundation.
10  Speculative.
11      A    A bunch of us were there when the -- the FBI
12  arrested him.
13      Q    It happened at the Gang Crime offices?
14      A    Yeah.
15          MR. KIVETZ:  Same objection.
16      A    Yes.
17      Q    Did you have any wind that it was about to
18  happen?
19      A    I'm sorry.
20          MR. KIVETZ:  Objection.  Form.  Foundation.
21  Speculation.
22      Q    Did you have any wind that it was about to
23  happen, or any sense that it was about to happen?
24      A    Not until he was arrested.  No one -- no one
25  had a clue.

Page 336

1       Q    So when he was arrested, it was a total
2   surprise to everybody that he had been the subject of
3   any investigation; is that right?
4           MR. KIVETZ:  Objection.  Form and foundation.
5   Speculative.
6       A    We were all stunned.
7       Q    Had you at that -- up to the point that he had
8   been arrested, had you heard anything from supervisors
9   or colleagues that indicated to you that people had some
10  sense that he was the subject of any kind of
11  investigation?
12          MR. KIVETZ:  Objection.  Form and foundation.
13  Speculative.
14      A    Not a clue.
15      Q    After his arrest, did anyone from the Chicago
16  Police Department talk to you about Joseph Miedzianowski
17  and his conduct while a Gang Crimes officer?
18          MR. KIVETZ:  Objection.  Form and foundation.
19      A    No one from the CPD at all.
20      Q    And did you -- was there ever any internal
21  investigation into Miedzianowski that you became aware
22  of while you were a gang specialist?
23          MR. KIVETZ:  Objection.  Form and foundation.
24      A    Not at all.
25      Q    Are you aware of any efforts by the

Page 337

1   Chicago Police Department to find out if there were
2   other individuals that had -- might have been involved
3   in Miedzianowski's criminal enterprise?
4           MR. KIVETZ:  Objection.  Form.  Foundation.
5   Speculative.
6       A    Okay.  What was the first part of that
7   question?
8       Q    Did anyone from internal of -- strike that.
9   Did you have -- did you ever come to learn of any
10  internal investigation into whether there was anyone
11  else in the department who had been involved with
12  Miedzianowski's criminal enterprise?
13          MR. KIVETZ:  Objection.  Form.  Foundation.
14      A    No.  Not at all.
15      Q    Was there any investigation done into other
16  individuals who worked closely with Detective Mied --
17  with Mr. Miedzianowski to find out if there were other
18  people who might have been tainted or involved in his
19  practices?
20          MR. KIVETZ:  Objection.  Form.  Foundation.
21      A    I know when the FBI was investigating him,
22  they investigated all of us.
23      Q    And when you say investigated all - "they
24  investigated all" of you, what do you mean?
25      A    Everyone on his team.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 88 of 132 PageID #:7678
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
338..341

Page 338

1    Q    And how were you -- so would that mean you
2  were investigated?
3         MR. KIVETZ:  Objection.  Form.  Foundation.
4    A    It -- it stands to reason that the FBI is
5  going to investigate one guy, they're going to
6  investigate everyone around him to see if -- if there
7  was any kind of conspiracy going on.
8    Q    Do you have any specific knowledge if the FBI
9  was investigating you?
10        MR. KIVETZ:  Objection.  Form.  Foundation.
11   A    The FBI notified all of us that our bank
12 records and our telephones were tapped, and our bank
13 records were checked and things like that.  But this was
14 after the fact.
15   Q    This was after Miedzianowski's arrest?
16   A    Yes.
17   Q    And they notified you after his arrest that
18 they had been tapping your phones or that they were
19 going -- that they had done that after the arrest?
20        MR. KIVETZ:  Objection.  Form.
21   A    Once he was in custody and that part of the
22 investigation was over, that's when they told us.
23   Q    That they had previously wire-tapped you or
24 tapped your phone without you knowing about it?
25   A    Correct.

Page 339

1    Q    Okay.  And did anyone from the Chicago Police
2  Department conduct any investigation into you or anyone
3  else who was on Miedzianowski's team, that you're aware
4  of?
5         MR. KIVETZ:  Objection.  Form and foundation.
6    A    Not that I'm aware of.
7    Q    And was there any changes that occurred within
8  your unit after Miedzianowski was arrested, as
9  implemented by the Chicago Police Department?
10        MR. KIVETZ:  Objection.  Form.
11   A    The unit was disbanded eventually.
12   Q    Was it because of the Miedzianowski's
13 investigation?
14        MR. KIVETZ:  Objection.  Form and foundation.
15   A    They denied it.  But we all knew that that was
16 coming.
17   Q    Okay.  Have you ever spoken to anyone about
18 Miedzianowski's criminal conduct in the criminal
19 enterprise, that he had been ultimately convicted of
20 operating?
21        MR. KIVETZ:  Objection.  Form.
22   A    Spoken to who specifically?
23   Q    To anyone.  Have you spoken publicly about
24 Miedzianowski?
25   A    Just, you know, amongst ourselves.

Page 340

1    Q    "Amongst ourselves" being among the gang
2  specialists?
3    A    Gang specialists and anybody who knew
4  Miedzianowski.  You know, patrol officers as well.
5    Q    Did you speak with anyone outside of CPD about
6  Miedzianowski for his criminal practices?
7    A    You mean like the -- there was a documentary
8  about him.  And I spoke in that documentary if that's
9  what you're talking about.
10   Q    So you spoke to the media about Miedzianowski?
11   A    Documentarian.
12   Q    Okay.  And what information did you provide to
13 the documentarian about Miedzianowski's criminal
14 enterprise?
15        MR. KIVETZ:  Objection.  Form.
16   A    Just whatever was in the newspapers because
17 there was a -- a newsman involved too.  He -- he did all
18 the -- he covered the whole story, the trial, and
19 everything.
20   Q    The things you learned about Miedzianowski's
21 criminal enterprise, did you learn any of it from CPD,
22 or did it all come from your own viewing of the news
23 media?
24   A    The CPD and newspaper articles.
25   Q    So what information did the CPD share with you

Page 341

1  directly about Miedzianowski's conduct?
2         MR. KIVETZ:  Objection.  Form.
3    A    Nothing.  They just -- when they came to
4  arrest him, they took -- they took files of anything
5  that his name may appear on.
6    Q    Other than that, did CPD ever sit the gang
7  specialists down and say, "hey, here's what we learned
8  about what was going on with Miedzianowski"?
9         MR. KIVETZ:  Objection.  Form.
10   A    They did not.
11   Q    Did anyone else --
12        MR. KIVETZ:  I'm sorry, foundation to the last
13 question.
14   Q    Did anyone from CPD ever sit you down as a
15 gang specialist and say, "Hey, here are some changes
16 we're going to make in order to prevent this kind of
17 thing from happening again"?
18        MR. KIVETZ:  Objection.  Form.  Foundation.
19 Speculative.
20   A    No.  To -- they just told us eventually that
21 they -- eventually when they disbanded the unit.  They
22 told us that they would be separating us and sending us
23 to different parts of the city.
24   Q    You came to learn eventually that
25 Miedzianowski had been sharing information about who

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 89 of 132 PageID #:7679
The Deposition of GEORGE FIGUEROA, taken on June 15, 2021
342..345

Page 342

1  certain undercover police officers were, correct?
2        MR. KIVETZ: Objection. Form. Foundation.
3  Speculative.
4     A   Yes. We did hear that.
5     Q   And did you come to learn that he was
6  tampering in police investigations in the street gangs?
7        MR. KIVETZ: Objection. Form. Foundation.
8  Speculative.
9     A   Nothing official. You know, we heard rumors,
10 that's about it.
11    Q   Did you come to learn that he had been
12 tampering in homicide investigations involving street
13 gangs?
14       MR. KIVETZ: Objection. Form. Foundation,.
15    A   Again, nothing official.
16    Q   When you say -- so what is the unofficial way
17 you would have learned about that?
18    A   Just people talk, and you hear rumors. That's
19 it.
20    Q   Did you ever hear while you were working --
21 did you ever hear of any Homicide detectives or gang
22 specialists, talking about a point in time when they had
23 come to learn that Miedzianowski he had taken documents
24 from homicide investigation files --
25       MR. KIVETZ: Objection. Form.

Page 343

1     Q   -- and shared them with gang members?
2        MR. KIVETZ: Objection. Form. Foundation.
3     A   You heard rumors after the arrest, but nothing
4  before that.
5     Q   Okay. Did you ever hear of anything about the
6  then Commander Klein banning Miedzianowski from Area
7  Five?
8        MR. KIVETZ: Objection. Form. Foundation.
9  Speculative.
10    A   No. Nothing specific.
11    Q   And what are some of the gangs or gang leaders
12 that you came to learn that Miedzianowski had been
13 working with?
14       MR. KIVETZ: Objection. Form. Foundation.
15    A   It's a long time ago. I don't remember their
16 names or -- to be honest with you, I don't remember any
17 of their names. Just what was in the newspapers.
18    Q   You came to learn that he had been working
19 with leaders of the Imperial Gangsters, correct?
20       MR. KIVETZ: Objection. Form. Foundation.
21 Assumes facts not in evidence. Misstate his
22 testimony.
23    A   Eventually you hear of stuff like that in the
24 newspapers.
25    Q   And you came to learn that he'd been working

Page 344

1  with Juan Martir, who had -- for a while was the leader
2  of the Imperial Gangsters, correct?
3        MR. KIVETZ: Objection. Form foundation.
4  Misstate the testimony.
5     A   I knew Juan Martir who was. He never really a
6  leader, and we heard that he was arrested in Florida
7  with some cocaine. That's all I heard.
8     Q   Did you ever hear of any connection between
9  Miedzianowski and Juan Martir?
10       MR. KIVETZ: Objection. Form. Foundation.
11    A   Well, the FBI told us that after his arrest in
12 Florida, that's what started the inv -- investigation
13 into Miedzianowski.
14    Q   So you learned that that part of the
15 investigation had focused on a connection between both
16 of -- between Miedzianowski and Martir. Do I have that
17 right?
18       MR. KIVETZ: Objection. Form. Foundation.
19 Speculative.
20    A   Yes.
21    Q   And there was also a high-level
22 Imperial Gangster named Joseph DeLeon. Do you recall
23 that?
24       MR. KIVETZ: Objection. Form. Foundation.
25    A   Well, I know Joseph DeLeon. If you're asking

Page 345

1  me that, I know him.
2     Q   Who is Joseph DeLeon?
3     A   That he was an old school Imperial Gangster,
4  and I find out because I saw it the newspapers.
5     Q   And he had been also working with
6  Miedzianowski, correct?
7        MR. KIVETZ: Objection. Form. Foundation.
8  Speculative.
9     A   That's what it said in the papers.
10    Q   And what kind of things did you come to learn
11 that Miedzianowski had been doing with the
12 Imperial Gangsters, including Martir and DeLeon?
13       MR. KIVETZ: Objection. Form. Foundation.
14 Speculative.
15    A   Only what was in the media.
16    Q   And what were some of the things you learned
17 from the media or from the rumors that you were hearing
18 from others about what -- in what way that Miedzianowski
19 was working with these senior people in the
20 Imperial Gangsters?
21       MR. KIVETZ: Objection. Form. Foundation.
22 Speculative. Relevant.
23    A   Just that he was in -- in the drug business
24 with Joseph DeLeon. The -- the CPD was -- they're not
25 going tell us anything, because they're, you know, doing

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 90 of 132 PageID #:7680
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
346..349

Page 346

1  their investigations and so they're not going to tip us
2  all.
3      Q   As you heard -- as you learn more afterward,
4  you came to learn that these members of the Imperial
5  Gangsters were assisting Miedzianowski, correct?
6          MR. KIVETZ: Objection. Form. Foundation.
7  Speculation. Relevance. What he knows from the
8  media.
9      A   Only what I read in the media.
10     Q   And you came to learn that Miedzianowski was
11 also providing protection for some of those
12 Imperial Gangster leaders, correct?
13         MR. KIVETZ: Objection. Form. Foundation.
14 Speculative. Relevance.
15     A   That's what the media said, yes.
16     Q   And do you have any reason to dispute any of
17 that information about Miedzianowski providing
18 protection to senior leaders in the Imperial Gangsters?
19         MR. KIVETZ: Objection. From. Foundation.
20 Speculative. Speculation.
21     A   Well, before he was arrested, as far as I was
22 concerned, he had very little to do with any of them. I
23 was mainly the Imperial Gangster guy.
24     Q   And so you had no idea that he'd been
25 communicating with those leaders of the

Page 347

1  Imperial Gangsters?
2      A   No. Not at all.
3      Q   Okay. Did you have any -- are you aware of
4  this idea that sometimes, high-level gang leaders will
5  rat out the lower-level guys in their gang to protect
6  themselves?
7          MR. KIVETZ: Objection. Form. Foundation.
8  Speculation.
9      A   That's -- that's pretty common, yes.
10     Q   Okay. And so for example, in a major case --
11 major narcotics case or a major homicide case, was it
12 common for the high-level leaders to basically give a
13 lower-level guy to the -- rat them out?
14         MR. KIVETZ: Objection. Form. Foundation.
15 Speculation. Relevance.
16     A   Well, I mean, I know that higher-level gang
17 members will try to in -- get less involved in the drug
18 trade, and let the younger members take the heat for
19 what they're doing.
20     Q   And was it ever the case that high-level gang
21 members, in your experience, if there was, you know,
22 some potential risk that they were going to be charged
23 in a case, that they would offer up lower-level members
24 in their gang or have their finger pointed at the
25 lower-level individuals to protect themselves?

Page 348

1          MR. KIVETZ: Objection. Form. Foundation.
2  Speculation. Incomplete hypothetical. Relevance.
3      A   You know, as far as, you know, they really
4  don't kind of pretty much don't tell on each other, you
5  know. They may tell on someone else, but not on one of
6  their own.
7      Q   Had you ever been accused of misconducts --
8  sorry. Had you ever had any complaints filed against
9  you in which you were accused along with Miedzianowski?
10         MR. KIVETZ: Objection. Form. Foundation. If
11 you know.
12     A   Nothing specific that I can recall.
13     Q   Did you work with him on -- an Operation
14 Mongoose?
15         MR. KIVETZ: Objection. Form. Foundation.
16     A   Yes.
17     Q   Did you work with -- and just tell us
18 generally what Operation Mongoose was about.
19     A   It involved the Spanish Cobras from the
20 25th District. And we had another officer from the --
21 patrol officer from the 25th District, we knew them. So
22 he was assigned to us to help us identify these guys.
23     Q   And did you work with him on an Operation
24 Diamond?
25         MR. KIVETZ: Objection. Form. Foundation.

Page 349

1      A   With who, with Miedzianowski?
2      Q   With Miedzianowski.
3      A   That operation was -- was strictly mine.
4      Q   Operation Diamond was strictly yours?
5      A   Right. His involvement was the fact that he
6  was on our team, and he may have been a surveillance
7  officer or something like that.
8      Q   And what was Operation Diamond generally
9  speaking?
10     A   Operation Diamond is what?
11     Q   What was Operation Diamond, just in general
12 terms?
13     A   It was a narcotics operation targeting the
14 Imperial Gangsters.
15     Q   Have you ever been disciplined by the
16 Chicago Police Department?
17     A   Yes.
18     Q   How many times?
19     A   Twice.
20     Q   When was the first time you were disciplined?
21     A   That was sometime in the '80s for not
22 inventorying property.
23     Q   This is when you were a Gang Crime specialist
24 or a patrolman?
25     A   I was the -- I think I was -- I believe I was



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 91 of 132 PageID #:7681
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
350..353

Page 350

1  still a tactical officer then.
2      Q    And what property had you failed to inventory?
3      A    It was a pager and money that I got off of a
4  kid whose father was a police officer.  He told me it
5  was his father's pager, so I didn't inventory it.  I
6  just hand carried it, gave it to his father, so his
7  father wouldn't have to go through all the hassle of
8  having to do paperwork to get his pager back.
9      Q    And who complained against you?
10     A    The police officer.
11     Q    The father?
12     A    The father, yeah.
13     Q    Why wasn't the father appreciative that you
14 gave him back the pager without having him have to go
15 through those extra steps?
16         MR. KIVETZ: Objection. Form. Foundation.
17     Speculative.
18     A    I couldn't tell you why he did it.  But it was
19 a professional courtesy.  And he just -- I -- I couldn't
20 tell you.  He denied that he complain -- he denied that
21 he complained against me, but internal affairs said that
22 he did.
23     Q    And did you give him -- so did you actually --
24 had you actually given the father back the pager?
25     A    Yeah.  I gave him back his pager and his kid's

Page 351

1  money.
2      Q    Before he ever complained against you?
3      A    Yeah.
4         MR. KIVETZ: Objection. Form. Foundation.
5         MR. SWAMINATHAN: Aria how much time do we have
6     left?
7         COURT REPORTER: You're at six hours and 53
8     minutes.  So seven minutes.
9  BY MR. SWAMINATHAN:
10     Q    Okay.  What was the other incident in which
11 you were disciplined?
12     A    It was for three -- three kids said that I --
13 I slapped them.  They were -- they robbed my nephews.
14 They were taken to custody, and I was never notified of
15 the robbery until after the fact.  But they said some
16 officers came -- one particular officer came and slapped
17 them.  And they -- IED got -- sorry the OPS got the CR
18 number on me, because they found out that they were my
19 nephews.  But I was never there.  These kids were shown
20 lineups, they picked other people.  But yet, they gave
21 me the -- I got the CR, I took a five-week suspension,
22 and then it was overturned later on.
23     Q    And then what was your discipline for the
24 first one in the '80s, for the inventory?
25     A    It was a -- a day in lieu of, which means I

Page 352

1  worked one day without pay.
2      Q    Other than those two instances, had you ever
3  been subject to any letters of reprimand?
4      A    Not that I can recall.
5      Q    What are the total number of CRs that you
6  received in your career?
7      A    Oh, I have no --
8         MR. KIVETZ: Objection. Form. Foundation.
9      A    I have no idea.
10     Q    Yeah.  If I said it was 54 CRs, does that
11 sound about right?
12         MR. KIVETZ: Objection. Form. Foundation.
13     A    I -- I couldn't tell you.
14     Q    Do you have an explanation for why you have so
15 many CRs?
16         MR. KIVETZ: Objection. Form. Foundation.
17     A    Over 38 --
18         MR. KIVETZ: Speculation.
19     A    -- over 38 years, yeah.  I could see why.
20 People who get arrested with search warrants accuse
21 officers of -- you know, misbehavior.  Or domestic
22 cases.  I always, you know, would lock up a husband,
23 generally -- and, you know, they get upset.  Yeah.  So
24 that -- I'm not surprised I always worked with in inner-
25 city.

Page 353

1      Q    You had -- there was a person named Frankie or
2  Francisco Figueroa in the Imperial Gangsters; is that
3  right?
4         MR. KIVETZ: Objection. Form. Foundation.
5      A    I don't -- I don't recall any Francisco
6  Figueroa.
7      Q    Okay.  I assume there's no relation to you.
8         MR. KIVETZ: Objection. Form. Foundation.
9      A    I have no relatives with that last name who
10 live in this city.
11     Q    Okay.  Do you -- in the course of the various
12 CRs that you had, how many times were you interviewed by
13 investigators from OPS or internal affairs or otherwise?
14         MR. KIVETZ: Objection. Form. Foundation.
15     A    Someone always interviewed me or whoever was
16 investigating CR number.
17     Q    Were you always interviewed or usually you
18 were allowed to just submit a memo, right?
19         MR. KIVETZ: Objection. Form. Foundation.
20     A    Som -- sometimes the interviews -- after the
21 interview, they would require for me to write a to-from
22 report.
23     Q    And was it ever the case that you did a to-
24 from without having to be interviewed?
25         MR. KIVETZ: Objection. Form. Foundation.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 92 of 132 PageID #:7682
The Deposition of GEORGE FIGUEROA, taken on June 15, 2021
354..357

Page 354

1    A    I don't recall that.
2    Q    Well, last few questions.  Have you ever seen
3  a Chicago Police detective or gang specialist commit
4  misconduct?
5         MR. KIVETZ: Objection.  Form.  Foundation.
6    Speculative.
7    A    Not knowingly, no.
8    Q    As in you -- as in that you've seen them
9  commit misconduct by accident?  Or you don't recall ever
10 seeing it, you're not aware of seeing it?
11   A    I -- I think I would remember that.  I've
12 never seen that.  I've never seen a Chicago police
13 officer commit any kind of misconduct.
14   Q    Have you ever seen a Chicago police officer
15 violate the law in any way?
16   A    No.
17   Q    If you did --
18   A    I don't want to wind up -- I don't want to
19 wind up in a penitentiary like them, so I wouldn't --
20 no.
21   Q    Would you -- if you did, would you report it
22 to your supervisors?
23   A    Absolutely.
24        MR. SWAMINATHAN:  I got nothing else.
25        MR. KIVETZ:  All right.  Can you pull up

Page 355

1    Exhibit A real quick, Anand?
2         MR. SWAMINATHAN:  Exhibit A.
3              CROSS EXAMINATION
4  BY MR. KIVETZ:
5    Q    Yeah.  Mr. Figueroa, I do have two follow-up
6  questions very quickly.
7    A    Okay.
8    Q    Do you recall Mr. Swaminathan asked you some
9  questions about whether or not you signed Exhibit A,
10 which is RFC 001002.  Do you see that on your screen?
11   A    Yes.  I do.
12   Q    And you indicated that you believe that you
13 did not give approval for someone to sign your name on
14 that particular document; is that correct?
15   A    That's correct.
16   Q    Is it fair to say you don't know, as you sit
17 here today, whether or not you did, in fact, give
18 another officer approval to sign your name on this
19 document, given the time that's occurred between -- the
20 date of this particular report and as you sit here
21 today?
22   A    It's very possible that someone asked if they
23 could sign my name to it and I just don't recall it.
24   Q    Okay.  And if you had given someone permission
25 to sign your name, would you have first checked in with

Page 356

1  them and made sure that the report was accurate to the
2  best of your ability?
3    A    Absolutely.  If someone would have asked me, I
4  would have assumed that it was the original arrest
5  report that I made.  And I would ask them what, you
6  know, what information is on there that was put on that
7  I didn't know.  And yes, I would've given them
8  permission.  But I just don't recall.
9    Q    Okay.  And then it's common for you to give
10 someone permission to sign your name back in the 1995
11 time period if you had kind of opportunity to understand
12 what they put in the report?
13   A    Certainly.
14   Q    Okay.  And then the report says the fact
15 that -- in the middle it says, "The facts for probable
16 cause to arrest and to substantiate the charges include
17 but are not limited to the following."  Do you see that
18 part there in Exhibit A?
19   A    Yes.  I do.
20   Q    Okay.  So besides the probable cause, what
21 does it mean to add -- to "substantiate charges"?
22   A    Essentially to justify the arrest.
23   Q    Okay.  So it's not only what the probable
24 cause was, but other things that might have occurred
25 after the arrest, to substantiate any type of charges

Page 357

1  that that particular offender was facing; is that
2  correct?
3         MR. SWAMINATHAN:  Objection.  Objection to
4    form.
5    Q    Okay.  Well what does "substantiate charges"
6  mean to you?
7    A    It means to justify the arrest.  I could put
8  something down on paper and then something would occur
9  later on where it would add further charges that I
10 wouldn't be aware of because obviously I wasn't there.
11 That has to be put in there also to justify the charges.
12   Q    And are you aware as an experienced police
13 officer that sometimes, you know, report writers when
14 they add someone who's an arresting officer and there's
15 usually a long list of names.  Do you know why sometimes
16 there's a long list of names included on those reports?
17   A    Because at some point those officers took part
18 in the investigation.
19   Q    And so is this the way that they give credit
20 to the officers by adding them as the -- an arresting
21 officer, even if they weren't physically present during
22 the arrest?
23   A    Not -- not just that, but also for court
24 purposes.
25   Q    Why is that important?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 93 of 132 PageID #:7683
The Deposition of GEORGE FIGUEROA, taken on June 13, 2021
358..361

Page 358

1    A    Well, because state's attorneys need to have
2 as much information as they need to prosecute a case.
3 They need to know who was there and what they did.
4    Q    Okay.  And then do you know whether or not
5 Detective Halvorsen and Guevara, from the time that they
6 were assigned this particular case, so May 30th, had any
7 amount of time off?
8    A    Like, a vacation or something?
9    Q    Yeah.  Do you know if they were taking time
10 off?
11    A    I have no idea.
12    Q    Okay.  And if they had taken time off -- well,
13 strike that.
14         MR. SWAMINATHAN:  Jeff, did you say you're
15 done?
16         MR. KIVETZ:  Yeah.  No, I've got one last
17 question.
18         MR. SWAMINATHAN:  Yes.
19         MR. KIVETZ:  Okay.  Anand, do you know where
20 the sup report is?  The May 30th sup report, what
21 exhibit number that is for Halvorsen's sup report?
22         MR. SWAMINATHAN:  Let me get it up here.
23         MR. KIVETZ:  It starts at RFC 22.
24         MR. SWAMINATHAN:  May 30th, sup report?
25         MR. KIVETZ:  Yeah.  Okay.  Could you please

Page 359

1 pull that up for me?  I appreciate it.  And then if
2 you could, go to page 25, third paragraph.
3         MR. SWAMINATHAN:  RFC 25, third paragraph.
4 BY MR. KIVETZ:
5    Q    Okay.  Sure.  Can you just take a look at the
6 third paragraph there?  It says, after you -- after they
7 went to the home of Alberto Rodriguez, where he
8 positively identified Thomas Sierra, there's a following
9 paragraph that says, "The reporting detectives attempted
10 to locate the second eyewitness, Jose Melendez, and also
11 have him do this photo array."  Did I read that
12 accurately?
13    A    Yes.
14    Q    And then it continues and says, "The reporting
15 detectives were not able to locate Jose Melendez at that
16 time."  Did I read that accurately?
17    A    Yes.
18    Q    Okay.  And then it said, "The reporting
19 detectives were not at work for the next four days and
20 returned to work on May 30th 1995."  Do you see that?
21    A    Yes.  I do.
22    Q    Okay.  Does that at all refresh your
23 recollection as to, you know, why Thomas Sierra wasn't
24 arrested until May 30th; if you know?
25         MR. SWAMINATHAN:  Objection.  Form and

Page 360

1 foundation.  Go ahead.
2    A    It -- it may very well be that -- since they
3 were off for four days, it may very well be that they
4 mentioned to me or someone else mentioned to me closer
5 to the 30th that he, meaning Thomas Sierra, was
6 identified as being one of the offenders.  Or being the
7 offender in this murder.
8    Q    And would the fact that the Detectives Guevara
9 and Halvorsen would that -- that the fact that they were
10 away maybe lead to some of the delay as to why and when
11 Thomas Sierra is finally arrested on May 30th?
12         MR. SWAMINATHAN:  Objection.  Form and
13 foundation.  Sorry, go ahead.
14    A    It -- it -- it could very well be for those
15 four days that they were gone that does not mean that
16 the investigation stopped.  Someone else may have
17 pursued this.  It may have been one of the other
18 detectives, you know, McMurray or Tony Wojcik.
19    Q    Or the investigation could have been put on
20 hold until they got back, correct?
21    A    That -- that's also a possibility.
22         MR. KIVETZ:  All right.  I have no further
23 questions.
24         REDIRECT EXAMINATION
25 BY MR. SWAMINATHAN:

