# EXHIBIT C

## ALBERTO RODRIGUEZ

called as a witness on behalf of the People of the
State of Illinois, having been first duly sworn,
was examined and testified as follows:

### DIRECT EXAMINATION

BY MR. ALESIA:

Q.  Sir, in a loud voice state your name,
and spell your first and last name.

A.  Alberto Rodriguez, A-l-b-e-r-t-o,
R-o-d-r-i-g-u-e-z.

Q.  Alberto, how old are you?

A.  Twenty-three.

Q.  Do you live in Chicago?

A.  Yes.

Q.  Who do you live with?

A.  My mom.

Q.  What's her name?

A.  Maria Rodriguez.

Q.  Do you have a nickname?

A.  Yes.

Q.  What's that?

A.  Titi.

Q.  Can you spell that?

A.  T-i-t-i.

SIERRA 002244

Q.    Mr. Rodriguez, you currently have a pending felony case against you, is that correct?

A.    Yes.

Q.    In fact for possession of a weapon?

A.    Yes.

Q.    And the possible sentence for that case is a period of probation or two to five years in the Illinois Department of Corrections, correct?

A.    Yes.

Q.    You also have a pending possession of controlled substance with intent to deliver case?

A.    Yes.

Q.    The possible sentence for that case is four to fifteen years in the Illinois Department of Corrections, isn't that true?

A.    Yes.

Q.    Sir, have any promises, any deals of leniency been made to you in return for your testimony today?

A.    No.

Q.    Has anybody promised you or threatened

88

SIERRA 002245

you in any way, be it police, State's Attorneys, anybody else to testify today?

    A.   No.

    Q.   In May of 1995 did you belong to a gang?

    A.   Yes.

    Q.   What was that?

    A.   Latin Kings.

    Q.   Do you belong to a gang today?

    A.   No, sir.

    Q.   Why not?

    A.   Because my partner being shot, I left it alone.

    Q.   When you say your partner, what's that person's name?

    A.   Noel.

    Q.   Noel Andujar?

    A.   Yes.

    Q.   Did you know Noel Andujar in May of 1995?

    A.   Yes.

    Q.   How long had you known him up until that point?

    A.   For about eight years.

SIERRA 002246

Q.   Is he also a Latin King?

A.   Yes.

Q.   Did he have a nickname?

A.   Yes.

Q.   What was that?

A.   Nuni.

Q.   Would that be like N-u-n-i?

A.   Yes.

Q.   Did you also know someone named Jose Melendez in May of '95?

A.   Yes.

Q.   How long had you known him until that point?

A.   Same amount of time.

Q.   Eight years?

A.   Yes.

Q.   Was he in a gang?

A.   Yes.

Q.   Which one?

A.   Latin Kings.

Q.   Did he have a nickname?

A.   Yes.

Q.   What was that?

A.   Macho.

90

SIERRA 002247

Q. There are more than one factions of the Latin Kings in the City of Chicago, correct?

A. Yes.

Q. Where was the territory of your faction of the Latin Kings in May of 1995?

A. Diversey and Hoyne.

Q. That would be on the north side of the city?

A. Yes.

Q. Did you know of a gang known as the Imperial Gangsters?

A. Yes, I heard of them.

Q. Did you also know of a gang called the Spanish Cobras?

A. Yes.

Q. Do the Latin Kings belong to higher group of gangs or bigger group of gangs?

A. Yes.

Q. What would that be?

A. Kings.

Q. Are the Kings part of a something called the People?

A. Yes.

Q. What are the People?

91

SIERRA 002248

A.    People are one gang, and Folks are another gang.

Q.    Did you know in May of '95 if the Imperial Gangsters were Folks or People?

A.    Yes.

Q.    What were they?

A.    Folks.

Q.    How about Spanish Cobras?

A.    They're Folks also.

Q.    In May of '95 was there animosity between People an Folks?

A.    Yes.  It was always like that.  Yes.

Q.    Specifically regarding your faction of the Latin Kings, in May of 1995, was there any war or disputes going on with factions of the Imperial Gangsters on the north side of the city?

A.    No.

Q.    Now, sir, I'll call your attention to May 23rd, 1995.  At about 10:15 at night do you know where you were?

A.    I was at home.

Q.    Would that be the area of 2717 North Hoyne in Chicago?

SIERRA 002249

A.    Yes.

Q.    Was anybody home with you?

A.    Yes.

Q.    Who?

A.    Noel Andujar.

Q.    Did anybody come to your house while you and Noel were home that night?

A.    Yes.

Q.    Who came over?

A.    Macho.

Q.    Did Macho walk there or did he drive there?

A.    He drove there.

Q.    What did he drive in?

A.    Cutlass, a blue Cutlass.

Q.    Was that his car?

A.    Yes.

Q.    When Macho came over to your house, did you, Noel and Macho stay there or did you go somewhere?

A.    We went for a ride.

Q.    And in whose car?

A.    In Macho's car.

Q.    Did Macho drive?

93

SIERRA 002250

A.   Yes.

Q.   And where were you seated?

A.   In the passenger seat.

Q.   Where was Noel?

A.   In the back seat.

Q.   Behind you or behind Macho?

A.   Behind Macho.

Q.   Where were you guys going?

A.   To Noel's girlfriend's house.

Q.   What was her name, if you know?

A.   Michelle.

Q.   Do you remember where she was at or where she was living at the time?

A.   On Armitage and Kedzie.

Q.   Now prior to Macho coming over to pick you up, you and Noel, before that did you drink any alcohol that day?

A.   No.

Q.   Had you ingested any kinds of narcotics?

A.   No.

Q.   Now while you were in the car with Macho and Noel, did you drink any alcohol?

A.   No.

SIERRA 002251

Q.   Did you ingest any narcotics?

A.   Yes.

Q.   What was that?

A.   Some marijuana.

Q.   How did you take this marijuana into your system?

A.   I took two tokes of it.  I smoked it.

Q.   That's a cigarette, a marijuana cigarette?

A.   Yes.

Q.   When you say two tokes, it's like two puffs?

A.   Yes.

Q.   Can you please explain for the ladies and gentlemen of the jury how you would drive towards Kedzie and Armitage, what streets did you take?

A.   We took Diversey to Logan and Logan to Kedzie.

Q.   Can you please tell us about the intersection of Logan and Kedzie?  Does another street also come in there?

A.   Milwaukee.

Q.   Are there any parks or landmarks in

95

SIERRA 002252

that area?

    A.    There is like a little statute around that area.

    Q.    When you're on Logan going towards Kedzie, can you go straight through this marked area or do you have to drive around it?

    A.    You have to drive around it.

    Q.    Is there a stoplight just before?  If you're going westbound on Logan, is there a stoplight right before that monument?

