# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS SIERRA, | ) | |
| | ) | No. 18 C 3029 |
| *Plaintiff,* | ) | |
| | ) | Hon. John Z. Lee, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | Hon. M. David Weisman, |
| | ) | Magistrate Judge |
| *Defendants.* | ) | |
| | ) | JURY TRIAL DEMANDED |

---

### PLAINTIFF'S RESPONSES TO DEFENDANT CITY OF CHICAGO'S
### FIRST SET OF INTERROGATORIES TO PLAINTIFF

Plaintiff Thomas Sierra, by and through his attorneys, Loevy & Loevy, respond as

follows to Defendant City of Chicago's First Set of Interrogatories to Plaintiff:

### OBJECTIONS

Plaintiff incorporates his objections to Defendant McMurray's First Set of

Interrogatories. Subject to and without waiving those objections, Plaintiff responds as follows:

### RESPONSES

1.        Identify each and every theory of liability Plaintiff intends to pursue against
Defendant City of Chicago pursuant to *Monell v. New York Dept. of Social Services*, 436 U.S.
658 (1978). A full and complete answer to this interrogatory includes every *Monell* claim
Plaintiff will present to a jury at trial in this case.

**RESPONSE**: Plaintiff objects that this interrogatory seeks the strategy, thoughts and

mental impressions of counsel, and therefore invades the attorney work product protection.

Plaintiff objects to this Request because it is premature to the extent this request calls for

quintessentially expert opinions but is propounded before Plaintiff's expert disclosures.

1

Subject to and without waiving these objections, Plaintiff references and incorporates his forthcoming expert reports and expert depositions. Plaintiff's *Monell* theories include failure to train, supervise and discipline claims, widespread practice claims, and express policy claims. Within each of those categories, Plaintiff is pursuing multiple theories of liability, including the following: (a) the failure to train, supervise and discipline Chicago Police officers who engage in investigative misconduct of all types, including witness coercion and abuse, eyewitness manipulation, lying, fabrication and suppression of evidence, and the failure to comply with documentation and disclosure obligations; (b) widespread practices, amounting to de facto policies, of allowing Chicago Police officers to engage in investigative misconduct of all types, including witness coercion and abuse, eyewitness manipulation, lying, fabrication and suppression of evidence, and the failure to comply with documentation and disclosure obligations; and (c) deficient policies—both in express terms and through obvious omissions— that authorized Chicago Police officers to engage in investigative misconduct of all types, including witness coercion and abuse, eyewitness manipulation, lying, fabrication and suppression of evidence, and the failure to comply with documentation and disclosure obligations. Plaintiff reserves the right to supplement this response.

2.  For each theory of liability pursuant to *Monell* identified in answer to Interrogatory Number 1, please state the factual basis and evidence upon which Plaintiff will rely to establish how such theory amounts to a "policy" pursuant to *Monell v. New York Dept. of Social Services*, 436 U.S. 658 (1978).

**RESPONSE:** Plaintiff objects that this interrogatory seeks the strategy, thoughts and mental impressions of counsel, and therefore invades the attorney work product protection. Plaintiff objects to this Request because it is premature to the extent this request calls for quintessentially expert opinions but is propounded before Plaintiff's expert disclosures. Subject to and without waiving these objections, Plaintiff will rely on the entire body of evidence

propounded in this case to prove each of his theories of liability. This is because every single one of the CR files and homicide files produced by the City in this case will be relied on by Plaintiffs' experts—to support their statistical analysis and additional findings; likewise, all of the underlying case documents and depositions, including 30(b)(6) depositions, are relevant to establishing underlying constitutional violations for which the moving force was the policies and practices set forth above and below.

**Supervision and Discipline:** Plaintiff's *Monell* theories based on the CPD's wholly inadequate disciplinary system—*i.e.*, related to the utter failure to appropriately investigate and act upon evidence of misconduct by Chicago Police officers, including through civilian complaints against officers—include express policy theories (*e.g.*, disciplinary policies that were obviously inadequate and incomplete), widespread practice theories (e.g., a widespread practice of failing to meaningfully investigate allegations of officer misconduct, depriving investigators of access to officers' disciplinary histories), and failure to train, supervise and discipline theories (e.g., the failure to train internal investigators to meaningfully investigate allegations of office misconduct, permitting supervisors to conduct disciplinary investigations of their own officers, etc.).

These theories based on the CPD's wholly inadequate disciplinary system are supported by the deposition testimony in this case, including from the individual officers and the City's 30(b)(6) designees disclosed in this case and others (Denham, Klimas, Moore, Bird, Skahill); CR files of the individual defendants in this case; the hundreds of additional CR files of Area 5 detectives; the City's discipline-related policies; publicly available records documenting the CPD's decades-long history of rampant misconduct, across Detective Divisions and other units such as gang crimes; and the qualitative and quantitative findings of Plaintiff's experts. In

addition, the list of materials reviewed contained in the expert report of Mr. Finnell in

*Reyes/Solache* identifies in detail documents supporting Plaintiffs' discipline-related *Monell*

theories.

  Among other things, this evidence shows the CPD disciplinary system was obviously and

facially deficient as a matter of policy, and that the de facto policies and widespread practices

related to disciplinary investigations were equally deficient in obvious ways. In the years leading

up to the Andujar homicide investigation, and going back to the 1980s, disciplinary

investigations were not conducted in a matter that comported with accepted police practices at

the time in that they disregarded anonymous complaints; regularly omitted any actual interviews

of the accused officers; failed to consider other CRs and allegations against an accused officer

such that patterns in the allegations against officers were ignored; took years to reach a

conclusion; produced abnormally low rates of sustained allegations; and resulted in little to no

discipline even in the rare cases when allegations were sustained. This evidence, and the

conclusions therefrom, are discussed at length in the expert report of Mr. Finnell.

  The evidence also shows that for decades CPD officers were able to commit

misconduct—including of the most egregious sort, including the abuse of witnesses and

manipulation of eyewitnesses—with almost total impunity, knowing that the disciplinary process

would almost certainly result in little to no discipline, regardless of the depth or breadth of

allegations against the accused officers and their units. Detective Guevara, for example, accrued

approximately 30 CRs, more than most officers, yet faced only minor discipline despite the

severity of the allegations against him. Indeed, by the 1990s, he had amassed a remarkable record

of physical abuse, threats, aggression, and other misconduct toward civilians and even fellow

officers. Yet even in the rare instances when allegations against him were sustained—in more

than one instance, finding that he had physically abused civilians, and then lied about it to CPD investigators—he received little more than a slap on the wrist, and was permitted to use his credibility as a Chicago Police officer to take the stand and place his thumb on the scale of justice against the criminal accused. Instead of meaningful discipline, he was promoted to detective. By the time of Plaintiff's wrongful conviction, there was ample, well-established evidence within CPD's own CR records for Guevara that he physically abused civilians, including women, and that he was a liar. Despite all of that evidence, Reynaldo Guevara was never meaningfully disciplined by CPD, and instead collects a pension to this day.

CPD's response to Guevara's misconduct was endemic of a much broader pattern of impunity for officers who repeatedly committed misconduct. In many other cases, allegations of misconduct—no matter how serious or numerous or credible—resulted in no meaningful discipline whatsoever, resulting in heinous misconduct against civilians and resulting in repeat wrongful convictions. By way of example, this same pattern can be seen with regard to officers including Jon Burge, John Yucaitis, Kenneth Boudreau, John Halloran, Michael Kill, Joe Miedzianowski, Kriston Kato, Ronald Watts, and many others. Collectively, these officers engaged in misconduct over a period beginning in the 1970s and continuing into the early 2000s (at least), bracketing the timeframe at issue in this case. That this collection of improperly disciplined officers appear across units and Areas, over many decades, is a reflection of the long-standing, Citywide and widespread nature of the policies and practices at issue; that the City had ample notice of the failures in its policies for decades before Plaintiffs' wrongful convictions; that the policies and practices existed before and after, and thus through, the time of their wrongful convictions; and that the City was deliberately indifferent to the obvious failures in its disciplinary polices and practices. Answering further, that such officers were not only able to get

5

away with such rampant misconduct for so long, yet almost no other officers came forward contemporaneously to blow the whistle on such misconduct, further reflects the code of silence that was put in place and propagated across CPD. Indeed, repeated scandals have resulted in name changes to the disciplinary bodies of the CPD, without any meaningful changes in policies, practices or outcomes. Public bodies, including the Department of Justice, have decried the City's disciplinary system for CPD officers. The City's former Mayor, Rahm Emanuel, has admitted to a code of silence within CPD. And a former Police Chief, Richard Brzeczek, has admitted a code of silence existed at least since his tenure in the 1980s. And at least one federal jury—in *Obrycka v. City of Chicago*—has found a code of silence existed within CPD. Evidence related to these aspects of Plaintiffs' discipline-related *Monell* theories, are set forth in even greater detail in the expert report of Mr. Finnell in Reyes/Solache, and will be discussed further in Plaintiff's forthcoming expert reports.

