# Exhibit 42

John Wixted, Ph.D.
Distinguished Professor
UC San Diego
858-705-3115
jwixted@ucsd.edu

---

Date:   March 25, 2023
To:     Josh Engquist
From:  John Wixted, Ph.D.
RE:    Sierra

---

      I was asked to consider the science-based principles of memory in relation to eyewitness identifications made during a police investigation conducted in 1995 and to respond to an expert report written by Dr. Jennifer Dysart. The opinions contained in this report are based on my training and expertise in experimental psychology and on my years of experience conducting research on (and teaching about) all aspects of memory. I have a Ph.D. in clinical psychology from Emory University in 1987, and I have been affiliated with UC San Diego since 1988, where my current title is Distinguished Professor of Psychology. My research focuses on the basic cognitive and brain mechanisms of memory and also on eyewitness memory. I am an author of more than 150 research articles and book chapters (almost all of which focus on memory and many of which focus specifically on eyewitness memory), I have served as the chief editor or as an associate editor of multiple scientific journals, and I have been the recipient of 7 federal research grants (including two that focus specifically on eyewitness identification). In addition, on a regular basis, I teach classes entitled *Memory & Amnesia* and *Psychology & Law*. In 2011, I received one of our field's highest honors – the [Warren Medal](#) – for the most significant research in experimental psychology published during the preceding 5 years. In addition, in 2019, I was elected to the [American Academy of Arts and Sciences](#), and in 2022, I was chosen by the American Association for the Advancement of Science to deliver the [John P. McGovern Award Lecture](#) in the Behavioral Sciences. My compensation rates are $400 per hour for consulting and testimony and $200 per hour for travel.

## Case Summary

      The materials I reviewed are listed in an appendix to this report. My understanding of the facts of this case is based on my reading of those materials (nothing more). On 23 May 1995, **Noel Andujar** was shot and killed while riding in the back seat of a car in Chicago's Logan Square neighborhood. The car was driven by **Jose Melendez**, with **Alberto Rodriguez** in the front passenger seat, when they came across a black Buick Park Avenue. A passenger in the Buick showed gang signs, opened his door, and began shooting at their car.

      According to the police file, **Thomas Sierra** became a potential suspect when the investigating detectives recalled seeing a black-colored Buick Park Ave with wire wheels (that appeared to match the suspect vehicle) days earlier. Days earlier, that car contained both **Thomas Sierra** and **Hector Montanez**, members of the Imperial Gangster street gang.

      The shooting of Noel Andujar reportedly occurred on 23 May 1995 in the Logan Square neighborhood. While driving, the victims stopped at a red light and noticed a car approaching

from the rear. The passenger of the Buick Park Ave pulled out a gun and started shooting.

A photo array was constructed containing **Thomas Sierra's** photograph. On May 25, 1995, this array was shown to **Alberto Rodriguez**, and he identified **Sierra**. Several days later, on May 30, 1995, **Jose Melendez** was shown the same photo array, and he also identified **Sierra**. On that same day, both witnesses were asked to walk through a parking lot to see if the shooter's car was there, and both witnesses identified a Buick as the car from which **Sierra** fired his gun.

At his trial in February of 1997, **Rodriguez** identified **Sierra** as the shooter, but **Melendez** did not. **Melendez** testified that he identified **Sierra** from the initial photo lineup only because Detective Guevara told him to do so. Detective Guevara testified that no such thing happened and that he simply put the photos on the table and asked **Melendez** if he saw anyone that was present on the night of the shooting. **Sierra** was found guilty of first-degree murder and sentenced to prison.

## Preliminary Bases for Opinions

*No Translation of science into policy recommendations had happened yet in 1995.* I begin by noting that the first science-based guidelines about how to properly conduct lineups were enumerated in a "white paper" (Wells, Small, Penrod, Malpass, Fulero, & Brimacombe, 1998) commissioned by the American Psychology-Law Society (APLS). The science-based recommendations presented in this paper were as follows: (1) the lineup administrator should be blind to the identity of the suspect, (2) the eyewitnesses should be informed that the culprit may or may not be in the lineup, (3) the suspect should not stand out in the lineup (i.e., the lineup should be fair), and (4) a confidence statement should be obtained at the time an identification is made and prior to any feedback from the police. These guidelines were published three years after this case was investigated in 1995. Later guidelines presented in 1999, 2013, and 2020 (National Institute of Justice, 1999; National Research Council, 2014; and Wells et al., 2020) generally endorsed the original guidelines and added others (e.g., that at least five fillers should be included in a lineup, that the lineup procedure should be videotaped, avoiding repeated testing involving the same witness and suspect, etc.). Because the first science-based guidelines appeared years after the Sierra case was investigated, the eyewitness identification procedures used in that investigation would not be expected to reflect modern-day best practices.

