# Exhibit 12

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HON. JOHN Z. LEE
HON. M. DAVID WEISMAN
NO. 18 C 3029

THOMAS SIERRA,
Plaintiff

V.

REYNALDO GUEVARA, ET AL.,
Defendants

DEPONENT: LIEUTENANT JOHN FOSTER, 30(b)(6)
DATE: JUNE 29, 2022
REPORTER: SYDNEY LITTLE

Page 2

HON. CHARLES P. KOCORAS
NO. 18 C 3335

ARIEL GOMEZ,
Plaintiff

V.

REYNALDO GUEVARA, ET AL.,
Defendants

DEPONENT: LIEUTENANT JOHN FOSTER, 30(b)(6)
DATE: JUNE 29, 2022
REPORTER: SYDNEY LITTLE

Page 3

HON. MARY M. ROWLAND
HON. SUSAN E. COX
NO. 18 C 7951

RICARDO RODRIGUEZ,
Plaintiff

V.

REYNALDO GUEVARA, ET AL.,
Defendants

DEPONENT: LIEUTENANT JOHN FOSTER, 30(b)(6)
DATE: JUNE 29, 2022
REPORTER: SYDNEY LITTLE

Page 4

HON. JOHN F. KNESS
HON. SUSAN E. COX
NO. 19 C 2441

ROBERT BUOTO,
Plaintiff

V.

REYNALDO GUEVARA, ET AL.,
Defendants

DEPONENT: LIEUTENANT JOHN FOSTER, 30(b)(6)
DATE: JUNE 29, 2022
REPORTER: SYDNEY LITTLE

Page 5

HON. FRANKLIN U. VALDERRAMA
HON. MARIA VALDEZ
NO. 19 C 6508

GERALDO IGLESIAS,
Plaintiff

V.

REYNALDO GUEVARA, ET AL.,
Defendants

DEPONENT: LIEUTENANT JOHN FOSTER, 30(b)(6)
DATE: JUNE 29, 2022
REPORTER: SYDNEY LITTLE

HON. SARA L. ELLIS
HON. HEATHER K. MCSHAIN
NO. 20 C 4156

DEMETRIUS JOHNSON,
Plaintiff

V.

REYNALDO GUEVARA, ET AL.,
Defendants

DEPONENT: LIEUTENANT JOHN FOSTER, 30(b)(6)
DATE: JUNE 29, 2022
REPORTER: SYDNEY LITTLE



APPEARANCES

ON BEHALF OF THE PLAINTIFFS, THOMAS SIERRA, ARIEL GOMEZ, RICARDO RODRIGUEZ, ROBERT BUOTO, GERALDO IGLESIAS, DEMETRIUS JOHNSON:
Anand Swaminathan, Esquire
Ruth Brown, Esquire
Loevy & Loevy
311 North Aberdeen Street
Third Floor
Chicago, Illinois 60607
Telephone No.: (312) 243-5900
E-mail: anand@loevy.com
ruth@loevy.com
(Appeared via videoconference)



APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
Eileen Rosen, Esquire
Jessica Zehner, Esquire
Rock Fusco & Connelly, LLC
333 West Wacker Drive
19th Floor
Chicago, Illinois 60606
Telephone No.: (312) 494-1000
E-mail: erosen@rfclaw.com
jzehner@rfclaw.com
(Appeared via videoconference)

ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:
Megan McGrath, Esquire
Josh Engquist, Esquire
Leinenweber Baroni & Daffada LLC
120 North LaSalle Street
Suite 2000
Chicago, Illinois 60602
Telephone No.: (866) 786-3705
E-mail: mkm@ilesq.com
jengquist@jsotoslaw.com
(Appeared via videoconference)



INDEX


| | Page |
|---|---|
| PROCEEDINGS | 12 |
| DIRECT EXAMINATION BY MR. SWAMINATHAN | 15 |
| CROSS EXAMINATION BY MS. ROSEN | 349 |
| REDIRECT EXAMINATION BY MR. SWAMINATHAN | 349 |


EXHIBITS


| Exhibit | Page |
|---|---|
| 1 - Notice of Deposition | 53 |
| 2 - Amended Notice of Deposition | 54 |
| 3 - Organized Crime Division Special Order 93-01 - RFC 276-284 | 82 |
| 4 - City of Chicago Department of Police Identification Procedures - Foster 30(b)(6) 68-74 | 158 |
| 5 - Preservice Gang Specialist Training - Foster 30(b)(6) 75-279 | 179 |
| 6 - Interrogations Field and Custodial Line-Up Procedures - Foster 30(b)(6) 1-2 | 199 |
| 7 - General Order 88-18 Rescinding 88-18 - Foster 30(b)(6) 3-4 | 201 |

EXHIBITS (CONTINUED)

8 - Line-Up Procedures Special Order S06-02 - Foster 30(b)(6) 5-7 201



STIPULATION

The VIDEO deposition of LIEUTENANT JOHN FOSTER, 30(b)(6) was taken at KENTUCKIANA COURT REPORTERS, 30 SOUTH WACKER DRIVE, FLOOR 22, CHICAGO, ILLINOIS 60606, via videoconference in which all participants attended remotely, on WEDNESDAY, the 29th day of JUNE 2022, at 10:09 a.m.; said VIDEO deposition was taken pursuant to the FEDERAL Rules of Civil Procedure 30(b)(6). The oath in this matter was sworn remotely pursuant to FRCP 30.

It is agreed that SYDNEY LITTLE, being a Notary Public and Court Reporter for the State of ILLINOIS, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.



PROCEEDINGS

COURT REPORTER: On record. My name is Sydney Little. I'm the online video technician and court reporter today representing Kentuckiana Court Reporters, located at 30 South Wacker Drive, Floor 22, Chicago, Illinois 60606. Today is the 29th day of June 2022. The time is 10:10 a.m. We are convened by videoconference to take the deposition of Lieutenant John Foster, 30(b)(6) in the matter of Thomas Sierra versus Reynaldo Guevara, et al., number 18 C 3029; Ariel Gomez versus Reynaldo Guevara, et al., number 18 C 3335; Ricardo Rodriguez versus Reynaldo Guevara, et al., number 18 C 7951; Robert Buoto versus Reynaldo Guevara, et al., number 19 C 2441; Geraldo Iglesias versus Reynaldo Guevara, et al., number 19 C 6508; Demetrius Johnson versus Reynaldo Guevara, et al., number 20 C 4156, pending in the United States District Court for the Northern District of Illinois, Eastern Division. Will everyone, but the witness, please state your appearance, how you're attending, and the location you're attending from, starting with Plaintiff's counsel?

MR. SWAMINATHAN: Thank you. Anand



Swaminathan for plaintiff in all of those cases you just listed in the captions.

MS. ROSEN: Eileen Rosen for the City of Chicago and the witness for all of the cases that you just listed in the caption.

MR. SWAMINATHAN: And sorry. Sorry, before we keep going, for plaintiffs, my colleague Ruth Brown may also be joining for part of the day today. She's not currently on, but I'll just identify her appearance to the extent she logs on at some point.

MS. ZEHNER: And this is –

MR. ENGQUIST: Josh – oh, go ahead.

MS. ZEHNER: Oh, thank you. This is Jessica Zehner on behalf of the City of Chicago, for all the cases, appearing remotely from Chicago.

MR. ENGQUIST: Josh Engquist on behalf of all the individual officer defendants in all the cases listed, with the exception of Reynaldo Guevara, attending remotely from my office in Chicago.

MS. MCGRATH: Megan McGrath on behalf of Defendant Reynaldo Guevara on all of the cases, attending remotely from my office in Chicago.

THE WITNESS: Don't want to click on anything with –

MS. ZEHNER: Thank you.

COURT REPORTER: Can you hold one second while I just fix the Zoom. Oh.
THE WITNESS: Thank you. I didn't want to do anything without knowing.
COURT REPORTER: All right. Lieutenant Foster, will you please state your name for the record?
THE WITNESS: John, J-O-H-N, Foster, F-O-S-T-E-R.
COURT REPORTER: Thank you. Do all parties stipulate that the witness is, in fact, Lieutenant John Foster?
MR. SWAMINATHAN: Plaintiff stipulates.
COURT REPORTER: Thank you, Lieutenant Foster –
MS. MCGRATH: Stipulates.
COURT REPORTER: Lieutenant Foster, will you please raise your right hand? Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth and nothing but the truth?
THE WITNESS: I do.
COURT REPORTER: Thank you. Counsel may begin.
DIRECT EXAMINATION



BY MR. SWAMINATHAN:
Q Thank you. Sir, could you state and spell your name for the record?
A John, J-O-H-N, Foster, F-O-S-T-E-R.
Q How old are you, sir?
A – 6.
Q Sir, you cut out there for a second.
A 56.
Q Okay. And you indicated that you're currently Lieutenant; is that correct, sir?
A Yes.
Q Okay. And during the course of this deposition, I want to treat you with your respect you deserve, I will try to refer to you as Lieutenant Foster. If I refer you as Mr. Foster; is that okay?
A John works, too.
Q Okay. All right, I appreciate that. You're - - you said you indicated that you're currently a lieutenant to the Chicago Police Department. What is your detail or assignment?
A I'm assigned to Area 5 homicide.
Q So are you currently overseeing violent crime - - is it – is the division referred to as Violent Crimes or Homicide?
A Currently the – as of about three years ago,



they separated Homicide from Violent Crimes. So there's Homicide, Violent Crimes, and property crimes.
Q Okay. And so you're currently assigned to – as a lieutenant overseeing homicide detectives and sergeants; is that correct?
A I'm the commanding officer of Area 5 – Area 5 homicide, excuse me.
Q Okay. And then is there a – and then, who do you report to? Do you report to a commander?
A Correct.
Q Okay. And who's the current Area 5 commander that you report to?
A Joel Howard.
Q And how long have you been in the position of lieutenant over Homicides?
A Approximately three years.
Q Okay. And were you previously a homicide detective at any point?
A Yes.
Q And I take it, then, when you were a detective, you were not a homicide detective, you were a violent crime detective; is that right?
A I was in the violent crime section, but I worked almost exclusively homicides when I was a detective.



Q Okay. What was the period of time you were a detective in violent crimes?
A Late 1999 to 2013.
Q Okay. Okay, when did you begin at the Chicago Police Department, sir?
A When that was – when was I hired?
Q Yes.
A November of 1991.
Q Okay. Okay, all right. Let's walk quickly through your career. I'm not going to ask you about all of it, but I wanted to just make sure I have an understanding of your background. So why don't you walk me through your career? I may – this is one of the rare times I may stop you as you're answering my questions, just to make sure I – I'm keeping up with you. But can you take me through from the time you joined the police department?
A Well, obviously you go through the – go through the police academy. I trained in the 10th District. After I was done with my training, I went to the 22nd District. I was on the TAC team in the 22nd District, I went to the 4th District.
Q So in –
A Back to the 4th –
Q – sorry, let me pause you there. The time

that you were in the 22nd District, what period of time was that approximately?
A 1993 to maybe 1995 or '6.
Q Okay. So you spent -- for your first two years in the department from '91 to '93, you were in the 10th District; is that right?
A No, my first year I was in the academy, and I trained in the 10th District, so that would've been a first year, year-and-a-half.
Q Okay. And then you went over to the 22nd District approximately '93?
A Could've been '92, but yeah, approximately, yes.
Q And you served as patrol officer in the 22nd District?
A Correct.
Q And then when did you join the tactical team in the 22nd District?
A A short time after, six months.
Q Around '94 to '95?
A Yes.
Q Okay. And then how long were you on the tactical team?
A In the 22nd District?
Q Yes.



A Probably three years or so.
Q And what was your assignments or functions within that tactical team?
A Well, it's what the tactical officers do. You do aggressive patrol. Respond to in progress calls.
Q Were you focused on certain types of crimes?
A Not necessarily.
Q During the time that you were working in those approximately three years on the tactical team in the 22nd District, were there any periods of time when you were focused on particular types of crimes or criminal activity?
A Yes.
Q What were those?
A Well, if we had a -- my recollection is that we had a crime pattern of -- of an offender assaulting women along the Metro line. I -- I know we worked on that for a while. I -- there was a pattern of Frito-Lay drivers getting robbed. Those are the two that -- that I can recollect quickly.
Q Okay. What area is the 22nd District in?
A The southwest side of the city.
Q And what Detective Division area would that have had encompassed?
A Area 2.



Q Okay. During that time, did you work with any gang specialists or gang tactical officers?
A Yes.
Q And just help me understand those concepts that will obviously be relevant during the course of this deposition, but I have heard over the course of my time that -- both the terms, gang tactical officer and gang specialists. Are those the same thing or something different?
A Completely different.
Q Okay. And let's start with gang tactical officers. What are gang tactical officers?
A The gang -- there was at that time -- what time frame are you referring to?
Q Let's stick to that same time frame around the early to mid-1990s as a starting point.
A So at that point in time, there were three TAC teams and one gang team, gang tactical team. They basically did the same function at that point in time. And those would be gang tactical officers.
Q And what was that function?
A High crime suppression, aggressive patrol, things of that nature.
Q And what was the command structure for that group -- strike that. Let me ask a better question. Who



did those gang tactical officers report to?
A Each TAC team, including the gang team, had a -- had an individual sergeant that they reported to.
Q And did those sergeants report up through the same command for patrol officers?
A They would've reported to the tactical lieutenant who would've reported to the -- the commander of the 22nd District via Patrol. So yeah, they would be in the Patrol Division.
Q Okay. So they -- so those gang tactical officers were within the Patrol Division, do I have that right?
A Yes.
Q Okay. And we were talking with the period from the -- in the early '90s. Did that change at some point in terms of the reporting of gang tactical officers within the Patrol Division?
A Not that I'm aware of, no.
Q Okay. And then tell me comparatively what the role of gang specialist was in that period in the early to mid '90s?
MS. ROSEN: Object to the form. But you can answer.
A I did not have any interaction with gang specialists at that point. They weren't in the

districts that I'm – that I can recollect.
Q Okay. You indicated earlier when I asked you that gang tactical officers and gang specialists were entirely different. So in what way were they different?
A Well, gang specialists were doing more intelligence gathering, they had more of an intelligence gathering mission than just going out and trying to suppress crime. They were more of an intelligence gathering.
Q Any other differences?
MS. ROSEN: Object to the form. You can answer.
A I know they're involved in – in long – longer term investigations. They work with the federal government and more conspiracy-type racketeering investigations.
Q Anything else?
MS. ROSEN: Object to the form. You can answer.
A Not that I can recall at this point.
Q Okay. And did they report with the Patrol Division or elsewhere?
A They, we're talking about the early '90s; is that correct, sir?
Q Yes.



A I believe that they were in the Patrol Division at that point in time.
Q And at what point did that change?
A I believe that until gangs was disbanded, they were in Patrol so, going forward.
Q Did they ever report within the Division of Organized Crime?
A Yes.
Q And when was that?
A I think that was previous or prior – prior to – it may have been after Patrol. They may have gone to Organized Crime after Patrol, so they were in Patrol and then they were moved to Organized Crime.
Q Okay. And you know approximately when that took place, was it in the early '90s or sometime later?
A Sometime later.
Q Okay. So there was some point when they moved from being within the Patrol Division to the Organized Crime section; is that right?
A Yes.
Q Okay. And can you say approximately when that was? Early '90s, late '90s, can you say it all?
A I want to say 1996, but I'm not completely positive about that.
Q Okay. And then at some point, did that change



in terms of what the gang specialists reporting into the Bureau of Organized Crime?
A Not that I'm aware of. I believe they were in Patrol Special Functions and then they ended up in Organized Crime, but that's –
Q And then –
A – after that I disbanded.
Q And when were they disbanded?
A I don't – I don't know the exact year.
Q Do you know approximately when?
A It had to be after '96, but I don't know when.
Q Okay. So you said you worked – and strike that. So during the time that you were working in the – on the tactical team, you said you had no interactions with gang specialists. Is that correct?
A In the early '90s we're talking about; is that correct?
Q Yes. During the period of time that you were working on the tactical team in the 22nd District, which is approximately '94 to '95 through about '98.
A I did not have – I don't remember – don't recollect having any kind of interaction with gang specialists.
Q Okay. And prior to the time you worked on the 22nd District tactical team, did you have any



interactions with or work with gang specialists?
A Not that I can recall.
Q Okay. So what was the next position you held in the department after your three years on the tactical team in the 22nd District?
A I went to the 4th District.
Q And what position did you have in the 4th District?
A I was a patrol officer, and I also was on the TAC team.
Q And what area was the 4th District within?
A Area 2.
Q Okay. And the TAC team, how long were you on – in that position with the 4th District TAC team?
A Approximately, maybe 1998 or early '99.
Q Until when?
A It would've been – would've been from '95 or '96 to '98 or '99.
Q Okay. So maybe I think I'm getting a little lost. In – around '94 to '95 you joined the 22nd District TAC team; right?
A Yeah, it could – it could have been '92 or '3, but yeah, I think I left 22 in '95 or '6, and then I went to the 4th District.
Q Okay. So you were on the TAC team for a

Page 26

couple of years in the 22nd District and then moved on to the 4th Street around -- 4th District around '95. Do I have that right?
A Could've been '96, but approximately speaking, yes.
Q Okay. And then you were in that position in the 4th District tactical team until about '98 to '99. Do I have that correct?
A That is correct, sir.
Q Okay. And when you were on that tactical team, did -- were there any periods of time when you were focused on particular crimes or criminal activity?
A Not that I recollect at this point.
Q Okay. During that period of time, did you have interactions with gang tactical officers?
A Yes.
Q During that period of time, did you have interactions with a gang specialist?
A Not that I can recollect at this time.
Q Okay. What was your next position?
A I went to the narcotics section.
Q Assigned to what district or area?
A That would've been an Area 4 narcotics team.
Q Where was that unit based?
A I'm sorry, sir.

Page 27

Q Where was that unit based?
A Homewood Square.
Q Okay. And what was your role in Area 4 narcotics?
A We -- I was on a street-level team that was tasked with street-level narcotics enforcement.
Q Did that include drug buys?
A Yes.
Q Did it include the use of confidential informants?
A Yes.
Q And were you a -- were you considered a tactical team officer at that point?
A On a -- I was on the narcotics enforcement team or the narcotics team, so we had -- I had served many roles on that team.
Q And so at that time, what were you referred to as? Were you considered a patrol officer, a TAC team officer, what were you considered?
A You were in narcotics. You were a narcotics officer. Narcotics was in the Organized Crime Division.
Q Okay. And was that your first position in the Organized Crime Division?
A Yes.
Q And how long were you in that position?

Page 28

A Approximately a year.
Q Okay. Did you interact with gang tactical officers while you were working in that unit?
A No.
Q Did you interact with gang specialists while you worked in that unit?
A Not that I can recollect, no.
Q Okay. And you -- I think I asked you this and I don't remember what you said, so I apologize. I will object, asked and answered to my own question, but I apologize. Did you say you did work with confidential informants while you were in that unit?
A "In that unit" being narcotics?
Q Yes.
A Yes.
Q Okay. All right, what was your next position in the department?
A Made detective.
Q And so what year was that approximately when you made detective?
A It was late 1999 or very early 2000s to my recollection.
Q Okay. And what area were you assigned to?
A Area 1.
Q Okay. And did you make detective based on a

Page 29

merit promotion or based on a test score?
A Test score.
Q Okay. When you joined Area 1 detectives, where were you first assigned within the Detective Division?
A Violent crimes.
Q And at that time, when you joined the Violent Crimes unit, what kinds of crimes were you investigating?
A Trajectory, or the tradition at Area 1 was, you started -- robberies were part of Violent Crimes and eventually you worked your way into investigating homicides.
Q Okay. And so was that your trajectory as well?
A It was, yes.
Q And approximately when did you start investigating homicides at Area 1?
A Area 1 at the time was very busy, so I would say within six months of being there, we were -- or I was working on murders.
Q Okay. And how long were you an Area 1 Violent Crimes detective?
A Until 2013.
Q Okay. And in 2013, were you promoted to

sergeant?
A I was, yes.
Q Okay. While you worked at Area 1 as a Violent Crimes detective, did you -- would it fair to say you investigated hundreds of homicides?
A You broke up a little bit. Can you repeat that?
Q Sorry. While you were at Area 1 Violent Crimes, would it be fair to say you investigated hundreds of homicides?
A Yes.
Q Did you work with other homicide detectives in investigating homicides?
A Yes.
Q Would -- did you work with -- strike that. Did you have different partners during the time you worked as an Area 1 homicide detective?
A Yes.
Q Did you interact with gang specialists during the time you worked as an Area 1 homicide detective?
A Not that I can recall, no.
Q Okay. Did you ever have interactions -- strike that. Did gang crimes officers ever assist in -- strike that. Did gang specialists ever assist in homicide investigations while you worked as an Area 1



detective?
A When I made detective, I believe the gang specialists had already been incorporated into the Detective Division.
Q And tell me what you mean by that.
A I mean that there were some gang specialists that were doing the job function as a detective.
Q In other words, they now had the title of detective.
A Oh, that's not what I said. They were doing the -- they were still gang specialists, if my recollection is correct, but they were doing the job as a -- of a detective.
Q Okay. So these were gang specialists who did not have the title of detective, they still had the title of gang specialists; correct?
A I believe at some point they were -- they were -- everybody was made a detective, but there was a -- there was that interim phase where they were still gang specialists and doing some detective tasks.
Q Okay. So those -- so there was a period of time when you were at Area 1 as detective, when you had gang specialists who still held that title who were participating in homicide investigations; correct?
A That was in -- after 2000.



Q Okay. And so for a period of time after 2000, these gang specialists were assigned to the Detective Division; correct?
A Yes.
Q And --
MS. ROSEN: And I'm going to lodge -- sorry, one second. I'm going to lodge an objection here. This is beyond the scope of the 30(b)(6) notice. The period of time extends to 1998. Now that we've established that what he's talking about happened in 2000, it's not relevant to the 30(b)(6) notice. Obviously, I'm not going to stop him quite yet, but at some point I will.
BY MR. SWARMINATHAN:
Q Understood, okay. And then in that period of -- and then there was some point after that, after 2000, when they just stopped being referred to as gang specialists and they became detectives; is that right?
A That's my recollection, yes.
Q Okay. And once they became detectives, they were performing -- they were clearly performing the functions of detectives in homicide investigations; correct?
A I can only speak for Area 1. I don't remember any gang specialist that turned detective that were --



that was doing homicide investigations.
Q Did that -- gang specialists that became detectives, what did they do then?
A Well, they -- they could have been -- they -- they could have served a multitude of other tasks, but my recollection is they weren't working on homicides. They could have been working on aggravated batteries or -- or burglaries or -- or anything -- any other criminal activity.
Q Okay.
MS. ROSEN: And just to be clear, all these answers, because they're beyond the scope of the 30(b)(6) notice and are limited to this witness' experiences at Area 1 and so, you know, like I said, you're beyond the 30(b)(6) notice. You get, like, maybe one more or two more questions on this, and then I'm going to cut it off. But I want to make sure that all the prior answers, because they're not within the scope of the 30(b)(6) are limited to information based on this witness' experiences, rather than as a 30(b)(6) witness.
BY MR. SWAMINATHAN:
Q And for these questions about your experience, sir, I'm focused on this section really on your experience, again, and understanding of the various

roles and experiences you had within the department.
Okay. So you were in that detective position from -- okay, well, strike that. Let me ask you, who were your partners within Area 1 during the time you worked as a detective?
A Want their names?
Q Yeah.
MS. ROSEN: What -- why is that relevant to the 30(b)(6) issue? You've never asked that type of question before.
MR. SWAMINATHAN: Yeah -- this is somebody who was -- I'm going to be asking a number of questions about Homicide Detective Division practices and I want to know who are some of the people he worked with, so I have an understanding of, for example --
BY MR. SWAMINATHAN:
Q One of the things we're going to talk about, sir, let me ask you this sir, let's lay a little bit of foundation. Fair to say that as a homicide detectives, one of the forms of training for homicide detectives is on-the-job training; correct?
A Yes.
Q Okay. And in fact, in your experience, would you say on-the-job training was one of the primary ways



in which you learned how to perform the job of a detective?
A Can you re-form that question?
Q I'm happy to do so. Would you say on-the-job training was one of the primary ways you learned how to perform the job of a detective?
A I don't know if I would use the word "primary."
Q How would you describe it?
A I would say that it's a -- a multifaceted approach to training and on-the-job is -- is one of the facets, but not the primary facet.
Q During the course of your time as a detective, did you work with more experienced homicide detectives?
A Work with, yes.
Q Okay. And when you were in your early years as a homicide detective, did you have a partner -- did you have partners in the period of time between 1990, '91? Sorry. In the period, in your early time as a homicide detective, between 1990 and 2000 and the next few years, did you work with more seasoned homicide detectives?
MS. ROSEN: Object to the form.
A I -- I'm -- I'm getting confused as what you're asking me. I worked with more seasoned



detectives when I made detective, I wasn't partnered with them.
Q Okay, so when you first became detective, did you have a period of time when you sort of had -- where you sort of rode along with or followed a more seasoned detective?
A Yes. The -- there was a training period when you -- when you arrived at the area.
Q And how long was that training period?
A It was informal. It -- it could have been up to a month.
Q Okay. And that's not the pre-detective service training, that's training with somebody in the Detective Division for about a month; is that right?
A Again, it could have been longer, but that's correct. Yes.
Q Okay. And that was a form of on-the-job training; correct?
A Form of it, yes.
Q Okay. And then subsequent to working with that, through that -- during that -- after that one-month period, did you get assigned partners?
A Again, I don't want to be specific about the time frame. It could have been -- could have been longer. Some people obviously trained longer than --



some people didn't. I think it was just based on how quickly you picked up some of the paperwork and conducting investigations, so yeah, at some point after you were trained, some guys partnered up and some guys didn't.
Q Okay. Did you partner up?
A Yes.
Q Okay. Who was the officer or officers you worked with in the period when you were sort of training and following around another detective?
MS. ROSEN: So I'm going to -- I'm again asking you for the relevance of this. First of all, this 30(b)(6) notice is focused primarily, other than with the respect to the issue of identification procedures, on gang crime specialist practices and policies. You are spending an inordinate amount of time right now on Detective Division practices and policies. Those topics, by agreement, were addressed by Eric Winstrom in the Solache/Reye's case. And the relevance of who his partners were to it -- with respect to a 30(b)(6) notice, generally speaking, is not relevant and now is even less relevant based on what he's here for. So if -- unless you can explain to me the relevance of who his particular partners were in

the context of why we were here, I am going to instruct him not to answer.

MR. SWAMINATHAN: Yeah. So there're -- we -- there are multiple Detective Division topics that are on the table for today. I agree that some topics have been covered. Secondly, this -- a number of those topics, Detective Division topics and other topics, specifically relate to the issue of training and on-the-job training and those topics, whether they relate to Detective Division training or gang crimes training, it is important for me to lay some foundation and understand this witness's knowledge about training, training practices, and the individuals he's trained with are going to be relevant to the question, from our perspective -- I'm allowed to ask some background questions. We're about 30 minutes into this dep. I've not been asking inordinate questions about this; I've been asking him mostly about connections of his work to gang crimes. But all of my questions have been relevant to our topics, which is Detective Division training and gang crimes training and his experience in those groups for him to be able to answer questions on these topics through the course of today's deposition. I'm



going to ask him several questions. I don't have probably more than two questions on this topic, but then I'm moving on, but I'm going to ask him my two questions.

BY MR. SWAMINATHAN:

Q So sir, who trained you?

MS. ROSEN: No. Whoa, whoa, whoa, whoa, whoa, whoa, whoa, whoa, whoa, whoa, whoa.

MR. SWAMINATHAN: Oh, you can instruct him not to answer --

MS. ROSEN: No, you're not going to -- wait --

MR. SWAMINATHAN: -- and then we'll address it.

MS. ROSEN: Yeah. So I'm going to respond to what you just said.

MR. SWAMINATHAN: Yes.

MS. ROSEN: So first and foremost, with respect to, there are a variety of topics that we're going to be talking about today related to Detective Division, please tell me beyond identification procedures as identified in the notice at -- and if you'll given me a minute, I'll find the paragraph, what other Detective Division topics do you believe are fair game?

MR. SWAMINATHAN: Identification procedures,



gang book procedures, confidential informants.

MS. ROSEN: Gang book procedures was already addressed and so was informants.

MR. SWAMINATHAN: No, they were not, Eileen. We did Reyes, remember.

MS. ROSEN: Direct me to the order of what you're talking about --

MR. SWAMINATHAN: And it's in the notice that we just sent you guys a couple days ago. We didn't do gang books and confidential informants.

MS. ROSEN: And what -- wait a minute. No, no, no, no. I just -- we negotiated a multi-page, 30(b)(6) notice, so tell me what paragraphs you're talking about --

MR. SWAMINATHAN: I'm not going to --

MS. ROSEN: before we, like, fight about it, we're all on the same page.

MR. SWAMINATHAN: All right. Let me share my screen. This is the notice. Topic J, the use of confidential informants, this is a topic which --

MS. ROSEN: What paragraph? Can you -- wait, wait, wait.

MR. SWAMINATHAN: Yeah.

MS. ROSEN: Can you just tell me -- I don't see a paragraph.



MR. SWAMINATHAN: Yeah, this is one -- topic 1J and Topic 1K.

MS. ROSEN: Just hold on one second. Hold on one second, please.

MR. SWAMINATHAN: Yeah, I'm just saying, look at 1J and 1K.

MS. ROSEN: Okay. And which one? One what?

MR. SWAMINATHAN: 1J and 1K.

MS. ROSEN: Okay.

MR. SWAMINATHAN: And then look at 1 -- what is the one on identification, so let me pull it up. I think it's 1C. And 1C. Okay, for the other topics, we specifically referenced that the topics that have already been covered for detectives in Reyes/Solache, but for 1C --

MS. ROSEN: Okay, fine.

MR. SWAMINATHAN: J and K, those are the three topics --

MS. ROSEN: So --

MR. SWAMINATHAN: -- that are on the table for him with regard to the Detective Division. So again --

MS. ROSEN: Right.

MR. SWAMINATHAN: I'm -- I'll ask my questions and I like I said, I only have a couple questions

on this topic, so -- and there're really just two questions.
BY MR. SWAMINATHAN:
Q Sir, who were the officer -- or strike that. Who were the detective or detectives that you trained with when you joined the Detective Division in Area 1?
MS. ROSEN: Okay. Objection, relevance, beyond the scope. But you can answer it.
A I believe I initially trained with Dave Golubiak.
BY MR. SWAMINATHAN:
Q Anyone else?
A Maybe John Griffin.
Q Okay. Anyone else you can recall?
A I'm sure -- I'm sure there was others, I -- I -- I just don't know.
Q Can you spell Golubiak for the record, just for me and the court reporter?
A G-O-L-U-B-I-A-K.
Q Okay. All right, and the only other question I have on this particular topic is, can you identify for me the partners that you worked with during the time you were a detective at Area 1?
MS. ROSEN: What is the relevance of that? It has nothing to do with training.



MR. SWAMINATHAN: Same. I believe that the partners that he had are of -- are relevant to the issue of his training and on-the-job training that detectives receive. I mean, you can disagree with me, but I believe it's relevant. I believe it's relevant both to the issue of his experience and training, and any potential issues of bias, depending on his answer. That's my basis. That's the only other question I have on this topic.
MS. ROSEN: How? I don't understand the -- I don't understand why his personal training is relevant at all. So the identities of his -- right? The question is the City's training, generally. Fine, if you -- I let you ask the question about who his training officers were, as marginally relevant as I view that, but I don't understand at all how his partners through his 8- or 9-year career go to training or anything related to the 30(b)(6) notice, and I don't understand your -- the point that you're making about bias. What does that mean?
MR. SWAMINATHAN: Yeah, I mean, this is a trial witness. This is somebody who can come to this trial and testify to defend the City of Chicago's policies and practices. I'm entitled to



probe this witness to figure out relevant cross-examination questions of this witness. I want to know who this -- who Mr. Foster's partners were, because it may be that he partnered with people who I have some real questions about. It may be the subject of additional cross-examination questioning and follow-up, depending on what this witness says. So certainly I have the right to probe this witness about sources of bias and otherwise, because this is a trial witness. Ultimately, if you don't like my question, you -- obviously, you can make an objection to relevance. Obviously, that's not a basis to refuse to allow a witness to answer questions. I do understand if you take the position that his response to this question, as with several other questions, is an answer that's not binding testimony as to the City because it's not within the subject of the 30(b)(6) notice. I understand that objection, but if you're going to instruct him not to answer, I guess, obviously, you can, but I don't see the basis to do that and we're wasting time. I would like to answer this question and move on, and if -- you can make an objection to the relevance of the question, fine, but that's my response.



MS. ROSEN: Well, it's go -- it's more than just relevance; right? I don't understand how this is fair game for a 30(b)(6) witness?
MR. SWAMINATHAN: It's simply because I'm laying foundation for my cross -- a 30(b)(6) witness, yes, must provide binding testimony on the topics. But every 30(b)(6) witness who has ever been questioned is questioned about their background and potential bias because these are trial witnesses, and I'm entitled to ask these -- this witness questions just as I asked James Spratte and other detectives and -- or -- and 30(b)(6) deponents who came in and testified in this case and testified in trials like Jacque Guevara's case, because in our view, they had extreme bias and I wanted to be able to question that witness about his bias and I questioned him at his deposition about sources of bias. So I'm moving on, but this is my -- I've asked my question. Are you instructing him not to answer?
MS. ROSEN: I am -- I'm going to confer with my client, and then I will let you know. So if you want to take a break, so that I can do that, we can do that. Otherwise, we can move on, and you can come back to it.

Page 46

MR. SWAMINATHAN: Yeah, we can take a break.
MS. ROSEN: Fine.
COURT REPORTER: All right. We're off the record. The time is 10:48.
(OFF THE RECORD)
COURT REPORTER: We are back on the record for the deposition of Lieutenant John Foster being conducted by video conference. My name is Sydney Little, today is June 29, 2022. The time is 10:56 a.m.
BY MR. SWAMINATHAN:
Q Okay. Sorry. Okay. Could you please identify for me the partners you had during the time you were an Area 1 detective?
MS. ROSEN: And I'm going to instruct him not to answer that question. It's beyond the scope of the 30(b)(6) notice. It's not relevant to his testimony as a 30(b)(6) notice, and I guess we can take it up with the court. I mean, obviously we can have a -- I have looked at this issue about bias, not in the last five minutes, but before. I believe that you're overstating it, but I'm certainly happy to discuss it with you when the depo's over, and if you can persuade me otherwise, obviously, I'll bring him back. Otherwise, we can

Page 47

let the court decide.
MR. SWAMINATHAN: Okay. And are you also -- will you also instruct him not to answer any questions about his complaint register history?
MS. ROSEN: That is correct.
MR. SWAMINATHAN: Okay. All right. All right, so I won't go through those in one by one. I'll just -- we'll just indicate that to the extent I have questions about CRs, you're -- you will be instructing him not to answer those subjects as well?
MS. ROSEN: That is correct, and have you produced those CRs in any of these cases?
MR. SWAMINATHAN: I have not even -- I have not. I've only seen publicly available information about them. I don't have them.
MS. ROSEN: Well, that's a different question. My question is, did you produce them in this case? I know you -- you can see whatever --
MR. SWAMINATHAN: I don't have any CRs for him to produce. I can see his CRs in publicly available records, but I have -- know nothing about them, that's why I was going to ask him about them.
MS. ROSEN: I understand we can all, like, search the Internet and find information. I had a

Page 48

specific question, which I think you've now answered, which in none of these cases, despite the hundreds and hundreds of thousands of pages that you've produced, have you produced this particular witness' CRs? So thank you.
MR. SWAMINATHAN: Not that I'm aware. No.
MS. ROSEN: Well, if you're not aware of it, who would be aware of it?
MR. SWAMINATHAN: I don't know, unless the city is aware that it's produced CRs for this individual as part of any of its productions, but I don't believe that to be the case.
MS. ROSEN: Okay. We can move on.
BY MR. SWAMINATHAN:
Q Okay. So sir, after you worked in the Detective Division, you moved up to sergeant. What was your first assignment as a sergeant?
A I was assigned back to the Patrol division shortly in the Fourth District.
Q And how long were you in Patrol in the Fourth District?
A Seven or eight months.
Q Okay. And before we move on, just to make sure I have a clear record, because we're going to -- we have to litigate this issue, sir, do you have three

Page 49

sustained CRs during the course of your CPD career?
MS. ROSEN: Going to instruct him not to answer for the reasons I've previously articulated.
Q Okay. All right. As to the Patrol Fourth District, I take it, then, you were supervising patrol officers?
A Correct, yes.
Q Okay. And what area was the Fourth District in?
A Area 2.
Q Okay. And then what was the next position you held?
A It was -- assigned back to the detective division.
Q When was that?
A Where?
MS. ROSEN: When?
Q When was that?
A Early 2014, maybe.
Q Okay. And is that as a sergeant?
A That's correct. Yes.
Q Okay. And who were you supervising as a sergeant in the detective division beginning in 2014?
A Homicide detective.
Q What area?

Page 50

A Area 2.
Q And then what was your next position?
A I was promoted to lieutenant.
Q And remind me when that was.
A January of '19, maybe.
Q Okay. So you – and back then, you were a lieutenant – you were promoted to lieutenant overseeing homicide detectives; correct?
A No, once I – once you get promoted, you go – generally go back to Patrol.
Q Okay. So you went back to Patrol in 2019 as a lieutenant; correct?
A Yeah, approximately. I'm not completely sure on these dates, but yes, I went back to Patrol briefly.
Q Okay. And in what district?
A Fifth District.
Q Okay. Which area is that in?
A Area 2.
Q Okay. And then what was your next position as lieutenant?
A Area 5 homicide.
Q Okay. And would that have also been in 2019 when you moved over to Area 5 homicide?
A It would've been, yes.
Q And you've been in that position since;

Page 51

correct?
A Correct.
Q Okay. During the time that you've – you worked as a sergeant and a lieutenant, it – overseeing homicide detectives, did you work with anyone who was in a position of gang specialist?
A There were no gang specialists in that time frame.
Q Okay. All right. Okay, sir, could you tell me what – we'll strike that. Let me go through a couple background points. Sir, how many times have you been deposed?
A I – I would say between 6-7 approximately. I don't know for sure.
Q Okay. And were those all in your capacity as a law enforcement officer?
A Yes.
Q Okay. You're – strike that. When you – let me just go through a couple background issues. This is a question-and-answer session. I'll ask you questions. You answer my questions to the best of your ability. A court reporter is taking it all down, so one important step is, let me ask my questions and finish asking my question before you answer the question, so we're not talking at the same time. Okay?

Page 52

A Sure.
Q And likewise, if you're answering a question and I have mistakenly believed you've completed your answer, please let me know and I'll let you finish your answer. Okay?
A Sure.
Q There'll be times in the deposition where you know where I'm going with my question. Make sure I finish my question before you answer, fair?
A Sure.
Q Okay. No nods of the head, no "uh-huhs," because those are non-verbal answers that the court reporter cannot write down; fair?
A Sure.
Q If you don't understand my question – you've already done this several times in the deposition, but if you don't understand my question, please ask me to rephrase it and I will do so; fair?
A Fair.
Q And likewise, if you answer my question, I'll assume you understood my question; fair?
A Fair.
Q Okay. If you need to take a break at any point, let us know and we will take a break, only rule is that you need to answer any pending question; fair?

Page 53

A Fair.
Q Okay. A couple of "yes," "no" questions. I'm not asking for details of your medical history, so just listen carefully to my question. Are you taking any medications that would prevent you from being able to understand my questions and answer them today?
A No.
Q Do you have any medical conditions that would prevent you from being able to understand my questions and answer them today?
A No.
Q Okay. Okay. Let's pull up – so you understand that you've been designated by the City of Chicago to provide testimony with regard to various 30(b)(6) topics today; correct?
A That's correct.
Q Okay. And you understand that this is for a - - a series of different cases, all of which were identified by the court reporter at the beginning of this deposition; correct?
A That's correct.
Q Okay. Let's – I'm going to share my screen with you now. All right, this first, actually. Okay. All right. I'm showing you a document we will mark as Exhibit 1. Now, how do I – one second. All right.

Page 54

Let's pull it up. Here we go. It should be bigger.
Okay. What I'm showing you now is a document I've marked as Exhibit 1. It's a four-page document. It's titled, Amended Supplemental Notice of Video Recorded Rule 30(b)(6) Deposition of City of Chicago, and it identifies the captions of various cases, Sierra, Gomez, Rodriguez, Buoto, Iglesias, and Johnson, and it identifies as -- you as a witness, Lieutenant John Foster. Do you see that, sir?
(EXHIBIT 1 MARKED FOR IDENTIFICATION)
A I do, sir.
Q Okay. And it identifies various topics on which you will be testifying on behalf of the City of Chicago as a 30(b)(6) witness. Do you see that, sir?
A You don't have it displayed.
Q Let's see. Well, I'll move to -- I'll show you the actual set of topics in a moment. If you see it, this notice lists you as testifying as to topics 1A through F, 1J through K, and so on. Do you see that?
A I do. Yes.
Q Had you seen this particular Notice of Deposition before today?
A Yes.
Q Okay. All righty, and then let me pull this down and let me show you what we've marked as Exhibit 2.

Page 55

Now, hold on here. All right. What I'm showing you now is the document I've marked as Exhibit 2. It contains the same case caption, and it's a 13-page document entitled, Amended Notice of Rule 30(b)(6) deposition of City of Chicago. Do you see that, sir?
(EXHIBIT 2 MARKED FOR IDENTIFICATION)
A Yes.
Q Okay. And this lists various topics and subtopics on which you have been designated to testify; correct?
A That's correct.
Q Okay. And just looking at topics -- let's start with Topic 1A. Topic 1A, just to paraphrase, concerns -- this concerns the City's policies and practices for the period of 1986 to 1998 related to witness interrogations and interviews in homicide investigations. Do you see that, sir?
A I do.
Q And are you -- have -- you understand that you've been designated to provide binding testimony for the city today on that topic, specifically with regard to gang specialists; correct?
MS. ROSEN: I'm objecting to the form of the question, specifically to the -- your use of the word "binding," but you can go ahead and answer the

Page 56

question.
A Yes.
BY MR. SWAMINATHAN:
Q Okay. And Topic 1B -- I won't re-paraphrase them each time. So you understand that you are to provide binding testimony on behalf of the City of Chicago today as to Topic 1B, specifically with regard to gang crimes officers; correct?
MS. ROSEN: Same objection with respect to "binding, but you can answer.
A Yes.
MR. SWAMINATHAN: And you can have a standing objection, Eileen, to all of -- to that as to all of these.
MS. ROSEN: Okay. Thanks.
BY MR. SWAMINATHAN:
Q Yeah, and then as to -- you understand that you are to provide binding testimony today on behalf of the City of Chicago as to Topic 1C for both detectives and gang crimes officers; correct?
A Correct.
Q You understand that you're to provide binding testimony today as to Topic 1D as to gang crimes specialist only; correct?
A Correct.

Page 57

Q And you understand you're to provide binding testimony today on behalf of the City of Chicago as to Topic 1E as to gang crime specialists only; correct?
A Correct.
Q And you understand you're to provide binding testimony today as to Topic 1F as to gang crime specialists only; correct?
A Correct. Yes.
Q And you understand you're to provide binding testimony today on behalf of the City of Chicago as to Topic 1J for both detectives and gang crime specialists; correct?
A Correct.
Q And you understand you're to provide binding testimony today on Topic 1K as to gang crime specialists and detectives; correct?
A Correct.
Q Okay. And you understand you're to provide binding testimony today on Topic 2A as to gang crime specialists only; correct?
A Correct.
Q You understand you're to provide binding testimony today on behalf of the City of Chicago as to Topic 2B for gang specialists only; correct?
A Correct.

Q And you understand you're to provide binding testimony today on Topic 2C as to gang crime specialist and detectives; correct?
A Correct.
Q You understand you're to provide binding testimony today on behalf of the City of Chicago as to Topic 2D as to gang crime specialists only; correct?
A Correct.
Q And you understand you're to provide binding testimony as to Topic 2E as to gang crime specialists only; correct?
A Correct.
Q You understand you're to provide binding testimony on behalf of the City of Chicago as to Topic 2F as to gang crimes only; correct?
A Correct.
Q And the same is true for Topic 2G; correct?
A Yes.
Q And you understand you're to provide binding testimony today on behalf of the City of Chicago as to Topic 2K as to detectives and gang crime specialists; correct?
A Correct.
Q And you understand you're to provide binding testimony today as to Topic 2L as to detectives and gang



crime specialists; correct?
A Correct.
Q And finally, you understand you're to provide binding testimony today as to Topic 13; correct?
A That's correct.
Q Okay. All right. Let me pull that down. Let me ask you what you did to prepare for today's deposition, sir?
A I met a few times with my – the City's attorneys.
Q Okay. How many times did you meet with Counsel?
A Three.
Q I think you just cut out. Did you say three times?
A I did say three. Yes.
Q Okay. And who was present? Was I – Ms. Rosen present when you met with the city?
A Yes.
Q Was anyone else present for those meetings?
A Did you ask me, who else?
Q Yes.
A Ms. Barber and Ms. Carney,
Q Anyone else – any non-attorneys who were present at that meeting?



A Not that I'm aware of.
Q Okay. Did you – approximately, how long did you spend in total in preparation – strike that. Approximately how long in total did you spend across those three meetings?
A 10 hours, maybe. Maybe a little more.
Q You said 10 hours?
A Approximately.
Q Okay. And that was across those – in total, across those three meetings; correct?
A Correct.
Q Okay. And when was the first of those three meetings? About how long ago?
A Couple weeks ago.
Q Okay. And when was the last of those meetings?
A One day.
Q Okay. Did you review any documents during the course of those meetings?
A Yes.
Q What documents did you review during the course of those meetings?
A The notice you just showed me, some general orders, some special orders. That's – that's all I can recollect right now.



Q Approximately how many general orders and special orders did you review?
A Maybe two or three each.
Q Okay. Did you review any training materials?
A We did. Yes.
Q And what training material did you review?
A The pre-service gang specialist training.
Q Any other training materials? Did you answer?
A I did. I said, no.
Q Okay. The pre-service gang training material that you reviewed, had you ever seen that before?
A No.
Q Okay. Outside of your meetings with counsel, did you review any other documents other than during the course of your meetings in preparation for this deposition?
MS. ROSEN: I'm going to – I just want to make a point of clarification. So when you asked about the training materials, it sounds like now, based on this question, you are assuming he reviewed them in my presence, so just to be clear –
BY MR. SWAMINATHAN:
Q I'll clarify the question, so just – there's no ambiguity. The materials that you described

Page 62

reviewing; did you review all of those materials in --
while you were meeting with counsel?
A No.
Q Okay. Did you review some of those materials outside of your time with counsel?
A Yes.
Q Which materials did you review on your own when you weren't with counsel?
A The pre-service gang training, several depositions, and some general special orders.
Q And so how many did you indicated that you had reviewed -- strike that. Did you review gang -- strike that. Did you review general orders and special orders while you were meeting with counsel?
A I believe so. Yes.
Q And then did you also review general orders and special orders on your own outside of the presence of counsel?
A Yes.
Q Were they the same materials?
A Yes.
Q Okay. What were the topics of the general orders and special orders that you reviewed whether in the presence of counsel or outside of counsel in preparation for this deposition?

Page 63

A Lineup procedures. That's the only one I can really recall right this second.
Q Fair enough. Did you review any general orders or special orders related to the use of confidential informants?
A I don't necessarily know that there were any general or special orders that were on point regarding confidential informants during the time frame that we are discussing.
Q Okay. Did you review any general orders or special orders regarding confidential informants regardless of whether they were related to this time frame?
A I did not.
Q Okay. Did you review any general orders or special orders related to the use of gang or photo books?
A Did I look at any general orders or special orders regarding gang books?
Q That's right.
A Is that what you're asking? I don't believe there were any general orders or special orders pertaining to gang books in the time frame that we are discussing.
Q Okay. Are you -- outside of -- putting aside

Page 64

whether it relates to this particular time frame, did you review any general orders or special orders related to gang book procedures?
A I don't believe there are any.
Q Okay. Did you review any general orders or special orders related to documentation practices or report writing?
A I believe the pre-service gang training touches on report writing.
Q Okay. So the gang -- the pre-service gang training materials you reviewed discussed some documentation or report requiring -- report writing requirements; is that right?
A Pre-service training program touches on report writing for the pre-service gang specialists.
Q Okay. Did you review any documentation -- strike that. Did you review any general orders or special orders, policies, related to documentation or report writing for detectives?
A I did not.
Q Did you view any general orders or special orders related to documentation or report writing for gang crime specialists?
A I don't believe there are any.
Q Okay. Did you --

Page 65

A But I did not.
Q Oh, I'm sorry, go ahead. Sorry. Did you change your answer?
A No, I -- I did not.
Q Okay. All right. Did you -- you said you indicated that you -- strike that. Any other general orders or special orders, the subjects of which you can remember as you sit here today?
A Not as I sit here right now. No.
Q Okay. Did you review any general orders or special orders related to interviews or interrogation procedures?
A I don't believe I did. No.
Q Okay. You said you reviewed several depositions; is that right?
A I'm sorry, sir. You broke up.
Q You said you reviewed several depositions; is that right?
A Yes.
Q What depositions did you review?
A Mr. Hickey's deposition?
Q Any others?
A Ms. Sullivan's deposition.
Q Anyone else?
A Mr. Spratte's deposition?

Q Anyone else?
A Mr. Winstrom's deposition.
Q Anyone else?
A Not that I can recollect at this time.
Q Okay.
A I think they gave me more than enough.
Q Okay. How long did you spend reviewing all of those depositions of Hickey, Sullivan, Spratte, and Winstrom?
A You want me to guess? I -- I have -- I don't have any --
Q Yeah. Your approximation. I mean, I assume did it take you -- did it take several hours for you to read that material?
A Oh, easily, yes.
Q Okay. So can you give me an approximate amount of time you spent reviewing those depositions?
A I don't know. 20-30 hours, maybe.
Q Okay. So you spent some time to make sure you read through them and understood them; correct?
A Correct.
Q Okay. And how many different depositions did you review from Mr. Hickey?
A One.
Q Do you recall which case it was in?



A I do not.
Q Did you review multiple depositions for any of those individuals, Mr. Hickey, Sullivan, Spratte, or Winstrom?
A No.
Q Okay. When you reviewed the deposition of Mr. Hickey, was there any information in that deposition that you found to be false or inaccurate?
A No.
Q When you reviewed the deposition of Ms. Sullivan, was there any information you found in that deposition to be false or inaccurate?
A No.
Q When you reviewed the deposition of Mr. Spratte, was there any information that you found to be false or inaccurate?
A Not that I can recollect, no.
Q And when you reviewed the deposition of Mr. Winstrom, was there anything he said that you found to be false or inaccurate?
A Not that I can recall at this time, no.
Q Okay. Well, when you reviewed it, did you think to yourself, "That's wrong." at any point when you were reading it?
A Not that I can recall, no.



Q Okay. And when you reviewed the deposition of Mr. Spratte, was there any point as you were reading it when you said, "That's not right."
A Not that I can recall, no.
Q Okay. Okay. Any other -- other than the general orders and special orders you reviewed, the pre-service gang service training, and the four depositions that you've just identified, any other documents that you reviewed in preparation for today's deposition?
A Not that I can recall right now. There may have been a few other documents, but I just -- I don't remember what they were at this point.
Q Okay. Did you speak with anyone in preparation for today's deposition other than your meetings with counsel?
A No.
Q Did you speak with any Chicago police officers who may have experience on the topics on which you're testifying today in preparation for today's deposition?
A No.
Q Did you inform anyone in the Chicago Police Department that you'd be providing testimony on these topics today?
MS. ROSEN: I'm going to ask you to clarify that. So it's possible, because of the breadth of



your question, that you're invading attorney-client privilege.
MR. SWAMINATHAN: Let's move on. I'm not -- I don't really care. I guess I don't really care. Move on, but what I would like to do is take a quick break and use the bathroom. Why don't we take five minutes?
MS. ROSEN: Sure.
COURT REPORTER: All right. We're off the record. Time is 11:23.
(OFF THE RECORD)
COURT REPORTER: We are back on the record for the deposition of Lieutenant John Foster being conducted by video conference. My name is Sydney Little. Today is June 29, 2022, and the time is 11:30 a.m.
BY MR. SWAMINATHAN:
Q All right, sir, I want to ask you about Topic 1J in the Notice, which was a topic related to the use of confidential informants, anonymous calls, and confidential street sources as those terms are used in the applicable police reports in these cases. All right. So let me start with that Topic 1J and let me start with a terminology question. So I understand that the term, "confidential informant", could mean different

things to different people. So can you start by helping me understand what terminology, if any, exists with -- within the Chicago Police Department, for the concept of individuals who come forward and cooperate or work as informants for the Chicago Police Department?

A So as I understand it, a confidential informant is somebody that's registered, signed up, and is -- is getting paid for information that he or she provides the Chicago Police Department. So they have withstood the test of credibility and things of that nature.

Q Okay. And so that's called a -- so the term, "confidential informant", refers to this so-called registered confidential informant; is that right?

A Yes.

Q Okay. And a registered confidential informant -- what does the term "registered" mean when you refer to a registered confidential informant?

A We know the person's identity, where they live. We have -- you know, we have the ability to communicate with them and -- and things of that nature. So they're -- they're registered with the city with their name, and they're recognized as having provided accurate information on several occasions.

Q Okay. And then is there some documentation



that's retained within the police department for registered confidential informants?

A Yes.

Q Okay. And then, so in addition to registered confidential informants -- oh, so strike that. What is a cooperating individual? Is that the same thing or something different?

A Well, I -- I think there's -- there's -- it's different terms for different things, and not to get -- to muddy the waters. I think, you know, that if you're not a confidential informant, meaning you're not a formal registered informant, then you could be a street source and a street source could be confidential.

Q Okay. And so what is the -- what distinction, if any, are you identifying between those street sources that are not registered confidential informants?

A Street sources are not paid. They're not registered.

Q Okay. Any other categories or sort of names for people who fall within these categories other than registered confidential informants and cooperating individuals or street sources?

MS. ROSEN: Object to the form. You can answer.

A Those are -- those are the -- I think the



terms that are most commonly used in the police department.

Q Okay. And so a cooperating individual, are they -- is that somebody who you characterize as a street source, or is that a registered confidential informant? I guess that's the one term I was unsure about.

MS. ROSEN: Object to the form.

A I don't know that we, the police -- Chicago Police Department has a -- or a cooperating individual term. I know that -- like I -- like I said before, if you're registered as an informant or -- or a cooperating individual, if you're registered, you're getting paid. If you're a street source, you're not. So confidential informant and cooperating individual could be one and the same.

Q All right. During the period from 1986 to 1998, were there any policies that applied to the use of registered confidential informants by detectives?

A Not that I'm aware of.

Q Okay. During the period from 1986 to 1998, were there any policies that applied to the use of cooperating individuals or street sources by detectives?

MS. ROSEN: Object to the form.

A Not that I'm aware of, no.



Q Okay. During the period from 1986 to 1998, were there any policies that applied to the use of registered confidential informants by gang crimes specialists?

A None that I'm aware of.

Q And in the period from 1986 to 1998, were there any policies that applied to the use of cooperating individuals by gang crime specialists or street sources?

A So you're using cooperating individual -- cooperating individuals and street sources synonymously; Is that correct? Is that --

Q Yes, but tell me if I shouldn't. I mean, I'm not intending to deliberately mush them. I -- you tell me, would it be more appropriate for me to use just the term "street sources" in this context? Is that -- are you more comfortable with that?

A Yeah, I would -- I would think that -- I think for our purposes, a confidential informant and street sources would be -- are two -- two different -- you know, that would be a good distinguishing term.

Q Okay. So in other words, confidential informant refers to sort of this registered confidential informant who is paid, street sources basically refers to everything else; is that fair?

A Well, I don't know if -- I don't know if I would go with everything else, but a street source is somebody that doesn't get paid and provides information.

Q Okay. And if I understand correctly, other than those two general categories of registered confidential informants and street sources -- there you're not aware of any other categories that exist within the department; is that right?

MS. ROSEN: Object to the form.

A That's correct.

Q And the reason -- again, just to make sure I understand. The reason you don't want to use the "cooperating individual" is because it's ambiguous. It's not really clear which of those two groups it fits into; is that fair?

MS. ROSEN: Object to the form.

A I just think it -- cooperating individual could -- could mean a couple different things. I don't think it distinguishes between, are they paid? Have they been found credible? Have they -- so I just, I think for the police department's purposes, a street source can give you information, but it would be whoever's receiving that information to vet it a little more carefully than you, maybe you would with a confidential informant. That information would be vetted



also. But this -- I mean, when we're talking about street source, that could be somebody anonymous that phones in and provides information.

Q I think you anticipated my next question. So the things that would fall in the category of street sources would be things like, an anonymous caller who calls in; is that right?

A Correct.

Q Okay. What are other examples of the kind of people who would fall in the category of street sources?

A Street sources can be -- I think that's -- it's -- there's many different answers, but it could be somebody that a law enforcement officers had contact with in the past that provides them information just informally and says, hey, I heard this or maybe that. Or it could be, if somebody is a senior citizen walking his dog saying, "Hey, I saw this. I don't want to be involved. And -- and it was a red car." So those are all street sources. None of them are being provided compensation, but there's different levels of that information.

Q Okay. And then at what point would somebody who's been, you know, providing information informally to a detective or gang crime specialist or other investigator become -- need to be registered as a



registered CI?

MS. ROSEN: Object to the form.

A I don't -- I'm not -- I'm not completely clear what you're asking me.

Q Yeah. Is there sort of a point at which somebody is, needs to no longer be simply referred to as a street source, but needs to be registered as a confidential informant?

MS. ROSEN: Object to the form.

A Are you asking if there's a Chicago Police Department policy or practice?

Q Yeah. Thank you. Thank you for that clarification. So yeah, let's start from a policy perspective. Is there a set of circumstances that says, all right, once a certain circumstance occurs, then you need to have this person become a registered CI rather than just be a typical street source?

MS. ROSEN: Object to the form.

A There's no policy that I'm aware of regarding the morphing in -- morphing of a confidential source becoming a registered informant.

Q Okay. If somebody is going to be paid, do they then need to be a registered confidential informant if they're going to be paid?

A Yes.



Q Okay. So other than once somebody's going to be paid compensation for providing information, is there any other scenario or criteria that would say, okay, that's another scenario where you need to be registered as a confidential informant?

A Again, there's no policy about how somebody would become a registered informant as opposed to a street source.

Q Okay. And then let me go back to my original question. Are there any policies about the use of street sources by gang crime specialists?

A None that I'm aware, no.

Q Okay. And I just apologize that I don't remember if I asked this question before we went on that tangent. Are there any policies you are aware of that apply to the use of registered confidential informants by gang crime specialists?

A You got me off on that tangent --

MS. ROSEN: Objection, asked and answered.

A Can you -- can you repeat the question because you said I went on that tangent. You got me off my game.

Q Yeah, I got both of us off our game. Let me ask it again. Are there any policies you're aware of that apply to the use of registered confidential

informants by gang crime specialists?
A None that I'm aware, no.
Q Okay. Are there any policies you're aware of that apply to the documentation of the use of registered confidential informants or street sources by detectives?
A Not that I'm --
MS. ROSEN: Object to the form.
A None that I'm aware, no.
Q And are there any policies that apply to the documentation of the use of registered confidential informants or street sources by gang crime specialists?
MS. ROSEN: Object to the form.
A None that I'm aware, no.
Q Okay. And so with regard to the registration of confidential informants who are paid, would it be fair to say that registration process is something that is a practice of the police department, but out of policy in the period from '86 to '98?
MS. ROSEN: Well, no, but object to the form and beyond the scope of the 30(b)(6). If you want to confine it to detectives and gang crime specialists, fine.
MR. SWAMINATHAN: Yes, yes, so --
MS. ROSEN: But you said "police department wide" and we know that there are other policies and



practices related to Organized Crime, so.
BY MR. SWAMINATHAN:
Q Okay. So let's do it this way. So during the period of time from '86 to '98, were gang crime specialists ever part of the Organized Crime Bureau?
A Yes.
Q Okay. And during the period of time that they were part of the Organized Crime Bureau between '86 and '98 were gang -- were there any policies that applied to gang crime specialists that related to the documentation of registered confidential informants and/or street sources?
A None that I'm aware of.
Q Okay. What were the practices of gang crime specialists in the period from '86 to 1998, with regard to the use of registered confidential informants?
A Well, I know that they used them, but I don't know as to what the -- beyond that, what the practice was. I know that confidential sources are, or -- now you got me using your word. Confidential informants were being used and street sources were being used also.
Q Okay. So in period from '86 and '90 gang crime specialists did use confidential informants; correct?
A That's my understanding, yes.



Q And in the period from '86 to '98, gang crime specialists did use street sources; correct?
A My understanding, yes.
Q Okay. And it would be fair to say that in the period from '86 to '98, when gang crime specialists used confidential informants, there were no uniform policies or practices that applied to that use?
MS. ROSEN: Object. I'm sorry. Can you read back the question because I missed it.
Q I'll say it again, Eileen. In the period from 1986 to 1998, when gang crime specialists used confidential informants, would it be fair to say that there were no uniform policies or practices as to that use?
MS. ROSEN: Object to the form.
A I don't -- I agree with you that there was no policy that I'm aware of. Obviously, there was a practice of them being used. So yeah, there was a practice of them being used.
Q Understood. And -- and I guess I'm asking specifically with -- strike that. With regard to the practice of using them, were there any guidelines, directives, or other instructions, related to that use of confidential informants by gang crime specialists?
A Well, that would've been policy at that point



and there's none that I'm aware of.
Q Okay. And so --
MS. ROSEN: I'm sorry to do this. But can we take a quick break for just two minutes? Sorry.
MR. SWAMINATHAN: Yes.
COURT REPORTER: Sorry. We're off the record. The time is 11:44.
(OFF THE RECORD)
COURT REPORTER: We are back on the record for the deposition of Lieutenant John Foster being conducted by video conference. My name is Sydney Little, today is June 29, 2022, the time is 11:48 a.m.
BY MR. SWAMINATHAN:
Q Okay. Lieutenant Foster, are you aware of any directives or instructions given to gang crime specialists in the period from '86 to '98, with regard to their use of confidential informants?
A Okay. So I think where -- I think where I'm getting confused is gangs went -- gang specialists went to Organized Crime in 1993, I believe, and I said 1996 previously. And that when they went to -- when they went to Organized Crime in 1993, and I don't want to go on a tangent on you, they would've been covered by a Organized Crime Division order.

Page 82

Q Okay. So there was some Organized Crime order that applied to gang specialist use of registered confidential informants beginning when they joined the Bureau of Organized Crime. Correct?
A In 1993. Yes. That's my recollection.
Q Okay. Okay. So let me go – let me ask the other question then come back to that one to make sure we're clear, now that I think we're clarifying the issue. So actually, let's pull this up first and just do it that way. All right. I'm showing you the document I've marked as Exhibit 3, it's RFC 276 through 284. And the title is, Organized Crime Division Special Order 93-01, subject is Cooperating Individual Files(CI). You see that, sir?
(EXHIBIT 3 MARKED FOR IDENTIFICATION)
A I do, sir.
Q Is this a document you reviewed in preparation for today's deposition?
A Yeah, I reviewed it a short time ago.
Q Okay. This document – pause – strike that. Did you review this document in the three prior meetings you had before today?
A No.
Q Did you review it as you were reviewing documents outside of those meetings before today?

Page 83

A No.
Q Okay. All right. Did you see this document for the first time today?
A I did.
Q Okay. Have you had sufficient opportunity to be able to review this material in order to provide testimony on behalf of the city on the topic of the use of confidential informants today?
A I have not read it in its entirety, if that's what you're asking.
Q Are you – do you feel prepared to testify on the topic of the use of confidential informants by the City of Chicago today? By gang crime specialists and detectives.
MS. ROSEN: Wait. Say that again. You broke up the rest of the –
Q Yeah. Sorry. With regard to the topic at issue, 1J, the use of confidential informants in the period from '86 to '98 by detectives and gang crime specialists. Are you prepared to testify on that topic today?
A Yes.
Q Okay. All right. All right. So this document that I just showed you, is this the document you're referring to regarding the policy that applied to

Page 84

gang crime specialists, once they joined Organized Crime?
A Yes.
Q Okay. So if I understand correctly, for the period from 1986 to 1993, before gang crime specialists joined the Bureau of Organized Crime, there were no policies that applied to their use of confidential informants; correct?
A No, that I'm aware of. Correct.
Q Okay. And then once they joined Organized Crime in and around 1993, the policy that's listed here as Exhibit 3, began to apply to gang crimes specialists; correct?
A That's correct sir.
Q Okay. And this policy, it says, was effective as of January 7, 1993; Is that correct?
A That's correct.
Q And do you have any reason to dispute that that's when it became effective?
A No.
Q Okay. And would you agree with me that this policy applies only to the use of confidential informants or registered confidential informants and does not apply to the use of street sources?
A That's correct.

Page 85

Q Okay. So for the entire period, from '86 to '98, there was no policy with regard to gang crime specialist use of street sources; correct?
A That's correct. Yes.
Q Okay. And having had a chance to review this, let me just clarify the other question that I think we've already addressed. But now that we've had a chance to review this, I want to make sure we're clear. This – well, let me ask in a different way. This policy, exhibit 3, does not apply to Detective Division personnel; correct?
A Correct.
Q Okay. So for the period from '86 to '98, there was no policy with regard to cooperating individual files, or CIs, as identified in Exhibit 3, that applied to the use of confidential informants by detectives; correct?
A Yeah. I'm not sure I've ever seen a detective use a confidential informant, but no.
Q Okay. And this policy does not apply to the use of street sources by detectives; correct?
A That's correct.
Q Okay. Other than this policy, are you aware of any other policy documents that set forth any policy as related to the use of confidential informants or

street sources for any other groups within the Chicago Police Department, other than individuals in the Organized Crime unit?
A None that I'm aware of right now.
Q Okay. And this policy, exhibit 3, would it be fair to say applied – well, let me ask this – strike that. To whom did this special order, 93-01 Exhibit 3, apply?
A Well, it – I think right away it says, the gang crime section, the asset forfeiture unit, and the intelligence section. Those are the three that they're calling out right away.
Q Okay. Okay. And were gang crime specialists trained on this policy when they joined the detective – strike that – were gang crime specialists trained on this policy when they joined the Bureau of Organized Crime?
A Yes.
Q Okay. And so were gang crime specialists trained on the need to register their CIs who met certain criteria as set forth in this policy?
A That's correct. Yes.
Q Okay. And other than this policy document, setting forth certain instructions about the use of confidential informants by gang crime specialists, were



there any other directives or instructions that set forth the practices that they should follow?
MS. ROSEN: Object to the form. Answer.
A The compound question is, can you simplify that a little bit for me?
Q Yeah. Again, so let me leave out some of the qualifiers. I'm focused exclusively on gang crime specialists for these questions. And I'm focused exclusively on the period once they joined Bureau of Organized Crime and this policy applied to them. Okay. So with that caveat, were there any instructions, guidelines, directives of any kind, other than this policy document, that provided guidance to gang crime specialists about what practices to follow with regard to the use of CIs?
A None that I'm aware of, no.
Q Okay. And prior to 1993, when gang crime specialists joined Organized Crime, were there any guidelines, directives, or other documents that provided guidance to gang crime specialists about the practices they should follow in using CIs?
A None that I'm aware of, no.
Q Okay. In the period between 1986 and 1993, when this policy would've first applied to gang crime specialists. So in that period from '86 to '93, what



were the practices of gang crime specialists with regard to the use of confidential informants?
A Well, obviously, like I said, they were – they were being used in certain – in certain type investigations and in some – in other – as in other investigations, I don't – confidential sources or informants or whatever term you want to use, weren't being used in other type investigations.
Q Okay. And so in that period from '86 and '93, there were no set practices for how gang crime specialists were to use CIs. Correct?
MS. ROSEN: And just for point of clarification, you're talking about the type of confidential informant or cooperating individual, that is required to be registered or are you – or is it broader than that?
BY MR. SWAMINATHAN:
Q No, I'm going to use only the terms "confidential informant" or "CI" or "street sources." Those are the only two categories. So CI, I'm referring to confidential informant; right? The two categories that we've identified, are you with me, Lieutenant?
A I am.
MR. SWAMINATHAN: Okay. Eileen, is that clarified?



MS. ROSEN: Yeah, I think so.
MR. SWAMINATHAN: Okay. All right. So –
MS. ROSEN: But now I've lost the question.
MR. SWAMINATHAN: Yeah, but now I'll ask the question again.
BY MR. SWAMINATHAN:
Q In the period from '86 to '93, before this policy applied to gang crime specialists, were there any set practices that were followed by gang crime specialists with regard to their use of CIs?
A None that I'm aware of.
Q Okay. And so in the period from '86 to '93, before this policy applied to them, would it be fair to say that the practices around the use of CIs by gang crime specialists was ad hoc?
MS. ROSEN: Object to the form. You haven't - - foundation.
Q Go ahead.
A Okay. Well, by ad hoc, I think you're – I think you mean disorganized and without any type of control and I don't – I don't necessarily know that I would agree with that.
Q Okay. So between '86 and '93 gang crime specialist use of CIs was not dictated by any set of

policies or set practices; fair?
MS. ROSEN: Object to the form. Foundation. You haven't even established that they used CIs in that time frame.
MR. SWAMINATHAN: No, he already testified that in the period from '86 to '98, gang crime specialists used CIs. We've already established that.
MS. ROSEN: In the broad period.
MR. SWAMINATHAN: Yeah. '86 to '98 specifically asked that.
MS. ROSEN: Object to the form. Foundation.
MR. SWAMINATHAN: Yeah.
A Your question is, did they use CIs?
BY MR. SWAMINATHAN:
Q No, we've already established -- you agree we've already established, they used -- gang crime specialists used CIs in the period from '86 to '98; fair?
MS. ROSEN: Object to the form.
A In certain type of investigations, yes.
Q Okay. When they used CIs in the period from 86 to 93, before they joined the Bureau of Organized Crime, there were no policies or set practices that applied to that use; fair?



MS. ROSEN: Object to the form. Foundation, beyond the scope of the 30(b)(6), if it doesn't apply to homicide. So there's still a foundation problem.
MR. SWAMINATHAN: Go ahead.
MS. ROSEN: He said, certain circumstances.
BY MR. SWAMINATHAN:
Q Go ahead.
A So again, in certain -- certain investigations they were being used, I don't believe there was any policy pre-1993. There obviously was a practice.
Q Okay. And who set the practices that applied in the period from '86 to '93 with regard to the use of confidential informants?
MS. ROSEN: Object to the form. Beyond the scope of the 30(b)(6) notice.
Q Go ahead.
A It would call for me to speculate. I don't know, but I would imagine it was the supervisors in the gang crimes section.
Q Meaning, would that be the sergeants and lieutenants?
A Yes.
Q Okay. All right. And then for the period from 1993 to 1998, were there -- let's strike that. In



the period from '86 to '93, what training, if any, was given to gang crime specialists about their use of confidential informants?
MS. ROSEN: Object to the form. Beyond the scope of the 30(b)(6), because you still haven't established that whatever he's talking about relates to homicides and that's the scope of the 30(b)(6) notice. So to the extent you know the answer to that question, you can answer.
A I don't really know.
Q Okay. Are you aware of any specific training for gang crime specialists, about their use of confidential informants in the period from '86 to '93?
MS. ROSEN: Same objection. Related to foundation and beyond the scope of the 30(b)(6) notice because you haven't established that what he is talking about applies to homicide investigation.
A The only information I have is some pre-service gang training that was dated 1996. It would be --
BY MR. SWAMINATHAN:
Q And does that the --
A -- outside the timeline that you're talking about.
Q Okay. That training that -- the pre-services



gang training you're talking about was, you said '96; correct?
A I believe so, yes.
Q Okay. Are you aware of any training existing with regard to the use of CIs by gang crime specialists prior to 1993?
MS. ROSEN: Same objection that I've been making about beyond the scope of the 30(b)(6) notice.
A None that I'm aware.
Q And are you aware of any gang crime specialist training, regarding the use of CIs prior to that 1996 training that you just referenced?
MS. ROSEN: Object to the form. Same objection with respect to beyond the scope of the 30(b)(6) notice.
A I am not.
Q Okay. And then with regard to the use of street sources, we've established that there is no -- there was no policy that applied to gang crime specialists with regard to their use of street sources, for the period of '86 through 1998; correct?
A That's correct. Excuse me.
Q And were there any set practices that applied to the use of street sources by gang crime specialists

in the period from '86 to '98?
A Well, again, you know, street sources cover -- covers a wide, wide variety of people providing information. So obviously I would say that the practice was to somehow, through a variety of methods, record that information that street sources may provide you.
Q Okay. And was that practice set -- who set that practice? Was it coming from a policy level or was it coming from the supervisors of detectives or from -- strike that. From the supervisors of gang crime specialists or the specialists themselves?
MS. ROSEN: Hold on a second. Can you either have the question read back or repeat it back?
MR. SWAMINATHAN: I'll re-ask. I'll re-ask it.
MS. ROSEN: Thanks.
BY MR. SWAMINATHAN:
Q The practice that you just described, who set that as the practice?
MS. ROSEN: Objection, beyond scope of the 30(b)(6) notice.
A I think the practice starts when you enter the Chicago Police Department Academy to record information that provided to you as a matter of any investigation.
Q Okay. So the practice during the period from



'86 next to '98, with regard to the use of street sources, was basically whatever the practices were with regard to documentation of information you're learning during the course of the investigation; is that fair?
A You would want to record information that you got from a street source that you determined to be relevant, yes.
Q Okay. And then in terms of what amount of information to collect about that street source, were there any policies or practices around that issue?
A When you say, "amount of information," can you -- can you tighten that up a little bit?
Q Yeah. Information about who they are, what their real name is, what their nickname is, where they live, any identifying information. Any past information they've provided about their reliability, all of those kinds of issues. So with that sort of -- does that make sense, what I'm saying?
A Yeah. Again, street sources are typically anonymous and they're street sources for a reason, that the information has to be vetted. And the -- the person providing that information is usually not willing to give you a lot of information about themselves.
Q Okay. You said street sources are supposed to be vetted. What do you mean by that?



A Well, for example, if I walk out of here today and somebody walks up to me and says -- points to somebody and says that gentleman just robbed a bank, I would probably not -- I would -- I would have to do further investigation before I would conduct an investigatory stop of that person. So you have to vet what they're saying. You have to -- you have to, you know, corroborate what they're saying.
Q Okay. And what is the type of, what were the type of steps detectives or gang crime specialists were expected to take to vet a street source before taking additional steps?
A You want to corroborate the information that they provided you.
Q And how were detectives expected, or gang crime specialists, expected to go about doing that?
A Well, it could be done in a multitude of ways. You could verify it via police reports. Was there -- was there a robbery using my scenario? Obviously, if there wasn't, then that information is not -- not accurate. If there was, and then the -- then that might lead you to a little more, take another additional investigatory step.
Q Okay. Ultimately, were there any policies or practices that defined what those corroborative steps



that were required when you had information that came in from a street source as a gang crime specialist or detective?
A Not that I'm aware of.
Q Okay. And so was that determination essentially made by the detectives themselves, about what amount of additional corroboration should be conducted when you get information from a street source?
MS. ROSEN: Object to the form.
A In regards to what? I mean, I think it's -- it would be kind of a case-by-case basis as to what crime we're talking about. And it could be something as minor as, they're repairing their cars in the alley against violating a city ordinance as all the way up to, you know, I saw somebody murder somebody.
Q Okay. In the period from '86 to '98, would you agree that detectives would get information from street sources in homicide cases?
MS. ROSEN: You broke up. Can you repeat it.
Q In the period from '86 to '98, did detectives get information from street sources in homicide cases?
A Sure.
Q And in the period from '86 to '98, did detectives get information from registered confidential informants?

A I've never seen that happen and I'm not aware of any confidential informant providing information directly to detectives.
Q Okay. And is there a policy that indicates that detectives are not to use registered confidential informants?
A No.
Q Okay. And so could detectives have registered confidential informants if they wanted to?
A Yes.
Q Okay. And your testimony is that, as you said here today, they could have them, but you're just not aware of if any detectives did; is that right?
MS. ROSEN: And I'm going to lodge an objection with respect to this question, because it's broader than homicide. If you want to leave it -- if you want to confine it to homicide, then I'll withdraw my objection. Otherwise it's beyond the scope of the 30(b)(6) notice.
Q Go ahead.
A I have never seen homicide detective use a confidential informant.
Q Okay. And -- excuse me. Did -- would you agree that in the period from '86 to 1998, gang crime specialists would get information from street sources



during the course of their investigations?
A Yes.
Q Okay. And would you agree with me that in the period from 1986 to 1998, gang crime specialists would sometimes assist in homicide investigations?
A Yes.
Q Okay. And when gang crime specialists assisted in homicide investigations, were they subject to the Detective Division special orders when they assisted in those homicide investigations?
A What time frame are we talking about?
Q In the period -- is there any point in the period from '86 to '98, when a gang crime specialist would be required to follow Detective Division special orders?
MS. ROSEN: You say '86 to '98, so we're back within the -- you're talking about the post-2000 thing; right?
MR. SWAMINATHAN: No.
A At no time were gang specialists, in the time frame that you just specified, part of the Detective Division. So though they would not be bound by Detective Division special orders, however, they would've been bound by Chicago Police Department, general orders.



BY MR. SWAMINATHAN:
Q Okay. So in period from '86 to '98, gang crime specialists were always subject to the general orders of the police department; correct?
A Every member of the Chicago Police Department is bound by the general orders.
Q Okay. And in the period from '86 to '98, there was no point when gang crime specialists were required to follow the Detective Division special orders; correct?
A Correct.
Q Okay. And when gang crime specialists assisted in homicide investigations, that didn't suddenly mean that the special orders for Detective Division applied to them; fair?
A Yes, that's correct.
Q Okay. And so -- and again, gang crime specialists were never trained that when they assisted in homicide investigations, they were then required to follow Detective Division policies; correct?
A Correct.
Q Okay. When gang -- did and -- fair to say, the period from '86 to '98, when gang crimes specialists assisted in homicide investigations, they would sometimes rely on street sources?



A Yes.
Q Okay. And when gang crime specialists relied on information from street sources in the period from '86 to '98 in assisting homicide investigations, were there any policies or practices that applied to that use?
A So from eight -- 1986 to 1998, gang specialist. I just want to make sure I heard this question correct. If they used a street source, there was no policy. Is that what you're asking me?
Q Were there any policies or practices that applied to their use of a street source in assisting a homicide investigation?
A No, not that I'm aware of.
Q Okay. Was there any training that was given to homicide -- strike that. Was there any training that was given to gang crime specialists assisting in homicide investigations regarding their use of street sources?
A Not that I'm aware of, no.
Q Okay. When gang crime specialists obtained information from street sources related to a homicide investigation, what documentation, if any, were they expected to create?
A Well, gang crime specialists did assist in

Page 102

homicide investigations, but peripherally, and I think a lot – in a lot of cases, they provided information to the detective orally, but ultimately they would've done a GIS report – had – if no other report was – was applicable.
Q Okay. So gang crime spec – what is a GIS report?
A Gang Investigation Section report, GIS.
Q Okay. And Gang Investigation Section reports were reports that gang specialists created; correct?
A Correct.
Q Okay. And I think you said the shorthand is GIS report; is that right?
A That's correct, sir.
Q Okay. And so a GIS report was a type of report that gang specialists would create on occasions when they assisted in homicide investigations; fair?
A Well, not necessarily. I don't – they're not required to do a GIS, they – a GIS report. They could have communicated with the detective whatever they needed to communicate. That wouldn't require a report. So they could have communicated orally.
Q Okay. So were there times – strike that. If a – were there circumstances in which a GI – in which a gang crime specialist was required to create a GIS

Page 103

report based on their assistance in a homicide investigation?
A None that I'm aware of, they were required to do a GIS report when no other report was applicable.
Q And what do you mean by that, "when no other report was applicable?"
MS. ROSEN: Anand, can you just get clarification? Because, you know, this gang crime shifts at '93, there's the shift, and so if you could just take care to make sure you're being clear on what time period. So you know, the GIS, I think, is a document that doesn't fit the whole-time frame, based on the information that we have. So just –
MR. SWAMINATHAN: All right.
MS. ROSEN: – be – be careful.
BY MR. SWAMINATHAN:
Q All right. Did the GIS report – was that a report that applied to gang crime specialists before they joined the Bureau of Organized Crime?
A Yes, I believe so.
Q Okay. So did they fill out GIS reports both - - throughout the period from '86 to '98?
A I'm not – I'm not entirely sure what they did after 1993, as far as reporting purposes – for

Page 104

reporting purposes.
Q After 1993, were there any reporting requirements – was there any type of report that was the equivalent of a GIS report that gang specialists were required to prepare?
A 1993, they were using GIS reports.
Q I was saying after '93, when they joined Bureau of Organized Crime?
A Yes. They were using – yes, I – yeah. After 1993, they were using GIS reports.
Q Okay. And before 1993, you said they were using GIS reports?
A I don't believe they were.
Q Okay. I think we might have gotten confused there. Okay. So prior to 1993, are you aware of any type of report that gang crime specialists were expected to fill out related to their work?
A Yes, they were doing Patrol Division supplemental reports.
Q Okay. And in the period from '86 to 1993, when they were doing Patrol Division supplemental reports, were they required to document their assistance in homicide investigations on those reports?
A Not necessarily, no.
Q Okay. Were there – were they required to

Page 105

document their assistance in homicide investigations in any other type of report in the period from '86 to '93?
A Can you repeat that question?
Q In the period from '86 to '93, when they were filling out Patrol Division supplemental reports, was there any other type of document they were required to fill in during their assistance of homicide investigations?
A Not that I'm aware of. Not homicide investigations, no.
Q Okay. And then after 1993, when they assisted in homicide investigations, they would – were there any other types of documents they were required to submit related to their assistance in a homicide investigation, other than a GIS report?
MS. ROSEN: Object to the form.
A None that I'm aware of.
Q Okay. And if I understand correctly, the practice was that a gang crime specialist between '93 and 1998 could either fill out a GIS report related to their assistance in a homicide investigation or share that information orally with a detective. Correct?
A I don't know that there was a – was a conscious decision either/or, I think it was a – it was more of a collaborative communication between a gang

Page 106

specialist and detective as to hey, this is, you know, whatever information he was providing. Do you want me to do a report, or do you want to encompass that in your supplemental report? And I think that was up to the detective at that time, whether he was going to incorporate it in his report or if he wanted a separate – post-1993, a GIS report, or supplemental report pre-1993.
Q Okay. So if – in the period from – well, let me ask this, because I think this is – regardless of what type of report gang crime specialists fit – filled in, for the entire period from '86 to – well, strike that. Let me just build off of your last answer. Is the practice that you just described, was that the practice throughout the period from '86 to 1998, with regard to information gang crime specialists learned during the course of their assistance in homicide investigations?
MS. ROSEN: Objection, form.
A Can you tighten it up just a little bit?
Q Yep. The practice – you just described a practice where there'd be a conversation between a gang crime specialist and a detective about who was going to document information. Correct?
A Correct.

Page 107

Q And that answer applied to my question, which was about the period from '93 to 1998. So I want to clarify, is that – was that practice also the practice in the period from '86 to 1993?
A Yes.
Q Okay. So throughout the period from '86 to 1998, the practice was that there'd be a conversation between the gang crime specialist and the detective about who was going to document certain information that might have been learned by the gang crime specialist; fair?
A Yes, the gang crime specialist would've – it would've been the detective's choice how he wanted to document that in – information that was provided by the gang specialist.
Q Okay. And so in the period from '86 to 1998, pertinent information learned by gang crime specialists during the court of – course of their assistance in a homicide investigation could be documented in a gang crime specialist report or by the detectives; correct?
A Yes.
Q Okay. There was no policy that required gang crime specialists to document pertinent information they learned during a homicide investigation; correct?
A Document themselves, you mean?

Page 108

Q Yes.
A That's correct. You're – you're right. Yes.
Q And there was no policy that instructed gang crime specialists that they were required to have a conversation with detectives about what information they learned during the homicide investigation; correct?
MS. ROSEN: Object to the form.
A Yeah. Can you repeat that?
Q Yeah. The – you described a practice of detectives and gang crime specialists having a conversation about who was going to document certain information. What I want to understand is, that back and forth, is that – was that something that was done subject to policy, or was that the practice?
A Well, there's no policy that I'm aware of. It was just a – a matter of sharing information and deciding how to best document it.
Q Was there any policy document in the period from '86 to 1998 that said gang crime specialists had to document pertinent information they learned during their assistance of a homicide investigation?
A None that I'm aware of.
Q Was there any policy document that instructed gang crime specialists that they had to fill out any – a gang supplementary report or GIS of any pertinent

Page 109

information they learned during a homicide investigation?
A There was no policy that I'm aware of.
Q Okay. Was there any policy that instructed gang specialists that they had to fill out a GIS or a Patrol Division special supplementary report? Strike that. Let me ask it without those unnecessary details. Was there any policy in the period from '86 to '98, 1998, that required gang specialists to document when they got information from a street source related to a homicide investigation?
A There was no policy that I'm aware of.
Q Okay. Now the practice – in terms of practices regarding the documentation of information learned by gang specialists assisting homicide investigations, was the practices the same across areas of the police department, to the extent you know?
A As to how information was documented and shared?
Q Yes.
A Yes, I believe it was across all areas.
Q And what is the basis for that understanding?
A Well –
MS. ROSEN: Go ahead. And I'm – actually, objection, outside the scope of the 30(b)(6)

notice, but you can answer.
A Just reading reports that I reviewed that seems to be from several different areas, so I – I assumed it was across all areas.
BY MR. SWAMINATHAN:
Q Okay. With regard to the – what the documents did you review that indicated to you that the practices were the same across areas of the police department?
A Some of the pre-service gang training materials.
Q Okay. And those pre-service gang training materials that you reviewed were a – applied across all gang specialists that were working across the city. Correct?
A Well, the gang specialists in pre-service would've been – would've graduated and been assigned across all areas or across the city, so that's my basis.
Q Yeah. Okay. And other than the gang services training that you reviewed that applied to all gang specialists across areas, are you – what other information are you relying on to indicate the practices of gang specialists regarding documentation of their role in homicide investigations?
MS. ROSEN: Same objection, beyond the scope



of the 30(b)(6) notice, but you can answer.
A My review of Mr. Spratte's deposition.
Q Anything else?
A Not that I can –
MS. ROSEN: Same objection.
A – not that I can think of right now.
Q Okay. In terms of the training provided to gang specialists about their assistance in homicide invest – strike that. Did gang specialists get any formal training about their documentation related to their assistance of homicide investigations?
A Well, all I – all I have to go on is – is a 1996 training manual. So it would appear that they – they've got some training about documenting information they received, but I do – does it go into the specifics of a homicide investigation? I'm not sure it does.
Q Okay. Fair to say that the – it's right that you're not aware of any training prior to 1996 for gang crime specialists related to their assistance in homicide investigations; fair?
A As far as training goes, is that what you're asking me?
Q Yes.
A You broke up. Yes?
Q Yes.



A Yes. You're – you're correct, yes.
Q Okay. And are you aware of any training for gang crime specialists prior to 1996 with regard to their use of street sources?
A None that I'm aware of, no.
Q Are you aware of any training for detectives about the use of street sources in homicide investigations prior to 1996?
A Other than on-the-job, but I'm not aware of, no.
Q Okay. And I shouldn't have limited that to '96, because now we're talking with detectives. So let me ask a better question. Are you aware of any training for detectives in the period from '86 to 1998 with regard to their use of street sources in homicide investigations?
A I wasn't – I did not have any of that stuff there – any information – that information reviewed, so I'm not aware of any.
Q Okay. Are you, as an agent – as the individual designated for the Chicago Police Department, can you identify the existence of any training for homicide detectives with regard to their use of street sources in the period from '86 to 1998?
MS. ROSEN: And just so that we're clear,



you're talking about specifically street sources as distinct from training related to just witnesses generally; right?
BY MR. SWAMINATHAN:
Q Yes, go ahead.
A Yeah, that's correct.
Q Okay. And you – you're not aware of any training for detectives in the period from '86 to 1998 with regard to the use of registered confidential informants; correct?
A Correct, yes.
Q Okay. All right. The – I want to take a look at this policy that I've got on the screen here as Exhibit 3.
MS. ROSEN: You read it.
THE WITNESS: Yeah.
Q Can you see that if I make it a little bigger?
A Yeah. Thank you.
Q Okay. I think we established that this policy applied – did not apply to detectives; correct?
A Correct.
Q And it applied to gang specialists once they joined the Organized Crime Division in 1993; correct?
A Correct. Yes.
Q Okay. And this document is specifically with

Page 114

regard to cooperating individuals – strike that. This
policy is particularly – applies to the use of
confidential informants and not street sources; correct?
A Correct, yes.
Q Okay. And so the references to a cooperating
individual or CI, in this document, is the idea of a
confidential informant or registered CI as we've been
using it; correct?
A That's correct, sir.
Q Okay. According to this policy, it identifies
the reasons for having registered cooperating
individuals. Do you see that, sir?
A What section are you at, sir?
Q I'm looking at section C in Roman numeral one.
A Ah – see it, yes.
Q Okay. The cooperating individuals – strike
that. The policy was that I provided – identified
reasons why it was necessary to have registered
cooperating individuals; correct?
A Correct.
Q Okay. And it – and according to the policy,
one of the reasons to register confident – CIs was to
document the identity of the person who was providing
the information; correct?
A Correct.

Page 115

Q Okay. And according to the policy, one of the
reasons to register confidential informants was to be
able to document their reliability; correct?
A Correct.
Q Okay. And ultimately, the credibility of the
information provided by confidential informants was
important to defending search warrants and other types
of follow-ups that may be conducted by investigators
based on information obtained from cooperating
individuals, according to the policy. Correct?
MS. ROSEN: Objection to the form, but you can
answer.
A I see that it supports credibility for search
warrants. I'm not – I don't see where it says –
document his or – yeah. The other part of your
question, I don't – I don't see that. Can you tell me
what number you're on?
Q Yeah, no, that is what I'm looking at. So it
identifies here that one of the reasons that –
according to the policy, one of the reasons for
registering confidential informants was to be able to
support statements about their credibility in search
warrants; correct?
A Yes.
Q Okay. And in the section right above that,

Page 116

where it makes reference to reliability, what was the –
what does that mean, to say that it was important to
document the reliability of confidential informants?
A Well, I would interpret it as their ability to
provide accurate information.
Q Okay. And so in other words, it was
documenting whether or not this person is, or
historically had been, providing accurate information to
police?
A Correct.
Q Okay. And then for these individuals who were
identified as registered confidential informants,
according to the policy – who they were, the identity
of these individuals was to be documented and collected;
correct?
A Yes. For a registered informant, yes.
Q Okay. And pursuant to the policy, these
registered confidential informants could still be
anonymous; correct?
A Yes.
Q In other words, the police department could
know who they are, but for purposes of documentation in
search warrants, or other documents that may be seen by
others, they could be anonymous; correct?
MS. ROSEN: Object to the form, and to your

Page 117

use of the phrase "in other documents." Foundation,
answer.
Q Go ahead.
A It's – the policy says that they must be
registered to be used as an anonymous source of
information seeking a search warrant.
Q Okay. But you agree with me that confidential
informants could be registered within the Chicago Police
Department, but still retain anonymity outside of the
department?
A As far as search warrants? Sure. You're not
- - their – their name's not going on the search
warrant as an affiant, but –
Q And according –
A – anonymity as far – go ahead.
Q Go ahead. Sorry.
A Anonymity as far as something else is far too
broad for me to comment on.
Q Okay. Looking at the policy, and this is in
section two – oh, sorry, section 3(b), the policy
specifically indicates that police officers can reassure
cooperating individuals that their identities will be
carefully concealed. Do you see that, sir?
A I do, sir.
Q Okay. And was that also the practice, that

gang specialists and others would inform confidential informants that their information -- their identities could be concealed?

MS. ROSEN: Objection, form, incomplete. Hypothetical, I guess, because it's confined to search warrants, and you keep taking that out.

BY MR. SWAMINATHAN:

Q It's not -- let me ask you this. Does this policy, in section three, does it indicate that it is in any way limited to search warrants?

A Well, can you go -- I'm not -- I can't -- you're controlling the -- yeah.

MR. SWAMINATHAN: Am I supposed to look --

MS. ROSEN: Do you mind if I give him a hard copy, Anand? Do you mind if I give him a hard copy?

MR. SWAMINATHAN: Not at all. I can make it bigger or give him a hard copy, whichever you prefer.

A I'm old school. I like to look at the hard copy. Okay, so you're on section -- you're on three; right?

BY MR. SWAMINATHAN:

Q Yep.

A So you're on --



Q I'm on policy -- I'm on two, and I'm on 3(b), but you can take a look at the entire policy.

A Sure. Yeah, I would interpret that as this is -- all has to do with anonymity as far as search warrants.

Q Okay. So the -- would you say that this policy is -- applies entirely to and exclusively to the use of registered confidential informants for search warrants?

A Well, I -- I would say that's the primary thrust of it, yes, because that's -- that's what Organized Crime, at that point in time, was mostly doing, was search warrants. I don't think it has -- I don't think they're touching on confidential informants, as far as investigations are involved.

Q Okay. So this policy that is Exhibit 3 applied to the use of registered confidential informants by gang specialists in the period from '93 to '96, with regard to their use in support of search warrants. Correct?

A I think that's the primary function of this order. That's correct, yes.

Q Okay. Did this policy apply to the use of registered confidential informants by gang specialists in their assistance in homicide investigations?



A Well, I don't have the luxury of reading every pages, but as I'm paging through it seems -- the common theme of it seems to be search warrants.

Q Okay.

A So I don't necessarily know that it would have applied to homicide investigations.

Q Okay. All right. Okay, pull this down. With regard to detectives and their use of street sources, were there any policies that applied -- strike that. With regard to the detectives in the period from '86 to 1998 in homicide investigations, was there any practice of having detectives cultivate street sources?

MS. ROSEN: Object to the form, but you can answer.

A That's an interesting question. When you say "detectives," in general, or homicide detectives?

Q Yeah. Let's focus on -- let's make it an easier question. Let's focus on homicide. In the period from '86 to 1998, were homicide detectives trained to cultivate street sources?

A No.

Q In the period from '86 to 1998, was there a practice of detectives cultivating street sources?

MS. ROSEN: Object to the form.

A Yeah, I -- my answer would be cultivating is



not a good word. I think that detectives were receptive to receiving information about investigations they were conducting, but were they cultivating it by -- by whatever means they -- they thought might work? I don't know that was -- that was happening.

Q Okay.

A I mean, I know it wasn't.

Q In the period from '86 to 1998, when detectives received information from street sources, the practice was to vet that information. Correct?

A I think that's only prudent, yes.

Q Okay. And so was there any policy that set -- that applied to detectives receiving information from street sources that required them to vet the reliability of the information from street sources?

A Other than there's -- there's policy, obviously, you want to conduct a thorough investigation, but specifically on point about street sources? No.

Q Okay. And was there any -- strike that. Was there any policy document that set forth the obligation of detectives to document information received from gang crime specialists during the course of a homicide investigation?

A I'm sorry, I got distracted. Sorry. Can you -- can you repeat that? I apologize. That's my fault.

Q I will, happily. Was there a policy that applied to detectives in the period from '86 to 1998 that applied to information they received from gang crime specialists?
A Not that I'm aware of, no.
Q Okay. So you're not aware of any policy that created any requirements around the documentation of information received from gang crime specialists to homicide detectives; correct?
A Other than the -- again, the policy that I quoted to conduct a thorough and fair investigation, no, not that -- nothing specific to the -- on point to receiving information from a gang specialist.
Q Okay. With regard to the gang crime, any reports created by gang crime specialists related to a homicide investigation, were there any policies that existed about how those documents would get to detectives?
A So I -- I think it's a very rare instance when a gang crime specialist would generate a report on a homicide investigation. I think almost always they would've -- the detectives would incorporate that into a sup. But in the case that a gang specialist did do a report on something regarding a homicide investigation -- what's your question?



Q When gang crime specialists created documentation related to their work assisting a homicide investigation, were there any policies that set forth how that information would get to the detectives or the Detective Division?
A Okay, good question. There is something in some manual that I reviewed, it said that the gang crime specialists will forward all the reports to a supervisor, which is the commander of the gang investigation or Gang Investigation Section will, on a case-by-case basis, determine the appropriateness of the information and make sure it gets to the detectives. So there was a -- there is a -- there was a policy in -- in play there.
Q Okay. That -- the -- what you just described, was that information you're saying was in a policy document, or something else?
A It's something that I reviewed for this -- for our meeting today. But as to what specific document, I don't know, but I know I read it. There is something about the dissemination of Gang Investigation Section reports.
Q Okay. And the thing that you read indicated that the information that gang crime specialists document in their reports should be shared with the



Detective Division if the supervisor deems it appropriate; is that right?
MS. ROSEN: And we're confining this to how -- you started this with homicide; right?
MR. SWAMINATHAN: Yeah. Yes.
MS. ROSEN: Okay.
A Yeah. There's -- there's something that -- there's -- there's a mechanism that the commanding officer or the commander would, based on what he deemed appropriate, would make -- would disseminate that information.
BY MR. SWAMINATHAN:
Q Okay. We'll come back to that. On -- let's turn to the topic of gang books, and maybe try to get through one more topic, and then maybe take lunch. We could take lunch now, or we could try to get through one more topic. Why don't you guys tell me what you think makes sense?
MS. ROSEN: Well, can we do lunch now since it --
MR. SWAMINATHAN: Yeah.
MS. ROSEN: -- arrived, which was our --
MR. SWAMINATHAN: Yeah. Yeah.
MS. ROSEN: -- distraction five minutes ago.
MR. SWAMINATHAN: Perfect.



THE WITNESS: We just need your debit card so you can pay for lunch.
MR. SWAMINATHAN: Deal. Deal.
COURT REPORTER: All right. We're off the record. The time is 12:42.
(OFF THE RECORD)
COURT REPORTER: We are back on the record for the deposition of Lieutenant John Foster being conducted by video conference. My name is Sydney Little. Today is June 29, 2022, and the time is 1:19 p.m.
BY MR. SWAMINATHAN:
Q All right. Lieutenant, did you get a chance to grab some lunch?
A I did. I'll send you the bill.
Q All right. Are you ready to go forward?
A Yes.
Q Okay. I think before we left off, we were just talking about confidential informants and street sources. I want to just ask you a couple final questions about street sources in particular. You talked about the idea that there are no particular policies that apply to -- well, strike that. Let me just ask my question. Were detectives expected to vet inform -- you indicated that detectives were expected to

vet information that they learned from street sources; correct?
A Yes.
Q Okay. Were detectives expected to vet information from street sources before arresting someone based on that information?
MS. ROSEN: Object to the form, incomplete hypothetical.
A So I think that it would be on a case-by-case basis, depending on the nature of the information, the level of detail -- excuse me. So I don't -- I don't think you can, you know, just paint that -- that -- answer that question with a -- with a broad brush.
Q So putting aside registered confidential informants for a moment, but rather only street sources, could detectives -- were there scenarios where information provided by a street source would be sufficient to arrest someone?
A Yeah.
MS. ROSEN: Object to the form. You can answer.
A Again, that would be on a case-by-case basis. I don't know the scenario that, you know, that would lead you to -- to do that. So I -- yeah, I don't know the specifics.



Q Are you aware of any instances when probable cause was established based exclusively on information obtained from a street source?
MS. ROSEN: Object to the form. You can answer.
A As I sit here right now, I can't think of any scenario. But I'm not going to -- you know, there could be a scenario.
Q Okay. But fair to say, detectives were expected to vet information from street sources before arresting someone based on that information; correct?
MS. ROSEN: Object to the form.
A Well, I would think that you'd want to vet to establish probable cause.
Q Okay. Were detectives expected to vet information from street sources before making someone a suspect in the investigation?
MS. ROSEN: Object to the form.
A Yeah, and that would be on a -- excuse me, a case-by-case basis. The nature of the information, if it was deemed relevant, would certainly, if it was accurate and -- and detailed enough, there would be -- that person that they're identifying as an offender, if that's, in fact, the information, definitely would cause somebody to be included on a suspect list.



Q Okay. Were detectives expected to vet information from street sources before making -- before subjecting someone to a custodial interrogation?
MS. ROSEN: Object to the form.
A Well, custodial interrogation would mean they're under arrest, which would be the same -- kind of the same nature. You'd have to establish probable cause to -- to effect an arrest.
Q Which would require you to vet someone before subjecting them to arrest and custodial interrogation; correct?
A Again, it'd be on a case-by-case basis. I don't know the facts, but I -- I'm sure there are some circumstances where -- that the information alone may establish probable cause based on, you know, on the level of detail and things of that nature, that -- of the -- the anonymous information, or the street source information.
Q But -- and I guess that's what I'm trying to understand. If the person provided detailed information, the vetting would be confirming that those details were correct; right?
A Well, not necessarily. I mean, it -- it's just a matter of -- again, you know, you're trying to -- you want to paint this with a very broad brush, and I



don't -- I don't necessarily know that we can do that here. I would think in most cases that you would want to vet the information, but for instance, a husband kills a wife and the -- a -- a child calls the police station and says, "My father killed my mother, and his name is -- is John Foster," I -- I would think that might be enough right there based on, statistically, that husbands kill wives, trad -- you know, and when there's a domestic- related murder. So that -- that might be a scenario where there is enough.
Q Oh --
A So I don't think you can speak in generalities is, I guess, my answer.
Q Okay. But in the typical homicide investigation, the subject of this case, we're talking about scenarios in which the use of street sources really applies in cases where you have a case where you don't know who the identities are of the individuals. You don't know -- you have people trying to provide information about somebody who's not known to the police, is not someone who's at the scene, that type of thing. Correct?
A Well to answer your question, no, most people that kill another human being don't stick around. So in most cases, we don't know who the offender -- who the

offender is right away.
Q Okay. Were -- I'm sorry, go ahead.
A No, go ahead.
Q Were detectives expected to vet information from street sources before putting them in lineups?
A Well, again, I mean, if -- if the persons in a lineup, unless he's in the police station voluntarily, he would've been under arrest. And again, that would be a custodial event, so it would be the same answer.
Q Okay. Were detectives expected to vet information from street sources before putting someone in a photo array?
A Well, I think that's a little more of a tricky question there. One could argue that if the -- if the street source provided a very accurate, specific information, that may be enough to put somebody in a photo array. There's nobody in custody. And if you've got a good witness, I don't see a problem with that.
Q Okay. So if the witness provided detailed and what seemed like reliable information, that would be a scenario where a detective could put that person into a photo array on that basis?
A Well --
MS. ROSEN: Object to the form, but you can answer.



A Okay. So we've gone from street source to witness.
Q Oh, I'm sorry. I didn't mean to do that. No. I didn't. That was -- that's a misstatement by me. So let me -- I didn't mean to cut you off, but that was an error in my question. I did not mean to change the subject matter. So let me re-ask the question. If I understand your testimony, where a street source provided information that was sufficiently detailed or had some indicia of reliability, detectives could -- it would be appropriate for a detective to then put that person into a photo array?
MS. ROSEN: Object to the form.
A Again, I think that it's on a case-by-case basis, but if a street source was making himself a witness or maybe some kind of third-party involvement, yeah. You could put somebody in a photo array and show him to a potential witness.
Q Okay. And if I understand your testimony, you'd be looking for some indicia of reliability or detail before doing so; correct?
A Yeah. I mean, you know, when we talk about street sources, I would think a lot of the information comes in, honestly, via telephonically and they could -- they could say that, you know, "John F. Kennedy is the



offender and the murderer." Well, we know that that's not really accurate information and we wouldn't put a former president in a photo array.
Q But also, is it true that one of the things that does happen in these investigations is that sometimes you have people who call in anonymously and want to point somewhere or other than this source of, you know, the perpetrator. In other words, sometimes gangs know, you know, "I can provide information that's going to lead the police in a different direction."
MS. ROSEN: Object to the form.
A So again, you know, I think there's different levels of quality of street sources and anonymous information that you receive. And I think that has to be, you know, gauged by the person receiving that information.
Q Okay. And tell me what you mean by that?
A What I mean by "gauged?"
Q Yeah. What do you mean there's different levels of information that have to be gauged?
A Well, you know, going back to our anonymous people that call the police station on -- telephonically, you get people that maybe are not of a good -- in a good mental health situation that want to talk about, you know, vast conspiracies as a -- and that



could be one end of the range to another of a former girlfriend calling about her boyfriend that she saw in the news kill somebody. That she saw a video snippet on -- on social media and she's said, "I recognize this guy. That -- it's so-and-so." So one is obviously very -- not very valuable and the other potentially very valuable.
Q Okay. In other words, anonymous -- it's fair to say anonymous callers call into the police department regularly?
A Yes.
Q Okay. And would it be -- and it is often the case that information that comes in from anonymous callers doesn't pan out; is that true?
A Yes, that's true.
Q And was it known within the Chicago Police Department -- strike that. Was it known among detectives that sometimes people could call in anonymously and try to lead detectives in the wrong direction?
A Well, I sure -- I'm sure -- I'm sure that's a possibility. Yes.
Q Okay. And so one of the reasons that detectives were vetting information that came in anonymously was because often that information is

Page 134

unreliable; correct?
A There's certainly an unreliability factor in anonymous phone calls. Yes.
Q And in the typical case, when detectives -- when homicide detectives get information from an anonymous caller saying, "Hey, I heard it was so-and-so," or "I heard it was so-and-so," they don't suddenly arrest that person; right?
MS. ROSEN: Object to the form. "Typical case," "suddenly," but you can answer.
A So again, it would be on a case-by-case basis. You could get a phone call that's -- that would say -- that would provide details that the public doesn't know about that case. And then they would say, "John Fosters is the offender." And because of those additional details that you know as a detective, nobody else knows, and this person is providing those, well that would increase that anonymous street source, however you want to characterize them, their credibility.
Q Okay. But -- and ultimately, what increases that credibility is the fact that they've provided information that's not otherwise publicly known? Beyond just simply saying it was so-and-so; correct?
A You're going to have to break that down for me.

Page 135

Q Yeah. I guess what I identified was an example where someone calls in and says, "Hey, I heard it was so-and-so." Those are the kind of calls that do often come in, right, as anonymous calls?
A Yes.
Q And some people can provide additional details to support why they -- you know, why they say it was so-and-so, and some people cannot; right?
A Yes.
Q Okay. And where an individual can provide additional details beyond just saying it was so-and-so, that can help detectives vet the information to determine whether it's sufficient to treat somebody as a suspect, arrest them, and so on; fair?
A Fair.
Q Okay. And where somebody calls in and simply says, "I heard it was so-and-so," and hangs up the phone, would you agree with me that's not sufficient information for a detective to make an arrest; correct?
MS. ROSEN: Object to the form.
A Again, it's -- I would think it'd be on a case- by-case basis. If somebody says -- calls and says, "John Foster just killed somebody," and that's the fourth phone call you've received and it's the same information repeated, then that may be enough. That may

Page 136

-- you know. So again, I don't think we can -- I don't think you can paint that with a broad brush. I think it has to be on a case-by-case basis.
Q But the important part of your example was, right, that you -- that's giving you multiple people providing you information, some of it in the immediate aftermath. And I'm -- and I completely -- in other words, what you're identifying in your responses, there's some corroboration that's taking place of any one of those callers; right? Which is that multiple other callers are also corroborating it; correct?
A Well, I think I understand what you're asking, but let me just give you a real time example of something that happened in the last couple months where there was a person that killed somebody, and five separate women all called and said it was this name that was involved in a -- that he was the shooter in this murder. And that's all they said. So yeah, I would think at that point, that would be more than enough. You've got five different women that are providing the same name that I think it would be -- the detective would be negligent not to put that person in a -- in a photo array.
Q Fair. And so I guess, and going back in that example, what made that information so powerful was that

Page 137

multiple people were providing it; correct?
A Correct.
Q Okay. Now going back to my example, and maybe the way to do it is to talk without, you know, acknowledging that there can always be exceptions to every rule. Let me ask a slightly better question. In general, if someone calls as an anonymous caller and simply says, "I heard so-and-so did it." In general, that would not be sufficient for a detective to go out and subject somebody to arrest in the period from '86 to '98?
MS. ROSEN: Object to the form. Incomplete hypothetical.
A Again, it's a case-by-case basis. I don't know that -- what other information detective may or may not have in regards to this case that you're -- you're talking about. (coughs) Excuse me. So it's hard to say. You know, if you -- because almost automatically when somebody calls and says it was so-and-so that did something, the detective's going to ask, "Well --" a follow-up question and they almost always get answered. And, you know, based on that, you're going to -- you're going to establish -- establish this person's credibility.
Q And if -- and so when -- if I understand you

correctly, when detectives would get one of these sort of anonymous calls, you know, pointing the finger at somebody, the expectation was that they would conduct some follow-up questioning to get additional information from that person; correct?
A I would say on a case-by-case basis. It may be the prudent thing to do, but again, there's – there's - - every investigation is dynamic, and it may have its own unique set of circumstances, so that may not be necessary. I don't think that you can automatically say.
Q For example, if there's exigent circumstances crime is in progress, you may not sit around on the phone asking 10 questions: fair?
A Fair.
Q Putting aside exigent circumstances, would you agree that if a detective gets a phone call and someone anonymously points the finger at so-and-so, detectives were expected to ask follow-up information of that person; correct?
A Well, again, you know, it depends on – it depends on the circumstances, but follow-up questions, I would think in most cases would be helpful, but there may be circumstances in which that's not possible.
Q Can you think of circumstances, other than



exigent circumstances, in which a detective wouldn't ask follow-up questions to an anonymous caller who says, "Hey, I heard it's so-and-so,"?
A Well, I think you brought up the example they hang up – they hang up.
Q Okay. But until somebody hangs up, if they have somebody on the phone, the detectives were expected to try to get additional information from that person to be able to assess the reliability of the information; is that fair?
MS. ROSEN: Object to the form.
A Well, I guess – I guess I would say there is – they would try to get information. Sometimes people are calling in a very emotional state and it's hard to get information. They may – they may ask it. They may not be able to. Maybe just screaming and, you know, emotional utterances. So I, you know, there – there's – there's a lot of circumstances in which you may not be able to elicit a follow-up question or answer.
Q So when detectives got an anonymous call, the practice was to ask additional follow-up information to assess the reliability of the information to the extent possible. Correct?
A Yeah. I think that it would be the most beneficial to ask follow-up questions, but again,



there's just no right or wrong way. And there's a lot of – you know, these – these anonymous phone calls are very fluid in their exchange of information, so you may not be able to.
Q Okay. And when additional information was obtained from the anonymous caller, that information was expected to be documented; correct?
A Documented. So again, I think that would be based on the relevant – the relevancy of the information.
Q So if an anonymous caller called in and provided information that proved to be true, it would be important to document that information; correct?
MS. ROSEN: Object to the form.
A So I guess – an anonymous phone caller calls and says – provides what the detectives determined to be relevant information. Is that what you're asking?
Q Yeah. If a detective – if somebody – anonymous caller calls in and points the finger at so-and-so, let's start there. Is that information expected to be documented?
MS. ROSEN: Object to the form. Incomplete hypothetical.
A So I guess to answer your question is where's this – where is this phone call being received at?



Q Okay. So –
A You know, I mean – go ahead.
Q No, go ahead. No, I'm sorry. I didn't mean to cut you off.
A I mean, most areas the phone call comes into a phone person. It may not be a detective, even. It could be a phone – a person – a police officer answering the phone and it could have came into 311. There's a whole – there's a lot of paths that these anonymous phone calls can come in on.
Q Okay. Whatever path that information comes in on, step one is, detective gets information saying that an anonymous caller says it's so-and-so, whether they get it directly from the caller or whether they get it secondhand. Under CPD policies, is that supposed to be documented?
MS. ROSEN: Object to the form.
A I am not aware of any policy in this time frame that requires documentation of anonymous phone calls.
Q Okay. And if a detective ultimately decided to act on the information provided from an anonymous caller, would – then would the information that came in from the anonymous caller expect to – be expected to have been documented?

MS. ROSEN: Object to the form.
A Can you break that down a little bit?
Q Yeah. Now we have not just an anonymous phone call, but one that a detective decided to conduct some follow-up based on. At that point, are they expected to have documented the existence of that anonymous phone call?
A Well --
MS. ROSEN: Same objection. Form, but you can answer.
A I think the answer would there be, is the information relevant?
Q So a detective could conduct some follow-up based on information provided on an anonymous phone call and still potentially not document that anonymous phone call; is that right? Under CPD policy?
A Well, again, I -- there's no CPD policy regarding anonymous phone calls. So yeah, you would -- if you -- if a detective followed up on an anonymous phone tip and he determined it not to be relevant information, then you would not document that.
Q Okay. And if CPD -- and if the CPD detective received anonymous phone call and conducted some follow-up -- conducted some follow-up and found it to be reliable information, were they expected to document it?



MS. ROSEN: Reliable or relevant?
MR. SWAMINATHAN: Reliable.
MS. ROSEN: Objection, form.
A So I don't know what your definition of "reliable" is, but I prefer to use "relevant" and if it's relevant --
BY MR. SWAMINATHAN:
Q Let's do relevant. Let me -- well, I'm sorry. I'm sorry. Go ahead. I'll re-ask it. Sorry. I didn't mean to cut you off. I'll re-ask it so that -- because you said you didn't like "reliable;" right?
A Right.
Q Okay. All right. So let me re-ask it. If a detective received an anonymous phone call and deemed the information to be relevant, were they expected to document that anonymous phone call?
A Yes.
Q And would the detectives be expected to document all of the information they received from the anonymous caller?
A All-relevant information should be documented.
Q And relevant information at that point could be information that ultimately proves to be accurate that the anonymous caller provided and that proves to be inaccurate; correct?



A Well, I don't necessarily know that I agree with that. Inaccurate information is not relevant information.
Q So in other words, would you agree inaccurate information could be exculpatory information for a criminal defendant?
MS. ROSEN: Object to the form. You can answer.
A No, I don't necessarily know that I can agree with that.
Q Were detectives expected to document information that would be exculpatory to criminal defendants?
A Absolutely.
Q Okay. And in terms of whether or not information provided by an anonymous caller was inculpatory or exculpatory, that determination was up to the detectives; correct?
MS. ROSEN: Object to the form.
A Based on the information -- the relevance -- the relevancy of the information.
Q Okay. And so ultimately, whether a detective needed to document information provided by anonymous caller was up to the detective; correct?
MS. ROSEN: Object to the form.



A Based on the content of the information that he's received -- that he received, if it's relevant, he should document it. If it's not relevant, he doesn't necessarily have to document it.
Q Okay. And the determination of relevance is made by a detective, not some supervisor; correct?
A Relevant -- the -- the bar for relevancy is, is it of evidentiary value?
Q And is that bar set as a matter of policy or practice?
A I'm aware of no policy, so it's practice.
Q Okay. And that practice about whether a detective ultimately just decides that a piece of information is of evidentiary value is the determination that the detective makes on his or her own; correct?
MS. ROSEN: Object to the form.
A Well, again, a detective is not -- is not conducting a -- an investigation in a vacuum. So there are -- there's different levels of supervision that are monitoring the progress of the investigation.
Q Okay. If detectives receive information from somebody -- strike that. So if a detective put somebody in a photo array based on information provided by an anonymous caller or somebody who provides it confidentially, are they expected to document the

information they received from the anonymous caller?
MS. ROSEN: Object to the form. Incomplete hypothetical.
A I think it would be based on -- excuse me. The relevancy of the information.
Q Okay. If the detective decided to put somebody in a photo array based on the information obtained from an anonymous caller, would -- is the detective expected to document any efforts to vet the information provided by that anonymous caller?
MS. ROSEN: Object to the form. Incomplete hypothetical.
A Well, I think, again, it depends on the relevancy of the information.
Q If a detective received information -- strike that. If a detective decided to include somebody in a photo array based on information provided by an anonymous caller, are they expected to document the indicia of reliability of the anonymous caller that warranted putting somebody in the photo array?
MS. ROSEN: Objection, form.
A I don't -- I don't -- I think, again, it's on a case-by-case basis. And I think you have to determine the relevancy of the information that you're receiving in order to determine its value.



Q What are the types of -- you said it's on a case-by-case basis. So what are the types of cases in which a detective would be able -- would be expected to document the indicia of reliability of the information received from an anonymous caller if they decided to put somebody in a photo array based on that information?
MS. ROSEN: Object to the form. Incomplete hypothetical.
A You're going to have to go much, much slower for me.
Q I'll do it again. You just said it's a case-by-case basis. So tell me what are the kind of cases where they would be expected to document those indicia of reliability that warranted including somebody in a photo array?
A So again, I'll go back -- I'll go --
MS. ROSEN: Objection, form. Sorry, go ahead.
A I'll go back to the husband killing the wife and a -- and a -- and a child calls. You may -- you may want to make sure -- you would need to vet that information for the purpose of a photo array. But somebody calling in saying it was June Bug that committed the murder, well, there's probably, you know, a couple thousand June Bugs in the city of Chicago. So that might be information that you want to get some --



gain some clarity and vet that. So those are -- that's what I mean by a case-by-case basis.
Q Let's turn to the subject of gang books. We talked about them briefly before. This is topic 1K in the Notice of Deposition. First of all, when I use the term "gang book," do you know what I'm referring to?
A I do, sir. Yes.
Q Okay. And do gang books also go by other names in the Chicago Police Department?
A Not that I'm aware of.
Q The term "photo book." Is that another term for gang books?
MS. ROSEN: Object to the form.
A There are different versions of photo books. There might be based on MO. Might be back in the day -- probably back in this time frame, there were guys, known robbers, that would be in a robbery book. Or known burglars that would be in a burglary book. But I think specific to our -- or germane to our conversation is gang books. And there were gang books created based on specific gangs.
Q Okay. So photo books could be by gang, photo books could be by type of crime or MO, et cetera? Does that make -- is that right?
A No. So photo books -- my understanding, photo



books is by crime, simplify, and gang books are by gang.
Q Okay. Got it. Got it. Okay. So okay. That helps me. So photo books are by crime or MO and gang books are by gang. Do I have that right?
A Yes.
Q Okay. And then I heard another term -- I've heard another term called "mug book." Is that something different or the same as one of those?
MS. ROSEN: Object to the form.
A I think we're really -- we're going in the way back machine here. I think mug books are the same as photo books.
Q Okay. All right. Okay. So first of all, starting with gang books. When were gang books -- well, strike that. With regard to -- let's start with detectives because this is a topic that applies for both detectives and gang crimes. So let me start by asking you as a general matter, how or when were gang books used in the Chicago Police Department?
A Well, again, you know, we're -- we're talking about -- I think the first time that -- in my review of materials, I saw gang books mentioned by Mr. Spratte in the '80s. So I assume that there were gang books in the '80s right up through, you know, 1993 or beyond when -- when they were -- they were disbanded. So I think for

that – for our – for our time frame, there were – there was always the existence of gang books.
Q And just to be clear, in our – and you said when they were disbanded. They weren't disbanded until well past – you said not in the early '90s they weren't disbanded. They were disbanded much later; right?
A Yes.
Q Okay. I think you just misspoke. In our time period from '86 to 1998, gang books were used; correct?
A Correct. Yes.
Q Okay. And then can you tell me generally, how were gang books used in assistance of homicide investigations in the period from '86 to '98?
A Sure. So the detective may get assigned an – a homicide investigation where there is a gang nexus, and they would go and ask a gang specialist about a particular gang. And from there, if there were witnesses, the gang books could be used for identification purposes if there was – if it was properly documented. So that would be – that would be one, you know, purpose of a gang book and how – how it was used.
Q You said gang book could be shown to witnesses if it was properly documented. What do you mean by that?



A Well, it's my understanding that gang books were gang-specific and that each page was numbered. And then there was a line and then in the photo – each photograph of suspects or gang members was – was – was numerically identified, too.
Q Okay. So in other words, there – you could identify a specific page and location in the gang book where each photo was; correct?
A Correct.
Q Okay. And so you could document which photos or which books were shown and you could document what individuals were selected, if any; correct?
A Yes.
Q And when those books were shown, it was expected to be documented; correct?
A Is there an identification being made?
Q Does it matter?
A Well, I don't think we were documenting negative – well, I – we weren't documenting if an identification was – was not being made in a – in a gang book. So yeah, it does matter.
Q Okay. So in the period from '86 to 1998, if a gang book was shown and nobody was identified, that was not documented pursuant to practice; correct?
MS. ROSEN: Object to the form. I think



you've twisted it, but objection to form. You can answer.
A Can you repeat it?
MS. ROSEN: Yeah.
Q In the period from '86 to 1998, if nobody was identified from a gang book, was it documented?
MS. ROSEN: Was it documented or was it – or was it required to be documented? If you're asking about the policy or if –
MS. SWAMINATHAN: I'm asking whether it was required to be documented. Yes or no?
MS. ROSEN: Okay.
A No, it was not.
BY MR. SWAMINATHAN:
Q Okay. In the period from '86 to 1998, was there any policy that required non-identifications in gang books to be documented?
A No.
Q In the period from '86 to –
A Not that I'm aware of.
Q In the period from '86 –
A Pardon me?
Q In the period from '86 to 1998, was there a practice of documenting non-identifications in gang books?



A No.
Q In the period from '86 to 1998 –
A Not that I'm aware of.
Q Sorry, you cut out at the end.
A I said no, not that I'm aware of, sir.
Q Okay. Have you seen any policy document or other written document that instructs detectives that they should document non-identifications from gang books in the period from '86 to 1998?
MS. ROSEN: Object to the form.
A Yeah. I'm unclear what you're asking.
Q Have you seen any document – as the representative of the Chicago Police Department on this topic, you seen any document, policy or otherwise, that indicates to you that there was a requirement to document non-identifications by detectives or gang specialists from gang books?
MS. ROSEN: Object to the form.
A From 1986 to 1998? Is that correct?
Q Correct.
MS. ROSEN: And you're answering a specific policy that addressed that specific issue.
MR. SWAMINATHAN: No. No. I'm just – you could – but, no –
MS. ROSEN: I mean, specific practice?

BY MR. SWAMINATHAN:
Q I'll ask it again, but I – if there's an objection to form, objection to form is okay, but I'll ask it again. Are you aware of any document, policy or otherwise – you're saying, "Not that I'm aware of." So I want to be clear. Are you aware of any document, a policy document, or any other written document, that says you are not required to document non-identifications in photo book procedures – gang book procedures?
A You know, my memory's failing me. I don't know. I may have reviewed a policy that said you have to document and I – I'm not sure I'm able to distinguish this right now as we speak between photo arrays and lineups. So I'm going to go with not that I'm aware of right now, but I could be mistaken.
Q Okay. We're going to come back to photo arrays and lineup. Do you agree with me gang book procedures are not considered photo arrays or photo spreads; correct?
A Correct.
Q Okay. Photo spreads and lineups, there is a policy associated with those; correct?
A Correct.
Q Okay. And there is no policy in the period



from '86 to 1998 related to the use of gang books; correct?
A Correct.
Q Okay. And you are not aware of any policy document that requires Chicago Police detectives or gang specialists to document non-identifications in the period from '86 to 1998 from gang books; correct?
A Correct.
Q Okay. And you're not aware of any other written instruction to detectives that they are not required to document non-IDs in gang books; correct?
A Correct.
Q And as a matter of practice in the period from '86 to 1998, detectives and gang specialists would not document non-identifications in gang books; correct?
MS. ROSEN: Objection to the form.
A Can you re-ask that? I'm a little unclear.
Q In the period from '86 to '98, and again, we're focused only on that period, non-identifications -- and just to be clear, let's shorten the questions a little bit. I'm asking only about '86 to 1998 for homicide investigations, just so that we're operating within the confines of the notice. The practice was not to document non-identifications in gang books; correct?
MS. ROSEN: Object to the form.



A Correct.
Q Okay. And the training during that period from '86 to 1998 was that non-identification in gang books did not need to be documented; correct?
MS. ROSEN: Object to the form.
A I don't know that there's anything on point regarding the training.
Q Okay. With regard to positive identifications from gang books, again, in the period from '86 to 1998, focus on homicide investigations, if there's a positive identification in a gang book, what did the policy require?
A I believe that there was a – there was requirements to notate, document if you will, the page, line, and specific picture that the witness that was viewing the gang book identified.
Q Okay. And so that was the requirement in the period from '86 to 1998 to document what page and location on the page had been selected; correct?
A Correct. There was a – there was a page, there was a line, and there's specific picture numbers on each line.
Q Okay. And that was supposed to be documented in a Detective Division supplementary report; correct, if there was a positive identification?



MS. ROSEN: Object to the form.
A So again, it's a gang book. It could have been documented by a gang specialist; I suppose.
Q Okay. So the information could be documented either – if it was done by a detective, it could be documented in a detective sup report. If it was done by a gang specialist, it could be documented in a gang's report; correct?
A So those are two – those are two reports that you could use to document an identification, but there – there are other avenues to document.
Q Okay. But either way, whichever – which – however it was documented, either a gang specialist or a detective that participated in that procedure was required to document the positive identification and the location of the photo that was identified; correct?
A Well, I don't know that there was a requirement. I think the policy is specific to photo arrays and lineups and you're – I mean, I think we've established that looking at a gang book is not a photo array, so I don't know that there was a requirement, but I would certainly think that you'd want to document an identification.
Q Okay. So you agree even a positive – even if there's a positive identification in a gang book, there

was no policy that required that to be documented; correct?
A Not that I'm aware of. No.
Q Okay. And you're saying as a matter of practice, that's what you believe detectives would do. Correct?
A Well, yeah. I would think you'd want to document the fact that you've now established a suspect.
Q Okay. You're saying, "I imagine you'd want to," but what I'm asking is, was that the practice or not in the period from '86 to 1998?
A Yes. That was the practice.
Q Okay. And was the practice to document the page and location of the photo that was identified?
A Well, again, I think we're getting into some sort of very specific information. I -- it was the practice to document that you've established a suspect. So I don't know that it was required to document the line and the page and all that to that level of detail.
Q Let's see here. Okay, this is Page 3. Okay. I'm going to show you a document I've marked as Exhibit 4. This is Bates stamped Foster 30(b)(6), 8 through 74. And the first page is titled City of Chicago Department of Police. Page 2 says Identification Procedures,. Sir, this is a document you reviewed in preparation for



today's deposition; correct?
(EXHIBIT 4 MARKED FOR IDENTIFICATION)
A Correct.
Q Okay. And this is a Detective Division training program related to identification procedures; correct?
A Correct.
Q And this is -- as a training that was provided beginning -- this was a training that was provided in 1996; correct?
A Correct.
Q Okay. And now this document consisting of 57 pages, is this -- this is essentially a packet of information that was used as related to the training provided in '96; correct?
A Yes. Correct.
Q Okay. All right. So -- and is this some -- so would this -- was this something that was provided, like, at roll call training? Was this a pre-service training? When was it provided to detectives?
A Well, right now you're showing me the half page of something. I don't know what training you're -- you're speaking about.
Q I'm talking about -- so this whole document, pages, you know, 1 through 67. Is this different



trainings, or is it one training? I'm just leafing through it here. I think this is a document you reviewed previously. If you guys have a hard copy, if that's easier, maybe you could pull that up.
MS. ROSEN: Yeah. I don't have that in the room with me. I can bring it here. I'm not sure -- well, he can answer the question, but --
BY MR. SWAMINATHAN:
Q Yeah. Why don't you see if you can answer. The first question is -- and then if you can't answer it, we can go pull -- we can have Eileen get that hard copy. But basically, my understanding is that this is one lesson plan related to Detective Division training on identification procedure. Is that right, or is that wrong?
A I think that's correct, from what I'm seeing.
Q Okay. And are -- and is it your understanding that this Exhibit 4 is essentially a lesson plan and associated documents that were used to train detectives about identification procedures?
A Yes.
Q Okay. And when would this training be given to detectives?
A Well, it appears to me it might be pre-service detective training.



Q okay. This was -- would you agree with me, this document, exhibit 4, is not training that was provided to gang crime specialists?
A That's correct.
Q Okay. And looking at this training, I'm looking at Foster 40. So the section that talks about identification procedures --
MS. ROSEN: Make it bigger?
MR. SWAMINATHAN: Yep. Yeah, yeah. This is section identification procedures, and it talks about photo identifications in section B. Oops. And it talks about various --
MS. ROSEN: Here, let's get the hard copy.
THE WITNESS: I'm okay.
MS. ROSEN: It's up to you.
THE WITNESS: Okay.
MR. SWAMINATHAN: Up to you. Do you want to hard -- get a hard copy? Is that easier?
MS. ROSEN: Yeah, it probably is. Can you just give me a minute to get a hard copy?
MR. SWAMINATHAN: Yeah, we'll go off the record. I'll just go -- I'll go use the rest room, too.
COURT REPORTER: All right. We're off the record. The time is 2:02.

Page 162

(OFF THE RECORD)
COURT REPORTER: We are back on the record for the deposition of Lieutenant John Foster, being conducted by video conference. My name is Sydney Little. Today is June 29, 2022, and the time is 2:09 p.m.
BY MR. SWAMINATHAN:
Q I want to ask you -- I think you have the hard copy in front of you now, sir, of Exhibit 4?
A I do, yes.
Q Okay. All right. Let's go to Page 35 of that. It's Bates stamped Foster 42.
MS. ROSEN: Are you going to screen share it for everybody else or --
Q Oh, yeah, yeah. I can do that here. Okay. Okay, this is Foster 42. Are you -- tell me when you're on that page.
A I'm -- I'm there.
Q Okay. I'm asking specifically about paragraph 10 here, at the top of the page. And if you look at the -- if you look at the previous page, just for context, the previous page talks about photo spreads; right? It's not talking about gang book or photo book identification procedures. Agreed?
A Agreed.

Page 163

Q Okay. So we look at paragraph 10. This is -- paragraph 10 is actually talking about gang book or photo book procedures; correct?
MS. ROSEN: Object to the form.
A Incorrect. It says photo albums. It doesn't say anything about gang books, unless I'm missing it.
Q Okay. So tell me what -- yeah. Tell -- so do you read paragraph 10 to apply to gang book procedures or not?
A No.
Q Okay. What are photo albums -- department photo albums?
A Same thing as -- it's just another term for photo books or photo or mug books. Mug, you know, books and albums are -- are one and the same.
Q Okay. So this -- these -- this training here, to the extent where it makes reference in paragraph 10 to department photo albums, does not include gang books; is that right?
A That's my interpretation. That's correct.
Q Okay. So in other words, where this training talks about documenting identifications from photo books in paragraph 10, it does not apply to gang book procedures; Is that correct?
MS. ROSEN: Object to the form.

Page 164

A That's correct.
Q Okay. So in -- would you agree with me that in paragraph 10, detectives were trained that they should document positive identifications from photo books by identifying the pages shown to the witness and what photo was selected. Correct.
MS. ROSEN: Object to the form.
A Yes. If an identification was made, in -- in a photo album, as it's characterized here, they should document the book number and page number.
Q Okay. So pursuant to CPD training, detectives were expected to document the book number and page number of the identification made from photo books; correct?
MS. ROSEN: Objection, form.
A Photo albums or photo books, yes.
Q Okay. And were detectives expected to follow the training that they received?
A Sure.
Q Okay. And so the expectation was that detectives were supposed to document the book and page number of any positive identification from a photo book; correct?
MS. ROSEN: Objection, form.
A Correct.

Page 165

Q Okay. And to the extent a smaller number of pages of that photo book were shown to a witness, that was also supposed to be documented in a supplementary report, according to this training; correct?
A You're going to have to slow it down a little bit. I missed -- I didn't get all that.
Q If you look at the second half of it says -- well, it says, "List in your supplementary report how many books or photos were viewed prior to the ID. It is also permissible to show two pages of the department photo book. That fact should also be noted in a supplementary report." Do you see all that in paragraph 10?
A I do. Yes.
Q In other words, the training says, "Document in a supplementary report what you actually showed the witness." Correct?
MS. ROSEN: Object to the form.
A Correct.
Q And then it also says, "And then also identify the exact page." And what does it say? "Page -- document the book number and page number of the actual identification." Correct?
A Correct. Yes.
Q And it was the expectation that Chicago police

Page 166

officers followed the training in paragraph 10; correct?
A Correct, yes.
Q Okay. And there was no training, however, about the performance of gang book identification procedures; correct?
MS. ROSEN: Object to the form.
A That's correct. Yes.
Q Okay. And the training did not require detectives to document any gang books that were shown to witnesses; correct?
A There's no --
MS. ROSEN: Object to the form.
A There's no mention of gang books in this training presentation.
Q Okay. And so there was no expectation that detectives document what photos were shown, or what pages of a gang book were shown to a witness or what -- or the location of any positive identification. Do I understand you correctly?
MS. ROSEN: Object to the form, foundation, as to detectives and gang books.
A That's correct, sir, yes.
Q Okay. Do you have any understanding of why the Chicago police Department had a different -- had required a specific training about how they were to go

Page 167

about documenting photo book identifications, that did not apply to gang book identifications?
MS. ROSEN: Object to the form.
A I -- I can only -- no. I can only speculate.
Q Okay. In terms of gang book -- would you agree that gang -- the procedure followed as a matter of practice in performing a gang book identification procedure and a photo book identification procedure was the same?
MS. ROSEN: Object to the form, foundation, as to detectives' use of gang books.
A Can you repeat that question please?
Q Yeah. The process for conducting a gang book identification procedure and a photo book identification procedure was basically the same; correct?
MS. ROSEN: Object to the form, foundation.
A The process appears similar, yes.
Q In other words, basically, you have a book full of photos. You have the witness look at all the photos and see if they recognize someone; correct?
MS. ROSEN: Object to the form.
A Correct.
Q Okay. And that's true for both photo books and gang books; correct?
A Correct.

Page 168

Q Okay. Now, with regard to gang books, do you agree that detectives did use gang books to assist them in homicide investigations during the period from '86 to '98?
A I do think that the detectives, with the assistance of gang specialists, use gang books. I think the gang specialists are more the driver of that -- you know, those books.
Q Okay.
A They were more the -- they're the custodians of those books.
Q Okay. The gang specialists were the custodians of the books; correct?
A Of gang books. Correct.
Q Oh, thank you. Let's clarify. Who -- did detectives keep photo books?
A In a -- in that time period that we're talking about, yes.
Q Okay. Did detectives keep gang books?
A No.
Q Did gang specialists keep photo books, in that period?
A They called them gang books.
Q Okay. So gang specialists kept the gang books; correct?

Page 169

A So again, I think we talked about this. Gang specialists kept gang-specific -- they organized books by a way of gang. And the other books that the detectives had were by way of crime.
Q Got it. So the -- to put simply, a gang book is essentially a book of photos of people all known to be members of one gang; correct?
A Correct.
Q Okay. And detectives would sometimes ask to be able to use those gang books to assist them in a homicide investigation; correct?
A Yes.
Q Okay. So for example, if detectives had a witness, they could show those gang books to a witness if they had some reason to suspect the involvement of a particular gang. Correct?
A Say that again.
Q Yeah. Detectives could have a witness view a gang book if they had a reason to believe that a suspect was a member, or the perpetrator was a member, of a particular gang; correct?
MS. ROSEN: Object to the form.
A Yeah. If the detectives thought there was a gang nexus, they would go to -- they would utilize the gang book as a resource.

Q Okay. And the practice -- you agree with me, in the period from '86 to 1998, there were, unfortunately, a lot of gang-related homicides in the city of Chicago; correct?
A Correct.
Q And would you agree that in the period from '86 to '98, it was common to have cases where detectives suspected the involvement of a particular gang?
A Yes.
Q But they did not have a particular suspect?
A Correct.
Q Okay. And in those instances, the detectives could use the gang books to see if they could hone in on a particular person within a particular gang; fair?
A They would need a witness to show those books to, but fair.
Q And so would you agree with me that it was common in that period to have witnesses who may have viewed the crime but were not familiar with who the perpetrator was. But the detectives could show a gang book to that witness, to see if they could hone in on a particular suspect?
MS. ROSEN: Object to the form.
A Yeah. I'm a little unclear what you're asking there.



Q Yeah. Let me -- I'll just -- I'll ask it -- I'll ask a different question. When -- what were the different ways in which detectives might suspect the involvement of a particular gang in a given shooting?
MS. ROSEN: We'll object to the form. You can answer.
A I guess it's -- it could be anything from -- ranging from the color of the clothing to information they receive, to information where the crime occurred. There's -- you know, there's many different, you know, things that could create a gang nexus.
Q Okay. So for example, obviously, if somebody indicates that the perpetrator was wearing certain clothing affiliated with a particular gang, that could be a lead pointing to that gang; fair?
A Yes.
Q If the crime occurred in a particular gang's territory, that could be a lead about who committed the crime; correct?
A Certainly a possibility, yes.
Q And the gang affiliation of a victim could, itself, be a lead about the involvement of a particular gang; correct?
A Correct.
Q And any known rivalries or beefs between



particular gangs could be a lead as to the involvement of a particular gang; correct?
A Correct. Yes.
Q And in any one of those instances, a gang book could be shown to witnesses; correct?
MS. ROSEN: Objection, form.
A Yes, could be.
Q And there was no particular requirements of a certain amount of probable cause or otherwise to be able to show a gang book to witnesses; correct?
A No. Correct.
Q Okay. So in other words, if you had any reason to suspect a particular gang, you could show gang books of that gang and hope to see if the witness might recognize somebody to have been involved; is that fair?
A Correct.
Q Okay. And if you happen to get a positive identification from one of those gang books, then that would give you a solid lead into an individual suspect, rather just -- than just an individual gang; fair?
A You broke up a little bit at the end.
Q Yeah. If you were lucky enough to get a positive identification from one of those gang book procedures, that would then allow you to hone in on a particular suspect within that particular gang; correct?



A Yes.
Q And where there was that type of positive identification from a gang book, typically, there would need to be some additional identification procedures conducted; correct? A gang book identification is not sufficient; is that right?
A Sufficient for what?
Q Good question. Is it sufficient for purposes of arrest?
A Yes, absolutely. I mean --
Q Okay. Was it sufficient for purposes of charging, or were they -- doing either a photo array or live lineup afterward, before seeking charges?
MS. ROSEN: Object to the form.
A We don't -- the police department doesn't determine what's -- what level is sufficient for charging. The state attorney's office would. But if you're asking me, historically and traditionally, what we would do, yes, we would conduct a photo array and do a lineup.
Q Okay. And why is that?
A Back in that time.
Q Why is that?
A Pardon me?
Q Why is that?

Page 174

A Great question. That's the best question you've asked so far. So this – when – as a detective, you have to be prepared for this case to be scrutinized at trial. A photo array is one level of identification. The lineup is another level of identification. And presumably, when this witness goes to the grand jury, that's the third level of identification. So in a gang case, like you've – like we're speaking about today, it's traditional, almost, that the witness would flip. And then you'd have all these layers of identification to confront that witness with. So that's just a detective preparing for an adversarial proceeding, you know, five years in the future.

Q Okay. Was there an understanding at that time that additional identification procedures would have less reliability, because the person is now seeing the same face over and over again?

MS. ROSEN: Object to the form.

A I'm not – I'm not – I can't speak to the reliability of identifications, but I can speak to the fact that they've looked at a photo array, probably a black-and-white computer-generated photograph at that time, or maybe a – maybe not computer-generated, but it was a black-and-white photograph. Now, they're looking at somebody in real time, face-to-face, which people's

Page 175

appearance change. And so I would think those are two separate procedures that this witness could potentially say, "I made a mistake, and this is not the right person."

Q If a witness selected somebody from a gang book, was there any expectation that they signed, you know, the back of the photo or anything like that to confirm the identification?

A So it's my understanding that the gang book photographs were not to be removed from those pages. So I don't think that it would've been possible to sign those pictures, because then obviously, that would've been suggestive for the next person looking at that – looking at that photograph.

Q If there was a positive identification from a gang book, was there any expectation that the photo be inventoried or copied in some way?

A Not that I'm aware of.

Q Okay. When detectives sought to use gang books, could they conduct the gang book procedures themselves? Were they conducted by gang specialists or by both?

A Well, my understanding of what happened is the – like I said before, the gang specialists were the custodians of the gang books. But the investigation is

Page 176

run by the detectives. So the detectives would be present for the gang books being displayed. Although, those are probably, like I said, they belong to the gang specialists or the gang section. So the detective would be – would've been involved in it.

Q But detectives didn't have to have a gang – detectives needed to get the gang books from the gang specialists; right? Because the gang specialists were the custodians; right?

A Yeah. They were in possession of those books, or – or their office, or their unit was.

Q Okay. The detectives were allowed to conduct gang book procedures without having a gang specialist with them; correct?

A Yes.

Q Were gang specialists allowed to conduct gang book procedures without detectives with them in homicide cases?

A I don't believe so.

Q Okay. So –

A The – the detectives could have delegated that – that authority for that specific purpose. But generally speaking, detectives would've conducted their own photo arrays, or shown the gang book, or – or things like that.

Page 177

Q Okay. So when –

A I'm not a gang specialist.

Q So when gang books were shown, you'd – the detectives – homicide detective would get them from the gang specialist, but they would conduct the gang book procedure themselves; fair?

MS. ROSEN: Object to the form.

A I think, generally speaking, on a case-by-case basis, yes. I think that's – that's most commonly what would happen.

Q And the only times that gang specialists were to be conducting gang book procedures and homicide cases was if the detectives specifically gave them permission to do so; correct?

MS. ROSEN: Object to the form.

A So I believe the role of the gang specialist in the time frame that we're talking about is in support of homicide investigations. So I don't think that they would've been showing gang books without some kind of consent from the detectives investigating the homicide.

Q Okay. And could gang books be shown to witnesses – strike that. Where were gang books shown to witnesses?

MS. ROSEN: Object to the form.

A That had adequate lighting to look at the

pictures and so you could actually get an -- you know, an accurate identification. So it could be on the street, in a building, in a police station.

Q Okay. So gang books procedures were conducted on the street with witnesses; correct?

MS. ROSEN: Object to the form.

A I have read documents or -- or depositions where there were cases where the gang books were in police vehicles. So presumably, on the street.

Q Okay. And there are gang procedures can be conducted at the Detective Division area; correct?

A I think that the first sentence I didn't get. I'm sorry.

Q Yeah. Basically any -- there was no limitations on where gang book procedures could be conducted; right?

A Not that I'm aware of. That's correct.

Q And gang books were allowed to leave the gang crime's custodian and be able to go out into the field; correct?

A Yeah. The -- at the convenience of a witness of who had to be done on the street, yes.

Q Okay. All right. And how were the gang books created or populated with photos?

A Well, as I understand it, they were



photographs, Polaroids, of admitted gang members by gangs, specific to each gang. And I believe that they were updated every six months, and every year they would do some kind of synoptic -- synoptic report. I presume that's some kind of audit report.

Q Okay. And so basically, the gang books would be based on the collection of photos that the gang specialists collected as they arrested people in the course of their various gang work; correct?

A Well, I think, yeah, people under arrest were certainly a -- an avenue that they got photographs from. But I think maybe interviewing people on the street, they would get photographs of them if they admitted to being in a gang or -- or things like that. So I think there's a few ways they were getting photographs.

Q Okay. Let's take a look at Exhibit 5.

(EXHIBIT 5 MARKED FOR IDENTIFICATION)

A What is this?

Q This is Exhibit 5 --

MS. ROSEN: What? Sorry.

Q Exhibit 5, Foster 75 through Foster 279. This is the Pre-service -- the title is Pre-service Gang Specialist. You reviewed this document in preparation for today's deposition; correct, sir?

A I did so, yes.



Q Okay.

MS. ROSEN: I have a copy of that in here. Do you mind if I give it to him?

Q Yeah. Please do. So why don't we start with page -- it's Foster 105. I'm sorry, Foster 107.

A All right. Let me get there. It's -- oh, you know what? You don't have the --

MS. ROSEN: I don't have the Bates on them. Sorry. Hold on. I -- the version I have in here --

Q It's listed as Page 9 at the bottom. It's, like, a 33rd page of the document, but it says Page 9 at the bottom.

A Okay. It's -- it's titled Intelligence Group?

Q Yeah. You got it. You got it.

A Okay.

Q If you look at the second page of this, that we're looking at now, this is Page 9, Foster 107. It says, "An additional responsibility of this group is the maintenance of this section's photo books." And that's a reference to what we've been calling gang books; correct?

A Correct.

Q "As each gang arrest information card is entered into the Gang Investigation Section database, an



arrest photo is requested of the subject. When this photo is received in this section, it is placed in a photo album, according to gang affiliation." Do you see that?

A I do, sir. Yes.

Q Okay. All right. So -- and this document that we're looking at, as we said, is the pre-service training document for gang specialists; correct?

A That's correct. Yes.

Q And this page that we're looking at now is a reference to the Gang Investigation Section standard operating procedures; correct?

A Correct. Yes.

Q Okay. So basically, as a matter of training and policy, it was understood that the Intelligence Group within the gang section was expected to be creating gang books based on gang arrest information cards; correct?

MS. ROSEN: In this time frame; right?

MR. SWAMINATHAN: Yes.

A That's correct. Yes.

Q Okay. And so -- and when we say, "in this time frame," we're referring to the period from '86 to '98; correct?

MS. ROSEN: Objection then, form. This is the

1995 or '6, or whatever it is.
Q Yeah. I'm sorry. Yeah. Okay. Okay, okay. I'm sorry. So this is -- sorry. Yeah. What is the year of this policy, as you understand it? this is a policy -- these are training documents that are attached to a letter dated January 23rd, 1995; correct?
A Correct.
Q Okay. All right. Now, do you have any -- is it your understanding that this -- is it your claim that this is the first training that was provided to gang specialists, with regard to these issues? Or is it your understanding that this is an example of the training that was provided over the period from '86 to '98?
A Well, this is my understanding, is this is the training that was provided in 1995 to persons making gang specialists. I don't know that we have any documentation or documents from other -- or for prior pre-service training.
Q Okay. But gang books were maintained by the Intelligence Group of the gang section, even prior to 1995. We agree about that; right?
MS. ROSEN: Object to the form. Foundation as to Intelligence Group.
Q Yeah, that's fine. I don't mean to reference it, but gang specialists were using gang books even



before 1995; right?
A If that's your question, yes.
Q Okay. And your understanding is that this process that's described here of gathering information from gang arrests and putting them into gang books, was a process that was followed throughout the period from '86 to '98; correct?
A Yes.
Q Okay. Now the -- and ultimately, what this particular document is referencing is that one of the ways in which these gang books were created was based on photos that were obtained in conjunction with gang arrests; right?
A Correct.
Q And one of the practices in the gang division, throughout the period from '86, 19 -- to 1998, was to collect information about gang members on arrest cards, or contact cards, or information cards; correct?
A Correct.
Q Okay. And let's take a look here. Let's see. I'm going to page -- so there's a better version of this. This is Foster -- I'm going to go to Foster 251, which is going to be -- it's near the back of the packet. And it's listed, it says Page 28 at the top left corner. It's near the back. It's about -- it's



177 out of 205 pages into the document.
A Okay.
Q Do you see that?
A I'm getting there. Be patient.
MS. ROSEN: I'm having a Bates stamped version brought in while we do this.
MR. SWAMINATHAN: Okay. Cool.
A Oh, I got it.
BY MR. SWAMINATHAN:
Q Okay. All right. You see -- what is -- is this a gang arrest contact card or gang arrest information card here, that's shown on this Foster 251?
A Yes.
Q Okay. All right. So this is what's referenced in that earlier standing -- standard operating procedure that we talked about; right? Where gang specialists, when they make an arrest, they fill out one of these cards; correct?
MS. ROSEN: Can you make this a little bigger?
MR. SWAMINATHAN: Yes.
A So this looks like it's a -- not necessarily an arrest record. It's a contact record.
Q Yeah. You said they created what I -- what would they call a gang arrest information card; correct?
MS. ROSEN: Object to the form.



A It's called a Contact Analysis Record on the top two boxes. It says -- you can check if he was arrested. (coughs) Excuse me. Or if it's for information only. So it's not necessarily, you're not collecting information for somebody necessarily under arrest.
Q Let's go back to page -- what was that? 30? Find it here. This is back at page 30. The one that was marked as Page 9, it's Foster 107.
A Okay.
Q "As each gang arrest information card is entered into the Gang Investigation Section database, an arrest photo is requested." And so what I'm trying to understand is, when it refers to the gang arrest information cards, and then requesting an arrest photo at the same time, is that contact card that we looked at, that's what that's referring to; correct?
MS. ROSEN: Objection, asked and answered.
A I don't necessarily know that's, in fact -- in fact, the case. Because this -- this contact, it says, "Contact analysis record." And if it was just for arrest, you wouldn't have you marking a box off saying he was arrested.
Q Are you aware of any -- oh, I'm sorry. Go ahead.

A No, go ahead.
Q Are you aware of any other type of gang arrest information card that's referred to in that paragraph that I read related to gang intelligence?
A I'm not – but – I'm not, but I don't know that this – this – this form that you're showing is a – is a gang arrest card. I don't – I don't know that it is.
Q So sitting here today, you can't say one way or the other, whether that is the card that's referenced in that gang intelligence paragraph; correct?
MS. ROSEN: Objection. Objection. Mischaracterizes testimony. I think he did just say it's not.
BY MR. SWAMINATHAN:
Q Okay. I want to be clear. Are you saying under oath, sir, that you are able to say, that as a matter – that you are able to say that is not what's referenced on – in page Foster 107?
A Well, what I'm saying is, it's called a gang arrest card in one thing. And here it's called a Contact Analysis Record. It's not the same terminology, so which would lead me to believe that it's not the same form.
Q Okay. If you look at this packet, are – do



you see any other document that you understand could be the gang arrest information card?
MS. ROSEN: I'm going to object. He doesn't have this thing memorized. So if you actually want him to look through it to ensure that, then we're going to have to do that. But –
MR. SWAMINATHAN: Yeah, I mean, I will just say I have a general concern that this witness is, I think, able to testify about Detective Division processes and practices and policies, but I don't believe this witness is prepared or has the experience to testify about gang subjects and is really offering me, especially on a topic like this, answers that aren't really appropriate for 30(b)(6) deposition. I mean, he should be able to tell me whether it is or whether it's not. But if he's just surmising something from the bottom of what's written on a document, that's not – I mean, I can do that. I can make some – I can surmise whether it is or is not, based on the bottom of a document.
MS. ROSEN: That's a –
MR. SWAMINATHAN: That's not a 30(b)(6) witness.
MS. ROSEN: You're wrong, because he's



somebody that's familiar with how the police department speaks and how they reference their documents. And it is a rare occasion where the – in fact, I can't think of any occasion where the police department talks about one document in one place and calls it one thing and talks about it in another place and calls it another. So I mean, I - - you know, you're – whether or not you believe he's competent enough to be a 30(b)(6) witness on gang crimes is up to you. And you can deal with that, but you're going to – in whatever way you feel necessary. But, you know, if you – if you're specifically asking him to find, in this packet of materials, the reference to that particular card, which quite frankly, I'm not sure what – how it fits within this 30(b)(6) notice, but we'll set that aside for a second. Then I'm – all I said was, "Give him a chance to look through the document.
MR. SWAMINATHAN: The notice asked specifically about how these are the gang books and how they are created.
MS. ROSEN: I understand.
MR. SWAMINATHAN: Okay, so –
MS. ROSEN: That – okay, but–



MR. SWAMINATHAN: Yeah. Okay. So let's just clarify the issue first. Okay?
BY MR. SWAMINATHAN:
Q When this document references gang arrest information cards, do you know what it's referring to?
A Oh, you're asking – I'm sorry. What was your question, sir?
Q When – on Foster 107, when it references gang arrest information cards, do you know what this is referring to?
A Gang arrest card? Yes.
Q Okay. Do – have you seen a gang arrest information card as written on Foster 107?
A I do not.
Q Sorry. Have you ever seen a gang arrest information card as that phrase is used on Foster 107?
A I believe I have. It's been a very long time ago, but I have, I believe I have.
Q The document that we just looked at that said something about contact card at the bottom, is it your understanding that that is not the gang arrest information card that you have seen before?
A My concern is, is that this card, I assume this is front and back of the card because it looks like two separate – there's a seam there in the middle of a

page. Is this front and back of that card?
Q I can only guess, but it looks to me like it's the front and back, both printed onto one page. But I don't know. You know better than I do.
A I don't -- as I'm sitting here right now, I don't think this is a gang arrest card.
Q Okay. And then let's take a look at -- I just sort of leafed through this here. I'm on Foster 119, which is probably about seven or eight pages after that gang intelligence page.
A Okay.
Q Okay. You see where it says Attachment number 4?
A Yeah. Yeah. I'm trying to -- yes, no.
Q This is probably about -- let's see, I think it's six or seven pages after that gang intelligence page. So it's about 45 pages into the document.
A We're getting the page record here. So I can go through this a little quicker.
MS. ROSEN: What's the Bates number on it?
MR. SWAMINATHAN: It's 119.
A Okay. It looks like what you're looking for, sir.
BY MR. SWAMINATHAN:
Q Is this -- looking at page Foster 119, does



this appear to be a gang arrest information card as referenced in that paragraph about gang intelligence?
A Yes.
Q Okay. All right. So this document on 180, this is basically a card that the gang specialist would fill in at the time they were making arrests; correct?
A Correct. Now, this wouldn't be exclusively used by a gang specialist. Anybody making an arrest, I believe they had a gang nexus to fill this card in also.
Q Okay. So in other words, beat officers could also fill these in if they have a gang nexus or they have a belief that that arrestee was a member of a particular gang; correct?
A Correct.
Q Okay. And would that information then be provided to the gang intelligence unit if it was filled in by somebody other than a gang specialist?
A So at that time, there was a -- there was information being shared from the district to the Gang Investigation Section or the gang unit back and forth.
Q Okay.
A So yes, that information would've been shared.
Q Okay. So these cards, even if they were filled out by a beat officer, would've ultimately been shared to the gang intelligence section; correct?



A Correct.
Q Okay. And then the gang intelligence section would've used these cards to then request photos that they would use to populate the gang books. Do I have it right?
A Certainly that was one way that they got photographs.
Q Yes. Okay. And so that was -- and when you say that was one way, which you're pointing out, is that they could actually gather photos to include in the gang books in additional ways too; correct?
A Correct.
Q Okay. But the expectation that was -- the expectation was that when they got one of these cards for somebody, they were to request a photo and include that in the gang books; correct? As at least part of the population of the gang books; correct?
A Yes; correct.
Q Okay. All right. I'm pulling that down for a moment. Were there any policies that set forth how the gang book procedures were supposed to be conducted? In other words, here's how you show the pages. Here's something you're supposed to say to them before you show them the photos. Was there any policy that set forth any set of instructions about how to go about showing



gang books to witnesses?
A There was no policy that I'm aware of. The gang books were shown, just like you'd read a book, you know, you turn the page from left to right.
Q Were there any admonishments provided to witnesses before they viewed gang books?
A There were no admonishments at that time. They weren't required.
Q Okay. And I'm asking, of course, exclusively about the period from '86 to '98 for all of these questions. And I'm asking you the questions with an understanding that detectives are the ones who primarily conducted these gang group procedures, unless they specifically delegated the task to a gang specialist. So it could have been conducted by a gang specialist. And I guess, let me be clear. In terms of what the procedures were for conducting the gang procedure, the gang book identification, there's no difference in terms of whether it was conducted by a detective versus a gang crimes officer in terms of the practices; correct?
A Correct.
Q Okay. So in terms of those practices, then -- strike that. Was there any policy that set -- I think we've established this. But in terms of, were there any policies that set forth what was to be documented after

Page 194

a gang book identification procedure was completed by a detective or a gang specialist?
A You're not -- no, there was no policy regarding identifications made from gang books.
Q Okay. And we agree there was no training about what documentation was to be created based on gang book identifications; correct?
A Training given to whom?
Q To detectives or gang crime specialists.
A Specific to gang books?
Q Yes.
A That's correct.
Q Okay. Was there any -- and then in terms of a matter of practice, what was the practice of detectives in terms of what they documented when they conducted a gang book procedure?
A It would've been the same as a photo array. You would've documented the page number and the book, the page number and the line and the specific picture.
Q Okay. So the practice was, if there was a positive identification, detectives would document the page number and the location of the photo in which book; correct?
A Correct.
Q And they would document what books were shown

Page 195

or what pages of books were shown; correct?
A Correct.
Q Okay. And then in terms of the practice, was there a practice of providing any kind of -- again -- strike that. Was there any practice in terms of creating any type of inventory or evidence associated with the positive identification from a gang book?
MS. ROSEN: Object to the form. I'm not sure what you're even asking.
A He is asking --
Q No, I'll strike the question. That was confusing. Were there any -- was there any policy provided -- strike that. Was there any policy that set forth what were practices that were prohibited in terms of how you could go about showing gang books to sus -- to witnesses?
A Well, there were general orders in the police department. Those -- those would cover showing, you know, what you were prohibited doing when -- when showing -- showing a witness a gang book. So those would still be in effect.
Q What were those general orders that would -- that set forth policy in terms of restrictions on what you could do during the course of a gang book procedure?
A Well, I -- there are lineup and photo array

Page 196

procedures that you still had to follow. You couldn't, you know, for example, put your finger on the picture of the person you wanted them to identify. You couldn't make it suggestive. So those policies, those are general orders, and that would cover everything.
Q Okay. All right.
MR. SWAMINATHAN: Okay. Let's move on. One second. Any -- all right.
MS. ROSEN: Did you say something we were supposed to hear?
MR. SWAMINATHAN: No, I was just mumbling to myself while I find my --
MS. ROSEN: Okay. I thought that's what it was, but I just wanted to make sure.
BY MR. SWAMINATHAN:
Q No, my apologies. All right. Let me ask you about identification procedures, and in particular, lineups, photo arrays, and other related procedures. Okay. That's another one of the topics on which you're here to testify with regard to -- for both detectives and gang crimes specialists; correct?
A Correct.
Q Okay. So let's start with some terminology first. There are live lineups; correct? You know what I'm referring to when I'm referring to live lineups?

Page 197

A Yes.
Q Okay. And just tell me in your words, what is a live lineup.
A Live lineup is where the suspect is standing with additional fillers and being viewed in real time by a witness. The witness is looking at hopefully five live bodies and is going to make a determination whether he can make an identification or not.
Q Okay. And then there is something called a photo array or photo spread; correct?
A Correct.
Q And what are photo arrays or photo spreads?
A So photo spreads, in this time frame, would've been probably IR photographs, other photographs shown to a witness to see if they can make an identification.
Q Okay. And then usually it was some set of photos consisting of a suspect and approximately a handful of fillers that would be shown to a witness; correct?
A Yeah. The policy is one suspect for four fillers. So you ideally would have five people in a photo array.
Q Okay.
A Or lineup, for that matter.
Q That was true for both; right? The number of

fillers that were required in a lineup or a photo array was the same; correct?
A Correct.
Q Okay. And we've already talked about then the idea that a gang book procedure or a photo book procedure is different than a photo array; correct?
A So yeah, I think I just want to make -- I just want to make the distinction between a gang book and a photo book, which are two different things.
Q Yes. Gang book and photo books are different things, but both of them are not photo arrays or photo spreads; correct?
A Right. There's policy that speaks to a photo book but doesn't speak to a gang book.
Q Okay. And so let me make sure I understand that. Let's take a look at the policy, actually. That was my question. Let's see. Is there a policy that speaks to -- there is a policy that speaks to live lineups; correct?
A Yes.
Q And is there -- there's a policy that speaks to photo arrays; correct?
A I believe it's one and the same policy, but yes.
Q Okay. And so that was going to be my next



question. Is there any difference in terms of the policy that applied to photo arrays and lineups?
A Not that I'm aware of. No. I believe it's all the same -- same general order.
Q Okay. Okay. And then was there any separate policy that applied to photo books?
A We just looked at some training material that speaks to photo books. I don't know if that's policy, but there was training material, but it doesn't mention gang books.
Q Okay. Let's take a look at Exhibit 6. This is Foster 1 and 2. This is a document you reviewed in preparation for today's deposition; correct?
(EXHIBIT 6 MARKED FOR IDENTIFICATION)
A Well, I don't --
MS. ROSEN: You go to the top, so we know which one it is.
MR. SWAMINATHAN: Yeah. Yeah.
MS. ROSEN: Blow it up a little because it's really bad copy. Or I can have it printed and brought in.
MR. SWAMINATHAN: Either one. And this book --
THE WITNESS: Oh, I have seen this.
BY MR. SWAMINATHAN:



Q You call this -- okay. This document provides -- is entitled Interrogations, Field and Custodial, but the subject is Lineup Procedures; correct?
A Yes.
Q Okay. And it says the effective date of this procedure was March 17, 1983; correct?
A Correct. Yes.
Q Okay. So this -- and this policy covers the conduct of lineups; correct?
A Yes.
Q Okay. And would you agree with me that a subsequent policy that you looked at references photo spreads or photo arrays; correct?
A Yes.
Q Okay. This policy does not reference photo spreads. It only references lineups; correct?
A Correct.
Q Okay. So just starting with the subject of photo arrays, this policy in Exhibit 6, Foster 1 and 2 did not -- apply to lineups, but not photo arrays; correct?
A Yes.
Q And then this policy also did not apply to photo book procedures or gang procedures; correct?
A Correct.



Q Okay. All right. And then if we look at Exhibit 7 -- let me share my screen. This is another document that you looked at in preparation for today's deposition. It's General Order 83-5 -- oh, let's see. No, no, no. This is 88-18 rescinding 83-5. And the subject is Lineup Procedures. It's two pages. Foster 3-4. This is a document you reviewed in preparation for today's deposition; correct?
(EXHIBIT 7 MARKED FOR IDENTIFICATION)
A Correct.
Q Okay. And this document also references lineups, but not photo arrays or photo books or gang books; correct?
A Correct.
Q Okay. And so this policy applied to lineup, but not photo arrays; correct?
A Correct.
Q And this policy, exhibit 7, did not apply to gang books or photo books; correct?
A Correct.
Q Okay. And then let's mark this Exhibit 8. And I'm showing you now document marked Exhibit 8. It is entitled Lineup Procedures, and its Special Order 06-02, Foster 5-7. This is a document you reviewed in preparation for today's deposition; correct?

(EXHIBIT 8 MARKED FOR IDENTIFICATION)
A Correct.
Q Okay. And this document references lineups. And it also references, if I can find it here, photo spreads; right?
A Which line are you on?
Q Let me pull it up for you here. Photo spread. It's the beginning of the word there. Photo spread. Do you see that?
A Yes.
Q Okay. So this policy document references lineups and photo spreads; correct?
A Correct.
Q Okay. So this policy in Exhibit 8 applied to both lineups and photo arrays; correct?
A Correct.
Q Okay. This policy in Exhibit 8 did not apply to photo books or gang books; correct?
A Correct.
Q Okay. And so sitting here today, are you aware of any other policy that applied to the conduct of photo book procedures?
A No.
Q Okay. The only information you're aware of that provided instruction to detectives about photo book



procedures is the reference in the Detective Division training that we looked at earlier; correct?
A Correct.
Q Okay. You're not aware of anything other than that paragraph that we reviewed in Exhibit 4; correct?
A That's correct.
Q Okay. All right. Let me go through a little bit more terminology. What is a photo show-up procedure?
A That's a misnomer. So there's photo arrays. There's a lineup, and then there's a show-up.
Q Okay. So what is a show-up?
A Show-up is an on-scene identification of the offender by a witness.
Q Okay. Is there a such thing as a photo show-up?
A Are you -- I think what you're asking is maybe a single -- shown somebody a single photograph?
Q Yes. That's what I'm referencing. So first I guess let me ask you, is the term photos show-up a term that was used in the Chicago Police Department?
A I have never heard it.
Q Okay. What I -- references to show-ups are reference to an in-person or on-scene viewing of a single suspect; correct?



A Yes.
Q Okay. Was it prohibited then to conduct -- to show a single photo of a suspect to a witness?
MS. ROSEN: Object to the form. Incomplete hypothetical.
A No, not at all.
Q So you could conduct -- you could show single photos to witnesses?
A Yeah. It's on a case-by-case basis depending on the circumstances, but there are -- there are instances where a single photograph would be appropriate for identification purposes.
Q Okay. So what are the types of circumstances -- and so when that -- when a single photo is shown, what is that referred to in terms of an identification procedure?
A I would just call it a single photograph identification.
Q Okay.
A I've never heard the term photo show-up. But to answer your question, what circumstances, a girl, let's say her ex-boyfriend kills her new boyfriend, and she says, "Yeah, I dated him for four years. I saw him every day for four years. It was John Foster that did it." She doesn't need to look at -- she knows who I am.



And is this -- we would show her a one photograph. Is this the John Foster? Are we talking about the same John Foster? Yes, we are. That would be an appropriate identification because she's seen me for four years every day. She knows -- it's just basically for confirming that we're talking about the same John Foster.
Q Okay. So that's -- that scenario you're describing is one involving -- essentially where the witness is familiar or very familiar with the suspect; correct?
A Correct.
Q Okay. And in most identification procedures and lineups and photo arrays, typically the witnesses don't know the suspect other than having observed them commit a crime; correct?
A Correct.
Q Okay. Other than the familiar face confirmation, is it fair to say that showing single photos to witnesses was not permitted?
MS. ROSEN: Object to the form.
A I don't necessarily -- I think it has to be on a case-by-case basis. There's different levels of, oh, well, you know somebody. So it may be just somebody that, you know, they've known each other for two weeks,

but that may be sufficient. Again, I don't think you -- it's one of these -- you can't paint it with a broad brush.

Q Fair. Let me ask a different question. Are there -- what are the types of circumstances in which single photo procedures were permitted other than scenarios involving a -- where the suspect was familiar to the witness?

A Well, I can't think of one right now, but I would think when there's some familial stuff -- familial relationships, it has more to do with relationships than anything else.

Q Yeah.

A It doesn't have to do with someone knowing somebody's name. You might work with somebody for three years and not really know his name. All you know him as Skip or something. And so it doesn't -- it doesn't -- it just kind of goes to the familiarity of the potential suspect.

Q Under CPD policy, were detectives permitted to show single photos of suspects to witnesses where it was a stranger identification?

MS. ROSEN: Object to the form.

A I don't know if there's a direct policy violation there to do what you just said, but I don't



think it'd be a good idea.

Q Okay. And as a matter of practice, is it the case that Chicago police detectives were not to conduct single photo viewings of suspects for witnesses in stranger identification scenarios?

A Again, I'm not -- I'm not -- I'm fairly well, you know, nuanced on the line of procedures. I don't know that if there's a policy violation there, but again, I don't know that it's a very prudent thing to do.

Q And when there were stranger identifications, when detectives were engaging in efforts to identify a suspect who was a stranger to the witness, the expectation was that they would conduct procedures like lineups or photo arrays; correct?

A Correct. Yes.

Q The expectation was that in a stranger identification scenario, they would not be showing single photos to suspects; correct?

A Again, to be on a case-by-case basis. But generally speaking, you would not want to use show a single photograph to a witness that does not know the offender.

Q Okay. As a matter of policy, there was -- I think you've indicated there was no prohibition on



single photo -- single photos being shown; is that right?

A I didn't memorize the order, but I don't remember reading a prohibition. No.

Q Okay. And as a matter of practice, there was no direction or instruction given to detectives that single photos being shown to suspects was prohibited; correct?

A Correct.

Q And as a matter of training, detectives were not trained that single photos being shown to witnesses of strangers as suspects was prohibited; Is that correct?

A I think a matter of training, they were -- they were taught that having four fillers in a suspect in a photo array is the ideal course of -- pending an identification.

Q Were they trained that it was inappropriate to conduct -- to show single photos of suspects to witnesses in a stranger scenario?

A Again, I think it's -- I think you have to do it on a case-by-case basis, but generally speaking, I think it's better to do a photo array.

Q Okay. And then, you -- a cloth -- is there such thing as a clothing lineup?



A A what?

Q A clothing lineup?

A Clothing? Clothing lineup. Is there such a thing?

Q Yes. Is that a term that's familiar to you? Clothing lineups.

A I have read it maybe two or three times in 31 years.

Q Okay. And what is a clothing lineup?

A It's where a witness identifies the clothes as what the offender was wearing at the time of offense. And let me just note that the police department, the Chicago Police Department does not count that as an identification because clothing can be changed. And the value of a clothing lineup is at best dubious.

Q Okay. So you have seen very few -- if I understand you correctly, clothing lineups are not a regular practice of the Chicago Police Department.

A Correct.

Q I think you indicated that you've probably only seen two or three ever in your 31 years.

A That's correct. It's something that's driven by the state attorney's office. They may request that, but again, I don't know of what quality that would be or what would bring to the investigation, but sometimes the

Page 210

state attorney's office would want something like that.
Q Okay. And am I understand you correctly, clothing lineups were not considered something of evidentiary value within the Chicago Police Department?
A Well, I wouldn't go that far. I said it's not counted as an identification.
Q I see that --
A It could be of evidence of value. That'd be something that would be determined at trial. But the evidentiary value at the time it's happening, at the time you're doing this lineup is beyond me, but I could see a scenario where it would be valuable potentially at trial.
Q Okay. And I misunderstood you. What you're saying -- so what you said is clothing lineups were not considered a positive identification within the Chicago Police Department.
A And by the Cook County State Attorney's Office, but yes, that's correct.
Q Okay. All right. And then clothing -- there was no policy regarding the performance of clothing lineups in the Chicago Police Department; correct?
A Correct.
Q Okay. And detectives were not trained in the performance of clothing lineups; correct?

Page 211

A Correct.
Q Okay. And there was no common practice of performing clothing lineups in the Chicago Police Department; correct?
A Correct.
Q Okay. And in fact, to the extent there was any discussion of clothing lineups, it was that they are not considered positive identifications done within the Detective Division; correct?
A In the police department or the state attorney's office, it's not considered a positive identification for obvious reasons.
Q Okay. Now you mentioned live show-ups before, or you referred to those as on-scene identifications; correct?
A Correct.
Q Okay. What are the circumstances in which live show-ups were permitted?
A I believe the Supreme Court's held that you have to do it within one hour of the crime being committed. The witness would look at the offender. You want to make it as less suggestive as possible. So you don't want to -- you wouldn't want to have the witness look at this -- show-up as the guy, as the offender's sitting in a police car. Maybe have him stand outside,

Page 212

and they can give you an indication, yes or no, this is the person I saw commit whatever offense you're investigating.
Q Okay.
A There is a time element. There is a time element there that I think is the most critical.
Q Okay. So detective -- the policy was that you're not to conduct live show-ups unless it's essentially very short in time after the crime itself; correct?
A One hour. That's correct. Yes.
Q Okay. So that -- was the training within the police department to use one hour, essentially, as the cutoff in terms of when you could conduct a live show-up?
A Correct.
Q Okay. And then was there any -- was there a policy that set forth the circumstances in which live show-up could be conducted?
A Can you repeat that question?
Q Was there any policy document that set out the circumstances in which live show-ups could be conducted?
A I don't know if there's anything specific on point, but I believe obviously the identification procedures, that general order would be applicable to

Page 213

some extent.
Q Okay. Those policies that we just looked at, that are the lineup procedures or identification procedures, they don't specifically reference live shows; correct?
A Correct.
Q Okay. And when detectives were trained, it sounds like what you're saying -- strike that. It sounds like what you're saying is when detectives were trained, they were trained not to conduct live show-ups unless it was with -- they had the person -- they had their suspect in custody, and they were within one hour of the crime; correct?
MS. ROSEN: Object to the form. And you said the word "custody" because it's a term of art.
A So yeah, obviously to do a photo array, somebody would have to be detained. Yes. That's in fact mostly accurate.
Q Okay. Was there any other circumstances in which live show-ups were permitted other than when you had somebody detained and you were within one hour of the crime?
A Well, that's a really broad question.
MS. ROSEN: Object to the form.
A Yeah. I'm not sure what you're asking.

Q Let's do it this way. Were detectives trained that other than when you were bringing somebody who was detained to the scene within one hour, that there were any other circumstances in which live show-ups were appropriate?
A Oh, I guess not.
Q Okay.
A I'm really unclear of what you're asking.
Q What I'm asking is basically, detectives were trained that when they have a suspect, they should be conducting either photo arrays or live lineups to the extent possible; correct?
A Absolutely.
Q Okay. And detectives were trained that live show-up was something can be done only in the most extraordinary circumstances where you've got your suspect detained within one hour; correct?
A Correct.
Q Okay. And they weren't trained that there were any other circumstances that they should be aware of when they should be conducting live show-ups in lieu of photo arrays or lineups; correct?
A Can you rephrase that?
Q Yes. I guess what I'm saying is one could always conceive of some exigent scenario. But what I'm



asking is: In terms of training, were detectives trained that there were any other scenarios in which they should conduct a live show-up other than the one we've discussed, within one hour of the crime?
A Yeah. I don't -- I don't think so. No.
Q All right. Okay. Let's take a look at those policies again for a moment. I'm going to ask you in particular about -- this is Exhibit 7. It's 88-18. General Order 88-18. This was the second of the three orders that we looked at. And again, I think we talked about, this is one that applied only to lineups, but not photo arrays; correct?
A Correct.
Q Okay. This policy has an effective date of September 24, 1988. You see that?
A Yes.
Q Okay. What was the time period in which this policy was in place?
A Oh, obviously started in 1988. And unless it's been rescinded by another order, it's still in place. I'm not sure. The last order we looked at, the special order, so obviously went from a general order to a special order for some reason. But unless this has been rescinded, it's still in place, but I do believe there's a more modern order.



Q Okay. And that gets to my question, which is -- let's take a look at the other one. All right. This is Exhibit 8. This is the special order on lineup procedures. And this one we talked about does cover lineups and photo spreads; correct?
A Correct.
Q And this one expressly indicates that it was rescinded in July of 2011. Do you see that?
A Yep.
Q And this has the same effective date on it, September 24, 1988. You see that?
A Yes.
Q So my question is, which one applied? Or did they apply to different groups? I mean, in other words, when -- I guess let's do it this way. What was the time period in which Exhibit 7 was applicable?
A Let's go up and look at that second order again. What's the date on it? I know it's 1988, but what day?
Q Yeah, let me pull it up. Same date, September 24, 1988.
A Okay. Okay.
MS. ROSEN: Can you put the other one back up again?
Q Yeah. They appear to have the same issue date



and same effective date.
A Correct.
Q Do you know which one is the one that went into effect in -- on September 24 of 1988, between these two policies?
MS. ROSEN: So this one rescinds '88. At the top, it says rescinds 88-18?
MR. SWAMINATHAN: This one says rescinds, yeah, 88-18.
MS. ROSEN: Correct. And then if you scroll to the bottom.
MR. SWAMINATHAN: Yeah.
MS. ROSEN: There's a screw-up in the date. So this is later.
THE WITNESS: Yeah.
MR. SWAMINATHAN: Okay.
MS. ROSEN: So this is the later one.
MR. SWAMINATHAN: So when did this one go into --
MS. ROSEN: So you asked, when did -- yeah.
BY MR. SWAMINATHAN:
Q Okay. When did this one go into effect? Do we know?
A I think 26 April 2011. It says current, in the bottom, it says current as of 26 April 2011.

MS. ROSEN: If you can scroll up. I know we figured it out somewhere and now I can't find it.

MR. SWAMINATHAN: Maybe what we can do is at some point when we take the next break, can you guys see if you can --

MS. ROSEN: Yeah.

MR. SWAMINATHAN: -- figure out the answer to that and then we can go back on the record about it.

MS. ROSEN: Yeah.

MR. SWAMINATHAN: And I'll pull it down for now and we'll come back to it.

MS. ROSEN: Okay. Yeah, we'll do that.

BY MR. SWAMINATHAN:

Q Okay. All right, let me move forward and then I'll -- and then I'll come back to it. Okay. Let me focus for a moment on the issue of live show-ups, I know we talked about them briefly just now. We will go through that quickly. We've talked about any policy that applied. In circumstances where it was feasible to conduct a lineup procedure, did the City of Chicago prohibit the use of live show-ups instead of the lineup procedures?

MS. ROSEN: Object to the form.

A So I mean, if I'm -- I want to make sure I



have this question clearer. Where you could've done a lineup, you did a show-up?

Q Right. In other words, was there -- if you had somebody who you detained and you had the ability, for example, you had sufficient probable cause to bring them to the police station and put them in a lineup, was there any policy or practice or training about the idea that well, you should conduct the lineup in lieu of the live show-up?

A There was no policy, no.

Q Okay. Was there any --

A Other than the --

Q Go ahead.

A The time constraint, that's the only -- that's really the only constraint there is as far as show-ups.

Q So I think what you've indicated is if you're outside of one hour, the practice and the training was, go do a live lineup; correct?

A Correct.

Q Okay. If you were within the one hour, was the practice that you should go ahead and do the live show- up, or that if you can wait and do a lineup, you should do a lineup instead?

A Well, if you waited, then you would be detaining him without any kind of probable cause, and



we'd be having a different conversation. So waiting is not really an option. If you're -- if somebody's telling you this is the offender, then you're going to -- you -- you have to establish probable cause somehow, and that would -- the first, most immediate way would be to do a show-up.

Q Okay. And if you had probable cause both to detain and to arrest, so you didn't need to be able to get that identification on scene, was the expectation then that the detectives would wait and conduct a lineup in lieu of a live show-up?

A So I think generally that most detectives would do a show-up. So there -- there is no policy that you'd have to wait to do a lineup. So no, there's no policy. I think if you're within that, your -- your window, your time window, that you would do a show-up.

Q Okay. Would it be permissible under Chicago policy practice or training to conduct a live show-up if the police had the suspect's photograph already so you could conduct a photo array instead?

A Again, the -- the offenders in custody, you can only detain him for so long, and a show-up would be appropriate as long as you're within your -- your -- your window, your time window.

Q Okay. So the practice and the training was,



if you're within that one-hour window, you don't need to -- it's not better or preferable to wait and do a photo array or lineup, you can go ahead and do your live show-up; is that right?

A Correct.

Q Okay. And if you got outside of that one-hour window, then you had to wait to do either the photo array or the live lineup; correct?

A Yeah. I would say that would be prudent for you to do a photo array after that. Obviously, the identification is not as fresh.

Q Okay. And if you had -- already had sufficient information to arrest the suspect, you would -- you could still go ahead and conduct the live show-up in lieu of bringing them to the police station?

A Well, again, I think I would need a little more case specifics. It would be on a case-by-case basis. But yeah, you would still do a show-up if you're within that window. You don't necessarily have to, I suppose, if you already have a probable cause, but again, you're kind of speaking on -- on a very, very broad hypothetical.

Q Okay. You identified some restrictions around the performance of live show-up. So what were the -- what was the training that was provided to detectives

about how they should go about conducting live show-ups in order to limit the suggestibility or bias in those procedures?
A Well, obviously the first one is -- is the time window. The second one is, I think, some -- some officers would -- would take an extra step to maybe take the offender out of the -- out of the police car so he wouldn't be just sitting in a car and shining a flashlight in his face. So at least you'd have a more accurate identification if the guy was -- the offender was outside the car, you could see his height, weight, see his face more clearly. Obviously, somebody's more visible outside as opposed to sitting in a vehicle. So I -- I -- I would think that you would still want to take efforts to make sure the identification is -- is accurate and, you know, it's not tainted in any way or suggestive.
Q Okay. And so what were the types -- so I think you said one of the things that was done to try to reduce suggestion or tainting was to have the witness -- have the suspect be out of the vehicle; correct?
A I don't know that there's -- I know there's no policy, as far as that goes. I'm just offering some suggestions or some things that I've seen done that would limit the suggestiveness -- the suggestiveness of


a show-up.
Q Okay. So let's again, confirm there. As a matter of policy, there was no policy document that laid out specific things that were to be done in order to ensure that a live show-up was not suggestive or tainted; correct?
A Correct.
Q Okay. And then as a matter of practice, the practice was to -- what were the practices that were followed in order to reduce taint or suggestibility of live show-ups?
A So again, there's no policy. A photo, a show-up in -- in by its very nature is suggestive. So you want to limit that. I would think as a detective, you would want to limit that as much as possible. And one example I gave is having the suspect be viewed outside of a police car instead of in the back seat of a police car, where there's a very limited opportunity to -- to view -- to view him. So that would be one opportunity or one -- one thing you could do to mitigate some of the suggestiveness of the show-up.
Q And I think you indicated one of the things that detectives were trained on is that live show-ups are inherently suggestive; correct?
A I don't necessarily know that they were


trained on it. I -- I, in fact, I know they weren't. The -- the police department's policy is if you're within one hour, you can do a show-up. I'm speaking about the reluctance, or some -- some ways, to mitigate the suggestiveness of the show-up just through experience, what I've seen done and what I've done.
Q What were other things that you saw as a matter of practice in this period from '86 to '98 to mitigate the suggestiveness of live show-ups, other than having the person out of the vehicle?
A Sure. You may -- the -- the person may have ran from the police after he committed a crime, he may have cuts, scrapes. You may -- you may want to clean him up so he doesn't have blood running down his face, things, that would be another example. But I mean, the -- the -- the examples are countless. You -- you just -- I would think that a detective would want to mitigate the inherent suggestiveness as much as possible.
Q Okay. And so ultimately, was the expectation that detectives take as many steps as they could to mitigate the risks of suggestiveness in the live show-ups when they did conduct them?
MS. ROSEN: Object to the form.
A The ultimate goal of the detective is to -- to prosecute the right person. So everything else is a --


is a means to an end.
Q Okay. In other words, I think if I understand you correctly, detectives were trained that the goal is not just to get a positive identification and get an arrest, it's to actually get the right person; correct?
A Absolutely. Yes.
Q Okay. And so were detectives trained that one of the ways to go about ensuring that you're getting to the truth, not just an arrest, is to ensure that you conduct identification procedures in a way that's uncontaminated and unsuggestive?
A As much as possible in the dynamic situation, and -- and on a case-by-case basis, yes.
Q Okay. And were the detectives trained that they should engage in certain practices, best practices, so as to try to avoid suggestion and taint in their identification procedures?
MS. ROSEN: Object to the form.
A I'm not -- I'm not -- I'm not sure what you mean by "best practices."
Q Yeah. Let me -- let's put aside the concept of best practices. Were detectives trained in practices that they should engage in to try to reduce suggestibility and taint so that they can get accurate and reliable identifications?

Page 226

A Are we talking about photo arrays or are we talking about identification procedures in general?
Q I'm talking in general.
A Absolutely, yes.
Q Yeah, okay. And – because that training applies to any kind of identification procedure. The goal is to have a procedure that doesn't just result in a positive identification, but an accurate positive identification; correct?
A Correct, yes.
Q And that applied to all identification procedures, including live show-ups; correct?
A Correct.
Q Okay. And so what other practices were detectives trained on as a way to mitigate the suggestiveness of live show-ups? Well, strike that. Were detectives – strike that. Having asked you the questions I did, were detectives trained that they should take whatever steps they could to mitigate the suggestiveness of live show-ups when they conducted them?
MS. ROSEN: Object to the form.
A So I – I – my recollection is the detectives were trained about, when it comes – when it came to show-ups, that they had a time window that they had to

Page 227

be in, but as far as mitigation of suggestiveness, I think that comes with experience. They weren't trained on that. That comes – that comes with experience.
Q Okay. Were there, other than the requirement that the live show-up could only be done within one hour of the crime occurring, were there any other requirements that existed in terms of how a live show-up procedure could be conducted?
A Not that I'm aware of, no.
Q Okay. When detectives conducted live show-ups, was there any requirement that they get approval from a supervisor before conducting a live show-up?
A Not that I'm aware of. Again, that – I don't know how practical that would be, you only have one hour and trying to find a supervisor that would authorize that would – would, you know, obviously work into your one hour. So –
Q Okay.
A Yeah, the quick answer is no.
Q Okay. And so were detectives trained that, hey, if you've got your person in, if you've been able to detain somebody within one hour of the crime, that ideally, you should get to the scene and do a live show-up to the extent you can?
MS. ROSEN: Object to the form.

Page 228

A Can you ask that again –
Q In other words –
A – please?
Q – when detectives had somebody, when detectives detained somebody within one hour and so had the opportunity to conduct a live show-up, was the training that they should conduct a live show-up if they can, or they should wait and conduct a photo array or a live lineup?
MS. ROSEN: Object to the form, incomplete hypothetical.
A So I think what you're asking here is a little unrealistic. Basically, when detectives are doing show-up, it's a – it's a – it's a crime that, A, a detective would go out on, B, that he would respond immediately to, so that limits it to about murders or – or shootings. And the offender being detained would be not be detained by the detectives, he would've been detained by responding police officers. So when a detective would get on the scene, and of course he would respond as quickly as he can, he would learn that there's somebody being detained and – and then decide what investigative steps would be the most appropriate. Sorry for the tangent.
Q No, not at all. And let me ask you maybe a

Page 229

different and hopefully a better question. Were detectives trained that even if you've got somebody – in – who's detained within one hour and you have the opportunity to conduct a live show-up, were they trained on any preference between the live show-ups versus waiting and doing a photo array or live lineup?
MS. ROSEN: Object to the form.
A No. There's – there's – there's no preference other than, again, detective's experience would probably drive that decision, whether to do a photo – a photo array or – or a show-up.
Q Okay. So ultimately, determination about whether to do the live show-up or wait and do a photo array or a live lineup is up to the detective; correct?
MS. ROSEN: Object to this form.
A Correct. Like I said, most detectives will take advantage of having somebody detained if they're within that one-hour window and do a show-up.
Q Okay. Was there – was removing handcuffs or any other evidence of the person being detained or arrested, was that a mitigating step that detectives were trained to follow?
A Again, there's no training as far as photo show-ups. Handcuffing would be something, removing the handcuffs could be a mitigating factor, but it's also a

– a safety factor. So I think that would definitely be on a – a very case-specific basis, whether handcuffs should or should not be removed.
Q Okay. In terms of documentation practices, what documentation was required for live show-ups?
A Well, you would document that in – in some type of report, that an identification was made or – or was not made.
Q So detectives were required to document live show-ups; correct?
A Yes.
Q Okay. And they were required – were they required to document live show-ups regardless of whether it resulted in a positive or negative identification?
A Yes.
Q Okay. And was there any policy that set forth that live show-ups required to be documented, whether they were positive or negative?
A I don't believe that we have any policy that, at this point in time, the – the time frame that we're speaking about, that's on point about regarding photo show-ups – show-ups.
Q Okay. And for – when live show-ups were conducted, you indicated they were required to be documented, what information was required to be



documented for a live show-up?
A Yeah, and there's no policy regarding show-ups, but I would – my – my experience would tell me that you would document who was looking at the show-up, the time would be very important of the show-up, and yeah, whether an identification was made. Another possibility, again, it's not training, is that because of the nature of the crime, that being, let's say, a homicide, you know that an ET or a – a forensic investigators on the way, and you might have him photograph the – the offender.
Q Okay. So you indicated there was, the expectation was that one of the things that was documented was the fact that you were within the one hour to conduct the live show-up; is that right?
A Correct.
Q Okay. And then you indicated that, if I understand correctly, that usually, if there was a positive identification in the live show-up, that there should be a photograph taken of the live show-up; is that right?
A I said, that's a – that's something that they may want to – they – the detective may consider.
Q Okay. If I understand correctly, you indicated live show-ups would be the kind of thing that



happened in rare instances when detectives are going to the scene immediately, like a homicide investigation; correct?
A Correct.
Q Okay. And in homicide cases, evidence technicians go to the scene as well; correct?
A Back in the – back in the time frame we're talking about, it would've been forensic investigators, but now it's ETs. So either way, somebody – somebody from the police department that collects evidence would've responded to the scene. Yes.
Q Okay. And so given that somebody from the evidence technician or forensic investigator was going to the scene, usually when you're conducting live show-ups in homicide investigations, there would be somebody available to take photos; correct?
A Again, it's – it's on a – it's on a case-by-case basis, because you are, assuming you've got an identification, it may be more beneficial to take the offender back to the area and get them out of that, get them off the scene. It just depends. If the ET's there, maybe the ET's close and maybe this – again, it's fluid and maybe you do take that picture. But I – it's – it's very case-specific.
Q Was the common – was there any practice



within the department to take photos at the scene when live show-ups occurred?
A Was there any practice?
Q Yeah. Was it the common practice to take photos at the scene in homicide cases when there was a live show-up conducted?
MS. ROSEN: Object to the form.
A No, there's no – I – I don't – there's no practice. It's just a matter of, you know, availability, and – and again, very case specific.
Q Essentially, in other words, it was up to the detectives?
MS. ROSEN: Object to the form, mischaracterizes his testimony.
A I think it's being driven by the circumstances of the investigation, as – as opposed to the detective just making a decision. I think it has to do with, there – there's a multitude of factors that would weigh in on whether you were going to get – get his photograph on the scene or not.
Q You indicated that detectives were required to document when they conducted live show-ups. What information – well, strike that. Were they required to document the time that the live show-up took place?
MS. ROSEN: Objection. Asked and answered.

Page 234

A Can you ask that again, please?
Q Yeah. Were detective required to document the time that the live show-up was conducted?
A Again, there's no requirement, there's no policy on photo – oh, boy, show-ups other than the time window. And because of that, I would – it – it would be most beneficial to document the time to – that the show-up was done so it would be admissible in court.
Q Okay. Was it required to document the location at which the photo show-up took place?
MS. ROSEN: Object to the – you – I'm sure you didn't mean to say photos show-up.
Q I'm sorry. Let me re-ask it. You are correct. Was it required to document the location of the live show-up?
A No requirements policy-wise. Again, it would probably be in practice something that would – would've been done. Yes.
Q Okay. Was it expected to document the persons or eyewitnesses viewing the live show-up?
A Yes, that would be an important element.
Q Was it expected to document the officers present for the live show-up?
A Well, most – most show-ups have a lot of police officers around it. So it – that's kind of a –

Page 235

it's an ambiguous. I don't think there's any requirement.
Q Was it expected to document the person or the detective that conducted the show-up?
A Sure. Yes.
Q In
A There's no requirement or policy requirement, but it would – it would've – should've been something that would – would've made the supplemental report at some point.
Q Was there an expectation that the location of the suspect was documented in a live show-up? In other words, were they in the vehicle, were they standing outside, the circumstances involving the suspect's location?
A There's no policy on that. That would've been something that would've been by a case-by-case basis.
Q So essentially, it was up to the detective, whether to document the – no, essentially, the circumstances of the viewing opportunity?
MS. ROSEN: Object to the form.
A Again, it's not – the detective's not making the decision, the decisions being's driven by external factors that are involved in any kind of fluid investigation.

Page 236

Q But in terms of what to document, was there an expectation? Was it up to the detectives whether or not to document the circumstances of the viewing opportunity? There was a lot of light, there was no light, we were inside, we were outside, he had handcuffs on, he didn't have handcuffs on, those various circumstances of the viewing opportunity, was it up to the detective whether to document those or was the expectation that they would document those?
A So I think what you're asking is, did the detective make the decision or does the detective make the decision on what to document, and my answer would be the same. The detective – the – the – the circumstances of the investigation are driving those decisions, not necessarily the detective.
Q What do you mean by that in terms of whether or not they document something? What is it about the circumstances of the investigation that decide whether they document the circumstances of the viewing opportunity?
A Sure. So let's – let's go back to the nexus that – that you like to talk about gang – gang murders. So let's say that the murder happens in a very – a Latin King's stronghold and a 26 is the offender, he shoots and kills a Latin King, and he gets caught by

Page 237

a group of other Latin Kings. And now, as unlikely as this may be, they hold them for the police. Well, when the detective gets there, he may just do a quick photo – show-up, show-up, and then get this guy off the scene as fast as he can as – as to not start, you know, a nuclear war. So that would be an example of circumstances driving a fluid investigation. And – and I would – I would argue that that detective made a wise decision because additional people probably were spared from getting hurt.
Q I understood, and I'm not asking about the detective's determinations about whether to get out of there quickly, whether to linger, whether to get the guy out of the vehicle or not. I'm asking what the subsequent documentation, that's all that I'm asking about. So in the fluid situation, I understand what you're saying, which is detectives have got to make some judgment calls about how they're going to handle the circumstances and based on the fluidity of the situation. Subsequent to that, when they're sitting down and writing their report, in terms of what they're documenting about that viewing opportunity, is it up to the detective whether to document those details about the circumstances of the viewing opportunity?
A So some – some – some detectives document

more heavily than others, but that's -- that's on a case-by-case basis and each detective has his own style as to what -- what he feels is relevant and what is not.
Q Was it up to detective -- strike that. Was the expectation that detectives document any comments made by the witnesses viewing a live show-up?
A I don't know if there was any expectation. Again, each detective had his own -- has his own style and some are more document-heavy than others.
Q Was the expectation that detectives document any statements about the level of confidence made by a witness during a live show-up?
A In this time frame that we're speaking of, those -- that was not an element that was something that was asked, it was either a positive identification or it wasn't. So those -- that wouldn't have been -- if the person made an identification, that was -- that was an identification.
Q Okay. So in this time period from '86 to '98, it was either a positive identification or a negative identification; correct?
A Correct.
Q Detectives were not instructed to document tentative identifications or confident statements about identifications; correct?



A Correct.
Q And that's true, not only for live show-ups, it's also true for photo arrays and live lineups as well; correct?
A During this time period.
Q Okay. In other words, in the period from '86 to 1998, when detectives conducted live lineups or photo arrays, they documented them either as positive identifications or negative identifications; correct?
A Correct.
Q In the period from '86 to 1998, detectives documented -- when detectives documented photo arrays and live lineups, they would not document if it was attentive of identification or other statements about the confidence level of the identification; correct?
A They would not, that's correct.
Q Okay. And that was a matter of both training and practice at that time, '86 to 1998; correct?
A Correct.
MS. ROSEN: Object to the form.
Q And to the extent identification procedures were conducted by gang specialists, that was also true for gang specialists; correct?
MS. ROSEN: Object to the form, foundation as to gang crime specialist conducting lineups.



A Can you re-ask that question, please, sir?
Q Yeah. To the extent gang specialists were involved in the performance of any type of identification procedure, the same is true for them; right? There was no expectation that they document anything other than positive identification or negative identification in this time period; correct?
MS. ROSEN: Objection, form and foundation as to documentation, but --
A That's correct. The same general orders that guide the detectives would've been -- would've bound the gang specialists as well.
Q Okay. So to the extent gang specialists participated in an identification procedure between '86 and 1998, they would not document tentative identifications or statements about the confidence level of identification; correct?
MS. ROSEN: Objection, form and foundation.
A Correct.
Q Okay. We're -- going back to the live show-ups, were detectives given any -- were detectives expected to document any instructions that they gave to the witnesses before viewing a live show-up?
A No.
Q Okay. During this time period from '86 to



1998, were detectives required to give witnesses any instructions before they viewed a live show-up?
MS. ROSEN: Objection, I think asked and answered, but go ahead.
A No.
Q During the time period from '86 to '98, were detectives required to -- strike that. Were detectives expected to give any instructions to witnesses before they viewed a live show-up?
A Can you say that again, please?
Q Yeah. But again, focus only on '86 to '98; right? Was there an expectation that detectives give particular instructions before a live show-up?
A No.
Q And --
MS. ROSEN: Can we take a break?
Q Yeah, let me ask one last question and let's take a break, if it's okay with you. You indicated that there was an expectation of documentation of live show-ups, what type of document were live show-ups to be documented on by detectives?
A Well, it could've been a supplemental report, could've been a general progress report. Those are the two that I can think of off the top of my head. There was a photograph taken that may be on a forensic report,

the three that I – I would think would be most likely
you'd find that information.
Q Okay. We can take a break, Eileen.
COURT REPORTER: Okay. We're off the record, the time is 3:47.
(OFF THE RECORD)
COURT REPORTER: We are back on the record for the deposition of Lieutenant John Foster being conducted by video conference. My name is Sydney Little, today is June 29, 2022, the time is 4:09 p.m.
BY MR. SWAMINATHAN:
Q Okay. All right. Lieutenant Foster, let me -- I'm going to put up a copy of Exhibit 7 and Exhibit 8, which are the line of procedures we looked at before. And first, I'm showing you a document marked Exhibit 7. This is 88-18. We looked at this previously and as we discussed, this was – this is a lineup procedure general order that provides instruction or policy with regard to the conduct of lineups, live lineups, but not photo arrays, photo books or gang books; correct?
A Correct. Yes.
Q Okay. And then sorry, I kind of lost everybody on the screen. Okay. And this policy was in



place from 1980 – from September 24, 1988 through 1996; correct? Oh sorry, we're from 1986 to 1998. So this policy was in place from September 24, 1988 through 1998; correct?
A 1998 is correct, yes.
Q Okay. And then looking at Exhibit – showing you now Exhibit 8; this is Foster 5 through 7. This is Special Order S06-02. This is another lineup procedure policy that we looked at before; correct?
A Correct, yes.
Q Okay. And this policy additionally provides policy guidance with regard to the conduct of photo arrays in addition to live lineups; correct?
A Correct, yes.
Q Okay. And as far as you understand, this is the first policy that goes into – that provides policy guidance as to the conduct of photo arrays; correct?
A Correct, sir. Yes.
Q Okay. And this policy, exhibit 8, went into effect after 1998; correct?
A Yes; correct.
Q Okay. In other words, this policy in Exhibit 8 did not apply during the period of our case, 1986 through 1998; correct?
A Correct, sir.



Q Okay. All right, let me pull this down. All right. Thanks for that clarification, Eileen. Let me ask you about – I asked you earlier about positive identifications versus negative identifications during this time period from '86 to 1998, and that essentially identifications either were put into one of those two buckets; correct?
A Correct.
Q Okay. And so if a – strike that. If a witness identified a filler during this time period, that would be documented as a non-identification or no ID; correct?
A Correct.
Q Okay. And if the suspect – strike that. The witness made a tentative identification of the suspect, that was documented as a positive identification; correct?
MS. ROSEN: Object to the form. Can you re – can you – I just want to make sure I heard it right. Can you read the question back or say it again?
Q I'll just it again. In the period from '86 to 1998, if the witness made a tentative identification of the suspect, that was a positive identification; correct?



MS. ROSEN: Objection to form.
A Incorrect. You're not correct.
Q How was a tentative identification documented in the period from '86 to 1998?
A Those are – not – tentative ID is not considered an identification.
Q So was a tentative identification documented as a non-identification or no ID?
A Not an identification. I don't know how it ended up getting documented, but it's – tentative ID is not an identification.
Q And then –
A It's not a positive identification.
Q Okay. And then what was the documentation requirement in the instances when there was a tentative identification?
A You would document it as a tentative ID, but police department and the state attorney's office don't consider that a positive identification, a tentative identification.
Q Was the requirement that tentative identifications be documented as tentative identifications?
A Well, I would – yes. You would I – identify that as a tentative ID, that witness wasn't sure.

Page 246

Q Okay. And so was there a policy that required tentative identify -- was there any policy about how tentative identifications were to be documented?
A Not that I'm aware of, no.
Q Okay. Was there a -- was there any training on how tentative identifications were to be documented?
A Not that I'm aware of, no.
Q Okay. And what was the practice with regard to the ident -- with regard to the documentation of tentative identifications?
A They were considered non-identifications and I -- and documented as such.
Q Okay. And when you say they were documented as non-identifications, was the fact that the person was tentative about their identification documented?
A Yes.
Q In other words, the practice was to document a statement about their lack of confidence in the identification; is that right?
A Correct.
Q Okay. And during this period from '86 to 1998, what was considered a tentative identification?
A Anything less than 100 percent.
Q Okay. Okay. Now, if I understand correctly in this time period, detectives were not trained to ask

Page 247

witnesses if they were 100 percent confident in their identifications; correct?
A Correct.
Q Okay. In this time period, detectives were not trained to obtain a statement of confidence from witnesses; correct?
A Correct.
Q Okay. So tentative identifications would only occur if the witness themself volunteered that they were not 100 percent certain; Is that correct?
A Correct.
Q Okay. And if a witness commented that they were not 100 percent certain, what steps were detectives permitted to take to try to understand what that meant?
MS. ROSEN: Object to the form.
A Yeah. I'm not clear on what you're asking.
Q I'll re-ask it. If a witness volunteered a statement that -- indicating that they were potentially something less than 100 percent certain in identification, were detectives permitted to conduct follow-up questioning of that witness to assess whether or not it was tentative versus a positive identification?
A Well, I don't know if -- I don't know that I like the word "permitted" because there is no policy. So

Page 248

permission is I don't know is the best word. They could, I suppose, conduct a follow-up. But at that point, the -- the identification has been made or not made. So I'm not sure what you would -- what the goal of having follow-up questions would be if the person couldn't make an identification.
Q Okay. So let me break that into its components. So if a witness volunteered some information that suggested they may or may not be 100 percent certain in their identification, there was no policy that said detectives could or could not conduct any follow-up statements or questions to the witness; correct?
A Correct.
Q Okay. And then as a matter of practice, it was really up to detectives, whether or not they were going to do any further follow-up with the witness about what that identification was.
MS. ROSEN: Objection, form.
A Well, I -- I guess I would argue that your -- your question was what -- what I -- your wording was, what that I -- identification was. And -- and I would argue there was no identification. So there's really -- I'm just not sure why you'd have subsequent conversation --

Page 249

Q Okay.
A -- with the witness.
Q Okay. In other words, the practice was that if -- once the witnesses provided to you an indication of uncertainty or lack of certainty in their identification, that was expected to be treated as a tentative identification or non-identification.
A Yeah. It was treated as not an identification and anything -- any follow-up questions could be -- I construed as you trying to influence the witness to change their mind. So I -- yeah.
Q Okay. So the expectation that detectives would not ask follow-up questions that might potentially influence the witness; is that fair?
A Again, there's no policy, but I -- in practice, I think once you -- once you got a less than 100 percent identification, then most detectives would've moved on.
Q Okay. Was there any policy to document how long it took witnesses to make identifications in the period from '86 to '98?
A How long, like, after looking at a line or -- or photo array -- how long it actually, no.
Q Okay. And it was not the practice during that period to document how long it took witnesses to make

identifications; correct?
A Correct.
Q Okay. Were detectives trained about documenting how long it took witnesses to make an identification?
A No.
Q Were detectives trained about whether the amount of time it took witnesses to make an identification was an indication of their level of certainty or confidence in the identification?
A No.
Q Were detectives trained that the amount of time it took a witness to make an identification was an indication of the accuracy or reliability of the identification?
A No.
MS. ROSEN: I have a belated objection to the assumption in that question that those things are related. So whatever that is, form or foundation but --
BY MR. SWAMINATHAN:
Q Okay. Let go back to the subject of live show- up which I promise I'm almost done with. We talked about the documentation associated with live show-ups and I -- just to be clear, the expectation was



that the person creating documentation of any live show-up would be the detective themselves; correct?
A I guess -- I guess the person that was conducting the show-up would document it in the appropriate fashion.
Q Okay. And that -- and the -- okay. So the person conducting the show-up was typically a detective; correct?
A Correct.
Q Okay. So the expectation then was that if the detective conducted a show-up, it would be that detective or his or her partner that documented the show-up; correct?
A Correct.
Q Were -- in homicide investigations, were scene officers permitted to carry -- carry out live show-ups?
A Scene officers. You mean patrol officers?
Q Yeah. Sorry, that was ambiguous. So in homicide investigations, were patrol officers or beat cars permitted to conduct live show-ups?
A I don't know that there's a policy regards -- in regards to who can do a show-up. Obviously, there's a policy of photo arrays and lineups, but I don't know that there's a policy for show-ups, and it has happened that patrolmen has conducted photo show-ups.



Q Okay. Patrol had conducted -- sorry. Go ahead.
A No. Is that -- is that -- is that extraordinary circumstance or -- yes. It's not -- it's unusual.
Q It was not typical practice for anyone other than detectives to conduct show-ups in homicide cases; correct?
A That's correct.
Q Okay. To the extent you can recall an instance when that occurred, an extraordinary instance, what were the circumstances?
MS. ROSEN: Object to the form.
A Police officers conducting show -- a show-up before the detectives arrived.
Q Okay.
A Still permissible, still in the time frame, but probably I -- I would consider it bad form.
Q Okay. What was the highest level of officer that was required to be present when a live show-up was conducted?
MS. ROSEN: Highest level of officer? Objection to form.
Q Yeah. Strike that. Let ask you differently. Let me ask it a better way. Was there any requirement



that any supervisor above a detective be present for a live show-up? Did you get the answer, court reporter, on the record? I -- it cut out for me a little bit?
COURT REPORTER: I did not. I didn't think he answered yet. Sorry.
A I said -- I said no.
Q I think we just cut out there in a second. Any restrictions on how many witnesses could view a live show-up at the same time?
A Well, again, there's no policy for show-ups, but obviously having multiple people look at a -- at a -- at a show-up at the same time would -- would be irregular and suggestive.
Q Okay. So the practice was the practice that detectives were not to have multiple witnesses view a show-up at the same time?
A Right; correct.
Q Okay. And was that the training for detectives as well with regard to live show-ups?
A In training for pre-service detective was very limited as far as show-ups are involved. You would've got that more of on-the-job through experience.
Q Okay. And once you had even a single positive identification and a live show-up, was it the practice to conduct additional live show-ups if you also had

other witnesses at the scene, or was the expectation that, now you've got probable cause to arrest, any future identification procedures should occur at the station?
A Great. That's a great question.
MS. ROSEN: Object to the form.
A Good question. Yeah, I would -- I would in practice after you get one show-up, the subsequent identification should come via photo array or -- and/or lineup.
Q Okay. And why was that?
A Establish probable cause with your one positive show-up and the subsequent identifications will be stronger and less suggestive using a photo array and/or lineup.
Q Okay. In other words, by doing a photo array and line -- lineup, those are less suggestive procedures; correct?
A Than -- than a show-up.
Q Then a live show-up; correct?
A Correct.
Q Okay. With regard to photo show-ups, I think you indicated -- we talked about the use of photo show-ups and that essentially it is -- there really are not circumstances in which photo show-ups are conducted in


stranger identification scenarios; correct?
MS. ROSEN: I'm going to object to the form.
A Yeah. I'm not sure what you're asking, sir.
Q Yeah. Let me just pull up Exhibit 4. Maybe I'm misremembering here. Let me see.
MS. ROSEN: Which one is this one? Is this the identification --
MR. SWAMINATHAN: This is the Detective Division pre-service training.
MS. ROSEN: Oh, I think it's -- yeah. Okay. Yep. What's the page number you're looking for?
MR. SWAMINATHAN: This is Foster 40. You have the Bates stamp version?
MS. ROSEN: Yep.
BY MR. SWAMINATHAN:
Q Okay. Let me know when you're there, Lieutenant.
A I am, sir.
Q Okay. All right. I'm looking -- this is the -- this is Foster 40 section on identification procedures as part of the Detective Division training lesson plan. And I'm looking in section B regarding photo identifications. Do you see that, sir?
A I do, sir.
Q Okay. And this is a section that's talking


about photo arrays; correct?
A Touches on photo arrays. Yes.
Q Okay. And this section, with the exception of number 10 that we talked about earlier, is focused on photo identifications; correct? Section B. I'm sorry. Is focused on photo arrays, not photo show-ups; correct?
A Yes, that's correct.
Q Okay. And in fact, in Paragraph 2 of this section, one that begins, "Whenever a suspect's loose photo is shown," do you see that?
A Yes.
Q These -- the training materials indicate that, "Whenever a suspect's loose photo is shown to a victim or witness, the photo will be placed in a group," do you see that?
A I do. Yes.
Q In other words, the training was that single photo show-ups or single-photo identification procedures were prohibited; correct?
A Yeah. I'm not seeing -- I'm not interpreting that the same way you are. This does not cover a single photo show-up as you're characterizing it. When somebody -- when a witness knows who the offender is.
Q Okay. So for purposes -- from a training perspective, there are two different scenarios, if I


understand correctly, where from a training perspective, the -- where you have a suspect who is familiar to the witness showing a loose photo just to confirm that you got the right person is permitted; correct?
A Correct. Yes.
Q Okay. And then in Paragraph 2, it's talking about stranger identification scenarios; correct?
A That's correct. It just says suspects' loose photos. Doesn't go into the knowledge the witness may have of the -- of the -- of the suspect.
Q Okay. But based on your experience, the way we should interpret Paragraph 2 is to understand that this is not talking about familiar faces. It's talking about stranger ID scenarios; correct?
A That's correct, sir. Yes.
Q Okay. And then the training that's in section B, Paragraph 2 is that detectives should not conduct photo show-ups or single-photo identification procedures involved in stranger scenarios; correct?
A Again, I think this is -- it's a case-by-case basis. I think there are some circumstances where you may have to, but this training is definitely pointing out or definitely alluding to that there are going to be issues and you're going to have to justify it. So in the most common of -- of circumstances, yeah, you should

have -- it should be a photo array or as they're describing, it's kind of poorly worded a suspect's loose photo should have -- be shown in a group presumably of other photographs.
Q Okay. And ultimately, if I -- is it fair to say that detectives were trained from the beginning, that if you're talking about a stranger identification scenario, you really should not be conducting single-photo identification procedures, unless there's some really unusual circumstance; fair?
A Correct. It's a kind of case-by-case basis, there are some reasons that you would, but generally speaking, you would -- you would do a photo array.
Q Okay. And detect -- were detectives trained on any of the circumstances in which you would conduct a single-photo identification procedure in a stranger scenario?
A Hold on a sec. Can you repeat that?
MS. ROSEN: Sorry.
A I'm sorry. Can you -- can you repeat that?
Q Detectives were not -- strike that. Were detectives trained on any of these circumstances in which a single-photo identification procedure could be conducted in a identification scenario?
A Obvious -- they were not trained in pre-



service. They would've learned some of those more unique circumstances on-the-job training, but as far as pre-service no.
Q Okay. So the pre-service training, was that basically, don't do that in stranger identification scenarios; fair?
A Correct.
Q Okay. And then on-the-job, what were the types of scenarios? Detectives were trained that single-photo identification procedures were permitted in single -- in stranger identification scenarios.
A Well, you know, like I said, there -- there's -- it's on a case-by-case basis and there's -- there's a million variables that you could throw in there, but a stranger is somebody -- I -- I think I used earlier. A guy you work with that you see every day, you may not know his -- his real name, but it's a person that you've seen every day. He might -- he may work in a -- four offices away. He's basically a stranger, but you know, in that circumstance, it -- it may be permissible, depending on some of the circumstances, to show that person a single finger, "Oh, this -- this is the person that you work with that you know as Skip." And that's the example that I used previously.
Q Okay. When -- if -- and when single photos



were shown to suspect -- strike that. When single photos were shown to witnesses, was that required to be documented?
A If it was relevant. Yes.
Q Okay. If -- let's start here. Was there any policy about showing single photos to suspects?
A Well, obviously there's some pre-service information regarding single photographs, but other than that, I don't believe there's any policy.
Q Okay. And so there was no policy prohibiting or permitting single-photo identification procedures; correct?
A Correct.
Q Okay. As a matter of practice, they were frowned upon in stranger identification scenario -- well, strike that. We've already covered the practice and the training. So let me just ask about documentation. As a matter of policy, there was no policy that set out the requirements for documentation related to single-photo identification procedures; correct?
A Correct.
Q Okay. And as a matter of practice, how were single-photo identification procedures documented?
A They would've been included in the



supplemental report that a detective showed a witness a single photograph.
Q Okay. And if a single photo was shown to a witness and it result -- and there was not a positive identification, was that required to be documented?
A Can you ask that again?
Q Yes. If a single photo was shown to a witness and it was -- and there was no positive identification, was that required to be documented by detectives?
A I don't know that there's any specific policy other than the photo array and lineup procedure orders that don't cover single photos. So I think in the strictest sense, they're -- they -- probably a single photo would not be covered under that order. But again, this is -- this may be something on a -- if the information is relevant, that detective may want to document and include in a supplemental report
Q As a matter of practice, were single-photo identification procedures documented in cases where there was a negative identification?
A Well, as a matter of practice, I think it's -- again -- it goes on -- it goes to a case-by-case basis. Some -- some detectives are, they document more than others. So I think it just has to do with each individual detective.

Page 262

Q Okay. So it – whether single-photo identification procedures that resulted in a negative identification were documented was essentially a case-by-case basis as decided by the detective involved; correct?
A Well, again, I partially agree with you. I don't know that the detective makes that decision. I – she certainly plays a role in that decision, but circumstances and the information that's relevant would also play a role in what gets documented and what does not get documented.
Q But ultimately the – that determination of what was relevant or not relevant is made by the detectives; correct?
A Well, not necessarily. I mean, relevant and not relevant is not determined by the detective. It's determined by what information is of evidentiary value.
Q And who makes that determination about the evidentiary value? Is it a supervisor or is it detective themselves?
A Well, it could – it could be both.
Q To the extent the detective involved the supervisor; correct?
A Correct.
Q Okay. Were detectives required to inform

Page 263

supervisors when they had negative identifications?
A I don't know if there's any requirement to run and tell your supervisor that you had a negative photo array or single photo, but I think in the normal course of a supervisor's duties, he would be kept abreast of the investigation. And – and he would, maybe not in real time, but he would know that there, in fact, was a negative single photo or negative photo array or any kind of negative identification.
Q Okay. So the practice was that in the day-to-day performance of their work in homicide investigations, the homicide detectives would keep their supervisors abreast of how those investigations were proceeding; correct?
A Yes. I would – I would say that's an integral role that a supervisor in the Detective Division serves or performs.
Q Especially in homicide cases; correct?
A Yes. Homicides are closely monitored, and the direction of the investigation is critical.
Q And the expectation was that detectives would keep supervisors abreast of any positive identifications or negative identifications they obtained during the course of a homicide investigation; correct?
A Well, I think the answer to that is some

Page 264

detectives are more forthcoming with information to their supervisors and some are not. And I think it's incumbent upon the supervisor to identify which detectives need to be more closely monitored than others.
Q Okay. And maybe a better way to put it is there was not a requirement that detectives inform their supervisors every time they got a positive or negative identification, but the practice was to keep the supervisors abreast of the results of the identification procedures; is that fair?
A That is fair. As long as you don't attach a time frame to it.
Q In other words, you may not do it right away. You might do it later.
A Correct.
Q But the practice was at some point you'll update your supervisors of the results of the identification procedures in homicide cases.
A At some point, yes.
Q Okay. And that's true, regardless of whether it's a positive or negative identification; correct?
A Yes, that's correct.
Q Okay. And that's true regardless of whether the positive or negative identification occurs in a live

Page 265

lineup, photo array, single photo show-up, live show-up, whatever it is; correct?
A Every aspect of a homicide investigation is monitored by a supervisor in the Detective Division. So yes, you're correct.
Q Okay. And I missed one. That's also true of gang books or photo book procedures, too; correct?
A Well, a Detective Division supervisor wouldn't be monitoring a gang book or photo or – or – or any kind of gang element. That would be done by the gang specialist supervisors.
Q But I thought you said earlier that the gang book procedures, the detectives would have to get the gang books from the gang specialists, but the detectives ultimately would conduct the gang book procedures, or they would delegate it to a gang specialist; correct?
A Correct.
Q Okay. So then if – then once the gang procedure was – the gang book procedure was conducted either by the detective or the gang specialist they delegated to, the detective would, of course, be informed of the results of that gang procedure, positive or negative; correct?
A At some point, yes.
Q Okay. And then the expectation was, just like

any other identification procedure, that the detectives would keep their supervisors abreast of the results of those gang procedures; correct?
A I understand what you're asking now. Yes, that's correct.
Q Okay. All right. All right. Let me move to -- let me ask you a couple more questions about photo show-up or photo – single-photo identification procedures, I think is what you – what you called them. Were detectives permitted to do single-photo identification procedures, basically showing a single photo to a witness before a lineup?
A Before a lineup?
Q Yes.
A What's the time – what's – I mean, again, it's a case-by-case basis, but I think you have to be more time-specific. Are – are we talking about three days before the lineup or three minutes before the lineup?
Q Yeah. If you have somebody in custody and you – and they're essentially, you could – you have the ability to conduct a live lineup. Okay? Once you're in that scenario where you're in position to be able to conduct a live lineup, because the persons in custody, is it permitted to show a single photo of that suspect


to a witness who could view that lineup?
A I don't know that there's any policy that you shouldn't, although I think in the lineup general order, it does talk about keeping witnesses separated, but I don't think it's any – there's anything specific spelled out as far as you cannot show them a single photograph before a lineup, but I'm not sure what purpose that would serve to do that.
Q So again, let's just break it down. As a matter of policy, there was no policy that prohibited detectives from showing single photos to witnesses before a live lineup when they've got somebody in custody; correct?
A That I'm aware of. You're correct.
Q Okay. As a matter of practice, was it permitted to show single photos to of your suspect, to a witness before a live lineup?
MS. ROSEN: Objection, form.
A Again, I think it would be on a case-to-case basis. It seems very unusual, but if – but I – you – I'd have to know the circumstances of –
Q If you have somebody in custody with the intention of conducting a live lineup, is it permissible to show them the – a photo that they selected of the person previously, you know, photo array, for example?


MS. ROSEN: Wait a second. A single photo or a photo array?
Q Yeah. Let me be clear. So often in the Chicago Police Department, you agree with me in homicide investigations, detectives would get a positive identification from a witness of their suspect in a photo array, and then they would subsequently conduct a lineup of that suspect; correct?
A Correct. Yes.
Q With the same witness; correct?
A Yes.
Q Okay. Now in those – in that scenario, was it permissible for the detective once they brought the person to the station, they're going to have them view a lineup to show them the photo from the photo array of that single suspect that they had previously identified.
A I understand what you're asking. I don't know that there's any policy violation, but I can say that I've never seen that done before.
Q And –
A I don't know what purpose it serves, but again, there could be a circumstance that I haven't thought of that would do that.
Q Would you agree that is contrary to practice?
MS. ROSEN: Contrary to what? You broke up.


Q Practice, general practice.
A I would agree that it's unusual.
Q Okay. And would you agree that if a single photo of the suspect was shown to a witness before the live lineup, that it would taint that lineup?
MS. ROSEN: Object to the form.
A Well –
MS. ROSEN: And beyond the scope of the 30(b)(6) notice. He's not here to opine about taint.
A I would argue that in your scenario that the - - the lineup – viewing of the lineup would already be tainted by your own argument, because they've already looked at a photo array and made an identification.
Q Okay.
A So it's kind of a moot point.
Q Okay. So the original photo array identification of the suspect taints the subsequent live lineup procedure, where that suspect is the only person that's the same from the photo array; is that fair?
MS. ROSEN: Objection. Beyond the scope of the 30 B6 notice. He's not here to opine about what constitutes taint in an identification procedure.
BY MR. SWAMINATHAN:

Page 270

Q Go ahead.
MS. ROSEN: Beyond that. You can answer the question.
A So I was – I was speaking about the scenario you gave me, and – and this is in which this witness looked at a photo array and has already made an identification. And now he's being shown, or she's being shown a single photograph just prior to a lineup. And earlier you – you alluded to the fact that lineups already tainted and that's – that would be my answer, is your answer is the lineup is already tainted apparent – according to you.
Q Well, I'm not – it's not about according to me. I'm asking you. For example, was it – I mean, we were talking about, what was the permitted set of practices? So was there a practice that you could show single photos of the person who's already been identified from a photo array after you've gotten a positive identification from the photo array?
MS. ROSEN: Objection, asked and answered.
A Again –
MS. ROSEN: Now you're going back to what you – where you started before you got to the opining about taint. So objection asked and answered.
BY MR. SWAMINATHAN:

Page 271

Q Go ahead.
A Again. I think that's a – it would be on a case-by-case basis. Would take – there would – there could be some unusual set of circumstances where that would be done. I – it – I would – the only thing I would answer that is it – it appears unusual.
Q Okay. Was the practice to try to avoid having a witness view the suspect more times than necessary in order to avoid taint or suggestiveness?
MS. ROSEN: I'm sorry, could you read back the question?
Q Was the practice to avoid having a witness view the suspect more times than necessary in order to avoid taint or suggestion?
MS. ROSEN: Objection to form.
A So "as necessary," using your words, is kind of subjective. I – I think an experienced detective likes having multiple layers of identification. So I don't necessarily know that the lineup is painted in my opinion. And again, the practice would be for detectives to obtain accurate, authentic identifications, so the right person is being identified.
Q Okay. And steps – and I think you testified earlier that because detective's goal is to get to the

Page 272

truth, not just get an arrest, they're going to take steps to try to mitigate things that will reduce the risk of a false identification; correct?
A Correct. Yes.
Q Okay. And one of the things that they do to try to do that is to try to create photo array procedures, and lineup procedures that have fillers that look similar to the suspect, for example; correct?
A Correct.
Q Okay. And would you agree with me that another thing – another – something that could be non-mitigating, that could actually create suggestion or taint in a lineup, would be if you show a picture of the suspect to the witness before they go into the lineup?
A So again, I don't know what the circumstances are and I suppose there could be a circumstance where you would do that. It's unusual.
A It's unusual, but not prohibited by policy.
Q Okay. And were detectives trained that they should not show photos of the suspect to the witness before an identification procedure because it could taint or reduce the reliability of that, or accuracy of that procedure?
MS. ROSEN: Objection, asked and answered, and foundation to the premise of the question, but you

Page 273

can answer.
A The detectives are trained to obtain, if possible, accurate, authentic identifications.
BY MR. SWAMINATHAN:
Q Okay. Were detectives trained about conducting photo arrays or live lineups in which everyone was a suspect?
MS. ROSEN: Object to the form.
A You're going to have to run that by me again, sir, please.
Q In other – yeah. In other words, could – were detectives, were detectives – under policy, could detectives conduct a photo array, for example, in which everybody was a potential suspect?
A Well, there's no policy on that, and I suppose chronology would weigh, would be a factor here. Because if there's been nobody identified and you're showing a photo array, everybody is a possible subject – or a suspect, I'm sorry. So I guess in your scenario, with the limited information you're providing me, that it's possible that everybody's a suspect.
Q So was there any – is there any policy that - - as I understand, there was no policy that prohibited detectives from conducting photo arrays in which all of the members of the photo array were people who were

potential suspects.
A Again, I don't think there's a policy violation, I think it's a matter of chronology. If there's nobody identified, then everybody's a suspect, and I don't see an issue there.
Q Okay. And so as a matter of practice, it would be appropriate for a detective to conduct a photo array in which everybody was a suspect?
MS. ROSEN: Objection to form, incomplete hypothetical.
A Again, I think it's a matter of, is there somebody been identified? The circumstances are so broad here, I don't know. I know that the policy says ideally you'd like to have four fillers for every suspect, but again, I don't -- you're -- I just -- I'm not really completely clear of what you're asking. So if there's been nobody identified, every -- if you don't know, if you're just taking a shot in the dark on a photo array, then everybody's a suspect.
Q So that, I mean, maybe that's another way to think about it. Let's say you've got a scenario where you got a detective who says, "Hey, we have information that suggests the person is a six-foot-tall Latino who's either a Spanish Cobra or an Imperial Gangster." Those are the two gangs we suspect, okay, and you've got some


description information that's pretty specific, tall guy, tall Latino guy, that he's in one of these two gangs. Could you create a photo array of known members of the Spanish Cobras and Imperial Gangsters who are six-foot-tall Latinos who match the description?
A You're holding up your hand like you're showing five pictures. Are you saying there's five pictures, or could I, in theory, show 55 pictures of Imperial Gangsters that fit the gender parameters of the description?
Q Yeah, let's start with what is typical of a photo array, which is something like 5, 6, 7, 8, 9 kind of photos. Do you agree with that?
A Yeah, five pictures is typically a photo array. I guess my question to you would be, how do you determine which five pictures to put in? I would think it would be -- yeah, which five pictures do you put in?
Q Yes, and that's my question. The five pictures, that's my que -- my question is the hypothetical is five question -- five pictures are put in, all of whom are people who the detective believes could have committed the crime, because they're members of the gangs they suspect and they fit the description. So that's essentially five people who are suspects: right? If any one of those people is identified, any


one of them would now be essentially somebody who could be arrested and subjected to interrogation or live lineups; correct?
MS. ROSEN: Object to the form, incomplete hypothetical. If you can answer, go ahead.
A This -- yeah, I don't have enough information. I don't -- I don't -- yeah, it's just not enough information.
Q In that example I just gave -- I'm sorry. In that scenario, what I've just described, it's different than a scenario in which you have fillers; right? Because a filler is -- a filler would be somebody who you know if the witness identifies that person, it's going to be a negative identification; correct?
A Correct.
Q In the scenario I've given you, any identification is going to be a positive identification; correct?
A Um --
MS. ROSEN: Never mind, go ahead.
A Not necessarily. I think that -- yeah, I think that's going to be some -- there's going to be a little more work required, far as if there is an identification based on your scenario, that that's, in fact, the offender. I think you're still -- you're a


ways away from going and getting him and subjecting him to a live lineup, as you termed it.
Q Okay. So in a --
MR. ENGQUIST: When you have a quick second, will I, can I take a quick break? I got to take care of a couple things, since it's getting close to five.
MR. SWAMINATHAN: Yeah, you want to take a break right now?
MR. ENGQUIST: Yeah, that'd be great.
MR. SWAMINATHAN: Yeah, okay.
MR. ENGQUIST: For five minutes.
COURT REPORTER: We're off the record, the time is 4:52 p.m.
(OFF THE RECORD)
COURT REPORTER: We are back on the record for the deposition of Lieutenant John Foster being conducted by video conference. My name is Sydney Little, today is June 29, 2022, the time is 4:58 p.m.
BY MR. SWAMINATHAN:
Q Okay. Let's take a look at Exhibit 4. Sorry, let's take a look at Exhibit 7. All right. This is General Order 88-18, which applied for the period from 19 -- of 1988 through 1998, in the time frame relevant

to this deposition; correct?
A That's correct.
Q Okay. And if you look at section G of this policy, it says, I think it is the second sentence, "When more than one suspect is placed in the lineup, the lineup ideally should consist of at least four non-suspects, in addition to the number of suspects in the lineup." Do you see that?
A I do, yes.
Q Okay. So at least with regard to lineups during this time period, an all-suspect lineup was prohibited by policy; correct?
A That's correct.
Q Okay. With regard to photo arrays, there was no prohibition on all-suspect photo arrays, because there was no policy in this time period; correct?
A Correct, I can see there's no policy.
Q Okay. Okay. All right, let's take a look at -- this is Exhibit 4 again, and again, this is the Detective Division training from 1996. Are you aware of any differences or changes in the training around identification procedures that were provided to detectives prior to 1996, in the period from 1988 to 1996?
A What's the Bates number you're -- you've got



up on the screen?
Q Yeah, this is Page 40 of the document, but really, my question is as to this entire document. We talked earlier about the fact that this Detective Division training manual is the training lesson plan from November of 1996; correct?
A Correct.
Q Okay. So this Exhibit 4 gives us information about what the training was that was conducted in 1996, and is it your understanding that this is consistent with the training that was provided through 1998, the end of this time period for this deposition?
A Yes.
Q Okay. And then you're designated to testify about the training, with regard to identification procedures, for the entirety of this period from 1986 to 1998; correct?
A Correct, yes.
Q Okay. So are you aware of any differences in the training regarding identification procedures that was provided to detectives prior to November of 1996?
A Well, I reviewed a few orders, and I do remember there being -- the differences are very nuanced, but there was something about documenting extraordinary circumstances, it's in and out of orders,



but that's the only thing of any kind of substance that I recall of any kind of difference between the -- between the orders.
Q Okay. So put -- and so basically, there was some very limited differences between the order that existed prior to 88-18 and 88-18; correct? You want me to say that again, was that confusing?
A I think you said the same order twice.
Q In the period from 1986 to 1998, there were basically two applicable lineup policies; correct? There was 88-18, which applied after 1988, and there was 83-5; correct? That's Exhibit 6 that we looked at earlier; correct?
A Yes.
Q Okay. And in terms of the requirements of those two policies, would you agree with me those two policies are very similar?
A Yes.
Q Okay. And what difference, if any, is there, in terms of -- substantively in terms of those, between those two policies, the policy before 1988 and the policy after?
A Yeah, I -- the only thing, like I said, I can recall is that there's a -- there's something in there about extraordinary circumstances or documenting



something, an unusual circumstance, but other than that they look very, very similar.
Q Okay. And then in terms of the training associated with these policies, we've -- now I'm going to pull Exhibit 4 back up again here but Exhibit 4 is the training that was provided in 1996, and my question for you is obviously you're designated as to the time period of 1986 all the way through 1998. So are you aware of any different training that was provided to detectives with regard to identification procedures in this period from 1988 through 1996, when this training was provided?
A I am not.
Q Okay. And so is it your understanding that the training that we're looking at here in Exhibit 4 about identification procedures for Detective Division, for detectives, is consistent with the training throughout the period from 1988 to 1996?
A Yes. As best of my knowledge, it's similar, yes.
Q Okay, all right. And so looking at this Exhibit 4, go back to that Page 40, approximately where we were before. Yeah, Foster 40. You see where -- all right, do you see where I am?
A Yes.

Page 282

Q Okay, all right. Looking again at section B on photo identifications, again, just to be clear, this training and the information contained in this training essentially reflects the training that was provided to detectives throughout the period from 1988 to 1996; correct?
MS. ROSEN: I object to the form. I think you said '88 to 96, and I think you meant --
MR. SWAMINATHAN: I'm sorry, let me correct that. Thank you.
MS. ROSEN: 88 --
BY MR. SWAMINATHAN:
Q The information contained in this training packet in Exhibit 4 reflects the training that was provided to detectives over the period from 1986 to 1998 regarding ID procedures; correct?
A That's correct, yes.
Q Okay. And looking at Paragraph 1 of section B, it says, "Photographs of criminal offenders or suspects are an invaluable investigative aid to detectives." Do you see where I'm looking?
A Yes.
Q Okay. It says, "However, their value can be abused, and the identification and arrest that follow will be thrown out of court." Do you see that?

Page 283

A I do.
Q What was the training for detectives about the ways in which their value can be abused?
A Well, I would -- my feeling would be that they could generate unduly suggestive photo arrays, which would, you know, make them too suggestive, and definitely erodes their authenticity and their value.
Q Okay. In other words, detectives were trained that -- really, what you talked about earlier, detectives were trained that if you don't do these procedures the right way, you could end up with positive identifications, but not necessarily accurate positive identifications?
A Correct.
Q Okay. And so really, in Paragraph 1, what it's talking about is detectives were trained that while photo identification procedures can be a useful tool at getting to the truth, they can result in errors if they're not done properly; is that fair?
A Yeah, I would say that's fair.
Q Okay. And would it be fair to say, based on your experience, that in this period from 1986 to 1998, it was understood by supervisors of detectives that it was important to conduct photo identification procedures in a way that wasn't suggestive, in order to ensure you

Page 284

were getting the right person?
A I think in any identification procedure that you conduct; you don't want it to be unduly suggestive, and to protect the integrity of the identification.
Q Okay. And in your experience, was it understood within the supervisory staff, you know, sergeants, lieutenants, and commanders of detectives, that there were risks to photo identification procedures if they weren't being done the right way?
A Risks, as far as what?
Q Risks, as far as getting inaccurate identifications, if they're not done properly.
A Yeah, I think if a photo array's, you know, unduly suggestive, then it -- you could lead -- it could lead to an identification that's not, you know, authentic.
Q Okay. And essentially there was, as it says here, there was an understanding within the command staff of sergeants, lieutenants, and commanders that these photo identification procedures could be abused if they weren't done correctly; is that fair?
MS. ROSEN: Object to the form.
A I think that the -- yeah, I think that supervisors are there in the Detective Division to ensure that the policies are being followed so that the

Page 285

ultimate goal to find the truth and find the right person that committed a crime are -- that's the end goal.
Q In your experience in the period from 1986 to 1998, did homicide detectives' supervisors know the policies that applied to homicide detectives?
A Yes.
Q Did the command staff, commanders, lieutenants, and sergeants, supervising homicide detectives understand why those policies existed?
A Yes.
Q And did they understand that when those policies were not being followed, it could result in false identifications or misidentifications?
A Yes.
Q And did those commanders, lieutenants, and sergeants want to ensure that proper identifications, accurate identifications, were being made, rather than just closing cases?
A Correct.
Q And in your experience, did that command staff take steps to monitor the overall process of identification procedures in these homicide divisions to ensure that the policies were being followed, in order to ensure that the processes weren't being abused?

Page 286

A I think the role of a supervisor in the Detective Division is to monitor the investigation, all aspects of it, not just the identification procedures, to ensure the integrity of the investigation. That's one of the primary roles of the supervisor.
Q Okay. And ultimately, is it your belief that these -- that the sergeants, lieutenants, and commanders -- strike that. Ultimately did the sergeants, lieutenants, and commanders, in this period from '86 to 1998, understand the risks or possibility of abusing identification procedures if they weren't being done correctly?
MS. ROSEN: I'm going to object and say this is outside the scope of the 30(b)(6) notice. Understanding of sergeants and above is not -- is outside the scope, but you can answer.
A I'm unclear as to what you are characterizing as risks.
BY MR. SWAMINATHAN:
Q Yeah, and maybe I shouldn't, maybe "risk" is the wrong word. We should just use what's in the document, I think that's probably more fair. In this time period from '86 to 1998, did sergeants, lieutenants, and commanders understand that these identification procedures could be abused if they weren't being done properly?

Page 287

MS. ROSEN: Abused and the identification and arrest that would follow would be thrown out in court, if we're going to be use the language of the document.
BY MR. SWAMINATHAN:
Q Go ahead.
A Yeah, so the supervisors are aware that not following proper procedure could result in identification of the photographs being abused, sure.
Q Okay. Now with regard to -- let's look at Paragraph 3 of the document, I'll move on. Paragraph 3 is training on the idea that the photos that are shown as part of a photo array procedure should include fillers that match the same physical characteristics of the suspect; correct?
A Correct.
Q And that steps should be taken to ensure that whenever photos are shown, the suspect's photo is not different in kind from the photos of the fillers; correct?
A Correct.
Q Okay. And ultimately these are steps that are listed in Paragraph 4 to ensure that the photo array is not suggestive or doesn't lead the person to be more likely to select only the suspect; correct?

Page 288

A Correct.
Q Okay. And same thing with Paragraph 4 and five, those are paragraphs that provide training for detectives about various steps they should take, in terms of selecting fillers to ensure that the lineup is fair; correct?
A Yes, that's correct.
Q Okay. And so it would be fair to say that detectives were extensively trained on the idea that when that there was an importance to the process of selecting fillers for photo arrays?
A Say that question again, please.
Q Yes. Would it be fair to say detective were well trained on the idea that it's important to be selecting fillers in the right way, to be thoughtful about selecting fillers when conducting photo arrays?
A Yes, I would agree with that.
Q And detectives were trained that if they don't select fillers that look similar to their suspects, it undermines the value of their photo array procedure; correct?
A Not only that, it would be -- it would be subject to a motion in criminal court, and it could be lost, it could be quashed.

Page 289

Q Okay. And ultimately, were detectives trained that these types, you know, what fillers you put into a photo array can itself result in suggestion that a detective doesn't even intend to have happen? In other words, it's easy to be suggestive, even without intending to?
MS. ROSEN: Object to the form.
A Sounds to me like you're talking about implicit bias.
Q No, and I'm not intending to talk about implicit bias. I'm just saying what this -- would it be fair to say that part of what this training is teaching detectives is that photo array procedures can be suggestive for a witness, even if the detective is not deliberately trying to be suggestive to a witness?
MS. ROSEN: Object to the form.
A Yeah, I'm not -- you're confusing me, but okay.
Q Let's move on. Let's do move on, let's move onto Paragraph 6. Paragraph 6 says that "Photo spreads will be shown to victims and witnesses separately and independently. After one identification is obtained, no further person should be allowed to view the photos." Do you see that?
A I do, yes.

Q Okay. And so can you explain for us what the training is there that detectives are being provided in Paragraph 6?
A So I think what's going on here is -- again, not worded as completely as well as it could have been, but when you show five photographs for -- to maintain that number, and somebody identifies those five photographs, they would sign these at the front or the back of that picture that they're identifying. At that point, those five photographs should be inventoried, and you use a new set of photographs, because the one picture that's been identified already has a signature on it. So that's, I think, that's what they're talking about there.
Q Okay. So was it the -- so you're identifying a practical concern, which is that once you've got a photo that's got a -- some writing on it, you don't want to use that same set of photos; is that right?
A Correct, that would be suggestive.
Q And in fact, the photos should be inventoried once they've been shown to a witness; correct?
A Correct.
Q Okay. And -- but isn't it also true what this paragraph is talking about is the idea that once you've got a positive identification from a photo array, you



typically have probable cause to arrest that suspect now; correct?
A Once you have one identification from a photo array, you would have probable cause to arrest, yes.
Q Okay.
A Yes.
Q And was it -- wasn't it the typical practice that once you've got a positive identification and you can arrest a suspect, that you shouldn't conduct additional photo arrays, but instead you should conduct -- subsequently, you should conduct live lineups?
A I think that was a decision that the detective would make based on a number of factors that has to do with the first person that made an identification. So my answer would be on a case-to-case basis, based on the circumstances, you may show multiple people photo arrays.
Q Okay. And so for example, if the first -- if you -- if the first person is shown a photo array and they're tentative about their identification, would that be a reason that you would conduct subsequent photo arrays?
A That would definitely be a reason, because the tentative ID, as we spoke about, is not an identification.



Q Okay. So in other words, it wouldn't be -- in that scenario, it wouldn't be sufficient probable cause, so you'd need to show a subsequent photo array before you could bring somebody in for a live lineup; correct?
A Correct, sir.
Q Okay. And putting aside unusual scenarios, if you have a true positive identification, detectives were trained, in Paragraph 6, that once you've got a positive identification in a photo array, you should stop conducting additional photo arrays; is that fair?
A No. What it says is you should not use -- after one identification is obtained, no further person should be allowed to view the photos, the photos being that set of five. You should use a new set of five. It doesn't say anything about not doing another photo array.
Q Okay. Other than the scenario in which you have a positive identification -- strike that. Other than the scenario in which you have a tentative identification in the initial photo array, what are other scenarios in which detectives would conduct additional photo arrays in lieu of a live lineup?
A We've talked about this, but I'll expound on it for you a little bit. In gang cases where you know that you have young witnesses that are going to flip



five years later at trial, and you want multiple layers of identification, you would show them all -- an experienced detective would show them all photo arrays and show them all lineups to get several layers of identification. If you have an elderly witness and you're concerned about him no longer being on the face of this earth, you may show another photo array to a younger witness. There could be -- you could have a chronology issue. You can't find a witness and one comes in, and that -- so there is a multitude of reasons why you would show more than one photo array, just to point out a few scenarios like you asked me to.
Q Okay. So is your testimony that in gang cases, it was more common to show photo arrays even after the initial photo positive identification in a photo array?
A I guess my testimony is that an experienced detective would want as many layers of identification as he could possibly get, in order to put the right person in jail.
Q Was there any policy that instructed detectives that they should not conduct additional photo arrays once they've gotten an initial positive identification in a photo array?
A No policy that I'm aware of, sir.

Page 294

Q Was there any policy that instructed detectives that once you've obtained a positive identification in a photo array, that undermines the reliability of any subsequent live lineup?
A There's no policy that -- in that regard, no.
Q Was there any training that a photo array identification undermines any subsequent live lineup identification if the only person that's the same is the suspect?
MS. ROSEN: I'm going to object. Asked and answered.
A No, sir.
Q Okay. Looking at the information in the margins in Paragraph 6, do you see it says, "Remember that it is difficult for a victim or witness to make -- " let me -- I'm losing my train. Sorry, let me re-ask my question. You see where I'm looking in the margin there, on the right side?
A I do, yes.
Q Okay, all right. So detectives were trained in the period from 1986 to 1998, that it was difficult for victims or witnesses to make positive identifications from photos; correct?
A Correct. That's what it says, yes.
Q Detectives were trained, in the period from

Page 295

1986 to 1998, that often victims or witnesses viewing photo arrays would make tentative identifications; correct?
A Correct, yes.
Q Okay. And is that consistent with your experience?
A No.
Q In your experience, was it common to have witnesses say that to make some identification, make a tentative identification in a photo array and indicate that they could be more sure if they saw a person in a lineup?
A I think the more likely scenario would be for somebody to not be able to make an identification, and then ask if they could look at a lineup when the offender was placed under arrest. That seemed, in my experience, would be the more common scenario.
Q Okay. In the period from '86 to 1998, as a matter of practice, how common was it for detectives to get positive identifications in photo array procedures?
MS. ROSEN: Object to the form, and outside the scope of the 30(b)(6) notice.
A I don't have any statistics for how often you would get a positive photo array.
Q Did detectives get any training on how often

Page 296

they could expect to get positive identifications in photo arrays?
MS. ROSEN: Objection, form.
A No.
Q And to the extent there was any training about how often there would be positive identifications, is there anything you're aware of, other than this guidance in this document, indicating that most of the time victims or witnesses will indicate being tentative about an identification?
MS. ROSEN: Objection, form.
A Can you ask that question again?
Q Yeah. The question is: Are you aware of any other guidance, other than that guidance on the right side of Page 41?
A Yeah. No, I'm not.
Q Okay. And it says that in Paragraph 8, detectives have -- most detectives have the person identifying the suspect's photo sign the back of the photo and place the date and time of the ID on the back. Do you see that?
A I do, yes.
Q Okay. Was that the typical practice?
A Typical practice was, have them sign the photograph. Some people did it on the front, some

Page 297

people did it on the back. Date and time was something that was, you know, done and not done, too. But the signature always was the big thing either, either on the front or back of the photograph.
Q Okay. And it was not required as a matter of policy; is that right?
A The signature?
Q Yeah, having someone sign the back, yeah.
A Not as a matter of policy, no.
Q Okay. Looking at Paragraph 11, can you tell me what Paragraph 11 means? I do not understand it.
A I think what it's saying there is don't bring a person in that does not have a photo -- so if you haven't been arrested at that point in time that we're talking about, there was no way to get a photograph.
Q I see.
A So if you did not have a prior arrest, then getting a photograph would've been next to impossible. And what they're saying is don't bring them in, don't arrest them, don't detain them, take a Polaroid, and then try to show it to somebody, because that would be an improper identification. That's my -- that's my sense of it.
Q Okay. All right. Looking at Page 44 of this, which involves special circumstances, let's see. This

is Foster 44; do you see the special circumstances section?
A I do, sir.
Q All right. And this talks about various special circumstances involving blind victims, masked offenders, and so on. Do you see that?
A I do, yes.
Q All right. So detectives were trained, in the period from 1986 to 1990, that blind victims could conduct lineups based on touch and smell. Is that true?
A That's correct, yes.
Q Is that something you ever did?
A No.
Q Detectives were trained, in the period from 1986 to 1998, that lineups could be conducted with masked offenders; correct?
A Correct.
Q And what were they trained on about how that could be conducted?
A Well, I think it -- I think it goes to are they fully masked, are they half-masked? That would be the first thing, and then at that point you could do a voice lineup. Like, let's say a robbery, and the offender said, "Give me your wallet," or something. And you could have them, each the suspect and the four



fillers, say the exact phrase that the potential robber said. So again, I don't know how valuable some of these are, that would be up to the trier of fact to determine, but they are -- that was something that was done on rare occasion.
Q Okay. And in Paragraph 4, it talks about juvenile lineups; correct?
A Correct.
Q Okay. And the last sentence of that says, "A youth officer may be required by law. If not, it's probably a good idea to have a youth officer present anyway." Do you see that?
A I do, yes.
Q Okay. So pursuant -- so in the training that was provided to detectives about identification procedures with juvenile witnesses, they were not told whether or not it was required by law; correct?
MS. ROSEN: Object to the form.
A Yeah, I'm unclear what you're looking for there.
Q I guess what I'm unclear about is, are they -- this training, the training that was provided to detectives was, maybe youth officers are required, maybe they're not; correct?
A That's what it says, it may be required by



law, yes.
Q Okay. So detectives weren't provided guidance about whether or not the youth officer's presence was required by law; correct?
MS. ROSEN: Objection to the form, foundation and mischaracterizes the paragraph.
Q Go ahead.
A What's your question?
Q Why don't I ask this question instead? Let me -- let me move on. Detectives were trained that they should have a youth officer present when conducting lineups with juvenile witnesses; correct?
A Are you talking about in Paragraph 4 -- number four?
Q Yes.
A I don't see where it says they should. It said it may be required by law and if not, you -- it'd be a good idea, but I don't see where it says you should.
Q Yeah. So isn't that what that -- I mean, what is the training? Is the training ultimately, "Hey, our -- what we're suggesting to you as detectives is, we're training you. Hey, it's a good idea to have a youth officer present when you conduct a lineup with juveniles," correct? That was the training provided to



detectives.
A Correct.
Q Okay. And so is it fair to say that the -- was it the common practice of detectives to then follow this training and typically have a youth officer present when they conducted lineups with juvenile witnesses?
A I would say that it was probably a good idea, but as far as what they did in 1986 and 1993, I'm not sure what role a youth officer would play in a lineup. There would be no questioning going on at that point. So I'm not sure what the role of the youth officer would've been during a lineup. The only thing I can -- the only thing I can surmise from this is if it's a juvenile offender, and I think this is where this is going, it's a juvenile offender amongst four adult fillers. Then the youth officer would be there to protect the juvenile's safety. And I think that's what -- what they're trying to say here. Not very well, I may add.
Q So you're indicating that this is at -- this actually applies only when not the witness is a juvenile, but when the suspect is a juvenile.
A I'm reading it again. So -- because I want to give you the best, accurate answer I can.
Q Yeah, please do.
A You were look -- you were taking a different

take on it than I was. I was thinking that the juvenile was the suspect in the lineup and that the youth officer was there to protect the juvenile from four adult fillers. And I take from your question, you're interpreting as the juvenile is a – is the witness viewing the lineup? Is that correct?
Q Yes.
A Yeah. Yeah.
MS. ROSEN: Okay. Go ahead. If you have a follow-up question.
Q No, that's what I'm asking. Do you – what is the – I mean, you're the 30(b)(6) witness. I'm – it doesn't matter what I think. What matters is what you tell me. Is Paragraph 4 reference to juvenile witnesses or juvenile suspects in lineups?
A Juvenile suspect, juvenile suspects, sir. I didn't mean to interrupt.
Q Okay. No. You didn't interrupt. I think this is the same. Let's move on from that. Let's talk about live lineups and in the period from 1986 to 1998, we've established that Exhibit 7 captures the policy that was in place during that time period with the limited exception of 1986 and 1987, when there were some slight differences with regard to special circumstances; correct?


A Correct. Yes.
Q Okay. And so looking at Exhibit 7, it sets forth various requirements under the policy for the conduct of live lineups; correct?
A Where – where are you at, sir?
Q Just overall, this document sets forth various requirements about how live lineups are to be conducted and to be documented in the period from 1986 to 1998; correct?
A That's correct, sir. Yes.
Q Okay. Were there any other requirements in terms of what was required with regard to the conduct of live lineups that is not documented in this policy document?
A Well, this is the most on point order. I guess there would be a peripheral one – persons in custody. There's a – there's a – an order that covers the treatment of prisoners in custody that I suppose would be applicable to this. These people are in custody, presumably. So that would – that would be a peripheral order. Those are the only two I can think of right off the top of my head at 5:00 in the afternoon.
Q What is the relevance of that one that you're referring to about people in custody to the issue of lineup – live lineup procedures?


A Well, there – there's just a general order about the treatment of persons in custody. So these people – the suspects in custody, it would go to how he's being treated.
Q Okay. But putting aside how the person in custody's being treated, if we focus on just the live lineup procedures themselves, is there anything that provides any policy guidance about how the live lineup procedure's to be conducted other than the information contained within this policy document?
A Not that I'm aware of.
Q Okay. And let's just pause for a moment and talk about gang specialists. Did gang specialists conduct live lineup procedures in the period from '86 to '98 in homicide cases?
A No.
Q Okay. Could gang – would gang specialists sometimes assist in a live lineup procedures in the period from '86 to 1998 in homicide investigations?
A Yes.
Q Okay. In what way would they assist?
A Well, so what – what happens with a lineup is some – so a detective would go in with the persons viewing the lineup and he would walk into the room and – and conduct that lineup. But as – on the other side


of the window, there's four fillers and a suspect. And there's a detective in there or a gang specialist in there assisting with maybe making the suspect sit in a particular way or stand or come to the window. So that would be a role that gang specialists would play. He would assist in the lineup by being with the fillers and the suspect.
Q Would gang specialists be in the room with the detective who's conducting the lineup with the sus – with the witness?
A I suppose it's possible, but generally the detective – the detectives run the lineups and they would be with the witnesses because they would want to ensure the, you know, the – the integrity of the identification.
Q Detectives – because detectives conducted the lineups, it would be with the witness, there would be no reason for a gang specialist to be in the room with the witness; correct?
A Well, I don't know if I would agree – necessarily agree with that. There – there may be a – there may be, you know, the gang specialist may have a relationship with the witness and the witness wants him there as a – as kind of as a – as emotional support. So as long as the gang specialist understands his role,

Page 306

I don't -- I don't think that there's a -- there's not, there's not a policy violation, so he may serve a useful function.
Q Okay. Gang specialists would not be the ones talking to the witness and performing the procedure with the witness; correct?
A That's correct, sir.
Q Okay. And we talked about photo array earlier. As gang specialists, would they conduct photo array procedures in homicide cases?
A Under certain circumstances under the direction of a detective, they may conduct a photo array.
Q In other words, if the homicide detective expressly delegated that task to gang specialist.
A Correct. Yes.
Q And unless a detective expressly delegated photo array procedure to a gang specialist, they would not conduct photo arrays; correct?
A Not in a homicide investigation; correct.
Q Looking at this policy document, it's obviously a general order, which means it applies to all police officers; correct?
A That's correct, sir.
Q But in homicide cases, what you've indicated

Page 307

is only detectives are conducting these lineup -- lineups. So this policy really -- homicide cases really applies only to homicide detectives; correct?
A Correct.
Q Okay. I asked you about whether there were any other policies that set forth requirements for how live lineups were conducted. I'm going to ask you a different question about documentation. Are there any other policies that set forth how live lineups were required to be documented other than this policy?
A Not that I'm aware of, no.
Q Okay. And pursuant to this policy, what was required to be documented is set forth in Paragraph J of the policy; correct?
A That's correct, sir.
Q Okay. And so pursuant to the policy in effect, in the period from 1986 to 1998, detectives were required to document the date, time and location of the lineup; correct?
A Correct.
Q They were required to document, essentially, the detectives that conducted the lineup; correct?
A Correct.
Q They were required to document the name and address of each person who viewed the lineup; correct?

Page 308

A Correct.
Q They were required to document the name and address of each person present during the lineup, other than those detectives conducting the lineup; correct?
A Correct.
Q And that could include things like gang specialists who might have been assisting, or maybe a criminal defense attorney who might have been present or a parent might have been present; correct?
A Correct.
Q Gang -- the detectives were required to document all available information about each person participating in the lineup, such as their name, sex, race, age, height, weight, central booking, or IR numbers; correct?
A Correct. Yes.
Q Okay. And essentially they were -- what that is requiring them to do is identify to -- strike that. To document as much information they can about the identities of each of the people participating in the lineup; correct?
A Correct.
Q And that documentation about each of the people participating in the requirement was required under this policy, both for the suspect and for the

Page 309

fillers; correct?
A Correct.
Q Okay. And under this policy, detectives were required to identify the name of any person's identified in the lineup; correct?
A Correct.
Q Okay. Now, during this period of time from '86 to 1998, if the person identified in the lineup was a filler, that would not be documented; correct?
A That's correct.
Q Okay. Because during this time period, if a filler was identified, would this -- would the lineup be documented at all?
A Can you ask that again?
Q Yes. If a filler was identified in the lineup, in the period from '86 to 1998, was there a requirement that lineup be documented at all?
A I think we were photographing lineups -- negative lineups. Yes.
Q You were photographing negative lineups, you said?
MS. ROSEN: They said -- are you asking about documenting? (Inaudible).
Q I'm just asking about documenting. That's why I thought you said photoing. So I want to make -- let

re-ask it. In the period from '86 to 1998, if a witness selected a filler in a lineup, was that lineup required to be documented?
A I believe it was, yes.
Q Okay. And if the person selected a filler that would not be documented – that – the person – the filler who was identified would not be documented and instead it would just say that there was a non-identification; correct?
A You're going to have to say that again. You're going way too fast for me.
Q Yeah. I'll read it – I'll say it again. Paragraph 6 says, "The name of the person identified in the lineup is required to be documented." You with me so far?
A Yes.
Q Okay. And you agree that was the policy in the period from '86 to '98; correct?
A Correct.
Q However, that was interpreted in that period to mean only if the suspect was identified; correct?
A Yes.
Q Okay. Because if a filler was the person identified in the lineup that was not documented in the period from '86 to '98; correct?



A That was not documented.
Q Okay. If you look –
A Correct.
Q Correct. Okay. Under this policy –
MS. ROSEN: Can we take a short break where it's convenient, because he needs to break.
MR. SWAMINATHAN: Yep. I'll just ask these last three questions, then we'll take a break. Is that okay?
MS. ROSEN: Sure. Yeah.
BY MR. SWAMINATHAN:
Q Under this – under the policy, detectives were required to document the name, rank and star number of the person photographing the lineup; correct?
A Correct.
Q And during this time period, evidence technicians or forensic investigators would photograph lineups; correct?
A Yes.
Q Did detectives also photograph lineups themselves?
A I don't know if they were doing that in this time frame. I did read some – something that they were doing that. So I believe that in certain circumstances, if an ET was unavailable, a detective would take the



photograph.
Q Was it – in your experience, was it a common practice for detectives to take – to photograph lineups themselves in the period from '86 to 1998?
A That was on a case-by-case basis. My recollection is some detectives like to take the photographs and someone wanted an ET. So I think it was preference by the detectives.
Q Okay. Last two questions. And then we'll take a break. It was required in the period from an '86 to 90 – 1998 for detectives to document any comments made by counsel for the arrestee during the lineup; correct?
A Correct.
Q And "arrestee" references the suspect; correct?
A Yes.
Q Okay. And then finally, if there were anything – any additional information or unusual circumstances that occurred during the lineup, that was required to be documented; correct?
A Correct.
Q Okay. It identifies several examples there – strike that. If what occurred during the course of the ID – of the lineup was that a witness indicated



uncertainty or a lack of confidence in their identification, what they said about their lack of confidence was not something that was documented during that time frame; correct?
A Are you asking me a question or are you reading something, because I don't see it.
Q No, I'm asking you because I think we talked about that earlier; right? Statements of confidence or a level of confidence were not documented – were not required to be documented during that time period; correct?
A Correct?. Yes.
Q Okay. So Paragraph 9, when it talks about documenting additional information or unusual circumstances, it's not referring to statements about the confidence levels of witnesses; correct?
A That's correct. Yes.
Q Okay. All right. We can – we'll take a break now.
COURT REPORTER: All right. We're off the – we're off the record. The time is 5:44.
(OFF THE RECORD)
COURT REPORTER: We are back on the record for the deposition of Lieutenant John Foster being conducted by video conference. My name is Sydney

Little. Today is June 29, 2022. The time is 5:53 p.m.

MS. ROSEN: Can you tell me how much time we have on the record?

COURT REPORTER: We're at 6:07.

MS. ROSEN: Thank you.

BY MR. SWAMINATHAN:

Q Looking again at Exhibit 7. Under the policy of Exhibit 7, detectives were not required to document any instructions given by -- that they gave to the witnesses in lineups; correct?

A Correct.

Q As a matter of -- strike that. Were detectives trained that they were required to document anything other than what's contained in Paragraph J of Exhibit 7?

MS. ROSEN: Object to the form.

A No. This is -- this is the requirement policy-wise.

Q Okay. And as a matter of practice, did detectives typically document anything other than what you see identified here in Paragraph J of Exhibit 7?

A Not as a matter of practice, no.

Q Okay. Detectives, when they prepared their documentation of a lineup, they were to do so on



essentially supplementary reports or lineup reports; correct?

A Correct. There's a lineup supplementary report.

Q Okay. I think you said in the period from 1986 to 1998, there was no requirement for detectives to give any type of admonishment or instruction to a witness before viewing a lineup; correct?

A That's correct.

Q Okay. And there was --

MS. ROSEN: Objection, asked and answered.

Q -- and the practice was not to give any admonishment before having a witness view a lineup; correct?

A Correct.

Q Okay. And were there any -- was there any -- were there any prohibitions in the period from '86 to 1998 on what instructions a detective could give a witness before they viewed a lineup?

MS. ROSEN: Object to the form.

A I'm unclear what you're asking me.

Q Yes. In the period from '86 to 1988 were detectives told that there are any prohibitions on what they can say to a witness before they have them view a lineup?



MS. ROSEN: Objection, form.

A There was no policy. No.

Q Okay. Was there any policy guidance about whether or not -- about ensuring that the suspect didn't have restraints or any other indications that they were a person in custody during the course of a live lineup?

A I don't know if there's a Detective Division special order at this time, but obviously, you wouldn't have a suspect handcuffed while the other fillers were not handcuffed. So --

Q Okay. And in Paragraph G of this policy, the policy does require that detectives make efforts to try to have lineups in which the fillers look similar to the suspect; correct? I don't -- I didn't get -- we didn't get the answer.

A Yes. That's correct, sir. I'm sorry. Yes.

Q Okay. All right. And some of the categories that detectives are instructed under this policy to consider in terms of trying to create fillers that look similar to the suspect is to consider height and weight and hair and skin color; correct?

A That's correct. Yes.

Q Okay. And according to this policy, witnesses are not supposed to see the suspect with police officers in advance of viewing a lineup; correct?



A Correct. Yes.

Q Okay. And I mean, the policy specifically says that no suspect should be handcuffed during the lineup unless all of the other suspects -- subjects are handcuffed as well; correct?

A Correct.

Q Okay. And detectives were not required to have any supervisors with them when they conducted lineups; correct?

A That's correct.

Q And there was no super -- detectives did not need to have a supervisor approve the fairness of a lineup before they conducted it; correct?

MS. ROSEN: Object to the form.

A That's correct.

Q Okay.

MS. ROSEN: Sorry. There's some weird noise in my ceiling right now.

THE WITNESS: Sounds alive.

MS. ROSEN: It does sound alive.

BY MR. SWAMINATHAN:

Q Okay. Let's see. All right. Let's turn back to the subject of gang crimes.

A Okay.

Q And let's start with -- pull on some of these

other documents here. Sharing with you Exhibit 5, which is a document we previously marked. This is the pre-service gang specialist training; correct, sir?
A Yes.
Q Okay. This was a training provided in and around July of – sorry, in and around January of 1995; correct?
A That's correct, yes.
Q Okay. And you are designated to provide testimony for the City of Chicago about training for gang crime detectives on various topics for the entire period from 1986 to 1998; correct?
A Correct. Yes.
Q Okay. And so is the training contained within this training document consistent with the training provided to gang crime specialists throughout the period from 1986 to 1998?
A Yes. That's correct.
Q Okay. All right. And so the training that we see contained – strike that. Let's see. In homicide investigations, would gang crime specialists conduct interrogations of suspects?
A I'm – I'm sure it's possible that the gang crime specialists interrogated suspects in other than homicide investigations



Q In homicide investigations, would gang crime specialists interrogate suspects?
A You're including homicide investigations?
Q I'm saying only in homicide investigations. You're designated only as to homicide investigations. So let me focus just on homicide investigations. In homicide investigations would de – did – would detectives – strike that. In homicide investigations, did gang crime specialists interrogate suspects?
A No.
Q Okay. In homicide investigations when gang crimes officers did assist in homicide investigations; correct?
A Correct.
Q In the course of assisting in homicide investigations, gang crime specialists would not interrogate suspects; correct?
A Correct.
Q In the course of assisting in homicide investigations, would gang crime specialists interview witnesses?
A Sure. Yes.
Q Okay.
A At the behest of the detective.
Q Okay. And would – and when gang crimes



officers assisted in investigations by interviewing witnesses, would they sometimes rely on their knowledge of the various gangs and their relationship to people in gangs?
A Yes.
Q Okay. And would it be the case that gang crime specialists would sometimes talk to somebody who they know on the streets and say, "Hey, you know, who has information about this particular crime?" That was part of their role in assisting in homicide investigations; correct?
A Correct.
Q Okay. And in the course of doing that, they might speak to somebody who actually shares information with them about – that they happen to have about that underlying homicide investigation; correct?
A That's correct. Yes.
Q And when that occurred, what was the expectation of gang specialists when they received that information pertinent to the homicide investigation?
A I guess what you're asking me is they might – there might be a couple things that would happen there. They would either bring that person in and have him talk directly to the detectives, or they could communicate with the detective that they found somebody that has



information, and how does the detective want to proceed. Or third, and probably less common, they could documented depending on the year on a Patrol Division supplemental report or GIS reports.
Q Okay. But if that gang crime specialist speaks the witness obviously – and learns information in the course of trying to find out who may have information outside the presence of a detective, are they required to document that conversation that took place before they're able to bring that witness to the detective?
A Well, I guess I'm a little unclear what you're asking. So –
Q Yeah, in other words, what we were describing is a scenario where gang crime specialist is out talking to people he knows or has relationships with who's in the gangs, and in the course of doing so finds someone who comes to him and says, "Hey, here's this information I have," that turns out to be pertinent to the homicide investigation. So far a common scenario; correct?
A Yes.
Q Okay. So at that point, the ho – the gang crime specialist has now learned information pertinent to the homicide investigation from a witness outside the presence of any detective; fair?

A Okay. So far they're on the street. Sure.
Q Okay. All right. And so at that point, the gang crime specialist has now effectively conducted an interview and learned information about homicide investigation that no one -- no detective or anybody else has participated in learning that information; correct?
A Correct.
Q Okay. And so one of the things that gang crime specialists might do at that point is take that witness and take them over to go speak with the detectives; correct?
A Correct.
Q Okay. That initial interview that's already happened before the witness is now going to go speak to the detectives, was there a requirement that conversation, the pertinent information learned during that conversation be documented?
A No.
Q Okay. Was there any requirement that the gang specialist take notes of that interview -- strike that. Was there any requirement that that gang specialist create documentation of that interview in which he learned pertinent information?
A No.



Q Okay. Was there any policy that required gang specialists to document that pertinent information learned during the course of that interview?
A No.
Q And were gang crime specialists trained to document that information that they learned -- pertinent information they learned during the course of that interview?
A I'm not sure they were trained to, so I would say there was no policy to document that, and I don't necessarily know that they were trained.
Q Okay. All right. Let me just pull up Exhibit 5. Now I'm looking at Page Foster 113 of the training documents at Exhibit 5.
A Okay.
Q Do you see the section of the bottom entitled Detective Division, Youth Division, Organized Crime Division?
A Yes.
Q Okay. And in that section, it says, "Gang analytical program reviews daily major incident logs produced by the Detective Division," correct?
A Correct.
Q Okay. And then it says, "Personnel from this section," referring to the gang section, "are assigned



to the Detective Division liaison program." Do you see that?
A Yes.
Q And it references the idea that gang specialists would conduct follow-up investigations into gang related incidents; correct?
A Correct.
Q And that would include homicides; correct?
MS. ROSEN: Object to the form, foundation.
A So I've gone ahead and read this whole paragraph. And this is something that I referenced earlier about --
Q Yep.
A It says the commander would disseminate reports. I would -- I would interpret this as gang-related incidents, including -- includes everything, but homicides.
Q And just tell me where it says that, or why you interpret it that way?
A Well, it doesn't -- it doesn't say it, but why I'm interpreting it that way is because if -- if you don't interpret it that way, you're -- you're basically documenting a parallel investigation, which would be counterproductive. So my interpretation of this is that when they're assisting detectives on an -- in a homicide



investigation, either the gang specialist or the detectives are going to document, but not both, because it seems to be right for impeachment at trial, potentially.
Q Okay. And is that interpretation based on any experience you have personally?
A Yes.
Q Okay. And what is the personal experience you're relying on to say that in this section is not -- is specifically excluding homicide investigations?
A I think we've -- I think my experience has been when -- when you have multiple people documenting the same event, you get several different perspectives and sometimes those perspectives are appear -- appear to be in conflict when they're not necessarily. So -- and that in something that's -- is as scrutinized as a homicide investigation, there should only be one set of documents that are -- are, you know, relating the facts as they occurred.
Q Okay. Let's take a look at 114. This refers to the responsibilities of the gang analytical program. Do you see that?
A Getting there. Okay. 114.
Q Okay. Yep. And it references the kind of information that was gathered by the gang analytical

program. And then it says, "They will provide a written overview of street gangs operating in each of the submitting districts." Do you see that?
A Yes.
Q And then it says, "The written gang -- " this is the last paragraph. "The written gang overview by the gang analytical program will be produced on a weekly basis, giving an up-to-date overview on street gangs to the districts, allowing for a coordinated allocation of the department resources to combat the growing gang problem." Do you see that?
A Yes.
Q Have you ever seen a weekly gang overview?
A I have not.
Q Okay. Do you know what information is contained in the weekly gang overviews?
A I do not know that. I'm not sure anybody's ever seen one of those.
Q What do you mean by that?
A I under -- I'm a -- I'm familiar with what the analytical program did. They -- they're basically liaison to the districts, but I don't know that a gang overview was ever generated on a consistent basis.
Q Okay. Taking a look at Foster 188, do you see that?



A Yes.
Q Okay. This is a report of investigation form of the Chicago Police Department for the Gang Investigation Section; correct?
A Commonly known as a GIS. Yes.
Q Okay. So this is the GIS. And if I understand you correctly, when gangs -- between '86 to 1998, as we've talked about, there was a period of time when gangs was in Organized Crime Bureau and a time when they were not; correct?
A Correct.
Q Okay. But because you're testifying with this entire period from '86 to 1998, if I understand you correctly, the -- whatever documentation gang specialists were creating throughout the period from '86 to 1998, the form may have changed between the GIS form and the -- and another form, but basically what they were required to document was the same; Is that correct?
A So there's two different forms, the GIS they would've used when they were in Organized Crime. And -- and before that they would use the Patrol Division supplemental report, which is a Patrol Division report. But yes, in effect, what they were documenting was the same, the content was the same. It was the form that



had changed at some point in 1993.
Q Okay. And in -- I think you've provided some comments about, in what circumstances gang specialists would write a report of investigations. So my question for you is: When gang specialists filled out reports of investigations, those were -- those have to submitted to their supervisors, correct?
A Correct.
Q Okay. And to -- and you said there may be instances when, at the detective's discretion, the gang detective -- the gang officer chooses to write the report of investigation or rather than the detective writing a supplementary report; correct?
A Can you -- can you rephrase that for me?
Q Yeah. I think what you said earlier, if I understand your testimony, when a gang specialist learns information during the course of a homicide investigation, the gang specialists may orally communicate that information to a detective, or they may write their own report of investigation; correct?
A Well, I think that's almost accurate. So when the gang specialist would learn information, he may communicate it orally to the detective who would then document it, if it's relevant in his supplemental report. Or -- and I think that was the most common



scenario. Or much less often they would do a Patrol Division supp or a GIS report, depending on the time frame.
Q Okay. So in the instances when they would do their own documentation, it would be either on this form or the Patrol Division supplementary report; correct?
A Depending on what year it was; correct.
Q Okay. And then looking at -- let's see, it was -- is it Foster? I'm looking -- I'm going Foster 237 to 237.
A Okay, hold on. 236 -- thanks, Eileen. 36 [sic].
Q Nope, 235. 235. 235 to 236.
A Okay. 235.
Q Okay. And 235 is essentially for purposes of the training. It's an example of the kind of information that gang specialists would fill into their GIS form during the course of assisting in a homicide investigation; correct?
A So yes, this is an example. I assume it was used for training and it does list the offense code as homicide. So this is something for educational purposes that was created, that they would generate one assisting in a homicide investigation.
Q Okay. And so gang specialists were trained on

Page 330

the use of GIS forms during the time they were in the Organized Crime Bureau, they were trained on documenting information. They learned during a homicide investigation in a GIS form; correct?

A Again, if that's something that the detective wanted created, then that would've been done by this mechanism, otherwise it would've been done orally and incorporated into a Detective Division sub.

Q But I'm putting aside, I understand you're saying detectives are going to make that call whether they want to do it themselves or not, but the point is for gang crime specialists, they were trained on how to document information they learned during a homicide investigation in the GIS forms; correct?

A Yeah. They were trained on it. Yes.

Q Okay. And then this -- the -- this training here is training on how to document their pertinent information from a homicide investigation on a GIS form. But I think you've indicated they were similarly trained on filling out the supplementary report for Patrol when they were in that division; correct?

A Correct.

Q Okay.

COURT REPORTER: You have a half an hour. Sorry to interrupt

Page 331

MR. SWAMINATHAN: You said what?

COURT REPORTER: You have a half an hour left.

BY MR. SWAMINATHAN:

Q All right. Thank you. Okay. And so then to the extent a gang officer was requested to fill out one of those supplementary reports or GIS forms to document pertinent information they learned during a homicide investigation, that information would ultimately have to be passed on to the homicide detectives; correct?

A Correct.

Q Would that -- so the GIS form or supplementary report that a gang specialist would fill out when they provided information in a homicide investigation, would that report go up the chain through the gang section?

A Yes.

Q Okay. And then it would go up the chain through the gang section and then it would have to make its way over to the Detective Division; correct?

MS. ROSEN: Object to the form. Foundation.

A So the report would be approved by the gang section -- investigation section, and then it would be -- it would be -- then there's a mechanism in place to the detectives would eventually get it. Yes. Is that your question?

Q Yeah, that was my question. And so but

Page 332

basically the process of it getting to detectives, was through the supervisors in the gang section; correct?

MS. ROSEN: Object to the form.

A Well, the supervisor would sign off on it and then the commander or the commanding officer of the gangs would forward it on, if he deemed it appropriate.

Q Okay. And so essentially that determination was being made by the senior person in the gang section; correct?

A Correct.

Q Okay. And was there any policy document that set out the process for ensuring that these ROIs that applied -- that the GIS forms or supplementary reports that a gang specialist filled out that was pertinent to a homicide investigation would be -- was required to get over to the Detective Division?

A There was no policy that I'm aware of.

Q Okay. Are you aware of any training on that point?

A No.

Q Okay. To the -- so is it -- if I understand your testimony correctly, to the extent gang crime specialists were requested to fill out the GIS form or supplementary reform -- supplementary report form based on pertinent information they learned in a homicide

Page 333

investigation, those GIS forms and supplementary reports should be in the homicide file kept in the Detective Division; correct?

MS. ROSEN: Can you repeat the question? (Inaudible).

Q Yeah. In other words, you've indicated that these reports, supplementary reports or GIS forms that get filled out by gang specialists, if they related to a homicide investigation, they were supposed to get over to the Detective Division through the supervisory staff. You with me so far?

A Yes.

Q Okay. And when they got to the Detective Division, the place where they would go is the investigative file; correct?

A Correct. Yes.

Q Would they go in the permanent retention or record division file as well? Or would they just be in the investigative file?

A They would be in the investigative file.

Q Okay. All right. So when looking at the -- ultimately, if you wanted to see or get a copy of the -- any GIS forms or supplement reports filled out by gang specialists in a homicide case, the place to look is the investigative file; correct?

MS. ROSEN: Object to the form.
A Yes.
Q Okay. Let me just see here. Yeah. Hold on. Let me – can you go Foster 261?
A 261?
Q 261, yes.
A Okay.
Q Can you tell me what this form is? The identification – it's identified as a notification worksheet.
A Yeah, this is – I've seen this before. It's just basically an internal document notification form that kind of describes the crime that they're working on. So if you look at the top, it's got an incident, there's a UCR code and then victim, offender. It's just kind of a – it's just kind of a, an internal document on, on what what's going on with a particular case.
Q Okay. And then if you go to Foster 120.
A 120?
Q Yeah, 120.
A Okay.
Q I can't really make out what's at the top of this document. It kind of looks like it's like a document related to a tip or something like that. But I wanted to just – maybe let me just ask the question.



Foster 120, can you tell me what this document is?
A So I – believe it or not, I've seen this before. It's been a long time. I looked at it when I was prepping. I think it's like anonymous. It's like – like we were talking about earlier, like a phone tip card or something that would come in, somebody providing street source information. And this is kind of a card that you would fill out to, try to garner as much information as you could. I haven't seen one of these in a long time, but I think that's what this is.
Q Okay. So basically this is a form that was available to gang specialists to gather information from people providing tips; Is that correct?
A Yeah. It would've been probably more authored by somebody answering the phone, but yes.
Q Okay. Somebody within the gang unit?
A (Inaudible) it did – it did exist, obviously.
Q Okay. And so this was a form that could also be used by people in the gang unit accepting information from street sources, for example; correct?
A Correct.
Q Okay. Closer to the end here. Would you agree with me? You've had a chance to review this training document before there's no training contained within Exhibit 5 regarding Brady obligations; correct?



A Regarding what?
Q Brady obligations.
A No.
Q So when you say no; is that correct?
A That's correct. Yes. You're correct. Yes.
Q All right. One second. All right. Let's see here. Okay. I'm taking a look at – this is a Pages 101 to 102. Actually, let's look at 100 to 102.
A Okay.
Q And on 100 to 102 –
MS. ROSEN: Can you make it look bigger?
Q Yeah. Yeah. Sorry. I'm starting at the bottom here. It documents various types of files that were kept within the gang unit. You see that the – it starts with the major case file?
A Yes.
Q Okay. So what are examples of – were homicide investigations the kind of things that may be part of a major case file?
A No.
Q Okay. That was typically related to narcotics training; correct?
A Yeah. I think if you go into this, it talks about major case files being, you know, going after the hierarchy of gangs and long-term gang-related



investigations.
Q Okay. So it – so major case files were a type of file that was kept within gang units; correct?
A Correct.
Q And then there's something called a minor case file that was also kept within the gang units; correct?
A Correct.
Q Okay. And was that similar, just different types of obviously less serious criminal investigations, but similar type of information that was being kept in those files?
A Yeah. I mean, this – these would be shorter-term investigations, not utilizing the kind of resources that a major case file would be. And one of the distinctions that they make with the major case files that usually involves a federal agency where the minor case file does not.
Q Okay. And then the next type of file list is a gang file. Do you see that?
A Yes.
Q And what type of information was kept in the gang files?
A Well, the only – I'm just going on what I'm reading the same as you are. It's just information about gangs. And I think with the – maybe the more

important aspect there is, you know, everybody's familiar with the Latin Kings or the Gangster Disciples, obviously that would be a big thick gang file. But there's a lot of smaller gangs that this probably become more in play because there's far less in intelligence. So somebody may say, you know, the Insane Fish and I've never heard of them. And they could go to this and get some relevant background where you probably wouldn't need it as far as some of the bigger, more well-known gangs.

Q Okay. And, but basically the gang – there was a gang file for each gang that was kept; correct?

A Correct.

Q And then the information in that gang file would basically be information about gang intelligence and arrests and other type of information that gang specialists had been gathering as to each of those gangs; correct?

A Correct.

Q Would the gang books that were kept, would they be kept as part of the gang files?

A The gang books were separate from the gang – from the gang file.

Q Okay. In terms of the gang files, to the extent gang specialists participated investigations into



specific members of gangs with regard to anything from guns to drugs, would those – would information that they were learning in the course of those investigations go into the gang file?

MS. ROSEN: Can you repeat the question?

A Yeah.

Q Yes. And maybe a better question is, when gang crime specialists, for example, participated in an investigation related to drugs or guns associated with a particular gang, they may fill out ROI. They may fill out GIS forms or sup reports; correct?

A Correct.

Q Okay. Would those sup reports or GIS reports go in the gang files?

A Yeah.

MS. ROSEN: Object to the form.

Q Assuming they weren't related to a minor case or a major case; correct?

MS. ROSEN: Object to the form.

A Correct.

Q Okay. And so then the – so if the GIS report or the sup report concerned an investigative steps that were taken in an investigation related to Spanish Cobras, that would go in the Spanish Cobras gang file. Do – am I understanding that correctly?



MS. ROSEN: Object to the form.

A That is also my understanding. Yes.

Q Okay. And then other than in the gang files - - we'll strike that. And then there's another file called the violent crime file. Do you see that on the next page?

A We on 112?

Q Yes. Top of 102.

A Okay. I'm on it. Yep.

Q Yep. And so that – and so what type of information was kept in the violent crime files?

A I believe that's shootings and other acts of violence committed by certain gangs or one or a particular gang.

Q So would that also be organized by gang?

A I don't know.

Q Okay. In terms – to the extent there were gang crime specialists that participated in violent crime investigations involving gangs. Would those GIS reports and supp reports go in the violent crime file?

MS. ROSEN: Objection. Form.

A Again, I don't know. I would suspect that they did, but I don't know. And I apologize.

Q Your understanding is that they did, but you're not certain of that?



A That's correct.

Q Okay. And in terms of the ROIs and – strike that. In terms of the violent crime files, I think you – just correct me if I'm wrong. Did you indicate that your understanding is that those were kept by gang?

A That's my understanding, but I don't know that definitively.

Q Okay. And then each of these sets of files, were they all kept in the gang crimes offices?

A Yes.

Q Okay. And so we talked earlier about the – in the instances when gang crime specialists created GIS reports or sup reports based on their participation in a homicide investigation. We said those reports were expected to get over to the Detective Division through the supervisory staff; correct?

A Correct.

Q Okay. And in addition, a copy would stay in the gang unit; correct?

A I would suspect so. The – the originals usually stay in the unit.

Q Yeah.

A But I've never seen any policy, or anything written down, but that's generally how the police department works. Yes.

Q Okay. And in other words, usually what goes to the Detective Division would've been a copy of a report, not an original?
A Correct.
Q Okay. And then the original would stay in the gang unit; correct?
A Correct.
Q Okay. And where that occurred in homicide investigations, would those documents go -- those document reports go in gang files or violent crime files or something else?
MS. ROSEN: Object to the form.
A I don't know where they would've been placed because homicides were treated and still are treated differently, and their documentation is treated differently. And as you know, we keep our homicide files separate than other crimes. So what the policy was, or if there was a policy, as far as what gangs did with their homicide-related reports, there was no policy. And -- and I haven't been able to learn what, if anything, was how that was, you know -- how they maintained custody of it.
Q Are you aware of any other repositories where those reports would go other than the violent crime file or gang file?



A The only other repository that I can think of would be, you know, the records division and that's -- that's the only thing that I can -- I can think that would -- that would have anything documentation-wise.
Q Okay. Any other place you can think of that those would've gone?
A No.
Q Okay. And if I understand correctly, the gang unit ultimately was disbanded and their documents -- when the gang unit was disbanded, they were at Maxwell Street; correct?
A No, when they were disbanded, they were at Homewood Square.
Q Okay. My apologies. When the gang unit was disbanded, those various violent crimes files, gang files, and whatever other files were kept within the gang unit. Where did those go?
MS. ROSEN: I'm going to object to the form. Compound because you're mixing files. Compound.
A Oh, I'm sorry. I can only speculate. I have no idea.
Q Do you have any knowledge about where those files are?
MS. ROSEN: I'm sorry. One more objection. Beyond the scope of 30(b)(6), though. It's because



you're talking about after 1998.
BY MR. SWAMINATHAN:
Q Okay. Last question on that topic. Do you have any knowledge about where those files are today?
A If I did, I'd come work for you. No, I have no idea.
Q This training -- this whole package, Exhibit 5. I lost my train of thought. Never mind. Let's see. The -- what policy, if any existed with regard to the process for ensuring that information contained in any of the gang files related to an -- to a homicide investigation was getting to the subpoena service unit?
A So as you know, the subpoena service unit, I'm not sure there was any mechanism in place for the gang files to get to the subpoena service unit. Obviously, somebody would subpoena a file and the subpoena unit would -- would -- would see there's a gang nexus and they would get whatever relevant or whatever available reports from gangs during that time. I'm sorry.
MS. ROSEN: Belated. Sorry. Belated small objection, as to get to the subpoena service unit, as if somebody simply sent documents on request.
Q Did -- are you aware of any policy that set forth requirements about how gang -- how investigative



information in the gang unit would get to the subpoena unit?
A No.
MS. ROSEN: Objection, form.
Q Are you aware of any directives or other written guidelines instructing gang units on how to get information to the subpoena unit related to a homicide investigation?
MS. ROSEN: Objection, form.
A No.
Q Are you aware of any guidance or written instructions to the subpoena unit about gathering information from the gang unit related to homicide investigation?
A No.
Q Are you aware of any training given to anyone in the gang unit, to ensure that documents in their files were getting to the subpoena service unit related to homicide investigations?
A No, I'm not.
Q Are you aware of any training for folks in the subpoena service unit, to ensure that documents in the gang files related to homicide investigations were getting to the subpoena unit? Your answer didn't come through?

A No, I'm sorry. No.
Q Okay. And were there any clerks -- strike that. Was there anybody who worked in the gang unit in the period from '86 to 1998 who was sort of a designated person whose job it was to respond to subpoenas?
A All I can tell you is it was civilian staff assigned to gangs. Presumably one would've had some kind of subpoena responsibilities, but in the documents that are reviewed, there was clerk one, two and three, you know, depending, I guess, on their seniority or responsibility. So as to which clerk would've had those responsibilities, I don't know. Obviously, there was support staff assigned to gangs.
Q Would it be fair to say that in the -- you agree with me that in the Detective Division, there were actual detectives who were assigned to respond to subpoenas; correct?
A Yes. The homicide unit, each homicide unit in every area has a -- has a detective winding down his career that is responsible for building and maintaining files and also fulfilling subpoena requests.
Q Okay. Was there any sworn employee in the gang unit who had that same responsibility in the period from '86 to '98?
A From the documents that I reviewed there was


not.
Q Okay. All right. Are you aware of any checklists or other docu -- strike that. Are you aware of any practice that existed within the gang units in the period from '86 to '98 to ensure that information contained in the gang files, was getting to the subpoena unit in related to homicide investigation?
MS. ROSEN: Objection, form. Foundation.
A No.
Q Okay. Last question for you in Exhibit 5. The very end of Exhibit 5, 272. Foster 272 is where I'm starting.
A Okay. Yes.
Q This is essentially a section from 272 through the end.
A Yes.
Q See here. Yeah. It talks about mainframe computer access. Do you see that?
A I do.
Q And it talks about various types of information that could be accessed through the mainframe computer. Do you see that?
A I do, yes.
Q Okay. And then for -- according to this document, basically information -- you could put in the


name of an individual and get information about that person and their gang affiliation; correct?
A Correct. I believe this is commonly known as a gang database.
Q Okay. And were there photos kept in the gang database?
A No, I truly don't know. I don't believe that this system had the capability or the -- yeah, the computer capability to store photographs.
Q Were there -- were gang contact cards -- what do they call? Gang arrest identification cards or contact cards contained within the mainframe computer?
MS. ROSEN: Objection, form.
A My answer to that would be, this is kind of a very rudimentary computer system that had just very basic information. There was no scanned documents. I don't even think that was invented yet. It was just basically a name. It was like, you know, looking at hell 6,000.
MR. SWAMINATHAN: All right, let me see if I have anything else. I think I'm done. You know what? I'm so bored of my own questions. I'm done.
MS. ROSEN: You're done asking questions?
MR. SWAMINATHAN: I'm done asking questions.
CROSS EXAMINATION


BY MS. ROSEN:
Q I have -- I actually have just a clarification question that I want to ask. With respect to Exhibit 5, which is the pre-service gang specialist training. Mr. Rails [sic], you were asked whether or not this was the training that was provided from 1986 through 1998. Do you recall those questions?
A I do.
Q Okay. And we've already talked about how in 1993, the same crime specialist division or unit was moved over to Organized Crime; correct?
A Yes.
Q So to the extent that the -- any of the information contained in the training materials is specific to Organized Crime, does that mean that information would not have been trained to gang crime specialists before 1993?
A Correct.
MS. ROSEN: That's all I have.
REDIRECT EXAMINATION
BY MR. SWAMINATHAN:
Q Okay. And to the information about -- just to make her understand. Information, we talked, for example, with the major crime file and the minor crime file, do you recall that?

Page 350

A Yes.
Q That would be – was that – is that information that would be specific to Organized Crime?
A Yes.
Q Okay. So that – those files, are you saying, wouldn't have existed prior – before gang crimes moved over to the Organized Crime; is that right?
A Correct.
Q Okay. The gang file and the violent crimes file, those were not specific to Organized Crime; correct?
A Correct.
MR. SWAMINATHAN: Okay. I have nothing else.
MS. ROSEN: Anybody else?
MR. ENGQUIST: Nothing for me.
MS. MCGRATH: Nothing for me
MR. SWAMINATHAN: Lieutenant. Sorry. Let me – anyone else?
COURT REPORTER: No.
MR. SWAMINATHAN: All right. Lieutenant, thank you very much for your time.
THE WITNESS: Thank you.
MS. ROSEN: We reserve signature.
COURT REPORTER: Reserve. All right. And Anand, how would you like your copy?

Page 351

MR. SWAMINATHAN: No copy for now. Thank you.
COURT REPORTER: Okay. Eileen?
MS. ROSEN: No, not now. If he – if plan for orders, then we want a copy.
COURT REPORTER: Okay. And if they do order, how would you like your copy?
MS. ROSEN: However we normally get it. I don't know, electronically.
COURT REPORTER: Okay. Megan, how about you?
MS. MCGRATH: Nothing right now. Thank you.
COURT REPORTER: All right. Let me get us off the record.
(DEPOSITION CONCLUDED AT 6:42 P.M.)

Page 352

CERTIFICATE OF REPORTER
STATE OF ILLINOIS

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page here of by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.

SYDNEY LITTLE,
COURT REPORTER/NOTARY
COMMISSION EXPIRES: 03/18/2026
SUBMITTED ON: 07/29/2022

## Exhibits

**Exhibit 1_ Foster** 53:25 54:3,10

**Exhibit 2_ Foster** 54:25 55:2,6

**Exhibit 3_ Foster** 82:11, 15 84:12 85:10, 15 86:5,7 113:14 119:16

**Exhibit 4_ Foster** 158:21, 22 159:2 160:18 161:2 162:9 203:5 255:4 277:22 278:19 279:8 281:5,15,22 282:14

**Exhibit 5_ Foster** 179:16, 17,19,21 318:1 323:13,14 335:25 344:8 347:10,11 349:3

**Exhibit 6_ Foster** 199:11, 14 200:19 280:12

**Exhibit 7_ Foster** 201:2,9, 18 215:8 216:16 242:14, 17 277:23 302:21 303:2 314:8,9,16,22

**Exhibit 8_ Foster** 201:21, 22 202:1,14,17 216:3 242:15 243:7,19,23

## 0

**06-02** 201:24

## 1

**1** 28:24 29:3,10, 18,19,22 30:3, 8,17,20,25 31:22 32:24 33:14 34:4 41:10 42:6,23 46:14 53:25 54:3,10 159:25 199:12 200:19 282:18 283:15

**10** 60:6,7 138:14 162:20 163:1,2,8,17,23 164:3 165:13 166:1 256:4

**100** 246:23 247:1,10,13,19 248:9 249:17 336:8,10

**101** 336:8

**102** 336:8,10 340:8

**105** 180:5

**107** 180:5,18 185:9 186:19 189:8,13,16

**10:10** 12:8

**10:48** 46:4

**10:56** 46:10

**10th** 17:19 18:6,8

**11** 297:10,11

**112** 340:7

**113** 323:13

**114** 325:20,23

**119** 190:8,21, 25

**11:23** 69:10

**11:30** 69:16

**11:44** 81:7

**11:48** 81:13

**120** 334:18,19, 20 335:1

**12:42** 125:5

**13** 59:4

**13-page** 55:3

**17** 200:6

**177** 184:1

**18** 12:12,13,15

**180** 191:4

**188** 326:24

**19** 12:16,17 50:5 183:16 277:25

**1980** 243:1

**1983** 200:6

**1986** 55:15 72:17,21 73:1,6 80:11 84:5 87:23 99:4 101:7 153:19 243:2,24 279:16 280:9 281:8 282:15 283:22 285:4 294:21 295:1 298:9,15 301:8 302:20,23 303:8 307:17 315:6 318:12, 17 349:6

**1987** 302:23

**1988** 215:15,19 216:11,18,21 217:4 243:1,3 277:25 278:23 280:11,21 281:11,18 282:5 315:22

**1990** 35:18,20 298:9

**1991** 17:8

**1993** 18:3 81:21,23 82:5 84:5,11,16 87:17,23 91:25 93:6 103:25 104:2,6,10,11, 15,20 105:11 106:8 107:4 113:23 149:24 301:8 328:1 349:10,17

**1995** 18:3 182:1,6,15,21 183:1 318:6

**1996** 23:23 81:21 92:19 93:12 111:13, 18 112:3,8 159:10 243:1 278:20,23,24 279:6,9,21 281:6,11,18 282:5

**1998** 25:15 32:9 55:15 72:18,21 73:1,6 79:15 80:11 91:25 93:22 98:24 99:4 101:7 105:20 106:15 107:2,7, 16 108:19 109:9 112:14, 24 113:8 120:11,19,22 121:8 122:2 150:9 151:22 152:5,15,23 153:2,9,19 155:1,7,14,21 156:3,9,18 158:11 170:2 183:16 239:7, 11,18 240:15 241:1 243:2,4, 5,20,24 244:5, 23 245:4 246:22 277:25 279:11,17 280:9 281:8 282:15 283:22 285:5 286:10, 23 294:21 295:1,18 298:15 302:20 303:8 304:19 307:17 309:8, 16 310:1 312:4, 11 315:6,18 318:12,17 327:8,13,16 344:1 346:4 349:6

**1999** 17:3 28:21

**1:19** 125:11

**1A** 54:18 55:13

**1B** 56:4,7

**1C** 41:12,15 56:19

**1D** 56:23

**1E** 57:3

**1F** 57:6

**1J** 41:2,6,8 54:19 57:11 69:19,23 83:18

**1K** 41:2,6,8 57:15 148:4

## 2

**2** 19:25 25:12 49:10 50:1,18 54:25 55:2,6 158:24 199:12 200:19 256:8 257:6,12,17

**20** 12:19

**20-30** 66:18

**2000** 31:25 32:1,11,16 35:20

**2000s** 28:21

**2011** 216:8 217:24,25

**2013** 17:3 29:24,25

**2014** 49:19,23

**2019** 50:11,22

**2022** 12:8 46:9 69:15 81:12 125:10 162:5 242:10 277:19 314:1

**205** 184:1

**22** 12:7 25:23
**22nd** 17:21 18:1,10,14,18, 24 19:10,21 21:8 24:19,25 25:5,20 26:1
**235** 329:13,14, 15
**236** 329:11,13
**237** 329:10
**23rd** 182:6
**24** 215:15 216:11,21 217:4 243:1,3
**2441** 12:16
**251** 183:22 184:12
**26** 217:24,25 236:24
**261** 334:4,5,6
**272** 347:11,14
**276** 82:11
**279** 179:21
**28** 183:24
**284** 82:12
**29** 46:9 69:15 81:12 125:10 162:5 242:10 277:19 314:1
**29th** 12:7
**2:02** 161:25
**2:09** 162:6
**2A** 57:19
**2B** 57:24
**2C** 58:2
**2D** 58:7
**2E** 58:10
**2F** 58:15
**2G** 58:17
**2K** 58:21
**2L** 58:25

**3**

**3** 25:23 82:11, 15 84:12 85:10, 15 86:5,7 113:14 119:16 158:20 287:12
**3(b)** 117:20 119:1
**3-4** 201:7
**30** 12:6 38:17 185:7,8 269:22
**30(b)(6)** 12:10 32:8,11 33:13, 15,19,21 34:9 37:13,21 40:13 43:19 44:18 45:3,5,7,13 46:17,18 53:15 54:5,14 55:4 78:20 91:2,16 92:5,8,15 93:8, 16 94:21 98:19 109:25 111:1 158:22 187:15, 23 188:9,16 269:9 286:14 295:22 302:12 343:25
**3029** 12:12
**31** 209:8,21
**311** 141:8
**3335** 12:13
**33rd** 180:12
**35** 162:11
**36** 329:12
**3:47** 242:5

**4**

**4** 26:23 27:3 158:22 159:2 160:18 161:2 162:9 190:13 203:5 255:4 277:22 278:19 279:8 281:5,15, 22 282:14 287:24 288:3 299:6 300:13 302:14
**40** 161:6 255:12,20 279:2 281:22, 23
**41** 296:15
**4156** 12:19
**42** 162:12,16
**44** 297:24 298:1
**45** 190:17
**4:09** 242:11
**4:52** 277:14
**4:58** 277:20
**4th** 17:22,24 25:6,7,11,14,24 26:2,7

**5**

**5** 15:21 16:6,11 50:21,23 179:16,17,19, 21 243:7 275:12 318:1 323:13,14 335:25 344:8 347:10,11 349:3
**5-7** 201:24
**55** 275:8
**56** 15:8
**57** 159:13
**5:00** 303:22
**5:44** 313:21
**5:53** 314:2

**6**

**6** 15:6 18:3 25:23 182:1 199:11,14 200:19 275:12 280:12 289:20 290:3 292:8 294:14 310:13
**6,000** 348:19
**6-7** 51:13
**60606** 12:7
**6508** 12:17
**67** 159:25
**6:07** 314:5
**6:42** 351:13

**7**

**7** 84:16 201:2,9, 18 215:8 216:16 242:14, 17 243:7 275:12 277:23 302:21 303:2 314:8,9,16,22
**74** 158:22
**75** 179:21
**7951** 12:15

**8**

**8** 158:22 201:21,22 202:1,14,17 216:3 242:15 243:7,19,23 275:12 296:17
**8-** 43:18
**80s** 149:23,24
**83-5** 201:4,5 280:11
**86** 78:18 79:4,8, 15,22 80:1,5 81:17 83:19 85:1,13 87:25 88:9 89:8,13,24 90:6,10,18,23 91:13 92:1,13 93:22 94:1 95:1 97:16,20,23 98:24 99:13,16 100:2,7,23 101:4 103:23 104:20 105:2,4 106:12,15 107:4,6,16 108:19 109:8 112:14,24 113:8 120:10, 19,22 121:8 122:2 137:10 150:9,13 151:22 152:5, 15,19,21,23 153:2,9 155:1, 7,14,18,21 156:3,9,18 158:11 168:3 170:2,7 181:23 182:13 183:7, 16 193:10 224:8 238:19 239:6,11,18 240:14,25 241:6,11 244:5, 22 245:4 246:21 249:21 286:9,23 295:18 304:14, 19 309:8,16 310:1,18,25 312:4,10 315:17,22 327:7,13,15 346:4,24 347:5
**88** 217:6 282:8, 11
**88-18** 201:5 215:8,9 217:7,9 242:17 277:24 280:6,11

**9**

**9** 180:11,12,18 185:9 275:12 313:13
**9-year** 43:18
**90** 79:22 312:11
**90s** 21:15,21 22:23 23:15,22 24:16 150:5
**91** 18:5 35:19

**92** 18:12 25:22

**93** 18:5,11 87:25 88:9 89:8,13,24 90:23 91:13 92:1,13 103:9 104:7 105:2,4, 19 107:2 119:18

**93-01** 82:13 86:7

**94** 18:20 24:20 25:20

**95** 18:20 24:20 25:17,20,23 26:2

**96** 24:11 25:18 26:4 93:1 112:12 119:18 159:15 282:8

**98** 24:20 25:18 26:7 78:18 79:4,9 80:1,5 81:17 83:19 85:2,13 90:6, 10,18 94:1 95:1 97:16,20,23 99:13,16 100:2, 7,23 101:4 103:23 109:8 137:11 150:13 155:18 168:4 170:7 181:24 182:13 183:7 193:10 224:8 238:19 241:6, 11 249:21 304:15 310:18, 25 346:24 347:5

**99** 25:15,18 26:7

**A**

**a.m.** 12:8 46:10 69:16 81:13

**ability** 51:21 70:20 116:4 219:4 266:22

**abreast** 263:5, 13,22 264:10 266:2

**absolutely** 144:14 173:10 214:13 225:6 226:4

**abused** 282:24 283:3 284:20 285:25 286:25 287:2,10

**abusing** 286:10

**academy** 17:19 18:7 94:23

**accepting** 335:19

**access** 347:18

**accessed** 347:21

**accuracy** 250:14 272:22

**accurate** 70:24 96:21 116:5,8 127:22 130:15 132:2 143:23 178:2 213:18 222:10,16 225:24 226:8 271:21 273:3 283:12 285:18 301:23 328:21

**acknowledging** 137:5

**act** 141:22

**activity** 19:12 26:12 33:9

**acts** 340:12

**actual** 54:17 165:22 346:16

**ad** 89:16,20

**add** 301:18

**addition** 71:4 243:13 278:7 341:18

**additional** 44:6 96:12,22 97:7 134:15 135:6,11 138:4 139:8,21 140:5 173:4 174:15 180:19 192:11 197:5 237:9 253:25 291:10 292:10,22 293:22 312:19 313:14

**additionally** 243:11

**address** 39:12 307:25 308:3

**addressed** 37:19 40:3 85:7 153:22

**adequate** 177:25

**admissible** 234:8

**admitted** 179:1,13

**admonishment** 315:7,13

**admonishments** 193:5,7

**adult** 301:15 302:3

**advance** 316:25

**advantage** 229:17

**adversarial** 174:12

**affiant** 117:13

**affiliated** 171:14

**affiliation** 171:21 181:3 348:2

**affirm** 14:19

**aftermath** 136:7

**afternoon** 303:22

**afterward** 173:13

**age** 308:14

**agency** 337:16

**agent** 112:20

**aggravated** 33:7

**aggressive** 19:5 20:22

**agree** 38:5 80:16 84:21 89:23 90:16 97:17 98:24 99:3 117:7 135:18 138:17 144:1,4,9 154:18 157:24 161:1 164:2 167:6 168:2 170:1,6,17 182:21 194:5 200:11 262:6 268:4,24 269:2, 3 272:10 275:13 280:16 288:18 305:20, 21 310:17 335:23 346:15

**Agreed** 162:24,25

**agreement** 37:19

**ahead** 13:12 55:25 65:2 89:19 91:5,8,17 98:20 109:24 113:5 117:3,15, 16 130:2,3 141:2,3 143:9 147:17 185:25 186:1 219:13, 21 221:3,14 241:4 252:2 270:1 271:1 276:5,20 287:7 300:7 302:9 324:10

**aid** 282:20

**album** 164:9 181:3

**albums** 163:5, 11,12,15,18 164:16

**alive** 317:19,20

**All-relevant** 143:21

**all-suspect** 278:11,15

**alley** 97:13

**allocation** 326:9

**allowed** 38:16 176:12,16 178:18 289:23 292:13

**allowing** 326:9

**alluded** 270:9

**alluding** 257:23

**ambiguity** 61:25

**ambiguous** 74:13 235:1 251:18

**Amended** 54:4 55:4

**amount** 37:17 66:17 95:8,11 97:7 172:9 250:8,12

**analysis** 185:1,21 186:22

**analytical** 323:21 325:21, 25 326:7,21

**Anand** 12:25 103:7 118:15 350:25

**and-so** 135:8 140:20

**and/or** 79:11

254:9,15

**anonymity** 117:9,15,17 119:4

**anonymous** 69:20 75:2,6 95:20 116:19, 24 117:5 128:17 132:13, 21 133:8,9,13 134:3,6,18 135:4 137:7 138:2 139:2,20 140:2,6,11,15, 19 141:10,13, 19,22,24 142:3, 6,14,15,18,19, 23 143:14,16, 20,24 144:16, 23 145:24 146:1,8,10,18, 19 147:5 335:4

**anonymously** 132:6 133:19, 25 138:18

**answering** 17:14 52:2 141:8 153:21 335:15

**answers** 33:12,18 52:12 75:12 187:14

**anticipated** 75:4

**anybody's** 326:17

**apologies** 196:16 343:14

**apologize** 28:9,11 77:13 121:25 340:23

**apparent** 270:11

**appearance** 12:22 13:10 175:1

**appearing** 13:15

**appears** 160:24 167:17 271:6

**applicable** 69:22 102:5 103:4,6 212:25 216:16 280:10 303:19

**applied** 72:18, 22 73:2,7 79:9 80:7 82:2 83:25 84:7 85:16 86:6 87:10,24 89:9, 14 90:25 91:12 93:20,24 100:15 101:5, 12 103:19 107:1 110:13, 20 113:20,22 119:17 120:6,9 121:13 122:2,3 199:2,6 201:15 202:14,21 215:11 216:13 218:20 226:11 277:24 280:11 285:6 332:13

**applies** 84:22 92:17 114:2 119:7 129:17 149:16 226:6 301:20 306:22 307:3

**apply** 77:16,25 78:4,9 84:12,24 85:10,20 86:8 91:3 113:20 119:23 125:23 163:8,23 167:2 200:20,23 201:18 202:17 216:14 243:23

**approach** 35:11

**appropriateness** 123:11

**approval** 227:11

**approve** 317:12

**approved** 331:20

**approximate** 66:16

**approximately** 16:16 18:2,11, 12 19:9 23:14, 21 24:10,20 25:15 26:4 28:1,19 29:17 50:13 51:13 60:2,4,8 61:1 197:17 281:22

**approximation** 66:12

**April** 217:24,25

**area** 15:21 16:6,11 19:21, 23,25 25:11,12 26:22,23 27:3 28:23,24 29:3, 10,18,19,22 30:3,8,17,20,25 31:22 32:24 33:14 34:4 36:8 42:6,23 46:14 49:8,10,25 50:1,17,18,21, 23 178:11 232:20 346:19

**areas** 109:16, 21 110:3,4,8, 18,21 141:5

**argue** 130:14 237:8 248:20, 23 269:11

**argument** 269:13

**Ariel** 12:12

**array** 130:12, 17,22 131:12, 17 132:3 136:23 145:23 146:7,17,20 147:6,15,21 157:21 173:12, 19 174:4,21 194:17 195:25 197:10,22 198:1,6 208:16, 23 213:16 220:20 221:3,8, 10 228:8 229:6, 11,14 249:23 254:9,14,16 258:1,13 261:11 263:4,8 265:1 267:25 268:2,7,15 269:14,17,20 270:6,18,19 272:6 273:13, 18,25 274:8,19 275:3,12,15 287:14,24 288:21 289:3, 13 290:25 291:4,19 292:3, 9,16,20 293:7, 11,16,24 294:3, 6 295:10,20,24 306:8,10,13,18

**array's** 284:13

**arrays** 154:15, 18,19 157:19 176:24 196:18 197:12 198:11, 22 199:2 200:13,19,20 201:12,16 202:15 203:10 205:14 207:15 214:11,22 215:12 226:1 239:3,8,12 242:21 243:13, 17 251:23 256:1,2,6 273:6,24 278:14,15 283:5 288:12, 17 291:10,17, 22 292:10,22 293:3,14,23 295:2 296:2 306:19

**arrest** 126:18 128:6,8,10 130:8 134:8 135:14,19 137:10 173:9 179:10 180:24 181:1,17 183:17 184:11, 17,22,24 185:6, 11,13,14,15,22 186:2,7,21 187:2 189:4,9, 11,12,15,21 190:6 191:1,8 220:8 221:13 225:5,9 254:2 272:1 282:24 287:3 291:1,4,9 295:16 297:17, 20 348:11

**arrested** 179:8 185:3,23 229:21 276:2 297:14

**arrestee** 191:12 312:12, 15

**arresting** 126:5 127:11

**arrests** 183:5, 13 191:6 338:16

**arrived** 36:8 124:22 252:15

**art** 213:15

**articulated** 49:3

**aspect** 265:3 338:1

**aspects** 286:3

**assaulting** 19:16

**assess** 139:9, 22 247:21

**asset** 86:10

**assigned** 15:21 16:3 26:22 28:23 29:4 32:2 36:22 48:18 49:13 110:17 150:14 323:25 346:7, 13,16

**assignment** 15:20 48:17

**assignments** 19:2

**assist** 30:23,24 99:5 101:25 168:2 169:10 304:18,21 305:6 319:12

**assistance** 103:1 104:22 105:1,7,14,21 106:17 107:18 108:21 111:8, 11,19 119:25 150:12 168:6

**assisted** 99:8, 10 100:13,18, 24 102:17 105:11 320:1

**assisting** 101:4,12,17 109:15 123:2 305:3 308:7 319:15,19 320:10 324:25 329:18,23

**assume** 52:21 66:12 149:23 189:23 329:20

**assumed** 110:4

**assuming** 61:20 232:18 339:17

**assumption** 250:18

**attach** 264:12

**attached** 182:5

**Attachment** 190:12

**attending** 12:23 13:19,22

**attentive** 239:14

**attorney** 308:8

**attorney's** 173:17 209:23 210:1,18 211:11 245:18

**attorney-client** 69:1

**attorneys** 59:10

**audit** 179:5

**authentic** 271:21 273:3 284:16

**authenticity** 283:7

**authored** 335:14

**authority** 176:22

**authorize** 227:15

**automatically** 137:18 138:11

**availability** 233:10

**avenue** 179:11

**avenues** 157:11

**avoid** 225:16 271:7,9,12,14

**aware** 21:18 24:3 48:6,7,8, 10 60:1 72:20, 25 73:5 74:7 76:19 77:12,15, 24 78:2,3,8,13 79:13 80:17 81:1,15 84:9 85:23 86:4 87:16,22 89:12 92:11 93:4,10, 11 97:4 98:1,13 101:14,20 103:3 104:15 105:9,17 108:15,22 109:3,12 111:18 112:2,5, 6,9,13,19 113:7 122:5,6 127:1 141:18 145:11 148:10 152:20 153:3,5 154:4, 5,6,16 155:4,9 158:3 175:18 178:17 185:24 186:2 193:2 199:3 202:21, 24 203:4 214:20 227:9, 13 246:4,7 267:14 278:20 279:19 281:9 287:8 293:25 296:7,13 304:11 307:11 332:17,18 342:23 344:24 345:5,11,16,21 347:2,3

**B**

**B6** 269:22

**back** 17:24 45:25 46:6,25 48:18 49:13 50:6,10,11,14 69:12 77:9 80:9 81:9 82:7 94:13 99:16 108:12 124:13 125:7 132:21 136:24 137:3 147:16, 18 148:15,16 149:11 154:17 162:2 173:22 175:7 183:23, 25 185:7,8 189:24 190:1,3 191:20 216:23 218:8,12,16 223:17 232:7, 20 236:21 240:20 242:7 244:20 250:22 270:22 271:10 277:16 281:5, 22 290:9 296:19,20 297:1,4,8 313:23 317:22

**background** 17:12 38:16 45:9 51:11,19 338:8

**bad** 199:20 252:18

**bank** 96:3

**bar** 145:7,9

**Barber** 59:23

**based** 26:24 27:1 28:25 29:1 33:20 37:1,23 61:20 103:1,13 115:9 124:9 126:6 127:2,11 128:15 129:7 137:22 140:9 142:5,14 144:20 145:1, 23 146:4,7,17 147:6 148:15, 20 179:7 181:17 183:11 187:20 194:6 237:19 257:11 276:24 283:21 291:13,15 298:10 325:5 332:24 341:13

**basic** 348:16

**basically** 20:19 73:24 95:2 160:12 167:15,18 178:14 179:6 181:14 191:5 205:5 214:9 228:13 259:5, 19 266:11 280:4,10 324:22 326:21 327:17 332:1 334:12 335:11 338:11,15 347:25 348:18

**basis** 43:8 44:13,21 97:11 109:22 110:18 123:11 126:10, 22 127:20 128:12 130:22 131:15 134:11 135:22 136:3 137:14 138:6 146:23 147:2, 12 148:2 177:9 204:9 205:23 207:20 208:22 221:18 225:13 230:2 232:18 235:17 238:2 257:21 258:11 259:13 261:22 262:4 266:16 267:20 271:3 291:15 312:5 326:8,23

**Bates** 158:22 162:12 180:8 184:5 190:20 255:13 278:25

**bathroom** 69:6

**batteries** 33:7

**beat** 191:10,24 251:19

**beefs** 171:25

**began** 84:12

**begin** 14:24 17:4

**beginning** 49:23 53:19 82:3 159:9 202:8 258:6

**begins** 256:9

**behalf** 13:14, 16,20 54:13 56:6,18 57:2, 10,23 58:6,14, 20 83:7

**behest** 319:24

**being's** 235:23

**belated** 250:17 344:21

**belief** 191:12 286:6

**believed** 52:3

**believes** 275:21

**belong** 176:3

**beneficial** 139:25 232:19 234:7

**bias** 43:7,21 44:9 45:9,16, 17,18 46:21 222:2 289:9,11

**big** 297:3 338:3

**bigger** 54:1 113:17 118:18 161:8 184:19 336:11 338:9

**bill** 125:15

**binding** 44:17 45:6 55:20,25 56:6,10,18,22 57:1,5,9,14,19, 22 58:1,5,9,13, 19,24 59:4

**bit** 30:6 34:19 87:5 95:12 106:20 142:2 155:21 165:6 172:21 203:8 253:3 292:24

**black-and-white** 174:22, 24

**blind** 298:5,9

**blood** 224:14

**Blow** 199:19

**bodies** 197:7

**book** 40:1,2 64:3 148:6,11, 17,18 149:7 150:21,23 151:7,21,23 152:6 154:9,18 156:11,16 157:2,20,25 162:23,24 163:2,3,8,23 164:10,12,21, 22 165:2,11,22 166:4,17 167:1, 2,5,7,8,13,14, 18 169:5,6,19, 25 170:21 172:4,10,23 173:3,5 175:6, 9,16,20 176:13, 17,24 177:5,12 178:15 192:21 193:3,17 194:1, 7,16,18,22 195:7,20,24 198:5,8,9,10,14 199:23 200:24 202:22,25 265:7,9,13,15, 19

**booking** 308:14

**books** 40:10 63:17,19,23 124:14 148:3,8, 12,14,20,22,23, 25 149:1,3,4, 11,12,14,18,22, 23 150:2,9,12, 18 151:1,11,14 152:17,25 153:8,17 155:1, 7,11,15,24 156:4,9 163:6, 14,18,22 164:5, 13,16 165:9 166:9,13,21 167:11,23,24 168:1,2,6,8,11, 13,14,16,19,21, 23,25 169:2,3, 10,14 170:13, 15 172:14,18 175:20,25 176:2,7,10 177:3,19,21,22 178:4,8,18,23 179:6 180:20, 21 181:17 182:19,25 183:5,11 188:21 192:4, 11,16,17 193:1, 3,6 194:4,10,25 195:1,15 198:10 199:6,8, 10 201:12,13, 19 202:18 242:21,22 265:7,14 338:20,22

**bored** 348:22

**bottom** 180:11, 13 187:17,20 189:20 217:11, 25 323:16 336:13

**bound** 99:22, 24 100:6 240:11

**box** 185:22

**boxes** 185:2

**boy** 234:5

**boyfriend** 133:2 204:22

**Brady** 335:25 336:2

**breadth** 68:25

**break** 45:23 46:1 52:23,24 69:6 81:4 134:24 142:2 218:4 241:16, 18 242:3 248:7 267:9 277:5,9 311:5,6,8 312:10 313:19

**briefly** 50:14 148:4 218:18

**bring** 46:25 160:6 209:25 219:5 292:4 297:12,19 320:23 321:10

**bringing** 214:2 221:15

**broad** 90:9 117:18 126:13 128:25 136:2 206:2 213:23 221:22 274:13

**broader** 88:16 98:16

**broke** 30:6 65:16 83:15 97:19 111:24 172:21 268:25

**brought** 139:4 184:6 199:21 268:13

**Brown** 13:7

**brush** 126:13 128:25 136:2 206:3

**buckets** 244:7

**Bug** 147:22

**Bugs** 147:24

**build** 106:13

**building** 178:3 346:20

**Buoto** 12:15 54:7

**Bureau** 24:2 79:5,8 82:4 84:6 86:16 87:9 90:23 103:20 104:8 327:9 330:2

**burglaries** 33:8

**burglars** 148:18

**burglary** 148:18

**busy** 29:19

**but--** 188:25

**buys** 27:7

**by-case** 135:22 147:12 262:4

## C

**call** 91:18 132:6,22 133:9, 18 134:12 135:24 138:17 139:20 140:25 141:5 142:4,7, 14,16,23 143:14,16 159:19 184:24 200:1 204:17 330:10 348:11

**called** 70:12 136:16 140:11 149:7 168:23 185:1 186:20, 21 197:9 266:9 337:5 340:5

**caller** 75:6 134:6 137:7 139:2 140:6,11, 15,19 141:13, 14,23,24 143:20,24 144:16,24 145:24 146:1,8, 10,18,19 147:5

**callers** 133:9, 14 136:10,11

**calling** 86:12 133:2 139:14 147:22 180:21

**calls** 19:5 69:20 75:7 129:4 134:3 135:2,3,4,16,22 137:7,19 138:2 140:2,15,19 141:10,20 142:18 147:19 188:6,7 237:18

**capability** 348:8,9

**capacity** 51:15

**caption** 13:5 55:3

**captions** 13:2 54:6

**captures** 302:21

**car** 75:18 211:25 222:7,8, 11 223:17,18

**card** 125:1 180:24 184:11, 12,24 185:11, 16 186:3,7,10, 21 187:2 188:14 189:11, 13,16,20,22,23, 24 190:1,6 191:1,5,9 335:6,7

**cards** 181:18 183:17,18 184:18 185:15 189:5,9 191:23 192:3,14

348:10,11,12
**care** 69:4 103:10 277:6
**career** 17:10, 13 43:18 49:1 346:20
**careful** 103:16
**carefully** 53:4 74:24 117:23
**Carney** 59:23
**carry** 251:16
**cars** 97:13 251:20
**case** 37:20 45:14,15 47:18 48:12 55:3 66:25 122:23 129:15,17 133:13 134:4, 10,14 137:16 174:3,8 185:20 207:3 221:17 232:18 233:10 243:23 320:6 333:24 334:17 336:15,19,24 337:2,5,14,15, 17 339:17,18
**case-** 135:22 147:11 262:3
**case-by-** 232:17
**case-by-case** 97:11 123:11 126:9,22 127:20 128:12 131:14 134:11 136:3 137:14 138:6 146:23 147:2 148:2 177:8 204:9 205:23 207:20 208:22 221:17 225:13 235:17 238:2 257:20 258:11 259:13 261:22 266:16 271:3 312:5
**case-specific** 230:2 232:24
**case-to-case** 267:19 291:15
**cases** 13:1,4, 15,17,21 47:13 48:2 53:18 54:6 69:22 97:18,21 102:2 129:2,17, 25 138:23 147:2,12 170:7 176:18 177:12 178:8 232:5 233:5 252:7 261:19 263:18 264:19 285:19 292:24 293:14 304:15 306:10, 25 307:2
**categories** 71:19,20 74:5,7 88:20,21 316:17
**category** 75:5, 10
**caught** 236:25
**caveat** 87:11
**ceiling** 317:18
**central** 308:14
**certainty** 249:5 250:10
**cetera** 148:23
**chain** 331:14, 16
**chance** 85:5,8 125:13 188:18 335:23
**change** 21:15 23:3,25 65:3 131:6 175:1 249:11
**changed** 209:14 327:16 328:1
**characteristics** 287:15
**characterize** 72:4 134:19
**characterized** 164:9
**characterizing** 256:22 286:17
**charges** 173:13
**charging** 173:12,17
**check** 185:2
**checklists** 347:3
**Chicago** 12:7 13:4,14,15,19, 22 15:19 17:4 53:14 54:5,14 55:5 56:7,19 57:2,10,23 58:6,14,20 68:17,21 70:3, 5,9 72:9 76:10 83:13 86:1 94:23 99:24 100:5 112:21 117:8 133:16 147:24 148:9 149:19 153:13 155:5 158:23 165:25 166:24 170:4 203:21 207:3 209:13, 18 210:4,16,22 211:3 218:21 220:17 268:4 318:10 327:3
**Chicago's** 43:25
**child** 129:4 147:19
**choice** 107:13
**chooses** 328:11
**chronology** 273:16 274:3 293:9
**CI** 76:1,16 88:19,20 114:6, 7
**circumstance** 76:15 252:4 258:10 259:20 268:22 272:16 281:1
**circumstances** 76:14 91:6 102:24 128:14 138:9,12,16,22, 24,25 139:1,18 204:10,13,21 206:5 211:17 212:18,22 213:19 214:4, 16,20 218:20 233:15 235:14, 20 236:3,7,14, 18,19 237:7,19, 24 252:12 254:25 257:21, 25 258:15,22 259:2,21 262:9 267:21 271:4 272:15 274:12 279:25 280:25 291:16 297:25 298:1,5 302:24 306:11 311:24 312:20 313:15 328:3
**CIS** 85:15 86:20 87:15,21 88:11 89:11,15, 25 90:3,7,14, 18,22 93:5,12 114:22
**citizen** 75:16
**city** 13:3,14 19:22 43:24 44:17 48:10 53:13 54:5,13 55:5,21 56:6,19 57:2,10,23 58:6,14,20 59:18 70:22 83:7,13 97:14 110:14,18 147:24 158:23 170:4 218:21 318:10
**City's** 43:13 55:14 59:9
**civilian** 346:6
**claim** 182:9
**clarification** 61:18 76:13 88:13 103:8 244:2 349:2
**clarified** 88:25
**clarify** 61:24 68:24 85:6 107:3 168:15 189:2
**clarifying** 82:8
**clarity** 148:1
**clean** 224:13
**clear** 33:11 48:24 61:22 74:14 76:3 82:8 85:8 103:11 112:25 150:3 154:6 155:20 186:16 193:16 247:16 250:25 268:3 274:16 282:2
**clearer** 219:1
**clerk** 346:9,11
**clerks** 346:2
**click** 13:23
**client** 45:22
**close** 232:22 277:6
**closely** 263:19 264:4
**Closer** 335:22
**closing** 285:19
**cloth** 208:24
**clothes** 209:10
**clothing** 171:8, 14 208:25 209:2,3,6,9,14, 15,17 210:3,15, 20,21,25 211:3, 7
**Cobra** 274:24
**Cobras** 275:4 339:24

**code** 329:21 334:15

**collaborative** 105:25

**colleague** 13:7

**collect** 95:9 183:17

**collected** 116:14 179:8

**collecting** 185:5

**collection** 179:7

**collects** 232:10

**color** 171:8 316:21

**combat** 326:10

**comfortable** 73:17

**command** 20:24 21:5 284:18 285:8, 21

**commander** 16:9,11 21:7 123:9 124:9 324:14 332:5

**commanders** 284:7,19 285:8, 16 286:7,9,24

**commanding** 16:6 124:8 332:5

**comment** 117:18

**commented** 247:12

**comments** 238:5 312:11 328:3

**commit** 205:16 212:2

**committed** 147:23 171:18 211:21 224:12 275:22 285:2 340:13

**common** 120:2 170:7,18 211:2 232:25 233:4 257:25 293:14 295:8,17,19 301:4 312:2 321:2,20 328:25

**commonly** 72:1 177:9 327:5 348:3

**communicate** 70:21 102:21 320:24 328:19, 23

**communicated** 102:20,22

**communication** 105:25

**comparatively** 21:19

**compensation** 75:20 77:2

**competent** 188:9

**complaint** 47:4

**completed** 52:3 194:1

**completely** 20:10 23:23 50:13 76:3 136:7 274:16 290:5

**components** 248:8

**compound** 87:4 343:19

**computer** 347:18,22 348:9,12,15

**computer-generated** 174:22,23

**concealed** 117:23 118:3

**conceive** 214:25

**concept** 70:3 225:21

**concepts** 20:4

**concern** 187:8 189:23 290:16

**concerned** 293:6 339:22

**concerns** 55:14

**CONCLUDED** 351:13

**conditions** 53:8

**conduct** 96:5 121:17 122:11 138:3 142:4,13 173:19 175:20 176:12,16 177:5 200:9 202:21 204:2,7 207:3,14 208:19 212:8, 14 213:10 215:3 218:21 219:8 220:10, 18,20 221:14 224:22 225:10 228:6,7,8 229:4 231:15 242:20 243:12,17 247:20 248:2, 11 251:20 252:7 253:25 257:17 258:15 265:15 266:22, 24 268:7 273:13 274:7 283:24 284:3 291:9,10,11,21 292:21 293:22 298:10 300:24 303:4,12 304:14,25 306:9,12,19 318:21 324:5

**conducted** 46:8 69:14 81:11 97:8 115:8 125:9 142:23,24 162:4 173:5 175:21 176:23 178:4,11,16 192:21 193:13, 15,19 194:15 212:19,22 226:20 227:8, 10 230:24 233:6,22 234:3 235:4 239:7,22 242:9 251:11, 25 252:1,21 254:25 258:24 265:19 277:18 279:9 298:15, 19 301:6 303:7 304:9 305:16 307:7,22 313:25 317:8, 13 322:3

**conducting** 37:3 121:3 145:18 167:13 177:12 193:17 214:11,21 222:1 227:12 232:14 239:25 251:4,7 252:14 258:8 267:23 273:6,24 288:17 292:10 300:11 305:9 307:1 308:4

**confer** 45:21

**conference** 46:8 69:14 81:11 125:9 162:4 242:9 277:18 313:25

**confidence** 238:11 239:15 240:16 246:18 247:5 250:10 313:1,3,8,9,16

**confident** 114:22 238:24 247:1

**confidential** 27:9 28:11 40:1,10,20 63:5,8,11 69:20,21,25 70:6,13,14,16, 18 71:2,5,11, 13,16,21 72:5, 14,19 73:3,19, 22,23 74:6,25 76:8,20,23 77:5,16,25 78:5,10,15 79:11,16,19,20, 23 80:6,12,24 81:18 82:3 83:8,12,18 84:7,22,23 85:16,19,25 86:25 88:2,6, 14,19,21 91:14 92:3,13 97:24 98:2,5,9,22 113:9 114:3,7 115:2,6,21 116:3,12,18 117:7 118:1 119:8,14,17,24 125:19 126:14

**confidentially** 145:25

**confine** 78:21 98:17

**confined** 118:5

**confines** 155:23

**confining** 124:3

**confirm** 175:8 223:2 257:3

**confirmation** 205:19

**confirming** 128:21 205:6

**conflict** 325:15

**confront** 174:11

**confused** 35:24 81:20 104:14

**confusing** 195:12 280:7

289:17

**conjunction** 183:12

**connections** 38:19

**conscious** 105:24

**consent** 177:20

**considered** 27:12,18,19 154:19 210:3, 16 211:8,11 245:6 246:11, 22

**consist** 278:6

**consistent** 279:10 281:17 295:5 318:15 326:23

**consisting** 159:12 197:17

**conspiracies** 132:25

**conspiracy-type** 22:15

**constitutes** 269:23

**constraint** 219:14,15

**construed** 249:10

**contact** 75:13 183:18 184:11, 22 185:1,16,20, 21 186:22 189:20 348:10, 12

**contained** 282:3,13 304:10 314:15 318:14,20 326:16 335:24 344:11 347:6 348:12 349:14

**content** 145:1 327:25

**context** 38:1 73:16 162:22

**contrary** 268:24,25

**control** 89:22

**controlling** 118:12

**convened** 12:9

**convenience** 178:21

**convenient** 311:6

**conversation** 106:22 107:7 108:5,11 148:19 220:1 248:25 321:9 322:17,18

**Cook** 210:18

**Cool** 184:7

**cooperate** 70:4

**cooperating** 71:6,21 72:3, 10,12,15,23 73:8,10,11 74:13,17 82:13 85:14 88:14 114:1,5,11,16, 19 115:9 117:22

**coordinated** 326:9

**copied** 175:17

**copy** 118:15, 16,18,21 160:3, 12 161:13,18, 20 162:9 180:2 199:20 242:14 333:22 341:18 342:2 350:25 351:1,4,6

**corner** 183:25

**correct** 15:10 16:5,10 18:16 22:24 24:15,17 26:8,9 31:12, 16,24 32:3,23 34:22 36:16,18 47:5,12 49:7,21 50:8,12 51:1,2 53:15,16,20,21 55:10,11,22 56:8,20,21,24, 25 57:3,4,7,8, 12,13,16,17,20, 21,24,25 58:3, 4,7,8,11,12,15, 16,17,22,23 59:1,2,4,5 60:10,11 66:20, 21 73:12 74:10 75:8 79:24 80:2 82:4 84:8,9,13, 14,16,17,25 85:3,4,11,12, 17,21,22 86:22 88:11 93:2,22, 23 100:4,10,11, 16,20,21 101:9 102:10,11,14 105:22 106:24, 25 107:20,24 108:2,6 110:15 112:1 113:6,10, 11,20,21,23,24 114:3,4,8,9,19, 20,24,25 115:3, 4,10,23 116:10, 15,19,24 119:20,22 121:10 122:9 126:2 127:11 128:11,22 129:22 131:21 134:1,23 135:19 136:11 137:1,2 138:5, 20 139:23 140:7,13 143:25 144:18, 24 145:6,15 150:9,10 151:8, 9,12,15,24 153:19,20 154:20,21,23, 24 155:2,3,7,8, 11,12,15,24 156:1,4,19,20, 24 157:8,16 158:2,6 159:1, 3,6,7,10,11,15, 16 160:16 161:4 163:3,20, 24 164:1,6,14, 23,25 165:4,17, 19,23,24 166:1, 2,5,7,10,22 167:15,20,22, 24,25 168:13, 14,25 169:7,8, 11,16,21 170:4, 5,11 171:19,23, 24 172:2,3,5, 10,11,16,25 173:5 176:14 177:14 178:5, 11,17,20 179:9, 24 180:22,23 181:8,9,12,13, 18,21,24 182:6, 7 183:7,14,18, 19 184:18,24 185:17 186:11 191:6,7,13,14, 25 192:1,11,12, 16,17,18 193:20,21 194:7,12,23,24 195:1,2 196:21, 22,24 197:10, 11,19 198:2,3, 6,12,19,22 199:13 200:3,6, 7,9,13,16,17, 21,24,25 201:8, 10,13,14,16,17, 19,20,25 202:2, 12,13,15,16,18, 19 203:2,3,5,6, 25 205:11,12, 16,17 207:15, 16,19 208:8,9, 13 209:19,22 210:19,22,23, 25 211:1,4,5,9, 15,16 212:10, 11,16 213:5,6, 13 214:12,17, 18,22 215:12, 13 216:5,6 217:2,10 219:18,19 221:5,8 222:21 223:6,7,24 225:5 226:9,10, 12,13 229:14, 16 230:10 231:16 232:3,4, 6,16 234:14 238:21,22,25 239:1,4,9,10, 15,16,18,19,23 240:7,10,17,19 242:22,23 243:2,4,5,9,10, 13,14,17,18,20, 21,24,25 244:7, 8,12,13,17,25 245:2 246:20 247:2,3,6,7,10, 11 248:13,14 250:1,2 251:2, 8,9,13,14 252:8,9 253:17 254:18,20,21 255:1 256:1,5, 6,7,19 257:4,5, 7,8,14,15,19 258:11 259:7 260:12,13,21, 22 262:5,14,23, 24 263:14,18, 24 264:16,22, 23 265:2,5,7, 16,17,23 266:3, 5 267:13,14 268:8,9,10 272:3,4,8,9 276:3,14,15,18 278:1,2,12,13, 16,17 279:6,7, 17,18 280:6,10, 12,13 282:6,9, 16,17 283:14 285:20 287:16, 17,21,22 288:1, 2,7,8,22 290:19,21,22 291:2 292:4,5 294:23,24 295:3,4 298:11, 16,17 299:7,8, 17,24 300:4,12, 25 301:2 302:6, 25 303:1,4,9,10 305:19 306:6,7, 16,19,20,23,24 307:3,4,14,15, 19,20,22,23,25 308:1,4,5,9,10, 15,16,21,22 309:1,2,5,6,9, 10 310:9,18,19, 21,25 311:3,4,

14,15,18 312:13,14,16, 21,22 313:4,11, 12,16,17 314:11,12 315:2,3,8,9,14, 15 316:14,16, 21,22,25 317:1, 5,6,9,10,13,15 318:3,7,8,12, 13,18 319:13, 14,17,18 320:11,12,16, 17 321:20 322:7,8,12,13 323:22,23 324:6,7,8 327:4,10,11,19 328:7,8,13,20 329:6,7,19 330:4,14,21,22 331:9,10,18 332:2,9,10 333:3,15,16,25 335:13,20,21, 25 336:4,5,22 337:3,4,6,7 338:12,13,18, 19 339:11,12, 18,20 341:1,4, 16,17,19 342:4, 6,7 343:11 346:17 348:2,3 349:11,18 350:8,11,12

**correctly** 74:4 84:4 105:18 138:1 166:19 209:17 210:2 225:3 231:18, 24 246:24 257:1 284:21 286:12 327:7, 14 332:22 339:25 343:8

**corroborate** 96:8,13

**corroborating** 136:11

**corroboration** 97:7 136:9

**corroborative** 96:25

**coughs** 137:17 185:3

**could've** 18:12 26:4 219:1 241:22,23

**counsel** 12:24 14:23 59:12 61:13 62:2,5,8, 14,18,24 68:15 312:12

**count** 209:13

**counted** 210:6

**counterproductive** 324:24

**countless** 224:16

**County** 210:18

**couple** 26:1 40:9 41:25 51:11,19 53:2 60:14 74:18 125:20 136:14 147:24 266:7 277:6 320:22

**court** 12:3,4,5, 20 14:1,5,10, 14,17,23 42:18 46:3,6,19 47:1 51:22 52:12 53:19 69:9,12 81:6,9 107:18 125:4,7 161:24 162:2 234:8 242:4,7 253:2,4 277:13,16 282:25 287:4 288:24 313:20, 23 314:5 330:24 331:2 350:19,24 351:2,5,9,11

**Court's** 211:19

**cover** 94:2 195:18 196:5 216:4 256:21 261:12

**covered** 38:6 41:14 81:24 260:16 261:14

**covers** 94:3 200:8 303:17

**CPD** 49:1 141:15 142:16, 17,22 164:11 206:20

**create** 101:24 102:16,25 171:11 272:6, 12 275:3 316:19 322:23

**created** 102:10 122:7,15 123:1 148:20 178:24 183:11 184:23 188:22 194:6 329:23 330:6 341:12

**creating** 181:17 195:6 251:1 327:15

**credibility** 70:10 115:5,13, 22 134:19,21 137:24

**credible** 74:20

**crime** 15:22 16:22,23 19:16 20:22 22:8 23:7,12,13,19 24:2,5 27:21,23 37:15 57:3,6, 11,15,19 58:2, 7,10,21 59:1 64:23 73:8 75:24 77:11,17 78:1,11,21 79:1,4,5,8,10, 14,23 80:1,5, 11,24 81:16,21, 23,25 82:1,4,12 83:13,19 84:1, 2,5,6,11 85:2 86:3,10,13,15, 17,19,25 87:7, 10,13,17,18,20, 24 88:1,10 89:9,10,16,24 90:6,17,24 92:2,12 93:5, 11,20,25 94:10 96:10,16 97:2, 12 98:24 99:4, 7,13 100:3,8, 12,17 101:2,17, 21,25 102:6,25 103:8,19,20 104:8,16 105:19 106:11, 16,23 107:8,10, 12,17,20,23 108:4,10,19,24 111:19 112:3 113:23 119:12 121:22 122:4,8, 14,15,20 123:1, 7,24 138:13 148:23 149:1,3 161:3 169:4 170:19 171:9, 17,19 194:9 205:16 211:20 212:9 213:13, 22 215:4 224:12 227:6, 22 228:14 231:8 239:25 275:22 285:2 318:11,16,21, 24 319:1,9,16, 20 320:7,9 321:5,15,23 322:3,10 323:5, 17 327:9,21 330:2,12 332:22 334:13 339:8 340:5,11, 18,19,20 341:3, 12 342:10,24 349:10,11,15, 16,24 350:3,7, 10

**crime's** 178:19

**crimes** 15:24 16:1,2 17:2 19:6,11 26:12 29:6,8,11,23 30:4,9,23 38:11,20,22 56:8,20,23 58:15 73:3 84:12 91:20 100:23 149:17 188:10 193:20 196:21 317:23 319:12,25 341:9 342:17 343:15 350:6,9

**criminal** 19:11 26:12 33:8 144:6,12 282:19 288:24 308:8 337:9

**criteria** 77:3 86:21

**critical** 212:6 263:20

**cross** 45:5 348:25

**cross-** 44:1

**cross-examination** 44:6

**CRS** 47:9,13, 20,21 48:5,10 49:1

**cultivate** 120:12,20

**cultivating** 120:23,25 121:3

**current** 16:11 217:24,25

**custodial** 128:3,5,10 130:9 200:2

**custodian** 178:19

**custodians** 168:10,13 175:25 176:9

**custody** 130:17 213:12, 15 220:21 266:20,24 267:13,22 303:17,18,20, 24 304:2,3 316:6 342:22

**custody's** 304:6

**cut** 15:7 33:17 59:14 131:5 141:4 143:10

153:4 253:3,7
**cutoff** 212:14
**cuts** 224:13

**D**

**daily** 323:21
**dark** 274:18
**database** 180:25 185:12 348:4,6
**date** 200:5 215:14 216:10, 18,20,25 217:1, 13 296:20 297:1 307:18
**dated** 92:19 182:6 204:23
**dates** 50:14
**Dave** 42:9
**day** 12:7 13:8 60:17 148:15 204:24 205:5 216:19 259:16, 18 263:11
**day-to-** 263:10
**days** 40:9 266:18
**de** 319:7
**deal** 125:3 188:10
**debit** 125:1
**decide** 47:1 228:22 236:18
**decided** 141:21 142:4 146:6,16 147:5 262:4
**decides** 145:13
**deciding** 108:17
**decision** 105:24 229:10 233:17 235:23 236:11,12 237:9 262:7,8 291:12
**decisions** 235:23 236:15
**deemed** 124:9 127:21 143:14 332:6
**deems** 124:1
**defend** 43:24
**defendant** 13:21 144:6
**defendants** 13:17 144:13
**defending** 115:7
**defense** 308:8
**defined** 96:25
**definition** 143:4
**definitively** 341:7
**delegate** 265:16
**delegated** 176:21 193:14 265:21 306:15, 17
**deliberately** 73:14 289:15
**Demetrius** 12:18
**dep** 38:17
**department** 15:19 17:5,17 18:5 25:4 28:17 34:1 68:22 70:3,5,9 71:1 72:2,10 74:8 76:11 78:17,24 86:2 94:23 99:24 100:4,5 109:17 110:9 112:21 116:21 117:9,10 133:9, 17 148:9 149:19 153:13 158:23 163:11, 18 165:10 166:24 173:15 188:2,5 195:18 203:21 209:12, 13,18 210:4,17, 22 211:4,10 212:13 232:10 233:1 245:18 268:4 326:10 327:3 341:25
**department's** 74:21 224:2
**depending** 43:8 44:7 126:10 204:9 259:21 321:3 329:2,7 346:10
**depends** 138:21,22 146:13 232:21
**depo's** 46:24
**deponents** 45:13
**deposed** 51:12
**deposition** 12:9 15:13 20:6 38:25 45:18 46:7 52:7,16 53:20 54:5,22 55:4 59:8 61:16 62:25 65:21,23, 25 66:2 67:6,7, 10,12,14,18 68:1,9,14,19 69:13 81:10 82:18 111:2 125:8 148:5 159:1 162:3 179:24 187:15 199:13 201:4,8, 25 242:8 277:17 278:1 279:12 313:24 351:13
**depositions** 62:10 65:15,17, 20 66:8,17,22 67:2 68:7 178:7
**describe** 35:9
**describes** 334:13
**describing** 205:9 258:2 321:14
**description** 275:1,5,10,23
**deserve** 15:14
**designated** 53:13 55:9,20 112:21 279:14 281:7 318:9 319:5 346:4
**detail** 15:20 126:11 128:16 131:21 158:19
**detailed** 127:22 128:20 130:19 131:9
**details** 53:3 109:7 128:22 134:13,16 135:6,11 237:23
**detain** 220:8, 22 227:22 297:20
**detained** 213:17,21 214:3,17 219:4 228:5,17,18,19, 22 229:3,17,20
**detaining** 219:25
**detect** 258:14
**detective** 16:18,21,22,25 17:2 19:23 28:18,20,25 29:4,23 30:4, 17,20 31:1,2,4, 7,9,13,15,18, 20,22 32:2,25 34:2,5,13 35:2, 6,13,17,20 36:1,3,6,14 37:10,17 38:4, 7,10,22 39:20, 23 41:21 42:5, 6,23 46:14 48:16 49:13,23, 24 75:24 85:10, 18 86:14 97:3 98:21 99:9,14, 21,23 100:9,14, 20 102:3,20 105:22 106:1,5, 23 107:8 123:5 124:1 130:21 131:11 134:16 135:19 136:21 137:9,15 138:17 139:1 140:18 141:6, 12,21 142:4,13, 19,22 143:14 144:22,24 145:6,13,15,17, 22 146:6,9,15, 16 147:3 150:14 156:24 157:5,6,14 159:4 160:13, 25 174:2,12 176:4 177:4 178:11 187:9 193:19 194:2 203:1 211:9 212:7 223:14 224:17,24 228:15,20 229:14 231:23 233:16 234:2 235:4,18 236:8, 11,13,15 237:3, 8,23 238:2,4,8 251:2,7,11,12 253:1,20 255:8, 21 261:1,16,25 262:4,7,16,20, 22 263:16 265:4,8,20,21 268:13 271:17 274:7,22 275:21 278:20 279:4 281:16 284:24 286:2 288:14 289:4, 14 291:12 293:3,18 304:23 305:2,9, 12 306:12,14, 17 311:25 315:18 316:7 319:24 320:25

321:1,8,11,25 322:5 323:17, 22 324:1 328:11,12,19, 23 330:5,8 331:18 332:16 333:2,10,13 341:15 342:2 346:15,19

**detective's** 107:13 137:20 229:9 235:22 237:12 271:25 328:10

**detectives** 16:4 29:3 30:12 32:18,20,22 33:3 34:20,21 35:14,22 36:1 41:14 42:5 43:4 45:12 50:8 51:5 56:19 57:11,16 58:3,21,25 64:19 72:19,23 78:5,21 83:14, 19 85:17,21 94:9 96:10,15 97:6,17,20,24 98:3,5,8,13 107:20 108:5, 10 112:6,12,14, 23 113:8,20 120:8,10,12,16, 19,23 121:1,9, 13,21 122:2,9, 18,22 123:4,12 125:24,25 126:4,16 127:9, 15 128:1 130:4, 10 131:10 133:18,19,24 134:4,5 135:12 138:1,18 139:7, 20 140:16 143:18 144:11, 18 145:21 149:16,17 153:7,16 155:5, 10,14 158:5 159:20 160:19, 23 164:3,11,17, 21 166:9,16,21 168:2,5,16,19 169:4,9,13,18, 23 170:7,12,20 171:3 175:19 176:1,6,7,12, 17,21,23 177:4, 13,20 193:12 194:9,14,21 196:20 202:25 206:20 207:3, 12 208:6,10 210:24 213:7,9 214:1,9,14 215:1 220:10, 12 221:25 223:23 224:20 225:3,7,14,22 226:15,17,18, 23 227:10,20 228:4,5,13,18 229:2,16,21 230:9 232:1 233:12,21 236:2 237:17, 25 238:5,10,23 239:7,11,12 240:11,21 241:1,7,12,21 246:25 247:4, 13,20 248:11, 16 249:12,17 250:3,7,12 252:7,15 253:15,19 257:17 258:6, 14,21,22 259:9 261:9,23 262:14,25 263:12,21 264:1,4,7 265:13,14 266:1,10 267:11 268:5 271:21 272:19 273:2,5,12,13, 24 278:23 279:21 281:10, 17 282:5,15,21 283:2,8,10,16, 23 284:7 285:6, 10 288:5,10,19 289:1,13 290:2 292:7,21 293:22 294:2, 20,25 295:19, 25 296:18 298:8,14 299:15,23 300:2,10,22 301:1,4 305:12, 16 307:1,3,17, 22 308:4,11 309:3 311:12, 20 312:3,6,8,11 314:9,14,21,24 315:6,23 316:12,18 317:7,11 318:11 319:8 320:24 322:12, 16 324:25 325:2 330:10 331:9,23 332:1 346:16

**detectives'** 167:11 285:5

**determination** 97:5 144:17 145:5,14 197:7 229:12 262:12, 18 332:7

**determinations** 237:12

**determine** 123:11 135:13 146:23,25 173:16 275:16 299:3

**determined** 95:6 140:16 142:20 210:9 262:16,17

**dictated** 89:25

**difference** 193:18 199:1 280:2,19

**differences** 22:10 278:21 279:19,23 280:5 302:24

**differently** 252:24 342:15, 16

**difficult** 294:15,21

**direct** 14:25 40:6 206:24

**direction** 132:10 133:20 208:6 263:20 306:12

**directives** 80:23 81:16 87:1,12,19 345:5

**directly** 98:3 141:14 320:24

**disagree** 43:4

**disbanded** 23:4 24:7,8 149:25 150:4,6 343:9,10,12,15

**Disciples** 338:2

**discretion** 328:10

**discuss** 46:23

**discussed** 64:11 215:4 242:18

**discussing** 63:9,24

**discussion** 211:7

**disorganized** 89:21

**displayed** 54:15 176:2

**dispute** 84:18

**disseminate** 124:10 324:14

**dissemination** 123:21

**distinct** 113:2

**distinction** 71:14 198:8

**distinctions** 337:15

**distinguish** 154:14

**distinguishes** 74:19

**distinguishing** 73:21

**distracted** 121:24

**distraction** 124:24

**district** 12:20 17:20,21,22 18:1,6,8,11,15, 18,24 19:10,21 21:8 24:19,25 25:5,6,8,11,14, 21,24 26:1,2,7, 22 48:19,21 49:5,8 50:15,16 191:19

**districts** 22:1 326:3,9,22

**division** 12:21 15:23 19:23 21:9,11,17 22:22 23:2,6,18 27:21,23 29:5 31:4 32:3 34:13 36:14 37:18 38:4,7,10,22 39:20,23 41:21 42:6 48:16,18 49:14,23 81:25 82:12 85:10 99:9,14,22,23 100:9,15,20 104:18,21 105:5 109:6 113:23 123:5 124:1 156:24 159:4 160:13 178:11 183:15 187:9 203:1 211:9 255:9,21 263:17 265:4,8 278:20 279:5 281:16 284:24 286:2 316:7 321:3 323:17, 18,22 324:1 327:22,23 329:2,6 330:8, 21 331:18 332:16 333:3, 10,14,18 341:15 342:2 343:2 346:15

349:10

**divisions** 285:23

**docu** 347:3

**document** 53:24 54:2,3 55:2,3 82:11, 17,20,21 83:2, 24 86:23 87:13 103:12 104:22 105:1,6 106:24 107:9,14,23,25 108:11,17,18, 20,23 109:9 113:25 114:6, 23 115:3,15 116:3 121:20, 21 123:17,19, 25 140:13 142:15,21,25 143:16,19 144:11,23 145:3,4,25 146:9,18 147:4, 13 151:10,11 153:6,7,8,12, 14,16 154:4,6, 7,8,13 155:5,6, 11,15,24 156:14,18 157:10,11,15, 22 158:8,13,17, 18,21,25 159:12,24 160:2 161:2 164:4,10,12,21 165:15,22 166:9,16 179:23 180:12 181:6,8 183:10 184:1 187:1,18, 21 188:5,19 189:4,19 190:17 191:4 194:21,25 199:12 200:1 201:3,7,11,22, 24 202:3,11 212:21 223:3 230:6,9,13 231:4 233:22, 24 234:2,7,9, 14,19,22 235:3, 19 236:1,3,8,9, 12,17,19 237:23,25 238:5,10,23 239:13 240:5, 15,22 241:20 242:16 245:17 246:17 249:19, 25 251:4 261:17,23 279:2,3 286:22 287:5,12 296:8 303:6,14 304:10 306:21 307:18,21,24 308:2,12,19 311:13 312:11 314:9,14,21 318:2,15 321:9 323:2,6,10 325:2 327:18 328:24 330:13, 17 331:6 332:11 334:12, 16,23,24 335:1, 24 342:10 347:25

**document-heavy** 238:9

**documentation** 64:6,12,16,18, 22 70:25 78:4, 10 79:10 95:3 101:23 109:14 110:23 111:10 116:22 122:7 123:2 141:19 182:17 194:6 230:4,5 237:15 240:9 241:19 245:14 246:9 250:24 251:1 260:18,19 307:8 308:23 314:25 322:23 327:14 329:5 342:15

**documentation-wise** 343:4

**documented** 107:19 109:18 116:14 140:7,8, 21 141:16,25 142:6 143:21 150:20,24 151:15,24 152:6,7,8,11,17 156:4,23 157:3, 4,6,7,13 158:1 165:3 193:25 194:15,18 230:17,25 231:1,14 235:12 239:8, 12 241:21 244:11,16 245:3,7,10,22 246:3,6,12,13, 15 251:12 260:3,24 261:5, 9,19 262:3,10, 11 303:8,13 307:10,13 309:9,13,17 310:3,6,7,14,24 311:1 312:21 313:3,9,10 321:3 322:18

**documenting** 111:14 116:7 151:18,19 152:24 163:22 167:1 237:22 250:4 279:24 280:25 309:23, 24 313:14 324:23 325:12 327:24 330:2

**documents** 60:18,21 61:14 68:8,11 82:25 85:24 87:19 105:13 110:7 116:23 117:1 122:17 160:19 178:7 182:5,17 188:3 318:1 323:14 325:18 336:13 342:9 343:9 344:23 345:17,22 346:8,25 348:16

**dog** 75:17

**domestic-** 129:9

**drive** 12:6 229:10

**driven** 209:22 233:15 235:23

**driver** 168:7

**drivers** 19:19

**driving** 236:14 237:7

**drug** 27:7

**drugs** 339:2,9

**dubious** 209:15

**duties** 263:5

**dynamic** 138:8 225:12

**E**

**earlier** 22:2 184:15 203:2 244:3 256:4 259:15 265:12 270:9 271:25 279:4 280:12 283:9 306:9 313:8 324:12 328:15 335:5 341:11

**early** 20:16 21:15,20 22:23 23:15,22 24:16 25:15 28:21 35:16,19 49:19 150:5

**earth** 293:7

**easier** 120:18 160:4 161:18

**easily** 66:15

**Eastern** 12:21

**easy** 289:5

**educational** 329:22

**effect** 128:8 195:21 217:4, 22 243:20 307:17 327:24

**effective** 84:15,19 200:5 215:14 216:10 217:1

**effectively** 322:3

**efforts** 146:9 207:12 222:15 316:12

**Eileen** 13:3 40:4 56:13 80:10 88:24 160:11 242:3 244:2 329:11 351:2

**either/or** 105:24

**elderly** 293:5

**electronically** 351:8

**element** 212:5, 6 234:21 238:14 265:10

**elicit** 139:19

**emotional** 139:14,17 305:24

**employee** 346:22

**encompass** 106:3

**encompassed** 19:24

**end** 133:1 153:4 172:21 225:1 279:12 283:11 285:2 335:22 347:11, 15

**ended** 24:4 245:10

**enforcement** 27:6,14 51:16 75:13

**engage** 225:15,23

**engaging** 207:12

**Engquist** 13:12,16 277:4, 10,12 350:15

**ensure** 187:5 223:5 225:9 283:25 284:25 285:17,24,25 286:4 287:18, 24 288:6 305:14 345:17, 22 347:5

**ensuring** 225:8 316:4 332:12 344:10

**enter** 94:22

**entered** 180:25 185:12

**entire** 85:1 106:12 119:2 279:3 318:11 327:13

**entirety** 83:9 279:16

**entitled** 43:25 45:10 55:4 200:2 201:23 323:16

**equivalent** 104:4

**Eric** 37:19

**erodes** 283:7

**error** 131:6

**errors** 283:18

**essentially** 97:6 159:13 160:18 169:6 205:9 212:9,13 233:11 235:18, 19 244:5 254:24 262:3 266:21 275:24 276:1 282:4 284:17 307:21 308:17 315:1 329:15 332:7 347:14

**establish** 127:14 128:7, 15 137:23 220:4 254:12

**established** 32:10 90:3,7, 16,17 92:6,16 93:19 113:19 127:2 157:20 158:8,17 193:24 302:21

**et al** 12:11,13, 14,17,18

**ET's** 232:21,22

**ETS** 232:9

**event** 130:9 325:13

**eventually** 29:12 331:23

**everybody's** 273:21 274:4, 19 338:1

**evidence** 195:6 210:8 229:20 232:5, 10,13 311:16

**evidentiary** 145:8,14 210:4, 10 262:17,19

**ex-boyfriend** 204:22

**exact** 24:9 165:21 299:1

**examination** 14:25 44:2 348:25 349:20

**examples** 75:9 224:16 312:23 336:17

**exception** 13:18 256:3 302:23

**exceptions** 137:5

**exchange** 140:3

**excluding** 325:10

**exclusively** 16:24 87:7,9 119:7 127:2 191:7 193:9

**exculpatory** 144:5,12,17

**excuse** 16:7 93:23 98:23 126:11 127:19 137:17 146:4 185:3

**exhibit** 53:25 54:3,10,25 55:2,6 82:11,15 84:12 85:10,15 86:5,7 113:14 119:16 158:21 159:2 160:18 161:2 162:9 179:16,17,19, 21 199:11,14 200:19 201:2,9, 18,21,22 202:1, 14,17 203:5 215:8 216:3,16 242:14,15,17 243:6,7,19,23 255:4 277:22, 23 278:19 279:8 280:12 281:5,15,22 282:14 302:21 303:2 314:8,9, 16,22 318:1 323:13,14 335:25 344:8 347:10,11 349:3

**exigent** 138:12,16 139:1 214:25

**exist** 74:7 335:17

**existed** 122:17 227:7 280:6 285:10 344:9 347:4 350:6

**existence** 112:22 142:6 150:2

**existing** 93:4

**exists** 70:2

**expect** 141:24 296:1

**expectation** 138:3 164:20 165:25 166:15 175:6,16 192:13,14 207:14,17 220:9 224:19 231:13 235:11 236:2,9 238:5, 7,10 240:5 241:12,19 249:12 250:25 251:10 254:1 263:21 265:25 320:19

**expected** 96:11,15,16 101:24 104:16 125:24,25 126:4 127:10, 15 128:1 130:4, 10 138:19 139:7 140:7,20 141:24 142:5, 25 143:15,18 144:11 145:25 146:9,18 147:3, 13 151:15 164:12,17 181:16 234:19, 22 235:3 240:22 241:8 249:6 341:15

**experience** 33:23,25 34:24 38:23 43:6 68:18 187:12 224:6 227:2,3 229:9 231:3 253:22 257:11 283:22 284:5 285:4,21 295:6, 8,17 312:2 325:6,8,11

**experienced** 35:14 271:17 293:3,17

**experiences** 33:14,21 34:1

**explain** 37:24 290:1

**expound** 292:23

**expressly** 216:7 306:15, 17

**extends** 32:9

**extensively** 288:10

**extent** 13:10 47:8 92:8 109:17 139:22 163:17 165:1 211:6 213:1 214:12 227:24 239:21 240:2, 13 252:10 262:22 296:5 331:5 332:22 338:25 340:17 349:13

**external** 235:23

**extra** 222:6

**extraordinary** 214:16 252:4, 11 279:25 280:25

**extreme** 45:16

**eyewitnesses** 234:20

F

**F-O-S-T-E-R** 14:9 15:4

**face** 174:17 205:18 222:9, 12 224:14 293:6

**face-to-face** 174:25

**faces** 257:13

**facet** 35:12

**facets** 35:12

**fact** 14:11 34:24 127:24 134:21 158:8 165:11 174:21 185:19,20 188:4 211:6 213:18 224:1 231:14 246:14 256:8 263:7 270:9 276:25 279:4 290:20 299:3

**factor** 134:2 229:25 230:1 273:16

**factors** 233:18 235:24 291:13

**facts** 128:13 325:18

**failing** 154:11

**fair** 30:4,9 34:20 39:24 45:3 52:9,13, 18,19,21,22,25 53:1 63:3 73:25 74:15 78:16 80:4,12 86:6 89:14 90:1,19, 25 95:4 100:15, 22 102:17 107:11 111:17, 20 122:11 127:9 133:8 135:14,15 136:24 138:14, 15 139:10 170:14,16 171:15 172:15, 20 177:6 205:19 206:4 249:14 258:5, 10 259:6 264:11,12 269:20 283:19, 20,21 284:21 286:22 288:7,9, 14 289:12 292:10 301:3 321:25 346:14

**fairly** 207:6

**fairness** 317:12

**fall** 71:20 75:5, 10

**false** 67:8,12, 16,20 272:3 285:14

**familial** 206:10

**familiar** 170:19 188:1 205:10, 18 206:7 209:5 257:2,13 326:20 338:2

**familiarity** 206:18

**fashion** 251:5

**fast** 237:5 310:11

**father** 129:5

**fault** 121:25

**feasible** 218:20

**federal** 22:14 337:16

**feel** 83:11 188:12

**feeling** 283:4

**feels** 238:3

**field** 178:19 200:2

**fight** 40:16

**figure** 44:1 218:7

**figured** 218:2

**file** 333:2,15, 18,19,20,25 336:15,19 337:3,6,14,17, 18,19 338:3,12, 14,23 339:4,24 340:4,5,20 342:24,25 344:17 349:24, 25 350:9,10

**files** 85:15

336:13,24 337:2,11,15,22 338:21,24 339:14 340:3, 11 341:3,8 342:10,17 343:15,16,19, 23 344:4,11,16 345:18,23 346:21 347:6 350:5

**Files(ci)** 82:14

**fill** 103:22 104:17 105:7, 20 108:24 109:5 184:17 191:6,9,11 329:17 331:5, 12 332:23 335:8 339:10

**filled** 106:12 191:16,24 328:5 332:14 333:8,23

**filler** 244:10 276:12 309:9, 12,15 310:2,5, 7,23

**fillers** 197:5, 18,21 198:1 208:15 272:7 274:14 276:11 287:15,20 288:6,12,16,17, 20 289:2 299:1 301:15 302:4 305:1,6 309:1 316:9,13,19

**filling** 105:5 330:20

**final** 125:20

**finally** 59:3 312:18

**find** 39:23 47:25 185:8 188:13 196:12 202:4 218:2 227:15 242:2 285:1 293:9 321:7

**finds** 321:17

**fine** 41:16 43:14 44:24 46:2 78:22 182:24

**finger** 138:2,18 140:19 196:2 259:22

**finish** 51:23 52:4,9

**Fish** 338:6

**fit** 103:12 106:11 275:9, 23

**fits** 74:14 188:16

**fix** 14:2

**flashlight** 222:9

**flip** 174:9 292:25

**Floor** 12:6

**fluid** 140:3 232:23 235:24 237:7,16

**fluidity** 237:19

**focus** 120:17, 18 156:10 218:17 241:11 304:6 319:6

**focused** 19:6, 11 26:12 33:24 37:13 87:7,8 155:19 256:4,6

**folks** 345:21

**follow** 87:2,14, 21 99:14 100:9, 20 164:17 196:1 229:22 282:24 287:3 301:4

**follow-** 142:23

**follow-up** 44:7 137:21 138:4, 19,22 139:2,19, 21,25 142:5,13,

24 247:21 248:2,5,12,17 249:9,13 302:10 324:5

**follow-ups** 115:8

**foremost** 39:17

**forensic** 231:9 232:8,13 241:25 311:17

**forfeiture** 86:10

**form** 21:22 22:11,18 35:23 36:17,19 55:23 71:23 72:8,24 74:9,16 76:2,9, 18 78:7,12,19 80:15 87:3 89:17 90:2,12, 20 91:1,15 92:4 93:14 97:9 105:16 106:19 108:7 115:11 116:25 118:4 120:13,24 126:7,20 127:4, 12,18 128:4 130:24 131:13 132:11 134:9 135:20 137:12 139:11 140:14, 22 141:17 142:1,9 143:3 144:7,19,25 145:16 146:2, 11,21 147:7,17 148:13 149:9 151:25 152:1 153:10,18 154:3 155:16, 25 156:5 157:1 163:4,25 164:7, 15,24 165:18 166:6,12,20 167:3,10,16,21 169:22 170:23 171:5 172:6 173:14 174:18 177:7,15,24 178:6 181:25 182:22 184:25

186:6,24 195:8 204:4 205:21 206:23 213:14, 24 218:24 224:23 225:18 226:22 227:25 228:10 229:7, 15 233:7,13 235:21 239:20, 24 240:8,18 244:18 245:1 247:15 248:19 250:19 252:13, 18,23 254:6 255:2 267:18 269:6 271:15 273:8 274:9 276:4 282:7 284:22 289:7, 16 295:21 296:3,11 299:18 300:5 314:17 315:20 316:1 317:14 324:9 327:2,16, 17,25 329:5,18 330:4,18 331:11,19 332:3,23,24 334:1,8,12 335:11,18 339:16,19 340:1,21 342:12 343:18 345:4,9 347:8 348:13

**formal** 71:12 111:10

**forms** 34:21 327:20 330:1, 14 331:6 332:13 333:1,7, 23 339:11

**forthcoming** 264:1

**forward** 23:5 70:4 123:8 125:16 218:15 332:6

**Foster** 12:10 14:6,8,12,15,17 15:4,15 46:7 54:9 69:13 81:10,15 125:8 129:6 135:23 158:22 161:6 162:3,12,16 179:21 180:5, 18 183:22 184:12 185:9 186:19 189:8, 13,16 190:8,25 199:12 200:19 201:7,24 204:24 205:2,3, 7 242:8,13 243:7 255:12, 20 277:17 281:23 298:1 313:24 323:13 326:24 329:9 334:4,18 335:1 347:11

**Foster's** 44:3

**Fosters** 134:14

**found** 67:8,11, 15,19 74:20 142:24 320:25

**foundation** 34:20 38:12 45:5 89:18 90:2,12 91:1,3 92:15 117:1 166:20 167:10, 16 182:22 239:24 240:8, 18 250:19 272:25 300:5 324:9 331:19 347:8

**four-page** 54:3

**fourth** 48:19,20 49:4,8 135:24

**frame** 20:14,15 36:24 51:8 63:8,13,23 64:1 90:4 99:11,21 103:13 141:19 148:16 150:1 177:17 181:19, 23 197:13 230:20 232:7 238:13 252:17 264:13 277:25 311:23 313:4 329:3

**frankly** 188:15

**fresh** 221:11

**Frito-lay** 19:18

**front** 162:9 189:24 190:1,3 290:8 296:25 297:4

**frowned** 260:15

**fulfilling** 346:21

**full** 167:19

**fully** 298:21

**function** 20:19,21 31:7 119:21 306:3

**functions** 19:2 24:4 32:22

**future** 174:13 254:3

## G

**G-O-L-U-B-I-A-K** 42:19

**gain** 148:1

**game** 39:24 45:3 77:22,23

**gang** 20:2,7,8, 11,12,13,18,20 21:1,2,10,16, 20,24 22:3,5 24:1,15,22 25:1 26:15,18 28:2,5 30:19,23,24 31:2,6,11,14, 16,19,23 32:2, 17,25 33:2 37:15 38:11,20, 22 40:1,2,10 51:6,7 55:22 56:8,20,23 57:3,6,11,15, 19,24 58:2,7, 10,15,21,25 61:7,10 62:9,12 63:16,19,23 64:3,8,10,15,23 68:7 73:3,8 75:24 77:11,17 78:1,11,21 79:4,9,10,14,22 80:1,5,11,24 81:16,20 82:2 83:13,19 84:1, 5,12 85:2 86:10,13,15,19, 25 87:7,13,17, 20,24 88:1,10 89:9,10,15,24 90:6,17 91:20 92:2,12,19 93:1,5,11,20,25 94:10 96:10,15 97:2 98:24 99:4,7,13,20 100:2,8,12,17, 22,23 101:2,7, 17,21,25 102:6, 8,9,10,16,25 103:8,19 104:4, 16 105:19,25 106:11,16,22 107:8,10,12,15, 17,19,22 108:3, 10,19,24,25 109:5,9,15 110:10,12,14, 16,19,20,23 111:8,9,18 112:3 113:22 118:1 119:18, 24 121:21 122:3,8,13,14, 15,20,23 123:1, 7,9,10,21,24 124:14 148:3,6, 8,12,20,22 149:1,3,4,14, 17,18,22,23 150:2,9,12,15, 16,17,18,21,23 151:1,4,7,21,23 152:6,17,24 153:8,16,17 154:9,18 155:1, 5,7,11,14,15,24 156:3,9,11,16 157:2,3,7,13, 20,25 161:3 162:23 163:2,6, 8,18,23 166:4, 9,13,17,21 167:2,5,6,7,11, 13,24 168:1,2, 6,7,12,14,19, 21,23,24 169:1, 3,5,7,10,14,16, 19,21,24,25 170:8,13,14,20 171:4,11,14,15, 21,23 172:2,4, 10,13,14,18,20, 23,25 173:3,5 174:7 175:5,9, 16,19,20,21,24, 25 176:2,3,4,6, 7,8,13,16,24 177:2,3,5,11, 12,16,19,21,22 178:4,8,10,15, 18,23 179:1,2, 6,7,9,14,22 180:21,24,25 181:3,8,11,16, 17 182:10,16, 19,20,25 183:5, 11,12,15,17 184:11,17,24 185:11,12,14 186:2,4,7,11,20 187:2,12 188:10,21 189:4,8,11,12, 15,21 190:6,10, 16 191:1,2,5,8, 9,11,13,16,17, 19,20,25 192:2, 4,10,16,17,21 193:1,3,6,13, 14,15,17,19 194:1,2,4,6,9, 10,16 195:7,15, 20,24 196:21 198:5,8,10,14 199:10 200:24 201:12,19 202:18 236:22 239:22,23,25 240:2,12,13 242:21 265:7,9, 10,12,14,15,16, 18,19,20,22 266:3 292:24 293:13 304:13, 17 305:2,5,8, 18,22,25 306:4, 9,15,18 308:6, 11 317:23

318:3,11,16,21, 23 319:1,9,11, 16,20,25 320:6, 19 321:5,15,22 322:3,9,20,22 323:1,5,20,25 324:4,6 325:1, 21,25 326:5,6, 7,10,13,16,22 327:3,14 328:3, 5,10,11,16,18, 22 329:17,25 330:12 331:5, 12,14,17,20 332:2,8,14,22 333:8,23 335:12,16,19 336:14 337:3,6, 19,22 338:3,11, 12,14,15,16,20, 21,22,23,24,25 339:4,8,10,14, 24 340:3,14,15, 18 341:5,9,12, 19 342:6,10,25 343:8,10,14,15, 17 344:11,15, 18,25 345:1,6, 13,17,23 346:3, 23 347:4,6 348:2,4,5,10,11 349:4,16 350:6, 9

**gang's** 157:7 171:17

**gang-** 324:15

**gang-related** 170:3 336:25

**gang-specific** 151:2 169:2

**gangs** 23:4 81:20 132:9 148:21 172:1 179:2 274:25 275:3,23 320:3, 4 321:17 326:2, 8 327:7,9 332:6 336:25 337:25 338:4,10,18 339:1 340:13, 19 342:18 344:20 346:7, 13

**Gangster** 274:24 338:2

**Gangsters** 275:4,9

**garner** 335:8

**gather** 192:10 335:12

**gathered** 325:25

**gathering** 22:6,7,9 183:4 338:17 345:12

**gauged** 132:15,18,20

**gave** 66:6 177:13 223:16 240:22 270:5 276:9 314:10

**gender** 275:9

**general** 60:23 61:1 62:10,13, 16,22 63:3,7, 10,15,18,22 64:2,5,17,21 65:6,10 68:6 74:5 99:25 100:3,6 120:16 137:7,8 149:18 187:8 195:17, 22 196:5 199:4 201:4 212:25 215:9,22 226:2, 3 240:10 241:23 242:19 267:3 269:1 277:24 304:1 306:22

**generalities** 129:12

**generally** 37:22 43:14 50:10 113:3 150:11 176:23 177:8 207:21 208:22 220:12 258:12 305:11 341:24

**generate** 122:20 283:5

329:23

**generated** 326:23

**gentleman** 96:3

**Geraldo** 12:16

**germane** 148:19

**get all** 165:6

**GI** 102:24

**girl** 204:21

**girlfriend** 133:2

**GIS** 102:4,6,8, 13,15,19,25 103:4,11,18,22 104:4,6,10,12 105:15,20 106:7 108:25 109:5 321:4 327:5,6,16,20 329:2,18 330:1, 4,14,18 331:6, 11 332:13,23 333:1,7,23 339:11,13,21 340:19 341:12

**give** 14:20 66:16 74:22 95:23 118:14, 15,18 136:13 161:20 172:19 180:3 188:18 212:1 241:1,8, 12 298:24 301:23 315:7, 12,18

**giving** 136:5 326:8

**goal** 224:24 225:3 226:7 248:4 271:25 285:1,3

**Golubiak** 42:10,17

**Gomez** 12:12 54:6

**good** 73:21 121:1 123:6 130:18 132:24 173:8 207:1 254:7 299:11 300:18,23 301:7

**government** 22:15

**grab** 125:14

**graduated** 110:17

**grand** 174:6

**great** 174:1 254:5 277:10

**Griffin** 42:13

**group** 20:25 180:14,19 181:16 182:20, 23 193:13 237:1 256:14 258:3

**groups** 38:23 74:14 86:1 216:14

**growing** 326:10

**guess** 44:20 46:18 66:10 69:4 72:6 80:20 118:5 128:19 129:13 135:1 136:24 139:12 140:15,24 171:7 190:2 193:16 203:20 214:6,24 216:15 248:20 251:3 273:19 275:15 293:17 299:21 303:16 320:21 321:12 346:10

**Guevara** 12:11,13,14,15, 17,18 13:18,21

**Guevara's** 45:15

**guidance** 87:13,20 243:12,17 296:7,14 300:2 304:8 316:3 345:11

**guide** 240:11

**guidelines** 80:22 87:12,19 345:6

**guns** 339:2,9

**guy** 133:5 211:24 222:10 237:4,13 259:16 275:2

**guys** 37:4 40:9 124:17 148:16 160:3 218:5

H

**hair** 316:21

**half** 159:21 165:7 330:24 331:2

**half-masked** 298:21

**hand** 14:18 275:6

**handcuffed** 316:9,10 317:3, 5

**Handcuffing** 229:24

**handcuffs** 229:19,25 230:2 236:5,6

**handful** 197:18

**handle** 237:18

**hang** 139:5

**hangs** 135:17 139:6

**happen** 98:1 132:5 172:17 177:10 289:4 320:15,22

**happened** 32:10 136:14 175:23 232:1 251:24 322:15

**happening** 121:5 210:10

**happily** 122:1

**happy** 35:4 46:23

**hard** 118:14, 15,18,20 137:17 139:14 160:3,11 161:13,18,20 162:8

**head** 52:11 241:24 303:22

**health** 132:24

**hear** 196:10

**heard** 20:6 75:15 101:8 134:6,7 135:2, 17 137:8 139:3 149:6,7 203:22 204:20 244:19 338:7

**heavily** 238:1

**height** 222:11 308:14 316:20

**held** 25:3 31:23 49:12 211:19

**hell** 348:19

**helpful** 138:23

**helping** 70:1

**helps** 149:3

**hey** 75:15,17 106:1 134:6 135:2 139:3 227:21 274:22 300:21,23 320:8 321:18

**Hickey** 66:8,23 67:3,7

**Hickey's** 65:21

**hierarchy** 336:25

**High** 20:22

**highest** 252:19,22

**hired** 17:6

**historically** 116:8 173:18

**history** 47:4 53:3

**ho** 321:22

**hoc** 89:16,20

**hold** 14:1 41:3 55:1 94:12 180:9 237:2 258:18 329:11 334:3

**holding** 275:6

**Homewood** 27:2 343:13

**homicide** 15:21,24 16:1, 2,4,7,17,21 30:12,17,20,25 31:24 32:22 33:1 34:13,20, 21 35:14,17,20, 21 49:24 50:8, 21,23 51:5 55:16 91:3 92:17 97:18,21 98:16,17,21 99:5,8,10 100:13,19,24 101:4,13,16,18, 22 102:1,17 103:1 104:23 105:1,7,9,12, 14,21 106:17 107:19,24 108:6,21 109:1, 11,15 110:24 111:8,11,16,20 112:7,15,23 119:25 120:6, 11,16,18,19 121:22 122:9, 16,21,24 123:2 124:4 129:14 134:5 150:12, 15 155:22 156:10 168:3 169:11 176:17 177:4,12,18,20 231:9 232:2,5, 15 233:5 251:15,19 252:7 263:11, 12,18,24 264:19 265:3 268:4 285:5,6, 9,23 304:15,19 306:10,14,20, 25 307:2,3 318:20,25 319:1,3,4,5,6,7, 8,11,12,15,19 320:10,16,20 321:19,24 322:4 324:25 325:10,17 328:17 329:18, 22,24 330:3,13, 18 331:7,9,13 332:15,25 333:2,9,24 336:18 341:14 342:8,16 344:12 345:7, 13,19,23 346:18 347:7

**homicide-related** 342:19

**homicides** 16:15,24 29:13, 18 30:5,10,13 33:6 92:7 170:3 263:19 324:8, 17 342:14

**hone** 170:13,21 172:24

**honestly** 131:24

**hope** 172:14

**hour** 211:20 212:11,13 213:12,21 214:3,17 215:4 219:17,20 224:3 227:5,14, 17,22 228:5 229:3 231:15 330:24 331:2

**hours** 60:6,7 66:13,18

**Howard** 16:13

**human** 129:24

**hundreds** 30:5,10 48:3

**hurt** 237:10

**husband** 129:3 147:18

**husbands** 129:8

**hypothetical** 118:5 126:8 137:13 140:23 146:3,12 147:8 204:5 221:22 228:11 274:10 275:20 276:5

**I**

**ID** 165:9 244:12 245:5,8,10,17, 25 257:14 282:16 291:24 296:20 312:25

**idea** 114:6 125:22 198:5 207:1 219:7 287:13 288:10, 15 290:24 299:11 300:18, 23 301:7 324:4 343:21 344:6

**ideal** 208:16

**ideally** 197:21 227:23 274:14 278:6

**ident** 246:9

**identification** 37:15 39:21,25 41:11 54:10 55:6 82:15 150:19 151:16, 20 156:11,25 157:10,15,23, 25 158:24 159:2,5 160:14, 20 161:7,10 162:24 164:8, 13,22 165:23 166:4,18 167:7, 8,14 172:18,23 173:3,4,5 174:4,5,7,10,15 175:8,15 178:2 179:17 193:18 194:1,21 195:7 196:17 197:8, 15 199:14 201:9 202:1 203:13 204:12, 15,18 205:4,13 206:22 207:5, 18 208:17 209:14 210:6, 16 211:12 212:24 213:3 220:9 221:11 222:10,15 225:4,10,17 226:2,6,8,9,11 230:7,14 231:6, 19 232:19 238:15,17,18, 20,21 239:14, 15,21 240:4,6, 7,14,17 244:15, 16,23,24 245:3, 6,7,9,11,13,16, 19,20 246:15, 19,22 247:20, 23 248:3,6,10, 18,22,23 249:6, 7,8,17 250:5,9, 10,13,15 253:24 254:3,9 255:1,7,20 256:18 257:7, 18 258:7,9,16, 23,24 259:5,10, 11 260:11,15, 20,24 261:5,8, 19,20 262:2,3 263:9 264:9,10, 19,22,25 266:1, 8,11 268:6 269:14,18,23 270:7,19 271:18 272:3, 21 276:14,17, 24 278:22 279:15,20 281:10,16 282:24 283:17,

24 284:2,4,8, 15,20 285:23 286:3,11,25 287:2,10 289:22 290:25 291:3,8,14,20, 25 292:7,9,12, 18,20 293:2,5, 15,18,24 294:3, 7,8 295:9,10,14 296:10 297:22 299:15 305:15 310:9 313:2 334:9 348:11

**identifications** 154:9 156:8 161:11 163:22 164:4 167:1,2 174:20 194:4,7 207:11 211:8, 14 225:25 238:24,25 239:9 240:16 244:4,6 245:22, 23 246:3,6,10 247:2,8 249:20 250:1 254:13 255:23 256:5 263:1,22,23 271:22 273:3 282:2 283:12, 13 284:12 285:14,17,18 294:23 295:2, 20 296:1,6

**identified** 39:21 53:19 68:8 85:15 88:22 114:17 116:12 135:1 151:5,23 152:6 156:16 157:16 158:14 221:23 244:10 268:16 270:18 271:23 273:17 274:4, 12,17 275:25 290:12 309:4,8, 12,15 310:7,13, 21,24 314:22 334:9

**identifies** 54:6, 8,12 114:10 115:19 209:10 276:13 290:7 312:23

**identify** 13:9 42:21 46:13 112:22 151:7 165:20 196:3 207:12 245:24 246:2 264:3 308:18 309:4

**identifying** 71:15 95:15 127:23 136:8 164:5 290:9,15 296:19

**identities** 43:12 117:22 118:2 129:18 308:20

**identity** 70:19 114:23 116:13

**Iglesias** 12:16 54:7

**Illinois** 12:7,21

**imagine** 91:19 158:9

**immediately** 228:16 232:2

**impeachment** 325:3

**Imperial** 274:24 275:4,9

**implicit** 289:9, 11

**importance** 288:11

**important** 38:11 51:22 115:7 116:2 136:4 140:13 231:5 234:21 283:24 288:15 338:1

**impossible** 297:18

**improper** 297:22

**in-person** 203:24

**inaccurate** 67:8,12,16,20 143:25 144:2,4 284:11

**inappropriate** 208:18

**Inaudible** 309:23 333:5 335:17

**incident** 323:21 334:14

**incidents** 324:6,16

**include** 27:7,9 146:16 163:18 192:10,15 261:17 287:14 308:6 324:8

**included** 127:25 260:25

**includes** 324:16

**including** 21:2 147:14 226:12 319:3 324:16

**incomplete** 118:4 126:7 137:12 140:22 146:2,11 147:7 204:4 228:10 274:9 276:4

**incorporate** 106:6 122:22

**incorporated** 31:3 330:8

**Incorrect** 163:5 245:2

**increase** 134:18

**increases** 134:20

**inculpatory** 144:17

**incumbent** 264:3

**independently** 289:22

**indicating** 247:18 296:8 301:19

**indication** 212:1 249:4 250:9,14

**indications** 316:5

**indicia** 131:10, 20 146:19 147:4,13

**individual** 13:17 21:3 48:11 71:6 72:3,10,13,15 73:10 74:13,17 82:13 85:15 88:14 112:21 114:6 135:10 172:19,20 261:25 348:1

**individuals** 38:14 67:3 70:4 71:22 72:23 73:8,11 86:2 114:1,12,16,19 115:10 116:11, 14 117:22 129:18 151:12

**influence** 249:10,14

**inform** 68:21 118:1 125:25 262:25 264:7

**informal** 36:10

**informally** 75:15,23

**informant** 69:25 70:7,13, 14,16,18 71:11, 12 72:6,12,15 73:19,23,24 74:25 76:8,21, 23 77:5,7 85:19 88:14,19,21 98:2,22 114:7 116:16

**informants** 27:10 28:12 40:1,3,10,20 63:5,8,11 69:20 70:5 71:2,5,16, 21 72:19 73:3 74:6 77:16 78:1,5,11,15 79:11,16,20,23 80:6,12,24 81:18 82:3 83:8,12,18 84:8,23 85:16, 25 86:25 88:2,7 91:14 92:3,13 97:25 98:6,9 113:10 114:3 115:2,6,21 116:3,12,18 117:8 118:2 119:8,14,17,24 125:19 126:15

**information** 33:20 47:15,25 67:7,11,15 70:8,24 74:3, 22,23,25 75:3, 14,21,23 77:2 92:18 94:4,6,23 95:3,5,9,11,13, 15,21,22,23 96:13,20 97:1, 8,17,21,24 98:2,25 101:3, 22 102:2 103:13 105:22 106:2,16,24 107:9,14,17,23 108:5,12,16,20 109:1,10,14,18 110:22 111:14 112:18 114:24 115:6,9 116:5,8 117:6 118:2 121:2,9,10,13, 15,21 122:3,8, 13 123:4,12,16, 24 124:11 126:1,5,6,10,17 127:2,10,11,16, 20,24 128:2,14, 17,18,21 129:3, 20 130:4,11,16, 20 131:9,23 132:2,9,14,16,

20 133:13,24, 25 134:5,22 135:12,19,25 136:6,25 137:15 138:4, 19 139:8,9,13, 15,21,22 140:3, 5,6,10,12,13, 17,20 141:11, 12,22,23 142:12,14,21, 25 143:15,19, 21,22,23 144:2, 3,5,12,16,20, 21,23 145:1,14, 21,23 146:1,5, 7,10,14,15,17, 24 147:4,6,21, 25 157:4 158:16 159:14 171:8,9 180:24 181:17 183:4, 17,18 184:12, 24 185:4,5,11, 15 186:3 187:2 189:5,9,13,16, 22 191:1,15,19, 22 202:24 221:13 230:25 233:23 242:2 248:9 260:8 261:16 262:9, 17 264:1 273:20 274:22 275:1 276:6,8 279:8 282:3,13 294:13 304:9 308:12,19 312:19 313:14 320:9,14,20 321:1,6,8,18,23 322:4,6,17,24 323:2,6,7 325:25 326:15 328:17,19,22 329:17 330:3, 13,18 331:7,8, 13 332:25 335:7,9,12,19 337:10,21,24 338:14,15,16 339:2 340:11 344:10 345:1,7, 13 347:5,21,25 348:1,16 349:14,16,22, 23 350:3

**informed** 265:22

**inherent** 224:18

**inherently** 223:24

**initial** 292:20 293:15,23 322:14

**initially** 42:9

**inordinate** 37:17 38:18

**Insane** 338:6

**inside** 236:5

**instance** 122:19 129:3 252:11

**instances** 127:1 170:12 172:4 204:11 232:1 245:15 328:10 329:4 341:12

**instruct** 38:2 39:9 44:20 46:15 47:3 49:2

**instructed** 108:3,23 109:4 238:23 293:21 294:1 316:18

**instructing** 45:20 47:10 345:6

**instruction** 155:10 202:25 208:6 242:19 315:7

**instructions** 80:23 81:16 86:24 87:1,11 192:25 240:22 241:2,8,13 314:10 315:18 345:12

**instructs** 153:7

**integral** 263:16

**integrity** 284:4 286:4 305:14

**intelligence** 22:6,8 86:11 180:14 181:15 182:20,23 186:4,11 190:10,16 191:2,16,25 192:2 338:5,15

**intend** 289:4

**intending** 73:14 289:6,10

**intention** 267:23

**interact** 28:2,5 30:19

**interaction** 21:24 24:22

**interactions** 24:15 25:1 26:15,18 30:22

**interesting** 120:15

**interim** 31:19

**internal** 334:12,16

**Internet** 47:25

**interpret** 116:4 119:3 257:12 324:15,19,22

**interpretation** 163:20 324:24 325:5

**interpreted** 310:20

**interpreting** 256:20 302:5 324:21

**interrogate** 319:2,9,17

**interrogated** 318:24

**interrogation** 65:11 128:3,5, 10 276:2

**interrogations** 55:16 200:2 318:22

**interrupt** 302:17,18 330:25

**interview** 319:20 322:4, 14,21,23 323:3, 8

**interviewing** 179:12 320:1

**interviews** 55:16 65:11

**invading** 69:1

**invaluable** 282:20

**invented** 348:17

**inventoried** 175:17 290:10, 20

**inventory** 195:6

**invest** 111:9

**investigated** 30:5,9

**investigating** 29:9,12,18 30:13 177:20 212:3

**investigation** 92:17 94:24 95:4 96:5 101:13,23 102:8,9 103:2 105:14,21 107:19,24 108:6,21 109:2, 11 111:16 121:17,23 122:11,16,21, 24 123:3,10,21 127:17 129:15 138:8 145:18, 20 150:15 169:11 175:25 180:25 181:11 185:12 191:20 209:25 232:2 233:16 235:25 236:14,18 237:7 263:6,20, 24 265:3 286:2, 4 306:20 320:16,20 321:20,24 322:5 324:23 325:1,17 327:2, 4 328:12,18,20 329:19,24 330:4,14,18 331:8,13,21 332:15 333:1,9 339:9,23 341:14 344:12 345:8,14 347:7

**investigations** 22:14,16 30:25 31:24 32:22 33:1 37:3 55:17 88:5,6,8 90:21 91:9 99:1,5,8, 10 100:13,19, 24 101:4,18 102:1,17 104:23 105:1,8, 10,12 106:18 109:16 110:24 111:11,20 112:8,16 119:15,25 120:6,11 121:2 132:5 150:13 155:22 156:10 168:3 177:18 232:15 251:15, 19 263:12,13 268:5 304:19 318:21,25 319:1,3,4,5,6,7, 8,11,12,16,20 320:1,11 324:5 325:10 328:4,6 336:18 337:1,9, 13 338:25 339:3 340:19 342:9 345:19, 23

**investigative** 228:23 282:20 333:15,19,20,

25 339:22 344:25

**investigator** 75:25 232:13

**investigators** 115:8 231:10 232:8 311:17

**investigatory** 96:6,23

**involved** 22:13 75:18 119:15 136:17 172:15 176:5 235:24 240:3 253:21 257:19 262:4, 22

**involvement** 131:16 169:15 170:8 171:4,22 172:1

**involves** 297:25 337:16

**involving** 205:9 206:7 235:14 298:5 340:19

**IR** 197:14 308:14

**irregular** 253:13

**issue** 34:9 37:14 38:8 43:3,6 46:20 48:25 82:9 83:18 95:10 153:22 189:2 216:25 218:17 274:5 293:9 303:24

**issues** 43:7 51:19 95:17 182:11 257:24

J

**J-O-H-N** 14:8 15:4

**Jacque** 45:14

**jail** 293:20

**James** 45:11

**January** 50:5 84:16 182:6 318:6

**Jessica** 13:13

**job** 31:7,12 35:1,6 346:5

**Joel** 16:13

**John** 12:10 14:8,12 15:4,16 42:13 46:7 54:8 69:13 81:10 125:8 129:6 131:25 134:14 135:23 162:3 204:24 205:2,3, 6 242:8 277:17 313:24

**Johnson** 12:18 54:7

**join** 18:17

**joined** 17:17 25:20 29:3,7 42:6 82:3 84:1, 6,10 86:14,16 87:9,18 90:23 103:20 104:7 113:23

**joining** 13:8

**Josh** 13:12,16

**judgment** 237:18

**July** 216:8 318:6

**June** 12:8 46:9 69:15 81:12 125:10 147:22, 24 162:5 242:10 277:19 314:1

**jury** 174:6

**justify** 257:24

**juvenile** 299:7, 16 300:12 301:6,13,15,21 302:1,3,5,14, 15,16

**juvenile's** 301:17

**juveniles** 300:25

K

**keeping** 17:15 267:4

**Kennedy** 131:25

**Kentuckiana** 12:5

**kill** 129:8,24 133:3

**killed** 129:5 135:23 136:15

**killing** 147:18

**kills** 129:4 204:22 236:25

**kind** 24:22 75:9 87:12 97:11 128:6 131:16 135:3 147:12 177:19 179:4,5 195:4 206:18 219:25 221:21 226:6 231:25 234:25 235:24 242:24 258:2, 11 263:9 265:10 269:16 271:16 275:12 280:1,2 287:20 305:24 325:24 329:16 334:13, 16,23 335:7 336:18 337:13 346:8 348:14

**kinds** 29:8 95:17

**King** 236:25

**King's** 236:24

**Kings** 237:1 338:2

**knowing** 14:4 206:14

**knowledge** 38:13 257:9 281:19 320:2 343:22 344:4

L

**lack** 246:18 249:5 313:1,2

**laid** 223:3

**language** 287:4

**late** 17:3 23:22 28:21

**Latin** 236:24,25 237:1 338:2

**Latino** 274:23 275:2

**Latinos** 275:5

**law** 51:16 75:13 299:10,17 300:1,4,17

**lay** 34:19 38:12

**layers** 174:10 271:18 293:1,4, 18

**laying** 45:5

**lead** 96:22 126:24 132:10 133:19 171:15, 18,22 172:1,19 186:23 284:14, 15 287:25

**leafed** 190:8

**leafing** 160:1

**learn** 228:21 328:22 342:20

**learned** 35:1,5 106:16 107:10, 17,24 108:6,20 109:1,15 126:1 259:1 321:23 322:4,17,24 323:3,6,7 330:3,13 331:7 332:25

**learning** 95:3 322:6 339:3

**learns** 321:6 328:16

**leave** 87:6 98:16 178:18

**left** 25:23 125:18 183:25 193:4 331:2

**lesson** 160:13, 18 255:22 279:5

**letter** 182:6

**level** 94:8 126:11 128:16 158:19 173:16 174:4,5,7 238:11 239:15 240:16 250:9 252:19,22 313:9

**levels** 75:20 132:13,20 145:19 205:23 313:16

**liaison** 324:1 326:22

**lieu** 214:21 219:8 220:11 221:15 292:22

**lieutenant** 12:10 14:5,11, 14,17 15:10,14, 19 16:4,15 21:7 46:7 50:3,7,12, 20 51:4 54:8 69:13 81:10,15 88:22 125:8,13 162:3 242:8,13 255:17 277:17 313:24 350:17, 20

**lieutenants** 91:22 284:7,19 285:9,16 286:7, 9,24

**light** 236:4,5

**lighting** 177:25

Case: 1:18-cv-03029 Document #: 506-13 Filed: 03/08/24 Page 112 of 131 PageID #:42357


**likes** 271:18

**likewise** 52:2, 20

**limit** 222:2,25 223:14,15

**limitations** 178:15

**limited** 33:13, 20 112:11 118:10 223:18 253:21 273:20 280:5 302:23

**limits** 228:16

**lineup** 63:1 130:7 154:18 173:13,20 174:5 195:25 197:3,4,24 198:1 200:3 201:6,15,23 203:11 208:25 209:2,3,9,15 210:11 213:3 216:3 218:21, 22 219:2,6,8, 18,22,23 220:10,14 221:3,8 228:9 229:6,14 242:18 243:8 254:10,15,17 261:11 265:1 266:12,13,18, 19,22,24 267:1, 3,7,12,17,23 268:8,15 269:5, 12,19 270:8,11 271:19 272:7, 13,14 277:2 278:5,6,8,11 280:10 288:6 292:4,22 294:4, 7 295:12,15 298:23 300:24 301:9,12 302:2, 6 303:25 304:7, 8,14,18,22,24, 25 305:6,9 307:1,19,22,25 308:3,4,13,21 309:5,8,12,16, 17 310:2,14,24 311:14 312:12, 20,25 314:25 315:1,3,8,13, 19,25 316:6,25 317:4,13

**lineups** 130:5 154:15,22 157:19 196:18, 24,25 198:19 199:2 200:9,16, 20 201:12 202:3,12,15 205:14 207:15 209:6,17 210:3, 15,22,25 211:3, 7 214:11,22 215:11 216:5 239:3,7,13,25 242:20,21 243:13 251:23 270:9 273:6 276:3 278:10 291:11 293:4 298:10,15 299:7 300:12 301:6 302:15, 20 303:4,7,13 305:12,17 307:2,7,9 309:18,19,20 311:18,20 312:3 314:11 316:13 317:9

**linger** 237:13

**list** 127:25 165:8 329:21 337:18

**listed** 13:2,5,18 84:11 180:11 183:24 287:24

**listen** 53:4

**lists** 54:18 55:8

**litigate** 48:25

**live** 70:20 95:15 173:13 196:24,25 197:3,4,7 198:18 211:13, 18 212:8,14,18, 22 213:4,10,20 214:4,11,14,21 215:3 218:17, 22 219:9,18,21 220:11,18 221:3,8,14,24 222:1 223:5,11, 23 224:9,21 226:12,16,20 227:5,7,10,12, 23 228:6,7,9 229:4,5,6,13,14 230:5,9,13,17, 23 231:1,15,19, 20,25 232:14 233:2,6,22,24 234:3,15,20,23 235:12 238:6, 12 239:2,3,7,13 240:20,23 241:2,9,13,19, 20 242:20 243:13 250:22, 24 251:1,16,20 252:20 253:2,8, 19,24,25 254:20 264:25 265:1 266:22, 24 267:12,17, 23 269:5,18 273:6 276:2 277:2 291:11 292:4,22 294:4, 7 302:20 303:4, 7,13,25 304:6, 8,14,18 307:7,9 316:6

**located** 12:6

**location** 12:23 151:7 156:19 157:16 158:14 166:18 194:22 234:10,14 235:11,15 307:18

**lodge** 32:6,7 98:14

**logs** 13:10 323:21

**long** 16:14 18:22 22:13 25:13 27:25 29:22 36:9 48:20 60:2,4,13 66:7 189:17 220:22,23 249:20,22,23, 25 250:4 264:12 305:25 335:3,10

**long-term** 336:25

**longer** 22:14 36:15,25 76:6 293:6

**looked** 46:20 174:21 185:16 189:19 199:7 200:12 201:3 203:2 213:2 215:10,21 242:15,17 243:9 269:14 270:6 280:12 335:3

**loose** 256:9,13 257:3,8 258:2

**losing** 294:16

**lost** 25:20 89:3 242:24 288:25 344:8

**lot** 95:23 102:2 131:23 139:18 140:1 141:9 170:3 234:24 236:4 338:4

**lucky** 172:22

**lunch** 124:15, 16,19 125:2,14

**luxury** 120:1

**M**

**machine** 149:11

**made** 28:18,20 31:2,18 36:1 97:6 136:25 145:6 151:16, 20 164:8,13 175:3 194:4 230:7,8 231:6 235:9 237:8 238:6,11,17 244:15,23 248:3,4 262:13 269:14 270:6 285:18 291:14 312:12 332:8

**mainframe** 347:17,21 348:12

**maintain** 290:6

**maintained** 182:19 342:22

**maintaining** 346:20

**maintenance** 180:20

**major** 323:21 336:15,19,24 337:2,14,15 339:18 349:24

**make** 17:11,15 28:25 33:18 44:11,23 48:23 52:8 61:18 66:19 74:11 82:7 85:8 95:17 101:8 103:10 113:17 118:17 120:17 123:12 124:10 135:19 147:20 148:24 161:8 184:17, 19 187:19 196:4,14 197:7, 8,15 198:7,8,15 211:22 218:25 222:15 236:11 237:17 244:19 248:6 249:20, 25 250:4,8,13 283:6 291:13 294:15,22 295:2,9,14 309:25 316:12 330:10 331:17 334:22 336:11 337:15 349:23

**makes** 116:1 124:18 145:15 163:17 262:7, 18

**making** 43:20 93:8 127:16 128:2 131:15

182:15 191:6,8 233:17 235:22 305:3

**manual** 111:13 123:7 279:5

**March** 200:6

**margin** 294:17

**marginally** 43:16

**margins** 294:14

**mark** 53:24 201:21

**marked** 54:3, 10,25 55:2,6 82:11,15 158:21 159:2 179:17 185:9 199:14 201:9, 22 202:1 242:16 318:2

**marking** 185:22

**masked** 298:5, 16,21

**match** 275:5 287:15

**material** 61:6, 10 66:14 83:6 199:7,9

**materials** 61:4, 8,19,25 62:1,4, 7,20 64:11 110:11,13 149:22 188:14 256:12 349:14

**matter** 12:10 94:24 108:16 128:24 131:7 145:9 149:18 151:17,21 155:13 158:4 167:6 181:14 186:18 194:14 197:24 207:2, 24 208:5,10,14 223:3,8 224:8 233:9 239:17 248:15 260:14, 18,23 261:18, 21 267:10,15 274:3,6,11 295:19 297:5,9 302:13 314:13, 20,23

**matters** 302:13

**Maxwell** 343:10

**Mcgrath** 13:20 14:16 350:16 351:10

**meaning** 71:11 91:21

**means** 121:4 225:1 297:11 306:22

**meant** 247:14 282:8

**mechanism** 124:8 330:7 331:22 344:15

**media** 133:4

**medical** 53:3,8

**medications** 53:5

**meet** 59:11

**meeting** 59:25 62:2,14 123:19

**meetings** 59:20 60:5,10, 13,16,19,22 61:13,15 68:15 82:21,25

**Megan** 13:20 351:9

**member** 100:5 169:20 191:12

**members** 151:4 169:7 179:1 183:17 273:25 275:3, 22 339:1

**memorize** 208:3

**memorized** 187:4

**memory's** 154:11

**mental** 132:24

**mention** 166:13 199:9

**mentioned** 149:22 211:13

**merit** 29:1

**met** 59:9,18 86:20

**methods** 94:5

**Metro** 19:17

**mid** 21:21

**mid-1990s** 20:16

**middle** 189:25

**million** 259:14

**mind** 118:14,15 180:3 249:11 276:20 344:8

**minor** 97:13 337:5,16 339:17 349:24

**minute** 39:22 40:11 161:20

**minutes** 38:17 46:21 69:7 81:4 124:24 266:18 277:12

**mischaracterizes** 186:13 233:14 300:6

**misidentifications** 285:14

**misnomer** 203:10

**misremembering** 255:5

**missed** 80:9 165:6 265:6

**missing** 163:6

**mission** 22:7

**misspoke** 150:8

**misstatement** 131:4

**mistake** 175:3

**mistaken** 154:16

**mistakenly** 52:3

**misunderstood** 210:14

**mitigate** 223:20 224:4,9, 17,21 226:15, 19 272:2

**mitigating** 229:21,25 272:12

**mitigation** 227:1

**mixing** 343:19

**MO** 148:15,23 149:3

**modern** 215:25

**moment** 54:17 126:15 192:20 215:7 218:17 304:12

**monitor** 285:22 286:2

**monitored** 263:19 264:4 265:4

**monitoring** 145:20 265:9

**month** 36:11, 14,22

**months** 18:19 29:20 48:22 136:14 179:3

**moot** 269:16

**morphing** 76:20

**mother** 129:5

**motion** 288:24

**move** 44:23 45:24 48:13,23 54:16 69:3,5 196:7 218:15 266:6 287:12 289:19 300:10 302:19

**moved** 23:13, 17 26:1 48:16 50:23 249:18 349:11 350:6

**moving** 39:3 45:18

**muddy** 71:10

**mug** 149:7,11 163:14

**multi-page** 40:12

**multifaceted** 35:10

**multiple** 38:4 67:2 136:5,10 137:1 253:11, 15 271:18 291:16 293:1 325:12

**multitude** 33:5 96:17 233:18 293:10

**mumbling** 196:11

**murder** 97:15 129:9 136:18 147:23 236:23

**murderer** 132:1

**murders** 29:21 228:16 236:23

**mush** 73:14

**N**

**name's** 117:12

**names** 34:6 71:19 148:9

**narcotics** 26:21,23 27:4, 6,14,15,20,21 28:13 336:21

**nature** 20:23 70:11,21 126:10 127:20 128:7,16 223:13 231:8

**necessarily** 19:7 63:6 89:22 102:18 104:24 120:5 128:23 129:1 144:1,9 145:4 184:21 185:4,5,19 205:22 221:19 223:25 236:15 262:15 271:19 276:21 283:12 305:21 323:11 325:15

**needed** 102:21 144:23 176:7

**negative** 151:19 230:14, 18 238:20 239:9 240:6 244:4 261:20 262:2 263:1,3, 8,9,23 264:8, 22,25 265:23 276:14 309:19, 20

**negligent** 136:22

**negotiated** 40:12

**news** 133:3

**nexus** 150:15 169:24 171:11 191:9,11 236:21 344:18

**nickname** 95:14

**nods** 52:11

**noise** 317:17

**non-** 154:8 272:11 278:6 310:8

**non-attorneys** 59:24

**non-identification** 156:3 244:11 245:8 249:7

**non-identifications** 152:16,24 153:8,16 155:6, 15,19,24 246:11,14

**non-ids** 155:11

**non-verbal** 52:12

**normal** 263:4

**Northern** 12:20

**notate** 156:14

**note** 209:12

**noted** 165:11

**notes** 322:21

**notice** 32:8,11 33:13,15 37:13, 22 39:22 40:8, 13,19 43:19 44:18 46:17,18 54:4,18,21 55:4 60:23 69:19 91:16 92:8,16 93:9,16 94:21 98:19 110:1 111:1 148:5 155:23 188:16, 20 269:9,22 286:14 295:22

**notification** 334:9,12

**November** 17:8 279:6,21

**nuanced** 207:7 279:24

**nuclear** 237:6

**number** 12:12, 13,14,16,17,19 34:12 38:7 115:17 164:10, 12,13,22 165:1, 22 190:13,20 194:18,19,22 197:25 255:11 256:4 278:7,25 290:7 291:13 300:13 311:13

**numbered** 151:2

**numbers** 156:21 308:15

**numeral** 114:14

**numerically** 151:5

**O**

**oath** 186:17

**object** 21:22 22:11,18 28:10 35:23 71:23 72:8,24 74:9,16 76:2,9,18 78:7, 12,19 80:8,15 87:3 89:17 90:2,12,20 91:1,15 92:4 93:14 97:9 105:16 108:7 116:25 120:13, 24 126:7,20 127:4,12,18 128:4 130:24 131:13 132:11 134:9 135:20 137:12 139:11 140:14,22 141:17 142:1 144:7,19,25 145:16 146:2, 11 147:7 148:13 149:9 151:25 153:10, 18 155:25 156:5 157:1 163:4,25 164:7 165:18 166:6, 12,20 167:3,10, 16,21 169:22 170:23 171:5 173:14 174:18 177:7,15,24 178:6 182:22 184:25 187:3 195:8 204:4 205:21 206:23 213:14,24 218:24 224:23 225:18 226:22 227:25 228:10 229:7,15 233:7, 13 234:11 235:21 239:20, 24 244:18 247:15 252:13 254:6 255:2 269:6 273:8 276:4 282:7 284:22 286:13 289:7,16 294:10 295:21 299:18 314:17 315:20 317:14 324:9 331:19 332:3 334:1 339:16,19 340:1 342:12 343:18

**objecting** 55:23

**objection** 32:7 42:7 44:12,19, 23 56:9,13 77:19 92:14 93:7,15 94:20 98:15,18 106:19 109:25 110:25 111:5 115:11 118:4 142:9 143:3 146:21 147:17 152:1 154:3 155:16 164:15, 24 172:6 181:25 185:18 186:12 233:25 240:8,18 241:3 245:1 248:19 250:17 252:23 267:18 269:21 270:20,24 271:15 272:24 274:9 296:3,11 300:5 315:11 316:1 340:21 343:24 344:22 345:4,9 347:8 348:13

**obligation** 121:20

**obligations** 335:25 336:2

**observed** 205:15

**obtain** 247:5 271:21 273:2

**obtained** 101:21 115:9 127:3 140:6 146:8 183:12 263:23 289:22 292:12 294:2

**obvious** 211:12 258:25

**occasion** 188:3,4 299:5

**occasions** 70:24 102:16

**occur** 247:9 254:3

**occurred** 171:9,17 233:2 252:11 312:20, 24 320:18 325:19 342:8

**occurring** 227:6

**occurs** 76:15 264:25

**offender** 19:16 127:23 129:25 130:1 132:1 134:15 203:14 207:23 209:11 211:21 220:3 222:7,10 228:17 231:11 232:20 236:24 256:23 276:25 295:16 298:24 301:14,15 334:15

**offender's**

211:24

**offenders** 220:21 282:19 298:6,16

**offense** 209:11 212:2 329:21

**offering** 187:13 222:23

**office** 13:19,22 173:17 176:11 209:23 210:1, 19 211:11 245:18

**officer** 13:17 16:6 18:14 20:7 25:9 27:13,18, 19,21 37:8 42:4 51:16 124:9 141:7 191:24 193:20 252:19, 22 299:10,11 300:11,24 301:5,9,11,16 302:2 328:11 331:5 332:5

**officer's** 300:3

**officers** 19:4 20:2,12,20 21:1,5,11,17 22:3 26:15 28:3 30:23 37:8 43:15 49:6 56:8,20 68:17 75:13 117:21 166:1 191:10 222:6 228:19 234:22,25 251:16,17,19 252:14 299:23 306:23 316:24 319:12 320:1

**offices** 259:19 341:9

**on-scene** 203:13,24 211:14

**on-the-job** 34:22,25 35:4, 11 36:17 38:9 43:3 112:9

253:22 259:2,8

**one-** 36:21

**one-hour** 221:1,6 229:18

**online** 12:4

**Oops** 161:11

**operating** 155:22 181:12 184:16 326:2

**opine** 269:9,22

**opining** 270:23

**opinion** 271:20

**opportunity** 83:5 223:18,19 228:6 229:4 235:20 236:4,7, 20 237:22,24

**opposed** 77:7 222:13 233:16

**option** 220:2

**orally** 102:3,22 105:22 328:18, 23 330:7

**order** 40:6 81:25 82:1,13 83:6 86:7 119:22 146:25 199:4 201:4,24 208:3 212:25 215:9,20,21,22, 23,25 216:3,17 222:2 223:4,10 242:19 243:8 261:14 267:3 271:9,13 277:24 280:5,8 283:25 285:24 293:19 303:15, 17,21 304:1 306:22 316:8 351:5

**orders** 60:24 61:1,2 62:10, 13,16,17,23 63:4,7,10,11, 15,16,18,19,22 64:2,5,6,17,18, 21,22 65:7,10,

11 68:6 99:9, 15,23,25 100:4, 6,10,14 195:17, 22 196:5 215:10 240:10 261:11 279:22, 25 280:3 351:4

**ordinance** 97:14

**organized** 23:7,12,13,18 24:2,5 27:21,23 79:1,5,8 81:21, 23,25 82:1,4,12 84:1,6,10 86:3, 16 87:10,18 90:23 103:20 104:8 113:23 119:12 169:2 323:17 327:9, 21 330:2 340:15 349:11, 15 350:3,7,10

**original** 77:9 269:17 342:3,5

**originals** 341:20

**overseeing** 15:22 16:4 50:7 51:4

**overstating** 46:22

**overview** 326:2,6,8,13,23

**overviews** 326:16

**P**

**p.m.** 125:11 162:6 242:11 277:14,20 314:2 351:13

**package** 344:7

**packet** 159:13 183:24 186:25 188:13 282:14

**pages** 48:3 120:2 159:13,

25 164:5 165:2, 10 166:17 175:10 184:1 190:9,16,17 192:22 195:1 201:6 336:7

**paging** 120:2

**paid** 70:8 71:17 72:13 73:24 74:3,19 76:22, 24 77:2 78:15

**paint** 126:12 128:25 136:2 206:2

**painted** 271:19

**pan** 133:14

**paperwork** 37:2

**paragraph** 39:23 40:21,25 162:20 163:1,2, 8,17,23 164:3 165:13 166:1 186:3,11 191:2 203:5 256:8 257:6,12,17 282:18 283:15 287:12,24 288:3 289:20 290:3,24 292:8 294:14 296:17 297:10,11 299:6 300:6,13 302:14 307:13 310:13 313:13 314:15,22 316:11 324:11 326:6

**paragraphs** 40:13 288:4

**parallel** 324:23

**parameters** 275:9

**paraphrase** 55:13

**Pardon** 152:22 173:24

**parent** 308:9

**part** 13:8 29:11 48:11 79:5,8 99:21 115:15 136:4 192:16 255:21 287:14 289:12 320:10 336:19 338:21

**partially** 262:6

**participated** 157:14 240:14 322:6 338:25 339:8 340:18

**participating** 31:24 308:13, 20,24

**participation** 341:13

**parties** 14:10

**partner** 35:17 37:6 251:12

**partnered** 36:1 37:4 44:4

**partners** 30:16 34:4 35:18 36:22 37:21,25 42:22 43:2,17 44:3 46:13

**passed** 331:9

**past** 75:14 95:15 150:5

**path** 141:11

**paths** 141:9

**patient** 184:4

**patrol** 18:14 19:5 20:22 21:5,8,9,11,17 22:21 23:1,5, 11,12,18 24:4 25:9 27:18 48:18,20 49:4,5 50:10,11,14 104:18,21 105:5 109:6 251:17,19 252:1 321:3 327:22,23 329:1,6 330:20

Case: 1:18-cv-03029 Document #: 506-13 Filed: 03/08/24 Page 116 of 131 PageID #:42361


**patrolmen** 251:25
**pattern** 19:16, 18
**pause** 17:25 82:20 304:12
**pay** 125:2
**pending** 12:19 52:25 208:16
**people** 34:15 36:25 37:1 44:4 70:1 71:20 75:10 94:3 129:19,23 132:6,22,23 133:18 135:6,8 136:5 137:1 139:13 169:6 179:8,10,12 197:21 237:9 253:11 273:25 275:21,24,25 291:16 296:25 297:1 303:19, 24 304:3 308:20,24 320:3 321:16 325:12 335:13, 19
**people's** 174:25
**percent** 246:23 247:1,10,13,19 248:10 249:17
**Perfect** 124:25
**perform** 35:1,6
**performance** 166:4 210:21, 25 221:24 240:3 263:11
**performing** 32:21 167:7 211:3 306:5
**performs** 263:17
**period** 17:1 18:1 21:14,20 24:18 26:14,17 31:21 32:1,9,15 35:18,19 36:4, 7,9,22 37:9 55:15 72:17,21 73:1,6 78:18 79:4,7,15,22 80:1,5,10 81:17 83:19 84:5 85:1,13 87:9, 23,25 88:9 89:8,13 90:6,9, 18,22 91:13,24 92:1,13 93:22 94:1,25 97:16, 20,23 98:24 99:4,12,13 100:2,7,23 101:3 103:11, 23 104:20 105:2,4 106:9, 12,15 107:2,4, 6,16 108:18 109:8 112:14, 24 113:8 119:18 120:10, 19,22 121:8 122:2 137:10 150:9,13 151:22 152:5, 15,19,21,23 153:2,9 154:25 155:7,13,18,19 156:2,9,18 158:11 168:3, 17,22 170:2,6, 18 181:23 182:13 183:6, 16 193:10 215:17 216:16 224:8 238:19 239:5,6,11 240:7,25 241:6 243:23 244:5, 10,22 245:4 246:21,25 247:4 249:21, 25 277:24 278:11,16,23 279:12,16 280:9 281:8,11, 18 282:5,15 283:22 285:4 286:9,23 294:21,25 295:18 298:9, 14 302:20,22 303:8 304:14, 19 307:17 309:7,11,16 310:1,18,20,25 311:16 312:4, 10 313:10 315:5,17,22 318:12,16 327:8,13,15 346:4,23 347:5
**periods** 19:10 26:11
**peripheral** 303:16,21
**peripherally** 102:1
**permanent** 333:17
**permissible** 165:10 220:17 252:17 259:20 267:23 268:13
**permission** 177:13 248:1
**permitted** 205:20 206:6, 20 211:18 213:20 247:14, 20,25 251:16, 20 257:4 259:10 266:10, 25 267:16 270:15
**permitting** 260:11
**perpetrator** 132:8 169:20 170:20 171:13
**person** 76:16 95:21 96:6 114:23 116:7 127:23 128:20 130:21 131:12 132:15 134:8, 17 136:15,22 138:5,20 139:8 141:6,7 170:14 174:16 175:4, 13 196:3 212:2 213:11 224:10, 11,25 225:5 227:21 229:20 235:3 238:17 246:14 248:5 251:1,3,7 257:4 259:17,22 267:25 268:14 269:19 270:17 271:22 274:23 276:13 284:1 285:2 287:25 289:23 291:14, 19 292:12 293:19 294:8 295:11 296:18 297:13 304:5 307:25 308:3, 12 309:8 310:5, 6,13,23 311:14 316:6 320:23 332:8 346:5 348:2
**person's** 70:19 137:23 309:4
**personal** 43:11 325:8
**personally** 325:6
**personnel** 85:11 323:24
**persons** 130:6 182:15 234:19 266:24 303:16 304:2,23
**perspective** 38:16 76:14 256:25 257:1
**perspectives** 325:13,14
**persuade** 46:24
**pertaining** 63:23
**pertinent** 107:17,23 108:20,25 320:20 321:19, 23 322:17,24 323:2,6 330:17 331:7 332:14, 25
**phase** 31:19
**phone** 134:3, 12 135:18,24 138:14,17 139:7 140:2,15, 25 141:5,6,7,8, 10,19 142:3,6, 14,15,18,20,23 143:14,16 335:5,15
**phones** 75:3
**photo** 63:16 130:12,17,22 131:12,17 132:3 136:23 145:23 146:7, 17,20 147:6,15, 21 148:11,14, 22,25 149:3,12 151:3,8 154:9, 14,17,19,22 157:16,18,20 158:14 161:11 162:22,24 163:3,5,11,12, 14,18,22 164:4, 6,9,13,16,22 165:2,11 167:1, 8,14,23 168:16, 21 173:12,19 174:4,21 175:7, 16 176:24 180:20 181:1,2, 3 185:13,15 192:15 194:17, 22 195:25 196:18 197:10, 12,13,22 198:1, 5,6,9,10,11,13, 22 199:2,6,8 200:12,13,15, 19,20,24 201:12,16,19 202:4,7,8,12, 15,18,22,25 203:8,10,15 204:3,14,20 205:14 206:6 207:4,15 208:1, 16,23 213:16 214:11,22 215:12 216:5 220:20 221:2,7,

10 223:12 226:1 228:8 229:6,11,13,23 230:21 234:5, 10 237:3 239:3, 7,12 242:21 243:12,17 249:23 251:23, 25 254:9,14,16, 22,23,25 255:23 256:1,2, 5,6,10,13,14, 18,22 257:3,18 258:1,3,9,13 261:3,7,11,14 263:3,4,8 265:1,7,9 266:7,8,12,25 267:24,25 268:1,2,7,15 269:4,14,17,20 270:6,18,19 272:6 273:6,13, 18,24,25 274:7, 19 275:3,12,14 278:14,15 282:2 283:5,17, 24 284:8,13,20 287:14,19,24 288:12,17,21 289:3,13,20 290:17,25 291:3,10,16,19, 21 292:3,9,10, 15,20,22 293:3, 7,11,14,15,16, 22,24 294:3,6 295:2,10,20,24 296:2,19,20 297:13 306:8,9, 12,18,19

**photograph** 151:4 174:22, 24 175:14 203:18 204:11, 17 205:1 207:22 220:19 231:11,20 233:20 241:25 261:2 267:7 270:8 296:25 297:4,15,18 311:17,20 312:1,3

**photographing** 309:18,20 311:14

**photographs** 175:10 179:1, 11,13,15 192:7 197:14 258:4 260:8 282:19 287:10 290:6,8, 10,11 312:7 348:9

**photoing** 309:25

**photos** 151:10 165:9 166:16 167:19,20 169:6 178:24 179:7 183:12 192:3,10,24 197:17 203:20 204:8 205:20 206:21 207:19 208:1,7,11,19 232:16 233:1,5 234:12 257:9 259:25 260:2,6 261:12 267:11, 16 270:17 272:20 275:13 287:13,19,20 289:23 290:18, 20 292:13 294:23 348:5

**phrase** 117:1 189:16 299:1

**physical** 287:15

**picked** 37:2

**picture** 156:15, 21 194:19 196:2 232:23 272:13 290:9, 12

**pictures** 175:12 178:1 275:7,8,14,16, 17,19,20

**piece** 145:13

**place** 23:15 136:9 188:6,7 215:18,21,24 233:24 234:10 243:1,3 296:20 302:22 321:10 331:22 333:14, 24 343:5 344:15

**plaintiff** 13:1 14:13

**Plaintiff's** 12:24

**plaintiffs** 13:7

**plan** 160:13,18 255:22 279:5 351:3

**play** 123:14 262:10 301:9 305:5 338:5

**plays** 262:8

**point** 13:10 16:18 20:16,17, 19 21:16,25 22:20 23:2,3, 17,25 26:13 27:13 31:17 32:13,16 37:3 43:20 52:24 61:18 63:7 67:23 68:2,12 75:22 76:5 80:25 88:12 99:12 100:8 119:12 121:18 122:12 132:7 136:19 142:5 143:22 156:6 212:24 218:4 230:20,21 235:10 248:3 264:17,20 265:24 269:16 290:10 293:12 297:14 298:22 301:10 303:15 321:22 322:2, 10 328:1 330:11 332:19

**pointing** 138:2 171:15 192:9 257:22

**points** 51:11 96:2 138:18 140:19

**Polaroid** 297:20

**Polaroids** 179:1

**police** 15:19 17:5,17,19 68:17,21 69:22 70:3,5,9 71:1 72:1,9,10 74:21 76:10 78:17,24 86:2 94:23 96:18 99:24 100:4,5 109:17 110:8 112:21 116:9,21 117:8, 21 129:4,21 130:7 132:10, 22 133:9,16 141:7 148:9 149:19 153:13 155:5 158:24 165:25 166:24 173:15 178:3,9 188:1,5 195:17 203:21 207:3 209:12,13,18 210:4,17,22 211:3,10,25 212:13 219:6 220:19 221:15 222:7 223:17 224:2,12 228:19 232:10 234:25 237:2 245:18 252:14 268:4 306:23 316:24 327:3 341:24

**policies** 37:16, 18 43:25 55:14 64:18 72:18,22 73:2,7 77:10, 15,24 78:3,9,25 79:9 80:6,13 84:7 90:1,24 95:10 96:24 100:20 101:5, 11 120:9 122:16 123:3 125:23 141:15 187:10 192:20 193:25 196:4 213:2 215:7 217:5 280:10, 16,17,21 281:4 284:25 285:6, 10,13,24 307:6, 9

**policy** 76:11, 13,19 77:6 78:18 80:17,25 83:25 84:11,15, 22 85:2,10,14, 20,23,24 86:5, 14,16,21,23 87:10,13,24 89:9,14 91:11 93:20 94:8 98:4 101:10 107:22 108:3,14,15,18, 23 109:3,4,8,12 113:13,19 114:2,10,17,21 115:1,10,20 116:13,17 117:4,19,20 118:9 119:1,2, 7,16,23 121:12, 16,20 122:1,6, 10 123:13,16 141:18 142:16, 17 145:9,11 152:9,16 153:6, 14,22 154:4,7, 12,23,25 155:4 156:11 157:18 158:1 181:15 182:4,5 192:24 193:2,23 194:3 195:12,13,23 197:20 198:13, 16,17,18,21,23 199:2,6,8 200:8,12,15,19, 23 201:15,18 202:11,14,17, 21 206:20,24 207:8,24 210:21 212:7, 18,21 215:14, 18 218:19 219:7,10 220:13,15,18 222:23 223:3, 12 224:2 230:16,19 231:2 234:5

Case: 1:18-cv-03029 Document #: 506-13 Filed: 03/08/24 Page 118 of 131 PageID #:42363


235:7,16 242:20,25 243:3,9,11,12, 16,19,22 246:1, 2 247:25 248:11 249:15, 19 251:21,23, 24 253:10 260:6,9,10,18, 19 261:10 267:2,10 268:18 272:18 273:12,15,22, 23 274:2,13 278:4,12,16,17 280:21,22 293:21,25 294:1,5 297:6,9 302:21 303:3, 13 304:8,10 306:2,21 307:2, 10,12,14,16 308:25 309:3 310:17 311:4, 12 314:8 316:2, 3,11,12,18,23 317:2 323:1,10 332:11,17 341:23 342:17, 18,20 344:9,24

**policy-** 314:19

**policy-wise** 234:16

**poorly** 258:2

**populate** 192:4

**populated** 178:24

**population** 192:17

**position** 16:14 25:3,7,14 26:6, 20 27:22,25 28:16 34:2 44:15 49:11 50:2,19,25 51:6 266:23

**positive** 23:24 156:8,10,25 157:15,24,25 164:4,22 166:18 172:17, 23 173:2

175:15 194:21 195:7 210:16 211:8,11 225:4 226:8 230:14, 18 231:19 238:15,20 239:8 240:6 244:3,16,24 245:13,19 247:22 253:23 254:13 261:4,8 263:22 264:8, 22,25 265:22 268:5 270:19 276:17 283:11, 12 290:25 291:8 292:7,8, 18 293:15,23 294:2,22 295:20,24 296:1,6

**possession** 176:10

**possibility** 133:22 171:20 231:7 286:10

**possibly** 293:19

**post-1993** 106:7

**post-2000** 99:17

**potential** 43:7 45:9 131:18 206:18 273:14 274:1 299:1

**potentially** 133:6 142:15 175:2 210:12 247:18 249:13 325:4

**powerful** 136:25

**practical** 227:14 290:16

**practice** 76:11 78:17 79:18 80:18,19,22 91:11 94:4,7,8, 18,19,22,25

105:19 106:14, 15,21,22 107:3, 7 108:9,14 109:13 117:25 120:11,23 121:10 139:21 145:10,11,12 151:24 152:24 153:25 155:13, 23 158:5,10,12, 13,17 167:7 170:1 194:14, 20 195:3,4,5 207:2 208:5 209:18 211:2 219:7,17,21 220:18,25 223:8,9 224:8 232:25 233:3,4, 9 234:17 239:18 246:8, 17 248:15 249:3,16,24 252:6 253:14, 24 254:8 260:14,16,23 261:18,21 263:10 264:9, 17 267:15 268:24 269:1 270:16 271:7, 12,20 274:6 291:7 295:19 296:23,24 301:4 312:3 314:20,23 315:12 347:4

**practices** 34:14 37:16,18 38:14 43:25 55:15 64:6 79:1,14 80:7,13 87:2,14,20 88:1,10 89:10, 15 90:1,24 91:12 93:24 95:2,10 96:25 101:5,11 109:14,16 110:8,22 183:15 187:10 193:20,22 195:14 223:9 225:15,20,22 226:14 230:4

270:16

**pre-** 68:6 92:18 106:7 258:25 318:2

**pre-1993** 91:11

**pre-detective** 36:12

**pre-service** 61:7,10 62:9 64:8,10,14,15 110:10,12,16 159:19 160:24 179:22 181:7 182:18 253:20 255:9 259:3,4 260:7 349:4

**pre-services** 92:25

**prefer** 118:19 143:5

**preferable** 221:2

**preference** 229:5,9 312:8

**premise** 272:25

**preparation** 60:3 61:15 62:25 68:9,14, 19 82:17 158:25 179:23 199:13 201:3,8, 25

**prepare** 59:7 104:5

**prepared** 83:11,20 174:3 187:11 314:24

**preparing** 174:12

**prepping** 335:4

**presence** 61:21 62:17,24 300:3 321:8,25

**present** 59:17, 18,20,25 176:2

234:23 252:20 253:1 299:11 300:11,24 301:5 308:3,8,9

**presentation** 166:14

**president** 132:3

**presume** 179:4

**pretty** 275:1

**prevent** 53:5,9

**previous** 23:10 162:21, 22

**previously** 16:17 49:3 81:22 160:3 242:17 259:24 267:25 268:16 318:2

**primarily** 37:13 193:12

**primary** 34:25 35:5,8,12 119:10,21 286:5

**printed** 190:3 199:20

**prior** 23:10 24:24 33:18 82:21 87:17 93:6,12 104:15 111:18 112:3,8 165:9 182:17, 20 270:8 278:23 279:21 280:6 297:17 350:6

**prisoners** 303:18

**privilege** 69:2

**probable** 127:1,14 128:7, 15 172:9 219:5, 25 220:4,7 221:20 254:2, 12 291:1,4

292:2
**probe** 44:1,8
**problem** 91:4 130:18 326:11
**procedure** 157:14 160:14 167:6,8,14,15 177:6 184:16 193:17 194:1, 16 195:24 198:5,6 200:6 203:9 204:16 218:21 226:6,7 227:8 240:4,14 242:19 243:8 258:16,23 261:11 265:19, 22 266:1 269:19,24 272:21,23 284:2 287:9,14 288:21 306:5, 18
**procedure's** 304:9
**procedures** 37:15 39:21,25 40:1,2 63:1 64:3 65:12 154:9,10,19 158:24 159:5 160:20 161:7, 10 162:24 163:3,8,24 166:5 172:24 173:4 174:15 175:2,20 176:13,17 177:12 178:4, 10,15 181:12 192:21 193:13, 16 196:1,17,18 200:3,24 201:6, 23 202:22 203:1 205:13 206:6 207:7,14 212:25 213:3,4 216:4 218:23 222:3 225:10, 17 226:2,12 239:21 242:15 254:3,18 255:21 256:18 257:18 258:9 259:10 260:11, 20,24 261:19 262:2 264:11, 19 265:7,13,15 266:3,9,11 272:7 278:22 279:16,20 281:10,16 282:16 283:11, 17,24 284:8,20 285:23 286:3, 11,25 289:13 295:20 299:16 303:25 304:7, 14,18 306:10
**proceed** 321:1
**proceeding** 174:12 263:14
**PROCEEDINGS** 12:1
**process** 78:16 167:13,17 183:4,6 285:22 288:11 332:1, 12 344:10
**processes** 187:10 285:25
**produce** 47:18,21
**produced** 47:13 48:4,10 323:22 326:7
**productions** 48:11
**program** 64:14 159:5 323:21 324:1 325:21 326:1,7,21
**progress** 19:5 138:13 145:20 241:23
**prohibit** 218:22
**prohibited** 195:14,19 204:2 208:7,12 256:19 267:10 272:18 273:23 278:12
**prohibiting** 260:10
**prohibition** 207:25 208:4 278:15
**prohibitions** 315:17,23
**promise** 250:23
**promoted** 29:25 50:3,7,9
**promotion** 29:1
**proper** 285:17 287:9
**properly** 150:20,24 283:19 284:12 287:1
**property** 16:2
**prosecute** 224:25
**protect** 284:4 301:16 302:3
**proved** 140:12
**proves** 143:23, 24
**provide** 45:6 53:14 55:20 56:6,18,22 57:1,5,9,14,18, 22 58:1,5,9,13, 19,24 59:3 83:6 94:6 116:5 129:19 132:9 134:13 135:6, 10 288:4 318:9 326:1
**provided** 70:23 75:19 87:13,19 94:24 95:16 96:14 102:2 107:14 111:7 114:17 115:6 126:17 128:20 130:15, 19 131:9 134:21 140:12 141:22 142:14 143:24 144:16, 23 145:23 146:10,17 159:8,9,15,18, 20 161:3 182:10,13,15 191:16 193:5 195:13 202:25 221:25 249:4 278:22 279:11, 21 281:6,9,12 282:4,15 290:2 299:15,22 300:2,25 318:5, 16 328:2 331:13 349:6
**providing** 68:22 75:23 77:2 94:3 95:22 98:2 106:2 114:23 116:8 134:17 136:6, 20 137:1 195:4 273:20 335:6, 13
**prudent** 121:11 138:7 207:9 221:9
**public** 134:13
**publicly** 47:15, 21 134:22
**pull** 41:11 53:12 54:1,24 59:6 82:9 120:7 160:4,11 202:7 216:20 218:11 244:1 255:4 281:5 317:25 323:12
**pulling** 192:19
**purpose** 147:21 150:21 176:22 267:8 268:21
**purposes** 73:19 74:21 103:25 104:1 116:22 150:19 173:8,11 204:12 256:24 329:15,22
**pursuant** 116:17 151:24 164:11 299:14 307:12,16
**put** 130:16,21 131:11,17 132:2 136:22 145:22 146:6 147:5 169:5 196:2 216:23 219:6 225:21 242:14 244:6 264:6 275:16, 17,20 280:4 289:2 293:19 347:25
**putting** 63:25 126:14 130:5, 11 138:16 146:20 183:5 292:6 304:5 330:9

**Q**

**qualifiers** 87:7
**quality** 132:13 209:24
**quashed** 288:25
**question** 20:25 28:10 34:10 35:3 38:15 42:20 43:9,13, 15 44:11,15,22, 24 45:16,19 46:16 47:17,18 48:1 51:24 52:2,8,9,15,17, 20,21,25 53:4 55:24 56:1 61:20,24 69:1, 24 75:4 77:10, 14,20 80:9 82:7 85:6 87:4 89:4, 6 90:14 92:9 94:13 98:15 101:9 105:3 107:1 112:13 115:16 120:15, 18 122:25

123:6 125:24 126:13 129:23 130:14 131:6,7 137:6,21 139:19 140:24 160:7,10 167:12 171:2 173:8 174:1 183:2 189:7 195:11 198:17 199:1 204:21 206:4 212:20 213:23 216:1, 13 219:1 229:1 240:1 241:17 244:20 248:21 250:18 254:5,7 270:3 271:11 272:25 275:15, 18,19,20 279:3 281:6 288:13 294:17 296:12, 13 300:8,9 302:4,10 307:8 313:5 328:4 331:24,25 333:4 334:25 339:5,7 344:3 347:10 349:3

**question-and-answer** 51:20

**questioned** 45:8,17

**questioning** 44:6 138:4 247:21 301:10

**questions** 17:15 33:16,23 34:13 38:17,18, 21,24 39:1,2,4 41:24,25 42:2 44:2,5,14,16 45:11 47:4,9 51:20,21,23 53:2,6,9 87:8 125:21 138:14, 22 139:2,25 155:20 193:11 226:18 248:5, 12 249:9,13 266:7 311:8 312:9 348:22, 23,24 349:7

**quick** 69:6 81:4 227:19 237:3 277:4,5

**quicker** 190:19

**quickly** 17:9 19:20 37:2 218:19 228:21 237:13

**quoted** 122:11

**R**

**race** 308:14

**racketeering** 22:15

**Rails** 349:5

**raise** 14:18

**ran** 224:12

**range** 133:1

**ranging** 171:8

**rank** 311:13

**rare** 17:14 122:19 188:3 232:1 299:4

**re-ask** 94:14 131:7 143:9,10, 13 155:17 234:13 240:1 247:17 294:16 310:1

**re-form** 35:3

**re-paraphrase** 56:4

**read** 66:14,20 80:8 83:9 94:13 113:15 123:20, 23 163:8 178:7 186:4 193:3 209:7 244:20 271:10 310:12 311:23 324:10

**reading** 67:24 68:2 110:2 120:1 208:4 301:22 313:6 337:24

**ready** 125:16

**real** 44:5 95:14 136:13 174:25 197:5 259:17 263:7

**reason** 74:11, 12 84:18 95:20 169:15,19 172:13 215:23 291:21,23 305:18

**reasons** 49:3 114:11,18,22 115:2,19,20 133:23 211:12 258:12 293:10

**reassure** 117:21

**recall** 22:20 25:2 30:21 42:14 63:2 66:25 67:21,25 68:4,10 252:10 280:2,24 349:7, 25

**receive** 43:4 132:14 145:21 171:9

**received** 111:15 121:9, 21 122:3,8 135:24 140:25 142:23 143:14, 19 145:2 146:1, 15 147:5 164:18 181:2 320:19

**receiving** 74:23 121:2,13 122:13 132:15 146:24

**receptive** 121:1

**recognize** 133:4 167:20 172:15

**recognized** 70:23

**recollect** 19:20 22:1 24:22 26:13,19 28:7 60:25 66:4 67:17

**recollection** 19:15 28:22 31:12 32:19 33:6 82:5 226:23 312:6

**record** 12:3 14:7 15:3 42:17 46:4,5,6 48:24 69:10,11,12 81:6,8,9 94:5, 23 95:5 125:5, 6,7 161:22,25 162:1,2 184:22 185:1,21 186:22 190:18 218:8 242:4,6,7 253:3 277:13, 15,16 313:21, 22,23 314:4 333:18 351:12

**Recorded** 54:4

**records** 47:22 343:2

**red** 75:18

**REDIRECT** 349:20

**reduce** 222:20 223:10 225:23 272:2,22

**refer** 15:14,15 70:17

**reference** 116:1 163:17 180:21 181:11 182:24 188:2, 14 200:15 203:1,24 213:4 302:14

**referenced** 41:13 93:13 184:15 186:10, 19 191:2 324:11

**references** 114:5 189:4,8 200:12,16 201:11 202:3,4, 11 203:23 312:15 324:4 325:24

**referencing** 183:10 203:19

**referred** 15:23 27:17 32:17 76:6 186:3 204:15 211:14

**referring** 20:14 83:25 88:20 148:6 181:23 185:17 189:5, 10 196:25 303:24 313:15 323:25

**refers** 70:13 73:23,24 185:14 325:20

**reflects** 282:4, 14

**reform** 332:24

**refuse** 44:13

**regard** 41:21 53:14 55:21 56:7 78:14 79:15 80:21 81:17 83:17 85:2,14 87:14 88:1 89:11 91:13 93:5,18, 21 95:1,3 106:16 110:6 112:3,15,23 113:9 114:1 119:19 120:8, 10 122:14 149:15 156:8 168:1 182:11 196:20 242:20 243:12 246:8,9 253:19 254:22 278:10,14 279:15 281:10 287:11 294:5 302:24 303:12 339:1 344:10

**register** 47:4 86:20 114:22 115:2

Case: 1:18-cv-03029 Document #: 506-13 Filed: 03/08/24 Page 121 of 131 PageID #:42366


**registered** 70:7,14,16,17, 18,22 71:2,4, 12,16,18,21 72:5,12,13,19 73:3,23 74:5 75:25 76:1,7, 16,21,23 77:4, 7,16,25 78:4,10 79:11,16 82:2 84:23 88:15 97:24 98:5,8 113:9 114:7,11, 18 116:12,16, 18 117:5,8 119:8,17,24 126:14

**registering** 115:21

**registration** 78:14,16

**regular** 209:18

**regularly** 133:10

**relate** 38:8,10

**related** 39:19 43:19 55:15 63:4,12,16 64:2,6,18,22 65:11 69:19 79:1,10 80:23 85:25 92:14 101:22 104:17 105:14,20 109:10 111:10, 19 113:2 122:15 123:2 129:9 155:1 159:5,14 160:13 186:4 196:18 250:19 260:20 324:6, 16 333:8 334:24 336:21 339:9,17,23 344:11 345:7, 13,18,23 347:7

**relates** 64:1 92:7

**relating** 325:18

**relationship** 305:23 320:3

**relationships** 206:11 321:16

**relevance** 37:12,20,25 42:7,24 44:12, 24 45:2 144:20 145:5 303:23

**relevancy** 140:9 144:21 145:7 146:5,14, 24

**relevant** 20:5 32:11 34:8 37:22,23 38:15, 21 43:2,5,6,12, 16 44:1 46:17 95:7 127:21 140:9,17 142:12,20 143:1,5,6,8,15, 22 144:2 145:2, 3,7 238:3 260:4 261:16 262:9, 13,15,16 277:25 328:24 338:8 344:19

**reliability** 95:16 115:3 116:1,3 121:14 131:10,20 139:9,22 146:19 147:4, 14 174:16,20 250:14 272:22 294:4

**reliable** 130:20 142:25 143:1,2, 5,11 225:25

**relied** 101:2

**reluctance** 224:4

**rely** 100:25 320:2

**relying** 110:22 325:9

**remember** 24:21 28:9 32:24 40:5 65:8 68:12 77:14 208:4 279:23 294:14

**remind** 50:4

**remotely** 13:15,19,22

**removed** 175:10 230:3

**removing** 229:19,24

**repairing** 97:13

**repeat** 30:6 77:20 94:13 97:19 105:3 108:8 121:25 152:3 167:12 212:20 258:18, 20 333:4 339:5

**repeated** 135:25

**rephrase** 52:18 214:23 328:14

**report** 16:9,12 21:1,4 22:21 23:6 64:7,9,12, 14,19,22 102:4, 7,8,13,15,16, 19,21 103:1,4, 6,18,19 104:3, 4,16 105:2,15, 20 106:3,4,6,7, 11 107:20 108:25 109:6 122:20,24 156:24 157:6,8 165:4,8,12,16 179:4,5 230:7 235:9 237:21 241:22,23,25 261:1,17 315:4 321:4 327:2,23 328:4,12,13,20, 25 329:2,6 330:20 331:12, 14,20 332:24 339:21,22 342:3

**reported** 21:3, 6,7

**reporter** 12:3,5 14:1,5,10,14, 17,23 42:18 46:3,6 51:22 52:13 53:19 69:9,12 81:6,9 125:4,7 161:24 162:2 242:4,7 253:2,4 277:13, 16 313:20,23 314:5 330:24 331:2 350:19, 24 351:2,5,9,11

**Reporters** 12:6

**reporting** 21:16 24:1 103:25 104:1,2

**reports** 69:22 96:18 102:9,10 103:22 104:6, 10,12,19,22,23 105:5 110:2 122:15 123:8, 22,25 157:9 315:1 321:4 324:15 328:5 331:6 332:13 333:1,7,23 339:11,13 340:20 341:13, 14 342:10,19, 24 344:20

**repositories** 342:23

**repository** 343:1

**representative** 153:13

**representing** 12:5

**request** 192:3, 15 209:23 344:23

**requested** 181:1 185:13 331:5 332:23

**requesting** 185:15

**requests** 346:21

**require** 102:21 128:9 156:12 166:8 316:12

**required** 88:15 97:1 99:14 100:9,19 102:19,25 103:3 104:5,22, 25 105:6,13 107:22 108:4 109:9 121:14 152:8,11,16 154:8 155:11 157:15 158:1, 18 166:25 193:8 198:1 230:5,9,12,13, 17,24,25 233:21,23 234:2,9,14 241:1,7 246:1 252:20 260:2 261:5,9 262:25 276:23 297:5 299:10,17,23, 25 300:4,17 303:12 307:10, 13,18,21,24 308:2,11,24 309:4 310:2,14 311:13 312:10, 21 313:10 314:9,14 317:7 321:9 323:1 327:18 332:15

**requirement** 153:15 156:17 157:18,21 227:4,11 234:4 235:2,7 245:15, 21 252:25 263:2 264:7 308:24 309:17 314:18 315:6 322:16,20,22

**requirements** 64:13 104:3 122:7 156:14 172:8 227:7 234:16 260:19 280:15 303:3,7, 11 307:6

344:25

**requires** 141:19 155:5

**requiring** 64:12 308:18

**rescinded** 215:20,24 216:8

**rescinding** 201:5

**rescinds** 217:6,7,8

**reserve** 350:23,24

**resource** 169:25

**resources** 326:10 337:13

**respect** 15:13 37:14,21 39:18 56:9 93:15 98:15 349:3

**respond** 19:5 39:14 228:15, 21 346:5,16

**responded** 232:11

**responding** 228:19

**response** 44:15,25

**responses** 136:8

**responsibilities** 325:21 346:8, 12

**responsibility** 180:19 346:11, 23

**responsible** 346:20

**rest** 83:16 161:22

**restraints** 316:5

**restrictions** 195:23 221:23 253:8

**result** 226:7 261:4 283:18 285:13 287:9 289:3

**resulted** 230:14 262:2

**results** 264:10, 18 265:22 266:2

**retain** 117:9

**retained** 71:1

**retention** 333:17

**review** 60:18, 21 61:2,4,6,14 62:1,4,7,12,13, 16 63:3,10,15 64:2,5,16,17 65:10,20 66:23 67:2 82:21,24 83:6 85:5,8 110:7 111:2 149:21 335:23

**reviewed** 61:11,21 62:12, 23 64:11 65:14, 17 67:6,10,14, 18,22 68:1,6,9 82:17,19 110:2, 13,20 112:18 123:7,18 154:12 158:25 160:3 179:23 199:12 201:7, 25 203:5 279:22 346:9, 25

**reviewing** 62:1 66:7,17 82:24

**reviews** 323:21

**Reyes** 40:5

**Reyes/ solache** 41:15

**Reynaldo** 12:11,12,14,15, 17,18 13:18,21

**RFC** 82:11

**Ricardo** 12:13

**righty** 54:24

**risk** 272:3 286:20

**risks** 224:21 284:8,10,11 286:10,18

**rivalries** 171:25

**robbed** 19:19 96:3

**robber** 299:1

**robberies** 29:11

**robbers** 148:17

**robbery** 96:19 148:17 298:23

**Robert** 12:15

**rode** 36:5

**Rodriguez** 12:14 54:7

**ROI** 339:10

**ROIS** 332:12 341:2

**role** 21:20 27:3 110:24 177:16 262:8,10 263:16 286:1 301:9,11 305:5, 25 320:10

**roles** 27:16 34:1 286:5

**roll** 159:19

**Roman** 114:14

**room** 160:6 161:22 304:24 305:8,18

**Rosen** 13:3 21:22 22:11,18 32:6 33:11 34:8 35:23 37:11 39:7,11,14,17 40:2,6,11,16, 21,24 41:3,7,9, 16,19,23 42:7, 24 43:10 45:1, 21 46:2,15 47:5,12,17,24 48:7,13 49:2,17 55:23 56:9,15 59:18 61:17 68:24 69:8 71:23 72:8,24 74:9,16 76:2,9, 18 77:19 78:7, 12,19,24 80:8, 15 81:3 83:15 87:3 88:12 89:1,3,17 90:2, 9,12,20 91:1,6, 15 92:4,14 93:7,14 94:12, 16,20 97:9,19 98:14 99:16 103:7,16 105:16 106:19 108:7 109:24 110:25 111:5 112:25 113:15 115:11 116:25 118:4,14 120:13,24 124:3,6,19,22, 24 126:7,20 127:4,12,18 128:4 130:24 131:13 132:11 134:9 135:20 137:12 139:11 140:14,22 141:17 142:1,9 143:1,3 144:7, 19,25 145:16 146:2,11,21 147:7,17 148:13 149:9 151:25 152:4,7, 12 153:10,18, 21,25 155:16, 25 156:5 157:1 160:5 161:8,13, 15,19 162:13 163:4,25 164:7, 15,24 165:18 166:6,12,20 167:3,10,16,21 169:22 170:23 171:5 172:6 173:14 174:18 177:7,15,24 178:6 179:20 180:2,8 181:19, 25 182:22 184:5,19,25 185:18 186:12 187:3,22,25 188:23,25 190:20 195:8 196:9,13 199:16,19 204:4 205:21 206:23 213:14, 24 216:23 217:6,10,13,17, 20 218:1,6,10, 13,24 224:23 225:18 226:22 227:25 228:10 229:7,15 233:7, 13,25 234:11 235:21 239:20, 24 240:8,18 241:3,16 244:18 245:1 247:15 248:19 250:17 252:13, 22 254:6 255:2, 6,10,14 258:19 267:18 268:1, 25 269:6,8,21 270:2,20,22 271:10,15 272:24 273:8 274:9 276:4,20 282:7,11 284:22 286:13 287:2 289:7,16 294:10 295:21 296:3,11 299:18 300:5 302:9 309:22 311:5,10 314:3, 6,17 315:11,20 316:1 317:14, 17,20 324:9 331:19 332:3 333:4 334:1 336:11 339:5, 16,19 340:1,21 342:12 343:18, 24 344:21 345:4,9 347:8 348:13,23

349:1,19 350:14,23 351:3,7

**rudimentary** 348:15

**rule** 52:24 54:5 55:4 137:6

**run** 176:1 263:2 273:9 305:12

**running** 224:14

**Ruth** 13:7

S

**S06-02** 243:8

**safety** 230:1 301:17

**scanned** 348:16

**scenario** 77:3, 4 96:19 126:23 127:7,8 129:10 130:21 205:8 207:18 208:20 210:12 214:25 258:8,17,24 260:15 266:23 268:12 269:11 270:4 273:19 274:21 276:10, 11,16,24 292:2, 17,19 295:13, 17 321:15,20 329:1

**scenarios** 126:16 129:16 206:7 207:5 215:2 255:1 256:25 257:7, 14,19 259:6,9, 11 292:6,21 293:12

**scene** 129:21 214:3 220:9 227:23 228:20 232:2,6,11,14, 21 233:1,5,20 237:4 251:15, 17 254:1

**school** 118:20

**scope** 32:8 33:12,19 42:8 46:16 78:20 91:2,16 92:5,7, 15 93:8,15 94:20 98:19 109:25 110:25 269:8,21 286:14,16 295:22 343:25

**score** 29:1,2

**scrapes** 224:13

**screaming** 139:16

**screen** 40:19 53:22 113:13 162:13 201:2 242:25 279:1

**screw-up** 217:13

**scroll** 217:10 218:1

**scrutinized** 174:3 325:16

**seam** 189:25

**search** 47:25 115:7,13,22 116:23 117:6, 11,12 118:6,10 119:4,8,13,19 120:3

**seasoned** 35:21,25 36:5

**seat** 223:17

**sec** 258:18

**secondhand** 141:15

**section** 16:23 23:19 26:21 33:24 86:10,11 91:20 102:8,9 114:13,14 115:25 117:20 118:9,21 123:10,21 161:6,10,11 176:4 180:25 181:2,11,16 182:20 185:12 191:20,25 192:2 255:20, 22,25 256:3,5,9 257:16 278:3 282:1,18 298:2 323:16,20,25 325:9 327:4 331:14,17,21 332:2,8 347:14

**section's** 180:20

**seeking** 117:6 173:13

**select** 288:1,20

**selected** 151:12 156:19 164:6 175:5 267:24 310:2,5

**selecting** 288:6,12,16,17

**send** 125:15

**senior** 75:16 332:8

**seniority** 346:10

**sense** 95:18 124:18 261:13 297:23

**sentence** 178:12 278:4 299:9

**separate** 106:6 136:16 175:2 189:25 199:5 338:22 342:17

**separated** 16:1 267:4

**separately** 289:21

**September** 215:15 216:11, 21 217:4 243:1, 3

**sergeant** 21:3 30:1 48:16,17 49:20,23 51:4

**sergeants** 16:5 21:4 91:21 284:7,19 285:9, 17 286:7,8,15, 23

**series** 53:18

**serve** 267:8 306:2

**served** 18:14 27:15 33:5

**serves** 263:17 268:21

**service** 36:13 68:7 92:19 259:1 318:3 344:13,14,16, 22 345:18,22

**services** 110:19

**session** 51:20

**set** 54:17 76:14 85:24 86:21 87:1 88:10 89:10,25 90:1, 24 91:12 93:24 94:7,18 121:12, 20 123:3 138:9 145:9 188:16 192:20,24,25 193:23,25 195:13,23 197:16 212:18, 21 230:16 260:19 270:15 271:4 290:11, 18 292:14 307:6,9,13 325:17 332:12 344:24

**sets** 303:2,6 341:8

**setting** 86:24

**sex** 308:13

**share** 40:18 53:22 105:21 162:13 201:2

**shared** 109:19 123:25 191:19, 22,25

**shares** 320:14

**sharing** 108:16 318:1

**shift** 103:9

**shifts** 103:9

**shining** 222:8

**shooter** 136:17

**shooting** 171:4

**shootings** 228:17 340:12

**shoots** 236:25

**short** 18:19 82:19 212:9 311:5

**shorten** 155:20

**shorter-** 337:12

**shorthand** 102:12

**shortly** 48:19

**shot** 274:18

**should've** 235:8

**show** 54:16,25 131:17 158:21 165:10 169:14 170:15,20 172:10,13 192:22,23 204:3,7 205:1 206:21 207:21 208:19 252:14 259:21 266:25 267:6,16,24 268:15 270:16 272:13,20 275:8 290:6 291:16 292:3 293:2,3,4,7,11, 14 297:21

**show-** 203:15 212:14 219:22 221:3 223:12

224:21 227:10, 23 228:13 231:2 232:14 240:20 241:19 250:23 251:1 254:23

**show-up** 203:8,11,12,13, 20 204:20 211:24 212:19 214:15 215:3 219:2,9 220:6, 11,13,16,18,22 221:14,18,24 223:1,5,21 224:3,5 227:5, 7,12 228:6,7 229:4,11,13,18 231:1,4,5,15, 19,20 233:6,24 234:3,8,10,12, 15,20,23 235:4, 12 237:4 238:6, 12 240:23 241:2,9,13 251:4,7,11,13, 22 252:14,20 253:2,9,12,16, 24 254:8,13,19, 20 256:22 265:1 266:8

**show-ups** 203:23 211:13, 18 212:8,22 213:10,20 214:4,21 218:17,22 219:15 222:1 223:11,23 224:9 226:12, 16,20,25 229:5, 24 230:5,10,13, 17,22,23 231:25 233:2, 22 234:5,24 239:2 241:20 250:25 251:16, 20,24,25 252:7 253:10,19,21, 25 254:22,25 256:6,18 257:18

**showed** 60:23 83:24 165:16

261:1

**showing** 53:24 54:2 55:1 82:10 159:21 177:19 186:6 192:25 195:15,18,20 201:22 205:19 207:18 242:16 243:6 257:3 260:6 266:11 267:11 273:17 275:7

**shown** 150:23 151:11,14,23 164:5 165:2 166:9,16,17 172:5 176:24 177:3,21,22 184:12 193:3 194:25 195:1 197:14,18 203:18 204:14 208:1,7,11 256:10,13 258:3 260:1,2 261:3,7 269:4 270:7,8 287:13, 19 289:21 290:21 291:19

**shows** 213:5

**sic** 329:12 349:5

**side** 19:22 294:18 296:15 304:25

**Sierra** 12:11 54:6

**sign** 175:11 290:8 296:19, 24 297:8 332:4

**signature** 290:12 297:3,7 350:23

**signed** 70:7 175:6

**similar** 167:17 272:8 280:17 281:2,19 288:20 316:13, 20 337:8,10

**similarly** 330:19

**simplify** 87:4 149:1

**simply** 45:4 76:6 134:23 135:16 137:8 169:5 344:23

**single** 203:18, 25 204:3,7,11, 14,17 205:19 206:6,21 207:4, 19,22 208:1,7, 11,19 253:23 256:17,21 259:11,22,25 260:1,6,8 261:2,3,7,12,13 263:4,8 265:1 266:11,25 267:6,11,16 268:1,16 269:3 270:8,17

**single-** 258:8

**single-photo** 256:18 257:18 258:16,23 259:10 260:11, 20,24 261:18 262:1 266:8,10

**sir** 15:2,5,7,10 17:5 22:24 26:9,25 33:24 34:19 39:6 42:4 48:15,25 51:9, 11 54:9,11,14 55:5,17 59:8 65:16 69:18 82:14,16 84:14 102:14 114:9, 12,13 117:23, 24 148:7 153:5 158:24 162:9 166:22 179:24 181:5 186:17 189:7 190:23 240:1 243:18, 25 255:3,18,23, 24 257:15 273:10 292:5 293:25 294:12 298:3 302:16 303:5,10 306:7,

24 307:15 316:16 318:3

**sit** 65:8,9 127:6 138:13 305:3

**sitting** 186:9 190:5 202:20 211:25 222:8, 13 237:20

**situation** 132:24 225:12 237:16,20

**six-foot-tall** 274:23 275:5

**skin** 316:21

**Skip** 206:17 259:23

**slight** 302:24

**slightly** 137:6

**slow** 165:5

**slower** 147:9

**small** 344:21

**smaller** 165:1 338:4

**smell** 298:10

**snippet** 133:3

**so-** 135:7 140:19

**so-and-** 134:6

**so-and-so** 133:5 134:7,23 135:3,11,17 137:8,19 138:18 139:3 141:13

**so-called** 70:13

**social** 133:4

**Solache/reye's** 37:20

**solemnly** 14:18

**solid** 172:19

**somebody's** 77:1 206:15

220:2 222:12

**sort** 36:4,5 37:9 71:19 73:23 76:5 95:17 138:1 158:16 190:8 346:4

**sought** 175:19

**sound** 317:20

**sounds** 61:19 213:8,9 289:8 317:19

**source** 71:13 72:5,14 74:2,22 75:2 76:7,17,20 77:8 95:6,9 96:11 97:2,8 101:9,12 109:10 117:5 126:17 127:3 128:17 130:15 131:1,8,15 132:7 134:18 335:7

**sources** 44:9 45:18 69:21 71:15,17,22 72:23 73:9,11, 16,20,24 74:6 75:6,10,11,19 77:11 78:5,11 79:12,19,21 80:2 84:24 85:3,21 86:1 88:6,19 93:19, 21,25 94:2,6 95:2,19,20,24 97:18,21 98:25 100:25 101:3, 19,22 112:4,7, 15,24 113:1 114:3 120:8,12, 20,23 121:9,14, 15,18 125:20, 21 126:1,5,15 127:10,16 128:2 129:16 130:5,11 131:23 132:13 335:20

**South** 12:6

**southwest** 19:22

**Spanish** 274:24 275:4 339:23,24

**spared** 237:9

**speak** 32:24 68:13,17 129:12 154:14 174:19,20 198:14 320:14 322:11,15

**speaking** 26:4 37:22 159:23 174:8 176:23 177:8 207:21 208:22 221:21 224:3 230:21 238:13 258:13 270:4

**speaks** 188:2 198:13,18,21 199:8 321:6

**spec** 102:6

**special** 24:4 60:24 61:2 62:10,13,17,23 63:4,7,11,16, 18,22 64:2,6, 18,21 65:7,11 68:6 82:12 86:7 99:9,14,23 100:9,14 109:6 201:23 215:22, 23 216:3 243:8 297:25 298:1,5 302:24 316:8

**specialist** 21:20 26:18 32:25 37:15 51:6 56:24 58:2 61:7 75:24 82:2 85:3 89:25 93:11 97:2 99:13 101:8 102:25 105:19 106:1,23 107:8, 10,12,15,20 122:13,20,23 150:16 157:3,7, 13 176:13 177:2,5,16 179:23 191:5,8, 17 193:14,15 194:2 239:25 265:11,16,20 305:2,18,22,25 306:15,18 318:3 321:5,15, 23 322:3,21,22 325:1 328:16, 22 331:12 332:14 349:4, 10

**specialists** 20:2,8 21:25 22:3,5 24:1,15, 23 25:1 28:5 30:19,24 31:3, 6,11,14,16,20, 23 32:2,18 33:2 51:7 55:22 57:3,7,11,15, 20,24 58:7,10, 21 59:1 64:15, 23 73:4,8 77:11,17 78:1, 11,22 79:5,10, 15,23 80:2,5, 11,24 81:17,20 83:13,20 84:1, 5,12 86:13,15, 19,25 87:8,14, 18,20,25 88:1, 11 89:9,11,16 90:7,18 92:2,12 93:5,21,25 94:11 96:10,16 98:25 99:4,7,20 100:3,8,12,18, 23 101:2,17,21, 25 102:10,16 103:19 104:4, 16 106:11,16 107:17,23 108:4,10,19,24 109:5,9,15 110:14,16,21, 23 111:8,9,19 112:3 113:22 118:1 119:18, 24 121:22 122:4,8,15 123:1,8,24 153:17 155:6, 14 161:3 168:6, 7,12,21,24 169:2 175:21, 24 176:4,8,16 177:11 179:8 181:8 182:11, 16,25 184:17 194:9 196:21 239:22,23 240:2,12,13 265:14 304:13, 17 305:5,8 306:4,9 308:7 318:16,21,24 319:2,9,16,20 320:7,19 322:10 323:2,5 324:5 327:15 328:3,5,18 329:17,25 330:12 332:23 333:8,24 335:12 338:17, 25 339:8 340:18 341:12 349:17

**specific** 36:23 48:1 92:11 122:12 123:19 130:15 148:19, 21 151:7 153:21,22,25 156:15,21 157:18 158:16 166:25 176:22 179:2 194:10, 19 212:23 223:4 233:10 261:10 267:5 275:1 339:1 349:15 350:3, 10

**specifically** 38:8 41:13 55:21,24 56:7 80:21 90:11 113:1,25 117:21 121:18 162:19 177:13 188:13,21 193:14 213:4 317:2 325:10

**specifics** 111:15 126:25 221:17

**speculate** 91:18 167:4 343:20

**spell** 15:2 42:17

**spelled** 267:6

**spend** 60:3,4 66:7

**spending** 37:16

**spent** 18:4 66:17,19

**spoke** 291:24

**Spratte** 45:12 66:8 67:3,15 68:2 149:22

**Spratte's** 65:25 111:2

**spread** 197:10 202:7,8

**spreads** 154:20,22 162:23 197:12, 13 198:12 200:13,16 202:5,12 216:5 289:20

**Square** 27:2 343:13

**staff** 284:6,19 285:8,21 333:10 341:16 346:6,13

**stamp** 255:13

**stamped** 158:22 162:12 184:5

**stand** 211:25 305:4

**standard** 181:11 184:15

**standing** 56:13 184:15 197:4 235:13

**star** 311:13

**start** 20:11 29:17 55:13 69:23,24 70:1 76:13 140:20 149:15,17 180:4 196:23 237:5 260:5 275:11 317:25

**started** 29:11 124:4 215:19 270:23

**starting** 12:24 20:16 149:14 200:18 336:12 347:12

**starts** 94:22 336:15

**state** 12:22 14:6 15:2 139:14 173:17 209:23 210:1, 18 211:10 245:18

**statement** 246:18 247:5, 18

**statements** 115:22 238:11, 24 239:14 240:16 248:12 313:8,15

**States** 12:19

**station** 129:5 130:7 132:22 178:3 219:6 221:15 254:4 268:14

**statistically** 129:7

**statistics** 295:23

**stay** 341:18,21 342:5

**step** 51:23 96:23 141:12 222:6 229:21

**steps** 96:10,12, 25 224:20 226:19 228:23 247:13 271:24 272:2 285:22 287:18,23 288:5 339:22

**stick** 20:15 129:24

**stipulate** 14:11

**stipulates** 14:13,16

**stop** 17:14 32:12 96:6 292:9

**stopped** 32:17

**store** 348:9

**stranger** 206:22 207:5, 11,13,17 208:20 255:1 257:7,14,19 258:7,16 259:5, 11,15,19 260:15

**strangers** 208:12

**street** 26:2 69:21 71:12,13, 15,17,22 72:5, 14,23 73:9,11, 16,19,24 74:2, 6,21 75:2,5,10, 11,19 76:7,17 77:8,11 78:5,11 79:11,21 80:2 84:24 85:3,21 86:1 88:19 93:19,21,25 94:2,6 95:1,6,9, 19,20,24 96:11 97:2,8,18,21 98:25 100:25 101:3,9,12,18, 22 109:10 112:4,7,15,23 113:1 114:3 120:8,12,20,23 121:9,14,15,18 125:19,21 126:1,5,15,17 127:3,10,16 128:2,17 129:16 130:5, 11,15 131:1,8, 15,23 132:13 134:18 178:3,5, 9,22 179:12 322:1 326:2,8 335:7,20 343:11

**street-level** 27:5,6

**streets** 320:8

**strictest** 261:13

**strike** 20:25 24:12 30:15,23, 24 34:3 42:4 51:10,18 60:3 62:12 64:17 65:6 71:5 80:21 82:20 86:6,15 91:25 94:10 101:16 102:23 106:13 109:6 111:9 114:1,16 120:9 121:19 125:23 133:17 145:22 146:15 149:15 177:22 193:23 195:5, 11,13 213:8 226:16,17 233:23 238:4 241:7 244:9,14 252:24 258:21 260:1,16 286:8 292:18 308:18 312:24 314:13 318:20 319:8 322:21 340:4 341:2 346:2 347:3

**stronger** 254:14

**stronghold** 236:24

**structure** 20:24

**stuff** 112:17 206:10

**style** 238:2,8

**subject** 44:6, 18 82:13 99:8 100:3 108:14 129:15 131:7 137:10 148:3 181:1 200:3,18 201:6 250:22 273:18 288:24 317:23

**subjected** 276:2

**subjecting** 128:3,10 277:1

**subjective** 271:17

**subjects** 47:10 65:7 187:12 317:4

**submit** 105:13

**submitted** 328:6

**submitting** 326:3

**subpoena** 344:12,14,16, 17,22 345:1,7, 12,18,22,24 346:8,21 347:6

**subpoenas** 346:5,17

**subsequent** 36:20 200:12 237:15,20 248:24 254:8, 13 269:18 291:21 292:3 294:4,7

**subsequently** 268:7 291:11

**substance** 280:1

**substantively** 280:20

**subtopics** 55:9

**suddenly** 100:14 134:7, 10

**sufficient** 83:5 126:18 135:13, 18 137:9 173:6, 7,8,11,16 206:1 219:5 221:13 292:2

**sufficiently** 131:9

**suggested** 248:9

**suggestibility** 222:2 223:10 225:24

**suggesting** 300:22

**suggestion** 222:20 225:16 271:14 272:12 289:3

**suggestions** 222:24

**suggestive** 175:13 196:4 211:22 222:17 223:5,13,24 253:13 254:14, 17 283:5,6,25 284:3,14 287:25 289:5, 14,15 290:19

**suggestivenes s** 222:25 223:21 224:5,9,18,21 226:16,20 227:1 271:9

**suggests** 274:23

**Sullivan** 66:8 67:3,11

**Sullivan's** 65:23

**super** 317:11

**supervising** 49:5,22 285:9

**supervision** 145:19

**supervisor** 123:9 124:1 145:6 227:12, 15 253:1 262:19,23 263:3,16 264:3 265:4,8 286:1,5 317:12 332:4

**supervisor's** 263:5

**supervisors** 91:19 94:9,10 263:1,13,22 264:2,8,10,18 265:11 266:2 283:23 284:24 285:5 287:8 317:8 328:7 332:2

**supervisory** 284:6 333:10 341:16

**supp** 329:2 340:20

**supplement** 333:23

**supplemental** 54:4 104:19,21 105:5 106:4,7 235:9 241:22 261:1,17 321:4 327:23 328:24

**supplementar y** 108:25 109:6 156:24 165:3,8, 12,16 315:1,3 328:13 329:6 330:20 331:6, 11 332:13,24 333:1,7

**support** 115:22 119:19 135:7 177:17 305:24 346:13

**supports** 115:13

**suppose** 157:3 221:20 248:2 272:16 273:15 303:18 305:11

**supposed** 95:24 118:13 141:15 156:23 164:21 165:3 192:21,23 196:10 316:24 333:9

**suppress** 22:8
**suppression** 20:22
**Supreme** 211:19
**surmise** 187:19 301:13
**surmising** 187:17
**sus** 195:15 305:9
**suspect** 127:17,25 135:14 158:8, 17 169:15,19 170:10,22 171:3 172:13, 19,25 197:4,17, 20 203:25 204:3 205:10, 15 206:7,19 207:13 208:15 213:12 214:10, 17 221:13 222:21 223:16 235:12 244:14, 15,24 257:2,10 260:1 266:25 267:16 268:6,8, 16 269:4,18,19 271:8,13 272:8, 14,20 273:7,14, 19,21 274:4,8, 15,19,25 275:23 278:5 287:16 288:1 291:1,9 294:9 298:25 301:21 302:2,16 305:1, 3,7 308:25 310:21 312:15 316:4,9,14,20, 24 317:3 340:22 341:20
**suspect's** 220:19 235:14 256:9,13 258:2 287:19 296:19
**suspected** 170:8
**suspects** 151:4 206:21 207:4,19 208:7, 12,19 260:6 274:1 275:24 278:7 282:20 288:20 302:15, 16 304:3 317:4 318:22,24 319:2,9,17
**suspects'** 257:8
**sustained** 49:1
**Swaminathan** 12:25 13:1,6 14:13 15:1 33:22 34:11,17 38:3 39:5,9,12, 16,25 40:4,8, 15,18,23 41:1, 5,8,10,17,20,24 42:3,11 43:1,22 45:4 46:1,11 47:2,6,14,20 48:6,9,14 56:3, 12,16 61:23 69:3,17 78:23 79:2 81:5,14 88:17,24 89:2, 5,7 90:5,10,13, 15 91:5,7 92:21 94:14,17 99:19 100:1 103:15, 17 110:5 113:4 118:7,13,17,23 124:5,12,21,23, 25 125:3,12 143:2,7 152:10, 14 153:23 154:1 160:8 161:9,17,21 162:7 181:20 184:7,9,20 186:15 187:7, 23 188:20,24 189:1,3 190:21, 24 196:7,11,15 199:18,22,25 217:8,12,16,18, 21 218:3,7,11, 14 242:12 250:21 255:8, 12,15 269:25 270:25 273:4 277:8,11,21 282:9,12 286:19 287:6 311:7,11 314:7 317:21 331:1,3 344:2 348:20, 24 349:21 350:13,17,20 351:1
**SWARMINATHAN** 32:14
**swear** 14:19
**sworn** 346:22
**Sydney** 12:3 46:8 69:14 81:11 125:9 162:4 242:9 277:18 313:25
**synonymously** 73:11
**synoptic** 179:4
**system** 348:8, 15

**T**

**table** 38:5 41:20
**TAC** 17:21 20:17 21:2 25:10,13,14,21, 25 27:18
**tactical** 18:17, 23 19:3,4,9 20:2,7,11,12, 18,20 21:1,6, 10,16 22:3 24:14,19,25 25:4 26:7,10,15 27:13 28:2
**taint** 223:10 225:16,24 269:5,10,23 270:24 271:9, 14 272:13,22
**tainted** 222:16 223:6 269:13 270:10,11
**tainting** 222:20
**taints** 269:18
**taking** 51:22 53:4 96:11 118:6 136:9 274:18 301:25 326:24 336:7
**talk** 34:18 131:22 132:25 137:4 236:22 267:4 289:10 302:19 304:13 320:7,23
**talked** 125:22 148:4 169:1 184:16 198:4 215:10 216:4 218:18,19 250:24 254:23 256:4 279:4 283:9 292:23 306:8 313:7 327:8 341:11 349:9,23
**talking** 21:14 22:23 24:16 32:10 39:19 40:7,14 51:25 75:1 88:13 92:6,17,23 93:1 97:12 99:11,17 112:12 113:1 125:19 129:15 137:17 149:20 159:24 162:23 163:2 168:17 177:17 205:2,6 226:1,2,3 232:8 255:25 257:6, 13 258:7 266:17 270:15 283:16 289:8 290:13,24 297:15 300:13 306:5 321:15 335:5 344:1
**talks** 161:6,10, 12 162:22 163:22 188:5,6 298:4 299:6 313:13 336:23 347:17,20
**tall** 275:1,2
**tangent** 77:15, 18,21 81:24 228:24
**task** 193:14 306:15
**tasked** 27:6
**tasks** 31:20 33:5
**taught** 208:15
**teaching** 289:12
**team** 17:21 18:17,23 19:3,9 20:18 21:2 24:14,19,25 25:5,10,13,14, 21,25 26:7,11, 23 27:5,13,15, 16,18
**teams** 20:18
**technician** 12:4 232:13
**technicians** 232:6 311:17
**telephonically** 131:24 132:23
**telling** 220:3
**tentative** 238:24 240:15 244:15,23 245:3,5,7,10, 15,17,19,21,22, 25 246:2,3,6, 10,15,22 247:8, 22 249:7 291:20,24 292:19 295:2, 10 296:9
**term** 22:14 69:25 70:12,17 72:6,11 73:16, 21 88:7 148:6, 11 149:6,7 163:13 203:20 204:20 209:5 213:15 337:13
**termed** 277:2

**terminology** 69:24 70:2 186:22 196:23 203:8

**terms** 20:7 21:16 24:1 69:21 71:9 72:1 88:18 95:8 109:13 111:7 144:15 167:5 193:16,18,20, 22,24 194:13, 15 195:3,5,14, 23 199:1 204:15 212:14 215:1 227:7 230:4 236:1,16 237:21 280:15, 20 281:3 288:6 303:12 316:19 338:24 340:17 341:2,3

**territory** 171:18

**test** 29:1,2 70:10

**testified** 45:13, 14 90:5 271:24

**testify** 43:24 55:9 83:11,20 187:9,12 196:20 279:14

**testifying** 54:13,18 68:19 327:12

**testimony** 14:19 44:17 45:6 46:18 53:14 55:20 56:6,18,23 57:2,6,10,15, 19,23 58:2,6, 10,14,20,25 59:4 68:22 83:7 98:11 131:8,19 186:13 233:14 293:13,17 318:10 328:16 332:22

**that'd** 210:8 277:10

**theme** 120:3

**themself** 247:9

**theory** 275:8

**there'd** 106:22 107:7

**There'll** 52:7

**there're** 38:3 42:1

**thick** 338:3

**thing** 20:8 71:6 99:18 123:23 129:22 138:7 163:13 186:21 187:4 188:6 203:15 207:9 208:25 209:4 223:20 231:25 271:5 272:11 280:1,23 288:3 297:3 298:22 301:12,13 343:3

**things** 20:23 34:18 70:1,10, 21 71:9 74:18 75:5,6 128:16 132:4 171:11 176:25 179:14 198:9,11 222:19,24 223:4,22 224:7, 15 231:13 250:18 272:2,5 277:6 308:6 320:22 322:9 336:18

**thinking** 302:1

**third-party** 131:16

**Thomas** 12:11

**thought** 121:4 169:23 196:13 265:12 268:23 309:25 344:8

**thoughtful** 288:16

**thousand** 147:24

**thousands** 48:3

**throw** 259:14

**thrown** 282:25 287:3

**thrust** 119:11

**tighten** 95:12 106:20

**time** 12:8 17:1, 16,25 18:1,19 19:8,10 20:1,7, 13,14,15,17,19 23:2 24:13,18, 24 26:11,14,17, 19 27:17 29:7, 19 30:16,20 31:22 32:1,9 34:4 35:13,18, 19 36:4,24 37:17 42:22 44:22 46:4,9,13 51:3,7,25 56:5 62:5 63:8,12,23 64:1 66:4,17,19 67:21 69:10,15 79:4,7 81:7,12 82:19 83:3 90:4 99:11,20 103:11,13 106:5 119:12 125:5,10 136:13 141:18 148:16 149:21 150:1,8 161:25 162:5 168:17 173:22 174:14, 23,25 177:17 181:19,23 185:16 189:17 191:6,18 193:7 197:5,13 209:11 210:10, 11 212:5,9 215:17 216:15 219:14 220:16, 24 222:5 226:25 230:20 231:5 232:7 233:24 234:3,5, 7 238:13,19 239:5,18 240:7, 25 241:6 242:5, 10 244:5,10 246:25 247:4 250:8,13 252:17 253:9, 12,16 263:7 264:8,13 266:15 277:14, 19,25 278:11, 16 279:12 281:7 286:23 296:8,20 297:1, 14 302:22 307:18 309:7, 11 311:16,23 313:4,10,21 314:1,3 316:8 327:8,9 329:2 330:1 335:3,10 344:20 350:21

**time-specific** 266:17

**timeline** 92:23

**times** 17:14 51:11 52:7,16 59:9,11,15 102:23 177:11 209:7 271:8,13

**tip** 142:20 334:24 335:5

**tips** 335:13

**title** 31:8,15,16, 23 82:12 179:22

**titled** 54:4 158:23 180:14

**today** 12:5,7 13:8 38:5 39:19 46:9 53:6,10,15 54:22 55:21 56:7,18,23 57:2,6,10,15, 19,23 58:2,6, 20,25 59:4 65:8 68:19,23 69:15 81:12 82:22,25 83:3,8,13,21 96:1 98:12 123:19 125:10 162:5 174:8 186:9 202:20 242:10 277:19 314:1 344:4

**today's** 38:25 59:7 68:9,14,19 82:18 159:1 179:24 199:13 201:3,8,25

**told** 299:16 315:23

**tool** 283:17

**top** 162:20 183:24 185:2 199:16 217:7 241:24 303:22 334:14,22 340:8

**topic** 39:2 40:19,20 41:1,2 42:1,21 43:9 55:13,21 56:4, 7,19,23 57:3,6, 11,15,19,24 58:2,7,10,14, 17,21,25 59:4 69:19,23 83:7, 12,17,20 124:14,15,17 148:4 149:16 153:14 187:13 344:3

**topics** 37:18 38:4,6,7,8,10, 21,24 39:18,24 41:13,18 45:7 53:15 54:12,17, 18 55:8,12 62:22 68:18,23 196:19 318:11

**total** 60:3,4,9

**touch** 298:10

**touches** 64:9, 14 256:2

**touching** 119:14

**trad** 129:8

**tradition** 29:10

**traditional** 174:9

**traditionally** 173:18

**train** 160:19 294:16 344:8

**trained** 17:19 18:8 36:25 37:4 38:14 39:6 42:5,9 86:14, 15,20 100:18 120:20 164:3 208:11,18 210:24 213:7, 10 214:1,10,14, 19 215:2 223:23 224:1 225:3,7,14,22 226:15,18,24 227:2,20 229:2, 4,22 246:25 247:5 250:3,7, 12 258:6,14,22, 25 259:9 272:19 273:2,5 283:8,10,16 288:10,15,19 289:1 292:8 294:20,25 298:8,14,18 300:10 314:14 323:5,9,11 329:25 330:2, 12,15,19 349:16

**training** 17:20 34:21,22,25 35:5,11 36:7,9, 13,18 37:9 38:9,11,13,22, 23 42:25 43:3, 7,11,13,15,18 61:4,6,7,8,10, 19 62:9 64:8, 11,14 68:7 92:1,11,19,25 93:1,4,12,13 101:15,16 110:10,12,20 111:7,10,13,14, 18,21 112:2,6, 13,22 113:2,8 156:2,7 159:5, 8,9,14,19,20,22 160:1,13,22,25 161:2,5 163:16, 21 164:11,18 165:4,15 166:1, 3,8,14,25 181:8,14 182:5, 10,12,15,18 194:5,8 199:7,9 203:2 208:10, 14 212:12 215:1 219:7,17 220:18,25 221:25 226:5 228:7 229:23 231:7 239:17 246:5 253:18, 20 255:9,21 256:12,17,24 257:1,16,22 259:2,4 260:17 278:20,21 279:5,9,11,15, 20 281:3,6,9, 11,15,17 282:3, 4,13,14 283:2 287:13 288:4 289:12 290:2 294:6 295:25 296:5 299:14, 22 300:21,23, 25 301:5 318:3, 5,10,14,15,19 323:14 329:16, 21 330:16,17 332:18 335:24 336:22 344:7 345:16,21 349:4,6,14

**trainings** 160:1

**trajectory** 29:10,14

**treat** 15:13 135:13

**treated** 249:6,8 304:4,6 342:14, 15

**treatment** 303:18 304:2

**trial** 43:23,24 44:10 45:10 174:4 210:9,13 293:1 325:3

**trials** 45:14

**tricky** 130:13

**trier** 299:3

**true** 58:17 132:4 133:14, 15 140:12 167:23 197:25 239:2,3,22 240:4 264:21, 24 265:6 290:23 292:7 298:10

**truth** 14:20,21 225:9 272:1 283:18 285:1

**turn** 124:14 148:3 193:4 317:22

**turned** 32:25

**turns** 321:19

**twisted** 152:1

**type** 34:9 88:4, 8,13 89:21 90:21 96:9,10 102:15 104:3, 16 105:2,6 106:11 129:21 148:23 173:2 186:2 195:6 230:7 240:3 241:20 315:7 337:3,10,18,21 338:16 340:10

**types** 19:6,11 105:13 115:7 147:1,2 204:13 206:5 222:18 259:9 289:2 336:13 337:9 347:20

**typical** 76:17 129:14 134:4,9 252:6 275:11 291:7 296:23, 24

**typically** 95:19 173:3 205:14 251:7 275:14 291:1 301:5 314:21 336:21

**U**

**UCR** 334:15

**uh-huhs** 52:11

**ultimate** 224:24 285:1

**ultimately** 44:10 96:24 102:3 115:5 134:20 141:21 143:23 144:22 145:13 183:9 191:24 224:19 229:12 258:5 262:12 265:15 286:6,8 287:23 289:1 300:21 331:8 333:22 343:9

**unavailable** 311:25

**uncertainty** 249:5 313:1

**unclear** 153:11 155:17 170:24 214:8 286:17 299:19,21 315:21 321:12

**uncontaminated** 225:11

**underlying** 320:16

**undermines** 288:21 294:3,7

**understand** 20:4 38:12 43:10,11,17,20 44:14,19 45:2 47:24 52:15,17 53:6,9,13,17 55:19 56:5,17, 22 57:1,5,9,14, 18,22 58:1,5,9, 13,19,24 59:3 69:24 70:2,6 74:4,12 84:4 105:18 108:12 128:20 131:8, 19 136:12 137:25 166:19 178:25 182:4 185:14 187:1 188:23 198:15 209:17 210:2 225:2 231:18, 24 237:16 243:15 246:24 247:14 257:1, 12 266:4 268:17 273:23 285:10,12 286:10,24 297:11 327:7, 13 328:16 330:9 332:21 343:8 349:23

**understanding** 17:12 33:25 34:15 79:25 80:3 109:22 148:25 151:1 160:12,17 166:23 174:14 175:9,23 182:9, 12,14 183:3 189:21 193:12 279:10 281:14 284:18 286:15 339:25 340:2, 24 341:5,6

**understands** 305:25

**understood** 32:15 52:21 66:20 80:20 181:15 237:11 283:23 284:6

**unduly** 283:5 284:3,14

**uniform** 80:6, 13

**unique** 138:9 259:2

**unit** 26:24 27:1 28:3,6,12,13 29:8 86:3,10 176:11 191:16, 20 335:16,19 336:14 341:19, 21 342:6 343:9, 10,14,17

344:13,14,16, 17,22 345:1,2, 7,12,13,17,18, 22,24 346:3,18, 23 347:7 349:10

**United** 12:19

**units** 337:3,6 345:6 347:4

**unnecessary** 109:7

**unrealistic** 228:13

**unreliability** 134:2

**unreliable** 134:1

**unsuggestive** 225:11

**unsure** 72:6

**unusual** 252:5 258:10 267:20 269:2 271:4,6 272:17,18 281:1 292:6 312:19 313:14

**up-to-date** 326:8

**update** 264:18

**updated** 179:3

**ups** 224:22 227:11 231:3 232:15 240:21 241:20 254:24

**utilize** 169:24

**utilizing** 337:13

**utterances** 139:17

**V**

**vacuum** 145:18

**valuable** 133:6,7 210:12 299:2

**variables** 259:14

**variety** 39:18 94:3,5

**vast** 132:25

**vehicle** 222:13, 21 224:10 235:13 237:14

**vehicles** 178:9

**verify** 96:18

**version** 180:9 183:21 184:5 255:13

**versions** 148:14

**versus** 12:11, 12,14,15,16,18 193:19 229:5 244:4 247:22

**vet** 74:23 96:6, 11 121:10,14 125:24 126:1,4 127:10,13,15 128:1,9 129:3 130:4,10 135:12 146:9 147:20 148:1

**vetted** 74:25 95:21,25

**vetting** 128:21 133:24

**victim** 171:21 256:13 294:15 334:15

**victims** 289:21 294:22 295:1 296:9 298:5,9

**video** 12:4 46:8 54:4 69:14 81:11 125:9 133:3 162:4 242:9 277:18 313:25

**videoconference** 12:9

**view** 43:16 45:15 64:21 169:18 223:19 253:8,15 267:1 268:14 271:8, 13 289:23 292:13 315:13, 24

**viewed** 165:9 170:19 193:6 197:5 223:16 241:2,9 307:25 315:19

**viewing** 156:16 203:24 234:20 235:20 236:3,7,19 237:22,24 238:6 240:23 269:12 295:1 302:6 304:24 315:8 316:25

**viewings** 207:4

**violating** 97:14

**violation** 206:25 207:8 268:18 274:3 306:2

**violence** 340:13

**violent** 15:22, 23 16:1,2,22,23 17:2 29:6,7,11, 22 30:3,8 340:5,11,18,20 341:3 342:10, 24 343:15 350:9

**visible** 222:13

**voice** 298:23

**voluntarily** 130:7

**volunteered** 247:9,17 248:8

**W**

**Wacker** 12:6

**wait** 39:11 40:11,21,22 83:15 219:22 220:10,14 221:2,7 228:8 229:13 268:1

**waited** 219:24

**waiting** 220:1 229:6

**walk** 17:9,12 96:1 304:24

**walking** 75:16

**walks** 96:2

**wallet** 298:24

**wanted** 17:11 45:16 98:9 106:6 107:13 196:3,14 312:7 330:6 333:22 334:25

**war** 237:6

**warrant** 117:6, 13

**warranted** 146:20 147:14

**warrants** 115:7,14,23 116:23 117:11 118:6,10 119:5, 9,13,19 120:3

**wasting** 44:22

**waters** 71:10

**ways** 34:25 35:5 96:17 171:3 179:15 183:11 192:11 224:4 225:8 277:1 283:3

**wearing** 171:13 209:11

**weekly** 326:7, 13,16

**weeks** 60:14 205:25

**weigh** 233:18 273:16

**weight** 222:11 308:14 316:20

**weird** 317:17

**well-known** 338:9

**whichever** 118:18 157:12

**whoa** 39:7,8

**whoever's** 74:23

**whole-** 103:12

**wide** 78:25 94:3

**wife** 129:4 147:18

**winding** 346:19

**window** 220:16,24 221:1,7,19 222:5 226:25 229:18 234:6 305:1,4

**Winstrom** 37:19 66:9 67:4,19

**Winstrom's** 66:2

**wise** 237:8 314:19

**withdraw** 98:18

**withstood** 70:10

**witness'** 33:13,20 48:5

**witness's** 38:13

**witnesses** 45:10 113:2 150:18,23 166:10 170:18 172:5,10 177:22,23 178:5 193:1,6 195:16 204:8

Case: 1:18-cv-03029 Document #: 506-13 Filed: 03/08/24 Page 131 of 131 PageID #:42376


205:14,20 206:21 207:4 208:11,20 238:6 240:23 241:1,8 247:1,6 249:4,20,25 250:4,8 253:8, 15 254:1 260:2 267:4,11 289:21 292:25 294:22 295:1,9 296:9 299:16 300:12 301:6 302:14 305:13 313:16 314:11 316:23 319:21 320:2

**wives** 129:8

**women** 19:17 136:16,20

**word** 35:7 55:25 79:20 121:1 202:8 213:15 247:25 248:1 286:21

**worded** 258:2 290:5

**wording** 248:21

**words** 31:8 73:22 116:6,21 132:8 133:8 136:8 144:4 151:6 163:21 165:15 167:18 172:12 191:10 192:22 197:2 216:14 219:3 225:2 228:2 233:11 235:13 239:6 243:22 246:17 249:3 254:16 256:17 264:14 271:16 273:11 283:8 289:5 292:1 306:14 321:14 333:6 342:1

**work** 20:1 22:14 25:1 28:11 30:12,15 35:14,15,21 38:20 51:5 70:4 104:17 121:4 123:2 179:9 206:15 227:16 259:16,18,23 263:11 276:23 344:5

**worked** 16:24 19:17 24:12,24 28:6 29:12 30:3,17,20,25 34:4,15 35:25 37:9 42:22 48:15 51:4 346:3

**working** 19:8 24:13,19 28:3 29:21 33:6,7 36:20 110:14 334:13

**works** 15:16 341:25

**worksheet** 334:10

**would've** 18:8 21:6,7 25:17 26:23 50:24 80:25 81:24 87:24 99:24 102:3 107:12, 13 110:17 122:22 130:8 175:11,12 176:5,23 177:19 191:22, 24 192:3 194:17,18 197:13 228:18 232:8,11 234:17 235:8,9, 16,17 240:11 249:18 253:21 259:1 260:25 297:18 301:11 327:21 330:6,7 335:14 342:2, 13 343:6 346:7, 11

**write** 52:13 328:4,11,20

**writing** 64:7,9, 12,15,19,22 237:21 290:17 328:13

**written** 153:7 154:7 155:10 187:18 189:13 326:1,5,6 341:24 345:6, 11

**wrong** 67:23 133:19 140:1 160:15 187:25 286:21 341:4

**Y**

**year** 18:7,9 24:9 28:1,19 179:3 182:4 321:3 329:7

**year-and-a-half** 18:9

**years** 15:25 16:16 18:5 19:1,9 25:4 26:1 35:16,21 174:13 204:23, 24 205:4 206:16 209:8, 21 293:1

**young** 292:25

**younger** 293:8

**youth** 299:10, 11,23 300:3,11, 23 301:5,9,11, 16 302:2 323:17

**Z**

**Zehner** 13:11, 13,14,25

**Zoom** 14:2