**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS SIERRA, | ) | |
| | ) | No. 18 C 3029 |
| *Plaintiff*, | ) | |
| | ) | Hon. John Robert Blakey, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | |
| | ) | JURY TRIAL DEMANDED |
| *Defendants*. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
SIERRA'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGEMENT**

Jon Loevy
Anand Swaminathan
Steve Art
Ruth Brown
Rachel Brady
Sean Starr
Wally Hilke
Meg Gould  **LOEVY
& LOEVY** 311 N.
Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

i

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES ......................................................................................... v

INTRODUCTION ........................................................................................................ 1

PART I—SIERRA'S CLAIM AGAINST GUEVARA FOR FABRICATION AND SUPPRESSION OF MELENDEZ'S IDENTIFICATIONS ........................................................................................... 4

STATEMENT OF UNDISPUTED FACTS ................................................................ 4

    I.      THE SHOOTING OF NOEL ANDUJAR ................................................. 4

    II.    THE INITIAL DESCRIPTIONS AT THE SCENE ................................ 5

    III.   GUEVARA FABRICATES IDENTIFICATIONS FROM MELENDEZ TO WRONGFULLY CONVICT THOMAS SIERRA OF MURDER ........................................................................ 5

    IV.   SIERRA IS WRONGLY CONVICTED ................................................ 6

    V.    MELENDEZ NEVER IDENTIFIED SIERRA OR THE CAR ........................................................................................................ 6

    VI.   GUEVARA TAKES THE FIFTH ON QUESTIONS ABOUT MELENDEZ ............................................................................ 7

ARGUMENT ............................................................................................................... 7

    I.      SIERRA IS ENTITLED TO SUMMARY JUDGMENT ON THE MELENDEZ DUE PROCESS THEORIES ................................. 9

          A. Guevara Fabricated Melendez's Photo Identification of Sierra and Suppressed the True Circumstances of That Identification Procedure........................................................... 11

          B. Guevara Fabricated Melendez's Live Lineup Identification of Sierra and Suppressed That There Was No Lineup ........................................................................................ 12

          C. Guevara Fabricated Melendez's Identification of the Car and Suppressed That Melendez Said the Car Was Not the One Used in the Shooting ........................................................ 13

    II.    GUEVARA CANNOT RAISE A GENUINE DISPUTE OF FACT GIVEN HIS ASSERTION OF THE FIFTH AMENDMENT.................................................................................. 14

          A. By Asserting the Fifth, Guevara Cannot Dispute Any of the Facts Supporting the Melendez Due Process Theories .................................................................................................. 15

B.  Guevara's Assertion of the Fifth Only Permits An Inference That Truthful Testimony Would Support Sierra's Summary Judgment Position ........................................... 177

C.  Guevara Cannot Point to His Other Testimony and Evidence He Created, Given His Assertion of the Fifth .............................. 199

PART II—SIERRA'S *MONELL* CLAIMS AGAINST THE CITY ........................................... 20

STATEMENT OF UNDISPUTED FACTS ........................................... 20

ARGUMENT ........................................... 20

I.  THE CITY IS PRECLUDED FROM RELITIGATING ITS OFFICIAL POLICY OF EVIDENCE SUPPRESSION ...................................... 21

A.  Sierra's *Monell* Theory Regarding Evidence Suppression ........................................... 22

B.  The City Lost the Same *Monell* Theory In *Fields* ........................................... 24

C.  The City Was Precluded From Relitigating the Issue in *Kluppelberg* ........................................... 26

D.  The City Lost the Same *Monell* Theory In *Rivera* ........................................... 27

E.  The City Is Precluded From Relitigating the Same Issue Here ........................................... 29

1.  The Issue Is the Same As That In Fields and Rivera ............................... 29

2.  The City's Policy Remained The Same During Time Period At Issue in *Fields*, *Rivera*, and This Case ...................................... 31

3.  The Issue Was Actually Litigated In *Fields* and *Rivera* ........................................... 33

4.  The Issue Was Essential to the *Fields* and *Rivera* Judgments ........................................... 33

5.  The City Had A Full and Fair Opportunity to Litigate In Past Cases ........................................... 34

6.  There Is No Equitable Reason Not to Apply Issue Preclusion ........................................... 35

II.  THE CITY OF CHICAGO CANNOT RAISE A GENUINE DISPUTE OF MATERIAL FACT REGARDING ITS EVIDENCE SUPPRESSION POLICY ........................................... 36

A.  A Municipality Is Liable When Its Policymakers Promulgate Deficient Policies or Fail to Adopt Needed Policies ........................................... 37

B.  The Summary Judgment Record Reflects That City Policymakers Promulgated Deficient Policies and Failed to Adopt Policies In Response to Notice of a Citywide Evidence Suppression Problem ........................................... 38

iii

1.   The City Had Notice of A Problem of Widespread
     Evidence Suppression ................................................................. 38

2.   The City Failed to Promulgate Policies to Solve the
     Evidence Suppression Problem ............................................... 40

C.          The City Cannot and Does Not Contest This
     Evidence   41

CONCLUSION ..................................................................................................... 42

## TABLE OF AUTHORITIES

**CASES**                                                                                          **Page(s)**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................8, 14, 16, 36

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017) ........................................................9, 14

*Avitia v. Metro. Club of Chicago*, 924 F.2d 689 (7th Cir. 1991) ...................................................34

*Babrocky v. Jewel Food Co.*, 773 F.2d 857 (7th Cir. 1985) ...................................................19, 20

*Bailey v. Andrews*, 811 F.2d 366 (7th Cir. 1987) ........................................................21

*Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162 (7th Cir. 1996) .......19, 20

*Board of Commissioners v. Brown*, 520 U.S. 397 (1997) .........................................................20, 37

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................................9, 10

*Calhoun v. Ramsey*, 408 F.3d 375 (7th Cir. 2005) ........................................................37

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................7, 36

*Chicago Truck Drivers v. Century Motor Freight, Inc.*, 125 F.3d 526 (7th Cir. 1997)................35

*Cho v. Holland*, 2006 WL 2859453, *5 (N.D. Ill. 2006)............................................................17

*City of Chicago v. Reliable Truck Parts Co., Inc.*, 822 F.Supp. 1288 (N.D. Ill. 1993)................19

*Clancy v. Coyne*, 244 F. Supp. 2d 894 (N.D. Ill. 2002)................................................................18

*Davis v. Carter*, 452 F.3d 686 (7th Cir. 2006)........................................................20

*Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008) ................................................................10

*Fields v. Chicago*, No. 10 C 1168, 2017 WL 4553411 3 (N.D. Ill. Oct. 12, 2017).......2, 23, 24,,34

*Fields v. Wharrie*, 672 F.3d 505 (7th Cir. 2012) ....................................................................10, 11

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ........................................................9

*Giglio v. United States*, 405 U.S. 150 (1972) ................................................................10, 11, 12

*Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372 (7th Cir. 2017).............................................20, 37

v

*Holland v. City of Chicago*, 643 F.3d 248 (7th Cir. 2011) ..........................................................10

*Iglesias v. Guevara, et al.*, No. 19 C 6508 (N.D. Ill.)..............................................................2

*In re Tapper*, 123 B.R. 594 (Bankr. N.D. Ill. 1991) ................................................................33

*J.K.J. v. Polk County*, 960 F.3d 367 (7th Cir. 2020)...........................................................20, 37

*James v. Hale*, 959 F.3d 307 (7th Cir. 2020) ....................................................................19, 20

*Jenkins v. Bartlett*, 487 F.3d 482 (7th Cir. 2007) ..................................................................21

*Johnson v. Dominguez*, 5 F.4th 818 (7th Cir. 2021) .................................................................36

*Jones v. Chicago*, 87 C 2536 (N.D. Ill.) ................................................................................22

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ......................................................10, 26

*King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012) .....................................................................37

*Kluppelberg v. Burge*, 2017 WL 3381717 (N.D. Ill. Aug. 7, 2017)..............................2, 26, 27, 34

*Kyles v. Whitley*, 514 U.S. 419 (1995)..................................................................................10

*LaSalle Bank Lake View v. Seguban*, 54 F.3d 387 (7th. Cir. 1995)....................................15, 16, 17

*LiButti v. United States*, 178 F.3d 114 (2d Cir. 1999) ........................................................17, 18

*Lucky Brand Dungarees v. Marcel Fashions Group*, 140 S. Ct. 1589 (2020) .............................32

*Martinsville Corral, Inc.*, 910 F.3d 996 (7th Cir. 2018)............................................................8

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) ................................................20

*Mooney v. Holohan*, 294 U.S. 103 (1935) ..............................................................................9

*Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001)................................................................10

*Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003)...........................................................11, 12

*Padilla v. City of Chicago*, 932 F.Supp.2d 907 (N.D. Ill. 2013) ..............................................17

*Palmer v. City of Chicago*, 82 C 2349 (N.D. Ill.)...................................................................22

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979)..........................................................21, 35

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)................................................20, 37

*Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014) ......................................................9

*Rivera v. Guevara*, No. 12-CV-4428, 2019 WL 13249674 (N.D. Ill. Sept. 20, 2019)...........22, 32

*S.E.C. v. Lytte*, 538 F.3d 601 (7th Cir. 2008)................................................18

*Scott v. Harris*, 550 U.S. 372  (2007) ...............................................................8

*SEC v. Graystone Nash, Inc.*, 25 F.3d 17 (3d. Cir 1994)................................................15

*Smith v. Cain*, 132 S. Ct. 627 (2012) .............................................10, 11, 12

*Sornberger v. Knoxville*, 434 F.3d 1006 (7th Cir. 2006) .........................................21

*Staats v. Sawyer*, 220 F.3d 511 (7th Cir. 2000) ................................................21

*Steidl v. Gramley*, 151 F.3d 739 (7th Cir. 1998)................................................37

*Thomas v. Cook County*, 604 F.3d 293 (7th Cir. 2010) ....................................37

*Thompson v. City of Chicago*, 2009 WL 674353 (N.D. Ill. 2009) ...........................16

*United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149 (1923)................................17

*United States v. 4003-4005* 5th Ave, 55 F.3d 78 (2d. Cir 1995) .................................15

*United States v. Agurs*, 427 U.S. 97 (1976) ..................................................10

*United States v. Bagley*, 473 U.S. 667 (1985) ..........................................11, 12

*Vodak v. Chicago*, 639 F.3d 738 (7th Cir. 2011)..............................................37

*Wearry v. Cain*, 577 U.S. 385 (2016) ..............................................10, 12

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012)...............................9, 10

*Zander v. Orlich*, 907 F.3d 956 (7th Cir. 2018)................................................36

**RULES**

FED. R. CIV. P. 56(a)...................................................................7

**OTHER AUTHORITIES**

18 Wright & Miller, Fed. Prac. & Proc. Juris.  (3d ed.).................................................................21

Plaintiff THOMAS SIERRA, by and through his attorneys, Loevy & Loevy, pursuant to Federal Rule of Civil Procedure 56, moves for partial summary judgment against Defendant Guevara on Plaintiff's due process claim and against the City of Chicago on certain of his *Monell* claims, for the reasons set out in Plaintiff's Local Rule 56.1 Statement of Undisputed Facts, Exhibits, and the following memorandum:

## INTRODUCTION

Thomas Sierra was wrongly convicted of the murder of Noel Andujar based solely on eyewitness identifications fabricated by Defendant Reynaldo Guevara and the other individual Defendants from two witnesses to the crime—Jose Melendez and Alberto Rodriguez—who had not seen the perpetrator. No real evidence ever implicated Sierra. To ensure his conviction, throughout Sierra's criminal proceedings, Guevara suppressed evidence that would have shown he was innocent and that Defendants had framed him.

