# Exhibit YY

| 09:29:57 | 1 | Judge Kennelly, November 29, 2016, 9:30 a.m., Fields v. City |

09:29:57  1  Judge Kennelly, November 29, 2016, 9:30 a.m., Fields v. City

09:30:46  2  of Chicago, trial.

09:39:19  3      THE CLERK:  Case No. 10 C 1168, Fields v. City of

09:39:25  4  Chicago.

09:39:28  5      THE COURT:  Good morning.

09:39:28  6      MR. LOEVY:  Good morning, your Honor.  Jon Loevy,

09:39:30  7  Steve Art, Anand Swaminathan, Candace Gorman and Tony for

09:39:36  8  Nathson Fields.

09:39:36  9      MR. NOLAND:

09:39:38  10      MR. MICHALIK:  Paul Michalik, Terry Burns and Dan

09:39:42  11  Noland for the defendant City of Chicago and Brannigan.

09:39:47  12      MR. KULWIN:  Shelly Kulwin and Rachel Katz on behalf

09:39:50  13  of Murphy.

09:39:50  14      THE COURT:  A couple of things we need to talk about.

09:39:52  15  One of them was a note I got from a juror yesterday.  I won't

09:39:56  16  give you the whole thing.  I won't read the whole thing.

09:39:59  17  Basically, this person works with clients, has to schedule

09:40:02  18  their appointments, she's been doing it after court.  She goes

09:40:07  19  back to the office and so the question is do you think I need

09:40:10  20  to push all my clients the week of December 16th by which I

09:40:17  21  think she means the week of December 12th to come after 5:00

09:40:21  22  p.m. or will we be done by the 12th?  If we do go into the

09:40:25  23  week of the 12/16, which again I think means the week of the

09:40:29  24  12th of December, will we still be done by 4:45?  Thank you.

09:40:32  25  I just need to be able to let my clients know.  They come in

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 3 of 303 PageID #:64166

| | |
|---|---|
| 09:40:37 | 1 |
| 09:40:40 | 2 |
| 09:40:43 | 3 |
| 09:40:45 | 4 |
| 09:40:48 | 5 |
| 09:40:51 | 6 |
| 09:40:56 | 7 |
| 09:41:00 | 8 |
| 09:41:03 | 9 |
| 09:41:08 | 10 |
| 09:41:13 | 11 |
| 09:41:19 | 12 |
| 09:41:22 | 13 |
| 09:41:23 | 14 |
| 09:41:23 | 15 |
| 09:41:25 | 16 |
| 09:41:28 | 17 |
| 09:41:31 | 18 |
| 09:41:34 | 19 |
| 09:41:36 | 20 |
| 09:41:38 | 21 |
| 09:41:40 | 22 |
| 09:41:46 | 23 |
| 09:41:49 | 24 |
| 09:41:50 | 25 |

1   every two to four weeks and can't work with anybody else.

2      I needed to talk to you today anyway about timing.

3      MR. LOEVY: Your Honor, we hope to close our case on

4   Wednesday. We are going to call -- I'll tell you right now.

5   We are going to call today our expert after Mr. Hawkins.

6   We're hoping to squeeze Mr. Wharrie in and obviously we are

7   slinking our witness exams a lot. There are some depositions

8   to read if we run out of witnesses today, we'd probably do

9   Murphy. Tomorrow is Kees, Murphy, I guess that would be,

10   yeah, tomorrow, Kees, Murphy, Conyers and Andrea line is on

11   stand by today as a short 15, 20 minute witness. That's it.

12      THE COURT: And the other excerpt is one that you

13   would call in rebuttal only?

14      MR. LOEVY: Yes.

15      THE COURT: The statistician?

16      MR. LOEVY: Yes. And I am not sure -- I'll tell you

17   putting our cards on the table. Mr. Brasfield is not going to

18   rely heavily on the statistics. I have a feeling the stats

19   are going to drop off.

20      THE COURT: You will have a feel later.

21      So assuming those are the people that they end up

22   calling, who is on the list on the defense side?

23      MR. MICHALIK: Obviously, we have our expert Bernie

24   Murray.

25      THE COURT: Yeah.

| | | |
|---|---|---|
| 09:41:51 | 1 | MR. MICHALIK:  We would probably be calling Daniel |
| 09:41:53 | 2 | Brannigan, there are some witnesses that we would be reading |
| 09:41:56 | 3 | in, Gerald Morris, Trammell Davis and Eugene Hunter.  Then we |
| 09:42:06 | 4 | might. |
| 09:42:07 | 5 | THE COURT:  You mean writted in or reading? |
| 09:42:11 | 6 | MR. MICHALIK:  Reading.  Like we did last time. |
| 09:42:18 | 7 | MR. NOLAND:  Mr. Sexton, Judge Hines. |
| 09:42:25 | 8 | MR. KULWIN:  Are they not calling Hogan? |
| 09:42:27 | 9 | MR. NOLAND:  Mr. Hogan, Mr. Poulos. |
| 09:42:32 | 10 | MR. KULWIN:  Possibly, possibly Mr. Rueckert and we |
| 09:42:39 | 11 | will be reading in excerpts from Ms. Langston. |
| 09:42:43 | 12 | THE COURT:  Okay. |
| 09:42:43 | 13 | MR. LOEVY: |
| 09:42:46 | 14 | MR. MICHALIK:  Also before I forget Mr. Maue.  We may |
| 09:42:51 | 15 | wiped up having to read in his trial testimony. |
| 09:42:53 | 16 | THE COURT:  You are still working on -- |
| 09:42:55 | 17 | MR. MICHALIK:  Yeah. |
| 09:42:55 | 18 | MR. NOLAND:  Judge, last time it was by video |
| 09:42:57 | 19 | conference. |
| 09:42:58 | 20 | THE COURT:  Yep. |
| 09:42:58 | 21 | MR. NOLAND:  And he's down in southern Illinois. |
| 09:43:00 | 22 | THE COURT:  Yeah. |
| 09:43:01 | 23 | MR. NOLAND:  And if we could setup -- we could do |
| 09:43:05 | 24 | that or a reading in. |
| 09:43:06 | 25 | THE COURT:  For setting up the video conference, you |

11/29/16 AM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 5 of 303 PageID #:64168
***REALTIME UNEDITED TRANSCRIPT ONLY***

4

09:43:09  1   need to be talking to Pam because Pam needs to be talking to

09:43:13  2   the person who does that who needs to be talking to the

09:43:15  3   prison.  The way those things work is that the prisons, they

09:43:18  4   have time slots, and because they're getting video conference

09:43:22  5   requests from all over the place for, you know, prisoners

09:43:25  6   doing settlement conferences and other things and you have to

09:43:28  7   make sure that the time slot is available.  You have to get it

09:43:34  8   locked in.

09:43:34  9        MR. MICHALIK:  There may be an issue with that

09:43:37  10  regarding Mr. Maue and his ability to do that.

09:43:42  11       MR. KULWIN:  And Jackie Clay.

09:43:43  12       THE COURT:  Who?

09:43:46  13       MR. KULWIN:  Jackie Clay.

09:43:47  14       THE COURT:  I thought you were saying Jay Cutler.

09:43:50  15       MR. KULWIN:  I wouldn't mind that, just so I could

09:43:52  16  cross-examine someone easily.

09:43:54  17       THE COURT:  Yeah, that would be shooting fish in a

09:43:57  18  barrel.

09:43:58  19       Okay.  So, look, I guess what I -- I guess what I am

09:44:04  20  inclined to tell these people is that it's, A, it's difficult

09:44:09  21  to predict because I don't know exactly how long any

09:44:14  22  particular witness is going to take.  I think it's reasonable

09:44:16  23  to expect that the evidence and the arguments will finish by

09:44:24  24  the end of next week.

09:44:25  25       MR. KULWIN:  I think sooner.


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

09:44:28   1        THE COURT:  I don't want to predict too much.  By the

09:44:31   2   end of next week, in other words, by the 9th, and then what

09:44:34   3   happens after that is up to the jury.  It's the length of the

09:44:36   4   deliberations which is up to them.  And so the question of

09:44:40   5   whether, you know, you're going to be still here the week of

09:44:44   6   the 12th, there is a decent chance you will and the schedule

09:44:48   7   will be largely up to the jury.  If you're in deliberations, I

09:44:53   8   have no problem with you stopping at 4:30 or 4:45 if you want,

09:44:57   9   so you need to figure how much planning ahead you need to do.

09:45:02  10   I want to keep it vague but keep some glimmer of light at the

09:45:06  11   end of the tunnel.

09:45:08  12        Two other things.  I got two early questions from Mr.

09:45:13  13   Hawkins.  I have two other questions, I don't know which, who

09:45:18  14   are the men sitting next to the witness Earl Hawkins?  We need

09:45:22  15   to figure out how to deal with that.  Or if or whether to deal

09:45:27  16   with that.  And then the other one I am just going to read to

09:45:29  17   you.  All the lawyers are showing statements and documents

09:45:31  18   from several court dates and trials.  Can we get the dates and

09:45:37  19   what the trial was for?  It's hard to keep up with what they

09:45:41  20   are talking about.  Maybe this was already said and I missed

09:45:45  21   it, question mark.

09:45:48  22        I guess what I'd be inclined to say to them is that

09:46:05  23   I'm going to try this on for you for sides.  I'll read part of

09:46:10  24   it.  I think I can tell them we have all heard evidence that

09:46:19  25   Mr. Fields had two criminal trials, one was in 2006 and one

11/29/16 AM

| | | |
|---|---|---|
| 09:46:24 | 1 | was from 2009 and a lot of the trials have been read from |
| 09:46:27 | 2 | those two dates.  I have tried to prompt the lawyers, is this |
| 09:46:30 | 3 | from the '86 trial or the 2009 trial.  There have also been |
| 09:46:34 | 4 | various other proceedings where people have testified at |
| 09:46:37 | 5 | various dates.  It's really, as a matter of evidence law, it's |
| 09:46:42 | 6 | not appropriate to go into the details of what those are.  And |
| 09:46:45 | 7 | you are just going to have to do your best to keep notes and |
| 09:46:48 | 8 | remember as you are going along.  That's what I am inclined to |
| 09:46:51 | 9 | say.  Does anybody have a better idea? |
| 09:46:55 | 10 | MR. KULWIN:  I think that's fair, Judge. |
| 09:46:56 | 11 | THE COURT:  Anybody have a problem with that or a |
| 09:46:58 | 12 | better idea. |
| 09:46:59 | 13 | MR. KULWIN:  The proceedings related to this case. |
| 09:47:01 | 14 | MR. LOEVY:  Some of them aren't.  I am going to |
| 09:47:03 | 15 | impeach him this morning with his testimony at these other |
| 09:47:08 | 16 | trials.  I am pretty sure that's what this stuff is about. |
| 09:47:11 | 17 | THE COURT:  This stuff is flying pretty fast.  You |
| 09:47:14 | 18 | have had testimony from depositions that were given in this |
| 09:47:18 | 19 | test, you have testimony from the state proceeding, testimony |
| 09:47:20 | 20 | from the earlier trial in this case. |
| 09:47:22 | 21 | MR. LOEVY:  Okay. |
| 09:47:22 | 22 | THE COURT:  There's at least five things out there, |
| 09:47:25 | 23 | probably more.  We had a couple yesterday with Mr. Hawkins |
| 09:47:28 | 24 | where he had trials in various. |
| 09:47:30 | 25 | MR. LOEVY:  That's going to happen this morning.  I |

11/29/16 AM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 8 of 303 PageID #:64171
***REALTIME UNEDITED TRANSCRIPT ONLY***

7

09:47:31   1   am going to impeach him -- should I say the name?  I was just

09:47:35   2   planning on saying, isn't it true you testified --

09:47:38   3          THE COURT:  Just give dates.

09:47:39   4          MR. LOEVY:  Got it.

09:47:40   5          MR. NOLAND:  Judge, I have one thing to raise on that

09:47:43   6   issue which would be consistent with the sidebar we had about

09:47:47   7   confusing the 2013 hearing.

09:47:49   8          THE COURT:  Yeah.

09:47:49   9          MR. NOLAND:  With Sexton versus the 2014 hearing

09:47:52   10  before the court.  I would think the jury should know that the

09:47:56   11  defendants were not involved in the 2013 hearing.  It was a

09:48:00   12  separate proceeding, 2014, because otherwise --

09:48:05   13         THE COURT:  That doesn't matter as a matter of

09:48:07   14  evidence law.  I mean, it doesn't matter.  To the extent the

09:48:10   15  stuff is admissible, it's admissible and whether somebody was

09:48:13   16  involved or not, it really -- it doesn't matter at least based

09:48:16   17  on any objection that I have had to rule on yet.  I am not

09:48:19   18  really inclined to do that.  The question was the way I read

09:48:23   19  this question is these dates are flying fast and furious, I am

09:48:26   20  having a hard time keeping up, can you kind of give me a key

09:48:29   21  to the dates and I am going to basically tell them no, I can't

09:48:32   22  give you a key.  There's a bunch -- there have been a bunch of

09:48:35   23  other proceedings in which people have testified.  It's not

09:48:38   24  appropriate as a matter of evidence law for me to give you a

09:48:41   25  list of those.  Just do your best to keep up.  I probably had

11/29/16 AM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 9 of 303 PageID #:64172
***REALTIME UNEDITED TRANSCRIPT ONLY***

8

09:48:47  1  collectively to do a better job of remembering these things

09:48:51  2  than any one person would.

09:48:53  3      MR. KULWIN:  If you want, the it's up to them,

09:48:56  4  address it in closing argument.

09:48:58  5      THE COURT:  It may get addressed this closing

09:49:00  6  argument.  If you have a specific question about, you know, a

09:49:03  7  particular witness, if you have a specific question about

09:49:07  8  specific witnesses, what was the date on which the person

09:49:09  9  testified, put that in questions and we will cover it.

09:49:11  10      Okay.  So what else do we have to take up before we

09:49:14  11  start?

09:49:14  12      MR. LOEVY:  We are going to hand you a deposition for

09:49:16  13  Beseth that has some calls you have to make.

09:49:19  14      THE COURT:  For what who?

09:49:21  15      MR. LOEVY:  The guy's name is Beseth, the

09:49:23  16  investigator.

09:49:23  17      THE COURT:  When do I have to read it by?

09:49:26  18      MR. LOEVY:  For tomorrow.

09:49:28  19      THE COURT:  You are giving me designations and

09:49:31  20  objections, basically?

09:49:32  21      MR. LOEVY:  This is the man who testified at the

09:49:33  22  civil trial but has died since the civil trial.  What you have

09:49:38  23  are designations from his civil trial testimony.

09:49:41  24      THE COURT:  And whose -- do I know who's designating

09:49:47  25  the testimony?  Is it everybody is designating some?

***REALTIME UNEDITED TRANSCRIPT ONLY***

9

| 09:49:51 | 1 | MR. KULWIN:  Everybody is designating some with |
| 09:49:53 | 2 | objections going back and forth. |
| 09:49:54 | 3 | THE COURT:  And it's testimony both from the previous |
| 09:49:57 | 4 | trial in this case and from the deposition. |
| 09:50:01 | 5 | MR. LOEVY:  We object to the deposition being read in |
| 09:50:04 | 6 | addition -- |
| 09:50:04 | 7 | THE COURT:  You say that in here? |
| 09:50:06 | 8 | MR. LOEVY:  Yes. |
| 09:50:06 | 9 | THE COURT:  I'll deal with it later. |
| 09:50:08 | 10 | MR. KULWIN:  What about the motion, Judge? |
| 09:50:10 | 11 | THE COURT:  Oh, yeah.  I'm open to suggestion. |
| 09:50:14 | 12 | MR. KULWIN:  I think I'm always a big fan of the |
| 09:50:18 | 13 | truth.  Just say Mr. Hawkins is in witness protection and |
| 09:50:23 | 14 | those are marshals. |
| 09:50:24 | 15 | MR. LOEVY:  We object to that, your Honor. |
| 09:50:25 | 16 | THE COURT:  What are we going to do? |
| 09:50:27 | 17 | MR. LOEVY:  Let's just ignore the question. |
| 09:50:28 | 18 | MR. KULWIN:  No.  They might think he's incarcerated |
| 09:50:32 | 19 | or something. |
| 09:50:33 | 20 | THE COURT:  They know he is not incarcerated.  He's |
| 09:50:35 | 21 | testified like six times or maybe four that he is not |
| 09:50:38 | 22 | incarcerated. |
| 09:50:39 | 23 | MR. LOEVY:  Because that would, you know, open a can |
| 09:50:41 | 24 | of worms, why is he in witness protection?  It's more |
| 09:50:44 | 25 | information than they need.  There is a Marshall there.  There |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 09:50:47 | 1 | is a Marshall there. |
| 09:50:48 | 2 | MR. KULWIN: I don't agree with that, Judge. |
| 09:50:50 | 3 | THE COURT: So describe the can of worms. |
| 09:50:55 | 4 | MR. LOEVY: Well, why is he in witness protection? |
| 09:50:58 | 5 | That sort of feeds their theory that other El Rukns want to |
| 09:51:00 | 6 | kill him because he testified against other El Rukns. And, |
| 09:51:04 | 7 | you know, we haven't finished our threat theory. |
| 09:51:06 | 8 | THE COURT: Is fact that -- no, he was still in |
| 09:51:10 | 9 | custody at the last trial. Was there anybody who testified at |
| 09:51:12 | 10 | the last trial who was out of custody? |
| 09:51:16 | 11 | MS. KATZ: Yes. |
| 09:51:17 | 12 | THE COURT: Who? |
| 09:51:18 | 13 | MS. KATZ: Kees. |
| 09:51:19 | 14 | THE COURT: No, he was still in could you say towed. |
| 09:51:21 | 15 | MR. KULWIN: Jackie Clay. |
| 09:51:23 | 16 | THE COURT: Clay. Did he have marshals here? Was he |
| 09:51:26 | 17 | still -- |
| 09:51:27 | 18 | MR. NOLAND: No, he was not. |
| 09:51:28 | 19 | THE COURT: He was not in any witness protection. So |
| 09:51:30 | 20 | it's a sui generis situation. Lovely. |
| 09:51:33 | 21 | MR. LOEVY: Because the inference would be he is in |
| 09:51:35 | 22 | witness protection because he faces threats which we object to |
| 09:51:38 | 23 | on its face, but also there could be an inference about Mr. |
| 09:51:42 | 24 | Fields and the easiest way is just to ignore it. |
| 09:51:44 | 25 | MR. KULWIN: I don't agree, Judge. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

09:51:46  1        THE COURT:  Explain why you don't agree.

09:51:48  2        MR. KULWIN:  Because I think that the jury could draw

09:51:50  3    an inference that somehow he's done something wrong or that

09:51:53  4    he's maybe -- he might be free, but he's under some kind of

09:51:56  5    restriction and that there's something untrustworthy about

09:52:02  6    him.  Who else walks into court with two federal marshals?

09:52:05  7        THE COURT:  I understand.  By telling them he's there

09:52:09  8    because he is in the U.S. marshals witness security program,

09:52:12  9    then the obvious question is going to be why, and so there is

09:52:16  10   a can, whether it's a can of worms or a can of something else

09:52:19  11   that has been opened.  How am I going to deal with that?

09:52:23  12       MR. KULWIN:  Think of a benign way of dealing with

09:52:26  13   that, Judge, that's neutral.  You could just say that the two

09:52:33  14   marshals are part of -- they're U.S. marshals who have

09:52:39  15   assisted him in traveling to court as he's still participating

09:52:45  16   in the relocation program.

09:52:46  17       MR. LOEVY:  Same problem, your Honor, same problem

09:52:49  18   with the relocation.  The only point I would add is if there

09:52:53  19   weren't jury questions, they would just have to wonder.  It's

09:52:56  20   99 percent of the trials.  The jury just has to wonder.

09:53:06  21       MR. KULWIN:  I think something that's neutral:

09:53:08  22       THE COURT:  What?

09:53:10  23       MR. KULWIN:  To me if I'm sitting here seeing two

09:53:12  24   marshals, maybe they think they are protecting us from him

09:53:16  25   because he is a killer.


***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 13 of 303 PageID #:64176
***REALTIME UNEDITED TRANSCRIPT ONLY***

12

09:53:18    1        THE COURT:  They saw me walk over right by the guy

09:53:20    2    six times.  Maybe they figure I'm like Jon Wayne or something.

09:53:24    3    I don't know.

09:53:25    4        MR. KULWIN:  You are tall and you look like Jon

09:53:27    5    Wayne.

09:53:27    6        THE COURT:  That is about the worse example of

09:53:29    7    sucking up to a judge I have ever heard in my entire life.  I

09:53:33    8    would -- in my entire life.

09:53:37    9        MR. KULWIN:  I have no shame.

09:53:38   10        THE COURT:  Okay.  Raise your hand if you think I

09:53:41   11    look like Jon Wayne.

09:53:43   12        MR. KULWIN:  I saw a picture in the paper recently,

09:53:49   13    it was my Johnnie dep moment.

09:53:51   14        THE COURT:  That would be item number two.

09:53:53   15        MR. KULWIN:  The inference could be a juror could

09:53:55   16    draw the inference that he is a dangerous person and that we

09:53:58   17    don't want him to close to members or --

09:54:01   18        THE COURT:  Look, I'm concerned, you know, for many

09:54:05   19    of the same reasons at the end of the first trial, after the

09:54:09   20    end of the first trial, one of the reasons -- one of the bases

09:54:13   21    on which I granted a new trial was my what I'll call just

09:54:19   22    colloquially inappropriate sloughing off of a jury

09:54:24   23    instruction.  It was to the instructions, so it was more that

09:54:29   24    the jury had to deal with, but it just seems to me as a

09:54:32   25    general matter if a juror is asking a question, that means

09:54:35  1    that there's something that there's likely to be speculation

09:54:38  2    about.  I don't know which way the speculation cuts.  I can

09:54:41  3    imagine it cutting any possible -- any number of ways.  I

09:54:45  4    would prefer to find a way to deal with it.  And so that's

09:54:52  5    what we are going to do.  We are going to find a way to deal

09:54:55  6    with it.

09:55:02  7         Look, as far as the can of worms is concerned, let me

09:55:07  8    just see if I can grab something here.

09:56:19  9         I am going to read something here.  What I am about

09:56:47  10   to read is something I propose to tell the jury.  I think it's

09:56:50  11   accurate.  I tried to write it in a way that's non--- sort of

09:57:03  12   as benign as possible.  I would say to the jury, if I can say

09:57:06  13   the whole thing without breaking into a coughing fit which is

09:57:10  14   not a foregone conclusion this morning.  There was a question

09:57:22  15   from the juror regarding who the gentleman were sitting by Mr.

09:57:28  16   Hawkins during the testimony and the answer to that question

09:57:29  17   is that they're federal marshals and they're there because Mr.

09:57:36  18   Hawkins is a participant in a relocation program that was part

09:57:40  19   of his overall agreement to cooperate with the federal

09:57:43  20   government in connection with several federal El Rukn trials

09:57:47  21   that you have heard some testimony about, none of those trials

09:57:50  22   involve Mr. Fields and you are not to draw any inference for

09:57:54  23   or against any party in the case based on what I just told

09:57:56  24   you.

09:57:57  25        MR. KULWIN:  Fine with us, Judge.

| | | |
|---|---|---|
| 09:57:58 | 1 | MR. LOEVY:  We don't want it, but you made the call |
| 09:58:00 | 2 | and that's what it's going to be. |
| 09:58:03 | 3 | THE COURT:  Do we know if he's back there? |
| 09:58:07 | 4 | THE CLERK:  I don't know. |
| 09:58:07 | 5 | THE COURT:  I actually did not see them hanging |
| 09:58:09 | 6 | around this morning. |
| 09:58:11 | 7 | MR. ART:  I saw one of the marshals earlier. |
| 09:58:24 | 8 | THE COURT:  Do we have other things that we need to |
| 09:58:26 | 9 | talk about before Hawkins testifies? |
| 10:00:49 | 10 | (The jury enters the courtroom.) |
| 10:00:49 | 11 | THE COURT:  One final thing before we resume with Mr. |
| 10:00:53 | 12 | Hawkins' testimony.  I had gotten a couple of notes or |
| 10:00:55 | 13 | questions from jurors.  One of them has to do with scheduling. |
| 10:00:58 | 14 | We will talk about that later today.  There is another one I |
| 10:01:00 | 15 | will deal with after Mr. Hawkins is done.  There are a couple |
| 10:01:03 | 16 | of questions for Mr. Hawkins that I am going to hold until the |
| 10:01:05 | 17 | end of his testimony and we will will discuss with the |
| 10:01:10 | 18 | lawyers.  There is one I am going to deal with here. |
| 10:01:13 | 19 | A juror handed a note to my clerk asking who are |
| 10:01:16 | 20 | these guys over here sitting over to the side next to Mr. |
| 10:01:19 | 21 | Hawkins.  So I am just going to tell you what the answer is. |
| 10:01:21 | 22 | They are federal marshals.  They're there because Mr. Hawkins |
| 10:01:25 | 23 | is involved in a relocation program.  That's part of his |
| 10:01:29 | 24 | overall agreement to cooperate in connection with several |
| 10:01:33 | 25 | federal El Rukn trials that you have heard some things about. |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 16 of 303 PageID #:64179
11/29/16 AM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

15

| | | |
|---|---|---|
| 10:01:35 | 1 | None of those trials involve Mr. Fields and you are not to |
| 10:01:40 | 2 | draw any inference in favor of or against anybody in this |
| 10:01:45 | 3 | case.  I have now cleared up that issue.  Mr. Loevy, you are |
| 10:01:48 | 4 | now on redirect. |
| 10:01:49 | 5 | MR. LOEVY:  Thank you, your Honor. |
| 10:01:49 | 6 | - - - |
| 10:01:49 | 7 | EARL HAWKINS, REDIRECT EXAMINATION |
| 10:01:49 | 8 | BY MR. LOEVY: |
| 10:01:52 | 9 | Q.  I want to ask a few questions about the grand jury |
| 10:01:56 | 10 | statement. |
| 10:01:57 | 11 | Now, you told Mr. Kulwin that it was a very long |
| 10:02:00 | 12 | statement and there were a lot of details.  Do you remember |
| 10:02:02 | 13 | that question? |
| 10:02:02 | 14 | A.  Yes, sir. |
| 10:02:03 | 15 | Q.  The fact that Nate was involved in a murder, that was an |
| 10:02:08 | 16 | important detail, correct? |
| 10:02:09 | 17 | A.  Yes. |
| 10:02:10 | 18 | Q.  And you said repeatedly that you never said he was |
| 10:02:15 | 19 | involved in the Smith/Hickman murder? |
| 10:02:16 | 20 | A.  Yes. |
| 10:02:17 | 21 | Q.  But you were asked when he read it is this accurate, Nate |
| 10:02:20 | 22 | did the Smith/Hickman, and you said yes, it is accurate, |
| 10:02:22 | 23 | correct? |
| 10:02:23 | 24 | MR. KULWIN:  I'm sorry, Judge.  I didn't hear the |
| 10:02:25 | 25 | question.  I apologize. |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 17 of 303 PageID #:64180

| | | |
|---|---|---|
| 10:02:26 | 1 | THE COURT: Rephrase the question. |
| 10:02:27 | 2 | BY MR. LOEVY: |
| 10:02:28 | 3 | Q. When? |
| 10:02:28 | 4 | THE COURT: There are too many its in there. Make it |
| 10:02:30 | 5 | a little clearer. |
| 10:02:31 | 6 | BY MR. LOEVY: |
| 10:02:32 | 7 | Q. When Mr. Hogan read the you statement, isn't it true Nate |
| 10:02:35 | 8 | Fields committed the Vaughn/White murder with you and Sumner, |
| 10:02:38 | 9 | your response was, yes, that's accurate, correct? |
| 10:02:41 | 10 | MR. KULWIN: Judge, I am going to object. That's not |
| 10:02:44 | 11 | what the statement says. He misstated it. |
| 10:02:46 | 12 | THE COURT: You are talking about the grand jury |
| 10:02:47 | 13 | statement. |
| 10:02:47 | 14 | MR. LOEVY: Yes, I am. |
| 10:02:48 | 15 | THE COURT: I think it makes more sense to just read |
| 10:02:51 | 16 | it rather than paraphrase it, or at least that part of it. I |
| 10:02:54 | 17 | am not talking about reading the obviously thing, obviously. |
| 10:03:34 | 18 | MR. LOEVY: Your Honor, I don't have the exact page. |
| 10:03:38 | 19 | May I ask a question about it or would you like me to find it? |
| 10:03:42 | 20 | THE COURT: Go ahead and ask a question in the |
| 10:03:44 | 21 | interest of time. |
| 10:03:44 | 22 | BY MR. LOEVY: |
| 10:03:45 | 23 | Q. What the grand jury statement was you, Mr. Sumner, and Mr. |
| 10:03:51 | 24 | Fields committed the Vaughn/White murder, correct? |
| 10:03:52 | 25 | MR. KULWIN: Objection, Judge, that's not what it |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 18 of 303 PageID #:64181

| | | |
|---|---|---|
| 10:03:54 | 1 | says. |
| 10:03:54 | 2 | THE COURT:  Do you have a copy of it? |
| 10:03:56 | 3 | MR. KULWIN:  If he hands me his, I am show him. |
| 10:03:59 | 4 | THE COURT:  Does somebody have a copy of it?  Thank |
| 10:04:01 | 5 | you.  Can Mr. Loevy borrow it so we can just ask the questions |
| 10:04:06 | 6 | about it? |
| 10:04:07 | 7 | This was shown. |
| 10:04:09 | 8 | MR. LOEVY:  It wasn't shown. |
| 10:04:10 | 9 | THE COURT:  Okay. |
| 10:04:11 | 10 | THE COURT:  Go ahead and show it to the witness.  If |
| 10:04:14 | 11 | you want to put it on the ELMO, you can do it so that he can |
| 10:04:17 | 12 | see it. |
| 10:04:18 | 13 | MR. LOEVY:  Thank you. |
| 10:04:18 | 14 | THE COURT:  And I will take it off the jury's |
| 10:04:20 | 15 | screens.  There you go.  Mr. Hawkins should be able to see |
| 10:04:24 | 16 | this. |
| 10:04:24 | 17 | BY MR. LOEVY: |
| 10:04:25 | 18 | Q.  Can you see those three lines, sir? |
| 10:04:27 | 19 | A.  Yes, sir. |
| 10:04:28 | 20 | Q.  That's not true, is it? |
| 10:04:29 | 21 | THE COURT:  Why don't you read it since the jury |
| 10:04:31 | 22 | can't see it. |
| 10:04:32 | 23 | BY MR. LOEVY: |
| 10:04:32 | 24 | Q.  At about the beginning of April 1985, Anthony Sumner, |
| 10:04:36 | 25 | Nathson Fields and I were involved in the murder of Joe White |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 19 of 303 PageID #:64182

10:04:38  1  and DeeEggars Vaughn, correct?

10:04:41  2          THE COURT:  Go to the next page because then there is

10:04:43  3  an answer.

10:04:44  4  BY MR. LOEVY:

10:04:44  5  Q.  The answer is on page 25.  Is that accurate so far to the

10:04:49  6  best of your recollection, Mr. Hawkins?

10:04:51  7          "ANSWER:  Yes, sir."

10:04:53  8          My first question is it's not true that Mr. Fields

10:04:56  9  was involved with you in the Vaughn/White murder, correct

10:04:58  10  A.  I never said that.

10:05:00  11  Q.  Okay.  That's not true, though, right?

10:05:01  12  A.  I never said that.

10:05:03  13          MR. LOEVY:  Your Honor, the only question is if he

10:05:06  14  was not involved.

10:05:07  15  BY MR. LOEVY:

10:05:07  16  Q.  Can we agree he had nothing to do with the crime?

10:05:11  17  A.  I said that all the time.

10:05:12  18  Q.  When they said to you is that accurate that he was

10:05:14  19  involved in a crime, you said to the grand jury that it was

10:05:18  20  accurate, correct?

10:05:19  21  A.  Sir, what do you want from me?  I said he wasn't in it.

10:05:26  22          THE COURT:  He is asking you about your testimony in

10:05:28  23  the grand jury.  That's what you are going to need to answer.

10:05:29  24  BY MR. LOEVY:

10:05:30  25  Q.  You told the grand jury that he was, correct?

| | | |
|---|---|---|
| 10:05:32 | 1 | A.  I didn't tell nobody nothing. |
| 10:05:34 | 2 | Q.  Are you saying that you made a mistake at the grand jury |
| 10:05:37 | 3 | or you didn't understand the question or you intended to say |
| 10:05:40 | 4 | that he was guilty? |
| 10:05:41 | 5 |         MR. KULWIN:  Objection, multiple questions. |
| 10:05:42 | 6 |         THE COURT:  Overruled. |
| 10:05:43 | 7 |         THE WITNESS:  I never said he was nowhere, so what |
| 10:05:47 | 8 | are you talking about? |
| 10:05:48 | 9 | BY MR. LOEVY: |
| 10:05:49 | 10 | Q.  I want to focus on your intent. |
| 10:05:50 | 11 | A.  Okay. |
| 10:05:51 | 12 | Q.  At the time you gave that testimony? |
| 10:05:52 | 13 | A.  Okay. |
| 10:05:52 | 14 | Q.  Did you make a mistake or did you understand that the U.S. |
| 10:05:56 | 15 | attorney wanted you to say he was involved and you said that's |
| 10:05:59 | 16 | accurate? |
| 10:05:59 | 17 | A.  The USA attorney didn't tell me to say nothing, and no, I |
| 10:06:06 | 18 | didn't make a mistake.  Maybe he spoke too soon, maybe I |
| 10:06:10 | 19 | didn't see it, maybe because I was worried about me, it got |
| 10:06:13 | 20 | past me. |
| 10:06:14 | 21 | Q.  It got past you? |
| 10:06:15 | 22 | A.  I said maybe. |
| 10:06:16 | 23 | Q.  All right.  Now, your grand jury statement was the thing |
| 10:06:25 | 24 | that took a couple of years to prepare? |
| 10:06:28 | 25 | A.  Yes, sir. |

10:06:29   1   Q.  And you carefully edited it?

10:06:30   2   A.  I edited it.

10:06:31   3   Q.  And it involved a lot of crimes and a lot of criminals,

10:06:35   4   correct?

10:06:35   5   A.  Yes, sir.

10:06:35   6   Q.  And that reference that we just read was the only place

10:06:38   7   that Nate Fields had anything to do with all those crimes and

10:06:41   8   all those criminals, correct?

10:06:42   9   A.  If you say so.

10:06:44   10  Q.  I'm asking you if that's true?

10:06:45   11      THE COURT:  It was covered on direct, Mr. Loevy.

10:06:47   12  BY MR. LOEVY:

10:06:48   13  Q.  Let's move to the testimony about the actual events that

10:06:50   14  day that you talked about with the defense attorneys.  Fuddy

10:06:53   15  was not someone you actually knew well, correct?

10:06:55   16  A.  Yes.

10:06:58   17  Q.  Mr. Banks had to point out to you who Fuddy was, correct?

10:07:02   18  A.  Yes.

10:07:02   19  Q.  And if he hadn't pointed out to you who Fuddy was, you

10:07:07   20  wouldn't have known who he was, correct?

10:07:08   21  A.  Yes.

10:07:10   22  Q.  All right.  Let's talk about where you were -- if I

10:07:15   23  understood your testimony, the team was put together, you,

10:07:19   24  Carter, Andrews and Fields, that's the team, right?

10:07:22   25  A.  Yes, sir.


                        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 22 of 303 PageID #:64185

| 10:07:23 | 1 | Q. And then you drove to the scene on the day of the supposed |
| 10:07:26 | 2 | crime, the crime? |
| 10:07:27 | 3 | A. Yes, sir. |
| 10:07:27 | 4 | Q. All right. And I'm going to show you can you see the |
| 10:07:33 | 5 | easel, sir? |
| 10:07:34 | 6 | A. Yes, sir. |
| 10:07:34 | 7 | THE COURT: If you need to move, just go ahead and |
| 10:07:36 | 8 | move. |
| 10:07:37 | 9 | BY MR. LOEVY: |
| 10:07:41 | 10 | Q. You're familiar with the area, correct? You were familiar |
| 10:07:45 | 11 | with the neighborhood, correct? |
| 10:07:46 | 12 | THE COURT: You drew a box and a line. The box is |
| 10:07:49 | 13 | the building I take it? |
| 10:07:52 | 14 | MR. LOEVY: Yes. |
| 10:07:52 | 15 | BY MR. LOEVY: |
| 10:07:53 | 16 | Q. You're familiar with the neighborhood? |
| 10:07:54 | 17 | A. Somewhat. |
| 10:07:54 | 18 | Q. The Fort was nearby the building was? |
| 10:07:56 | 19 | A. Yes. |
| 10:07:58 | 20 | THE COURT: Mr. Loevy, you are going to have to move |
| 10:08:00 | 21 | that back so the other lawyers can see it. Move it back to |
| 10:08:04 | 22 | the space between the podium and your table. |
| 10:08:09 | 23 | MR. LOEVY: Does this work, your Honor? |
| 10:08:10 | 24 | THE COURT: Do your best to crane your neck, guys. |
| 10:08:13 | 25 | BY MR. LOEVY: |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 23 of 303 PageID #:64186

| | | |
|---|---|---|
| 10:08:14 | 1 | Q.  This as the judge recognized, that rectangle is the |
| 10:08:17 | 2 | building where Fuddy was shot, right? |
| 10:08:19 | 3 | THE COURT:  Why don't you stand on the other side?  I |
| 10:08:22 | 4 | know you're right-handed but whatever. |
| 10:08:24 | 5 | BY MR. LOEVY: |
| 10:08:24 | 6 | Q.  This street out in front of the building is what, sir? |
| 10:08:28 | 7 | THE COURT:  What street is that? |
| 10:08:31 | 8 | BY MR. LOEVY: |
| 10:08:31 | 9 | Q.  The east-west street that the building is on? |
| 10:08:33 | 10 | A.  The building is supposed to be on the other side of the |
| 10:08:35 | 11 | street. |
| 10:08:35 | 12 | Q.  Well, if this is north going up? |
| 10:08:37 | 13 | THE COURT:  North is going up. |
| 10:08:38 | 14 | BY MR. LOEVY: |
| 10:08:40 | 15 | Q.  This is 39th Street, which is Pershing, correct, and this |
| 10:08:46 | 16 | is what, the north south street? |
| 10:08:48 | 17 | A.  I told you I recognized him.  You want to draw it again? |
| 10:08:51 | 18 | Q.  I guess your memory matters.  Do you know the north south |
| 10:08:54 | 19 | street? |
| 10:08:54 | 20 | A.  I don't know your drawing. |
| 10:08:55 | 21 | Q.  All right.  This is Langley, right? |
| 10:08:57 | 22 | A.  No. |
| 10:08:58 | 23 | Q.  All right.  There's another east-west street where you |
| 10:09:04 | 24 | first identified Fuddy, correct? |
| 10:09:05 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 10:09:07 | 1 | Q.  What street was that? |
| 10:09:09 | 2 | A.  Langley. |
| 10:09:09 | 3 | Q.  When -- did you not tell Mr. Burns yesterday that you made |
| 10:09:13 | 4 | the identification on Oakwood? |
| 10:09:14 | 5 | A.  Oakwood, Langley, yes. |
| 10:09:17 | 6 | Q.  Well, this is Langley and this is Oakwood? |
| 10:09:20 | 7 | A.  No. |
| 10:09:20 | 8 | Q.  I am going to represent to you that this is in my drawing? |
| 10:09:23 | 9 | A.  Yeah, that's your drawing. |
| 10:09:24 | 10 | Q.  This is Oakwood.  And Oakwood and Langley intersect, |
| 10:09:27 | 11 | correct? |
| 10:09:27 | 12 | A.  Yes.  That's what I said, sir. |
| 10:09:29 | 13 | Q.  And your testimony has always been at the intersection of |
| 10:09:32 | 14 | Oakwood and Langley is where you identified Fuddy for the |
| 10:09:35 | 15 | guys, right? |
| 10:09:35 | 16 | A.  Yes. |
| 10:09:35 | 17 | Q.  You said that in 2009, correct? |
| 10:09:39 | 18 | A.  Yes, sir. |
| 10:09:39 | 19 | Q.  You said it in 2014? |
| 10:09:41 | 20 | A.  Yes, sir. |
| 10:09:42 | 21 | Q.  And you said it in 2012? |
| 10:09:44 | 22 | A.  Yes, sir. |
| 10:09:44 | 23 | Q.  Every time you have been asked the plan was you were up in |
| 10:09:48 | 24 | your cars, you got to Oakwood and Langley and you pointed out |
| 10:09:52 | 25 | to George and Nate, there's Fuddy, that's the guy you should |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 25 of 303 PageID #:64188
11/29/16 AM
***REALTIME UNEDITED TRANSCRIPT ONLY***

24

| | | |
|---|---|---|
| 10:09:57 | 1 | kill, correct? |
| 10:09:58 | 2 | A.  Yes, sir. |
| 10:09:58 | 3 | Q.  And showing you your testimony from the criminal trial, |
| 10:10:05 | 4 | this is page 96? |
| 10:10:06 | 5 | THE COURT:  That one of the jury can see, so I am |
| 10:10:08 | 6 | going to put the jury's monitors on. |
| 10:10:16 | 7 | Are you done with the diagram you think now? |
| 10:10:19 | 8 | MR. LOEVY:  I am going to go back to it in a minute, |
| 10:10:22 | 9 | your Honor. |
| 10:10:22 | 10 | BY MR. LOEVY: |
| 10:10:22 | 11 | Q.  You did testify at the trial that the identification was |
| 10:10:25 | 12 | made on Oakwood? |
| 10:10:26 | 13 | A.  Yes. |
| 10:10:26 | 14 | MR. KULWIN:  Judge, asked and answered. |
| 10:10:29 | 15 | THE COURT:  Overruled. |
| 10:10:29 | 16 | BY MR. LOEVY: |
| 10:10:30 | 17 | Q.  Now, showing you this map, which is a little better than |
| 10:10:33 | 18 | my drawing I will acknowledge? |
| 10:10:35 | 19 | THE COURT:  It's a photograph, so by definition, it's |
| 10:10:37 | 20 | better than a drawing. |
| 10:10:38 | 21 | BY MR. LOEVY: |
| 10:10:38 | 22 | Q.  Can you see the map? |
| 10:10:39 | 23 | A.  Yes. |
| 10:10:41 | 24 | Q.  This is the building, right? |
| 10:10:42 | 25 | A.  That's the topographical.  I never was on an airplane and |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 26 of 303 PageID #:64189
11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

25

| | | |
|---|---|---|
| 10:10:48 | 1 | seen down like that.  I never seen it like that before. |
| 10:10:52 | 2 | Q.  Fair enough.  You recognize in this picture that's the |
| 10:10:55 | 3 | building that Fuddy was shot in front of?  Let me orient you. |
| 10:10:59 | 4 | This is 39th Street going east-west.  There is Langley going |
| 10:11:06 | 5 | north south, this is Oakwood at the bottom of the map? |
| 10:11:09 | 6 | THE COURT:  Bottom of the map going across from left |
| 10:11:12 | 7 | to right is Oakwood? |
| 10:11:13 | 8 | MR. LOEVY:  Exactly. |
| 10:11:15 | 9 | BY MR. LOEVY: |
| 10:11:15 | 10 | Q.  This is Oakwood.  Can you point to the jury where you were |
| 10:11:18 | 11 | at Oakwood and Langley where you pointed out Fuddy? |
| 10:11:21 | 12 | THE COURT:  Where he was or where Fuddy was? |
| 10:11:23 | 13 | BY MR. LOEVY: |
| 10:11:24 | 14 | Q.  No, where he was when he pointed out Fuddy? |
| 10:11:26 | 15 | THE COURT:  You can go down. |
| 10:11:27 | 16 | THE WITNESS:  I was right around here. |
| 10:11:32 | 17 | BY MR. LOEVY: |
| 10:11:32 | 18 | Q.  Okay.  This is where Fuddy was.  You're here at Oakwood |
| 10:11:36 | 19 | and Langley? |
| 10:11:36 | 20 | A.  Oakwood and Langley, back here.  Somewhere around here, |
| 10:11:41 | 21 | yes. |
| 10:11:41 | 22 | Q.  In fact, there was a stipulation -- |
| 10:11:42 | 23 | THE COURT:  Just for the record. |
| 10:11:44 | 24 | THE WITNESS:  Stay close to the building, came up, |
| 10:11:48 | 25 | you couldn't see me from over here, but we could see them from |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 27 of 303 PageID #:64190
11/29/16 AM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

26

| | | |
|---|---|---|
| 10:11:52 | 1 | over here. |
| 10:11:53 | 2 | BY MR. LOEVY: |
| 10:11:53 | 3 | Q.  This is the Lincoln center.  You say, guys, there's Fuddy, |
| 10:11:57 | 4 | right? |
| 10:11:58 | 5 | A.  Yes. |
| 10:11:58 | 6 | THE COURT:  Just so the record is clear, he pointed |
| 10:12:00 | 7 | to a spot just to the left of the building that's on the |
| 10:12:02 | 8 | northeast corner of Langley and Oakwood. |
| 10:12:05 | 9 | MR. LOEVY:  Correct. |
| 10:12:11 | 10 | THE COURT:  Left on the diagram, on the photograph I |
| 10:12:14 | 11 | mean. |
| 10:12:14 | 12 | BY MR. LOEVY: |
| 10:12:14 | 13 | Q.  Sir, isn't it true that that's more than 400 feet away, |
| 10:12:18 | 14 | 500 feet away? |
| 10:12:19 | 15 | A.  I don't know what -- how far it is away.  You can see it. |
| 10:12:22 | 16 | Q.  Showing you stipulation from the second criminal trial? |
| 10:12:25 | 17 | MR. LOEVY:  Your Honor, we'd ask that this be put on |
| 10:12:27 | 18 | the ELMO.  This is page 160. |
| 10:12:29 | 19 | THE COURT:  The jurors can see it. |
| 10:12:30 | 20 | BY MR. LOEVY: |
| 10:12:31 | 21 | Q.  It is stipulated between the parties that the shortest |
| 10:12:34 | 22 | distance between Oakley Boulevard and the entrance to the |
| 10:12:38 | 23 | breezeway of the building, which stood at 706 East 39th |
| 10:12:42 | 24 | Street, as they existed on August 28, 1948 is 500 feet.  That |
| 10:12:47 | 25 | was stipulated at Mr. Fields' trial.  Does that comport with |

11/29/16 AM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 28 of 303 PageID #:64191
***REALTIME UNEDITED TRANSCRIPT ONLY***

27

| | | |
|---|---|---|
| 10:12:50 | 1 | your recollection? |
| 10:12:50 | 2 | A.  Yes. |
| 10:12:51 | 3 | Q.  500 feet is ten times the length of this courtroom from |
| 10:12:54 | 4 | where you're sitting to that wall, would you agree with that? |
| 10:12:57 | 5 | A.  I saw him. |
| 10:12:59 | 6 | Q.  500 feet is triple? |
| 10:13:02 | 7 | A.  500 feet, 500 feet. |
| 10:13:04 | 8 | Q.  Is triple the distance where the boys were playing |
| 10:13:07 | 9 | baseball to the breezeway, correct? |
| 10:13:12 | 10 |         MR. KULWIN:  Objection. |
| 10:13:12 | 11 |         THE COURT:  Argumentative, sustained.  You will argue |
| 10:13:14 | 12 | this later, Mr. Loevy.  You have the stipulation in from the |
| 10:13:16 | 13 | trial. |
| 10:13:17 | 14 | BY MR. LOEVY: |
| 10:13:17 | 15 | Q.  The last question I want to ask is isn't it true that if |
| 10:13:20 | 16 | you were on Oakwood, at best you could have seen a spec in |
| 10:13:24 | 17 | front of that building? |
| 10:13:25 | 18 | A.  No. |
| 10:13:25 | 19 | Q.  You told Mr. Fields and Mr. Carter, that's the spec I want |
| 10:13:31 | 20 | you to murder? |
| 10:13:37 | 21 |         MR. BURNS:  Objection, your Honor. |
| 10:13:38 | 22 |         THE COURT:  Sustained to the form of the question. |
| 10:13:39 | 23 | BY MR. LOEVY: |
| 10:13:50 | 24 | Q.  Yesterday, you walked through with Mr. Burns some details |
| 10:13:53 | 25 | about a Charlie green and Minerva.  And a maroon Oldsmobile |

| | | |
|---|---|---|
| 10:13:57 | 1 | and a radio.  Do you remember answering those questions |
| 10:14:00 | 2 | yesterday? |
| 10:14:01 | 3 | A.  Yes, sir. |
| 10:14:01 | 4 | Q.  Now, those were the questions you went over with Mr. Burns |
| 10:14:06 | 5 | on Sunday, correct? |
| 10:14:07 | 6 | A.  Yes, sir. |
| 10:14:07 | 7 | Q.  If we had asked you those same questions last Friday |
| 10:14:11 | 8 | before the meeting with burns, you would not have been able to |
| 10:14:15 | 9 | give those same details? |
| 10:14:16 | 10 | A.  Probably not. |
| 10:14:16 | 11 | Q.  At the meeting, what you did you went over transcripts? |
| 10:14:19 | 12 | A.  No, I needed my memory refreshing. |
| 10:14:22 | 13 | Q.  They helped refresh your memory? |
| 10:14:24 | 14 | A.  Yeah. |
| 10:14:25 | 15 | Q.  Who was in the car when you were driving over to the |
| 10:14:32 | 16 | murder, sir, who were you with? |
| 10:14:33 | 17 | A.  Hank Andrews. |
| 10:14:36 | 18 | Q.  Are you sure of that? |
| 10:14:37 | 19 | A. |
| 10:14:39 | 20 |          MR. BURNS:  Objection, your Honor. |
| 10:14:40 | 21 |          MR. LOEVY:  All right.  Let me ask him another |
| 10:14:42 | 22 | question. |
| 10:14:42 | 23 | BY MR. LOEVY: |
| 10:14:43 | 24 | Q.  Do you remember testifying on October 1st, 1991, that you |
| 10:14:45 | 25 | were in the car with Nate Fields on the way to the murder? |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 30 of 303 PageID #:64193

| | | |
|---|---|---|
| 10:14:49 | 1 | A.  That's what I said? |
| 10:14:55 | 2 | Q.  Isn't it true you also testified on July 29th, 1996, that |
| 10:15:00 | 3 | you, Nate, and Carter were in the same car and that Andrews |
| 10:15:03 | 4 | was by himself? |
| 10:15:05 | 5 | A.  Yes. |
| 10:15:08 | 6 | Q.  Isn't it true you're making it up each time you tell the |
| 10:15:12 | 7 | story? |
| 10:15:12 | 8 | A.  No. |
| 10:15:12 | 9 | Q.  So your testimony is that Mr. Fields hopped out of a car |
| 10:15:21 | 10 | with Jackie Clay wearing a ski mask, ran up to Fuddy and shot |
| 10:15:26 | 11 | him, basically? |
| 10:15:27 | 12 | A.  That's what happened. |
| 10:15:27 | 13 | Q.  And then they hopped into another car to make their get |
| 10:15:30 | 14 | away? |
| 10:15:30 | 15 | A.  Yes. |
| 10:15:31 | 16 | Q.  So you're saying on a busy morning with people out, they |
| 10:15:35 | 17 | jumped out of his own car and left his car at the scene? |
| 10:15:38 | 18 | A.  I never said that. |
| 10:15:42 | 19 | Q.  All right.  But you did just say he got out of his car in |
| 10:15:45 | 20 | a ski mask, ran over and shot him? |
| 10:15:47 | 21 | A.  You said that. |
| 10:15:48 | 22 | Q.  Okay.  Did he leave his car at the scene? |
| 10:15:49 | 23 | A.  You said that. |
| 10:15:50 | 24 | Q.  Did he leave his car at the scene? |
| 10:15:52 | 25 | A.  No, I said they came from behind the building.  See them. |

10:15:59   1   The next time I seen them, they came through the breezeway.

10:16:02   2   That's my testimony, sir.

10:16:03   3   Q.  The idea was you picked people who weren't familiar with

10:16:05   4   the neighborhood, right?

10:16:06   5   A.  Correct.

10:16:06   6   Q.  Because they didn't want to be recognized, right?

10:16:08   7   A.  Correct.

10:16:08   8   Q.  And they're supposed to wear masks, right?

10:16:10   9   A.  Correct.

10:16:11   10  Q.  And you gave them masks in your story, correct?

10:16:14   11          MR. KULWIN:  Objection to your story, Judge.

10:16:16   12          THE COURT:  Overruled.

10:16:17   13          THE WITNESS:  Yes.

10:16:18   14          MR. KULWIN:  Objection.

10:16:19   15          THE COURT:  I overruled the objection.  I already

10:16:22   16  did.  You got a ruling.

10:16:23   17          MR. KULWIN:  Thank you.

10:16:23   18  BY MR. LOEVY:

10:16:24   19  Q.  Did you see them jump out of Mr. Fields' car?

10:16:25   20  A.  How can I see them jump out of a car and there is a

10:16:28   21  building.  I told you the next time that I seen him, don't try

10:16:31   22  to confuse me, the next time I seen them they were running

10:16:36   23  across the street.

10:16:36   24          THE COURT:  Stop, ask your questions slower, answer

10:16:39   25  the question directly, don't volunteer.  Or I am going to have

11/29/16 AM   ***REALTIME UNEDITED TRANSCRIPT ONLY***

10:16:44   1 | to strike testimony.
10:16:44   2 | BY MR. LOEVY:
10:16:45   3 | Q. Did you see Mr. Fields and Mr. Carter jump out of the car?
10:16:47   4 | A. No, sir.
10:16:48   5 | Q. Did you testify yesterday that you did?
10:16:52   6 |       THE COURT:  The jury heard the testimony from
10:16:53   7 | yesterday.  You'll argue that later.
10:16:55   8 | BY MR. LOEVY:
10:16:55   9 | Q. All right.  The team that was put together according to
10:16:58  10 | you is George Carter, Nate Fields, Hank Andrews and you?
10:17:03  11 | A. Yes, sir.
10:17:04  12 | Q. That was a week before the shooting, the generals and Jeff
10:17:06  13 | Fort who said put together the team, right?
10:17:08  14 | A. Yes, sir.
10:17:09  15 | Q. And that was always the team, Mr. Fields, you, Hank
10:17:13  16 | Andrews and George Carter, that's your testimony, right?
10:17:16  17 | A. What is you asking me.
10:17:18  18 | Q. That was always the team, right?
10:17:19  19 | A. Always what team?
10:17:21  20 | Q. Never mind.
10:17:22  21 |       MR. LOEVY:  May I move on, your Honor?
10:17:24  22 |       THE COURT:  I'd like you to.
10:17:25  23 | BY MR. LOEVY:
10:17:25  24 | Q. All right.  Now, the idea was to pick guys who weren't
10:17:30  25 | familiar from the neighborhood, why did they pick you?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 33 of 303 PageID #:64196
11/29/16 AM       ***REALTIME UNEDITED TRANSCRIPT ONLY***

32

| | | |
|---|---|---|
| 10:17:32 | 1 | A.  Because they wanted me to pick out the guy who it was. |
| 10:17:35 | 2 | Q.  But you didn't know the guy who it was? |
| 10:17:38 | 3 | A.  I didn't know them that familiar, but Rodell was telling |
| 10:17:41 | 4 | me that I knew him. |
| 10:17:42 | 5 | Q.  All right.  Wouldn't it have been better since you're well |
| 10:17:45 | 6 | known in the building to have you not involved? |
| 10:17:48 | 7 | A.  That was the plan. |
| 10:17:50 | 8 | Q.  The plan was it didn't matter if you were known or not |
| 10:17:52 | 9 | because you were going to be wearing masks isn't that true, |
| 10:17:55 | 10 | sir? |
| 10:17:55 | 11 | A.  You are making the plan. |
| 10:17:57 | 12 | Q.  Who did make the plan? |
| 10:17:59 | 13 | A.  I just told you who made the plan. |
| 10:18:02 | 14 | Q.  Who made the plan? |
| 10:18:03 | 15 | A.  We made the plan, the general in our offices in security |
| 10:18:06 | 16 | with Jeff Fort.  If you want to do something else, that's on |
| 10:18:09 | 17 | you. |
| 10:18:09 | 18 | Q.  All right.  Were you wearing a mask that day? |
| 10:18:11 | 19 | A.  No. |
| 10:18:12 | 20 | Q.  Were you concealing yourself in the car? |
| 10:18:15 | 21 | A.  Mostly I was down in the car like this, like this. |
| 10:18:21 | 22 | Q.  Isn't that kind of suspicious looking? |
| 10:18:23 | 23 | THE COURT:  Just for the record he's lunched down |
| 10:18:24 | 24 | with his jacket kind of pulled up over the bottom of his face. |
| 10:18:29 | 25 | BY MR. LOEVY: |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 34 of 303 PageID #:64197
11/29/16 AM
***REALTIME UNEDITED TRANSCRIPT ONLY***

33

| 10:18:29 | 1 | Q. Don't you think that would draw attention to yourself? |
| 10:18:32 | 2 | MR. KULWIN: Objection, speculation. |
| 10:18:33 | 3 | THE COURT: Sustained and argumentative. |
| 10:18:38 | 4 | MR. KULWIN: And argumentative. |
| 10:18:39 | 5 | BY MR. LOEVY: |
| 10:18:40 | 6 | Q. It's your testimony if I understand it with Mr. Burns that |
| 10:18:44 | 7 | Fuddy was standing outside the building for a good half hour |
| 10:18:46 | 8 | before the shooting happened? |
| 10:18:47 | 9 | A. Yes, sir. |
| 10:18:51 | 10 | Q. Because the idea was that Rodell Banks supposedly called |
| 10:18:54 | 11 | you and said he's out there and you then put everybody |
| 10:18:58 | 12 | together and you went over there and he was still out there, |
| 10:19:00 | 13 | right? |
| 10:19:00 | 14 | A. Yes, sir. |
| 10:19:01 | 15 | Q. And the whole time you were there, he was just standing |
| 10:19:04 | 16 | outside the building, right? |
| 10:19:06 | 17 | A. Standing, people coming and going, talking to him, |
| 10:19:09 | 18 | speaking to him. |
| 10:19:10 | 19 | Q. I want to focus on he was present in front of the building |
| 10:19:12 | 20 | for the whole time, right in? |
| 10:19:13 | 21 | THE COURT: Who is the he? |
| 10:19:15 | 22 | MR. LOEVY: He being Fuddy Smith. |
| 10:19:17 | 23 | THE WITNESS: Yes. |
| 10:19:17 | 24 | BY MR. LOEVY: |
| 10:19:17 | 25 | Q. Did he not disappear for ten minutes, did he? He was out |

| 10:19:20 | 1 | there the whole time, right? |
| 10:19:21 | 2 | A. Yes, sir. |
| 10:19:21 | 3 | Q. He did not shortly before the shooting come walking |
| 10:19:24 | 4 | through a breezeway by himself, did he? |
| 10:19:26 | 5 | A. No, sir. |
| 10:19:27 | 6 | Q. And you said he was by himself for most of that time? |
| 10:19:33 | 7 | A. Yes, sir. |
| 10:19:34 | 8 | Q. He was not with Talman Hickman until the very last minute? |
| 10:19:37 | 9 | A. What are you talking about? |
| 10:19:40 | 10 | Q. Who is the other guy that got killed? |
| 10:19:41 | 11 | A. Talman Hickman. |
| 10:19:42 | 12 | Q. Talman Hickman showed up at the very last second, right? |
| 10:19:44 | 13 | A. Yes. |
| 10:19:45 | 14 | Q. All right. So you can say definitively that Talman |
| 10:19:51 | 15 | Hickman and Fuddy did not walk out together shortly before the |
| 10:19:53 | 16 | shooting, correct? |
| 10:19:54 | 17 | A. No, I did not say that. |
| 10:19:56 | 18 | Q. I'm saying you say that didn't happen, right? |
| 10:19:59 | 19 | A. No, I'm saying Fuddy was standing out there and the other |
| 10:20:02 | 20 | guy walked up. |
| 10:20:03 | 21 | Q. At the last second, right? |
| 10:20:04 | 22 | A. Yes. |
| 10:20:04 | 23 | Q. Okay. Now, let's talk a little bit about the bribe |
| 10:20:11 | 24 | testimony you did yesterday. The conversations that you claim |
| 10:20:15 | 25 | Mr. Fields were part of -- strike that. |

11/29/16 AM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 36 of 303 PageID #:64199
***REALTIME UNEDITED TRANSCRIPT ONLY***

35

10:20:17    1          Your attorney, Mr. Swano, was the one who made the

10:20:20    2    bribe, correct?

10:20:21    3    A.  Yes, he was a major part of it, yes.

10:20:24    4    Q.  And Mr. Fields had his own attorney, right?

10:20:28    5    A.  Yes.

10:20:28    6    Q.  And you claim that Mr. Swano talked about the bribe in Mr.

10:20:31    7    Fields' presence, if I understood your testimony yesterday?

10:20:34    8    A.  Yes.

10:20:34    9    Q.  In the bull pen is where you testified that happened,

10:20:36    10   correct?

10:20:36    11   A.  One of the places.

10:20:38    12   Q.  And in fact, when you first told the story, you said the

10:20:42    13   discussions were when he visited you in the basement at the

10:20:45    14   jail, correct?

10:20:45    15   A.  That was one of them.

10:20:47    16   Q.  This is your testimony from the April 14th hearing in this

10:20:54    17   case, page 2705.

10:20:56    18          "QUESTION:  Isn't it true, Mr. Hawkins, that when you

10:20:58    19   first -- when you told this story before about the discussions

10:21:02    20   with Mr. Swano, you testified that Mr. Swano visited you in

10:21:05    21   the basement of the jail with Mr. Fields to talk about the

10:21:07    22   bribe isn't that correct?

10:21:09    23   A.  Yes, sir.

10:21:09    24   Q.  That was your first story.  You changed it to the bull

10:21:12    25   pen, didn't you?

| 10:21:12 | 1 | MR. KULWIN: Objection. |
| 10:21:13 | 2 | MR. BURNS: Objection. |
| 10:21:14 | 3 | THE COURT: Sustained. Argumentative. |

10:21:17   4  BY MR. LOEVY:

10:21:18   5  Q. Now, as far as the time frame, you have no idea when these

10:21:23   6  conversations took place, correct?

10:21:26   7  A. What do you mean?

10:21:32   8  Q. Do you have any time frame when these conversations took

10:21:35   9  place, the time frame that Mr. Fields supposedly heard about

10:21:37  10  the bribe?

10:21:39  11  A. When we were going to court, what are you talking about?

10:21:43  12  Q. Did you ever have these conversations at Cook County?

10:21:47  13  A. Yes, that's where we were at.

10:21:49  14  Q. Isn't it true Mr. Fields and you were in different

10:21:52  15  divisions?

10:21:52  16  A. Yes.

10:21:53  17  Q. You were in six, he was in one?

10:21:54  18  A. You got it backwards.

10:21:56  19  Q. You were in one, he was in six?

10:21:57  20  A. Yes.

10:21:58  21  Q. Different.

10:22:02  22       All right. Did Swano ever tell you he was working

10:22:05  23  with the judge to keep the money?

10:22:07  24  A. No.

10:22:09  25  Q. Your testimony on March 18th, 1993, lines 14, 4 through

10:22:17   1   14?

10:22:18   2              MR. KULWIN:  I'm sorry, what was the date?

10:22:20   3              MR. LOEVY:  3/18/1993.

10:22:22   4              MR. KULWIN:  Can I see the transcript?

10:22:24   5              THE COURT:  Show it to him.

10:22:26   6              MR. KULWIN:  What case it's from?

10:22:29   7              THE COURT:  Actually, this is probably an appropriate

10:22:31   8   place to deal with a question one of the jurors asked.  There

10:22:34   9   was a question that one of the jurors asked, it really wasn't

10:22:36  10   a question for the witness, I'll paraphrase it.  The lawyers

10:22:42  11   are showing statements from or talking about statements from

10:22:45  12   several court dates and trials.  Can we get the dates and what

10:22:49  13   the trials were for.  It's hard to keep up with what they're

10:22:53  14   talking about.  Maybe I missed something.

10:22:54  15              So here's the answer to that question.  So you've

10:22:58  16   heard that there were two criminal trials of Mr. Fields.  1986

10:23:02  17   and 2009.  And when questions have been asked about those, I

10:23:06  18   have tried to kind of pop in if the lawyers haven't identified

10:23:08  19   them to identify which criminal trial it is.

10:23:10  20              There have been other occasions on which various

10:23:14  21   witnesses have testified on matters relating to the issues

10:23:16  22   that we have here.  There's a whole bunch of them.  And as a

10:23:21  23   matter of evidence law, it's really not appropriate for me to

10:23:24  24   be going into for the lawyers to be going into exactly what

10:23:27  25   the proceeding involved.  So you're just going to have to do

10:23:30  1  your best to keep notes and whatnot.

10:23:34  2      I will tell you this.  It's been my consistent

10:23:36  3  experience over the quick math, 17 years I have been a judge,

10:23:43  4  about the same, 18 years that I was a lawyer before that, that

10:23:47  5  12 of you will do way better than one of you at remembering

10:23:50  6  things.  That's why we have 12 jurors as opposed to one.

10:23:53  7      MR. KULWIN:  Judge, I'd like to be heard on this.

10:23:55  8      THE COURT:  Let me see you at sidebar.

10:24:02  9   (The following proceedings were had at sidebar outside the

10:24:04  10  hearing of the jury:)

10:24:04  11      THE COURT:  By the way, you have blown way through 20

10:24:07  12  minutes.  How much more do you have?  You told me 20

10:24:09  13  yesterday.

10:24:09  14      MR. LOEVY:  I was trying to compress it to finish by

10:24:12  15  the day.

10:24:12  16      THE COURT:  Life, one of the other things that life

10:24:15  17  has taught me, that most lawyers I give them overnight, they

10:24:20  18  shorten up.  They shorten it.

10:24:22  19      MR. LOEVY:  No.

10:24:23  20      THE COURT:  So you're the exception that disproves

10:24:25  21  the rule.

10:24:25  22      MR. KULWIN:  Shorter if I have more time.

10:24:27  23      THE COURT:  What's the -- will the me look at this.

10:24:30  24  This is testimony from what proceeding?

10:24:32  25      MR. LOEVY:  You told me not to read the trial name.

***REALTIME UNEDITED TRANSCRIPT ONLY***

10:24:35  1    THE COURT:  U.S. v. Maloney.  What's the question?

10:24:41  2    MR. KULWIN:  My point is we weren't given any notice

10:24:44  3  that he was going to pull this transcript out.  Had he given

10:24:47  4  me in I notice, I would have gone and searched the transcript.

10:24:50  5  I don't know if this is the whole context or not.  He could

10:24:53  6  have six pages later clarified it.  I think it's unfair.

10:24:59  7    THE COURT:  Wow.  That objection is overruled.

10:25:02  8    MR. KULWIN:  Okay.

10:25:02  9    THE COURT:  I got to say something more about this.

10:25:05  10  Everybody knows about this witness' prior testimony.  I'll

10:25:08  11  just say this.  Okay?  These were, I'm looking at the

10:25:11  12  transcript from the Maloney trial, it's leading questions by

10:25:15  13  Mr. Hogan, Mr. Hogan being the lawyer who spent the most time

10:25:20  14  than anybody in the entire world with this witness, they are

10:25:23  15  leading questions from Mr. Hogan.  I mean, I think you can be

10:25:27  16  relatively comfortable.

10:25:31  17    MR. NOLAND:  Judge, I would like to bring out at the

10:25:33  18  last trial the Court barred, this Court, you barred us from

10:25:37  19  getting into prior consistent statement of both Hawkins in

10:25:41  20  July of '87 that he told the FBI and Pat Deedee that Fields

10:25:45  21  was surprised of the bribe.  Mr. Loevy just stated that isn't

10:25:48  22  it true the first time you told this story was in 2014.  That

10:25:52  23  is incorrect.  I think that has opened the door to this

10:25:54  24  statement.  It has two references in there that prior to the

10:25:57  25  trial, that he, Swano, talked to him about the bribe, he told

10:26:01    1    Fields.

10:26:01    2            THE COURT:  Show me.

10:26:03    3            MR. NOLAND:  I highlighted both for the Court.

10:26:05    4            THE COURT:  We can all look at it.  The doctor said

10:26:09    5    it's likely just my asthma.

10:26:15    6            So really, the one thing -- the one part in here that

10:26:33    7    would potentially be admissible on this theory is the

10:26:35    8    statement on the second full paragraph on page 2 of this 302

10:26:40    9    involving an interview on July 1, 1997, Defense Exhibit 113

10:26:45   10    that Hawkins advised that based on his prior experience with

10:26:47   11    Swano who represented him on other cases he told Fields and

10:26:51   12    Carter that Swano probably asked for 20,000 for the judge and

10:26:53   13    would probably keep 5,000 for himself.  It's a commission.

10:26:59   14            MR. LOEVY:  Mr. Noland said that I said the first

10:27:02   15    time he ever told anybody, and I don't know if he is being

10:27:04   16    precise with his question, you have the realtime, I guess I

10:27:07   17    would want to know.

10:27:08   18            THE COURT:  Let me look at it.  I am glad I looked at

10:27:55   19    that.  I think actually Mr. Noland let me say two things.

10:28:01   20    What the questions involved that Mr. Loevy asked was isn't it

10:28:03   21    a fact that the first time you told the story about Mr. Fields

10:28:11   22    being told about the bribe, you said that it happened in the

10:28:15   23    basement of the jail.  So he didn't say that the first time he

10:28:19   24    told the story about Mr. Fields knowing that the bribe was

10:28:22   25    2014.  I don't see that in the transcript.  So there's no

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 42 of 303 PageID #:64205
11/29/16 AM                     ***REALTIME UNEDITED TRANSCRIPT ONLY***

41

| | | |
|---|---|---|
| 10:28:24 | 1 | basis for a prior consistent. |
| 10:28:29 | 2 | (The following proceedings were had in open court in the |
| 10:28:41 | 3 | presence and hearing of the jury:) |
| 10:28:41 | 4 | THE COURT:  You can proceed. |
| 10:28:41 | 5 | BY MR. LOEVY: |
| 10:28:42 | 6 | Q.  The question was did Swano tell you that he was working on |
| 10:28:50 | 7 | the judge trying to keep the money? |
| 10:28:51 | 8 | A.  Yes, that came up before. |
| 10:28:53 | 9 | Q.  Why did you say no a minute ago? |
| 10:28:55 | 10 | MR. BURNS:  Objection, your Honor? |
| 10:28:56 | 11 | THE COURT:  Sustained.  Leave it for argument. |
| 10:28:58 | 12 | BY MR. LOEVY: |
| 10:28:59 | 13 | Q.  All right.  Another time you told the story, you claimed |
| 10:29:04 | 14 | the judge kept the money until the verdict isn't that true, |
| 10:29:07 | 15 | sir? |
| 10:29:07 | 16 | A.  Yeah. |
| 10:29:09 | 17 | Q.  Is that true that the judge kept the money until the |
| 10:29:12 | 18 | verdict? |
| 10:29:12 | 19 | A.  When I found out that he gave the money back, I thought |
| 10:29:16 | 20 | the verdict was in. |
| 10:29:17 | 21 | Q.  All right.  Another time you told the story, the judge |
| 10:29:20 | 22 | gave it back two days into the trial, isn't it true? |
| 10:29:26 | 23 | MR. KULWIN:  Judge, I am going to object to |
| 10:29:28 | 24 | foundation.  We don't have a foundation. |
| 10:29:29 | 25 | THE COURT:  Sustained. |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 43 of 303 PageID #:64206
11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

42

| | | |
|---|---|---|
| 10:29:30 | 1 | BY MR. LOEVY: |
| 10:29:30 | 2 | Q. Isn't it true you testified on October 29th, 19991, that |
| 10:29:34 | 3 | the judge gave the bribe money back two days into the trial, |
| 10:29:37 | 4 | did you give that testimony? |
| 10:29:38 | 5 | A. Yes, sir. |
| 10:29:39 | 6 | Q. Was that true? |
| 10:29:40 | 7 | A. I thought it was, yes. |
| 10:29:42 | 8 | Q. All right. That's different than the other stores stories |
| 10:29:47 | 9 | is it not? |
| 10:29:47 | 10 | THE COURT: Same, argumentative. |
| 10:29:49 | 11 | BY MR. LOEVY: |
| 10:29:50 | 12 | Q. Did Swano ever say he was going to come up with the bribe |
| 10:29:52 | 13 | money from his own pocket? |
| 10:29:53 | 14 | A. No, I never heard that. |
| 10:29:55 | 15 | Q. This is your testimony on 3/18/1993 at page 1680. |
| 10:30:00 | 16 | "QUESTION: Did Swano ever tell you that he was going |
| 10:30:02 | 17 | to come up with 6,000 out of his own pocket? |
| 10:30:04 | 18 | "ANSWER: Yeah." |
| 10:30:06 | 19 | Did you give that testimony, sir? |
| 10:30:07 | 20 | A. Yes. |
| 10:30:08 | 21 | Q. When Swano told you that the money was giving the money |
| 10:30:15 | 22 | back, who was present for this conversation, sir? |
| 10:30:18 | 23 | A. When he said he was giving the money back? |
| 10:30:21 | 24 | Q. The judge was going to give the money back, who was |
| 10:30:24 | 25 | present? |

| | | |
|---|---|---|
| 10:30:24 | 1 | A. Me and Swano and probably Jack sweeten. |
| 10:30:35 | 2 | Q. Do you remember saying in 2013 that George Carter was |
| 10:30:40 | 3 | present? |
| 10:30:40 | 4 | A. Yes. |
| 10:30:40 | 5 | Q. Was he present? |
| 10:30:41 | 6 | A. I thought he was. |
| 10:30:42 | 7 | Q. His case had been severed long before, correct? |
| 10:30:44 | 8 | A. Long before. |
| 10:30:44 | 9 | Q. Right. |
| 10:30:46 | 10 | A. No, it wasn't long before. |
| 10:30:47 | 11 | Q. Was George Carter present when the bribe was talked about |
| 10:30:51 | 12 | or not, sir? |
| 10:30:51 | 13 | A. No, not that I remember. |
| 10:30:54 | 14 | Q. Okay. Do you remember giving this testimony in August |
| 10:30:57 | 15 | 2013 at page 188, line 19: At some point during the trial, |
| 10:31:03 | 16 | later on in the trial, did you later -- did Swano give you |
| 10:31:05 | 17 | some bad news? |
| 10:31:06 | 18 | "ANSWER: Yes. |
| 10:31:08 | 19 | "QUESTION: Where did you talk to Swano? |
| 10:31:10 | 20 | "ANSWER: In the bull pen |
| 10:31:11 | 21 | "QUESTION: Who was present for that conversation? |
| 10:31:13 | 22 | "ANSWER: Nathson Fields, George Carter. |
| 10:31:16 | 23 | "QUESTION: What, if anything, did he tell you? |
| 10:31:18 | 24 | "ANSWER: He said I got some bad news for you. |
| 10:31:21 | 25 | "QUESTION: What did he say? |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 45 of 303 PageID #:64208

| | | |
|---|---|---|
| 10:31:22 | 1 | "ANSWER:  I said what are you talking about?  He said |
| 10:31:25 | 2 | the judge -- he want to give the money back.  I said what? |
| 10:31:29 | 3 | Did you give that testimony, sir? |
| 10:31:31 | 4 | A. Yes, sir. |
| 10:31:31 | 5 | Q. You're making this up as you go along? |
| 10:31:34 | 6 | MR. KULWIN:  Objection. |
| 10:31:35 | 7 | THE COURT:  Sustained. |
| 10:31:37 | 8 | BY MR. LOEVY: |
| 10:31:38 | 9 | Q. Do you recall whether there was a problem with getting the |
| 10:31:39 | 10 | bribe money together? |
| 10:31:41 | 11 | A. Yes, sir. |
| 10:31:45 | 12 | Q. What was the problem? |
| 10:31:46 | 13 | A. That he wanted to make sure that it was for all his men, |
| 10:31:50 | 14 | that's my knowledge. |
| 10:31:51 | 15 | Q. What's that? |
| 10:31:51 | 16 | A. He wanted to make sure that it was for everybody, that was |
| 10:31:56 | 17 | in the situation. |
| 10:31:57 | 18 | Q. Swano didn't have any money, right? |
| 10:31:59 | 19 | A. I don't know what Swano had. |
| 10:32:00 | 20 | Q. He didn't have the bribe money, wasn't that the problem? |
| 10:32:04 | 21 | A. You are talking about getting him the money, yes. |
| 10:32:06 | 22 | Q. Wasn't that a problem that Swano didn't have the bribe |
| 10:32:09 | 23 | money, there was some kind of delay, do you remember that, yes |
| 10:32:13 | 24 | or no? |
| 10:32:13 | 25 | MR. KULWIN:  Or I don't recall either. |

| | | |
|---|---|---|
| 10:32:16 | 1 | THE COURT:  The question is -- no, do you remember |
| 10:32:18 | 2 | that? |
| 10:32:19 | 3 | MR. KULWIN:  Okay. |
| 10:32:20 | 4 | THE COURT:  It would have to be yes or no. |
| 10:32:23 | 5 | THE WITNESS:  Your question? |
| 10:32:24 | 6 | BY MR. LOEVY: |
| 10:32:25 | 7 | Q.  Was there some kind of unexplained delay in getting the |
| 10:32:27 | 8 | money?  Do you remember that being part of the story? |
| 10:32:30 | 9 | A.  It took time to get the money together and we got it to |
| 10:32:40 | 10 | him when we could, yes. |
| 10:32:41 | 11 | Q.  The criminal case got continued to June 11th, 1986, and |
| 10:32:47 | 12 | there was still no money, correct? |
| 10:32:49 | 13 | A.  Okay. |
| 10:32:49 | 14 | Q.  I'm asking.  Is that what happened? |
| 10:32:50 | 15 | A.  Okay. |
| 10:32:51 | 16 | Q.  Is that what happened? |
| 10:32:52 | 17 | A.  Okay. |
| 10:32:53 | 18 | Q.  No okay is ambiguous.  I'm asking you? |
| 10:32:56 | 19 | MR. KULWIN:  Judge, I am going to object. |
| 10:32:57 | 20 | Argumentative. |
| 10:32:57 | 21 | THE COURT:  Well, it may be argumentative, but it's |
| 10:33:00 | 22 | right.  So you need to answer it yes or no or I don't know: |
| 10:33:04 | 23 | Those are the possibilities. |
| 10:33:08 | 24 | THE WITNESS:  I don't know. |
| 10:33:08 | 25 | BY MR. LOEVY: |

10:33:09   1   Q.  Isn't it true you testified on March 18th, 1993, at page

10:33:12   2   1553, lines 20 as follows:

10:33:16   3        "QUESTION:  Now, once again, was your case continued

10:33:19   4   from May 12th until June 11th?

10:33:21   5        "ANSWER:  Yes.

10:33:22   6        "QUESTION:  In that intervening period, sir, in May and

10:33:25   7   June, were there continuing conversations about trying to get

10:33:28   8   the money to Bill Swano?

10:33:30   9        "ANSWER:  Yes."

10:33:33   10       Do you remember that testimony, sir?

10:33:34   11  A.  Yes, sir.

10:33:35   12  Q.  Isn't it true you had to decide whether you were going to

10:33:38   13  pick a jury or a bench before you knew there was going to be a

10:33:41   14  bribe?

10:33:41   15  A.  I don't understand the question.

10:33:45   16  Q.  The money hadn't been gathered yet, correct?

10:33:47   17  A.  Okay.

10:33:48   18  Q.  So the bribe hadn't been paid, correct?

10:33:50   19  A.  Yes, sir.

10:33:51   20  Q.  So you had to choose jury or a bench before you knew if

10:33:56   21  there was going to be a bribe, correct?

10:33:56   22  A.  No, sir.

10:33:57   23  Q.  If there hadn't been any money, how could it have been

10:34:00   24  paid?

10:34:00   25  A.  The plan could have been in the making, they just didn't


                      ***REALTIME UNEDITED TRANSCRIPT ONLY***

10:34:04  1 | put the money on there.

10:34:05  2 | Q.  Was that the plan --

10:34:06  3 | A.  That's what I thought was going on.

10:34:08  4 | Q.  But you knew no bribe had been paid at the time that the

10:34:10  5 | criminal trial started, correct?

10:34:12  6 | A.  I don't understand your question.

10:34:16  7 | Q.  At the time the trial started, you knew that although you

10:34:21  8 | had a plan, no bribe had been paid, correct?

10:34:23  9 | A.  I still don't understand.  You're saying before the trial

10:34:27 10 | started?

10:34:28 11 | Q.  Right.  The trial started --

10:34:30 12 |         THE COURT:  He's asking whether the bribe was paid

10:34:32 13 | before the trial started.

10:34:33 14 |         THE WITNESS:  That's --

10:34:35 15 |         THE COURT:  Yes or no?

10:34:38 16 |         THE WITNESS:  Before the trial started, if it's a

10:34:39 17 | bribe, it would have to be paid before the trial started.

10:34:42 18 |         THE COURT:  He's asking whether it was.

10:34:45 19 | BY MR. LOEVY:

10:34:45 20 | Q.  You said there was a plan.  I'm asking did the plan

10:34:48 21 | happened before the trial started?

10:34:49 22 | A.  As I remember, yes.

10:34:50 23 | Q.  Okay.  Do you remember this testimony, this is page 181 of

10:34:53 24 | the 2013 proceeding.

10:34:55 25 |         "QUESTION:  Did you have additional conversations with

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 10:34:59 | 1 | El Rukns on still trying to get the money together? |
| 10:35:01 | 2 | "ANSWER: Yes. |
| 10:35:01 | 3 | "QUESTION: Again, was your case -- |
| 10:35:03 | 4 | THE COURT: Slower, please. |
| 10:35:05 | 5 | BY MR. LOEVY: |
| 10:35:06 | 6 | Q. Again, was your case continued once more from June 11th, |
| 10:35:09 | 7 | to June 16th? Your answer yes. Did the case get continued to |
| 10:35:14 | 8 | the next date, June 17th? |
| 10:35:15 | 9 | "ANSWER: Yes. |
| 10:35:17 | 10 | "QUESTION: At that point you elected to either take a |
| 10:35:19 | 11 | bench trial or a jury trial? |
| 10:35:20 | 12 | "ANSWER: I don't think so |
| 10:35:22 | 13 | "QUESTION: Well, the first time that your case was |
| 10:35:24 | 14 | called that morning was Swano even there? |
| 10:35:26 | 15 | "ANSWER: I don't think so. I think they had to wait |
| 10:35:28 | 16 | on it. |
| 10:35:29 | 17 | "QUESTION: Did he finally appear to court on June |
| 10:35:31 | 18 | 17th? |
| 10:35:32 | 19 | "ANSWER: Yes. |
| 10:35:33 | 20 | "QUESTION: On that day, did you finally take or elect |
| 10:35:36 | 21 | to take a bench trial finally? |
| 10:35:38 | 22 | "ANSWER: Yes, sir. |
| 10:35:39 | 23 | "QUESTION: Did Fields take a bench trial on that date |
| 10:35:41 | 24 | as well? |
| 10:35:42 | 25 | "ANSWER: Yes, sir." |

| | | |
|---|---|---|
| 10:35:43 | 1 | Did you give that testimony, sir |
| 10:35:44 | 2 | MR. KULWIN: I object. |
| 10:35:45 | 3 | MR. LOEVY: That has the date. |
| 10:35:46 | 4 | THE COURT: Overruled. |
| 10:35:47 | 5 | THE WITNESS: Yes, sir. |
| 10:35:47 | 6 | BY MR. LOEVY: |
| 10:35:48 | 7 | Q. The date was June 17th, correct? |
| 10:35:51 | 8 | A. Okay. |
| 10:35:53 | 9 | Q. Now, when do you claim that you and Mr. Fields learned |
| 10:35:57 | 10 | that Maloney was giving the money back? |
| 10:36:00 | 11 | A. We was in trial already. |
| 10:36:09 | 12 | Q. The trial had already started, right? |
| 10:36:12 | 13 | A. Yes. |
| 10:36:12 | 14 | Q. So according to you, no, I'm sorry, this is your testimony |
| 10:36:16 | 15 | in this court before Judge Kennelly on April 2014 at page 267, |
| 10:36:22 | 16 | line 19. |
| 10:36:23 | 17 | "QUESTION: Just to clarify in my mind, when was it |
| 10:36:28 | 18 | that you first learned that the money had been given back by |
| 10:36:31 | 19 | Judge Maloney at the time of the bribe? When was the first |
| 10:36:34 | 20 | time you learned? |
| 10:36:34 | 21 | "ANSWER: A couple of days before the trial. |
| 10:36:39 | 22 | "QUESTION: Before the trial began or when? And then |
| 10:36:44 | 23 | Judge Kennelly said he just said a couple of days before the |
| 10:36:47 | 24 | trial. |
| 10:36:48 | 25 | "QUESTION: Okay. And then Mr. Burns asked you |

| | | |
|---|---|---|
| 10:36:51 | 1 | MR. KULWIN:  May I have a page, please, Judge? |
| 10:36:53 | 2 | MR. LOEVY:  2679 and 2680. |
| 10:36:56 | 3 | THE COURT:  That's what he said. |
| 10:36:57 | 4 | MR. LOEVY:  The question again was the money for the |
| 10:36:59 | 5 | bribe had been returned, though, correct, sir?  Yes, sir.  Did |
| 10:37:03 | 6 | you give that testimony in this court. |
| 10:37:04 | 7 | THE WITNESS:  Yes, sir. |
| 10:37:04 | 8 | BY MR. LOEVY: |
| 10:37:05 | 9 | Q.  All right.  Was it true? |
| 10:37:06 | 10 | A.  No, sir. |
| 10:37:06 | 11 | Q.  Did you intentionally give untruthful testimony in May |
| 10:37:11 | 12 | 2014? |
| 10:37:11 | 13 | A.  No, sir. |
| 10:37:12 | 14 | Q.  If the money had been given back once the trial -- before |
| 10:37:21 | 15 | the trial began, as you testified in 2014, then would you have |
| 10:37:26 | 16 | known that the heat was on, correct? |
| 10:37:27 | 17 | A.  What's your question, sir? |
| 10:37:30 | 18 | Q.  Once the money was given back, then would you have known |
| 10:37:34 | 19 | that you have a problem, right? |
| 10:37:34 | 20 | A.  Yes. |
| 10:37:36 | 21 | Q.  All right.  And if the money was given back before the |
| 10:37:38 | 22 | trial and if that was true that it was given back before the |
| 10:37:43 | 23 | trial, then when you make an election, you knew you should |
| 10:37:45 | 24 | have stayed away from Judge Maloney, correct? |
| 10:37:47 | 25 | A.  What's your question, sir? |

| 10:37:50 | 1 | Q. The reason the money coming back was a problem because |
| 10:37:53 | 2 | that would suggest you're in more trouble, right, he's going |
| 10:37:56 | 3 | to convict, right? |
| 10:37:57 | 4 | A. That could be one way looking at it. |
| 10:37:59 | 5 | Q. All right. But you knew before the trial started that he |
| 10:38:03 | 6 | was giving the money back, didn't you? |
| 10:38:04 | 7 | A. No. |
| 10:38:04 | 8 | Q. And you knew before you had to elect a jury or bench that |
| 10:38:08 | 9 | he had given the money back, correct? |
| 10:38:10 | 10 | A. No. |
| 10:38:10 | 11 | Q. But that is what you testified to under oath in 2014? |
| 10:38:13 | 12 | A. Yes. |
| 10:38:13 | 13 | Q. When was Mr. Fields arrested, sir? |
| 10:38:15 | 14 | A. I don't know. |
| 10:38:16 | 15 | Q. Why did you tell Mr. Kulwin yesterday that -- |
| 10:38:20 | 16 | A. Because I thought. |
| 10:38:22 | 17 | Q. Mr. Kulwin said isn't it true he was arrested in June 85 |
| 10:38:25 | 18 | and you said yes, sir? |
| 10:38:26 | 19 | MR. KULWIN: Objection, Judge. I don't think I said |
| 10:38:28 | 20 | that. |
| 10:38:28 | 21 | THE COURT: Overruled. |
| 10:38:28 | 22 | BY MR. LOEVY: |
| 10:38:29 | 23 | Q. You said yes, sir, right? |
| 10:38:30 | 24 | A. Okay. A little while after me, I knew that. |
| 10:38:32 | 25 | Q. But you didn't know the answer even though you said yes, |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 10:38:35 | 1 | sir, correct? |
| 10:38:36 | 2 | A. I don't know the answer to a lot of stuff you're saying |
| 10:38:39 | 3 | I'm saying yes, sir. |
| 10:38:40 | 4 | Q. All right. How about the questions he was asking you |
| 10:38:43 | 5 | about the prosecution memos. Do you know exactly when you saw |
| 10:38:47 | 6 | the prosecution memos, was it before you testified, after you |
| 10:38:50 | 7 | testified, you don't know the sequence, do you? |
| 10:38:51 | 8 | A. No, sir. |
| 10:38:52 | 9 | Q. So when you asked you yesterday, isn't it true you had |
| 10:38:55 | 10 | already given all of your testimony and you already locked it |
| 10:38:57 | 11 | in before you saw the prosecution memos, why did you say yes, |
| 10:39:00 | 12 | sir to those questions? |
| 10:39:02 | 13 | THE COURT: There is no human being that could have |
| 10:39:04 | 14 | understood all of the words that you said so quickly. If you |
| 10:39:07 | 15 | want to ask the question, slow it down. |
| 10:39:10 | 16 | BY MR. LOEVY: |
| 10:39:11 | 17 | Q. You have no idea at what point you saw the prosecution |
| 10:39:14 | 18 | memos, right? |
| 10:39:15 | 19 | A. That's the question? |
| 10:39:16 | 20 | Q. Yes. |
| 10:39:16 | 21 | A. How do you know I know I did? |
| 10:39:18 | 22 | Q. I thought you told me that three questions ago? |
| 10:39:20 | 23 | A. I didn't tell you that. You made it up. |
| 10:39:22 | 24 | Q. Do you know the timing of when you saw the prosecution |
| 10:39:24 | 25 | memos? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 10:39:24 | 1 | A. No, sir. |
| 10:39:25 | 2 | Q. Okay. Then we have established that. |
| 10:39:26 | 3 | Yesterday, when Mr. Kulwin started asking you |
| 10:39:29 | 4 | questions, he was saying to you isn't it true, sir, that you |
| 10:39:32 | 5 | didn't see the prosecution memos until after you had already |
| 10:39:36 | 6 | put Nate in the story, you said yes, sir, didn't you? |
| 10:39:38 | 7 | A. Yes, sir. |
| 10:39:39 | 8 | Q. Okay. You said that even though you had no idea what he |
| 10:39:42 | 9 | was talking about, didn't you? |
| 10:39:43 | 10 | A. I knew exactly what he was talking about. |
| 10:39:47 | 11 | Q. Okay. Same questions for when you first told O'Callaghan |
| 10:39:51 | 12 | that he was not involved in Vaughn/White. Do you remember |
| 10:39:53 | 13 | what year it was that you first told O'Callaghan that Nate was |
| 10:39:57 | 14 | not involved in the Vaughn/White murder? |
| 10:39:58 | 15 | A. No, sir. |
| 10:39:59 | 16 | Q. Then why did you testify yesterday? |
| 10:40:01 | 17 | A. Because it refreshed my memory, he refreshed my memory. |
| 10:40:05 | 18 | Q. Is it still refreshed? |
| 10:40:10 | 19 | A. Yes. |
| 10:40:10 | 20 | Q. What year was it? |
| 10:40:11 | 21 | A. I don't know, 78, 91, somewhere between there. |
| 10:40:15 | 22 | Q. All right. Let's talk about your memory of the events of |
| 10:40:19 | 23 | your capital murder trial. |
| 10:40:20 | 24 | Do you remember how you were identified -- how the |
| 10:40:23 | 25 | witnesses identified the people in the get away car? |

11/29/16 AM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 55 of 303 PageID #:64218
***REALTIME UNEDITED TRANSCRIPT ONLY***

54

| | |
|---|---|
| 10:40:25 | 1 |
| 10:40:27 | 2 |
| 10:40:29 | 3 |
| 10:40:31 | 4 |
| 10:40:34 | 5 |
| 10:40:37 | 6 |
| 10:40:40 | 7 |
| 10:40:41 | 8 |
| 10:40:41 | 9 |
| 10:40:43 | 10 |
| 10:40:47 | 11 |
| 10:40:48 | 12 |
| 10:40:49 | 13 |
| 10:40:52 | 14 |
| 10:40:53 | 15 |
| 10:40:56 | 16 |
| 10:40:57 | 17 |
| 10:40:58 | 18 |
| 10:41:01 | 19 |
| 10:41:03 | 20 |
| 10:41:07 | 21 |
| 10:41:08 | 22 |
| 10:41:11 | 23 |
| 10:41:12 | 24 |
| 10:41:13 | 25 |

MR. KULWIN:  Judge, I am going to object.  This has been asked and answered, gone over and outside the scope.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  Mr. Kulwin asked you some questions about Randy Langston and James Speights.  Do you remember those questions from yesterday?

A.  Yes, sir.

Q.  Isn't it true that the police were talking to you before the retrial but they needed an explanation for why Randy's testimony was all over the board?

MR. KULWIN:  Objection, argumentative.

THE COURT:  Sustained.  It was covered.

BY MR. LOEVY:

Q.  Mr. Kulwin asked you isn't it true you solved like 20, 30 murders, do you remember those questions?

A.  Yes, sir.

Q.  Some of those murders you actually knew about and some of them you didn't, isn't that true, sir?

A.  Some of them I had firsthand knowledge and some of them I had second knowledge.

Q.  Some of them they read you that grand jury statement and you said yes, sir?

MR. KULWIN:  Objection, argumentative.

THE COURT:  Sustained.

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 56 of 303 PageID #:64219
11/29/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

55

10:41:13  1  BY MR. LOEVY:

10:41:14  2  Q.  All right.  Let's talk about your sentence and the

10:41:20  3  calculations.  Do you remember when Mr. Kulwin was asking you

10:41:22  4  those questions yesterday about in this and that and this and

10:41:25  5  that.  Did you know into he was talking about?

10:41:27  6  A.  I knew exactly what he was talking about when he was

10:41:29  7  talking about my sentence.

10:41:31  8  Q.  In 2014 when you testified in this court, what was your

10:41:34  9  understanding of your out date?

10:41:35  10  A.  September 2016.

10:41:38  11  Q.  All right.  You allowed the Court and the participants to

10:41:45  12  have the impression that it was 2027, didn't you?

10:41:50  13  A.  That's not my fault.

10:41:51  14  Q.  Did you discuss with the attorneys in the context of your

10:41:54  15  testimony whether there's going to be something in it for you?

10:41:57  16  A.  No, sir.

10:41:58  17  Q.  It didn't come up at all?

10:42:00  18  A.  No, sir.

10:42:01  19  Q.  You did get a sentence break, did you not?

10:42:07  20         MR. BURNS:  Objection?

10:42:07  21         MR. LOEVY:

10:42:08  22         THE WITNESS:  Yes, sir.

10:42:08  23  BY MR. LOEVY:

10:42:09  24  Q.  You're saying you never talked about it with them?

10:42:11  25         THE COURT:  The objection to the previous question is

| | | |
|---|---|---|
| 10:42:14 | 1 | overruled. |
| 10:42:14 | 2 | BY MR. LOEVY: |
| 10:42:14 | 3 | Q.  You say that when the attorneys were saying it was 2027? |
| 10:42:17 | 4 | MR. KULWIN:  Could you. |
| 10:42:19 | 5 | BY MR. LOEVY: |
| 10:42:19 | 6 | Q.  When Mr. Burns was saying in -- |
| 10:42:24 | 7 | A.  I tried to, but they kept saying let's go.  I knew what it |
| 10:42:28 | 8 | was. |
| 10:42:28 | 9 | Q.  Did you explain that to Mr. Burns? |
| 10:42:29 | 10 | A.  I tried to explain it to anybody that was in any of these |
| 10:42:32 | 11 | hearings before we started, sir. |
| 10:42:33 | 12 | Q.  That's the critical part.  Before we even started, did you |
| 10:42:36 | 13 | try to explain that to Mr. Burns? |
| 10:42:38 | 14 | A.  Yes, sir. |
| 10:42:38 | 15 | Q.  Tell me what you remember about that? |
| 10:42:41 | 16 | A.  As I was explaining to people. |
| 10:42:43 | 17 | THE COURT:  I need to see the lawyers at sidebar. |
| 10:42:48 | 18 | (The following proceedings were had at sidebar outside the |
| 10:42:54 | 19 | hearing of the jury:) |
| 10:42:54 | 20 | THE COURT:  Okay.  So you're now 40 minutes which is |
| 10:42:57 | 21 | double the estimate and the only reason it's 40 as opposed to |
| 10:43:03 | 22 | 50, your treading on thin ice because you are essentially |
| 10:43:07 | 23 | inviting him to bring out that there was a prior trial in the |
| 10:43:10 | 24 | case.  That's number one.  Actually that's number two. |
| 10:43:13 | 25 | No. 3 is that you are repeating the direct and just |

10:43:15   1   because a subject was covered on cross doesn't mean you get to

10:43:18   2   repeat the direct over again.  So I am going to ask you again,

10:43:22   3   or I guess fool me once, shame on me or you, fool me twice

10:43:27   4   shame on me or I don't know which way that works, whatever,

10:43:31   5   how much more do you have?

10:43:31   6          MR. LOEVY:  Less than five minutes even before you

10:43:33   7   said that.  I am at the very end.  This is an important

10:43:36   8   subject for this reason.  In 2014, Mr. Burns said you're in

10:43:40   9   until 2017.  Yesterday, Mr. Kulwin said you knew the whole

10:43:43  10   time you were getting out in 2016.  Those are 100 percent

10:43:47  11   opposite positions and it's a real problem.  One of them is

10:43:50  12   very wrong.

10:43:52  13          MR. KULWIN:  Well, I am going to say.

10:43:54  14          THE COURT:  Go ahead.

10:43:55  15          MR. KULWIN:  I want to say that's completely wrong.

10:44:03  16   Thing number one is what Mr. Burns brought out was I guess at

10:44:07  17   the 2014 trial, I wasn't here, when -- what was the out date.

10:44:12  18          THE COURT:  Yesterday, he said 2016.

10:44:15  19          MR. KULWIN:  What he thought was, that's what he

10:44:17  20   believed.  Okay?  And that's what led to the problem because

10:44:22  21   you were saying 2025 and he's going no, I think it's 2016.

10:44:26  22   It's right on the transcript.  He was under a belief different

10:44:30  23   from what all the lawyers were telling him.  I made that

10:44:32  24   perfectly clear.

10:44:33  25          MR. BURNS:  Just so we have the transcript from that

10:44:36    1    prior proceeding.

10:44:36    2           THE COURT:   Page 2679.

10:44:38    3           MR. BURNS:   We did have a discussion.  He was talking

10:44:41    4    about the 2016 release.  The Court at that time, and you had

10:44:44    5    some concerns about going into other matters and what was

10:44:47    6    happening, so we stopped the testimony and did not get into an

10:44:50    7    explanation at that time.  That's what I believe the

10:44:56    8    transcript represents.

10:44:56    9           THE COURT:   Wow, okay.  I am going to say something

10:44:59   10    that lawyers say.  The fact that I am not responding to that

10:45:02   11    does not mean I agree with what you said because I don't.

10:45:07   12           Here's the deal.  We are getting off the field here.

10:45:11   13    You now have five minutes.

10:45:13   14           MR. LOEVY:   Yeah.

10:45:13   15           THE COURT:   Okay.

10:45:18   16     (The following proceedings were had in open court in the

10:45:23   17    presence and hearing of the jury:)

10:45:23   18           THE COURT:   Okay.  Proceed.

10:45:23   19    BY MR. LOEVY:

10:45:31   20    Q.  All right.  Sir, since 1996, you have not cooperated

10:45:35   21    against any people except Nate Fields, correct?

10:45:39   22    A.  Yes, sir.

10:45:40   23    Q.  And in 1994 or 1996, your out date was 2027, correct?

10:45:46   24    A.  As I told you many times and anybody else that's been

10:45:55   25    listening, my understanding of my out date was September 2016.

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 60 of 303 PageID #:64223
11/29/16 AM
***REALTIME UNEDITED TRANSCRIPT ONLY***

59

| 10:45:59 | 1 | Q. No, but that's after it got reworked, your deal got |
| 10:46:02 | 2 | reworked in 2009, right? |
| 10:46:04 | 3 | MR. BURNS: Objection, argumentative, your Honor? |
| 10:46:05 | 4 | MR. LOEVY: No. |
| 10:46:06 | 5 | THE COURT: Overruled. |
| 10:46:06 | 6 | BY MR. LOEVY: |
| 10:46:07 | 7 | Q. Your deal got reworked in 2009 -- |
| 10:46:09 | 8 | A. I told you, sir, my understanding -- my out date. |
| 10:46:13 | 9 | Q. Different question. Different question, sir. Your deal |
| 10:46:16 | 10 | got reworked when you testified against Mr. Fields in 2009, |
| 10:46:18 | 11 | right? |
| 10:46:18 | 12 | A. Yes. |
| 10:46:19 | 13 | Q. And that's when you believe your out date became 2016, |
| 10:46:22 | 14 | right? |
| 10:46:24 | 15 | A. No. |
| 10:46:24 | 16 | Q. You believed you were out sooner than 2016 before your |
| 10:46:27 | 17 | deal got reworked in connection with that testimony? |
| 10:46:29 | 18 | A. I'm not saying that. |
| 10:46:30 | 19 | Q. Your deal got reworked before you gave the deposition in |
| 10:46:33 | 20 | 2013, correct? |
| 10:46:34 | 21 | A. Yes. |
| 10:46:35 | 22 | Q. And after both of those times, after both those |
| 10:46:40 | 23 | reworkings, your out date was 2016, correct? |
| 10:46:42 | 24 | A. It was always 2016. |
| 10:46:45 | 25 | Q. Then why did it get reworked twice if it was always 2016. |

10:46:49   1   I don't understand.  Maybe you can explain?

10:46:50   2          MR. KULWIN:  I object.  He is conflating --

10:46:53   3          THE COURT:  Overruled.

10:46:54   4   BY MR. LOEVY:

10:46:56   5   Q.  Do you understand the question?

10:46:56   6   A.  I understand crystal clear.  What is your answer?

10:46:59   7   Q.  If your out date was always 2016, then why was the deal

10:47:04   8   reworked in 2009 when you testified at the criminal trial and

10:47:08   9   why was it reworked again in 2013 when you testified at his

10:47:11  10   deposition?

10:47:12  11   A.  I don't know.

10:47:13  12   Q.  The answer to that is because they cut your time both

10:47:16  13   times isn't it true?

10:47:18  14          MR. KULWIN:  Objection, Judge.  Misstates the

10:47:21  15   evidence.

10:47:21  16          MR. LOEVY:  Objection, Judge, argumentative.

10:47:23  17          THE COURT:  Both objections are overruled.

10:47:26  18          THE WITNESS:  So your question?

10:47:27  19   BY MR. LOEVY:

10:47:27  20   Q.  They cut your time when you agreed to testify against

10:47:30  21   Nate, right?

10:47:30  22          MR. KULWIN:  Objection, foundation.

10:47:32  23          THE COURT:  Overruled.

10:47:33  24          THE WITNESS:  Yes, they took off a few years.

10:47:37  25   BY MR. LOEVY:

***REALTIME UNEDITED TRANSCRIPT ONLY***

61

| | | |
|---|---|---|
| 10:47:37 | 1 | Q. All right. Let's talk about your parole hearing when Mr. |
| 10:47:40 | 2 | Kulwin was asking you those questions yesterday, he said that |
| 10:47:43 | 3 | isn't it true that your first real parole hearing was 2014? |
| 10:47:46 | 4 | Do you remember him asking those questions? |
| 10:47:49 | 5 | A. Yes. |
| 10:47:49 | 6 | Q. Do you have any idea what he is talking about? |
| 10:47:51 | 7 | A. Yes. |
| 10:47:51 | 8 | Q. Why did you not have a real parole hearing in 2012? |
| 10:47:53 | 9 | A. Why didn't I have a real parole, because you have to do a |
| 10:47:57 | 10 | certain amount of time before you're eligible for parole. |
| 10:47:59 | 11 | Q. All right. So if this was your parole that mattered, by |
| 10:48:02 | 12 | the way, this is the first parole hearing that mattered after |
| 10:48:05 | 13 | your deal was reworked, correct? |
| 10:48:06 | 14 | A. No -- |
| 10:48:10 | 15 | MR. KULWIN: Objection, Judge. |
| 10:48:10 | 16 | THE COURT: Sustained, confusing. |
| 10:48:11 | 17 | BY MR. LOEVY: |
| 10:48:12 | 18 | Q. In 2013, they erased your state time so all you had left |
| 10:48:15 | 19 | was federal time, correct? |
| 10:48:16 | 20 | MR. KULWIN: Same objection, Judge. |
| 10:48:17 | 21 | THE COURT: Sustained. |
| 10:48:18 | 22 | BY MR. LOEVY: |
| 10:48:18 | 23 | Q. All right. In 2014 -- |
| 10:48:20 | 24 | THE COURT: Again, I think this was covered, this |
| 10:48:22 | 25 | point was covered sufficiently on direct. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 63 of 303 PageID #:64226
11/29/16 AM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

62

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 10:48:24 | 1  | BY MR. LOEVY:                                                 |
| 10:48:24 | 2  | Q. All right.  Just two more questions.                      |
| 10:48:27 | 3  |     In 2014 when you knew you were having an important        |
| 10:48:31 | 4  | parole hearing, did you say to the defendants a couple of    |
| 10:48:35 | 5  | months after you testified in this hearing I need you to keep|
| 10:48:40 | 6  | your commitment?                                             |
| 10:48:40 | 7  | A. Probably so.                                              |
| 10:48:41 | 8  | Q. Tell me what you remember about that.                     |
| 10:48:42 | 9  | A. I told them that the time that he said they're cutting off|
| 10:48:47 | 10 | my sentence hasn't caught up with me yet.                    |
| 10:48:49 | 11 | Q. And that you needed their help?                           |
| 10:48:50 | 12 | A. I needed what you said that you were going to do to do,   |
| 10:48:54 | 13 | the time.                                                    |
| 10:48:54 | 14 |         MR. BURNS:  Objection.                               |
| 10:48:55 | 15 |         THE COURT:  What's the objection?                    |
| 10:48:56 | 16 |         MR. BURNS:  Misstates facts, your Honor.            |
| 10:48:58 | 17 |         THE COURT:  He is answering the question.           |
| 10:48:59 | 18 |         MR. BURNS:  The question calls for it.  We discussed|
| 10:49:02 | 19 | it yesterday.                                                |
| 10:49:02 | 20 |         MR. LOEVY:  No, your Honor.                          |
| 10:49:06 | 21 |         THE COURT:  Which defendants are you talking about? |
| 10:49:08 | 22 | That's the question.                                         |
| 10:49:09 | 23 | BY MR. LOEVY:                                                 |
| 10:49:09 | 24 | Q. O'Callaghan and Murphy or just O'Callaghan?               |
| 10:49:12 | 25 | A. What are you talking about?                               |

| 10:49:14 | 1 | THE COURT: For crying out loud. |
| 10:49:23 | 2 | MR. LOEVY: Can we read back his answer? |
| 10:49:27 | 3 | (The following proceedings were had at sidebar outside the |
| 10:49:29 | 4 | hearing of the jury:) |
| 10:49:29 | 5 | THE COURT: It's not a deal, it's an order. It's not |
| 10:49:32 | 6 | a deal. I don't require your agreement and I am not asking |
| 10:49:34 | 7 | for your agreement. You just made the exact same mistake that |
| 10:49:37 | 8 | I had to instruct the jury on yesterday. You had Mr. Murphy |
| 10:49:41 | 9 | doing something for Mr. Hawkins. I had to instruct the jury |
| 10:49:43 | 10 | on that yesterday because you admitted that you blew it and |
| 10:49:47 | 11 | you did blow it. Now I am going to have to instruct them |
| 10:49:49 | 12 | again and you're done. |
| 10:49:50 | 13 | MR. LOEVY: Thank you. |
| 10:49:56 | 14 | (The following proceedings were had in open court in the |
| 10:49:57 | 15 | presence and hearing of the jury:) |
| 10:49:57 | 16 | THE COURT: All right. As I said yesterday, I am |
| 10:49:59 | 17 | going to say it again with regard to Mr. Murphy, there is no |
| 10:50:04 | 18 | -- Mr. Murphy did not write any letters or do anything for Mr. |
| 10:50:07 | 19 | Hawkins with regard to the parole board in 2014. That's a |
| 10:50:11 | 20 | fact you are to take. |
| 10:50:13 | 21 | Recross based on the redirect. |
| 10:50:19 | 22 | MR. KULWIN: Can I have one second, Judge? |
| 10:50:19 | 23 | - - - |
| 10:50:19 | 24 | EARL HAWKINS, RECROSS-EXAMINATION |
| 10:50:38 | 25 | BY MR. KULWIN: |

10:50:38   1   Q.  You were just asked a whole bunch of questions about your

10:50:41   2   out date and people cutting you a deal.  Do you remember those

10:50:44   3   questions just now?

10:50:44   4   A.  Yes, sir.

10:50:45   5   Q.  Okay.  The out date that you're talking about is your

10:50:48   6   federal out date, correct?

10:50:51   7          MR. LOEVY:  Objection, your Honor, covered on his

10:50:52   8   last exam.

10:50:53   9          THE COURT:  I am going to let you do a couple of

10:50:55  10   questions about this because I cut Mr. Loevy off at a fairly

10:50:59  11   early stage for repeating the direct and I am going to cut you

10:51:02  12   off at a fairly early stage for repeating the question.  I am

10:51:06  13   going to let you have a couple questions, so make them good

10:51:10  14   ones.

10:51:10  15          MR. KULWIN:  It's a good one.

10:51:10  16   BY MR. KULWIN:

10:51:13  17   Q.  The out date that you're referring is your federal out

10:51:16  18   date?

10:51:16  19   A.  Yes, sir.

10:51:17  20   Q.  And that never changed the entire time we are talking

10:51:19  21   about; is that correct?

10:51:20  22          MR. LOEVY:  Objection.

10:51:21  23          THE WITNESS:  Yes.

10:51:23  24          THE COURT:  Overruled.

10:51:24  25   BY MR. KULWIN:

| 10:51:24 | 1 | Q. Now, let's talk about the deals after that that was |
| 10:51:26 | 2 | reducing your time, the three years.  Do you remember those |
| 10:51:28 | 3 | questions, right? |
| 10:51:29 | 4 | A. Yes, sir. |
| 10:51:29 | 5 | Q. That's as counsel well knows, that's the state? |
| 10:51:33 | 6 | MR. LOEVY:  Objection, your Honor. |
| 10:51:34 | 7 | THE COURT:  What's the objection? |
| 10:51:35 | 8 | MR. LOEVY:  He said as counsel well knows. |
| 10:51:37 | 9 | MR. KULWIN:  I'll take that. |
| 10:51:38 | 10 | THE COURT:  No, you don't have to take it back.  It's |
| 10:51:41 | 11 | stricken. |
| 10:51:41 | 12 | MR. KULWIN:  Okay. |
| 10:51:42 | 13 | THE COURT:  It's improper.  The jury is directed to |
| 10:51:46 | 14 | disregard it.  I am just telling everybody right now.  The |
| 10:51:48 | 15 | next time somebody does something like that, I don't care who |
| 10:51:51 | 16 | it is, there's going to be a price to pay.  That's it. |
| 10:51:54 | 17 | Everybody get that?  I want to make sure everybody is looking |
| 10:51:57 | 18 | at me. |
| 10:51:58 | 19 | MR. KULWIN:  Got it. |
| 10:51:59 | 20 | BY MR. KULWIN: |
| 10:51:59 | 21 | Q. The three years off that you were asked about in 2009, et |
| 10:52:05 | 22 | cetera, that was the state prosecutors making your deal for |
| 10:52:10 | 23 | state time, correct? |
| 10:52:11 | 24 | A. Yes, sir. |
| 10:52:11 | 25 | Q. Okay.  And that was in return for cooperation in |

| | | |
|---|---|---|
| 10:52:19 | 1 | proceedings in 2009 and in 2013 relating to state proceedings |
| 10:52:24 | 2 | relating to Mr. Fields, correct? |
| 10:52:26 | 3 | A. Yes, sir. |
| 10:52:26 | 4 | Q. Okay. Now, your grand jury statement that you were asked |
| 10:52:33 | 5 | about so we're clear, you walked into the grand jury |
| 10:52:48 | 6 | preparing for one year with Mr. Hogan and federal and state |
| 10:52:51 | 7 | investigators, right? Do you remember that? |
| 10:52:52 | 8 | A. Why he is. |
| 10:52:53 | 9 | Q. Okay. And it was a lengthy statement, true, 36 pages, |
| 10:52:57 | 10 | correct? |
| 10:52:57 | 11 | A. Yes, sir. |
| 10:52:58 | 12 | Q. And Mr. Hogan read the statement, right? |
| 10:53:01 | 13 | MR. LOEVY: Objection. This was covered, your Honor. |
| 10:53:03 | 14 | THE COURT: Overruled. |
| 10:53:03 | 15 | BY MR. KULWIN: |
| 10:53:05 | 16 | Q. Correct? |
| 10:53:05 | 17 | THE COURT: Let's get to it. |
| 10:53:06 | 18 | MR. KULWIN: I'm getting to it right now. |
| 10:53:08 | 19 | THE WITNESS: Yes, sir. |
| 10:53:08 | 20 | BY MR. KULWIN: |
| 10:53:10 | 21 | Q. And I want to show it to you, he read -- he read you three |
| 10:53:21 | 22 | full pages of testimony, I want to show it to you, sir, about |
| 10:53:26 | 23 | a variety of matters including one sentence concerning |
| 10:53:31 | 24 | Vaughn/White before he asked you is that correct, two full |
| 10:53:39 | 25 | pages. Let me check this. |

10:54:23   1         MR. KULWIN:  Hold on for a second, Judge.

10:54:31   2         I apologize.

10:54:32   3   BY MR. KULWIN:

10:54:32   4   Q.  By the time he got to the Vaughn/White statement, which

10:54:36   5   was one sentence, he had already been reading for 22 pages is

10:54:40   6   that right, sir?  Can you just take a look at that?  About 22

10:54:45   7   pages before he even mentioned Vaughn/White, correct?

10:54:48   8   A.  Yes.

10:54:51   9   Q.  Okay.  And then before he said am I right so far, he read

10:54:56   10   a full another page about other matters as well where he says

10:55:01   11   is this accurate so far?  Do you see that?  Here's where you

10:55:06   12   first mention Vaughn/White on page 23, and then he goes

10:55:09   13   through a whole page on 24 before he says to you is that

10:55:13   14   accurate so far, do you see that, sir?

10:55:16   15   A.  Yes.

10:55:16   16   Q.  Now, with respect to all the photos that you were shown

10:55:33   17   and all this other stuff where you could see 500 feet, let me

10:55:37   18   ask you this, Fuddy Smith was out in front of '709 that day,

10:55:41   19   wasn't he?

10:55:42   20   A.  706.

10:55:43   21   Q.  706, right.  Fuddy Smith got shot in the back of the head

10:55:47   22   in front of 706 that day, right?

10:55:49   23   A.  Yes, sir.

10:55:49   24   Q.  You were there that day, right?

10:55:51   25   A.  Yes, sir.

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 69 of 303 PageID #:64232

| | | |
|---|---|---|
| 10:55:51 | 1 | Q.  You were asked some questions about whether you got the |
| 10:56:04 | 2 | details of when the bribe was and all that stuff when you |
| 10:56:08 | 3 | testified in 2014.  But you gave testimony perfectly |
| 10:56:12 | 4 | consistently in 2013 in another proceeding, didn't you? |
| 10:56:16 | 5 | THE COURT:  Just ask the question. |
| 10:56:18 | 6 | MR. KULWIN:  Sure. |
| 10:56:18 | 7 | BY MR. KULWIN: |
| 10:56:19 | 8 | Q.  Do you remember this question and answer in a proceeding |
| 10:56:22 | 9 | that took place on the 21st day of August 2013 in a proceeding |
| 10:56:27 | 10 | relating to Mr. Fields. |
| 10:56:29 | 11 | MR. LOEVY:  Page? |
| 10:56:30 | 12 | MR. KULWIN:  181. |
| 10:56:31 | 13 | MR. LOEVY:  Thank you. |
| 10:56:31 | 14 | BY MR. KULWIN: |
| 10:56:44 | 15 | Q. |
| 10:56:44 | 16 | "QUESTION:  Did he finally appear to court on June -- |
| 10:56:47 | 17 | I'm sorry. |
| 10:56:48 | 18 | "QUESTION:  Well, the first time your case was called |
| 10:56:50 | 19 | that morning was Swano there? |
| 10:56:52 | 20 | "ANSWER:  I don't think so.  I think they had to wait |
| 10:56:54 | 21 | on him. |
| 10:56:55 | 22 | "QUESTION:  Did he finally appear to court on June |
| 10:56:58 | 23 | 17th? |
| 10:57:00 | 24 | "ANSWER:  Yes |
| 10:57:01 | 25 | "QUESTION:  On that date did you finally take or elect |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 70 of 303 PageID #:64233

| | | |
|---|---|---|
| 10:57:03 | 1 | to take a bench trial finally? |
| 10:57:06 | 2 | "ANSWER: Yes, sir. |
| 10:57:07 | 3 | "QUESTION: Did Fields take a bench trial on that date |
| 10:57:10 | 4 | as well? |
| 10:57:11 | 5 | "ANSWER: Yes, sir |
| 10:57:11 | 6 | "QUESTION: In fact, you recall the jury being |
| 10:57:14 | 7 | assembled outside as you were waiving the jury trial? |
| 10:57:17 | 8 | "ANSWER: Yes, sir |
| 10:57:17 | 9 | "QUESTION: Did you both waive jury together? |
| 10:57:20 | 10 | "ANSWER: Yes |
| 10:57:20 | 11 | "QUESTION: Did you talk to each other in the bull pen |
| 10:57:23 | 12 | on June 17th of '86? |
| 10:57:25 | 13 | "ANSWER: Yes. |
| 10:57:26 | 14 | "QUESTION: And were you constant, did you also talk in |
| 10:57:29 | 15 | the bull pen on June 16th, 1986? |
| 10:57:33 | 16 | "ANSWER: Yes. |
| 10:57:34 | 17 | "QUESTION: On June 17th, 1986, before you went out and |
| 10:57:36 | 18 | waived the jury trial, did you talk to Swano when he finally |
| 10:57:39 | 19 | appeared on that day? |
| 10:57:40 | 20 | "ANSWER: Yes |
| 10:57:41 | 21 | "QUESTION: What did he tell you that made you want to |
| 10:57:42 | 22 | take a bench trial? |
| 10:57:43 | 23 | "ANSWER: He said he got the money and got to talk to |
| 10:57:47 | 24 | the judge. He said he got, he could make it work. |
| 10:57:49 | 25 | "QUESTION: Was Fields present when Swano told you this |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 71 of 303 PageID #:64234
11/29/16 AM      ***REALTIME UNEDITED TRANSCRIPT ONLY***

70

| | | |
|---|---|---|
| 10:57:52 | 1 | in the bull pen? |
| 10:57:53 | 2 | "ANSWER:  Yes. |
| 10:57:54 | 3 | "QUESTION:  Was Carter present? |
| 10:57:55 | 4 | "ANSWER:  Yes. |
| 10:57:56 | 5 | "QUESTION:  Did you then come out and waive jury trial? |
| 10:57:59 | 6 | "ANSWER:  Yes. |
| 10:57:59 | 7 | "QUESTION:  Did Fields waive jury trial? |
| 10:58:01 | 8 | "ANSWER:  Yes." |
| 10:58:04 | 9 | Did you give those answers in 2013 in a state |
| 10:58:07 | 10 | proceeding involving Mr. Fields back then? |
| 10:58:10 | 11 | A.  Yes, sir. |
| 10:58:10 | 12 | Q.  Now, more to the point -- oh, did you give the answers, |
| 10:58:18 | 13 | right?  You gave the answers? |
| 10:58:19 | 14 | A.  Yes, sir. |
| 10:58:19 | 15 | Q.  More to the point, Mr. Fields, any question in your mind |
| 10:58:26 | 16 | that the El Rukns? |
| 10:58:27 | 17 | THE COURT:  You said Mr. Fields, you mean Mr. |
| 10:58:29 | 18 | Hawkins. |
| 10:58:29 | 19 | BY MR. KULWIN: |
| 10:58:31 | 20 | Q.  Mr. Hawkins, I apologize. |
| 10:58:32 | 21 | A.  No problem. |
| 10:58:33 | 22 | Q.  Thank you. |
| 10:58:33 | 23 | Mr. Hawkins, is there any question in your mind, any |
| 10:58:36 | 24 | dispute whatsoever in your mind that the El Rukns provided |
| 10:58:41 | 25 | $10,000 to Bill Swano to bribe Judge Maloney? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 10:58:45 | 1 | MR. LOEVY:  Objection, covered. |
| 10:58:46 | 2 | THE COURT:  Sustained. |
| 10:58:47 | 3 | BY MR. KULWIN: |
| 10:59:07 | 4 | Q.  You were asked a number of questions about how this |
| 10:59:11 | 5 | happened, what happened.  In the 2009 hearing, Mr. Hawkins? |
| 10:59:26 | 6 | MR. KULWIN:  Can I have the ELMO, Judge? |
| 10:59:28 | 7 | THE COURT:  Yes. |
| 10:59:30 | 8 | MR. LOEVY:  What page? |
| 10:59:31 | 9 | MR. KULWIN:  9. |
| 10:59:33 | 10 | BY MR. KULWIN: |
| 10:59:35 | 11 | Q.  You were asked questions about whether you were familiar |
| 10:59:37 | 12 | with the 706 building, whether you were familiar with Fuddy. |
| 10:59:42 | 13 | You were asked those questions.  Did you give this truthful |
| 10:59:45 | 14 | testimony on? |
| 10:59:47 | 15 | MR. LOEVY:  We object to scope, your Honor. |
| 10:59:48 | 16 | THE COURT:  Let me see -- hang on a second.  The |
| 10:59:57 | 17 | scope objection is overruled. |
| 10:59:58 | 18 | BY MR. KULWIN: |
| 11:00:04 | 19 | Q.  Did you give this testimony on February 25th, 2009, in a |
| 11:00:09 | 20 | criminal trial -- in the criminal trial, people v. Nathson |
| 11:00:13 | 21 | Fields. |
| 11:00:15 | 22 | "QUESTION:  Okay.  Specifically back in the spring of |
| 11:00:18 | 23 | 1984, were you familiar with the address of 706 East Pershing? |
| 11:00:22 | 24 | "ANSWER:  Yes. |
| 11:00:23 | 25 | "QUESTION:  How were you familiar with that address? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 73 of 303 PageID #:64236
11/29/16 AM
***REALTIME UNEDITED TRANSCRIPT ONLY***

72

| | | |
|---|---|---|
| 11:00:26 | 1 | "ANSWER: I've been living around there all my life and |
| 11:00:29 | 2 | I had a daughter that was born in the building. |
| 11:00:30 | 3 | "QUESTION: Would you be in the area of that address on |
| 11:00:33 | 4 | a fairly regular basis back in 1984? |
| 11:00:35 | 5 | "ANSWER: Yes, sir. |
| 11:00:36 | 6 | "QUESTION: Were you involved in the narcotics, sale of |
| 11:00:39 | 7 | narcotics back in 1984 in that area? |
| 11:00:41 | 8 | "ANSWER: Yes, sir. |
| 11:00:42 | 9 | "QUESTION: What type of narcotics did you sell back |
| 11:00:44 | 10 | then? |
| 11:00:45 | 11 | "ANSWER: Codeine syrup. |
| 11:00:47 | 12 | "QUESTION: Was that on behalf of the El Rukns street |
| 11:00:50 | 13 | gang? |
| 11:00:50 | 14 | "ANSWER: Partly, yes. |
| 11:00:52 | 15 | "QUESTION: Now, back in the spring much 1984, were you |
| 11:00:54 | 16 | aware of another gang that basically hung out in the area? |
| 11:00:57 | 17 | "ANSWER: Yes. |
| 11:00:58 | 18 | "QUESTION: What gang was that? |
| 11:01:01 | 19 | "ANSWER: The Goon Squad." |
| 11:01:02 | 20 | MR. LOEVY: I object to scope. |
| 11:01:03 | 21 | MR. KULWIN: I am getting to it. |
| 11:01:04 | 22 | THE COURT: Then let's get to it. |
| 11:01:06 | 23 | BY MR. KULWIN: |
| 11:01:08 | 24 | Q. "QUESTION: Did you know who the leader of that gang |
| 11:01:09 | 25 | was? |

| 11:01:10 | 1 | "ANSWER: Fuddy |
| 11:01:11 | 2 | "QUESTION: Do you know his real name? |
| 11:01:13 | 3 | "ANSWER: Jerome Smith." |
| 11:01:17 | 4 | THE COURT: Okay. Based on that, the scope objection |
| 11:01:19 | 5 | is overruled. |
| 11:01:19 | 6 | BY MR. KULWIN: |
| 11:01:20 | 7 | Q. You knew who Fuddy Smith was back then, right, back in |
| 11:01:26 | 8 | '84? You knew who Fuddy Smith was? |
| 11:01:28 | 9 | A. Yes. |
| 11:01:30 | 10 | Q. You were asked questions about whether Nate Fields was |
| 11:02:18 | 11 | there or not, how he came in his own car. In that same |
| 11:02:24 | 12 | proceeding, did you give this testimony in February 2009: |
| 11:02:31 | 13 | THE COURT: This is also from the criminal trial? |
| 11:02:34 | 14 | MR. KULWIN: Yes, your Honor. |
| 11:02:34 | 15 | THE COURT: I am putting it up on the jury's monitor. |
| 11:02:38 | 16 | MR. KULWIN: Thank you, your Honor. |
| 11:02:39 | 17 | BY MR. KULWIN: |
| 11:02:40 | 18 | Q. |
| 11:02:40 | 19 | "QUESTION: Let me stop you for a minute. When you saw |
| 11:02:43 | 20 | George Carter coming running towards your car |
| 11:02:45 | 21 | THE COURT: Page number? |
| 11:02:46 | 22 | MR. KULWIN: I'm sorry, Judge, page 42, the February |
| 11:02:49 | 23 | 2009 criminal proceeding, people v. Fields. |
| 11:02:52 | 24 | THE COURT: Okay. |
| 11:02:53 | 25 | BY MR. KULWIN: |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 75 of 303 PageID #:64238
11/29/16 AM
***REALTIME UNEDITED TRANSCRIPT ONLY***

74

| | | |
|---|---|---|
| 11:02:53 | 1 | Q. |
| 11:02:53 | 2 | "QUESTION:  Let me stop you for a minute.  When you saw |
| 11:02:57 | 3 | George Carter coming running towards your car after the |
| 11:02:59 | 4 | shooting, was his mask still on? |
| 11:03:01 | 5 | "ANSWER:  Yes. |
| 11:03:01 | 6 | "QUESTION:  Tell the judge how the mask was on his |
| 11:03:03 | 7 | head? |
| 11:03:04 | 8 | "ANSWER:  Rolled up on his head. |
| 11:03:06 | 9 | "QUESTION:  When Nathson Fields came back to the car |
| 11:03:09 | 10 | after the shooting, where was his mask on his face? |
| 11:03:11 | 11 | "ANSWER:  Rolled up on his head. |
| 11:03:13 | 12 | "QUESTION:  Could you see their faces when they ran to |
| 11:03:16 | 13 | the car? |
| 11:03:17 | 14 | "ANSWER:  Yes." |
| 11:03:18 | 15 | That was truthful testimony, correct, sir? |
| 11:03:21 | 16 | A. Yes. |
| 11:03:21 | 17 | Q. You were asked some questions about an alleged pros memo |
| 11:03:29 | 18 | that you allegedly saw back when you were about to testify in |
| 11:03:33 | 19 | the RICO trials against the El Rukns.  Do you remember those |
| 11:03:35 | 20 | questions? |
| 11:03:35 | 21 | A. Yes, sir. |
| 11:03:36 | 22 | Q. You don't know that it was a pros memo.  That's just |
| 11:03:39 | 23 | something counsel came up with, you don't know what it was? |
| 11:03:43 | 24 | MR. LOEVY:  Objection, your Honor, scope, |
| 11:03:44 | 25 | argumentative and form. |

| | | |
|---|---|---|
| 11:03:45 | 1 | THE COURT:  The comment is stricken. |
| 11:03:49 | 2 | MR. KULWIN:  Okay. |
| 11:03:50 | 3 | MR. KULWIN:  I'll rephrase it. |
| 11:03:51 | 4 | BY MR. KULWIN: |
| 11:03:52 | 5 | Q.  You don't know that it was really a pros, you don't |
| 11:03:55 | 6 | remember that, do you? |
| 11:03:57 | 7 | MR. LOEVY:  Objection, scope. |
| 11:03:58 | 8 | THE COURT:  Overruled.  But it's -- |
| 11:04:00 | 9 | MR. KULWIN:  I'll get right to it, Judge. |
| 11:04:02 | 10 | THE WITNESS:  He showed me -- do you do, when I'm in |
| 11:04:05 | 11 | the cell, they said do you want to see these papers, I don't |
| 11:04:09 | 12 | want to see them papers, we will just slide them under your |
| 11:04:12 | 13 | door, no, I don't want to see them. |
| 11:04:14 | 14 | BY MR. KULWIN: |
| 11:04:14 | 15 | Q.  You don't know whether it was a pros memo one way or the |
| 11:04:17 | 16 | other? |
| 11:04:17 | 17 | A.  That's what they say it was.  They same. |
| 11:04:20 | 18 | THE COURT:  The question is do you know what it was? |
| 11:04:22 | 19 | BY MR. KULWIN: |
| 11:04:22 | 20 | Q.  Do you know? |
| 11:04:23 | 21 | A.  No, sir. |
| 11:04:23 | 22 | Q.  And you didn't look at them? |
| 11:04:24 | 23 | A.  No, sir. |
| 11:04:25 | 24 | Q.  And when you were asked about how you could say that you |
| 11:04:29 | 25 | knew it was after you had already cooperated, you don't know |

11/29/16 AM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 77 of 303 PageID #:64240
***REALTIME UNEDITED TRANSCRIPT ONLY***

76

| | | |
|---|---|---|
| 11:04:32 | 1 | the specific dates of when you saw that or when you |
| 11:04:36 | 2 | cooperated, you don't know the specific dates like May 15th, |
| 11:04:39 | 3 | 1982 or things like that, right, you don't remember those |
| 11:04:42 | 4 | dates; is that fair? |
| 11:04:43 | 5 | A.  No. |
| 11:04:43 | 6 | Q.  But you do remember that when that document came out, you |
| 11:04:46 | 7 | had already cooperated, already provided information, and that |
| 11:04:50 | 8 | that had nothing to do with anything? |
| 11:04:51 | 9 | A.  Yes, sir, that's what I believe. |
| 11:05:03 | 10 | MR. KULWIN:  May I have one moment, Judge?  Your |
| 11:05:30 | 11 | Honor, at this time we have no further questions. |
| 11:05:31 | 12 | MR. BURNS:  I have none, your Honor.  Thank you. |
| 11:05:33 | 13 | MR. LOEVY:  Will you permit four questions, your |
| 11:05:35 | 14 | Honor? |
| 11:05:36 | 15 | THE COURT:  Okay.  Four. |
| 11:05:38 | 16 | - - - |
| 11:05:38 | 17 | EARL HAWKINS, REDIRECT EXAMINATION |
| 11:05:38 | 18 | BY MR. LOEVY: |
| 11:05:39 | 19 | Q.  You did -- you were told that these papers that they were |
| 11:05:43 | 20 | showing you were prosecution memos, that's what you just said, |
| 11:05:46 | 21 | right? |
| 11:05:46 | 22 | MR. KULWIN:  Objection. |
| 11:05:48 | 23 | THE COURT:  Sustained. |
| 11:05:50 | 24 | MR. KULWIN:  Argumentative. |
| 11:05:50 | 25 | THE COURT:  Sustained.  That is not a correct |

| | | |
|---|---|---|
| 11:05:51 | 1 | statement of what he said. |
| 11:05:53 | 2 | BY MR. LOEVY: |
| 11:05:53 | 3 | Q. What did they tell you the papers were? |
| 11:05:55 | 4 | MR. KULWIN: Objection, asked and answered, Judge. |
| 11:05:57 | 5 | THE COURT: Well, based on the recross, no. He can |
| 11:06:01 | 6 | answer the question. |
| 11:06:02 | 7 | THE WITNESS: Who is they? |
| 11:06:03 | 8 | MR. LOEVY: Does that not count as my question. |
| 11:06:08 | 9 | THE COURT: You just gave the statement about what |
| 11:06:10 | 10 | these other guys -- |
| 11:06:11 | 11 | THE WITNESS: I thought he was saying what the |
| 11:06:13 | 12 | prosecutors. |
| 11:06:13 | 13 | THE COURT: The other guys at the MCC. |
| 11:06:15 | 14 | THE WITNESS: They were saying they were some kind of |
| 11:06:17 | 15 | papers from the U.S. Attorney's Office, yes. |
| 11:06:19 | 16 | BY MR. LOEVY: |
| 11:06:19 | 17 | Q. Weren't you at least a little bit curious to see what |
| 11:06:22 | 18 | those papers might be? |
| 11:06:23 | 19 | MR. KULWIN: Objection, argumentative. |
| 11:06:25 | 20 | THE COURT: Sustained. |
| 11:06:25 | 21 | BY MR. LOEVY: |
| 11:06:26 | 22 | Q. Mr. Kulwin asked you, read you several pages of transcript |
| 11:06:29 | 23 | testimony from the April 2000 proceeding about the bribe. Do |
| 11:06:33 | 24 | you remember those questions that he just asked you and read |
| 11:06:37 | 25 | you the two pages of questions? |

| 11:06:40 | 1 | THE COURT:  Just ask the question. |
| 11:06:42 | 2 | BY MR. LOEVY: |
| 11:06:43 | 3 | Q.  The only response was yes, yes, yes, yes, yes, yes, yes, |
| 11:06:48 | 4 | and yes, sir? |
| 11:06:49 | 5 | MR. KULWIN:  Objection. |
| 11:06:50 | 6 | BY MR. LOEVY: |
| 11:06:50 | 7 | Q.  That's literally the only thing you said? |
| 11:06:52 | 8 | A.  Pretty much. |
| 11:06:54 | 9 | THE COURT:  All right.  I have a couple of questions |
| 11:06:55 | 10 | from the jurors that were handed to me.  I've got those.  Are |
| 11:06:58 | 11 | there other questions that anybody has?  I think I see -- |
| 11:07:02 | 12 | nobody is writing.  Let me see the lawyers at sidebar. |
| 11:07:06 | 13 | (The following proceedings were had at sidebar outside the |
| 11:07:19 | 14 | hearing of the jury:) |
| 11:07:19 | 15 | THE COURT:  Just two questions.  Number one, what |
| 11:07:22 | 16 | date and month were you released from prison, anybody have a |
| 11:07:25 | 17 | problem with that?  He said it, but I'm not sure it's entirely |
| 11:07:29 | 18 | clear.  The second one says I'll quote it, I think this was |
| 11:07:32 | 19 | probably written out yesterday just to be clear because it was |
| 11:07:35 | 20 | handed to me this morning. |
| 11:07:36 | 21 | Regarding your appearance here today and your |
| 11:07:38 | 22 | statement, I made a commitment and that was part of it.  To |
| 11:07:41 | 23 | whom did you make the commitment and for what reason? |
| 11:07:44 | 24 | Basically, I think what I'd ask him is you testified yesterday |
| 11:07:49 | 25 | regarding your appearance here to testify today that you made |

11/29/16 AM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 80 of 303 PageID #:64243
***REALTIME UNEDITED TRANSCRIPT ONLY***

79

| | | |
|---|---|---|
| 11:07:52 | 1 | a commitment and this is part of it.  Who did you make the |
| 11:07:54 | 2 | commitment to and what was it?  Does anybody have a problem |
| 11:07:57 | 3 | with either one of those? |
| 11:07:58 | 4 | MR. LOEVY:  We do.  Because this witness is so |
| 11:08:00 | 5 | suggestible and leadable, he did say it in the context of |
| 11:08:03 | 6 | O'Callaghan the first time and he gave an answer. |
| 11:08:07 | 7 | THE COURT:  Okay.  That objection is overruled. |
| 11:08:09 | 8 | MR. KULWIN:  Judge, one other thing, I apologize. |
| 11:08:13 | 9 | Mr. Loevy just made a representation that all he said was yes |
| 11:08:16 | 10 | yes yes yes.  He didn't.  He specifically said he got the |
| 11:08:18 | 11 | money, he got to talk to the judge, he said he got, he could |
| 11:08:22 | 12 | make it work. |
| 11:08:22 | 13 | MR. LOEVY:  That's not what I said. |
| 11:08:24 | 14 | MR. KULWIN:  That misstates what he said.  I should |
| 11:08:27 | 15 | at least be -- |
| 11:08:29 | 16 | MR. LOEVY:  Page 183, I'm sorry, your Honor. |
| 11:08:31 | 17 | THE COURT:  Go ahead. |
| 11:08:32 | 18 | MR. LOEVY:  Before he says that, I heard him start |
| 11:08:35 | 19 | reading on page 181 and he stopped right around George Carter. |
| 11:08:39 | 20 | MR. KULWIN:  No, I stopped all the way over here. |
| 11:08:43 | 21 | THE COURT:  Look, the answer is no.  You read the |
| 11:08:47 | 22 | testimony, he said something about it, it's been covered. |
| 11:08:49 | 23 | MR. LOEVY:  All right. |
| 11:08:51 | 24 | (The following proceedings were had in open court in the |
| 11:08:55 | 25 | presence and hearing of the jury:) |

11/29/16 AM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 81 of 303 PageID #:64244
***REALTIME UNEDITED TRANSCRIPT ONLY***

80

11:08:55  1      THE COURT:  Okay.  Two questions.  What was -- what

11:08:57  2   date and what month -- when were you released were prison,

11:09:01  3   what month, what year?

11:09:02  4      THE WITNESS:  December 17th, 2014.

11:09:05  5      THE COURT:  Thank you.  Yesterday, you were asked

11:09:08  6   some questions about why you were appearing here today.  You

11:09:11  7   said something along the lines of I made a commitment and this

11:09:14  8   is part of it.  Do you recall that?

11:09:15  9      THE WITNESS:  Yes, sir.

11:09:15  10      THE COURT:  The question is who did you make the

11:09:17  11   commitment to?

11:09:18  12      THE WITNESS:  I guess when I was cooperating Mr. .

11:09:22  13   Nobody can hear what you are saying commitment to whom?

11:09:25  14      THE WITNESS:  When I agreed to cooperate, that's what

11:09:27  15   --

11:09:27  16      THE COURT:  Who were you making the commitment to is

11:09:29  17   the question.

11:09:29  18      THE WITNESS:  Whoever I agreed to cooperate, the

11:09:31  19   state and federal government, I guess.

11:09:33  20      THE COURT:  All right.  I think that covers it.

11:09:35  21   Follow-up based on those two questions?

11:09:38  22                          - - -

11:09:38  23         EARL HAWKINS, REDIRECT EXAMINATION

11:09:38  24   BY MR. LOEVY:

11:09:39  25   Q.  You were gesturing that way when you said who you made the

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 82 of 303 PageID #:64245
11/29/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

81

| | | |
|---|---|---|
| 11:09:43 | 1 | commitment to? |
| 11:09:43 | 2 | THE COURT:  Well, he was gesturing that way and I |
| 11:09:47 | 3 | asked him to explain the answer, he explained the answer. |
| 11:09:49 | 4 | BY MR. LOEVY: |
| 11:09:50 | 5 | Q.  These are the gentlemen you were cooperating with? |
| 11:09:52 | 6 | A.  Yes. |
| 11:09:52 | 7 | MR. KULWIN:  Objection. |
| 11:09:54 | 8 | MR. BURNS:  Judge. |
| 11:09:55 | 9 | THE COURT:  The objection is sustained.  It's all |
| 11:09:58 | 10 | covered. |
| 11:09:58 | 11 | MR. KULWIN:  A follow-up on that, Judge, to clarify. |
| 11:10:00 | 12 | THE COURT:  I just sustained the objection.  Are we |
| 11:10:03 | 13 | now going to have follow up on questions on which I sustained |
| 11:10:07 | 14 | objections and didn't permit answers?  Go ahead.  Let's see if |
| 11:10:09 | 15 | you can ask a question, a sustained objection as I have told |
| 11:10:13 | 16 | the jury multiple times, questions are not evidence.  The jury |
| 11:10:17 | 17 | is not to consider questions on which I sustained objections. |
| 11:10:20 | 18 | So if you think that there's testimony that you need to follow |
| 11:10:23 | 19 | up on, please feel free to get up. |
| 11:10:26 | 20 | MR. KULWIN:  That's fine, Judge. |
| 11:10:26 | 21 | THE COURT:  Please feel free to get up. |
| 11:10:28 | 22 | MR. KULWIN:  No thanks. |
| 11:10:29 | 23 | THE COURT:  The witness is excused.  We are going to |
| 11:10:31 | 24 | take a break because we have so discuss some things before the |
| 11:10:34 | 25 | next testimony.  We will probably for probably about 15 |

| 11:10:39 | 1 | minutes. |
|---|---|---|
| 11:11:54 | 2 | (The jury leaves the courtroom.). |

11:11:54  3    THE COURT:  Do you want to make a record on anything,

11:11:58  4  Mr. Kulwin?

11:11:58  5    MR. KULWIN:  No, I've made my record to the best I

11:12:01  6  can make it.

11:12:01  7    THE COURT:  In terms of what your questions were that

11:12:03  8  you wanted to ask.  That's what I'm talking about.

11:12:06  9    MR. KULWIN:  No.  I withdrew my question, Judge.

11:12:09  10  That's what I did.

11:12:09  11    THE COURT:  The next witness is who?

11:12:11  12    MR. LOEVY:  Mr. Brasfield, plaintiff's expert on

11:12:14  13  Monell.

11:12:15  14    THE COURT:  We need to deal with this thing that you

11:12:16  15  submitted yesterday that's called Plaintiff's Proffer Relating

11:12:16  16  Jones and Palmer.  That's going to come up during the direct,

11:12:20  17  right?

11:12:20  18    MR. LOEVY:  Correct, Judge.

11:12:22  19    THE COURT:  So let me hear from the defense on this.

11:12:25  20  I think it would probably make sense, because it's in numbered

11:12:28  21  paragraphs, I think it would probably make sense for you to

11:12:31  22  start off by going through and telling me which parts do you

11:12:35  23  have an objection to and then we'll go back through them.

11:12:39  24    MR. LOEVY:  Your Honor, may we suggest that our

11:12:40  25  expert be present so hear so he can hear what the rulings are

***REALTIME UNEDITED TRANSCRIPT ONLY***

11:12:43  1  and know what he can say and what he can't say.

11:12:46  2  THE COURT:  That's a fair point.  He is an expert.

11:12:49  3  He is in the room.

11:12:50  4  MR. LOEVY:  Mr. Brasfield.

11:12:51  5  THE COURT:  Just have a seat, but listen.  Mr.

11:12:54  6  Noland, go ahead.

11:12:55  7  MR. NOLAND:  Judge, I guess just for the record, this

11:12:59  8  is the fourth time I think they have made one of those

11:13:02  9  proffers.  It seems like they're trickling it out.

11:13:05  10  THE COURT:  You know what, I am treating this as the

11:13:07  11  universe.  This thing -- this document is the universe.  I'm

11:13:10  12  not really dealing with the previous ones, to the extent there

11:13:17  13  were any.  I know there's been discussion about it before.  I

11:13:19  14  am treating this as the universe of what they intend to

11:13:23  15  present.

11:13:23  16  MR. NOLAND:  So it looks like on the proffer on page

11:13:26  17  2, the third and fourth line, they say the city officials were

11:13:33  18  aware that.

11:13:34  19  THE COURT:  Which paragraph number was this?

11:13:37  20  MR. NOLAND:  Paragraph 1.  That Jones could not have

11:13:39  21  committed the murder.  I think that should be may not have

11:13:42  22  committed the murder.  It was potentially exculpatory

11:13:45  23  evidence.

11:13:48  24  The next line.  Laverty's information was placed in a

11:13:59  25  so-called --

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 11:13:54 | 1 | THE COURT: Slow down. |
| 11:13:55 | 2 | MR. NOLAND: Laverty's information was placed in a |
| 11:13:59 | 3 | so-called street file which the CPD did not turn over to |
| 11:14:02 | 4 | prosecutors in the criminal defense. My recollection was that |
| 11:14:05 | 5 | Mr. Hickey had stated that the understanding was that the memo |
| 11:14:09 | 6 | had been provided to the -- I think somebody named Dee and it |
| 11:14:16 | 7 | wasn't turned. You know what? I'll waive that. |
| 11:14:19 | 8 | THE COURT: Okay. |
| 11:14:20 | 9 | MR. NOLAND: Waived. |
| 11:14:20 | 10 | The next line as far as in spring of '82, Laverty |
| 11:14:27 | 11 | learned Jones was on trial for murder. He told his commander |
| 11:14:30 | 12 | that than an innocent person was being prosecuted and his |
| 11:14:31 | 13 | commander did nothing. Laverty informed Jones' criminal |
| 11:14:35 | 14 | defense attorney. I think we are going beyond what's |
| 11:14:37 | 15 | necessary for the -- their notice argument, Judge, so I think |
| 11:14:41 | 16 | a lot of the details and I think that's going to be a lot of |
| 11:14:44 | 17 | our arguments hereafter. Jones filed a Section 1983 lawsuit. |
| 11:14:49 | 18 | Again -- |
| 11:14:49 | 19 | THE COURT: This is paragraph 2? |
| 11:14:50 | 20 | MR. NOLAND: Yeah, paragraph 2. I think that is |
| 11:14:53 | 21 | unnecessary as well. I think the jury -- as far as there was |
| 11:15:00 | 22 | litigation with respect to this incident I think is what the |
| 11:15:03 | 23 | Court had previously allowed. So I would object to that |
| 11:15:11 | 24 | entire sentence. |
| 11:15:12 | 25 | And then paragraph 3 we would object to as far as of |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 86 of 303 PageID #:64249

11:15:15    1    the CPD initiating disciplinary proceedings against Laverty.

11:15:20    2            THE COURT:  Keep going.

11:15:21    3            MR. NOLAND:  Paragraph B, or section B, paragraph 4,

11:15:27    4    they're talking again about the specifics of Palmer class

11:15:30    5    action, I think that the litigation was filed regarding -- and

11:15:35    6    as far as the policies and practices of suppressing

11:15:40    7    investigative materials and street files, we believe that

11:15:42    8    would open the door to the result in Palmer 2 which was that

11:15:46    9    there was no policy and practice, there was a single case and

11:15:51   10    Palmer 2 found it.  Basically, too much detail.

11:15:58   11            THE COURT:  What do you think would be an appropriate

11:16:01   12    amount of detail?

11:16:02   13            MR. NOLAND:  I think what the Court has already

11:16:03   14    allowed, which was that there was litigation that the city

11:16:10   15    changed its policy, the superintendent had the city change its

11:16:14   16    policy during the litigation as a result of the detectives

11:16:18   17    maintaining their notes and so I think that is I think what

11:16:25   18    should be allowed.  And that is why they changed their policy

11:16:28   19    without saying what the -- and that there was this issue in

11:16:32   20    the Jones case is acceptable too which I think the Court has

11:16:36   21    allowed before.

11:16:38   22            Then they get into a lot of detail about days after

11:16:42   23    the suit was filed, a federal judge order the city to preserve

11:16:45   24    all the street files.  And the department notice and et

11:16:49   25    cetera.  I think as far as the order preserving the street

11/29/16 AM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 87 of 303 PageID #:64250
***REALTIME UNEDITED TRANSCRIPT ONLY***

86

| | | |
|---|---|---|
| 11:16:53 | 1 | files for that time, it's probably okay.  So no objection to |
| 11:16:58 | 2 | that, but it would go into the general, the policy was changed |
| 11:17:04 | 3 | as a result by the superintendent. |
| 11:17:08 | 4 | The next line. |
| 11:17:09 | 5 | THE COURT:  Hang on a second.  So sentence 2 of |
| 11:17:11 | 6 | paragraph 5 says that the superintendent then issued a |
| 11:17:16 | 7 | departmental notice instructing that all notes be preserved. |
| 11:17:20 | 8 | Is there something wrong with that sentence? |
| 11:17:21 | 9 | MR. NOLAND:  That's okay. |
| 11:17:22 | 10 | THE COURT:  It's the following sentence? |
| 11:17:23 | 11 | MR. NOLAND:  It's the following sentence. |
| 11:17:24 | 12 | THE COURT:  The Court's order was amended in '82 when |
| 11:17:28 | 13 | the Court learned that the detectives were circumventing the |
| 11:17:31 | 14 | order and they were instructed to preserve all street files. |
| 11:17:34 | 15 | Let me ask, what was the amendment in September of '82?  Can I |
| 11:17:38 | 16 | ask plaintiff's counsel? |
| 11:17:40 | 17 | MR. ART:  So the amendment in '82 is the Court |
| 11:17:45 | 18 | reacting to the teletype. |
| 11:17:47 | 19 | THE COURT:  I'm asking something way more specific. |
| 11:17:51 | 20 | What was changed about the order?  This is a preliminary |
| 11:17:53 | 21 | injunction or the TRO, whichever it was? |
| 11:17:56 | 22 | MR. ART:  Right. |
| 11:17:57 | 23 | MR. SWAMINATHAN:  You're asking the difference from |
| 11:18:00 | 24 | the original 84? |
| 11:18:01 | 25 | THE COURT:  How was the order amended, that's the |

11/29/16 AM                Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 88 of 303 PageID #:64251
***REALTIME UNEDITED TRANSCRIPT ONLY***

87

| | |
|---|---|
| 11:18:03 | 1 | question? |
| 11:18:03 | 2 | MR. SWAMINATHAN:  The TRO was amended to make it |
| 11:18:05 | 3 | essentially a little more broad to say not just street files, |
| 11:18:08 | 4 | it's like street files plus any locations in which street |
| 11:18:11 | 5 | files may exist.  It was just -- |
| 11:18:13 | 6 | THE COURT:  Okay.  Keep going, Mr. Noland.  You don't |
| 11:18:16 | 7 | have to talk about that one. |
| 11:18:19 | 8 | MR. NOLAND:  Paragraph 6, as far as the specifics of |
| 11:18:22 | 9 | the federal judge's finding on March 31st, 1983, we believe |
| 11:18:26 | 10 | all of that would is improper and would open the door and |
| 11:18:29 | 11 | require us to respond with Palmer 2 because specifically. |
| 11:18:36 | 12 | THE COURT:  When you say Palmer 2, I just want to |
| 11:18:38 | 13 | make sure -- I understand what you're talking about.  Which -- |
| 11:18:42 | 14 | you're talking about one of the Court of Appeals? |
| 11:18:44 | 15 | MR. NOLAND:  Yes, 806 F.2d 1360. |
| 11:18:47 | 16 | THE COURT:  Which one is that?  Is that the one |
| 11:18:50 | 17 | that's partially affirmed and partially overturned in the |
| 11:18:51 | 18 | preliminary injunction? |
| 11:18:51 | 19 | MR. NOLAND:  No. |
| 11:18:53 | 20 | THE COURT:  That's the later one? |
| 11:18:53 | 21 | MR. NOLAND:  It's the later one where the Court said |
| 11:18:55 | 22 | the claim depends on there being exculpatory material in the |
| 11:18:57 | 23 | street file and there isn't any. |
| 11:19:00 | 24 | THE COURT:  Keep going. |
| 11:19:00 | 25 | MR. NOLAND:  And the argument on that would be -- |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11:19:02   1   their argument is this comes in as to notice.  And the city --

11:19:06   2   the superintendent, of course, the policy was changed and they

11:19:10   3   now about the litigation in '82 and '83.  However, they also

11:19:13   4   now that the plaintiffs weren't finding anything in these

11:19:15   5   alleged street files so the plaintiffs are trying to make it

11:19:18   6   seem like there's this incredibly, giving notice that the city

11:19:21   7   was on notice that there was an epidemic of withholding their

11:19:24   8   street files when that's not the case.

11:19:28   9            To continue, so that would be paragraph 6.

11:19:31   10           Paragraph 6B as to what the commanders interpreted.

11:19:40   11   This is all -- these are all things happening in advance of

11:19:43   12   the policy being rewritten for 83-1 and then 83-2.  So to us

11:19:50   13   it's irrelevant.  That all these details will confuse the jury

11:19:56   14   as to what they're being called upon here, whether or not

11:19:59   15   after 83-1, whether or not there was a practice of withholding

11:20:03   16   exculpatory material.

11:20:04   17           THE COURT:  Pause for a second.  So are you talking

11:20:07   18   -- are you talking about paragraph 7 yet?  Or you are not to

11:20:11   19   paragraph 7?

11:20:11   20           MR. NOLAND:  That was paragraph 6.

11:20:13   21           And it would be the same thing with respect to

11:20:27   22   paragraph 7 because the Court's finding, the District Court's

11:20:33   23   finding was overturned and so this insufficient -- the city

11:20:39   24   was on in the that its policy before owe.

11:20:41   25           THE COURT:  When was it overturned?  What was the

11:20:43   1   date?

11:20:44   2           MR. NOLAND:  November of '86.  However, the

11:20:46   3   litigation was ongoing and the city wasn't on in the of any

11:20:49   4   other cases in that litigation and the appeal was filed in '84

11:20:54   5   as to that ruling.  And so the city was actually -- they're

11:20:58   6   trying to say the city was on notice of this epidemic of the

11:21:00   7   pre 83-1 policy when in fact the opposite is true, the facts

11:21:04   8   in the litigation developed that there wasn't.  It was simply

11:21:07   9   the Jones case, so this leads a misimpression and misleading

11:21:11  10   facts for the jury.  So that would be paragraph 7.

11:21:17  11           THE COURT:  Can I ask this question?  There's special

11:21:20  12   order 83-1 and then there's special order 83-2.  Right?

11:21:24  13           MR. NOLAND:  Yes, sir.

11:21:25  14           THE COURT:  Both of which Hickey -- somebody

11:21:28  15   testified about it?

11:21:29  16           MR. NOLAND:  Hickey testified about it.

11:21:30  17           THE COURT:  When was 83-2 adopted?

11:21:32  18           MR. NOLAND:  May of '83.

11:21:33  19           THE COURT:  Did Hickey testify about the background

11:21:37  20   for the change from 83-1 to 83-2?

11:21:41  21           MR. NOLAND:  Yes, he did.  He explained that it was

11:21:42  22   in conjunction with discussions relative to the litigation

11:21:50  23   with the corporation counsel's office, the plaintiff's

11:21:51  24   attorneys, I think -- and the -- I can't remember.  I think

11:21:56  25   specifically he probably would have said that people in the

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 91 of 303 PageID #:64254
11/29/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

90

11:21:58  1    police department.

11:22:01  2            THE COURT:  Okay.  Have you covered what you needed

11:22:03  3    to cover?

11:22:04  4            MR. NOLAND:  Yes, your Honor.

11:22:05  5            THE COURT:  All right.  So, look, we had a lot of

11:22:12  6    discussion about this.  I am going to tell you what you can do

11:22:14  7    and what you can't do.

11:22:15  8            I'm going through this proffer as you've written it.

11:22:18  9            Paragraph 1 on page 2, I am not going to get into a

11:22:23  10   fight over may versus could in terms of whether Jones may or

11:22:28  11   may not have committed the murder, could, I am not going to

11:22:32  12   micro manage it to that level of detail.

11:22:36  13           The first three sentences I think are all appropriate

11:22:40  14   and admissible.  I don't think the fourth sentence that reads,

11:22:44  15   in spring 1982, Laverty learned Jones was on trial for murder,

11:22:49  16   he told his commander that an innocent person was being

11:22:54  17   prosecuted and his commander did nothing.  I don't think

11:22:54  18   that's necessary.  I am excluding that under 403.

11:22:57  19           The last two sentences are fine because they are

11:22:59  20   admissible to show notice as I have previously ruled.  That

11:23:03  21   topic is admissible, so the two sentences about telling Jones'

11:23:07  22   criminal defense attorney and declaring a mistrial and the

11:23:11  23   charges being dropped, those are appropriate.

11:23:13  24           As far as paragraph 2 is concerned, I think it goes

11:23:16  25   into too much detail regarding what the lawsuit said.  I think

| | |
|---|---|
| 11:23:20 | 1 |
| 11:23:25 | 2 |
| 11:23:30 | 3 |

1  you can bring out that in 1983, Mr. Jones filed a civil

2  lawsuit challenging the practices that had been -- you know,

3  he claimed to have been exposed in that case, period.

4  Paragraph 3 about disciplinary proceedings against

5  Laverty, I don't see that as admissible.  I don't think it's

6  relevant.  Even if it is relevant, it's unfairly prejudicial

7  and gets us off into a side track.  That's excluded.

8  Paragraph 4, now we have flipped over to Palmer, I

9  think that on the first -- that on that sentence or first

10  sentence on that, I think the way it needs to be elicited is

11  that there was a class action lawsuit alleging a policy and

12  practice rather than it was filed to challenge the policy and

13  practice, it's a lawsuit alleging a policy and practice of

14  suppressing investigative materials.  The second sentence is

15  fine, city policy makers had notice and participated in the

16  lawsuit.

17  In terms of paragraph 5, days after the lawsuit was

18  filed, give a date.  You know it.  It's a court order.  You

19  know what the date is.  Let's give a date than the day after

20  the lawsuit was filed.  The first two sentences are fine.  On

21  whatever date the judge ordered that the CPD preserve all

22  street files and the superintendent issued a departmental

23  notice instructing that all notes be preserved.  I'll just

24  point out that the second sentence is already coming in I

25  think through Hickey.

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 93 of 303 PageID #:64256

11:24:44   1          I think that the amendment of the order, it's really

11:24:46   2   inconsequential for purposes of this and certainly the reasons

11:24:50   3   for it I don't think are terribly significant and so -- and it

11:24:54   4   gets us off into a side track, so I am excluding the third

11:24:57   5   sentence of paragraph 5.

11:24:59   6          Paragraph 6 and 7, I am basically going to collapse

11:25:03   7   into one thing.  Because I don't really think it's either

11:25:07   8   necessary or appropriate to get into the details of the

11:25:14   9   judge's findings in the case.  I just want to look at one

11:25:20  10   thing.  Hang on a second.

11:25:24  11          The details of the judge's findings in the case, so

11:25:27  12   the stuff about how there was a finding that how people were

11:25:31  13   applying it in an improperly restricted way and what

11:25:36  14   commanders were doing, how official reports from sometimes

11:25:41  15   prepared and so on, I don't think any of that is necessary.

11:25:43  16   However, I do think that -- I think if I didn't say this, I at

11:25:47  17   least hinted it pretty strongly in the order that I entered

11:25:50  18   previously on this topic, the written order, that I think that

11:25:54  19   you're entitled to bring in that there was -- that there was a

11:25:58  20   determination by a judge that special order 83-1 was

11:26:03  21   insufficient to accord criminal defendants the full rights to

11:26:06  22   which they were entitled.  But I do not think that the

11:26:12  23   specifics of that are relevant.  I mean, I think that you can

11:26:18  24   then -- you have a basis to link that up with Hickey's

11:26:21  25   testimony that in May of '83, there was a further amendment

| | | |
|---|---|---|
| 11:26:26 | 1 | based on he testified, discussions with plaintiff's counsel, |
| 11:26:30 | 2 | so you can put in the first sentence of paragraph 7, not the |
| 11:26:33 | 3 | rest of it, not paragraph 6, and I continue to believe and I |
| 11:26:38 | 4 | am again ruling that what happened on the appeals is not |
| 11:26:40 | 5 | relevant because this is all being admitted for the purpose of |
| 11:26:43 | 6 | showing notice.  And there was no finding on appeal until 1986 |
| 11:26:49 | 7 | besides.  So there you go. |
| 11:26:51 | 8 | All right.  Is everybody clear enough on all of that? |
| 11:26:53 | 9 | MR. LOEVY:  I think so, your Honor. |
| 11:26:54 | 10 | THE COURT:  All right.  So take 10 minutes and then |
| 11:26:57 | 11 | we will resume. |
| 11:26:58 | 12 | MR. LOEVY:  Thank you. |
| 11:26:58 | 13 | MR. KULWIN:  Thanks, Judge. |
| 11:26:59 | 14 | (Short break.) |
| 11:35:24 | 15 | (The jury enters the courtroom.) |
| 11:35:32 | 16 | THE COURT:  All right.  Everybody can have a seat. |
| 11:35:34 | 17 | The next witness is on his way up. |
| 11:35:36 | 18 | (Witness sworn.) |
| 11:35:53 | 19 | THE COURT:  Mr. Loevy, you can go ahead. |
| 11:35:55 | 20 | - - - |
| 11:35:55 | 21 | MICHAEL DAVID BRASFIELD, DIRECT EXAMINATION |
| 11:35:55 | 22 | BY MR. LOEVY: |
| 11:35:56 | 23 | Q. Sir, if you'd state your name for the record. |
| 11:35:59 | 24 | A. Michael David Brasfield. |
| 11:36:01 | 25 | Q. What is your profession? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | |
|---|---|
| 11:36:02 | 1 |
| 11:36:05 | 2 |
| 11:36:08 | 3 |
| 11:36:11 | 4 |
| 11:36:13 | 5 |
| 11:36:16 | 6 |
| 11:36:20 | 7 |
| 11:36:25 | 8 |
| 11:36:29 | 9 |
| 11:36:34 | 10 |
| 11:36:37 | 11 |
| 11:36:43 | 12 |
| 11:36:46 | 13 |
| 11:36:50 | 14 |
| 11:36:54 | 15 |
| 11:36:59 | 16 |
| 11:37:06 | 17 |
| 11:37:10 | 18 |
| 11:37:13 | 19 |
| 11:37:19 | 20 |
| 11:37:24 | 21 |
| 11:37:27 | 22 |
| 11:37:28 | 23 |
| 11:37:33 | 24 |
| 11:37:41 | 25 |

A.  I am retired from law enforcement after about 40 years and
I occasionally do an expert witness and consulting work.
Q.  Let's focus on your law enforcement career.  Tell the jury
a little bit about your history.
A.  As briefly as I can, I started in law enforcement in a
small agency in Washington state in 1968.  After a year there,
I transferred to the Seattle police department on January --
in January of 1969.  I stayed with the Seattle police
department until my retirement in January of 1995.  About 26
years.  While I was with the Seattle police department, I
served as a patrol officer, took an exam and eventually became
a detective, served in a number of investigative units within
the police department.  I then was promoted to sergeant.  I
served in a number of positions as a sergeant including
internal affairs and vice and prosecution enforcement.  I was
eventually promoted in 1978 to lieutenant and I was assigned
at the time the city of Seattle had a contract to provide all
law enforcement training statewide in the statewide police
academy and I became a commander of that.  We train law
enforcement officers from approximately 130 different
agencies, provided them with the basic tools to become police
officers.
        I was promoted to captain in 1980.  I was in command
of both the downtown commercial water front business precinct.
I was then transferred to the command of the internal

11:37:45  1    investigation section and I held that position for a couple of

11:37:50  2    years, investigated everything from officer involved shootings

11:37:54  3    to police misconduct, including felony accusations and

11:37:59  4    allegations against officers.

11:38:01  5        After the two years there, I was requested and was

11:38:04  6    assigned to be the commander of the university district, the

11:38:10  7    University of Washington, and a number of other universities

11:38:17  8    were and I stayed there for the two years.  He was then in the

11:38:21  9    city of Seattle captain is the highest civil service rank.  I

11:38:26  10   was tapped to become a major and was put in charge of the

11:38:30  11   instructional service division.  And in the inspectional

11:38:33  12   services definition, among many other things, we reviewed,

11:38:38  13   wrote, modified policies and practices throughout the

11:38:42  14   department including homicides, homicide investigations.  We

11:38:47  15   also conducted audits and inspections of units throughout the

11:38:52  16   police department.

11:38:53  17   Q.  Let me slow you down there for a second?

11:38:56  18   A.  Yes, sir.

11:38:57  19   Q.  You were talking about your ranks.  Did you achieve ranks

11:38:59  20   all the way up to assistant chief and chief?

11:39:02  21   A.  Yes.

11:39:02  22   Q.  Tell the jury about that?

11:39:03  23   A.  After I served as commander of the inspector services

11:39:08  24   division, I was promoted to assistant chief which is one step

11:39:12  25   below the chief of police and my responsibilities were as

11:39:17  1   assistant chief with the administrative services and that

11:39:21  2   included the records bureau, the maintenance of the subpoena

11:39:26  3   services, and a number of other units including 911 dispatch

11:39:32  4   services.

11:39:33  5   Q.  All right.  Did you eventually become a police chief?

11:39:35  6   A.  I did.  After retiring in January of '95, I was contacted

11:39:41  7   by the city of Fort Lauderdale Florida and in June or July of

11:39:46  8   1995, I was selected to be the police chief there.  And I

11:39:52  9   served in that capacity until I decided it was time for a

11:39:56  10  second retirement and I left as chief of police in Fort

11:40:02  11  Lauderdale in 2001.

11:40:03  12  Q.  After that?

11:40:03  13  A.  I returned to Washington state.  I kind of sat in the

11:40:11  14  retirement cabin for a little while and got bored and there

11:40:17  15  was an upcoming election for sheriff of Jefferson County,

11:40:20  16  Washington, predominantly a rural area.  I had never been

11:40:24  17  involved officially in politics.  And decided to run for

11:40:28  18  sheriff.  I was elected.  I completed my first term, ran for

11:40:32  19  reelection, was successful and started grooming a replacement

11:40:41  20  and about halfway through my second four-year term, I decided

11:40:46  21  to retire and my successor was appointed to fill that

11:40:50  22  position.

11:40:50  23  Q.  Now, you have some associations and memberships.  Can you

11:40:54  24  just summarize that?

11:40:54  25  A.  I was granted life membership with the international

11/29/16 AM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 98 of 303 PageID #:64261
***REALTIME UNEDITED TRANSCRIPT ONLY***

97

| 11:40:58 | 1 | associations of chiefs of police, life membership with the |
| 11:41:02 | 2 | police executive research forum, life membership with the |
| 11:41:08 | 3 | national sheriff's association,as well as a number of state |
| 11:41:14 | 4 | organizations. |
| 11:41:14 | 5 | Q.  And in that capacity, do you have the ability or the |
| 11:41:17 | 6 | opportunity to interact with other agencies and become |
| 11:41:21 | 7 | familiar with other police departments policies and practices? |
| 11:41:23 | 8 | A.  Yes, both in the process of writing policies and practices |
| 11:41:27 | 9 | and implementing them and monitoring them in the city of |
| 11:41:30 | 10 | Seattle as well as as a chief and as a sheriff, I have regular |
| 11:41:38 | 11 | and significant interaction with other agencies. |
| 11:41:40 | 12 | Q.  And you mentioned audits, and I cut you off at audits. |
| 11:41:43 | 13 | Briefly, did that give you experience and opportunity to learn |
| 11:41:45 | 14 | about other police departments too? |
| 11:41:47 | 15 | A.  Yes.  I was while on active duty, I participated in a |
| 11:41:54 | 16 | federal grant to inspect and provide audit information on the |
| 11:42:01 | 17 | delivery of police services to a number of cities nationwide |
| 11:42:06 | 18 | on the delivery of police services in public housing, and that |
| 11:42:10 | 19 | process, my portion of the team was to look at their records |
| 11:42:12 | 20 | keeping and their delivery of information to outside request |
| 11:42:18 | 21 | errs. |
| 11:42:18 | 22 | Q.  So that was actually the area of your expertise was record |
| 11:42:21 | 23 | keeping documentation and transmitting that stuff to outside? |
| 11:42:24 | 24 | A.  In that particular project, yes. |
| 11:42:26 | 25 | Q.  You also mentioned training.  Did that also in your |

11:42:29   1   training capacity, did that give you experience with other

11:42:33   2   departments too?

11:42:33   3   A.  Yes, one of the processes at training both at the entry

11:42:36   4   level police officer deputy training is to look at their

11:42:41   5   policies and practices.  You have an academy class, three

11:42:49   6   academy classes with officers from multiple agencies, you have

11:42:53   7   to become familiar with their policies and procedures and

11:42:56   8   tailored the training to reflect what they need to do in

11:42:59   9   theirs.  In that process, you're looking at their policies and

11:43:04   10  practices and there's not too many agencies that I am aware of

11:43:07   11  when you're doing policies like when I was at inspection

11:43:12   12  services or the chief or the sheriff, you are not always

11:43:16   13  hoping to reinvent the wheel.  You are looking to see what

11:43:19   14  some of the other agencies are doing nationwide.

11:43:22   15  Q.  You said you actually worked in records division for a

11:43:24   16  time, correct?

11:43:25   17  A.  As an assistant chief, I absorbed that division, yes.

11:43:29   18  Q.  Supervising?

11:43:29   19  A.  Yes.

11:43:30   20  Q.  And that would include homicide files as well, right?

11:43:33   21  A.  Yes.

11:43:33   22  Q.  When you were the chief in Fort Lauderdale, did that give

11:43:36   23  you jurisdiction over the policies and practices including

11:43:38   24  what you've called high risk policies and practices?

11:43:40   25  A.  Yes.  When I describe high risk policies, things that have

| 11:43:49 | 1 | the opportunity or the potential for significant impact either |
| 11:43:53 | 2 | budgetarily or legal liability and, in some instances, police |
| 11:43:56 | 3 | pursuits and use of deadly force that either citizens or |
| 11:44:00 | 4 | officer's lives are in danger. |
| 11:44:02 | 5 | Q.  All right.  Were you a detective -- did you have |
| 11:44:05 | 6 | supervision over detective over the course of your career? |
| 11:44:07 | 7 | A.  Yes, I had that opportunity both as a sergeant and as a |
| 11:44:13 | 8 | captain and as a chief and as a sheriff. |
| 11:44:17 | 9 | Q.  Have you investigated as a detective homicides? |
| 11:44:19 | 10 | A.  I have investigated traffic homicides, traffic fatalities |
| 11:44:24 | 11 | for hit and runs.  You have situations where you have a fatal |
| 11:44:29 | 12 | crash, you may or may not have a suspect at the scene, you |
| 11:44:35 | 13 | have to assemble the files. |
| 11:44:36 | 14 | Q.  All right.  And as a suspect in charge of internal |
| 11:44:40 | 15 | investigations and the assistant chief in Seattle, did you |
| 11:44:42 | 16 | regularly oversee and review detective doing homicide |
| 11:44:46 | 17 | investigations? |
| 11:44:46 | 18 | A.  Yes. |
| 11:44:47 | 19 | Q.  Is that a subject about which you have great familiarity? |
| 11:44:50 | 20 | A.  I am. |
| 11:44:51 | 21 | Q.  All right.  Let's talk about this real briefly, the |
| 11:44:58 | 22 | Washington state Attorney General homicide investigation |
| 11:45:01 | 23 | tracking system. |
| 11:45:02 | 24 | A.  The Washington state Attorney General instituted because |
| 11:45:07 | 25 | of dissatisfaction statewide with clearances of homicide |

11:45:12    1    investigations and inconsistent procedures for homicide

11:45:17    2    investigations created what the acronym was HITS, homicide

11:45:25    3    investigation tracking system.  It consisted of 10 or 12

11:45:30    4    practitioners, the number varied from time to time including

11:45:33    5    what we call in Washington State prosecuting attorneys, police

11:45:37    6    investigators, and we would review problematic homicide cases

11:45:44    7    from around the state that were either coming to a dead end or

11:45:51    8    not seeming to have a coordination in the investigation.

11:45:56    9    Q.  All right.  In summary then, is the subject of policies

11:45:59    10   and practices about documenting and disclosing investigation

11:46:02    11   materials, is that something you have expertise in, sir?

11:46:04    12   A.  Yes, sir.

11:46:05    13   Q.  All right.  Since you've retired, you mentioned you do

11:46:08    14   some expert witness stuff?

11:46:09    15   A.  Yes.

11:46:09    16   Q.  Some consulting.

11:46:11    17        About how many cases have you been involved with?

11:46:13    18   A.  I have actually been retained somewhere between 120 or

11:46:21    19   130.  However, the distinction is how many I have been deposed

11:46:26    20   Oregon to trial on.

11:46:27    21   Q.  So let's break that down.  Sometimes you get retained and

11:46:31    22   you get a fee to review materials?

11:46:33    23   A.  Right, that's correct.

11:46:34    24   Q.  What's your first step when you get retained?

11:46:36    25   A.  I ask for copies of certain documents relative to the

11:46:41  1   litigation, whether it is the criminal -- the civil complaint,

11:46:47  2   any depositions that have already been taken, any statements,

11:46:52  3   any police reports, that type of thing and review them.

11:46:55  4   Q.  Then you do a review?

11:46:57  5   A.  Yes.

11:46:58  6   Q.  Does it matter who hires you as far as the opinion and the

11:47:02  7   money, explain?

11:47:03  8   A.  No, looked recently, about 60 to 66 percent of the cases

11:47:09  9   have been for governmental entities, for cities, counties,

11:47:16  10  state agencies, police departments.  The other 40 have been

11:47:18  11  for plaintiff's cases where someone is suing the agencies.

11:47:23  12  Q.  If a lawyer calls you and says they want you to review the

11:47:26  13  facts of the case, does that mean you automatically are going

11:47:29  14  to take their side or testify for them?

11:47:30  15  A.  No, depending on whether I had experience with the

11:47:33  16  attorney or the law firm in the past, I may agree to take a

11:47:38  17  quick look at some material to see if it's something that I

11:47:41  18  thought I could honestly be engaged in.  Oftentimes, I'll look

11:47:48  19  at the material and indicate I appreciate what you're trying

11:47:53  20  to do here, but I am not going to be a very good witness for

11:47:56  21  you because I don't feel that what was done was correct.

11:47:58  22  Q.  All right.  So you'll only do the cases where you believe

11:48:02  23  it was correct?

11:48:02  24  A.  Yes.

11:48:03  25  Q.  Do you generally charge an hourly rate to review materials

| | | |
|---|---|---|
| 11:48:06 | 1 | in these cases? |
| 11:48:06 | 2 | A. I do. |
| 11:48:07 | 3 | Q. So you get paid that rate either way regardless of whether |
| 11:48:10 | 4 | you have good news or bad news for the attorney? |
| 11:48:12 | 5 | A. That's correct. |
| 11:48:12 | 6 | Q. All right. In this case, you did a lot of work, did you |
| 11:48:15 | 7 | not? |
| 11:48:15 | 8 | A. I did. This was one. Most time consuming. |
| 11:48:18 | 9 | Q. How many hours would you say you've spent in this case? |
| 11:48:21 | 10 | A. Somewhere between 100 and 150, perhaps. |
| 11:48:25 | 11 | Q. Hours? |
| 11:48:25 | 12 | A. Yes. |
| 11:48:26 | 13 | Q. And what is your hourly rate? |
| 11:48:27 | 14 | A. $300 an hour. |
| 11:48:28 | 15 | Q. Is that commensurate with the hourly rate of people in |
| 11:48:32 | 16 | your industry? |
| 11:48:32 | 17 | A. Yes, it is. |
| 11:48:33 | 18 | Q. Has your rate stayed the same Oregon up overtime? |
| 11:48:36 | 19 | A. I initially started out probably eight or nine years ago |
| 11:48:40 | 20 | at $250 an hour and four or five years ago I raised it to 3, |
| 11:48:46 | 21 | but it's been that way. |
| 11:48:47 | 22 | Q. In addition to this case with the 100 to 150 hours, have |
| 11:48:53 | 23 | you had or cases to study the policies and practices of the |
| 11:48:56 | 24 | Chicago Police Department? |
| 11:48:57 | 25 | A. I have. |

| 11:48:58 | 1 | MR. NOLAND: Objection. |

| 11:48:58 | 2 | THE COURT: I need to ask you about this at sidebar. |

11:49:09   3   (The following proceedings were had at sidebar outside the

11:49:11   4   hearing of the jury:)

11:49:11   5   THE COURT: Where are you going with this? Is it

11:49:13   6   just yes or no? Are you going to ask him details?

11:49:15   7   MR. LOEVY: I was going to ask him you have spent how

11:49:19   8   many hours, I believe he would say 4 to 500 hours looking at

11:49:23   9   the Chicago's policies and practices. Your Honor had a little

11:49:23   10   discussion about what this opens to and how far. If they want

11:49:27   11   to say, isn't it true you did a bunch of cases against

11:49:29   12   Chicago, we are going to say, well, those cases say this and

11:49:32   13   that. Just talk about, hey, I spent 4 to 500 hours looking at

11:49:37   14   the city's policies and practices.

11:49:38   15   THE COURT: I understand.

11:49:39   16   Articulate the objection, Mr. Noland.

11:49:42   17   MR. NOLAND: The objection is that that would I think

11:49:46   18   be a not disclosed opinion as to us as which is things he

11:49:51   19   relied on in the Fields case and what's in the Fields report.

11:49:55   20   I told Mr. Loevy it was unlikely I would be asking him about

11:49:59   21   other cases that Mr. Loevy's firm has hired Mr. Brasfield on

11:50:04   22   relative to the City of Chicago.

11:50:05   23   THE COURT: Okay. I am going to exclude it at this

11:50:07   24   point. If you think that there's something that's covered on

11:50:09   25   cross that opens the door, then you'll tell me before the

| 11:50:12 | 1 | redirect. |
| 11:50:12 | 2 |      MR. LOEVY:  Got it. |
| 11:50:13 | 3 |  (The following proceedings were had in open court in the |
| 11:50:16 | 4 | presence and hearing of the jury:) |
| 11:50:16 | 5 |      THE COURT:  Okay.  You can proceed. |
| 11:50:18 | 6 | BY MR. LOEVY: |
| 11:50:19 | 7 | Q. All right.  Let's turn to your role in this case.  What |
| 11:50:24 | 8 | did you review as part of forming opinions? |
| 11:50:28 | 9 | A. I looked at the depositions of the city's representative, |
| 11:50:37 | 10 | Mr. Hickey, I've looked at policies and procedures of the |
| 11:50:44 | 11 | Chicago Police Department, I've looked at records that have |
| 11:50:47 | 12 | been found or located or retained in the Chicago Police |
| 11:50:51 | 13 | Department, I've reviewed other depositions and other court |
| 11:50:54 | 14 | material. |
| 11:50:55 | 15 | Q. All right.  Let's focus on the files that got found.  Can |
| 11:50:59 | 16 | you tell the jury what your understanding is what the files |
| 11:51:00 | 17 | were? |
| 11:51:01 | 18 | A. Well, which files? |
| 11:51:04 | 19 | Q. The files from the basement. |
| 11:51:06 | 20 | A. Okay.  What are commonly referred to as the basement |
| 11:51:10 | 21 | files.  You want me to give the background? |
| 11:51:13 | 22 | Q. Yes, please. |
| 11:51:14 | 23 | A. There were literally hundreds of files that were located |
| 11:51:22 | 24 | in the basement of I believe area one pertaining to homicide |
| 11:51:27 | 25 | investigations.  They ranged in time period from I believe as |

| | |
|---|---|
| 11:51:31 | 1 early as the 1940s up through 2000s. They were files that had |
| 11:51:39 | 2 not previously been disclosed. |
| 11:51:42 | 3 MR. NOLAND: Objection, your Honor. Move to strike. |
| 11:51:46 | 4 THE COURT: Well, the last sentence I am going to |
| 11:51:48 | 5 strike not because it's right or wrong but because it's not |
| 11:51:51 | 6 responsive to the question. |
| 11:51:52 | 7 MR. LOEVY: All right. |
| 11:51:53 | 8 THE COURT: Let's proceed on a question by question |
| 11:51:55 | 9 basis. |
| 11:51:55 | 10 BY MR. LOEVY: |
| 11:51:56 | 11 Q. You're undertaking part of it was to examine some of those |
| 11:51:59 | 12 files, correct? |
| 11:51:59 | 13 A. That's correct. |
| 11:52:00 | 14 Q. All right. Of those files from the basement, how did you |
| 11:52:03 | 15 determine your sample, tell the jury what your sample was? |
| 11:52:05 | 16 A. Well, the first -- the case in point here was one of the |
| 11:52:13 | 17 driving, Mr. Fields' case, but also to pick out two groups of |
| 11:52:20 | 18 files. A group of files that would represent a time period |
| 11:52:23 | 19 roughly three years before and after Mr. Fields' first trial |
| 11:52:29 | 20 and a second group of files that would as closely as possible |
| 11:52:36 | 21 correspond to his second trial. That time period -- the first |
| 11:52:40 | 22 time period was from 1983 to 1986. The second time period was |
| 11:52:45 | 23 from 1999, I believe, to 2006, somewhere in there. |
| 11:52:50 | 24 Q. All right. It was on both sides of both criminal trials, |
| 11:52:53 | 25 right? |

| | | |
|---|---|---|
| 11:52:53 | 1 | A.  Yes. |
| 11:52:54 | 2 | Q.  Six-year time periods? |
| 11:52:55 | 3 | A.  Yes, six and seven. |
| 11:52:56 | 4 | Q.  Just to lead you through it, it was your understanding |
| 11:52:58 | 5 | that the Fields file was disclosed many years after the fact, |
| 11:53:02 | 6 | the Fields investigative file, correct? |
| 11:53:03 | 7 | A.  That's correct. |
| 11:53:04 | 8 | Q.  And the Fields file was among some file cabinets that had |
| 11:53:08 | 9 | other files, correct? |
| 11:53:10 | 10 | A.  Yes. |
| 11:53:11 | 11 | Q.  And then one of the questions was whether the materials in |
| 11:53:13 | 12 | these investigative files had been disclosed to the criminal |
| 11:53:16 | 13 | justice system, that was one of the things you looked at? |
| 11:53:18 | 14 | A.  That's correct. |
| 11:53:18 | 15 | Q.  Did you analyze those files, the sample you just told us |
| 11:53:27 | 16 | about? |
| 11:53:27 | 17 | A.  Yes, I did. |
| 11:53:28 | 18 | Q.  And that was part of your opinions in this case, correct? |
| 11:53:31 | 19 | A.  Yes. |
| 11:53:31 | 20 | Q.  All right.  Let's back up and tell the jury turning to |
| 11:53:37 | 21 | your opinions, do police departments have systems, are they |
| 11:53:41 | 22 | supposed to have systems for turning over exculpatory evidence |
| 11:53:43 | 23 | and can you explain? |
| 11:53:44 | 24 | A.  Yes.  What's commonly referred to as Brady v. Maryland, |
| 11:53:51 | 25 | which back I believe in 1963, but the process that officers |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | |
|---|---|
| 11:53:57 | 1 |
| 11:54:01 | 2 |
| 11:54:06 | 3 |
| 11:54:15 | 4 |
| 11:54:25 | 5 |
| 11:54:27 | 6 |
| 11:54:29 | 7 |
| 11:54:37 | 8 |

1  learn and more importantly, commanders and administrative

2  police agencies and sheriff's office develop systems so that

3  they have a as much as possible a consistent foolproof process

4  of delivering information, all information pertaining -- that

5  could be potentially useful to the prosecutor in determining

6  or the state's attorney in determining whether they want to

7  file charges and to the -- eventually if charges are filed to

8  the criminal defense attorney.

9  Q.  In your experience, do all modern police departments have

10  a responsibility to create such systems that work?

11  A.  Yes.

12  Q.  And you said documenting information.  Are detectives

13  supposed to document all potentially relevant information?

14  A.  Yes.

15  Q.  Can you explain?

16  A.  When a detective is developing leads, developing

17  information, whether it's in the field, on the phone, face to

18  face interviews, they gather, as you can well imagine, all

19  sorts of information.  Oftentimes, you don't know the

20  relevance of that information at the time.  So when someone

21  tells you that they were either in a place or not in a place

22  at a certain time, that's the kind of information you want to

23  document.  If they give you information about physical

24  evidence, a description of a car, a description of an

25  individual, information about something that they observed,

11/29/16 AM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 109 of 303 PageID #:64272
***REALTIME UNEDITED TRANSCRIPT ONLY***

108

| | | |
|---|---|---|
| 11:55:32 | 1 | all of those kinds of things, as well as physical evidence, |
| 11:55:36 | 2 | obviously, should be documented. |
| 11:55:39 | 3 | Q.  Why is it important or necessary to document seemingly |
| 11:55:43 | 4 | benign details? |
| 11:55:44 | 5 | A.  Because if you -- it's much like if you picked up a who |
| 11:55:49 | 6 | done it novel, you don't know until you get towards the end |
| 11:55:55 | 7 | what the eventual solution is, if you will, or the outcome and |
| 11:55:59 | 8 | oftentimes, in fact, the times I'm familiar with, if you |
| 11:56:03 | 9 | picked up what's commonly referred to in police parlance as a |
| 11:56:07 | 10 | murder book, you see a number of different investigative |
| 11:56:12 | 11 | tracks or leads.  They go off in different directions. |
| 11:56:16 | 12 | Q.  All right.  So it is important to document everything? |
| 11:56:18 | 13 | A.  Yes. |
| 11:56:18 | 14 | Q.  Is that universal and throughout the country? |
| 11:56:19 | 15 | A.  In any that I have been familiar with, it is.  With |
| 11:56:24 | 16 | perhaps one exception. |
| 11:56:24 | 17 | Q.  And who does -- what's that one exception? |
| 11:56:26 | 18 | A.  Chicago Police Department. |
| 11:56:27 | 19 | Q.  Does Chicago stand out as an aberration in your review for |
| 11:56:33 | 20 | how well or poorly they do that job? |
| 11:56:34 | 21 |         MR. NOLAND:  Objection, your Honor.  Foundation. |
| 11:56:36 | 22 |         THE COURT:  Overruled. |
| 11:56:37 | 23 |         THE WITNESS:  In my opinion, based on the material |
| 11:56:39 | 24 | that I have had access to and reviewed, they have done a very, |
| 11:56:43 | 25 | very poor job of doing it through the years. |

| 11:56:47 | 1 | BY MR. LOEVY: |
| 11:56:47 | 2 | Q. I'm saying compared to other departments? |
| 11:56:49 | 3 | A. Compared to others, in not only my personal experience but |
| 11:56:55 | 4 | in my reading and in my visits and my audits of other agencies |
| 11:57:00 | 5 | and all over the 40-year period of time, the best way of doing |
| 11:57:06 | 6 | that is a centralized file, centralized records system. As |
| 11:57:12 | 7 | soon as you split that off, then you start getting more and |
| 11:57:16 | 8 | more information in different units in different files and it |
| 11:57:23 | 9 | becomes harder. |
| 11:57:23 | 10 | Q. Let me break in there. |
| 11:57:24 | 11 | So is it a standard in modern police departments to |
| 11:57:27 | 12 | have a single centralized place? |
| 11:57:28 | 13 | A. That's correct. |
| 11:57:29 | 14 | Q. And you started to explain why that's important. By the |
| 11:57:33 | 15 | way, single centralized place where stuff relating to homicide |
| 11:57:37 | 16 | investigations is kept? |
| 11:57:38 | 17 | A. Right. |
| 11:57:38 | 18 | Q. Explain why that's important. |
| 11:57:39 | 19 | A. Well, your technical term of stuff is as good as any. You |
| 11:57:45 | 20 | need to be able for a half a dozen reasons, one is the |
| 11:57:49 | 21 | integrity of the investigation. Everything has to be in one |
| 11:57:52 | 22 | location. You're likely to have numerous detectives or |
| 11:57:58 | 23 | specialty lab individuals, gang squad, bomb and arson, they're |
| 11:58:05 | 24 | all under different chains of command oftentimes in different |
| 11:58:09 | 25 | agencies. All that information has to come to a central |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 11:58:12 | 1 | point. |
| 11:58:14 | 2 | From a purely administrative standpoint, it's |
| 11:58:17 | 3 | critical because you have to be able to have a supervisor and |
| 11:58:20 | 4 | a chain of command all the way up to the superintendent or the |
| 11:58:23 | 5 | chief knowing that the investigation is thorough and complete. |
| 11:58:26 | 6 | And you can't do that by sending for records here or sending |
| 11:58:30 | 7 | for records there. |
| 11:58:31 | 8 | Very important is for the discovery process to be |
| 11:58:36 | 9 | able -- let me back up one. Is to present to a prosecutor or |
| 11:58:42 | 10 | a state's attorney a complete and thorough investigation, not |
| 11:58:45 | 11 | one that just says this person did it, this is the evidence we |
| 11:58:52 | 12 | have, wield's like to see charges on it. There has to be an |
| 11:58:55 | 13 | opportunity for the prosecutor, the state's attorney to look |
| 11:58:59 | 14 | at all of the other things. |
| 11:59:01 | 15 | Q. And is that -- is one way modern police departments do |
| 11:59:05 | 16 | that is to keep everything in one place? |
| 11:59:06 | 17 | A. Yes. |
| 11:59:06 | 18 | Q. All right. How about an index, is that a necessary part |
| 11:59:10 | 19 | of a functioning process? |
| 11:59:12 | 20 | A. Absolutely. It becomes even more critical if an agency |
| 11:59:16 | 21 | should choose not to have centralized records. Then it is |
| 11:59:21 | 22 | very important, but there has to be a central index too. |
| 11:59:23 | 23 | Q. All right. And then as far as training for subpoenaed |
| 11:59:27 | 24 | processing and stuff like that, is that important and |
| 11:59:29 | 25 | expected? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 11:59:29 | 1 | A. Yes. |
| 11:59:30 | 2 | Q. All right. Let's talk about the early '80s in the City of |
| 11:59:35 | 3 | Chicago. Is it your understanding that the City of Chicago |
| 11:59:38 | 4 | was put on notice for lack of a better word that there was a |
| 11:59:41 | 5 | problem in the early '80s? |
| 11:59:42 | 6 | A. Yes, they were. |
| 11:59:43 | 7 | Q. Can you summarize for the jury? |
| 11:59:45 | 8 | A. There were a couple of lawsuits that had allegations |
| 11:59:51 | 9 | contained in them from the superintendent on down were aware |
| 11:59:59 | 10 | of that indicated that there were separate street files and |
| 12:00:04 | 11 | that the information was not being shared. |
| 12:00:06 | 12 | Q. All right. Let me focus you on April 1982 and a boy named |
| 12:00:11 | 13 | George Jones. Can you briefly summarize what that was? |
| 12:00:14 | 14 | A. Yes. There was I believe a 12 year old girl who was |
| 12:00:18 | 15 | murdered. Her brother was also assaulted in the attack. |
| 12:00:26 | 16 | Q. Without getting the facts of the murder, how did that put |
| 12:00:29 | 17 | the city on notice that there was a street file problem? |
| 12:00:32 | 18 | A. That information, there were representatives of the police |
| 12:00:36 | 19 | department, high level command officials in the police |
| 12:00:39 | 20 | department that participated in the litigation, and ignoring |
| 12:00:46 | 21 | for a moment just the news media, but the formal notification |
| 12:00:51 | 22 | of the process in the legal system. |
| 12:00:52 | 23 | Q. And in that Jones case, how was it that it came to the |
| 12:00:55 | 24 | city's attention that there was a problem, there was a |
| 12:00:57 | 25 | detective named Laverty and what did he disclose? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 113 of 303 PageID #:64276
***REALTIME UNEDITED TRANSCRIPT ONLY***

112

| | | |
|---|---|---|
| 12:01:00 | 1 | A.  Detective Laverty discovered or unearthed in the court of |
| 12:01:06 | 2 | his investigation information that would have cleared or |
| 12:01:12 | 3 | seriously impeded any decision to prosecute young Mr. George |
| 12:01:20 | 4 | Jones, and he wrote it up in an informal process that ended up |
| 12:01:26 | 5 | in an investigative feel.  That investigative file, the |
| 12:01:30 | 6 | contents of what detective Laverty put in there that would |
| 12:01:34 | 7 | have cleared George Jones was never disclosed to the defense |
| 12:01:38 | 8 | attorney. |
| 12:01:38 | 9 | Q.  And then did Laverty do something in response? |
| 12:01:41 | 10 | A.  When he -- when he completed his information and submitted |
| 12:01:46 | 11 | it, he had been -- received some reassurances that the |
| 12:01:51 | 12 | prosecution, the information would get to the state's |
| 12:01:54 | 13 | attorney. |
| 12:01:54 | 14 | Q.  Did he then inform the process, the justice system |
| 12:02:00 | 15 | participant? |
| 12:02:00 | 16 | A.  Yes, he did. |
| 12:02:01 | 17 | Q.  What did he inform them? |
| 12:02:02 | 18 | A.  He went to the -- he saw in the paper the prosecution in |
| 12:02:07 | 19 | fact was proceeding, and he went to the public -- the criminal |
| 12:02:11 | 20 | defense attorney and shared with him or her the information |
| 12:02:16 | 21 | about George Jones. |
| 12:02:18 | 22 | Q.  And about the street file practice? |
| 12:02:20 | 23 | A.  And the street file practice. |
| 12:02:21 | 24 | Q.  And then was there some litigation in '82 and '83 alleging |
| 12:02:24 | 25 | a policy and practice of suppressing investigative materials |

| | | |
|---|---|---|
| 12:02:30 | 1 | in street files? |
| 12:02:32 | 2 | A.  There was a case referred to by the Palmer case where a |
| 12:02:36 | 3 | group of people alleged in court that there was a practice |
| 12:02:40 | 4 | within the Chicago police of doing just what had happened with |
| 12:02:45 | 5 | the George Jones case, and that became part of a legal suit. |
| 12:02:50 | 6 | Q.  All right.  And then on April 20th, 1982, shortly after |
| 12:02:54 | 7 | that lawsuit was filed, did a federal judge enter any orders? |
| 12:02:56 | 8 | A.  Yes. |
| 12:02:58 | 9 | Q.  Tell the jury about that. |
| 12:03:02 | 10 | A.  There was a direction, order from the court, that all |
| 12:03:06 | 11 | documents would be maintained and retained. |
| 12:03:11 | 12 | Q.  All right.  And was there a reason from the Jones case to |
| 12:03:15 | 13 | conclude that the policymakers had notice and participated in |
| 12:03:19 | 14 | the lawsuit, the city's policymakers? |
| 12:03:22 | 15 | A.  Yes, they were called upon to testify and gave testimony |
| 12:03:26 | 16 | and were very officially and clearly put on notice. |
| 12:03:32 | 17 | Q.  And then just to draw your attention to a finding in |
| 12:03:35 | 18 | February 3rd, 1983, did the judge make a ruling that -- by the |
| 12:03:40 | 19 | way, did the city enter -- create a special order in response |
| 12:03:43 | 20 | to this litigation? |
| 12:03:44 | 21 | A.  Yes. |
| 12:03:44 | 22 | Q.  What was that special order? |
| 12:03:46 | 23 | A.  82-1, that they would preserve. |
| 12:03:49 | 24 | THE COURT:  82-1? |
| 12:03:50 | 25 | MR. LOEVY:  82-1, was the first one which they |

| | | |
|---|---|---|
| 12:03:54 | 1 | preserved stuff. |
| 12:03:56 | 2 | BY MR. LOEVY: |
| 12:03:57 | 3 | Q.  And then? |
| 12:03:58 | 4 | A.  The subsequent one, which was to retain and not dispose of |
| 12:04:04 | 5 | and make available investigative files. |
| 12:04:06 | 6 | THE COURT:  Just put numbers on these. |
| 12:04:08 | 7 | MR. LOEVY:  The second one was 83.1, correct. |
| 12:04:11 | 8 | THE WITNESS:  83.1, yes. |
| 12:04:13 | 9 | BY MR. LOEVY: |
| 12:04:14 | 10 | Q.  Did the judge make a finding that 83.1 was insufficient to |
| 12:04:17 | 11 | afford criminal defendants the full rights to which they were |
| 12:04:20 | 12 | entitled? |
| 12:04:20 | 13 | A.  Yes. |
| 12:04:21 | 14 | THE COURT:  As we discussed, you need to put the date |
| 12:04:23 | 15 | on that.  It was a couple of questions ago. |
| 12:04:27 | 16 | THE WITNESS:  Sorry. |
| 12:04:28 | 17 | BY MR. LOEVY: |
| 12:04:28 | 18 | Q.  Do you have the date there before you, sir? |
| 12:04:30 | 19 | A.  I don't have it right in front of me, no. |
| 12:04:32 | 20 | Q.  It looks like the lawsuit was filed -- |
| 12:04:34 | 21 | THE COURT:  You can ask a leading question on the |
| 12:04:36 | 22 | date of the judge's order. |
| 12:04:37 | 23 | BY MR. LOEVY: |
| 12:04:37 | 24 | Q.  February 3rd, 1983. |
| 12:04:40 | 25 | A.  I believe that's correct. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 116 of 303 PageID #:64279
11/29/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

115

| | | |
|---|---|---|
| 12:04:41 | 1 | Q.  4/20/82? |
| 12:04:57 | 2 | A.  April 20th, 1982. |
| 12:04:59 | 3 | THE COURT:  Was what? |
| 12:05:01 | 4 | MR. LOEVY:  When was the judge's order? |
| 12:05:03 | 5 | MR. SWAMINATHAN:  The judge's order was the same |
| 12:05:05 | 6 | date. |
| 12:05:06 | 7 | BY MR. LOEVY: |
| 12:05:07 | 8 | Q.  4/20/82? |
| 12:05:08 | 9 | THE COURT:  It needs to be testimony. |
| 12:05:11 | 10 | THE WITNESS:  It was -- |
| 12:05:12 | 11 | THE COURT:  Excuse me.  Ask a question, please. |
| 12:05:15 | 12 | BY MR. LOEVY: |
| 12:05:15 | 13 | Q.  What was the date of the order? |
| 12:05:16 | 14 | A.  The date of the order was April 20th, 1982. |
| 12:05:19 | 15 | Q.  All right.  After the order of the court was entered to |
| 12:05:24 | 16 | improve the system and the city enacted these policies, did |
| 12:05:27 | 17 | you see evidence that the problem persisted? |
| 12:05:28 | 18 | A.  Yes, I did. |
| 12:05:29 | 19 | Q.  And let's focus, for example on the investigative file in |
| 12:05:35 | 20 | this case.  Did you review the investigative file that was not |
| 12:05:38 | 21 | disclosed to Mr. Fields in this case? |
| 12:05:39 | 22 | A.  I did. |
| 12:05:39 | 23 | Q.  And was that evidence that the problem continued and can |
| 12:05:44 | 24 | you explain, please? |
| 12:05:45 | 25 | A.  Yes, over the course of two criminal trials and appeals, |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12:05:49    1    there were at least six or seven formal either subpoenas or

12:05:55    2    written requests for disclosure of investigative file in the

12:06:01    3    Fields case.  And each time the city or the police

12:06:08    4    department's response was that there was no such material

12:06:13    5    available.  And in fact the city at one point initiated an

12:06:18    6    internal investigation to determine if there was an

12:06:23    7    investigative file and they produced a document, a written

12:06:28    8    conclusion that there was no investigative file.

12:06:30    9    Q.  What were the hallmarks of this investigative file file,

12:06:33    10    the field's investigative file, actually, it was the

12:06:38    11    Smith/Hickman investigative file that was outside the general

12:06:41    12    orders?

12:06:41    13    A.  When it was eventually discovered in 2010 or 11, that it

12:06:48    14    contained specific types of documents that were -- that were

12:06:58    15    described in the litigation as not to have been in that

12:07:05    16    format.

12:07:05    17    Q.  What kind of documents were those?

12:07:07    18    A.  They were to and from memos between detectives and between

12:07:13    19    chain of command, there were -- sorry.

12:07:22    20    Q.  Were notes --

12:07:25    21    A.  Yeah, handwritten notes were contained in it, notes were

12:07:30    22    not put onto official format and those documents -- even where

12:07:38    23    they were were not submitted.

12:07:40    24    Q.  How about inventories or lack thereof and things not in

12:07:43    25    supp reports?

| | | |
|---|---|---|
| 12:07:44 | 1 | A.  The inventory were required by the general orders and the |
| 12:07:49 | 2 | supplemental reports were not as required by the policies. |
| 12:07:53 | 3 | Q.  All right.  Did you see evidence when you reviewed that |
| 12:07:57 | 4 | sample of files from the basement that the Smith/Hickman file |
| 12:08:02 | 5 | was typical or atypical of other investigative files? |
| 12:08:05 | 6 | A.  In my review of the portions of the basement files as I |
| 12:08:10 | 7 | previously described, I found them to be consistent with or |
| 12:08:16 | 8 | the Hickman/Smith discovery files were similar. |
| 12:08:22 | 9 | Q.  And the same kinds of things you just talked about were |
| 12:08:26 | 10 | evident in the other files as well? |
| 12:08:28 | 11 | A.  Yes. |
| 12:08:28 | 12 | Q.  All right.  You did analyze those files, correct? |
| 12:08:31 | 13 | A.  I did. |
| 12:08:32 | 14 | Q.  And tell the jury how exhaustive your analysis of those |
| 12:08:37 | 15 | files was. |
| 12:08:38 | 16 | A.  Do you want me to describe the total number of files? |
| 12:08:45 | 17 | Q.  However you want to describe what you did when you got |
| 12:08:48 | 18 | those files. |
| 12:08:49 | 19 | A.  I mentioned earlier and discussed the fact that I took a |
| 12:08:53 | 20 | sample from the six-year time period, 83 to 89 and the second |
| 12:09:00 | 21 | year time period from 1999 to 2006, pulled out all of the |
| 12:09:11 | 22 | ones, the homicide investigation files for that time period, |
| 12:09:14 | 23 | then looked at the investigative file itself to determine what |
| 12:09:22 | 24 | it contained, what it did not contain.  I looked at the |
| 12:09:27 | 25 | permanent retention files that the city used or supposedly |

| 12:09:31 | 1 | used to provide discovery. |
| 12:09:35 | 2 | Q. So let me make sure I understand. You had a basement file |
| 12:09:38 | 3 | that referred to an investigation and then you had also the |
| 12:09:40 | 4 | corresponding official file, right? |
| 12:09:42 | 5 | A. That's correct. |
| 12:09:42 | 6 | Q. All right. Then continue. |
| 12:09:44 | 7 | A. And that I would prefer to and the city does as a |
| 12:09:49 | 8 | permanent retention file that supposedly has everything about |
| 12:09:52 | 9 | the homicide case, but only if it's on an official |
| 12:09:57 | 10 | supplementary report on arrest report, a lab report, that type |
| 12:10:04 | 11 | of thing, but permanent retention file after review, I can go |
| 12:10:10 | 12 | no that if you want later. |
| 12:10:11 | 13 | Q. Well, we are going to talk about your review. Basically, |
| 12:10:14 | 14 | you described you did a stand alone of the investigative file? |
| 12:10:17 | 15 | A. Yes. |
| 12:10:17 | 16 | Q. And then you did a comparison with the permanent |
| 12:10:22 | 17 | retention? |
| 12:10:22 | 18 | A. I looked at the permanent retention files by themselves. |
| 12:10:25 | 19 | Q. Okay. |
| 12:10:26 | 20 | A. So I looked at the investigative files, I looked at the |
| 12:10:29 | 21 | permanent retention files and then I looked and compared. |
| 12:10:32 | 22 | Q. So that's a third thing? |
| 12:10:33 | 23 | A. The permanent retention files as to what was, what they |
| 12:10:36 | 24 | had in them that were reflected, did they reflect what was of |
| 12:10:42 | 25 | substantive value in the investigative file. |

11/29/16 AM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 120 of 303 PageID #:64283
***REALTIME UNEDITED TRANSCRIPT ONLY***

119

| | | |
|---|---|---|
| 12:10:44 | 1 | Q. So the third thing then was a comparison between the |
| 12:10:47 | 2 | investigative files and the permanent retention files? |
| 12:10:50 | 3 | A. Yes. |
| 12:10:50 | 4 | Q. Was there a fourth analysis you did? |
| 12:10:52 | 5 | A. Yes. |
| 12:10:52 | 6 | Q. Tell us about that. |
| 12:10:53 | 7 | A. Also, through material provided to me, the criminal |
| 12:10:58 | 8 | defense files that corresponded with where there were criminal |
| 12:11:06 | 9 | defense files that corresponded with the investigative files |
| 12:11:10 | 10 | and the permanent retention files. So I looked at those as a |
| 12:11:13 | 11 | stand alone process to see what was in there from as it |
| 12:11:19 | 12 | pertained to what was actually in the investigation and in the |
| 12:11:22 | 13 | permanent retention files. And then finally, in the fifth |
| 12:11:27 | 14 | step was to compare what was in the criminal defense files and |
| 12:11:32 | 15 | the permanent retention files. |
| 12:11:34 | 16 | Q. All right. Based on that review, did you make any |
| 12:11:38 | 17 | findings about whether the practice that was supposed to have |
| 12:11:41 | 18 | stopped with the Palmer/Jones litigation persisted through and |
| 12:11:47 | 19 | continuing through Mr. Fields' trial? |
| 12:11:49 | 20 | A. Yes. |
| 12:11:49 | 21 | Q. What was that finding? |
| 12:11:50 | 22 | A. In my professional opinion that the practices that were |
| 12:11:54 | 23 | the City of Chicago and the Chicago Police Department and its |
| 12:11:58 | 24 | command staff was aware of in as early as 1982 but should have |
| 12:12:04 | 25 | been much earlier than that was continuing and no substantive |

| | | |
|---|---|---|
| 12:12:09 | 1 | changes, and in fact, evidence that there was no change at |
| 12:12:15 | 2 | all. |
| 12:12:15 | 3 | Q.  In refresh your recollection last answer, you said that |
| 12:12:17 | 4 | the command and the policy makers should have been aware |
| 12:12:20 | 5 | before the Jones litigation in '82.  Can you explain? |
| 12:12:22 | 6 | MR. NOLAND:  Objection. |
| 12:12:23 | 7 | THE COURT:  Sustained. |
| 12:12:24 | 8 | BY MR. LOEVY: |
| 12:12:24 | 9 | Q.  All right.  At this time, your Honor, plaintiff would move |
| 12:12:27 | 10 | to introduce Plaintiff's Exhibit 307 which is his summary |
| 12:12:31 | 11 | chart of the basis of his opinions. |
| 12:12:34 | 12 | THE COURT:  It's a demonstrative? |
| 12:12:35 | 13 | MR. LOEVY:  Yes, your Honor. |
| 12:12:36 | 14 | THE COURT:  Okay.  Go show it to him. |
| 12:12:45 | 15 | MR. NOLAND:  I'm sorry. |
| 12:12:46 | 16 | THE COURT:  Yeah.  That's fine. |
| 12:12:51 | 17 | MR. NOLAND:  Subject to our prior, the court's |
| 12:12:57 | 18 | ruling. |
| 12:12:57 | 19 | THE COURT:  If I already ruled, I already ruled. |
| 12:12:59 | 20 | This is -- you heard me use the word demonstrative. |
| 12:13:02 | 21 | It's a big legal word.  What this means is this is used to |
| 12:13:06 | 22 | illustrate testimony.  It's not part of the evidence.  You're |
| 12:13:08 | 23 | not going to actually have it back there.  It's used to |
| 12:13:11 | 24 | illustrate testimony.  If you want to take notes on it, do |
| 12:13:13 | 25 | that because you won't actually have -- |

| 12:13:15 | 1 | MR. LOEVY: Actually, your Honor, after he lays the |
| 12:13:18 | 2 | foundation. |
| 12:13:18 | 3 | THE COURT: For now, it's a demonstrative exhibit. |
| 12:13:21 | 4 | MR. LOEVY: We do intend to move it into evidence |
| 12:13:23 | 5 | after he lays the foundation for it. |
| 12:13:25 | 6 | THE COURT: We will worry about that when we have to |
| 12:13:28 | 7 | worry about it. |
| 12:13:29 | 8 | MR. LOEVY: Can we ask Mr. Brasfield to come down and |
| 12:13:31 | 9 | explain it. |
| 12:13:32 | 10 | THE COURT: The deal is he needs to keep his voice |
| 12:13:34 | 11 | up. Which side are you going to have him stand on, right |
| 12:13:46 | 12 | here? |
| 12:13:46 | 13 | MR. LOEVY: What do you prefer? |
| 12:13:48 | 14 | THE COURT: You stand here so you are closer to the |
| 12:13:52 | 15 | mic. Counsel can move down in order to see. |
| 12:13:55 | 16 | MR. NOLAND: Thank you, your Honor. |
| 12:13:55 | 17 | BY MR. LOEVY: |
| 12:13:55 | 18 | Q. Let's start with the middle column. Can you explain to |
| 12:13:58 | 19 | the jury what we are looking at? Your Honor, may we put it on |
| 12:14:00 | 20 | the ELMO too? |
| 12:14:02 | 21 | THE COURT: Either way. I don't care. |
| 12:14:05 | 22 | MR. LOEVY: The computer, your Honor. |
| 12:14:06 | 23 | THE COURT: Computer. |
| 12:14:08 | 24 | THE WITNESS: This rainbow effect here, this blue |
| 12:14:13 | 25 | section here that has a number of columns in it are the |

12:14:19   1   investigative file information and some of it, it's just

12:14:21   2   housekeeping, referring to what the lawyers call Bates numbers

12:14:26   3   that are stamped on the bottom of pages to identify things.

12:14:30   4   But one of the first things they did does the basement file

12:14:36   5   contain an inventory.

12:14:39   6   BY MR. LOEVY:

12:14:40   7   Q.   That's a yes, no, question?

12:14:41   8   A.   That's a simple yes, no, and as I said that's Bates

12:14:45   9   numbers.  If it did not, there's reference to that.

12:14:49   10          Is the inventory complete?  If there is an inventory

12:14:52   11   in the investigative file, I mean, that's good in and of

12:14:56   12   itself, but is the inventory actually reflect what is there,

12:15:02   13   what should be there?

12:15:04   14          Then we have the examples of items that were missing

12:15:11   15   from the inventory, so as I'm looking at that and making notes

12:15:17   16   to myself as to whether, okay, is this item in there, if it's

12:15:23   17   not in there, what is it?  Put a list on that.

12:15:26   18          Are there handwritten notes in the file?  The

12:15:32   19   handwritten notes themselves may or may not be important as to

12:15:37   20   their actual content, but what is very important is are they

12:15:44   21   supposed to be in there as handwritten notes?  That's a

12:15:49   22   violation of policy as to how they're in there.  So it's

12:15:53   23   two-fold.  One is the substantive value, if you will of the

12:15:58   24   material, but also demonstrating adherence to a policy.

12:16:02   25          And then I gave examples of specifics so that you can

11/29/16 AM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 124 of 303 PageID #:64287
***REALTIME UNEDITED TRANSCRIPT ONLY***

123

12:16:09   1   look those up.

12:16:10   2        Are there to/from memos.  This is again the same

12:16:13   3   thing, the policies and procedures indicate that they are

12:16:19   4   supposed to be in there, are they in there, if yes, no, what

12:16:25   5   were they.

12:16:27   6        And then I gave again the Bates numbers a reference

12:16:30   7   so that with the sheer volume of this being able to go back,

12:16:35   8   look through and identify them.

12:16:36   9   BY MR. LOEVY:

12:16:36   10  Q.  If you could turn to the stand then.

12:16:38   11  A.  Thank you.

12:16:38   12  Q.  All right.  Now, when you did the analysis in the blue

12:16:44   13  column there, you weren't actually comparing the investigative

12:16:48   14  files to any other files?

12:16:49   15  A.  No.

12:16:49   16  Q.  Just looking at them themselves?

12:16:50   17  A.  As a stand alone.

12:16:55   18  Q.  Did you draw any conclusions about the investigative

12:16:57   19  files?

12:16:57   20  A.  I did.

12:16:57   21  Q.  Tell the jury what your findings were?

12:16:59   22  A.  That the information that I was seeing in these basement

12:17:02   23  files, particularly investigative files, were in my mind from

12:17:08   24  a professional standpoint evidence that the things that were

12:17:14   25  supposed to have changed that should have been done and

| | | |
|---|---|---|
| 12:17:20 | 1 | accomplished after the city was put on notice were continuing. |
| 12:17:23 | 2 | Q. Let's talk about the example you gave about handwritten |
| 12:17:26 | 3 | notes. Now, they're supposed to take notes, but they're |
| 12:17:30 | 4 | supposed to be on GPRs, right? |
| 12:17:32 | 5 | A. General progress reports, yes. |
| 12:17:34 | 6 | Q. The jury has already heard testimony about what a GPR is. |
| 12:17:38 | 7 | Just real quickly? |
| 12:17:39 | 8 | A. Just that your information that you made heaven forbid |
| 12:17:46 | 9 | written on the back of a business card or a McDonald's order |
| 12:17:50 | 10 | slip is put into a general progress report so that it's |
| 12:17:54 | 11 | formalized. |
| 12:17:55 | 12 | Q. All right. And was there evidence based on your review |
| 12:17:58 | 13 | that the department's rule change that all notes had to be |
| 12:18:01 | 14 | taken on general progress reports, was that being followed? |
| 12:18:04 | 15 | A. No, it was not based on the material I looked at. |
| 12:18:07 | 16 | Q. What was the statistical analysis for the period 83 to 89, |
| 12:18:12 | 17 | in what proportion of the cases was that policy not being |
| 12:18:16 | 18 | followed? |
| 12:18:16 | 19 | A. I found that 82 percent of the cases that I looked at, |
| 12:18:19 | 20 | they were not being followed. |
| 12:18:20 | 21 | Q. And then for the later time period? |
| 12:18:22 | 22 | A. From the 1999 to 2006, 61 percent. |
| 12:18:25 | 23 | Q. How about the existence of two from memos, those were |
| 12:18:29 | 24 | memos that were not on official supp reports; is that correct? |
| 12:18:32 | 25 | A. That's correct. |

12:18:33  1  Q.  And that policy too was supposed to change with the policy

12:18:35  2  change, right?

12:18:36  3  A.  That's correct.

12:18:36  4  Q.  Did you see evidence that it did change?  Did or didn't?

12:18:45  5  A.  It did not.

12:18:46  6  Q.  Tell the jury.

12:18:46  7  A.  The initial period from 1983 to 1989, 43 percent of the

12:18:53  8  files that I reviewed continued to show unofficial informal

12:18:57  9  memorandums and that the 1999 to 2006 time period, that 17

12:19:03  10  percent of the files continued to show these supposedly not to

12:19:08  11  occur to/from memos.

12:19:10  12  Q.  Does that suggest to you whether the system was or wasn't

12:19:13  13  working from a supervisory perspective?

12:19:16  14  A.  From a supervisory, either a first line supervisor or as

12:19:19  15  an auditor within the department or as the superintendent, it

12:19:23  16  would give me a clear indication that it just wasn't working.

12:19:26  17  Q.  All right.  Have you seen that level of failure at other

12:19:30  18  departments around the country?

12:19:31  19  A.  No, I have not.

12:19:32  20  Q.  All right.  What percentage of the basement files had

12:19:38  21  evidence of violations of the policies and the special orders

12:19:42  22  that were put into place?

12:19:43  23  A.  100 percent.

12:19:44  24  Q.  All right.

12:19:46  25          MR. LOEVY:  Your Honor, if I could have the witness

***REALTIME UNEDITED TRANSCRIPT ONLY***

12:19:48    1    step down again to talk about the next column.

12:19:50    2          THE COURT:  That's fine.

12:19:51    3    BY MR. LOEVY:

12:19:56    4    Q.  Tell us about the purple and what this represents?

12:19:58    5    A.  The City of Chicago police department has -- had a

12:20:06    6    permanent retention file that was supposed to be the go to,

12:20:10    7    this is where if you want to know what happened in a

12:20:13    8    particular homicide and you want it for discovery purposes,

12:20:17    9    this is where it's going to be.  It's in the permanent

12:20:22   10    retention file.  So as I looked at that as a stand alone

12:20:25   11    process looking for the same types of things, whether there

12:20:29   12    were inventory sheet as required, what types of documents that

12:20:38   13    were supposedly in there were or were not, and also regardless

12:20:44   14    of how the City of Chicago interpreted permanent retention

12:20:48   15    file were there actually substantive information in the

12:20:52   16    investigative file that was not getting into the permanent

12:20:55   17    retention file.

12:20:55   18    Q.  Well, before we talk about the comparison, let's talk

12:20:58   19    about just the purple?

12:20:59   20    A.  Yes.

12:21:00   21    Q.  So tell the jury what the Fields were.

12:21:02   22    A.  We have again does the permanent retention file have an

12:21:12   23    inventory, the investigative file inventory complete, does it

12:21:17   24    have items missing?  I'm sorry to block your view.  You

12:21:23   25    probably can't see it.  Again, I talked about the Bates


        ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 128 of 303 PageID #:64291
***REALTIME UNEDITED TRANSCRIPT ONLY***

127

12:21:27  1  numbers.  Are there general progress reports from the basement

12:21:31  2  files in the permanent retention file?  And, again, I have to

12:21:35  3  acknowledge that the City of Chicago didn't feel that it was

12:21:37  4  necessary, but they weren't in there and I made a note of it.

12:21:43  5  And are there handwritten notes in the permanent retention

12:21:47  6  file?  If so, and then describe what they were and where they

12:21:53  7  were.  Are there to/from memos in the basement files that are

12:21:59  8  in the permanent retention file and yes or no and where

12:22:05  9  appropriate, identify those.

12:22:07  10      And then in general observations about some of those

12:22:10  11  individual permanent retention file.

12:22:12  12  Q.  All right.  Would you resume the stand, please.

12:22:15  13      Did you reach any conclusions regarding the permanent

12:22:26  14  retention file?

12:22:26  15  A.  Yes.

12:22:27  16  Q.  How many permanent retention files did you look at?

12:22:29  17  A.  There were a total of there were a total of 249 files

12:22:42  18  overall and as far as permanent retention file, they were on

12:22:47  19  the light number.

12:22:48  20  Q.  And did you form any conclusions about the city's policies

12:22:56  21  and practices after you performed the analysis you did to the

12:22:58  22  permanent retention file?

12:22:59  23  A.  I did.

12:22:59  24  Q.  Can you describe to the jury what those were?

12:23:01  25  A.  First and foremost if the City of Chicago police

| | | |
|---|---|---|
| 12:23:04 | 1 | department is going to use the permanent retention file as a |
| 12:23:07 | 2 | representation of the homicide investigation, it failed |
| 12:23:12 | 3 | miserably.  What I found in there is a single story line. |
| 12:23:17 | 4 | It's what I would refer to as a charging document that after a |
| 12:23:22 | 5 | detective or detectives have completed a homicide |
| 12:23:25 | 6 | investigation, they have gone down their various paths and |
| 12:23:28 | 7 | looked at all the various possibilities and eliminated |
| 12:23:32 | 8 | suspects and so forth, they just have a clean copy.  It's not |
| 12:23:38 | 9 | the murder book that you would expect to find that would show |
| 12:23:42 | 10 | that an anonymous caller said Bob Smith did it, but we |
| 12:23:49 | 11 | interview witnesses and determined that he had an alibi and so |
| 12:23:53 | 12 | on and so forth.  All the permanent retention file is this is |
| 12:24:00 | 13 | the arrest report, this is some lab reports, this is -- |
| 12:24:05 | 14 | Q.  Why we think this guy did it? |
| 12:24:07 | 15 | A.  Yes. |
| 12:24:07 | 16 | Q.  And is that aberrational, different, unlike other cities |
| 12:24:13 | 17 | that you have reviewed and audited? |
| 12:24:15 | 18 | A.  Yes. |
| 12:24:15 | 19 | Q.  How does it work in places that are functioning |
| 12:24:18 | 20 | legitimately? |
| 12:24:18 | 21 | MR. NOLAND:  Objection, argumentative. |
| 12:24:19 | 22 | THE COURT:  Overruled. |
| 12:24:21 | 23 | THE WITNESS:  You go into any homicide investigative |
| 12:24:28 | 24 | file either cold, just by looking at the book, or physically |
| 12:24:33 | 25 | into various agencies, you see a document that starts out with |

12:24:38   1    the call from 911 or the discovery of whatever the gathering

12:24:45   2    of information inevitably, not inevitably, but quite often in

12:24:52   3    homicide initial investigations, there might be multiple

12:24:56   4    suspects, and somebody thinks, well, this person had a

12:25:01   5    domestic problem or the person was -- had a bad debt or

12:25:06   6    problems with the neighbor and so you have all of these

12:25:08   7    various avenues that you have to investigate, and then you

12:25:12   8    either eliminate them and document why they were eliminated

12:25:17   9    and there's other information that you're developing.

12:25:22   10   Oftentimes, again, as I said earlier that initially may not

12:25:26   11   seem like it's important at all, but you have to document it

12:25:28   12   and put it in the file.  This is obviously for a number of

12:25:31   13   reasons as I said before.

12:25:34   14         You have detectives or individuals from throughout

12:25:38   15   the police department that may have worked on a case, and they

12:25:41   16   have to go to a central location, to a central document to be

12:25:44   17   able to see what's been done and what hasn't been done and

12:25:48   18   that needs to be done.

12:25:48   19   BY MR. LOEVY:

12:25:50   20   Q.  You mentioned in your analogy you used a little bit ago

12:25:53   21   about a novel.  Would a plot twist fit in your analogy on the

12:25:57   22   way an investigation is supposed to be documented in a

12:26:00   23   permanent retention file?

12:26:00   24         MR. NOLAND:  Judge, I object based on foundation and

12:26:02   25   not disclosed.

| | | |
|---|---|---|
| 12:26:03 | 1 | THE COURT:  Rephrase the question, please. |
| 12:26:05 | 2 | BY MR. LOEVY: |
| 12:26:05 | 3 | Q.  All right.  In the investigative files you're talking |
| 12:26:11 | 4 | about from other jurisdictions, is it always linear, start to |
| 12:26:15 | 5 | finish? |
| 12:26:15 | 6 | THE COURT:  Sorry.  Something happened. |
| 12:26:17 | 7 | THE WITNESS:  No, it's not. |
| 12:26:18 | 8 | BY MR. LOEVY: |
| 12:26:18 | 9 | Q.  Can you explain? |
| 12:26:19 | 10 | A.  It can go off on tangents.  I have seen investigations |
| 12:26:23 | 11 | where literally weeks, if not months, can go into what in good |
| 12:26:28 | 12 | faith was thought to be a legitimate line of investigation |
| 12:26:32 | 13 | only determined for whatever reason that the individual that |
| 12:26:37 | 14 | was thought to be the best suspect was in fact not. |
| 12:26:42 | 15 | Q.  And in other jurisdictions, is all that stuff in the |
| 12:26:45 | 16 | permanent file? |
| 12:26:45 | 17 | A.  Yes. |
| 12:26:46 | 18 | Q.  And is that true in Chicago? |
| 12:26:47 | 19 | A.  No. |
| 12:26:48 | 20 | MR. NOLAND:  Judge, objection. |
| 12:26:50 | 21 | THE COURT:  Let me see the lawyers at sidebar, |
| 12:26:52 | 22 | please. |
| 12:26:55 | 23 | (The following proceedings were had at sidebar outside the |
| 12:27:04 | 24 | hearing of the jury:) |
| 12:27:04 | 25 | THE COURT:  So while we are at it, I am holding |

| | | |
|---|---|---|
| 12:27:06 | 1 | myself in contempt for my cell phone going off, when I fine |
| 12:27:10 | 2 | myself at some later amount. |
| 12:27:13 | 3 | MR. NOLAND:  I think he's gone well beyond the |
| 12:27:16 | 4 | permanent retention file discussion from his report where he |
| 12:27:19 | 5 | said 34 and 35 where he is talking about perform rather than |
| 12:27:22 | 6 | this whole issue we just talked about for the last several |
| 12:27:25 | 7 | paragraphs as far as the investigation and a study of the |
| 12:27:29 | 8 | permanent retention files. |
| 12:27:30 | 9 | THE COURT:  So you want -- let me just -- is it, A, |
| 12:27:36 | 10 | starting on page 34? |
| 12:27:41 | 11 | MR. SWAMINATHAN:  Judge, this is also part of it. |
| 12:27:45 | 12 | THE COURT:  Let me look at it.  I think this is |
| 12:27:56 | 13 | fairly within the scope two paragraphs that precede the letter |
| 12:27:59 | 14 | that had an A on paragraph 34. Essentially what he's saying -- |
| 12:28:01 | 15 | the way I'm getting it at least is what he saw is that the |
| 12:28:05 | 16 | permanent retention file basically tended to contain |
| 12:28:08 | 17 | information that supported the conclusion of the investigation |
| 12:28:10 | 18 | and it's supposed to include more than that, and I think |
| 12:28:12 | 19 | that's essentially what these two paragraphs say, so I |
| 12:28:17 | 20 | overrule the objection. |
| 12:28:20 | 21 | (The following proceedings were had in open court in the |
| 12:28:23 | 22 | presence and hearing of the jury:) |
| 12:28:23 | 23 | THE COURT:  Okay.  The objection is overruled.  You |
| 12:28:25 | 24 | can proceed. |
| 12:28:26 | 25 | BY MR. LOEVY: |

12:28:26   1   Q.  Do you remember the question?

12:28:26   2   A.  No.

12:28:29   3   Q.  You were saying in other jurisdictions and the plot twist

12:28:34   4   thing?

12:28:35   5   A.  Yes.  As I described or paraphrased.

12:28:42   6          THE COURT:  Let me be more specific.  The two

12:28:45   7   preceding questions were in other jurisdictions is all that

12:28:49   8   stuff in the permanent file?  You said yes.  And then there

12:28:51   9   was a question is that true in Chicago?  Answer, no.  And then

12:28:55  10   I think he was going to ask you to explain.

12:28:57  11   BY MR. LOEVY:

12:28:58  12   Q.  Can you explain that?

12:28:59  13   A.  The structure and the practice based on the material that

12:29:05  14   I have reviewed here is that there is an eventual

12:29:14  15   determination of who the police feel is the person that did

12:29:19  16   the crime.  And oftentimes, there is a reverse engineering of

12:29:25  17   the plot.

12:29:25  18          MR. NOLAND:  Objection.

12:29:28  19          THE COURT:  Yeah, let's get more directly to the

12:29:30  20   point here.

12:29:30  21   BY MR. LOEVY:

12:29:31  22   Q.  All right.

12:29:31  23          THE COURT:  Ask a more leading question, if you

12:29:33  24   would.  You understand from the sidebar where we are going

12:29:36  25   here, Mr. Loevy?

| | | |
|---|---|---|
| 12:29:37 | 1 | MR. LOEVY: I think it's been covered too. |
| 12:29:38 | 2 | THE COURT: Fair enough. |
| 12:29:39 | 3 | BY MR. LOEVY: |
| 12:29:40 | 4 | Q. Who does that protect if you do it the proper way and |
| 12:29:42 | 5 | document everything? |
| 12:29:43 | 6 | A. Well, it protects the integrity of the criminal justice |
| 12:29:48 | 7 | system as a whole, it protects the -- it provides legal |
| 12:29:55 | 8 | protection for the individual who is eventually charged so |
| 12:29:59 | 9 | that the criminal defense attorney has a fair opportunity to |
| 12:30:02 | 10 | provide and mount a defense, and it provides I think in |
| 12:30:07 | 11 | fairness to the victims. |
| 12:30:09 | 12 | Q. Is that something that other jurisdictions take seriously |
| 12:30:12 | 13 | and do effectively? |
| 12:30:13 | 14 | A. Yes. |
| 12:30:13 | 15 | Q. Does Chicago meet up to that standard? |
| 12:30:15 | 16 | A. No, in my opinion Mr. . Are you changing topics? |
| 12:30:18 | 17 | MR. LOEVY: Yes. |
| 12:30:18 | 18 | THE COURT: We are going to stop for lunch. I have |
| 12:30:21 | 19 | one very short case at 1:30. We should be able to start |
| 12:30:25 | 20 | within a few minutes of 1:30. I will take the jury out. (The |
| 12:30:58 | 21 | jury leaves the courtroom.) |
| 12:30:58 | 22 | THE COURT: Okay. Anything we need to discuss? |
| 12:31:01 | 23 | MR. LOEVY: Your Honor, we had some issues whenever |
| 12:31:03 | 24 | your Honor is ready to talk about them. We still have the |
| 12:31:05 | 25 | intimidation issue that's hanging out there. We have a couple |

11/29/16 AM
***REALTIME UNEDITED TRANSCRIPT ONLY***

134

| | | |
|---|---|---|
| 12:31:08 | 1 | of new issues too. |
| 12:31:09 | 2 | THE COURT:  Just tell me what they are and we are not |
| 12:31:12 | 3 | going to talk about them now.  Just tell me what they are. |
| 12:31:15 | 4 | MR. LOEVY:  The first issue is you ordered the |
| 12:31:17 | 5 | discovery on Mr. Kees's deal and you ordered them to give us |
| 12:31:21 | 6 | their emails and such.  We have written them an email saying |
| 12:31:24 | 7 | we think there are some gaps and deficiencies and to my |
| 12:31:29 | 8 | knowledge, they haven't yet responded; is that correct? |
| 12:31:31 | 9 | MR. ART:  That's correct. |
| 12:31:32 | 10 | MR. LOEVY:  At some point we are being to want to |
| 12:31:34 | 11 | raise with the Court, there are some holes in the production |
| 12:31:36 | 12 | and we want to talk about that with your Honor. |
| 12:31:38 | 13 | THE COURT:  Kees is testifying tomorrow, right? |
| 12:31:39 | 14 | MR. LOEVY:  Correct. |
| 12:31:40 | 15 | THE COURT:  We will talk about that at the end of the |
| 12:31:42 | 16 | day.  Just be prepared to talk about that at the end of the |
| 12:31:46 | 17 | day. |
| 12:31:46 | 18 | MR. LOEVY:  Other issue, your Honor, is yesterday a |
| 12:31:47 | 19 | photograph was put on the screen by Mr. Kulwin that was not in |
| 12:31:51 | 20 | the pretrial order -- |
| 12:31:54 | 21 | MR. ART:  Mr. Burns. |
| 12:31:56 | 22 | MR. LOEVY:  I'm sorry.  I cannot tell these people |
| 12:31:58 | 23 | apart. |
| 12:31:58 | 24 | MR. KULWIN:  He continue tell me and Mr. Burns apart. |
| 12:32:03 | 25 | MR. LOEVY:  I keep saying defense counsel. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12:32:05   1        THE COURT:  You mistook me for Jon Wayne.

12:32:08   2        MR. KULWIN:  You do look like Jon Wayne.

12:32:11   3        THE COURT:  There you go between.

12:32:13   4        MR. LOEVY:  There was a photograph in the pretrial

12:32:15   5   order.

12:32:15   6        THE COURT:  What was the photo?

12:32:16   7        MR. LOEVY:  There was a photo with some initials on

12:32:18   8   it of where Mr. Hawkins was and where Mr. Langston was.

12:32:25   9        MR. SWAMINATHAN:  It's Defendants' Exhibit 384.

12:32:26  10        MR. LOEVY:  It was not an original exhibit.  We also

12:32:28  11   don't think we got it in discovery.  We are still checking

12:32:30  12   that, but we would ask, I don't know if you want to talk about

12:32:33  13   the issues now but we want no more new exhibits and no more

12:32:40  14   new photographs, because it's late.

12:32:43  15        THE COURT:  Go ahead, Mr. Noland, that's fine.

12:32:44  16        MR. NOLAND:  If you like now.

12:32:45  17        THE COURT:  On this point.  It looks like --

12:32:48  18        MR. NOLAND:  We had told the plaintiffs that those

12:32:49  19   exhibits were actually just the copies of the Plaintiff's

12:32:56  20   Exhibit 219 so our 388 through 391 are Plaintiff's Exhibit, a

12:33:00  21   part of Plaintiff's Exhibit 219.  They have it.

12:33:03  22        THE COURT:  I think he said this was 384, though.

12:33:06  23        MR. NOLAND:  I don't think it was.

12:33:08  24        THE COURT:  It wasn't 384.

12:33:09  25        MR. NOLAND:  384 is a photo that was used at the

                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

12:33:15   1   certificate of innocence proceeding with the plaintiff's

12:33:17   2   counsel, and so all the photos -- they were parties to that

12:33:22   3   proceeding.

12:33:23   4          MR. LOEVY:  Parties to the proceeding, but it wasn't

12:33:25   5   on the pretrial order, so we were was surprised by it.

12:33:29   6          THE COURT:  How are you harmed?  That's the question.

12:33:31   7          MR. LOEVY:  We want it to stop.  At least if they are

12:33:35   8   going to show something that's not in the pretrial order, show

12:33:38   9   me before they put it on the screen.  That's all I'm asking.

12:33:38  10          THE COURT:  That doesn't sound unreasonable.

12:33:41  11          MR. NOLAND:  All right, Judge.

12:33:42  12          MR. LOEVY:  We have been working together on

12:33:45  13   stipulations, your Honor.  There is a Buckles police report

12:33:47  14   and the Murphy GPR that are not in the Chicago Police

12:33:51  15   Department's files, and we're hopeful and remain hopeful we

12:33:54  16   are going to come to a stipulation, but if we don't, we have

12:33:57  17   asked the city to bring a record keeper here tomorrow who can

12:34:00  18   talk knowledgeably about those topics so we don't want there

12:34:04  19   to be any surprise that we do have a record keeper to say we

12:34:08  20   have looked and these things are not in the files.

12:34:10  21          THE COURT:  Okay.

12:34:10  22          MR. LOEVY:  Then there is the intimidation issue.

12:34:13  23          THE COURT:  That's it?

12:34:14  24          MR. LOEVY:  That's it.  That's my issue.

12:34:17  25          MR. KULWIN:  I don't understand.


***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 12:34:18 | 1 | THE COURT: It's the same issue that I've put off |
| 12:34:20 | 2 | several times and I talked about it several times. There may |
| 12:34:22 | 3 | not be much more to talk about. |
| 12:34:24 | 4 | Who is up after this witness? |
| 12:34:26 | 5 | MR. LOEVY: Mr. Wharrie the next witness? |
| 12:34:30 | 6 | MR. ART: No. |
| 12:34:31 | 7 | MR. LOEVY: Who is the next witness? |
| 12:34:33 | 8 | MR. ART: Lyon. |
| 12:34:34 | 9 | MR. LOEVY: Andrea Lyon. |
| 12:34:36 | 10 | THE COURT: We are going to close out the |
| 12:34:38 | 11 | intimidation issue to the extent that there's anything more to |
| 12:34:41 | 12 | talk about at the end of the day. We will deal with this Kees |
| 12:34:44 | 13 | issue that you mentioned at the end of the day. The photo |
| 12:34:47 | 14 | thing I've dealt with. The stipulations, you'll tell me when |
| 12:34:52 | 15 | you have something to talk about. |
| 12:34:54 | 16 | MR. ART: A juror left his notebook in the front row. |
| 12:34:56 | 17 | THE COURT: I'll get it. Thanks. |
| 12:34:59 | 18 | MR. MICHALIK: Judge, we just had an issue with |
| 12:35:01 | 19 | respect to Andrea Lyon, they let us know a couple of days ago |
| 12:35:06 | 20 | that they were intending to call her and we are uncertain for |
| 12:35:09 | 21 | the basis on which they are doing so. To our knowledge. |
| 12:35:15 | 22 | THE COURT: I'm listening. |
| 12:35:16 | 23 | MR. MICHALIK: She was disclosed as someone who would |
| 12:35:19 | 24 | testify with about one of the files. |
| 12:35:25 | 25 | THE COURT: Go ahead. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 12:35:26 | 1 | MR. MICHALIK: She was identified as a witness |
| 12:35:28 | 2 | regarding. |
| 12:35:28 | 3 | THE COURT: Did she testify at the other trial? |
| 12:35:30 | 4 | MR. MICHALIK: No. |
| 12:35:30 | 5 | THE COURT: I don't remember. |
| 12:35:31 | 6 | MR. MICHALIK: She was identified as a witness who |
| 12:35:33 | 7 | was going to testify about the people v. |
| 12:35:37 | 8 | THE COURT: People v.? |
| 12:35:38 | 9 | MR. MICHALIK: People v. Fuller which was one -- full |
| 12:35:41 | 10 | ton, I'm sorry, f-u-l-t-o-n, and that was one of the basement |
| 12:35:47 | 11 | files that Mr. Brasfield has not relied upon, so that's the |
| 12:35:51 | 12 | only basis that we can think of that she would testify about. |
| 12:35:54 | 13 | THE COURT: What's that? |
| 12:35:56 | 14 | MS. GARVEY: She is going to testify about the full |
| 12:35:58 | 15 | ton case, she was disclosed about the full ton case. She was |
| 12:36:01 | 16 | one of our Monell cases. |
| 12:36:02 | 17 | THE COURT: In other words, she is going to say I was |
| 12:36:04 | 18 | his lawyer, I was this person's lawyer, I didn't get the |
| 12:36:07 | 19 | stuff, something like that. |
| 12:36:08 | 20 | MR. SWAMINATHAN: We identified specific pages for |
| 12:36:10 | 21 | them that she says she did not receive. She is going to |
| 12:36:14 | 22 | testify about her case, what those pages were she hadn't |
| 12:36:17 | 23 | received. |
| 12:36:18 | 24 | MR. KULWIN: I guess the question is -- |
| 12:36:19 | 25 | MR. MICHALIK: Our understanding is that she was post |

***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

139

| 12:36:22 | 1 | conviction counsel on that case, so I don't know how she could |
| 12:36:24 | 2 | testify as to what was or was not in the criminal defense |
| 12:36:27 | 3 | file. |
| 12:36:28 | 4 | MR. SWAMINATHAN:  She will be able to lay a |
| 12:36:29 | 5 | foundation for all of that. |
| 12:36:30 | 6 | THE COURT:  If she can't lay the foundation, you will |
| 12:36:33 | 7 | make the proper objection at the proper time and I will rule |
| 12:36:35 | 8 | on it.  I can conjure in my own mind what it is likely she |
| 12:36:42 | 9 | will say and you will argue it to me at the appropriate time. |
| 12:36:45 | 10 | MR. MICHALIK:  Okay. |
| 12:36:45 | 11 | THE COURT:  See you at 1:30. |
| 12:36:47 | 12 | (The trial was adjourned at 12:35 p.m. until 1:30 p.m. of |
| 12:36:52 | 13 | this same day and date.) |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 01:05:18 | 1 | Judge Kennelly, November 29, 2016, 1:30 p.m. call and then |
| 01:05:24 | 2 | trial. |
| 01:34:57 | 3 | THE CLERK:  Case number 10 C 1168, Fields v. City of |
| 01:35:01 | 4 | Chicago. |
| 01:35:01 | 5 | THE COURT:  All right.  Is everybody good to go? |
| 01:35:03 | 6 | MR. LOEVY:  We are, your Honor. |
| 01:35:04 | 7 | THE COURT:  You can get the witness back on the |
| 01:35:06 | 8 | stand.  You can bring the jury in. |
| 01:35:07 | 9 | MR. LOEVY:  Could we get clarification if |
| 01:35:12 | 10 | Mr. O'Callaghan is going to cross on the Monell? |
| 01:35:15 | 11 | THE COURT:  I don't think that Mr. O'Callaghan would |
| 01:35:17 | 12 | be doing anything.  It would be Mr. Kulwin. |
| 01:35:20 | 13 | MR. KULWIN:  Good catch, Judge. |
| 01:35:22 | 14 | THE COURT:  I am as sharp as a tack. |
| 01:35:23 | 15 | MR. KULWIN:  I may have a few questions, yes, Judge. |
| 01:35:27 | 16 | MR. LOEVY:  We object to the tag team. |
| 01:35:28 | 17 | THE COURT:  Well, but you asked Mr. O'Callaghan a |
| 01:35:32 | 18 | whole bunch of questions about record keeping practices, so I |
| 01:35:36 | 19 | mean, you know, the testimony is -- I mean, it's primarily |
| 01:35:42 | 20 | obviously directed towards the Monell claim, but there's |
| 01:35:44 | 21 | certainly things that he says and issues about record keeping |
| 01:35:48 | 22 | that might be pertinent to the claim against Mr. O'Callaghan |
| 01:35:52 | 23 | too.  So the whole none duplication thing applies as it always |
| 01:35:56 | 24 | does.  I am not going to preclude somebody from |
| 01:36:00 | 25 | cross-examination. |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 142 of 303 PageID #:64305
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

2

| | | |
|---|---|---|
| 01:36:00 | 1 | MR. KULWIN:  Judge, I have an emergency phone call |
| 01:36:02 | 2 | that I have to take.  You can start without me. |
| 01:36:04 | 3 | THE COURT:  Seriously? |
| 01:36:05 | 4 | MR. KULWIN:  It will only take two minutes, literally |
| 01:36:08 | 5 | two minutes. |
| 01:36:47 | 6 | (The jury enters the courtroom.) |
| 01:36:48 | 7 | THE COURT:  Do you understand you are still under |
| 01:36:49 | 8 | oath? |
| 01:36:49 | 9 | THE WITNESS:  Yes, your Honor. |
| 01:36:50 | 10 | THE COURT:  Give it one second for everybody to get |
| 01:36:52 | 11 | situated. |
| 01:36:54 | 12 | All right.  Mr. Loevy, you can go ahead. |
| 01:36:56 | 13 | - - - |
| 01:36:56 | 14 | MICHAEL DAVID BRASFIELD, DIRECT EXAMINATION CONTINUED |
| 01:36:56 | 15 | BY MR. LOEVY: |
| 01:36:57 | 16 | Q.  Mr. Brasfield, to orient you, you told us of the analysis |
| 01:37:00 | 17 | you did just looking at the investigative files themselves to |
| 01:37:03 | 18 | see if they complied with the policy, right? |
| 01:37:04 | 19 | A.  Yes. |
| 01:37:04 | 20 | Q.  And you also told us about your analysis of the permanent |
| 01:37:08 | 21 | retention files themselves to make observations about whether |
| 01:37:11 | 22 | they were the way you thought they were supposed to look, |
| 01:37:13 | 23 | right? |
| 01:37:14 | 24 | A.  Yes. |
| 01:37:14 | 25 | Q.  I want to ask you now about a third area of analysis.  Did |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 143 of 303 PageID #:64306

| | | |
|---|---|---|
| 01:37:18 | 1 | you do any comparison between these files that were found in |
| 01:37:21 | 2 | the basement and their corresponding permanent retention |
| 01:37:26 | 3 | files? |
| 01:37:26 | 4 | A. Yes, I did. |
| 01:37:26 | 5 | Q. Tell the jury about that. |
| 01:37:28 | 6 | A. Again, looking at the material that was in the basement |
| 01:37:32 | 7 | file, there were a lot of unofficial reports that were not |
| 01:37:36 | 8 | getting onto official forms and consequently not getting into |
| 01:37:42 | 9 | the permanent retention files and roughly somewhere, 50 |
| 01:37:49 | 10 | percent of those 89 files from the 80s did show the relevant |
| 01:37:55 | 11 | information, the unofficial notes going into the official |
| 01:38:03 | 12 | reports. |
| 01:38:03 | 13 | Q. How many basement files did you say you had? |
| 01:38:05 | 14 | A. The ones that I actually had to be able to compare to were |
| 01:38:08 | 15 | only found in the first time period, so there were 27 in the. |
| 01:38:16 | 16 | Q. 27 corresponding permanent retention files? |
| 01:38:20 | 17 | A. Yes. |
| 01:38:20 | 18 | Q. So there were 400 some basement files? |
| 01:38:23 | 19 | A. 220 million if you want to call it a universe. |
| 01:38:26 | 20 | Q. That's what I'm getting at? |
| 01:38:27 | 21 | A. Yes. |
| 01:38:27 | 22 | Q. Then you found? |
| 01:38:29 | 23 | A. 23 in the first group and 27 in the second group. |
| 01:38:34 | 24 | Q. All right. Was that significant to you that 50 percent of |
| 01:38:41 | 25 | the permanent retention official files were missing from the |

| 01:38:45 | 1 | investigative files? |
| 01:38:45 | 2 | A. Yes, I would expect there to be near 100 percent |
| 01:38:48 | 3 | compliance. |
| 01:38:49 | 4 | Q. And is that consistent with your experience in other |
| 01:38:51 | 5 | places, is that an unfair or unrealistic representation? |
| 01:38:58 | 6 | A. I don't feel in my experience at looking at other homicide |
| 01:39:02 | 7 | foils and homicide investigations that I would expect that |
| 01:39:05 | 8 | high of a deficiency. |
| 01:39:06 | 9 | Q. 50 percent struck you as an aberration? |
| 01:39:10 | 10 | A. Yes. |
| 01:39:10 | 11 | Q. Have you ever worked with or audited a department that |
| 01:39:13 | 12 | performed that poorly? |
| 01:39:14 | 13 | A. Not in the case of homicide files, no. |
| 01:39:18 | 14 | Q. All right. Did you do the first line work to fill out the |
| 01:39:22 | 15 | boxes, whether it was an inventory, non-inventory, et cetera? |
| 01:39:25 | 16 | A. No, I did not. |
| 01:39:26 | 17 | Q. Tell the jury who you relied on to do that? |
| 01:39:28 | 18 | A. Because of the sheer volume and I don't want to do that |
| 01:39:34 | 19 | kind of stuff, the initial material review, not review, the |
| 01:39:41 | 20 | material that was listed and documented put in the spreadsheet |
| 01:39:45 | 21 | was done by people from your office. |
| 01:39:48 | 22 | Q. Staff hired by us, correct? |
| 01:39:50 | 23 | A. Yes. |
| 01:39:50 | 24 | Q. And did you then review the work that they had done to |
| 01:39:54 | 25 | compile the chart, the box? |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 145 of 303 PageID #:64308

01:39:56  1  A.  Yes, the discussion initially was it was the best

01:40:01  2  utilization of my time because I value it is that that initial

01:40:05  3  work would be done and then I would have the Bates numbers and

01:40:08  4  the file numbers to go back and check and verify that that's

01:40:12  5  the way they were.

01:40:13  6  Q.  And you also charged $300 an hour, right?

01:40:16  7  A.  That's correct.

01:40:16  8  Q.  So that is probably not the most efficient use of your

01:40:19  9  time?

01:40:19  10  A.  It's not the most official and it's not the most

01:40:22  11  enjoyable.

01:40:22  12  Q.  Did you spend a lot of hours making sure it was accurate?

01:40:25  13  A.  I did.

01:40:25  14  Q.  Tell the jury, approximately, what you did to do that and

01:40:28  15  how long it took?

01:40:28  16  A.  Once the material was provided to me in electronic format,

01:40:31  17  I went through the files, looked at the corresponding Bates

01:40:36  18  numbers and if anything, it errs on the side of the city

01:40:41  19  because I looked at to verify when it said that things were

01:40:45  20  either to/from memos or handwritten notes or material that

01:40:50  21  should have been in a permanent retention file, I verified

01:40:55  22  that in fact what people that you had hired found was correct.

01:41:01  23  I did not go a further step and see if I could find some more

01:41:05  24  errors.

01:41:05  25  Q.  So you only caught errors going against you?

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 146 of 303 PageID #:64309
11/29/16 PM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

6

01:41:09   1   A.  Yes.

01:41:09   2   Q.  Is it acceptable in your field and your industry to rely

01:41:13   3   on other people to do some of the data entry in this kind of

01:41:15   4   work?

01:41:15   5   A.  Yes.

01:41:16   6   Q.  All right.  I want to talk about your fourth analysis, and

01:41:19   7   that involves the criminal defense class?

01:41:22   8   A.  Yes.

01:41:22   9   Q.  Tell the jury what your fourth layer of analysis was?

01:41:25  10   A.  Well, part of the underlying issue here was whether

01:41:29  11   material was getting discovered if it was going to go to the

01:41:34  12   criminal defense attorney, and the most obvious way to

01:41:39  13   determine that is to determine how many criminal defense files

01:41:42  14   were available that correlated with information that was in

01:41:46  15   basement files and were in permanent retention files.  So

01:41:51  16   again people that were hired by you sought out the criminal

01:41:55  17   defense attorneys and were able to eventually receive criminal

01:42:02  18   defense attorney files for 27 cases in the first time period

01:42:10  19   -- or 23 in the first time period and 27 in the second.

01:42:13  20   Q.  All right.  So it was your understanding that as many

01:42:15  21   criminal defense files as possible were located to compare

01:42:18  22   with the basement files, correct?

01:42:20  23   A.  Yes.

01:42:20  24   Q.  And by the way, your Honor, at this time we do move

01:42:23  25   Plaintiff's Exhibit 307 into evidence under?

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 147 of 303 PageID #:64340

| 01:42:27 | 1 | THE COURT:  1006. |
| 01:42:29 | 2 | MR. LOEVY:  Yeah, 1006. |
| 01:42:30 | 3 | THE COURT:  We will talk about that at the end of the |
| 01:42:32 | 4 | direct.  Let's -- we will do a sidebar at the end of the |
| 01:42:35 | 5 | direct to talk about it. |
| 01:42:37 | 6 | BY MR. LOEVY: |
| 01:42:37 | 7 | Q.  All right.  When you did this analysis of comparing the |
| 01:42:40 | 8 | available criminal defense files to the basement files, what |
| 01:42:43 | 9 | was your findings? |
| 01:42:43 | 10 | A.  Well, in 90 percent of the time out of the 50 cases, 45 of |
| 01:42:49 | 11 | them, they were investigating materials that were missing, |
| 01:42:52 | 12 | approximately 80 percent. |
| 01:42:53 | 13 | Q.  Before we leave that, I want to make sure I understand. |
| 01:42:56 | 14 | So in the basement files, 90 percent of the time the criminal |
| 01:42:59 | 15 | defense attorneys files did not have all the materials in the |
| 01:43:02 | 16 | basement files? |
| 01:43:03 | 17 | A.  That's correct. |
| 01:43:03 | 18 | Q.  All right.  Did you say -- what was the next number that |
| 01:43:08 | 19 | you -- |
| 01:43:09 | 20 | A.  Approximately 80 percent, 40 of the 50 were missing the |
| 01:43:13 | 21 | criminal defense files were missing handwritten notes that |
| 01:43:17 | 22 | were present in the basement files that detectives or others |
| 01:43:19 | 23 | had written down. |
| 01:43:22 | 24 | Q.  How about GPRs and to/from memos? |
| 01:43:25 | 25 | A.  Approximately 46 percent of the criminal defense files |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 148 of 303 PageID #:64314

01:43:29  1   were missing, general progress reports, that could be found in

01:43:33  2   the basement files.

01:43:33  3   Q.  And how many of the criminal defense attorney's files

01:43:40  4   showed evidence of having received the inventory?

01:43:42  5   A.  There were 36 percent of the cases, of the criminal

01:43:50  6   defense attorneys even received an inventory, and I might also

01:43:55  7   mention that only 20 -- 20 percent were missing to/from memos

01:43:59  8   that were in the basement files too.

01:44:00  9   Q.  Now, you just said whether the criminal defense attorneys

01:44:03  10  received it, but you don't actually know what they got and

01:44:05  11  what they didn't get?

01:44:06  12  A.  No, in my report, I made very clear, I had no firsthand

01:44:10  13  knowledge of what the criminal defense attorney received or

01:44:14  14  when it was received.

01:44:15  15  Q.  You had to use as a proxy their file, correct?

01:44:17  16  A.  That's correct.

01:44:18  17  Q.  And you don't claim -- do you claim that this would be a

01:44:21  18  perfect and, you know, unchallengeable procedure to guarantee

01:44:25  19  exactly every document that they did or didn't have?

01:44:28  20  A.  No.

01:44:28  21  Q.  All right.  Overall, though, did you see evidence of a

01:44:34  22  problem?

01:44:34  23  A.  I did.  There was a consistent pattern of the material

01:44:40  24  that I reviewed that would show the types of things that were

01:44:43  25  in the investigative file were not making into criminal

11/29/16 PM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 149 of 303 PageID #:64812
***REALTIME UNEDITED TRANSCRIPT ONLY***

9

| | | |
|---|---|---|
| 01:44:49 | 1 | defense files. |
| 01:44:50 | 2 | Q.  All right.  You're familiar with the defense hired an |
| 01:44:53 | 3 | expert named Mr. Murray, correct? |
| 01:44:54 | 4 | A.  Yes. |
| 01:44:55 | 5 | Q.  And he spent quite a few hours going over the same |
| 01:44:59 | 6 | material, correct? |
| 01:45:00 | 7 | A.  That's my understanding. |
| 01:45:00 | 8 | Q.  All right.  And there is -- it was detected that there was |
| 01:45:04 | 9 | a problem with your analysis of the Octavio Anima file, was |
| 01:45:08 | 10 | there not? |
| 01:45:10 | 11 | A.  Yes. |
| 01:45:10 | 12 | Q.  Tell the jury what the problem was? |
| 01:45:10 | 13 | A.  In the spreadsheet that you see enlarged there, I made |
| 01:45:15 | 14 | reference to Bates numbers, and in one of the -- in a |
| 01:45:21 | 15 | particular case there was a range of pages where a digit was |
| 01:45:26 | 16 | transcribed, and, for example -- I can given you the exact |
| 01:45:33 | 17 | number.  In any event, it was a typographical error, and it |
| 01:45:37 | 18 | should have been what was, a 1 should have been a 2 or a 2 |
| 01:45:42 | 19 | should have been a 1 so that the range instead of having a |
| 01:45:47 | 20 | hundred and some pages missing, there were only seven or eight |
| 01:45:51 | 21 | pages missing. |
| 01:45:53 | 22 | Q.  How many pages is your document, sir, about 15? |
| 01:45:56 | 23 | A.  It covers 439 different cases, so I don't know exactly how |
| 01:46:01 | 24 | many pages there are. |
| 01:46:02 | 25 | Q.  All right.  You are not claiming it is completely free of |

01:46:04   1   all typos, are you?

01:46:05   2   A.  No, it was an effort to impartially examine what was

01:46:10   3   available.

01:46:10   4   Q.  All right.  Who is that on, the typo, was that on you or

01:46:14   5   somebody else, who takes responsibility on that?

01:46:16   6   A.  It's both on the initial typist, but it's also clearly on

01:46:19   7   me, so.

01:46:20   8   Q.  All right.  Does that change your opinions at all that you

01:46:23   9   were wrong about this Bates range?

01:46:24  10   A.  No.  In fact, even if the two possible things.  Even if

01:46:31  11   you completely removed that Octavia Anima case, it doesn't

01:46:39  12   change the overall pattern of everything that I looked at.

01:46:42  13   Secondly, there were things missing regardless of that one

01:46:47  14   particular typographical.

01:46:48  15   Q.  So notwithstanding the typo, there still were --

01:46:52  16   A.  Yes.

01:46:52  17   Q.  How about the Christopher people's file, this is the one

01:46:56  18   from the 150 pages from the criminal defense lawyer.  Do you

01:46:59  19   want to give some context there?

01:47:00  20   A.  That very clearly out of the 50 was one that should not

01:47:04  21   have been included in the material for me to look at.  It

01:47:08  22   didn't represent a criminal defense file.  There were

01:47:10  23   documents there.  But I didn't feel it would be fair to either

01:47:14  24   side to say oh, well, this one, I don't like this one, I'll

01:47:19  25   take it out.  It was there, I looked at it, I did my process.

01:47:22   1    Q.  Has the defense or anybody else brought to your attention

01:47:25   2    any other significant errors that you are aware of?

01:47:27   3    A.  No.

01:47:27   4    Q.  Does the fact that that mistake was made, does that change

01:47:32   5    any of your overall opinions?

01:47:34   6    A.  No, it does not.

01:47:35   7    Q.  Does it affect your analysis of the blue column, the

01:47:38   8    purple column, the blue versus purple column?

01:47:43   9    A.  No, it does not.

01:47:44   10    Q.  The defense expert also said that some of the documents

01:47:46   11    that were missing from the criminal defense files were things

01:47:49   12    like court attendance sheets, notes like VIN records, stuff

01:47:55   13    that was administrative.  Did that -- what's your opinion of

01:47:57   14    that criticism?

01:47:58   15    A.  I don't think that is an accurate or fair explanation.  As

01:48:04   16    I testified to before, you never know.

01:48:06   17          MR. NOLAND:  Judge.

01:48:07   18          THE WITNESS:  What is going to be.

01:48:08   19          MR. LOEVY:  Mr. Brasfield, if you could hold on.

01:48:10   20    There is an objection.

01:48:11   21          THE COURT:  Any hear it.

01:48:12   22          MR. NOLAND:  None disclosed.

01:48:13   23          THE COURT:  Let me see the lawyers at sidebar.  Bring

01:48:15   24    the report.

01:48:29   25     (The following proceedings were had at sidebar outside the

***REALTIME UNEDITED TRANSCRIPT ONLY***

01:48:35   1  hearing of the jury:)

01:48:35   2       THE COURT:  The question on the table has to do with

01:48:37   3  material missing from criminal defense files?

01:48:40   4       MR. KULWIN:  It was actually the reason, he was

01:48:43   5  talking about his review of Mr. Murray, our expert's report.

01:48:47   6  They haven't disclosed any rebuttal from him with respect to

01:48:50   7  any review.

01:48:50   8       THE COURT:  Actually, it was in the question.  It was

01:48:53   9  in the question.  So why don't you word the questions in a

01:48:55  10  different way.

01:48:56  11       MR. LOEVY:  I would be happy to stay away from it if

01:48:58  12  they don't want to get into it.  If it's a disclosure issue,

01:49:02  13  fine.  If they're going to do it on cross.  I'd be happy to

01:49:05  14  stay away from the subject.

01:49:06  15       MR. NOLAND:  We are certainly going to ask him he

01:49:08  16  didn't review the prosecutor's files and show him some of

01:49:11  17  those things.  He's had that report for months and --

01:49:15  18       THE COURT:  Basically what you're saying is that he

01:49:17  19  can't comment on the other side's criticism of his report?  I

01:49:22  20  don't think I agree with that.

01:49:22  21       MR. NOLAND:  He didn't submit a rebuttal is all I'm

01:49:25  22  saying, your Honor.  Yes.

01:49:26  23       THE COURT:  When was his dep taken in terms of the

01:49:31  24  sequence between plaintiff's report, defendants' report,

01:49:35  25  deposition, where did it fall?

***REALTIME UNEDITED TRANSCRIPT ONLY***

01:49:36   1         MR. NOLAND:  We took his deposition before we

01:49:39   2   disclosed our report.

01:49:39   3         THE COURT:  Okay.

01:49:41   4         MR. LOEVY:  I will stay away from it if they are not

01:49:43   5   going to bring it up.  The criticism I thought they were going

01:49:46   6   to do on cross is some of this stuff is benign.  If they are

01:49:50   7   not going there, we are done with it.

01:49:52   8         THE COURT:  I think you can probably word the

01:49:53   9   questions in a way that doesn't say the defendants' expert

01:49:57  10   says this.  I mean, I am not sure is going to happen here, I

01:50:01  11   suppose in theory somebody could say you did such a great job

01:50:05  12   on cross on this guy, we are not going to call this person.

01:50:12  13      (The following proceedings were had in open court in the

01:50:13  14   presence and hearing of the jury:)

01:50:13  15         THE COURT:  Okay.  You can proceed.

01:50:15  16   BY MR. LOEVY:

01:50:17  17   Q.  Some of the materials in the investigative files that were

01:50:20  18   not evidenced in the criminal defense attorney's files was

01:50:23  19   more significant than other materials, right?

01:50:25  20   A.  That is correct.

01:50:26  21   Q.  All right.  As far as any criticism that who cares if some

01:50:31  22   of this stuff was left out of the criminal defense attorney's

01:50:33  23   files, can you speak to that?  I am talking about

01:50:36  24   administrative documents, notes about a VIN number on a car,

01:50:39  25   that kind of thing.

| | | |
|---|---|---|
| 01:50:40 | 1 | A. As I had previously testified to, oftentimes, you don't |
| 01:50:46 | 2 | know what is important or what may have value either to |
| 01:50:50 | 3 | prosecution or defense. Administrative things such as who |
| 01:50:56 | 4 | appeared in court, you may discover later that the key part of |
| 01:51:02 | 5 | a prosecution is that an officer was on the street and saw |
| 01:51:05 | 6 | something, but in reality, you have the administrative |
| 01:51:08 | 7 | document that said they were in court on that day. I mean, |
| 01:51:11 | 8 | that's just an off-the-cuff example. But the administrative |
| 01:51:15 | 9 | type material can be important, oftentimes, it is not. But |
| 01:51:20 | 10 | until you have it or don't have it, you're in a quandary. |
| 01:51:25 | 11 | Q. All right. When you did your analysis, some of the |
| 01:51:28 | 12 | materials that you listed as undisclosed were probably truly |
| 01:51:33 | 13 | benign, right? |
| 01:51:34 | 14 | A. That's correct. Absolutely. |
| 01:51:36 | 15 | Q. You didn't attempting to through and sort oh, this page is |
| 01:51:39 | 16 | blank or this page is not exculpatory page by page, right? |
| 01:51:42 | 17 | A. I tried to be as objective and just put down what the |
| 01:51:46 | 18 | facts were. |
| 01:51:46 | 19 | Q. All right. Let's change topics then, sir. |
| 01:51:49 | 20 | Do you have any problem as a police practices expert |
| 01:51:52 | 21 | with police officers having a policy of destruction of notes, |
| 01:51:56 | 22 | and can you explain? |
| 01:51:57 | 23 | A. I don't have a problem. In fact, in my own career, I have |
| 01:52:04 | 24 | shredded for lack of a better word notes, but it's in the |
| 01:52:08 | 25 | context of having taken a two or three-word or two or |

| | |
|---|---|
| 01:52:15 | 1 |
| 01:52:20 | 2 |
| 01:52:23 | 3 |
| 01:52:31 | 4 |
| 01:52:35 | 5 |
| 01:52:40 | 6 |
| 01:52:44 | 7 |
| 01:52:48 | 8 |
| 01:52:50 | 9 |
| 01:52:56 | 10 |
| 01:52:58 | 11 |
| 01:53:01 | 12 |
| 01:53:03 | 13 |
| 01:53:09 | 14 |
| 01:53:14 | 15 |
| 01:53:19 | 16 |
| 01:53:21 | 17 |
| 01:53:22 | 18 |
| 01:53:25 | 19 |
| 01:53:29 | 20 |
| 01:53:29 | 21 |
| 01:53:30 | 22 |
| 01:53:33 | 23 |
| 01:53:34 | 24 |
| 01:53:37 | 25 |

1 three-line note that I may have scratched in the field and
2 elaborating that on an official document when I am back in the
3 office.  If I happen to go out to a bodega and talk to Sam
4 Smith at the bodega that may be a pencil note but when I come
5 back in, it is on such-and-such a date at such-and-such a date
6 on such-and-such a location, I interviewed whoever and this is
7 the context that I learned while it's fresh in my mind.  That
8 is the official document.  That reflects what was actually
9 done.  That scrap of paper then --
10 Q.  So is there a national norm then that as long as you take
11 the information and put it in a report, you don't have to
12 preserve the notes, would you agree or disagree with that?
13 A.  It could be either way.  The key issue is the information
14 that was garnered put into a form that is available for either
15 review or discovery later.
16 Q.  Which means in the official file, right?
17 A.  Yes, in the official file.
18 Q.  Would you have a problem with a policy that allowed you to
19 disregard or destroy or withhold notes if it didn't go into an
20 official report?
21 A.  Absolutely.
22 Q.  And would that be an aberration?
23 A.  It would.
24 Q.  You were asked some questions previously about show me a
25 specific policy that, you know, from another city.  Do you

***REALTIME UNEDITED TRANSCRIPT ONLY***

01:53:40  1   remember being asked those questions?

01:53:41  2   A.  During a deposition, yes.

01:53:43  3   Q.  All right.  Do you have the Tallahassee policy from 1982?

01:53:47  4   A.  No, I do not.

01:53:48  5   Q.  Do you have the el pass owe policy from 1984?

01:53:50  6   A.  I have no files that contain historic policies and

01:54:00  7   procedures from other jurisdictions.

01:54:02  8   Q.  Do you nonetheless have a familiarity request other

01:54:06  9   policies and procedures?

01:54:07  10  A.  Yes.  From the start of my college education in science in

01:54:12  11  the studying of policies of procedures and investigations and

01:54:15  12  then more importantly through my professional practice of

01:54:21  13  developing, not to go over the same ground, but I have visited

01:54:26  14  other police departments, I have audited other police

01:54:29  15  departments, I have reviewed their policies, I have looked in

01:54:35  16  the popular literature at the time and of those eras and I

01:54:40  17  actually was a commander in those eras and I am familiar with

01:54:46  18  what was the way things were written.

01:54:50  19  Q.  All right.  Back quickly to the comparison you did between

01:54:55  20  the criminal defense files and the basement files, why did you

01:54:59  21  choose -- well, first of all, you have an understanding that

01:55:02  22  the defense attorney did a different comparison, correct?

01:55:05  23  A.  Yes.

01:55:05  24  Q.  I'm sorry, the defense attorney hired an expert.  And what

01:55:08  25  did the defense expert Mr. Murray compare the files to?

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 157 of 303 PageID #:64320
11/29/16 PM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

17

| | | |
|---|---|---|
| 01:55:14 | 1 | MR. NOLAND:  Objection. |
| 01:55:14 | 2 | THE COURT:  Same basis as the previous one? |
| 01:55:16 | 3 | MR. NOLAND:  Yes, Judge. |
| 01:55:16 | 4 | THE COURT:  Again, I need to see the lawyers at |
| 01:55:18 | 5 | sidebar, please.  Bring the report. |
| 01:55:22 | 6 | (The following proceedings were had at sidebar outside the |
| 01:55:30 | 7 | hearing of the jury:) |
| 01:55:30 | 8 | THE COURT:  You did what I told you not to do.  The |
| 01:55:41 | 9 | defense expert did this, the defense expert did that.  I told |
| 01:55:45 | 10 | you not to word questions that way. |
| 01:55:46 | 11 | MR. LOEVY:  I apologize. |
| 01:55:48 | 12 | THE COURT:  Here's the deal.  I don't think that |
| 01:55:50 | 13 | there's anything inappropriate or beyond -- or outside the |
| 01:55:53 | 14 | scope of Rule 26(a)(2) and the part of Rule 37 that goes along |
| 01:55:57 | 15 | with it for him to be able to respond to criticism by a |
| 01:56:00 | 16 | defense expert, so either he gets to do it now or he is going |
| 01:56:05 | 17 | to get to bring him on later.  Do you have a preference? |
| 01:56:08 | 18 | MR. LOEVY:  We do. |
| 01:56:09 | 19 | THE COURT:  I'm asking you, put him on in rebuttal to |
| 01:56:13 | 20 | comment on what your guy said about him. |
| 01:56:15 | 21 | MR. NOLAND:  If that would be the ruling, then I |
| 01:56:17 | 22 | would rather have him do it now. |
| 01:56:18 | 23 | THE COURT:  That would be the ruling.  Let's have him |
| 01:56:23 | 24 | do it now. |
| 01:56:23 | 25 | (The following proceedings were had in open court in the |

11/29/16 PM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 158 of 303 PageID #:64321
***REALTIME UNEDITED TRANSCRIPT ONLY***

18

| | | |
|---|---|---|
| 01:56:24 | 1 | presence and hearing of the jury:) |
| 01:56:24 | 2 | THE COURT: Okay. The objection is overruled. You |
| 01:56:27 | 3 | can proceed. |
| 01:56:27 | 4 | BY MR. LOEVY: |
| 01:56:27 | 5 | Q. Just as foundation, what is your understanding of the |
| 01:56:30 | 6 | analysis that the defense expert under took? |
| 01:56:34 | 7 | A. It is my understanding from reading his report and |
| 01:56:37 | 8 | deposition that he looked at. |
| 01:56:41 | 9 | Q. Same basement files, right? |
| 01:56:42 | 10 | A. Same basement files. |
| 01:56:43 | 11 | Q. What did he compare them to? |
| 01:56:45 | 12 | A. He compared them to state's attorney's office files. |
| 01:56:47 | 13 | Q. You compared the same basement files to the criminal |
| 01:56:50 | 14 | defense and then they compared them to the state's attorney's |
| 01:56:52 | 15 | office files, right? |
| 01:56:53 | 16 | A. That's correct. |
| 01:56:53 | 17 | Q. And neither of one of you did what the other one did? |
| 01:56:56 | 18 | A. That's correct. |
| 01:56:56 | 19 | Q. Why did you choose to compare the basement files to the |
| 01:57:00 | 20 | criminal defense files to determine what the criminal defense |
| 01:57:03 | 21 | attorneys had? |
| 01:57:03 | 22 | A. I tried to keep it as straightforward as possible. The |
| 01:57:09 | 23 | issue that I was asked to look at was material relevant to the |
| 01:57:13 | 24 | investigation of homicides being given and made available to |
| 01:57:19 | 25 | the criminal defense attorney. And the most straightforward |

01:57:22  1  way to do that is to look at the criminal defense attorney's

01:57:26  2  files.

01:57:26  3  Q.  All right.  You've already testified that 90 percent of

01:57:31  4  the criminal defense attorney files were missing some

01:57:35  5  materials from the basement file.  Do you have any knowledge

01:57:40  6  as to what was in or wasn't in the state's attorney's files?

01:57:46  7  A.  No, I do not.

01:57:47  8  Q.  Let's talk about a few more areas.

01:57:49  9       You talked before lunch about why it's important to

01:57:51  10  have policies governing the subpoena unit and the subpoena

01:57:55  11  response unit.  Did the City of Chicago after they enacted the

01:57:58  12  changes we talked about this morning, did they fix the

01:58:00  13  subpoena unit problems?

01:58:02  14  A.  No, they did not.

01:58:03  15  Q.  Can you explain?

01:58:04  16  A.  The policies that were promulgated did nothing to

01:58:11  17  establish guidelines or policies and procedures or training or

01:58:18  18  follow up auditing or in worst case scenario, discipline for

01:58:26  19  the successful operation of the subpoena services unit.  There

01:58:29  20  was no checklist if you did a subpoena from a state's

01:58:35  21  attorney's office, you do this, this, and this.  It becomes

01:58:37  22  even more critically important to have that when you have a

01:58:41  23  police department with a culture of parallel files of

01:58:50  24  different sources of files.  You get a subpoena, and the staff

01:58:54  25  with no training is supposed to determine, well, how do I

01:58:59   1   respond to this?  Do I send something in writing over to the

01:59:03   2   gang squad because the gang squad may have had involvement in

01:59:06   3   this but their records aren't included in the investigative

01:59:12   4   file?  Do I send for things from the photo lab or from the

01:59:19   5   crime lab?  You can say that an experienced employee would

01:59:23   6   know that, but given the turnover and the fact that there is

01:59:27   7   absolutely no evidence that I have seen of any type of

01:59:33   8   guideline, of any training, of any policy or procedure as to

01:59:40   9   how they will respond or what sources that they will examine

01:59:45  10   to get the material.

01:59:47  11   Q.  All right.  Did you review testimony by Mr. Hickey that

01:59:49  12   provided insight into this problem?

01:59:51  13   A.  A great deal of testimony from Mr. Hickey, yes.

01:59:53  14   Q.  And what did you conclude based on that?

01:59:55  15   A.  That he acknowledged as the city's expert in that field

02:00:01  16   that what I had just testified to was the case, that there was

02:00:06  17   no training, there were no guidelines, and in fact, material

02:00:10  18   that I reviewed, that there were instances where there was

02:00:16  19   confusion or question among staff as to what should be turned

02:00:20  20   over or what shouldn't be turned over, and that none of that

02:00:28  21   questioning was ever resolved or sent up the chain of command

02:00:33  22   to decide what to do.

02:00:34  23   Q.  All right.  In addition to the lack of -- basically, did

02:00:40  24   any of the new policies that got passed, did they govern the

02:00:44  25   subpoena unit?

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 161 of 303 PageID #:64324

| | | |
|---|---|---|
| 02:00:46 | 1 | A.  No. |
| 02:00:47 | 2 | Q.  Was there a lack of policies there? |
| 02:00:50 | 3 | A.  There was a lack of policy. |
| 02:00:51 | 4 | Q.  All right.  Let's talk about the policies that were |
| 02:00:52 | 5 | passed.  Did those solve the problem for the decentralized |
| 02:00:55 | 6 | divisions you've just described? |
| 02:00:57 | 7 | A.  No, they did not address anything about a centralized |
| 02:01:01 | 8 | record system process.  And I might add, the larger the |
| 02:01:05 | 9 | organization gets, the more critically important it is to have |
| 02:01:08 | 10 | a centralized record system. |
| 02:01:09 | 11 | Q.  How out of the norm is Chicago's deficiency in that |
| 02:01:14 | 12 | regard? |
| 02:01:14 | 13 | A.  As I have said on several occasions, it is totally alien |
| 02:01:22 | 14 | to my experience that the City of Chicago police department |
| 02:01:26 | 15 | would have that type of system. |
| 02:01:28 | 16 | Q.  Did the policies leave too much or too little discretion |
| 02:01:32 | 17 | to detectives as far as what to make into official files? |
| 02:01:35 | 18 | A.  Well, they used the term relevant and one of the |
| 02:01:45 | 19 | depositions that I reviewed, I believe it was from a gentleman |
| 02:01:49 | 20 | by the name of /STEUT I shall indicated that what might be |
| 02:01:54 | 21 | important or relevant. |
| 02:01:55 | 22 |         MR. NOLAND:  Objection, your Honor.  I believe that's |
| 02:01:57 | 23 | the subject of the discussion before the testimony. |
| 02:02:00 | 24 |         THE COURT:  Okay.  Well, the last part of the answer |
| 02:02:04 | 25 | was not responsive, so I am going to strike the last part.  I |

02:02:09   1   am going to strike the whole answer.  Why don't you put the

02:02:12   2   question again.  The answer really wasn't responsive.

02:02:14   3   BY MR. LOEVY:

02:02:15   4   Q.  Did you see any evidence either way that the system in

02:02:17   5   Chicago left too much discretion to police officers to decide

02:02:20   6   what to put in the official file?

02:02:22   7           THE COURT:  That's just a yes or no.

02:02:24   8           THE WITNESS:  Yes.

02:02:24   9   BY MR. LOEVY:

02:02:25  10   Q.  Can you explain?

02:02:25  11           THE COURT:  Is this the issue where there is an

02:02:27  12   objection?

02:02:27  13           MR. NOLAND:  Yes, the reference to a particular name.

02:02:29  14           THE COURT:  Bring the -- again, I need to talk to the

02:02:32  15   lawyers at sidebar.  Bring the relevant ruling.

02:02:46  16     (The following proceedings were had at sidebar outside the

02:02:48  17   hearing of the jury:)

02:02:48  18           THE COURT:  Is this my ruling?  You're talking about.

02:02:53  19           MR. NOLAND:  The proffer.

02:02:53  20           THE COURT:  You are talking about the proffer.  This

02:02:58  21   is not Jones Palmer?

02:03:02  22           MR. SWAMINATHAN:  No one knows that his reference to

02:03:08  23   skive I shall testifying is him testifying in Jones and

02:03:11  24   Palmer.  He is just saying a guy name skive I shall who is a

02:03:15  25   commander said certain things.


              ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 163 of 303 PageID #:64326
11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

23

02:03:17    1        MR. LOEVY:  In other words, that would have been

02:03:19    2  outside the Jones proffer but we are not offering it for the

02:03:22    3  Jones proffer.  It has nothing to do with the Jones proffer.

02:03:25    4  He just said I looked at /STEUB itch's testimony.

02:03:28    5        THE COURT:  Who is is it I object I shall?

02:03:30    6        MR. SWAMINATHAN:  He is a command he were for the

02:03:32    7  city.

02:03:32    8        THE COURT:  Testified in the Palmer case?

02:03:34    9        MR. SWAMINATHAN:  It was in the Palmer case.

02:03:36   10        MR. NOLAND:  It's the pre 83 policy, yes.

02:03:38   11        THE COURT:  Okay.  And what do you expect his

02:03:40   12  testimony to be on this?

02:03:43   13        MR. LOEVY:  Just what he said.

02:03:44   14        THE COURT:  Say it again.

02:03:44   15        MR. LOEVY:  That there was too much discretion left

02:03:46   16  to the detectives to decide what's in and what's out.

02:03:49   17        THE COURT:  And the problem with that is?

02:03:50   18        MR. NOLAND:  It was the pre 83 policy.  That was a

02:03:55   19  decision a change the policy.  He is talking about a different

02:04:02   20  policy before 83-1.

02:04:06   21        MR. MICHALIK:  It's misleading to discuss testimony

02:04:11   22  before 83-1 comes out.

02:04:12   23        THE COURT:  Reword the question so it doesn't do

02:04:14   24  that.

02:04:15   25    (The following proceedings were had in open court in the


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

02:04:19   1   presence and hearing of the jury:)

02:04:19   2       THE COURT: Okay. The question is going to be

02:04:21   3   rephrased.

02:04:21   4   BY MR. LOEVY:

02:04:22   5   Q. All right. You looked at what happened in the City of

02:04:27   6   Chicago after they tried to solve the problem of the Jones

02:04:29   7   Palmer era, correct?

02:04:31   8   A. That's correct.

02:04:31   9   Q. And I believe you told us you think they did an inadequate

02:04:35   10   job of solving that problem?

02:04:36   11   A. Yes.

02:04:36   12   Q. Did they solve the problem with having too much or too

02:04:40   13   little discretion to detectives to decide what to memorialize?

02:04:44   14   A. No.

02:04:45   15   Q. They did not?

02:04:46   16   A. No.

02:04:46   17   Q. If you could explain a little bit about your reference to

02:04:49   18   Mr. /STEUB itch?

02:04:51   19   A. They used what I would consider vague terminology and left

02:04:55   20   it up to individual detectives to determine what was relevant

02:04:58   21   and what they did with the information that they thought was

02:05:02   22   relevant.

02:05:04   23   Q. And that's not in the norm in police practices?

02:05:07   24   A. No.

02:05:07   25   Q. You talked a little bit about training and just a few more

02:05:10   1   questions, really.  But when they did these new policies and
02:05:14   2   these new practices, did they do the kind of training that
02:05:17   3   would be expected in your industry?
02:05:19   4   A.  Not for a significant policy such as discovery in
02:05:24   5   constitutional state crimes for individuals that and as
02:05:34   6   evidenced by the information I had available to me, that was
02:05:38   7   an inbreded cultural problem that needed very significant
02:05:47   8   training, planning for the training in advance, training
02:05:50   9   presented by high level commanders, perhaps even with an
02:05:55   10  introduction by the superintendent that it encompass everyone
02:06:00   11  that would have their hands-on an investigation, not just the
02:06:08   12  major crimes detectives as I mentioned before.  They should
02:06:13   13  include bomb and arson, gang squad, anyone that has an
02:06:16   14  investigative responsibility and to a lesser extreme, the
02:06:21   15  patrol officer, and it should not be a one time deal.  People
02:06:25   16  transfer in and out.  There are going to be questions arise in
02:06:29   17  time.  You have a major significant change in the culture as
02:06:35   18  to well, does this mean this, does that mean that, there needs
02:06:40   19  to be and often is additional follow-up training.
02:06:43   20  Q.  As a 40-year law enforcement person, do you regard this as
02:06:47   21  a significant change in the way of doing business?
02:06:51   22  A.  Yes.
02:06:51   23  Q.  Is a one-three-hour training of the detectives sufficient?
02:06:55   24  A.  No.
02:06:55   25  Q.  The last question is you described the culture as

11/29/16 PM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 166 of 303 PageID #:64329
***REALTIME UNEDITED TRANSCRIPT ONLY***

26

| | | |
|---|---|---|
| 02:06:58 | 1 | ingrained.  Can you explain from a police practices standpoint |
| 02:07:02 | 2 | how an organization can have culture resistance to change? |
| 02:07:05 | 3 | MR. NOLAND:  Objection, Judge, relevance. |
| 02:07:06 | 4 | THE COURT:  Overruled. |
| 02:07:09 | 5 | THE WITNESS:  For instance, when the requirement to |
| 02:07:18 | 6 | read suspects their rights which goes back decades and decades |
| 02:07:21 | 7 | and decades, that was not what police were used to doing and |
| 02:07:28 | 8 | thought that it was going to let the bad guys get away.  It's |
| 02:07:32 | 9 | a cultural thing that had to be totally turned around 180 |
| 02:07:36 | 10 | degrees.  The same is true about, for instance, warning shots. |
| 02:07:44 | 11 | Anyway, warning shots. |
| 02:07:46 | 12 | MR. KULWIN:  I will object. |
| 02:07:47 | 13 | THE COURT:  Sustained. |
| 02:07:48 | 14 | MR. KULWIN:  I ask that it be stricken. |
| 02:07:50 | 15 | THE COURT:  That comment is stricken. |
| 02:07:51 | 16 | MR. LOEVY:  I'm finished. |
| 02:07:53 | 17 | THE COURT:  What did you say? |
| 02:07:55 | 18 | MR. LOEVY:  I'm finished. |
| 02:07:56 | 19 | THE COURT:  You're finished. |
| 02:07:57 | 20 | Mr. Noland. |
| 02:07:58 | 21 | - - - |
| 02:07:58 | 22 | MICHAEL DAVID BRASFIELD, CROSS-EXAMINATION |
| 02:07:58 | 23 | BY MR. NOLAND: |
| 02:08:40 | 24 | Q.  Now, Mr. Brasfield, before lunch, you talked a lot about |
| 02:08:44 | 25 | notes and that in the files you reviewed, you saw notes that |

02:08:48   1   were not on general progress report forms, do you remember

02:08:51   2   that testimony?

02:08:52   3   A.  Yes, I do.

02:08:52   4   Q.  And sometimes you might see it on the back of a piece of

02:08:55   5   paper or something not on the official general progress report

02:08:58   6   form, correct?

02:08:59   7   A.  That's not what I testified to this morning, but, yes, I

02:09:02   8   agree.

02:09:02   9   Q.  All right.  And now just recently after lunch, you've

02:09:06  10   acknowledged that you would shred your own notes as a police

02:09:11  11   officer after completing a report; isn't that true?

02:09:16  12   A.  That's correct.

02:09:16  13   Q.  And to you that's a perfectly acceptable practice, right?

02:09:18  14   A.  In the context of my explanation of transferring the

02:09:21  15   information in full onto official forms.

02:09:25  16   Q.  So you would not give your notes to the criminal defense

02:09:28  17   attorneys so he would have those notes in the courtroom in

02:09:30  18   order to cross-examine you with what you wrote

02:09:32  19   contemporaneously with your interview of somebody, correct,

02:09:36  20   yes or no?

02:09:36  21   A.  Yes.

02:09:37  22   Q.  And you would not give those notes to the prosecutor so he

02:09:40  23   could see what you wrote, he or she could see what you wrote

02:09:43  24   down contemporaneously with your investigation; isn't that

02:09:43  25   true?

02:09:48  1  A.  That's true.

02:09:48  2  Q.  And you have talked about a lot of criticism of Chicago's

02:09:56  3  policy.  We just heard that, correct?

02:09:58  4  A.  Yes.

02:09:58  5  Q.  Wouldn't you agree, sir, that in fact keeping notes,

02:10:03  6  retaining notes permanently so that they're available in the

02:10:05  7  criminal process is a better policy than your very own

02:10:09  8  personal policy of shredding your notes; isn't that true?

02:10:13  9  A.  No, it is not.

02:10:14  10  Q.  Now, Mr. Brasfield, you were never personally assigned as

02:10:22  11  a homicide detective is that true?

02:10:23  12  A.  That's true.

02:10:24  13  Q.  But you're aware that in the Seattle police department as

02:10:29  14  with your practice, the Seattle police officers would shred

02:10:32  15  their notes after completing a report, right?

02:10:34  16  A.  In that era.

02:10:36  17  Q.  Is that true?

02:10:36  18  A.  That's true.

02:10:39  19  Q.  And Mr. Brasfield, isn't it true that in all your time in

02:10:43  20  Seattle, all those 20 plus years, you never did anything to

02:10:46  21  change that policy; isn't that true?

02:10:48  22  A.  No, that's not true.

02:10:48  23  Q.  Isn't it true, Mr. Brasfield, that you didn't do anything

02:10:51  24  to change the policy at Seattle of detectives who threw their

02:10:55  25  notes away; isn't that true?

02:10:57   1   A.  That's not true.

02:10:57   2   Q.  Well, Mr. Brasfield, you were the chief of police in Fort

02:11:02   3   Lauderdale; is that correct?

02:11:02   4   A.  That's correct.

02:11:02   5   Q.  And you don't even know what the policy was in Fort

02:11:06   6   Lauderdale with respect to whether or not detectives could

02:11:08   7   destroy their notes after completing a report; isn't that

02:11:08   8   true?

02:11:13   9   A.  That's not entirely true, no.

02:11:14   10  Q.  At your deposition you told us you didn't know one way or

02:11:18   11  the other what the policy was in Fort Lauderdale?

02:11:22   12          MR. LOEVY:  Objection, page and line.

02:11:24   13          THE COURT:  Sustained.  That's not the proper way to

02:11:28   14  do it.

02:11:31   15  BY MR. NOLAND:

02:11:36   16  Q.  Page 327.  Line 10.  Isn't it true that you were asked

02:11:51   17  these questions.

02:11:52   18          "QUESTION:

02:11:52   19          MR. LOEVY:  Objection to the characterization with

02:11:54   20  respect to the policies.  Just the question and the answer.

02:11:57   21          THE COURT:  Ask the questions.  Read the questions

02:11:58   22  and answers, leave out the commentary.

02:12:01   23  BY MR. NOLAND:

02:12:03   24  Q.

02:12:03   25          "QUESTION:  But what did they do with the actual notes?

***REALTIME UNEDITED TRANSCRIPT ONLY***

02:12:06    1  Did they throw them away?

02:12:07    2      "ANSWER:  They were transcribed and the notes, I don't

02:12:10    3  have an independent recollection right now what they were,

02:12:13    4  what was done with them.  So it's possible they were just

02:12:15    5  thrown away.  The information would have been contained in the

02:12:17    6  file.  It's possible.  I said I have no independent

02:12:20    7  recollection.

02:12:24    8      So the question is, it's possible that the notes in

02:12:26    9  Fort Lauderdale that the detectives took after they

02:12:29   10  electronically called them in and had them transcribed or

02:12:32   11  typed them or did whatever that they did with them and put

02:12:35   12  them in the file could have been thrown away?

02:12:37   13      "ANSWER:  That could have been."

02:12:39   14  A.  That's correct.

02:12:40   15      MR. LOEVY:  Objection, not impeaching.

02:12:44   16      THE COURT:  I am going to overrule the objection.

02:12:46   17  When you read the things, say question and answer.  You are

02:12:50   18  not going to do it again, but when you do it say question and

02:12:53   19  answer so the jury understands what's being read.

02:13:06   20      I am overruling the objection because it's a matter

02:13:09   21  of weight.

02:13:09   22      MR. NOLAND:  Thank you, Judge.

02:13:10   23  BY MR. NOLAND:

02:13:10   24  Q.  Isn't it true that as the chief of policy, you didn't have

02:13:14   25  a policy one way or the other with retention of notes in Fort

11/29/16 PM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 171 of 303 PageID #:64334
***REALTIME UNEDITED TRANSCRIPT ONLY***

31

| 02:13:19 | 1 | Lauderdale? |
| 02:13:19 | 2 | A.  The policy. |
| 02:13:21 | 3 | MR. LOEVY:  Objection. |
| 02:13:22 | 4 | THE COURT:  The question is did you have a policy? |
| 02:13:24 | 5 | THE WITNESS:  We had a policy. |
| 02:13:25 | 6 | BY MR. NOLAND: |
| 02:13:26 | 7 | Q.  Page 328, line 1.  Isn't it true you were asked this |
| 02:13:29 | 8 | question and gave this answer: |
| 02:13:31 | 9 | "QUESTION:  And as chief of police, you didn't have a |
| 02:13:34 | 10 | policy one way or the other? |
| 02:13:35 | 11 | "ANSWER:  I don't recall what the policy.  I don't have |
| 02:13:37 | 12 | it in front of me now." |
| 02:13:39 | 13 | Isn't it truism objection, your Honor |
| 02:13:42 | 14 | THE COURT:  The objection is sustained.  Not |
| 02:13:44 | 15 | impeaching.  The jury is instructed to disregard. |
| 02:13:50 | 16 | BY MR. NOLAND: |
| 02:13:50 | 17 | Q.  Now, Mr. Brasfield, you acknowledged after lunch here that |
| 02:13:53 | 18 | the key in all of this with respect to the review that you've |
| 02:13:55 | 19 | done in your testimony here today is that the information is |
| 02:13:59 | 20 | provided in the criminal justice process so that the |
| 02:14:02 | 21 | prosecutors get the information and the information will be |
| 02:14:05 | 22 | tendered to the criminal defense attorney; is that fair? |
| 02:14:10 | 23 | A.  The information that the police have are supposed to give |
| 02:14:14 | 24 | to the prosecutor or the state's attorney's office, yes. |
| 02:14:16 | 25 | Q.  And it is true, isn't it, that if the police -- when the |

02:14:21   1   police provide the information to the prosecutor, the police

02:14:23   2   have fulfilled their duty to disclose under generally accepted

02:14:30   3   police practices; isn't that true?

02:14:32   4   A.  If they disclosed everything that they have, yes.

02:14:35   5   Q.  Yet, Mr. Brasfield, in this review you talked about with

02:14:43   6   plaintiff's counsel, you did not even look look at the

02:14:46   7   prosecutor's files in comparison to the 50 investigative files

02:14:51   8   from the basement, did you?

02:14:52   9   A.  That's correct.

02:14:53   10  Q.  Now, Mr. Brasfield, you've talked about a lot about

02:15:06   11  permanent retention files.  Do you remember that testimony?

02:15:07   12  A.  Yes.

02:15:07   13  Q.  Now, Mr. Brasfield, you understand that at the Chicago

02:15:10   14  Police Department there's a permanent retention file that has

02:15:12   15  a supplementary reports and the case reports, that's correct?

02:15:15   16  A.  That's correct.

02:15:16   17  Q.  And there's also the investigative file that is maintained

02:15:20   18  at the area while the investigation is ongoing; isn't that

02:15:20   19  true?

02:15:24   20  A.  That's one of the other files, yes.

02:15:25   21  Q.  And the investigative files are available to get requested

02:15:32   22  and subpoenaed in the criminal process by the prosecutors and

02:15:35   23  the criminal defense attorneys; isn't that true?

02:15:38   24  A.  There is though policy or practice that would indicate how

02:15:41   25  it's supposed to operate.

| | | |
|---|---|---|
| 02:15:41 | 1 | Q. Well, it's supposed to operate in that the detectives, the |
| 02:15:46 | 2 | special order requires that detectives be submit their |
| 02:15:49 | 3 | information that they generated or received in an |
| 02:15:53 | 4 | investigation into that investigative file for preservation, |
| 02:15:57 | 5 | isn't that what it says?  Isn't that what it says, yes or no? |
| 02:16:00 | 6 | A. That's what it says. |
| 02:16:03 | 7 | Q. Thank you. |
| 02:16:04 | 8 |        And in this case, there is about 450 investigative |
| 02:16:13 | 9 | files that are listed on this table that the plaintiff's |
| 02:16:17 | 10 | attorneys gave you? |
| 02:16:18 | 11 | A. More than 29, yes. |
| 02:16:19 | 12 | Q. And by the way, you didn't prepare this, they prepared it, |
| 02:16:22 | 13 | and provided it to you, correct? |
| 02:16:23 | 14 | A. That's correct. |
| 02:16:23 | 15 | Q. And but only on 50 of those 429 cases did they provide you |
| 02:16:30 | 16 | with any criminal defense file is that true? |
| 02:16:32 | 17 | A. That's true. |
| 02:16:33 | 18 | Q. And on those criminal defense attorney's files, there were |
| 02:16:44 | 19 | almost all of them general progress reports and other notes |
| 02:16:49 | 20 | that were contained in those criminal defense attorneys files, |
| 02:16:53 | 21 | true? |
| 02:16:54 | 22 | A. Those. |
| 02:16:54 | 23 | Q. Is that true or not, sir? |
| 02:16:56 | 24 | A. No. |
| 02:16:56 | 25 | Q. You were aware that information from the investigative |

| 02:16:59 | 1 | files was produced in the criminal process, correct? |
| 02:17:03 | 2 | A.  You'll have to rephrase that. |
| 02:17:06 | 3 | Q.  There are -- you came across dozens and dozens of general |
| 02:17:12 | 4 | progress reports that were in these criminal defense |
| 02:17:14 | 5 | attorney's files that you reviewed; isn't that true? |
| 02:17:16 | 6 | A.  There were general progress reports in some of the files |
| 02:17:20 | 7 | that I looked at, yes. |
| 02:17:21 | 8 | Q.  So that was evidence that attorneys were getting material |
| 02:17:26 | 9 | from the investigative files, correct? |
| 02:17:28 | 10 | A.  In some instances, yes. |
| 02:17:30 | 11 | Q.  And in fact, it's your understanding that the practice at |
| 02:17:36 | 12 | Chicago or the policy is that the general progress reports do |
| 02:17:39 | 13 | not go into the permanent retention file, they go into the |
| 02:17:43 | 14 | investigative file, correct? |
| 02:17:44 | 15 | A.  That's correct. |
| 02:17:44 | 16 | Q.  Now, with respect to these 50 or so criminal defense |
| 02:17:57 | 17 | attorneys files that were provided to you, you didn't |
| 02:17:59 | 18 | personally do anything to independently verify that they were |
| 02:18:04 | 19 | complete or incomplete; is that right? |
| 02:18:06 | 20 | A.  I verified -- |
| 02:18:08 | 21 | Q.  Sir; is that right? |
| 02:18:12 | 22 | A.  I received. |
| 02:18:13 | 23 | Q.  Sir; is that right? |
| 02:18:15 | 24 | A.  Please ask the question again. |
| 02:18:16 | 25 | Q.  Isn't it true, sir, that of the 50 criminal defense |

02:18:20  1    attorney's files that were provided to you by the plaintiff's

02:18:22  2    counsel, you did nothing to independently verify that they

02:18:26  3    were complete or incomplete; isn't that true?

02:18:29  4    A.  I took them at face value.

02:18:31  5    Q.  And you don't know how many times those files changed

02:18:35  6    hands from one attorney to another attorney to another

02:18:37  7    attorney over the years, true?

02:18:38  8    A.  That's true.

02:18:39  9    Q.  And most of these files were between 15 and some in excess

02:18:43  10   of 30 years old; isn't that right?

02:18:46  11   A.  That's possible.

02:18:46  12   Q.  And you don't know how many of these files were given to

02:18:51  13   appellate lawyers, right?

02:18:52  14   A.  That's correct.

02:18:52  15   Q.  You don't know how many were given -- how many post

02:18:55  16   conviction lawyers took those files, correct?

02:18:57  17   A.  All I know is they came from criminal defense attorneys.

02:19:00  18   Q.  And you didn't talk to any criminal defense attorneys and

02:19:03  19   say, hey, is this file complete, true?

02:19:05  20   A.  That's true.

02:19:06  21   Q.  Mr. Loevy brought up with you the Christopher Peoples

02:19:21  22   case, right, that was a case we talked about at your

02:19:24  23   deposition?

02:19:24  24   A.  Yes.

02:19:25  25   Q.  And that was a file that was provided to you by the

| | | |
|---|---|---|
| 02:19:31 | 1 | plaintiff's counsel, right? |
| 02:19:32 | 2 | A.  That's correct. |
| 02:19:33 | 3 | Q.  I'm going to show you what the plaintiffs have marked as |
| 02:19:38 | 4 | Plaintiff's Exhibit 383.  That is the criminal defense |
| 02:19:46 | 5 | attorney's file that the plaintiff's attorneys provided to |
| 02:19:49 | 6 | you; isn't that true? |
| 02:19:51 | 7 | A.  I believe so. |
| 02:19:52 | 8 | THE COURT:  Can you spell peoples? |
| 02:19:54 | 9 | MR. NOLAND:  It is p-e-o-p-l-e-s-. |
| 02:20:00 | 10 | THE COURT:  Thanks. |
| 02:20:00 | 11 | BY MR. NOLAND: |
| 02:20:02 | 12 | Q.  Sir? |
| 02:20:03 | 13 | MR. NOLAND:  Judge, could we have the computer? |
| 02:20:20 | 14 | MR. NOLAND:  If we could have 306-8. |
| 02:20:23 | 15 | THE COURT:  Is this in evidence? |
| 02:20:24 | 16 | MR. NOLAND:  This is Plaintiff's Exhibit. |
| 02:20:24 | 17 | THE COURT:  I understand.  That's not my question. |
| 02:20:26 | 18 | Just focus on my question.  Is it in evidence?  Let me ask it |
| 02:20:31 | 19 | a different way.  Is there an objection? |
| 02:20:32 | 20 | MR. LOEVY:  We do not object. |
| 02:20:33 | 21 | THE COURT:  Fine.  Then the jury will be able to see |
| 02:20:35 | 22 | it.  306-10? |
| 02:20:38 | 23 | MR. NOLAND:  018, your Honor. |
| 02:20:38 | 24 | BY MR. NOLAND: |
| 02:20:45 | 25 | Q.  Sir, while Laura is pulling that up, the first page of |

***REALTIME UNEDITED TRANSCRIPT ONLY***

02:20:48  1  that document has the name of the attorney for Christopher

02:20:53  2  Peoples, his name is Gary Scanlon is that true?

02:20:55  3  A.  That's correct.

02:20:57  4      THE COURT:  I did it again.  There's two defense

02:21:00  5  tables.  I put it on the wrong one.  My mistake.  Sorry about

02:21:03  6  that.  There you go.

02:21:04  7  BY MR. NOLAND:

02:21:12  8  Q.  Mr. Brasfield, on the screen in front of you, that is page

02:21:17  9  17 of your attachment F to your report; is that true?

02:21:22  10  A.  That's correct.

02:21:22  11  Q.  And you prepared this page 17, correct?

02:21:27  12  A.  I did.

02:21:28  13  Q.  And this was officially based upon your review of the --

02:21:33  14  this spreadsheet on the demonstrative exhibit that plaintiff's

02:21:37  15  counsel gave you, right?

02:21:38  16  A.  Yes.

02:21:38  17  Q.  And then you took that and did a file by file comparison

02:21:42  18  of the documents that were in the investigative files from the

02:21:46  19  police and the criminal defense attorney's files given to you,

02:21:49  20  right?

02:21:49  21  A.  That's correct.

02:21:57  22      MR. NOLAND:  Laura, can you highlight the entire

02:22:00  23  paragraph missing from criminal defense files.

02:22:10  24  BY MR. NOLAND:

02:22:10  25  Q.  There's actually 288 pages in that Chicago Police

| | | |
|---|---|---|
| 02:22:13 | 1 | Department file, correct, that you note on attachment F? |
| 02:22:15 | 2 | A. Yes. |
| 02:22:15 | 3 | Q. And I have added them up beforehand,I think we talked |
| 02:22:22 | 4 | about it at your deposition, the documents you said were |
| 02:22:24 | 5 | missing from the criminal defense attorney's files were about |
| 02:22:27 | 6 | 250 pages or 257 pages; is that true? |
| 02:22:30 | 7 | A. I don't recall. |
| 02:22:31 | 8 | Q. Okay. But it was somewhere in that ballpark, does that |
| 02:22:34 | 9 | sound about right? |
| 02:22:35 | 10 | A. I would say that's fair. |
| 02:22:39 | 11 | MR. NOLAND: Laura, if you could pull up Plaintiff's |
| 02:22:41 | 12 | Exhibit 383, pages. |
| 02:22:47 | 13 | THE COURT: Is there any objection to this one? |
| 02:22:48 | 14 | MR. LOEVY: What is it, your Honor? |
| 02:22:50 | 15 | THE COURT: 383. |
| 02:22:51 | 16 | MR. LOEVY: Is it a file? |
| 02:22:53 | 17 | MR. NOLAND: It's the file that's in front of him. |
| 02:22:55 | 18 | MR. LOEVY: No objection. |
| 02:22:56 | 19 | THE COURT: Okay. Fine. So the 306 was -- 306 dot |
| 02:23:04 | 20 | whatever was the page from the report, the 383 is the people's |
| 02:23:07 | 21 | file. |
| 02:23:08 | 22 | MR. NOLAND: Thank you, Judge. |
| 02:23:09 | 23 | This would be base stamp pages 8651-52. |
| 02:23:16 | 24 | BY MR. NOLAND: |
| 02:23:36 | 25 | Q. So, sir, on the copy in front of you and on the screen, in |

| | | |
|---|---|---|
| 02:23:40 | 1 | the middle of the document, there is a reference to the RD |
| 02:23:43 | 2 | number for this case.  That's the records division number; is |
| 02:23:43 | 3 | that right? |
| 02:23:46 | 4 | A.  Yes. |
| 02:23:46 | 5 | Q.  And that would be H H 358668, that's the records division |
| 02:23:53 | 6 | number relative to the homicide at issue relative to this |
| 02:23:59 | 7 | Christopher people's case? |
| 02:24:00 | 8 | A.  Yes. |
| 02:24:00 | 9 | Q.  And that's one page.  Can you go back to the other one, |
| 02:24:04 | 10 | Laura?  Under the subject line, Laura, could you highlight |
| 02:24:07 | 11 | that? |
| 02:24:08 | 12 | BY MR. NOLAND: |
| 02:24:08 | 13 | Q.  This is a request for prisoner to be held past next |
| 02:24:11 | 14 | scheduled court call, right? |
| 02:24:13 | 15 | A.  Yes. |
| 02:24:13 | 16 | Q.  Again, the subject of this document is it request for |
| 02:24:22 | 17 | prisoner to be held past court call, correct? |
| 02:24:25 | 18 | A.  Yes. |
| 02:24:25 | 19 | Q.  And again it's the same RD number that we just read, |
| 02:24:31 | 20 | correct? |
| 02:24:31 | 21 | A.  Correct. |
| 02:24:31 | 22 | Q.  Now, isn't it true, Mr. Brasfield, that there isn't any |
| 02:24:35 | 23 | other police report in that file, the criminal defense file |
| 02:24:39 | 24 | that the plaintiff's attorneys gave you that has the records |
| 02:24:43 | 25 | division number for the homicide at issue in that case? |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 180 of 303 PageID #:64343
11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

40

02:24:46   1   A.  I don't independently recall, but if that's what you
02:24:48   2   indicated, yes.
02:24:49   3   Q.  I'll represent to you that that is the case.
02:24:52   4        So when you received this file and you did your file
02:24:59   5   by file comparison, you wrote down all those documents as
02:25:04   6   missing from the criminal defense file that were inspect
02:25:06   7   basement file, true?
02:25:08   8   A.  That's correct.
02:25:08   9   Q.  So you accepted at that time when you issued your report
02:25:11  10   that this was a complete criminal defense file that the
02:25:15  11   plaintiff's attorneys were supplying to you?
02:25:19  12   A.  That's correct.
02:25:19  13   Q.  And you didn't notice at all even though there's only two
02:25:23  14   pages of requests to hold over a prisoner in that file that,
02:25:26  15   say, hey, wait a minute, this file is incomplete, you didn't
02:25:30  16   notice that?
02:25:30  17   A.  I acknowledge that that was in error.
02:25:35  18        MR. NOLAND:  Laura, could you pull up defense 245;
02:25:49  19   page 270.  Jon, this is from the prosecutor's file.
02:25:52  20        THE COURT:  Any objection to this?
02:25:53  21        MR. LOEVY:  No, your Honor.
02:25:55  22        THE COURT:  Okay.
02:25:56  23        MR. NOLAND:  Can you highlight the discovery receipt
02:26:00  24   part, Laura?  Thank you.
02:26:03  25   BY MR. NOLAND:


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 PM

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 181 of 303 PageID #:64844
***REALTIME UNEDITED TRANSCRIPT ONLY***

41

| | | |
|---|---|---|
| 02:26:05 | 1 | Q. So Mr. Brasfield, you understand this document and it's |
| 02:26:10 | 2 | signed at the bottom by Gary Stanton; is that right? |
| 02:26:14 | 3 | A. The attorney in this case. |
| 02:26:15 | 4 | Q. Mr. Stanton was the public defender for Christopher |
| 02:26:19 | 5 | Peoples? |
| 02:26:19 | 6 | A. That's correct. |
| 02:26:19 | 7 | Q. You understand this document that he signed to be |
| 02:26:22 | 8 | acknowledging receipt of materials from the state's attorney's |
| 02:26:24 | 9 | office, true? |
| 02:26:25 | 10 | A. That's true. |
| 02:26:25 | 11 | Q. And the first line says RD, two pages, right? |
| 02:26:29 | 12 | A. Yes. |
| 02:26:30 | 13 | Q. Now, that would be the case report for the case where the |
| 02:26:33 | 14 | initial beat officers respond to the scene and report on what |
| 02:26:36 | 15 | they saw, right? |
| 02:26:37 | 16 | A. It may. |
| 02:26:40 | 17 | Q. You don't know it, you don't know what the RD is? |
| 02:26:42 | 18 | A. I know what an RD is, yes, of course. |
| 02:26:44 | 19 | Q. Is it or it is not the case report that the beat officers |
| 02:26:48 | 20 | did? |
| 02:26:48 | 21 | A. It may be, yes. |
| 02:26:49 | 22 | Q. And then the next line has supp report that's a page. |
| 02:26:54 | 23 | Then if we go down, there's one, two, three, four, five -- six |
| 02:26:59 | 24 | supplemental reports and they have the pages -- three pages |
| 02:27:01 | 25 | and two pages and three and 14 and 14, correct? |

11/29/16 PM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 182 of 303 PageID #:64345
***REALTIME UNEDITED TRANSCRIPT ONLY***

42

02:27:05    1   A.  That's correct.

02:27:05    2   Q.  Are any of those supplementary reports in that file in

02:27:08    3   front of you, sir?

02:27:09    4   A.  I would have to look through them.

02:27:13    5   Q.  I will represent to you that they are not in there?

02:27:15    6   A.  You represent that, I will accept that.

02:27:20    7           MR. NOLAND:  Laura, can you go to the next page?

02:27:26    8   BY MR. NOLAND:

02:27:26    9   Q.  And the next page of this document, page 271, defendants'

02:27:29   10   245, again has 8 more supplementary reports with the pages

02:27:39   11   listed on them, correct?

02:27:40   12   A.  That's correct.

02:27:40   13   Q.  Again, it's signed by Gary Stanton as receiving them,

02:27:45   14   right?

02:27:45   15   A.  That's correct.

02:27:46   16           MR. NOLAND:  Can you go to the next page, Laura.

02:27:50   17   BY MR. NOLAND:

02:27:58   18   Q.  Even more supplementary reports to Mr. Stanton that aren't

02:28:01   19   in that file?

02:28:01   20   A.  That's correct.

02:28:02   21   Q.  Do you see the CS P R.  About four lines down, do you know

02:28:08   22   what that is?

02:28:09   23   A.  I don't recall right off the top of my head the CS P R.

02:28:13   24   Q.  Isn't it true it's the crime scene processing report?

02:28:17   25   A.  Yeah.


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 183 of 303 PageID #:64846
11/29/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

43

| 02:28:19 | 1 | Q. Are you aware it's the crime scene processing report? |
| 02:28:22 | 2 | A. I was not aware -- |
| 02:28:29 | 3 | MR. MICHALIK: Laura, can you highlight the GPRs 73. |
| 02:28:36 | 4 | BY MR. NOLAND: |
| 02:28:37 | 5 | Q. What does this signify, Mr. Brasfield? |
| 02:28:38 | 6 | A. That the public defender, Mr. Stanton, received 73 pages |
| 02:28:42 | 7 | of GPRs. |
| 02:28:43 | 8 | Q. And you didn't notice at all when you were preparing your |
| 02:28:50 | 9 | report and reviewing the spreadsheet that all of these |
| 02:28:54 | 10 | documents that had been provided to Mr. Stanton, the public |
| 02:28:59 | 11 | defender, were missing from his file; is that correct? |
| 02:29:02 | 12 | MR. LOEVY: Objection. There is no foundation. He |
| 02:29:05 | 13 | didn't have this document. No foundation. |
| 02:29:08 | 14 | THE COURT: Rephrase the question. |
| 02:29:09 | 15 | BY MR. NOLAND: |
| 02:29:10 | 16 | Q. Wouldn't you have liked to have had this discovery receipt |
| 02:29:12 | 17 | before you made the representation in your report that the |
| 02:29:15 | 18 | Chicago Police Department withheld all of these documents from |
| 02:29:17 | 19 | Mr. Stanton? Wouldn't you have liked to have had that? |
| 02:29:21 | 20 | A. It certainly would have been helpful. |
| 02:29:22 | 21 | Q. You wouldn't have made that mistake, would you, of missing |
| 02:29:25 | 22 | dozen and dozens of pages in your report, wouldn't you? |
| 02:29:29 | 23 | A. I acknowledged -- |
| 02:29:30 | 24 | Q. Sir, would you have made that mistake? |
| 02:29:32 | 25 | A. I wouldn't have made that mistake. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

02:29:33  1   Q.  Would this mistake have been made to you on the

02:29:37  2   spreadsheet by counsel if you had had this discovery receipt?

02:29:40  3   A.  No.

02:29:41  4   Q.  Sir, it was incumbent upon you as an expert before you

02:29:46  5   came in here and gave testimony to look at those prosecutor's

02:29:49  6   files before making any claim of what the Chicago Police

02:29:52  7   Department did or did not produce in any of these cases; isn't

02:29:52  8   that true?

02:29:55  9   A.  No, it is not.

02:30:22 10        MR. NOLAND:  Laura, are you pull up Plaintiff's

02:30:25 11   Exhibit 306-011.

02:30:28 12   BY MR. NOLAND:

02:30:34 13   Q.  Mr. Brasfield, referring your attention to another case,

02:30:39 14   you looked at a case called people v. James Crockett,; is that

02:30:39 15   true?

02:30:44 16   A.  Yes, I did.

02:30:44 17   Q.  And c-r-o-c-k-e-t-t, and this is a document you prepared

02:30:50 18   as attachment F to your report with respect to the allegedly

02:30:55 19   missing from criminal defense file pages, true?

02:30:57 20   A.  That's correct.

02:30:57 21   Q.  And this file had -- this investigative file had 159

02:31:03 22   pages, right?

02:31:04 23   A.  That's correct.

02:31:04 24   Q.  And by the way, Mr. Brasfield, you refer to these as the

02:31:07 25   basement files, correct?

***REALTIME UNEDITED TRANSCRIPT ONLY***

02:31:08  1   A.  Street files, basement files.

02:31:11  2   Q.  Mr. Brasfield, isn't it true that these files were put

02:31:15  3   into the Chicago Police Department, a basement for storage

02:31:19  4   purposes in the year 2012 when the CPD reorganized its areas

02:31:24  5   from areas 1, 2, 3, 4, and 5 to areas north, central, and

02:31:29  6   south, right?

02:31:29  7   A.  I have no personal knowledge as to how they were moved or

02:31:33  8   who moved them or why they were moved.

02:31:34  9   Q.  And Mr. Brasfield, I'll represent to you that in the

02:31:45  10  missing from criminal defense file section of your report

02:31:47  11  here, that there is approximately 107 pages that you contend

02:31:51  12  are missing, right?

02:31:52  13  A.  I haven't added them up, but that looks to be a fair

02:31:57  14  amount.

02:31:57  15  Q.  And included in this list of documents you say are missing

02:32:05  16  are supplementary reports, all of the general progress

02:32:09  17  reports, correct?

02:32:09  18  A.  I'm sorry.  Would you ask the question again?

02:32:13  19  Q.  Sure.

02:32:14  20       Included in the documents you say are missing are a

02:32:16  21  number of supplementary reports and a number of general

02:32:20  22  progress reports, right?

02:32:20  23  A.  That's correct.

02:32:21  24  Q.  Mr. Brasfield, I'm going to show you Plaintiff's Exhibit

02:32:35  25  359 which is the criminal defense file that plaintiff's


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 186 of 303 PageID #:64349
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

46

02:32:38  1   counsel provided to you for this case.  Mr. Brasfield, I put

02:32:52  2   flags on that exhibit which I provided to you which identified

02:33:02  3   a couple of police reports that are in this file.

02:33:07  4   A.  All right.

02:33:08  5   Q.  If I could point you out the pages.  The first page is

02:33:13  6   Bates stamped 43388, and then the next one, the next report

02:33:21  7   would be 43392.  And then there's also an arrest report for

02:33:31  8   Mr. Crockett of 43116.

02:33:34  9        In reference to those pages, Mr. Brasfield, isn't it

02:33:37  10  true that there aren't any other Chicago Police Department

02:33:40  11  supplementary reports or arrest reports in that particular

02:33:44  12  file in front of you?

02:33:45  13  A.  Without going through the several hundred pages, I had no

02:33:54  14  way of telling.

02:33:55  15  Q.  Okay?

02:33:57  16        MR. NOLAND:  Laura, can you pull up plaintiff's 359,

02:34:03  17  page 43647.

02:34:25  18  BY MR. NOLAND:

02:34:25  19  Q.  Now, Mr. Brasfield, this was the state, the people of the

02:34:29  20  State of Illinois's answer to discovery in this Crockett case

02:34:33  21  that was provided to you, true?

02:34:34  22  A.  I imagine I will be answering some of your questions here.

02:34:41  23  I'm taking you at your word and what you are putting in front

02:34:44  24  of me, but I don't specifically recall this document as we are

02:34:49  25  speaking.  It's argumentative, but.

| | | |
|---|---|---|
| 02:34:52 | 1 | Q. Sir, if you don't understand one of my questions or if you |
| 02:34:56 | 2 | think I'm being too argumentative, please let me know and I'll |
| 02:34:59 | 3 | rephrase it. |
| 02:35:00 | 4 | A. No. Ask your question for me, please, again. |
| 02:35:05 | 5 | MR. NOLAND: Laura, can you just show Mr. Brasfield |
| 02:35:08 | 6 | the whole document so he can see. |
| 02:35:09 | 7 | BY MR. NOLAND: |
| 02:35:10 | 8 | Q. Do you know what this -- first of all, this page, this |
| 02:35:13 | 9 | document was given to you, right? |
| 02:35:14 | 10 | A. It may have been, yes. |
| 02:35:19 | 11 | Q. Well, in the bottom right-hand corner here you have the |
| 02:35:24 | 12 | Bates range of the criminal defense files and this page starts |
| 02:35:27 | 13 | with 43647. This was in a Bates range that you represented in |
| 02:35:33 | 14 | your report that you received? |
| 02:35:34 | 15 | A. Yes, yes. |
| 02:35:35 | 16 | Q. All right. |
| 02:35:36 | 17 | MR. NOLAND: Laura, go back to the whole document so |
| 02:35:41 | 18 | Mr. Brasfield can see it. |
| 02:35:42 | 19 | BY MR. NOLAND: |
| 02:35:43 | 20 | Q. Mr. Brasfield, do you know what this document is? |
| 02:35:44 | 21 | A. It's labeled an answer to discovery from the -- it's |
| 02:35:50 | 22 | people of the State of Illinois, it begins and then three |
| 02:35:57 | 23 | defendants here. |
| 02:35:58 | 24 | Q. Do you know what the significance of this document is in |
| 02:36:02 | 25 | the criminal courts here in Cook County? |

| | | |
|---|---|---|
| 02:36:03 | 1 | A. It would be a -- probably an appeal situation. |
| 02:36:09 | 2 | Q. Appeals? |
| 02:36:11 | 3 | A. I don't know. |
| 02:36:12 | 4 | Q. You don't know what this document is. |
| 02:36:14 | 5 | Sir, I'll represent to you that this document, and |
| 02:36:20 | 6 | you let me know if you disagree, that the people, the |
| 02:36:23 | 7 | prosecutors in the case are required during the case to |
| 02:36:28 | 8 | identify their witnesses and other information on the answer |
| 02:36:31 | 9 | to discovery to provide that to the criminal defense attorney |
| 02:36:34 | 10 | in advance of the trial? |
| 02:36:36 | 11 | A. Yes, I understand. |
| 02:36:37 | 12 | Q. Is your recollection refreshed? |
| 02:36:39 | 13 | A. Yes. |
| 02:36:39 | 14 | Q. Thank you. |
| 02:36:40 | 15 | And, sir, your understanding is that the names of the |
| 02:36:45 | 16 | witnesses, civilian witnesses and police officers that the |
| 02:36:49 | 17 | prosecutors get and put in these answers to discovery are |
| 02:36:52 | 18 | based upon the police reports that are supplied to them by the |
| 02:36:55 | 19 | police department? |
| 02:36:56 | 20 | A. That would be one source, yes. |
| 02:37:02 | 21 | Q. First of all, we have several witnesses, Kevin McElroy |
| 02:37:06 | 22 | m-c-E-l-r-o-y, Heywood Bobo b-o-b-o, and Tyrone Carr |
| 02:37:12 | 23 | c-a-r-r-on the first page. Do you see that? |
| 02:37:14 | 24 | A. Yes. |
| 02:37:14 | 25 | Q. Mr. Brasfield, I'm going to represent to you that those |

| | | |
|---|---|---|
| 02:37:39 | 1 | couple of police reports in the file, the criminal defense |
| 02:37:42 | 2 | file that's in front of you right now, that if you get all the |
| 02:37:46 | 3 | names of witnesses and police officers in those reports, the |
| 02:37:51 | 4 | only ones that could be found are the highlighted names on |
| 02:37:54 | 5 | this answer to discovery.  Okay?  I'm just going to represent |
| 02:37:58 | 6 | that to you.  I know -- you didn't do this analysis, did you? |
| 02:38:02 | 7 | A.  I'm sorry.  You got two questions going on here. |
| 02:38:05 | 8 | MR. LOEVY:  We accept the representation. |
| 02:38:08 | 9 | THE COURT:  Ask another question. |
| 02:38:09 | 10 | BY MR. NOLAND: |
| 02:38:10 | 11 | Q.  Did you conduct any analysis of the answer to discovery on |
| 02:38:13 | 12 | this Crockett case to see whether all the names in here could |
| 02:38:17 | 13 | have been derived from the police reports that are in the |
| 02:38:20 | 14 | criminal defense file provided to you? |
| 02:38:22 | 15 | A.  No, as I testified, I have looked at what material was -- |
| 02:38:28 | 16 | the pages that were in the criminal defense files. |
| 02:38:30 | 17 | Q.  Mr. Brasfield, assume hypothetically that these names that |
| 02:38:33 | 18 | I have highlighted are the only names that are found in that |
| 02:38:36 | 19 | criminal defense file that show up on this answer to discovery |
| 02:38:39 | 20 | that the people filled out and gave to the criminal defense |
| 02:38:43 | 21 | attorney? |
| 02:38:43 | 22 | MR. LOEVY:  Your Honor, we do object to the |
| 02:38:45 | 23 | assumption .  It hasn't been supplied -- we have no way to |
| 02:38:48 | 24 | check it. |
| 02:38:48 | 25 | THE COURT:  Finish the question. |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 190 of 303 PageID #:64353
11/29/16 PM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

50

| | | |
|---|---|---|
| 02:38:49 | 1 | BY MR. NOLAND: |
| 02:38:50 | 2 | Q.  Accepting that -- I'm asking you to accept that |
| 02:38:54 | 3 | hypothetically and that the other names that are not |
| 02:38:56 | 4 | highlighted on this document are found nowhere in that |
| 02:39:00 | 5 | criminal defense file.  Okay?  Those are the hypothetical |
| 02:39:04 | 6 | facts I'd like you to assume. |
| 02:39:06 | 7 | A.  All right. |
| 02:39:07 | 8 | Q.  Isn't it true, sir, that this would be evidence that the |
| 02:39:09 | 9 | criminal defense file supplied to you by the plaintiff's |
| 02:39:12 | 10 | counsel is incomplete because the state's attorney's clearly |
| 02:39:17 | 11 | would have gotten these names from police reports supplied to |
| 02:39:20 | 12 | them by the police department? |
| 02:39:21 | 13 | MR. LOEVY:  Objection. |
| 02:39:21 | 14 | THE COURT:  Is this going to be connected up with |
| 02:39:25 | 15 | another witness?  That's my question to you. |
| 02:39:27 | 16 | MR. NOLAND:  It would be through our expert. |
| 02:39:28 | 17 | THE COURT:  Okay.  Then I'll overrule the objection. |
| 02:39:31 | 18 | I remind the jury that a question is not evidence. |
| 02:39:34 | 19 | All right.  Go ahead and answer. |
| 02:39:36 | 20 | THE WITNESS:  That your hypothetical, I would assume |
| 02:39:40 | 21 | that because there are names here, they must have come from an |
| 02:39:44 | 22 | investigative file, is that your question? |
| 02:39:47 | 23 | BY MR. NOLAND: |
| 02:39:47 | 24 | Q.  That's the point.  Would you agree with that? |
| 02:39:49 | 25 | A.  In your hypothetical, yes. |

11/29/16 PM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 191 of 303 PageID #:64354
***REALTIME UNEDITED TRANSCRIPT ONLY***

51

02:39:55   1   Q.   Thank you.

02:39:57   2         Because the prosecutors aren't -- I mean, in your

02:40:00   3   experience, they are not just making up names out whole cloth

02:40:03   4   as having relevant information to an investigation and

02:40:08   5   supplying it to the criminal defense attorney, correct?

02:40:10   6         MR. LOEVY:   Objection, your Honor.

02:40:10   7         THE COURT:   What's the basis for the objection?

02:40:12   8         MR. LOEVY:   Form of the question and foundation and

02:40:14   9   argumentative.

02:40:14   10         THE COURT:   Sustained.

02:40:16   11   BY MR. NOLAND:

02:40:19   12   Q.   So presuming my hypothetical is true, Mr. Brasfield, which

02:40:22   13   you just acknowledged, that would mean that the information on

02:40:27   14   this chart that was supplied to you and on your attachment F

02:40:31   15   that you typed out would be inaccurate because the criminal

02:40:34   16   defense attorney actually had other police reports that are

02:40:36   17   not in that file in front of you, correct?

02:40:39   18   A.   You would have to have the state's attorney's file to

02:40:45   19   determine that.

02:40:46   20   Q.   Okay.

02:41:28   21         MR. NOLAND:   Judge, could I switch the ELMO, please?

02:41:31   22         THE COURT:   Sure.   There you go.

02:41:34   23   BY MR. NOLAND:

02:41:49   24   Q.   I'm showing the witness what's been marked as Defense

02:41:52   25   Exhibit 203, page 7.   What is this document, Mr. Brasfield?

11/29/16 PM

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 192 of 303 PageID #:64355
***REALTIME UNEDITED TRANSCRIPT ONLY***

52

02:41:57   1   A. The subpoena duces tecum.

02:42:01   2         MR. LOEVY: We do object to the state's attorney's

02:42:05   3   files, no foundation for this witness.

02:42:06   4         THE COURT: I don't know what it is and I'll wait

02:42:08   5   until I get a question.

02:42:08   6   BY MR. NOLAND:

02:42:14   7   Q. Actually --

02:42:15   8         THE COURT: Go ahead and ask a question.

02:42:16   9   BY MR. NOLAND:

02:42:16   10   Q. This is a document from the investigative files that

02:42:18   11   plaintiff's counsel supplied to you, correct?

02:42:19   12         MR. LOEVY: I stand corrected, your Honor.

02:42:21   13         THE COURT: There you go.

02:42:22   14   BY MR. NOLAND:

02:42:22   15   Q. Mr. Brasfield, isn't this a document that you said was

02:42:24   16   missing from the criminal defense attorney's files that were

02:42:27   17   given to you?

02:42:28   18   A. Given the volume of material here, I would have to take

02:42:30   19   the time to look and cross-check. Again, to move things, if

02:42:37   20   you're telling me that that's what's in there, then I'll

02:42:42   21   accept it as an honest question.

02:42:43   22   Q. I appreciate that for all of us, Mr. Brasfield.

02:42:45   23         Sir, this is a subpoena from the --

02:42:49   24         MR. NOLAND: Laura --

02:42:55   25   BY MR. NOLAND:

| | | |
|---|---|---|
| 02:42:55 | 1 | Q. I'll just point here, from a man named Jon Dillon of the |
| 02:43:00 | 2 | state's attorney's office, correct? |
| 02:43:01 | 3 | A. Yes. |
| 02:43:01 | 4 | Q. D-i-l-l-o-n, and this is a document that on this |
| 02:43:07 | 5 | spreadsheet here that plaintiff's counsel told you was missing |
| 02:43:09 | 6 | and you accepted was missing investigative material, correct? |
| 02:43:13 | 7 | A. Yes, I assume that's correct. |
| 02:43:15 | 8 | Q. Mr. Brasfield, a subpoena at the Cook County state's |
| 02:43:21 | 9 | attorney's office that they created can't be missing |
| 02:43:24 | 10 | investigative material that the police department withheld |
| 02:43:27 | 11 | from the state's attorney's office, correct? |
| 02:43:29 | 12 | A. I'm sorry. You will have to ask that again. |
| 02:43:32 | 13 | Q. A subpoena that the state's attorney's office prepared |
| 02:43:35 | 14 | themselves is not investigative material of the police |
| 02:43:40 | 15 | department; isn't that true? |
| 02:43:41 | 16 | A. That would be -- normally, that would be the case. |
| 02:43:44 | 17 | Q. Under what -- and the police department can't withhold |
| 02:43:51 | 18 | from the prosecutor a document that the prosecutor created, |
| 02:43:56 | 19 | correct? |
| 02:43:56 | 20 | A. If a police agency receives copies of legal documents, |
| 02:44:04 | 21 | including subpoena duces tecum or arrest warrants or whatever |
| 02:44:09 | 22 | are generally included in the investigative file in my |
| 02:44:13 | 23 | experience. |
| 02:44:13 | 24 | Q. And the prosecutor has a copy, in your experience, the |
| 02:44:16 | 25 | prosecutor has a copy of the subpoena that he wrote and spent |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 194 of 303 PageID #:64357
11/29/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

54

| 02:44:19 | 1 | to the police department, right? |
| 02:44:19 | 2 | A.  You would hope so. |
| 02:44:20 | 3 | Q.  And I'll show you another one of these pages or another |
| 02:44:27 | 4 | subpoena. |
| 02:44:41 | 5 | A.  I recognize the name there. |
| 02:44:42 | 6 | Q.  I didn't catch that? |
| 02:44:43 | 7 | THE COURT:  Different Noland? |
| 02:44:45 | 8 | MR. NOLAND:  That's a different Nolan. |
| 02:44:50 | 9 | THE COURT:  Yours has a D. |
| 02:44:51 | 10 | BY MR. NOLAND: |
| 02:44:53 | 11 | Q.  I'm showing you what's been marked as Defense Exhibit 287, |
| 02:44:58 | 12 | this is another page and I'll represent to you that it's on |
| 02:45:00 | 13 | this spreadsheet that plaintiff's attorneys and your he have |
| 02:45:04 | 14 | says is missing investigative material from the police |
| 02:45:08 | 15 | department? |
| 02:45:08 | 16 | A.  Yes. |
| 02:45:08 | 17 | Q.  This subpoena here from my namesake Dan yelled Nolan |
| 02:45:13 | 18 | public defender on behalf of the defendant Tyrone Brown is a |
| 02:45:17 | 19 | subpoena from the public defender to the police department, |
| 02:45:20 | 20 | correct? |
| 02:45:20 | 21 | A.  Yes. |
| 02:45:20 | 22 | Q.  And once again, a subpoena created by the public defender |
| 02:45:26 | 23 | is not investigative material of the police department, true? |
| 02:45:29 | 24 | A.  I found a number of these types of documents in the |
| 02:45:34 | 25 | basement files. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 195 of 303 PageID #:64358
11/29/16 PM    ***REALTIME UNEDITED TRANSCRIPT ONLY***

55

|          |    |                                                                  |
|----------|----|------------------------------------------------------------------|
| 02:45:35 | 1  | Q.  And you included them on this spreadsheet, or you and the     |
| 02:45:38 | 2  | plaintiff's counsel, as missing investigative material of the    |
| 02:45:42 | 3  | police department isn't that true, what's on this spreadsheet?   |
| 02:45:46 | 4  | A.  That's correct.                                              |
| 02:45:46 | 5  | Q.  And I've got several more subpoenas and there are a bunch     |
| 02:45:49 | 6  | of subpoenas that you included just like these ones on this      |
| 02:45:52 | 7  | chart, correct?                                                  |
| 02:45:53 | 8  | A.  That's correct.                                              |
| 02:45:59 | 9  | MR. LOEVY:  Object to relevance, your Honor.          |
| 02:46:00 | 10 | THE COURT:  Overruled.                                 |
| 02:46:06 | 11 | BY MR. NOLAND:                                                   |
| 02:46:10 | 12 | Q.  Mr. Brasfield, some more documents you included on your       |
| 02:46:12 | 13 | chart are a series of Illinois state crime lab reports from      |
| 02:46:22 | 14 | several of the files; is that true?                             |
| 02:46:24 | 15 | A.  Yes.                                                         |
| 02:46:24 | 16 | Q.  In this exhibit I'm showing you on the ELMO it is marked      |
| 02:46:34 | 17 | defendants' 246, page 20.  And there is a cc in the bottom       |
| 02:46:40 | 18 | left of this document, correct?                                 |
| 02:46:42 | 19 | A.  Yes.                                                         |
| 02:46:42 | 20 | Q.  And who is the cc to?                                        |
| 02:46:43 | 21 | A.  Assistant state's attorney David winter.                    |
| 02:46:47 | 22 | Q.  And there are -- I have several pages, approximately 10 or    |
| 02:46:51 | 23 | 15 of similar Illinois state police reports in my hand.  You     |
| 02:46:55 | 24 | would agree that there's several Illinois state police reports   |
| 02:46:58 | 25 | with cc's to the prosecutors that you've included on this       |

| 02:47:02 | 1 | table as missing investigative material of the Chicago Police |
| 02:47:06 | 2 | Department, true? |
| 02:47:07 | 3 | A.  That's correct. |
| 02:47:07 | 4 | Q.  Mr. Brasfield, what's a cc mean? |
| 02:47:18 | 5 | A.  In the old days, a carbon copy, but a copy. |
| 02:47:24 | 6 | Q.  That means a copy of this report is being supplied to the |
| 02:47:28 | 7 | assistant state's attorneys, correct? |
| 02:47:31 | 8 | A.  It was intended to be routed there, yes, that's correct. |
| 02:47:34 | 9 | Q.  And isn't it true, Mr. Brasfield, you don't have any |
| 02:47:38 | 10 | knowledge that the Illinois State Police, by the way, is the |
| 02:47:42 | 11 | Illinois State Police the same thing as the Chicago Police |
| 02:47:45 | 12 | Department? |
| 02:47:45 | 13 | A.  No. |
| 02:47:45 | 14 | Q.  The Illinois state police has a crime lab is your |
| 02:47:49 | 15 | understanding, right? |
| 02:47:49 | 16 | A.  That's correct. |
| 02:47:50 | 17 | Q.  And in Chicago at least as of 1995 and onward, Illinois |
| 02:47:53 | 18 | State Police handles the forensic, most of the forensic |
| 02:47:58 | 19 | responsibilities for crimes occurring in Chicago, right? |
| 02:48:00 | 20 | A.  That's my understanding. |
| 02:48:00 | 21 | Q.  And do you have any evidence, Mr. Brasfield, that the |
| 02:48:06 | 22 | Illinois State Police scientists when they say that they're |
| 02:48:09 | 23 | ccing a prosecutor are lying? |
| 02:48:14 | 24 | A.  No, it would be my belief and understanding that if it |
| 02:48:17 | 25 | said it was routed there, that's where it would be routed. |

02:48:19  1   Q.  But, again, these are materials that you were saying?

02:48:26  2        MR. LOEVY:  Objection, your Honor, asked and

02:48:28  3   answered.

02:48:29  4        THE COURT:  Sustained.

02:48:30  5   BY MR. NOLAND:

02:48:30  6   Q.  Showing you the next group of documents, Mr. Brasfield.

02:48:37  7   This would be Exhibit 266, page 130.  It's a several page

02:48:48  8   document.  I am just showing the first page.

02:48:49  9        Mr. Brasfield, isn't it true that this document I am

02:48:52  10  showing you is a felony review blue back from the state's

02:48:57  11  attorney's office?

02:48:57  12  A.  I think that's the common terminology they use.

02:48:59  13  Q.  And once again, Mr. Brasfield, I'll represent to you that

02:49:04  14  this document is on the spreadsheet that the plaintiff's

02:49:06  15  attorneys provided, gave to you and that you guys identified

02:49:08  16  as missing investigative material?

02:49:11  17  A.  Yes.

02:49:12  18  Q.  As with the subpoena, Mr. Brasfield, the Chicago Police

02:49:15  19  Department can't withhold documents from the state's

02:49:19  20  attorney's office that the state's attorney's office actually

02:49:21  21  created, right?

02:49:22  22  A.  They can withhold documents.

02:49:31  23  Q.  So you're saying this document?

02:49:34  24        THE COURT:  I think it was an issue with the phrasing

02:49:36  25  of your question.


               ***REALTIME UNEDITED TRANSCRIPT ONLY***

02:49:37    1        MR. NOLAND:  Thanks, Judge.

02:49:39    2    BY MR. NOLAND:

02:49:41    3    Q.  Isn't it true that the prosecutors would be in possession

02:49:43    4    of their own felony review blue back, right?

02:49:47    5    A.  I agree with that, yes.

02:49:48    6    Q.  And so this isn't a document that the police department

02:49:53    7    could be withholding from the prosecutors because the

02:49:56    8    prosecutors have it, right?

02:49:57    9    A.  From the prosecutors, but if it's subpoenaed from another

02:50:01   10    source, then that would be a different matter.

02:50:04   11    Q.  You have no evidence with respect to that particular

02:50:10   12    document that the prosecutors withheld it from the criminal

02:50:13   13    defense attorney, do you?

02:50:14   14    A.  No, I do not.

02:50:15   15    Q.  And you don't have any evidence that there was some

02:50:18   16    subpoena that the police department didn't comply with and not

02:50:22   17    provide that particular document to the criminal defense

02:50:24   18    attorney, do you?

02:50:24   19    A.  Not in this particular case, no.

02:50:26   20    Q.  Thank you.

02:50:27   21        Now, Mr. Brasfield, I am going to show you another

02:50:36   22    document, a representative document.  This one has got the

02:50:44   23    Bates stamp defendants' 244, page 120.  This is a statement of

02:50:55   24    Jerome h-o-l-m-e-s, correct?

02:50:58   25    A.  Yes.

11/29/16 PM

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 199 of 303 PageID #:64362
***REALTIME UNEDITED TRANSCRIPT ONLY***

59

02:50:58    1    Q.  And Mr. Brasfield, there are dozens and dozens of pages in

02:51:04    2    the criminal defense attorney's files that have been

02:51:06    3    identified -- strike that.

02:51:09    4            There's dozens and dozens the pages from the

02:51:12    5    investigative files that you and the plaintiff's counsel have

02:51:14    6    identified as missing investigative material on this

02:51:18    7    spreadsheet, correct?

02:51:19    8    A.  Yes.

02:51:19    9    Q.  And these -- this page in front of you that's up on the

02:51:24   10    screen in front of jury and similar documents, this is a

02:51:28   11    document created by the assistant state's attorney from felony

02:51:31   12    review who goes to the police department and takes statements

02:51:34   13    from witnesses; isn't that true?

02:51:37   14            MR. LOEVY:  Objection, your Honor.

02:51:37   15            THE COURT:  Overruled.

02:51:39   16            THE WITNESS:  Correct.

02:51:40   17            THE COURT:  The answer can stand.

02:51:41   18    BY MR. NOLAND:

02:51:42   19    Q.  Isn't it true, Mr. Brasfield, that the prosecutor, the

02:51:45   20    assistant felony review prosecutor who goes out to the police

02:51:48   21    department and takes statements like these brings the

02:51:50   22    originals of those statements back to his or her office after

02:51:56   23    taking them, correct?

02:51:57   24    A.  I have no independent knowledge of how that works.

02:52:01   25    Q.  Okay.  But if -- assuming hypothetically that is the way

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 200 of 303 PageID #:64363
11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

60

02:52:06    1   it works, then the prosecutors would be in possession of all

02:52:08    2   of these documents as well?

02:52:09    3          MR. LOEVY:  Objection to the relevance, your Honor,

02:52:11    4   because every document is handled that way.

02:52:13    5          THE COURT:  When you say all of these, you need to

02:52:15    6   specify what all of these are.

02:52:17    7          MR. NOLAND:  Thank you, Judge.

02:52:18    8          THE COURT:  You mean similar documents like this one.

02:52:20    9          MR. NOLAND:  Yes, the Court phrased it a lot better

02:52:22   10   than I did.

02:52:23   11          THE WITNESS:  That if it is the practice of the

02:52:26   12   state's attorney or the prosecutor that generates these

02:52:28   13   documents and they take them back to their office, they would

02:52:32   14   be in possession of them if that's your question.

02:52:36   15   BY MR. NOLAND:

02:52:36   16   Q.  That is my question.

02:52:37   17          So once again, these wouldn't be documents that the

02:52:40   18   police department withheld from the prosecutors because the

02:52:43   19   prosecutors created them and have them, right?

02:52:46   20   A.  I can't agree with that.

02:52:51   21   Q.  It's the prosecutor's duty in the criminal justice

02:53:02   22   materials to provide the materials, the prosecutor receives

02:53:05   23   from the police on the case to the criminal defense attorney,

02:53:07   24   right?

02:53:07   25   A.  That's correct.


                        ***REALTIME UNEDITED TRANSCRIPT ONLY***

02:53:08   1   Q.  So if the prosecutors had these statements, it was

02:53:11   2   incumbent upon -- strike that.

02:53:14   3          If the prosecutors had these statements, these felony

02:53:17   4   review statements that the prosecutor prepared, it would be

02:53:19   5   the prosecutor's duty to provide that to the criminal defense

02:53:22   6   attorney, right?

02:53:23   7   A.  I have to answer that question in the context of what I

02:53:28   8   examined, and that if a centralized homicide investigation.

02:53:33   9          MR. NOLAND:  Judge.

02:53:34  10          THE WITNESS:  Contains documents.

02:53:35  11          THE COURT:  Finish the answer.

02:53:39  12   BY MR. NOLAND:

02:53:40  13   Q.  Please, Mr. Brasfield.

02:53:41  14          THE COURT:  You can finish the answer.

02:53:43  15          THE WITNESS:  The police department should turn over

02:53:47  16   everything that they have to the state's attorney's office.

02:53:51  17   There will be duplicative items in there.  There may be

02:53:55  18   material that the state's attorney already has, but if you get

02:53:58  19   to a system where you have to pick and choose, well, I think

02:54:02  20   .prosecutor already has this so I don't need to send it, the

02:54:05  21   next step is, well, they probably have this, but I don't need

02:54:09  22   to send it.  The simple, keep it simple process is send

02:54:15  23   everything that you have in your files to the prosecutor.

02:54:16  24   BY MR. NOLAND:

02:54:17  25   Q.  Mr. Brasfield, the point is that it's the duty of the

| 02:54:21 | 1 | prosecutor to provide it to the criminal defense attorney, |
| 02:54:25 | 2 | correct? |
| 02:54:26 | 3 | A.  Yes. |
| 02:54:26 | 4 | MR. LOEVY:  Objection, asked and answered, your |
| 02:54:27 | 5 | Honor. |
| 02:54:27 | 6 | THE COURT:  Overruled.  He can answer. |
| 02:54:30 | 7 | BY MR. NOLAND: |
| 02:54:30 | 8 | Q.  So this would be evidence that the criminal defense files |
| 02:54:34 | 9 | you were supplied are incomplete because you didn't find these |
| 02:54:39 | 10 | felony review state's attorney's documents in those criminal |
| 02:54:42 | 11 | defense files, isn't that fair, yes or no? |
| 02:54:45 | 12 | A.  I. |
| 02:54:45 | 13 | Q.  Yes or no, sir? |
| 02:54:46 | 14 | A.  Ask me the question once more, please. |
| 02:54:50 | 15 | Q.  Isn't it fair that if the -- these documents, these felony |
| 02:54:54 | 16 | review witness statements that we are talking about, you're |
| 02:54:57 | 17 | saying that some of them -- you didn't find them in the |
| 02:54:59 | 18 | criminal defense files, correct? |
| 02:55:01 | 19 | A.  That's correct. |
| 02:55:01 | 20 | Q.  Isn't it in fact true, sir, that that would be some |
| 02:55:04 | 21 | evidence that the criminal evidence files, because it's the |
| 02:55:09 | 22 | prosecutor's responsibility to provide those statements in the |
| 02:55:11 | 23 | prosecutor's possession to the criminal defense attorney, |
| 02:55:13 | 24 | isn't that fair? |
| 02:55:14 | 25 | A.  As I testified. |

11/29/16 PM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 203 of 303 PageID #:64366
***REALTIME UNEDITED TRANSCRIPT ONLY***

63

| | | |
|---|---|---|
| 02:55:15 | 1 | Q. Isn't that fair? |
| 02:55:17 | 2 | A. Yes. |
| 02:55:18 | 3 | Q. Thank you. |
| 02:55:20 | 4 | Showing the witness Exhibit defense 210, page 58. |
| 02:55:38 | 5 | Mr. Brasfield, this is another document. Strike that. |
| 02:55:42 | 6 | What is this document? |
| 02:55:44 | 7 | A. It's a post mortem examination report. |
| 02:55:46 | 8 | Q. It's the autopsy? |
| 02:55:47 | 9 | A. It's the autopsy report. |
| 02:55:48 | 10 | Q. The autopsy of the murder victim in this particular case, |
| 02:55:51 | 11 | right? |
| 02:55:51 | 12 | A. Yes. |
| 02:55:51 | 13 | Q. And there's a number of post mortems that you identify on |
| 02:55:57 | 14 | this table and as missing investigative material from the |
| 02:56:02 | 15 | Chicago Police Department, right? |
| 02:56:02 | 16 | A. Yes. |
| 02:56:03 | 17 | Q. And are there -- are Chicago police officers doing the |
| 02:56:08 | 18 | post mortem? |
| 02:56:08 | 19 | A. They should be attending them. |
| 02:56:10 | 20 | Q. Okay. Are Chicago police officer writing these reports? |
| 02:56:13 | 21 | A. No. |
| 02:56:13 | 22 | Q. These reports are done by the coroner, right? |
| 02:56:16 | 23 | A. That's correct. |
| 02:56:17 | 24 | Q. And, Mr. Brasfield, wouldn't you expect that in my murder |
| 02:56:27 | 25 | case that a minimally competent criminal defense attorney |

| | | |
|---|---|---|
| 02:56:31 | 1 | would make sure to have the post mortem report on the cause of |
| 02:56:34 | 2 | death before that criminal defense attorney defended their |
| 02:56:38 | 3 | client in the courtroom, wouldn't you expect that? |
| 02:56:40 | 4 | A. I would expect that. |
| 02:56:41 | 5 | Q. And if they didn't have that post mortem, wouldn't you |
| 02:56:45 | 6 | expect that they would try to get it, true? |
| 02:56:48 | 7 | A. I would expect that to be the case. |
| 02:56:54 | 8 | MR. LOEVY: Objection to relevance, your Honor. |
| 02:56:55 | 9 | THE COURT: Overruled. It goes to weight. |
| 02:56:57 | 10 | BY MR. NOLAND: |
| 02:57:04 | 11 | Q. I am not going to put them on the screen because they are |
| 02:57:07 | 12 | crime scene photographs that you have contended are missing |
| 02:57:10 | 13 | from the criminal defense attorney files. Just as a |
| 02:57:14 | 14 | representative sample, I'm showing a stack that's about three |
| 02:57:18 | 15 | or four inches thick. I represent to you that these are crime |
| 02:57:22 | 16 | scene photographs on this table that you and the plaintiff's |
| 02:57:25 | 17 | attorneys have prepared and suggested is missing investigative |
| 02:57:29 | 18 | material? |
| 02:57:29 | 19 | A. Yes. |
| 02:57:30 | 20 | Q. Do you accept that representation? |
| 02:57:31 | 21 | A. Yes. |
| 02:57:34 | 22 | Q. Same question on the crime scene photographs, sir. |
| 02:57:38 | 23 | Wouldn't you expect a criminal defense attorney, minimally |
| 02:57:41 | 24 | competent, would obtain crime scene photographs of the dead |
| 02:57:45 | 25 | bodies and the crime scene before they march into a courtroom |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 205 of 303 PageID #:64368
11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

65

02:57:47   1   before a jury and try to defend that case, wouldn't you expect

02:57:52   2   that?  Yes or no?  Yes or no, sir?

02:57:54   3   A.  Yes, with an explanation.

02:57:55   4   Q.  Wouldn't you expect that that the prosecutor needs to

02:57:58   5   prove -- one of the things a prosecutor needs to prove is that

02:58:01   6   somebody, in a homicide case, somebody was killed, right?

02:58:04   7          MR. LOEVY:  Objection to relevance, your Honor.

02:58:06   8          THE WITNESS:  Yes.

02:58:06   9          THE COURT:  Overruled.

02:58:07  10   BY MR. NOLAND:

02:58:07  11   Q.  And wouldn't the way to do that, you don't bring the body

02:58:11  12   in, the dead body into the courtroom, do you, sir?

02:58:13  13   A.  Not under normal circumstances, no.

02:58:16  14   Q.  And so the way it's done is that photographs of the

02:58:21  15   victims are shown to the jury just like this jury has seen in

02:58:24  16   this case, right?

02:58:25  17   A.  Depending on the judge's ruling, yes.

02:58:27  18   Q.  Well, the judge might exclude them in case they're too

02:58:31  19   gruesome, right?

02:58:32  20   A.  That's one possibility, yes.

02:58:33  21   Q.  But the point is is that the prosecutor has to get these

02:58:37  22   crime scene photographs before the trial on a murder case in

02:58:40  23   order to prove their case in court isn't that fair?

02:58:43  24   A.  That would be part of a criminal defense attorney's

02:58:48  25   process, I would think.

| | | |
|---|---|---|
| 02:58:49 | 1 | Q. And the prosecutor, right? |
| 02:58:51 | 2 | A. I would hope. |
| 02:58:52 | 3 | Q. May I have them? |
| 02:58:55 | 4 | A. Please. |
| 02:58:56 | 5 | Q. But, again, you're contending that all these pages are |
| 02:58:59 | 6 | missing investigative materials from the criminal defense |
| 02:59:02 | 7 | files, right? |
| 02:59:03 | 8 | A. I'm contending that they were not in the criminal defense |
| 02:59:05 | 9 | files that I looked at. |
| 02:59:06 | 10 | Q. And that's it, right, that's all you're doing is that you |
| 02:59:09 | 11 | had a criminal defense attorney file on the one hand, you had |
| 02:59:12 | 12 | a police investigative file on the other, and all you're |
| 02:59:15 | 13 | saying is, well, this piece of paper is not in this pieces of |
| 02:59:18 | 14 | paper, so I'll put it on this chart, right? |
| 02:59:21 | 15 | A. That's correct. |
| 02:59:21 | 16 | Q. And you were make -- you were really not thinking at all |
| 02:59:25 | 17 | of whether or not that document in '99.9 percent likelihood |
| 02:59:31 | 18 | was the in the possession of that prosecutor at the time of |
| 02:59:33 | 19 | the trial, you didn't take that into account at all, did you? |
| 02:59:36 | 20 | MR. LOEVY: Objection to the suggestion that 99 |
| 02:59:38 | 21 | percent, your Honor. We have been accepting the |
| 02:59:41 | 22 | representations, but we don't accept that one. |
| 02:59:43 | 23 | THE COURT: The answer can stand. Sustained as to |
| 02:59:50 | 24 | the form of the question. What what understood of the |
| 03:00:03 | 25 | objection. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 03:00:03 | 1 | BY MR. NOLAND: |

03:00:03   1   BY MR. NOLAND:

03:00:06   2   Q. Mr. Brasfield, I think you characterized it as a mistake

03:00:09   3   with respect to the Anima case, do you remember that?

03:00:12   4   A. Yes.

03:00:12   5        THE COURT: Let's pause. Let's take our mid

03:00:14   6   afternoon right here. We are going to break for ten minutes.

03:00:17   7   I will be right back out.

03:00:50   8      (The jury leaves the courtroom.).

03:00:50   9        THE COURT: Since you are being questioned by the

03:00:52   10   other side's lawyer, you can't discuss your testimony, but you

03:00:55   11   can take a break.

03:00:55   12        THE WITNESS: Thank you, sir.

03:00:57   13        THE COURT:

03:12:49   14      (The jury enters the courtroom.)

03:12:50   15        THE COURT: Okay. Everybody can have a seat. Mr.

03:12:58   16   Noland, you can go ahead.

03:12:58   17        MR. NOLAND: Thank you, your Honor.

03:12:59   18   BY MR. NOLAND:

03:13:03   19   Q. Mr. Brasfield, to pick up what we were talking about, you

03:13:08   20   did a side by side comparison of the police investigative file

03:13:12   21   on the one hand and then the criminal defense attorney's file

03:13:15   22   and then the documents that were not in the investigative file

03:13:18   23   and in the criminal defense file were labeled missing

03:13:23   24   investigatory?

03:13:23   25   A. That's correct.

| 03:13:24 | 1 | Q.  So the point I was making, you weren't doing any |
| 03:13:28 | 2 | qualitative analysis of the documents to think, you know what, |
| 03:13:31 | 3 | this document more than likely would have been in the criminal |
| 03:13:35 | 4 | defense attorney's files so that the criminal defense |
| 03:13:38 | 5 | attorney's files given to me have to be complete, you weren't |
| 03:13:41 | 6 | making that analysis, correct? |
| 03:13:42 | 7 | A.  No. |
| 03:13:43 | 8 | Q.  Mr. Brasfield, I'd like to talk to you about the Anima |
| 03:13:46 | 9 | case that Mr. Loevy brought up with you. |
| 03:13:54 | 10 |        MR. NOLAND:  Laura, can you bring up Plaintiff's |
| 03:14:00 | 11 | Exhibit 306, page 19.  Thanks, Judge. |
| 03:14:06 | 12 | BY MR. NOLAND: |
| 03:14:16 | 13 | Q.  Mr. Brasfield, I'm showing you the portion of the Anima |
| 03:14:18 | 14 | file that I showed you at your deposition o-c-t-a-v-i-a, when |
| 03:14:23 | 15 | I brought this issue to your attention.  Do you remember that? |
| 03:14:25 | 16 | A.  Yes, I do. |
| 03:14:26 | 17 | Q.  And what we had talked about at the deposition is that you |
| 03:14:28 | 18 | were contending in your report that there were 110 pages from |
| 03:14:32 | 19 | the police investigative file that were not in the criminal |
| 03:14:35 | 20 | defense attorney's file, right? |
| 03:14:36 | 21 | A.  It's reflected in the spreadsheet, yes. |
| 03:14:39 | 22 | Q.  And that we had actually found in there that about 100 of |
| 03:14:42 | 23 | those pages actually were in the criminal defense attorney's |
| 03:14:46 | 24 | files and you guys missed it, right? |
| 03:14:47 | 25 | A.  That there was a typographical error in the spreadsheet. |

| | | |
|---|---|---|
| 03:14:51 | 1 | Q. And so you testified that that was a typographical error. |
| 03:14:54 | 2 | I'm showing you Plaintiff's Exhibit 306, page 19 up on the |
| 03:15:00 | 3 | screen. And this is the document that is attachment F to your |
| 03:15:04 | 4 | report, right? |
| 03:15:05 | 5 | A. Yes. |
| 03:15:05 | 6 | Q. And you typed up this report personally, right? |
| 03:15:07 | 7 | A. I did. |
| 03:15:08 | 8 | Q. And it was while you were doing the file by file |
| 03:15:10 | 9 | comparison, right? |
| 03:15:11 | 10 | A. Yes. |
| 03:15:11 | 11 | Q. And I've highlighted for you that I'll represent to you |
| 03:15:16 | 12 | the pages that you said were not in the criminal defense |
| 03:15:22 | 13 | attorney's file and that were in fact were and that the |
| 03:15:26 | 14 | typographical error had been made? |
| 03:15:28 | 15 | A. That's correct. |
| 03:15:28 | 16 | Q. You typed in Lee's report page 82189-91, correct? |
| 03:15:34 | 17 | A. Correct. |
| 03:15:34 | 18 | Q. And that's under the phrase missing from criminal defense |
| 03:15:37 | 19 | attorney file. Could you highlight that one? |
| 03:15:40 | 20 | A. That's correct. |
| 03:15:41 | 21 | Q. And then you typed in arrest report 82192, correct? |
| 03:15:49 | 22 | A. Correct. |
| 03:15:49 | 23 | Q. And then you typed in computer screen shot, correct? |
| 03:15:52 | 24 | A. Yes. |
| 03:15:52 | 25 | Q. And then you typed in criminal history report and you gave |

03:15:55  1  the number 82194, right?

03:15:57  2  A.  I typed all of those.

03:15:58  3  Q.  And that number 82194 is the number of the basement file

03:16:02  4  that you couldn't find in the criminal defense attorney's

03:16:05  5  file, right?

03:16:05  6  A.  It was not on the spreadsheet, yes.

03:16:09  7  Q.  And so what you -- and you said that you were conducting a

03:16:14  8  case by case comparison yourself, right?

03:16:17  9  A.  Yes.

03:16:18  10  Q.  Now, Mr. Brasfield, what's up on the screen before the

03:16:24  11  jury, that's quite a long typo, isn't it?

03:16:27  12  A.  Well, the typo represents, as I've said, on the

03:16:30  13  spreadsheet itself, I had that it was missing Bates pages 173

03:16:46  14  to 2 something and in the back it should have been 2 something

03:16:50  15  to 2 something.

03:16:51  16  Q.  The typo was on the spreadsheet, right?

03:16:54  17  A.  It was an error, I admit that.

03:16:56  18  Q.  The typo was on the spreadsheet?

03:16:59  19  A.  Yes.

03:17:00  20  Q.  And when you were doing your case by case analysis then

03:17:02  21  and you typed in leads report 82189 and so and so on, you were

03:17:09  22  representing that you were looking at those two files side by

03:17:12  23  side and you were confirming that those pages were not in the

03:17:15  24  Anima file?

03:17:16  25  A.  That's what I should have been doing, yes.

11/29/16 PM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 211 of 303 PageID #:64374
***REALTIME UNEDITED TRANSCRIPT ONLY***

71

03:17:17  1  Q. But for this particular case, it's pretty evidence,

03:17:21  2  Mr. Brasfield, you didn't do that case by case analysis at

03:17:24  3  all, did you?

03:17:24  4  A. That's not correct.  I did.

03:17:28  5  Q. Mr. Brasfield, if you did a case by case analysis yourself

03:17:33  6  of this Anima case, how could you possibly include all of the

03:17:37  7  information that's highlighted on the jury that's in front of

03:17:39  8  them, how could that have happened?

03:17:41  9  A. I hate to admit it, but I made a mistake.

03:17:46  10  Q. So you thought that you saw LEADS report in the criminal

03:17:51  11  defense file and you typed it in?

03:17:52  12  A. I typed it in.  This is my magic fingers on the computer.

03:17:56  13  I did it.

03:17:56  14  Q. And then you thought that you saw that arrest report 82192

03:18:01  15  in that file and you typed it in?

03:18:02  16  A. That's correct.

03:18:02  17  Q. And you thought that you saw that computer screen shot in

03:18:08  18  the criminal defense file?

03:18:10  19  A. Yes.

03:18:11  20  Q. As you're sitting there comparing the files one next to

03:18:14  21  the other?

03:18:14  22        MR. LOEVY:  Judge, asked and answered, your Honor.

03:18:15  23        THE COURT:  Sustained.

03:18:16  24  BY MR. NOLAND:

03:18:18  25  Q. Mr. Brasfield, isn't it in fact true that you didn't do

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 212 of 303 PageID #:64375
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

72

| | | |
|---|---|---|
| 03:18:21 | 1 | any case by case comparison of any of these cases, you just |
| 03:18:25 | 2 | accepted this spreadsheet that the plaintiff's attorneys gave |
| 03:18:28 | 3 | to you and regurgitated it onto your paper? |
| 03:18:31 | 4 | A. That is not correct. |
| 03:18:47 | 5 | MR. NOLAND: Judge, if I may go back the ELMO, |
| 03:18:54 | 6 | please. |
| 03:18:54 | 7 | THE COURT: Okay. |
| 03:18:55 | 8 | BY MR. NOLAND: |
| 03:19:00 | 9 | Q. Mr. Loevy had talked to you about something called a court |
| 03:19:02 | 10 | attendance report and you acknowledged with Mr. Loevy that you |
| 03:19:13 | 11 | included on this table and the plaintiff's attorneys did a |
| 03:19:19 | 12 | number of those court attendance sheets as missing |
| 03:19:22 | 13 | investigative material, correct? |
| 03:19:23 | 14 | A. That's correct. |
| 03:19:23 | 15 | Q. And just at the top, that's a court attendance report for |
| 03:19:34 | 16 | a detective Harrington who was required to show up in court |
| 03:19:39 | 17 | for this particular case, right? |
| 03:19:40 | 18 | A. That's correct. |
| 03:19:40 | 19 | Q. And I think you acknowledged that this is purely |
| 03:19:44 | 20 | administrative document that is not investigative in nature, |
| 03:19:47 | 21 | correct? |
| 03:19:47 | 22 | A. No, I think what I said was is that it's intended as an |
| 03:19:51 | 23 | administrative document but could be used in some |
| 03:19:54 | 24 | investigative value to establish either a lead as to who might |
| 03:20:00 | 25 | have been possibly involved in the case that was not disclosed |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 213 of 303 PageID #:64376
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

73

| | |
|---|---|
| 03:20:05 | 1 |
| 03:20:11 | 2 |
| 03:20:15 | 3 |
| 03:20:16 | 4 |

03:20:05  1  or to either provide an alibi or discredit an alibi.

03:20:11  2  Q.  Mr. Brasfield, I just highlighted what it states on there.

03:20:15  3  Trial in progress, correct?

03:20:16  4  A.  Yes.

03:20:17  5  Q.  So this is a detective actually showing up in court while

03:20:19  6  the trial is proceeding.  That's what it appears to be, right?

03:20:22  7  A.  Yes.

03:20:23  8  Q.  And so is it your testimony that you want the Chicago

03:20:26  9  Police Department detectives and officers when they show up in

03:20:28  10  court and do their paperwork proving that that they're

03:20:31  11  supposed to fill out a court attendance report and turn it

03:20:35  12  into their supervisors, right, so they can get paid?

03:20:37  13  A.  That's correct.

03:20:37  14  Q.  And then you want them to also walk over to the criminal

03:20:40  15  defense attorneys and say, hey, by the way, I know you saw me

03:20:45  16  in court and hey, that's me?

03:20:47  17  A.  That's not what I am saying.  It should be included in the

03:20:50  18  centralized investigative file.

03:20:52  19  Q.  The point is it's not created until the time of trial, so

03:20:55  20  it couldn't have been produced to the criminal defense

03:20:57  21  attorney because they're at trial, it's created at trial,

03:21:01  22  right?

03:21:01  23  A.  It's part of the record.

03:21:02  24  Q.  Mr. Brasfield, I'm showing you a packet of documents from

03:21:36  25  the relative to the murder of Melvin Rodriguez which is one of

03:21:42    1   the cases.  This is a document in a series of documents you

03:21:46    2   stated are missing investigative material.  It's Bates number

03:21:49    3   D-221-003.  I'm going to show you the date of this

03:21:58    4   document,May 2000.  And I'm going to represent to you that --

03:22:04    5   I'll show it to you if you'd like that this packet all deals

03:22:08    6   with investigation in this particular homicide in the year

03:22:11    7   2000.  Do you want to take a look at that?

03:22:14    8   A.  I have done a quick scan of it, yes.

03:22:29    9   Q.  On the first page, does that indicate when the homicide

03:22:31   10   occurred?

03:22:32   11   A.  I don't see it on the first page, right.

03:22:39   12   Q.  I thought I saw it on there.  If I could take a look at

03:22:42   13   it.

03:22:43   14   A.  It may be.

03:22:45   15   Q.  Just right here, above name prisoners wanted for the

03:22:50   16   investigation of a homicide from 1 July 1985.  Do you see

03:22:53   17   that?

03:22:54   18   A.  I see that.  I am not arguing with it.  It just says

03:22:58   19   investigation of a homicide from 1 July 1985.  If that means

03:23:03   20   that's when a homicide occurred.

03:23:04   21   Q.  Okay.  I'll represent to you, Mr. Brasfield, that this is

03:23:09   22   the Ruben Avalez, I don't know if you remember that name, the

03:23:09   23   Rube Avalez criminal defense attorney's file that the

03:23:21   24   plaintiff's counsel gave you and you put on your spreadsheet.

03:23:21   25   Do you remember that name?

03:23:22  1   A.  It's possible.  There were a lot of names.

03:23:23  2   Q.  Now, isn't it true, Mr. Brasfield, that the criminal

03:23:27  3   defense attorneys that the plaintiff's attorneys supplied to

03:23:30  4   you was relative to a trial of Mr. Ruben Avalez that occurred

03:23:35  5   in the mid 1980s, do you remember that?

03:23:38  6   A.  I would have to look at my documents.  Again, if what

03:23:43  7   you're telling me is correct, then I'll just say yes.

03:23:46  8   Q.  Okay.

03:23:47  9   A.  Otherwise, if this was a criminal trial, I would be saying

03:23:50  10  I have to look at my records.

03:23:51  11  Q.  I think we all appreciate that.  Thank you.

03:23:53  12  A.  All right.

03:23:54  13  Q.  And the point I'm making is that the file given to you was

03:23:58  14  from a criminal prosecution in the mid 1980s and the packet of

03:24:02  15  documents in front of you which you state are missing from the

03:24:06  16  criminal defense attorney's file were created about 15 years

03:24:09  17  later.  Okay?

03:24:10  18  A.  All right.

03:24:14  19  Q.  Do you have that?

03:24:15  20      Mr. Brasfield, isn't it true that documents created

03:24:18  21  15 years after the fact couldn't have been withheld from a

03:24:22  22  criminal defense attorney 15 years before in 1987?

03:24:27  23  A.  Sure.

03:24:28  24  Q.  So if you had thought about it at all before putting it on

03:24:31  25  this spreadsheet in your report, you would have said, wait a

| | | |
|---|---|---|
| 03:24:36 | 1 | minute, these documents were created after the fact so there |
| 03:24:39 | 2 | is no way they could have been in the criminal defense |
| 03:24:41 | 3 | attorney's file, correct? |
| 03:24:42 | 4 | A. No, that's not correct. What I tried to do herewith this |
| 03:24:46 | 5 | spreadsheet is to provide information that both sides can take |
| 03:24:51 | 6 | a look at and you can weigh the value, you can evaluate what |
| 03:24:57 | 7 | you want with it. I strictly looked at what was in the |
| 03:25:00 | 8 | investigative file and what was in the criminal defense file. |
| 03:25:04 | 9 | That's just the objective process. |
| 03:25:06 | 10 | Q. Without any thought one way or another of whether or not |
| 03:25:10 | 11 | the stuff in fact was withheld by the police from the criminal |
| 03:25:16 | 12 | defense, right? ; am I correct? I'm sorry. I didn't get the |
| 03:25:22 | 13 | answer? |
| 03:25:22 | 14 | A. I'm sorry. Ask the question again. |
| 03:25:24 | 15 | Q. That is without any thought whatsoever before stating that |
| 03:25:28 | 16 | it's missing investigative material in your report that in |
| 03:25:30 | 17 | fact it was withheld from the police department from the |
| 03:25:36 | 18 | criminal defense attorney, without thinking about that at all? |
| 03:25:38 | 19 | A. That's correct. |
| 03:25:39 | 20 | Q. Thank you. |
| 03:25:42 | 21 | In fact, you don't have any personal knowledge on any |
| 03:25:45 | 22 | of these 50 cases at issue that any of the documents were |
| 03:25:49 | 23 | withheld from the Chicago Police Department from these |
| 03:25:51 | 24 | criminal defense counsel, correct? |
| 03:25:53 | 25 | A. I can draw some generalized inferences which I did. |

| | | |
|---|---|---|
| 03:25:57 | 1 | Q.  I'm asking you, you said you don't have any specific |
| 03:26:01 | 2 | knowledge that any specific piece of paper in any of these 50 |
| 03:26:04 | 3 | or 51 cases was actually withheld by the police department |
| 03:26:06 | 4 | from anybody in the criminal process, true? |
| 03:26:08 | 5 | A.  I stated. |
| 03:26:09 | 6 | Q.  That's it, yes or no, sir? |
| 03:26:10 | 7 | A.  Yes, I've stated that in my report. |
| 03:26:13 | 8 | Q.  I'm sorry.  Did you say yes? |
| 03:26:14 | 9 | THE COURT:  Okay.  Enough.  Next question. |
| 03:26:16 | 10 | MR. NOLAND:  Thank you, Judge. |
| 03:26:17 | 11 | BY MR. NOLAND: |
| 03:26:21 | 12 | Q.  Mr. Brasfield, you've talked about to/from memoranda? |
| 03:26:26 | 13 | A.  Yes. |
| 03:26:26 | 14 | Q.  And you identified some to/from memoranda in your report |
| 03:26:39 | 15 | as missing from the file, files. |
| 03:26:43 | 16 | Showing you a series of these.  One is Exhibit D |
| 03:26:49 | 17 | 230-129.  And you will see this is a September 23rd, 2014, |
| 03:27:01 | 18 | subpoena in this particular case; is that right? |
| 03:27:04 | 19 | A.  Yes. |
| 03:27:04 | 20 | Q.  And so similar to my last question to Mr. Brasfield, and |
| 03:27:10 | 21 | there is a packet of these, these documents that were created |
| 03:27:13 | 22 | well after the criminal defense attorney's files -- well after |
| 03:27:17 | 23 | the criminal trials could not have been in the criminal |
| 03:27:20 | 24 | defense attorney's files at the time of the criminal |
| 03:27:22 | 25 | prosecutions, correct? |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 218 of 303 PageID #:64381

| | | |
|---|---|---|
| 03:27:22 | 1 | A.  But they also represent -- |
| 03:27:24 | 2 | Q.  Is that true, sir? |
| 03:27:25 | 3 | A.  To your specific question, which is -- yes. |
| 03:27:29 | 4 | Q.  But another specific question, you put them on the table |
| 03:27:34 | 5 | and in your report as missing investigative material, correct? |
| 03:27:37 | 6 | A.  That's correct. |
| 03:27:37 | 7 | Q.  Now, Mr. Brasfield, you talked about the Jones and Palmer |
| 03:27:51 | 8 | case a little bit about Mr. Loevy, correct? |
| 03:27:53 | 9 | A.  Yes. |
| 03:27:53 | 10 | Q.  And you talked about the process by which special order |
| 03:27:58 | 11 | 83-1 went into place in about January 1983, correct? |
| 03:28:02 | 12 | A.  Yes. |
| 03:28:03 | 13 | Q.  And you talked about how then with the Court and the |
| 03:28:07 | 14 | plaintiff's attorneys the special order was revised pursuant |
| 03:28:10 | 15 | to some of the Court's comments and that was done four months |
| 03:28:14 | 16 | later in May of 1983 by the police department, correct? |
| 03:28:17 | 17 | A.  That's correct. |
| 03:28:17 | 18 | Q.  Mr. Brasfield, you've also talked about, I think you |
| 03:28:26 | 19 | referenced something called a murder book, right? |
| 03:28:28 | 20 | A.  Yes. |
| 03:28:28 | 21 | Q.  So you've seen or at least in Seattle or some other |
| 03:28:31 | 22 | jurisdictions that investigative detectives would have a |
| 03:28:34 | 23 | murder book on a particular homicide, right? |
| 03:28:36 | 24 | A.  Yes. |
| 03:28:36 | 25 | Q.  Now, a murder book is simply another way of saying that |

11/29/16 PM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 219 of 303 PageID #:64382
***REALTIME UNEDITED TRANSCRIPT ONLY***

79

03:28:42  1  the file on that case in that particular jurisdiction?

03:28:46  2  A.  That's police parlance generally speaking for that.

03:28:49  3  Q.  And certainly in that murder book there could be documents

03:28:54  4  such as a crime lab type document, they might have a DNA

03:28:59  5  analysis in the recent times, not in the old times or some

03:29:03  6  type of other document that might have some source documents

03:29:08  7  elsewhere, correct?

03:29:09  8  A.  That's correct.

03:29:10  9  Q.  But if it was in the murder book and referenced in the

03:29:14  10  murder book that the prosecutors and the criminal defense

03:29:16  11  attorneys would know, oh, hey, the crime lab did a report on

03:29:19  12  this case, it's right here in the file, you know, maybe they

03:29:22  13  have some additional source documents I might want to get,

03:29:28  14  correct?

03:29:28  15  A.  No, that's not correct.  My response to your original

03:29:31  16  question was physical evidence.  Obviously, you are not going

03:29:33  17  to have shells from a gun or blood splatter, clothing, but

03:29:43  18  you'll actually have a report from the crime lab.

03:29:47  19  Q.  Sir, in fact, if you had an example of say if the Marine

03:29:51  20  patrol unit was involved in a particular case and there was a

03:29:54  21  reference to it in the murder book, that the prosecutor would

03:29:56  22  know, hey, you know, there could be some other documents over

03:29:59  23  at the marine patrol unit that I might want to grab; isn't

03:29:59  24  that true?

03:30:05  25  A.  Not in the types of murder investigations that I'm

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 220 of 303 PageID #:64383
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

80

03:30:07   1   familiar with.

03:30:07   2   Q.  Mr. Brasfield, at your deposition at page 201, line 9,

03:30:14   3   isn't it true that you were asked this question and gave this

03:30:17   4   answer?

03:30:17   5        "QUESTION:  So that the prosecutor will be able to read

03:30:20   6   that in the murder book and then they could also contact the

03:30:23   7   Marine patrol unit to see if they had any additional

03:30:26   8   documentation; is that correct?

03:30:27   9        "ANSWER:  That would be how -- that would be how it

03:30:30   10  would normally work."

03:30:31   11       MR. LOEVY:  Objection.

03:30:31   12  BY MR. NOLAND:

03:30:33   13  Q.  That question was asked and that answer was given?

03:30:36   14  A.  Yes.

03:30:36   15       MR. LOEVY:  We object, your Honor.  It's not

03:30:38   16  impeaching.

03:30:38   17       THE COURT:  It's a question.  The objection is

03:30:40   18  overruled.

03:30:41   19       THE WITNESS:  I would have to see it in the context.

03:30:43   20       MR. NOLAND:  Sir.

03:30:45   21       THE COURT:  I overruled the objection.  He said he

03:30:48   22  would have to see it in the context.

03:30:51   23  BY MR. NOLAND:

03:30:52   24  Q.  The question was that was asked --

03:30:55   25       THE COURT:  You are going to have to show it to him.

| | | |
|---|---|---|
| 03:30:58 | 1 | There is a potential Rule 106 issue. |
| 03:31:00 | 2 | MR. NOLAND:  Okay. |
| 03:31:11 | 3 | THE WITNESS:  This section here? |
| 03:31:12 | 4 | BY MR. NOLAND: |
| 03:31:13 | 5 | Q.  Yeah, I read from you beginning at line 9 to 13.  That's |
| 03:31:18 | 6 | what I just read to you? |
| 03:31:19 | 7 | A.  That would be an accurate recounting of what I said at |
| 03:31:27 | 8 | that part of the deposition in the context of the entire |
| 03:31:30 | 9 | deposition. |
| 03:31:30 | 10 | Q.  Thank you, sir. |
| 03:31:31 | 11 | Just one question.  Did you rely -- I am going to |
| 03:32:07 | 12 | show you Exhibit F of your report.  Is there a case in here |
| 03:32:13 | 13 | called Fulton? |
| 03:32:14 | 14 | A.  In the attachment F which is the investigative base? |
| 03:32:30 | 15 | Q.  I'm showing you, yes, attachment F where you list on pages |
| 03:32:34 | 16 | 2 and 3, that's where you list the table of contents of the 50 |
| 03:32:39 | 17 | or so files that you compared? |
| 03:32:41 | 18 | A.  And the name you were asking? |
| 03:32:43 | 19 | Q.  Fulton. |
| 03:33:00 | 20 | A.  I don't see it initially. |
| 03:33:03 | 21 | Q.  Thanks. |
| 03:33:10 | 22 | MR. NOLAND:  If I may have a moment, your Honor. |
| 03:33:12 | 23 | THE COURT:  Sure. |
| 03:33:12 | 24 | (Brief pause.) |
| 03:33:18 | 25 | MR. NOLAND:  Thank you, Mr. Brasfield.  Thank you, |

03:33:23    1   your Honor.

03:33:23    2          THE COURT:  Mr. Kulwin.

03:33:24    3                         - - -

03:33:24    4          MICHAEL DAVID BRASFIELD, CROSS-EXAMINATION

03:33:24    5   BY MR. KULWIN:

03:34:31    6   Q.  Mr. Brasfield, a detective conducting a homicide

03:34:53    7   investigation isn't required to take notes in your opinion?

03:34:57    8          MR. LOEVY:  Objection, your Honor.  That subject was

03:34:59    9   covered.

03:34:59   10          MR. KULWIN:  No, Judge.

03:35:00   11          MR. LOEVY:  Notes was covered.

03:35:02   12          THE COURT:  The objection is overruled to this

03:35:03   13   particular question.  The rule of duplication applies.  I'll

03:35:08   14   see where it goes.

03:35:09   15   BY MR. KULWIN:

03:35:11   16   Q.  Let me start over.

03:35:12   17          Mr. Brasfield, a detective in a homicide

03:35:14   18   investigation isn't required to take notes as he gathers

03:35:17   19   information, correct?

03:35:18   20   A.  It depends on the agency.

03:35:21   21   Q.  Okay.  But you agree that some detectives have super

03:35:26   22   memories and they can remember stuff, it looks in their mind

03:35:31   23   and then they can keep it in their mind until they write a

03:35:35   24   written report, correct?

03:35:35   25   A.  It's theoretically possible, yes.


                        ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 03:35:37 | 1 | Q. And you actually believe that yourself; isn't that true? |
| 03:35:41 | 2 | A. I don't think it's the best practice. |
| 03:35:42 | 3 | Q. But you agree it can be done, right? |
| 03:35:44 | 4 | A. It can be done. |
| 03:35:45 | 5 | Q. Okay. And in fact, isn't it true that at times when a |
| 03:35:54 | 6 | detective is talking to somebody, if someone says during the |
| 03:35:57 | 7 | course of their statement that they happen to remember seeing |
| 03:36:00 | 8 | such and such standing on a corner, they would lock it into |
| 03:36:03 | 9 | their memory, they being the detective, and by the time they |
| 03:36:06 | 10 | left to do a follow-up report if they were going to do one, |
| 03:36:08 | 11 | they would have that, correct? |
| 03:36:09 | 12 | A. If they did a follow-up report in a timely manner, within |
| 03:36:13 | 13 | a short period of time. |
| 03:36:14 | 14 | Q. Right. |
| 03:36:15 | 15 | So the answer is yes, you don't have a problem with a |
| 03:36:17 | 16 | detective talking to a witness? |
| 03:36:19 | 17 | MR. LOEVY: Objection, asked and answered, your |
| 03:36:20 | 18 | Honor. |
| 03:36:21 | 19 | THE COURT: Sustained. |
| 03:36:21 | 20 | BY MR. KULWIN: |
| 03:36:30 | 21 | Q. Now, did I hear you correctly that you said you spent 150 |
| 03:36:40 | 22 | hours preparing your report? |
| 03:36:40 | 23 | A. Somewhere in that -- not preparing the report, but in |
| 03:36:44 | 24 | reviewing the material. |
| 03:36:44 | 25 | Q. So you spent 150 hours in reviewing the material and then |

11/29/16 PM

***REALTIME UNEDITED TRANSCRIPT ONLY***

84

| | | |
|---|---|---|
| 03:36:50 | 1 | writing the report? |
| 03:36:50 | 2 | A.  I billed, if I recall, somewhere in that area. |
| 03:36:55 | 3 | Q.  I just want to get the time right.  Are you saying that |
| 03:37:01 | 4 | between the time you first got the assignment from the |
| 03:37:04 | 5 | plaintiff's lawyers until the time you reviewed everything and |
| 03:37:08 | 6 | wrote the report, it was 150 hours? |
| 03:37:10 | 7 | A.  I was contacted by the attorney's office sometime in |
| 03:37:17 | 8 | December and I believe the date of my report is March 15th. |
| 03:37:21 | 9 | So I spent the time looking at material and writing my report. |
| 03:37:25 | 10 | Q.  All right.  And that was 150 hours is that your testimony? |
| 03:37:30 | 11 | A.  Billable hours.  I am pretty sure I spent a lot more time |
| 03:37:35 | 12 | on it than that. |
| 03:37:35 | 13 | Q.  Okay.  Well, do you remember giving a deposition in this |
| 03:37:40 | 14 | case in June of this year and being asked these questions and |
| 03:37:45 | 15 | giving these answers? |
| 03:37:47 | 16 | MR. LOEVY:  Page? |
| 03:37:48 | 17 | MR. KULWIN:  Page 265, line 13. |
| 03:37:48 | 18 | BY MR. KULWIN: |
| 03:37:52 | 19 | Q.  "QUESTION:  And so you had to squeeze it in, right? |
| 03:37:57 | 20 | "ANSWER:  I indicated that I spent approximately 60 |
| 03:37:59 | 21 | hours on the case." |
| 03:38:03 | 22 | Go to the next page, page 266. |
| 03:38:05 | 23 | "QUESTION:  Now, the 60 hours that you spent, how many |
| 03:38:08 | 24 | hours did you spend actually reviewing the file before you |
| 03:38:10 | 25 | reached your conclusion? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 225 of 303 PageID #:64388
11/29/16 PM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

85

03:38:11  1        "ANSWER:  I can't give you a break down of how much it

03:38:14  2  was because the work was simultaneously, I was looking at the

03:38:17  3  files and working on my report, so I can't give you how much

03:38:20  4  of it was this and how much of it was that."

03:38:23  5        Were those questions asked and did you give those

03:38:26  6  answers?

03:38:26  7  A.  Yes.

03:38:26  8  Q.  All right.  Now, did I hear you correctly, sir, that part

03:38:43  9  of the basis for your opinions about what other -- that

03:38:49  10  Chicago is so different from other police reports is that in

03:38:54  11  your career, you've audited police departments?

03:38:56  12  A.  That's correct.

03:38:57  13  Q.  But the fact of the matter is, sir, I don't believe --

03:39:03  14  you've never audited any police department on the issue of

03:39:08  15  whether -- how they're properly maintaining their files and

03:39:12  16  disclosing it in criminal cases; isn't that true?

03:39:15  17  A.  That's correct.

03:39:16  18  Q.  The only audits?

03:39:17  19  A.  I misunderstood your question.  I thought you asked did I

03:39:21  20  testify in a criminal case on that.  No, I have reviewed

03:39:26  21  procedures and processes and discoveries in various cities.

03:39:29  22  Q.  My question -- maybe ships passing in the wind here.  Let

03:39:34  23  me be clear.

03:39:35  24        You've told the jury that part of the basis of your

03:39:38  25  opinion here is the auditing work you've done, right?

| 03:39:40 | 1 | A.  Yes. |
| 03:39:40 | 2 | Q.  But the fact of the matter is, sir, that you have never, |
| 03:40:01 | 3 | you've never conducted any independent audit of any police |
| 03:40:11 | 4 | department on the issue of their disclosure of information in |
| 03:40:14 | 5 | criminal cases; isn't that true? |
| 03:40:23 | 6 | A.  I'll refer back to my testimony.  I have visited and |
| 03:40:28 | 7 | audited engaged to look at the delivery of police services |
| 03:40:33 | 8 | which included record keeping and discovery processes. |
| 03:40:38 | 9 | Q.  All right.  Going back to your deposition of June of this |
| 03:40:41 | 10 | year starting at page 319, line 24? |
| 03:40:44 | 11 | "QUESTION:  Okay.  And I want to be clear.  Your |
| 03:40:48 | 12 | testimony is that those other major cities, though, the way |
| 03:40:52 | 13 | they do it is every piece of information they get during a |
| 03:40:55 | 14 | homicide investigation is documented, put in a file and turned |
| 03:40:59 | 15 | over to either the defense attorneys or the prosecutor.  Do I |
| 03:41:03 | 16 | understand that correctly? |
| 03:41:04 | 17 | "ANSWER:  I'm saying that is the general practice. |
| 03:41:07 | 18 | "QUESTION:  Was that what was going on in New York and |
| 03:41:10 | 19 | Baltimore and all the places you did audits on? |
| 03:41:12 | 20 | "ANSWER:  My familiarity with the way it was done -- |
| 03:41:18 | 21 | I'm sorry.  My familiarity with the way it was done was that |
| 03:41:23 | 22 | was the desire.  Whether it occurred on each, I did not do and |
| 03:41:26 | 23 | have not done an independent audit of the New York police |
| 03:41:29 | 24 | department's homicide unit." |
| 03:41:31 | 25 | Then it goes on. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

03:41:33  1        MR. LOEVY:  Your Honor, that's not impeaching.

03:41:35  2        MR. KULWIN:  I am not done.

03:41:36  3        THE COURT:  I am going to wait until he is done.

03:41:38  4    BY MR. KULWIN:

03:41:40  5    Q.  Okay.  So you say in your resume you did some auditing,

03:41:43  6    you did auditing of police department?

03:41:44  7    A.  Yes.

03:41:44  8    Q.  Was it Baltimore or Oxford?

03:41:49  9        THE COURT:  Say the question, answer.

03:41:49  10   BY MR. KULWIN:

03:41:53  11   Q.  Question, wasn't it Baltimore or Oxford, where else?

03:41:57  12       "ANSWER:  I think there were six cities.

03:41:57  13       "QUESTION:  Yeah, Baltimore, Oxford.  Can you tell me,

03:42:00  14   it would help me out besides Baltimore and Oxford.

03:42:02  15       THE COURT:  Oxnard?

03:42:05  16   BY MR. KULWIN:

03:42:06  17   Q.  Sorry, Judge.  Seattle, Memphis, Oxnard, Baltimore, a city

03:42:10  18   in Ohio, I'll have to find it in here.  It goes on.  We'll get

03:42:15  19   back to it, but just let's stick with Baltimore, Oxnard, and

03:42:19  20   the city in Mississippi.  Where is Oxnard, is that in

03:42:22  21   Mississippi?

03:42:23  22       "ANSWER:  It's Oxnard, California.

03:42:25  23       "QUESTION:  Oh, sorry, I'm confused.

03:42:28  24       "ANSWER:  An area outside of Los Angeles.

03:42:28  25       "QUESTION:  How big is Oxnard?

                   ***REALTIME UNEDITED TRANSCRIPT ONLY***

03:42:32   1        "ANSWER:  As I recall at the time, it was maybe in the

03:42:34   2   couple hundred thousand.

03:42:35   3        "QUESTION:  All right.  All right.  Now, I want to be

03:42:37   4   clear.  You were asked to audit these city's police

03:42:41   5   departments like in --

03:42:43   6        "ANSWER:  It was part of a federal grant process to

03:42:46   7   examine delivery of police services.  And so in part of that,

03:42:49   8   as part of the team, we would meet with the chief of police,

03:42:52   9   we would meet with community leaders, we would look at the

03:42:54   10  functioning and organization and staffing levels and budgetary

03:43:01   11  appropriations for the organization.

03:43:02   12       "QUESTION:  In any of these cities, did you -- did you

03:43:05   13  investigate or audit their disclosure of information in

03:43:08   14  criminal cases?

03:43:09   15       "ANSWER:  No."

03:43:11   16       MR. LOEVY:  Objection, your Honor.  Not impeaching.

03:43:13   17  That's a discrete number of cities.

03:43:16   18       THE COURT:  Sustained.

03:43:19   19  BY MR. NOLAND:

03:43:21   20  Q.  In any of these -- in any of these investigations --

03:43:25   21       THE COURT:  Sustained.  I want to say it given your

03:43:28   22  facial reaction, given the question you asked at 3:39 in the

03:43:32   23  afternoon.  That is not impeaching.  The jury is directed to

03:43:35   24  disregard the reading from the deposition.

03:43:37   25       MR. KULWIN:  I will ask a different question.

|            |    |                                                              |
|------------|----|--------------------------------------------------------------|
| 03:43:39   | 1  | BY MR. KULWIN:                                                |
| 03:43:39   | 2  | Q.  In any of these investigations that you did, any audits  |
| 03:43:42   | 3  | that you did, in any audits that you've done in your career  |
| 03:43:47   | 4  | that you're referencing, did you look at or audit or try to  |
| 03:43:50   | 5  | analyze whether they were fulfilling these -- these cities   |
| 03:43:54   | 6  | were disclosing their disclosure obligations in homicide     |
| 03:44:00   | 7  | cases?                                                        |
| 03:44:00   | 8  | A.  It was part of my what my duties and responsibilities as a |
| 03:44:03   | 9  | specialist in records in discovery to look at that.  But it  |
| 03:44:08   | 10 | was a minor, the overall was the delivery of police services |
| 03:44:12   | 11 | to public housing, which included that process.              |
| 03:44:15   | 12 | Q.  All right.  Now going back to your deposition, page 322,  |
| 03:44:19   | 13 | line 5.  In any of these investigations, did you look at or  |
| 03:44:22   | 14 | audit or try to analyze whether they were fulfilling their   |
| 03:44:25   | 15 | disclosure obligations in homicide or other criminal cases?  |
| 03:44:29   | 16 | "ANSWER:  No, that was not part of the mandate               |
| 03:44:31   | 17 | MR. LOEVY:  Objection, your Honor.  The mandate is           |
| 03:44:33   | 18 | talking about the federal mandate.                           |
| 03:44:34   | 19 | THE COURT:  Overruled.  Did he read that particular          |
| 03:44:38   | 20 | question and answer correctly?                               |
| 03:44:39   | 21 | THE WITNESS:  Yes.                                           |
| 03:44:40   | 22 | BY MR. KULWIN:                                               |
| 03:44:48   | 23 | Q.  Now, if I understand it correctly, one of the ways that -- |
| 03:45:08   | 24 | there are two legs to the information that you've employed in |
| 03:45:13   | 25 | determining that Chicago is an anomaly in how they handle    |

| | | |
|---|---|---|
| 03:45:19 | 1 | their information and gather it and disclose it to -- in |
| 03:45:23 | 2 | criminal cases, am I right?  Two legs, right? |
| 03:45:26 | 3 | A.  Which two legs? |
| 03:45:27 | 4 | Q.  Well, one is you go to a bunch of conferences that you |
| 03:45:30 | 5 | attend with other police chiefs, right?  That was one of the |
| 03:45:33 | 6 | legs, right, that you told me about? |
| 03:45:35 | 7 | THE COURT:  He thinks you're saying line, you're |
| 03:45:38 | 8 | saying less, right? |
| 03:45:39 | 9 | BY MR. KULWIN: |
| 03:45:40 | 10 | Q.  I'm sorry, legs. |
| 03:45:41 | 11 | A.  I'm sorry. |
| 03:45:41 | 12 | Q.  Let me do it again.  My fault. |
| 03:45:43 | 13 | As I understand it from earlier testimony you've |
| 03:45:47 | 14 | given, there are two legs that you rely on in determining that |
| 03:45:52 | 15 | Chicago was an anomaly vis-à-vis production of information to |
| 03:45:59 | 16 | criminal defendants than other cities? |
| 03:46:02 | 17 | MR. LOEVY:  Objection, your Honor.  Given the entire |
| 03:46:06 | 18 | testimony, it's improper.  He's got to show him -- |
| 03:46:10 | 19 | THE COURT:  I think that question can be answered. |
| 03:46:13 | 20 | The objection is overruled. |
| 03:46:14 | 21 | BY MR. KULWIN: |
| 03:46:15 | 22 | Q.  Mr. Brasfield, do I have it? |
| 03:46:16 | 23 | A.  I am sorry.  You're losing me here. |
| 03:46:21 | 24 | Q.  Okay.  As I understand it, let me see if I can help you |
| 03:46:27 | 25 | out. |

03:46:28  1        You attend certain conferences of police chiefs,

03:46:31  2  right?

03:46:31  3  A.  I have over the years.

03:46:32  4  Q.  And that's one of the ways that you concluded how other

03:46:36  5  police departments handle their -- that's one of the ways on

03:46:47  6  which -- that you've articulated in your report the standard

03:46:51  7  is of how they handle their disclosure of information,

03:46:55  8  correct?

03:46:55  9  A.  I don't believe that's in my report.

03:46:57  10  Q.  Well, I guess maybe I'm not asking the question

03:47:04  11  accurately.  Let me see if I can try it again.

03:47:06  12        You went to a bunch of conferences in which police

03:47:13  13  chiefs talked about best practices, including the chief of

03:47:16  14  police of Chicago, and you're basing your knowledge here in

03:47:19  15  part that all major police departments fulfill your

03:47:22  16  professional standard that you've articulated in your report

03:47:25  17  based on what you've learned in those conferences is that

03:47:28  18  right?

03:47:28  19        MR. LOEVY:  Objection, compound, your Honor.

03:47:29  20        THE COURT:  Overruled.

03:47:30  21        THE WITNESS:  I think that's entirely a

03:47:34  22  misrepresentation of my testimony.

03:47:36  23  BY MR. KULWIN:

03:47:36  24  Q.  Okay.

03:47:36  25  A.  Or in my deposition.  I described --


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 232 of 303 PageID #:64395
11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

92

03:47:39   1         THE COURT:  I think you have answered the question.

03:47:40   2    Ask another question.

03:47:41   3    BY MR. KULWIN:

03:47:41   4    Q.  Let me go back to your deposition and I'll ask you this

03:47:44   5    question.

03:47:46   6         MR. LOEVY:  Line and page number?

03:47:48   7         MR. NOLAND:

03:47:48   8         MR. KULWIN:  I am getting there.  Line 4, page 336.

03:47:53   9    BY MR. KULWIN:

03:47:54  10    Q.

03:47:54  11         "QUESTION:  I understand that and I'm going to leave

03:47:56  12    this topic and go onto another topic, same topic, but another

03:48:00  13    area.  All I'm trying to get at, sir, was, you know, you went

03:48:04  14    to a bunch of conferences in which police chiefs talked about

03:48:07  15    best practice including the chief of police of the City of

03:48:09  16    Chicago and you're basing your knowledge in part that all

03:48:12  17    major police departments fulfill your professional standard

03:48:16  18    that you've articulated in this report based in part on what

03:48:19  19    you've learned at those conferences about best practices?

03:48:22  20         "ANSWER:  That was a leg of it."

03:48:27  21    A.  That was a leg of it.

03:48:28  22    Q.  That's what I asked you.  That was a leg of it?

03:48:31  23    A.  The statement was yours, but the leg of it was mine.

03:48:35  24    Q.  All right.  Now, the fact is, though, sir, when you went

03:48:48  25    to these conferences that you're talking about that you're

                   ***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

03:48:51  1  basing your conclusions that this is all these other cities do

03:48:55  2  it, you don't have any written material from any of those

03:48:57  3  conferences that substantiate your view; isn't that right?

03:49:01  4  A.  You're totally misrepresentation my testimony.

03:49:04  5  Q.  Sir, can you answer my question?  Do you have any written

03:49:07  6  material from any of those conferences that you attended that

03:49:09  7  substantiate that they told you that these are the best

03:49:12  8  practices at these conferences?  Do you have anything like

03:49:16  9  that?

03:49:16  10  A.  I indicated that I had gone to conferences in response to

03:49:21  11  a question of how I formed my opinion.  That was an

03:49:26  12  insignificant portion of it.  No, I don't have any documents

03:49:30  13  from that.

03:49:31  14  Q.  All right.  And you can't name one police chief as you're

03:49:37  15  sitting there today from any major city who stood up and said,

03:49:40  16  yeah, we produce a hundred percent of everything that we get

03:49:46  17  in a criminal investigation, we turn it over to the criminal

03:49:48  18  defendants?

03:49:48  19          MR. LOEVY:  Objection to the question, your Honor.

03:49:50  20  Relevance.

03:49:50  21          THE COURT:  Overruled.

03:49:51  22          MR. LOEVY:  Same with the hundred percent.

03:49:55  23          THE COURT:  Overruled.  Goes to weight.

03:49:56  24          THE WITNESS:  You're talking about a very minor

03:50:00  25  portion of what I based my opinion on.  I've said in my

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 PM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 234 of 303 PageID #:64397
***REALTIME UNEDITED TRANSCRIPT ONLY***

94

| | | |
|---|---|---|
| 03:50:08 | 1 | deposition that among dozens of things, I also go to |
| 03:50:13 | 2 | conferences and talk to police chiefs informally, discuss |
| 03:50:18 | 3 | various issues that are on the front burner at the time, |
| 03:50:22 | 4 | whether they're use of force, police pursuits, whatever. |
| 03:50:25 | 5 | BY MR. KULWIN: |
| 03:50:26 | 6 | Q.  Sir, the question is at these conferences that you went |
| 03:50:30 | 7 | to, no police chief that you can name as you're sitting there |
| 03:50:34 | 8 | today said, yeah, we do a hundred percent disclosure, you |
| 03:50:39 | 9 | can't name one, can you? |
| 03:50:40 | 10 | A.  When we -- I would. |
| 03:50:42 | 11 | Q.  Sir, the question was can you? |
| 03:50:44 | 12 | A.  I would not. |
| 03:50:44 | 13 | Q.  Can you is the question? |
| 03:50:49 | 14 | A.  I will not. |
| 03:50:49 | 15 | Q.  Not will you not, you couldn't isn't that true, you |
| 03:50:52 | 16 | couldn't name one particular one; isn't that true? |
| 03:50:55 | 17 | A.  That's not true. |
| 03:50:55 | 18 | Q.  Okay.  Do you remember this question.  Page 332 at line |
| 03:51:04 | 19 | 14.  At line 24.  No, no, no, first answer my question.  Did |
| 03:51:11 | 20 | anyone say -- I'm sorry.  Line 14.  Page 332. |
| 03:51:16 | 21 | "QUESTION:  I'm going to get to the rest of the |
| 03:51:18 | 22 | information, but I'm focusing on these conferences.  In these |
| 03:51:21 | 23 | conferences |
| 03:51:22 | 24 | "ANSWER:  Okay. |
| 03:51:23 | 25 | "QUESTION:  Nobody that you can identify, not one chief |

03:51:25   1   of police that you can identify stood up and said this is how

03:51:29   2   we're dealing with disclosure of investigative information in

03:51:32   3   criminal cases, we do it X, Y, and Z, and we have 100 percent

03:51:37   4   compliance rate.  Nobody said that, correct?

03:51:41   5        "ANSWER:  What was the discussion?

03:51:42   6        "QUESTION:  No, no, no.  First answer my question.  Did

03:51:45   7   anyone say that?

03:51:46   8        "ANSWER:  I can't give you names of particular

03:51:49   9   individuals, but because it was such a hot topic of court

03:51:54  10   cases and disclosure, that was an item of discussion and we

03:51:56  11   would, people would give their horror stories of what happened

03:52:00  12   when they failed to do it and why it was so important that we

03:52:05  13   all as a professional group changed our ways

03:52:07  14        MR. LOEVY:  Objection.

03:52:08  15   BY MR. KULWIN:

03:52:09  16   Q.  That was the question and that was your answer; isn't that

03:52:09  17   true?

03:52:11  18        MR. LOEVY:  Objection.

03:52:11  19        THE COURT:  Overruled.

03:52:12  20        THE WITNESS:  Yes.

03:52:12  21   BY MR. KULWIN:

03:52:17  22   Q.  And in fact, what they were telling you, what you were

03:52:28  23   hearing at these conferences from these police chiefs, was,

03:52:32  24   look, we have successes, we've got failures, we're doing our

03:52:35  25   best, that's what you heard.  You didn't hear a hundred


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

03:52:38    1    percent, right?

03:52:40    2    A.  That's not what I stated.

03:52:41    3           MR. LOEVY:  Objection.

03:52:42    4    BY MR. KULWIN:

03:52:43    5    Q.  What?

03:52:43    6    A.  That's not what I stated.

03:52:44    7           THE COURT:  The answer can stand.

03:52:46    8    BY MR. KULWIN:

03:52:46    9    Q.  So you never heard a hundred percent, right?

03:52:48   10    A.  I answered the question the best I can.

03:52:53   11    Q.  Now, another one of the legs, another one of the legs that

03:53:08   12    you relied on for your conclusion that Chicago is an anomaly

03:53:12   13    on how major cities disclose information that they gather in

03:53:19   14    criminal cases is the federal government's funding of various

03:53:24   15    institutions isn't that right?  Information you get from that

03:53:27   16    isn't that true?

03:53:28   17    A.  The information I get from literature either produced by

03:53:32   18    the federal government or funded by the federal government, I

03:53:35   19    think that that was the context of my answer.

03:53:36   20    Q.  All right.  So another leg is the federal government has

03:53:42   21    expended a tremendous amount of money, the national institute

03:53:44   22    of justice, the bureau of justice statistics, the bureau of

03:53:48   23    justice administration, the FBI, the whole alphabet of soup of

03:53:52   24    agencies and universities to examine the rise of violent crime

03:53:55   25    and strategies to address it.  You look at that literature,

03:53:57   1   right?

03:53:58   2   A.  Yes.

03:53:58   3   Q.  And that's one of the bases for your conclusions, that

03:54:02   4   literature, that Chicago is an anomaly in how they deal with

03:54:11   5   their disclosure of information, right?

03:54:13   6   A.  I'm sorry.  You are losing me.  My statement in my

03:54:23   7   deposition is what it was.

03:54:24   8   Q.  I know that.  But my question is, my question is that one

03:54:31   9   of the things that you say that you rely on in your report to

03:54:36  10   reach the conclusion that you've given the jury that Chicago

03:54:40  11   is an anomaly are these statistics and things of that nature

03:54:44  12   from all these different federal agencies, right?

03:54:47  13   A.  That it forms a basis of knowledge about how things are

03:54:54  14   done in the United States in police agencies.

03:54:57  15   Q.  All right.  But you're not saying that this work by the

03:55:02  16   Department of Justice substantiates your standard of a hundred

03:55:05  17   percent disclosure of all information gathered in a homicide

03:55:09  18   investigation, those agencies research doesn't substantiate

03:55:14  19   that at all, does it?

03:55:15  20   A.  In the context of the question that I was asked during the

03:55:18  21   deposition as to what I form my opinion on was how other law

03:55:23  22   enforcement agencies respond to discovery requests and that it

03:55:28  23   was based on centralized records keeping, accurate indexing,

03:55:34  24   and full disclosure, all of which was not the case that I had

03:55:38  25   seen in Chicago.

| | | |
|---|---|---|
| 03:55:39 | 1 | Q. Right. And my question to you, sir, is one of the bases |
| 03:55:43 | 2 | for that opinion is all this information from these federal |
| 03:55:46 | 3 | agencies and you don't have any information from those |
| 03:55:49 | 4 | agencies that substantiates that conclusion; isn't that right? |
| 03:55:54 | 5 | A. I disagree with how you're presenting that. |
| 03:55:58 | 6 | Q. All right. Here's the question from your deposition? |
| 03:56:07 | 7 | MR. LOEVY: Page? |
| 03:56:08 | 8 | MR. KULWIN: Page 338. |
| 03:56:09 | 9 | BY MR. NOLAND: |
| 03:56:09 | 10 | Q. |
| 03:56:09 | 11 | "QUESTION: You just said, you just said that a key leg |
| 03:56:13 | 12 | of your conclusion was that the Department of Justice was |
| 03:56:16 | 13 | doing all these investigations about violent crimes and police |
| 03:56:20 | 14 | chiefs all over the country were aware of it. Okay? But |
| 03:56:24 | 15 | there were -- there's, but you're not saying that any of |
| 03:56:27 | 16 | these, that this work by the Department of Justice |
| 03:56:28 | 17 | substantiates your standard that it's a hundred percent |
| 03:56:31 | 18 | disclosure a hundred percent of all the information? |
| 03:56:34 | 19 | "ANSWER: That's the goal, and that -- that's -- |
| 03:56:38 | 20 | "QUESTION: That's the goal? |
| 03:56:40 | 21 | "ANSWER: And |
| 03:56:42 | 22 | "QUESTION: That's the goal? |
| 03:56:43 | 23 | "ANSWER: Close from a practical standpoint that your |
| 03:56:46 | 24 | cases and the way you operate are conducted in that manner." |
| 03:56:50 | 25 | It's a goal |

03:56:51  1          MR. LOEVY:  Objection, your Honor.  That's an

03:56:54  2    unintelligible question.

03:56:56  3          THE COURT:  Sustained.

03:56:56  4    BY MR. KULWIN:

03:57:08  5    Q.  As you sit there today, sir, can you name any departments,

03:57:11  6    any police departments that you gleaned from looking at this

03:57:18  7    Department of Justice information that reaps this hundred

03:57:22  8    percent disclosure rule?

03:57:24  9          MR. LOEVY:  Objection to this hundred percent.  This

03:57:26  10   was the subject of a motion in limine.

03:57:28  11         THE COURT:  Sustained.  You can't word the question

03:57:30  12   that way.

03:57:31  13   BY MR. KULWIN:

03:58:03  14   Q.  Sir, if I understand it, if I understand it, sir, in your

03:58:15  15   professional opinion, the issue in this case is that Chicago

03:58:18  16   doesn't maintain their records appropriately and as a result

03:58:20  17   of that, that leads to failure to disclose everything which

03:58:24  18   leads to problems, that's what we're talking about, right?

03:58:26  19   A.  That's a major portion of it, yes.

03:58:30  20   Q.  Okay.  And as you said before, you think it's an anomaly

03:58:36  21   to other cities doing that same stuff, right?

03:58:38  22   A.  That's what I stated.

03:58:40  23   Q.  Okay.  But you haven't done an analysis or a comparison of

03:58:47  24   any major city with a similar in size of population and the

03:58:53  25   number of homicides as Chicago that were occurring between

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 03:58:57 | 1 | 1983 and 2006 to come to that conclusion, correct? |
| 03:59:01 | 2 | A.  That I haven't done a study? |
| 03:59:05 | 3 | Q.  Yeah, you have not done any study of any major city of |
| 03:59:09 | 4 | similar size as Chicago with the same type of number of |
| 03:59:13 | 5 | homicides between 1983 and 2006, you have done no comparison |
| 03:59:19 | 6 | between Chicago and those cities on that issue, have you? |
| 03:59:21 | 7 | A.  I testified to the fact that during the time period that |
| 03:59:25 | 8 | we are discussing here for both time periods, I was aware of |
| 03:59:29 | 9 | and familiar with policies and procedures in other states, |
| 03:59:33 | 10 | other cities in average cities included. |
| 03:59:36 | 11 | Q.  But you've done no such analysis isn't that true? |
| 03:59:40 | 12 | A.  I was not hired to do an analysis and I did not do an |
| 03:59:43 | 13 | analysis, but I can very comfortably and faithfully say that I |
| 03:59:48 | 14 | am familiar with the policies and procedures of those |
| 03:59:53 | 15 | jurisdictions and that they are not consistent with the way |
| 03:59:55 | 16 | the City of Chicago does it. |
| 03:59:56 | 17 | Q.  Let me break that down.  I don't care about just what you |
| 04:00:00 | 18 | retained here.  Never in your? |
| 04:00:02 | 19 |         MR. LOEVY:  Objection, your Honor.  Asked and |
| 04:00:04 | 20 | answered. |
| 04:00:06 | 21 |         MR. KULWIN:  Sorry, Judge. |
| 04:00:08 | 22 |         THE COURT:  Yeah, if you want to go beyond the |
| 04:00:10 | 23 | report. |
| 04:00:11 | 24 |         MR. KULWIN:  No. |
| 04:00:11 | 25 |         THE COURT:  No, because you just are about to. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 241 of 303 PageID #:64404

| | | |
|---|---|---|
| 04:00:14 | 1 | That's the way your question is being worded. |
| 04:00:19 | 2 | MR. KULWIN:  Sorry, Judge. |
| 04:00:22 | 3 | THE COURT:  I will read back to you what you said. |
| 04:00:24 | 4 | MR. KULWIN:  No, I got it. |
| 04:00:24 | 5 | THE COURT:  Let me break it down, I don't care just |
| 04:00:27 | 6 | about what you were retained for in your report, never in your |
| 04:00:31 | 7 | entire, dot, dot, dot. |
| 04:00:33 | 8 | BY MR. KULWIN: |
| 04:00:36 | 9 | Q.  Okay.  Sir, you've not done an analysis of any comparison |
| 04:00:44 | 10 | that's similar in size of population and similar in the number |
| 04:00:47 | 11 | of homicides that were occurring from 1983 to 2006 that you |
| 04:00:53 | 12 | compared to Chicago to come to the conclusion that Chicago is |
| 04:00:57 | 13 | an anomaly on that issue? |
| 04:00:59 | 14 | MR. LOEVY:  Same objection, your Honor. |
| 04:01:00 | 15 | THE COURT:  Can I see the lawyers at sidebar, please. |
| 04:01:09 | 16 | (The following proceedings were had at sidebar outside the |
| 04:01:17 | 17 | hearing of the jury:) |
| 04:01:17 | 18 | THE COURT:  The way you worded the question, it's a |
| 04:01:19 | 19 | universe of one.  Way city of similar population with a |
| 04:01:24 | 20 | similar number of homicide during the period of 1983 to 2006, |
| 04:01:26 | 21 | means it's a universe of one.  What would the other city be? |
| 04:01:30 | 22 | MR. KULWIN:  I don't know.  New York? |
| 04:01:31 | 23 | THE COURT:  No. |
| 04:01:32 | 24 | MR. KULWIN:  Los Angeles. |
| 04:01:33 | 25 | THE COURT:  Much bigger population, smaller number of |

| | | |
|---|---|---|
| 04:01:35 | 1 | homicides, a smaller number of homicides in the second one. |
| 04:01:39 | 2 | It's a universe of one, so I am going to sustain the |
| 04:01:42 | 3 | objection. |
| 04:01:45 | 4 | (The following proceedings were had in open court in the |
| 04:01:46 | 5 | presence and hearing of the jury:) |
| 04:01:46 | 6 | THE COURT: The objection is sustained. |
| 04:01:49 | 7 | BY MR. KULWIN: |
| 04:02:12 | 8 | Q. Sir, in the city where you were chief of police, Seattle, |
| 04:02:15 | 9 | they had a about what, 55 homicides a year? |
| 04:02:18 | 10 | A. I was not the chief of police in Seattle. I was the |
| 04:02:21 | 11 | assistant chief in Seattle. I was the chief of police in Fort |
| 04:02:26 | 12 | Lauderdale, Florida. |
| 04:02:26 | 13 | Q. So when you were assistant chief of Seattle, they had |
| 04:02:30 | 14 | what, 55 homicides a year? |
| 04:02:31 | 15 | A. I think the all time record might have been pushing 100, |
| 04:02:34 | 16 | but on average, somewhere, I haven't looked at it recently, |
| 04:02:37 | 17 | but that's probably a ballpark figure. |
| 04:02:42 | 18 | Q. Ballpark, as of June of 2016, isn't that what you thought |
| 04:02:46 | 19 | it was, 50, 55? |
| 04:02:47 | 20 | A. I believe that's what I testified to. |
| 04:02:50 | 21 | Q. Okay. And Fort Lauderdale, and I think that Fort |
| 04:02:57 | 22 | Lauderdale you thought had maybe 10 or 20? |
| 04:02:59 | 23 | A. They were -- I have gone back and checked and probably |
| 04:03:03 | 24 | closer to the 20, 25 range. |
| 04:03:05 | 25 | Q. Okay. And when you were the sheriff, maybe one in a bad |

| 04:03:09 | 1 | year? |
| 04:03:09 | 2 | A. Yeah, that's true. |
| 04:03:10 | 3 | Q. And the Seattle detectives while you were out there, each |
| 04:03:16 | 4 | detective was handling maybe two or three homicides per year, |
| 04:03:19 | 5 | correct? |
| 04:03:19 | 6 | A. No, it was a much smaller homicide unit, so they were |
| 04:03:24 | 7 | carrying a larger caseload than that. |
| 04:03:27 | 8 | Q. This question, page 317. In the city that has an average |
| 04:03:45 | 9 | -- to line 17. We were talking about Seattle. In a city that |
| 04:03:49 | 10 | has about an ample 50, it 55, you got two or three homicides |
| 04:03:53 | 11 | per detective, right? |
| 04:03:55 | 12 | "ANSWER: On ample on active cases, two or three |
| 04:04:00 | 13 | A. Active cases. |
| 04:04:01 | 14 | MR. LOEVY: Objection. |
| 04:04:02 | 15 | THE COURT: The objection is overruled. |
| 04:04:03 | 16 | BY MR. KULWIN: |
| 04:04:04 | 17 | Q. You don't even recall the number of detectives, homicide |
| 04:04:07 | 18 | detectives you had in Fort Lauderdale, correct? |
| 04:04:09 | 19 | A. I don't recall what my answer was in the deposition. |
| 04:04:10 | 20 | Q. Do you recall now what -- you don't recall, do you recall |
| 04:04:13 | 21 | now? |
| 04:04:14 | 22 | A. No, there are probably 10 or 12. |
| 04:04:17 | 23 | Q. So they were handling maybe one or two per year of |
| 04:04:20 | 24 | homicides, right? |
| 04:04:21 | 25 | A. They were handling more than that. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:04:27  1  Q.  If you had 10 or 12 and you only had 20 to 25 homicides

04:04:33  2  per year that are active cases per year, maybe one or two?

04:04:39  3  A.  As a group.  I won't argue the point with you.

04:04:41  4  Q.  Finally, sir, you were asked some questions about, you

04:04:46  5  know, how an investigation goes and I think you referred to

04:04:51  6  some be novelest bar /ET or something, it's like a novel, you

04:04:56  7  never know how it's going to end, right, wasn't that your

04:04:58  8  analogy?

04:04:59  9  A.  That was an analogy, yes.

04:05:00  10  Q.  Okay.  So one question I have for you is when you were

04:05:04  11  reviewing all these files, you didn't take any notes, right?

04:05:08  12  A.  I took -- I think I testified in the deposition that as I

04:05:14  13  did any of my cases, I do my work on a computer, I maintain

04:05:24  14  what I am doing there and it is a living document.

04:05:26  15  Q.  But the living document is actually the report that you're

04:05:29  16  writing, that's the living document, the novel in this case,

04:05:31  17  right?

04:05:31  18  A.  Yes.

04:05:32  19  Q.  So you have all these investigative reports, you've got

04:05:34  20  your okay report to plaintiff's counsel on Fields v. City of

04:05:39  21  Chicago, you've got it in your report format, you're starting

04:05:42  22  with that, right?

04:05:42  23  A.  Yes.

04:05:42  24  Q.  Okay.  Then you've got all the files that you're looking

04:05:45  25  at and what you're doing is you are not going through the

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:05:48   1   files and saying this one or that one, you're just typing into

04:05:52   2   the report, right?

04:05:52   3            MR. LOEVY:  Objection to the form of the question.

04:05:53   4            MR. KULWIN:  I will rephrase it if you want, Judge.

04:05:55   5            MR. LOEVY:  I will withdraw the objection.

04:05:57   6            THE COURT:  Okay.

04:05:58   7   BY MR. KULWIN:

04:05:58   8   Q.  You are not actually creating a document that just

04:06:01   9   analyzes what's in what, right?

04:06:03  10   A.  I'm looking at the electronic versions on the split screen

04:06:08  11   of the material that I've -- depending on the case that I'm

04:06:12  12   looking at and then I'm typing in whatever is relevant at the

04:06:16  13   time.

04:06:16  14   Q.  Right into what's going to be the final report, correct?

04:06:21  15   A.  If I understand your question, yes.

04:06:25  16   Q.  And the last point on that, sir, on this novel idea, you

04:06:35  17   agree, sir, that criminal investigations take twists and

04:06:38  18   turns, right?

04:06:39  19   A.  Yes.

04:06:39  20   Q.  And it's easy to look back as a detective to another

04:06:45  21   detective's work and go, wow, he should have done this and he

04:06:49  22   should have done that and why didn't he see that and why

04:06:52  23   didn't he see that, hindsight is 20/20, isn't it sir?

04:06:56  24   A.  That's not what I testified to.

04:06:57  25   Q.  I'm not asking what you testified to.  I'm asking, you're

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 246 of 303 PageID #:64409
11/29/16 PM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

106

| | | |
|---|---|---|
| 04:07:02 | 1 | an expert; isn't that true? |
| 04:07:04 | 2 | A.  Hindsight is 20/20? |
| 04:07:05 | 3 | Q.  Yes. |
| 04:07:06 | 4 | A.  Yes. |
| 04:07:07 | 5 | Q.  Any detective or any expert or any lawyer can look back at |
| 04:07:10 | 6 | what a detective did 30 years ago and said he made this |
| 04:07:14 | 7 | mistake, that mistake and this mistake; isn't that right? |
| 04:07:17 | 8 | A.  Individually, that's certainly true.  As an aggregate when |
| 04:07:20 | 9 | you look at dozens of cases or hundreds ever cases, that's a |
| 04:07:23 | 10 | different matter with different detectives. |
| 04:07:27 | 11 | MR. KULWIN:  If I may have a second. |
| 04:07:29 | 12 | (Brief pause.) |
| 04:07:34 | 13 | MR. KULWIN:  Nothing else, your Honor.  Thank you. |
| 04:07:36 | 14 | THE COURT:  Redirect. |
| 04:07:37 | 15 | MR. LOEVY:  Thank you, your Honor. |
| 04:07:37 | 16 | - - - |
| 04:07:37 | 17 | MICHAEL DAVID BRASFIELD, REDIRECT EXAMINATION |
| 04:07:37 | 18 | BY MR. LOEVY: |
| 04:07:38 | 19 | Q.  You were just asked if it's easy to look back and look at |
| 04:07:42 | 20 | a detective's work and say they should have done this, they |
| 04:07:45 | 21 | should have done that.  My question, sir, is are you able to |
| 04:07:48 | 22 | look a back at detectives and say they should have done this |
| 04:07:51 | 23 | and should have done that if they don't document and |
| 04:07:55 | 24 | memorialize things? |
| 04:07:56 | 25 | A.  No, it makes it extremely possible. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:07:58 | 1 | Q.  You were asked if having a high homicide load causes |
| 04:08:02 | 2 | problems, is that? |
| 04:08:03 | 3 | MR. KULWIN:  Objection, Judge, I didn't ask him that. |
| 04:08:07 | 4 | THE COURT:  Overruled. |
| 04:08:08 | 5 | BY MR. LOEVY: |
| 04:08:08 | 6 | Q.  Is it a valid excuse not to document things if you have a |
| 04:08:11 | 7 | caseload of homicides? |
| 04:08:12 | 8 | A.  No. |
| 04:08:13 | 9 | Q.  Is that too much to expect from a municipality with a high |
| 04:08:16 | 10 | level of homicides that they document things? |
| 04:08:18 | 11 | A.  I would -- as I have said before, it becomes even more |
| 04:08:23 | 12 | critically important that procedures and processes are in |
| 04:08:27 | 13 | place and centralized record keeping. |
| 04:08:29 | 14 | Q.  You were asked about your report being a living document. |
| 04:08:32 | 15 | Are police reports supposed to be living documents that can be |
| 04:08:35 | 16 | edited as the facts come in, or are they supposed to be set, |
| 04:08:40 | 17 | finalized and submitted? |
| 04:08:41 | 18 | A.  They are not supposed to be manipulated, if I understand |
| 04:08:47 | 19 | your question correctly. |
| 04:08:48 | 20 | Q.  In other words, let's say you have an event that happens |
| 04:08:50 | 21 | on Monday and you have another event that happens on Thursday |
| 04:08:52 | 22 | and another happens on next Tuesday, are you allowed to keep |
| 04:08:56 | 23 | your report unwritten as a living document until you see where |
| 04:08:59 | 24 | it's going or are you supposed to submit at each event? |
| 04:08:59 | 25 | MR. KULWIN:  Leading and argumentative. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:09:00 | 1 | THE COURT: Overruled. |
| 04:09:01 | 2 | THE WITNESS: You're supposed to put the information |
| 04:09:04 | 3 | as close to the time that you gathered it or learned of it and |
| 04:09:09 | 4 | then you put it in there. |
| 04:09:11 | 5 | BY MR. LOEVY: |
| 04:09:11 | 6 | Q. You were asked about some detectives might have super |
| 04:09:16 | 7 | memories. Is there an exemption to the need to document |
| 04:09:19 | 8 | things for detectives who believe that they themselves can |
| 04:09:22 | 9 | remember things? |
| 04:09:23 | 10 | A. Absolutely not. |
| 04:09:23 | 11 | Q. Can you explain? |
| 04:09:24 | 12 | A. You are not -- no one has an infallible memory and even if |
| 04:09:29 | 13 | one had Carnac the Magnificent and was able to absolutely |
| 04:09:33 | 14 | recall things, they have to document to put in the report so |
| 04:09:38 | 15 | that it's available for others to see it any time. I'm sorry |
| 04:09:44 | 16 | about the poor analogy. But the detective can get hit by a |
| 04:09:48 | 17 | bus and if he's got three weeks' worth of information in his |
| 04:09:53 | 18 | wonderful memory it does no one any good. |
| 04:09:56 | 19 | Q. And memories do fade? |
| 04:09:58 | 20 | MR. KULWIN: Objection, he is not an expert. |
| 04:10:01 | 21 | THE COURT: Overruled as to what he is talking about. |
| 04:10:03 | 22 | BY MR. LOEVY: |
| 04:10:03 | 23 | Q. If I can have the ELMO? |
| 04:10:05 | 24 | THE COURT: You've got it. |
| 04:10:06 | 25 | BY MR. LOEVY: |

04:10:06   1   Q.  8625.  This is a police report for Nathson Fields dated

04:10:11   2   June the 17th and then submitted July the 7?

04:10:14   3        MR. KULWIN:  Objection, Judge to the premise.  That's

04:10:18   4   inaccurate.  It's a misstatement of the evidence.

04:10:21   5        MR. LOEVY:  Just ask the question.

04:10:22   6   BY MR. LOEVY:

04:10:23   7   Q.  If a police officer does an interview on June 13th of an

04:10:26   8   important witness, a suspect in a homicide case, is it

04:10:29   9   consistent or inconsistent with police practices to rely on

04:10:33   10  your memory and not create the police report until four days

04:10:36   11  later with no notes?

04:10:37   12  A.  I would expect the report to be done the same day and even

04:10:40   13  if it entailed unpaid overtime that before they went home for

04:10:45   14  the night, that would be written up.

04:10:47   15  Q.  How universal is that expectation?

04:10:48   16  A.  That's an expectation on the front line supervisor,

04:10:53   17  sergeants, lieutenants, captains, commanders.

04:10:57   18  Q.  How universal in the country as a law enforcement expert

04:11:01   19  is that?

04:11:01   20  A.  That's common practice.  That's my experience.

04:11:03   21  Q.  All right.  You were asked about, you said you spent a

04:11:08   22  range of 100 to 150 hours on the case?

04:11:11   23  A.  Yes.

04:11:12   24  Q.  And how many of those 100 to 150 hours in the case, you

04:11:15   25  did other things than review the file?

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 250 of 303 PageID #:64413
11/29/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

110

| | | |
|---|---|---|
| 04:11:17 | 1 | A.  Yes. |
| 04:11:17 | 2 | Q.  Tell the jury what else you did besides review the file? |
| 04:11:22 | 3 | A.  I reviewed at least three or four portions because |
| 04:11:26 | 4 | sometimes the depositions, for instance, with Mr. Hickey, were |
| 04:11:31 | 5 | done over several days, and so there were hours and hours |
| 04:11:35 | 6 | worth of transcribed depositions that I reviewed.  The |
| 04:11:40 | 7 | policies and procedures that I have reviewed, case. |
| 04:11:44 | 8 | Q.  Drafting the report as well? |
| 04:11:45 | 9 | A.  Drafting the report, yes. |
| 04:11:47 | 10 | Q.  You estimated you spent about 60 hours on the files.  Was |
| 04:11:53 | 11 | that a sufficient amount of time to accomplish the project |
| 04:11:55 | 12 | that you accomplished? |
| 04:11:55 | 13 | A.  In the parameters that I had, yes. |
| 04:11:58 | 14 | Q.  All right.  Returning to Mr. Noland's questions, if there |
| 04:12:02 | 15 | were 57, 745 criminal defense file pages and 88,290 basement |
| 04:12:10 | 16 | file pages for a total of about 140,000, I'll ask you to |
| 04:12:14 | 17 | assume that, did you do a page by page audit of all 140,000 |
| 04:12:19 | 18 | pages? |
| 04:12:19 | 19 | A.  No. |
| 04:12:19 | 20 | Q.  How much would that have cost for you to look through |
| 04:12:22 | 21 | every page and see if it should be in or out and putting |
| 04:12:26 | 22 | thought into every page? |
| 04:12:27 | 23 | A.  I can't even begin to imagine how many weeks or months |
| 04:12:31 | 24 | that would have taken. |
| 04:12:32 | 25 | Q.  All right.  You have come to learn that the defendant |

04:12:34   1   spent quite a bit of time and money doing that audit, correct?

04:12:37   2   A.  Yes.

04:12:37   3   Q.  And they have confronted you with some of the mistakes you

04:12:40   4   made, correct?

04:12:42   5   A.  Yes.

04:12:42   6   Q.  All right.  After having been confronted with those pages

04:12:45   7   that should have been on one side of the line and you put them

04:12:48   8   on the other side of the line, does that change anything about

04:12:50   9   your opinions?

04:12:50   10  A.  No, it does not.

04:12:51   11  Q.  In fact, several hundred pages out of a sample size that

04:12:55   12  bad, is that a terrible rate of error?

04:12:58   13          MR. KULWIN:  Objection, leading.

04:12:59   14          THE COURT:  Overruled.

04:13:00   15          THE WITNESS:  Well, I would prefer to have no errors,

04:13:02   16  obviously, but it's not significant in the pattern that I was

04:13:07   17  observing.

04:13:07   18  BY MR. LOEVY:

04:13:08   19  Q.  Talk about that for a minute, if you would, sir.  They

04:13:11   20  showed you examples of specific pages that shouldn't have been

04:13:14   21  on.  Tell me about the broader patterns you saw.

04:13:18   22  A.  In the individual cases that I looked at, there were very

04:13:25   23  specific listing of individuals who were identified as

04:13:30   24  possible suspects or alternative suspects in the

04:13:36   25  investigation, that there were witnesses that had information

04:13:41  1    that was not followed up on, or that there was contradictory

04:13:48  2    information, for instance, a witness seeing someone but was

04:13:52  3    too far away to identify them or they were wearing masks.

04:13:55  4    Q.  All right.  That kind of pattern, was that evident

04:13:57  5    notwithstanding the fact that some of the court records should

04:14:01  6    have been listed as produced and not produced?

04:14:03  7         MR. NOLAND:  Objection, argumentative.

04:14:04  8         THE COURT:  Sustained.

04:14:06  9    BY MR. LOEVY:

04:14:06  10   Q.  All right.  Mr. Noland asked you if you were lying about

04:14:08  11   having performed the case by case analysis.  Do you remember

04:14:10  12   that question?

04:14:11  13   A.  Yes, I do.

04:14:12  14   Q.  Were you lying, sir?

04:14:13  15   A.  No.

04:14:13  16   Q.  Tell the jury what you did to do that review, sir, where

04:14:17  17   you were, provide some context.

04:14:18  18   A.  I have a home office set up with a couple of computers and

04:14:26  19   an iPad and as I have the material electronically, I open up

04:14:31  20   the files, I look at them, I as thoroughly as I try to be put

04:14:40  21   that material there, I'll start a spreadsheet, I'll start a

04:14:45  22   list of material reviewed, I'll start a list of bibliography

04:14:51  23   and as I am getting more information and it's kind of like a

04:14:55  24   homicide investigation, as you're getting more information,

04:14:58  25   you're adding to it, and you eventually finish and develop

| | | |
|---|---|---|
| 04:15:01 | 1 | your product.  That's the way I do it. |
| 04:15:04 | 2 | Q.  All right.  You said this morning that you started at 90 |
| 04:15:07 | 3 | percent of the investigative files were missing -- the |
| 04:15:11 | 4 | criminal defense files were missing investigative materials, |
| 04:15:14 | 5 | did I get that right? |
| 04:15:15 | 6 | A.  Yes. |
| 04:15:15 | 7 | Q.  Even after the examples that they pointed out at your |
| 04:15:18 | 8 | deposition, what is the number of criminal defense files that |
| 04:15:20 | 9 | were missing investigative material, what percentage? |
| 04:15:22 | 10 | A.  100 percent. |
| 04:15:23 | 11 | Q.  So the fact that they were able to provide you some |
| 04:15:28 | 12 | examples of files, of documents that you thought were missing |
| 04:15:31 | 13 | but weren't missing, did that change the overall number of |
| 04:15:35 | 14 | files that were missing documents? |
| 04:15:36 | 15 | A.  No, when you're looking at all of these files and you take |
| 04:15:41 | 16 | out either, you know, one and, for instance, in Anima, there |
| 04:15:49 | 17 | were still pages that were missing, but you can even say, |
| 04:15:55 | 18 | okay, I am going to give the city the absolute benefit of the |
| 04:16:04 | 19 | doubt and throw the case away, it doesn't change my opinion. |
| 04:16:06 | 20 | Q.  You did the 60-hour job which was obviously a rough way of |
| 04:16:10 | 21 | doing it? |
| 04:16:11 | 22 | A.  Yes. |
| 04:16:12 | 23 | MR. KULWIN:  Objection, objection, argumentative. |
| 04:16:14 | 24 | THE COURT:  Sustained. |
| 04:16:15 | 25 | BY MR. LOEVY: |

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:16:15   1   Q.  If I understood your answers to Mr. Kulwin and Mr. Noland,

04:16:19   2   you were saying you weren't actually considering each page and

04:16:21   3   say was -- you know, let me look at the context of a page.  It

04:16:25   4   was just yes or no, is it in one file, is it in the other

04:16:29   5   file, is that a fair summary?

04:16:31   6   A.  Yes.

04:16:31   7   Q.  Even though you did it in very rough page and didn't

04:16:35   8   analyze the page, was it still a useful exercise?

04:16:38   9   A.  Yes, it was.

04:16:38  10   Q.  You were asked about the 50 criminal defense attorneys

04:16:41  11   foils and those were the files that could be located, correct?

04:16:45  12   A.  Yes.

04:16:45  13   Q.  If more could have been located?

04:16:47  14        MR. NOLAND:  Objection, Judge, foundation as to that

04:16:49  15   last statement.

04:16:50  16        THE COURT:  Overruled.

04:16:51  17   BY MR. LOEVY:

04:16:51  18   Q.  Is your any understanding there was any cherry-picking at

04:16:54  19   all as far as criminal defense files weren't given to you?  If

04:16:56  20   they were located, you were supposed to get them?

04:16:58  21        MR. NOLAND:  Objection.

04:16:58  22        THE COURT:  Overruled.

04:16:59  23        THE WITNESS:  Yes.

04:17:00  24   BY MR. LOEVY:

04:17:00  25   Q.  All right.  You admitted you didn't interview defense


               ***REALTIME UNEDITED TRANSCRIPT ONLY***

04:17:04   1   attorneys.  You did not interview these 50 defense attorneys,

04:17:09   2   right?

04:17:09   3   A.  That's right.

04:17:10   4   Q.  All right.  You were asked if a document that was created

04:17:14   5   15 years later could have been withheld.  Do you remember that

04:17:17   6   question?

04:17:17   7   A.  I believe so.

04:17:18   8   Q.  All right.  Of course in Mr. Fields' case, if he was

04:17:20   9   convicted in '86 and he had a retrial in 2009, a document that

04:17:24   10  was created 15 years later very well could have been withheld

04:17:27   11  and been material, correct?

04:17:29   12  A.  Yes.

04:17:29   13  Q.  You don't know going into an investigation what's going to

04:17:31   14  be material and what's not, right?

04:17:32   15  A.  Correct.

04:17:33   16  Q.  That's why you need processes that work?

04:17:35   17  A.  Yes.

04:17:35   18  Q.  All right.  You were asked about Mr. Noland put on the

04:17:39   19  screen, there was a bunch of names and he asked you isn't it

04:17:41   20  true some of these names were in the police reports, do you

04:17:44   21  remember that question?

04:17:44   22  A.  Yes.

04:17:44   23  Q.  You did not analyze all the police reports and all the

04:17:47   24  names in these 140,000 files, correct?

04:17:49   25  A.  No, I did not.

| 04:17:50 | 1 | Q. And you never purported to, correct? |
| 04:17:52 | 2 | A. No. |
| 04:17:52 | 3 | Q. The fact that a name is in a police report, does that mean |
| 04:17:56 | 4 | that all the exculpatory information relating to the name |
| 04:17:59 | 5 | that's also in the investigative file has been given to the |
| 04:18:02 | 6 | criminal defendant? |
| 04:18:03 | 7 | A. No, absolutely not. |
| 04:18:04 | 8 | THE COURT: Hang on. |
| 04:18:05 | 9 | MR. NOLAND: Objection, argumentative. It misstates |
| 04:18:09 | 10 | -- |
| 04:18:09 | 11 | THE COURT: Everybody was talking at the same time. |
| 04:18:11 | 12 | I'll just look at what you said. Overruled. It wasn't |
| 04:18:19 | 13 | attempting to paraphrase a question. |
| 04:18:21 | 14 | BY MR. LOEVY: |
| 04:18:21 | 15 | Q. For example, document number 8609 has a reference to a |
| 04:18:26 | 16 | Delbert Edwards, correct? |
| 04:18:27 | 17 | A. Yes. |
| 04:18:27 | 18 | Q. And the jury has seen these do you mean. But just because |
| 04:18:30 | 19 | Delbert Edwards is in the official file does not mean that the |
| 04:18:34 | 20 | defense attorney is getting a copy of plaintiff's 1-69 from |
| 04:18:38 | 21 | the investigative file with additional information, correct? |
| 04:18:40 | 22 | A. That's absolutely correct. |
| 04:18:41 | 23 | Q. So is it sufficient just to put a name in a police report? |
| 04:18:44 | 24 | A. No. |
| 04:18:44 | 25 | Q. Now, you were asked about court attendance sheets. And |

| | | |
|---|---|---|
| 04:18:49 | 1 | you were asked isn't it true some of them might not be |
| 04:18:51 | 2 | helpful, right? |
| 04:18:52 | 3 | A.  Yes. |
| 04:18:52 | 4 | Q.  You were also asked isn't it true that if it happened in |
| 04:18:56 | 5 | court it couldn't possibly be exculpatory, do you remember |
| 04:18:57 | 6 | that? |
| 04:18:58 | 7 | A.  Yes. |
| 04:18:58 | 8 | Q.  Let me give you a hypothetical.  Let's say in Nate Fields |
| 04:19:01 | 9 | case in 1986, there was a court attendance sheet that showed |
| 04:19:04 | 10 | O'Callaghan was present in court on a day he wasn't scheduled |
| 04:19:07 | 11 | to be there but Randy Langston was there? |
| 04:19:10 | 12 | MR. KULWIN:  I'm going to object to the nature. |
| 04:19:12 | 13 | There is no basis for that question. |
| 04:19:14 | 14 | THE COURT:  I am going to say it's beyond the scope |
| 04:19:16 | 15 | of the report.  You'll argue it later. |
| 04:19:18 | 16 | BY MR. LOEVY: |
| 04:19:19 | 17 | Q.  May I ask then, there are ways in which even |
| 04:19:22 | 18 | administrative documents might turn out to be exculpatory, |
| 04:19:25 | 19 | right? |
| 04:19:25 | 20 | A.  Absolutely. |
| 04:19:25 | 21 | Q.  And that's why everything should be turned over? |
| 04:19:27 | 22 | A.  Yes. |
| 04:19:27 | 23 | Q.  All right.  You were asked about the Crockett file.  Do |
| 04:19:31 | 24 | you remember those questions? |
| 04:19:32 | 25 | A.  Yes. |

| 04:19:32 | 1 | Q. I am going to move to the end here. |

04:19:32  1  Q.  I am going to move to the end here.

04:19:37  2       You were asked about criminal defense attorney files

04:19:40  3  having subpoenas.  Do you remember those questions?

04:19:42  4  A.  Yes.

04:19:42  5  Q.  Does the fact that the Chicago Police Department has

04:19:46  6  documents that are in the state's attorney's file mean that

04:19:51  7  they are not withholding anything?

04:19:52  8  A.  Would you rephrase?  I'm sorry.  Say that again.

04:19:55  9  Q.  I'm going to show you Plaintiff's Exhibit 312105.  This is

04:20:00  10  from the sees he will Robinson file?

04:20:03  11  A.  Yes.

04:20:04  12  Q.  Do you remember examples where criminal defendants sent

04:20:09  13  subpoenas c-e-c-i-i-l, sent documents directly to the Chicago

04:20:13  14  Police Department?

04:20:13  15       MR. KULWIN:  Judge, I am going to object here for a

04:20:15  16  second on this particular document and ask to take it off the

04:20:20  17  ELMO and ask to be heard.

04:20:21  18       MR. LOEVY:  Your Honor, I will withdraw it.  I don't

04:20:23  19  want to waste any more time.

04:20:24  20       THE COURT:  Fine.

04:20:26  21  BY MR. LOEVY:

04:20:28  22  Q.  All right.  Now, you were asked a lot of questions of your

04:20:38  23  comparison between blue and green which is the investigative

04:20:42  24  files and the defense files?

04:20:42  25  A.  That is correct.

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 259 of 303 PageID #:64422

| | | |
|---|---|---|
| 04:20:43 | 1 | Q.  Let's say you got everything wrong on the comparison |
| 04:20:46 | 2 | between the criminal defense files and the investigative |
| 04:20:49 | 3 | files, do you understand my hypothetical? |
| 04:20:49 | 4 | A.  Yes, I do. |
| 04:20:50 | 5 | Q.  Does that have anything to do with the opinion you gave, |
| 04:20:53 | 6 | the blue problem, all the problems with the investigative |
| 04:20:55 | 7 | files as a stand alone problem, does that have any effect on |
| 04:20:58 | 8 | that at all? |
| 04:20:59 | 9 | A.  Absolutely none. |
| 04:21:00 | 10 | Q.  How about your analysis on the permanent retention files, |
| 04:21:03 | 11 | do any of the typos and missing documents have any effect on |
| 04:21:06 | 12 | any of the opinions you've given here in court about the |
| 04:21:08 | 13 | problems with the permanent retention files? |
| 04:21:12 | 14 | A.  No, they do not. |
| 04:21:13 | 15 | Q.  Does it have any problem that the stuff in the |
| 04:21:16 | 16 | investigative files wasn't getting into the permanent |
| 04:21:18 | 17 | retention files? |
| 04:21:18 | 18 | A.  It has absolutely no effect on it. |
| 04:21:20 | 19 | Q.  And as far as the problems they showed you that some. |
| 04:21:27 | 20 | Documents you thought had been withheld from the criminal |
| 04:21:29 | 21 | defense attorneys files weren't, you understand that the |
| 04:21:33 | 22 | state's attorney, they have done a similar review of the |
| 04:21:36 | 23 | state's attorney's documents, correct? |
| 04:21:38 | 24 | A.  I am aware of that. |
| 04:21:40 | 25 | Q.  If 60 percent of the files from the state's attorney's |

04:21:43   1   office did not have material from the basement files, is that

04:21:46   2   an acceptable percentage?

04:21:47   3   A.  No, it's not.

04:21:48   4   Q.  Okay.  Let me confer for a moment?

04:21:51   5      (Brief pause.)

04:21:57   6          MR. LOEVY:  Your Honor, we would want to admit 307,

04:22:01   7   if there's any additional information from the witness.

04:22:04   8          THE COURT:  No it's not a foundational.  Anything

04:22:10   9   else, Mr. Noland?

04:22:12   10          MR. NOLAND:  Just quickly, Judge.

04:22:12   11                              - - -

04:22:12   12          MICHAEL DAVID BRASFIELD, RECROSS-EXAMINATION

04:22:12   13   BY MR. NOLAND:

04:22:14   14   Q.  Mr. Loevy, was asking you about a color, the blue color

04:22:17   15   thing with the permanent retention files and your opinions?

04:22:21   16   A.  The blue was the investigative files.

04:22:23   17   Q.  Okay.  And the investigative files about whether or not

04:22:27   18   there are notes not on a GPR form in those types of files, is

04:22:31   19   that the blue section?

04:22:32   20   A.  I'm sorry.  Say that again.

04:22:35   21   Q.  What is the blue section?

04:22:36   22   A.  The blue section is the investigative files.

04:22:39   23   Q.  But you are not saying?

04:22:42   24   A.  The basement files, mischaracterized basement files.

04:22:47   25   Q.  That wasn't the section dealing with the comparison with


                       ***REALTIME UNEDITED TRANSCRIPT ONLY***

04:22:49   1   the criminal defense files, correct?

04:22:51   2   A. I'm sorry. Say that again.

04:22:55   3   Q. I'm sorry. I was confused with the question with

04:22:58   4   plaintiff's counsel and probably my fault.

04:23:00   5   What I'm asking you is that the comparison with the

04:23:05   6   -- the only comparison you made with respect to whether or not

04:23:08   7   documents were missing from criminal defense files were on

04:23:12   8   those 50 cases that you and I spent some time with, right?

04:23:15   9   A. Yes.

04:23:15   10   Q. So all the other opinions you've given with respect to

04:23:23   11   permanent retention files and anything else and investigative

04:23:25   12   files, you're not offering any opinion that anything from

04:23:28   13   those files were withheld in those criminal cases; am I

04:23:36   14   correct? You are just giving an opinion about the compliance

04:23:38   15   or non-compliance with the special order, right?

04:23:40   16   A. I've testified what I testified to. The material, when we

04:23:47   17   were looking at the criminal -- when I was looking at the

04:23:49   18   criminal defense files, whether they contained or did not

04:23:53   19   contain documents. I also testified that I looked at the

04:23:59   20   investigative files as a stand alone process, what was in it,

04:24:02   21   what wasn't in it, I looked at the permanent retention files,

04:24:06   22   what was in it, what weren't in it, and then a comparison

04:24:10   23   between the investigative file and the basement file so the

04:24:15   24   permanent retention file.

04:24:15   25   Q. And my question was that the only aspect of your review

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 262 of 303 PageID #:64425
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

122

| | | |
|---|---|---|
| 04:24:20 | 1 | related to what the CPD produced or didn't produce had to do |
| 04:24:24 | 2 | with the comparison with those 50 criminal defense files, |
| 04:24:27 | 3 | correct? |
| 04:24:27 | 4 | A.  Not entirely. |
| 04:24:29 | 5 | Q.  Isn't it true that you had no basis to say that in any of |
| 04:24:39 | 6 | those -- nothing to evaluate with with any of the files other |
| 04:24:43 | 7 | than those 50 files, you have the 400 or so? |
| 04:24:46 | 8 | MR. LOEVY:  Objection, scope, your Honor. |
| 04:24:48 | 9 | THE COURT:  Hang on a second.  Let me hear the whole |
| 04:24:50 | 10 | question. |
| 04:24:51 | 11 | BY MR. NOLAND: |
| 04:24:51 | 12 | Q.  That anything was withheld from criminal defense attorneys |
| 04:24:53 | 13 | in those cases? |
| 04:24:54 | 14 | THE COURT:  Hang on a second.  I am going to sustain |
| 04:25:00 | 15 | the objection under Rule 403. |
| 04:25:04 | 16 | MR. NOLAND:  Nothing else.  Thanks, Judge. |
| 04:25:07 | 17 | THE WITNESS:  Thank you. |
| 04:25:08 | 18 | MR. KULWIN:  Nothing else, Judge. |
| 04:25:09 | 19 | MR. LOEVY:  We could try to call the next witness, |
| 04:25:11 | 20 | your Honor. |
| 04:25:11 | 21 | THE COURT:  Well, do you have any more questions |
| 04:25:13 | 22 | based on the redirect? |
| 04:25:14 | 23 | MR. LOEVY:  No. |
| 04:25:15 | 24 | THE COURT:  Do any of the jurors have any questions? |
| 04:25:17 | 25 | We are definitely going to start with the next |

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 263 of 303 PageID #:64426
11/29/16 PM                     ***REALTIME UNEDITED TRANSCRIPT ONLY***

123

04:25:36   1   witness.

04:25:40   2          THE COURT:  Let me see the lawyers at sidebar.

04:25:42   3      (The following proceedings were had at sidebar outside the

04:25:48   4   hearing of the jury:)

04:25:48   5          THE COURT:  Okay.  I am going to read these.  What

04:25:55   6   did you mean by this -- the early part of miss testimony, what

04:25:58   7   did you mean by this case herewith Mr. Fields was the driving

04:26:02   8   file, the word is driving.  I honestly don't remember it.

04:26:05   9          MR. LOEVY:  I don't understand the question.

04:26:07  10          THE COURT:  You referred to the -- the juror thought

04:26:13  11   he said something along the lines the case herewith Mr. Fields

04:26:17  12   was the driving file.  I really don't --

04:26:20  13          MR. BURNS:  Early on when you were identifying files,

04:26:23  14   you identified Fields first.

04:26:24  15          MR. LOEVY:  I was trying to say was it typical of the

04:26:27  16   others or do they mean running file?

04:26:29  17          MR. KULWIN:  I think -- the way I take it, what I

04:26:32  18   heard was that it was like the driving thing that led to his

04:26:36  19   retention and why he was.

04:26:38  20          THE COURT:  Maybe I will just ask him a leading

04:26:40  21   question about that.

04:26:41  22          The second question, were the other files, the

04:26:44  23   basement files that he looked at, were they all homicide

04:26:48  24   files, anybody have a problem with that?

04:26:53  25          MR. NOLAND:  No.

11/29/16 PM

124

04:26:54    1      THE COURT:  You stated that there was not enough

04:26:56    2  police training for constitutional safeguards for individual,

04:26:58    3  will you elaborate on constitutional safeguards for

04:27:02    4  individuals, what individuals?

04:27:04    5      MR. KULWIN:  Can I have that one again?

04:27:06    6      THE COURT:  Just look at it.

04:27:10    7      MR. KULWIN:  There was not enough police training for

04:27:13    8  constitutional safeguards, what individuals?  You can ask

04:27:17    9  that, Judge.

04:27:19   10      THE COURT:  Okay.  Fine.

04:27:22   11      Who is the next witness?

04:27:24   12      MR. LOEVY:  Andrea Lyon.

04:27:26   13      MR. NOLAND:  The only point I was trying to make at

04:27:29   14  the end, the last objection you sustained, what I was trying

04:27:34   15  to get at was a motion in limine, he couldn't say anything

04:27:37   16  other than the criminal defense files and those other 400 or

04:27:40   17  so he looked at that anything was withheld.  We had a motion

04:27:45   18  in limine on that.

04:27:45   19      THE COURT:  It wasn't what it sounded like to me, so

04:27:49   20  I overruled it.

04:27:53   21  (The following proceedings were had in open court in the

04:27:54   22  presence and hearing of the jury:)

04:27:54   23      THE COURT:  I think it was somewhere early in your

04:27:57   24  direct examination, I think a question may have been asked

04:28:00   25  that referred to Mr. Fields' case as kind of the driving file.

04:28:06   1    Is it fair to say that what prompted you to be retained in

04:28:10   2    this case was the Fields matter?

04:28:11   3             THE WITNESS:  Yes.

04:28:12   4             THE COURT:  Okay.  The other basement files that you

04:28:15   5    looked at, were they all homicide cases?

04:28:18   6             THE WITNESS:  Yes.

04:28:18   7             THE COURT:  Okay.  And then the last question is you

04:28:20   8    made, you gave some testimony along the lines of there wasn't

04:28:23   9    enough training involving constitutional safeguards for

04:28:27   10   individuals.  And the question is who are the individuals you

04:28:30   11   are talking about?  Are you talking about defendants in

04:28:32   12   criminal cases?

04:28:32   13            THE WITNESS:  That would be part of the group, yes.

04:28:35   14            THE COURT:  Okay.  Follow-up based on that,

04:28:38   15   Mr. Loevy?

04:28:38   16            MR. LOEVY:  No, your Honor.

04:28:40   17            THE COURT:  Anybody else?

04:28:40   18            MR. NOLAND:  No, your Honor.

04:28:41   19            THE COURT:  You are excused.

04:28:42   20            THE WITNESS:  Thank you, your Honor.

04:28:44   21            THE COURT:  Please call the next witness.

04:28:47   22            MR. SWAMINATHAN:  Plaintiff calls Andrea line.

04:29:53   23            THE COURT:  Come on up.

04:29:56   24       (Witness sworn.)

04:29:56   25                               - - -

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:29:56 | 1 | ANDREA LYON, DIRECT EXAMINATION |
| 04:30:10 | 2 | BY MR. SWAMINATHAN: |
| 04:30:10 | 3 | Q.  Good afternoon, could you please state your name. |
| 04:30:13 | 4 | A.  Andrea Lyon, L-y-o-n. |
| 04:30:16 | 5 | Q.  Please tell the jury what you do? |
| 04:30:18 | 6 | A.  I am the dean of the Valparaiso university law school. |
| 04:30:21 | 7 | Q.  What does that position entail? |
| 04:30:23 | 8 | A.  A lot of things.  I run the law school, I teach, set |
| 04:30:26 | 9 | policy, fund raise, deal with personnel issues, there is seems |
| 04:30:32 | 10 | to be at least one crises a day seems to be part of it. |
| 04:30:35 | 11 | Q.  Do you loss have a private practice? |
| 04:30:38 | 12 | A.  I have some cases that I work on.  I wouldn't call it a |
| 04:30:42 | 13 | business.  My students work with me. |
| 04:30:45 | 14 | Q.  What kind of cases do you work on? |
| 04:30:47 | 15 | A.  Right now I have one that is in state post conviction and |
| 04:30:51 | 16 | one that is in state appeals court. |
| 04:30:52 | 17 | Q.  When you say state post conviction, are these criminal |
| 04:30:56 | 18 | cases? |
| 04:30:56 | 19 | A.  Yes, they are both criminal cases. |
| 04:30:58 | 20 | Q.  Criminal cases in an appeals phase? |
| 04:31:00 | 21 | A.  Correct. |
| 04:31:01 | 22 | Q.  Do you have experience doing criminal trials? |
| 04:31:03 | 23 | A.  I do. |
| 04:31:04 | 24 | Q.  How many -- let me ask you, do you have experience doing |
| 04:31:08 | 25 | homicide trials? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:31:09  1  A.  I do.

04:31:09  2  Q.  Approximately how many homicide trials do you think you've

04:31:12  3  done?

04:31:12  4  A.  It's actually I know the number, it's 138 murder trials

04:31:16  5  that I have defended.

04:31:16  6  Q.  And when did you first begin doing homicide trials?

04:31:20  7  A.  Now I have to tell my age.  1979.

04:31:24  8       MR. KULWIN:  Judge, I am going to object to all of

04:31:26  9  this on relevancy grounds based on what we were surprised for

04:31:29 10  the purpose of this witness.

04:31:30 11       THE COURT:  I think you're pretty close to getting to

04:31:32 12  the point tip point, Mr. Swaminathan.

04:31:35 13       MR. SWAMINATHAN:  All right.

04:31:36 14  BY MR. SWAMINATHAN:

04:31:37 15  Q.  When you started doing outside cases were you working at

04:31:40 16  the Cook County public defender's office?

04:31:41 17  A.  I was.

04:31:43 18  Q.  When you worked there, did you work in the homicide

04:31:46 19  division?

04:31:46 20  A.  I did.

04:31:47 21  Q.  What position did you hold there?

04:31:48 22  A.  I was one of the members of the task force and then I was

04:31:51 23  a supervisor and then I was the chief.

04:31:52 24  Q.  When you worked there, did you become familiar with the

04:31:55 25  file keeping practices?

04:31:57  1    A.  Yes.

04:31:57  2    Q.  And what was the practice?

04:31:58  3    A.  The practice was you kept absolutely every piece of paper.

04:32:01  4          MR. KULWIN:  Judge, I am going to object on this and

04:32:03  5    ask to be heard.

04:32:05  6          THE COURT:  Okay.

04:32:15  7      (The following proceedings were had at sidebar outside the

04:32:22  8    hearing of the jury:)

04:32:22  9          MR. KULWIN:  We were told, we were told -- we were

04:32:25  10   told that the only purpose for this witness was to come in and

04:32:28  11   say I worked on this specific file that I remember I got this

04:32:32  12   stuff or didn't get this stuff.  They have now tried to shoe

04:32:36  13   horn her as an expert in criminal defense and now they are

04:32:40  14   trying to get her to give an expert opinion on the practices

04:32:43  15   of the public defender's office and what their retention

04:32:46  16   policies is, it wasn't disclosed, it has never been disclosed

04:32:49  17   and my view of it is they are it's highly prejudicial,

04:32:55  18   undisclosed.

04:32:55  19         MR. LOEVY:  Both side disclosed a number of Monell

04:32:58  20   witnesses.  We deposed just about every state's attorney they

04:33:01  21   disclosed.  They didn't disclose Ms. Lyon.  She is barely

04:33:04  22   listed on the pretrial order.  She is a witness in the case.

04:33:12  23         MR. BURNS:  She is disclosed.

04:33:13  24         THE COURT:  Let me look at it.

04:33:18  25         MR. MICHALIK:  Page 7, Judge.


                     ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 269 of 303 PageID #:64432
11/29/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

129

| 04:33:28 | 1 | MR. BURNS: She was disclosed here. |

04:33:28　1　　　　　MR. BURNS:  She was disclosed here.

04:33:31　2　　　　　THE COURT:  What were you going to show me,

04:33:33　3　Mr. Michalik?

04:33:34　4　　　　　MR. MICHALIK:  It was that page and I'll also

04:33:36　5　represent the only document that was produced, there was no

04:33:38　6　criminal defense file produced in the Fulton case for which

04:33:41　7　she has been disclosed.  The only document was an unsigned

04:33:44　8　undated petition of the post conviction.  So any testimony as

04:33:50　9　to policies, practices, of the public defender goes far beyond

04:33:54　10　the scope of anything that was disclosed here.

04:33:56　11　　　　　MR. LOEVY:  The only thing I would add is they

04:33:58　12　disclosed, how many states attorneys have they disclosed?

04:34:02　13　　　　　MR. SWAMINATHAN:  20 to 25.

04:34:05　14　　　　　MR. LOEVY:  We deposed a lot of them.  They disclosed

04:34:09　15　25 Monell witnesses, we disclosed roughly the same number B

04:34:13　16　yeah, but I mean people make judgments about who to depose

04:34:16　17　based on what the disclosure is and the way I'm reading that

04:34:19　18　disclosure was that she was disclosed as somebody who was

04:34:22　19　going to testify about a particular case and now she's been

04:34:25　20　asked a question about policies and practices.  My view of

04:34:28　21　this is it's not admissible on direct.  It may be admissible

04:34:32　22　on redirect depending on what the cross is about whatever.

04:34:35　23　But you can't do it on direct.

04:34:37　24　　　　　MR. LOEVY:  All right.

04:34:38　25　　　　　MR. SWAMINATHAN:  The state's attorneys, they have

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 270 of 303 PageID #:64435
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

130

04:34:42   1   disclosed for specific cases that they have said in their

04:34:44   2   depositions and we expect them to say they are not going to

04:34:47   3   have they have any knowledge about the specific cases.

04:34:50   4   Instead, they are going to testify about the practices in the

04:34:52   5   department because they don't have any memory of the specific

04:34:54   6   files they have been disclosed for so really each of the

04:34:58   7   people they have identified.

04:34:59   8              THE COURT:  You don't -- starting to walk away --

04:35:04   9              MR. SWAMINATHAN:  Given that context, she is

04:35:06  10   essentially doing the same thing, the only difference being

04:35:08  11   they don't know exactly what she is going to be saying because

04:35:11  12   they chose not to depose her.

04:35:13  13              THE COURT:  Look, what I'm saying is that you cannot

04:35:19  14   ask this question in this way.  I don't know exactly what

04:35:22  15   she's going to testify to.  My understanding is she is going

04:35:25  16   to say that certain documents weren't in the file that she

04:35:28  17   reviewed as post conviction attorney.  Right?  Did I basically

04:35:32  18   the primary thrust of her testimony?  Whether you can get this

04:35:36  19   in in some other way in the context of, you know, what is it

04:35:39  20   that make her think that the file is complete, I don't know, I

04:35:42  21   am going to have to wait until I see it.  But there you go.

04:35:47  22              MR. KULWIN:  I want to be heard on that point.  I'm

04:35:49  23   very sorry.

04:35:50  24              THE COURT:  Is there going to be a question on cross,

04:35:52  25   do you have any idea if the file is complete.

                     ***REALTIME UNEDITED TRANSCRIPT ONLY***

04:35:55    1          MR. KULWIN:  No, I am not going to ask her that.  I
04:35:57    2   don't think that they can now set her up with the answer was
04:36:03    3   stricken and them announcing do you know whether in this file
04:36:06    4   this stuff was in there, they can ask that, but they can't say
04:36:11    5   how down and then she is going to know that the policy of the
04:36:14    6   public defender's office.
04:36:16    7          THE COURT:  It's going to be what happened.
04:36:17    8          MR. SWAMINATHAN:  She is going to explain for this
04:36:19    9   file why she has a complete file, she wept and got the file,
04:36:24   10   she went to the police department, and now with regard to this
04:36:29   11   file, the basement file.
04:36:33   12          MR. MICHALIK:  What I am hearing.
04:36:35   13          THE COURT:  What time is it right now?
04:36:40   14          MR. KULWIN:  4:40.
04:36:42   15          THE COURT:  We are going to stop here.  We are not
04:36:45   16   even close to finishing her direct.
04:36:47   17          MR. SWAMINATHAN:  Five to seven minutes.
04:36:51   18          THE COURT:  Let's see where we get.
04:36:59   19     (The following proceedings were had in open court in the
04:36:59   20   presence and hearing of the jury:)
04:36:59   21          THE COURT:  All right.  The objection is sustained.
04:37:01   22   The last question and answer are stricken.  The jury is
04:37:03   23   directed to disregard it.  Mr. Swaminathan, you can go ahead.
04:37:05   24   BY MR. SWAMINATHAN:
04:37:08   25   Q.

                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:37:08   1         MR. KULWIN: We have a question in the back from a

04:37:10   2   juror.

04:37:10   3         THE JURY:    I got up to 1979 with some.   I couldn't

04:37:15   4   hear.

04:37:15   5         THE COURT: Okay. You can't do that. If you have --

04:37:18   6   I am going to say it again. I said at the beginning of the

04:37:21   7   trial. If you have a question, ask it then. And it's

04:37:26   8   completely appropriate, it's completely appropriate for a

04:37:29   9   juror to ask I missed something, can you please repeat this.

04:37:32   10   That's completely appropriate because sometimes miss things.

04:37:36   11   The lawyers have been working with these for a long time. You

04:37:38   12   guys are getting it all cold, that's just fine. I need you to

04:37:41   13   do it in the way I described is you can write it out.   Go

04:37:45   14   ahead.

04:37:46   15   BY MR. SWAMINATHAN:

04:37:47   16   Q. I want to turn to the present day.

04:37:48   17   A. Sure.

04:37:49   18   Q. At some point did you become aware that there was a file,

04:37:51   19   a street file that was not disclosed to Mr. Fields long after

04:37:54   20   his criminal trial?

04:37:55   21   A. I did.

04:37:56   22   Q. Okay. And did you become aware that there were other

04:37:58   23   homicide files that were possibly in the same location as

04:38:01   24   where Mr. Fields' street file was located?

04:38:04   25   A. Yes.

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:38:05 | 1 | Q. Okay. And did you learn that one of those files related |
| 04:38:07 | 2 | to a case of yours? |
| 04:38:08 | 3 | A. I did. |
| 04:38:09 | 4 | Q. What was that case? |
| 04:38:10 | 5 | A. I represent Jon Fulton in the post conviction criminal |
| 04:38:15 | 6 | case that I referred to earlier. |
| 04:38:16 | 7 | Q. And what is he charged with? |
| 04:38:18 | 8 | A. He's actually been convicted of murder. That's the -- |
| 04:38:23 | 9 | Q. Approximately when was the crime for which he's been |
| 04:38:26 | 10 | charged? |
| 04:38:26 | 11 | A. 2003. |
| 04:38:26 | 12 | Q. Okay. And do you have a file, a file that you keep |
| 04:38:30 | 13 | related to Mr. Fulton's case? |
| 04:38:32 | 14 | A. I do. |
| 04:38:32 | 15 | Q. Now, you said that you're his post conviction lawyer which |
| 04:38:35 | 16 | means you did not represent him at the original criminal |
| 04:38:37 | 17 | trial, correct? |
| 04:38:38 | 18 | A. That's right. |
| 04:38:38 | 19 | Q. Approximately when was that trial? |
| 04:38:40 | 20 | A. That was in 2003. I started representing him, I believe |
| 04:38:44 | 21 | it was 2011. |
| 04:38:45 | 22 | Q. Okay. And how do you end up with the file for Mr. Fulton? |
| 04:38:51 | 23 | A. Once I started representing him and I got a release from |
| 04:38:54 | 24 | him and then I went to all the lawyers that had represented |
| 04:38:57 | 25 | him previously, trial lawyers, appellate lawyers, and got the |

04:39:00  1   files from them to begin working on the post conviction

04:39:04  2   petition.

04:39:04  3   Q.  Okay.  And did those attorneys then give you their files?

04:39:07  4   A.  They did.

04:39:08  5   Q.  Did any of them withhold their files?

04:39:10  6   A.  No.

04:39:10  7   Q.  Did any of them tell you they're not giving you the

04:39:13  8   complete files?

04:39:13  9   A.  No, they wouldn't.

04:39:15  10  Q.  What is your understanding of the completeness of the file

04:39:17  11  you have?

04:39:17  12  A.  I believe I have --

04:39:20  13       THE COURT:  As compared to what is the request yes.

04:39:23  14  BY MR. SWAMINATHAN:

04:39:24  15  Q.  In other words, do you have you have a complete set of all

04:39:26  16  the material from the prior attorneys that were representing

04:39:29  17  Mr. Fulton?

04:39:29  18  A.  I do.

04:39:30  19  Q.  And did you take any other steps to ensure that you had a

04:39:32  20  complete file other than speaking to criminal defense

04:39:34  21  attorneys?

04:39:35  22  A.  I did.  After I filed the post conviction petition and

04:39:39  23  therefore was in court and could issue a subpoena, we issued a

04:39:44  24  subpoena, well a number of subpoenas, one of them was to the

04:39:46  25  Chicago Police Department for a full set of the police reports

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:39:49    1   just to double-check.

04:39:50    2   Q.  And what was in that set of police reports?

04:39:52    3   A.  The same police reports I received previously.  There was

04:39:56    4   no difference.

04:39:56    5   Q.  Okay.  Now, later on you obtained a file that was found in

04:40:01    6   the same basement or the same area where Mr. Fields' street

04:40:04    7   file was found, correct?

04:40:05    8   A.  That's correct.

04:40:06    9   Q.  So that was not in response -- the subpoena that you

04:40:09   10   September to the Chicago Police Department?

04:40:10   11   A.  That's correct.  It was quite a few months after that.

04:40:13   12   Q.  Were any of the materials in that new file in the file,

04:40:16   13   materials you got from the Chicago Police Department when you

04:40:18   14   issued your earlier subpoena?

04:40:19   15   A.  You mean the basement file?

04:40:22   16   Q.  That's correct.

04:40:23   17   A.  There were about 12 pages or so that I had never seen.

04:40:28   18   Q.  Okay.  Now, let me take a step back.  At some point you

04:40:32   19   basically had a file that consisted of all the materials from

04:40:35   20   the criminal defense attorneys previously plus the material

04:40:38   21   you got from the police department?

04:40:39   22   A.  Correct.

04:40:39   23   Q.  In response to your subpoena, correct?

04:40:41   24   A.  Yes.

04:40:41   25   Q.  And then subsequently you got a copy of the basement file,

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:40:44 | 1 | correct? |
| 04:40:44 | 2 | A. Right. |
| 04:40:44 | 3 | Q. Okay. Now, that basement file, what did you do with that |
| 04:40:47 | 4 | file? |
| 04:40:47 | 5 | A. I sat down and compared it page by page to see if there |
| 04:40:52 | 6 | was anything new in there that I hadn't seen before and as I |
| 04:40:55 | 7 | said, there were about a dozen pages that were totally new. |
| 04:40:58 | 8 | Q. Okay. Those pages that were totally new, did they contain |
| 04:41:02 | 9 | information that was also new to you? |
| 04:41:04 | 10 | A. Some of them did, yes. |
| 04:41:06 | 11 | Q. Okay. Up say it was approximately 12 pages? |
| 04:41:18 | 12 | A. That's my memory, correct. |
| 04:41:19 | 13 | Q. If I may hand you a document. This is Plaintiff's Exhibit |
| 04:41:22 | 14 | 638-145. Can you tell the jury what this document is? Can |
| 04:41:36 | 15 | you tell me what this is? |
| 04:41:36 | 16 | A. This is part of the file that I received once the basement |
| 04:41:39 | 17 | file was produced to me and this is a page that was brand new |
| 04:41:42 | 18 | to me. |
| 04:41:42 | 19 | Q. Okay. And is this one of the pages that you then |
| 04:41:45 | 20 | identified as being a page you did not receive previously? |
| 04:41:48 | 21 | A. That's correct. |
| 04:41:48 | 22 | Q. Okay. I'd like to show it to the jury. |
| 04:41:52 | 23 | MR. NOLAND: Let me see it. |
| 04:41:53 | 24 | THE COURT: From the ELMO? It's on. |
| 04:41:56 | 25 | MR. SWAMINATHAN: From the ELMO. |

11/29/16 PM
Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 277 of 303 PageID #:64440
***REALTIME UNEDITED TRANSCRIPT ONLY***

137

| 04:41:57 | 1 | BY MR. SWAMINATHAN: |
| 04:42:13 | 2 | Q. Plaintiff's Exhibit 638-145, this is what's on the |
| 04:42:16 | 3 | document.  So this is the document you're referring to? |
| 04:42:19 | 4 | A. It is. |
| 04:42:20 | 5 | Q. Can you tell me if -- what is new about this document? |
| 04:42:23 | 6 | A. Well, everything.  There's a different RD number which is |
| 04:42:28 | 7 | the number by which the Chicago Police Department keeps track |
| 04:42:31 | 8 | of cases, there was a plate number of a car, there was a date, |
| 04:42:37 | 9 | there was a name I hadn't heard of before, there were two |
| 04:42:41 | 10 | phone numbers I hadn't heard of before, reference to a car, |
| 04:42:44 | 11 | nobody knew anything about. |
| 04:42:46 | 12 | Q. Is this information that was -- that you ended up putting |
| 04:42:49 | 13 | to use in some way? |
| 04:42:51 | 14 | A. We have been investigating it, yes. |
| 04:42:52 | 15 | Q. Tell us about what you did or what was actionable about |
| 04:42:55 | 16 | this? |
| 04:42:55 | 17 | A. After we received this, we issued a subpoena based on the |
| 04:43:00 | 18 | new RD number and received some police reports in response to |
| 04:43:04 | 19 | that regarding the incident with this car.  Would you like me |
| 04:43:09 | 20 | to describe that? |
| 04:43:10 | 21 | Q. Please. |
| 04:43:12 | 22 | A. So what had happened was there was some kind of a car |
| 04:43:16 | 23 | accident involving the car with these plates and then |
| 04:43:23 | 24 | apparently, according to the police report, the man was |
| 04:43:28 | 25 | driving the car was disrespectful or otherwise unkind to the |

| | | |
|---|---|---|
| 04:43:31 | 1 | woman whose car he hit whereupon her son, it was a Hispanic |
| 04:43:37 | 2 | name, I am not remembering the name, I'm sorry, got out of the |
| 04:43:40 | 3 | car and hit the person who was driving the car, like |
| 04:43:43 | 4 | physically hit him, and ended up charged with a battery and I |
| 04:43:48 | 5 | think some other car related charges, but I am not certain. |
| 04:43:50 | 6 | Q.  Why is that important to you in the context of your |
| 04:43:52 | 7 | defense of Mr. Fulton? |
| 04:43:53 | 8 | A.  Well, it's very interesting to me that this occurred on |
| 04:43:57 | 9 | the right date in a similar neighborhood close by to where the |
| 04:44:02 | 10 | homicide had occurred that these were witnesses that I knew |
| 04:44:06 | 11 | nothing about and it appeared that it was a lead possibly to |
| 04:44:13 | 12 | some other evidence and definitely needed to be followed up |
| 04:44:16 | 13 | on. |
| 04:44:16 | 14 | Q.  Do you think that this is a potentiality alternate suspect |
| 04:44:23 | 15 | or did you consider this a potentiality gnat suspect? |
| 04:44:25 | 16 | A.  I did and I still do. |
| 04:44:27 | 17 | Q.  I am going to show her Plaintiff's Exhibit 638-86 can you |
| 04:44:38 | 18 | tell me what that document is? |
| 04:44:39 | 19 | A.  That's also a document that I had not seen in the police |
| 04:44:41 | 20 | reports before. |
| 04:44:41 | 21 | Q.  It is one.   Documents you identified -- strike that. |
| 04:44:44 | 22 | Is this information that you believe was important to |
| 04:44:59 | 23 | your defense of Mr. Fulton? |
| 04:45:01 | 24 | A.  Yes. |
| 04:45:01 | 25 | Q.  And did you put it to some use?  Strike that.  Let me ask |

| | | |
|---|---|---|
| 04:45:05 | 1 | you a different question.  In what way is this important |
| 04:45:08 | 2 | information to you? |
| 04:45:09 | 3 | A.  This, Mr. Fulton's case is, our position was wrongly |
| 04:45:15 | 4 | convicted as a result of a false confession obtained from him |
| 04:45:18 | 5 | when he was 18 years old and a senior in high school after |
| 04:45:22 | 6 | four entire days of interrogation. |
| 04:45:25 | 7 | MR. KULWIN:  Objection to four -- |
| 04:45:27 | 8 | THE WITNESS:  And this photograph shows. |
| 04:45:28 | 9 | THE COURT:  Hang on.  When you hear an objection, as |
| 04:45:30 | 10 | you know, as you know, you stop talking. |
| 04:45:32 | 11 | THE WITNESS:  Sorry, Judge. |
| 04:45:35 | 12 | THE COURT:  Overruled.  It's the only way that |
| 04:45:37 | 13 | relevance can be explained.  Let's get to the point.  Go ahead |
| 04:45:40 | 14 | and continue your answer. |
| 04:45:41 | 15 | THE WITNESS:  And so the photograph of my client |
| 04:45:49 | 16 | looking like he was in distress or disarray or under dressed |
| 04:45:53 | 17 | in the area or et cetera would have been relevant or helpful |
| 04:45:56 | 18 | in the defense of the trial itself. |
| 04:45:59 | 19 | BY MR. SWAMINATHAN: |
| 04:45:59 | 20 | Q.  Okay.  I am not going to show you additional documents. |
| 04:46:03 | 21 | Were there other documents as well that you put to use that |
| 04:46:05 | 22 | you found in the basement file that you didn't previously |
| 04:46:08 | 23 | have? |
| 04:46:08 | 24 | A.  Yes. |
| 04:46:09 | 25 | Q.  Okay.  And you say you put them to use .  What -- strike |

| 04:46:14 | 1 | that. |
| 04:46:14 | 2 | What is the type of material that was in those other |
| 04:46:17 | 3 | documents that was important to you that you put to use? |
| 04:46:20 | 4 | A.  Some of it was not particularly important.  Some of it |
| 04:46:26 | 5 | was, there was a report regarding an interview with one. |
| 04:46:31 | 6 | Eyewitnesses that had some details in it that were not in |
| 04:46:34 | 7 | another report.  The fact that this eyewitness existed was |
| 04:46:38 | 8 | known, but that these other statements had been made was not |
| 04:46:40 | 9 | known, and this is something that could have been followed up |
| 04:46:43 | 10 | on and used in the original trial as well. |
| 04:46:46 | 11 | There were many items of this nature. |
| 04:46:48 | 12 | Q.  Was the basement file material that you expected to have |
| 04:46:52 | 13 | been available to your client available at his original trial? |
| 04:46:57 | 14 | MR. MICHALIK:  Objection. |
| 04:46:58 | 15 | THE COURT:  I need a basis. |
| 04:47:00 | 16 | MR. MICHALIK:  Foundation.  And improper opinions. |
| 04:47:05 | 17 | THE COURT:  I didn't hear the second part. |
| 04:47:07 | 18 | MR. MICHALIK:  It's an opinion.  It's a legal |
| 04:47:09 | 19 | opinion. |
| 04:47:11 | 20 | THE COURT:  Overruled.  I don't agree. |
| 04:47:19 | 21 | BY MR. SWAMINATHAN: |
| 04:47:20 | 22 | Q.  You can answer. |
| 04:47:20 | 23 | A.  Yes it's what I expected to receive. |
| 04:47:26 | 24 | MR. SWAMINATHAN:  Nothing further. |
| 04:47:27 | 25 | THE COURT:  We are going to stop here.  Tomorrow same |

***REALTIME UNEDITED TRANSCRIPT ONLY***

\*\*\*REALTIME UNEDITED TRANSCRIPT ONLY\*\*\*

| 04:47:29 | 1 | as today.  Be ready at 9:30.  We will probably start a few |

04:47:29  1  as today.  Be ready at 9:30.  We will probably start a few

04:47:33  2  minutes after that.  Don't discuss the case with each other or

04:47:36  3  anyone else.  I will take the jury out and be right back.

04:47:39  4    (The jury leaves the courtroom.)

04:48:40  5        THE WITNESS:  Judge, would it be at all possible to

04:48:42  6  take my cross at nor time?  I'm very booked tomorrow.  I can

04:48:47  7  cancel the counsel of deans meeting if I need to.

04:48:51  8        THE COURT:  You're the boss, right?

04:48:54  9        THE WITNESS:  Actually not there, the president of

04:48:56  10  the university is there.  I am the boss otherwise.

04:48:58  11        MR. LOEVY:  Your Honor, we have asked the defendants

04:49:00  12  if there is a possibility they might not cross her, they are

04:49:03  13  going to think about that, so that's also in the mix.

04:49:05  14        THE COURT:  That's what any lawyer would say in this

04:49:08  15  situation is that I would think about it.  I think I have to

04:49:10  16  assume there's going to be some cross.

04:49:12  17        THE WITNESS:  Judge, I will be back here at 9:30

04:49:15  18  unless I hear differently from counsel.  Have a good evening,

04:49:18  19  sir.

04:49:18  20        THE COURT:  The jurors reminded me on the way out

04:49:20  21  that I forgot to give them the whole thing about scheduling.

04:49:23  22  I'll remember to do that in the morning.

04:49:26  23        MR. KULWIN:  Which one, Judge?

04:49:27  24        THE COURT:  The question that they had asked about

04:49:29  25  scheduling and how long the trial is going to go.  I will deal

\*\*\*REALTIME UNEDITED TRANSCRIPT ONLY\*\*\*

04:49:31   1   with that in the morning.

04:49:33   2          The things that I have on my list that I need to deal

04:49:37   3   with would be number one -- hang on a second.  The emails

04:49:47   4   regarding Kees, number two, the intimidation issue, No. 3, if

04:49:52   5   I have to deal with it, stipulations about non-present reports

04:49:58   6   in certain files.

04:49:59   7          On the Kees thing, so what's the issue?  You think

04:50:05   8   you haven't gotten something that should be turned over?

04:50:11   9          MR. SWAMINATHAN:  The issue with Kees the government

04:50:14  10   and Mr. Kees, we got a response back.  The response with

04:50:17  11   regard to counsel's answers were we think fine.  We don't have

04:50:21  12   any quibble with that.  In terms of the responses of

04:50:24  13   Mr. Murphy and Mr. O'Callaghan themselves, we have some

04:50:27  14   concerns.  The answers are very sparse.

04:50:30  15          THE COURT:  Can I see them?

04:50:31  16          MR. SWAMINATHAN:

04:50:33  17          MR. SWAMINATHAN:  Yes.

04:50:36  18          THE COURT:  Just pop it on the ELMO.  This one is

04:50:50  19   Mr. Murphy's response.

04:50:52  20          THE COURT:  At no time did defendant Murphy or

04:50:54  21   defendants' attorneys ask Mr. Hogan or anybody at the U.S.

04:50:58  22   Attorney's Office to offer any benefit to Kees.  I assume what

04:51:00  23   you're telling me is that's not comprehensive enough.  What do

04:51:03  24   you think it should include?

04:51:04  25          MR. SWAMINATHAN:  The issue is that you had said,

11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | |
|---|---|
| 04:51:06 | 1 | report anything regarding Kees. This is a narrow version of |
| 04:51:09 | 2 | that, which may be totally innocuous. Our question to them |
| 04:51:13 | 3 | was could you just confirm that this is actually a complete |
| 04:51:16 | 4 | response to what Kennelly ordered you to do, the judge ordered |
| 04:51:21 | 5 | you to do, everything regarding Kees, can you make that |
| 04:51:23 | 6 | representation. |
| 04:51:23 | 7 | THE COURT: I am trying to remember. Was there a |
| 04:51:25 | 8 | written order on this or was it verbal? |
| 04:51:27 | 9 | MR. KULWIN: Oral. |
| 04:51:28 | 10 | THE COURT: So I can go back and look at what I said. |
| 04:51:31 | 11 | MR. SWAMINATHAN: You did issue an order. |
| 04:51:33 | 12 | THE COURT: There is an order. I thought there was. |
| 04:51:36 | 13 | MR. NOLAND: The court -- judge, you identified four |
| 04:51:38 | 14 | questions. |
| 04:51:38 | 15 | THE COURT: Here it is. I think this is it. Any |
| 04:51:48 | 16 | communications by defendants or their counsel regarding Kees |
| 04:51:51 | 17 | with any agency of the government, any attorney for the |
| 04:51:53 | 18 | government, Kees or his attorney from the date of the 2014 |
| 04:51:56 | 19 | trial and this case to the present. That's what I directed. |
| 04:52:03 | 20 | So as I'm reading that and as I'm looking at the |
| 04:52:07 | 21 | answer, the answer refers to a number of conversations, but |
| 04:52:11 | 22 | kind of the clean up at the end was there was no offer of a |
| 04:52:17 | 23 | benefit to Kees. |
| 04:52:18 | 24 | MR. SWAMINATHAN: And just to be clear. |
| 04:52:19 | 25 | MR. NOLAND: Your Honor is reading it correctly. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

144

04:52:21  1        MR. SWAMINATHAN:  Everything above that is

04:52:23  2   communications that counsel is representing to us which we

04:52:25  3   have no problem with.  This is the only sentence that refers

04:52:28  4   to Mr. Murphy.

04:52:32  5        THE COURT:  Let me just ask this question.  Is the

04:52:34  6   correct reading of the answer that Mr. Murphy had no

04:52:38  7   communications regarding Mr. Kees or any agency of the

04:52:42  8   government, any attorney for the government, Mr. Kees or his

04:52:44  9   attorney?

04:52:45  10        MR. NOLAND:  Yes, your Honor.

04:52:45  11        THE COURT:  There you go.

04:52:46  12        MR. NOLAND:  You --

04:52:47  13        THE COURT:  Yes is good enough.  There you go.  There

04:52:50  14   is your answer.

04:52:50  15        MR. SWAMINATHAN:  The other issue.

04:52:52  16        MR. NOLAND:  Other than there was an email we

04:52:53  17   attached, which we produced it.

04:52:55  18        MR. SWAMINATHAN:  The other issue with Mr.

04:52:57  19   O'Callaghan, it's loosely related to Mr. Murphy.  Basically,

04:53:00  20   the issue is we got this single document produced to us.

04:53:04  21        THE COURT:  I think somebody showed this to me the

04:53:06  22   other day.

04:53:07  23        MR. SWAMINATHAN:  This was probably in the packet you

04:53:09  24   got.

04:53:09  25        THE COURT:  Yeah, it looks like what happened is that

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:53:11    1    Mr. Hogan sent Mr. Brannigan, Mr. O'Callaghan and Mr. Murphy a

04:53:15    2    copy of the government's motion to reduce Mr. Kees's sentence.

04:53:18    3            MR. SWAMINATHAN:  Yes.  So this is the single

04:53:20    4    communication we have in which O'Callaghan or Murphy is

04:53:23    5    communicating with anyone from the federal government or

04:53:25    6    Mr. Kees.

04:53:25    7            THE COURT:  Right.

04:53:26    8            MR. SWAMINATHAN:  So potentially the understanding is

04:53:28    9    they only have a single communication, in this case to Mr.

04:53:31   10    O'Callaghan's personal email address in the last two and a

04:53:34   11    half years.  That's possible.  We said could you just confirm

04:53:37   12    that he did a proper search because when we look at his

04:53:41   13    response.

04:53:41   14            THE COURT:  Who is the owe, this is Mr. O'Callaghan

04:53:43   15    at this point?

04:53:44   16            MR. SWAMINATHAN:  This is Mr. O'Callaghan now.

04:53:45   17            THE COURT:  It says Mr. O'Callaghan advised that to

04:53:47   18    the best of his recollection he's had no communications with

04:53:50   19    anyone in the federal government, Kees and/or Kees's attorneys

04:53:53   20    during the relevant period, had anything concerning Kees's

04:53:56   21    testimony in this matter and/or benefits he may or may not

04:53:59   22    have received as a result of testifying in this matter.

04:54:02   23            MR. SWAMINATHAN:  So on this one all we said.

04:54:04   24            THE COURT:  Are you ever going to get anything better

04:54:07   25    than the best of his recollection.


                            ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 286 of 303 PageID #:64449

04:54:08  1       MR. SWAMINATHAN:  The issue only is to the best of

04:54:09  2  his recollection, does that mean he conducted some diligent

04:54:12  3  search, that's all we asked.

04:54:13  4       THE COURT:  I think you've got an answer to the

04:54:16  5  interrogatory.  That's that issue.  I'm scratching that off

04:54:19  6  the list.

04:54:19  7       On the intimidation thing, so I have previously said

04:54:26  8  multiple times, I've lost count at this point, if it was

04:54:29  9  introduced at the criminal trial one or two, then what was

04:54:34  10  introduced at the trial comes in.  On Mr. Hawkins, I dealt

04:54:38  11  with it already.  Mr. Hawkins is now on and off the witness

04:54:41  12  stand.

04:54:42  13       And so then the other specific item that's discussed

04:54:46  14  in the motion that was filed called motion for curative

04:54:49  15  instruction and to bar future testimony has to do with this

04:54:52  16  quote-unquote witness protection program issue regarding

04:54:56  17  Mr. Morris.  Didn't I deal with that?

04:54:58  18       MR. LOEVY:  No, your Honor.

04:54:58  19       THE COURT:  I didn't deal with it?

04:55:01  20       MR. LOEVY:  I no.

04:55:04  21       THE COURT:  Tell me what it is that you're asking me

04:55:06  22  to do.

04:55:06  23       MR. LOEVY:  Document docket 550 was your order on the

04:55:10  24  motion in limine.

04:55:10  25       THE COURT:  Um-hmm.

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 287 of 303 PageID #:64450

04:55:11   1          MR. LOEVY:  And you said each defendant proposes to

04:55:16   2    testify regarding El Rukn intimidation of witnesses and others

04:55:19   3    and you quite clearly said that they are barred from providing

04:55:22   4    this testimony from the stand, it does not bar all such

04:55:28   5    evidence.  No defendant is allowed to talk about El Rukn

04:55:31   6    witness intimidation.  On direct Mr. Kulwin asked Mr.

04:55:37   7    O'Callaghan, first question Mr. O'Callaghan, at the time based

04:55:39   8    on your experience, was Mr. Morris in a dangerous situation?

04:55:43   9    That is so far beyond what you permitted at trial for the

04:55:46   10   purpose you permitted at trial.  Mr. Morris' testimony at

04:55:51   11   trial was what it was.  You can't ask him and I'll put it on

04:55:53   12   the screen.

04:55:54   13          THE COURT:  Go ahead.

04:55:55   14          MR. LOEVY:  I apologize.

04:55:59   15          THE COURT:  This is the rough transcript.

04:56:00   16          MR. LOEVY:  This is rough transposed to a memo.

04:56:03   17          MR. KULWIN:  This redirect?  Is this redirect,

04:56:07   18   recross?

04:56:08   19          THE COURT:  Whose examination is this?

04:56:10   20          MR. LOEVY:  This is Mr. Kulwin's.

04:56:12   21          MR. ART:  Direct.

04:56:13   22          THE COURT:  Well.

04:56:14   23          MR. KULWIN:  Which direct?

04:56:15   24          MR. LOEVY:  I went first and then he went.

04:56:17   25          THE COURT:  Mr. Kulwin's initial examination of Mr.

04:56:19   1   O'Callaghan?

04:56:19   2           MR. LOEVY:  That's my understanding.

04:56:20   3           MR. ART:  Yes.

04:56:23   4           MR. LOEVY:  So here is your order, your Honor.  I'll

04:56:25   5   let you read that.  I'll show you the order.

04:56:30   6           THE COURT:  Hang on a second.  The first question,

04:56:32   7   Mr. O'Callaghan, at the time based on your experience, was

04:56:34   8   Mr. Morris in a dangerous situation?

04:56:37   9           "ANSWER:  Yes.

04:56:38   10          "QUESTION:  Based on your experience at the time,

04:56:40   11  without getting far afield, you understand?

04:56:42   12          "ANSWER:  I understand

04:56:43   13          "QUESTION:  What was the danger that he was in?  There

04:56:45   14  was a sidebar.  I assume at the sidebar, you shut it down

04:56:49   15  because after the sidebar there's no more questions asked

04:56:51   16  about it.  I'm sorry.  I don't remember what I said at the

04:56:54   17  side war.  The next question is you were asked a lot of

04:56:56   18  questions about trips you made up to Milwaukee regarding

04:56:58   19  Mr. Morris and his family.  Do you remember those questions?

04:57:00   20          "ANSWER:  Yes.

04:57:02   21          "QUESTION:  Was the purpose of those trips to assist

04:57:04   22  him in the move with his family as part of the witness

04:57:06   23  protection that the state's attorney's office was running?

04:57:08   24          "ANSWER:  Yes."

04:57:10   25           Okay.  Now I get it.  Okay

04:57:13   1          MR. LOEVY:  May I show you the order then, this is

04:57:16   2     the motion in limine that we claim they blew right past.

04:57:21   3          THE COURT:  That's the thing you just referred to.

04:57:23   4          MR. LOEVY:  Yes.

04:57:23   5          THE COURT:  Docket No. 550 which is from March of

04:57:27   6     2014.

04:57:27   7          MR. LOEVY:  Yes.

04:57:28   8          THE COURT:  Let me hear from Mr. Kulwin.

04:57:29   9          MR. KULWIN:  Can you put the transcript backup?

04:57:31  10          THE COURT:  That previous page.

04:57:33  11          MR. LOEVY:  Steve, give me the whole thing.  We've

04:57:36  12     got it.

04:57:36  13          MR. KULWIN:  This is enough.  Not to bore the court

04:57:40  14     with the orphan who cries I'm sorry after they murder their

04:57:43  15     parents, look at the question that precedes it.  Now, you were

04:57:47  16     asked a lot of questions about whether Mr. Morris got a

04:57:50  17     specific threat from the El Rukns before he was placed in that

04:57:52  18     program.

04:57:53  19          THE COURT:  I see where you're reading.  So what

04:57:58  20     you're saying was that there was questioning on Mr. Loevy's

04:58:01  21     examination before this?

04:58:02  22          MR. KULWIN:  Absolutely.  He spent an inordinate

04:58:05  23     amount of time.  I'll tell you, Judge, I don't have the

04:58:08  24     photographic memory of some people.  I can't tell you chapter

04:58:11  25     and verse.  There is no way I go into that unless he goes

| 04:58:15 | 1 | into, you don't have any evidence of specific threats, you |
| 04:58:17 | 2 | took him out there because it was a benefit, all this other |
| 04:58:20 | 3 | stuff. And it was invited, there was a sidebar, they leave |
| 04:58:24 | 4 | out what's in the sidebar, and then the next question is, you |
| 04:58:27 | 5 | were asked a lot of questions about trips you made up to |
| 04:58:29 | 6 | Milwaukee, which he was. Do you remember those questions? |
| 04:58:32 | 7 | Was the purpose of those trips to assist him in a move as part |
| 04:58:35 | 8 | of the witness protection, yes, no objection. Obviously, it |
| 04:58:38 | 9 | was -- |
| 04:58:39 | 10 | THE COURT: Presumably that's because I made a ruling |
| 04:58:41 | 11 | at the sidebar, although I have to say I don't know because I |
| 04:58:43 | 12 | don't have the sidebar. Sidebar. |
| 04:58:45 | 13 | MR. KULWIN: I don't have the sidebar. |
| 04:58:47 | 14 | MR. LOEVY: Do you have the sidebar, Steve? |
| 04:58:49 | 15 | MR. ART: I have the whole transcript here. |
| 04:58:51 | 16 | THE COURT: Just pop it up on the screen there for a |
| 04:58:54 | 17 | second. All right. Flip it over to the next page. Slide it |
| 04:59:05 | 18 | down, slide it down so I can see the rest of it. Some of that |
| 04:59:14 | 19 | is kind of garbled. Flip over to the next page. Yeah, so it |
| 04:59:35 | 20 | -- it looks like what I -- what I did at the sidebar is I side |
| 04:59:40 | 21 | you're not going to be able to go into the reasons that Mr. |
| 04:59:44 | 22 | Kulwin wasn't going to be able to go into whatever reasons why |
| 04:59:48 | 23 | Mr. Morris was and what was referred to as a witness |
| 04:59:50 | 24 | protection program, and that's where I cut it off. I would |
| 04:59:55 | 25 | cut him off in the middle of a sentence if he started trying |

| | |
|---|---|
| 04:59:58 | 1 |
| 05:00:01 | 2 |
| 05:00:08 | 3 |
| 05:00:09 | 4 |
| 05:00:10 | 5 |
| 05:00:12 | 6 |
| 05:00:12 | 7 |
| 05:00:15 | 8 |
| 05:00:17 | 9 |
| 05:00:20 | 10 |
| 05:00:23 | 11 |
| 05:00:26 | 12 |
| 05:00:31 | 13 |
| 05:00:34 | 14 |
| 05:00:35 | 15 |
| 05:00:37 | 16 |
| 05:00:41 | 17 |
| 05:00:45 | 18 |
| 05:00:49 | 19 |
| 05:00:50 | 20 |
| 05:00:52 | 21 |
| 05:00:55 | 22 |
| 05:00:58 | 23 |
| 05:01:02 | 24 |
| 05:01:04 | 25 |

1  to give the reasons.  Flip over to the next page for a second.

2       Yeah.

3       MR. ART:  Do you want to see the start of the

4  testimony?

5       THE COURT:  No, you have refreshed my memory well

6  enough.

7       MR. LOEVY:  Our position is, it's a very clear motion

8  in limine ruling.  He can talk about what happened at trial,

9  he can talk about there were or weren't threats, which is what

10  I called O'Callaghan, there were no threats.  What they

11  weren't supposed to say tell the jury which doesn't go to a

12  claim or defense, why Gerald was in reasonable fear.  If you

13  wanted to revisit that, your Honor, he could have.  He blew

14  right past it.

15       THE COURT:  Time out, though, I am going to say the

16  same thing to you that I said about eight times to Mr. Kulwin

17  in overruling his objections, I cut it off.  A question is not

18  evidence.  And so I cut it off.

19       MR. LOEVY:  Your Honor, the testimony continues.

20       THE COURT:  In terms of the reasons, that's what I

21  cut off.  That's where you drew the line.  That's where I drew

22  the line.  If I drew the line in the wrong place, that's why

23  God invented courts of appeal.  That's it.  I am really

24  honestly not going to revisit this at this point in time.

25       MR. LOEVY:  There is still the representation.

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 05:01:05 | 1 | THE COURT: Is there any other witness who is going |
| 05:01:07 | 2 | to testify about Morris? |
| 05:01:09 | 3 | MR. KULWIN: Yes, Judge. |
| 05:01:10 | 4 | THE COURT: Who? |
| 05:01:11 | 5 | MR. NOLAND: Brian Sexton. |
| 05:01:12 | 6 | MR. KULWIN: And Jack Hines -- well, at the last |
| 05:01:17 | 7 | trial, Judge, you had Mr. Hines testify about what he called |
| 05:01:22 | 8 | witness protection but was victim witness. You also asked Ms. |
| 05:01:27 | 9 | Conyers on cross-examination testify in her experience, it was |
| 05:01:32 | 10 | not rare that it happened, that victims and witnesses were |
| 05:01:36 | 11 | relocated. I wanted to elicit both of that. Because what the |
| 05:01:40 | 12 | defendant -- what the plaintiff has done is and what they're |
| 05:01:43 | 13 | trying to do in my view and I know your patience on this is |
| 05:01:46 | 14 | justifiably thin, so I will be short, is they have made this |
| 05:01:50 | 15 | argument to the jury that Mr. O'Callaghan -- that Mr. |
| 05:01:55 | 16 | O'Callaghan has threatened these witnesses, coerced them, that |
| 05:01:57 | 17 | they live in fear of him. Okay? And that the whole -- or if |
| 05:02:01 | 18 | it's not that, then he's making these trips up to Milwaukee |
| 05:02:04 | 19 | trying to bribe him with appliances and gifts. It's false, |
| 05:02:08 | 20 | it's miss representative, and I can't -- I'm entitled to |
| 05:02:12 | 21 | defend against that. When he says it's not part of any claim, |
| 05:02:15 | 22 | that's part of his whole case. His entire case is that either |
| 05:02:19 | 23 | O'Callaghan had no reasonable basis to not recommend but to |
| 05:02:24 | 24 | present the case for probable cause to the state's attorney |
| 05:02:26 | 25 | because assuming everything was totally legit, on the up and |

| | | |
|---|---|---|
| 05:02:30 | 1 | up, he should have said, there's not enough here, I got to get |
| 05:02:33 | 2 | more before I go to him, or alternatively, assuming the |
| 05:02:37 | 3 | argument that what he had was enough, he shouldn't have done |
| 05:02:39 | 4 | it because he knew it was all phony because he had coerced him |
| 05:02:43 | 5 | or bribed him to get it.  That is his case and I should be |
| 05:02:47 | 6 | able to respond and he's made that case over and over and over |
| 05:02:50 | 7 | again with every witness.  With Randy Langston, you were |
| 05:02:52 | 8 | afraid of him.  With Eric Lange, you were scared of them.  And |
| 05:02:56 | 9 | on and on. |
| 05:02:57 | 10 | THE COURT:  Last word. |
| 05:02:57 | 11 | MR. LOEVY:  Thank you, your Honor. |
| 05:02:58 | 12 | THE COURT:  Keep it short. |
| 05:02:59 | 13 | MR. LOEVY:  We disagree with him, but the evidence is |
| 05:03:02 | 14 | in.  O'Callaghan said way more than we wanted about threats. |
| 05:03:07 | 15 | Gerald, his wife and children were put into the witness |
| 05:03:09 | 16 | protection program and we still are asking you to correct that |
| 05:03:12 | 17 | as a factual matter. |
| 05:03:13 | 18 | THE COURT:  Here is the deal.  When are we expecting |
| 05:03:15 | 19 | to see Mr. Sexton or Mr. Hines. |
| 05:03:18 | 20 | MR. KULWIN:  In our case.  Sexton is in their case. |
| 05:03:22 | 21 | THE COURT:  Stop.  I am asking Mr. Burns a question. |
| 05:03:26 | 22 | I have to preface everything.  Mr. Murphy is is going to |
| 05:03:30 | 23 | testify about this too. |
| 05:03:31 | 24 | MR. BURNS:  If he is asked a question that he deals |
| 05:03:33 | 25 | with the Milwaukee trip, this is where it comes from, so |

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
| 05:03:36 | 1  | Mr. Loevy would control that.                              |
| 05:03:37 | 2  | THE COURT:  Here is what I am going to direct.  Are        |
| 05:03:39 | 3  | you calling Mr. Murphy?                                     |
| 05:03:40 | 4  | MR. LOEVY:  Yes.                                            |
| 05:03:40 | 5  | THE COURT:  When?                                           |
| 05:03:41 | 6  | MR. LOEVY:  Tomorrow if we get to him and we are           |
| 05:03:43 | 7  | hoping to.                                                  |
| 05:03:43 | 8  | THE COURT:  And are you calling Mr. Sexton?                 |
| 05:03:46 | 9  | MR. LOEVY:  Unlikely because we are going to have to       |
| 05:03:49 | 10 | finish our case.                                           |
| 05:03:50 | 11 | THE COURT:  Are you calling Mr. Hines.                     |
| 05:03:52 | 12 | MR. LOEVY:  Probably not, same reason.                     |
| 05:03:53 | 13 | THE COURT:  There's three people that's been              |
| 05:03:55 | 14 | identified and only three people that this issue is going to |
| 05:03:58 | 15 | come up.  I am going to tell you guys to do the same thing I |
| 05:04:01 | 16 | told plaintiff to do on a number of things.  I want a proffer, |
| 05:04:04 | 17 | this is what we propose to have Murphy testify about, this is |
| 05:04:06 | 18 | what we propose to have Hines testify about, this is what we |
| 05:04:09 | 19 | propose to have Sexton testify about this, and if -- and then |
| 05:04:14 | 20 | I need some sort of little short justification, it can be |
| 05:04:17 | 21 | repeating what you just told me, but I need it in one place so |
| 05:04:20 | 22 | I don't have to draw together 14 places that we have talked |
| 05:04:22 | 23 | about this.                                                 |
| 05:04:23 | 24 | MR. KULWIN:  Do you want it typed or do you want it        |
| 05:04:25 | 25 | orally?                                                     |

***REALTIME UNEDITED TRANSCRIPT ONLY***

155

05:04:25  1      THE COURT:  No, like every time I have asked for this

05:04:28  2  from the plaintiff, I need it in writing.

05:04:29  3      MR. KULWIN:  Sure, Judge.

05:04:30  4      THE COURT:  I apologize in advance to Ms. Katz.  She

05:04:35  5  didn't catch it.

05:04:36  6      MS. KATZ:  I did.  I thought I put it in writing, but

05:04:41  7  I didn't apparently.

05:04:42  8      MR. KULWIN:  It's not just Ms. Katz.

05:04:43  9      MR. LOEVY:  Still unresolved is our request that you

05:04:46  10  tell the jury that Gerald Morris, his wife and his children

05:04:49  11  were not placed into the witness protection program.  There

05:04:51  12  was no good faith basis to ask that, it's not true and the

05:04:56  13  jury has been lied to.

05:04:57  14      THE COURT:  Look, I mean, I'm collecting my thoughts

05:05:12  15  to just give me a minute.  I am reasonably certain that if you

05:05:26  16  were to ask Mr. Sexton and Mr. Hines both of whom were

05:05:30  17  assistant state's attorneys at the relevant time whether Cook

05:05:34  18  County state's attorney's office had anything called a witness

05:05:36  19  protection program they would say no.  I am equally certain

05:05:40  20  that if you were to ask them whether the Cook County state's

05:05:43  21  attorney's office had a victim witness program, they would say

05:05:45  22  yes and I am reasonably certain and pretty close to a moral

05:05:48  23  certainty that they would say that that was a program

05:05:51  24  sometimes used to relocate witnesses, you know, who were for

05:05:55  25  whatever reason concerned about their safety.  Okay?  I am

***REALTIME UNEDITED TRANSCRIPT ONLY***

05:05:58   1   confident of this.  I know this because I lived in that world

05:06:02   2   not as much as some of the people in this room did but enough

05:06:05   3   to know.  Okay?  So honestly, I'm not -- I don't think that's

05:06:12   4   an appropriate instruction.  Now, if once all of the evidence

05:06:15   5   on this is in, okay, I need everybody's attention here for a

05:06:19   6   second.

05:06:22   7           MS. KATZ:  Sorry.

05:06:22   8           THE COURT:  Thank you.  Once all of the evidence on

05:06:24   9   this is in, you know, after I make whatever rulings I make,

05:06:28   10   after I get the proffer about Mr. Murphy and Mr. Hines and Mr.

05:06:33   11   Sexton and that testimony comes in, you can revisit this

05:06:36   12   before closing argument to talk to me about what people should

05:06:39   13   and shouldn't be able to say and that is the next time I am

05:06:41   14   going to deal with that part of it.  Okay?  So the second --

05:06:44   15   actually, the second to the next time.  The next time is when

05:06:47   16   I rule on this proffer and then the last time, the second and

05:06:50   17   last time is going to be when you're making a motion, if you

05:06:52   18   make it before closing argument.

05:06:54   19           So now we're going to move on to the next thing,

05:06:57   20   which I don't think there is anything else.

05:06:59   21           MR. LOEVY:  I don't think there is, your Honor.

05:07:00   22           THE COURT:  Okay.  You guys got any issues for me?

05:07:03   23           MR. KULWIN:  The proffer is just to explain what they

05:07:05   24   are going to say about witness protection, right.

05:07:07   25           THE COURT:  It's really what they are going to say

| | | |
|---|---|---|
| 05:07:09 | 1 | about this issue as it relates to Morris. |
| 05:07:11 | 2 | MR. KULWIN: We got it. |
| 05:07:12 | 3 | THE COURT: This issue as it relates to Morris. |
| 05:07:14 | 4 | MS. KATZ: Okay. |
| 05:07:15 | 5 | THE COURT: But if there's going to be -- if you're |
| 05:07:17 | 6 | intending to elicit some testimony that goes beyond Morris |
| 05:07:20 | 7 | specifically and what this program was in the Cook County |
| 05:07:23 | 8 | state's attorney's office, I want to see that too. |
| 05:07:24 | 9 | MR. KULWIN: We will do that. |
| 05:07:25 | 10 | MR. LOEVY: Are we talking about witness, threats, |
| 05:07:27 | 11 | intimidation. |
| 05:07:28 | 12 | THE COURT: I am talking about what I am talking |
| 05:07:29 | 13 | about. Now we are moving onto the next issue for crying out |
| 05:07:33 | 14 | loud. Do you have other issues. |
| 05:07:34 | 15 | MR. LOEVY: No, your Honor. |
| 05:07:35 | 16 | THE COURT: Thanks. Stop talking. |
| 05:07:36 | 17 | THE COURT: Do you have other issues. |
| 05:07:37 | 18 | MR. KULWIN: One other issue. |
| 05:07:38 | 19 | THE COURT: What? |
| 05:07:39 | 20 | MR. KULWIN: It deals with Derrick Kees. |
| 05:07:41 | 21 | THE COURT: Derrick Kees. |
| 05:07:43 | 22 | MR. KULWIN: Derrick Kees, Judge. Derrick Kees is |
| 05:07:46 | 23 | going to testify, I think, I'm getting calls, I believe |
| 05:07:52 | 24 | Mr. Kees I have been surprised is here tonight and I believe. |
| 05:07:56 | 25 | THE COURT: Here here as in what? |

05:07:58   1          MR. KULWIN:  Here in this building.

05:07:59   2          THE COURT:  I haven't seen the marshals lurking in

05:08:02   3   the back hallway.

05:08:03   4          MR. KULWIN:  He wouldn't be in the back hallway.  I

05:08:05   5   believe he comes through the U.S. Attorney's Office.  I think

05:08:07   6   he is in lock up.

05:08:10   7          THE COURT:  He is still in custody.

05:08:12   8          MR. KULWIN:  He is still in custody.  Anyway, and I

05:08:16   9   believe if he is going to get out of here needs to go on first

05:08:19  10   thing in the morning, so I am communicating that.  But that's

05:08:22  11   not my purpose.  I just thought I would advise you of that.

05:08:25  12   That's what I heard.

05:08:26  13          THE COURT:  People -- we are going to finish with Ms.

05:08:29  14   Lyon first.  Are we okay with putting Kees on after that?

05:08:33  15          MR. LOEVY:  We burned with Hawkins.

05:08:35  16          THE COURT:  So Kees is the next witness.

05:08:37  17          MR. KULWIN:  The question becomes about this Rule 35.

05:08:40  18   I imagine that the plaintiff is going to cross him on the Rule

05:08:46  19   35.

05:08:46  20          THE COURT:  Well, I don't think you have to imagine

05:08:48  21   that.

05:08:49  22          MR. KULWIN:  Well, you know.  Whatever.  So I imagine

05:08:52  23   that, and the question I want is guidance on what's allowed in

05:08:57  24   the --

05:08:57  25          THE COURT:  Well, ask me something specific.

***REALTIME UNEDITED TRANSCRIPT ONLY***

159

| | | |
|---|---|---|
| 05:08:59 | 1 | MR. KULWIN:  I want to go into the Rule 35.  I want |
| 05:09:01 | 2 | to show it to him, how he got it. |
| 05:09:02 | 3 | THE COURT:  Ask me something specific.  What is it -- |
| 05:09:05 | 4 | the document is not going to go into evidence.  Okay?  So what |
| 05:09:08 | 5 | is it you want to go into about it? |
| 05:09:10 | 6 | MR. KULWIN:  This is a Rule 35 motion that the |
| 05:09:12 | 7 | government gave you, provided you.  You're a lawyer, asked |
| 05:09:16 | 8 | them to file it, they filed it on your behalf, correct and who |
| 05:09:19 | 9 | signed it, okay?  All right.  You know, and who is the |
| 05:09:23 | 10 | signature line and all that stuff.  And, you know. |
| 05:09:27 | 11 | THE COURT:  Has it been ruled on yet? |
| 05:09:29 | 12 | MR. KULWIN:  Yeah.  What I'm concerned is that |
| 05:09:34 | 13 | they're going to make it look like or try to, those guys over |
| 05:09:38 | 14 | there, and he'll point over to us, we're somehow behind it.  I |
| 05:09:43 | 15 | don't want that to happen. |
| 05:09:44 | 16 | THE COURT:  Now we are down to hand gestures are |
| 05:09:50 | 17 | unfairly prejudicial. |
| 05:09:51 | 18 | MR. KULWIN:  Yes, they are. |
| 05:09:52 | 19 | THE COURT:  The record will reflect laughing by Mr. |
| 05:09:58 | 20 | Kulwin and by the judge even though I am laughing on the |
| 05:10:00 | 21 | inside. |
| 05:10:00 | 22 | MR. KULWIN:  With all seriousness -- |
| 05:10:04 | 23 | THE COURT:  Honestly, are you going to argue that |
| 05:10:06 | 24 | there's something inappropriate with him eliciting that it was |
| 05:10:09 | 25 | the U.S. government that moved for the reduction in sentence? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 05:10:11 | 1 | That's a question.  Just answer it. |
| 05:10:12 | 2 | MR. LOEVY:  The answer is no. |
| 05:10:13 | 3 | THE COURT:  Okay.  I think it's completely |
| 05:10:15 | 4 | appropriate for you to elicit that it was the U.S. government |
| 05:10:18 | 5 | that moved for the reduction of the sentence. |
| 05:10:20 | 6 | MR. KULWIN:  And that I want to show him the |
| 05:10:22 | 7 | document, I want to show him who signed it.  Okay? |
| 05:10:24 | 8 | THE COURT:  Who signed it? |
| 05:10:25 | 9 | MR. KULWIN:  Farden and Yonan. |
| 05:10:27 | 10 | THE COURT:  Okay. |
| 05:10:28 | 11 | MR. KULWIN:  Because that's important to me. |
| 05:10:30 | 12 | MR. ART:  The Rule 35 motion is not signed by Hogan. |
| 05:10:35 | 13 | MS. KATZ:  Jason -- |
| 05:10:36 | 14 | THE COURT:  I read it. |
| 05:10:38 | 15 | MR. KULWIN:  Jason Yonan, I saw it. |
| 05:10:43 | 16 | MR. KULWIN:  I want that in evidence. |
| 05:10:45 | 17 | MR. LOEVY:  Your Honor, the inference here is that |
| 05:10:47 | 18 | the government has some interest in helping and we do have the |
| 05:10:51 | 19 | email copying O'Callaghan and Murphy where William Hogan sends |
| 05:10:56 | 20 | the Rule 35 and Joe Murphy says, thanks for the help. |
| 05:11:00 | 21 | MR. KULWIN:  Right. |
| 05:11:01 | 22 | MR. LOEVY:  Thanks for the help. |
| 05:11:01 | 23 | THE COURT:  Nothing wrong with you bringing that up. |
| 05:11:03 | 24 | What we don't want them to suggest -- by the way, this Rule 35 |
| 05:11:06 | 25 | motion was filed during our trial.  What Mr. Kulwin is milling |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-52 Filed: 03/15/24 Page 301 of 303 PageID #:64464
11/29/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

161

| | | |
|---|---|---|
| 05:11:11 | 1 | around the edges is edges is the government has reasons to do |
| 05:11:18 | 2 | it. We wanted to bar Kees, your Honor disagreed, but we |
| 05:11:21 | 3 | certainly want to cross-examine on it and Mr. Kulwin should |
| 05:11:24 | 4 | not be allowed to suggest this is unrelated to his clients. |
| 05:11:27 | 5 | MR. KULWIN: Hold the phone, Judge. If they are |
| 05:11:29 | 6 | going to say -- first of all, it was Mr. Murphy, not my client |
| 05:11:33 | 7 | that said thanks for the help. The purpose why the government |
| 05:11:37 | 8 | did it is highly relevant because they want to make it look |
| 05:11:40 | 9 | like we went to the government and said, help us out in the |
| 05:11:46 | 10 | civil case, we're hurting here. |
| 05:11:47 | 11 | THE COURT: You are not going to get any of this out |
| 05:11:49 | 12 | of Mr. Kees; am I correct? Mr. Kees -- is there any |
| 05:11:53 | 13 | possibility on God's green earth that Mr. Kees has some |
| 05:11:58 | 14 | insight because he is, if I can borrow a phrase, Carnac The |
| 05:12:02 | 15 | Magnificent into what the government's motivation was? |
| 05:12:05 | 16 | MR. KULWIN: No. |
| 05:12:06 | 17 | THE COURT: So it's not going to come out of |
| 05:12:08 | 18 | Mr. Kees. I assume that you are going to attempt to do is |
| 05:12:11 | 19 | elicit this from Mr. Hogan. |
| 05:12:12 | 20 | MR. KULWIN: Absolutely. |
| 05:12:12 | 21 | THE COURT: Am I right? |
| 05:12:12 | 22 | MR. KULWIN: Yes. |
| 05:12:12 | 23 | THE COURT: When is Mr. Hogan going to testify? |
| 05:12:15 | 24 | MR. KULWIN: In our case. |
| 05:12:16 | 25 | THE COURT: Not yet? |

| | | |
|---|---|---|
| 05:12:17 | 1 | MR. KULWIN:  Not yet. |
| 05:12:18 | 2 | THE COURT:  I will address at that point in time or |
| 05:12:20 | 3 | before that point in time exactly what can be testified to or |
| 05:12:24 | 4 | not.  It's unlikely that you are going to be able to go into |
| 05:12:27 | 5 | some whole chapter and verse on that.  It's almost certain |
| 05:12:30 | 6 | that I am going to permit you to elicit from Mr. Hogan that |
| 05:12:32 | 7 | this -- assuming it's true, is this a decision made by the |
| 05:12:36 | 8 | U.S. Attorney's Office, did you get any input from any of the |
| 05:12:40 | 9 | defendants in this case, did you get input from any of the |
| 05:12:42 | 10 | defense lawyers in this case, was this a decision that was |
| 05:12:44 | 11 | made at the U.S. Attorney's Office based on what you |
| 05:12:46 | 12 | considered to be the merits, those are all going to be proper |
| 05:12:49 | 13 | questions because you're entitled to attempt to disassociate |
| 05:12:53 | 14 | that motion from the defendants in this case. |
| 05:12:58 | 15 | On the other hand, the plaintiff is entitled to |
| 05:12:59 | 16 | elicit that Mr. Kees is getting a benefit for his testimony in |
| 05:13:02 | 17 | this case because that's exactly what the motion says.  Okay? |
| 05:13:06 | 18 | So it says that. |
| 05:13:07 | 19 | MR. KULWIN:  But that's -- I don't -- we can do this |
| 05:13:10 | 20 | later. |
| 05:13:10 | 21 | THE COURT:  I'm just giving you the parameters.  None |
| 05:13:13 | 22 | of this is going to come in.  None of the government's |
| 05:13:17 | 23 | motivation is properly admissible through Mr. Kees.  If it's |
| 05:13:20 | 24 | admissible, the extent it's admissible is going to be from |
| 05:13:24 | 25 | somebody who knows. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

\*\*\*REALTIME UNEDITED TRANSCRIPT ONLY\*\*\*

| | | |
|---|---|---|
| 05:13:25 | 1 | MR. KULWIN:  At that point, then, Mr. Loevy should be |
| 05:13:27 | 2 | precluded from putting this thing under his face and say the |
| 05:13:30 | 3 | reason you got this, it says right in your motion was because |
| 05:13:33 | 4 | they wanted to give you a benefit for testifying in this case. |
| 05:13:37 | 5 | He shouldn't be allowed to do that without me being able to |
| 05:13:40 | 6 | say, yeah, the reason they wanted to do that was because what? |
| 05:13:43 | 7 | THE COURT:  Those are two different things, Mr. |
| 05:13:46 | 8 | Kulwin, and I know that you know the rules of evidence well |
| 05:13:48 | 9 | enough to understand the distinction.  I mean, what he |
| 05:13:52 | 10 | understood is that he was getting a benefit that was based on |
| 05:13:58 | 11 | the testimony he's given in the case.  That is perfectly |
| 05:14:02 | 12 | admissible what the government's motivation was, you can't get |
| 05:14:07 | 13 | in through him, period. |
| 05:14:09 | 14 | Now, is there any other topics we need to talk about. |
| 05:14:12 | 15 | MR. LOEVY:  Not from the plaintiff. |
| 05:14:13 | 16 | MR. KULWIN:  Not until Mr. Hogan is going to testify. |
| 05:14:15 | 17 | THE COURT:  I want some lead time on it. |
| 05:14:16 | 18 | MR. KULWIN:  Absolutely. |
| 05:14:17 | 19 | THE COURT:  Okay. |
| 05:14:18 | 20 | MR. LOEVY:  Thank you. |
| 05:14:29 | 21 | (The trial was adjourned at 5:15 p.m. until 9:30 a.m. on |
| 05:14:38 | 22 | November 30, 2016.) |
| | 23 | |
| | 24 | |
| | 25 | |

\*\*\*REALTIME UNEDITED TRANSCRIPT ONLY\*\*\*