# Exhibit BBB

| | | |
|---|---|---|
| 12:22:13 | 1 | November 17, 2016, 12:30 p.m., no morning session; just |
| 12:22:13 | 2 | afternoon, volume 4. |
| 12:23:08 | 3 | Realtime seems to be working great! Just in case, |
| 12:23:14 | 4 | I'll keep my fingers crossed. |
| 12:29:49 | 5 | THE CLERK:  Case number 10 C 1168, Fields v. City of |
| 12:29:57 | 6 | Chicago. |
| 12:29:57 | 7 | THE COURT:  Good morning.  Good afternoon. |
| 12:29:58 | 8 | MR. LOEVY:  Good afternoon, your Honor, Jon Loevy, |
| 12:30:00 | 9 | Steve Art, Ann Swaminathan, Candace Gorman for our client |
| 12:30:11 | 10 | Nathson Fields. |
| 12:30:12 | 11 | MR. BURNS: . |
| 12:30:13 | 12 | MR. KULWIN:  Shelly Kulwin and Rachel Katz on behalf |
| 12:30:16 | 13 | of Detective O'Callaghan. |
| 12:30:17 | 14 | MR. LOEVY:  Your Honor, we are not going to do the |
| 12:30:19 | 15 | field trip this afternoon.  We would like to start the |
| 12:30:22 | 16 | testimony.  You had deferred the issue about the feet.  Our |
| 12:30:25 | 17 | preference would be to just move. |
| 12:30:27 | 18 | MR. KULWIN:  Having said that, Judge, you said 12:29 |
| 12:30:30 | 19 | have the transcript with the 80 feet.  I've got it for you. |
| 12:30:33 | 20 | THE COURT:  In fact, it is 12:29.  Okay.  I'll look |
| 12:30:38 | 21 | at it.  Since we are not going to deal with it right now, I'll |
| 12:30:42 | 22 | look at it. |
| 12:30:42 | 23 | Did you have another issue, Mr. Kulwin, that you |
| 12:30:45 | 24 | wanted to take up? |
| 12:30:47 | 25 | MR. KULWIN:  No, that was it. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 3 of 215 PageID #:64742
***REALTIME UNEDITED TRANSCRIPT ONLY***

2

| | | |
|---|---|---|
| 12:30:49 | 1 | THE COURT: Oh, that was it. |
| 12:30:51 | 2 | Get him on the witness stand. |
| 12:31:14 | 3 | MR. BURNS: Judge, if we may before you bring the |
| 12:31:18 | 4 | jury out. |
| 12:31:20 | 5 | THE COURT: The jury is coming out.. that's why I |
| 12:31:23 | 6 | asked if anybody has any issues. |
| 12:31:24 | 7 | MR. BURNS: It's the question as to Mr. Stainthorpe |
| 12:31:28 | 8 | representing plaintiffs in cases against the City of Chicago. |
| 12:31:31 | 9 | We asked. |
| 12:31:35 | 10 | THE COURT: I can't hear. |
| 12:31:37 | 11 | MR. BURNS: We have a concern that it would open up |
| 12:31:39 | 12 | issues relative to his filing of other issues against the City |
| 12:31:42 | 13 | of Chicago. Our purpose would be simply to ask does he file |
| 12:31:46 | 14 | those without inviting or opening, if the Court believes we |
| 12:31:49 | 15 | would be opening the door, to discussion as to other cases. |
| 12:31:51 | 16 | THE COURT: What exactly are you planning to ask him? |
| 12:31:54 | 17 | Do you file lawsuits against the City of Chicago? |
| 12:31:56 | 18 | MR. BURNS: As part of that, yes, your Honor. |
| 12:31:57 | 19 | THE COURT: Yes, and then you move on or what? |
| 12:32:01 | 20 | MR. BURNS: Yes. We are not getting into the |
| 12:32:03 | 21 | details. |
| 12:32:03 | 22 | THE COURT: It's one question? |
| 12:32:05 | 23 | MR. BURNS: It really is, Judge. |
| 12:32:06 | 24 | MR. LOEVY: We had wanted to ask him you had through |
| 12:32:08 | 25 | your work some familiarity with the policies and practices, |

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 4 of 215 PageID #:64743

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 12:32:12 | 1 | that's why sent a lot of subpoenas for the investigative and |
| 12:32:13 | 2 | sent four of them because he wasn't getting investigative |
| 12:32:15 | 3 | files back.  I am glad we are talking about it because I |
| 12:32:18 | 4 | wanted to ask him isn't it true for why the policy got changed |
| 12:32:24 | 5 | in the mid '80s, you had some involvement with the policy |
| 12:32:27 | 6 | change. |
| 12:32:28 | 7 | As far as the issue about whether to ask him about |
| 12:32:30 | 8 | whether he does suits against the City of Chicago, I guess I |
| 12:32:33 | 9 | can live with the one question.  Does that open the door to |
| 12:32:36 | 10 | what kind, I'm okay with with that. |
| 12:32:38 | 11 | THE COURT:  It doesn't open the door to him talking |
| 12:32:42 | 12 | about the issue of other suits. |
| 12:32:44 | 13 | MR. BURNS:  As far as the other issue, that's being |
| 12:32:47 | 14 | that hasn't been disclosed previously, his policies, |
| 12:32:50 | 15 | practices, when they were changed from the City of Chicago. |
| 12:32:52 | 16 | THE COURT:  You know what, a question will be asked, |
| 12:32:54 | 17 | you'll make an objection, we will rule on it:? |
| 12:33:41 | 18 | (The jury enters the courtroom.) |
| 12:33:42 | 19 | THE COURT:  Everyone can have a seat: We are ready to |
| 12:33:46 | 20 | start.  Mr. Stainthorpe, remember you are still under oath. |
| 12:33:51 | 21 | THE WITNESS:  Yes. |
| 12:33:54 | 22 | - - - |
| 12:33:54 | 23 | JOHN STAINTHORPE, DIRECT EXAMINATION CONTINUED |
| 12:33:54 | 24 | BY MR. LOEVY: |
| 12:33:56 | 25 | Q.  Mr. Stainthorpe, Mr. Randy Langston.  Do you remember |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 5 of 215 PageID #:64744
***REALTIME UNEDITED TRANSCRIPT ONLY***

4

12:33:59   1   that?

12:33:59   2   A. I do. It was my partner who -- from Randy, yes, that was

12:34:03   3   Tim who got that statement.

12:34:05   4   Q. When you and him visited Randy on the south side?

12:34:08   5   A. No.

12:34:08   6   Q. That was Gerald?

12:34:09   7   A. No. Tim got the statement when he visited Randy in some

12:34:13   8   institution. I am not sure it was an institution, a prison or

12:34:19   9   whatever, and then he had the affidavit, that was produced to

12:34:23   10   the state, and I believe subsequently, possibly before, but I

12:34:29   11   am pretty sure subsequently Tim and I went to see Randy when

12:34:32   12   he's out on the street and we talked to him when he was out in

12:34:34   13   the street on the south side.

12:34:35   14   Q. And that's what you talked about yesterday?

12:34:37   15   A. Correct.

12:34:37   16   Q. All right. And then you then communicated to the state's

12:34:42   17   attorney what Mr. Laura and you had learned?

12:34:46   18   A. That is correct.

12:34:47   19   Q. And they communicated back to you in a manner that you

12:34:51   20   described in that letter that you sent and confirmed?

12:34:55   21   A. That's correct, yes.

12:34:56   22   Q. And what did the state's attorney communicate back to you?

12:34:59   23   A. They communicated.

12:35:00   24        MR. BURNS: Objection, your Honor. Hearsay, your

12:35:02   25   Honor.

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 6 of 215 PageID #:64745

| | | |
|---|---|---|
| 12:35:03 | 1 | THE COURT:  For what purpose is this being offered? |
| 12:35:05 | 2 | MR. LOEVY:  Because what the state's attorney sent |
| 12:35:07 | 3 | back to him, not for the truth, they sent back the new Randy |
| 12:35:10 | 4 | affidavit.  I was just backing up to that where we left off. |
| 12:35:12 | 5 | THE COURT:  The objection is overruled.  Go ahead. |
| 12:35:14 | 6 | THE WITNESS:  Yes.  First of all, the arrest had |
| 12:35:19 | 7 | orally told me that Randy gave me a new statement. |
| 12:35:23 | 8 | MR. KULWIN:  I'll object to that, the oral statement. |
| 12:35:26 | 9 | THE COURT:  I overruled the objection.  Does |
| 12:35:31 | 10 | everybody get it now?  Go ahead. |
| 12:35:35 | 11 | THE WITNESS:  Okay.  So the state's attorney had it |
| 12:35:38 | 12 | would me that, orally, I believe in a court appearance, that |
| 12:35:42 | 13 | they had then gone out to reinvestigate -- to re-enter view |
| 12:35:46 | 14 | Randy Langston, he had given another statement in which he |
| 12:35:50 | 15 | denied his -- he contradicted his trial testimony, said that |
| 12:35:56 | 16 | he could not see the faces of the shooters at the time of the |
| 12:36:00 | 17 | shooting because they had masks on. |
| 12:36:00 | 18 | BY MR. LOEVY: |
| 12:36:02 | 19 | Q.  And -- |
| 12:36:03 | 20 | A.  And Mr. Kelley told me that he was going to memorialize |
| 12:36:06 | 21 | this in a written document.  I never received that written |
| 12:36:10 | 22 | document. |
| 12:36:11 | 23 | Q.  Then you sent the letter? |
| 12:36:12 | 24 | A.  I sent the letter, and I subsequently did get the written |
| 12:36:16 | 25 | document memorializing Randy Langston's new statement. |

| 12:36:21 | 1 | MR. LOEVY: Your Honor, at this time, we move |
| 12:36:23 | 2 | Plaintiff's Exhibit 131 into evidence. This is the letter |
| 12:36:28 | 3 | that Mr. Stainthorpe described. |
| 12:36:30 | 4 | THE COURT: Is this the one sitting up here? |
| 12:36:31 | 5 | MR. LOEVY: It might be the copy. |
| 12:36:33 | 6 | THE COURT: Can I just look at it for a second? All |
| 12:36:40 | 7 | right. It's admitted. |
| 12:36:42 | 8 | (Above-mentioned exhibit was received in evidence.) |
| 12:36:43 | 9 | BY MR. LOEVY: |
| 12:36:44 | 10 | Q. Did the state's attorney send something back? |
| 12:36:46 | 11 | A. Yes. |
| 12:36:46 | 12 | Q. What was that? |
| 12:36:47 | 13 | A. Sent back a written document that memorialized the new |
| 12:36:51 | 14 | statement that Randy Langston had given apparently to the |
| 12:36:54 | 15 | state's attorneys and their vectors in which he acknowledged |
| 12:36:58 | 16 | that he could not see the faces. |
| 12:37:00 | 17 | Q. I'm going to show that document. That is Plaintiff's |
| 12:37:04 | 18 | Exhibit 132 which is in evidence, your Honor? |
| 12:37:05 | 19 | THE COURT: Okay. |
| 12:37:08 | 20 | BY MR. LOEVY: |
| 12:37:09 | 21 | Q. Can you tell the jury or identify that this is the |
| 12:37:10 | 22 | document you're talking about? |
| 12:37:11 | 23 | A. Yes, this is the document that I subsequently received |
| 12:37:16 | 24 | from David Kelley. |
| 12:37:18 | 25 | Q. All right. And this memorialized a statement that the |

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 8 of 215 PageID #:64747

| | | |
|---|---|---|
| 12:37:21 | 1 | state's attorneys took with Randy Langston at his home, |
| 12:37:24 | 2 | correct? |
| 12:37:24 | 3 | A.  Yes. |
| 12:37:25 | 4 | Q.  All right.  And this paragraph here refers to what Randy, |
| 12:37:34 | 5 | this is after Randy had gone back and forth about whether he |
| 12:37:37 | 6 | did or didn't see the masks, correct? |
| 12:37:39 | 7 | A.  Correct. |
| 12:37:39 | 8 | Q.  What is his position as of February 29th, 2000? |
| 12:37:44 | 9 | A.  His position as of that time was that the men who he saw |
| 12:37:53 | 10 | doing the shooting wore masks at all times during the shooting |
| 12:37:58 | 11 | and that so they were masked the entire time and then they ran |
| 12:38:05 | 12 | back through the breezeway while still masked. |
| 12:38:09 | 13 | Q.  Now, this -- now he's saying that he saw them in the get |
| 12:38:12 | 14 | away car, does he not, that's how he saw their faces? |
| 12:38:16 | 15 | A.  Well, I don't think it's entirely clear that he's saying |
| 12:38:20 | 16 | that he saw their faces. |
| 12:38:22 | 17 | MR. BURNS:  Judge, objection. |
| 12:38:23 | 18 | THE COURT:  Time out.  Time out.  The answer is |
| 12:38:25 | 19 | stricken.  I think he was just asking you to read it.  Put |
| 12:38:27 | 20 | your question again.  The answer is stricken.  The jury is |
| 12:38:30 | 21 | directed to disregard it. |
| 12:38:31 | 22 | MR. LOEVY:  May I ask a different question, your |
| 12:38:33 | 23 | Honor? |
| 12:38:33 | 24 | THE COURT:  Yes. |
| 12:38:34 | 25 | BY MR. LOEVY: |

12:38:34   1   Q.  He was asked why he had recanted -- why he had recanted,

12:38:39   2   correct?

12:38:39   3   A.  That's correct.

12:38:40   4   Q.  Can you read his answer?

12:38:41   5   A.  Because at that time I did not want to be involved or be

12:38:45   6   bothered with it anymore.

12:38:48   7   Q.  Did he in this statement in anyplace to your review of it

12:38:51   8   say that he recanted earlier because of supposed threats by

12:38:54   9   gangs or any other threats?

12:38:56   10  A.  No, not at all.

12:38:57   11  Q.  I'd like to turn your attention to another witness in the

12:38:59   12  case, Gerald Morris.  Do you -- can you sort of summarize for

12:39:04   13  the jury based on your review what Gerald Morris' role in the

12:39:09   14  case was?

12:39:09   15  A.  Gerald Morris had testified at the trial, this is back in

12:39:16   16  the mid '80s, that he had been in his apartment which was in

12:39:20   17  the back of the building, of the CHA building.  And I think he

12:39:25   18  said he was getting dressed and he heard shots.  He then

12:39:31   19  looked out of the window with his girlfriend and saw two men

12:39:38   20  running to a car that was parked on the street and at trial,

12:39:48   21  he identified Nathson Fields and Earl Hawkins as those men.

12:39:56   22  Q.  All right.  When you interviewed Randy?

12:39:59   23  A.  We are talking about Gerald now.

12:40:00   24  Q.  I'm sorry.  I'm really bad with names.  We are talking

12:40:03   25  about Gerald.

11/17/16 PM    Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 10 of 215 PageID #:64740
***REALTIME UNEDITED TRANSCRIPT ONLY***

9

| | | |
|---|---|---|
| 12:40:04 | 1 | Was there an issue about from the first trial about |
| 12:40:08 | 2 | when Gerald became identified as a witness?  Was he identified |
| 12:40:12 | 3 | early or later? |
| 12:40:13 | 4 | A.  There was an issue about that because according to the |
| 12:40:17 | 5 | police reports, he had first been identified as a witness more |
| 12:40:22 | 6 | than a year after this had occurred.  But Mr. Morris said in |
| 12:40:28 | 7 | his testimony, I believe, said that he had talked to the |
| 12:40:32 | 8 | police right away, so immediately after the incident be. |
| 12:40:35 | 9 | Q.  When did you go see Gerald? |
| 12:40:37 | 10 | A.  I went -- I saw him twice, both times in 1999, first time |
| 12:40:43 | 11 | in June, second time I think in August. |
| 12:40:45 | 12 | Q.  And this is 13 years after the criminal trial when you're |
| 12:40:49 | 13 | working on the appeal, correct? |
| 12:40:50 | 14 | A.  Well, no.  Actually, at this point, the case -- I had -- |
| 12:40:58 | 15 | we had prevailed in the post conviction.  The state appealed |
| 12:41:03 | 16 | that, it had been affirmed by the Illinois Supreme Court, and |
| 12:41:07 | 17 | case had been remanded for a new trial. |
| 12:41:10 | 18 | Q.  So you were investigating -- |
| 12:41:12 | 19 | A.  So at this point, I am investigating the case for the |
| 12:41:15 | 20 | purposes of the new trial. |
| 12:41:17 | 21 | Q.  When you went to see Gerald Morris, who went with you? |
| 12:41:23 | 22 | A.  The first time I went with my partner, Tim lawyer, the |
| 12:41:26 | 23 | same person that talked to Randy. |
| 12:41:27 | 24 | Q.  Did the state give you Randy's -- Gerald's address? |
| 12:41:31 | 25 | A.  No, they did not. |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 11 of 215 PageID #:64750
***REALTIME UNEDITED TRANSCRIPT ONLY***

10

| | | |
|---|---|---|
| 12:41:33 | 1 | Q. Did you ask for it? |
| 12:41:34 | 2 | A. I asked for it and they objected to giving it to me so we |
| 12:41:42 | 3 | went ahead and found it ourselves. |
| 12:41:43 | 4 | Q. How did you find it? |
| 12:41:44 | 5 | A. In the phone book. |
| 12:41:46 | 6 | Q. What did you do when you got his address? |
| 12:41:47 | 7 | A. We went around to his house, and we talked to him. |
| 12:41:51 | 8 | Q. And did he know you were coming? |
| 12:41:53 | 9 | A. No, he did not. |
| 12:41:54 | 10 | Q. As a defense attorney, is there anything unusual in |
| 12:41:57 | 11 | knocking on somebody's door to talk to them without giving |
| 12:42:00 | 12 | them prior notice you're coming? |
| 12:42:02 | 13 | MR. KULWIN: I am going to object, asked and answered |
| 12:42:04 | 14 | and expert testimony. |
| 12:42:05 | 15 | THE COURT: It's not expert testimony. So that part |
| 12:42:07 | 16 | of the objection is overruled. But you did ask this question, |
| 12:42:11 | 17 | so that part is sustained. |
| 12:42:12 | 18 | MR. LOEVY: Okay. |
| 12:42:12 | 19 | BY MR. LOEVY: |
| 12:42:13 | 20 | Q. Did Gerald express any reluctance to talk to you, do you |
| 12:42:17 | 21 | remember any reluctance? |
| 12:42:18 | 22 | MR. KULWIN: Judge, I am going to object to leading. |
| 12:42:20 | 23 | THE COURT: Overruled. |
| 12:42:21 | 24 | THE WITNESS: He had no hesitation in talking to me |
| 12:42:25 | 25 | at all. |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 12 of 215 PageID #:64751
***REALTIME UNEDITED TRANSCRIPT ONLY***

11

| | | |
|---|---|---|
| 12:42:25 | 1 | BY MR. LOEVY: |
| 12:42:26 | 2 | Q. All right. What did you ask him, what did he tell you? |
| 12:42:28 | 3 | A. I referred back to his trial testimony, I said, look, you |
| 12:42:32 | 4 | were a witness at the trial of Nathson Fields, I now represent |
| 12:42:35 | 5 | Nathson Fields, and can you tell me was this testimony |
| 12:42:40 | 6 | accurate and correct. |
| 12:42:43 | 7 | Q. What did he say? |
| 12:42:44 | 8 | A. He said, no, it was. |
| 12:42:45 | 9 | Q. What did he tell you about that? |
| 12:42:46 | 10 | A. He told me that he actually could not see the faces of the |
| 12:42:52 | 11 | people who were running through the parking lot or running to |
| 12:42:56 | 12 | the parking lot, and that he actually was unable to identify |
| 12:43:03 | 13 | who these people were, and I then, because I knew he had |
| 12:43:08 | 14 | identified them at trial, so I said and also at a lineup, I |
| 12:43:13 | 15 | believe, so I said to him, well, how did you make an |
| 12:43:17 | 16 | identification then? How did you identify these people. |
| 12:43:20 | 17 | Q. And what did he say? |
| 12:43:21 | 18 | A. He said by intuition. |
| 12:43:23 | 19 | Q. All right. And did he -- did he -- did you take notes |
| 12:43:28 | 20 | during his statement? |
| 12:43:29 | 21 | A. No. During the statement, no. |
| 12:43:31 | 22 | Q. All right. What was the explanation for why he couldn't |
| 12:43:36 | 23 | see the people well enough to make an identification? |
| 12:43:38 | 24 | A. Because they were still wearing masks. |
| 12:43:40 | 25 | Q. Which direction were they running from him? |

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 13 of 215 PageID #:64752

| | | |
|---|---|---|
| 12:43:44 | 1 | A. They were running away from him. He said they were |
| 12:43:46 | 2 | running on a diagonal, so not right below the building but on |
| 12:43:51 | 3 | a diagonal to a car. |
| 12:43:52 | 4 | MR. LOEVY: Your Honor, may I ask Mr. Stainthorpe to |
| 12:43:55 | 5 | come down and show on the diagram the direction. |
| 12:43:57 | 6 | THE COURT: That's fine. If others need to see, you |
| 12:43:59 | 7 | can move to the other side of the courtroom. |
| 12:44:01 | 8 | BY MR. LOEVY: |
| 12:44:01 | 9 | Q. Mr. Stainthorpe, if you could orient the jury. The |
| 12:44:03 | 10 | shooting happened in the front of the building, right? |
| 12:44:05 | 11 | A. Yes. |
| 12:44:05 | 12 | Q. This is the building? |
| 12:44:06 | 13 | A. Yes. |
| 12:44:06 | 14 | Q. Are you oriented? |
| 12:44:08 | 15 | A. Here is the shooting. Gerald Morris is somewhere back |
| 12:44:12 | 16 | here, exactly how far over, I am in the sure. |
| 12:44:14 | 17 | Q. Somewhere back here? |
| 12:44:16 | 18 | A. Somewhere over here, so he can't see in the front. He can |
| 12:44:19 | 19 | only see the back, and then. |
| 12:44:21 | 20 | Q. The tunnel goes through the building? |
| 12:44:23 | 21 | A. The tunnel goes like this, and then he said he saw the men |
| 12:44:29 | 22 | running up on a diagonal over there. |
| 12:44:30 | 23 | Q. This is a parking lot with cars and you can't really see |
| 12:44:33 | 24 | it in the picture? |
| 12:44:34 | 25 | A. That's correct. |

11/17/16 PM     Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 14 of 215 PageID #:64753
***REALTIME UNEDITED TRANSCRIPT ONLY***

13

12:44:34   1   Q.  Did he say -- did he have any memory exactly where the car
12:44:37   2   was all those years later or just a general idea?
12:44:39   3   A.  My recollection is I thought he said it was on the street,
12:44:42   4   but, you know what, I don't have a real clear recollection of
12:44:45   5   that.
12:44:46   6   Q.  The men would have been running away from him at that
12:44:48   7   time, correct?
12:44:49   8   A.  Yes, correct.
12:44:50   9   Q.  Thank you.  .
12:45:04  10        All right.  Did you have any communications ^  with
12:45:09  11   anybody before you went to see Gerald Morris in in other
12:45:13  12   words, did you have -- did El Rukn, anybody associated with
12:45:17  13   the El Rukn street gang communicate with you in any way before
12:45:22  14   going to see him?
12:45:23  15   A.  Absolutely not.  I was going to see him because he
12:45:26  16   obviously was an important witness and I wanted to see.  Yeah,
12:45:30  17   I wanted to see what he was going to say.
12:45:32  18   Q.  All right.  You did file the post conviction petition,
12:45:34  19   correct?
12:45:35  20   A.  I did.
12:45:35  21   Q.  And what were some of the arguments you raised, do you
12:45:39  22   recall?
12:45:39  23   A.  So, initially, I filed two, I believe.
12:45:42  24   Q.  Let's start with the first one.
12:45:43  25   A.  Okay.  So the first one is filed in 1991 shortly after I

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 15 of 215 PageID #:64754
11/17/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

14

| | | |
|---|---|---|
| 12:45:49 | 1 | got the case.  There was a time limit.  It had to be within |
| 12:45:53 | 2 | six months of resolution of direct appeal.  So the primary |
| 12:45:59 | 3 | issues that I raised in that post conviction were allegations |
| 12:46:02 | 4 | of ineffective assistance of counsel. |
| 12:46:06 | 5 | Q.  Basically that the trial lawyer could have done a better |
| 12:46:09 | 6 | job? |
| 12:46:09 | 7 | A.  Exactly, both in terms of the guilt, innocence phase and |
| 12:46:13 | 8 | also in terms of the sentencing phase. |
| 12:46:16 | 9 | Q.  Any other arguments? |
| 12:46:17 | 10 | A.  There were other arguments.  There had been this somewhat |
| 12:46:23 | 11 | bizarre proceeding in the -- at the trial where after the |
| 12:46:29 | 12 | judge had found them guilty, the defense lawyers had brought a |
| 12:46:35 | 13 | motion to appoint a special prosecutor alleging that they had |
| 12:46:39 | 14 | been subjected to death threats, and. |
| 12:46:43 | 15 | Q.  Mr. Stainthorpe, let me lead you here? |
| 12:46:45 | 16 | A.  Yeah. |
| 12:46:46 | 17 | Q.  The death penalty was unconstitutional, correct? |
| 12:46:47 | 18 | A.  That was an allegation. |
| 12:46:49 | 19 | Q.  And there was no evidence of guilt an allegation, correct? |
| 12:46:52 | 20 | A.  That is correct. |
| 12:46:52 | 21 | Q.  All right.  Did you explain to Nate that you were trying |
| 12:46:56 | 22 | to make arguments that would help him save, you know, win the |
| 12:47:00 | 23 | appeal? |
| 12:47:00 | 24 | A.  Oh, absolutely, yes. |
| 12:47:02 | 25 | Q.  And was -- did you explain to him that you weren't going |

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 16 of 215 PageID #:64755

| | | |
|---|---|---|
| 12:47:05 | 1 | to get a lot of chances for that? |
| 12:47:06 | 2 | A.  You get one chance for post conviction.  You can amend the |
| 12:47:10 | 3 | post conviction, but that's it. |
| 12:47:11 | 4 | Q.  All right.  In the five years after Nate's conviction, did |
| 12:47:15 | 5 | you ever raise the argument that the trial was corrupted? |
| 12:47:19 | 6 | A.  Well, yes, I did, because. |
| 12:47:21 | 7 | Q.  Before you got to the second petition.  I'm saying until |
| 12:47:24 | 8 | you got to the second petition when you filed the first one, |
| 12:47:27 | 9 | was there any argument that there was any kind of problem with |
| 12:47:30 | 10 | the bribe? |
| 12:47:30 | 11 | A.  Oh, no.  I was completely unaware of any allegation of a |
| 12:47:34 | 12 | bribe at the time of filing the first petition. |
| 12:47:37 | 13 | Q.  Did Nate give you every opportunity -- did you give Nate |
| 12:47:41 | 14 | every opportunity to help you make arguments to save his life? |
| 12:47:45 | 15 | A.  Oh, yeah.  Obviously, as I said I went to talk to him, I |
| 12:47:49 | 16 | would talk about the petition.  I believe he had to verify the |
| 12:47:53 | 17 | petition too. |
| 12:47:53 | 18 | Q.  All right.  Did you at any time have any knowledge that |
| 12:47:56 | 19 | this was an argument that you could raise after talking to Mr. |
| 12:47:59 | 20 | Fields? |
| 12:47:59 | 21 | A.  No the at all. |
| 12:48:00 | 22 | Q.  All right.  Let's change topics, sir. |
| 12:48:03 | 23 |      Your office represented -- how many people in your |
| 12:48:05 | 24 | office at the time? |
| 12:48:05 | 25 | A.  Of this? |

| | | |
|---|---|---|
| 12:48:07 | 1 | Q. Yeah. |
| 12:48:07 | 2 | A. Probably around eight. |
| 12:48:11 | 3 | Q. All right. And there was another lawyer who represented |
| 12:48:13 | 4 | another participant at the trial, correct? Do you remember |
| 12:48:18 | 5 | George Carter? |
| 12:48:19 | 6 | A. Okay. |
| 12:48:20 | 7 | Q. Not at the trial, I'm sorry, another person who was |
| 12:48:23 | 8 | accused of the crime, right? |
| 12:48:27 | 9 | THE COURT: Why don't you restate the question. Slow |
| 12:48:29 | 10 | it down a little bit. |
| 12:48:30 | 11 | MR. LOEVY: All right. |
| 12:48:31 | 12 | THE COURT: And just ask clearer questions. |
| 12:48:33 | 13 | BY MR. LOEVY: |
| 12:48:33 | 14 | Q. Did anybody in your office represent anybody that had a |
| 12:48:36 | 15 | connection to the case? |
| 12:48:37 | 16 | A. Yes. |
| 12:48:39 | 17 | Q. Who was that? |
| 12:48:39 | 18 | A. My partner at the time, Peter /SPHAO*EL, who was a member |
| 12:48:46 | 19 | of the Federal Defender panel had represented in federal |
| 12:48:49 | 20 | court, so different court system, George Carter, who. |
| 12:48:56 | 21 | THE COURT: That's the answer to the question. Ask |
| 12:48:58 | 22 | another question. |
| 12:48:58 | 23 | BY MR. LOEVY: |
| 12:48:58 | 24 | Q. All right. Did you have -- did you coordinate defenses |
| 12:49:01 | 25 | with George Carter's attorney in any way? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 18 of 215 PageID #:64757
***REALTIME UNEDITED TRANSCRIPT ONLY***

17

| | | |
|---|---|---|
| 12:49:03 | 1 | A. No. |
| 12:49:03 | 2 | Q. All right. Let's talk about the subpoenas that you served |
| 12:49:09 | 3 | prior to the retrial. |
| 12:49:10 | 4 | You got ready to do the retrial with Mr. Fields, |
| 12:49:13 | 5 | correct? |
| 12:49:14 | 6 | A. Yes, that is correct. |
| 12:49:15 | 7 | Q. And you did some investigation? |
| 12:49:17 | 8 | A. Yes. |
| 12:49:17 | 9 | Q. Did you serve some subpoenas? |
| 12:49:19 | 10 | A. I did. |
| 12:49:19 | 11 | Q. Tell us what you did and why? |
| 12:49:21 | 12 | A. Okay. So the first subpoena actually dates from 1991. So |
| 12:49:28 | 13 | that's from when I was dealing with the post conviction |
| 12:49:31 | 14 | petition. And then subsequently after we had won the post |
| 12:49:38 | 15 | conviction and it came back for a retrial, I sent three |
| 12:49:41 | 16 | additional subpoenas. |
| 12:49:41 | 17 | Q. What did -- really briefly, what is a subpoena? |
| 12:49:45 | 18 | A. A subpoena is essentially a legal order to someone. It's |
| 12:49:50 | 19 | signed by either the clerk or the attorney, and it is a legal |
| 12:49:54 | 20 | order to someone or an institution, to produce certain |
| 12:49:59 | 21 | documents. |
| 12:49:59 | 22 | Q. All right. And what did you serve -- seek in serving |
| 12:50:04 | 23 | those subpoenas? |
| 12:50:05 | 24 | A. I sought every police report, memorandum, notes, informal |
| 12:50:13 | 25 | notes, street files, detective files, running files. I tried |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 19 of 215 PageID #:64758
***REALTIME UNEDITED TRANSCRIPT ONLY***

18

| | | |
|---|---|---|
| 12:50:18 | 1 | to be as complete as possible in terms of asking for every |
| 12:50:22 | 2 | document that conceivably pertained to Nathson Fields's case. |
| 12:50:27 | 3 | MR. LOEVY:  Your Honor, at this time we move |
| 12:50:29 | 4 | Plaintiff's Exhibit 31 into evidence.  These are the |
| 12:50:31 | 5 | subpoenas. |
| 12:50:33 | 6 | MR. BURNS:  Just a minute. |
| 12:50:37 | 7 | MR. NOLAND:  No objection, your Honor. |
| 12:50:38 | 8 | THE COURT:  Hang on one second.  I am now thinking |
| 12:50:43 | 9 | that maybe the microphones at the tables have been turned back |
| 12:50:46 | 10 | on.  Sorry.  I will turn those off.  What's the exhibit number |
| 12:50:51 | 11 | again Mr. Loevy? |
| 12:50:53 | 12 | MR. LOEVY:  31. |
| 12:50:53 | 13 | THE COURT:  It's admitted. |
| 12:50:55 | 14 | (Above-mentioned exhibit was received in evidence.) |
| 12:50:56 | 15 | BY MR. LOEVY: |
| 12:50:57 | 16 | Q.  This is the subpoena you served, correct? |
| 12:50:58 | 17 | A.  This is the one from 1991. |
| 12:51:00 | 18 | Q.  All right.  And showing you the request, by the way, in |
| 12:51:03 | 19 | your work at your office, you sometimes bring lawsuits against |
| 12:51:06 | 20 | the City of Chicago, correct? |
| 12:51:07 | 21 | A.  That is correct. |
| 12:51:07 | 22 | Q.  And by doing that, you've gained some familiarity with the |
| 12:51:11 | 23 | record keeping and file keeping practices of the department, |
| 12:51:13 | 24 | correct? |
| 12:51:14 | 25 | A.  That is correct. |

12:51:14   1   Q. All right.  Showing you what you sought, can you summarize

12:51:19   2   for the -- that's basically what you answered, right, you

12:51:22   3   sought every kind of name for what the investigative file is?

12:51:25   4   A. Correct.  I knew the police officers and especially the

12:51:32   5   detectives kept files under several, they called them several

12:51:35   6   different things, so I tried to include every name that I had

12:51:38   7   ever heard.

12:51:39   8   Q. All right.  And turning you to page 4 of the same exhibit,

12:51:44   9   you received this response on what date, sir?

12:51:46  10   A. Okay.  No -- okay.  Actually, I think it's June the 12th.

12:51:54  11   Q. In any event, a memo dated June the 10th?

12:51:56  12   A. June 12th, 1991, so I get a response to this subpoena, and

12:52:03  13   it is from the commander of detective division Area 1 which

12:52:09  14   says there are no documents on file at detective division Area

12:52:13  15   1 pertaining to the above subject.

12:52:14  16   Q. All right.  What did you do when you got back that there

12:52:18  17   are no such investigative files?

12:52:20  18   A. Well, at that point, I didn't pursue it further.  At that

12:52:23  19   point, I was dealing with the post conviction and nothing came

12:52:27  20   up.

12:52:27  21   Q. Did you subsequently serve additional subpoenas?

12:52:30  22   A. Yes.  So several years later when the case is now back for

12:52:35  23   retrial, I served three additional subpoenas.

12:52:37  24   Q. And did you receive any -- did you receive the

12:52:41  25   investigative file in response to those subpoenas, sir?

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 21 of 215 PageID #:64760
***REALTIME UNEDITED TRANSCRIPT ONLY***

20

12:52:43  1  A.  I did not.

12:52:45  2  Q.  What did you get back?  Did you get back any new documents

12:52:49  3  that you previously didn't have?

12:52:50  4  A.  Yes, I believe I got a photograph of -- that appeared to

12:52:56  5  be of a lineup with someone holding up Mr. Fields' shirt.

12:52:59  6  Q.  All right.  Showing you Defendant's Exhibit 88, page 5,

12:53:03  7  this is in evidence, your Honor?

12:53:05  8       THE COURT:  Okay.

12:53:06  9  BY MR. LOEVY:

12:53:06  10  Q.  This is a copy of the photo you got back?

12:53:09  11  A.  Yes.

12:53:10  12  Q.  And this had not previously been disclosed?

12:53:12  13  A.  Correct.

12:53:13  14  Q.  Showing you the same exhibit, page 2, had the lineup photo

12:53:17  15  been disclosed?

12:53:18  16  A.  You know what, I am not sure whether that had been

12:53:25  17  disclosed.

12:53:25  18  Q.  If you are not sure, it's best to say you are not sure.

12:53:28  19       Let's turn your attention back to the post conviction

12:53:30  20  petition.  There is a reference in there, is there not, that

12:53:35  21  you have had a chance to review to a high ranking for Mr.

12:53:40  22  Fields.  Do you remember that reference?

12:53:41  23  A.  I do.

12:53:41  24  Q.  Having reviewed the document, correct?

12:53:43  25  A.  Yes.

12:53:43  1  Q.  Do you have any personal knowledge about the El Rukns,

12:53:45  2  whether an officer is high ranking or how high ranking an

12:53:48  3  officer is?

12:53:49  4  A.  I don't.  I know very little about the El Rukns.

12:53:51  5  Q.  All right.  What was the outcome of the petition, that

12:53:55  6  first one?

12:53:55  7  A.  Well, the first -- it was amended.  I amended it about a

12:53:59  8  year later.

12:54:00  9  Q.  And was that to include when you learned about the

12:54:02  10  allegations of the bribe?

12:54:04  11  A.  Yeah, because subsequently Judge Maloney, who was the

12:54:07  12  trial judge who had presided over Nathson's case was indicted

12:54:14  13  for taking a $10,000 bribe in the case and then returning it.

12:54:17  14  Q.  All right.  What year was that?

12:54:18  15  A.  I think that was 92.

12:54:20  16  Q.  And did you then catch your legal filings up to this new

12:54:24  17  information?

12:54:24  18  A.  That and another issue also.

12:54:27  19  Q.  What was Nate's -- what did the Court do to your revised

12:54:31  20  petition?

12:54:32  21  A.  After some litigation, the petition was granted and so

12:54:41  22  both the conviction and the death sentence were vacated.

12:54:43  23  Q.  All right.  Were you able to communicate that to Mr.

12:54:46  24  Fields?

12:54:46  25  A.  Yes.

| 12:54:47 | 1 | Q. All right. Do you remember his reaction? |
| 12:54:49 | 2 | A. Well, I think he was very relieved. |
| 12:54:52 | 3 | Q. All right. But was he free of the charges? |
| 12:54:54 | 4 | A. No. |
| 12:54:56 | 5 | Q. There was a retrial pending, correct? |
| 12:54:58 | 6 | A. Well, actually, there's another step before that. |
| 12:55:01 | 7 | Q. What was the next step? |
| 12:55:03 | 8 | A. Okay. So the next step is that the state appealed Judge |
| 12:55:07 | 9 | Dooling's decision to the Illinois Supreme Court. All death |
| 12:55:12 | 10 | penalty cases, they don't go to the enter media appellate |
| 12:55:15 | 11 | court, they go directly to the Illinois Supreme Court, so the |
| 12:55:18 | 12 | state appealed Judge Dooling's decision to the Illinois |
| 12:55:22 | 13 | Supreme Court. I represented Nathson during that appeal, did |
| 12:55:27 | 14 | the oral argument and the Illinois Supreme Court affirmed |
| 12:55:32 | 15 | Judge Dooling's decision vacating both the conviction and the |
| 12:55:34 | 16 | sentence. |
| 12:55:35 | 17 | Q. All right. Were you getting paid for all this |
| 12:55:37 | 18 | professional work, sir? |
| 12:55:38 | 19 | A. A little bit. I was still appointed via the capital |
| 12:55:42 | 20 | resource center. |
| 12:55:44 | 21 | Q. And did there come a point where you were no longer |
| 12:55:47 | 22 | getting paid by the capital resource center? |
| 12:55:49 | 23 | A. Yes. After the case was remanded to the Circuit Court of |
| 12:55:54 | 24 | Cook County, the state decided that they were not going to |
| 12:55:59 | 25 | pursue the death penalty anymore. |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 24 of 215 PageID #:64763
***REALTIME UNEDITED TRANSCRIPT ONLY***

23

| | | |
|---|---|---|
| 12:56:02 | 1 | Q. And that meant you were not able to get money? |
| 12:56:05 | 2 | A. At that point, I could no longer be appointed as a capital |
| 12:56:09 | 3 | defense lawyer because there was no death penalty, so at that |
| 12:56:12 | 4 | point, my official appointment ended. |
| 12:56:16 | 5 | Q. All right. Were you able to keep working for free, sir? |
| 12:56:18 | 6 | A. Well, it was almost free, but I did want to keep |
| 12:56:26 | 7 | representing Nathson in the case and we did enter into an |
| 12:56:30 | 8 | agreement that he and his family would pay me to continue |
| 12:56:34 | 9 | representing him, and so I actually represented him for quite |
| 12:56:39 | 10 | a while. |
| 12:56:39 | 11 | Q. How much money was him and his family able to come up |
| 12:56:44 | 12 | with? |
| 12:56:45 | 13 | A. $4,000. |
| 12:56:45 | 14 | Q. Was that commence rale with the market value of the |
| 12:56:49 | 15 | services you were providing? |
| 12:56:50 | 16 | MR. KULWIN: Judge, I object, relevance. |
| 12:56:53 | 17 | THE COURT: Overruled. |
| 12:56:55 | 18 | THE WITNESS: I mean, I did a ton of work. It wasn't |
| 12:56:57 | 19 | even close. |
| 12:56:58 | 20 | BY MR. LOEVY: |
| 12:56:58 | 21 | Q. Did you subsequently decide to withdraw? |
| 12:56:59 | 22 | A. Yes, sometime later, though, after I had represented him |
| 12:57:02 | 23 | for quite a while. |
| 12:57:03 | 24 | Q. All right. Did you take steps to ensure that he got new |
| 12:57:06 | 25 | counsel? |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 25 of 215 PageID #:64764
***REALTIME UNEDITED TRANSCRIPT ONLY***

24

| | | |
|---|---|---|
| 12:57:07 | 1 | A.  Yes, I did. |
| 12:57:07 | 2 | Q.  Who did you introduce him to? |
| 12:57:09 | 3 | A.  He had contact with attorneys who were excellent attorneys |
| 12:57:17 | 4 | at the University of Chicago, shell and Gene Snyder. |
| 12:57:23 | 5 | Q.  You mentioned the issue about Mr. Swano, Mr. Hawkins' |
| 12:57:28 | 6 | attorney bribing the judge.  Did you take steps to investigate |
| 12:57:30 | 7 | that as part of your amended post conviction petition? |
| 12:57:32 | 8 | A.  Well, I think the -- yes, but most of that was depending |
| 12:57:39 | 9 | on the prosecution of Judge Maloney, so I made myself familiar |
| 12:57:46 | 10 | with the information that came out. |
| 12:57:48 | 11 | Q.  As part of the reply brief that you filed, the reply to |
| 12:57:51 | 12 | the petition that the jury read about yesterday, did you talk |
| 12:57:54 | 13 | to Mr. Smeeton? |
| 12:57:57 | 14 | A.  I did talk to Mr. Smeeton. |
| 12:57:59 | 15 | Q.  And what did your investigation uncover with that? |
| 12:58:04 | 16 | MR. BURNS:  Objection, your Honor? |
| 12:58:05 | 17 | THE COURT:  Can I see the lawyers at sidebar, please. |
| 12:58:11 | 18 | (The following proceedings were had at sidebar outside the |
| 12:58:16 | 19 | hearing of the jury:) |
| 12:58:16 | 20 | THE COURT:  What do you expect the answer to be? |
| 12:58:20 | 21 | MR. LOEVY:  He talked to Mr. Smeeton, he prepared an |
| 12:58:24 | 22 | affidavit, the affidavit confirmed that Nate had no |
| 12:58:26 | 23 | involvement and he filed it as part of the petition. |
| 12:58:31 | 24 | THE COURT:  This is filed in the PC? |
| 12:58:33 | 25 | MR. LOEVY:  Exhibit C to the reply. |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 26 of 215 PageID #:64765
***REALTIME UNEDITED TRANSCRIPT ONLY***

25

| | | |
|---|---|---|
| 12:58:35 | 1 | THE COURT: Oh, reply to what? The brief in front of |
| 12:58:41 | 2 | the trial court. |
| 12:58:41 | 3 | MR. LOEVY: I was told the reply in support of the |
| 12:58:44 | 4 | PC. |
| 12:58:45 | 5 | THE COURT: The trial court. Okay. |
| 12:58:48 | 6 | MR. LOEVY: I wasn't going to introduce the |
| 12:58:50 | 7 | affidavit. |
| 12:58:50 | 8 | THE COURT: Well, but you want to elicit from him |
| 12:58:52 | 9 | what Mr. Smeeton told him. |
| 12:58:53 | 10 | MR. LOEVY: Um-hmm. |
| 12:58:54 | 11 | THE COURT: Okay. And I guess what's the nature of |
| 12:58:57 | 12 | the objection? |
| 12:58:58 | 13 | MR. BURNS: First and foremost, your Honor, it's |
| 12:59:00 | 14 | hearsay. |
| 12:59:01 | 15 | THE COURT: Okay. Is there some non-hearsay basis |
| 12:59:03 | 16 | for which you think this is admissible? |
| 12:59:05 | 17 | MR. LOEVY: Well, it supports his investigation, it |
| 12:59:08 | 18 | completes the, you know, the investigation. |
| 12:59:11 | 19 | THE COURT: The objection is sustained. |
| 12:59:13 | 20 | (The following proceedings were had in open court in the |
| 12:59:19 | 21 | presence and hearing of the jury:) |
| 12:59:19 | 22 | THE COURT: All right. The objection is sustained. |
| 12:59:21 | 23 | BY MR. LOEVY: |
| 12:59:21 | 24 | Q. I am going to change topics, sir. |
| 12:59:23 | 25 | You mentioned yesterday that you went out to the |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 12:59:27 | 1 | scene and there was some measurements that you had referenced |
| 12:59:31 | 2 | earlier? |
| 12:59:32 | 3 | A.  Yes. |
| 12:59:32 | 4 | Q.  I am going to show you the trial testimony of |
| 12:59:36 | 5 | Mr. Smeeton's investigator, a man named Mr. Beseth.  This is |
| 12:59:44 | 6 | page 512 of the trial testimony? |
| 12:59:46 | 7 | THE COURT:  '86 trial? |
| 12:59:47 | 8 | MR. LOEVY:  Yes, the first trial. |
| 12:59:50 | 9 | BY MR. LOEVY: |
| 12:59:50 | 10 | Q.  And just to refresh your recollection since you |
| 12:59:53 | 11 | undoubtedly haven't memorized the transcript.  Since the day |
| 12:59:56 | 12 | you made the plat, have you had occasion to measure the |
| 12:59:59 | 13 | distance from the pitching mound in the baseball field to the |
| 01:00:01 | 14 | corner of the breezeway.  The answer why is, yes, I have. |
| 01:00:04 | 15 | What is that distance?  Answer, 155 feet, approximately. |
| 01:00:09 | 16 | When you went to the scene, did you rely and review |
| 01:00:12 | 17 | that distance from the pitcher's mound to the breezeway? |
| 01:00:15 | 18 | A.  Yes, and that seemed accurate. |
| 01:00:17 | 19 | Q.  All right.  I want to change topics again, sir. |
| 01:00:20 | 20 | You have subsequently learned in preparing to talk |
| 01:00:23 | 21 | about these issues at this trial that a new file showed up in |
| 01:00:27 | 22 | 2010, 2011, correct? |
| 01:00:30 | 23 | A.  That is correct. |
| 01:00:30 | 24 | Q.  You have had a chance to review it and look through it |
| 01:00:34 | 25 | carefully? |

01:00:34    1    A.  I have.

01:00:35    2         MR. LOEVY:  That's Plaintiff's Exhibit 1, your Honor.

01:00:37    3    BY MR. LOEVY:

01:00:37    4    Q.  That's the investigative file.

01:00:38    5         Had you had access to this investigative file during

01:00:41    6    your preparation of the criminal defense for Mr. Fields?

01:00:44    7    A.  The majority of it, no.  There is I think one police

01:00:48    8    report in there that I did have.

01:00:50    9    Q.  All right.  But the file itself, was that made available

01:00:53   10    to the defense?

01:00:54   11    A.  No.

01:00:54   12    Q.  All right.  Let's talk about some of the things in it.

01:00:57   13         First of all, can you describe generally what this

01:01:00   14    investigative file is that showed up?

01:01:01   15    A.  Well, it appears to be notes, memoranda, inform at reports

01:01:10   16    for the most part, so not formally written on Chicago Police

01:01:16   17    Department forms that relate to the investigation of the

01:01:21   18    Smith/Hickman murders.

01:01:22   19    Q.  Is there any reference to Mr. Nathson Fields anywhere in

01:01:26   20    the investigative file?

01:01:27   21    A.  There is not.

01:01:28   22    Q.  All right.  If you had had access to this file during the

01:01:35   23    investigative stage of preparing for the retrial,would you

01:01:39   24    have been able to investigate the leads and material within

01:01:42   25    it?

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 29 of 215 PageID #:64768
***REALTIME UNEDITED TRANSCRIPT ONLY***

28

| | | |
|---|---|---|
| 01:01:42 | 1 | A. I would have certainly I would have attempted to and the |
| 01:01:47 | 2 | file contains a lot of leads in terms of alternate suspects. |
| 01:01:53 | 3 | Q. Let's talk about it and let's go more question and answer. |
| 01:01:57 | 4 | A. Sure. |
| 01:01:57 | 5 | Q. So I don't get one-sided here. |
| 01:02:01 | 6 | Let's take a look at the documents related to Ricky |
| 01:02:05 | 7 | Baldwin's brother. You didn't know who Ricky Baldwin was back |
| 01:02:09 | 8 | when you represented Mr. Fields, correct? |
| 01:02:10 | 9 | A. I don't believe I did. |
| 01:02:11 | 10 | Q. All right. Showing you a copy of Plaintiff's Exhibit 1, |
| 01:02:14 | 11 | page 104? |
| 01:02:17 | 12 | MR. LOEVY: The investigative file is in evidence, |
| 01:02:19 | 13 | your Honor. |
| 01:02:19 | 14 | THE COURT: Okay. |
| 01:02:20 | 15 | BY MR. LOEVY: |
| 01:02:20 | 16 | Q. Describe -- |
| 01:02:21 | 17 | THE COURT: This is 104, you said? |
| 01:02:23 | 18 | MR. LOEVY: It's 1, page 104. |
| 01:02:25 | 19 | THE COURT: Page 104 of Exhibit 1. |
| 01:02:27 | 20 | MR. LOEVY: Correct. |
| 01:02:28 | 21 | BY MR. LOEVY: |
| 01:02:28 | 22 | Q. This is a to from memo, correct, to from? |
| 01:02:34 | 23 | A. Yeah, okay. |
| 01:02:35 | 24 | Q. It does not bear a date, does it? |
| 01:02:37 | 25 | A. It does not. |

| | |
|---|---|
| 01:02:38 | 1 | Q. All right. I am going to turn your attention to the first |
| 01:02:41 | 2 | paragraph, and I'll make you read it instead of me. Can you |
| 01:02:46 | 3 | read it. |
| 01:02:46 | 4 | A. Okay. No time to leave a supp. We interviewed Langston, |
| 01:02:51 | 5 | James, male, black, age 14, of '706 East 39th Street, |
| 01:02:57 | 6 | apartment 106. He witnessed the murders. He was playing |
| 01:03:00 | 7 | baseball across the street from the scene. |
| 01:03:02 | 8 | A. He said that the offenders were wearing skull caps pulled |
| 01:03:06 | 9 | over their faces to conceal their identity. He saw the |
| 01:03:09 | 10 | offenders fleeing in a blue Cadillac. He said the car went |
| 01:03:12 | 11 | south on Langley and then went on 39th. He said that there |
| 01:03:15 | 12 | were four men in the car. The person sitting -- it says |
| 01:03:19 | 13 | setting, I think it's sitting next to the driver in the front |
| 01:03:22 | 14 | seat was the brother of Ricky Baldwin, a/k/a, Rick dog, who |
| 01:03:26 | 15 | was murdered last summer. File number R. D. Number, see our |
| 01:03:33 | 16 | notes for more details. |
| 01:03:35 | 17 | Q. Okay. So this person, this Langston brother was claiming |
| 01:03:38 | 18 | that somebody in the car was a brother of Ricky Baldwin, |
| 01:03:43 | 19 | correct? |
| 01:03:43 | 20 | A. Yes. |
| 01:03:43 | 21 | Q. The second paragraph here says that the detectives showed |
| 01:03:48 | 22 | photos, probably to Mr. Loevy there, of two of the Baldwin |
| 01:03:54 | 23 | brothers, Shawn and Paul, correct? |
| 01:03:55 | 24 | A. Yes. |
| 01:03:55 | 25 | Q. And he did recognize Shawn as one of the Baldwins, but not |

| | | |
|---|---|---|
| 01:03:59 | 1 | the bald win brother he was talking? |
| 01:04:03 | 2 | A.  Not the person in the car, right. |
| 01:04:05 | 3 | Q.  You did not have any of this information back during the |
| 01:04:07 | 4 | criminal defense, right? |
| 01:04:08 | 5 | A.  I don't believe I did. |
| 01:04:09 | 6 | Q.  All right.  Let's take a look at another page here.  This |
| 01:04:13 | 7 | is also in the file.  Be this is page 106.  I'm sorry.  I am |
| 01:04:23 | 8 | going to go straight to page 145 first. |
| 01:04:26 | 9 |        This is would it be fair to characterize this as a |
| 01:04:32 | 10 | note, a handwritten note in the file? |
| 01:04:35 | 11 | A.  It appears to be. |
| 01:04:36 | 12 | Q.  It says they got an anonymous tip, right? |
| 01:04:38 | 13 | A.  Yes. |
| 01:04:39 | 14 | Q.  It says the guy driving the car was early -- was Ed |
| 01:04:43 | 15 | Stewart with Darryl Baldwin and Chico, correct? |
| 01:04:47 | 16 | A.  Yes. |
| 01:04:47 | 17 | Q.  And then it got further information, right? |
| 01:04:50 | 18 | A.  Correct. |
| 01:04:50 | 19 | Q.  So that is at least two people claiming that one of the |
| 01:04:55 | 20 | Baldwin brothers might have been involved in the shooting, |
| 01:04:59 | 21 | correct? |
| 01:04:59 | 22 | A.  Yes. |
| 01:04:59 | 23 | Q.  And then showing you the same exhibit, Page 91, a |
| 01:05:03 | 24 | different note on a different page, girlfriend of offender, |
| 01:05:09 | 25 | Jimmy green in Baldwin's home is Linda Smith and additional |

***REALTIME UNEDITED TRANSCRIPT ONLY***

01:05:13   1   information including sister of Jerome Smith, right?

01:05:16   2   A. Yes.

01:05:16   3   Q. Do you have any idea why they were calling Jimmy green the

01:05:19   4   offender in the Baldwin home at this time?

01:05:21   5   A. Well, it looks like he had been charged in it.

01:05:24   6           MR. KULWIN:  Objection, your Honor.

01:05:25   7           THE COURT:  Yeah, the objection is sustained.  Asking

01:05:27   8   why somebody else wrote something.

01:05:28   9   BY MR. LOEVY:

01:05:29  10   Q. But you have no knowledge, correct?

01:05:30  11   A. I do not.

01:05:33  12   Q. Okay.  Let's take a look at page 106 of the same document,

01:05:38  13   and -- sorry, different document.

01:05:40  14           Describe what this is.  It's called a general

01:05:42  15   progress report.  It looks like it's undated and it's signed

01:05:45  16   by minute owe, does it not?

01:05:48  17   A. Yes.

01:05:48  18   Q. What is a general -- wait.  Sorry.  It's dated up here in

01:05:52  19   typing, May and April 1984?

01:05:56  20   A. Yes.

01:05:57  21   Q. What is a general progress report?

01:05:58  22   A. So this was the form that was created to -- that

01:06:05  23   detectives were supposed to memorialize their more informal

01:06:09  24   notes with respect to an investigation.

01:06:10  25   Q. All right.  Let's take a look at the first paragraph.  Can

11/17/16 PM  Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 33 of 215 PageID #:64772
***REALTIME UNEDITED TRANSCRIPT ONLY***

32

| 01:06:13 | 1 | you read that paragraph?  This also relates obviously to the |
| 01:06:18 | 2 | Smith/Hickman homicide? |
| 01:06:20 | 3 | A.  Correct.  The following information was provided to the R. |
| 01:06:23 | 4 | D.S, reporting detectives, by Mr. David m-i-n-n-i-f-i-e-l-d, |
| 01:06:29 | 5 | male black age 26 who was the utility janitor at Dearborn |
| 01:06:33 | 6 | homes, 2960 south federal, phone number.  On 29th of April 84 |
| 01:06:37 | 7 | at 2010 hours he received an on anonymous phone call from a |
| 01:06:42 | 8 | youthful male black.  The Caller said he saw a phone number on |
| 01:06:45 | 9 | television, phone number, for persons with information |
| 01:06:47 | 10 | regarding this homicide.  The Caller told motion in limine |
| 01:06:50 | 11 | that Edward Stewart was driving the car used in the murder and |
| 01:06:54 | 12 | that Stewart was in the company of Darryl Baldwin and Chico. |
| 01:06:59 | 13 | He also said that Stewart was living with Olivia Wallace at |
| 01:07:03 | 14 | 4716 south Cottage Grove, apartment 220.  He had no further |
| 01:07:06 | 15 | information. |
| 01:07:07 | 16 | Q.  Now, at the bottom, it looks like this detective minute |
| 01:07:10 | 17 | owe did some investigation.  Can you read the last sentence |
| 01:07:12 | 18 | there? |
| 01:07:13 | 19 | A.  Yeah, it says s-t-e-w-a-r-s, photo, and also in the file, |
| 01:07:19 | 20 | there is not a record for Darryl Baldwin in the alpha file. |
| 01:07:23 | 21 | Q.  All right.  And there were some photos in the file, for |
| 01:07:26 | 22 | example, of Paul Baldwin, correct? |
| 01:07:29 | 23 | A.  Yeah, the other two Baldwin brothers. |
| 01:07:31 | 24 | Q.  But apparently, they could not find a photo of Darryl |
| 01:07:36 | 25 | Baldwin? |

01:07:36   1   A.  That's what this appears to indicate.

01:07:38   2   Q.  Did you see anything in the file that anybody took that

01:07:41   3   lead anything further trying to find a photo of Darryl and

01:07:44   4   show it to anybody?

01:07:45   5   A.  No.  as far as I recall, there's nothing in that

01:07:49   6   investigative file that shows any further investigation with

01:07:52   7   respect to that.

01:07:53   8   Q.  If you had received this information back in 1999, what

01:07:57   9   would you have done?

01:07:57  10   A.  I would have attempted to investigate this.  This

01:08:02  11   obviously was potentially exculpatory information as providing

01:08:06  12   a version of events that contradicted the state's version of

01:08:10  13   events.

01:08:10  14   Q.  Is alternate suspects the kind of thing that could be

01:08:13  15   useful to a criminal defense attorney?

01:08:15  16   A.  It certainly could, that could be -- if it pans out, that

01:08:19  17   could be a viable form of defense.

01:08:20  18   Q.  All right.  Taking a look at this paragraph here, the one

01:08:25  19   immediately above it, Edward Stewart was allegedly the driver?

01:08:29  20   A.  Yes.

01:08:29  21   Q.  To summarize it, there's some background information, and

01:08:33  22   somebody has asked for his alibi it looks like.  On the date

01:08:36  23   of his murder he was in his apartment and went to work, works

01:08:40  24   at McDonald's, he began his sift at 10:30, that's what it

01:08:44  25   says, correct?

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 35 of 215 PageID #:64774
11/17/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

34

01:08:45   1   A.  Correct.

01:08:45   2   Q.  It also says we could not verify his alibi because

01:08:49   3   McDonald's was closed that day?

01:08:51   4        MR. KULWIN:  Your Honor, I apologize.  Our screens

01:08:53   5   don't -- they just went out.

01:08:55   6        THE COURT:  Out out?  Is it possible that you brushed

01:08:57   7   against the switch?

01:09:00   8        MR. KULWIN:  Anything is possible, Judge.  I didn't

01:09:02   9   mean to.

01:09:02   10       THE COURT:  Both of yours went out?

01:09:05   11       MR. KULWIN:  They both went out.

01:09:07   12       THE COURT:  That suggests it's not a wire or

01:09:08   13  something.  No slight intended to the people on that side of

01:09:50   14  the table.  They need to see it more importantly than you.

01:09:53   15       Go ahead, Mr. Loevy.

01:09:54   16       MR. LOEVY:

01:09:55   17  BY MR. LOEVY:

01:09:56   18  Q.  There is this sentence here, we could not verify his

01:09:58   19  alibi.  McDonald's was closed.  Do you see that?

01:10:01   20  A.  I do.

01:10:02   21  Q.  There was some ambiguity as to whether McDonald's was

01:10:05   22  closed during the time of his alibi or closed when they

01:10:08   23  checked?

01:10:09   24       MR. KULWIN:  Objection, your Honor.

01:10:10   25       THE COURT:  Overruled.


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 36 of 215 PageID #:64775
11/17/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

35

01:10:11  1        THE WITNESS:  Yes, I agree.  That's an ambiguous

01:10:14  2   statement.

01:10:14  3   BY MR. LOEVY:

01:10:15  4   Q.  Do you see anything in the file anywhere else that anybody

01:10:16  5   did anything else to determine whether Edward Stewart had a

01:10:17  6   viable alibi or not?

01:10:18  7   A.  I didn't see anything.

01:10:19  8   Q.  All right.  There were other alternative suspects

01:10:23  9   identified in this investigative file, were there not?

01:10:26  10  A.  There were.

01:10:27  11  Q.  Do you remember reviewing the documents that you did

01:10:30  12  receive learning about a shooting of a man named Delbert

01:10:34  13  Edwards the night before somebody assassinated Fuddy Smith?

01:10:40  14  A.  Yes.

01:10:40  15  Q.  And this was in the police reports, was it not, that were

01:10:43  16  provided to Mr. Fields?

01:10:44  17  A.  There was some information about that incident in a police

01:10:47  18  report, yes.

01:10:48  19  Q.  Taking a look at Plaintiff's Exhibit 1, page 79, I am

01:10:53  20  going to show you what was disclosed in the police report that

01:10:55  21  was provided to Mr. Fields.  Delbert Edwards was interviewed

01:11:00  22  and he reported that he was shot at by members of the Goon

01:11:04  23  Squad and that he reported this to the police.  Do you see

01:11:07  24  that?

01:11:07  25  A.  I do see that.

11/17/16 PM

36

01:11:08  1  Q.  And that they were arrested on April 27th, the day before

01:11:10  2  the murder at about 1530?

01:11:13  3  A.  Correct.

01:11:13  4  Q.  And further information that he spent the night, he didn't

01:11:20  5  get up the next day until 11:30 and then he heard the

01:11:24  6  shootings, correct?

01:11:24  7  A.  That's correct.

01:11:25  8  Q.  From his father who picked him up at his aunt's and then

01:11:28  9  his family verified Delbert had an alibi?

01:11:32  10  A.  Yes.

01:11:32  11  Q.  All right.  But as that was disclosed to Mr. Fields?

01:11:36  12  A.  That was disclosed.

01:11:37  13  Q.  All right.  I'd like to show you a note in the file and

01:11:42  14  ask you whether this was disclosed to Mr. Fields.  This is

01:11:44  15  coming from Plaintiff's Exhibit 1 again, the page number is

01:11:48  16  69.

01:11:49  17      It looks like a handwritten note that's written on

01:11:57  18  the back of a scrap paper here, correct?

01:12:01  19  A.  Okay.  Yes.

01:12:03  20  Q.  Here's the back.  That's what I was showing you.

01:12:07  21  A.  Okay.

01:12:07  22  Q.  All right.  It starts out by describing Lawrence and

01:12:13  23  Marshall as the Edwards brothers, right?

01:12:15  24  A.  Yes.

01:12:15  25  Q.  And then it says that they were -- that somebody heard

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 38 of 215 PageID #:64777
***REALTIME UNEDITED TRANSCRIPT ONLY***

37

| | | |
|---|---|---|
| 01:12:19 | 1 | them talking about killing Fuddy because of the shooting |
| 01:12:23 | 2 | night, right? |
| 01:12:23 | 3 | A.  Yes. |
| 01:12:23 | 4 | Q.  Then it says this person saw them about 9:00 o'clock in |
| 01:12:32 | 5 | the stairwell, Lawrence, one of Delbert's brothers, said he |
| 01:12:36 | 6 | was going to get the gun, and that they would put on masks and |
| 01:12:40 | 7 | Lawrence said he wouldn't live through the night and Marshall |
| 01:12:43 | 8 | said he won't be jumping on you anymore.  That's what this |
| 01:12:47 | 9 | note says, correct? |
| 01:12:48 | 10 | A.  That's correct. |
| 01:12:48 | 11 | Q.  Is that materially different than what was in the police |
| 01:12:51 | 12 | report that was provided to Mr. Fields? |
| 01:12:52 | 13 | A.  Yes, it's a lot of additional information and I would have |
| 01:12:58 | 14 | liked more information too.  I would have wanted to know where |
| 01:13:00 | 15 | that information came, which I don't think is shown on that -- |
| 01:13:04 | 16 | on those notes. |
| 01:13:05 | 17 | Q.  Showing you a copy of page 115 from the same file, this is |
| 01:13:14 | 18 | the report of the shooting from April 27th, and it does |
| 01:13:23 | 19 | contain names of suspects, does it not? |
| 01:13:26 | 20 | A.  Oh, yeah, this is the report of the shooting the prior |
| 01:13:30 | 21 | night, and that does -- that shows the victim, Delbert |
| 01:13:35 | 22 | Edwards, and it has the names of the alleged shooters. |
| 01:13:38 | 23 | Q.  Paul Haily and Chundell Leaks.  This was also in the |
| 01:13:42 | 24 | investigative file, correct? |
| 01:13:42 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 01:13:43 | 1 | Q.  And it was not in the official file that was provided to |
| 01:13:46 | 2 | Mr. Fields, correct? |
| 01:13:46 | 3 | A.  I don't believe so. |
| 01:13:47 | 4 | Q.  Okay.  Showing you page 117 c-h-U.N. d-e-l-l-leaks of the |
| 01:13:55 | 5 | continuing narrative, they learned that the victim had been |
| 01:13:58 | 6 | shot by two subjects name Paul Hailey and Chundell Leaks. |
| 01:14:03 | 7 | Victim said he had been having problems with these subjects |
| 01:14:06 | 8 | who are members of the black gangster Goon Squad and because |
| 01:14:09 | 9 | of other pending court cases against other members of the |
| 01:14:13 | 10 | gang, something I can't make out.  Do you see that, sir? |
| 01:14:15 | 11 | A.  Yes. |
| 01:14:15 | 12 | Q.  That's an independent motive having nothing to do with the |
| 01:14:18 | 13 | case against Mr. Fields isn't that true, sir? |
| 01:14:20 | 14 |         MR. KULWIN:  Objection, leading. |
| 01:14:21 | 15 |         THE COURT:  Sustained. |
| 01:14:22 | 16 | BY MR. LOEVY: |
| 01:14:23 | 17 | Q.  What would you have done with that information, sir? |
| 01:14:25 | 18 | A.  I would have attempted to investigate it because it -- it |
| 01:14:29 | 19 | is another version of the events and if that version of the |
| 01:14:32 | 20 | events was the actual version, it would significantly under |
| 01:14:37 | 21 | cut the case against Mr. Fields. |
| 01:14:38 | 22 | Q.  Showing you page 106 again, this is the GPR that was in |
| 01:14:56 | 23 | the file, the investigative file that's dated May 1st the |
| 01:15:03 | 24 | other anonymous call that alleged that Lawrence and Marshall |
| 01:15:08 | 25 | Edwards were the killers was checked out.  Both were |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 40 of 215 PageID #:64770
***REALTIME UNEDITED TRANSCRIPT ONLY***

39

01:15:10  1   interviewed and stated they were home at the time of the

01:15:12  2   shooting in the company of their family members.  Those photos

01:15:14  3   and descriptions are in the file.  Do you see that?

01:15:16  4   A.  I do.

01:15:16  5   Q.  As a criminal defense attorney, were you required to

01:15:18  6   accept that the police checked it out and that they therefore

01:15:22  7   didn't have to tell you about it?

01:15:23  8   A.  Not at all, no.

01:15:24  9   Q.  Can you explain?

01:15:25  10  A.  I would want to check it out.  And it also doesn't seem

01:15:29  11  like there was much checking of the alibi.

01:15:32  12         MR. BURNS:  Objection.

01:15:32  13         THE COURT:  Overruled.  He's explaining the answer.

01:15:36  14  BY MR. LOEVY:

01:15:42  15  Q.  I am going to show you another document from the file,

01:15:44  16  this is Plaintiff's Exhibit 1, page 98.  Another GPR created

01:15:49  17  by someone it looks like named Davis and it is dated 29th of

01:15:54  18  April, the day after the shooting or so.  Can you read this

01:15:59  19  GPR?

01:16:00  20  A.  Yeah, R. O., reporting officer, received a phone call from

01:16:04  21  a male black who stated that Rodell Banks was the person who

01:16:08  22  had shot the people on 39th Street.  This caller refused to

01:16:12  23  give any, I think it's any further information about himself

01:16:16  24  and banks, call received at 1305 hours, then it's dated April

01:16:22  25  29th.

11/17/16 PM Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 41 of 215 PageID #:64780
***REALTIME UNEDITED TRANSCRIPT ONLY***

40

01:16:22  1   Q.  All right.  Why is that valuable information in the

01:16:25  2   preparation of Mr. Fields' criminal defense?

01:16:26  3   A.  Very much so, because, again, it provides an ultimate

01:16:32  4   version of what occurred.

01:16:34  5   Q.  Who was Rodell Banks, do you remember from reviewing the

01:16:37  6   documents that he was an El Rukn?

01:16:38  7   A.  I do remember that, and, yes, and also in this file is his

01:16:46  8   rap sheet.

01:16:47  9   Q.  And his photographs, correct?

01:16:48  10  A.  And his photo.

01:16:49  11  Q.  All right.  Do you know what the police did to investigate

01:16:52  12  from reviewing the files or any indication that they did to

01:16:56  13  investigate that an El Rukn named Rodell Banks was the

01:17:04  14  shooter?

01:17:04  15  A.  Other than pulling his rap sheet which is in the file, I

01:17:07  16  didn't see anything else.

01:17:07  17  Q.  Is that the kind of information that you as a criminal

01:17:09  18  defense attorney would have made use of?

01:17:11  19  A.  Absolutely, and, you know, the rap sheet is interesting

01:17:15  20  too.

01:17:15  21  Q.  All right.  Because it's a long rap sheet, is it not?

01:17:17  22  A.  Well, it has --

01:17:19  23         THE COURT:  It's a yes or no question.

01:17:20  24         THE WITNESS:  It wasn't long, but it was

01:17:22  25  significantly --

01:17:24    1              MR. BURNS:  Objection.

01:17:24    2              THE COURT:  The answer is stricken.

01:17:26    3   BY MR. LOEVY:

01:17:26    4   Q.  Let's take a look at another rap sheet for a man named

01:17:31    5   Earl Hawkins that was also in the investigative file.  This is

01:17:35    6   page 125.

01:17:38    7              This is a Chicago Police Department rap sheet from

01:17:43    8   the era, correct?

01:17:44    9   A.  Yes.

01:17:44   10   Q.  I guess they have to type them as they went in pre

01:17:48   11   computers, correct?

01:17:49   12   A.  Yes.

01:17:49   13   Q.  It's hard to make out the Bates stamp on this page, but I

01:17:52   14   will show you the second page.

01:17:53   15   A.  Yes.

01:17:54   16   Q.  When was this inquiry made regarding Earl Hawkins?

01:17:57   17   A.  Well, it's dated April 27th.

01:18:01   18   Q.  Which is the date --

01:18:02   19              THE COURT:  Of what year?

01:18:03   20              THE WITNESS:  I'm sorry of 1984.

01:18:05   21   BY MR. LOEVY:

01:18:06   22   Q.  Which is the day before the shooting, correct?

01:18:08   23   A.  That's correct.

01:18:08   24   Q.  And this is in the investigative file for a shooting that

01:18:12   25   happened the 28th?

                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 43 of 215 PageID #:64782
***REALTIME UNEDITED TRANSCRIPT ONLY***

42

01:18:13    1   A.  Correct.

01:18:14    2   Q.  So it either was pulled the day before or somebody didn't

01:18:16    3   roll the same, one of the two things?

01:18:18    4   A.  True.

01:18:18    5   Q.  All right.  Why is it -- let me show you another -- first

01:18:22    6   of all, is there any explanation anywhere in the official file

01:18:25    7   or in this investigative file for why Earl Hawkins, they were

01:18:28    8   pulling his rap sheet in April 84?

01:18:30    9   A.  I don't believe so.

01:18:31   10   Q.  All right.  I'm going to show you another rap sheet of a

01:18:35   11   man named William Doyle also in the investigative file.  Can

01:18:39   12   you see that, sir?

01:18:40   13   A.  I do.

01:18:40   14   Q.  This is page 127, same exhibit.

01:18:43   15        Also pulled on the same day, April 27th, do you see

01:18:46   16   that?

01:18:46   17   A.  That's what it says, yeah.

01:18:48   18   Q.  All right.  Showing you page 121 from the same file, can

01:18:53   19   you tell the jury what William Doyle's nickname was?

01:18:56   20   A.  His nickname was sundown.

01:18:59   21   Q.  So sometime very close to the shooting, there's evidence

01:19:06   22   that the police suspected or had some reason to be looking at

01:19:10   23   Earl Hawkins and a man named sundown in their investigation,

01:19:14   24   correct?

01:19:14   25   A.  Yes.


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

43

| | | |
|---|---|---|
| 01:19:15 | 1 | Q. Now, it looks like from this note going back to page 127 |
| 01:19:21 | 2 | that they quickly or that they were able to rule out Doyle as |
| 01:19:27 | 3 | a suspect, this note here, does it not? |
| 01:19:29 | 4 | A. Yeah, apparently he is in jail. |
| 01:19:31 | 5 | Q. He was in prison at the time? |
| 01:19:33 | 6 | A. Right. |
| 01:19:33 | 7 | Q. So that leaves Earl Hawkins and someone named sundown who |
| 01:19:37 | 8 | is not Mr. Doyle, correct? |
| 01:19:39 | 9 | A. Yes. |
| 01:19:39 | 10 | Q. Who was another man from your knowledge of the case whose |
| 01:19:42 | 11 | nick named sundown? |
| 01:19:43 | 12 | A. Anthony Sumner. |
| 01:19:44 | 13 | Q. Is there any indication anywhere in this file why the |
| 01:19:47 | 14 | police suspected Hawkins and sundown right after the murder? |
| 01:19:51 | 15 | A. I don't believe so. |
| 01:19:53 | 16 | Q. Have you ever seen any piece of paper, either in the |
| 01:19:55 | 17 | unofficial file or the official file that explains that? |
| 01:19:57 | 18 | A. No. |
| 01:19:58 | 19 | Q. Why is it significant that the police suspected Earl |
| 01:20:03 | 20 | Hawkins and sundown of this murder before May of 1985? |
| 01:20:09 | 21 | MR. BURNS: Objection, your Honor. |
| 01:20:10 | 22 | THE COURT: Basis? |
| 01:20:11 | 23 | MR. BURNS: Foundation. |
| 01:20:12 | 24 | THE COURT: Why don't you rephrase the question. Why |
| 01:20:15 | 25 | is it significant, how. |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 45 of 215 PageID #:64784
***REALTIME UNEDITED TRANSCRIPT ONLY***

44

01:20:17    1   BY MR. LOEVY:

01:20:18    2   Q.  If you had been apprised that the police department was

01:20:20    3   actually considering Hawkins and sundown maybe as suspects

01:20:25    4   before May of '85, what would you have done as his criminal

01:20:28    5   defense attorney?

01:20:29    6           MR. BURNS:  Objection, your Honor.  Speculation,

01:20:31    7   argumentative.

01:20:32    8           THE COURT:  Overruled.

01:20:33    9           THE WITNESS:  I would have wanted to explore why

01:20:37   10   those people were suspects immediately after the murder when

01:20:43   11   the other evidence in the case indicated they didn't become

01:20:48   12   suspects until the evidence I had didn't indicate they became

01:20:51   13   suspects until over a year later in 1985.

01:20:53   14   BY MR. LOEVY:

01:20:54   15   Q.  And in 1985, that's when Sumner got arrested, correct?

01:20:57   16   A.  Yes.

01:20:57   17   Q.  And he started talking to the authorities, right?

01:20:59   18   A.  Yes.

01:21:00   19   Q.  And the trial that was presented against Nate in 1986 was

01:21:04   20   the -- what was the state's theory of the case about how

01:21:07   21   Sumner came forward with this information?

01:21:09   22   A.  The evidence as far as Mr. Fields was concerned was that

01:21:18   23   -- how was it.

01:21:20   24           THE COURT:  You're asking how it was presented at the

01:21:22   25   '86 trial, right.

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 46 of 215 PageID #:64785
***REALTIME UNEDITED TRANSCRIPT ONLY***

45

01:21:23  1        MR. LOEVY:  Right.

01:21:23  2   BY MR. LOEVY:

01:21:23  3   Q.  Was it presented at the '86 trial as if Sumner had said,

01:21:27  4   guys, take out your pads, I'll tell you about a crime, or was

01:21:31  5   it presented as the police said to Sumner, we have -- we

01:21:34  6   suspect you in this very murder, what do you have to say about

01:21:37  7   that, do you understand the difference between the two I'm

01:21:40  8   asking you?

01:21:40  9        MR. KULWIN:  I am going to object on the form of the

01:21:42  10  question.

01:21:42  11       THE COURT:  Sustained.

01:21:43  12  BY MR. LOEVY:

01:21:43  13  Q.  All right.  Can you explain how it was presented that

01:21:46  14  Sumner came to be giving the authorities this information?

01:21:50  15  A.  That -- I'm sorry.

01:21:54  16       THE COURT:  You're fine.

01:21:55  17       THE WITNESS:  I understand that Sumner would have

01:22:00  18  been arrested then said, look, I have all this information

01:22:03  19  about various crimes that have been committed.

01:22:06  20  BY MR. LOEVY:

01:22:07  21  Q.  All right.  If you had known that in fact the police

01:22:09  22  suspected sundown of the very crime that he gave the

01:22:11  23  information about, would that have changed cross-examination

01:22:15  24  of these things had they in 2009?

01:22:20  25  A.  Yes, most certainly, because it had indicated that


               ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 01:22:23 | 1 | Sumner's statement that -- |
| 01:22:26 | 2 | MR. BURNS:  Objection. |
| 01:22:28 | 3 | THE WITNESS:  Fields. |
| 01:22:28 | 4 | MR. LOEVY:  Mr. Stainthorpe, there is an objection. |
| 01:22:30 | 5 | THE WITNESS:  I'm sorry.  I didn't hear it. |
| 01:22:32 | 6 | MR. BURNS:  Your Honor, speculate. |
| 01:22:33 | 7 | THE COURT:  I don't agree that it's speculative. |
| 01:22:35 | 8 | He's asking what he would have done if he had been given this |
| 01:22:38 | 9 | information.  Go ahead, Mr. Loevy. |
| 01:22:58 | 10 | BY MR. LOEVY: |
| 01:22:59 | 11 | Q.  I asked Mr. Stainthorpe to explain it. |
| 01:23:01 | 12 | A.  Because it provided information that Sumner who was eye |
| 01:23:05 | 13 | tempting to deflect blame from himself when he in fact had |
| 01:23:10 | 14 | been a suspect in the murder and was attempting to deflect the |
| 01:23:13 | 15 | blame and put it on Mr. Fields. |
| 01:23:15 | 16 | Q.  Was that very different than anything that had been given |
| 01:23:17 | 17 | to Mr. Fields in 1986? |
| 01:23:19 | 18 | A.  Very much so, yes. |
| 01:23:20 | 19 | Q.  May I have a moment, your Honor? |
| 01:23:27 | 20 | MR. LOEVY:  We have no further questions, your Honor. |
| 01:23:33 | 21 | THE COURT:  Go ahead, Mr. Burns. |
| 01:23:36 | 22 | - - - |
| 01:23:36 | 23 | JOHN STAINTHORPE, CROSS-EXAMINATION |
| 01:23:36 | 24 | BY MR. BURNS: |
| 01:23:49 | 25 | Q.  Good afternoon, Mr. Stainthorpe. |

01:23:52   1   A.  Good afternoon.

01:23:52   2   Q.  Mr. Stainthorpe, you testified under questioning by

01:23:56   3   Mr. Loevy that some of the work that you do is actually civil

01:24:00   4   rights work where you file cases against the City of Chicago

01:24:03   5   and against the police department; is that correct?

01:24:05   6   A.  Yes, that is.

01:24:05   7   Q.  Now, let me take you back in time.  You told us about the

01:24:12   8   post conviction petition.  Do you remember that, that's why

01:24:15   9   you became involved, true?

01:24:16  10   A.  Yes.

01:24:16  11   Q.  What is a post conviction petition?  Could you give us

01:24:21  12   some idea of what that's about just so the ladies and

01:24:24  13   gentlemen of the jury understand that a little better?

01:24:26  14   A.  So a post conviction petition is a mechanism under

01:24:29  15   Illinois law where after someone who has been convicted in a

01:24:34  16   criminal case and who's direct appeals have been denied can

01:24:40  17   raise additional issues attempting to under cut either the

01:24:44  18   conviction or the sentence.

01:24:46  19   Q.  So part of your job, if I understand correctly when you

01:24:52  20   were retained, was to go out, gather information about the

01:24:54  21   incident itself which would have been the shooting that

01:24:58  22   occurred on April 28th of 1984, correct?

01:25:01  23   A.  Yes.

01:25:02  24   Q.  And to try to interview witnesses, correct?

01:25:06  25   A.  Yes.

| | | |
|---|---|---|
| 01:25:06 | 1 | Q. Gather records, including attorney's files and information |
| 01:25:12 | 2 | that they had in their possession, correct? |
| 01:25:13 | 3 | A. Yes. |
| 01:25:14 | 4 | Q. And I'm talking about specifically the trial attorneys who |
| 01:25:18 | 5 | defended the allegations before Judge Thomas Maloney, correct? |
| 01:25:22 | 6 | A. Correct. |
| 01:25:22 | 7 | Q. Now, one of the attorneys was a Jack Smeeton, correct? |
| 01:25:27 | 8 | A. Yes. |
| 01:25:27 | 9 | Q. Jack Smeeton represented Nathson Fields? |
| 01:25:31 | 10 | A. Correct. |
| 01:25:32 | 11 | Q. Did you get his files? |
| 01:25:33 | 12 | A. No. |
| 01:25:34 | 13 | Q. William Swano represented Earl Hawkins; am I correct? |
| 01:25:39 | 14 | A. Yes. |
| 01:25:39 | 15 | Q. Did you get his file? |
| 01:25:41 | 16 | A. No. |
| 01:25:41 | 17 | Q. Counsel had asked you some questions about information |
| 01:25:50 | 18 | that was contained in the -- what you referred to the police |
| 01:25:56 | 19 | working file.  Do you remember that? |
| 01:25:57 | 20 | A. I think he referred to it as investigative file. |
| 01:26:03 | 21 | Q. Well? |
| 01:26:04 | 22 | A. Didn't he? |
| 01:26:05 | 23 | Q. Let's call it the file that was produced later was not |
| 01:26:08 | 24 | produced in 1984? |
| 01:26:10 | 25 | A. Yes got it. |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 50 of 215 PageID #:64799
***REALTIME UNEDITED TRANSCRIPT ONLY***

49

| 01:26:11 | 1 | Q. Whether we call it the investigative or working, but you |
| 01:26:14 | 2 | do understand what we're referring to? |
| 01:26:16 | 3 | A. I do. |
| 01:26:16 | 4 | Q. Good. |
| 01:26:17 | 5 | And one of the issues that he began to talk to you |
| 01:26:21 | 6 | about, he raised James Langston, something about Rick dog |
| 01:26:26 | 7 | Baldwin, do you remember that? |
| 01:26:27 | 8 | A. Yes. |
| 01:26:28 | 9 | Q. He also talked about a Gerald Green and a report from |
| 01:26:31 | 10 | Detective Minoque, M-i-n-o-q-u-e. |
| 01:26:38 | 11 | THE COURT: Thanks. |
| 01:26:40 | 12 | BY MR. BURNS: |
| 01:26:40 | 13 | Q. Do you remember that discussion? |
| 01:26:41 | 14 | A. Yes. |
| 01:26:41 | 15 | Q. And he also referenced this report, if I may, just to |
| 01:26:45 | 16 | refresh your recollection, he showed you this report moments |
| 01:26:49 | 17 | ago. Do you remember seeing that, sir, and I'll show you page |
| 01:26:54 | 18 | 2? |
| 01:26:55 | 19 | A. Yes. |
| 01:26:55 | 20 | Q. And this deals with an incident that happened the night |
| 01:27:01 | 21 | before April 28th, 1984? |
| 01:27:04 | 22 | A. Yes. |
| 01:27:05 | 23 | Q. That date being April the 27th, 1984, correct? |
| 01:27:08 | 24 | A. Yes. |
| 01:27:08 | 25 | Q. And that was a shooting involving Delbert Edwards, |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 51 of 215 PageID #:64790
***REALTIME UNEDITED TRANSCRIPT ONLY***

50

| | | |
|---|---|---|
| 01:27:12 | 1 | correct? |
| 01:27:13 | 2 | A. Yes. |
| 01:27:13 | 3 | Q. So this -- that information if I understood your testimony |
| 01:27:21 | 4 | correctly, this might have involved some type of retaliation |
| 01:27:26 | 5 | by members of the Goon Squad to members of the El Rukns? |
| 01:27:28 | 6 | A. Yes. |
| 01:27:29 | 7 | Q. And you said that would be information that you'd want to |
| 01:27:32 | 8 | know about, correct? |
| 01:27:33 | 9 | A. Yes. |
| 01:27:33 | 10 | Q. And yet that information that you're talking about is |
| 01:27:37 | 11 | contained in the police reports, the very police reports that |
| 01:27:41 | 12 | you have told the ladies and gentlemen of the jury that you |
| 01:27:43 | 13 | had reviewed as part of your analysis and investigation in |
| 01:27:50 | 14 | order to prepare the post conviction petition isn't that also |
| 01:27:55 | 15 | correct? |
| 01:27:56 | 16 | A. Yes. |
| 01:27:57 | 17 | Q. And may I show -- |
| 01:28:00 | 18 | A. Some of it is. I think there's additional information. |
| 01:28:03 | 19 | Q. Allow me to show me, if you would. |
| 01:28:07 | 20 | MR. BURNS: This is Exhibit 60, counsel. |
| 01:28:10 | 21 | THE COURT: 60. |
| 01:28:12 | 22 | MR. BURNS: Yes, sir. |
| 01:28:12 | 23 | BY MR. BURNS: |
| 01:28:17 | 24 | Q. And as you can see, this report that was prepared in 1984 |
| 01:28:22 | 25 | following the murders of Smith and Hickman references this |

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 52 of 215 PageID #:64791

| | | |
|---|---|---|
| 01:28:26 | 1 | incident, doesn't it, an incident that happened the day |
| 01:28:29 | 2 | involving Goon Squad members, Delbert Edwards, do you see that |
| 01:28:33 | 3 | information? |
| 01:28:33 | 4 | A. Yes. |
| 01:28:34 | 5 | Q. And it talks about Cleveland Ball providing that |
| 01:28:39 | 6 | information? |
| 01:28:41 | 7 | A. Yes. |
| 01:28:43 | 8 | Q. And on the following page, if I may, there is information |
| 01:28:48 | 9 | at the very bottom regarding Delbert Edwards, correct? |
| 01:28:52 | 10 | A. Correct. |
| 01:28:52 | 11 | Q. All right. So let me ask you this to begin with you. Did |
| 01:28:56 | 12 | you interview Delbert Edwards? |
| 01:28:58 | 13 | A. No. |
| 01:28:58 | 14 | Q. All right. What about Cleveland Ball? |
| 01:29:03 | 15 | A. I don't know about Cleveland Ball, but I don't have a |
| 01:29:08 | 16 | recollection of that. |
| 01:29:08 | 17 | Q. So this would have been information that could have been |
| 01:29:12 | 18 | helpful you told the ladies and gentlemen of the jury, but you |
| 01:29:15 | 19 | did not speak to either of those gentleman, though this |
| 01:29:18 | 20 | information was known to you as part of the police reports |
| 01:29:22 | 21 | that you had? |
| 01:29:22 | 22 | A. Yeah -- |
| 01:29:24 | 23 | Q. You have answered the question. |
| 01:29:28 | 24 | A. I am unsure about Cleveland Ball. |
| 01:29:31 | 25 | THE COURT: He said he is unsure about Cleveland |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 53 of 215 PageID #:64792
***REALTIME UNEDITED TRANSCRIPT ONLY***

52

01:29:34  1  Ball.

01:29:35  2  BY MR. BURNS:

01:29:36  3  Q.  Let me ask you about James Langston.  Do you remember that

01:29:39  4  name?

01:29:39  5  A.  I do.

01:29:39  6  Q.  Mr. Langston would have been an important witness; is that

01:29:42  7  correct?

01:29:42  8  A.  Yeah.

01:29:44  9  Q.  Now, you didn't even try to find him, did you?

01:29:46  10  A.  I think I -- I think he was deceased by the time I got

01:29:50  11  involved.

01:29:50  12  Q.  Really?

01:29:52  13        MR. BURNS:  Judge, may I refresh his recollection?

01:29:54  14        THE COURT:  Go ahead.

01:29:55  15        MR. BURNS:  Thank you.

01:30:00  16        THE COURT:  By the way, you don't need to ask

01:30:02  17  permission to do that.  Just go ahead.

01:30:05  18        MR. BURNS:  Thank you, Judge.

01:30:19  19        THE WITNESS:  Okay.

01:30:24  20  BY MR. BURNS:

01:30:25  21  Q.  So I am correct in my question that you don't think you

01:30:27  22  ever tried to find him actually?

01:30:30  23  A.  Correct.  I think I might have known he was dead.

01:30:33  24  Q.  But you don't know?

01:30:34  25  A.  I don't have a memory of everything from back then, that's

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 54 of 215 PageID #:64793
***REALTIME UNEDITED TRANSCRIPT ONLY***

53

01:30:40   1    true.

01:30:40   2    Q.  In any event, that information could have been helpful to

01:30:44   3    you, correct?

01:30:45   4    A.  What information?

01:30:47   5    Q.  Information about James Langston?

01:30:49   6    A.  Yeah.

01:30:51   7    Q.  So let's talk a little bit more, I'd like to if I may for

01:30:58   8    a moment, about the petition that you filed before judge

01:31:01   9    Deborah Mary Dooling who is the criminal court judge?

01:31:04   10   A.  It started off with one judge and moved to another.

01:31:06   11   Q.  Eventually it ended up in front of Judge Dooling; am I

01:31:09   12   correct?

01:31:09   13   A.  Yes.

01:31:10   14   Q.  And before Judge Dooling, you filed a petition and then an

01:31:15   15   amended petition?

01:31:15   16   A.  I think the initial petition was in front of another

01:31:20   17   judge, but I am not entirely sure.

01:31:21   18   Q.  When did you file the first amended petition?

01:31:23   19   A.  The amended petition?

01:31:25   20   Q.  Yes.

01:31:26   21   A.  I think that was 92.

01:31:27   22   Q.  Would it be September the eighth, 1992?

01:31:30   23   A.  That sounds like it could well be correct.

01:31:33   24   Q.  And the basis of that amended petition was the bribe to

01:31:38   25   Judge Maloney, correct?

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 55 of 215 PageID #:64794

01:31:41  1   A.  That and there was another issue also.

01:31:43  2   Q.  Ineffective assistance of counsel still remained?

01:31:47  3   A.  No, there was an issue about Sumner.

01:31:48  4   Q.  So you included that and Judge Dooling without an

01:31:55  5   evidentiary hearing ruled in favor of Mr. Fields, correct, on

01:32:01  6   the petition?

01:32:02  7   A.  That timing is incorrect.

01:32:06  8   Q.  Let me ask you.  Let me slow down if you think it's

01:32:09  9   incorrect.  We will make sure we clarify.

01:32:11  10       The petition you filed was in September of 1992,

01:32:15  11  you've told us, correct?

01:32:16  12  A.  Yes.

01:32:16  13  Q.  Judge Dooling did rule on the petition, correct?

01:32:20  14  A.  Quite a while later I think.

01:32:23  15  Q.  Well, we are going to get to it.  The question is did she

01:32:26  16  rule on it?

01:32:27  17  A.  Eventually.

01:32:27  18  Q.  Eventually.

01:32:28  19       In fact, it was ruled upon, I believe, in September

01:32:32  20  of 1996?

01:32:38  21  A.  That sounds right.

01:32:39  22  Q.  And Judge Dooling granted the petition, correct?

01:32:44  23  A.  Yes.

01:32:44  24  Q.  And she granted the petition and vacated the conviction of

01:32:50  25  Mr. Fields?

01:32:50   1   A.  Correct.

01:32:50   2   Q.  And gave him a new trial?

01:32:53   3   A.  Correct.

01:32:53   4   Q.  And she did that based on the information, solely on the

01:33:00   5   information of the bribe; isn't that correct?

01:33:02   6   A.  Yes.  Yes, it was based on that issue, that's true.

01:33:06   7   Q.  She said the trial was corrupted, no one could have a fair

01:33:11   8   trial under those circumstances; am I correct?

01:33:15   9   A.  Yes.

01:33:15   10   Q.  And I think we talked -- she did that without even the

01:33:18   11   need for an evidentiary hearing?

01:33:21   12   A.  Well, by that time Jim Maloney had been convicted.

01:33:25   13   Q.  I'm sorry.  My question is -- I'm probably not being as

01:33:30   14   clear as I should be.  She did that without the need to

01:33:33   15   conduct an evidentiary hearing?

01:33:35   16          THE COURT:  It's a yes or no question.

01:33:37   17          THE WITNESS:  Yes, there was no evidentiary hearing.

01:33:41   18          MR. BURNS:  Let me just have one moment, your Honor.

01:34:09   19          THE COURT:  Okay.

01:34:10   20     (Brief pause.)

01:34:20   21          MR. BURNS:  Thank you, Mr. Stainthorpe.

01:34:21   22          THE COURT:  Mr. Kulwin.

01:34:23   23          MR. KULWIN:  Yes, your Honor.  Could I have just one

01:34:26   24   second .

01:34:28   25                              - - -

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 57 of 215 PageID #:64796
11/17/16 PM    ***REALTIME UNEDITED TRANSCRIPT ONLY***

56

| | |
|---|---|
| 01:34:28 | 1 |
| 01:34:28 | 2 |
| 01:34:54 | 3 |
| 01:34:55 | 4 |
| 01:34:56 | 5 |
| 01:35:04 | 6 |
| 01:35:06 | 7 |
| 01:35:07 | 8 |
| 01:35:12 | 9 |
| 01:35:16 | 10 |
| 01:35:17 | 11 |
| 01:35:18 | 12 |
| 01:35:21 | 13 |
| 01:35:23 | 14 |
| 01:35:24 | 15 |
| 01:35:27 | 16 |
| 01:35:30 | 17 |
| 01:35:33 | 18 |
| 01:35:35 | 19 |
| 01:35:37 | 20 |
| 01:35:38 | 21 |
| 01:35:40 | 22 |
| 01:35:41 | 23 |
| 01:35:45 | 24 |
| 01:35:45 | 25 |

1    JOHN STAINTHORPE, CROSS-EXAMINATION

2  BY MR. KULWIN:

3  Q.  Good afternoon, Mr. Stainthorpe.

4  A.  Good afternoon.

5  Q.  Mr. Stainthorpe, you testified that you visited Gerald

6  Morris in Milwaukee to interview him; is that correct?

7  A.  That's correct.

8  Q.  And did I hear you right that when you first started your

9  investigation, you asked the assistant state's attorneys where

10  Mr. Morris was?

11  A.  I asked --

12  Q.  Did you ask him that?

13  A.  That was --

14  Q.  Did you ask him?

15  A.  Excuse me.  That was part of a much broader request.

16          THE COURT:  So that would be yes, you asked him that.

17  You might have asked him other things, but you asked him that.

18          THE WITNESS:  I'm sorry, Judge.  That's a yes.

19          THE COURT:  That's a yes.  Go ahead.

20  BY MR. KULWIN:

21  Q.  And they would not tell you where he was, correct?

22  A.  That's correct.

23  Q.  And they told you why they wouldn't tell you where he was,

24  didn't they?

25  A.  They represented --

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 58 of 215 PageID #:64797
***REALTIME UNEDITED TRANSCRIPT ONLY***

57

01:35:49  1   Q.  Sir, the question is they told you why they wouldn't tell

01:35:53  2   you where he was; isn't that correct?

01:35:56  3   A.  I don't think they were accurately telling me why.

01:35:58  4          MR. KULWIN:  Judge, I move to strike.

01:35:59  5          THE WITNESS:  I don't think they did tell me why.

01:36:00  6          THE COURT:  Why don't you rephrase your question.

01:36:02  7   Did they give you a reason why?

01:36:05  8   BY MR. KULWIN:

01:36:06  9   Q.  They gave you a reason why?

01:36:07  10  A.  They did give me a reason.

01:36:08  11  Q.  And the reason was that they didn't want you to know where

01:36:12  12  he was because he was afraid of the El Rukns; isn't that true?

01:36:16  13  A.  That's what they said.

01:36:17  14  Q.  Okay.  Now, you went up to Milwaukee with another fellow;

01:36:17  15  isn't that right?

01:36:26  16  A.  With Mr. Lohraff, correct.

01:36:28  17  Q.  And he is a private investigator, correct?

01:36:30  18  A.  No, incorrect.

01:36:31  19  Q.  What is he?

01:36:31  20  A.  He is an attorney.

01:36:32  21  Q.  Okay.  In any event, so the two of you drive up to

01:36:35  22  Milwaukee, correct?

01:36:36  23  A.  Yes.

01:36:37  24  Q.  And you find Mr. Morris, correct?

01:36:39  25  A.  That's correct.

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 59 of 215 PageID #:64798
***REALTIME UNEDITED TRANSCRIPT ONLY***

58

| | | |
|---|---|---|
| 01:36:40 | 1 | Q. You don't give him any advance warning, correct? |
| 01:36:43 | 2 | A. Yes. |
| 01:36:43 | 3 | Q. Because you want to take him by surprise, correct? |
| 01:36:45 | 4 | A. I want to talk to him. |
| 01:36:46 | 5 | Q. Sir, the question was? |
| 01:36:48 | 6 | A. No, I don't want to take him by surprise. I want to talk |
| 01:36:50 | 7 | to him. |
| 01:36:51 | 8 | Q. Sir, didn't you say yesterday that one of the reasons you |
| 01:36:54 | 9 | don't contact people is that you want to surprise them so that |
| 01:36:58 | 10 | you can get them to talk to you? |
| 01:37:00 | 11 | A. No, I don't think I ever used the word surprised. |
| 01:37:03 | 12 | Q. Well, you want to -- you don't want to give them notice |
| 01:37:06 | 13 | because you are afraid if you give them notice, they might not |
| 01:37:08 | 14 | talk to you; isn't that right? |
| 01:37:11 | 15 | A. I know that if you just go up and try to talk to someone, |
| 01:37:16 | 16 | it's much more likely you are going to get them to talk to |
| 01:37:19 | 17 | you. |
| 01:37:19 | 18 | Q. My question is, sir, you don't give them any notice |
| 01:37:23 | 19 | because you are fearful if you call them up and say, hey, I'm |
| 01:37:26 | 20 | an attorney, I want to talk to you about your testimony in a |
| 01:37:29 | 21 | criminal trial, they'll say no? |
| 01:37:31 | 22 | MR. LOEVY: Judge, asked and answered. |
| 01:37:32 | 23 | THE COURT: I think it's been covered sufficiently at |
| 01:37:35 | 24 | this point. ^ . |
| 01:37:37 | 25 | BY MR. KULWIN: |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 60 of 215 PageID #:64798
***REALTIME UNEDITED TRANSCRIPT ONLY***

59

| | | |
|---|---|---|
| 01:37:37 | 1 | Q. And so you show up at Mr. Morris' home, right? |
| 01:37:40 | 2 | A. Correct. |
| 01:37:40 | 3 | Q. And you knock -- you and another fellow, right? |
| 01:37:45 | 4 | A. I didn't. |
| 01:37:46 | 5 | Q. You and another fellow, right? |
| 01:37:48 | 6 | A. Meaning Mr. Lohraff, right. |
| 01:37:51 | 7 | Q. You knock on the door? |
| 01:37:53 | 8 | A. We may have rung the doorbell. |
| 01:37:54 | 9 | Q. The doorbell, he opens the door, right? |
| 01:37:57 | 10 | A. I don't recall actually the exact sequence of events |
| 01:38:02 | 11 | there. |
| 01:38:03 | 12 | Q. Somebody opened the door, correct? |
| 01:38:05 | 13 | A. We were at his home and we came into contact with him. |
| 01:38:10 | 14 | Exactly how that happened, I am not sure. |
| 01:38:12 | 15 | Q. So you might have not gone into his home? |
| 01:38:15 | 16 | A. I know I didn't go into his home. |
| 01:38:18 | 17 | Q. So you ran into him out in front? |
| 01:38:20 | 18 | A. That might be. Either I rang the bell or, yeah. |
| 01:38:23 | 19 | Q. It's possible, I just want to be sure, I want to get clear |
| 01:38:27 | 20 | the context of where you spoke with him. It's possible, sir, |
| 01:38:30 | 21 | you didn't find him at home and you went looking for him |
| 01:38:33 | 22 | around the premises and you found him somewhere around the |
| 01:38:35 | 23 | premises? |
| 01:38:35 | 24 | A. No, I don't think so. |
| 01:38:36 | 25 | Q. So as you sit there today, you don't know how or where you |

| | | |
|---|---|---|
| 01:38:39 | 1 | found him? |
| 01:38:40 | 2 | MR. LOEVY:  Objection, your Honor. |
| 01:38:41 | 3 | THE WITNESS:  I do. |
| 01:38:42 | 4 | THE COURT:  He's answered the question. |
| 01:38:44 | 5 | BY MR. KULWIN: |
| 01:38:44 | 6 | Q.  You know where you found him? |
| 01:38:45 | 7 | A.  I know that we met with him at his home, but not inside |
| 01:38:49 | 8 | his home, outside his home. |
| 01:38:51 | 9 | Q.  Where outside his home did you find him? |
| 01:38:53 | 10 | A.  I think the front porch. |
| 01:38:55 | 11 | MR. LOEVY:  Object to relevance, your Honor. |
| 01:38:57 | 12 | THE COURT:  Overruled. |
| 01:38:58 | 13 | BY MR. KULWIN: |
| 01:38:59 | 14 | Q.  So you go up to his house and he is sitting on his front |
| 01:39:02 | 15 | porch, right? |
| 01:39:03 | 16 | A.  No, I don't think that's true. |
| 01:39:04 | 17 | Q.  Why don't you tell me what was he doing on the front |
| 01:39:07 | 18 | porch, sir? |
| 01:39:07 | 19 | A.  Well, he wasn't -- I don't have any recollection of him |
| 01:39:11 | 20 | sitting on the front porch.  I came into contact with him |
| 01:39:15 | 21 | outside his house, not inside his house, and at that point, I |
| 01:39:20 | 22 | talked to him. |
| 01:39:22 | 23 | Q.  And since he was outside of his house, you recognized him |
| 01:39:28 | 24 | somehow, correct? |
| 01:39:30 | 25 | A.  Well, I asked him, are you Gerald Morris. |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 62 of 215 PageID #:64801
***REALTIME UNEDITED TRANSCRIPT ONLY***

61

| | | |
|---|---|---|
| 01:39:32 | 1 | Q. Okay. And he said, yes, I am? |
| 01:39:35 | 2 | A. He did. |
| 01:39:36 | 3 | Q. And then you said, oh, nice to meet you, I'm John |
| 01:39:39 | 4 | Stainthorpe, I represent Nathson Fields? |
| 01:39:41 | 5 | MR. LOEVY: Objection, relevance, your Honor. |
| 01:39:43 | 6 | THE COURT: Overruled. |
| 01:39:44 | 7 | THE WITNESS: Something along those lines. I |
| 01:39:46 | 8 | probably gave him my card. I wanted him to know who I was. |
| 01:39:49 | 9 | MR. KULWIN: Judge, I move to strike anything other |
| 01:39:51 | 10 | than yes or no. |
| 01:39:55 | 11 | THE COURT: Overruled. |
| 01:39:55 | 12 | BY MR. KULWIN: |
| 01:39:56 | 13 | Q. All right. And then after you introduced yourself and |
| 01:39:59 | 14 | give him your card, you introduce your partner, Mr. Lohraff; |
| 01:39:59 | 15 | is that right? |
| 01:40:03 | 16 | A. He probably introduced himself. |
| 01:40:04 | 17 | Q. Okay. But the key, though, is, sir, you told him that you |
| 01:40:08 | 18 | there to represent Nathson Fields, correct? |
| 01:40:11 | 19 | A. Yes, absolutely. |
| 01:40:12 | 20 | Q. And you wanted to talk to him about his testimony, |
| 01:40:16 | 21 | correct? |
| 01:40:16 | 22 | A. That's correct. |
| 01:40:17 | 23 | Q. The testimony that helped put Nathson Fields behind bars, |
| 01:40:22 | 24 | correct? |
| 01:40:22 | 25 | A. Yes. |

01:40:22   1   Q.  And at the time, Nathson Fields was still in the El Rukns,

01:40:29   2   wasn't he?

01:40:30   3   A.  I don't think he was, actually.

01:40:33   4   Q.  Well, would you --

01:40:35   5   A.  You know what, I don't even know.

01:40:38   6   Q.  Okay.  Well, it's important.

01:40:39   7         Are you aware that Mr. Fields has testified that --

01:40:42   8         THE COURT:  No, I am going to stop you right there.

01:40:44   9   That's for argument.

01:40:45  10         MR. KULWIN:  All right, Judge.

01:40:46  11   BY MR. KULWIN:

01:40:47  12   Q.  In any event, and as soon as Mr. Morris hears that you're

01:40:54  13   with Mr. Fields, he says, sure, I'll talk to you, what do you

01:40:57  14   want to know?

01:40:58  15         MR. LOEVY:  We move to strike.  There is no evidence

01:41:00  16   that Mr. Fields was still in the El Rukns.

01:41:02  17         THE COURT:  That's not the pending question.

01:41:04  18         THE WITNESS:  Can you repeat it?  I have forgotten

01:41:06  19   what you asked.

01:41:07  20   BY MR. KULWIN:

01:41:08  21   Q.  Let me put it a different way.

01:41:12  22         You have approached Mr. Morris out of the blue and

01:41:16  23   after you tell him, I'm representing Nathson Fields and I want

01:41:21  24   to talk to you, he says, no problem?

01:41:23  25   A.  Yes.


                   ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 64 of 215 PageID #:64803
***REALTIME UNEDITED TRANSCRIPT ONLY***

63

| 01:41:23 | 1 | Q. He doesn't say -- well, we won't get into what he doesn't |
| 01:41:30 | 2 | say. |
| 01:41:30 | 3 |     All right.  Then he is extremely cooperative, right? |
| 01:41:32 | 4 | A. Very. |
| 01:41:33 | 5 | Q. Yeah, you want to ask him a question, sure, what do you |
| 01:41:36 | 6 | want to know, he says that, right, something like that? |
| 01:41:38 | 7 | A. Yeah, I asked him questions and he answered them. |
| 01:41:40 | 8 | Q. Yeah, and as you're sitting there, you've got your buddy |
| 01:41:43 | 9 | taking notes the whole time, right? |
| 01:41:45 | 10 | A. No, no one was taking notes. |
| 01:41:46 | 11 | Q. Really? |
| 01:41:50 | 12 |     MR. KULWIN:  Can I have one second? |
| 01:41:51 | 13 |     THE COURT:  Can I see the lawyers at sidebar, please. |
| 01:42:02 | 14 |   (The following proceedings were had at sidebar outside the |
| 01:42:04 | 15 | hearing of the jury:) |
| 01:42:04 | 16 |     THE COURT:  So I am going to say this now so that I |
| 01:42:06 | 17 | don't have to say it later in front of the jury. |
| 01:42:07 | 18 |     THE WITNESS:  The little common dear after the |
| 01:42:09 | 19 | answers has got to stop, the really and all has got to stop. |
| 01:42:13 | 20 | I am going to give you a little bit of unsolicited advice as |
| 01:42:16 | 21 | somebody who has talked to a couple, 3,000 jurors, the |
| 01:42:20 | 22 | demeanor, I'm just going to tell you, I am saying this to help |
| 01:42:24 | 23 | you out is counter productive.  It is.  I'm just telling you. |
| 01:42:32 | 24 |   (The following proceedings were had in open court in the |
| 01:42:54 | 25 | presence and hearing of the jury:) |

01:42:54    1          MR. KULWIN:  I lost my train of thought there for a

01:42:58    2    second.

01:42:58    3    BY MR. KULWIN:

01:42:59    4    Q.  Mr. Stainthorpe?

01:42:59    5          THE COURT:  The last question I think was whether

01:43:01    6    Mr. Morris was cooperative.

01:43:03    7          MR. KULWIN:  Actually, I think I was a little past

01:43:05    8    that.  Was somebody taking your notes.

01:43:06    9          THE COURT:  You are absolutely right.  That's true.

01:43:08   10    BY MR. KULWIN:

01:43:10   11    Q.  So and I forgot what your answer was.  Nobody was taking

01:43:15   12    notes?

01:43:15   13    A.  No, what I said is while we were talking to Mr. Morris, no

01:43:19   14    one was taking notes.

01:43:22   15    Q.  But someone ultimately took notes?

01:43:23   16    A.  After the conversation ended, yes, we did -- we went back

01:43:30   17    to the car and we did take notes.

01:43:31   18    Q.  So there was no contemporaneous?

01:43:35   19          MR. LOEVY:  Objection, asked and answered, your

01:43:36   20    Honor.

01:43:36   21          THE COURT:  I haven't heard the whole question yet.

01:43:39   22    BY MR. KULWIN:

01:43:40   23    Q.  There was no contemporaneous taking of the notes while he

01:43:43   24    was actually speaking?

01:43:44   25    A.  That's correct.


                       ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM    Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 66 of 215 PageID #:64805
***REALTIME UNEDITED TRANSCRIPT ONLY***

65

01:43:45   1              MR. LOEVY:  Objection.  Asked and answered.

01:43:46   2              THE COURT:  The objection is overruled.

01:43:47   3              THE WITNESS:  Correct.

01:43:48   4    BY MR. KULWIN:

01:43:50   5    Q.  And then you wrote up an affidavit of that interview,

01:44:00   6    correct?

01:44:00   7    A.  Yes.

01:44:01   8    Q.  And if I understand it correctly, you wrote it up not

01:44:15   9    based on the notes that you folks took but based on your

01:44:18   10   memory, correct?

01:44:19   11   A.  It was based both on the notes and my memory, yes.

01:44:21   12   Q.  Do you recall giving testimony in this case in a prior

01:44:33   13   hearing on April 18th, 2014?

01:44:36   14   A.  Okay.

01:44:38   15   Q.  And you were under oath at the time?

01:44:40   16   A.  Sure.

01:44:40   17   Q.  Were you asked this question.

01:44:44   18              MR. KULWIN:  I'm sorry, page 1897.

01:44:47   19   BY MR. KULWIN:

01:44:48   20   Q.  Those are notes and based upon those notes then you

01:44:50   21   prepared the affidavit; am I correct??

01:44:51   22        "ANSWER:  No.  I actually -- the affidavit was based on

01:44:54   23   my recollection of the interview with Mr. Morris."

01:44:58   24        I'm sorry, I stand corrected.  The end of the notes.

01:45:02   25   I'm sorry.  I withdraw the objection.  I was wrong.

                         ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 67 of 215 PageID #:64806
***REALTIME UNEDITED TRANSCRIPT ONLY***

66

01:45:09   1   BY MR. KULWIN:

01:45:10   2   Q. Now, did I understand you correctly that you had no

01:45:21   3   familiarity with the El Rukns or you had no contact with them

01:45:24   4   before you interviewed Mr. Morris?

01:45:26   5   A. I had no contact with them, with the El Rukns, I never had

01:45:30   6   any contact with the El Rukns.

01:45:31   7   Q. My question was did I understand you right you had no

01:45:35   8   familiarity with the El Rukns or no contact with them?

01:45:38   9   A. I generally knew about the El Rukns.

01:45:39   10   Q. All right. During your interview, you never asked

01:45:47   11   Mr. Morris why he was in Milwaukee, correct?

01:45:49   12   A. I don't recall ever asking him that.

01:45:54   13   Q. Or why he suddenly left Chicago where he was born and

01:45:59   14   raised and moved to Milwaukee, you never asked him that

01:46:02   15   either?

01:46:02   16         MR. LOEVY: Objection, your Honor, relevance.

01:46:04   17         THE WITNESS: I had no --

01:46:05   18         THE COURT: The answer can stand. Go ahead. Finish

01:46:08   19   the answer.

01:46:08   20         THE WITNESS: I had no information that he had left

01:46:11   21   suddenly. I didn't know anything about the circumstances

01:46:14   22   under which he had left Chicago.

01:46:16   23   BY MR. KULWIN:

01:46:16   24   Q. When you were interviewing him, you knew he had been in

01:46:18   25   Chicago, correct?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 68 of 215 PageID #:64807
11/17/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

67

01:46:19     1   A. Clearly.

01:46:19     2   Q. And so just to be clear, you didn't ask him --

01:46:24     3        MR. LOEVY: Objection, your Honor. Asked and

01:46:25     4   answered.

01:46:25     5        THE COURT: Sustained. It's been covered.

01:46:26     6   BY MR. KULWIN:

01:46:27     7   Q. Now, when you were talking to him, you had the opportunity

01:46:42     8   to ask him anything you wanted that you thought was germane to

01:46:46     9   your investigation, correct?

01:46:48    10   A. Yeah, I think so.

01:46:50    11   Q. Okay. Now, if we can look at -- I'm sorry.

01:47:09    12        MR. KULWIN: Can I have one second, Judge?

01:47:11    13        THE COURT: Sure.

01:47:15    14     (Brief pause.)

01:47:17    15        MR. KULWIN: May I put this up? It's Plaintiff's

01:47:20    16   Exhibit 42.

01:47:22    17        THE COURT: I assume there is no objection.

01:47:23    18        MR. LOEVY: No objection.

01:47:24    19        THE COURT: That's fine.

01:47:25    20   BY MR. KULWIN:

01:47:31    21   Q. Now, this is the affidavit that you wrote a couple months

01:47:35    22   after the interview of Gerald Morris that you took in 1999,

01:47:39    23   correct?

01:47:39    24   A. Yes, it is.

01:47:40    25   Q. Now, there's nothing in the affidavit, is there, that

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 69 of 215 PageID #:64808
***REALTIME UNEDITED TRANSCRIPT ONLY***

68

| | | |
|---|---|---|
| 01:47:48 | 1 | Detective O'Callaghan coerced Mr. Morris into saying anything |
| 01:47:53 | 2 | is that true? |
| 01:47:54 | 3 | A.  There's nothing -- right, there's nothing in there about |
| 01:48:02 | 4 | O'Callaghan coercing someone to say something, that's true. |
| 01:48:05 | 5 | Q.  In fact, there's nothing in there that says that Detective |
| 01:48:13 | 6 | O'Callaghan even suggested to him who to pick isn't that |
| 01:48:18 | 7 | right? |
| 01:48:18 | 8 | A.  I disagree with that. |
| 01:48:20 | 9 | Q.  Well, is there a statement anywhere that says Detective |
| 01:48:26 | 10 | O'Callaghan influenced me on who to pick out of the pictures? |
| 01:48:28 | 11 | A.  I viewed his comment as saying by intuition as indicating |
| 01:48:34 | 12 | that O'Callaghan had indicated to him who to pick out, that's |
| 01:48:39 | 13 | what I thought he meant. |
| 01:48:41 | 14 | MR. KULWIN:  I move to strike that, Judge. |
| 01:48:42 | 15 | THE COURT:  Restate the question again, Mr. Kulwin. |
| 01:48:45 | 16 | MR. KULWIN:  Sure. |
| 01:48:46 | 17 | THE COURT:  I just struck the answer. |
| 01:48:47 | 18 | MR. KULWIN:  You are asking her? |
| 01:48:49 | 19 | BY MR. KULWIN: |
| 01:48:50 | 20 | Q.  You didn't write in the affidavit anywhere that Gerald |
| 01:48:52 | 21 | Morris told you Detective O'Callaghan told me who to pick out |
| 01:48:56 | 22 | of the picture? |
| 01:48:57 | 23 | THE COURT:  The question is whether the words appear |
| 01:48:59 | 24 | in the substance in the affidavit. |
| 01:49:00 | 25 | THE WITNESS:  That is correct.  Those words do not |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 01:49:02 | 1 | appear. |
| 01:49:05 | 2 | BY MR. KULWIN: |
| 01:49:06 | 3 | Q.  Okay.  Now, at the time that you were doing your |
| 01:49:10 | 4 | investigation, and I don't want to be repetitive in any way, |
| 01:49:16 | 5 | you were gathering information for this -- let me take that |
| 01:49:20 | 6 | back. |
| 01:49:20 | 7 | One of the things that you were doing was to gather |
| 01:49:23 | 8 | information to support the post conviction ruling? |
| 01:49:26 | 9 | MR. LOEVY:  Objection, asked and answered. |
| 01:49:27 | 10 | THE WITNESS:  This is beyond that.  Approximate.  C |
| 01:49:30 | 11 | is -- |
| 01:49:31 | 12 | THE COURT:  I'll let the answer stand.  Go ahead. |
| 01:49:33 | 13 | BY MR. KULWIN: |
| 01:49:33 | 14 | Q.  This is for some other investigatory purpose? |
| 01:49:38 | 15 | A.  This is for the retrial. |
| 01:49:39 | 16 | Q.  So at that time you were thinking you were going to be |
| 01:49:42 | 17 | representing him at the retrial? |
| 01:49:44 | 18 | A.  Yes. |
| 01:49:44 | 19 | Q.  Okay.  And while you were talking to him, you could have |
| 01:49:52 | 20 | asked him anything you wanted about the lineups isn't that |
| 01:49:59 | 21 | right that he witnessed? |
| 01:49:59 | 22 | A.  Yeah, I think so. |
| 01:50:01 | 23 | Q.  And there's nothing in this affidavit that says that you |
| 01:50:09 | 24 | -- that he told you anything about the line ups? |
| 01:50:11 | 25 | MR. LOEVY:  Objection, improper impeachment, your |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 71 of 215 PageID #:64810
***REALTIME UNEDITED TRANSCRIPT ONLY***

70

| | | |
|---|---|---|
| 01:50:13 | 1 | Honor. |
| 01:50:14 | 2 | THE COURT:  Sustained.  Well, no, I don't think that |
| 01:50:19 | 3 | that's what it's being offered for.  I changed my mind. |
| 01:50:22 | 4 | Overruling the objection. |
| 01:50:23 | 5 | THE WITNESS:  That's correct.  There is nothing about |
| 01:50:24 | 6 | the in-person line ups. |
| 01:50:26 | 7 | BY MR. KULWIN: |
| 01:50:27 | 8 | Q.  And you talked to him about the line ups, didn't you? |
| 01:50:29 | 9 | A.  I have no recollection of that.  It's possible I did, but |
| 01:50:33 | 10 | I have no recollection. |
| 01:50:34 | 11 | Q.  But certainly had he told you at that time something |
| 01:50:39 | 12 | extremely bizarre or unusual happening in the lineup, you |
| 01:50:42 | 13 | would have written that down, correct? |
| 01:50:44 | 14 | MR. LOEVY:  Objection, your Honor.  That's improper |
| 01:50:46 | 15 | impeachment. |
| 01:50:46 | 16 | THE COURT:  Overruled. |
| 01:50:47 | 17 | THE WITNESS:  Yes, I think I would. |
| 01:50:48 | 18 | BY MR. KULWIN: |
| 01:50:49 | 19 | Q.  And you would have included it in your affidavit? |
| 01:50:54 | 20 | A.  I think I would have. |
| 01:50:55 | 21 | Q.  Now, when you were talking to Mr. Morris, he told you that |
| 01:51:09 | 22 | before the trial he met with the state's attorneys several |
| 01:51:13 | 23 | times; isn't that true? |
| 01:51:19 | 24 | A.  I don't recall that. |
| 01:51:20 | 25 | Q.  That's fair.  That's fair. |

01:51:23    1          MR. KULWIN:  I'm going to refresh his recollection,

01:51:25    2   Judge.

01:51:25    3          THE COURT:  Can I ask you a question?  Somewhere in

01:51:27    4   here we have to take a break.  When you are going to do a

01:51:30    5   change of subject, let me know.

01:51:32    6          MR. KULWIN:  It's getting close to that, Judge.

01:51:35    7   BY MR. KULWIN:

01:51:36    8   Q.  Mr. Stainthorpe, let me show you what I believe are the

01:51:38    9   notes of Mr. Lohraff?

01:51:40   10   A.  Laurel.

01:51:40   11   Q.  I think it's Defense Exhibit 380, if not it's J. MSN Y

01:51:47   12   009060.  Could you take a look at that?  I have highlighted

01:51:50   13   the bottom and I think it goes over to the next page.

01:51:55   14   A.  Okay.  Yeah, those notes would indicate we did ask him

01:52:00   15   that.

01:52:00   16          MR. LOEVY:  Objection, your Honor.  That wasn't the

01:52:02   17   question.  Those aren't his notes.

01:52:06   18          THE COURT:  There wasn't a question pending, so

01:52:08   19   whatever he said is stricken.  Now you can ask a question.

01:52:10   20   You just asked him to take a look at it.

01:52:12   21          MR. KULWIN:  I know.

01:52:14   22   BY MR. KULWIN:

01:52:16   23   Q.  I want to be sure I'm right here.

01:52:18   24          So you did talk to him during the interview about him

01:52:21   25   meeting with the state's attorneys before the trial, correct?

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 73 of 215 PageID #:64812
***REALTIME UNEDITED TRANSCRIPT ONLY***

72

01:52:25  1   A.  It appears so.

01:52:26  2   Q.  Okay.  And you're familiar with the term pre trying a

01:52:30  3   witness, aren't you, Mr. Stainthorpe?

01:52:32  4   A.  Pre trying?

01:52:32  5   Q.  Yes; you have heard that before, haven't you?

01:52:36  6   A.  No, I haven't, actually.

01:52:37  7   Q.  Okay.  Have you tried cases?

01:52:39  8   A.  Yes.

01:52:40  9   Q.  Okay.  What -- when you try cases, do you interview your

01:52:44  10  potential witness?

01:52:45  11       THE COURT:  Why don't you use the word preparing.

01:52:48  12       THE WITNESS:  I absolutely prepare witnesses.

01:52:50  13  BY MR. KULWIN:

01:52:50  14  Q.  You prepare?

01:52:51  15  A.  Yes.

01:52:51  16  Q.  Back in the day we called it that.

01:52:54  17       Okay.  Anyway, so you prepare the witnesses, right?

01:52:59  18  A.  Yes.

01:52:59  19  Q.  And there's nothing wrong with that, right?

01:53:01  20  A.  It's your duty.

01:53:02  21  Q.  Right.

01:53:03  22       And so when Mr. Morris told you that he went over his

01:53:08  23  testimony several times with the state's attorney about what

01:53:12  24  he saw and where he stood and all those things, you viewed

01:53:15  25  that as they were preparing him for trial, correct?


                  ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 74 of 215 PageID #:64813
***REALTIME UNEDITED TRANSCRIPT ONLY***

73

| | | |
|---|---|---|
| 01:53:17 | 1 | A. They clearly were preparing him for trial, yes. |
| 01:53:20 | 2 | Q. Not that they were trying to influence or intimidate or |
| 01:53:23 | 3 | coerce him or tell him what to say, correct? |
| 01:53:26 | 4 | A. Yeah, I would agree. |
| 01:53:30 | 5 | Q. All right. Because if you had thought that's what it was, |
| 01:53:34 | 6 | it would have been in the affidavit, true? |
| 01:53:36 | 7 | A. If he said that that's what was happening, yes. |
| 01:53:41 | 8 | THE COURT: Are we at the subject change? |
| 01:53:43 | 9 | MR. KULWIN: Yes. |
| 01:53:43 | 10 | THE COURT: We are going to take a 10-minute break. |
| 01:53:45 | 11 | The jurors can come with me. |
| 01:55:11 | 12 | (Short break.) |
| 02:04:44 | 13 | (The jury enters the courtroom.) |
| 02:04:45 | 14 | THE COURT: All right. Everyone can have a seat. |
| 02:04:50 | 15 | Mr. Kulwin, you can go ahead. |
| 02:04:52 | 16 | MR. KULWIN: Thanks, Judge. |
| 02:05:03 | 17 | BY MR. KULWIN: |
| 02:05:14 | 18 | Q. Mr. Stainthorpe, going back to the affidavit? |
| 02:05:20 | 19 | MR. KULWIN: Judge, can you turn on the computer? |
| 02:05:23 | 20 | THE COURT: I did. Oh, I put defense 2, my mistake, |
| 02:05:27 | 21 | I have the wrong table. |
| 02:05:30 | 22 | MR. KULWIN: I think it's Plaintiff's Exhibit 42. |
| 02:05:37 | 23 | THE COURT: There you go. |
| 02:05:39 | 24 | BY MR. KULWIN: |
| 02:05:40 | 25 | Q. Now, Mr. Stainthorpe, in paragraph 7, you say that -- you |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 75 of 215 PageID #:64814
\*\*\*REALTIME UNEDITED TRANSCRIPT ONLY\*\*\*

74

| | |
|---|---|
| 02:05:52 | 1 | recorder a long time after the shooting, Detective O'Callaghan |
| 02:05:57 | 2 | showed me four photographs to see if I could identify anyone. |
| 02:06:01 | 3 | Do you see that? |
| 02:06:01 | 4 | A. Yes. |
| 02:06:01 | 5 | Q. In the notes of the -- when you met with him and |
| 02:06:05 | 6 | Mr. Lohraff took notes, he didn't make any notation of that; |
| 02:06:10 | 7 | is that correct? |
| 02:06:10 | 8 | A. I believe that's correct accurate, yes. |
| 02:06:11 | 9 | Q. And in paragraph 9, you put down after I picked out a |
| 02:06:15 | 10 | photograph, O'Callaghan said that's him, right? |
| 02:06:18 | 11 | A. Right. |
| 02:06:19 | 12 | Q. That's not in the notes either? |
| 02:06:20 | 13 | A. I think that's correct also. |
| 02:06:22 | 14 | Q. All right. Now, yesterday, you spent some time talking to |
| 02:06:31 | 15 | counsel about Mr. Beseth's map, do you remember that? |
| 02:06:39 | 16 | A. No. |
| 02:06:39 | 17 | Q. Or you used -- you used some calculations that Mr. Beseth |
| 02:06:44 | 18 | had done on the map; isn't that right? |
| 02:06:46 | 19 | A. I was familiar with the -- yes, the distance that he |
| 02:06:51 | 20 | apparently had measured back in 1984 or something. |
| 02:06:55 | 21 | Q. I think it was 1985, but close enough? |
| 02:06:58 | 22 | A. Okay. |
| 02:06:58 | 23 | Q. It's a long time ago, a long, long time ago? |
| 02:07:02 | 24 | A. Correct. |
| 02:07:02 | 25 | Q. And you used the specific measurement of 155 feet, right? |

02:07:06    1   A.  Yeah, that's what was his testimony.

02:07:08    2   Q.  Okay.  Now, did you ever during your investigation review

02:07:15    3   Mr. Buckles' testimony?

02:07:17    4   A.  I'm sure I did.

02:07:19    5   Q.  And do you recall that Mr. Buckles said something a little

02:07:24    6   bit different about where Randy was standing?

02:07:26    7   A.  I don't recall those details, no.

02:07:30    8   Q.  Okay.  But you certainly reviewed Randy Langston's

02:07:33    9   testimony; isn't that right?

02:07:35   10   A.  Yes.

02:07:35   11   Q.  ?

02:08:06   12           MR. KULWIN:  Judge, can you ask the jurors if it's

02:08:08   13   big enough for them?

02:08:10   14           THE COURT:  The jurors aren't seeing it because when

02:08:13   15   I turn it off -- it's big enough.

02:08:15   16   BY MR. KULWIN:

02:08:17   17   Q.  Now, this is testimony from --

02:08:21   18           THE COURT:  Do you have a page number?

02:08:23   19           MR. KULWIN:  Yes, it's page 162.

02:08:25   20           THE COURT:  Thanks.

02:08:26   21   BY MR. KULWIN:

02:08:34   22   Q.  And there's this question, and Fuddy and Talman were right

02:08:39   23   at the edge of the breezeway?  Yes.  And I just want to skip

02:08:43   24   down now to the bottom.

02:08:48   25           Now, isn't it true that from where you were standing,

                        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 77 of 215 PageID #:64846
11/17/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

76

| | | |
|---|---|---|
| 02:08:51 | 1 | meaning Randy Langston, to the edge of that breezeway, was a |
| 02:09:01 | 2 | good hundred feet or more? |
| 02:09:03 | 3 | A.  Okay.  Now I see it, yes. |
| 02:09:05 | 4 | Q.  And Mr. Langston says, no.  Well, you tell me how far it |
| 02:09:11 | 5 | was.  And Mr. Langston says it was about from here where I'm |
| 02:09:14 | 6 | standing about to the end of this courtroom.  And then the |
| 02:09:18 | 7 | next question is from there to the end of the courtroom? |
| 02:09:21 | 8 | "ANSWER:  Yes. |
| 02:09:21 | 9 | "QUESTION:  Let me walk to the back of the courtroom |
| 02:09:24 | 10 | and tell me is this about the view you had, about this far |
| 02:09:27 | 11 | away? |
| 02:09:28 | 12 | "ANSWER:  No, it was a little bit farther. |
| 02:09:31 | 13 | "QUESTION:  A little farther.  Tell me when. |
| 02:09:35 | 14 | "ANSWER:  About to the end of that -- back to the wall, |
| 02:09:38 | 15 | to the end of the wall. |
| 02:09:40 | 16 | "QUESTION:  About this far? |
| 02:09:41 | 17 | "ANSWER:  Yes. |
| 02:09:43 | 18 | And then the court says, a distance of '80 feet |
| 02:09:47 | 19 | A.  That's Judge Maloney. |
| 02:09:50 | 20 | Q.  I don't know.  I am just telling you what that is. |
| 02:09:52 | 21 | A.  Judge Maloney. |
| 02:09:55 | 22 | Q.  Okay.  Do you see that testimony? |
| 02:09:57 | 23 | A.  I do. |
| 02:09:57 | 24 | Q.  Are you saying Judge Maloney was saying something |
| 02:10:00 | 25 | different than what it was? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

02:10:01   1   A.  He may have been.

02:10:02   2   Q.  Do you know?

02:10:03   3   A.  I don't know.  I know he was a fairly corrupt judge.

02:10:07   4   Q.  I guess my question on that one was he was the fact

02:10:11   5   finder?

02:10:11   6   A.  He was.

02:10:12   7   Q.  He wasn't trying to influence a jury by saying 80 feet?

02:10:16   8   A.  True.

02:10:16   9   Q.  And you have been to 26th Street, right?

02:10:20   10  A.  Yes.

02:10:20   11  Q.  And you know the size of the smaller courtrooms?

02:10:22   12  A.  It was not a smaller courtroom.

02:10:24   13  Q.  I do know that?

02:10:25   14  A.  Because I know Judge Maloney's courtroom back then.

02:10:28   15  Q.  And you know the size of the other courtrooms?

02:10:30   16  A.  Yes.

02:10:30   17  Q.  And are they bigger than this one?

02:10:33   18  A.  Yes.

02:10:33   19  Q.  You think the courtrooms at 26th and California are bigger

02:10:37   20  than this courtroom, seriously?

02:10:39   21  A.  Yes.

02:10:39   22  Q.  In any event, he said 80 feet, right?

02:10:50   23  A.  Judge Maloney did, yes.

02:10:53   24  Q.  Now, Beseth, who got the interview who used the 155-foot

02:11:08   25  distance, he got that when he was out interviewing

                 ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 02:11:11 | 1 | Mr. Langston with bill Swano; is that correct? |
| 02:11:16 | 2 | A.  I don't know that. |
| 02:11:17 | 3 | Q.  Isn't it true that Mr. Swano and Mr. Beseth went out to |
| 02:11:23 | 4 | interview Mr. Langston at his home in July of '85? |
| 02:11:28 | 5 | A.  That may well be true, but I don't know that. |
| 02:11:30 | 6 | Q.  Well, I thought you reviewed the transcripts of the trial, |
| 02:11:35 | 7 | didn't that come out? |
| 02:11:36 | 8 | A.  A long time ago. |
| 02:11:37 | 9 | Q.  Did that come out, do you recall that? |
| 02:11:39 | 10 | MR. LOEVY:  Asked and answered, your Honor. |
| 02:11:41 | 11 | THE COURT:  Sustained. |
| 02:11:41 | 12 | BY MR. KULWIN: |
| 02:11:43 | 13 | Q.  And at that point in time, Mr. Swano and Mr. Beseth |
| 02:11:49 | 14 | approached Mr. Langston and told them they were a state's |
| 02:11:54 | 15 | attorney and a police detective; isn't that right? |
| 02:11:56 | 16 | A.  I don't know that. |
| 02:11:56 | 17 | Q.  So you didn't see that in the transcript either when you |
| 02:12:00 | 18 | were reviewing it? |
| 02:12:01 | 19 | A.  I may well have seen that in the transcript. |
| 02:12:08 | 20 | MR. LOEVY:  Objection, your Honor.  Actually, that's |
| 02:12:09 | 21 | not in the transcript. |
| 02:12:10 | 22 | THE COURT:  You don't get to testify, so you can put |
| 02:12:12 | 23 | up the transcript at some point.  So the comment is stricken. |
| 02:12:15 | 24 | The objection is overruled. |
| 02:12:16 | 25 | MR. KULWIN:  If I am in error, I apologize. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM   Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 80 of 215 PageID #:64810
***REALTIME UNEDITED TRANSCRIPT ONLY***

79

| | | |
|---|---|---|
| 02:12:20 | 1 | BY MR. KULWIN: |
| 02:12:22 | 2 | Q. Now, you learned -- did you learn that after Mr. Morris |
| 02:12:38 | 3 | signed your affidavit, he signed another affidavit?  Are you |
| 02:12:44 | 4 | aware of that? |
| 02:12:44 | 5 | A. That does sound right, yes. |
| 02:12:51 | 6 | Q. He signed one a year after -- he signed one -- your |
| 02:12:56 | 7 | affidavit was signed before you ever filed a lawsuit, right? |
| 02:13:00 | 8 | A. Before Mr. Fields. |
| 02:13:01 | 9 | Q. This lawsuit? |
| 02:13:01 | 10 | A. Oh, sure, this was -- the criminal case was still pending. |
| 02:13:05 | 11 | Q. Right. |
| 02:13:05 | 12 |     And your affidavit is -- |
| 02:13:26 | 13 |     THE COURT:  Back to the computer. |
| 02:13:28 | 14 |     MR. KULWIN:  I will go faster. |
| 02:13:31 | 15 |     THE COURT:  You don't have to keep pulling it down. |
| 02:13:34 | 16 | It just makes the light go on. |
| 02:13:36 | 17 | BY MR. KULWIN: |
| 02:13:37 | 18 | Q. Your affidavit is nine sentences, true? |
| 02:13:42 | 19 | A. Well, hold on.  Yes. |
| 02:13:46 | 20 | Q. Have you seen the affidavit that Mr. Morris signed in |
| 02:14:05 | 21 | 2011, do you recall seeing that? |
| 02:14:06 | 22 | A. I probably have not seen that. |
| 02:14:11 | 23 | Q. Can I show it to you to see if it refreshes your |
| 02:14:14 | 24 | recollection? |
| 02:14:15 | 25 | A. Sure. |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 81 of 215 PageID #:64820
***REALTIME UNEDITED TRANSCRIPT ONLY***

80

| 02:14:16 | 1 | Q. Have you seen these? |
| 02:14:19 | 2 | A. Okay. I can tell you this does not look familiar. |
| 02:14:34 | 3 | Q. Okay. I just want do clarify something on this affidavit |
| 02:15:17 | 4 | that you got from Randy Langston -- that was gotten from Randy |
| 02:15:22 | 5 | Langston in August of 1999. All right? |
| 02:15:25 | 6 | A. Okay. |
| 02:15:26 | 7 | Q. That was obtained by Mr. Low; is that correct? |
| 02:15:32 | 8 | A. Yes. |
| 02:15:32 | 9 | Q. And that was obtained while Mr. Langston was in prison? |
| 02:15:35 | 10 | A. I believe so. |
| 02:15:36 | 11 | Q. And we heard testimony from -- in this case that there's a |
| 02:15:41 | 12 | lot of gang culture in these prisons, you are aware of that, |
| 02:15:45 | 13 | right? |
| 02:15:45 | 14 | A. Well, I haven't heard that testimony in this case, but I |
| 02:15:49 | 15 | will absolutely agree with you. |
| 02:15:50 | 16 | MR. LOEVY: Object to relevance, your Honor. |
| 02:15:51 | 17 | THE COURT: Overruled. |
| 02:15:54 | 18 | BY MR. KULWIN: |
| 02:15:56 | 19 | Q. And so while Mr. Langston is being visited by Mr. Fields' |
| 02:16:01 | 20 | attorney in prison, he's living in an atmosphere that infested |
| 02:16:09 | 21 | with gangs, right? |
| 02:16:10 | 22 | MR. LOEVY: Objection. |
| 02:16:10 | 23 | THE COURT: Sustained. The objection is sustained. |
| 02:16:12 | 24 | BY MR. KULWIN: |
| 02:16:13 | 25 | Q. Now, after he gives this affidavit, though, and -- pardon |

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 82 of 215 PageID #:64821

02:16:21  1  | me.
02:16:21  2  |        This affidavit, the last time Randy Langston had
02:16:26  3  | opined or testified about what he saw had been at the death
02:16:31  4  | sentence hearing before this affidavit, right?
02:16:33  5  | A. Okay. So the affidavit is 99. I don't think that's
02:16:37  6  | accurate.
02:16:37  7  | Q. So there was testimony between the death sentence hearing
02:16:41  8  | and the affidavit?
02:16:41  9  | A. In a different proceeding.
02:16:44  10 | Q. Okay?
02:16:47  11 |        MR. KULWIN: Can I have a moment, Judge?
02:16:48  12 |        THE COURT: Sure.
02:17:19  13 | BY MR. KULWIN:
02:17:19  14 | Q. I want to be clear about something. Maybe the time frame.
02:17:23  15 | Maybe I have the time frame wrong.
02:17:25  16 |        You know there was a trial in '86?
02:17:27  17 | A. Yes.
02:17:28  18 | Q. And then there was a death sentence hearing, correct?
02:17:30  19 | A. Yes.
02:17:30  20 | Q. And then there was a new trial in 2009, correct?
02:17:33  21 | A. In this case, yeah.
02:17:36  22 | Q. In Mr. Fields' case, right?
02:17:38  23 | A. Right, right.
02:17:39  24 | Q. And you had -- you filed post conviction proceedings, but
02:17:42  25 | there wasn't an actual evidentiary hearing, correct?

02:17:44  1  A.  That's correct.

02:17:44  2  Q.  So there was no testimony that Mr. Langston gave under

02:17:52  3  oath in a hearing between the time he testified at the death

02:17:55  4  sentence and the time you got your affidavit from him in 1999?

02:17:59  5  A.  I don't think that's accurate.

02:18:00  6  Q.  You are aware?

02:18:06  7       THE COURT:  He has now said it twice.  Are you going

02:18:09  8  to go onto something else or what?

02:18:11  9       MR. KULWIN:  Judge, if we could be heard about

02:18:13  10 something.  I have a feeling that we might get into something

02:18:16  11 I am not aware -- I am concerned about something, Judge, real

02:18:20  12 quick.

02:18:20  13      THE COURT:  All right.

02:18:26  14   (The following proceedings were had at sidebar outside the

02:18:31  15 hearing of the jury:)

02:18:31  16      THE COURT:  He might be right or he might be wrong.

02:18:38  17 It's what he's saying.

02:18:39  18      MR. KULWIN:  I want to ask him.  I'm worried will he

02:18:42  19 say it's the innocence hearing.

02:18:42  20      THE COURT:  So don't ask him.

02:18:44  21      MR. KULWIN:  Okay.

02:18:53  22   (The following proceedings were had in open court in the

02:18:53  23 presence and hearing of the jury:)

02:18:53  24 BY MR. KULWIN:

02:18:55  25 Q.  In any event, sir, the affidavit that you got is

                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

02:18:59  1    consistent with what Mr. Langston was saying in the death

02:19:03  2    penalty hearing, correct?

02:19:05  3    A.  Yes, the sentencing hearing portion, yes.

02:19:08  4    Q.  It's inconsistent with what he testified to at trial?

02:19:11  5    A.  Yes.

02:19:11  6    Q.  And inconsistent with what he testified in 2009, correct,

02:19:17  7    under oath?

02:19:17  8    A.  Yeah, you know, I am not familiar with his testimony in

02:19:21  9    2009.

02:19:21  10   Q.  All right.  And without telling me what the proceeding is,

02:19:28  11   the affidavit is consistent with what his testimony was at

02:19:32  12   whatever proceeding you think occurred during that time

02:19:34  13   period?

02:19:34  14   A.  You know, I haven't looked at that, his testimony from

02:19:41  15   that other proceeding, so I am not comfortable in making an

02:19:44  16   evaluation as to that.

02:19:45  17   Q.  You don't know.  It may be?

02:19:47  18        MR. LOEVY:  Objection, your Honor.  Asked and

02:19:48  19   answered.

02:19:48  20        THE COURT:  Sustained.  That's as good as it's going

02:19:50  21   to get Mr. Kulwin.  I am now telling you to move on.  I am not

02:19:53  22   asking you to move on.

02:19:54  23        MR. KULWIN:  If I could have a moment, Judge.

02:20:01  24        THE COURT:  Yes.

02:20:02  25     (Brief pause.)


                 ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 85 of 215 PageID #:64824
***REALTIME UNEDITED TRANSCRIPT ONLY***

84

| 02:20:09 | 1 | MR. KULWIN:  No further questions, Judge |
| 02:20:11 | 2 | THE COURT:  Redirect. |
| 02:20:11 | 3 | - - - |
| 02:20:11 | 4 | JOHN STAINTHORPE, REDIRECT EXAMINATION |
| 02:20:11 | 5 | BY MR. LOEVY: |
| 02:20:13 | 6 | Q.  When you went to see Gerald Morris who asked a lot of |
| 02:20:16 | 7 | questions by Mr. Kulwin? |
| 02:20:17 | 8 | A.  Yes. |
| 02:20:17 | 9 | Q.  He could have slammed the door in his face? |
| 02:20:20 | 10 | A.  Yes. |
| 02:20:20 | 11 | MR. KULWIN:  Judge, objection. |
| 02:20:21 | 12 | THE COURT:  Hang on a second. |
| 02:20:27 | 13 | THE COURT:  Put the question again. |
| 02:20:28 | 14 | BY MR. LOEVY: |
| 02:20:29 | 15 | Q.  If he had slammed the door in your face, what would you |
| 02:20:31 | 16 | have done? |
| 02:20:32 | 17 | MR. KULWIN:  Objection, Judge.  Calls for |
| 02:20:34 | 18 | speculation. |
| 02:20:34 | 19 | THE WITNESS:  I might have tried to ask him again to |
| 02:20:36 | 20 | talk to me, but if he didn't want to talk to him, that was his |
| 02:20:40 | 21 | choice. |
| 02:20:40 | 22 | BY MR. LOEVY: |
| 02:20:40 | 23 | Q.  But he did speak to you? |
| 02:20:41 | 24 | A.  He spoke to me on two different occasions. |
| 02:20:43 | 25 | Q.  And to state the obvious he was no longer a young man in |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 86 of 215 PageID #:64825
***REALTIME UNEDITED TRANSCRIPT ONLY***

85

02:20:46  1  his 20s by now?

02:20:48  2       MR. KULWIN:  Objection, Judge, that's argumentative.

02:20:50  3       THE WITNESS:  Overruled.

02:20:51  4  BY MR. LOEVY:

02:20:53  5  Q.  How old would he have been 13 years after the trial, do

02:20:56  6  you remember his age?

02:20:56  7  A.  I think mid to late 30s.

02:21:00  8  Q.  You were asked some questions about whether there was

02:21:02  9  anything in the affidavit that you created that suggests that

02:21:04  10  there was suggestiveness.  Do you remember those questions

02:21:06  11  /#-6R7B89S judge, that's not what the request question was.

02:21:10  12  It was did it say that?

02:21:11  13       THE WITNESS:  Yes.

02:21:13  14       THE COURT:  Okay.  Well, put the question in a

02:21:15  15  different way.

02:21:15  16  BY MR. LOEVY:

02:21:15  17  Q.  All right.  The affidavit -- can you read paragraph 7,

02:21:20  18  please?

02:21:21  19       THE COURT:  Hang on a second.  Let me just get the

02:21:25  20  ELMO backup here.  There you go.  Paragraph 7.

02:21:28  21       THE WITNESS:  Okay.  Paragraph 7, a long time after

02:21:32  22  the shooting, Detective O'Callaghan showed me four photographs

02:21:35  23  to see if I could identify anyone.

02:21:36  24  THE ATTORNEY:

02:21:37  25  Q.  All right.  Showing you defendants' demonstrative No. 2,

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 87 of 215 PageID #:64826
***REALTIME UNEDITED TRANSCRIPT ONLY***

86

02:21:41  1  the photographs of Mr. O'Callaghan's suspects, is that

02:21:44  2  suggestive if he showed him the four people he believed were

02:21:48  3  involved in the crime?

02:21:49  4          MR. KULWIN:  I am going to object.

02:21:50  5          THE COURT:  Sustained.  It's a matter for argument at

02:21:52  6  this point.

02:21:52  7  BY MR. LOEVY:

02:21:53  8  Q.  There is nothing in this affidavit that should be read

02:21:56  9  that there wasn't suggestive?

02:21:57  10         MR. KULWIN:  Objection, your Honor.

02:21:59  11         MR. LOEVY:  There was a lot of questioning on this.

02:22:00  12         THE COURT:  I tell you what, so, A, don't talk over

02:22:04  13  each other, and B, if I want a response to an objection, I

02:22:07  14  will ask for one.  The objection is overruled.

02:22:13  15         Put the question again.

02:22:14  16         THE WITNESS:  Yeah.

02:22:15  17  BY MR. LOEVY:

02:22:15  18  Q.  All right.  You were asked a series of questions by Mr.

02:22:18  19  Kulwin?

02:22:18  20         THE COURT:  Let me put the question.  Is there

02:22:20  21  anything in the affidavit that should be read that there

02:22:22  22  wasn't suggestion, that is a yes or no question, please answer

02:22:25  23  it yes or no.

02:22:26  24         THE WITNESS:  No.

02:22:27  25  BY MR. LOEVY:

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 88 of 215 PageID #:64827

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 02:22:27 | 1 | Q. How about number 9, sir, can you read that paragraph? |
| 02:22:30 | 2 | A. After I picked out a photograph, O'Callaghan said, that's |
| 02:22:33 | 3 | him, right. |
| 02:22:34 | 4 | Q. All right. Is that suggestive? |
| 02:22:37 | 5 | MR. KULWIN: Same objection. |
| 02:22:39 | 6 | THE COURT: Sustained. Leave it for argument. |
| 02:22:41 | 7 | BY MR. LOEVY: |
| 02:22:41 | 8 | Q. You were asked a series of questions about whether you |
| 02:22:47 | 9 | included certain things from your partner's notes in the |
| 02:22:50 | 10 | affidavit. Do you remember those questions? |
| 02:22:51 | 11 | A. Yes. |
| 02:22:51 | 12 | Q. Approaching with a copy of Defendant's Exhibit 380, your |
| 02:22:55 | 13 | Honor. |
| 02:22:55 | 14 | THE COURT: Okay. Is that the notes? |
| 02:22:59 | 15 | MR. LOEVY: These are the notes. |
| 02:23:00 | 16 | BY MR. LOEVY: |
| 02:23:01 | 17 | Q. There are quite a few other things in the notes that are |
| 02:23:03 | 18 | not in the affidavit, too, correct, sir? |
| 02:23:05 | 19 | A. Yes. |
| 02:23:08 | 20 | Q. Can you read the fourth paragraph from the bottom, the one |
| 02:23:14 | 21 | that says? |
| 02:23:15 | 22 | MR. KULWIN: Judge. |
| 02:23:15 | 23 | BY MR. LOEVY: |
| 02:23:16 | 24 | Q. Said he talked? |
| 02:23:17 | 25 | MR. KULWIN: Judge, I object. I don't think the |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 89 of 215 PageID #:64828
***REALTIME UNEDITED TRANSCRIPT ONLY***

88

| 02:23:18 | 1 | notes are in evidence.  I think that we were asking -- |
| 02:23:21 | 2 | MR. LOEVY:  I can have him refresh.  Sorry. |
| 02:23:25 | 3 | THE COURT:  Ask it in a different way then. |
| 02:23:27 | 4 | BY MR. LOEVY: |
| 02:23:27 | 5 | Q.  All right.  Looking -- let's take it from the bottom up. |
| 02:23:30 | 6 | Looking at the last line, do you see that? |
| 02:23:32 | 7 | A.  Yes. |
| 02:23:32 | 8 | Q.  Okay.  Does that refresh your recollection about what |
| 02:23:37 | 9 | Gerald told you about how he had been prepared by the state's |
| 02:23:41 | 10 | attorney's? |
| 02:23:41 | 11 | A.  Yes. |
| 02:23:41 | 12 | Q.  What did Gerald tell you about having been prepared by the |
| 02:23:44 | 13 | state's attorneys? |
| 02:23:45 | 14 | A.  That he had been corrected many times with maps, photos, |
| 02:23:48 | 15 | et cetera. |
| 02:23:49 | 16 | MR. KULWIN:  Judge, I object and move to strike.  I |
| 02:23:51 | 17 | don't think he says that his memory was exhausted on the |
| 02:23:53 | 18 | point.  I don't think it was really used for refreshing |
| 02:23:57 | 19 | recollection.  It was leading. |
| 02:23:59 | 20 | THE COURT:  Okay.  Let me talk to you all over here. |
| 02:24:07 | 21 | (The following proceedings were had at sidebar outside the |
| 02:24:08 | 22 | hearing of the jury:) |
| 02:24:08 | 23 | THE COURT:  So look, you went into the notes and |
| 02:24:13 | 24 | there was something in the notes that wasn't put in the |
| 02:24:15 | 25 | affidavit, so he's going to get to put in that there was other |

11/17/16 PM   Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 90 of 215 PageID #:64820
***REALTIME UNEDITED TRANSCRIPT ONLY***

89

02:24:18  1    stuff in the notes that wasn't in the affidavit.  If that

02:24:20  2    requires him to read from it, he is going to be permitted to

02:24:22  3    read from it.  And the objection, if there is one, is

02:24:25  4    overruled.

02:24:27  5       (The following proceedings were had in open court in the

02:24:31  6    presence and hearing of the jury:)

02:24:31  7           THE COURT:  Okay.  All right.  The objection is

02:24:33  8    overruled.  You can proceed.

02:24:34  9    BY MR. LOEVY:

02:24:35  10   Q.  All right.  There's a lot of things in the notes that

02:24:37  11   aren't in the affidavit, correct, sir?

02:24:39  12   A.  Correct.

02:24:39  13   Q.  How about the sentence before it, what was also in the

02:24:42  14   notes that Gerald told you?

02:24:44  15   A.  By state's attorneys at 26th Street, what to say, not to

02:24:49  16   say at trial.

02:24:50  17   Q.  All right.  And then moving up two bullet points above,

02:24:53  18   what were you told by Gerald about O'Callaghan?

02:24:54  19   A.  That he said he talked to O'Callaghan a few days after the

02:24:58  20   murder, definitely within one week.

02:25:00  21   Q.  And then how many times did he talk to O'Callaghan after

02:25:02  22   that?

02:25:03  23   A.  He talked to him 10 to 12 times.

02:25:05  24   Q.  All right.  You didn't put that in the affidavit either?

02:25:10  25   A.  Correct.

| | | |
|---|---|---|
| 02:25:10 | 1 | Q. Two bullet points up, what did it tell you about Gerald |
| 02:25:15 | 2 | telling you about the El Rukns and the Goon Squad? |
| 02:25:17 | 3 | A. That the El Rukns in the other groups in the buildings, in |
| 02:25:19 | 4 | the neighborhood had a truce, but we, meaning Fuddy and Gerald |
| 02:25:24 | 5 | Morris, didn't go to the meetinging. |
| 02:25:25 | 6 | Q. So that in fact he told you there was a truce between the |
| 02:25:27 | 7 | El Rukns and the Goon Squad, correct? |
| 02:25:29 | 8 | A. Correct. |
| 02:25:29 | 9 | Q. Okay. Backing up two more bullet points, does he -- |
| 02:25:34 | 10 | THE COURT: The point has been made at this point. |
| 02:25:36 | 11 | MR. LOEVY: All right. |
| 02:25:38 | 12 | BY MR. LOEVY: |
| 02:25:39 | 13 | Q. You were asked some questions about Randy Langston's |
| 02:25:41 | 14 | affidavit and whether there are gangs. Do you have a copy of |
| 02:25:45 | 15 | it in front of you, sir? |
| 02:25:46 | 16 | A. No. |
| 02:25:46 | 17 | Q. Bringing you a copy of plaintiff's 43, where was Randy |
| 02:25:50 | 18 | Langston when you -- when your partner took that affidavit |
| 02:25:54 | 19 | from him 12 or 13 years after the criminal trial? |
| 02:25:57 | 20 | A. He was at the Paris work camp in Paris, Illinois. |
| 02:26:01 | 21 | Q. Do you have any reason to believe that anybody that knew |
| 02:26:04 | 22 | about the case was in the Paris work camp in Paris, Illinois? |
| 02:26:07 | 23 | MR. KULWIN: Objection, Judge, calls for speculation. |
| 02:26:08 | 24 | THE COURT: Hang on a second. The objection is |
| 02:26:15 | 25 | sustained. |

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 92 of 215 PageID #:64831

02:26:15    1    BY MR. LOEVY:

02:26:15    2    Q.  All right.  You were asked some questions about an

02:26:17    3    affidavit by Gerald Morris that you hadn't seen.  Do you

02:26:20    4    recall that?

02:26:20    5    A.  Correct.

02:26:21    6    Q.  Approaching with a copy of Plaintiff's Exhibit 24.  If you

02:26:26    7    could just review that.  Is there anything at all inconsistent

02:26:30    8    with what Gerald put in that affidavit that was inconsistent

02:26:33    9    with what you were told?

02:26:34   10    A.  So there's two affidavits here.  There is --

02:26:43   11    Q.  It's basically the same story, is it not, sir?

02:26:45   12    A.  Well, you know what, I can't say that.

02:26:48   13    Q.  You'd have to review it?

02:26:49   14    A.  I'd have to review.

02:26:51   15            MR. LOEVY:  Your Honor, I'd like permission to move

02:26:55   16    on.

02:26:55   17            THE COURT:  Yes.

02:26:55   18    BY MR. LOEVY:

02:26:56   19    Q.  I'd like to finish asking but questions about.  Mr. Kulwin

02:27:00   20    read you testimony that Randy estimated it was 80 feet away.

02:27:04   21    Do you remember that testimony?

02:27:05   22    A.  Apparently, yes.  Well, Judge Maloney he agreed.

02:27:07   23    Q.  Leaving aside what Judge Maloney said.  When you went and

02:27:12   24    used 155-foot estimate as opposed to Randy's best estimate

02:27:16   25    from the witness stand about how far he was, why did you

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 93 of 215 PageID #:64832

02:27:20   1   choose to use the estimate to the ball field instead of

02:27:23   2   Randy's eyeballing to the end of the courtroom?

02:27:25   3   A.  Because the distance from the ball field, which was I

02:27:30   4   believe still there when we went there, to the entrance to the

02:27:33   5   building appeared to be 155 feet.  That appeared to be

02:27:37   6   accurate.

02:27:38   7   Q.  All right.  When you were asked about the James Langston

02:27:45   8   notes, do you remember Mr. Burns asking you about that?

02:27:47   9   A.  Yes.

02:27:53  10   Q.  Now, you had some information about James Langston at the

02:27:57  11   time before you got the concealed file, correct?

02:27:59  12   A.  Yes.

02:27:59  13   Q.  But did you know that James Langston was having to have

02:28:04  14   seen Ricky Baldwin's brother driving away from the shooting?

02:28:08  15   A.  I don't believe I was ever aware of that.

02:28:10  16   Q.  So even though you could have talked to James Langston,

02:28:13  17   would you have responded differently if you had actually known

02:28:15  18   this additional information?

02:28:16  19   A.  Well, that was additional information I could have used,

02:28:20  20   but I think -- I think James wasn't around.

02:28:24  21          MR. BURNS:  Objection to speculation, your Honor.

02:28:25  22          THE COURT:  Overruled.  It's something he testified

02:28:27  23   to at least five times this afternoon.

02:28:30  24   BY MR. LOEVY:

02:28:32  25   Q.  Moving to the last subject, Delbert Edwards.  There was a

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 94 of 215 PageID #:64833
11/17/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

93

| 02:28:34 | 1 | suggestion in the questioning that Delbert Edwards was an El |
| 02:28:36 | 2 | Rukn.  Do you remember that question by Mr. Burns? |
| 02:28:38 | 3 | A.  Actually, I don't. |
| 02:28:41 | 4 | Q.  All right.  Do you have any knowledge that Delbert Edwards |
| 02:28:44 | 5 | was an El Rukn in any way at all? |
| 02:28:46 | 6 | A.  No, none whatsoever.  In fact, I think he denied being a |
| 02:28:50 | 7 | gang member. |
| 02:28:51 | 8 | Q.  All right? |
| 02:28:55 | 9 | MR. LOEVY:  I have no further questions, your Honor. |
| 02:28:56 | 10 | THE COURT:  Anything based on the redirect? |
| 02:28:58 | 11 | MR. KULWIN:  I do, Judge. |
| 02:29:00 | 12 | MR. BURNS:  Your Honor, I have nothing.  Thank you. |
| 02:29:02 | 13 | THE COURT:  Go ahead, Mr. Kulwin. |
| 02:29:06 | 14 | - - - |
| 02:29:06 | 15 | JOHN STAINTHORPE, RECROSS-EXAMINATION |
| 02:29:06 | 16 | BY MR. KULWIN: |
| 02:29:12 | 17 | Q.  Just a couple points, sir. |
| 02:29:13 | 18 | First, on the question of -- on the question of why |
| 02:29:19 | 19 | you used the 155 feet as opposed to the 80 feet, you said you |
| 02:29:23 | 20 | thought it was more accurate, right? |
| 02:29:25 | 21 | A.  Yes. |
| 02:29:25 | 22 | Q.  Okay.  You mean the measurement was more accurate? |
| 02:29:28 | 23 | A.  From -- yeah, the measurement from the ballpark to the |
| 02:29:36 | 24 | entrance of the building would be more like 155. |
| 02:29:40 | 25 | Q.  But that would assume that Mr. Baldwin? |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 95 of 215 PageID #:64834
***REALTIME UNEDITED TRANSCRIPT ONLY***

94

| | | |
|--|--|--|
| 02:29:45 | 1 | A.  That's the measurement I was using. |
| 02:29:46 | 2 | Q.  But in fact, page 157, but in fact, sir, Mr. Langston |
| 02:30:02 | 3 | testified as follows. |
| 02:30:03 | 4 | "QUESTION:  Where were you standing? |
| 02:30:07 | 5 | "ANSWER:  We were standing along the sidewalk." |
| 02:30:09 | 6 | That's what he testified to, right, under oath? |
| 02:30:14 | 7 | A.  Well, he said he was in the field across the street along |
| 02:30:18 | 8 | -- yeah, along the side of that field. |
| 02:30:23 | 9 | Q.  No? |
| 02:30:23 | 10 | A.  That was next to the sidewalk. |
| 02:30:25 | 11 | Q.  Let me read it to you again? |
| 02:30:26 | 12 | THE COURT:  He's looking at the further up on the |
| 02:30:29 | 13 | page part that you have highlighted there. |
| 02:30:33 | 14 | MR. KULWIN:  That's my fault. |
| 02:30:34 | 15 | THE WITNESS:  But the -- |
| 02:30:35 | 16 | MR. KULWIN:  That's me again. |
| 02:30:36 | 17 | BY MR. KULWIN: |
| 02:30:37 | 18 | Q.  Let's just stop from the top so we can go slow.  He |
| 02:30:39 | 19 | testified so you were in a field across the street from the |
| 02:30:42 | 20 | breezeway where the shooting took place; is that correct? |
| 02:30:44 | 21 | "ANSWER:  Yes |
| 02:30:45 | 22 | "QUESTION:  How long had you been out there before this |
| 02:30:47 | 23 | happened? |
| 02:30:47 | 24 | "ANSWER:  We had been out there for 20 minutes |
| 02:30:51 | 25 | "QUESTION:  You were standing there in the grassy area |

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 96 of 215 PageID #:64835

02:30:53  1 | on the field?

02:30:54  2 | "ANSWER:  No

02:30:55  3 | "QUESTION:  Where were you standing?

02:30:56  4 | "ANSWER:  We were standing along the sidewalk."

02:31:01  5 | A.  That was the testimony, yeah.

02:31:03  6 | Q.  And just real quick, one other point ^  you were asked

02:31:13  7 | some questions about what was in the notes that wasn't in the

02:31:19  8 | affidavit.  Do you remember those questions just now?

02:31:21  9 | A.  Yes.

02:31:21  10 | Q.  Okay.  You put in what you believed were the most

02:31:26  11 | important points in the affidavit?

02:31:28  12 | A.  The crucial issue was that he could not ID the people and

02:31:31  13 | that's -- I pointed to the crucial issues, yes.

02:31:35  14 | MR. KULWIN:  Move to strike, Judge.

02:31:36  15 | THE COURT:  Overruled.

02:31:37  16 | BY MR. KULWIN:

02:31:37  17 | Q.  And just to be clear, there was nothing in the notes about

02:31:44  18 | him showing four photos, right?

02:31:46  19 | A.  Correct.

02:31:47  20 | Q.  And nothing in the notes of the interview that were taken

02:31:51  21 | in 1999 that indicated that he ever said that Mr. O'Callaghan

02:31:55  22 | said that's right after he picked out Mr. Fields or anyone

02:31:58  23 | else, correct?

02:31:59  24 | A.  True.  That's correct.

02:32:01  25 | MR. KULWIN:  Nothing else.

| | | |
|---|---|---|
| 02:32:02 | 1 | THE COURT: Anything else? |
| 02:32:03 | 2 | MR. LOEVY: No, your Honor. |
| 02:32:04 | 3 | THE COURT: Do any of the jurors have any questions |
| 02:32:07 | 4 | for the witness? I do not see anybody writing. You are |
| 02:32:09 | 5 | excused. |
| 02:32:10 | 6 | THE WITNESS: Thank you. |
| 02:32:10 | 7 | THE COURT: While somebody is getting the next |
| 02:32:12 | 8 | witness, can I see the lawyers at sidebar just to talk about |
| 02:32:17 | 9 | scheduling. If somebody can go get the next witness. |
| 02:32:21 | 10 | (The following proceedings were had at sidebar outside the |
| 02:32:33 | 11 | hearing of the jury:) |
| 02:32:33 | 12 | THE COURT: So do we know if Mr. Langston is here. |
| 02:32:35 | 13 | MR. LOEVY: I don't think he is coming until 2:30 I |
| 02:32:38 | 14 | was told. |
| 02:32:38 | 15 | THE COURT: So based on what all you guys told me |
| 02:32:43 | 16 | yesterday we need to put him on at 3:00, so you are going to |
| 02:32:46 | 17 | need to tell somebody at your table to be out there waiting |
| 02:32:49 | 18 | for him and to tap you on injure shoulder and to stop. |
| 02:32:53 | 19 | MR. LOEVY: My exam is less than half an hour. |
| 02:32:56 | 20 | THE COURT: I don't care. 3:00 o'clock. |
| 02:32:58 | 21 | MR. LOEVY: Got it. We will take a break? |
| 02:33:01 | 22 | THE COURT: No. |
| 02:33:12 | 23 | (The following proceedings were had in open court in the |
| 02:33:42 | 24 | presence and hearing of the jury:) |
| 02:33:42 | 25 | (Witness sworn.) |

11/17/16 PM    ***REALTIME UNEDITED TRANSCRIPT ONLY***

97

| | | |
|---|---|---|
| 02:33:42 | 1 | - - - |
| 02:33:42 | 2 | KEVIN DUFFIN, DIRECT EXAMINATION |
| 02:33:42 | 3 | BY MR. LOEVY: |
| 02:33:51 | 4 | Q. Sir, if you would state and spell your name for the |
| 02:33:53 | 5 | record, please. |
| 02:33:54 | 6 | A. Kevin Duffin, D-u-f-f-i-n. |
| 02:33:58 | 7 | Q. And who is your employer? |
| 02:33:59 | 8 | A. City of Chicago, Chicago Police Department. |
| 02:34:01 | 9 | Q. What is your rank with the department? |
| 02:34:02 | 10 | A. I am a commander of detectives. |
| 02:34:04 | 11 | Q. And that's a very high rank, is it not? |
| 02:34:06 | 12 | A. Yes, sir. |
| 02:34:07 | 13 | Q. In fact, there's not too many above that, is there? |
| 02:34:10 | 14 | A. No. |
| 02:34:12 | 15 | Q. All right. Let's talk about your involvement in this |
| 02:34:16 | 16 | case. You were not involved back in the day that it happened, |
| 02:34:19 | 17 | right? |
| 02:34:19 | 18 | A. In the early '80s? |
| 02:34:22 | 19 | Q. Right. |
| 02:34:23 | 20 | A. No, sir. |
| 02:34:23 | 21 | Q. You got involved later? |
| 02:34:24 | 22 | A. Yes, sir. |
| 02:34:25 | 23 | Q. At some point in either 2010 or 2011, it came to your |
| 02:34:29 | 24 | attention that a file had surfaced relating to the old murder, |
| 02:34:33 | 25 | right? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 99 of 215 PageID #:64838
***REALTIME UNEDITED TRANSCRIPT ONLY***

98

02:34:33  1   A.  Yes, sir.

02:34:33  2   Q.  And as the commander, was it troubling to you that a file

02:34:39  3   that related to the old murder investigation had gone missing

02:34:43  4   for more than 20 years?

02:34:46  5          MR. MICHALIK:  Object, Judge.

02:34:47  6          THE COURT:  Overruled.

02:34:48  7          THE WITNESS:  At the point that I became aware, I was

02:34:50  8   not commander, sir.

02:34:52  9   BY MR. LOEVY:

02:34:53  10  Q.  Okay.  Thanks for that clarification.  What was your rank

02:34:55  11  at that time?

02:34:55  12  A.  At that time I was the lieutenant assigned to Area 1.

02:34:57  13  Q.  All right.  But back to the question, it was nonetheless

02:35:00  14  troubling to learn that an investigative file relating to a

02:35:03  15  murder case that had been tried twice had showed up whereas it

02:35:07  16  had not been previously known of?

02:35:09  17  A.  Yes, sir.

02:35:09  18  Q.  And it's a big deal, an investigation file in a murder

02:35:13  19  case, right?

02:35:13  20  A.  Yes, sir.

02:35:13  21  Q.  So you decided to conduct an investigation to discover

02:35:18  22  where the file had been for the intervening 25 years, correct?

02:35:21  23  A.  Yes, sir.

02:35:22  24  Q.  And when was this investigation that you commenced, late

02:35:28  25  2011, would you say?

02:35:29  1  A.  Late fall of 2011, yeah.

02:35:31  2  Q.  Why did you conduct an investigation into the missing

02:35:34  3  file?

02:35:34  4  A.  To ascertain if we could determine where, who found it and

02:35:40  5  where.

02:35:41  6  Q.  Who found it.

02:35:43  7       All right.  Did you speak to everybody who you

02:35:46  8  thought might have access to the missing file?

02:35:48  9  A.  Yes, sir.

02:35:48  10  Q.  And do you recall, as you just alluded to, that there was

02:35:51  11  an issue that nobody found the unfound file?

02:35:55  12       THE COURT:  Can you rephrase that?

02:35:57  13  BY MR. LOEVY:

02:35:57  14  Q.  All right.  You had a little trouble determining who found

02:36:00  15  the missing file, right?

02:36:01  16  A.  Yes.

02:36:01  17  Q.  Did you speak to Sharon Colby?

02:36:04  18  A.  Yes, sir.

02:36:04  19  Q.  Why did you choose Sharon Colby to talk to?

02:36:07  20  A.  She was one of the detectives that worked on the file

02:36:11  21  room.

02:36:11  22  Q.  Did she have any answers as to who found this file?

02:36:14  23  A.  She did not, no.

02:36:16  24  Q.  How about Karen Willis, did you talk to her?

02:36:19  25  A.  Karen Williams?

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 101 of 215 PageID #:64840

| | | |
|---|---|---|
| 02:36:20 | 1 | Q.  Yes.  Thank you? |
| 02:36:21 | 2 | A.  Yes, I did. |
| 02:36:22 | 3 | Q.  Why did you pick her? |
| 02:36:23 | 4 | A.  She also worked on the files. |
| 02:36:25 | 5 | Q.  Did she have any answer as to who found it or where they |
| 02:36:28 | 6 | found it? |
| 02:36:28 | 7 | A.  No, sir. |
| 02:36:28 | 8 | Q.  How about Sam brown? |
| 02:36:30 | 9 | A.  Yes, sir. |
| 02:36:31 | 10 | Q.  Who is Sam brown? |
| 02:36:32 | 11 | A.  Sam brown was also a detective assigned to filing. |
| 02:36:35 | 12 | Q.  And did he have any answers? |
| 02:36:38 | 13 | A.  He had no recollection either. |
| 02:36:40 | 14 | Q.  John /PO*Z and detective owe Brian, same thing? |
| 02:36:46 | 15 | A.  Same thing. |
| 02:36:47 | 16 | Q.  Those are people you thought might have information but |
| 02:36:49 | 17 | they had none, right? |
| 02:36:51 | 18 | A.  Correct. |
| 02:36:51 | 19 | Q.  Did you talk to all the people who worked around the |
| 02:36:53 | 20 | files, sir? |
| 02:36:54 | 21 | A.  To the best of my knowledge, those were the only people |
| 02:36:59 | 22 | that had access to the files at that time frame. |
| 02:37:03 | 23 | Q.  You didn't leave anybody out? |
| 02:37:04 | 24 | A.  No, sir. |
| 02:37:04 | 25 | Q.  Were you able to determine a single thing at the |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 102 of 215 PageID #:64841
***REALTIME UNEDITED TRANSCRIPT ONLY***

101

| | | |
|---|---|---|
| 02:37:06 | 1 | conclusion of your investigation as to where this file had |
| 02:37:08 | 2 | been for the last 25 years? |
| 02:37:10 | 3 | A.  None of the aforementioned people could recall having |
| 02:37:15 | 4 | located that file. |
| 02:37:15 | 5 | Q.  If you couldn't find the person who found it then you |
| 02:37:18 | 6 | couldn't find where the person who found it found it, correct? |
| 02:37:22 | 7 | A.  Correct. |
| 02:37:22 | 8 | Q.  So you were unable to determine whether the file had been |
| 02:37:25 | 9 | for the previous 25 years? |
| 02:37:26 | 10 | A.  Yes, sir. |
| 02:37:27 | 11 | Q.  Now, you had a hunch where the file had been, had you not? |
| 02:37:30 | 12 | A.  Yes, sir. |
| 02:37:30 | 13 | Q.  Because the department had a place where it kept files |
| 02:37:33 | 14 | like this, right, sir? |
| 02:37:34 | 15 | A.  Yes, sir. |
| 02:37:35 | 16 | Q.  And your hypothesis was perhaps the file was sitting in a |
| 02:37:40 | 17 | file cabinet at the Area 1 police department, right? |
| 02:37:43 | 18 | A.  Yes, sir. |
| 02:37:44 | 19 | Q.  Because in that file cabinet at Area 1, where was that |
| 02:37:47 | 20 | file cabinet, sir? |
| 02:37:48 | 21 | A.  At what point? |
| 02:37:49 | 22 | Q.  At the point, say, back in the '80s? |
| 02:37:53 | 23 | A.  I have no knowledge as to where it was bang in the '80s. |
| 02:37:58 | 24 | Q.  The file cabinet might have been moved? |
| 02:38:00 | 25 | A.  Yes, sir. |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 103 of 215 PageID #:64843
***REALTIME UNEDITED TRANSCRIPT ONLY***

102

| | | |
|---|---|---|
| 02:38:00 | 1 | Q. But this was the file cabinet that was in the detective's |
| 02:38:03 | 2 | division, right? |
| 02:38:03 | 3 | A. Yes, sir. |
| 02:38:03 | 4 | Q. And your hypothesis was that this investigative file was |
| 02:38:07 | 5 | probably sitting in a drawer in chronological order in the |
| 02:38:11 | 6 | file cabinet where the investigative files are kept, correct? |
| 02:38:13 | 7 | A. Yes, sir. |
| 02:38:14 | 8 | Q. And you have no reason, as you sit here today, to believe |
| 02:38:17 | 9 | that that's not exactly where the file was, do you? |
| 02:38:19 | 10 | A. No, sir. |
| 02:38:20 | 11 | Q. Did you check and see if the file cabinet where this file |
| 02:38:33 | 12 | was had other files that had not been turned over? |
| 02:38:37 | 13 | A. No, sir. |
| 02:38:38 | 14 | Q. Let's turn back to the mid '80s. Was it the policy and |
| 02:38:43 | 15 | practice of the Chicago Police Department to turn over |
| 02:38:46 | 16 | investigative files like this? |
| 02:38:47 | 17 | MR. MICHALIK: Objection, foundation. |
| 02:38:49 | 18 | THE COURT: Lay the foundation first. |
| 02:38:52 | 19 | BY MR. LOEVY: |
| 02:38:52 | 20 | Q. When did you first become a Chicago police officer, sir? |
| 02:38:54 | 21 | A. 14th of June, 14th of June 1982. |
| 02:38:58 | 22 | Q. All right. So you were a member of the Chicago Police |
| 02:39:01 | 23 | Department in the 1984, 85, 86 time period, correct? |
| 02:39:05 | 24 | A. I was a patrolman assigned to the Englewood district, yes, |
| 02:39:09 | 25 | sir. |

02:39:09    1    Q.  Were you familiar with the policies and the practices of

02:39:11    2    the Chicago Police Department at the time?

02:39:13    3    A.  I was familiar with patrol division policies and

02:39:18    4    practices.

02:39:18    5    Q.  All right.  Did you have any knowledge about whether the

02:39:21    6    Chicago Police Department had a policy and practice to turn

02:39:24    7    over investigative files like this in 1984?

02:39:27    8    A.  I have no knowledge to that.

02:39:28    9    Q.  Do you know having -- you've subsequently become a

02:39:35   10    detective, correct?

02:39:35   11    A.  I was a sergeant of the detective and a lieutenant of the

02:39:41   12    detectives.

02:39:41   13    Q.  Does that mean you are a detective or you just supervise

02:39:44   14    detectives?

02:39:45   15    A.  I just supervise detectives.

02:39:46   16    Q.  Tell the jury what year you were a sergeant of the

02:39:48   17    detectives?

02:39:48   18    A.  I went to the detective division in November of 1999.

02:39:52   19    Q.  And when did you get promoted to lieutenant?

02:39:57   20    A.  In October of 2010.

02:40:00   21    Q.  So you are familiar with the policies and the practices of

02:40:04   22    the police department as they pertained to detective business,

02:40:07   23    correct?

02:40:08   24    A.  From the late '90s through current day, yes.

02:40:13   25    Q.  All right.  Let's talk -- changing topics, let's talk

| | | |
|---|---|---|
| 02:40:16 | 1 | about what detectives do.  They solve crimes, correct? |
| 02:40:19 | 2 | A.  Yes, sir. |
| 02:40:19 | 3 | Q.  They gather information is that a fair summary? |
| 02:40:22 | 4 | A.  Yes, sir. |
| 02:40:22 | 5 | Q.  And that information in the course of a criminal |
| 02:40:26 | 6 | investigation has to be turned over to the criminal justice |
| 02:40:29 | 7 | system in criminal cases, correct? |
| 02:40:30 | 8 | A.  Yes, sir. |
| 02:40:30 | 9 | Q.  So it has to be written down, right? |
| 02:40:33 | 10 | A.  Memorialized, yes, sir. |
| 02:40:34 | 11 | Q.  A big part of the detective's job is to take notes, would |
| 02:40:37 | 12 | you agree with that? |
| 02:40:38 | 13 | A.  Yes, sir. |
| 02:40:38 | 14 | Q.  Tell the jury why detectives have to take notes? |
| 02:40:40 | 15 | A.  To refresh their memory when they memorialize the case. |
| 02:40:45 | 16 | Q.  In other words, the detective doesn't know if they're |
| 02:40:48 | 17 | going to go to court in two days or 20 years, right? |
| 02:40:50 | 18 | A.  Yes, sir. |
| 02:40:50 | 19 | Q.  Would you agree with me that for that reason the a |
| 02:40:53 | 20 | critical part of a detective's responsibility to be a very |
| 02:40:57 | 21 | good chronicler of details? |
| 02:40:59 | 22 | A.  Yes, sir. |
| 02:41:00 | 23 | Q.  Would you also agree that when you start a criminal |
| 02:41:01 | 24 | investigation, you don't know what fact is going to be |
| 02:41:03 | 25 | relevant ten months from now? |

02:41:05  1  A. Yes, sir.

02:41:06  2  Q. And that means you have to write everything down because

02:41:09  3  you don't know in advance what's going to turn out to be

02:41:11  4  pertinent and what's not, correct?

02:41:13  5  A. That's correct.

02:41:13  6  Q. And sometimes in these investigations, detectives work

02:41:16  7  with each other, work with other detectives, correct?

02:41:18  8  A. Yes, sir.

02:41:19  9  Q. Is that a reason why you also have to write things down?

02:41:22  10  A. Yes, sir.

02:41:23  11  Q. Can you explain?

02:41:24  12  A. Well, if two different detectives are working on it and

02:41:28  13  one detective develops information that the other one doesn't

02:41:32  14  have, then he can refer back to his notes.

02:41:34  15  Q. All right. And then the notes are supposed to turn into

02:41:37  16  reports, are they not?

02:41:38  17  A. Yes, sir.

02:41:38  18  Q. Explain to the jury what that means.

02:41:40  19  A. Detectives write closing supplementary reports, well, if

02:41:47  20  they close the case, a closing supplementary reports that

02:41:52  21  documents the entire investigation from inception to the end.

02:41:54  22  Q. That's the end of the investigation. But as the

02:41:56  23  investigation is progressing, they are supposed to create

02:42:00  24  supplementary reports, correct?

02:42:01  25  A. Yes, progress reports.

| | | |
|---|---|---|
| 02:42:03 | 1 | Q. Well, supplementary reports or progress report? |
| 02:42:08 | 2 | A. A progress report is a type of supplementary report. |
| 02:42:11 | 3 | Q. I thought a general progress report is notes, right, |
| 02:42:13 | 4 | handwritten notes, supposed to be on general progress reports? |
| 02:42:16 | 5 | A. Semantics here, general progress notes are handwritten |
| 02:42:23 | 6 | notes. |
| 02:42:23 | 7 | Q. Notes, right? |
| 02:42:24 | 8 | A. A progress report is a computerized report that comes out |
| 02:42:30 | 9 | when they enter the report into the CRIS system. |
| 02:42:32 | 10 | Q. All right. A supplementary report is when we think of |
| 02:42:36 | 11 | police reports, official police reports, they're supplementary |
| 02:42:39 | 12 | reports, right? |
| 02:42:39 | 13 | A. There are multiple times of supplementary reports. There |
| 02:42:43 | 14 | can be evidence supplements, progress supplements, lab |
| 02:42:47 | 15 | supplements. |
| 02:42:47 | 16 | Q. All I'm getting at, maybe we are getting semantic, a |
| 02:42:51 | 17 | detective take a lots of notes, right? |
| 02:42:53 | 18 | A. Yes. |
| 02:42:53 | 19 | Q. And they take the pertinent stuff in the notes and create |
| 02:42:56 | 20 | police reports? |
| 02:42:57 | 21 | A. Yes. |
| 02:42:58 | 22 | Q. And that's a big part of the job, right? |
| 02:43:00 | 23 | A. Yes. |
| 02:43:00 | 24 | Q. All right. Now, once the information is gathered, it has |
| 02:43:07 | 25 | to be disclosed to the criminal justice system. We already |

| | | |
|---|---|---|
| 02:43:09 | 1 | talked about that, right? |
| 02:43:10 | 2 | A. Yes. |
| 02:43:10 | 3 | Q. That's important both to make sure that the right -- the |
| 02:43:14 | 4 | victim gets justice and the right guy is prosecuted, right? |
| 02:43:17 | 5 | A. Yes. |
| 02:43:18 | 6 | Q. And it's also important to the rights of the accused, |
| 02:43:21 | 7 | right? |
| 02:43:21 | 8 | A. Yes, sir. |
| 02:43:21 | 9 | Q. Let's talk about the Chicago Police Department's policies |
| 02:43:23 | 10 | and practices as far as what's supposed to be memorialized. |
| 02:43:27 | 11 | Isn't it true that if someone is an eyewitness to the |
| 02:43:30 | 12 | event, it's important to create a document that records what |
| 02:43:34 | 13 | they saw, all the details? |
| 02:43:36 | 14 | A. Yes, sir. |
| 02:43:37 | 15 | MR. MICHALIK: Objection, vagueness as to time frame. |
| 02:43:39 | 16 | THE COURT: I can't hear you. |
| 02:43:40 | 17 | MR. MICHALIK: Vagueness as to time frame. |
| 02:43:42 | 18 | THE COURT: Yeah. You need to set. |
| 02:43:45 | 19 | BY MR. LOEVY: |
| 02:43:45 | 20 | Q. Do you have any reason to believe that the policies in the |
| 02:43:47 | 21 | mid '80s were different from when you were a supervisor? |
| 02:43:50 | 22 | THE COURT: |
| 02:43:52 | 23 | BY MR. LOEVY: |
| 02:43:52 | 24 | Q. About documentation of pertinent information? |
| 02:43:55 | 25 | A. No, sir. |

| 02:43:55 | 1 | Q. You believe they are consistent, do you not? |
| 02:43:58 | 2 | A. Yes, sir. |
| 02:43:58 | 3 | Q. All right. Then let's talk about -- |
| 02:44:00 | 4 | THE COURT: You can proceed. |
| 02:44:01 | 5 | BY MR. LOEVY: |
| 02:44:02 | 6 | Q. If a person is investigating a murder, and they come |
| 02:44:07 | 7 | across a person who purports to be an eyewitness, what's |
| 02:44:11 | 8 | supposed to happen if that person has information about what |
| 02:44:13 | 9 | the guy looked like? |
| 02:44:14 | 10 | A. The detective would write that down. |
| 02:44:18 | 11 | Q. They would write down, for example, whether they were |
| 02:44:22 | 12 | white or black, whether they had braids, whether they were |
| 02:44:25 | 13 | tall or short, any information available, right? |
| 02:44:27 | 14 | A. Absolutely. |
| 02:44:27 | 15 | Q. Now, you have any hesitation that any description an |
| 02:44:30 | 16 | eyewitness should provide should be documented in writing? |
| 02:44:34 | 17 | A. I'm not sure I understand the question. |
| 02:44:40 | 18 | Q. It doesn't make sense. There is no way a detective would |
| 02:44:43 | 19 | not write down a description of a witness if an eyewitness had |
| 02:44:46 | 20 | a description? |
| 02:44:47 | 21 | A. No. |
| 02:44:47 | 22 | Q. You agree with me, right? |
| 02:44:48 | 23 | A. Yes, I agree with you. |
| 02:44:49 | 24 | Q. And certainly the detective should write down the |
| 02:44:51 | 25 | description of the eyewitness before the detective shows him |

| | | |
|---|---|---|
| 02:44:54 | 1 | photographs of the suspects, you would agree with that, too, |
| 02:44:56 | 2 | right? |
| 02:44:57 | 3 | A.  Yes. |
| 02:44:57 | 4 | Q.  Can you think of any reason why a detective would want to |
| 02:45:01 | 5 | show the eyewitness a suspect before they memorialized what |
| 02:45:06 | 6 | the eyewitness was claiming the guy looked like? |
| 02:45:09 | 7 | A.  If an eyewitness knew a suspect but didn't know his name |
| 02:45:18 | 8 | -- like a street name or something, I could envision a |
| 02:45:22 | 9 | detective might show a photo before taking the physical |
| 02:45:24 | 10 | description. |
| 02:45:25 | 11 | Q.  Any other scenario? |
| 02:45:26 | 12 | A.  No. |
| 02:45:26 | 13 | Q.  All right.  Well, let's go back to the one you identified. |
| 02:45:29 | 14 | If the person -- if an eyewitness said I saw Candace shoot the |
| 02:45:33 | 15 | person, you should write down I know the person and I saw they |
| 02:45:38 | 16 | did it, right? |
| 02:45:39 | 17 | A.  Yes, sir. |
| 02:45:39 | 18 | Q.  Is there any equivocation, any exception that says if an |
| 02:45:42 | 19 | eyewitness says I know the guy who did it, I know who did it |
| 02:45:45 | 20 | that the detective has to memorialize that? |
| 02:45:47 | 21 | A.  No. |
| 02:45:49 | 22 | Q.  You agree with me, right? |
| 02:45:51 | 23 | A.  Yes. |
| 02:45:51 | 24 | Q.  That ensures the fairness of the process, correct? |
| 02:45:55 | 25 | A.  Yes. |

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 111 of 215 PageID #:64850

02:45:56  1  Q.  How about suspects in the murder.  If eyewitnesss or other

02:46:00  2  witnesses give the detectives suspects who might have done it,

02:46:04  3  do the detectives have to write that down?

02:46:06  4  A.  Yes, sir.

02:46:06  5  Q.  They have to write do you know who is a suspect, right?

02:46:09  6  A.  Yes.

02:46:09  7  Q.  And they have to write down why that person is a suspect,

02:46:12  8  right?

02:46:12  9  A.  Yes.

02:46:12  10  Q.  Why is that so important?

02:46:13  11  A.  To further the investigation.

02:46:16  12  Q.  You don't know two years from now if new information is

02:46:19  13  going to come and people are going to change I didn't remember

02:46:22  14  stories, right?

02:46:22  15  A.  Yes.

02:46:23  16  Q.  You have to lock them in, right?

02:46:24  17  A.  Yes.

02:46:24  18  Q.  Tell the jury what it means to look somebody in with a

02:46:28  19  report?

02:46:28  20  A.  As simple as it sounds, you're locking in that statement

02:46:34  21  that night that that person gives you because sometimes down

02:46:37  22  the road, witnesses change their version for one reason or

02:46:41  23  another.

02:46:41  24  Q.  And the person who is accused of a crime has a right to

02:46:46  25  confront the witness with the fact that they changed their

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 112 of 215 PageID #:64851
***REALTIME UNEDITED TRANSCRIPT ONLY***

111

| | | |
|---|---|---|
| 02:46:48 | 1 | version, right? |
| 02:46:49 | 2 | A. Absolutely. |
| 02:46:49 | 3 | Q. Did the policies in the Chicago Police Department require |
| 02:46:52 | 4 | the detective to write down the original version? |
| 02:46:54 | 5 | A. Yes. |
| 02:46:54 | 6 | Q. How about confessions, if somebody supposedly confesses to |
| 02:47:00 | 7 | a crime, does that have to get written down? |
| 02:47:02 | 8 | A. Yes. |
| 02:47:03 | 9 | Q. Does that get documented in a police report? |
| 02:47:05 | 10 | MR. MICHALIK: I am going to object to the relevance. |
| 02:47:06 | 11 | THE COURT: Overruled. You can answer. |
| 02:47:09 | 12 | THE WITNESS: I'm sorry. |
| 02:47:10 | 13 | BY MR. LOEVY: |
| 02:47:11 | 14 | Q. For example, if Anthony Sumner gave a confession or said |
| 02:47:15 | 15 | that somebody else gave a confession, is that the kind of |
| 02:47:17 | 16 | information that goes in a police report? |
| 02:47:18 | 17 | A. Yes, sir. |
| 02:47:19 | 18 | Q. How about if Anthony Sumner said my buddy Earl Hawkins |
| 02:47:25 | 19 | committed a crime, is that the information that would go in a |
| 02:47:27 | 20 | police report? |
| 02:47:27 | 21 | A. Yes, that would go in a police report. |
| 02:47:29 | 22 | Q. You can say yes and we can agree that that is an |
| 02:47:32 | 23 | absolutely firm requirement of the Chicago Police Department |
| 02:47:34 | 24 | to memorialize that information? |
| 02:47:36 | 25 | A. Yes, sir. |

| | | |
|---|---|---|
| 02:47:37 | 1 | Q. As soon as practical as possible, correct? |
| 02:47:40 | 2 | A. Yes, sir. |
| 02:47:41 | 3 | Q. Are you familiar with the change in the Chicago Police |
| 02:47:48 | 4 | Department's policies and practices in 1983 or is that |
| 02:47:51 | 5 | something you're not familiar with? |
| 02:47:52 | 6 | A. Change as to what? |
| 02:47:55 | 7 | Q. When special order 83.1 was enacted, is that something you |
| 02:48:00 | 8 | have familiarity with? |
| 02:48:01 | 9 | A. I am not sure. |
| 02:48:03 | 10 | MR. LOEVY: All right. I have no further questions, |
| 02:48:05 | 11 | your Honor. Thank you. |
| 02:48:05 | 12 | THE COURT: Mr. Michalik. |
| 02:48:07 | 13 | MR. MICHALIK: Thank you, your Honor. |
| 02:48:20 | 14 | - - - |
| 02:48:20 | 15 | KEVIN DUFFIN, CROSS-EXAMINATION |
| 02:48:20 | 16 | BY MR. MICHALIK: |
| 02:48:21 | 17 | Q. Good afternoon, commander. |
| 02:48:22 | 18 | A. Good afternoon. |
| 02:48:23 | 19 | Q. Let's go through your background a little bit more. I |
| 02:48:25 | 20 | know you talked about it in bits and pieces. Can you tell the |
| 02:48:30 | 21 | ladies and gentlemen of the jury when you started with the CPD |
| 02:48:33 | 22 | and when your assignment was? |
| 02:48:34 | 23 | A. 14, June 1982 was my appointment date and out of the |
| 02:48:38 | 24 | academy I was assigned to the Englewood district. |
| 02:48:40 | 25 | Q. What was your rank at the time? |

02:48:41  1  A.  He was a patrolman.

02:48:43  2  Q.  How long did you work as a patrolman for the police

02:48:46  3  department?

02:48:46  4  A.  Until 1996 at which time I was promoted to sergeant.

02:48:54  5  Q.  And where were you -- where was your first assignment as a

02:49:00  6  sergeant?

02:49:00  7  A.  I was back in Englewood.

02:49:03  8  Q.  Okay.  Did you have a different position after you were a

02:49:07  9  sergeant?

02:49:07  10  A.  For the next two years until 98, I was a tactical sergeant

02:49:12  11  in Englewood and in '98, I became the Area 1 saturation team

02:49:21  12  sergeant.

02:49:21  13  Q.  And for the ladies and gentlemen of the jury, can you

02:49:23  14  explain what Area 1 is?

02:49:25  15  A.  The city's divided, back then it was 25 police districts

02:49:31  16  and there were five different areas, Area 1 based at 51st and

02:49:37  17  Wentworth, it encompassed the 7th, eighth, 9th, 2nd and 21st

02:49:42  18  districts on the south side of Chicago.

02:49:45  19  Q.  All right.  Now, you talked a little bit the detectives.

02:49:52  20  Are there different kinds of detectives that work in Area 1?

02:49:55  21  A.  Yes.

02:49:57  22  Q.  What are they, if you can just briefly explain.

02:50:00  23  A.  Well, we have detectives who work exclusively in

02:50:04  24  homicides, detectives who work on robberies, detectives who

02:50:07  25  work on burglaries, detectives who work on sex crimes and

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 115 of 215 PageID #:64854
***REALTIME UNEDITED TRANSCRIPT ONLY***

114

| | |
|---|---|
| 02:50:10 | 1 | detectives who work on youth related crimes. |
| 02:50:12 | 2 | Q. All right. And you told us that your current rank is |
| 02:50:16 | 3 | commander? |
| 02:50:16 | 4 | A. Yes, sir. |
| 02:50:17 | 5 | Q. And when were you promoted to that position? |
| 02:50:22 | 6 | A. In February of 2014. |
| 02:50:27 | 7 | Q. Okay. You were asked some questions about files and |
| 02:50:32 | 8 | supplementary reports and the CRIS system. Could you explain |
| 02:50:35 | 9 | to the ladies and gentlemen of the jury what the CRIS system |
| 02:50:37 | 10 | is? |
| 02:50:37 | 11 | A. CRIS is a automated computer system where the detectives |
| 02:50:44 | 12 | type -- well, they used to type the reports on pieces of |
| 02:50:48 | 13 | paper. Now it's all computerized. It goes, the name of the |
| 02:50:52 | 14 | system is the CRIS system. I forget what the acronym stands |
| 02:50:56 | 15 | for. |
| 02:50:56 | 16 | Q. Do you know when the CRIS system was first adopted by the |
| 02:50:59 | 17 | police department? |
| 02:51:00 | 18 | A. I want to say in 2000, 2001. |
| 02:51:07 | 19 | Q. So back in 1985, and 1986, in that time frame and then |
| 02:51:12 | 20 | 1984, this CRIS system did not exist? |
| 02:51:15 | 21 | A. No, sir. |
| 02:51:15 | 22 | Q. Do you know how police officers would prepare their |
| 02:51:22 | 23 | reports prior to the CRIS system? |
| 02:51:24 | 24 | A. Manual typewriter. |
| 02:51:26 | 25 | Q. Now, this first -- this file that you were talking about, |

| | | |
|---|---|---|
| 02:51:32 | 1 | Exhibit 1, which Mr. Loevy has right here, this first came to |
| 02:51:36 | 2 | your attention in 2011? |
| 02:51:39 | 3 | A.  Late spring of 2011, yes. |
| 02:51:41 | 4 | Q.  All right.  And what were you told about this file? |
| 02:51:45 | 5 | A.  I was told by commander Walsh, who was the commander of |
| 02:51:52 | 6 | Area 1 at the time that that file was going to be the subject |
| 02:51:55 | 7 | of some litigation. |
| 02:51:55 | 8 | Q.  All right.  Were you told at that time that this file had |
| 02:51:58 | 9 | been missing for a period of time? |
| 02:52:00 | 10 | A.  No, sir, I was not. |
| 02:52:02 | 11 | Q.  Were you told any details at all about this file? |
| 02:52:04 | 12 | A.  No, sir, not at that time. |
| 02:52:06 | 13 | Q.  Did anyone ever tell you that this file had been hidden? |
| 02:52:11 | 14 | A.  No, sir. |
| 02:52:11 | 15 | Q.  All right.  When you were told that this file might become |
| 02:52:23 | 16 | the subject of litigation, what, if anything, did you do with |
| 02:52:26 | 17 | it? |
| 02:52:26 | 18 | A.  I secured it in my office. |
| 02:52:29 | 19 | Q.  And why did you do that? |
| 02:52:30 | 20 | A.  I was told that counselors from Dykema would be contacting |
| 02:52:38 | 21 | me and I figured it was the prudent thing to do, I would keep |
| 02:52:41 | 22 | it in my office for ease of access. |
| 02:52:43 | 23 | Q.  Did attorneys eventually come to your office to look at |
| 02:52:46 | 24 | these files? |
| 02:52:46 | 25 | A.  Yes. |

| 02:52:47 | 1 | Q. Did attorneys besides attorneys from Dykema come to look |
| 02:52:50 | 2 | at this file? |
| 02:52:50 | 3 | A. Yes. |
| 02:52:51 | 4 | Q. Do you remember anyone, Ms. Gorman, coming to look at this |
| 02:52:53 | 5 | file? |
| 02:52:54 | 6 | A. Yes, sir. |
| 02:52:55 | 7 | Q. You were also asked some questions regarding your |
| 02:53:00 | 8 | investigation into this particular file and where it had been |
| 02:53:06 | 9 | found? |
| 02:53:06 | 10 | A. Yes. |
| 02:53:06 | 11 | Q. Okay. Were you able to determine where the file had been |
| 02:53:14 | 12 | before it was found in 2010? |
| 02:53:16 | 13 | A. I was not able to determine that, no. |
| 02:53:18 | 14 | Q. Okay. Your understanding was, though, that the file was |
| 02:53:21 | 15 | found in 2010? |
| 02:53:23 | 16 | A. Yes, sir. |
| 02:53:24 | 17 | Q. And it was your belief that it was found at Area 1? |
| 02:53:28 | 18 | A. Yes, sir. |
| 02:53:29 | 19 | Q. Do you have a belief as to who it was that found this |
| 02:53:32 | 20 | file? |
| 02:53:32 | 21 | A. I believe it was probably detective Sam Riley. |
| 02:53:38 | 22 | MR. LOEVY: Objection, foundation. |
| 02:53:42 | 23 | BY MR. MICHALIK: |
| 02:53:43 | 24 | Q. Why do you believe that? |
| 02:53:43 | 25 | A. Sam was the primary ^ file guy at that time, so. |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 118 of 215 PageID #:64857
***REALTIME UNEDITED TRANSCRIPT ONLY***

117

| | | |
|---|---|---|
| 02:53:48 | 1 | Q. And when you say at that time, you mean in May or June of |
| 02:53:51 | 2 | 2010? |
| 02:53:51 | 3 | A. Yes. |
| 02:53:51 | 4 | Q. I know you talked to a lot of other file persons or people |
| 02:53:58 | 5 | who had access to the filing system at Area 1? |
| 02:54:00 | 6 | A. Yes, sir. I did, yes. |
| 02:54:05 | 7 | Q. Why was it that you thought it was Sam as opposed to |
| 02:54:09 | 8 | anyone else? |
| 02:54:10 | 9 | A. Well, like I said, Sam was the primary guy, the other |
| 02:54:14 | 10 | people, Karen Williams, Sharon Colby, if Sam was off for some |
| 02:54:20 | 11 | reason or if he was on vacation, they would fill in, but it |
| 02:54:23 | 12 | just seemed statistically that the odds were that he was the |
| 02:54:27 | 13 | one that found it. |
| 02:54:28 | 14 | Q. I think you told Mr. Loevy that you had talked to Sam |
| 02:54:31 | 15 | brown as part of your investigation? |
| 02:54:32 | 16 | A. I did. |
| 02:54:33 | 17 | Q. And Mr. Brown told you that he did not recall if he was |
| 02:54:37 | 18 | the person who found this file, correct? |
| 02:54:39 | 19 | A. He could not recall, yes, sir. |
| 02:54:41 | 20 | Q. Do you find it unusual or did you find it unusual in the |
| 02:54:44 | 21 | investigation that Mr. Brown was unable to tell you whether he |
| 02:54:48 | 22 | was the person that found this file? |
| 02:54:50 | 23 | A. No, sir. |
| 02:54:50 | 24 | Q. Why not? |
| 02:54:51 | 25 | A. Sam routinely pulled 20, 30 files a day, made copies and |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 119 of 215 PageID #:64858

118

| | | |
|---|---|---|
| 02:55:00 | 1 | sent them out, so the fact that one didn't stick out in his |
| 02:55:03 | 2 | mind, I didn't find that surprising at all. |
| 02:55:06 | 3 | Q.  Do you recall when it was that you had asked Sam if he had |
| 02:55:10 | 4 | ever found this file? |
| 02:55:11 | 5 | A.  I'm sorry.  I didn't -- |
| 02:55:14 | 6 | THE COURT:  When did you ask him? |
| 02:55:16 | 7 | BY MR. MICHALIK: |
| 02:55:16 | 8 | Q.  When did you ask him if he found the file? |
| 02:55:19 | 9 | A.  Late fall of 2011. |
| 02:55:21 | 10 | Q.  And you were asking him about a file that someone had |
| 02:55:24 | 11 | found in May or June of 2010? |
| 02:55:27 | 12 | A.  18 months prior, yes. |
| 02:55:29 | 13 | Q.  In 2010, at Area 1, where was the file cabinet where you |
| 02:55:35 | 14 | believe this file was found? |
| 02:55:36 | 15 | A.  Second floor. |
| 02:55:41 | 16 | Q.  Did anything happen in 2012 that caused that file cabinet |
| 02:55:45 | 17 | to be moved from the second floor at Area 1? |
| 02:55:48 | 18 | A.  Yes, sir. |
| 02:55:50 | 19 | Q.  What was that? |
| 02:55:51 | 20 | A.  In March of 2012, there was a consolidation of detective |
| 02:55:58 | 21 | areas.  I previously said there had been five detective areas, |
| 02:56:04 | 22 | they were consolidated down to three in March of 2012, |
| 02:56:07 | 23 | resulting in Area 1 absorbing some of the districts and open |
| 02:56:13 | 24 | investigations from area 4 and area 5, so due to that, we |
| 02:56:19 | 25 | inherited a lot more files. |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 120 of 215 PageID #:64859
***REALTIME UNEDITED TRANSCRIPT ONLY***

119

| | | |
|---|---|---|
| 02:56:22 | 1 | Q. So if Area 1 no longer existed, what was it called? |
| 02:56:25 | 2 | A. It was referred to as area central. |
| 02:56:27 | 3 | Q. Where was area central located? |
| 02:56:29 | 4 | A. 51st and went worth. |
| 02:56:32 | 5 | Q. That's where Area 1 was prior to that? |
| 02:56:35 | 6 | A. Yes, sir. |
| 02:56:36 | 7 | Q. Where was the file cabinet moved? |
| 02:56:38 | 8 | A. Shortly after the consolidation, it was moved down to the |
| 02:56:42 | 9 | basement of the building at 51st and Wentworth. |
| 02:56:46 | 10 | Q. Were there any other file cabinets that were moved from |
| 02:56:49 | 11 | the second floor down to the basement at area central? |
| 02:56:52 | 12 | A. Multiple file cabinets, yes. |
| 02:56:53 | 13 | Q. Were there file cabinets moved to the basement from the |
| 02:56:56 | 14 | other areas that were sending their files to area central? |
| 02:56:59 | 15 | A. Yes, sir. |
| 02:57:00 | 16 | Q. Why would they put it in the basement? |
| 02:57:03 | 17 | A. Because we had room down in the basement. |
| 02:57:05 | 18 | Q. Were the file cabinets moved down into the basement so |
| 02:57:09 | 19 | they could be hidden? |
| 02:57:10 | 20 | A. No, sir. |
| 02:57:11 | 21 | Q. Were you ever told to keep the existence of the file |
| 02:57:15 | 22 | cabinets in the basement a secret? |
| 02:57:17 | 23 | A. No, sir. |
| 02:57:29 | 24 | MR. MICHALIK: Can I can have a moment, your Honor. |
| 02:57:31 | 25 | THE COURT: Sure. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

02:57:31    1    (Brief pause.)

02:58:06    2         MR. MICHALIK:  I have no further questions, your

02:58:08    3    Honor.  Thank you.

02:58:09    4         THE COURT:  Mr. Kulwin.

02:58:09    5         MR. KULWIN:  Yes.

02:58:10    6                        - - -

02:58:10    7              KEVIN DUFFIN, CROSS-EXAMINATION

02:58:10    8    BY MR. MICHALIK:

02:58:19    9    Q.  Commander Duffin?

02:58:21   10    A.  Yes.

02:58:21   11    Q.  A couple questions.  You were asked some questions about

02:58:25   12    policemen locking people in written reports.  Do you remember

02:58:28   13    those questions?

02:58:28   14    A.  Yes, sir.

02:58:29   15    Q.  Okay.  So like when a detective is interviewing a suspect,

02:58:34   16    it's important for them to write down -- put in the report

02:58:37   17    what the suspect says, correct?

02:58:39   18    A.  Yes, sir.

02:58:40   19    Q.  Okay.  And, sir, as a commander or supervisor of

02:58:45   20    detectives, have you ever encountered a situation in your

02:58:49   21    experience where a suspect of a double murder who has been

02:58:53   22    arrested and brought to the police station is not asked about

02:58:56   23    the double murder by the policemen?

02:58:58   24    A.  I can't imagine that, no.

02:58:59   25    Q.  That could never occur, right?

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 122 of 215 PageID #:64861
***REALTIME UNEDITED TRANSCRIPT ONLY***

121

| | | |
|---|---|---|
| 02:59:01 | 1 | A.  Right. |
| 02:59:02 | 2 | Q.  And you were asked a bunch of questions about GPR that |
| 02:59:13 | 3 | sometimes are notes, right? |
| 02:59:14 | 4 | A.  Yes. |
| 02:59:15 | 5 | Q.  Progress reports.  Is it fair to say that a detective can |
| 02:59:19 | 6 | put information that he gathers in an investigation directly |
| 02:59:21 | 7 | into a supplemental report without having to fill out a |
| 02:59:25 | 8 | written GPR? |
| 02:59:26 | 9 | A.  I wouldn't say it's completely impossible, but it would be |
| 02:59:32 | 10 | very rare. |
| 02:59:32 | 11 | Q.  Okay. |
| 02:59:41 | 12 | MR. KULWIN:  Nothing else. |
| 02:59:43 | 13 | THE COURT:  Redirect. |
| 02:59:43 | 14 | - - - |
| 02:59:43 | 15 | KEVIN DUFFIN, REDIRECT EXAMINATION |
| 02:59:43 | 16 | BY MR. LOEVY: |
| 02:59:45 | 17 | Q.  Why is that? |
| 02:59:45 | 18 | A.  Why is what? |
| 02:59:47 | 19 | Q.  You just answered the question if you make a GPR, you say |
| 02:59:50 | 20 | it's supposed to be in a report and you said it would be very, |
| 02:59:53 | 21 | very rare.  What's the protocol? |
| 02:59:54 | 22 | A.  Well, I mean,depending upon the type of crime, if you're |
| 02:59:59 | 23 | investigating a broken car window, someone's car window was |
| 03:00:04 | 24 | broken and you are calling the victim and he has no |
| 03:00:07 | 25 | information on the offender, I would imagine that detective |

| | | |
|---|---|---|
| 03:00:09 | 1 | could put that right -- he wouldn't need to do GPRs, it's a |
| 03:00:14 | 2 | telephone interview and he is typing his report as he talks. |
| 03:00:18 | 3 | Q.  Let's keep it to murders and serious crimes? |
| 03:00:20 | 4 | A.  All crime is serious.  Murder, I can't imagine it would |
| 03:00:24 | 5 | happen, no. |
| 03:00:24 | 6 | Q.  You were asked about the file cabinets moving into the |
| 03:00:28 | 7 | basement so I understand, you're saying the file cabinets |
| 03:00:31 | 8 | moved into the basement but after this file was found, right? |
| 03:00:34 | 9 | A.  Yes. |
| 03:00:35 | 10 | Q.  So when the file was found, the file cabinet was still in |
| 03:00:38 | 11 | the detective's division, right? |
| 03:00:39 | 12 | A.  On the second floor of 51st and Wentworth, yes, sir. |
| 03:00:43 | 13 | MR. LOEVY:  No further questions. |
| 03:00:44 | 14 | THE COURT:  Anything based on the redirect? |
| 03:00:45 | 15 | MR. MICHALIK:  No, your Honor. |
| 03:00:46 | 16 | MR. KULWIN:  No your Honor. |
| 03:01:05 | 17 | THE COURT:  Do the jurors have questions? .  Sidebar. |
| 03:01:09 | 18 | THE COURT:  Do we know if Mr. Langston is here? |
| 03:01:11 | 19 | MR. LOEVY:  He is not here.  We have witnesses we can |
| 03:01:14 | 20 | fill up the afternoon. |
| 03:01:15 | 21 | THE COURT:  The question is why did you have a hunch, |
| 03:01:18 | 22 | close quote, that the file was in the file cabinet in the |
| 03:01:23 | 23 | basement of Area 1 and what is the basis of your hunch.  Does |
| 03:01:29 | 24 | anybody have a problem.  I think the word was used in the |
| 03:01:31 | 25 | question and he adopted it with his answer. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

03:01:33  1          MR. LOEVY:  I have no objection.

03:01:34  2          THE COURT:  Okay.  ^  open court.

03:01:42  3          THE COURT:  The question was asked by one of the

03:01:44  4  lawyers whether you had a hunch where the file had been and

03:01:48  5  you said you had a hunch that it had -- you responded that it

03:01:51  6  you thought it had been in the detective definition at Area 1.

03:01:54  7  Why was it that you thought that when this all came about?

03:01:59  8          THE WITNESS:  Well, it only seemed to make sense.  It

03:02:01  9  was a case that had been -- I believe it was originally from

03:02:06  10  area 3 which was consolidated into Area 1.  It was an Area 1

03:02:11  11  investigation, and.

03:02:14  12          THE COURT:  So it was logical that that's where it

03:02:17  13  would be.

03:02:18  14          THE WITNESS:  Yes.

03:02:19  15          THE COURT:  I know these numbers change from time to

03:02:21  16  time.  It might have been originally area 3, but eventually

03:02:23  17  that became part of Area 1 which is where the file was found?

03:02:28  18          THE WITNESS:  Yes, sir.

03:02:28  19          THE COURT:  Any follow up based on that.

03:02:30  20          MR. LOEVY:  Briefly.

03:02:31  21  BY MR. LOEVY:

03:02:32  22  Q.  Nothing about your investigation gave you any reason to

03:02:33  23  believe that the file wasn't exactly where it belonged, right?

03:02:36  24  A.  Nothing, no.

03:02:37  25          MR. LOEVY:  I have no further questions.


***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 125 of 215 PageID #:64864
***REALTIME UNEDITED TRANSCRIPT ONLY***

124

| | | |
|---|---|---|
| 03:02:40 | 1 | - - - |
| 03:02:40 | 2 | ^ WITNAME, RECROSS-EXAMINATION |
| 03:02:41 | 3 | BY MR. LOEVY: |
| 03:02:41 | 4 | BY MR. MICHALIK: |
| 03:02:42 | 5 | Q.  When you say it was exactly where it was where it belonged |
| 03:02:45 | 6 | you are talking about in 2010? |
| 03:02:47 | 7 | A.  Yes, sir. |
| 03:02:48 | 8 | MR. MICHALIK:  All right. |
| 03:02:48 | 9 | THE COURT:  You are excused.  Please call the next |
| 03:02:51 | 10 | witness. |
| 03:02:51 | 11 | MR. LOEVY:  Your Honor, we call Officer Melean. |
| 03:03:12 | 12 | THE COURT:  There is another witness coming this |
| 03:03:15 | 13 | afternoon, that if that person comes in, we are going to |
| 03:03:18 | 14 | interrupt the testimony and put this on pause.  I am basically |
| 03:03:22 | 15 | asking them to have somebody keep an eye on whether the person |
| 03:03:28 | 16 | gets here.  Just so you know, the reason why we're going to |
| 03:03:34 | 17 | get a witness from another room is that typically the rule is |
| 03:03:38 | 18 | witnesses are testifying about facts don't listen to the |
| 03:03:40 | 19 | testimony of other witnesses unless they are parties to the |
| 03:03:43 | 20 | case.  We have a little room across the hall where people |
| 03:03:46 | 21 | wait. |
| 03:04:11 | 22 | (Witness sworn.) |
| 03:04:21 | 23 | THE COURT:  All right.  You can proceed. |
| 03:04:22 | 24 | - - - |
| 03:04:22 | 25 | FREDERICK MELEAN, DIRECT EXAMINATION |

***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

125

| | | |
|---|---|---|
| 03:04:22 | 1 | BY MS. GORMAN: |
| 03:04:26 | 2 | Q. Good afternoon, Sergeant. |
| 03:04:26 | 3 | A. Lieutenant. |
| 03:04:27 | 4 | Q. Congratulations on the promotion. |
| 03:04:29 | 5 | A. Thanks. |
| 03:04:31 | 6 | Q. Lieutenant, could you state your name? |
| 03:04:33 | 7 | A. Lieutenant Frederic Melean, M-e-l-e-a-n. |
| 03:04:36 | 8 | Q. Obviously, you're an employee of the Chicago Police |
| 03:04:42 | 9 | Department in your uniform. How long have you been an |
| 03:04:44 | 10 | employee of the police department? |
| 03:04:44 | 11 | A. Almost 24 years. |
| 03:04:47 | 12 | Q. I want to draw your attention to the period of 2005 to |
| 03:04:51 | 13 | 2010 when you were the administrative sergeant for records? |
| 03:04:56 | 14 | A. Yes. |
| 03:04:56 | 15 | Q. Is that correct? |
| 03:04:57 | 16 | That was from February of 2005 to April of 2010? |
| 03:05:00 | 17 | A. Yes. |
| 03:05:00 | 18 | Q. And as part of your many duties as an administrative |
| 03:05:05 | 19 | sergeant, you were in charge of the subpoena unit isn't that |
| 03:05:09 | 20 | correct? Or you were a supervisor over the subpoena unit? |
| 03:05:12 | 21 | A. Yes, I was one of the supervisors, correct. |
| 03:05:13 | 22 | Q. And subpoenas would come in seeking criminal records from |
| 03:05:18 | 23 | homicides and other crimes; is that correct? |
| 03:05:20 | 24 | A. All kinds of crimes. |
| 03:05:23 | 25 | Q. And the subpoenas would come in either from state's |

***REALTIME UNEDITED TRANSCRIPT ONLY***

03:05:28   1   attorneys, prosecutors, or they'd come in from defense

03:05:31   2   attorneys; is that correct?

03:05:32   3   A.  Correct.

03:05:32   4   Q.  And if there was a problem with a subpoena, if someone

03:05:36   5   that had filed a subpoena with the police department ran into

03:05:39   6   a problem, you were sometimes the person that would be

03:05:42   7   contacted; isn't that correct?

03:05:43   8   A.  Occasionally, yes.

03:05:44   9   Q.  Occasionally.

03:05:45   10          And just so that the jury knows, it's a requirement

03:05:49   11  when there is a subpoena to provide the materials as part of

03:05:52   12  the criminal justice system; isn't that correct?

03:05:54   13  A.  Yes.

03:05:54   14  Q.  Now, I'm drawing your attention to January of 2006, the

03:06:01   15  subpoena came into your unit.  Do you recall that?

03:06:04   16  A.  I didn't receive a subpoena myself, but I recall getting a

03:06:10   17  fax from an attorney.

03:06:12   18  Q.  This is exhibit, Plaintiff's Exhibit 36.

03:06:15   19          THE COURT:  The computer?

03:06:17   20          MS. GORMAN:  This has been admitted.

03:06:19   21          THE COURT:  I just need to know, is it the computer

03:06:21   22  or the ELMO?

03:06:22   23          MS. GORMAN:  It's the computer.

03:06:23   24          THE COURT:  Got it.  Thanks.

03:06:24   25          MS. GORMAN:  It's been admitted.


                          ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 128 of 215 PageID #:64867

127

| | | |
|---|---|---|
| 03:06:32 | 1 | THE COURT: 36. |
| 03:06:34 | 2 | BY MS. GORMAN: |
| 03:06:35 | 3 | Q. Do you see this subpoena? |
| 03:06:36 | 4 | A. Yes, I do. |
| 03:06:37 | 5 | Q. It's dated January 27th, 2006? |
| 03:06:41 | 6 | A. Correct. |
| 03:06:41 | 7 | Q. And it's a subpoena from ^ Jean ^ Gene Snyder, one of the |
| 03:06:46 | 8 | attorneys for Nathson Fields; is that correct? |
| 03:06:47 | 9 | A. That's correct. |
| 03:06:48 | 10 | Q. And if you look at page 3 of the subpoena, I'm sorry, page |
| 03:06:54 | 11 | 4 of the subpoena, there's a rider, a document request. Do |
| 03:07:01 | 12 | you see that? |
| 03:07:03 | 13 | THE COURT: She's getting to it. There we go. |
| 03:07:05 | 14 | THE WITNESS: Yes, I see it. |
| 03:07:06 | 15 | BY MS. GORMAN: |
| 03:07:07 | 16 | Q. Thank you. |
| 03:07:07 | 17 | And the subpoena was seeking, if we look in the first |
| 03:07:11 | 18 | paragraph, all police records, reports, notes, and street |
| 03:07:14 | 19 | files relating to R. D. F-151922, the homicide of Jerome Smith |
| 03:07:22 | 20 | and Talman Hickman. Do you see that? |
| 03:07:24 | 21 | A. Yes. |
| 03:07:25 | 22 | Q. And it was also seeking another RD number Y 322288; is |
| 03:07:25 | 23 | that correct? |
| 03:07:32 | 24 | A. That's correct. |
| 03:07:33 | 25 | Q. Can you explain to the jury what an RD number is? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

03:07:35   1   A. RD number is a number assigned to a case report generated

03:07:39   2   by the Chicago Police Department.

03:07:40   3   Q. And then the files are kept in that numerical order by

03:07:44   4   year?

03:07:44   5   A. Everything is referred to the RD number, correct.

03:07:47   6   Q. Okay. And F was for the year; is that correct?

03:07:49   7   A. That's correct.

03:07:50   8   Q. And so 1984, this was 1984 murder and that's why the

03:07:54   9   letter F was used?

03:07:56  10   A. If that was the date, yes, I don't recall the dates.

03:07:59  11   Q. And 1985 was G and et cetera.

03:08:04  12       The second request was for all reports, notes, or

03:08:08  13   street files relating to Earl Hawkins, Randy Langston, Eric

03:08:13  14   Langston, Gerald Morris, Anthony Sumner, witnesses in this

03:08:16  15   incident or defendant Nathson Fields, do you see that?

03:08:20  16   A. Yes.

03:08:20  17   Q. And then the third part of the request was for all letters

03:08:23  18   or other correspondence from or to Nathson Fields. Do you see

03:08:27  19   that?

03:08:27  20   A. Yes.

03:08:27  21   Q. And sometime in February of 2006, there was a complaint

03:08:38  22   from Ms. Snyder; isn't that correct?

03:08:42  23   A. I recall getting a phone call because I was given a fax

03:08:45  24   with my name on it, so I don't recall the phone conversation,

03:08:48  25   but I do remember receiving a fax with my name spelled

| | | |
|---|---|---|
| 03:08:54 | 1 | incorrectly, but I was the only one close to that. |
| 03:08:57 | 2 | Q. So that came to your attention? |
| 03:08:58 | 3 | A. Correct. |
| 03:08:59 | 4 | Q. And Ms. Snyder was complaining because she had filed a |
| 03:09:02 | 5 | subpoena seeking all of these records and she was not getting |
| 03:09:05 | 6 | what she was looking for; is that correct ^ ? |
| 03:09:08 | 7 | A. I believe there is a problem with one of the reports. |
| 03:09:12 | 8 | Q. With one of the reports? |
| 03:09:13 | 9 | A. I don't recall which report, about you she had a problem |
| 03:09:16 | 10 | obtaining a report. I don't recall which one. |
| 03:09:18 | 11 | Q. She was having a problem -- she was having a problem |
| 03:09:24 | 12 | getting the documents that she was seeking; isn't that |
| 03:09:24 | 13 | correct? |
| 03:09:29 | 14 | A. She had a problem getting reports. I don't recall which |
| 03:09:30 | 15 | ones, though. |
| 03:09:31 | 16 | Q. Okay. What did you do when you got Ms. Snyder, attorney |
| 03:09:35 | 17 | Snyder's complaint? |
| 03:09:37 | 18 | A. She sent me a fax and then when I received the fax, I gave |
| 03:09:40 | 19 | it to my subpoena unit supervisor and told her to take care of |
| 03:09:45 | 20 | it. |
| 03:09:45 | 21 | Q. Did you try to locate the file? |
| 03:09:47 | 22 | A. Myself, no. |
| 03:09:47 | 23 | Q. Okay. Did you do any follow up to see if the file was |
| 03:09:50 | 24 | ever found for her? |
| 03:09:51 | 25 | A. No. |

03:09:51   1   Q.  Why not?

03:09:54   2   A.  Well, because I gave it to my supervisor and she was a

03:10:01   3   good person and she handles all the jobs and I didn't hear

03:10:04   4   back from Ms. Snyder, so I assumed it was completed.

03:10:06   5   Q.  You have no recollection of being able to find the file

03:10:08   6   that Ms. Snyder was complaining about, do you?

03:10:11   7   A.  No, I didn't look for the file myself.

03:10:13   8   Q.  You have no recollection about producing anything to Ms.

03:10:17   9   Snyder in response to the subpoena, do you?

03:10:19   10  A.  No, I didn't produce anything myself.

03:10:21   11  Q.  Do you have any independent recollection of your

03:10:28   12  correspondence and phone calls with Ms. Snyder?

03:10:31   13  A.  No, just if it was addressed to me, so I must have told

03:10:37   14  her just to fax what she needed directly to me and I would

03:10:40   15  hand it to the subpoena unit.

03:10:41   16  Q.  You know from the records in your division that the

03:10:44   17  subpoena came through at that time; isn't that correct?

03:10:47   18  A.  What I heard -- I don't get every subpoena that came to

03:10:50   19  the records division, so I wouldn't know that a particular

03:10:54   20  subpoena came that day unless there is a problem with the

03:10:56   21  civilian supervisor that they would contact me.

03:10:59   22          THE COURT:  Ms. Gorman, you need to find a good spot

03:11:03   23  to take a pause.  If you want to finish this sub topic, we

03:11:07   24  will do that.  I believe the other witness is here.

03:11:10   25          MS. GORMAN:  Thank you.


                        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 132 of 215 PageID #:64871
11/17/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

131

03:11:11   1   BY MS. GORMAN:

03:11:12   2   Q.  Lieutenant Melean, in 2006, your division had a computer

03:11:16   3   system isn't that correct for keeping track of the records of

03:11:19   4   subpoenas?

03:11:20   5   A.  Yes, it did.

03:11:21   6   Q.  Did you look through that computer system to refresh your

03:11:26   7   recollection about the subpoena?

03:11:27   8   A.  No, I never looked in the access database myself.  That

03:11:32   9   was the subpoena unit's job.

03:11:34  10   Q.  Did you try to look through that access base at the time?

03:11:36  11   A.  No, I didn't have the access database on my computer in my

03:11:40  12   office.

03:11:40  13   Q.  Do you know if the access database had 2006 files at that

03:11:44  14   time?

03:11:44  15   A.  According to my previous testimony, I had asked database

03:11:52  16   supervisor if they could find the data that was stored and he

03:11:55  17   said he could not.

03:11:56  18   Q.  And do you know why they could not?

03:11:57  19   A.  No.

03:11:58  20   Q.  Didn't they tell you that the records were -- that the

03:12:00  21   2006 records were lost?

03:12:02  22   A.  He just said they couldn't find it, so I had no idea what

03:12:07  23   he meant by that.

03:12:10  24           MS. GORMAN:  I think I should.

03:12:11  25           THE COURT:  Yeah, okay.


                   ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 03:12:12 | 1 | MS. GORMAN: Save this. |
| 03:12:13 | 2 | THE COURT: My apologies. We are going to need to |
| 03:12:17 | 3 | pause to get another witness. You can go back to the room |
| 03:12:22 | 4 | that you were in before. |
| 03:12:25 | 5 | MR. MICHALIK: Your Honor, if I could just explain to |
| 03:12:27 | 6 | him. |
| 03:12:27 | 7 | THE COURT: Yeah, explain it to him outside the room, |
| 03:12:30 | 8 | but explain it to him. Thanks. |
| 03:13:06 | 9 | (Witness sworn.) |
| 03:13:16 | 10 | THE COURT: Mr. Loevy, you can go ahead. |
| 03:13:17 | 11 | MR. LOEVY: Thank you, your Honor. |
| 03:13:18 | 12 | - - - |
| 03:13:18 | 13 | ERIC LANGSTON, DIRECT EXAMINATION |
| 03:13:18 | 14 | BY MR. LOEVY: |
| 03:13:19 | 15 | Q. Sir, could you state your name for the record. |
| 03:13:20 | 16 | A. Eric Langston. |
| 03:13:23 | 17 | Q. Where do you live, Mr. Langston? |
| 03:13:25 | 18 | A. 158 south ridge way. |
| 03:13:28 | 19 | THE COURT: All right. Now I am going to undo what I |
| 03:13:31 | 20 | just said. I don't want you all the way up on that |
| 03:13:34 | 21 | microphone. Here is some water. It looks like you have a |
| 03:13:37 | 22 | scratchy throat. If he gave an actual address, the address is |
| 03:13:44 | 23 | stricken. Just so the jury knows why we did that, as of the |
| 03:13:48 | 24 | last five years, we don't put actual addresses on the record |
| 03:13:51 | 25 | anymore. Just city and state. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 03:13:52 | 1 | BY MR. LOEVY: |
|---|---|---|
| 03:13:53 | 2 | Q.  Who do you live with? |
| 03:13:54 | 3 | A.  What? |
| 03:13:55 | 4 | Q.  Who do you live with? |
| 03:13:56 | 5 | A.  My wife and kids. |
| 03:13:58 | 6 | Q.  What do you do for a living? |
| 03:13:59 | 7 | A.  I work. |
| 03:14:00 | 8 | Q.  What's your job? |
| 03:14:01 | 9 | A.  I work at an laundry company. |
| 03:14:05 | 10 | Q.  Laundry company.  What days of the work do you work, sir? |
| 03:14:08 | 11 | A.  Tuesday through Friday. |
| 03:14:09 | 12 | Q.  Was today a workday? |
| 03:14:11 | 13 | A.  Yes. |
| 03:14:11 | 14 | Q.  Was it an imposition on your schedule to have to be here? |
| 03:14:15 | 15 | A.  Yes. |
| 03:14:17 | 16 |         MR. NOLAND:  Objection, relevance. |
| 03:14:18 | 17 |         THE COURT:  Overruled. |
| 03:14:18 | 18 | BY MR. LOEVY: |
| 03:14:19 | 19 | Q.  You were subpoenaed to testify, correct, sir? |
| 03:14:20 | 20 | A.  Yes. |
| 03:14:21 | 21 | Q.  Do you want to be here? |
| 03:14:22 | 22 | A.  No. |
| 03:14:22 | 23 | Q.  Do you know Mr. Fields? |
| 03:14:24 | 24 | A.  No, I don't. |
| 03:14:25 | 25 | Q.  Have you ever met the man in your life? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 03:14:28 | 1 | A. No. |
| 03:14:28 | 2 | Q. Are you receiving any kind of benefit or anything being |
| 03:14:32 | 3 | here good for you? |
| 03:14:33 | 4 | A. No. |
| 03:14:33 | 5 | Q. Do you wish this case would just go away? |
| 03:14:35 | 6 | A. Yes. |
| 03:14:35 | 7 | Q. All right. Turning your attention back to April 28th, |
| 03:14:40 | 8 | 1984, that's the day that those men were murdered in your |
| 03:14:43 | 9 | building. Do you remember that, sir? |
| 03:14:44 | 10 | A. Yes. |
| 03:14:44 | 11 | Q. How old were you then? |
| 03:14:46 | 12 | A. Probably like 11. |
| 03:14:49 | 13 | Q. 11 you say is your memory? |
| 03:14:50 | 14 | A. Yes. |
| 03:14:51 | 15 | Q. All right. Where were you living at the time? |
| 03:14:52 | 16 | A. 706 East 39th Street. |
| 03:14:56 | 17 | Q. And who were you living with at the time? |
| 03:14:58 | 18 | A. My mama. |
| 03:14:59 | 19 | Q. And some of your other family too, do you remember? |
| 03:15:04 | 20 | A. My mama and the rest of my family. |
| 03:15:05 | 21 | Q. All right. Do you remember which apartment you lived in? |
| 03:15:09 | 22 | A. Yes. |
| 03:15:09 | 23 | Q. Which apartment was that? |
| 03:15:10 | 24 | A. Apartment number 106. |
| 03:15:11 | 25 | Q. All right. And I want to show you this building here. |

| | | |
|---|---|---|
| 03:15:19 | 1 | Was it -- was your apartment in the back of the building or |
| 03:15:23 | 2 | the front of the building? |
| 03:15:24 | 3 | A.  It was in the back. |
| 03:15:25 | 4 | Q.  All right.  What drew your attention to the fact that |
| 03:15:31 | 5 | somebody had shot somebody that day? |
| 03:15:32 | 6 | A.  I didn't know because I was already looking, I was looking |
| 03:15:37 | 7 | out the window. |
| 03:15:37 | 8 | Q.  All right.  Sir, did you hear gunshots? |
| 03:15:40 | 9 | A.  Yes. |
| 03:15:41 | 10 | Q.  Do you have an exact memory 30 years later about who was |
| 03:15:45 | 11 | running where, up down, sideways? |
| 03:15:48 | 12 | A.  No. |
| 03:15:48 | 13 | Q.  Were you outside at the time of the shooting? |
| 03:15:50 | 14 | A.  No, I wasn't. |
| 03:15:52 | 15 | Q.  When you heard gunshots, what did you do? |
| 03:15:55 | 16 | A.  I looked out the window. |
| 03:15:58 | 17 | Q.  What did you see? |
| 03:15:59 | 18 | A.  I went out. |
| 03:16:02 | 19 | Q.  Yeah? |
| 03:16:02 | 20 | A.  I saw some car guy in a car with ski masks. |
| 03:16:07 | 21 | Q.  Did you see guys running? |
| 03:16:10 | 22 | A.  Later on I saw the guys with ski masks running. |
| 03:16:14 | 23 | Q.  Did you ever see their faces? |
| 03:16:16 | 24 | A.  No, I could not. |
| 03:16:17 | 25 | Q.  Why didn't you see their faces? |

| | | |
|---|---|---|
| 03:16:18 | 1 | A. They had ski masks. |
| 03:16:21 | 2 | Q. Do you remember if they were going north, south, east, |
| 03:16:24 | 3 | west or right or left? |
| 03:16:25 | 4 | A. No. |
| 03:16:25 | 5 | Q. Did you ever interact with them face to face? |
| 03:16:28 | 6 | A. No. |
| 03:16:28 | 7 | Q. Did you ever see them without their masks? |
| 03:16:30 | 8 | A. No. |
| 03:16:30 | 9 | Q. At some point later, did you end up interacting with the |
| 03:16:33 | 10 | police? |
| 03:16:34 | 11 | A. Yes. |
| 03:16:34 | 12 | Q. Did you ever tell the police or anyone else that you could |
| 03:16:36 | 13 | identify people with masks, the people you've seen? |
| 03:16:40 | 14 | A. Yes. |
| 03:16:40 | 15 | Q. You told them? |
| 03:16:41 | 16 | A. No, that I said that I saw them with masks, but I couldn't |
| 03:16:46 | 17 | identify them. |
| 03:16:46 | 18 | Q. All right. Did you ever tell anybody any reason to |
| 03:16:48 | 19 | believe you could pick out who did that murder? |
| 03:16:50 | 20 | A. No. |
| 03:16:50 | 21 | Q. Did the police ask you to help them identify the murder? |
| 03:16:57 | 22 | A. Yes. |
| 03:16:57 | 23 | Q. What did you tell them? |
| 03:16:58 | 24 | A. I didn't know. |
| 03:16:59 | 25 | Q. What do you mean? What did you tell them? |

| | | |
|---|---|---|
| 03:17:03 | 1 | A. I said I didn't know who did it, they had masks on. I |
| 03:17:06 | 2 | couldn't see their faces. |
| 03:17:07 | 3 | Q. Did the police accept that answer? |
| 03:17:09 | 4 | A. No. |
| 03:17:09 | 5 | Q. Were you shown photographs? |
| 03:17:10 | 6 | A. Yes. |
| 03:17:11 | 7 | Q. What do you recall about that? Were you able to pick out |
| 03:17:15 | 8 | any photographs? |
| 03:17:17 | 9 | MR. KULWIN: Objection, Judge, multiple questions. |
| 03:17:19 | 10 | THE COURT: I'm sorry. |
| 03:17:20 | 11 | MR. KULWIN: Multiple questions. He had one pending |
| 03:17:23 | 12 | and started another one. |
| 03:17:24 | 13 | MR. LOEVY: I did, your Honor. |
| 03:17:25 | 14 | THE COURT: Ask one. |
| 03:17:28 | 15 | BY MR. LOEVY: |
| 03:17:28 | 16 | Q. Were you able to pick out any people from the photographs? |
| 03:17:30 | 17 | A. No. |
| 03:17:30 | 18 | Q. Why not? |
| 03:17:30 | 19 | A. Because I didn't know who it was. |
| 03:17:33 | 20 | Q. All right. Showing you a copy of Plaintiff's Exhibit |
| 03:17:40 | 21 | 8628, this is in evidence. |
| 03:17:42 | 22 | THE COURT: 86-28 I assume? |
| 03:17:45 | 23 | MR. LOEVY: Yes, your Honor. |
| 03:17:46 | 24 | BY MR. LOEVY: |
| 03:17:46 | 25 | Q. This is a police report dated June 17th, 1985? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 139 of 215 PageID #:64878

03:17:53   1            MR. LOEVY:  Your Honor, the ELMO.

03:17:54   2            THE COURT:  You will be able to see this on your

03:17:56   3    screen there.

03:17:57   4    BY MR. LOEVY:

03:17:57   5    Q.  That's your name, Eric Langston, right?

03:17:59   6    A.  Yes.

03:17:59   7    Q.  Showing you the second page, and this is a report create

03:18:02   8    the by Detective O'Callaghan on the 17th of June 1985.  I

03:18:07   9    would like to read you this sentence.  Eric Langston viewed

03:18:10  10    the lineup and positively identified the subject Nathson

03:18:13  11    Fields as one of the subjects who shot the victims.  Do you

03:18:16  12    see that?

03:18:16  13    A.  Yes.

03:18:16  14    Q.  Are you able to identify anybody as the one who shot the

03:18:20  15    victims?

03:18:21  16    A.  No.

03:18:21  17    Q.  Did you see the shooting?

03:18:22  18    A.  No.

03:18:22  19    Q.  Did you ever tell the police that you identified Nathson

03:18:27  20    Fields as the one who saw that shot the victims?

03:18:30  21    A.  No.

03:18:31  22    Q.  Do you remember if the police seemed interested in

03:18:36  23    particular suspects?

03:18:38  24    A.  I don't recall.

03:18:40  25    Q.  You don't recall how it went down?


                   ***REALTIME UNEDITED TRANSCRIPT ONLY***

03:18:42   1   A.  No.

03:18:42   2   Q.  All right.  Did they come try to get you to testify?

03:18:45   3   A.  Yes.

03:18:46   4   Q.  And what did you tell them when it came time to go to

03:18:50   5   court?

03:18:50   6   A.  That I didn't want to go to court.

03:18:52   7   Q.  Why did you tell them you didn't want to go to court?

03:18:54   8   A.  Because I didn't know who did it.

03:18:55   9   Q.  Did you explain to the adults, you were a kid then still?

03:18:58  10   A.  Yes.

03:18:58  11   Q.  Although a couple years later?

03:19:00  12   A.  Yes.

03:19:00  13   Q.  Did you explain to the adults that you didn't want to go

03:19:03  14   to court because you didn't know who committed the murder?

03:19:06  15   A.  Yes.

03:19:06  16   Q.  Were they accepting that for an answer?

03:19:08  17   A.  No, they was not.

03:19:09  18   Q.  Were you -- were you scared?

03:19:12  19   A.  Very.

03:19:12  20   Q.  Was it scary to have to go to court, point your finger and

03:19:17  21   somebody and say they committed a murder if you didn't in fact

03:19:20  22   know they committed a murder?

03:19:21  23   A.  Yes.

03:19:21  24           MR. KULWIN:  Judge, I am going to object.

03:19:22  25           THE COURT:  The objection is overruled.


                   ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 03:19:23 | 1 | BY MR. LOEVY: |
| 03:19:24 | 2 | Q. Did it scare the heck out of you? |
| 03:19:29 | 3 | A. Yes. |
| 03:19:29 | 4 | Q. Did you go to court? |
| 03:19:30 | 5 | A. Yes. |
| 03:19:31 | 6 | Q. Did you ever have to testify at a trial about whether or |
| 03:19:33 | 7 | not you saw Mr. Fields? |
| 03:19:34 | 8 | A. Yes. |
| 03:19:34 | 9 | Q. In fact, that was at the sentencing after he had been |
| 03:19:37 | 10 | convicted, right? |
| 03:19:37 | 11 | A. Yes. |
| 03:19:37 | 12 | Q. Did you tell the truth? |
| 03:19:39 | 13 | A. Yes. |
| 03:19:39 | 14 | Q. And the truth was you never saw anybody without masks? |
| 03:19:43 | 15 | A. No. |
| 03:19:44 | 16 | Q. All right, do you remember being steered toward any |
| 03:20:00 | 17 | particular suspects? |
| 03:20:02 | 18 | MR. KULWIN: Judge, I am going to object. Asked and |
| 03:20:03 | 19 | answered. |
| 03:20:03 | 20 | THE COURT: Overruled. |
| 03:20:08 | 21 | BY MR. LOEVY: |
| 03:20:08 | 22 | Q. Do you remember, sir? |
| 03:20:09 | 23 | A. What was that? |
| 03:20:10 | 24 | Q. Do you remember if the police were trying to steer you to |
| 03:20:12 | 25 | any particular suspects? |

03:20:14   1   A.  No.

03:20:15   2   Q.  All right.  Do you remember being asked these questions at

03:20:18   3   a prior hearing in this case in 2004?

03:20:22   4           MR. KULWIN:  Page, please?

03:20:23   5           MR. LOEVY:  This is page 2596, lines 7 through 18.

03:20:28   6   BY MR. LOEVY:

03:20:29   7   Q.

03:20:29   8           "QUESTION:  I'm going to show you a picture of the

03:20:31   9   lineup.  First I'm going to ask you what happened during the

03:20:34  10   lineup.  Do you remember?

03:20:35  11           "ANSWER:  They were trying to get me to pick out who

03:20:38  12   did it and I couldn't tell them who did it because the person

03:20:40  13   who did it had a ski mask on

03:20:42  14           THE COURT:  I am going to make a suggestion.  First

03:20:44  15   of all, no human being can understand what you're saying

03:20:47  16   because you are saying it too quickly.  I am going to turn off

03:20:51  17   the jury's monitor, he will be able to see it.

03:20:57  18   BY MR. LOEVY:

03:20:58  19   Q.  Mr. Langston?

03:21:00  20           MR. NOLAND:  Your Honor, I am going to object.  Is it

03:21:05  21   to --

03:21:06  22           THE COURT:  Overruled.  There is no question pending

03:21:08  23   at this second.

03:21:09  24   BY MR. LOEVY:

03:21:10  25   Q.  Can he sue it?

***REALTIME UNEDITED TRANSCRIPT ONLY***

03:21:10  1  A. Yes.

03:21:10  2  Q. Isn't it true on a prior occasion in 2014, you were asked

03:21:14  3  questions, correct?

03:21:15  4  A. Yes.

03:21:15  5  Q. And isn't it true that your answer when asked what

03:21:19  6  happened during the lineup, do you remember, was they were

03:21:22  7  trying to get me to pick out who did it and I couldn't tell

03:21:25  8  them who did it because the person I thought did it had a ski

03:21:29  9  mask on.  So he kind of like coerced me.

03:21:32  10      "QUESTION:  Did Detective O'Callaghan say anything to

03:21:34  11  you before you went into the lineup?

03:21:35  12      "ANSWER:  Yes.

03:21:36  13      "QUESTION:  What did he say to you?

03:21:37  14      "ANSWER:  He was telling me the guy they wanted to get,

03:21:41  15  and I guess that guy was Mr. Fields."

03:21:45  16      Did you give those answers, sir

03:21:46  17  A. Yes.

03:21:46  18  Q. Is that consistent with your recollection?

03:21:48  19  A. Yes.

03:21:48  20  Q. Would you have been able to make an identification without

03:21:50  21  help from the police about who you were supposed to pick?

03:21:53  22  A. No.

03:21:53  23  Q. Did anybody ever threaten in any way in connection with

03:21:58  24  anything having to do with this case, sir?

03:22:00  25  A. No.

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 144 of 215 PageID #:64883

| | | |
|---|---|---|
| 03:22:00 | 1 | Q. Did you ever have any contact with any gang members about |
| 03:22:06 | 2 | whether you were or weren't going to testify? |
| 03:22:08 | 3 | A. No. |
| 03:22:08 | 4 | Q. Was this a memory from your childhood, this court case, |
| 03:22:16 | 5 | keep coming back? |
| 03:22:17 | 6 | A. Yes. |
| 03:22:18 | 7 | Q. All right. Is it a pleasant memory? |
| 03:22:20 | 8 | A. No. |
| 03:22:21 | 9 | MR. LOEVY: I have no further questions, your Honor. |
| 03:22:23 | 10 | THE COURT: Mr. Kulwin. |
| 03:22:25 | 11 | MR. KULWIN: Thank you, your Honor. |
| 03:22:27 | 12 | - - - |
| 03:22:27 | 13 | ERIC LANGSTON, CROSS-EXAMINATION |
| 03:22:27 | 14 | BY MR. KULWIN: |
| 03:22:44 | 15 | Q. Mr. Langston, originally police detectives came to see you |
| 03:22:52 | 16 | -- were on the scene right after the murders. Do you remember |
| 03:22:55 | 17 | that back in 1984? There were a bunch of policemen |
| 03:22:58 | 18 | investigating? |
| 03:22:59 | 19 | A. No. |
| 03:23:04 | 20 | Q. After the people got shot and killed in 1984, did police |
| 03:23:08 | 21 | come to the building to investigate? |
| 03:23:09 | 22 | A. Yes. |
| 03:23:10 | 23 | Q. Okay. In 1984, you weren't in your apartment -- well, let |
| 03:23:22 | 24 | me take that back. |
| 03:23:23 | 25 | Is the apartment you lived in one floor or two |

03:23:26   1   floors, the apartment you actually lived in?

03:23:27   2   A.  It had a first and second floor.

03:23:30   3   Q.  The apartment did?

03:23:31   4   A.  Yes.

03:23:31   5   Q.  All right.  So when you heard the shots, you ran upstairs?

03:23:36   6   A.  No, I was already upstairs.

03:23:38   7   Q.  Let me just see.  I know it's a long time ago.

03:23:47   8           Let me refresh your recollection?

03:23:52   9           THE COURT:  Never mind.

03:23:54  10           MR. KULWIN:  What?

03:23:55  11           THE COURT:  Never mind.

03:23:56  12   BY MR. KULWIN:

03:24:03  13   Q.  This is your testimony, Mr. Langston, from the sentencing

03:24:06  14   hearing a long time ago.

03:24:13  15           THE COURT:  You don't get to talk up there.  Just so

03:24:19  16   you know, you can put that on the screen if you want and he'll

03:24:22  17   be able to see it.  The jurors are not turned on.

03:24:24  18           MR. KULWIN:  I didn't realize that, Judge.  I

03:24:26  19   apologize.

03:24:27  20   BY MR. KULWIN:

03:24:28  21   Q.  Does that refresh your recollection, Mr. Langston?

03:24:31  22   A.  Yes.

03:24:31  23   Q.  That you went upstairs after you heard the gunshots?

03:24:34  24   A.  Yes.

03:24:34  25   Q.  Now, you saw when you looked out the window a blue

| | | |
|---|---|---|
| 03:24:44 | 1 | Cadillac, remember? |
| 03:24:46 | 2 | A.  No. |
| 03:24:48 | 3 | Q.  You don't remember? |
| 03:24:49 | 4 | A.  No. |
| 03:24:50 | 5 | Q.  Okay.  Judge, I am going to put this up and we will look |
| 03:25:02 | 6 | at it. |
| 03:25:03 | 7 | THE COURT:  Sure. |
| 03:25:03 | 8 | BY MR. KULWIN: |
| 03:25:05 | 9 | Q.  This is another page from your sentencing hearing |
| 03:25:08 | 10 | testimony many years ago.  You could look at the question line |
| 03:25:13 | 11 | 16.  Do you see that? |
| 03:25:13 | 12 | A.  Yes. |
| 03:25:13 | 13 | Q.  Okay.  Does that refresh your recollection that you when |
| 03:25:17 | 14 | you looked out the window, you saw a blue Cadillac? |
| 03:25:20 | 15 | A.  No. |
| 03:25:20 | 16 | Q.  I am going to leave it up, Judge, if the jury can see it? |
| 03:25:28 | 17 | THE COURT:  No, but if you are asking for them to. |
| 03:25:31 | 18 | MR. KULWIN:  Yes. |
| 03:25:32 | 19 | MR. LOEVY:  We object. |
| 03:25:32 | 20 | THE COURT:  The reason I overruled the other |
| 03:25:34 | 21 | objection by Mr. Kulwin and the reason I am overruling this |
| 03:25:36 | 22 | one is Rule 801(d) 1-A, so I am going to put it up so the jury |
| 03:25:42 | 23 | can see it.  Just one second.  All right.  There you go. |
| 03:25:48 | 24 | BY MR. KULWIN: |
| 03:25:50 | 25 | Q.  Mr. Langston, do you remember being asked these questions |

03:25:52   1   under oath at the sentencing hearing.

03:25:53   2        "QUESTION:  At first I was looking in a playground and

03:25:57   3   then I saw two men running.

03:25:59   4        "QUESTION:  The two men that you saw run, where did

03:26:01   5   they run to?

03:26:02   6        "ANSWER:  A blue Cadillac

03:26:04   7        "QUESTION:  Where was this Cadillac parked?

03:26:08   8        "ANSWER:  On Langley."

03:26:10   9         Do you remember that testimony?

03:26:11  10   A.  No.

03:26:12  11   Q.  That was a long time ago, a year after the murder occurred

03:26:14  12   when your memory of it was a lot fresher than it is today,

03:26:19  13   right?

03:26:19  14   A.  Okay.

03:26:21  15   Q.  And then I think I heard you say, then you saw the two men

03:26:37  16   after you saw them running from the Cadillac, you saw them

03:26:40  17   running back to the Cadillac?

03:26:41  18   A.  Yes.

03:26:42  19   Q.  Here's my question for you, Mr. Langston.  You were 10, 11

03:26:51  20   years old at the time?

03:26:51  21   A.  Yes.

03:26:52  22   Q.  And all of a sudden you hear gunshots, right?

03:26:55  23   A.  Yes.

03:26:55  24   Q.  Okay.  And then you run upstairs to look out the window,

03:26:59  25   right?

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 148 of 215 PageID #:64887
***REALTIME UNEDITED TRANSCRIPT ONLY***

147

| 03:26:59 | 1 | A.  Yes. |
| 03:26:59 | 2 | Q.  And so you saw the men running to the car after the |
| 03:27:06 | 3 | gunshots, right? |
| 03:27:07 | 4 | A.  Yes. |
| 03:27:08 | 5 | Q.  You couldn't have seen them running from the car before |
| 03:27:10 | 6 | the gunshots, right? |
| 03:27:11 | 7 | A.  No. |
| 03:27:12 | 8 | Q.  Isn't that right? |
| 03:27:13 | 9 | A.  No. |
| 03:27:13 | 10 | Q.  That is right? |
| 03:27:14 | 11 | A.  That is right. |
| 03:27:16 | 12 | Q.  There you go. |
| 03:27:17 | 13 |      Now, when you were looking at the men as they ran to |
| 03:27:23 | 14 | the blue Cadillac, you could see how big they were, right? |
| 03:27:28 | 15 | A.  No. |
| 03:27:28 | 16 | Q.  You couldn't see -- like one man was tall and one man was |
| 03:27:34 | 17 | short? |
| 03:27:34 | 18 | A.  No. |
| 03:27:35 | 19 | Q.  You saw? |
| 03:28:16 | 20 |      MR. KULWIN:  Can I have one second, Judge?  I |
| 03:28:18 | 21 | apologize.  I lost my place. |
| 03:28:20 | 22 |   (Brief pause.) |
| 03:29:02 | 23 |      MR. KULWIN: |
| 03:29:02 | 24 | Q.  Now, when you were looking out your window, at one point |
| 03:29:05 | 25 | after the man ran to the car, you saw them take their ski |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 03:29:09 | 1 | masks off, didn't you? |
| 03:29:11 | 2 | A. No. |
| 03:29:11 | 3 | Q. Let's go back to your testimony from the trial 30 plus |
| 03:29:17 | 4 | years ago under oath, the sentencing hearing under oath, page |
| 03:29:23 | 5 | 1217. Here was the question, sir. |
| 03:29:29 | 6 | MR. KULWIN: So the jury can see it, Judge. |
| 03:29:38 | 7 | BY MR. KULWIN: |
| 03:29:39 | 8 | Q. When the two men got into the car, did they take their ski |
| 03:29:42 | 9 | masks off? |
| 03:29:43 | 10 | "ANSWER: Yes. Do you remember that |
| 03:29:45 | 11 | A. Yes. |
| 03:29:45 | 12 | Q. That's what happened, isn't it? |
| 03:29:47 | 13 | A. Yes. |
| 03:29:47 | 14 | Q. Now, when the police came in 1984, you didn't talk to |
| 03:30:09 | 15 | them, you didn't talk to any police right after the murders |
| 03:30:11 | 16 | occurred, right? |
| 03:30:12 | 17 | A. No. |
| 03:30:12 | 18 | Q. And as you said just a moment ago, it was a pretty scary |
| 03:30:20 | 19 | event, you didn't want to talk to them? |
| 03:30:22 | 20 | A. No. |
| 03:30:22 | 21 | Q. You didn't want to be involved at all with it? |
| 03:30:24 | 22 | A. No, I did not. |
| 03:30:25 | 23 | Q. And you certainly didn't want to testify at any trials, |
| 03:30:28 | 24 | that's for sure, right? |
| 03:30:29 | 25 | A. Right. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 03:30:30 | 1 | Q. But a year after the shootings, a year later, another |
|---|---|---|
| 03:30:37 | 2 | detective, another couple detectives came to see you.  Do you |
| 03:30:40 | 3 | remember that at your home? |
| 03:30:42 | 4 | A. No. |
| 03:30:44 | 5 | Q. You don't remember that? |
| 03:30:46 | 6 | A. No. |
| 03:30:46 | 7 | Q. Was it a Detective O'Callaghan and a submit /AOE came to |
| 03:30:52 | 8 | your house and talked to your brother at the time? |
| 03:30:54 | 9 | A. I remember O'Callaghan. |
| 03:30:55 | 10 | Q. Okay.  And he -- and he asked you at some point if you |
| 03:31:09 | 11 | would come down and see a lineup, right? |
| 03:31:11 | 12 | A. Yes. |
| 03:31:11 | 13 | Q. And you told him before he asked you that what you had |
| 03:31:16 | 14 | seen that day, right? |
| 03:31:17 | 15 | A. Yes. |
| 03:31:17 | 16 | Q. All right.  The men had run to the car with masks? |
| 03:31:21 | 17 | A. Ski masks on. |
| 03:31:23 | 18 | Q. And they took their masks off and got in the car? |
| 03:31:28 | 19 | A. Right. |
| 03:31:28 | 20 | Q. And so -- and you felt comfortable enough to talk to him |
| 03:31:33 | 21 | and go down with him to look at these line ups, right? |
| 03:31:36 | 22 | A. Right. |
| 03:31:36 | 23 | Q. Yeah. |
| 03:31:37 | 24 |     Now, when you looked -- and you looked at a lineup |
| 03:31:49 | 25 | with Mr. Fields in it.  Now you know his name is Mr. Fields. |

| | | |
|---|---|---|
| 03:31:52 | 1 | You looked at a lineup with some guys in it, right? |
| 03:31:57 | 2 | A.  Right. |
| 03:31:57 | 3 | Q.  And Mr. Fields was one of them? |
| 03:31:58 | 4 | A.  Right. |
| 03:31:59 | 5 | Q.  And Mr. O'Callaghan was with you in the viewing room, |
| 03:32:01 | 6 | right? |
| 03:32:02 | 7 | A.  Yes. |
| 03:32:03 | 8 | Q.  And then after you got done looking, he asked you who you |
| 03:32:09 | 9 | saw and you pointed him out, right? |
| 03:32:12 | 10 | A.  Yes. |
| 03:32:12 | 11 | Q.  Now, after that happened, about a month later your family |
| 03:32:29 | 12 | moved from the 706 building to Sawyer street.  Do you remember |
| 03:32:35 | 13 | that? |
| 03:32:35 | 14 | A.  Yes. |
| 03:32:35 | 15 | Q.  1533 -- |
| 03:32:38 | 16 | THE COURT:  Old dresses are not a problem. |
| 03:32:40 | 17 | BY MR. KULWIN: |
| 03:32:41 | 18 | Q.  1533 Sawyer, do you remember that? |
| 03:32:44 | 19 | A.  Yes. |
| 03:32:44 | 20 | Q.  And a couple of folks came to see you and wanted to talk |
| 03:32:48 | 21 | to you about what happened while you were living there.  Do |
| 03:32:51 | 22 | you recall that? |
| 03:32:51 | 23 | A.  Yes. |
| 03:32:52 | 24 | Q.  And they said, one guy said he was a state's attorney and |
| 03:32:55 | 25 | the other guy said he was with the police.  Do you recall |

| | | |
|---|---|---|
| 03:32:57 | 1 | that? |
| 03:32:57 | 2 | A.  Yes. |
| 03:32:57 | 3 | Q.  And they took you and your brother out to the ball field? |
| 03:33:05 | 4 | A.  Yes. |
| 03:33:06 | 5 | Q.  You recall that, right. |
| 03:33:08 | 6 | And later you found out that going to wasn't a |
| 03:33:11 | 7 | state's attorney and the other guy wasn't a policeman, they |
| 03:33:15 | 8 | were Mr. Swano and some other guy? |
| 03:33:16 | 9 | MR. LOEVY:  Objection, leading, your Honor. |
| 03:33:17 | 10 | THE COURT:  Overruled. |
| 03:33:18 | 11 | BY MR. KULWIN: |
| 03:33:19 | 12 | Q.  Right? |
| 03:33:20 | 13 | A.  Yes. |
| 03:33:20 | 14 | Q.  And it was Bill Swano who put you on the stand at the |
| 03:33:31 | 15 | sentencing hearing when you testified, right, when you were |
| 03:33:35 | 16 | about 11? |
| 03:33:36 | 17 | A.  Yes. |
| 03:33:36 | 18 | Q.  And a number of years later when you were in your early |
| 03:33:49 | 19 | 20s, 1999, you had occasion to talk to a guy named Dave |
| 03:33:55 | 20 | Kelley, assistant state's attorney Dave Kelley.  Do you |
| 03:33:58 | 21 | remember that? |
| 03:33:58 | 22 | A.  Yes. |
| 03:33:58 | 23 | Q.  He asked you, Mr. Langston, how come after identifying Mr. |
| 03:34:03 | 24 | Fields you testified at the sentencing hear.  Do you remember |
| 03:34:04 | 25 | him asking you that? |

03:34:05    1    A. No.

03:34:07    2    Q. Okay. And didn't you tell Mr. Kelley at that time because

03:34:12    3    the El Rukns scared the shit out of me?

03:34:14    4    A. No.

03:34:15    5    Q. You don't remember that?

03:34:16    6    A. No.

03:34:16    7    Q. Okay. Well, you testified in a prior proceeding in this

03:34:23    8    case.

03:34:28    9        MR. KULWIN: Page 2604, line 18.

03:34:33   10    BY MR. KULWIN:

03:34:35   11    Q. There was another proceeding in this case that you

03:34:36   12    testified to, right?

03:34:37   13    A. What was that?

03:34:38   14    Q. There was another --

03:34:39   15        THE COURT: You've been here before, right.

03:34:41   16        THE WITNESS: Yes.

03:34:44   17    BY MR. KULWIN:

03:34:44   18    Q. And you didn't want to be --

03:34:46   19        MR. LOEVY: Objection, your Honor. This isn't proper

03:34:47   20    impeachment.

03:34:48   21        THE COURT: Can I see it, please? Can somebody just

03:34:51   22    hand it to me.

03:34:53   23        MR. KULWIN: Sure.

03:34:54   24        THE COURT: What page am I looking at?

03:34:57   25        MR. KULWIN: 2604.

| | |
|---|---|
| 03:34:58 | 1 |
| 03:35:06 | 2 |
| 03:35:11 | 3 |
| 03:35:13 | 4 |
| 03:35:15 | 5 |
| 03:35:23 | 6 |
| 03:35:23 | 7 |
| 03:35:29 | 8 |
| 03:35:35 | 9 |
| 03:35:39 | 10 |
| 03:35:43 | 11 |
| 03:35:46 | 12 |
| 03:35:50 | 13 |
| 03:35:53 | 14 |
| 03:36:03 | 15 |
| 03:36:04 | 16 |
| 03:36:05 | 17 |
| 03:36:35 | 18 |
| 03:36:39 | 19 |
| 03:36:41 | 20 |
| 03:36:41 | 21 |
| 03:36:52 | 22 |
| 03:36:53 | 23 |
| 03:36:54 | 24 |
| 03:37:00 | 25 |

1   THE COURT:  Thank you very much.

2   The objection is overruled.

3   MR. KULWIN:  Am I allowed to put this up on the

4   screen, Judge, or no?

5   THE COURT:  Yes, same Rule 801(d) 1-A.

6   BY MR. KULWIN:

7   Q.  This was back in 2014.  Do you remember being asked these

8   questions in 2014 and isn't it in fact true that in 1999, ten

9   years later, you talked to assistant state's attorney by the

10  name of David Kelley isn't that right that, about this case?

11  True.  And isn't it true that you told Kelly that the

12  testimony you gave in August 1986 when Mr. Goodman showed it

13  to you, in fact, you gave it because they scared the shit out

14  of you, the El Rukns, and you answered, true, right?  That's

15  what you said, right?

16  A.  Yes.

17  Q.  Now, at the time you testified at the sentencing hearing,

18  Mr. Langston, you were still living at the 706 building where

19  the murders had occurred, right?

20  A.  Yes.

21  Q.  And the 706 building was about a block away from the El

22  Rukn Fort, right?

23  A.  Yes.

24  Q.  And when you went to that sentencing hearing, your brother

25  Larry brought you down to that court hearing, correct, your

| | | |
|---|---|---|
| 03:37:04 | 1 | brother Larry, do you remember that? |
| 03:37:06 | 2 | A.  No. |
| 03:37:08 | 3 | Q.  And he had just gotten out of the penitentiary, do you |
| 03:37:12 | 4 | recall? |
| 03:37:12 | 5 | A.  Yes. |
| 03:37:12 | 6 | Q.  Okay.  Let me see if I can show you something. |
| 03:37:16 | 7 | THE COURT:  On this one you are refreshing his |
| 03:37:19 | 8 | recollection, so I am going to take that down the screen.  You |
| 03:37:22 | 9 | can still do it on his screen. |
| 03:37:24 | 10 | BY MR. KULWIN: |
| 03:37:25 | 11 | Q.  Can you see it on your screen? |
| 03:37:27 | 12 | THE COURT:  You have to put it up there.  It's pretty |
| 03:37:29 | 13 | hard to see it. |
| 03:37:30 | 14 | MR. KULWIN:  That would be difficult.  That would be |
| 03:37:32 | 15 | a miracle. |
| 03:37:38 | 16 | THE COURT:  I have turned off the jury's screen, so |
| 03:37:41 | 17 | you can still do it on the ELMO. |
| 03:38:45 | 18 | BY MR. KULWIN: |
| 03:38:45 | 19 | Q.  I am going to show you if I can the testimony again from |
| 03:38:48 | 20 | your examination when you were in this proceeding in this |
| 03:38:51 | 21 | court.  Why don't you look at this for a second and I'll move |
| 03:38:58 | 22 | it up. |
| 03:39:07 | 23 | THE COURT:  It's that one that's at line 14 there. |
| 03:39:10 | 24 | MR. KULWIN:  Yeah. |
| 03:39:10 | 25 | THE COURT:  Look at that.  The question is does that |

| 03:39:13 | 1 | refresh your recollection about how you got to court? |
| 03:39:15 | 2 | THE WITNESS: Yes. |
| 03:39:16 | 3 | BY MR. KULWIN: |
| 03:39:17 | 4 | Q. It does, right? |
| 03:39:20 | 5 | A. Yes. |
| 03:39:20 | 6 | Q. Your brother Larry brought you? |
| 03:39:23 | 7 | A. Yes. |
| 03:39:23 | 8 | Q. And Larry had just gotten out of the penitentiary a couple |
| 03:39:26 | 9 | months earlier, right? |
| 03:39:27 | 10 | A. Yes. |
| 03:39:27 | 11 | Q. And when you were looking out the window at the blue |
| 03:40:06 | 12 | Cadillac, you were about a hundred feet away? |
| 03:40:10 | 13 | MR. LOEVY: Objection, your Honor, no foundation, |
| 03:40:15 | 14 | memory of the Cadillac. |
| 03:40:17 | 15 | THE COURT: Overruled. |
| 03:40:18 | 16 | THE WITNESS: What was that? |
| 03:40:18 | 17 | BY MR. KULWIN: |
| 03:40:20 | 18 | Q. I'm sorry. |
| 03:40:20 | 19 | So the shooting takes place, you run upstairs, you |
| 03:40:24 | 20 | look out the window, the Cadillac where the men got into the |
| 03:40:27 | 21 | car was about a hundred feet away? |
| 03:40:30 | 22 | A. Probably a little farther. |
| 03:40:34 | 23 | THE COURT: Probably a little farther is what he |
| 03:40:37 | 24 | said. |
| 03:40:37 | 25 | BY MR. KULWIN: |

| | | |
|---|---|---|
| 03:40:38 | 1 | Q. Let me go back to this and see if this helps you out? |
| 03:40:41 | 2 | THE COURT: You are not refreshing his recollection |
| 03:40:44 | 3 | because he didn't -- you can do it -- |
| 03:40:47 | 4 | MR. KULWIN: Impeachment. |
| 03:40:48 | 5 | THE COURT: I can't tell you what to do. I am going |
| 03:40:52 | 6 | to tell you what you can do. |
| 03:41:00 | 7 | BY MR. KULWIN: |
| 03:41:01 | 8 | Q. Going back to that hearing you testified to before, that |
| 03:41:04 | 9 | prior hearing, do you remember? |
| 03:41:05 | 10 | MR. LOEVY: Can we get the date on that, your Honor? |
| 03:41:07 | 11 | MR. KULWIN: Yes. |
| 03:41:07 | 12 | THE COURT: Not the date, just the page number. |
| 03:41:09 | 13 | MR. KULWIN: You mean the page or the date. |
| 03:41:11 | 14 | THE COURT: He wants the page number. |
| 03:41:13 | 15 | MR. KULWIN: Page 2593. |
| 03:41:14 | 16 | THE COURT: The page is all we need. |
| 03:41:16 | 17 | MR. KULWIN: Okay. |
| 03:41:16 | 18 | BY MR. KULWIN: |
| 03:41:22 | 19 | Q. How far away was that -- line 22. How far away was that |
| 03:41:26 | 20 | car from you? Probably like a hundred feet. Do you remember |
| 03:41:29 | 21 | that question and answer? |
| 03:41:30 | 22 | A. No. |
| 03:41:32 | 23 | Q. Okay. In any event, so it was about -- there was a ball |
| 03:41:37 | 24 | field across the yard from where you lived, right? |
| 03:41:40 | 25 | A. Yes. |

| 03:41:40 | 1 | Q. You played on that field, right? |
| 03:41:41 | 2 | A. Yes. |
| 03:41:42 | 3 | Q. Played baseball? |
| 03:41:43 | 4 | A. Yes. |
| 03:41:43 | 5 | Q. So it was about the distance from home plate to a little |
| 03:41:47 | 6 | bit past first base? |
| 03:41:49 | 7 | A. A few feet further than that. |
| 03:41:52 | 8 | Q. A few feet further? |
| 03:41:56 | 9 | MR. KULWIN: If I may have a moment, Judge. I don't |
| 03:42:15 | 10 | have anything else, Judge. |
| 03:42:17 | 11 | MR. MICHALIK: No questions, your Honor. |
| 03:42:18 | 12 | THE COURT: Redirect? |
| 03:42:19 | 13 | MR. LOEVY: Yes, your Honor. |
| 03:42:19 | 14 | - - - |
| 03:42:19 | 15 | ERIC LANGSTON, REDIRECT EXAMINATION |
| 03:42:19 | 16 | BY MR. LOEVY: |
| 03:42:30 | 17 | Q. All right. Sir, you were asked questions about your |
| 03:42:33 | 18 | testimony at the sentencing. That was quite a bit of time |
| 03:42:36 | 19 | ago, correct? |
| 03:42:36 | 20 | A. Yes. |
| 03:42:36 | 21 | Q. Your memory was firmer back then than it is now? |
| 03:42:44 | 22 | A. Yes. |
| 03:42:44 | 23 | Q. I am going to show you from the same hearing your |
| 03:42:46 | 24 | testimony at page 1223. Did you give this testimony. Do you |
| 03:42:54 | 25 | recognize the person that you picked out of the lineup as |

| | | |
|---|---|---|
| 03:42:57 | 1 | somebody you saw that night? |
| 03:42:58 | 2 | THE COURT: Hang on. Given the way you are doing |
| 03:43:02 | 3 | this, the jury is entitled to see it. It's not just |
| 03:43:05 | 4 | refreshing. Now it's up there. |
| 03:43:06 | 5 | BY MR. LOEVY: |
| 03:43:07 | 6 | Q. Did you recognize the person that you picked out of the |
| 03:43:08 | 7 | lineup as somebody you saw that night -- I'm sorry. |
| 03:43:14 | 8 | THE COURT: You got the wrong next page there. |
| 03:43:16 | 9 | MR. LOEVY: Yes. |
| 03:43:17 | 10 | THE COURT: I don't think you would have given the |
| 03:43:19 | 11 | answer five to that question. |
| 03:43:20 | 12 | MR. LOEVY: Thank you. |
| 03:43:22 | 13 | BY MR. LOEVY: |
| 03:43:28 | 14 | Q. Not the night, the morning. Shooting? |
| 03:43:30 | 15 | "ANSWER: No. |
| 03:43:31 | 16 | "QUESTION: Did somebody tell you who to pick out? |
| 03:43:33 | 17 | "ANSWER: Yes |
| 03:43:34 | 18 | "QUESTION: Who did? |
| 03:43:35 | 19 | "ANSWER: O'Callaghan." |
| 03:43:37 | 20 | Do you remember that testimony? |
| 03:43:38 | 21 | A. Yes. |
| 03:43:39 | 22 | Q. Would you have been able to pick out without help from the |
| 03:43:42 | 23 | police officers? |
| 03:43:42 | 24 | A. No. |
| 03:43:42 | 25 | Q. Now, Mr. Kulwin showed you a question and answer about |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 160 of 215 PageID #:64898
***REALTIME UNEDITED TRANSCRIPT ONLY***

159

03:43:45   1   seeing the guys in the car without their ski masks.  Do you

03:43:48   2   remember him asking you those questions?

03:43:49   3   A.  Yes.

03:43:49   4   Q.  Okay.  Showing you the same page but backing up, this is

03:43:52   5   page 1317,

03:43:55   6            MR. KULWIN:  I'm sorry, what page?

03:43:56   7            MR. LOEVY:  1317.

03:43:57   8   BY MR. LOEVY:

03:43:58   9   Q.  The questions he asked you are here at lines 17 through 19

03:44:02  10   when the men got into their car, did they take their masks

03:44:06  11   off.

03:44:07  12            When the men turned around and looked when they got

03:44:09  13   in the car with the ski masks still on?

03:44:11  14            "ANSWER:  Yes.

03:44:12  15            "QUESTION:  Could you tell if there was anybody in the

03:44:14  16   car?

03:44:15  17            "ANSWER:  Yes.

03:44:16  18            "QUESTION:  How many people could you see in the car?

03:44:18  19            "ANSWER:  Three

03:44:19  20            "QUESTION:  Do you remember anything or see the faces

03:44:21  21   of the people that were in the car from your window looking

03:44:23  22   across the playground from the car on Langley?

03:44:27  23            "ANSWER:  No.

03:44:28  24            "QUESTION:  When the two men got into the car, did they

03:44:31  25   take the ski masks off?  That's the answer you gave.  From

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 161 of 215 PageID #:64900
***REALTIME UNEDITED TRANSCRIPT ONLY***

160

| | | |
|---|---|---|
| 03:44:34 | 1 | where you were situated looking across the play lot from the |
| 03:44:38 | 2 | car on Langley, could you see their faces once they got in the |
| 03:44:41 | 3 | car? |
| 03:44:42 | 4 | "ANSWER:  No." |
| 03:44:43 | 5 | Is that the full context of your testimony |
| 03:44:45 | 6 | A.  Yes. |
| 03:44:46 | 7 | MR. KULWIN:  Judge, I am going to object to the |
| 03:44:47 | 8 | phrase full context. |
| 03:44:48 | 9 | THE COURT:  Overruled.  The answer can stand.  He |
| 03:44:51 | 10 | said yes. |
| 03:44:52 | 11 | BY MR. LOEVY: |
| 03:44:52 | 12 | Q.  You were not making these identifications the day after |
| 03:44:55 | 13 | the shooting, were you? |
| 03:44:56 | 14 | A.  No. |
| 03:44:56 | 15 | Q.  At least a year went by? |
| 03:44:58 | 16 | A.  Yes. |
| 03:44:58 | 17 | Q.  You were asked some questions about whether it scared the |
| 03:45:01 | 18 | heck out of you to give these identifications. |
| 03:45:03 | 19 | Was it scary to you, did it scare the S out of you to |
| 03:45:07 | 20 | go to court, point your finger at somebody that you didn't |
| 03:45:09 | 21 | know? |
| 03:45:09 | 22 | A.  Didn't know, right.  Yes. |
| 03:45:11 | 23 | Q.  Did any El Rukns contact you ever? |
| 03:45:13 | 24 | A.  No. |
| 03:45:13 | 25 | Q.  Did you ever receive any threat at all? |

03:45:16    1   A.  No.

03:45:16    2   Q.  Did anybody ever bother you about this except white guys

03:45:21    3   with suits and ties?

03:45:23    4   A.  No.

03:45:23    5   Q.  Now, Mr. Kulwin started asking you questions about

03:45:29    6   Mr. Swano and the state's attorney and the ball field.  Do you

03:45:32    7   remember those questions he was asking you?

03:45:33    8   A.  Yes.

03:45:33    9   Q.  You said yes to everyone of those questions?

03:45:36   10   A.  Yes.

03:45:36   11   Q.  Who is Mr. Swano?

03:45:37   12   A.  He was a detective.

03:45:38   13   Q.  He was a what?

03:45:39   14   A.  I think he was a detective.

03:45:41   15   Q.  You have no idea who Mr. Swano?

03:45:42   16   A.  No.

03:45:43   17   Q.  Why did you say yes to his questions?

03:45:45   18           MR. KULWIN:  Judge, I am going to object.

03:45:46   19           THE COURT:  Sustained.  You can argue it.

03:45:49   20   BY MR. LOEVY:

03:45:50   21   Q.  He is an attorney, all right, sir, did you know that?

03:45:52   22   A.  No.

03:45:52   23   Q.  All right.  Are you someone who sometimes says yes if you

03:45:55   24   are not sure?

03:45:56   25   A.  No.

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 163 of 215 PageID #:64908
***REALTIME UNEDITED TRANSCRIPT ONLY***

162

| | | |
|---|---|---|
| 03:45:56 | 1 | Q. All right. You got me there. |
| 03:46:04 | 2 | MR. LOEVY: I have no further questions. |
| 03:46:06 | 3 | MR. KULWIN: Just a few. |
| 03:46:08 | 4 | THE COURT: Mr. Kulwin, anything else? |
| 03:46:09 | 5 | MR. KULWIN: Sorry, I do. |
| 03:46:12 | 6 | - - - |
| 03:46:12 | 7 | ERIC LANGSTON, RECROSS-EXAMINATION |
| 03:46:12 | 8 | BY MR. KULWIN: |
| 03:46:18 | 9 | Q. Mr. Langston, Mr. Loevy just read you a bunch of testimony |
| 03:46:21 | 10 | from that sentencing hearing, right? |
| 03:46:23 | 11 | A. Yes. |
| 03:46:23 | 12 | Q. That's the sentencing hearing that you told assistant |
| 03:46:28 | 13 | state's attorney Kelly you gave that testimony because the El |
| 03:46:31 | 14 | Rukns scared the shit out of you remember? |
| 03:46:33 | 15 | MR. LOEVY: Objection. |
| 03:46:34 | 16 | THE COURT: What's the objection? |
| 03:46:34 | 17 | MR. LOEVY: He said we just saw that. It's improper |
| 03:46:37 | 18 | impeachment. It's the same point. |
| 03:46:39 | 19 | THE COURT: Sustained. It's repeating the cross. |
| 03:46:42 | 20 | MR. KULWIN: Okay. |
| 03:46:42 | 21 | BY MR. KULWIN: |
| 03:46:44 | 22 | Q. He also asked you? |
| 03:47:09 | 23 | THE COURT: We will be taking a break. I want to |
| 03:47:11 | 24 | finish this witness before we do. |
| 03:47:13 | 25 | MR. KULWIN: I just have a couple questions if I can |

| | | |
|---|---|---|
| 03:47:15 | 1 | find the point.  You apologize, Judge. |
| 03:47:58 | 2 | (Brief pause.) |
| 03:48:35 | 3 | BY MR. KULWIN: |
| 03:48:47 | 4 | Q.  You were asked some questions about whether or not you |
| 03:48:51 | 5 | knew who Mr. Swano was.  Do you remember that? |
| 03:48:54 | 6 | A.  Yes. |
| 03:48:54 | 7 | Q.  But before you testified here you said you had no idea who |
| 03:49:14 | 8 | he was, is that your testimony? |
| 03:49:18 | 9 | A.  Yes. |
| 03:49:18 | 10 | Q.  In a prior proceeding in this case, didn't you tell? |
| 03:49:26 | 11 | MR. LOEVY:  Page? |
| 03:49:27 | 12 | MR. KULWIN:  Page 2601. |
| 03:49:35 | 13 | BY MR. KULWIN: |
| 03:49:35 | 14 | Q.  In a prior proceeding, you were asked some questions by |
| 03:49:37 | 15 | one of plaintiff's other attorneys, a fellow by the name of |
| 03:49:41 | 16 | Mr. Goodman.  Do you remember that? |
| 03:49:42 | 17 | A.  Yes. |
| 03:49:42 | 18 | Q.  And he had met with you before your testimony and gone |
| 03:49:46 | 19 | over it with you, right? |
| 03:49:47 | 20 | A.  Yes. |
| 03:49:47 | 21 | Q.  Okay.  And do you remember him asking you this question |
| 03:49:51 | 22 | and you giving this answer: And when the police came at that |
| 03:49:55 | 23 | time, you knew the lawyer and the investigator, you knew that |
| 03:49:58 | 24 | they weren't the police isn't that true?  And you said, yes. |
| 03:50:03 | 25 | You knew that they represented one of the defendants in the |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 165 of 215 PageID #:64904
***REALTIME UNEDITED TRANSCRIPT ONLY***

164

03:50:05  1  case isn't that true?  Yes.  In fact, they told you that,

03:50:09  2  didn't they?  Yes.  You gave that testimony under oath in a

03:50:13  3  proceeding in this case isn't that right when Mr. Goodman

03:50:16  4  asked you?

03:50:17  5  A.  Yes.  Yes.

03:50:18  6  Q.  So it all happened a long time ago, right, Mr. Langston?

03:50:24  7  A.  Yes.

03:50:25  8  Q.  And it was a very scary incident, right?  You have to say

03:50:29  9  yes?

03:50:30  10  A.  Yes.

03:50:32  11       MR. KULWIN:  That's all I have, sir.  Nothing else,

03:50:35  12  Judge.

03:50:35  13       THE COURT:  Non-repetitive.

03:50:35  14                    - - -

03:50:35  15       ERIC LANGSTON, REDIRECT EXAMINATION

03:50:35  16  BY MR. LOEVY:

03:50:39  17  Q.  All the times you have come to court, 2006, 2014, have you

03:50:42  18  ever, ever claimed that you could identify Mr. Fields and

03:50:45  19  Mr. Hawkins as the murderers?

03:50:47  20  A.  No.

03:50:48  21       MR. LOEVY:  I have no further questions.

03:50:49  22       THE COURT:  Do any of the jurors have any questions

03:50:50  23  for the witness?

03:50:52  24       Thanks.  You were excused.  You can step down.  We

03:50:54  25  will take a break for ten minutes.  If we can have the

| 03:50:57 | 1 | previous witness back on the stand when we resume. |
| 03:51:01 | 2 | (Short break.) |
| 04:01:21 | 3 | THE COURT:  We've got lieutenant Melean, right? |
| 04:01:25 | 4 | THE WITNESS:  Melean. |
| 04:01:26 | 5 | THE COURT:  My apologies.  You are still under oath. |
| 04:01:28 | 6 | Do you understand that? |
| 04:01:30 | 7 | THE WITNESS:  Yes. |
| 04:01:30 | 8 | THE COURT:  You can have a seat as can everybody |
| 04:01:32 | 9 | else.  Ms. Gorman, you can go ahead. |
| 04:01:32 | 10 | - - - |
| 04:01:32 | 11 | ^ WITNAME, DIRECT EXAMINATION |
| 04:01:36 | 12 | BY MR. NOLAND:     Continued |
| 04:01:36 | 13 | BY MR. LOEVY: |
| 04:01:37 | 14 | Q.  Detective Melean, we started off with me asking you about |
| 04:01:40 | 15 | the 2006 database records.  Do you remember that? |
| 04:01:42 | 16 | A.  Yes. |
| 04:01:43 | 17 | Q.  Do you recall your testimony in the earlier proceeding in |
| 04:01:45 | 18 | which you said that those records from 2006 were lost? |
| 04:01:48 | 19 | A.  Yes, when I asked the database guy, he told me he could |
| 04:01:52 | 20 | not find them. |
| 04:01:53 | 21 | Q.  That all of the 2006 records were lost? |
| 04:01:58 | 22 | A.  I believe so, yes. |
| 04:01:59 | 23 | Q.  I'd like to to you about the Chicago Police Department |
| 04:02:09 | 24 | policies and practices for responding to a homicide subpoena? |
| 04:02:12 | 25 | A.  Yes. |

04:02:13   1   Q.  How would you go about ensuring that all documents

04:02:17   2   pursuant to a subpoena for a homicide ^  got produced?

04:02:19   3   A.  For a some side calls?

04:02:26   4   Q.  Some side?

04:02:28   5   A.  The division would fill it out, send it back to the

04:02:32   6   subpoena unit and send it to court.

04:02:36   7   Q.  The subpoena unit would send the request to the

04:02:38   8   detectives?

04:02:39   9   A.  Correct.

04:02:39  10   Q.  To fulfill the subpoena?

04:02:41  11   A.  Yes.

04:02:42  12   Q.  Were there any checks and balances to make sure that

04:02:45  13   everything was tendered?

04:02:46  14   A.  Not that I am aware of.  I didn't get too many complaints,

04:02:53  15   no.

04:02:53  16   Q.  I'm sorry?

04:02:54  17   A.  Not that I am aware of.

04:02:58  18   Q.  If everything was tendered, people wouldn't know if they

04:03:02  19   had everything?

04:03:02  20   A.  If somebody didn't have what they wanted, they would have

04:03:04  21   contacted us and seen what was wrong with the subpoena, yes.

04:03:07  22   Q.  Why do you send the subpoenas to the detective division?

04:03:11  23   Why doesn't the people working under you just go to the

04:03:14  24   warehouse and get it themselves?

04:03:16  25   A.  It's been the policy and procedures since before I got

04:03:20    1    there.

04:03:20    2    Q.  So you send the subpoenas to the detectives and they give

04:03:23    3    you whatever they give you?

04:03:26    4             MR. MICHALIK:  Objection, misstates the testimony.

04:03:29    5             THE COURT:  It's a question.  The objection is

04:03:30    6    overruled.

04:03:33    7             THE WITNESS:  Can you repeat that, please?

04:03:35    8    BY MS. GORMAN:

04:03:36    9    Q.  So you would send a subpoena to the detective unit and

04:03:39   10    then the detectives would send you whatever they felt like

04:03:42   11    sending you; is that correct?

04:03:43   12    A.  Not whatever they felt like sending me, whatever was in

04:03:47   13    the subpoena.

04:03:47   14    Q.  Do you know how they kept their files in the detective

04:03:51   15    units?

04:03:52   16    A.  No.

04:03:52   17    Q.  Do you know if they have multiple files for homicide?

04:03:55   18    A.  I am not part of the detective division.  I don't handle

04:03:58   19    that.

04:03:59   20    Q.  Do you know if they pick and choose which documents are

04:04:00   21    going to be tendered?

04:04:01   22    A.  No, I don't know any of that.

04:04:02   23    Q.  Do you know if the detective -- if the detective unit

04:04:07   24    copies everything that they're supposed to file in response to

04:04:09   25    a subpoena?

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 169 of 215 PageID #:64908
***REALTIME UNEDITED TRANSCRIPT ONLY***

168

04:04:10  1   A.  Once again, I am not part of the detective division, so I

04:04:14  2   don't know the procedure.

04:04:14  3   Q.  In other words, the Chicago Police Department's homicide

04:04:18  4   subpoena system depended on the detectives to be honest and

04:04:22  5   complete; isn't that correct?

04:04:27  6   A.  I believe it was every job to do their job to the best of

04:04:31  7   their ability.

04:04:32  8   Q.  My question is about the homicide, the subpoena unit

04:04:35  9   depended on the detectives to be complete and honest; isn't

04:04:35  10  that correct?

04:04:40  11  A.  That's correct.

04:04:42  12          MS. GORMAN:  I have nothing more.

04:04:43  13          THE COURT:  Mr. Michalik.

04:04:46  14                      - - -

04:04:46  15              ^ WITNAME, CROSS-EXAMINATION

04:04:46  16  BY MR. MICHALIK:

04:04:50  17  Q.  Thank you, your Honor.  Good afternoon, lieutenant.

04:04:59  18  Backup just a little bit.

04:05:00  19          Could you tell us and the ladies and gentlemen of the

04:05:03  20  jury when you first started with the Chicago Police

04:05:05  21  Department?

04:05:05  22  A.  7/7/92.

04:05:07  23  Q.  Was that 1992?

04:05:09  24  A.  1992, sorry.

04:05:10  25  Q.  Eventually you became a sergeant as you told Ms. Gorman?

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 04:05:14 | 1 | A. Yes. |
| 04:05:14 | 2 | Q. In 1999? |
| 04:05:16 | 3 | Q. And you became a lieutenant? |
| 04:05:17 | 4 | A. Yes. |
| 04:05:17 | 5 | Q. And when did that take place? |
| 04:05:20 | 6 | A. I think it was October 2010. |
| 04:05:21 | 7 | Q. What is your current assignment as a lieutenant? |
| 04:05:23 | 8 | A. I am the tactical lieutenant for the 22nd district. |
| 04:05:28 | 9 | Q. 22nd district on the south side? |
| 04:05:31 | 10 | A. Yes, correct. |
| 04:05:32 | 11 | Q. Let's go back to 2006. At that time, I think you said you |
| 04:05:36 | 12 | were .administrative sergeant of the records inquiry section |
| 04:05:39 | 13 | is that accurate? |
| 04:05:40 | 14 | A. That's correct. |
| 04:05:40 | 15 | Q. Can you tell the ladies and gentlemen of the jury exactly |
| 04:05:43 | 16 | what is the records inquiry section? |
| 04:05:47 | 17 | A. At that time, it was a section that was a multitude of |
| 04:05:51 | 18 | functions, they had many various units, subpoena section, |
| 04:05:56 | 19 | FOIA, administration, numerical, gun registration, records |
| 04:06:01 | 20 | processing, data entry, and latent print examiners, there's |
| 04:06:07 | 21 | many. |
| 04:06:08 | 22 | Q. And as the administrative sergeant, you were a supervisor |
| 04:06:11 | 23 | overall of those different areas? |
| 04:06:13 | 24 | A. Yes, we had civilians who supervised all of them. |
| 04:06:18 | 25 | Q. Was the records inquiry section part of the records |

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:06:22 1 | division?

04:06:22 2 | A. Yes.

04:06:22 3 | Q. And you said that the subpoena unit was part -- under that

04:06:26 4 | whole umbrella?

04:06:27 5 | A. That's correct.

04:06:28 6 | Q. Where was your office located in 2006?

04:06:32 7 | A. In 2006, my office was located on the first floor in the

04:06:37 8 | back of the unit.

04:06:38 9 | Q. And where was that?

04:06:39 10 | A. 3510 South Michigan.

04:06:41 11 | Q. Is that police headquarters?

04:06:43 12 | A. Yes, it is.

04:06:44 13 | Q. As the administrative sergeant for the records inquiry

04:06:48 14 | section, what was your role with respect to the subpoena unit?

04:06:52 15 | A. With respect to the subpoena unit, we had a civilian

04:06:58 16 | supervisor, detective Martin who handled the day-to-day

04:07:01 17 | operations and my role just came if anything went wrong or she

04:07:05 18 | wasn't there, somebody had a complaint, it might be forwarded

04:07:08 19 | to my attention and then I would take care of it.

04:07:11 20 | Q. How long did you hold the position of administrative

04:07:16 21 | sergeant for records inquiry section?

04:07:18 22 | A. A little over five years.

04:07:20 23 | Q. During that time period, how many people worked in the

04:07:25 24 | subpoena unit?

04:07:25 25 | A. I'd say approximately eight.

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 172 of 215 PageID #:64911

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:07:28   1    Q. Were they full-time employees?

04:07:30   2    A. Yes, they were.

04:07:30   3    Q. Did they work five days a week?

04:07:33   4    A. Correct.

04:07:33   5    Q. So do you have any idea how many subpoenas were served on

04:07:37   6    the Chicago Police Department on a weekly basis in 2006?

04:07:41   7    A. Not offhand, but it's many.

04:07:43   8    Q. All right. So you had eight individuals working five days

04:07:47   9    a week, eight hours a day doing nothing but responding to

04:07:52  10    subpoenas to the Chicago Police Department?

04:07:54  11    A. That's correct.

04:07:54  12    Q. Did you actually process any subpoenas yourself when you

04:08:04  13    were the administrative sergeant?

04:08:05  14    A. No, I did not.

04:08:06  15    Q. You just oversaw the people who did that work?

04:08:10  16    A. That's correct.

04:08:10  17    Q. I think you said that sometimes there might be a problem

04:08:16  18    and you would have to get involved?

04:08:17  19    A. That is correct.

04:08:18  20    Q. If there was a problem with a subpoena and somebody said I

04:08:22  21    want to talk to a supervisor, you might have been one of those

04:08:25  22    people?

04:08:25  23    A. That's correct.

04:08:25  24    Q. Now?

04:08:29  25       MS. GORMAN: Objection to time period.

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:08:30 | 1 | THE COURT:  Do that with the next question. |
| 04:08:34 | 2 | BY MR. MICHALIK: |
| 04:08:34 | 3 | Q.  All right.  So you're talking about the time frame of 2005 |
| 04:08:38 | 4 | to 2010 when you were the administrative sergeant? |
| 04:08:40 | 5 | A.  That's correct. |
| 04:08:40 | 6 | Q.  When the subpoena unit responded to a subpoena, would |
| 04:08:46 | 7 | there be someone assigned to go through each and every page of |
| 04:08:49 | 8 | whatever it was that was being produced in response to the |
| 04:08:52 | 9 | subpoena? |
| 04:08:53 | 10 | A.  No, that would be the subpoena officer, yes, they would go |
| 04:08:56 | 11 | through the subpoena for sure. |
| 04:08:57 | 12 | Q.  Would anyone go through whatever ^  was being produced and |
| 04:09:01 | 13 | pull things out? |
| 04:09:02 | 14 | A.  No. |
| 04:09:02 | 15 | Q.  So whatever materials were being received by the subpoena |
| 04:09:07 | 16 | unit, that's what would be forwarded to whoever it was that |
| 04:09:10 | 17 | was requesting that? |
| 04:09:11 | 18 | A.  That's correct. |
| 04:09:11 | 19 | Q.  You talked a little bit to Ms. Gorman about how the |
| 04:09:21 | 20 | subpoena unit would respond to a subpoena for a homicide file. |
| 04:09:25 | 21 | Do you recall that testimony? |
| 04:09:26 | 22 | A.  Yes. |
| 04:09:27 | 23 | Q.  All right.  So let's start.  The subpoena comes in to the |
| 04:09:32 | 24 | subpoena unit, correct? |
| 04:09:34 | 25 | A.  Correct. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 174 of 215 PageID #:64913
***REALTIME UNEDITED TRANSCRIPT ONLY***

173

04:09:34   1   Q.  All right.  What happens at that point if it's a homicide

04:09:40   2   file?

04:09:40   3   A.  A copy of the subpoena is sent directly to the detective

04:09:43   4   division.

04:09:43   5   Q.  Is the detective division part of the records division?

04:09:48   6   A.  No.

04:09:48   7   Q.  Okay.  What if any role did the detective division play in

04:09:52   8   responding to subpoenas involving homicide files?

04:09:54   9   A.  They would send whatever they had back to the subpoena

04:09:59   10  section and the subpoena section would take whatever they had

04:10:03   11  and forward it out.

04:10:03   12  Q.  So the detective division would contact whoever it was

04:10:06   13  that they were looking for a homicide file and then send

04:10:10   14  whatever they got to the subpoena unit?

04:10:12   15  A.  Correct.

04:10:13   16  Q.  Now, Ms. Gorman also asked you some questions about a

04:10:23   17  contact that you had from an attorney ^ Jean ^ Gene Snyder.

04:10:26   18  Do you recall those questions?

04:10:26   19  A.  Yes.

04:10:26   20  Q.  All right.  And Ms. Snyder brought some type of a problem

04:10:31   21  to your attention, true?

04:10:32   22  A.  True.

04:10:33   23  Q.  Did you respond to whatever it was that Ms. Snyder was

04:10:38   24  requesting?

04:10:38   25  A.  Yes, I did.

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 175 of 215 PageID #:64914
***REALTIME UNEDITED TRANSCRIPT ONLY***

174

| | | |
|---|---|---|
| 04:10:39 | 1 | Q. How did you know that? |
| 04:10:41 | 2 | A. Because once she gave the fax ^ once I found out that I |
| 04:10:46 | 3 | had the fax that had my name on it, although it was spelled |
| 04:10:50 | 4 | incorrectly, it was my name and it was me, I was sure that the |
| 04:10:54 | 5 | spoken was handled appropriately. |
| 04:10:56 | 6 | Q. After that ^ contact with Ms. Snyder, did she ever get in |
| 04:11:01 | 7 | touch with you again about any further problems she was |
| 04:11:04 | 8 | having? |
| 04:11:04 | 9 | A. No. |
| 04:11:05 | 10 | Q. Did you ever learn from anyone in the subpoena unit that |
| 04:11:07 | 11 | Ms. Snyder was continuing to have problems with whatever it |
| 04:11:11 | 12 | was that she was requesting? |
| 04:11:11 | 13 | A. No. |
| 04:11:12 | 14 | Q. Going back to the process of responding to a subpoena for |
| 04:11:26 | 15 | a homicide file, when that file would come in from the |
| 04:11:31 | 16 | detective division, would it be the original file or it would |
| 04:11:35 | 17 | be a copy of a file? |
| 04:11:36 | 18 | A. A copy. |
| 04:11:49 | 19 | MR. MICHALIK: If I may have a moment, your Honor. |
| 04:11:54 | 20 | THE COURT: Sure. |
| 04:11:55 | 21 | MR. MICHALIK: No further questions. Thank you. |
| 04:11:57 | 22 | THE COURT: Mr. Kulwin, anything? |
| 04:11:58 | 23 | MR. KULWIN: No, Judge. |
| 04:11:59 | 24 | THE COURT: Redirect, Ms. Gorman. |
| 04:12:01 | 25 | MR. LOEVY: Yes, very briefly. |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 176 of 215 PageID #:64915
***REALTIME UNEDITED TRANSCRIPT ONLY***

175

| | | |
|---|---|---|
| 04:12:02 | 1 | - - - |
| 04:12:02 | 2 | ^ WITNAME, REDIRECT EXAMINATION |
| 04:12:03 | 3 | BY MR. NOLAND: |
| 04:12:03 | 4 | BY MS. GORMAN: |
| 04:12:04 | 5 | Q. Lieutenant Melean, Ms. Snyder was complaining because she |
| 04:12:09 | 6 | didn't get all of the files from the Fields, from the Hickman |
| 04:12:14 | 7 | Smith murder? |
| 04:12:15 | 8 | A. I believe there was a problem with one of the case |
| 04:12:19 | 9 | reports. I don't recall which file it was, but, yes. |
| 04:12:21 | 10 | Q. She never got this file, did she? |
| 04:12:23 | 11 | A. I have no idea. |
| 04:12:23 | 12 | Q. You have no idea, don't you. Because the records people |
| 04:12:26 | 13 | would send the request to the homicide -- to the detectives |
| 04:12:29 | 14 | and they would send whatever they wanted back to her isn't |
| 04:12:33 | 15 | that correct? |
| 04:12:33 | 16 | MR. MICHALIK: Object to the form. |
| 04:12:33 | 17 | BY MR. LOEVY: |
| 04:12:34 | 18 | Q. And that's what you would produce? |
| 04:12:36 | 19 | THE COURT: Rephrase the question. |
| 04:12:37 | 20 | BY MR. LOEVY: |
| 04:12:38 | 21 | Q. The records? |
| 04:12:38 | 22 | THE COURT: You got two questions in there. |
| 04:12:40 | 23 | BY MR. LOEVY: |
| 04:12:40 | 24 | Q. The records people would send the request to the homicide |
| 04:12:44 | 25 | -- to the detective division isn't that correct? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:12:46   1   A. Correct.

04:12:46   2   Q. And then the detectives would send something back to you?

04:12:50   3   A. Yes.

04:12:50   4   Q. And that's what you would produce isn't that correct?

04:12:53   5   A. That's correct.

04:12:53   6   Q. And you understand that Ms. Snyder never got this file;

04:12:53   7   isn't that correct?

04:12:59   8   A. I did not know she never got the file.

04:13:04   9       MS. GORMAN: Thank you. I am done.

04:13:05   10       THE COURT: Mr. Michalik.

04:13:42   11       MR. MICHALIK: No.

04:13:42   12       THE COURT: Do the jurors have any questions?

04:13:50   13   (Sidebar.

04:13:51   14       THE COURT: The question is who filled the request at

04:13:54   15   the detective division, is it the detective or anybody else?

04:13:56   16   I'll ask him if he knows. I'll lay the foundation.

04:14:02   17    (The following proceedings were had in open court in the

04:14:03   18   presence and hearing of the jury:)

04:14:03   19       THE COURT: So the question is do you know -- at the

04:14:05   20   detective division, do you know who type of personnel fills

04:14:09   21   the request that is sent to the detective or.

04:14:14   22       THE WITNESS: No, I believe they had their own person

04:14:16   23   in place.

04:14:17   24       THE COURT: But you don't know exactly who that would

04:14:19   25   be.

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 178 of 215 PageID #:64917
11/17/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

177

| | | |
|---|---|---|
| 04:14:20 | 1 | THE WITNESS: I don't know exactly what it is right |
| 04:14:21 | 2 | now. |
| 04:14:21 | 3 | THE COURT: Well, back at the time in question here |
| 04:14:25 | 4 | when this particular subpoena came in, do you know whether the |
| 04:14:28 | 5 | person on the other end filling the request would have been a |
| 04:14:32 | 6 | detective or somebody other than a detective? |
| 04:14:35 | 7 | THE WITNESS: I believe at that time it was an |
| 04:14:37 | 8 | officer. |
| 04:14:37 | 9 | THE COURT: An officer. Follow-up questions? |
| 04:14:39 | 10 | MR. LOEVY: No, your Honor. |
| 04:14:40 | 11 | MR. MICHALIK: No. |
| 04:14:41 | 12 | THE COURT: Thanks. You are excused. |
| 04:14:43 | 13 | Next witness, please. |
| 04:14:44 | 14 | MR. LOEVY: Your Honor, the next witness is going to |
| 04:14:47 | 15 | be a reader and perhaps the Court could explain this is trial |
| 04:14:50 | 16 | testimony from 1986 of a witness. Carlos Willis. |
| 04:14:56 | 17 | THE COURT: What's going to happen next is that some |
| 04:14:59 | 18 | of the testimony from the 1986 criminal trial is going to be |
| 04:15:03 | 19 | read to you and it's the testimony of Carlos. |
| 04:15:08 | 20 | MR. LOEVY: Carlos Willis. |
| 04:15:09 | 21 | THE COURT: Carlos Willis and so the gentleman at the |
| 04:15:12 | 22 | podium is going to ask the questions that the lawyer asked in |
| 04:15:15 | 23 | the 19 '86 trial and the gentleman on the witness stand is |
| 04:15:18 | 24 | going to read the answers that Mr. Willis gave at the trial, |
| 04:15:21 | 25 | so I am not going to swear them in because all they are doing |

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:15:25  1   is reading testimony.  Can you identify what you are

04:15:44  2   /#12K3W4R-7 my name is same h-e-p-p-e-l-l, my name is /KAOEUL

04:15:49  3   b-u-l-l-o-c-k, he is the witness.

04:15:53  4            THE COURT:  Go ahead.

04:15:56  5                              - - -

04:15:56  6            CARLOS WILLIS, DIRECT EXAMINATION

04:15:57  7   BY MR. HEPPELL:  (Reading:)

04:15:57  8   Q.  Sir, I want you to state your name and spell your last

04:16:01  9   name for the record?

04:16:02  10  A.  Carlos Willis, w-i-l-l-i-s.

04:16:05  11  Q.  Where do you live?

04:16:05  12  A.  3846, south Langley.

04:16:08  13  Q.  That's in the City of Chicago?

04:16:11  14  A.  Yes.

04:16:13  15  Q.  How old are you?

04:16:14  16  A.  16.

04:16:15  17  Q.  Are you in school?

04:16:16  18  A.  Yes.

04:16:21  19  Q.  What school?

04:16:22  20  A.  When Dell Phillips.

04:16:25  21  Q.  What grade are you in?

04:16:26  22  A.  11th.

04:16:27  23  Q.  Did you go out for any sports?

04:16:30  24  A.  Yes.

04:16:30  25  Q.  What sports?

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:16:30 | 1 | A. Baseball. |
| 04:16:31 | 2 | Q. Who did you live with on Langley? |
| 04:16:33 | 3 | A. My grandmother. |
| 04:16:33 | 4 | Q. How long have you lived at that address? |
| 04:16:35 | 5 | A. I have been living there all my life. |
| 04:16:37 | 6 | Q. Calling your attention to April 28, 1984, did you have |
| 04:16:45 | 7 | cakes to be near the baseball field located across from 706 |
| 04:16:49 | 8 | East 39th Street? |
| 04:16:50 | 9 | A. Yes. |
| 04:16:51 | 10 | Q. What were you doing there? |
| 04:16:53 | 11 | A. We was getting ready to play baseball. |
| 04:16:57 | 12 | Q. Who else was there with you that you remember? |
| 04:16:59 | 13 | A. Randy Langston. |
| 04:17:00 | 14 | Q. Anybody else? |
| 04:17:02 | 15 | A. I think his little sister Marcia. |
| 04:17:05 | 16 | Q. Where were you standing at that time, across the street? |
| 04:17:11 | 17 | A. Standing right by the personal, by the mailbox. |
| 04:17:14 | 18 | Q. Now, did you know a person by the name of Fuddy? |
| 04:17:18 | 19 | A. Yes. |
| 04:17:19 | 20 | Q. Do you know his name? |
| 04:17:21 | 21 | A. No. |
| 04:17:22 | 22 | Q. How long had you known Fuddy? |
| 04:17:25 | 23 | A. About two years. |
| 04:17:26 | 24 | Q. Do you know a person by the name of Tom? |
| 04:17:30 | 25 | A. No. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 04:17:31 | 1 | Q. Did you see Fuddy that morning? |
| 04:17:34 | 2 | A. Earlier in the day. |
| 04:17:36 | 3 | Q. Where was he standing? |
| 04:17:38 | 4 | A. Under the building. |
| 04:17:39 | 5 | Q. While you were standing at the baseball field, did you |
| 04:17:45 | 6 | hear anything unusual? |
| 04:17:46 | 7 | A. Yes. |
| 04:17:47 | 8 | Q. What did you hear? |
| 04:17:50 | 9 | A. I heard gunshots. |
| 04:17:51 | 10 | Q. How many shots did you hear? |
| 04:17:57 | 11 | A. About six. |
| 04:17:57 | 12 | Q. Which direction did you go after you heard the shots? |
| 04:18:03 | 13 | What did you do after you heard the shots? |
| 04:18:05 | 14 | A. I ran south. |
| 04:18:07 | 15 | Q. Would that be south along what street? |
| 04:18:13 | 16 | A. Langley, going towards Oakwood. |
| 04:18:15 | 17 | Q. Where was Randy Langston at that time? |
| 04:18:17 | 18 | A. I don't know. |
| 04:18:18 | 19 | Q. After you heard shots, did you have occasion to look back |
| 04:18:24 | 20 | towards the building? |
| 04:18:25 | 21 | A. Yes. |
| 04:18:26 | 22 | Q. When you looked back towards the building, what did you |
| 04:18:31 | 23 | see? |
| 04:18:31 | 24 | A. I seen one man going under the building. |
| 04:18:34 | 25 | Q. When you say under the building, where was he going? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 182 of 215 PageID #:64921
***REALTIME UNEDITED TRANSCRIPT ONLY***

181

| | | |
|---|---|---|
| 04:18:38 | 1 | A. Through the breezeway. |
| 04:18:40 | 2 | Q. Could you see that man's face? |
| 04:18:44 | 3 | A. No. |
| 04:18:45 | 4 | Q. Why not? |
| 04:18:46 | 5 | A. Because he had something on, a ski mask. |
| 04:18:51 | 6 | Q. Where was the ski mask? |
| 04:18:54 | 7 | A. It was on his head. |
| 04:18:55 | 8 | Q. Now, after the shots, did you return back to the building |
| 04:19:00 | 9 | sometime later that day? |
| 04:19:01 | 10 | A. Yes. |
| 04:19:02 | 11 | Q. Did you speak with police officers either that day or the |
| 04:19:07 | 12 | next day? |
| 04:19:08 | 13 | A. The next morning. |
| 04:19:08 | 14 | Q. Where did the police officers come to? |
| 04:19:11 | 15 | A. To my house. |
| 04:19:13 | 16 | Q. And did you tell them what you have just told to the |
| 04:19:17 | 17 | judge? |
| 04:19:17 | 18 | A. Yes. |
| 04:19:17 | 19 | Q. Now, calling your attention to about a year later, May |
| 04:19:24 | 20 | 1985, did the police once again come to your house? |
| 04:19:27 | 21 | A. Yes. |
| 04:19:28 | 22 | Q. Do you know the name of the officer that came to your |
| 04:19:31 | 23 | house on that day? |
| 04:19:32 | 24 | A. Yes.  His name was O'Callaghan. |
| 04:19:34 | 25 | Q. Now, what, if anything, did you do when Detective |

| | | |
|---|---|---|
| 04:19:42 | 1 | O'Callaghan came to your house that day in May of 1985? |
| 04:19:45 | 2 | A. Well, he asked us to go down to the police station. |
| 04:19:51 | 3 | Q. He asked you to go to the police station? |
| 04:19:53 | 4 | A. Yes. |
| 04:19:53 | 5 | Q. Did you go to the police station? |
| 04:19:55 | 6 | A. Yes. |
| 04:19:57 | 7 | Q. Who else went with you? |
| 04:19:58 | 8 | A. My grandmother. |
| 04:20:00 | 9 | Q. What's your grandmother's name? |
| 04:20:02 | 10 | A. Evelyn Custer. |
| 04:20:05 | 11 | Q. When you went to that police station, what did you do? |
| 04:20:10 | 12 | A. He showed up, he showed us a lineup of men. |
| 04:20:15 | 13 | Q. And were you able to identify anybody in that lineup? |
| 04:20:18 | 14 | A. No. |
| 04:20:19 | 15 | Q. Now, I would like to show you what's been previously |
| 04:20:24 | 16 | marked as Defense Exhibit number 6. Do you recognize this |
| 04:20:29 | 17 | photograph, what's shown in this photograph? |
| 04:20:31 | 18 | A. Yes. |
| 04:20:31 | 19 | Q. What is that? |
| 04:20:33 | 20 | A. That's the men in the lineup. |
| 04:20:35 | 21 | Q. Is that the same lineup that you saw? |
| 04:20:38 | 22 | A. Yes. |
| 04:20:39 | 23 | Q. After you indicated that you couldn't identify anybody, |
| 04:20:44 | 24 | what did Detective O'Callaghan say to you? |
| 04:20:47 | 25 | A. He kept telling me to look at this one man. |

| | | |
|---|---|---|
| 04:20:51 | 1 | Q.  Which man was that? |
| 04:20:55 | 2 | A.  The one on the left end. |
| 04:20:57 | 3 | Q.  Would you please place an X over that man's head.  May the |
| 04:21:02 | 4 | record reflect the witness has placed an X over the defendant, |
| 04:21:05 | 5 | Earl Hawkins. |
| 04:21:10 | 6 | How many times did he ask you to look at that one |
| 04:21:12 | 7 | man? |
| 04:21:13 | 8 | A.  About five or six. |
| 04:21:14 | 9 | Q.  Was your grandmother present at that time? |
| 04:21:17 | 10 | A.  Yes. |
| 04:21:18 | 11 | Q.  What else did he say to you about identifying that man? |
| 04:21:22 | 12 | A.  I kept asking me to look at him to make sure that I know |
| 04:21:26 | 13 | him.  I told him I didn't see him and I didn't know who did |
| 04:21:32 | 14 | it, so I couldn't identify him. |
| 04:21:36 | 15 | Q.  Was there any conversation about section 8 housing? |
| 04:21:40 | 16 | A.  Yes. |
| 04:21:40 | 17 | Q.  Who was that conversation with? |
| 04:21:43 | 18 | A.  With my grandmother and O'Callaghan. |
| 04:21:45 | 19 | Q.  You were in the same room when that was going on? |
| 04:21:49 | 20 | A.  Yes, in my house and at the police station. |
| 04:21:52 | 21 | Q.  Now, in April of 1984, you knew Randy Langston, right? |
| 04:21:59 | 22 | A.  Yes. |
| 04:22:00 | 23 | Q.  Was he a member of any gang? |
| 04:22:02 | 24 | A.  Not that I know of. |
| 04:22:04 | 25 | Q.  Do you know anybody by the name of Gerald Morris? |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 185 of 215 PageID #:64924
***REALTIME UNEDITED TRANSCRIPT ONLY***

184

| | | |
|---|---|---|
| 04:22:10 | 1 | A. No. |
| 04:22:10 | 2 | Q. How about Richard Buckles? |
| 04:22:12 | 3 | A. Yes. |
| 04:22:13 | 4 | Q. Is Richard Buckles a member of a gang? |
| 04:22:16 | 5 | A. I don't think so. |
| 04:22:16 | 6 | Q. I would like to show you what's been marked as Defense |
| 04:22:23 | 7 | Exhibit number 1. Do you recognize what's shown in that |
| 04:22:26 | 8 | photograph? |
| 04:22:26 | 9 | A. Yes. |
| 04:22:26 | 10 | Q. What's shown in that photograph? |
| 04:22:30 | 11 | A. This shows the baseball park where we were playing and the |
| 04:22:33 | 12 | building. |
| 04:22:33 | 13 | Q. Do you see the direction in which you ran after you heard |
| 04:22:36 | 14 | the shots? |
| 04:22:37 | 15 | A. Yes. |
| 04:22:47 | 16 | MR. NOLAND: This would be the cross-examination by |
| 04:22:49 | 17 | Mr. R-u-e-k-k-e-r-it, the assistant state's attorney. |
| 04:22:55 | 18 | BY MR. NOLAND: |
| 04:22:56 | 19 | Q. Carlos, where you live is known as the Ida B. Wells |
| 04:23:00 | 20 | housing project, right? |
| 04:23:01 | 21 | A. Yes. |
| 04:23:02 | 22 | Q. You're right across Langstonly from that 706 building, |
| 04:23:05 | 23 | correct? |
| 04:23:06 | 24 | A. Correct. |
| 04:23:06 | 25 | Q. Now, you say that Fuddy was a member of the Goon Squad? |

04:23:09   1   A.  Yes.

04:23:09   2   Q.  You know that because you were a member of the Goon Squad?

04:23:12   3   A.  No.

04:23:12   4   Q.  You're familiar with the El Rukns, aren't you?

04:23:14   5   A.  Yes.

04:23:14   6   Q.  You know where the El Rukn temple is, don't you?

04:23:18   7   A.  Yes.

04:23:18   8   Q.  In fact, if you stand out in front of your building, you
04:23:21   9   can see the El Rukn temple, can't you?

04:23:23  10   A.  No.

04:23:23  11   Q.  If you walk to the corner of Langley and 39th Street, you
04:23:29  12   could see it, couldn't you?

04:23:31  13   A.  Yes.

04:23:31  14   Q.  You could see it from the baseball field, right?

04:23:34  15   A.  Yes.

04:23:34  16   Q.  You were living in those Ida B. Wells project buildings
04:23:38  17   when this murder happened, right?

04:23:39  18   A.  Yes.

04:23:40  19   Q.  How did you know Fuddy was in the Goon Squad?

04:23:45  20   A.  Because I know you still live in that same building today,
04:23:53  21   right ^  .

04:23:54  22   A.  Yes.

04:23:54  23   Q.  You can still see the El Rukn temple if you walk to the
04:23:59  24   corner of Langley and 39th Street, right?

04:24:01  25   A.  Yes.

| 04:24:01 | 1 | Q. How far would you say your building is from the corner of |
| 04:24:05 | 2 | 39th and Langley? |
| 04:24:06 | 3 | A. It's about half a block. |
| 04:24:07 | 4 | Q. Now, you remember talking to the police after this |
| 04:24:09 | 5 | incident, don't you? |
| 04:24:10 | 6 | A. Yes. |
| 04:24:10 | 7 | Q. You told the police you saw two men out there shooting, |
| 04:24:13 | 8 | right? |
| 04:24:14 | 9 | A. No. |
| 04:24:14 | 10 | Q. Do you remember talking to Robert Evans and detective |
| 04:24:18 | 11 | hood? |
| 04:24:18 | 12 | A. No, just O'Callaghan. |
| 04:24:19 | 13 | Q. You don't remember talking to detectives hood and Evans? |
| 04:24:23 | 14 | A. It was somebody with them, but I do know who they was. |
| 04:24:27 | 15 | They didn't tell me their names. |
| 04:24:28 | 16 | Q. In April of '84, right after the shooting, did you talk to |
| 04:24:33 | 17 | some detectives? |
| 04:24:33 | 18 | A. The next morning. |
| 04:24:34 | 19 | Q. You told them what you had seen, didn't you? |
| 04:24:37 | 20 | A. Yes. |
| 04:24:37 | 21 | Q. Do you remember telling them you saw two guys out there |
| 04:24:41 | 22 | shooting? |
| 04:24:41 | 23 | A. No. |
| 04:24:42 | 24 | Q. Do you remember telling them after the shooting you saw |
| 04:24:45 | 25 | both men run back the way they came through the breezeway? |

| 04:24:50 | 1 | A. No. |
| 04:24:51 | 2 | Q. Do you remember telling them after a short time, you heard |
| 04:24:53 | 3 | a car door slam and the squealing of tires? |
| 04:24:57 | 4 | A. No. |
| 04:24:57 | 5 | Q. Do you remember telling them after the shooting you stood |
| 04:25:00 | 6 | together for several minutes with Randy Langston? |
| 04:25:01 | 7 | A. No. |
| 04:25:02 | 8 | Q. You do remember going to look at a lineup, though, don't |
| 04:25:05 | 9 | you? |
| 04:25:05 | 10 | A. Yes. |
| 04:25:05 | 11 | Q. That's after you talked to O'Callaghan, right? |
| 04:25:07 | 12 | A. Right. |
| 04:25:10 | 13 | Q. By the way, Carlos, have you ever been in that El Rukn |
| 04:25:14 | 14 | building at 39th and Drexel? |
| 04:25:15 | 15 | A. No. |
| 04:25:15 | 16 | Q. You don't spin records for the El Rukns on Friday nights? |
| 04:25:18 | 17 | A. No. |
| 04:25:18 | 18 | Q. Do you remember talking to O'Callaghan in April of this |
| 04:25:25 | 19 | year? |
| 04:25:25 | 20 | A. No. |
| 04:25:25 | 21 | Q. At your apartment? |
| 04:25:27 | 22 | A. No. |
| 04:25:27 | 23 | Q. With your grandmother present? |
| 04:25:30 | 24 | A. No. |
| 04:25:30 | 25 | Q. And sergeant Murphy present? |

| | | |
|---|---|---|
| 04:25:32 | 1 | A. No. |
| 04:25:32 | 2 | Q. Do you remember that conversation? |
| 04:25:34 | 3 | A. No. |
| 04:25:34 | 4 | Q. You don't telling them you pun records for the El Rukns? |
| 04:25:39 | 5 | A. No. |
| 04:25:39 | 6 | Q. Who's the first person that contacted you about this case? |
| 04:25:47 | 7 | A. O'Callaghan is the one that kept coming over to my house. |
| 04:25:50 | 8 | Q. How about Wednesday of last week? |
| 04:25:54 | 9 | A. I wasn't home. |
| 04:25:55 | 10 | Q. Didn't you get a subpoena? |
| 04:25:57 | 11 | A. My grandmother did. |
| 04:25:58 | 12 | Q. You didn't?  I'm sorry I didn't hear the answer? |
| 04:26:01 | 13 | A. No.  My grandmother got it. |
| 04:26:08 | 14 | MR. NOLAND:  Thank you. |
| 04:26:11 | 15 | THE COURT:  Now you are doing the redirect |
| 04:26:13 | 16 | examination from the trial?  /#12K3W4R-6 correct. |
| 04:26:18 | 17 | - - - |
| 04:26:18 | 18 | CARLOS WILLIS, REDIRECT EXAMINATION |
| 04:26:18 | 19 | BY MR. NOLAND: (Reading) |
| 04:26:20 | 20 | Q. This man drove you to court and home from court; is that |
| 04:26:20 | 21 | right? |
| 04:26:24 | 22 | A. Yes. |
| 04:26:24 | 23 | Q. That was all that he did? |
| 04:26:25 | 24 | A. Right. |
| 04:26:25 | 25 | Q. He never interviewed you about the case? |

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 190 of 215 PageID #:64928
11/17/16 PM                     ***REALTIME UNEDITED TRANSCRIPT ONLY***

189

| 04:26:28 | 1 | A. No. |
| 04:26:28 | 2 | Q. You first were interviewed by Mr. Smeeton and myself when |
| 04:26:32 | 3 | you were brought to court; is that right? |
| 04:26:32 | 4 | A. Yes. |
| 04:26:35 | 5 | Q. Prior to that you had been interviewed by the police? |
| 04:26:38 | 6 | A. Right. |
| 04:26:38 | 7 | Q. Mr. O'Callaghan? |
| 04:26:40 | 8 | A. O'Callaghan. |
| 04:26:40 | 9 | Q. And then the day after the shooting, you were interviewed |
| 04:26:43 | 10 | by the police also, right? |
| 04:26:44 | 11 | A. Yes.  ^  end of deposition. |
| 04:26:50 | 12 | THE COURT: Is that it? |
| 04:26:51 | 13 | MR. LOEVY: That's it, your Honor. |
| 04:26:52 | 14 | THE COURT: Okay. You can step down. |
| 04:26:54 | 15 | Next witness. |
| 04:26:54 | 16 | MR. LOEVY: Your Honor, at this time plaintiff calls |
| 04:26:56 | 17 | Mr. O'Callaghan. |
| 04:27:18 | 18 | (Witness sworn.) |
| 04:27:18 | 19 | THE COURT: Have a seat. |
| 04:27:28 | 20 | - - - |
| 04:27:28 | 21 | DAVID O'CALLAGHAN, DIRECT EXAMINATION |
| 04:27:28 | 22 | BY MR. LOEVY: |
| 04:27:36 | 23 | Q. Sir, if you would state your name for the record, please. |
| 04:27:38 | 24 | A. David O'Callaghan, that's O'Callaghan. |
| 04:27:43 | 25 | Q. And you are a former Chicago police officer, correct? |

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 191 of 215 PageID #:64930
11/17/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

190

| | | |
|---|---|---|
| 04:27:47 | 1 | A. Yes, sir. |
| 04:27:47 | 2 | Q. All right. I want to shoot your attention forward to err |
| 04:27:53 | 3 | I can Langston. You did investigate the Smith/Hickman |
| 04:27:56 | 4 | homicide, correct? |
| 04:27:56 | 5 | A. Yes, sir, I did. |
| 04:27:57 | 6 | Q. And in the process you developed some eyewitnesss against |
| 04:28:00 | 7 | Mr. Fields and Mr. Hawkins, correct? |
| 04:28:02 | 8 | A. That would be correct. |
| 04:28:03 | 9 | Q. And one of the eyewitnesss you developed was Eric |
| 04:28:06 | 10 | Langston, correct? |
| 04:28:06 | 11 | A. Yes, he was among them. |
| 04:28:07 | 12 | Q. That was the man who was in court an hour ago? |
| 04:28:10 | 13 | A. Yes, sir. |
| 04:28:11 | 14 | Q. Did you remember him? |
| 04:28:12 | 15 | A. Yes, I remembered him. |
| 04:28:13 | 16 | Q. All right. Do you remember his relationship to Randy |
| 04:28:17 | 17 | Langston? |
| 04:28:17 | 18 | A. I think they were Eric and Randy, they were brothers. |
| 04:28:28 | 19 | Correct. I'm sorry. You asked me his relationship to Randy, |
| 04:28:32 | 20 | brothers. |
| 04:28:32 | 21 | Q. Thank you. |
| 04:28:33 | 22 | Do you remember how old Eric was at the time? |
| 04:28:36 | 23 | A. I believe he was -- I know he said 10 or 11, but I believe |
| 04:28:41 | 24 | he was about 15. |
| 04:28:42 | 25 | Q. 14 sound right? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:28:43  1   A.  It's right in that area, yes.

04:28:45  2   Q.  All right.  And do you remember where Eric Langston was at

04:28:49  3   the time of the shootings?

04:28:50  4   A.  Eric Langston?

04:28:57  5   Q.  Yes?

04:28:57  6   A.  I believe he was in his apartment.

04:28:59  7   Q.  He was indoors at the time of the shooting, correct?

04:29:02  8   A.  I believe that's what he just said, yes.

04:29:04  9   Q.  Is that how you remembered it?

04:29:05 10   A.  I'd have to look at all my reports, but, yeah, probably,

04:29:08 11   it would say that.

04:29:09 12   Q.  You got an eyewitnesss ID from a guy who was inside,

04:29:13 13   didn't you?

04:29:13 14   A.  Yes.

04:29:13 15   Q.  And his apartment in fact was in the back of the building,

04:29:18 16   wasn't it?

04:29:19 17   A.  Back and the side, yes.

04:29:21 18   Q.  Do you remember where his apartment was, sir?

04:29:23 19   A.  Yes.

04:29:23 20   Q.  Now, what description did Eric Langston give you of the

04:29:32 21   two men he saw shooting the victims prior to you showing him

04:29:37 22   photos in a lineup?

04:29:39 23   A.  I didn't take a full description that day, just indicated

04:29:43 24   that he would be able to identify them.

04:29:44 25   Q.  I didn't ask you if you took a full description.  I said

| | | |
|---|---|---|
| 04:29:49 | 1 | what description was Eric Langston able to provide you of the |
| 04:29:51 | 2 | shooters before you showed him the pictures of your suspects? |
| 04:29:54 | 3 | A.  I didn't take a description. |
| 04:29:55 | 4 | Q.  So, in other words, he was unable to describe anything, |
| 04:29:58 | 5 | wasn't he? |
| 04:29:59 | 6 | MR. KULWIN:  Objection, argumentative, Judge. |
| 04:30:01 | 7 | THE COURT:  Overruled. |
| 04:30:02 | 8 | THE WITNESS:  I didn't ask key questions because I |
| 04:30:05 | 9 | knew I was going to bring him to a different location later, |
| 04:30:08 | 10 | so the answer is, no, I didn't ask all those questions. |
| 04:30:12 | 11 | MR. LOEVY:  Your Honor, I'd ask that that be |
| 04:30:14 | 12 | stricken. |
| 04:30:14 | 13 | THE COURT:  Stricken as nonresponsive.  Put the |
| 04:30:17 | 14 | question again if you'd like. |
| 04:30:19 | 15 | BY MR. LOEVY: |
| 04:30:19 | 16 | Q.  If Eric was able to tell you before you showed him the |
| 04:30:22 | 17 | picture if the perpetrator was white or black? |
| 04:30:24 | 18 | A.  I didn't ask at that time. |
| 04:30:26 | 19 | Q.  Was Eric able to tell you if the person was tall or short? |
| 04:30:29 | 20 | A.  I didn't ask at that time. |
| 04:30:30 | 21 | Q.  How about if he had facial hair or a beard? |
| 04:30:32 | 22 | A.  I did not ask at that time. |
| 04:30:33 | 23 | Q.  Was it a real good idea to show him Mr. Fields' picture |
| 04:30:38 | 24 | before you asked him for a description? |
| 04:30:39 | 25 | A.  It was a perfect idea. |

04:30:41  1  Q.  Where are your notes, sir, of what Eric told you before

04:30:47  2  you showed him the photo and the lineup?

04:30:49  3  A.  I didn't take notes of those interviews on that day for my

04:30:54  4  own reasons.

04:30:54  5  Q.  The answer is there are no notes?

04:30:56  6  A.  There are no notes from that day, you are correct.

04:30:58  7  Q.  You are going to have to go off your memory, right, you

04:31:03  8  are going off your memory of what he told you, you don't have

04:31:06  9  notes?

04:31:06  10  A.  As I told you, I didn't ask him the questions.  My memory

04:31:09  11  is I spoke to him, made arrangements later.

04:31:12  12  Q.  I think we are talking past each other.  I asked you

04:31:14  13  you're going off your memory, right?

04:31:17  14        MR. KULWIN:  I am going to object.  The question is

04:31:20  15  argumentative.

04:31:20  16        THE COURT:  No, it's not.  The objection is

04:31:22  17  overruled.  ^ .

04:31:24  18        THE WITNESS:  I'm going off my police reports that I

04:31:27  19  submitted in the following dates.

04:31:28  20  BY MR. LOEVY:

04:31:29  21  Q.  And you know from your police reports that there is no

04:31:30  22  description, right?

04:31:33  23  A.  From my police reports?

04:31:34  24  Q.  Yes.

04:31:35  25  A.  From -- okay.  The answer is I knew descriptions and I did

04:31:43  1   not take full statements that day.

04:31:45  2   Q.  All right.  I will -- you didn't take any statement that

04:31:49  3   day, did you?

04:31:50  4   A.  On May 14th and 15?

04:31:52  5   Q.  Correct.

04:31:52  6   A.  No, I did not.

04:31:54  7   Q.  All right.  All I'm saying, sir, is do you have an

04:31:58  8   independent recollection of talking to Eric Langston all these

04:32:01  9   years later?

04:32:01  10  A.  I do.

04:32:02  11  Q.  So as you sit here today, you can remember the

04:32:04  12  conversation with Eric?

04:32:05  13  A.  Pretty good, as I told you, it wasn't much of a

04:32:09  14  conversation.  I remember speaking to the two --

04:32:12  15  Q.  It's more of a yes, no, question.  Do you remember it or

04:32:16  16  you don't?

04:32:16  17  A.  I remember meeting the Langston boys.

04:32:18  18  Q.  All right.  For example, you had a chance to review your

04:32:21  19  reports, right?

04:32:21  20  A.  I have reviewed them, yes.

04:32:23  21  Q.  And you know what they say, right?

04:32:24  22  A.  Basically.

04:32:26  23  Q.  So I guess with that clarity, are you saying you know what

04:32:29  24  happened because you read about it or are you saying as you

04:32:32  25  sit there on the witness stand, you can remember the

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 196 of 215 PageID #:64935
***REALTIME UNEDITED TRANSCRIPT ONLY***

195

04:32:34   1   conversation, you remember the questions you asked him, which

04:32:37   2   is it?

04:32:37   3   A.  The way your question is, the answer would be I didn't ask

04:32:41   4   him the loaded questions, so I can remember not asking him the

04:32:46   5   questions.

04:32:46   6   Q.  Do you think -- so you made an intentional decision prior

04:32:50   7   to showing Nate's photograph, you said to yourself, I'm not

04:32:53   8   going to ask him to tell me what the guy looked like, that was

04:32:56   9   a decision you made?

04:32:56   10          MR. KULWIN:  Judge, I am going to object to the

04:32:58   11  question implying that he only showed him Nate's photograph.

04:33:01   12          THE COURT:  Overruled.

04:33:02   13          MR. LOEVY:  Objection to argumentative.

04:33:03   14          THE COURT:  Overruled.  I don't want a speaking

04:33:07   15  objection.  Just give me a short version.

04:33:11   16          The objection is overruled.

04:33:13   17  BY MR. LOEVY:

04:33:13   18  Q.  It sounds like you made an intentional decision not to

04:33:17   19  take a statement before you showed the pictures?

04:33:20   20  A.  I made an intentionality decision not to take statements

04:33:25   21  or show photos on the dates of May 14th and 15th, yes.

04:33:28   22  Q.  Prior to showing Nate in a lineup, you made an intentional

04:33:33   23  decision not to write what the kid had told you?

04:33:35   24  A.  That's incorrect, sir.  That's incorrect.

04:33:37   25  Q.  You didn't write down what the kid told you as far as a

| | | |
|---|---|---|
| 04:33:40 | 1 | description prior to Nate's lineup, right? |
| 04:33:42 | 2 | A.  Your reference is incorrect. |
| 04:33:43 | 3 | Q.  Okay.  What description did he provide and where is it |
| 04:33:47 | 4 | written? |
| 04:33:47 | 5 | MR. KULWIN:  Judge, I am going to object as asked and |
| 04:33:50 | 6 | answered. |
| 04:33:50 | 7 | THE COURT:  Overruled. |
| 04:33:50 | 8 | THE WITNESS:  Descriptions were in the initial |
| 04:33:52 | 9 | reports.  I didn't repeat a summation of everybody's reports |
| 04:33:59 | 10 | that I had.  I didn't go into detail as to description.  He |
| 04:34:04 | 11 | already gave me a photo ID of Nate. |
| 04:34:09 | 12 | BY MR. LOEVY: |
| 04:34:10 | 13 | Q.  All right.  Let's move forward.  It's a good idea when you |
| 04:34:13 | 14 | are interviewing people like the Langstons not to have people |
| 04:34:17 | 15 | together? |
| 04:34:17 | 16 | A.  Yes. |
| 04:34:17 | 17 | Q.  You should separate them? |
| 04:34:19 | 18 | A.  Yes. |
| 04:34:19 | 19 | Q.  Now, when you interviewed Randy Langston's little brother |
| 04:34:23 | 20 | Eric and Gerald Morris were also present for that interview |
| 04:34:26 | 21 | isn't that true, sir? |
| 04:34:27 | 22 | A.  That's another incorrect statement on your part. |
| 04:34:29 | 23 | Q.  Do you remember giving testimony at the trial in 1986 and |
| 04:34:33 | 24 | being asked these questions and giving these answers on page |
| 04:34:36 | 25 | 272 and 273 at line 20: Is? |

04:34:41   1          "QUESTION:  Now when you interviewed Randy Langston on

04:34:43   2   the 16th, that was at the state's attorney's office?  And your

04:34:46   3          "ANSWER:  That's correct

04:34:48   4          "QUESTION:  And was Gerald Morris also present?

04:34:50   5          "ANSWER:  He was up there, yes

04:34:52   6          "QUESTION:  Was Eric Langston also present?

04:34:55   7          "ANSWER:  Yes, sir."

04:34:58   8          The question is did you give those questions under

04:35:00   9   oath, sir?

04:35:01  10   A.  I'll just answer as you read that, the answer is yes, the

04:35:06  11   inference is wrong.

04:35:07  12   Q.  Okay.  But you did give those answers under oath?

04:35:09  13   A.  Yes, as you read them correctly, yes.

04:35:12  14   Q.  Now, your report records -- showing you Plaintiff's

04:35:19  15   Exhibit 86, page 28.  This is a report you signed and

04:35:25  16   authored, correct?

04:35:26  17   A.  Yes.

04:35:26  18   Q.  Dated the 17th of June 1985?

04:35:29  19   A.  That's correct.

04:35:30  20   Q.  Now, Eric Langston is never -- no police officer written

04:35:35  21   down any description by Eric Langston until after the date

04:35:39  22   Nate is arrested on June 17th, 85, that is a true statement,

04:35:42  23   right?

04:35:42  24   A.  I don't know that.  I'd have to see every single report

04:35:46  25   again.


                   ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:35:46 | 1 | Q. Would it surprise you that Eric Langston had never given |
| 04:35:49 | 2 | any description prior to June? Yes or no, sir? |
| 04:35:56 | 3 | A. No, I don't know. I just don't know. I'm sorry. |
| 04:35:58 | 4 | Q. Isn't it true, sir, that of every single witness who was |
| 04:36:01 | 5 | outside that day, not a single one of them was able to provide |
| 04:36:05 | 6 | a single descriptor about what those men looked like, that's |
| 04:36:10 | 7 | true, isn't it? |
| 04:36:10 | 8 | A. On the day of the shooting? |
| 04:36:12 | 9 | Q. Yes. When the police came by the day of the shooting, not |
| 04:36:16 | 10 | one of the six witnesses who came forward and gave their names |
| 04:36:19 | 11 | and addresses was able to give a single description, that's |
| 04:36:22 | 12 | true, isn't it? |
| 04:36:23 | 13 | A. That's absolutely false. |
| 04:36:24 | 14 | Q. Tell me which witness described the victims that day? |
| 04:36:27 | 15 | A. First of all, I don't have the scene. I didn't get |
| 04:36:30 | 16 | involved in this case until 1985. |
| 04:36:32 | 17 | Q. I just asked -- you said it was false? |
| 04:36:35 | 18 | A. The answer is false because if you look at the |
| 04:36:38 | 19 | supplementary reports that were generated on that day, |
| 04:36:41 | 20 | descriptions were taken by other detectives called the scene |
| 04:36:45 | 21 | detectives, there might be a half dozen of them on that day, |
| 04:36:50 | 22 | and police officers that did provide descriptions at least two |
| 04:36:56 | 23 | of the offenders. |
| 04:36:57 | 24 | Q. We will get back to that because it's getting late in the |
| 04:37:00 | 25 | day. Your understanding is there was eyewitnesss at the scene |

| | | |
|---|---|---|
| 04:37:04 | 1 | who provided descriptions before they were shown photos? |
| 04:37:06 | 2 | A.  A year before, more than a year before, yes. |
| 04:37:08 | 3 | Q.  All right.  Let's talk about Eric.  He was indoors, |
| 04:37:11 | 4 | correct?  We talked about that.  He gave you an identification |
| 04:37:14 | 5 | of the shooter, right? |
| 04:37:15 | 6 | A.  Shooters and passenger of the car, if I remember |
| 04:37:20 | 7 | correctly, but I'd have to review all my reports. |
| 04:37:23 | 8 | Q.  Showing the report I showed you previously, Eric Langston |
| 04:37:26 | 9 | viewed the lineup and positive? |
| 04:37:27 | 10 | MR. KULWIN:  Judge, can I get a page? |
| 04:37:29 | 11 | MR. LOEVY:  This is the following page, 8629. |
| 04:37:31 | 12 | MR. KULWIN:  86? |
| 04:37:32 | 13 | THE COURT:  Page 29. |
| 04:37:33 | 14 | BY MR. LOEVY: |
| 04:37:34 | 15 | Q.  Eric Langston vowed the lineup and positively identified |
| 04:37:36 | 16 | the subject Nathson Fields as one of the subjects who shot the |
| 04:37:40 | 17 | victim.  Do you see that? |
| 04:37:41 | 18 | A.  Yes, I wrote that. |
| 04:37:42 | 19 | Q.  And Eric would say at the time of the shooting at an |
| 04:37:46 | 20 | apartment behind the building; is that correct? |
| 04:37:49 | 21 | A.  That's correct. |
| 04:37:49 | 22 | Q.  Did you help Eric Langston identify the shooter? |
| 04:37:53 | 23 | A.  In so many words, absolutely not. |
| 04:37:56 | 24 | Q.  Eric identified other suspects for you, didn't he? |
| 04:37:58 | 25 | A.  I believe so. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:37:59  1  Q.  He identified Mr. Hawkins and Mr. Carter, right?

04:38:03  2  A.  That's correct.

04:38:03  3  Q.  So he was three for three on the suspects, right?

04:38:06  4  A.  He was three out of four, nobody ever identified Hank

04:38:12  5  Andrews, none of them.

04:38:13  6  Q.  We will talk about that tomorrow, sir.  Who did Eric

04:38:15  7  identify as the short?

04:38:16  8  A.  He identified Fields and Hawkins, I believe.

04:38:19  9  Q.  All right.  So Eric misidentified Hawkins, right?  That's

04:38:25  10  true, isn't it?

04:38:26  11          MR. KULWIN:  Judge, can he answer the question?

04:38:29  12          THE WITNESS:  I don't believe that's totally truism.

04:38:31  13  THE ATTORNEY:

04:38:31  14  Q.  All right.  Eric as part of your lineup procedure said he

04:38:38  15  was the shooter?

04:38:39  16  A.  He named him as one of the shooters.

04:38:41  17  Q.  And you later in the trial heard Hawkins say I wasn't one

04:38:45  18  of the shooters, right?

04:38:45  19  A.  I was excluded, no, I don't, I can't answer that question.

04:38:48  20  Q.  All right.  What is your understanding as you sit here

04:38:50  21  today of who the shooters were?

04:38:52  22  A.  My understanding is that Hawkins was out front as the look

04:38:59  23  out.

04:38:59  24  Q.  I asked the shooter?

04:39:00  25          MR. KULWIN:  Judge.


***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 202 of 215 PageID #:64941
***REALTIME UNEDITED TRANSCRIPT ONLY***

201

| | | |
|---|---|---|
| 04:39:01 | 1 | THE WITNESS:  My answer is that as you sit here |
| 04:39:06 | 2 | today, Carter and Mr. Fields were the shooters. |
| 04:39:08 | 3 | BY MR. LOEVY: |
| 04:39:08 | 4 | Q.  Can we agree that you procured a misidentification as |
| 04:39:12 | 5 | Hawkins as the shooter from Eric Langston? |
| 04:39:13 | 6 | A.  We can agree that I showed a photo array and followed the |
| 04:39:20 | 7 | leads and the identifications. |
| 04:39:21 | 8 | Q.  All right.  Eric was indoor and he identified a shooter, |
| 04:39:27 | 9 | correct? |
| 04:39:28 | 10 | A.  Shooters, yes. |
| 04:39:30 | 11 | Q.  And he also identified a get away car driver, right? |
| 04:39:34 | 12 | A.  No, you're wrong on that issue totally. |
| 04:39:38 | 13 | Q.  He did not identify George Carter as the guy in the car? |
| 04:39:40 | 14 | A.  He identified George Carter as the passenger of the car. |
| 04:39:46 | 15 | Q.  All right. |
| 04:39:46 | 16 | A.  And getting out of the car, he let the other two in the |
| 04:39:50 | 17 | back seat, nobody was able to identify the driver of that car. |
| 04:39:53 | 18 | Q.  All right.  You used the same 14 year old eyewitness to |
| 04:39:57 | 19 | both identify the shooter in the front of the building and the |
| 04:40:01 | 20 | get away passenger in the back of the building, right, same |
| 04:40:04 | 21 | boy? |
| 04:40:04 | 22 | A.  I think -- I think they identified him in the back, so as |
| 04:40:09 | 23 | the shooters is running away from the scene. |
| 04:40:12 | 24 | Q.  The question was the same boy identified the shooter who |
| 04:40:16 | 25 | shot the -- the shooting that happened in the front and the |

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 203 of 215 PageID #:64942
***REALTIME UNEDITED TRANSCRIPT ONLY***

202

| 04:40:22 | 1 | driver that was parked in the back, right, the same boy? |
| 04:40:25 | 2 | A. I think you are misstating. George Carter was not |
| 04:40:29 | 3 | identified by them as a shooter that day. |
| 04:40:31 | 4 | Q. No, George was identified as someone in the car, right? |
| 04:40:34 | 5 | A. Someone was -- he became a front seat passenger, yes. |
| 04:40:40 | 6 | Q. And the car was behind the building, right? |
| 04:40:44 | 7 | A. To my information, yes. |
| 04:40:47 | 8 | Q. So it's pretty impossible for somebody to have both |
| 04:40:50 | 9 | identified the shooter who is in the front? |
| 04:40:52 | 10 | MR. KULWIN: Objection, argumentative, Judge. |
| 04:40:54 | 11 | MR. LOEVY: I will withdraw it, your Honor. |
| 04:40:56 | 12 | BY MR. LOEVY: |
| 04:40:57 | 13 | Q. Now, Eric would not come to court and give that |
| 04:41:00 | 14 | identification, would he, at the criminal trial, he didn't |
| 04:41:05 | 15 | want to do it? |
| 04:41:06 | 16 | A. George Carter? |
| 04:41:07 | 17 | Q. No? |
| 04:41:08 | 18 | A. Which Carter are we talk about? |
| 04:41:11 | 19 | Q. When, said you got to come to court, you got to identify |
| 04:41:15 | 20 | the men that you saw, right? |
| 04:41:16 | 21 | A. I did not. |
| 04:41:17 | 22 | Q. Did you speak to Eric Langston prior to the trial? |
| 04:41:20 | 23 | A. No, that would be handled by the state's attorney's. |
| 04:41:23 | 24 | Q. So why is it the detectives wouldn't talk to witnesses |
| 04:41:29 | 25 | before trials? |

04:41:29  1  A.  I am not going to say never ever.

04:41:31  2  Q.  You talked to quite a few of the witnesses before the

04:41:33  3  trials, didn't you?

04:41:34  4  A.  I may have.

04:41:35  5  Q.  All right.  Now, Eric in any event did not want to testify

04:41:40  6  at trial, correct?

04:41:41  7  A.  I don't think any of them were too happy about testifying

04:41:45  8  in that trial.

04:41:45  9  Q.  Yeah.  Would you be happy to testify at a trial about

04:41:48  10  somebody you didn't see?

04:41:49  11         MR. KULWIN:  Objection, your Honor.  Argumentative.

04:41:50  12         THE COURT:  Sustained.  The objection is sustained.

04:41:52  13         MR. LOEVY:  We ask that the answer be stricken too,

04:41:54  14  your Honor.

04:41:55  15         THE WITNESS:  I didn't answer.

04:41:56  16         MR. LOEVY:  When he said anybody would be unhappy.

04:41:58  17         THE WITNESS:  I didn't say that.

04:41:59  18         MR. LOEVY:  I will move on.

04:42:00  19         THE COURT:  Overruled.

04:42:01  20  BY MR. LOEVY:

04:42:01  21  Q.  Now, when Eric didn't come to trial, you testified at

04:42:06  22  trial, correct?

04:42:09  23         MR. KULWIN:  Objection.

04:42:10  24         THE COURT:  You have to rephrase the question,

04:42:12  25  please.

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 205 of 215 PageID #:64944

| | | |
|---|---|---|
| 04:42:12 | 1 | BY MR. LOEVY: |
| 04:42:13 | 2 | Q.  You testified at Nate's trial, didn't you? |
| 04:42:15 | 3 | A.  I did, both of them. |
| 04:42:17 | 4 | Q.  And you testified to the Court that you had procured an |
| 04:42:23 | 5 | identification from Eric Langston of Nathson Fields, didn't |
| 04:42:26 | 6 | you? |
| 04:42:26 | 7 | A.  Both times, yes. |
| 04:42:28 | 8 | Q.  All right.  Take can a look at your testimony from June |
| 04:42:31 | 9 | 18th, 1986, this is page 268, line 8:.  Isn't it true you gave |
| 04:42:36 | 10 | the following testimony: |
| 04:42:37 | 11 | Who viewed the lineup, if you recall? |
| 04:42:42 | 12 | "ANSWER:  The same three parties, Randy Langston and |
| 04:42:45 | 13 | Gerald Morris and Eric Langston. |
| 04:42:46 | 14 | "QUESTION:  Did they follow the same procedure in |
| 04:42:48 | 15 | viewing the lineup as you used when the lineup was conducted |
| 04:42:51 | 16 | on Earl Hawkins? |
| 04:42:52 | 17 | "ANSWER:  Yes |
| 04:42:54 | 18 | "QUESTION:  And by that I mean they viewed it |
| 04:42:56 | 19 | separately? |
| 04:42:57 | 20 | "ANSWER:  They did |
| 04:42:58 | 21 | "QUESTION:  Did you say anything to these individuals |
| 04:42:59 | 22 | prior to them viewing the lineup? |
| 04:43:01 | 23 | "ANSWER:  I just told them that they are not to speak |
| 04:43:03 | 24 | to each other and moved them to separate rooms |
| 04:43:06 | 25 | "QUESTION:  Did any of the three make an identification |

11/17/16 PM

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 206 of 215 PageID #:64945
***REALTIME UNEDITED TRANSCRIPT ONLY***

205

| | | |
|---|---|---|
| 04:43:10 | 1 | of Nathson Fields at that time? |
| 04:43:12 | 2 | "ANSWER:  And you said they did and the question was |
| 04:43:15 | 3 | who did they identify? |
| 04:43:17 | 4 | "ANSWER:  They identified Mr. Fields as one of the |
| 04:43:18 | 5 | shooters |
| 04:43:19 | 6 | "QUESTION:  All of them?  Your answer was yes, they |
| 04:43:22 | 7 | did, correct |
| 04:43:23 | 8 | A.  That's correct. |
| 04:43:23 | 9 | Q.  At Mr. Fields' capital murder trial, you took the stand |
| 04:43:26 | 10 | and put your credibility behind that identification, didn't |
| 04:43:29 | 11 | you? |
| 04:43:29 | 12 | A.  As I do in all cases. |
| 04:43:32 | 13 | MR. KULWIN:  Objection, Judge, argumentative. |
| 04:43:33 | 14 | THE COURT:  Overruled.  He said as I do in all cases. |
| 04:43:36 | 15 | The answer can stand. |
| 04:43:36 | 16 | BY MR. LOEVY: |
| 04:43:37 | 17 | Q.  And you asked the judge to accept the premise that Eric |
| 04:43:40 | 18 | Langston had legitimately identified Nate Fields, didn't you? |
| 04:43:44 | 19 | A.  Yes, because he did. |
| 04:43:45 | 20 | MR. LOEVY:  I have no further questions, I guess, |
| 04:43:48 | 21 | your Honor.  I am not done with the witness. |
| 04:43:50 | 22 | THE COURT:  Are you changing topics at this point? |
| 04:43:51 | 23 | MR. LOEVY:  Yes. |
| 04:43:52 | 24 | THE COURT:  We are pretty close to 4:45.  We are |
| 04:43:54 | 25 | going to stop for the day.  Remember tomorrow slightly earlier |

11/17/16 PM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:44:00 | 1 | start time, 9:00 o'clock.  Don't discuss the case.  (The jury |
| 04:44:46 | 2 | leaves the courtroom.) |
| 04:44:46 | 3 | THE COURT:  Okay.  Since you're being questioned by |
| 04:44:53 | 4 | the other side's lawyer, you cannot discuss your testimony |
| 04:44:55 | 5 | with anyone.  Do you understand? |
| 04:44:57 | 6 | THE WITNESS:  I remember all those rules, yes, sir. |
| 04:44:59 | 7 | THE COURT:  Anything anybody needs to take up? |
| 04:45:01 | 8 | MR. LOEVY:  Something important from plaintiff, your |
| 04:45:02 | 9 | Honor. |
| 04:45:03 | 10 | MR. KULWIN:  I'll yield. |
| 04:45:04 | 11 | MR. LOEVY:  All right.  Here is the issue, your |
| 04:45:06 | 12 | Honor. |
| 04:45:06 | 13 | THE COURT:  You people don't have to be standing up |
| 04:45:08 | 14 | unless you really desperately want to. |
| 04:45:11 | 15 | MR. LOEVY:  We received notification today that the |
| 04:45:12 | 16 | federal government has filed a motion to get a sentence |
| 04:45:16 | 17 | reduction for Derrick Kees.  I haven't yet read the motion. |
| 04:45:20 | 18 | THE COURT:  Okay. |
| 04:45:21 | 19 | MR. LOEVY:  We are not asking your Honor to do |
| 04:45:22 | 20 | anything right now.  We haven't read it.  I would like to |
| 04:45:25 | 21 | point out that this is a civil case, this is a witness in a |
| 04:45:29 | 22 | civil case getting a benefit to testify.  In my view that is |
| 04:45:33 | 23 | no different than if we had given Derrick Kees $10,000 to |
| 04:45:37 | 24 | testify to our story.  This is not a plea bargain in context. |
| 04:45:40 | 25 | He is getting a sentence break. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 208 of 215 PageID #:64947
11/17/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

207

| | | |
|---|---|---|
| 04:45:41 | 1 | THE COURT:  Okay. |
| 04:45:42 | 2 | MR. LOEVY:  To testify. |
| 04:45:44 | 3 | THE COURT:  What are you asking? |
| 04:45:45 | 4 | MR. LOEVY:  We are going to be asking you to bar him. |
| 04:45:47 | 5 | THE COURT:  I've dealt with that motion I think three |
| 04:45:49 | 6 | or four times in this case. |
| 04:45:50 | 7 | MR. LOEVY:  Well. |
| 04:45:50 | 8 | THE COURT:  Maybe most of them before you were in it. |
| 04:45:54 | 9 | MR. LOEVY:  The only difference is before they could |
| 04:45:55 | 10 | say it was in connection with the certificate of innocence |
| 04:45:58 | 11 | proceeding and the State of Illinois was involved, now this is |
| 04:46:02 | 12 | a civil matter. |
| 04:46:02 | 13 | THE COURT:  Whatever the arguments were made, I |
| 04:46:05 | 14 | believe that the basis on which I denied the motion every time |
| 04:46:08 | 15 | it's been presented to me and I think -- I've written a lot of |
| 04:46:12 | 16 | stuff in this case.  I think that one of these was in writing, |
| 04:46:14 | 17 | but I am not a hundred percent positive.  I don't think that's |
| 04:46:19 | 18 | an appropriate remedy.  It's a matter to take up on |
| 04:46:21 | 19 | cross-examination. |
| 04:46:23 | 20 | MR. LOEVY:  All right.  Then, your Honor, what we |
| 04:46:25 | 21 | would ask is a complete and total and full disclosure of, you |
| 04:46:29 | 22 | know, how is it that the federal government negotiated a plea |
| 04:46:32 | 23 | agreement for Derrick Kees in a case that the federal |
| 04:46:34 | 24 | government is not a party to the undisputed and sole benefit |
| 04:46:38 | 25 | of these parties. |

11/17/16 PM   Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 209 of 215 PageID #:64948
***REALTIME UNEDITED TRANSCRIPT ONLY***

208

| | | |
|---|---|---|
| 04:46:39 | 1 | THE COURT:  Do we know what the motion says? |
| 04:46:41 | 2 | MR. LOEVY:  I know the title is the motion to reduce |
| 04:46:44 | 3 | sentence. |
| 04:46:44 | 4 | THE COURT:  All right.  Hang on a second.  Let me see |
| 04:46:48 | 5 | if I can pull it up, just a second. |
| 04:46:49 | 6 | MR. KULWIN:  Judge. |
| 04:46:50 | 7 | THE COURT:  Let me see if I can pull it up here. |
| 04:46:52 | 8 | Just a second. |
| 04:46:53 | 9 | MR. KULWIN:  Sure. |
| 04:46:59 | 10 | THE COURT:  K-e-e-s? |
| 04:47:05 | 11 | MR. ART:  Do you want the case number, your Honor? |
| 04:47:08 | 12 | THE COURT:  No, it's easier to pull it up by his |
| 04:47:11 | 13 | name.  Derrick do we think? |
| 04:47:14 | 14 | MR. ART:  That's right. |
| 04:47:15 | 15 | MR. KULWIN:  K-e-e-s-. |
| 04:47:17 | 16 | THE COURT:  I've got it.  I am going to assume it's |
| 04:47:21 | 17 | at the end.  It's a relatively safe assumption. |
| 04:47:27 | 18 | Okay.  It's docket number 5867.  Let me take a look |
| 04:47:34 | 19 | at it.  Well, just to be clear about it, the motion |
| 04:47:50 | 20 | specifically says that the sentence reduction is being granted |
| 04:47:55 | 21 | because of his anticipated testimony in this trial.  The |
| 04:48:02 | 22 | government anticipates -- I am reading from page 2. |
| 04:48:05 | 23 | The government anticipates that Kees will soon |
| 04:48:10 | 24 | testify again in a Section 1980 trial in which El Rukn gang |
| 04:48:12 | 25 | member Nathson Fields was convicted of murder in 1986 alleges |

04:48:14  1  that he was framed by law enforcement.  The trial before Judge

04:48:18  2  Kennelly began on Monday, November 13th, 2016.

04:48:22  3          Kees has agreed to provide truthful testimony in that

04:48:24  4  trial to show that Nathson Fields was not framed and in fact

04:48:26  5  participated in the murder.  Because of this additional act of

04:48:29  6  substantial assistance did not become useful to the government

04:48:32  7  until long after his initial sentencing and because its

04:48:34  8  usefulness could not have reasonably been anticipated by Kees

04:48:38  9  through this motion, the government seeks a reduction in

04:48:41  10  sentence from Kees pursuant to Rule 35 asking to reduce it,

04:48:45  11  his federal sentence, from whatever it was before to 12 years,

04:48:49  12  so that he will be eligible for release in approximately

04:48:52  13  November 2021, the equivalent of his one-third federal parole

04:48:57  14  date.

04:48:57  15          You can read it yourself.  It's about -- it's a

04:49:06  16  pretty long motion actually.  It goes through a lot of

04:49:09  17  history.  I'm guessing it's maybe in front of a judge who is

04:49:12  18  different from the one who sentenced him originally.  It's

04:49:15  19  about a 19-page motion with about 30 pages of exhibits.

04:49:19  20          MR. LOEVY:  Your Honor, we do intend to file

04:49:21  21  something, we hope you will at least hear what we have to say.

04:49:23  22          THE COURT:  File what you are going to file.  Do we

04:49:26  23  know -- are you calling him?

04:49:27  24          MR. LOEVY:  We would call him if you don't bar him.

04:49:32  25          THE COURT:  If I don't bar him, you will call him.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 211 of 215 PageID #:64950
11/17/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

210

04:49:34  1        MR. LOEVY:  None of us wants a situation where we

04:49:36  2   find out later about deals or understandings or agreements.  I

04:49:41  3   think we can -- we won't do it on the spot but to fully

04:49:45  4   disclose every communication between this table and the

04:49:47  5   federal government and, you know, how -- well, you get the

04:49:50  6   idea.

04:49:51  7        THE COURT:  So, look, okay.  Does anybody on the

04:49:53  8   other side want to talk about this at all?  So the thing that

04:49:57  9   I think that I have on the table is a -- is a request for

04:50:02  10  discovery, I guess is what I would call it, request for

04:50:05  11  discovery of any communications between any person or

04:50:11  12  associated with the defense team and federal government

04:50:15  13  regarding Kees.

04:50:16  14       MR. LOEVY:  Yes, at a minimum.

04:50:18  15       THE COURT:  There you go.  Does anybody have an

04:50:21  16  objection to me telling you to respond to that kind of request

04:50:25  17  in fairly short order?

04:50:27  18       MR. KULWIN:  Well, I guess before I say anything,

04:50:29  19  Judge, I would say that Mr. Walsh and.

04:50:32  20       THE COURT:  Who is Mr. Walsh.

04:50:33  21       MR. KULWIN:  Tom Walsh from the civil division and

04:50:36  22  Mr. Kuhn sent an email to all parties some time ago, a couple

04:50:41  23  weeks ago, and said that all benefits that were given, every

04:50:46  24  single benefit that was given to Mr. Kees that was going to be

04:50:49  25  given -- that had been or will be given prior to his testimony

11/17/16 PM
Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 212 of 215 PageID #:64951
***REALTIME UNEDITED TRANSCRIPT ONLY***

211

04:50:55 1  will be disclosed by the federal government.  They'll show

04:50:59 2  them everything that there is.  So I think that that cuts to

04:51:03 3  the heart of they can cross-examine them all about it.

04:51:06 4          THE COURT:  Like I say, I have given some comments

04:51:10 5  about the request to bar.  I understand I'm going to get a

04:51:13 6  motion.  That's not what I'm asking right now.

04:51:16 7          MR. KULWIN:  You want to know all.

04:51:17 8          THE COURT:  Would you like me to repeat myself.

04:51:19 9          MR. KULWIN:  No, I don't have a problem with any of

04:51:22 10 my professional communications.

04:51:24 11         THE COURT:  What does that mean?

04:51:25 12         THE WITNESS:

04:51:26 13         MR. KULWIN:  Well, I have been friends with Jim Kuhn

04:51:30 14 for a long time.  About his health, his kids.

04:51:33 15         THE COURT:  Anything you all want to say, Mr. Noland

04:51:36 16 or Mr. Burns.

04:51:37 17         MR. NOLAND:  We'd like to take a look at the motion.

04:51:39 18         THE COURT:  What I'm entertaining right now is an

04:51:42 19 oral motion by Mr. Loevy asking to serve a discovery request

04:51:47 20 by letter, I assume, he is asking for any communications

04:51:52 21 between anybody associated with the defense.  You will word it

04:51:57 22 however you want.  And anybody associated with the federal

04:52:02 23 government related to Mr. Kees.

04:52:05 24         MR. NOLAND:  I don't think we have any communication.

04:52:07 25 We sent a letter months ago asking for --


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

04:52:09  1         THE COURT:  You can serve that request.  And it's

04:52:12  2    answerable within 24 hours after you serve it.

04:52:14  3         MR. LOEVY:  Thank you, your Honor.  Owe we object.

04:52:19  4         THE COURT:  As far as the rest of it is concerned,

04:52:21  5    you will file whatever motion you are going to file when you

04:52:24  6    file it and I will deal with it.

04:52:25  7         MR. LOEVY:  Thank you.

04:52:26  8         THE COURT:  I will ask people if they want to respond

04:52:28  9    to it.

04:52:29  10        MR. KULWIN:  I have something unrelated.  It goes to

04:52:31  11   Mr. O'Callaghan's testimony.  It goes to the whole motion in

04:52:34  12   limine idea, Judge.

04:52:35  13        THE COURT:  The whole motion in limine idea?

04:52:40  14        MR. KULWIN:  The motion in limine.  This is how I

04:52:43  15   understand, Mr. Noland correct me if I'm wrong because I read

04:52:45  16   the transcripts a lot of times.  At the second and -- the

04:52:49  17   second trial, I think the ruling was was that the way the

04:52:53  18   malicious prosecution claim was structured, this came up

04:52:56  19   before --

04:52:57  20        THE COURT:  I am just going to tell you that if

04:52:59  21   you're going to talk to me about a ruling you made, you need

04:53:03  22   to do me the favor of showing it to me, particularly if it's

04:53:05  23   something that's made in the course of the transcript.  If

04:53:08  24   it's a written ruling, I can pull it up very easily.  If it's

04:53:11  25   a transcript, I need to see it.

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 214 of 215 PageID #:64953
11/17/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

213

04:53:13   1          MR. KULWIN:  We will need to get it to you early.  It

04:53:15   2   really is -- the summary of it is and we will get that to you

04:53:20   3   tomorrow before court, the summary is that my understanding is

04:53:23   4   that the lawyers Sexton and Hogan can talk about the benefits

04:53:29   5   -- can talk the information the informants gave, the El Rukn

04:53:36   6   informants, but Murphy, Brannigan and O'Callaghan couldn't

04:53:40   7   testify what they knew.  It had to come in through Hogan and

04:53:44   8   Sexton.

04:53:45   9          At the damages trial, though, you did allow

04:53:49   10  Mr. O'Callaghan to testify to show no malice that between 86

04:53:53   11  and 09 when he was prosecuted again, he knew about the

04:53:57   12  informants and now we're in a combined proceeding and I'm a

04:54:01   13  little -- that's why Mr. Noland and I the other day, he was

04:54:05   14  saying you can't do this and I was saying I intended to and

04:54:09   15  you said you better not do anything in violation.  We will get

04:54:12   16  you the orders.  That's my recollection.

04:54:14   17         THE COURT:  I can't comment one way or the other

04:54:15   18  until I know -- like I say, do me the favor of showing me what

04:54:21   19  I said.

04:54:22   20         MR. LOEVY:  If it's a motion to reconsider.

04:54:23   21         THE COURT:  I don't know if it's a motion to

04:54:24   22  reconsider.  The way it's being referred to is it's not a

04:54:27   23  motion to reconsider.  I don't know one way or the other and I

04:54:31   24  am done talking about it.

04:54:32   25         What else?


                       ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-55 Filed: 03/15/24 Page 215 of 215 PageID #:64954

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:54:33   1              MR. LOEVY:  Nothing from plaintiff.

04:54:34   2              THE COURT:  9:00 o'clock, ready to go.  Thanks.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25