# Exhibit EEE

| | | |
|---|---|---|
| 01:24:23 | 1 | Judge Kennelly, December 5, 2016, 1:25 p.m. |
| 01:25:06 | 2 | THE CLERK:  10 C 1168, Fields v. City. |
| 01:27:45 | 3 | THE COURT:  All right.  Are we good to go? |
| 01:27:47 | 4 | MR. KULWIN:  Well, go ahead. |
| 01:27:48 | 5 | MR. LOEVY:  We want to raise the Kuhn issue, your |
| 01:27:51 | 6 | Honor. |
| 01:27:52 | 7 | THE COURT:  Is he back? |
| 01:27:54 | 8 | MR. KULWIN:  He is.  And I talked to him over lunch |
| 01:27:56 | 9 | and told him to come back at 1:30.  Sorry, Judge. |
| 01:28:00 | 10 | MR. LOEVY:  I had a chance to speak to him briefly, |
| 01:28:02 | 11 | too.  He hasn't looked or searched or done any looking yet. |
| 01:28:05 | 12 | Your Honor, from our perspective, the issue is this.  Those |
| 01:28:09 | 13 | Murphy notes are important, those are the ones where it says |
| 01:28:13 | 14 | -- you know the issue.  So either the U.S. Attorney's Office |
| 01:28:15 | 15 | has some original notes or they have no original notes.  If |
| 01:28:18 | 16 | they have some original notes, then we are going to want an |
| 01:28:21 | 17 | explanation for why they have not these original notes.  I |
| 01:28:25 | 18 | think it might be based on our informal research, they might |
| 01:28:29 | 19 | have no original notes.  In which case we believe what's going |
| 01:28:32 | 20 | on is the Chicago Police Department does not -- the U.S. |
| 01:28:34 | 21 | Attorney's Office does not take custody of the original notes. |
| 01:28:36 | 22 | So it will not be enough if he comes here and says I can't |
| 01:28:41 | 23 | find these notes. |
| 01:28:42 | 24 | THE COURT:  I would rather talk about what the |
| 01:28:43 | 25 | consequences are once I hear what the guy has to say rather |

12/05/16 PM
Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 3 of 174 PageID #:65296
***REALTIME UNEDITED TRANSCRIPT ONLY***

2

01:28:47  1    than go through this exercise of speculating.

01:28:50  2         MR. LOEVY:  Okay.  We are going to read two things

01:28:53  3    and then discovery and then rest.

01:28:55  4         THE COURT:  The criminal trial excerpt?

01:28:57  5         MR. LOEVY:  Yes.

01:28:57  6         THE COURT:  And discovery responses of some sort.

01:29:00  7         MR. LOEVY:  Yes.

01:29:01  8         THE COURT:  When you rest, you are going to say

01:29:03  9    subject to dealing with exhibits because we need to get

01:29:06  10   together and discuss what's in and what's not in.

01:29:08  11        MR. KULWIN:  One other point of inquiry.  Did I miss

01:29:12  12   hear, I am sure I misheard, that Friday you have to miss some

01:29:16  13   time for a conference?

01:29:17  14        THE COURT:  It's possible, that I am going to have to

01:29:20  15   miss part of the morning which given where it is in the

01:29:23  16   morning might mean we just do an afternoon.  You just do like

01:29:27  17   a 12:00 to the end of the day or something like that.

01:29:29  18        MR. KULWIN:  Just looking for a time.

01:29:35  19        THE COURT:  It's really a crucial issue for people, I

01:29:39  20   guess.

01:29:39  21        MR. KULWIN:  For guys like me.  You start to look

01:29:44  22   like Bozo after a while.

01:29:49  23        What else?

01:29:49  24        MR. LOEVY:  We are going to rest subject to.  We did

01:29:51  25   raise the law firm with you.

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 4 of 174 PageID #:65297

01:29:53    1          THE COURT:  What's that?

01:29:54    2          MR. LOEVY:  An issue that we may call.

01:29:57    3          THE COURT:  She is not available until later in the

01:29:58    4    week.  I'll let you reopen for that.

01:30:01    5          MR. LOEVY:  We have another stipulation out to them

01:30:04    6    for Kelly, but that will probably be rebuttal if we don't get

01:30:08    7    a stipulation.  That's what we are reserving too.

01:30:10    8          THE COURT:  Do you guys have witnesses?

01:30:11    9          MR. KULWIN:  We do.  I personally don't, but they are

01:30:17   10    in the record.

01:30:17   11          MR. LOEVY:  Hopefully, we can start moving.

01:30:20   12          THE COURT:  If he have a reader, they can come up.

01:30:37   13          MR. LOEVY:  Judge, do you want to wait for Kuhn?

01:30:41   14          THE COURT:  That clock is actually wrong.  I have

01:30:43   15    five clocks.  They all say different things, but that's the

01:30:47   16    slowest one.  That gets out voted and the others are right.

01:30:56   17          MR. KULWIN:  Mine says 1:29.

01:30:59   18          THE COURT:  If he is not here in one minute, then

01:31:01   19    somebody is going to need -- when he comes in, if somebody

01:31:04   20    gives him a note saying he needs to be up here at.

01:31:08   21          MR. KULWIN:  3:00?

01:31:11   22          THE COURT:  At 3:00 o'clock?

01:31:12   23          MR. KULWIN:  Do you want me to text?  I don't have to

01:31:16   24    be here for the reading.  I'll do that.

01:31:33   25      (The jury enters the courtroom.) Sam h-e-p-p-e-l-l, lawyer,

01:31:36   1   and Mark west is the reader

01:31:39   2        THE COURT:  Next is going to be some more testimony

01:31:42   3   from which criminal trial.

01:31:47   4        MR. HEPPELL:  The 1986 criminal trial.  Not the

01:31:50   5   actual witness,not the actual questioner.  It's the testimony

01:31:52   6   of whom?

01:31:53   7        MR. HEPPELL:  Torrence White, a portion from the

01:31:56   8   liability phase and a portion from the sentencing phase.

01:31:58   9        THE COURT:  You can proceed.

01:32:00  10                - - -

01:32:00  11      TORRENCE WHITE, DIRECT EXAMINATION, BY DEPOSITION

01:32:03  12   BY MR. HEPPELL: (Reading:)

01:32:03  13   Q.  Sir, I would like you to state your name and spell your

01:32:07  14   last name?

01:32:07  15   A.  Torrence White.

01:32:08  16   Q.  You have to speak up a lot louder than that.  Okay?

01:32:11  17        How old are you, Mr. White?

01:32:13  18   A.  16.

01:32:13  19   Q.  Are you a student?

01:32:14  20   A.  Yes.

01:32:14  21   Q.  Where do you go to school?

01:32:17  22   A.  Wendell Phillips.

01:32:18  23   Q.  What year are you?

01:32:19  24   A.  I'll be a sophomore.

01:32:21  25   Q.  Do you go out for any sports?

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 6 of 174 PageID #:65299

| 01:32:22 | 1 | A. Basketball and baseball. |
| 01:32:25 | 2 | Q. Where do you live, sir? |
| 01:32:27 | 3 | A. 706 East 39th Street. |
| 01:32:28 | 4 | Q. Which apartment? |
| 01:32:29 | 5 | A. 105. |
| 01:32:31 | 6 | Q. Calling your attention to April of 1984, where did you |
| 01:32:35 | 7 | live then? |
| 01:32:36 | 8 | A. 706 East 39th Street. |
| 01:32:38 | 9 | Q. How long had you lived there? |
| 01:32:39 | 10 | A. 16 years, all my life. |
| 01:32:43 | 11 | Q. In April of 1984, did you know a person by the name of |
| 01:32:47 | 12 | Fuddy? |
| 01:32:48 | 13 | A. Yes. |
| 01:32:48 | 14 | Q. How did you know him? |
| 01:32:51 | 15 | A. By my brother. |
| 01:32:52 | 16 | Q. Was he a friend of yours? |
| 01:32:54 | 17 | A. Yes, he was a good friend. |
| 01:32:56 | 18 | Q. You have to speak up, please. |
| 01:32:57 | 19 | How long had you known Fuddy? |
| 01:32:58 | 20 | A. About for a year. |
| 01:33:00 | 21 | Q. Did you know another person by the name of Tom? |
| 01:33:04 | 22 | A. Yes. |
| 01:33:04 | 23 | Q. Did you know his real name? |
| 01:33:06 | 24 | A. No. |
| 01:33:07 | 25 | Q. Do you know it now to be Talman Hickman? |

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 7 of 174 PageID #:65800

| | | |
|---|---|---|
| 01:33:09 | 1 | A. Yes. |
| 01:33:09 | 2 | Q. How long had you known Tom? |
| 01:33:12 | 3 | A. I've been knowing him for quite a while, about two or |
| 01:33:16 | 4 | three years. |
| 01:33:17 | 5 | Q. Was he also a friend of yours? |
| 01:33:18 | 6 | A. Yes. |
| 01:33:19 | 7 | Q. Do you know whether or not Fuddy was a head of or a member |
| 01:33:24 | 8 | of any gangs? |
| 01:33:24 | 9 | A. Yes. |
| 01:33:25 | 10 | Q. What gang? |
| 01:33:27 | 11 | A. Goon Squad. |
| 01:33:29 | 12 | Q. Calling your attention to about 10:15 in the morning of |
| 01:33:32 | 13 | April 28th, 1984, where were you? |
| 01:33:35 | 14 | A. Across the street from the 706 building. |
| 01:33:37 | 15 | Q. What were you doing? |
| 01:33:38 | 16 | A. Getting ready to play some baseball. |
| 01:33:40 | 17 | Q. What's located there? |
| 01:33:42 | 18 | A. The diamond, field diamond. |
| 01:33:45 | 19 | Q. Who were you with that morning? |
| 01:33:47 | 20 | A. Randy Langston, Carlos Willis. |
| 01:33:50 | 21 | Q. Was anybody else there on the field with you? |
| 01:33:54 | 22 | A. Yes, Randy's little nephew Mike, Michael. |
| 01:33:57 | 23 | Q. Where were you at that time in the field area? |
| 01:34:01 | 24 | A. I was by the Dimond gate. |
| 01:34:02 | 25 | Q. What was Randy doing? |

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 8 of 174 PageID #:65301

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 01:34:04 | 1 | A.  He was by the bench. |
| 01:34:05 | 2 | Q.  Where was Carlos Willis? |
| 01:34:06 | 3 | A.  He was about I would say one inch away from me.  He was |
| 01:34:10 | 4 | just -- he was just throwing the ball around. |
| 01:34:13 | 5 | Q.  You and he were throwing the ball around? |
| 01:34:15 | 6 | A.  Yes. |
| 01:34:16 | 7 | Q.  Was Randy participating in that? |
| 01:34:17 | 8 | A.  He was standing with his little nephew Michael by the |
| 01:34:22 | 9 | bench. |
| 01:34:22 | 10 | Q.  When you were out there in the baseball area, did you see |
| 01:34:26 | 11 | Fuddy or Tom? |
| 01:34:26 | 12 | A.  No.  I saw them when they came out of the house before I |
| 01:34:30 | 13 | came across the street. |
| 01:34:32 | 14 | Q.  Where did you see them? |
| 01:34:32 | 15 | A.  Under the building. |
| 01:34:34 | 16 | Q.  Is that the 706 building? |
| 01:34:35 | 17 | A.  Yes. |
| 01:34:35 | 18 | Q.  While you were out there on the baseball diamond, did you |
| 01:34:39 | 19 | hear anything unusual? |
| 01:34:40 | 20 | A.  Yes. |
| 01:34:41 | 21 | Q.  What did you hear? |
| 01:34:42 | 22 | A.  A shot. |
| 01:34:43 | 23 | Q.  How many shots did you hear? |
| 01:34:45 | 24 | A.  I heard one, then we started running, me and Randy and |
| 01:34:49 | 25 | Carlos, Randy picked up his little nephew Michael and we ran |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 9 of 174 PageID #:65302

01:34:55   1   down Langley towards Oakwood.

01:34:57   2   Q.  Did Randy run with you?

01:34:59   3   A.  Yes.

01:34:59   4   Q.  When you started running, was he right there with you?

01:35:02   5   A.  He was behind me.

01:35:03   6   Q.  How far behind you?

01:35:04   7   A.  About two feet.

01:35:05   8   Q.  And Carlos Willis, where was he?

01:35:08   9   A.  He was behind Randy.

01:35:10  10   Q.  How far did you run away from the building after you heard

01:35:15  11   the shots?

01:35:15  12   A.  To that brown cottage across down there by Langley and

01:35:20  13   Oakwood.

01:35:20  14   Q.  About how many blocks away is that?

01:35:23  15   A.  That's one block.

01:35:24  16   Q.  Did Randy run there with you?

01:35:26  17   A.  Yes.

01:35:26  18   Q.  After a period of time, did you return back to the

01:35:30  19   building?

01:35:30  20   A.  Yes, when we saw people coming downstairs.

01:35:33  21   Q.  When you returned back to the building, where was Randy?

01:35:37  22   A.  He was coming with us.

01:35:38  23   Q.  So Randy was with you the entire time?

01:35:41  24   A.  Yes.

01:35:41  25   Q.  And when you returned back to the building, did you see

| 01:35:45 | 1 | any bodies? |
| 01:35:45 | 2 | A. Yes. |
| 01:35:46 | 3 | Q. Those were whose bodies? |
| 01:35:48 | 4 | A. Fuddy and Tommy. |
| 01:35:51 | 5 | Q. And then people started to gather at that time? |
| 01:35:53 | 6 | A. Yes. |
| 01:35:53 | 7 | Q. Now, did the police speak with you on that day? |
| 01:35:56 | 8 | A. No. |
| 01:35:57 | 9 | Q. When is the first time that you spoke with the police? |
| 01:35:59 | 10 | A. A year later. |
| 01:36:01 | 11 | Q. By the way, do you know a person by the name of Richard |
| 01:36:05 | 12 | Buckles? |
| 01:36:05 | 13 | A. Yes. |
| 01:36:06 | 14 | Q. Do you know his nickname? |
| 01:36:07 | 15 | A. Yes. |
| 01:36:07 | 16 | Q. What's his nickname? |
| 01:36:09 | 17 | A. They call him bookie. |
| 01:36:12 | 18 | Q. Did you see him in the vicinity of the building at the |
| 01:36:16 | 19 | time you heard the shots? |
| 01:36:17 | 20 | A. No. |
| 01:36:17 | 21 | Q. Do you know a person by the name of Gerald Morris? |
| 01:36:20 | 22 | A. Yes. |
| 01:36:21 | 23 | Q. Do you know whether or not Gerald Morris is a member of a |
| 01:36:25 | 24 | gang? |
| 01:36:25 | 25 | A. Yes. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 01:36:25 | 1 | Q.  What gang? |
| 01:36:27 | 2 | A.  Goon Squad. |
| 01:36:28 | 3 | Q.  In April of 1984, did you know whether Randy Langston was |
| 01:36:34 | 4 | a member of a gang? |
| 01:36:36 | 5 | A.  Yes. |
| 01:36:36 | 6 | Q.  What gang? |
| 01:36:37 | 7 | A.  Goon Squad. |
| 01:36:38 | 8 | Q.  And when was it that you first spoke with the police, |
| 01:36:44 | 9 | Mr. White? |
| 01:36:44 | 10 | A.  It was a year later, they came to the -- |
| 01:36:46 | 11 | Q.  No, on May 18th of 1985, a year after the shooting, did |
| 01:36:51 | 12 | police come to your house? |
| 01:36:52 | 13 | A.  Yes. |
| 01:36:52 | 14 | Q.  And where did you go? |
| 01:36:54 | 15 | A.  On 51st. |
| 01:36:56 | 16 | Q.  What did you do when you were there? |
| 01:36:58 | 17 | A.  They wanted -- they pointed out some mens and asked me did |
| 01:37:04 | 18 | I know them.  I said no. |
| 01:37:05 | 19 | Q.  When you went to that lineup, were you able to identify |
| 01:37:09 | 20 | anyone? |
| 01:37:09 | 21 | A.  No. |
| 01:37:10 | 22 | Q.  I would like to show you what's been previously marked as |
| 01:37:14 | 23 | Defense Exhibit number 6.  Do you recognize what this photo |
| 01:37:17 | 24 | shows? |
| 01:37:17 | 25 | A.  No. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 12 of 174 PageID #:65305
12/05/16 PM            ***REALTIME UNEDITED TRANSCRIPT ONLY***

11

| | | |
|---|---|---|
| 01:37:18 | 1 | Q.  Do you recognize this to be the lineup? |
| 01:37:21 | 2 | A.  Yes.  That's the lineup. |
| 01:37:23 | 3 | Q.  Is that the same lineup that you saw? |
| 01:37:25 | 4 | A.  Yes. |
| 01:37:25 | 5 | Q.  You were unable to make any identification? |
| 01:37:28 | 6 | A.  Yes. |
| 01:37:29 | 7 | Q.  Was that detective conducting the lineup with you? |
| 01:37:32 | 8 | A.  Yes. |
| 01:37:33 | 9 | Q.  Did he say anything with regard to picking anybody out in |
| 01:37:37 | 10 | that lineup? |
| 01:37:39 | 11 | A.  Yes. |
| 01:37:39 | 12 | Q.  What did he say? |
| 01:37:40 | 13 | A.  He said that -- he said if I pick one of them out, they |
| 01:37:47 | 14 | would help us by the projects. |
| 01:37:49 | 15 | Q.  Did he single anybody out when he said that to you? |
| 01:37:52 | 16 | A.  Yes. |
| 01:37:53 | 17 | Q.  How many times did he point to that man? |
| 01:37:56 | 18 | A.  About two or three times. |
| 01:37:59 | 19 | Q.  Now, do you know the defendant Earl Hawkins? |
| 01:38:03 | 20 | A.  No. |
| 01:38:03 | 21 | Q.  Do you know the defendant Nathson Fields? |
| 01:38:06 | 22 | A.  No. |
| 01:38:07 | 23 | Q.  Are you a member of the El Rukns? |
| 01:38:09 | 24 | A.  No. |
| 01:38:10 | 25 | Q.  Are you a member of any gang? |

01:38:11    1    A.  No.

01:38:16    2                              - - -

01:38:16    3         TORRENCE WHITE, CROSS-EXAMINATION, BY DEPOSITION

01:38:16    4    BY MR. NOLAND:  (Reading:)

01:38:22    5    Q.  You had a conversation with that same detective just prior

01:38:25    6    to looking at the lineup, right?

01:38:27    7    A.  Right.

01:38:27    8    Q.  And in fact, when you looked at the lineup, didn't you

01:38:31    9    tell that detective that you had known Earl since he was a

01:38:33   10    baby?

01:38:34   11    A.  No, I didn't.  I didn't say that.

01:38:36   12    Q.  You didn't say that.

01:38:37   13         Didn't you tell that same detective that you weren't

01:38:40   14    an El Rukn but the El Rukns are cool with you?

01:38:42   15    A.  No, I didn't tell him that.

01:38:45   16    Q.  You know some El Rukns, don't you?  You know Assan

01:38:49   17    (phonetic)^ in dep trx, don't you?

01:38:49   18    A.  Yes .

01:38:51   19    Q.  Rodell Banks, right?

01:38:53   20    A.  Yes.

01:38:53   21    Q.  You know Rodell Banks very well, don't you?  He comes to

01:38:57   22    your apartment all the time, doesn't he?

01:38:59   23    A.  Not all the time.

01:39:00   24    Q.  He comes to see your mother, doesn't he?

01:39:04   25    A.  Yes.

| 01:39:04 | 1 | Q. Rodell Banks, has an is an El Rukn, isn't he? |
| 01:39:08 | 2 | A. Yes, I guess so.  I don't know. |
| 01:39:09 | 3 | Q. Yes, you guess so?  So you do know an El Rukn, don't you? |
| 01:39:14 | 4 | A. Yes. |
| 01:39:14 | 5 | Q. Assan, very well? |
| 01:39:17 | 6 | A. Not that well. |
| 01:39:18 | 7 | Q. He comes to see your mother, right? |
| 01:39:19 | 8 | A. Yes. |
| 01:39:20 | 9 | Q. 706 East 39th Street, he comes to see your mother, doesn't |
| 01:39:29 | 10 | he? |
| 01:39:29 | 11 | A. Yes. |
| 01:39:29 | 12 | Q. The same apartment you lived in in April when you say you |
| 01:39:32 | 13 | saw this shooting isn't that right? |
| 01:39:34 | 14 | A. Yes. |
| 01:39:34 | 15 | Q. The same apartment you live in today, right? |
| 01:39:36 | 16 | A. Right. |
| 01:39:36 | 17 | Q. The same apartment /HA*Z, the El Rukn, comes to visit you |
| 01:39:40 | 18 | in? |
| 01:39:40 | 19 | A. Right. |
| 01:39:41 | 20 | Q. Are you telling us /HA*Z is the only El Rukn you know? |
| 01:39:45 | 21 | A. Yes. |
| 01:39:45 | 22 | Q. Are you telling us /HA*Z is the only El Rukn you know? |
| 01:39:50 | 23 | A. Yes. |
| 01:39:51 | 24 | Q. You know where the El Rukns stay, don't you? |
| 01:39:54 | 25 | A. What? |

| | | |
|---|---|---|
| 01:39:55 | 1 | Q. You know where the El Rukn mosque is, don't you, the |
| 01:40:00 | 2 | temple? |
| 01:40:00 | 3 | A. Yes. |
| 01:40:00 | 4 | Q. On 39th and Drexel, right? |
| 01:40:03 | 5 | A. Yes. |
| 01:40:03 | 6 | Q. You can see the temple when you look out your front |
| 01:40:07 | 7 | window? |
| 01:40:07 | 8 | A. No, I have to come out the door. |
| 01:40:09 | 9 | Q. When you come out the door, you can see the El Rukn |
| 01:40:12 | 10 | temple, right? |
| 01:40:12 | 11 | A. Yes. |
| 01:40:13 | 12 | Q. You know /HA*Z goes to that temple, don't you? |
| 01:40:16 | 13 | A. Yes. |
| 01:40:16 | 14 | Q. You know Carlos is coming today to testify? |
| 01:40:24 | 15 | A. Yes, I knew. |
| 01:40:25 | 16 | Q. Through him, did he tell you or did they tell you? |
| 01:40:29 | 17 | A. No, Carlos told me. |
| 01:40:31 | 18 | Q. Carlos told you. Carlos told you I'm coming to testify, |
| 01:40:39 | 19 | right? |
| 01:40:39 | 20 | A. No. Friday when I saw him, he told me he was coming on |
| 01:40:45 | 21 | Monday. |
| 01:40:45 | 22 | Q. He told you he was going to testify here today, right? |
| 01:40:48 | 23 | A. Yes. |
| 01:40:48 | 24 | Q. And you told him I'm going to testify too, right? |
| 01:40:51 | 25 | A. No, I told him I was coming back Monday too. |

| | | |
|---|---|---|
| 01:40:53 | 1 | Q. That's what you told Carlos, right? |
| 01:40:56 | 2 | A. Right. |
| 01:40:57 | 3 | Q. They both knew you were coming here today to testify? |
| 01:41:00 | 4 | A. Yes. |
| 01:41:00 | 5 | Q. Who brought you down today? |
| 01:41:03 | 6 | A. I came in a car. |
| 01:41:04 | 7 | Q. Whose car? |
| 01:41:06 | 8 | A. I forgot his name. |
| 01:41:07 | 9 | Q. Well, do you see him out here somewhere? |
| 01:41:11 | 10 | A. Yes. |
| 01:41:11 | 11 | Q. Point him out, which guy brought you here today? |
| 01:41:15 | 12 | A. In the blue tam. |
| 01:41:19 | 13 | Q. Which guy? |
| 01:41:20 | 14 | A. Blue tam. |
| 01:41:23 | 15 | Q. Blue turban? |
| 01:41:25 | 16 | A. Yes. |
| 01:41:25 | 17 | Q. This guy here, he picked you up and brought you down here? |
| 01:41:28 | 18 | A. Yes. |
| 01:41:28 | 19 | Q. You weren't the only person in that car either, were you? |
| 01:41:32 | 20 | A. No. |
| 01:41:32 | 21 | Q. Some of the other witnesses who were going to testify here |
| 01:41:35 | 22 | today were in that car, weren't they? |
| 01:41:36 | 23 | A. No, Carlos's grandmother was. |
| 01:41:39 | 24 | Q. Well, she was back there with you, wasn't she? |
| 01:41:42 | 25 | A. Yes. |

01:41:42   1   Q.  You only heard one shot, right, Torrence?

01:41:48   2   A.  Right.

01:41:50   3                         - - -

01:41:50   4       TORRENCE WHITE, REDIRECT EXAMINATION, BY DEPOSITION

01:41:55   5   BY MR. HEPPELL:

01:41:55   6   Q.  The police picked you up and brought you down to see a

01:41:59   7   lineup?

01:42:00   8   A.  Yes.

01:42:00   9   Q.  The same day they brought Carlos Willis down there?

01:42:03   10   A.  I didn't see Carlos Willis down there.

01:42:05   11   Q.  You didn't see him down there that day?

01:42:06   12   A.  No.

01:42:06   13   Q.  Did either Mr. Swano or myself ever talk to you before the

01:42:10   14   police talked to you?

01:42:11   15   A.  No.

01:42:11   16   Q.  Did you know Nathson Fields, the man sitting at the end of

01:42:15   17   the table?

01:42:15   18   A.  No.

01:42:20   19           THE COURT:  Is that it?

01:42:22   20           MR. HEPPELL:  The sentencing proceedings.

01:42:23   21           THE COURT:  The next part is the testimony during the

01:42:25   22   sentencing hearing, part of the 1986 trial.^

01:42:30   23                         - - -

01:42:30   24       TORRENCE WHITE, DIRECT EXAMINATION

01:42:31   25   BY MR. HEPPELL:


                      ***REALTIME UNEDITED TRANSCRIPT ONLY***

01:42:31  1   Q.  Would you state your name and spell your last name?

01:42:33  2   A.  Torrence White, W-h-i-t-e.

01:42:34  3   Q.  How old are you, Mr. White?

01:42:36  4   A.  16.

01:42:37  5   Q.  Do you go to school?

01:42:39  6   A.  Yes.

01:42:39  7   Q.  Where?

01:42:39  8   A.  Wendell Phillips.

01:42:41  9   Q.  What year are you?

01:42:42  10  A.  Sophomore.

01:42:43  11  Q.  Did you go out for any sports?

01:42:45  12  A.  I went out for basketball.

01:42:46  13  Q.  When do you start school, this fall?

01:42:49  14  A.  Yes.

01:42:49  15  Q.  Calling your attention to April 28th, 1984, where did you

01:42:54  16  live on that day?

01:42:55  17  A.  706 East 39th Street.

01:42:57  18  Q.  Calling your attention to about 10:00 o'clock in the

01:42:59  19  morning, do you remember where you were?

01:43:01  20  A.  Across the street on Langley getting ready to play some

01:43:04  21  baseball.

01:43:05  22  Q.  When you say across the street, where were you across the

01:43:08  23  street from?

01:43:08  24  A.  From my building, like on the Dimond right across the

01:43:12  25  street from my building.


          ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 01:43:13 | 1 | Q. By diamond, you mean baseball diamond? |
| 01:43:18 | 2 | A. Yes. |
| 01:43:18 | 3 | Q. At 10:00 o'clock on that day, were you on the baseball |
| 01:43:21 | 4 | field? |
| 01:43:21 | 5 | A. By the bench. |
| 01:43:22 | 6 | Q. While you were there at 10:00 o'clock in the morning on |
| 01:43:25 | 7 | that day, did you hear any gunshots? |
| 01:43:27 | 8 | A. Yes. |
| 01:43:27 | 9 | Q. How many gunshots did you hear? |
| 01:43:29 | 10 | A. I heard two and I started running. |
| 01:43:31 | 11 | Q. In which direction did you start running? |
| 01:43:33 | 12 | A. Langley. |
| 01:43:35 | 13 | Q. When you ran, who else was with you? |
| 01:43:37 | 14 | A. Randy Langston and Carlos Willis. |
| 01:43:40 | 15 | Q. When you ran in which direction did you run? |
| 01:43:43 | 16 | A. Towards Langley and Oakwood. |
| 01:43:45 | 17 | Q. Was that away from the building? |
| 01:43:47 | 18 | A. Yes. |
| 01:43:47 | 19 | Q. Did Randy Langston run with you? |
| 01:43:49 | 20 | A. Yes. |
| 01:43:50 | 21 | Q. While you were running, as you were running, did you have |
| 01:43:54 | 22 | occasion to turn around and look in the direction of the |
| 01:43:57 | 23 | shots? |
| 01:43:57 | 24 | A. No. |
| 01:43:57 | 25 | Q. Did you turn around and look at the breezeway at any time? |

| | | |
|---|---|---|
| 01:44:00 | 1 | A. No. |
| 01:44:00 | 2 | Q. Did you have occasion to see any men at that time? |
| 01:44:04 | 3 | A. No. |
| 01:44:05 | 4 | Q. You kept on running? |
| 01:44:08 | 5 | A. I didn't turn around. |
| 01:44:09 | 6 | Q. After hearing the shots, did you look back in the |
| 01:44:12 | 7 | direction of the shots or come back in that direction at any |
| 01:44:15 | 8 | time? |
| 01:44:15 | 9 | A. I came back after it was over with. |
| 01:44:18 | 10 | Q. Did you see any men with ski masks? |
| 01:44:21 | 11 | A. No. |
| 01:44:21 | 12 | Q. Did you see anybody? |
| 01:44:23 | 13 | A. No. |
| 01:44:23 | 14 | Q. How long was it before you came back? |
| 01:44:26 | 15 | A. Be I came back about 10 minutes. |
| 01:44:29 | 16 | Q. As you ran, did Randy Langston run with you? |
| 01:44:32 | 17 | A. Yes. |
| 01:44:32 | 18 | Q. When you came back, did Randy Langston come back with you? |
| 01:44:36 | 19 | A. Yes. |
| 01:44:36 | 20 | Q. Now, calling your attention to May of 1985, almost a year |
| 01:44:43 | 21 | -- over a year after the shooting in 1984, did you have |
| 01:44:46 | 22 | occasion to go to 51st and Wentworth to view a lineup? |
| 01:44:50 | 23 | A. Yes. |
| 01:44:51 | 24 | Q. And who conducted that lineup? |
| 01:44:54 | 25 | A. I don't know his name. |

01:44:54  1   Q.  Does the name Detective O'Callaghan refresh your

01:44:58  2   recollection?

01:44:58  3   A.  Yes.

01:44:59  4   Q.  Showing you Defense Exhibit No. 5 for purposes of

01:45:03  5   sentencing, do you recognize one of the persons depicted in

01:45:06  6   this photograph?

01:45:07  7   A.  O'Callaghan.

01:45:08  8   Q.  Is that the detective that conducted the lineup?

01:45:12  9   A.  Yes.

01:45:12  10  Q.  Now, when you viewed the lineup, did you view it alone or

01:45:18  11  with other people?

01:45:19  12  A.  Alone.

01:45:19  13  Q.  When you looked at the lineup, were you able to identify

01:45:22  14  anybody that was involved in the shooting?

01:45:24  15  A.  No.

01:45:25  16  Q.  Did you tell Detective O'Callaghan that?

01:45:28  17  A.  Yes.

01:45:28  18  Q.  What did Detective O'Callaghan try to do at that time?

01:45:32  19  A.  He told me if I tell him, if you point to somebody, he

01:45:39  20  said if I could tell them that, identify him, he would move me

01:45:44  21  out of the projects.

01:45:45  22  Q.  Showing you Defense Exhibit number 6 for identification,

01:45:48  23  do you recognize this to be the lineup that you viewed?

01:45:49  24  A.  Yes.

01:45:50  25  Q.  Do you see the person that Detective O'Callaghan tried to

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 01:45:53 | 1 | get you to identify? |
| 01:45:55 | 2 | A. Yes. |
| 01:45:55 | 3 | Q. Right here? |
| 01:45:57 | 4 | Q. Do you know the name of that person now? |
| 01:45:59 | 5 | A. Yes. |
| 01:45:59 | 6 | Q. What's his name? |
| 01:46:00 | 7 | A. Earl Hawkins. |
| 01:46:01 | 8 | Q. Had you seen Earl Hawkins on April 28th, was he involved |
| 01:46:06 | 9 | in the shooting at all? |
| 01:46:07 | 10 | A. No. |
| 01:46:07 | 11 | Q. Did you tell Detective O'Callaghan that? |
| 01:46:09 | 12 | A. Yes. |
| 01:46:09 | 13 | Q. How many times did Detective O'Callaghan make you identify |
| 01:46:14 | 14 | Earl Hawkins? |
| 01:46:14 | 15 | A. About three times. |
| 01:46:16 | 16 | Q. And what did you tell him each time? |
| 01:46:18 | 17 | A. I told him I didn't know him. |
| 01:46:24 | 18 | - - - |
| 01:46:24 | 19 | TORRENCE WHITE, CROSS-EXAMINATION |
| 01:46:24 | 20 | BY MR. NOLAND: |
| 01:46:28 | 21 | Q. You testified for the defense in trial, right? |
| 01:46:30 | 22 | A. Yes. |
| 01:46:31 | 23 | Q. I'm sorry? |
| 01:46:33 | 24 | A. Yes. |
| 01:46:33 | 25 | Q. In the trial that these two guys were convicted on is that |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/05/16 PM
Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 23 of 174 PageID #:65316
***REALTIME UNEDITED TRANSCRIPT ONLY***

22

| 01:46:46 | 1 | right?  Well, at the time they were on trial for murder on? |
| 01:46:48 | 2 | A.  Yes. |
| 01:46:48 | 3 | Q.  And you testified, didn't you? |
| 01:46:51 | 4 | A.  Yes. |
| 01:46:51 | 5 | Q.  And they were found guilty? |
| 01:46:53 | 6 | A.  I don't know about that. |
| 01:46:54 | 7 | Q.  The lawyers didn't tell you they were found guilty? |
| 01:46:57 | 8 | A.  Yes,they told me. |
| 01:46:59 | 9 | Q.  So you did know they were found guilty, the same lawyers |
| 01:47:02 | 10 | who told you they were found guilty, told you to come down |
| 01:47:06 | 11 | here and testify today, right? |
| 01:47:07 | 12 | A.  Yes. |
| 01:47:08 | 13 | Q.  They were the same lawyers who brought you here the first |
| 01:47:11 | 14 | time? |
| 01:47:12 | 15 | A.  Yes. |
| 01:47:12 | 16 | Q.  And you knew Earl Hawkins and Nathson Fields' lawyers? |
| 01:47:17 | 17 | A.  Yes. |
| 01:47:17 | 18 |         MR. KULWIN:  Judge, I am having a little trouble |
| 01:47:20 | 19 | hearing.  Is the microphone off? |
| 01:47:22 | 20 |         THE COURT:  It's on.  I can't hear him. |
| 01:47:25 | 21 |         MR. NOLAND:  Me? |
| 01:47:26 | 22 |         MR. KULWIN:  No, the witness. |
| 01:47:27 | 23 |         THE COURT:  Point it more at your face. |
| 01:47:30 | 24 | BY MR. NOLAND: |
| 01:47:32 | 25 | Q.  You know some El Rukns, don't you? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 24 of 174 PageID #:65317
12/05/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

23

01:47:33    1    A.  No.

01:47:34    2    Q.  Well, Torrence, didn't we go through this at the first

01:47:38    3    trial also?   I asked you if --

01:47:43    4    A.  We did.

01:47:44    5    Q.  I asked you if you knew Hawkins, and Hawkins is an El

01:47:49    6    Rukn, isn't he?

01:47:49    7    A.  Not no more.

01:47:50    8    Q.  Well, did he used to be?

01:47:52    9    A.  Yes.

01:47:52   10    Q.  And he lives with your mother once in a while, doesn't he?

01:47:57   11    A.  No.

01:47:57   12    Q.  He stays with your mother once in a while, doesn't he?

01:48:01   13    A.  No.

01:48:01   14    Q.  Didn't we go over this in the first trial?

01:48:03   15    A.  He used to stay on the first floor.

01:48:06   16    Q.  But he used to see your brother, didn't he?

01:48:09   17    A.  Yes, he used to see my mother.  He stayed with her.

01:48:13   18    Q.  And from 39th Street, you can see the El Rukn temple,

01:48:16   19    can't you?

01:48:16   20    A.  Yes.

01:48:17   21    Q.  And you still live at that address on 39th Street?

01:48:22   22    A.  Yes.

01:48:22   23    Q.  Don't you?

