# Exhibit FFF

Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 2 of 125 PageID #:65469

***REALTIME UNEDITED TRANSCRIPT ONLY***

1

| | |
|---|---|
| 09:28:25 | 1 |
| 09:41:14 | 2 |
| 09:41:20 | 3 |
| 09:41:21 | 4 |
| 09:41:24 | 5 |
| 09:41:30 | 6 |
| 09:41:31 | 7 |
| 09:41:39 | 8 |
| 09:41:39 | 9 |
| 09:41:43 | 10 |
| 09:41:45 | 11 |
| 09:41:46 | 12 |
| 09:41:48 | 13 |
| 09:41:51 | 14 |
| 09:41:53 | 15 |
| 09:41:56 | 16 |
| 09:42:03 | 17 |
| 09:42:06 | 18 |
| 09:42:09 | 19 |
| 09:42:11 | 20 |
| 09:43:12 | 21 |
| 09:43:15 | 22 |
| 09:43:17 | 23 |
| 09:43:20 | 24 |
| 09:43:22 | 25 |

1 Judge Kennelly, December 8, 2016, 9:30 call and trial.

2 THE CLERK: Case number 10 C 1168, Fields v. City of

3 Chicago.

4 MR. LOEVY: Good morning, your Honor. Jon Loevy,

5 Anand Swaminathan, Steve Art, Candace Gorman for our client

6 Nate Fields.

7 MR. NOLAND: Dan Noland, Terry Burns, and Paul

8 Michalik for the City and Mr. Murphy.

9 MR. KULWIN: Shelly Kulwin and Rachel Katz on behalf

10 of Dave O'Callaghan.

11 THE COURT: All right. Anything before we start?

12 MR. LOEVY: Your Honor, we thought we began our

13 cross-examination after the defense was done with this

14 witness. Mr. Kulwin has indicated that he has questions too.

15 Our only point, your Honor, is that Mr. Noland has elicited

16 everything that was permissible under Rule 26 and that any

17 questioning on the policies and practices at this point would

18 be cumulative is our position, your Honor.

19 THE COURT: Hang on one second. I want to pull

20 something up here. So when I asked you yesterday whether you

21 had any questions and you said no, that was wrong I take it?

22 I asked you that at 3:16 p.m.

23 MR. KULWIN: At 3:16 p.m. I had no questions.

24 THE COURT: You are not in your direct at this point.

25 He is in his cross.

***REALTIME UNEDITED TRANSCRIPT ONLY***

09:43:25  1          MR. KULWIN:  I am not asking to ask questions now.

09:43:27  2          MR. LOEVY:  I am --

09:43:28  3          MR. KULWIN:  I am not asking to ask questions now.

09:43:31  4          THE COURT:  All right.  I assume you're going to do

09:43:38  5     redirect first.

09:43:40  6          MR. NOLAND:  Yes.

09:43:40  7          THE COURT:  And then if you have something that

09:43:42  8     hasn't been covered, ask me for a sidebar.

09:43:45  9          MR. KULWIN:  I will.

09:43:45  10         THE COURT:  Fair enough.

09:43:46  11         MR. LOEVY:  Thank you.

09:43:47  12         THE COURT:  All right.  Let's get the jury and we can

09:43:50  13    get the witness back on the stand.  We are still missing a

09:44:17  14    juror.  They called in.  They are on the red line.

09:44:25  15      (Short break.)

09:56:17  16      (The jury enters the courtroom.)

09:56:17  17         THE COURT:  Everybody can have a seat.  We are ready

09:56:20  18    to proceed with Mr. Murray's testimony.  You remember you are

09:56:23  19    still under oath?

09:56:24  20         THE WITNESS:  Yes.

09:56:24  21                              - - -

09:56:24  22         BERNARD MURRAY, CROSS-EXAMINATION CONTINUED

09:56:24  23    BY MR. LOEVY:

09:56:26  24    Q.  Good morning, Mr. Murray.

09:56:30  25         What was missing from the criminal defense files in

12/08/16 AM
Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 4 of 125 PageID #:65471
***REALTIME UNEDITED TRANSCRIPT ONLY***

3

| 09:56:32 | 1 | your view was not a good proxy for what was missing generally, |
| 09:56:36 | 2 | right |
| 09:56:36 | 3 | A.  For various reasons, yes. |
| 09:56:39 | 4 | Q.  But isn't it true that in a lot of cases, the exact same |
| 09:56:43 | 5 | documents that were missing from the criminal defense files |
| 09:56:45 | 6 | were also missing from the state's attorney's files? |
| 09:56:49 | 7 | A.  Well, a high percentage of the documents were found in the |
| 09:56:53 | 8 | prosecutor's files. |
| 09:56:54 | 9 | Q.  For example, in people v. Christophino Garcia (phonetic), |
| 09:56:58 | 10 | according to your report, 5 one of the missing pages were |
| 09:57:03 | 11 | missing from the state's attorney's file and 54 were missing |
| 09:57:06 | 12 | from the criminal defense file, correct? |
| 09:57:07 | 13 | A. |
| 09:57:13 | 14 |         MR. NOLAND:  Where is that? |
| 09:57:14 | 15 | BY MR. LOEVY: |
| 09:57:15 | 16 | Q.  Paragraph 8, sir, on page 26? |
| 09:57:18 | 17 | A.  That's correct. |
| 09:57:18 | 18 | Q.  Basically, the same 50 or so missing pages were missing |
| 09:57:22 | 19 | from both files, right? |
| 09:57:23 | 20 | A.  On that file, yes. |
| 09:57:26 | 21 | Q.  All right.  And looking at people v. Derrick Johnson this |
| 09:57:31 | 22 | is paragraph 15 on 41, it looks like 19 pages from missing |
| 09:57:36 | 23 | from the state's attorney's file and those same 19 were |
| 09:57:38 | 24 | missing from the criminal defense file with two more missing |
| 09:57:42 | 25 | from the criminal defense file? |

12/08/16 AM
Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 5 of 125 PageID #:65472
***REALTIME UNEDITED TRANSCRIPT ONLY***

4

09:57:43    1   A.  Right, but other information indicated that the

09:57:45    2   prosecutors provided the complete investigative file.

09:57:48    3           MR. LOEVY:  Your Honor, we'd move to strike

09:57:50    4   everything.

09:57:50    5           THE COURT:  Stricken as none responsive.

09:57:56    6   BY MR. LOEVY:

09:57:56    7   Q.  In people v. Devon Terrell, there were 24 missing pages in

09:58:00    8   the criminal defense file and those same 24 were missing from

09:58:03    9   the prosecutor, correct?

09:58:04   10   A.  I'm sorry.  What file?

09:58:05   11   Q.  It's page 55.  This is Devon Terrell.

09:58:13   12   A.  25 pages.

09:58:21   13   Q.  25 missing from the criminal defense attorney, 24 of those

09:58:26   14   missing from the state's attorney, right?

09:58:27   15   A.  That's correct.

09:58:27   16   Q.  The same 24 missing pages, right?

09:58:30   17   A.  The -- yeah, the 25, yes, the 25 pages were alleged

09:58:36   18   missing from the defense file were not found in the

09:58:38   19   prosecutor's file, 24 of the 25.

09:58:40   20   Q.  So the issue in that particular case was not an issue with

09:58:43   21   the criminal defense files because the state's attorney had

09:58:46   22   the same issue, right?

09:58:47   23   A.  That the pages were missing?

09:58:52   24   Q.  Yes.

09:58:53   25   A.  But then what are the pages?


                        ***REALTIME UNEDITED TRANSCRIPT ONLY***

09:58:56  1    MR. LOEVY:  Your Honor, we move to strike but then

09:58:59  2  what are the pages?

09:59:00  3    THE COURT:  The last part of the answer is stricken,

09:59:02  4  it's not responsive.

09:59:04  5  BY MR. LOEVY:

09:59:04  6  Q.  You can see the stacks here in front of your witness box.

09:59:08  7  Those are missing pages?

09:59:09  8  A.  Yes.

09:59:09  9  Q.  From various files.

09:59:10  10    Now, that's only 30 missing from 30 of the 400 some

09:59:16  11  files in the sample, correct?

09:59:17  12  A.  31.

09:59:18  13  Q.  This is represents what's missing from approximately how

09:59:21  14  many files are we talking about?

09:59:22  15  A.  44.

09:59:23  16  Q.  I thought?

09:59:24  17  A.  I'm sorry, 43.

09:59:26  18  Q.  How many state's attorney's files were found?

09:59:32  19  A.  43.

09:59:33  20  Q.  It's about 10 percent from the missing sample?

09:59:35  21  A.  I don't understand the question.

09:59:36  22  Q.  In other words, you are talking about the pages missing

09:59:39  23  from 40 files, but there were actually 460-some files pulled?

09:59:45  24    MR. NOLAND:  Objection, your Honor.

09:59:48  25    MR. LOEVY:  I will withdraw it.


***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 09:59:49 | 1 | BY MR. LOEVY: |
| 09:59:49 | 2 | Q.  What was the exact number of the total? |
| 09:59:51 | 3 | A.  457 files. |
| 09:59:53 | 4 | Q.  All right.  That 457 represented all the files from three |
| 09:59:57 | 5 | years before and three years after each of Mr. Fields' files? |
| 10:00:01 | 6 | A.  I don't know what year it represents, but those were the |
| 10:00:04 | 7 | files that were being examined. |
| 10:00:05 | 8 | Q.  Of those 450 some files the state's attorney was only able |
| 10:00:09 | 9 | to find corresponding files and the criminal defense attorneys |
| 10:00:13 | 10 | only found corresponding files for about 40 you said? |
| 10:00:16 | 11 | MR. NOLAND:  Objection, Judge, foundation and |
| 10:00:18 | 12 | mischaracterizing. |
| 10:00:19 | 13 | MR. LOEVY:  It's a question, your Honor. |
| 10:00:20 | 14 | THE COURT:  It's a question.  The objection is |
| 10:00:22 | 15 | overruled.  Go ahead. |
| 10:00:24 | 16 | THE WITNESS:  The 457 files were not what was alleged |
| 10:00:28 | 17 | today have missing pages. |
| 10:00:30 | 18 | BY MR. LOEVY: |
| 10:00:30 | 19 | Q.  Right.  The 457 files were the files in the basement? |
| 10:00:34 | 20 | A.  I don't know where they were stored, but the 457 files |
| 10:00:38 | 21 | were not what was allege today have missing pages. |
| 10:00:40 | 22 | Q.  I guess the only point is the missing pages from the 457 |
| 10:00:44 | 23 | files is not just what's on the floor.  That's only a small |
| 10:00:47 | 24 | fraction of the missing pages, correct? |
| 10:00:49 | 25 | MR. NOLAND:  Objection, Judge.  Foundation. |

10:00:51  1        THE COURT:  Sustained.

10:00:52  2   BY MR. LOEVY:

10:00:55  3   Q.  All right.  If the Chicago Police Department produced the

10:01:01  4   files at issue, they would have produced them with this cover

10:01:04  5   page.

10:01:04  6        MR. LOEVY:  Your Honor, if we could have the ELMO,

10:01:07  7   this is Plaintiff's Exhibit 1-57.

10:01:09  8        THE COURT:  There you go.

10:01:10  9   BY MR. LOEVY:

10:01:11  10  Q.  Was it your experience, sir, that when the police

10:01:13  11  department produced the file, they also produced the

10:01:16  12  identifying cover page?

10:01:17  13  A.  That was not my experience.

10:01:19  14  Q.  Was it your experience that if the Chicago Police

10:01:22  15  Department produced the file, they did not, they did not

10:01:25  16  produce where the file -- where the documents came from?

10:01:27  17  A.  No, they did not -- it was not my experience that the

10:01:32  18  cover of the file was produced, no.

10:01:34  19  Q.  So they would just give you documents, you couldn't tell

10:01:37  20  where they came from?

10:01:38  21  A.  No, they were responding to a subpoena I sent and the

10:01:42  22  documents would be xeroxed out of the file itself.

10:01:45  23  Q.  This is the Smith/Hickman, it says cleared and closed for

10:01:49  24  homicide data sheets.  However, debt supp clearing and closing

10:01:53  25  the case is missing from this file.  Do you see that?

12/08/16 AM
Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 9 of 125 PageID #:65476
***REALTIME UNEDITED TRANSCRIPT ONLY***

8

| 10:01:55 | 1 | A. I see that. |

10:01:55  1   A.  I see that.

10:01:56  2   Q.  That's the kind of information that should be disclosed to

10:01:59  3   the criminal defendant, isn't it?

10:02:00  4   A.

10:02:02  5          MR. NOLAND:  Objection, vague.

10:02:03  6          THE COURT:  Overruled.

10:02:04  7          THE WITNESS:  Well, it's not investigative material

10:02:09  8   per se.  It's indicating that the file doesn't have all the

10:02:13  9   documents in it.

10:02:14  10  BY MR. LOEVY:

10:02:15  11  Q.  Sir, when up use this term investigative, the requirement

10:02:18  12  under Brady is exculpatory, right if?

10:02:19  13         THE COURT:  Can I see the lawyers at sidebar, please.

10:02:22  14  I want to highlight an issue.

10:02:26  15    (The following proceedings were had at sidebar outside the

10:02:27  16  hearing of the jury:)

10:02:27  17         THE COURT:  It's more to remind myself than anything

10:02:30  18  else.  So there were questions early in the direct where I did

10:02:34  19  not sustain an objection about, you know, what Brady requires

10:02:38  20  and what rule 412 requires and there was questions at the end

10:02:41  21  of the direct where I did sustain an objection about him

10:02:44  22  rendering an opinion about whether there was a compliance with

10:02:48  23  Brady is that basically right?

10:02:49  24         MR. LOEVY:  Yes.

10:02:50  25         THE COURT:  And this part is directed towards the

| | | |
|---|---|---|
| 10:02:52 | 1 | first part? |
| 10:02:52 | 2 | MR. LOEVY:  Exactly. |
| 10:02:57 | 3 | THE COURT:  All right. |
| 10:02:59 | 4 | (The following proceedings were had in open court in the |
| 10:02:59 | 5 | presence and hearing of the jury:) |
| 10:02:59 | 6 | THE COURT:  My fault.  You can proceed, Mr. Loevy. |
| 10:03:01 | 7 | BY MR. LOEVY: |
| 10:03:01 | 8 | Q.  You discussed on the direct Brady v. Maryland, the Supreme |
| 10:03:05 | 9 | Court Rules, right? |
| 10:03:06 | 10 | A.  Yes. |
| 10:03:06 | 11 | Q.  There is no requirement in that about it has to be |
| 10:03:08 | 12 | investigative versus administrative, right? |
| 10:03:11 | 13 | A.  No, but it -- no. |
| 10:03:13 | 14 | Q.  There is to administrative exception to exculpatory, |
| 10:03:18 | 15 | right? |
| 10:03:19 | 16 | A.  No. |
| 10:03:19 | 17 | Q.  If an administrative document is exculpatory, then it |
| 10:03:22 | 18 | counts just as much as an investigative document that's |
| 10:03:26 | 19 | exculpatory, correct? |
| 10:03:27 | 20 | A.  If there's some relevance to being exculpatory, yes. |
| 10:03:31 | 21 | Q.  Yeah.  So this distinction between investigative and |
| 10:03:36 | 22 | administrative is not recognized in the Brady case law you |
| 10:03:43 | 23 | talked about or the Supreme Court Rules, right? |
| 10:03:46 | 24 | A.  I have not studied the Brady case law with administrative |
| 10:03:50 | 25 | documents.  I don't know if I can say that. |

| 10:03:51 | 1 | Q. What you can say is Brady and the rules require is |
| 10:03:54 | 2 | anything that's potentially exculpatory, whether it's |
| 10:03:56 | 3 | administrative, investigative, photographic, or anything else |
| 10:03:59 | 4 | has to be turned over, right? |
| 10:04:00 | 5 | A. Brady deals with exculpatory material, yes. |
| 10:04:03 | 6 | Q. All right. You talked about the files, how you found some |
| 10:04:11 | 7 | of the files had documents that you felt were misfiled because |
| 10:04:14 | 8 | they had different RD numbers. Do you remember that? |
| 10:04:16 | 9 | A. Correct. |
| 10:04:16 | 10 | Q. Even if they have different RD numbers, they can still be |
| 10:04:20 | 11 | exculpatory, correct? |
| 10:04:20 | 12 | A. Theoretically, I guess they could be, yes. |
| 10:04:24 | 13 | Q. All right. Let's show you an example from the |
| 10:04:26 | 14 | Smith/Hickman file. This is Plaintiff's Exhibit 1-118 through |
| 10:04:30 | 15 | 120. You're now more familiar with the Smith/Hickman |
| 10:04:33 | 16 | investigation, correct? |
| 10:04:34 | 17 | A. I reviewed the documents you handed to me yesterday. |
| 10:04:37 | 18 | Q. All right. This is a document in the street file, the |
| 10:04:41 | 19 | investigative file with a different RD number dealing with a |
| 10:04:44 | 20 | shooting that happened the previous night before Mr. Fuddy |
| 10:04:51 | 21 | Smith was murdered. It details. |
| 10:04:53 | 22 | MR. LOEVY: Your Honor, are we still on the ELMO? |
| 10:04:57 | 23 | THE COURT: Yes. |
| 10:04:57 | 24 | BY MR. LOEVY: |
| 10:04:58 | 25 | Q. It details a shooting with Paul Hailey where Goon Squad |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 10:05:02 | 1 | were getting into it with other guys and that was the end of |
| 10:05:07 | 2 | it.  Do you remember reading that? |
| 10:05:08 | 3 | A.  I don't remember the names, but I remember the reference |
| 10:05:10 | 4 | to a shooting. |
| 10:05:11 | 5 | Q.  Here is an example of a document, totally different RD |
| 10:05:15 | 6 | number, it's in the street file, but it could be potentially |
| 10:05:18 | 7 | exculpatory, correct? |
| 10:05:19 | 8 | A.  Potentially. |
| 10:05:20 | 9 | Q.  That doesn't mean this is misfiled just because it has a |
| 10:05:23 | 10 | different RD number, right? |
| 10:05:24 | 11 | A.  In this instance, no, it does not mean that. |
| 10:05:27 | 12 | Q.  In fact, detectives would typically put leads from |
| 10:05:31 | 13 | different cases into the investigative files because the |
| 10:05:34 | 14 | investigation might go in that direction, right? |
| 10:05:36 | 15 | A.  I am not exactly sure what they typically do, but if there |
| 10:05:40 | 16 | was information that was relevant to the investigation, it |
| 10:05:43 | 17 | would be included in the investigative file. |
| 10:05:46 | 18 | Q.  But you can't say just because it has a different RD |
| 10:05:49 | 19 | number, it's not exculpatory, right, that's true? |
| 10:05:51 | 20 | A.  No, you have to examine it and see what it is. |
| 10:05:54 | 21 | Q.  Here's another document with a different RD number in the |
| 10:05:57 | 22 | Smith/Hickman street file.  This is Plaintiff's Exhibit 1-82, |
| 10:06:02 | 23 | different RD number, some guy gets arrested for cocaine I |
| 10:06:06 | 24 | think it is, narcotics arrest and then they are talking about |
| 10:06:11 | 25 | the fact that the guy is driving a light blue Cadillac, do you |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/08/16 AM
Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 13 of 125 PageID #:65480
***REALTIME UNEDITED TRANSCRIPT ONLY***

12

10:06:17  1  | see it?

10:06:17  2  | A.  I see it.

10:06:18  3  | Q.  Isn't it true that different documents with a different RD

10:06:22  4  | could lead to different investigative leads that a defendant

10:06:26  5  | could pursue?

10:06:27  6  | A.  Right.

10:06:27  7  | Q.  You wouldn't want to say that documents that had a

10:06:30  8  | different RD number need to be in the not relevant pile per

10:06:34  9  | se?

10:06:34  10 | A.  You need to examine them to determine if there's any

10:06:37  11 | relevance to the rest of the file.

10:06:38  12 | Q.  You, by the way, did not master all 99,000 of the pages,

10:06:43  13 | right?

10:06:43  14 | A.  No.

10:06:44  15 | Q.  In fact, you read, what did you say, like 500 of the

10:06:48  16 | 99,000?

10:06:48  17 | A.  Well, maybe 500.  I reviewed pages, then other pages I

10:06:53  18 | read more carefully, yes.

10:06:54  19 | Q.  But you maybe reviewed about 10 percent of the 99,000 and

10:06:59  20 | probably read something closer to 500 pages, right?

10:07:02  21 | A.  Those are rough estimates.

10:07:04  22 | Q.  So you're not claiming that you are totally versed in all

10:07:07  23 | of these cases if you only read that small of a percentage,

10:07:10  24 | right?

10:07:10  25 | A.  I didn't have to read all the pages to be familiar with

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 10:07:13 | 1 | the facts of the file. |
| 10:07:14 | 2 | Q. But it might have been lost on you why a different RD |
| 10:07:18 | 3 | number was potentially exculpatory not misfiled, you don't |
| 10:07:24 | 4 | claim to have a comprehensive understanding of all the files? |
| 10:07:27 | 5 | MR. NOLAND: Objection, vague. |
| 10:07:29 | 6 | THE COURT: Overruled. |
| 10:07:33 | 7 | THE WITNESS: I think I have an understanding of the |
| 10:07:35 | 8 | pages that were missing in an examination of the relevance to |
| 10:07:41 | 9 | the file. I would say that. |
| 10:07:42 | 10 | BY MR. LOEVY: |
| 10:07:43 | 11 | Q. Now, you said that in a lot of cases even if there was |
| 10:07:46 | 12 | investigatory materials in the street files that didn't make |
| 10:07:50 | 13 | it into the official reports, at least the names were in the |
| 10:07:54 | 14 | official reports, right, that was one of your testimonies? |
| 10:07:56 | 15 | A. The names and other identifying information, the |
| 10:07:59 | 16 | relevance. |
| 10:07:59 | 17 | Q. Right. Now, showing you Plaintiff's Exhibit 1-104, here |
| 10:08:03 | 18 | is an example of a James Langston. You saw his name in the |
| 10:08:06 | 19 | official documents last night, right? |
| 10:08:08 | 20 | A. Yes. |
| 10:08:08 | 21 | Q. All right. But it didn't say in the official documents |
| 10:08:12 | 22 | that he had seen the drivers of the car that shot Fuddy and it |
| 10:08:15 | 23 | was a Baldwin, did it? |
| 10:08:16 | 24 | A. I'd have to review the file again, but I don't recall |
| 10:08:19 | 25 | that. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/08/16 AM
Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 15 of 125 PageID #:65482
***REALTIME UNEDITED TRANSCRIPT ONLY***

14

| | |
|---|---|
| 10:08:20 | 1 | Q. All right. So just having the name in the official file |
| 10:08:23 | 2 | is not sufficient, is it? |
| 10:08:24 | 3 | A. Well, the name and information of his relevance to the |
| 10:08:30 | 4 | case is important. |
| 10:08:30 | 5 | Q. But there were other examples in the other street files |
| 10:08:35 | 6 | where there would be a name in the official file but more |
| 10:08:37 | 7 | information in the investigative file is that true? |
| 10:08:40 | 8 | A. The information in the -- no. That's not true. |
| 10:08:44 | 9 | Q. So what I just showed you is just atypical, there's no |
| 10:08:48 | 10 | other example of this anywhere? |
| 10:08:50 | 11 | A. I wouldn't say it's atypical, but it's not accurate. |
| 10:08:52 | 12 | Q. I just showed you an example of a situation where there is |
| 10:08:55 | 13 | a name in the official file, James Langston, but what's |
| 10:08:58 | 14 | withheld from the official file is it that he actually saw the |
| 10:09:01 | 15 | killer and it was someone other than the defendant, that's |
| 10:09:03 | 16 | what this example shows, right? |
| 10:09:04 | 17 | A. Well, first off, I don't know if it's withheld from the |
| 10:09:07 | 18 | official file, but there's different information associated |
| 10:09:10 | 19 | with Mr. Langston in the permanent record. |
| 10:09:12 | 20 | Q. That's what I mean by withheld. It wasn't in the |
| 10:09:15 | 21 | permanent record an it is in the street file, and I'm asking |
| 10:09:20 | 22 | you, is this the only example you have seen in all this or are |
| 10:09:23 | 23 | there other examples in similar scenarios like that? |
| 10:09:26 | 24 | A. The examples I saw were if the information was in a |
| 10:09:30 | 25 | general progress report, there would be more information about |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/08/16 AM
Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 16 of 125 PageID #:65483
***REALTIME UNEDITED TRANSCRIPT ONLY***

15

| | | |
|---|---|---|
| 10:09:33 | 1 | that person typed into the supplemental report, supplementary |
| 10:09:38 | 2 | reports as well. |
| 10:09:38 | 3 | Q.  You showed us some examples where there were blue backs |
| 10:09:41 | 4 | that reflected a street file received? |
| 10:09:43 | 5 | A.  Received and then tendered, yes. |
| 10:09:45 | 6 | Q.  But all of the blue backs did not say street files |
| 10:09:50 | 7 | received and tendered? |
| 10:09:50 | 8 | A.  No. |
| 10:09:51 | 9 | Q.  Can we infer on the ones where it didn't say that that the |
| 10:09:55 | 10 | street files were withheld? |
| 10:09:56 | 11 | A.  No, you can't. |
| 10:09:57 | 12 | Q.  You were asked about photographs.  And I believe I |
| 10:10:01 | 13 | understand your testimony to be that the criminal defendants |
| 10:10:04 | 14 | would have known they're photographs and would have got the |
| 10:10:07 | 15 | photographs, right? |
| 10:10:07 | 16 | A.  Yes. |
| 10:10:08 | 17 | Q.  And there are some examples, though, where some |
| 10:10:11 | 18 | photographs were turned over but not all the photographs, |
| 10:10:14 | 19 | correct? |
| 10:10:14 | 20 | A.  I am not sure -- there were some where the photographs |
| 10:10:20 | 21 | were not found in the prosecutor's file. |
| 10:10:22 | 22 | Q.  All right.  So, for example, people v. Mervin white, there |
| 10:10:26 | 23 | was a be big stack of photographs turned over, right, in the |
| 10:10:29 | 24 | prosecutor's file? |
| 10:10:30 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 10:10:30 | 1 | Q. And both the prosecutor and the criminal defense attorneys |
| 10:10:34 | 2 | would have assumed these were the photographs, right? |
| 10:10:36 | 3 | A. Can you tell me what case Mr. White is? |
| 10:10:40 | 4 | Q. Mervin white, it's page 75 of your report. Here are the |
| 10:10:44 | 5 | photographs. It turned out, sir, there were a half dozen |
| 10:11:17 | 6 | photographs that weren't turned over to the state's attorney, |
| 10:11:19 | 7 | correct? |
| 10:11:19 | 8 | A. Five Polaroid photographs from the crime scene. |
| 10:11:22 | 9 | Q. And none of us know enough about the facts to know if some |
| 10:11:25 | 10 | of those Polaroids might have affected the fact pattern, |
| 10:11:29 | 11 | right? |
| 10:11:29 | 12 | A. Well, I know enough from reviewing the file to tell you |
| 10:11:36 | 13 | what the photographs are related to. |
| 10:11:37 | 14 | Q. I mean, maybe the criminal defense attorney could tell you |
| 10:11:40 | 15 | that this shows that the lamp wasn't knocked over, I mean, you |
| 10:11:43 | 16 | don't know enough to know all the details, right? |
| 10:11:46 | 17 | MR. KULWIN: Objection, argumentative. |
| 10:11:47 | 18 | MR. LOEVY: I will withdraw the question. |
| 10:11:50 | 19 | THE COURT: Okay. |
| 10:11:50 | 20 | BY MR. LOEVY: |
| 10:11:51 | 21 | Q. At a minimum, though, the fact that some photos got turned |
| 10:11:54 | 22 | over doesn't mean that the criminal defense attorney would |
| 10:11:56 | 23 | have known that all the photographs weren't turned over, |
| 10:11:58 | 24 | right? |
| 10:11:58 | 25 | A. The -- first off, I don't know if those photographs were |

12/08/16 AM

***REALTIME UNEDITED TRANSCRIPT ONLY***

17

10:12:09  1  not turned over.  They very possibly could have been.  We are

10:12:13  2  dealing with a file that's probably 30 years old, so you're

10:12:16  3  assuming that the trial file -- that the criminal defense

10:12:20  4  attorney trial file now is reflective of the way it looked 30

10:12:24  5  years ago.

