# Exhibit JJJ

March 27, 2023

TO: Josh M. Engquist
The Sotos Law Firm, P.C.
141 w. Jackson Blvd, Suite 1240A
Chicago, IL 60604

RE: Thomas Sierra v. Guevara, et al.
18 CV 3029

I have been retained by The Sotos Law Firm in Chicago, Illinois, which is representing some of the individual defendants in this matter, as an expert witness. After reviewing the documents provided to me, which are listed below, I am submitting this report with my expert opinions in this matter. I base my opinions on careful analysis of the information which I was provided, my professional experience and training, and I make them to a reasonable degree of professional certainty. I have relied on my 40-plus years of law enforcement experience, training, and education to reach the opinions listed in this report. During my tenure in the Homicide Unit with the Miami Police Department, I actively participated in hundreds of murder investigations as either the "Lead Investigator," "Co-Lead Investigator" for another detective who was assigned as the lead investigator, or as a Detective Sergeant supervising the detectives assigned murder cases. In addition to murder investigations, I participated in thousands of death investigations for deaths caused by suicide, accidental deaths, natural deaths, etc. During my professional career, I have also reached out to known experts in crime scene and homicide investigations when questions arose in order to verify certain aspects of my cases. I utilized both personal knowledge and personal experience in reaching my conclusions and opinions, which are generally accepted in the law enforcement community.

**FORMAL EDUCATION**
Bachelor's degree in PUBLIC ADMINISTRATION
    Barry University – Miami, FLA
    Magna Cum Laude
Bachelor's degree in CRIMINAL JUSTICE
    Grantham University – Lenexa, KS
    Summa Cum Laude
Master's degree in PUBLIC ADMINISTRATION
    Barry University – Miami, FLA
Doctoral degree in EDUCATION & ORGANIZATIONAL LEADERSHIP
    Barry University – Miami, FLA

**LAW ENFORCEMENT EXPERIENCE**
Graduated from the Miami-Dade College of Criminal Justice - 1980
    I) Florida certified law enforcement officer

Began working as a uniformed police officer in the Patrol Division with the City of Miami Police Department (MPD) – 1980 to 1981

Transferred to the Homicide Unit in the Criminal Investigations Division of the City of Miami Police Department as a Homicide Detective – 1981 to 1995

Promoted to the rank of Detective Sergeant and remained in the Homicide Unit supervising two teams of detectives. 1995-2002
      a) Regular homicide team consisting of four detectives
      b) Cold Case Squad consisting of two senior detectives

Detached to the Drug Enforcement Administration (DEA) as part of a team of Federal, State and Local law enforcement personnel investigating a Columbian drug syndicate responsible for dozens of murders throughout the world; the main target was Griselda Blanco.

Detached to the Federal Bureau of Investigations (FBI) as part of a team of Federal, State and Local law enforcement personnel investigating a Miami based drug syndicate responsible for approximately eight murders in South Florida; the main targets were Willie Falcon and Sal Maglutta.

Served as the Acting Commander of the entire homicide unit on several occasions: for weeks or months at a time.

Honorably retired at the rank of Lieutenant from the City of Miami Police Department, remaining on as a reserve police officer assisting then current homicide detectives in their cases until 2005.

2005 - Hired by the City of West Miami Police Department (WMPD) as the second in command, with the rank of Police Captain.

2012 – Promoted to the rank of Chief of Police with the City of West Miami Police Department.

2020 – Honorably retired as the Chief of Police from the City of West Miami Police Department. Remaining on in a reserve officer capacity with the rank of Executive Assistant to the Chief of Police; this is my current position.

**LAW ENFORCEMENT TRAINING**
During my tenures with both MPD and WMPD, I attended countless In-Service training classes both within the respective police departments, as well those offered by other local, state, and federal law enforcement agencies. These classes included, but were not limited to: Medicolegal Death Investigations, Interviews and Interrogation, Criminal Investigation, Homicide Investigation, Internal Affairs Investigations, Firearms, and Evidence.

In 1998, I graduated as a Polygraph Examiner from the International Academy of Polygraph and

as Truth Verification Expert from the National Institute of Truth Verification.

**TEACHING EXPERIENCE:**
Over the past five years, as an adjunct professor, I have taught courses at the below universities in the respective subjects. Additionally, I have instructed many In-Service courses to police officers, including but not limited to: Criminal Investigations, Interview and Interrogations, Crime Scene, Homicide Investigation, First Line Supervision, and others, for the Miami Police Department, Miami-Dade Police Department, and others.

