# Exhibit KKK

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

## CASE NO. 1:18-CV-03029

## THOMAS SIERRA

## V.

## REYNALDO GUEVARA, ET AL.

## DEPONENT:

## NELSON ANDREU

## DATE:

## May 12, 2023



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4                  HON. JOHN Z. LEE

5                HON. M. DAVID WEISMAN

6               CASE NO. 1:18-CV-03029

7

8                   THOMAS SIERRA,

9                      Plaintiff

10

11                        V.

12

13             REYNALDO GUEVARA, ET AL.,

14                    Defendants

15

16

17

18

19

20

21

22

23   DEPONENT:  NELSON ANDREU

24   DATE:      MAY 12, 2023

25   REPORTER:  SYDNEY LITTLE



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 2

1                    APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFFS, THOMAS SIERRA, GERALDO
4    IGLESIAS:
5    Anand Swaminathan, Esquire
6    Loevy & Loevy
7    311 North Aberdeen Street
8    Third Floor
9    Chicago, Illinois 60607
10   Telephone No.: (312) 243-5900
11   E-mail: anand@loevy.com
12   (Appeared via videoconference)

13

14   ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
15   Catherine M. Barber, Esquire
16   Rock Fusco & Connelly, LLC
17   321 North Clark Street
18   Chicago, Illinois 60654
19   Telephone No.: (312) 494-1000
20   E-mail: cbarber@rfclaw.com
21   (Appeared via videoconference)

22

23

24

25

Page 3

1              APPEARANCES (CONTINUED)

2

3    ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:
4    Megan K. McGrath, Esquire
5    Leinenweber Baroni & Daffada LLC
6    120 North LaSalle Street
7    Suite 2000
8    Chicago, Illinois 60602
9    Telephone No.: (866) 786-3705
10   E-mail: mkm@ilesq.com
11   (Appeared via videoconference)

12

13   ON BEHALF OF THE DEFENDANTS, ERNEST HALVORSEN, ANTHONY
14   WOJCIK, JOHN MCMURRAY, GEORGE FIGUEROA, EDWARD MINGEY,
15   ROBERT BIEBEL, FRANCIS CAPPITELLI:
16   Jeffrey R. Kivetz, Esquire
17   The Sotos Law Firm, P.C.
18   141 West Jackson Boulevard
19   Suite 1240A
20   Chicago, Illinois 60604
21   Telephone No.: (630) 735-3300
22   E-mail: jkivetz@jsotoslaw.com
23   (Appeared via videoconference)

24

25

Page 4

1                      INDEX

2                                        Page

3    PROCEEDINGS                          6
4    DIRECT EXAMINATION BY MR. SWAMINATHAN    8
5    CROSS-EXAMINATION BY MR. KIVETZ      199
6

7

8                    EXHIBITS

9    Exhibit                             Page
10   1 - Expert Report of Nelson Andreu
11      March 27, 2023                    20
12   2 - Thomas Sierra Investigation File
13      RFC-Sierra 000111-000178         103
14   3 - Expert Report of Thomas Tiderington   193
15   4 - Invoices from Nelson Andreu to
16      The Sotos Law Firm, P.C.
17      December 1, 2022 and January 2, 2023    192
18

19

20

21

22

23

24

25

Page 5

1                    STIPULATION

2

3    The VIDEO deposition of NELSON ANDREU was taken at
4    KENTUCKIANA COURT REPORTERS, 110 NORTH WACKER DRIVE,
5    CHICAGO, ILLINOIS 60606, via videoconference in which
6    all participants attended remotely, on FRIDAY the 12th
7    day of MAY 2023 at 10:05 a.m. (CT); said VIDEO
8    deposition was taken pursuant to the FEDERAL Rules of
9    Civil Procedure 30(b)(6).  The oath in this matter was
10   sworn remotely pursuant to FRCP 30(b)(6).

11

12   It is agreed that SYDNEY LITTLE, being a Notary Public
13   and Digital Reporter for the State of ILLINOIS, may
14   swear the witness and that the reading and signing of
15   the completed transcript by the witness is not waived.

16

17

18

19

20

21

22

23

24

25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

```
 1                 PROCEEDINGS
 2
 3        THE REPORTER:  On record.  My name is Sydney
 4   Little.  I'm the online video technician and court
 5   reporter today, representing Kentuckiana Court
 6   Reporters, located at 110 North Wacker Drive,
 7   Chicago, Illinois 60606.  Today is the 12th day of
 8   May 2023. The time is 10:06 a.m. Central.  We are
 9   convened by videoconference to take the deposition
10   of Dr. Nelson Andreu, in the matter of Thomas
11   Sierra v. Reynaldo Guevara, et al., pending in the
12   United States District Court for the Northern
13   District of Illinois, Eastern Division, Case number
14   118-CV-03029.  Will everyone but the witness please
15   state your appearance, how you are attending, and
16   the location you're attending from, starting with
17   Plaintiff's Counsel?
18        MR. SWAMINATHAN:  Anand Swaminathan for
19   Plaintiff Thomas Sierra, appearing by Zoom from
20   Chicago.
21        MR. KIVETZ:  Good morning.  This is Jeff
22   Kivetz on behalf of the individual defendants,
23   except for Defendant Guevara, appearing via Zoom,
24   from Chicago, Illinois.
25        MS. BARBER:  Catherine Barber for Defendant
```

Page 7

```
 1   City of Chicago, also by Zoom in Chicago.
 2        MS. MCGRATH:  Megan McGrath for Defendant
 3   Guevara, also by Zoom in Chicago.
 4        MS. FLEMING:  Elizabeth Fleming on behalf of
 5   the individual defendants, except Defendant
 6   Guevara, appearing by Zoom in Chicago.
 7        THE REPORTER:  Thank you.  Dr. Andreu, will
 8   you please state your name for the record?
 9        THE WITNESS:  Nelson Andreu.
10        THE REPORTER:  Thank you.  And do all parties
11   stipulate that the witness is, in fact, Nelson
12   Andreu?
13        MR. SWAMINATHAN:  So stipulated by Plaintiff.
14        MR. KIVETZ:  Stipulated by the Defendants.
15        MS. MCGRATH:  So stipulated.
16        THE REPORTER:  Thank you.
17        MS. BARBER:  Agreed.
18        THE REPORTER:  Thank you.  And sir, will you
19   please raise your right hand?  Do you solemnly
20   swear or affirm that the testimony you're about to
21   give will be the truth, the whole truth, and
22   nothing but the truth?
23        THE WITNESS:  I do.
24        THE REPORTER:  Thank you.  Counsel may begin.
25                 DIRECT EXAMINATION
```

Page 8

```
 1   BY MR. SWAMINATHAN:
 2        Q.   Good morning, Mr. Andreu.  How are you?
 3        A.   Good morning, sir.  How are you?
 4        Q.   Good.  Nice to see you again.  You've given a
 5   deposition before, yes?
 6        A.   Yes.
 7        Q.   And how many times have you given depositions
 8   in your capacity as an expert?
 9        A.   I believe three.
10        Q.   Okay.  And how many times have you given
11   depositions in your capacity as a law enforcement
12   officer?
13        A.   Hundreds of times.
14        Q.   Florida is a depositions state, correct? Where
15   there's depositions before criminal trials?
16        A.   That is correct.
17        Q.   Okay.  And so you've been deposed hundreds of
18   times before criminal trials; is that fair?
19        A.   That's fair.
20        Q.   Okay.  And so you understand how the
21   deposition process works quite well; is that fair?
22        A.   Yes, sir.
23        Q.   Okay.  I'll just go through the -- I'll go
24   through those -- just how this works again, even though
25   I know you know, it, but this is a question and answer
```

Page 9

```
 1   session, please make sure that you give verbal answers
 2   so the court reporter can write it down, understood?
 3        A.   Yes.
 4        Q.   Okay.  And you understand that if I ask you a
 5   question, and you don't understand it, you're welcome to
 6   tell me that you don't understand the question and I'll
 7   rephrase it, fair?
 8        A.   Yes, sir.
 9        Q.   Okay.  And if you answer my question, I will
10   assume you understood my question; is that fair?
11        A.   Correct.
12        Q.   Okay.  If you need to take a break, we can, of
13   course, take a break, just answer any pending questions;
14   is that fair?
15        A.   Yes, sir.
16        Q.   Okay.  Do you have any medi -- strike that.  Do
17   you have any medical conditions that would prevent you
18   from being able to understand my questions and answer
19   them today?
20        A.   No, sir.
21        Q.   Are you taking any medications that would
22   impair your ability to understand my questions and
23   answer them truthfully today?
24        A.   No, sir.
25        Q.   Okay.  We don't have to make this a long
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 10

1  deposition, so let me just go through some questions
2  that I think are -- came up in your Reyes deposition,
3  and I think we can sort of short circuit them here.  So
4  did you have a chance to review the deposition
5  transcript of your testimony in the Reyes case?
6      A.  No, sir.  I have not.
7      Q.  Did you -- did -- you recall testifying as an
8  expert in the Reyes case in a deposition, correct?
9      A.  I do.
10      Q.  Okay.  Is there anything that you said during
11  the course of that deposition that you felt was
12  misleading or inaccurate in any way?
13      A.  I don't believe so, but I -- I haven't had an
14  opportunity to review it, and I would like to.
15      Q.  You said you would like to?
16      A.  Well, if -- if at all possible, yes.
17      Q.  Okay.  Have you -- are you aware that there is
18  a transcript of your deposition in the Reyes case?
19      A.  I assume there is, yes.
20      Q.  Have you requested a copy of it up to today?
21      A.  No, sir.
22      Q.  Okay.  At any point --
23          MR. KIVETZ:  Anand, do you have a copy of the
24      transcript?  We were understanding that nobody
25      ordered it.

Page 11

1          MR. SWAMINATHAN:  I haven't ordered it.
2          MR. KIVETZ:  Yeah.  And I don't have it
3      either, so...
4  BY MR. SWAMINATHAN:
5      Q.  Yeah, but you're welcome to get a copy.
6  Mr. Andreu, you understand you're able to get a copy of
7  the transcript if you'd like one, correct?
8          MR. KIVETZ:  Through his counsel, but yes.  Go
9      ahead.
10          THE WITNESS:  Yes.  Through the counsel.
11      Correct.
12  BY MR. SWAMINATHAN:
13      Q.  Okay.  And you have not requested it, correct?
14      A.  That is correct.
15      Q.  Okay.  At any point between the time of your
16  testimony -- strike that.  At any point between the time
17  of your deposition testimony in the Reyes-Solache case
18  and today, have you ever thought to yourself, boy, I
19  said something during the course of that deposition that
20  was not accurate or truthful?
21          MR. KIVETZ:  Objection.  Form, foundation.
22          THE WITNESS:  I don't believe so, but again,
23      without reviewing it, I -- I really can't answer
24      for certain.
25  BY MR. SWAMINATHAN:

Page 12

1      Q.  So you think it's possible that you gave some
2  untruthful or inaccurate testimony during that
3  deposition?
4          MR. KIVETZ:  Objection.  Form, misstates his
5      testimony.
6          THE WITNESS:  I -- I wouldn't say untrue, but
7      I -- in any event, I would like to -- to review it.
8  BY MR. SWAMINATHAN:
9      Q.  Okay.  And you haven't taken that opportunity
10  between then and today; is that fair?
11          MR. KIVETZ:  Objection.  Form.  Because he --
12      no -- there is no transcript available, but go
13      ahead.
14          THE WITNESS:  That's correct.
15  BY MR. SWAMINATHAN:
16      Q.  Sitting here today, is there anything that you
17  said during that deposition that you believe to be false
18  or inaccurate?
19          MR. KIVETZ:  Objection.  Form.
20          THE WITNESS:  As I stated before, I don't
21      believe so, but again, it would be better to review
22      the testimony.
23  BY MR. SWAMINATHAN:
24      Q.  Okay.  And fair to say, in the Reyes case,
25  when you offered opinions in that case, your opinions

Page 13

1  were based on the -- I mean, we testified about this in
2  that case, but let me just ask you.  In the Reyes case,
3  that was the case involving Detective Guevara and other
4  Area 5 Chicago Police detectives, correct?
5      A.  Yes, sir.
6      Q.  And in that case, you opined that there were
7  no deviations from accepted police practices by any of
8  the Chicago Police officers; is that fair?
9      A.  None that I would -- that I could see in the
10  documents I reviewed, correct.
11      Q.  Okay.  And that's also your opinion in this
12  case, correct?  That there were no deviations from
13  police practices by Detective Guevara, or any of the
14  other police officers involved in the Andujar
15  investigation?
16      A.  Correct.
17      Q.  Okay.  In the Reyes case, fair to say your
18  opinion was based on acceptance of the information
19  contained in the police reports, correct?
20      A.  In all of the -- in all of the documents that
21  I reviewed, yes.  Including the --
22      Q.  In the Reyes case, you didn't offer any
23  opinions that were based on accepting some of the
24  testimony that was contained in the deposition
25  transcripts, isn't that fair?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1       THE WITNESS: Say that again?
2       MR. KIVETZ: Objection to form.
3       THE WITNESS: I didn't understand.
4   BY MR. SWAMINATHAN:
5       Q.  In the Reyes case, your opinions did not
6   accept the testimony of Mr. Reyes and Mr. Solache, for
7   example, correct?
8       MR. KIVETZ: Objection. Form.
9       THE WITNESS: I -- I still don't understand
10      your question, sir.
11  BY MR. SWAMINATHAN:
12      Q.  You understand, in the Reyes case, Mr. Reyes
13  and Mr. Solache specifically testified that they were
14  physically abused during the course of their
15  interrogation; do you recall that?
16      A.  Yes, I do.
17      Q.  Okay.  And is it your opinion that that is
18  consistent with the generally accepted police practices,
19  to physically abuse suspects?
20      MR. KIVETZ: Objection. Form.
21      THE WITNESS: No, it's not.
22  BY MR. SWAMINATHAN:
23      Q.  Okay.  So in that case, you did not accept
24  that testimony as being true, correct?
25      A.  Correct.

Page 15

1       MR. KIVETZ: Objection. Form.
2   BY MR. SWAMINATHAN:
3       Q.  Go ahead.
4       A.  Correct.
5       Q.  Okay.  Because if, in fact, you did credit
6   their testimony, you would agree that would be a
7   deviation from accepted police practices, correct?
8       A.  Police abuse, yes.
9       Q.  Okay.  And in that case, you -- instead of
10  crediting the testimony of Mr. Reyes and Mr. Solache,
11  you credited the testimony -- strike that.  In that --
12  in the Reyes-Solache case, instead of crediting the
13  testimony of Mr. Reyes and Mr. Solache, you credited the
14  police report's descriptions of what happened during the
15  course of those interrogations; is that fair?
16      MS. BARBER: Objection. Form and foundation.
17      THE WITNESS: Not just -- not just the police
18      reports, but the totality of the documents that I
19      reviewed.
20  BY MR. SWAMINATHAN:
21      Q.  But not the testimony of Mr. Reyes and
22  Mr. Solache?
23      A.  Not the parts --
24      MR. KIVETZ: Objection. Form, foundation.
25      THE WITNESS: Not the parts of their statement

Page 16

1   alleging police abuse.
2   BY MR. SWAMINATHAN:
3       Q.  In this case, in the Thomas Sierra case, you
4   accepted the information contained in the police reports
5   as true, correct?
6       A.  Correct.
7       Q.  Okay.  And for purposes of your opinions in
8   this case, you're relying on the police reports as being
9   accurate; is that fair?
10      MR. KIVETZ: Objection. Form.
11      THE WITNESS: The police reports and other
12      documents that I was presented and reviewed, yes.
13  BY MR. SWAMINATHAN:
14      Q.  But you didn't credit all of the documents
15  that you reviewed; is that fair?
16      MS. BARBER: Objection. Form.
17      MR. KIVETZ: Objection. Form, foundation.
18      THE WITNESS: Yes, that is correct.
19  BY MR. SWAMINATHAN:
20      Q.  Okay.  For example, you reviewed -- you
21  received a transcript of the testimony of Hector
22  Montanez, correct?
23      A.  Yes, sir.
24      Q.  And if Hector Montanez's testimony was true,
25  do you believe that the police officers followed

Page 17

1   generally accepted police practices?
2       MR. KIVETZ: Objection. Form, foundation.
3       THE WITNESS: So he recanted what he had
4       originally said, but -- so I -- I believe the
5       original statement that he gave to the ASA.
6   BY MR. SWAMINATHAN:
7       Q.  Okay.  So you credited his original statement
8   to the ASA, but not his deposition testimony; is that
9   fair?
10      MR. KIVETZ: Objection. Form.
11      THE WITNESS: Yes.
12  BY MR. SWAMINATHAN:
13      Q.  Okay.  And so for purposes of your opinions,
14  you accepted the police reports and handwritten
15  statements that were contained in the police file, but
16  not his deposition testimony; is that fair?
17      A.  Other -- other documents, including the police
18  reports and his original statement, that is correct.
19      Q.  Okay.  And -- but for purposes of your
20  opinions, you did not credit his deposition testimony;
21  is that fair?
22      A.  His recanting, yes, that is fair.
23      Q.  Okay.  And did you credit, at all, the
24  testimony of Jose Melendez?
25      MR. KIVETZ: Objection. Form, foundation.

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

1          THE WITNESS:  I credit his original statement
2     that he gave to the state attorney.  Yes.
3 BY MR. SWAMINATHAN:
4     Q.    Yeah.  You're talking about as documented in
5 the police reports?
6     A.    Yes.
7     Q.    Okay.  Did you credit his --
8     A.    And --
9     Q.    -- did you credit his --
10    A.    And -- and --
11    Q.    -- I'm sorry, go ahead.  Go ahead.  Go ahead.
12    A.    And in his -- his written statement.
13    Q.    Did you credit his criminal trial testimony in
14 offering your opinions in this case?
15          MR. KIVETZ:  Objection.  Form.
16          THE WITNESS:  Who -- which one?  Which person
17    was that?
18 BY MR. SWAMINATHAN:
19    Q.    Jose Melendez, the eyewitness who was in the
20 vehicle with the victim.
21    A.    His recanting in the trial testimony, no.
22    Q.    You did not credit that in -- for purposes of
23 your opinions, correct?
24    A.    That is correct.
25    Q.    And did you credit any of the testimony he's

Page 19

1 given in any depositions since the criminal trial?
2          MR. KIVETZ:  Objection.  Form, foundation.
3          THE WITNESS:  Not in which he recanted his
4    original statement, no.
5 BY MR. SWAMINATHAN:
6     Q.    Why not?
7     A.    Because I am leery, and -- and in my
8 experience -- that recantations can be made for a
9 variety of reasons.  And usually I have found that the
10 original statement that's given close in time to the
11 actual incident is the truthful one.
12    Q.    Okay.  And so ultimately your opinions in this
13 case are based on your credibility determinations; is
14 that fair?
15          MR. KIVETZ:  Objection.  Form, misstates his
16    testimony.
17          THE WITNESS:  No, credibility is -- is up to
18    the trier of facts.  I'm just relaying what my
19    experience has shown.
20 BY MR. SWAMINATHAN:
21    Q.    But ultimately, your opinions are based on
22 your assessment of credibility; is that fair?
23          MR. KIVETZ:  Objection.  Form, foundation,
24    misstates his testimony.
25          THE WITNESS:  No, sir.  Not necessarily.

Page 20

1    Again, I -- I -- it -- my experience shows that --
2     that there's -- when people recant, they -- they
3     usually aren't being as truthful as they were when
4     they gave their original statement.
5 BY MR. SWAMINATHAN:
6     Q.    Are you an expert on truthfulness?
7          MR. KIVETZ:  Objection.  Form.
8          THE WITNESS:  No, not untruthfulness.  I mean
9     that, I guess, would require some type of a -- of a
10    psychological training or degree, but my experience
11    in -- in -- in dozens, if not hundreds, of cases
12    has shown me to believe that the original
13    statements are -- are the most accurate and most
14    truthful.
15 BY MR. SWAMINATHAN:
16    Q.    Okay.  And you're relying on that experience
17 and your conclusions based on that experience in
18 offering your opinions in this case; is that fair?
19          MR. KIVETZ:  Objection.  Form, foundation.
20          THE WITNESS:  Yes, sir.
21 BY MR. SWAMINATHAN:
22    Q.    Okay.  Can you tell me, do you have a copy of
23 your report in front of you, sir?
24    A.    I do.
25          MR. SWAMINATHAN:  Let's mark it as Exhibit 1.

Page 21

1          (EXHIBIT 1 MARKED FOR IDENTIFICATION)
2 BY MR. SWAMINATHAN:
3     Q.    Can you show me where in your report you
4 credit the testimony of Hector Montanez?
5          MR. KIVETZ:  Objection.  Form.
6          THE WITNESS:  On Page 8, Point 29, when the
7     detectives interviewed Montanez, he provided
8     information that he was in the car when Sierra
9     produced a gun, and fired shots at the victim, and
10    -- and/or the victim's car.
11 BY MR. SWAMINATHAN:
12    Q.    And where is -- where are you getting that
13 information from?  In -- so you identified Paragraph 29;
14 is that right?
15    A.    Yes, sir.
16    Q.    Okay.  And in Paragraph 29, where did you get
17 that information from Paragraph 29 from?
18    A.    From the information that I reviewed,
19 primarily the police supplementary reports.
20    Q.    Not primarily, entirely the police
21 supplementary report, correct?
22          MR. KIVETZ:  Objection.  Form.
23          THE WITNESS:  I can't say entirely, because I
24    reviewed countless documents, but I would say
25    primarily from the police reports.



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

```
 1   BY MR. SWAMINATHAN:
 2        Q.   Other than the police reports, is there any
 3   other documents that you're aware of that support the
 4   information contained in Paragraph 29?
 5        A.   The statement of Mr. Montanez given to the
 6   State Attorney.
 7        Q.   Thank you.  Anything else?
 8        A.   Not that I can recall offhand, but again, it
 9   was a totality of everything that I reviewed in this
10   case.
11        Q.   Okay.  And now, can you tell me where in your
12   report you credit the deposition testimony of Hector
13   Montanez?
14             MR. KIVETZ:  Objection.  Form.  You keep
15        saying credit.  This is an expert.  He's not --
16        he's looking at the total synopsis of everything.
17             MR. SWAMINATHAN:  You've made your objection,
18        we've got it.
19             MR. KIVETZ:  He's not making any credibility
20        determination.
21             MR. SWAMINATHAN:   We've noted your objection.
22        You've made your objection.
23             MR. KIVETZ:   You know that full well.  So I
24        mean, I don't know why you're trying to confuse the
25        issue by asking bad, awkward questions that are
```

Page 23

```
 1        getting --
 2             MR. SWAMINATHAN:  Objection to form.  Objection
 3        to form.  Let's just do objections to form.
 4   BY MR. SWAMINATHAN:
 5        Q.   Go ahead, Mr. Andreu.
 6             MR. KIVETZ:  Objection to form.  I just -- I'm
 7        going to follow the Federal Rules, but I wish that
 8        you would just ask a reasonable question, and not
 9        try to turn it and manipulate it in a way that's
10        just making it confusing and ridiculous when you
11        know full well no one here is making any --
12             MR. SWAMINATHAN:  No speaking objections.
13             MR. KIVETZ:  -- credibility --
14             MR. SWAMINATHAN:  Do Federal Rules allow
15        speaking objections?
16             MR. KIVETZ:  -- nobody is making any type of
17        credibility --
18             MR. SWAMINATHAN:  Where are the speaking
19        objections allowed in the Federal Rules?  Please
20        stop.
21   BY MR. SWAMINATHAN:
22        Q.   Go ahead, Mr. Andreu.
23        A.   I'm going through my report.
24        Q.   Thank you.
25        A.   Could you ask -- repeat that question please?
```

Page 24

```
 1        Q.   Yes.  Can you show me where in your report you
 2   credit the deposition testimony of Hector Montanez?
 3             MR. KIVETZ:  Objection.  Form, misstates his
 4        previous testimony.
 5             MR. SWAMINATHAN:  Thank you.
 6             MR. KIVETZ:  Foundation.
 7             THE WITNESS:  No, sir.  I don't see anywhere
 8        where I discredited Montanez.
 9   BY MR. SWAMINATHAN:
10        Q.   Is there anywhere where you credit
11   Mr. Montanez's testimony?
12             MR. KIVETZ:  Objection.  Form, foundation,
13        misstates his previous testimony.
14             THE WITNESS:  On Page 11, Point 51, it says,
15        "Montez [sic] identified Sierra as the shooter."
16   BY MR. SWAMINATHAN:
17        Q.   Is that from his deposition testimony, or from
18   the reports?
19             MR. KIVETZ:  Objection.  Form, foundation.
20             THE WITNESS:  From the police reports, and --
21        and -- and all the other information, not from his
22        deposition.
23   BY MR. SWAMINATHAN:
24        Q.   Okay.  And is there any -- would you agree
25   with me there's nowhere in your deposition -- strike
```

Page 25

```
 1   that.  Would you agree with me that there's nowhere in
 2   your report where you credit the deposition testimony of
 3   Hector Montanez?
 4             MR. KIVETZ:  Objection.  Form, foundation,
 5        misstates his report.  I mean, it's in the
 6        materials reviewed.
 7   BY MR. SWAMINATHAN:
 8        Q.   Go ahead.
 9        A.   I -- I did not find that in my report.
10        Q.   Okay.  And there's nowhere in your report
11   where you accept the deposition testimony of Hector
12   Montanez, and consider it in your opinions; is that
13   fair?
14             MR. KIVETZ:  Objection.  Form, foundation,
15        misstates his report.
16             THE WITNESS:  I considered the totality of
17        what I reviewed in -- in my opinions, to include
18        deposition testimony of all the depositions that I
19        -- that I was presented with in the documents in
20        which I reviewed.
21   BY MR. SWAMINATHAN:
22        Q.   Hector Montanez testified at his deposition
23   that he was threatened and subjected to promises; is
24   that fair?
25             MR. KIVETZ:  Objection.  Form.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1        THE WITNESS:  Yes, sir.  I read that.
2  BY MR. SWAMINATHAN:
3     Q.   Okay.  And would you agree that the
4  interrogation techniques that were used on Mr. Montanez,
5  as he described them, would deviate from generally
6  accepted police practices?
7        MR. KIVETZ:  Objection.  Form.
8        THE WITNESS:  As he described them, yes.
9  BY MR. SWAMINATHAN:
10     Q.   Okay.  And so in your report, you don't
11  acknowledge that -- if the police officers deviated from
12  generally accepted police practices, based on
13  Mr. Montanez's testimony about what occurred; is that
14  fair?
15        MR. KIVETZ:  Objection.  Form, foundation,
16     misstates his report.  Go ahead.
17        THE WITNESS:  That is correct.
18  BY MR. SWAMINATHAN:
19     Q.   And that's because you did not credit his
20  deposition testimony about what occurred during the
21  course of his interrogations, correct?
22        MR. KIVETZ:  Objection.  Form, foundation,
23     misstates the report.
24     A.   No, sir.  Not -- not necessarily.  Again, I --
25  I believe that what individuals -- what the -- what all

Page 27

1  the individuals said in their written statements to
2  the State Attorney, close at hand to when the incident
3  occurred, are more credible, and there are reasons for,
4  later on, individuals recanting or changing their
5  testimony, based on --
6     Q.   Okay.
7     A.   -- experience.
8     Q.   Okay.  And so part of your opinion ultimately
9  is that the statements given to police officers were
10  more credible than later statements given at deposition;
11  is that fair?
12        MR. KIVETZ:  Objection.  Form.
13        THE WITNESS:  My experience leads me to
14     believe they'll get that, yes.
15  BY MR. SWAMINATHAN:
16     Q.   Okay.  And that experience that you've just
17  described, ultimately, is something you relied on for
18  purposes of offering your opinions in this case; is that
19  fair?
20        MR. KIVETZ:  Objection.  Form.
21        THE WITNESS:  My experience, training, and
22     education.  Yes, sir.
23  BY MR. SWAMINATHAN:
24     Q.   Okay.  And would it be fair to say that, in
25  your report, you do not credit the testimony of Jose

Page 28

1  Melendez about what occurred during the course of his --
2  the identification procedures that he was involved in;
3  is that fair?
4        MR. KIVETZ:  Objection.  Form.  I mean, this -
5     - it -- these questions are ridiculous.  Nobody is
6     crediting anything or not, it's all up to the jury,
7     you know full --
8        MR. SWAMINATHAN:  Stop making speaking
9     objections.
10        MR. KIVETZ:  -- well about that.  I mean,
11     you're trying to confuse the witness.  It --
12     it's --
13        MR. SWAMINATHAN:  I'm not trying to confuse
14     the witness.
15        MR. KIVETZ:  It's --
16        MR. SWAMINATHAN:  Mr. Andreu is a --
17        MR. KIVETZ:  Police officer.
18  BY MR. SWAMINATHAN:
19     Q.   How long have you been in -- how long have you
20  been -- were you a police officer, Mr. Andreu?
21     A.   40 years.
22     Q.   Am I confusing you?
23     A.   Some of your questions are strange, yes.
24     Q.   Yeah.  Tell me what's confusing for you.
25     A.   Well, because I've said several times that my

Page 29

1  experience is that the initial statements are more
2  reliable and more truthful.  And you keep asking me
3  individuals the same question [sic].
4     Q.   So are there words that I've used during this
5  deposition that you don't understand?
6     A.   No, sir.
7     Q.   Okay.  Thank you.  Mr. Andreu, let me ask the
8  question again, and Mr. Kivetz can make an objection, a
9  non-speaking objection, an objection to form, if he'd
10  like. Would you agree with me that, in your report,
11  there is nowhere where you credit the deposition
12  testimony or criminal trial testimony of Jose Melendez?
13        MR. KIVETZ:  Objection.  Form, misstates his
14     report.
15        THE WITNESS:  Specifically in the report, no.
16  BY MR. SWAMINATHAN:
17     Q.   Okay.  Because ultimately you agree that, if
18  you credit the criminal trial testimony and deposition
19  testimony of Jose Melendez, that would be a deviation
20  from generally accepted police practices, correct?
21        MR. KIVETZ:  Objection.  Form.
22        THE WITNESS:  The allegations of police
23     misconduct and abuse that were made later on, I
24     believe, if those occurred, were -- were not proper
25     police procedures.  I agree.  But again, you have

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 30

1  to go back to my opinions that the first statement
2  given to the ASA were [sic] the most accurate and
3  most truthful.
4  BY MR. SWAMINATHAN:
5    Q.  Mr. Melendez says that things occurred before
6  he gave the statement to the ASA; is that fair?
7           MR. KIVETZ:  Objection.  Form, foundation.
8           THE WITNESS:  That -- say that again.
9  BY MR. SWAMINATHAN:
10   Q.  Mr. Melendez testified that the police
11 officers did things during the course of the
12 identification procedures and their interviews of him
13 before he ever met with the ASA, correct?
14          MR. KIVETZ:  Objection.  Form, foundation.
15          Which testimony are you referring to?
16 BY MR. SWAMINATHAN:
17   Q.  Go ahead.
18   A.  I -- I -- I don't understand that question,
19 sir.
20   Q.  Yeah.  You reviewed the deposition testimony
21 and criminal trial testimony of Mr. Melendez, Correct?
22   A.  Yes, sir.
23   Q.  Okay.  And in the -- both of those
24 testimonies, Mr. Melendez indicated that, during the
25 course of his interviews with police officers, before he

Page 31

1  met with the ASA, he informed them that he didn't get a
2  view of the shooter's face, correct?
3           MR. KIVETZ:  Objection.  Form, foundation.
4           THE WITNESS:  Specifically having seen that, I
5  -- I don't recall.  If you could bring up that
6  testimony or something, and allow me to review it,
7  I would be able to answer your question, but...
8  BY MR. SWAMINATHAN:
9    Q.  In offering your opinion -- oh, sorry.  Go
10 ahead.  Go ahead. In offering your opinions in this
11 case, did you consider any testimony that indicated that
12 Mr. Melendez was not able to make an identification of
13 the shooters?
14          MR. KIVETZ:  Objection.  Form.
15          THE WITNESS:  No, sir.
16 BY MR. SWAMINATHAN:
17   Q.  Okay.
18   A.  The statement that he gave through --
19 indicated to me otherwise.
20   Q.  What indicated otherwise?
21   A.  That he was able to make an identification.
22   Q.  What indicated other -- what indicated that he
23 was able to make an identification?
24   A.  It's -- he -- he made the identification in
25 his statement to the State Attorney.

Page 32

1    Q.  So in the police reports, in the statements to
2  the State's Attorney?
3    A.  Yes, sir.
4    Q.  What about in his deposition testimony, or
5  criminal trial testimony?
6    A.  Again, I would have to actually see what point
7  you're talking about in those testimonies.  I reviewed
8  thousands of pages of documents, and I really can't
9  remember every one.
10   Q.  In the deposition testimony and criminal trial
11 testimony of Mr. Melendez, he says that he was
12 specifically told which photo to select, fair?
13          MR. KIVETZ:  Objection.  Form, foundation.
14          Misstates his testimony.
15          THE WITNESS:  Again, I would like to be able
16 to review that part of his testimony before --
17 BY MR. SWAMINATHAN:
18   Q.  You don't remember that piece of testimony
19 from Mr. Melendez?  It's kind of a big deal in this
20 case, yeah?
21          MR. KIVETZ:  Objection.  Form.  He can --
22 stop.  He just asked you if -- for a specific cite
23 to show whatever support you think you're coming up
24 with here.  He asked you specifically, you're
25 refusing to do it.  And now you're basically

Page 33

1  harassing him by claiming, "You don't remember?"  I
2  mean, come on.  It -- this happens all the time in
3  these deps --
4           MR. SWAMINATHAN:  Your objection --
5           MR. KIVETZ:  It happens to me almost every dep
6  that I take with you.  Somebody says they don't
7  remember.  They ask you to point out the specific
8  piece of evidence, which they're entitled to do.
9  You're refusing to do it.
10          MR. SWAMINATHAN:  I am refusing to do it.
11 BY MR. SWAMINATHAN:
12   Q.  Mr. Andreu, let the record reflect I'm
13 refusing to do it.  So let's be really clear.  Is it
14 your -- is it the case that, in this case -- did you
15 spend time preparing for this deposition at all?
16   A.  Yes, sir.
17   Q.  How much time did you spend preparing for this
18 deposition?
19   A.  Maybe ten hours.
20   Q.  Okay.  And did you review your report and the
21 various materials that you'd reviewed in writing your
22 report?
23   A.  Not all of the material.  That wouldn't be
24 possible in ten hours.
25   Q.  Okay.  But you reviewed a lot of it, fair?


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 12 of 77 PageID #:65790
THE DEPOSITION OF WELDON ANDREWS taken May 22, 2020

34..37

Page 34

1    A.    Some -- most of it -- or some of it, I should
2  say, not even most of it.
3    Q.    And what did you review?  Did you review all
4  the police reports?
5    A.    I reviewed the police reports.
6    Q.    Okay.  Did you review all the depositions?
7    A.    No, not all of the depositions.
8    Q.    Did you review any of the depositions in
9  preparation for this deposition?
10    A.    Yes, sir.
11    Q.    Which depositions did you review?
12    A.    I can't remember at this point, but I reviewed
13  depositions.  I reviewed Mr. Tiderington's report.
14    Q.    Can you tell me any depositions that you
15  recall reviewing in preparation for today's deposition?
16    A.    No, sir.
17    MS. BARBER:  I'm sorry.  Can -- I didn't hear
18    that question?  Can you say that again?
19  BY MR. SWAMINATHAN:
20    Q.    Can you tell me any depositions that you
21  recall reviewing in preparation for this deposition?
22    A.    Not by specific names right now, sir.  No, I
23  can't specifically tell you, but I did review
24  depositions.
25    Q.    Okay.  And as you sit here today, is it your

Page 35

1  testimony that you have no idea whether Jose Melendez
2  testified that he was told by the police officers which
3  photo to select?
4    MR. KIVETZ:  No.  Objection.  Form.  Misstates
5    his testimony.  He asked you to provide the
6    specific sentence that you're asking about in
7    regards to the -- either the deposition or the
8    criminal trial testimony, you're refusing to
9    provide it.
10  BY MR. SWAMINATHAN:
11    Q.    Go ahead.
12    A.    No, sir.  No, sir.  I'm not saying that.  What
13  I'm saying is that I may have reviewed it.  I may have
14  seen it, but I would like to be able to read that
15  portion where he says that, either deposition or trial
16  testimony, if that would be possible.
17    Q.    No.  I'm just asking you a simple question.
18  Sitting here today, do you have any idea what Jose
19  Melendez said occurred during the course of the photo
20  array identification procedure, in his testimony?
21    A.    Say that question again, please?
22    Q.    Yeah.  Sitting here today, do you have any
23  idea what Jose Melendez testified had occurred during
24  the course of the photo array identification procedure?
25    MR. KIVETZ:  Objection.  Form.  And which

Page 36

1  testimony on it?  His criminal trial or his
2  deposition?
3  BY MR. SWAMINATHAN:
4    Q.    Any of it.  Go ahead.
5    A.    I do -- I do remember his trial testimony and
6  his deposition.  I'm not -- I just don't remember
7  specifically the question you're asking me.  That's why
8  I would like to -- to view that portion.
9    Q.    Focus on my question.  Do you remember -- you
10  said you do remember that -- his criminal trial
11  testimony and his deposition.  What do you remember
12  about it?
13    A.    Sir, the -- the trial testimony and the
14  depositions were hours long.  I -- I can't tell you
15  specifically what I remember and I don't remember.
16    Q.    So what do you remember generally about it?
17    A.    What -- that he recanted his -- his initial
18  statement.  That's the gist of what -- what I can
19  remember.
20    Q.    Yeah.  And what does he -- do you remember
21  anything about what he says about how he came to
22  identify Thomas Sierra?
23    MR. KIVETZ:  Objection to form.
24    THE WITNESS:  Sir, I -- I -- in order to give
25    an accurate answer to that question, I would like

Page 37

1    to view that portion of his testimonies.
2  BY MR. SWAMINATHAN:
3    Q.    Do you have any understanding, sitting here
4  today at this deposition in the Thomas Sierra case,
5  whether or not Jose Melendez testified that he was told
6  which photo to select?  Any idea?
7    A.    That may --
8    MR. KIVETZ:  Objection.  Form, foundation.
9    THE WITNESS:  That may be in the -- in -- in
10    the documents that I reviewed.  I'm not saying
11    definitively that it's not there, but again, I
12    would like to review those documents before -- and
13    so that I will be guessing at your answer.
14  BY MR. SWAMINATHAN:
15    Q.    If Mr. Melendez testified that he was told
16  which photo to select from the photo array, would you
17  agree with me that would be a deviation from generally
18  accepted police practices?
19    A.    Yes, sir.
20    Q.    Okay.  And if Jose Melendez was given any
21  indication about which photo to select from the photo
22  array, do you agree that would deviate from generally
23  accepted police practices?
24    MR. KIVETZ:  Objection.  Form.  Hold on.
25    Objection.  Form, foundation, speculative,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 13 of 77 PageID #:65791
THE DEPOSITION OF WALDON ANDREU, taken May 9, 2022

38..41

Page 38

1    incomplete hypothetical.
2         THE WITNESS: Yes, sir.
3    BY MR. SWAMINATHAN:
4         Q.   And you don't include, anywhere in your
5    report, the opinion that, if Jose Melendez was given any
6    indication of which photo to select from the photo
7    array, that that would deviate from generally accepted
8    police practices, correct?
9         A.   That is correct.
10        Q.   Why not?
11        A.   Because I don't believe that those took --
12   took place.  I think that the -- the changes in
13   testimony that happened subsequent to their initial
14   statements to the State Attorney occurred for reasons
15   that I don't know, but I -- I -- I stand by my
16   statements that their initial statements are, in my
17   opinion, the most reliable.
18        Q.   Okay.  Because ultimately you -- for purposes
19   of your opinions, you accepted what's contained in the
20   police reports and handwritten statements about what
21   Mr. Melendez experienced rather than his testimony; is
22   that fair?
23        MR. KIVETZ: Objection to form.
24        THE WITNESS: I considered everything, but
25        yes, primarily the -- the original statements and

Page 39

1    the police reports.
2    BY MR. SWAMINATHAN:
3         Q.   Okay.  And did you review the deposition of
4    Lucy Montalvo?
5         A.   Yes.
6         Q.   And where in your report do you credit the
7    deposition testimony of Lucy Montalvo, if at all?
8         A.   I don't believe that -- that I mentioned her
9    deposition in my report.
10        Q.   Why not?
11        A.   Because again, I relied on her initial
12   statement and the police reports.
13        Q.   Okay.  Take a look at Page 5 of your report?
14        A.   Yes, sir.
15        Q.   Beginning on Page 5 of your report, you begin
16   to discuss the Andujar homicide investigation and the
17   related -- and the Gonzalez murder investigation,
18   correct?
19        A.   Yes, sir.
20        Q.   Okay.  And let's go to Page 9; is that where
21   your opinions begin?
22        A.   Yes, sir.
23        Q.   Okay.  And so from Page 9 to Page 19 of your
24   expert report, that is the section that contains your
25   opinions in this case, correct?

Page 40

1         A.   Yes.
2         Q.   Okay.  And in your opinions, from Page 9 to
3    the end of the report, Page 19, can you please identify
4    for me anywhere in your report where you credited
5    testimony from any witnesses?
6         MR. KIVETZ: Objection.  Form.
7         MS. BARBER: Objection.  Form.
8         THE WITNESS: On Page 10, I explain what Melendez
9         told the police officers.
10   BY MR. SWAMINATHAN:
11        Q.   Is that from testimony, or is that from police
12   reports?
13        A.   That's from police reports, I believe --
14        Q.   Okay.
15        A.   -- at -- at that point in -- in my report.
16        Q.   Okay.  So tell me where -- let me ask the
17   question again.  Just focus on what I'm asking you
18   about.  I'm not asking you about police reports.  I'm
19   asking you about testimony, okay?
20        A.   Okay.
21        Q.   So let me -- let me ask you --
22        MR. KIVETZ: Deposition testimony --
23        deposition testimony, recant testimony, criminal
24        trial testimony?  What testimony are you asking
25        him?

Page 41

1         MR. SWAMINATHAN: I'm asking you about
2         testimony of any kind.
3    BY MR. SWAMINATHAN:
4         Q.   You understand, sir, when I say the word
5    "testimony," testimony is anything that's a sworn
6    statement under oath, like a criminal trial testimony or
7    deposition transcript, fair, Mr. Andreu?
8         A.   Okay.  If that's what you're referring to.
9         Q.   Yeah.  Okay.  You understand what the word
10   testimony means, correct?
11        A.   Yeah, but testimony can be verbal, as well.  If
12   a person says something that to the detectives, they're
13   testifying to what they saw --
14        Q.   Okay.
15        A.   -- it may not -- that may not be under oath,
16   but that is verbal testimony.
17        Q.   Okay.  Thank you.  Let's make that -- that's a
18   valuable clarification.  Thank you.  When I refer to
19   testimony, I'm talking about any statements given by
20   witnesses under oath, either in a criminal -- in a
21   criminal trial proceeding, deposition testimony, do you
22   understand that?
23        A.   Okay.
24        Q.   Okay.  As compared to statements given to
25   police officers, unsworn.  Do you understand that?

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 42

1    A.   Yes, sir.

2    Q.   For example, you understand, when you give

3  testimony under oath at a criminal trial, which you've

4  done many, many times, that's different than simply

5  something you might say in conversation with somebody;

6  is that fair?

7    A.   Correct.

8    Q.   You understand the importance of giving -- of

9  a statement being sworn?

10    A.   Yes.

11        MR. KIVETZ:  Objection.  Form.

12        THE WITNESS:  Yes.

13  BY MR. SWAMINATHAN:

14    Q.   You understand the difference between unsworn

15  and sworn statements, correct?

16    A.   Yes.

17    Q.   And you understand the seriousness of sworn

18  statements, correct?

19    A.   Yes.

20    Q.   Okay.  And you understand that depositions are

21  sworn testimony, correct?

22    A.   Yes.

23    Q.   And you understand that criminal trial

24  testimony is sworn testimony, correct?

25    A.   Yes.

Page 43

1    Q.   Okay.  And you understand that when someone

2  speaks to a police officer, that is unsworn statements,

3  correct?

4    A.   Not necessarily.  They -- those statements

5  could be given under oath, as well.

6    Q.   Okay.  Are there any statements given under

7  oath in the police reports in this case?

8    A.   To the State Attorney --

9        MR. KIVETZ:  Objection.  Form.

10        THE WITNESS:  I -- I would assume that the

11    statements given to the State Attorney were under

12    oath.

13  BY MR. SWAMINATHAN:

14    Q.   Were they?

15    A.   I believe they were.

16    Q.   For purposes of your opinions, is it your

17  understanding that the statements given to the State's

18  Attorney were under oath?

19        MR. KIVETZ:  Objection.  Form.  Foundation.

20        THE WITNESS:  I believe they were.  I can't be

21    100 percent certain because I wasn't there and

22    didn't know if they were sworn in, but I would

23    assume that a formal statement taken by an

24    Assistant State Attorney would be formal.

25  BY MR. SWAMINATHAN:

Page 44

1    Q.   And when you were working in Miami, did you

2  take sworn statements from witnesses?

3    A.   Yes, sir.

4    Q.   And when you were working in Miami, when you

5  took sworn statements from witnesses, how was that done?

6    A.   I would swear the witness in, or the court

7  reporter would swear the witness in, or -- one of the

8  other supervisors or detectives.

9    Q.   And then what would happen?

10    A.   Then we would take a statement.

11    Q.   And how would that be -- how would the

12  statement be taken: Was it done by video, by audio, in

13  writing?  How was that done?

14    A.   We did not have video when I was in Miami.  It

15  was either stenographically reported -- we had in-house

16  stenographers that we could use.  Or they would be tape

17  recorded, or they could be handwritten.  Either of the

18  one, but no video at that time.

19    Q.   In 1995 in Miami, were you using audio

20  recordings to take statements from witnesses?

21    A.   We had the ability to do so, and -- and they

22  were taken at times, yes.

23    Q.   Okay.  And in 1995 in Miami, when you took

24  audio-recorded statements, it's your testimony that you

25  would take them as sworn statements.  You'd swear the

Page 45

1  witness in and then take the statement; is that fair?

2    A.   Yes, sir.

3    Q.   Okay.  And in -- and when you took written

4  statements from witnesses in Miami, would you write the

5  statements out or would the witness write their

6  statements?

7    A.   I would write the statement out.

8    Q.   Would you ever have the witnesses write their

9  own statements?

10    A.   I can't remember a time when I did, but I -- I

11  can't say never.

12    Q.   When you took statements from witnesses in

13  Miami, would you document what the witnesses told you?

14    A.   It would be documented either by the

15  stenographer, or the tape recorder, or in the -- in my

16  written statement.

17    Q.   And when you met -- when you spoke to

18  witnesses in Miami, would it be the case that sometimes

19  witnesses' stories would change over time?

20    A.   Yes.

21    Q.   And would you document all of the different

22  changes to a witness's statement or just the portion

23  that you liked?

24    A.   What do you mean by the portion that I liked?

25    Q.   Well, let me ask it this way.  Would you -- if



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1  -- when -- as witnesses' stories shifted during the
2  course of your interviews of a witness, would you
3  document all of the different things that the witness
4  told you or just some of what they told you?
5        MR. KIVETZ: Objection. Form. Foundation.
6  Speculative. Incomplete hypothetical.
7        THE WITNESS: Yes. If a witness gave me a
8  sworn statement, that would be my last contact with
9  that witness, as far as questioning is concerned.
10 Unless, later on, maybe there was a -- a -- a live
11 lineup or something like that. But the -- the
12 sworn statement that was given, however it was
13 reported or documented, would end my conversation
14 with that witness.
15 BY MR. SWAMINATHAN:
16       Q.  And if, before the sworn statement, the
17 witness gave you different information than what's
18 contained in the sworn statement, would you document
19 that anywhere?
20       MR. KIVETZ: Objection. Form. Foundation.
21 Speculative. Incomplete hypothetical.
22       THE WITNESS: No. No, sir. Not necessarily,
23 because I would -- if -- if -- if I knew that what
24 the person was telling me, initially, had happened
25 at 10:00 at night, when I knew that it happened at

Page 47

1  10:00 in the morning, I would continue interviewing
2  that individual and find out why that discrepancy,
3  so -- until I got to the final statement. And if
4  the individual kept saying it was 10:00 in the
5  morning, then so be it. That was -- that would be
6  what was recorded, ultimately, in his or her
7  statement.
8  BY MR. SWAMINATHAN:
9        Q.  Okay. So in other words, if witnesses gave
10 you information that was inconsistent with your
11 understanding of the crime, you may not document some of
12 that information, correct?
13       MR. KIVETZ: Objection. Form. Misstates his
14 testimony.
15       THE WITNESS: That is correct. Until the --
16 BY MR. SWAMINATHAN:
17       Q.  And so you would -- go ahead. I'm sorry. Go
18 ahead.
19       A.  Until the -- the final statement, when I -- I
20 believed or realized that that was what the person's
21 statement was going to be, and then it would be
22 memorialized in one way or another, then that -- that
23 was his or her statement.
24       Q.  Okay. And any prior statements that they'd
25 given that were contrary to that, you wouldn't document

Page 48

1  those; is that fair?
2        MR. KIVETZ: Objection. Form.
3        THE WITNESS: No, sir. I don't think I would
4  document that.
5  BY MR. SWAMINATHAN:
6        Q.  Okay. And for example, if a witness -- strike
7  that. If a suspect denied involvement in a crime ten
8  times, before, then, admitting to the crime, you
9  wouldn't document the first ten times that they denied
10 involvement; is that fair?
11       MR. KIVETZ: Objection. Form. Foundation.
12 Speculative. Incomplete hypothetical.
13       THE WITNESS: Again, in -- and every case is
14 different, and it depends on -- on the individual
15 case, but I would -- it -- it goes without saying,
16 as a homicide investigator, that when you go to
17 interview an offender, he or she is going to
18 initially deny that.
19       I -- I cannot recall a case when I sat down,
20 advised an individual suspect of his or her rights,
21 and the individual says, yeah, I did it, you're
22 right. I just can't recall. I mean, maybe in a
23 husband-and-wife situation where something
24 happened, but they're -- 99 percent of the time,
25 the individual is going to deny involvement. I --

Page 49

1  I don't feel the -- the need to document his or her
2  denials.
3  BY MR. SWAMINATHAN:
4        Q.  And it's -- and your practice, in your
5  opinion, that there's not a need to document a suspect's
6  series of denials before a subsequent admission, is
7  consistent with generally accepted police practices?
8        MR. KIVETZ: Objection. Form. Foundation.
9  Speculative. Incomplete hypothetical.
10       THE WITNESS: In my opinion, yes. I -- I know
11 that later on, in deposition or trial testimony, if
12 I am asked, did Mr. Smith deny shooting Mrs. Smith?
13 I would say yes, of course, the denial -- he denied
14 it for three hours during our interview, until he
15 finally admitted what -- his participation and
16 whatever he did. I mean, I wouldn't -- I would not
17 hide his denials. Absolutely not.
18 BY MR. SWAMINATHAN:
19       Q.  Well, you wouldn't include them in your police
20 reports, though, under generally accepted police
21 practices, correct?
22       A.  I --
23       MR. KIVETZ: Objection. Form. Foundation.
24 Speculative. Incomplete hypothetical.
25       THE WITNESS: I can't say that I would never



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 16 of 77 PageID #:65794
THE DEPOSITION OF SHELDON ANDRUS, taken May 12, 2022

50..53

Page 50

```
 1     include that in -- in my police report.  Again,
 2     every case is different.  Every situation is
 3     different.  So I can't give you a definitive
 4     answer, that I would or would not, sir.
 5  BY MR. SWAMINATHAN:
 6     Q.  Under generally accepted police practices, it
 7  is permissible to document a final admission or
 8  confession, but not document earlier denials; is that
 9  fair?
10     MR. KIVETZ: Objection. Form. Foundation.
11  Speculative. Incomplete hypothetical.
12     THE WITNESS: No. You -- you used the word
13     that -- that it's -- it's -- not permissible. It's
14     -- again, is it a requirement, 100 percent, that it
15     be done?  No.  Is it prohibited that it be done?
16     No.  So again, every situation, every case is -- is
17     different, so I -- I can't answer that question
18     definitively.
19  BY MR. SWAMINATHAN:
20     Q.  What are the kinds of circumstances in which
21  you should, under generally accepted police practices,
22  document a witness's denials before a subsequent
23  admission?
24     MR. KIVETZ: Objection. Form. Foundation.
25  Speculative. Incomplete hypothetic.
```

Page 51

```
 1     THE WITNESS: Again, you're asking me to -- to
 2     -- to provide you with a specific answer on when it
 3     would be or when it would not be.  And without
 4     knowing details of the -- of the -- of the case, or
 5     the -- the incident, I can't answer that question,
 6     sir.
 7  BY MR. SWAMINATHAN:
 8     Q.  I'm not asking you for any specifics.  I'm
 9  asking you to give me any kind of circumstance in which
10  you should, under generally accepted police practices,
11  document a suspect's denials before a subsequent
12  admission?
13     MR. KIVETZ: Objection --
14     MS. BARBER: That's not your previous
15     question.
16     MR. SWAMINATHAN: Go ahead.
17     MR. KIVETZ: Objection. Form. Foundation.
18     Speculative. Incomplete hypothetical.
19     THE WITNESS: I -- I -- I can't -- I can't
20     give you a -- a -- a -- a specific time when it
21     would be acceptable without knowing the
22     circumstances of the case.
23  BY MR. SWAMINATHAN:
24     Q.  Can you tell me any circumstances, under
25  generally accepted police practices, when it would be
```

Page 52

```
 1  acceptable not to document earlier denials before a
 2  subsequent admission?
 3     A.  It -- the same as my previous --
 4     MR. KIVETZ: Form. Foundation. Speculative.
 5     Incomplete hypothetical.
 6     THE WITNESS: The same as -- as my previous
 7     answer.  Without knowing the specifics of the case,
 8     I cannot answer that question.
 9  BY MR. SWAMINATHAN:
10     Q.  And if I understand your testimony correctly,
11  it was your experience that individuals who are
12  suspected or -- in crimes don't just immediately admit
13  to it; is that what you said?
14     A.  The overwhelming majority of the time, yes.
15  That's correct.
16     Q.  In other words, people typically deny
17  involvement before ever making any kind of admission; is
18  that fair?
19     MR. KIVETZ: Objection. Form. Foundation.
20     Speculative. Incomplete hypothetical.
21     THE WITNESS: Again, the overwhelmingly --
22     overwhelmingly, they do that.  Yes.
23  BY MR. SWAMINATHAN:
24     Q.  And based on your practices, as you've
25  described them, it would often be the case that, if one
```

Page 53

```
 1  were to look at Mr. Andreu's police reports from his
 2  investigations in Miami, one wouldn't necessarily get
 3  the full story of what happened during the investigation
 4  from your police reports, fair?
 5     MR. KIVETZ: Objection. Form. Foundation.
 6     Speculative. Incomplete hypothetical.
 7     THE WITNESS: No, sir.  That's not necessarily
 8     true.  My report may include that the individual
 9     denied it for four hours, but if -- if, in my
10     report -- let me give you an example.  My report, I
11     -- I start talking to an individual at 9:00 in the
12     morning, and my statement is taken at 5:00
13     afternoon -- in the afternoon, it goes without
14     saying that for those -- that period of time, he
15     was in denial, or he was providing denials.
16     (Coughs.) Excuse me.
17  BY MR. SWAMINATHAN:
18     Q.  And it goes without saying that that person
19  was probably interviewed multiple times during the
20  course of those, you know, eight, nine hours; is that
21  fair, too?
22     A.  It could be --
23     MR. KIVETZ: Objection. Form. Hold on a
24     second, everybody.  Let's just slow down with this
25     incredible hypothetical scenario here.  Objection.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 17 of 77 PageID #:65795
THE DEPOSITION OF NELSON ANDREU taken May 12, 2023

54..57

Page 54

1  Form. Foundation. Speculative. Incomplete
2  hypothetical.
3       THE WITNESS: Say that question again, please?
4  BY MR. SWAMINATHAN:
5       Q. Yeah. And in your example, you know, you've
6  got somebody in custody for eight to nine hours who's
7  your suspect. You said, we can safely assume that if
8  I've got that person in custody for eight to nine hours
9  before I got an admission, that they'd been denying up
10 to that point, correct?
11      MR. KIVETZ: Objection. Form. Foundation.
12 Speculative. Incomplete hypothetical.
13      THE WITNESS: That would make sense, that they
14 -- those -- that period of time, they were denying.
15 BY MR. SWAMINATHAN:
16      Q. And during that period of time, we can safely
17 assume that you were questioning the witness and had
18 gone into the room multiple times, but you're not
19 necessarily documenting every instance that you went
20 into the room; is that fair?
21      A. It --
22      MR. KIVETZ: Objection. Form. Foundation.
23 Speculative. Incomplete hypothetical.
24      THE WITNESS: It -- it could have been just
25 one continuous interview, or it could be several

Page 55

1  different interviews. They may have asked to go to
2  the restroom or something like that. There --
3  there is no way to -- to specify that. (Coughs.)
4  Excuse me.
5  BY MR. SWAMINATHAN:
6       Q. And in your conception of generally accepted
7  police practices, it would be acceptable to go into the
8  room multiple times and interrogate the same suspect,
9  fair?
10      MR. KIVETZ: Objection. Form. Foundation.
11 Speculative. Incomplete hypothetical.
12      THE WITNESS: Yes, sir.
13 BY MR. SWAMINATHAN:
14      Q. And, in fact, it was common when somebody
15 denied involvement, to leave and then come back and
16 question them again, correct?
17      MR. KIVETZ: Objection. Form. Foundation.
18 Speculative. Incomplete hypothetical. Do you need
19 a break to get some water, Mr. Nelson?
20      THE WITNESS: I do. Not -- not for water, but
21 I've been battling this -- these cough attacks for
22 a while. If we could take a break, I would
23 appreciate --
24      MR. SWAMINATHAN: Yeah. Why don't we take a
25 five-minute break? If you need ten minutes, we'll

Page 56

1  leave it up to you. All right.
2       THE WITNESS: Okay. Let me get ten minutes.
3       THE REPORTER: All right. We are off the
4  record. The time is 10:56 Central.
5       (OFF THE RECORD)
6       THE REPORTER: We are back on the record for
7  the deposition of Nelson Andreu being conducted by
8  videoconference. My name is Sydney Little. Today
9  is May 12th, 2023, and the time is 11:08 a.m.
10 Central.
11 BY MR. SWAMINATHAN:
12      Q. Mr. Andreu, have you ever been involved in
13 investigating allegations of wrongdoing by police
14 officers?
15      A. No, sir. I cannot remember any case where I -
16 - I did any investigation like that.
17      Q. Okay. And during the course of your -- not
18 your expert career, but your law enforcement career, did
19 you ever have instances when you would investigate
20 officers to determine whether they should be disciplined
21 in any way?
22      A. Yes. And -- and I should back up and say,
23 when I was the captain and the chief in West Miami,
24 there -- there were some investigations that -- that I
25 did involving police officers. I was --

Page 57

1       Q. Were those in -- I'm sorry. Go ahead.
2       A. I was thinking of the City of Miami. But in
3  West Miami, since I was part of the administration, I
4  did participate in that.
5       Q. And how long were you in West Miami?
6       A. I believe 15 years.
7       Q. And were you -- did you work in Internal
8  Affairs or any other sort of department responsible for
9  discipline of police officers?
10      A. It was -- it was not technically called
11 Internal Affairs, but the chief at the time, when I was
12 the second in command, would assign me to investigate
13 some cases.
14      Q. Okay. And were those officer-involved
15 shooting cases or different types of cases?
16      A. No. None -- none -- none were officer-
17 involved shooting cases.
18      Q. Okay. And what were the types of cases that
19 you were asked to investigate when you were in West
20 Miami?
21      A. Improper conduct, false police reports -- all
22 -- not reports, but overtime slips and -- and things of
23 that nature.
24      Q. Did you ever investigate cases involving
25 allegations of misconduct by police officers towards

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 58

1  civilians?
2      A.   Yes.  At least one I --
3      Q.   And were there any --
4      A.   -- at least one that I can remember in West
5  Miami.
6      Q.   Okay.  And in that instance in West Miami, did
7  you find that the officer had engaged in any misconduct
8  towards a civilian?
9      A.   Yes.  There were some -- some findings that
10 that -- that there was improper conduct on his part.
11     Q.   And what were the findings of misconduct in
12 that case?
13     A.   Sir, I don't remember.
14     Q.   Do you recall anything about what the findings
15 were against the officer?
16     A.   No.  It was -- again, without being certain,
17 without going back and reviewing the case, I would think
18 that he was discourteous, that type of a thing.
19     Q.   Okay.  Any discipline as a result of that?
20     A.   He may have been reprimanded.  I'm not
21 100 percent sure of that.
22     Q.   When you were in West Miami, do you recall any
23 instances in which your investigations into allegations
24 of misconduct by police officers towards civilians
25 resulted in any suspensions or firings?

Page 59

1      A.   Yes.  There were -- there were several
2  suspensions and firings on my part.
3      Q.   In West Miami?
4      A.   Yes, sir.
5      Q.   For what kinds of issues?
6      A.   One that I can remember offhand was theft of -
7  - I don't know if it would be City property.  It was a -
8  - an -- an individual officer that was -- went to buy
9  uniforms, and instead of getting them for himself, got
10 them for his father.  The other one that I can remember
11 was claiming having gone to court, and not really going
12 to court, on several occasions, and filing for overtime.
13     Q.   Okay.  And I may not have asked a clear
14 question, so let me focus on my question here, which is
15 going to be focused on police misconduct in the
16 treatment of civilians, okay?  So let me just ask the
17 question, but I just want to make that clear.  In your
18 time in West Miami, were there any instances in which
19 you recommended suspension or firing for an officer
20 based on a finding of misconduct towards a civilian?
21     A.   Not suspension and firing that I can remember.
22 But either counseling or reprimand, I -- I would say
23 yes.
24     Q.   Okay.  And that was the one instance in which
25 you gave a verbal reprimand for discourteous conduct; is

Page 60

1  that fair?
2      A.   That's the one that I can remember now, yes.
3      Q.   When you were in the Miami Police Department -
4  - how many years were you there?
5      A.   From 1980 to 2005, so 25.
6      Q.   So in the 25 years you were in the Miami
7  Police Department, how many times did you recommend
8  suspension or firing for a police officer based on
9  misconduct towards a civilian?
10     A.   That was not part of my -- my job.  We had a
11 big Internal Affairs unit that would handle those types
12 of things.
13     Q.   Okay.  When you were in Miami, you did
14 investigate officer-involved shootings, correct?
15     A.   Yes, sir.
16     Q.   And how many officer-involved shootings do you
17 think you investigated while you were in Miami?
18     A.   A guess would be five, maybe as high as ten.
19 Something like that.
20     Q.   In any of those five to ten officer-involved
21 shootings that you investigated when you were in Miami,
22 in any instance, did you find that the officer's conduct
23 was not justified?
24     A.   That's not a decision that I make.  We work in
25 conjunction with the Internal Affairs unit and a

Page 61

1  prosecutor from the State Attorney's office, so they --
2  they would be the ones that would make that
3  determination, not me.
4      Q.   And would you provide a recommendation?
5      A.   No.  I would just submit my reports, and they
6  would make that decision.
7      Q.   In any of those five to ten cases of officer-
8  involved shooting that you investigated when you were in
9  Miami, did you believe that the officer had engaged in
10 misconduct in any of those cases?
11         MR. KIVETZ:  Objection.  Form.  Foundation.
12         THE WITNESS:  I cannot think of any offhand,
13     but again, I -- I cannot be certain.  I -- I don't
14     know.  I know that there were some cases that I was
15     involved in in the periphery where the officers
16     ended up getting arrested and going to trial.  But
17     again, those were not cases actually assigned to
18     me, but that I've worked and handled, I've worked
19     on and assisted on.
20 BY MR. SWAMINATHAN:
21     Q.   Were there any officer-involved shooting cases
22 that you investigated in which you believed the shooting
23 was not justified based on your involvement in the
24 investigation?
25         MR. KIVETZ:  Objection.  Form.  Foundation.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 19 of 77 PageID #:65797
THE DEPOSITION OF ELADION ANDRES MARTINEZ taken May 9, 2023

62..65

Page 62

1    THE WITNESS:  None that I can think of right
2    now.  No, sir.
3 BY MR. SWAMINATHAN:
4    Q.   Were there any instances when you were in
5 Miami or West Miami that you reported another officer
6 for engaging in misconduct at any time?
7         MR. KIVETZ:  Object -- sorry.  Against a
8    civilian?
9 BY MR. SWAMINATHAN:
10   Q.   Yeah.  That -- that's a good question.  Let --
11 yeah.  Let me -- I want to focus on civilian, so let me
12 ask you again.  Were there any instances during the
13 course of the time that you worked in Miami or West
14 Miami that you reported another officer for misconduct
15 in the treatment of a civilian?
16   A.   Reported is not a -- a -- a -- a -- a good
17 word for me, but I handled, and -- and -- and counseled,
18 and -- and may have even reprimanded officers for -- for
19 -- for that.  But I wouldn't have -- I -- I wouldn't say
20 I reported it to somebody else.  I would've handled it
21 myself, as a supervisor.
22   Q.   Can you explain what you mean by that?  As a
23 -- in your supervisory capacity, you would have reports
24 made to you of misconduct by officers, and then you
25 would conduct some investigation; am I understanding

Page 63

1 that correctly or not?
2         MR. KIVETZ:  Objection.  Form.
3         THE WITNESS:  No.  I wouldn't say that
4    officers would -- would send me that information.
5    It would be something that either I observed, or
6    that came -- a complaint that would come in from a
7    citizen, something like that, but it -- I don't
8    think I got a report, ever, from an officer saying,
9    you need to look at this.
10 BY MR. SWAMINATHAN:
11   Q.   And during the course of your years, did you
12 ever say to Internal Affairs, or a supervisor, or
13 anybody else, hey, I believe this officer has engaged in
14 misconduct in the course of their treatment of a
15 civilian?
16        MR. KIVETZ:  Objection.  Form.  Foundation.
17        THE WITNESS:  I can't be 100 percent certain,
18    but I do not believe so.
19 BY MR. SWAMINATHAN:
20   Q.   Is there any time during the course of your
21 law enforcement career that you reported to a
22 supervisor, or to Internal Affairs, that another officer
23 had committed misconduct during the course of an
24 investigation?
25   A.   Again, without -- cannot be 100 percent

Page 64

1 certain, but I do not believe so.
2    Q.   Are there any instances during the course of
3 your law enforcement career in which you observed
4 another officer commit misconduct during the course of a
5 criminal investigation?
6         MR. KIVETZ:  Objection to form.  Foundation.
7         THE WITNESS:  No, sir.  I can't remember
8    offhand, but I -- I -- again, I cannot be
9    100 percent certain.
10 BY MR. SWAMINATHAN:
11   Q.   Are there any instances during the course of
12 your law enforcement career in which you reported
13 another officer for deviating from accepted police
14 practices during the course of a criminal investigation?
15        MR. KIVETZ:  Objection to form.  Foundation.
16        THE WITNESS:  I would have to give the same
17    answer.  I can't recall anything right now, but I
18    cannot be 100 percent certain.
19 BY MR. SWAMINATHAN:
20   Q.   Okay.  And during the course of your -- strike
21 that.  During the course of your time working as an
22 expert, are there any instances in which you found that
23 a police officer deviated from generally accepted police
24 practices?
25        MR. KIVETZ:  Objection.  Form.  Foundation.

Page 65

1         THE WITNESS:  Do you mean in cases that I have
2    reviewed and documents that have been sent to me
3    and -- by -- by attorneys?
4 BY MR. SWAMINATHAN:
5    Q.   Yeah.  Thank you for that clarification.  So
6 as an expert, tell me the kind of capacities in which
7 you've worked as an expert, other than as a consultant
8 in reviewing police files and offering opinions in
9 lawsuits?
10        MR. KIVETZ:  Objection --
11        THE WITNESS:  No.  That's -- that's the only
12    type of expert work that I've done.
13 BY MR. SWAMINATHAN:
14   Q.   Okay.  Thank you.  So in your capacity as an
15 expert, are there any cases in which you found any
16 deviations from generally accepted police practices by
17 any officer?
18   A.   No, sir.  I can't say that -- that I have.  I
19 mean, again, if we look at some of the allegations that
20 -- that have been made in some of the reports by
21 Plaintiffs of police misconduct, those, if they were to
22 be true, would be inconsistent with police practices.
23 Again, I'm not -- I'm not offering an -- an opinion on -
24 - on truth or -- or not truth, or who's telling the
25 truth and who's not.  Simply, that's up to the trier of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 20 of 77 PageID #:65798
THE DEPOSITION OF NELSON ANDREU, taken May 12, 2023

66..69

Page 66

1  facts. I'm just offering what my experience has been.
2      Q.  And in any of the cases that you've offered
3  expert opinions in, has it been your opinion that the
4  officers deviated -- that any of the officers deviated
5  from generally accepted police practices?
6      A.  There may have been things that could have
7  been done differently. Sometimes things fall through
8  the cracks. But as far as intentional misconduct, I
9  have not seen, in any of the reports that I reviewed.
10      Q.  In any of your reports as an expert, have you
11  ever documented anything that the officers could have
12  done differently?
13          MR. KIVETZ: Objection. Form. Foundation.
14          THE WITNESS: I -- without reviewing all the
15      other reports, I -- I can't answer 100 percent, but
16      I would say, yes, that -- that I have said that --
17      that this could have been handled differently or
18      that they could have done something additional.
19      But then again, that happens to every detective in
20      every case. You always have 20/20 vision, you
21      know, the day after.
22  BY MR. SWAMINATHAN:
23      Q.  In your report in the Thomas Sierra case, did
24  you include anything in your report about things that
25  you thought could be done differently?

Page 67

1      A.  I'd --
2          MR. KIVETZ: Objection. Form. Foundation.
3          THE WITNESS: I'd have to read it completely
4      again, but I can't say for certain whether I did or
5      not. If you'd like me to go through it?
6  BY MR. SWAMINATHAN:
7      Q.  Yeah. Please go through it. Tell me if you
8  identify any things that you think could have been done
9  differently in your report?
10          MR. KIVETZ: Yeah. Okay.
11          MR. SWAMINATHAN: Hey, sorry, can we take a
12      quick five-minute break, guys?
13          THE WITNESS: Sure.
14          MR. SWAMINATHAN: Thank you. I appreciate it.
15      Sorry.
16          THE REPORTER: All right. We are off the
17      record. The time is 11:21 --
18              (OFF THE RECORD)
19          THE REPORTER: We are back on the record for
20      the deposition of Nelson Andreu being conducted by
21      videoconference. My name is Sydney Little. Today
22      is May 12th, 2023, and the time is 11:30 a.m.
23      Central.
24  BY MR. SWAMINATHAN:
25      Q.  Thank you, Mr. Andreu. I apologize for that.

Page 68

1  My question that I had asked before we took a break was:
2  Do you -- in your report in the Thomas Sierra case, do
3  you identify any specific things that you think could be
4  -- could have been done differently during the course of
5  the Andujar homicide investigation?
6      A.  No, nothing specific. On Page 9, Points 39
7  and 40, I explained that no -- no homicide case is
8  perfect or ever handled the same. But specifically
9  pointing out things that would've been done different,
10  no, sir.
11      Q.  Okay. And do you, having had a chance to
12  review all of the materials in this case, find that
13  there are any things that could have been done
14  differently in this case?
15          MR. KIVETZ: Objection. Form.
16          THE WITNESS: Probably -- I'm just trying to
17      think of -- of anything specific that I would have
18      done different. No, not -- not necessarily.
19      Nothing's coming up right off the top of my head of
20      anything that could be done different.
21  BY MR. SWAMINATHAN:
22      Q.  When you reviewed all the documents and
23  reports in this case, did you think to yourself that
24  there was anything you saw in those documents that you
25  would have done differently if you were conducting the

Page 69

1  investigation?
2          MR. KIVETZ: Objection. Form. Foundation.
3          THE WITNESS: No, sir. I can't recall
4      anything right now that would've been done
5      different. No.
6  BY MR. SWAMINATHAN:
7      Q.  This is not the first case in which you have
8  opined that involves Detective Reynaldo Guevara,
9  correct?
10      A.  Correct.
11      Q.  And you understand that Detective Guevara has
12  pleaded the Fifth with regard to his conduct during the
13  course of this homicide investigation?
14          MR. KIVETZ: Objection. Form.
15          THE WITNESS: Yes.
16  BY MR. SWAMINATHAN:
17      Q.  And you reviewed his deposition testimony in
18  this case, correct?
19      A.  Yes.
20      Q.  Would it be a fair summary to say that he --
21  when asked about every aspect of his involvement in this
22  investigation, he pleaded the Fifth?
23      A.  Yes.
24      Q.  Okay. And did you consider that at all in
25  forming your opinions in this case?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 21 of 77 PageID #:65799
THE DEPOSITION OF WILLSON FRED 03/15/24, Taken 02/27/2020

70..73

Page 70

1    A.  Well, both Guevara and Halvorsen at one point
2  in their depositions took the -- plead the Fifth. Again,
3  to me, that's not an admission or a denial. It's simply
4  no answer. Similar in fashion to when Sierra didn't
5  testify at his trial. The -- the jury should not draw
6  upon that, that he's lying or being truthful. It was
7  simply no answer.
8    Q.  So for your -- purposes of your opinions, you
9  treated the pleading of the Fifth by Detectives Guevara
10 and Halvorsen regarding their conduct in this case as
11 basically being the equivalent of no answer, fair?
12         MR. KIVETZ:  Objection. Form.
13         THE WITNESS:  Yes, sir.
14 BY MR. SWAMINATHAN:
15   Q.  Okay. And ultimately did you, in offering
16 your opinions, include anywhere in your opinions that
17 they had asserted the Fifth Amendment?
18   A.  No, sir, I did not. I should add that
19 Halvorsen, later on, did provide answers to questions on
20 -- on deposition.
21   Q.  In which case?
22   A.  In this case.
23   Q.  Mr. Halvorsen gave deposition testimony in the
24 Thomas Sierra case?
25         MR. KIVETZ:  Objection. Form.

Page 71

1         THE WITNESS:  He -- he -- I -- I know that he
2  later answered questions. I don't remember if it
3  was a deposition or -- or where it was. But
4  initially, they both invoked the Fifth, and that,
5  to me, is just a no answer.
6  BY MR. SWAMINATHAN:
7    Q.  Okay. And during the course of your career,
8  in the many hundreds of times that you had been deposed
9  and given testimony, did you ever plead the Fifth?
10   A.  No, sir.
11   Q.  Why not?
12         MR. KIVETZ:  Objection. Form.
13         THE WITNESS:  It never came up that that was
14         and -- and the -- the State Attorney or Counsel
15         never instructed me to do so.
16 BY MR. SWAMINATHAN:
17   Q.  Did you ever consider pleading the Fifth in
18 any case in which you testified?
19         MR. KIVETZ:  Anand, you're talking about
20         criminal cases, right?
21         MR. SWAMINATHAN:  Yeah, thank you. In any
22         criminal case in which you testified at deposition
23         or at the criminal trial, did you ever consider
24         pleading the Fifth?
25         MR. KIVETZ:  Objection.

Page 72

1         THE WITNESS:  No, sir. Not -- not that I can
2  remember. No, sir.
3  BY MR. SWAMINATHAN:
4    Q.  Why not?
5         MR. KIVETZ:  Objection. Form.
6         THE WITNESS:  As I explained before, I didn't
7         believe the need [sic] my attorneys or the State
8         Attorney did not instruct me to do so, so it -- it
9         just never occurred.
10 BY MR. SWAMINATHAN:
11   Q.  Do you have -- sitting here today, do you have
12 any knowledge or understanding of how many convictions
13 have been thrown out that were cases investigated by
14 Detective Guevara and his colleagues at Area 5?
15   A.  I know there were several. The -- the -- the
16 number, I don't know.
17   Q.  When you say several, what do you mean?
18   A.  I don't know, a handful, I'm guessing.
19   Q.  Your understanding is that there's
20 approximately a handful of convictions that were thrown
21 out involving Detective Guevara and his colleagues at
22 Area 5?
23         MR. KIVETZ:  Objection. Form. Foundation.
24         THE WITNESS:  That's what I -- I believe, that
25         number, more or less.

Page 73

1  BY MR. SWAMINATHAN:
2    Q.  Okay. Is there any number of convictions
3  being thrown out that would cause you to question the
4  integrity of the underlying police investigation?
5         MR. KIVETZ:  Objection. Form, foundation,
6         speculative.
7         THE WITNESS:  I don't think that a number,
8         whether it is one or 100, go to the integrity of
9         the investigations involved in this. There are
10        reasons why people change their testimony, recant
11        later on, make accusations of police misconduct or
12        abuse. So just -- just a number, in my opinion,
13        would not be a generalization to say that the
14        police investigations were flawed.
15 BY MR. SWAMINATHAN:
16   Q.  Is there any number of exonerations or
17 convictions being vacated that would cause you to have
18 pause about offering opinions that there were no
19 violations of accepted police practices?
20         MR. KIVETZ:  Objection. Form, foundation,
21         speculative.
22         THE WITNESS:  Again, no -- no number. I know
23         that the -- the State Attorney in -- in Cook County
24         has refused to prosecute or bring these cases back
25         to trial for whatever reason she has. And that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1    doesn't say that the case could not be proven
2    again, they just -- or she just does not want to
3    bring these cases forward again. So she is the one
4    that's making that decision.
5    BY MR. SWAMINATHAN:
6        Q.    Do you have an opinion about whether that was
7    an appropriate decision?
8        A.    Do I have an --
9              MR. KIVETZ:  Objection.  Form, foundations,
10   speculative.
11             THE WITNESS:  Ask that again, please.  I'm
12   sorry.
13   BY MR. SWAMINATHAN:
14       Q.    Do you have an opinion about whether the Cook
15   County State's Attorney's decision to not retry
16   individuals whose cases involve Detective Guevara,
17   whether that's a good decision or not?
18             MS. BARBER:  Also calls for a legal
19   conclusion.
20             MR. KIVETZ:  Yeah.  Objection.  Form,
21   foundation, speculative, and then calls for --
22             THE WITNESS:  That's -- that's not a decision
23   that's -- that's up to me to make, no, sir.  I
24   don't know.
25   BY MR. SWAMINATHAN:

Page 75

1        Q.    Do you have any opinions about it?
2        A.    No, I don't have an opinion --
3              MR. KIVETZ:  Objection.  Form, foundation,
4    speculative.
5              MR. SWAMINATHAN:  And if Detective Guevara had
6    been in involved in a hundred cases that resulted
7    in convictions being thrown out, would that cause
8    you to have any pause about offering opinions that
9    there were no deviations from accepted police
10   practices?
11             MR. KIVETZ:  Objection.  Form, foundation,
12   speculative, and --
13             THE WITNESS:  No, sir.  No, sir.
14             MR. KIVETZ:  -- asked and answered.
15             THE WITNESS:  Like I said, the number itself
16   wouldn't -- wouldn't change for me.
17   BY MR. SWAMINATHAN:
18       Q.    Okay.  And so the fact that there have been
19   approximately 40 convictions that have been thrown out
20   in cases involving Detective Guevara, that's of no
21   importance to you for purposes of your opinions about
22   whether there were deviations from accepted police
23   practices; is that fair?
24             MR. KIVETZ:  Objection.  Form.
25             THE WITNESS:  No, the -- the number again,

Page 76

1    does not -- does not change for me.
2    BY MR. SWAMINATHAN:
3        Q.    Okay.  If there were 40 convictions thrown out
4    involving Detective Guevara, would that cause you to
5    have any pause about offering opinions that his work in
6    the underlying investigations was good in each of those
7    cases?
8              MR. KIVETZ:  Objection.  Form, foundation,
9    asked and answered.
10             THE WITNESS:  I've never been asked to opine
11   on Detective Guevara or the allegations of abuse.
12   So no, I'm not -- I can't answer that.
13   BY MR. SWAMINATHAN:
14       Q.    In your report, are you intending to offer any
15   opinions about whether Detective Guevara followed
16   generally accepted police practices?
17       A.    It's my opinion --
18             MR. KIVETZ:  Objection to form.
19             THE WITNESS:  It's my opinion that all the
20   detectives involved in this case did.
21   BY MR. SWAMINATHAN:
22       Q.    Okay.  And is it your opinion that Detective
23   Guevara followed generally accepted police practices in
24   this case?
25       A.    Yes, sir.

Page 77

1        Q.    And you reviewed the documents in the Arturo
2    Reyes and Gabrielle Solache case, correct?
3        A.    Yes, sir.
4        Q.    And in that case, you found that Detective
5    Guevara had not deviated from any generally accepted
6    police practices, correct?
7        A.    That is correct.  Again, if you -- I did read
8    the allegations being made by the plaintiffs in that
9    case in which they allege misconduct, but I did not see
10   it, other than those allegations.
11       Q.    Okay.  And you didn't -- and in the Reyes-
12   Solache case, you did not credit any testimony of any
13   witnesses indicating misconduct by Detective Guevara,
14   fair?
15             MR. KIVETZ:  Objection to form.
16             THE WITNESS:  Again, I'm not here to judge
17   who's telling the truth and who's not.  I'm just
18   saying that what I read, the totality of the
19   investigation was properly conducted.
20   BY MR. SWAMINATHAN:
21       Q.    Okay.  Based on the assumption that, in fact,
22   Mr. Guevara had not engaged in the misconduct that was
23   alleged in that case, fair?
24       A.    Yes.
25       Q.    Okay.  And in this case too, your opinion is

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 78

1  based on the assumption that Mr. Guevara did not engage
2  in any of the misconduct that's alleged in this case,
3  correct?
4         MR. KIVETZ:  Objection.  Form.
5         THE WITNESS:  Yes.  I'm sorry, yes.
6  BY MR. SWAMINATHAN:
7     Q.   Okay.  And in this case, your opinions are
8  based on the assumption that none of the other officers
9  engaged in any of the misconduct that's alleged in this
10  case, correct?
11    A.   Yes.
12    Q.   Okay.  So did you ever conduct eyewitness
13  identifications during your time as a police officer?
14    A.   Yes, sir.
15    Q.   And how did you go about conducting eyewitness
16  identification procedures?
17    A.   Primarily there were photo displays and on --
18  on several occasions, they were actual live lineups, but
19  primarily photo.
20    Q.   In other words, when you say photo, you --
21  you're referring of like what Chicago Police Department
22  calls photo arrays?
23    A.   Yes, sir.
24    Q.   And so how would you go about conducting photo
25  arrays?

Page 79

1     A.   The police department had a folder with six
2  cutouts with numbers underneath, and we would place a
3  photograph in each of those four cutouts.  One of them
4  would be a photograph of the suspect.
5     Q.   And so when you did photo procedures in Miami,
6  you showed the witness a suspect plus three other
7  photos?
8     A.   No, five --
9         MR. KIVETZ:  Objection.  Form.
10         THE WITNESS:  Five other photos.  Six total.
11  BY MR. SWAMINATHAN:
12    Q.   Okay.  Thank you.  And were you doing photo
13  procedures -- strike that.  Were you doing photo
14  identification procedures in Miami in the 1990s?
15    A.   Yes.
16    Q.   And when you conducted photo identification
17  procedures in Miami in the 1990s, you used six total
18  photos; is that correct?
19    A.   That is correct.
20         MR. KIVETZ:  Objection.  Form.
21  BY MR. SWAMINATHAN:
22    Q.   And in that example, you would have one person
23  who is your suspect, correct?
24    A.   Yes.
25    Q.   Would you ever conduct photo arrays in which

Page 80

1  you had -- all of the individuals in the lineup were
2  suspects?
3         MR. KIVETZ:  Objection.  Form, foundation.
4         THE WITNESS:  No, sir.  I never did that.
5  BY MR. SWAMINATHAN:
6     Q.   If you had multiple suspects in a case, would
7  you include them in the same photo array when you were
8  in Miami?
9         MR. KIVETZ:  Objection.  Form, foundation,
10         speculative, incomplete hypothetical.
11         THE WITNESS:  Probably not, but I can't say
12         that it wasn't done.  But more than likely no.
13  BY MR. SWAMINATHAN:
14    Q.   But your practice -- strike that.  Your
15  practice in Miami was to -- when doing photo arrays, was
16  to have one suspect and five fillers, correct?
17         MR. KIVETZ:  Objection.  Form and foundation.
18         THE WITNESS:  Yes, sir.
19  BY MR. SWAMINATHAN:
20    Q.   And the five fillers, were they individuals
21  that you believed looked sufficiently similar to the
22  suspect?
23    A.   Yes.  Not --
24    Q.   And it was important to you -- I'm sorry, go
25  ahead.

Page 81

1     A.   Not twins, but sufficiently similar to not be
2  biased.
3     Q.   And so why was it important to have fillers
4  that weren't -- that looked sufficiently similar?
5     A.   To avoid a suppression of the lineup and the
6  identification later on in trial and -- and just to make
7  it fair.
8     Q.   Okay.  And when you conducted photo array
9  procedures in the 1990s in Miami, your fillers were not
10  other suspects; is that fair?
11         MR. KIVETZ:  Objection.  Form and foundation.
12         THE WITNESS:  No, they were just photographs
13         from our crime scene area where they had hundreds
14         of them.
15  BY MR. SWAMINATHAN:
16    Q.   Okay.  When you conducted photo procedures in
17  the 1990s, what instructions would you give the
18  witnesses before you had them view the photo array?
19         MR. KIVETZ:  Objection.  Form and foundation.
20         THE WITNESS:  Generally it was, I'm going to
21         show you a group of photographs, see if there's
22         anybody there that you recognize and from where.  I
23         would tell them that -- take into consideration
24         that people have beards, they take their beards
25         off.  They have short hair, they have long hair,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 82

1    they change the color of their hair, just to look
2    at the face of the individuals.
3    BY MR. SWAMINATHAN:
4        Q.    And was there any kind of admonition form that
5    you would read to the witnesses before they viewed photo
6    arrays?
7            MR. KIVETZ:  Objection.  Form, foundation.  And
8        then in the entirety of the 1990s; is that what
9        we're talking about?
10           MR. SWAMINATHAN:  Yes, during the '90s.
11           MR. KIVETZ:  -- 1990 to 1999?
12           THE WITNESS:  I -- I believe that at one point
13       those admonitions, like -- like I just said, were
14       printed on the back of that six folder, but I can't
15       tell you when that was.  I'm not even 100 percent
16       sure if it was ever done, but I just remember that
17       in the back of my mind.  But my words to the
18       witness were usually basically what I just
19       explained.
20   BY MR. SWAMINATHAN:
21       Q.    Okay.  And when you showed photo array to
22   witnesses in the 1990s, would you tell them that the
23   person that you believed committed the crime was in the
24   photos?
25           MR. KIVETZ:  Objection.  Form, foundation,

Page 83

1    speculative.
2            THE WITNESS:  I don't believe I ever said that
3        to an individual.
4    BY MR. SWAMINATHAN:
5        Q.    Would -- I'm sorry, go ahead.
6        A.    No, to an individual.
7        Q.    Why not?
8            MR. KIVETZ:  Objection.  Form.
9            THE WITNESS:  I just didn't.
10   BY MR. SWAMINATHAN:
11       Q.    When you were showing photo arrays in the
12   1990s, would you tell the witnesses not to guess?
13           MR. KIVETZ:  Objection.  Form.
14           THE WITNESS:  Ye -- yes, and sometimes the
15       witness would say, well, this kind of looks like
16       him or her, except for the hair or whatever.  And
17       I'd say, remember, don't look at the hair, just
18       look at the face.
19           And if they did not give me 100 percent
20       identification, then I would ask them, well, what,
21       you know, give me a percentage of what you think
22       that is. Again, that was, if they'd say 70 percent,
23       that negated probable cause for an arrest, but it
24       helped me in -- in continuing the investigation.
25   BY MR. SWAMINATHAN:

Page 84

1        Q.    And would you document their level of
2    confidence?
3        A.    Yes.
4        Q.    Was it your practice to document the level of
5    confidence of the witnesses when they viewed photo
6    arrays?
7            MR. KIVETZ:  Objection.  Form, foundation.
8        From 1991 to 1999?
9            MR. SWAMINATHAN:  Yeah, through the '90s.
10           THE WITNESS:  I would have to say yes, there
11       would be some kind of documentation.
12   BY MR. SWAMINATHAN:
13       Q.    Did you admonish witnesses when they viewed
14   lineups or photo arrays in the 1990s that the person who
15   committed the crime may or may not be in the photo
16   array?
17       A.    I don't think I used those words, "may or may
18       not be."  I just didn't tell them he or she was in
19       there.  And I told them to, if they recognize anyone,
20       which one, which number, and the circumstances behind,
21       you know, what was -- where does he or she recognize
22       that person from?
23       Q.    When you conducted photo array procedures in
24   the 1990s, would you document the fact that you'd shown
25   photos to the witness, regardless of what the outcome of

Page 85

1    the lineup was?
2            MR. KIVETZ:  Objection.  Form.  I don't really
3        understand the question.
4            THE WITNESS:  Yeah.  If you could phrase that
5        a different way, yes.
6    BY MR. SWAMINATHAN:
7        Q.    Sure, Mr. Andreu.  When you conducted photo
8    array procedures in the 1990s, would you document the
9    outcome of the photo array procedure, whether it
10   resulted in a positive identification or a negative
11   identification?
12       A.    I would say more likely than not, yes.
13       Q.    What do you mean by more likely than not?
14       A.    Well, I -- I -- I can't remember every
15       specific case that -- that I showed a photo array and
16       there was or wasn't an identification.  But I would say
17       that normally, there would be a -- a documentation, but
18       I can't say 100 percent of the time, because it's just
19       too many of them, and I don't remember.
20       Q.    If there were -- if the -- you showed a
21   witness a photo array and they were not able to identify
22   the suspect, was it your practice to document that?
23       A.    Again, I --
24           MR. KIVETZ:  Objection.  Form.
25           THE WITNESS:  Again, I've got to give the same

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 25 of 77 PageID #:65803
THE DEPOSITION OF SHELDON ANDERS, taken May 6, 2022

86..89

Page 86

1    answer, more likely than not, but I can't say
2    100 percent that that would be documented.  But I
3    would -- I would try to, if I -- if -- if that
4    would be the answer.
5    BY MR. SWAMINATHAN:
6        Q.   In Miami, if you conducted photo arrays with
7    witnesses, did you then conduct subsequent lineups with
8    those witnesses, live lineups?
9        A.   Not necess --
10           MR. KIVETZ:  Objection.  Form.
11           THE WITNESS:  Not necessarily.  I probably
12    conducted no more than ten live lineups, 15 live
13    lineups in -- in all the cases that I investigated.
14    It was just a photo array.
15    BY MR. SWAMINATHAN:
16        Q.   How many photo arrays do you think you
17    conducted during the course of your time in Miami?
18        A.   Oh, God, hundreds.
19        Q.   Okay.  And how many total live lineups did you
20    say you conducted?
21        A.   Five, ten, 15 at the most.
22        Q.   Why didn't you conduct live lineups very
23    often?
24        A.   It was just what I was taught by -- by senior
25    detectives, that's -- that's how it was done.  The State

Page 87

1    Attorney's Office didn't have a requirement that that be
2    done.  And I think the times when I did do a live lineup
3    was probably when the witness was 90 percent sure or
4    something like that, and I wanted to actually have them
5    view the person live to see if the individual that
6    committed the crime was -- was in that group.
7        Q.   So in the instances -- in the limited
8    instances when you conducted live lineups, your
9    recollection is that it was typically when the witness
10    wasn't entirely certain in the photo array procedure,
11    and so you wanted to see if they could develop more
12    confidence in the live lineup; is that fair?
13        A.   I wouldn't say all the time, but sometimes
14    yes.
15        Q.   Yeah.  Other than the circumstance in which
16    the witness wasn't sure during the photo array
17    procedure, what are other circumstances in which you did
18    a live lineup in Miami?
19        A.   I -- I can't think of the specific reasons why
20    it was done, no, not at this time.
21        Q.   In your experience in Miami, was it that --
22    did you find that it was harder to be able to conduct
23    fair live lineups as compared to photo arrays where you
24    have many, many more pictures that you can use to
25    identify fillers?

Page 88

1           MR. KIVETZ:  Objection.  Form, foundation,
2    speculative.
3           THE WITNESS:  We usually used civilian
4    employees.  I know that in -- in my reading of
5    Chicago cases, they go down to -- to the lockup and
6    -- and, you know, bring up other inmates.  We never
7    did that.  We don't -- our -- our -- our prisoner
8    processing area, many times, was empty.  You know,
9    they tried to get them out of there and to the
10    county jail as quick as possible.  So we would go
11    around the building and -- and choose civilian
12    employees to put them in a lineup, usually.
13    BY MR. SWAMINATHAN:
14        Q.   Okay.  And that's -- would you agree with me
15    that's not an ideal circumstance for trying to create a
16    fair lineup?
17           MR. KIVETZ:  Objection.  Form, foundation,
18    misstates his testimony.
19           THE WITNESS:  I don't understand why you're
20    saying --
21    BY MR. SWAMINATHAN:
22        Q.   What is -- go ahead.
23        A.   I don't understand why you say that that's not
24    fair or proper.
25        Q.   Yeah, I mean, conducting a live lineup with

Page 89

1    civilian employees in the department is going to give
2    you a limited set of options for trying to create a
3    lineup in which your fillers look sufficiently similar
4    to your suspect; do you agree?
5           MR. KIVETZ:  Objection.  Form, foundation,
6    speculative.
7           THE WITNESS:  We had to do our best with what
8    we had.  But again, I don't know how many inmates
9    that Chicago Police Department can have at one time
10    in the lockup and how many of those are willing to
11    participate in a -- in a lineup where there were
12    hundreds of employees in the police department that
13    we could choose from.
14    BY MR. SWAMINATHAN:
15        Q.   How often -- strike that.  You said that you
16    probably conducted around ten to 15 total live lineups
17    during your career in Miami.  How often did you conduct
18    live lineups with the witness after they had already
19    previously viewed a photo array?
20           MR. KIVETZ:  Objection.  Form.
21           THE WITNESS:  I can't provide you a number,
22    whether it was done or it was not done.  I -- I
23    just simply don't remember.
24    BY MR. SWAMINATHAN:
25        Q.   Can you recall any instances in which you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 90

1  conducted a photo array and obtained a positive
2  identification and then conducted a subsequent live
3  lineup with that same witness and the same suspect?
4          MR. KIVETZ: Objection. Form, foundation.
5          THE WITNESS: Again, I can't answer
6      100 percent, but I'm sure that -- that between
7      those five, ten, 15, it was probably done on -- on
8      at least one occasion. I can't rule it out
9      100 percent.
10 BY MR. SWAMINATHAN:
11     Q.  Okay. And is it fair to say that in Miami,
12 your typical practice was not to conduct a photo array
13 with a witness viewing a suspect and then have that same
14 witness view the same suspect in a live lineup
15 afterward?
16         MS. BARBER: Objection. Form. Misstates the
17     testimony.
18         THE WITNESS: No, I wouldn't say that that was
19     policy. It was, like I said before -- I can't tell
20     you how many times if it was done, if it was ever
21     done, I just don't remember. But it wasn't a
22     policy that I -- that I can remember.
23 BY MR. SWAMINATHAN:
24     Q.  Thank you. Let me -- let me make sure my
25 question is clear. Having a witness view a suspect in a

Page 91

1  photo array and then having that same witness view the
2  same suspect in a live lineup, that was not a typical
3  practice in Miami; is that fair?
4      A.  Typical practice, again, is -- is -- is a
5  broad -- is very broad. I just would -- would say that
6  it did not happen often.
7      Q.  Okay. And --
8      A.  Would be a better answer.
9      Q.  And during the course of your career, it was
10 not your typical practice to conduct a photo array with
11 a witness viewing a suspect and then have them view a
12 subsequent lineup with that same witness viewing the
13 same suspect; is that fair?
14     A.  Well --
15         MR. KIVETZ: Objection. Form.
16         THE WITNESS: Come to think of it, I remember
17     doing it one time on a -- on a very high-profile
18     case. So it was done by me at least one time.
19 BY MR. SWAMINATHAN:
20     Q.  And so it was not your typical practice; is
21 that fair?
22     A.  It -- I was not done every time. So if you
23 want to say that's typical practice, then so be it.
24     Q.  And in the one case where you do recall having
25 a witness view the suspect in a photo array and then in

Page 92

1  a live lineup, what was the reason you did that?
2      A.  It was a person who viewed her parents killed
3  when she was, like, 10 years old. And we identified the
4  suspect when she was like, I don't know, 15 or 20 years
5  old. She was -- she viewed a lineup and asked, if -- if
6  I'm not mistaken, she's the one that asked, can I
7  actually see the person, and we conducted a live lineup
8  in that instance.
9      Q.  In the 1990s, would you agree with
10 Mr. Tiderington that it was known in police departments
11 that there was this phenomenon of false identifications?
12         MR. KIVETZ: Objection. Form.
13         THE WITNESS: Aware is, again, is a -- is a
14     broad word. I never experienced that in the
15     hundreds of cases that -- that I investigated. So
16     -- or that anyone that worked for me investigated.
17 BY MR. SWAMINATHAN:
18     Q.  When you say you never experienced that, never
19 experienced what?
20     A.  I never experienced a witness identify,
21 falsely, a -- a suspect.
22     Q.  As far as you know?
23         MR. KIVETZ: Objection. Form, foundation.
24         THE WITNESS: I don't know what you mean by as
25     far as I know.

Page 93

1  BY MR. SWAMINATHAN:
2      Q.  Well, are you saying that in every single
3  instance, you can say with certainty that the witness's
4  identification was accurate?
5          MR. KIVETZ: Objection. Form.
6          THE WITNESS: Yes, I can say that because it
7      was backed up either by another witness, physical
8      evidence, a confession, something like that.
9  BY MR. SWAMINATHAN:
10     Q.  How often during the course of your career
11 would you close a case based on only eyewitness
12 identifications?
13         MR. KIVETZ: Objection. Form, foundation.
14         THE WITNESS: I -- I can't say that. I know
15     it happened, but I can't give you a number.
16 BY MR. SWAMINATHAN:
17     Q.  Were there any cases in which you -- during
18 the course of your career, where you determined that
19 eyewitness identifications were not going to be
20 reliable?
21     A.  No, sir. I can't say I did.
22     Q.  Were there -- are there any circumstances,
23 based on your experience, where you would say that's
24 just a circumstance in which it would be too difficult
25 for somebody to make a reliable identification?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 27 of 77 PageID #:65805
THE DEPOSITION OF BRANDON ROBERS taken may 12, 2023

94..97

Page 94

1  MR. KIVETZ: Objection. Form, foundation,
2  speculative, incomplete hypothetical.
3  THE WITNESS: Explain that to me again,
4  please.
5  BY MR. SWAMINATHAN:
6  Q. Yeah. Like is there -- in your -- from your
7  experience, would you say, well, look, if a person is
8  500 yards away, they could not possibly make a reliable
9  identification?
10  MR. KIVETZ: Objection. Form, foundation,
11  speculative.
12  THE WITNESS: If someone was 500 yards away, I
13  wouldn't even bother to show them a lineup.
14  BY MR. SWAMINATHAN:
15  Q. So during the -- so as an investigator, you
16  would make assessments about whether you thought the
17  witnesses were in a position to be able to make
18  identifications; is that fair?
19  MR. KIVETZ: Objection. Form.
20  THE WITNESS: I would say an assessment was
21  made, yes.
22  BY MR. SWAMINATHAN:
23  Q. Yeah. And really any time as a detective or
24  investigator that you were speaking with witnesses,
25  you're assessing those witnesses and their credibility;

Page 95

1  is that fair?
2  MR. KIVETZ: Objection. Form.
3  THE WITNESS: Yes. To some extent, yes.
4  BY MR. SWAMINATHAN:
5  Q. Okay. And that's part of your job as a police
6  officer, to try to assess whether the people who are
7  telling you things are telling you the truth or not,
8  fair?
9  MR. KIVETZ: Objection. Form, foundation.
10  THE WITNESS: Correct.
11  BY MR. SWAMINATHAN:
12  Q. And as a police officer, when you spoke with
13  witnesses, part of what you were doing was assessing
14  whether the information they were giving you was
15  inconsistent with other information that you knew about
16  the case; is that fair?
17  MR. KIVETZ: Objection. Form.
18  THE WITNESS: Yes, that's fair.
19  BY MR. SWAMINATHAN:
20  Q. And that's one of the ways that you would
21  assess whether or not the witnesses were giving you
22  truthful or reliable information, correct?
23  MR. KIVETZ: Objection. Form.
24  THE WITNESS: One of the ways, yes.
25  BY MR. SWAMINATHAN:

Page 96

1  Q. And when you were speaking with eyewitnesses,
2  when you would ask them about the circumstances of what
3  they had observed, you'd be making assessments about
4  whether or not you thought they could make a reliable
5  identification of a suspect; is that fair?
6  MR. KIVETZ: Objection. Form.
7  THE WITNESS: Yes, you could say that's fair
8  most of the time, yes.
9  BY MR. SWAMINATHAN:
10  Q. And when you interviewed eyewitnesses, would
11  you ask them if they could identify the perpetrator?
12  MR. KIVETZ: Objection. Form.
13  THE WITNESS: I -- not all the time, but that
14  could be asked. I mean, if -- if, for example,
15  there's a -- a bank robbery-murder and there's ten
16  people in the -- in the lobby standing 20 feet away
17  from the guy, I -- I wouldn't have to ask them. I
18  would -- I would assume that they could make an
19  identification.
20  BY MR. SWAMINATHAN:
21  Q. So are there certain -- are you saying that
22  your practice was to typically ask eyewitnesses if they
23  could make an identification, or not?
24  MR. KIVETZ: Objection. Form.
25  THE WITNESS: No, no, not necessarily. If I

Page 97

1  believe that they could make an identification,
2  that -- that there -- there were times where the --
3  like the example you gave, they're 500 yards away,
4  the witness says there's, you know, there's no way
5  I can identify, I didn't see his face, or her face.
6  BY MR. SWAMINATHAN:
7  Q. Were there certain -- what are the kinds of
8  circumstances in which, as a police officer, you'd make
9  the determination that this is not a circumstance in
10  which the person can make a reliable identification?
11  MR. KIVETZ: Objection. Form, speculative.
12  THE WITNESS: Again, speculating, it would be
13  your example of 500 yards away, the individual was
14  wearing a mask. That's just two examples. I'm
15  sure there are others.
16  BY MR. SWAMINATHAN:
17  Q. Okay. So distance would be a kind of thing
18  you would take into consideration in terms of whether or
19  not your witness could make an identification; is that
20  fair?
21  A. Distance is one, yes.
22  Q. And whether or not the face was exposed or
23  visible is another factor you'd take into consideration
24  in terms of whether your witness could make an
25  identification; is that fair?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 28 of 77 PageID #:65806
The Deposition of Sheldon Jarman, taken May 9, 2023

98..101

Page 98

1     MR. KIVETZ: Objection. Form.
2     THE WITNESS: Yes.
3  BY MR. SWAMINATHAN:
4     Q.  And lighting is another factor that you take
5  into consideration; is that fair?
6     MR. KIVETZ: Objection. Form.
7     THE WITNESS: Yes, lighting would be another
8  factor.
9  BY MR. SWAMINATHAN:
10    Q.  And so, for example, if it was a significant
11 distance or it was -- well, strike that.  The amount of
12 time to view the person's face, is that another factor
13 you take into consideration in assessing whether --
14    MR. KIVETZ: Objection. Form, speculative.
15    MR. SWAMINATHAN:  -- you're able to make an
16 identification?
17    THE WITNESS: Not necessarily.  Some people
18 can see a face for two seconds and make an
19 identification.  Other people can see it for five
20 minutes and not make an identification.  Nothing is
21 etched in stone.
22 BY MR. SWAMINATHAN:
23    Q.  And did you take into consideration whether
24 the witness was viewing somebody who they knew or was
25 familiar to them or versus whether they were a stranger?

Page 99

1     MR. KIVETZ: Objection. Form, speculative.
2     THE WITNESS: Well, if the person was known to
3  them, like their next door neighbor that they'd
4  seen, you know, every day for the past 12 years, I
5  wouldn't even put that in the lineup.  I'd show
6  them a single photo.  If it's his brother, cousin,
7  you know, whatever, no need for a lineup.
8  BY MR. SWAMINATHAN:
9     Q.  And would you agree with the idea that when
10 someone's making an identification of someone familiar
11 to them or known to them, that's a more reliable
12 identification circumstance than when somebody is trying
13 to identify a stranger's face?
14    MR. KIVETZ: Objection. Form.
15    THE WITNESS: Probably, but I -- I -- I
16 wouldn't, again, say 100 percent and not etch that
17 in stone.  Sometimes they know who they are and
18 they just don't want to identify for whatever
19 reason they may have.
20 BY MR. SWAMINATHAN:
21    Q.  And as a police officer, it sounds like what
22 you're describing is your practices were different in
23 the instances of a -- of a familiar identification
24 procedure rather than a stranger identification
25 procedure; is that fair?

Page 100

1     MR. KIVETZ: Objection. Form.
2     THE WITNESS: At times, I would say, would be
3  the best answer.
4  BY MR. SWAMINATHAN:
5     Q.  Okay.  Now, as a police practices expert, were
6  there anything about the circumstances of the Andujar
7  shooting that would cause you to have any concerns about
8  the ability of the witnesses to make an identification?
9     A.  No.
10    Q.  Okay.  Was there anything in this case about
11 the circumstances that would cause you to believe that
12 those witnesses would not be able to make a reliable
13 identification of the perpetrator?
14    A.  No, sir.
15    Q.  Did you -- were you aware when you offered
16 your opinions in this case that the shooter's car had
17 tinted windows?
18    A.  Yes, I read that in the reports.
19    Q.  And did you accept that as true for purposes
20 of your opinions?
21    A.  Did I do what, sir, I'm sorry?
22    Q.  Did you accept as true the fact that shooter's
23 car had tinted windows?
24    A.  Yes, but the description of the tinted windows
25 was a light-tint, and they were able to see the

Page 101

1  individual put the -- throw the gang signs down, put a
2  hood over his head.  So they were able to see through
3  the light tint.
4     Q.  So the idea that the windows were light-tinted
5  as opposed to dark-tinted, that was important to you as
6  you considered whether or not these witnesses could make
7  identifications; is that fair?
8     MR. KIVETZ: Objection.
9     THE WITNESS: Yes, the -- the -- the -- being
10 -- being that they were light tints, I mean, if
11 they were limo tints, they wouldn't have been able
12 to see any of the actions that took place inside
13 the car.
14 BY MR. SWAMINATHAN:
15    Q.  Okay.
16    A.  But since they explained in their statements
17 that they saw the -- the -- the, especially the shooter
18 do something and they were able to count the number of
19 individuals that were in the car, the -- the tints were
20 sufficiently light to allow them to observe that.
21    Q.  And so ultimately, fair to say that one of
22 your opinions in this case is that the circumstances of
23 the shooting were such that these eyewitnesses,
24 Mr. Rodriguez and Mr. Melendez, could make a reliable
25 identification?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Page 102

1    A.   Yes, sir.  I think they -- they -- they were
2    in the position to make that identification.
3    Q.   Okay.  And tell me all the circumstances of
4    the shooting that factored into your opinion that the
5    witnesses could make reliable identification in this
6    case.
7    A.   As I just explained a moment ago, they were
8    able to see the number of individuals that were in the
9    offending vehicle.  They were able to see the actions of
10   the shooter with the hand signs and putting up of the
11   hoodie.  They -- they viewed hundreds of photographs.
12   They never told the detectives, I can't identify, why
13   are you making me look at all these gang books?  Those
14   were the things that -- that led me to opine that they
15   could make an identification.
16   Q.   Anything else?
17   A.   Not that I can think of right now, sir.
18   Q.   Did you take into consideration the general
19   offense case report, the initial report written by the
20   paper car, Mr. Trempe?
21   A.   I -- I read Mr. Trempe's report, yes.
22   Q.   And you read his deposition too, correct?
23   A.   Yes.
24   Q.   And what conclusions did you draw from
25   reviewing his report about the witness's ability to make

Page 103

1    an identification?
2         MR. KIVETZ:  Objection.  Form.
3         THE WITNESS:  I can't remember his specific
4    testimony, but I don't remember him saying the
5    witnesses told me they couldn't identify or
6    anything like that.
7         MR. SWAMINATHAN:  I'm going to mark the
8    investigative file from this case as Exhibit 2.
9    Let me mark it first.
10        (EXHIBIT 2 MARKED FOR IDENTIFICATION)
11   BY MR. SWAMINATHAN:
12   Q.   All right, sir, I'm showing you a document I
13   marked as Exhibit 2.  This is the investigative file
14   from the Sierra case.  It's Bates-stamped RFC-Sierra 1
15   through --
16        THE WITNESS:  You --
17        MR. SWAMINATHAN:  -- just one thing, let me
18   just identify it for you.  It's RFC-Sierra 111
19   through RFC-Sierra 178.  You reviewed the
20   investigative file from this case, correct, sir?
21        THE WITNESS:  No --
22        MR. SWAMINATHAN:  I think you're cutting out.
23        THE WITNESS:  -- I don't know if it's -- I
24   don't know if it's my end or your end.
25        MR. SWAMINATHAN:  Jeff, are you able to hear

Page 104

1    me normal?
2         MR. KIVETZ:  Yeah, I can hear you normal.  And
3    then I --
4         MR. SWAMINATHAN:  So I think -- go ahead.
5         MR. KIVETZ:  I just heard Nelson come back in,
6    but I can't tell if he's -- can you just drop the
7    exhibit for a second and see if it works?
8         MR. SWAMINATHAN:  Yeah.  Mr. Andreu, can you
9    just do a little test?
10        THE WITNESS:  See, I -- I can hear you, but I
11   cannot hear Arnad [sic].  See his mouth moving, but
12   I can't hear what he's saying.
13        MR. SWAMINATHAN:  Are you talking about me?
14   Can you hear me now?
15        THE WITNESS:  I can hear you.
16        MR. KIVETZ:  Can you hear me now, Mr. Andreu?
17        THE WITNESS:  Now I can, yes.
18        MR. SWAMINATHAN:  Okay.
19        THE REPORTER:  I don't have a video of Mr.
20   Andreu.  Oh, there he is.  Okay.  Okay.
21   BY MR. SWAMINATHAN:
22   Q.   Okay.  Let's try again.  You can hear me now,
23   Mr. Andreu?
24   A.   Yes, sir.
25   Q.   Okay.  I'm showing you now a document we've

Page 105

1    marked as Exhibit 2, identify it by Bates stamps for the
2    record.  This is the investigative file from the Andujar
3    homicide.
4    A.   When you -- (audio cuts out) -- the document
5    up - (audio cuts out) -- on and goes - (audio cuts out)
6    -- end.
7    Q.   That is very unusual.  I have not had this
8    problem before.
9    A.   Yeah.  See, and the video is choppy and I
10   cannot hear it.  And black --
11        MR. SWAMINATHAN:  Yeah, his video is going
12   entirely choppy now.
13        MR. KIVETZ:  Yeah.  Seems like it's every time
14   you throw up --
15        THE REPORTER:  Would you like to go off the
16   record and see if we can figure it out real quick?
17        MR. SWAMINATHAN:  Yeah.
18        MR. KIVETZ:  Yep.
19        THE REPORTER:  Okay.  We're off the record.
20   The time is 12:08.
21        (OFF THE RECORD)
22        THE REPORTER:  We are back on the record for
23   the deposition of Nelson Andreu being conducted by
24   videoconference.  My name is Sydney Little.  Today
25   is May 12th, 2023, and the time is 12:19 p.m.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 106

1    Central.
2    BY MR. SWAMINATHAN:
3        Q.    Okay, sir.  We are looking at Exhibit 2, which
4    is the Sierra investigative file.
5        A.    Okay.
6        Q.    I'd like you to take a look at Page RFC-Sierra
7    159, which is the General Offense Case Report.  Let me
8    know when you're there, please.
9        A.    Okay.  150 -- okay, 159.
10       Q.    Yeah.  Thank you.  You see that document, the
11   General Offense Case Report?
12       A.    It says "General Offense Case Report."  Yes.
13       Q.    Yes.  And you understood, when you reviewed
14   these reports, that this is the original report filled
15   out by the patrol officer who arrives at the scene,
16   correct?
17       A.    Yes.
18       Q.    Okay.  And this was prepared by Mr. Trempe,
19   who you indicated that you had reviewed his deposition,
20   correct?
21       A.    Yes.
22       Q.    Okay.  And in this General Offense Case
23   Report, there is a section in which the offender's
24   descriptions are provided, correct?
25       A.    Yes, I believe so.

Page 107

1        Q.    Okay.  In the middle section where it lists
2    offender's name or describe clothing, et cetera, it
3    indicates number 1 and number 2, and it lists NFD.  Do
4    you see that?
5        A.    Yes.
6        Q.    And what does NFD stand for?
7        A.    I believe, no further description.
8        Q.    Okay.  And so in that section, the only
9    information that was provided by Mr. Melendez and
10   Mr. Rodriguez to Mr. Trempe was that it was a male,
11   white Hispanic, were the -- were perpetrators 1 and 2;
12   is that correct?
13       A.    That's what I believe it says there, yes.
14       Q.    Okay.  And then it says that the third person
15   in the offender's vehicle, down in the section below, it
16   indicates was a male, Black, correct?
17       A.    Yes.  It -- actually in the narrative portion.
18   Okay.
19       Q.    Yes.  And it says "M/1," which you understood
20   to mean that offender number 3 was described by
21   Mr. Melendez and Mr. Rodriguez as a male Black, correct?
22       A.    Yes.
23       Q.    Okay.  And the description that Mr. Melendez
24   and Mr. Rodriguez were able to provide to Mr. Trempe was
25   no further description, correct?

Page 108

1        A.    Yes.
2              MR. KIVETZ:  Objection to form.
3    BY MR. SWAMINATHAN:
4        Q.    So you understood that when Mr. Trempe
5    interviewed Mr. Melendez and Mr. Rodriguez at the scene,
6    other than identifying that the individuals were males
7    and that they were white Hispanics and Black, there was
8    no further description that they were able to provide to
9    the scene officer.  Did you understand that when you
10   offered your opinions?
11             MR. KIVETZ:  Objection.  Form.
12             THE WITNESS:  I don't know if it was that they
13       could not offer additional -- they just didn't
14       provide Officer Trempe with any additional
15       information.
16   BY MR. SWAMINATHAN:
17       Q.    And what was your understanding when you
18   offered your opinion in this case about whether Mr.
19   Trempe asked them for additional description of
20   information?
21             MR. KIVETZ:  Objection to form.
22             THE WITNESS:  Say that again, please?
23   BY MR. SWAMINATHAN:
24       Q.    Yeah.  What was your understanding when you
25   offered your opinions in this case about whether Mr.

Page 109

1    Trempe asked them for additional descriptive
2    information?
3              MR. KIVETZ:  Objection to form.
4              THE WITNESS:  I don't remember, in -- in his
5        deposition if -- if he said that he had asked them
6        for additional descriptors or not, but in any --
7    BY MR. SWAMINATHAN:
8        Q.    Would it matter -- I'm sorry.  Go ahead.
9    Sorry.
10       A.    In -- in any event, like I -- I outlined in my
11   report, or explained in my report, I -- I would not
12   expect the uniformed officer on one of my cases to get
13   detailed information on -- on the suspects in the case.
14   That's for detectives to do subsequent to their -- their
15   being out -- off the scene and in the homicide office.
16   So to put that they were Latin males and no other
17   description and a -- a Black male and no other
18   description doesn't surprise me.
19       Q.    So your practice was to deliberately have
20   patrol officers not learn descriptive information from
21   eyewitnesses at a scene; is that correct?
22       A.    No, I --
23             MR. KIVETZ:  Objection.  Form.  Foundation.
24       Misstates his testimony.
25             THE WITNESS:  I -- I didn't say deliberately.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 110

1   I just said that they get the -- the -- the minimal
2   information that they need to complete their
3   report.  I had people going on murder scenes and
4   they were so -- the uniformed cop was so determined
5   to get the victim's name that he is pulling a
6   wallet out of his -- that dead guy's pocket to get
7   his name from his driver's license.
8       I didn't want them doing that.  Document what
9   you have and whatever the witnesses tell you, but
10  don't go questioning them.  That's a detective's
11  role.
12  BY MR. SWAMINATHAN:
13      Q.   How long after Mr. Trempe arrived at the scene
14  did the detectives arrive at the scene?
15      MR. KIVETZ:  Objection to form.
16      THE WITNESS:  It wasn't a long -- from what --
17  from what I remember, it was not a long time.
18  BY MR. SWAMINATHAN:
19      Q.   Do you have any idea?
20      A.   Again, I -- I could go back and review it, but
21  I would say within -- well within an hour, half hour.
22      Q.   And so in this case, the perpetrators fled,
23  correct?
24      A.   Yes.
25      Q.   Would it be valuable to get descriptive

Page 111

1   information to try to see if you could catch the
2   perpetrators?
3       MR. KIVETZ:  Objection to form.
4       THE WITNESS:  The description -- the
5   description of the vehicle -- again, if they
6   would've said they're -- they're 20 --
7   approximately 23 years old and they have black
8   hair, wearing shorts and a white T-shirt, that's
9   probably half the population in Chicago, so I don't
10  know if that would be sufficient.
11      If he -- if he was wearing a -- a Mickey Mouse
12  outfit, well, then that would narrow it down.  I'm
13  just giving examples.  But to put out the
14  description of the car occupied by three males, I
15  believe, is sufficient information for the other
16  officers to be on the lookout for -- for this
17  vehicle and these occupants.
18  BY MR. SWAMINATHAN:
19      Q.   And if Mr. Trempe testified that it was his
20  practice to collect as much descriptive information as
21  he could from the witnesses, do you discredit that
22  testimony?
23      A.   No, I wouldn't discredit his testimony.
24      Q.   And if Mr. Trempe testified that he would
25  deliberately make it a point to gather as much

Page 112

1   descriptive information as he could from the
2   eyewitnesses about the descriptions of the perpetrators,
3   would that have any impact on your opinions in this
4   case?
5       MR. KIVETZ:  Objection to form.
6       THE WITNESS:  No, not -- not necessarily.
7   BY MR. SWAMINATHAN:
8       Q.   I'm not asking whether not -- necessarily or
9   not.  They did do -- does it have it -- would it have
10  any impact on your opinions?  Yes or no?
11      A.   No.
12      MR. KIVETZ:  Objection to form.
13      THE WITNESS:  No.
14  BY MR. SWAMINATHAN:
15      Q.   Okay.  And so is it fair to say, for purposes
16  of your opinions, you did not consider the idea that
17  Mr. Trempe had asked for as much descriptive information
18  as he could, and that what's contained in the General
19  Offense Case Report is as much information as the
20  witnesses were able to provide; is that fair?
21      MR. KIVETZ:  Objection.  Form.  Misstates his
22  testimony.
23      THE WITNESS:  Well, I don't know if -- Trempe
24  may say that he -- he -- he attempts to get as much
25  information as he can.  Doesn't specify that --

Page 113

1   that's what happened in this case.  Also, you have
2   to take into account these witnesses just
3   experienced a -- a traumatic event.
4       And how much do they give the officer at this
5   time?  Again, sometimes gangs want to retaliate.
6   So there's -- there's several things that could go
7   into why this is the only description in Officer
8   Trempe's report.
9   BY MR. SWAMINATHAN:
10      Q.   Okay.  And ultimately, the fact that -- strike
11  that.  Ultimately, the fact that the only description
12  that's provided in the General Offense Case Report for
13  Mr. Trempe is that the offenders were male white
14  Hispanics and a male Black with no further description
15  was not relevant, from your perspective, in offering
16  your opinions in this case; is that fair?
17      MR. KIVETZ:  Objection.  Misstates his
18  testimony.
19      THE WITNESS:  No.
20  BY MR. SWAMINATHAN:
21      Q.   You said -- is that is that is that fair or
22  not?
23      MR. KIVETZ:  He said no.
24      THE WITNESS:  I said no.
25  BY MR. SWAMINATHAN:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 32 of 77 PageID #:65810
THE DEPOSITION OF SHELDON ANDREU, taken May 12, 2022

114..117

Page 114

1    Q.   Okay.  And so it was relevant to you?
2    A.   I said no.  No, sir.
3    Q.   I think that's why we're getting confused.  Was
4  it relevant to you that no further description was
5  provided by these witnesses in the General Offense Case
6  Report?
7        MR. KIVETZ:  Objection.  Form.  I'm confused.
8        Like, I don't know what you're asking.  I don't
9        know what you're asking.
10  BY MR. SWAMINATHAN:
11    Q.   Go ahead, Mr. Andreu.  Okay.  I think we were
12  maybe talking past each other.  Was it relevant to you?
13    A.   No.
14    Q.   Okay.  Thank you.  Let's look at --
15        MR. KIVETZ:  I'm just going to object to the
16        form of the last question.
17  BY MR. SWAMINATHAN:
18    Q.   Let's take a look at the -- your list of
19  materials reviewed in your report, beginning at the
20  bottom of Page 3.
21    A.   Okay.
22    Q.   Looking through your list of materials
23  reviewed from the bottom of Page 3 through Page 5, are
24  there any items missing from your list of materials
25  reviewed?

Page 115

1    A.   No, sir.  I -- I believe -- I believe that's
2  an accurate list of what I reviewed.
3    Q.   Is there anything that you reviewed in
4  offering your opinions in this case that's not included
5  in this list?
6    A.   The -- I -- I -- you're asking me to go
7  through a list and remember what I read months ago.  I
8  believe that when I compiled this list, it was an
9  accurate list of what I -- but, you know, I -- I
10  wouldn't put my head in a guillotine and say that, but I
11  believe it to be.
12    Q.   Okay.  In other words, when you look at this
13  list, you don't -- you can't think of something that you
14  think you reviewed that's not listed here; is that fair?
15    A.   I -- I don't believe so, yes.
16    Q.   Okay.  And is there anything that you reviewed
17  that was new, after offering this report and before this
18  deposition?
19    A.   Ask that question again, please?
20    Q.   Yeah.  Did you review anything additional
21  after creating this report, relevant to this case?
22    A.   No.  I don't -- I didn't receive any other
23  information.
24    Q.   Okay.  And is it fair to say that your
25  opinions are based on this set of reports that's listed

Page 116

1  in your materials reviewed?
2    A.   That is correct.
3    Q.   Is there anything else that you reviewed as a
4  reference or otherwise for purposes of offering your
5  opinions in this case?
6    A.   No, sir.  I don't believe so.  This is the
7  entirety of the list.
8    Q.   Okay.  And so is your report, when you drafted
9  it, was it based on the things listed in this list of
10  materials reviewed?
11    A.   Yes, sir.
12    Q.   Was it based on anything else?
13    A.   Oh, based on my experience, training, and
14  education, but as far as documents, just these.
15    Q.   Okay.  And so your report does not list, in
16  your materials reviewed, any national standards or other
17  policing standards, correct?
18    A.   No, sir.  I was not --
19    Q.   And you don't -- I'm sorry.
20        MR. KIVETZ:  Let me finish.
21        THE WITNESS:  I was not asked to opine on --
22        on those.
23  BY MR. SWAMINATHAN:
24    Q.   Okay.  And you said you were not -- you were
25  not asked to opine on any national policing standards;

Page 117

1  is that fair?
2        MR. KIVETZ:  Objection.  Form.
3        THE WITNESS:  That is correct.
4  BY MR. SWAMINATHAN:
5    Q.   Okay.  And you didn't consult any national
6  policing standards in offering your opinions, correct?
7    A.   That is correct.
8    Q.   And in your report, you don't cite to any
9  national policing standards, correct?
10    A.   That is correct.
11    Q.   Okay.  And that's because you, in offering
12  your opinions, were not intending to offer opinions
13  about national policing standards; is that fair?
14        MR. KIVETZ:  Objection.  Form.  Misstates
15        his --
16        THE WITNESS:  No, not necessarily.  I know
17        police standards, both national and -- and local.
18        I don't know a lot about the -- the ones in
19        Chicago, but the national standards, I'm -- I'm
20        familiar with.  I don't have to cite -- I didn't
21        feel I had to cite them in my report.
22  BY MR. SWAMINATHAN:
23    Q.   Okay.  And then you didn't review any of them
24  or -- in preparing your report; is that fair?
25    A.   I -- I may have.  I -- I don't remember right



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 33 of 77 PageID #:65811
THE DEPOSITION OF SHELDON ANDREWS taken May 9, 2023

118..121

Page 118

1  now.  If I had any questions, I may have gone to the
2  IACP website or something, but again, I can't tell you
3  100 percent.
4      Q.   You didn't list any IACP materials in your
5  list of materials reviewed, correct?
6      A.   That is correct.
7      Q.   And you don't have any memory of consulting
8  the IACP in preparing your Sierra Expert Report; is that
9  fair?
10     A.   I don't have any memory.  It doesn't mean that
11  I did not.  I just don't remember at this time.
12     Q.   Looking at your list of materials reviewed,
13  did you receive any materials related to Mr. Sierra
14  receiving a Certificate of Innocence?
15     A.   I believe that's included in there somewhere,
16  maybe one of the -- the court hearings or something, but
17  in any event, I -- I know that he did receive that.
18     Q.   Did it have any impact on your opinion?
19     A.   No, sir.
20     Q.   The conclusions of Judge Reddick, you saw
21  those in your materials, correct?
22         MR. KIVETZ:  Objection.  Form.  Foundation.
23         THE WITNESS:  Yes, sir.
24  BY MR. SWAMINATHAN:
25     Q.   And so you were aware of her findings based on

Page 119

1  the Certificate of Innocence hearing that she conducted,
2  correct?
3         MR. KIVETZ:  Objection.  Form.
4         THE WITNESS:  Yes, sir.  I remember reading
5     that.
6  BY MR. SWAMINATHAN:
7     Q.   Did that have any impact on your opinions?
8     A.   No, sir.
9     Q.   Did you -- would you agree that Ms. -- that
10  Judge Reddick found that, in fact, there had been
11  misconduct that occurred in -- in our homicide
12  investigation?
13         MR. KIVETZ:  Objection to form.  Foundation.
14         THE WITNESS:  Ask that question again, please?
15  BY MR. SWAMINATHAN:
16     Q.   In -- you agree that in reviewing Judge
17  Reddick's conclusions after the Certificate of Innocence
18  hearing, that she did conclude that there had been
19  police misconduct in the investigation?
20         MR. KIVETZ:  Objection.  Form.  Foundation.
21         THE WITNESS:  She did write that in her -- in
22     her findings, or her report, or whatever.
23  BY MR. SWAMINATHAN:
24     Q.   Do you disagree with Judge Reddick's findings?
25         MR. KIVETZ:  Objection.  Form.

Page 120

1         THE WITNESS:  Yeah.  I -- I'm not here to
2     agree or disagree.  I just offered opinion on the
3     investigation.  The judge is -- is welcome to his
4     or her opinion.  I don't know if she's a man or a
5     woman.
6  BY MR. SWAMINATHAN:
7     Q.   And actually in this case, you're not offering
8  an opinion about whether or not misconduct occurred; is
9  that fair?
10     A.   Whether the misconduct occurred?  No, I'm not
11  offering an opinion on that.
12     Q.   Okay.  All you're doing is saying that if you
13  accept the version of events that is told in the police
14  reports and the handwritten statement, that would be
15  consistent with accepted police practices; is that fair?
16     A.   Basically, yes, sir.
17     Q.   Okay.  Go down to the deposition section, if
18  you don't mind, sir.
19     A.   Where -- where do you want me to go, sir?
20     Q.   In your expert report on Page 4 in your list
21  of materials reviewed.
22     A.   Okay.
23     Q.   There's a depositions section.  Do you see
24  that?  And you list a bunch of depositions?
25     A.   Yes, sir.

Page 121

1     Q.   Okay.  Thank you.  The fourth item on there is
2  the Ron Malczyk deposition, including exhibits.  Do you
3  see that?
4     A.   Yes, sir.
5     Q.   You reviewed Mr. Malczyk's deposition, yes?
6     A.   I did.
7     Q.   Okay.  Did you review it in its entirety?
8     A.   Yes, sir.
9     Q.   Did you find it notable, memorable?
10     A.   Sir, I -- I don't remember the details of --
11  of his deposition.  I would have to go back and -- and
12  read it again.  Like -- like, there's many -- many on
13  that list.  I don't want to confuse one name with
14  another.
15     Q.   Is it fair to say that you -- in your report,
16  you don't discuss the deposition testimony of
17  Mr. Malczyk at all, correct?
18     A.   I don't believe so, no, sir.
19     Q.   Okay.  And you -- and you know that
20  Mr. Malczyk was the police officer who was at the scene
21  of the Ruben Gonzalez murder, correct?
22         MR. KIVETZ:  Objection.  Form.  Foundation.
23         THE WITNESS:  I -- I -- I can't remember those
24     details, but if you are -- if you're telling me so,
25     then I have no reason to doubt you.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 122

```
 1        MR. KIVETZ:  Well, and also, Anand, you know,
 2    we're not offering any opinions on the Ruben
 3    Gonzalez matter.  It's right on Page 2 [sic] of his
 4    report.
 5  BY MR. SWAMINATHAN:
 6    Q.   Yeah.  And Mr. Andreu, so let's just be --
 7    let's make sure we got it clear on the record from you.
 8    You're not offering any opinions about the Ruben
 9    Gonzalez homicide investigation, correct?
10    A.   No, sir.
11    Q.   And you understand, however, that there was
12    information that was purportedly learned during the
13    Ruben Gonzalez deposition that was relevant in the
14    Andujar homicide investigation, correct?
15    A.   Yes.  And I -- I -- I can remember the
16    visiting of the detectives to Gonzalez' mother, which
17    led to some vital information on the Andujar case.
18    Q.   Okay.  And so ultimately, there was
19    information that was purportedly learned in the Gonzalez
20    investigation that led to Mr. Sierra becoming a suspect
21    in the Andujar case, correct?
22    A.   Yes, sir.
23    Q.   And that information had to do, in part, with
24    information about a description of a particular vehicle,
25    correct?
```

Page 123

```
 1    A.   Yes, sir.
 2    Q.   Okay.  And did you look at the information in
 3    the Gonzalez file about the vehicle that had been
 4    described as being involved?
 5    A.   I don't --
 6        MR. KIVETZ:  Objection to form and foundation.
 7        THE WITNESS:  I don't know what information I
 8        received on the Gonzalez files and -- and -- file
 9        and what it -- what it said or didn't say.  I just
10        don't remember at this point.
11  BY MR. SWAMINATHAN:
12    Q.   You -- in your list of materials reviewed, you
13    agree with me, you list the Ruben Gonzalez homicide
14    investigative file and permanent retention file,
15    correct?
16    A.   Yeah.  Yes, you're right.  I did review.  What
17    I'm saying is I -- I can't remember now, specifically,
18    the details of it.
19    Q.   Okay.  And if you look at Page 5 of your
20    report --
21    A.   Yes, sir.
22    Q.   -- you discuss the Ruben Gonzalez murder
23    investigation, correct?
24    A.   Yes.
25    Q.   And you provide a general summary of that
```

Page 124

```
 1    murder investigation, correct?
 2    A.   Yes.
 3    Q.   Okay.  And in that section, you do -- you
 4    agree with me, you do not discuss the testimony of the
 5    police officer in that case, Mr. Malczyk, correct?
 6    A.   Correct.
 7    Q.   Okay.  Why didn't you discuss the testimony of
 8    Mr. Malczyk?
 9    A.   All I was doing was laying, like, a foundation
10    of what had happened in the Ruben Gonzalez murder, the -
11    - the location, the time, the date, to show proximity to
12    the Andujar case, and -- and the -- and a possible
13    connection, but I -- I didn't provide you with details.
14    Q.   Okay.  Do you -- and ultimately, because you
15    were not offering opinions about the Ruben Gonzalez
16    case, correct?
17    A.   Exactly.
18    Q.   Okay.  Do you have a copy of Mr. Tiderington's
19    expert report?
20    A.   I do.
21    Q.   Can you get that in front of you?  Let me know
22    when you have that.
23    A.   Okay.  I have it.
24        MR. KIVETZ:  Oh, hold on.  I need a second.
25        Okay.
```

Page 125

```
 1  BY MR. SWAMINATHAN:
 2    Q.   Okay.  If you look at that report and go to
 3    Page 30 of that report -- Mr. Tiderington's report?
 4    A.   Okay.
 5    Q.   Okay.  And on that -- in that -- in Mr.
 6    Tiderington's report, he offers some opinions on Pages
 7    30 through 33 about what occurred during the Ruben
 8    Gonzalez homicide investigation, correct?
 9    A.   Yes.
10    Q.   Okay.  And you're not offering any opinions in
11    response to Mr. Tiderington's discussion of the Ruben
12    Gonzalez investigation; is that fair?
13        MR. KIVETZ:  Objection.  Form.
14        THE WITNESS:  That's fair.  I was not
15        requested to opine on that, and I did not.
16  BY MR. SWAMINATHAN:
17    Q.   Okay.  And so the opinions Mr. Tiderington
18    offers on Pages 30 through 33 of his report, you're not
19    responding or disagreeing with those; is that fair?
20        MR. KIVETZ:  Objection.
21        THE WITNESS:  Neither -- neither agreeing or
22        disagreeing, no.
23  BY MR. SWAMINATHAN:
24    Q.   Okay.  Thank you.  And if you look on Page 31
25    of his report -- this is probably the easiest way to do
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 126

1  it since we can't show on the screen.  Let's use his
2  report.  If you look on Page 31 of his report --
3      A.   Yes, sir.
4      Q.   You -- when you offered your report in this
5  case, you obviously reviewed Mr. Tiderington's report,
6  correct?
7      A.   Yes.
8      Q.   And in fact, you were -- the purpose of this -
9  - respond to some of the opinions of Mr. Tiderington,
10 correct?
11     A.   Right.
12     Q.   Okay.  And just, by the way, to be clear,
13 Mr. Tiderington has a number of opinions about Chicago
14 Police Department policies and practices.  You're not
15 offering any opinions about that, correct?
16     A.   Yes, sir, correct.
17          MR. KIVETZ:  Wait a minute.  I just -- what
18     page are you on?
19          MR. SWAMINATHAN:  I -- I'm just ask -- I'm
20     asking him just general question, not about the
21     report.
22          MR. KIVETZ:  Okay.
23 BY MR. SWAMINATHAN:
24     Q.   And Mr. Tiderington, when you reviewed his
25 report, had a number of opinions, for example, about the

Page 127

1  Special Order 83-1 and the subsequent Special Orders
2  related to investigative files and street files. You saw
3  that in his report, correct?
4      A.   Yes.
5      Q.   And you're not offering any opinions about
6  those Special Orders, correct?
7      A.   That's correct.
8      Q.   And Mr. Tiderington had some opinions about
9  information that should have been documented and
10 disclosed in the Andujar homicide investigation. You're
11 not offering any opinions about what was disclosed or
12 not disclosed, correct?
13          THE WITNESS:  Well --
14          MR. KIVETZ:  Objection. Form.
15          THE WITNESS:  Ask that question again.  I'm
16     sorry, sir.
17 BY MR. SWAMINATHAN:
18     Q.   Yeah.  You're not offering any opinions about
19 what information was disclosed or not disclosed to
20 prosecutors in the criminal defense in the Andujar
21 homicide investigation, correct?
22          MR. KIVETZ:  Objection to form.
23          THE WITNESS:  Correct -- that is correct.
24 BY MR. SWAMINATHAN:
25     Q.   Okay.  And as a matter of your practices when

Page 128

1  you were in homicide, when you were -- strike that.
2  As a matter of your practices when you were an
3  investigator, you turned over all of the police reports
4  in your file to the prosecutor; is that fair?
5      A.   Yes.
6      Q.   Okay.  And you would never pick and choose
7  which police reports or police documents to share; is
8  that correct?
9      A.   That is correct.
10     Q.   Okay.  And I think, as you've now indicated,
11 your opinions here are focused on responding to
12 Mr. Tiderington, specifically with regard to the
13 investigation that was conducted in the Andujar case,
14 correct?
15     A.   Yes, sir.
16     Q.   And are there any opinions that
17 Mr. Tiderington had with regard to how the Andujar
18 investigation was conducted that you agree with?
19          MR. KIVETZ:  Objection to form.
20          THE WITNESS:  Again, I'd have to go through
21     the whole report, but I -- I can't name anything
22     right now.  I -- I can say that what he talks about
23     -- the misconduct, if that misconduct, in fact,
24     took place, that would not be a correct way to
25     conduct an investigation.

Page 129

1  BY MR. SWAMINATHAN:
2      Q.   Okay.
3      A.   But again, I'm not giving any opinion on that.
4      Q.   Okay.  And so if I understand you correctly,
5  one of the things Mr. Tiderington does in his report is
6  he discusses some of the evidence that was contained in
7  the record that makes accusations of misconduct by
8  police officers, correct?
9      A.   Yes.  I've read that.  Correct.
10     Q.   And one of the things he does is he opines
11 that if that misconduct that was described by various
12 witnesses, in fact, occurred, that would be a violation
13 of generally accepted police practices, correct?
14          MR. KIVETZ:  Objection to form.  Assuming a
15     jury credits it, but yes.
16 BY MR. SWAMINATHAN:
17     Q.   Go ahead.
18     A.   Yes, sir.
19     Q.   Okay.  And you agree with him that those
20 things that are described would be deviations from
21 generally accepted police practices if they, in fact,
22 occurred, correct?
23          MR. KIVETZ:  Objection. Form.  Again,
24     assuming a jury credits it.  Go ahead.
25          THE WITNESS: Yes, sir.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 36 of 77 PageID #:65814
THE DEPOSITION OF SHELDON ANDERSON taken May 9, 2023

130..133

Page 130

BY MR. SWAMINATHAN:

Q. Okay. And if you look, for example, at Page 23 of his report -- tell me when you're there, sir.

A. Okay, 23. I'm here.

Q. Yep. Okay. And in around the middle of the page, he has a sections -- he has a section -- well, he has -- there's two bullet points on that page -- on Page 23. Do you see that?

A. Yes.

Q. And in those bullet points, he discusses IACP policy documents and American Judicature Society information. Do you see that?

A. Yes, sir.

Q. And his discussion there, he's basically talking about various national policing standards that indicate that even by 1995, there was an understanding within the world of policing about some of the challenges related to eyewitness identifications. Do you agree?

MR. KIVETZ: Objection. Form.

THE WITNESS: That's what he wrote in his report, yes.

BY MR. SWAMINATHAN:

Q. Do you -- and you didn't say anything in your report disputing or challenging that; is that fair?

Page 131

MR. KIVETZ: Objection. Form.

THE WITNESS: I don't believe I did. No, sir.

BY MR. SWAMINATHAN:

Q. Okay. And so you're not disagreeing with Mr. Tiderington about the idea that even by 1995, the challenges associated with eyewitness identifications were known in the world of policing; is that fair?

MR. KIVETZ: Objection. Form.

THE WITNESS: I'm agreeing or -- what he wrote in his report, yes.

BY MR. SWAMINATHAN:

Q. Okay. And so his citation to the IACP policies and some Supreme Court standards in his report, you're not disagreeing with those opinions; is that fair?

MR. KIVETZ: Objection to form.

THE WITNESS: No, sir. I mean, I didn't go to his -- to his footnotes and open up the IACP information. I -- I'm -- I'm hopeful that what he wrote there is -- is what's listed in IACP, but I didn't check it out. No.

BY MR. SWAMINATHAN:

Q. Okay. But he writes on there -- I mean, you saw in his report where he quoted from it. "Police frequently rely on eyewitness identifications.

Page 132

Unfortunately, civilian eyewitnesses frequently prove to be unreliable observers and erroneous identifications are often the result. Misidentification by our" -- "eyewitnesses are normally the result of a combination of factors." That's a citation that he provided directly from the IACP policy center documents, correct?

MR. KIVETZ: Objection to form.

THE WITNESS: Yes. I see it's in quotation, so I'm assuming that that is directly from there.

BY MR. SWAMINATHAN:

Q. Okay. And you don't disagree with that statement from the policy documents of the IACP, correct?

MR. KIVETZ: Objection. Form. Misstates his previous testimony.

THE WITNESS: I agree with police frequently rely on eyewitness information. Frequently proved to be unreliable observers, I'm not too sure about.

BY MR. SWAMINATHAN:

Q. Okay. When you read this portion of Mr. Tiderington's report, you did not decide that you felt that you needed to offer a counter-opinion on his discussion of the IACP's policy documents, correct?

MR. KIVETZ: Objection. Form.

THE WITNESS: No, sir.

Page 133

BY MR. SWAMINATHAN:

Q. Okay. Why not?

A. I can't tell you what was going on in my mind at the time. I just didn't.

Q. But you didn't find anything that Mr. Tiderington had written about what was contained in the IACP policy documents from 1992 and 1993 to be false or inaccurate; is that fair?

MR. KIVETZ: Objection. Form.

THE WITNESS: Again, I didn't --

MS. BARBER: Misstates testimony.

THE WITNESS: I didn't go back and -- and -- and check the footnotes that he wrote in his report, but I -- I believe that what he put in there is accurate. I mean, it'd have to be, it was what's in his report.

BY MR. SWAMINATHAN:

Q. Okay. And so you don't dispute that in 1992 and 1993, the IACP had papers stating that civilian eyewitness frequently proved to be unreliable observers; is that fair?

MR. KIVETZ: Objection. Form.

THE WITNESS: What he wrote there is -- is from the IACP. My -- my experience in -- in homicide, I don't remember ever having a case,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 37 of 77 PageID #:65815
THE DEPOSITION OF SHELDON ANDERS, taken May 27, 2022

134..137

Page 134

1 ever, where a witness identified a suspect and --
2 and the person was convicted and later on it was
3 proven that the eyewitness identification was not -
4 - not true, that he -- he made -- he or she made a
5 mistake. That never happened in any of my cases.
6 BY MR. SWAMINATHAN:
7     Q. Have you ever had a case that you investigated
8 and resulted in a conviction in which the conviction was
9 later thrown out?
10     A. No, sir.
11     Q. Have you -- do you know any officer who worked
12 with you ever in Miami who had even five instances of
13 cases that they worked on, having the convictions thrown
14 out?
15     A. I can't answer that.
16         MR. KIVETZ: Objection to form.
17         THE WITNESS: I can't answer that. I don't
18     know everybody that worked in homicide that -- you
19     know, what happened in their cases.
20 BY MR. SWAMINATHAN:
21     Q. Oh, thank you. I'm not asking you about
22 things you don't know. I'm asking you only about what
23 you do know. So let me ask it again. Are you aware of
24 a single investigator from Miami who had multiple
25 instances in which an investigation they conducted

Page 135

1 resulted in convictions being thrown out?
2         MR. KIVETZ: Objection. Form. You're saying
3     now, outside of a lineup, because I think that's
4     where I'm confused.
5         MR. SWAMINATHAN: I'm asking -- yeah. I'm
6     asking about anything.
7         MR. KIVETZ: Okay.
8         THE WITNESS: No, I -- I can't recall any
9     case.
10 BY MR. SWAMINATHAN:
11     Q. Can you recall a single detective or
12 investigator that you worked with whose cases resulted
13 in multiple convictions being thrown out?
14         MR. KIVETZ: Objection. Form. Foundation.
15         THE WITNESS: No, sir, I cannot.
16 BY MR. SWAMINATHAN:
17     Q. Okay. If you go to Page 30 of
18 Mr. Tiderington's report?
19     A. 30?
20     Q. 30, yeah, Page 30. Thank you.
21     A. Okay.
22     Q. He has a discussion there, obviously, with the
23 Ruben Gonzalez investigation. We talked about that. If
24 you look at Page 31 of his report.
25     A. Okay.

Page 136

1     Q. He has a section where he has cut and paste
2 [sic] in a portion of the police report from the
3 Gonzalez case. Do you see that?
4     A. Yes, sir.
5     Q. Okay. And what he's citing there is to
6 Detective Woitowich and Graf's interview of Malczyk at
7 the scene. Do you see that?
8     A. Yes, sir.
9     Q. And that was among the documents that you
10 reviewed, correct?
11     A. Correct.
12     Q. Okay.
13         MS. BARBER: Sorry.
14 BY MR. SWAMINATHAN:
15     Q. And then what --
16         MS. BARBER: Sorry. What page?
17         MR. KIVETZ: 31.
18         MR. SWAMINATHAN: This is Page 31 of the
19     Tiderington report.
20         MS. BARBER: Thank you.
21         MR. SWAMINATHAN: Yeah.
22 BY MR. SWAMINATHAN:
23     Q. Okay. And on Page 32 of the report, he then
24 cites to a separate police report that discusses an
25 interview of Mr. Malczyk. Do you see that?

Page 137

1     A. Okay.
2     Q. Right? And so what he basically discusses on
3 Page 31 and 32 are two different reports in the Gonzalez
4 investigation, one written by Woitowich and Graf about
5 their conversation with Mr. Malczyk, and then a later
6 one written by Detective Guevara and Halvorsen about
7 their conversation with Mr. Malczyk. Do you see that?
8         MR. KIVETZ: Objection. Form. Take your time
9     if you need to read, review it.
10 BY MR. SWAMINATHAN:
11     Q. Yeah. Take as much time as you need.
12     A. Okay.
13     Q. Okay. And when you reviewed Mr. Tiderington's
14 report, you understood that one of the things he was
15 pointing out was that there's a significant
16 contradiction between the Woitowich and Graf report and
17 the Guevara-Halvorsen report, correct?
18         MR. KIVETZ: Objection to form.
19         THE WITNESS: There is difference.
20 BY MR. SWAMINATHAN:
21     Q. Okay. And the key difference is that in one
22 report, Mr. Malczyk had told Woitowich and Graf that the
23 Imperial Gangsters in the silver car drove away without
24 providing any information. And in the Guevara-
25 Halvorsen report, Mr. Malczyk purportedly told them that

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 138

1 he did get information from the two Imperial Gangsters;
2 is that fair?
3    A.   Yes, sir.
4        MR. KIVETZ:  Objection.  Form.
5 BY MR. SWAMINATHAN:
6    Q.   Do you have an explanation for that
7 contradiction?
8        MR. KIVETZ:  Objection.  Form.  Foundation.
9 Speculative.
10       THE WITNESS:  No, sir.  I do not.
11 BY MR. SWAMINATHAN:
12   Q.   Are you aware of any evidence about which of
13 those two versions is correct?
14       MR. KIVETZ:  Objection.  Form.  Foundation.
15 Speculative.
16       THE WITNESS:  No, sir.  I do not.
17 BY MR. SWAMINATHAN:
18   Q.   And do you have -- strike that.  Mr. Malczyk,
19 you said you had a copy of his deposition, correct?
20   A.   Yes.
21   Q.   And in fact, Mr. Tiderington also cited
22 specifically to the deposition of Ron Malczyk in
23 Footnote 19, you see that?
24   A.   Yes
25   Q.   And --

Page 139

1        MR. KIVETZ:  Objection.  Form.  Foundation.
2 BY MR. SWAMINATHAN:
3    Q.   -- when you review -- I'm sorry.  Go ahead,
4 Jeff.
5        MR. KIVETZ:  Yeah.  I mean, it seems like what
6 you're trying to do is get him to provide opinions
7 that he hasn't provided and that's outside the four
8 corners of his report.  If that's what you're
9 trying to do, I'd say that that's improper and also
10 inconsistent with his report.  So that's what I'm
11 trying to figure out, if you're trying to get him
12 to provide opinions that he's not providing?
13       MR. SWAMINATHAN:  Nothing to solve, I'll just
14 ask the questions.  And I'm not trying to do that,
15 obviously.
16 BY MR. SWAMINATHAN:
17   Q.   I would -- Mr. Andreu, I want to be very
18 clear.  You're not intending to offer any opinions in
19 this deposition today that are different or additional
20 to what you offered in your report; is that fair?
21       MR. KIVETZ:  Objection.  Beyond what he's
22 testified to today, sure.
23       THE WITNESS:  Yes.  My report speaks for
24 itself.
25 BY MR. SWAMINATHAN:

Page 140

1    Q.   Okay.  And are you intending in this
2 deposition to offer new or different opinions?
3    A.   No, sir.
4    Q.   Okay.  And if you look at that second to last
5 bullet point in Mr. Tiderington's report, I mean, you
6 reviewed this entire section of Mr. Tiderington's report
7 when you offered your opinions, correct?
8    A.   Yes.
9    Q.   Okay.  And on that second-to-last bullet
10 point, Mr. Tiderington discusses the testimony of
11 Mr. Malczyk, correct?
12   A.   Yes.
13   Q.   And he cites to the fact that Mr. Malczyk was
14 very clear that the Guevara and Halvorsen report was
15 false, correct?
16   A.   That's what I believe he said in his
17 deposition.  Yes, sir.
18   Q.   And to what role did that play, if any,
19 in your opinions in this case?
20       MR. KIVETZ:  Objection.  Form.
21       THE WITNESS:  None --
22       MR. KIVETZ:  Foundation.  Outside the scope of
23 his report.
24       THE WITNESS:  None, because this dealt with
25 the Gonzalez murder, not the -- the Mont -- the

Page 141

1 Andujar murder.
2 BY MR. SWAMINATHAN:
3    Q.   Did you take into consideration, in offering
4 your opinions in this case, that a police officer swore
5 under oath that Detective Guevara and Halvorsen's report
6 was -- had created a false report?
7        MR. KIVETZ:  Objection.  Form.  Foundation.
8 Speculative.  Outside the scope of his report.
9        THE WITNESS:  No, sir.  Not really.
10 BY MR. SWAMINATHAN:
11   Q.   Okay.
12       MR. KIVETZ:  Do you guys want to do about some
13 type of break here for lunch or I don't -- you said
14 you weren't going to be --
15       MR. SWAMINATHAN:  Yeah, I think, I mean, I
16 think I'm going to be done inside of an hour.
17       MR. KIVETZ:  You think you're going to be done
18 inside of an hour?
19       MR. SWAMINATHAN:  Yes.  And -- and --
20       MR. KIVETZ:  Do you have some place to go at
21 2:00?
22       MR. SWAMINATHAN:  No, but ideally even less
23 than that.  So let's -- so it's up to you, though,
24 we could take a lunch break, though.  It's really
25 up to you.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 39 of 77 PageID #:65817
THE DEPOSITION OF NELSON ANDRU/taken May 12, 2023

142..145

Page 142

1     THE WITNESS: I -- I don't need a lunch break.
2  I just need a bathroom break.
3     MR. KIVETZ: Yeah. I only just need, like,
4  ten minutes, though. Like, I'm personally hungry,
5  I've seen you sna -- we're off the record, Sydney,
6  please.
7     THE REPORTER: Okay. We're off the record.
8  The time is 12:56.
9        (OFF THE RECORD)
10    THE REPORTER: We are back on the record for
11 the deposition of Nelson Andreu being conducted by
12 videoconference. My name is Sydney Little. Today
13 is May 12th, 2023, and the time is 1:16 p.m.
14 Central.
15 BY MR. SWAMINATHAN:
16    Q.  Okay. Mr. Andreu, when witnesses review --
17 strike that. We talked earlier about your practices
18 with regard to the conduct of eyewitness identification
19 procedures and in particular, photo arrays. Do you
20 recall that?
21    A.  Yes, sir.
22    Q.  Okay. When you would conduct photo arrays
23 with witnesses, would you document how long it took for
24 the witness to be able to make an identification?
25    MR. KIVETZ: Objection. Form. Foundation.

Page 143

1  I'm not sure what time period we're talking about
2  here.
3     THE WITNESS: Document, like, to say it took
4  him two seconds or 20 seconds? No, I don't
5  remember ever documenting that in a report.
6  BY MR. SWAMINATHAN:
7     Q.  Would it be fair to -- strike that. The
8  amount of time it takes a witness to make an
9  identification, is that something that would be relevant
10 to you, ever, as a investigator?
11    MR. KIVETZ: Objection. Form. Speculative.
12    THE WITNESS: I don't understand why -- what
13 your question is, would it be relevant?
14 BY MR. SWAMINATHAN:
15    Q.  Yeah. Like, if it took the witness a minute
16 of looking at the photographs, you know, would that
17 matter to you, versus whether the witness saw it and
18 said immediately, aha, that's the person?
19    MR. KIVETZ: Objection. Form. Incomplete
20 hypothetical.
21    THE WITNESS: It depends on the circumstances.
22 For example, this is the victim and somebody close
23 to the witness, and he or she looks at this
24 photographs [sic] and -- and maybe crying or
25 unable, you know, something like that, it may take

Page 144

1  a little longer. But normally it takes, usually,
2  no longer than 30 seconds.
3  BY MR. SWAMINATHAN:
4     Q.  In your experience, having conducted a lot of
5  photo arrays, typically, usually you can -- the witness
6  is going to be able to make an identification with 30 --
7  within 30 seconds if they're going to be able to make an
8  identification. Am I understanding you correctly?
9     A.  Most of the time.
10    MR. KIVETZ: Objection. Form.
11    THE WITNESS: Yes. Most of the time.
12 BY MR. SWAMINATHAN:
13    Q.  Okay. And if it was going to -- if it took
14 the witness five minutes, you know, before they could
15 make a pick, is that something you would sort of note as
16 you're considering the reliability of the witness's
17 identification?
18    MR. KIVETZ: Objection. Form. Incomplete
19 hypothetical.
20    THE WITNESS: Again, and -- and I know what
21 you're saying, that he's -- that he said it in
22 testimony, that it took him five to ten minutes.
23 People, in my opinion, have a -- a -- a -- a hard
24 time judging time. And again, he may be saying
25 from the time the detectives got there to the time

Page 145

1  he left was five or ten minutes. I don't think in
2  his testimony, he says it took me five to ten
3  minutes to pick out the photograph. So I don't --
4  you know, to me, it was a positive identification
5  that was probably done -- in reading some of the
6  other detectives' testimony, it did not take five
7  to ten minutes.
8  BY MR. SWAMINATHAN:
9     Q.  Okay. If you agree that if it had really
10 taken the witness five to ten minutes to be able to pick
11 a photo, that would cause you to have some concerns
12 about whether that was a good identification; is that
13 fair?
14    MR. KIVETZ: Objection to form.
15    THE WITNESS: If the individual is looking at
16 the lineup for five to ten minutes before he or she
17 makes an identification, yes. I mean, I would -- I
18 would -- I wouldn't -- I would say, listen, you --
19 you want to ask a question? Sometimes witnesses
20 will ask questions during the lineup about hair or
21 a mustache or something like that. So why -- why
22 is this taking place? I --
23 BY MR. SWAMINATHAN:
24    Q.  If it was -- in other words, if I'm
25 understanding you correctly, if it was taking as much as

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 40 of 77 PageID #:65818
THE DEPOSITION OF SHELDON ANDREWS, taken May 12, 2022

146..149

Page 146

1  -- if the witness is staring at the pictures for five
2  minutes, at some point you're probably going to end that
3  procedure; is that fair?
4         MR. KIVETZ: Objection. Form. Foundation.
5  Speculative. Incomplete hypothetical.
6         THE WITNESS: I -- I wouldn't say end it. I
7      would say I would ask, "What's -- what's going on?
8      What's the problem? Do you recognize anybody or
9      don't you?" Something to -- something like that.
10  BY MR. SWAMINATHAN:
11      Q.   Okay. And in this case, you indicated that
12  you saw the testimony of Mr. Rodriguez, that it took him
13  five to ten minutes, you saw that, correct?
14      A.   Yes.
15         MR. KIVETZ: Objection. Form.
16  BY MR. SWAMINATHAN:
17      Q.   And for purposes of your report, you assume
18  that it didn't really actually take him five to ten
19  minutes of actually viewing the photos; is that fair?
20         MR. KIVETZ: Objection.
21         THE WITNESS: I don't believe it took that
22      long, correct.
23  BY MR. SWAMINATHAN:
24      Q.   Okay. And so you, for purposes of your
25  report, interpreted that testimony to mean that he was

Page 147

1  talking about, you know, maybe how long the police
2  officers were there or something else, but not the
3  amount of time he was looking at the photos, correct?
4         MR. KIVETZ: Objection. Form.
5         THE WITNESS: That, and, again, the people's
6      perception of time is -- is difficult to judge.
7  BY MR. SWAMINATHAN:
8      Q.   Okay. Because if, in fact, he'd been looking
9  at the photos for five to ten minutes before he could
10  make a pick, that would cause you to have concerns about
11  the reliability of his pick; is that fair?
12         MR. KIVETZ: Objection. Form. Foundation.
13         THE WITNESS: If the photograph were placed in
14      front of him and it took him up to ten minutes to
15      say something, without any interjection from any of
16      the detectives, yes, that would be of some sort of
17      concern.
18  BY MR. SWAMINATHAN:
19      Q.   Okay. If you look at -- let's see. Go back
20  to your report, sir, please.
21      A.   My report? Yes.
22      Q.   Yeah. Thank you. If you go to Page 8 of your
23  report.
24      A.   Okay. Page 8.
25      Q.   If you go to Paragraph 27.

Page 148

1      A.   Okay.
2      Q.   And on Paragraph 27, it talks about Melendez
3  and Rodriguez making identifications of a Buick Park
4  Avenue in the police parking lot, correct?
5      A.   Yes.
6      Q.   Okay. That information in Paragraph 27, that
7  is not what Mr. Rodriguez and Mr. Melendez testified to,
8  correct?
9         MR. KIVETZ: Hold on a second. You're on
10      Paragraph 27?
11         MR. SWAMINATHAN: Yeah.
12         MR. KIVETZ: Yeah. Objection to form.
13         THE WITNESS: Okay. They -- they -- this is
14      what is in the police reports. They may have
15      testified differently at -- at trial. I think
16      there was an issue with the tinted windows in their
17      trial testimony.
18  BY MR. SWAMINATHAN:
19      Q.   Okay. So in Paragraph 27, why didn't you
20  include the information from the criminal trial
21  testimony and their deposition testimony?
22         MR. KIVETZ: Objection. Form.
23         THE WITNESS: Because I was -- if you go back
24      to the previous page, this is -- these are not
25      opinions. These are from the homicide

Page 149

1      investigation.
2  BY MR. SWAMINATHAN:
3      Q.   Okay. So Paragraphs 17 through 29 are written
4  based on the information contained in the police
5  investigation file, correct?
6      A.   Yes, sir.
7      Q.   Okay. And then Paragraph 30 -- well, we can
8  skip that. Paragraph 37 on, is where you have your
9  opinions, correct?
10      A.   Paragraph 37 is where they begin. Yes.
11      Q.   Okay. And in your opinion section, you don't
12  discuss anywhere that Mr. Melendez and Mr. Rodriguez
13  testified that they did not identify the Buick Park
14  Avenue as being the vehicle, correct?
15         MR. KIVETZ: Objection. Form. Misstates the
16      evidence. And --
17         THE WITNESS: I'm looking through the report,
18      give me a minute.
19  BY MR. SWAMINATHAN:
20      Q.   Uh-huh.
21      A.   In number 48, there is similarity. The
22  description of the -- the vehicle by the eyewitnesses as
23  having had spoke wheels, is consistent with the vehicle
24  they identified in the area parking lot.
25      Q.   Okay. So in Paragraph 48, you discuss this



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 150

1  issue of their -- the car identification, correct?
2      A.   Yes, sir.
3      Q.   And the information in Paragraph 48 in your
4  opinions is based on the information contained in the
5  police reports, correct?
6          MR. KIVETZ:  Objection.  Form.
7          THE WITNESS:  48?  Yes.
8  BY MR. SWAMINATHAN:
9      Q.   In Paragraph 48, you do not discuss the
10  testimony at the criminal trial and the deposition
11  testimony of Mr. Melendez or Mr. Rodriguez, correct?
12      A.   Correct.  I do not.
13      Q.   Okay.  And there's nowhere in your report
14  where you discuss the deposition testimony or criminal
15  trial testimony of Mr. Melendez and Mr. Rodriguez
16  regarding the car identification; is that fair?
17          MR. KIVETZ:  Objection.  Form.  You know,
18      beyond the materials reviewed.
19  BY MR. SWAMINATHAN:
20      Q.   Go ahead.
21      A.   I believe so.
22      Q.   Okay.  Okay.  In your opinion, you don't offer
23  any opinions about whether or not Mr. Melendez and
24  Mr. Rodriguez actually made an identification of the car
25  in the police parking lot; is that true?

Page 151

1          MR. KIVETZ:  Objection.  Form.
2          THE WITNESS:  I think we just went over that.
3      Now, Page -- Page 8, number 27, it says they --
4      they identified the vehicle.
5  BY MR. SWAMINATHAN:
6      Q.   Maybe I'm misunderstanding.  I understood you
7  in Paragraph 27 to just be reciting what's in the police
8  report, that that's not your opinion.
9      A.   Oh, I see what you're saying.
10      Q.   Is that correct?
11      A.   Yes.
12          MR. KIVETZ:  Objection.  Form.  You're asking
13      him to go through his entire report and ask him if
14      he can track down a single line about whether or
15      not the individuals identified the report [sic].  I
16      mean, I don't think that that's very fair.
17          MR. SWAMINATHAN:  I don't think it's hard.  I
18      mean, Mr. Andreu, you -- I think we've already --
19          MR. KIVETZ:  It's in his report.  I mean, it's
20      right there.  Why don't you direct him to the
21      paragraph instead of wasting everyone's time and --
22          MR. SWAMINATHAN:  It's not -- it's --
23          MR. KIVETZ:  -- not play this trickster game
24      where you get him to say that it's not because he
25      can't quickly find it, and then we have to go back

Page 152

1  and correct it later.  I mean, it's clearly in his
2  report.
3          MR. SWAMINATHAN:  Do you want to tell me where
4      in his report he discusses the testimony of
5      Melendez and Rodriguez about the car ID?
6          MR. KIVETZ:  It's in 48 and he reviewed it,
7      and he's told you multiple times that he reviewed
8      everything in consideration of making his --
9  BY MR. SWAMINATHAN:
10      Q.   Okay.  So Paragraph 48, we just talked about
11  it, though.  Mr. Andreu, you and I agree that first, we
12  talked about Paragraph 27, and in Paragraph 27, you
13  agree that that is based on the police reports, not the
14  testimony of Mr. Melendez and Mr. Rodriguez, fair?
15      A.   Fair.
16      Q.   Okay.  And Paragraph 48 is, again, based on
17  the police reports, not the testimony of Mr. Melendez
18  and Mr. Rodriguez, fair?
19          MR. KIVETZ:  Objection.  Form.
20          THE WITNESS:  Again, the -- the opinions are
21      formed on the totality of the case.  Is there
22      mention of the testimony by the witnesses in
23      reference to the -- the Park Avenue?  No.
24  BY MR. SWAMINATHAN:
25      Q.   Okay.  You agree that in the testimony of

Page 153

1  Mr. Melendez and Mr. Rodriguez, they deny that they made
2  a positive identification of the cars being the vehicle
3  that was used with the suspects, correct?
4          MR. KIVETZ:  Objection.  Form.  Misstates the
5      evidence.
6          THE WITNESS:  I don't know if -- if they
7      actually say, "No, that was not the car."  They may
8      say it was similar.  It had the spoke wheels.  I
9      think their -- one of the things was they were
10      concerned about the tinted windows, things like
11      that, but I don't think they outright say, "That
12      was not the car."
13  BY MR. SWAMINATHAN:
14      Q.   Did the -- any of the -- did Mr. Melendez say
15  that anywhere in his testimony?
16      A.   I don't --
17          MR. KIVETZ:  Objection.  Form.  Foundation.
18          THE WITNESS:  I don't remember exactly what he
19      said in his deposition testimony or trial
20      testimony, what either of the witnesses may or may
21      not have said.  I just recall that they -- their
22      concern was primarily the aspect of the tint on the
23      windows.
24  BY MR. SWAMINATHAN:
25      Q.   In the police reports, did the police reports

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 42 of 77 PageID #:65820
THE DEPOSITION OF SHELDON ANDREW, taken May 12, 2022

154..157

Page 154

1  document that the individuals said that it was a
2  positive identification of the vehicle, or did they
3  document that they said it looks similar or it could be
4  the vehicle?  Did they make that distinction in the
5  police report?
6           MR. KIVETZ:  Objection.  Form.  Foundation.
7       This isn't a memory test.
8           THE WITNESS:  I -- I believe that the -- in
9       the police report, it says that they identified the
10      vehicle.
11 BY MR. SWAMINATHAN:
12      Q.  Okay.  The police reports -- you documented it
13 in Paragraph 27, as you identified.  The police reports
14 do not state that Mr. Melendez and Mr. Rodriguez said,
15 "This is a similar looking car or could be the car."
16 It's not documented in the police reports, correct?
17          MR. KIVETZ:  Objection.  Form.
18          THE WITNESS:  Again, there was a lot reviewed
19      concerning the car, but I do not believe that that
20      is in the police report.
21 BY MR. SWAMINATHAN:
22      Q.  Okay.  And if, in fact, Mr. Melendez and
23 Mr. Rodriguez did not make an identification of the
24 vehicle, that should have been documented, correct?
25          MR. KIVETZ:  Objection.  Form.

Page 155

1           THE WITNESS:  In the police report?
2  BY MR. SWAMINATHAN:
3       Q.  In the police report, yes.
4       A.  If they did not make an identification, yes.
5       Q.  Okay.  If Mr. Melendez looked at what was
6  taken to the parking lot and did not identify the Buick
7  Park Avenue as being the vehicle that was used by the
8  shooter, that should have been documented, correct?
9           MR. KIVETZ:  Objection.  Form.
10          THE WITNESS:  Yes.  I would say that should
11      have been documented.
12 BY MR. SWAMINATHAN:
13      Q.  And if, in fact, Mr. Melendez, as he
14 testified, did not identify that as being the vehicle,
15 it would be a deviation from accepted police practices
16 not to have documented that; is that fair?
17          MR. KIVETZ:  Objection.  Form.
18          THE WITNESS:  Again, a deviation, it should
19      have been in there.  Could it have been something
20      that slipped through the cracks?  That, too.  I
21      don't think it was intentionally left out of there,
22      but again, that -- that's my opinion and -- and the
23      trier of facts will have to determine who told the
24      truth.
25 BY MR. SWAMINATHAN:

Page 156

1       Q.  Okay.  And so ultimately you're not offering
2  an opinion in this case that Mr. Melendez's testimony is
3  true or not true about what happened; is that fair?
4       A.  Yes.  I -- I'm not judging people's
5  testimonies as to -- as to truthfulness
6       Q.  For purposes of your opinions, you're assuming
7  that, in fact, the police reports are true, that
8  Mr. Melendez made a positive identification of the
9  vehicle; is that fair?
10          MR. KIVETZ:  Objection.  Form.  Assuming if
11      the trier of fact credits that testimony.
12 BY MR. SWAMINATHAN:
13      Q.  Go ahead, Mr. Andreu.
14      A.  That's -- that's it.  It's going to -- the --
15 it's -- I believe that the police reports were accurate.
16 But again, like I said before, it's not to me to draw a
17 credibility conclusion.
18      Q.  Okay.
19      A.  That's going to be the judge or a jury later
20 on down the road.
21      Q.  Okay.  And could we look at the section on
22 Pages --
23      A.  My report?
24      Q.  Yeah, your report.  I'm sorry.  If you go to
25 your opinion section starting on Page 37.

Page 157

1       A.  I don't have 37 pages.
2       Q.  I'm sorry, Paragraph 37 on Page 9.  My
3  apologies.
4       A.  Okay.
5       Q.  Okay.  Paragraphs 37 through 41, the beginning
6  of your opinion section.
7       A.  Okay.
8       Q.  I think, as you just indicated, those are
9  based on the assumption that the police reports are
10 accurate and truthful, correct?
11          MR. KIVETZ:  Objection.  Form.
12          THE WITNESS:  Again, based on the totality of
13      the -- of the information that -- that I reviewed,
14      including the police reports.
15 BY MR. SWAMINATHAN:
16      Q.  Okay.  But Paragraph 37 through 41 would not
17 be true if you credit some of the testimony that you
18 reviewed in the depositions; is that fair?
19      A.  I don't know.  Let me see.
20          MR. KIVETZ:  Objection.  Form.
21          THE WITNESS:  Let me see.  Okay.  Ask me the
22      question again, sir.
23 BY MR. SWAMINATHAN:
24      Q.  Yeah.  Paragraphs 37 through 41 are based on
25 the assumption that the information contained in the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 158

1 police reports is true?
2          MR. KIVETZ:  Objection.  Form.
3          THE WITNESS:  It also includes the
4    complexities and the way homicide investigations
5    are never perfect.  But again, it's the totality of
6    everything that I read.
7 BY MR. SWAMINATHAN:
8    Q.    Yes.  But if you look at Paragraph 38, for
9 example, there you opine that the police officers acted
10 in accordance with generally accepted police practices,
11 correct?
12    A.    Correct.
13    Q.    And if you credited the testimony of Hector
14 Montanez or Jose Melendez, for example, you would not
15 opine that they -- the detective acted in accordance
16 with generally accepted police practices; is that fair?
17          MR. KIVETZ:  Objection.  Form.  What
18    testimony?
19          THE WITNESS:  I -- I, again, am -- am not
20    drawing a conclusion as to the truthfulness or not
21    of -- of Montanez and -- and the witnesses.  But --
22    and again, I don't say here in this -- in these
23    opinions, that the police reports -- that what's
24    written in the police reports is the gospel.  I
25    just say in, again, in the totality of the -- of

Page 159

1    the information that I reviewed.
2 BY MR. SWAMINATHAN:
3    Q.    Okay.  So in Paragraph 38, we can understand -
4 - because you considered the Montanez and the Melendez
5 testimony about what occurred during their interviews,
6 we can understand that you believe that what they
7 described was, in fact, consistent with generally
8 accepted police practices?
9    A.    What they said in their sworn statements to
10 the State Attorney, yes.
11    Q.    And what about their deposition testimony and
12 criminal trial testimonies?
13    A.    Again, they -- they -- stories changed from
14 what they gave the -- during their State Attorney's
15 statement.  And as I've said before, while not giving
16 credibility weight to one or the other, my experience
17 has shown that the initial -- initial statements more
18 close to the time of the incident is probably more
19 accurate.
20    Q.    Okay.  And Paragraph 38 is based on that
21 assumption, that the information given to the State's
22 Attorney and in the police reports is more accurate than
23 the subsequent testimony at the criminal trial and
24 deposition, fair?
25          THE WITNESS:  Not necess --

Page 160

1          MR. KIVETZ:  Objection.  Form.
2          THE WITNESS:  Not necessarily more accurate.
3    Again, I'm not -- I'm not here to -- to give -- put
4    weight on who's telling the truth and who's not.
5    That's up -- that's not up to me.  It's just what I
6    read in the entire file, the thousands of pages in
7    this file, that I made these opinions.  I can't
8    specifically say it was A and not B, or C and
9    not D.
10 BY MR. SWAMINATHAN:
11    Q.    Is there any place in your report where you
12 credit the testimony of Hector Montanez from his
13 deposition?
14          MR. KIVETZ:  Objection.  Form.  Asked and
15    answered.
16          THE WITNESS:  I don't believe I've mentioned
17    their depositions at all.  No, sir.
18 BY MR. SWAMINATHAN:
19    Q.    Is there any set of opinions that you have in
20 your report that are based on crediting Mr. Montanez'
21 deposition testimony about what happened?
22          MR. KIVETZ:  Objection.  Form.
23          THE WITNESS:  No, sir.  I don't believe so.
24 BY MR. SWAMINATHAN:
25    Q.    Because if you credited his testimony, your

Page 161

1 opinions would be that there were violations of
2 generally accepted police practices, correct?
3          MR. KIVETZ:  Objection.  Form.  If a jury
4    credits.  Go ahead.
5          THE WITNESS:  That's -- that's not my
6    decision.
7 BY MR. SWAMINATHAN:
8    Q.    I'll ask the question again.  If you credited
9 the testimony of Mr. Montanez, it would be a deviation
10 from generally accepted police practices; is that fair?
11          MR. KIVETZ:  Objection.  Form.
12          THE WITNESS:  If -- if I were to believe what
13    he says in -- in -- in their statements, then there
14    -- there could be issues with police practice.
15 BY MR. SWAMINATHAN:
16    Q.    Okay.  And if the jury ultimately credits the
17 testimony of Mr. Montanez, Paragraph 38 would not be
18 true in your report, correct?
19          MR. KIVETZ:  Objection.  Form.
20          THE WITNESS:  I don't know that it wouldn't be
21    true.  My opinion would still be the same.  The
22    jury will decide, well, I believe what they said in
23    their -- in their testimony or depositions or trial
24    testimony, but that's the jury's decision to make.
25 BY MR. SWAMINATHAN:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 44 of 77 PageID #:65822
THE DEPOSITION OF SHELDON ANDREW taken May 27, 2022

162..165

Page 162

1   Q.   Okay.  And so your opinion is based on the
2   assumption that Mr. Montanez' testimony is not true,
3   correct?
4         MR. KIVETZ:  Objection.  Form.  Asked and
5   answered, like, 13 times.
6         THE WITNESS:  No, sir.  Not -- not -- not that
7   I don't believe what he said.  Again, I -- like I
8   said, my -- my experience and training and
9   knowledge has led me to assume and believe that the
10   statements given as close -- closer in proximity to
11   the incident is probably the most accurate.
12  BY MR. SWAMINATHAN:
13   Q.   If you go to Page 11 of your report.
14   A.   Yes, sir.
15   Q.   In Paragraph 52 you say, "Had there been no
16  identification and/or conflicting identification(s),
17  then the detectives should have sought out additional
18  suspects."  Do you see that?
19   A.   Yes, sir.
20   Q.   What do you mean by that?
21   A.   That means if -- if the witnesses had not
22  identified Sierra, then this -- there's, you know, half
23  the people in Chicago were suspects, so the
24  investigation would continue.
25   Q.   And so if there had not been an identification

Page 163

1   of Sierra, the detectives should have gone back to work
2   to identify additional suspects?
3         A.   Go back and continue the investigation, yes.
4         Q.   Okay.  And in this case, by the way, there
5   were not -- Mr. Montanez was not charged, correct?
6         A.   That's my understanding, yes.
7         Q.   From your perspective, should there have been
8   additional investigation that was done to try to develop
9   additional evidence against Mr. Montanez?
10         MR. KIVETZ:  Objection.  Form.
11         THE WITNESS:  That was the decision that was
12         made by the State Attorney's Office, and it was
13         beyond the -- the realm of what the detectives
14         could say.  If you could --
15  BY MR. SWAMINATHAN:
16   Q.   You're talking about the decision to approve
17  or not approve charges, was made by the State's
18  Attorney, is that what you're saying?
19   A.   Yes.
20         MR. KIVETZ:  Object -- again, it's Hector
21         Montanez, right?  Want to just make sure --
22         MR. SWAMINATHAN:  Yes.
23         MR. KIVETZ:  -- we're talking about the same
24         thing.
25  BY MR. SWAMINATHAN:

Page 164

1   Q.   Yes, it's the -- and -- yes.  And so for
2   Mr. Montanez, what you're indicating is that the
3   decision not to charge him was made by the ASA, correct?
4         A.   Yes, sir.
5         Q.   Okay.  And the ASA does not decide whether or
6   not a police officer does additional investigation, do
7   you agree with that?
8         MR. KIVETZ:  Objection.  Form.
9         THE WITNESS:  No, but --
10         MR. KIVETZ:  Speculative.  Incomplete
11         hypothetical.
12         THE WITNESS:  The State Attorney has asked me
13         on -- on several cases to -- to do additional
14         investigation.
15  BY MR. SWAMINATHAN:
16   Q.   And you're not -- you don't need the State's
17  Attorney's permission as a detective to be able to
18  continue an investigation, do you?
19         MR. KIVETZ:  Objection.  Form.  Foundation.
20         Speculative.  Incomplete hypothetical.
21         THE WITNESS:  Permission, no, no.  But if --
22         if the -- if the State Attorney wants additional
23         investigation, it -- it should be done.  The State
24         Attorney may always say, "Listen, this -- this --
25         this individual," again, using Montanez

Page 165

1   hypothetically, "he didn't know what was going on,
2   we're never going to charge him," then that's it.
3   BY MR. SWAMINATHAN:
4         Q.   Was there any indication in the -- oh, I'm
5   sorry.  Go ahead.
6         A.   I'm not saying that's what happened, but I'm
7   just giving you a hypothetical.
8         Q.   Did you see any evidence in this investigation
9   that the State's Attorney instructed the police officers
10  that there was never going to be charges against Hector
11  Montanez?
12         MR. KIVETZ:  Object to the form.
13         THE WITNESS:  I didn't -- I didn't hear
14         anything either way.
15  BY MR. SWAMINATHAN:
16   Q.   Okay.  And you -- did you see any evidence in
17  your review of all the materials in this case, the
18  State's Attorney instructed the homicide detectives not
19  to conduct further investigation?
20         A.   Again, same thing, I didn't hear to or not to.
21         Q.   What the police report said, that you
22  reviewed, is that the State's Attorney decided not to
23  charge Montanez because they didn't have enough evidence
24  against Mr. Montanez, correct?
25         A.   Correct.  But they did --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 166

1    MR. KIVETZ:  Objection.  Form.
2    THE WITNESS:  But they did -- there's no
3 mention of the -- the State Attorney saying, "Do --
4 do some more investigation or go talk to this
5 person or that person," no.
6 BY MR. SWAMINATHAN:
7    Q.  And is it your -- and so it's -- if I
8 understand correctly, your opinion is that police
9 officers should not conduct additional investigation
10 unless the State's Attorney tells them to?
11    MR. KIVETZ:  Objection.  Form.  Misstates his
12 testimony.
13    THE WITNESS:  That -- that's not what I'm
14 saying.  I'm just saying that in the -- in the file
15 that I reviewed, there's no mention by the State
16 Attorney, that I saw, of either one way or another.
17 At the time, he said, and it's -- it's in the file,
18 that there was insufficient evidence to charge
19 Montanez.
20 BY MR. SWAMINATHAN:
21    Q.  If this had been your case --
22    MR. KIVETZ:  Objection.
23 BY MR. SWAMINATHAN:
24    Q.  -- would you have done additional
25 investigation?

Page 167

1    MR. KIVETZ:  Objection.  Form.  Foundation.
2 Speculative.
3    THE WITNESS:  Not necessarily.  Listen, there
4 were two people in the car.  Sierra would have to
5 say, "Montanez handed me the gun and told me to
6 shoot."  Is he ever going to say that?  No.  There
7 was nobody else in the car.  Where's the other
8 information going to come from?
9 BY MR. SWAMINATHAN:
10    Q.  Okay.  So you're -- so in this case, you
11 believe, based on the evidence, there was no point in
12 doing any further investigation into Montanez?
13    A.  No.
14    MR. KIVETZ:  Objection.  Form.
15    THE WITNESS:  Again, that's not what I'm
16 saying.  I'm just citing you as an example, that
17 Sierra is not going to --
18    MR. KIVETZ:  Let him finish.
19    THE WITNESS:  -- Sierra is not going to point
20 the finger at Montanez and say, "He handed me the
21 gun," or "He told me he was having a problem with
22 these guys and that's why I fired," you know,
23 something to that extent.  That's -- that's one.
24    Could Montanez have told somebody else, "Yeah,
25 I was part of it," you know, six months later, and

Page 168

1 gotten additional information that way?  Who knows?
2 That's too -- I -- I can't speculate on what's
3 going to happen tomorrow or six months down the
4 road.
5 BY MR. SWAMINATHAN:
6    Q.  And so if you'd been the homicide investigator
7 on this case, you would've said, "Nah, probably not
8 going to go anywhere, I'm just going to do no further
9 investigation"?
10    MR. KIVETZ:  Objection.  Form.  Foundation.
11 Misstates his testimony.  Speculative.
12    THE WITNESS:  No, sir.  I wouldn't say that.
13 Just I -- I'm saying it would be -- it would be
14 probably put on the back burner because there are
15 other cases coming in.  But if information came in,
16 like again, I'll cite an example, Montanez tells
17 another gang member that's later arrested and wants
18 to flip and say, "Hey, by the way, Montanez told me
19 that he's the one that handed Sierra the -- the
20 gun, because he wanted this guy killed -- one of
21 the guys in that car killed," then that's a
22 different story.  But it's -- it's -- it's -- at
23 the time of -- of the -- of Sierra's arrest, there
24 was no other evidence that I'd read about to charge
25 Montanez.

Page 169

1 BY MR. SWAMINATHAN:
2    Q.  Did you see any efforts in the course of the
3 investigation to identify who the male Black was in
4 the back of the car?
5    MR. KIVETZ:  Objection.  Form.
6    THE WITNESS:  He -- it -- they -- he refused
7 to identify him.  And what -- what the police
8 department did, the detectives did to try and
9 identify him, I -- I can't answer that.  Was there
10 any attempt to identify him?  I can't answer that.
11 Did the State Attorney do something?  I don't know.
12 BY MR. SWAMINATHAN:
13    Q.  In this case, was there anything preventing
14 the detectives from doing some additional investigation
15 to try to obtain physical evidence?
16    MR. KIVETZ:  Objection.  Form.
17    THE WITNESS:  Physical evidence of what type?
18 Testimonial, I can see, but not physical.
19 BY MR. SWAMINATHAN:
20    Q.  Was there any physical evidence that could
21 have potentially been collected in this case from
22 Mr. Montanez?
23    A.  I don't think so.
24    MR. KIVETZ:  Objection.  Form.
25    THE WITNESS:  I'm just thinking of



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 170

1      Mr. Montanez as a driver, I can't think of
2  anything.
3  BY MR. SWAMINATHAN:
4     Q.  Could a search have been done of
5  Mr. Montanez's home?
6      MR. KIVETZ: Objection. Form. Foundation.
7  Speculative.
8      THE WITNESS: I don't know that the detectives
9  could convince a judge to give them a search
10  warrant based on the circumstances and the facts
11  that they knew at that time.
12  BY MR. SWAMINATHAN:
13     Q.  That's what I'm asking you. With with Hector
14  Montanez's handwritten statement, would there have been
15  any basis for them to try to get access to his home to
16  search for a murder weapon, for example?
17      MR. KIVETZ: Objection. He just answered that
18  question.
19      THE WITNESS: No. I -- I don't think there
20  was sufficient information to justify and get
21  probable cause to search his house.
22  BY MR. SWAMINATHAN:
23     Q.  Was there anything to prevent them from asking
24  him for consent to search?
25     A.  I --

Page 171

1      MR. KIVETZ: Objection. Form.
2      THE WITNESS: I don't know that -- that there
3  was anything preventing them, or if they did, I
4  don't know. I didn't read anything about that in
5  their file one way or another.
6  BY MR. SWAMINATHAN:
7     Q.  You didn't see anything in the file -- oh,
8  sorry. Go ahead.
9     A.  -- one way or another.
10    Q.  You didn't see anything in the file indicating
11  that they asked Mr. Montanez if they could search his
12  home?
13     A.  No, sir.
14      MR. KIVETZ: Objection.
15  BY MR. SWAMINATHAN:
16    Q.  You didn't see anything in the file indicating
17  that they made efforts to engage in some forensic
18  assessment of the vehicle?
19      MR. KIVETZ: Objection. Form.
20      THE WITNESS: They -- the vehicle, I know was
21  photographed. My knowledge and experience would
22  lead me to believe that that vehicle was searched.
23  And there was nothing of evidentiary value
24  recovered, that I read, in any of the information
25  that was provided.

Page 172

1  BY MR. SWAMINATHAN:
2     Q.  Based on your experience, you would've
3  expected the vehicle to be searched?
4      MR. KIVETZ: Objection. That misstates what
5  he said.
6      THE WITNESS: Yes. But -- and -- and I'm sure
7  that it -- it was. Knowing police officers like I
8  know them, that vehicle would've been, was or
9  would've been, should have been searched.
10  BY MR. SWAMINATHAN:
11    Q.  Absolutely. And did you see any evidence that
12  the vehicle was, in fact, searched in your review of the
13  police records in this case?
14      MR. KIVETZ: Objection. Form. You're --
15  assumes facts -- or misrepresents the facts,
16  whatever you want to call it. Go ahead.
17      THE WITNESS: The vehicle was photographed. As
18  far as any mention of an actual search, I did not
19  see it.
20  BY MR. SWAMINATHAN:
21    Q.  Yeah. Did you see any evidence -- or strike
22  that. Did you see any information in the file that
23  evidence technicians were called out to search --
24      MR. KIVETZ: Objection. Form.
25  BY MR. SWAMINATHAN:

Page 173

1     Q.  -- to check on the vehicle or search the
2  vehicle?
3     A.  I don't remember where, but I think that
4  evidence technicians were the ones who were called out
5  to photograph it.
6     Q.  To photograph the vehicle?
7     A.  I believe so.
8     Q.  Okay. And then did the -- was there any
9  indication that the evidence technicians conducted a
10  search of the vehicle for bullet casings, for example,
11  or anything else?
12      MR. KIVETZ: Objection. Form.
13      THE WITNESS: I don't believe that I saw any
14  of that in the documents that I reviewed.
15  BY MR. SWAMINATHAN:
16    Q.  But that would be an appropriate thing to do,
17  you agree?
18      MR. KIVETZ: Objection. Form.
19      THE WITNESS: Yes. And I -- I -- again, I --
20  I believe that it was done.
21  BY MR. SWAMINATHAN:
22    Q.  And if that was done -- I'm sorry. Go ahead.
23     A.  While it's not documented, it -- it -- police
24  officers in a situation like that would search that car.
25     Q.  And if that was not done -- strike that. If

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 174

1  there was not a search of the vehicle, that would be a
2  deviation from accepted police practices, fair?
3            MR. KIVETZ:  Objection.  Form.  He just says -
4  - he just said that he believes that the search
5  occurred, based upon the normal practices and it
6  wasn't written down.  You're assuming the opposite
7  when you're asking that question.
8            MR. SWAMINATHAN:  Exactly.  That's a
9  hypothetical question.  It's called a hypothetical
10  question to an expert.
11           MR. KIVETZ:  So you're admitting it's a
12  hypothetical question and it's absolutely useless
13  and baseless?  All right.  Go ahead.
14           MR. SWAMINATHAN:  It's not.  It's not, because
15  you --
16           MR. KIVETZ:  Objection to form.
17           MR. SWAMINATHAN:  -- you have a whole fucking
18  file that doesn't have that in it anywhere.  It's
19  completely made-up nonsense.  It's completely made-
20  up nonsense.
21           MR. KIVETZ:  All right.
22           MR. SWAMINATHAN:  It's completely made-up
23  nonsense.  I'm going to cross him on exactly this
24  point in trial --
25           MR. KIVETZ:  -- that police officers --

Page 175

1            MR. SWAMINATHAN:  -- because it's such a joke.
2            MR. KIVETZ:  -- that police officers who bring
3  in a car don't search it --
4            MR. SWAMINATHAN:  Show me where --
5            MR. KIVETZ:  -- for security --
6            MR. SWAMINATHAN:  -- show me the document that
7  they searched the vehicle.
8            MR. KIVETZ:  -- just to take photos?  They
9  don't take a look in the back seat?
10           MR. SWAMINATHAN:  Yeah.
11           MR. KIVETZ:  Because it wasn't written down,
12  you're assuming it wasn't done?
13           MR. SWAMINATHAN:  That's what's so stupid
14  about it.
15           MR. KIVETZ:  Oh, my God.
16           MR. SWAMINATHAN:  Why wouldn't they document
17  whether or not they found anything in the vehicle?
18           MR. KIVETZ:  You want every little thing to
19  document, every little thing, so you can later on
20  just nuance it and then just find a problem with
21  that.  That's just all you do, nitpick little stuff
22  and make it seem bigger than it actually is.  And
23  you know it.
24           MR. SWAMINATHAN:  It's a homicide
25  investigation --

Page 176

1            MR. KIVETZ:  It's nonsense.
2            MR. SWAMINATHAN:  -- it should be taken
3  seriously, right, Mr. Andreu?
4            MR. KIVETZ:  It's -- I can't take your stuff
5  seriously, because of this shit that you do.
6  BY MR. SWAMINATHAN:
7       Q.   Mr. Andreu, this is a homicide investigation;
8  it should be taken seriously, right?
9       A.   Yes, sir.
10           MR. KIVETZ:  Objection to form.
11  BY MR. SWAMINATHAN:
12      Q.   And you consider a witness saying that they
13  were told which picture to pick out of a lineup; do you
14  consider that to be a minor issue?
15           MR. KIVETZ:  Objection to form.
16           THE WITNESS:  Let me back up, I'm going to --
17  I'm going to answer it.  The -- the investigation
18  of the case itself is very important.  That was
19  your previous question.  Now, what was the last
20  one?
21  BY MR. SWAMINATHAN:
22      Q.   The next question is: If there are witnesses
23  who say that they were told what picture to pick out of
24  a lineup, would that be a minor issue to you, as Counsel
25  just characterized it?

Page 177

1            MR. KIVETZ:  I didn't characterize that.
2  That's not exactly -- that is not even close to
3  what I said.  This is the stuff that you do.
4            MR. SWAMINATHAN:  You say that all we do is
5  pick on small issues?
6            MR. KIVETZ:  This is the exact nonsense that
7  you do.  That makes zero sense.  You just assume
8  that's the particular part that I was talking
9  about.
10           MR. SWAMINATHAN:  No.  You said, "All you do
11  is pick on small issues."  I've been talking about
12  all these issues.
13           MR. KIVETZ:  This is ridiculous.
14           MR. SWAMINATHAN:  So you're telling me all
15  these issues are small issues?
16           MR. KIVETZ:  This is ridiculous.  Don't drag
17  me into your questions.
18           MR. SWAMINATHAN:  No, you're asking me --
19  you're talking about a bunch of --
20           MR. KIVETZ:  Don't drag me into your
21  questions.  Stop.
22           MR. SWAMINATHAN:  -- I'm asking about whether
23  you think what I'm doing is bogus.
24           MR. KIVETZ:  Stop.  Ask a regular question
25  that you can actually use in front of a trial

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 48 of 77 PageID #:65826
The Deposition of NELSON ANDREU, taken May 12, 2023
178..181

Page 178

```
 1        judge. Ask it and move on.
 2             MR. SWAMINATHAN: I'm going to ask each of
 3        these questions because they're so obviously
 4        relevant in a case that stinks.
 5   BY MR. SWAMINATHAN:
 6        Q.  Does this -- Mr. Andreu, did -- does anything
 7   about this case just sit -- doesn't sit right with you?
 8             MR. KIVETZ: Objection. Form, foundation.
 9        Speculative.
10             THE WITNESS: No. I think that the detectives
11        did a good job.
12   BY MR. SWAMINATHAN:
13        Q.  They did a great job. And you felt they did a
14   great job in the Reyes case, too, right?
15             MR. KIVETZ: Objection. Form. Harassing. All
16        right. I'm -- we need a break, clearly. We'll
17        take five minutes.
18             THE REPORTER: All right. We're off the
19        record. The time is 1:50.
20                  (OFF THE RECORD)
21             THE REPORTER: We are back on the record for
22        the deposition of Nelson Andreu being conducted by
23        videoconference. My name is Sydney Little. Today
24        is May 12th, 2023, and the time is 1:56 p.m.
25        Central.
```

Page 179

```
 1   BY MR. SWAMINATHAN:
 2        Q.  Mr. Andreu?
 3        A.  Yes, sir.
 4        Q.  If Mr. Guevara and Halvorsen falsified police
 5   reports as Mr. Malczyk testified to, would that be a big
 6   deal to you?
 7             MR. KIVETZ: Objection. Form.
 8             THE WITNESS: Yes, that would be improper.
 9   BY MR. SWAMINATHAN:
10        Q.  Okay. Is that something that you take very
11   seriously?
12        A.  Yes.
13             MR. KIVETZ: Objection. Form.
14   BY MR. SWAMINATHAN:
15        Q.  Is that a minor issue to you?
16             MR. KIVETZ: Objection to form.
17             THE WITNESS: If -- if they -- if -- just let
18        me -- let me clarify. There's a difference between
19        making an -- an error on a report, but to do
20        something purposely that could affect the outcome
21        is -- is something that's serious. Yes.
22   BY MR. SWAMINATHAN:
23        Q.  If Detective Guevara or other detectives
24   pointed at a specific picture to influence Mr. Melendez,
25   is that something you take very seriously?
```

Page 180

```
 1        A.  Yes, sir.
 2        Q.  Is that a small issue?
 3        A.  No.
 4        Q.  And if that allegation is true, you would find
 5   that to be serious misconduct in a homicide
 6   investigation. Is that fair?
 7        A.  That they pointed to the suspect in the
 8   lineup? Yes, sir.
 9        Q.  Okay. And do you have an understanding of how
10   many years of life were taken from the 40 men who had
11   their convictions thrown out involving Detective
12   Guevara?
13             MS. MCGRATH: Objection. Form.
14             THE WITNESS: Do I have what?
15   BY MR. SWAMINATHAN:
16        Q.  Any idea how many years of life were taken
17   from these 40 men who sat in prison and that had their
18   convictions later thrown out?
19        A.  No, I don't have the totality.
20        Q.  Do you have an understanding of how long
21   Thomas Sierra spent in prison before his conviction was
22   thrown out?
23             MR. KIVETZ: Objection to form and foundation.
24             MS. MCGRATH: Objection to form.
25             THE WITNESS: I think it was 20-some years.
```

Page 181

```
 1   BY MR. SWAMINATHAN:
 2        Q.  Is that an issue of serious importance and
 3   gravity to you?
 4             MR. KIVETZ: Objection. Form.
 5             MS. MCGRATH: Objection. Form.
 6             THE WITNESS: If he was not guilty of the
 7        crime, yes.
 8   BY MR. SWAMINATHAN:
 9        Q.  And if he's not guilty of the crime, it's an
10   even bigger problem, isn't it?
11             MR. KIVETZ: Objection.
12             MS. MCGRATH: Same objection.
13             THE WITNESS: Of course.
14   BY MR. SWAMINATHAN:
15        Q.  The stakes in a homicide investigation are
16   huge, correct?
17             MS. MCGRATH: Objection. Form.
18             MR. KIVETZ: Objection.
19             THE WITNESS: The stakes, you said?
20   BY MR. SWAMINATHAN:
21        Q.  Yes?
22        A.  Yes, sir.
23        Q.  The stakes are huge for the victim and the
24   victim's family, correct?
25        A.  Yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 182

1          MR. KIVETZ:  Objection.  Form.
2  BY MR. SWAMINATHAN:
3      Q.    And the stakes are huge for anybody who's
4  suspected and charged and convicted of such a crime,
5  correct?
6          MR. KIVETZ:  Objection.
7          MS. MCGRATH:  Objection.  Form.
8          THE WITNESS:  Yes, sir.
9  BY MR. SWAMINATHAN:
10     Q.    Should you cut corners in a homicide
11 investigation?
12         MR. KIVETZ:  Objection.  Form.
13         THE WITNESS:  No, sir.
14 BY MR. SWAMINATHAN:
15     Q.    Should homicide detectives allow themselves to
16 be sloppy in how they conduct a homicide investigation?
17         MS. MCGRATH:  Objection.  Form.
18         MR. KIVETZ:  Objection.  Form.
19         THE WITNESS:  They should not.  No.
20 BY MR. SWAMINATHAN:
21     Q.    Supervisors train their detectives to be
22 thorough in their homicide investigations?
23         MR. KIVETZ:  Objection to form.
24         THE WITNESS:  Yes, sir.
25 BY MR. SWAMINATHAN:

Page 183

1      Q.    Is one of the jobs of the supervisor to make
2  sure that officers are not being sloppy and cutting
3  corners in a homicide investigation?
4          MR. KIVETZ:  Objection.  Form.
5          THE WITNESS:  Yes, sir.
6  BY MR. SWAMINATHAN:
7      Q.    In this case, could the detectives have
8  searched for fingerprints of Thomas Sierra in the Buick
9  Park Avenue?
10         MR. KIVETZ:  Objection.  Form.
11         MS. MCGRATH:  Objection.  Form.
12         MR. KIVETZ:  Foundation, speculative.
13         THE WITNESS:  Anything is possible that --
14 that they -- they could have.  Again, is that
15 something that was a big deal because it was not
16 done or was it something that fell through the
17 cracks?  No.  But it's something that could have
18 been done.  Yes.
19 BY MR. SWAMINATHAN:
20     Q.    Is it some -- is there anything preventing the
21 detectives in this case from having dusted the car for
22 fingerprints?
23         MR. KIVETZ:  Objection.  Form, foundation,
24 speculative.
25         MS. MCGRATH:  Join.

Page 184

1          THE WITNESS:  That prohibited them from doing
2  that?  No.
3  BY MR. SWAMINATHAN:
4      Q.    Okay.  And did you see any evidence that they
5  did do that?
6          MR. KIVETZ:  Objection.  Form.
7          THE WITNESS:  No, sir.  I did not.
8  BY MR. SWAMINATHAN:
9      Q.    And if they had done that and found Thomas
10 Sierra's fingerprints, that would've been useful
11 evidence, correct?
12         MR. KIVETZ:  Objection.  Form.
13         MS. MCGRATH:  Objection.  Form.
14         THE WITNESS:  That would've been additional
15 evidence, yes.
16 BY MR. SWAMINATHAN:
17     Q.    Okay.
18     A.    Let me explain.
19     Q.    Is it something that in Miami -- strike that.
20         MR. KIVETZ:  He didn't finish, he's still
21 speaking.
22         THE WITNESS:  You can't date a fingerprint.
23 And -- and my -- what I have been reading in these
24 Chicago cases is that these gang members frequently
25 swap cars, borrow cars, sell cars, buy cars.  So if

Page 185

1  his fingerprint would've been in there and they
2  would've asked the -- the latent examiner who
3  identified it to Mr. Sierra, when was this
4  fingerprint put on there, the day of the murder or
5  six weeks later, or two days after the murder?
6  There's no way to date it.
7          So it would've been additional information,
8  but it wouldn't have been, you know, concrete that
9  -- that he left that fingerprint the day of the
10 shooting or the night of the shooting.
11 BY MR. SWAMINATHAN:
12     Q.    In Miami, when you conducted homicide
13 investigations, if you had a vehicle that was believed
14 to have been used in the crime, would you do things like
15 dust the vehicle for the fingerprints of your suspects?
16         MR. KIVETZ:  Objection.  Form, foundation,
17 speculative, incomplete hypothetical.
18         THE WITNESS:  Oftentimes, yes.
19 BY MR. SWAMINATHAN:
20     Q.    And would you do things like search the
21 vehicle for things like physical evidence that might
22 contain DNA or other ways to connect it to the suspect?
23         MR. KIVETZ:  Objection.  Form, foundation,
24 speculative, incomplete hypothetical.
25         THE WITNESS:  Yes, sir.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 186

BY MR. SWAMINATHAN:
2      Q.   And would you do things in Miami, like have
3  that vehicle searched thoroughly for bullet casings that
4  could end up in hard-to-reach places?
5           MR. KIVETZ:  Objection.  Form, foundation,
6      speculative, incomplete hypothetical.
7           THE WITNESS:  Yes.  Even though he -- the --
8      the witnesses said he stuck his gun out the -- the
9      -- the door.  So that would not be a -- a high
10     probability of finding a casing in that car.
11 BY MR. SWAMINATHAN:
12     Q.   What direction do bullet casings usually
13 eject, sir?
14          MR. KIVETZ:  Objection.  Form.  Object.
15          THE WITNESS:  I'm not a gun expert, but it
16     depends on the weapon.
17 BY MR. SWAMINATHAN:
18     Q.   What was the weapon that was understood to be
19 used in this case?
20     A.   Well, but -- I'm not -- I'm -- it was 9-
21 millimeter, but the brand depends on which side the --
22 the casing ejects from.
23     Q.   And do casings usually eject forward or
24 backward?
25          MR. KIVETZ:  Objection.  Form.

Page 187

1           THE WITNESS:  Sir.  I -- I don't know enough
2      about firearms except, you know, when I have gone
3      and they go to the side, I guess.
4  BY MR. SWAMINATHAN:
5      Q.   Did you see any indication in the police
6  reports that you reviewed in the Andujar homicide
7  investigation that the police had the bar -- Buick Park
8  Avenue dusted for fingerprints?
9           MR. KIVETZ:  Objection.  Form.
10          THE WITNESS:  I did not read that in the
11     reports.
12 BY MR. SWAMINATHAN:
13     Q.   Did you see anywhere in the police report that
14 you reviewed for the Andujar homicide investigation that
15 the detectives collected any physical evidence in the
16 vehicle that might be used to connect it to Mr. Montanez
17 or Mr. Sierra?
18          MR. KIVETZ:  Objection.  Form.
19          THE WITNESS:  I did not read that in the
20     reports.
21 BY MR. SWAMINATHAN:
22     Q.   How did the vehicle get to the police station?
23     A.   One of the witnesses, I can't remember which
24 one right now, drove it to the police station, if I
25 remember correctly.

Page 188

1      Q.   And in your estimation, should that vehicle
2  have been brought in by the police rather than brought
3  in by some other third party?
4           MR. KIVETZ:  Objection.  Form.  Misstates the
5      evidence.
6           THE WITNESS:  I -- I don't remember right now
7      how it was that the vehicle was -- who was in it
8      when it was stopped and the -- the location
9      where it was, where it was stopped, but it could
10     have -- it could have been towed in.  It could have
11     been driven in by an officer.  Or the detectives, I
12     guess, felt it proper to have the -- whoever was in
13     it, drive it to the police station.
14 BY MR. SWAMINATHAN:
15     Q.   When you were investigating homicides, if you
16 had seized a vehicle in the street that you believed to
17 have been involved in a murder, would you have somebody
18 get in the car and drive it to the police station or
19 would you have it towed in?
20          MR. KIVETZ:  Objection.  Form, foundation,
21     speculative, incomplete hypothetical.
22          THE WITNESS:  I would say that the majority of
23     the time I would have it towed in.
24 BY MR. SWAMINATHAN:
25     Q.   Why is that?

Page 189

1           MR. KIVETZ:  Objection.  Form, speculative,
2      incomplete hypothetical.
3           THE WITNESS:  Again, police practices and what
4      I was taught.
5  BY MR. SWAMINATHAN:
6      Q.   You want to reduce the amount of potential
7  contamination, correct?
8           MR. KIVETZ:  Objection.  Form, foundation,
9      speculative, incomplete hypothetical.
10          THE WITNESS:  One of the reasons.
11 BY MR. SWAMINATHAN:
12     Q.   Okay.  And it's a homicide investigation, that
13 kind of evidence can be extremely important, right?
14          MR. KIVETZ:  Objection.  Form, foundation,
15     speculative, incomplete hypothetical.
16          THE WITNESS:  Yes, sir.  It could be.
17 BY MR. SWAMINATHAN:
18     Q.   And you want to get it right?
19          MR. KIVETZ:  Objection.  Form.
20          THE WITNESS:  Yes, sir.
21 BY MR. SWAMINATHAN:
22     Q.   Stakes are high, right?
23          MR. KIVETZ:  Objection.  Form.  Asked and
24     answered.
25          THE WITNESS:  Yes, sir.  They are.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 190

1  BY MR. SWAMINATHAN:
2      Q.  Go to Page 16 of your report, please.
3      A.  1-6?
4      Q.  Yeah.  Thank you.
5      A.  Okay, sir.
6      Q.  In Paragraph 75.
7      A.  Okay.
8      Q.  There you're citing to the deposition
9  testimony of Alberto Rodriguez, correct?  From 2009.
10     A.  Yes.
11     Q.  Okay.  So that's one place where you discuss
12  the testimony of a witness in this case, right?
13     A.  Yes.
14     Q.  That's one case where you discussed the
15  deposition testimony of one of the witnesses, correct?
16     A.  Yes.
17     Q.  So you discussed the testimony of
18  Mr. Rodriguez in 2009.  Do you discuss anywhere in your
19  report, any subsequent testimony that he gave?
20     A.  I don't believe so.  No, sir.
21     Q.  And you discussed the testimony of
22  Mr. Rodriguez in 2009.  Do you discuss any of the
23  deposition testimony of Jose Melendez in your report?
24         MR. KIVETZ:  Objection.  Asked and answered
25     multiple times.

Page 191

1  BY MR. SWAMINATHAN:
2      Q.  Okay.  I'll ask you a different question.  Why
3  did you refer to the deposition testimony of
4  Mr. Rodriguez in your report, but not the deposition
5  testimony of Mr. Melendez anywhere in your report?
6         MR. KIVETZ:  Objection.  Form.
7         THE WITNESS:  I was offering an opinion to
8      show the testimony of one of the witnesses to have
9      -- to remain until 2009, sure that it was
10     Mr. Sierra that had committed the crime.
11 BY MR. SWAMINATHAN:
12     Q.  And so you credited Mr. Rodriguez's 2009
13  testimony?
14     A.  Yes, sir.
15     Q.  Okay.  But you didn't credit Mr. Melendez'
16  testimonies in his depositions for purposes of your
17  opinions, correct?
18         MR. KIVETZ:  Objection.  Form, foundation.  I
19     mean, asked multiple times, and he has explained to
20     you, he's looked at the totality of the
21     circumstances. And assumed --
22         THE WITNESS:  Specifically --
23         MR. KIVETZ:  -- the trier of fact considers
24     one thing, then his opinions would change.
25         THE WITNESS:  So specifically no testimony of

Page 192

1  any of the other witnesses?  That is correct.
2  Again, I -- I put -- I -- I noted what Rodriguez
3  had said in his deposition to show that the
4  detectives had the right individual, Mr. Sierra.
5  And that -- that the credibility of what the
6  witnesses were saying, whether it be Rodriguez or
7  Melendez or whoever it was.
8      Again, it's not up to me to decide.  The --
9  the -- the Court or the jury will read, like I did,
10  the totality of it and come to a decision on who
11  they determine is truthful or not truthful.
12 BY MR. SWAMINATHAN:
13     Q.  In this case, sir, I have two invoices from
14  you that add up to approximately $45,000.  Is that --
15  sound about right in terms of the amount of time you
16  spent preparing your expert report in this case?
17     A.  That sounds about right.  Yes, sir.
18     Q.  Okay.  And what portion of your time that you
19  spent on this case did you spend on reviewing the
20  documents as opposed to writing your report?
21     A.  Probably 90 percent.
22     Q.  90 percent was on reviewing the documents?
23     A.  Yes.
24     Q.  Okay.  All right.  Let's mark -- are we at
25  Exhibit 4?

Page 193

1         THE REPORTER:  We are at 3
2         MR. SWAMINATHAN:  At 3.  I thought I made the
3     Tiderington report Exhibit 3.  No?
4         THE REPORTER:  You didn't mark it, but we can.
5         MR. SWAMINATHAN:  Okay.  Let's mark that as
6     Exhibit 3.  I may have made a mistake.
7         (EXHIBIT 3 MARKED FOR IDENTIFICATION)
8  BY MR. SWAMINATHAN:
9      Q.  Okay.  Let's see.  Do you have your invoices
10  in front of you?  Just because the sharing screen seems
11  to be a problem.
12     A.  No, but I can bring them up on my computer.
13  Just a moment.
14     Q.  Okay.  Should I try putting it up real quick?
15  Because I think we're going to go fast.  Let me see if
16  it works for me to put it up.  And if it doesn't, you
17  can find it.  Are you getting -- can you hear me okay?
18  Are we getting -- is it freezing a little?  Yep.
19         MR. KIVETZ:  It's freezing on us.
20  BY MR. SWAMINATHAN:
21     Q.  Okay.  I'm taking it off.
22     A.  Again.  I can't hear.  Lost the video.  Did
23  everything --
24         MR. KIVETZ:  I think he's just taking a break.
25         THE WITNESS:  Oh, okay.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 52 of 77 PageID #:65830
THE DEPOSITION OF ALLDON ANDRED, taken May 9, 2023

194..197

Page 194

1      MR. KIVETZ:  Just a child issue.  It's okay.
2  BY MR. SWAMINATHAN:
3      Q.   Sorry.  I'm in my daughter's room.  That's my
4  office.  This is what I've been relegated to.
5      A.   No, I can't -- hold on.  Because now it locked
6  up my thing here.  Hold on.  Wow.  Okay.
7      Q.   You have it, sir?
8      A.   Yes.
9      Q.   Okay.
10     A.   What do you need me to bring up?
11     Q.   Your two invoices that I'm -- I have a January
12  invoice and a December invoice.
13     A.   January and December.  Here is December.
14     MR. KIVETZ:  Wait, the December invoice?  160,
15  Andreu 160?
16     MR. SWAMINATHAN:  Yeah, I have it as Andreu 2
17  -- Andreu 1 and 2.  I think they were in the one
18  that was sent to me last night and the 1 through
19  251 that was sent yesterday, or last few days ago.
20     MR. KIVETZ:  McIntosh billings?
21     MS. FLEMING:  No, it's the subpoena response.
22  BY MR. SWAMINATHAN:
23     Q.   Subpoena response.  Yeah.  It's basically
24  Pages 1 and 2 of the subpoena response that was sent to
25  us, I think probably four or five days ago or something.

Page 195

1      A.   Okay.  The January one is for $7,875.
2      Q.   Yes.  Thank you.  And then the December one is
3  for $36,225.  Do you see that?
4      A.   Hold on.  Here.
5      Q.   You have it, Mr. Andreu?
6      A.   No, I'm looking here.  I show a different one.
7  Let me make sure.  Whoops.  Okay.  The one that's dated
8  December 1st --
9      Q.   Yes, sir.
10     A.   -- is -- is for the work done in November.
11     Q.   Correct.  And that bill is for 36,225,
12  correct?
13     A.   Yes.
14     Q.   Okay.  Let's -- and then you have the other
15  bill too, the January 2nd bill?
16     A.   Yes.
17     Q.   For work in December.  Okay.  So let me --
18  let's go out -- let's do it on the record properly here.
19  Okay.  So let me ask you the questions.  So Mr. Andreu,
20  I'm showing you a document, marking it as Exhibit 4.  And
21  it's Bates-stamped Andreu 1 and Andreu 2.  And these are
22  invoices that -- for the Sierra v. Guevara, et al.,
23  case.  One is dated January 2nd, 2023, and one is dated
24  December 1st, 2022.  Are these your invoices related to
25  the Thomas Sierra matter?

Page 196

1      (EXHIBIT 4 MARKED FOR IDENTIFICATION)
2      A.   Yes.  Let me go back to the other one.  What
3  is -- November?  This one is December.  Okay.  Yes.  One
4  for $7,875, and one for $36,225, correct.
5  BY MR. SWAMINATHAN:
6      Q.   Okay.  Thank you.  Do you have any other bills
7  for the Thomas Sierra matter?
8      A.   I have a pending invoice for work that I've
9  done in preparation for the deposition.
10     Q.   Okay.
11     A.   That has not been submitted.
12     Q.   Thank you.  These -- Exhibit 4 containing
13  these two invoices from December and January, are -- do
14  these invoices reflect all the time you spent on the
15  Sierra case through the time of completing your expert
16  report?
17     A.   Let me look at this.  Yes, sir.  I believe
18  that's two -- those are the -- those are the two, and
19  again, the one that's pending that has not been
20  submitted.
21     Q.   Okay.  And to just -- I'm just going to ask a
22  couple precise questions.  The two bills in Exhibit 4,
23  all of the time that's listed in these two exhibits, in
24  these two invoices, was time spent on your expert
25  report.  Is that fair?

Page 197

1      A.   No.  The -- the expert report is towards the
2  end where it says, "Began report," and then --
3      MR. KIVETZ:  Don't -- no --
4  BY MR. SWAMINATHAN:
5      Q.   No, no.  I'm sorry.  Sorry, Mr. Andreu.  Yeah.
6  First, the version we have, that has redactions on it,
7  so I don't want you to tell me what's contained on the
8  left-hand column of the report.
9      A.   Okay.
10     Q.   And let me try to be -- let me ask a better
11  question.  I think I understand where we're crossing
12  paths here.  You basically spent time reviewing
13  materials and writing a report, is that fair?
14     A.   Correct.
15     Q.   Okay.  The Exhibit 4, consisting of your two
16  invoices, is all of the time on these two invoices
17  related to your review of documents and report writing
18  in the Sierra matter?
19     A.   Yes.  But again, while I am writing my report,
20  I may go back -- and I frequently do -- to go back and
21  review additional things.  So it's not -- I'm just not
22  typing out -- typing out the report.  So I go back and
23  forth.
24     Q.   Okay.  But ultimately, the -- if I added up
25  the total number of hours on these two invoices, which

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 53 of 77 PageID #:65831
THE DEPOSITION OF NELSON ANDRU, taken May 12, 2023

198..201

Page 198

1  is 126 total hours, that's the amount of time you spent
2  reviewing materials and generating your report, fair?
3      A.   Yes.  That's fair.
4      Q.   Okay.  And then there is not any additional
5  time that you spent preparing your report that's not
6  captured on these two invoices, is that also fair?
7      A.   Fair.
8      Q.   Okay.  Are you -- you have previously worked
9  on cases involving the City of Chicago in McIntosh,
10 Brown, and Reyes, Solaches, correct?
11     A.   Yes, sir.
12     Q.   Are you working on any other cases for the
13 Chicago Police Department?
14     A.   Not --
15          MR. KIVETZ:  Objection.  Form.  Hold on, Tony
16     (phonetic), don't -- I'm going to advise not to
17     answer that question.
18 BY MR. SWAMINATHAN:
19     Q.   Let me ask this: Are you working on any other
20 cases -- are there any other cases on which you've
21 worked for the Chicago Police Department in which you've
22 disclosed an opinion?
23     A.   No, just these three.
24     Q.   Okay.  And you've offered an opinion in an El
25 Paso case called Villegas, correct?

Page 199

1      A.   Yes, sir.
2      Q.   And is that also a wrongful conviction case?
3      A.   I only was asked to provide an opinion on the
4  actions of a police officer, a uniformed police officer
5  who had nothing to do with the actual investigation.
6      Q.   Okay.  Are you working on any other cases
7  outside the City of Chicago in your capacity as an
8  expert?
9          MR. KIVETZ:  Objection.  Form.  Where he's
10     provided a report?
11 BY MR. SWAMINATHAN:
12     Q.   Yeah.  That fair.  I'm not -- I think that
13 that's fair.  Where you provided a report?
14     A.   No, sir.
15          MR. SWAMINATHAN:  I have no further questions.
16               CROSS-EXAMINATION
17 BY MR. KIVETZ:
18     Q.   Mr. Andreu, I just have a quick couple of
19 questions and then we'll take a break, and then I think
20 we should be done.  Before things kind of went off the
21 rails, you were discussing your opinion that you
22 believed the officers did not violate any generally
23 accepted practices by not documenting a failure or an
24 inability to find any shells, bullet shells, in the car
25 that matched the description of the shooting.  Is that

Page 200

1  fair?
2      A.   Yes, sir.
3      Q.   Yeah.  And is that your opinion, that you came
4  to the conclusion that the officers did not violate any
5  generally accepted practices by not documenting the
6  failure to find any evidence in the car?
7      A.   That is correct.
8      Q.   Were you aware that the car was transferred in
9  between the time of the shooting and the time of
10 collection to another individual?
11     A.   Yes.
12     Q.   Okay.  And you would agree that transfer would
13 contaminate any potential evidence in the car?
14     A.   Yes, I considered that.  And -- and also
15 usually when you get a new car, the first thing you do
16 is clean it.
17          MR. KIVETZ:  Let's just take a five-minute
18     break.  I -- it should be two minutes on it.
19          THE WITNESS:  Okay.  Okay.
20          THE REPORTER:  Okay.  We're off the record.
21     The time is 2:20.
22          (OFF THE RECORD)
23          THE REPORTER:  We are back on the record for
24     the deposition of Nelson Andreu being conducted by
25     videoconference.  My name is Sydney Little.  Today

Page 201

1  is May 12th, 2023 and the time is 2:25 p.m.
2  Central.
3          MR. KIVETZ:  I'm -- I have no further
4  questions.
5          MS. BARBER:  I don't have any questions.
6          MS. MCGRATH:  I don't have any questions
7  either.  Thank you.
8          MR. SWAMINATHAN:  No more questions from me.
9  Thank you, Mr. Andreu.
10         THE REPORTER:  Let me get orders while we're
11 on the record.  Anand, would you like a copy of the
12 transcript?
13         MR. SWAMINATHAN:  No.  Thank you.
14         THE REPORTER:  How about the video?
15         MR. SWAMINATHAN:  No, thank you.
16         THE REPORTER:  Okay.  Jeff, would you like a
17 copy?
18         MR. SWAMINATHAN:  I think --
19         MR. KIVETZ:  Same.
20         MR. SWAMINATHAN:  I think we can short circuit
21 it and all this Counsel are not request --
22         THE REPORTER:  Nobody's ordering.  Okay.
23 Sounds good.  Let me get us off --
24         MS. BARBER:  Not at this time.
25         THE REPORTER:  All right.  Okay.  We're off

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 202

1  the record.

2         (DEPOSITION CONCLUDED AT 2:26 P.M. CT)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 203

1         CERTIFICATE OF DIGITAL REPORTER

2              STATE OF ILLINOIS

3

4  I do hereby certify that the witness in the foregoing

5  transcript was taken on the date, and at the time and

6  place set out on the Stipulation page hereof, by me

7  after first being duly sworn to testify the truth,

8  whole truth, and nothing but the truth; and that the

9  said matter was recorded digitally by me and then

10 reduced to typewritten form under my direction, and

11 constitutes a true record of the transcript as taken,

12 all to the best of my skill and ability. I certify that

13 I am not a relative or employee of either counsel and

14 that I am in no way interested financially, directly or

15 indirectly, in this action.

16

17              OFFICIAL SEAL
                SYDNEY LITTLE
18         NOTARY PUBLIC, STATE OF ILLINOIS
        MY COMMISSION EXPIRES MARCH 18, 2026
19

20  *Sydney Little*

21

22 SYDNEY LITTLE,

23 DIGITAL REPORTER/NOTARY

24 MY COMMISSION EXPIRES: 03/18/2026

25 SUBMITTED ON: 02/28/2024

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

**Exhibit 1_ Andreu** 20:25 21:1

**Exhibit 2_ Andreu** 103:8, 10,13 105:1 106:3

**Exhibit 3_ Andreu** 193:3, 6,7

**Exhibit 4_ Andreu** 192:25 195:20 196:1, 12,22 197:15

---

**$**

**$36,225** 195:3 196:4

**$45,000** 192:14

**$7,875** 195:1 196:4

---

**1**

**1** 20:25 21:1 103:14 107:3, 11 194:17,18, 24 195:21

**1-6** 190:3

**10** 40:8 92:3

**100** 43:21 50:14 58:21 63:17,25 64:9, 18 66:15 73:8 82:15 83:19 85:18 86:2 90:6,9 99:16 118:3

**10:00** 46:25 47:1,4

**10:06** 6:8

**10:56** 56:4

**11** 24:14 162:13

**110** 6:6

**111** 103:18

**118-CV-03029** 6:14

**11:08** 56:9

**11:21** 67:17

**11:30** 67:22

**12** 99:4

**126** 198:1

**12:08** 105:20

**12:19** 105:25

**12:56** 142:8

**12th** 6:7 56:9 67:22 105:25 142:13 178:24 201:1

**13** 162:5

**15** 57:6 86:12, 21 89:16 90:7 92:4

**150** 106:9

**159** 106:7,9

**16** 190:2

**160** 194:14,15

**17** 149:3

**178** 103:19

**19** 39:23 40:3 138:23

**1980** 60:5

**1990** 82:11

**1990s** 79:14,17 81:9,17 82:8,22 83:12 84:14,24 85:8 92:9

**1991** 84:8

**1992** 133:7,18

**1993** 133:7,19

**1995** 44:19,23 130:16 131:5

**1999** 82:11 84:8

**1:16** 142:13

**1:50** 178:19

**1:56** 178:24

**1st** 195:8,24

---

**2**

**2** 103:8,10,13 105:1 106:3 107:3,11 122:3 194:16,17,24 195:21

**20** 92:4 96:16 111:6 143:4

**20-some** 180:25

**20/20** 66:20

**2005** 60:5

**2009** 190:9,18, 22 191:9,12

**2022** 195:24

**2023** 6:8 56:9 67:22 105:25 142:13 178:24 195:23 201:1

**23** 111:7 130:3, 4,8

**25** 60:5,6

**251** 194:19

**27** 147:25 148:2,6,10,19 151:3,7 152:12 154:13

**29** 21:6,13,16, 17 22:4 149:3

**2:00** 141:21

**2:20** 200:21

**2:25** 201:1

**2:26** 202:2

**2nd** 195:15,23

---

**3**

**3** 107:20

**114:**20,23 193:1,2,3,6,7

**30** 125:3,7,18 135:17,19,20 144:2,6,7 149:7

**31** 125:24 126:2 135:24 136:17, 18 137:3

**32** 136:23 137:3

**33** 125:7,18

**36,225** 195:11

**37** 149:8,10 156:25 157:1,2, 5,16,24

**38** 158:8 159:3, 20 161:17

**39** 68:6

---

**4**

**4** 120:20 192:25 195:20 196:1, 12,22 197:15

**40** 28:21 68:7 75:19 76:3 180:10,17

**41** 157:5,16,24

**48** 149:21,25 150:3,7,9 152:6,10,16

---

**5**

**5** 13:4 39:13,15 72:14,22 114:23 123:19

**500** 94:8,12 97:3,13

**51** 24:14

**52** 162:15

**5:00** 53:12

---

**6**

**60606** 6:7

---

**7**

**70** 83:22

**75** 190:6

---

**8**

**8** 21:6 147:22, 24 151:3

**83-1** 127:1

---

**9**

**9** 39:20,23 40:2 68:6 157:2

**9-** 186:20

**90** 87:3 192:21, 22

**90s** 82:10 84:9

**99** 48:24

**9:00** 53:11

---

**A**

**a.m.** 6:8 56:9 67:22

**ability** 9:22 44:21 100:8 102:25

**absolutely** 49:17 172:11 174:12

**abuse** 14:19 15:8 16:1 29:23 73:12 76:11

**abused** 14:14

**accept** 14:6,23 25:11 100:19, 22 120:13

**acceptable** 51:21 52:1 55:7

**acceptance** 13:18

**accepted** 13:7



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

14:18 15:7 16:4
17:1,14 26:6,12
29:20 37:18,23
38:7,19 49:7,20
50:6,21 51:10,
25 55:6 64:13,
23 65:16 66:5
73:19 75:9,22
76:16,23 77:5
120:15 129:13,
21 155:15
158:10,16
159:8 161:2,10
174:2 199:23
200:5

**accepting**
13:23

**access** 170:15

**accordance**
158:10,15

**account** 113:2

**accurate** 11:20
16:9 20:13 30:2
36:25 93:4
115:2,9 133:15
156:15 157:10
159:19,22
160:2 162:11

**accusations**
73:11 129:7

**acknowledge**
26:11

**acted** 158:9,15

**actions** 101:12
102:9 199:4

**actual** 19:11
78:18 172:18
199:5

**add** 70:18
192:14

**added** 197:24

**additional**
66:18 108:13,
14,19 109:1,6
115:20 139:19
162:17 163:2,8,
9 164:6,13,22
166:9,24 168:1
169:14 184:14

185:7 197:21
198:4

**administration**
57:3

**admission**
49:6 50:7,23
51:12 52:2,17
54:9 70:3

**admit** 52:12

**admitted** 49:15

**admitting** 48:8
174:11

**admonish**
84:13

**admonition**
82:4

**admonitions**
82:13

**advise** 198:16

**advised** 48:20

**Affairs** 57:8,11
60:11,25 63:12,
22

**affect** 179:20

**affirm** 7:20

**afternoon**
53:13

**afterward**
90:15

**agree** 15:6
24:24 25:1 26:3
29:10,17,25
37:17,22 88:14
89:4 92:9 99:9
119:9,16 120:2
123:13 124:4
128:18 129:19
130:19 132:16
145:9 152:11,
13,25 164:7
173:17 200:12

**Agreed** 7:17

**agreeing**
125:21 131:9

**aha** 143:18

**ahead** 11:9
12:13 15:3
18:11 23:5,22
25:8 26:16
30:17 31:10
35:11 36:4
47:17,18 51:16
57:1 80:25 83:5
88:22 104:4
109:8 114:11
129:17,24
139:3 150:20
156:13 161:4
165:5 171:8
172:16 173:22
174:13

**Alberto** 190:9

**allegation**
180:4

**allegations**
29:22 56:13
57:25 58:23
65:19 76:11
77:8,10

**allege** 77:9

**alleged** 77:23
78:2,9

**alleging** 16:1

**allowed** 23:19

**Amendment**
70:17

**American**
130:11

**amount** 98:11
143:8 147:3
189:6 192:15
198:1

**Anand** 6:18
10:23 71:19
122:1 201:11

**and/or** 21:10
162:16

**Andreu** 6:10
7:7,9,12 8:2
11:6 23:5,22
28:16,20 29:7
33:12 41:7
56:7,12 67:20,
25 85:7 104:8,

16,20,23
105:23 114:11
122:6 139:17
142:11,16
151:18 152:11
156:13 176:3,7
178:6,22 179:2
194:15,16,17
195:5,19,21
197:5 199:18
200:24 201:9

**Andreu's** 53:1

**Andujar** 13:14
39:16 68:5
100:6 105:2
122:14,17,21
124:12 127:10,
20 128:13,17
141:1 187:6,14

**answers** 9:1
70:19

**apologies**
157:3

**apologize**
67:25

**appearance**
6:15

**appearing**
6:19,23 7:6

**approve**
163:16,17

**approximately**
72:20 75:19
111:7 192:14

**area** 13:4
72:14,22 81:13
88:8 149:24

**Arnad** 104:11

**array** 35:20,24
37:16,22 38:7
80:7 81:8,18
82:21 84:16,23
85:8,9,15,21
86:14 87:10,16
89:19 90:1,12
91:1,10,25

**arrays** 78:22,
25 79:25 80:15
82:6 83:11

84:6,14 86:6,16
87:23 142:19,
22 144:5

**arrest** 83:23
168:23

**arrested** 61:16
168:17

**arrive** 110:14

**arrived** 110:13

**arrives** 106:15

**Arturo** 77:1

**ASA** 17:5,8
30:2,6,13 31:1
164:3,5

**aspect** 69:21
153:22

**asserted** 70:17

**assess** 95:6,21

**assessing**
94:25 95:13
98:13

**assessment**
19:22 94:20
171:18

**assessments**
94:16 96:3

**assign** 57:12

**assigned**
61:17

**Assistant**
43:24

**assisted** 61:19

**assume** 9:10
10:19 43:10,23
54:7,17 96:18
146:17 162:9
177:7

**assumed**
191:21

**assumes**
172:15

**assuming**
129:14,24
132:9 156:6,10
174:6 175:12



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**assumption**
77:21 78:1,8
157:9,25
159:21 162:2

**attacks** 55:21

**attempt** 169:10

**attempts**
112:24

**attending**
6:15,16

**attorney** 18:2
22:6 27:2 31:25
32:2 38:14
43:8,11,18,24
71:14 72:8
73:23 159:10,
22 163:18
164:12,22,24
165:9,18,22
166:3,10,16
169:11

**Attorney's**
61:1 74:15 87:1
159:14 163:12
164:17

**attorneys** 65:3
72:7

**audio** 44:12,19
105:4,5

**audio-
recorded**
44:24

**Avenue** 148:4
149:14 152:23
155:7 183:9
187:8

**avoid** 81:5

**aware** 10:17
22:3 92:13
100:15 118:25
134:23 138:12
200:8

**awkward**
22:25

———

**B**

**back** 30:1

55:15 56:6,22
58:17 67:19
73:24 82:14,17
104:5 105:22
110:20 121:11
133:12 142:10
147:19 148:23
151:25 163:1,3
168:14 169:4
175:9 176:16
178:21 196:2
197:20,22
200:23

**backed** 93:7

**backward**
186:24

**bad** 22:25

**bank** 96:15

**bar** 187:7

**Barber** 6:25
7:17 15:16
16:16 34:17
40:7 51:14
74:18 90:16
133:11 136:13,
16,20 201:5,24

**based** 13:1,18,
23 19:13,21
20:17 26:12
27:5 52:24
59:20 60:8
61:23 77:21
78:1,8 93:11,23
115:25 116:9,
12,13 118:25
149:4 150:4
152:13,16
157:9,12,24
159:20 160:20
162:1 167:11
170:10 172:2
174:5

**baseless**
174:13

**basically**
32:25 70:11
82:18 120:16
130:14 137:2
194:23 197:12

**basis** 170:15

**Bates** 105:1

**Bates-
stamped**
103:14 195:21

**bathroom**
142:2

**battling** 55:21

**beards** 81:24

**Began** 197:2

**begin** 7:24
39:15,21
149:10

**beginning**
39:15 114:19
157:5

**behalf** 6:22 7:4

**believed** 47:20
61:22 80:21
82:23 185:13
188:16 199:22

**believes** 174:4

**biased** 81:2

**big** 32:19 60:11
179:5 183:15

**bigger** 175:22
181:10

**bill** 195:11,15

**billings** 194:20

**bills** 196:6,22

**black** 105:10
107:16,21
108:7 109:17
111:7 113:14
169:3

**bogus** 177:23

**books** 102:13

**borrow** 184:25

**bother** 94:13

**bottom** 114:20,
23

**boy** 11:18

**brand** 186:21

**break** 9:12,13
55:19,22,25
67:12 68:1
141:13,24
142:1,2 178:16
193:24 199:19
200:18

**bring** 31:5
73:24 74:3 88:6
175:2 193:12
194:10

**broad** 91:5
92:14

**brother** 99:6

**brought** 188:2

**Brown** 198:10

**Buick** 148:3
149:13 155:6
183:8 187:7

**building** 88:11

**bullet** 130:7,10
140:5,9 173:10
186:3,12
199:24

**bunch** 120:24
177:19

**burner** 168:14

**buy** 59:8
184:25

———

**C**

**call** 172:16

**called** 57:10
172:23 173:4
174:9 198:25

**calls** 74:18,21
78:22

**capacities**
65:6

**capacity** 8:8,
11 62:23 65:14
199:7

**captain** 56:23

**captured**
198:6

**car** 21:8,10
100:16,23
101:13,19
102:20 111:14
137:23 150:1,
16,24 152:5
153:7,12
154:15,19
167:4,7 168:21
169:4 173:24
175:3 183:21
186:10 188:18
199:24 200:6,8,
13,15

**career** 56:18
63:21 64:3,12
71:7 89:17 91:9
93:10,18

**cars** 153:2
184:25

**case** 6:13 10:5,
8,18 11:17
12:24,25 13:2,
3,6,12,17,22
14:5,12,23
15:9,12 16:3,8
18:14 19:13
20:18 22:10
27:18 31:11
32:20 33:14
37:4 39:25 43:7
45:18 48:13,15,
19 50:2,16
51:4,22 52:7,25
56:15 58:12,17
66:20,23 68:2,
7,12,14,23
69:7,18,25
70:10,21,22,24
71:18,22 74:1
76:20,24 77:2,
4,9,12,23,25
78:2,7,10 80:6
85:15 91:18,24
93:11 95:16
100:10,16
101:22 102:6,
19 103:8,14,20
106:7,11,12,22
108:18,25
109:13 110:22
112:4,19 113:1,
12,16 114:5
115:4,21 116:5



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 58 of 77 PageID #:65836
The Deposition of NELSON ANDREU, taken 3/2 May 26, 2023
207

120:7 122:17, 21 124:5,12,16 126:5 128:13 133:25 134:7 135:9 136:3 140:19 141:4 146:11 152:21 156:2 163:4 165:17 166:21 167:10 168:7 169:13,21 172:13 176:18 178:4,7,14 183:7,21 186:19 190:12, 14 192:13,16, 19 195:23 196:15 198:25 199:2

**cases** 20:11 57:13,15,17,18, 24 61:7,10,14, 17,21 65:1,15 66:2 71:20 72:13 73:24 74:3,16 75:6,20 76:7 86:13 88:5 92:15 93:17 109:12 134:5, 13,19 135:12 164:13 168:15 184:24 198:9, 12,20 199:6

**casing** 186:10, 22

**casings** 173:10 186:3, 12,23

**catch** 111:1

**Catherine** 6:25

**center** 132:6

**Central** 6:8 56:4,10 67:23 106:1 142:14 178:25 201:2

**certainty** 93:3

**Certificate** 118:14 119:1, 17

**cetera** 107:2

**challenges** 130:18 131:6

**challenging** 130:25

**chance** 10:4 68:11

**change** 45:19 73:10 75:16 76:1 82:1 191:24

**changed** 159:13

**changing** 27:4

**characterize** 177:1

**characterized** 176:25

**charge** 164:3 165:2,23 166:18 168:24

**charged** 163:5 182:4

**charges** 163:17 165:10

**check** 131:21 133:13 173:1

**Chicago** 6:7, 20,24 7:1,3,6 13:4,8 78:21 88:5 89:9 111:9 117:19 126:13 162:23 184:24 198:9,13,21 199:7

**chief** 56:23 57:11

**child** 194:1

**choose** 88:11 89:13 128:6

**choppy** 105:9, 12

**circuit** 10:3 201:20

**circumstance** 51:9 87:15 88:15 93:24

97:9 99:12

**circumstance s** 50:20 51:22, 24 84:20 87:17 93:22 96:2 97:8 100:6,11 101:22 102:3 143:21 170:10 191:21

**citation** 131:12 132:5

**cite** 32:22 117:8,20,21 168:16

**cited** 138:21

**cites** 136:24 140:13

**citing** 136:5 167:16 190:8

**citizen** 63:7

**City** 7:1 57:2 59:7 198:9 199:7

**civilian** 58:8 59:20 60:9 62:8,11,15 63:15 88:3,11 89:1 132:1 133:19

**civilians** 58:1, 24 59:16

**claiming** 33:1 59:11

**clarification** 41:18 65:5

**clarify** 179:18

**clean** 200:16

**clear** 33:13 59:13,17 90:25 122:7 126:12 139:18 140:14

**close** 19:10 27:2 93:11 143:22 159:18 162:10 177:2

**closer** 162:10

**clothing** 107:2

**colleagues** 72:14,21

**collect** 111:20

**collected** 169:21 187:15

**collection** 200:10

**color** 82:1

**column** 197:8

**combination** 132:4

**command** 57:12

**commit** 64:4

**committed** 63:23 82:23 84:15 87:6 191:10

**common** 55:14

**compared** 41:24 87:23

**compiled** 115:8

**complaint** 63:6

**complete** 110:2

**completely** 67:3 174:19,22

**completing** 196:15

**complexities** 158:4

**computer** 193:12

**conception** 55:6

**concern** 147:17 153:22

**concerned** 46:9 153:10

**concerns** 100:7 145:11

147:10

**conclude** 119:18

**CONCLUDED** 202:2

**conclusion** 74:19 156:17 158:20 200:4

**conclusions** 20:17 102:24 118:20 119:17

**concrete** 185:8

**conditions** 9:17

**conduct** 57:21 58:10 59:25 60:22 62:25 69:12 70:10 78:12 79:25 86:7,22 87:22 89:17 90:12 91:10 128:25 142:18,22 165:19 166:9 182:16

**conducted** 56:7 67:20 77:19 79:16 81:8,16 84:23 85:7 86:6,12, 17,20 87:8 89:16 90:1,2 92:7 105:23 119:1 128:13, 18 134:25 142:11 144:4 173:9 178:22 185:12 200:24

**conducting** 68:25 78:15,24 88:25

**confession** 50:8 93:8

**confidence** 84:2,5 87:12

**conflicting** 162:16



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 59 of 77 PageID #:65837
Prev Deposition of NELSON ANDREU taken 3/2 May 02, 2023
208

confuse 22:24 28:11,13 121:13

confused 114:3,7 135:4

confusing 23:10 28:22,24

conjunction 60:25

connect 185:22 187:16

connection 124:13

consent 170:24

consideration 81:23 97:18,23 98:5,13,23 102:18 141:3 152:8

considered 25:16 38:24 101:6 159:4 200:14

considers 191:23

consistent 14:18 49:7 120:15 149:23 159:7

consisting 197:15

consult 117:5

consultant 65:7

consulting 118:7

contact 46:8

contained 13:19,24 16:4 17:15 22:4 38:19 46:18 112:18 129:6 133:6 149:4 150:4 157:25 197:7

contaminate 200:13

contamination 189:7

continue 47:1 162:24 163:3 164:18

continuing 83:24

continuous 54:25

contradiction 137:16 138:7

contrary 47:25

convened 6:9

conversation 42:5 46:13 137:5,7

convicted 134:2 182:4

conviction 134:8 180:21 199:2

convictions 72:12,20 73:2, 17 75:7,19 76:3 134:13 135:1, 13 180:11,18

convince 170:9

Cook 73:23 74:14

cop 110:4

copy 10:20,23 11:5,6 20:22 124:18 138:19 201:11,17

corners 139:8 182:10 183:3

correct 8:14,16 9:11 10:8 11:7, 11,13,14 12:14 13:4,10,12,16, 19 14:7,24,25 15:4,7 16:5,6, 18,22 17:18 18:23,24 21:21

26:17,21 29:20 30:13,21 31:2 38:8,9 39:18,25 41:10 42:7,15, 18,21,24 43:3 47:12,15 49:21 52:15 54:10 55:16 60:14 69:9,10,18 77:2,6,7 78:3, 10 79:18,19,23 80:16 95:10,22 102:22 103:20 106:16,20,24 107:12,16,21, 25 109:21 110:23 116:2, 17 117:3,6,7,9, 10 118:5,6,21 119:2 121:17, 21 122:9,14,21, 25 123:15,23 124:1,5,6,16 125:8 126:6,10, 15,16 127:3,6, 7,12,21,23 128:8,9,14,24 129:8,9,13,22 132:6,13,23 136:10,11 137:17 138:13, 19 140:7,11,15 146:13,22 147:3 148:4,8 149:5,9,14 150:1,5,11,12 151:10 152:1 153:3 154:16, 24 155:8 157:10 158:11, 12 161:2,18 162:3 163:5 164:3 165:24, 25 181:16,24 182:5 184:11 189:7 190:9,15 191:17 192:1 195:11,12 196:4 197:14 198:10,25 200:7

correctly 52:10 63:1 129:4 144:8 145:25 166:8

187:25

cough 55:21

Coughs 53:16 55:3

counsel 6:17 7:24 11:8,10 71:14 176:24 201:21

counseled 62:17

counseling 59:22

count 101:18

counter-opinion 132:22

countless 21:24

county 73:23 74:15 88:10

couple 196:22 199:18

court 6:4,5,12 9:2 44:6 59:11, 12 118:16 131:13 192:9

cousin 99:6

cracks 66:8 155:20 183:17

create 88:15 89:2

created 141:6

creating 115:21

credibility 19:13,17,22 22:19 23:13,17 94:25 156:17 159:16 192:5

credible 27:3, 10

credit 15:5 16:14 17:20,23 18:1,7,9,13,22, 25 21:4 22:12, 15 24:2,10 25:2 26:19 27:25

29:11,18 39:6 77:12 157:17 160:12 191:15

credited 15:11, 13 17:7 40:4 158:13 160:25 161:8 191:12

crediting 15:10,12 28:6 160:20

credits 129:15, 24 156:11 161:4,16

crime 47:11 48:7,8 81:13 82:23 84:15 87:6 181:7,9 182:4 185:14 191:10

crimes 52:12

criminal 8:15, 18 18:13 19:1 29:12,18 30:21 32:5,10 35:8 36:1,10 40:23 41:6,20,21 42:3,23 64:5,14 71:20,22,23 127:20 148:20 150:10,14 159:12,23

cross 174:23

CROSS-EXAMINATION 199:16

crossing 197:11

crying 143:24

CT 202:2

custody 54:6,8

cut 136:1 182:10

cutouts 79:2,3

cuts 105:4,5

cutting 103:22 183:2



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 60 of 77 PageID #:65838
The Deposition of NELSON ANDREUW, taken 3/2 May 02, 2023
209

## D

**dark-tinted** 101:5

**date** 124:11 184:22 185:6

**dated** 195:7,23

**daughter's** 194:3

**day** 6:7 66:21 99:4 185:4,9

**days** 185:5 194:19,25

**dead** 110:6

**deal** 32:19 179:6 183:15

**dealt** 140:24

**December** 194:12,13,14 195:2,8,17,24 196:3,13

**decide** 132:21 161:22 164:5 192:8

**decided** 165:22

**decision** 60:24 61:6 74:4,7,15, 17,22 161:6,24 163:11,16 164:3 192:10

**Defendant** 6:23,25 7:2,5

**defendants** 6:22 7:5,14

**defense** 127:20

**definitive** 50:3

**definitively** 37:11 50:18

**degree** 20:10

**deliberately** 109:19,25 111:25

**denial** 49:13 53:15 70:3

**denials** 49:2,6, 17 50:8,22 51:11 52:1 53:15

**denied** 48:7,9 49:13 53:9 55:15

**deny** 48:18,25 49:12 52:16 153:1

**denying** 54:9, 14

**dep** 33:5

**department** 57:8 60:3,7 78:21 79:1 89:1,9,12 126:14 169:8 198:13,21

**departments** 92:10

**depends** 48:14 143:21 186:16, 21

**deposed** 8:17 71:8

**deposition** 6:9 8:5,21 10:1,2,4, 8,11,18 11:17, 19 12:3,17 13:24 17:8,16, 20 22:12 24:2, 17,22,25 25:2, 11,18,22 26:20 27:10 29:5,11, 18 30:20 32:4, 10 33:15,18 34:9,15,21 35:7,15 36:2,6, 11 37:4 39:3,7, 9 40:22,23 41:7,21 49:11 56:7 67:20 69:17 70:20,23 71:3,22 102:22 105:23 106:19 109:5 115:18 120:17 121:2,5,

11,16 122:13 138:19,22 139:19 140:2, 17 142:11 148:21 150:10, 14 153:19 159:11,24 160:13,21 178:22 190:8, 15,23 191:3,4 192:3 196:9 200:24 202:2

**depositions** 8:7,11,14,15 19:1 25:18 34:6,7,8,11,13, 14,20,24 36:14 42:20 70:2 120:23,24 157:18 160:17 161:23 191:16

**deps** 33:3

**describe** 107:2

**describing** 99:22

**description** 100:24 107:7, 23,25 108:8,19 109:17,18 111:4,5,14 113:7,11,14 114:4 122:24 149:22 199:25

**descriptions** 15:14 106:24 112:2

**descriptive** 109:1,20 110:25 111:20 112:1,17

**descriptors** 109:6

**detailed** 109:13

**details** 51:4 121:10,24 123:18 124:13

**detective** 13:3, 13 66:19 69:8, 11 72:14,21

74:16 75:5,20 76:4,11,15,22 77:4,13 94:23 135:11 136:6 137:6 141:5 158:15 164:17 179:23 180:11

**detective's** 110:10

**detectives** 13:4 21:7 41:12 44:8 70:9 76:20 86:25 102:12 109:14 110:14 122:16 144:25 147:16 162:17 163:1,13 165:18 169:8, 14 170:8 178:10 179:23 182:15,21 183:7,21 187:15 188:11 192:4

**detectives'** 145:6

**determination** 22:20 61:3 97:9

**determinations** 19:13

**determine** 56:20 155:23 192:11

**determined** 93:18 110:4

**develop** 87:11 163:8

**deviate** 26:5 37:22 38:7

**deviated** 26:11 64:23 66:4 77:5

**deviating** 64:13

**deviation** 15:7 29:19 37:17 155:15,18 161:9 174:2

**deviations** 13:7,12 65:16

75:9,22 129:20

**difference** 42:14 137:19, 21 179:18

**differently** 66:7,12,17,25 67:9 68:4,14,25 148:15

**difficult** 93:24 147:6

**direct** 7:25 151:20

**direction** 186:12

**directly** 132:6, 9

**disagree** 119:24 120:2 132:11

**disagreeing** 125:19,22 131:4,14

**discipline** 57:9 58:19

**disciplined** 56:20

**disclosed** 127:10,11,12, 19 198:22

**discourteous** 58:18 59:25

**discredit** 111:21,23

**discredited** 24:8

**discrepancy** 47:2

**discuss** 39:16 121:16 123:22 124:4,7 149:12, 25 150:9,14 190:11,18,22

**discussed** 190:14,17,21

**discusses** 129:6 130:10

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

136:24 137:2
140:10 152:4

**discussing**
199:21

**discussion**
125:11 130:14
132:23 135:22

**displays** 78:17

**dispute** 133:18

**disputing**
130:25

**distance**
97:17,21 98:11

**distinction**
154:4

**District** 6:12,
13

**Division** 6:13

**DNA** 185:22

**document**
45:13,21 46:3,
18 47:11,25
48:4,9 49:1,5
50:7,8,22 51:11
52:1 84:1,4,24
85:8,22 103:12
104:25 105:4
106:10 110:8
142:23 143:3
154:1,3 175:6,
16,19 195:20

**documentatio**
**n** 84:11 85:17

**documented**
18:4 45:14
46:13 66:11
86:2 127:9
154:12,16,24
155:8,11,16
173:23

**documenting**
54:19 143:5
199:23 200:5

**documents**
13:10,20 15:18
16:12,14 17:17
21:24 22:3
25:19 32:8

37:10,12 65:2
68:22,24 77:1
116:14 128:7
130:11 132:6,
12,23 133:7
136:9 173:14
192:20,22
197:17

**door** 99:3
186:9

**doubt** 121:25

**dozens** 20:11

**drafted** 116:8

**drag** 177:16,20

**draw** 70:5
102:24 156:16

**drawing**
158:20

**drive** 6:6
188:13,18

**driven** 188:11

**driver** 170:1

**driver's** 110:7

**drop** 104:6

**drove** 137:23
187:24

**dust** 185:15

**dusted** 183:21
187:8

———————

**E**

**earlier** 50:8
52:1 142:17

**easiest** 125:25

**Eastern** 6:13

**education**
27:22 116:14

**efforts** 169:2
171:17

**eject** 186:13,23

**ejects** 186:22

**El** 198:24

**Elizabeth** 7:4

**employees**
88:4,12 89:1,12

**empty** 88:8

**end** 40:3 46:13
103:24 105:6
146:2,6 186:4
197:2

**ended** 61:16

**enforcement**
8:11 56:18
63:21 64:3,12

**engage** 78:1
171:17

**engaged** 58:7
61:9 63:13
77:22 78:9

**engaging** 62:6

**entire** 140:6
151:13 160:6

**entirety** 82:8
116:7 121:7

**entitled** 33:8

**equivalent**
70:11

**erroneous**
132:2

**error** 179:19

**estimation**
188:1

**et al** 6:11
195:22

**etch** 99:16

**etched** 98:21

**event** 12:7
109:10 113:3
118:17

**events** 120:13

**everyone's**
151:21

**evidence** 33:8
93:8 129:6
138:12 149:16
153:5 163:9

165:8,16,23
166:18 167:11
168:24 169:15,
17,20 172:11,
21,23 173:4,9
184:4,11,15
185:21 187:15
188:5 189:13
200:6,13

**evidentiary**
171:23

**exact** 177:6

**EXAMINATIO**
**N** 7:25

**examiner**
185:2

**examples**
97:14 111:13

**Excuse** 53:16
55:4

**exhibit** 20:25
21:1 103:8,10,
13 104:7 105:1
106:3 192:25
193:3,6,7
195:20 196:1,
12,22 197:15

**exhibits** 121:2
196:23

**exonerations**
73:16

**expect** 109:12

**expected**
172:3

**experience**
19:8,19 20:1,
10,16,17 27:7,
13,16,21 29:1
52:11 66:1
87:21 93:23
94:7 116:13
133:24 144:4
159:16 162:8
171:21 172:2

**experienced**
38:21 92:14,18,
19,20 113:3

**expert** 8:8 10:8

20:6 22:15
39:24 56:18
64:22 65:6,7,
12,15 66:3,10
100:5 118:8
120:20 124:19
174:10 186:15
192:16 196:15,
24 197:1 199:8

**explain** 40:8
62:22 94:3
184:18

**explained** 68:7
72:6 82:19
101:16 102:7
109:11 191:19

**explanation**
138:6

**exposed** 97:22

**extent** 95:3
167:23

**extremely**
189:13

**eyewitness**
18:19 78:12,15
93:11,19
130:18 131:6,
25 132:17
133:20 134:3
142:18

**eyewitnesses**
96:1,10,22
101:23 109:21
112:2 132:1,4
149:22

———————

**F**

**face** 31:2 82:2
83:18 97:5,22
98:12,18 99:13

**fact** 7:11 15:5
55:14 75:18
77:21 84:24
100:22 113:10,
11 119:10
126:8 128:23
129:12,21
138:21 140:13
147:8 154:22

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 62 of 77 PageID #:65840
The Deposit of NELSON ANDREW taken 3/2 Mayof 62 of 2013
211

155:13 156:7,
11 159:7
172:12 191:23

**factor** 97:23
98:4,8,12

**factored** 102:4

**factors** 132:5

**facts** 19:18
66:1 155:23
170:10 172:15

**failure** 199:23
200:6

**fair** 8:18,19,21
9:7,10,14
12:10,24 13:8,
17,25 15:15
16:9,15 17:9,
16,21,22 19:14,
22 20:18 25:13,
24 26:14 27:11,
19,24 28:3 30:6
32:12 33:25
38:22 41:7 42:6
45:1 48:1,10
50:9 52:18
53:4,21 54:20
55:9 60:1 69:20
70:11 75:23
77:14,23 81:7,
10 87:12,23
88:16,24 90:11
91:3,13,21
94:18 95:1,8,
16,18 96:5,7
97:20,25 98:5
99:25 101:7,21
112:15,20
113:16,21
115:14,24
117:1,13,24
118:9 120:9,15
121:15 125:12,
14,19 128:4
130:25 131:7,
15 133:8,21
138:2 139:20
143:7 145:13
146:3,19
147:11 150:16
151:16 152:14,
15,18 155:16
156:3,9 157:18
158:16 159:24

161:10 174:2
180:6 196:25
197:13 198:2,3,
6,7 199:12,13
200:1

**fall** 66:7

**false** 12:17
57:21 92:11
133:7 140:15
141:6

**falsely** 92:21

**falsified** 179:4

**familiar** 98:25
99:10,23
117:20

**family** 181:24

**fashion** 70:4

**fast** 193:15

**father** 59:10

**Federal** 23:7,
14,19

**feel** 49:1
117:21

**feet** 96:16

**fell** 183:16

**felt** 10:11
132:22 178:13
188:12

**figure** 105:16
139:11

**file** 17:15
103:8,13,20
105:2 106:4
123:3,8,14
128:4 149:5
160:6,7 166:14,
17 171:5,7,10,
16 172:22
174:18

**files** 65:8 123:8
127:2

**filing** 59:12

**filled** 106:14

**fillers** 80:16,20
81:3,9 87:25

89:3

**final** 47:3,19
50:7

**finally** 49:15

**find** 25:9 47:2
58:7 60:22
68:12 87:22
121:9 133:5
151:25 175:20
180:4 193:17
199:24 200:6

**finding** 59:20
186:10

**findings** 58:9,
11,14 118:25
119:22,24

**finger** 167:20

**fingerprint**
184:22 185:1,4,
9

**fingerprints**
183:8,22
184:10 185:15
187:8

**finish** 116:20
167:18 184:20

**firearms** 187:2

**fired** 21:9
167:22

**firing** 59:19,21
60:8

**firings** 58:25
59:2

**five-minute**
55:25 67:12
200:17

**flawed** 73:14

**fled** 110:22

**Fleming** 7:4
194:21

**flip** 168:18

**Florida** 8:14

**focus** 36:9
40:17 59:14
62:11

**focused** 59:15
128:11

**folder** 79:1
82:14

**follow** 23:7

**Footnote**
138:23

**footnotes**
131:18 133:13

**forensic**
171:17

**form** 11:21
12:4,11,19
14:2,8,20 15:1,
16,24 16:10,16,
17 17:2,10,25
18:15 19:2,15,
23 20:7,19
21:5,22 22:14
23:2,3,6 24:3,
12,19 25:4,14,
25 26:7,15,22
27:12,20 28:4
29:9,13,21
30:7,14 31:3,14
32:13,21 35:4,
25 36:23 37:8,
24,25 38:23
40:6,7 42:11
43:9,19 46:5,20
47:13 48:2,11
49:8,23 50:10,
24 51:17 52:4,
19 53:5,23
54:1,11,22
55:10,17 61:11,
25 63:2,16
64:6,15,25
66:13 67:2
68:15 69:2,14
70:12,25 71:12
72:5,23 73:5,20
74:9,20 75:3,
11,24 76:8,18
77:15 78:4
79:9,20 80:3,9,
17 81:11,19
82:4,7,25 83:8,
13 84:7 85:2,24
86:10 88:1,17
89:5,20 90:4,16
91:15 92:12,23
93:5,13 94:1,

10,19 95:2,9,
17,23 96:6,12,
24 97:11 98:1,
6,14 99:1,14
100:1 103:2
108:2,11,21
109:3,23
110:15 111:3
112:5,12,21
114:7,16 117:2,
14 118:22
119:3,13,20,25
121:22 123:6
125:13 127:14,
22 128:19
129:14,23
130:20 131:1,8,
16 132:7,14,24
133:9,22
134:16 135:2,
14 137:8,18
138:4,8,14
139:1 140:20
141:7 142:25
143:11,19
144:10,18
145:14 146:4,
15 147:4,12
148:12,22
149:15 150:6,
17 151:1,12
152:19 153:4,
17 154:6,17,25
155:9,17
156:10 157:11,
20 158:2,17
160:1,14,22
161:3,11,19
162:4 163:10
164:8,19
165:12 166:1,
11 167:1,14
168:10 169:5,
16,24 170:6
171:1,19
172:14,24
173:12,18
174:3,16
176:10,15
178:8,15 179:7,
13,16 180:13,
23,24 181:4,5,
17 182:1,7,12,
17,18,23 183:4,
10,11,23 184:6,
12,13 185:16,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02029 Document #: 511-64 Filed: 03/15/24 Page 63 of 77 PageID #:65841
The Deposition of NELSON ANDREW, taken 12 May, 2023
212

23 186:5,14,25
187:9,18 188:4,
20 189:1,8,14,
19,23 191:6,18
198:15 199:9

**formal** 43:23,
24

**formed** 152:21

**forming** 69:25

**forward** 74:3
186:23

**found** 19:9
64:22 65:15
77:4 119:10
175:17 184:9

**foundation**
11:21 15:16,24
16:17 17:2,25
19:2,23 20:19
24:6,12,19
25:4,14 26:15,
22 30:7,14 31:3
32:13 37:8,25
43:19 46:5,20
48:11 49:8,23
50:10,24 51:17
52:4,19 53:5
54:1,11,22
55:10,17 61:11,
25 63:16 64:6,
15,25 66:13
67:2 69:2 72:23
73:5,20 74:21
75:3,11 76:8
80:3,9,17
81:11,19 82:7,
25 84:7 88:1,17
89:5 90:4 92:23
93:13 94:1,10
95:9 109:23
118:22 119:13,
20 121:22
123:6 124:9
135:14 138:8,
14 139:1
140:22 141:7
142:25 146:4
147:12 153:17
154:6 164:19
167:1 168:10
170:6 178:8
180:23 183:12,
23 185:16,23

186:5 188:20
189:8,14
191:18

**foundations**
74:9

**fourth** 121:1

**freezing**
193:18,19

**frequently**
131:25 132:1,
16,17 133:20
184:24 197:20

**front** 20:23
124:21 147:14
177:25 193:10

**fucking** 174:17

**full** 22:23 23:11
28:7 53:3

——— G ———

**Gabrielle** 77:2

**game** 151:23

**gang** 101:1
102:13 168:17
184:24

**gangs** 113:5

**Gangsters**
137:23 138:1

**gather** 111:25

**gave** 12:1 17:5
18:2 20:4 30:6
31:18 46:7,17
47:9 59:25
70:23 97:3
159:14 190:19

**general** 102:18
106:7,11,12,22
112:18 113:12
114:5 123:25
126:20

**generalization**
73:13

**generally**
14:18 17:1
26:5,12 29:20
36:16 37:17,22

38:7 49:7,20
50:6,21 51:10,
25 55:6 64:23
65:16 66:5
76:16,23 77:5
81:20 129:13,
21 158:10,16
159:7 161:2,10
199:22 200:5

**generating**
198:2

**gist** 36:18

**give** 7:21 9:1
36:24 42:2 50:3
51:9,20 53:10
64:16 81:17
83:19,21 85:25
89:1 93:15
113:4 149:18
160:3 170:9

**giving** 42:8
95:14,21
111:13 129:3
159:15 165:7

**God** 86:18
175:15

**Gonzalez**
39:17 121:21
122:3,9,13,19
123:3,8,13,22
124:10,15
125:8,12
135:23 136:3
137:3 140:25

**Gonzalez'**
122:16

**good** 6:21 8:2,
3,4 62:10,16
74:17 76:6
145:12 178:11
201:23

**gospel** 158:24

**Graf** 137:4,16,
22

**Graf's** 136:6

**gravity** 181:3

**great** 178:13,
14

**group** 81:21
87:6

**guess** 20:9
60:18 83:12
187:3 188:12

**guessing**
37:13 72:18

**Guevara** 6:11,
23 7:3,6 13:3,
13 69:8,11
70:1,9 72:14,21
74:16 75:5,20
76:4,11,15,23
77:5,13,22 78:1
137:6 140:14
141:5 179:4,23
180:12 195:22

**Guevara-**
137:24

**Guevara-**
**halvorsen**
137:17

**guillotine**
115:10

**guilty** 181:6,9

**gun** 21:9 167:5,
21 168:20
186:8,15

**guy** 96:17
168:20

**guy's** 110:6

**guys** 67:12
141:12 167:22
168:21

——— H ———

**hair** 81:25 82:1
83:16,17 111:8
145:20

**half** 110:21
111:9 162:22

**Halvorsen**
70:1,10,19,23
137:6,25
140:14 179:4

**Halvorsen's**
141:5

**hand** 7:19 27:2
102:10

**handed** 167:5,
20 168:19

**handful** 72:18,
20

**handle** 60:11

**handled** 61:18
62:17,20 66:17
68:8

**handwritten**
17:14 38:20
44:17 120:14
170:14

**happen** 44:9
91:6 168:3

**happened**
15:14 38:13
46:24,25 48:24
53:3 93:15
113:1 124:10
134:5,19 156:3
160:21 165:6

**harassing**
33:1 178:15

**hard** 144:23
151:17

**hard-to-reach**
186:4

**harder** 87:22

**head** 68:19
101:2 115:10

**hear** 34:17
103:25 104:2,
10,11,12,14,15,
16,22 105:10
165:13,20
193:17,22

**heard** 104:5

**hearing** 119:1,
18

**hearings**
118:16

**Hector** 16:21,
24 21:4 22:12
24:2 25:3,11,22
158:13 160:12



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 64 of 77 PageID #:65842
The Deposition of NELSON ANDREW, taken on May 2, 2023

213

163:20 165:10
170:13

**helped** 83:24

**hey** 63:13
67:11 168:18

**hide** 49:17

**high** 60:18
186:9 189:22

**high-profile**
91:17

**Hispanic**
107:11

**Hispanics**
108:7 113:14

**hold** 37:24
53:23 124:24
148:9 194:5,6
195:4 198:15

**home** 170:5,15
171:12

**homicide**
39:16 48:16
68:5,7 69:13
105:3 109:15
119:11 122:9,
14 123:13
125:8 127:10,
21 128:1
133:25 134:18
148:25 158:4
165:18 168:6
175:24 176:7
180:5 181:15
182:10,15,16,
22 183:3
185:12 187:6,
14 189:12

**homicides**
188:15

**hood** 101:2

**hoodie** 102:11

**hopeful** 131:19

**hour** 110:21
141:16,18

**hours** 33:19,24
36:14 49:14
53:9,20 54:6,8

197:25 198:1

**house** 170:21

**huge** 181:16,23
182:3

**hundred** 75:6

**hundreds**
8:13,17 20:11
71:8 81:13
86:18 89:12
92:15 102:11

**hungry** 142:4

**husband-and-
wife** 48:23

**hypothetic**
50:25

**hypothetical**
38:1 46:6,21
48:12 49:9,24
50:11 51:18
52:5,20 53:6,25
54:2,12,23
55:11,18 80:10
94:2 143:20
144:19 146:5
164:11,20
165:7 174:9,12
185:17,24
186:6 188:21
189:2,9,15

**hypothetically**
165:1

———————

**I**

**IACP** 118:2,4,8
130:10 131:12,
18,20 132:6,12
133:7,19,24

**IACP's** 132:23

**ID** 152:5

**idea** 35:1,18,23
37:6 99:9 101:4
110:19 112:16
131:5 180:16

**ideal** 88:15

**ideally** 141:22

**identification**

21:1 28:2 30:12
31:12,21,23,24
35:20,24 78:16
79:14,16 81:6
83:20 85:10,11,
16 90:2 93:4,25
94:9 96:5,19,23
97:1,10,19,25
98:16,19,20
99:10,12,23,24
100:8,13
101:25 102:2,5,
15 103:1,10
134:3 142:18,
24 143:9 144:6,
8,17 145:4,12,
17 150:1,16,24
153:2 154:2,23
155:4 156:8
162:16,25
193:7 196:1

**identification(
s)** 162:16

**identifications**
78:13 92:11
93:12,19 94:18
101:7 130:18
131:6,25 132:2
148:3

**identified**
21:13 24:15
92:3 134:1
149:24 151:4,
15 154:9,13
162:22 185:3

**identify** 36:22
40:3 67:8 68:3
85:21 87:25
92:20 96:11
97:5 99:13,18
102:12 103:5,
18 105:1
149:13 155:6,
14 163:2 169:3,
7,9,10

**identifying**
108:6

**Illinois** 6:7,13,
24

**immediately**
52:12 143:18

**impact** 112:3,
10 118:18
119:7

**impair** 9:22

**Imperial**
137:23 138:1

**importance**
42:8 75:21
181:2

**important**
80:24 81:3
101:5 176:18
189:13

**improper**
57:21 58:10
139:9 179:8

**in-house** 44:15

**inability**
199:24

**inaccurate**
10:12 12:2,18
133:8

**incident** 19:11
27:2 51:5
159:18 162:11

**include** 25:17
38:4 49:19 50:1
53:8 66:24
70:16 80:7
148:20

**included** 115:4
118:15

**includes** 158:3

**including**
13:21 17:17
121:2 157:14

**incomplete**
38:1 46:6,21
48:12 49:9,24
50:11,25 51:18
52:5,20 53:6
54:1,12,23
55:11,18 80:10
94:2 143:19
144:18 146:5
164:10,20
185:17,24
186:6 188:21

189:2,9,15

**inconsistent**
47:10 65:22
95:15 139:10

**incredible**
53:25

**indicating**
77:13 164:2
171:10,16

**indication**
37:21 38:6
165:4 173:9
187:5

**individual** 6:22
7:5 47:2,4
48:14,20,21,25
53:8,11 59:8
83:3,6 87:5
97:13 101:1
145:15 164:25
192:4 200:10

**individuals**
26:25 27:1,4
29:3 52:11
74:16 80:1,20
82:2 101:19
102:8 108:6
151:15 154:1

**influence**
179:24

**information**
13:18 16:4
21:8,13,17,18
22:4 24:21
46:17 47:10,12
63:4 95:14,15,
22 107:9
108:15,20
109:2,13,20
110:2 111:1,15,
20 112:1,17,19,
25 115:23
122:12,17,19,
23,24 123:2,7
127:9,19
130:12 131:19
132:17 137:24
138:1 148:6,20
149:4 150:3,4
157:13,25
159:1,21 167:8
168:1,15



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02029 Document #: 511-64 Filed: 03/15/24 Page 65 of 77 PageID #:65843
Prev Deposition of NELSON ANDREU taken 1/2 May 02, 2023
214

170:20 171:24
172:22 185:7

**informed** 31:1

**initial** 29:1
36:17 38:13,16
39:11 102:19
159:17

**initially** 46:24
48:18 71:4

**inmates** 88:6
89:8

**Innocence**
118:14 119:1,
17

**inside** 101:12
141:16,18

**instance** 54:19
58:6 59:24
60:22 92:8 93:3

**instances**
56:19 58:23
59:18 62:4,12
64:2,11,22
87:7,8 89:25
99:23 134:12,
25

**instruct** 72:8

**instructed**
71:15 165:9,18

**instructions**
81:17

**insufficient**
166:18

**integrity** 73:4,
8

**intending**
76:14 117:12
139:18 140:1

**intentional**
66:8

**intentionally**
155:21

**interjection**
147:15

**Internal** 57:7,
11 60:11,25

63:12,22

**interpreted**
146:25

**interrogate**
55:8

**interrogation**
14:15 26:4

**interrogations**
15:15 26:21

**interview**
48:17 49:14
54:25 136:6,25

**interviewed**
21:7 53:19
96:10 108:5

**interviewing**
47:1

**interviews**
30:12,25 46:2
55:1 159:5

**investigate**
56:19 57:12,19,
24 60:14

**investigated**
60:17,21 61:8,
22 72:13 86:13
92:15,16 134:7

**investigating**
56:13 188:15

**investigation**
13:15 39:16,17
53:3 56:16
61:24 62:25
63:24 64:5,14
68:5 69:1,13,22
73:4 77:19
83:24 119:12,
19 120:3 122:9,
14,20 123:23
124:1 125:8,12
127:10,21
128:13,18,25
134:25 135:23
137:4 149:1,5
162:24 163:3,8
164:6,14,18,23
165:8,19 166:4,
9,25 167:12
168:9 169:3,14

175:25 176:7,
17 180:6
181:15 182:11,
16 183:3 187:7,
14 189:12
199:5

**investigations**
53:2 56:24
58:23 73:9,14
76:6 158:4
182:22 185:13

**investigative**
103:8,13,20
105:2 106:4
123:14 127:2

**investigator**
48:16 94:15,24
128:3 134:24
135:12 143:10
168:6

**invoice**
194:12,14
196:8

**invoices**
192:13 193:9
194:11 195:22,
24 196:13,14,
24 197:16,25
198:6

**invoked** 71:4

**involve** 74:16

**involved** 13:14
28:2 56:12
57:17 61:8,15
73:9 75:6 76:20
123:4 188:17

**involvement**
48:7,10,25
52:17 55:15
61:23 69:21

**involves** 69:8

**involving** 13:3
56:25 57:24
72:21 75:20
76:4 180:11
198:9

**issue** 22:25
148:16 150:1
176:14,24

179:15 180:2
181:2 194:1

**issues** 59:5
161:14 177:5,
11,12,15

**item** 121:1

**items** 114:24

_____

**J**

**jail** 88:10

**January**
194:11,13
195:1,15,23
196:13

**Jeff** 6:21
103:25 139:4
201:16

**job** 60:10 95:5
178:11,13,14

**jobs** 183:1

**Join** 183:25

**joke** 175:1

**Jose** 17:24
18:19 27:25
29:12,19 35:1,
18,23 37:5,20
38:5 158:14
190:23

**judge** 77:16
118:20 119:10,
16,24 120:3
147:6 156:19
170:9 178:1

**judging** 144:24
156:4

**Judicature**
130:11

**jury** 28:6 70:5
129:15,24
156:19 161:3,
16,22 192:9

**jury's** 161:24

**justified** 60:23
61:23

**justify** 170:20

_____

**K**

**Kentuckiana**
6:5

**key** 137:21

**killed** 92:2
168:20,21

**kind** 32:19 41:2
51:9 52:17 65:6
82:4 83:15
84:11 97:17
189:13 199:20

**kinds** 50:20
59:5 97:7

**Kivetz** 6:21,22
7:14 10:23
11:2,8,21 12:4,
11,19 14:2,8,20
15:1,24 16:10,
17 17:2,10,25
18:15 19:2,15,
23 20:7,19
21:5,22 22:14,
19,23 23:6,13,
16 24:3,6,12,19
25:4,14,25
26:7,15,22
27:12,20 28:4,
10,15,17 29:8,
13,21 30:7,14
31:3,14 32:13,
21 33:5 35:4,25
36:23 37:8,24
38:23 40:6,22
42:11 43:9,19
46:5,20 47:13
48:2,11 49:8,23
50:10,24 51:13,
17 52:4,19
53:5,23 54:11,
22 55:10,17
61:11,25 62:7
63:2,16 64:6,
15,25 65:10
66:13 67:2,10
68:15 69:2,14
70:12,25 71:12,
19,25 72:5,23
73:5,20 74:9,20
75:3,11,14,24
76:8,18 77:15
78:4 79:9,20



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

80:3,9,17
81:11,19 82:7,
11,25 83:8,13
84:7 85:2,24
86:10 88:1,17
89:5,20 90:4
91:15 92:12,23
93:5,13 94:1,
10,19 95:2,9,
17,23 96:6,12,
24 97:11 98:1,
6,14 99:1,14
100:1 101:8
103:2 104:2,5,
16 105:13,18
108:2,11,21
109:3,23
110:15 111:3
112:5,12,21
113:17,23
114:7,15
116:20 117:2,
14 118:22
119:3,13,20,25
121:22 122:1
123:6 124:24
125:13,20
126:17,22
127:14,22
128:19 129:14,
23 130:20
131:1,8,16
132:7,14,24
133:9,22
134:16 135:2,7,
14 136:17
137:8,18 138:4,
8,14 139:1,5,21
140:20,22
141:7,12,17,20
142:3,25
143:11,19
144:10,18
145:14 146:4,
15,20 147:4,12
148:9,12,22
149:15 150:6,
17 151:1,12,19,
23 152:6,19
153:4,17 154:6,
17,25 155:9,17
156:10 157:11,
20 158:2,17
160:1,14,22
161:3,11,19
162:4 163:10,

20,23 164:8,10,
19 165:12
166:1,11,22
167:1,14,18
168:10 169:5,
16,24 170:6,17
171:1,14,19
172:4,14,24
173:12,18
174:3,11,16,21,
25 175:2,5,8,
11,15,18 176:1,
4,10,15 177:1,
6,13,16,20,24
178:8,15 179:7,
13,16 180:23
181:4,11,18
182:1,6,12,18,
23 183:4,10,12,
23 184:6,12,20
185:16,23
186:5,14,25
187:9,18 188:4,
20 189:1,8,14,
19,23 190:24
191:6,18,23
193:19,24
194:1,14,20
197:3 198:15
199:9,17
200:17 201:3,
19

**knew** 46:23,25
95:15 98:24
170:14

**knowing** 51:4,
21 52:7 172:7

**knowledge**
72:12 162:9
171:21

—————

**L**

**latent** 185:2

**Latin** 109:16

**law** 8:11 56:18
63:21 64:3,12

**lawsuits** 65:9

**laying** 124:9

**lead** 171:22

**leads** 27:13

**learn** 109:20

**learned**
122:12,19

**leave** 55:15
56:1

**led** 102:14
122:17,20
162:9

**leery** 19:7

**left** 145:1
155:21 185:9

**left-hand**
197:8

**legal** 74:18

**level** 84:1,4

**license** 110:7

**life** 180:10,16

**light** 101:3,10,
20

**light-tint**
100:25

**light-tinted**
101:4

**lighting** 98:4,7

**limited** 87:7
89:2

**limo** 101:11

**lineup** 46:11
80:1 81:5 85:1
87:2,12,18
88:12,16,25
89:3,11 90:3,14
91:2,12 92:1,5,
7 94:13 99:5,7
135:3 145:16,
20 176:13,24
180:8

**lineups** 78:18
84:14 86:7,8,
12,13,19,22
87:8,23 89:16,
18

**list** 114:18,22,
24 115:2,5,7,8,

9,13 116:7,9,15
118:4,5,12
120:20,24
121:13 123:12,
13

**listed** 115:14,
25 116:9
131:20 196:23

**listen** 145:18
164:24 167:3

**lists** 107:1,3

**live** 46:10
78:18 86:8,12,
19,22 87:2,5,8,
12,18,23 88:25
89:16,18 90:2,
14 91:2 92:1,7

**lobby** 96:16

**local** 117:17

**located** 6:6

**location** 6:16
124:11 188:8

**locked** 194:5

**lockup** 88:5
89:10

**long** 9:25 28:19
36:14 57:5
81:25 110:13,
16,17 142:23
146:22 147:1
180:20

**longer** 144:1,2

**looked** 80:21
81:4 155:5
191:20

**lookout** 111:16

**Lost** 193:22

**lot** 33:25
117:18 144:4
148:4 149:24
150:25 154:18
155:6

**Lucy** 39:4,7

**lunch** 141:13,
24 142:1

**lying** 70:6

—————

**M**

**M/1** 107:19

**made** 19:8
22:17,22 29:23
31:24 62:24
65:20 77:8
94:21 134:4
150:24 153:1
156:8 160:7
163:12,17
164:3 171:17
193:2,6

**made-** 174:19

**made-up**
174:19,22

**majority** 52:14
188:22

**make** 9:1,25
29:8 31:12,21,
23 41:17 54:13
59:17 60:24
61:2,6 73:11
74:23 81:6
90:24 93:25
94:8,16,17
96:4,18,23
97:1,8,10,19,24
98:15,18,20
100:8,12 101:6,
24 102:2,5,15,
25 111:25
122:7 142:24
143:8 144:6,7,
15 147:10
154:4,23 155:4
161:24 163:21
175:22 183:1
195:7

**makes** 129:7
145:17 177:7

**making** 22:19
23:10,11,16
28:8 52:17 74:4
96:3 99:10
102:13 148:3
152:8 179:19

**Malczyk** 121:2,
17,20 124:5,8



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

COURT REPORTERS

136:6,25 137:5, 7,22,25 138:18, 22 140:11,13 179:5

**Malczyk's** 121:5

**male** 107:10, 16,21 109:17 113:13,14 169:3

**males** 108:6 109:16 111:14

**man** 120:4

**manipulate** 23:9

**mark** 20:25 103:7,9 192:24 193:4,5

**marked** 21:1 103:10,13 105:1 193:7 196:1

**marking** 195:20

**mask** 97:14

**matched** 199:25

**material** 33:23

**materials** 25:6 33:21 68:12 114:19,22,24 116:1,10,16 118:4,5,12,13, 21 120:21 123:12 150:18 165:17 197:13 198:2

**matter** 6:10 109:8 122:3 127:25 128:2 143:17 195:25 196:7 197:18

**Mcgrath** 7:2,15 180:13,24 181:5,12,17 182:7,17 183:11,25 184:13 201:6

**Mcintosh** 194:20 198:9

**means** 41:10 162:21

**medi** 9:16

**medical** 9:17

**medications** 9:21

**Megan** 7:2

**Melendez** 17:24 18:19 28:1 29:12,19 30:5,10,21,24 31:12 32:11,19 35:1,19,23 37:5,15,20 38:5,21 40:8 101:24 107:9, 21,23 108:5 148:2,7 149:12 150:11,15,23 152:5,14,17 153:1,14 154:14,22 155:5,13 156:8 158:14 159:4 179:24 190:23 191:5 192:7

**Melendez'** 191:15

**Melendez's** 156:2

**member** 168:17

**members** 184:24

**memorable** 121:9

**memorialized** 47:22

**memory** 118:7, 10 154:7

**men** 180:10,17

**mention** 152:22 166:3, 15 172:18

**mentioned**

39:8 160:16

**met** 30:13 31:1 45:17

**Miami** 44:1,4, 14,19,23 45:4, 13,18 53:2 56:23 57:2,3,5, 20 58:5,6,22 59:3,18 60:3,6, 13,17,21 61:9 62:5,13,14 79:5,14,17 80:8,15 81:9 86:6,17 87:18, 21 89:17 90:11 91:3 134:12,24 184:19 185:12 186:2

**Mickey** 111:11

**middle** 107:1 130:5

**millimeter** 186:21

**mind** 82:17 120:18 133:3

**minimal** 110:1

**minor** 176:14, 24 179:15

**minute** 126:17 143:15 149:18

**minutes** 55:25 56:2 98:20 142:4 144:14, 22 145:1,3,7, 10,16 146:2,13, 19 147:9,14 178:17 200:18

**misconduct** 29:23 57:25 58:7,11,24 59:15,20 60:9 61:10 62:6,14, 24 63:14,23 64:4 65:21 66:8 73:11 77:9,13, 22 78:2,9 119:11,19 120:8,10 128:23 129:7, 11 180:5

**Misidentification** 132:3

**misleading** 10:12

**misrepresents** 172:15

**missing** 114:24

**misstates** 12:4 19:15,24 24:3, 13 25:5,15 26:16,23 29:13 32:14 35:4 47:13 88:18 90:16 109:24 112:21 113:17 117:14 132:14 133:11 149:15 153:4 166:11 168:11 172:4 188:4

**mistake** 134:5 193:6

**mistaken** 92:6

**misunderstanding** 151:6

**moment** 102:7 193:13

**Mont** 140:25

**Montalvo** 39:4, 7

**Montanez** 16:22 21:4,7 22:5,13 24:2,8 25:3,12,22 26:4 158:14,21 159:4 160:12 161:9,17 163:5, 9,21 164:2,25 165:11,23,24 166:19 167:5, 12,20,24 168:16,18,25 169:22 170:1 171:11 187:16

**Montanez'** 160:20 162:2

**Montanez's** 16:24 24:11

26:13 170:5,14

**Montez** 24:15

**months** 115:7 167:25 168:3

**morning** 6:21 8:2,3 47:1,5 53:12

**mother** 122:16

**Mouse** 111:11

**mouth** 104:11

**move** 178:1

**moving** 104:11

**multiple** 53:19 54:18 55:8 80:6 134:24 135:13 152:7 190:25 191:19

**murder** 39:17 110:3 121:21 123:22 124:1, 10 140:25 141:1 170:16 185:4,5 188:17

**mustache** 145:21

— N —

**Nah** 168:7

**names** 34:22

**narrative** 107:17

**narrow** 111:12

**national** 116:16,25 117:5,9,13,17, 19 130:15

**nature** 57:23

**necess** 86:9 159:25

**necessarily** 19:25 26:24 43:4 46:22 53:2,7 54:19 68:18 86:11 96:25 98:17

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02029 Document #: 511-64 Filed: 03/15/24 Page 68 of 77 PageID #:65846
PAUL DEPUGH, RON NELSON, ANDREW CRAVEN - 3/2 May 26, 2023

217

112:6,8 117:16
160:2 167:3

**needed** 132:22

**negated** 83:23

**negative** 85:10

**neighbor** 99:3

**Nelson** 6:10
7:9,11 55:19
56:7 67:20
104:5 105:23
142:11 178:22
200:24

**NFD** 107:3,6

**Nice** 8:4

**night** 46:25
185:10 194:18

**nitpick** 175:21

**Nobody's**
201:22

**non-speaking**
29:9

**nonsense**
174:19,20,23
176:1 177:6

**normal** 104:1,2
174:5

**North** 6:6

**Northern** 6:12

**notable** 121:9

**note** 144:15

**noted** 22:21
192:2

**Nothing's**
68:19

**November**
195:10 196:3

**nuance** 175:20

**number** 6:13
72:16,25 73:2,
7,12,16,22
75:15,25 84:20
89:21 93:15
101:18 102:8
107:3,20

126:13,25
149:21 151:3
197:25

**numbers** 79:2

___

**O**
___

**oath** 41:6,15,20
42:3 43:5,7,12,
18 141:5

**object** 62:7
114:15 163:20
165:12 186:14

**objection**
11:21 12:4,11,
19 14:2,8,20
15:1,16,24
16:10,16,17
17:2,10,25
18:15 19:2,15,
23 20:7,19
21:5,22 22:14,
17,21,22 23:2,6
24:3,12,19
25:4,14,25
26:7,15,22
27:12,20 28:4
29:8,9,13,21
30:7,14 31:3,14
32:13,21 33:4
35:4,25 36:23
37:8,24,25
38:23 40:6,7
42:11 43:9,19
46:5,20 47:13
48:2,11 49:8,23
50:10,24 51:13,
17 52:19 53:5,
23,25 54:11,22
55:10,17 61:11,
25 63:2,16
64:6,15,25
65:10 66:13
67:2 68:15
69:2,14 70:12,
25 71:12,25
72:5,23 73:5,20
74:9,20 75:3,
11,24 76:8,18
77:15 78:4
79:9,20 80:3,9,
17 81:11,19
82:7,25 83:8,13

84:7 85:2,24
86:10 88:1,17
89:5,20 90:4,16
91:15 92:12,23
93:5,13 94:1,
10,19 95:2,9,
17,23 96:6,12,
24 97:11 98:1,
6,14 99:1,14
100:1 101:8
103:2 108:2,11,
21 109:3,23
110:15 111:3
112:5,12,21
113:17 114:7
117:2,14
118:22 119:3,
13,20,25
121:22 123:6
125:13,20
127:14,22
128:19 129:14,
23 130:20
131:1,8,16
132:7,14,24
133:9,22
134:16 135:2,
14 137:8,18
138:4,8,14
139:1,21
140:20 141:7
142:25 143:11,
19 144:10,18
145:14 146:4,
15,20 147:4,12
148:12,22
149:15 150:6,
17 151:1,12
152:19 153:4,
17 154:6,17,25
155:9,17
156:10 157:11,
20 158:2,17
160:1,14,22
161:3,11,19
162:4 163:10
164:8,19 166:1,
11,22 167:1,14
168:10 169:5,
16,24 170:6,17
171:1,14,19
172:4,14,24
173:12,18
174:3,16
176:10,15
178:8,15 179:7,

13,16 180:13,
23,24 181:4,5,
11,12,17,18
182:1,6,7,12,
17,18,23 183:4,
10,11,23 184:6,
12,13 185:16,
23 186:5,14,25
187:9,18 188:4,
20 189:1,8,14,
19,23 190:24
191:6,18
198:15 199:9

**objections**
23:3,12,15,19
28:9

**observe**
101:20

**observed** 63:5
64:3 96:3

**observers**
132:2,18
133:20

**obtain** 169:15

**obtained** 90:1

**occasion** 90:8

**occasions**
59:12 78:18

**occupants**
111:17

**occupied**
111:14

**occurred**
26:13,20 27:3
28:1 29:24 30:5
35:19,23 38:14
72:9 119:11
120:8,10 125:7
129:12,22
159:5 174:5

**offender** 48:17
107:20

**offender's**
106:23 107:2,
15

**offenders**
113:13

**offending**
102:9

**offense** 102:19
106:7,11,12,22
112:19 113:12
114:5

**offer** 13:22
76:14 108:13
117:12 132:22
139:18 140:2
150:22

**offered** 12:25
66:2 100:15
108:10,18,25
120:2 126:4
139:20 140:7
198:24

**offering** 18:14
20:18 27:18
31:9,10 65:8,23
66:1 70:15
73:18 75:8 76:5
113:15 115:4,
17 116:4 117:6,
11 120:7,11
122:2,8 124:15
125:10 126:15
127:5,11,18
141:3 156:1
191:7

**offers** 125:6,18

**offhand** 22:8
59:6 61:12 64:8

**office** 61:1
87:1 109:15
163:12 194:4

**officer** 8:12
28:17,20 43:2
58:7,15 59:8,19
60:8 61:9 62:5,
14 63:8,13,22
64:4,13,23
65:17 78:13
95:6,12 97:8
99:21 106:15
108:9,14
109:12 113:4,7
121:20 124:5
134:11 141:4
164:6 188:11
199:4



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-02029 Document #: 511-64 Filed: 03/15/24 Page 69 of 77 PageID #:65847
The Deposition of NELSON ANDREU, taken 12 May, 2023
218

officer's 60:22

officer- 57:16
61:7

officer-
involved 57:14
60:14,16,20
61:21

officers 13:8,
14 16:25 26:11
27:9 30:11,25
35:2 40:9 41:25
56:14,20,25
57:9,25 58:24
61:15 62:18,24
63:4 66:4,11
78:8 109:20
111:16 129:8
147:2 158:9
165:9 166:9
172:7 173:24
174:25 175:2
183:2 199:22
200:4

Oftentimes
185:18

online 6:4

open 131:18

opine 76:10
102:14 116:21,
25 125:15
158:9,15

opined 13:6
69:8

opines 129:10

opinion 13:11,
18 14:17 27:8
31:9 38:5,17
49:5,10 65:23
66:3 73:12
74:6,14 75:2
76:17,19,22
77:25 102:4
108:18 118:18
120:2,4,8,11
129:3 144:23
149:11 150:22
151:8 155:22
156:2,25 157:6
161:21 162:1
166:8 191:7

198:22,24
199:3,21 200:3

opinions 12:25
13:23 14:5 16:7
17:13,20 18:14,
23 19:12,21
20:18 25:12,17
27:18 30:1
31:10 38:19
39:21,25 40:2
43:16 65:8 66:3
69:25 70:8,16
73:18 75:1,8,21
76:5,15 78:7
100:16,20
101:22 108:10,
25 112:3,10,16
113:16 115:4,
25 116:5 117:6,
12 119:7 122:2,
8 124:15 125:6,
10,17 126:9,13,
15,25 127:5,8,
11,18 128:11,
16 131:14
139:6,12,18
140:2,7,19
141:4 148:25
149:9 150:4,23
152:20 156:6
158:23 160:7,
19 161:1
191:17,24

opportunity
10:14 12:9

opposed 101:5
192:20

opposite 174:6

options 89:2

order 36:24
127:1

ordered 10:25
11:1

ordering
201:22

orders 127:1,6
201:10

original 17:5,7,
18 18:1 19:4,10
20:4,12 38:25

106:14

originally 17:4

outcome 84:25
85:9 179:20

outfit 111:12

outlined
109:10

outright
153:11

overtime
57:22 59:12

overwhelming
52:14

overwhelming
ly 52:21,22

_____

P

p.m. 105:25
142:13 178:24
201:1 202:2

pages 32:8
125:6,18
156:22 157:1
160:6 194:24

paper 102:20

papers 133:19

paragraph
21:13,16,17
22:4 147:25
148:2,6,10,19
149:7,8,10,25
150:3,9 151:7,
21 152:10,12,
16 154:13
157:2,16 158:8
159:3,20
161:17 162:15
190:6

Paragraphs
149:3 157:5,24

parents 92:2

Park 148:3
149:13 152:23
155:7 183:9
187:7

parking 148:4
149:24 150:25
155:6

part 27:8 32:16
57:3 58:10 59:2
60:10 95:5,13
122:23 167:25
177:8

participate
57:4 89:11

participation
49:15

parties 7:10

parts 15:23,25

party 188:3

Paso 198:25

past 99:4
114:12

paste 136:1

paths 197:12

patrol 106:15
109:20

pause 73:18
75:8 76:5

pending 6:11
9:13 196:8,19

people 20:2
52:16 73:10
81:24 95:6
96:16 98:17,19
110:3 144:23
162:23 167:4

people's 147:5
156:4

percent 43:21
48:24 50:14
58:21 63:17,25
64:9,18 66:15
82:15 83:19,22
85:18 86:2 87:3
90:6,9 99:16
118:3 192:21,
22

percentage
83:21

perception

147:6

perfect 68:8
158:5

period 53:14
54:14,16 143:1

periphery
61:15

permanent
123:14

permissible
50:7,13

permission
164:17,21

perpetrator
96:11 100:13

perpetrators
107:11 110:22
111:2 112:2

person 18:16
41:12 46:24
53:18 54:8
79:22 82:23
84:14,22 87:5
92:2,7 94:7
97:10 99:2
107:14 134:2
143:18 166:5

person's
47:20 98:12

personally
142:4

perspective
113:15 163:7

phenomenon
92:11

phonetic
198:16

photo 32:12
35:3,19,24
37:6,16,21 38:6
78:17,19,20,22,
24 79:5,12,13,
16,25 80:7,15
81:8,16,18
82:5,21 83:11
84:5,14,15,23
85:7,9,15,21
86:6,14,16

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 70 of 77 PageID #:65848
PrevDeposition of NELSON ANDREU taken 12 May, 2023

219

87:10,16,23
89:19 90:1,12
91:1,10,25 99:6
142:19,22
144:5 145:11

**photograph**
79:3,4 145:3
147:13 173:5,6

**photographed**
171:21 172:17

**photographs**
81:12,21
102:11 143:16,
24

**photos** 79:7,
10,18 82:24
84:25 146:19
147:3,9 175:8

**phrase** 85:4

**physical** 93:7
169:15,17,18,
20 185:21
187:15

**physically**
14:14,19

**pick** 128:6
144:15 145:3,
10 147:10,11
176:13,23
177:5,11

**picture** 176:13,
23 179:24

**pictures** 87:24
146:1

**piece** 32:18
33:8

**place** 38:12
79:2 101:12
128:24 141:20
145:22 160:11
190:11

**places** 186:4

**Plaintiff** 6:19
7:13

**Plaintiff's** 6:17

**plaintiffs** 65:21
77:8

**play** 140:18
151:23

**plead** 70:2 71:9

**pleaded** 69:12,
22

**pleading** 70:9
71:17,24

**pocket** 110:6

**point** 10:22
11:15,16 21:6
24:14 32:6 33:7
34:12 40:15
54:10 70:1
82:12 111:25
123:10 140:5,
10 146:2
167:11,19
174:24

**pointed** 179:24
180:7

**pointing** 68:9
137:15

**points** 68:6
130:7,10

**police** 13:4,7,8,
13,14,19 14:18
15:7,8,14,17
16:1,4,8,11,25
17:1,14,15,17
18:5 21:19,20,
25 22:2 24:20
26:6,11,12 27:9
28:17,20 29:20,
22,25 30:10,25
32:1 34:4,5
35:2 37:18,23
38:8,20 39:1,12
40:9,11,13,18
41:25 43:2,7
49:7,19,20
50:1,6,21
51:10,25 53:1,4
55:7 56:13,25
57:9,21,25
58:24 59:15
60:3,7,8 64:13,
23 65:8,16,21,
22 66:5 73:4,
11,14,19 75:9,
22 76:16,23
77:6 78:13,21

79:1 89:9,12
92:10 95:5,12
97:8 99:21
100:5 117:17
119:19 120:13,
15 121:20
124:5 126:14
128:3,7 129:8,
13,21 131:24
132:16 136:2,
24 141:4 147:1
148:4,14 149:4
150:5,25 151:7
152:13,17
153:25 154:5,9,
12,13,16,20
155:1,3,15
156:7,15 157:9,
14 158:1,9,10,
16,23,24 159:8,
22 161:2,10,14
164:6 165:9,21
166:8 169:7
172:7,13
173:23 174:2,
25 175:2 179:4
187:5,7,13,22,
24 188:2,13,18
189:3 198:13,
21 199:4

**policies**
126:14 131:13

**policing**
116:17,25
117:6,9,13
130:15,17
131:7

**policy** 90:19,22
130:11 132:6,
12,23 133:7

**population**
111:9

**portion** 35:15
36:8 37:1
45:22,24
107:17 132:20
136:2 192:18

**position** 94:17
102:2

**positive** 85:10
90:1 145:4
153:2 154:2

156:8

**possibly** 94:8

**potential** 189:6
200:13

**potentially**
169:21

**practice** 49:4
80:14,15 84:4
85:22 90:12
91:3,4,10,20,23
96:22 109:19
111:20 161:14

**practices** 13:7,
13 14:18 15:7
17:1 26:6,12
29:20 37:18,23
38:8 49:7,21
50:6,21 51:10,
25 52:24 55:7
64:14,24 65:16,
22 66:5 73:19
75:10,23 76:16,
23 77:6 99:22
100:5 120:15
126:14 127:25
128:2 129:13,
21 142:17
155:15 158:10,
16 159:8 161:2,
10 174:2,5
189:3 199:23
200:5

**precise** 196:22

**preparation**
34:9,15,21
196:9

**prepared**
106:18

**preparing**
33:15,17
117:24 118:8
192:16 198:5

**presented**
16:12 25:19

**prevent** 9:17
170:23

**preventing**
169:13 171:3
183:20

**previous** 24:4,
13 51:14 52:3,6
132:15 148:24
176:19

**previously**
89:19 198:8

**primarily**
21:19,20,25
38:25 78:17,19
153:22

**printed** 82:14

**prior** 47:24

**prison** 180:17,
21

**prisoner** 88:7

**probability**
186:10

**probable**
83:23 170:21

**problem** 105:8
146:8 167:21
175:20 181:10
193:11

**procedure**
35:20,24 85:9
87:10,17 99:24,
25 146:3

**procedures**
28:2 29:25
30:12 78:16
79:5,13,14,17
81:9,16 84:23
85:8 142:19

**proceeding**
41:21

**PROCEEDING
S** 6:1

**process** 8:21

**processing**
88:8

**produced** 21:9

**prohibited**
50:15 184:1

**promises**
25:23



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02029 Document #: 511-64 Filed: 03/15/24 Page 71 of 77 PageID #:65849
Prev Deposition of NELSON ANDREU taken 3/2 May 3, 2023

220

proper 29:24
88:24 188:12

properly 77:19
195:18

property 59:7

prosecute
73:24

prosecutor
61:1 128:4

prosecutors
127:20

prove 132:1

proved 132:17
133:20

proven 74:1
134:3

provide 35:5,9
51:2 61:4 70:19
89:21 107:24
108:8,14
112:20 123:25
124:13 139:6,
12 199:3

provided 21:7
106:24 107:9
113:12 114:5
132:5 139:7
171:25 199:10,
13

providing
53:15 137:24
139:12

proximity
124:11 162:10

psychological
20:10

pulling 110:5

purportedly
122:12,19
137:25

purpose 126:8

purposely
179:20

purposes 16:7
17:13,19 18:22
27:18 38:18

43:16 70:8
75:21 100:19
112:15 116:4
146:17,24
156:6 191:16

put 88:12 99:5
101:1 109:16
111:13 115:10
133:14 160:3
168:14 185:4
192:2 193:16

putting 102:10
193:14

—————

Q

question 8:25
9:5,6,9,10
14:10 23:8,25
29:3,8 30:18
31:7 34:18
35:17,21 36:7,
9,25 40:17
50:17 51:5,15
52:8 54:3 55:16
59:14,17 62:10
68:1 73:3 85:3
90:25 114:16
115:19 119:14
126:20 127:15
143:13 145:19
157:22 161:8
170:18 174:7,9,
10,12 176:19,
22 177:24
191:2 197:11
198:17

questioning
46:9 54:17
110:10

questions
9:13,18,22 10:1
22:25 28:5,23
70:19 71:2
118:1 139:14
145:20 177:17,
21 178:3
195:19 196:22
199:15,19
201:4,5,6,8

quick 67:12
88:10 105:16

193:14 199:18

quickly 151:25

quotation
132:8

quoted 131:24

—————

R

rails 199:21

raise 7:19

read 26:1 35:14
67:3 77:7,18
82:5 100:18
102:21,22
115:7 121:12
129:9 132:20
137:9 158:6
160:6 168:24
171:4,24
187:10,19
192:9

reading 88:4
119:4 145:5
184:23

real 105:16
193:14

realized 47:20

realm 163:13

reason 73:25
92:1 99:19
121:25

reasonable
23:8

reasons 19:9
27:3 38:14
73:10 87:19
189:10

recall 10:7
14:15 22:8 31:5
34:15,21 48:19,
22 58:14,22
64:17 69:3
89:25 91:24
135:8,11
142:20 153:21

recant 20:2
40:23 73:10

recantations
19:8

recanted 17:3
19:3 36:17

recanting
17:22 18:21
27:4

receive 115:22
118:13,17

received 16:21
123:8

receiving
118:14

reciting 151:7

recognize
81:22 84:19,21
146:8

recollection
87:9

recommend
60:7

recommendati
on 61:4

recommended
59:19

record 6:3 7:8
33:12 56:4,5,6
67:17,18,19
105:2,16,19,21,
22 122:7 129:7
142:5,7,9,10
178:19,20,21
195:18 200:20,
22,23 201:11
202:1

recorded
44:17 47:6

recorder 45:15

recordings
44:20

records
172:13

recovered
171:24

redactions
197:6

Reddick
118:20 119:10

Reddick's
119:17,24

reduce 189:6

refer 41:18
191:3

reference
116:4 152:23

referring 30:15
41:8 78:21

reflect 33:12
196:14

refused 73:24
169:6

refusing 32:25
33:9,10,13 35:8

regard 69:12
128:12,17
142:18

regular 177:24

related 39:17
118:13 127:2
130:18 195:24
197:17

relaying 19:18

relegated
194:4

relevant
113:15 114:1,4,
12 115:21
122:13 143:9,
13 178:4

reliability
144:16 147:11

reliable 29:2
38:17 93:20,25
94:8 95:22 96:4
97:10 99:11
100:12 101:24
102:5

relied 27:17
39:11

rely 131:25
132:17

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**relying** 16:8
20:16

**remain** 191:9

**remember**
32:9,18 33:1,7
34:12 36:5,6,9,
10,11,15,16,19,
20 45:10 56:15
58:4,13 59:6,
10,21 60:2 64:7
71:2 72:2 82:16
83:17 85:14,19
89:23 90:21,22
91:16 103:3,4
109:4 110:17
115:7 117:25
118:11 119:4
121:10,23
122:15 123:10,
17 133:25
143:5 153:18
173:3 187:23,
25 188:6

**repeat** 23:25

**rephrase** 9:7

**report** 20:23
21:3,21 22:12
23:23 24:1
25:2,5,9,10,15
26:10,16,23
27:25 29:10,14,
15 33:20,22
34:13 38:5
39:6,9,13,15,24
40:3,4,15 50:1
53:8,10 63:8
66:23,24 67:9
68:2 76:14
102:19,21,25
106:7,11,12,14,
23 109:11
110:3 112:19
113:8,12 114:6,
19 115:17,21
116:8,15 117:8,
21,24 118:8
119:22 120:20
121:15 122:4
123:20 124:19
125:2,3,6,18,25
126:2,4,5,21,25
127:3 128:21
129:5 130:3,22,

25 131:10,13,
24 132:21
133:14,16
135:18,24
136:2,19,23,24
137:14,16,17,
22,25 139:8,10,
20,23 140:5,6,
14,23 141:5,6,8
143:5 146:17,
25 147:20,21,
23 149:17
150:13 151:8,
13,15,19 152:2,
4 154:5,9,20
155:1,3 156:23,
24 160:11,20
161:18 162:13
165:21 179:19
187:13 190:2,
19,23 191:4,5
192:16,20
193:3 196:16,
25 197:1,2,8,
13,17,19,22
198:2,5 199:10,
13

**report's** 15:14

**reported** 44:15
46:13 62:5,14,
16,20 63:21
64:12

**reporter** 6:3,5
7:7,10,16,18,24
9:2 44:7 56:3,6
67:16,19
104:19 105:15,
19,22 142:7,10
178:18,21
193:1,4 200:20,
23 201:10,14,
16,22,25

**Reporters** 6:6

**reports** 13:19
15:18 16:4,8,11
17:14,18 18:5
21:19,25 22:2
24:18,20 32:1
34:4,5 38:20
39:1,12 40:12,
13,18 43:7
49:20 53:1,4
57:21,22 61:5

62:23 65:20
66:9,10,15
68:23 100:18
106:14 115:25
120:14 128:3,7
137:3 148:14
150:5 152:13,
17 153:25
154:12,13,16
156:7,15 157:9,
14 158:1,23,24
159:22 179:5
187:6,11,20

**representing**
6:5

**reprimand**
59:22,25

**reprimanded**
58:20 62:18

**request** 201:21

**requested**
10:20 11:13
125:15

**require** 20:9

**requirement**
50:14 87:1

**respond** 126:9

**responding**
125:19 128:11

**response**
125:11 194:21,
23,24

**responsible**
57:8

**restroom** 55:2

**result** 58:19
132:3,4

**resulted** 58:25
75:6 85:10
134:8 135:1,12

**retaliate** 113:5

**retention**
123:14

**retry** 74:15

**review** 10:4,14
12:7,21 31:6

32:16 33:20
34:3,6,8,11,23
37:12 39:3
68:12 110:20
115:20 117:23
121:7 123:16
137:9 139:3
142:16 165:17
172:12 197:17,
21

**reviewed**
13:10,21 15:19
16:12,15,20
21:18,24 22:9
25:6,17,20
30:20 32:7
33:21,25 34:5,
12,13 35:13
37:10 65:2 66:9
68:22 69:17
77:1 103:19
106:13,19
114:19,23,25
115:2,3,14,16
116:1,3,10,16
118:5,12
120:21 121:5
123:12 126:5,
24 136:10
137:13 140:6
150:18 152:6,7
154:18 157:13,
18 159:1
165:22 166:15
173:14 187:6,
14

**reviewing**
11:23 34:15,21
58:17 65:8
66:14 102:25
119:16 192:19,
22 197:12
198:2

**Reyes** 10:2,5,
8,18 12:24
13:2,17,22
14:5,6,12
15:10,13,21
77:2 178:14
198:10

**Reyes-** 77:11

**Reyes-
solache** 11:17

15:12

**Reynaldo** 6:11
69:8

**RFC-SIERRA**
103:14,18,19
106:6

**ridiculous**
23:10 28:5
177:13,16

**rights** 48:20

**road** 156:20
168:4

**robbery-
murder** 96:15

**Rodriguez**
101:24 107:10,
21,24 108:5
146:12 148:3,7
149:12 150:11,
15,24 152:5,14,
18 153:1
154:14,23
190:9,18,22
191:4 192:2,6

**Rodriguez's**
191:12

**role** 110:11
140:18

**Ron** 121:2
138:22

**room** 54:18,20
55:8 194:3

**Ruben** 121:21
122:2,8,13
123:13,22
124:10,15
125:7,11
135:23

**rule** 90:8

**Rules** 23:7,14,
19

---

S

---

**safely** 54:7,16

**sat** 48:19
180:17



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02029 Document #: 511-64 Filed: 03/15/24 Page 73 of 77 PageID #:65851
The Deposition of NELSON ANDREU, taken 3/2 May 2, 2023
222

**scenario** 53:25

**scene** 81:13
106:15 108:5,9
109:15,21
110:13,14
121:20 136:7

**scenes** 110:3

**scope** 140:22
141:8

**screen** 126:1
193:10

**search** 170:4,
9,16,21,24
171:11 172:18,
23 173:1,10,24
174:1,4 175:3
185:20

**searched**
171:22 172:3,9,
12 175:7 183:8
186:3

**seat** 175:9

**second-to-last**
140:9

**seconds** 98:18
143:4 144:2,7

**section** 39:24
106:23 107:1,8,
15 120:17,23
124:3 130:6
136:1 140:6
149:11 156:21,
25 157:6

**sections** 130:6

**security** 175:5

**seized** 188:16

**select** 32:12
35:3 37:6,16,21
38:6

**sell** 184:25

**send** 63:4

**senior** 86:24

**sense** 54:13
177:7

**sentence** 35:6

**separate**
136:24

**series** 49:6

**seriousness**
42:17

**session** 9:1

**set** 89:2 115:25
160:19

**share** 128:7

**sharing** 193:10

**shells** 199:24

**shifted** 46:1

**shit** 176:5

**shoot** 167:6

**shooter** 24:15
101:17 102:10
155:8

**shooter's** 31:2
100:16,22

**shooters**
31:13

**shooting**
49:12 57:15,17
61:8,21,22
100:7 101:23
102:4 185:10
199:25 200:9

**shootings**
60:14,16,21

**short** 10:3
81:25 201:20

**shorts** 111:8

**shots** 21:9

**show** 21:3 24:1
32:23 81:21
94:13 99:5
124:11 126:1
175:4,6 191:8
192:3 195:6

**showed** 79:6
82:21 85:15,20

**showing** 83:11
103:12 104:25
195:20

**shown** 19:19
20:12 84:24
159:17

**shows** 20:1

**sic** 24:15 29:3
30:2 72:7
104:11 122:3
136:2 143:24
151:15

**side** 186:21
187:3

**Sierra** 6:11,19
16:3 21:8 24:15
36:22 37:4
66:23 68:2
70:4,24 103:14
106:4 118:8,13
122:20 162:22
163:1 167:4,17,
19 168:19
180:21 183:8
185:3 187:17
191:10 192:4
195:22,25
196:7,15
197:18

**Sierra's**
168:23 184:10

**significant**
98:10 137:15

**signs** 101:1
102:10

**silver** 137:23

**similar** 70:4
80:21 81:1,4
89:3 153:8
154:3,15

**similarity**
149:21

**simple** 35:17

**simply** 42:4
65:25 70:3,7
89:23

**single** 93:2
99:6 134:24
135:11 151:14

**sir** 7:18 8:3,22
9:8,15,20,24

10:6,21 13:5
14:10 16:23
19:25 20:20,23
21:15 24:7
26:1,24 27:22
29:6 30:19,22
31:15 32:3
33:16 34:10,16,
22 35:12 36:13,
24 37:19 38:2
39:14,19,22
41:4 42:1 44:3
45:2 46:22 48:3
50:4 51:6 53:7
55:12 56:15
58:13 59:4
60:15 62:2 64:7
65:18 68:10
69:3 70:13,18
71:10 72:1,2
74:23 75:13
76:25 77:3
78:14,23 80:4,
18 93:21
100:14,21
102:1,17
103:12,20
104:24 106:3
114:2 115:1
116:6,11,18
118:19,23
119:4,8 120:16,
18,19,25 121:4,
8,10,18 122:10,
22 123:1,21
126:3,16
127:16 128:15
129:18,25
130:3,13 131:2,
17 132:25
134:10 135:15
136:4,8 138:3,
10,16 140:3,17
141:9 142:21
147:20 149:6
150:2 157:22
160:17,23
162:6,14,19
164:4 168:12
171:13 176:9
179:3 180:1,8
181:22 182:8,
13,24 183:5
184:7 185:25
186:13 187:1
189:16,20,25

190:5,20
191:14 192:13,
17 194:7 195:9
196:17 198:11
199:1,14 200:2

**sit** 34:25 178:7

**sitting** 12:16
35:18,22 37:3
72:11

**situation** 48:23
50:2,16 173:24

**skip** 149:8

**slipped** 155:20

**slips** 57:22

**sloppy** 182:16
183:2

**slow** 53:24

**small** 177:5,11,
15 180:2

**Smith** 49:12

**sna** 142:5

**Society** 130:11

**Solache** 14:6,
13 15:10,13,22
77:2,12

**Solaches**
198:10

**solemnly** 7:19

**solve** 139:13

**someone's**
99:10

**sort** 10:3 57:8
144:15 147:16

**sought** 162:17

**sound** 192:15

**sounds** 99:21
192:17 201:23

**speaking**
23:12,15,18
28:8 94:24 96:1
184:21

**speaks** 43:2
139:23



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA COURT REPORTERS**

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-64 Filed: 03/15/24 Page 74 of 77 PageID #:65852
The Deposition of NELSON ANDREW, taken on May 4, 2023
223

**Special** 127:1, 6

**specific** 32:22 33:7 34:22 35:6 51:2,20 68:3,6, 17 85:15 87:19 103:3 179:24

**specifically** 14:13 29:15 31:4 32:12,24 34:23 36:7,15 68:8 123:17 128:12 138:22 160:8 191:22, 25

**specifics** 51:8 52:7

**speculate** 168:2

**speculating** 97:12

**speculative** 37:25 46:6,21 48:12 49:9,24 50:11,25 51:18 52:4,20 53:6 54:1,12,23 55:11,18 73:6, 21 74:10,21 75:4,12 80:10 83:1 88:2 89:6 94:2,11 97:11 98:14 99:1 138:9,15 141:8 143:11 146:5 164:10,20 167:2 168:11 170:7 178:9 183:12,24 185:17,24 186:6 188:21 189:1,9,15

**spend** 33:15, 17 192:19

**spent** 180:21 192:16,19 196:14,24 197:12 198:1,5

**spoke** 45:17 95:12 149:23 153:8

**stakes** 181:15, 19,23 182:3 189:22

**stamps** 105:1

**stand** 38:15 107:6

**standards** 116:16,17,25 117:6,9,13,17, 19 130:15 131:13

**standing** 96:16

**staring** 146:1

**start** 53:11

**starting** 6:16 156:25

**state** 6:15 7:8 8:14 18:2 22:6 27:2 31:25 38:14 43:8,11, 24 61:1 71:14 72:7 73:23 86:25 154:14 159:10,14 163:12 164:12, 22,23 166:3,15 169:11

**State's** 32:2 43:17 74:15 159:21 163:17 164:16 165:9, 18,22 166:10

**stated** 12:20

**statement** 15:25 17:5,7,18 18:1,12 19:4,10 20:4 22:5 30:1, 6 31:18,25 36:18 39:12 41:6 42:9 43:23 44:10,12 45:1, 7,16,22 46:8, 12,16,18 47:3, 7,19,21,23 53:12 120:14 132:12 159:15 170:14

**statements** 17:15 20:13

27:1,9,10 29:1 32:1 38:14,16, 20,25 41:19,24 42:15,18 43:2, 4,6,11,17 44:2, 5,20,24,25 45:4,5,6,9,12 47:24 101:16 159:9,17 161:13 162:10

**States** 6:12

**stating** 133:19

**station** 187:22, 24 188:13,18

**stenographer** 45:15

**stenographers** 44:16

**stenographica lly** 44:15

**stinks** 178:4

**stipulate** 7:11

**stipulated** 7:13,14,15

**stone** 98:21 99:17

**stop** 23:20 28:8 32:22 177:21, 24

**stopped** 188:8, 9

**stories** 45:19 46:1 159:13

**story** 53:3 168:22

**strange** 28:23

**stranger** 98:25 99:24

**stranger's** 99:13

**street** 127:2 188:16

**strike** 9:16 11:16 15:11 24:25 48:6 64:20 79:13

80:14 89:15 98:11 113:10 128:1 138:18 142:17 143:7 172:21 173:25 184:19

**stuck** 186:8

**stuff** 175:21 176:4 177:3

**stupid** 175:13

**subjected** 25:23

**submit** 61:5

**submitted** 196:11,20

**subpoena** 194:21,23,24

**subsequent** 38:13 49:6 50:22 51:11 52:2 86:7 90:2 91:12 109:14 127:1 159:23 190:19

**sufficient** 111:10,15 170:20

**sufficiently** 80:21 81:1,4 89:3 101:20

**summary** 69:20 123:25

**supervisor** 62:21 63:12,22 183:1

**supervisors** 44:8 182:21

**supervisory** 62:23

**supplementar y** 21:19,21

**support** 22:3 32:23

**suppression** 81:5

**Supreme**

131:13

**surprise** 109:18

**suspect** 48:7, 20 54:7 55:8 79:4,6,23 80:16,22 85:22 89:4 90:3,13, 14,25 91:2,11, 13,25 92:4,21 96:5 122:20 134:1 180:7 185:22

**suspect's** 49:5 51:11

**suspected** 52:12 182:4

**suspects** 14:19 80:2,6 81:10 109:13 153:3 162:18, 23 163:2 185:15

**suspension** 59:19,21 60:8

**suspensions** 58:25 59:2

**Swaminathan** 6:18 7:13 8:1 11:1,4,12,25 12:8,15,23 14:4,11,22 15:2,20 16:2, 13,19 17:6,12 18:3,18 19:5,20 20:5,15,21,25 21:2,11 22:1, 17,21 23:2,4, 12,14,18,21 24:5,9,16,23 25:7,21 26:2,9, 18 27:15,23 28:8,13,16,18 29:16 30:4,9,16 31:8,16 32:17 33:4,10,11 34:19 35:10 36:3 37:2,14 38:3 39:2 40:10 41:1,3 42:13 43:13,25 46:15 47:8,16 48:5

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

49:3,18 50:5,19
51:7,16,23
52:9,23 53:17
54:4,15 55:5,
13,24 56:11
61:20 62:3,9
63:10,19 64:10,
19 65:4,13
66:22 67:6,11,
14,24 68:21
69:6,16 70:14
71:6,16,21
72:3,10 73:1,15
74:5,13,25
75:5,17 76:2,
13,21 77:20
78:6 79:11,21
80:5,13,19
81:15 82:3,10,
20 83:4,10,25
84:9,12 85:6
86:5,15 88:13,
21 89:14,24
90:10,23 91:19
92:17 93:1,9,16
94:5,14,22
95:4,11,19,25
96:9,20 97:6,16
98:3,9,15,22
99:8,20 100:4
101:14 103:7,
11,17,22,25
104:4,8,13,18,
21 105:11,17
106:2 108:3,16,
23 109:7
110:12,18
111:18 112:7,
14 113:9,20,25
114:10,17
116:23 117:4,
22 118:24
119:6,15,23
120:6 122:5
123:11 125:1,
16,23 126:19,
23 127:17,24
129:1,16 130:1,
23 131:3,11,22
132:10,19
133:1,17 134:6,
20 135:5,10,16
136:14,18,21,
22 137:10,20
138:5,11,17
139:2,13,16,25

141:2,10,15,19,
22 142:15
143:6,14 144:3,
12 145:8,23
146:10,16,23
147:7,18
148:11,18
149:2,19 150:8,
19 151:5,17,22
152:3,9,24
153:13,24
154:11,21
155:2,12,25
156:12 157:15,
23 158:7 159:2
160:10,18,24
161:7,15,25
162:12 163:15,
22,25 164:15
165:3,15 166:6,
20,23 167:9
168:5 169:1,12,
19 170:3,12,22
171:6,15 172:1,
10,20,25
173:15,21
174:8,14,17,22
175:1,4,6,10,
13,16,24 176:2,
6,11,21 177:4,
10,14,18,22
178:2,5,12
179:1,9,14,22
180:15 181:1,8,
14,20 182:2,9,
14,20,25 183:6,
19 184:3,8,16
185:11,19
186:1,11,17
187:4,12,21
188:14,24
189:5,11,17,21
190:1 191:1,11
192:12 193:2,5,
8,20 194:2,16,
22 196:5 197:4
198:18 199:11,
15 201:8,13,15,
18,20

swap 184:25
swear 7:20
44:6,7,25
swore 141:4

sworn 41:5
42:9,15,17,21,
24 43:22 44:2,
5,25 46:8,12,
16,18 159:9

Sydney 6:3
56:8 67:21
105:24 142:5,
12 178:23
200:25

synopsis
22:16

_____

T

_____

T-SHIRT 111:8

takes 143:8
144:1

taking 9:21
145:22,25
193:21,24

talk 166:4

talked 135:23
142:17 152:10,
12

talking 18:4
32:7 41:19
53:11 71:19
82:9 104:13
114:12 130:15
143:1 147:1
163:16,23
177:8,11,19

talks 128:22
148:2

tape 44:16
45:15

taught 86:24
189:4

technically
57:10

technician 6:4

technicians
172:23 173:4,9

techniques
26:4

telling 46:24

65:24 77:17
95:7 121:24
160:4 177:14

tells 166:10
168:16

ten 33:19,24
48:7,9 55:25
56:2 60:18,20
61:7 86:12,21
89:16 90:7
96:15 142:4
144:22 145:1,2,
7,10,16 146:13,
18 147:9,14

terms 97:18,24
192:15

test 104:9
154:7

testified 13:1
14:13 25:22
30:10 35:2,23
37:5,15 71:18,
22 111:19,24
139:22 148:7,
15 149:13
155:14 179:5

testify 70:5

testifying 10:7
41:13

Testimonial
169:18

testimonies
30:24 32:7 37:1
156:5 159:12
191:16

testimony
7:20 10:5
11:16,17 12:2,
5,22 13:24
14:6,24 15:6,
10,11,13,21
16:21,24 17:8,
16,20,24 18:13,
21,25 19:16,24
21:4 22:12
24:2,4,11,13,17
25:2,11,18
26:13,20 27:5,
25 29:12,18,19
30:15,20,21

31:6,11 32:4,5,
10,11,14,16,18
35:1,5,8,16,20
36:1,5,11,13
38:13,21 39:7
40:5,11,19,22,
23,24 41:2,5,6,
10,11,16,19,21
42:3,21,24
44:24 47:14
49:11 52:10
69:17 70:23
71:9 73:10
77:12 88:18
90:17 103:4
109:24 111:22,
23 112:22
113:18 121:16
124:4,7 132:15
133:11 140:10
144:22 145:2,6
146:12,25
148:17,21
150:10,11,14,
15 152:4,14,17,
22,25 153:15,
19,20 156:2,11
157:17 158:13,
18 159:5,11,23
160:12,21,25
161:9,17,23,24
162:2 166:12
168:11 190:9,
12,15,17,19,21,
23 191:3,5,8,
13,25

theft 59:6

thing 58:18
97:17 103:17
163:24 165:20
173:16 175:18,
19 191:24
194:6 200:15

things 30:5,11
46:3 57:22
60:12 66:6,7,24
67:8 68:3,9,13
95:7 102:14
113:6 116:9
129:5,10,20
134:22 137:14
153:9,10
185:14,20,21
186:2 197:21

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

199:20

**thinking** 57:2
169:25

**Thomas** 6:10,
19 16:3 36:22
37:4 66:23 68:2
70:24 180:21
183:8 184:9
195:25 196:7

**thought** 11:18
66:25 94:16
96:4 193:2

**thousands**
32:8 160:6

**threatened**
25:23

**throw** 101:1
105:14

**thrown** 72:13,
20 73:3 75:7,19
76:3 134:9,13
135:1,13
180:11,18,22

**Tiderington**
92:10 125:17
126:9,13,24
127:8 128:12,
17 129:5 131:5
133:6 136:19
138:21 140:10
193:3

**Tiderington's**
34:13 124:18
125:3,6,11
126:5 132:21
135:18 137:13
140:5,6

**time** 6:8 11:15,
16 19:10 33:2,
15,17 44:18
45:10,19 48:24
51:20 52:14
53:14 54:14,16
56:4,9 57:11
59:18 62:6,13
63:20 64:21
67:17,22 78:13
85:18 86:17
87:13,20 89:9
91:17,18,22

94:23 96:8,13
98:12 105:13,
20,25 110:17
113:5 118:11
124:11 133:4
137:8,11 142:8,
13 143:1,8
144:9,11,24,25
147:3,6 151:21
159:18 166:17
168:23 170:11
178:19,24
188:23 192:15,
18 196:14,15,
23,24 197:12,
16 198:1,5
200:9,21 201:1,
24

**times** 8:7,10,
13,18 28:25
42:4 44:22
48:8,9 53:19
54:18 55:8 60:7
71:8 87:2 88:8
90:20 97:2
100:2 152:7
162:5 190:25
191:19

**tint** 101:3
153:22

**tinted** 100:17,
23,24 148:16
153:10

**tints** 101:10,11,
19

**today** 6:5,7
9:19,23 10:20
11:18 12:10,16
34:25 35:18,22
37:4 56:8 67:21
72:11 105:24
139:19,22
142:12 178:23
200:25

**today's** 34:15

**told** 32:12 35:2
37:5,15 40:9
45:13 46:4
84:19 102:12
103:5 120:13
137:22,25
152:7 155:23

167:5,21,24
168:18 176:13,
23

**tomorrow**
168:3

**Tony** 198:15

**top** 68:19

**total** 22:16
79:10,17 86:19
89:16 197:25
198:1

**totality** 15:18
22:9 25:16
77:18 152:21
157:12 158:5,
25 180:19
191:20 192:10

**towed** 188:10,
19,23

**track** 151:14

**train** 182:21

**training** 20:10
27:21 116:13
162:8

**transcript**
10:5,18,24 11:7
12:12 16:21
41:7 201:12

**transcripts**
13:25

**transfer**
200:12

**transferred**
200:8

**traumatic**
113:3

**treated** 70:9

**treatment**
59:16 62:15
63:14

**Trempe** 102:20
106:18 107:10,
24 108:4,14,19
109:1 110:13
111:19,24
112:17,23
113:13

**Trempe's**
102:21 113:8

**trial** 18:13,21
19:1 29:12,18
30:21 32:5,10
35:8,15 36:1,5,
10,13 40:24
41:6,21 42:3,23
49:11 61:16
70:5 71:23
73:25 81:6
148:15,17,20
150:10,15
153:19 159:12,
23 161:23
174:24 177:25

**trials** 8:15,18

**trickster**
151:23

**trier** 19:18
65:25 155:23
156:11 191:23

**true** 14:24 16:5,
24 53:8 65:22
100:19,22
134:4 150:25
156:3,7 157:17
158:1 161:18,
21 162:2 180:4

**truth** 7:21,22
65:24,25 77:17
95:7 155:24
160:4

**truthful** 11:20
19:11 20:3,14
29:2 30:3 70:6
95:22 157:10
192:11

**truthfully** 9:23

**truthfulness**
20:6 156:5
158:20

**turn** 23:9

**turned** 128:3

**twins** 81:1

**type** 20:9 23:16
58:18 65:12
141:13 169:17

**types** 57:15,18
60:11

**typical** 90:12
91:2,4,10,20,23

**typically** 52:16
87:9 96:22
144:5

**typing** 197:22

———

**U**

**Uh-huh** 149:20

**ultimately**
19:12,21 27:8,
17 29:17 38:18
47:6 70:15
101:21 113:10,
11 122:18
124:14 156:1
161:16 197:24

**unable** 143:25

**underlying**
73:4 76:6

**underneath**
79:2

**understand**
8:20 9:4,5,6,18,
22 11:6 14:3,9,
12 29:5 30:18
41:4,9,22,25
42:2,8,14,17,
20,23 43:1
52:10 69:11
85:3 88:19,23
108:9 122:11
129:4 143:12
159:3,6 166:8
197:11

**understanding**
10:24 37:3
43:17 47:11
62:25 72:12,19
108:17,24
130:16 144:8
145:25 163:6
180:9,20

**understood**
9:2,10 106:13
107:19 108:4
137:14 151:6



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

186:18

**uniformed** 109:12 110:4 199:4

**uniforms** 59:9

**unit** 60:11,25

**United** 6:12

**unreliable** 132:2,18 133:20

**unsworn** 41:25 42:14 43:2

**untrue** 12:6

**untruthful** 12:2

**untruthfulness** 20:8

**unusual** 105:7

**useless** 174:12

_____

**V**

**vacated** 73:17

**valuable** 41:18 110:25

**variety** 19:9

**vehicle** 18:20 102:9 107:15 111:5,17 122:24 123:3 149:14,22,23 151:4 153:2 154:2,4,10,24 155:7,14 156:9 171:18,20,22 172:3,8,12,17 173:1,2,6,10 174:1 175:7,17 185:13,15,21 186:3 187:16, 22 188:1,7,16

**verbal** 9:1 41:11,16 59:25

**version** 120:13 197:6

**versions** 138:13

**versus** 98:25 143:17

**victim** 18:20 21:9 143:22 181:23

**victim's** 21:10 110:5 181:24

**video** 6:4 44:12,14,18 104:19 105:9, 11 193:22 201:14

**videoconference** 6:9 56:8 67:21 105:24 142:12 178:23 200:25

**view** 31:2 36:8 37:1 81:18 87:5 90:14,25 91:1, 11,25 98:12

**viewed** 82:5 84:5,13 89:19 92:2,5 102:11

**viewing** 90:13 91:11,12 98:24 146:19

**Villegas** 198:25

**violate** 199:22 200:4

**violation** 129:12

**violations** 73:19 161:1

**visible** 97:23

**vision** 66:20

**visiting** 122:16

**vital** 122:17

_____

**W**

**Wacker** 6:6

**Wait** 126:17 194:14

**wallet** 110:6

**wanted** 87:4, 11 168:20

**warrant** 170:10

**wasting** 151:21

**water** 55:19,20

**ways** 95:20,24 185:22

**weapon** 170:16 186:16, 18

**wearing** 97:14 111:8,11

**website** 118:2

**weeks** 185:5

**weight** 159:16 160:4

**West** 56:23 57:3,5,19 58:4, 6,22 59:3,18 62:5,13

**wheels** 149:23 153:8

**white** 107:11 108:7 111:8 113:13

**Whoops** 195:7

**windows** 100:17,23,24 101:4 148:16 153:10,23

**witness's** 45:22 50:22 93:3 102:25 144:16

**witnesses** 40:5 41:20 44:2,5,20 45:4, 8,12,13,18 47:9 77:13 81:18 82:5,22 83:12 84:5,13 86:7,8 94:17,24,25

95:13,21 100:8, 12 101:6 102:5 103:5 110:9 111:21 112:20 113:2 114:5 129:12 142:16, 23 145:19 152:22 153:20 158:21 162:21 176:22 186:8 187:23 190:15 191:8 192:1,6

**witnesses'** 45:19 46:1

**Woitowich** 136:6 137:4,16, 22

**woman** 120:5

**word** 41:4,9 50:12 62:17 92:14

**words** 29:4 47:9 52:16 78:20 82:17 84:17 115:12 145:24

**work** 57:7 60:24 65:12 76:5 163:1 195:10,17 196:8

**worked** 61:18 62:13 65:7 92:16 134:11, 13,18 135:12 198:8,21

**working** 44:1,4 64:21 198:12, 19 199:6

**works** 8:21,24 104:7 193:16

**world** 130:17 131:7

**would've** 62:20 68:9 69:4 111:6 168:7 172:2,8,9 184:10,14 185:1,2,7

**Wow** 194:6

**write** 9:2 45:4, 5,7,8 119:21

**writes** 131:23

**writing** 33:21 44:13 192:20 197:13,17,19

**written** 18:12 27:1 45:3,16 102:19 133:6 137:4,6 149:3 158:24 174:6 175:11

**wrongdoing** 56:13

**wrongful** 199:2

**wrote** 130:21 131:9,20 133:13,23

_____

**Y**

**yards** 94:8,12 97:3,13

**Ye** 83:14

**years** 28:21 57:6 60:4,6 63:11 92:3,4 99:4 111:7 180:10,16,25

**yesterday** 194:19

_____

**Z**

**Zoom** 6:19,23 7:1,3,6



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com