Page 361

1    Q    You have no knowledge about whether Detective
2 Guevara and Halvorsen were actually on vacation on the
3 26th, 27th, 28th and 29th, correct?
4    A    Only what's on the report?
5    Q    Okay.  And it is common for detectives when
6 they're gone for the day or gone for the next shift, to
7 pass on the next investigative steps to other detectives
8 to continue the investigation, correct?
9         MR. KIVETZ:  Objection.  Form.  Foundation.
10    A    Yeah.  It -- it all depends.  If -- if the
11 investigation is -- is ongoing, then yeah, they'll --
12 they'll pass the information along.  If they're at a
13 dead end where there are no more clues then they may not
14 necessarily pass anything along, because there's nothing
15 to pass along.
16    Q    Do you agree with me this was not a case that
17 was -- this was a case that was active and could have
18 been passed on on the 25th, it was not a dead end,
19 agreed?
20         MR. KIVETZ:  Objection.  Form.  Foundation.
21    A    I can't say because I didn't take part in the
22 investigation.
23         MR. SWAMINATHAN:  Okay.  I have nothing else.
24         RECROSS EXAMINATION
25 BY MR. KIVETZ:

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 94 of 132 PageID #:7684
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

362..364

Page 362

1    Q    It also could be that they were waiting to get
2  a positive identification from Jose Melendez before
3  sending someone else to arrest Tom Sierra, right?
4    A    That's a likely possibility.
5          MR. KIVETZ:  Okay.  Thank you very much.
6          FURTHER DIRECT EXAMINATION
7  BY MR. SWAMINATHAN:
8    Q    And that could have been done by another
9  detective, correct?
10   A    It cou -- it could have been, sure.
11         MR. SWAMINATHAN:  I have nothing else.
12         FURTHER CROSS EXAMINATION
13 BY MR. KIVETZ:
14   Q    Do you want to continue lawyering, if not I've
15 got one more?  Okay.  That's assuming that somebody was
16 available to track down Jose Melendez during that time
17 period, right?
18   A    Yes.
19         MR. KIVETZ:  All right.
20         THE WITNESS:  It sounds like -- sounds like
21 one-up --
22         MR. KIVETZ:  Okay.  Now we are -- it's up to
23 you.
24         MR. SWAMINATHAN:  I have nothing else.
25         MR. KIVETZ:  Okay.  So we're going to reserve

Page 363

1  signature.
2          COURT REPORTER:  I'm sorry.  You are going to?
3  Or no?
4          MR. KIVETZ:  We are.  We will.
5          COURT REPORTER:  Okay.  Right.
6          MR. SWAMINATHAN:  Thank you, Mr. Figueroa.
7  Jeff, thank you.  Madam Court Reporter, thank you
8  for your endurance.
9          COURT REPORTER:  Yes.  And give me one moment.
10 Let me get us off the record.
11         (DEPOSITION CONCLUDED AT 7:38 P.M.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 364

1          CERTIFICATE OF REPORTER
2              STATE OF INDIANA
3
4   I do hereby certify that the witness in the foregoing
5   transcript was taken on the date, and at the time and
6   place set out on the Title page here of by me after
7   first being duly sworn to testify the truth, the whole
8   truth, and nothing but the truth; and that the said
9   matter was recorded stenographically and mechanically by
10  me and then reduced to type written form under my
11  direction, and constitutes a true record of the
12  transcript as taken, all to the best of my skill and
13  ability. I certify that I am not a relative or employee
14  of either counsel, and that I am in no way interested
15  financially, directly or indirectly, in this action.
16
17
18
19
20
21
22  ARIA EDWARDS,
23  COURT REPORTER / NOTARY
24  MY COMMISSION EXPIRES ON: 03/23/2029
25  SUBMITTED ON: 06/28/2021

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

### Exhibits

---

**ExhibitA_ Figueroa**
202:18,20 203:14 224:3 234:3,25 258:23 355:1,2, 9 356:18

**ExhibitB_ Figueroa**
232:17,21 234:20 235:4, 14

**ExhibitC_ Figueroa**
233:17,19 234:6,10,14,25 236:17 237:19

**ExhibitD_ Figueroa**
263:15,19

**ExhibitE_ Figueroa**
277:25 278:3

**ExhibitF_ Figueroa**
287:16,20

**ExhibitG_ Figueroa**
300:8,10 302:10 303:3 306:20 308:14, 17

**ExhibitH_ Figueroa**
301:23 302:4, 10 303:3 308:13

**ExhibitI_ Figueroa**
309:20 310:1 322:12 323:10 326:21 327:19

**ExhibitJ_ Figueroa**
318:6,9 322:19

**ExhibitK_ Figueroa**
327:4,8

**ExhibitL_ Figueroa**
328:3,16

**ExhibitM_ Figueroa**
328:22 329:1

**ExhibitN_ Figueroa**
329:7,9

**ExhibitO_ Figueroa**
329:13,17

---

### 0

**001002** 355:10

---

### 1

**1** 202:19 203:15 206:18 207:7 216:21 237:6 265:7 280:15, 19 303:14 308:19 310:9 311:1

**10** 155:13 329:3

**100** 40:13 157:22

**10:00** 256:14

**11** 141:22 307:14 329:3,4

**118-CV-03029** 7:14

**11:00** 258:12, 16 260:1,7 287:17

**11:09** 7:6

**11:33** 12:17

**12** 296:7 307:22 329:4

**12:00** 318:18

**13** 329:4

**134** 208:14

**13th** 10:20

**14** 220:7 329:20

**1411** 219:9 220:5,19

**1413** 219:14 220:5,9,13,24

**14th** 10:22,23 22:22,23 311:4

**15** 334:4

**16** 334:1,4

**161** 233:17

**16867** 208:22

**17** 232:17

**17th** 7:5

**18** 255:2

**1851** 19:14

**19** 232:18 237:20

**1951** 19:14

**1964** 19:12,14, 22

**1976** 9:12 10:19

**1978** 10:24

**1980** 10:24

**1981** 21:15,24

**1982** 11:3 12:24

**1987** 13:5 15:13

**1988** 13:5 15:13

**1990** 36:16

**1995** 27:25 28:17,19,20 30:6,8,18 35:4, 20,24 36:13,17, 20 106:18 133:20 137:11, 14 138:18,20,

**24** 139:8,9 178:14 222:6 237:20 240:10, 17 241:4 248:2 249:5,12 260:7 268:7 273:6 275:6,11,14 287:17 289:8 294:15 296:7, 17,18 299:20 300:4 309:24 323:10 328:7 356:10 359:20

**1999** 13:17 15:24 16:1

**19:00** 292:24

**19th** 9:12

**1:00** 29:14

**1:07** 84:9

**1:16** 90:4

**1A** 305:12

**1st** 179:19,21 180:17,23 207:2 236:14, 18 239:16 256:22,23

---

### 2

**2** 203:15 206:18 207:7 255:1 257:3,9 260:13 265:7 270:14 288:4,22 301:1 304:3 310:11, 12 314:11

**20** 299:20 300:4 309:24

**2000** 13:17 15:20 16:6,16, 25 18:3

**2000s** 18:14 41:24

**2001** 17:3

**2014** 9:9

**2021** 7:5

**20th** 318:17

**321:13,17 323:15**

**21:00** 236:25

**22** 287:16 358:23

**23** 323:10

**23:00** 258:12

**24th** 250:8

**25** 223:1 292:24 294:15 296:7, 17,18 359:2,3

**25th** 208:17 250:8 297:1 348:20,21 361:18

**26** 30:16 181:15 251:7 277:2

**26th** 250:8 361:3

**2717** 293:1

**27th** 250:4 361:3

**28** 207:22,24

**2845** 328:22

**2857** 328:22

**28th** 250:4 297:2 361:3

**29** 219:2,7 282:11,12 287:16

**2997** 301:23

**29th** 250:4 361:3

**2:10** 136:19

**2:32** 136:21

---

### 3

**3** 206:19 237:19 257:22 262:3 289:14 304:7 320:15,19

**30** 20:19 106:18 133:1 184:1

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03929 Document #: 292-4 Filed: 07/05/21 Page 96 of 132 PageID #:7686
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

366

219:5 221:11
222:6,20
240:10,17
241:4 248:2
249:12 260:7
282:6 287:17
289:8

**3008** 301:23

**30th** 105:6,11,
14,18,23 106:5,
8,23 128:9
134:4 154:22
177:10,21
178:2 179:23,
25 180:5,6,16,
23 181:12
182:8 189:10,
14,18 222:7,13
232:2 237:12,
15,20 238:1,4,
7,15 239:5,17
240:2 241:19
242:4 249:4
250:3 253:7
256:21 260:2,7
262:15,19,21
286:1 358:6,20,
24 359:20,24
360:5,11

**31st** 178:5
179:25 181:12
182:8

**3501** 289:13,15

**3510** 223:6,7

**3532** 220:22

**36** 280:21

**38** 352:17,19

**39** 213:3,24
214:7

**3:30** 218:3,21,
22 219:1
221:22 222:6,
12 232:1
254:12 289:8

**3:55** 199:22

───────────

**4**

**4** 206:19 290:2

296:6 301:4
321:3

**4900** 309:20

**4901** 309:20

**4904** 318:7

**4907** 318:7

**4986** 327:24

**4998** 327:25

**4:34** 223:24

───────────

**5**

**5** 9:9 263:15,16
295:11 301:9,
12 304:14
329:25

**5.1** 263:16

**53** 351:7

**54** 19:13 352:10

**5509** 277:25

**5555** 224:7
260:15

**5886** 300:8,13

**5891** 300:13

**59** 269:24 270:1

**5:00** 256:20
277:14,15

**5:30** 29:14

**5:49** 277:21

───────────

**6**

**6** 263:16 301:14
305:15

**62** 329:7

**64** 19:13

**6474** 205:10

**6:00** 29:14
277:16

───────────

**7**

**7** 205:14,19,25
206:3,6,14,21
207:6 305:22
331:2,3

**70** 329:8

**72** 266:22
267:6,9

**746-8282**
224:11

**7:38** 363:11

───────────

**8**

**8** 205:14,22
207:21 208:1
328:23,24

**80s** 314:14
349:21 351:24

**82** 334:2

**86** 289:20

**88** 289:20

───────────

**9**

**9** 306:3

**90** 334:2

**90s** 41:24
43:20,25 44:11
150:11

**95** 137:10 219:5
292:24 318:18
321:13

**95-GI-0624**
255:3,17

**97** 15:13

**98** 15:24 334:1

**99** 15:24 43:14

**9:00** 29:14
236:18,25

**9th** 328:7

───────────

**A**

**a.m.** 7:6 12:17

**ability** 201:9
294:15 356:2

**absolutely**
78:4 168:6
317:20 354:23
356:3

**abuse** 199:8

**academy**
119:11,13

**access** 54:20
71:17 107:3,22
108:12 144:10

**accident**
314:13 354:9

**accompanied**
239:1 253:16
254:16

**accompany**
260:20

**accomplish**
113:19

**accosted**
267:18

**account**
228:17

**accuracy**
120:10 230:19

**accurate**
112:16 119:25
120:6,12,24
121:6,9,13
122:8,13,20
123:4 124:6,9
126:25 127:6,
21 221:9
224:17 225:16
313:8 317:2
319:23 320:2
356:1

**accurately**
120:20 211:5
359:12,16

**accuse** 352:20

**accused** 22:24
23:4 348:7,9

**act** 96:22 97:1
105:23 226:20

**actions** 105:23
166:2 228:18
239:5,16
241:19

**active** 148:7,8
361:17

**activities**
116:24

**activity** 116:19
117:25 118:1

**actual** 65:8
136:1 167:13
214:13

**add** 180:11
356:21 357:9,
14

**adding** 357:20

**addition** 38:8
65:18,23 162:5
240:10,18

**additional**
163:24

**address** 78:12
80:14 141:14
221:2 222:23
223:4 224:7
289:16,18

**addresses**
19:22,23 111:9
142:18

**affairs** 350:21
353:13

**affiliated**
300:23 301:1,6,
12

**affiliation**
269:23

**affirm** 8:12
224:16

**affirmatively**
110:2

**affirming** 83:7



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03929 Document #: 292-4 Filed: 07/05/21 Page 97 of 132 PageID #:7687
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
367

afraid 58:11
96:3

African 21:10,
11

afternoon
218:22

afterward
152:1 346:3

aggravated
17:14,16

agree 8:4,7
76:23 91:10,18
92:10,21 93:2,
22 95:25
108:22 109:5,
16 110:1
119:17 129:23
150:10,19
203:18 204:17
208:8 225:21,
25 226:3
227:12 228:20
234:9 237:7
242:16,18,22
247:9 251:8,15
252:2,5 258:20
262:3 264:16
275:3,4,7 277:4
284:7 286:20
287:14,19,21
290:12 292:3,
17 294:11
298:3,8 301:14
305:24 306:19
311:8 312:23
313:2 314:7
317:17 322:10
323:1,14 325:4,
6 361:16

agreed 239:15
361:19

agreement
331:8,11

ahead 11:18
22:2 23:12 39:2
58:8,10 100:4
110:21,22
113:2,4 117:23
121:25 122:2
124:1 178:3
184:15 196:3
203:22 205:20

220:8 238:12
239:11 261:9
273:2 279:22
282:10 294:6
308:21 309:9
310:12 322:5
360:1,13

air 312:11

aka 306:14

Alan 307:15,22

Albany 60:10
273:20 274:5
275:5,10

Alberto
190:18,25
264:19 293:1,
11 294:2,14
295:24 296:7
298:16,17,19
359:7

alias 65:9
143:6,15

aliases 62:22
63:8,12 149:1

alibi 91:7

allegations
21:1 22:12
332:23 333:10,
12

alleged 21:4
22:14,20

allegedly 22:6

alleging 23:15

allowed
210:11 353:18

allowing 12:5

alphabetical
61:22 139:19
143:16 149:5

alter 29:24

altercation
23:20

Amendment
326:15

American
21:11

amount 358:7

Anand 7:18
82:15 123:11
223:15 355:1
358:19

and/or 149:1

Andujar 28:9,
11,12 104:22
105:1,19
106:17 107:14,
21 153:22
160:8 161:2
162:3,6,7,15
163:18 165:1,5,
10 171:14,19
173:2,17
186:11,21
187:2,25 189:4,
11,23 190:7,12,
19,25 191:23
192:22 193:1,7,
13,19,25
194:14,20
195:18 196:7
197:24 198:5
200:1,10,18
213:25 214:6,
13,19 240:2
247:24 248:16
263:18 296:1,2
330:1,5,7,11

answering
25:23

answers 25:25
26:15 83:17
329:14,15

anymore
66:21

apologies
236:16

apologize
106:10

apparently
173:9 192:14
194:24 195:4
205:24 212:10
235:13 276:19

appearance
7:15

appeared
140:24

appears 68:8
83:5 263:20
265:22 266:16
267:14 268:3
323:20 327:25

appreciating
83:7

appreciative
350:13

apprehend
97:24

apprehension
s 18:7

approached
140:15 148:9
169:15 241:24

approval
130:15 131:20
209:3 210:2
237:2 355:13,
18

approved
218:20 259:15
281:24 282:24

approves
208:19

approximately
12:24 13:5
15:13 59:15
66:6 156:10
161:14

April 106:5,8

ar 53:11

area 8:1 15:18
16:6,15,19,24
17:6 18:3,7
19:5 27:24
33:22 34:4,24
35:2 37:12
41:12,22 42:6,
9,11,15,24
43:6,17 50:18
51:14,17,22
52:4,8,12,14,17
125:5,17 133:4
135:1 174:19
175:11,17

179:5,8 180:6
181:3 183:1
197:19 219:22
220:2,3 223:9
224:7,11 239:2
253:16 254:20
256:8,9,17
257:4,8,24
258:2,15
259:25 260:15
269:11,13
273:19 274:5,
15 281:1
282:22 285:12
286:5,7,10
288:10 343:6

areas 14:17
16:23 33:18
43:9 44:2 50:15
51:8,22 259:13
281:22

argue 229:6

Argumentativ
e 93:25 326:2

Aria 7:3 263:4
351:5

arrange
311:24 313:13

arranged
64:16 311:3,9
314:6

array 53:13,24
54:6 55:8,19
85:9 86:16
90:11 91:12
92:1 94:23
95:12,22 96:8
99:10,14,19
100:15 101:3,
16 102:8,17
103:18 196:21
197:13,19
285:4 286:18
293:4,9,15,19,
22 294:2,10,19
295:1,7 296:7,
14,17 359:11

arrays 46:6

arrest 50:2
54:10,17 56:19
61:7 69:9,21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

72:13,17,25
73:7 74:1,2,19
75:24 77:21
78:1,11 79:6,7,
12,20,22 80:6,
24 81:6,18,20
84:15,19 85:3,
10,17 86:6
87:1,8 88:16
96:15,21 98:9,
12 100:12,17
101:5,11,17
102:8,10,18
104:15,18
124:18 125:5,8,
18,19,22 126:1,
6,11,16,25
127:6,10,16,23
128:2,9,15
129:2,8 130:24
131:10 132:10,
25 133:8,12,22
134:2,3,10,11,
15,21 135:4,6,
8,11,16,23
136:2,3,7
139:11,16,18
141:5,8,11,12,
25 142:4,9,13,
14,15,23
143:10,18
144:13,17,19,
20,24,25 145:4,
5,7,11,18,19,25
146:1,6,9,15,
16,20,21
152:22,24
154:4,14,15,17,
18,21 162:24
165:22 167:22
169:8,18 170:5,
8,15 171:3
174:5 175:17
176:1,18,22
177:9 180:5,15
181:3 182:4
184:21 185:13
186:3 188:21
189:3,9,14,17
191:25 192:2,6,
11 198:18
199:9 200:23
201:17,20,22
202:2,18
203:17,20
204:4,6,10

208:19 209:19,
25 212:5,7
213:8 214:5,12,
19 215:10
216:20 217:24,
25 218:2,11,13,
20,21,22 219:4,
9,21,25 220:18,
23,25 221:8,13
222:5,23 224:3,
21,24 225:6,8
226:5,17,25
227:2,7,8,10,
15,20 228:7,11
229:4,12,14,18
230:24 231:8,
11 232:1,6,7,12
233:18,21,22,
23,25 234:3,19,
24 235:10,11
237:9 238:2,5,8
243:23 245:23
246:15,17,21,
25 247:1,7,8,
13,14,18,19
248:2,4,7,11,18
251:11 252:1,2
253:11,21,24,
25 254:3,6,11,
17,23,24
255:10,14
256:10,13
257:17 258:9,
10,16,21,22
259:2,14,19,24
260:1,8,14,15,
23 261:11
278:5 280:7,11
281:3,7,11,23
282:3,4,6,13,23
283:1,2,5,7
284:16,22
285:17,18
286:2,14,20
288:19 289:1
291:14 295:16
327:4,6,14
336:15 338:15,
17,19 341:4
343:3 344:11
356:4,16,22,25
357:7,22 362:3

**arrested** 68:19
69:4,20 74:6
75:3,17 76:5,6

77:1,13,20 80:3
86:18 87:24
88:9,18 102:19
117:20 127:11,
12 129:18,25
130:7,14,25
131:18 141:9
142:4,8 167:16,
18 169:9 171:1,
15 173:20
174:19,23
175:1,4 177:1,7
182:20,23
183:17 184:4,7
187:24 188:5
200:21 218:1
219:1,12,13,16,
19 220:12,21
221:12,21
222:6,12,18
223:5 225:23
226:2,6 227:24
228:23 237:22
246:3,4,11,13,
19 256:3 259:9,
20 286:9 289:7
296:9 335:12,
24 336:1,8
339:8 344:6
346:21 352:20
359:24 360:11

**arrestee** 281:5

**arresting**
81:16 82:3
127:19 142:2
145:10,12,15
179:16 191:7,
10 210:1 216:6,
12,14,18,19
219:11 225:12,
17 226:7,18,20,
24 227:13
228:12,22
240:10,18
255:21,23
256:4,6 258:1
278:14,21
279:10 357:14,
20

**arrests** 56:23
67:15 73:3 78:5
79:1 125:2,3,13
128:21 129:14
146:5,10

165:23 166:8
246:5 251:18

**arrive** 264:8

**arrived** 184:23

**articles** 333:10
340:24

**arts** 54:8 61:18
62:1,13

**ASAP** 94:5

**asks** 282:12
329:25

**ass** 107:1

**asserted**
326:14

**assigned**
11:14 18:18
32:3,5,6,9,11,
18,22 34:25
41:7,18 140:25
148:6,10 200:1,
10,17 201:10
206:13 320:10
348:22 358:6

**assignments**
33:17

**assist** 41:3,4
44:12,22,25
45:1,6 46:1
47:22 48:3
49:25 50:15
58:18,19,22
59:2 67:15
95:10 107:1
113:16 114:2
120:24 121:5,9
122:7 195:17
200:1 238:16
276:10

**assistance**
46:7,11 49:5,20
52:23 67:16
79:13 290:5

**assistant**
298:18,24
299:4,8

**assisted** 45:19
52:14 105:1,4,
10,13 106:25

107:20 108:23
109:18 114:23
166:8 290:11

**assisting** 42:2
44:17 67:22
95:8,18 106:4
108:10,16
113:8 258:6
290:14 346:5

**assume** 25:5
27:1 104:1
108:21 181:21
185:20,24
189:1 200:4
206:21 214:24
217:7 353:7

**assumed**
172:24 200:7
356:4

**assumes**
124:25 207:12
343:21

**assuming**
159:20 172:5
182:11 187:13
205:23 217:15
241:20 283:15
362:15

**assumption**
81:17 180:24
181:5 182:1,5,
9,14 195:24
206:25 236:9,
12 279:20
280:2

**attempted**
359:9

**attempts**
252:21

**attend** 156:13,
14,19 157:3

**attendance**
157:23 158:1,4

**attended**
157:13,18
158:6,12,13

**attending**
7:16,25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03929 Document #: 292-4 Filed: 07/05/21 Page 99 of 132 PageID #:7689
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

369

**attestation**
329:20

**attorney** 99:24
129:13,17
130:1,8,15
131:1,7,12,19
132:2 157:9,14
160:13 256:14
259:4,7 281:24

**attorneys**
92:25 128:19
152:18 156:11
157:10,11,18
167:5 298:19,
24 299:4,8
358:1

**Austin** 7:24

**authority**
256:15

**Avenue** 224:7
267:19 268:9
289:20 292:10,
20 295:13,18

**Avenues**
268:19 269:1

**aware** 21:19
27:22 40:11
44:9 55:21,23
103:12 147:12
215:24 231:2
238:20,25
296:13 298:13
307:7,12 318:1
326:16 330:16
332:22 334:11,
12 336:21,25
339:3,6 347:3
354:10 357:10,
12

---

**B**

**back** 18:19
23:9,17 59:11
61:21 62:4
89:24 118:22
123:17,22
133:20 159:25
179:3 209:2
233:15 244:11
255:1 268:7

**286:10 288:6**
296:5 303:12
308:15 320:12,
13 323:9 350:8,
14,24,25
356:10 360:20

**bank** 338:11,12

**banning** 343:6

**barely** 159:7

**based** 13:7
21:9 88:7,17
99:9 132:23
134:15 135:17,
23 145:7 146:9,
10,20 173:11
174:7 175:13,
14 179:8
180:24,25
181:4,5 182:5,
14 195:23
197:16,18
200:18 201:10
206:24,25
208:3 213:8
217:24 219:4,6
220:11 236:9,
12 249:5,15,17
250:4,5,12
257:23 258:1,6
262:22 271:8
272:7 280:2
303:1

**bases** 135:22

**basic** 62:16
141:10,13
142:17

**basically** 24:9
126:13,15
219:22 347:12

**basis** 27:18
31:12 79:22
116:24 127:16
135:5 202:2,12
211:24 212:2
217:19 222:11
225:7 230:4
279:5 284:23
330:2,18

**Bates** 237:20
263:16 300:12
318:6

**bathroom**
223:15 277:12

**battery** 17:14,
17

**beard** 47:16,17

**beat** 22:16
117:16 120:3
205:10 219:9,
11,12,13,15,20,
21 220:4,12,23
264:8,17 265:7
270:20

**beaten** 24:4

**beating** 23:16

**beats** 219:18

**beefs** 275:23

**begin** 8:17
9:10

**beginning**
10:19 12:24
263:8 290:1
301:24

**begins** 292:23

**behalf** 7:21
211:13

**Belden** 289:15

**belief** 245:1

**believed** 211:5

**bell** 327:12,17

**Belmont** 13:8
51:1,10,13,22
52:4 179:3

**benefit** 92:2

**betwe** 154:3

**bide** 91:8

**Biebel** 158:7,
13 193:13
280:22

**bigger** 203:4,7,
8

**birth** 62:11
66:2 141:14

**bit** 17:1 24:8
25:20 28:2 89:9

**141:19 221:17**
234:4 249:10
270:4 309:21

**black** 221:14
267:19 268:9
269:5 273:12
289:19 292:9,
19 295:13,18
306:6

**blank** 135:12
170:22,23
281:25 282:7,
13,16,17,23
283:2,7,15,17,
23

**block** 175:5
179:2

**blocked**
218:14,15

**blocks** 219:19

**Blow** 334:14

**blue** 267:13,19
268:9 269:5

**Bongiorno**
317:24,25

**book** 52:9,23
53:7 85:15,21
86:4 87:6,22
88:7,17 90:11
91:12,24 95:11
96:7 97:25
99:10 103:19
139:24 140:3,
10 196:14,18
305:2

**books** 45:22
46:2 51:16,18,
23 52:12,15,20
54:17 56:14,16,
18,25 57:5,11
58:2,4,5 59:10,
20,22 139:20
316:16

**born** 19:6,8,9,
14

**borrow** 151:10,
19

**borrowed**
151:13

**bother** 215:3

**bothers** 215:7

**bottom** 235:15
244:4 262:4
300:9 305:12
317:21

**box** 213:3,24
214:7,12,19
216:17,21
218:8 219:2,7
221:11,14
222:20,25
223:1 224:15
266:22 267:5,6,
9 269:23 270:1
280:15,18,21
282:11,12

**boxes** 126:7,14

**brain** 171:9

**break** 15:16
26:18,19 27:3
83:23 123:12
132:6 136:11
199:13 223:15
263:2 277:11

**bright** 334:25

**bring** 12:2
74:19 133:6,8
180:5 281:2

**bringing** 52:5
95:20

**broke** 15:15
43:13,14 55:12
89:3

**broken** 13:15,
19 15:16 43:18
44:1

**brothers** 22:19

**brought** 28:5
77:1 88:9 91:13
92:12,20 93:4,
13

**Buick** 267:10,
19 268:9,19
269:1 289:20
292:10,19
295:13,18
315:14,17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 190 of 132 PageID #:7690
The Deposition of GEORGE FIGUEROA, taken on June 19, 2019