    A.    Yes, a stop sign.

    Q.    A stop sign.

        Is there a light further west of that sign?

    A.    Yes.

    Q.    Did your car -- did Jose drive up to that stoplight?

    MR. SARLEY:  Objection, leading.

    THE WITNESS:  Yes.

    THE COURT:  Overruled.

BY MR. ALESIA:

    Q.    When you got up to that light, was it red or green?

    A.    Red.

SIERRA 002253

Q.    So your car was stopped, correct?

A.    Yes.

Q.    What happened then?

A.    Macho told me to watch this car that is on the left hand side of us.

Q.    Did you see what car he was talking about?

A.    Yes.

Q.    What kind of car was it?

A.    A Buick Park Avenue.

Q.    Do you remember what color it was?

A.    It was blue.

Q.    Light blue or dark blue?

A.    Like a dark blue.

Q.    Anything unusual about the wheels?

A.    It had spoke rims on it.

Q.    How about the windows?

A.    It had like a light tint on the windows.

Q.    When you say like a light tint on the windows, was this like a mirror?  Did it reflect whoever was looking into the car?

A.    No.

Q.    Were you still able to look into the

97

SIERRA 002254

car?

A.    Yes.

Q.    By the way, where the light was, are there streetlights in the area?

A.    Yes.

Q.    Were they working that night?

A.    Yes.

Q.    After Macho told you to watch out, did you look inside of that car?

A.    Yes.

Q.    What did you see?

MR. SARLEY:  Objection, leading.

THE COURT:  Don't lead.

MR. ALESIA:  Sorry, judge.

THE COURT:  Sustained.

BY MR. ALESIA:

Q.    Did you look at that car?

A.    Yes.

Q.    Specifically what part of the Buick did you look at?

A.    At the passenger, at the passenger in the front seat.

Q.    Why were you looking at this person?

A.    Because he was throwing up gang

E  98

SIERRA 002255

slogans.

Q.   When you say he was throwing up gang slogans, what was he doing?

A.   He was doing all types of things with his hands, like gang symbols.

Q.   Is it typical for gang members to have hand gang symbols to signify their gang?

THE COURT:   Overruled.

THE WITNESS:   Yes.

BY MR. ALESIA:

Q.   Did the Latin Kings -- when you were a Latin King, did you have a hand symbol?

A.   Yes.

Q.   What's that?

A.   Just go like this.

MR. ALESIA:   Your honor, for the record he has his right hand index and pinky finger up as well as thumb extended out.

BY MR. ALESIA:

Q.   Is there a way to disrespect a certain gang using a hand signal?

A.   Yes.

Q.   How would you do that?

A.   By putting it upside down like this.

99

SIERRA 002256

Q. What is that called?

A. King killer.

Q. Did you see that passenger in the front seat of the Buick make that signs towards your car?

A. Yes.

Q. Were you ever able to recognize any of the other signals he was making towards your car?

A. Not really.

Q. Did you see that person in court making those signals towards your car?

A. Yes.

Q. Point to him, and describe something he's wearing.

A. He's wearing a white shirt with a tie.

Q. Does he have glasses on?

A. Yes.

MR. ALESIA: Your honor, may the record reflect in-court identification of the defendant?

THE COURT: Record shall reflect in-court identification.

SIERRA 002257

BY MR. ALESIA:

Q. What part of the defendant's face were you able to see when you were looking at it?

A. Front of the face.

Q. He was looking at you when he was making these signals?

A. Yes.

Q. Have you ever seen this person before?

A. No.

Q. You didn't know him?

A. No.

Q. Did you or anybody in your car make any representations back to that Buick?

A. No, sir.

Q. Now did your car eventually pull away from the stoplight?

A. After the light turned green, we pulled away.

Q. Were you watching the defendant the entire time after Macho told you to watch out?

MR. SARLEY: Objection, leading.

THE COURT: All right.

BY MR. ALESIA:

Q. How long were you watching the

101

SIERRA 002258

defendant before their car pulled away?

A.   Since the light turned green, I kept my eye on him.

Q.   From the time you pulled up until the light turned green, how much time is that?

A.   About a minute.

Q.   As your car began to pull away, what happened?

A.   He threw a white hood over his head, and he opened up the passenger car door and pointed a weapon at us.

Q.   When you say a weapon, was it a gun or knife?

A.   A gun.

Q.   When you say he pulled a white hood over his head --

A.   Yes.

Q.   -- did he cover any part of his face or just his head?

A.   Just his head.

Q.   What part of his head did it cover?

A.   Most of his hair, just this part.

MS. SUDENDORF:   Just for the record he's made an outline of his face.

E  102

THE COURT:  All right.

BY MR. ALESIA:

Q.    By the way, Alberto, how close was that Buick to your car when you were stopped at the stoplight?

A.    It was just one lane over.

Q.    Was there an empty lane in between your cars or were they next to each other?

A.    Next to each other.

Q.    Now you say the defendant reached out and pointed a gun.  He had a gun in his hand, correct?

A.    Yes.

Q.    Did you see in what direction he was aiming that gun?

A.    He was aiming it at our car.

Q.    How close were your cars at this time?

A.    Very close.

Q.    Did that Buick also pull away from the green light when you guys pulled away?

A.    Yes.

Q.    What happened after he pointed that gun at your car?

A.    He began shooting.

103

SIERRA 002260

Q.  Did you actually see muzzle flashes come out of the gun?

MR. SARLEY:  Objection, leading.

THE COURT:  Overruled.

THE WITNESS:  I seen him point a gun.

BY MR. ALESIA:

Q.  Did you see any flashes come out of that gun?

A.  I'm not sure any flashes, but he shot like twice, and I just went down.

Q.  So you saw him reach around with the gun pointing at your car.  You heard two shots, and then you ducked?

A.  Yes.

Q.  What happened next?

A.  After the shots were fired, I ducked my head down, and Macho tried to get away from him by making a right turn down Wrightwood Street.

Q.  Did Macho speed up at all?

A.  Yes.

Q.  Did you hear any more shots after those first two before you ducked?

A.  Yes.

E 104

SIERRA 002261

Q.    About how many did you hear?

A.    About six or seven more shots.

Q.    When did these shots finally stop?

A.    Like after we turned down Wrightwood about half of that block.

Q.    You went west down Wrightwood which was Logan, correct?

A.    Yes.

Q.    Were you able to tell whether or not any of those shots were hitting your car?

A.    Yes.

Q.    How were you able to do that?

A.    The windows were flying off, and I heard bullets going through the car.

Q.    How many did you hear breaking these windows and going through the car?

A.    Several.

Q.    After you passed Wrightwood and the bullets stopped, what happened?

A.    We kept driving to Kimball Street.  We were going down Wrightwood.  We made a right turn on Kimball to go back around from where we came from.  We made a U-turn.