Answering further, Plaintiff references and incorporates the expert report of Anthony Finnell, produced in *Reyes/Solache v. City of Chicago*, and the expert report of Timothy Longo in *Hood/Washington v. City of Chicago*, both of which discuss many of these theories and the evidence supporting them, in tremendous detail.

**Street Files:** Plaintiff's *Monell* theories based on the CPD's pattern and practice of *Brady* violations—*i.e.*, related to the repeated failure to disclose exculpatory information to criminal defendants—include express policy theories (*e.g.*, documentation, notetaking and file keeping policies that were plainly inadequate on their face); widespread practice theories (*e.g.*, a widespread practice of failing to document investigative steps, permitting officers to keep street file that were not later disclosed); and failure to train, supervise and discipline theories (*e.g.*, the failure to train detectives on documentation, notetaking and file keeping policies, the failure to

conduct audits to ensure such policies were being following, the failure to discipline officers for violating documentation, notetaking and file keeping policies).

These theories based on the CPD's pattern and practice of *Brady* violations are supported by the deposition testimony in this case, including from the individual officers (regarding their documentation and filekeeping practices), and the City's 30(b)(6) designees disclosed in this case and others (Foster, Winstrom, Hickey, Sullivan); the homicide file in this case; the hundreds of additional Area 5 homicide files produced in this case, as well as in *Rivera* and *Fields*, including but not limited to the common *Guevara* productions; the corresponding Cook County Public Defender and Cook County State's Attorney's Office files in this case, as well as in *Rivera* and *Fields*, of Area 5 detectives; the expert reports previously produced in *Reyes, Rivera,* and *Fields*; the City's documentation, notetaking and file keeping policies, and lack thereof; the *Jones* and *Palmer* litigation, and the findings and revelations therein related to CPD's street files practice and the wrongful prosecution of George Jones; and the qualitative and quantitative findings in Plaintiff's forthcoming expert reports, which will mirror the *Monell* findings in Mr. Tiderington's expert report in *Reyes/Solache*. Answering further, Mr. Tiderington's expert report lists his materials reviewed, which identify in detail evidence supporting Plaintiffs' *Brady*-related theories.

Among other things, this evidence shows that for decades going back to the 1970s and 1980s at the latest, CPD maintained a policy and widespread practice of permitting officers to keep "street files" containing evidence that could be, and was, withheld from criminal defendants. Officers could choose what information from their street files to turn in to CPD to be made part of any official file and to be disclosed to criminal defendants. CPD permitted this system of multiple files containing investigative information for a given case, rather than the

centralized file keeping system used by many other departments. All of this was exposed in or around 1981, with the prosecution of George Jones. In that case, CPD whistleblower Detective Frank Laverty revealed that a memo indicating Mr. Jones's innocence had been buried in a CPD street file and withheld from the prosecution and defense. Based on Laverty's heroic act of coming forward publicly to expose the existence of file keeping containing exculpatory evidence, Jones' prosecution was dismissed. Laverty was scapegoated and punished by CPD for blowing the whistle, in further support of the code of silence within CPD discussed above.

The *Jones* street files revelation spawned additional litigation, *Palmer*, in which Judge Milton Shadur of the Northern District of Illinois found that the CPD's documentation, notetaking and file keeping policies were broken. He ordered numerous steps to be taken to fix the problem. CPD ultimately enacted a set of policies, from 1981 through 1986, ostensibly to address the street files problem but that were obviously and facially deficient. Those inadequate policies, for example, continued to perpetuate the multi-file system rather than a centralized file keeping system; it contained no direction or instruction to file clerks responsible for subpoena responses to ensure they had gathered the multiple files associated with a single investigation; and remarkably, it contained no actual instruction that the entire investigative file must be disclosed to prosecutors and criminal defendants. In addition, the training on the policy was insufficient (a single training for several hours on a single day), *ad hoc* at best, and not uniform, and there was no follow-on training or auditing to ensure the policy changes were actually being followed or that *Brady* violations were not occurring, as admitted by 30(b)(6) designees on the topic. Nor was there any policy or training governing the transmission of files from the CPD to the CCSAO or criminal defendants in response to requests for records or subpoenas for records. These failures are discussed in detail in the expert report of Mr. Tiderington in *Reyes/Solache*,

and in the expert reports of Mike Brasfield in *Rivera* and *Fields*, appended thereto, and are referenced and incorporated herein

Not surprisingly, then, CPD's own homicide files reveal that in case after case, the new policy was not being followed, and that instead the widespread practice of failing to document all investigative steps (including exculpatory and impeaching information) and of withholding investigative documentation not turned over into an official file continued unabated. The result of these broken policies and widespread practice of withholding, is that constitutional *Brady* violations occurred far too often. Likewise, secret files of investigative information not accounted for or disclosed has kept turning up across CPD. In *Fields*, in the Area Central basement, hundreds of Area 1 and other Area homicide files turned up, including the highly exculpatory street file in Nathson Field's case, spanning a period from the 70s and 80s into the 2000s. In *Kluppelberg*, a palette containing hundreds of files from homicides and other violent crime investigations turned up, including the highly exculpatory street file in Kluppelberg's own case. In *Rivera*, hundreds of homicide files were found at Area North, and in Rivera's own case a street file was discovered, containing highly exculpatory evidence not disclosed to Mr. Rivera until his civil case decades after his wrongful conviction. *Fields* resulted in a $21 million jury verdict, and a finding of liability under *Brady* against both the individual officers and the City. *Rivera* resulted in a $17 million jury verdict, and a finding of liability under *Brady* against both the individual officers and the City.

Moreover, the numerous Guevara-related exonerations alone reflect case after case in which exculpatory information was not documented, and was not disclosed. Demetrius Johnson's case is emblematic: in that case, a highly exculpatory lineup report documenting the identification of an alternate suspect was buried in a file at Area 5, but was not included in the

9

official permanent retention file or disclosed to the prosecutors and criminal defendant. In *Iglesias*, a lead police pursued indicating witnesses during the initial investigation implicated the Spanish Cobras—and thus pointing away from Plaintiff—was never disclosed to Iglesias; that information was suppressed. In *Gomez*, multiple witnesses told police highly exculpatory information indicating that individuals other than Mr. Gomez fired weapons at the intersection where the victim was killed, but that evidence was suppressed.

These policies and practices have produced the same results in this case. For instance, in this case, Defendants suppressed evidence that Jose Melendez informed them that he could not make an identification given his extremely limited viewing opportunity, that Defendant Guevara pointed to a picture of Plaintiff and told Melendez to select him, that Melendez told them that the car they used to connect Sierra to the crime was not the car used in the crime, that Alberto Rodriguez also denied that the car they presented to him was the car used in the crime, that a person named Snoopy was a suspect in the crime whose photos Defendants requested for use in a photo array, that Defendants possessed a second set of photos that included Thomas Sierra that were used to conduct additional undocumented identification procedures, that Defendant Guevara had made up a purported statement from Esther Reyes that helped him solve the Andujar murder days before it ever happened, that Hector Montanez was pressured and threatened into falsely implicating Thomas Sierra, that Defendants made up statements from Officer Malczyk in order to connect the Andujar and Gonzalez murders and to create a connect that would justify their frame-up of Plaintiff, that Lucy Montalvo had corroborated Plaintiff's testimony about where he usually was at the time this crime occurred, and that at the time of Plaintiff's criminal trial Defendant Guevara was the subject of numerous CRs including sustained CRs in which CPD investigators found he lied.

Ultimately, the City's policy and practice of withholding exculpatory information has continued unabated from the *Jones*/*Palmer* litigation in the early 1980s, through the *Fields* and *Rivera* investigations and prosecutions in the late 1980s, through the *Sierra* investigation in the mid 1990s, and all the way through to today. A June 2020 report by the City of Chicago Office of Inspector General reached the following conclusion about CPD's documentation, notetaking and file keeping policies: "CPD's record management and production processes are inadequate to ensure the Department can meet its constitutional and other legal obligations." A follow up OIG report in 2021 found that the problem, still, continued unabated. The City of Chicago has been utterly recalcitrant for decades in meeting its constitutional *Brady* obligations. In answering further, Plaintiff references and incorporates the expert reports of Michael Brasfield in *Fields* and *Rivera*, and Tom Tideringtonl in *Reyes/Solache*, which discuss many of these theories and the evidence supporting them, in tremendous detail.