Whether or not the photo arrays and lineups were conducted in accordance with any eyewitness identification *policies* that might have been in effect in the Chicago Police Department (CPD) in 1993 is unknown to me. I have no expertise in any CPD eyewitness identification policies, and I did not consider any such policies in forming my opinions. My overall goal in writing this report is to provide a science-based analysis of the eyewitness identification evidence in the Sierra case. Nothing I say should be interpreted as a science-based criticism of the procedures used in the police investigation of Sierra's possible role in this crime.

*Focus on the first test of the witness's memory.* My second preliminary comment will clarify why, as a memory expert, I generally place little weight on what witnesses recall from memory long after the witnessed crime. This means that I place little weight on what the legal system places maximum weight upon, namely, sworn testimony at the criminal trial months or years after the crime was committed. I place even less weight on affidavits and depositions that are often conducted decades after the crime in question. According to my understanding of the relevant science, memory-based testimony of that nature is as likely to be as prejudicial as it is probative. Therefore, to the extent it can be determined, I focus on the results of the first test for each witness's memory of who committed the crime. The first test usually occurs early in a

police investigation (e.g., an initial lineup). This approach minimizes the chances that the witness's memory has been contaminated and therefore maximizes the accuracy of reports from memory.

An important and still relatively new understanding in the field of eyewitness identification is that the initial test of a witness's memory of a suspect unavoidably and irretrievably changes (i.e., contaminates) the witness's memory of that suspect. Because there is no way to decontaminate the witness's memory, it is not possible to independently test the witness's memory without it being influenced by the first test. A commonly asked question at trial ("As you sit here today, do you have an independent recollection of…?") reflects the way that actors in the legal system imagine how memory works, not how memory actually works according to decades of scientific research. In truth, the independent recollections are to be found on the first test of memory conducted early in a police investigation, not the last test of memory that occurs months or years later at trial (and certainly not at depositions conducted decades after the crime). Therefore, assuming a good-faith effort on the part of the witness and a reasonable photo of the suspect, no later test can provide more accurate information than the first (Wells, Kovera, Douglass, Brewer, Meissner, & Wixted, 2020; Wixted, Wells, Loftus, & Garrett, 2021). Whether the eyewitness evidence in this case is probative of innocence or guilt (or is instead inconclusive) is informed by the results of each witness's first test involving each suspect. Therefore, in forming my opinions, I focus on the results of that test only.

*The assumption of good faith*. Finally, in my analysis, I also presume good faith on the part of the witnesses because (1) judging whether witnesses might secretly be acting in bad faith falls outside of my area of expertise (it is a judgment call to be made by judges and/or jurors), and (2) all the relevant research applies to witnesses acting in good faith. It is that research that I endeavor to explain. I also assume good faith on the part of the detectives who investigated this case, again because I have no special expertise in judging whether police officers who write the reports that I rely upon might secretly be acting in bad faith. I realize that the plaintiff argues that the detectives acted in bad faith, but this is also a matter for a judge or jury, not a memory expert. I assume good faith all around.

Next, I provide my independent assessment of the eyewitness evidence in this case. I then comment on the analysis provided by Dr. Dysart in her expert report.

## Opinions Concerning the Eyewitness Identifications in the Sierra Case

This is a stranger ID case (i.e., the witnesses were not previously familiar with Sierra). For many years, the field believed that eyewitness memory for strangers was inherently unreliable, but in recent years, the field has come to understand that, even for stranger IDs, there are conditions under which eyewitness memory is reliable and conditions under which it is unreliable. Thus, for any particular case, it is important to determine which set of conditions applies. Evidence from the Innocence Project and from Garrett (2011) indicate that ~70% of DNA exonerations of innocent prisoners involved eyewitness misidentifications. These statistics would seem to support the impression that eyewitness memory is generally unreliable, but the field has recently come to appreciate that the opposite is in fact true. What is missing in those seemingly unfavorable statistics is the all-important distinction between (1) eyewitness IDs made on the initial (uncontaminated or at least minimally contaminated) memory test, often from a lineup, and (2) eyewitness IDs made on later (contaminated) memory tests, such as the ID that occurs in court at the time of the trial. The field now understands that the very act of testing memory for a suspect contaminates the witness's memory of that suspect, as can many other factors, such as post-ID comments made by the investigating officer (e.g., Wells & Bradfield,

1998). Therefore, the most informative eyewitness evidence comes from the *very first memory test* (i.e., from the photo lineup in this case). With respect to the eyewitness identification evidence, speaking scientifically (but not necessarily legally), everything that happened subsequently – up to and including what the witnesses said under oath in court – is less relevant because the witness's memory was irreversibly changed (i.e., contaminated) not only by the first lineup test but by many later factors as well. Thus, assuming the witnesses were being honest, the IDs made from the initial lineups provide the most probative and least prejudicial information than any subsequent memory tests.