Sierra served 21 years in prison for a crime he did not commit. Throughout, he consistently maintained his innocence and fought to clear his name. In 2018, based on the revelation that false evidence had been used to obtain his conviction, a state court vacated Sierra's conviction, and then state prosecutors dropped all charges against him. In 2022, the State of Illinois granted Sierra a certificate of innocence.

In 2018, Sierra brought this suit to hold the individual Defendants and the City of Chicago accountable for violating his constitutional rights and causing his wrongful conviction. As discussed in Sierra's response to Defendants' motions for summary judgment, genuine disputes of material fact require a jury trial in this case of Sierra's claims against all Defendants. But Sierra is entitled to partial summary judgment on two claims.

First, this Court should grant Sierra summary judgment on his claim that Guevara violated his right to due process and a fair trial when Guevara fabricated Jose Melendez's identifications

1

implicating Sierra in the crime and suppressed evidence relating to the true circumstances of those identifications. Defendant Guevara cannot raise any material dispute of fact on this due process claim, given his assertion of his Fifth Amendment right not to incriminate himself. Sierra's due process claim against Guevara is discussed in Part I, below.

Second, this Court should grant partial summary judgment to Sierra on his *Monell* claims against the City of Chicago. For starters, the City is precluded from relitigating one of Sierra's *Monell* theories—that the City had an official policy of suppressing exculpatory evidence—having litigated and lost precisely the same *Monell* theory in two recent federal civil trials, *Fields v. Chicago*, No. 10 C 1168, 2017 WL 4553411, at \*3 (N.D. Ill. Oct. 12, 2017), *affirmed*, 981 F.3d 534 (7th Cir. 2020), and *Rivera v. Guevara*, No. 12-CV-4428, 2019 WL 13249674, at \*2 (N.D. Ill. Sept. 20, 2019). Another Court in this District has already concluded that the City is precluded from relitigating this theory. *Kluppelberg v. Burge*, 2017 WL 3381717 (N.D. Ill. Aug. 7, 2017). While Sierra concedes that the City will be able to litigate at trial the causation issue—whether the City's policy of evidence suppression contributed to Sierra's wrongful conviction—it cannot relitigate the existence of that official policy. A motion to apply issue preclusion on this *Monell* theory nearly the same as this one is currently pending before Judge Valderrama in another Guevara case, *Iglesias v. Guevara, et al.*, No. 19 C 6508, Dkts. 244, 245, 248 (N.D. Ill.).

The doctrine of preclusion exists to prevent a repeat litigant like the City from consuming judicial resources by relitigating issues that have been fully aired in prior cases to a definitive conclusion. Applying this principle promotes finality, conserves litigation resources, and prevents a party from taking multiple bites of the apple in order to create disparate litigation outcomes. The City has litigated its evidence suppression official policy exhaustively, including in another case involving Guevara. It has lost repeatedly at trial, and those jury verdicts have been upheld by

2

Judges in this District and by the Seventh Circuit. In these circumstances, there is no justification for allowing the City to relitigate the same issue again in this case. Partial summary judgment should be granted to Sierra on preclusion grounds.

Independently, partial summary judgment should be granted to Sierra on another of his *Monell* theories because the City has not and cannot raise any genuine issue of material fact requiring a trial. Sierra contends that, in response to notice that the Chicago Police Department had a citywide problem of evidence suppression in homicide cases, City policymakers promulgated facially deficient written policies, which permitted the suppression of exculpatory evidence. This theory is supported by all of the evidence adduced by both sides in the summary judgment record, and the City's own designated Rule 30(b)(6) witnesses and experts do not contest it. Accordingly, summary judgment should be granted to Sierra on this theory as well. Again, Sierra concedes that the City will have the chance to litigate at trial whether its facially deficient policies caused the suppression of evidence in Sierra's case, but it cannot relitigate whether it put in place deficient policies in the first place.

The *Monell* theories addressed in this motion have been litigated exhaustively. The City has lost these theories at trial every time. Still, the City engages in protracted litigation of these same theories in subsequent litigation. Efficient resolution of pending litigation and conservation of judicial and party resources demands that the City's perpetual and vexatious litigation of the same *Monell* issues be brought to an end. Sierra's *Monell* claims against the City are discussed in Part II, below.

**PART I—SIERRA'S CLAIM AGAINST GUEVARA FOR FABRICATION AND
SUPPRESSION OF MELENDEZ'S IDENTIFICATIONS**

**STATEMENT OF UNDISPUTED FACTS**

The following undisputed facts are taken from the summary judgment record, which for purposes of this motion, the Court construes in the light most favorable to Guevara and the City, drawing inferences in their favor. Sierra focuses in this brief on the way in which Guevara and the City contributed to the violation of his rights and his wrongful conviction, leaving discussion of other Defendants and theories largely to his response to Defendants' motions for summary judgment.

## I. THE SHOOTING OF NOEL ANDUJAR

On the night of May 23, 1995, Noel Andujar was shot and killed in the Logan Square neighborhood of Chicago. AS ¶ 1.[1] The shooting occurred around 10:30 p.m., after dark as Andujar was riding in the back seat of a car with his friends Jose Melendez, who was driving, and Alberto Rodriguez, who was in the front passenger seat. AS ¶¶ 2-3. The three had been smoking marijuana. AS ¶ 8. As they drove around the Illinois Centennial Monument in Logan Square, shots came from another moving car. AS ¶ 4.

As Jose Melendez described the incident during his deposition in this case, the shooter opened the passenger front door of a car with tinted windows, which was travelling to his left (*i.e.*, driver's side), reached around the door frame with a handgun, and began firing into their car. AS ¶ 5. Melendez and Rodriguez immediately ducked down, and Melendez sped away. AS ¶ 6. They stopped a couple of blocks down the street, discovered that Andujar had been struck in the head, and flagged down a Chicago Police Department (CPD) patrol car. AS ¶ 7.

---

[1] Sierra's affirmative statement of facts in support of this motion is cited as "AS."

4

## II.     THE INITIAL DESCRIPTIONS AT THE SCENE

According to a CPD report written by the first responding officers, neither Melendez nor Rodriguez could describe the perpetrator. They said he was a Latino male, but they could not provide any further description: they could not estimate his age, height, weight, eye color, hair color, complexion, or any other identifying features. AS ¶ 10. The same was true for the driver of the shooter car, a male Latino, and the backseat passenger, a Black male; other than their races, Melendez and Rodriguez could not provide any additional descriptive information. AS ¶ 11. The responding officer testified that he obtained all possible details about the perpetrators at the scene, and that he would have included any details provided in his report. AS ¶¶ 12-13. Likewise, Melendez testified that he did not have the opportunity to see the shooter's face. AS ¶ 14.

At the scene, Melendez described the shooter car as "a dark blue or black Park Avenue Buick (plates unknown), with spoke wheels and tinted windows." AS ¶ 15. In his deposition, Melendez testified that by spoke wheels he meant that they were custom rims and that the tinted windows made it impossible to identify a face in the other car. AS ¶¶ 16-17.

## III.    GUEVARA FABRICATES IDENTIFICATIONS FROM MELENDEZ TO WRONGFULLY CONVICT THOMAS SIERRA OF MURDER

On May 24, 1995, Guevara was assigned to the case. AS ¶ 18. A week later, on May 31, 1995, Sierra was charged with the murder of Noel Andujar. AS ¶ 19. Guevara did not write any police reports between May 24 and 30. Guevara's first report was submitted the night of May 30, after Thomas Sierra was already in custody and had purportedly been identified as the shooter by Melendez and Rodriguez. AS ¶ 20.

According to Guevara's closing report, Sierra was arrested at 3:30 p.m. on the afternoon of May 30, 1995. AS ¶ 23. The report states that Guevara contacted Melendez and that he arrived at Area Five at 5:30 p.m. AS ¶ 24. According to the report, Melendez stated he would only be able

to identify the shooter, then identified Sierra as the shooter in a photo array, and then again in a live lineup. AS ¶¶ 25, 27. The report states Melendez identified a car parked in the parking lot at Area Five as the black Buick Park Avenue used in the shooting. AS ¶ 26. According to Guevara, he was able to connect Sierra to the car because Guevara had seen Sierra in a black Buick Park Avenue three days before the Andujar shooting, while at Esther Reyes's house investigating another shooting. AS ¶ 21. Even though the Andujar shooting (and the vehicle description that was then provided) would not happen for another three days, according to Guevara, he had the foresight to ask who the occupants of the vehicle were, and he learned that Sierra was one of the occupants. AS ¶ 22.

## IV.    SIERRA IS WRONGLY CONVICTED

As discussed at length in Sierra's response to Defendants' motions for summary judgment, Sierra Response Brief Argument IV(B)(3), Melendez's two reported identifications of Sierra and his identification of the car were used to charge and prosecute Sierra. AS ¶ 28. At Sierra's criminal trial, consistent with this evidence, Guevara testified that Melendez had twice identified Sierra as the perpetrator and had identified the car, among other things. AS ¶ 29. Sierra was convicted and sentenced to 55 years in prison. AS at ¶ 30.

## V.     MELENDEZ NEVER IDENTIFIED SIERRA OR THE CAR

It is undisputed at summary judgment that Guevara's identifications attributed to Melendez of both Sierra and the shooter car were wholly fabricated, and that Guevara suppressed truth about those purported identifications. AS ¶¶ 34-38.