01:48:23   24            But you didn't know O'Callaghan's name until --

01:48:35   25            MR. NOLAND:  The transcript is cut off, your Honor.


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

12/05/16 PM

01:48:40  1  BY MR. NOLAND:

01:48:41  2  Q.  But you didn't know O'Callaghan's name until they

01:48:44  3  mentioned it, did you?

01:48:44  4  A.  I knew him, but couldn't think of his name.

01:48:47  5  Q.  By the way, even though O'Callaghan made you these

01:48:50  6  promises and told you all these things, you never made an

01:48:53  7  identification, did you?

01:48:54  8  A.  No.

01:49:02  9          THE COURT:  Is that it?

01:49:04  10          MR. LOEVY:  That's the end.

01:49:05  11          THE COURT:  You can step down.  Is he still up there?

01:49:08  12  Is there another excerpt you are going to read?

01:49:14  13          MR. HEPPELL:  No.  That's it.

01:49:15  14          THE COURT:  Who is next?  Ball Ball Cleveland Ball.

01:49:29  15          THE COURT:  This is from the 1986 trial.

01:49:32  16                              - - -

01:49:32  17    CLEVELAND BALL, DIRECT EXAMINATION, BY PREVIOUS TESTIMONY

01:49:34  18  BY MR. NOLAND:

01:49:34  19  Q.  State your name and spell it for the record, please.

01:49:37  20  A.  Cleveland Ball, B-a-l-l.

01:49:39  21  Q.  Where do you live?

01:49:40  22  A.  706 East 39th Street.

01:49:41  23  Q.  How long have you lived at that address?

01:49:43  24  A.  13 years.

01:49:44  25  Q.  How old are you, sir?

| 01:49:46 | 1 | A. 21. |
| 01:49:47 | 2 | Q. Do you know a person by the name much Fuddy or did you |
| 01:49:53 | 3 | know a person named Fuddy? |
| 01:49:54 | 4 | A. Yes. |
| 01:49:54 | 5 | Q. How long had you known Fuddy? |
| 01:49:56 | 6 | A. About 13 years. |
| 01:49:57 | 7 | Q. What was your relationship with him? |
| 01:49:58 | 8 | A. He was a friend. |
| 01:49:59 | 9 | Q. Did you know a person by the name of Talman Hickman or |
| 01:50:02 | 10 | Tom? |
| 01:50:02 | 11 | A. Yes. |
| 01:50:03 | 12 | Q. What was your relationship with him? |
| 01:50:04 | 13 | A. A friend. |
| 01:50:05 | 14 | Q. Now, what's the apartment that you lived in in April of |
| 01:50:11 | 15 | 1984? |
| 01:50:11 | 16 | A. 706 East 39th Street, apartment 309. |
| 01:50:14 | 17 | Q. Calling your attention to about 10:00 o'clock in the |
| 01:50:17 | 18 | morning on April 28th, 1984, did you have occasion to see |
| 01:50:21 | 19 | Fuddy? |
| 01:50:21 | 20 | A. Yes. |
| 01:50:22 | 21 | Q. Where did you see him first that morning? |
| 01:50:24 | 22 | A. He knocked on my door looking for my little brother. |
| 01:50:27 | 23 | Q. What's your little brother's name? |
| 01:50:29 | 24 | A. Preston ball. |
| 01:50:30 | 25 | Q. In April of 1984, did you know whether or not Fuddy was a |

| | | |
|---|---|---|
| 01:50:34 | 1 | member of a gang? |
| 01:50:34 | 2 | A. Yes. |
| 01:50:35 | 3 | Q. What gang was that? |
| 01:50:37 | 4 | A. Black Gangster Goon Squad. |
| 01:50:41 | 5 | Q. What about your brother Preston, was he a member of a |
| 01:50:44 | 6 | gang? |
| 01:50:44 | 7 | A. Yes. |
| 01:50:44 | 8 | Q. What gang was that? |
| 01:50:46 | 9 | A. Black Gangster Goon Squad. |
| 01:50:49 | 10 | Q. When Fuddy came to the door, was he with anybody else? |
| 01:50:54 | 11 | A. Yes. |
| 01:50:54 | 12 | Q. Did you admit Fuddy into your apartment that morning? |
| 01:50:57 | 13 | A. No. |
| 01:50:58 | 14 | Q. What did you tell him when you knocked on the door? |
| 01:51:00 | 15 | A. I told him that my little brother was not there, that he |
| 01:51:04 | 16 | had gone out west. |
| 01:51:05 | 17 | Q. Did Fuddy leave then? |
| 01:51:06 | 18 | A. Yes. |
| 01:51:06 | 19 | Q. What did you do after Fuddy left? |
| 01:51:08 | 20 | A. I was sweeping.  I had the door open.  I was sweeping the |
| 01:51:11 | 21 | kitchen floor. |
| 01:51:12 | 22 | Q. Did you hear any sounds? |
| 01:51:13 | 23 | A. Yes, about a minute and a half to two minutes, I heard |
| 01:51:17 | 24 | four gunshots. |
| 01:51:18 | 25 | Q. Where did you hear the gunshots sound from? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

27

| | | |
|---|---|---|
| 01:51:20 | 1 | A.  From the -- it was like a big bang under the breezeway, I |
| 01:51:24 | 2 | heard bangs, the echos from out the breezeway. |
| 01:51:26 | 3 | Q.  By the way, who else was in your apartment at this time |
| 01:51:29 | 4 | when you heard the shots? |
| 01:51:30 | 5 | A.  My brother, Roy Ball, my mother. |
| 01:51:33 | 6 | Q.  What's your mother's name? |
| 01:51:34 | 7 | A.  Rita May Ball. |
| 01:51:37 | 8 | Q.  Who else? |
| 01:51:38 | 9 | A.  My sister-in-law, ^ pat ^ Pat /REURB is that bell done. |
| 01:51:42 | 10 | Q.  What else? |
| 01:51:42 | 11 | A.  My brother Michael and my little nephews. |
| 01:51:44 | 12 | Q.  What did you do after you heard the shots from the |
| 01:51:48 | 13 | breezeway window? |
| 01:51:49 | 14 | A.  I went to the back window which faced on 39th Street and I |
| 01:51:52 | 15 | looked out the window. |
| 01:51:53 | 16 | Q.  What did you see? |
| 01:51:54 | 17 | A.  I seen Fuddy lying down facedown in the mud and I seen |
| 01:51:59 | 18 | Tommy's legs, the part hanging out from around the corner. |
| 01:52:02 | 19 | Q.  What did you do after you saw that? |
| 01:52:04 | 20 | A.  I ran to the back of the window. |
| 01:52:06 | 21 | Q.  What direction does that look out? |
| 01:52:07 | 22 | A.  That looks north going down Langley. |
| 01:52:09 | 23 | Q.  What's located in that area of the building? |
| 01:52:11 | 24 | A.  Okay.  I can see part of the breezeway, like the gangway |
| 01:52:15 | 25 | of the building where the shots came from, and I could see the |

***REALTIME UNEDITED TRANSCRIPT ONLY***

01:52:18  1  parking lot and the playground.

01:52:19  2  Q.  Which window did you look out of?

01:52:21  3  A.  The kitchen window.

01:52:23  4  Q.  How much time elapsed from the time you looked out the one

01:52:27  5  window and saw the bodies until you ran to the other kitchen

01:52:29  6  window?

01:52:30  7  A.  Approximately three seconds, three, four seconds.

01:52:32  8  Q.  When you looked out that window, did you see anything?

01:52:35  9  A.  Yes.

01:52:36  10  Q.  What did you see?

01:52:36  11  A.  I seen two men running diagonal through the playground

01:52:40  12  with ski masks on, red ski masks.

01:52:42  13  Q.  What color were the ski masks?

01:52:44  14  A.  Red.

01:52:44  15  Q.  I'd like to show you what's been previously marked as

01:52:48  16  defense Exhibit number 8 for identification.  Do you recognize

01:52:51  17  that view depicted in that photograph?

01:52:52  18  A.  Yes.  This is the view from my kitchen window.

01:52:55  19  Q.  Do you see in that photograph where it was that you saw

01:52:58  20  the two men?

01:52:59  21  A.  Okay.  I seen the two men running where it says P P Mac

01:53:03  22  right here, from here, they came through here, they cut across

01:53:07  23  this little dirt way, hit the parking lot and they ran through

01:53:10  24  the parking lot right here and they met a car coming down

01:53:13  25  Langley and they got in the car.

| | | |
|---|---|---|
| 01:53:14 | 1 | Q. What kind of car was it, if you know? |
| 01:53:16 | 2 | A. It was a blue two-door, 79 coupe DeVille. |
| 01:53:20 | 3 | Q. Is that a Cadillac? |
| 01:53:22 | 4 | A. Right. |
| 01:53:22 | 5 | Q. Did the men get in that Cadillac? |
| 01:53:24 | 6 | A. Yes. |
| 01:53:24 | 7 | Q. Were you able to see the face of either of these two men? |
| 01:53:29 | 8 | A. No, they had on ski masks. |
| 01:53:30 | 9 | Q. Did they ever take the ski masks off from the time you |
| 01:53:33 | 10 | first saw them until the time they entered the Cadillac? |
| 01:53:36 | 11 | A. No, sir. |
| 01:53:36 | 12 | Q. What street is located out there? |
| 01:53:40 | 13 | A. Langley. |
| 01:53:41 | 14 | Q. Now, did you see the blue Cadillac move in any way? |
| 01:53:45 | 15 | A. Yes. |
| 01:53:45 | 16 | Q. What direction was it moving? |
| 01:53:46 | 17 | A. It was moving north. |
| 01:53:47 | 18 | Q. Now, that day after you saw the men run to the blue |
| 01:53:53 | 19 | Cadillac where did you go, what did you do? |
| 01:53:55 | 20 | A. After I seen them get in the car and the car moved out, I |
| 01:53:59 | 21 | ran downstairs. |
| 01:53:59 | 22 | Q. What did you see downstairs? |
| 01:54:01 | 23 | A. I seen two dead bodies. |
| 01:54:02 | 24 | Q. Do you know a person by the name of Richard Buckles or |
| 01:54:07 | 25 | Bucky? |

12/05/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 01:54:07 | 1 | A. Yes. |
| 01:54:07 | 2 | Q. Is he a member of a gang? |
| 01:54:10 | 3 | A. Yes, he is a member of the Black Gangster Goon Squad. |
| 01:54:14 | 4 | Q. Do you know Gerald Morris? |
| 01:54:15 | 5 | A. Yes, he is a member of the Black Gangster Goon Squad. |
| 01:54:18 | 6 | Q. Does he have a nickname? |
| 01:54:19 | 7 | A. Dirty face. |
| 01:54:20 | 8 | Q. Do you know Randy Langston? |
| 01:54:21 | 9 | A. Yes. |
| 01:54:21 | 10 | Q. Is he a member of a gang? |
| 01:54:23 | 11 | A. Black Gangster Goon Squad. |
| 01:54:25 | 12 | Q. That day, did the police come to your house and interview |
| 01:54:28 | 13 | you? |
| 01:54:29 | 14 | A. Yes. |
| 01:54:29 | 15 | Q. And do you remember about what time it was that they came |
| 01:54:32 | 16 | to your house? |
| 01:54:33 | 17 | A. The incident took place about 10:15, they came to |
| 01:54:37 | 18 | interview me about 11:30. |
| 01:54:41 | 19 | Q. Who else was there when the police interviewed you? |
| 01:54:43 | 20 | A. Me, Ray Ball, my brother, my sister, my sister-in-law, and |
| 01:54:46 | 21 | my brother Mike. |
| 01:54:49 | 22 | Q. Did you tell the police what you told the Court here |
| 01:54:51 | 23 | today? |
| 01:54:51 | 24 | A. Yes. |
| 01:54:51 | 25 | Q. Did your brother Roy participate in that conversation? |

12/05/16 PM
Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 32 of 174 PageID #:65325
***REALTIME UNEDITED TRANSCRIPT ONLY***

31

| 01:54:53 | 1 | A.  Yes. |

01:54:53  1   A.  Yes.

01:54:54  2   Q.  How, since that day, have you been contacted by the police

01:54:57  3   or asked to go to any lineups?

01:54:59  4   A.  No, they brought a picture to my house.

01:55:02  5   Q.  You were not asked to go to a lineup?

01:55:05  6   A.  No.

01:55:05  7   Q.  When they brought a picture to your house, how many

01:55:08  8   pictures did they have?

01:55:09  9   A.  They had about four.

01:55:10  10  Q.  About four?

01:55:12  11  A.  About four pictures.

01:55:13  12  Q.  You don't know my client, Earl Hawkins, do you?

01:55:17  13  A.  No.

01:55:17  14  Q.  Do you know Mr. Smeeton's client, Mr. Fields?

01:55:22  15  A.  No.

01:55:22  16  Q.  Are you a member of any gang?

01:55:23  17  A.  No.

01:55:27  18                        - - -

01:55:27  19    CLEVELAND BALL, CROSS-EXAMINATION, BY PREVIOUS TESTIMONY

01:55:27  20  BY MR. NOLAND:  (Reading:)

01:55:34  21  Q.  Do you remember these detectives, the names of those

01:55:38  22  detectives you talked to?

01:55:38  23  A.  Cunningham, something like that.

01:55:42  24  Q.  The day of the shooting, was it Evans and hood?

01:55:44  25  A.  I don't know, it was a tall white guy.

| | | |
|---|---|---|
| 01:55:47 | 1 | Q. Two white detective, right? |
| 01:55:49 | 2 | A. Right. |
| 01:55:49 | 3 | Q. They came up to your house to interview you? |
| 01:55:51 | 4 | A. Right. |
| 01:55:51 | 5 | Q. This was an hour and a little bit something after the |
| 01:55:55 | 6 | shooting, right? |
| 01:55:55 | 7 | A. Right. |
| 01:55:56 | 8 | Q. You didn't tell them anything in that interview about any |
| 01:56:00 | 9 | ski masks, did you? |
| 01:56:00 | 10 | A. Yes, I did. |
| 01:56:01 | 11 | Q. You told those detectives that the two guys you saw |
| 01:56:05 | 12 | running had ski masks? |
| 01:56:06 | 13 | A. I told them exactly what I seen, they had ski masks on |
| 01:56:09 | 14 | their face, I seen their face at all. |
| 01:56:14 | 15 | Q. Now, even though you can't pick out your apartment on this |
| 01:56:18 | 16 | plat, you are familiar with? |
| 01:56:21 | 17 | A. That's an odd diagram to even look at. |
| 01:56:23 | 18 | Q. Do you understand the word parallel? |
| 01:56:25 | 19 | A. Yes. |
| 01:56:25 | 20 | Q. You know there is a sidewalk that goes parallel from the |
| 01:56:28 | 21 | building to the breezeway to Langley, right? |
| 01:56:30 | 22 | A. Not parallel. |
| 01:56:31 | 23 | Q. It goes right alongside the building to Langley? |
| 01:56:35 | 24 | A. Just a straight line. |
| 01:56:36 | 25 | Q. Okay. Well, there is a straight line to the building too, |

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 34 of 174 PageID #:65327

| | | |
|---|---|---|
| 01:56:40 | 1 | right? |
| 01:56:41 | 2 | A.  Right. |
| 01:56:41 | 3 | Q.  There is a sidewalk that goes right along that straight |
| 01:56:44 | 4 | line out to Langley, right? |
| 01:56:46 | 5 | A.  It all depends on what angle you are talking about.  You |
| 01:56:49 | 6 | can get from Langley from -- |
| 01:56:51 | 7 | Q.  I am going to show you what's been marked as people's |
| 01:56:54 | 8 | number 14.  Do you recognize what's in that picture? |
| 01:56:58 | 9 | A.  Yes. |
| 01:56:58 | 10 | Q.  That's the back of 706, right? |
| 01:57:00 | 11 | A.  Yes. |
| 01:57:00 | 12 | Q.  Do you recognize the sidewalk down here? |
| 01:57:03 | 13 | A.  Yes. |
| 01:57:04 | 14 | Q.  That sidewalk goes all the way to Langley, doesn't it? |
| 01:57:09 | 15 | A.  Yes, but that wasn't the sidewalk. |
| 01:57:12 | 16 | Q.  That sidewalk goes all the way to Langley? |
| 01:57:15 | 17 | A.  That wasn't the sidewalk that they came through.  That's a |
| 01:57:18 | 18 | whole different view of everything.  That ain't got nothing to |
| 01:57:21 | 19 | do with it. |
| 01:57:22 | 20 | Q.  Now, if I can ask my question.  That sidewalk goes all the |
| 01:57:25 | 21 | way to Langley, doesn't it? |
| 01:57:26 | 22 | A.  Yes, it do. |
| 01:57:27 | 23 | Q.  You can't see Langley where that sidewalk hits Langley, |
| 01:57:31 | 24 | you can't see that from your apartment, can you? |
| 01:57:34 | 25 | A.  No, sir. |

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 35 of 174 PageID #:65328
12/05/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

34

| | | |
|---|---|---|
| 01:57:35 | 1 | Q.  Just like this picture, Defendant's Exhibit number 8, |
| 01:57:42 | 2 | shows you can't see where that sidewalk hits Langley, can you? |
| 01:57:45 | 3 | A.  I see it. |
| 01:57:46 | 4 | Q.  Sir, my question is, you can't see where that sidewalk |
| 01:57:49 | 5 | hits Langley? |
| 01:57:50 | 6 | A.  I can see Langley. |
| 01:57:51 | 7 | Q.  Can you see the portion of Langley where that sidewalk |
| 01:57:55 | 8 | connects? |
| 01:57:56 | 9 | A.  Okay.  They got a parking lot. |
| 01:57:59 | 10 | Q.  Can you see where that sidewalk hits Langley? |
| 01:58:03 | 11 | A.  Yes. |
| 01:58:03 | 12 | Q.  You can? |
| 01:58:03 | 13 | A.  I can see a sidewalk going down Langley. |
| 01:58:06 | 14 | Q.  Can you see where this sidewalk gets to Langley from your |
| 01:58:10 | 15 | apartment? |
| 01:58:11 | 16 | A.  Not from that. |
| 01:58:12 | 17 | Q.  You can't, can you? |
| 01:58:13 | 18 | A.  Not right there. |
| 01:58:14 | 19 | Q.  You can't see where this sidewalk hits Langley from your |
| 01:58:19 | 20 | apartment, can you? |
| 01:58:21 | 21 | A.  It all depends on which sidewalk you're talking about, |
| 01:58:24 | 22 | sir.  It's five or six sidewalks out there. |
| 01:58:26 | 23 | Q.  Okay.  The sidewalk I just asked you about. |
| 01:58:29 | 24 | A.  Okay.  Now, that's a different angle from my window.  I |
| 01:58:33 | 25 | can't -- I cannot see that. |

12/05/16 PM
Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 36 of 174 PageID #:65329
***REALTIME UNEDITED TRANSCRIPT ONLY***

35

01:58:34　1　Q. Can you see that sidewalk where it hits Langley, that's my

01:58:36　2　question?

01:58:38　3　A. No, not from that point.

01:58:39　4　Q. So if a car was parked right on Langley where that

01:58:42　5　sidewalk was, you couldn't see that car, could you?

01:58:45　6　A. I seen a moving car, moving blue two-door coupe DeVille

01:58:51　7　79, moving at the same diagonal as the persons that were

01:58:54　8　running.

01:58:54　9　Q. I will ask you the question again.

01:58:56　10　A. I seen the car.

01:58:58　11　Q. If a car was parked on Langley where that sidewalk hits

01:59:02　12　Langley, you couldn't see it from your apartment, could you?

01:59:08　13　A. I couldn't, no.

01:59:09　14　Q. You couldn't say anything to the police officers before

01:59:11　15　the car got moving when these guys got into it?

01:59:15　16　A. It was moving together like --

01:59:17　17　Q. My question was you didn't tell the police officers that,

01:59:19　18　did you?

01:59:19　19　A. Did I tell the police officers what, sir?

01:59:23　20　Q. That the car was moving before these guys got into it?

01:59:27　21　A. No, it was moving with them. As they were running, it was

01:59:29　22　moving. The car was coming straight and they were running

01:59:32　23　parallel to the car through the parking lot.

01:59:34　24　Q. You still live at 706 East 39th Street, don't you?

01:59:39　25　A. Yes.

| | | |
|---|---|---|
| 01:59:39 | 1 | Q. Since you're familiar with all these gang members, you |
| 01:59:41 | 2 | must be familiar with the El Rukns also, aren't you? |
| 01:59:44 | 3 | A. Yes. |
| 01:59:44 | 4 | Q. You know where the El Rukn temple is, don't you? |
| 01:59:48 | 5 | A. Yes. |
| 01:59:48 | 6 | Q. That's on 39th and Drexel, isn't it? |
| 01:59:52 | 7 | A. Yes. |
| 01:59:52 | 8 | Q. By the way, your apartment is the farthest apartment in |
| 01:59:55 | 9 | that building away from Langley, isn't it? |
| 01:59:58 | 10 | A. The 9s, yes. |
| 01:59:59 | 11 | Q. You are not on the side closest to Langley, are you? |
| 02:00:02 | 12 | A. No. |
| 02:00:02 | 13 | Q. You are on the other side of the building? |
| 02:00:04 | 14 | A. Right. |
| 02:00:05 | 15 | Q. That's the side closest to the El Rukn temple, isn't it? |
| 02:00:08 | 16 | A. What do you mean by closest? |
| 02:00:11 | 17 | Q. That side of the building is the closest to the El Rukn |
| 02:00:15 | 18 | temple, isn't it? |
| 02:00:16 | 19 | A. Yes. |
| 02:00:16 | 20 | Q. Now, when you say you saw these guys running away, their |
| 02:00:20 | 21 | backs are -- were always towards you, weren't they? |
| 02:00:23 | 22 | A. No. |
| 02:00:23 | 23 | Q. Well, sir, you never left your apartment, did you? |
| 02:00:27 | 24 | A. I was looking directly out my window. |
| 02:00:30 | 25 | Q. You never left your apartment, did you? |

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 38 of 174 PageID #:65331
12/05/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

37

| | |
|---|---|
| 02:00:31 | 1 |
| 02:00:32 | 2 |
| 02:00:35 | 3 |
| 02:00:37 | 4 |
| 02:00:40 | 5 |

02:00:31   1   A.  No.

02:00:32   2   Q.  And to run through the breezeway to Langley, they're

02:00:35   3   running away from you, aren't they?

02:00:37   4   A.  In the same diagonal, they stayed in my sight until they

02:00:40   5   got in the car.

02:00:40   6   Q.  Okay.  I'll ask the same question.  They're not running

02:00:44   7   towards you, are they?

02:00:45   8   A.  No.

02:00:45   9   Q.  Langley is in the other direction from you, right?

02:00:49  10   A.  Sir.

02:00:50  11   Q.  Is Langley in the other direction from where you were?

02:00:53  12   A.  They did not run that way.  Okay.  This is 39th and

02:00:57  13   Langley.  They ran toward 38th and Langley.  That means I got

02:01:01  14   a straight through from 38th and Langley from 39th straight

02:01:05  15   across.

02:01:05  16   Q.  When they were running towards 38th and Langley or

02:01:08  17   wherever you said they were running, they were running away

02:01:11  18   from you, weren't they?

02:01:12  19   A.  Yes.

02:01:12  20   Q.  So that means you saw their backs, didn't you?

02:01:16  21   A.  But I still seen them.  They came past me first.  I am

02:01:20  22   looking directly out the window.  Like, this is the breezeway,

02:01:23  23   coming out the breezeway like I seen men, you know, coming out

02:01:26  24   the breezeway with ski masks on.

02:01:28  25   Q.  Didn't you just testify after you heard the four gunshots,

| | | |
|---|---|---|
| 02:01:32 | 1 | the first thing you did was to go to the front of the |
| 02:01:34 | 2 | building? |
| 02:01:34 | 3 | A.  Right, 39th. |
| 02:01:35 | 4 | Q.  And you looked out there and you saw Fuddy, right? |
| 02:01:38 | 5 | A.  Yes. |
| 02:01:38 | 6 | Q.  That took some time, didn't it? |
| 02:01:41 | 7 | A.  It took a split second. |
| 02:01:42 | 8 | Q.  You looked out and saw Tom, didn't you? |
| 02:01:45 | 9 | A.  I seen the legs of Tom. |
| 02:01:47 | 10 | Q.  When you had to run back to the other end of your |
| 02:01:49 | 11 | apartment -- then you had to run back to the other end of your |
| 02:01:52 | 12 | apartment, right? |
| 02:01:52 | 13 | A.  Three seconds, right. |
| 02:01:54 | 14 | Q.  And that's the first time you saw these guys running, |
| 02:01:56 | 15 | right? |
| 02:01:57 | 16 | A.  Okay.  That was the first time I seen them coming out the |
| 02:02:00 | 17 | breezeway. |
| 02:02:00 | 18 | Q.  That breezeway is not right under your apartment, is it? |
| 02:02:03 | 19 | A.  Coming out of it is. |
| 02:02:07 | 20 | Q.  There are apartments between you and the breezeway, aren't |
| 02:02:09 | 21 | there? |
| 02:02:09 | 22 | A.  Just a little space. |
| 02:02:10 | 23 | Q.  Are there apartments between your apartment and the |
| 02:02:16 | 24 | breezeway? |
| 02:02:16 | 25 | A.  Yes, it is. |

| | | |
|---|---|---|
| 02:02:17 | 1 | Q. You're on the third floor, aren't you? |
| 02:02:19 | 2 | A. Yes. |
| 02:02:20 | 3 | Q. Looking down, right? |
| 02:02:22 | 4 | A. Yes. |
| 02:02:22 | 5 | Q. And you say you heard only four shots, right? |
| 02:02:25 | 6 | A. I heard four shots. |
| 02:02:27 | 7 | Q. By the way, sir, were your windows open or closed at the |
| 02:02:30 | 8 | time? |
| 02:02:30 | 9 | A. My window was cracked. |
| 02:02:32 | 10 | Q. Cracked? |
| 02:02:33 | 11 | A. Yes, half and half. |
| 02:02:34 | 12 | Q. How much was it cracked? |
| 02:02:35 | 13 | A. Enough for me to stick my head. |
| 02:02:37 | 14 | Q. And you had to stick your head out, didn't you? |
| 02:02:40 | 15 | A. Yes. |
| 02:02:40 | 16 | Q. When you got to the window, you just couldn't look out and |
| 02:02:45 | 17 | see Fuddy laying there, could you? |
| 02:02:46 | 18 | A. No. |
| 02:02:47 | 19 | Q. You had to look out, turn around and look down to see |
| 02:02:50 | 20 | Fuddy, right? |
| 02:02:50 | 21 | A. Just like this here, to look out the window. |
| 02:02:53 | 22 | Q. That's the same thing you had to do to see Tom, right? |
| 02:02:57 | 23 | A. Tom was unseeable, the only thing I seen about Tom was |
| 02:03:01 | 24 | just his legs, about the part of his legs hanging out from |
| 02:03:04 | 25 | where I was. |

| 02:03:04 | 1 | Q. Where Fuddy was laying, it was bright sunshine out there, |
| 02:03:07 | 2 | right? |
| 02:03:07 | 3 | A. Yes, dead in the morning. |
| 02:03:09 | 4 | Q. How did you get to court today, Cleveland? |
| 02:03:12 | 5 | A. I was brought by Mr. Swano. |
| 02:03:14 | 6 | Q. When is the first time you were contacted by Mr. Swano? |
| 02:03:17 | 7 | A. Last year in July. |
| 02:03:19 | 8 | Q. In between then and now, have you been contacted by |
| 02:03:23 | 9 | anything -- by anybody else? |
| 02:03:24 | 10 | A. No, sir. |
| 02:03:25 | 11 | Q. Do you know anybody sitting out in the courtroom here? |
| 02:03:29 | 12 | A. No, I don't. |
| 02:03:31 | 13 | Q. I'm sorry? |
| 02:03:32 | 14 | A. No, I don't. |
| 02:03:36 | 15 | THE COURT: Is that it? Okay. You can step down. |
| 02:03:43 | 16 | The next thing is the discovery thing. I want to |
| 02:03:46 | 17 | know what to tell the jury. I want to see what it is. |
| 02:03:53 | 18 | (Sidebar.) |
| 02:04:00 | 19 | MR. SWAMINATHAN: That's the request to admit. |
| 02:04:01 | 20 | THE COURT: Which requests to admit? |
| 02:04:02 | 21 | MR. SWAMINATHAN: We have removed the ones that are |
| 02:04:05 | 22 | irrelevant. |
| 02:04:05 | 23 | MR. LOEVY: The numbers aren't -- |
| 02:04:07 | 24 | THE COURT: Got it. All right. And these are the |
| 02:04:11 | 25 | city's requests to admit, so I am going to tell the jury. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 02:04:16 | 1 | MR. SWAMINATHAN: City's responses. |
| 02:04:17 | 2 | THE COURT: City's responses. I'm going to tell the |
| 02:04:20 | 3 | jury that you're to take these points as admitted by the city. |
| 02:04:29 | 4 | MR. MICHALIK: Right. The one request that I had was |
| 02:04:31 | 5 | that the date of the requests. |
| 02:04:35 | 6 | THE COURT: Show the page, right. And then on the |
| 02:04:39 | 7 | interrogatory answers again, this is the city. I should just |
| 02:04:45 | 8 | tell them that this is -- it's part of the evidence in the |
| 02:04:47 | 9 | case. |
| 02:04:49 | 10 | Okay. The reason I had you over here is that you |
| 02:04:56 | 11 | don't have to worry about making a rule -- Rule 50 motion on |
| 02:04:59 | 12 | the record, but I'm going to want them, you know, sometime |
| 02:05:04 | 13 | within the calendar day today. Okay? |
| 02:05:06 | 14 | MR. MICHALIK: Understood. |
| 02:05:07 | 15 | THE COURT: Good. The record should reflect Mr. |
| 02:05:10 | 16 | Kulwin is pointing at Mr. Michalik. |
| 02:05:13 | 17 | MR. LOEVY: We are going to rest after this and it's |
| 02:05:15 | 18 | subject to the Kuhn issue too. I won't say that in front of |
| 02:05:19 | 19 | the jury. |
| 02:05:19 | 20 | THE COURT: Fine. |
| 02:05:24 | 21 | (The following proceedings were had in open court in the |
| 02:05:24 | 22 | presence and hearing of the jury:) |
| 02:05:24 | 23 | THE COURT: The next thing that's going to happen is |
| 02:05:29 | 24 | that some different type of material is going to be read to |
| 02:05:31 | 25 | you. I want to explain to you what it is. The first is I |

02:05:34  1   believe the City of Chicago's responses to something called

02:05:38  2   requests to admit.  And it's a thing that's used in lawsuits.

02:05:43  3   And so these are the city's responses to requests to admit.

02:05:48  4   Are you going to show them on the screen?

02:05:49  5             MR. SWAMINATHAN:  Yes.

02:05:53  6             THE COURT:  Again, you should take notes on these

02:05:55  7   because you will not have them in the jury room.  You should

02:05:57  8   take the facts as stated in these responses as having been

02:06:00  9   admitted by the City of Chicago.  And then when you get to the

02:06:03  10  second thing, I'll explain what the second thing is.  You will

02:06:07  11  be able to see these on your screen.

02:06:09  12            The date of these was?

02:06:11  13            MR. SWAMINATHAN:  These are dated, this is

02:06:16  14  Plaintiff's Exhibit 29.

02:06:16  15            THE COURT:  October 25th, 2012.

02:06:18  16            MR. SWAMINATHAN:  October 25th, 2012.

02:06:20  17            THE COURT:  All right.

02:06:21  18            MR. SWAMINATHAN:  These are defendants' City of

02:06:25  19  Chicago's response to plaintiff's requests to admit.

02:06:27  20            Number 9, please admit that immediately prior to

02:06:34  21  being held in the office of lieutenant Duffin, the city

02:06:38  22  believes that Plaintiff's Exhibit 1 was kept in the file

02:06:42  23  cabinet labeled 1983/1984 in a room on the second floor at

02:06:49  24  51st and Wentworth in the sect division.

02:06:52  25            Response, admit plaintiff's exhibit 1 was located at

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | |
|---|---|
| 02:06:56 | 1 | Area 1, but the city is without sufficient information to |

02:06:56   1   Area 1, but the city is without sufficient information to

02:06:58   2   admit or deny precisely where the file was located at that

02:07:02   3   location.

02:07:03   4        Number 10, please admit that the city is unable to

02:07:08   5   determine precisely where Plaintiff's Exhibit 1 had been

02:07:14   6   stored since 1984 until it was found in approximately May

02:07:17   7   2010.

02:07:18   8        Response, admit.

02:07:21   9        Number 11, please admit that the City of Chicago is

02:07:30   10   unable to determine which employee at area one located and

02:07:33   11   retrieved Plaintiff's Exhibit 1 in 2011.

02:07:37   12        Response, admit.

02:07:39   13        Number 12, please admit that the City of Chicago is

02:07:42   14   unable to determine which employee and/or employees at area

02:07:46   15   one made the copies of Plaintiff's Exhibit 1 and then sent

02:07:51   16   said documents to the legal affairs division.

02:07:52   17        Response, admit.

02:07:55   18        No. 13, please admit that the Chicago Police

02:07:59   19   Department employees interviewed by the city's legal team

02:08:02   20   stated that they had no recollection of having made copies of

02:08:05   21   Plaintiff's Exhibit 1.

02:08:07   22        Response, admit.

02:08:09   23        Number 17, please admit that at the time of the June

02:08:13   24   12th, 2012, visit there was a file cabinet located midway down

02:08:18   25   the left wall of the room which contained five drawers of

***REALTIME UNEDITED TRANSCRIPT ONLY***

02:08:21   1   files related to honestly sides at area one.

02:08:25   2          Response: Admit.

02:08:26   3          Number 20: Please admit that the city believes that

02:08:36   4   plaintiff's exhibit had been stored, at some time, in the file

02:08:40   5   cabinet described above in paragraph 17, in the fourth or

02:08:44   6   fifth drawer from the top, alongside the other homicide files

02:08:46   7   from area one dating from between 1983 and 1985.

02:08:50   8          Response: The city is without sufficient information

02:08:54   9   to admit or deny this request.

02:08:56  10          Number 28: Please admit that if, in fact, Plaintiff's

02:09:02  11   Exhibit 1 was ever located in the file cabinet that

02:09:05  12   plaintiff's counsel viewed on June 12, 2012, and which are

02:09:08  13   described in paragraphs 17 and 18 that the city does not know

02:09:12  14   how long they were located in that file cabinet.

02:09:14  15          Response: Admit.

02:09:16  16          Number 33: Please admit that the city had no evidence

02:09:23  17   that could support an inference that Plaintiff's Exhibit 1 had

02:09:26  18   ever been provided to the plaintiff prior to September eighth,

02:09:30  19   2011.

02:09:31  20          Response: The city admits that it has no knowledge

02:09:34  21   that the entire Plaintiff's Exhibit 1 was provided to

02:09:39  22   plaintiff prior to September 8, 2011.

02:09:41  23          Number 35: Please admit that the city has no evidence

02:09:48  24   that could support an inference that Plaintiff's Exhibit 1 of

02:09:52  25   ever been provided to the Cook County state's attorney's

02:09:55    1    office prior to September 8th, 2011.

02:09:58    2            Response: The city admits it has no knowledge that

02:10:02    3    the entire Plaintiff's Exhibit 1 was provided to the Cook

02:10:05    4    County state's attorney's office prior to September 8th, 2011.

02:10:08    5            Number 38: Please admit that Plaintiff's Exhibit 1

02:10:21    6    contains no reference to the plaintiff Nathson Fields.

02:10:24    7            Response: Admit.

02:10:27    8            Number 39: Please admit that Plaintiff's Exhibit 1

02:10:32    9    contains no photograph of the plaintiff Nathson Fields.

02:10:34   10            Response: Admit.

02:10:38   11            THE COURT:  Okay.  So that's it for that.

02:10:40   12            Then the other thing that's going to be read from are

02:10:42   13    what are called responses to interrogatories.  These are

02:10:45   14    written questions that are served as part of a case.  Again,

02:10:48   15    it's the City of Chicago's responses.  You are again to take

02:10:52   16    this as part of the evidence in the case.  Okay.

02:10:54   17            MR. SWAMINATHAN:  This is defendant, City of

02:10:58   18    Chicago's third amended and supplemental answers to paragraphs

02:11:01   19    4 and 5 of plaintiff's first set of interrogatories.

02:11:03   20            The interrogatory is No. 4.  And this is Plaintiff's

02:11:10   21    Exhibit 205.