10:12:24  6  Q.  What I'm saying is these Polaroids are not in the

10:12:27  7  prosecutor's file either, right?

10:12:29  8  A.  The prosecutors' file could be incomplete after 30 years

10:12:33  9  as well.

10:12:33  10        THE COURT:  The answer is not responsive.  Please

10:12:36  11  answer the question.

10:12:38  12  BY MR. LOEVY:

10:12:39  13  Q.  The Polaroids were not in the prosecutor's file, right?

10:12:41  14  A.  We did not find copies of them in the prosecutor's file.

10:12:44  15  Q.  And they weren't in the criminal defense attorney's file?

10:12:47  16  A.  That's true.

10:12:48  17  Q.  They were in the street file, right?

10:12:49  18  A.  They were in the investigative file.

10:12:51  19  Q.  That would be some evidence that the investigative file

10:12:54  20  wasn't turned over to the prosecutor, right?

10:12:58  21  A.  I don't think it's some evidence of that, no.

10:12:59  22  Q.  All right.  Photo arrays are supposed to be documented,

10:13:02  23  correct, if a witness is shown a photo array?

10:13:04  24  A.  Yeah, use the identification process, yes.

10:13:08  25  Q.  Tell the jury what you're supposed to do if you do it by

***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

10:13:11   1   the book?

10:13:11   2   A.  If you show a photo array to a witness, you're supposed to

10:13:15   3   indicate the names of the people and you are supposed to keep

10:13:22   4   a copy of the photographs and include it in a supplementary

10:13:26   5   report.

10:13:26   6   Q.  Was it your experience that the Chicago police officers

10:13:28   7   followed that practice?

10:13:29   8   A.  I would say they followed it for the most part, yes.

10:13:32   9   Q.  All right.  In your career, do you remember a situation

10:13:40   10   where an official Chicago police report disappeared or went

10:13:44   11   missing, the actual one with the signature and the original?

10:13:47   12   A.  Supplementary report?

10:13:49   13   Q.  Yeah.

10:13:50   14   A.  Something like that?  I never had that experience.

10:13:52   15   Q.  And how about all the people you supervised, did it ever

10:13:54   16   come to your attention that an official document from records

10:13:58   17   division with the signature on it had disappeared?

10:14:00   18   A.  No.

10:14:01   19   Q.  All right.  Let's talk about the inventory to the files.

10:14:09   20   Do you remember.  If I understand your testimony, it is that

10:14:13   21   usually those did not get turned over, the inventories?

10:14:16   22   A.  Maybe half the time I received them.

10:14:19   23   Q.  All right.  So it was not atypical that the police

10:14:22   24   department would not make those available, correct?

10:14:24   25   A.  That's correct.

10:14:24   1   Q.  And Mr. Brasfield's numbers were 15 percent of the

10:14:29   2   permanent retention files had inventories, do you dispute that

10:14:33   3   number?

10:14:33   4   A.  15 percent of the 59 files.

10:14:38   5   Q.  15 percent of the permanent retention file corresponding

10:14:41   6   to the 59 files that had only 15 percent had inventories?

10:14:44   7   A.  I didn't examine the permanent retention files.  I

10:14:47   8   examined the documents he claimed were missing from the

10:14:52   9   investigative file.

10:14:52  10   Q.  All right.  Showing you a -- so you don't dispute

10:14:55  11   Mr. Brasfield's number, 15 percent?

10:14:56  12   A.  I have no ability to dispute it or not.

10:14:57  13   Q.  All right.  Showing you 83-1, the new special order

10:15:03  14   specifically provided rules about the investigative file

10:15:07  15   inventory sheet, correct?

10:15:08  16   A.  I see that.

10:15:12  17   Q.  It says it's supposed to be created and it becomes the

10:15:16  18   case index for all documents in the file folder and it also

10:15:20  19   says a copy of the form will be forwarded to the records

10:15:24  20   division whenever felony charges are placed.  Correct?

10:15:30  21   A.  Yes.

10:15:30  22   Q.  And the specific purpose is to ensure proper notice of all

10:15:35  23   existing documents pertaining to the subject investigation can

10:15:37  24   be made to the state's attorney's office, the courts, and the

10:15:40  25   defense counsel, correct?

| | | |
|---|---|---|
| 10:15:42 | 1 | A. Yes, proper notice of all, yes. |
| 10:15:44 | 2 | Q. So although that's what it says on the books, you've |
| 10:15:47 | 3 | already acknowledged that they weren't doing that as a matter |
| 10:15:49 | 4 | of practice, correct? |
| 10:15:50 | 5 | A. Well, if I'm reading that correctly, it says that the |
| 10:15:54 | 6 | police department is keeping that document so they can ensure |
| 10:15:57 | 7 | proper notice of all existing documents. |
| 10:15:59 | 8 | Q. Well, it's supposed to be forwarded to the records |
| 10:16:02 | 9 | division, right? |
| 10:16:03 | 10 | A. Right. |
| 10:16:03 | 11 | Q. And then people sent subpoenas to the records division for |
| 10:16:08 | 12 | all the documents related to the case, right, right? |
| 10:16:10 | 13 | A. Yes. |
| 10:16:10 | 14 | Q. And the inventories weren't coming back in response to |
| 10:16:13 | 15 | those subpoenas, correct? |
| 10:16:15 | 16 | A. Maybe I'm misreading this, but I'm reading this as the |
| 10:16:18 | 17 | records division could use the inventory to make sure they |
| 10:16:21 | 18 | provided all the documents to the state's attorney's office. |
| 10:16:23 | 19 | Q. All right. Another provision here is general progress |
| 10:16:27 | 20 | reports. You know what the rules required for general |
| 10:16:31 | 21 | progress reports, right? |
| 10:16:31 | 22 | A. That they're supposed to use the general progress reports |
| 10:16:37 | 23 | form. |
| 10:16:37 | 24 | Q. The rules on the book are you are not supposed to take |
| 10:16:40 | 25 | handwritten notes, you are supposed to use this form? |

| 10:16:43 | 1 | A.  That's my understanding. |
| 10:16:43 | 2 | Q.  And it's a mandatory rule, is it not? |
| 10:16:45 | 3 | A.  The rule that created by the Chicago Police Department. |
| 10:16:49 | 4 | Q.  As a matter of practice, they weren't following the rule |
| 10:16:52 | 5 | on the books, were they? |
| 10:16:53 | 6 | A.  For the most part, they used general progress reports, I |
| 10:16:56 | 7 | mean, the form.  Other notes were either on the back of a |
| 10:17:02 | 8 | general progress report or not on a general progress report. |
| 10:17:04 | 9 | Q.  There was a lot of handwritten notes in those files? |
| 10:17:09 | 10 | A.  There were a number. |
| 10:17:09 | 11 | Q.  What's that? |
| 10:17:10 | 12 | A.  There were a number of handwritten notes. |
| 10:17:11 | 13 | Q.  In fact, Mr. Brasfield's opinion was 82 percent of the |
| 10:17:14 | 14 | files showed continued use of unofficial handwritten notes. |
| 10:17:17 | 15 | Do you disagree with that or agree with that? |
| 10:17:19 | 16 | A.  Again, what files is he referring to? |
| 10:17:21 | 17 | Q.  82 percent of the criminal defense files had -- of the |
| 10:17:26 | 18 | investigative files had evidence -- sorry, investigative files |
| 10:17:28 | 19 | had evidence that handwritten notes were used in contravention |
| 10:17:32 | 20 | of the requirement to use general progress reports? |
| 10:17:34 | 21 | A.  On the 51 files? |
| 10:17:35 | 22 | Q.  Yes. |
| 10:17:36 | 23 | A.  That's possible. |
| 10:17:37 | 24 | Q.  All right.  Back to the inventories, now, if the purpose |
| 10:17:51 | 25 | of the inventory is to have a comprehensive list of all the |

12/08/16 AM
Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 23 of 125 PageID #:65490
***REALTIME UNEDITED TRANSCRIPT ONLY***

22

10:17:56  1  documents, all the reports, all the supp reports, all the

10:17:59  2  GPRs, right?

10:17:59  3  A.  That's in the investigative file.

10:18:00  4  Q.  Okay.  Didn't you regard it as a big red flag that the

10:18:04  5  police department was not turning over the list of everything

10:18:06  6  that exists?

10:18:07  7  A.  As I said before, I am not sure if they had to send the

10:18:12  8  list to us or if they were using the list just to make sure

10:18:15  9  they sent documents to the prosecutor's office.

10:18:17  10  Q.  Well, I'm asking you a different question.  Isn't it true

10:18:19  11  that's a big red flag that the police department didn't want

10:18:21  12  to turn over the list of all the documents that existed?

10:18:24  13  A.  No.

10:18:25  14  Q.  All right.  Let's take a look at Devon Taylor's case.

10:18:32  15  This is an example, this is Plaintiff's Exhibit 616-6.  This

10:18:37  16  is an example of a inventory that was not produced, correct?

10:18:41  17  This is page 54 of your report.

10:18:43  18  A.  I have the page.

10:18:52  19  Q.  And it is an example of an inventory that was in the

10:18:56  20  investigative file but not in the prosecutor's file, correct?

10:18:59  21  A.  Correct.

10:19:01  22  Q.  And on it, in yellow, are examples of documents on this

10:19:06  23  inventory that also didn't get produced to either the state's

10:19:10  24  attorneys or the criminal defense attorneys.  These chest

10:19:19  25  memos and some phone records?

12/08/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 10:19:20 | 1 | A. I see that. |
| 10:19:21 | 2 | Q. Isn't it true that if the inventory had not been withheld, |
| 10:19:25 | 3 | then the criminal defense attorney could have known that -- or |
| 10:19:29 | 4 | could not have known if it was withheld that there was missing |
| 10:19:32 | 5 | phone records too? |
| 10:19:33 | 6 | A. Again, assuming that the criminal defense file and the |
| 10:19:39 | 7 | prosecutor's files are accurate all these years later, and I'm |
| 10:19:46 | 8 | not assuming that. |
| 10:19:47 | 9 | Q. You said the prosecutors typically didn't have inventories |
| 10:19:49 | 10 | in their files? |
| 10:19:49 | 11 | A. I'm talking about whether those documents were turned over |
| 10:19:52 | 12 | during the discovery process from the police to the |
| 10:19:55 | 13 | prosecutors and the prosecutors to the defense attorney. |
| 10:19:57 | 14 | Q. All right. You do acknowledge that the documents in |
| 10:20:00 | 15 | yellow were not in the state's attorney's files, right? |
| 10:20:04 | 16 | A. Yes. |
| 10:20:04 | 17 | Q. You do acknowledge that they were in the street files? |
| 10:20:06 | 18 | A. In the investigative file, yes. |
| 10:20:08 | 19 | Q. All right. Showing you another one. This is from the |
| 10:20:12 | 20 | case of LaToya Jones. This is on page 30 of your report. |
| 10:20:16 | 21 | Here is another inventory that was withheld, correct, or it |
| 10:20:19 | 22 | wasn't in the state's attorney's files? |
| 10:20:20 | 23 | A. Correct. |
| 10:20:21 | 24 | Q. And it shows a bunch of recorded voice transmissions and |
| 10:20:26 | 25 | things that also were not produced, correct? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 25 of 125 PageID #:65492
12/08/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

24

10:20:28  1  A.  Those documents were not found in the prosecutor's file.

10:20:39  2  Q.  All right.  And showing you a copy of a GPR from the

10:20:45  3  Smith/Hickman case, this is at Defendant's Exhibit 70, this is

10:20:50  4  an example of a GPR that the jury has seen that is not on the

10:20:54  5  inventory, plaintiff's exhibit 194, from the Smith/Hickman

10:20:59  6  investigation.  All right, sir?

10:21:01  7  A.  I have not examined these documents.  I'll take your word

10:21:05  8  for it.

10:21:06  9  Q.  I'm asking you to do that.

10:21:07  10       Now, this document, this investigative inventory,

10:21:10  11  though administrative, could have tremendous exculpatory value

10:21:13  12  if it could be proved that this document that was supposedly

10:21:17  13  created in either May of '85 or May of '86 was not on the

10:21:21  14  inventory, correct?

10:21:22  15       MR. NOLAND:  Judge, opens the door.

10:21:23  16       THE COURT:  Okay.  Given what I have to ask you, let

10:21:31  17  me talk to you at sidebar.

10:21:37  18  (The following proceedings were had at sidebar outside the

10:21:38  19  hearing of the jury:)

10:21:38  20       THE COURT:  I figure it's more prudent to what does

10:21:41  21  it open the door too.

10:21:43  22       MR. NOLAND:  I was barred from asking him about

10:21:45  23  opining on Brady, Brady material for the 15, 483 cases, and

10:21:52  24  now he is asking him to opine on Brady exculpatory.

10:21:55  25       THE COURT:  What was the question that you ask would?

10:21:57   1        MR. LOEVY:  Couldn't this administrative document

10:21:58   2   have exculpatory material if it could show that this report

10:22:01   3   was --

10:22:02   4        THE COURT:  Right.  What was the question that you

10:22:04   5   say that I precluded you from asking about this?

10:22:08   6        MR. NOLAND:  It wasn't this document, whether the 43

10:22:11   7   cases you evaluated, whether or not there was exculpatory due

10:22:14   8   process, Brady material withheld.

10:22:16   9        MR. LOEVY:  Should I rephrase it then, your Honor,

10:22:18  10   and say this could have been potentially helpful to the

10:22:21  11   criminal defendant?

10:22:21  12        THE COURT:  Well, the question that you asked, if I

10:22:24  13   am recalling correctly, that I sustained the objection to was

10:22:26  14   closer to something along the lines of do you have an opinion

10:22:29  15   about whether the police, maybe the state's attorney, I forget

10:22:33  16   what they had in there, complied with their obligations under

10:22:36  17   Brady.  I don't think that this type of -- this is about as

10:22:42  18   squarely within the scope of the direct as I can imagine.  I

10:22:45  19   don't think this opens the door to that is my answer.

10:22:48  20        MR. NOLAND:  Okay.

10:22:55  21     (The following proceedings were had in open court in the

10:22:55  22   presence and hearing of the jury:)

10:22:55  23        THE COURT:  Mr. Loevy.  You can go ahead.

10:22:58  24   BY MR. LOEVY:

10:22:58  25   Q.  Do you remember the question, sir?

10:23:00    1   A.  No.

10:23:01    2   Q.  If this administrative inventory did not reflect that this

10:23:05    3   GPR that's dated as it states here was not contemporaneously

10:23:11    4   logged, then that inventory, though administrative, could have

10:23:16    5   great exculpatory value, correct?

10:23:17    6   A.  I don't believe that's great exculpatory value.

10:23:21    7   Q.  It could be shown that this GPR was not logged at the time

10:23:29    8   it was allegedly created, then a criminal defendant could show

10:23:32    9   that this was back dated, couldn't he?

10:23:35   10   A.  I guess theoretically that could be done.

10:23:38   11   Q.  The reason you create these logs is to have a

10:23:40   12   chronological log of what the file contains, correct?

10:23:44   13   A.  What the file contains, yes.

10:23:46   14   Q.  And if this document is missing from it, then that's a

10:23:50   15   problem, isn't it?

10:23:51   16   A.  It could be.  It could be a document was not entered into

10:23:59   17   the list, it doesn't mean it was back dated or didn't exist or

10:24:02   18   did exist.

10:24:03   19   Q.  But the criminal defendant has a right to make that

10:24:05   20   argument, doesn't he?

10:24:06   21   A.  And the presence of the log doesn't preclude him from

10:24:16   22   making that argument.

10:24:17   23   Q.  If he doesn't get the log, he can't make that argument?

10:24:20   24   A.  Theoretically the log could help him make that argument.

10:24:23   25   Q.  Mr. Noland showed you a document yesterday -- or showed

                          ***REALTIME UNEDITED TRANSCRIPT ONLY***

|          |    |                                                               |
|----------|----|---------------------------------------------------------------|
| 10:24:36 | 1  | you some other documents that you argued or you characterized |
| 10:24:40 | 2  | as administrative.  I'm going to show you Defendant's Exhibit  |
| 10:24:45 | 3  | 268-5.  This document says as follows: It looks like it's from |
| 10:25:01 | 4  | this person to this person, lieutenant, I have a subpoena that |
| 10:25:04 | 5  | came by way of Joe p-e-r-f-e-t-t-i-.  It's dated September 18, |
| 10:25:09 | 6  | 2014.  From the description of the subpoena, it is for a file  |
| 10:25:12 | 7  | in the room that last I was aware I was told that I cannot     |
| 10:25:16 | 8  | enter.  Can we please clarify who the order not to enter the   |
| 10:25:20 | 9  | files in the lead room is from and whether a subpoena is       |
| 10:25:23 | 10 | enough to cause to retrieve the file.                          |
| 10:25:25 | 11 | MR. NOLAND:  Judge.                                            |
| 10:25:27 | 12 | BY MR. LOEVY:                                                  |
| 10:25:27 | 13 | Q.  Do you see that?                                           |
| 10:25:27 | 14 | THE COURT:  I think I know what this is and so I               |
| 10:25:29 | 15 | don't want to guess.  Let me find out at sidebar.             |
| 10:25:35 | 16 | (The following proceedings were had at sidebar outside the     |
| 10:25:37 | 17 | hearing of the jury:)                                          |
| 10:25:37 | 18 | THE COURT:  Is this me?  Is this my order?                     |
| 10:25:40 | 19 | MR. NOLAND:  Yes.                                              |
| 10:25:41 | 20 | MR. LOEVY:  No.  Let me get the document.                      |
| 10:25:42 | 21 | THE COURT:  Yeah, get the document.                            |
| 10:25:49 | 22 | THE COURT:  I assume it's the lead room, not the lead          |
| 10:25:52 | 23 | room.                                                          |
| 10:25:53 | 24 | MR. LOEVY:  We thought it was prohibited for                   |
| 10:25:55 | 25 | environmental reasons.                                         |

10:25:57   1   THE COURT: Like it's secured from a nuclear

10:26:00   2   holocaust.

10:26:00   3   MR. LOEVY: The reason we thought that is because

10:26:01   4   Brown said -- we argued was it the boiler room, she said no,

10:26:06   5   it's the room with the lead in it. Remember what Brown said?

10:26:07   6   He said it's the lead room.

10:26:08   7   THE COURT: Maybe it is the lead room.

10:26:11   8   MR. LOEVY: I think it's the lead room, but the

10:26:12   9   answer -- the answer to who the order is from not to get the

10:26:18   10   files is from me. I would stay away from it.

10:26:20   11   MR. LOEVY: I thought it was environmental.

10:26:24   12   (The following proceedings were had in open court in the

10:26:25   13   presence and hearing of the jury:)

10:26:25   14   THE COURT: Okay. We are going to move on to a

10:26:28   15   different area.

10:26:33   16   BY MR. LOEVY:

10:26:33   17   Q. As far as Mr. Brasfield's charts you looked at them

10:26:36   18   presumably, right?

10:26:37   19   A. In the past, yes.

10:26:38   20   Q. All right. You did not audit them and run his numbers?

10:26:41   21   A. No.

10:26:41   22   Q. In fact, you didn't do any analysis to criminal defense

10:26:44   23   files at all, correct?

10:26:45   24   A. The pages that were allegedly missing from the criminal

10:26:50   25   defense files were the ones I was examining.

Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 30 of 125 PageID #:65497
12/08/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

29

| | | |
|---|---|---|
| 10:26:52 | 1 | Q. But you didn't take issue with any of his conclusions, |
| 10:26:57 | 2 | correct? |
| 10:26:57 | 3 | A. Well, I took issue with his whole premise, so I think by |
| 10:27:00 | 4 | taking issue with his premise, I am taking issue with his |
| 10:27:03 | 5 | conclusions. |
| 10:27:04 | 6 | Q. He did some analysis about the investigative files, he did |
| 10:27:07 | 7 | some analysis about the permanent retention files, he did some |
| 10:27:11 | 8 | analysis of the comparing .two and the fourth thing he did was |
| 10:27:14 | 9 | compared the investigative files, the blue to the green. |
| 10:27:16 | 10 | That's where you focused your attention, right? |
| 10:27:18 | 11 | A. I focused my attention on the missing pages, alleged |
| 10:27:23 | 12 | missing pages in the investigative file, yes. |
| 10:27:24 | 13 | Q. All right. Now, Mr. Noland showed you an example of a |
| 10:27:30 | 14 | document. This is Plaintiff's Exhibit 511-34. This was a GPR |
| 10:27:37 | 15 | that you said although it was withheld from the state's |
| 10:27:43 | 16 | attorney and the criminal defense attorney, all the |
| 10:27:45 | 17 | information in it made it into the supp report so it was a no |
| 10:27:48 | 18 | harm, no foul? |
| 10:27:49 | 19 | MR. NOLAND: Objection, mischaracterizes. |
| 10:27:51 | 20 | THE COURT: Overruled. You can answer. |
| 10:27:52 | 21 | THE WITNESS: I didn't say it was withheld. I said |
| 10:27:55 | 22 | it was missing from the criminal defense file and the |
| 10:27:57 | 23 | prosecutor's file. |
| 10:27:57 | 24 | BY MR. LOEVY: |
| 10:27:58 | 25 | Q. I believe your take away was it was a no harm, no foul |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 10:28:01 | 1 | because it got into the supp report anyway? |
| 10:28:03 | 2 | A.  If not on this page, the next page in sequence. |
| 10:28:06 | 3 | Q.  Let's talk about the next page.  That's the one I want to |
| 10:28:08 | 4 | focus on. |
| 10:28:10 | 5 | This is a man named Tim Malone, right? |
| 10:28:13 | 6 | A.  Yes. |
| 10:28:13 | 7 | Q.  And it says?  Here that Tim Malone was Mirandized at 16 -- |
| 10:28:18 | 8 | 6:30 p.m. after the lineup, right? |
| 10:28:20 | 9 | A.  Yes. |
| 10:28:22 | 10 | Q.  Now, I am going to show you the supp report.  And this is |
| 10:28:26 | 11 | 511-54.  And isn't it true that the supp report actually |
| 10:28:31 | 12 | contradicts the GPR.  Take a look at it. |
| 10:28:35 | 13 | THE COURT:  Do you want to point to the area? |
| 10:28:39 | 14 | MR. LOEVY:  Your Honor, this is the ELMO, is it not? |
| 10:28:41 | 15 | BY MR. LOEVY: |
| 10:28:42 | 16 | Q.  Malone was brought to area one for questioning.  Once |
| 10:28:44 | 17 | there he was given his Miranda warning and he acknowledged he |
| 10:28:47 | 18 | understood his rights.  During this time we're out looking for |
| 10:28:50 | 19 | witnesses, gathering information, the lawyer arrived, then he |
| 10:28:55 | 20 | was brought to -- this witness was brought to view a lineup in |
| 10:29:01 | 21 | area one and positively identify Malone.  Do you see that? |
| 10:29:04 | 22 | A.  Yes. |
| 10:29:04 | 23 | Q.  This summary in the official report implies that he was |
| 10:29:07 | 24 | given his Miranda warning before he was given a lineup or put |
| 10:29:10 | 25 | in a lineup, right? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/08/16 AM
Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 32 of 125 PageID #:65499
***REALTIME UNEDITED TRANSCRIPT ONLY***

31

10:29:11   1   A.  In that lineup, yes.

10:29:13   2   Q.  All right.  But this one contradicts it, does it not, the

10:29:18   3   GPR says he was Mirandized after the lineup?

10:29:21   4   A.  It's different.  It doesn't mean he wasn't Mirandized

10:29:26   5   twice.

10:29:26   6   Q.  All right.  But the criminal defense -- the criminal

10:29:29   7   defendant had a right to the GPR too, didn't he?

10:29:33   8   A.  To the investigative material, yes, he did.

10:29:37   9   Q.  All right.  You were also asked yesterday about the

10:29:42   10  Crockett case.  I'm going to show you -- I am not going to go

10:29:48   11  through 50 pages, but I am going to go through two.

10:29:50   12       This is the official supp report, 873-5.  It looks

10:29:55   13  like it's a car in the Crockett case.  They're looking for a

10:29:59   14  74, 76 Chevy Nova.  Do you see that?

10:30:01   15  A.  Yes.

10:30:02   16  Q.  Now, I'm going to show you a page that from the

10:30:05   17  investigative file, this is 448-90.  Can you confirm for the

10:30:10   18  jury that that was not found in the state's attorney or the

10:30:12   19  criminal defense attorney's files?

10:30:16   20       MR. NOLAND:  Objection, foundation.

10:30:17   21       THE COURT:  Overruled.

10:30:17   22       THE WITNESS:  I'm sorry.  Can you tell me what case?

10:30:22   23  What page.