 **Florida International University**
  1) Criminal Law
  2) Criminal Investigations
  3) Introduction to Criminal Justice
  4) Criminological Theory
  5) Criminal Evidence
  6) Criminal Justice System
  7) Security and Crime Scene Science
  8) Drugs and Crime
  9) Corrections
  10) Law Enforcement
 **Carlos Albizu University**
  1) Policing and Law Enforcement
  2) Crime Scene Investigations
  3) Interviews and Interrogations
  4) Introduction to Criminal Justice
  5) Criminal Investigations
 **Florida National University**
  1) Introduction to Criminal Justice
  2) Juvenile Justice
 **Barry University**
  1) Ethics in Public Administration
  2) Methods and Techniques in Public Administration
  3) Public Management and the Political Process
  4) Contemporary Issues in Public Safety

My resume contains additional information, including my publications. In the last four years, I have testified as an expert witness at three depositions: (1) in the matter of *McIntosh v. Bach*, 20 CV 324 (N.D. Ill.), where I was also retained by The Sotos Law Firm, P.C.; (2) in the matter of *Arthur Brown v. City of Chicago*, 18 CV 7064, where I was retained by Hale & Monico LLC; and (3) the combined cases of *Solache v. Guevara*, 18 CV 2312 and *DeLeon-Reyes v. Guevara*, 18 CV 1028. The compensation for my work is $350 per hour.

*<u>MATERIALS REVIEWED</u>*

- Documents

3

- Complaint
- Arrest Report (RFC 1-2)
- Perm Retention File Corrected (RFC 5-35)
- Photographs (RFC 36-100)
- Photographs (RFC 101-110)
- Investigative File (RFC 111-178)
- Ruben Gonzalez Homicide Investigative File (RFC 4843-4959)
- Ruben Gonzalez Homicide Permanent Retention File (RFC 4960-5015)
- Public Defender File (Sierra 5462-5940)
- CCSAO File (CCSAO Sierra 1-269)
- State of Illinois v. Thomas Sierra First, Second, and Third Supplement to Amended Petition for Post-Conviction Relief (Sierra 5074-5151)
- PC Petition Exhibits (Sierra 3042-5073)
- Order granting COI (Guevara-L 60)
- 01/09/2018 Dismissal Order (EP Sierra Sub. Resp. 9276-9277)
- Thomas Sierra COI Transcript 02-10-2022 (Guevara-L 114-130)
- Sierra & Iglesias Court of Claims Orders (Guevara-L 131-136)
- Arrest Reports (Guevara-L 1175-1179)
- Amended Complaint
- Thomas J. Tiderington Expert Report in this case
- Thomas J. Tiderington Supplemental Expert Report in this case

- Transcripts
  - State of Illinois v. Thomas Motion Hearing Transcript 08/20/1996 (Sierra 735-781)
  - State of Illinois v. Thomas Motion Hearing transcript 02/03/1997 (Sierra 782-824)
  - State of Illinois v. Thomas Motion Hearing Transcript 02-04-1997 (Sierra 825-848)
  - State of Illinois v. Thomas Trial Transcript 02/05/1997 (Sierra 849-1000)
  - State of Illinois v. Thomas Trial Transcript 02/06/1997 (Sierra 1148-1422)
  - State of Illinois v. Thomas Trial Transcript 02/07/1996 (Sierra 1427-1696)
  - 11/17/2018 Transcript of Proceedings: Hearing on Motion to Bifurcate before the Honorable Judge John Z. Lee
  - 11/07/2022 Transcript of Proceedings: Hearing on Motion to Compel before Magistrate Judge Joe J. Volpe (United States District Court, Eastern Division of Arkansas, Central Division)
  - State of Illinois v. Thomas Sierra Criminal trial transcripts (Sierra 1147-1739)

- Depositions
  - Luz Montalvo Deposition, including exhibits (05/19/2021)
  - Bernard Sarley Vol I and II Depositions, including exhibits (01/25/2022, 04/19/2022)
  - Daryll Daly Deposition, including exhibits (09/01/2021)
  - Ron Malczyk Deposition, including exhibits (05/11/2022)
  - Anthony Wojcik Deposition, including exhibits (08/11/2022)
  - George Figuera Deposition, including exhibits (06/17/2021)
  - John McMurry Deposition, including exhibits (06/10/2021)
  - Thomas Sierra Deposition, including exhibits (08/26/2021)
  - Jose Melendez Deposition, including exhibits (09/13/2021)
  - William Farrell Deposition, including exhibits (11/10/2021)
  - Edward Mingey Deposition, including exhibits (05/27/2021)
  - Robert Biebel Deposition, including exhibits (07/08/2021)
  - Reynaldo Guevara Deposition, including exhibits (08/20/2019, 08/21/2019)

- o   Robert Biebel Deposition, including exhibits (03/15/2022)
- o   Bernard Graf Deposition, including exhibits (02/02/2022)
- o   John Foster Deposition, including exhibits (06/29/2022)
- o   Ernest Halvorsen Deposition, including exhibits (02/06/2019) (from Serrano case)
- o   Hector Montanez Deposition, including exhibits (08/02/2022)
- o   Ken Trempe Deposition, including exhibits (10/01/2020)
- o   Thomas J. Tiderington, including exhibits (12/08/2022)

*CASE SUMMARY*

My opinions in this report consist of two separate, yet linked murder investigation.
- First is the murder of Ruben Gonzalez, which occurred on 05/20/1995, at approximately 4:25am, at 3302 Fullerton Avenue, in Chicago, Illinois.
    - o   I will offer no expert opinions on this case, simply show the link which led to the identification of Thomas Sierra in the Andujar murder case.
- Second is the murder of Noel Andujar, which occurred on 05/23/1995, at approximately 10:30pm, at 2600 N. Kedzie Avenue, in Chicago, Illinois.
    - o   It is on the Noel Andujar murder investigation where my expert opinions will be based.