370

316:2 323:14 325:15

**Buicks** 268:25

**build** 91:9

**building** 15:7

**bunch** 126:7 139:23 223:8 335:11

**busiest** 60:4

**business** 345:23

**buy** 151:20

**C**

**ca** 195:18

**cage** 185:11

**calendar** 206:10 208:3

**call** 12:5,6 50:11 67:24,25 131:6 132:2 176:15 256:9, 16,25 257:24 312:5,11

**called** 11:9 24:2,4 58:20,22 115:2 116:17 117:1,3,24 118:11 133:17 184:8 243:3 256:5,7 313:19

**calling** 98:5 185:1

**calm** 24:13

**camera** 54:21 55:11,14,20

**capitalized** 212:12,17

**capitalizing** 212:15

**Capitelli** 193:19

**car** 59:14 120:3 144:24 148:15, 16 149:17

150:8,9,24,25 151:2,9,25 152:6 179:1 185:12 222:21 268:5,9,15 289:21 295:14, 25 296:1 314:12,13,15, 25 323:4,12,25 324:24 326:3

**card** 140:23 141:4,11,16,18 142:4 143:10, 19 144:17,25 145:7,19 146:1, 6 148:24 243:9 245:23 246:10, 16,17,21 247:8, 14,19 248:4 260:23,24 261:11 291:18

**cards** 139:17, 18 141:6,8,25 142:9,13,14,16, 23 143:10,19 144:14,19 145:11 146:9, 15,20 147:4 148:13,18,23 149:9 204:6 243:23 244:11 245:12 246:25 248:7 291:14

**career** 18:9,22 89:4 120:13 165:22 215:12, 24 352:6

**careful** 99:4 100:3,6

**carefully** 27:7 73:5

**Carlo** 314:15

**carried** 350:6

**cars** 117:17 149:25 150:7 151:10,12,17, 19,20 152:4 268:18 269:6, 10,13

**case** 7:14 21:12,17,25

22:5,10,11,12 23:3 24:21,23, 25 28:4 35:24 37:20,23 38:1, 8,18 47:8 48:12 49:11 53:22 73:5 76:15 80:11 82:8 84:23 85:1,2 90:19 91:9 92:19 95:7 98:4,7 100:8, 15,24 102:4 103:12 104:2, 14 107:14,21 115:10 118:21 125:6,18 131:8 132:17 134:1 136:3,7 139:12 159:20,21,23 162:6,13 163:18 164:4,9, 15,22 166:12, 15,21 167:4,8, 24 168:8 170:3 171:22 180:11, 12,13 182:12 186:21 187:25 190:7,13,25 191:17 199:9 205:23 206:5 212:6 213:25 226:21,22 233:7 234:21 239:17 247:16 255:8,24 261:1 263:17,22 264:3,12,13 265:3 270:10 272:7,9,15,21, 23 276:17,23 281:2,19 283:14 284:20 285:11 287:5 296:2 299:22 307:4,9 323:8 327:5,15,19,21 328:1,17 332:3 347:10,11,20, 23 353:23 358:2,6 361:16, 17

**cases** 17:21,25 18:18 40:17 53:14 64:11

78:6,25 90:14 93:5 96:14 108:3 114:3 115:11 118:9 129:5 131:9,17, 18 151:5 166:7, 14,16,24 283:6 352:22

**catch** 35:10 43:24

**caused** 133:12 166:6 168:20

**CD** 257:2

**central** 15:4

**certainty** 283:17

**chance** 100:9, 11 136:24 160:25 223:16 310:15 320:20 321:10 327:13 328:8,16

**change** 13:10, 12 18:16 29:24 64:19 94:3 103:1,6 138:13

**changed** 28:24 29:5,6 97:4 152:4 315:8 326:2

**characterize** 233:5

**charge** 48:12 84:22 99:5 116:14 125:15 256:15 259:8

**charged** 259:4 347:22

**charges** 218:20 259:15 281:24 282:24 356:16,21,25 357:5,9,11

**chatted** 251:1, 3

**check** 69:22,25 70:6,21 71:18 73:6 122:19

126:14 175:6 243:18

**checked** 70:17 71:9 244:24,25 338:13 355:25

**checking** 70:13 244:3

**checks** 71:2,23 72:6,9,12,20

**Chevrolet** 314:14

**Chicago** 7:22, 25 9:6,11,14, 16,20 10:5,13, 17 19:8,11,16 21:14,20 33:23 84:13 92:11 120:4,13 158:19 159:5 203:21,25 215:12 224:3 263:17 333:4 336:15 337:1 339:1,9 349:16 354:3,12,14

**Chicagoland** 8:1

**chief** 160:13

**children** 20:7

**choice** 121:19

**chunk** 199:14

**circu** 98:18

**circum** 70:20 132:7

**circumstance** 86:11 130:22 239:1

**circumstance s** 29:23 88:15 92:6 97:7 98:18 102:5 115:3 128:14,21 129:7,22 130:13 132:9, 11,12,18 168:23 169:1,2, 5 170:15 226:23



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1-18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 191 of 132 PageID #:7691
The Deposition of GEORGE FIGUEROA, taken on June 19, 2019
371

city 7:25 8:3
14:4 16:23
19:9,10,16 22:3
33:18 34:3
341:23 352:25
353:10

citywide 15:6

civil 21:3,5
24:21 157:16
215:8,9

civilians 144:4
149:15

clarify 39:18
73:4

clear 184:20
229:12 234:24
249:20 260:13
302:17,22

Cleared 302:6
327:25 328:5

clip 285:19

close 203:5

closed 187:17
302:6 327:25
328:5

closely 337:16

closer 360:4

Closing 328:17

clue 274:2
279:4 312:16
326:24 335:25
336:14

clues 361:13

Cobra 60:12
270:16 307:18

Cobras 60:5,
12,13,14,19
270:5,6,8,22
271:8,9 272:8
273:11,12,13
275:9 304:1
307:19,25
308:7 348:19

cocaine 344:7

coincide
259:14

colleagues
336:9

collected
270:1

collecting
10:4,7

collection
62:7,18,24
64:10 66:5,13,
24 141:5
148:17 243:14,
22 245:7
261:12 301:18
302:3 304:25
305:6 306:10
316:21 317:3

collects
144:23

color 47:18
61:18 267:13

colored 269:6
289:20 314:14

comfortable
211:3

commander
50:10,11 67:25
208:16 343:6

commit 271:14
354:3,9,13

committed
47:17 129:2,15
272:2 274:11,
12,17 330:23

committing
271:16,20

common 43:7
50:17,21,25
76:4 86:21
91:10,12,18
93:2,8 94:21
129:23 130:4,5
177:13 214:11
271:15 313:21
347:9,12 356:9
361:5

commonly
109:5 242:23

communicate

69:3 75:16 80:1

communicate
d 50:4 67:21
68:18 76:25
77:4,11 80:5,12
133:12

communicatin
g 346:25

communicatio
ns 160:3

comp 213:2
224:5

company 9:21
12:11

compilation
140:9 301:18
302:2

compilations
140:3

complain
350:20

complainant
213:2 214:3
224:6

complained
350:9,21 351:2

complaint
38:4

complaints
213:12,13,14
214:4 215:2,21
348:8

complete
229:1 330:2

completely
89:14

Compound
303:4

comprehensiv
e 316:22

computer
12:2,4 54:9
70:1 71:4,22
80:21

computers
140:5

con 7:10

concern
170:14 217:10,
12

concerned
186:19 228:6
229:19 285:21
346:22

concerns
100:17 331:3

CONCLUDED
363:11

conclusion
330:25

conditions
27:11

conduct 45:11
46:6,10 52:9,23
53:7,11,12 78:5
90:11 93:20
109:4 165:1
336:17 339:2,
18 341:1

conducted
46:14,24 47:12
54:4 87:7

conducting
45:2 46:19

conference
12:5

confess
130:19

confidential
297:4

conflict 135:12
169:20,21
170:6,10,16

conflicts
169:23

connect
268:15

connected
118:21 243:19
245:24 247:7
261:12

connecting
248:1 249:3

260:24

connection
89:17,22
106:21 240:24
241:19 242:5,7
243:24 245:16
249:10,20,21,
25 250:3,11
261:24 344:8,
15

connects
248:16

consistent
27:18 254:12
273:15 322:11

consists
307:25

conspiracy
338:7

constitute
84:15,18 85:3,
10,16 98:11
99:20 100:16
101:5

constitutes
102:17

constituting
148:18

contact 23:4
164:18 177:14
332:11,20

contacted
200:13 290:5
311:2 332:5

contained
169:16 225:6
230:19 258:22

contend
329:25

contention
330:3

contents
160:2,4

context 20:20

continue 9:25
10:2 82:22
361:8 362:14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 192 of 132 PageID #:7692
The Deposition of GEORGE FIGUEROA, taken on June 17, 2013

372

continues 359:14

contradictory 98:19

contradicts 323:14

controlled 273:20 274:16

convened 7:6

Convenience 58:16

convenient 58:12 59:9

conversation 172:25 173:8 176:15 192:18, 21 262:6 285:8 292:14 311:18 315:24 317:25 323:24 324:23

conversations 104:14,16 189:22 191:16, 22 192:14,25 193:6,12,18,24 194:13,19 198:24

convicted 339:19

conviction 28:8 330:18

cooperating 94:4 96:4 97:5

cooperative 94:4,9,25 102:25 103:7

cooperator 297:9

copies 107:15 108:2 125:5 159:20 160:22

cops 264:8,17 265:8

copy 37:22 38:1 107:12 125:22 126:1 145:5 161:21

163:7 209:19 255:13 261:4,6, 10,14

corner 132:1 169:14 179:4 183:16,22

correct 14:25 25:12,15,18 28:5,6 29:19 30:5 31:2,5,8 37:4,7,10 38:5, 6,9,10 39:20, 21,23 41:20 46:2,17 50:2 51:11 53:10 54:3 60:25 62:7,25 63:5 64:23 65:9,12, 14,20,22 68:12 71:23 72:6,14, 21,25 73:9 74:20,22 75:6 76:3 77:14,17, 21 78:2 80:24 81:18,19,21 84:15 85:3,10 86:12,18 87:24 89:2,5 90:8 91:1,14 94:9 99:10,21 101:6, 11 102:11,14, 19,22 103:11 105:2,7,11,14, 16,25 106:3 108:24 109:6 115:15,17 118:10,14,15 119:2,5 120:7, 17 121:10 123:1,9 125:19 126:16 127:12, 14,16,19,20 128:22 135:20 138:24 139:25 140:1,11,12,14 141:7 143:6,7, 15 144:20 145:13,20 146:2,3,11,13 147:14,15,17, 21 148:19,20 155:10 156:4 160:20 164:22 165:2,11,13 167:4,10

168:18,19 170:12 171:9, 11,12 172:22 174:21 177:10 178:15 179:24 181:1,5 182:16, 17 184:4,5 186:3,5 187:24 188:3 190:3,4 191:7 192:23, 24 193:2,5,8, 11,14,17,20,23 194:1,4,10 195:13,16 202:14,15 203:25 204:7, 11,21,22 207:2 208:6,7,9 214:14 216:1,4, 14,19 217:1,2 220:19,20 221:8 224:8,9, 12,22,23 225:1, 4,8,11 228:24 229:25 230:1,5, 10,11 232:2,7 235:2,3,6,7,19, 22,23 236:3,4 237:9,10,12,13, 23,24 238:2,5, 6,9,17 239:6,18 240:3,7,11,19, 22 244:12 245:5,8,12 246:6,16 247:2, 5 248:24 249:2, 6,16,22,23,25 250:6,9,16,17 251:12,18,20, 24 252:4,18 253:4,7,8,12 254:1,4,9,10,13 255:21 257:21, 24,25 258:2,5, 7,16 259:2,21 260:2,5,16,21, 22 261:1,5,14, 22,25 262:23, 24 263:18,23, 24 264:5,9,24 265:9 266:1,19, 24 267:25 268:21 269:2,7 270:8,12 271:16,17,21, 24 272:2,5

273:20 276:11, 17,23 278:2,22, 25 279:8,10,13 280:3,7,12 281:13 282:4, 13,14 283:24 284:9,12,13 285:9 286:2,11, 12,14 287:5,9, 10,23,24 289:2 291:6 292:5,6, 12,13,15,16,20, 22 293:5 294:12,16 298:10 299:16, 18,22,23 300:1 305:16,17 306:9,21 307:19 308:7,9, 10 310:4,5 311:11,19 317:19 318:20 321:25 322:14 330:14 332:17 333:17 338:25 342:1 343:19 344:2 345:6 346:5,12 355:14,15 357:2 360:20 361:3,8 362:9

correctly 74:17 100:14 101:2 160:19 201:9 205:7 215:23 239:15 244:9 251:9

corroborate 87:17

corroboration 88:23,24

cou 362:10

coughing 43:23

coughs 97:6 244:4 246:11

counsel 7:17 155:4,12,15,19, 22,25 156:3,6 160:5 162:19 264:1

counting 181:19

couple 34:20 35:7 139:4 152:23,25 161:7 163:22, 23 164:2 165:19 224:4 298:15 335:1

court 7:3,4,10, 12 8:4,7,10,16 12:9,10,12,16 24:6,12 25:6, 11,15,23,24 26:16 71:11 84:4,9 89:12,25 90:4 123:19 136:14,18,21 169:13 171:4, 16 173:23 175:5 177:8,13, 17,20 178:25 179:1 180:5 194:3,5 199:20, 22 205:23 223:19,22,24 231:19,21 241:14,16 263:5,9,12 277:19,21 286:24 320:21, 25 351:7 357:23 363:2,5, 7,9

courtesy 350:19

covered 340:18

covering 221:14

covers 289:21

CPD 54:8 336:19 340:5, 21,24,25 341:6, 14 345:24

CR 351:17,21 353:16

creat 302:2

create 204:6

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 193 of 132 PageID #:7693
The Deposition of GEORGE FIGUEROA, taken on June 19, 2013

373

**created** 142:4
146:6

**credit** 357:19

**crime** 15:23
17:11 33:22
36:21 41:13
47:17 50:13
67:15 78:2
129:1,5,15
151:25 169:2,5
188:15 196:6
197:7 204:20
212:8 264:8,13
271:14,16
272:2 273:25
274:11,12,18
275:15,24,25
276:4,8,11
330:14,23
335:8,13
349:23

**crimes** 11:1,6,
9,13 12:24
13:1,7,10,13
15:12,22 16:1
17:12,13 22:21
27:15,23,25
34:5 36:21
37:15 38:13
40:24 42:16,19,
20 43:3,9 50:18
51:1 68:23,24
147:14,20
158:17 245:15
246:10,12,14,
20 253:17
255:10 305:3
331:21 334:4
336:17

**criminal** 25:6,
15 93:23
153:18 335:7
337:3,12
339:18 340:6,
13,21

**critical** 230:8

**Croatian** 22:18

**cross** 64:20
223:13 355:3
362:12

**CRS** 352:5,10,
15 353:12

**cuff** 185:16,18

**cuffed** 185:20,
24

**custody** 73:23
98:6 99:5,9
100:7 104:11
105:5,11,14
106:23 125:16
130:18,21,23
133:18 135:2,
15 178:11
187:5,7,21
188:5 191:18
237:16 242:3
256:12 259:16,
21 334:1
338:21 351:14

**cut** 16:12 26:4
72:2 110:22
194:5

**cutting** 89:8,
10,15

———————

**D**

**daily** 31:12
116:19,23

**damage**
331:12

**damages**
331:3,6

**dark** 267:13,19
268:9 269:5
315:14,17
316:2 323:14
325:15

**date** 18:13
28:22 62:11
66:2 141:14
182:3 219:3
236:20 282:2,6
283:1,7 286:2
294:16 355:20

**dated** 179:19
182:13 236:18
287:17 328:7

**dates** 17:4

**dating** 61:17

**day** 7:5 29:17
30:2,23 31:17
32:4,24 35:7
36:25 116:24
117:19 137:6
138:3,10
150:22 156:2
160:19,20
173:20 175:9
177:3,4,7,14,
17,20,23 178:1,
2,5,22,24
179:12,16,22
180:2,3,7,9,10
181:9,10,15
183:15 205:24
206:2,3,6,13,
14,17,19,20,22
207:1,6,7,14,15
208:1 209:2
211:11 212:4,5
222:2,8,9
241:25 244:6
252:20 254:4,6
256:19,21,23
262:23 296:23
315:9 351:25
352:1 361:6

**days** 62:2
97:24 129:7
137:7,9,15
138:1,2,7,11,
12,18 151:18,
21 152:5 156:3
176:2,25 178:6,
7,14,19,20
181:14,16,19,
20,24,25 182:3,
11,12 198:5
200:25 201:11
206:7,12,13
207:15,22,23,
24 323:10
359:19 360:3,
15

**daytime**
173:22 221:23
222:3 254:7,9,
13

**de** 292:7

**dead** 158:3
361:13,18

**dealing** 151:22

**dealt** 27:17

**deceased**
318:24

**decide** 98:5

**decided** 13:20
15:16 25:3
175:5

**declare** 224:16
230:10

**defendant**
7:22,24 8:3
20:23 164:21
329:13 330:4

**defendants**
160:5 164:14

**degree** 283:16

**delay** 360:10

**Deleon** 344:22,
25 345:2,12,24

**deliberately**
97:23 128:3
282:16 283:23
325:5,17,23

**denied** 339:15
350:20

**department**
9:7,11,14,17,20
10:5,13,14,18
13:20 18:5
74:10 92:11
181:14 224:3
336:16 337:1,
11 339:2,9
349:16

**depend** 29:23

**depended**
57:2

**dependent**
192:10

**depending**
29:25 102:4
125:5 282:21

**depends**
31:23,24,25
57:8 64:8 79:4,
10 86:2 87:19
88:3,12 90:18,

19 91:23 92:5
109:14,25
128:18 129:21
131:5 132:17,
18 207:13
227:18 361:10

**depicted**
328:24 329:4

**deposition** 7:7
20:14 21:16
24:19 25:21
28:4 82:22
152:13,14,20
153:6 154:11
155:2,5 162:3
163:15,21
232:20 264:1
278:1 288:1
310:4 318:20
363:11

**descent** 19:5

**description**
45:9 59:6
150:17,18
264:23 265:9,
16,19,25
266:18,23
267:23 268:4,8,
25 271:4
289:21 314:17,
23 323:25

**descriptive**
266:11

**deserve**
229:20

**designed** 34:1

**desire** 75:16

**desk** 18:22
42:8,11 281:4

**detailed** 11:12
16:19 41:12,19
42:23 43:6,8,
17,21 44:2

**dete** 109:15

**detect** 52:22

**detective** 9:6,
14 15:18 16:25
17:2,7,9,10
18:3,10 38:17



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 194 of 132 PageID #:7694
The Deposition of GEORGE FIGUEROA, taken on June 19, 2018

374

40:6,11 41:7,20
42:14,19 43:22
46:18 48:5,9,25
50:11 53:4,14
54:1 68:8,10,15
69:10,13,19
70:7 74:8,9,25
75:8,21 76:9
78:7,10 79:4,6,
10,14,16 80:20
81:5 82:7 86:5,
16 87:16,19
88:3,6,12,13,21
89:2,5,6 90:8,9,
10 92:2 93:19
94:6,20 95:6
96:20 98:4
100:24 101:18,
23 102:4,7,15,
18 104:7
109:14,17
110:8 112:6
113:9 114:18
115:7,17,19
118:13 119:1,4,
5,7,19,25 120:3
123:9 124:11
129:1,8,16
130:6 131:16
132:9 158:7,12
159:1,16 193:7
201:17 213:6
214:22 215:1
224:6 259:25
262:7,18
278:23 282:21
285:8,9,22
312:5 317:22,
23,24,25 318:8,
14 321:4
322:13 324:22
325:14 326:1,8,
14,20 331:18,
20,21 332:15,
19,23 333:11
337:16 354:3
358:5 361:1
362:9

**detective's**
81:1 125:23
134:8 169:22,
24

**detectives**
14:7,10 16:20,
22 17:8 18:1

37:12 38:8,11
40:23,24 41:3,
4,7 42:2,15,23
44:2,12 46:14
47:1,12 50:1,
22,25 51:6,8,
10,14,17,21
52:8,15,24
53:2,8,20 59:4
67:22 68:18,22
69:3 71:16,23
72:5 74:20
75:16 76:5,13,
19,24 77:11
78:14,20,24
80:1 87:23
88:13,16 93:10,
12,17 94:21
95:9,18,19
97:18 99:25
100:3,6 102:2
103:8 104:15,
17,21 105:1,10,
13 106:5,25
107:2,16,20
108:11,17,18,
23 109:11,20,
24 110:2,16,18,
24,25 113:16
114:2,10
128:18,21
129:24 133:25
134:16 135:13,
17,24 136:1
158:17 170:4,
10,17 180:13
182:25 200:14
202:14 218:12
238:16 240:11,
19 249:22
254:20 257:13
259:12 276:10,
17,23 278:14,
21 281:21
282:17 283:1,
18 285:11
287:4,8,12
290:4,11,15
292:1,8,25
295:23 297:9
308:14,16
311:2,5,10,18,
24 312:18,24
313:1,12 314:5
315:25 318:22
319:6,8,22

321:23 324:2
325:6,16,22
342:21 359:9,
15,19 360:8,18
361:5,7

**detectives'**
107:3,22 108:3

**determination**
101:24

**determined**
76:13 238:23
295:14

**detour** 175:6

**devices** 89:23

**Diamond**
348:24 349:4,8,
10,11

**Dickens**
174:11 219:19
220:22 223:6,7,
14

**dictated** 73:23

**died** 17:19

**differently**
182:13 212:11

**difficult** 166:19

**dire** 292:8

**DIRECT** 8:18
362:6

**direction**
83:15

**directly** 80:2
200:13 332:6
341:1

**disbanded**
15:22,23,24
16:1 339:11
341:21

**Disciples** 60:6,
7,8,9,14,20
273:10,11,12

**discipline**
351:23

**disciplined**
349:15,20
351:11

**discovery**
331:12

**discuss** 160:1,
4,7

**discussing**
317:16

**dismissed**
21:9

**dispute**
135:22,25
217:19 222:4,
11,15 230:12,
17,18 289:6
346:16

**distance** 52:5

**district** 7:12,13
10:20,22,23
22:22,23
208:17 219:24
220:2 311:4
348:20,21

**districts**
219:17

**divided** 33:4
207:22 219:17

**division** 7:13
42:19 50:11
68:8,10,16
125:4 162:11
259:25

**divisions**
15:18 17:9

**DNA** 82:9

**doc** 160:25

**document**
74:6 173:12
174:4 181:11
202:17 203:14,
24 204:5 208:4
210:23,25
213:1 216:5
217:11,13
222:24 224:2,5,
14 229:10
232:16,19
233:1,5,15,16
237:14 238:14
248:15 250:15
251:21,22

253:6,15 255:2,
20 258:10
261:23 263:14
264:4,17 265:8
277:24,25
279:13 280:20
281:6 287:15,
23,25 288:2,3,
4,19 294:13
300:7 301:22
309:19 310:16
311:8 318:5,19
327:3 328:21
329:12,22
355:14,19

**document's**
289:7

**documentaria
n** 340:11,13

**documentary**
340:7,8

**documented**
291:13 310:22
313:2 322:12
326:8,9,21

**documenting**
105:22 237:7,8,
11 239:5,16

**documents**
31:11 107:15
133:13,15,16
134:4,7 139:2,
22 153:15
155:1 157:21
159:17,23
160:1,4,23
161:13 162:1,
16,20,21 163:1,
8,14 164:1,4
166:22 167:9
169:16 171:2,
11,21 174:1,8
175:14 177:16
192:4,10
197:17 242:9
247:23,25
249:5,16 250:5,
12 263:21
264:7 277:5
299:21 342:23

**DOG** 205:23

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 195 of 132 PageID #:7695
The Deposition of GEORGE FIGUEROA, taken on June 19, 2013

375

domestic 352:21

door 285:19

doubles 309:16

doubt 146:18

downstairs 208:17

drive 150:14

driven 149:17, 25 152:7 269:6 314:24

driver 184:9 295:15

driver's 70:18

driving 150:8, 21,23 184:9 252:12 295:13 315:8,14,17 316:2 323:13

dropping 179:1

drove 150:18 151:8 268:9 292:19

drug 345:23 347:17

duties 44:21

duty 169:12 170:20 171:3

**E**

e-mailed 161:7 162:16

earlier 31:7 96:2 98:4 99:13 139:20 142:17 162:23 177:4 238:7 249:4,10, 11 250:7 252:22 253:7 281:20 287:3

early 41:24 91:4 119:13 296:18 314:14

---

Eastern 7:6,13 12:17 84:9 90:4 136:19,22 199:23 223:25 277:21

Ed 158:4

Edmond 34:13

Edwards 7:3

effort 295:17

efforts 336:25

eight-and-a-half 141:22

Eldon 34:22 35:15

else's 170:6 189:3 228:17

employed 9:3 174:24

encounters 238:23 250:16, 18,24 251:6,9, 16

end 30:3 89:10 295:21,22 299:15 361:13, 18

ended 18:9

ends 208:14

endurance 363:8

Engquist 156:25 157:7, 15

ensure 122:13

ensuring 122:7

enterprise 335:7 337:3,12 339:19 340:14, 21

entire 161:1,5, 17 163:21

entirety 120:13

entitled 207:24

---

Ernest 38:18 158:1 192:22 292:18

essence 91:8

essentially 16:18 18:19 19:21 42:2 68:1,6 76:2 101:1 111:25 117:17,25 120:22 122:25 135:14 140:6 143:21,23 172:10 176:16 237:8 242:15 255:13 281:1,2 356:22

established 102:9 246:25 292:4

Esther 289:11 292:10,15

et al 7:11

evening 29:17 30:3

event 240:21

eventually 14:21 17:19 165:17,18 167:5 187:4 335:6 339:11 341:20,21,24 343:23

evidence 106:2 124:25 127:22 195:21 196:9 197:3,22 198:7,21 199:11 239:22 260:18,20 261:1 301:20 303:5 311:13 330:17 343:21

exact 18:13

EXAMINATION 8:18 355:3 360:24 361:24 362:6,12

exceptionally

---

334:25

excessive 22:13 23:16

exclude 231:7, 10,15

exclusive 72:8 117:16 255:6

exclusively 46:14 173:11

excuse 84:12 97:6 244:4 246:11

exhausted 104:10

exhibit 202:17, 18,20,22 203:14 224:3 232:17,21 233:17,19 234:3,6,10,14, 20,25 235:4,14 236:17 237:19 258:23 263:15, 19 277:25 278:3 287:16, 20 300:8,10 301:23 302:4, 10,18 303:3 306:20 308:13, 14,17 309:20 310:1 318:6,9 322:12,19 323:10 326:21 327:4,8,19,24 328:3,16,22 329:1,5,7,9,13, 17 355:1,2,9 356:18 358:21

existed 133:21 134:3,10 139:22 210:6 215:10 231:3

existence 217:21

exonerated 330:14

expand 205:16

expect 103:20 245:22 246:5,

---

14,18,20 247:15 291:13, 18 296:8,17

expectation 123:2 124:5,7, 10

expected 252:13

experience 43:6 66:22 76:4,12 86:12, 22 94:19 97:11, 17,18 103:6,17 104:13 108:17, 22 213:9 217:24 323:23 324:16 347:21

experienced 357:12

experiences 331:18

explain 206:16 208:1 281:18 324:14

explained 254:18

explaining 115:8

explains 127:18

explanation 325:25 352:14

extent 144:15 311:16 313:23 332:4

extra 350:15

eyewitness 190:7 292:25 359:10

eyewitnesses 295:23

**F**

face 81:20 168:10,12 218:8

---

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 196 of 132 PageID #:7696
The Deposition of GEORGE FIGUEROA, taken on June 19, 2019