Q.    After you made the U-turn, what

105

happened?

    A.    We came back up Wrightwood Street.

    Q.    Before you started driving down Wrightwood Street, did you check on the condition of Macho and Noel?

    A.    Yes, Macho asked me if I was okay, and I told him yes. And then I looked toward the back seat to see if my friend was okay too, and he was just like in shock biting his tongue. He was shot on the side of his head.

    MR. ALESIA: For the record the witness is pointing to the right side of his head.

BY MR. ALESIA:

    Q.    Did you see any blood?

    A.    Yes.

    Q.    Did you try and shake him?

    A.    Yes, I tried to wake him up, but he wouldn't wake.

    Q.    So what happened?

    A.    So then I told Macho let's go to the hospital, drive straight to the hospital.

    Q.    Which way did Macho go?

    A.    After we made a U-turn, we made a right on Wrightwood to Kedzie, Kedzie to

SIERRA 002263

Fullerton Street. There was an officer there, and we pulled over and told him my partner had been shot.

Q. Did more police arrive after your car was stopped when you flagged the officers down?

A. Yes.

Q. Did you speak to any of the officers on the scene?

A. Yes.

Q. Was it on the street or in a squad car?

A. In a squad car.

Q. How long was that conversation?

A. For about a half hour.

Q. Did you have an opportunity to go to Grand and Central Area Five Violent Crimes that same evening?

A. Yes.

Q. Did Macho also go there?

A. Yes.

Q. Did the police speak with you there?

MR. SARLEY: Objection to all the leading.

THE WITNESS: Yes.

THE COURT: Overruled.

107

SIERRA 002264

BY MR. ALESIA:

    Q.    When the police spoke with you there, did they speak with you alone or was Macho also with you?

    A.    They spoke to me alone.

    Q.    Did the police show you anything at the station?

    A.    Some photographs.

    Q.    About how many, if you remember?

    A.    It was a lot, a couple bundles, pictures.

    Q.    Did you recognize anybody in those photographs?

    A.    No.

    Q.    Did you go home that night after that?

    A.    Yes.

    Q.    A couple days later about 7:00 in the evening were you again at home?

    A.    Yes.

    Q.    Did anybody come to your house at that time?

    A.    Yes.

    Q.    Who came over?

    A.    Three officers.

SIERRA 002265

Q.    When these officers came to your house, did they say anything to you?

A.    Yes.

Q.    What happened?

A.    They said they got some photographs to show me to see if I could pick out the suspect.

Q.    This was regarding the shooting of Noel, is that correct?

A.    Yes.

Q.    Did they give you any photos to look at?

A.    Yes.

MR. SARLEY:    Objection to the leading.

THE COURT:    Overruled.

THE WITNESS:    Yes.

BY MR. ALESIA:

Q.    How did this happen?

A.    He gave me some pictures, and I laid them down on the table to go through them.

Q.    Did you go through those pictures?

A.    Yes.

Q.    You said how many were there?

A.    Around six or seven.

Q.    Did you look at the front or backs of

E   109

SIERRA 002266

those pictures?

    A.   Front.

    Q.   After looking at those pictures, did you recognize anybody?

    A.   Yes.

    Q.   Who was that?

    A.   The shooter.

    Q.   Is that the defendant who you pointed out earlier?

    A.   Yes.

    MR. SARLEY:  Objection, leading.

    THE COURT:  Sustained.  The answer will be stricken.

BY MR. ALESIA:

    Q.   The person you identified in that picture -- I'm sorry, in that series of pictures, did the police tell you to pick that person?

    A.   No.

    Q.   Did they point to that picture while you were looking at it?

    A.   No.

    Q.   How long did you look at those pictures before you picked out the picture of

SIERRA 002267

the person you thought did the shooting?

A.    A couple minutes.

Q.    Did the police say anything else to you that night?

A.    No.

Q.    Did you pick anybody else out of that series of photos?

A.    No.

Q.    On May 30th of 1995 about five days later about 5:30 in the evening, did the police call you again?

A.    Yes.

Q.    Did you go anywhere after they called you?

A.    Yes.

Q.    Where did you go to?

A.    To Grand and Central.

Q.    Same police station you were at the night of the shooting?

A.    Yes.

Q.    Did you meet with anybody there?

A.    Yes, I went over there with Macho.

Q.    When you and Macho went to the police station, did you meet any of those detectives

E  111

SIERRA 002268

regarding this case?

A.    Yes.

Q.    What happened at that point?

A.    We went to a lineup.

Q.    When you say "we", who viewed this lineup while you were looking at it?

A.    Me and the officer.

Q.    Was Macho with you?

A.    No.

Q.    This lineup you looked at, do you remember about how many people were in this lineup?

A.    About seven or eight people.

Q.    Were they standing or were they seated?

A.    They were seated.

Q.    Did you recognize anybody in that lineup?

A.    Yes.

Q.    Who was that?

A.    This gentleman over here in the white shirt.

MR. ALESIA:    Just for the record indicating the defendant.

E 112

SIERRA 002269

THE COURT:   All right.

BY MR. ALESIA:

Q.   How long had you been viewing that lineup before you picked out the defendant?

A.   About a minute.

Q.   A couple hours after that did the police take you to any other part of the police station?

A.   Yes.

Q.   Where did they take you to?

A.   To the parking lot of the police station.

Q.   Did you learn why they took you to the parking lot?

A.   To see if I could identify the car.

Q.   What did they tell you, the police?

A.   To look around the parking lot to see if I could identify the vehicle.

Q.   Do you know which vehicle that they were talking about?

A.   The vehicle that was in the shooting.

Q.   The Buick?

A.   Yes.

Q.   Did you walk around the lot as they

SIERRA 002270

asked you to?

A.   Yes.

MR. SARLEY:  Objection, leading.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. ALESIA:

Q.   What happened after you were walking around that parking lot?

A.   I was looking for the car.

Q.   Did you find -- did you recognize any cars there?

A.   Yes.

Q.   Which car did you recognize?

A.   A blue Park Avenue Buick.

Q.   At the time you looked at that car, was there anything different than when you saw it on the night of May 23rd?

A.   Yes.

Q.   What was that?

A.   It was -- it had a light tint window on the car, and it didn't have it at the time I seen it at the station.

Q.   A little while after that at about 8:30 on May 30th of 1995, did you speak with

114

SIERRA 002271

someone named Bill Farrell?

    A.   Yes.

    Q.   Did you learn that he was an Assistant State's Attorney?

    A.   Yes.

    MR. ALESIA:  Your honor, may I approach?

    THE COURT:  Yes.