***Eyewitness Identifications***: In addition to all of the above, Plaintiff will also pursue a theory that the Chicago Police Department had a widespread practice of manipulating eyewitness identification procedures to create false positive identifications of police suspects, and also failed to document identification procedures. Plaintiff's *Monell* theories based on the CPD's pattern and practice of improper eyewitness identification tactics—*i.e.* suggestive,  coercive and manipulated lineups and photo identification procedures—include express policy theories (*e.g.*, policy omitting photo arrays and all other identification procedures other than live lineups, permitting non-documentation and misidentification of filler identifications and tentative identifications, and omitting witness statements of confidence or lack thereof); widespread practice theories (*e.g.* a widespread practice of using suggestive identification procedures); and failure to train, supervise, and discipline theories (*e.g.* the failure to supervise and discipline detectives who used improper

identification tactics to secure eyewitness identifications from witnesses who had no meaningful opportunity to view the perpetrator). Those widespread practices have a direct connection to this case, and in particular the false and manipulated eyewitness identifications of Jose Melendez and Alberto Rodriguez a, neither of whom had any meaningful opportunity to view the shooters, and communicated as much to the initial detectives who interviewed them. Yet, weeks after the crime they somehow identified Plaintiff, who just happened to be the police suspect. This was due to coercive, manipulative, and/or suggestive identification procedures performed by Defendants Guevara and Halvorsen, consistent with the policy and practice of detectives using such improper procedures and tactics to obtain false identifications of their suspects. Plaintiff incorporates his responses to the Individual Defendants' interrogatories, which further discuss the constitutional misconduct in this case.

In addition, Plaintiff references and incorporates the expert reports of Gary Wells and Jennifer Dysart in *Rivera v. City of Chicago*, and Dr. Steblay in *Velez v. City of Chicago*. Plaintiff also incorporates his objections and response to Request No. 4, below. Plaintiff reserves the right to supplement this response.

Finally, Plaintiff intends incorporate his expert reports and expert depositions in this matter. Given that Plaintiff has not yet disclosed his expert reports, he reserves the right to supplement this response.

3.      For each alleged policy identified in answer to Interrogatory Number 2, identify all evidence known to Plaintiff that establishes why each alleged policy is unconstitutional.

**RESPONSE**: Plaintiff objects that this request is vague and ambiguous, in that it fails to define "policy," and is unduly burdensome. Plaintiff objects that this interrogatory seeks the strategy, thoughts and mental impressions of counsel, and therefore invades the attorney work product protection. Plaintiff objects to this Request because it is premature to the extent this

request calls for quintessentially expert opinions but is propounded before Plaintiff's expert disclosures.

Subject to and without waiving these objections, see Plaintiff's response to Request No. 2. Plaintiff also references and incorporates the expert reports and 30(b)(6) depositions referenced above. Answering further, that the policies and practices set forth above are unconstitutional is obvious.

The City's policies and practices related to the failure to discipline Chicago Police officers is a tried and true theory of liability for unconstitutional policies and practices under *Monell*. Pursuant to these policies and practices, officers engaged in misconduct that produced rampant violations of individuals' constitutional rights, including Plaintiffs. That is true of every one of the rogue officers identified in response to Request No. 2, including Defendant Guevara. Because the City's policies and practices permitted these officers, including Guevara and the other Defendants, to commit misconduct with impunity, they did. Just as Defendants did to Plaintiffs. Moreover, the code of silence within the Chicago Police Department in which officers could engage in misconduct knowing that other officers would not dare to expose their wrongdoing, has been admitted to by City officials as discussed above; and, has been found to be unconstitutional by at least one federal jury, in *Obrycka v. City of Chicago*. Put simply, Plaintiffs' constitutional rights were violated when they were physically abused into giving false confessions, when additional fabricated evidence was created by detectives to secure their convictions, when exculpatory and impeaching evidence was withheld from them, as discussed below, and when they were wrongfully arrested and prosecuted without probable cause; the moving force behind the Defendants' misconduct was the failures in the City's policies and practices for disciplining officers. The same is true of Plaintiffs' theories related to the disclosure

of exculpatory information to criminal defendants. Exculpatory information was withheld from Plaintiffs in this case, as set forth below, which is unconstitutional under *Brady v. Maryland*; the moving force behind that constitutional violation, and others like it as set forth below and in the expert report of Mr. Tiderington in *Reyes/Solache*, was the City's policies and practices. The same is also true of Plaintiffs' theories related to the manipulation of eyewitness identification procedures. The Defendants in this case used suggestion and manipulation to coerce two witnesses who could not possibly identify the shooter into selecting the Defendants' chosen suspect, in blatant violation of Plaintiff's constitutional rights; and the moving force behind these violations was the policies and practices within the Chicago Police Department that permitted such misconduct to occur repeatedly, across the City, over decades, for example as discussed at length in the expert report of Prof. Steblay in *Velez v. City of Chicago*, which is referenced and incorporated herein.

Plaintiff reserves the right to supplement this response.

4.      For each policy identified in answer to Interrogatory Number 2, identify all evidence known to Plaintiff that establishes that Defendant City of Chicago had notice that the alleged policy was in effect, including all evidence that establishes that the City had notice that the alleged policy caused or would cause the violation of any individual's constitutional rights before or during the time of investigation of the murder of Noel Andujar.

**RESPONSE:** Plaintiff objects that this request is vague and ambiguous, in that it fails to define how it intends to use the term "policy" and "notice," and is unduly burdensome. Plaintiff object that this interrogatory seeks the strategy, thoughts and mental impressions of counsel, and therefore invades the attorney work product protection. Plaintiff objects to this Request because it is premature to the extent this request calls for quintessentially expert opinions but is propounded before Plaintiff's expert disclosures.

Subject to and without waiving these objections, see Plaintiff's response to Request No. 2, which outlines detailed evidence of notice to the City of Chicago. Answering further, CPD's senior leaders have known for decades that the City's disciplinary system was insufficient and permitted officers to engage in egregious misconduct without any fear of punishment. From approximately 1972-1985, Jon Burge and his fellow detectives were inflicting horrific forms of torture against Black men in Area 2 in order to secure false confessions. This conduct resulted in at least 50 victims of such misconduct, including allegations of beatings, electric shock, use of a firearm to threaten or strike suspects, placing plastic bags over the suspect's head, and even hangings. At least 26 CRs related to such conduct were filed. The investigations were conducted either by the Office of Professional Standards or by the Internal Affairs Division. This massive set of CRs provided ample notice to the City of torture at Area 2; yet not a single one of the 26 CRs resulted in a sustained finding. In addition, in 1982 Dr. Raba, the Medical Director at Cook County Jail, wrote a letter to CPD Superintendent Brzeczek detailing the torture of Andrew Wilson and requested an investigation; in 1986 Andrew Wilson filed his civil case alleging torture; throughout the 1980s, the Citizen's Alert, the Task Force to Confront Police Violence and 50 other organizations routinely demonstrated outside the federal courthouse, at Police Headquarters and at City Hall, challenging then Mayor Daley and the Superintendent of the CPD to investigate the torture and fire Burge; in 1990 the Goldston Report documented a systematic practice of physical abuse of suspects. Yet, it took until 1993, and a large public outcry, for Burge to finally be fired. But for decades he had engaged in torture, without any fear of discipline, and then was promoted to Commander, and spread his tactics to additional Areas. This included Boudreau and Halloran, detectives who worked under Burge and then took his toolkit of abuse to Area 1, where they systemically abused suspects into confessions throughout

15

the early 1990s. Many of those cases have resulted in exonerations, some based on DNA evidence proving that the confessions Boudreau and Halloran obtained were false (*e.g.,* Harold Hill, Dan Young, Terrill Swift). In addition, in 1991 (Marcus Wiggins) two confessions of young suspects were suppressed based on "screaming" at the station. In 1992, they obtained a confession from Peter Williams, even though he was incarcerated at the time of the murder. All of these instances, along with the many other claims of physical abuse against these officers throughout the early 1990s, provided additional evidence of notice to the City.

So too did the overall rates of civilian complaints against CPD officers throughout the 1980s and 1990s, and the extremely low sustained rates for such allegations, the obvious failures of a disciplinary system that simply ignored anonymous complaints, did not interview most of the accused officers, that often took years to reach completion, and that ultimately resulted in reduced to no discipline even in the rare cases when discipline was recommended.

The same pattern holds with Detective Guevara, for whom the City had ample notice of misconduct. Dating back over 20 years before the Andujar investigation, Guevara was accused of physical and verbal abuse of a woman named Annie Turner in 1982. Medical report from Presbyterian St Lukes on 5/9/82 at 1:15 says she was treated for a strained left wrist and multiple contusions, yet Guevara was exonerated. Guevara was the subject of no less than 15 additional CRs by the time he testified against Thomas Sierra. He was the subject of numerous allegations of fabrication of evidence. Twice in 1986 he was alleged to have physically abused civilians. The strength of the evidence of his abuse was so overwhelming that the allegations against him were actually sustained. In each of those investigations, he lied to investigators and denied the abuse that CPD found he had committed. Yet, he received little more than a slap on the wrist, was not disciplined for his lies, and was later promoted to a position as detective, from which he used his

16

"credibility" to testify at dozens of murder trials in which is testimony was critical to securing wrongful convictions he orchestrated through lies and fabrications. Since the mid-1980s the City has had ample notice that Guevara had no business being on the streets investigating violent crimes, but it did nothing to stop him. Answering further, Plaintiff also references and incorporates the expert report of Timothy Longo in *Hood*.