In years gone by, the field was under the impression that eyewitness confidence is inherently uninformative, even on an initial, uncontaminated test (and certainly on later tests involving contaminated memory). However, on an initial test from a lineup, the field has recently come to understand that IDs made with high confidence can be highly accurate (Juslin, Olsson, & Winman, 1996; Palmer, Brewer, Weber, & Nagesh, 2013; Wixted, Mickes, Clark, Gronlund & Roediger, 2015; Wixted & Wells, 2017; Wixted, Mickes, & Fisher, 2018). It is true that witnesses make a lot of filler IDs in real-world police lineups (these are known errors in which an innocent person has been misidentified), but what was not known until recently is that, when they do make that error, the IDs are usually made with low confidence (Wixted, Mickes, Dunn, Clark, & Wells, 2016). In other words, witnesses usually signal the inconclusive nature of their mistaken IDs on the scientifically most relevant (i.e., first) memory test. It is only later that confidence becomes an unreliable indicator of accuracy.

Similarly, according to Garrett's (2011) analysis of court documents in the DNA exoneration cases discussed above, 92 cases involved testimony about the initial memory test. Not a single one was made with high confidence. Instead, all of the initial misidentifications, if any occurred at all, were made with low confidence. Some of the initial IDs were made to fillers, and some did not even occur because the witness rejected the lineup containing the innocent suspect. It was only later, after memory had been irrevocably contaminated by the first test, that these same witnesses made high-confidence misidentifications at trial (in front of the jury). But on the initial, uncontaminated memory test, the eyewitnesses in the DNA exoneration cases were reliable in the sense that they clearly signaled the error-prone nature of their IDs (i.e., they clearly signaled the inconclusive nature of the only forensic memory test result that involves uncontaminated evidence).

The legal system's occasional failure to consider only the initial expressions of low confidence—and its inadvertent reliance on tainted memory evidence at trial—is not an indictment of eyewitness memory. Analogously, imagine (1) ignoring a forensic DNA test that was determined to be "inconclusive," (2) unintentionally contaminating the evidence with the DNA of an innocent suspect, (3) running the DNA test again, this time obtaining a conclusive result, and then (4) using that conclusive result to convict the defendant. If that were standard practice, it would not be an indictment of the reliability of forensic DNA evidence, but it would be an indictment of police practices (however unintentional). For similar reasons, blaming the wrongful convictions on the fallibility of eyewitness memory is now understood to have been misplaced. The key lesson, one that was learned only recently, is that the focus must be placed solely on the initial good-faith test of memory, ignoring all later tests. On an initial, uncontaminated test, eyewitness memory is highly accurate in the sense that high confidence implies high accuracy, whereas low confidence implies low accuracy.

A high-confidence ID is made immediately and without equivocation. If the lineup is fair and if the witness's memory has not yet been contaminated by seeing the suspect's face (e.g., on the news or a wanted poster), such IDs tend to be highly accurate. By contrast, witnesses who equivocate (e.g., if the ID is made with low confidence or after examining the faces for minutes),

tend to be inaccurate (not much better than random chance) even if they identify the suspect from a fair lineup on an initial test of memory.

The contemporaneous police records indicate that **Jose Melendez** and **Alberto Rodriguez** both identified **Sierra** from a photo array when they were first tested independently in the days after the crime. The contemporaneous police records do not indicate how quickly the IDs were made, nor do they indicate how confident the witnesses were when they made the IDs. Thus, the critical information needed to determine how reliable the IDs were is not available. At trial, in February of 1997, almost two years after the crime, **Melendez** testified that he looked at the photos for "a couple of minutes." **Rodriguez** similarly testified at trial that he took even longer to identify Sierra from the initial photo lineup ("Five, ten minutes"). If accurate, this would tend to indicate that the IDs were made with low confidence and were therefore unlikely to be very accurate. However, witnesses are known to be inaccurate in estimating continuous variables like duration, weight, height, and distance even shortly after a crime, so these estimates coming almost two years after the crime are unlikely to be very informative. In other words, it is difficult to imagine how reports from memory that are not particularly accurate even shortly after a crime is committed would exceed chance accuracy nearly two years down the line (after much forgetting and contamination likely would have occurred). Still, even one assumes that both IDs were made with low confidence, if they were independent (i.e., no influence from the lineup administrator, the lineup was fair, no communication between the two witnesses about who the other witness picked), then the fact that both witnesses landed on the same suspect should increase confidence that the suspect was in fact the perpetrator. As an example, in a fair 6-person lineup administered without influence from the administrator, an ID made by an eyewitness has a 1/6 probability of landing on the suspect by chance. However, two independent IDs have only a $1/6 \times 1/6 = 1/36$ probability of both landing on the suspect by chance.