Melendez has made clear that he did not identify the car in the Area Five parking lot as the one used in the shooting. AS ¶ 34. Instead, he said to Guevara and Halverson that the car was *not* the one used in the shooting. AS ¶ 34. In fact, the undisputed evidence shows that Guevara's basis for connecting Sierra to the car in the Area 5 parking lot—a purported encounter at Esther Reyes'

6

house—was fabricated; it never happened. AS ¶ 35. Moreover, Melendez has made clear that he did not identify Sierra in a live lineup. In fact, he was never even shown a live lineup. AS ¶ 38.

Finally, Melendez testified he did not identify Sierra as the perpetrator in a photo array. AS ¶ 36. Instead, Guevara showed Melendez a photo array, held Sierra's photo in his hand while the others were on the table, and instructed Melendez to select Sierra's photo, telling Melendez that Sierra was the perpetrator. AS ¶¶ 36-37.

## VI. GUEVARA TAKES THE FIFTH ON QUESTIONS ABOUT MELENDEZ

In response to questions about these instances of misconduct, Guevara pleaded his Fifth Amendment right to remain silent, fearing that truthful answers would incriminate him. AS ¶¶ 39-43. At summary judgment, Guevara does not move for summary judgment on the theories that he fabricated and suppressed evidence relating to Melendez's identifications of Sierra and the car, or that he fabricated the story about seeing Sierra in the car used in the shooting three days before the shooting occurred. Dkt. 505 at 2-3. Moreover, no other Defendants contest the facts just discussed—they merely argue they were not involved. Dkt. 504 at 18-20.

## ARGUMENT

Sierra is entitled to summary judgment on his theory that Guevara fabricated and suppressed evidence regarding eyewitness Melendez's purported identifications of Sierra and the car used in the shooting, in violation Sierra's right to due process and a fair trial. Guevara has not and cannot raise a genuine dispute of material fact on this theory.

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Because Sierra moves for summary judgment, he "bears the initial responsibility of informing the district court of the basis for [his] motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]hen a properly supported motion for summary judgment is made, the adverse

party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks omitted). Where no reasonable jury could find for the nonmoving party, summary judgment is appropriate. *Scott v. Harris*, 550 U.S. 372, 380 (2007); see also *Martinsville Corral, Inc.*, 910 F.3d 996, 998 (7th Cir. 2018) ("Summary judgment is appropriate when no material fact is disputed and the moving part[y] [is] entitled to judgment as a matter of law, meaning that no reasonable jury could find for the other party based on the evidence in the record.") (quotation marks omitted).

The record evidence establishes that: (1) Guevara knowingly fabricated Melendez's photo identification of Sierra by pointing out Sierra's photo, instructing Melendez to select Sierra's photo, and telling Melendez that Sierra was the person who had committed the crime; (2) Guevara at all times suppressed the true circumstance of Melendez's purported photo identification, including that Melendez said he did not know who the shooter was and had not seen the shooter's face; (3) Guevara knowingly fabricated that Melendez subsequently identified Sierra in a live lineup procedure, when in fact Melendez never viewed a live lineup; (4) Guevara at all times suppressed that Melendez had not viewed a live lineup and had not selected Sierra in a live lineup; (5) Guevara knowingly fabricated that Melendez identified a car as the one used be the perpetrators of the shooting; and (6) Guevara at all times suppressed that Melendez had told him that the car in question was not the one used in the shooting. (These theories are referred to collectively as the "Melendez Due Process Theories" in this motion.)

The *only* evidence contradicting Sierra's record evidence supporting the Melendez Due Process Theories consists of (1) sworn police reports on which Guevara is listed as a reporting detective, and (2) Guevara's own testimony during Sierra's criminal trial. But Guevara himself cannot rely on those items of evidence to create a genuine dispute of fact in this case because he

has pleaded his Fifth Amendment right to be free of self-incrimination in response to all questions about those items of evidence and the Melendez Due Process Theories.

## I. SIERRA IS ENTITLED TO SUMMARY JUDGMENT ON THE MELENDEZ DUE PROCESS THEORIES

The record evidence establishes that Sierra is entitled to judgment as a matter of law on the Melendez Due Process Theories. Three of those theories concern Guevara's fabrication of Melendez's eyewitness identifications evidence used against Sierra at his criminal trial, and the other three concern Guevara's suppression of the fact that he fabricated those identifications.

The Supreme Court and Seventh Circuit "'have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'" *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). This due process theory of fabrication is entirely distinct from the due process theory based on suppression of evidence. *Petty v. City of Chicago*, 754 F.3d 416, 421-24 (7th Cir. 2014).

Where a due process violation concerns witness testimony, the Seventh Circuit has been careful to distinguish between coerced testimony and fabricated testimony. Police coercion of witnesses that produces truthful testimony does not by itself violate due process, absent a violation of the *Brady* duty to disclose facts about the police coercion that was used to obtain the testimony. *Avery*, 847 F.3d at 439 (citing *Fields v. Wharrie*, 740 F.3d 1107, 1123 (7th Cir. 2014) (*Fields II*)). Police fabrication of witness testimony that the officers know to be false, however, violates due process without need for further analysis. *Id.* at 439-40 (citing *Petty*, 754 F.3d at 423).

With respect to Sierra's evidence suppression theories, *Brady v. Maryland*, 373 U.S. 83, 87 (1963), requires that exculpatory and impeachment evidence material to the criminal case be

9

disclosed to prosecutors and the defense, "[a]nd police officers can be held liable under *Brady* and its progeny when they withhold exculpatory evidence from prosecutors[.]" *Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011); *see also Kyles v. Whitley*, 514 U.S. 419, 438 (1995). The Seventh Circuit has long recognized that section 1983 due process claims may be brought against police who withhold exculpatory and impeachment evidence, causing wrongful convictions. *Whitlock*, 682 F.3d at 572; *Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001); *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988).

"Evidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury." *Wearry v. Cain*, 577 U.S. 385, 392 (2016). A litigant "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted.… He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* (citing *Smith v. Cain*, 132 S. Ct. 627, 629-31 (2012)).

When conducting this analysis, the Court must consider the suppressed evidence cumulatively, not piece by piece. *Wearry*, 577 U.S. at 394. The question depends also on the strength of other evidence used in the criminal proceedings—it might take only a little evidence to disturb an already-weak conviction. *United States v. Agurs*, 427 U.S. 97, 113 (1976). Here, Sierra's conviction was based on exceedingly weak evidence—the purported identifications of two eyewitnesses and the testimony of Guevara.

Importantly, it is established that evidence that would impeach a key eyewitness is material. *Giglio v. United States*, 405 U.S. 150 at 153-54 (1972); see also *Smith*, 565 U.S. at 75 (impeachment evidence regarding eyewitness material when eyewitness was the only evidence connecting defendant to the crime); *Fields v. Wharrie*, 672 F.3d 505, 517 (7th Cir. 2012) (*Fields*

10

*I*) ("The constitutional violation occurs when the means by which the testimony was acquired are not disclosed at trial—or when other information that impeach the testimony's reliability are not shared with the defense."); *Newsome v. McCabe*, 319 F.3d 301, 302-05 (7th Cir. 2003) (holding that "the details about how [the police] induced the witnesses to finger Newsome" was "information vital to probe whether manipulation occurred"). The same is true of evidence that would impeach other key witnesses, including the police. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Smith*, 565 U.S. at 75; *Giglio*, 405 U.S. at 154-55; *Fields I*, 672 F.3d at 517; *Newsome*, 319 F.3d at 302-05.

Sierra is entitled to summary judgment on each of the Melendez Due Process theories, which each satisfy these legal standards. There is no material dispute of fact on any of them.

### A.    Guevara Fabricated Melendez's Photo Identification of Sierra and Suppressed the True Circumstances of That Identification Procedure

The undisputed testimony of Jose Melendez is that when Guevara showed him the photo array, he told Guevara that he "didn't see the person that shot" and that he "ain't seen the face of the shooter." So, Guevara manufactured the evidence he wanted. When he showed Melendez the set of photos, he held a photo of Sierra in his hand, while the other photos were laid on the table. He then told Melendez that Sierra was the person who had killed his friend and that he should identify him. Melendez's testimony on this point has been consistent, going back to his criminal trial testimony. Guevara himself admitted during pre-trial criminal proceedings that he conducted the photo array with Melendez in an interview room at Area Five, but he now pleads the Fifth about whether he engaged in the misconduct Melendez has asserted. So, neither Guevara nor anyone else disputes Melendez's account. AS ¶¶ 36-37, 42.

These undisputed facts constitute a fabricated identification. When Melendez was shown the photo array, he told Guevara that he did not see the shooter's face and thus *could not* make an

identification; by contrast, the closing report, of which Guevara is an author, says that Melendez stated that he *could* identify the shooter, and that he selected Sierra from the photo array. AS ¶ 25. Guevara knew that the identification he attributed to Melendez was false.

Neither the closing report nor any other report or evidence disclosed to the defense makes mention of several critical facts: that Melendez had told Guevara that he did not see the shooter's face and that he could not make an identification, that Guevara specifically singled out Sierra's photo, and that Guevara told Melendez that Sierra was the perpetrator and that he should pick him. This is critical exculpatory and impeachment evidence regarding the critical eyewitness in the case—the one closest to the shooter and the only one with an unobstructed view to his side of the vehicle—and that could have been used to undermine not only the identifications that were attributed to Melendez at trial, but to impeach Guevara and other prosecution witnesses at trial. *Giglio*, 405 U.S. at 153-54; *Smith*, 565 U.S. at 75; *Bagley*, 473 U.S. at 676; *Newsome*, 319 F.3d at 302-05. Such evidence would unquestionably "undermine confidence" in the verdict and is material. *Wearry*, 577 U.S. at 392.

Sierra is entitled to summary judgment against Guevara on his due process claim because his theories relating to Guevara's fabrication and suppression of Melendez's purported photo array identification are uncontested.

## B. Guevara Fabricated Melendez's Live Lineup Identification of Sierra and Suppressed That There Was No Lineup

Likewise, the undisputed evidence is clear that Guevara fabricated the claim that Melendez identified Sierra in a live lineup, when in fact no such lineup ever occurred. Melendez has testified unequivocally that no such lineup ever occurred. AS ¶ 38. The lineup report states that the lineup was conducted by Guevara and Halvorsen. AS ¶ 27. But neither Guevara nor Halvorsen disputes Melendez's account. When specifically asked whether he made up the claim that Melendez viewed

a lineup and identified Sierra, Guevara pleaded the Fifth. AS ¶ 43. And Halvorsen, too, pleaded the Fifth with regard to every aspect of his conduct in the Andujar investigation, including the live lineup, and whether he participated in framing Sierra for the crime. AS ¶ 44.

Here, too, Guevara knowingly fabricated evidence that Melendez viewed a lineup and positively identified Sierra, and then testified to his fabrications at trial. And while Guevara testified that Melendez had identified Sierra in a lineup, he suppressed the fact that no such lineup had ever occurred, and that the police reports stating so were false.