02:11:12   22            Identify the names of any known persons, agencies,

02:11:15   23    government offices, entities, or law enforcement officers or

02:11:20   24    agencies both currently or previously involved in identifying,

02:11:24   25    selecting, handling, transporting or coping documents or

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 47 of 174 PageID #:65340
12/05/16 PM      ***REALTIME UNEDITED TRANSCRIPT ONLY***

46

02:11:28    1   materials related to the investigation of the April 28, 1984,

02:11:33    2   murders of Jerome Fuddy Smith and Talman Hickman.  This

02:11:40    3   interrogatory seeks to establish the chronological chain of

02:11:43    4   custody for any and all documents, notes, or materials

02:11:46    5   compiled during the investigation of the murders of Jerome

02:11:51    6   Fuddy Smith and Talman Hickman, including but not limited to

02:11:54    7   Plaintiff's Exhibit 1.

02:11:58    8          In answer, the stay states as follows:  The city has

02:12:09    9   been unable to, quote, establish the chronological chain of

02:12:12   10   custody, end quote, of plaintiff's exhibit 1, hereinafter

02:12:17   11   referred to as the subject file, from 1984 to the present as

02:12:20   12   requested in this interrogatory.  However, the city states

02:12:23   13   based on the deposition testimony of certain of the detectives

02:12:26   14   initially assigned to investigate the April 28th, 1984

02:12:31   15   Smith/Hickman homicides, that the subject file would have been

02:12:35   16   initially maintained at the former Area 1 located at 51st and

02:12:39   17   Wentworth in the City of Chicago after the murders in 1984 and

02:12:42   18   available to area one detective division personnel working on

02:12:46   19   the case at that time.  The names of area one personnel who

02:12:50   20   may have handled documents in the subject file include but not

02:12:55   21   be limited to the persons whose names are identified in the

02:12:58   22   file, including former detectives Fields, Carroll, van better

02:13:03   23   shot, hood, Evans, Minogue, Bogdalek, and Davis and sergeants

02:13:13   24   McCrae m-c-c-r-a-e, and Murphy.  Based on the WE TIP document

02:13:20   25   Bates stamped city-N F-001052 contained in the subject file

***REALTIME UNEDITED TRANSCRIPT ONLY***

02:13:27  1  and referencing Detective Hood, it appears the file was at

02:13:31  2  area one as of June 1984.  The file does not appear to contain

02:13:35  3  documents generated after June 1984.

02:13:37  4        The city does not know where the subject file was

02:13:39  5  maintained after June 1984 until it was located at Area 1

02:13:43  6  after the filing of this case in 2010.

02:13:46  7        There is a verification from Sergeant Robert Flores

02:13:52  8  signed at the office of legal affairs, Chicago Police

02:13:55  9  Department.  It verifies that he signed the foregoing

02:13:58  10  defendant City of Chicago's third amended and supplemental

02:14:02  11  answers, paragraph 4 and 5 of plaintiff's first

02:14:05  12  interrogatories decked to the city, that he is duly authorized

02:14:09  13  to do so and that the foregoing answers are true and correct

02:14:12  14  to the best of his knowledge and/or belief.

02:14:14  15        THE COURT:  Okay.  And.

02:14:16  16        MR. LOEVY:  Your Honor, at this time, plaintiff

02:14:17  17  rests.

02:14:17  18        THE COURT:  That's just so the jury knows, it's

02:14:19  19  subject to a couple of exceptions and things we talked about

02:14:21  20  add sidebar.

02:14:22  21        Okay.  Next witness, please.

02:14:25  22        MR. NOLAND:  Judge, could we have a couple things

02:14:30  23  with this witness that we could have a sidebar about.

02:14:33  24        THE COURT:  Okay.

02:14:39  25   (The following proceedings were had at sidebar outside the

***REALTIME UNEDITED TRANSCRIPT ONLY***

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 02:14:43 | 1  | hearing of the jury:)                                        |
| 02:14:43 | 2  | THE COURT:  Who are we talking about?                       |
| 02:14:45 | 3  | MR. NOLAND:  Brannigan.                                     |
| 02:14:49 | 4  | THE COURT:  Okay.                                            |
| 02:14:51 | 5  | MR. NOLAND:  First of all, we need to make our             |
| 02:14:53 | 6  | motions now.                                                 |
| 02:14:53 | 7  | THE COURT:  No, no, you don't need to make them now.       |
| 02:14:57 | 8  | I need them by the end of the day.                          |
| 02:15:00 | 9  | MR. NOLAND:  Thank you.                                     |
| 02:15:03 | 10 | Two issues for one of the El Rukn cooperators that we      |
| 02:15:06 | 11 | are reading Eugene Hunter, the plaintiffs have designated some |
| 02:15:09 | 12 | entries where this witness Brannigan and myself went to see |
| 02:15:13 | 13 | him out of state during this litigation.                    |
| 02:15:18 | 14 | THE COURT:  Okay.                                            |
| 02:15:19 | 15 | MR. NOLAND:  And they are trying to raise an               |
| 02:15:20 | 16 | inference I think from those designations that there's some |
| 02:15:24 | 17 | type of impropriety with Brannigan being involved with respect |
| 02:15:27 | 18 | to talking to Hunter and testifying in this case.  What I   |
| 02:15:33 | 19 | would like to do is ask Mr. Brannigan why he accompanied me to |
| 02:15:36 | 20 | see Mr. Hunter and the answer I would suspect he would give is |
| 02:15:40 | 21 | because Hunter was initial in the witness protection program, |
| 02:15:43 | 22 | he's currently living in an undisclosed location with an     |
| 02:15:47 | 23 | assumed name and that it would not have been prudent for me to |
| 02:15:51 | 24 | show up or contact him unannounced without any prior advance |
| 02:15:55 | 25 | notice or wondering what was going on.                      |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | |
|---|---|
| 02:15:57 | 1 |
| 02:15:58 | 2 |
| 02:16:01 | 3 |
| 02:16:04 | 4 |
| 02:16:07 | 5 |
| 02:16:10 | 6 |
| 02:16:12 | 7 |
| 02:16:16 | 8 |

1    THE COURT:  What's the second issue?

2    MR. NOLAND:  The second issue is Ms. Conyers

3    testified with respect to some of the benefits offered or

4    provided to Mr. Hawkins during the 2009 trial and we

5    understand the Court's ruling about that.  She went further

6    than that with respect to certain things including phone calls

7    that Mr. Hawkins was provided and moneys that he was provided

8    and she testified.

9    THE COURT:  60 bucks into his commissary account or

10    something like that.

11    MR. NOLAND:  And family benefit, she said money was

12    given to his family members and she commented that that was

13    highly unusual.  That we think -- we think we need to

14    ameliorate that in some way.  The reason that was done was for

15    safety considerations.  Mr. Brannigan provided an in 1995, a

16    30-page affidavit explaining a lot of these items.  These are

17    items that he addressed in his affidavits.

18    THE COURT:  Which items?

19    MR. NOLAND:  The issue of phone calls and money for

20    family members as far as relocation.  The primary reason is

21    safety.  Three El Rukn family members --

22    THE COURT:  The same frame -- this is after he became

23    a cooperator in the federal case?

24    MR. NOLAND:  Yes, your Honor.  And he goes through in

25    his affidavit about how these phone calls were crucial because

02:17:07   1   the El Rukns cooperators were very worried about their family,

02:17:12   2   the safety of their family members and that the government was

02:17:14   3   providing this information for relocation.

02:17:16   4            THE COURT:  So this is what you want to elicit from

02:17:18   5   Brannigan?

02:17:18   6            MR. NOLAND:  That and that -- Mr. Brannigan describes

02:17:24   7   the evidence supporting why this was crucial and absolutely

02:17:28   8   necessary which was that three El Rukn cooperators's family

02:17:32   9   members had been shot or shot at, and so in some way, we feel

02:17:37   10  we need to address this issue to ameliorate what the testimony

02:17:42   11  of Ms. Conyers.

02:17:43   12           THE COURT:  Let me hear from Mr. Loevy.

02:17:46   13           MR. LOEVY:  The testimony at Hunter's deposition is

02:17:48   14  that Brannigan went with to make the introduction.  That's not

02:17:52   15  impropriety.  That's Brannigan went with to make the

02:17:56   16  introduction.

02:17:56   17           THE COURT:  This is from Hunter's deposition or

02:17:58   18  Brannigan?

02:17:59   19           MR. LOEVY:  Hunter says, yes, that I made the

02:18:01   20  introduction to Dan.  What does that have to do with opening

02:18:03   21  the door to he's in the witness protection program?  It has

02:18:07   22  nothing to do with it.  The witness protection stuff has

02:18:09   23  nothing to do with this case.  It implies that Nate --

02:18:11   24           THE COURT:  Let me ask you this question.  Are you

02:18:13   25  going to bring out that Mr. Brannigan was involved in the

                     ***REALTIME UNEDITED TRANSCRIPT ONLY***

| 02:18:16 | 1 | interview? |
| 02:18:16 | 2 | MR. LOEVY:  No. |
| 02:18:17 | 3 | THE COURT:  Okay.  So the predicate for this was |
| 02:18:20 | 4 | somebody bringing out that Brannigan was involved.  Is that -- |
| 02:18:25 | 5 | you said it comes in somehow. |
| 02:18:26 | 6 | MR. NOLAND:  That's not the predicate. |
| 02:18:27 | 7 | THE COURT:  You started off by saying that some of |
| 02:18:29 | 8 | the designations that the plaintiff has made from Hunter |
| 02:18:32 | 9 | indicated that they wanted to bring out that you and |
| 02:18:35 | 10 | Mr. Brannigan were in on the initial interview and that there |
| 02:18:38 | 11 | was some suggestion that that was improper. |
| 02:18:39 | 12 | MR. NOLAND:  If that's what I was saying, it was the |
| 02:18:41 | 13 | initial introduction.  Mr. Loevy is correct, that's what |
| 02:18:44 | 14 | Mr. Hunter says. |
| 02:18:44 | 15 | THE COURT:  Are you going to bring out the initial |
| 02:18:46 | 16 | introduction? |
| 02:18:47 | 17 | MR. LOEVY:  No. |
| 02:18:47 | 18 | THE COURT:  If they are not going to bring it out, |
| 02:18:49 | 19 | why do you need to go into it? |
| 02:18:50 | 20 | MR. NOLAND:  It's designated in there.  It's |
| 02:18:52 | 21 | designated in their Hunter designations. |
| 02:18:54 | 22 | THE COURT:  Undesignate it. |
| 02:18:55 | 23 | MR. LOEVY:  Or I don't have an objection to him |
| 02:18:57 | 24 | saying I made the introduction. |
| 02:18:58 | 25 | THE COURT:  I understand.  You can't control what the |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/05/16 PM
Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 53 of 174 PageID #:65346
***REALTIME UNEDITED TRANSCRIPT ONLY***

52

| | | |
|---|---|---|
| 02:19:01 | 1 | man is going to say and what you quoted me as Hunter's |
| 02:19:04 | 2 | deposition and the witness is Brannigan.  So you either |
| 02:19:06 | 3 | undesignate. |
| 02:19:06 | 4 | MR. LOEVY:  We will undesignate. |
| 02:19:08 | 5 | THE COURT:  What's the next point then?  And there is |
| 02:19:10 | 6 | not going to be any argument that Brannigan being there was |
| 02:19:13 | 7 | any effort to influence him. |
| 02:19:15 | 8 | MR. LOEVY:  No. The Earl -- |
| 02:19:20 | 9 | MR. NOLAND:  The photos. |
| 02:19:22 | 10 | MR. LOEVY:  The testimony at the criminal trial was |
| 02:19:25 | 11 | they put 60 bucks in his commissary.  There was other |
| 02:19:29 | 12 | testimony that Earl got other money, that that wasn't elicited |
| 02:19:33 | 13 | and for his family.  All Ms. Conyers did was read the trial |
| 02:19:38 | 14 | testimony or say I cross-examined him at trial.  They want to |
| 02:19:41 | 15 | put in other evidence -- |
| 02:19:42 | 16 | THE COURT:  Let me go back.  I need to go back and |
| 02:19:44 | 17 | look at exactly what she said.  Was it on her direct or cross |
| 02:19:49 | 18 | or redirect or redirect? |
| 02:19:51 | 19 | MR. KULWIN:  Direct, I believe, Judge. |
| 02:19:55 | 20 | THE COURT:  I am going to send the jury out so I can |
| 02:19:57 | 21 | look at this stuff. |
| 02:20:01 | 22 | (The following proceedings were had in open court in the |
| 02:20:01 | 23 | presence and hearing of the jury:) |
| 02:20:01 | 24 | THE COURT:  There's an issue that's going to require |
| 02:20:03 | 25 | me to look at the rough transcript from this morning.  Rather |

| | | |
|---|---|---|
| 02:20:08 | 1 | than have you folks sit here, you can go back there and have |
| 02:20:13 | 2 | another cup of coffee or something. |
| 02:20:43 | 3 | (The jury leaves the courtroom.). |
| 02:20:43 | 4 | THE COURT: I found it already. I love this thing. |
| 02:21:04 | 5 | It's so great. I just did a search. I'll just wait until Mr. |
| 02:21:09 | 6 | Kulwin gets back. |
| 02:21:09 | 7 | MR. NOLAND: Actually, he said proceed without him. |
| 02:21:11 | 8 | He had to go do something. |
| 02:21:12 | 9 | THE COURT: It was actually the redirect I think. |
| 02:21:17 | 10 | No, no, my mistake. It's during the direct. |
| 02:21:20 | 11 | Okay. If you're looking for this later, it's about |
| 02:21:25 | 12 | at 10:46 in the morning. During -- |
| 02:21:27 | 13 | "QUESTION: During your cross-examination did Hawkins |
| 02:21:29 | 14 | reveal that in the past, he had received benefits for his |
| 02:21:32 | 15 | testimony? |
| 02:21:32 | 16 | "ANSWER: Yes. |
| 02:21:33 | 17 | "QUESTION: What year did he testify that he started to |
| 02:21:38 | 18 | receiving benefits? |
| 02:21:39 | 19 | "ANSWER: I believe he started receiving benefits in |
| 02:21:41 | 20 | 1987. |
| 02:21:42 | 21 | "QUESTION: Okay. What benefits do you recall Hawkins |
| 02:21:45 | 22 | testifying in the 2009 trial that he received? |
| 02:21:48 | 23 | "ANSWER: He got to make phone calls to family and |
| 02:21:51 | 24 | friends from the U.S. Attorney's Office, the U.S. Attorney's |
| 02:21:54 | 25 | Office put money into his commissary books, approximately $60 |

02:21:57  1   I believe a month, the U.S. Attorney's Office gave his family

02:22:00  2   members money, they were like for the phone calls and he was

02:22:02  3   also permit today have sex with his girlfriend in the federal

02:22:07  4   court building.

02:22:08  5        "QUESTION:  Okay, during your cross-examination of

02:22:10  6   Hawkins, did he also testify that he was on death row when he

02:22:14  7   started cooperating?

02:22:15  8        "ANSWER:  That he was the federal jail downtown.

02:22:19  9        "QUESTION:  Okay.  In your experience in criminal cases

02:22:22 10   are parties permitted to pay benefits to witnesses?  Answer

02:22:25 11   answer no.

02:22:26 12        "QUESTION:  Why not?  She starts to answer.  I told

02:22:29 13   Mr. Art to rephrase the question.  Let me ask the question in

02:22:32 14   a different way.

02:22:33 15          In your experience, do the deals that prosecutors

02:22:36 16   make with witnesses to testify typically involve reducing

02:22:40 17   prison sentences?

02:22:41 18        "ANSWER:  Yes.

02:22:42 19        "QUESTION:  In your experience, is it unusual for

02:22:45 20   prosecutors to receive the type of benefits that Hawkins

02:22:48 21   received?

02:22:48 22        "ANSWER:  Yeah, I think yes.

02:22:50 23        "QUESTION:  Is it typical to have sex with your

02:22:53 24   girlfriend in the federal courthouse?

02:22:54 25        "ANSWER:  Practically unheard of."

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 02:22:57 | 1 | So that's the end of the testimony. |
| 02:22:59 | 2 | And so you want to -- the material that you discussed |
| 02:23:03 | 3 | in the sidebar, Mr. Noland, is if I'm catching it correctly, |
| 02:23:09 | 4 | it's essentially to explain why certain aspects of these |
| 02:23:14 | 5 | benefits were given and specifically it would be the money for |
| 02:23:19 | 6 | the family members and making phone calls, being able to make |
| 02:23:27 | 7 | phone calls from the U.S. Attorney's Office? |
| 02:23:28 | 8 | MR. NOLAND: Yes. |
| 02:23:29 | 9 | THE COURT: And so you want -- give me in a nutshell |
| 02:23:33 | 10 | again what the various points are that you want to elicit from |
| 02:23:36 | 11 | Mr. Brannigan? |
| 02:23:37 | 12 | MR. NOLAND: Mr. Brannigan would be expected to |
| 02:23:40 | 13 | testify that the reason phone calls were provided was because |
| 02:23:43 | 14 | of primarily safety concerns for the families. The El Rukn |
| 02:23:47 | 15 | cooperators shortly before Mr. Hawkins began to cooperate, |
| 02:23:53 | 16 | three El Rukn cooperators's family members were shot and/or |
| 02:23:57 | 17 | shot at. That would be Anthony Sumner, Trammell Davis and |
| 02:24:01 | 18 | Henry Harris which occurred in late 1987. The benefits and |
| 02:24:06 | 19 | the cooperation I believe of Mr. Hawkins would be shortly |
| 02:24:09 | 20 | thereafter in '88 and 89 and Mr. Brannigan explained in an |
| 02:24:13 | 21 | affidavit submitted in 1995 that that was one of the driving |
| 02:24:18 | 22 | forces of the overarching concern was safety for the |
| 02:24:23 | 23 | cooperators who were constantly worried about -- so that would |
| 02:24:28 | 24 | be number. |
| 02:24:28 | 25 | With respect to the phone calls, so they were keeping |

***REALTIME UNEDITED TRANSCRIPT ONLY***

02:24:31 1 in constant contact with the family.

02:24:32 2 THE COURT: So they could keep in touch with their

02:24:35 3 family.

02:24:35 4 MR. NOLAND: They could keep in touch with them to

02:24:37 5 make sure they were safe and to keep in contact for those

02:24:40 6 purposes.

02:24:41 7 And as well there were -- that would be the same

02:24:45 8 thing for the expenses, the money for the family members which

02:24:50 9 really would be, you know, relocation expenses.

02:24:52 10 THE COURT: Is that what -- it wasn't clear what she

02:24:55 11 was saying was -- she said U.S. Attorney's Office gave the

02:24:58 12 family members money for the phone calls is what she says.

02:25:04 13 MR. LOEVY: Yeah.

02:25:04 14 THE COURT: You're saying there was actually more

02:25:06 15 money than just for phone calls. There was money for

02:25:10 16 relocation.

02:25:10 17 MR. NOLAND: I believe it's for relocating the

02:25:12 18 family, in particular Mr. Hawkins' common law wife was

02:25:15 19 relocated.

02:25:16 20 THE COURT: The jury already knows he was in witness

02:25:21 21 protection because he has marshals sitting with them.

02:25:24 22 Everybody knows that?

02:25:25 23 MR. ART: You instructed them on that, yeah.

02:25:27 24 MR. KULWIN: No, you told them he was in a program.

02:25:31 25 The compromise was we'll tell them that he is in a government

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 02:25:35 | 1 | program. |
| 02:25:35 | 2 | MR. ART: About witness relocation. |
| 02:25:37 | 3 | THE COURT: I told them I was in a witness |
| 02:25:40 | 4 | relocation. I know I didn't say he was in a government |
| 02:25:42 | 5 | program. |
| 02:25:43 | 6 | MR. KULWIN: Aren't we all? |
| 02:25:44 | 7 | THE COURT: Okay. So let me hear last word on this |
| 02:25:49 | 8 | from plaintiff's counsel. |
| 02:25:50 | 9 | MR. LOEVY: Your Honor, from our perspective, all |
| 02:25:52 | 10 | that Mr. Art elicited was this was testified to at the second |
| 02:25:57 | 11 | criminal trial, it was the subject of cross-examination. They |
| 02:25:59 | 12 | now want to prove up something that didn't get proved up at |
| 02:26:01 | 13 | the second criminal trial which is the reason why. You know, |
| 02:26:04 | 14 | if you want to have -- say that the phone calls were so he |
| 02:26:08 | 15 | could be in contact with his family, that's one thing. What |
| 02:26:11 | 16 | Mr. Noland just suggested is oh, he needs to talk to them |
| 02:26:13 | 17 | because three El Rukns got shot at. It doesn't even follow. |
| 02:26:16 | 18 | THE COURT: This is what the ruling is. First of |
| 02:26:18 | 19 | all, if all that had been asked was what did he testify to in |
| 02:26:22 | 20 | the trial and it stopped right there, then I would agree with |
| 02:26:26 | 21 | you. But it went beyond that. It said it was this question |
| 02:26:30 | 22 | about whether these benefits were unusual. That was elicited. |
| 02:26:33 | 23 | Okay? So that means they're entitled to explain that. You |
| 02:26:41 | 24 | cannot elicit under Rule 403 that there were family members of |
| 02:26:45 | 25 | other people who were shot. That's just no evidence it's |

02:26:49   1   connected to Mr. Fields.  It would be wildly unfairly

02:26:55   2   prejudicial.  You can put in that -- and, honestly this is why

02:26:59   3   we are taking a break so you can go talk to Mr. Brannigan.

02:27:03   4   That's why I decided to take a break.  You can talk to him.

02:27:06   5   You can elicit from Mr. Brannigan that Mr. Hawkins had

02:27:10   6   concerns about his family safety because he was cooperating

02:27:14   7   and that was the reason why he was allowed to make calls from

02:27:19   8   the U.S. Attorney's Office to check on them.  And if he can

02:27:22   9   honestly testify that there was money given for the relocation

02:27:24  10   of his family, then he can testify to it because he had

02:27:28  11   concerns about the safety of his family.

02:27:30  12           MR. NOLAND:  May I lead on those two points?

02:27:32  13           THE COURT:  You should.  You should also go out and

02:27:34  14   talk to him first to let him know what he can and can't say.

02:27:38  15           MR. KULWIN:  Judge, I am going to call down and see

02:27:41  16   if Mr. Kuhn can come up now.

02:27:43  17           THE COURT:  I said 3:00.  And it's going to be out of

02:27:47  18   whack.

02:27:48  19           MR. KULWIN:  He came back.

02:27:50  20           MR. LOEVY:  He spoke to Mr. Kulwin and I.  We can

02:27:52  21   report to the Court.

02:27:53  22           THE COURT:  Maybe we don't need him.  What do you

02:27:56  23   know.

02:27:56  24           MR. LOEVY:  He doesn't have Murphy's original notes.

02:28:00  25   They wouldn't have received Murphy's notes given the time

               ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|--|--|--|
| 02:28:04 | 1 | period and all he had was a copy of the deposition. |
| 02:28:07 | 2 | THE COURT: Is that what he said? |
| 02:28:08 | 3 | MR. KULWIN: He said that plus he said that there are |
| 02:28:12 | 4 | 482 boxes down there and there's no way -- and the index is |
| 02:28:16 | 5 | less than -- |
| 02:28:17 | 6 | THE COURT: At least he knows there's 482. |
| 02:28:20 | 7 | MR. KULWIN: He says the index is less than precise. |
| 02:28:22 | 8 | THE COURT: Nobody has to look through 482 boxes. We |
| 02:28:26 | 9 | don't have to discuss that. You can text Mr. Kuhn back. I |
| 02:28:30 | 10 | don't need him up there. You now have representation from him |
| 02:28:33 | 11 | as to what he believes. It's never going to get better than |
| 02:28:36 | 12 | that unless I order somebody to look through 482 boxes and I |
| 02:28:40 | 13 | am not sure he can do better than that then. We will figure |
| 02:28:43 | 14 | out how to deal with this later. |
| 02:28:47 | 15 | Take five minutes. |
| 02:28:49 | 16 | (Short break.) |
| 02:37:34 | 17 | (Witness sworn.) |
| 02:37:47 | 18 | THE COURT: Mr. Noland, you can go ahead. |
| 02:37:49 | 19 | MR. NOLAND: Thank you, your Honor. |
| 02:37:49 | 20 | - - - |
| 02:37:49 | 21 | DANIEL BRANNIGAN, DIRECT EXAMINATION |
| 02:37:49 | 22 | BY MR. NOLAND: |
| 02:37:50 | 23 | Q. Sir, would you please state your name? |
| 02:37:53 | 24 | A. Daniel Brannigan, B-r-a-n-n-i-g-a-n. |
| 02:37:58 | 25 | THE COURT: Let me do this. So you don't need to |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 02:38:00 | 1 | feel like you have to lean into it, I'll move it a little |
| 02:38:03 | 2 | closer to you.  That's actually plenty close enough. |
| 02:38:06 | 3 | BY MR. NOLAND: |
| 02:38:07 | 4 | Q.  What is your current occupation? |
| 02:38:08 | 5 | A.  I am an investigator for the state's attorney's office, |
| 02:38:11 | 6 | Cook County. |
| 02:38:11 | 7 | Q.  And are you retired from the Chicago Police Department |
| 02:38:15 | 8 | before you started that job? |
| 02:38:16 | 9 | A.  Yes, sir. |
| 02:38:17 | 10 | Q.  And when did you start with the Chicago Police Department? |
| 02:38:19 | 11 | A.  January 1969, 6, January 1969 to be exact. |
| 02:38:25 | 12 | Q.  And can you give the jury just a brief description of your |
| 02:38:30 | 13 | assignments with the police department from 1969 to about |
| 02:38:34 | 14 | 1974. |
| 02:38:35 | 15 | A.  Basically, patrol, plain clothes unit, and then in '74 I |
| 02:38:41 | 16 | made detective. |
| 02:38:42 | 17 | Q.  And when you made detective in 1947, where were you |
| 02:38:46 | 18 | assigned? |
| 02:38:47 | 19 | A.  Initially, I was assigned to the organized crime division, |
| 02:38:50 | 20 | the intelligence unit working the organized crime. |
| 02:38:55 | 21 | Q.  And then in approximately 1975, did you receive a new |
| 02:39:00 | 22 | assignment? |
| 02:39:00 | 23 | A.  That's correct. |
| 02:39:01 | 24 | Q.  What was that? |
| 02:39:01 | 25 | A.  I went to the gang crimes unit, gang investigations, gang |

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 62 of 174 PageID #:65355
12/05/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

61

| | | |
|---|---|---|
| 02:39:06 | 1 | intelligence. |
| 02:39:06 | 2 | Q.  What does the gang crimes, gang intelligence unit do? |
| 02:39:09 | 3 | A.  Investigate crimes related to gang members and anything |
| 02:39:13 | 4 | else we were assigned to do, assist in any other case. |
| 02:39:17 | 5 | Q.  And in or about 1977 or 1978, did you receive a more |
| 02:39:22 | 6 | specific assignment in the gang crimes unit? |
| 02:39:24 | 7 | A.  Yes, sir.  Myself, my partners and everybody in the gang |
| 02:39:29 | 8 | intelligence unit was assigned to specific gang or a couple of |
| 02:39:32 | 9 | gangs. |
| 02:39:32 | 10 | Q.  So before that you were just generally working |
| 02:39:37 | 11 | miscellaneous gang activity and then there was a more specific |
| 02:39:41 | 12 | assignment in around that time frame in '77? |
| 02:39:44 | 13 | A.  That's correct. |
| 02:39:44 | 14 | Q.  And what was that assignment that you received? |
| 02:39:48 | 15 | A.  I was assigned to devote some of my time and energy to |
| 02:39:55 | 16 | working the El Rukn street gang. |
| 02:39:57 | 17 | Q.  At that time, who were you partnered with? |
| 02:39:59 | 18 | A.  I was initially I was partnered with an individual named |
| 02:40:03 | 19 | Danny Davis. |
| 02:40:04 | 20 | Q.  And had Mr. Davis been working that particular |
| 02:40:09 | 21 | organization for a time? |
| 02:40:10 | 22 | A.  Yes, sir, he worked on a plain clothes team in the |
| 02:40:14 | 23 | district where their base of their operation was, the 21st |
| 02:40:19 | 24 | district on the south side of the city. |
| 02:40:20 | 25 | Q.  And did you learn background information on the |

| 02:40:22 | 1 | organization from Mr. Davis and others in the unit? |
| 02:40:25 | 2 | A. Yes, sir. There were many older people in the unit, older |
| 02:40:30 | 3 | investigators, detectives officers who had previously worked |
| 02:40:32 | 4 | on it. |
| 02:40:33 | 5 | Q. Just generally speaking, can you give the background |
| 02:40:35 | 6 | information with respect to the El Rukn organization that you |
| 02:40:39 | 7 | were aware of when you started this assignment in around 1977? |
| 02:40:43 | 8 | MR. LOEVY: Objection to relevance, your Honor, and |
| 02:40:45 | 9 | 403. |
| 02:40:46 | 10 | THE COURT: Leading question. Ask it by the way of a |
| 02:40:52 | 11 | leading question and let's compress it? |
| 02:40:54 | 12 | BY MR. NOLAND: |
| 02:40:54 | 13 | Q. Mr. Brannigan, you are aware that the El Rukn street gang |
| 02:40:57 | 14 | had a couple prior names; is that correct? |
| 02:40:59 | 15 | A. Correct. |
| 02:41:00 | 16 | MR. LOEVY: Objection, relevance. |
| 02:41:01 | 17 | THE COURT: Rule 403 on that. I didn't realize |
| 02:41:04 | 18 | that's what you were going into it. I'm sustaining the |
| 02:41:07 | 19 | objection under Rule 403. It's been covered by a sufficient |
| 02:41:10 | 20 | number of witnesses at this point. |
| 02:41:11 | 21 | BY MR. NOLAND: |
| 02:41:12 | 22 | Q. About 1977 who was the leader of the El Rukn organization? |
| 02:41:16 | 23 | MR. LOEVY: Objection. |
| 02:41:17 | 24 | THE COURT: Overruled. You can answer that. |
| 02:41:18 | 25 | THE WITNESS: An individual by the name of Jeff Fort. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 02:41:20 | 1 | He had become the sole leader of that organization. |
| 02:41:22 | 2 | BY MR. NOLAND: |
| 02:41:23 | 3 | Q.  And did you then work -- what did you do for the next five |
| 02:41:26 | 4 | years or so in this role investigating the El Rukns? |
| 02:41:30 | 5 | A.  When not obligated with other assignments, we would try to |
| 02:41:45 | 6 | stay focused on them, gather intelligence, vehicles that were |
| 02:41:46 | 7 | utilized, informants, things of that nature, investigate any |
| 02:41:47 | 8 | cases that were attributed to members of the organization. |
| 02:41:49 | 9 | Q.  In connection with that job, did you from time to time |
| 02:41:54 | 10 | work with some federal agents? |
| 02:41:56 | 11 | A.  Yes, sir. |
| 02:41:58 | 12 | MR. LOEVY:  Objection to relevance. |
| 02:41:59 | 13 | THE COURT:  Overruled. |
| 02:42:01 | 14 | BY MR. NOLAND: |
| 02:42:01 | 15 | Q.  What were your -- what was the connection with working |
| 02:42:03 | 16 | with federal agents in that time frame? |
| 02:42:05 | 17 | A.  Basically, it was investigating gun crimes as related to |
| 02:42:08 | 18 | gang members.  Both the El Rukns and any other gang that was |
| 02:42:12 | 19 | out there. |
| 02:42:12 | 20 | Q.  And directing your attention to approximately 1982 or |
| 02:42:17 | 21 | 1983, did you receive a new assignment with respect to the El |
| 02:42:21 | 22 | Rukns? |
| 02:42:21 | 23 | A.  Yes, sir, I did. |
| 02:42:22 | 24 | Q.  And when was that specifically? |
| 02:42:24 | 25 | A.  I would guess sometime in the summer of '82, maybe, I was |

| | | |
|---|---|---|
| 02:42:31 | 1 | assigned to work with some ATF agents. |
| 02:42:33 | 2 | Q. And what were you assigned to do with the ATF agents with |
| 02:42:37 | 3 | respect to the El Rukns? |
| 02:42:38 | 4 | A. We were assigned to work with the organized crime drug |
| 02:42:47 | 5 | enforcement task force and see if there was a potential for |
| 02:42:52 | 6 | putting together a case against the El Rukns. |
| 02:42:56 | 7 | Q. It's true that the task force, the El Rukn task force was |
| 02:42:59 | 8 | established to investigate El Rukn narcotics dealing and other |
| 02:43:02 | 9 | illegal and violent activity is that true? |
| 02:43:04 | 10 | A. That's correct. |
| 02:43:05 | 11 | Q. And who put this task force together? |
| 02:43:08 | 12 | A. It was basically -- it was basically two ATF agents, agent |
| 02:43:14 | 13 | owe Brian and agent wonderful who had previously worked it on |
| 02:43:19 | 14 | and off. They came up with the idea and submitted the |
| 02:43:21 | 15 | proposal for this task force to take place. |
| 02:43:24 | 16 | Q. And who was the proposal submitted to? |
| 02:43:27 | 17 | A. The OCDETF group, that's organized crime drug enforcement |
| 02:43:33 | 18 | task force, one of the big long alphabet agencies. |
| 02:43:37 | 19 | Q. In this task force, were there other alphabet agencies |
| 02:43:40 | 20 | that were folded into its work? |
| 02:43:42 | 21 | A. Yes, sir, it was FBI, DEA, secret service, that way you |
| 02:43:50 | 22 | would be able to utilize all the different sources of those |
| 02:43:53 | 23 | agencies. |
| 02:43:53 | 24 | Q. Mr. Brannigan, can you describe what your duties were with |
| 02:43:56 | 25 | the task force from when you joined in approximately 1982 |

| | | |
|---|---|---|
| 02:44:02 | 1 | until 1985? |
| 02:44:03 | 2 | MR. LOEVY:  Objection, your Honor. |
| 02:44:07 | 3 | THE COURT:  Sustained.  Rule 403 and relevance. |
| 02:44:12 | 4 | BY MR. NOLAND: |
| 02:44:13 | 5 | Q.  Mr. Brannigan, were you sworn as a federal agent to work |
| 02:44:17 | 6 | with the task force? |
| 02:44:17 | 7 | A.  Yes, sir, I was, after I was vetted. |
| 02:44:20 | 8 | Q.  I want to direct your attention to May of 1985? |
| 02:44:29 | 9 | A.  Correct.  Got you. |
| 02:44:30 | 10 | Q.  Was there an assignment that you received relative to the |
| 02:44:35 | 11 | El Rukns in or about May of 8 of 1985? |
| 02:44:42 | 12 | A.  Yes, there was. |
| 02:44:43 | 13 | Q.  What was that assignment? |
| 02:44:44 | 14 | A.  I was assigned by the U.S. attorney assigned to the case, |
| 02:44:49 | 15 | Mr. Patrick Deady, Deady, and I was told that there was |
| 02:44:53 | 16 | information developed in an unrelated investigation by FBI |
| 02:44:58 | 17 | agents in Washington, D.C. |
| 02:45:01 | 18 | MR. LOEVY:  Objection to hearsay and relevance, your |
| 02:45:02 | 19 | Honor. |
| 02:45:02 | 20 | THE COURT:  Let's just stop the answer right there. |
| 02:45:06 | 21 | Proceed to the next question. |
| 02:45:07 | 22 | BY MR. NOLAND: |
| 02:45:07 | 23 | Q.  All right.  And did the assignment relate to -- can you |
| 02:45:11 | 24 | specifically what the assignment related to with respect to |
| 02:45:14 | 25 | what you were being asked to do? |

| | | |
|---|---|---|
| 02:45:16 | 1 | THE COURT:  Without disclosing what people from |
| 02:45:17 | 2 | Washington, D.C. or people said, what was the nature of the |
| 02:45:21 | 3 | assignment? |
| 02:45:22 | 4 | THE WITNESS:  The subject wanted for a triple murder |
| 02:45:24 | 5 | was hiding in a safe house in east Cleveland, Ohio.  An El |
| 02:45:28 | 6 | Rukn. |
| 02:45:28 | 7 | BY MR. NOLAND: |
| 02:45:29 | 8 | Q.  And what was this individual's name? |
| 02:45:31 | 9 | A.  James Walker. |
| 02:45:32 | 10 | Q.  And what assignment -- what did Mr. Deady ask you to do? |
| 02:45:38 | 11 | A.  Mr. Deady requested I accompany FBI agents in east |
| 02:45:46 | 12 | Cleveland, Ohio in attempt to apprehend Mr. Walker, James |
| 02:45:51 | 13 | Walker. |
| 02:45:51 | 14 | Q.  And to your understanding, why was it you that Mr. Deady |
| 02:45:56 | 15 | requested to go to east Cleveland? |
| 02:45:58 | 16 | A.  I drew the short straw, somebody had to go out there so I |
| 02:46:03 | 17 | ended up going out there. |
| 02:46:04 | 18 | Q.  And would you be able to recognize Mr. Walker? |
| 02:46:07 | 19 | A.  That's correct. |
| 02:46:07 | 20 | Q.  Did you then fly out to east Cleveland shortly thereafter? |
| 02:46:15 | 21 | A.  Yes, sir, the next day, I believe. |
| 02:46:17 | 22 | Q.  And when was there ultimately was there a raid that was |
| 02:46:21 | 23 | conducted at this particular safe house? |
| 02:46:22 | 24 | A.  Yes, a raid was conducted by members of the FBI's swat |
| 02:46:27 | 25 | team and other members of their office. |

12/05/16 PM

67

| | | |
|---|---|---|
| 02:46:29 | 1 | Q.  When, if you recall, based on reviewing the documents, |
| 02:46:34 | 2 | when this raid occurred? |
| 02:46:35 | 3 | A.  This, I believe, was the next day, it would have been May |
| 02:46:39 | 4 | 9th.  I believe it was a Friday. |
| 02:46:40 | 5 | Q.  And do you have a recollection of what this particular |
| 02:46:46 | 6 | safe house looked like? |
| 02:46:47 | 7 | A.  I recall it was a large frame type house with maybe some |
| 02:46:52 | 8 | brick in it or on it, and it was divided up into numerous |
| 02:47:00 | 9 | rooms later once we got in there. |
| 02:47:03 | 10 | Q.  What time of day did you accompany the FBI agents to this |
| 02:47:09 | 11 | house? |
| 02:47:09 | 12 | A.  It was early in the morning, 6:00, 7:00 o'clock-ish, |
| 02:47:13 | 13 | something in that nature. |
| 02:47:13 | 14 | Q.  Can you please describe what happened when you got there? |
| 02:47:16 | 15 | A.  There was a perimeter setup with either members of the |
| 02:47:21 | 16 | east Cleveland police department or the Cleveland police |
| 02:47:23 | 17 | department, there was a number of FBI agents who would |
| 02:47:28 | 18 | actually go on the raid, whatever it was called be and a |
| 02:47:34 | 19 | couple of other FBI agents and myself. |
| 02:47:36 | 20 | Q.  Who made entry into the house first? |
| 02:47:38 | 21 | A.  The swat team made the initial entry. |
| 02:47:40 | 22 | Q.  And at some point, did you go in? |
| 02:47:43 | 23 | A.  Approximately a minute or so after I was called into the |
| 02:47:47 | 24 | building. |
| 02:47:48 | 25 | Q.  And what did you see? |

02:47:49  1  A.  There was -- I was directed to a room and there was an

02:47:54  2  individual in there sitting on a bed and they were asking me

02:47:58  3  if it was James Walker and I said, yes, it was.