10:30:23   24  BY MR. LOEVY:

10:30:23   25  Q.  This is the Crockett case which is in your report 101.

| | |
|---|---|
| 10:30:55 | 1 | A. This is a case where the prosecutors were unable to locate |
| 10:30:57 | 2 | their file. |
| 10:30:58 | 3 | Q. All right. But it wasn't in the criminal defense |
| 10:31:00 | 4 | attorney's files, right? |
| 10:31:01 | 5 | A. Right. This is -- yes. |
| 10:31:05 | 6 | Q. All right. And it's talking about the blue Chevy Nova, |
| 10:31:13 | 7 | the two-door that they're looking for, right? |
| 10:31:15 | 8 | A. Yes. |
| 10:31:16 | 9 | Q. And it's talking about a totally different motive that has |
| 10:31:19 | 10 | nothing to do with Mr. Crockett, isn't it? |
| 10:31:21 | 11 | A. I have not read this before. |
| 10:31:26 | 12 | Q. Take a look at it. It's highlighted. It's talking about |
| 10:31:29 | 13 | a gangster disciple and a GD and then this is the night |
| 10:31:43 | 14 | before, the day before the shooting. The car is not rated by |
| 10:31:53 | 15 | an older, just recently out of the joint, the car pulled up |
| 10:31:57 | 16 | out of the alley, ran out of the vehicle, I was a advice Lord, |
| 10:32:01 | 17 | they had a beef, they confronted him. After the |
| 10:32:04 | 18 | confrontation, he returned and then ^ Karl ^ Carl, this is the |
| 10:32:07 | 19 | name I want to focus on, ^ Karl ^ Carl made a motion with his |
| 10:32:10 | 20 | hand forming a pistol and said bang. Chap /PHABs? |
| 10:32:16 | 21 | A. That is correct. |
| 10:32:16 | 22 | Q. /STKPHR-FRPBLTS that is a lead that is Albert Chapman, |
| 10:32:20 | 23 | article, that is a lead that is different than what is in the |
| 10:32:23 | 24 | supp reports, correct? |
| 10:32:24 | 25 | A. That's correct. |

10:32:25   1   Q.  In other words, there's no supp report in the Crockett

10:32:28   2   case that reflect this information?

10:32:30   3   A.  That's correct.

10:32:32   4   Q.  And looking at the state's answer to discovery in the same

10:32:36   5   place, Plaintiff's Exhibit 359-260, Mr. Noland showed you

10:32:39   6   /KPAFRPBLs of answers to discovery, correct?

10:32:41   7   A.  Yes.

10:32:42   8   Q.  The names on this missing report are not listed in the

10:32:47   9   state's list of names, correct?

10:32:51   10  A.  That's -- the prosecutor's answer to discovery doesn't

10:32:56   11  list every single name that's in a police report.

10:32:58   12  Q.  You did talk yesterday with Mr. Noland isn't it true that

10:33:00   13  the names are what --

10:33:02   14  A.  Yes.

10:33:02   15  Q.  All right.  So the names on this supp report were not only

10:33:06   16  not -- I'm sorry, the names on this GPR were not only in the

10:33:09   17  sum reports but they weren't in the state's answer to

10:33:11   18  discovery, right?

10:33:12   19  A.  From the documents you just showed me, that's true.

10:33:17   20  Q.  All right.  So this would be an example of the street file

10:33:21   21  process being maintained to the detriment of a criminal

10:33:26   22  defendant, correct?

10:33:26   23  A.  I can't answer it that way because of the inadequacy of

10:33:31   24  the criminal defense file in this case.

10:33:33   25  Q.  All right.  But you could say the criminal defense file

10:33:36    1  had a terrible record keeping but it's not in the supp reports

10:33:39    2  either, right?  That's true, right, sir?

10:33:41    3  A.  That's true, but if it's in the GPR.

10:33:44    4        THE COURT:  The answer is that's true.  The rest is

10:33:46    5  stricken.

10:33:47    6  BY MR. LOEVY:

10:33:51    7  Q.  All right.  You said -- if I understand your testimony

10:33:55    8  about half of the documents that were in the criminal defense

10:33:58    9  attorney's files wasn't missing, just visually, if you look at

10:34:03   10  the stacks, that one stack is about half as big as the other

10:34:06   11  staff?

10:34:06   12        MR. NOLAND:  Objection, that mischaracterizes.

10:34:09   13        THE WITNESS:  That's not half.

10:34:12   14  BY MR. LOEVY:

10:34:14   15  Q.  Give me a percent?

10:34:15   16        THE COURT:  The answer can stand.

10:34:16   17        THE WITNESS:  I don't know the percentage, sir.

10:34:17   18  BY MR. LOEVY:

10:34:18   19  Q.  Can you give me a ballpark, do you think it's two-thirds,

10:34:21   20  one-third?

10:34:21   21  A.  It's maybe a third.  I don't know what it is eyeballing

10:34:32   22  it.

10:34:33   23  Q.  Just eyeballing it.  When you gave this number, 94

10:34:37   24  percent, it's not 94 percent, is it?

10:34:38   25  A.  --

| 10:34:41 | 1 | Q. Let's just start with that question. It's not 94 percent, |
| 10:34:44 | 2 | is it? |
| 10:34:44 | 3 | MR. NOLAND: Objection. |
| 10:34:44 | 4 | THE COURT: You need to make the question a little |
| 10:34:47 | 5 | clearer. |
| 10:34:48 | 6 | BY MR. LOEVY: |
| 10:34:48 | 7 | Q. When you throughout the number 94 percent, what you meant |
| 10:34:53 | 8 | was 94 percent of the material you deemed investigatory or |
| 10:34:57 | 9 | relevant or that kind of thing, right? |
| 10:34:58 | 10 | A. 94 percent of the documents alleged to be missing were |
| 10:35:02 | 11 | accounted for in the police investigative file or the |
| 10:35:07 | 12 | prosecutor's file. |
| 10:35:08 | 13 | Q. But that's not 94 percent, is it, it's closer to |
| 10:35:11 | 14 | two-thirds. That's what I'm not getting? |
| 10:35:13 | 15 | A. It's of the pages allegedly missing. |
| 10:35:17 | 16 | Q. But? |
| 10:35:18 | 17 | A. In other words, the -- it was not alleged that the |
| 10:35:22 | 18 | criminal defense file was missing every single document, |
| 10:35:26 | 19 | criminal defense files were alleged to be missing a certain |
| 10:35:30 | 20 | amount of pages. |
| 10:35:31 | 21 | Q. I'm not -- so this is what the criminal defense attorneys |
| 10:35:34 | 22 | were allegedly missing, right? |
| 10:35:37 | 23 | A. Correct. |
| 10:35:37 | 24 | Q. And it's skewed a little bit because there's a couple of |
| 10:35:41 | 25 | 200 pages based on a typo that should not have been listed as |

Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 37 of 125 PageID #:65504
12/08/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

36

| | | |
|---|---|---|
| 10:35:45 | 1 | missing, right? |
| 10:35:45 | 2 | A. Well, they were listed as missing, though. |
| 10:35:48 | 3 | Q. Like this one chunk is accountable entirely to that typo, |
| 10:35:53 | 4 | correct? |
| 10:35:53 | 5 | A. I don't know if it's that one, but -- |
| 10:35:59 | 6 | Q. There's a couple that are -- |
| 10:36:00 | 7 | A. They were the pages that were alleged to be missing. |
| 10:36:03 | 8 | Q. All right. So why is the difference not the relevant |
| 10:36:07 | 9 | personal. Where is the 94 percent versus the difference? |
| 10:36:10 | 10 | A. The criminal defense attorney's files were missing a set |
| 10:36:17 | 11 | -- alleged to be missing a set number of pages. 94 percent of |
| 10:36:22 | 12 | those documents were found either -- were found in the state's |
| 10:36:29 | 13 | attorney's file or -- I'm sorry, were found in the state's |
| 10:36:33 | 14 | attorney's file. So it's not 94 percent of the total. It's |
| 10:36:38 | 15 | 94 percent of what was alleged to be missing was found, was |
| 10:36:41 | 16 | accounted for. |
| 10:36:42 | 17 | Q. But the pile on the right is what was allegedly missing, |
| 10:36:45 | 18 | right? |
| 10:36:45 | 19 | A. Yes. |
| 10:36:45 | 20 | Q. And the pile on the left is what was allegedly found? |
| 10:36:48 | 21 | A. No, no. |
| 10:36:49 | 22 | Q. The two small piles there? |
| 10:36:50 | 23 | A. That's -- those are the pages that were alleged to be |
| 10:36:54 | 24 | missing. |
| 10:36:54 | 25 | Q. Okay. And then the pile on the left is what? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

10:36:56  1    A. My left?

10:36:58  2    Q. I'm sorry. My left. The smaller pile.

10:37:03  3    A. Well, it actually was broken into the stacks, I believe,

10:37:09  4    this stack, right?

10:37:10  5    Q. Okay. So what's this stack?

10:37:12  6    A. I'm sorry. It's the material that that I are he viewed

10:37:18  7    yesterday, that was the pages that were still not found.

10:37:21  8    Q. All right.

10:37:21  9    A. In the prosecutor's file or accounted for in any way.

10:37:25  10   Q. All right. Can you hold that up then? That is not 6

10:37:30  11   percent of the big stack, is it?

10:37:32  12   A. Sure, it is.

10:37:32  13   Q. This, what you're holding in your hand is 6 percent of

10:37:38  14   this?

10:37:38  15   A. Yes.

10:37:38  16   Q. So 20 times that -- no?

10:37:42  17        THE COURT: Would be about 16 and a half times.

10:37:44  18   BY MR. LOEVY:

10:37:45  19   Q. 16 and a half times. Thank you, your Honor.

10:37:47  20        Let's get away from math for a second.

10:37:50  21        Now that you had a chance to review the permanent

10:37:55  22   retention file, showing you again plaintiff's 125, in the

10:37:58  23   Smith/Hickman case, this is Earl Hawkins's rap sheet, and it's

10:38:06  24   got an inquiry date of April 27th, which is roughly the date

10:38:09  25   of the murder, it should have been 28?

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 10:38:11 | 1 | A.  I see that. |
| 10:38:12 | 2 | Q.  If you were in your review, where did you do your review, |
| 10:38:16 | 3 | by the way, when you were doing your review, not last night, |
| 10:38:19 | 4 | when you were doing your protocol for the other stuff? |
| 10:38:21 | 5 | A.  Primarily out of the city's law firm's office. |
| 10:38:25 | 6 | Q.  All right.  When you were over at the city's law firm |
| 10:38:28 | 7 | office, if you would have come across this document in the |
| 10:38:31 | 8 | Smith/Hickman pile, would you put this in the relevant missing |
| 10:38:35 | 9 | or the irrelevant missing? |
| 10:38:36 | 10 | A.  Well. |
| 10:38:37 | 11 |         MR. KULWIN:  Asked and answered, Judge. |
| 10:38:39 | 12 |         THE COURT:  I don't think that particular -- I don't |
| 10:38:40 | 13 | think that particular question was asked and answered. |
| 10:38:43 | 14 | Overruled. |
| 10:38:43 | 15 |         THE WITNESS:  I'd have to be doing the full analysis |
| 10:38:46 | 16 | of the documents that were alleged to be missing and documents |
| 10:38:49 | 17 | that were found in the prosecutor's file.  I'd have to do all |
| 10:38:52 | 18 | that. |
| 10:38:53 | 19 | BY MR. LOEVY: |
| 10:38:53 | 20 | Q.  But you did get last name the permanent retention file, |
| 10:38:56 | 21 | right? |
| 10:38:56 | 22 | A.  That's one aspect of my review.  I would have reviewed a |
| 10:38:59 | 23 | lot more documents. |
| 10:39:00 | 24 | Q.  You have had a chance, though, to look at every sing |
| 10:39:05 | 25 | single document in the official file? |

10:39:09    1    A.  This is the RD.

10:39:10    2    Q.  That's what the Chicago Police Department turns over as

10:39:11    3    the official file, right /STKPHR-FRPBLT?

10:39:13    4    A.  No, they -- pursuant to subpoena and discovery process, we

10:39:18    5    get the investigative file as well as the records division

10:39:21    6    file.

10:39:22    7    Q.  All right.  Based on the official file, if you had been

10:39:25    8    doing your review and all was available to you was the

10:39:28    9    official file, would you have put this in the relevant

10:39:31    10   withheld or the irrelevant withheld pile?

10:39:33    11   A.  That's not the way I did my analysis, though.  I needed to

10:39:36    12   have all the other sources of documents to determine if it was

10:39:40    13   in the prosecutor's file, which was received from the police,

10:39:44    14   and then tendered during discovery.

10:39:46    15   Q.  You acknowledge you only read 500 of the 99,000 pages,

10:39:50    16   right?

10:39:50    17   A.  Read, I skimmed more pages than that.

10:39:54    18   Q.  You did a lot of skimming, right.

10:39:57    19         How about this document here?  1-121 with the

10:40:01    20   nickname sundown suggesting the police were looking for an El

10:40:05    21   Rukn named sundown.  Would you have put that in the irrelevant

10:40:07    22   withheld or the relevant withheld?

10:40:09    23   A.  The problem I have in asking your question is all I

10:40:15    24   reviewed yesterday is these, the records division files.  I

10:40:19    25   don't have the investigative file, I don't have the state's

10:40:21   1   attorney file, so for me to be able to determine whether this

10:40:24   2   document was already available in the prosecutor's file or was

10:40:29   3   found elsewhere, I can't make that determination.

10:40:31   4   Q.  All right.  Then I am going to ask you to make the

10:40:34   5   determination based on just the official file that you have

10:40:36   6   now reviewed, okay?

10:40:37   7   A.  That's not the way to do the analysis.

10:40:39   8   Q.  Then I am asking you a different question.

10:40:41   9        Based on what's in the official file, would this have

10:40:44   10  been irrelevant withheld or relevant withheld?

10:40:47   11       MR. NOLAND:  Objection, Judge, incomplete

10:40:48   12  hypothetical.

10:40:48   13       THE COURT:  Overruled.

10:40:53   14       THE WITNESS:  I would say it's a document that was

10:40:57   15  should have been provided during discovery.

10:40:59   16  BY MR. LOEVY:

10:41:00   17  Q.  How about this photograph of Earl Hawkins, should this

10:41:03   18  have been provided during discovery?

10:41:04   19  A.  His name is already identified in these records.  The

10:41:12   20  common practice is to provide the mug shot during discovery.

10:41:17   21  Q.  All right.  Because it might have been relevant to Mr.

10:41:20   22  Fields that in April of '84, they were showing Hawkins' photo

10:41:25   23  to the witnesses and not getting an ID?

10:41:28   24       MR. KULWIN:  Mischaracterizes, argumentative and

10:41:31   25  prejudicial.

10:41:32  1    THE COURT:  Sustained as to argumentative.

10:41:33  2  BY MR. LOEVY:

10:41:34  3  Q.  All right.  Couldn't a criminal defendant have made

10:41:37  4  exculpatory value of the fact that the police had his

10:41:39  5  photograph as far back as April 84 when they were canvassing

10:41:43  6  witnesses?

10:41:44  7  A.  I don't know if they had the photograph.  My review of the

10:41:48  8  file would be different than the question you're asking.

10:41:51  9  Q.  All right.  Let's take a look at another note from the

10:41:54  10  file.  Based on the official record, would this document,

10:41:58  11  1-68, this Edwards brother, Lawrence and Marshall Edwards,

10:42:03  12  would this have been irrelevant withheld or relevant withheld?

10:42:06  13    MR. NOLAND:  Objection, Judge, same objection.

10:42:08  14    THE COURT:  I'll let you do one more.  The objection

10:42:13  15  is overruled.

10:42:13  16    MR. LOEVY:

10:42:13  17  THE ATTORNEY:

10:42:14  18  Q.  Then let's shoot to the important one?

10:42:16  19    MR. KULWIN:  Judge, I am going to object.  Move to

10:42:18  20  strike.

10:42:18  21    THE COURT:  Overruled.

10:42:18  22  BY MR. LOEVY:

10:42:19  23  Q.  169, take a look at this one.  Heard the Edwards brothers

10:42:24  24  talking about killing Fuddy because of the shooting.  Saw them

10:42:27  25  about 900 in the stairwell.  They were talking about getting

Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 43 of 125 PageID #:65510
12/08/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

42

10:42:30   1   Fuddy.  We've seen this note before.  Would this have been

10:42:32   2   relevant or irrelevant?

10:42:33   3   A.  It should have been provided during discovery.

10:42:35   4   Q.  But isn't it true that a handwritten note like this, you

10:42:40   5   can't tell from just a -- those are just names scrawled on a

10:42:43   6   piece of paper, right?

10:42:44   7   A.  There's other information around it, but.

10:42:48   8   Q.  Yeah, but it could turn occupant that this handwritten

10:42:51   9   note with names ^  scrawled on a piece of paper turned out to

10:42:55  10   be the actual killers, right, that could happen?

10:42:57  11   A.  Theoretically, yes.

10:42:58  12   Q.  That's why it's important that all the handwritten

10:43:00  13   scrawled names in the investigative file have to be turned

10:43:02  14   over to the criminal defendant, right?

10:43:03  15   A.  If it's relevant to the investigation, yes.

10:43:08  16   Q.  And presumably it wouldn't be an investigative file unless

10:43:12  17   it was relevant to the investigation, correct?

10:43:13  18   A.  Well, we found a lot of pieces of paper that were misfiled

10:43:17  19   or not relevant to the investigation.

10:43:19  20   Q.  But just looking at this piece of paper, you can't tell?

10:43:23  21          MR. NOLAND:

10:43:24  22          MR. KULWIN:  Objection, argumentative, Judge.

10:43:25  23          THE COURT:  Overruled.

10:43:28  24   BY MR. LOEVY:

10:43:28  25   Q.  On its face?


               ***REALTIME UNEDITED TRANSCRIPT ONLY***

10:43:29   1   A.  Knowing more of the facts of the case, that might be very

10:43:32   2   important information ^ .

10:43:34   3   Q.  All right.  I am going to show you a few more pages from

10:43:48   4   the Smith/Hickman investigation.  And I'm going to ask you if

10:43:53   5   this information was reflected in the permanent retention file

10:43:56   6   that you saw last night.  Okay?

10:43:59   7   A.  Okay.

10:43:59   8   Q.  A guy driving the car, this is the getaway car was Ed

10:44:05   9   Stewart with Darryl Baldwin and Chico.  Baldwin with Olivia

10:44:10  10   Wallace.  None of this information is in the official reports,

10:44:13  11   correct?

10:44:13  12   A.  I didn't see that, no.

10:44:14  13   Q.  All right.  And that's a problem, right?

10:44:17  14   A.  It could be.  If the information in those notes were

10:44:28  15   provided, then it wouldn't be a problem.

10:44:30  16   Q.  But you have what was provided, that's the permanent

10:44:33  17   retention file?

10:44:33  18           MR. NOLAND:  Objection, Judge.

10:44:35  19           THE COURT:  Rephrase the question /SKPWHR-FRPBLT.

10:44:36  20   THE ATTORNEY:

10:44:36  21   Q.

10:44:36  22           MR. LOEVY:  You know what was provided to /PHR-FP

10:44:38  23   because you reviewed it last night.

10:44:40  24           THE WITNESS:  I know.

10:44:41  25           THE COURT:  I am going to sustain the objection.


                  ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 10:44:43 | 1 | BY MR. LOEVY: |
| 10:44:44 | 2 | Q. All right.  Looking at this document, this looks like an |
| 10:44:46 | 3 | administrative document, correct? |
| 10:44:48 | 4 | A. It's a gang arrest information card. |
| 10:44:56 | 5 | Q. But it identifies Chico as Ray mar tell, right? |
| 10:44:59 | 6 | A. Yes. |
| 10:45:01 | 7 | Q. And then there's the GPR with Rodell Banks, this also was |
| 10:45:07 | 8 | information that was not in any supp report, correct? |
| 10:45:10 | 9 | A. Rodell Banks, I did not -- I don't think I saw his name in |
| 10:45:16 | 10 | there, no. |
| 10:45:16 | 11 | Q. And there were other GPRs that were also not in supp |
| 10:45:21 | 12 | reports in the official file, correct? |
| 10:45:23 | 13 | A. If you give me one specific. |
| 10:45:25 | 14 | Q. This one, plaintiff's 1-106 reflects a lot of information |
| 10:45:29 | 15 | about the shooting and an alternate /S-PLT that was nowhere |
| 10:45:34 | 16 | reflected in the permanent retention file, correct? |
| 10:45:35 | 17 | A. That information, no. |
| 10:45:37 | 18 | Q. All right.  Having now been shown maybe 10 pages from the |
| 10:45:44 | 19 | street file in the Smith/Hickman case, by the way, that's |
| 10:45:48 | 20 | about 5 percent of the total, right, if it's a 200 page file? |
| 10:45:52 | 21 | A. I'll take your word on the math. |
| 10:45:54 | 22 | Q. All right.  That 5 percent that was withheld that was in |
| 10:46:00 | 23 | the street file, was that typical of the 5 percent that was |
| 10:46:03 | 24 | withheld from the other files, was it an aberration abrasion, |
| 10:46:06 | 25 | was it an outlier, can you give us some perspective? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

45

| | | |
|---|---|---|
| 10:46:12 | 1 | A.  The documents that you showed me are investigative |
| 10:46:15 | 2 | documents for the most part that should have been provided |
| 10:46:17 | 3 | during the discovery process.  All the different cases I |
| 10:46:20 | 4 | examined, that's the documents that were not found in the |
| 10:46:23 | 5 | prosecutor's files, which could have been there originally, |
| 10:46:26 | 6 | were not of that nature. |
| 10:46:27 | 7 | Q.  All right.  But the 5 percent that was missing from the |
| 10:46:31 | 8 | permanent retention file in the Smith/Hickman case, was that |
| 10:46:35 | 9 | an aberration 5 percent or was it typical, was the |
| 10:46:38 | 10 | Smith/Hickman one typical or atypical? |
| 10:46:41 | 11 | A.  Each one of the cases I examined were sue generis, you |
| 10:46:46 | 12 | have to look at each one on their own.  There is no typical |
| 10:46:50 | 13 | pattern to percentages of pages found or not found. |
| 10:46:53 | 14 | Q.  Would it be fair to say in terms of information missing |
| 10:46:56 | 15 | the Smith/Hickman file fell somewhere in the middle of the |
| 10:46:59 | 16 | level of exculpatory information that was missing? |
| 10:47:01 | 17 | MR. NOLAND:  Objection, Judge, vague. |
| 10:47:02 | 18 | THE COURT:  Sustained. |
| 10:47:03 | 19 | BY MR. LOEVY: |
| 10:47:06 | 20 | Q.  Each of the files was missing information, right? |
| 10:47:08 | 21 | A.  Missing allege would documents missing were not found in |
| 10:47:14 | 22 | the prosecutor's file. |
| 10:47:14 | 23 | Q.  And some of the missing information was more relevant in |
| 10:47:17 | 24 | some files than in other files, right? |
| 10:47:18 | 25 | A.  Actually, very few of it was investigative material, a lot |

***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

46

| | | |
|---|---|---|
| 10:47:25 | 1 | of it was duplicates and other stuff. |
| 10:47:27 | 2 | Q.  All right.  So are you saying the Smith/Hickman case was |
| 10:47:30 | 3 | an outlier or was typical? |
| 10:47:32 | 4 | A.  As I said before, you can take each case on its own and |
| 10:47:36 | 5 | examine it. |
| 10:47:37 | 6 | MR. LOEVY:  I have no further questions, your Honor. |
| 10:47:40 | 7 | THE COURT:  Mr. Noland. |
| 10:47:41 | 8 | - - - |
| 10:47:41 | 9 | BERNARD MURRAY, REDIRECT EXAMINATION |
| 10:47:41 | 10 | BY MR. NOLAND: |
| 10:48:31 | 11 | Q.  Mr. Murray, I'm showing you the answer to discovery that |
| 10:48:33 | 12 | we showed you yesterday in the Crockett case.  Do you remember |
| 10:48:35 | 13 | that? |
| 10:48:35 | 14 | A.  Yes. |
| 10:48:35 | 15 | Q.  Counsel asked you some questions about a GPR from the |
| 10:48:38 | 16 | criminal defense file.  Do you remember that a moment ago? |
| 10:48:41 | 17 | A.  Yes. |
| 10:48:41 | 18 | Q.  Was there a state's attorney file found for the Crockett |
| 10:48:46 | 19 | case? |
| 10:48:46 | 20 | A.  No, there was not. |
| 10:48:47 | 21 | Q.  What is your opinion about whether or not the criminal |
| 10:48:49 | 22 | defense file in the Crockett case is complete or incomplete? |
| 10:48:51 | 23 | A.  It's wholly incomplete, not wholly, but very much |
| 10:48:54 | 24 | incomplete. |
| 10:48:55 | 25 | Q.  What is that based upon? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

10:48:56   1    A.  Part of the analysis was the document you're looking at
10:49:02   2    right here, the answer to discovery, the criminal defense
10:49:04   3    attorney claims that they didn't have or the file is missing
10:49:08   4    documents that have a whole bunch of names that were on police
10:49:12   5    reports.
10:49:12   6    Q.  All right.  And counsel had showed you and suggested that
10:49:16   7    names from that GPR he showed you would necessarily be in the
10:49:19   8    answer to discovery, do you remember those questions?
10:49:20   9    A.  Yes.
10:49:21   10   Q.  Why wouldn't those names necessarily be in the answer to
10:49:23   11   discovery?
10:49:23   12   A.  The answer to discovery does try to be somewhat
10:49:27   13   comprehensive, but it's usually the witnesses the prosecutor
10:49:30   14   intends to call at trial or potentially call at trial.
10:49:33   15   Q.  Your Honor, may I quickly have the ELMO, please?
10:49:46   16           THE COURT:  Yes.  There you go.
10:49:53   17           MR. NOLAND:  Thank you.
10:49:54   18   BY MR. NOLAND:
10:49:54   19   Q.  Showing you the blue back in the Derrick Johnson case that
10:49:59   20   counsel talked about a little while ago.  Do you remember
10:50:01   21   that?
10:50:01   22   A.  Yes.
10:50:02   23   Q.  And turning to the Derrick Johnson section of your report
10:50:20   24   which would be at page 31, you state that plaintiff contends
10:50:28   25   after an examination of the investigative file numbered ACB