**RUBEN GONZALEZ MURDER INVESTIGATION:**

On June 8, 1995, Jorge Mulero, a person claiming to be a witness to the Gonzalez homicide, came forward and told the investigating detectives the following information:

1. On May 20, 1995, at approximately 4:25 a.m., Ruben Gozalez was driving his vehicle (a 1984 Oldsmobile Regency) on Fullerton Avenue with passenger Jorge Mulero. While driving around, they observed an individual known to Mulero as "Koolaid." Gonzalez and Koolaid got into a heated verbal argument and Mulero told Gonzalez to drive away, which he did.

2. Moments later, the car driven by Koolaid rammed into the rear of the vehicle that Mulero and Gonzalez were in, causing Gonzalez to lose control and crash into a light pole.

3. Mulero observed Koolaid exit his vehicle, approach Gonzalez (who was also attempting to exit his vehicle), and shoot Gonzalez— first in the leg, then in the back. Koolaid returned to his vehicle and drove away.

4. Gonzalez was transported to the hospital, where he later died. The Cook County Medical Examiner's Office classified the cause of death as a homicide caused by multiple gun shot wounds.

5. Mulero told CPD detectives that he knew Koolaid prior to the incident. Mulero later positively identified the photograph of Jose E. Melendez, in a photographic line up, as the individual he saw shoot and kill Gonzalez.

5

6. Koolaid was located and interviewed by CPD detectives at Area 5, at which point he denied any involvement. Koolaid was subsequently arrested and charged with the Gonzalez murder.

## NOEL ANDUJAR MURDER INVESTIGATION:

### *The Shooting*

7. Three days later, during the evening of May 23, 1995, and a mere two blocks away from the Gonzalez homicide crime scene, there was a second car-to-car shooting that resulted in a murder.

8. This time, three men—Jose M. Melendez,[1] Alberto Rodriguez, and Noel Andujar were together in Melendez's 1979 Oldsmobile Cutlass, with Andujar seated in the rear passenger seat.

9. As these three individuals were driving down the street, a dark colored Buick Park Avenue with spoked wheels approached them. This Buick was occupied by three individuals, which neither Melendez nor Rodriguez recognized by name.

10. As the two cars passed one another, the Buick passengers represented themselves as Spanish Cobras. Melendez, Rodriguez, and Andujar were members of the Latin Kings. The Buick then fired upon Melendez's vehicle, with one of the bullets striking Andujar in the right side of the head.

11. The Buick then sped off, and Melendez and Rodriguez flagged down nearby officers for assistance. An ambulance took Andujar to a local hospital; he remained in critical condition before he died of his wound on May 24, 1995 at 1:15 p.m.

### *The Initial Investigation*

12. When an ambulance took Andujar to the hospital, the beat officers who had been flagged down by Melendez and Rodriguez called in reinforcements to investigate.

13. Detectives McMurray and Wojcik responded to the scene. From Melendez, detectives learned of the Buick's passengers' Spanish Cobras representations, that the Buick passengers instigated the interaction, that the Buick's front passenger opened the door to fire around it, and that numerous shots were fired. Rodriguez offered much of the same information.

14. Rodriguez and Melendez also provided the following Buick passenger descriptions:

---

[1] For clarity in this report, I will only refer to Jose E. Melendez as "Koolaid" and only refer to Jose M. Melendez as "Melendez."

6

    a. The driver was a 20-25 year old white male hispanic, with a darker complexion and a fade haircut.
    b. The shooter—the front passenger—was an 18-22 year old white male hispanic, with a lighter complexion, black pushed back hair, and wearing a white hoodie.
    c. The rear passenger was a 23-27 year old black male with a dark complexion.

15. The vehicle was described as a 1980's 4-door dark Buick Park Ave with lightly tinted windows and spoked wheels.

16. After speaking with the detectives, Rodriguez and Melendez also had the opportunity to review photobooks containing several hundred photos of various members of Cobra-affiliated gangs. No identification was made.

### *The Homicide Investigation*

17. When Andjuar died, the investigation was reclassified as a homicide investigation. Detectives Halvorsen and Guevara had already been working the May 20th Gonzalez homicide when they were assigned to the May 23rd Andujar homicide.

18. In conducting the earlier Gonzalez homicide investigation, Detectives Guevara and Halvorsen had paid a visit to Gonzalez's mother—Esther Reyes—to discuss the case with her. While there, two visitors came to express their condolences: Junito and Lil Hector.

19. While Gonzalez himself was not believed to be an active gang member, he was associated with the members of the Imperial Gangsters, the gang to which Junito and Lil Hector belonged.