376

facing 357:1

fact 8:5 92:17
95:10 152:4
167:21 169:9,
16 170:20
171:8,15
175:13,19
177:19 178:2,5
181:2,8 188:4
204:4 209:25
212:11 216:12,
19 219:13
236:10 238:24
243:4 244:11
248:21 249:17
271:9 272:21,
25 273:18
274:15 279:6
330:10 338:14
349:5 351:15
355:17 356:14
360:8,9

facts 49:11
80:11 84:25
122:25 123:3
124:25 125:14,
17 132:24
197:6 207:12
224:16 231:7,
11,15,25 232:6,
10 284:8,11,15,
19 343:21
356:15

factual 124:8
330:2

failed 350:2

fair 25:8,9
26:19,20,23
27:1 41:18 79:7
83:20 84:12
86:6,22 94:15
96:10,13 103:1,
4,5 112:15
113:19 116:6
121:6 143:8
146:21 173:4,
12,15 201:6,12,
14 202:10,11
204:2 210:18
211:6,7 231:23
254:24,25
265:19 269:14
270:19 272:6

273:16,17
321:18 323:4
330:9,12
332:14 355:16

false 216:13
217:3,13,15
330:25

familiar 48:25
50:14 117:11
168:18 198:9,
14 233:17
264:4 268:5
289:16,17
303:23 304:5,
10 314:4
326:25

family 19:14
144:4

fancy 269:18

fashion 83:8

fast 277:17

fastidious
317:1

father 350:4,6,
7,11,12,13,24

father's 350:5

FBI 335:11
337:21 338:4,8,
11 344:11

February
207:23

feel 9:24
101:24 102:7

feels 101:18
102:15

fellow 23:19

felony 131:9,
17,18

feuded 275:21

field 18:23

Figgy 27:19

Figuero 7:8

Figueroa 7:9,
10,22 8:5,10,
20,21 9:1 12:22

136:24 160:16
204:17,21
208:9 290:5
311:3,5 329:13
330:4 353:2,6
355:5 363:6

figure 165:24,
25 166:11
314:18

figured 165:21
312:11

file 125:8,23
140:24 141:4
143:10,19
147:7,9,13,16,
18,20,24,25
148:12,14,18
149:9 153:21,
24 161:1,2,6,
11,17,19,22
162:5,7,9,10,
11,13,14
163:21 167:4,6,
7,8,14 168:13,
14,15 180:12
235:12 244:25
245:6 247:24
248:16 255:9
263:22 276:16
291:23

filed 37:19,23
38:1 348:8

files 107:23
139:3 147:4
148:2 149:19,
24 162:1 244:3
341:4 342:24

fill 31:11,15
116:19,23
117:18,21
118:1,5 125:18
126:8 145:7,18,
19 146:1
203:25 209:13,
17 214:5
216:10,13,17
229:8 236:13
256:25 278:12
279:6 280:10
284:2

filled 126:16
135:16 141:24

170:8 207:1
209:6,10
212:20 213:16,
24 229:24
234:15 247:2
255:21 257:19
278:6,15,20
280:7 281:11
282:25 283:6
290:10

filler 307:13

filling 126:25
127:6,22
282:18 286:1,4
329:15

final 124:10

finally 360:11

find 64:11,17,
18 70:7 76:11,
21 80:13 82:10
90:23 95:16
140:20 144:15
146:25 151:14
152:5 187:10
252:14,22
253:3 283:6
291:18 319:21
320:2,3 337:1,
17 345:4

finding 252:6,
10

fine 8:23
136:17 203:10

finger 347:24

finish 26:1,6,
10,12 178:23

finished 26:4

fire 270:15

Firm 7:21
156:7,11

firsthand
186:24 259:5

fit 268:18

five-minute
277:11

five-week
351:21

fix 89:17,21

Flavin 32:15
37:1,2,6 184:3,
22 185:18
191:7,10
204:24,25
211:9,13
235:22 251:24
280:10

flaws 102:1

Flores 306:3,7,
13

Florida 344:6,
12

FLT 164:13

fluctuated
137:12 207:15

fluent 19:2

focus 59:24
84:24 131:8

focused 33:21
34:25 144:10
344:15

follow 88:9
102:11 219:20

follow-up
355:5

force 22:13
23:16

foremost
152:21

forget 113:24

form 14:9,11
15:5 20:5 22:8
23:6,22,25
29:11,22 30:14
31:3 32:23
33:3,14,24 35:1
36:24 38:14,21
39:9,14 40:2,8,
12,19 41:1,8,
14,21 42:12,25
43:10 44:3,7,23
45:3,13,23
46:8,12,15,21
47:6,13 48:10,
18 49:6,15,21
50:5,19,23

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 197 of 132 PageID #:7697
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

377

51:3,12 52:3,
10,25 53:15
54:7,14 55:2
56:9,20 57:1,6
60:21 62:15
63:1,6,13,20
64:6,13,21
65:2,10,25 66:8
68:13,20 69:5,
24 70:9,14,24
73:1,10,16
74:3,21 75:4,
12,18 76:7,17
77:15,22 78:3,
8,16 79:2,15
80:7,18 81:7,22
82:4 83:8 84:20
85:4,22 86:7
87:3,10,25
88:10,19 90:16
91:2,15,21
92:13,22 93:6,
15,24 94:10,16
95:1,13,23
96:11,17,23
97:14,20 98:1,
14,21 99:12,22
100:21 101:7,
12,21 102:12,
20 103:2,9,15,
22 104:3,19,23
105:3,8,15,20
106:1,19 107:5,
10,18,24 108:7,
13,19,25 109:7,
13,22 110:5,11
111:6,13,17,23
112:9,19,23
113:12,20
114:5,11,19,25
115:5,13,24
116:10,12,21,
25 117:5,9,14,
18 118:3,19
119:9,15,20
120:1,8,15,21
121:2,11,17
122:9,15,21
123:5,10,23
124:13,24
125:9,20 126:3,
10,19,22 127:3,
7,24 128:5,16,
23 129:10,19
130:2,10,16
131:3,13,23

132:15 133:2,
23 134:6,13,23
135:9,18 136:8
137:22 138:8,
16 142:1,5,11
143:2,11 144:2,
12,21 145:1,9,
21 146:4,7,12,
17,22 147:5
150:4,13,20
151:7,23 154:1
158:24 159:6,
14 164:6,12,17
165:3,12
166:17 169:11,
25 170:13,18
171:5 172:14
173:5,13 174:2,
9 175:2 176:24
177:6,22
179:10 181:6
184:24 186:4,8,
13,17,23 187:3,
18 188:1,11,17,
24 189:5,19,25
190:8,14,21
191:1,14,24
192:8,12 193:3,
9,15,21 194:2,
7,15 195:9,20
196:8,23 197:2,
8,25 198:6,10,
15,20 199:5,10
200:3,15,19
201:1,13,23
202:4 203:22
204:8 205:6
206:4,9 207:4,9
209:18,21
210:4,16
211:10,15,21
212:23 213:10,
18 214:1,9,16,
20 215:5,14,19
216:2 217:4,14
220:15 221:3
222:14 223:11
225:2,9 226:8,
12 227:16
228:4,13,25
229:16 230:14
231:13 232:3,8
237:3 238:10
239:21 240:4
241:8,22
242:20 243:15,

25 244:14
245:3,10,19,25
246:7 247:3,10,
20 248:3,9,13,
19,25 251:13,
19 252:8,15,19,
23 253:9,22
254:5 255:11
256:18 257:6,
10,15,20 258:3,
17,24 259:10
260:3,9 261:7,
15,20 262:1,9,
13,16 265:10,
14,20,24 266:2,
8,14 267:4,7
268:1,11,22
269:3,8,15
270:2,24 271:3,
11,22 272:3,10,
18 273:21
274:19,24
275:17 276:1,
12,18,24 279:1
280:5,13
281:14 282:19
283:3,9,21
284:18,25
285:15 286:22
287:1 288:11
289:24 290:16
291:15,20
292:21 293:16,
23 294:22
295:3,8,19
296:3,10,20
297:6,10,14,21
298:1,6,11,22
299:17 301:19
302:12 303:4
307:5,10 308:2
309:14 310:19,
24 311:12,20
312:1,8,15,20
313:4,15 314:1,
9,20 315:20
316:3,12,17,24
317:6,11 318:3
319:2,9,24
321:19 322:2,6,
15 323:5,17
324:3,11,25
325:7,19 326:4,
11,17,22 327:9
329:10 330:15,
19,24 331:22

332:9,24 333:5,
13 334:5,8,15,
20 335:9,20
336:4,12,18,23
337:4,13,20
338:3,10,20
339:5,10,14,21
340:15 341:2,9,
18 342:2,7,14,
25 343:2,8,14,
20 344:3,10,18,
24 345:7,13,21
346:6,13 347:7,
14 348:1,10,15,
25 350:16
351:4 352:8,12,
16 353:4,8,14,
19,25 354:5
357:4 359:25
360:12 361:9,
20

**formed** 18:8
330:18

**forms** 111:15
112:1,8,13

**found** 21:12
164:3,8,15,20
187:8 252:13,
18 253:11
351:18

**foundation**
14:11 15:5
23:25 29:22
30:14 31:3,13,
22 32:7,23
33:3,15,24 35:1
38:14 39:14
40:2,8,12 41:8,
14 43:10 44:3,7
45:3,23 46:8,
12,15,21 47:6,
13 48:10 49:15,
21 50:6 51:3,24
52:25 53:15
54:7,14 55:2
56:2,9,20 57:1,
6,13,15,19
58:24 61:5,25
62:10,15 63:1,
6,13,20 64:1,7,
13,21 65:2,10,
25 66:8 67:1,6
69:6,24 70:14,
24 71:20,24

72:15 73:1,10,
16 74:3,15,21
75:4,12 76:7,17
77:3,15,22 78:8
79:2 80:7,18,25
81:7,22 82:4
85:4,22 86:7
87:3,10,25
88:10,19 90:16
91:2,15,21
92:13,22 93:6,
15,24 94:10,16
95:1,23 96:11,
17,23 97:14,20
98:1,14,21
99:22 100:21
101:7,12,21
102:12,20
103:2,9,15,22
104:3,23 105:8,
15 106:1,19
107:5,24 108:7,
13,19,25 109:7,
13,22 110:5,11
111:7,13,17,23
112:9,19,23
113:12,20
114:5,11,19,25
115:5,13
116:10,21,25
117:5,9 118:7
119:9,15,20
120:1,8,15
121:17 122:9,
15,21 123:5,10,
23 124:13,24
125:9 126:3,19,
22 127:3,7,24
128:5,10,16,23
129:10,19
130:2,10,16
131:3,13,23
132:15 135:9,
18 136:8
137:16 138:8
142:5 145:1
154:1 161:23
162:8 164:6,17
170:1,13,18
171:5 176:24
177:6 186:8,13,
17,23 187:3,19
188:1,11,17,24
189:5,19,25
190:8,14,21
191:1,14,24

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 108 of 132 PageID #:7698
The Deposition of GEORGE FIGUEROA, taken on June 17, 2019

378

192:8,12 193:3,
9,15,21 194:2,
7,15 195:9,20
196:8,23 197:2,
8,25 198:6,15,
20 199:5,10
200:3,11,15,19
201:1,13,23
202:4 204:8
205:6 206:4,9
209:18 210:4,
16 211:10,15,
21 213:10,18
214:1,9,16,20
215:5,14 216:3
217:4,14 221:5
222:14 223:11
225:2,9 227:16
228:4,13,25
229:16 230:14
231:13 232:3,8
237:3 239:21
240:5 241:8,22
243:16,25
245:3,19,25
246:7 247:3,10,
20 248:3,9,13,
19,25 251:19
252:15,19,23
253:9 255:11
256:18 257:6,
10,15,20 258:3,
17,24 259:10
260:3,9 261:15,
20 262:1,9,17
265:1,10,14,20
266:2,8,14
267:4,8 268:1,
11,22 269:3,8,
15 270:2,24
271:3,11,22
272:3,10,18
273:21 274:19,
24 275:17
276:1,12,18,24
280:14 281:14
282:19 283:9,
21 284:18
285:15 288:11
289:24 291:15,
20 292:21
293:16,23
294:22 295:3,8,
19 296:3,10,20
297:6,10,14,21
298:1,6,11,22

301:19 307:5,
10 310:19,24
311:12,20
312:1,8,15,20
313:4,15 314:1,
9,20 315:20
316:3,12,17,24
317:6,11 318:3
319:2,9,24
322:6,15 323:5,
17 324:3,11,25
325:7,19 326:4,
11,17,22 327:9
329:10 330:15,
19,24 331:22
332:9,24 333:5,
13 334:8,15,20
335:9,20 336:4,
12,23 337:4,13,
20 338:3,10
339:5,14
341:12,18
342:2,7,14
343:2,8,14,20
344:3,10,18,24
345:7,13,21
346:6,13,19
347:7,14 348:1,
10,15,25
350:16 351:4
352:8,12,16
353:4,8,14,25
354:5 360:1,13
361:9,20

**four-door**
289:20

**fourth** 154:13

**Francisco**
353:2,5

**Frank** 9:2

**Frankie** 353:1

**frankly** 22:25
160:11 217:16

**free** 254:25

**fresh** 121:16,
20

**Friday** 138:4

**friend's** 150:9,
25

**friends** 23:18
42:3 144:4
324:19

**front** 305:10
328:4

**frustrating**
24:14

**fugitive** 18:6

**full** 62:19
160:19

**Fullerton**
314:12

**furlough**
205:22 207:21
208:1,2,3

**Furloughs**
207:22

**furnace** 66:17

---

**G**

**Galligan** 35:8,
12,25 36:12

**gang** 11:1,6,8,
9,13 12:23
13:1,2,3,7,10,
13 14:15,18,23
15:2,4,6,11,12,
13,15,16,22
16:1,2,4,5,15,
19 17:6,15
18:8,12,17
22:21 27:15,17,
23,25 29:1,7,8,
20 30:11 31:15,
20 32:12 33:4,
6,11,22 34:5
36:21 37:14,15
38:12,13,19
39:8,11,12,15,
22,25 40:6,10,
22,23,24 41:6
42:3 43:8,18
44:1,5,11,14,25
45:9,22 46:1,2
47:5 50:13,14
51:2,7,10,18
52:9,15,23
53:7,12,25
54:17,20 55:11,

14,21,24,25
56:1,15,18,25
57:3,5,8,11,14,
18,21 58:2,4,5
59:10,16,19,20,
23,25 60:2
66:10,23 67:4,
15 68:21,25
69:1 70:21
71:1,17 72:5,8,
11,13,19 73:6,
15,20,22 74:12,
18 75:23 77:6,
11 78:2,13,22,
25 79:11,19
81:25 85:21
86:4 87:6,22
88:7,17 90:11
91:11 95:9,11,
17 96:7,15
97:12,25 98:3
99:10 103:19
107:2,20 108:1,
2,6,10,16
111:2,5,16,20
112:7,21
114:18,23
115:23 116:4,
13,16 118:2,6
123:9 124:11,
18,19,22,23
125:1,7 126:2,
21 137:5,19
139:3,6,13,15,
16,18,23,24
140:3,4,10,11,
14,21,25 141:1,
10 142:21
143:17 144:24,
25 145:13,15,
16,17,22,25
146:8,11
147:13,14,17,
20,21 149:13,
15,18,20,25
196:14,18
200:5 204:5,7,
20 212:8
245:15 246:10,
12,14,19 247:2,
6,17 250:21
255:10 269:22
270:17 271:13,
14,15,16,20,25
272:13 273:3,
15,20,24 274:5

275:5,11,16
289:23 294:19
295:12 297:9
300:23,25
301:6,11
304:12 305:2,3
311:2,4 316:16
319:1,12,14,19
322:9 324:1,9
328:13 331:21
333:20,24,25
334:4,19,24
335:7,13
336:17,22
340:1,3 341:6,
15 342:21
343:1,11 347:4,
5,16,20,24
349:23 354:3

**gang's** 139:20
200:5

**gang-related**
49:19

**gangs** 14:17
15:23 43:13,14
48:24 51:6
59:18,21 60:16,
19,25 117:16
148:6,10
151:22 273:5,8
274:3,22 305:7
319:3,5,15
333:23 334:2
335:5 342:6,13
343:11

**Gangster** 60:7
148:12 242:1
273:12 297:15
344:22 345:3
346:12,23

**gangsters**
60:3 148:1,3,5
174:17,19
200:6 238:21
251:2 272:14,
16 273:10
275:4,8,13,15,
20,22,24
276:21 277:8
297:13,20,25
298:5 300:24
313:17 314:4,
19,24 315:8,13

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 109 of 132 PageID #:7699
The Deposition of GEORGE FIGUEROA, taken on June 17, 2019

379

316:1,6,14,16,
23 323:3
324:23 325:14
326:3 332:7
343:19 344:2
345:12,20
346:5,18 347:1
349:14 353:2

**garbage** 66:16

**gargled** 12:6

**gather** 264:9

**gathered**
264:17,21

**gave** 63:18
64:3 65:19
132:24 135:17,
24 143:5
210:23 229:17
256:6,15 265:8
294:8 298:17
350:6,14,25
351:20

**GCP** 212:8

**GCSP** 204:17,
24 212:6

**general** 32:8
69:15 107:19
131:9 263:17
264:3,11 272:7,
15 331:8,11,13
349:11

**generally**
29:12 30:21
35:2 44:13
50:7,16 54:23
58:3 66:11
69:25 70:16
78:10 80:12,15
92:24 96:25
104:8 114:21
117:16 119:3
125:2,25 128:1
137:19 145:10
280:18 332:11
348:18 349:8
352:23

**George** 7:8,22
9:1 38:21
204:21 311:3
329:13

**Gerry** 32:15
37:1 177:8
178:25 191:18
204:25

**girlfriend's**
150:8

**give** 8:12 13:17
17:12 18:13
21:16 28:22
63:10,11,22
64:4 89:16,22
202:22 209:3
211:1,3 216:15
251:14 310:7
314:23 315:18
323:25 327:10
328:7 347:12
350:23 355:13,
17 356:9
357:19 363:9

**giving** 24:18
82:18 231:7,11

**glasses**
240:12

**Gonzalez**
153:16,25
161:22 198:4,9,
12,25 199:9
299:20 309:24
310:17 327:5,
19,21 328:11,
17

**Gonzalez's**
327:15

**good** 7:20
24:10 39:4 92:7
98:9 99:25
101:25 199:14
203:9,12 263:2,
3 302:23,24
319:8,12,18
320:7 325:22
335:3

**goodbye** 159:3

**gosh** 333:25

**GPR** 112:5,7,
13

**GPRS** 111:18,
20,25 153:9

**grab** 81:12

**Graf** 318:14,23,
24 321:4
322:20 323:1,
16 324:22
326:10

**Grand** 224:7
260:15

**graphic** 54:8
61:18 62:1,13

**great** 131:24
158:25

**grew** 19:9

**ground** 24:17
25:21

**groundwork**
28:3

**group** 138:3,18
205:24,25
206:2,3,6,13,
14,21 207:6,7
208:1 211:11
303:6

**groups** 206:17
207:14

**growing** 19:17

**grown** 20:11

**guess** 71:15
83:10 172:12
194:23 201:4
214:25 236:24
244:8 252:24,
25 263:10
269:4 302:22

**guessing**
201:3 253:2

**Guevara** 7:11
8:3 39:7 40:6,
11 104:25
157:23 172:1,5
191:22 192:5,
11 194:13
198:24 213:6
225:13,18
226:1 248:23
255:25 256:2
262:7,18
278:23 292:11,

18 294:13
302:8,11 303:3,
8 305:19
306:17 310:7
323:11 326:1,8,
14,20 328:6
331:19,21
332:15,23
333:11 358:5
360:8 361:2

**Guevara's**
224:6

**guy** 21:6 76:10
90:21 109:21
150:7 158:25
159:15 338:5
346:23 347:13

**guys** 17:15
22:16,17 23:1
27:20 32:19
33:16 91:5
117:6 151:17,
20,21,25
169:14 183:23
188:23 263:1
290:25 320:3
347:5 348:22

---

**H**

**ha** 17:25

**hair** 47:18

**half** 66:10

**Halvorsen**
38:18 104:25
158:1 171:25
172:1,5 192:14,
20,22 225:13,
18 226:1
248:23 255:25
256:2 278:24
287:18,21
292:11,18
294:14 302:8,
11 303:3,9
305:19 306:17
310:7 323:11
326:9 328:7
332:19 358:5
360:9 361:2

**Halvorsen's**

358:21

**hand** 8:11
112:5 350:6

**handcuffed**
185:15 186:2

**handed** 145:5

**handled** 18:1
325:12

**handling** 98:4
285:11

**hands** 94:24
152:4

**handwriting**
303:12,14,16,
18 304:8,14,15,
17,19,23
305:21,22
306:4,5,8
307:15 309:6

**handwritten**
153:9 298:18,
21,25 299:2,5,
6,9

**hang** 174:20
220:3,9

**hangs** 132:1

**happen** 75:10
86:12 92:24
312:7 335:18,
23

**happened**
21:8 76:15
129:6 172:24
176:4 215:20
239:3 243:8,11,
12 247:17
249:4 252:11
274:7 283:11
326:2 335:13

**happening**
150:11 277:15
292:5 317:18
341:17

**happenstance**
252:11

**happy** 217:16
320:14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**hard** 11:23
166:15 206:15
208:1 227:3
333:22

**harm** 97:9
100:9

**hassle** 350:7

**head** 36:18
37:16 82:17
83:4,16 133:20
166:2 241:6
242:9 276:6
327:2

**headed** 33:5

**hear** 11:20,21,
24,25 89:7,17
334:13 342:4,
18,20,21 343:5,
23 344:8

**heard** 333:3
336:8 342:9
343:3 344:6,7
346:3

**hearing** 345:17

**heart** 101:24

**hearts** 101:25

**heat** 347:18

**Hec** 238:8

**Hector** 186:10,
16 187:23
188:6,20
189:17 288:5,
10,14 290:6,11,
15,21,24 291:1,
4,7,8,12,25
292:19 295:13
297:4,8,12
299:1 302:14
305:25 306:1
317:9

**height** 141:14

**held** 9:5,13
10:18,21 11:16

**helped** 24:5
249:22,25

**helpful** 150:21
151:3,4,8,11

152:10

**helping** 240:18

**hey** 69:12,18,
20 75:1,9,23
134:20 312:5
341:7,15

**high** 96:16
97:10,12,18
297:24

**high-level**
344:21 347:4,
12,20

**higher-level**
347:16

**highlighted**
265:6 267:9
269:23

**highlighting**
267:5

**hints** 314:24
315:18

**Hispanics**
266:1,7,13
321:25

**hit** 227:6 263:5

**hold** 29:10
33:14 54:12
82:15 169:25
218:14 240:12
302:17 360:20

**holding** 331:12

**Homan** 13:25
14:20,22,24
16:7,8,14

**home** 160:23
163:9 169:13
170:21 171:4,
16 173:23
175:1,5 178:12,
25 179:13
221:2 277:18
279:19 292:10,
25 293:11
294:1,14 359:7

**homes** 52:13

**homicide**
17:20,25 18:1

28:11,16 43:3
44:12,19 45:1,6
46:1,7,11 47:22
48:3 49:5,25
52:14,23 53:14
78:6,11,25
79:13 82:7
84:24 85:2,9,
13,16 89:1
92:19 93:3
95:8,18 96:14,
20 105:2,19
106:4,6,18
107:2,9,20,22
108:3,11,16,17,
23 110:4,9
113:9,17 114:3,
24 115:4,11,16,
19,21 125:23
129:5,24 131:8,
9,15 133:5
151:3 161:2
162:2,15 165:2,
6,10 169:3,6
173:17 175:12,
24 176:18
186:11,21
187:2 189:4,11,
23 190:19,25
191:5,23
192:22 193:1,7,
13,19,25
194:14,20
196:7 200:2,10,
14,18 213:14
214:22,24
233:6 247:24
248:16 283:6
299:15,20,25
310:17 328:11,
18 342:12,21,
24 347:11

**homicides**
17:18

**honest** 187:21
333:8 343:16

**honestly** 28:23
30:15 95:4
130:5 137:13
187:21 202:6
209:8 213:23
221:22 227:11,
19 259:3
285:12 296:24

**hope** 158:3

**hours** 29:25
30:3,18 31:6,
12,16 137:6
155:21 162:20
200:25 201:11
258:12 263:6
292:24 351:7

**house** 227:6
228:8

**houses** 223:8

**Hoyne** 293:1

**humper** 117:8,
11,15 118:1

**hundreds** 25:8
59:18 204:2

**hung** 174:11,
13,14 223:9

**hurry** 279:18

**hurt** 100:11

**hurting** 100:12

**husband**
352:22

**hypothetical**
52:11 76:18
80:10 81:8 82:5
84:21 85:5,23
86:8 87:4,11
88:1,11,20
91:3,16,22
92:14,23 93:7,
16 94:1,17
95:2,24 96:12,
24 97:15,21
98:2,15,22
99:23 100:22
101:13,22
102:13,21
103:3,10,23
104:5 108:20
109:1,8 110:12
114:6,12,20
115:14 122:22
128:17,24
129:11,20
130:3,11,17
131:4,14,24
132:16 229:1

313:6 325:2

**hope** 158:3

**hours** 29:25
30:3,18 31:6,
12,16 137:6
155:21 162:20
200:25 201:11
258:12 263:6
292:24 351:7

241:9 261:16
268:12 269:9
294:23 295:4,9
312:9 324:4,12
348:2

**Hypothetically**
86:20

___

**I**

**I-G-U-E-R-O-A**
9:2

**ID** 93:5 94:23
118:21

**ide** 296:25

**idea** 67:14
69:16 99:16
172:8 206:25
208:12 209:10
234:17 252:21
257:12 273:13
304:13 326:6,7,
13 346:24
347:4 352:9
358:11