BY MR. ALESIA:

    Q.   Mr. Rodriguez, I'll show you what is marked as People's No. 3 for identification.  I ask you to look at that.  Do you recognize what that is?

    A.   Yes.

    Q.   What is that?

    A.   That's the vehicle we were driving.

    Q.   Is that Macho's car?

    A.   Yes.

    Q.   Does that photo truly and accurately show the way it looked after you flagged the police down?

    A.   Yes.

    Q.   I'll show you what has been marked as People's Exhibit No. 10 for identification.  Do you recognize what that is?

115

SIERRA 002272

A.    Yes.

Q.    What is that?

A.    It's the car that was shooting at us.

Q.    Is that the Buick you identified in the Grand and Central parking lot?

A.    Yes.

Q.    Is there anything different in that photo about the location of that car as when you viewed it on May 30th in the parking lot.

A.    There was other cars around it.

Q.    I'm sorry?

A.    When I pointed the car out, there was other cars around it also.

Q.    And this photo shows there were no other cars around it?

A.    Yes.

Q.    Sir, I'll show you what has been marked as People's Exhibit No. 11 for identification.  Do you recognize what that is?

A.    Yes.

Q.    What is that?

A.    A picture of the lineup.

Q.    Is that a photo of the lineup which you observed on May 30th of 1995?

SIERRA 002273

A.    Yes.

Q.    And do you see the person you selected in the lineup as the shooter?

A.    Yes.

Q.    Can you please take this photo and mark an "X" over his head?

MR. ALESIA:  Your honor, for the record the witness placed an "X" over the second person from the left.

THE COURT:  All right.

BY MR. ALESIA:

Q.    Sir, I'm going to show you People's Exhibit No. 12 for identification.  Do you recognize what that?

A.    Yes.

Q.    What is that?

A.    It's the person that I picked in the lineup, the shooter.

Q.    Sir, do all these exhibits, 10, 11 and 12, truly and accurately reflect the way those individuals and those vehicles looked at the time you observed them back in May of 1995?

A.    Yes.

Q.    Sir, I'll show you what is marked as

117

SIERRA 002274

People's Group Exhibit thirteen. I'll ask you to take a look at these photos. I'll mark them 13A, B, C, D, E and F.

Do you recognize those photos, sir?

A.    Yes.

Q.    When was the last time you saw those photos?

A.    The first night the officer came to my house to show me the pictures.

Q.    Was that on May 25th of '95?

A.    Yes.

Q.    Can you please show the ladies and gentlemen of the jury how you viewed those pictures back on May 25th?

A.    I just went through them first like this, and then I just laid them out.

MR. ALESIA:  Just for the record the witness shuffled the pictures and now is laying them out in front of him.

THE WITNESS:  And I went through the pictures, and I seen the guy that did the shooting.

MR. ALESIA:  Judge, for the record the

SIERRA 002275

witness identified People's Group 13C.

THE COURT: All right.

BY MR. ALESIA:

Q. That's the same picture you pointed out to the police on the night of May 25th?

A. Yes, sir.

Q. Do those photos appear to be in the same condition back when you viewed them on May 25th?

A. Yes.

MR. ALESIA: I ask that the witness be allowed to step down.

BY MR. ALESIA:

Q. Alberto, I'll show you what is marked as People's Exhibit No. 4 for identification and ask you to take this pen.

Do you recognize what this is?

A. Yes.

Q. What is it?

A. It's a picture of all the streets.

Q. Is this picture of the street of Logan Square?

A. Yes.

Q. Please take the pen, and place the

SIERRA 002276

number one in the area where the stoplight was when that Buick and yourself were right next to each other the first time you saw the Buick.

A.   At the stoplight?

Q.   Yes.

A.   Right around this area here.

Q.   Can you draw a number one please, and can you draw a number two where the shots began to be fired at your car?

A.   Shots started ringing out about right here.

Q.   And can you please draw a number three where your car was when the shots finally stopped?

A.   Number three?

Q.   Yes.

A.   About right here.

Q.   Can you please draw a number four where you were -- where you flagged down the police department?

A.   Right here.

MR. ALESIA:   Judge, for the record the witness has placed a one, two, three and four on People's No. 4.

120

SIERRA 002277

THE COURT:  All right.

MR. ALESIA:  Thank you, sir.  You can have a seat.

Thank you, judge.  No further questions.

THE COURT:  Cross-examination?

MR. SARLEY:  Thank you, your honor.

CROSS-EXAMINATION

BY MR. RODRIGUEZ:

Q.  Mr. Rodriguez, you say that you're not a Latin King now?

A.  No, sir.

Q.  You were a Latin King in May of 1995?

A.  Yes.

Q.  Latin King is the name of a street gang?

A.  Yes.

Q.  And as a Latin King your street gang had certain gangs that you considered enemies, enemy gangs, correct?

A.  Correct.

Q.  And these are gangs that you did not get along with?

A.  Yes.

121

SIERRA 002278

Q.   And they were gangs that the people that were in these gangs were automatically your rivals, is that right?

A.   Yes.

Q.   Even if you didn't know them?

A.   Yes.

Q.   How long -- in May of 1995 how long were you in the Latin Kings?

A.   For about eight or nine years.

Q.   So that would make you how old when you joined the Latin Kings?

A.   About fifteen or sixteen.

Q.   And for those eight or nine years you were in the Latin Kings, Jose Melendez was also in the Latin Kings?

A.   Yes.

Q.   As well as Noel Andujar?

A.   Yes.

Q.   Now one of the gangs that you were natural rivals with was a gang called the Imperial Gangsters, is that right?

A.   Yes.

Q.   Latin Kings are People, and Imperial Gangsters are Folks?

E  122

SIERRA 002279

A.    Correct.

Q.    People and Folks are different factions of the gangs?

A.    Yes.

Q.    And People and Folks are enemy gangs?

A.    Yes.

Q.    So the Imperial Gangsters was an enemy gang of yours?

A.    Yes.

Q.    And when you joined the Latin Kings, you took an oath to support other Latin Kings, isn't that right?

A.    Yes.

Q.    And as a part of this oath to support Latin Kings, it was also an oath to seek revenge against alien or opposite gang members?

A.    Yes.

Q.    And part of that oath included if you couldn't get back at the particular gang member that was on the opposite side, you would get back at any gang member on the opposite side, isn't that right?

A.    Yes.

Q.    And that was part of that oath,

E 123

SIERRA 002280

correct?

    A.    Yes.

    Q.    Now you said that you spoke to the police right after this happened for about a half hour in a squad car?

    A.    Yes.

    Q.    And during that half hour you spoke to the police about what had just happened?

    A.    Correct.

    Q.    And during that half hour conversation, the officer gave you an opportunity to give them a description or tell them about the person that just did the shooting, right?