With regard to Plaintiff's *Brady*-related *Monell* claims detailed in Request No. 2, as of 1981, the City was on notice of the failure of its documentation, notetaking and file keeping policies and practices, and the refusal of detectives to adopt a cultural change to comply with their *Brady* obligations. The practices continued unabated, as was obvious based on the obvious deficiencies in its new policies, and the lack of training, supervision, auditing, or discipline related to actually change the existing widespread practices.

With regard to Plaintiff's eyewitness identification theories detailed in response to Request No. 2, the City was on notice of the critical importance of ensuring fair and non-suggestive identification procedures, and the "danger" of abusing photo identification procedures to obtain false identifications of detectives' suspects—as admitted in 30(b)(6) testimony (Foster) and CPD's own training materials—and the subsequent taint of improper tactics on live lineup procedures. The need for policies to ensure that detectives understood the prohibitions on the use of suggestive and manipulative tactics was obvious, yet CPD failed to enact such policies, omitting all identification procedures in their entirety other than lineups.

Answering further, Plaintiff also references and incorporates the expert reports of Michael Brasfield in *Fields* and *Rivera*, Prof. Steblay in *Velez*, Tom Tiderington in *Reyes/Solache*, and Anthony Finnell in *Reyes/Solache*. Plaintiff also references and incorporates his forthcoming expert reports and expert depositions. Plaintiff reserves the right to supplement this response.

17

5.      For each alleged policy identified in answer to Interrogatory Number 2, identify all evidence known to Plaintiff that establishes that Defendant City of Chicago was deliberately indifferent to violations of constitutional rights caused by the alleged policy.

**RESPONSE:** Plaintiff objects that this request is vague and ambiguous, in that it fails to define how it intends to use the term "policy" and "deliberately indifferent," and is unduly burdensome. Plaintiff objects that this interrogatory seeks the strategy, thoughts, and mental impressions of counsel, and therefore invades the attorney work product protection, and calls for legal conclusions beyond the scope of an interrogatory request. Plaintiff object to this Request because it is premature to the extent this request is propounded before Plaintiffs' expert disclosures. Subject to and without waiving these objections, see Plaintiff's response to Request Nos. 1, 2, 3 and 4. Those prior answers explain in detail each of the policies and practices that Plaintiff alleges caused the constitutional violations in this case, when and in what forms notice to the City occurred, and both the City's inaction and acquiescence in the continuation of the same failed policies, constituting deliberate indifference. Plaintiff also references and incorporate his forthcoming expert reports and expert depositions, as well as the expert reports and Rule 30(b)(6) transcripts referenced herein.  Plaintiff reserves the right to supplement this response.

6.      Please state with specificity all evidence known to Plaintiff that establishes how the alleged policy identified in Interrogatory Number 2 was the "moving force" behind the alleged violation of Plaintiff's constitutional rights. For this interrogatory, "moving force" shall have the same meaning as provided in *Monell v. New York Dept. of Social Services*, 436 U.S. 658 (1978).

**RESPONSE:** Plaintiff objects that this request is vague and ambiguous, in that it fails to define how it intends to use the term "policy" and "moving force," and is unduly burdensome. Plaintiff objects that this interrogatory seeks the strategy, thoughts, and mental impressions of counsel, and therefore invades the attorney work product protection, and calls for legal conclusions beyond the scope of an interrogatory request. Plaintiff object to this Request because

it is premature to the extent this request is propounded before Plaintiffs' expert disclosures. Subject to and without waiving these objections, see Plaintiff's response to Request Nos. 2, 3 and 4. Those responses are referenced and incorporated here. Nevertheless, in the interest of compromise, Plaintiff will repeat it here, in summary form: Plaintiff's constitutional rights were violated when Defendants secured false identifications from Jose Melendez and Alberto Rodriguez through suggestion and manipulation, falsified statements from these witnesses and Hector Montanez and Lucy Montalvo, created additional fabricated evidence to secure their convictions, withheld exculpatory and impeaching evidence from Plaintiff (including their own misconduct), and when they wrongfully arrested and prosecuted Plaintiff without probable cause. The moving force behind the Defendants' misconduct was the failures in the City's policies and practices for conducting eyewitness identification procedures, as previewed in the expert report of Prof. Steblay in *Velez* and will be further explained in the expert reports submitted in this case. And, the failure of the City's disciplinary policies and practices, which permitted officers, including Defendants, to engage in such misconduct with impunity, as discussed at length above and in the expert report of Mr. Finnell in *Reyes/Solache* and will be further explained in the expert reports submitted in this case. And, Plaintiffs' theories related to the disclosure of exculpatory information to criminal defendants, in that exculpatory information was withheld from Plaintiffs in this case, as set forth below, which is unconstitutional under *Brady v. Maryland*; the moving force behind that constitutional violation, and others like it—as set forth in these responses and in the expert report of Mr. Tiderington in *Reyes/Solache* and will be further explained in the expert reports submitted in this case—was the City's policies and practices, which allowed detectives and other investigators to learn information during the course of an investigation and then either not document it or document it and withhold those records

19

from prosecutors and criminal defendants. Plaintiff also references and incorporate his

forthcoming expert reports and expert depositions, as well as the expert reports and Rule

30(b)(6) transcripts referenced in these responses.  Plaintiff reserves the right to supplement this

response.

7.      For each alleged policy identified in answer to Interrogatory Number 2, identify
each instance during the investigation into the murder of Noel Andujar that Chicago Police
Detectives deviated from those policies. For each alleged deviation, please specify how this
purported deviation from policy gave rise to Plaintiff's alleged constitutional violations.

**RESPONSE:** Plaintiff objects that this request is vague and ambiguous in that it fails to

define how it intends to use the term "policy," and is unduly burdensome. Plaintiff objects that

this interrogatory seeks the strategy, thoughts, and mental impressions of counsel, and therefore

invades the attorney work product protection. Plaintiff objects to this Request because it is

premature to the extent this request calls for quintessentially expert opinions but is propounded

before Plaintiff's expert disclosures.

Subject to and without waiving these objections, see Plaintiff's response to Request Nos.

2,3, 4 and 6, which explain in detail the relationship between the policies and practices at issue

and their relationship and application to Plaintiff's case. Answering further, the question as

phrased is difficult to respond to, and in fact irrelevant. Plaintiffs' *Monell* claims are not based on

deviations from the policies and practices set forth in response to Request No. 2; Plaintiffs'

*Monell* claims are based on the Defendants' actions consistent with the policies and practices set

forth in response to Request No. 2, which were the moving force the constitutional violations

Plaintiffs suffered. So, for example, in Plaintiffs' case Defendants acted pursuant to the City's

policies and practices when they manipulated and coerced eyewitnesses who could not possibly

make an identification into falsely identifying Plaintiff in various identification procedures, and

when they fabricated and withheld evidence as discussed above, in violation of their

20

constitutional rights. Plaintiff also references and incorporates his forthcoming expert reports and

expert depositions, as well as the expert reports referenced herein. Plaintiff reserves the right to

supplement this response.

8.      Is it your contention that deficiencies in the Chicago Police Department's disciplinary system were the moving force behind Plaintiff's alleged constitutional violations? If yes, identify (a) the alleged misconduct that occurred; (b) the City's response to the allegation that was deficient, (c) what discipline Plaintiff alleges the City should have imposed and (d) what notice the City had of the alleged misconduct. To the extent that Plaintiff has produced documents regarding these incidents, please identify them by bates number.

**RESPONSE:** Plaintiff objects that this request is vague and ambiguous in that it fails to

define how it intends to use the terms "policy" and "moving force," and is unduly burdensome,

particularly with respect to subpart (c).. Plaintiff objects that this interrogatory seeks the strategy,

thoughts, and mental impressions of counsel, and therefore invades attorney work product

protection. Plaintiff objects to this Request because it is premature to the extent this request calls

for quintessentially expert opinions but is propounded before Plaintiff's expert disclosures.

Plaintiff also objects that this interrogatory contains subparts that should be propounded as

separate interrogatories.

Subject to and without waiving these objections, see Plaintiff's response to Request Nos.

2, 3, 4 and 6, which explain in detail the relationship between the policies and practices at issue

and their relationship and application to Plaintiff's case.

For example, from Plaintiffs' response to Request No. 2:

The evidence also shows that for decades CPD officers were able to commit misconduct—including of the most egregious sort, including the abuse of witnesses and manipulation of eyewitnesses—with almost total impunity, knowing that the disciplinary process would almost certainly result in little to no discipline, regardless of the depth or breadth of allegations against the accused officers and their units. Detective Guevara, for example, accrued approximately 30 CRs, more than most officers, yet faced only minor discipline despite the severity of the allegations against him. Indeed, by the 1990s, he had amassed a remarkable record of physical abuse, threats, aggression, and other misconduct toward civilians and even fellow officers. Yet even in the rare instances when allegations against him were sustained—in more

21

than one instance, finding that he had physically abused civilians, and then lied about it to CPD investigators—he received little more than a slap on the wrist, and was permitted to use his credibility as a Chicago Police officer to take the stand and place his thumb on the scale of justice against the criminal accused. Instead of meaningful discipline, he was promoted to detective. By the time of Plaintiff's wrongful conviction, there was ample, well-established evidence within CPD's own CR records for Guevara that he physically abused civilians, including women, and that he was a liar. Despite all of that evidence, Reynaldo Guevara was never meaningfully disciplined by CPD, and instead collects a pension to this day.