At Sierra's trial in February of 1997, **Melendez** testified that, during the photo lineup, he did not spontaneously identify anyone. Instead, according to his testimony, Detective Guevara told him to identify **Sierra** because he had reason to believe he was the shooter. Even if this was honest testimony, the science of eyewitness memory suggests that it may not have much information value. By the time of trial, much forgetting would have occurred, and his memory could have been unwittingly contaminated by conversations with others. A layperson might think "there is no way anyone would forget having been encouraged like that to make an ID," but a memory expert knows how wrong it is to think that way. The question is not whether such an event would be remembered if it had occurred; instead, the question is whether the event might be remembered despite the fact that it had *not* occurred. The answer is that it might be remembered either way. Detective Guevara may very well have pointed to Sierra's photograph with **Melendez**, or he may not have done that despite **Melendez** sincerely remembering otherwise. Subjectively truthful reports from memory almost two years after the fact are not of much help in adjudicating the issue one way or the other because human memory is not up to the task. For that reason, to decide whether or not the detective pointed to a photo of Sierra during the administration of the photo lineup, independent (ideally contemporaneous) corroborating evidence is needed, and this is a matter that was disputed at trial and it is a determination that falls outside the purview of an eyewitness memory expert.

## Comments on Dr. Dysart's Expert Report

I next comment on the expert report provided by Dr. Dysart. Her substantive comments begin in Section V of the report, which provides a brief overview of how memory works. In my opinion, this section is unbalanced because it focuses exclusively on the fallibility of memory, with no discussion at all of the brain mechanisms and cognitive models that explain why

memory can be accurate under some circumstances and inaccurate under other circumstances. For example, her report notes that "In a 2011 analysis of the first 250 DNA exoneration cases in the United States, Duke University Law Professor Brandon Garrett found that the leading contributing factor in these wrongful convictions was erroneous eyewitness identification, which occurred in 76% of the first 250 cases." However, as I noted earlier in this report, Garrett's analysis also examined 92 cases for which testimony about the initial identification was available. Although the witnesses in those cases testified with high confidence at trial, not one of them did so on the initial test (the test on which eyewitness identification accuracy can be highly reliable). A balanced presentation of the relevant science should not omit that important detail. This section of her report also notes that "In addition to the wrongful conviction cases described above, archival studies of police records also show that eyewitness identifications can be unreliable" based on the observation that one-third of all positive identifications are made to fillers and are therefore known to be incorrect. This, too, provides an unbalanced overview of the relevant science because it omits the critical observation that when eyewitnesses misidentify fillers, they usually do so with low confidence, but when they identify suspects, they usually do so with high confidence, thereby providing useful information about whether or not the ID was correct (Wixted et al., 2016).

Section IV of Dr. Dysart's report provides the basis for her opinions in this case. She first considers the distinction between estimator variables and system variables, which was originally proposed by Wells (1978). System variables are factors that can affect memory performance and that are under the control of law enforcement (e.g., whether to use a simultaneous photo array or a sequential photo array, or whether a fair or unfair lineup is administered). By contrast, estimator variables are factors that can affect memory performance and are not under the control of law enforcement (e.g., how dark it was when the crime occurred). While everyone agrees that system variables are a relevant consideration, it seems important to emphasize that Wells himself, in his original article and still to this day, does not regard an analysis of estimator variables to be useful. One problem with focusing on estimator variables is well illustrated by Dr. Dysart's report. Her report focuses exclusively on estimator variables that might have impaired memory, with no attention paid to estimator variables that might have enhanced memory. Her report is unbalanced in that respect. Some estimator variables can harm performance (e.g., darkness), whereas others can enhance performance (e.g., young witnesses with sharp eyes and optimal brain functioning).