Sierra is entitled to summary judgment against Guevara on his due process claim because his theories relating to Guevara's fabrication and suppression of Melendez's purported lineup identification are uncontested.

### C. Guevara Fabricated Melendez's Identification of the Car and Suppressed That Melendez Said the Car Was Not the One Used in the Shooting

When Guevara took Melendez to the Area Five parking lot to identify the black Buick Park Avenue used to connect Sierra to the crime, Melendez told Guevara that it was *not* the car used in the shooting. AS ¶ 34. When presented with an opportunity to defend his claim that Melendez identified the car, Guevara pleaded the Fifth. AS ¶ 40. There is thus no dispute that Guevara knowingly fabricated the car identification.

The closing report, claiming the opposite, is therefore false and fabricated. In neither that report, nor any other police report or document, was it disclosed to Sierra before trial that Melendez had failed to identify as the perpetrator car the Buick Park Avenue the police had used to connect Sierra to the crime. Nor was it disclosed that Melendez said the car was not the one used in the shooting.

Sierra is entitled to summary judgment against Guevara on his due process claim because his theories relating to Guevara's fabrication and suppression of Melendez's purported car identification are uncontested.

Moreover, there is a second, independent fabrication related to the purported car identification. Sierra's purported connection to a black Buick Park Avenue was the whole basis by which he became a suspect in the case, according to Guevara's story about seeing Sierra in that car three days before the shooting at Esther Reyes's house. AS ¶¶ 21-22. But the undisputed evidence is that the purported encounter at Reyes's house never occurred. AS ¶ 35. Guevara does not dispute this, again pleading the Fifth when specifically asked whether he fabricated Sierra's connection to a black Buick Park Avenue. AS ¶ 40 This additional fabrication related to the car identification independently warrants summary judgment. Indeed, that the whole case against Sierra was based on a fabrication that Guevara knew was a lie constitutes a clear due process violation. *Avery*, 847 F.3d at 439. And the suppression of this critical fact—that there was no basis to ever make Sierra a suspect in the first place—is clearly exculpatory and would have been powerful impeachment evidence that would undermine confidence in his conviction.

## II. GUEVARA CANNOT RAISE A GENUINE DISPUTE OF FACT GIVEN HIS ASSERTION OF THE FIFTH AMENDMENT

On Sierra's claims that he fabricated and suppressed evidence about Melendez's identifications, Guevara is unable to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation marks omitted). That is because Guevara has exercised his Fifth Amendment right against self-incrimination and refused to answer any questions concerning his conduct while investigating Sierra. Specifically, Guevara has asserted the Fifth Amendment in response to specific questions about every aspect of his misconduct relating to the Melendez Due Process Theories and his Reyes fabrication. AS ¶¶ 39-43.

14

That decision has consequences: First, it means that Guevara has not himself disputed *any* of the material facts supporting the Melendez Due Process Theories. Second, even at this stage, with Sierra moving for summary judgment, the Seventh Circuit has instructed that a court should draw the inference that the assertion of the Fifth Amendment means that Sierra's evidence supporting the Melendez Due Process Theories is true. Third, Guevara's assertion of his Fifth Amendment rights carries an evidentiary consequence—namely, he cannot point to his own prior testimony and other evidence that he created during Sierra's criminal case to raise a genuine dispute of material fact. Considered together, the consequence of Guevara's decision to assert the Fifth Amendment is that he cannot point to any evidence that might raise genuine disputes of material fact relating to the Melendez Due Process Theories.

### A.     By Asserting the Fifth, Guevara Cannot Dispute Any of the Facts Supporting the Melendez Due Process Theories

Guevara's assertion of the Fifth Amendment prevented the factual development of the Melendez Due Process Theories, obstructing Sierra's ability to obtain any discovery from Guevara. *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 n.4 (7th. Cir. 1995); *SEC v. Graystone Nash, Inc.*, 25 F.3d 17, 190 (3d. Cir 1994) ("[I]nvocation of the Fifth Amendment poses substantial problems for an adverse party who is deprived of a source of information that might conceivably be determinative in a search for the truth."); *United States v. 4003-4005 5th Ave*, 55 F.3d 78, 84 (2d. Cir 1995) (explaining that "an assertion of the Fifth Amendment is an effective way to hinder discovery and provides a convenient method for obstructing a proceeding."). His silence in response to questions about his fabrication and suppression of Melendez's identifications amounts to a failure to offer any specific facts refuting Sierra's motion for summary judgment.

In order to show a genuine dispute that necessitates a trial, the nonmoving party must provide "specific facts" that contradict the moving party's evidence, such that a reasonable jury

could find for either party. *Anderson*, 477 U.S. at 250. Here, Guevara's invocation of his Fifth Amendment right against self-incrimination means that he has not presented any such specific facts. The Seventh Circuit has analogized a non-moving defendant's Fifth Amendment silence to a party that does not file a timely motion in opposition to summary judgment. *Seguban*, 54 F.3d at 391-92. Guevara's silence is properly treated as a refusal to dispute Sierra's evidence, discussed above, supporting the Melendez Due Process Theories.

As Sierra discusses at length in his response to Defendants' motions for summary judgment, Sierra Response Brief Argument III, the Seventh Circuit has held that the assertion of the Fifth Amendment by a *non-moving party* at summary judgment does not alone justify granting summary judgment to the *moving* party. *Seguban*, 54 F.3d at 390. As a result, and unlike the application of the Fifth Amendment assertion to Defendants' motions for summary judgment, where they are moving parties, Sierra Response Brief Argument III, Guevara's assertion of the Fifth Amendment here as the non-moving party does not alone justify a grant of summary judgment.

But that rule is wholly consistent with the notion that Guevara cannot contest the other material facts in the record, given his assertion of the Fifth Amendment in response to questions about those facts, and thus cannot raise a genuine dispute of material fact relating to those facts. *Thompson v. City of Chicago*, 2009 WL 674353, *3 (N.D. Ill. 2009) ("Standing alone these inferences [from invocation of the Fifth Amendment] are not sufficient to support the entry of summary judgment, *or to create an issue of fact to avoid summary judgment*. They can, however, be considered in conjunction with other evidence in determining whether summary judgment is appropriate.") (emphasis added).

**B.** **Guevara's Assertion of the Fifth Only Permits An Inference That Truthful Testimony Would Support Sierra's Summary Judgment Position**

Moreover, although judgment cannot be entered solely based on Guevara's assertion of the Fifth as a non-moving party, it is permissible at this stage to draw an inference against Guevara based on his assertion of the Fifth Amendment, even though he is the non-moving party for purposes of Sierra's motion for summary judgment. A party can only exercise their Fifth Amendment right to silence "when honest answers would tend to subject the answerer to criminal liability." *Padilla v. City of Chicago*, 932 F.Supp.2d 907, 919 (N.D. Ill. 2013). "Silence is often evidence of the most persuasive character." *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54 (1923); *LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999) ("An adverse inference [based on the invocation of the Fifth Amendment] may be given significant weight because silence when one would be expected to speak is a powerful persuader.").

While the invocation of the Fifth is not *by itself* enough to enter summary judgment against the party invoking it, "the [Seventh Circuit has] made clear that, even on summary judgment, it is permissible to draw an adverse inference against a party in a civil proceeding who remains silent in the face of incriminating evidence." *Cho v. Holland*, 2006 WL 2859453, *5 (N.D. Ill. 2006) (discussing *Seguban*, 54 F.3d at 390). This Court can draw the inference against Guevara that his assertion of the Fifth means that Sierra's version of events is true. "[I]f the party opposing summary judgment fails to respond to the facts set out by the movant, the court may assume those facts to be admitted and use them in determining whether the movant is entitled to judgment as a matter of law." *Seguban*, 54 F.3d at 389.

In assuming the moving party's facts are true where the Fifth is asserted in response, the Court is "no more than operationaliz[ing] an inference that could in any event be reasonably drawn

from Fifth Amendment silence in the face of such evidence—that the facts it reveals are true." *Id.* at 391. The Seventh Circuit explained that this "'inference' . . . that the facts revealed by the opponent's evidence are true" is a "conservative inference" to draw from a nonmoving defendant's silence, "because it does not give any separate and additional evidentiary weight to the silence itself." *Id.* at 391 n.7. Put differently, the defendant's silence is not itself evidence—which would be in tension with the summary judgment standard of assuming evidentiary disputes in favor of the nonmovant—but it creates a permissible inference that the movant's facts are true. *Id.* at 391, 391 n.7.

Guevara's assertion of the Fifth in this context means that summary judgment can be entered against him, because he is the only person who might contradict Sierra's facts, considering that all other record evidence supports Sierra's view of the facts, even when that record is construed for Guevara. When the non-moving defendant remains silent, the plaintiff's circumstantial evidence in combination with the lack of the defendant's testimony to contradict it has the effect that "no reasonable jury could doubt" that the defendant committed the misconduct in question. *S.E.C. v. Lytte*, 538 F.3d 601 (7th Cir. 2008). Put differently, if the moving plaintiff meets their burden of production and persuasion at summary judgment, and the nonmoving defendant—"the only person with firsthand knowledge of all the issues"—remains silent, the court should grant summary judgment. *See Clancy v. Coyne*, 244 F. Supp. 2d 894, 899 (N.D. Ill. 2002). Melendez has given firsthand testimony, which Sierra has presented; Guevara has not. This Court can enter summary judgment on that basis. "[T]he claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation." *LiButti* , 107 F.3d at 124.

### C. Guevara Cannot Point to His Other Testimony and Evidence He Created, Given His Assertion of the Fifth

Finally, Guevara's refusal to answer questions about Melendez's eyewitness identifications prevents him from introducing his own prior testimony and evidence that he created during his investigation of Sierra in response to Sierra's motion for summary judgment. It is a "long followed [ ] rule" in the Seventh Circuit that "parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact." *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1168 (7th Cir. 1996). While courts cannot decide credibility issues at summary judgment, "district court[s] [have a] duty to ignore sham issues in determining the appropriateness of summary judgment." *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir. 1985).

For instance, a party cannot respond to deposition questions and then, in refuting a motion for summary judgment, proffer additional contradictory evidence in an attempt to demonstrate a dispute of material facts that requires a jury determination. *See id.*; *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) ("[A] *genuine* issue of material fact cannot be conjured out of nothing."); *Bank of Illinois*, 75 F.3d at 1170 (stating that "a party ought not be able to thwart a summary judgment" by "creat[ing] only a sham issue of fact"). The same logic applies here: "[I]n [a] civil case [a defendant] cannot use the Fifth Amendment as both a sword and a shield. The individual defendants cannot hide behind the protection of the Fifth Amendment as to their contentions and later attempt to offer privileged testimony disputing the [plaintiff's] evidence or supporting their own defenses." *City of Chicago v. Reliable Truck Parts Co., Inc.*, 822 F.Supp. 1288, 1293 (N.D. Ill. 1993). In rejecting such attempts, courts preserve "the very purpose of the summary judgment motion—to weed out unfounded claims, specious denials, and sham defenses." *Babrocky*, 773 F.2d at 861.