02:48:00  4  Q.  At that time, did you see any other individuals that you

02:48:02  5  recognized?

02:48:03  6  A.  No, sir, I didn't see anyone.

02:48:05  7  Q.  Do you know whether or not there was any other individuals

02:48:07  8  in the safe house at that time?

02:48:08  9  A.  Yes, sir.  I was certain there were other people in there

02:48:11  10  because I could still hear commotion going on during the

02:48:15  11  course of the raid.

02:48:16  12  Q.  What happened next with respect to your interaction with

02:48:20  13  Mr. Walker?

02:48:20  14  A.  Mr. Walker and I grabbed Mr. Walker with some other agents

02:48:26  15  and out the door we went.

02:48:27  16  Q.  Where did you go?

02:48:27  17  A.  Hopped into a waiting FBI car with a couple of FBI agents

02:48:33  18  and off we went while the raid continued.

02:48:35  19        MR. LOEVY:  Objection to relevance, your Honor.

02:48:36  20        THE COURT:  Overruled.

02:48:37  21  BY MR. NOLAND:

02:48:38  22  Q.  And what did you -- where did you go with the FBI agents

02:48:41  23  and Mr. Walker?

02:48:42  24  A.  We went -- I believe it was the FBI offices in east

02:48:46  25  Cleveland -- in Cleveland, Ohio.

| | | |
|---|---|---|
| 02:48:48 | 1 | Q.  And when you got there, did you -- what did you do when |
| 02:48:54 | 2 | you got to the FBI office at east Cleveland? |
| 02:48:56 | 3 | A.  Myself and the FBI agents sat down with Mr. Walker, |
| 02:49:04 | 4 | Mr. Walker was advised that we had an arrest warrant for him, |
| 02:49:07 | 5 | the murder. |
| 02:49:08 | 6 |         MR. LOEVY:  Objection to relevance. |
| 02:49:10 | 7 |         THE COURT:  Sustained as to walker.  You need to move |
| 02:49:14 | 8 | ahead. |
| 02:49:14 | 9 | BY MR. NOLAND: |
| 02:49:15 | 10 | Q.  Did you speak with Mr. Walker, did he provide you |
| 02:49:18 | 11 | information? |
| 02:49:18 | 12 | A.  Did Mr. Walker provide me? |
| 02:49:20 | 13 |         MR. NOLAND:  May I ask that, your Honor? |
| 02:49:21 | 14 |         THE COURT:  Yes.  It's just a yes or no. |
| 02:49:23 | 15 | BY MR. NOLAND: |
| 02:49:24 | 16 | Q.  Did Mr. Walker provide you any information? |
| 02:49:25 | 17 | A.  He chose not to talk to me or the agents. |
| 02:49:28 | 18 | Q.  What happened next after your dealings with Mr. Walker? |
| 02:49:31 | 19 | Did you go somewhere else? |
| 02:49:32 | 20 | A.  Yes, sir, I did. |
| 02:49:33 | 21 | Q.  Where is that? |
| 02:49:34 | 22 | A.  I went back to the east Cleveland police department. |
| 02:49:36 | 23 | Q.  And what happened when you got back to the east Cleveland |
| 02:49:40 | 24 | police department? |
| 02:49:41 | 25 | A.  I learned that there were a number of people arrested at |

02:49:47  1  the scene of the raid or inside the safe house in east

02:49:52  2  Cleveland and they were all in the police station.  I was told

02:49:54  3  that by the FBI agents.

02:49:55  4  Q.  All right.  And did you see who these individuals were?

02:49:58  5  A.  Eventually, I did, yes, sir.

02:50:00  6  Q.  And who were they?

02:50:01  7  A.  A couple members of the El Rukns and two other people from

02:50:07  8  out that way.

02:50:07  9  Q.  And do you recall what their names were?

02:50:09  10 A.  Yes, sir.

02:50:10  11 Q.  Please?

02:50:12  12 A.  There was an Anthony Sumner, there was an Earl Hawkins,

02:50:17  13 there were two other people who I didn't recognize

02:50:21  14 immediately, I recognized their faces but didn't know their

02:50:24  15 name.  That would be a J. L Houston and a subject by the name

02:50:28  16 of Alvin Tony.  And there was the individual who kept --

02:50:32  17       MR. LOEVY:  Objection, your Honor.

02:50:33  18       THE COURT:  That's good enough for now.

02:50:33  19 BY MR. NOLAND:

02:50:36  20 Q.  And did you have to make -- did you make some

02:50:39  21 notifications back to Chicago when you discovered these

02:50:42  22 individuals and Mr. Walker at the house?

02:50:44  23 A.  Oh, I made all kinds of notifications back to Chicago that

02:50:48  24 the raid was successful and now there's other people here.

02:50:52  25 Q.  And at some point during that day, did you learn that

02:50:54  1  there were going to be other individuals in law enforcement

02:50:56  2  from Chicago out to east Cleveland to join you?

02:50:59  3  A.  Later on I learned that yes, sir.

02:51:04  4  Q.  What were those other individuals that were going to be

02:51:06  5  joining you?

02:51:07  6  A.  I learned that an assistant state's attorney and a

02:51:09  7  detective who was handle -- one of the detectives handling the

02:51:13  8  triple murder that they were on their way out to east

02:51:16  9  Cleveland.

02:51:16  10  Q.  Mr. Brannigan, did you then talk to these other El Rukns

02:51:22  11  at the east Cleveland police station that you he encountered?

02:51:27  12  A.  Yes, I talked to them and the other two individuals who

02:51:29  13  were not El Rukns.

02:51:30  14  Q.  And what was your purpose in talking to these individuals?

02:51:32  15  A.  To find out what was going on and who they were.  I only

02:51:35  16  knew who two of them were.

02:51:37  17  Q.  Were any efforts made to discover the identity of the

02:51:40  18  other two individuals?

02:51:41  19         MR. LOEVY:  Objection, your Honor.  This has nothing

02:51:44  20  to do with the case.

02:51:44  21         THE COURT:  Can I see the lawyers at sidebar, please.

02:51:52  22    (The following proceedings were had at sidebar outside the

02:51:53  23  hearing of the jury:)

02:51:53  24         THE COURT:  I'm assuming that this is all a prelude

02:51:56  25  to him interviewing Sumner.

| | | |
|---|---|---|
| 02:51:57 | 1 | MR. NOLAND:  Exactly. |
| 02:51:57 | 2 | THE COURT:  Let's get to that.  Okay? |
| 02:51:59 | 3 | MR. NOLAND:  Can I just -- |
| 02:52:00 | 4 | THE COURT:  I don't understand why we need to go into |
| 02:52:01 | 5 | all of the other stuff. |
| 02:52:02 | 6 | MR. NOLAND:  The important part is the process in |
| 02:52:05 | 7 | which he was interviewing these individuals so that the other |
| 02:52:08 | 8 | El Rukns would not discovered that he was talking to |
| 02:52:11 | 9 | Mr. Sumner and that Mr. Sumner started to provide information |
| 02:52:13 | 10 | and it would also go to refute the allegations they have made |
| 02:52:17 | 11 | through Mr. Beseth that Mr. Brannigan physically assaulted |
| 02:52:21 | 12 | Mr. Sumner providing that statement. |
| 02:52:22 | 13 | THE COURT:  I think you can get to all of that |
| 02:52:24 | 14 | without going through what did the first guy say to you and |
| 02:52:29 | 15 | what did the second guy say to you and what did the third guy |
| 02:52:32 | 16 | say to you.  I think you can get to those points which I think |
| 02:52:35 | 17 | are relevant without going through those points. |
| 02:52:37 | 18 | MR. NOLAND:  What was the process you utilized in |
| 02:52:40 | 19 | talking to these individuals generally. |
| 02:52:40 | 20 | MR. LOEVY:  He is not giving responsive answers.  He |
| 02:52:42 | 21 | keeps going past the answer. |
| 02:52:43 | 22 | THE COURT:  No.  Honestly, let's say it.  I will rank |
| 02:52:46 | 23 | him among the witnesses in this case in the non-responsive |
| 02:52:51 | 24 | scale as pretty good.  It doesn't mean he is perfect.  It |
| 02:52:54 | 25 | means he is way better than the average. |

02:52:57   1    (The following proceedings were had in open court in the

02:53:02   2    presence and hearing of the jury:)

02:53:02   3         THE COURT:  Okay.  Mr. Noland, you can go ahead.

02:53:05   4         MR. NOLAND:  Thank you, your Honor.

02:53:06   5    BY MR. NOLAND:

02:53:07   6    Q.  Mr. Brannigan, can you explain the process in which you

02:53:09   7    utilized talking to these four other individuals that you

02:53:13   8    recognized as El Rukns?

02:53:13   9    A.  They were housed in the east Cleveland police station as I

02:53:19   10   mentioned, they were in the lock up downstairs is my

02:53:23   11   recollection, and I would bring them up one at a time and

02:53:26   12   speak to them.  And I would speak to them maybe 20 minutes, 25

02:53:31   13   minutes or so at a time and then bring them back down.  I was

02:53:36   14   trying to find out what was going on and they, of course,

02:53:41   15   gathering intelligence and they of course were doing the same

02:53:44   16   thing to me.

02:53:44   17   Q.  At a certain point during the day -- did you talk to these

02:53:48   18   individuals on a few occasions during the day?

02:53:51   19   A.  A couple times.  Let's pick a number like three, I

02:53:55   20   believe.

02:53:55   21   Q.  At a certain point during the day, did one of them

02:54:01   22   indicate to you in some way that he may be willing to

02:54:04   23   cooperate with you?

02:54:05   24   A.  Yes, sir, Anthony Sumner was saying things to me.  He was

02:54:09   25   making noise that suggested to me that he might want to

02:54:13  1   cooperate.

02:54:13  2   Q.  And can you explain what noise he was making, what things

02:54:19  3   he was saying that led you to believe that he may be willing

02:54:21  4   to cooperate?

02:54:21  5   A.  Anthony Sumner was telling me that he was the first one to

02:54:28  6   tell me that they were all on the run that they were in this

02:54:32  7   safe house, they felt they were being sent out of the country.

02:54:35  8   I remembered him saying he thought he was going to either

02:54:40  9   Jamaica or Africa.

02:54:41 10        MR. LOEVY:  Objection, your Honor.  Nonresponsive.

02:54:43 11        THE COURT:  Yeah, no, it was responsive.  But let's

02:54:47 12   ask another question.

02:54:48 13   BY MR. NOLAND:

02:54:49 14   Q.  And during that day, did Mr. Sumner actually provide you

02:54:54 15   -- this is the Friday I think May 10th, 1985, okay?

02:54:58 16   A.  Friday of the raid we are talking about.

02:55:00 17   Q.  Friday.  Friday.

02:55:02 18   A.  Okay.

02:55:02 19   Q.  That day did Mr. Sumner, do you recall if he provided any

02:55:06 20   specific information about the triple homicide?

02:55:09 21   A.  He didn't provide any information about any crime that

02:55:13 22   day.

02:55:14 23   Q.  Okay.  So these indications to you were you felt that he

02:55:19 24   may be feeling that he wanted to cooperate with your

02:55:22 25   investigation?

| | | |
|---|---|---|
| 02:55:23 | 1 | A. That's correct. |
| 02:55:24 | 2 | Q. Turning your attention to Saturday, May the 11th, 1985. |
| 02:55:30 | 3 | Had Mr. Wharrie and Mr. Smith and a Chicago police detective, |
| 02:55:37 | 4 | had they arrived? |
| 02:55:38 | 5 | A. They arrived Friday night is my recollection after I was |
| 02:55:41 | 6 | done talking to all these guys. |
| 02:55:42 | 7 | Q. And were there further conversations with these four men |
| 02:55:48 | 8 | on the Saturday? |
| 02:55:50 | 9 | A. On the Saturday before Wharrie and Smith got to the |
| 02:55:54 | 10 | station, I started the whole process all over again talking to |
| 02:55:58 | 11 | these guys. |
| 02:55:59 | 12 | Q. And just so we're clear, the other individuals were not -- |
| 02:56:03 | 13 | they weren't providing you any information or giving you any |
| 02:56:05 | 14 | indication of cooperation? |
| 02:56:06 | 15 | A. No, sir, and the two of them were not even telling me |
| 02:56:09 | 16 | their names. |
| 02:56:10 | 17 | Q. With respect to Sumner, at some point during that day, |
| 02:56:15 | 18 | Saturday, did Mr. Sumner provide information with respect to |
| 02:56:19 | 19 | that triple homicide? |
| 02:56:20 | 20 | A. Yes, sir, he did. |
| 02:56:22 | 21 | Q. And did he indicate the offenders that he was aware of in |
| 02:56:27 | 22 | the triple homicide? |
| 02:56:28 | 23 | A. Yes, sir. |
| 02:56:29 | 24 | Q. And generally speaking, do you recall who he identified as |
| 02:56:34 | 25 | being involved in that case? |

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 77 of 174 PageID #:65370
12/05/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

76

02:56:35  1  A.  Well, he identified James Walker who was already arrested.

02:56:40  2         MR. LOEVY:  Objection to relevance, your Honor.

02:56:41  3         THE COURT:  Sustained.

02:56:42  4  BY MR. NOLAND:

02:56:43  5  Q.  Did Mr. Sumner provide you any information about any other

02:56:48  6  cases when you were out there in east Cleveland?

02:56:50  7  A.  No, just the triple homicide.

02:56:53  8  Q.  Did you ask him any questions about any specific other

02:56:57  9  cases that he might know about?

02:56:58  10  A.  No, sir, I had no idea why they were all out there other

02:57:02  11  than walker.

02:57:03  12  Q.  Mr. Brannigan, were the other individuals released later

02:57:11  13  that day or the next day?

02:57:13  14  A.  Yes, sir.

02:57:14  15  Q.  And what was the process you utilized in indicating that

02:57:20  16  the east Cleveland police would be in a position to release

02:57:23  17  those other individuals?

02:57:24  18  A.  Well, as we found out and identified who the individuals

02:57:29  19  were and whether or not they had any warrants out for them or

02:57:33  20  any wants on them, they were released.  This was done through

02:57:36  21  their fingerprints being taken.  So when the prints came back

02:57:40  22  identifying somebody as who they were, that there was nobody

02:57:46  23  looking for them, they were released all but J. L Houston.  He

02:57:51  24  happened to have a warrant on him.

02:57:52  25         MR. LOEVY:  Objection, your Honor.


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 78 of 174 PageID #:65371
12/05/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

77

| 02:57:53 | 1 | THE COURT: The fact that he has a warrant is fine. |
| 02:57:56 | 2 | Keep going. |
| 02:57:56 | 3 | BY MR. NOLAND: |
| 02:57:57 | 4 | Q. Was Earl Hawkins released? |
| 02:57:58 | 5 | A. Earl Hawkins was released, yes, sir. |
| 02:58:00 | 6 | Q. And why was he released? |
| 02:58:02 | 7 | A. There were no wants on him, there were no stop orders on |
| 02:58:05 | 8 | him, there was no arrest warrants on him, there was no |
| 02:58:09 | 9 | nothing, so he was released. |
| 02:58:10 | 10 | Q. What happened with Anthony Sumner? |
| 02:58:11 | 11 | A. Anthony Sumner was also cleared, but by this time, he had |
| 02:58:17 | 12 | begun to cooperate, he told us about the triple homicide. |
| 02:58:21 | 13 | Q. Mr. Brannigan, what was the significance of in your |
| 02:58:28 | 14 | investigation of Mr. Sumner providing that information to you |
| 02:58:32 | 15 | at that time? |
| 02:58:32 | 16 | A. Mr. Sumner was the first high ranking member of the |
| 02:58:37 | 17 | organization that provided us with any, any information |
| 02:58:42 | 18 | regarding the activities, the illegal activities of that |
| 02:58:45 | 19 | group. |
| 02:58:46 | 20 | Q. Did you place Mr. Sumner under arrest at that time? |
| 02:58:49 | 21 | A. No, Mr. Sumner was not under arrest. Mr. Sumner was free |
| 02:58:54 | 22 | to leave. |
| 02:58:54 | 23 | Q. And did you have a discussion with Mr. Sumner about coming |
| 02:58:58 | 24 | back to Chicago? |
| 02:58:58 | 25 | A. Yes, sir, I did. |

| | | |
|---|---|---|
| 02:59:01 | 1 | Q. And please, what was that discussion? |
| 02:59:03 | 2 | A. You're in for a dime, you're in for a dollar. Do you want |
| 02:59:06 | 3 | to come back with me and he said yes. |
| 02:59:08 | 4 | Q. Now, Mr. Brannigan, did you mistreat Anthony Sumner when |
| 02:59:16 | 5 | you were in east Cleveland with him in any way on May the -- |
| 02:59:20 | 6 | during that weekend? |
| 02:59:20 | 7 | A. No, sir, I'm trying to recruit him to be a cooperator. |
| 02:59:25 | 8 | Q. Did you hit him? |
| 02:59:26 | 9 | A. No, sir. |
| 02:59:27 | 10 | Q. Did you slam his head against a locker? |
| 02:59:31 | 11 | A. No, sir. |
| 02:59:31 | 12 | Q. Did you tell Mr. Sumner that you were going to put him in |
| 02:59:35 | 13 | the car as the get away driver on the triple homicide? |
| 02:59:38 | 14 | A. No, sir. |
| 02:59:39 | 15 | Q. Did you do anything -- did you do anything physically to |
| 02:59:44 | 16 | Mr. Sumner? |
| 02:59:45 | 17 | A. No, sir. |
| 02:59:45 | 18 | Q. Mr. Brannigan, when did you return to Chicago? |
| 02:59:53 | 19 | A. I came back to Chicago -- came back to Chicago on Monday, |
| 03:00:00 | 20 | I think that would have been the 13th of May. |
| 03:00:01 | 21 | Q. And did you come back with somebody? |
| 03:00:03 | 22 | A. Yes, sir, I did. |
| 03:00:05 | 23 | Q. Who did you come back with? |
| 03:00:07 | 24 | A. Anthony Sumner, I took a plane ride from east Cleveland, |
| 03:00:11 | 25 | Ohio, to Chicago. |

03:00:11   1   Q.  And was Mr. Sumner brought to the state's attorney's

03:00:16   2   office?

03:00:16   3   A.  Yes, sir, he was.

03:00:17   4   Q.  And where is the state's attorney's office?

03:00:20   5   A.  For those who are familiar with the city, 2650 south

03:00:25   6   California avenue, the south side of the city.

03:00:28   7   Q.  And what -- where did -- what happened with Mr. Sumner

03:00:32   8   after you got to the state's attorney's office?

03:00:33   9   A.  Mr. Sumner was brought up to the gang prosecution's floor

03:00:40   10  which was the 13th floor, the administrative floor of the

03:00:42   11  building, and he met with a number of state's attorneys.

03:00:46   12  Q.  And did you have any -- on that Monday, did you have any

03:00:49   13  further interaction with Sumner?

03:00:50   14  A.  No, sir, I didn't.  He was turned over to other members of

03:00:54   15  the gang intelligence unit.

03:00:56   16  Q.  Now, turning your attention to the next day,

03:00:58   17  Mr. Brannigan, May the 14th, 1985.  Were there some

03:01:02   18  debriefings of Sumner at the office?

03:01:04   19  A.  That's correct.

03:01:05   20  Q.  And please explain to the jury who was involved in those

03:01:08   21  debriefings?

03:01:09   22  A.  There was a number of state's attorneys that were involved

03:01:14   23  in the debriefing, there was an assistant U.S. attorney

03:01:17   24  involved, Sergeant Murphy, I think he was a sergeant at the

03:01:21   25  time, he was involved, I can't remember who else was there.

| | | |
|---|---|---|
| 03:01:26 | 1 | There may have been some people from gangs there in addition |
| 03:01:28 | 2 | to myself. |
| 03:01:29 | 3 | Q.  And what was the room in which this was occurring, the |
| 03:01:33 | 4 | debriefing? |
| 03:01:33 | 5 | A.  It was one of the conference type rooms in the state's |
| 03:01:40 | 6 | attorney's office, long table surrounded by chairs, conference |
| 03:01:45 | 7 | table. |
| 03:01:45 | 8 | Q.  You were there? |
| 03:01:45 | 9 | A.  Yes, sir, I was. |
| 03:01:46 | 10 | Q.  And were there -- was somebody asking questions or were |
| 03:01:51 | 11 | people asking questions of Mr. Sumner? |
| 03:01:52 | 12 | A.  A number of people were, but most of them were directed by |
| 03:01:56 | 13 | Sergeant Murphy. |
| 03:01:56 | 14 | Q.  And what kinds of questions was Sergeant Murphy asking |
| 03:02:00 | 15 | Mr. Sumner? |
| 03:02:01 | 16 | A.  He was basically asking I guess you'd call them open-ended |
| 03:02:07 | 17 | questions, what do you know, what cases can you tell us about, |
| 03:02:10 | 18 | what can you tell us. |
| 03:02:11 | 19 | Q.  And were there notes being taken during this debriefing |
| 03:02:16 | 20 | process? |
| 03:02:16 | 21 | A.  There were note pads all over place.  I remember Murphy |
| 03:02:20 | 22 | taking notes. |
| 03:02:21 | 23 | Q.  And were there -- what kinds of paper was being utilized |
| 03:02:26 | 24 | to take notes? |
| 03:02:26 | 25 | A.  I remember legal pads being out and detective -- they call |

| | | |
|---|---|---|
| 03:02:35 | 1 | them GPRs, general progress report, just a piece of paper with |
| 03:02:40 | 2 | lines on it to take additional notes. |
| 03:02:41 | 3 | Q.  What was your role in this debriefing process? |
| 03:02:44 | 4 | A.  Basically, I was acting as a guide or interpreter into the |
| 03:02:50 | 5 | world of the El Rukns.  Anthony might mention a building that |
| 03:02:55 | 6 | they had, and I would know the address of that building and I |
| 03:02:59 | 7 | would relate that to the other people or maybe a nickname, |
| 03:03:03 | 8 | things of that nature. |
| 03:03:04 | 9 | Q.  And without getting into specifics, Mr. Brannigan, isn't |
| 03:03:09 | 10 | it true that Mr. Sumner provided information about a |
| 03:03:11 | 11 | significant number of El Rukn murders and shootings? |
| 03:03:16 | 12 | A.  That's correct, he did. |
| 03:03:17 | 13 | Q.  Isn't it true that Mr. Sumner provided information that |
| 03:03:20 | 14 | implicated a significant number of other El Rukns? |
| 03:03:22 | 15 | A.  That's correct, he did. |
| 03:03:24 | 16 | Q.  Now, I want to talk about the Smith and Hickman case.  Was |
| 03:03:30 | 17 | -- did Mr. Sumner provide information about the murders of |
| 03:03:33 | 18 | Jerome Fuddy Smith and Talman Hickman that day? |
| 03:03:36 | 19 | A.  That's correct. |
| 03:03:36 | 20 | Q.  And what do you recall about the information Mr. Sumner |
| 03:03:40 | 21 | provided about those murders? |
| 03:03:41 | 22 | A.  The short version of events is he named the four offenders |
| 03:03:47 | 23 | in the case. |
| 03:03:48 | 24 | Q.  And do you recall who he named as the four offenders? |
| 03:03:51 | 25 | A.  Nathson Fields and George Carter he identified as the |

| 03:04:00 | 1 | shooters and Hank Andrews he said was one of the get away |
| 03:04:02 | 2 | drivers along with Earl Hawkins who was kind of orchestrating |
| 03:04:10 | 3 | and pointing out what was going on. |
| 03:04:12 | 4 | Q. Did Mr. Sumner identify for those in the room how he had |
| 03:04:15 | 5 | this information? |
| 03:04:16 | 6 | A. Yes, sir. He did. |
| 03:04:18 | 7 | Q. And what did he say? |
| 03:04:19 | 8 | A. It's my best -- it was a long time ago, but it's my best |
| 03:04:24 | 9 | recollection he had a conversation with Earl Hawkins a couple |
| 03:04:28 | 10 | of days after the incident went down, the murder went down, |
| 03:04:34 | 11 | they were in one of their buildings, and Earl Hawkins told him |
| 03:04:37 | 12 | that he did it and in passing somewhere, he had a conversation |
| 03:04:41 | 13 | with Nathson Fields. |
| 03:04:44 | 14 | Q. And what did Mr. Sumner say on May 14th, 1985, that Mr. |
| 03:04:50 | 15 | Fields had advised him? |
| 03:04:50 | 16 | A. He mentioned something about the shooting and Nathson |
| 03:04:54 | 17 | Fields said it was a good exercise. |
| 03:04:57 | 18 | Q. And Mr. Brannigan, do you recall if Mr. Sumner provided |
| 03:05:03 | 19 | information about the Vaughn and white murders on that |
| 03:05:07 | 20 | particular day? |
| 03:05:07 | 21 | A. That was one of the cases he talked about, yes, sir. |
| 03:05:10 | 22 | Q. And what do you recall Sumner said about who did the |
| 03:05:16 | 23 | Vaughn and White case? |
| 03:05:17 | 24 | A. Mr. Sumner implicated himself. He said it was himself, |
| 03:05:22 | 25 | Earl Hawkins, and Nathson Fields that committed that murder, |

03:05:26   1   that was a double murder.

03:05:27   2   Q.  And was anything about what Mr. Sumner said with respect

03:05:31   3   to the participants of that that made it seem -- made it

03:05:36   4   reliable to you?

03:05:36   5   A.  Well, the mere fact that he's there providing any

03:05:40   6   information on the El Rukns made him reliable to me, and the

03:05:45   7   fact that he implicated himself in this double murder, a home

03:05:48   8   invasion double murder.

03:05:50   9   Q.  Mr. Brannigan, do you know now as you sit here today that

03:05:54   10  the information that Sumner provided putting Fields into the

03:06:00   11  Vaughn and White case, do you know that to be false?

03:06:01   12  A.  That was absolutely false.

03:06:02   13  Q.  Did you know that to be false on May 14th, 1985?

03:06:05   14  A.  No, sir, I did not.

03:06:08   15  Q.  When did you recall learning for the first time that that

03:06:11   16  information was false?

03:06:12   17  A.  That would have been many years later I learned from one

03:06:16   18  of the assistant U.S. attorneys, maybe 1991.  That's what I

03:06:22   19  recollect from reviewing all the files.

03:06:24   20  Q.  Mr. Brannigan, after Mr. Sumner provided this information,

03:06:27   21  what happens next with respect to the information he provided?

03:06:30   22  A.  A number of arrest reports or arrest packets, arrest

03:06:37   23  packets on all the wanted individuals were put together.  The

03:06:41   24  state's attorneys were getting arrest warrants for a number of

03:06:45   25  individuals, and we were preparing to do a series of raids on

03:06:51  1  the locations owned or controlled by members of the El Rukns,

03:06:56  2  a number of buildings, maybe seven or eight.

03:06:58  3  Q.  And were specific detectives assigned to each of the cases

03:07:03  4  that Mr. Sumner had provided information about?

03:07:06  5  A.  That's correct.  There were teams assigned to each

03:07:10  6  different individual that there was an arrest warrant on.

03:07:13  7  Q.  Directing your attention to your next involvement with

03:07:18  8  respect to the case, did you have a role in putting together

03:07:21  9  these arrest packets?

03:07:22  10  A.  Yes, sir, I was one of the people helping to put the

03:07:25  11  packets together and work on the logistics from people of the

03:07:33  12  detective division, the bosses of the detective difficulties.

03:07:35  13  A.  The gang, and the special operations group.

03:07:38  14  Q.  And were then a series of raids conducted on May the 18th,

03:07:43  15  1985?

03:07:43  16  A.  Yes, sir.

03:07:44  17  Q.  And how many -- were you involved in that raid, in those

03:07:50  18  raids?

03:07:50  19  A.  Yes, sir, I was.  I was one of the participants.

03:07:52  20  Q.  And how many other participants were there in law

03:07:55  21  enforcement in those raids?

03:07:56  22  A.  There were lots.  I mean, it was -- I'll give you a number

03:08:04  23  of maybe 200 detectives, policemen, K-9 officers, you name it.

03:08:10  24  Q.  And how many different locations were hit that particular

03:08:14  25  day looking for some of these individuals that there were

| 03:08:17 | 1 | arrest warrants on? |
| 03:08:18 | 2 | A.  Initially we hit all of the buildings owned or controlled |
| 03:08:20 | 3 | by them and then we worked our way out to other addresses |
| 03:08:24 | 4 | known to be frequented by the wanted individuals.  How many we |
| 03:08:29 | 5 | actually hit, I couldn't tell you. |
| 03:08:30 | 6 | Q.  Where did you go first on that day? |
| 03:08:34 | 7 | A.  My first stop was 6416 south Kenwood, that was one of the |
| 03:08:40 | 8 | buildings they controlled.  It was a six flat, if memory |
| 03:08:45 | 9 | serves me correct, and a few more rooms than a standard six |
| 03:08:51 | 10 | flat and that was one of their buildings.  It was called the |
| 03:08:54 | 11 | African Hut. |
| 03:08:55 | 12 | Q.  Who was believed to be at the African Hut? |
| 03:08:58 | 13 | A.  I was going to there to look for my primary assignment was |
| 03:09:02 | 14 | to go there to look for Earl Hawkins. |
| 03:09:05 | 15 | Q.  And was there anybody else at the -- suspected to be at |
| 03:09:09 | 16 | that building who there was an arrest warrant for that day? |
| 03:09:13 | 17 | A.  Nathson Fields also lived at that building or that was our |
| 03:09:16 | 18 | intelligence, our information. |
| 03:09:18 | 19 | Q.  Did you find any of the subjects of the arrest warrants at |
| 03:09:22 | 20 | the African Hut on May 18, 1985? |
| 03:09:26 | 21 | A.  I found Earl Hawkins, myself and my team found Earl |
| 03:09:29 | 22 | Hawkins. |
| 03:09:29 | 23 | Q.  Did you also look for Nathson Fields at the African Hut on |
| 03:09:32 | 24 | that day? |
| 03:09:33 | 25 | A.  Of course we did we had a warrant for him in the same |

03:09:37   1   building.

03:09:37   2   Q.  And was Mr. Fields located at that time?

03:09:40   3   A.  No, sir, he was not located.

03:09:42   4   Q.  All right.  Did you make other efforts that day to try to

03:09:46   5   find and serve with the arrest warrants some of the other El

03:09:53   6   Rukns?

03:09:53   7   A.  I was at every building they owned or controlled or any

03:09:56   8   other addresses that I was aware of for these people.

03:09:59   9   Q.  Were all of the subjects of the arrest warrants found on

03:10:03  10   May 18th, 1985?

03:10:04  11   A.  No, sir.

03:10:05  12   Q.  In the ensuing days, were there other efforts made to try

03:10:11  13   to locate Mr. Fields?

03:10:12  14            MR. LOEVY:  Objection, your Honor, just this witness'

03:10:14  15   efforts.  I don't think he has foundation for it, relevance.

03:10:18  16            THE COURT:  Sustained.

03:10:18  17   BY MR. NOLAND:

03:10:19  18   Q.  Mr. Brannigan, did you make other efforts to find Mr.

03:10:22  19   Fields after May 18, 1985?

03:10:24  20   A.  Yes, I did.

03:10:25  21   Q.  What did you do?

03:10:25  22   A.  I went to every known address there was for him and any of

03:10:29  23   the other wanted people out there.

03:10:31  24   Q.  How many times did you go to the African Hut in the next

03:10:36  25   several weeks looking for Nathson Fields?

03:10:43  1  A.  Way more than one.  I couldn't tell you, three or four

03:10:46  2  times.  I wasn't certain.  I went to all kinds of addresses,

03:10:48  3  every one of their buildings.

03:10:49  4  Q.  Were you going to the buildings looking for other

03:10:52  5  individuals as well who hadn't been located?

03:10:54  6  A.  That's correct.

03:10:54  7  Q.  Now, Mr. Brannigan, what is a UFAP warrant?

03:11:00  8  A.  That's another one of these government acronyms, it means

03:11:04  9  unlawful flight to avoid prosecution warrant.

03:11:08  10        MR. LOEVY:  Your Honor, we object to this.  There is

03:11:09  11  no such warrant for Mr. Fields.

03:11:11  12        MR. KULWIN:  Objection, Judge, objection to the

03:11:14  13  speaking objection.

03:11:15  14        THE COURT:  I have said that more times than I can

03:11:17  15  count in this case.  The jury is directed to disregard the

03:11:22  16  comment.  Let me see the lawyers at sidebar.

03:11:26  17    (The following proceedings were had at sidebar outside the

03:11:28  18  hearing of the jury:)

03:11:28  19        THE COURT:  You really have to stop doing that.  Can

03:11:31  20  I see it?  Okay.  So this is a letter, Defendant's Exhibit 84

03:11:38  21  is a letter to Mr. Valukas, the U.S. attorney requesting

03:11:48  22  unlawful.

03:11:49  23        MR. NOLAND:  The Court previously ruled in the first

03:11:52  24  trial that this exhibit was admissible.

03:11:55  25        THE COURT:  Okay.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 89 of 174 PageID #:65382
12/05/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

88

03:12:01  1          MR. LOEVY:  It has subsequently come to light that

03:12:04  2   this warrant was never issued, there is no proof that this

03:12:06  3   warrant was in existence.  The reason I did an inappropriate

03:12:09  4   speaking objection, and it was inappropriate and I apologize,

03:12:13  5   is because this subject is way out of bounds.  They know this

03:12:16  6   warrant was never issued.  They know there is no foundation

03:12:19  7   for it.

03:12:19  8          THE COURT:  Was the warrant ever issued?