                 ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | |
|---|---|
| 10:50:32 | 1 | and you give the numbers that 2 one of the 187 pages were not |
| 10:50:35 | 2 | found in the defense file, an examination of the state's file |
| 10:50:39 | 3 | reveals that at least 2 of those 21 pages were present in the |
| 10:50:43 | 4 | prosecutor's file.  Is that what you wrote? |
| 10:50:44 | 5 | A.  Yes. |
| 10:50:44 | 6 | Q.  Mr. Murray, this blue back indicates that a 181 page |
| 10:50:54 | 7 | street file which includes 18 pages that have writing on the |
| 10:50:59 | 8 | back and a series of other things were tendered in open court; |
| 10:50:59 | 9 | is that right? |
| 10:51:02 | 10 | A.  That's correct. |
| 10:51:02 | 11 | Q.  And would you have an opinion then whether the state's |
| 10:51:05 | 12 | file is currently complete or incomplete on the Derrick |
| 10:51:09 | 13 | Johnson case? |
| 10:51:10 | 14 | A.  I'd say the state's attorney's file is currently |
| 10:51:13 | 15 | incomplete.  At the time that they were preparing for trial, |
| 10:51:16 | 16 | they had far more documents than are in the file now. |
| 10:51:36 | 17 | MR. NOLAND:  Your Honor, may I have the computer |
| 10:51:37 | 18 | back? |
| 10:51:38 | 19 | THE COURT:  Okay. |
| 10:51:41 | 20 | MR. NOLAND:  Can you pull up plaintiff's 118, page |
| 10:51:44 | 21 | 120.  Exhibit 1, page 118.  Please put it side by side with |
| 10:52:31 | 22 | plaintiff's 86, page 9. |
| 10:52:34 | 23 | BY MR. NOLAND: |
| 10:52:48 | 24 | Q.  Counsel asked you some questions about these documents a |
| 10:52:51 | 25 | moment ago.  Do you remember that Mr. Murray? |

| | | |
|---|---|---|
| 10:52:59 | 1 | A.  Yes. |
| 10:52:59 | 2 | Q.  And the questions he asked was about whether or not an RD |
| 10:53:03 | 3 | number, a case report from another case would be potentially |
| 10:53:06 | 4 | relevant in a case.  Do you remember that? |
| 10:53:07 | 5 | A.  Yes. |
| 10:53:09 | 6 | MR. NOLAND:  Laura, could you highlight on the page |
| 10:53:12 | 7 | on the left, plaintiff's 1, the RD number at the top |
| 10:53:15 | 8 | right-hand corner. |
| 10:53:16 | 9 | BY MR. NOLAND: |
| 10:53:17 | 10 | Q.  What's that number is it 150899? |
| 10:53:22 | 11 | A.  150899. |
| 10:53:27 | 12 | MR. NOLAND:  Laura, if you could take that. |
| 10:53:29 | 13 | MR. NOLAND: |
| 10:53:30 | 14 | THE ATTORNEY: |
| 10:53:30 | 15 | Q.  And then on the document on the right, the Delbert Edwards |
| 10:53:35 | 16 | section, the third line down, can you highlight that number. |
| 10:53:37 | 17 | What's that number say, Mr. Murray? |
| 10:53:39 | 18 | A.  150899. |
| 10:53:41 | 19 | Q.  Mr. Murray, and this was -- this report on the right was |
| 10:53:48 | 20 | one in the stack of materials that counsel asked you to review |
| 10:53:51 | 21 | last night; is that right? |
| 10:53:53 | 22 | A.  Let me just take a look.  Yes. |
| 10:53:56 | 23 | Q.  All right.  And this is the material that you understand |
| 10:53:59 | 24 | that the plaintiffs acknowledge was provided and available Mr. |
| 10:54:04 | 25 | Fields' criminal defense attorney? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 10:54:05 | 1 | A. Yes. |
| 10:54:05 | 2 | Q. So this document would show that the case report on the |
| 10:54:11 | 3 | left which Mr. Loevy referred to in fact was available and |
| 10:54:15 | 4 | identified in the information provided to them; is that right? |
| 10:54:18 | 5 | A. Yes. |
| 10:54:18 | 6 | Q. Thank you. |
| 10:54:20 | 7 | Counsel asked you some questions about cover pages of |
| 10:54:26 | 8 | these files. Were cover pages something /SHA you would |
| 10:54:30 | 9 | routinely receive as a prosecutor? |
| 10:54:31 | 10 | A. Cover pages were not routinely received. |
| 10:54:34 | 11 | Q. Was that something that you would be reaching out to |
| 10:54:38 | 12 | obtain cover pages of files or file jackets? |
| 10:54:41 | 13 | A. No. |
| 10:54:41 | 14 | Q. Why not? |
| 10:54:42 | 15 | A. Well, the subpoena was for all the documents contained in |
| 10:54:44 | 16 | the file and the police -- whoever responded to the subpoena |
| 10:54:50 | 17 | were responding to the subpoena on that case. I didn't need |
| 10:54:52 | 18 | the cover, the cardboard cover of the file. |
| 10:54:55 | 19 | Q. All right. Another topic, Mr. Murray. We talked a lot |
| 10:54:59 | 20 | about administrative documents and a large packet of documents |
| 10:55:02 | 21 | we went through? |
| 10:55:02 | 22 | A. Yes. |
| 10:55:03 | 23 | Q. And did you evaluate the 43 files here to determine |
| 10:55:07 | 24 | whether or not these administrative documents were relevant to |
| 10:55:10 | 25 | those particular 43 proceedings? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 52 of 125 PageID #:65519
12/08/16 AM
***REALTIME UNEDITED TRANSCRIPT ONLY***

51

| | | |
|---|---|---|
| 10:55:13 | 1 | MR. LOEVY:  Your Honor, objection, it was covered in |
| 10:55:15 | 2 | the last exam. |
| 10:55:16 | 3 | THE COURT:  You said covered in direct? |
| 10:55:18 | 4 | MR. LOEVY:  Yes. |
| 10:55:18 | 5 | THE COURT:  I kind of think it was.  Sustained. |
| 10:55:20 | 6 | BY MR. NOLAND: |
| 10:55:21 | 7 | Q.  Counsel asked you in general whether or not administrative |
| 10:55:23 | 8 | -- he was comparing administrative and exculpatory.  Do you |
| 10:55:27 | 9 | remember those questions? |
| 10:55:27 | 10 | A.  Yes. |
| 10:55:28 | 11 | Q.  Mr. Murray, what's your opinion with respect to whether or |
| 10:55:31 | 12 | not administrative documents are exculpatory? |
| 10:55:34 | 13 | A.  That they're not exculpatory. |
| 10:55:36 | 14 | Q.  All right.  Counsel had asked you some questions, showed |
| 10:55:53 | 15 | you an I have inventory with respect to the Devon /TERL case, |
| 10:55:56 | 16 | do you recall that and some phone records? |
| 10:55:59 | 17 | A.  Yes. |
| 10:55:59 | 18 | Q.  We discussed those phone records yesterday; is that right? |
| 10:56:02 | 19 | A.  Yes, we did. |
| 10:56:02 | 20 | Q.  All right.  What is your opinion with respect to whether |
| 10:56:04 | 21 | those phone records were available to the prosecutor? |
| 10:56:06 | 22 | A.  The indication in the file was that the prosecutor had the |
| 10:56:09 | 23 | phone records at one point and was wondering if they had any |
| 10:56:12 | 24 | relevant information on them, so even though the phone records |
| 10:56:16 | 25 | are not in the prosecutor's files, it appears at one time they |

12/08/16 AM
Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 53 of 125 PageID #:65520
***REALTIME UNEDITED TRANSCRIPT ONLY***

52

10:56:21   1   had them.

10:56:21   2   Q.  All right.  Mr. Murray, referring back to yesterday, do

10:56:27   3   you remember some questions about whether the plaintiff's

10:56:28   4   expert Mr. Brasfield was relying upon investigative material

10:56:33   5   of blank pages and other administrative documents, do you

10:56:39   6   remember that?

10:56:40   7   A.  Yes.

10:56:40   8   Q.  And do you remember he was relying on those as

10:56:42   9   administrative investigative material?

10:56:45   10  A.  Yes.

10:56:45   11  Q.  ^  this is the chart that Mr. Brasfield did and

10:56:49   12  plaintiff's counsel, is it true the one on the board in front

10:56:51   13  of you?

10:56:52   14  A.  Yes.

10:56:53   15  Q.  And I'm handing you a full copy of it.

10:56:58   16       MR. NOLAND:  Laura, could we have Exhibit 394, page

10:57:03   17  1.

10:57:03   18  BY MR. NOLAND:

10:57:08   19  Q.  On the screen here is one of those investigative file

10:57:11   20  controls; is that right?

10:57:11   21  A.  Yes.

10:57:11   22  Q.  All right.  Directing your attention to page 29 of

10:57:16   23  Mr. Brasfield's table?

10:57:29   24  A.  Okay.

10:57:29   25  Q.  Paragraph 92.

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 10:57:34 | 1 | A.  Paragraph 92. |
| 10:57:35 | 2 | Q.  Under the column missing investigatory information is the |
| 10:57:44 | 3 | page that we are talking about which is also ACB 4925.  Is |
| 10:57:49 | 4 | that identified by Mr. Brasfield as missing investigatory |
| 10:57:52 | 5 | material? |
| 10:57:52 | 6 | A.  Yes, it is. |
| 10:58:01 | 7 | MR. NOLAND:  Laura, could we have Exhibit 394, page |
| 10:58:04 | 8 | 116. |
| 10:58:04 | 9 | BY MR. NOLAND: |
| 10:58:24 | 10 | Q.  Mr. Murray, just a reminder, was this one of the |
| 10:58:27 | 11 | administrative documents we talked about yesterday, one of the |
| 10:58:29 | 12 | subpoenas were well after the civil subpoenas well after the |
| 10:58:31 | 13 | criminal trial? |
| 10:58:32 | 14 | A.  Yes, it is. |
| 10:58:32 | 15 | Q.  And I'm directing your attention to Mr. Brasfield's table. |
| 10:58:38 | 16 | Page 33. |
| 10:58:44 | 17 | MR. LOEVY:  Your Honor, we object on Rule 26. |
| 10:58:48 | 18 | THE COURT:  Can I see the lawyers at sidebar, please. |
| 10:58:50 | 19 | Can you bring the document, the other document.  The big one |
| 10:58:55 | 20 | on the screen. |
| 10:58:58 | 21 | (The following proceedings were had at sidebar outside the |
| 10:59:02 | 22 | hearing of the jury:) |
| 10:59:02 | 23 | THE COURT:  What's the Rule 26 issue? |
| 10:59:03 | 24 | MR. LOEVY:  He didn't audit Mr. Brasfield's -- he |
| 10:59:07 | 25 | didn't audit Mr. Brasfield's results. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 10:59:10 | 1 | THE COURT: Spreadsheet. What was the question? |
| 10:59:13 | 2 | MR. NOLAND: Whether or not that particular document |
| 10:59:14 | 3 | was -- all these documents were on the missing investigative |
| 10:59:19 | 4 | material category that Mr. Brasfield was relying upon in his |
| 10:59:21 | 5 | report. |
| 10:59:21 | 6 | THE COURT: Now tell me again what the issue is. |
| 10:59:24 | 7 | MR. LOEVY: Mr. Brasfield said I made a gross |
| 10:59:26 | 8 | analysis what's in, what's out, and they're now going document |
| 10:59:30 | 9 | by document. There was nothing in his report where he said I |
| 10:59:33 | 10 | think certain documents were claimed and shouldn't have been |
| 10:59:37 | 11 | claimed. |
| 10:59:38 | 12 | THE COURT: Shouldn't have been claimed as. |
| 10:59:40 | 13 | MR. LOEVY: Investigatory or whatever the point he is |
| 10:59:42 | 14 | making. |
| 10:59:44 | 15 | MR. ART: With respect to attachment D. It's never |
| 10:59:48 | 16 | been audited the way it's on the stand now /STPHO what |
| 10:59:52 | 17 | Mr. Murray 16 of his report is based upon the table, the table |
| 10:59:58 | 18 | has a column missing investigative material, Mr. Loevy |
| 11:00:00 | 19 | suggested yesterday that Mr. Brasfield was not claiming that |
| 11:00:02 | 20 | all those administrative documents and blank pages were |
| 11:00:06 | 21 | investigative material. In fact, it's right there on this |
| 11:00:09 | 22 | table that he is claiming. |
| 11:00:10 | 23 | THE COURT: I am overruling the objection. |
| 11:00:12 | 24 | (The following proceedings were had in open court in the |
| 11:00:17 | 25 | presence and hearing of the jury:) |

| 11:00:17 | 1 | THE COURT: The objection is overruled. |
| 11:00:20 | 2 | BY MR. NOLAND: |
| 11:00:22 | 3 | Q. Mr. Murray, with respect to this page, 116 on the screen, |
| 11:00:28 | 4 | directing your attention to page 33 of Mr. Brasfield's table, |
| 11:00:32 | 5 | paragraph 132. |
| 11:00:35 | 6 | A. Okay. |
| 11:00:35 | 7 | Q. And is page ACB 19028 identified as missing investigative |
| 11:00:43 | 8 | material by Mr. Brasfield? |
| 11:00:43 | 9 | A. Yes, it is. |
| 11:00:46 | 10 | MR. NOLAND: Laura, could we have page 139 of Exhibit |
| 11:00:50 | 11 | 394. |
| 11:00:51 | 12 | BY MR. NOLAND: |
| 11:00:53 | 13 | Q. Mr. Murray, I'll be directing your attention to page 1 of |
| 11:01:01 | 14 | Brasfield's table, paragraph 7. |
| 11:01:05 | 15 | Mr. Murray, on the screen, we have one of the court |
| 11:01:08 | 16 | attendance reports that we talked about yesterday, right? |
| 11:01:10 | 17 | A. Yes. |
| 11:01:10 | 18 | Q. And is it your opinion that that's administrative? |
| 11:01:12 | 19 | A. Yes. |
| 11:01:12 | 20 | Q. And this is page ACB 5609. Does Mr. Brasfield contend |
| 11:01:22 | 21 | that this is a missing -- this is missing investigatory |
| 11:01:25 | 22 | material? |
| 11:01:25 | 23 | A. He does. |
| 11:01:26 | 24 | MR. NOLAND: Laura, can we have Exhibit 394, page |
| 11:01:31 | 25 | 223. |

12/08/16 AM
Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 57 of 125 PageID #:65524
***REALTIME UNEDITED TRANSCRIPT ONLY***

56

| 11:01:31 | 1 | BY MR. NOLAND: |
| 11:01:33 | 2 | Q. Mr. Murray, I'm directing your attention to page 27 of |
| 11:01:35 | 3 | Brasfield's table, paragraph 85, page -- did Mr. Brasfield |
| 11:01:49 | 4 | contend that this blank page, page ACB 48131 is missing |
| 11:01:54 | 5 | investigative material? |
| 11:01:55 | 6 | A. Yes. |
| 11:01:56 | 7 | MR. NOLAND: Laura. |
| 11:01:57 | 8 | MR. LOEVY: Your Honor, we object to at this point |
| 11:02:00 | 9 | cumulative. Are we going to go through every page that |
| 11:02:03 | 10 | Mr. Brasfield said was out or in? |
| 11:02:05 | 11 | MR. NOLAND: I can do it in a summary question. |
| 11:02:07 | 12 | THE COURT: Okay. |
| 11:02:07 | 13 | BY MR. NOLAND: |
| 11:02:07 | 14 | Q. Mr. Murray, is it your understanding that all these |
| 11:02:09 | 15 | administrative documents Mr. Brasfield's contending in that |
| 11:02:13 | 16 | table are missing investigatory material? |
| 11:02:16 | 17 | A. Yes. |
| 11:02:16 | 18 | Q. Are these administrative documents, these blank pages, |
| 11:02:19 | 19 | these civil subpoenas years after the fact, court attendance |
| 11:02:23 | 20 | sheets, are these -- is this investigative material in any |
| 11:02:27 | 21 | way? |
| 11:02:27 | 22 | A. Not in my opinion. |
| 11:02:29 | 23 | Q. Mr. Murray, I want to ask you some questions about the 94 |
| 11:02:50 | 24 | percent figure to clarify some things. |
| 11:02:54 | 25 | So? |

| | |
|---|---|
| 11:02:55 | 1 |
| 11:02:57 | 2 |
| 11:02:58 | 3 |
| 11:03:00 | 4 |
| 11:03:01 | 5 |
| 11:03:03 | 6 |
| 11:03:07 | 7 |
| 11:03:09 | 8 |
| 11:03:09 | 9 |
| 11:03:19 | 10 |
| 11:03:24 | 11 |
| 11:03:25 | 12 |
| 11:03:25 | 13 |
| 11:03:28 | 14 |
| 11:03:29 | 15 |
| 11:03:32 | 16 |
| 11:03:35 | 17 |
| 11:03:37 | 18 |
| 11:03:37 | 19 |
| 11:03:42 | 20 |
| 11:03:44 | 21 |
| 11:03:45 | 22 |
| 11:03:46 | 23 |
| 11:03:47 | 24 |
| 11:03:50 | 25 |

1      MR. LOEVY:  Your Honor, we objected to the 94

2  percent.

3      THE COURT:  Okay.  I am going to wait until I hear a

4  question.

5  BY MR. NOLAND:

6  Q.  You were asked just on counsel's questions about how that

7  figure was arrived at.  Do you remember those questions?

8  A.  Yes.

9  Q.  And in your report, you identified in each one of these

10  pages how many pages in total are in the 43 investigative

11  files; is that right?

12  A.  Correct.

13  Q.  So for each one of the files you list the number of pages?

14  A.  That's correct.

15  Q.  And you totaled those autopsy and the total amount of

16  those pages was 9,480 is that right?

17  A.  That sounds right, yes /STKPWR-FRPBLTS.

18  Q.

19      MR. LOEVY:  Your Honor, we do object Rule 26 for the

20  reasons discussed at sidebar.

21      THE COURT:  I think it's covered in the cross, so I

22  am going to permit it.

23  BY MR. NOLAND:

24  Q.  So that's the starting figure that you started with for

25  this analysis, right?

| | | |
|---|---|---|
| 11:03:51 | 1 | A.  Correct. |
| 11:03:51 | 2 | Q.  And then Mr. Murray, the stack of papers you have in front |
| 11:03:58 | 3 | of you with the pages that after all the identifications by |
| 11:04:03 | 4 | plaintiff of missing pages which is defendants' 392, the stack |
| 11:04:09 | 5 | in front of you, defense 394, the last Bates number on it is |
| 11:04:18 | 6 | what? |
| 11:04:18 | 7 | A.  40928. |
| 11:04:24 | 8 | Q.  And the total number is 572? |
| 11:04:28 | 9 | A.  Yes, the group exhibit total number is 572. |
| 11:04:32 | 10 | Q.  So the documents that we have been talking about that were |
| 11:04:36 | 11 | unable to be located in the prosecutor's files is 572 is that |
| 11:04:40 | 12 | right? |
| 11:04:40 | 13 | A.  That's correct. |
| 11:04:41 | 14 | Q.  And the plaintiff has never made any contention that these |
| 11:04:53 | 15 | document from here to the top of the 43 files to 392, they |
| 11:04:59 | 16 | have never made any contention that any of those documents |
| 11:05:01 | 17 | were missing from any of the files is that right? |
| 11:05:03 | 18 | A.  That's correct. |
| 11:05:03 | 19 | Q.  Mr. Murray, 9,480 minus 572 equals 8,908. ; is that right? |
| 11:05:22 | 20 | A.  Yes. |
| 11:05:23 | 21 | Q.  You want to come down and check my math, feel free. |
| 11:05:26 | 22 | A.  I'll take your word for it, counsel. |
| 11:05:29 | 23 | Q.  You did that before you hit the stand yesterday? |
| 11:05:33 | 24 | A.  Yes. |
| 11:05:33 | 25 | Q.  And Mr. Murray, 8,? |

11:05:36   1          MR. LOEVY:  Same disclosure objection, your Honor.

11:05:38   2          THE COURT:  You asked this on cross, Mr. Loevy.  The

11:05:41   3   objection is overruled.

11:05:42   4   BY MR. NOLAND:

11:05:42   5   Q.  8908 divided by 9,480 equals 93.9 percent; is that

11:05:54   6   correct?

11:05:54   7   A.  That's correct.

11:05:55   8   Q.  And is that the 94 percent figure's talking about?

11:05:58   9   A.  It is.

11:05:58   10  Q.  But in the end, Mr. Murray, is this supposed to be a

11:06:06   11  numbers game?

11:06:07   12  A.  No, we're trying to look for missing investigative

11:06:13   13  material.

11:06:13   14  Q.  And is it the information or is it a blank piece of paper

11:06:18   15  that we're concerned about in the criminal discovery process?

11:06:21   16  A.  No, we're concerned about investigative material, not

11:06:26   17  blank pages or items like that.

11:06:31   18  Q.  Counsel asked you yesterday, we did not ask you to study

11:06:38   19  the file in this case is that right?

11:06:40   20  A.  That's correct.

11:06:40   21  Q.  We asked you -- you were advised that that working file

11:06:46   22  had not been tendered to Mr. Fields' counsel, right?

11:06:49   23  A.  Yes.

11:06:50   24  Q.  And you would agree that the information should have been

11:06:54   25  tendered; is that right?

12/08/16 AM
Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 61 of 125 PageID #:65527
***REALTIME UNEDITED TRANSCRIPT ONLY***

60

| | | |
|---|---|---|
| 11:06:55 | 1 | A.  Yes. |
| 11:06:55 | 2 | Q.  So we asked you to take a look at the 59 files that they |
| 11:06:59 | 3 | identified to see whether or not there were any problems with |
| 11:07:02 | 4 | any of those other cases; is that right? |
| 11:07:04 | 5 | A.  That is correct. |
| 11:07:04 | 6 | Q.  And what is your opinion after -- and we obtained 43 of |
| 11:07:10 | 7 | those 59 files from the state's attorney's office; is that |
| 11:07:10 | 8 | right? |
| 11:07:14 | 9 | A.  That's correct. |
| 11:07:15 | 10 | Q.  And those are the files right in front of you right now? |
| 11:07:17 | 11 | A.  That's correct. |
| 11:07:18 | 12 | Q.  And what is your opinion about whether or not you found |
| 11:07:20 | 13 | any problems with respect to the production of material in |
| 11:07:24 | 14 | those 43 cases? |
| 11:07:25 | 15 | A.  I didn't find any problems with the production of the |
| 11:07:28 | 16 | material.  The high majority of the pages even at this late |
| 11:07:33 | 17 | date were accounted for. |
| 11:07:34 | 18 | Q.  And you and I went through yesterday in pretty significant |
| 11:07:40 | 19 | detail the pages that were left over; is that right? |
| 11:07:44 | 20 | A.  Yes. |
| 11:07:44 | 21 | Q.  And? |
| 11:07:45 | 22 | MR. LOEVY:  Same objection, if it happened yesterday, |
| 11:07:47 | 23 | your Honor. |
| 11:07:50 | 24 | MR. NOLAND:  I'm responding to counsel. |
| 11:07:52 | 25 | THE COURT:  It's just a preliminary question.  Go |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 11:07:53 | 1 | ahead. |
| 11:07:53 | 2 | BY MR. NOLAND: |
| 11:07:54 | 3 | Q.  You were asked questions yesterday suggesting that we had |
| 11:07:57 | 4 | not showed every single piece of paper in this stack to the |
| 11:08:01 | 5 | jury.  Do you remember those questions? |
| 11:08:02 | 6 | A.  I do. |
| 11:08:02 | 7 | Q.  But Mr. Murray, we had -- you had grouped these pages |
| 11:08:10 | 8 | together in order to system /AOT /KHRAOE explain to the jury |
| 11:08:14 | 9 | what they are? |
| 11:08:15 | 10 | A.  That's correct. |
| 11:08:15 | 11 | MR. LOEVY:  Objection, leading. |
| 11:08:16 | 12 | THE COURT:  Overruled. |
| 11:08:17 | 13 | BY MR. NOLAND: |
| 11:08:17 | 14 | Q.  So, for instance, we showed the jury the investigative |
| 11:08:24 | 15 | file control form, do you remember that? |
| 11:08:25 | 16 | A.  I do. |
| 11:08:26 | 17 | Q.  And you grouped together 22 of these pages, the same kind |
| 11:08:29 | 18 | of page, right? |
| 11:08:31 | 19 | A.  Same type of page from different cases. |
| 11:08:33 | 20 | Q.  So how many -- we showed the jury one of these 22 pages? |
| 11:08:36 | 21 | A.  That's correct. |
| 11:08:37 | 22 | Q.  We didn't go through them all? |
| 11:08:39 | 23 | A.  We didn't go through all 22 of them, no. |
| 11:08:41 | 24 | Q.  Same thing with the daily mainly /EUPBLS dent log.  We |
| 11:08:44 | 25 | showed the jury an example of one of the daily major incident |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 63 of 125 PageID #:65530
12/08/16 AM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

62

11:08:48   1   logs?

11:08:49   2   A. That's correct.

11:08:49   3   Q. And there were 42 pages of those?

11:08:52   4   A. That's right.

11:08:52   5   Q. Did we show the jury all of those?

11:08:55   6   A. No.

11:08:56   7   Q. I don't not?

11:08:56   8   A. They were different, different information but the

11:08:59   9   formatting and the type of document was the same.

11:09:01   10   Q. And we showed ^  the jury the investigative file inventory

11:09:05   11   form; is that right?

11:09:06   12   A. Yes.

11:09:06   13   Q. And there were 51 of those pages left over; is that right?

11:09:06   14   A. Yes.

11:09:11   15   Q. And we didn't go through every single one of them?

11:09:14   16   A. No, we didn't.

11:09:14   17   Q. Why not?

11:09:15   18   A. The same thing.  Those forms are from different cases, the

11:09:20   19   formatting and the type of information included is the same.

11:09:24   20   Q. Would the same answer be given to similar questions for

11:09:27   21   the substantial part of these documents, this stack that we

11:09:31   22   talked about yesterday?

11:09:31   23   A. Yes.