20. As the Gonzalez and Andujar shooting homicides were close in time, close in proximity, both car-to-car shootings, and both involved perpetrators representing themselves as rival gangs, detectives considered the possibility of relatedness between the two. With that, and with similar descriptions between the Andujar homicide perpetrators and the individuals who visted Gonzalez's mother, detectives looked into Junito and Lil Hector further.

21. Detectives contacted Gang Crimes Specialist George Figueroa, who provided the names of Hector Montanez and Thomas Sierra, as well as photographs of both individuals.

22. On May 25, 1995, detectives went to Rodriguez's home to interview him and showed him a six-person photo array. Rodriguez informed the detectives that he could only identify the shooter and selected the photograph of Sierra. The detectives attempted, but were unable to locate Melendez to view the photo array.

23. On May 30, 1995, Sierra was taken into custody and brought to the Area for questioning. Detectives contacted Melendez and Rodriguez and asked they come to the Area. While

7

there, detectives showed Melendez the same photo array previously shown to Rodriguez. Melendez positively identified Sierra (aka Junito) as the shooter from the photo array.

24. Subsequently, Sierra was placed in a live lineup, which was viewed by both Melendez and Rodriguez. Both individuals independently identified Sierra as the person who fired shots at them and who shot and killed Andujar. Written statements were taken from both men by Assistant State Attorney (ASA) William Farrell.

25. Sierra was interviewed regarding his involvement in the Andujar murder wherein he provided the initial alibi of his girlfriend, Lucy Montalvo. Specifically, when Sierra was interviewed post-Miranda warnings, he denied any involvement in the shooting of Andujar and explained that he was at Montalvo's house at the time of the shooting.

26. Meanwhile, officers observed the reported vehicle of Montanez—a black Buick Park Ave— driving down the street. The vehicle was stopped, and the driver was determined to be Koolaid. He agreed to bring the car to Area Five and park it amongst others in the lot for the eyewitnesses of Andujar's murder to view. He also stated he had traded his car earlier that day with Montanez

27. Both Melendez and Rodriguez where taken to the parking lot of vehicles and identified the Buick Park Avenue as the car Sierra was the front passenger in during the Andujar shooting. Photos were taken of the vehicle and saved in the file.

28. Detectives also contacted Montalvo, Sierra's alibi witness, who came in and was interviewed by detectives on May 30, 1995. Montalvo explained that Sierra would come to her house after her parents went to sleep, between 11:00 p.m. and midnight and that a male hispanic named Hector would usually drop him off. She further stated that she was not with Sierra at the time of the Andujar murder. Montalvo also provided a statement to ASA William Farrell attesting to this information.

29. Detectives then asked Montanez if he would assist in locating witnesses in the Gonazalez investigation, which he agreed to. Montanez was also interviewed and informed he was a suspect in the murder, in addition to being informed they had his vehicle, his vehicle was identified as the offender vehicle, and that eyewitnesses had already identified him and Sierra as involved. He was Mirandized and provided a statement to ASA Farrell that he was the driver of that vehicle on May 23th and observed Sierra (his then-front passenger) produce a handgun from under the front seat and fire several shots from his weapon at the vehicle that was driving next to them. Montanez would not identify the individual in the backseat.

### *Charging and Trial*

30. On May 30th, ASA Farrell approved charges against Sierra for first degree murder. He was also charged with two counts of aggravated discharge of a firearm for shooting at Melendez

8

and Rodriguez.

30. Sierra was tried by a jury beginning February 6, 1997. Neither Montalvo, nor any other person was offered as an alibi witness.

31. Melendez testified and recanted his identification of Sierra, leaving only Rodriguez to testify to his positive identification of Sierra as the shooter.

32. On February 7th, Sierra was found guilty of all three charges. He was subsequently sentenced to a total of 55 years of incarceration.

*Post-Conviction Proceedings*

33. Sierra's convictions were upheld by the appellate court.

34. In 1999, Sierra filed a *pro se* post-conviction petition. In response, the judge reduced his sentence to 45 years of incarceration, but dismissed the remainder of his petition.

35. On November 17, 2017, Sierra was paroled.

36. On January 9, 2018, Sierra's conviction was vacated and the case was dismissed.

**OPINIONS**

37. After reviewing the materials listed above, it is my professional opinion that the CPD detectives working the Andujar investigation conducted themselves professionally and, in a manner, consistent with generally accepted police principles and investigatory norms.

38. Furthermore, it is my professional opinion that the CPD detectives/officers acted in accordance with generally accepted police practices and procedures during the course of the Noel Andujar murder Investigation.

39. No homicide investigation is ever perfect, nor is it ever the same. The benefit of hindsight, especially once you have knowledge of the outcome, will inevitably reveal investigative action(s) that could have been taken beyond those that were completed while the investigation was ongoing. This is the nature of homicide investigations: they are complex, dynamic, multifaceted, evolve quickly, and rarely develop in an identical manner to prior investigations handled.

40. The complexity and intricacies of homicide investigations differ significantly from other types of criminal investigations in two areas. The first, and most notable, is the fact that the victim is deceased and cannot provide any information as to what occurred or identify the assailant. Secondly, and as was the case in this investigation, the crime scene(s) was fluid and covered a significant area, versus a crime scene in a localized and in one secure

9

location. No two homicide investigations are exactly alike, however, there are typical methods, practices, and procedures that are commonly utilized with the goal of bringing the investigation to its conclusion.