**iden** 288:4

**ident** 93:21

**identi** 140:19

**identification**
44:22 45:2,5,
12,14,18 46:23
47:9,11,19
50:16 52:21
53:7 85:15
86:3,4,5 87:6,7,
17,21 88:7,17,
25 90:14 91:11,
19,20 92:9,18
93:4,12,21 94:8
95:11,21 96:7
97:25 98:25
99:10,19,20
100:15,19,25
101:4,16,19
102:1,7,16
103:19 152:6
196:19,22
200:8 202:20
232:21 233:19
263:19 278:3
287:20 294:21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 111 of 132 PageID #:7701
The Deposition of GEORGE FIGUEROA, taken on June 11, 2019

381

296:2 300:10
302:4 310:1
313:18 318:9
327:8 328:3
329:1,9,17
362:2

**identifications**
86:24

**identified**
17:24 55:18
56:24 82:9
84:17 85:1,7,8,
14,20 86:15
87:1 99:7
103:18 133:5
139:14,22
154:4 175:12,
23 176:17
197:19 222:23
229:11,13
232:18 235:22
236:10 240:1
242:2 249:18
258:10 270:6,7,
11,22 280:23
285:3 286:17
296:6,16,24,25
304:4 332:3
359:8 360:6

**identifies** 38:4
99:14 127:11
225:12 231:25
240:1,17 255:2,
20 260:14,19
265:6 307:15

**identify** 44:18
45:19 48:16
61:1 110:8
134:9,12 135:5
139:5 143:17,
24 149:6,17
173:24 176:12
178:13 201:9
217:25 223:4
226:17,18,24
227:23 238:8,9
240:11,19
255:23 259:2
268:8 275:14
302:9 348:22

**identifying**
42:3 44:13
127:15 164:21

225:17 228:21
238:16 260:19
271:7 290:6,11,
15

**IDS** 96:4

**IED** 351:17

**IG's** 304:19

**IGS** 60:19
220:3 223:9
276:4,7 307:25
308:1,4 323:12

**Illinois** 7:13,23

**immediately**
76:14 87:24
96:22 97:1
165:7

**Impe** 316:11

**Imperial** 60:3
148:1,3,5,11
174:17,19
200:5,6 238:21
242:1 272:14,
16 273:10
275:4,7,13,15,
20,22,23
276:21 277:7
297:13,15,20,
25 298:4
300:24 313:17
314:4,19,24
315:8,12 316:1,
6,14,15,23
322:9 323:3
324:23 325:14
326:2 332:7
343:19 344:2,
22 345:3,12,20
346:4,12,18,23
347:1 349:14
353:2

**implemented**
339:9

**importance**
119:8,12,18,22

**important**
25:25 84:14
119:24 120:5
127:10 225:5
357:25

**improper**
271:2

**impulse** 83:2

**inaccurate**
217:3 226:11

**incidences**
49:24

**incident** 125:8
255:2,5,17
351:10

**include** 17:18
42:16,18 56:25
101:17 230:3,
22 232:6 263:7
281:12 282:3
286:19 356:16

**included** 124:8
230:3 260:25
261:14 306:20
317:4,9,14
357:16

**including** 38:5
155:8 345:12

**income** 9:17
10:9,14

**incomplete**
52:11 76:18
80:10 81:8 82:5
84:20,21 85:5,
23 86:8 87:4,11
88:1,11,20
91:3,16,22
92:14,23 93:7,
16,25 94:17
95:2,24 96:12,
18,24 97:15,21
98:2,22 99:23
100:22 101:13,
22 102:13,21
103:3,10,23
104:4 108:20
109:1,8 110:12
114:6,12,20
115:14 122:22
128:17,24
129:11,20
130:3,11,17
131:4,14,24
132:16 241:9
261:16 268:12
269:9 294:23

295:4,9 312:9
324:4,12 348:2

**inconsistent**
221:24 222:1
228:23

**incorrect**
220:18

**inde** 53:1

**independent**
171:11 191:3
197:10,15,21,
22 198:3 199:2
202:8

**independently**
48:5,13 53:2

**index** 141:16,
18 148:13,18,
23,24 149:9
245:12 260:24
261:11 291:18

**indi** 149:6
156:7 281:9

**indicating**
31:12,16
116:24 172:20
245:23 281:10
292:19 306:7

**indication**
179:22 212:20
213:15 253:20
260:6 264:12
272:22 273:23
274:17 276:15
289:7 290:10

**individual** 23:4
57:8 64:8 68:11
72:12 74:25
75:8,10,17
76:25 79:22
85:1,8,13,14,25
87:1 88:12,18
91:13 93:13
94:8,24 129:24
140:20 142:8,
10 143:18,23
144:3 149:7
225:8 226:20
268:16 300:19,
21 304:4
309:24 327:1

**individual's**
62:18 86:6
142:25 143:14

**individually**
320:5

**individuals**
38:4,17 56:24
66:7 68:19
70:22 74:13
90:22 139:5,14,
23 140:4
157:19 225:17
226:19,24
227:14,23,24,
25 228:10,21
229:11,13
264:24 270:20
289:22 292:8
300:17 315:18
318:25 320:10
337:2,16
347:25

**individuals'**
246:6

**info** 258:9

**informant**
297:5

**information**
17:24 61:2
62:12,16 65:24
67:21 71:18
79:21 80:5,16,
21 81:4 82:1
87:19 88:4
98:20 102:3
112:1,5 113:6
114:14 124:8
125:12 126:8
128:4 130:24
133:11,25
134:16,17,19
135:8,16,17,23
141:10,13
142:14,15,17,
21 144:19,23
145:20 146:14,
15 148:9,23
166:18 176:20,
21 177:1,3
188:5 197:14
202:3,7,13
209:13,17,24
211:4 216:24

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 112 of 132 PageID #:7702
The Deposition of GEORGE FIGUEROA, taken on June 17, 2019

382

217:1,3,12,20
219:6 220:16
222:5,12,19
224:22 225:16
226:11 228:23
230:2,4,7,8,13,
19,23 234:7
236:5 246:25
247:1,8,18
248:1 250:2,22
255:10 256:5,7,
25 257:1,3,9,
22,23 258:7
259:23 264:7,
18,21 265:8,23
266:12,22
267:1 268:15
269:21,22
270:1 276:9,16,
22 277:1,6
281:10,12
284:2,19
285:13,19
286:18 305:11,
13 314:18
315:11 322:9,
11 323:3,15
324:1,8,21
325:5,13,17,24
333:1 340:12,
25 341:25
346:17 356:6
358:2 361:12

**initial** 321:12

**initiated** 255:8

**inner-** 352:24

**Insane** 275:1,3

**inside** 132:19
145:3 227:24
228:8

**instance** 92:18
100:14 186:7
214:6,12
215:24

**instances**
21:14,22 25:11,
15 45:11 53:19
74:1,17,23,24
75:7 91:1 92:8
93:9,10 95:11
100:16 101:15
102:6,9,15,18

210:22 215:11
250:25 251:10
352:2

**instincts**
334:22 335:3

**instruct** 75:22

**instructed**
180:12

**instructing**
160:15

**instruction**
38:22 83:15
119:11 215:22

**insufficient**
101:10,17

**intelligence**
13:22 15:11,17
18:8,12,17,19
40:17 116:18

**intend** 320:17,
19

**intended** 93:10
280:25

**intention**
95:25 253:23

**inter** 48:15

**interacting**
70:23

**interaction**
70:5 183:4
189:8,9

**interactions**
40:5 158:19
159:2,10
186:10 189:10,
13,16 190:3,6,
18,24 191:4,12
192:5,10 199:4
251:17 262:7
319:1

**interfere**
285:24

**interfered**
23:17

**internal** 336:20
337:8,10
350:21 353:13

**Internet** 89:24

**interpreting**
213:8

**interrogated**
188:9

**interrogating**
49:18

**interrogations**
49:14,20 109:6
197:1

**Interrogatorie
s** 329:14

**interrogatory**
329:16

**interrupt** 24:6

**interview**
48:13,15 112:3,
4,6 114:22
313:13 317:16
321:13,15
322:13 326:15,
20 353:21

**interviewed**
111:10 188:10
353:12,15,17,
24

**interviewing**
48:4 49:4
130:19

**interviews**
48:8 109:4,6
196:25 353:20

**inv** 344:12

**inventoried**
261:2,5,14,18
294:20 295:1

**inventory**
260:18,20
261:1,17,19,23
350:2,5 351:24

**inventorying**
295:7 349:22

**invest** 18:20

**investigate**
338:5,6

**investigated**

133:3 337:22,
23,24 338:2

**investigating**
129:6 134:1
337:21 338:9
353:16

**investigation**
28:1,12,16
29:25 30:4 45:6
46:11 75:25
76:10 77:13
79:13 81:10,11
85:9,14,16
98:25 102:11
104:22 105:2,
18,19,24 106:6,
18 107:2,9
108:5 113:9,17
115:4,9 118:18
130:7 144:8
153:16,22,25
160:8 161:2,3,
6,22 162:2,3,7,
15 164:5 165:2,
6,10,16 166:3,6
167:10,15
170:2,11
171:15,18,20
173:3,17
186:11,19,22
187:2,16 188:7,
15 189:4,11,24
190:20 191:5,
13,23 192:23
193:2,8,14,20
194:1,14,20
196:7 197:7
198:4 200:2,10,
18 201:10
217:7,9 225:20
226:14,15
230:17 237:12
240:2 248:16
253:17 263:18
288:15 299:15
310:8,18
320:10 328:11,
19 336:3,11,21
337:10,15
338:22 339:2,
13 342:24
344:12,15
357:18 360:16,
19 361:8,11,22

**investigations**
18:20 34:2
40:17 42:23
43:3 44:12
45:1,2 46:1,7
47:22 48:3 49:5
50:1 52:24
58:19,23 59:2,5
84:25 91:5 93:3
108:11 109:19
110:4,9 114:24
115:22 151:4
166:8 342:6,12
346:1

**investigative**
120:25 121:15
161:1,19 162:5
163:21 167:4
202:9 235:12
237:8 239:16
263:22 280:21,
24 320:16
361:7

**investigator**
86:2 162:14
332:16,19

**investigators**
353:13

**involved** 21:25
68:1 98:20
157:16 186:20
187:9 198:17
200:6 225:20
251:11 266:24
276:4 295:25
302:2 313:18,
23 314:19
324:1,9,10
337:2,11,18
340:17 347:17
348:19

**involvement**
105:19 106:6
188:7,15
190:12 197:7
202:8 211:5
237:11 272:8
298:20 299:1,6,
10,13,25
301:17 310:17
327:6,15
328:10,14
349:5



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1-18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 113 of 132 PageID #:7703
The Deposition of GEORGE FIGUEROA, taken on June 11, 2021

383

involving
276:7 342:12

**IR** 61:19 62:3,
11 66:2 149:1

**issue** 76:11
89:17,22

**issued** 68:8
104:9

**issues** 49:19
68:10

**J**

**James** 34:22

**January** 10:24

**Jeff** 11:18,21
72:1 136:12
277:16 322:5
331:4 358:14
363:7

**Jeffrey** 7:21

**Jerry** 32:15

**job** 9:5,18
18:22

**jobs** 9:19
117:20

**Joe** 35:8
333:19 334:14,
18

**jog** 166:21

**John** 35:8,12

**Jorge** 327:1

**Jose** 190:7,10
198:13,18
199:4,7 264:18
295:15,23
299:5 306:3,7,
13 327:4,7
359:10,15
362:2,16

**Joseph** 35:12
333:17 336:16
344:22,25
345:2,24

**Josh** 156:25
157:7

**Juan** 303:20
304:5 344:1,5,9

**judge** 68:7

**June** 7:5
179:19,21
180:17,23
207:2 236:14,
18 237:6
239:16 256:22,
23 328:7

**Junior** 242:15,
19,21,23

**Junito** 176:17
238:9,16,21
240:11,19,24
241:5,6,20,25
242:1,6,15,21
243:3,6,20
244:5,18 245:2,
24 246:3,15,21
247:7 248:2,8,
12,17,24 249:4,
11,21 260:25
261:13,25
290:6,20,25
291:1,3

**justify** 82:2
134:3,10 225:7
232:6 356:22
357:7,11

**justifying**
128:1

**K**

**keeping** 58:1,
15 66:24 67:9
317:2

**Kerry** 34:23

**ki** 204:5

**kid** 350:4

**kid's** 350:25

**kids** 277:18
351:12,19

**killed** 98:8
330:10

**killer** 102:24

**kind** 31:16
37:17 47:10
74:8 75:11
82:24 91:8 97:8
99:16 112:21
114:15,16,17
115:25 116:2,
23 118:17
125:8,11
126:11 137:21
147:4 153:21,
24 165:20
166:13 204:5
276:9 298:4
320:22 321:14
325:24 336:10
338:7 341:16
345:10 348:4
354:13 356:11

**kinds** 132:21

**King** 273:4,14

**Kings** 190:11
270:12 272:22
273:5,9 275:1
276:21 277:8

**Kivetz** 7:20,21
8:9 11:17,19,23
12:4,18 14:9,11
15:5 17:22 20:5
22:8 23:6,22,25
24:7,9,13
29:10,22 30:14
31:3,9,13,18,22
32:7,13,23
33:3,8,14,19,24
34:9,12 35:1,20
36:24 38:14,21,
24 39:2,5,9,14
40:2,8,12,19
41:1,8,14,21
42:12,25 43:10,
23 44:3,7,23
45:3,7,13,23
46:4,8,12,15,21
47:6,13 48:10,
18,22 49:6,15,
21 50:5,19,23
51:3,12,24
52:3,10,18,25
53:15,21 54:2,
7,12,14,18,22
55:2,12,15,22
56:2,9,20 57:1,
6,13,15,19,24

58:10,24 59:3
60:21 61:5,25
62:10,15,20
63:1,6,13,20,25
64:6,13,21
65:2,10,15,21,
25 66:8 67:1,6,
12 68:13,20
69:5,24 70:9,
14,24 71:20,24
72:3,7,15,22
73:1,10,16,21
74:3,15,21
75:4,12,18
76:7,17 77:2,8,
15,22 78:3,8,16
79:2,8,15,23
80:7,10,18,25
81:7,22 82:4,15
83:1,3,23 84:2,
7,20 85:4,11,
18,22 86:1,7,
13,19,23 87:3,
10,14,25 88:10,
19 89:3,10,14,
19 90:2,16
91:2,15,21
92:13,22 93:6,
15,24 94:10,16
95:1,13,23
96:11,17,23
97:2,14,20
98:1,14,21
99:12,22
100:21 101:7,
12,21 102:12,
20 103:2,9,15,
22 104:3,19,23
105:3,8,15,20
106:1,7,19
107:5,10,18,24
108:4,7,13,19,
25 109:7,13,22
110:5,11,19
111:6,13,17,23
112:9,17,19,23
113:12,20
114:5,11,19,25
115:5,13,18,24
116:10,21,25
117:5,9,14
118:3,7,19
119:9,15,20
120:1,8,15,21
121:2,11,17
122:9,15,21

123:5,10,16,23
124:13,24
125:9,20 126:3,
10,19,22 127:3,
7,13,24 128:5,
10,16,23
129:10,19
130:2,10,16
131:3,13,22
132:15 133:2,
23 134:6,13,23
135:9,18 136:8,
13,17 137:16,
22 138:8,16
142:1,5,11
143:2,11,22
144:2,12,21
145:1,9,21
146:4,7,12,17,
22 147:5
149:11 150:4,6,
13,20 151:7,23
154:1 156:14,
19 157:3,9,15
158:24 159:6,
14 160:9
161:23 162:8
164:6,12,17
165:3,12
166:17 169:11,
25 170:13,18
171:5 172:14
173:5,13 174:2,
9,14 175:2
176:24 177:5,
22 178:16,23
179:10,17
181:6 184:24
186:4,8,13,17,
23 187:3,18
188:1,11,17,24
189:5,19,25
190:5,8,14,21
191:1,14,24
192:8,12 193:3,
9,15,21 194:2,
5,7,15 195:9,
14,20 196:1,3,
8,12,16,23
197:2,8,25
198:6,10,15,20
199:5,10,18
200:3,11,15,19
201:1,4,13,18,
23 202:4,21,24
203:22 204:8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 114 of 132 PageID #:7704
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

384

205:6 206:4,9
207:4,9,12
209:18 210:4,
16 211:10,15,
21 212:23
213:10,18
214:1,8,15,20
215:5,14,19
216:2 217:4,14
218:14,18
220:15 221:3,5
222:14 223:11,
15,18 225:2,9
226:8,12
227:16 228:4,
13,25 229:16
230:14 231:13
232:3,8,15
237:3 238:10,
18 239:7,12,19
240:4,12,20
241:8,22
242:20 243:15,
25 244:14,21
245:3,10,19,25
246:7 247:3,10,
20 248:3,9,13,
19,25 250:7
251:13,19
252:8,15,19,23
253:9,22 254:5
255:11 256:18
257:6,10,15,20
258:3,17,24
259:10 260:3,9
261:7,15,20
262:1,9,13,16
263:4,7,10
264:25 265:10,
14,20 266:2,8,
14 267:4,7,15
268:1,11,17,22
269:3,8,15
270:2,9,24
271:3,11,18,22
272:3,10,18
273:21 274:1,6,
19,24 275:17
276:1,5,12,18,
24 277:13
279:1 280:5,13
281:14 282:19
283:3,9,21
284:18,25
285:15 286:22,
24 287:1

288:11,16,21,
25 289:3,24
290:16,22
291:15,20
292:21 293:6,
16,23 294:22
295:3,8,19
296:3,10,20
297:6,10,14,21
298:1,6,11,22
299:17 301:19
302:12,17,24
303:4 307:5,10
308:2,18,20
309:14 310:19,
24 311:12,20
312:1,8,15,20
313:4,15 314:1,
9,20 315:1,4,20
316:3,12,17,24
317:6,11 319:2,
9,13,24 320:21,
24 321:19
322:2,6,15
323:5,17 324:3,
11,25 325:7,19
326:4,11,17,22
327:9 329:10
330:15,19,24
331:8,11,22
332:9,24 333:5,
13 334:5,8,15,
20 335:9,15,20
336:4,12,18,23
337:4,13,20
338:3,10,20
339:5,10,14,21
340:15 341:2,9,
12,18 342:2,7,
14,25 343:2,8,
14,20 344:3,10,
18,24 345:7,13,
21 346:6,13,19
347:7,14 348:1,
10,15,25
350:16 351:4
352:8,12,16,18
353:4,8,14,19,
25 354:5,25
355:4 358:16,
19,23,25 359:4
360:22 361:9,
20,25 362:5,13,
19,22,25 363:4

**Klein** 343:6

**KNA** 237:16

**knew** 53:4
62:21 63:8
79:16 94:13
133:17 135:14
141:1 151:2
158:16 170:2
200:4 240:25
241:1 242:11,
13 244:17
250:14,15,19
284:22 320:6
339:15 340:3
344:5 348:21

**knowing** 190:1
213:20 226:13
244:23 248:5
294:17 332:6
338:24

**knowingly**
190:1 215:16
354:7

**knowledge**
186:24 215:18,
20 224:17
229:22 230:16
259:6 299:14
308:6,11
324:16 330:6
338:8 361:1

**knowledgeable** 335:2

**Kool-aid**
198:13,18

---

**L**

**labeled** 263:16

**languages**
335:1

**large** 315:14,17
316:2 323:13
325:15

**larger** 141:20

**lasted** 160:19
162:19

**late** 37:11

**Latin** 60:5,8,9,
20 190:11

270:12 272:22
273:4,5,9,10,
11,14 275:1
276:21 277:8

**law** 7:21 156:7,
11 354:15

**lawsuit** 20:23
21:2,8,22 28:1
37:19,22 38:1
157:19 164:21,
22,25 165:9,14

**lawyering**
362:14

**lawyers** 156:7

**lay** 28:2

**lead** 86:2 88:21
104:21 151:3
272:8 324:8
360:10

**leader** 344:1,6

**leaders**
343:11,19
346:12,18,25
347:4,12

**leading** 207:25

**leads** 314:23

**leafing** 301:25
302:1

**learn** 130:23
188:6,9,14
189:3 335:6
337:9 340:21
341:24 342:5,
11,23 343:12,
18,25 345:10
346:3,4,10

**learned** 61:7
187:23 188:20
197:6 232:7
270:20 323:2
340:20 341:7
342:17 344:14
345:16

**leave** 9:8 91:6
97:7 281:25
282:22 283:1,7
285:13

**leaving** 9:16,
20 37:18

**led** 87:7 332:8

**left** 135:11
169:19 170:22,
23 204:14
282:6,13,15,16
283:15,17,23
351:6

**legal** 112:22

**legitimate**
70:18 73:12
81:14 101:25

**lend** 152:3

**letter** 212:16,
17

**letters** 212:12,
15 352:3

**liability** 81:20

**license** 70:18

**lie** 87:18 99:18

**lieu** 351:25

**Lil** 238:8 290:6,
11,15,21,24
291:1,4,8,12

**limited** 46:22
265:18 356:17

**lineup** 46:19
47:2 84:18 85:2
91:13,20 92:4,
12,21,25 93:5,
11,20 94:22
95:6 96:10
196:11

**lineups** 46:10,
20,24 94:5,7
95:20 96:1
299:14 351:20

**link** 12:7,11
289:22

**list** 113:15,23
114:13 216:5
227:13 228:11
243:19 256:4,6
284:7,11
357:15,16

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 115 of 132 PageID #:7705
The Deposition of GEORGE FIGUEROA, taken on June 17, 2019

385

**listed** 140:8
213:2,5 226:7
258:1 279:9,12
280:12 289:19

**listen** 27:6 73:5
83:16,21

**listing** 265:3

**lists** 219:9
224:6,10
225:13 236:20
260:14 288:4
312:24 320:14,
15

**live** 19:17,19,
24 20:2 46:10,
19 84:17 85:2
91:13,20 92:12,
20 93:5,11,20
94:22 95:20
96:10 144:5
353:10

**lived** 19:21
221:1 268:20
289:13,15

**local** 27:17

**locate** 44:17,19
47:22,25 238:2
295:18 359:10,
15

**locating** 50:1
195:17

**location** 7:16
52:16 219:23
227:14 228:1,
11,22 260:15

**lock** 352:22

**locked** 125:15

**Loevy** 7:19

**log** 12:5 37:24
125:12

**Logan** 273:19

**long** 11:5
16:10,13 20:18
23:2 79:16
155:12,19,25
176:22 201:7
297:16 326:13
333:19 343:15

357:15,16

**long-term**
18:20

**looked** 140:23
152:21 153:1
154:7,9 163:17
168:18 173:1
234:4,25 242:8
243:22 258:22
302:6 306:19
314:14 322:12

**loose** 60:18
93:23 102:25

**Lords** 275:2

**lot** 27:18
128:20 150:10
151:17 152:4
269:5,10,13,17,
18 295:24

**lots** 109:10
166:14 268:25
269:1 273:7

**Louis** 174:11
223:14

**Lovers** 60:5,20
273:11

**lower** 221:17,
19

**lower-level**
347:5,13,23,25

**Lucy** 189:23
190:3 299:9

**lunch** 123:12
136:25

**lying** 90:22

—————
**M**

**M4** 266:6

**Macho** 190:11

**Madam** 12:10
231:19 241:14
363:7

**made** 16:21,22
17:8 22:12
30:23 56:23
115:16 125:2,3,

18 131:10
145:11,17,25
146:5,10 152:5,
22,23,24,25
166:7 178:11
209:20 216:20
238:5,20,25
242:7 247:13,
14 249:11
250:3,12
252:21 256:23
261:4,6,13
296:13 326:15,
20 333:24,25
356:1,5

**magic** 304:18

**main** 44:16

**maintained**
58:6

**major** 347:10,
11

**majority**
320:17

**make** 20:13
23:3,4 26:1,11
38:24 47:19
74:16 79:1,6,12
80:6,24 81:6
92:9 93:11
96:15,21
100:13 101:23
104:15,17
106:15 113:23
114:16 115:8
116:12 122:19,
25 128:21
129:8,14,24
131:10 133:22
144:10 145:4,6
170:9 180:20
203:4,7,8 227:8
229:4 240:23
241:19 243:23
249:22,25
256:16,24
284:16,21
312:7 341:16

**makes** 92:18
166:19 224:24

**making** 100:18
113:14 128:14
261:24

**Malczyk** 311:4,
10,19,25 312:6
313:24 314:6
315:24 316:5,
10 317:4,16,17
321:5,13,15,17,
22 322:14,19,
21,23 323:2,11,
12 324:17
325:13,25
326:16,21

**male** 265:25
266:6,13
321:24

**man** 28:8 159:8
284:23

**Maniac** 60:8,9
273:10

**manufacture**
91:7

**map** 206:15

**March** 9:9

**mark** 202:18
203:14 232:17
233:16 263:15
277:24 287:15
300:7 301:23
305:7 309:20
318:6 327:3
328:21 329:12

**marked** 202:20
203:14 224:2
232:21 233:19
263:19 278:3
287:20 300:10
302:4 310:1
318:9 327:8
328:3 329:1,9,
17

**marker** 304:18
306:7

**Martinez**
307:15,22

**Martir** 344:1,5,
9,16 345:12

**mass** 320:17

**materials**
163:11

**math** 100:10

**mathematicall
y** 100:11

**matter** 7:11
78:15,17

**Maxwell** 14:21,
23 16:2,4,8,9

**Mcmurray**
158:10,12
159:1 193:7
225:14,21
278:24 360:18

**Mcmurtry**
158:8

**meaning** 45:17
244:19 260:19
360:5

**means** 25:17
104:10 206:16,
21 208:2 212:8
266:6 351:25
357:7

**meant** 222:20

**mechanism**
69:2

**media** 340:10,
23 345:15,17
346:8,9,15

**medical** 9:22
27:11

**medications**
27:7

**meet** 155:4,12,
19,22,25
312:12

**meeting**
156:13,14,19
157:3,13,18,21,
24 158:2,4,6,
12,13 159:18,
24 160:4,7,19,
23 161:14
162:19,20
163:2,5,8,12
263:25 311:3,9,
19,24 312:5,14,
19,21 313:10,
13 321:14,17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 116 of 132 PageID #:7706
The Deposition of GEORGE FIGUEROA, taken on June 11, 2019

386

meetings
156:9 195:7
332:12

Melendez
190:7,11
198:13,19
199:4,8 264:18,
22 265:17,23
267:2 295:15,
23 299:5 327:4,
7 359:10,15
362:2,16

Melendez's
270:15

member
140:21 149:18
304:12

members
27:17 33:2 35:4
40:1 42:3 55:24
56:1,25 57:14,
18,21 60:19,25
66:10 139:5,15,
23 140:4
149:15 150:1
174:17 250:21
271:13,15,25
289:23 322:9
343:1 346:4
347:17,18,21,
23

memo 353:18

memories
160:8 165:15,
17,18 167:14
192:3,9 310:21
328:18

memory
104:16 121:16
132:24 133:11,
13,20 134:20
135:7 165:5
166:1,21
167:19,20,25
168:3,8 171:9,
14,20 172:3,4,8
173:19,25
174:7,10,18,22,
25 175:14,16
177:12 180:14,
18,24 181:4,23
182:6,9,15,22