    A.    Yes.

    Q.    And you told them one, that the person was a male Hispanic, right?

    A.    Yes.

    Q.    And two, you told them that the person was a Spanish Cobra?

    A.    I told them that I think it was the Spanish Cobras.

    Q.    You told them that you think it was a Spanish Cobra?

E 124

A.    Yes.

Q.    And that's because the person that did the shooting made a hand sign saying that he was a Spanish Cobra?

A.    He was doing lots of gang signs.  I couldn't keep up with him.

Q.    So you couldn't follow what gang signs this person was doing, is that right?

A.    Yes, some of them.

Q.    I'm sorry.  Go ahead.

A.    Some of the gangs he threw up I didn't understand.

Q.    You didn't understand.

And you say you had been in the Latin Kings for eight years?

A.    Yes.

Q.    And for eight years you have been exposed to gang signs of the gang slogans of the area?

A.    Yes.

Q.    One of the gang signs being the Spanish Cobras?  Aren't the Spanish Cobras from that area?

A.    From where I live?

E  125

SIERRA 002282

Q.    Area around where the shooting happened.

A.    Yes, I believe so.

Q.    You believe the Spanish Cobras were around that area?

A.    I think so, yes.

Q.    Before that person -- well strike that.

One of the hand signs that person threw up to you was throwing down the crown like this like I'm showing right now?

A.    Yes.

MR. SARLEY:  For the record I have three fingers pointing down, judge.

BY MR. SARLEY:

Q.    And to you that was a sign that meant trouble?

A.    Yes, sir.

Q.    It meant that that person was an enemy of yours because you were a Latin King?

A.    Yes.

Q.    Now you said that the person -- strike that.

The car that these shots came

126

from was a Buick Park Avenue, right?

A.    Yes.

Q.    And you just testified now that the windows were lightly tinted?

A.    Yes.

Q.    Actually weren't the windows dark tinted?

A.    They were kind of a light tint.

Q.    Kind of light tint?

A.    Yes.

Q.    And kind of dark tinted?

A.    If he had a dark area, you wouldn't be able to see through it.

Q.    Well, did you ever in the past tell me that they were dark tinted?

A.    No.

Q.    In a conversation out in the hallway on August 20th of 1995?

A.    I told you it had a tint on it.

MS. SUDENDORF:    Objection.

THE COURT:    What's your objection?    You want to approach the bench?

MS. SUDENDORF:    Yes.

127

SIERRA 002284

(WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HAD OUT OF THE PRESENCE OF THE JURY:)

MS. SUDENDORF:  The last question and answer that was asked, is there a good faith basis?  Is there going to be a way of proving that particular line of questioning to the court, and is the attorney now making himself a witness?

MR. SARLEY:  Good faith basis is that's what he told me.

THE COURT:  Do you have a way of proving it?

MR. SARLEY:  Well, he told me.

THE COURT:  Do you have a way of proving it?

MR. SARLEY:  No.

THE COURT:  Then don't pursue this.

MR. SARLEY:  Then I'll withdraw the question.  I'll withdraw the last question.

THE COURT:  Okay.

SIERRA 002285

(WHEREUPON, THE FOLLOWING
PROCEEDINGS WERE HAD IN THE
HEARING OF THE JURY:)

BY MR. SARLEY:

    Q.   So you're saying the windows were tinted?

    A.   Yes.

    Q.   When you looked at the car on May 30th of '95 in the parking lot, you're saying that the windows were different than from the car that you saw on May 23rd, is that right?

    A.   Yes.

    MR. SARLEY:  If I may approach the witness, your Honor?  May I approach the witness, your Honor?

    THE COURT:  Yes.

BY MR. SARLEY:

    Q.   Mr. Rodriguez, I'm going to show you People's Exhibit No. 10 for identification.  I'm going to show you People's Exhibit No. 10 for identification.  And you have already identified that as the car which you saw in the parking lot at the police station on May 30th, correct?

    A.   Yes.

129

Q.   I'm also going to show you Defense Exhibit Nos. 1, 2 and 3 for identification. Would you look at those three photographs?

Now those are also three photographs of that same car, isn't that correct?

A.   Yes.

Q.   Those are three photographs of that car as it appeared in the police station on May 30th of 1995?

A.   Yes.

Q.   That's the car that you viewed, correct?

A.   Yes.

Q.   And that's what you're saying that car looked like the car that did the shooting, correct, or that the shots came out of?

A.   Yes.

Q.   Right?

A.   Yes.

Q.   But the windows are different?

A.   Yes.

Q.   Because these windows are not tinted at all, are they?

SIERRA 002287

A.    No, sir.

THE COURT:  What are those exhibit numbers?

MR. SARLEY:  They're 1, 2 and 3 and People's 10.

THE COURT:  Thank you.

BY MR. SARLEY:

Q.    Now, Mr. Rodriguez, you said that the person that did the shooting you didn't know, correct?

A.    Yes.

Q.    And you didn't recognize him, correct, at the time?

A.    No, I didn't know him.

Q.    So you don't know who it was?

A.    No.

Q.    Now once the shots started, you ducked, isn't that right?

A.    After the two shots that rang out, yes.

Q.    After the first two shots, you ducked because obviously you wanted to get out of the way?

A.    Yes.

Q.    When you talked to that police officer

E  131

for the half hour right after it happened --
well, strike that. I'll withdraw that and ask
another question.

        The first officer you spoke to
was actually a uniformed police officer, wasn't
it?

A.   Yes.

Q.   And you talked to that officer a few
minutes after he was flagged down, correct?

A.   Yes.

Q.   You asked that officer or strike that.

        That officer asked you if you
could at all describe the person that did the
shooting, isn't that right?

A.   Yes.

Q.   And you told the person that it was a
male Hispanic, right?

A.   Yes.

Q.   And that he represented the Spanish
Cobras?

A.   He represented a lot of gang slogans.

Q.   I'm asking you did you tell that
officer that the person that did the shooting
represented Spanish Cobras?

132

SIERRA 002289

A.    No.

Q.    During that -- and you gave -- other than a male Hispanic, you gave no other physical description of that person to that officer, did you?

A.    No.

Q.    When you had the conversation with that detective in the car at the outside or around where the car was stopped, you said that was a half-hour conversation?

MR. ALESIA:  Objection, asked and answered.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. SARLEY:

Q.    During that conversation that officer asked you if you could describe the person that did the shooting, isn't that right?

A.    Yes.

Q.    You told that officer that the person was a male Hispanic, right?

A.    Yes.

Q.    And you told that officer that person represented Spanish Cobras?

A.    No.

SIERRA 002290

Q.   Other than male Hispanic, you were not able to describe to that officer any other physical characteristics of this offender, isn't that right?