CPD's response to Guevara's misconduct was endemic of a much broader pattern of impunity for officers who repeatedly committed misconduct. In many other cases, allegations of misconduct—no matter how serious or numerous or credible—resulted in no meaningful discipline whatsoever, resulting in heinous misconduct against civilians and resulting in repeat wrongful convictions. By way of example, this same pattern can be seen with regard to officers including Jon Burge, John Yucaitis, Kenneth Boudreau, John Halloran, Michael Kill, Joe Miedzianowski, Kriston Kato, Ronald Watts, and many others. Collectively, these officers engaged in misconduct over a period beginning in the 1970s and continuing into the early 2000s (at least), bracketing the timeframe at issue in this case. That this collection of improperly disciplined officers appear across units and Areas, over many decades, is a reflection of the long-standing, Citywide and widespread nature of the policies and practices at issue; that the City had ample notice of the failures in its policies for decades before Plaintiffs' wrongful convictions; that the policies and practices existed before and after, and thus through, the time of their wrongful convictions; and that the City was deliberately indifferent to the obvious failures in its disciplinary polices and practices. Answering further, that such officers were not only able to get away with such rampant misconduct for so long, yet almost no other officers came forward contemporaneously to blow the whistle on such misconduct, further reflects the code of silence that was put in place and propagated across CPD. Indeed, repeated scandals have resulted in name changes to the disciplinary bodies of the CPD, without any meaningful changes in policies, practices or outcomes. Public bodies, including the Department of Justice, have decried the City's disciplinary system for CPD officers. The City's former Mayor, Rahm Emanuel, has admitted to a code of silence within CPD. And a former Police Chief, Richard Brzeczek, has admitted a code of silence existed at least since his tenure in the 1980s. And at least one federal jury—in *Obrycka v. City of Chicago*—has found a code of silence existed within CPD. Evidence related to these aspects of Plaintiffs' discipline-related Monell theories are set forth in even greater detail in the expert report of Mr. Finnell in *Reyes/Solache*, and will be discussed further in Plaintiff's forthcoming expert reports.

Answering further, Plaintiff references and incorporates the expert report of Anthony Finnell, produced in *Reyes/Solache v. City of Chicago*, and the expert report of Timothy Longo in *Hood/Washington v. City of Chicago*, both of which discuss many of these theories and the evidence supporting them, in tremendous detail.

And for example, from Plaintiffs' response to Request No. 6:

The moving force behind the Defendants' misconduct was . . . the failure of the City's disciplinary policies and practices, which permitted officers, including Defendants, to engage in

such misconduct with impunity, as discussed at length above and in the expert report of Mr. Finnell in *Reyes/Solache* and will be further explained in the expert reports submitted in this case.

Plaintiff also references and incorporates his forthcoming expert reports and expert depositions, as well as the expert reports referenced herein. Plaintiff reserves the right to supplement this response.

9.      When, if at all, do you contend that the City of Chicago was on notice of purported deficiencies in its disciplinary system which gave rise to Plaintiff's alleged constitutional violations? If your answer is in the affirmative, please identify the date of each occurrence and those within the City of Chicago or the Chicago Police Department who were made aware of the incident. To the extent that Plaintiff has produced documents regarding these incidents, please identify them by bates number.

**RESPONSE:** Plaintiff objects that this request is vague and ambiguous in that it fails to define how it intends to use the terms "notice," and is unduly burdensome. Plaintiff objects that this interrogatory seeks the strategy, thoughts, and mental impressions of counsel, and therefore invades attorney work product protection. Plaintiff objects to this Request because it is premature to the extent this request calls for quintessentially expert opinions but is propounded before Plaintiff's expert disclosures. Plaintiff also objects that this interrogatory contains subparts that should be separate interrogatories.

Subject to and without waiving these objections, YES: Plaintiffs contend that the City of Chicago was on Notice as early as 1986 regarding purported deficiencies in its disciplinary system which gave rise to Plaintiffs' alleged constitutional violations. *See* Plaintiffs' response to Request Nos. 2, 3, 4 and 6, which explain in detail the relationship between the policies and practices at issue and their relationship and application to Plaintiff's case.

For example, from Plaintiffs' response to Request No. 6:

Answering further, CPD's senior leaders have known for decades that the City's disciplinary system was insufficient and permitted officers to engage in egregious misconduct without any fear of punishment. From approximately 1972-1985, Jon Burge and his fellow detectives were inflicting horrific forms of torture against Black men in Area 2 in order to secure

false confessions. This conduct resulted in at least 50 victims of such misconduct, including allegations of beatings, electric shock, use of a firearm to threaten or strike suspects, placing plastic bags over the suspect's head, and even hangings. At least 26 CRs related to such conduct were filed. The investigations were conducted either by the Office of Professional Standards or by the Internal Affairs Division. This massive set of CRs provided ample notice to the City of torture at Area 2; yet not a single one of the 26 CRs resulted in a sustained finding. In addition, in 1982 Dr. Raba, the Medical Director at Cook County Jail, wrote a letter to CPD Superintendent Brzeczek detailing the torture of Andrew Wilson and requested an investigation; in 1986 Andrew Wilson filed his civil case alleging torture; throughout the 1980s, the Citizen's Alert, the Task Force to Confront Police Violence and 50 other organizations routinely demonstrated outside the federal courthouse, at Police Headquarters and at City Hall, challenging then Mayor Daley and the Superintendent of the CPD to investigate the torture and fire Burge; in 1990 the Goldston Report documented a systematic practice of physical abuse of suspects. Yet, it took until 1993, and a large public outcry, for Burge to finally be fired. But for decades he had engaged in torture, without any fear of discipline, and then was promoted to Commander, and spread his tactics to additional Areas.

This included Boudreau and Halloran, detectives who worked under Burge and then took his toolkit of abuse to Area 1, where they systemically abused suspects into confessions throughout the early 1990s. Many of those cases have resulted in exonerations, some based on DNA evidence proving that the confessions Boudreau and Halloran obtained were false (*e.g.,* Harold Hill, Dan Young, Terrill Swift). In addition, in 1991 (Marcus Wiggins) two confessions of young suspects were suppressed based on "screaming" at the station. In 1992, they obtained a confession from Peter Williams, even though he was incarcerated at the time of the murder. All of these instances, along with the many other claims of physical abuse against these officers throughout the early 1990s, provided additional evidence of notice to the City.

So too did the overall rates of civilian complaints against CPD officers throughout the 1980s and 1990s, and the extremely low sustained rates for such allegations, the obvious failures of a disciplinary system that simply ignored anonymous complaints, did not interview most of the accused officers, that often took years to reach completion, and that ultimately resulted in reduced to no discipline even in the rare cases when discipline was recommended.

The same pattern holds with Detective Guevara, for whom the City had ample notice of misconduct. Dating back over 20 years before the Andujar investigation, Guevara was accused of physical and verbal abuse of a woman named Annie Turner in 1982. Medical report from Presbyterian St Lukes on 5/9/82 at 1:15 says she was treated for a strained left wrist and multiple contusions, yet Guevara was exonerated. Guevara was the subject of no less than 15 additional CRs by the time he testified against Thomas Sierra. He was the subject of numerous allegations of fabrication of evidence. Twice in 1986 he was alleged to have physically abused civilians. The strength of the evidence of his abuse was so overwhelming that the allegations against him were actually sustained. In each of those investigations, he lied to investigators and denied the abuse that CPD found he had committed. Yet, he received little more than a slap on the wrist, was not disciplined for his lies, and was later promoted to a position as detective, from which he used his "credibility" to testify at dozens of murder trials in which is testimony was critical to securing wrongful convictions he orchestrated through lies and fabrications. Since the mid-1980s the City has had ample notice that Guevara had no business being on the streets investigating violent crimes, but it did nothing to stop him.

And for example, from Plaintiffs' response to Request No. 2:

These theories based on the CPD's wholly inadequate disciplinary system are supported by the deposition testimony in this case, including from the individual officers and the City's 30(b)(6) designees disclosed in this case and others (Denham, Klimas, Moore, Bird, Skahill)); CR files of the individual defendants in this case; the hundreds of additional CR files of Area 5 detectives; the City's discipline-related policies; publicly available records documenting the CPD's decades-long history of rampant misconduct, across Detective Divisions and other units such as gang crimes; and the qualitative and quantitative findings of Plaintiff's experts. In addition, the list of materials reviewed contained in the expert report of Mr. Finnell in *Reyes/Solache* identifies in detail documents supporting Plaintiffs' discipline-related *Monell* theories.