Critically, eyewitness experts cannot know every relevant detail of the encoding conditions at the time of the crime, so they cannot know if the encoding conditions were sufficient to form a memory of the perpetrator. In the original paper proposing the concept of "estimator variables," Wells (1978) explained why. The problem is that there are simply too many variables that would have to be simultaneously considered, some of which would help to encode the perpetrator's face and some of which would have the opposite effect. We cannot know the status of all the relevant variables in effect the night of the crime, and (critically) even if we did, the field has no idea how those variables might interact with each other. As Wells (1978) put it:

> **For example, one may have a checklist such as "What is the victim's race? What is the defendant's race? How attractive was the defendant? What is the witness's sex? How old is the defendant? How severe was the crime? What was the witness's perceptual set? visual context? exposure time?" and so on. But surely any psychologist must realize the futility of such an approach" (p. 1551).**

More recently, Quigley-McBride and Wells (2023) underscored this point:

**Estimator variables provide only limited guidance in a real eyewitness identification case… If estimator variables typically cannot be identified and measured, they cannot be used to effectively sort between identifications of suspects and known-innocent fillers in real-world lineups. For the same reasons, it is unlikely that estimator variables could be used effectively in the field to distinguish between identifications of innocent and guilty suspects (p. 2).**

Although it is unlikely that a consideration of estimator variables can aid in the assessment of the reliability of the eyewitness identifications in this case, this is precisely what Dr. Dysart does in her report, focusing only on estimator variables that might have made it difficult for the witnesses to form a memory of the perpetrator. The purpose of such one-way speculation is not clear to me. Indeed, in this regard, Wells (1978) made the following cogent point: "How can we be assured that psychologists' expert testimony will not create jurors and judges who are less believing of witnesses than they should be?" (p. 1551). Yet Dysart's report asserts the following: "Together, these estimator variables likely created a scenario where it would have been difficult for either witness to have a strong memory for the perpetrator."

Dr. Dysart's basic argument is that accuracy would be impaired by the limited opportunity to observe the event and by high stress. This may or may not be true (depending on other estimator variables that may have enhanced the formation of a memory), but even if it is true, the kind of "accuracy" that is affected by these variables is not the kind of accuracy that is relevant to the assessment of the reliability of the suspect IDs that occurred in this case. Poor estimator variables make it less likely that the witness will form a memory of the perpetrator and therefore increase the odds that the witness will later make the mistake of failing to identify the suspect from a lineup even when the suspect is guilty. Poor estimator variables do not implant a false memory of an innocent suspect who might appear in a showup or a lineup. For example, if the event happens so fast that the witness did not have an opportunity to view the face of the perpetrator, the end result would not be a false memory of an innocent suspect who might later be presented to an eyewitness as part of an identification test. Indeed, even Dr. Dysart's report correctly points out that "…the effect of stress was larger for target-present than for target-absent lineups—that is, stress particularly reduced *correct* identification rates" (emphasis added).

Had the witnesses in this case failed to identify a person who was (somehow) known to have committed the crime, and had they also indicated that they did not get a good look at the perpetrator's face because the lighting was very poor, a review of the effect of suboptimal estimator variables like poor lighting would help us to understand that memory error. However, spending time explaining why the witnesses might not have encoded a memory of the perpetrator when (assuming good faith all around) we already know that the witnesses *did* identify Sierra is, in my opinion, unproductive. The question of interest concerns the accuracy of a suspect ID given that it has occurred, not the accuracy of any memory decision (suspect ID, lineup rejection, or filler ID) that will occur following poor estimator variables conditions. Recent work on lineups suggests that estimator variables, whether favorable or unfavorable, often have little to no effect on the accuracy of suspect IDs made with a given level of confidence (Semmler et al., 2018). Also, as noted earlier, estimator variables are rarely uniformly unfavorable, and accurately estimating the status of each relevant estimator variable and how they interact with each other in an effort to estimate eyewitness reliability is beyond the capabilities of an eyewitness memory expert (Wells, 1978). This is why, in my opinion, it is misleading for Dr. Dysart's report to assert that "In this case, there were many estimator and system variables present that have been shown to decrease eyewitness reliability."

With regard to "description accuracy," Dr. Dysart's report points out that the witnesses provided relatively vague descriptions of the perpetrator. Although she states that in her own professional experience, witnesses rarely provide such vague descriptions, the scientific literature