Guevara was deposed under oath and refused to answer any questions about Melendez's supposed identifications or the Reyes encounter in order to avoid incriminating himself. Guevara's silence in the face of Melendez's testimony entitles Sierra to summary judgment on the claims related to Melendez's identifications and the Reyes encounter. The Seventh Circuit has affirmed that a party cannot respond to a motion for summary judgment with evidence contradicting their own deposition testimony to circumvent a grant of summary judgment. *See, e.g.*, *Babrocky*, 773 F.2d at 861; *Bank of Illinois*, 75 F.3d at 1168-71; *James*, 959 F.3d at 315–16. Any attempt from Guevara to offer his prior testimony at Sierra's criminal trial or his prior police reports, which he refused to testify about under oath, must be dismissed as a sham defense to summary judgment.

## PART II—SIERRA'S *MONELL* CLAIMS AGAINST THE CITY

### STATEMENT OF UNDISPUTED FACTS

With respect to Sierra's motion for partial summary judgment against the City on a portion of his *Monell* claims, Sierra has prepared an extensive account of the undisputed material facts relevant to his partial motion for summary judgment in his Local Rule 56.1 statement. Instead of repeating all of those facts at the outset, he discusses them in the arguments below.

### ARGUMENT

The City is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), if the violation of Sierra's constitutional rights were caused by: (1) application of an express policy, including a deficient policy that reflects a municipal decision not to adopt or to omit needed policies, *J.K.J. v. Polk County*, 960 F.3d 367, 377-84 (7th Cir. 2020) (*en banc*) (holding that a jury could find a municipality liable for gaps in a jail sexual assault policy when the risk was obvious that male guards might assault female detainees); *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379-81 (7th Cir. 2017) (*en banc*) ("[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable."); (2) a widespread custom or practice that

pervades to an extent where acquiescence on the part of policymakers is apparent, *id.* at 379 (citing *Monell*, 436 U.S. 690-91); *Davis v. Carter*, 452 F.3d 686, 691-92 (7th Cir. 2006); (3) an action taken by an official who exercises final policymaking authority for the municipality, *Commissioners v. Brown*, 520 U.S. 397, 403-04 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); or (4) a failure to train, supervise, or discipline officers that amounts to deliberate indifference to the rights of individuals with whom they come into contact, *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007); *Sornberger v. Knoxville*, 434 F.3d 1006, 1029-30 (7th Cir. 2006).

## I. THE CITY IS PRECLUDED FROM RELITIGATING ITS OFFICIAL POLICY OF EVIDENCE SUPPRESSION

Summary judgment is warranted because the City is precluded from relitigating Sierra's *Monell* theory that the City had an official policy during the relevant time period of suppressing exculpatory evidence. Whether issue preclusion should be applied is a legal question that this Court considers *de novo*; if the Court encounters a factual issue in resolving that question, it construes the evidence in the light most favorable to the nonmoving party. *Staats v. Sawyer*, 220 F.3d 511, 514 (7th Cir. 2000).

Preclusion "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party . . . and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979). Among other things, preclusion encourages finality in litigation, avoids inconsistent results, and protects courts against the burdens of repetitive litigation, particularly from parties, like the City, who might otherwise insist on a second, third, fourth try on issues that federal courts have thoroughly considered and decided against them. 18 WRIGHT & MILLER, FED. PRAC. & PROC. JURIS. §§ 4403, 4416 (3d ed.).

For issue preclusion (also called collateral estoppel) to apply in a § 1983 suit, four requirements must be met: (1) the issue must be the same as that involved in the prior judicial

21

proceeding; (2) the issue must actually have been litigated; (3) the issue must have been resolved; and (4) the issue must have been necessary to the judgment in the prior proceeding. *Bailey v. Andrews*, 811 F.2d 366, 369 (7th Cir. 1987). Each criterion is met for the theory that the City had an official policy of suppressing exculpatory and impeachment evidence.

### A.     Sierra's *Monell* Theory Regarding Evidence Suppression

Sierra contends in this case that his wrongful conviction of the Andujar murder was caused because material exculpatory and impeachment evidence was suppressed throughout his wrongful conviction. Sierra contends that the Defendants, during the Andujar investigation, suppressed from state prosecutors and his attorneys a wide array of evidence, which is set out completely in Sierra's response to the Defendants' motion for summary judgment. Sierra Response Brief Argument IV(C). The suppression of this evidence was material to Sierra's criminal case and caused Sierra's wrongful conviction. Apart from Guevara's suppression of evidence relating to Melendez's purported identifications, discussed above, a trial is necessary on the suppression theories against other Defendant Officers, as Sierra argues in his response to Defendants' motions for summary judgment. *Id.*

However, Sierra's position is that the concealment of exculpatory evidence in his criminal case was not an isolated incident, but instead was done pursuant to the City's official policy of suppressing investigative information in homicide investigations. AS ¶ 45. In support of this claim, Sierra's has amassed substantial evidence, including the City's past litigation concerning this issue, written policies, testimony of the City's Rule 30(b)(6) designees, and his police practices expert Thomas Tiderington. AS ¶¶ 46-57, 58-74, 75-84, 85-92, 93-102, 104-115.

The evidence reflects that, starting in the early 1980s, City policymakers, including the Chicago Police Superintendent, received notice in the lawsuits *Jones v. Chicago*, 87 C 2536 (N.D. Ill.), and *Palmer v. City of Chicago*, 82 C 2349 (N.D. Ill.), that the City had a citywide problem

creating, maintaining, and producing investigative information in homicide investigations, which resulted in the suppression of evidence and due process violations. AS ¶¶ 46-49, 52, 55-56. City policymakers responded by promulgating written policies, which were intended to address the widespread evidence suppression problem, but those policies were facially deficient, had limited effect, and did not correct the problem. AS ¶¶ 58-74, 75-84, 85-87, 89-102. Instead, the suppression of evidence in homicide investigations continued unabated. AS ¶¶ 62, 63, 67, 70, 72-74, 78-84, 87-102. The City's Rule 30(b)(6) witnesses testified that an audit of homicide files revealed that evidence suppression issues were present citywide, and that the promulgated policies did not solve the problem. AS ¶¶ 52-54, 57, 60-74, 75-84.

Sierra's expert Tiderington concurred that the written policies could not solve the evidence suppression problem. AS ¶¶ 92, 93-102. Tiderington reviewed and analyzed 475 Area Five investigative files from 1991-1995 that were provided to him for analysis, as well as 344 Area Five files from 1995-1998 that were provided to him for analysis, and compared them to available permanent retention files and criminal defense files for those time periods. AS ¶ 93. Based on his review, Tiderington concluded that the Special Orders did nothing to ameliorate the evidence suppression issues of which the City was aware: (1) detectives consistently used handwritten notes not on GPRs, and also used to-from memos, rather than including that information in GPRs and Supplemental Reports; (2) inventory sheets were not consistently included in the investigative files (and when they were included, the majority of them were incomplete); (3) not all relevant information in unofficial documents was transcribed in official reports—including potentially exculpatory information contained on handwritten notes, not transferred into official reports–leaving those official reports incomplete; and (4) criminal defense files revealed that important investigative materials were regularly withheld from criminal defendants. AS ¶¶ 94-102.

23

Based on this evidence, Sierra contends that the City had an official policy of suppressing exculpatory and impeachment evidence in homicide investigations.

**B.     The City Lost the Same *Monell* Theory in *Fields***

In 2016, the same evidence suppression theory was tried to a verdict against the City in *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.). Nathan Fields was wrongfully convicted and sent to death row for the 1984 murders of Jerome Smith and Talman Hickman on the south side of Chicago. *See* 2017 WL 3987356. After his conviction was reversed and he was acquitted in his 2009 retrial, Fields filed a § 1983 lawsuit, claiming that investigating officers had suppressed exculpatory information throughout his criminal proceedings, and contending that the City of Chicago was liable for its official policy of evidence suppression. *Id.* During discovery in Fields's civil lawsuit, it came to light that investigative information had been suppressed in a clandestine file, which contained highly exculpatory material. *Id.*

As in this case, Fields developed evidence that the evidence suppressed in his case was not an isolated incident. The evidence in *Fields* was the same as the evidence in this case, it included past litigation, written policies, Rule 30(b)(6) testimony, and experts on both sides, and it concerned exactly the same City policy of evidence suppression. AS ¶ 88-91. In that case, Fields's police practices expert, Michael Brasfield, conducted a comprehensive analysis of 429 Chicago Police Department homicide files, summaries of which were introduced as substantive evidence, which was almost entirely unrebutted, and which showed that the policy of evidence suppression continued, at minimum, from 1983 to 1989, and from 1999 to 2009, across the City of Chicago, in Chicago Police Department Detective Areas One, Two, Three, and Four. AS ¶ 89-90. Comparison of the CPD homicide files to permanent retention files and criminal defense files demonstrated systematic underproduction of key categories of investigative information—Brasfield testified that approximately 80% of the criminal defense files were missing handwritten

24

notes from the CPD files, 46% were missing general progress reports (on which detectives take notes), and 36% were missing inventories. AS ¶ 90. Fields thus introduced uncontroverted evidence that the City's policy of evidence suppression persisted from the early 1980s until 2009.

*Fields* was tried over the course of five weeks in November and December 2016 before Judge Kennelly. The City was capably defended by attorneys from Dykema Gossett, an experienced litigation firm whose lawyers have been defending the City in countless § 1983 cases for a period of decades. Fields was represented by the same counsel that represents Sierra here. During trial, both sides presented extensive *Monell* evidence, which is collected in the parties' post-trial submissions. AS ¶ 106.

When Fields's *Monell* claim was submitted to the jury, the jury was instructed that, to succeed on his *Monell* claim, Fields had to prove:

> 1. Material exculpatory and/or impeachment evidence in the possession of the Chicago Police Department was concealed from the prosecutor, and the evidence was not otherwise available to the plaintiff through the exercise of reasonable diligence. . . . .
>
> 2. At the time of the concealment, it was the policy of the City of Chicago to conceal material exculpatory and/or impeachment evidence. The term policy means: (a) an express policy, (b) A widespread practice that is so permanent and well-settled that it constitutes a custom. . . ., (c) A decision or policy statement made by the Superintendent of Police. This includes the Superintendent's approval of a decision or policy made by someone else, or (d) A practice of failing to train or supervise employees. . . .
>
> 3. The policy as described in paragraph 2 caused the concealment of material exculpatory or impeachment evidence in the plaintiff's criminal case.
>
> 4. The plaintiff was damaged as a result.