03:12:21  9          MR. NOLAND:  No, on July 23rd, 1985, there is a memo

03:12:24  10  in which the FBI agent assigned to issue the warrant had

03:12:28  11  another assignment so he had not gotten to it.  He had

03:12:31  12  inquired and learned that in fact Mr. Fields had been captured

03:12:35  13  by that time and so the warrant was canceled.  We are seeking

03:12:38  14  to introduce this because it disproves Mr. Fields claim that

03:12:43  15  he's made very strongly that law enforcement made no efforts

03:12:46  16  to find this man and that isn't true, and this is proof of

03:12:49  17  that.

03:12:49  18         MR. LOEVY:  This is extremely inappropriate.

03:12:51  19         THE COURT:  Time out.  Time out.  So the part of

03:12:57  20  this, the one part of this that I think is potentially

03:12:59  21  unfairly prejudicial is this unlawful flight thing.  It

03:13:05  22  doesn't imply, it says unlawful flight to avoid prosecution.

03:13:08  23  So you can with leading questions ask did you make an effort

03:13:13  24  to get a federal warrant to arrest Mr. Fields?  Yes, they did.

03:13:17  25  What did you do?  This exhibit isn't going to go in because it

03:13:20   1   has the unlawful flight language and you can elicit that.

03:13:25   2          MR. LOEVY:  Your Honor, may I be heard on that?

03:13:27   3          THE COURT:  You have been heard and I ruled.  Be.

03:13:31   4          MR. KULWIN:  Judge, can you lay a foundation that

03:13:34   5   this is he's aware that other police officers were also and

03:13:40   6   Mr. Fields can ask him do you know.

03:13:43   7          MR. LOEVY:  It would be hearsay.

03:13:44   8          MR. KULWIN:  No.

03:13:44   9          THE COURT:  Why would it not be hearsay?

03:13:46  10          MR. KULWIN:  Because he is out there searching.  He

03:13:49  11   knows they're out there.  It's a very important issue.  Mr.

03:13:54  12   Fields is a strong part of his defense is I am sitting at home

03:13:59  13   drinking coffee and nobody is out looking for me.

03:14:02  14          THE COURT:  I don't know about drinking coffee, but I

03:14:04  15   get your point.

03:14:05  16          MR. KULWIN:  I think it's extremely important.  He is

03:14:07  17   one -- he's where that other officers -- he sees them going

03:14:12  18   out looking for them.  They are all together.  You can at

03:14:15  19   least ask do you know whether other police officers were

03:14:18  20   searching for Mr. Fields at this time?  He can say yes, how do

03:14:21  21   you know?  Because I was out there looking for him with them.

03:14:24  22          MR. LOEVY:  Your Honor.

03:14:24  23          THE COURT:  Go ahead.

03:14:25  24          MR. LOEVY:  He said I made three or four trims.

03:14:27  25   Anybody was, what he can't say is other people.  There are no

03:14:33   1    reports.  He can't say other people --

03:14:36   2             THE COURT:  I am trying to figure out what the

03:14:37   3    hearsay exception is.  Can somebody articulate one for me that

03:14:41   4    he knows there's other people.

03:14:42   5             MR. KULWIN:  It's a verbal act, it's admissible.

03:14:46   6             THE COURT:  No, it's not.  It's not a verbal act.

03:14:49   7             MR. KULWIN:  Okay.  How is this?  In I'm sitting in

03:14:51   8    your chambers and the issue is did everybody run out of the

03:14:54   9    building, I can say, yeah, I know I ran out and I know the

03:14:57  10    secretary ran out.

03:14:58  11             THE COURT:  And you know that because you saw them.

03:15:00  12             MR. KULWIN:  Right, he can say the people searching.

03:15:04  13    Does he know?

03:15:05  14             THE COURT:  The distinction that I would draw then is

03:15:08  15    -- because I mean, if he's searching, he can talk about other

03:15:11  16    people who were with him, but he can't talk about what he

03:15:15  17    learned about what other people were doing because that is

03:15:17  18    hearsay and I can't think of any exception.  I'm sitting here

03:15:20  19    doing a mental inventory through all the exceptions and I

03:15:23  20    can't come up with one.

03:15:24  21             MR. KULWIN:  The last point is it seems to me that he

03:15:26  22    can say he knows, he knows because he is -- what is he

03:15:33  23    supposed to do all all 30 members, are you searching, are you

03:15:37  24    searching?  We could do it.  I guess we could call 30 other

03:15:40  25    task force members, we could be here for six months.  There is

| 03:15:44 | 1 | no dispute. |

03:15:44  1  no dispute.

03:15:46  2      MR. LOEVY:

03:15:47  3      MR. KULWIN:  May I finish, please?  It is ludicrous

03:15:50  4  to believe that --

03:15:51  5      THE COURT:  It's no more ludicrous to believe that

03:15:55  6  somebody sat on a UFAP letter for two months.  You could tell

03:15:59  7  me that that would be lewd cross too and I would say that is,

03:16:03  8  and nobody would do that.

03:16:05  9      MR. KULWIN:  That did happen.  They have a drug task

03:16:07  10  force, they have four suspects, they arrest Hawkins with this

03:16:11  11  giant raid with 200 people and they all just go home and say

03:16:15  12  never mind.  He should be able to testify that the importance

03:16:17  13  of this was to find Nathson Fields and that we were all out

03:16:21  14  looking for him and it's really unfair and highly prejudicial

03:16:26  15  to say that I alone was the only one out there.  If that's the

03:16:30  16  rule of the court, I understand that.  We have to figure out

03:16:33  17  how many other police officers we can trot in here and say I

03:16:36  18  was looking for him too.  It's unfair.

03:16:39  19      MR. LOEVY:  It's about evidence.  It has to be

03:16:41  20  admissible evidence they were looking for Nathson Fields and

03:16:43  21  he had as no admissible evidence he looked for Nate Fields.

03:16:47  22  He did it three or four times .  He can't say I know other

03:16:50  23  people were out looking because that's hearsay and he can't

03:16:53  24  prove it if it's not admissible.

03:16:55  25      MR. KULWIN:  It is admissible because he is on the

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 93 of 174 PageID #:65386
12/05/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

92

| | |
|---|---|
| 03:16:57 | 1 |
| 03:17:02 | 2 |
| 03:17:06 | 3 |
| 03:17:07 | 4 |
| 03:17:09 | 5 |
| 03:17:13 | 6 |
| 03:17:21 | 7 |
| 03:17:23 | 8 |
| 03:17:26 | 9 |
| 03:17:32 | 10 |
| 03:17:35 | 11 |
| 03:17:37 | 12 |
| 03:17:40 | 13 |
| 03:17:42 | 14 |
| 03:17:43 | 15 |
| 03:17:45 | 16 |
| 03:17:48 | 17 |
| 03:17:51 | 18 |
| 03:17:52 | 19 |
| 03:17:55 | 20 |
| 03:17:59 | 21 |
| 03:18:03 | 22 |
| 03:18:06 | 23 |
| 03:18:09 | 24 |
| 03:18:11 | 25 |

1  task force, he knows from participating in the meetings like

2  is it hearsay?  It's like, okay, everybody go out and look for

3  Fields.  That's a directional act.

4         THE COURT:  Okay.  That is a different story.  That

5  is not the testimony that was being elicited from him.  If

6  somebody was -- if there was testimony that I heard so and so

7  direct all of us to go out and look for Mr. Fields, he could

8  elicit that because a direction is not hearsay, but that's not

9  what you were eliciting from him.  I get, yeah, you have to

10  bring in 20 witnesses, but it is about evidence.

11         MR. KULWIN:  So he can ask him in a leading way, do

12  you know if there was a direction from the task force to go

13  out looking for Fields.

14         THE COURT:  Yes.

15         MR. NOLAND:  On the warrant, Mr. Brannigan, I expect

16  him to testify that the request for a federal warrant would

17  not be made or approved.

18         THE COURT:  You lost me.

19         MR. NOLAND:  With Mr. Brannigan, I would like to ask

20  him if the request for the federal warrant by the chief of the

21  detective division would not be made without the detectives

22  and those involved having made efforts to find Mr. Fields.

23  They are not going to ask for the federal warrant unless they

24  had made prior efforts.

25         MR. LOEVY:  But they didn't get the warrant.  That's

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 94 of 174 PageID #:65387
12/05/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

93

03:18:12  1    the point.

03:18:13  2                THE COURT:  That's the question.  Guys, everybody

03:18:15  3    stop talking at this point.  Okay.  So here's the ruling.  You

03:18:21  4    can elicit, you can ask him whether there were directions to

03:18:24  5    people on the task force to go look for Mr. Fields and other

03:18:29  6    people with the warrants.  You can ask it again.  Remind me

03:18:33  7    what the basis for his knowledge of this is this UFAP thing?

03:18:39  8                MR. NOLAND:  Because the UFAPs have to go from the

03:18:42  9    chief to the detective division.

03:18:44  10                THE COURT:  You can ask him without using UFAP,

03:18:47  11   unlawful flight, avoid prosecution or anything like that, you

03:18:50  12   can ask him what's the process for obtaining a federal warrant

03:18:54  13   in a situation like this, who does it have to go through, and

03:18:59  14   then you can ask him was there a request made.  Okay?  I'm

03:19:03  15   done.  There.

03:19:08  16     (The following proceedings were had in open court in the

03:19:08  17   presence and hearing of the jury:)

03:19:08  18                THE COURT:  Okay.  Go ahead.  Consistent with the

03:19:17  19   sidebar.

03:19:17  20                MR. NOLAND:  Thank you, your Honor.

03:19:18  21   BY MR. NOLAND:

03:19:19  22   Q.  Mr. Brannigan, what's the process for obtaining -- making

03:19:25  23   the request for a federal warrant?

03:19:29  24                THE COURT:  In this type of situation?

03:19:29  25   BY MR. NOLAND:


                         ***REALTIME UNEDITED TRANSCRIPT ONLY***

```
03:19:31    1   Q.  In this --
03:19:32    2             THE COURT:  What's the process that would have been
03:19:33    3   gone through at that time to obtain a warrant in this type of
03:19:36    4   situation?
03:19:37    5             THE WITNESS:  The chief of detective is notified of
03:19:39    6   the facts and circumstances of what has been done so far and
03:19:43    7   then the chief of detectives for the Chicago Police Department
03:19:47    8   would then write another memo or letter to the head of the FBI
03:19:55    9   and to the U.S. Attorney's Office.
03:19:57   10             THE COURT:  All right.
03:19:58   11             THE WITNESS:  Requesting the warrant.
03:20:00   12   BY MR. NOLAND:
03:20:01   13   Q.  And what has been done is what has been done to look for
03:20:04   14   this particular subject before the chief of detectives is
03:20:05   15   going to ask the federal government to get involved; is that
03:20:05   16   right?
03:20:08   17   A.  That's correct.
03:20:09   18   Q.  And Mr. Brannigan, was -- to your knowledge, did the chief
03:20:15   19   of detectives of the Chicago Police Department make a request
03:20:19   20   for a federal warrant for Nathson Fields on or about May 23rd,
03:20:26   21   1985, for the federal government to issue a warrant to capture
03:20:31   22   him for the case for which he had an arrest warrant?
03:20:35   23   A.  That's correct.
03:20:36   24   Q.  Now, Mr. Brannigan, you've testified that you personally
03:20:43   25   went out looking for other El Rukns and Mr. Fields after May
```

| | | |
|---|---|---|
| 03:20:48 | 1 | 18th, 1985; is that right? |
| 03:20:50 | 2 | A. Correct. |
| 03:20:50 | 3 | Q. Was there a direction for yourself and others from |
| 03:20:56 | 4 | supervisors to go and try to find Mr. Fields and the other El |
| 03:21:00 | 5 | Rukns who had not been captured, had there been an order |
| 03:21:04 | 6 | provided to you? |
| 03:21:04 | 7 | A. Yes, sir. |
| 03:21:05 | 8 | Q. Based upon that order, were other individuals other than |
| 03:21:11 | 9 | yourself directed to attempt to find Mr. Fields? |
| 03:21:16 | 10 | MR. LOEVY: Objection, foundation, your Honor. |
| 03:21:17 | 11 | THE COURT: Overruled. |
| 03:21:18 | 12 | THE WITNESS: Yes, sir. |
| 03:21:19 | 13 | BY MR. NOLAND: |
| 03:21:19 | 14 | Q. And who were those other individuals that were directed to |
| 03:21:23 | 15 | attempt to find Mr. Fields and the other El Rukns who had not |
| 03:21:28 | 16 | been captured? |
| 03:21:29 | 17 | THE COURT: That's the thing you can't do. |
| 03:21:31 | 18 | THE WITNESS: I'm sorry? |
| 03:21:32 | 19 | MR. NOLAND: Withdrawn. |
| 03:21:33 | 20 | THE COURT: Okay. |
| 03:21:33 | 21 | BY MR. NOLAND: |
| 03:21:35 | 22 | Q. Did you find Mr. Fields on the other occasions that you |
| 03:21:37 | 23 | went looking for him? |
| 03:21:38 | 24 | A. No, sir, I did not. |
| 03:21:39 | 25 | Q. Did you learn that Mr. Fields in fact was captured on June |

| | | |
|---|---|---|
| 03:21:44 | 1 | the 13th, 1985? |
| 03:21:46 | 2 | A. Yes, sir. |
| 03:21:46 | 3 | Q. Okay. Mr. Brannigan, I'd like to return to Anthony |
| 03:21:50 | 4 | Sumner. We had talked about that you were involved in a |
| 03:21:53 | 5 | debriefing of Mr. Sumner on May 14th, 85, correct? |
| 03:21:57 | 6 | A. Correct. |
| 03:21:58 | 7 | Q. What was done with Mr. Sumner after May 14th, 1985? |
| 03:22:02 | 8 | A. There was at least one more debriefing that I am aware of. |
| 03:22:09 | 9 | I did not participate in it, but one with the U.S. attorney in |
| 03:22:13 | 10 | the federal building. |
| 03:22:14 | 11 | Q. And then at some point was Mr. Sumner relocated out of |
| 03:22:17 | 12 | Chicago? |
| 03:22:18 | 13 | A. Correct. Immediately or almost immediately upon the |
| 03:22:22 | 14 | debriefings, he was relocated up to the Gurnee area. |
| 03:22:27 | 15 | Q. And how long did he spend in Gurnee? |
| 03:22:30 | 16 | A. I would, with the passage of time, I'd guess about two |
| 03:22:39 | 17 | weeks, ten days. |
| 03:22:39 | 18 | Q. With as there a federal agent assigned to be with |
| 03:22:42 | 19 | Mr. Sumner at that time? |
| 03:22:43 | 20 | A. There was always somebody with him for security. |
| 03:22:45 | 21 | Q. And then was Mr. Sumner relocated out of the Chicago area? |
| 03:22:48 | 22 | A. That's correct. |
| 03:22:48 | 23 | Q. Where was that? |
| 03:22:50 | 24 | A. He was relocated to Indianapolis, Indiana. |
| 03:22:53 | 25 | Q. Who relocated Mr. Sumner to Indianapolis? |

12/05/16 PM

| | | |
|---|---|---|
| 03:22:56 | 1 | A. Members of the task force. |
| 03:22:58 | 2 | Q. Do you know specifically who did that? |
| 03:23:02 | 3 | MR. LOEVY: Objection to relevance, your Honor. |
| 03:23:04 | 4 | THE COURT: Overruled. |
| 03:23:04 | 5 | THE WITNESS: My partner, Richard k-o-l-o-v-i-t-z, |
| 03:23:11 | 6 | and I believe it was agent owe Brian and agent wolf. I don't |
| 03:23:16 | 7 | know who else may have assisted them. I can't recall at this |
| 03:23:18 | 8 | time. |
| 03:23:19 | 9 | BY MR. NOLAND: |
| 03:23:20 | 10 | Q. A few months later, Mr. Brannigan, did you learn that |
| 03:23:25 | 11 | Anthony Sumner had disappeared? |
| 03:23:26 | 12 | A. Yes, sir, I did. |
| 03:23:29 | 13 | Q. And at some point did you learn that Anthony Sumner had |
| 03:23:32 | 14 | gone back to the El Rukns? |
| 03:23:33 | 15 | A. That's correct. |
| 03:23:34 | 16 | Q. What did you learn about why Anthony Sumner returned to |
| 03:23:38 | 17 | the El Rukns? |
| 03:23:39 | 18 | MR. LOEVY: Objection, hearsay. |
| 03:23:41 | 19 | THE COURT: Overruled. |
| 03:23:43 | 20 | THE WITNESS: The investigation disclosed that |
| 03:23:47 | 21 | Anthony Sumner's wife, Brenda, she was be very upset about. |
| 03:23:53 | 22 | MR. LOEVY: Objection, your Honor. |
| 03:23:54 | 23 | THE COURT: Very upset is sufficient. |
| 03:23:57 | 24 | BY MR. NOLAND: |
| 03:23:58 | 25 | Q. At some point, Mr. Brannigan, did you learn that Anthony |

03:24:02   1   Sumner had provided a recant statement?

03:24:06   2   A.  Yes, sir.

03:24:06   3   Q.  And did you learn that the recant statement made

03:24:12   4   allegations against you that you had physically mistreated him

03:24:17   5   out in east Cleveland?

03:24:20   6   A.  Yes, sir.

03:24:20   7   Q.  Mr. Brannigan, directing your attention to February 1986,

03:24:27   8   were you contacted by somebody?

03:24:29   9   A.  Yes, sir, I was.

03:24:31  10   Q.  And who is that?

03:24:32  11   A.  Anthony Sumner.

03:24:33  12   Q.  How did Mr. Sumner contact you?

03:24:40  13   A.  He could he tacked me, he paged me at my pager number.  No

03:24:46  14   cell phones back then.

03:24:47  15   Q.  Do you remember a specific day?

03:24:49  16   A.  Oh, yes.

03:24:49  17   Q.  What day was that?

03:24:50  18   A.  It was Valentine's Day.  I was trying to have a

03:24:54  19   Valentine's dinner.

03:24:54  20   Q.  And at that time, what was your conversation with Sumner

03:24:58  21   at that time when he contacted you?

03:24:59  22   A.  Hello, where have you been, what's going on, are you

03:25:04  23   coming back, yes, okay.

03:25:06  24   Q.  And did Sumner turn himself in shortly thereafter?

03:25:09  25   A.  That night, yes, sir.

03:25:11   1    Q.  And was Sumner charged with anything after returning to

03:25:17   2    law enforcement?

03:25:17   3    A.  Yes, sir, he was.

03:25:19   4    Q.  What's that?

03:25:19   5    A.  Yes, sir, he was.

03:25:21   6    Q.  And what was he charged with?

03:25:22   7    A.  The Vaughn/White murder, the double murder.

03:25:26   8    Q.  Mr. Brannigan, you are aware that the Smith and Hickman

03:25:35   9    double murder case proceeded to trial in June of 1986 before

03:25:40   10   Judge Maloney; is that right?

03:25:41   11   A.  That's correct.

03:25:43   12          MR. NOLAND:  Judge, may I have the ELMO?

03:25:45   13          THE COURT:  Yep.  I think it's on, actually.

03:25:50   14   BY MR. NOLAND:

03:25:58   15   Q.  Mr. Brannigan?

03:25:59   16          MR. LOEVY:  Objection, your Honor.  This has already

03:26:02   17   been published to the jury.

03:26:03   18          THE COURT:  Overruled.  Overruled.

03:26:05   19   BY MR. NOLAND:

03:26:06   20   Q.  I am going to read you some of the testimony of Anthony

03:26:08   21   Sumner at the June 1986 trial.

03:26:12   22          "QUESTION:  When you came back, did you speak to any El

03:26:18   23   Rukns?

03:26:18   24          "ANSWER:  Yes.

03:26:19   25          "QUESTION:  And who did you speak to?

03:26:21   1          "ANSWER:  Sammy Knox and Jeff Ford

03:26:24   2          "QUESTION:  Sammy Knox and Jeff Ford?

03:26:26   3          "ANSWER:  Yes

03:26:28   4          "QUESTION:  What is Sammy Knox's real name?

03:26:31   5          "ANSWER:  General I shall mail

03:26:34   6          "QUESTION:  And how did you talk to Jeff Fort, in

03:26:37   7    person or by telephone?

03:26:39   8          "ANSWER:  Over the phone

03:26:40   9          "QUESTION:  Where was Jeff Fort at when you talked to

03:26:43  10    him?

03:26:43  11          "ANSWER:  In the federal penitentiary.

03:26:45  12          "QUESTION:  What did Jeff Ford say to you over the

03:26:48  13    telephone, if anything?

03:26:49  14          "ANSWER:  He told medical that I wouldn't have to worry

03:26:57  15    and just go along with the lawyers and do what the gentle me

03:27:03  16    to do and to say what the gentle me to say and I won't have to

03:27:07  17    worry about nothing happening to me or my kids.

03:27:11  18          "QUESTION:  Or your kids?

03:27:13  19          "ANSWER:  Yes.

03:27:20  20          "QUESTION:  Did you then talk to general Ishmael, Sammy

03:27:24  21    Knox?

03:27:25  22          "ANSWER:  Yes."

03:27:28  23          Turning to page 1137.  Continued testimony of Anthony

03:27:40  24    Sumner.

03:27:41  25          "QUESTION:  Do you know


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

03:27:43   1          MR. LOEVY:  Same objection, it's republication of

03:27:45   2   stuff that's already been published.

03:27:46   3          THE COURT:  Overruled.

03:27:48   4   BY MR. NOLAND:

03:27:49   5   Q.  Do you know if Earl Washington represented some El Rukns

03:27:52   6   at that time?

03:27:52   7          "ANSWER:  Yes.

03:27:54   8          "QUESTION:  Did you know if Mr. Swano represented some

03:27:57   9   El Rukns?

03:27:58  10          "ANSWER:  Yes.

03:27:58  11          "QUESTION:  Did you in fact go down to Mr. Washington's

03:28:04  12   office, the Hancock building, and talk to them?

03:28:06  13          "ANSWER:  Yes.

03:28:07  14          "QUESTION:  Tell the ladies and gentlemen how you got

03:28:10  15   down to the Hancock building for that interview.

03:28:14  16          "ANSWER:  Sammy Knox and Selin, took me down there.

03:28:20  17          "QUESTION:  Who is Selin?

03:28:21  18          "ANSWER:  A general.

03:28:22  19          "QUESTION:  Before you went down to talk to those

03:28:24  20   lawyers, did Sammy Knox say anything to you?

03:28:27  21          "ANSWER:  Yes.

03:28:28  22          "QUESTION:  What did he say?

03:28:31  23          "ANSWER:  He said just say was I said before, that

03:28:37  24   everything that I said was a lie and that the police beat me,

03:28:45  25   and if they who brought you down here tell them one of your

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 03:28:50 | 1 | relatives, tell them one of your relatives? |
| 03:28:55 | 2 | "QUESTION:  Did you then give a so-called voluntary |
| 03:28:58 | 3 | statement to Mr. Swano and Mr. Washington? |
| 03:28:59 | 4 | "ANSWER:  Yes. |
| 03:29:00 | 5 | "QUESTION:  And when you got done with that interview, |
| 03:29:04 | 6 | with the lawyers, did you see Sammy Knox? |
| 03:29:06 | 7 | "ANSWER:  Yes. |
| 03:29:08 | 8 | "QUESTION:  Did he have any questions for you relative |
| 03:29:09 | 9 | to what happened in the interview in |
| 03:29:11 | 10 | "ANSWER:  No response. |
| 03:29:13 | 11 | "QUESTION:  Did you talk to him about it? |
| 03:29:15 | 12 | "ANSWER:  Yes." |
| 03:29:21 | 13 | Those questions were asked and those answers were |
| 03:29:24 | 14 | given is that right? |
| 03:29:25 | 15 | A.  That's correct. |
| 03:29:25 | 16 | Q.  Mr. Brannigan, who is Sal even who is referred to in that |
| 03:29:38 | 17 | transcript? |
| 03:29:38 | 18 | A.  That would be Eugene Hunter, one of the El Rukn generals. |
| 03:29:42 | 19 | Q.  Turning your attention to February 1987, did you receive a |
| 03:29:58 | 20 | letter from somebody?  Showing what's in evidence as |
| 03:30:06 | 21 | defendants' 106. |
| 03:30:08 | 22 | MR. LOEVY:  No objection, your Honor. |
| 03:30:09 | 23 | THE COURT:  All right. |
| 03:30:12 | 24 | BY MR. NOLAND: |
| 03:30:13 | 25 | Q.  Did you receive this letter? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

03:30:14  1   A.  Yes, sir, I did.

03:30:17  2        THE COURT:  You said no objection, Mr. Loevy?

03:30:19  3        MR. LOEVY:  Yes.

03:30:20  4   BY MR. NOLAND:

03:30:21  5   Q.  Who is this letter from?

03:30:22  6   A.  This is from Earl Hawkins.

03:30:23  7   Q.  Was this letter solicited by you?

03:30:26  8   A.  No, sir.

03:30:26  9   Q.  The letter states, dear Daniel, I write you in hope that

03:30:33  10  in best interest of you and can talk hoping you and I can come

03:30:38  11  to some mutual understanding that can benefit us both I am

03:30:42  12  sure before February 2.  Earl Hawkins N-63645, detective

03:30:50  13  Daniel Brannigan.  Did you receive this letter?

03:30:52  14  A.  Yes, sir, I did.

03:30:53  15  Q.  Do you know what the date was of February 2nd?

03:30:57  16  A.  I learned later, yes, sir.

03:30:58  17  Q.  What was that?

03:30:59  18  A.  It was one of the dates that was set for Earl Hawkins's

03:31:04  19  execution for the double murder.

03:31:05  20  Q.  Mr. Brannigan, what did you do after you received this

03:31:11  21  letter?

03:31:11  22  A.  I made the state's attorneys, the USA attorney, and my

03:31:18  23  bosses aware of the letter.

03:31:19  24  Q.  And what action did you take next after notifying those

03:31:25  25  personnel?

| | | |
|---|---|---|
| 03:31:25 | 1 | A.  Eventually I went down to Menard prison. |
| 03:31:30 | 2 | Q.  And who did you go with? |
| 03:31:31 | 3 | A.  I went with Murphy, Sergeant Murphy at the time. |
| 03:31:34 | 4 | Q.  And did you meet with Earl Hawkins? |
| 03:31:37 | 5 | A.  Yes, sir, we did. |
| 03:31:38 | 6 | Q.  And Mr. Brannigan, can you describe for the jury what was |
| 03:31:41 | 7 | said in that conversation between you and Sergeant Murphy and |
| 03:31:46 | 8 | Earl Hawkins? |
| 03:31:46 | 9 | A.  Earl Hawkins said he wanted to cooperate with the law |
| 03:31:54 | 10 | enforcement into the investigation that was at hand on the El |
| 03:31:57 | 11 | Rukns. |
| 03:31:57 | 12 | Q.  And what did you say to him in response? |
| 03:32:01 | 13 | A.  More than willing to have you cooperate.  We need all the |
| 03:32:10 | 14 | help we can get, something to that effect. |
| 03:32:12 | 15 | Q.  And was there discussion whether or not you could do |
| 03:32:14 | 16 | anything for Mr. Hawkins? |
| 03:32:15 | 17 | A.  Yeah, he wanted to get out of jail free card, but we told |
| 03:32:20 | 18 | him it doesn't work that way. |
| 03:32:22 | 19 | Q.  What did you tell him with respect to what he was saying? |
| 03:32:26 | 20 | A.  Well, Mr. Hawkins was told that we can't make a deal with |
| 03:32:29 | 21 | him.  We can only promise that every scrap of information and |
| 03:32:34 | 22 | every bit of cooperation he provides will be brought to the |
| 03:32:37 | 23 | attention of the state's attorneys, his attorneys, and any |
| 03:32:41 | 24 | entity he comes before at a later date, any judge, anyone, the |
| 03:32:45 | 25 | full extent of his cooperation will be made known.  But as far |

| 03:32:50 | 1 | as promising you anything about getting out of jail at a |
| 03:32:52 | 2 | certain time, no can do, and I believe Mr. Hawkins was well |
| 03:32:56 | 3 | aware of that. |
| 03:32:56 | 4 | Q.  Was that discussion the type of discussion you've had with |
| 03:33:01 | 5 | many other potential cooperating individuals? |
| 03:33:04 | 6 | A.  Before, at that one and to this day. |
| 03:33:07 | 7 | Q.  What happened after you left Menard that day and got back |
| 03:33:15 | 8 | to Chicago? |
| 03:33:15 | 9 | A.  At some point we notified the state's attorneys, the U.S. |
| 03:33:22 | 10 | attorney what was going on that Earl Hawkins had agreed to |
| 03:33:27 | 11 | cooperate with the investigation. |
| 03:33:28 | 12 | Q.  And was Mr. Hawkins then at some point brought back to |
| 03:33:31 | 13 | Chicago? |
| 03:33:32 | 14 | A.  Yes, several weeks later.  I can't remember how long. |
| 03:33:37 | 15 | Q.  Now, Mr. Brannigan, Mr. Hawk was allowed to make telephone |
| 03:33:49 | 16 | calls while he was in federal custody as a cooperating witness |
| 03:33:52 | 17 | with family members is that true? |
| 03:33:54 | 18 | A.  That's correct. |
| 03:33:54 | 19 | Q.  And isn't it true, Mr. Brannigan, that he was allowed to |
| 03:34:00 | 20 | make those telephone calls to his family for safety reasons so |
| 03:34:05 | 21 | that he could checkup on them; is that right? |
| 03:34:07 | 22 | A.  Correct. |
| 03:34:07 | 23 | Q.  In addition, Mr. Brannigan was Mr. Hawkins' common law |
| 03:34:14 | 24 | wife relocated at or around the time that he was cooperating? |
| 03:34:19 | 25 | A.  That's correct. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

03:34:21  1  Q.  And Mr. Brannigan, it's true that she was relocated for

03:34:26  2  her own safety as a result of the cooperation that he was

03:34:29  3  providing?

03:34:29  4  A.  That's correct.

03:34:30  5  Q.  Now, in July of 2014, were you asked to write a letter for

03:34:45  6  Earl Hawkins?

03:34:45  7  A.  Yes, sir, I was.

03:34:47  8  Q.  And who asked you to do that?

03:34:48  9  A.  It was his attorney and it came through William Hogan, an

03:34:55  10  assistant U.S. attorney in this building.

03:34:57  11  Q.  And what did they say to you when they asked you to write

03:35:00  12  this letter?

03:35:01  13  A.  Would you document what you had told him before, that you

03:35:06  14  would in fact notify anybody, any entity, any judge, any

03:35:10  15  parole board, any anything he came before the extent of his

03:35:16  16  cooperation.

03:35:16  17  Q.  And did you agree to do that?

03:35:18  18  A.  Yes, sir, I did.

03:35:18  19  Q.  When did you -- did you learn at some point that he had a

03:35:22  20  parole hearing in July of 2014?

03:35:24  21  A.  I knew he had one coming up, yes, sir.

03:35:27  22  Q.  And did you learn that -- when, approximately, did you

03:35:32  23  learn that Mr. Hawkins had a parole hearing in July of 2014?

03:35:37  24          MR. LOEVY:  Your Honor, our objection is this would

03:35:39  25  open the door.

***REALTIME UNEDITED TRANSCRIPT ONLY***

03:35:39   1          THE COURT:  Overruled.  Worry about what it does and

03:35:44   2   doesn't do until later.  There is no basis --

03:35:49   3          THE WITNESS:  Could you back up?

03:35:50   4   BY MR. NOLAND:

03:35:50   5   Q.  Sure.

03:35:51   6          Did you know in April of 2014 that Hawkins had a

03:35:55   7   parole hearing in July of 2014?

03:35:56   8   A.  I knew there was one coming up.  I don't remember if I

03:35:59   9   knew exactly when.

03:36:01   10  Q.  Okay.  And did you have an understanding of whether or not

03:36:07   11  Mr. Hawkins was likely to receive parole in July of 2014?

03:36:12   12  A.  No, it was my understanding he was not going to get

03:36:17   13  parole.  They just wanted that letter.

03:36:19   14         MR. LOEVY:  Foundation, your Honor.

03:36:20   15         THE COURT:  Go ahead and lay the foundation.

03:36:24   16  BY MR. NOLAND:

03:36:26   17  Q.  Were you advised when you were asked to write

03:36:28   18  correspondence for Mr. Hawkins whether or not there was a

03:36:32   19  likelihood that he would receive parole in the summer of 2014?

03:36:35   20  A.  I was advised that he was not going to receive parole.  He

03:36:43   21  was not eligible yet.  That was my understanding.

03:36:45   22         MR. LOEVY:  Same objection, your Honor.

03:36:46   23         THE COURT:  Overruled.

03:36:46   24  BY MR. NOLAND:

03:36:46   25  Q.  Did you have an understanding of when he was going to be


                   ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 03:36:49 | 1 | eligible for parole? |
| 03:36:50 | 2 | A.  I don't remember the date, but it was always that he would |
| 03:36:54 | 3 | be eligible, he would be around 72 when he would be able to |
| 03:36:59 | 4 | receive parole.  That was my understanding. |
| 03:37:01 | 5 | Q.  Then why were they asking his lawyer and the U.S. |
| 03:37:05 | 6 | Attorney's Office asking for a letter from you in July of |
| 03:37:08 | 7 | 2014? |
| 03:37:10 | 8 | MR. LOEVY:  Objection to anybody asking. |
| 03:37:11 | 9 | THE COURT:  Sustained the way it was asked.  Why was |
| 03:37:13 | 10 | somebody else asking for it.  You can ask it in a different |
| 03:37:15 | 11 | way. |
| 03:37:16 | 12 | BY MR. NOLAND: |
| 03:37:16 | 13 | Q.  Were you told -- were you told in these conversations when |
| 03:37:18 | 14 | you were being asked for a letter? |
| 03:37:20 | 15 | MR. LOEVY:  Same objection, your Honor. |
| 03:37:22 | 16 | THE COURT:  Let me hear the question. |
| 03:37:24 | 17 | BY MR. NOLAND: |
| 03:37:25 | 18 | Q.  Why it was that you were being asked to provide a letter |
| 03:37:28 | 19 | if in fact Mr. Hawkins wasn't eligible for parole until 2027? |
| 03:37:34 | 20 | THE COURT:  And the objection is what? |
| 03:37:35 | 21 | MR. LOEVY:  There is no foundation. |
| 03:37:36 | 22 | THE COURT:  The objection is what, foundation, |
| 03:37:38 | 23 | something else, what? |
| 03:37:38 | 24 | MR. LOEVY:  Asked to provide a letter. |
| 03:37:43 | 25 | THE COURT:  Is the objection to lack of foundation? |

12/05/16 PM

03:37:45   1   MR. LOEVY:  Yes, your Honor.

03:37:45   2   THE COURT:  So it's a yes, no, question whether he

03:37:52   3   was asked.  If the answer is yes, then the next question is

03:37:54   4   who asked, and then we go from there.

03:37:56   5   So were you asked in.

03:37:57   6   THE WITNESS:  Was I asked?  Yes, sir.

03:38:00   7   THE COURT:  Okay.  By who?

03:38:00   8   BY MR. NOLAND:

03:38:01   9   Q.  Who asked you?

03:38:03   10   A.  The U.S. attorney or his attorney through the U.S.

03:38:06   11   attorney.

03:38:07   12   THE COURT:  Okay.

03:38:07   13   THE WITNESS:  That was my understanding.

03:38:09   14   THE COURT:  Now, you can go ahead and ask the

03:38:10   15   question.

03:38:11   16   BY MR. NOLAND:

03:38:12   17   Q.  And what was said to you about why they were asking for

03:38:14   18   you to write a letter at that time in July 2014 if he wasn't

03:38:20   19   going to get out until 2027?

03:38:22   20   A.  All right.  The black humor was that you're going to be

03:38:29   21   dead soon and I want a letter in my file requesting parole

03:38:34   22   before you die, meaning me.  I'm old.  Getting older.

03:38:40   23   Q.  Did that letter that you provided in July 2014 have

03:38:45   24   anything to do with his civil case that we're here for today?

03:38:48   25   A.  No, sir.