11:09:32   24   Q. And then at the end of the examination yesterday, we

11:09:36   25   talked about the smaller stack of approximately 69 pages that

Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 64 of 125 PageID #:65531
12/08/16 AM
***REALTIME UNEDITED TRANSCRIPT ONLY***

63

| | |
|---|---|
| 11:09:44 | 1 | were arguably investigative material, do you remember? |
| 11:09:49 | 2 | MR. LOEVY: Your Honor, this is a redo of the direct. |
| 11:09:52 | 3 | THE COURT: Sustained. Just get to a question that's |
| 11:09:56 | 4 | responsive. Just a reminder to both sides, you need to be |
| 11:10:00 | 5 | budgeting your time. |
| 11:10:01 | 6 | BY MR. NOLAND: |
| 11:10:01 | 7 | Q. In sum, you explained the material from the missing -- the |
| 11:10:07 | 8 | remaining material, the few pages that you considered to be |
| 11:10:12 | 9 | investigative material that is not in the prosecutor's files |
| 11:10:16 | 10 | right? |
| 11:10:16 | 11 | MR. LOEVY: Objection. |
| 11:10:16 | 12 | THE COURT: I am going to overrule the objection in |
| 11:10:18 | 13 | the interest of time. |
| 11:10:19 | 14 | THE WITNESS: And I did. |
| 11:10:23 | 15 | BY MR. NOLAND: |
| 11:10:28 | 16 | Q. Counsel asked you some questions about Mr. Brasfield's |
| 11:10:31 | 17 | review of permanent retention files. Do you remember those? |
| 11:10:34 | 18 | A. I do remember those questions. |
| 11:10:35 | 19 | Q. And he also used a number with you about 400 and I think |
| 11:10:43 | 20 | 59 investigative files? |
| 11:10:45 | 21 | A. Yes. |
| 11:10:47 | 22 | Q. 457? |
| 11:10:48 | 23 | A. 457 I think it is. |
| 11:10:49 | 24 | Q. Do you know how many investigative files were the |
| 11:10:52 | 25 | plaintiffs contending didn't have information that they got or |

| | | |
|---|---|---|
| 11:10:57 | 1 | they looked at from criminal defense files? |
| 11:10:59 | 2 | A.  59. |
| 11:10:59 | 3 | Q.  And were those the 59 files that you were analyzing? |
| 11:11:04 | 4 | A.  Yes, they were. |
| 11:11:05 | 5 | Q.  Were you analyzing any of the approximately 400 files for |
| 11:11:11 | 6 | which the plaintiffs had not obtained a criminal defense file |
| 11:11:13 | 7 | to make any comparison? |
| 11:11:14 | 8 | A.  I didn't examine those files. |
| 11:11:16 | 9 | Q.  And we didn't request those 400 or so files? |
| 11:11:19 | 10 | A.  No. |
| 11:11:19 | 11 | Q.  It was they who chose that 59 files to put in play in this |
| 11:11:23 | 12 | case? |
| 11:11:23 | 13 | A.  That's correct. |
| 11:11:23 | 14 | Q.  Counsel asked you questions about some of the pages we |
| 11:11:32 | 15 | went through yesterday with just the name of an individual on |
| 11:11:36 | 16 | a handwritten note.  Do you remember those? |
| 11:11:37 | 17 | A.  Yes. |
| 11:11:37 | 18 | Q.  And did you look through the state's attorney's files, the |
| 11:11:44 | 19 | information in the state's attorney's files and available for |
| 11:11:46 | 20 | those names when there was just a name? |
| 11:11:48 | 21 | MR. LOEVY:  Your Honor, objection, covered on direct, |
| 11:11:50 | 22 | your Honor. |
| 11:11:51 | 23 | THE COURT:  Sustained. |
| 11:11:51 | 24 | BY MR. NOLAND: |
| 11:11:58 | 25 | Q.  Do you remember counsel showed you the stipulation, a |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/08/16 AM
Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 66 of 125 PageID #:65533
***REALTIME UNEDITED TRANSCRIPT ONLY***

65

| | | |
|---|---|---|
| 11:12:04 | 1 | stipulation yesterday, a one paragraph of it, it talked about |
| 11:12:07 | 2 | the Donnell Johnson case? |
| 11:12:10 | 3 | A. I recall that, yes. |
| 11:12:11 | 4 | Q. And that was the one case in which there was a printing |
| 11:12:14 | 5 | error at the state's attorney's office for one of these files? |
| 11:12:16 | 6 | A. That's correct. |
| 11:12:19 | 7 | MR. LOEVY: Objection, one case, your Honor. |
| 11:12:20 | 8 | THE COURT: Rephrase the question. A case. |
| 11:12:25 | 9 | Otherwise, it's argumentative. |
| 11:12:26 | 10 | BY MR. NOLAND: |
| 11:12:26 | 11 | Q. Are you aware of any other case in which there was a |
| 11:12:28 | 12 | printing error at the state's attorney's office? |
| 11:12:30 | 13 | A. No. |
| 11:12:30 | 14 | Q. And in fact, the stipulation reads, Mr. Loevy read you -- |
| 11:12:41 | 15 | MR. NOLAND: Your Honor, could I have the ELMO, |
| 11:12:43 | 16 | employees? |
| 11:12:43 | 17 | THE COURT: Yes. Witness only, not the jury. There |
| 11:12:48 | 18 | you go. |
| 11:12:48 | 19 | BY MR. NOLAND: |
| 11:12:54 | 20 | Q. Mr. Loevy read you the paragraph 24 about the state's |
| 11:12:58 | 21 | attorney's office didn't know exactly who was the clerical |
| 11:13:00 | 22 | employee who printed the file out, right? |
| 11:13:02 | 23 | A. Right. |
| 11:13:02 | 24 | Q. The very next paragraph, paragraph 25 that wasn't showed |
| 11:13:06 | 25 | to you reads as follows after discovery of this printing |

11:13:09   1   error, the cc SAO in the meantimed all disks with documents in

11:13:12   2   all files that the cc SAO produced.  The cc SAO checked and

11:13:19   3   confirmed that there are no other disks in the cc SAO files

11:13:23   4   with documents with the area central basement files on them;

11:13:29   5   is that correct?

11:13:29   6   A.  That's correct.

11:13:29   7   Q.  That's what they stipulated, the plaintiffs and defendant

11:13:35   8   estimated to?

11:13:35   9   A.  That's my understanding.

11:13:37   10  Q.  Did you rely on any of those documents in your analysis in

11:13:39   11  this case?

11:13:40   12  A.  No, I analyzed it as they were not found.

11:13:42   13  Q.  And, again, turning to the stipulation with respect to the

11:13:48   14  Donnell Johnson case, it reads, with respect to that case,

11:13:54   15  Mr. Murray does not claim in his report that the pages with

11:13:57   16  the area central basement Bates stamped printed from the disk

11:14:00   17  in the d-o-n-n-e-l-l-Johnson file were in the prosecution

11:14:04   18  files at any relevant time, right?

11:14:06   19  A.  That's correct.

11:14:06   20  Q.  Counsel also asked you about whether or not -- whether or

11:14:16   21  not the files, the state's files that were compared with the

11:14:20   22  43 files were the trial files.  Do you remember that?

11:14:22   23  A.  Yes.

11:14:23   24  Q.  And there were questions that there were two, only two

11:14:26   25  files with post conviction materials in them?

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | |
|---|---|
| 11:14:29 | 1 | A.  That's correct. |
| 11:14:29 | 2 | Q.  Mr. Murray, can you explain to the jury what the -- |
| 11:14:34 | 3 | MR. LOEVY:  Your Honor, it doesn't say.  It says at |
| 11:14:35 | 4 | least two.  Inaccurate statement. |
| 11:14:40 | 5 | THE COURT:  Just proceed ahead. |
| 11:14:41 | 6 | BY MR. NOLAND: |
| 11:14:42 | 7 | Q.  How many post conviction -- how many of these 43 files |
| 11:14:46 | 8 | were there post conviction materials? |
| 11:14:47 | 9 | A.  Maybe two.  I was examining the state's attorney's |
| 11:14:55 | 10 | office's trial file and that is different than the post |
| 11:14:58 | 11 | conviction file. |
| 11:15:00 | 12 | Q.  Explain how the difference between a trial file and a post |
| 11:15:04 | 13 | conviction file and why the post conviction materials wouldn't |
| 11:15:07 | 14 | have the times of documents that you were reviewing? |
| 11:15:09 | 15 | A.  ^ trial documents are the type of files we would be |
| 11:15:14 | 16 | discussing during my testimony where the prosecutor is trying |
| 11:15:17 | 17 | to obtain the investigative material, the typed up |
| 11:15:22 | 18 | supplementary reports, /RAERPs, lab sheets, rap sheets, all |
| 11:15:28 | 19 | that type of stuff in order to prepare for trial.  A post |
| 11:15:31 | 20 | conviction file is something that happens after someone has |
| 11:15:34 | 21 | been convicted, maybe even years later where they're seeking |
| 11:15:38 | 22 | to have their conviction overturned.  That type of file is |
| 11:15:41 | 23 | primarily legal documents, like file by someone seeking to |
| 11:15:45 | 24 | have their conviction overturned, maybe a reply legal document |
| 11:15:50 | 25 | from the prosecutor, there may be some documents that are |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 69 of 125 PageID #:65536
12/08/16 AM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

68

11:15:52   1   added to it, maybe a transcript is relevant from the trial for

11:15:55   2   that type of proceeding.  It is not trial file from the

11:15:59   3   nature.  It doesn't include any of the police reports unless

11:16:01   4   there's a report that's at issue and that file is maintained

11:16:05   5   separately from the trial file.

11:16:06   6   Q.  Counsel asked you some questions yesterday about how much

11:16:12   7   time you spent on the case.  Do you remember those?

11:16:14   8   A.  Yes.

11:16:14   9   Q.  And you spent I think as of now about 413 or now that

11:16:19  10   you've testified for a couple hours, maybe 416, 417 hours?

11:16:23  11   A.  Yes.

11:16:23  12   Q.  And do you remember how much time you spent up to your

11:16:27  13   deposition?

11:16:28  14   A.  Up to the deposition?

11:16:30  15   Q.  Yes.  At the time of the deposition through the

11:16:32  16   deposition.

11:16:32  17   A.  I think it was approximately 330.

11:16:34  18   Q.  Do you recall how long Mr. Brasfield said he spent up

11:16:39  19   through the time of his deposition after his review of the

11:16:45  20   chart and all the analysis that he has in his lengthy report?

11:16:48  21        MR. LOEVY:  Objection, your Honor.

11:16:49  22        THE COURT:  Sustained.

11:16:49  23   BY MR. NOLAND:

11:16:51  24   Q.  Mr. Murray, could you have done a professional and

11:16:53  25   thorough analysis in this case if you had only spent 60 hours?


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

11:16:56  1    A.  No.

11:16:57  2    Q.  Why not?

11:16:57  3    A.  Examining the documents that were missing from the

11:17:02  4    prosecutor's file to determine their relevance to the case

11:17:06  5    takes far more time than that.

11:17:14  6              MR. NOLAND:  Your Honor, may I have the ELMO with the

11:17:16  7    jury?  These are documents that are in evidence.

11:17:20  8              THE COURT:  Okay.

11:17:21  9    BY MR. NOLAND:

11:17:23  10   Q.  Talking about the Cecil Robinson subpoena.  Do you

11:17:27  11   remember questions yesterday about this memo that counsel

11:17:30  12   suggested a subpoena was sent for the Cecil Robinson

11:17:35  13   investigative file and this message was sent in return from

11:17:39  14   area three.  Do you remember that?

11:17:40  15   A.  Yes.

11:17:41  16   Q.  Can you explain to the jury what happened with respect to

11:17:43  17   the Cecil Robinson subpoena and this document in front of you?

11:17:46  18   A.  The Cecil Robinson murder did not happen in area three.

11:17:52  19   It happened in area 4 as the police areas were designated at

11:17:58  20   that time, and it was like a six year gap between the crime

11:18:03  21   happening and it being solved.  So when the request was sent

11:18:07  22   out to gather the material, it was sent to the wrong area,

11:18:10  23   area three was the wrong area.  So this letter reflects they

11:18:16  24   searched for documents not knowing whether the case was theirs

11:18:20  25   or not and they didn't find any documents there.

11:18:22   1   Q.  Would that be expected because they didn't investigate the

11:18:24   2   case?

11:18:24   3   A.  Because, yeah, the file would not have been stored there

11:18:29   4   initially or at any time actually.

11:18:31   5   Q.  Mr. Murray, I'm showing you a document from the state's

11:18:36   6   attorney's file in the case on the Cecil Robinson case.  You

11:18:39   7   reviewed this; is that right?

11:18:41   8   A.  Yes.

11:18:41   9   Q.  And you also reviewed that file, the Cecil Robinson state

11:18:47  10   file and investigative file, right?

11:18:49  11   A.  Yes.

11:18:49  12   Q.  And was there evidence you found that in fact the

11:18:52  13   investigative in the Cecil Robinson case had been provided to

11:18:56  14   the prosecutors?

11:18:56  15   A.  Yes.

11:18:56  16   Q.  What is this document indicate, Mr. Murray, with respect

11:19:01  17   to the Cecil Robinson case?

11:19:03  18   A.  These are documents that the prosecutors ordered and then

11:19:06  19   if they had received them.

11:19:08  20   Q.  And so under the ordered section, it shows that the street

11:19:12  21   file was ordered by the prosecutors on May 17th.  It looks

11:19:16  22   like 1987; is that right?

11:19:17  23   A.  Yes.

11:19:17  24   Q.  And then under the received column?

11:19:20  25   A.  Or 89, maybe.

| 11:19:22 | 1 | Q. Or 89. Under the received column it shows that the |
|---|---|---|
| 11:19:25 | 2 | prosecutors received the street file on June 16th, 1989? |
| 11:19:29 | 3 | A. Yes. |
| 11:19:36 | 4 | MR. NOLAND: May I have a moment, your Honor? |
| 11:19:40 | 5 | (Brief pause.) |
| 11:20:06 | 6 | MR. NOLAND: No further questions, your Honor. |
| 11:20:07 | 7 | THE COURT: We are going to take a break here for ten |
| 11:20:09 | 8 | minutes. I will take the jury out and be right back. |
| 11:20:48 | 9 | (The jury leaves the courtroom.). |
| 11:20:48 | 10 | THE COURT: Mr. Kulwin, is there going to be |
| 11:20:50 | 11 | anything. |
| 11:20:51 | 12 | MR. KULWIN: No. |
| 11:20:52 | 13 | THE COURT: No. Mr. Loevy, before you do the cross |
| 11:20:55 | 14 | or recross, if there is going to be recross, how long is it |
| 11:20:58 | 15 | going to be? |
| 11:20:58 | 16 | MR. LOEVY: Ten minutes. |
| 11:20:59 | 17 | THE COURT: Look, I am telling everybody. You guys |
| 11:21:02 | 18 | aren't budgeting your time. You're all I think operating on |
| 11:21:05 | 19 | the assumption that you are going to get more time than I |
| 11:21:08 | 20 | already have given you extra. Don't assume that. Don't |
| 11:21:13 | 21 | assume it. |
| 11:21:14 | 22 | MR. LOEVY: 7 and a half minutes. |
| 11:21:15 | 23 | MR. KULWIN: I am not assuming it. |
| 11:21:16 | 24 | THE COURT: Take a 10-minute break. |
| 11:21:19 | 25 | (Short break.) |

Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 73 of 125 PageID #:65540
12/08/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

72

| | | |
|---|---|---|
| 11:33:06 | 1 | (The jury enters the courtroom.) |
| 11:33:06 | 2 | THE COURT:  Everybody can have a seat. |
| 11:33:10 | 3 | Mr. Loevy. |
| 11:33:15 | 4 | - - - |
| 11:33:15 | 5 | ^ WITNAME, RECROSS-EXAMINATION |
| 11:33:15 | 6 | BY MR. LOEVY: |
| 11:33:15 | 7 | BY MR. LOEVY: |
| 11:33:16 | 8 | Q.  Mr. Murray, Mr. Noland showed you the part of the |
| 11:33:18 | 9 | stipulation about the disks about the area basement files |
| 11:33:22 | 10 | being cut off at the bottom.  Do you remember that? |
| 11:33:24 | 11 | A.  Yes. |
| 11:33:25 | 12 | Q.  I'm going to show you a cut out here with two pages 0063 |
| 11:33:30 | 13 | and Nate Fields 5627.  This is an example of a page from that |
| 11:33:37 | 14 | file, the done he will Johnson file where it was supposed to |
| 11:33:41 | 15 | ^  look like the one on the left when the police department |
| 11:33:43 | 16 | provided it to the state's attorney, correct? |
| 11:33:46 | 17 | A.  Yes. |
| 11:33:46 | 18 | Q.  And then when it got into the state's attorney's file, |
| 11:33:49 | 19 | you'd be able to tell that this came from the 2014 production, |
| 11:33:54 | 20 | not back in the day, right? |
| 11:33:55 | 21 | A.  Yes. |
| 11:33:56 | 22 | Q.  But when the state's attorney printed it and put it in the |
| 11:34:00 | 23 | file, they somehow enlarged and shrunk and enlarged and shrunk |
| 11:34:04 | 24 | in a way that the marking got disappeared, right? |
| 11:34:07 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 11:34:08 | 1 | Q. So when you actually looked at the document in the state's |
| 11:34:11 | 2 | attorney's file, you were no longer able to tell on the face |
| 11:34:13 | 3 | of it if it got in originally or if it got in in 2014, right? |
| 11:34:18 | 4 | A. On that file, yes. |
| 11:34:19 | 5 | Q. All right. And you are not aware of how many other cases |
| 11:34:23 | 6 | might have been printed in that manner before the disk error |
| 11:34:26 | 7 | was caught, correct? |
| 11:34:28 | 8 | A. My understanding no other files were printed that way. |
| 11:34:31 | 9 | Q. But nobody knows, do they? |
| 11:34:33 | 10 | MR. NOLAND: Objection, Judge. |
| 11:34:34 | 11 | THE COURT: Objection to that question is sustained. |
| 11:34:37 | 12 | BY MR. LOEVY: |
| 11:34:38 | 13 | Q. You have no foundation to know how many files were printed |
| 11:34:41 | 14 | before or after that error -- sorry, before that error was |
| 11:34:45 | 15 | discovered, correct? |
| 11:34:45 | 16 | A. Well, from the agreement with the state's attorney's |
| 11:34:48 | 17 | office, I think that was the file. |
| 11:34:49 | 18 | Q. Well, what the agreement was after they caught the error, |
| 11:34:53 | 19 | they agreed to stop doing it, right? |
| 11:34:56 | 20 | MR. NOLAND: Objection, Judge. Mischaracterized the |
| 11:34:58 | 21 | stipulation. |
| 11:34:58 | 22 | THE COURT: Sustained. |
| 11:34:59 | 23 | BY MR. LOEVY: |
| 11:35:00 | 24 | Q. There is nothing on the stipulation about did we do this |
| 11:35:02 | 25 | inadvertently before we discovered the problem, correct? |

| 11:35:07 | 1 | THE COURT:  Overruled. |
| 11:35:08 | 2 | THE WITNESS:  I think it was just that file. |
| 11:35:10 | 3 | BY MR. LOEVY: |
| 11:35:14 | 4 | Q.  You were asked about your 94 percent figure.  This is not |
| 11:35:18 | 5 | a figure that was in your report, correct? |
| 11:35:21 | 6 | A.  No. |
| 11:35:22 | 7 | Q.  It was not a figure when we had a chance to interview you |
| 11:35:24 | 8 | at your deposition that you had come to? |
| 11:35:27 | 9 | A.  Correct. |
| 11:35:27 | 10 | Q.  So I have not gotten any chance to ask you questions about |
| 11:35:30 | 11 | it, would that be fair? |
| 11:35:32 | 12 | A.  Yes. |
| 11:35:32 | 13 | Q.  If I understand how you're coming up with this and I'm |
| 11:35:35 | 14 | trying to understand it, you are excluding categorically all |
| 11:35:40 | 15 | administrative documents, right?  Can we start with a yes, no? |
| 11:35:46 | 16 | A.  No. |
| 11:35:46 | 17 | Q.  You are only counting documents that you deemed to be |
| 11:35:48 | 18 | sufficiently investigative value? |
| 11:35:50 | 19 | A.  No. |
| 11:35:51 | 20 | Q.  All right.  Let me try and understand then. |
| 11:35:55 | 21 | This stack here is stuff that's missing, right? |
| 11:35:57 | 22 | A.  Yes, that's the same stack I have here, right? |
| 11:35:59 | 23 | Q.  All right.  And did you put these two stacks with the |
| 11:36:02 | 24 | stuff you say is not missing and the stuff that is missing, |
| 11:36:06 | 25 | then the difference is the 6 percent? |

12/08/16 AM

| | | |
|---|---|---|
| 11:36:08 | 1 | MR. NOLAND: Objection, Judge, mischaracterizes. |
| 11:36:11 | 2 | THE COURT: It's a question. |
| 11:36:12 | 3 | THE COURT: It's a question, I agree. The objection |
| 11:36:14 | 4 | is overruled. |
| 11:36:15 | 5 | THE WITNESS: No. |
| 11:36:17 | 6 | BY MR. LOEVY: |
| 11:36:20 | 7 | Q. What's missing and what's not missing is not 6 percent, |
| 11:36:24 | 8 | the stack to the left and the stack to the right is not 6 |
| 11:36:28 | 9 | percent, right? |
| 11:36:28 | 10 | A. What's still missing is from the total of the |
| 11:36:34 | 11 | investigative files. I can explain it. Do you want me to |
| 11:36:41 | 12 | explain it? |
| 11:36:41 | 13 | Q. Please. |
| 11:36:42 | 14 | A. Mr. Brasfield examined 59 files. That's the large stack |
| 11:36:47 | 15 | right here. And that compared to the criminal defense files |
| 11:36:52 | 16 | and he alleged a certain amount of pages from missing. So he |
| 11:36:55 | 17 | had the total universe of those documents to look and compare |
| 11:36:59 | 18 | and he only alleged a certain amount of documents were |
| 11:37:02 | 19 | missing. |
| 11:37:02 | 20 | Then I looked at the -- in conjunction with the |
| 11:37:07 | 21 | lawyers' looked at the prosecutor's files and found that there |
| 11:37:10 | 22 | were only a certain percentage of documents his missing and |
| 11:37:14 | 23 | then the analysis after that was to determine whether they |
| 11:37:17 | 24 | were relevant or whatever. So 94 percent of the investigative |
| 11:37:20 | 25 | files were accounted for. |

| 11:37:21 | 1 | Q. Because the investigative files contained a lot of the |
| 11:37:24 | 2 | supp reports, right? |
| 11:37:26 | 3 | A. Investigative files contained everything from the area. |
| 11:37:31 | 4 | Q. A the lot of the investigative file is just duplicates of |
| 11:37:35 | 5 | the regular official documents, right? |
| 11:37:36 | 6 | A. Incompetent wouldn't say they're duplicates. |
| 11:37:37 | 7 | Q. There's copies of the police reports in all the |
| 11:37:40 | 8 | investigative files, right? |
| 11:37:42 | 9 | A. There's copies in most of them, yes. |
| 11:37:44 | 10 | Q. So a lot of it in these investigative files is the same |
| 11:37:48 | 11 | stuff that the criminal defendant already had, right? |
| 11:37:51 | 12 | A. I don't know. I just -- Mr. Brasfield said this amount of |
| 11:37:58 | 13 | documents were not found in the criminal defense attorney |
| 11:38:01 | 14 | files and after he did that, after he compared it to the |
| 11:38:04 | 15 | police investigative files. |
| 11:38:05 | 16 | Q. But if there's ten pages that are withheld and those are |
| 11:38:08 | 17 | the pages with the notes, that could be the most important 6 |
| 11:38:14 | 18 | percent, right? |
| 11:38:14 | 19 | MR. NOLAND: Objection, incomplete hypothetical. |
| 11:38:16 | 20 | THE COURT: Sustained. Argumentative. |
| 11:38:17 | 21 | BY MR. LOEVY: |
| 11:38:19 | 22 | Q. Mr. Brasfield in fairness to him, all he said was I'm |
| 11:38:24 | 23 | going to do a rough analysis of the stuff that's in the |
| 11:38:27 | 24 | basement files and the stuff that's in the criminal defense |
| 11:38:30 | 25 | files and I am going to tell you what wasn't in it, right? |

| | | |
|---|---|---|
| 11:38:33 | 1 | A.  Yeah, that's how he started. |
| 11:38:35 | 2 | Q.  He didn't take a look at a blank page and give the opinion |
| 11:38:39 | 3 | that I as a law enforcement officer think this blank page had |
| 11:38:42 | 4 | investigative value, that was not his opinion, was it? |
| 11:38:45 | 5 | A.  That's where he listed it in his chart. |
| 11:38:47 | 6 | Q.  All he did was list every page, right? |
| 11:38:49 | 7 | A.  Without any qualitative analysis on it, so he -- by fact |
| 11:38:57 | 8 | he's claiming it's investigative material. |
| 11:39:00 | 9 | Q.  If we paid him a hundred thousand dollars, he could have |
| 11:39:03 | 10 | gone page by page? |
| 11:39:05 | 11 | MR. NOLAND:  Objection. |
| 11:39:06 | 12 | THE COURT:  Sustained. |
| 11:39:08 | 13 | BY MR. LOEVY: |
| 11:39:09 | 14 | Q.  He's saying I got a stack of stuff that's missing, plenty |
| 11:39:12 | 15 | of it is worthless and some of it is not.  That's |
| 11:39:15 | 16 | Mr. Brasfield's opinion, right? |
| 11:39:17 | 17 | A.  That's not his opinion. |
| 11:39:18 | 18 | THE COURT:  Mr. Loevy, at some point, you are going |
| 11:39:20 | 19 | to need to save this part for argument. |
| 11:39:23 | 20 | MR. LOEVY:  I'm oh done. |
| 11:39:24 | 21 | THE COURT:  Is there anything else? |
| 11:39:27 | 22 | - - - |
| 11:39:27 | 23 | BERNARD MURRAY, REDIRECT EXAMINATION |
| 11:39:27 | 24 | BY MR. NOLAND: |
| 11:39:27 | 25 | Q.  That Donnell Johnson page that he put up again, did you |

| 11:39:30 | 1 | rely upon that page in any way in your analysis? |
| 11:39:33 | 2 | A.  No. |
| 11:39:33 | 3 | Q.  Did you rely upon any of the pages from that case that had |
| 11:39:38 | 4 | been cut off in your analysis? |
| 11:39:39 | 5 | A.  No. |
| 11:39:40 | 6 |      MR. NOLAND:  No further questions. |
| 11:39:41 | 7 |      THE COURT:  Do any of the jurors have any questions |
| 11:39:42 | 8 | for the witness?  Go ahead and pass them down. |
| 11:40:01 | 9 |   (The following proceedings were had at sidebar outside the |
| 11:40:09 | 10 | hearing of the jury:) |
| 11:40:09 | 11 |      THE COURT:  ^  I am just going to read this.  If you |
| 11:40:19 | 12 | agree that a chronological log or inventory of files is |
| 11:40:22 | 13 | administrative, administrative in quotes, and you said the log |
| 11:40:26 | 14 | that is missing out information with the GPR with the two |
| 11:40:31 | 15 | different dates noted in the Smith/Hickman was exculpatory, |
| 11:40:34 | 16 | why did you state a few minutes later administrative dates are |
| 11:40:39 | 17 | not exculpatory.  The objection is sustained.  Argumentative. |
| 11:40:41 | 18 |      All right.  Is it common for documents to be in the |
| 11:40:45 | 19 | state's attorney's file and then not be there later.  If this |
| 11:40:50 | 20 | happens, why wouldn't they be here 20 years later or 30 years |
| 11:40:55 | 21 | later for example?  What about that? |
| 11:40:57 | 22 |      MR. LOEVY:  Can I read it?  ^  I have no objection |
| 11:41:05 | 23 | because I don't understand it. |
| 11:41:09 | 24 |      THE COURT:  Okay. |
| 11:41:14 | 25 |   (The following proceedings were had in open court in the |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11:41:14  1  presence and hearing of the jury:)

11:41:14  2       THE COURT:  So one of the questions I am not going to

11:41:17  3  ask.  The other one I am.

11:41:20  4       So in your experience, would it be common for

11:41:28  5  documents to be in the state's attorney's file at one point

11:41:32  6  and then go missing later and not be there later, is that a

11:41:36  7  common thing?

11:41:37  8       THE WITNESS:  Not a common thing, but over years.

11:41:41  9       THE COURT:  Okay.

11:41:41  10       THE WITNESS:  Documents can go missing.

11:41:45  11       THE COURT:  Can you give a couple of examples of why

11:41:47  12  that might happen based on your experience of course.

11:41:50  13       THE WITNESS:  Based upon my experience, if you're

11:41:52  14  getting ready for trial, you have all the relevant documents

11:41:55  15  you need for trial, and after discovery is all done, you go to

11:41:59  16  trial, you used the documents, now you got to store your

11:42:02  17  state's attorney file in the warehouse.  All the documents

11:42:05  18  that you gathered during discovery, you might not have kept in

11:42:09  19  your trial file when you send it to the warehouse.  That's one

11:42:12  20  example of how some documents that you went originally might

11:42:15  21  have went missing.