41. In this case, there was no arrest of a suspect at the scene, no recovered murder weapon, no DNA evidence, and no video footage of the crime in progress. But the Detectives did have two eyewitnesses who saw the shooting take place and who could possibly: identify, or eliminate, possible suspects, provide a description of the vehicle, and provide information that suggested gang involvement, including specific gang affiliation. The detectives correctly focused on the evidence they had, took appropriate investigative measures and actions, following the leads as they developed, which ultimately led them to a suspect, Thomas Sierra, who was identified by the two eyewitnesses, charged, and convicted. It is my professional opinion that these were the appropriate investigative steps to take to conduct a thorough investigation. The detectives did what any other seasoned investigators would do—make use of the information they had and actively work to seek out more information.

### A. Initial Investigation

42. Detectives were assigned to the scene as well as lab technicians, who were deployed to process and document the crime scenes. Detectives McMurray and Wojcik responded to the scene and conducted a preliminary investigation—they spoke with the on-scene officers who provided an initial summary of the occurrence, assessed the crime scene, assisted in the collection of evidence, interviewed the witnesses, and collected information on the victim. Detectives properly documented their preliminary investigation, including the descriptions provided from the eyewitnesses of the offender's vehicle and its three occupants.

43. Detectives were confronted with evidence that this was a gang shooting. Drive-by shootings are commonly used by gangs. Additionally, Melendez reported that the occupants of the offender's vehicle represented themselves as Spanish Cobras while Melendez, Rodriguez and Andujar were members of the Latin Kings. For all of these reasons, it would be logical for detectives to consider the likelihood that the shooting was gang related, and that the suspect could be a member or associate of Cobra affiliated gangs. To that end, it was logical for the detectives to have Melendez and Rodriguez view photobooks containing several hundred photos of various members of Cobra-affiliated gangs, shortly after the shooting incident, with the hope of identifying a suspect.

44. It is my professional opinion that these were appropriate investigative steps to take, based upon generally accepted police procedures and investigative protocols, to initiate an investigation into the shooting of Andujar.

### B. Identifications and Further investigation

10

45. The initial investigation at the scene identified Rodriguez and Melendez as eyewitnesses to the shooting, who could potentially identify the shooter by either face or identify the offender's vehicle. The most effective and equitable way to either confirm or eliminate suspects was exactly what the Detectives did: prepare a photo array to show to the eyewitness. This is a sound and widely accepted investigative technique to use.

46. Having received information that Sierra and Montanez might be involved in the Andujar shooting, Detectives Guevara, Halvorsen, and McMurray attempted to, and did, vet this information by use of a six-person photo array shown to Rodriguez at his home, wherein he identified Sierra as the shooter.

47. This identification was later confirmed when Melendez selected Sierra from the same photo array. Upon completion of the photo array, the detectives proceeded to the next logical and generally accepted phase of the investigation: a live lineup. The results of the live lineup further confirmed the Sierra identification.

48. Detectives initial belief that the Buick Park Avenue could have been involved in the Andujar shooting was verified by Melendez and Rodriguez, both in their physical identifications of Sierra and in their physical identification of the vehicle itself. Similarly, the description of the vehicle by the eyewitnesses as having had "spoked wheels," is consistent with the vehicle they identified in the Area parking lot.

49. These actions by the detectives to investigate and identify a plausible suspect, and then receive positive identifications of that suspect as the shooter, were and are sound and widely accepted investigative techniques used to develop investigations and to vet whether an individual is a viable suspect.

50. In his initial interview at Area Five, Sierra denied having any involvement in the Andujar homicide and requested that the detectives contact his girlfriend, Montalvo, who would provide an alibi for him. Upon learning of this, detectives investigated Sierra's claimed alibi defense by locating and interviewing Montalvo.

51. Having received information implicating Montanez, it made sense for detectives to interview him next. After being mirandized, Montanez identified Sierra as the shooter. Shortly thereafter, Sierra was informed of Montanez's statements, who requested to call his attorney. No further questioning of Sierra occurred after this.

52. The detectives search for additional suspects ended appropriately when the witnesses identified Sierra, both in the photo lineup/display and then again in the live lineup. Had there been no identification and/or conflicting identification(s), then the detectives should have sought out additional suspects. However, since the two eyewitnesses provided a positive identification of Sierra both photographically and live, the detectives were correct, and performed their investigative duties within generally accepted police investigative practices.

53. The detectives would have been negligent in their duties had they forsworn the two positive witness identifications, and not investigated Sierra for his participation in the Andujar shooting/murder. It is my opinion, based on my training, experience, and education that the detectives acted in accordance with established investigative norms and generally accepted police practices by focusing their investigation on Sierra as the perpetrator in the Andujar shooting/murder.