185:1,4 186:16,
20 187:12,14
190:2,10,15,24
191:3,6,11,21
193:18,24
194:12,19
195:2,4,6,23
197:16 199:3
200:9,12,18
201:10 206:24
220:11 221:25
236:8 241:2,18,
21 242:6,9
244:2,3 248:22
249:15,24
250:5 251:5
253:4 254:12
262:22 280:2
281:18 283:25
285:5 287:4,8,
11 290:14,19,
21 291:2,4
292:4,11,14
293:25 294:9,
12,16 299:25
302:1 303:2
305:20 306:18
310:16 311:14
312:13 316:7
317:18 318:4
327:14,20

mental 242:7

mentally 242:8

mention 32:14

mentioned
103:24 191:17
281:20 285:18
360:4

mentioning
187:15 217:17

Mercedes
304:8

met 155:14
156:3 167:5

method 68:17
135:7

methods 76:24

Michael 8:2

middle 22:4
204:14 288:23

356:15

Mied 337:16

Miedzianowsk
i 35:8,12,25
36:12 41:12
333:17,19
334:18 336:16,
21 337:17
339:8,24 340:4,
6,10 341:8,25
342:23 343:6,
12 344:9,13,16
345:6,11,18
346:5,10,17
348:9 349:1,2

Miedzianowsk
i's 337:3,12
338:15 339:3,
12,18 340:13,
20 341:1

mind 24:7 94:3
103:7 121:20
165:21 166:1
171:14 192:3
310:22 320:21

minds 97:4

mine 349:3

Mingey 158:4
193:25 205:8

minute 89:16,
21,22 327:10
334:17

minutes
123:13,14
155:13 199:17
351:8

misbehavior
352:21

misconduct
332:23 333:10,
12 354:4,9,13

misconducts
348:7

misdemeanor
131:5

missed 35:10
71:7 122:24
160:12 286:25

mission 97:9

Misstate
343:21 344:4

Misstated
68:13

misstates 22:8
48:11 62:20
82:5 88:1 94:11
104:4 106:2
125:10 134:13,
23 173:13
175:2 178:16
179:10 181:6
188:2 189:6,20
191:15 193:4,
10,16,22 194:8,
16 195:21
196:9 197:3
198:7,21
199:11 207:9
214:8,15
227:17 228:5
229:1,17 232:9
238:10,18
239:7,8,21,22
240:5,20,21
241:9,23
244:14,21
245:4 249:1
260:10 275:18
284:25 288:12
290:23 301:20
303:5 308:20
311:13,21

Mo 278:11

moment
123:19 299:24
322:13 363:9

moments
302:7

Monday 138:4,
5 155:16,18,20,
23 156:10,20
162:18 207:7,8,
16,17

Mondays
207:13

money 350:3
351:1

Mongoose

348:14,18

Montalvo
189:23 190:3
299:9

Montanez
186:11,16
187:24 189:17
288:5,10,15
291:7,25
292:19 295:13
297:4,8,12
299:1 302:14
305:25 306:2
317:10

Montanez's
188:6,21

Monte 314:14

month 13:4
206:11 207:25

months 41:25
161:8 163:22
207:23

Monument
273:19

mood 94:4

morning 7:20
29:15

mother's
150:8

motive 197:23

mouth 149:12
187:11 188:21,
22

move 10:23
19:11 83:16
94:14 167:24
221:16

moved 14:13
16:15 19:15

moving 14:16,
17 320:11

mu 308:11

mug 54:10,17
55:17

mugshot 55:6
56:14



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 117 of 132 PageID #:7707
The Deposition of GEORGE FIGUEROA, taken on June 17, 2019
387

Mulero 327:1

multiple 34:6
142:9

murder 87:16
88:17 96:15,21
99:6 125:15,16
153:16,22,25
198:4 285:23,
24 360:7

murdered
330:1,6

murderer
97:24

murders 130:4

_____

**N**

named 28:9
189:23 190:25
198:18 199:4
289:10 290:25
292:15 309:24
344:22 353:1

names 22:18,
19 23:1 35:8,
15,16 61:15,16,
21,23 62:2,3,11
63:2,3,5,10,11,
16 64:17,19
65:17 71:13,21
111:9 114:21
142:18 184:2
213:21 227:11
250:22 291:1
305:7 343:16,
17 357:15,16

narcotics
347:11 349:13

narrative
128:2 170:25
229:23 230:3,
13,20,24 231:4,
8,25 232:5
237:22 238:1,
14 239:5,25
240:16 267:17
284:4,8,12
285:14,21
286:19

narrative's

232:10

narratives
142:22

narrowed
166:13

national 19:4

natural 82:25

nature 30:4

necessarily
31:10 73:3
87:12 98:9
99:15 274:8,10
361:14

needed 17:24
47:24 48:1
55:18 76:13
80:2 90:23
107:11 114:7
121:12 148:22
284:22 313:12,
18

needing
128:22 129:9

neighborhood
27:21 144:5
242:24 289:17

neighborhood
s 9:23 20:3
268:21 269:7

nephews
351:13,19

news 333:1,9
340:22

newsman
340:17

newspaper
340:24

newspapers
340:16 343:17,
24 345:4

NFD 265:7,13

nick 249:19

nickname 45:8
59:4 61:6 63:24
64:12 147:2,9,
13,16,18,20,23,

24,25 148:2,12,
18,25 149:7,9
240:25 242:13,
19 243:6,9
244:3,11,24,25
245:6 246:15,
20,21 248:2,8,
12,17,24
249:18 260:25
261:13,25
290:20,21
291:8,10,12,22
300:22 303:21
334:7,9

nicknames
27:16,20 61:9
63:4,8,12 64:15
65:1,6,14,16,20
66:7,11 106:22
142:18 143:4,
24 144:16
146:25 147:6
149:5 172:1,9,
13,20 173:3
192:15 242:14,
17 243:14,19,
23 245:17
246:6 250:23
290:17,22
294:8

night 178:8
179:4,20
256:14 258:12,
13

nights 29:21

nods 26:15

Noel 28:9
197:24 198:5
213:25 214:6,
13,19 263:18
295:25 330:1,5,
7,11

non- 157:17

non-attorney
157:14

non-homicide
131:17

noon 256:12

normal 137:25
179:9 186:5

north 8:3 11:1,
6,9,13 12:24
13:1,7,10,13
15:12,22,23
19:18,19,21,22,
25 33:23 34:6
36:21 37:15
38:13 40:24
147:14,20
219:20 293:1
319:3,5

Northern 7:13

note 106:13

notebook
112:22

noted 280:21
298:5

notepad
112:22

notes 108:12,
18,21,24 109:5,
12,18,21,25
110:3,10,13,17,
24,25 111:3,5,
16 113:17
114:1,3,16,17
116:5 121:3,5,8
153:9

notified 176:5,
8,12 200:22
215:8 280:24
296:22 338:11,
17 351:14

notify 69:10
281:3

noting 282:3

number 7:14
33:11 38:4,7
61:19 62:3
97:3,10,23 99:4
100:1 110:2
118:21 138:1
159:22 205:10,
11 208:20,25
209:1,2 216:21
219:2 222:25
223:1 224:10,
11 255:3,5,17
257:2 265:7
266:22 268:18

279:12 280:15,
19 282:9,11,12
301:1,4,9,12,14
320:9 329:25
331:3 333:23
351:18 352:5
353:16 358:21

numbers
62:11 66:2
138:2 149:1
205:14 206:19

_____

**O**

OAS 60:5,10,
20 273:11
274:8,9,10,16,
17,23 275:24
276:4,8 315:14
316:2 323:13

oath 25:10,14,
18

Obj 169:25

object 160:9,
12 245:10

objected
160:11

objecting
160:10

objection
14:9,11 15:5
17:22 20:5 22:8
23:6,22,25
29:10,22 30:14
31:3,9,13,18,22
32:7,13,23
33:3,8,14,19,24
34:9,12 35:1
36:24 38:14,21,
25 39:9,14
40:2,8,12,19
41:1,8,14,21
42:12,25 43:10
44:3,7,23 45:3,
7,13,23 46:4,8,
12,15,21 47:6,
13 48:10,18,22
49:6,15,21
50:5,19,23
51:3,12,24
52:3,10,18,25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 118 of 132 PageID #:7708
The Deposition of GEORGE FIGUEROA, taken on June 11, 2019

388

53:15,21 54:2,
7,14,18,22
55:2,15,22
56:2,9,20 57:1,
6,13,15,19,24
58:24 59:3
60:21 61:5,25
62:10,15,20
63:1,6,13,20,25
64:6,13,21
65:2,10,15,21,
25 66:8 67:1,6,
12 68:13,20
69:5,24 70:9,
14,24 71:20,24
72:7,15,22
73:1,10,16,21
74:3,15,21
75:4,12,18
76:7,17 77:2,8,
15,22 78:3,8,16
79:2,8,15 80:7,
18,25 81:7,22
82:4 83:8 84:20
85:4,11,18,22
86:1,7,13,19,23
87:3,10,14,25
88:10,19 90:16
91:2,15,21
92:13,22 93:6,
15,24 94:10,16
95:1,13,23
96:11,17,23
97:2,14,20
98:1,14,21
99:12,22
100:21 101:7,
12,21 102:12,
20 103:2,9,15,
22 104:3,19,23
105:3,8,15,20
106:1,7,13,19
107:5,10,18,24
108:7,13,19,25
109:7,13,22
110:5,11 111:6,
13,17,23 112:9,
19,23 113:12,
20 114:5,11,19,
25 115:5,13,18,
24 116:10,21,
25 117:5,7,9,14
118:3,7,19
119:9,15,20
120:1,8,15,21
121:2,11,17

122:9,15,21
123:5,10,23
124:13,24
125:9,20 126:3,
10,19,22 127:3,
7,13,24 128:5,
10,16,23
129:10,19
130:2,10,16
131:3,13,22,23
132:15 133:2,
23 134:6,13,23
135:9,18 136:8
137:16,22
138:8,16 142:1,
5,11 143:2,11,
22 144:2,12,21
145:1,9,21
146:4,7,12,17,
22 147:5
149:11 150:4,
13,20 151:7,23
154:1 158:24
159:6,14
161:23 162:8
164:6,12,17
165:3,12
166:17 169:11,
25 170:13,18
171:5 172:14
173:5,13 174:2,
9 175:2 176:24
177:5,22
178:16 179:10,
17 181:6
184:24 186:4,8,
13,17,23 187:3,
18 188:1,11,17,
24 189:5,19,25
190:5,8,14,21
191:1,14,24
192:8,12 193:3,
9,15,21 194:2,
6,7,15 195:9,
14,20 196:1,8,
12,16,23 197:2,
8,25 198:6,10,
15,20 199:5,10
200:3,11,15,19
201:1,13,18,23
202:4 203:22
204:8 205:6
206:4,9 207:4,9
209:18 210:4,
16 211:10,15,
21 212:23

213:10,18
214:1,8,15,20
215:5,14,19
216:2 217:4,14
220:15 221:3
222:14 223:11
225:2,9 226:8,
12 227:16
228:4,13,25
229:16 230:14
231:13 232:3,8,
15 237:3
238:10,18
239:7,21 240:4,
20 241:8,22
242:20 243:15,
25 244:14,21
245:3,19,25
246:7 247:3,10,
20 248:3,9,13,
19,25 250:7
251:13,19
252:8,15,19,23
253:9,22 254:5
255:11 256:18
257:6,10,15,20
258:3,17,24
259:10 260:3,9
261:7,15,20
262:1,9,13,16
264:25 265:10,
14,20 266:2,8,
14 267:4,7,15
268:1,11,17,22
269:3,8,15
270:2,9,24
271:3,11,18,22
272:3,10,18
273:21 274:1,6,
19,24 275:17
276:1,5,12,18,
24 279:1 280:5,
13 281:14
282:19 283:3,9,
21 284:18,25
285:15 286:22,
25 287:1
288:11,16
289:24 290:16,
22 291:15,20
292:21 293:16,
23 294:22
295:3,8,19
296:3,10,20
297:6,10,14,21
298:1,6,11,22

299:17 301:19
302:12 303:4
307:5,10 308:2,
18,20 309:14
310:19,24
311:12,20
312:1,8,15,20
313:4,15 314:1,
9,20 315:1,4,20
316:3,12,17,24
317:6,11 318:3
319:2,9,13,24
321:19 322:2,6,
15 323:5,17
324:3,11,25
325:7,19 326:4,
11,17,22 327:9
329:10 330:15,
19,24 331:22
332:9,24 333:5,
13 334:5,8,15,
20 335:9,15,20
336:4,12,18,23
337:4,13,20
338:3,10,20
339:5,10,14,21
340:15 341:2,9,
18 342:2,7,14,
25 343:2,8,14,
20 344:3,10,18,
24 345:7,13,21
346:6,13,19
347:7,14 348:1,
10,15,25
350:16 351:4
352:8,12,16
353:4,8,14,19,
25 354:5 357:3
359:25 360:12
361:9,20

**objective**
52:19

**observed**
238:24 251:23
295:12

**obtained** 128:9
202:6

**occasion**
251:4 253:3

**occasionally**
10:3 17:23
43:1,4 45:24
46:9 49:16 55:7

61:6,20 62:8
112:11 332:2

**occur** 53:18
357:8

**occurred**
172:21 173:9,
11,25 174:5
198:5 273:18
274:4 332:13
339:7 355:19
356:24

**October** 9:12

**odd** 30:3

**offender** 48:16
85:7,8,14 133:5
175:12,24
176:18 264:24
265:6 267:24
270:7 285:3
357:1 360:7

**offender's**
266:24 267:3

**offenders**
44:14 45:20
265:9 270:7,23
271:8 272:17,
23 360:6

**offense** 263:17
264:3,11 272:7,
15

**offer** 59:4
347:23

**office** 51:14
54:24 125:1,11
140:14 144:6,9
145:3,6 245:16
255:10 313:19

**officer** 10:20,
22 11:7,10
12:23 20:21
21:14,20 22:21
25:6 27:16,23,
25 69:7 70:4
72:10 77:9
78:2,22 84:13
100:23 118:23,
24 120:5,14
123:9 124:12
127:5 129:1,13
145:12,15,23

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 119 of 132 PageID #:7709
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

389

158:20,23
159:5,13,16
164:19 166:24
184:23 185:2,
20 203:21,25
210:2 215:12
216:6,7,12,14,
18,19 224:20
225:1 235:18
236:11 255:23
279:10 316:10
317:4 321:4,13,
15 331:21
333:4 336:17
348:20,21
349:7 350:1,4,
10 351:16
354:13,14
355:18 357:13,
14,21

**officer's**
235:21

**officers** 11:8
14:6,12 23:19,
23 69:18 70:12
73:22 75:22
77:7,12 78:13
129:14 142:2
145:10 146:6
157:16 158:6
164:9,10 184:6,
14,16,21,25
188:22 191:4,
12 225:13,17
226:7,18,24
227:13 228:12,
22 237:15
238:22 239:2
246:20 253:16
255:21 256:4,6
258:1,6 270:20
319:16,18,22
320:8 323:24
324:5,7,8,13
340:4 342:1
351:16 352:21
357:17,20

**offices** 51:10,
19 55:11,14
56:1 124:23
125:7 126:2,21
139:3,7,14
204:7 305:3
335:8,13

**official** 116:8
297:17 342:9,
15

**officially** 13:14
256:13

**oft** 117:2

**omit** 128:3
325:24

**omitted** 325:17

**one-up** 362:21

**ongoing**
361:11

**opened** 270:15

**operating**
335:7 339:20

**operation**
348:13,18,23
349:3,4,8,10,
11,13

**operator** 70:1

**opinion** 158:22
159:4,12
326:19 330:22
331:20,24
332:15,18
333:11 334:18

**opportunity**
107:8 310:8
356:11

**opposed**
135:25 166:7
273:4,5,8

**OPS** 351:17
353:13

**order** 61:22
68:3,5 69:9,11,
22 70:2,13,16
71:3,19 72:21
73:14,18,23,25
74:17,25 75:8,
17,22 76:3,6,
11,15 77:18,19
85:21,24 86:6,
17,25 103:13,
20 104:8
139:19 143:13,
16 149:5
166:20 246:9

320:13 341:16

**orders** 68:17,
21,22 69:2,17
70:22 71:5,12,
14 73:7 74:12
76:20,24 77:10
86:21 104:8

**organized**
59:20,21
139:18 140:11
142:25 149:4

**origin** 19:4

**original** 61:18
152:22 154:15
162:24 235:10,
11 261:18
294:24,25
309:5 356:4

**Orquestra**
60:10 273:20
274:5 275:5,10

**oth** 182:3

**other's** 151:10,
19

**overlap** 40:10

**overlapped**
40:16

**oversight**
279:23

**overturned**
351:22

———————

**P**

**p.m.** 84:9 90:4
136:19,22
199:23 222:6,
12 223:24
232:1 236:25
258:16 260:1,7
277:21 287:17
289:8 318:18
363:11

**pad** 112:22

**pager** 350:3,5,
8,14,24,25

**pages** 329:3,5

**paper** 111:8,
14,19,21
112:14,24
113:5 116:7
141:17,22
228:18 256:11
285:25 357:8

**papers** 167:1,2
345:9

**paperwork**
166:25 197:18
213:23 350:8

**paragra** 290:2

**paragraph**
288:22 289:14
290:2 292:23
295:22 317:22
322:10,18
331:2 359:2,3,
6,9

**parents** 19:6

**Park** 267:19
268:9,19 269:1
289:20 292:10,
19 295:13,18

**parked** 321:24

**parking** 295:24

**part** 13:21,22,
23 36:16 39:20
40:25 71:7
124:18 130:7
191:22 194:6
196:6 197:7
206:23 214:25
217:7,9 220:1
226:14,15,16
227:9 235:12
271:19 287:21
337:6 338:21
344:14 356:18
357:17 361:21

**part-time** 9:18,
19 10:10

**partial** 234:3

**participate**
23:20 43:2
46:19 48:8 49:1
171:17 196:11,
14,17,21,25

226:25 228:1
293:8 295:16,
17 296:1
317:24

**participated**
184:21 226:19
280:11 294:2,
18 313:1
321:12,17

**participating**
79:7 227:2
228:10 229:12,
14 293:10
294:10

**participation**
46:22 105:17,
24 106:17,24

**parties** 8:4,7

**partner** 21:7
22:6,25 31:21,
25 32:1,3,5,6,8,
22 156:23
169:13 173:23
175:4 177:8
184:3 204:25
210:19 213:21
216:9 225:24
247:13 255:25
280:10

**partners**
32:11,18 41:2
213:22

**parts** 34:3
341:23

**pass** 361:7,12,
14,15

**passed** 361:18

**passengers**
267:18

**past** 53:23
128:19

**pat** 11:10

**patrol** 10:20,22
11:10 22:21,22
70:12 72:9
73:22 75:22
77:6,11 78:13,
22 118:23,24
123:8 124:12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 120 of 132 PageID #:7710
The Deposition of GEORGE FIGUEROA, taken on June 17, 2019

390

146:6 319:16,
18,22 323:23
324:8 340:4
348:21

**patrolman**
311:4,10,25
312:6 313:14
349:24

**pattern** 82:24

**pause** 295:15

**Paxton** 22:25

**pay** 352:1

**payment** 21:23

**pending** 7:12

**penitentiary**
116:15 354:19

**pension** 10:4

**pensions** 10:7

**people** 17:20,
24 22:24 24:3
35:5,6 37:17
39:20 55:16
57:21 58:5,11
70:5 71:2 76:20
78:12 82:20
87:18 90:21
97:9 111:9
114:22 117:19
140:7 141:9
144:7 145:2,3
149:14 151:9
183:24 206:17
210:8 214:17
215:21 226:6
227:7,8 242:24
268:20 272:1
300:15 334:13
336:9 337:18
342:18 345:19
351:20 352:20

**people's** 113:6
213:22

**percent** 40:13
157:22

**percentage**
66:6

**Perfect** 199:19

**perform** 45:6
113:22

**period** 17:5
18:2,21 19:19
30:10,12 37:6,9
41:11 42:1,5,8,
22 43:2,6,20,25
89:4 90:7 147:8
333:17 356:11
362:17

**periods** 20:2

**permanent**
162:6,10

**permission**
129:17,25
130:8 131:1,12
210:9,10,12,15,
17,20,21,23
211:1,3 215:4,
13,22 216:1
217:11,22
234:10,11
355:24 356:8,
10

**permitted**
130:14

**perpetrator**
85:2

**perpetrator's**
266:19

**perpetrators**
265:19,25
270:21 273:14
274:4 325:15

**person** 21:10
36:3 47:15 55:8
64:2 68:7,8
69:8,13,19
70:2,6,8,18
72:21,24 73:7,
15,23 74:1,5,19
75:2,24 76:6,
16,22 80:3,15
81:13,16 82:3,
9,10 86:17
87:24 88:9
90:23 91:24,25
92:1,3 93:23
97:6,8 98:6,13,
20,24 99:3
102:10 104:7,

11 114:14
127:19,23
129:3 130:14,
20,25 131:25
132:18 143:23,
25 144:16
145:6,17 151:8
152:7 198:18
199:4 211:4
213:16 227:25
247:12 280:18,
20,24 300:25
301:3,8,11
304:10 307:21
309:17 353:1

**person's** 73:8
81:17 146:25
148:25

**personal**
66:25 104:16
121:19 133:13,
20,24 140:9
149:9,24
153:21,24
191:11 245:7
261:12 304:25
305:5 306:10
316:19,21
330:6

**personally**
67:24 134:22
242:11

**personnel**
9:22

**persons** 292:9

**pertain** 48:24

**pertinent**
142:21 257:1

**petition** 181:13

**pho** 91:24 92:1

**phone** 224:11
257:24 302:23
338:24

**phones** 338:18

**phonetic** 331:9

**photo** 46:6
53:11,13,24
54:6 55:18
56:25 80:16,17

85:9,15 86:3,
16,24 87:1
90:11 91:11,12,
19,24 92:1,9
93:3,21 94:8,23
95:5,12,22 96:8
97:25 99:10,14,
19 100:15
101:3,16 102:8,
16 103:18
139:20,24
140:3 175:23
176:17 196:21
197:13,19
285:4 286:17
293:4,8,15,18,
19,22 294:2,10,
19 295:1,7
296:7,14,16
302:15,16
305:8,18,25
306:1,21
307:14 308:13,
14,16,23 309:1,
3,4,8,10,13
317:4,9 359:11

**photographs**
153:13 287:4,9,
12

**photos** 54:5,8,
10,16,17,25
55:7,24,25
56:4,7,13,19,24
57:3,4,10,14,
17,20 58:1,3,5,
12,15,17,18,22
59:12,15 60:18,
24 61:4,10,18,
22,24 62:13,17,
24 63:3 64:10,
24 65:20,24
66:6,13,24 67:9
140:10 142:23
148:17 262:8,
11,12 291:24
293:14,21
294:20,24,25
295:7 300:12,
14 301:18,25
302:3,8,9,10
303:2,6,7,8,11
304:25 305:10,
11 306:11,20
307:25 308:2,
13 309:18

313:21,24
314:3 316:6,9,
14,15,19,21,23
317:2,3,8,13,17

**physical** 23:20
199:8 228:11

**physically**
23:4 227:1,8,
14,24 228:1
357:21

**pick** 90:21

**picked** 47:15
91:24 197:13
285:23 296:14
351:20

**picking** 91:25
99:2

**picture** 166:2
168:15,17,18
300:25 301:3,8,
11,14 304:3,21
305:15 306:13,
16 307:1

**pictures** 55:16
59:22 168:24
304:24

**piece** 141:17,
21

**place** 19:5
23:20 28:16
72:17 74:25
75:8,17,21
76:5,14 77:19
85:21,25 86:25
103:13,21
127:23 139:24
150:12 218:16
242:3 253:23
256:13 274:15
299:15,20
309:23 312:14

**plaintiff** 7:19
330:1,6

**plaintiff's** 7:17
329:14

**plates** 267:19

**played** 226:16
310:22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 121 of 132 PageID #:7711
The Deposition of GEORGE FIGUEROA, taken on June 17, 2019
391

**PLAYS** 123:22

**point** 26:19
27:4 30:7,8
76:9,21 80:6
92:7 111:1
137:14 138:17,
20 155:23
165:6 167:3,8
168:11 178:14
187:23 232:11,
12 262:13
264:2 288:10,
15 331:9 336:7
342:22 357:17

**pointed** 347:24

**points** 82:10
272:16

**Polaroid** 54:21
55:9,11,13,20,
25 56:4,7,19
57:3

**Polaroids**
62:5,6,14

**police** 9:6,11,
14,16,20 10:5,
13,14,17 11:7,8
12:23 14:6,12
18:4 20:20
21:14,20 23:23
25:6 58:12
59:8,9 71:21
77:9 84:13
92:11 119:11,
13 120:5,13
127:5 129:1,13
154:6,10,24
158:20,22
159:5,12,15
164:9,10,19
166:24 167:10,
14 181:13
184:6 185:3
188:22 189:1
191:4,12
203:21,25
215:12 224:3,
20,22,25
263:18 312:10
320:8 321:4,13
324:13 333:4
336:16 337:1
339:1,9 342:1,6
349:16 350:4,

10 354:3,12,14
357:12

**policed** 20:4

**policies** 122:5

**policy** 95:5
170:4 185:9,24
186:5,7 284:1

**pop** 69:9 70:1

**popular** 268:19

**populated**
56:18

**portion** 278:12

**position** 9:8
10:18,21,25
11:6,15 12:23,
25 15:14
275:14

**positions** 18:4
84:13 120:4

**positive** 90:13
93:21 94:23
95:21 96:7
100:14 101:4,
15 102:7
294:21 362:2

**positively**
296:6 359:8

**possibility**
274:21 360:21
362:4

**possibly**
138:24 142:12
187:8 300:4
314:3

**potential** 81:20
93:23 96:21
102:24 188:6
190:12 274:3,4
307:4 324:9
347:22

**potentially**
160:20 276:22

**power** 271:20

**Pr** 33:13

**practically**
70:3

**practice** 66:23
67:5,9 90:15
91:19 92:10
94:6,21 95:19
109:11 110:9
120:11 122:6,
12 186:1
214:18 226:18
227:13,21,22
228:9 230:22
231:7,10
259:18 279:7
280:6,9 281:11
282:25 331:13

**practices**
122:5 179:9
180:25 181:5
228:24 229:3
337:19 340:6

**preface** 95:15

**prefer** 218:12

**preference**
259:22

**preferred** 94:5

**preparation**
152:12,20
154:10 155:2,4
163:15 195:7
232:20 264:1
278:1 288:1
298:20 299:2,
10 310:4
318:19

**prepare**
152:13 229:21
233:23

**prepared**
152:15,17,20
162:21 163:18,
25 229:14
233:9 234:21
235:2,5,9
255:15,19
286:13 287:18,
23 298:18,24
299:4,8 310:6
318:8