A.   Yes.

Q.   Yes meaning it's right, right?

A.   Yes.

Q.   After this half-hour conversation you were taken -- you went or were taken to a police station eventually, correct?

A.   Yes.

Q.   And at the police station you had another conversation with a detective?

A.   Yes.

Q.   And how long did that conversation take place?

A.   Quite awhile, a long time.

Q.   About an hour?

A.   Yes.

Q.   And once again during that hour, that officer was asking you questions about this incident, isn't that right?

A.   Yes.

Q.   And during that conversation you told

SIERRA 002291

the officer that the offender was a male
Hispanic, right?

    A.    Yes.

    Q.    And you told the officer during the
conversation that the offender represented
Spanish Cobras, didn't you?

    A.    No, probably Macho told him that.
I did not tell him that.

    Q.    You did not tell him that.

        Did you -- during this
conversation did you give the officer a
description of the person's hair?

    A.    I can't recall that.

    Q.    You can't recall?

    A.    No.

    Q.    Specifically do you recall whether you
told that officer during that conversation at
the police station that the offender had black
hair pushed back?

    A.    Yes.

    Q.    You did tell the officer that?

    A.    Yes.

    Q.    Now when you -- after that
conversation -- strike that.

135

SIERRA 002292

Other than those descriptions, you didn't describe the offender any other way to that officer, did you?

A. No.

Q. Two days later police officers came over to your house, isn't that right?

A. Yes.

Q. And they came over to your house with a set of six photographs?

A. Yes.

Q. Now you just testified that you last saw -- you were just shown six photographs by one of the prosecutors in this case.

A. Yes.

Q. And he asked you the last time you saw those photographs. Remember that question?

A. Yes.

Q. And you said it was on May 25th when the officer showed you those photographs.

A. Which photographs are you talking about?

MR. SARLEY: Well, may I approach the witness, your honor?

THE COURT: Yes.

SIERRA 002293

BY MR. SARLEY:

Q.    Mr. Rodriguez, I'll show you what has been marked as Group Exhibit No. 13, People's Group Exhibit 13 for identification.  Do you see these six photographs I'm showing you?

A.    Yes.

Q.    You just testified -- didn't you just testify on direct examination the last time you saw these photographs was on May 25th when the officer showed them to you?

A.    Yes, at my house.

Q.    But that isn't the last time you saw these photographs, is it?

A.    No.

Q.    You actually saw these photographs in court here on August 20th of 1996, correct?

A.    Yes.

Q.    In this very courtroom in front of this very judge.

And specifically People's Exhibit No. 13C is a picture you picked out of that group, isn't that right?

A.    Yes.

Q.    Now when the police officers came to

E 137

SIERRA 002294

your house that night, how many officers were
there?

    A.    Three officers.

    Q.    And you didn't know they were coming,
did you?

    A.    No, sir.

    Q.    When the officers got there, they told
you they wanted to see if you could make an
identification?

    A.    Yes.

    Q.    Do you remember which -- do you
remember the name of the officer that was
actually speaking to you or doing this?

    A.    No.

    Q.    Could you describe him at all?

    A.    It was three officers.

    Q.    Okay, can you describe the one officer
that was actually talking and conducting the
photo array?

    A.    Yes.

    Q.    Describe him please.

    A.    He was a male white person.  He was
kind of tall.

    Q.    And he was a detective?

E 138

SIERRA 002295

A.    Yes.

Q.    And when this detective -- just before the detective showed you the photographs, he told you that they probably got the guy, didn't he?

A.    Yes.

Q.    And after that detective told you that they probably got the guy, he showed you -- he gave you those six photographs?

A.    Yes.

Q.    Right?

A.    Yes.

Q.    And you looked at those six photographs, didn't you?

A.    Yes.

Q.    And you looked at those photographs for about between five to ten minutes before you picked a photograph out, didn't you?

A.    Five minutes.

Q.    About five minutes.

      Was it more like five to ten minutes?

A.    No.

Q.    Sir, do you remember testifying in

E  139

this courtroom in front of Judge Palmer on the 20th day of August of 1996?

A.   Yes.

Q.   And do you remember being asked questions by me and answering the questions?

A.   Yes.

Q.   Were you under oath when you were asked the questions?

A.   No.

Q.   You were not under oath.

        Did you swear to tell the truth before you made the answers?

A.   Yes, yes.

Q.   And this was in front of Judge Palmer in this very courtroom?

A.   Yes.

Q.   And do you recall me asking you this question and you answering this question?

A.   The same questions you just asked me now?

Q.   Just a minute.  I'll find it please.

        "Q    Okay, and how long did it take for you to look through those pictures?

        A    Five, ten minutes."

140

SIERRA 002297

A.   Yes.

Q.   So you did answer that five, ten minutes under oath, is that correct?

A.   Yes.

Q.   And after that period of time you looked at those photographs, you picked out that picture, isn't that right?

A.   Yes.

Q.   Out of those six?

A.   Yes.

Q.   You testified that you had -- were you smoking marijuana that night prior to the shooting?

A.   Yes.

Q.   Okay, and you were smoking it in the car?

A.   Yes.

Q.   In fact there was a bag of marijuana that was in the car when the shooting happened?

A.   Yes.

Q.   You left -- it was your house that the car left, the car that -- strike that.

MR. SARLEY:   That's unclear.  I'm sorry, your honor.

141

SIERRA 002298

BY MR. SARLEY:

Q.   Jose Melendez or Macho came and picked you up at your house?

A.   Yes.

Q.   Were you there with Noel Andujar?

A.   Yes.

Q.   And you left your house about 10:00?

A.   Yes, around that time.

Q.   And after you left, you got in the car and started driving around?

A.   We went to -- we were on our way to Noel's.

Q.   You were driving around, correct?

A.   Yes.

Q.   And you were smoking the marijuana while you were driving around?

A.   Yes.

Q.   And it was about 10:30 when the shooting happened?

A.   Yes.

Q.   So when this all happened you were buzzed from smoking the marijuana?

A.   I was lightly buzzed, yes.

MR. SARLEY:   If I may approach the witness

E 142

again, your honor?

    THE COURT:  Uh-huh.

BY MR. SARLEY:

    Q.    I'm going to show you what has been marked as People's No. 11 for identification.

        When you looked at that lineup, these are the six people that appeared in that lineup, isn't that right?

    A.    Yes.

    Q.    And you were shown previously People's Exhibit No. 12 for identification.  This is a closeup picture of the person you picked out of the lineup?

    A.    Yes.

    Q.    And I'll show you -- I'm going to show you two other photos, Defense Exhibit No. 4 for identification and Defense Exhibit No. 5 for identification.

        Are these two smaller photos also photos of the six people that appeared in the lineup?