Among other things, this evidence shows the CPD disciplinary system was obviously and facially deficient as a matter of policy, and that the de facto policies and widespread practices related to disciplinary investigations were equally deficient in obvious ways. In the years leading up to the Andujar homicide investigation, and going back to the 1980s, disciplinary investigations were not conducted in a matter that comported with accepted police practices at the time in that they disregarded anonymous complaints; regularly omitted any actual interviews of the accused officers; failed to consider other CRs and allegations against an accused officer such that patterns in the allegations against officers were ignored; took years to reach a conclusion; produced abnormally low rates of sustained allegations; and resulted in little to no discipline even in the rare cases when allegations were sustained. This evidence, and the conclusions therefrom, are discussed at length in the expert report of Mr. Finnell.

The evidence also shows that for decades CPD officers were able to commit misconduct—including of the most egregious sort, including the abuse of witnesses and manipulation of eyewitnesses—with almost total impunity, knowing that the disciplinary process would almost certainly result in little to no discipline, regardless of the depth or breadth of allegations against the accused officers and their units. Detective Guevara, for example, accrued approximately 30 CRs, more than most officers, yet faced only minor discipline despite the severity of the allegations against him. Indeed, by the 1990s, he had amassed a remarkable record of physical abuse, threats, aggression, and other misconduct toward civilians and even fellow officers. Yet even in the rare instances when allegations against him were sustained—in more than one instance, finding that he had physically abused civilians, and then lied about it to CPD investigators—he received little more than a slap on the wrist, and was permitted to use his credibility as a Chicago Police officer to take the stand and place his thumb on the scale of justice against the criminal accused. Instead of meaningful discipline, he was promoted to detective. By the time of Plaintiff's wrongful conviction, there was ample, well-established evidence within CPD's own CR records for Guevara that he physically abused civilians, including women, and that he was a liar. Despite all of that evidence, Reynaldo Guevara was never meaningfully disciplined by CPD, and instead collects a pension to this day.

CPD's response to Guevara's misconduct was endemic of a much broader pattern of impunity for officers who repeatedly committed misconduct. In many other cases, allegations of misconduct—no matter how serious or numerous or credible—resulted in no meaningful discipline whatsoever, resulting in heinous misconduct against civilians and resulting in repeat wrongful convictions. By way of example, this same pattern can be seen with regard to officers including Jon Burge, John Yucaitis, Kenneth Boudreau, John Halloran, Michael Kill, Joe

Miedzianowski, Kriston Kato, Ronald Watts, and many others. Collectively, these officers engaged in misconduct over a period beginning in the 1970s and continuing into the early 2000s (at least), bracketing the timeframe at issue in this case. That this collection of improperly disciplined officers appear across units and Areas, over many decades, is a reflection of the long-standing, Citywide and widespread nature of the policies and practices at issue; that the City had ample notice of the failures in its policies for decades before Plaintiffs' wrongful convictions; that the policies and practices existed before and after, and thus through, the time of their wrongful convictions; and that the City was deliberately indifferent to the obvious failures in its disciplinary polices and practices. Answering further, that such officers were not only able to get away with such rampant misconduct for so long, yet almost no other officers came forward contemporaneously to blow the whistle on such misconduct, further reflects the code of silence that was put in place and propagated across CPD. Indeed, repeated scandals have resulted in name changes to the disciplinary bodies of the CPD, without any meaningful changes in policies, practices or outcomes. Public bodies, including the Department of Justice, have decried the City's disciplinary system for CPD officers. The City's former Mayor, Rahm Emanuel, has admitted to a code of silence within CPD. And a former Police Chief, Richard Brzeczek, has admitted a code of silence existed at least since his tenure in the 1980s. And at least one federal jury—in *Obrycka v. City of Chicago*—has found a code of silence existed within CPD. Evidence related to these aspects of Plaintiffs' discipline-related *Monell* theories are set forth in even greater detail in the expert report of Mr. Finnell in *Reyes/Solache*, and will be discussed further in Plaintiff's forthcoming expert reports.

Plaintiff also references and incorporates his forthcoming expert reports and expert depositions, as well as the expert reports referenced herein. Plaintiff reserves the right to supplement this response.

10.     Identify each investigative step that Plaintiff contends occurred during the criminal investigation into the murder of Noel Andujar that was not documented. For each investigative step identified, please (a) identify the factual basis and evidence Plaintiff will rely upon to establish that such an investigative step occurred and was not documented; (b) state the basis for Plaintiff's belief that it should have been documented (c) identify the evidence that supports Plaintiff's belief that the information should have been documented, and (d) identify the constitutional deprivation(s) resulting from the alleged failure to document.

**RESPONSE:** Plaintiff objects that this request is vague and ambiguous in that it fails to define how it intends to use the terms "investigative step," and is unduly burdensome. Plaintiff objects that this interrogatory seeks the strategy, thoughts, and mental impressions of counsel, and therefore invades attorney work product protection, and because it calls for a legal conclusion. Plaintiff objects to this Request because it is premature to the extent this request calls

for quintessentially expert opinions but is propounded before Plaintiff's expert disclosures. Plaintiff also objects that this interrogatory contains subparts that should be propounded as separate interrogatories.

Subject to and without waiving these objections, see Plaintiff's response to Request Nos. 2, 3 , 4, 6 and 10, which explain in detail the relationship between the policies and practices at issue and their relationship and application to Plaintiff's case. For example, from Plaintiff's response to Request No. 2:

For instance, in this case, Defendants suppressed evidence that Jose Melendez informed them that he could not make an identification given his extremely limited viewing opportunity, that Defendant Guevara pointed to a picture of Plaintiff and told Melendez to select him, that Melendez told them that the car they used to connect Sierra to the crime was not the car used in the crime, that Alberto Rodriguez also denied that the car they presented to him was the car used in the crime, that a person named Snoopy was a suspect in the crime whose photos Defendants requested for use in a photo array, that Defendants possessed a second set of photos that included Thomas Sierra that were used to conduct additional undocumented identification procedures, that Defendant Guevara had made up a purported statement from Esther Reyes that helped him solve the Andujar murder days before it ever happened, that Hector Montanez was pressured and threatened into falsely implicating Thomas Sierra, that Defendants made up statements from Officer Malczyk in order to connect the Andujar and Gonzalez murders and to create a connect that would justify their frame-up of Plaintiff, that Lucy Montalvo had corroborated Plaintiff's testimony about where he usually was at the time this crime occurred, and that at the time of Plaintiff's criminal trial Defendant Guevara was the subject of numerous CRs including sustained CRs in which CPD investigators found he lied.

Plaintiff also incorporates his response to the Individual Defendants' interrogatories, which lay out in detail the investigative steps taken during the Andujar investigation. Plaintiff also references and incorporates his forthcoming expert reports and expert depositions, as well as the expert reports referenced herein. Plaintiff reserves the right to supplement this response.

11. Is it your contention that a criminal defense attorney for [Thomas Sierra] [requested erroneously references Demetrius Johnson] issued a subpoena to the Chicago Police Department and that the Chicago Police Department failed to comply with that subpoena? If so, please identify (a) the date the subpoena was issued and (b) the evidence Plaintiff has to support his belief that the Chicago Police Department did not comply with the subpoena.

**RESPONSE:** Plaintiff objects that this interrogatory seeks the strategy, thoughts, and mental impressions of counsel, and therefore invades attorney work product protection. Plaintiff objects to this Request because it seeks information that is equally available to Defendants as it is to Plaintiff.

Subject to and without waiving these objections, Plaintiff states that his defense counsel knew to send subpoenas and believes he would have in this case, and indeed Mr. Sarley issued a subpoena on or about June 9, 1995 requesting "all police reports, notes and memoranda contained in the CPD 'street files,' also known as 'office unit or working files or running files' at Area 5 V/C," as well as "notes of interviews, statements, to-from memos and written records of any kind." In addition, on or about July 27, 1995, prosecutors issued a subpoena all "records, reports, hand or typewritten notes, writings, GPRs, or 'investigative file'" associated with this homicide investigation. (RFC-Sierra 114). Then, on or about October 1, 1996, the prosecutors issued another document subpoena in this matter for all "police reports, arrest reports, rap sheets, 'street files,' also known as office unit or working files, general progress notes, investigative files, major crime worksheet, inventory slips, evidence technician reports, and lab reports" (RFC-Sierra 113). However, neither Mr. Sarley nor the prosecutors had any way of knowing whether the responses they received contained all responsive documents and information learned during the investigation. Plaintiff also states that his defense counsel issued discovery requests to the Cook County State's Attorney's Office, with the expectation that the prosecutors would share with him whatever police documents they received in response to subpoenas or informally. Plaintiff reserves the right to supplement this response.

12.     State with specificity the factual basis and evidence that establishes that Plaintiff's constitutional rights would not have been violated if any of the alleged policies identified in answer to Interrogatory Number 2 had not been in place.