7

instead suggests that it is common. For example, Lindsay et al. (1994) investigated that very issue, noting that "The data strongly support our concern that eyewitness descriptions are frequently vague" (p. 531). Similarly, in a review of the literature, Meissner, Sporer, and Schooler (2007) stated that "Person descriptions tend to be vague and nondiscriminative" (p. 26). Her report also notes that "With respect to research on witness description accuracy, in Professor Garrett's (2011) book studying the first 250 DNA-based exonerations, he found there was a substantial mismatch between the description provided by witnesses and the actual appearance of the innocent defendant in a full 62% of the 161 wrongful conviction cases that were based in part on misidentification." But this is how it should be. The witnesses accurately described the *perpetrator* to the police shortly after the crime, not the innocent suspect whose face would later contaminate the witness's memory (leading to a high-confidence ID of the innocent suspect at trial). Her report goes on to say "Garrett's finding is consistent with scientific research showing a correlation between the presence of incorrect descriptors and inaccurate identifications in that, as the number of incorrect descriptors of a suspect increases, identification accuracy decreases." In support of that claim, Dr. Dysart cites a review article by Meissner et al. (2008). However, that paper reaches the *opposite* conclusion. Meissner et al. (2008) found a small relationship in studies that lacked realism (the relationship highlighted by Dr. Dysart), but the relationship was "…weakest in studies that utilised eyewitness identification paradigms that focused encoding and identification on a single target face presented in a more realistic manner (via a videotaped or live event)" (p. 443). In other words, the more realistic the study, the less description accuracy predicted identification accuracy. Meissner et al. (2008) also state the following: "The courts have suggested that a witness's description may be used to assess the veracity of his/her identification of the suspect (Neil v. Biggers, 1972); however, the current review questions the application of this assumption…" (p. 445). Meissner et al. (2007) summarize the research even more succinctly: "Despite the appeal of the belief that a strong relationship should exist between face description quality and identification accuracy, research reveals that this relationship is at best very weak and often nonexistent" (p. 20).

For all of these reasons, I disagree with Dr. Dysart's suggestion that "The lack of description detail and the witness' inability to provide additional information when asked should have been a red flag for investigators that these witnesses did not have a strong memory for the shooter and would therefore would not likely be reliable eyewitnesses in the investigation."

Dr. Dysart's report then considers the following system variables:

1) Photo Array and Lineup Bias

2) Pre-identification Warnings/Instructions

3) Non-blind Lineup Administration

4) Repeated Identification Procedures, Unconscious Transference and Commitment Effects

5) Witness Confidence

6) Post-identification Feedback

I next consider her discussion of each of these variables in turn.


**1) Photo Array and Lineup Bias**

With regard to the first issue, Dr. Dysart states that "In my opinion, the photo array shown to Mr. Rodriguez on May 25, 1995 and Mr. Melendez on May 30, 1995 was biased

against Mr. Sierra. Foremost, Mr. Melendez testified at trial (TT. E209) and again at his 2019 deposition in this case (P.42) that Det. Guevara held only Mr. Sierra's photograph in his hand during the photo array procedure. If true, this alone would have made the identification procedure unnecessarily suggestive and extremely biased against Mr. Sierra." However, eyewitness memory experts are in no position to determine if the later allegations (made decades after the fact) are true or not. The reason is that memory is malleable, and even her own report describes how malleable memory is:

> **Specifically, researchers have identified a number of ways that eyewitness evidence – a witness' recollection of events – like other forms of trace evidence in an investigation, can be altered and/or affected through contamination, especially when the witness' memory is not strong to begin with. Contamination of a witness' memory can come from many sources including information learned from (or about) other witnesses, information provided by law enforcement or other individuals charged with the collection (and preservation) of eyewitness evidence, media and social media accounts relating to the case. Regardless of the source, however, once a witness' memory has been exposed to post-event information, it is extremely difficult to ascertain the full impacts of this contamination on a witness' subsequent recollection of events and people.**

This is correct, and it is precisely why the focus must be placed on the initial tests of memory, typically conducted early in a police investigation. That is where reliable information can be obtained from a witness's memory. Yet Dr. Dysart based her opinion on the biased nature of the lineup administration on reports from memory emerging for the first time years after the event in question. As she clearly explains in her report, memory is malleable. As a result, reports from memory become less informative with the passage of time, and this is true whether those reports favor the plaintiff or the defendants.

    Dr. Dysart's report also states that "Both witnesses described the shooter as being as young as 18. It is very unlikely that some fillers in the photo array could possibly be 18 years old. For example, the arrest photo of #1 (J. Sepulueda) was taken in 1987, over 7 years before the shooting in this case. Photo #2 (M. Ruiz) was taken in 1988, over 6 years before this case. In this photograph, Mr. Ruiz appears much older than 18." The recommended approach is to use description-matched fillers, but, according to a 2013 survey of police department procedures (Police Executive Research Forum, 2013), most police departments in the U.S. use suspect-matched fillers instead (i.e., fillers chosen to have generally the same height, weight, age, and race). The judgment call as to whether or not the fillers in the photo lineup used in this case were sufficiently similar to the suspect falls outside the expertise of an eyewitness identification expert. The expert explains the science-based principles that determine whether or not a lineup is biased against the suspect; the expert does not make the judgment call as to whether or not any particular lineup was in fact biased against the suspect.

    Dr. Dysart's report states that "After being selected from an unnecessarily suggestive photo array, the results from any subsequent procedure are relatively meaningless. That is the bias from the first suggestive procedure renders any second procedure's outcome irrelevant for the purposes of determining witness accuracy." Again, whether or not the photo array was unnecessarily suggestive is a judgment call to be made by factfinders, but it is worth noting here that the first procedure (suggestive or not) renders any second procedure's outcome irrelevant for the purposes of determining eyewitness accuracy for a given suspect. Seeing the suspect's face in a fair or unfair lineup contaminates the witness's memory of that suspect.