AS ¶ 105.

At the conclusion of the trial on December 15, 2016, the jury found for Fields on the *Monell* claim (and other claims too), and it awarded $22 million in compensatory damages (as well as punitive damages). AS ¶¶ 91, 107. Judge Kennelly entered judgment on the verdict. AS

¶ 107.

The City filed a post-trial motion challenging the *Monell* judgment under Rules 50 and

59. AS ¶¶ 106-07. Judge Kennelly denied the City's post-trial motion, concluding:

> Fields's evidence, including evidence of systematic underproduction of police reports, was sufficient to show a systemic failing that went beyond his own case. The City and police department were on notice, via the *Jones*/*Palmer* litigation and the department's own subsequent internal inquiry, of deficiencies in its recordkeeping and record-production practices that, at least in some situations, led to harm. And Fields offered evidence that permitted a reasonable jury to find that the policies instituted to deal with these problems were insufficient to correct them. . . . The gaps here include, but are not limited to, insufficient or unnecessarily subjective instructions regarding what materials had to be maintained, insufficient instructions on producing materials to prosecutors, and the absence of any supervision or after-the-fact auditing.

*Fields*, 2017 WL 3987356, at *3.

The City appealed and the Seventh Circuit affirmed, concluding that the *Monell* verdict

against the City regarding its policy of suppressing exculpatory evidence was amply supported.

*Fields v. Chicago*, 981 F.3d 534, 563 (7th Cir. 2020). Indeed, the Seventh Circuit decided that

the City's knowledge of the risk of constitutional violations caused by its policy was

"unquestionable in this case." *Id.* The Seventh Circuit reaffirmed that it had recognized this

particular policy of the City, stating, "[i]n *Jones*, 856 F.2d at 996, we recognized that the custom

of the maintenance of street files was department-wide and of long standing, and that a jury could

therefore conclude it was consciously approved at the highest policy-making level for decisions

involving the police department. . . . In fact, the City in *Jones* did not even contest that the use of

such a practice presented a due process problem[.]" *Id.*

## C.    The City Was Precluded From Relitigating the Issue in *Kluppelberg*

In 2017, based on *Fields* alone, Judge Lefkow concluded in *Kluppelberg v. Burge*, No. 13

C 3963 (N.D. Ill.), that the City was precluded from relitigating whether it had an official policy

of suppressing exculpatory evidence, 276 F. Supp. 3d 773, 776 (N.D. Ill. 2017). Like *Fields*,

*Kluppelberg* concerned a claim that the City had a policy of suppressing exculpatory evidence that resulted in the suppression of investigative information in a 1984 homicide arson investigation that led to James Kluppelberg's 1988 arrest and 1989 wrongful conviction, and Kluppelberg advanced that theory with all of the same evidence offered in *Fields*, including an expert analysis of 164 additional homicide files from Area Three. AS ¶ 115.

Judge Lefkow granted Kluppelberg's motion to preclude the City from relitigating whether it had a policy of suppressing exculpatory evidence. *Kluppelberg*, 276 F. Supp. 3d at 776; AS ¶ 115. The City argued "it is impossible for the court to determine from a general jury verdict whether the issues are the same and whether determination of the issue was essential to the final judgment in the first action" and that it would be unfair to apply issue preclusion, but the court rejected these arguments. *Kluppelberg*, 276 F. Supp. 3d at 776-79; AS ¶ 115.

### D.     The City Lost the Same *Monell* Theory In *Rivera*

In 2018, again the same *Monell* theory was tried and resulted in a jury verdict against the City in *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.).[2] AS ¶¶ 104, 111. Rivera was wrongfully convicted of the 1988 murder of Felix Valentin on the northwest side of Chicago. Like Sierra, Rivera's conviction was based on false evidence fabricated by Chicago Police officers working out of Detective Area Five. AS ¶ 109. As in this case, the investigation was led by Guevara. AS ¶ 109.

After Rivera's conviction was vacated and charges against him were dropped in 2011, Rivera, too, filed a § 1983 lawsuit. AS ¶ 109. Like Sierra does here, Rivera claimed that the defendants had suppressed exculpatory information throughout his criminal proceedings, and he

---

[2] Prior to trial, Rivera made an underdeveloped argument for issue preclusion based on *Fields*, which spanned only three paragraphs in his summary judgment response. *Rivera*, No. 10 C 4428, Dkt. 321 at 53-54. The decision rejecting preclusion in *Rivera* is discussed below, *infra* at 14-15.

contended that the City was liable for its official policy of suppressing exculpatory evidence. AS ¶ 110. Like Fields before him and Sierra here, Rivera amassed evidence to show that the suppression of evidence was not an isolated incident but was the result of municipal policy, including evidence of the City's past litigation of the issue, its written policies, its designated Rule 30(b)(6) witness, and expert testimony. AS ¶ 112. That evidence used in *Rivera* showed that the Chicago Police Department was aware, based on *Jones* and *Palmer*, that it had a problem of suppressing evidence in 1982, that the reforms the City put in place in response were deficient, and that evidence suppression in homicide investigations continued unabated, throughout the time period that Rivera was prosecuted and convicted. AS ¶ 112; *see also* 80, 81, 83, 88, 104.

As in *Fields*, Rivera's expert, Michael Brasfield, conducted an analysis of 435 Chicago Police Department homicide files, this time from Area Five, for the years 1985 to 1991, which revealed that, in more than 90% of cases, information in Chicago Police Department files was not produced to prosecutors and criminal defense attorneys in the criminal justice system, and in 100% of cases the written policies promulgated by the City after *Palmer* were not followed. AS ¶¶ 102, 114. That analysis was not rebutted by the City's expert; while Fields established the City's policy of evidence suppression from the early 1980s to 2009, Rivera introduced unchallenged evidence that the policy was alive and well between 1985 and 1991. AS ¶¶ 102, 110-114.

*Rivera* was tried in June 2018 before Judge Gottschall. The City was capably defended by the same attorneys representing the Defendants here. Sierra's counsel represented Rivera. At trial, both sides presented extensive *Monell* evidence, which is collected in the post-trial submissions in *Rivera*. AS ¶¶ 112, 114.

The jury was instructed that, to succeed on his *Monell* claim, Rivera had to prove:

1. The plaintiff's constitutional rights were violated as defined in these instructions;

2. The City of Chicago has a policy of concealing material exculpatory and/or impeachment evidence. The term policy means: (a) An express policy; or (b) A widespread practice that is so permanent and well-settled that it constitutes a custom. . . . .; or (c) A decision or policy statement, including a decision not to adopt a needed policy, made by the City of Chicago; or (d) A practice of failing to train employees of the City of Chicago or the Chicago Police Department.

3. The policy as described in paragraph 2 caused the violation of the plaintiff's constitutional rights.

AS ¶ 110.

At the conclusion of the trial on June 28, 2018, the jury found for Rivera on the *Monell* claim (and other claims), and it awarded $17 million in compensatory damages (and punitive damages). AS ¶ 111. Judge Gottschall entered judgment on the verdict. AS ¶ 111. The City filed a post-trial motion challenging the *Monell* judgment under Rules 50 and 59. AS ¶¶ 112-13. Judge Gotschall denied that motion. *Rivera*, 2019 WL 13249674, at *4; AS ¶ 113.

### E. The City Is Precluded From Relitigating the Same Issue Here

The City is precluded from relitigating in this case the issue of whether it had an official policy of suppressing exculpatory and impeachment evidence at the time of Sierra's wrongful conviction. All four criteria for the application of issue preclusion are firmly satisfied, and there is no equitable reason not to apply the doctrine.

#### 1. The Issue Is the Same As That In Fields and Rivera

On the first factor, Sierra's *Monell* theory that the City had an official policy of suppressing exculpatory and impeachment evidence at the time of the Andujar murder and his subsequent prosecution and conviction is the same as the issue litigated to judgment against the City in *Fields* and *Rivera*. In fact, the issues are identical in every material respect.

All three cases concern a theory, evidence, and argument that the City's evidence suppression problem was first exposed in *Jones* and *Palmer*, that policymaking officials at the

29

highest levels of City government and the Chicago Police Department were on notice of and investigated the problem, and that new written policies were promulgated in response. Those written policies—Special Orders 83-1, 83-2, 86-3, and the effectively identical 1988 Standard Operating Procedures—are the same in all three cases. In all three, the plaintiffs offered a large volume of evidence that the City's policy response was deficient—the written policies did not end the problem of evidence suppression across the Chicago Police Department during the relevant time period—consisting of written policies, testimony from the City's own designated Rule 30(b)(6) witnesses, legions of cases in which material evidence was suppressed (including *Fields*, *Kluppelberg*, and *Rivera*), and testimony from experts on both sides. Indeed, the categories of evidence in play in each of the three cases are the same. In many instances, the witnesses are the same, the testimony at issue is the same, and the documentary evidence on which both sides rely is the same.

Moreover, in each of the cases the plaintiffs' experts have undertaken detailed analyses of hundreds of Chicago Police Department homicide files, which have all reached the same conclusion that the persistent problem of evidence suppression continued without interruption across investigations conducted by the Chicago Police Department at all relevant times. In each of the cases, the City's experts have responded without contesting the accuracy of plaintiffs' experts' data. Fundamentally, there has been no dispute in the exchange of expert viewpoints that the City's policy of evidence suppression continued after the implementation of new policies in the wake of *Palmer* and *Jones.* In fact, that assertion has been unanimously supported by the City's own Rule 30(b)(6) witnesses. AS ¶¶ 75-83, 85-102, 103, 112-1114, 115.

The identity of *Monell* issues does not end there. Rivera was implicated in a 1988 shooting in the Humboldt Park neighborhood, which was investigated by Defendant Guevara and others

30

stationed in Area Five, leading to Rivera's prosecution and conviction in 1990. Sierra was implicated in a 1995 shooting that occurred just a few blocks away, which was also investigated by Guevara and officers from Area Five, resulting in Sierra's conviction in 1996. It is hard to imagine how the cases could be more analogous for preclusion purposes.

Moreover, the cases are being tried by the same attorneys, in the same courthouse, under the same Local Rules, and pursuant to the same federal statutes and constitutional provisions, eliminating any concern that there is something anomalous about one of the cases. Issue preclusion asks whether the issue between a past case and the present one are the same in relevant respects, not in every way possible, *Matter of Magnafici*, 16 B.R. 246, 254 (Bankr. N.D. Ill. 1981), and these cases satisfy that standard. Indeed, *Rivera* and this case are identical in nearly every way.