12/05/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

110

| | | |
|---|---|---|
| 03:38:48 | 1 | Q. Why did you provide that letter on Mr. Hawkins' behalf? |
| 03:38:54 | 2 | MR. LOEVY: Objection, asked and answered. |
| 03:38:55 | 3 | THE COURT: Sustained. No, you can answer that |
| 03:38:58 | 4 | question. He didn't tie that up yet. Why did you provide the |
| 03:39:01 | 5 | letter? |
| 03:39:01 | 6 | THE WITNESS: Because I was obligated to do it. I |
| 03:39:03 | 7 | told him I would. It was a moral obligation to do it. |
| 03:39:09 | 8 | BY MR. NOLAND: |
| 03:39:10 | 9 | Q. And was the -- what information had Mr. Hawkins provided |
| 03:39:17 | 10 | to give you that obligation in your mind to write that letter |
| 03:39:21 | 11 | on his behalf? |
| 03:39:21 | 12 | A. He testified in numerous, numerous federal and state |
| 03:39:26 | 13 | trials regarding illegal activities of the El Rukn |
| 03:39:31 | 14 | organization, and he was a principal player in helping to |
| 03:39:35 | 15 | bring them down. |
| 03:39:37 | 16 | MR. NOLAND: Your Honor, may I have one moment, |
| 03:39:39 | 17 | please? |
| 03:39:39 | 18 | THE COURT: Yeah. |
| 03:39:40 | 19 | (Brief pause.) |
| 03:39:48 | 20 | MR. KULWIN: No further questions. |
| 03:39:49 | 21 | THE COURT: Are you going to have questions, Mr. |
| 03:39:50 | 22 | Kulwin? |
| 03:39:51 | 23 | MR. KULWIN: No. |
| 03:39:51 | 24 | THE COURT: Since we took our break earlier, we are |
| 03:39:53 | 25 | going to take a 10-minute break right here and then we will go |

***REALTIME UNEDITED TRANSCRIPT ONLY***

03:39:57    1    until 4:45. (The jury leaves the courtroom.)

03:40:35    2             THE COURT:  What is it.

03:40:37    3             MR. LOEVY:  The issue is that Mr. Brannigan, the

03:40:40    4    strong impression was just laid that Mr. Brannigan wrote the

03:40:44    5    letter because he had a moral obligation and --

03:40:47    6             THE COURT:  It wasn't a strong impression.  It was

03:40:49    7    testimony just to be clear about it.

03:40:50    8             MR. LOEVY:  And that any law enforcement would do the

03:40:55    9    same.

03:40:55   10             THE COURT:  He didn't say any other law enforcement

03:40:57   11    would do the same.  He did it.

03:41:01   12             MR. LOEVY:  The door was opened that at the time he

03:41:03   13    opened it he was in the exact same position as Murphy and

03:41:06   14    O'Callaghan as a defendant in the case.  What they attempted

03:41:08   15    to do was show it's normal that O'Callaghan would write this

03:41:11   16    letter.  This guy Brannigan doesn't have a horse in the race

03:41:13   17    and he wrote the letter.

03:41:14   18             THE COURT:  Who you would you propose to get into

03:41:16   19    that?

03:41:17   20             MR. LOEVY:  Isn't it true that at the time you wrote

03:41:19   21    the letter, you were a party to this case.  That's the only

03:41:22   22    fairway to resolve it.  The only way they asked those

03:41:25   23    questions was to imply that a reasonable law enforcement

03:41:27   24    officer like O'Callaghan would do it because he has a moral

03:41:30   25    obligation.  There is no terrible prejudice to saying, you

***REALTIME UNEDITED TRANSCRIPT ONLY***

03:41:33  1   were -- in fact, it probably hurts us that you formally were a

03:41:37  2   party because it looks like he got out.  We cannot have our

03:41:40  3   hands tied to show that he is just not objective.

03:41:44  4        THE COURT:  Mr. Noland.

03:41:44  5        MR. NOLAND:  Judge, it certainly wasn't our intent.

03:41:47  6   It was simply that he wrote a letter --

03:41:49  7        THE COURT:  It did get flagged, even though I cut

03:41:51  8   Mr. Loevy off in front of the jury, he did say it opens the

03:41:54  9   door.

03:41:54  10       MR. NOLAND:  We expected Mr. Loevy to ask the

03:41:57  11  questions about the letter if we didn't ask the questions and

03:42:00  12  we don't believe.  It was simple answers, he made his promise,

03:42:04  13  he wrote the letter, he was requested to do so.

03:42:07  14       THE COURT:  You are not addressing the point that was

03:42:09  15  made.  The point that was made is you're basically putting

03:42:13  16  this as sort of 404(b) -- other act evidence so to speak that

03:42:17  17  other law enforcement officers who were not similarly situated

03:42:19  18  to Mr. O'Callaghan or Mr. Murphy, it wasn't a similar, it was

03:42:25  19  Mr. O'Callaghan that wrote the letter, if I recall correctly,

03:42:28  20  for the parole hearing, that other law enforcement officers

03:42:30  21  that weren't similarly situated to Mr. O'Callaghan also wrote

03:42:34  22  a letter which tends to suggest that it's -- it puts in it its

03:42:41  23  best light possible.  What Mr. Loevy is saying I should be

03:42:44  24  able to bring out that at the time he was a defendant in the

03:42:46  25  case.

***REALTIME UNEDITED TRANSCRIPT ONLY***

03:42:46    1          MR. NOLAND:  Judge, we think that would be

03:42:48    2    unnecessary.  It's pretty clear that Mr. Brannigan, it will

03:42:51    3    come out, he was on the task force with Mr. Murphy and

03:42:54    4    Mr. O'Callaghan.  It's going to be evident to the jury that

03:42:56    5    he's with law enforcement, he was on this task force, that's

03:43:00    6    what he did for years, so the -- to need to create an

03:43:06    7    additional on top of bias I think for Mr. Brannigan in writing

03:43:11    8    this letter or motive I think it would be unnecessary.  I

03:43:13    9    think the jury -- the already there.  It's evident that he

03:43:17   10    worked with these gentlemen on this task force for years and

03:43:20   11    so I just don't think it's necessary.  I think under Rule 403,

03:43:25   12    it would not be appropriate.

03:43:29   13          MR. KULWIN:  Judge, if I may.  As Mr. Noland pointed

03:43:32   14    out, you're caught in the Hobson's choice.  If you don't bring

03:43:35   15    the letter out, your witness is getting hammered, didn't you

03:43:39   16    write this letter, it's going to make him look biased.  He

03:43:42   17    really had no choice but to bring it out.  It seems far more

03:43:45   18    prejudicial, I know he said 403, but it's far more to

03:43:49   19    prejudicial to suddenly say you were a party in this case

03:43:52   20    okay.  That's going to confuse the jury.  What do you mean he

03:43:55   21    is a party in this case, did he settle for millions, did he

03:43:58   22    settle for ten cents, how did he get out, did the court throw

03:44:02   23    it out, it may cut against the plaintiff but it may cut

03:44:06   24    against the defendant.  One thing it will do for sure is

03:44:09   25    inject an unnecessary issue.  I think Mr. Noland is right.  He

12/05/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | |
|---|---|
| 03:44:12 | 1 | can make the point. |
| 03:44:13 | 2 | THE COURT: Thanks. Mr. Loevy, last word. |
| 03:44:15 | 3 | MR. LOEVY: Your Honor, we weren't going to go into |
| 03:44:16 | 4 | the letter for obvious reasons. The letter is terrible for |
| 03:44:19 | 5 | us. Mr. Noland feeds our argument. A guy who is in the task |
| 03:44:22 | 6 | force, is working in the trenches, this is absolutely how you |
| 03:44:25 | 7 | pay back a cooperator. You have a moral obligation to do it. |
| 03:44:29 | 8 | It legitimizes what Mr. O'Callaghan did. If he thought, I |
| 03:44:33 | 9 | tried to object, he kept doing it more, and there is no |
| 03:44:35 | 10 | argument, no inference, nothing this evidence was put in for |
| 03:44:40 | 11 | other than to say any police officer would have done the same |
| 03:44:43 | 12 | thing because of a moral obligation. There is no prejudice to |
| 03:44:46 | 13 | saying isn't it true that at the time you wrote this letter, |
| 03:44:51 | 14 | you were a party to this case. In fact, it probably should be |
| 03:44:54 | 15 | brought out anyway because it shows his bias. There is no |
| 03:44:56 | 16 | unfair prejudice and there would be a ton of unfair prejudice, |
| 03:45:00 | 17 | we spent so much time saying to O'Callaghan, this is an |
| 03:45:02 | 18 | extraordinary letter you wrote, you only wrote it because you |
| 03:45:05 | 19 | were a defendant. They have opened the door. |
| 03:45:07 | 20 | THE COURT: Thank you. Here is the ruling. Here is |
| 03:45:09 | 21 | what you can do, here is what you can't do. |
| 03:45:12 | 22 | You can elicit -- Mr. Brannigan is listening which is |
| 03:45:15 | 23 | a good thing. You can elicit from Mr. Brannigan, isn't it a |
| 03:45:18 | 24 | fact that when you wrote that letter, you understood that your |
| 03:45:21 | 25 | conduct in this case was under question, too, period. That's |

***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 03:45:24 | 1 | it, you can't bring out he is a party.  The reason you can't |
| 03:45:27 | 2 | bring out he was a party is that it gets us down into a rabbit |
| 03:45:31 | 3 | hole as to why is he no longer a party and that can't be |
| 03:45:34 | 4 | explained in any way that's understandable and would take a |
| 03:45:38 | 5 | limited amount of time, so that's what I'm letting you do. |
| 03:45:43 | 6 | Does everybody understand? |
| 03:45:44 | 7 | MR. LOEVY:  Yes, your Honor. |
| 03:45:45 | 8 | MR. KULWIN:  Yes.  And he heard -- |
| 03:45:47 | 9 | THE COURT:  He heard it.  I am glad he was here. |
| 03:45:50 | 10 | MR. KULWIN:  He had as a hearing issue, Judge. |
| 03:45:51 | 11 | THE COURT:  Go over with him, Mr. Noland, so he |
| 03:45:55 | 12 | knows. |
| 03:45:55 | 13 | (Short break.) |
| 03:53:17 | 14 | THE COURT:  Okay.  What is it that you need to bring |
| 03:53:19 | 15 | up. |
| 03:53:19 | 16 | MR. LOEVY:  Your Honor, our understanding was the |
| 03:53:21 | 17 | curative instruction was supposed to give the jury the |
| 03:53:23 | 18 | impression. |
| 03:53:24 | 19 | THE COURT:  Curative question. |
| 03:53:25 | 20 | MR. LOEVY:  The curative question was your conduct in |
| 03:53:28 | 21 | this case was under question too at the time you wrote the |
| 03:53:31 | 22 | letter and Mr. Noland just told me he is going to say no, |
| 03:53:34 | 23 | that's not true. |
| 03:53:34 | 24 | THE COURT:  And? |
| 03:53:35 | 25 | MR. NOLAND:  We were asking him to ask the question |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/05/16 PM
Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 117 of 174 PageID #:65410
***REALTIME UNEDITED TRANSCRIPT ONLY***

116

| 03:53:37 | 1 | in April 2014 his conduct was under question. |
| 03:53:44 | 2 | MR. LOEVY: The issue has to be when he wrote the |
| 03:53:46 | 3 | letter. |
| 03:53:46 | 4 | THE COURT: What's the date on the letter? |
| 03:53:48 | 5 | MR. NOLAND: July 6. |
| 03:53:52 | 6 | MR. LOEVY: July 6. |
| 03:53:53 | 7 | MR. NOLAND: July 6. |
| 03:53:54 | 8 | MR. KULWIN: 2014. |
| 03:53:56 | 9 | THE COURT: And what's your point? |
| 03:53:58 | 10 | MR. KULWIN: The new trial, he had been found not |
| 03:54:01 | 11 | liable, but the new trial wasn't granted. |
| 03:54:03 | 12 | THE COURT: A motion for new trial had been found? |
| 03:54:05 | 13 | MR. KULWIN: It had, but it hadn't been granted. |
| 03:54:09 | 14 | THE COURT: Are you going to split that hair with me? |
| 03:54:11 | 15 | MR. NOLAND: Gotcha. |
| 03:54:12 | 16 | THE COURT: Seriously. If everybody wants to go |
| 03:54:14 | 17 | through the whole history of that and then we can start this |
| 03:54:17 | 18 | over next Monday with a new jury, that would be lovely, but, |
| 03:54:21 | 19 | no. |
| 03:54:22 | 20 | MR. NOLAND: I just want to know the question he |
| 03:54:26 | 21 | needs to answer. |
| 03:54:27 | 22 | THE COURT: The answer needs to be yes. And honestly |
| 03:54:30 | 23 | it is factually true because his conduct is still under |
| 03:54:35 | 24 | question at any time before the case goes up on appeal. |
| 03:55:43 | 25 | (The jury enters the courtroom.) |

| | | |
|---|---|---|
| 03:55:43 | 1 | THE COURT:  Mr. Brannigan is on his way backup. |
| 03:55:46 | 2 | Everybody can have a seat.  Mr. Loevy, you can go ahead. |
| 03:55:49 | 3 | - - - |
| 03:55:49 | 4 | DANIEL BRANNIGAN, CROSS-EXAMINATION |
| 03:55:49 | 5 | BY MR. LOEVY: |
| 03:55:51 | 6 | Q.  Mr. Brannigan, you were asked a number of questions about |
| 03:55:53 | 7 | that letter you wrote for Earl Hawkins, correct? |
| 03:55:55 | 8 | A.  Correct. |
| 03:55:56 | 9 | Q.  Isn't it true, though, sir, at the time that you wrote |
| 03:55:59 | 10 | that letter, your conduct in this case was under question too, |
| 03:56:05 | 11 | correct, this civil case? |
| 03:56:06 | 12 | A.  Correct. |
| 03:56:06 | 13 | Q.  And at the time you wrote that letter, you had |
| 03:56:15 | 14 | conversations with Mr. O'Callaghan about it? |
| 03:56:16 | 15 | A.  I don't know.  I'll guess yes, but I do not know that. |
| 03:56:24 | 16 | Q.  You knew he was writing a letter for Earl too, right? |
| 03:56:27 | 17 | A.  I knew it was requested that he write a letter for Earl. |
| 03:56:31 | 18 | Q.  And you didn't write a letter for Earl in 2008, 2009, |
| 03:56:35 | 19 | 2011, right? |
| 03:56:36 | 20 | A.  Correct, I wasn't asked to. |
| 03:56:40 | 21 | MR. LOEVY:  Objection, your Honor.  We ask that be |
| 03:56:44 | 22 | stricken after yes. |
| 03:56:44 | 23 | THE COURT:  I am going to overrule it.  Just give |
| 03:56:46 | 24 | responsive answers to the questions. |
| 03:56:48 | 25 | THE WITNESS:  Yes, sir. |

03:56:49    1   BY MR. LOEVY:

03:56:49    2   Q.  All right.  Let's back up.

03:56:50    3       You said Mr. Sumner gave you indications that he was

03:56:53    4   going to cooperate when he got apprehended, correct?

03:56:56    5   A.  After speaking to him a couple of times, yes, sir.

03:57:00    6   Q.  All right.  Would you agree that people in Mr. Sumner's

03:57:03    7   situations are generally not inclined to implicate their

03:57:07    8   colleagues in crimes, right?

03:57:09    9   A.  He certainly was.

03:57:11   10   Q.  All right.  He was free to leave, you said?

03:57:13   11   A.  Absolutely.  He wasn't free to leave at that time, we

03:57:18   12   didn't know if he was -- had in any outstanding warrants on

03:57:23   13   him or if anybody had any outstanding warrants.

03:57:27   14   Q.  But you did establish pretty quickly he was free to leave?

03:57:30   15   A.  No.

03:57:31   16   Q.  At some point he was free to leave?

03:57:32   17   A.  Yes.  I don't know when his fingerprints cleared.

03:57:37   18   Everybody was getting their prints taken.

03:57:39   19   Q.  All right.  Once his prints cleared -- once his prints

03:57:45   20   cleared, he was free to leave?

03:57:47   21   A.  Once his prints were cleared, yes.

03:57:49   22   Q.  How did you incentivize Mr. Sumner to make a whole bunch

03:57:54   23   of cases against El Rukns if he was clear to leave?

03:57:56   24       MR. NOLAND:  Objection.  Assumes facts not in

03:57:58   25   evidence.


***REALTIME UNEDITED TRANSCRIPT ONLY***

| 03:58:00 | 1 | THE COURT: Sustained to the form of the question. |
| 03:58:02 | 2 | BY MR. LOEVY: |
| 03:58:03 | 3 | Q. Let's just keep it simple. How did you incentivize |
| 03:58:06 | 4 | Mr. Sumner to make a whole bunch of cases against a whole |
| 03:58:08 | 5 | bunch of El Rukns? |
| 03:58:09 | 6 | MR. NOLAND: That's the same -- objection. |
| 03:58:10 | 7 | THE COURT: Yeah. It assumes facts not in evidence. |
| 03:58:13 | 8 | BY MR. LOEVY: |
| 03:58:14 | 9 | Q. Mr. Sumner did make a whole bunch of cases against a whole |
| 03:58:17 | 10 | bunch of El Rukns, correct? |
| 03:58:18 | 11 | A. Not in east Cleveland, no, sir. |
| 03:58:19 | 12 | Q. At some point he did, correct? |
| 03:58:21 | 13 | A. Later on when we went back to Chicago, yeah. |
| 03:58:24 | 14 | Q. Okay. In Cleveland at a minimum, he implicates El Rukns |
| 03:58:28 | 15 | in that triple homicide? |
| 03:58:29 | 16 | A. That's correct. |
| 03:58:30 | 17 | Q. How did you incentivize Mr. Sumner to tell you, a law |
| 03:58:34 | 18 | enforcement officer, about a triple homicide committed by his |
| 03:58:37 | 19 | colleagues? |
| 03:58:37 | 20 | MR. NOLAND: Objection. |
| 03:58:38 | 21 | THE COURT: That's the part that assumed a fact not |
| 03:58:41 | 22 | in evidence. That's the part I sustained an objection to. |
| 03:58:43 | 23 | MR. LOEVY: All right. I understand. |
| 03:58:45 | 24 | BY MR. LOEVY: |
| 03:58:45 | 25 | Q. Mr. Sumner did implicate his colleagues in the triple |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 121 of 174 PageID #:65414
12/05/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

120

03:58:48 1 homicide, right?

03:58:48 2 A. When we were out in east Cleveland, yes, sir.

03:58:50 3 Q. Okay. While you were out in east Cleveland, how did you

03:58:54 4 incentivize Mr. Sumner to implicate his colleagues in that

03:58:57 5 triple homicide?

03:58:58 6     MR. NOLAND: Objection.

03:58:58 7     THE COURT: Sustained.

03:58:59 8     MR. LOEVY: I don't understand.

03:59:01 9     THE COURT: Then I am going to explain it to you at

03:59:09 10 sidebar.

03:59:11 11  (The following proceedings were had at sidebar outside the

03:59:11 12 hearing of the jury:)

03:59:11 13     THE COURT: It assumes that he did.

03:59:13 14     MR. LOEVY: I thought he did.

03:59:14 15     THE COURT: It assumes that he incentivized him.

03:59:18 16     MR. LOEVY: Okay.

03:59:21 17  (The following proceedings were had in open court in the

03:59:21 18 presence and hearing of the jury:)

03:59:21 19     THE COURT: Proceed.

03:59:22 20 BY MR. LOEVY:

03:59:23 21 Q. What was your understanding of why Mr. Sumner was telling

03:59:26 22 law enforcement that his colleagues had committed this triple

03:59:29 23 homicide?

03:59:29 24 A. Mr. Sumner was kind of between a rock and a hard place.

03:59:36 25 Mr. Sumner was on the run for something, I didn't know what,

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 03:59:41 | 1 | he didn't want to go to Africa or Jamaica as he was describing |
|---|---|---|
| 03:59:45 | 2 | to me, and he was saying phrases and words to the effect of |
| 03:59:50 | 3 | I'm sick of all of this, and well, you know, maybe I can help |
| 03:59:54 | 4 | you.  I've been on the run for a couple of weeks or whatever |
| 03:59:57 | 5 | it was, and those -- that's what I'm referring to when I said |
| 04:00:01 | 6 | he was making noise about maybe he'll cooperate. |

**Q.** All right.  The maybe I can help you is the part I was asking about then.  What did you tell him you could do for him?

**A.** In what sense?

**Q.** Well, helping him.

**A.** If you want to cooperate with us, you will be protected from them because he voiced a great deal of concern about the welfare of himself and his family and his children regarding the El Rukns.

**Q.** Okay.  So if he was concerned about it, then why did he nonetheless do it?  Do you understand what I'm asking?

**A.** He did it because apparently he did not want to play with the El Rukns anymore.  He wanted to come to law enforcement.

**Q.** I see?

**A.** It was a big jump for him.  Yes, sir, I agree.

**Q.** No violence was used, though, is your testimony, right?

**A.** No, sir.  That's not --

**Q.** Putting him in the car on the triple homicide, was he threatened that if you don't couldn't, we are going to put the

| | | |
|---|---|---|
| 04:00:58 | 1 | murder charge on you? |
| 04:00:58 | 2 | A.  No, sir, he was not. |
| 04:01:00 | 3 | Q.  Why not?  Why isn't that a legitimate interrogation |
| 04:01:05 | 4 | tactic? |
| 04:01:05 | 5 | A.  Not one of my interrogation tactics.  You catch more flies |
| 04:01:10 | 6 | with honey than you do with vinegar. |
| 04:01:13 | 7 | Q.  Describe the events from May 9th, May 10th, May 11th, from |
| 04:01:18 | 8 | 1985.  Do you have any notes from any of those days? |
| 04:01:21 | 9 | A.  No, sir. |
| 04:01:21 | 10 | Q.  So when you were saying what happened on May 9th versus |
| 04:01:24 | 11 | May 10th versus May 11th, is there any document that you were |
| 04:01:28 | 12 | referring to? |
| 04:01:28 | 13 | A.  For me? |
| 04:01:29 | 14 | Q.  Yes. |
| 04:01:30 | 15 | A.  No. |
| 04:01:31 | 16 | Q.  Any report that you've seen that describes what happened |
| 04:01:34 | 17 | on May 10th versus 9th versus 11? |
| 04:01:38 | 18 | A.  If there is, I can't remember, but I didn't prepare any. |
| 04:01:40 | 19 | Q.  So all the testimony that you gave on direct about what |
| 04:01:43 | 20 | happened on May 9th, May 10th, May 11, that was all from |
| 04:01:46 | 21 | memory 31 years ago? |
| 04:01:48 | 22 | A.  No, not from memory from 31 years ago.  There was prior |
| 04:01:51 | 23 | testimony to how this all came about. |
| 04:01:53 | 24 | Q.  All right.  Is it the policy and practice of the police |
| 04:01:57 | 25 | department that there should be notes or reports about what |

| 04:01:59 | 1 | happened on May 9th, May 10th and May 11? |
| 04:02:02 | 2 | A.  There was.  There was an arrest report prepared by the |
| 04:02:06 | 3 | FBI. |
| 04:02:06 | 4 | Q.  Well, there was an arrest report after he was arrested on |
| 04:02:08 | 5 | what day? |
| 04:02:09 | 6 | A.  On who now?  Who are we talking about? |
| 04:02:13 | 7 | Q.  Whoever you were just talking about? |
| 04:02:14 | 8 | MR. NOLAND:  Objection, Judge. |
| 04:02:16 | 9 | THE COURT:  I think we are talking about Mr. Sumner. |
| 04:02:17 | 10 | MR. LOEVY:  Yeah. |
| 04:02:19 | 11 | THE WITNESS:  Sumner was not arrested that day. |
| 04:02:22 | 12 | Sumner. |
| 04:02:22 | 13 | BY MR. LOEVY: |
| 04:02:23 | 14 | Q.  Then we wouldn't have an arrest report, would we? |
| 04:02:26 | 15 | A.  You are absolutely correct.  I was confused with walker. |
| 04:02:29 | 16 | There was an arrest report with walker and I am sure there was |
| 04:02:35 | 17 | an FBI 302 prepared on the raid. |
| 04:02:39 | 18 | Q.  Back to my question, does the policy of the police |
| 04:02:45 | 19 | department require you to take notes when Anthony Sumner was |
| 04:02:47 | 20 | saying what he was saying in Cleveland? |
| 04:02:47 | 21 | MR. NOLAND:  Objection, Judge, vague. |
| 04:02:49 | 22 | THE COURT:  Overruled. |
| 04:02:49 | 23 | THE WITNESS:  Yes, notes were taken by Detective |
| 04:02:52 | 24 | Smith when he talked about the triple homicide. |
| 04:02:54 | 25 | MR. LOEVY:  Objection, your Honor.  It was if the |

***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:02:56 | 1 | policy required it. |
| 04:02:57 | 2 | THE COURT: Does the policy require it? |
| 04:02:59 | 3 | THE WITNESS: Yes. |
| 04:03:00 | 4 | THE COURT: Yes is the answer. |
| 04:03:01 | 5 | THE WITNESS: Yes is the answer. |
| 04:03:02 | 6 | BY MR. LOEVY: |
| 04:03:02 | 7 | Q. Who was Detective Smith? |
| 04:03:03 | 8 | A. Detective Smith was detective from area 3 who was assigned |
| 04:03:07 | 9 | to the triple homicide. |
| 04:03:08 | 10 | Q. And it's your testimony that this Detective Smith took |
| 04:03:10 | 11 | notes on what happened in east Cleveland? |
| 04:03:12 | 12 | A. When he was speaking with Anthony Sumner and Anthony |
| 04:03:16 | 13 | Sumner provided him the information. |
| 04:03:18 | 14 | Q. Okay. |
| 04:03:18 | 15 | A. Regarding the triple homicide. |
| 04:03:20 | 16 | Q. Where are those notes now? |
| 04:03:21 | 17 | A. I don't know where Detective Smith's notes are. |
| 04:03:24 | 18 | Q. Have you ever seen them? |
| 04:03:25 | 19 | A. I am sure I reviewed notes or reports that he generated |
| 04:03:30 | 20 | back then. |
| 04:03:30 | 21 | Q. So it's your understanding the Chicago Police Department |
| 04:03:32 | 22 | has Detective Smith's police reports from this debriefing of |
| 04:03:37 | 23 | Anthony Sumner? |
| 04:03:38 | 24 | A. The debriefing or the -- you're confusing me. The |
| 04:03:46 | 25 | debriefing of Anthony Sumner was conducted in Chicago. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:03:49 | 1 | Q. All right. Let's not get hung up on the word. You just |
| 04:03:52 | 2 | said Detective Smith? |
| 04:03:53 | 3 | MR. NOLAND: Objection, your Honor. |
| 04:03:54 | 4 | THE COURT: The objection is overruled. |
| 04:03:55 | 5 | BY MR. LOEVY: |
| 04:03:56 | 6 | Q. Detective Smith took notes of what Sumner was saying in |
| 04:03:58 | 7 | Cleveland. That's your testimony, right? |
| 04:03:59 | 8 | A. That's what I seem to remember, yes, he took notes and |
| 04:04:03 | 9 | then he wrote a report because I know I've seen the report. |
| 04:04:07 | 10 | Q. That report should exist, Detective Smith's police report? |
| 04:04:11 | 11 | A. Should exist, sure. |
| 04:04:13 | 12 | Q. When is the last time you've seen it? |
| 04:04:15 | 13 | A. I can't recall. |
| 04:04:15 | 14 | Q. In the last year? |
| 04:04:16 | 15 | A. I can't recall. |
| 04:04:16 | 16 | Q. The last five years? |
| 04:04:17 | 17 | A. I'm telling you, I can't recall. |
| 04:04:19 | 18 | Q. Have you seen it in the last ten years? |
| 04:04:22 | 19 | MR. KULWIN: Judge, objection. |
| 04:04:23 | 20 | THE COURT: Sustained. |
| 04:04:24 | 21 | BY MR. LOEVY: |
| 04:04:24 | 22 | Q. All right. Let's talk about the interrogation. You said |
| 04:04:27 | 23 | the task force was put together to put cases on the El Rukns |
| 04:04:31 | 24 | for illegal things. Did I get your testimony correctly? |
| 04:04:36 | 25 | A. I think you're mischaracterizing it. |

| | | |
|---|---|---|
| 04:04:38 | 1 | Q. But you did, the task force goal was to arrest as many El |
| 04:04:42 | 2 | Rukns as possible, can we agree with that? |
| 04:04:44 | 3 | A. If they committed crimes, yes, sir. |
| 04:04:46 | 4 | Q. You wanted to basically decapitate the leadership and take |
| 04:04:49 | 5 | the gang out, that was the objective, correct? |
| 04:04:51 | 6 | A. Correct, utilizing the federal racketeering statutes. |
| 04:04:55 | 7 | Q. And Anthony Sumner was the first crack that you had |
| 04:04:57 | 8 | against the El Rukns, correct? |
| 04:04:58 | 9 | A. He was the first ranking cooperator we had. We had |
| 04:05:04 | 10 | several lesser guys that were soldiers or used to be soldiers |
| 04:05:08 | 11 | in the organization cooperating with us. |
| 04:05:09 | 12 | Q. And one of the murder cases that he was asked about was |
| 04:05:13 | 13 | the murder of Smith/Hickman isn't that correct? |
| 04:05:16 | 14 | MR. NOLAND:  Objection, foundation. |
| 04:05:17 | 15 | THE COURT:  You mean when? |
| 04:05:21 | 16 | MR. NOLAND:  Where and when. |
| 04:05:22 | 17 | THE COURT:  Let's get the when. |
| 04:05:23 | 18 | BY MR. LOEVY: |
| 04:05:23 | 19 | Q. All right.  Did you talk to Anthony Sumner? |
| 04:05:25 | 20 | THE COURT:  About? |
| 04:05:26 | 21 | BY MR. LOEVY: |
| 04:05:26 | 22 | Q. About Smith/Hickman? |
| 04:05:29 | 23 | A. Did I? |
| 04:05:30 | 24 | Q. Yes? |
| 04:05:32 | 25 | A. No, sir. |

                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:05:32 | 1 | Q. Didn't you tell Mr. Noland that you talked to him about |
| 04:05:37 | 2 | Nathson Fields confessing? |
| 04:05:39 | 3 | MR. NOLAND: Objection, what conversation. |
| 04:05:41 | 4 | MR. LOEVY: Just change it. |
| 04:05:42 | 5 | BY MR. LOEVY: |
| 04:05:42 | 6 | Q. Is that true then what you just said that you never talked |
| 04:05:45 | 7 | to Anthony Sumner about Smith/Hickman, that's true, right? |
| 04:05:48 | 8 | MR. NOLAND: Objection, foundation. |
| 04:05:48 | 9 | THE COURT: Overruled. |
| 04:05:49 | 10 | THE WITNESS: I don't recall specifically questioning |
| 04:05:52 | 11 | Anthony Sumner about the Smith/Hickman murders. |
| 04:05:57 | 12 | BY MR. LOEVY: |
| 04:05:57 | 13 | Q. Okay. |
| 04:05:58 | 14 | A. I was present when he was questioned. |
| 04:05:59 | 15 | Q. All right. Isn't it true that one of the crimes Sumner |
| 04:06:05 | 16 | was asked about was the murder of Smith/Hickman? |
| 04:06:09 | 17 | MR. NOLAND: Objection, foundation as to when. |
| 04:06:11 | 18 | THE COURT: Okay. So now we are back to where we |
| 04:06:14 | 19 | were. Let's get the when. |
| 04:06:15 | 20 | BY MR. LOEVY: |
| 04:06:15 | 21 | Q. Whenever you're talking about being present, I don't know |
| 04:06:17 | 22 | when. When was it, sir, when you were present? |
| 04:06:20 | 23 | A. I don't know -- in east Cleveland, Ohio, the only |
| 04:06:23 | 24 | questions that I remember him being asked and the only thing |
| 04:06:27 | 25 | he is talking about specifically was Detective Smith and |

| | | |
|---|---|---|
| 04:06:32 | 1 | state's attorney Wharrie questioned him regarding the triple |
| 04:06:35 | 2 | homicide. |
| 04:06:35 | 3 | Q. All right. Then I am not talking about that. |
| 04:06:37 | 4 | A. Okay. |
| 04:06:38 | 5 | Q. I am talking about questions about -- |
| 04:06:39 | 6 | MR. NOLAND: Objection. |
| 04:06:40 | 7 | BY MR. LOEVY: |
| 04:06:40 | 8 | Q. Smith/Hickman? |
| 04:06:41 | 9 | THE COURT: Mr. Noland have a seat. The objection is |
| 04:06:45 | 10 | overruled. |
| 04:06:46 | 11 | BY MR. LOEVY: |
| 04:06:46 | 12 | Q. All right. Do you understand I'm asking of Anthony Sumner |
| 04:06:51 | 13 | Mr. Smith/Hickman. Do you understand that question? |
| 04:06:53 | 14 | A. Correct. |
| 04:06:53 | 15 | Q. Were you present you're saying or you weren't present? |
| 04:06:56 | 16 | A. I was present when he was debriefed in Chicago at 2650 |
| 04:06:56 | 17 | South California on the 13th floor of the gang prosecution |
| 04:07:02 | 18 | unit. |
| 04:07:02 | 19 | Q. Now back to my question which is: Isn't it true that one |
| 04:07:05 | 20 | of the murder cases that Sumner was asked about was the murder |
| 04:07:09 | 21 | of Smith and Hickman, sir? |
| 04:07:10 | 22 | A. Then, yes, correct. I got it now. |
| 04:07:13 | 23 | Q. All right. And by asked about, people said to Anthony |
| 04:07:17 | 24 | Sumner, do you have information about the Smith/Hickman case |
| 04:07:21 | 25 | isn't that true, sir? |

| | | |
|---|---|---|
| 04:07:22 | 1 | A.  He was asked -- I would phrase it -- or paraphrase it, I |
| 04:07:29 | 2 | would say they were open-ended questions, what case can you |
| 04:07:32 | 3 | tell us about and he would say, well, I know who shot Charlie |
| 04:07:36 | 4 | brown over on wherever and then we would -- the questions |
| 04:07:40 | 5 | would be asked by Murphy or whoever else was questioning him, |
| 04:07:45 | 6 | tell us about Charlie brown, tell us about whatever else he |
| 04:07:48 | 7 | brought up. |
| 04:07:48 | 8 | Q.  All right.  When Sumner was asked about the murder of |
| 04:07:53 | 9 | Smith/Hickman, can you be sure you were in the room, sir? |
| 04:07:55 | 10 | MR. KULWIN:  Objection, Judge. |
| 04:07:56 | 11 | THE COURT:  Overruled. |
| 04:08:00 | 12 | BY MR. LOEVY: |
| 04:08:00 | 13 | Q.  Can you be sure you were in the room? |
| 04:08:01 | 14 | A.  I was in the room for part of it.  I might have got up to |
| 04:08:05 | 15 | get a drink of water, by would have been, yes, sir. |
| 04:08:08 | 16 | Q.  Is it fair to say you wouldn't have a specific independent |
| 04:08:11 | 17 | recollection all these years later because you have no notes? |
| 04:08:14 | 18 | A.  Correct. |
| 04:08:14 | 19 | Q.  Most of the interrogating, though, was done by Murphy, |
| 04:08:17 | 20 | right? |
| 04:08:17 | 21 | A.  That's correct. |
| 04:08:18 | 22 | Q.  And by this time Anthony Sumner was cooperating, correct? |
| 04:08:20 | 23 | A.  Correct.  Now he's cooperating, we're in Chicago at the |
| 04:08:25 | 24 | gang office. |
| 04:08:26 | 25 | Q.  And at this point he's implicating a lot of his former |