11:42:15  22       THE COURT:  Okay.  Follow-up based on that?

11:42:20  23       MR. LOEVY:  Yes, your Honor.

11:42:21  24  BY MR. LOEVY:

11:42:21  25  Q.  The rules require the lawyers to maintain the integrity of

12/08/16 AM

Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 81 of 125 PageID #:65548
***REALTIME UNEDITED TRANSCRIPT ONLY***

80

| 11:42:27 | 1 | the files? |
| 11:42:28 | 2 | A.  Yes. |
| 11:42:28 | 3 | Q.  And that's something you all took seriously? |
| 11:42:30 | 4 | A.  Yes. |
| 11:42:31 | 5 | MR. LOEVY:  I have no further questions. |
| 11:42:32 | 6 | MR. NOLAND:  No questions. |
| 11:42:33 | 7 | THE COURT:  You are excused.  Please call the next |
| 11:42:36 | 8 | witness. |
| 11:42:38 | 9 | MR. BURNS:  Your Honor, we call Jeffrey noble. |
| 11:43:59 | 10 | (Witness sworn.) |
| 11:44:07 | 11 | MR. BURNS:  May I proceed? |
| 11:44:08 | 12 | THE COURT:  Go ahead. |
| 11:44:09 | 13 | MR. BURNS:  Thank you. |
| 11:44:10 | 14 | - - - |
| 11:44:10 | 15 | ^ WITNAME, DIRECT EXAMINATION |
| 11:44:11 | 16 | BY MR. NOLAND: |
| 11:44:11 | 17 | BY MR. BURNS: |
| 11:44:11 | 18 | Q.  Good morning? |
| 11:44:12 | 19 | A.  Good morning, sir. |
| 11:44:13 | 20 | Q.  Would you kindly tell the ladies and gentlemen of the jury |
| 11:44:16 | 21 | your name and for the benefit of the record, spell your last |
| 11:44:19 | 22 | name? |
| 11:44:19 | 23 | A.  Jeff noble, n-o-b-l-e- |
| 11:44:21 | 24 | Q.  Mr. Noble, will you tell the ladies and gentlemen of the |
| 11:44:25 | 25 | jury what your profession or occupation is? |

| | | |
|---|---|---|
| 11:44:27 | 1 | A.  I am a consultant for police practices. |
| 11:44:30 | 2 | Q.  A consultant for police practices.  Help us out.  What is |
| 11:44:34 | 3 | police practices? |
| 11:44:35 | 4 | A.  I was a police officer for almost 30 years and as a |
| 11:44:41 | 5 | consultant for police practices, what I do is I consult /W-P |
| 11:44:45 | 6 | police agencies, sometimes with cities regarding a variety of |
| 11:44:48 | 7 | issues from internal affairs investigations to disciplinary |
| 11:44:52 | 8 | issues, use much force pursuits, supervision, policies, |
| 11:44:59 | 9 | administrative issues with police. |
| 11:45:01 | 10 | Q.  As a result of that experience and the work that you do, |
| 11:45:06 | 11 | are you familiar with police practices throughout the country? |
| 11:45:08 | 12 | A.  I am. |
| 11:45:09 | 13 | Q.  And furthermore, are you familiar in terms of given your |
| 11:45:16 | 14 | experience how different /TKEPLTS will deal with subjects such |
| 11:45:21 | 15 | as working files or investigative files? |
| 11:45:23 | 16 | A.  Yes, sir, I am. |
| 11:45:25 | 17 | Q.  So you told us you were in law enforcement; is that |
| 11:45:28 | 18 | correct? |
| 11:45:28 | 19 | A.  Yes, sir. |
| 11:45:29 | 20 | Q.  Would you tell us a little bit more about your experience |
| 11:45:31 | 21 | in law enforcement. |
| 11:45:33 | 22 | A.  I became a police officer in 1984 in I are vine |
| 11:45:38 | 23 | California, I are vine is a city that's got a population of |
| 11:45:42 | 24 | about 15,000, 200 police officers in orange county, south of |
| 11:45:50 | 25 | Disneyland, just New Port beach.  I began there as a police |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 11:45:56 | 1 | officer, I worked as an officer in patrol for about four |
| 11:45:59 | 2 | years. |
| 11:46:00 | 3 | A.  In the late '80s, I was assigned to a narcotics unit.  I |
| 11:46:04 | 4 | did narcotics for about four and a half years in an undercover |
| 11:46:07 | 5 | capacity.  /STKPWHR-FRPBLT went back to patrol for a short |
| 11:46:10 | 6 | period of time, was promoted to sergeant.  As a sergeant, I |
| 11:46:14 | 7 | supervised ^ pat ^ Pat ROM unit, then I was assigned to a |
| 11:46:17 | 8 | variety of positions.  I was a sergeant for about ten years. |
| 11:46:21 | 9 | I was assigned to emergency management, I was assigned to our |
| 11:46:25 | 10 | training unit for about two years in our training unit, not |
| 11:46:31 | 11 | only was I responsible for hiring but training all the current |
| 11:46:34 | 12 | officers, ensuring that all of our new officers went to the |
| 11:46:37 | 13 | police academy, that they were getting qualified, but I was |
| 11:46:40 | 14 | also responsible for the department's policy manual during |
| 11:46:43 | 15 | that period of time, so I reviewed all of our policies, I |
| 11:46:46 | 16 | would write policies.  If the chief wanted to change policies |
| 11:46:49 | 17 | or I wanted to make a recommendation for change in policy, I |
| 11:46:52 | 18 | would do that.  I was also as a sergeant in our internal |
| 11:46:56 | 19 | affairs unit for about four years.  I was a swat sergeant for |
| 11:47:03 | 20 | seven years which is a collateral assignment.  I did that in |
| 11:47:06 | 21 | addition to what I was -- my primary assignment of sergeant. |
| 11:47:10 | 22 | I was then promoted to lieutenant.  As a lieutenant I was a |
| 11:47:14 | 23 | watch commander in a patrol.  I was a lieutenant for about |
| 11:47:18 | 24 | three months before I was promoted to commander.  As a |
| 11:47:22 | 25 | commander, the city of I are vine is the chief of police, one |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 11:47:26 | 1 | deputy chief and then three commanders.  Each commander was |
| 11:47:30 | 2 | responsible for about a third of the city, so my area of |
| 11:47:33 | 3 | responsibility for the eight years that I was a commander was |
| 11:47:37 | 4 | what we call the university area which is the southern portion |
| 11:47:40 | 5 | of the city which is if you're familiar with southern |
| 11:47:43 | 6 | California is the area around Jon Wayne /AEURPBT, university |
| 11:47:47 | 7 | of California I are vine is within the city of I are vine, it |
| 11:47:51 | 8 | actually has its own police department but I was the liaison, |
| 11:47:55 | 9 | and because their police department was small, if I go in |
| 11:48:00 | 10 | happened, the I are vine police department would take over |
| 11:48:03 | 11 | because it was technically within our city.  /STKPWHR-FRPBLT |
| 11:48:05 | 12 | and then after being a commander for eight years, I was a dep |
| 11:48:09 | 13 | /AOUPT chief for the last years of my career. |
| 11:48:11 | 14 | Q.  In your experience, you talked a little bit about |
| 11:48:14 | 15 | responsibility for reviewing and developing policies; is that |
| 11:48:17 | 16 | correct? |
| 11:48:17 | 17 | A.  Yes. |
| 11:48:18 | 18 | Q.  Just so it's clear, how long a period of time were you |
| 11:48:21 | 19 | with the I are vine California police department? |
| 11:48:24 | 20 | A.  I was there for 28 years before I retired. |
| 11:48:26 | 21 | Q.  And part of that experience was the review and drafting of |
| 11:48:29 | 22 | policies.  Did those policies include policies relative to |
| 11:48:34 | 23 | investigative notes taken during the course of homicides? |
| 11:48:37 | 24 | A.  No, we didn't have a specific policy regarding |
| 11:48:41 | 25 | investigative notes. |

| | | |
|---|---|---|
| 11:48:42 | 1 | Q.  You did not? |
| 11:48:42 | 2 | A.  No, sir. |
| 11:48:43 | 3 | Q.  Okay.  We will come back to that. |
| 11:48:46 | 4 | Tell me, if you would, beyond the experience in I are |
| 11:48:49 | 5 | vine, were you further involvement in law enforcement? |
| 11:48:51 | 6 | A.  For about the last 12 years, even while I was still |
| 11:48:54 | 7 | working with ire vine, I started doing some consulting work |
| 11:48:59 | 8 | that mostly consisted of doing witness work like I am today, |
| 11:49:04 | 9 | but also consists of working with police departments directly. |
| 11:49:08 | 10 | Sometimes I've been hired by cities like the city of San |
| 11:49:12 | 11 | Francisco and the say of Austin when they would have a mainly |
| 11:49:18 | 12 | event in their city, in Austin, it was two officer involved |
| 11:49:23 | 13 | shootings, in San Francisco, it was the indictment of nine |
| 11:49:26 | 14 | members of their command staff where internal investigations |
| 11:49:28 | 15 | were conducted and the city's lacked some confidence or had |
| 11:49:32 | 16 | some concerns regarding those investigations and I was hired |
| 11:49:34 | 17 | as a consultant to review those investigations to determine |
| 11:49:37 | 18 | the reasonableness ^  of the investigation that was conducted. |
| 11:49:41 | 19 | I've also been hired as a consultant in cities like |
| 11:49:44 | 20 | Seattle based on a consent decree and reviewed all their use |
| 11:49:50 | 21 | of force incidents for a year to look at the reasonableness |
| 11:49:55 | 22 | and the completeness and thoroughness of their use of force |
| 11:49:59 | 23 | investigations as they worked with the monitor that was |
| 11:50:01 | 24 | appointed by the federal court to monitor the city of Seattle. |
| 11:50:05 | 25 | Q.  In cases in which you have acted as an expert, you said |

| | | |
|---|---|---|
| 11:50:11 | 1 | such as cases as we are here today, correct? |
| 11:50:14 | 2 | A. Yes. |
| 11:50:14 | 3 | Q. And on those cases, are you typically just involved on |
| 11:50:18 | 4 | behalf of police departments or law enforcement agencies? |
| 11:50:20 | 5 | A. No, I have been retained as an expert witness probably in |
| 11:50:25 | 6 | excess of 125 times, and pretty even split between plaintiffs, |
| 11:50:30 | 7 | people suing the police, and police departments, and I've also |
| 11:50:34 | 8 | been retained in criminal trials where police officers are |
| 11:50:40 | 9 | being prosecuted and each of those times I was re/TAEUPBLD by |
| 11:50:44 | 10 | the prosecutor's office to offer opinions where I felt an |
| 11:50:48 | 11 | officer had done something improperly and they were being |
| 11:50:51 | 12 | criminally prosecuted. |
| 11:50:52 | 13 | Q. Have you given expert testimony in courts around the |
| 11:50:55 | 14 | country? |
| 11:50:55 | 15 | A. I have. |
| 11:50:56 | 16 | Q. And that both in federal and state courts? |
| 11:50:58 | 17 | A. It is, yes. |
| 11:50:59 | 18 | Q. Tell us a little bit, if you would, just briefly, about |
| 11:51:02 | 19 | your educational background in addition to your experience in |
| 11:51:05 | 20 | law enforcement. |
| 11:51:06 | 21 | A. I have a bachelors degree in criminal justice at Cal tech, |
| 11:51:14 | 22 | while I was working as a police officer, I went to law school, |
| 11:51:17 | 23 | a university in I are vine offered a program where you went |
| 11:51:22 | 24 | part-time. So I went to law school. I graduated, passed the |
| 11:51:26 | 25 | bar. I am licensed in the State of Illinois as an attorney. |

| | | |
|---|---|---|
| 11:51:29 | 1 | I never really practiced law.  When I got out of law school, I |
| 11:51:33 | 2 | worked on a part-time basis as a law firm to see if I liked |
| 11:51:37 | 3 | it.  That was in the early '90s.  Since then I haven't |
| 11:51:40 | 4 | practiced law at all. |
| 11:51:40 | 5 | Q.  Tell us a little bit more about your involvement in terms |
| 11:51:43 | 6 | of police practices.  Have you been called upon to give |
| 11:51:48 | 7 | lectures to various /TKPWRAOUPLS or entities relative to |
| 11:51:52 | 8 | police practices? |
| 11:51:52 | 9 | A.  Yes. |
| 11:51:52 | 10 | Q.  And where has that been, if you could elaborate? |
| 11:51:54 | 11 | A.  Just -- I made presentations for the international |
| 11:51:59 | 12 | associations of chiefs of police I A.C. P, they do an annual |
| 11:52:03 | 13 | conference.  It's about 10,000 people.  I have /TAUBGT |
| 11:52:10 | 14 | conferences there three or four times.  I have taught for the |
| 11:52:15 | 15 | department of the federal Department of Justice through cops |
| 11:52:19 | 16 | office, I have been retained by the Mexican government to go |
| 11:52:23 | 17 | to Mexico to teach the state and federal police about how to |
| 11:52:27 | 18 | conduct internal affairs investigations. |
| 11:52:29 | 19 | Q.  Have you also contributed to professional literature |
| 11:52:33 | 20 | within your area of discipline and expertise? |
| 11:52:36 | 21 | A.  I have.  I drafted and published about 20 articles for |
| 11:52:40 | 22 | policing magazines, one case in an academy journal, a couple |
| 11:52:48 | 23 | articles in Atlantic magazine, I published a textbook on |
| 11:52:52 | 24 | managing accountability for police about how to conduct an |
| 11:52:57 | 25 | internal affairs investigation, and I published a couple |

| 11:52:59 | 1 | chapters in college level textbooks. |
| 11:53:04 | 2 | Q. As part of your work in dealing with matters such as |
| 11:53:08 | 3 | you're involved here over the past many years, you said over |
| 11:53:12 | 4 | the past 10 to 12 years; is that correct? |
| 11:53:14 | 5 | A. Yes. |
| 11:53:14 | 6 | Q. Have you ever been involved in work on behalf of the |
| 11:53:17 | 7 | Chicago Police Department? I don't want to get into the |
| 11:53:19 | 8 | specifics of it, but have you been involved with that work? |
| 11:53:21 | 9 | A. I have. |
| 11:53:22 | 10 | Q. And over what period of time? |
| 11:53:23 | 11 | A. The last 12 years. |
| 11:53:24 | 12 | Q. Are you being compensated for your time here today, your |
| 11:53:29 | 13 | professional time? |
| 11:53:30 | 14 | A. Yes, I am. |
| 11:53:31 | 15 | Q. And what is your hourly rate of compensation, sir, if you |
| 11:53:35 | 16 | would share that with us? |
| 11:53:36 | 17 | A. $295 an hour. |
| 11:53:37 | 18 | Q. Now, if I may, Mr. Noble, I'd like to direct your |
| 11:53:41 | 19 | attention to approximately June of this year, earlier this |
| 11:53:44 | 20 | year in June, were you engaged by my firm to become involved |
| 11:53:48 | 21 | to review certain policies relative to the Chicago Police |
| 11:53:52 | 22 | Department? |
| 11:53:52 | 23 | A. Yes,sir, I was. |
| 11:53:54 | 24 | Q. And as part of that engagement, were you provided with |
| 11:53:59 | 25 | certain materials relative to your review? |

11:54:01  1  A.  Yes, I was.

11:54:02  2  Q.  And I don't want to go in -- I know we have your report.

11:54:06  3  I believe there are approximately two pages of material, but

11:54:08  4  could you highlight in essence the materials that were

11:54:11  5  provided to you for the ladies and gentlemen of the jury.

11:54:14  6  A.  Sure.  I was provided copies of the policies that are at

11:54:18  7  issue in this case.  I reviewed deposition testimony and trial

11:54:23  8  testimony from director Hickey, Mr. Brasfield's report,

11:54:29  9  Mr. Brasfield's deposition in this case and some other cases

11:54:34  10  where Mr. Brasfield has testified, I reviewed the depositions

11:54:37  11  of detectives brown and /KOL bee who worked in the subpoena

11:54:41  12  unit.  That's generally it.

11:54:46  13  Q.  Were you asked to address the issue of the working files

11:54:53  14  or street files as we have heard that terminology before?

11:54:57  15  A.  Yes.

11:54:58  16  Q.  And beyond that were you also asked about retention of

11:55:00  17  that information, materials that might have been obtained

11:55:04  18  through working or street files?

11:55:05  19  A.  Yes, I was.

11:55:06  20  Q.  Did you also address the issue of the subpoena unit and

11:55:09  21  how the Chicago Police Department responds to subpoenas in

11:55:13  22  matters in which violent crimes have been charged against

11:55:17  23  individuals and the response by the Chicago Police Department?

11:55:19  24  A.  Yes.

11:55:19  25  Q.  So let's begin then, if we may.

| 11:55:23 | 1 | I'd like to direct your attention -- |
| 11:55:27 | 2 | MR. BURNS: Your Honor, is the computer? |
| 11:55:29 | 3 | BY MR. BURNS: |
| 11:55:30 | 4 | Q. To Defendant's Exhibit No. 54. Are you able to see that, |
| 11:55:42 | 5 | sir? |
| 11:55:42 | 6 | A. Yes. |
| 11:55:42 | 7 | Q. And this is a detective division special order number |
| 11:55:48 | 8 | 83-1. Do you see that? |
| 11:55:49 | 9 | A. Yes. |
| 11:55:49 | 10 | Q. And are you familiar with that based on your review in |
| 11:55:52 | 11 | this case? |
| 11:55:53 | 12 | A. Yes, I am. |
| 11:55:54 | 13 | Q. And when in fact was that issued? |
| 11:55:56 | 14 | A. February 3, 1983. |
| 11:55:59 | 15 | Q. February -- that's the effective date? |
| 11:56:02 | 16 | A. Yes. |
| 11:56:02 | 17 | Q. And immediately to the left it specifies the date that the |
| 11:56:05 | 18 | order was issued; is that correct? |
| 11:56:07 | 19 | A. Yes, that's January 13, 1983. |
| 11:56:09 | 20 | Q. And that special order was issued by the chief of |
| 11:56:15 | 21 | detectives is that also correct? |
| 11:56:17 | 22 | A. Yes, sir. |
| 11:56:17 | 23 | Q. And that is at the time was a will yam has been heart? |
| 11:56:25 | 24 | A. Yes, sir. |
| 11:56:25 | 25 | Q. What was the subject of '83-1 ^ ? |

11:56:28  1   A.  This was a policy that was written to direct officers to

11:56:32  2   maintain their investigative notes.

11:56:35  3   Q.  So the subject matter was the investigative notes; is that

11:56:37  4   correct?

11:56:37  5   A.  Yes.

11:56:38  6   Q.  Investigative notes, is that all part and parcel of a

11:56:43  7   working file?

11:56:45  8   A.  Well, the /KHEUPLD has three separate -- essentially three

11:56:51  9   separate filings systems and they go by different names, so

11:56:54  10  they have a permanent retention file, which contains the

11:56:57  11  original case report and supplemental reports, those formal

11:57:02  12  reports, they have an investigative file which would contain

11:57:05  13  what this policy is talking about which are the investigative

11:57:09  14  notes, to/from memorandums, notes that are taken by

11:57:13  15  detectives, and then they have this third thing called a

11:57:15  16  working file.  A working file is nothing more than copies of

11:57:19  17  documents that may be in one of those first two permanent

11:57:21  18  files, and the purpose of a working file is so a detective

11:57:26  19  doesn't have to go to records every time or go to a building

11:57:29  20  that you want to refresh your memory about something, about

11:57:32  21  what somebody said or did or what another detective did who

11:57:36  22  may have taken some notes or wrote a report, it's just copies

11:57:39  23  of a file that you would keep with you at your desk or in your

11:57:43  24  car as you're out conducting your investigation.

11:57:46  25  Q.  So investigative notes that are prepared during the course

| | |
|---|---|
| 11:57:51 | 1 |

11:57:51   1   of an investigation are typically part of a working file; is

11:57:57   2   that correct?

11:57:57   3        MR. LOEVY:  Objection.  Leading, your Honor.

11:57:58   4        THE WITNESS:  Well, it could be --

11:58:00   5        THE COURT:  When you hear an objection, stop.  The

11:58:02   6   objection is sustained.

11:58:04   7   BY MR. BURNS:

11:58:05   8   Q.  Let's go back.  Working file, you've told us that working

11:58:08   9   files have also been referred to as street files?

11:58:12  10   A.  Yes, they are.

11:58:12  11   Q.  All right.  Subject of '83-1 is the working or street

11:58:18  12   file; am I correct?

11:58:18  13   A.  Well, it's both the working and street file and the

11:58:24  14   investigative file.

11:58:26  15   Q.  So we have heard to explain for the ladies and gentlemen

11:58:29  16   of the jury something about a murder book.  Do you remember

11:58:31  17   that terminology?  Have you heard that before in your

11:58:34  18   professional experience?

11:58:34  19   A.  I'm familiar with murder books.

11:58:36  20   Q.  And would you explain to the ladies and gentlemen of the

11:58:39  21   jury what a murder book is?

11:58:41  22   A.  Well, when the investigators are, you know, particularly

11:58:44  23   conducting murder and honestly side investigations they will

11:58:47  24   form what's called a murder book, it's nothing more than a

11:58:51  25   working file that is copies of all the reports and copies of

11:58:55  1  all the investigative notes and, again, that's /KOEPLS of

11:59:00  2  these files,it's a working file or a murder book that's kept

11:59:03  3  at your desk to help the detective as they're going through

11:59:07  4  and conducting their investigation.

11:59:09  5  Q.  In this case, with regard to working files, let's talk

11:59:11  6  about notes, specifically notes that homicide detectives would

11:59:16  7  be taking during the course of investigation.  All right?

11:59:20  8          According to 831, what should happen to those notes

11:59:26  9  that detectives would be taking during the course of a

11:59:29  10  homicide investigation?

11:59:30  11  A.  All their notes must be retained and placed as part of the

11:59:35  12  investigative file.

11:59:36  13  Q.  Now, are you familiar with the accepted police practices

11:59:42  14  relative throughout this country, relative to investigative

11:59:46  15  notes that are obtained by detectives in the course of

11:59:49  16  investigations?

11:59:50  17  A.  Yes.

11:59:50  18  Q.  And how are those investigative notes handled according to

11:59:57  19  the accepted police practices?

11:59:58  20  A.  Generally accepted police practices, if you take notes on

12:00:02  21  an investigation, you'll use those notes to write your formal

12:00:06  22  report, the formal report will be maintained and your note

12:00:09  23  will be destroyed.

12:00:10  24  Q.  And the notes are destroyed?

12:00:11  25  A.  Yes, sir.

Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 94 of 125 PageID #:65561
12/08/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

93

| | | |
|---|---|---|
| 12:00:12 | 1 | Q. And how does Chicago then differ with that concept? |
| 12:00:14 | 2 | A. They require that those notes are maintained. |
| 12:00:17 | 3 | Q. So by maintaining them, does it help you form an opinion |
| 12:00:22 | 4 | as to the special order or policy of the Chicago Police |
| 12:00:26 | 5 | Department with regard to notes, homicide detective notes |
| 12:00:31 | 6 | taken during the course of their investigation? |
| 12:00:34 | 7 | A. Yes, their policy is above and beyond what other agencies |
| 12:00:37 | 8 | across the country require. |
| 12:00:38 | 9 | Q. All right. So in the course of this investigation, you've |
| 12:00:54 | 10 | told us what you have done relative to these notes. In terms |
| 12:01:01 | 11 | of reviewing your understanding, what does this policy intend |
| 12:01:07 | 12 | to accomplish, what is its purpose as you understood it and |
| 12:01:10 | 13 | set forth in the policy itself and I'm going to refer you if I |
| 12:01:16 | 14 | may page 1, purpose, if you see that before you? |
| 12:01:18 | 15 | A. Yes. |
| 12:01:18 | 16 | Q. And what does it say if you look to at least paragraph A. |
| 12:01:27 | 17 | Would you share that with the ladies and gentlemen of the |
| 12:01:28 | 18 | jury. |
| 12:01:29 | 19 | A. Sure. The purpose is specifically written that these |
| 12:01:32 | 20 | guidelines are for the proper retention of official department |
| 12:01:36 | 21 | reports, notes, memoranda, and miscellaneous documents of |
| 12:01:39 | 22 | potential evidentiary value /KHRAOUPL lated during the course |
| 12:01:43 | 23 | of a particular violent crime field investigation. |
| 12:01:45 | 24 | Q. And if we would then drop down to the policy itself. Do |
| 12:01:52 | 25 | you see that? Is that stated on there as well, sir? |

12:01:54   1   A.  Yes, it is.

12:01:55   2   Q.  And it's labeled Roman numeral number 3, policy; am I

12:02:00   3   correct?

12:02:00   4   A.  Yes.

12:02:00   5   Q.  If we could highlight that then, it begins on this page

12:02:04   6   and carries over to the next?

12:02:05   7   A.  Yes.

12:02:06   8   Q.  Would you share that then with the ladies and gentlemen of

12:02:09   9   the jury.

12:02:09  10   A.  Sure.  It's the policy of the Chicago Police Department to

12:02:12  11   conduct all criminal investigations in an impartial and

12:02:15  12   objective manner and to maintain the integrity of this

12:02:19  13   investigative files to ensure that due process rights of the

12:02:24  14   accused are not compromised during the subject investigation,

12:02:28  15   initial court hearing or any subsequent reviews.

12:02:33  16   Additionally, it is the policy of the Chicago Police

12:02:36  17   Department to record and preserve any relevant information

12:02:39  18   maintained by any detective during the course of a violent

12:02:43  19   crime field investigation.

12:02:44  20   Q.  Does it go onto set forth what the policy is in /TERPBLS

12:02:48  21   terms of what it's trying to keep for the benefit of future

12:02:53  22   review?

12:02:53  23   A.  Yes, sir, it does.