54. The detectives had no additional, nor contradictory witnesses nor evidence at the time, other than what these witnesses had told them. Therefore, it is my opinion, based on my experience, training, and knowledge that the CPD detectives conducted the Andujar murder investigation properly and well within generally accepted investigative methods and police practices, following the evidence/testimony where it was taking them.

### C. Ballistics

55. Neither Melendez nor Rodriguez, both eyewitnesses, have provided testimony or statements suggesting there was more than one shooter. Understanding that a .22 caliber spent casing was recovered at or near the scene is not conclusive evidence of there having been more than one shooter. Knowing the number of shootings that were occurring during this time, it is most likely that this .22 caliber casing is not related to the Andujar murder and it is from another unrelated shooting. The CPD personnel correctly collected this .22 caliber casing in the course of their initial investigation and without the benefit of knowing what occurred. Several times during my tenure at MPD homicide, there were unrelated casings recovered from a previous shooting at the scene of a new shooting/murder.

56. The projectile recovered from Noel Andujar during his autopsy, is described as a "medium sized" projectile. In fact, at trial the parties stipulated to the finding that that bullet was, in fact, a 9 millimeter bullet. I found no evidence in the documents that I reviewed that any of the projectiles, nor projectile fragments recovered at the shooting scene were indicative of having been a .22 caliber round.

57. As I have said before, hindsight is 20/20. In every investigation I participated in during my career—either as lead investigator, co-lead investigator, or as part of a team of investigators—there was undoubtedly always something that "could have" been done: that one extra question I should have asked the witness or suspect; that one extra photograph I should have requested the crime scene technician take; that extra 25 feet I should have extended the crime scene. All homicide detectives have had to live with these questions, especially after having an offender acquitted. Not every investigation was flawless or free of all errors, but I do not see evidence here that officers failed to fulfill their investigative roles.

58. As to supervisory actors, there is a difference between being a detective investigating a case and being the commander/overseer of an investigative unit. Supervisors are not the boots-on-the-ground individuals conducting the day-to-day investigatory tasks and, based on my

12

40 plus years of experience in Miami, are not usually overseeing just one homicide case at a time either. It is not wise to micromanage your investigators; rather, a supervisory actor should be keeping themselves updated on case developments and assist where necessary with logistics, tools, and manpower. He or she will not be an active participant in the direct evidentiary tasks themselves.

### D. TUNNEL VISION

59. It is also my opinion that, looking at the investigation as a whole and in the order in which it came about, there was no tunnel vision employed.[2] To the contrary, in my review of this case, and based on my experience, training, and knowledge, it was a well investigated murder case consistent with generally accepted investigative techniques and police practices in which the CPD detectives followed the investigation where the evidence and witness statements took them.

60. Mr. Tiderington claims that inappropriate tunnel vision was employed in this investigation— namely, detectives wrongfully focused the investigation in on Sierra. To maintain this assertion, several noteworthy pieces of information would be discounted:

    a. The Andujar shooting/murder was undeniably gang related.
    b. The vehicle lead linking the Buick from the Gonzalez murder occurred by chance. Had the detectives not gone to speak with Ms. Reyes on that particular day at that specific time, they would not have observed the Buick nor its two occupants.
    c. It was logical for the detectives to seek out the names or nicknames of the two occupants. From there, detectives followed the lead by speaking with gang specialist (Figueroa) who provided the detectives with the real names and photographs of the two individuals.
    d. The identification procedures utilized by the detectives occurred after the viewing of the Buick as stated above.
    e. The eyewitnesses independently made positive identifications of Sierra as the shooter from the photographic lineup/display.
    f. To further bolster the eyewitnesses' photo identification and assure themselves Sierra was in fact the shooter, the detectives placed Sierra in a live lineup, where he was again positively identified.
    g. Furthermore, in an effort to make sure the Buick in question was in fact the vehicle Sierra was in when Andujar was shot and ultimately killed, the detectives had the Buick parked in a parking lot mixed among many vehicles and asked if the eyewitnesses could identify it. Upon the witnesses walking around the parking lot, they positively identified the same Buick as the car from which Sierra shot and killed Andujar.

---

[2] There were also, in the documents that I reviewed, allegations of policy, training, and discipline issue. I have not been requested to provide opinions in these matters, thus I will not.

13

    h. Montanez identified Sierra as the shooter.
    i. Luz Montalvo has testified that she knew Thomas Sierra by the nickname "June Bug," not Junior nor Junnie. Yet, in Thomas Sierra's prior arrest history, the nicknames or AKA's are listed ONLY as: "Jr. G." (09/14/1993) – "Junnie" (09/18/1993) – "Jr" (04/27/1994) and "Junior" (08/21/1994).[3] Additionally, in Thomas Sierra's pre-sentence investigation, his nickname is listed as "Junior."[4]

61. Mr. Tiderington comments that the detectives employed investigative tunnel vision because Melendez and Rodriguez provided a limited description of the offenders to the uniformed officers, as compared to what they later provided to detectives. I find no issues with these discrepancies as I have often experienced these inconsistencies during my tenure investigating murders. Therefore, having the reporting/uniformed officer write no further description ("NFD") in his report is not unusual based on my experience, training, and knowledge.