**preparing**
18:20

**presence** 48:9

52:24 53:13

**present** 48:14
157:20 227:14
256:3 296:1
312:18 330:4
357:21

**prestige**
297:16

**pretty** 32:15,16
44:21 46:22
60:17 82:12
151:20 152:18
165:20 167:1,
11,17,23
170:21 185:9
203:5 239:2
252:3 313:21
314:3 316:22
317:1 322:11
335:1 347:9
348:4

**prevent** 27:8,
12 341:16

**previous**
160:11 260:10
285:1 308:21

**previously**
124:4 246:4,13,
19,24 253:10
299:19 319:5
338:23

**primarily**
220:9

**print** 205:15

**printer** 141:21

**prior** 106:11
155:23 159:2,9
177:9 238:22
246:5 248:2,17
250:16,18,24
251:9,16
254:11

**priority** 96:16
97:10,12,18

**pro** 202:12

**Prob** 247:12

**probable**
77:21,25 80:23

81:3,5,17,21
82:2 84:15,18
85:3,10,16
88:7,16 98:11
99:9,15,20
100:16 101:5,
11,17 102:2,8,
17 127:19,23
128:4 130:24
131:11,19
132:7,10,25
133:21 134:2,
10,12,19 135:6,
22 201:21
202:2,10,13
230:4,23 231:2,
7,11 232:1,6
260:8 284:8,11,
16,23 356:15,
20,23

**probation**
74:10

**problem** 52:6
183:2 252:6
289:9

**problems**
252:9

**procedure**
45:12,15 47:11
52:9 53:7 84:18
85:9,15,21
86:4,16 87:2,6
88:8,18 91:11,
14 92:10 93:14,
20 94:8,22 96:8
97:25 101:3,16
102:17 103:19
296:2

**procedures**
44:22 45:2,5,18
52:23 53:13,25
54:6 90:11
95:11,12
196:11,15,18,
19,22 214:23

**proceed** 137:2

**PROCEEDING
S** 7:1

**process** 228:1

**product**
160:13

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 122 of 132 PageID #:7712
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
392

**professional** 350:19

**promoted** 13:2,3 14:14 35:6

**pronounce** 27:19

**proofread** 122:17,18

**properly** 58:7 106:12

**property** 17:11 68:23 266:21 349:22 350:2

**prosecute** 358:2

**prosecution** 195:19

**prosecutors** 194:19,22 195:7

**protect** 99:3 347:5,25

**protection** 346:11,18

**provide** 9:21 80:17 179:18 234:7 264:12 265:18,24 266:11 267:24 272:22 273:23 274:16 276:10 289:22 293:14 305:13 306:16 308:23 314:17 330:2 340:12

**provided** 79:21 127:22 161:21 162:6 167:3 176:20 202:3,13 257:8 266:23 267:1 276:16,23 293:18,21 305:19 306:25 308:13,16 309:6

**providing** 82:19 346:11,

17

**publicly** 339:23

**Puerto** 19:6

**pull** 250:21 354:25 359:1

**pulled** 250:20 314:12 322:22

**punched** 21:6 22:6 23:9,17

**punitive** 331:3, 6,12

**pure** 252:25

**purportedly** 315:24 323:11

**purpose** 47:4 58:1 76:3 99:3 271:19

**purposely** 82:17,20 83:6

**purposes** 52:21 58:14 75:25 77:13 162:3 205:23 357:24

**pursuant** 186:2

**pursued** 360:17

**put** 17:15 30:23 55:8,18 56:14 74:12,25 75:8, 21 76:5,14 77:19 85:21,25 86:5,17 95:15 103:13,20 122:4 123:3 135:7,10,13 144:24 168:10, 12 170:5 175:10 185:6,9 212:6,21 214:6, 11,13,18 215:1 217:12 218:17 228:18 229:19 247:7,8 256:11 258:2,6,7,15,21 259:13,15,18

278:17 281:23 282:23 285:25 311:23 313:9 356:6,12 357:7, 11 360:19

**putting** 36:20 68:25 75:17 86:25 115:21 185:4 211:4 247:17 285:21

─── Q ───

**question** 24:18 26:1,10,11,12, 21,23,25 27:1,6 28:1 39:18 43:24 44:24 47:8 51:9 55:10 72:1,2,3 73:19 75:19 79:24 92:8 95:14,16 106:11 107:19 110:18 123:18, 21 124:2,10 132:5 134:5 144:13 172:16, 17 177:6 192:20 194:9 195:2 216:15 222:10 231:9 236:24 238:13, 14,24 239:13, 14,19 240:14 244:8 249:7 251:14 302:22 303:1 323:19 327:23 328:9 329:25 331:2 337:7 341:13 358:17

**question-and-answer** 25:22

**questioning** 49:2

**questions** 12:19 25:22,23, 24 27:8,12 40:21 47:10 48:24 83:16 122:4 139:4 144:7 224:4 298:15 320:14

331:7 354:2 355:6,9 360:23

**quick** 199:13 263:2 277:11 298:15 355:1

**quickly** 89:17 96:5 102:19 252:3 355:6

─── R ───

**R-B-I-K-S** 36:10

**race** 21:10

**radar** 187:1

**radio** 71:21 185:3 312:10

**Rahe** 7:24

**raise** 8:11

**raised** 270:4

**ran** 72:11,19 73:6

**random** 116:5

**range** 33:10

**rank** 9:13 14:5 16:22 297:13, 16,20,25 298:4, 13

**rare** 92:17

**rarity** 49:23 52:1

**rat** 347:5,13

**rea** 205:18

**reached** 76:9, 21 296:18 311:17 332:7

**react** 82:25

**read** 123:17 152:15 163:1 164:22 165:19 168:8 231:24 257:16,18 267:14 310:8, 12 320:13,18 321:7 327:16

328:8 346:9 359:11,16

**reading** 192:16 205:7 231:23, 24 270:19 320:20 328:9

**ready** 137:2,3

**real** 61:13,15, 16 62:19 63:11, 23 64:4,18,19, 20,25 65:7,8, 16,19 143:1,5, 6,15 147:2 291:1 293:24 355:1

**realize** 215:9

**reason** 69:21 74:7 76:20 81:14 83:20 86:9 98:9,24 99:1,18 100:1 135:22 177:20, 24 180:18,22 181:2 186:6 192:16 222:4, 11 225:5 229:9 230:12,17,18 261:2 280:1 282:15 283:17 289:6 294:7 297:23 309:16 313:22 320:7 321:11 324:20 325:4,9,16,21, 23 327:5 338:4 346:16

**reasons** 78:20 97:3,10 99:4,8 100:1 102:23

**recall** 11:3 21:21 32:21 34:23 36:15 37:13,18 51:5 104:14 147:7, 22 155:21 158:9 159:18 160:24 162:12 173:16 175:21 176:10 177:2 182:18 183:8, 10,12,14,19,20 184:2 186:9

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 123 of 132 PageID #:7713
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
393

188:13,19
193:12 195:10,
11 200:16
201:16 244:5
248:10,14
250:13 264:2
276:2,3 285:10
288:17 290:18
293:10,12,17
296:14 297:11,
18,22 321:14
329:15 344:22
348:12 352:4
353:5 354:1,9
355:8,23 356:8

**received** 177:1
352:6

**recent** 275:23
276:20 277:7
309:18

**recently**
275:25 309:10

**reco** 199:2

**recognize**
168:5 300:13,
15,17,19,21
301:3,8 307:21
308:4 328:23,
24 329:4,8

**recognized**
292:8 322:8

**recollection**
189:2 197:10,
21,22 198:3,17,
23 199:3 288:9
315:23 321:12
328:10 331:5
359:23

**record** 8:25
12:13,15,16
84:5,8,9 89:21
90:1,3,4 106:20
136:15,18,20,
21 141:9 171:6
193:4,10,16,22
194:8,16
198:21 199:11,
20,21,22
207:12 223:20,
22,23,24 239:8
240:6 241:10,
23 254:11

**record's**
302:17

**recording**
235:21

**records** 125:2,
4,10 147:4
149:19,22,24
154:6 162:10
166:23 182:15
255:7 315:7
317:2 338:12,
13

**RECROSS**
361:24

**REDIRECT**
360:24

**refer** 8:21
28:11 244:11
250:24 334:13

**reference**
204:20 205:14
251:15,17
304:1 307:19

**referred**
242:23 313:20

**referring** 28:15
35:9,14 111:18
116:1 141:5
156:6 170:24
174:15,16
250:25 251:9,
24

**reflect** 236:21,
25 267:9

**reflected**
211:5

**reflects** 229:10

**refrain** 82:21
83:9

**refresh** 310:16
327:14,20
359:22

**regard** 103:13
182:8 187:1
192:20 201:15

245:16 298:10
317:15

**regular** 30:2
117:2 137:8
150:24 265:3

**regularly** 29:5,
6 39:19 151:21

**reiterated**
119:18

**related** 24:18
154:18,21
162:2 164:4
165:1 171:14,
19 173:16
186:11 187:24
189:4,11 192:4,
22 198:24
269:22 288:15
299:22 309:22
327:19 330:25

**relating**
153:22,25

**relation** 353:7

**relationship**
69:1

**relative** 92:4

**relative's**
150:25

**relatives** 353:9

**Relevance**
346:7,14
347:15 348:2

**Relevant**
345:22

**relied** 133:24

**rely** 134:7
174:1,7

**relying** 177:19
192:4

**remain** 24:13
322:22

**remarkable**
334:22

**remember**
13:4 18:15
22:17 23:1

29:16 35:7,15,
17 36:18,19
37:16 106:11
113:7 126:5
134:22 135:10
137:18 138:19
165:19 166:6
168:21,23,25
169:1 172:25
173:2,8 176:14,
25 183:3,7
184:9 192:13,
17,21,25 193:6
194:23 202:6
221:10,22
222:2,15
243:11,12,20,
21 244:20,23
257:12 277:3
291:11 298:14
300:4,6 312:21
343:15,16
354:11

**remembered**
168:9 169:4,8
172:12,21,23
264:14

**remind** 331:6

**reminder**
38:22

**rental** 150:24

**repeat** 44:24
79:23 212:1
231:9 249:7
284:10

**rephrase**
26:22

**report** 30:23
31:2 61:7
115:4,8 116:17,
18,23 117:8,10,
11,25 118:1,14
119:8,10,11,12,
18 123:3 124:8
125:19,22
126:1 127:10
134:11,15,21
135:5,8,11,13,
17,23 136:3,7
141:12 145:5,8,
18 146:1,21
152:22,24

153:2 154:4,5,
6,13,15,16
159:20 162:24,
25 169:18,22,
24 170:6,7,8
172:6,9,19
173:1,9 178:11
180:6,9,10,15,
16,20 182:12
192:17 202:18
203:17,20
204:4,10 206:5
207:1 209:4,6,
11,14,17,19,24
210:1,12 211:8,
9,12,19 212:6,
7,19 213:8,17
214:12,19
215:13,25
216:11,13,20
217:20,25
219:4 220:18
221:7 222:5
224:4,21,22
225:12 226:17
228:7,21 229:4,
18,24 231:23,
25 232:9,18
233:6,8,11,12,
18,21,22,23,25
234:3,15,19,20
235:5,10,11
236:6,13,17,20,
22 237:1,6,7,
19,21,25
238:11,19
239:8,15,22
246:15,17
247:9,13,19
251:10,16
255:14 256:23,
24 257:4,9,17
258:22 259:24
260:13,20
263:17 264:4,
12,20,25 265:3,
11,15,21 266:4,
9,11,15,17
269:21 270:10,
15,19 272:7,11,
13,15 278:5,20
281:7,13
285:17,18
286:14 287:17
290:9 295:11,
22 302:6

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 124 of 132 PageID #:7714
The Deposition of GEORGE FIGUEROA, taken on June 17, 2019

394

309:22 310:3,6,
23 311:1,21
313:9 314:11
318:7 321:16,
19,22 322:2,7,
25 323:6,15,18
327:4,11,14,16
328:1,6,17,25
353:22 354:21
355:20 356:1,5,
12,14 357:13
358:20,21,24
361:4

**report's**
222:12

**reporter** 7:3,4,
10 8:4,7,10,16
12:10,12,16
24:6,12 25:23,
24 26:16 84:4,9
89:12,25 90:4
123:19,22
136:14,18,21
194:3,5 199:20,
22 223:19,22,
24 231:20,21
241:14,16
263:5,9,12
277:19,21
286:24 320:21,
25 351:7 363:2,
5,7,9

**reporting**
235:18 236:10
290:4 291:25
292:7,25
295:23 311:2,5
312:18,24
313:1 315:25
317:23 359:9,
14,18

**reports** 105:7,
22 107:4,9,22
108:3 114:24
115:11,20,21,
22,25 116:2,6,8
118:6,8,17,22,
24 119:2,3,4,
22,25 120:6,12,
19,25 121:6,9,
13,14 122:6,13,
20 124:17,18,
21 125:3 126:6,
7,11,16,25

127:4,6 134:8
139:12 144:20,
24 146:16
152:15,16,19
154:10,14,17,
24 159:21,23
162:22 163:17,
24 208:19
214:5 215:10
217:25 224:24,
25 225:6
227:20 229:7
230:24 231:8,
12 234:20,25
235:8 247:2,18
248:11 255:8,
19 266:3 267:8
268:2 270:3,25
280:7,11
281:11 283:1,5
286:20 291:14
312:23 327:18
357:16

**represent**
271:16,20

**represented**
270:21 271:9

**representing**
270:16 271:14

**reprimand**
352:3

**request** 50:4
67:17 68:11
69:3 96:20
115:16 177:9

**requested**
79:20 123:22
290:5

**requesting**
104:15,17

**requests**
68:18 129:24

**require** 92:25
132:11 353:21

**required**
132:13

**requirement**
79:11

**research**

116:15

**reserve** 362:25

**residence**
220:22

**resolve** 12:8

**resources**
139:6 140:21
143:19,25
144:6,9 147:3
149:8,18
245:15

**respected**
159:15

**respectful**
8:22

**response**
330:3

**responsible**
81:9 273:24

**rest** 35:16
73:19 216:24

**restaurant**
80:14

**restroom**
199:15

**resulted** 21:23
86:4 202:9

**results** 101:4

**retention**
162:7,10

**retired** 9:4
34:16,19 35:6
66:19 89:6 90:9

**retirement**
18:5

**returned**
322:21 359:20

**revenge** 97:9

**review** 107:9
122:12 153:9,
11,13,19
157:21 159:22
161:1,5,9,11
162:1,20
163:11,14
164:1,4 166:5,

22 173:11
182:15 197:17
210:23 235:12
247:23 249:5,
15 250:5,12
263:25 272:13
287:25 310:15
321:10 327:10,
13 328:16
329:22

**reviewed**
154:25 155:2
161:14,18
163:5,20,25
164:25 165:14
169:17 171:2
175:14 177:17
232:19 263:22
277:5 278:1
299:21 310:3
318:19

**reviewing**
152:16 159:18
161:17

**Reyes** 289:11
292:10,15

**Reynaldo** 7:11
39:7 157:23
191:22 192:5,
11 194:13
198:24 292:18
331:19,20

**RFC** 202:19
203:15 232:17
233:17 237:20
255:2 263:15,
16 287:16
309:20 318:6
327:24 328:22
329:7 355:10
358:23 359:3

**Rican** 19:7

**rid** 16:22 152:2

**rights** 21:3,5
326:15

**ring** 327:12

**ringing** 302:23

**rings** 327:17

**rise** 231:7,11

**risk** 81:16
347:22

**riv** 275:10

**rivalries**
273:15

**rivalry** 275:10
277:7

**rivals** 274:17,
23 275:5

**Roach** 303:21
304:4

**robbed** 351:13

**robbery** 17:11
351:15

**Robert** 22:25

**Rodriguez**
190:19,25
225:14,22
256:1,2 264:19,
22 265:18,24
267:2 293:1,11
294:2,14
295:12,24
296:8 298:16,
17,19 359:7

**role** 16:18
18:10,16 42:1
310:22 319:15

**Ron** 311:4

**room** 47:1

**rooms** 281:5

**rotate** 328:23

**Ruben** 153:15,
25 161:22
198:4,9,12,25
199:9 299:19
309:24 310:17
327:5,15,19,21
328:11

**Ruiz** 304:8

**rules** 24:17
25:21

**rumors** 333:3
342:9,18 343:3
345:17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 125 of 132 PageID #:7715
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
395

run 53:19,22,23
71:1,13,14,21
72:6,9 128:19

running 53:8
125:12

_____

**S**

S/c 303:25

safety 78:15,
18,19,23

salary 10:15

Saturday
138:4

scar 61:11

scars 142:18

scenarios
132:21

scene 196:6
264:8,13
314:13 322:21
323:25 325:18

Schalka 8:2

schedule 29:9
137:8,21,24,25

schlepping
59:10

school 92:3
119:5,7,19
345:3

scrap 111:21

scratch 111:8,
12,14,19
112:24 113:5
116:7

screaming
24:9

screen 202:24
203:2 298:16
328:1 355:10

search 227:6,
22 352:20

sec 202:24

seconds 184:1

section 60:4,5
127:15,18,22
229:23 230:3,9,
13,20 231:8,25
232:5 238:1
239:5,25
240:17 260:18
265:5 266:18,
22 267:18
284:4,9,12
286:19 310:8
317:16 321:7,
11

secure 128:14

security 9:21,
22

seek 87:23

seemingly
275:8

Seldom 49:7

sell 151:20
152:1,3

sending
341:22 362:3

senior 345:19
346:18

seniority
297:24

sense 17:12
144:11 177:13
335:23 336:10

sentence
237:18,21
253:15 292:24

separate 13:21
60:22

separating
341:22

Sepulveda
303:20 304:5

sergeant 33:5
34:11,19 158:7,
17 191:18
193:13,19,25
205:8 236:2
237:2 280:22

sergeant's

205:3,4

sergeants
34:14,17,18,20

serial 251:2

series 255:20
300:12 308:13
320:16

serve 49:13

served 167:1,2

session 25:22

set 66:5 67:9
139:22 140:10
161:13 301:25
302:3 306:20
307:24 311:19
312:5 316:22
329:14

sets 302:9

settle 25:3

settled 22:3
24:25

settlement
21:23 22:11

Sex 68:23

shaking 82:17
83:3

shaky 99:1,21
101:19

share 324:1,8
340:25

shared 277:6
343:1

sharing 341:25

sheet 31:16

Shields 32:15
37:3,5,10

shift 29:8,9,17
30:2,3,13 295:2
361:6

shifts 28:19,24
29:2,12,13,24
30:2,7 137:4

shirt 183:13

shooting 28:8
190:7 197:24
198:5,25
271:10,21
273:14,18
274:4 277:7
295:25 300:4
309:22 323:25

shootings
17:17 150:11,
15 275:23
276:3,7,20

shortly 296:9

shot 275:25
315:13 316:2
323:13 330:5

shots 54:10,17
55:17 98:5

shouting 45:9

show 45:21
46:2 55:19
262:12 300:7
302:13 313:20,
21,24

showed
291:24 303:2
309:5 317:3

showing 52:15
202:17 203:13
232:16,25
277:24 287:4,8,
12,15 327:3
328:21 329:12

shown 302:7,
11,13,15,16
316:6,9 317:17
327:18 351:19

shows 221:21
305:15

sic 36:1,10

side 14:3
19:18,20,21,22,
25 33:23
204:14 269:21
319:17

Sierra 7:11,19
28:5 103:14
105:4,11,14
106:23 132:25

134:3,11
154:19,22
167:16,19,21
168:1,4,22
169:9,10
170:16 171:1,
16 173:21
175:9,17,23
177:25 182:19,
21,22 184:22
185:5,8 186:1
189:9,11,14
191:7,11
195:18 197:11
201:17,20
202:19 203:15
204:11 216:9
218:1,25
220:12,21
221:1,8 222:5
225:22 226:1,6
228:23 232:17
233:17,22
237:9,20,22
238:2 240:10,
18,24 241:7,20
242:6,18,23
243:5,6,19
244:17 245:1,
17,24 246:19
247:7 248:1,8,
12,17,23 249:4,
11,21 250:15,
19 251:11,16
252:6,10
253:11 254:15
256:3 260:1,8,
24 261:13,24
277:25 286:10,
17 289:1,7
291:25 296:5,6
297:19,24
298:3,10 300:8,
13,18 301:15,
23 302:14
304:19 305:16
309:13,20
317:5 318:6
327:24 328:22
329:7 330:1,10,
14,22 359:8,23
360:5,11 362:3

Sierra's 128:9
153:3 155:1
163:4 181:3

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 126 of 132 PageID #:7716
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

396

219:4 242:17

**sign** 136:6
209:3 210:3,8,
11,14,19,24
211:9 214:4
215:21 224:21
233:25 279:15
280:1,6,10,16
355:13,18,23,
25 356:10

**signature**
204:13,14,15
205:1,3,5
208:5,6,7,14,
15,21 210:2
217:21 224:15
229:7 233:12
234:12 235:1,
15,18,24 262:4
329:20 363:1

**signed** 125:4
136:3 211:12,
13,20,25 212:3
213:12,13
215:4,12,25
217:11 234:9,
15 236:2
298:19,25
299:5,9 355:9

**significance**
305:13

**significant**
49:19 298:4

**signify** 280:25

**signing** 211:4
215:2 235:25
329:22

**signs** 280:19

**silver** 323:3
324:23 326:3

**silver-** 314:13

**silver-colored**
321:23 322:20,
22 323:12

**similar** 66:23
95:19 141:13
165:23 166:16
209:21 314:15

**similarly** 26:9,
25 86:15

**simply** 75:9
109:12,21

**sincerely**
224:16 230:9

**single** 139:23
140:4 215:24
275:16

**sir** 8:22 9:4
20:1 83:17 90:8
199:25 203:13,
18 224:5
232:19 263:18
278:2 279:22
289:3 300:9
309:25 311:6
314:15 329:16

**sit** 35:7 81:11
133:19 166:10
197:11 231:1
250:10 259:1
281:17 284:14
313:11 330:21
341:6,14
355:16,20

**sitting** 132:23
133:10 135:21
299:24

**situation** 91:23
227:18

**situations**
128:25

**size** 141:17,18,
21

**skittish** 59:7

**slang** 117:24

**slapped**
351:13,16

**slogans** 45:10
275:19

**sloppy** 320:4

**Slow** 310:14

**small** 141:17
205:15 212:9,
17

**Smaller** 141:23

**Snoopy** 300:22
302:14 306:7,
14,21,22 307:1,
3,9

**Snoopy's**
302:16

**so-and-so**
80:13 87:16
98:8,9,11

**social** 9:22

**socially** 332:1

**solemnly** 8:11
224:15 230:9

**solid** 98:7

**solve** 276:11

**Som** 353:20

**somebody's**
227:6

**someone's**
65:4 313:8

**someplace**
132:19 175:10

**sort** 29:8 33:22
59:19 98:17,18
116:5 126:17

**Sotos** 7:21
156:7,11

**sound** 158:10
352:11

**sounds** 39:4
125:23 128:20
320:22 362:20

**source** 146:20

**sources** 9:17
10:9,14

**Spanish** 18:25
19:2 60:12,13
270:5,6,8,16,
21,22 271:8,9
272:7,8 273:11,
13 275:9 304:1
307:19,25
308:7 348:19

**Spaulding**

219:19

**spe** 145:16

**speak** 18:25
19:2 25:25
76:10,13 88:25
93:17 183:1
254:20 308:3
326:1 340:5

**speaker** 11:23
320:23

**speaking** 24:7
28:13 44:13
92:25 117:16
125:3 128:1
145:10 280:18
288:9,17
311:17 317:22,
23 320:22
349:9

**speaks** 171:6
265:1,11,15,21
266:3,9,15
267:8 268:2
270:3,25
272:11 321:19
322:3,7 323:6,
18

**special** 111:15

**specialist**
13:2,3 15:13
16:2,5,15,19
17:6 29:1,7
30:11 31:15,20
32:12 34:5
36:21 37:15
38:12,19 39:8,
12,13,23 40:7,
10,23 44:11,25
46:1 47:5 50:14
53:12,25 57:9
59:16,24 74:18
78:2,22 79:12,
19 81:25 95:9,
17 96:15 98:3
107:3,21 108:2,
6,10,16 111:2,
5,16 112:7,21
114:18,23
115:23 116:4
118:2,6 123:9
124:11,18,19,
22 137:5,19

140:25 145:13,
16,17,22
147:13,17,21
200:5 204:21
212:8 247:6
272:14 294:20
295:12 297:9
311:3,4 319:1
332:6 333:25
334:19,24
336:22 341:15
349:23 354:3

**specialists**
14:15,18,23
15:2,7,15 17:15
29:8,21 33:4,6,
11 39:16 40:1,
22 41:6 43:8
44:5 51:2,7
54:20 55:21
57:3 66:23
67:4,15 68:22,
25 69:1 70:21
71:1,17 72:6,8,
11,13,19 73:6,
15,20,22 74:12
75:23 77:6,11
78:13,25 97:12
111:20 144:25
149:14 204:6
247:2,17
319:12,14
333:20,24
340:2,3 341:7
342:22

**specialized**
60:16

**specialty**
59:24

**specific** 28:22
30:4 78:11
84:25 113:22
118:18 126:8
140:20 166:1
167:14,20,25
168:3 171:8,14
172:3,4,25
173:19 174:18,
22,25 175:16
176:14 180:14,
18 181:4 182:9,
15 184:15
185:1,4 187:12,
14 189:1



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 127 of 132 PageID #:7717
The Deposition of GEORGE FIGUEROA, taken on June 17, 2013
397

191:21 192:3,9
200:12 201:16
236:8 241:18
242:6,9 244:2
249:24 251:5
268:25 283:25
285:5 289:22
291:2,3 338:8
343:10 348:12

**specifically**
71:5,6,8,10,12,
13 115:11
140:25 159:19
166:12 200:16
225:19 238:13
339:22

**specifics**
191:20

**speculate**
228:15

**Speculation**
72:7 280:13
313:5 333:14
335:21 346:7,
20 347:8,15
348:2 352:18

**speculative**
24:1 31:4 33:25
38:15 40:3
41:9,15 43:11
44:8,23 46:16
47:7,14 48:18
49:6,22 50:5
51:4,25 52:3,10
53:16 54:22
55:3,15 56:10,
21 57:7 63:7,
14,21,25 64:6,
14,22 65:3,11
66:1,9 67:2,7
68:20 69:5
70:9,15,25
72:16 73:2,11,
17 74:4 75:5,
13,18 76:8,18
77:3,16,23 78:9
79:3 80:8,19
81:8,23 82:5
84:21 85:5,23
86:8 87:4,11
88:1,11,20
90:17 91:3,16,
22 92:14,23