    A.    Yes.

    Q.    Okay, those are the -- and that is the same lineup that is depicted in this other

E 143

SIERRA 002300

pictures here, People's No. 11, right?

A.   Yes.

Q.   The only difference the two I have just shown you, 4 and 5, Defense 4 and 5, shows shots from the side of these people's heads, right; whereas 11, People's 11 is a straight shot?

A.   Yes.

Q.   And that's how -- these pictures depict how Thomas Sierra looked when you looked at this lineup on May 30th of 1995?

A.   Yes.

Q.   Correct?

A.   Yes.

Q.   When you looked at the photographs when you were shown those six photographs on the 25th of May of 1995, those pictures had none of the same people that were standing in a lineup except for Thomas Sierra?

A.   Can you repeat that please?

Q.   Well, better yet.  I'll show you the pictures.

I would ask you to look at People's Exhibit No. 11 which is a picture of

E  144

SIERRA 002301

the lineup, and People's Group Exhibit No. 13A through F.

And isn't it true out of the first group and the second group, the only person that is in both groups is Thomas Sierra?

A.    Yes.

Q.    And in fact you picked the same picture out of the lineup as you picked out of the photos?

A.    Yes.

Q.    When this incident -- when the shooting started, you were on the opposite side of the car from where the shots were fired?

A.    Yes.

Q.    The shots were to your left?

A.    Excuse me?

Q.    Shots were coming from your left?

A.    Yes.

Q.    You also testified that you have two cases pending, is that right?

A.    Yes.

Q.    One of them is an unlawful use of weapons charge?

A.    Yes.

E 145

SIERRA 002302

Q.     And the other is a charge of possession of drugs with intent to deliver?

A.     Yes.

Q.     And when were you arrested for that charge?

MR. ALESIA:  Objection, judge.

THE COURT:  Overruled.

Well, for which one?

MR. SARLEY:  The possession with intent to deliver.

THE COURT:  Overruled.

THE WITNESS:  I cannot tell you the exact date.

BY MR. SARLEY:

Q.     Can you give me a month?

A.     It was four or five months ago.

Q.     Four or five months ago.

Was that before or after you quit the gang?

A.     Before.

Q.     So you just quit the gang recently within the last few months?

A.     After what happened to Noel like a couple months later.

E 146

SIERRA 002303

Q.   So you were not a member of a gang when you were arrested for possession of drugs with intent to deliver?

A.   No.

Q.   By the way, what's State's Attorneys are prosecuting those two cases?

MR. ALESIA:  Objection, judge.  It violates an order of the court.

MR. SARLEY:  No, it doesn't.

THE COURT:  Come on up, guys.

(WHEREUPON, THE FOLLOWING
PROCEEDINGS WERE HAD OUT OF THE
PRESENCE OF THE JURY:)

MR. ALESIA:  Judge, there was a motion in limine to bar what courtroom this was in. You're the presiding judge.  Obviously the courtroom, we don't have to be that specific.

THE COURT:  We'll take a short recess.

MS. SUDENDORF:  Judge, for the record your honor previously granted a motion in limine regarding Mr. Rodriguez' pending case.  The motion barred anybody from asking what courtroom and what judge was the presiding judge.

I am assuming that the

E 147

SIERRA 002304

prosecution, the courtroom that would all be considered the same thing. I don't think we have to be that particular. I believe in the spirit that question was in violation of your order.

MR. SARLEY: No way. I wasn't going to ask what judge or what courtroom. I don't see how a juror can infer because the same prosecutors are prosecuting two cases, it's in the same courtroom in front of the same judge.

They don't know. People prosecute cases everywhere. I certainly think it's relevant that it's the exact same people that are prosecuting him, putting him on as a witness. I'm not going to bring up your honor's name or the courtroom. The people prosecuting the case is very relevant.

MR. ALESIA: I believe that the heart of the whole motion in limine was where the case was pending.

THE COURT: Mr. Sarley wanted to tell the jury the same prosecutors prosecuting him are prosecuting Mr. Sierra. He wanted the same State's Attorneys.

E 148

MR. ALESIA:  He can't.

THE COURT:  Why not?

MR. ALESIA:  Because first of, all since I myself just came in this courtroom since the first of the year, I have never been around when that case has been called.  I had no idea about that case until I was alerted that this case was going to trial.  I never was, and I don't think Patty was.  She came into this courtroom the same day as I did.

THE COURT:  That's not the point.  The point is that he's got a case pending.  That case is currently assigned to you guys, and that's the point he's trying to make.

MR. ALESIA:  That doesn't mean we are prosecuting it.  We have other people in this courtroom prosecuting cases on behalf of our office.  If he wants to say the office, maybe that's fine, but not that Patty and I are prosecuting this case.

MR. SARLEY:  I disagree, and I don't think I should be limited to saying the office.

MS. SUDENDORF:  He's trying go through the back door what he can't get through the front

149

SIERRA 002306

door.

THE COURT: I don't want the jury to know the case is pending in front of me, but I can understand the relevance of them knowing that the same prosecutors are involved in both prosecutions. It doesn't necessarily flow in a citizen's mind it's the same courtroom. I'll overrule the objection.

All right, we'll take a short recess.

(SHORT RECESS WAS HAD.)

(WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HAD IN THE HEARING OF THE JURY:)

THE COURT: Go ahead.

MR. SARLEY: Thank you, your honor. Just a few more questions.

BY MR. SARLEY:

Q. Mr. Rodriguez, either during the conversation you had with the uniformed police officer right after you flagged him down or the detective in the car or the detective at the police station later that night, in all three of those conversations you never told the police

150

that the offender was an Imperial Gangster, did you?

A.   No.

Q.   And just like an Imperial Gangster is a natural enemy of the Latin King, the Spanish Cobra is a natural enemy of the Latin King?

A.   Yes.

Q.   Now with regard to your two pending cases, the gun case and the possession with intent case, isn't it true that these two people also prosecute those cases?

A.   I don't know nothing about that.

Q.   You don't know who prosecutes you, who the prosecutor is in your other cases?

A.   No.

Q.   On the U.U.W. case the range of penalty -- when I say U.U.W., I'm sorry on the gun case, the range of penalty is anywhere from probation to five years in jail?

A.   Yes.

Q.   And on the possession of drugs with intent to deliver, the range of penalties is anywhere from four years in jail to fifteen years in jail, isn't that right?

E   151

SIERRA 002308

A.    Yes.

Q.    And when is your next court date on those cases?

A.    This month on the 19th.

Q.    February 19th?

A.    Yes.

MR. SARLEY:  I have no other questions, your honor.

THE COURT:  Redirect?

MR. ALESIA:  Thank you, judge.

REDIRECT EXAMINATION

BY MR. ALESIA:

Q.    Mr. Rodriguez, has anybody promised you anything in regard to your testimony regarding those two cases?

A.    No, sir.

Q.    Did anybody promise you, talking about the State's Attorney's Office or any prosecutor, anything at all regarding those cases or this case?

A.    No.

Q.    Do you know what the hand sign is for the Imperial Gangsters?

A.    Yes.

E   152

SIERRA 002309

Q.   What was that?

A.   It was like this.

THE COURT:  Hold it up.

MR. ALESIA:  Just for the record making a crown with his hands.

THE COURT:  All right.

BY MR. ALESIA:

Q.   Did you recognize that sign you made as one of the signs this defendant was making to you that night?

A.   No, sir.

Q.   Do you know what false flagging is?

A.   Yes.

Q.   Tell us what that is.

A.   It's a person who throws up a gang sign, and they're not even in that gang.  It's a different gang.

Q.   Why would someone throw up a false flag?

MR. SARLEY:  Objection.

THE WITNESS:  So that they think they're in a different gang than what they are in.

BY MR. ALESIA:

Q.   So the person that sees that sign

E  153

thinks the person giving that sign is in a different gang?

A.   Yes.

Q.   The night of May 23rd when you took those two tokes on the joint, that wasn't the first time you smoked marijuana?

A.   No.

Q.   This light buzz, did that tint your perception that evening?

A.   No.

Q.   Did it affect your eyesight?

A.   No.

Q.   Do you wear glasses?

A.   No.

MR. ALESIA:  Your honor, may I approach?

THE COURT:  Uh-huh.

BY MR. ALESIA:

Q.   I will show you what has been marked as Defendant's 4 and 5.  First I'll show you No. 4 for identification.  Counsel just showed you that picture, correct?

A.   Yes.

Q.   That's the picture of the lineup you viewed at Area Five, correct?

E.   154

A.    Yes.

Q.    Please take that pen and make an "X" over the person you wrote on the lineup on May 30th, 1995.

A.    Here.

MR. ALESIA:  For the record the witness has placed an "X" on the second person from the left.

BY MR. ALESIA:

Q.    Again People's Exhibit 5 for identification, a picture of the lineup.  This way the people are looking towards their right, is that true?

A.    Yes.

Q.    Take an "X" and mark an "X" over the person you identified as the shooter in that lineup.

A.    Yes.

MR. ALESIA:  He again placed an "X" over the second person from the right.

THE COURT:  All right.

BY MR. ALESIA:

Q.    The person you just placed an "X" over over in People's Exhibit No. 5, that's this guy

E  155

right here, the defendant?

A.    Yes.

Q.    He's the shooter in your case?

MR. SARLEY:    Objection.

THE COURT:    Overruled.

BY MR. ALESIA:

Q.    That's the person you saw shooting at your car?

A.    Yes.

Q.    And People's Group No. 13C, that was the defendant's photo you identified in the photo array, correct?

A.    Yes.

Q.    That's the shooter, that's this guy right here?

A.    Yes.

Q.    And People's No. 11, that's the picture I showed you earlier of the lineup which you were shown at Area Five, correct?

A.    Yes.

Q.    The person whose head you drew an "X" over, that's the picture of the guy that shot in your car and killed your friend, Noel, correct?

A.    Yes.

SIERRA 002313

MR. SARLEY: Objection, all asked and answered.

THE COURT: Sustained.

MR. ALESIA: Nothing further, judge.

RECROSS EXAMINATION

BY MR. SARLEY:

Q. Mr. Rodriguez, you talked about false flagging.

A. Yes.

Q. And you said that it is when a gang member gives a gang sign of a different gang?

A. Yes.

Q. Well, gang members do that when they want to mislead the people that they're flashing gang signs at as to what gang they're in, isn't that right?

A. Yes.

Q. And they do that because they want the gang members they're trying to mislead to think that they're friendly with them, isn't that right?

A. It's depends on what gang slogan.

Q. Okay, well, let's say that you wanted to false flag with somebody that you thought was

E 157

SIERRA 002314

in an opposite gang, okay, and you're in the Latin Kings.

A.   I was.

Q.   You were in the Latin Kings, and let's say someone in the Latin Kings wants someone in the Spanish Cobras to think they're friendly with them.

What they're going to do they're going to flash Spanish Cobras to that person, aren't they?

A.   Yes.

Q.   Because they wanted them to think -- they want the Spanish Cobras to think these are friendly people?

A.   Yes.

Q.   So if somebody was false flagging at you as a Latin King and wanted to make you think that we are friendly, then they would flash you Latin Kings, isn't that right, with the crown up?

A.   Yes.

Q.   Because that would make you feel safer, right?

A.   Yes.

158

SIERRA 002315

Q.    You would think that was a friend of yours and that would be a way to lure these people into a false sense of security, and something bad happens?

A.    Yes.

Q.    But in this case the Spanish Cobras are your enemies, right?

A.    Yes.

Q.    And the Imperial Gangsters are also your enemies, right?

A.    Yes.

Q.    So if somebody flashed you a Spanish Cobra sign, but was really an Imperial Gangster, that wouldn't do you any good, right?  Is that a no?

A.    Yes.

MR. SARLEY:  No further questions, your honor.

THE COURT:  Anything else?

159

SIERRA 002316

## REDIRECT EXAMINATION

### BY MR. ALESIA:

Q.   Mr. Rodriguez, the entire point of false flagging someone is to mislead them, isn't it?

A.   Yes.

Q.   And within the Spanish Cobras, within the Latin Kings, within the Imperial Gangsters, there are different factions?

A.   Yes.

Q.   You're not all Latin Kings throughout the city and state, are you?

MR. SARLEY:   Objection.

THE COURT:   Sustained.

BY MR. ALESIA:

Q.   Well, do all factions of the Latin Kings get along?

MR. SARLEY:   Objection.

THE COURT:   Overruled.

THE WITNESS:   No.

BY MR. ALESIA:

Q.   So there are some factions in the Latin Kings that don't get along with other factions?

SIERRA 002317

A.    Yes.

Q.    There are certain factions that get along with the I.G.'s?

A.    Yes.

Q.    There were certain factions of the Kings that also get along with certain factions of the Cobras, isn't that true?

A.    Yes.

MR. ALESIA:  Nothing further, judge.

MR. SARLEY:  I have no other questions.

THE COURT:  You're excused.  Thank you.

THE WITNESS:  Thank you.

(WITNESS EXCUSED.)

THE COURT:  Call your next witness.

MS. SUDENDORF:  We would call Jose Melendez.

THE COURT:  All right.

THE CLERK:  Sir, raise your right hand.

(WITNESS SWORN TO TESTIFY.)

THE CLERK:  Have a seat please.

E  161

SIERRA 002318