**RESPONSE:** Plaintiff objects that this request is vague and ambiguous, in that it fails to define how it intends to use the term "policy" and asks for Plaintiffs to point to evidence of counterfactual that did not occur, and because it is unduly burdensome. Plaintiff further objects with respect to "had not been in place," given that part of Plaintiff's *Monell* claim is that Chicago failed to enact appropriate policies that would have prevented some of the constitutional deprivations that occurred during the Andujar investigation. Plaintiffs also object to this request because it asks for information wholly irrelevant to this case. Plaintiff objects that this interrogatory seeks the strategy, thoughts, and mental impressions of counsel, and therefore invades attorney work product protection, and that this interrogatory calls for a legal conclusion. Plaintiff objects to this Request because it is premature to the extent this request calls for quintessentially expert opinions but is propounded before Plaintiff's expert disclosures.

Subject to and without waiving these objections, this request is duplicative of Request No. 6, which asks Plaintiffs to identify evidence that the *Monell* theories at issue were the moving force behind the violations of Plaintiffs' constitutional rights. Plaintiffs do not interpret there to be any difference between the information sought in response to this request and Request No. 6. Accordingly, see Plaintiffs' response to Request No. 6, which is referenced and incorporated herein. Answering further, see also Plaintiffs' response to Request Nos. 1, 2, and 4

Plaintiff also references and incorporates his forthcoming expert reports and expert depositions. Plaintiff reserves the right to supplement this response.

13.     Is it your contention that there are documents contained in the Chicago Police Department Investigative Files produced in this case (specifically, those from Rivera, Fields, and Solache/Reyes) (herein referred to as the "Chicago Police Department Investigative Files" or "City's Monell production") that contain documents and/or information that was not produced to the criminal defendant(s) and/or criminal defense attorney(s) during the resulting criminal prosecution? If your answer is yes, please identify each and every Chicago Police Department Investigative File by RD Number and the accompanying Cook County Public Defender or

criminal defense attorney file for the underlying criminal prosecution by bates number and the name of the criminal defendant.

**RESPONSE:** Plaintiff objects that this request is unduly burdensome. Plaintiff objects that this interrogatory seeks the strategy, thoughts, and mental impressions of counsel, and therefore invades attorney work product protection. Plaintiff objects to this Request because it is premature to the extent this request calls for quintessentially expert opinions but is propounded before Plaintiff's expert disclosures.

Subject to and without waiving these objections, Plaintiff refers Defendants to the expert reports disclosed of Mr. Tiderington in *Reyes*, and incorporates his forthcoming expert reports. Plaintiff also incorporates his responses to interrogatories 2, 4, 10, and 11, as well as Plaintiff's response to the individual Defendants' interrogatories, which discuss the documents and information in the Andujar investigation that was suppressed or concealed. Answering further, yes, Plaintiff contends that there are documents contained in the CPD investigative files produced in this case that contain documents and or information that was not produced to the criminal defendant. Those documents will be identified with specificity in Plaintiff's expert reports. Plaintiff references and incorporates the expert reports of Brasfield in *Rivera* and *Fields*, and Thomas Tiderington in *Reyes/Solache,* and the expert reports and expert depositions to be disclosed in this matter. Plaintiffs reserve the right to supplement this response.

14. With respect to the Chicago Police Department Investigative Files identified in response to Request No. 13, please (a) state with particularity each document and/or piece of information that Plaintiff alleges was not provided to the criminal defendant(s) or the criminal defense attorney(s); (b) identify the specific bates number of the purportedly undisclosed document; (c) detail with specificity each piece of information Plaintiff alleges was not provided to the criminal defendant(s) and/or their criminal defense attorney(s); and (d) for each such piece of information and/or documents identified, please state with specificity all witnesses and/or evidence (including documents) that support Plaintiff's contention that said documents and/or information was not provided.

**RESPONSE:** Plaintiff objects that this request is vague and ambiguous, and unduly burdensome, in that it asks Plaintiff to identify each and every document or "piece of information" that was not disclosed. A complete response to this request would likely span dozens, or even hundreds, of pages. Plaintiff further objects that this interrogatory seeks the strategy, thoughts and mental impressions of counsel, and therefore invades the attorney work product protection. Specifically, Defendants have all the same records as Plaintiff and can conduct the same analysis themselves. Plaintiff objects to this Request because it is premature to the extent this request calls for quintessentially expert opinions but is propounded before Plaintiff's expert disclosures. Plaintiff also objects that this interrogatory contains subparts that should be separate interrogatories.

Subject to and without waiving these objections, see Plaintiff's response to Request No. 13. Plaintiff also references and incorporates his forthcoming expert reports and expert depositions. Plaintiff reserves the right to supplement this response.

15. For each document and/or piece of information or material identified in response to Interrogatory No. 14, state with specificity how the document and/or piece of information was exculpatory, impeachment, or *Brady* material, including an explanation of the facts and evidence that supports Plaintiff's contention that if the documents had been produced, it would have changed the outcome of the particular criminal defendant's case.

**RESPONSE:** Plaintiff objects that this request is vague and ambiguous, and unduly burdensome in that it asks Plaintiff to identify each and every document or "piece of information" that was not disclose, identify every reason that each such piece of information had exculpatory value, and offer a legal conclusion about how each piece of information would have "changed the outcome of the particular criminal defendant's case." A complete response to this request would likely span dozens, or even hundreds, of pages. Plaintiff further objects that this interrogatory calls for a legal conclusion beyond the scope of a contention interrogatory, and

seeks the strategy, thoughts and mental impressions of counsel, and therefore invades the

attorney work product protection. Specifically, Defendants have all the same records as Plaintiff

and can conduct the same analysis themselves. Plaintiff objects to this Request because it is

premature to the extent this request calls for quintessentially expert opinions but is propounded

before Plaintiff's expert disclosures. Plaintiff also objects that this interrogatory contains subparts

that should be separate interrogatories.

Subject to and without waiving these objections, see Plaintiff's response to Request No.

13. Plaintiff also references and incorporates his forthcoming expert reports and expert

depositions. Plaintiff reserves the right to supplement this response.

16.     Identify each Complaint Register file that Plaintiff contends (a) support any
aspect of his *Monell* claim; and (b) identify the specific constitutional violations you contend are
demonstrated by each such file, along with the basis for your contention.

**RESPONSE:** Plaintiff objects that this request is unduly burdensome. Plaintiff objects

that this interrogatory seeks the strategy, thoughts, and mental impressions of counsel, and

therefore invades attorney work product protection. Plaintiff objects to this Request because it is

premature to the extent this request calls for quintessentially expert opinions but is propounded

before Plaintiff's expert disclosures. Plaintiff also objects that this interrogatory contains

subparts that should be propounded as separate interrogatories.

Subject to and without waiving these objections, see Plaintiff's response to Request Nos.

2, 4, 6, 8 and 9, which discuss various CRs and disciplinary failures. Answering further, Plaintiff

will rely on all of the CR files produced in this case, both of the individual defendants and the

additional CR files produced as part of *Monell* discovery, all of which support Plaintiff's *Monell*

claim, in some cases individually and in some cases in the aggregate. The CR files will be

identified with specificity in Plaintiff's expert reports, and as such Plaintiff references and

incorporates the expert reports of Michael Brasfield in *Rivera* and of Tim Longo in *Hood*, the

expert reports and expert depositions to be disclosed in this matter, as well as Mr. Finnell's

expert report in *Reyes/Solache*.  Plaintiffs reserve the right to supplement this response.

17.     Is it your contention that the files produced pursuant to the City's *Monell*
production contain coerced confessions or witness statements? If so, please identify (a) the
specific Investigative File by RD number; (b) the specific confession or statement, by bates
number, that was purportedly coerced; and (c) the specific evidence you claim supports the
contention.

**RESPONSE:** Plaintiff objects that this request is unduly burdensome and vague as to

"coerced confessions or witness statements." Plaintiff objects that this interrogatory seeks the

strategy, thoughts, and mental impressions of counsel, and therefore invades attorney work

product protection. Plaintiff further objects that this request is irrelevant to this case, in which

Plaintiff never gave any confession or otherwise implicated himself in the crime. Plaintiff objects

to this Request because it is premature to the extent this request calls for quintessentially expert

opinions but is propounded before Plaintiff's expert disclosures. Plaintiff also objects to the

extent that Defendants have exceeded the number of interrogatories allowed by Rule 33.

Subject to and without waiving these objections, yes, Plaintiff contends that there are

documents contained in the CPD *Monell* production in this case that contain coerced confessions

or witness statements. Plaintiff references and incorporates the expert reports he will be

disclosing in this matter. Plaintiff reserves the right to supplement this response.

18.     Is it your contention that the files produced pursuant to the City's *Monell*
production contain fabricated police documents? If so, please identify (a) the specific
Investigative File by RD number, (b) the specific document, by bates number, that you purport to
be fabricated; and (c) the specific evidence you claim supports the contention.

**RESPONSE:** Plaintiff objects that this request is unduly burdensome and vague in that

the City does not explain what it means by "fabricated." Plaintiff objects that this interrogatory

seeks the strategy, thoughts, and mental impressions of counsel, and therefore invades attorney

work product protection. Plaintiff objects to this Request because it is premature to the extent

this request calls for quintessentially expert opinions but is propounded before Plaintiff's expert

disclosures. Plaintiff also objects to the extent that Defendants have exceeded the number of

interrogatories allowed by Rule 33.

Subject to and without waiving these objections, yes, Plaintiff contends that there are

fabricated police documents contained within the CPD *Monell* production in this case. Plaintiff

references and incorporates the expert reports he will be disclosing in this matter, and also

incorporates the expert reports or Tom Tiderington and Anthony Finnell in *Reyes/Solache,* and

the expert reports of Michael Brasfield in *Fields*, and *Rivera*, and the expert report of Gary Wells

and Jennifer Dysart in *Rivera.* Plaintiff reserves the right to supplement this response.

19.     Is it your contention that the files produced pursuant to the City's *Monell*
production contain evidence that detectives manipulated any eyewitness identification
procedure? If so, please identify (a) the specific Investigative File by RD number; (b) the specific
identification procedure, by bates number, that you purport to be manipulated; and (c) the
specific evidence you claim supports the contention.

**RESPONSE:** Plaintiff objects that this request is unduly burdensome and vague as to

"manipulated any eyewitness identification procedure." Plaintiff objects that this interrogatory

seeks the strategy, thoughts, and mental impressions of counsel, and therefore invades attorney

work product protection. Plaintiff objects to this Request because it is premature to the extent

this request calls for quintessentially expert opinions but is propounded before Plaintiff's expert

disclosures. Plaintiff also objects to the extent that Defendants have exceeded the number of

interrogatories allowed by Rule 33.

Subject to and without waiving these objections, yes, Plaintiff contends that there are

documents within the CPD *Monell* production in this case that contain evidence that detectives

manipulated eyewitness identification procedures, and fabricated and suppressed documents and

information related thereto. Plaintiff references and incorporates the expert reports he will be

disclosing in this matter, and also incorporates the expert report of Prof. Steblay in *Velez*, which

previews such claims, and the expert reports of Michael Brasfield and Gary Wells and Jennifer

Dysart disclosed in *Reyes, Fields*, and *Rivera.* Plaintiff reserves the right to supplement this

response.

20.     Identify, by bates number, all photo arrays and lineup procedures contained in the
Chicago Police Department Investigative Files produced in this case that you contend were
unconstitutional.

**RESPONSE:** Plaintiff objects that this request is vague and ambiguous, because it is not

clear what the request means by "unconstitutional" and because it is not clear what this request is

asking that is not duplicative of the prior request. Plaintiff also objects that this request is unduly

burdensome. Plaintiff objects that this interrogatory seeks the strategy, thoughts, and mental

impressions of counsel, and therefore invades attorney work product protection, and calls for a

legal conclusion. Plaintiff objects to this Request because it is premature to the extent this

request calls for quintessentially expert opinions but is propounded before Plaintiff's expert

disclosures. Plaintiff also objects to the extent that Defendants have exceeded the number of

interrogatories allowed by Rule 33.

Subject to and without waiving these objections, see Plaintiff's response to Request No

19. Plaintiff reserves the right to supplement this response.

21.     For each confession or statement identified in response to interrogatory number
17, identify the facts and evidence supporting your contention that the City's final policymaker
had notice that the confession or statement was coerced.

**RESPONSE:** Plaintiff objects that this request is vague, ambiguous and unduly

burdensome, and to the extent it is duplicative of early requests regarding notice, and to that end

see Plaintiff's response to requests No. 2-4. Plaintiff also objects that this request is irrelevant, in

that it reflects a misunderstanding of the law, and because Plaintiff never confessed. Plaintiff

objects that this interrogatory seeks the strategy, thoughts, and mental impressions of counsel,

and therefore invades attorney work product protection. Plaintiff objects to this Request because

it is premature to the extent this request calls for quintessentially expert opinions but is

propounded before Plaintiff's expert disclosures. Plaintiff also objects to the extent that

Defendants have exceeded the number of interrogatories allowed by Rule 33.

      22.     For each document identified as fabricated in response to interrogatory number 18, identify the facts and evidence supporting your contention that the City's final policymaker had notice that the document was fabricated.

     **RESPONSE:** Plaintiff objects that this request is vague, ambiguous and unduly

burdensome, and to the extent it is duplicative of early requests regarding notice, and to that end

see Plaintiff's response to requests No. 2-4. Plaintiff also objects that this request is irrelevant, in

that it reflects a misunderstanding of the law. Plaintiff objects that this interrogatory seeks the

strategy, thoughts, and mental impressions of counsel, and therefore invades attorney work

product protection. Plaintiff objects to this Request because it is premature to the extent this

request calls for quintessentially expert opinions but is propounded before Plaintiff's expert

disclosures. Plaintiff also objects to the extent that Defendants have exceeded the number of

interrogatories allowed by Rule 33.

     Subject to and without waiving these objections, see Plaintiff's response to Request Nos.

2-4, 18. Plaintiff also references and incorporates the expert reports he will be disclosing in this

matter, and also incorporates the expert reports or Tom Tiderington and Anthony Finnell in

*Reyes/Solache,* and the expert reports of Michael Brasfield in *Fields*, and *Rivera*, and the expert

report of Gary Wells and Jennifer Dysart in *Rivera.* Plaintiff reserves the right to supplement this

response.

23.     For each eyewitness identification procedure identified in response to interrogatory number 19, identify the facts and evidence supporting your contention that the City's final policymaker had notice that the document was fabricated.

**RESPONSE:** Plaintiff objects that this request is vague, ambiguous and unduly

burdensome, and to the extent it is duplicative of early requests regarding notice, and to that end

see Plaintiff's response to requests No. 2-4. Plaintiff also objects that this request is irrelevant, in

that it reflects a misunderstanding of the law. Plaintiff objects that this interrogatory seeks the

strategy, thoughts, and mental impressions of counsel, and therefore invades attorney work

product protection. Plaintiff objects to this Request because it is premature to the extent this

request calls for quintessentially expert opinions but is propounded before Plaintiff's expert

disclosures. Plaintiff also objects to the extent that Defendants have exceeded the number of

interrogatories allowed by Rule 33.

Subject to and without waiving these objections, see Plaintiff's response to Request Nos.

2-4, 19. Plaintiff also references and incorporates the expert reports he will be disclosing in this

matter, and also incorporates the expert report of Prof. Steblay in *Velez*, and the expert reports of

Michael Brasfield and Gary Wells and Jennifer Dysart disclosed in *Reyes, Fields*, and *Rivera.*.

Plaintiff reserves the right to supplement this response.

24.     Is it your contention that the full and complete criminal defense file(s) exist from [Thomas Sierra's] [request erroneously references Demetrius Johnson] criminal prosecution? If your answer is in the affirmative, please identify (a) the specific bates numbers which represent the file(s) and (b) the specific evidence that you have to support that the file is complete.

**RESPONSE**: Plaintiff objects that this request is vague as to "full and complete criminal

defense file(s)," and because it is unduly burdensome. Plaintiff objects that this interrogatory

seeks the strategy, thoughts, and mental impressions of counsel, and therefore invades attorney

work product protection. Plaintiff also objects to the extent that Defendants have exceeded the

number of interrogatories allowed by Rule 33.

37

Subject to these and the general objections, Plaintiff was represented by the Public Defender's Office, and the full and complete set of documents in the Public Defender's file for this case (other than documents identified on their privilege log) have been produced at Sierra 5462-5940. Plaintiff reserves the right to supplement this response.

25.     Is it your contention that the full and complete criminal defense file(s) from [Thomas Sierra's] [request erroneously references Demetrius Johnson] criminal prosecution has been lost or destroyed? If your answer is in the affirmative, please identify each and every piece of evidence to support that the file(s) no longer exist.

**RESPONSE**: Plaintiff objects to this interrogatory as unduly burdensome, and because it seeks the strategy, thoughts, and mental impressions of counsel, and therefore invades attorney work product protection. Plaintiff also objects on the ground that Defendant City has exceeded the number of interrogatories allowed by Rule 33.

Subject to these and the general objections, see Plaintiff's response to Request No. 24.

Dated: August 11, 2022

Respectfully Submitted,

**THOMAS SIERRA**

BY:     /s/ Anand Swaminathan
        *One of Plaintiff Thomas Sierra's*

Arthur Loevy
Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Bella Aguilar
**LOEVY & LOEVY**
311 N. Aberdeen, Third Floor
Chicago, IL 60607

## <u>CERTIFICATE OF SERVICE</u>

I, Anand Swaminathan, an attorney, certify that on August 11, 2022, I served the foregoing interrogatory responses upon on all counsel of record via electronic mail.

<u>/s/ Anand Swaminathan</u>
*One of Plaintiff's Attorneys*