**2) Pre-identification Warnings/Instructions**

With regard to the use of inappropriate pre-lineup instructions, Dr. Dysart's report states "Mr. Melendez testified at trial – and in his deposition testimony – that Det. Guevara pointed out Mr. Sierra's photograph in the array and told Mr. Melendez to pick him because Det. Guevara had reason to believe it was the right guy." Here again, this is testimony that occurred almost two years after the fact, and her own expert report explains why such testimony can be false (even if sincerely believed by Melendez). Her report also notes that "In 1992, the International Association of Chiefs of Police issued Training Key (#414) on how to conduct identification procedures and that training key included recommendations for pre-identification warnings." It is not clear why this point is being made given that the training key in question has nothing to do with the science of eyewitness identification. As I noted earlier, the first science-based recommendations were published three years after this case was investigated.

In any case, the version of events described by Melendez is determined to be accurate, it would not require an eyewitness memory expert to conclude that the ID was not based on Melendez's memory but was instead based on Detective Guevara's instruction. However, if the only evidence that Detective Guevara steered Melendez to identify Sierra on the initial test is a sincerely-held memory being reported for the first time more than 1.5 years after the fact, then the best one can say is that the memory might be true or it might be false. Independent corroborating evidence would be needed to decide the issue.

**3) Non-blind Lineup Administration**

The identification procedures in this case were conducted by detectives who were aware that Mr. Sierra was the suspect in the photo array. Dr. Dysart's report states the following: "In summary, though double-blind administration was not the norm in the United States in 1995, if double-blind administration had been used in this case, it would have eliminated the possibility that the administering detectives influenced the witnesses to select Mr. Sierra from the photo arrays and lineup. In cases, such as this one, where law enforcement have 'steered' a witness toward a particular lineup member, the resulting selection is relatively meaningless with respect to witness reliability." It is unclear to me why Dr. Dysart has concluded that law enforcement steered a witness toward a particular lineup member. This is a matter that was disputed at trial and it is a determination that falls outside the purview of an eyewitness memory expert.

**4) Repeated Identification Procedures, Unconscious Transference and Commitment Effects**

I basically agree with the general message of this section of Dr. Dysart's report, which is that additional identification procedures (beyond the first) involving the same suspect constitute tests of contaminated forensic memory evidence. Such tests are biased against the suspect, so the focus should be placed on the first test only.

**5) Witness Confidence**

Here again, I basically agree with the general message of this section of Dr. Dysart's report, which is that confidence can be a strong indicator of accuracy on the initial test but is much less informative on later tests.

**6) Post-identification Feedback**

  Yet again, I basically agree with the general message of this section of Dr. Dysart's report, which is that a number of factors that follow the initial identification can affect how a witness remembers the crime and how confident they were on an initial memory test.

_____
John Wixted, Ph.D.

# References

Garrett, B. (2011). *Convicting the Innocent: Where Criminal Prosecutions Go Wrong*. Cambridge, MA: Harvard University Press.

Juslin, P., Olsson, N., & Winman, A. (1996). Calibration and diagnosticity of confidence in eyewitness identification: Comments on what can be inferred from the low confidence–accuracy correlation. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 22*(5), 1304–1316.

Meissner, C. A., Sporer, S. L., & Schooler, J. W. (2007). Person descriptions as eyewitness evidence. In R. C. L. Lindsay, D. F. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol. 2. Memory for people* (pp. 3–34). Lawrence Erlbaum Associates Publishers.

Meissner, C. A., Sporer, S. L., & Susa, K. J. (2008). A theoretical and meta-analytic review of the relationship between verbal descriptions and identification accuracy in memory for faces. *European Journal of Cognitive Psychology*, *20*, 414-455.

National Institute of Justice (1999). *Eyewitness Evidence A Guide for Law Enforcement* (http://www.ncjrs.gov/pdffiles1/nij/178240.pdf)

National Research Council (2014). *Identifying the Culprit: Assessing Eyewitness Identification*. Washington, DC: The National Academies Press.

Palmer, M., Brewer, N., Weber, N. & Nagesh, A. (2013). The confidence-accuracy relationship for eyewitness identification decisions: Effects of exposure duration, retention interval, and divided attention. Journal of Experimental Psychology: Applied, 19, 55-71.

Police Executive Research Forum (2013). A National Survey of Eyewitness Identification Procedures in Law Enforcement Agencies. Retrieved March 29, 2016, from http://www.policeforum.org/

Quigley-McBride, A., & Wells, G. L. (2023). Eyewitness confidence and decision time reflect identification accuracy in actual police lineups. *Law and Human Behavior.* Advance online publication. https://doi.org/10.1037/lhb0000518

Semmler, C., Dunn, J., Mickes, L. & Wixted, J. T. (2018). The role of estimator variables in eyewitness identification. *Journal of Experimental Psychology: Applied, 24*, 400-415.

Wells, G. L. (1978). Applied eyewitness-testimony research: System variables and estimator variables. *Journal of Personality and Social Psychology, 36(12)*, 1546–1557.

Wells, G. L., & Bradfield, A. L. (1998). "Good, you identified the suspect": Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83*(3), 360–376

Wells, G. L., Kovera, M. B., Douglass, A. B., Brewer, N., Meissner, C. A., & Wixted, J. T. (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44*, 3-36.

Wells, G. L., Small, M., Penrod, S. J., Malpass, R. S., Fulero, S. M., & Brimacombe, C. A. E. (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. *Law and Human Behavior, 22*, 603–647.

Wixted, J. T., Mickes, L., Dunn, J. C., Clark, S. E. & Wells, W. (2016). Estimating the reliability of eyewitness identifications from police lineups. *Proceedings of the National Academy of Sciences, 113*, 304-309.

Wixted, J. T., Mickes, L. & Fisher, R. P. (2018). Rethinking the Reliability of Eyewitness Memory. *Perspectives on Psychological Science, 13*, 324-335.

Wixted, J. T., Mickes, L., Clark, S. E., Gronlund, S. D. & Roediger, H. L. (2015). Initial eyewitness confidence reliably predicts eyewitness identification accuracy. *American Psychologist, 70*, 515-526.

Wixted, J. T. & Wells, G. L. (2017). The Relationship between Eyewitness Confidence and Identification Accuracy: A New Synthesis. *Psychological Science in the Public Interest, 18*, 10-65.

Wixted, J. T., Wells, G. L., Loftus, E. F., & Garrett, B. L. (2021). Test a witness's memory for a suspect only once. *Psychological Science in the Public Interest*. https://doi.org/10.1177/15291006211026259

# Appendix

**Materials Reviewed**:

Jose Melendez testimony 6FEB97.pdf
Sierra - Dysart 2022 Report.pdf
0. Google Map.pdf
0. Guevara-L 000131-000136 - Sierra and Iglesias Court of Claims Awards(1).pdf
0. Jose Melendex dep 063014.pdf
0. PC 2011-04-18 Petition Amend Original.pdf
0. PC Petition 1999-09-18.pdf
1. Amended Complaint.pdf
2. First Night - Scene Report.pdf
3. First Night - Area Five Report.pdf
5. Sierra Rap Sheet.pdf
7. Arrest Report.pdf
8. Closing Report.pdf
9. Investigative File and Inventory.pdf
10. Jose M Stmt.pdf
12. Lucy Stmt.pdf
13. Arrest Report.pdf
15. SIERRA 5462-5940 - PD File_v1_current.pdf
16. 1_9_18 dismissal order (EP Sierra Sub. Resp. 9276-9277).pdf
17. Black Car in Parking Lot Photos.pdf
19. Photo Array Photos.pdf
20. Scene Photo at Night.pdf
21. Arrest Report.pdf
23. Perm Retention File.pdf
24. Photos.pdf
25. More Photos.pdf
27. SIERRA 1148-1149 & 1234-1308 - Feb 6, 1997 ROP.pdf
28. Jose Melendez Criminal Trial Testimony (2-6-1997).pdf
29. Reynaldo Guevara Criminal Trial Testimony (2-6-1997).pdf
34. Jose 2010.3.28 affidavit.pdf
36. PC 2017-09-20 Petition Amend 2.pdf
37. PC 2017-x Petition Amend 3.pdf
39. Dysart Report 2016.pdf
39. Map of Scene.pdf
40. Order 2018-01.09 Charges dismissed.pdf
41. 082621 Thomas Sierra Dep_full_ex.pdf
42. COI Order.pdf
46. Letter to Alberto Rodriguez 2021.08.19.pdf
47. AR Letter April 27, 2021.pdf
48. BOP JD Crook Email re AR Letter.pdf
50. JOSE MELENDEZ DEP 9-13-2021_revised_full_ex.pdf
51. Thomas Sierra_full_ex.pdf
54. John McMurray Deposition.pdf
55. Malczyk Dep.pdf
56. Trempe, Kenneth 100120 PDF Portfolio.pdf
57. Wojcik Dep.pdf

58. Reynaldo Guevara  8-20-19  PDF.pdf

15