### 2. The City's Policy Remained The Same During Time Period At Issue in *Fields*, *Rivera*, and This Case

The City may try to argue as it has in past cases that the issue in these cases is not the same because the time at which the cases were investigated are different. This Court should reject that argument—the fact that the cases occurred at different times between 1984 and 1996 does not mean that the City's policy was different. In fact, the City has admitted that the relevant policy was the same from 1983 all the way into the 2000s. AS ¶¶ 85-92. Thus, the policies at issue in *Fields* and *Rivera* regarding evidence disclosure are the same policies in effect at the time of Sierra's wrongful conviction.

When Rivera argued at summary judgment in his case that the City should be precluded from relitigating the issue given *Fields*, Judge Gotschall concluded that preclusion did not apply because *Fields* concerned an investigation in 1984 and *Rivera* one in 1988, which "render[ed] the issue in *Fields* sufficiently dissimilar to defeat collateral estoppel." *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1062-63 (N.D. Ill. May 11, 2018). "Widespread practices do not necessarily persist

indefinitely," the Court said, "And the gravamen of the City's position on this practice, pointing to the aspirations stated in the orders issued in the wake of the *Palmer*/*Jones* cases, is that the CPD was on a path of reform." *Id.*[3]

If the City argues that preclusion should not apply because the time frame at issue in Sierra's case is different than that at issue in *Rivera* or *Fields*, there are at least four reasons to reject that argument. First, contrary to Judge Gotschall's conclusion, *Fields* did not establish an official policy in effect only in 1984, the year of the crime at issue there. Instead, *Fields* established that the policy was in effect, at minimum, from 1983 to 1989 and 1999 to 2009, both before and after the time frame in which Sierra was investigated, prosecuted, and convicted. AS ¶ 46. The City could not seriously suggest that its policy was the same both before and after Sierra's wrongful conviction but different at the time that conviction occurred.

Second, though *Rivera* rejected the application of issue preclusion based solely on *Fields*, the issue has since been tried again, in *Rivera* itself, and there is now a second verdict against the City on the same issue. That the City has now *twice* lost the same issue considerably amplifies the argument for applying issue preclusion to prevent re-litigation of the issue this time. One judgment alone is enough to invoke preclusion, *Lucky Brand Dungarees v. Marcel Fashions Group*, 140 S. Ct. 1589, 1594 (2020), and here even if there were a question raised by the City about one of the judgments, there are two that have preclusive effect. Moreover, with respect to time frame, the verdict in *Rivera* established that the City's evidence suppression policy was alive and well in Area Five between 1985 and 1991, the time period at issue in that case. Together *Fields* and *Rivera* establish a citywide policy of evidence suppression between 1983 and 2009, with a tremendous

---

[3] As discussed, Rivera's presentation of the preclusion argument was limited to three paragraphs in his response to the defendants' motions for summary judgment in that case, AS ¶ 65, accordingly the Court's analysis of the issue was similarly truncated, *Rivera*, 319 F. Supp. 3d at 1062-63.

amount of evidence that the policy was persistent and causing wrongful convictions in Area Five in the years leading up to Sierra's criminal case.

Third, to the extent there were arguments that *Fields* and *Rivera* had differences that entitled the City to the benefit of the doubt about whether its policies were the same in both cases, those arguments about differences are not present here. There is nothing dissimilar at all between *Rivera* and this case. This case and *Rivera* are nearly identical—the crimes were investigated by the same police officers and prosecuted within a period of a few years.

Fourth, and perhaps most importantly, in recent 30(b)(6) testimony and other evidence, the City has now admitted—as the evidence in *Fields* and *Rivera* established—that there was no change whatsoever in any of the City's policies regarding evidence suppression at any time between 1988 (the time of crime at issue in *Rivera*) and 1995 (at the time of the crime in this case). In fact, the policies remained the same from 1983 through 2012. AS ¶¶ 85, 89-91, 102, 108, 111-114. Multiple 30(b)(6) representatives have testified to the unchanged nature of these policies, including the areas of deficiencies. AS ¶¶ 85-87.

### 3. The Issue Was Actually Litigated In *Fields* and *Rivera*

Next, the City cannot dispute that the issue was actually litigated in both *Fields* and *Rivera*. In both cases it was the central *Monell* theory contested throughout discovery, at a full jury trial on the merits, in post-trial motions, and in *Fields* on appeal, entailing a huge volume of evidence on both sides. A full trial on the merits is the "situation most clearly contemplated by the 'actually litigated' standard." *In re Tapper*, 123 B.R. 594, 601 (Bankr. N.D. Ill. 1991).

### 4. The Issue Was Essential to the *Fields* and *Rivera* Judgments

Nor can the City credibly argue that the *Monell* issue on which Sierra seeks preclusion was not essential to the final judgment in both *Fields* and *Rivera*. The juries in both *Fields* and *Rivera* were each instructed that, to find against the City on the policy claim, the plaintiffs had to prove

by a preponderance of the evidence that the City had a policy of concealing material exculpatory evidence. AS ¶ 105 (*Monell* Instruction in *Fields*) ("it was the policy of the City of Chicago to conceal material exculpatory and/or impeachment evidence"); AS ¶ 110 (*Monell* Instruction in *Rivera*) ("The City of Chicago had a policy of concealing material exculpatory and/or impeachment evidence"). The verdicts and resulting judgments against the City in these cases therefore necessarily required a finding that the City had a policy of concealing exculpatory evidence, for that was the *Monell* theory on which each jury was instructed. *See Kluppelberg v. Burge*, 276 F. Supp. 3d 773, 777 (N.D. Ill. 2017) ("[T]here is no other policy or practice that would have supported the verdict[.]"). Were there any doubt that the litigation of the issue was essential to the judgment, the City's principal argument in its post-trial motions in *Rivera* and *Fields* and on appeal in *Fields* was that there was not sufficient evidence to support this *Monell* theory and thus the judgments against it. *Rivera*, 2019 WL 13249674, at *4; *Fields*, 2017 WL 4553411, at *3, *aff'd*, 981 F.3d at 563.

### 5. The City Had A Full and Fair Opportunity to Litigate In Past Cases

On the last factor, it is beyond dispute that the City had a full and fair opportunity to litigate the issue in *Fields* and *Rivera*. Assisted by experienced counsel, the City did so at every stage (summary judgment, motions *in limine*, at trial, in Rule 50 and Rule 59 motions, and appeal), using every type of evidence (including written policies, designated Rule 30(b)(6) witnesses, and expert opinion testimony). AS ¶ 62-70; *see also Rivera*, 2019 WL 13249674, at *4 (discussing the litigation of the issue at each stage). A party has a full opportunity to litigate "[o]nce a party is afforded a hearing on an issue that comports with due process," absent circumstances not present. *Avitia v. Metro. Club of Chicago*, 924 F.2d 689, 691 (7th Cir. 1991).

34

### 6. There Is No Equitable Reason Not to Apply Issue Preclusion

Lastly, there is no equitable reason not to apply issue preclusion in this case. The Supreme Court has expressed concern that issue preclusion might be "unfair to a defendant" if in the first action (1) the defendant was sued for "small or nominal damages" for which the defendant "may have had little incentive to defend vigorously"; (2) the "judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant"; or (3) "the second action affords the defendant procedural opportunities [e.g., discovery procedures] unavailable in the first action that could readily cause a different result." *Chicago Truck Drivers v. Century Motor Freight, Inc.*, 125 F.3d 526, 531 (7th Cir. 1997) (quoting *Parklane Hosiery*, 439 U.S. at 330-31). None of these situations is present here: *Fields* and *Rivera* were each multi-million-dollar lawsuits; the judgments in those cases are consistent, not inconsistent, with past judgments in litigation in this district, including in *Jones* and *Palmer*; and the procedural opportunities in each case were the same in all respects.

* * *

All four requirements for applying issue preclusion are satisfied. There is no equitable reason to avoid applying the doctrine. The City is before the Court as a repeat, losing litigant on the question whether it had an official policy of suppressing exculpatory and impeachment evidence. Multiple federal juries have concluded that the City had such a policy; multiple federal judges have found those verdicts amply supported and have entered judgments against the City; the Seventh Circuit has affirmed the City's liability on this ground. This Court should prevent the City's continued misuse of the judicial system and hold that it is precluded from relitigating whether it had an official policy of suppressing exculpatory and impeachment evidence.

If the Court decides this motion on preclusion grounds, then it will have no reason to address the alternative argument below that summary judgment should be granted because there

are no material disputes on Sierra's theory that City policymakers promulgated facially deficient policies in response to the problem of evidence suppression.

## II. THE CITY OF CHICAGO CANNOT RAISE A GENUINE DISPUTE OF MATERIAL FACT REGARDING ITS EVIDENCE SUPPRESSION POLICY

Alternatively, Sierra seeks summary judgment on his theory that City policymakers put in place facially deficient express policies, which permitted the suppression of exculpatory evidence. Even if the Court concludes that the City is not precluded from relitigating its evidence suppression policy, the Court should grant summary judgment on this theory.

Summary judgment is warranted if "there is no genuine dispute as to any material fact," FED. R. CIV. P. 56(a), meaning that a reasonable jury could not return a verdict for the nonmoving party, here the City, *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (citing *Anderson*, 477 U.S. at 248). If the City cannot produce evidence sufficient to establish an element essential to its case, then it cannot survive a summary judgment challenge. *Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018) (citing *Celotex*, 477 U.S. at 322).

The City has not produced any evidence in discovery to oppose the theory that its final policymakers put in place express policies that were facially deficient to stop the suppression of exculpatory evidence in homicide investigations. This theory was tried to a verdict against the City in *Fields* and affirmed on direct appeal. *Fields v. City of Chicago*, 981 F.3d 534, 562-63 (7th Cir. 2020) (upholding verdict finding the City labile for failing to promulgate needed express policies requiring police to disclose evidence). Yet the City still includes no argument about it in its own motion for summary judgment. See Dkt. 504 at 1-5 (describing theories); *id.* at 9 (Part II, addressing widespread practice relating to eyewitness identifications); *id.* at 18 (Part III, addressing widespread practice of evidence suppression); *id.* at 37 (Part IV, addressing widespread

practice of failure to discipline). That is because the City has no evidence to contest the theory. All of the evidence, including the City's own experts, supports this theory.

### A. A Municipality Is Liable When Its Policymakers Promulgate Deficient Policies or Fail to Adopt Needed Policies

The Seventh Circuit has reaffirmed repeatedly that a municipal decision to promulgate deficient policies or to omit or refuse to adopt needed policies creates liability under the express policy framework of *Monell*. *J.K.J.*, 960 F.3d at 378 (gaps in policy and municipal failures to act give rise to municipal liability when municipality is on notice of constitutional problems); *Glisson*, 849 F.3d at 381 ("[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable."); *Thomas v. Cook County*, 604 F.3d 293, 303 (7th Cir. 2010) ("[I]n situations where rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make a policy is also actionable."); *Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005) (holding that a single application of a deficient express policy resulting in a constitutional violation is enough to establish liability).

Closely related, a municipality is liable under *Monell* for the deliberate conduct of its final policymakers whose acts are fairly said to be those of the municipality. *Board of Commissioners v. Brown*, 520 U.S. 397, 403-04 (1997); *Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1986). This includes a policymaker's decision to omit policies necessary to solve a problem of which the policymaker has notice. *Vodak v. Chicago*, 639 F.3d 738, 747-48 (7th Cir. 2011) (actions of policymakers about how to implement policy gives rise to liability); *see also King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction"); *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) (policymaker aware of a systematic lapse in policy who fails to correct renders municipality liable).

**B.** **The Summary Judgment Record Reflects That City Policymakers Promulgated Deficient Policies and Failed to Adopt Policies in Response to Notice of a Citywide Evidence Suppression Problem**

Sierra contends that the City is liable under *Monell* because the Chicago Police Department's express written policies governing the creation, maintenance, and production of homicide investigative information were facially deficient, and because the City's final policymakers, who admit they were on notice of the problem of systemic suppression of investigative materials, chose not to adopt policies to ensure transmission of investigative information to prosecutors and criminal defendants. Sierra asserts that these municipal actions caused the suppression of exculpatory investigative materials in Sierra's case. While Sierra again concedes that the City may contest this final point at trial—whether its municipal actions *caused* the violation of Sierra's constitutional rights—it has not adduced any evidence to create a genuine dispute of material fact about whether its policymakers promulgated facially deficient policies that permitted the suppression of exculpatory evidence.

### 1. The City Had Notice of A Problem of Widespread Evidence Suppression

It is beyond dispute that following *Jones* and *Palmer* City policymakers had notice of a citywide problem of evidence suppression in homicide cases starting in 1982. The City's own Rule 30(b)(6) witness, James Hickey, testified that the City was aware of this problem by 1982 at the latest. AS ¶¶ 42, 52. In the criminal prosecution at issue in *Jones*, a Chicago Police detective whistleblower informed the criminal justice system and City policymakers that exculpatory evidence was routinely suppressed. AS ¶¶ 46-48. The *Jones* case resulted in a jury verdict finding a custom of maintaining "street files" that were withheld from the State's Attorney's Office and criminal defendants. AS ¶¶ 48.

In response to the revelations in *Jones*, a class action lawsuit captioned *Palmer v. City of Chicago* was filed, and during hearings in that litigation City policymakers testified and were put

38

on notice that the Chicago Police Department was suppressing information in homicide investigations, including (a) by allowing documents created during homicide investigations to be placed in unofficial parallel files kept by the detectives, commonly referred to as street files, (b) by failing to document pertinent investigative leads and other information in police reports, in essence concealing whole branches of the investigation, and (c) by failing to disclose exculpatory and impeaching information to prosecutors and criminal defendants. AS ¶¶ 49, 52, 56.

City policymakers, including the City's designated Rule 30(b)(6) witness Hickey, investigated the issue, concluding that the problem of evidence suppression was present citywide. AS ¶¶ 52-57. They concluded that the problem arose from the Chicago Police Department's "decentralized" file system for homicide investigations, whereby investigative steps were documented in informal notes and internal to-from memoranda between investigators, all of which were treated as the personal property of the investigators and were stored in parallel files that were not disclosed to criminal defendants, and because entire branches of homicide investigations were not documented in official reports. AS ¶¶ 54-56. City officials were aware that the street files practice documented above resulted in wrongful prosecutions and convictions. AS ¶¶ 55-57.

By the time the *Jones* case got to the Seventh Circuit in 1988, that Court observed that the City's custom of evidence suppression was "department-wide and of long standing," was a "frightening abuse of power by members of the Chicago police force and unlawful conduct by the City itself," and that "the jury was entitled to conclude that it had been consciously approved at the highest policy-making level for decisions involving the police department[.]" AS ¶ 48; *Jones*, 856 F.3d at 996.

### 2. The City Failed to Promulgate Policies to Solve the Evidence Suppression Problem

It is also undisputed that City policymakers responded to the evidence suppression problem by promulgating written policies that on their face were insufficient to solve the problem. First, this is clear from the face of the written policies themselves. Detective Division Special Orders 83-1 (effective February 3, 1983), 83-2 (effective May 2, 1983), and 86-3 (effective May 29, 1986), put in place in response to the problem, required that detectives keep notes and memoranda on a new official form called a "General Progress Report" and preserve them in a new "Investigative File" kept in the Detective Area. AS ¶¶ 65, 68-73. But the written policies had facial deficiencies, including: (1) the policies did not include any instruction to disclose to prosecutors and criminal defendants investigative information, and they did not require the disclosure of the newly created "investigative files," AS ¶¶ 61, 63, 67, 70, 72, 73; (2) they allowed for the continued use of a decentralized, parallel file system in which investigative information was kept in different places, perpetuating the risk that material would not be gathered from all of those locations, AS ¶¶ 61, 67, 70, 73, 74 (3) they failed to cover gang crimes officers and other non-detective investigators participating in homicide investigations, meaning there was no change in rules when it came to investigative information gathered by these individuals, AS ¶¶ 70, 81; (4) they left to the discretion of detectives what information to record in official files, based on detectives' own subjective determinations, AS ¶¶ 67, 70, 73, 74; (5) they did nothing to ensure that the Chicago Police Department subpoena service unit (charged with responding to subpoenas from the criminal justice system for investigative information), the Detective Divisions, or anyone else in the Chicago Police Department actually produced to the criminal justice system all of the different investigative information created by the Chicago Police Department during an investigation, AS ¶¶ 62, 67, 70, 72, 73, 74.

40

Second, the City policymakers' deficient response to the evidence suppression problem is evident in the fact that the promulgated policies contained the above facial deficiencies, despite Judge Shadur's identification in *Palmer* of many of these specific problems as those in need of a solution. AS ¶¶ 49, 56. That put the City's policymakers on notice at such a particular level of detail of the failures that needed correcting that the policymakers' decision to leave these particular gaps in policy cannot be construed as anything more than an explicit decision to allow the problem to continue. AS ¶¶ 75-102.

Third, the City's deficient response is further shown by the Chicago Police Department's lack of effort to implement the new Special Orders. Policymakers were aware of a substantial resistance with the Chicago Police Department to any change in policies requiring disclosure of information. AS ¶¶ 55-57. Still, the City did not audit the effect of the new policies or take any steps to monitor compliance with the new policies. AS ¶¶ 66, 70, 75, 76, 77.

Fourth, the City's policymakers and designees in charge of this policymaking concede that the Special Orders it put in place did not address Judge Shadur's concerns, and that the policies put forth were insufficient to overcome a problem as entrenched as the Chicago Police Department's evidence suppression policy. AS ¶¶ 62-74, 75-84, 85-88. And as discussed above, after Special Order 86-3 there was no further change in City policy before the time that Sierra was wrongly convicted of the Andujar murder. AS ¶ 73-75, 85.

**C.     The City Cannot and Does Not Contest This Evidence**

As described above, the evidence in the record on Sierra's *Monell* theory that City policymakers responded to notice of a citywide problem of evidence suppression with facially deficient policies all points in one direction. The City cannot create a genuine dispute on any part of this express policy *Monell* theory, and thus Sierra is entitled to summary judgment.

41

In response to the ample evidence above—including, among other things, the City's own written policies, 30(b)(6) designees and district court and appellate rulings—the City has not put forth a single fact witness, Rule 30(b)(6) witness, or even expert witness who challenges Sierra's evidence. The City's 30(b)(6) designees have admitted that the policies put in place were deficient in various ways, and did not address a number of the deficiencies in the policies that Judge Shadur explicitly identified, including the continued use of parallel files, the lack of any guidance as to what constituted relevant information that needed to be documented, the lack of any guidance to the subpoena service unit about what to gather in response to document requests from prosecutors and criminal defendants, and most fundamentally the lack of any directive to produce all investigative information contained in police investigative files. AS ¶ 34-40, 42. It is particularly striking that, despite disclosing multiple experts in this case, the City has not disclosed any expert to defend the City's express written policies governing the documentation and disclosure of exculpatory and impeachment evidence–*i.e.*, Special Orders 83-1, 83-2, and their progeny. AS ¶ 104.

\* \* \*

The record reflects that City policymakers had notice of a citywide problem of evidence suppression in homicide investigations starting in 1982, promulgated facially deficient policies in response, failed to implement them, and then left the bad policies in place well past Sierra's wrongful conviction. The City has not and cannot adduce evidence that creates a genuine issue of material fact on this *Monell* theory. If the Court does not grant summary judgment more broadly on preclusion grounds, it should grant summary judgment on this theory.

## CONCLUSION

For these reasons, this Court should grant summary judgment to Sierra on his due process claim against Guevara. In addition, it should grant Sierra summary judgment on issue preclusion

grounds on the *Monell* theory that the City had an official policy of suppressing exculpatory and impeachment evidence. Alternatively, this Court should conclude that there are no genuine disputes of material fact on the *Monell* theory that City policymakers promulgated facially deficient policies in response to the problem of evidence suppression, and it should grant summary judgment to Sierra on that theory.

**March 15, 2024**                                RESPECTFULLY SUBMITTED,

**THOMAS SIERRA**

By:  /s/ Steve Art
*One of Plaintiff's Attorneys*

Jon Loevy
Anand Swaminathan
Steve Art
Ruth Brown
Rachel Brady
Sean Starr
Wally Hilke
Meg Gould
**LOEVY & LOEVY**
311 N. Aberdeen Street
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

**CERTIFICATE OF SERVICE**

I, Steve Art, an attorney, hereby certify that, on March 15, 2024, I filed the foregoing

PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT using the Court's

CM/ECF system, which effected service on all counsel of record.

 /s/ Steve Art
*One of Plaintiff's Attorneys*

Jon Loevy
Anand Swaminathan
Steve Art
Ruth Brown
Rachel Brady
Sean Starr
Wally Hilke
Meg Gould
**LOEVY &**
**LOEVY** 311 N.
Aberdeen St.
Chicago, IL 60607
(312) 243-5900

44