| 04:08:30 | 1 | colleagues this crimes, correct? |
| 04:08:31 | 2 | A. Correct. |
| 04:08:31 | 3 | Q. And he's helping the law enforcement people make a lot of |
| 04:08:34 | 4 | cases, right? |
| 04:08:35 | 5 | A. He's just providing information now and hopefully they'll |
| 04:08:39 | 6 | develop into the cases, yes, sir. |
| 04:08:40 | 7 | Q. And at this point, he's trying to get a deal for himself, |
| 04:08:44 | 8 | correct? |
| 04:08:45 | 9 | A. Of course. |
| 04:08:45 | 10 | Q. So he is not just providing this to help the law |
| 04:08:48 | 11 | enforcement, right? |
| 04:08:48 | 12 | A. No, he is -- there's something up his sleeve, we know |
| 04:08:52 | 13 | that. He's already implicated himself in one of the murders. |
| 04:08:54 | 14 | Q. And at this point, it was communicated to Anthony Sumner |
| 04:08:58 | 15 | that if you're going to get our help from law enforcement with |
| 04:09:01 | 16 | your criminal problems, we need you to make as many cases |
| 04:09:04 | 17 | against as many people, would you agree with that? |
| 04:09:06 | 18 | A. Yes, sir, and they all know that. The more information |
| 04:09:09 | 19 | they have, the better off they are. |
| 04:09:11 | 20 | Q. All right. You said that Sumner named four shooters, but |
| 04:09:15 | 21 | you're not positive you were in the room when Sumner named |
| 04:09:17 | 22 | four shooters, correct? |
| 04:09:18 | 23 | MR. KULWIN: Objection, argumentative, Judge. |
| 04:09:20 | 24 | THE COURT: Overruled. |
| 04:09:21 | 25 | THE WITNESS: I don't remember saying I was or |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 04:09:24 | 1 | wasn't. At this point in time, though, I can't remember was I |
| 04:09:29 | 2 | there that minute, no. |
| 04:09:30 | 3 | BY MR. LOEVY: |
| 04:09:30 | 4 | Q. That's what I'm asking? |
| 04:09:31 | 5 | A. Independent recollection, no, just reviewing the GPRs and |
| 04:09:34 | 6 | everything from that day. I remember that day. |
| 04:09:37 | 7 | Q. All right. But you have no notes of this particular |
| 04:09:39 | 8 | conversation when Anthony Sumner supposedly said Nate did it, |
| 04:09:43 | 9 | you have no notes of that, right? |
| 04:09:44 | 10 | A. No, sir, I wasn't the note taker. |
| 04:09:46 | 11 | Q. And this business that Sumner at some point said Nate said |
| 04:09:55 | 12 | it was a good exercise, you didn't take any notes on that, |
| 04:09:57 | 13 | correct? |
| 04:09:57 | 14 | A. I wasn't questioning him, correct. |
| 04:09:59 | 15 | Q. And you have -- you have no memory if you were in the room |
| 04:10:02 | 16 | or not in the room for that part either, right? |
| 04:10:05 | 17 | A. I couldn't tell you when I might have stepped out of the |
| 04:10:08 | 18 | room for a drink of water, go to the bathroom, I don't know. |
| 04:10:13 | 19 | It's a long time ago, 32 years ago, I believe. |
| 04:10:16 | 20 | Q. But you could tell us if you had notes of the |
| 04:10:19 | 21 | conversation, right? |
| 04:10:20 | 22 | A. I am not the taker of the notes. You don't want 25 people |
| 04:10:25 | 23 | taking notes. I am there to assist the detectives with |
| 04:10:29 | 24 | nicknames, addresses, background on the gang itself. |
| 04:10:33 | 25 | Q. So since you don't remember if you were present when |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:10:37 | 1 | Sumner said that Nate was the shooter or that Nate confessed, |
| 04:10:40 | 2 | you don't know exactly what point that got into the story |
| 04:10:43 | 3 | isn't that fair to say also? |
| 04:10:44 | 4 | MR. NOLAND:  Objection, argumentative. |
| 04:10:45 | 5 | THE COURT:  Overruled. |
| 04:10:47 | 6 | THE WITNESS:  It got in there that day because I |
| 04:10:51 | 7 | remember reviewing everything that day. |
| 04:10:52 | 8 | BY MR. LOEVY: |
| 04:10:53 | 9 | Q.  Did you see something in writing on May the 14th, 1985, |
| 04:10:56 | 10 | that had all that in writing? |
| 04:10:57 | 11 | A.  I saw a number of notes and GPRs that day, yes, sir. |
| 04:11:02 | 12 | Q.  Can you describe any with more particularity, like what |
| 04:11:06 | 13 | are you talking about? |
| 04:11:07 | 14 | A.  Notes and GPRs.  There was some legal pads, I remember |
| 04:11:11 | 15 | some of the state's attorneys and other people had legal pads |
| 04:11:17 | 16 | out. |
| 04:11:17 | 17 | Q.  So there should -- how about just focus on the Chicago |
| 04:11:20 | 18 | Police Department.  There should be something written down by |
| 04:11:23 | 19 | some member of the Chicago Police Department that this |
| 04:11:25 | 20 | happened? |
| 04:11:25 | 21 | A.  Yes, sir. |
| 04:11:26 | 22 | Q.  Who would have been taking those notes? |
| 04:11:29 | 23 | A.  That would probably have been Murphy.  That would have |
| 04:11:31 | 24 | been Murphy.  Not probably.  It would have been Murphy. |
| 04:11:35 | 25 | Q.  You said you have been investigating the El Rukns since |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:11:37 | 1 | the '70s, correct? |
| 04:11:38 | 2 | A.  Yes, sir. |
| 04:11:38 | 3 | Q.  And you have had contacts over the years with Hawkins and |
| 04:11:41 | 4 | with Sumner, right? |
| 04:11:42 | 5 | A.  That's right. |
| 04:11:42 | 6 | Q.  But you had absolutely no contact with Nate Fields; isn't |
| 04:11:42 | 7 | that correct? |
| 04:11:46 | 8 | A.  I remember absolutely no contact.  He must have been |
| 04:11:51 | 9 | somewhere else. |
| 04:11:51 | 10 | MR. LOEVY:  Objection, your Honor. |
| 04:11:52 | 11 | THE COURT:  The he must have been somewhere else is |
| 04:11:54 | 12 | stricken.  The jury is directed to disregard it.  It's not |
| 04:11:57 | 13 | responsive to the question. |
| 04:11:58 | 14 | BY MR. LOEVY: |
| 04:11:59 | 15 | Q.  All right.  Sumner was put in front of a grand jury three |
| 04:12:02 | 16 | or four days after the raid, correct? |
| 04:12:03 | 17 | A.  Yeah, okay, yeah, it was the day we came back I think he |
| 04:12:11 | 18 | went -- he went to the grand jury, yes, sir. |
| 04:12:13 | 19 | Q.  One of the reasons you put a witness before the grand jury |
| 04:12:16 | 20 | is to lock in their testimony, correct? |
| 04:12:17 | 21 | A.  That's correct. |
| 04:12:18 | 22 | Q.  And that way they can't change it later, correct? |
| 04:12:21 | 23 | A.  That's correct. |
| 04:12:22 | 24 | Q.  Now, when Sumner was put before the grand jury, did he |
| 04:12:25 | 25 | lock in testimony that Nate Fields was one of the shooters, |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/05/16 PM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

134

04:12:29  1   yes or no, sir?

04:12:29  2   A.  I can't remember.

04:12:30  3   Q.  Okay.  Did he lock in testimony that Nate said it was a

04:12:34  4   good exercise before the grand jury?

04:12:35  5   A.  Show me, if you have a document from the grand jury, that

04:12:40  6   would help.  As we sit here right now, I just can't remember

04:12:43  7   what he said in the grand jury.  I am drawing a blank.

04:12:45  8   Q.  All right.  Is it your understanding that he would have

04:12:47  9   said that it was a good exercise or that Nate was done it?

04:12:51  10        MR. KULWIN:  Objection, argumentative, calls --

04:12:52  11        THE COURT:  No, it's neither of those but form of the

04:12:55  12   question.

04:12:56  13   BY MR. LOEVY:

04:12:57  14   Q.  Isn't it true that Sumner didn't say anything about Nate

04:13:00  15   Fields at that time, sir?

04:13:01  16        THE COURT:  What's at that time?  The grand jury?

04:13:04  17        MR. LOEVY:  Yes, the grand jury.

04:13:07  18        THE WITNESS:  Regarding what case?  I am getting a

04:13:09  19   little confused.

04:13:11  20   BY MR. LOEVY:

04:13:11  21   Q.  Any case?

04:13:13  22        MR. KULWIN:  Objection, Judge, any case is not

04:13:15  23   germane.

04:13:15  24        THE COURT:  Overruled.

04:13:16  25        THE WITNESS:  He only spoke of the first day in the


                   ***REALTIME UNEDITED TRANSCRIPT ONLY***

04:13:18   1   grand jury, if my recollection serves me, because it serves me

04:13:22   2   correct because he only spoke of the triple homicide that we

04:13:26   3   went out to east Cleveland for.

04:13:29   4   BY MR. LOEVY:

04:13:30   5   Q.  My question was he didn't say anything about Nate Fields,

04:13:33   6   correct?

04:13:33   7           MR. NOLAND:  Objection.

04:13:33   8           MR. KULWIN:  Objection, foundation, argumentative.

04:13:35   9           MR. LOEVY:  Your Honor --

04:13:35  10           THE COURT:  It's neither of those.  The objection is

04:13:38  11   overruled.

04:13:39  12           THE WITNESS:  I don't know what all he said in the

04:13:42  13   grand jury.  My understanding was it was only about the triple

04:13:44  14   from east Cleveland that we went out to east Cleveland, Ohio

04:13:50  15   on.

04:13:50  16   BY MR. LOEVY:

04:13:51  17   Q.  You said that.  I am asking a different question.  He

04:13:53  18   didn't mention Nate Fields?

04:13:56  19   A.  At the triple?

04:13:57  20   Q.  At the grand jury when he was having his story locked in,

04:13:59  21   he did not mention Nate Fields, correct?

04:14:01  22   A.  On the triple, no, he did not talk about Nate Fields.

04:14:06  23   Q.  All right.  You said there was a big raid on May 18th

04:14:09  24   after Sumner had said what he said, correct?

04:14:11  25   A.  Correct, a series of raids, yes, sir.

04:14:14  1   Q.  And a number of locations were investigated by law

04:14:17  2   enforcement, correct?

04:14:18  3   A.  That's correct.

04:14:18  4   Q.  A very wide net was cast on El Rukns, correct?

04:14:22  5   A.  That's correct.

04:14:23  6   Q.  And basically, all of the top leadership of the gang was

04:14:26  7   under arrest or at least a lot of it, correct?

04:14:30  8   A.  No.

04:14:31  9   Q.  Well, you said there were hundreds of law enforcement out

04:14:34  10  arresting people, correct?

04:14:35  11  A.  That's correct.

04:14:36  12  Q.  Now, your Honor asked about your efforts to find Nate

04:14:39  13  Fields.  You weren't specifically looking for Nate when you

04:14:43  14  went back three, four times, were you?

04:14:46  15           THE COURT:  Went back where?

04:14:47  16           MR. LOEVY:  Let me set a better thing.

04:14:49  17  BY MR. LOEVY:

04:14:49  18  Q.  Nate was not arrested in the first round, right?

04:14:52  19  A.  That's correct.

04:14:52  20  Q.  All right.  And then there were subsequent, you said you

04:14:55  21  went two or three or four more times looking for people,

04:14:58  22  correct?

04:14:58  23  A.  That's correct.

04:14:58  24  Q.  But you weren't saying I'm going to go out and look for

04:15:02  25  Nate Fields, you were looking for anybody who wasn't arrested

12/05/16 PM

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:15:05  1  in the first waive is that accurate?

04:15:06  2  A.  That's correct, I wasn't focused on him.  I was focused on

04:15:09  3  anybody who was still wanted.

04:15:10  4  Q.  All right.  That's just what I was trying to establish.

04:15:13  5       So as far as the three or four times you claim you

04:15:16  6  went out, are there any documents on that, sir?

04:15:18  7  A.  No, sir.

04:15:19  8  Q.  Are there any notes?

04:15:21  9  A.  No, sir.

04:15:22  10  Q.  Are there any reports?

04:15:23  11  A.  No, you know, I don't do it.  No reports are made when you

04:15:28  12  go somewhere and there is nobody there.

04:15:29  13  Q.  Wouldn't you want to have a record of where you went, who

04:15:33  14  you looked for, who you found, isn't the Chicago Police

04:15:35  15  Department required to make those kind of records?

04:15:37  16  A.  No, we had a list of all the players and their addresses

04:15:41  17  or best addresses and photographs and copies, hard copies of

04:15:48  18  the arrest warrants and that's what you worked off.

04:15:50  19  Q.  Would it be fair to say that the only proof that you had

04:15:53  20  that you went back to that address more than once is your own

04:15:56  21  memory, that's accurate, correct?

04:15:58  22  A.  That's correct.

04:15:58  23  Q.  You said that there was a federal warrant.  Do you

04:16:01  24  remember that question with Mr. Noland?

04:16:02  25  A.  That's correct.

| 04:16:02 | 1 | Q. Isn't it true that warrant was never issued, sir? |
| 04:16:05 | 2 | A. That's correct, in the end, it was never issued. |
| 04:16:09 | 3 | Q. All right.  Did you go to Robbins looking for Mr. Fields? |
| 04:16:13 | 4 | A. I don't think I went to Robbins.  I know my partner did, |
| 04:16:18 | 5 | though. |
| 04:16:18 | 6 | Q. Showing -- were you there when your partner did, sir? |
| 04:16:22 | 7 | A. No, he advised me that he did. |
| 04:16:24 | 8 | Q. Did you have a report of that? |
| 04:16:25 | 9 | A. There wouldn't be a need for a report. |
| 04:16:27 | 10 | Q. Do you have a report for that, sir? |
| 04:16:29 | 11 | A. No, I do not.  I just told you no need for it.  No notes. |
| 04:16:33 | 12 | Q. You just happen to remember my partner went to Robbins? |
| 04:16:35 | 13 | A. There's been many, many proceedings in this case and other |
| 04:16:38 | 14 | El Rukn cases over the years, dozens of proceedings. |
| 04:16:42 | 15 | Q. All right.  Plaintiff's Exhibit 62.  This is the warrant |
| 04:16:46 | 16 | for Nate Fields that was issued on the 17th of May, correct? |
| 04:16:50 | 17 | A. Yes, sir. |
| 04:16:50 | 18 | Q. All right.  Tell the jury what the warrant was issued for |
| 04:16:53 | 19 | on the 17th of May under your name? |
| 04:16:54 | 20 | A. Vaughn and White. |
| 04:17:00 | 21 | Q. Do you have any proof in writing that you were looking for |
| 04:17:03 | 22 | Fields on Smith/Hickman after Sumner got arrested and said |
| 04:17:07 | 23 | what he said?  By proof, I mean something written down. |
| 04:17:10 | 24 | A. No, those files are all gone.  They're just arrest |
| 04:17:15 | 25 | packets. |

| | | |
|---|---|---|
| 04:17:15 | 1 | Q. What files are all gone? |
| 04:17:19 | 2 | A. The arrest packets that were made. Whatever case -- |
| 04:17:21 | 3 | whatever arrest warrant was out there like that hard copy you |
| 04:17:24 | 4 | just saw. |
| 04:17:25 | 5 | Q. Yeah. |
| 04:17:26 | 6 | A. For Nathson Fields, okay, they were made and passed out to |
| 04:17:31 | 7 | all kinds of people and then there was a big like master list |
| 04:17:36 | 8 | or something of all these character. |
| 04:17:38 | 9 | Q. I want to get back to my question. My question is is |
| 04:17:41 | 10 | there anything in writing on an actual piece of paper, a |
| 04:17:47 | 11 | document that verifies that as of May 17th you were looking |
| 04:17:51 | 12 | for Nate on anything other than Vaughn/White? Do you have a |
| 04:17:53 | 13 | piece of paper? |
| 04:17:54 | 14 | A. No, that's what the arrest warrant says. |
| 04:17:56 | 15 | Q. That's what the arrest warrant says. I'm asking a |
| 04:17:59 | 16 | different question. Are you aware of any piece of paper in |
| 04:18:02 | 17 | existence that corroborates your claim that Nate Fields as of |
| 04:18:07 | 18 | May 17th was wanted for anything other than Vaughn and White? |
| 04:18:11 | 19 | A. There was the interview -- the notes and everything from |
| 04:18:15 | 20 | the other cases. |
| 04:18:18 | 21 | Q. What notes? |
| 04:18:18 | 22 | A. The notes from the debriefing, rather, of Anthony Sumner. |
| 04:18:23 | 23 | Q. Your notes? |
| 04:18:25 | 24 | MR. KULWIN: Objection, asked and answered. |
| 04:18:26 | 25 | THE COURT: Sustained. |

| | | |
|---|---|---|
| 04:18:28 | 1 | BY MR. LOEVY: |
| 04:18:32 | 2 | Q. You were asked if Earl was given promises to get out of |
| 04:18:38 | 3 | jail, side promises. Do you remember those questions? |
| 04:18:40 | 4 | A. Earl Hawkins when? |
| 04:18:43 | 5 | Q. You were asked would it be improper if Earl was given |
| 04:18:46 | 6 | assurances he'd get out sooner than his out date. Do you |
| 04:18:50 | 7 | remember counsel asking you those questions? |
| 04:18:51 | 8 | A. I don't remember exactly how he said it, no. |
| 04:18:54 | 9 | Q. All right. It would be improper if Earl was given |
| 04:18:57 | 10 | assurances he was going to get out sooner than he was |
| 04:18:59 | 11 | representing in court that he was going to get out, correct? |
| 04:19:02 | 12 | A. I can't funnel this. |
| 04:19:05 | 13 | Q. Would it have been improper if the detectives had told |
| 04:19:09 | 14 | Earl the papers say you're getting out in 2027, but we have an |
| 04:19:13 | 15 | understanding you're going to get out sooner, that would be |
| 04:19:15 | 16 | improper? |
| 04:19:16 | 17 | A. That would be improper if someone told him that, yeah. |
| 04:19:19 | 18 | Q. And you have no knowledge as to whether he was told that |
| 04:19:21 | 19 | or not, right? |
| 04:19:21 | 20 | A. That's correct. |
| 04:19:22 | 21 | Q. And you told Hawkins that cooperating was not a get out of |
| 04:19:26 | 22 | jail free card, was that the word you used? |
| 04:19:28 | 23 | A. No, sir. |
| 04:19:29 | 24 | Q. You didn't use the expression? |
| 04:19:31 | 25 | A. No, that Earl Hawkins wanted a get out of jail free card. |

04:19:38   1   They all want a get out of jail free card.

04:19:43   2   Q.  He did get?

04:19:45   3            MR. NOLAND:  Objection.

04:19:46   4            MR. KULWIN:  Objection.

04:19:46   5            THE COURT:  Sustained.

04:19:47   6   BY MR. LOEVY:

04:19:48   7   Q.  The last thing I want to talk about is the Vaughn/White

04:19:51   8   crime.  You said you found Sumner reliable because he put

04:19:54   9   himself in the Vaughn/White crime?

04:19:55  10   A.  That was one of the things that made him believable, yes,

04:19:58  11   sir.

04:19:58  12   Q.  Sumner did not put himself in the Smith/Hickman crime that

04:20:00  13   he was accusing Nate of, correct?

04:20:04  14   A.  No, sir.

04:20:05  15   Q.  He said I heard from other people that other people did

04:20:07  16   it, right?

04:20:08  17   A.  Correct.

04:20:08  18   Q.  Hawkins, two guys from Evanston, and my landlord were the

04:20:12  19   guys he eventually --

04:20:14  20            MR. KULWIN:  Objection, Judge, to landlord.

04:20:15  21            THE COURT:  Sustained.  Rephrase the question.

04:20:19  22   BY MR. LOEVY:

04:20:19  23   Q.  Did Hawkins -- I'm sorry.  At any time did Sumner ever

04:20:22  24   tell you that he was part of a team that got in a car with

04:20:25  25   guns to go kill Fuddy?


              ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:20:26 | 1 | A. Sumner told me a number of cases he was out -- |
| 04:20:31 | 2 | Q. I'm talking about this one, sir. |
| 04:20:33 | 3 | A. I can't remember if that one. It wouldn't surprise me if |
| 04:20:36 | 4 | he did. They were always out stalking somebody. That was |
| 04:20:38 | 5 | their term. |
| 04:20:39 | 6 | Q. Back to my question, did Sumner ever tell you that about |
| 04:20:42 | 7 | this case? |
| 04:20:43 | 8 | A. He may have. I don't recall right now. |
| 04:20:45 | 9 | Q. If he had, would you have written it down? |
| 04:20:48 | 10 | A. No, not necessarily. No I wasn't questioning him. |
| 04:20:52 | 11 | MR. KULWIN: |
| 04:20:54 | 12 | BY MR. LOEVY: |
| 04:20:54 | 13 | Q. When Nate went to trial, the man pointing the finger at |
| 04:20:57 | 14 | him, Anthony Sumner, was saying I'm disinterested? |
| 04:21:01 | 15 | MR. KULWIN: Judge, I object. He didn't say that. I |
| 04:21:04 | 16 | object. It's argumentative. |
| 04:21:05 | 17 | MR. NOLAND: Objection. |
| 04:21:06 | 18 | THE COURT: Rephrase the question. |
| 04:21:07 | 19 | BY MR. LOEVY: |
| 04:21:08 | 20 | Q. All right. You do have an understanding that at trial, |
| 04:21:10 | 21 | Sumner said I wasn't involved in this crime and I'm just |
| 04:21:14 | 22 | saying who did it, right? |
| 04:21:15 | 23 | MR. KULWIN: I am going to object, Judge. |
| 04:21:16 | 24 | BY MR. LOEVY: |
| 04:21:16 | 25 | Q. That was the gist of it? |

12/05/16 PM

***REALTIME UNEDITED TRANSCRIPT ONLY***

143

| | | |
|---|---|---|
| 04:21:17 | 1 | MR. KULWIN: Misstates the testimony. He can read |
| 04:21:22 | 2 | it. |
| 04:21:22 | 3 | THE COURT: Overruled. |
| 04:21:25 | 4 | THE WITNESS: Back it up, coach. Back it up, sir. |
| 04:21:28 | 5 | BY MR. LOEVY: |
| 04:21:28 | 6 | Q. The theory of the state's case was Sumner was saying I am |
| 04:21:31 | 7 | not -- I have nothing to do with this case, but I can tell you |
| 04:21:34 | 8 | who confessed to me, right? |
| 04:21:35 | 9 | MR. KULWIN: I am going to object, Judge, |
| 04:21:38 | 10 | argumentative. |
| 04:21:39 | 11 | THE COURT: Overruled. My suggestion would be rather |
| 04:21:41 | 12 | than talking about this case, that case, you talk about what |
| 04:21:43 | 13 | case. |
| 04:21:44 | 14 | MR. LOEVY: I am talking about Smith/Hickman. |
| 04:21:45 | 15 | THE COURT: Put that in your question. |
| 04:21:46 | 16 | MR. LOEVY: Got it. |
| 04:21:47 | 17 | BY MR. LOEVY: |
| 04:21:47 | 18 | Q. In Smith/Hickman, I'm sorry, if it wasn't clear, the |
| 04:21:53 | 19 | theory of the case in Smith/Hickman was Sumner was supposedly |
| 04:21:57 | 20 | not involved but he was saying that other people confessed to |
| 04:22:00 | 21 | him, right? |
| 04:22:00 | 22 | MR. KULWIN: Objection, lack of foundation. |
| 04:22:02 | 23 | THE COURT: Overruled. |
| 04:22:03 | 24 | THE WITNESS: I don't remember the whole theory of |
| 04:22:04 | 25 | the case. |

| 04:22:04 | 1 | THE COURT: He is just asking what Sumner said. |
| 04:22:06 | 2 | THE WITNESS: I don't remember what Sumner said. How |
| 04:22:08 | 3 | is that? |
| 04:22:09 | 4 | BY MR. LOEVY: |
| 04:22:09 | 5 | Q. Do you remember if Sumner said he was involved, wasn't |
| 04:22:12 | 6 | involved, do you remember that? |
| 04:22:12 | 7 | A. I don't remember that as I sit here now. |
| 04:22:15 | 8 | Q. Let's talk about Vaughn/White. Sumner did tell you that |
| 04:22:17 | 9 | Nate was involved in the Vaughn/White murder, correct? |
| 04:22:19 | 10 | A. I remember that, yes, sir. |
| 04:22:20 | 11 | Q. Was he convincing? Did you believe him? |
| 04:22:23 | 12 | A. Did I believe him, I believed everything that Anthony was |
| 04:22:28 | 13 | saying at that time. Again, he just -- |
| 04:22:30 | 14 | Q. That's an answer? |
| 04:22:31 | 15 | A. -- |
| 04:22:33 | 16 | Q. When Anthony Sumner told you the story about how he? |
| 04:22:36 | 17 | MR. KULWIN: Object to story. |
| 04:22:37 | 18 | MR. LOEVY: It was a story, wasn't it, sir. |
| 04:22:39 | 19 | MR. KULWIN: Objection, Judge. |
| 04:22:44 | 20 | THE COURT: Everybody come over here. |
| 04:22:49 | 21 | (The following proceedings were had at sidebar outside the |
| 04:22:51 | 22 | hearing of the jury:) |
| 04:22:51 | 23 | THE COURT: Everybody stand over there. Everybody |
| 04:22:55 | 24 | stand over there. Okay. At this point, I am regarding the |
| 04:22:59 | 25 | objections to at least two out of three questions as an effort |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 04:23:03 | 1 | to obstruct the cross. Okay. That's a warning. |
| 04:23:14 | 2 | (The following proceedings were had in open court in the |
| 04:23:15 | 3 | presence and hearing of the jury:) |
| 04:23:15 | 4 | THE COURT: The objection is overruled. You can |
| 04:23:16 | 5 | reput the question. |
| 04:23:17 | 6 | MR. LOEVY: Thank you. |
| 04:23:20 | 7 | BY MR. LOEVY: |
| 04:23:20 | 8 | Q. When Anthony Sumner told you this story about how Nate and |
| 04:23:23 | 9 | Earl and he killed the Vaughn/White couple, did you believe |
| 04:23:27 | 10 | him? Let's start with yes, no, did you believe him? |
| 04:23:30 | 11 | A. I don't know what you mean by story. Are we talking the |
| 04:23:34 | 12 | debriefing? Is that what we're referring to, during that time |
| 04:23:37 | 13 | period? |
| 04:23:38 | 14 | Q. I'll backup. |
| 04:23:39 | 15 | Did Anthony Sumner tell you that he, Nate, and Earl |
| 04:23:43 | 16 | killed Joe White and Dee Eggars Vaughn? |
| 04:23:46 | 17 | A. He said that in his debriefings yes. |
| 04:23:50 | 18 | Q. Then that's what I'm talking about. |
| 04:23:52 | 19 | A. Okay. |
| 04:23:52 | 20 | Q. And you heard it, right? |
| 04:23:54 | 21 | A. Yes. |
| 04:23:54 | 22 | Q. When Anthony Sumner told you that story in the debriefings |
| 04:23:57 | 23 | that Nate and he and Hawkins had stabbed and murdered that |
| 04:24:04 | 24 | couple, did you believe Anthony Sumner? |
| 04:24:05 | 25 | A. I had no reason to disbelieve him. Yes, I did believe |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:24:08 | 1 | him. |
| 04:24:08 | 2 | Q. Did you later learn that he was lying, right? |
| 04:24:10 | 3 | A. That's correct. |
| 04:24:11 | 4 | Q. And did you later learn what his motive was for lying to |
| 04:24:15 | 5 | you? |
| 04:24:15 | 6 | A. Yes, sir. |
| 04:24:15 | 7 | Q. What was his motive? |
| 04:24:17 | 8 | A. He said that he didn't like Nathson Fields, Nathson Fields |
| 04:24:22 | 9 | had thrown his family out of the building they were living in. |
| 04:24:27 | 10 | I believe it was 64 -- yeah, it was 6416 south Kenwood, the |
| 04:24:31 | 11 | African Hut. |
| 04:24:33 | 12 | Q. In your line of work, you meet people who tell the truth |
| 04:24:36 | 13 | and people who lie, right? |
| 04:24:37 | 14 | A. That's correct. |
| 04:24:38 | 15 | Q. And did you get pretty good at being able to tell the |
| 04:24:41 | 16 | difference? |
| 04:24:41 | 17 | A. I don't know how good I got, but sometimes I could read |
| 04:24:46 | 18 | people right and sometimes I was really surprised. |
| 04:24:49 | 19 | Q. And when Nate -- when Anthony Sumner told you that story |
| 04:24:53 | 20 | about how Nate supposedly helped stab and shoot that couple, |
| 04:24:58 | 21 | he had you going, didn't he? |
| 04:24:59 | 22 | A. Yes, sir, he did. |
| 04:25:00 | 23 | Q. He was a convincing liar, wasn't he? |
| 04:25:02 | 24 | A. At that time, yes, sir, he was. I believed him. |
| 04:25:06 | 25 | MR. LOEVY: I have no further yes, sir, your Honor. |

04:25:08   1          THE COURT:  Redirect.

04:25:09   2                         - - -

04:25:09   3          DANIEL BRANNIGAN, REDIRECT EXAMINATION

04:25:09   4   BY MR. NOLAND:

04:25:12   5   Q.  Mr. Brannigan, you also understood at the same time that

04:25:16   6   Sumner acknowledged lying about Mr. Fields about Vaughn and

04:25:21   7   White that he reaffirmed that Mr. Fields was involved in the

04:25:24   8   Smith/Hickman case; is that true?

04:25:26   9          MR. LOEVY:  Objection, leading, your Honor.

04:25:26   10          THE COURT:  Sustained to leading.

04:25:27   11   BY MR. NOLAND:

04:25:28   12   Q.  Did you learn what Mr. Sumner was saying about Smith and

04:25:32   13   Hickman and Mr. Fields at the same time he was acknowledging

04:25:35   14   about Vaughn and White?

04:25:36   15   A.  Yes, sir, I did.

04:25:37   16   Q.  What did you learn in that respect?

04:25:38   17   A.  I learned that Nate was -- Nate was one of the two

04:25:41   18   shooters, was still -- he didn't change that.

04:25:44   19   Q.  Mr. Loevy asked you some questions about some phrases from

04:25:48   20   May 14th, 1985.  One of them was stalking.  Do you recall that

04:25:52   21   term used on that day?

04:25:54   22   A.  I recall that was the first time I had heard it in that --

04:25:58   23   you know, you stalk a deer, but we all know about stalking

04:26:02   24   people now.  That's the first time I heard it from the El

04:26:07   25   Rukns, that that was their term for surveillances or following

| 04:26:10 | 1 | someone around before they whacked them or killed them. |
| 04:26:13 | 2 | Q. And did that term -- did that stick in your mind from that |
| 04:26:17 | 3 | day? |
| 04:26:17 | 4 | A. Yes, sir, it did. |
| 04:26:18 | 5 | Q. You heard the term about the terms good exercise that day |
| 04:26:23 | 6 | as well, correct? |
| 04:26:24 | 7 | A. Yes. |
| 04:26:24 | 8 | MR. LOEVY: Objection,leading, your Honor. |
| 04:26:25 | 9 | THE COURT: Overruled to the preliminary question, |
| 04:26:27 | 10 | but not beyond that. |
| 04:26:28 | 11 | BY MR. NOLAND: |
| 04:26:28 | 12 | Q. Did that term stick in your mind? |
| 04:26:30 | 13 | A. Yes, sir, it did. |
| 04:26:31 | 14 | Q. Why is that? |
| 04:26:32 | 15 | A. It was the first time I heard that in reference to a |
| 04:26:34 | 16 | shooting or a murder. I heard it several times after that |
| 04:26:38 | 17 | too. |
| 04:26:38 | 18 | Q. Counsel asked you some questions about that Earl got a get |
| 04:26:43 | 19 | out of jail free card. How much time did Earl spend in |
| 04:26:46 | 20 | custody? |
| 04:26:47 | 21 | A. I am not really good at doing the math as I sit here. But |
| 04:26:51 | 22 | he was in custody since we arrested him in May of '85 up until |
| 04:26:58 | 23 | 14. |
| 04:26:59 | 24 | Q. So approximately 30 years? |
| 04:27:01 | 25 | A. That's not a get out of jail free card to me. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 150 of 174 PageID #:65443

| | | |
|---|---|---|
| 04:27:05 | 1 | Q. Counsel asked you some questions about the warrant for Mr. |
| 04:27:09 | 2 | Fields was on the Vaughn/White case. Do you recall those? |
| 04:27:11 | 3 | A. Correct. |
| 04:27:12 | 4 | Q. When a warrant is obtained on an individual for a crime, |
| 04:27:19 | 5 | is another crime poured onto that warrant? |
| 04:27:23 | 6 | A. One warrant will serve to arrest the individual for any |
| 04:27:26 | 7 | number of other issues. |
| 04:27:27 | 8 | Q. Turning again to May 14th, 1985, what was your role with |
| 04:27:34 | 9 | respect to your participation in the debriefing that day? |
| 04:27:38 | 10 | A. Basically, I was providing information to the state's |
| 04:27:43 | 11 | attorneys and Murphy and the U.S. attorney as to nicknames of |
| 04:27:49 | 12 | the El Rukns, Anthony was not the most articulate fellow out |
| 04:27:54 | 13 | there, addresses. When he would say a building, he might just |
| 04:27:58 | 14 | refer to it as the Minerva building, what does that mean, |
| 04:28:02 | 15 | things of that nature. |
| 04:28:03 | 16 | Q. So you were being asked questions yourself by the others |
| 04:28:05 | 17 | of law enforcement in the room? |
| 04:28:07 | 18 | A. That's correct. |
| 04:28:07 | 19 | Q. Counsel asked you questions about who brought up the Smith |
| 04:28:14 | 20 | and Hickman homicide on May 14th, 1985. Who brought that up? |
| 04:28:18 | 21 | A. That would have been Anthony. That's how the debriefing |
| 04:28:21 | 22 | was constructed. You tell us what you can tell us about. |
| 04:28:25 | 23 | Q. Counsel asked you questions about reports on the triple |
| 04:28:30 | 24 | homicide, detectives Smith's reports? |
| 04:28:32 | 25 | A. That's correct. |

| 04:28:33 | 1 | MR. LOEVY: Objection, your Honor. Nobody said |
| 04:28:34 | 2 | anything about the triple homicide. |
| 04:28:35 | 3 | THE COURT: Text message, the witness did. |
| 04:28:37 | 4 | MR. LOEVY: The reports? |
| 04:28:38 | 5 | THE COURT: Yes, he did. |
| 04:28:39 | 6 | MR. LOEVY: All right. |
| 04:28:40 | 7 | BY MR. NOLAND: |
| 04:28:41 | 8 | Q. Referring to those questions, you've seen reports of |
| 04:28:45 | 9 | Detective Smith with respect to the triple homicide is that |
| 04:28:47 | 10 | true? |
| 04:28:48 | 11 | A. That's correct. |
| 04:28:48 | 12 | Q. And where would those be located? |
| 04:28:50 | 13 | A. The Chicago Police Department records. Area 3 is no |
| 04:28:54 | 14 | longer with us, but. |
| 04:28:55 | 15 | Q. With the file for the triple homicide? |
| 04:28:57 | 16 | A. That's correct. |
| 04:28:58 | 17 | Q. Counsel asked you some questions about clearing prints and |
| 04:29:06 | 18 | suggesting that prints would clear right away back in May of |
| 04:29:09 | 19 | 1985. What was the process with respect to clearing of |
| 04:29:17 | 20 | prints? |
| 04:29:18 | 21 | A. They were sent somewhere in Virginia to clear the prints. |
| 04:29:20 | 22 | This was by fax. They weren't transmitted electronically as |
| 04:29:24 | 23 | they are now. This all took time depending on how busy the |
| 04:29:29 | 24 | lockup keepers were, how busy they were where the prints were |
| 04:29:33 | 25 | being reviewed, it could take 24 hours, it could take 36 |

04:29:37   1   hours, it could take 40 hours, maybe.

04:29:40   2         MR. NOLAND:  May I have a moment, your Honor?

04:29:41   3         THE COURT:  Yes.

04:29:59   4   BY MR. NOLAND:

04:30:00   5   Q.  Mr. Brannigan, I show you a note from Exhibit 72?

04:30:09   6         THE COURT:  Defendants' or plaintiff's.

04:30:11   7         MR. NOLAND:  Plaintiff's 72, your Honor.

04:30:13   8   BY MR. NOLAND:

04:30:13   9   Q.  Mr. Brannigan, would that be a note of the interview of

04:30:18  10   Anthony Sumner with respect to the triple homicide?

04:30:20  11   A.  That's correct.  Wait.  Hold it.  Where are we at?  I

04:30:30  12   can't read this.  Okay.  I got it.

04:30:41  13   Q.  Without getting into details, is that a note of

04:30:45  14   referencing the offenders in the triple homicide?

04:30:46  15   A.  That's correct.

04:30:47  16   Q.  Including General Walker?

04:30:49  17   A.  That's correct, yes, sir.

04:30:49  18   Q.  There's another note from -- another note from plaintiff's

04:30:55  19   72 dealing with Smith/Hickman.  Do you see that?

04:30:56  20   A.  Yes, sir.

04:30:59  21   Q.  And directing your attention, Mr. Brannigan, to the bottom

04:31:04  22   of the page, does it indicate that Sumner had been out

04:31:10  23   stalking them earlier, do you see that?

04:31:12  24   A.  Yes, sir.

04:31:12  25   Q.  Thank you.

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 153 of 174 PageID #:65446
12/05/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

152

| | |
|---|---|
| 04:31:15 | 1 |
| 04:31:33 | 2 |
| 04:31:35 | 3 |
| 04:31:37 | 4 |
| 04:31:37 | 5 |
| 04:31:37 | 6 |
| 04:31:38 | 7 |
| 04:31:42 | 8 |
| 04:31:42 | 9 |
| 04:31:42 | 10 |
| 04:31:45 | 11 |
| 04:31:46 | 12 |
| 04:31:49 | 13 |
| 04:31:51 | 14 |
| 04:31:52 | 15 |
| 04:31:56 | 16 |
| 04:31:57 | 17 |
| 04:32:04 | 18 |
| 04:32:04 | 19 |
| 04:32:08 | 20 |
| 04:32:13 | 21 |
| 04:32:13 | 22 |
| 04:32:16 | 23 |
| 04:32:18 | 24 |
| 04:32:21 | 25 |

2          MR. NOLAND:  That's all.  Thank you, your Honor.

3          THE COURT:  Anything else Mr. Loevy?

4                              - - -

5               DANIEL BRANNIGAN, RECROSS-EXAMINATION

6    BY MR. LOEVY:

7    Q.  You were asked about the good exercise sticking in your

8    mind?

9    A.  Yes, sir.

10   Q.  If you weren't even sure you heard it, how could it stick

11   in your mind?

12   A.  Reviewing all those notes and discussing the interviews

13   and the debriefing with Murphy and the state's attorneys that

14   were all present.

15   Q.  All right.  You were -- you mentioned Mr. Smith's police

16   reports had to do with the triple homicide, right?

17   A.  Mr. Smith, the one that came out to area three, yes, sir.

18   East Cleveland, yes, sir.

19   Q.  Then I obviously misunderstood.  I thought you said Smith

20   wrote police reports about Sumner's debriefing in the

21   Smith/Hickman case?

22   A.  Okay.  I got you.  That was the confusion back then.

23   Q.  I apologize for my confusion.

24          So we have Smith's police reports on the triple, but

25   my question is who wrote the police reports on Sumner's

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 154 of 174 PageID #:65447
12/05/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

153

| 04:32:24 | 1 | information about Smith/Hickman? |
| 04:32:28 | 2 | MR. NOLAND: Judge, I believe beyond the scope. |
| 04:32:30 | 3 | THE COURT: No, it isn't. Overruled. |
| 04:32:32 | 4 | THE WITNESS: I don't remember who wrote the reports |
| 04:32:34 | 5 | on that. |
| 04:32:35 | 6 | BY MR. LOEVY: |
| 04:32:35 | 7 | Q. Should there be police reports? |
| 04:32:36 | 8 | A. Yeah, sure. On the triple -- I mean, on the Smith/Hickman |
| 04:32:41 | 9 | case, there are reports on it, yes, sir it. |
| 04:32:43 | 10 | Q. Should there be police reports for what Sumner originally |
| 04:32:48 | 11 | told the police, sir? |
| 04:32:49 | 12 | A. I imagine they're there. |
| 04:32:51 | 13 | Q. Have you ever seen anybody in the 30 years since? |
| 04:32:53 | 14 | A. I'm sure I have. I can't recall right now as I sit here. |
| 04:32:57 | 15 | Q. Because you can't imagine there wouldn't be police reports |
| 04:33:00 | 16 | detailing this information? |
| 04:33:03 | 17 | MR. KULWIN: Objection. |
| 04:33:04 | 18 | THE COURT: Overruled. |
| 04:33:04 | 19 | THE WITNESS: Police reports detailing? |
| 04:33:06 | 20 | BY MR. LOEVY: |
| 04:33:07 | 21 | Q. Detailing Anthony Sumner's implication of Nate Fields in |
| 04:33:11 | 22 | the double homicide of Fuddy and Hickman, there has to be such |
| 04:33:14 | 23 | police reports, correct? |
| 04:33:14 | 24 | A. I'm sure there's something mentioned there. |
| 04:33:17 | 25 | Q. You were shown some notes, defendants' 72, pages 11 |

04:33:22   1   through 12.  Do you remember Mr. Noland showing you those

04:33:25   2   notes?

04:33:25   3   A.  Yes, sir.

04:33:25   4   Q.  Do you know why these weren't turned over to the criminal

04:33:28   5   defendant in the case, Mr. Fields?

04:33:29   6          MR. KULWIN:  Objection, Judge.

04:33:30   7          THE COURT:  The question is do you know.

04:33:33   8          THE WITNESS:  Do I know, no.

04:33:35   9   BY MR. LOEVY:

04:33:36  10   Q.  Would the policies and practices of the Chicago Police

04:33:38  11   Department have required someone who took these notes to turn

04:33:41  12   them over to the criminal justice program as part of the

04:33:48  13   prosecution?

04:33:48  14   A.  I thought they were.

04:33:49  15   Q.  You were asked about whether Sumner was asked about

04:33:53  16   Smith/Hickman or whether he brought it up.  Do you remember

04:33:56  17   both sides asking you those questions?

04:33:57  18   A.  Yes, sir.

04:33:57  19   Q.  Isn't it true you testified under oath that Sumner was

04:34:01  20   asked about Smith/Hickman before he was opening up about

04:34:05  21   Smith/Hickman?

04:34:05  22   A.  My recollection of the debriefings is tell us what you

04:34:12  23   know about this case, tell us what you know about that case,

04:34:14  24   tell us what you know --

04:34:16  25   Q.  I'm talking about your testimony, sir.

12/05/16 PM
Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 156 of 174 PageID #:65449
***REALTIME UNEDITED TRANSCRIPT ONLY***

155

04:34:18   1   A.  I'm just telling you what I recall now.

04:34:20   2   Q.  All right.

04:34:20   3   A.  He was --

04:34:21   4   Q.  You asked?

04:34:22   5   A.  Telling us what he remembered.

04:34:23   6   Q.  You were asked about Mr. Hawkins getting 30 years and that

04:34:26   7   being a good deal.  Of course, he committed 10 to 15 murders?

04:34:31   8   A.  I'm not sure of his exact body count, but he committed a

04:34:36   9   lot of murders, yes, sir.

04:34:36  10   Q.  The Vaughn/White murder alone could justify 30 years,

04:34:41  11   right?

04:34:41  12   A.  Yes, sir, it justified the death penalty when it was done.

04:34:43  13   Q.  All right.  So he is now free, right?

04:34:46  14   A.  That's correct.

04:34:47  15   Q.  And the last 12 years that got knocked off his sentence --

04:34:50  16   by the way, strike that, if I may.

04:34:52  17         What was your understanding when he was supposed to

04:34:54  18   get out of prison?

04:34:55  19   A.  He would have been 72 years old.  I forget what that

04:34:58  20   calculated to, but that was always the number that I was told.

04:35:01  21   Q.  All right.  But he got out before 60, didn't he?

04:35:04  22   A.  Yes, sir.

04:35:05  23   Q.  And the last 12 years that got shaved off his sentence

04:35:08  24   were a result of a series of deals to testify against Nathson

04:35:12  25   Fields isn't that true, sir?

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 04:35:13 | 1 | A. That's not my understanding, no. |
| 04:35:15 | 2 | Q. When did he get his first deal to get out sooner? |
| 04:35:18 | 3 | A. I am not -- I'm not certain what deals were cut or what |
| 04:35:25 | 4 | arrangements were made and how the parole commission came up |
| 04:35:29 | 5 | with letting him out. I am not aware of their numbers. |
| 04:35:32 | 6 | Q. Would you be surprised that the only cuts he got in his |
| 04:35:35 | 7 | plea deals was testifying against Mr. Fields, you can't say |
| 04:35:42 | 8 | that you know that? |
| 04:35:42 | 9 | A. I don't know that, sir. |
| 04:35:43 | 10 | MR. LOEVY: I don't have anything else. |
| 04:35:44 | 11 | THE COURT: Mr. Noland, anything else? |
| 04:35:46 | 12 | - - - |
| 04:35:46 | 13 | DANIEL BRANNIGAN, REDIRECT EXAMINATION |
| 04:35:46 | 14 | BY MR. NOLAND: |
| 04:35:47 | 15 | Q. Mr. Brannigan, how many murders did Mr. Hawkins help |
| 04:35:51 | 16 | solve? |
| 04:35:52 | 17 | A. Not just the murders, but the shootings, general |
| 04:35:57 | 18 | information on the organization. |
| 04:35:57 | 19 | Q. Would it be fair to say over 20? |
| 04:35:59 | 20 | A. That would be a safe number, I believe, yes, sir. |
| 04:36:03 | 21 | Q. Mr. Brannigan, Mr. Loevy asked you about notes. Have you |
| 04:36:07 | 22 | seen this note relative to the Smith/Hickman homicide, |
| 04:36:10 | 23 | correct? |
| 04:36:12 | 24 | THE COURT: Defendant's Exhibit 70 for the record. |
| 04:36:15 | 25 | THE WITNESS: Yes, sir. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:36:18   1   BY MR. NOLAND:

04:36:18   2   Q.  And is this one of the notes you were referring to is that

04:36:21   3   you saw on May 14th, 1985?

04:36:23   4   A.  Correct.

04:36:27   5           MR. NOLAND:  No further questions.

04:36:27   6           MR. LOEVY:  Your Honor, may I?

04:36:29   7           THE COURT:  I am going to have to see you at sidebar.

04:36:32   8           THE COURT:  All right.

04:36:35   9     (The following proceedings were had at sidebar outside the

04:36:37  10   hearing of the jury:)

04:36:37  11           THE COURT:  What do you intend to ask.

04:36:42  12           MR. LOEVY:  Two questions.  First of all, is he

04:36:44  13   claiming to have an independent recollection that he saw this

04:36:46  14   document, that's what he just elicited, that's a big point,

04:36:49  15   and if he says yes, I'm going to ask him did you notice

04:36:52  16   anything about it.

04:36:53  17           THE COURT:  Okay.  Fine.

04:36:54  18           MR. LOEVY:  The second point is you put a lot of

04:36:56  19   people in prison, he made a lot of cases, but he testified --

04:37:01  20   he put --

04:37:01  21           THE COURT:  You are not going to get that out of this

04:37:03  22   guy.  You've applied enough of the Hawkins deal with this guy.

04:37:09  23   You can ask the first question but not the second.  I'm

04:37:12  24   telling you.  Fine.  Say what you're going to say.

04:37:15  25           MR. LOEVY:  He put a lot of people in prison, some of


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-27 Filed: 02/24/17 Page 159 of 174 PageID #:32431

04:37:18 whom he genuinely knew about and some of whom he didn't.
04:37:22 THE COURT: It's beyond the scope. Sustained.
04:37:24 (The following proceedings were had in open court in the presence and hearing of the jury:)
04:37:27 THE COURT: Proceed.
04:37:29 - - -
04:37:29 DANIEL BRANNIGAN, RECROSS-EXAMINATION
04:37:29 BY MR. LOEVY:
04:37:30 Q. Are you claiming, sir, showing you Defendant's Exhibit 70 that as you sit there in this chair, you remember back in May of 1985 that you saw this document?
04:37:39 A. Yes, sir. Yes, sir.
04:37:42 Q. What is it about it that jogs your memory there? Is it the date?
04:37:46 A. Well, it's the date, I remember that there was all these notes and GPRs and we discussed them afterwards.
04:37:53 Q. Would it be more accurate to say look, I remember people had notes and GPRs, but I can't remember this is the document I saw?
04:38:01 A. It sure looks like the documents I saw.
04:38:03 Q. Did you notice that it was dated May 86 here submitted at the bottom?
04:38:08 A. Yes, sir.
04:38:08 Q. Did you notice that back in '85?
04:38:10 A. I learned of it later.

Case: 1:18-cv-03029 Document #: 511-58 Filed: 03/15/24 Page 160 of 174 PageID #:65453
12/05/16 PM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

159

| 04:38:11 | 1 | MR. LOEVY: I have no further questions, your Honor. |
| 04:38:14 | 2 | THE COURT: Do any of the jurors have any questions |
| 04:38:16 | 3 | for the witness? I don't see anybody writing. The witness is |
| 04:38:21 | 4 | excused. |
| 04:38:23 | 5 | Is the next -- is it a live witness? |
| 04:38:26 | 6 | MR. KULWIN: It's a reading, Judge. |
| 04:38:29 | 7 | THE COURT: How long is it? Which person? |
| 04:38:32 | 8 | MR. KULWIN: 50 pages. |
| 04:38:36 | 9 | THE COURT: Which person? |
| 04:38:38 | 10 | MR. KULWIN: Richard Buckles. |
| 04:38:39 | 11 | THE COURT: We are going to start. We are going to |
| 04:38:41 | 12 | get 10 minutes in. Let's go. This is testimony from which |
| 04:39:02 | 13 | trial? |
| 04:39:03 | 14 | MR. LOEVY: 86. |
| 04:39:04 | 15 | THE COURT: The 1986 trial. |
| 04:39:17 | 16 | MR. KULWIN: May I have one second, Judge? ^ |
| 04:39:59 | 17 | Richard Buckles, by deposition. |
| 04:39:59 | 18 | - - - |
| 04:39:59 | 19 | RICHARD BUCKLES, DIRECT EXAMINATION, BY DEPOSITION |
| 04:39:59 | 20 | BY MR. KULWIN: (Reading:) |
| 04:40:05 | 21 | Q. Would you tell us your name. |
| 04:40:06 | 22 | A. Richard Buckles. |
| 04:40:07 | 23 | Q. How do you spell the last name? |
| 04:40:09 | 24 | A. B-u-c-k-l-e-s. |
| 04:40:10 | 25 | Q. Richard, how old are you? |

12/05/16 PM

160

04:40:11  1   A.  16.

04:40:11  2   Q.  Now, Richard in November of 1984, were you convicted of a

04:40:16  3   UUW as a juvenile; is that correct?

04:40:18  4   A.  Yes, it is.

04:40:19  5   Q.  And you went to St. Charles for a while?

04:40:21  6   A.  Yes, I did.

04:40:22  7   Q.  You stayed in St. Charles until August of 1985?

04:40:27  8   A.  Yes, I did.

04:40:28  9   Q.  Richard, you were also placed on probation as a juvenile

04:40:31  10  in 1983, correct?

04:40:33  11  A.  Yes.

04:40:33  12  Q.  That was for a burglary?

04:40:36  13  A.  Yes.

04:40:36  14  Q.  Richard, where were you living in April of 1984?

04:40:40  15  A.  In Ida B. Wells.

04:40:43  16  Q.  And where is Ida B. Wells located?

04:40:44  17  A.  39th and King Drive.

04:40:46  18  Q.  Is part of Ida B. Wells also on Langley?

04:40:52  19  A.  Yes, it is.

04:40:53  20  Q.  Are you familiar with a building 706 East 39th Street?

04:40:58  21  A.  Yes.

04:40:59  22  Q.  Where is that in relation to where you live?

04:41:01  23  A.  Across the street.

04:41:03  24  Q.  Across the street?

04:41:04  25  A.  Langley.

| | | |
|---|---|---|
| 04:41:05 | 1 | Q. Now, I want to direct your attention to April 28th, 1984. |
| 04:41:10 | 2 | Do you remember where you were about 10:00 o'clock in the |
| 04:41:13 | 3 | morning? |
| 04:41:14 | 4 | A. Yes. |
| 04:41:14 | 5 | Q. Where were you? |
| 04:41:15 | 6 | A. In my window. |
| 04:41:16 | 7 | Q. Did you see anybody that you knew about 10:00 o'clock in |
| 04:41:19 | 8 | the morning? |
| 04:41:19 | 9 | A. Yes. |
| 04:41:19 | 10 | Q. Who did you see? |
| 04:41:20 | 11 | A. Fuddy. |
| 04:41:21 | 12 | Q. Did you know Fuddy's real name? |
| 04:41:23 | 13 | A. Yes. |
| 04:41:24 | 14 | Q. What is his real name? |
| 04:41:26 | 15 | A. Jerome Smith. |
| 04:41:27 | 16 | Q. How long had you known Fuddy? |
| 04:41:29 | 17 | A. For about five years. |
| 04:41:30 | 18 | Q. What was Fuddy doing when you first saw him? |
| 04:41:33 | 19 | A. Walking through my backyard. |
| 04:41:35 | 20 | Q. Could you tell where he was going? |
| 04:41:38 | 21 | A. To his building. |
| 04:41:39 | 22 | Q. What was his building? |
| 04:41:40 | 23 | A. 706. |
| 04:41:41 | 24 | Q. What did you do after you saw Fuddy walk to 706? |
| 04:41:44 | 25 | A. What did I see him do? |

12/05/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

162

| | | |
|---|---|---|
| 04:41:46 | 1 | Q. What did you do after you saw Fuddy go to 706? |
| 04:41:50 | 2 | A. I waited for a few minutes, then I went to 706. |
| 04:41:53 | 3 | Q. And when you say you went to 706, where exactly did you |
| 04:41:56 | 4 | go? |
| 04:41:56 | 5 | A. To the corner. |
| 04:41:58 | 6 | Q. The corner of what streets? |
| 04:42:00 | 7 | A. Langley, closest corner to the building. |
| 04:42:03 | 8 | Q. All right. I'm going to ask you to look at this drawing |
| 04:42:06 | 9 | here. Do you see what is in that drawing? |
| 04:42:09 | 10 | A. Yes, sir, I do. |
| 04:42:10 | 11 | Q. Do you recognize what is in that drawing? |
| 04:42:12 | 12 | A. Yes, I do. |
| 04:42:13 | 13 | Q. What do you recognize that to be? |
| 04:42:14 | 14 | A. 706. |
| 04:42:16 | 15 | Q. Do you see on the corner -- do you see on there the corner |
| 04:42:21 | 16 | that you are talking about? |
| 04:42:22 | 17 | A. Yes, I do. |
| 04:42:23 | 18 | Q. I'm going to ask you to take this pen, just step-off |
| 04:42:26 | 19 | there, put your initials RB in the corner you walked to. |
| 04:42:32 | 20 | All right. Now, Richard, when you got to that |
| 04:42:35 | 21 | corner, could you see anybody that you know? |
| 04:42:39 | 22 | A. Yes, I did. |
| 04:42:40 | 23 | Q. Who did you see that you knew? |
| 04:42:41 | 24 | A. I saw Fuddy and Talman. |
| 04:42:44 | 25 | Q. When you say Fuddy, is that the same Jerome Smith that you |

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:42:48   1   were talking about?

04:42:48   2   A.  Yes, it is.

04:42:49   3   Q.  When you say Talman, who are you talking about?

04:42:51   4   A.  The other person who was standing up under the building.

04:42:54   5   Q.  Did you know Talman?

04:42:55   6   A.  Yes, I did.

04:42:56   7   Q.  How long had you known Talman?

04:42:58   8   A.  For about two years.

04:42:59   9   Q.  Do you see on that picture people's No. 5 where Fuddy was

04:43:03  10   standing?

04:43:03  11   A.  Yes, I do.

04:43:04  12   Q.  Why don't you come off the witness stand, why don't you

04:43:09  13   come off the witness stand and just point -- no, not yet.  We

04:43:13  14   don't have that one.  Wait a second.

04:43:17  15           And just point to where you saw Fuddy standing?

04:43:22  16   A.  Right there where an F is at.

04:43:24  17   Q.  Do you see on there where Talman was standing?

04:43:27  18   A.  Yes, I do.

04:43:27  19   Q.  Why don't you point to that.

04:43:31  20           Now, Richard what was Fuddy doing when you saw him?

04:43:35  21   A.  Talking to Talman.

04:43:36  22   Q.  And which way was he facing?

04:43:38  23   A.  To the back of 706, back is up against the wall.

04:43:42  24   Q.  Which which was Talman facing?

04:43:45  25   A.  Through the breezeway.

| | | |
|---|---|---|
| 04:43:46 | 1 | Q. Was he looking at Fuddy? |
| 04:43:47 | 2 | A. No, he was looking like across the street. |
| 04:43:49 | 3 | Q. Across 39th Street? |
| 04:43:51 | 4 | A. Yes. |
| 04:43:51 | 5 | Q. While you were standing there watching Fuddy and Talman, |
| 04:43:54 | 6 | did you see anything unusual? |
| 04:43:55 | 7 | A. Yes, I did. |
| 04:43:56 | 8 | Q. What did you see? |
| 04:43:56 | 9 | A. I saw two men come from the back of the breezeway with ski |
| 04:44:01 | 10 | masks and guns in their hands. |
| 04:44:03 | 11 | Q. All right. Were these two men black or white? |
| 04:44:06 | 12 | A. They was black. |
| 04:44:07 | 13 | Q. Can you describe the two men? |
| 04:44:08 | 14 | A. Yes, I can. |
| 04:44:09 | 15 | Q. How would you describe them, the two men? |
| 04:44:12 | 16 | A. One was tall, light skinned had on a right jacket and blue |
| 04:44:19 | 17 | pants. |
| 04:44:20 | 18 | Q. And he had is a ski mask on? |
| 04:44:22 | 19 | A. Yes, he had. |
| 04:44:23 | 20 | Q. Did he have anything in his hand? |
| 04:44:24 | 21 | A. Yes, he did. |
| 04:44:25 | 22 | Q. What did he have in his hand? |
| 04:44:26 | 23 | A. He had a gun in his hand. |
| 04:44:28 | 24 | Q. Now, when you say he was tall, how much taller was he then |
| 04:44:31 | 25 | you or was he taller than you? |

| | | |
|---|---|---|
| 04:44:33 | 1 | A. Yes, he was taller than me. |
| 04:44:35 | 2 | Q. About how tall are you? |
| 04:44:37 | 3 | A. About five, six. |
| 04:44:38 | 4 | Q. How much taller is this guy than you? |
| 04:44:40 | 5 | A. A couple of inches. |
| 04:44:41 | 6 | Q. Now, the other guy, was he taller or shorter than the |
| 04:44:46 | 7 | light complected going to? |
| 04:44:47 | 8 | A. Shorter. |
| 04:44:47 | 9 | Q. Was he bigger or smaller than the light complected guy? |
| 04:44:50 | 10 | A. He was bigger. |
| 04:44:51 | 11 | Q. What was his complexion like? |
| 04:44:52 | 12 | A. He was dark skinned, he had on a blue jacket, blue pair of |
| 04:44:57 | 13 | pants a ski mask and a gun in his hand. |
| 04:45:00 | 14 | Q. What is the next thing you saw happen, Richard? |
| 04:45:02 | 15 | A. I saw the guy in the red jacket walk up behind Talman. |
| 04:45:05 | 16 | Q. What did he do when he walked up behind Talman? |
| 04:45:08 | 17 | A. He pointed the gun at Talman, at his back, at the back of |
| 04:45:13 | 18 | his neck where his head. |
| 04:45:14 | 19 | Q. Why don't you stand up and show the judge where you were |
| 04:45:17 | 20 | pointing? |
| 04:45:17 | 21 | A. About -- about back here and up here. |
| 04:45:20 | 22 | Q. What is the next thing that happened? |
| 04:45:22 | 23 | A. He fired. |
| 04:45:23 | 24 | Q. Did you see what happened to Talman when this guy fired? |
| 04:45:26 | 25 | A. Yes, I did. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:45:27 | 1 | Q. What happened? |
| 04:45:27 | 2 | A. Talman fell. |
| 04:45:29 | 3 | Q. Could you see Fuddy at that point? |
| 04:45:31 | 4 | A. Yes. |
| 04:45:31 | 5 | Q. Did you see what Fuddy tried to do? |
| 04:45:33 | 6 | A. Yes, I did. |
| 04:45:35 | 7 | Q. What did Fuddy tried to do? |
| 04:45:38 | 8 | A. Fuddy looked to see what happened. |
| 04:45:39 | 9 | Q. What happened then? |
| 04:45:40 | 10 | A. The guy in the red jacket shot Fuddy. |
| 04:45:44 | 11 | Q. What did Fuddy do when she was shot? |
| 04:45:46 | 12 | A. He slipped in the mud and fell. |
| 04:45:48 | 13 | Q. What is the next thing you saw happened? |
| 04:45:50 | 14 | A. Both of the guys walked unto Talman, I heard about several |
| 04:45:54 | 15 | shots and then the guy in the red jacket walked up to Fuddy |
| 04:45:56 | 16 | and shot Fuddy, point the gun at Fuddy. |
| 04:45:59 | 17 | Q. Now, when both these guys walked up to Talman, was he on |
| 04:46:02 | 18 | the ground? |
| 04:46:02 | 19 | A. Yes, he was. |
| 04:46:03 | 20 | Q. How close were those two guys to Talman when they walked |
| 04:46:06 | 21 | up to him? |
| 04:46:07 | 22 | A. It was very close. |
| 04:46:08 | 23 | Q. And you heard several shots? |
| 04:46:10 | 24 | A. Yes. |
| 04:46:10 | 25 | Q. How close was the guy in the red jacket when he walked up |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:46:13 | 1 | to Fuddy? |
| 04:46:14 | 2 | A. Standing right over him. |
| 04:46:15 | 3 | Q. Is that when he fired the last shot? |
| 04:46:17 | 4 | A. Yes, it was. |
| 04:46:18 | 5 | Q. What is the next thing you saw happen, Richard? |
| 04:46:21 | 6 | A. They pulled their ski masks up. |
| 04:46:23 | 7 | Q. When you say they, you mean both guys? |
| 04:46:26 | 8 | A. Yes, I do. |
| 04:46:28 | 9 | Q. Do you mean they pulled their ski masks up, show the |
| 04:46:31 | 10 | judge? |
| 04:46:31 | 11 | A. They pulled them up like this and looked around. |
| 04:46:33 | 12 | Q. Could you see their faces at that point? |
| 04:46:35 | 13 | A. Yes. |
| 04:46:36 | 14 | Q. Did you recognize either one of the two guys? |
| 04:46:38 | 15 | A. Yes. |
| 04:46:39 | 16 | Q. Who did you recognize? |
| 04:46:40 | 17 | A. Monday sear. |
| 04:46:43 | 18 | Q. Had you known moss injury before? |
| 04:46:46 | 19 | A. Yes, I did. |
| 04:46:47 | 20 | Q. Where? |
| 04:46:48 | 21 | A. In the Ida B. Wells. |
| 04:46:48 | 22 | Q. Do you see Mansur in the courtroom? |
| 04:46:52 | 23 | A. Yes. |
| 04:46:53 | 24 | Q. Would you point him out, please? |
| 04:46:54 | 25 | A. Right there. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:46:55 | 1 | Q.  Which guy are you pointing to, Richard? |
| 04:46:57 | 2 | A.  The one right there. |
| 04:46:58 | 3 | Q.  This guy? |
| 04:46:59 | 4 | A.  Yes. |
| 04:46:59 | 5 | Q.  Richard, do you recognize anybody else in the courtroom? |
| 04:47:03 | 6 | A.  No, I think he is the other shooter, but I am not sure. |
| 04:47:07 | 7 | Q.  What is the next thing -- |
| 04:47:11 | 8 | THE COURT:  If this is a change of topics, this is a |
| 04:47:13 | 9 | good place. |
| 04:47:14 | 10 | MR. KULWIN:  Yes, it is. |
| 04:47:15 | 11 | THE COURT:  We will stop right here.  We will resume |
| 04:47:17 | 12 | at probably going to be I want to say 9:35 or some tomorrow. |
| 04:47:23 | 13 | Don't discuss the case with each other or anybody tells.  I |
| 04:47:26 | 14 | will be right back out.    (The jury leaves the courtroom.) |
| 04:48:03 | 15 | THE COURT:  What's the lineup for tomorrow. |
| 04:48:04 | 16 | MR. LOEVY:  We have a little problem.  I'll answer |
| 04:48:07 | 17 | your question first. |
| 04:48:09 | 18 | MR. ART:  You won't.  They will. |
| 04:48:11 | 19 | THE COURT:  The lineup for tomorrow? |
| 04:48:13 | 20 | MR. KULWIN:  The lineup for tomorrow. |
| 04:48:15 | 21 | MR. MICHALIK:  What we have so far, Judge, we will |
| 04:48:17 | 22 | finish this reading and then we are going to have Jackie Clay. |
| 04:48:22 | 23 | THE COURT:  That's also a reading? |
| 04:48:23 | 24 | MR. MICHALIK:  No, no, no, that's a live witness.  We |
| 04:48:27 | 25 | will have I think judge Hines and we will have Robert Evans, |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 04:48:34 | 1 | live witness. |
| 04:48:35 | 2 | THE COURT: Remind me who Evans is. |
| 04:48:37 | 3 | MR. MICHALIK: Pardon. |
| 04:48:38 | 4 | THE COURT: Remind me who Evans is. |
| 04:48:40 | 5 | MR. MICHALIK: Evans is one of the detectives from |
| 04:48:42 | 6 | the initial 1984 investigation. |
| 04:48:44 | 7 | THE COURT: All right. |
| 04:48:44 | 8 | MR. MICHALIK: And then I think we also have a |
| 04:48:46 | 9 | reading for Gerald Morris which. |
| 04:48:50 | 10 | THE COURT: Morris. |
| 04:48:50 | 11 | MR. MICHALIK: If there's time we will fit in. |
| 04:48:52 | 12 | THE COURT: All right. |
| 04:48:53 | 13 | MR. KULWIN: We will fit all of those in depending on |
| 04:48:55 | 14 | scheduling and somebody's late or something, we will put a |
| 04:48:58 | 15 | reading in. |
| 04:48:58 | 16 | THE COURT: All right. |
| 04:48:59 | 17 | MR. KULWIN: Judge, the issue that's been raised. |
| 04:49:01 | 18 | MR. LOEVY: Can I raise it because it's my issue. |
| 04:49:03 | 19 | MR. KULWIN: I'm going to raise it. You raised it |
| 04:49:05 | 20 | I'll tell it. On page 216 of the transcript. |
| 04:49:08 | 21 | THE COURT: Of which transcript? |
| 04:49:09 | 22 | MR. KULWIN: The one I was just reading. |
| 04:49:10 | 23 | THE COURT: Yes. |
| 04:49:11 | 24 | MR. KULWIN: When he identified -- |
| 04:49:13 | 25 | THE COURT: Does someone have a copy I can look at? |

| 04:49:15 | 1 | MR. KULWIN: Yeah. Mr. . What's the page? |

04:49:15  1      MR. KULWIN: Yeah. Mr. . What's the page?

04:49:26  2      MR. KULWIN: 216.

04:49:28  3      THE COURT: 152, I'm there. Okay.

04:49:34  4      MR. KULWIN: When I read the identification, I didn't

04:49:36  5  read Rueckert saying that he was identifying Earl Hawkins. I

04:49:39  6  didn't read any of the be pointing. And they're upset because

04:49:44  7  they think I did that on purpose. I have no problem starting

04:49:47  8  over tomorrow at the prior page and say guy are you pointing

04:49:51  9  to, Richard, the one right there, this going to, answer, yes,

04:49:54  10  and then indicating for the record it was Earl Hawkins.

04:49:56  11      THE COURT: Okay.

04:49:57  12      MR. KULWIN: I thought it was clear that it was

04:49:59  13  Mansoor from before. I didn't do with any malice or fore

04:50:02  14  thought.

04:50:02  15      THE COURT: I didn't have a copy of the transcript.

04:50:04  16  I was actually kind of surprised having had cases with

04:50:08  17  Mr. Rueckert, not as a prosecutor, but as a defense attorney

04:50:10  18  that he would not have put that on the record. So, yeah, you

04:50:13  19  should read that.

04:50:14  20      MR. KULWIN: I will do that, Judge. I only did it

04:50:16  21  because prior to that, there was a number of times where

04:50:19  22  Mr. Rueckert said indicating this, indicating that, indicating

04:50:22  23  this. And I hadn't read them. It's on me. It wasn't done

04:50:27  24  with any malice or fore thought to confuse the jury. I don't

04:50:31  25  think they will be confused. May I finish.

04:50:33   1         MR. LOEVY:  It's my issue.

04:50:34   2         MR. KULWIN:  Since I don't believe that anybody is

04:50:36   3   confused that Mansoor is Earl Hawkins at this point.  I'll go

04:50:40   4   back and fix it.

04:50:41   5         MR. LOEVY:  Your Honor, it was our issue, and it was

04:50:43   6   yellow, and he was supposed to read indicating for the record,

04:50:46   7   Judge, the in court identification of the defendant Earl

04:50:49   8   Hawkins and our concern is this jury just got sent home with

04:50:52   9   some ambiguity about whether Buckles identified somebody in

04:50:57   10  Nate's trial.

04:50:57   11        THE COURT:  We are going to correct this in the

04:50:59   12  morning.  I will just say, I assume that what the highlighting

04:51:04   13  on this thing is that's the parts that everybody has agreed to

04:51:07   14  read, to let's just read the highlighted parts.

04:51:10   15        MR. KULWIN:  No problem, Judge.  Thank you.

04:51:12   16        THE COURT:  Remind me in the morning.  I am going to

04:51:14   17  keep this transcript up here.

04:51:15   18        MR. KULWIN:  Sure.

04:51:15   19        THE COURT:  Remind me in the morning and I am going

04:51:17   20  to explain that we are going to get backup because a comment

04:51:20   21  by one of the lawyers was left out and we are going to go back

04:51:23   22  and reread the last page.

04:51:24   23        MR. KULWIN:  No problem, Judge.

04:51:26   24        MS. KATZ:  Your Honor, just --

04:51:27   25        THE COURT:  Just reminders.  By 7:00 o'clock, I need


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

12/05/16 PM  ***REALTIME UNEDITED TRANSCRIPT ONLY***

172

| | |
|---|---|
| 04:51:31 | 1 | whatever requests I'm going to get from the defendants for |
| 04:51:33 | 2 | additional time justified the same way I asked the plaintiff |
| 04:51:36 | 3 | to justify it and I also need sometime before I guess before |
| 04:51:42 | 4 | 11:59 and 59 seconds whatever the Rule 50 motions are. |
| 04:51:45 | 5 | MR. KULWIN: I wouldn't be expecting a big heavy one. |
| 04:51:47 | 6 | THE COURT: Understood. |
| 04:51:48 | 7 | MR. LOEVY: When we made our motion. |
| 04:51:49 | 8 | THE COURT: None of them are heavy because they're |
| 04:51:52 | 9 | all just bits. |
| 04:51:53 | 10 | MR. KULWIN: Point is well taken, Judge. |
| 04:51:55 | 11 | MR. LOEVY: When we made our motion, we represented |
| 04:51:56 | 12 | the witnesses that we had understood that the defendants were |
| 04:51:58 | 13 | going to call. |
| 04:51:59 | 14 | THE COURT: Yeah. |
| 04:51:59 | 15 | MR. LOEVY: And the defendants were not totally |
| 04:52:01 | 16 | committed to that. |
| 04:52:02 | 17 | THE COURT: Which motion are you talking about? |
| 04:52:03 | 18 | MR. LOEVY: Our motion for more time. We laid out |
| 04:52:05 | 19 | the witnesses. |
| 04:52:06 | 20 | THE COURT: If you're trying to prep me for you |
| 04:52:08 | 21 | wanting more time, just save it until I get something from |
| 04:52:12 | 22 | you. |
| 04:52:13 | 23 | MR. LOEVY: I am not trying to prep you for that. |
| 04:52:16 | 24 | What I am trying to say, your Honor, the defendants have |
| 04:52:18 | 25 | disclosed two experts as potentials that were not contemplated |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/05/16 PM

04:52:21  1  when I made that motion, so it is a prep for the motion that's

04:52:25  2  coming to you.

04:52:25  3          THE COURT:  Look, what I am going to say to you is

04:52:27  4  what I said in the order.  And by the way, you did it finally

04:52:33  5  on Brannigan, okay?

04:52:35  6          MR. LOEVY:  What did I do?

04:52:36  7          THE COURT:  You were compact.  I mean, seriously, you

04:52:44  8  were compact.  The purpose, it's just like getting page limits

04:52:48  9  on appellate briefs which everybody has had before they were

04:52:51  10  lawyers.  The purpose is to for people to make judgments and

04:52:54  11  you don't ask questions of every witness that you could

04:52:57  12  possibly ask.  That's why the drafters of the rule of civil

04:52:59  13  procedure invented depositions, that's not why they invented

04:53:03  14  trials.  I understand what you're saying.  Don't assume that

04:53:05  15  you're going to get more time.  Just like you shouldn't have

04:53:09  16  assumed before that you were ever going to get more time than

04:53:12  17  I gave you before and behave accordingly, and if there's

04:53:15  18  something that you have to ask me at some point in time, I'll

04:53:18  19  deal with it when you ask me, not at some point in time in the

04:53:23  20  hypothetical.  See you tomorrow.  (The trial was adjourned at

04:53:28  21  4:50 p.m. until 9:35 a.m. on December 6, 2016.)

22

23

24

25