12:02:54  24   Q.  Would you share that with the ladies and gentlemen of the

12:02:57  25   jury, would you continue to read what that policy states.

| 12:02:59 | 1 | A.  Sure.  When assigned to violent crime field |
| 12:03:04 | 2 | investigations, detectives will preserve and record |
| 12:03:06 | 3 | information and materials obtained in the course of the |
| 12:03:09 | 4 | investigation to assure not only that information and |
| 12:03:12 | 5 | materials indicating the possible guilt are preserved but also |
| 12:03:17 | 6 | that any information and materials that may tend to show his |
| 12:03:20 | 7 | possible innocence or aid in his defense is preserved |
| 12:03:26 | 8 | deviation from this policy adversely impacts the goals and |
| 12:03:29 | 9 | objectives of the Chicago Police Department and may result in |
| 12:03:32 | 10 | disciplinary action against that department member. |
| 12:03:34 | 11 | Q.  So if I understand the objective at the end is to keep |
| 12:03:42 | 12 | everything is that true? |
| 12:03:43 | 13 | A.  Yes, sir. |
| 12:03:43 | 14 | Q.  Now, this policy when it was implemented in 1983, was |
| 12:03:50 | 15 | there training relative to that policy as you understand it |
| 12:03:54 | 16 | based upon your review of this case? |
| 12:03:56 | 17 | A.  Yes. |
| 12:03:56 | 18 | Q.  And would you share with the ladies and gentlemen of the |
| 12:03:59 | 19 | jury your understanding of the training that was provided to |
| 12:04:02 | 20 | the detectives who would be impacted by this policy? |
| 12:04:04 | 21 | A.  It's my understanding that director Hickey directed |
| 12:04:11 | 22 | training classes for every detective that lasted as I recall |
| 12:04:14 | 23 | three or four hours regarding this specific policy. |
| 12:04:17 | 24 | Q.  And the specific policy again is to keep all notes |
| 12:04:21 | 25 | relative and other records relative to homicide |

| | | |
|---|---|---|
| 12:04:23 | 1 | investigations; is that correct? |
| 12:04:24 | 2 | A. Yes, that's correct. |
| 12:04:26 | 3 | Q. Does the policy or any subsequent policies to this -- a |
| 12:04:41 | 4 | special order, is it fair to call that a policy? |
| 12:04:43 | 5 | A. Yes. |
| 12:04:43 | 6 | Q. Does this policy or any subsequent policies address the |
| 12:04:47 | 7 | issue of review to ensure compliance? |
| 12:04:50 | 8 | A. Well, every policy that's written as part of a police |
| 12:04:56 | 9 | manual requires some level of review, so every policy that's |
| 12:04:59 | 10 | enacted supervisors are responsible to conduct reviews and be |
| 12:05:04 | 11 | sure that employees are following the policies. Specifically, |
| 12:05:07 | 12 | in another version of this policy that came out in 1986, there |
| 12:05:11 | 13 | was a provision that was specifically added that mandated the |
| 12:05:18 | 14 | exempt members, so people who are in management staff, would |
| 12:05:22 | 15 | conduct periodic unscheduled inspections to ensure that this |
| 12:05:27 | 16 | policy is being followed. |
| 12:05:27 | 17 | Q. And was that also anticipated in the earlier policies that |
| 12:05:33 | 18 | the supervisors would be reviewing to ensure compliance? |
| 12:05:35 | 19 | A. Right. Again, as I said before, every policy within a |
| 12:05:39 | 20 | police department's policy manual, supervisors are responsible |
| 12:05:42 | 21 | to ensure compliance. |
| 12:05:43 | 22 | Q. Now, you talked a little bit about the training that |
| 12:05:47 | 23 | director assistant director Hickey was involved with when the |
| 12:05:50 | 24 | policy was developed and implemented, correct? You just told |
| 12:05:53 | 25 | us about that? |

| 12:05:54 | 1 | A. Yes, sir. |
| 12:05:54 | 2 | Q. Is there also, as you understand it, training foremen and |
| 12:05:59 | 3 | women of the Chicago Police Department /STKPHR-FRPBLT who |
| 12:06:00 | 4 | would be prom /OEPTed and assigned to the detective division? |
| 12:06:03 | 5 | A. Yes, it's my understanding that when you become a |
| 12:06:07 | 6 | detective, you're required to attend a course, I can't recall |
| 12:06:11 | 7 | if it was a week or two weeks long, about how to be a |
| 12:06:14 | 8 | detective and these policies would be covered during that |
| 12:06:18 | 9 | course. |
| 12:06:18 | 10 | Q. Are there also -- is there also discussion based upon your |
| 12:06:23 | 11 | review in this case of GPRs? |
| 12:06:26 | 12 | A. Yes, sir. |
| 12:06:27 | 13 | Q. And what is a GPR, as you understand it? |
| 12:06:29 | 14 | A. Well, a GPR, it stands for GPR records and it's really |
| 12:06:34 | 15 | nothing more than a form ^  to take notes on. |
| 12:06:37 | 16 | Q. So that form was intended, though, for the police |
| 12:06:47 | 17 | department, members of the detective division to actually |
| 12:06:50 | 18 | /WROEU their notes on a form that says general progress |
| 12:06:52 | 19 | report? |
| 12:06:53 | 20 | A. Yes, that's what it's intended for. |
| 12:06:56 | 21 | Q. And if someone were to obtained handwritten notes, should |
| 12:07:00 | 22 | they disregard those if they are not written on a general |
| 12:07:02 | 23 | progress report or how is that handled? |
| 12:07:05 | 24 | A. No, the goal of the policy is to maintained your notes. |
| 12:07:09 | 25 | If the detectives out in the field and they don't happen to |

| 12:07:11 | 1 | have this form with them, we certainly wouldn't want to |
| 12:07:14 | 2 | discourage them from taking notes, so they would take notes |
| 12:07:17 | 3 | whether they used a note pad or a napkin, whatever was |
| 12:07:20 | 4 | convenient, whatever they wrote their notes on, they would be |
| 12:07:23 | 5 | required to maintain that document. |
| 12:07:24 | 6 | Q.  Now, you told us that you compared this policy and its |
| 12:07:29 | 7 | progeny, this special order, and compared it, tried to compare |
| 12:07:35 | 8 | it with other /TKEPLTS throughout the United States, true? |
| 12:07:37 | 9 | A.  I tried to, yes. |
| 12:07:38 | 10 | Q.  And you said no one seems to have it but Chicago? |
| 12:07:41 | 11 | A.  I didn't say that, but that's true, nobody -- I did try to |
| 12:07:47 | 12 | compare it. |
| 12:07:48 | 13 | MR. LOEVY:  Your Honor, objection, if he didn't say |
| 12:07:50 | 14 | it, then he shouldn't say it now. |
| 12:07:52 | 15 | THE COURT:  He was just talking about his own answer. |
| 12:07:54 | 16 | MR. LOEVY:  I apologize. |
| 12:07:55 | 17 | MR. BURNS: . |
| 12:07:56 | 18 | THE ATTORNEY: |
| 12:07:56 | 19 | Q.  Would you please complete your answer, sir? |
| 12:07:58 | 20 | A.  I tried to find a comparison, so this was a policy I had |
| 12:08:02 | 21 | not seen before.  Obviously, this is my field, I study this a |
| 12:08:07 | 22 | lot, I attend seminars, I read journals, I read articles, I |
| 12:08:11 | 23 | had not seen a policy that mandated this, so I started |
| 12:08:18 | 24 | checking.  Many police departments today have their policy |
| 12:08:20 | 25 | manuals available on line.  Los Angeles police department, |

| | | |
|---|---|---|
| 12:08:25 | 1 | Seattle, Austin, I checked those agencies.  I have worked on |
| 12:08:29 | 2 | cases in cities like New York and Miami, you know, cities all |
| 12:08:33 | 3 | over the country, Georgia, Tennessee, Memphis.  And I've never |
| 12:08:38 | 4 | seen such a policy.  So I looked in Mr. Brasfield's report to |
| 12:08:42 | 5 | see whether he gave some indication of an individual policy. |
| 12:08:46 | 6 | Q.  Was there any help by looking at that report Mr. Brasfield |
| 12:08:50 | 7 | authored? |
| 12:08:51 | 8 | A.  No, no, not at all.  He didn't offer any specific examples |
| 12:08:56 | 9 | of any policies similar to this anywhere.  In fact, what he |
| 12:09:01 | 10 | said he worked for the Seattle police department, Fort |
| 12:09:07 | 11 | Lauderdale for the sheriff's department in Washington state |
| 12:09:09 | 12 | and in Fort Lauderdale, he was the policy maker, chief of |
| 12:09:14 | 13 | police of the sheriff.  He didn't have those policies there. |
| 12:09:16 | 14 | Q.  Let me ask you then relative to that.  You told us the |
| 12:09:19 | 15 | policy goes above and beyond what are expected by nationally |
| 12:09:22 | 16 | accepted police practices, true? |
| 12:09:24 | 17 | A.  Yes. |
| 12:09:24 | 18 | Q.  What about the policy provisions relative to the audit, in |
| 12:09:30 | 19 | other words, the review of the compliance by the officers or |
| 12:09:35 | 20 | administrators within the Chicago Police Department? |
| 12:09:36 | 21 | A.  Well, obviously, if nobody else has a policy, nobody else |
| 12:09:41 | 22 | will have a policy to audit a policy they don't have. |
| 12:09:44 | 23 | Q.  Okay.  If I may, I'd like to change subjects just for a |
| 12:09:49 | 24 | moment. |
| 12:09:49 | 25 | We talked about the subpoena unit of the Chicago |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 12:09:53 | 1 | Police Department and you have reviewed this matter relative |
| 12:09:55 | 2 | to that unit; is that correct? |
| 12:09:56 | 3 | A. Yes, sir. |
| 12:09:57 | 4 | Q. Tell us first of all, what's your understanding of the |
| 12:10:02 | 5 | subpoena unit of the Chicago Police Department in terms of how |
| 12:10:05 | 6 | it is staffed? |
| 12:10:06 | 7 | A. My understanding is that it is led by a police sergeant, |
| 12:10:11 | 8 | that there's one officer, and I believe there are five |
| 12:10:14 | 9 | civilian members of the staff. |
| 12:10:16 | 10 | Q. So there is a supervisor sergeant? |
| 12:10:20 | 11 | A. Yes. |
| 12:10:20 | 12 | Q. Is there any other police personnel other than civilian |
| 12:10:24 | 13 | staff assigned to that unit? |
| 12:10:25 | 14 | A. One officer. |
| 12:10:26 | 15 | Q. So you have a sergeant, a police officer and civilian |
| 12:10:29 | 16 | staff? |
| 12:10:29 | 17 | A. Yes, sir. |
| 12:10:30 | 18 | Q. Is civilian staff acceptable within police practices in |
| 12:10:36 | 19 | terms of staffing a subpoena unit? |
| 12:10:38 | 20 | A. Oh, absolutely. You know, different /TKEPLTS do things |
| 12:10:44 | 21 | differently. Our goal in policing is to put officers out in |
| 12:10:48 | 22 | the street. They are police officers. This is an |
| 12:10:49 | 23 | administrative task. I can tell you in California in I are |
| 12:10:53 | 24 | vine where I was an officer, our record divisions were always |
| 12:10:56 | 25 | staffed completely including the supervisors by civilian |

***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 12:10:59 | 1 | staff. |
| 12:10:59 | 2 | Q.  So what is the benefit to having police personnel, a |
| 12:11:03 | 3 | sergeant or a patrol officer assigned to that division? |
| 12:11:06 | 4 | A.  Well, I think in some cases it could offer some additional |
| 12:11:09 | 5 | oversight, some different additional knowledge and experience, |
| 12:11:14 | 6 | if somebody has a question, but it certainly could be done |
| 12:11:16 | 7 | /WOUPT that. |
| 12:11:17 | 8 | Q.  What about training, is there a formal training protocol |
| 12:11:23 | 9 | for civilian personnel who work in subpoena units? |
| 12:11:25 | 10 | A.  No, as you can imagine, because every police department |
| 12:11:29 | 11 | their records management systems are setup a little bit |
| 12:11:32 | 12 | differently, all those would be trained to be conducted in |
| 12:11:37 | 13 | house.  It would be on-the-job training. |
| 12:11:38 | 14 | Q.  There's been some criticism in this matter that there is a |
| 12:11:42 | 15 | parallel system of record keeping in the Chicago Police |
| 12:11:45 | 16 | Department rather than a centralized system of record keeping. |
| 12:11:48 | 17 | Are you aware of those? |
| 12:11:49 | 18 | A.  Yes. |
| 12:11:49 | 19 | Q.  And what is your opinion relative to the process by which |
| 12:11:53 | 20 | Chicago maintains its homicide investigation reports? |
| 12:11:57 | 21 | A.  I think their system is reasonable and promote.  I mean, |
| 12:12:04 | 22 | if different organizations setup systems differently.  There |
| 12:12:08 | 23 | is no one set of rules that requires ^  many agencies maintain |
| 12:12:14 | 24 | records in different places, they'll have laboratory reports |
| 12:12:17 | 25 | in one place, photographs, fingerprints, so it's not uncommon |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 12:12:22 | 1 | in policing to have multiple records systems. |
| 12:12:25 | 2 | Q.  Does the system that the Chicago Police Department have |
| 12:12:28 | 3 | hinder its ability to respond to subpoenas? |
| 12:12:31 | 4 | A.  No. |
| 12:12:32 | 5 | Q.  Would you explain to the ladies and gentlemen of the jury |
| 12:12:35 | 6 | why you believe that? |
| 12:12:35 | 7 | A.  Well, this is their system.  They're training their |
| 12:12:40 | 8 | people, their in-house people on how to receive subpoenas and |
| 12:12:42 | 9 | how to respond to them, so they're comfortable with their own |
| 12:12:45 | 10 | system and they're certainly capable and able to complete that |
| 12:12:50 | 11 | task. |
| 12:12:50 | 12 | Q.  How is it that the Chicago Police Department responds to a |
| 12:12:53 | 13 | subpoena it's received by the subpoena unit of the department |
| 12:12:57 | 14 | to a subpoena?  What do they do with it as it pertains to |
| 12:13:01 | 15 | homicide investigations? |
| 12:13:02 | 16 | A.  My understanding is that all subpoenas are initially |
| 12:13:05 | 17 | /SEPBLT to the superintendent's office and then they are sent |
| 12:13:08 | 18 | down to the one would be sent to the records bureau for that |
| 12:13:14 | 19 | permanent file and then a copy of the subpoena would be sent |
| 12:13:18 | 20 | to the individual district or area where these investigative |
| 12:13:22 | 21 | files are maintained. |
| 12:13:24 | 22 | Q.  And once they are sent out, the requests are made to these |
| 12:13:29 | 23 | other areas, what happens with that information? |
| 12:13:31 | 24 | A.  Well, the subpoena unit would go out and make copies of |
| 12:13:35 | 25 | the files and respond to the subpoena. |

| 12:13:37 | 1 | Q. And do you make /KOEPLS of everything or what portion of |
| 12:13:41 | 2 | the files then are copied? |
| 12:13:42 | 3 | A. No, they make copies of everything. |
| 12:13:44 | 4 | Q. And then the response? |
| 12:13:45 | 5 | MR. LOEVY: Objection to foundation, your Honor. |
| 12:13:47 | 6 | THE COURT: Lay the foundation. |
| 12:13:52 | 7 | BY MR. BURNS: |
| 12:13:53 | 8 | Q. In the course of your review of this case, you have |
| 12:13:55 | 9 | reviewed you told us depositions and policies of the Chicago |
| 12:13:59 | 10 | Police Department; is that correct? |
| 12:13:59 | 11 | A. Yes. |
| 12:14:00 | 12 | Q. And have you reviewed information relative to the Chicago |
| 12:14:04 | 13 | Police Department and how it responds to subpoenas in this |
| 12:14:06 | 14 | case? |
| 12:14:07 | 15 | A. Yes. |
| 12:14:07 | 16 | Q. And are you basing your testimony here on that |
| 12:14:10 | 17 | information? |
| 12:14:11 | 18 | A. Yes, specifically on the depositions of detective /KOL bee |
| 12:14:15 | 19 | and brown. |
| 12:14:15 | 20 | THE COURT: All right. The objection is overruled. |
| 12:14:17 | 21 | MR. BURNS: . |
| 12:14:18 | 22 | THE ATTORNEY: |
| 12:14:18 | 23 | Q. So pa point, what happens then when information is being |
| 12:14:23 | 24 | requested to a subpoena, the subpoena is sent to the |
| 12:14:25 | 25 | respective, whether it be the records division or sent over to |

| | | |
|---|---|---|
| 12:14:29 | 1 | the area where the homicide occurred, what happens with that |
| 12:14:32 | 2 | information? |
| 12:14:33 | 3 | A.  They make a copy of a file and they send a copy onto |
| 12:14:37 | 4 | whoever has requested the subpoena. |
| 12:14:38 | 5 | Q.  And then with that information, when it's received, is it |
| 12:14:41 | 6 | returned to the subpoena unit? |
| 12:14:43 | 7 | A.  Yes. |
| 12:14:43 | 8 | Q.  And what does the subpoena unit then do with that? |
| 12:14:46 | 9 | A.  They send the copies onto the court or whoever sent the |
| 12:14:50 | 10 | subpoena. |
| 12:14:51 | 11 | Q.  Thank you. |
| 12:14:52 | 12 | MR. BURNS:  May I just have one moment, Judge? |
| 12:15:01 | 13 | (Brief pause.) |
| 12:15:18 | 14 | MR. BURNS:  Thank you, Mr. Noble.  No further |
| 12:15:21 | 15 | questions at this time. |
| 12:15:21 | 16 | THE COURT:  Mr. Kulwin, any questions. |
| 12:15:39 | 17 | MR. KULWIN:  Just a couple quick ones, Judge. |
| 12:15:43 | 18 | - - - |
| 12:15:43 | 19 | JEFFREY NOBLE, CROSS-EXAMINATION |
| 12:15:45 | 20 | BY MR. LOEVY: |
| 12:15:45 | 21 | BY MR. KULWIN: |
| 12:15:45 | 22 | Q.  Mr. Noble, in your upon as a policy and police procedures |
| 12:15:50 | 23 | expert, are detectives who are investigating a serious felony |
| 12:15:54 | 24 | always required to take notes when they're interviewing |
| 12:15:56 | 25 | witnesses? |

Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 106 of 125 PageID #:65573
12/08/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

105

| | | |
|---|---|---|
| 12:15:56 | 1 | MR. LOEVY:  Objection to Rule 26, your Honor. |
| 12:15:58 | 2 | THE COURT:  Sustained.  Unless you can show me at |
| 12:16:00 | 3 | sidebar. |
| 12:16:12 | 4 | MR. KULWIN:  May I have a moment? |
| 12:16:13 | 5 | THE COURT:  Yes. |
| 12:16:14 | 6 | (Brief pause.) |
| 12:16:26 | 7 | MR. LOEVY:  We will withdraw the objection. |
| 12:16:27 | 8 | THE COURT:  Mr. Kulwin, go ahead.  The objection has |
| 12:16:29 | 9 | been withdrawn.  Go ahead. |
| 12:16:31 | 10 | BY MR. KULWIN: |
| 12:16:34 | 11 | Q.  Do you recall the question, sir? |
| 12:16:35 | 12 | THE COURT:  Why don't you put it again. |
| 12:16:37 | 13 | BY MR. KULWIN: |
| 12:16:38 | 14 | Q.  Are detectives always required to take notes in your |
| 12:16:40 | 15 | opinion when they're investigating a homicide? |
| 12:16:43 | 16 | A.  No, they are not required. |
| 12:16:44 | 17 | Q.  Okay.  Are there circumstances in which you could |
| 12:16:50 | 18 | ascertain that that would not be done? |
| 12:16:51 | 19 | A.  Yeah, there are certain times.  I mean, some detectives -- |
| 12:16:56 | 20 | I wouldn't, you know, as a practice do it, but some detectives |
| 12:16:59 | 21 | have very good memories and they practice taking notes and |
| 12:17:04 | 22 | other times detectives feel like if they break out a note pad |
| 12:17:08 | 23 | in front of a witness, it may impede the witness from giving a |
| 12:17:12 | 24 | statement, particularly if you're in a -- for example, like if |
| 12:17:16 | 25 | you're in a gang neighborhood and the person doesn't want |

| 12:17:18 | 1 | other people if you're out in public and doesn't want other |
| 12:17:21 | 2 | people to see that you're actually giving information to the |
| 12:17:24 | 3 | police that are writing it down. |
| 12:17:26 | 4 | Q. Is it acceptable practice for a detective to interview |
| 12:17:29 | 5 | somebody and then put the information they obtained directly |
| 12:17:31 | 6 | into a typewritten supplemental report or police report, is |
| 12:17:34 | 7 | that acceptable? |
| 12:17:35 | 8 | MR. LOEVY: Objection, Rule 26, your Honor. |
| 12:17:36 | 9 | THE WITNESS: Sure. |
| 12:17:37 | 10 | THE COURT: Sustained. |
| 12:17:39 | 11 | MR. KULWIN: I have nothing further, Judge. |
| 12:17:42 | 12 | THE COURT: Mr. Loevy. |
| 12:17:44 | 13 | - - - |
| 12:17:44 | 14 | ^ WITNAME, CROSS-EXAMINATION |
| 12:17:44 | 15 | BY MR. LOEVY: |
| 12:17:44 | 16 | BY MR. LOEVY: |
| 12:17:47 | 17 | Q. Mr. Noble, you have worked for the City of Chicago before, |
| 12:17:50 | 18 | correct? |
| 12:17:50 | 19 | A. Yes, sir. |
| 12:17:51 | 20 | Q. In fact, tell the jury between 2012 and 2016 how much the |
| 12:17:57 | 21 | City of Chicago has paid you in connection with being a |
| 12:18:00 | 22 | consultant expert witness in court cases? |
| 12:18:02 | 23 | A. Oh, I have probably done at least 12 cases between 2012 |
| 12:18:07 | 24 | and 2016. |
| 12:18:08 | 25 | Q. The question was how much money, sir? |

| | | |
|---|---|---|
| 12:18:10 | 1 | A. Sir, I don't know. |
| 12:18:11 | 2 | Q. More than $200,000? |
| 12:18:12 | 3 | A. Probably close to that, yes. |
| 12:18:14 | 4 | Q. Does $222,000 sound right? |
| 12:18:17 | 5 | A. Probably somewhere around that, yes. |
| 12:18:19 | 6 | Q. In fact, prior to 2011, there was another $50,000, |
| 12:18:23 | 7 | correct? |
| 12:18:23 | 8 | A. I can't recall, but I certainly had cases prior to that, |
| 12:18:29 | 9 | yes. |
| 12:18:30 | 10 | Q. With this case you're going to get pretty close to |
| 12:18:33 | 11 | $300,000, aren't you, when you add up prior to with 2011 plus |
| 12:18:37 | 12 | the 2012 and 2012 and 2016 and this case it's going to be |
| 12:18:42 | 13 | about $300,000? |
| 12:18:46 | 14 | A. Yes, sir. |
| 12:18:47 | 15 | Q. Is that a substantial portion of your income? |
| 12:18:49 | 16 | A. My fees were less in the earlier years, but today it's |
| 12:18:54 | 17 | two-thirds or three quarters of my income. |
| 12:18:56 | 18 | Q. Is that a big chunk of it coming from the City of Chicago? |
| 12:18:59 | 19 | A. It's certainly a percentage. I had about 125 cases and |
| 12:19:03 | 20 | about 17 with Chicago. |
| 12:19:05 | 21 | Q. All right. You spent about two and a half hours drafting |
| 12:19:09 | 22 | your report in this case, correct? |
| 12:19:10 | 23 | A. I would have to have my billing statements in front of me, |
| 12:19:16 | 24 | but that's probably true. |
| 12:19:17 | 25 | Q. How much is your total bill going to come to for your |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 12:19:20 | 1 | opinions in this case? |
| 12:19:21 | 2 | A. I think I billed about $15,000 up until coming here. |
| 12:19:25 | 3 | Q. So it's going to be about how much total? |
| 12:19:26 | 4 | A. Probably another 6 or $7,000 between travel time and |
| 12:19:31 | 5 | testifying. |
| 12:19:31 | 6 | Q. So you're going to be over 20,000 for the opinions today? |
| 12:19:35 | 7 | A. Yes, sir. |
| 12:19:35 | 8 | Q. You didn't review any of the files, did you? |
| 12:19:37 | 9 | A. No, I did not. |
| 12:19:38 | 10 | Q. So basically drawing on your experience and your |
| 12:19:41 | 11 | knowledge, right? |
| 12:19:42 | 12 | A. Yes, sir. |
| 12:19:42 | 13 | Q. All right. As you've mentioned, you've been hired by the |
| 12:19:47 | 14 | City of Chicago quite a bit, correct? |
| 12:19:48 | 15 | A. Yes, sir. |
| 12:19:48 | 16 | Q. Most recently in 2016 the man /STKPWHRAER /RA case? |
| 12:19:53 | 17 | A. Yes. |
| 12:19:53 | 18 | Q. You were asked to give an opinion about the reasonableness |
| 12:19:56 | 19 | of their investigative, investigations and disciplinary |
| 12:19:58 | 20 | procedures, right? |
| 12:19:59 | 21 | A. Yes. |
| 12:19:59 | 22 | Q. In your opinion was that they're great, right? |
| 12:20:03 | 23 | A. They were reasonable, yes. |
| 12:20:04 | 24 | Q. And then in the Kluppelberg case also in year, you were |
| 12:20:10 | 25 | asked to give opinions about street files? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 110 of 125 PageID #:65577
12/08/16 AM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

109

| | | |
|---|---|---|
| 12:20:13 | 1 | A. Yes. |
| 12:20:13 | 2 | Q. And your opinion was Chicago's policies were great? |
| 12:20:16 | 3 | A. Same as in this case. |
| 12:20:17 | 4 | Q. In the /RAO*UB, another wrongful conviction case, your |
| 12:20:21 | 5 | opinion was the City of Chicago's policies were great? |
| 12:20:24 | 6 | A. /THERPB reasonable. |
| 12:20:25 | 7 | Q. In Coleman, intern affairs and discipline, you were asked |
| 12:20:32 | 8 | to give an opinion about the city's policies? |
| 12:20:34 | 9 | A. Yes. |
| 12:20:34 | 10 | Q. What was your opinion? |
| 12:20:35 | 11 | A. They were reasonable. |
| 12:20:36 | 12 | Q. How about low /TEZ, use of force case, different subject, |
| 12:20:39 | 13 | does the city have excellent policies on that? |
| 12:20:42 | 14 | A. As I recall, that case was about the policies were about |
| 12:20:47 | 15 | internal affairs than this one, but, yes, they're reasonable. |
| 12:20:52 | 16 | Q. How about the /TKPWAOEULS case, officer involved |
| 12:20:56 | 17 | shootings? |
| 12:20:56 | 18 | MR. KULWIN:  Judge, I am going to object. |
| 12:20:58 | 19 | THE COURT:  Overruled. |
| 12:20:59 | 20 | BY MR. LOEVY: |
| 12:20:59 | 21 | Q. City of Chicago's policies and practices regarding officer |
| 12:21:02 | 22 | involved shootings, are those all above average too? |
| 12:21:06 | 23 | A. They were reasonable. |
| 12:21:07 | 24 | Q. Above average or reasonable? |
| 12:21:08 | 25 | A. Basically, when I give an opinion about policies, I make a |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | |
|---|---|
| 12:21:12 | 1 determination whether they're reasonable and appropriate and |
| 12:21:16 | 2 not above average.  I don't have a way of assessing above |
| 12:21:19 | 3 average. |
| 12:21:19 | 4 Q.  Are you saying the same thing here today with regard to |
| 12:21:22 | 5 these policies that they're acceptable, not better or worse, |
| 12:21:26 | 6 just acceptable in your case? |
| 12:21:28 | 7 A.  I think in this case, nobody else has these policies, so |
| 12:21:32 | 8 they're above. |
| 12:21:32 | 9 Q.  How about in the fury case in 2013, internal affairs |
| 12:21:36 | 10 investigations, was the Chicago's poll seals above in that |
| 12:21:39 | 11 too? |
| 12:21:39 | 12     THE COURT:  You're running up against Rule 403 at |
| 12:21:42 | 13 this point. |
| 12:21:42 | 14 BY MR. LOEVY: |
| 12:21:43 | 15 Q.  All right.  How many times have you on different subjects |
| 12:21:45 | 16 given opinions that the City of Chicago's policies, you have |
| 12:21:51 | 17 told juries in cases that the City of Chicago's policies are |
| 12:21:55 | 18 what they should be? |
| 12:21:56 | 19 A.  I think in /TPHAERPL -- I'm certain in every case that I |
| 12:22:00 | 20 have been involved with the City of Chicago where I have |
| 12:22:02 | 21 reviewed the particular policy, I found it to be reasonable. |
| 12:22:05 | 22 Q.  17 times, right? |
| 12:22:06 | 23 A.  Yes, sir. |
| 12:22:06 | 24 Q.  And you said nearly, but you do mean every time you've |
| 12:22:10 | 25 looked at the city's policies, you found them to be good, |

| 12:22:14 | 1 | right? |
| 12:22:15 | 2 | A. I found them to be reasonable. For those policies that |
| 12:22:17 | 3 | were involved in a particular case. |
| 12:22:20 | 4 | Q. All right. You are a lawyer as well, correct? |
| 12:22:21 | 5 | A. Yes. |
| 12:22:22 | 6 | Q. You said that the Chicago's requirement about the |
| 12:22:30 | 7 | /TKPW-RPLS was a unique type solution? |
| 12:22:34 | 8 | A. Yes. |
| 12:22:35 | 9 | Q. Chicago at that time had a unique type problem didn't it? |
| 12:22:38 | 10 | A. There was litigation from my understanding at that time, |
| 12:22:40 | 11 | yes. |
| 12:22:40 | 12 | Q. Chicago had a problem that was unique, wasn't it? |
| 12:22:45 | 13 | A. Yes, they had litigation. |
| 12:22:46 | 14 | Q. And the uniqueness of the problem was there was an |
| 12:22:51 | 15 | ingrained practice at the Chicago Police Department to not |
| 12:22:54 | 16 | turn over their notes to the criminal justice system, correct? |
| 12:22:58 | 17 | A. No, I don't know what the problem was. All I know is |
| 12:23:01 | 18 | there was litigation. |
| 12:23:02 | 19 | Q. You have no idea what the litigation was? |
| 12:23:03 | 20 | A. No. |
| 12:23:04 | 21 | Q. You spent $20,000 was how many hours of work? |
| 12:23:10 | 22 | MR. BURNS: Objection, your Honor. Argumentative. |
| 12:23:11 | 23 | THE COURT: That's not argumentative. Overruled. |
| 12:23:13 | 24 | THE WITNESS: I don't know. I would have -- it's |
| 12:23:16 | 25 | 295. I'd have to do on my math. Probably about 20 hours. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12:23:20    1  BY MR. LOEVY:

12:23:20    2  Q.  But in none of the work that you did did you review the

12:23:23    3  Jones problem and the City of Chicago's problems?

12:23:24    4          MR. BURNS:  Objection, your Honor.

12:23:25    5          THE COURT:  Sustained.  You have covered the

12:23:28    6  /POEUPBLT.

12:23:28    7  BY MR. LOEVY:

12:23:28    8  Q.  All right.  Would it change your opinions if you knew that

12:23:31    9  the reason Chicago enacted this GPR solution is because they

12:23:35   10  were having a real problem with detectives not wanting to

12:23:37   11  disclose their work product investigation files?

12:23:40   12  A.  No.

12:23:41   13  Q.  All right.  Did you know as you sit in that chair that the

12:23:46   14  Jones case involved an /EPB trenched and cultural problem at

12:23:53   15  the /KHEUPLD not turning over investigative material?

12:23:56   16          MR. BURNS:  Objection.

12:23:56   17          THE COURT:  The objection is sustained.  He testified

12:24:03   18  he didn't know about those cases.

12:24:04   19  BY MR. LOEVY:

12:24:04   20  Q.  The GPR says detectives have to take notes on a form?

12:24:08   21  A.  Yes.

12:24:08   22  Q.  Do you have any knowledge either way as to whether they

12:24:10   23  actually follow that policy, that requirement?

12:24:12   24  A.  No, I did not conduct any review.

12:24:14   25  Q.  All right.  Even leaving aside your review, do you have

                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

12/08/16 AM

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | |
|---|---|
| 12:24:17 | 1 | any knowledge either way whether that was just words on the |
| 12:24:20 | 2 | book or whether they actually did it? |
| 12:24:21 | 3 | A.  The only knowledge I have is director Hickey testifying he |
| 12:24:25 | 4 | had like 140,000 copies of that form.  That's it. |
| 12:24:29 | 5 | Q.  All right.  If 82 percent of the files that were at issue |
| 12:24:33 | 6 | in this case contained unofficial handwritten notes not on |
| 12:24:37 | 7 | GPRs, that would be a problem for the policy, would it not? |
| 12:24:40 | 8 | A.  Not the intent of the policy.  As I testified was that the |
| 12:24:46 | 9 | goal of the policy was to maintain the notes, whether it was |
| 12:24:49 | 10 | on that particular form or another format, I don't think it |
| 12:24:52 | 11 | matters. |
| 12:24:52 | 12 | Q.  Doesn't the policy explicitly require that GPR forms are |
| 12:24:57 | 13 | supposed to be used?  That's a yes, no question. |
| 12:24:59 | 14 | A.  Yes. |
| 12:25:00 | 15 | Q.  All right.  So if the policy on the books explicitly |
| 12:25:04 | 16 | requires that the GPR form be used, why doesn't it bother you |
| 12:25:07 | 17 | that in practice in '82 percent of the files, they didn't |
| 12:25:11 | 18 | adhere to the policy on the books? |
| 12:25:13 | 19 | MR. BURNS:  Objection.  Form of the question. |
| 12:25:15 | 20 | THE COURT:  Overruled. |
| 12:25:16 | 21 | THE WITNESS:  For two reasons.  First, you know, the |
| 12:25:19 | 22 | goal of the policy is about maintaining these notes and as |
| 12:25:25 | 23 | being engaged in police practices, I recognize as a police |
| 12:25:28 | 24 | officer you don't always have a form with you.  Second, |
| 12:25:31 | 25 | director Hickey testified that he felt had that that was |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 115 of 125 PageID #:65582
12/08/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

114

12:25:34   1   promote and that's the training they do.

12:25:36   2   BY MR. LOEVY:

12:25:36   3   Q.   In I are vine when you guys had policies on the books,

12:25:39   4   were the police officers required to follow them?

12:25:41   5   A.   Of course.

12:25:41   6   Q.   Were there any examples of widespread disregard of the

12:25:46   7   official policies in I are vine?

12:25:47   8            MR. BURNS:  Objection, argumentative, relevance.

12:25:50   9            THE COURT:  Sustained.  Argumentative.

12:25:53  10   BY MR. LOEVY:

12:25:54  11   Q.   It doesn't do any good to enact a written policy in the

12:25:58  12   detectives aren't going to follow it, would you agree with

12:26:00  13   that?

12:26:00  14   A.   No, I think the policy corresponds with training and

12:26:04  15   supervision and there's a combination.

12:26:06  16   Q.   Would you agree with me that a department can have a

12:26:08  17   culture where if they enact rules and then everybody just

12:26:11  18   ignores them that the problems could be exacerbated, would you

12:26:16  19   agree with that?

12:26:16  20            MR. BURNS:  Objection, your Honor.

12:26:17  21            THE COURT:  Overruled.

12:26:18  22            THE WITNESS:  Certainly if you create rules and

12:26:21  23   nobody follows any of the rules, yeah, that would be a

12:26:24  24   problem.

12:26:24  25   BY MR. LOEVY:

| | | |
|---|---|---|
| 12:26:24 | 1 | Q. That makes it worse than if you don't have rules at all, |
| 12:26:27 | 2 | doesn't it? |
| 12:26:28 | 3 | A. It would certainly be a problem, yes. |
| 12:26:30 | 4 | Q. Now, you said that requiring notes to be maintained you |
| 12:26:36 | 5 | thought was a good step, right? |
| 12:26:37 | 6 | A. Sure. |
| 12:26:38 | 7 | Q. All right. But it's actually worse to a regime where you |
| 12:26:42 | 8 | require notes to be maintained but you don't put them into |
| 12:26:46 | 9 | official supp reports, that's A. Okay? Are you with me on my |
| 12:26:51 | 10 | A? I'll give you a hypothetical A. You require the |
| 12:26:54 | 11 | detectives to maintain their notes, but they don't put them |
| 12:26:58 | 12 | into the official police reports. Okay. Do you understand A? |
| 12:27:01 | 13 | A. I understand. |
| 12:27:01 | 14 | Q. And B, you let detectives destroy your notes, their notes, |
| 12:27:05 | 15 | but you require them to record the information into official |
| 12:27:09 | 16 | supp reports. Do you understand the difference? |
| 12:27:10 | 17 | A. Yes. |
| 12:27:11 | 18 | Q. B is actually a better system, isn't it? |
| 12:27:13 | 19 | A. I don't believe you can compare it as better system. In B |
| 12:27:20 | 20 | you're taking notes and you're taking those notes and |
| 12:27:23 | 21 | incorporating them into your report and that's what's a |
| 12:27:27 | 22 | generally accepted police practice. In A, you're taking notes |
| 12:27:29 | 23 | and for whatever reason some of those notes don't get |
| 12:27:35 | 24 | incorporated into a report, you still maintain the notes so |
| 12:27:39 | 25 | the notes are accessible, so they're there. It's like a |

12/08/16 AM
Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 117 of 125 PageID #:65584
***REALTIME UNEDITED TRANSCRIPT ONLY***

116

| | | |
|---|---|---|
| 12:27:43 | 1 | report. It's similar. |
| 12:27:43 | 2 | Q. Notes being there is not a way to get the information to a |
| 12:27:47 | 3 | criminal defendant, correct? |
| 12:27:48 | 4 | A. Well, in this case, they are, because. |
| 12:27:51 | 5 | Q. In which case? |
| 12:27:52 | 6 | A. Here, by these policies they are because they're being |
| 12:27:57 | 7 | maintained and the subpoena unit is required to produce them. |
| 12:27:59 | 8 | Q. All right. So if the system worked in perfection, then |
| 12:28:03 | 9 | every note would get handed over to a subpoena, right? |
| 12:28:06 | 10 | A. Absolutely, that's the purpose. |
| 12:28:08 | 11 | Q. You have no knowledge as to whether or not there were |
| 12:28:12 | 12 | notes in those investigative files that were found in the |
| 12:28:15 | 13 | basement that weren't getting handed over to subpoenas? |
| 12:28:18 | 14 | MR. BURNS: Objection, form of the question, |
| 12:28:20 | 15 | foundation. |
| 12:28:21 | 16 | THE COURT: Overruled. It's just a question whether |
| 12:28:23 | 17 | he has any knowledge. |
| 12:28:25 | 18 | THE WITNESS: I have no knowledge. |
| 12:28:26 | 19 | MR. LOEVY: Your Honor, this would be a change |
| 12:28:31 | 20 | topics. Could we break for lunch? |
| 12:28:32 | 21 | THE COURT: No. |
| 12:28:34 | 22 | MR. LOEVY: No. |
| 12:28:34 | 23 | THE COURT: Do the other five minutes. |
| 12:28:36 | 24 | BY MR. LOEVY: |
| 12:28:36 | 25 | Q. Let's take a look at the other policy in here. This is |

| | | |
|---|---|---|
| 12:28:39 | 1 | 83-2. |
| 12:28:42 | 2 | MR. LOEVY: Could we have the ELMO, please, your |
| 12:28:46 | 3 | Honor. |
| 12:28:47 | 4 | BY MR. LOEVY: |
| 12:28:48 | 5 | Q. The policy that you thought was good says D, investigative |
| 12:28:55 | 6 | file inventory sheet. Do you see that? |
| 12:28:57 | 7 | A. Yes. |
| 12:28:57 | 8 | Q. We all the inventory sheet, that's the sheet that lists |
| 12:29:01 | 9 | the reports? |
| 12:29:02 | 10 | A. Yes. |
| 12:29:02 | 11 | Q. And it says, I'm going to turn your attention to page 4, |
| 12:29:07 | 12 | 6. Whenever a subpoena or discovery motion is received in any |
| 12:29:10 | 13 | case, two copies of the investigative file inventory sheet |
| 12:29:14 | 14 | will be forwarded to the office of legal affairs of the |
| 12:29:16 | 15 | department in the case of a subpoena or to the criminal |
| 12:29:20 | 16 | division of the state's attorney's office in any case of a |
| 12:29:22 | 17 | discovery motion so that one of such copies may be transmitted |
| 12:29:26 | 18 | to the attorney for the defendant. Do you see that? |
| 12:29:28 | 19 | A. Yes. |
| 12:29:28 | 20 | Q. Okay. So the policy on the book required the police |
| 12:29:32 | 21 | department whenever there was a subpoena in a criminal case to |
| 12:29:35 | 22 | turn over the inventory, right? |
| 12:29:36 | 23 | A. The inventory sheet, yes. |
| 12:29:37 | 24 | Q. That's a good idea, right? |
| 12:29:38 | 25 | A. You know, it's more important that the actual documents |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 12:29:42 | 1 | are there, but, yes. |
| 12:29:43 | 2 | Q. Well, I'm focused on the inventory.  It's a good idea that |
| 12:29:48 | 3 | the inventory gets turned over, right?  Sir, how can you |
| 12:29:53 | 4 | hesitate with that? |
| 12:29:55 | 5 | MR. BURNS:  Objection. |
| 12:29:56 | 6 | THE COURT:  The objection is overruled. |
| 12:29:57 | 7 | THE WITNESS:  The inventory sheet is nothing more |
| 12:30:00 | 8 | than a listing in the file.  What's important is the |
| 12:30:03 | 9 | documents.  The inventory sheet is just a listing of what's in |
| 12:30:05 | 10 | the file ^ . |
| 12:30:06 | 11 | BY MR. LOEVY: |
| 12:30:06 | 12 | Q. If you're ever going to have a dispute whether the guy got |
| 12:30:09 | 13 | everything or didn't get everything, wouldn't you want to turn |
| 12:30:14 | 14 | over the index? |
| 12:30:14 | 15 | A. If the policy requires them to turn over the index, they |
| 12:30:17 | 16 | should turnover the index. |
| 12:30:19 | 17 | Q. That's a good policy on the books? |
| 12:30:21 | 18 | A. It's certainly reasonable. |
| 12:30:23 | 19 | Q. Do you have any idea whether Chicago followed that policy? |
| 12:30:26 | 20 | A. No. |
| 12:30:26 | 21 | Q. If the city in practice didn't follow the policies that |
| 12:30:30 | 22 | you said are good policies, would that change your opinion? |
| 12:30:33 | 23 | A. Change my opinion as to what? |
| 12:30:35 | 24 | Q. The opinions you're giving in court today? |
| 12:30:37 | 25 | A. No, my opinions are about the policy, not about whether |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 12:30:40 | 1 | they followed it. |
| 12:30:43 | 2 | MR. LOEVY:  Are we at lunch yet, your Honor? |
| 12:30:45 | 3 | THE COURT:  We are.  We are going to break for lunch. |
| 12:30:51 | 4 | Don't discuss the case.  We will be back at 1:30. |
| 12:31:21 | 5 | (The jury leaves the courtroom.). |
| 12:31:21 | 6 | THE COURT:  You understand you can't discuss your |
| 12:31:23 | 7 | testimony with anyone. |
| 12:31:26 | 8 | THE WITNESS:  Yes. |
| 12:31:26 | 9 | THE COURT:  After this witness, what's upcoming? |
| 12:31:32 | 10 | MR. MICHALIK:  After this witness we will have our |
| 12:31:34 | 11 | third expert Judy Roberts. |
| 12:31:35 | 12 | THE COURT:  Roberts, okay.  And then after that? |
| 12:31:43 | 13 | MR. MICHALIK:  After that we may play a video or |
| 12:31:48 | 14 | potentially have a reading. |
| 12:31:49 | 15 | THE COURT:  Davis and the reading would be Hunter? |
| 12:31:52 | 16 | MR. MICHALIK:  Yes. |
| 12:31:52 | 17 | THE COURT:  Any other live witnesses this afternoon? |
| 12:31:56 | 18 | MR. KULWIN:  I think -- |
| 12:32:01 | 19 | MR. MICHALIK:  There may be another reading.  We have |
| 12:32:03 | 20 | to work it out with Mr. Art on the Maue. |
| 12:32:06 | 21 | MR. ART:  There is a tiny issue on Maue. |
| 12:32:09 | 22 | THE COURT:  On Maue.  Tell me what the issue is. |
| 12:32:11 | 23 | MR. ART:  Maue starts testifying, he gets the |
| 12:32:13 | 24 | incident wrong, it's on the video, so there's some testimony |
| 12:32:17 | 25 | testimony testimony testimony then there's a sidebar where the |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 12:32:19 | 1 | court says, he's not remembering what we're talking about |
| 12:32:22 | 2 | here. |
| 12:32:22 | 3 | MR. LOEVY:  You struck the testimony. |
| 12:32:24 | 4 | MR. ART:  And then you struck the prior testimony. |
| 12:32:26 | 5 | And we say the testimony should be struck. |
| 12:32:32 | 6 | MR. MICHALIK:  Actually. |
| 12:32:32 | 7 | THE COURT:  Only the /TPAEUPB test of bells. |
| 12:32:35 | 8 | MR. MICHALIK:  What happened was on the video he |
| 12:32:37 | 9 | started to discuss a different incident involving Mr. Fields |
| 12:32:40 | 10 | and then we had a sidebar and one of the problems was it was |
| 12:32:45 | 11 | done by video.  We have the transcript here. |
| 12:32:47 | 12 | THE COURT:  Let me look at it. |
| 12:32:54 | 13 | MR. MICHALIK:  This portion being read is the part |
| 12:32:56 | 14 | that was objected to. |
| 12:32:57 | 15 | THE COURT:  So I'm looking at 3428 through 29. |
| 12:33:06 | 16 | MR. MICHALIK:  Just to orient your Honor, the |
| 12:33:09 | 17 | incident in question was May 6th of 1997.  But Mr. Fields was |
| 12:33:14 | 18 | placed into the administrative detention on May 1st of 1997. |
| 12:33:20 | 19 | THE COURT:  Say what you just said again. |
| 12:33:21 | 20 | MR. MICHALIK:  Okay.  The incident. |
| 12:33:24 | 21 | THE COURT:  May 6th but he was put -- the date he was |
| 12:33:27 | 22 | put in sag was 5/1. |
| 12:33:33 | 23 | MR. ART:  Right.  So if you're looking at 3428 at |
| 12:33:36 | 24 | line 6, there is a question about when he gets put in and |
| 12:33:39 | 25 | there is a correct answer to that.  We are fine with that. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 12:33:43 | 1 | But then down the page, he starts testifying about that |
| 12:33:45 | 2 | incident and all of that testimony in our view is when he is |
| 12:33:53 | 3 | confused. |
| 12:33:55 | 4 | THE COURT:  What is it you're objecting to 3428, line |
| 12:34:00 | 5 | 19 through 3429 line 25. |
| 12:34:03 | 6 | MR. ART:  Correct. |
| 12:34:03 | 7 | THE COURT:  Is there a contention that this is the |
| 12:34:06 | 8 | incident that Mr. Fields testified about on his examination? |
| 12:34:10 | 9 | MR. MICHALIK:  Yes, your Honor.  If you remember from |
| 12:34:12 | 10 | the video, there's a portion where the correctional officers, |
| 12:34:17 | 11 | including Mr. Maue, go to -- go to where Mr. Fields is being |
| 12:34:22 | 12 | detained and they escort him out of there to the shower.  That |
| 12:34:25 | 13 | is why is being discussed at this point.  This is the |
| 12:34:28 | 14 | beginning of what you see on the video and that's why we |
| 12:34:31 | 15 | wanted to include it. |
| 12:34:32 | 16 | THE COURT:  Wait a second.  But at the bottom of |
| 12:34:35 | 17 | 3428, there's a question of whether the tact -- so earlier on |
| 12:34:42 | 18 | 3428, it says he was put into the administrative detention |
| 12:34:48 | 19 | unit on May 1, 1997.  The bottom of 3428 was the tactical unit |
| 12:34:56 | 20 | activated for the transfer of Mr. Fields to the administrative |
| 12:34:59 | 21 | detention unit on May 1 and he said yes, explains why.  And |
| 12:35:05 | 22 | then the question on 3429 page 3 asks about the May 6 |
| 12:35:10 | 23 | incident.  The May 6 incident, is that the one that Mr. Fields |
| 12:35:12 | 24 | testified about? |
| 12:35:13 | 25 | MR. ART:  That's the one that is on the video, but |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:18-cv-03029 Document #: 511-59 Filed: 03/15/24 Page 123 of 125 PageID #:65590

| 12:35:15 | 1 | the problem is if you keep reading, you get to a sidebar and |
|---|---|---|
| 12:35:18 | 2 | then on 3434 at 3, the court says this is what I'm going to |
| 12:35:23 | 3 | do, I am going to strike the matter that we just talked about |
| 12:35:27 | 4 | because he is confusing the two events.  After the sidebar |
| 12:35:30 | 5 | they ask leading questions about the actual events in question |
| 12:35:33 | 6 | and our contention is after the court struck the testimony. |
| 12:35:35 | 7 | THE COURT:  The question is when I said I struck the |
| 12:35:40 | 8 | testimony, the question is how far back does this go. |
| 12:35:42 | 9 | MR. ART:  Basically our position is when he is |
| 12:35:45 | 10 | talking about what he thinks is May 6th above the court's |
| 12:35:49 | 11 | ruling, it isn't. |
| 12:35:51 | 12 | THE COURT:  I see what you're saying. |
| 12:35:55 | 13 | THE COURT:  And the yellow on here is the stuff |
| 12:35:57 | 14 | that's designated? |
| 12:35:58 | 15 | MR. ART:  Yes. |
| 12:35:59 | 16 | MR. MICHALIK:  Yes. |
| 12:36:00 | 17 | THE COURT:  So here's the deal.  You cut it off after |
| 12:36:06 | 18 | line 20 on page 3429 because he's clearly present on May the |
| 12:36:15 | 19 | 6th, right?  There is no question that he's present. |
| 12:36:17 | 20 | MR. ART:  Right. |
| 12:36:17 | 21 | THE COURT:  So when from 3429 line 3 to line 20 he's |
| 12:36:22 | 22 | basically saying he was present on May 6th, this is the |
| 12:36:25 | 23 | capacity in which I'm present, this is what my duties and |
| 12:36:27 | 24 | obligations are.  3 -- 3429 lines 21 through 25 he starts to |
| 12:36:33 | 25 | talk about a particular incident.  That may be what's wrong. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 12:36:36 | 1 | It's not really necessary because it picks up on 3425.  Those |
| 12:36:43 | 2 | are the five lines to cut out.  Any other live witness as soon |
| 12:36:48 | 3 | as. |
| 12:36:48 | 4 | MR. KULWIN:  Mr. Poulos.  Once again, Judge, |
| 12:36:52 | 5 | depending on how things go, Mr. Hogan. |
| 12:36:55 | 6 | MR. LOEVY:  That could take us before 4:00 o'clock. |
| 12:36:59 | 7 | Roberts is a short difficulties. |
| 12:37:00 | 8 | THE COURT:  Davis is long. |
| 12:37:02 | 9 | MR. MICHALIK:  25. |
| 12:37:03 | 10 | THE COURT:  Hunter is longer or shorter than Davis? |
| 12:37:06 | 11 | MS. KATZ:  Longer. |
| 12:37:07 | 12 | MR. LOEVY:  Longer. |
| 12:37:08 | 13 | MR. ART:  It's a reading. |
| 12:37:09 | 14 | THE COURT:  And Maue the parts that you're reading |
| 12:37:13 | 15 | looks short. |
| 12:37:13 | 16 | MR. MICHALIK:  It looks like 20 minutes or so. |
| 12:37:15 | 17 | THE COURT:  How long is the direct on Roberts? |
| 12:37:18 | 18 | MR. MICHALIK:  20 minutes to a half an hour.  I won't |
| 12:37:20 | 19 | think it will be all that long. |
| 12:37:22 | 20 | MR. LOEVY:  Our cross is shorter. |
| 12:37:24 | 21 | THE COURT:  Poulos is how long a direct? |
| 12:37:30 | 22 | MR. KULWIN:  15. |
| 12:37:32 | 23 | MR. NOLAND:  15 minutes, your Honor. |
| 12:37:33 | 24 | MR. LOEVY:  We won't think it's that long, but that's |
| 12:37:36 | 25 | our position. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 12:37:36 | 1 | MR. KULWIN:  That takes you to about 4:00. |
| 12:37:38 | 2 | THE COURT:  What are the issues still on the table on |
| 12:37:40 | 3 | Mr. Hogan? |
| 12:37:41 | 4 | MR. KULWIN:  There's a number of them, Judge. |
| 12:37:43 | 5 | THE COURT:  Laundry list. |
| 12:37:44 | 6 | MR. KULWIN:  Rule 35, what did he say about the |
| 12:37:48 | 7 | documents that were taken, what use -- we didn't raise this, |
| 12:37:56 | 8 | what use I can make of this document, it's not admissible in |
| 12:37:59 | 9 | evidence but I want to talk to you about that, you know, we |
| 12:38:02 | 10 | had talked about this Maloney issue and you had ruled a |
| 12:38:05 | 11 | certain way about it, but I think I was not articulate in what |
| 12:38:09 | 12 | I wanted -- |
| 12:38:11 | 13 | THE COURT:  Yeah. |
| 12:38:11 | 14 | MR. KULWIN:  I just want to explain it to you before |
| 12:38:13 | 15 | I get to it because it is different than what you ruled on.  I |
| 12:38:16 | 16 | don't want to go into the whole nine yards, but I can explain |
| 12:38:19 | 17 | it to you later.  That's pretty much it. |
| 12:38:21 | 18 | THE COURT:  Okay.  Afternoon break. |
| 12:38:23 | 19 | MR. KULWIN:  Afternoon break. |
| 12:38:26 | 20 | THE COURT:  1:30. |
| 12:38:28 | 21 | (The trial was adjourned at 12:35 p.m. until 1:30 of this |
| 12:38:34 | 22 | same day and date.). |
| | 23 | |
| | 24 | |
| | 25 | |

***REALTIME UNEDITED TRANSCRIPT ONLY***