62. During my over 20 years with the City of Miami Police Department's Homicide Unit, I would request that responding patrol officer(s) minimally interview witnesses and/or victims. The patrol officer's victim/witness interview should be limited to finding out what happened, obtaining basic descriptions of suspects and vehicles, how and in what direction the offenders left the scene, as well as other information that could initially lead to the identification and whereabouts of the offenders; this of course after ascertaining the victim(s) and/or witness(s) well-being. This was requested knowing that homicide detectives would conduct more detailed interviews and obtain any additional and substantial facts. Notwithstanding, it was important to maintain all the witnesses and or victims separated from each other, which was done properly by the CPD personnel. With regards to an area canvass, that too should be conducted by the homicide detectives.

63. This is not to suggest that a patrol officer should not speak to people on the street and see what if anything they know, heard, or saw, but more importantly to obtain contact information in order for the detectives to interview these potential witnesses at a later time.

64. The patrol officer's initial report is just what the word implies: initial. All of the specifics, details, and other pertinent information will be obtained and documented by the homicide detectives in their follow up or supplementary reports. The report should record the known names (including known nicknames) of everyone involved; victim(s), witnesses, suspect(s), basic description(s) of: suspect(s), vehicle(s), weapons, date/time, location(s), etc., as well as a narrative explanation of the incident. This was properly done here.

65. The detectives followed acceptable police practices in providing the eyewitnesses with opportunities to view a possible suspect through appropriate methods, beginning the night

---

[3] Sierra 005543 -005546
[4] Sierra 005620

of the shooting. The fact that it is not documented whether Melendez and Rodriguez were asked if they could identify the offenders in the Andujar murder does not render the investigation shoddy. The fact they were shown hundreds of gang member photos is sufficient evidence that they could in fact identify the person(s) responsible, as they ultimately did.

### E. REPORT WRITING

66. Mr. Tiderington claims that the detectives failed to thoroughly document their investigation. However, the CPD detectives and officers properly documented their investigative steps. The entirety of the investigation was properly documented in the final supplementary report.

    Here, the detectives and officers properly documented their investigative steps throughout the Andujar investigation. Detectives correctly documented the witnesses lack of identification (gang book photos), the plaintiff's denials, and properly continued their investigation. This was the correct and generally accepted investigative procedure at that point in the investigation.

67. My experience, training, and knowledge have also demonstrated to me that detectives often pass along information verbally to each other, without paper documentation. Thus, I see nothing wrong with the way the CPD detectives relayed information to one another in this investigation.

68. While some detectives do take contemporaneous notes, my training, experience, and knowledge has demonstrated to me that others do not. Regardless of one's note taking preference, the importance is that the information is documented in subsequent reports. Therefore, it is my opinion that the lack of note taking cannot be shown to indicate sloppiness or negligence on the part of the CPD detectives.

69. Certainly, officers should endeavor to be accurate, complete, and to compile reports as close-in-time as is possible to the events the report is intended to capture; however, the contemporaneous memorialization of events is not always feasible. While police investigative policies and best practices call for documentation of a detective's findings, nothing prohibits them from completing reports at a later date. Many investigations span several months and sometimes years; thus, it is their responsibility to utilize both their notes and their memories when completing the final or closing supplementary reports. In my review, I found no evidence that the officers excluded exculpatory evidence or statements in their reports.

70. I found the defendants properly and thoroughly documented their actions and the investigative steps they took during the Andujar shooting/murder investigation; all within generally accepted investigatory procedures. My experience, training and knowledge

15

indicates a well conducted investigation, to include the documentation of investigative steps and action by the CPD detectives.

### F. Identification Procedures

71. Detectives followed proper investigative techniques to vet Sierra's viability as a suspect—through a photo array and two lineups—which led to the determination that he was the shooter seen by the eyewitnesses.

72. In conducting the photo array, the Detectives followed proper investigative procedure in placing a photograph of Sierra in a photo array of similarly appearing individuals and showing it to the Rodriguez and Melendez. Following their identifications of Sierra, it was proper for the detectives to conduct a live lineup.

73. During the deposition of Lieutenant John Foster on 06/29/2022, Lt. Foster explained how there were several levels of identification of a suspect from a witness. He testified that CPD would often experience a witness would "flip," or change his/her testimony when he/she had to testify in court (pages 1274, 293). For this reason, CPD would first show a photo lineup or display, then a live lineup, and finally the witnesses Grand Jury testimony would be a third time for the witness to identify the perpetrator. This was done to be able to impeach a witness at trial when, and if, he/she would recant their previous identification(s).

74. The plaintiff alleges in his complaint that the defendants failed to disclose their manipulative actions during the lineup identifications by witnesses Melendez and Rodriguez. Other than what is now being alleged by the plaintiff, I found no evidence of any wrongdoing or manipulation in the documents which I reviewed. Therefore, it is my opinion that both the photographic identification and live lineup identification by both Melendez and Rodriguez were conducted correctly and within generally accepted police practices and procedures. I found no evidence of intimidation, or manipulation, in the documents that I reviewed, of either Melendez or Rodriguez during their identifications of Sierra as the shooter in the Andujar murder.

75. To date, Rodriguez stands behind his identification of Sierra and previously testified in his 2009 deposition that he was 100% sure the person he picked (photo lineup) was the person who shot at them and killed Noel Andujar. [5]

76. Rodriguez confirmed this at his 2009 deposition wherein he testified that the detectives never told him which photograph to choose, when shown the photo lineup.[6] Additionally, McMurray testified at his 2021 deposition that the photo lineup procedure was primarily conducted by Detective Halvorsen and himself, with Detective Guevara playing little, if any

---

[5] Sierra 003595
[6] Sierra 003582

16

part, in the procedure with Rodriguez.[7] McMurray further testified that Rodriguez said, "[t]his is the guy who shot my friend" when he selected Sierra's photo.

77. Therefore, it is my opinion that both the photographic identification and live lineup identification by both Melendez and Rodriguez were conducted correctly and within generally accepted police practices and procedures. I found no evidence of intimidation, nor manipulation, in the documents that I reviewed, of either Melendez or Rodriguez during their identifications of Sierra as the shooter in the Andujar murder.

### G. Gang Involvement in Homicide investigations

78. Chicago has long been plagued with a barrage of gang related shootings and murders dating back to the date of the Andujar shooting and continuing too today. South Florida also experienced its share of gang related shootings and murders, although not to the extent that has and continues to occur in Chicago. It is my experience that these gang related murders are often difficult to solve and to identify the perpetrator(s); primarily due to the loyalty amongst gang members, the fact they want to revenge these actions on their own, without police involvement, and fear of retribution. I should also note that many of these shootings/murders are retaliatory in nature with many remaining open and unsolved. Making gang related homicide investigations even more difficult are the unique challenges present in most gang related murders; code of silence, distrust of the police, wanting personal retaliation, to name a few.

79. Some of these concerns were at issue in the Andujar investigation. Rodriguez previously testified that he would become fearful if other gang members (in prison) found out that he testified because the (gang) "rule" is to never give a statement (to police).[8] He further testified that Sierra sent or tried to send him a message not to testify and/or show up in court.[9]

80. Montalvo testified during her 2021 deposition that she did not remember much about the Andujar murder because it occurred a long time ago. However, in that same deposition she recalled specifically that she would page Thomas Sierra much earlier than the times she told ASA Farrell during her initial statement on 05/20/1997.

### H. Further opinions & plaintiff's expert rebuttal

81. Additionally, I found no evidence that the defendants fabricated, manufactured, nor solicited false evidence or testimony. It is my opinion, based on my experience, training, and knowledge that the defendants conducted the Andujar shooting/murder investigation in the proper manner, within generally accepted police practices and procedures, and

---

[7] McMurray Depo (06/10/2021) page 209
[8] Sierra 003585
[9] Sierra 003582

presented the true evidence they had obtained through their investigation to the SAO for prosecution.

82. There have been allegations made that Detectives Guevara and Halvorsen mistreated some of the witnesses, something I found no evidence of, except for the subsequent allegations being made by those individuals. ASA Farrell testified that he spoke to the witnesses, outside of the presence of any detectives, as was customary for ASA Farrell, and he inquired of them the treatment they received from the CPD detectives. None of the witnesses informed ASA Farrell of any mistreatment whatsoever. Additionally, in their written statements this treatment question was again asked of the witnesses by ASA Farrell, and again there is no testimony of any type of abuse. Notwithstanding the allegations of abuse/misconduct against any CPD detectives which I have read, and which I have not been asked, nor will I opine on, I found no evidence other than the allegations made by several individuals in this case of abuse at the hands of the CPD detectives. I saw no abuse allegations being made by Thomas Sierra in the documents which I reviewed.

83. In the documents that I reviewed I found no evidence of the defendants withholding, hiding, and/or destroying exculpatory evidence from Sierra nor his initial defense attorney(s). I found the defendants properly and thoroughly documented their actions and the investigative steps they took during the Andujar shooting/murder investigation; all within generally accepted investigatory procedures. My experience, training and knowledge indicates a well conducted investigation, to include the documentation of investigative steps and action by the CPD detectives.

### Concluding opinions

84. After reviewing the materials listed above, it is my professional opinion that the CPD detectives/officers working the Noel Andujar murder investigation conducted themselves professionally and, in a manner, consistent with generally accepted police principles and investigatory norms.

85. For all the reasons mentioned above, it is my professional opinion that the CPD detectives/officers acted in accordance with generally accepted police practices and procedures during the course of the Noel Andujar murder Investigation.

86. Based on my review in this case, it is my opinion that the CPD detectives did not withhold, destroy, or modify and evidence; neither inculpatory nor exculpatory during the Andujar murder investigation.

87. For all the reasons mentioned above, it is my professional opinion that the CPD officers/detectives acted in accordance with generally accepted police practices and procedures during the course of the Andujar shooting/murder Investigation.

88. I reserve the right to modify this report, if and when, new information/documents are presented to me.

*[signature]*

Dr. Nelson Andreu