93:7,16,25
94:11,17 95:2,
24 96:12,18,24
97:15,21 98:2,
15,22 99:23
100:22 101:8,
13,22 102:13,
21 103:3,10,23
104:4,24 107:6,
10 108:14,20
109:1,8,23
110:6,12 111:6,
24 112:10,20
113:13,21
114:6,12,20
115:1,6,14
117:6 120:2,9,
16,21 121:11,
18 122:10,16,
22 123:6,11,24
124:14 125:10,
20 126:4 127:8,
13,25 128:6,17,
24 129:11,20
130:3,11,17
131:4,14,23
132:16 135:19
138:9 142:6
143:2,11,22
144:2,21 145:9,
21 146:17,22
149:11 150:6,
13,20 151:7,23
165:12 166:17
170:1,19 186:4
187:18 188:12,
18,25 191:15
198:1 199:11
211:16,22
212:23 213:11,
19 214:2,9,16,
21 215:6,15,19
216:2 217:5
221:5 225:3,10
228:5,14 229:1
230:15 231:14
232:9 237:4
241:9,23
242:20 243:15
244:1 245:20
246:1,8 247:4,
11,21 252:16
255:12 257:7,
11 258:4,18
259:11 260:4
261:7,16,21

262:10,17
268:12,23
269:9,16
271:12,23
272:4,11,19
274:20,25
276:13,25
281:15 282:20
283:10,22
285:16 291:16,
21 294:23
295:4,9 296:11,
21 298:7,12
301:20 307:6,
11 312:2,9
313:16 314:2,
10,21 315:21
316:13,18,25
317:7,12 318:3
319:10,25
323:6,18 324:4,
12 325:1,8,20
326:5,12,23
327:10 330:25
331:23 332:10
333:6 334:16,
21 335:10
336:5,13 337:5
341:19 342:3,8
343:9 344:19
345:8,14,22
346:14,20
350:17 354:6

**speed** 91:7

**spell** 8:24 36:7,
9

**split** 33:18
213:23

**spoke** 113:8
152:18 248:22
258:11,14
267:20 268:10
269:14,18
288:14 315:25
321:4 322:19
334:25 335:1
340:8,10

**spoken**
339:17,22,23

**spot** 312:12

**spotted** 216:8

**spread** 14:4

**spring** 208:2

**squad** 70:1
185:12

**Square** 13:25
14:20,22,24
16:7,8,14
273:19

**St** 174:11
223:14

**stabbed** 21:6
22:6

**stack** 34:13,19
59:22 236:3

**stamp** 300:12

**stamped**
237:20 318:6

**stand** 265:13

**Standard** 7:6
12:17 84:10
90:5 136:19,22
199:23 223:25
277:22

**standing** 179:3
183:22

**stands** 205:24
338:4

**star** 208:14,20,
25 209:1,2
279:12 331:9

**start** 147:2
157:11 192:1,2
250:21,22
263:8 296:19
303:13

**started** 296:12
344:12

**starting** 7:17
119:13

**starts** 358:23

**state** 7:15 8:24
99:24

**state's** 92:25
128:19 129:12,
17,25 130:8,15
131:1,6,12,19

132:2 256:14
259:4,7 281:24
298:19,24
299:4,8 358:1

**stated** 224:17
315:13 316:1

**statement**
109:17 225:7
243:5 298:17,
18,21,25 299:2,
5,6,9,11

**statements**
153:11

**states** 7:12
330:4

**station** 59:8,9
185:8

**stations** 58:12

**stay** 34:7

**stayed** 34:10

**staying** 82:11
179:5

**steal** 151:10

**step** 91:12
93:2,10

**steps** 120:23,
25 121:15
202:9 320:16
350:15 361:7

**stick** 181:8

**stipulation**
331:5

**stop** 68:2,5,17,
21,22 69:2,9,
11,12,17,22
70:2,13,16,22
71:3,5,12,14,18
72:21 73:3,14,
18,23,25 74:12,
17,24 75:8,17,
21,22 76:3,6,
11,14,20,23
77:10,18,19
83:11 85:21,24
86:6,17,21,25
103:12,20
104:8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 128 of 132 PageID #:7718
The Deposition of GEORGE FIGUEROA, taken on June 17, 2019
398

**stopped** 68:11, 15 69:8 71:11 74:7 96:3 295:14 314:13 360:16

**storming** 24:3

**story** 326:2,7 340:18

**stranger** 92:9, 19 93:5

**strategy** 88:22

**street** 14:21,23 16:2,4,8,9 63:4, 24 64:5,12 129:2 131:11, 25 132:1 139:11 140:6 149:14,16 168:4 169:14 175:7 177:24 179:4 183:16, 22 188:23 238:25 251:1, 23 252:12 270:17 275:16 295:14 322:9 342:6,12

**streets** 223:13 334:7

**stressed** 119:21

**strict** 95:5

**strictly** 349:3,4

**strike** 23:23 24:17 27:24 28:2 35:22 39:17 49:8 51:9 52:22 53:12 54:5 55:9,25 58:18,21 61:3 70:20 71:16,25 72:2,3,5 74:24 77:18 85:7 86:3 93:1 104:13 107:1 109:16 115:20 116:3 124:6,21 128:13 132:8 142:15 145:17 156:14 164:24

172:15,16 176:21 190:23 191:5,9 195:6 197:22 198:12 199:25 209:25 211:8 227:12 231:1,24 233:11 234:8 242:17 243:5 249:19 261:10 262:6 275:3 281:10 282:2 286:16 287:15 295:17 298:17 312:17 316:20 337:8 358:13

**strong** 100:1,8 102:17

**struck** 331:9

**stuff** 125:13 320:13 343:23

**stunned** 336:6

**su** 197:11

**subject** 74:1,2 237:16 238:20, 22,24 336:2,10 352:3

**subjected** 199:8

**submit** 353:18

**submitted** 31:1 236:21,22 237:1 318:17

**submitting** 122:14 281:13

**subsection** 17:14

**subsequent** 9:16 18:4 92:20 179:22 205:13 230:8

**subsequently** 91:20

**substantiate** 356:16,21,25 357:5

**subtract** 182:3

**suddenly** 326:1

**sued** 21:13,20, 24 28:4 38:5,8, 17 157:19 164:3,8,15 165:1

**sufficient** 82:12 102:8 268:8,15

**suggest** 297:24

**suggests** 229:10

**suing** 21:10

**suit** 157:16 215:8,9

**sum** 325:18

**summer** 208:2

**Sunday** 138:4, 5

**supervisor** 50:7,8 67:17,25 80:2 115:7,19 118:13 180:12 200:14 281:4 332:11,12

**supervisors** 123:3 124:5,7, 11 332:8 336:8 354:22

**Supple** 118:8

**supplement** 179:21

**supplementaries** 118:20

**supplementary** 115:8 118:6,8, 14,17 119:3,22 153:2 154:5,16 162:25 169:20, 22,24 172:6 178:11 179:19 180:20 192:17 232:18 233:6,8 234:19 235:5 236:17 237:19 255:14 287:17

290:9 309:22 318:7 328:17

**support** 240:2

**supported** 134:19 232:1

**supporting** 128:4 239:17 284:8,11,15

**supposed** 80:13 169:18 232:10

**surprise** 215:7 336:2

**surprised** 352:24

**surprising** 210:3,5

**surrounded** 24:4

**surveillance** 349:6

**suspect** 49:12, 18 55:6 85:20 86:5,15,17 87:7,9,22 88:17 90:14 92:12,20 93:4 96:15,21 101:4 102:16, 19 197:12 307:4,9

**suspected** 97:24 250:20

**suspects** 47:25 49:4,14 50:2 55:1,7,17 109:4 128:22 197:1 266:12

**suspension** 351:21

**sustain** 106:13

**Swaminathan** 7:18 8:8,19 11:18,21,25 12:9,14,20,21 24:15 35:21,23 39:6 71:25 72:4 82:13,23 83:2, 12,13,25 84:3,

6,11 88:5 89:8, 13,15,20 90:6 104:12 108:1,9 123:13,17,20, 25 132:4 136:11,16,23 160:14 172:15, 18 194:11 196:5 199:17, 19,24 201:6 203:3 218:16, 23 223:17,21 224:1 229:5 231:18,22 239:10,24 240:8 241:11, 14,17 261:9 262:15,20,25 263:13 267:6, 12 277:10,15, 23 287:2 288:22 289:2,5 302:21,25 308:24 321:2 323:22 331:4, 10,15,16 351:5, 9 354:24 355:2, 8 357:3 358:14, 18,22,24 359:3, 25 360:12,25 361:23 362:7, 11,24 363:6

**swear** 8:11

**swearing** 224:21

**sworn** 24:19 224:25 225:6,7 230:8

---

**T**

---

**T-SHIRTS** 141:2

**tabs** 74:8

**tac** 117:17

**tactical** 13:21, 23 14:2,3,16,19 145:23 319:17 350:1

**tainted** 337:18

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 129 of 132 PageID #:7719
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021
399

**taking** 27:7
81:16 100:6,8,
10,11 105:4,10,
13 106:22
108:24 109:5,
12 110:10
121:1,3 127:16
146:24 150:11
304:7 358:9

**talk** 8:22 24:16
25:20 69:13
70:7 75:1,10,23
76:15 90:24
139:10,11
140:7 164:9,14
170:3,4 250:21
314:6 322:23
331:17 336:16
342:18

**talked** 67:14
95:10 96:3
102:24 118:12
124:16 139:2
162:22 248:21

**talking** 39:3
70:5 120:22
126:6,9 139:20
143:23 144:3,4
149:13 165:11
227:1 245:7
250:22 254:18
262:14 271:6
288:25 302:18
328:6 340:9
342:22

**talks** 317:22

**tampering**
342:6,12

**tapped** 338:12,
24

**tapping** 338:18

**targeting**
349:13

**task** 113:23

**tattoo** 61:11

**tattoos** 141:3,
14 142:18

**tavern** 24:3

**team** 17:14
32:24 33:1,2,7,
12,21 34:7,10,
11,15,24 35:4,
5,13,18,25
36:12,16,17,23
37:2,3,7,10,14
38:12 39:8,12,
17,20 227:10
228:7 332:1
333:16,21,23
337:25 339:3
349:6

**teams** 33:5
34:6 39:13,23
40:1

**technically**
169:12

**technician** 7:4

**techniques**
121:23

**telephone**
176:9 224:10

**telephones**
338:12

**telling** 116:12
175:17 315:25

**tells** 219:21
323:11

**template**
126:13,15

**ten** 33:16

**tend** 82:20

**tendency**
83:10

**tentative**
101:19

**term** 45:16,17
117:12

**terms** 33:11
137:9 144:8
147:3 149:19
154:3 181:9
186:25 201:9
213:8 225:16
322:13 349:12

**territory** 274:8

**testified** 24:20,
25 25:5,11,15
174:3

**testify** 25:2,3

**testifying**
194:24 195:2

**testimony**
8:12 22:9 24:19
48:11 62:20
68:14 82:6
87:23 88:2
94:11 104:4
123:22 134:14,
24 153:3,18,19
154:25 163:3
173:14 175:3
178:17 179:11
181:7 182:10
188:2 189:6,20
191:15 201:8
207:10 214:9,
16 215:23
227:17 228:5
229:2,17
238:19 239:9
240:5,21 244:9,
15,22 245:4
249:1 260:10
275:18 278:24
280:1 285:1
290:23 308:21
343:22 344:4

**Thereabouts**
16:17 43:16

**thing** 44:16
56:15 69:22
75:11 126:9
141:11 147:4
164:2 179:6,8
281:22 298:9
341:17

**things** 17:17
42:3 45:10,25
47:9,18 49:25
59:5 66:2 70:19
88:22 90:20
95:4 109:18
110:3 113:6,7,
15,18 114:2,22
116:5,13,15
117:20 120:19
122:19 129:4
130:21 139:12

141:15 142:18
144:5 170:10
240:1,9,16
257:2 259:13
281:21 304:16,
18 306:6 317:2,
18 320:11
338:13 340:20
345:10,16
356:24

**thinking**
318:13

**Thomas** 7:11,
19 28:5 103:13
105:4,11,14
106:22 128:9
132:25 134:3,
10 154:19,22
155:1 167:16,
19,21 168:1,4,
21,22 169:9,10
170:16 171:1,
16 173:21
175:9,17 181:3
182:19,22
184:22 185:5,8
186:1 189:9,11,
14 191:7,10
195:18 197:11
201:17,20
202:19 204:11
218:1,25 219:4
220:12,21,25
221:8 222:5
225:22 226:1,6
233:22 237:9,
22 238:2
240:10,18,24
241:7,20 242:5,
17,18,22 243:5,
6,19 244:17
245:1,17,23
246:19 247:7
248:1,8,12,17,
23 249:4,11,21
250:14,15,19
251:11,16
252:6,10
253:11 254:15
256:3 260:1,8,
24 261:12,24
286:10,17
289:1,7 291:25
296:5,6 297:19,
24 298:3,10

301:15 302:13
305:16 309:13
317:4 330:1,10,
14,22 359:8,23
360:5,11

**Thomas's**
192:5,11

**thoroughness**
120:10

**thought** 26:5
97:6,8 167:21
325:22 334:22,
23

**thousands**
143:9

**threw** 66:16

**thrown** 114:8
330:18

**Thursday**
207:19

**tickets** 117:19

**tie** 183:13

**time** 7:5,6
10:12 12:17
13:9,12 15:21
17:5 18:14,21
19:19 20:2
21:15,21,24
22:21 23:2 26:1
27:15 28:25
30:7,8,10,12
31:1 32:12 34:8
36:20 37:6,9,14
38:12 39:11
40:6 41:11
43:7,12,20,25
44:10 47:16
59:16,23 78:1
84:10 87:18
89:2,4 90:7,8
91:9 94:20
95:9,17 107:25
108:4 109:9,10,
24 128:12
136:19 137:5,
14 145:4 147:8
152:8 155:14
161:18 164:5
167:3,9,11
170:21 172:7,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 130 of 132 PageID #:7720
The Deposition of GEORGE FIGUEROA, taken on June 17, 2019
400

25 173:20,24
176:1 186:3
189:17 197:9
199:9 200:22
203:21 204:25
205:11 206:3
211:20,25
212:3 217:25
218:2,11,12,20,
21,22,25
219:24 221:7,
10,12,22 222:2,
8,16 227:15
236:21,25
254:3,8,11
256:10,19
258:10,15,20,
22 259:2,7,8,
14,16,18,19,20
260:1,14
262:14 263:4,7
268:20 273:6,9,
16 274:23
275:6,11,15,24,
25 276:4,8
279:19 281:23
282:3,6,13,23,
24 283:8
284:21 288:19
289:1 293:5,6
294:16,19
297:16 326:13
331:9 333:4,17
342:22 343:15
349:20 351:5
355:19 356:11
358:5,7,9,12
359:16 362:16

**timecard**
31:16

**times** 20:16
21:19 25:6,8
26:10 29:2
30:24 53:6
62:21 91:8
142:9 155:7
161:11 163:17,
19,20,23 164:1,
2 165:19
253:17 349:18
353:12

**tinted** 267:20
268:10 269:14,
17

**tip** 346:1

**tired** 122:23

**title** 14:5

**to-** 353:23

**to-do** 113:14
114:13

**to-from** 353:21

**today** 7:4,5
10:2 27:9,13
28:4 132:23
133:10,19
134:18 135:21
155:8,10,12
156:9,15 168:1,
4 171:9 197:11
231:2 250:10
259:1 281:17
284:14 285:6
313:12 330:21
355:17,21

**today's**
152:12,13,20
154:10 155:2,5
163:15,21
232:20 278:1
288:1 310:4
318:19

**told** 133:4
134:25 175:11,
20 178:19
191:6 197:18
241:25 253:25
254:20,22
258:2,7,15,21
284:15 285:2,3,
22 286:16
290:25 297:1,2
321:23 322:21
323:12 325:13
338:22 341:20,
22 344:11
350:4

**Tom** 153:3
242:22 362:3

**Tommy** 163:3
175:23 177:25
182:21 216:8
300:18

**Tony** 158:9
193:1 360:18

**top** 36:18 37:16
241:6 276:6
317:16 327:2

**topic** 331:17

**tossed** 21:12

**total** 154:10
336:1 352:5

**town** 91:6 97:7

**tr** 25:4

**track** 149:25
166:15 362:16

**trade** 151:17
152:1,3 347:18

**traded** 151:13

**trained** 119:24
120:5 127:5
129:14

**training** 119:7,
12 132:6,10

**transcript**
153:2 154:25
163:3

**transcripts**
153:7

**translate**
48:23

**translator**
49:13

**transport**
184:8,10,23
185:2,5,6,10,20
222:21

**transported**
221:8,12
222:20

**trash** 114:8

**treat** 96:16

**trends** 116:13

**trial** 22:4 24:21
25:1 153:3,18
155:1 163:4
194:24 195:3,8,
18 340:18

**true** 75:3,11
96:6 101:20

123:8 124:11
173:6 211:14
243:24 313:3
326:7

**trunk** 59:14
148:15,16,21
149:10 243:14,
18 244:12
291:19

**trust** 100:25

**trustworthines
s** 100:18

**truth** 8:13,14
217:8

**truthfully** 27:9,
13

**Tuesday**
207:17,18

**turn** 114:9,17
145:11 232:16
298:16 328:12,
23

**turned** 17:20
125:16 179:2

**twi** 268:10

**two-page**
203:17

**type** 116:9
118:5 126:18
165:23 203:24
217:1 276:22
286:18 356:25

**typed** 216:23,
25 236:5,6,7
278:25 279:3

**types** 45:5
120:18 124:17

**typewriter**
126:21 286:7

**typewritten**
209:8 212:25

**typical** 29:8
90:15 92:10
94:6 137:24
141:21 180:25
203:20,23
280:6,9 281:11

**typically** 31:21
52:15 63:4,11
64:4 78:21 88:8
93:12 96:8
102:19 126:18
137:15,21
138:7 210:7
223:9 247:15
281:9 286:19

**typing** 236:9

**typo** 122:24

---

**U**

**U-R-B-I** 36:6

**uh-huhs** 26:15

**ultimate** 28:8

**ultimately**
49:10 81:9,15
339:19

**undercover**
342:1

**underlying**
164:5 167:9,13
169:2 188:15
197:6

**undersigned**
237:15 238:22,
25 239:1
251:23 253:16

**understand**
25:17 26:2,22
27:8,12 28:3,7,
13,15 69:2
71:16 74:16
75:19 77:4
83:17 100:13
101:2 114:16
144:7,13
160:16,18
201:8 215:23
216:10,25
239:15 242:2
244:9 251:8
283:14,19
303:25 323:19
330:13 356:11

**understanding**
43:5 63:23
70:12 84:14



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 131 of 132 PageID #:7721
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

401

154:9 157:17
173:10 197:23
201:21 202:1
211:19 234:2
250:11 278:19
305:18 307:3
308:12 313:22

**understood**
27:1 71:15
164:25 201:25

**union** 36:10

**unique** 107:21
224:24

**unit** 11:13
13:14,19,21,22,
23 14:3 15:4,9,
10,15 17:10,16
18:8,12,17
41:20 42:14
43:13,14,18,22
44:1 50:12,18
51:1 141:10
145:25 146:8,
11 147:6,9
255:6 280:21,
24 319:19
320:6 332:12
339:8,11
341:21

**United** 7:12

**units** 14:17,19
41:7 42:18 43:9
117:17

**unknown**
267:11,20
285:22

**Unknowns**
275:1

**Unlike** 224:25

**unmarked**
185:12

**unofficial**
342:16

**unsafe** 9:24

**unstable** 89:16

**untrustworthy**
99:2 101:18

**unusual** 43:7
271:2,7,13

**updated** 58:3

**upset** 352:23

**upstairs** 51:15

**Urbikas** 34:22
35:15 36:6,12

**urgency** 97:6

---

**V**

**vacation** 358:8
361:2

**vague** 165:17,
18

**variances**
138:1

**varied** 33:9
137:23 138:6
178:20

**variety** 34:16,
18

**vast** 320:17

**vehicle** 150:18,
22 184:8,10
185:5,6,10
266:19,23,24
267:3,25
270:16 321:23,
24 322:20,22
324:9 328:24
329:4,8

**vehicles**
150:12

**verbal** 26:15

**verbally** 50:7
67:18 176:10

**verdict** 21:23

**version** 234:3

**versions**
234:19

**versus** 129:9
132:12 166:16
326:9

**Vice** 275:2

**victim** 17:19
213:2,25 214:3,
13 224:5 265:4
315:13 316:1
323:13

**victim's**
321:24

**victims** 52:6,
20 55:19 59:6
94:3 96:2 102:5
103:6 120:22
270:11 272:21
273:14

**Vicus** 36:1,3

**video** 7:4
263:10

**videoconferen
ce** 7:7

**view** 95:20
99:2 132:19
153:15 226:11

**viewed** 92:12
95:7 293:4

**viewing**
340:22

**violate** 21:5
354:15

**Violation** 21:3

**violent** 17:12,
13 41:13 42:16,
19,20 43:3,9
50:18 51:1
68:23 158:17
253:17

**visit** 52:13 59:8

**voluntarily**
75:2 239:1
253:16 254:16

**Vujacic** 22:18

---

**W**

**wait** 26:9 38:24
88:23 97:23
98:12,19 99:8
117:6 131:22
239:19 295:6

**waited** 88:18

**waiting** 362:1

**walk** 295:24

**walking**
131:25 168:4

**wanted** 13:20
30:17 47:19
52:8 70:7 71:3
76:5 77:1 81:13
94:2 104:7
134:9 135:1,14
139:4,21 140:2,
19,20 143:17,
24 144:15
147:1 149:6,17
170:9 173:24
183:1 210:15
238:21 245:14
254:20 279:19
283:18 285:23
297:2 313:24
314:5

**war** 275:8,15,
20 277:2,3

**warm** 141:2

**warned** 71:2

**warrant** 68:6
70:16,18 71:10
72:12,24 73:8,
12,13 128:8,12,
14,22 129:3,8,9
130:20 132:3,
12,13 227:6,7,
22

**warrants** 71:3,
6 73:5 104:9
352:20

**Washburn**
34:22

**watch** 50:10
208:16

**ways** 44:10,11
55:10 58:17,21
59:1 67:20
75:15 77:10
259:13 269:11
281:21 282:17

**wearing** 141:2
183:10,12

**weather** 141:2

**Wednesday**
207:18,19

**week** 137:7,9,
15 138:12,13
155:9 162:19
178:19 181:17,
24 206:8
207:14,17,18,
19 295:6

**weekends**
138:21,22,23,
25 206:20
207:20

**weeks** 129:7
200:25 201:2,
12

**weight** 141:14

**west** 220:22
223:6,7 224:7
260:15 289:15
314:12

**Western** 13:8
51:1,11,13,23
52:5 179:3

**wheel** 289:21

**wheels** 267:20
268:10 269:14,
18

**whichever**
71:22

**white** 266:7,13
321:25

**whoa** 110:19

**wife** 21:11
23:16

**Williams** 34:23

**wind** 335:17,22
354:18,19

**windows**
267:20 268:10
269:14,17

**Wiora** 225:14,
22 256:1,2
295:12

**wire** 289:21

---



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 292-4 Filed: 07/05/21 Page 132 of 132 PageID #:7722
The Deposition of GEORGE FIGUEROA, taken on June 17, 2021

402

wire-tapped
338:23

wit 265:3

withheld
324:21 325:5

witness's
52:16

witnessed
133:3

witnesses
44:17 45:22
46:2 47:22
48:4,8,16
51:20,23 52:6,
20 55:1,4,19
59:7 87:18
90:19 94:3,14
95:20 102:5
103:6 109:4
114:21 120:22
195:17 197:1
264:18 265:3,8
267:2 323:24

Wo 323:15

Woitowich
318:8,10,11,13,
14,22,24 321:4
322:20 323:1,
16 324:22
325:14 326:9

Wojcik 158:9
159:9,10 193:1
225:13,21
278:24 360:18

woman 289:10
292:15

word 81:1,13
104:6 149:12
172:23 187:11
188:21,22
212:15

wording
135:11

words 11:9
39:18 53:2
68:10 75:20
78:21 79:5
83:22 98:10
143:4 146:19

149:13 151:12
176:14 178:10
182:2 207:15
219:18 241:4
254:7 256:12
296:25

work 9:18,25
10:2,10 14:18
16:19 17:10,11,
21 20:20 28:19
29:7,8,9 30:1
31:21 34:2
36:11 38:11,18
39:7,12,25
40:16,21,23,24,
25 41:3,7,12,19
42:5,14 43:8,21
44:2 69:23
109:20 124:19
160:13 174:23
177:15 178:8
179:4,14,16
206:16 238:15
319:3,21
348:13,17,23
359:19,20

worked 9:19
10:12 13:9,13
15:10 18:6,22
27:15 29:1,2,21
31:12,17 32:14
34:7,16,19
35:13 36:22
39:15,19 70:3
94:21 95:19
97:13,19
109:17 110:8
137:7,8,9,15
138:21,22,23
145:2 146:8
207:1 319:5,16
320:5 325:3
332:1 333:23
334:3 337:16
352:1,24

workers 9:22

working 11:9
14:16 16:5 17:5
18:3 27:23,24
30:2,3,7,11,12,
18 31:1,7,20
32:1,2,4,21,25
34:5 35:17
36:16,21,25

40:23 50:21
51:2 95:17
100:24 138:11
145:24 178:14
179:12,23
180:13 211:20,
25 212:3 281:4
319:19 323:23
333:20 342:20
343:13,18,25
345:5,19

worksheet
116:20

world 275:20

worthwhile
150:9

would've
264:14 356:7

wri 172:6

write 61:3,10,
13,15,20,21,23
62:3,9,18 63:9
64:20 111:11
112:1,5 113:5,
10 114:24
115:4,10,21,22
116:9 118:13,
18,20,22,23
119:25 120:6,
19 121:13,14
122:6 124:6,17,
18,22 127:5
169:21 180:6,9,
10,15,16
236:17 254:16
313:7,8 353:21

writers 357:13

writing 25:24
111:8 119:8,10,
11,13,18
120:24 121:5,9
136:1 170:9,11
236:22 256:24
281:12

written 62:25
134:21 154:14,
17 171:21
172:9,11
179:20,22
180:2 204:16
205:10 208:9,

20,22 211:20,
25 212:3 217:8,
20 230:13
231:3 239:4
243:7,9 304:18

wrong 72:1
99:3 219:13

wrote 115:20
117:19 119:1,4
120:12 134:15
135:23 136:1
145:5 154:4,5,6
170:15,17
180:10 208:11
212:20 217:16,
17 236:19
237:1,5,6
239:16 257:23
281:7

―――――――――
Y
―――――――――

year 11:2 27:25
30:6 116:11
139:1 206:11

years 20:19
30:16 35:14
155:24 156:1,4,
10 157:3
159:18 161:15
181:15 251:7
277:2 283:12
333:24 334:1,4
352:19

YLO 60:9,13,14
273:11

York 19:9,10

you've' 321:10

younger
347:18

youwould
245:23

―――――――――
Z
―――――――――

zoom 12:5,7
309:21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS