# Exhibit MMM

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

# CASE NO. 1:18-CV-1028

# CASE NO. 1:18-CV-2312

# ARTURO DELEON-REYES

# V.

# REYNALDO GUEVARA, ET AL.

# AND

# GABRIEL SOLACHE

# V.

# CITY OF CHICAGO, ET AL.

# DEPONENT: BERNARD MURRAY, VOLUME I

# DATE: FEBRUARY 7, 2023



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com
☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION
               CASE NO. 1:18-CV-1028
3               CASE NO. 1:18-CV-2312

4

5             ARTURO DELEON-REYES,
                 Plaintiff

6

7                  v.

8           REYNALDO GUEVARA, ET AL.,
                Defendants

9

10                  AND

11

12           GABRIEL SOLACHE,
                 Plaintiff

13

14

15          CITY OF CHICAGO, ET AL.,
                Defendants

16

17

18

19

20

21

22

23  DEPONENT:  BERNARD MURRAY, VOLUME I

24  DATE:       FEBRUARY 7, 2023

25  REPORTER:  EMILIA LOPEZ



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

APPEARANCES

1               APPEARANCES

2

3  ON BEHALF OF THE PLAINTIFF, ARTURO DELEON-REYES:

4  Anand Swaminathan, Esquire

5  Annie Prossnitz, Esquire

6  Loevy & Loevy

7  311 North Aberdeen Street

8  Third Floor

9  Chicago, Illinois 60607

10  Telephone No.: (312) 243-5900

11  E-mail: anand@loevy.com

12  (Appeared via Videoconference)

13

14  ON BEHALF OF THE PLAINTIFF, GABRIEL SOLACHE:

15  Jan Susler, Esquire

16  People's Law Office

17  1180 North Milwaukee Avenue

18  Chicago, Illinois 60642

19  Telephone No.: (773) 235-0070

20  E-mail: jsusler@peopleslawoffice.com

21  (Appeared via Videoconference)

22

23

24

25

Page 4

1            APPEARANCES (CONTINUED)

2

3

4  ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:

5  Michael J. Schalka, Esquire

6  Leinenweber Baroni & Daffada LLC

7  120 North La Salle Street

8  Suite 2000

9  Chicago, Illinois 60602

10  Telephone No.: (866) 786-3705

11  E-mail: mjs@ilesq.com

12  (Appeared via Videoconference

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1        APPEARANCES (CONTINUED)

2

3  ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO AND THE

4  DEPONENT, BERNARD MURRAY:

5  Theresa Berousek Carney, Esquire

6  Rock Fusco & Connelly, LLC

7  333 West Wacker

8  Floor 19

9  Chicago, Illinois 60606

10  Telephone No.: (312) 494-1000

11  E-mail: tcarney@rfclaw.com

12  (Appeared via Videoconference)

13

14  ON BEHALF OF THE DEFENDANTS, ERNEST HALVORSEN, EDWIN

15  DICKINSON, R. RUTHERFORD, STANKUS, NAUJOKAS, J.

16  KARALOW, MARK HARVEY, DANIEL TREVINO, EDWARD MINGEY,

17  BIEBEL, AND FRANK J. CAPPITELLI:

18  Caroline Golden, Esquire

19  The Sotos Law Firm, P.C.

20  141 West Jackson Boulevard

21  Suite 1240A

22  Chicago, Illinois 60604

23  Telephone No.: (630) 735-3300

24  E-mail: cgolden@jsotoslaw.com

25  (Appeared via Videoconference)

Page 5

1               INDEX

2                             Page

3  PROCEEDINGS                           7

4  DIRECT EXAMINATION BY MR. SWAMINATHAN     9

5

6

7               EXHIBITS

8  Exhibit                         Page

9  1 - Expert Report               35

10  2 - Mr. Brasfield's Report       67

11  3 - Materials Reviewed         71

12  4 - Special Order 83-1        121

13

14

15

16

17

18

19

20

21

22

23

24

25



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273** Phone
**502.584.0119** Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

STIPULATION

The VIDEO deposition of BERNARD MURRAY, VOLUME I was taken at KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET, SUITE 101, LOUISVILLE, KENTUCKY 40220, via videoconference in which all participants attended remotely, on TUESDAY, the 7th day of FEBRUARY, 2023 at 10:08 a.m. CENTRAL TIME; said VIDEO deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. The oath in this matter was sworn remotely pursuant to FRCP 30.

It is agreed that EMILIA LOPEZ, being a Notary Public and Court Reporter for the State of ILLINOIS, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

Page 7

PROCEEDINGS

THE REPORTER: Okay. We're now on the record. My name is Emilia Lopez. I'm the online video technician and court reporter today representing Kentuckiana Court Reporters, located at 730 West Main Street, Suite 101, Louisville, Kentucky, 40202. Today is the 7th day of February 2023 and the time is 10:08 a.m. Central Time. We're convened by videoconference to take the deposition of Bernard Murray in the matter of Arturo DeLeon-Reyes v. Reynaldo Guevara, et al., case number 1:18-CV-1028, and Gabriel Solache v. City of Chicago, et al, case number 1:18-CV-2312 pending in the U.S. District Court for the Northern District of Illinois Eastern Division. Will everyone but the witness please state your appearance, how you're attending, and your location, starting with the plaintiff's counsel?

MR. SWAMINATHAN: Hi, good morning. Anand Swaminathan for Plaintiff Arturo DeLeon-Reyes, appearing by Zoom from Chicago.

MS. SUSLER: Jan Susler on behalf of the plaintiff Gabriel Solache also on Zoom in Chicago.

MS. CARNEY: Theresa Carney on behalf --

Page 8

MR. SWAMINATHAN: I'm sorry, Theresa, we have my colleague Annie's on --

MS. CARNEY: Oh, sorry. Go ahead.

MR. SWAMINATHAN: So I decided to let her join in. Sorry.

MS. PROSSNITZ: Annie Prossnitz appearing on behalf of Mr. Reyes, appearing from Washington D.C.

MR. SCHALKA: Michael Schalka on behalf of Defendant Guevara, appearing from -- remotely from Chicago.

MS. GOLDEN: Caroline Golden for the individual officer defendants Halvorsen, Dickinson, Rutherford, Stankus, Naujokas, Karalow, Harvey, Trevino, Mingey, Biebel, and Cappitelli.

MS. CARNEY: Theresa Carney on behalf of the City of Chicago, as well as the department.

THE REPORTER: Thank you. And Mr. Murray, will you please state your full name for the record?

THE WITNESS: Yes. Bernard Murray.

THE REPORTER: Murray. Okay. Do all parties stipulate that the witness is in fact Bernardo [sic] Murray?

MR. SWAMINATHAN: So stipulated for Plaintiff Reyes.

Page 9

MS. SUSLER: So stipulated for Plaintiff Solache.

MS. CARNEY: For the record, it's Bernard not Bernard.

THE REPORTER: Bernard? Okay. Sir, will you please raise your hand? Do you solemnly swear or affirm the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE REPORTER: Thank you.

DIRECT EXAMINATION
BY MR. SWAMINATHAN:

Q. Good morning, Mr. Murray. Could you please state and spell your name for the record?

A. It's Bernard Murray, B-E-R-N-A-R-D. Murray, M-U-R-R-A-Y.

Q. Okay. And we've met before in prior instances. Nice to see you again. Let me start by asking you, sir, you have given depositions before in the past, correct?

A. I have.

Q. Okay. In how many instances have you been deposed?

A. Twice.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1     Q.  Okay.  And were both -- those both in matters
2  in which you were serving as an expert consultant for
3  the City of Chicago?
4     A.  Yes.
5     Q.  Have you ever taken depositions before?
6     A.  No.
7     Q.  Okay.  And obviously you have -- you -- you're
8  a longtime former prosecutor, correct?
9     A.  Current prosecutor.
10    Q.  Current prosecutor.  My apologies.  Where are
11  you currently a prosecutor?
12    A.  DuPage County State's Attorney's Office.
13    Q.  Okay.  All right.  You're still there at this
14  time?
15    A.  I am.
16    Q.  And when did you begin there?
17    A.  I started in DuPage County in January of 2009.
18    Q.  And in that capacity, you are a trial
19  prosecutor, correct?
20    A.  I'm -- I'm -- I'm in supervisory roles though
21  I also conduct trials.
22    Q.  Okay.  Suffice to say you have a lot of
23  experience questioning witnesses under oath, correct?
24    A.  I have.
25    Q.  Okay.  All right.  Let me just go through the

Page 11

1  ground rules, although I know you know them, but let's
2  go through them quickly.  So this is obviously a
3  deposition.  Basically a question and answer session.
4  I'll ask my questions, you'll answer them to the best of
5  your ability.  And the court reporter is going to take
6  it all down, so during the deposition, please make sure
7  that I complete my question before you answer my
8  question so the court reporter is not trying to take
9  down two people at the same time, fair?
10    A.  Yes.
11    Q.  Okay.  If for some reason I have cut you off,
12  because I thought you finished your question, please let
13  me know and I'll let you continue, okay?
14    A.  Yes.
15    Q.  And likewise, there may be times when you know
16  where I'm going with my question and there'll be many
17  times where you know where I'm going with my question.
18  Please make sure I've completed my question before you
19  answer, fair?
20    A.  Yes.
21    Q.  Again, because the court reporter is
22  trying to write it all down, no non-verbal
23  communication, no "uh-huhs" or nods of your head, okay?
24    A.  Yes.
25    Q.  If I ask you a question and you don't

Page 12

1  understand it, please tell me and I will rephrase the
2  question, okay?
3    A.  Yes.
4    Q.  And if you -- if I ask you a question and you
5  answer my question, I'll assume you understood my
6  question; is that fair?
7    A.  Yes.
8    Q.  Okay.  If at any time you need to take a
9  break, we can take a break.  Please just let me know and
10  we will do that.  The only requirement is that you
11  complete answering any pending question before we take a
12  break, okay?
13    A.  I understand.
14    Q.  Okay.  This is a yes or no question, so I'm
15  not looking to get into your medical history in any way.
16  Do you have any medical conditions that would prevent
17  you from being able to understand my questions and
18  answer them truthfully today?
19    A.  No.
20    Q.  And, sir, are you taking any medications that
21  would prevent you from being able to understand my
22  questions and answer them truthfully today?
23    A.  No.
24    Q.  Okay.  All right.  Can you tell me in how many
25  instances you have served as a -- as an expert in

Page 13

1  litigation?
2    A.  Two.
3    Q.  Two cases prior to this one; is that right?
4    A.  Yes.
5    Q.  Okay.  And are those two cases both completed
6  at this stage?
7    A.  Yes, they are.
8    Q.  Okay.  And I'm going to venture a guess that
9  the two prior cases in which you served as an expert are
10  the Jacques Rivera case and the Nathson Fields case; is
11  that correct?
12    A.  That's correct.
13    Q.  Okay.  And so since the -- since you're --
14  since -- strike that.  Since the conclusion of your
15  involvement in those cases, the next case in which
16  you have served as an expert is this case, the Reyes,
17  Solache case; is that correct?
18    A.  Yes, it is.
19    Q.  Okay.  And are you serving as a -- as an
20  expert in any other cases?
21    A.  No.
22    Q.  Okay.  Have you been retained to serve as an
23  expert in any other cases?
24    A.  No.
25    MS. GOLDEN:  Objection.  Calls for an invasion



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Page 14**

1 of the privilege.  Or potentially does, but I'll
2 withdraw it based on the answer.
3 BY MR. SWAMINATHAN:
4   Q.   All right.  And how much are you being paid
5 for your work in this case?
6   A.   I am not being compensated.
7   Q.   When you say you're not being compensated, are
8 you doing the case for free?
9        MS. CARNEY:  Objection.  Form.
10       THE WITNESS:  I'm -- I'm -- I'm not being
11 compensated.  Work -- work requirements and
12 (Inaudible).
13 BY MR. SWAMINATHAN:
14   Q.   Oh, sorry.  It -- the -- it -- the -- it's
15 cutting out as you're talking there, so I only got half
16 your answer.
17   A.   I'm not being compensated because my -- my
18 DuPage County State's Attorney's Office employment
19 precludes me from accepting monetary legal employment
20 outside of the office.
21       MR. SWAMINATHAN:  Okay.  It's kind of coming
22       in and out a little bit for me.  Madam Court
23       Reporter, is this -- are you getting the same
24       thing?
25       THE REPORTER:  Yeah, it is.

**Page 15**

1        MR. SWAMINATHAN:  Can we try to see, is there
2        a mic that we can move a little closer?  Maybe it's
3        just not catching him all the time.
4        MS. CARNEY:  It's in the ceiling, so I can't
5        move it.  So just to keep --
6        THE WITNESS:  I'll keep my voice up.
7 BY MR. SWAMINATHAN:
8   Q.   Okay.  Let's see if that works.  I'm going to
9 ask the question again, I apologize, and let you answer
10 again, just because it came in and out from what we
11 heard, okay?  So let me just ask it again.  Sir, are you
12 doing this case for free?
13   A.   My employment with DuPage County State's
14 Attorney's Office precludes me accepting compensation
15 for legal work outside of that office.  Not accepting
16 --
17   Q.   Okay.
18   A.   -- compensation for that reason.
19   Q.   Okay.  And is there anybody who's receiving
20 compensation for your work in this case?  DuPage County,
21 or anybody else?
22   A.   No.
23   Q.   Okay.  When you agreed to offer expert
24 opinions in this case, did you do so with an
25 understanding that you would not receive any

**Page 16**

1 compensation for your work?
2   A.   No.  I -- I thought I could be compensated
3 when I accepted expert in this case.
4   Q.   Okay.  Did you get -- you -- I think it cut
5 out a little bit there, but I think I got it --
6   A.   I -- I -- I expected to be compensated when I
7 was employed in this case.
8   Q.   Okay.  And how recently did you learn that you
9 could not be compensated?
10   A.   I believe it was August or September --
11   Q.   Okay.
12   A.   -- 2022.
13   Q.   And at that point, had you submitted any
14 invoices on the matter?
15   A.   No.
16   Q.   And at -- to date, have you submitted any
17 invoices on the matter?
18   A.   I have not.  I've totaled up my hours that I
19 worked on the case, but I -- obviously it's not for
20 received compensation.
21   Q.   Okay.  What is the hourly rate that you had
22 agreed upon prior to you -- to learning that you could
23 not be compensated?
24   A.   $200 an hour when I'm working on the file,
25 filing my report, and $300 an hour for deposition or

**Page 17**

1 court testimony.
2   Q.   Okay.  And if you had -- strike that.  If you
3 had known that you could not be compensated for your
4 work on this matter, would you agree to be retained and
5 offered disclosed opinions in this matter?
6        MS. CARNEY:  Form.
7        THE WITNESS:  I've -- I had already done -- I
8        already received the file and was ready to work on
9        it, so I don't know how I would answer that.  I
10       would have to say that I felt I'd already been
11       familiar with the case, I would've stayed on it.
12 BY MR. SWAMINATHAN:
13   Q.   If you are asked to perform -- strike that.  If
14 you're asked to perform expert work on behalf of the
15 City of Chicago in a future case, I assume the DuPage
16 County requirements would still apply to you, correct?
17   A.   Yes.
18   Q.   In other words, if you were asked to work on
19 future work, you would not be able to be compensated for
20 that work, correct?
21   A.   Yes.
22   Q.   And if you're asked for --
23       MS. GOLDEN:  Object to foundation.
24 BY MR. SWAMINATHAN:
25   Q.   And if you are asked to perform future work

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Page 18**

1  for the City of Chicago and offer disclosed opinions, do
2  you intend to agree to do such work if the facts are
3  right or at this point, knowing that you can't be
4  compensated, would you decline to perform expert work?
5         MS. GOLDEN:  Form.
6         MS. CARNEY:  Form.  Calls for speculation.
7  BY MR. SWAMINATHAN:
8      Q.  Go ahead.
9      A.  I don't know.
10     Q.  You know -- you're not sure what you would do
11 in that situation?
12     A.  I'm not sure what I would do in that
13 situation.
14     Q.  So it's possible that in --
15        MS. GOLDEN:  One second, Anand.  Anand.
16        MR. SWAMINATHAN:  Go ahead.
17        MS. GOLDEN:  Please, just one second.  I'm --
18        have a belated objection to form.  Thank you.
19 BY MR. SWAMINATHAN:
20     Q.  In future cases, you would consider --
21        MS. CARNEY:  One second.
22        MR. SWAMINATHAN:  Oh, I'm sorry.  Somebody's
23     saying something?
24        MS. CARNEY:  You need to listen and, like,
25     give a second for people to object.

**Page 19**

1         THE WITNESS:  I will.
2         MS. GOLDEN:  Yeah.  Mr. Murray, just with the
3     lag in the video feed, I don't want to interrupt
4     you.  So if you could just pause for a second before
5     answering, just so I can get a chance to object if
6     I need to.  Appreciate it.
7         THE WITNESS:  Yes, I will.
8         MS. GOLDEN:  Thank you.
9  BY MR. SWAMINATHAN:
10     Q.  So if you're asked to offer disclosure
11 opinions in future cases for the City of Chicago, you
12 would consider doing so even if you're not compensated;
13 is that fair?
14        MS. CARNEY:  Objection.  Form.  Calls for
15     speculation.
16        THE WITNESS:  I don't know.
17 BY MR. SWAMINATHAN:
18     Q.  I'm asking if you would consider it or if you
19 would preclude it.  Is the answer you would consider it
20 or the answer is you don't know if you would consider
21 it?
22        MS. GOLDEN:  Objection.  Asked and answered.
23        THE WITNESS:  I don't know if I would consider
24     it.
25 BY MR. SWAMINATHAN:

**Page 20**

1      Q.  Okay.  All right.  How many total hours have
2  you said you've -- strike that.  You said you've kept a
3  total of the number of hours you worked on this matter.
4  How many hours is that?
5      A.  Check the document I created, approximately 41
6  hours.
7      Q.  Okay.  And is that 41 hours up to and through
8  the time of your disclosed report, or at some point
9  before or after that?
10     A.  It's through my disclosed report.  No, I'm
11 sorry.  It's through this morning.
12     Q.  Through this morning, okay.  So if I
13 understand correctly, you've totaled up your hours in a
14 document up to this point and it's 41 hours; is that
15 right?
16        MS. CARNEY:  Objection.  Form.
17 BY MR. SWAMINATHAN:
18     Q.  Go ahead.
19     A.  It's -- I'm -- I'm approximating it, but I
20 think it's 41 hours through this morning.
21     Q.  Okay.  And how many hours did you spend
22 preparing for today's deposition?
23     A.  Maybe two hours last week.
24     Q.  And that two hours, was that reviewing
25 materials or was that in meeting with Counsel?

**Page 21**

1      A.  Both.
2      Q.  Okay.  So -- strike that.  Have you had any
3  meetings with Counsel in preparation for today's
4  deposition?
5      A.  Yes.
6      Q.  And how long was your meeting with Counsel?
7      A.  Approximately two, two and a half hours.
8      Q.  Okay.  Who was present at that meeting other
9  than yourself?
10     A.  Ms. Carney.
11     Q.  Anyone else?
12     A.  No.
13     Q.  And during that meeting, did you review your
14 expert report?
15     A.  Yes.
16     Q.  Did you review any other materials?
17     A.  I had the -- Mr. Tiderington's report as well.
18     Q.  Anything else that you reviewed in that
19 meeting?
20     A.  No.
21     Q.  Did you do anything else to prepare for
22 today's deposition other than that two to two and a half
23 hour meeting with Ms. Carney?
24     A.  I read over the same materials yesterday.
25     Q.  When you say same materials, you're referring

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1  to your report and the expert report of Mr. Tiderington,
2  correct?
3      A.  Yes.
4      Q.  Okay.  Anything else you did to prepare for
5  today's deposition?
6      A.  I also looked at a police order.  I think it's
7  8301.  And I looked at parts of my previous deposition
8  Rivera.
9      Q.  And you did that outside the presence of
10  Counsel, I take it?
11      A.  Yes.
12      Q.  Okay.  And how long did you spend reviewing --
13  strike that.  Anything else that you reviewed other than
14  the -- your expert report, expert report of Mr.
15  Tiderington, special order 83-1, and parts of your
16  Rivera deposition?
17      A.  Preparing for the deposition, that's all I
18  reviewed.
19      Q.  Okay.  And how long did you spend reviewing
20  the special order and the parts of the Rivera
21  deposition?
22      A.  Reviewing the deposition, maybe longer, maybe
23  three hours as well as the report.
24      Q.  You cut out there.  "Three hours as well as,"
25  and I didn't catch it.

Page 23

1      A.  Also included in that time was the deposition
2  and the police order.
3      Q.  Okay.  So in preparation for this deposition,
4  you've spent approximately five to five and a half hours
5  meeting with Counsel and reviewing certain documents; is
6  that fair?
7      A.  That sounds like a good approximation.
8      Q.  Okay.  Anything else you've done in the period
9  between the time that you completed your expert report
10  in this matter and this morning?
11      A.  No.
12      Q.  Okay.  So if we want to understand the total
13  hours that you've spent approximately in preparing your
14  report, it would be the 41 hours, up to this point,
15  minus the five to five and a half hours you spent in
16  preparation; is that fair?
17      A.  No, that -- actually that's not accurate.  I'd
18  say the five hours are in -- in addition to the 41.
19      Q.  Okay.  So 41 hours was up to the point that
20  you completed your disclosed report?
21      A.  That's correct.
22      Q.  And then you spent an additional five to five
23  and a half hours on -- in preparation for this
24  deposition.  Do I have that right?
25      A.  Yes.

Page 24

1      Q.  Okay.  When you reviewed your testimony, you
2  said it was the deposition that you gave in the Jacques
3  Rivera case; is that correct?
4      A.  Yes.
5      Q.  When you reviewed your testimony from the
6  Jacques Rivera deposition, did you find anything in that
7  deposition transcript that was incorrect?
8      MS. CARNEY:  Objection.  Form.
9      THE WITNESS:  No.
10  BY MR. SWAMINATHAN:
11      Q.  Let me strike that.  Let me ask a better
12  question.  When you reviewed your testimony from the
13  Rivera deposition, did you find that there were any
14  answers you had given that were inaccurate or incorrect?
15      A.  No.
16      Q.  When you reviewed that deposition transcript
17  from the Rivera matter, did you find that there were any
18  answers you were given -- you had given that were false?
19      A.  No.
20      Q.  Do you stand by the answers you gave in the
21  transcript of the Rivera deposition?
22      A.  Yes.
23      Q.  Okay.  Have you at any point reviewed the
24  testimony that you gave at the Rivera trial?
25      A.  No.

Page 25

1      Q.  At any point since you completed that
2  testimony at the Rivera trial, did you think to yourself
3  -- strike that.  At any point, have you come to believe
4  that there was any testimony you gave at the Rivera
5  trial that was false or inaccurate?
6      A.  No.
7      Q.  Do you have any reason to believe any of the
8  testimony you gave at the Rivera trial was false or
9  inaccurate?
10      A.  No.
11      Q.  And do you stand by the testimony you gave at
12  the Rivera trial?
13      A.  Yes.
14      Q.  Have you had an opportunity to review your
15  testimony from the Nathson Fields trial?
16      A.  No.
17      Q.  Did you review it in preparation -- strike
18  that.  Did you review your testimony at the Fields trial
19  in your work in preparing your expert report in the
20  Rivera case?
21      A.  I -- I may have reviewed my deposition in
22  preparing for the Rivera deposition, but frankly I -- I
23  don't recall right now if -- if I did that.  I think I
24  did that.  That's what I'm guessing.
25      Q.  In other words, you recall reviewing your



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 10 of 104 PageID #:65947
The Deposition of BERNARD HARCOURT, Volume 1, taken on February 7, 2019
26..29

Page 26

1  Fields deposition testimony during the course of your
2  involvement in the Rivera matter; is that fair?
3       A.   That's my best recollection.
4       Q.   Okay.  At any point when you reviewed your
5  testimony from the Fields deposition, did you find that
6  any of the answers you had given were false or
7  inaccurate?
8            MS. GOLDEN:  Object to foundation.
9            THE WITNESS:  No.
10 BY MR. SWAMINATHAN:
11      Q.   At any point after you completed -- strike
12 that.  At any point during or after the Fields
13 deposition, did you believe that you had provided any
14 information that was false or inaccurate?
15           MS. GOLDEN:  Same objection.
16           THE WITNESS:  No.
17           MS. GOLDEN:  Add form.
18           THE WITNESS:  No.
19 BY MR. SWAMINATHAN:
20      Q.   And do you stand by your deposition testimony
21 in Fields?
22           MS. GOLDEN:  Form.
23           THE WITNESS:  Yes.
24 BY MR. SWAMINATHAN:
25      Q.   And have you had an opportunity at any point

Page 27

1  to review your trial testimony in the Fields matter?
2       A.   No.
3       Q.   At any point during or after you gave that
4  testimony, did you come to believe any of that testimony
5  was false or inaccurate?
6       A.   I don't -- I don't think I understand the --
7  the form of that question.
8       Q.   Let me ask it again.
9       A.   During my testimony?
10      Q.   Say that again?  Sorry.
11      A.   During my testimony?
12      Q.   Yeah.  No, let me -- yeah.  So let me ask a
13 better question.  As you were giving the testimony at
14 the Fields trial, did you have any moment where you
15 thought to yourself ooh, I made a mistake.  I said
16 something I didn't mean to say?
17           MS. GOLDEN:  Foundation.
18           THE WITNESS:  No.
19 BY MR. SWAMINATHAN:
20      Q.   At any point after you gave your testimony at
21 the Fields trial you think to yourself oh, I gave
22 some testimony there that I didn't mean to give?
23           MS. CARNEY:  Objection.  Form.
24           THE WITNESS:  No.
25 BY MR. SWAMINATHAN:

Page 28

1       Q.   And so during -- strike that.  So either
2  during or after you gave testimony at the Fields trial,
3  did you ever come to believe that you'd provided any
4  information that was false or inaccurate at that trial?
5            MS. GOLDEN:  Foundation.
6            THE WITNESS:  No.
7  BY MR. SWAMINATHAN:
8       Q.   Go ahead.
9       A.   No.
10      Q.   And do you stand by your testimony from the
11 Fields trial?
12           MS. GOLDEN:  Form.
13           THE WITNESS:  Yes.
14 BY MR. SWAMINATHAN:
15      Q.   Okay.  And then last question in this line.
16 Apologies for sort of the tediousness of it.  You
17 testified in the Rivera trial, correct?
18      A.   Yes.
19      Q.   And have you had any opportunity to review
20 your trial testimony from Rivera?
21           MS. CARNEY:  Objection.  Asked and answered.
22           MR. SWAMINATHAN:  Did I do the Rivera trial?
23 I'm sorry.  You -- did you say yes, Theresa?
24           MS. CARNEY:  Yeah, you did, but that's okay.
25           MR. SWAMINATHAN:  I will take -- I will take

Page 29

1  you -- yeah, I trust you.  Thank you.  Let me move
2  on then.
3  BY MR. SWAMINATHAN:
4       Q.   In the Rivera matter, do you recall
5  approximately how many hours you spent in preparing your
6  report in that matter?
7       A.   I don't recall.
8       Q.   Okay.  In the Fields matter, do you recall how
9  many hours you spent preparing your report in that
10 matter?
11      A.   I don't recall.
12      Q.   Do you recall how much you were paid in the
13 Fields matter?
14      A.   An hourly rate?
15      Q.   No.  The total amount that you were paid in
16 Fields.
17      A.   I do not recall that amount.
18      Q.   Would it be accurate to say that the amount
19 you were paid in Fields was in the ballpark of
20 $100,000?
21      A.   I don't think it made it to $100,000, but it
22 was 90,000s for sure.
23      Q.   Okay.  So in the ballpark of 90,000 is what
24 you were paid for Fields; is that fair?
25      A.   That's my best recollection.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 11 of 104 PageID #:65948
The Deposition of Dr. BERNARD FROHM, taken on February 9, 2023
30..33

Page 30
1    Q.   Okay.  And what's your best recollection of
2  the amount you were paid in the Rivera matter?
3    A.   Approximately 16,000, 17,000.  That's an
4  estimate.
5    Q.   Okay.  Okay.  In the Rivera matter, fair to
6  say you were paid in -- strike that.  In both the Rivera
7  matter and in the Fields matter, you gave depositions --
8  strike that.  In both the Rivera matter and in the
9  Fields matter, you gave disclosed opinions, gave
10  depositions, and testified at trial, correct?
11    A.   Yes.
12    Q.   All right.  And you were paid approximately
13  four times less in the Rivera matter than you were paid
14  in the Fields matter, correct?
15    MS. CARNEY:  Objection.
16  BY MR. SWAMINATHAN:
17    Q.   Go ahead.
18    A.   I'm not doing the math quickly, but sounds --
19  that sounds about accurate.
20    Q.   Okay.  And in both those cases, you charged
21  the same hourly rate, that is $200 per hour for your
22  review of materials and report writing, and then $300
23  per hour for testimony, correct?
24    A.   Yes.
25    Q.   Why were your total hours -- so in other

Page 31
1  words, not only were your -- was the total amount you
2  were paid approximately four times less, the total hours
3  you put into the case were approximately four times
4  less; is that fair?
5    A.   That's accurate.
6    Q.   Okay.  Why would -- why did you spend
7  approximately four times more in Fields than you did in
8  Rivera?
9    MS. GOLDEN:  Objection.  I think that goes
10  into the drafting process.
11  BY MR. SWAMINATHAN:
12    Q.   Go ahead.
13    A.   The --
14    MS. CARNEY:  Sorry.  I'm sorry.  I was just
15  trying to think of the question.  I'm going to
16  object to the extent that the answer is going to
17  impede on any of the attorney-client communications
18  you had with the attorney for Rivera.  Answer that
19  without going into drafting process or the --
20    THE REPORTER:  Last thing I heard was "or
21  the."
22    MS. CARNEY:  Or the communications with either
23  set of city attorneys on those cases.
24  BY MR. SWAMINATHAN:
25    Q.   Go ahead.

Page 32
1    A.   I -- I looked at fewer files -- Rivera.
2    Q.   When you say you looked at fewer files in
3  Rivera, you mean you -- there were fewer total files in
4  which you conducted a comparison of police files to
5  public defender files and prosecutor files; is that
6  right?
7    A.   Yes.
8    Q.   Okay.  In other words, there was a time-
9  consuming process of comparing files that you conducted
10  in the Fields case for many dozens of files, correct?
11    A.   Yes.
12    Q.   And then in Rivera, you didn't conduct that
13  same file comparison for nearly as many files, correct?
14    A.   Examined far fewer files.
15    Q.   Okay.  And then similarly in this case, you
16  examined far fewer files than you examined in Fields,
17  correct?
18    A.   Yes.
19    Q.   Okay.  And that's not because there were fewer
20  available files in the cases, it's because you decided
21  to review fewer files for purposes of your analysis in
22  this case, correct?
23    MS. GOLDEN:  Objection.  Privilege.
24    MS. CARNEY:  Objection.  Form.  Foundation.
25  And the extent that what you reviewed will --

Page 33
1  includes attorney-client communications.
2    THE REPORTER:  Last thing we heard was
3  attorney-client communications.
4    MS. CARNEY:  Sorry.  I'm objecting on the
5  grounds that to answer that question, it would
6  likely call for attorney-client communication.  So
7  if you can answer that question without revealing
8  our attorney- client communication work product,
9  you can, otherwise I'm going to instruct you not to
10  answer.
11    MS. GOLDEN:  And the decision-making process
12  in terms of drafting reports and formulating
13  opinions.
14  BY MR. SWAMINATHAN:
15    Q.   Go ahead, Mr. Murray.
16    A.   Forgot the question.
17    MR. SWAMINATHAN:  Let me ask again.  I -- I'm
18  having a little bit of struggle here with the sort
19  of sound coming in and out.  Is it -- Theresa, is
20  it possible to switch to your audio potentially?
21    MS. CARNEY:  Yeah, that won't -- it won't work
22  on mine.  I have a backup potentially coming in if
23  it's -- if it's continuing to be difficult, but
24  it's all -- it's the system in here.  So there's
25  not much I can do. So we can -- I can have a backup



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 12 of 104 PageID #:65949
The Deposition of DR. BERNARD MURRAY, on 06/05/2019
34..37

Page 34

1    be brought in at some point.  It's going to take a
2    -- it'll take a minute to get it done.  So if we
3    just try to --
4         MR. SWAMINATHAN:  Do you have a sense of
5    generally how long that will take?
6         MS. CARNEY:  I don't because it's -- it -- the
7    system is supposed to be set up that it --
8         MR. SWAMINATHAN:  Let's go off the record for
9    a minute.  I think Theresa just stepped off.
10        THE REPORTER:  Okay.
11        MS. CARNEY:  No, I'm here.
12        MR. SWAMINATHAN:  Oh.
13        THE REPORTER:  Do you guys want to go off the
14   record?
15        MR. SWAMINATHAN:  Yeah.  Let's go off the
16   record.  I want to see if we can figure out --
17   because the in and out is a real challenge.
18        THE REPORTER:  Okay.
19        MR. SWAMINATHAN:  Especially when some of the
20   instructions are be given as the witness, and I
21   can't hear that.
22        THE REPORTER:  Going off the record.  The time
23   is 10:37 a.m.
24        (OFF THE RECORD)
25        THE REPORTER:  We're back on the record.  The

Page 35

1         time is 10:47 a.m.
2    BY MR. SWAMINATHAN:
3         Q.  All right.  Mr. Murray, I'm going to show you
4    a document we'll mark as Exhibit 1.  The copy of your
5    expert report in the case.  Do you have that in front of
6    you?
7              (EXHIBIT 1 MARKED FOR IDENTIFICATION)
8         A.  Yes, I do.
9    BY MR. SWAMINATHAN:
10        Q.  Okay.  And if you got it in front of you, I
11   don't think we need to put it up on the screen.  If at
12   any point it's useful for you -- if it's useful to you
13   for me to put it up on the screen, I will do that, okay?
14        A.  Okay.
15        Q.  All right.  Looking at Exhibit 1, that is a
16   copy of your expert report in this matter, correct?
17        A.  Yes.
18        Q.  Okay.  And you signed that expert report,
19   correct?
20        A.  Yes, I did.
21        Q.  And the expert report itself is --
22   let's see.  You signed it on the 23rd page, correct?
23        A.  Yes.
24        Q.  Okay.  And then in addition to that report,
25   you include your CV, correct?

Page 36

1         A.  Yes.
2         Q.  And then you also attached your materials
3    reviewed, right?  Two pages of materials reviewed?
4         A.  Yes.
5         Q.  And then subsequent to that, you have an
6    Attachment A, correct?
7         A.  Attachment A.
8              MS. CARNEY:  So you might have to put it up
9         because he --
10             THE WITNESS:  Yeah.
11             MS. CARNEY:  -- he does not have all the
12        attachments, hard copies.
13             MR. SWAMINATHAN:  Okay.  Let me -- yeah.  Let
14        me put it up.
15   BY MR. SWAMINATHAN:
16        Q.  All right.  So what I'm showing you now is
17   Exhibit 1, which I have identified as the -- as your
18   expert report.  Looking at -- let's just -- since I've
19   got it up on the screen here, looking at Page 23 of
20   Exhibit 1, that's your signature, correct, sir?
21        A.  Yes.
22        Q.  Okay.  And so Pages 1 through 23 constitute
23   the expert report that you disclosed in this matter,
24   correct?
25        A.  Yes.

Page 37

1         Q.  And you're not intending to offer any opinions
2    in this matter other than those disclosed on Pages 1
3    through 23 of your report; is that fair?
4         A.  That's my intention.
5         Q.  Okay.  And you're not intending to present to
6    the jury different opinions in those -- for additional
7    opinions other than those that are contained within your
8    report on Pages 1 through 23, correct?
9         A.  I don't intend to.
10        Q.  Okay.  And then after that -- strike that.
11   Exhibit 1 is a, in total, 167-page document.  Do you see
12   that?
13        A.  Show me that Exhibit -- Attachment A again.
14   I'm sorry.
15        Q.  Yes.  Let me get to that in one minute.
16   Exhibit 1 is a total of 167 pages.  And what I'm showing
17   you now is that on the next page, after you signed your
18   report, is a copy of your CV.  Do you see that?
19        A.  I do.
20        Q.  Okay.  And that is an accurate copy of the CV
21   that you disclosed in this matter, correct?
22        A.  It's where I disclosed, but it's not fully
23   accurate.
24        Q.  Okay.  And in what sense is it not accurate,
25   sir?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1    A.   Well, there's a further employment.  After
2  2015, I actually worked for the Illinois State Appellate
3  Prosecutor's Office for less than one year, maybe nine
4  months.  I also worked on a case for the Kane County
5  State's Attorney's Office.  And then I returned to the
6  DuPage County State's Attorney's Office.  I think that's
7  on there, returning to the State's Attorney's Office.
8    Q.   Okay.  So in other words, there are a few
9  employment positions that you held that are not listed
10  in your professional experience here, correct?
11    A.   That's correct.
12    Q.   Okay.  Any reason you omitted those from this
13  resume?
14    A.   The -- no, there isn't.
15    Q.   Okay.  Did you consider those not to be
16  employment that was worthy of including on our resume?
17    A.   When I forwarded this resume for you using
18  this -- with this report, I thought it was my most up-
19  to-date resume.  I realized over the weekend that it was
20  not.
21    Q.   Okay.  And looking at your -- at this resume,
22  it indicates that your -- all of your professional
23  experience is in the role of a prosecutor; is that
24  correct?
25    A.   Yes, that is correct.

Page 39

1    Q.   Okay.  And the two additional -- you
2  identified a couple of additional items of experience
3  that you have that were not listed on this report, but
4  those were also in a role as a prosecutor, correct?
5    A.   Yes.
6    Q.   It would be -- and when you graduated from law
7  school, you went directly into the prosecutor's office,
8  correct?
9    A.   Yes.
10    Q.   Okay.  And so fair to say you've spent your
11  entire career working either in the Cook County State's
12  Attorney's Office or other prosecutor offices?
13    A.   Yes.
14    Q.   Okay.  The position you currently have with
15  the DuPage County State's Attorney's Office, in that
16  role do you have any involvement in police
17  investigations?
18    MS. CARNEY:  Objection.  Form.
19    THE WITNESS:  My position is that of the first
20  assistant, so I don't directly go out and work on
21  investigations.  But from time to time, I'm called
22  to review files to determine whether charges should
23  be placed or not.  That's fairly rare, but it does
24  happen.
25  BY MR. SWAMINATHAN:

Page 40

1    Q.   Okay.  In your work at the DuPage County
2  State's Attorney's office, have you reviewed any police
3  department -- DuPage Sheriff's Department policies?
4    A.   No.
5    Q.   And in your work, you said you've also spent
6  some time working in the Kane County State's Attorney's
7  office?
8    A.   Yes.
9    Q.   And have you reviewed any policies of the Kane
10  County Sheriff's Department or any other law enforcement
11  agencies in that jurisdiction?
12    A.   No.
13    Q.   And was there any other prosecutor's office
14  that you said you worked for?
15    A.   In my role with the Illinois State Appellate
16  Prosecutors in --
17    Q.   Yes.  I'm sorry.  I didn't mean that.  In your
18  work with the Illinois -- can you say it again?
19  Illinois?
20    A.   Illinois State's Attorney -- the State's
21  Attorney's Appellate Prosecutor's office.
22    Q.   In that office did you review any policies of
23  any law enforcement agencies?
24    A.   No.
25    Q.   And during your time working in the Cook

Page 41

1  County State's Attorney's office, in your role as a
2  prosecutor in any one of the roles you held as a
3  prosecutor, did you ever review any Chicago Police
4  Department policies?
5    A.   I became aware of the general order we
6  referred to before, the 83-1, I became aware of that
7  during my career as a prosecutor, but I did not
8  specifically review their policies during my career with
9  the Cook County State's Attorney's Office.
10    Q.   Okay.  And when you say you "became aware of
11  special order 83-1," you had not -- you did not see that
12  policy at any point while you were working in the Cook
13  County State's Attorney's Office, correct?
14    A.   Yeah, I knew it existed, but I don't recall
15  seeing it until after that time.
16    Q.   Okay.  And when you say you saw it for the
17  first time after you worked at the Cook County State's
18  Attorney's Office, the first time was in the context of
19  your work in the Fields case as an expert, correct?
20    MS. GOLDEN:  Objection.  Misstates his
21  testimony.  He just did not say that.
22  BY MR. SWAMINATHAN:
23    Q.   Go ahead.
24    MS. GOLDEN:  You can answer.
25    THE WITNESS:  I did not -- I don't recall



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 14 of 104 PageID #:65951
The Deposition of Doe, BERNARD MURRAY, on 03/15/24 Page 14 of 104 PageID #65951
42..45

Page 42

1  reading it or reviewing it while I was in the Cook
2  County State's Attorney's Office, but I knew of its
3  existence.
4  BY MR. SWAMINATHAN:
5      Q.  I'll ask the question again.  The first time
6  you saw that policy was while you were serving as an
7  expert in the Fields matter, correct?
8      A.  That sounds right.  I don't remember exactly
9  when I first saw it, but I think that sounds right to
10  me.
11      Q.  Okay.  And you don't recall any point at which
12  you saw that policy in the context of your work as a
13  Cook County State's attorney, correct?
14      A.  Well, I didn't see it, but I was aware of it.
15      Q.  Okay.  And when you say you were "aware of
16  it," how did you become aware of it?
17      A.  Well, I knew there were -- that we had
18  discovery obligations to defense attorneys, so I knew
19  all -- during my career we were doing everything
20  possible to comply with that.  I was also aware the --
21  probably primarily through news media of the original
22  Street Files case and how, as a result of that, an order
23  was placed -- you know, this order was created to make
24  sure Street Files notes and all those type of materials
25  were preserved and that we, as prosecutors, should

Page 43

1  obtain them and tender them to defense attorneys.
2      Q.  And when you say you had knowledge about the
3  -- of the original Street Files case, what are you
4  referring to?
5      A.  I don't remember the name of the offender, but
6  it was a case in federal court where a prior criminal
7  defendant said there were Street Files, or that was a
8  characterization that were withheld from him that would
9  have proved his innocence.
10      Q.  Okay.  And is there -- was -- and you learned
11  about the existence of that original Street Files case
12  through the news media; is that right?
13      A.  That's my recollection, yes.
14      Q.  Okay.  And did you learn any other information
15  about that case other than what you learned through the
16  news media?
17      A.  Well, in that -- growing out of that, the
18  general order was created 83-01 or one of those reports
19  was created for police officers to retain investigative
20  files, notes, GPRs, whatever they came to be called.
21      Q.  And that -- and you learned about the
22  existence of that general order coming out of the
23  original Street Files case through the news media?
24      A.  Primarily, yes.
25      Q.  Okay.  And then was there anything else that

Page 44

1  you looked at or reviewed that provided you with
2  information about that original Street Files case or the
3  creation of a special order in response?
4      A.  I don't --
5          MS. CARNEY:  Form.
6      A.  -- understand your question.
7  BY MR. SWAMINATHAN:
8      Q.  Yeah.  Other than news media, was there
9  anything else that you reviewed to learn more about that
10  original Street Files case?
11          MS. CARNEY:  Form.
12          THE WITNESS:  Just so I'm clear, you're
13      referring back when I was working for the Cook
14      County State's Attorney's Office?
15  BY MR. SWAMINATHAN:
16      Q.  Yes.
17      A.  I don't recall reviewing other materials.
18      Q.  And other than what you saw on the news media
19  was there anything else you reviewed while you were
20  working in the Cook County State's Attorney's Office
21  about the special orders or general orders that emanated
22  from that event?
23          MS. CARNEY:  Foundation.
24  BY MR. SWAMINATHAN:
25      Q.  Go ahead.

Page 45

1      A.  I -- not that I recall.
2      Q.  Okay.  And then the next time that you -- oh,
3  strike that.  And when you said you learned about the
4  general orders that came out of that situation, you
5  didn't review a copy of that general order or special
6  order, correct?
7          MS. CARNEY:  Objection.  Form.
8          THE WITNESS:  I don't recall reviewing it
9      during that time period.
10  BY MR. SWAMINATHAN:
11      Q.  Okay.  And did you -- were you ever provided
12  with any document or information that summarized what
13  the contents of that order were while you were still
14  working in the Cook County State Attorney's office?
15      A.  Not that I recall.
16      Q.  Okay.  So it would be fair to say you,
17  basically, knew generally of its existence, but you
18  didn't know exactly what the policy said; is that fair?
19          MS. GOLDEN:  Form.
20          MS. CARNEY:  Objection.  Form.  Foundation.
21      Misstates his testimony.  You can answer.
22          THE WITNESS:  No, I knew specifically that the
23      order referred to retaining notes, I think now
24      called general progress reports, and any other
25      investigative material that was collected by law



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 15 of 104 PageID #:65952
The Deposition of BERNARD MURRAY, Volume 1, on 01/13/2020

46..49

Page 46

1    enforcement officers with the Chicago Police
2    Department during the course of their investigation
3    so that they would be available for use by
4    prosecutors and available to defense attorneys
5    prior to and during trial.
6    BY MR. SWAMINATHAN:
7        Q.    And you were just testifying a moment ago when
8    I asked you a question about the idea that you were
9    doing "everything we could to make sure information was
10   being disclosed to criminal defendants." Do you recall
11   saying that?
12       A.    Yeah.
13            MS. CARNEY:  Objection.  Form.  And it
14       misstates his testimony.  You can answer.
15   BY MR. SWAMINATHAN:
16       Q.    All right.  Yeah.  Let me ask a different
17   question.  Would it be fair to say that, during the time
18   you were a Cook County prosecutor, you were doing
19   everything you could to make sure that investigative
20   information was being disclosed to criminal defendants?
21       A.    Yes.
22       Q.    Okay.  And what would you -- what were you
23   doing to make sure everything was being disclosed to
24   criminal defendant as a prosecutor?
25       A.    As early in my career as working in the

Page 47

1    juvenile court, we had seminars by more senior
2    prosecutors telling us either different sources of law
3    enforcement information and even outside agency
4    information, and telling us -- telling young prosecutors
5    to use both interoffice mail forms with Chicago Police
6    Department.  And I think, pretty much, by the time I --
7    even when I was in juvenile court we were using
8    subpoenas to make sure we obtained those reports and,
9    you know, other related law enforcement reports that
10   were not necessarily Chicago Police Department.
11       Q.    And so you were taking steps to try to gather
12   the relevant materials you needed from the police
13   department; is that right?
14       A.    Yes.  This is -- this was training that I
15   received back in my first courtroom assignment, but it
16   was things that prosecutors more senior to me were
17   doing.
18       Q.    And so you were learning from them based on
19   what their experiences were, right?
20       A.    Yes.
21       Q.    And so one of the things you're describing
22   that you would do to make, you know -- when you say you
23   did everything you could to try to make sure you were
24   disclosing material to the criminal defendants, one of
25   the thing you did was you got trained by others in the

Page 48

1    prosecutor's office about where to go to gather that
2    information, correct?
3        A.    Okay.  I missed the end of your question.  I'm
4    sorry.  I didn't understand the end of it.
5        Q.    One of the things you did was learn or get
6    trained from other prosecutors about where to go to
7    gather the information, correct?
8        A.    The use of forms or other documents to
9    obtain -- or subpoenas to obtain those items.
10       Q.    Okay.  In other words, the ways in which to go
11   about making requests to the police department for those
12   -- for that information, fair?
13       A.    And also other agencies, yes.
14       Q.    Okay.  Thank you.  And what else were the
15   things you were doing as a prosecutor to do everything
16   you could to make sure you were turning everything over
17   to criminal defendants?
18       A.    Well, during my time throughout the office if
19   I had not received reports in a timely manner for court
20   -- for disclosure in court, I would reach out to law
21   enforcement officers and ask them to bring their files
22   by so we can expedite the discovery process.
23       Q.    Yeah.  In other words, if you weren't getting
24   things -- if you weren't getting police reports when you
25   wanted them, you would ask officers to just bring them

Page 49

1    to you directly; is that right?
2        A.    Yes.
3        Q.    And why was that helpful?
4        A.    Well, there's different court dates, and
5    judges are expecting that the discovery is completed and
6    we can get the matter either to trial or resolved short
7    of trial, so there are certain just time restraints put
8    upon a prosecutor and a defense attorney in a courtroom.
9    So if I had asked for police reports and did not receive
10   all of them before the next court date, I didn't want to
11   get sanctioned or disciplined by the judge, frankly.  I
12   wanted to try to get the reports for my own benefit for
13   preparing for trial, preparing my answer to discovery,
14   as well as for providing them to defense counsel.
15       Q.    Okay.  And so what you're describing is one of
16   the things you could do to circumvent the subpoena
17   process in going through the subpoena unit was to just
18   ask the detective to directly bring the file to you,
19   correct?
20            MS. GOLDEN:  Form.
21            MS. CARNEY:  Form.  Misstates his testimony.
22       You can answer.
23            THE WITNESS:  Well, it's not just subpoenas
24       we're, you know, sending inter-office form
25       requests, too.  So if those items were not



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 50

1     returned, it would be a different phone call to a
2     different person. But, yes, it's the same idea to
3     get items in a quicker fashion.
4 BY MR. SWAMINATHAN:
5     Q. And one of the ways you could get them in a
6 quicker fashion was to ask the detective to just bring
7 it to you directly, correct?
8     A. Yes.
9     Q. Okay. And I think you indicated that one of
10 the kinds of -- strike that. One of the circumstances
11 that would come up in your work as a prosecutor was that
12 sometimes you'd get some of the files from the police
13 department, but not all of the files, correct?
14     MS. CARNEY: Objection. Form. Misstates his
15     testimony.
16     MS. GOLDEN: Foundation.
17     MS. CARNEY: You can answer.
18     THE WITNESS: I would request, you know --
19     through different subpoenas or different forms, I
20     would request every police report I could conceive
21     of. And maybe some of them came in a timely manner
22     and some were -- some requests had not made it to
23     my desk or made it to my office prior to the next
24     court date.
25 BY MR. SWAMINATHAN:

Page 51

1     Q. And so sometimes you couldn't -- you would
2 make calls or requests to get information that hadn't
3 -- that -- for part of the police file that hadn't
4 gotten to you yet, fair?
5     A. That's accurate.
6     Q. Okay. And one of the things you would do to
7 try to do that was sometimes reach out directly to the
8 detective involved in the investigation, fair?
9     A. Yes.
10     Q. Okay.
11     A. Or other officers.
12     Q. And sometimes others as well, right?
13     A. Yes.
14     Q. And sometimes directly with the officer who
15 was involved in the investigation, fair?
16     A. Yes.
17     Q. Okay. And you've described to me some of the
18 things you would do to try to make sure you were turning
19 everything over to the criminal defendants, including
20 your efforts to try to get materials from the police
21 department to you, correct?
22     A. Yes.
23     Q. And then were there steps you would take to
24 try to ensure that you were doing everything you could
25 to get the materials to the criminal defendants once you

Page 52

1 had the materials from the police department?
2     A. I'm not sure I quite understand that question.
3     Q. Yeah. Once you had materials from the police
4 department, what steps would you take to do everything
5 you could to get the materials to the criminal
6 defendant?
7     A. I would provide them in court. I would
8 include some of the information in my answer discovery.
9 And if there were bulk items, like physical evidence or
10 maybe whole sets of photographs, I would tell the
11 defense attorney that the -- if they want to review them
12 pre-motions or pre-trial, we would make all those items
13 available as well.
14     Q. Would you disclose all of the documents and
15 reports that you received from the police department to
16 the criminal defense attorneys?
17     A. Yes, I would.
18     Q. Would you pick and choose which documents to
19 disclose to the criminal defendants from the police
20 records and documents you had?
21     A. If you could explain to me what you mean by
22 "pick and choose," I think I'd be better able to answer
23 your question.
24     Q. Yeah. Would you go through the police reports
25 and records that were provided to you by the police

Page 53

1 department and decide to deliberately leave some of
2 those out in terms of what you gave to the criminal
3 defendant?
4     A. No.
5     Q. Okay. And when you would receive files from
6 the police department -- strike that. Would it be fair
7 to say that your practice was to err on the side of
8 disclosing the materials that you received from the
9 police department to criminal defendants?
10     A. That was the whole purpose of obtaining the
11 police reports would be to tender them to defense
12 counsel.
13     Q. Okay. And that was your practice?
14     A. Yes.
15     Q. And that was the policy of your -- of the
16 state's attorney's office, correct?
17     A. I don't know if the office had a written
18 policy, but we were told it was, for lack of a better
19 phrase, an open file office that we'd give over
20 everything we have in our file to the defense counsel.
21     Q. Okay.
22     A. Obviously, if there's work products, something
23 like that, or something with an informant that what --
24 would be by the rules, I would not have to tender those.
25     Q. Okay. But putting aside obviously work



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 17 of 104 PageID #:65954
The Deposition of DOE BERNARD REYNOLDS, on 02/15/24 Page 17 of 104 PageID #65954
54..57

Page 54

1  product -- by work product, you mean things that were
2  created within your office as part of your analysis and
3  strategy and so on, correct?
4      A.   Yes.
5      Q.   Okay.  But you're not -- when you talk about
6  work product you're not talking about documents that
7  come from the police department, correct?
8      A.   Well, there might be something that deals with
9  an informant.
10     Q.   That's separate and apart from the issue of
11 work product, correct?
12     A.   Yes.
13     Q.   Okay.  So --
14         MS. GOLDEN:  I'm not --
15     Q.   -- putting aside --
16         MR. SWAMINATHAN:  Oh, I'm sorry.
17         MS. GOLDEN:  No, just pace.  Like if you could
18  -- I think you cut him off.
19         MR. SWAMINATHAN:  Yeah.  Oh, I'm sorry.  Okay.
20 BY MR. SWAMINATHAN:
21     Q.   Sorry.  Let me just make the -- make sure the
22 record is clear.  When it comes to work product, you're
23 not referring to confidential informants, correct?
24     A.   No.
25     Q.   And when it comes to work product you're not

Page 55

1  referring to materials from the police department,
2  correct?
3      A.   No.
4      Q.   And when you say -- I should ask it
5  differently because I'm saying "Correct?"  And you're
6  saying "No."  So let me re-ask it so we're clear.  When
7  you're talking about work product, you're not referring
8  to -- strike that.  When you're talking about work
9  product, are you referring to documented materials that
10 come from the police department?
11     A.   I'm not referring to that.
12     Q.   Okay.  And then confidential informants is --
13 well, strike that.  I don't care about that right now.
14 Okay.  Were -- did you serve as a supervisor in the
15 State's Attorney's office?  Strike that.  Did you
16 supervise other state's attorneys in the State's
17 Attorney's office?
18     A.   Yes, I did.
19     Q.   And specifically at Cook County?
20     A.   Yes, I did.
21     Q.   Okay.  And as supervisor, was it your
22 expectation that others were following the same practice
23 that you did of disclosing everything in your file that
24 you got from the police department?
25     A.   Yes.

Page 56

1      Q.   Did -- was it your experience that prosecutors
2  in your office disclosed everything in their file to
3  criminal defense attorneys?
4      A.   That was my experience.
5      Q.   Okay.  Did you have any instances where you
6  had prosecutors working in your office that you felt
7  were picking and choosing what to give to the criminal
8  defendants?
9          MS. CARNEY:  Objection.  Form.  Foundation.
10         You can answer.
11         THE WITNESS:  I did not feel that.
12 BY MR. SWAMINATHAN:
13     Q.   Okay.  Was it your experience that prosecutors
14 in your office were erring on the side of disclosure of
15 criminal defendants?
16     A.   Well, like I've said before, when we get the
17 police reports, we're tendering them to defense counsel,
18 so it's not necessarily erring on the side of.  It's what
19 we do.
20     Q.   Okay.  And in terms of the actions you would
21 take as a prosecutor to ensure that you were doing
22 everything you could to turn everything over to criminal
23 defendants, would you make sure that you were putting
24 all the documents that you received from the police
25 department into your file?

Page 57

1          MS. CARNEY:  Objection.  Form.
2          THE WITNESS:  Yeah.  I missed -- I'm sorry.  I
3  don't understand that question.
4  BY MR. SWAMINATHAN:
5      Q.   Yeah.  In other words, part of making sure you
6  give everything over to the criminal defendants is
7  making sure that you keep a complete file of all the
8  materials you're receiving from the police department,
9  correct?
10     A.   Well, as we're gathering the -- all the
11 reports from the police -- from Chicago Police
12 Department, we would have them in our file.
13     Q.   Okay.  And when you say "in our file," what
14 are you referring to?
15     A.   A manila folder where we put the police
16 reports that we received from the police department.
17     Q.   Okay.  And so was there a practice around what
18 was done in your office in terms of the materials that
19 are gathered from the police department that go into a
20 particular type of file?
21     A.   I don't know if it's a particular type of
22 file.  Some people may use manila, some people may use
23 brown folders.  I don't really know that, but obviously
24 we're collecting police reports from law enforcement
25 agencies and other people who may be involved in the


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

1  investigation and we have to put them into a folder so
2  we can then copy them and tender them to defense
3  counsel.
4      Q.   Okay.  And then the documents that you -- oh,
5  I'm sorry.  I didn't want to cut you off.
6      A.   I didn't finish -- and compile our answer
7  discovery, for example.
8      Q.   Okay.  And then those documents that you
9  gathered and made copies of and provided to criminal
10 defense attorneys, what would you do with those copies
11 that you had received?
12     A.   Copies I had received from Chicago Police
13 Department?
14     Q.   Yes.
15     A.   I would keep them in preparation for motions
16 at trial.
17     Q.   Okay.  And would that go into a trial file?
18     A.   Well, the file --
19          MS. CARNEY:  Objection.  Form.  Foundation.
20 You can answer.
21          THE WITNESS:  Well, the file is a file.  If we
22          go to trial or we plea out or we go to motions,
23          that's the file.
24 BY MR. SWAMINATHAN:
25     Q.   Okay.  So there was one file that was kept for

Page 59

1  the prosecution in an individual case throughout the
2  process through trial or however far it went; is that
3  fair?
4      A.   Well, through trial or resolution of the case
5  in the trial court.
6      Q.   Okay.  And then what would happen if the case
7  went up on appeal?
8          MS. CARNEY:  Objection.  Form.  Foundation.
9  Calls for speculation.  You can answer if you know.
10         THE WITNESS:  Our file would be -- if all
11         defendants were resolved, our file would be packed
12         up and sent to a warehouse for storage.
13 BY MR. SWAMINATHAN:
14     Q.   Okay.  And so then -- okay.  Strike that.
15 Before the file was packed up and sent off to storage,
16 would you remove any of the police reports or other
17 documents from the police department from the file?
18         MS. CARNEY:  Objection.  Form.  Foundation.
19 Calls for speculation.
20         THE WITNESS:  If there were duplicate reports,
21         we would clean out the file, we would take manila
22         folders out of the file -- of the inside of the
23         file, but we would keep a complete set of all the
24         reports that we gathered during the investigation
25         and use at motions or trial.

Page 60

1  BY MR. SWAMINATHAN:
2      Q.   Okay.  Would you throw away any of the police
3  reports that you had -- that became part of the file you
4  received from the police department?
5      A.   If it was a duplicate, an exact duplicate,
6  that may be discarded in an effort to clean up the file
7  for storage, but we would not remove any reports.
8      Q.   And the -- and so the file that was packed up
9  and went to storage would include all of the police
10 reports and other materials received from the police
11 department; is that right?
12     A.   And I would --
13         MS. CARNEY:  Objection.  Form.  Foundation.
14 Calls for speculation.  Go ahead.
15         THE WITNESS:  You receive all the reports and
16         other agency reports and photographs and jury
17         instructions and motions.
18 BY MR. SWAMINATHAN:
19     Q.   Okay.  And then you said once you -- so in
20 other words, you would take -- there would be some step
21 of making sure that everything you've got associated
22 with that case from all the various police departments
23 or agencies you've received, it is all in the file
24 before it gets packed up; is that right?
25     A.   Well, the prosecutor who handled the case

Page 61

1  would pack it up.
2      Q.   Okay.  And then it would go off to storage; is
3  that right?
4      A.   Yes.
5      Q.   Okay.  And then if the case was up on appeal,
6  there would be a separate appeal file that is created?
7  Is that how it worked?
8          MS. CARNEY:  Objection.  Form.  Foundation.
9  Calls for speculation.
10         THE WITNESS:  I worked in appeals at the
11         beginning of my career.  The appellate prosecutors
12         would receive -- if it were conviction obviously --
13         would receive the brief from the defense -- from
14         the defendant appellate attorney, and they would
15         file their briefs and they would examine the record
16         on appeal that was compiled by the defense attorney
17         filing the appeal. So that's a completely different
18         part of the office that doesn't necessarily rely
19         upon the trial file.
20 BY MR. SWAMINATHAN:
21     Q.   Okay.  And so during the time you were working
22 on appeals, it -- you, typically, were not requesting
23 copies of the trial file that had gone to storage, fair?
24     A.   Almost never.
25         MS. CARNEY:  Objection.  Form.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1          MR. SWAMINATHAN:  Did you get the answer,
2     Madam Court Reporter?
3          THE REPORTER:  Yes.
4          MR. SWAMINATHAN:  Okay.  Sorry.  Okay.
5  BY MR. SWAMINATHAN:
6     Q.   All right.  In your practice, when you
7  completed a case and we're packing up the trial to --
8  file to go to storage, would you ever remove materials
9  that you had received from the police department other
10 than duplicates?
11    A.   I think I answered that.  No, I would not.
12    Q.   Okay.  And during your time supervising other
13 prosecutors, are you aware of any prosecutors that would
14 remove any of the police reports or other documents
15 released from police -- received from police agencies
16 other than duplicates?
17         MS. CARNEY:  Objection.  Form.  Foundation.
18    Calls for speculation.
19         THE WITNESS:  I'm not aware of anyone removing
20    police reports from the closed trial file.
21 BY MR. SWAMINATHAN:
22    Q.   Okay.  And was it your expectation, as a
23 supervisor, that other state's attorneys were -- when
24 they closed the case and were packing up the trial file,
25 that they were not taking out materials from that file

Page 63

1  other than any duplicates?
2     A.   They -- to my knowledge, they were not taking
3  out police reports from the file.
4     Q.   Okay.  Let's go back to your report.  And
5  let's see here.  This is Exhibit 1 that I'm putting back
6  up on the screen.  We've made it to Page 24 there before
7  my dalliance.  So let's take a look at -- Page 25 and 26
8  of this Report are your materials reviewed.  Do you see
9  that, sir?
10    A.   I do.
11    Q.   Okay.  And does that accurately reflect the
12 materials you reviewed in preparation for -- strike
13 that.  Does this -- do Pages 25 and 26 of Exhibit 1 list
14 the materials you reviewed in preparing your report in
15 this matter?
16    A.   Yes.
17    Q.   Okay.  And do -- does Pages 25 and 26
18 accurately reflect the documents that you reviewed and
19 relied on in preparing your report in this matter?
20    A.   Yes.
21    Q.   Okay.  And are there any other documents that
22 you reviewed while you were preparing your report in
23 this case?
24    A.   No.
25    Q.   Okay.  And then Attachment A begins on

Page 64

1  Page 27, and then, basically, Pages 28 through 167 of
2  your report disclosed in this matter are an Attachment
3  A.  And can you tell us what Attachment A consists of?
4     A.   I'm looking at in the screen right now.  I
5  don't have a paper copy in front of me, so it's kind of
6  hard to read.
7     Q.   Would it be fair to say that Attachment A
8  appears to be your report in the Fields matter?
9     A.   Yes.
10    Q.   And, in addition -- I'm sort of just leafing
11 through it here with you looking at it with me here.  I'm
12 going through it here little by little, and I just don't
13 want to waste your time, but I'm going through this page
14 by page, and this includes the discussion of case after
15 case from the Fields matter.  Does that look familiar to
16 you?
17    A.   It does look familiar to me.
18    Q.   Okay.  So in other words, as I'm going through
19 this, this basically contains the -- strike that.  The
20 Fields report that I'm showing you on the screen as part
21 of Attachment A to your report is your case by case
22 discussion of each of the police files and corresponding
23 prosecutor files and public defender files in the Fields
24 matter, correct?
25    A.   It appears to be my entire report.

Page 65

1     Q.   Okay.  And your report included a discussion
2  of each case for which you had a prosecutor file and
3  public defender file to go along with a police file,
4  correct?
5     A.   Yes, that's my recollection.
6     Q.   Okay.  And then I'm just continuing to leaf
7  through each of those case-by-case discussions in your
8  Field report.  Okay.  And you see that on Page 144 of
9  Exhibit 1 it includes your signature on a date of
10 June 24, 2016 reflecting the entirety of your Fields
11 expert report, correct?
12    A.   I see that, yes.
13    Q.   Okay.  And that was a 117-page report that you
14 submitted in the Fields case, correct?
15    A.   Yep.  Yes.
16    Q.   Okay.  And then if you look at the next page,
17 this is Page 145 of Exhibit 1, part of Attachment A also
18 includes a letter and subsequently an expert report that
19 you submitted in the Rivera matter, correct?
20    A.   That's what it looks like, yes.
21    Q.   Okay.  So Attachment A consists of your Field
22 expert report and your expert report in the Rivera
23 matter, correct?
24    A.   Yes.
25    Q.   Okay.  And in the Rivera matter, your expert



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 20 of 104 PageID #:65957
The Deposition of Dr. BERNARD HARCOURT, Volume I, taken on February 17, 2023

66..69

Page 66

1  report was -- strike that.  On Page 167 of Exhibit 1, it
2  indicates your signature on your report in the Jacques
3  Rivera case dated May 12, 2017, correct?
4      A.  Yes.
5      Q.  And your report in that case was 22 pages,
6  correct?
7      A.  Yes.
8      Q.  Okay.  And the reason your report was much
9  shorter in the Rivera case is because you didn't conduct
10 the same number of file comparisons between prosecutor
11 files and public defender files and police files,
12 correct?
13     A.  I focused on a smaller set of files.
14     Q.  Okay.  In the Rivera case, were you aware that
15 there were more prosecutor files and public defender
16 files that had been disclosed during the discovery in
17 the matter than the ones that you had reviewed?
18         MS. CARNEY:  Objection.  Form.  Foundation.
19     You can answer.
20         THE WITNESS:  There were more files examined
21     by the plaintiff's expert, but as I recall from
22     that case, he focused as -- I think the word he
23     used was examples, the cases that I focused my
24     examination on.
25 BY MR. SWAMINATHAN:

Page 67

1      Q.  Okay.  So you -- in the Rivera case, you chose
2  to review a subset of the total prosecutor files and
3  public defender files and public -- and police files
4  that were available, correct?
5          MS. CARNEY:  Objection.  Form.
6          MS. GOLDEN:  Privilege.
7          THE WITNESS:  I examined the files that he
8      listed as examples, I think is the word he used, or
9      maybe both experts used that phrase as examples of
10     discovery issues.
11 BY MR. SWAMINATHAN:
12     Q.  The expert for the plaintiff in that matter
13 also identified some examples that he highlighted in
14 that case, too, correct?
15     A.  Boy, I don't recall right now.
16     Q.  Oh.
17     A.  That sounds correct, but I just don't recall.
18     Q.  You said it sounds correct, but you don't
19 recall?
20     A.  Yeah.
21     Q.  Yeah.  We can go back to it.  In fact, let's
22 do that right now.  Let me pull this down.  Okay.
23 Showing you a document, marking as Exhibit 2.  This is
24 the Brassfield expert report in Fields.  And, in fact,
25 if we go to Page 1 here, you see this is the expert

Page 68

1  report of Michael Brassfield and Nathson Fields.  Do you
2  see that?
3          (EXHIBIT 2 MARKED FOR IDENTIFICATION)
4      A.  Yes.
5  BY MR. SWAMINATHAN:
6      Q.  Okay.  And that Michael Brassfield, you agree,
7  is the expert that had been hired by the plaintiff in
8  the Rivera matter, correct?  In the Fields matter,
9  correct?
10     A.  Yes.  Yes.
11     Q.  And then on Page 19 of his report --
12 Mr. Brassfield's report, he has a section discussing the
13 missing pages containing information and relevant --
14 containing important and relevant information that
15 should have been disclosed to criminal defendants.  Do
16 you see that?
17     A.  Right.  I see that.
18     Q.  Okay.  And then he has the discussion of
19 particular files and the examples of particular cases,
20 correct?
21     A.  As you're scrolling down, I can see that.
22     Q.  Okay.  So in the -- I'll -- we don't need to
23 spend more time on that.  But in the Fields case, you
24 recall that Mr. Brassfield looked at some specific
25 examples from the set of files that were available,

Page 69

1  correct?
2      A.  Yes.  I don't remember the number that he used
3  as examples, but I remember that he did that.
4      Q.  Okay.  And in that case, you looked at all of
5  the examples that he highlighted in his report in your
6  own analysis, correct?
7      A.  Yes.
8      Q.  And then you also looked at additional files
9  other than the ones that were just highlighted on Pages
10 19 and ensuing pages of his report, correct?
11     A.  Yes.
12     Q.  Okay.  In the Rivera matter, you looked only
13 at the ones that were highlighted in the report, right?
14     A.  Yes.
15     Q.  Okay.  You didn't look at all of the other
16 prosecutor files and public defender files that had been
17 disclosed during the discovery process, correct?
18     A.  I did not.
19     Q.  And in this case, you looked only at the
20 examples that had been provided by Mr. Tiderington,
21 correct?
22     A.  Well, I went beyond the examples by
23 Mr. Tiderington because it was a -- a number of pages --
24 or I'm sorry, documents on Page 51 that he included as
25 examples, so I looked at those as well.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 21 of 104 PageID #:65958
The Deposition of Joe BERNARD FILKOW, Conducted on 02/15/24, Page 21 of 104 PageID #:65958

70..73

Page 70

1    Q.   In this --
2    A.   Those pages -- necessarily pages -- not
3  necessarily -- each page wasn't necessarily its own
4  file.
5    Q.   Explain what you mean by that.  I'm not sure I
6  understand.
7    A.   Like there might've been two or three or four
8  or five pages which were one file.  So it wasn't one --
9  it wasn't one page that he cited equaled one file.
10   Q.   When -- for -- so some of the files that you
11 have listed in your materials reviewed in this case, are
12 you saying that you looked at the entire files that were
13 provided to you or just pages from those files?
14   A.   I looked at the documents that he claimed --
15 well, excuse me.  I looked at the documents that he
16 claimed were not in the defense file, and I looked in
17 other places to see if they were included in the
18 prosecutor file, if they were in the defense file, or if
19 the file that he was relying upon was sufficient.
20   Q.   Okay.  And let me take a step back and maybe
21 try to try to do it in order.  In this matter, the total
22 number of files for which you look at the police file
23 and the public defender file and the prosecutor file was
24 approximately how many?
25   A.   Well, if I can examine my report, I believe --

Page 71

1    Q.   Please.
2    A.   -- it's -- so I'm starting at Page 13 in my
3  report.  There was a comparison of eight defense
4  attorney files to investigative files.  Those -- I think
5  he called them examples or something like that.  But
6  prior to that, in my report, starting on Page 10, there
7  were reports of investigatory notes from other files
8  that he claimed were not provided to defense counsel as
9  well.  So that could be -- let's see.  One -- that could
10 be another eight cases because I'd -- I'd have to go
11 back and review it again, but it's another -- another
12 number of cases and one case overlapped from the eight
13 cases and the cases I examined from Page 50 -- the pages
14 I examined from Page 51.
15   Q.   Okay.  Let's look at --
16   A.   Page 51 of his report.
17   Q.   I'm just opening a document here.  Sorry.  All
18 right.  And just for maybe ease, I'm going to put your
19 materials reviewed on the screen here as Exhibit C.
20 Sorry, Exhibit 3.  So Exhibit 3 is just a two-page
21 document consisting of your materials reviewed in this
22 matter.  Do you see that, sir?
23              (EXHIBIT 3 MARKED FOR IDENTIFICATION)
24   A.   I do.
25 BY MR. SWAMINATHAN:

Page 72

1    Q.   Okay.  And looking at your list of materials
2  reviewed, you discuss -- you identify a series of RD
3  numbers for which you looked at the public defender file
4  and the state's attorney file in addition to the police
5  file, correct?
6    A.   Well, they're not -- they're not all files,
7  but yes, I did examine those documents listed on those
8  two pages.
9    Q.   Okay.  And if you look at this list here of
10 your materials reviewed, if we want to identify the
11 instances in which you reviewed the police file as well
12 as the corresponding public defender file and state's
13 attorney file, we can identify those files from your
14 materials reviewed, correct?
15   A.   I'm in -- I'm examining it right now.  Yes, I see
16 the names of some of the offenders listed on this -- on
17 the two-page summary that are also the names of the
18 offenders in Section 5 of his report.
19   Q.   Okay.  And so, for example, entry number five
20 on your materials reviewed is the first instance in this
21 list where you reviewed the police file as well as the
22 public defender file and prosecutor file, correct?
23   A.   Yes.  Well --
24   Q.   Okay.  And then you looked at the police file
25 in addition to the --

Page 73

1         MS. GOLDEN:  Well --
2    Q.   -- prosecutor file.
3         MS. GOLDEN:  I think -- Anand, you interrupted
4    him.
5         THE WITNESS:  Yeah, I -- I -- I see the RD
6    listed in number -- not -- RD listed number three
7    and number four.  And off the top of my head, I
8    don't know what cases they associate with, but
9    regarding the list of the materials reviewed, yes,
10   number five appears to be the first case where I
11   looked at the public defender file and the state's
12   attorney file.
13 BY MR. SWAMINATHAN:
14   Q.   Okay.  And then -- and focusing again on
15 instances where you looked at the police file, in
16 addition to the public defender file, in state's
17 attorney file, that's also the case in number -- for
18 number six, right?
19   A.   Yes.
20   Q.   And number seven, correct?
21   A.   Yes.
22   Q.   So that's three, correct?
23   A.   Yes.
24   Q.   And we get to number 13 as well, right?
25   A.   Well, there was number eight.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 22 of 104 PageID #:65959
The Deposition of DAVID MURRAY, taken on 03/15/24 Page 22 of 104 PageID #:65959

74...77

Page 74

1    Q.   I'm sorry, number -- yeah.  I'm sorry.  What I
2  did -- so five, six, seven, and number eight, right?
3    A.   Yes.
4    Q.   So five, six, seven, and eight are instances
5  in which you reviewed the police file in addition to the
6  public defender file and state's attorney file, correct?
7    A.   Right.
8    Q.   And then 13, 14, 15, 16, and 18 are instances
9  in which you reviewed the public defender file and
10  state's attorney file, correct?
11    A.   Yes.  Number nine, I attempted to look at more
12  than just the investigative file, but I think that was
13  all I had at the time.  But yes, the other ones are
14  where I looked at public defender file and state's
15  attorney file.
16    Q.   And then number 19 as well is one where you
17  looked at the investigative file and -- strike that.
18  Number 19 is another one where you reviewed the police
19  files as well as the public defender file and state's
20  attorney file, correct?
21    A.   Yes.  See -- just one second, please.
22    Q.   Yes.
23    A.   Yes, I did.
24    Q.   Okay.  And number nine is the Soto homicide,
25  is the reference to the file in this particular case,

Page 75

1  correct?
2    A.   I think it is, but the RD is different.
3    Q.   Yeah.  Let's see.
4        MS. GOLDEN:  Could you repeat the question?
5        MR. SWAMINATHAN:  Yeah.  One second.
6        MS. CARNEY:  The court reporter could do it.
7        MR. SWAMINATHAN:  Okay.
8        MS. CARNEY:  Well, could I have the last
9    question read back, please?
10       THE REPORTER:  Yes.  One second.
11       (REPORTER PLAYS BACK REQUESTED QUESTION)
12       MS. GOLDEN:  Thanks.
13  BY MR. SWAMINATHAN:
14    Q.   Okay.  And just to clarify, Mr. Murray, I'll
15  just represent to you C198126 is the RD number for the
16  Reyes-Solache investigative file related to the double
17  murder of the Soto mother and father, you understand?
18    A.   I do understand.
19    Q.   Okay.  So number nine is a reference to the
20  investigative file from the police department in the
21  underlying homicide investigation that's a subject of
22  this litigation, correct?
23    A.   Yeah.  Yes.
24    Q.   Okay.  And then number 19 is an investigative
25  file for a different case involving a criminal defendant

Page 76

1  named Oscar Soto, correct?
2    A.   Yes.  And I -- I believe that's one of the
3  cases I discussed under Section 5 in my report.
4    Q.   That's correct.  Okay.  And so in this case --
5  strike that.  For purpose -- for the Reyes-Solache
6  matter with RD number C198126, you reviewed the police
7  investigative file from this litigation, correct?
8    A.   Yes.  Not -- not to any great extent, but it
9  was available for me to review.
10    Q.   Okay.  And then did you -- when you say not to
11  any great extent, what do you mean?
12    A.   I can't hear you.
13    Q.   Oh, you cut out there for a second.  For the -
14  - when you say you only reviewed the investigative file
15  from this case, "not to any great extent," what do you
16  mean?
17    A.   I -- I did not go through what was or was not
18  tendered to -- in the manner that I did on the other
19  files.  I think I had a discussion at the end of my
20  report regarding photos.  I think that's the -- the part
21  of the file I was focusing on.
22    Q.   Okay.  So when you -- when you looked at the
23  investigative file for the Soto homicide, fair to say
24  you weren't going through that file in significant
25  detail to understand the entire investigation, correct?

Page 77

1    A.   No.  Referring to the photographs, I did that.
2        MS. CARNEY:  Object to the form.
3  BY MR. SWAMINATHAN:
4    Q.   So you focused on the photographs in the file?
5    A.   The -- the Polaroid photographs that were used
6  during the trial.
7    Q.   Okay.  I think I asked a poor question right
8  -- one question before this, so let me re-ask it
9  properly.  You did not spend time going through the file
10  -- investigative file for the Soto homicide in detail to
11  understand the entire investigation?
12    A.   I -- I --
13       MS. CARNEY:  Object to form.
14       THE WITNESS:  I did not.
15  BY MR. SWAMINATHAN:
16    Q.   Okay.  And so the body of evidence that made
17  up the incriminating evidence and any exculpatory
18  evidence and witness interviews and so on, you didn't go
19  through that in any detail?
20    A.   I did not.
21       MS. CARNEY:  Object to form.
22       THE WITNESS:  I did not.
23  BY MR. SWAMINATHAN:
24    Q.   Okay.  And you didn't review the public
25  defender file that was produced related to the Soto

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 23 of 104 PageID #:65960
The Deposition of DOUG BERNARD, taken on February 15, 2024

78 .. 81

Page 78

1  homicide?
2     A.  I did not.
3     Q.  And you didn't review the prosecutor file
4  disclosed in this litigation associated with the Soto
5  homicide, correct?
6     A.  Only as pertains to the Polaroid photographs.
7  Other than that, I did not.
8     Q.  Now, when you say you reviewed the prosecutor
9  file only as it pertains to the Polaroid photos, what do
10 you mean?
11    A.  Well, there was an exhibit and I'm trying to
12 remember if it was in the state's attorney's file or I
13 think it might even have been impounded with the Court.
14 So I knew that came from the prosecutors during the
15 trial.  So to the extent that that exhibit was either
16 copied into the prosecutor's file or was found
17 elsewhere, that's an example of something that I
18 would've reviewed potentially coming from the
19 prosecutor's file.
20    Q.  But you didn't have a copy of the entire
21 prosecutor file for the Soto homicide, correct?
22    A.  I did not review that file.
23    Q.  Okay.  And so we -- we've identified the list
24 from your materials reviewed of the instances in which
25 you -- let me put it back up.  Sorry.  We've identified

Page 79

1  the instances from your materials reviewed in which you
2  conducted a comparison of the police file to the public
3  defender file and state's attorney file, and it appears
4  to be approximately -- four, five, six, seven, eight,
5  nine, ten, ten cases where you had the prosecutor file,
6  public defender file, and police file, correct?
7     A.  That's what's listed there, but I -- I'm --
8  looking at my reports, there's eight files I
9  specifically looked at.  And then there's, in that
10 Section 5, I think it's it's six files in there.  May
11 -- well, maybe one of -- math has overlapped.  So five
12 additional files in there.  So that would be 13 files I
13 looked at anything that I had at my fingertips.
14    Q.  Thirteen files through which you viewed
15 anything and for some of those cases, it was just the
16 underlying police file, not the all the comparator
17 prosecutor file and PD file, correct?
18    MS. GOLDEN:  Form.
19    THE WITNESS:  I -- I looked at whatever I had.
20 BY MR. SWAMINATHAN:
21    Q.  Understood.  And I want to make sure I just
22 understand when we look at your materials reviewed, I
23 think we went through the items on your materials
24 reviewed, which are the items where you actually had a
25 police file as well as the corresponding PD file and

Page 80

1  state's attorney file, correct?
2     A.  That's -- that's in the listing.  That's what
3  it lists -- lists first, the investigative and RD file,
4  then it lists a public defender and then the -- in the
5  prosecutor's file third.
6     Q.  Okay.
7     A.  So --
8     Q.  And those are number five?  Six?
9     MS. GOLDEN:  And Anand --
10    MR. SWAMINATHAN:  Oh, I'm sorry.
11    MS. GOLDEN:  You're flying and he is trying to
12 answer questions and his cadence is much slower
13 than --
14    MR. SWAMINATHAN:  Okay.  Yeah.  Let me slow
15 down.  Let me slow down.
16    MS. GOLDEN:  He was still answering that
17 question.
18 BY MR. SWAMINATHAN:
19    Q.  Go ahead.
20    A.  No.  So I was saying that in the materials
21 reviewed, you can see that those are examples of where I
22 -- I had an investigative file, a public defender file,
23 and a prosecutor file to look at to compare other
24 examples would be just an investigative file and an RD
25 file.  Other examples, I -- another example, I think --

Page 81

1  well, other examples where -- where the public defender
2  file was wholly inadequate, I guess.  So though I tried
3  to examine them, there was either nothing or maybe just
4  a couple pages of reports in there.
5     Q.  Okay.  So looking at this list of materials
6  reviewed, the instances in which you had a police file,
7  in addition to a prosecutor file and public defender
8  file, were numbers five, six, seven, eight, 13, 14, 15,
9  16, 18, and 19, correct?
10    A.  As the way they're listed, yes.
11    Q.  Okay.  So that's ten files for which you had
12 the police file and public defender file and state's
13 attorney file, correct?
14    A.  That's what's listed here, yes.
15    Q.  Okay.  And when you say that's what's listed
16 here, you're not saying that you believe there's a bunch
17 of other cases in which you had the police file,
18 prosecutor file, and state's attorney -- and defense
19 file, correct?
20    A.  No.  But as I said to you a few minutes ago, I
21 -- I know in the Section 5 of my report, I know there's
22 five cases in there.  There's six cases, but math has
23 overlapped.  So I know there's five cases in there and
24 off the top of my head, I don't recall what I examined.
25 I -- I -- I might -- I might not have had all three of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 82

1  those things to compare and contrast to, but the the --
2  Section material, it -- it -- it -- from -- in my report
3  is gleaned from Page 51 of the expert's report. And in
4  that part, he is claiming that he's comparing
5  investigative file to RD only.
6       Q.  Understood.
7       A.  So he -- he's not stating that he examined a
8  public defender file, even though, like I said the one
9  case, math has overlapped, there was a public defender
10 file.  So --
11      Q.  Understood.  In this -- you indicated that in
12 the Rivera case, you were aware that there were more
13 prosecutor files, public defender files that
14 corresponded to investigative files that had been
15 tendered in discovery in that litigation than the number
16 that you actually reviewed for purposes of your
17 disclosure, correct?
18      A.  In Rivera?
19      Q.  Yes.
20      A.  Yes.
21      Q.  And in this case, do you understand that there
22 were more prosecutor files and public defender files
23 corresponding police files than you reviewed in this
24 matter?
25          MS. CARNEY:  Objection.  Form.  Foundation.

Page 83

1  You can answer.
2          THE WITNESS:  I -- I believe I answered that
3  yes.
4  BY MR. SWAMINATHAN:
5       Q.  Okay.  And ultimately, you reviewed only the
6  portion of the public defender files and prosecutor
7  files for the instances in which there Mr. Tiderington
8  had provided an example, instance -- strike that.  Strike
9  that.  In this case, you looked at a subset of the total
10 prosecutor files and public defender files that had been
11 tendered in discovery; is that fair?
12      A.  Not -- not completely accurate.  I -- I looked
13 at the eight cases that he used examples, but then I
14 went into the Page 51 cases, which were number of pages
15 like one -- one case might've been, you know, four or
16 five pages.  So not -- it's not a one-to-one
17 relationship between pages of cases.  And then, also, I
18 looked at -- at the very conclusion, the photos -- the
19 Polaroid photographs from the Solache-Reyes case.
20      Q.  Okay.  And you understood that that was only a
21 portion of the police files, prosecutor files, and
22 public defender files that had been tendered in
23 discovery in this case, correct?
24      A.  That's my understanding.
25      Q.  Okay.  And so in that way, your analysis in

Page 84

1  this case was different than the analysis you conducted
2  in Fields, correct?
3       A.  I believe I've answered that, yes.
4       Q.  Okay.  And in this case, your analysis
5  involved a review of many fewer files than you view --
6  than you reviewed in Fields, correct?
7          MS. CARNEY:  Objection.  Form.  You can
8  answer.
9          THE WITNESS:  As I said before, yes.
10 BY MR. SWAMINATHAN:
11      Q.  Okay.  And then you had started to say
12 something a little while ago about the documents that
13 you actually reviewed in conducting your comparisons.  I
14 want to ask you a little bit more about that.  So let me
15 just sort of preface that and then get into my
16 questions.  So when you -- strike that.  In your
17 materials review, you indicate that you received each of
18 these, you know, investigative files, public defender
19 files and CCSAO files in their entirety, did you review
20 each of those files in their entirety or did you focus
21 on portions of those files?
22      A.  I -- I focused on what Mr. Tiderington's --
23 tiderington said was missing or not disclosed.  That was
24 the -- the focus of the examination.
25      Q.  Okay.  Did you -- were you -- other than the

Page 85

1  files themselves in their entirety, were you also
2  provided with packets that contain just portions of
3  those -- of the document from the file?
4          MS. CARNEY:  Objection.  Form.  You can
5  answer.
6          THE WITNESS:  I'm -- I'm sorry, sir.  I don't
7  understand that question.
8  BY MR. SWAMINATHAN:
9       Q.  Yeah.  In other words, you could be provided
10 with the entire files, right?  Or you could be provided
11 with the relevant portions of the file as identified by
12 Mr. Tiderington?
13      A.  Oh, no.  I had the entire files.
14      Q.  Okay.  And then in terms of -- did Counsel
15 ever -- for each of these file for any -- strike that.
16 For any of the files listed in your materials reviewed,
17 did Counsel provide you with any specific documents from
18 those files separate from the entire file?
19      A.  No.  I mean, he -- I -- I -- I was provided
20 the entire file, so there was not a separate part of the
21 file that was provided.  I was given the file.
22      Q.  Okay.  And you weren't given subsets of the
23 file to focus on?
24      A.  No.  I mean, the -- the -- my focus came out
25 of the plaintiff's expert's report, what he said was



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 25 of 104 PageID #:65962
The Deposition of BERNARD MICHALEK, on 02/15/24

86..89

Page 86

1  missing.
2      Q.  Okay.  Did you perform any work -- strike
3  that.  In Mr. Tiderington's report in this matter, he
4  has a number of attachments to his report.  You saw
5  those, correct?
6      A.  Yes, I did see that.
7      Q.  Okay.  And one of his attachments is an
8  attachment that's a huge spreadsheet that lists out all
9  the documents for which he conducted an analysis of
10  whether it was in the public defender file and so on.  Do
11  you recall that attachment?
12          MS. CARNEY:  Objection.  Misstates the
13      evidence.  You can answer.
14          THE WITNESS:  I -- I -- the attachments with
15      the -- with the different charts with the -- that
16      were created, I would refer to them as I needed to.
17      I didn't spend time reading every one of the
18      entries and whether they're accurate or not.
19  BY MR. SWAMINATHAN:
20      Q.  And that was going to be my question.  I know
21  you obviously looked at the examples Mr. Tiderington
22  disclosed in his report itself, right?  He basically
23  wrote out a paragraph or two about each of those example
24  cases, correct?
25      A.  Yeah.  I was -- he would say in this report,

Page 87

1  this -- the -- in a certain case, certain pages are
2  missing or -- he believed not tendered at all.  So
3  those would be the pages I'd look at.  And to the degree
4  that a case was either lined out in one of the
5  attachments where he considered he would not examine it,
6  I would point that out.
7      Q.  In the -- did you spend time going through
8  each of the rows that were in his Attachment G that
9  listed out for each specific investigation, what
10  documents were not contained in the public defender
11  file?
12      A.  I did not.
13      Q.  Okay.  Did you conduct any analysis of the
14  blue columns in his attachment that laid out his
15  analysis of whether the general orders and special
16  orders were being followed?
17          MS. CARNEY:  Objection.  Misstates the
18      evidence.  You can answer.
19          THE WITNESS:  I did not.
20  BY MR. SWAMINATHAN:
21      Q.  And did you conduct any analysis of his work
22  in the purple columns about the permanent retention
23  files?
24          MS. CARNEY:  Objection.  Misstates the
25      evidence.  You can answer.

Page 88

1          THE WITNESS:  I did not.
2          MR. SWAMINATHAN:  Okay.  We've been going for
3      another good chunk.  Should we take a quick five-
4      minute break?
5          MS. CARNEY:  Yeah, that'd be great.
6          MR. SWAMINATHAN:  Okay.
7          THE REPORTER:  Okay.  Going off the record.
8      The time is 11:48 a.m.
9              (OFF THE RECORD)
10          THE REPORTER:  We're back on the record.  The
11      time is 12:06 p.m.
12  BY MR. SWAMINATHAN:
13      Q.  Sir, would you agree with me that your
14  opinions in this case are very similar to your opinions
15  in the Fields and Rivera cases?
16          MS. CARNEY:  Objection.  Form.  You can
17      answer.
18          THE WITNESS:  Regarding a process of -- yes.
19  BY MR. SWAMINATHAN:
20      Q.  Okay.  And in the Fields case, you basically
21  opined that you saw no evidence of any systemic failure
22  to disclose Brady evidence; is that correct?
23      A.  That's correct.
24      Q.  And in the Rivera case, you reached the same
25  conclusion that there was no evidence of systemic

Page 89

1  failure to disclose information to criminal defendants,
2  correct?
3      A.  Yes.
4      Q.  And in this case, you reached that same
5  conclusion that there's no evidence of a systemic
6  problem with failing to disclose information from police
7  reports to criminal defendants, correct?
8      A.  Yes.
9      Q.  Okay.  And you've never opined in any other
10  cases other than these three cases, correct?
11      A.  I've only been expert on three cases.
12      Q.  Okay.  And all three cases were for the
13  Chicago Police Department, correct?
14      A.  Yes.
15      Q.  Okay.  Your opinions in this case, did you cut
16  and paste any portions of your opinions in this case
17  from your prior reports?
18      A.  Yes.
19          MS. CARNEY:  Oh, hold on.  Obviously, the
20      answer can now stand because he answered, but to
21      the extent you're going to ask him any more
22      questions about the drafting of his report, I'm
23      going to object and instruct him not to answer
24      based on the --
25  BY MR. SWAMINATHAN:



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

1      Q.   Yeah.  And I don't want to go into the details
2  of your drafting process and back and forth with
3  Counsel, which it is -- Counsel's correctly identifying
4  as subject to a -- to a privilege.  I'm really just
5  asking you about the content of the report itself as
6  disclosed, okay?  So with that caveat, is it fair to say
7  that there are portions of your report in this case that
8  are basically paragraphs that are basically identical to
9  paragraphs in your prior reports in Fields and Rivera?
10         MS. CARNEY:  Object to the form.  And I'm
11      going to instruct him not to answer on the basis of
12      work product in keeping with the previous
13      objections that you have lodged in depositions of
14      your experts. I'm not going to let him talk about
15      any of the portions in the drafting of his report.
16         MR. SWAMINATHAN:  But I'm not -- okay.
17      Understood.  I'm not going to ask him about the
18      drafting process at all.  I'm just asking him about
19      the final disclosed opinion in each case.  Do they
20      contain -- you know, that -- I could put them all
21      up on the three one by one next to each other and
22      say, do these paragraphs match these paragraphs one
23      by one?  I don't want to spend an hour doing that
24      and I -- but I could. I mean, we can do that if we
25      need to do that.  So let me ask the question.  And

Page 91

1      then, Theresa, you can object if you think you need
2  to.
3  BY MR. SWAMINATHAN:
4      Q.   So let me clarify my question.  Your final
5  version of your report -- I'm not asking the process
6  that resulted in a final version of the Fields report or
7  the Rivera report or this report, okay?  So with that
8  caveat, the final version that you disclosed of your
9  report in this matter, would you agree that it contains
10  paragraphs that are identical to paragraphs contained in
11  your final disclosed reports in Rivera and Fields?
12         MS. CARNEY:  Okay.  That's fine.  You can
13      answer.
14         THE WITNESS:  There are paragraphs, yes, that
15      are similar to or nearly identical to paragraphs
16      regarding the legal standards from the other
17      report.
18  BY MR. SWAMINATHAN:
19      Q.   Okay.  And you looked at different comparator
20  files in this case than you looked at in Fields and
21  Rivera, correct?
22      A.   I'm sorry, I don't understand the question.
23      Q.   You looked at a different set of underlying
24  police report -- police files and prosecutor files and
25  PD files in case -- in this case than you looked at in

Page 92

1  Rivera and Fields, correct?
2      A.   I think almost all of them are -- are -- are
3  new.
4      Q.   Okay.  But -- okay.  But then the overall
5  opinions that you reached are the same in each of the
6  cases, correct?
7      A.   That there's not a systemic failure to
8  disclose documents, yeah.  That -- that opinion is
9  consistent.
10      Q.   Okay.  And you have some opinions about the
11  disclosure obligations of the prosecutor's office in all
12  three of your opinions, correct?
13      A.   Disclosure to defense -- defense attorneys?
14      Q.   Correct.
15      A.   Yes.
16      Q.   And you have some opinions in all three cases
17  about the files that were provided by the public
18  defender's office and the veracity of those files,
19  correct?
20         MS. GOLDEN:  Form.
21         MS. CARNEY:  You can answer.
22         THE WITNESS:  I don't -- I don't know the
23      veracity is the word I'd use.  I definitely use
24      completeness.
25  BY MR. SWAMINATHAN:

Page 93

1      Q.   Okay.  And ultimately, the overall opinions
2  you're offering in this case are consistent with the
3  opinions you offered in Rivera and Fields, correct?
4         MS. GOLDEN:  Objection.  Asked and answered.
5         MS. CARNEY:  You can answer it again.
6         THE WITNESS:  Yes.
7  BY MR. SWAMINATHAN:
8      Q.   And in other words, you looked at different
9  sets of underlying files, but you reached the same
10  conclusions in this case as you did in Rivera and
11  Fields, correct?
12         MS. GOLDEN:  Same objections.
13         THE WITNESS:  Yes.
14  BY MR. SWAMINATHAN:
15      Q.   And are there any opinions that you're
16  offering in this case that are new, something you didn't
17  offer in Fields or Rivera?
18         MS. GOLDEN:  Form.  You can answer.
19         THE WITNESS:  I -- I don't think so.
20  BY MR. SWAMINATHAN:
21      Q.   Okay.  You -- well, strike that.  In terms of
22  the -- strike that.  All right.  I want to ask you about
23  a little bit about your experience.  You indicated
24  previously that you have spent your entire career
25  working in prosecutors' offices, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 94

1   A.   Yes.
2        Q.   And you're not holding yourself out as an
3   expert in this case in police practices, are you?
4        A.   The what?  How they conduct investigation? No.
5        Q.   Okay.  Are you holding yourself out as an
6   expert in this case on police procedures?
7        A.   What do you mean by -- can you explain what
8   you mean by procedure?
9        Q.   Yeah.  In other words, how police officers are
10  taught to go about conducting the day-to-day work of
11  conducting investigations?
12       A.   I don't know how they're -- how or -- how
13  they're taught, no.
14       Q.   Okay.  And are you holding yourself out as an
15  expert in this case on the generally accepted police
16  practices around the country?
17       A.   No.
18       Q.   Are you holding yourself out as an expert in
19  this case on the national standards for police practices
20  in this country?
21       A.   I think that's the same question.  No.
22       Q.   Okay.  Are you holding yourself out as an
23  expert in this case on police policy writing?
24       A.   No.
25       Q.   Are you holding yourself out as an expert in

Page 95

1   this case on police training?
2        A.   I think you just asked that, but no, I'm not.
3        Q.   The last question was policy writing and this
4   one was training, but I appreciate you answering the
5   question.  Before you were retained in this case, you
6   had never reviewed -- actually seen any Chicago Police
7   Department policies; is that correct?
8             MS. CARNEY:  Objection.  Form.  Misstates his
9        testimony.
10            THE WITNESS:  Prior to this case, no.  I had
11       reviewed the special order prior to Fields.
12  BY MR. SWAMINATHAN:
13       Q.   Sorry.  Yeah.  That -- I've asked the question
14  before.  Let me ask again.  Before you consulted in the
15  Fields matter, you had never reviewed any Chicago Police
16  Department general orders or special orders, correct?
17            MS. CARNEY:  Objection.  Form.
18            THE WITNESS:  You'd have to narrow that down
19       because I -- I -- I know I've looked at other
20       general orders over the years, but not -- not the
21       general orders regarding the keeping of notes and
22       the keeping of investigative materials.
23  BY MR. SWAMINATHAN:
24       Q.   Okay.  And so the -- you have -- before you
25  were retained in the Fields matter, you'd never reviewed

Page 96

1   the Chicago Police Department's special orders regarding
2   the documentation and file retention associated with
3   investigations, correct?
4        A.   I was aware of them, but I had not reviewed
5   them.
6        Q.   Okay.  And so during your time working in the
7   Cook County State's Attorney's Office, you did not --
8   well, I'll strike that.  I've already asked you that.
9   Prior to your retention by the by the City of Chicago to
10  work in the Fields matter, did you have any knowledge
11  about whether any of the of the police department,
12  general orders or special orders regarding documentation
13  and file retention were amended at any point?
14            MS. CARNEY:  Objection.  Form.  You can answer
15       if you understand.
16            THE WITNESS:  I don't think I understand your
17       question.
18  BY MR. SWAMINATHAN:
19       Q.   So for example, you said you were aware of
20  Special Order 83-1, but you hadn't actually read it,
21  correct?
22       A.   That's correct.
23       Q.   Were you aware of any amendments or changes to
24  Special Order 83-1 during your time working in the Cook
25  County State's Attorney's Office?

Page 97

1        A.   I -- I don't think I was aware of amendments
2   to it, but I obviously filed -- investigative file
3   retention was a topic during that time period.  So to
4   the extent that there were amendments to it, it was up
5   to us to obtain police reports.  So I know we were
6   continuing our practices on that front.
7        Q.   And were there changes to your practices
8   around getting access to police reports as there were
9   amendments or changes to police department policies on
10  that issue?
11            MS. GOLDEN:  Foundation.
12            THE WITNESS:  No.  I -- we would pursue police
13       reports through all the -- all the manners I've
14       described earlier.
15  BY MR. SWAMINATHAN:
16       Q.   During your time working in the Cook County
17  State's Attorney's Office, did you ever review or see
18  any written policies of the subpoena service unit?
19       A.   No.
20       Q.   At any point while you were working in the
21  Cook County State's Attorney's Office, did you become
22  aware of any written policies in the subpoena service
23  unit?
24       A.   I'm not sure if I was aware of their policies
25  other than for -- for a period of time, we would send



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Page 98**

1  subpoenas and document requests and -- and inter-office
2  forms to the area as well as to 11th and State or 35th
3  and Michigan. And at some point during that time
4  period, they stressed that we should just send all our
5  requests to 11th and State or 35th and Michigan to
6  obtain the reports. So to the degree, that's the
7  subpoena service or whatever you refer to it as that's
8  something I was aware of.
9      Q.   Okay. And so you were aware of an instruction
10  to you as a prosecutor about where to submit your
11  requests to for subpoenas, correct?
12     A.   That's correct.
13     Q.   Okay. But in terms of the process within the
14  police department, once those subpoena requests were
15  received, you are not aware of any policies associated
16  with how the police department then responded to those
17  subpoena requests, correct?
18     A.   Policies, no.
19     Q.   And you're not aware of any procedure manuals
20  that provided guidance to police staff about how to
21  respond to those subpoena requests, correct?
22     A.   I'm not familiar with their policy manuals on
23  subpoena requests.
24     Q.   Have you ever -- strike that. Are you aware
25  of any training that was provided to individuals within

**Page 99**

1  the police department about how to respond to subpoena
2  requests?
3      A.   No.
4      Q.   Are you aware of any training ever received to
5  anybody who staffed the subpoena service unit?
6      A.   I -- I -- I don't know what training, if any,
7  they received. So I -- I can't -- I don't know that to
8  answer that, whether it was extensive or minimal or
9  whether those was a manual on it or a general order or
10  special order. I don't know those things.
11     Q.   In the -- in your work as an expert on this
12  case and Fields and Rivera, did you review any documents
13  that provided you with guidance on what the policies
14  were within the Chicago Police Department for responding
15  to subpoena requests?
16     A.   Documents regarding policy, no.
17     Q.   During your course of your expert work in this
18  case and Fields and Rivera, did you review any documents
19  that constituted checklists or guidelines or procedure
20  manuals to guide individuals within the police
21  department on collecting materials as requested in
22  subpoenas?
23     A.   Well, checklists is kind of a broad term. I
24  did not review their policy manuals, but it was obvious
25  in the subpoenas that we sent to 11th and State or 35th

**Page 100**

1  and Michigan that they were circling items in the
2  subpoena request form and sending them to different
3  areas. We'd get the same Xeroxed subpoena from
4  different areas with different things circled or checked
5  off on it. So that's not a policy manual examined, but
6  I think it was evidence of their practice possibly.
7      Q.   Did you review anything in the course of your
8  expert work across these three cases that constituted
9  some kind of internal guidance about where to go and how
10  to go about collecting material and response to
11  subpoena?
12         MS. CARNEY: Objection. Form. You can
13     answer.
14         THE WITNESS: Is that -- you're saying police
15     department forms? I'm sorry. Police department
16     documents? No.
17  BY MR. SWAMINATHAN:
18     Q.   Yes. Okay. In the course of your expert work
19  in this case or Rivera or Fields, did you go out and
20  review any documents associated with police practices in
21  any other jurisdictions?
22     A.   No.
23     Q.   Did you review any policy police department
24  policies within in any other jurisdictions?
25     A.   No.

**Page 101**

1      Q.   In the course of your extra work in this
2  matter, did you review any research or studies regarding
3  Brady disclosures in jurisdictions across the country?
4      A.   Can you rephrase that?
5      Q.   Yeah. During the course of your expert work
6  in these three cases, did you go out and look at any
7  research or studies regarding Brady disclosures?
8      A.   I did not look at research or studies.
9      Q.   Okay. And did you, in the course of your work
10  on this matter, investigate what the police -- what the
11  what the generally accepted police practices were around
12  the country with regard to the disclosure of information
13  in police files?
14         MS. CARNEY: Object to form. Go ahead.
15         THE WITNESS: You -- can you rephrase that? I
16     -- I didn't quite -- quite get the -- the -- the --
17     the middle part, I think, actually.
18  BY MR. SWAMINATHAN:
19     Q.   Yeah. In the course of your expert work on
20  these three matters, did you go out and review any of
21  the generally accepted police practices on the
22  disclosure of information in police files to prosecutors
23  and criminal defendants?
24     A.   You mean generated by police agencies?
25     Q.   Sure.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 102

1    A.  I have not.
2    Q.  Okay.  And do you consider yourself to be an
3  expert on how police departments should set up their
4  policies to address their Brady disclosure obligations?
5    A.  No.
6    Q.  And do you claim to be an expert on how police
7  departments should set up their practices with regard to
8  the documentation and disclosure of information from
9  their police files?
10   A.  No.
11   Q.  Do you claim to be an expert in how police
12 departments should go about training officers in their
13 documentation and disclosure obligations?
14   A.  No.
15   Q.  And you claim to be an expert in how police
16 departments should go about monitoring and auditing
17 their policies related to disclosure and documentation?
18   A.  How they should monitor their own -- I'm
19 sorry, their own procedures?
20   Q.  Yeah.  Yeah, let -- yeah, exactly.  But let me
21 ask it again.  So it's may -- maybe I was a little
22 unclear.  And do you claim to be an expert on how police
23 departments should set up their policies or practices --
24 strike that.  Do you claim to be an expert in how police
25 departments should conduct monitoring or auditing to

Page 103

1  ensure that their policies are followed with regard to
2  documentation and disclosure of police files?
3    A.  No.
4    Q.  And I may have asked you this, so I apologize
5  if so, but you've never reviewed any Brady related
6  policies of any other police department other than the
7  Chicago Police Department, correct?
8    MS. CARNEY:  Objection.  Form.  You can answer
9    if you understand.
10   THE WITNESS:  Other agencies' Brady policies?
11 BY MR. SWAMINATHAN:
12   Q.  Yes.
13   A.  I have not.
14   Q.  And you have not reviewed any other police
15 agency other than the Chicago Police Department's
16 policies regarding the documentation and disclosure of
17 police files, correct?
18   A.  I have not looked at other agencies, no.
19   Q.  Okay.  And if we look at your materials
20 reviewed in this matter, this is Exhibit 3, your list of
21 materials reviewed does not include the Chicago Police
22 Department policies associated with disclosure -- with
23 documentation and disclosure, correct?
24   A.  No, they do not.
25   Q.  Okay.  And you didn't review those documents

Page 104

1  in preparing your report in this case, correct?
2    A.  No, I did not.
3    Q.  Okay.  You didn't rely on those documents --
4  strike that.  And you didn't rely on the Chicago Police
5  Department policies regarding documentation and
6  disclosure in preparing your report in this case,
7  correct?
8    A.  Well, I -- I did examine the -- the Special
9  Order 83-1 and what was included in there.  But any
10 other policy manuals, no, I did not.
11   Q.  Okay.  And when you say you looked at Special
12 Order 83-1, you had previously looked at 83-1 in the
13 context of your work in Fields and Rivera, correct?
14   A.  That is correct.
15   Q.  Okay.  But you didn't receive it again and
16 review it again in preparing your report in this case,
17 correct?
18   MS. CARNEY:  Objection.  Form.  Misstates his
19   testimony.
20   THE WITNESS:  I -- I definitely reviewed it
21   again.
22 BY MR. SWAMINATHAN:
23   Q.  In preparing your report in this case?
24   A.  Yes.
25   Q.  Okay.  And so you -- so your materials

Page 105

1  reviewed listed here should actually include an
2  additional item, which is Special Order 83-1; is that
3  right?
4    A.  It should.
5    Q.  Okay.  Any other documents that you reviewed
6  in preparation in preparing your report that are not
7  disclosed here on your materials reviewed?
8    A.  None that I'm aware of.
9    Q.  Okay.  Are there any other special orders that
10 you reviewed in preparing your report in this case,
11 other than Special Order 83-1?
12   A.  No.
13   Q.  Okay.  And are there any other special orders
14 that you relied on in preparing in your -- preparing
15 your opinions in this case, other than Special Order
16 83-1?
17   A.  No.
18   Q.  Okay.  And so you did not review special Order
19 83-2 in preparing your opinions in this case, correct?
20   A.  I did not.
21   Q.  If I asked you what was contained in Special
22 Order 83-2, could you tell me?
23   A.  Not off the top of my head.  I -- I know I --
24 I -- I looked at it maybe prior to Fields, but I -- I
25 don't recall what's in it.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

Q. Okay. And you didn't you -- and you don't -- you did not study -- strike that. You did not study Special Order 83-2 and offer opinions about it in your report, correct?

A. I did not.

MS. GOLDEN: Foundation.

BY MR. SWAMINATHAN:

Q. Go ahead.

A. Prior to this case, I did -- I did not.

Q. Okay. And in your materials reviewed, you didn't -- strike that. You did not review Special Order 8-3 in preparing your report in this case, correct?

MS. GOLDEN: Objection. Foundation.

THE WITNESS: Prior to this case, no.

Q. And prior -- and I say prior to this case, you mean in preparing your report in this case, you did not review Special Order 86-3, correct?

A. I did not.

Q. And you didn't rely on Special Order 86-3 in preparing this report, correct?

A. I did not.

Q. Okay. And you don't reference Special Order 86-3 in your report?

A. No, I -- I -- I think I say 83-1 and other orders, but no, I did not specifically review it -- or

Page 107

prior to compiling this report.

Q. And if I asked you what was in Special Order 86-3, could you tell me?

A. Could not.

Q. And fair to say you did not study Special Order 86-3 and offer opinions about it in your report?

MS. GOLDEN: Foundation.

MS. CARNEY: Form.

THE WITNESS: Well, as -- as -- as I said, I did not review it prior to compiling this report, but I did mention 83-1 and -- and later orders. So to the extent that I had reviewed it prior to Fields, I knew there were other orders that were regulated investigative files, compilation and retention and -- and -- and providing them. I -- I did not specifically review them in that manner.

BY MR. SWAMINATHAN:

Q. Okay. And ultimately you didn't study 86-3 and offer opinions about that particular policy in your report in this matter, correct?

A. Did -- did not.

Q. Okay. When you say "I did not," that is correct?

A. That's correct.

Q. Okay. And that's my apologies for the

Page 108

questioning. In preparing your report in this matter, you did not review documents related to the George Jones homicide investigation from in or around 1981, correct?

MS. CARNEY: Objection. Form. You can answer.

THE WITNESS: In -- in preparing for this report, I did not.

BY MR. SWAMINATHAN:

Q. Did you review the court opinions related to the Jones or Palmer cases from the early 1980s?

A. I did not.

Q. In preparing your report in this matter, did you review any of the hearing transcripts related to Jones and Palmer?

A. I did not.

Q. In preparing your report in this matter, did you review any of the deposition testimony of James Hickey about what happened in Jones and Palmer?

A. I did not.

Q. Have you ever reviewed the court opinions related to the Jones and Palmer cases from the early 1980s?

A. I -- I -- I may have read either or both of them, but -- and if I did, it would've been prior to Fields, but I -- I -- I don't recall. Again, I don't

Page 109

recall if I read them or maybe just cut to the head notes or something like that, frankly.

Q. But fair to say you weren't -- you didn't remember the contents of those court opinions related to Jones and Palmer at the time you were writing your report in this case, correct?

A. That's correct.

Q. Okay. And so you didn't rely on -- I -- on the Jones and Palmer court opinions in offering your opinions in this case, correct?

A. I did not.

Q. And you didn't rely on any of the information in the hearing transcripts related to Jones and Palmer informing your opinions in this case, correct?

A. I did not.

Q. And you did not rely on any testimony of James Hickey or any other Chicago police officers about what happened in Jones and Palmer, correct?

A. I did not.

Q. Did you review any documents in preparing your report in this case that talked about what the problems within the Chicago Police Department were that were being solved by the Special Order 83-1?

MS. CARNEY: Objection. Form. You can answer.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 31 of 104 PageID #:65968
The Deposition of BERNARD MILNER, on March 15, 2024
110..113

Page 110

1      THE WITNESS: Yeah. I'm sorry. Could you
2   restate that question?
3 BY MR. SWAMINATHAN:
4     Q. Yeah. In preparing your report in this case,
5 did you review any documents that discussed what the
6 underlying problems were that resulted in Special order
7 83-1?
8      MS. CARNEY: Objection. Form.
9      THE WITNESS: I did not review documents that
10   described the underlying issues.
11 BY MR. SWAMINATHAN:
12     Q. Okay. And so in preparing your report in this
13 case, you didn't review any documents that indicated to
14 you -- strike that. And if you didn't review documents
15 about what the problems were that Special Order 83-1 was
16 intended to solve, you're not intending to offer
17 opinions in this case about whether 83-1 was an
18 effective solution to those problems, correct?
19      MS. CARNEY: Objection. Form. Foundation.
20   You can answer.
21      THE WITNESS: Well, I knew from referring --
22   from -- from reading 83-1, that there was a direct
23   about to make sure that investigative materials
24   were retained. So I knew that before I examined
25   the -- the plaintiff's expert's report and made my

Page 111

1   analysis.
2 BY MR. SWAMINATHAN:
3     Q. Are you claiming to have a complete
4 understanding of what the problems were that had been
5 identified within the Chicago Police Department that
6 resulted in Special Order 83-1?
7      MS. CARNEY: Objection. Form. Assumes facts
8   not in evidence. You can answer.
9      THE WITNESS: A -- a complete understanding. I
10   -- I think it's evident from the 83-1 that they
11   were emphasizing the retention of investigative
12   matters, which had been referred to as Street Files
13   before, and to retain them and make them available.
14 BY MR. SWAMINATHAN:
15     Q. And you have that knowledge -- and you're
16 saying you have knowledge about what the problems were
17 that 83-1 was intended to solve based on reading 83-1-1
18 itself; is that right?
19      MS. CARNEY: Objection. Form. Misstates his
20   testimony. You can answer.
21      THE WITNESS: I know from reading 83-1 and --
22   and knowing that -- that there was a -- change in
23   policy to make sure investigative materials, which
24   were referred to as Street Files, to make sure
25   those items were retained.

Page 112

1 BY MR. SWAMINATHAN:
2     Q. You don't know what specific problems any
3 federal judges identified with CPD's policies before
4 Special Order 83-1, correct?
5     A. I do not.
6     Q. And so you don't know whether Special Order
7 83-1 sufficiently addressed the problems that had been
8 identified by any federal judges, correct?
9      MS. CARNEY: Objection. Form.
10      THE WITNESS: I -- I don't know what the
11   federal -- what the federal judge opined.
12 BY MR. SWAMINATHAN:
13     Q. Okay. And so you can't say whether or not the
14 policy solved those problems that the federal judge
15 opined on; is that fair?
16      MS. CARNEY: Objection. Form.
17      THE WITNESS: I only know what the -- the
18   order tried to accomplish.
19 BY MR. SWAMINATHAN:
20     Q. You know what the you know what the order
21 said, correct?
22     A. Yeah, I can read. I can know what -- what it
23 says.
24     Q. Well, understood. But you don't know what
25 specifically were the -- strike that. Do you know what

Page 113

1 problems were specifically identified by Chicago Police
2 officials that needed to be fixed leading to Special
3 Order 83-1?
4      MS. CARNEY: Objection. Form. Asked and
5   answered. Assumes facts not in evidence. You can
6   answer.
7      THE WITNESS: They were from the Street Files
8   allegations, which were in newspapers, what they
9   were trying to resolve was to create a retention of
10   investigative materials as part of -- part of the
11   police department investigations. So those
12   materials will be available later for motion for
13   defendants for trials for prosecutors.
14 BY MR. SWAMINATHAN:
15     Q. And is that the only issue that the Chicago
16 Police Department identified that needed to be solved?
17      MS. CARNEY: Objection. Form. Foundation.
18      THE WITNESS: I don't claim that was the only
19   issue that they're trying to address, but that's
20   the one that jumps off the pages.
21 BY MR. SWAMINATHAN:
22     Q. Okay. And to the extent there were other
23 problems -- strike that. Do you know what other
24 problems the Chicago Police Department identified that
25 needed to be solved?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 32 of 104 PageID #:65969
The Deposition of DR. BERNARD CHIERRT, VOl. I, taken on February 8, 2024
114..117

Page 114

1    MS. CARNEY: Objection. Form.
2    THE WITNESS: I do not know what, if any,
3 other problems they're trying to address.
4 BY MR. SWAMINATHAN:
5    Q.   Okay.  And so can you say whether the Special
6 Order 83-1 was a good solution to those other problems?
7    MS. CARNEY: Objection. Form.
8    THE WITNESS: Well, if I don't know if that --
9 what other problems are, if any, then I would not
10 know if it was a successful way of answering those
11 problems, if any.
12    Q.   Okay.  Thank you.  Did you -- sorry.  Sorry.
13 Okay.  And so in light of your testimony on these
14 points, are you offering an opinion in this case that
15 Special Order 83-1 comports with generally accepted
16 police practices?
17    A.   I don't know what generally accepted police
18 practices are.
19    Q.   Are you offering an opinion in this case that
20 Special Order 83-1 was consistent with national policing
21 standards for documentation and disclosure?
22    A.   Since I'm not aware of those standards, I
23 don't know what it -- if it's addressed or not.
24    Q.   And are you offering an opinion in this case
25 that Special Order 83-1 was an effective solution to all

Page 115

1 of the problems that had been identified during the
2 course of the George Jones case?
3    MS. CARNEY: Objection. Form.
4    THE WITNESS: Regarding the George -- no, I'm
5 not addressing that at all.
6 BY MR. SWAMINATHAN:
7    Q.   Okay.  And ultimately, sir, are you qualified
8 to opine about whether Special Order 83-1 is a good
9 policy from a police perspective?
10    MS. CARNEY: Objection. Form.
11    THE WITNESS: I -- I never said from a police
12 perspective, no.
13 BY MR. SWAMINATHAN:
14    Q.   Okay.  Okay.  I think you've previously
15 indicated that -- strike that.  You're aware of what a
16 Chicago Police Department inventory form is, correct?
17    MS. CARNEY: Objection. Oh, nevermind. Go
18 ahead.
19    THE WITNESS: Well, there's -- when a -- a
20 when a forensic investigator is on a crime scene or
21 maybe a detective and they recover evidence and
22 preserve that evidence for either testing by a lab
23 or use later on a trial, that is referred to as an
24 inventory report.
25 BY MR. SWAMINATHAN:

Page 116

1    Q.   Okay.  And are you aware of, sort of, a list
2 that's kept in typically in investigative files that
3 lists each of the documents that's added to the
4 investigative file?
5    A.   I'm aware of that form as well.
6    Q.   Okay.  And that form is referred to as an
7 inventory or investigative file inventory, correct?
8    A.   You know, I guess it is.  I'm not necessarily
9 familiar with the title of it.
10    Q.   Okay.  You're not sure what title it has, but
11 you are familiar with that document, correct?
12    A.   I am.
13    Q.   Okay.  And if I refer to that as an inventory
14 or investigative file inventory, you know what I'm
15 referring to, correct?
16    A.   As long as you don't wander into evidence
17 recovery, yes, I'm okay with this.
18    Q.   Okay.  So putting aside evidence reports,
19 crime scene processing reports, those types of things,
20 I'm -- when I say for at least for this line of
21 questioning, when I'm referring to an inventory report
22 or inventory, you understand I'm referring to that list
23 of documents contained with the investigative -- within
24 the investigative file.  You with me?
25    A.   I -- I understand what you're saying.

Page 117

1    Q.   Okay.  When you were acting as a prosecutor in
2 the Cook County State's Attorney's Office, would you get
3 copies of the inventory forms from the police
4 department?
5    A.   During the course of subpoenaing materials
6 from the police department, yes, we'd receive that form.
7    Q.   And would you receive -- how often would you -
8 - strike that.  How often would you receive that form?
9    A.   You -- you know, I -- I'm -- I'm not sure with
10 -- with certainty if we received it on every case.  I
11 assume we did.  It wasn't necessarily a form that I was
12 looking for when I received investigative material.
13    Q.   Would it be fair to say you got it about half
14 the time?
15    A.   It -- probably --
16    MS. CARNEY: Objection. Form. You can
17 answer.
18    THE WITNESS: Probably half the time.  Maybe
19 -- maybe more.  It's just a form that I didn't
20 necessarily focus on when I was requesting
21 investigative material.
22 BY MR. SWAMINATHAN:
23    Q.   In your trial testimony in the Rivera matter
24 on page 3908, you were asked, "In your experience, it
25 was typical or atypical that this index would get

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 34 of 104 PageID #:65971
THE DEPOSITION OF BERNARD MURRAY, VOLUME III, taken on March 7, 2023
122..125

**Page 122**

1  A.  It is.
2  Q.  Okay.  You hadn't realized that before?
3  A.  I -- I might have realized in the past, but I
4  didn't realize it's today when I -- or over the weekend
5  when I reviewed again, this file sheet.
6  Q.  Okay.  The inventory sheet component of this
7  policy is -- it's just not all that important to you; is
8  that right?
9  MS. CARNEY:  Objection.  Form.  Misstates his
10  testimony.
11  THE WITNESS:  It's a -- a -- a form that it
12  was not significant to me from compiling the
13  investigative material and getting it to defense
14  counsel and for my own use at trial.  I was -- when
15  I reviewed 83-1, I was most focused on Section 3
16  policy.
17  BY MR. SWAMINATHAN:
18  Q.  Okay.  In any way, if you received a copy of
19  the inventory -- strike that.  In the instances when you
20  received a copy of the inventory sheet from the police
21  department, did you disclose that to the criminal
22  defense attorneys?
23  A.  If I received it, I did, yes.
24  Q.  Okay.  And looking at Section D there on the
25  inventory sheet, it explains that it's a multi-line

**Page 123**

1  eight and a half by 11 sheet of paper with columns to
2  identify each investigative document that is placed in
3  the investigative file case folder.  Do you see that?
4  A.  I do.
5  Q.  Okay.  And it's indicates that it -- "This
6  form functions as the case index for all documents
7  within the investigative file case folder," correct?
8  A.  That's what it says.
9  Q.  Okay.  And then it continues, and it says, "A
10  copy of the form will be forwarded to the Records
11  Division whenever felony charges are placed against a
12  person to ensure proper notice of all existing documents
13  pertaining to the subject investigation to be" -- I --
14  maybe I read that wrong.  I'll read it again.  Section
15  D.  This is the top of Page 3.  "A copy of the form will
16  be forwarded to the Records Division whenever felony
17  charges are placed against a person to ensure proper
18  notice of all existing documents pertaining to this
19  subject investigation, can be made to the State's
20  Attorney's Office, the courts, and defense C=counsel."
21  Do you see that?
22  A.  I do see that.
23  Q.  Okay.  And so pursuant to CPD's own policies,
24  the inventory sheet had a particular importance,
25  correct?

**Page 124**

1  MS. CARNEY:  Objection.  Form.  Foundation.
2  You can answer.
3  THE WITNESS:  In the order, they -- the -- the
4  -- it had a significance for identifying reports
5  that were included in the investigative file.
6  BY MR. SWAMINATHAN:
7  Q.  Okay.  And the -- in the -- in Chicago's --
8  sorry, strike that.  In the CPD policies, the inventory
9  sheet was the mechanism to ensure that the prosecution
10  and the defense knew if they got everything, correct?
11  MS. CARNEY:  Objection.  Form.  Foundation.
12  THE WITNESS:  Well, I don't know if it's a --
13  a mechanism.  If -- if we're following the overall
14  policy of retaining everything, then -- all
15  investigative material, that would be the way to
16  ensure that the material was retained by the -- by
17  the detective investigating the case.  This is a
18  list of what's -- what purports to be in the file.
19  BY MR. SWAMINATHAN:
20  Q.  Okay.  And what it -- what this policy says is
21  that you should create a list of everything in the file,
22  "To ensure proper notice of all existing documents to
23  the State's Attorney's Office, the courts, and the
24  defense counsel," correct?
25  A.  That's what it says, yes.

**Page 125**

1  Q.  Okay.  In other words, this is a mechanism
2  that is -- strike that.  The inventory sheet is supposed
3  to be shared with the prosecutors so that you can
4  confirm whether in fact you got everything in the
5  investigative file, correct?
6  A.  Well, that's one way.  Yes.
7  Q.  That's the way that's written in the policy,
8  correct?
9  A.  That's correct.
10  Q.  Okay.  Now there's -- you're referring to the
11  fact that there's another way for you as a prosecutor to
12  try to do that, correct?
13  A.  Yes.
14  Q.  And what are you saying is the way to do that?
15  A.  I'm -- as I receive all the reports, I'm
16  reading them and making sure that the -- the typical
17  reports from the -- from the Records Division are
18  included.  And when I have a Records Division report
19  that has a detailed interview, then I expect to see a
20  GPR related to that so I can read the file in context to
21  realize whether I've received everything.
22  Q.  Okay.  So for example, you -- if you reviewed
23  the file and you saw a detailed interview, then you'd
24  expect to see a GPR of that interview, correct?
25  A.  That's one example.  Yes.


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 126

1    Q.   And if you didn't see a GPR of that interview,
2  then you would know that you're probably missing
3  something you've got to follow-up; is that right?
4         MS. CARNEY:  Incomplete hypothetical.
5         THE WITNESS:  If a -- if I'm reading a police
6    report and there's a detailed interview in there, I
7    would expect that there would be a GPR of some
8    length that was created at the time of the
9    interview.
10  BY MR. SWAMINATHAN:
11    Q.   And if that -- if you didn't find that in the
12  police file, what would you do?
13    A.   Well, I'd start off by calling the detectives
14  saying, I think I'm missing a GPR.
15    Q.   And is this a hypothetical that you're giving
16  me or is this something that you would -- a way that you
17  would address this --
18    A.   Both.
19    Q.   -- when you were serving as the prosecutor?
20    A.   It's both.
21    Q.   Okay.  And when you say it's both, what do you
22  mean by that?
23    A.   It's a hypothetical, but it's also what I did.
24    Q.   Okay.  So you're describing in -- what one of
25  your practices in terms of -- strike that.  So let me

Page 127

1  ask you this.  Was it your practice as you were
2  reviewing the police files that were coming in to assess
3  whether or not you were getting all the different types
4  of documents you typically expect to see?
5    A.   Yes.  From the investigative file, the RD
6  file, we're trying to read the -- the reports at the
7  same time to make sure we've got everything that we
8  normally would have, not just from the investigative
9  file, but also, you know, for example, there's always a
10  case report when a -- when a crime happens.  If I don't
11  have that, then I know I'm missing that report.
12    Q.   Okay.  And so your practice was to see if you
13  were getting all the different types of documents you
14  typically expect, for example, GPRs.  Well, let me break
15  it down.  Sorry.  I'm asking you a poor question. One of
16  your practices was to see if you were getting all the
17  different types of documents you'd expect to see in a
18  police file; is that correct?
19    A.   Yes.
20    Q.   Okay.  And one of the types of document --
21  strike that.  Were GPRs or handwritten notes a type of
22  document you'd expect to see in the files?
23         MS. CARNEY:  Objection.  Form.  Incomplete
24    hypothetical.  You can answer.
25         THE WITNESS:  Well, again, depending upon the

Page 128

1    investigation, if the -- for the example you used
2    earlier, if there was a detailed interview, I'd
3    expect there'd be some sort of a GPR.
4  BY MR. SWAMINATHAN:
5    Q.   Okay.  But if there were -- you'd expect to
6  see some supplementary reports in the police file,
7  correct?
8         MS. GOLDEN:  Object to foundation.  Form.
9         THE WITNESS:  Supplemental reports would be in
10    the -- in the RD file as opposed to the
11    investigative file, right?
12  BY MR. SWAMINATHAN:
13    Q.   They would also be in the investigative file,
14  right?
15    A.   It could be.
16    Q.   Or not?  Go ahead.
17    A.   Yes, they could be.
18    Q.   Okay.  And when you looked at the
19  investigative file, would you expect to see there to be
20  some general progress reports or other handwritten
21  notes?
22    A.   Well, depending upon the course of the
23  investigation, the example we used earlier, a detailed
24  interview in a police report.  If it wasn't video
25  recorded or court reported or handwritten at the time,

Page 129

1  yeah, I would expect there to be some sort of a GPR of
2  whatever length associated with that.
3    Q.   Okay.  So the practice in your office was to
4  be paying attention to whether you were getting the
5  types of materials you typically expected so that you
6  could follow up if needed; is that right?
7    A.   Yes.  We read the entire file to determine
8  that.
9    Q.   And in other words, in addition to seeing if
10  you're getting all the types of documents you'd expect
11  to see, you were also assessing whether there was
12  specific information in the files that suggested to you
13  that there may be something else you hadn't received; is
14  that right?
15    A.   Yes.
16    Q.   In other words, you may have some GPRs, but if
17  you notice that you have a detailed interview for which
18  you don't have a GPR, you'd do a follow-up?
19         MS. GOLDEN:  Object to foundation.
20         MS. CARNEY:  And incomplete hypothetical.  You
21    can answer.
22         THE WITNESS:  It -- it would depend upon the
23    -- the scenario of how that detailed interview was
24    initially recorded.  But as I said previously, that
25    -- that would cause -- would make me ask, are there

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 36 of 104 PageID #:65973
The Deposition of BERNARD MURRAY, dated 01/08/19, taken on 04/12/19
130..133

Page 130

1    GPRs that I'm missing?
2    BY MR. SWAMINATHAN:
3        Q.   Okay.  And in those instances, what was your
4    practice?
5        A.   As I said earlier, I would probably start off
6    with calling the -- the police officer, the detective on
7    the case.  But that doesn't preclude that, you know,
8    investigative materials and the RD files and all sorts
9    of police reports do not land on my desk on the same
10   day.  So it might just be a timing thing where I
11   received something on one day and -- then I'm still
12   waiting for the GPRs or some other report on another
13   day.
14       Q.   And so was it common for you get a copy of a
15   investigative file where you had to follow-up to get
16   access to the GPRs?
17            MS. CARNEY:  Objection.  Form.  Incomplete
18   hypothetical.
19   BY MR. SWAMINATHAN:
20       Q.   Let's strike that.  I'll ask a better
21   question.  I'm sorry.  When you received a copy of the
22   investigative file, you weren't given the investigative
23   file in drips and drabs, you were given the entire
24   investigative file, right?
25            MS. CARNEY:  Objection.

Page 131

1            MS. GOLDEN:  Form.
2            THE WITNESS:  Could you rephrase that?
3    BY MR. SWAMINATHAN:
4        Q.   Yeah.  And I'm sorry, I'm asking you poor
5    questions.  I understand that you're indicating that,
6    you know, sometimes your requests for documents related
7    to the police investigation may involve you getting
8    documents from different places within the police
9    department.  That's fair?
10       A.   Yes.
11       Q.   Okay.  And in fact, you said you were trained
12   on, you know, knowing what forms to submit and where to
13   go to get information from within the police department,
14   correct?
15       A.   Yes.
16       Q.   And that's because the Chicago Police
17   Department kept documents related to police
18   investigations in different repositories, correct?
19            MS. CARNEY:  Objection.  Form.  Foundation.
20            THE WITNESS:  Yes.
21   BY MR. SWAMINATHAN:
22       Q.   Okay.  And -- but once you were -- strike
23   that.  So one of the repositories of information that
24   you would request in your cases as a matter of practice
25   was the investigative file, correct?

Page 132

1        A.   Yes.
2        Q.   Okay.  And when you requested the
3    investigative file, would you request a portion or
4    pieces of the investigative file, or would you request
5    the entire investigative file?
6        A.   To be accurate, the -- the subpoenas that were
7    often sent out wouldn't -- wouldn't necessarily say
8    investigative file.  They would say GPRs, for example,
9    or what's called Street Files, or what's called RD
10   files.  So it would be -- I don't know if we'd use that
11   label that you used, but we would ask for any and all
12   investigative and other materials.
13       Q.   And when you submitted those requests, was it
14   your expectation that you would get the entire
15   investigative file or pieces of it?
16       A.   Well, we're always hoping to get the entire
17   reports that we're requesting, but sometimes we didn't
18   get all the RD reports at the same time.  Sometimes we
19   didn't get the case report at the same time, and
20   sometimes we didn't receive all of the GPRs at the same
21   time for whatever reason.
22       Q.   Okay.  And so some -- and so when you made the
23   request, though, your expectation was that they were
24   going to be giving you everything in their file that
25   they had at the time?  That they weren't going to be

Page 133

1    picking and choosing within the police department; is
2    that right?
3        A.   Our subpoenas and our other forms are requests
4    for any and all documents.
5        Q.   Okay.  And so when you made a request to the
6    Records Division for the RD file, you were -- your
7    expectation was that they were going to give you-all of
8    the documents in the RD file, correct?
9        A.   Any and all.
10       Q.   And when you made a request to the -- for the
11   investigative file from the police department, your
12   expectation was they were going to give you the entire
13   investigative file, correct?
14       A.   Any and all documents.
15       Q.   Okay.  And so when you'd received the
16   investigative files, if you found that there were --
17   strike that.  When you received investigative files,
18   what you've indicated is that there'd be occasions when
19   you'd find that you didn't have all of the GPRs,
20   correct?
21       A.   That -- yes, there could be.
22       Q.   Okay.  And in those instances, you would reach
23   out first to the detective to get those copies, correct?
24       A.   If -- if I couldn't -- if it was not an
25   obvious timing issue, you know, the -- the GPRs could be



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 134

1  submitted with the -- a draft copy of the final closing
2  supplemental report.  So maybe those GPRs and that final
3  supplemental report wasn't ready because the sergeant
4  hadn't reviewed them yet.  So if it was not a timing
5  issue like that -- if it was a timing issue, I'd
6  probably just subpoena them again.  But if it was not a
7  timing issue where I thought all the materials had been
8  compiled, I would first then go to the detective and
9  say, what am I missing?
10     Q.  Okay.  And that would happen from time to
11 time, right?  Where you'd have to follow up with the
12 detective because some documents from the investigative
13 file didn't get to you?
14        MS. CARNEY:  Hold on.  He wasn't done
15 answering.
16        MR. SWAMINATHAN:  Oh.
17        THE WITNESS:  Yeah.  My last thing I said was,
18        if any materials were actually missing.  Like I
19        said before, the -- the -- the -- the manner in
20        which a -- the example we've been using is a
21        detailed interview.  If it was recorded, a court
22        reported statement, or nowadays a video statement
23        or even back then a handwritten statement, that
24        maybe the GPRs either wouldn't exist or wouldn't be
25        as detailed if it was recorded in a different

Page 135

1        manner.  So that's what I mean by if anything was
2        missing, but it would give me reason to call and
3        ask.
4  BY MR. SWAMINATHAN:
5     Q.  And you -- you've testified I know in an --
6  the -- previously in Rivera and Fields, you acknowledged
7  that there were times when you would get an
8  investigative file from the police department and it
9  would turn out that there were some additional documents
10 that hadn't been provided to you yet, right?  That you
11 had to follow-up and get?
12    A.  Yes.
13    Q.  And you acknowledged that there were times
14 when, you know, there were GPRs that you'd call and say,
15 "Hey, I didn't -- I don't see these."  And then they
16 would turn up when you made the call, correct?
17        MS. GOLDEN:  Object to form.
18        THE WITNESS:  And it -- it -- it -- and it
19        could be for many reasons.  Again, timing or,
20        again, as I mentioned a second ago, the -- the
21        sergeant hadn't signed off on the closing supp, so
22        the GPR hadn't been submitted into the
23        investigative file yet.  But the point is that I
24        would reach out and see if I was missing anything.
25 BY MR. SWAMINATHAN:

Page 136

1     Q.  Okay.  And -- okay.  And so there were
2  multiple reasons that you were often given for why --
3  strike that.  In the instance -- strike that.  In -- let
4  me start over.  When you didn't get GPRs that you were
5  expecting as part of the investigative files that had
6  been provided to you, there were multiple explanations
7  for why that would happen; is that fair?
8     A.  If -- if in fact that there was a GPR -- and
9  no, again, a GPR might not have been ever created.  But
10 if -- if I believe that there should be a -- a GPR, I
11 would ask.  And yes, then there would be multiple
12 reasons why maybe it wasn't originally submitted.
13    Q.  Okay.  And can you say, sitting here today,
14 how often that happened that you -- that a GPR just
15 hadn't been submitted to you, and when you followed up,
16 they provided it?
17        MS. GOLDEN:  Object to foundation.
18        THE WITNESS:  I -- I -- I can't say how often
19        as -- as I said numerous times today, when -- when
20        -- my issue with police reports and -- and GPRs
21        usually revolved around the timing of when I needed
22        to tender them in court and when they finally came
23        to me from the police department.
24 BY MR. SWAMINATHAN:
25    Q.  And so in terms of how often it was that you

Page 137

1  followed up about a GPR and then were -- after you
2  followed up, they provided you with a copy of a GPR
3  based on your follow-up, can -- you can't say how often
4  that is that that happened; is that right?
5     A.  I can't.
6        MS. GOLDEN:  Form.
7        MR. SWAMINATHAN:  Go ahead.
8        MS. GOLDEN:  Go ahead.
9        MR. SWAMINATHAN:  Did you get the answer,
10        Madam Court Reporter?
11        THE WITNESS:  I cannot say.
12 BY MR. SWAMINATHAN:
13    Q.  Okay.  Sorry.  All right.  Let me ask you
14 about -- and by the way, when the detectives would send
15 you their GPRs, as a prosecutor, do you have the ability
16 to say whether the GPRs that were submitted to you or
17 all of the GPRs on a case?
18        MS. CARNEY:  Objection.  Form.
19        THE WITNESS:  I -- I don't understand the
20        question.
21 BY MR. SWAMINATHAN:
22    Q.  Yeah.  As a prosecutor, can you say once
23 you've received some number of GPRs that, in fact, there
24 are no other GPRs that exist for that case?
25        MS. GOLDEN:  Same objection.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 138

1 THE WITNESS: Only from the context of my
2 reviewing of the file.
3 BY MR. SWAMINATHAN:
4 Q. In other words, you may be able to -- if there
5 was a GPR that was created that's missing from the
6 investigative file you received, you may be able to
7 catch it in some instances, correct?
8 MS. CARNEY: Objection. Form. Incomplete
9 hypothetical. You can answer.
10 THE WITNESS: Yeah. If I believed one was
11 missing, I would reach out and try to find out if
12 one was actually missing.
13 BY MR. SWAMINATHAN:
14 Q. But you wouldn't always be able to catch it if
15 there were GPRs that were missing, correct?
16 MS. GOLDEN: Form.
17 THE WITNESS: Well, I -- I can only estimate
18 from my examination of the total file.
19 BY MR. SWAMINATHAN:
20 Q. So, for example, if you had GPRs documenting
21 interviews, but those interviews weren't documented in
22 the supplementary reports, you'd have no idea that there
23 were GPRs related to that interview, correct?
24 A. Well, two things. Usually if there was a -- a
25 -- some significant interview, I think that would be

Page 139

1 documented in -- in, even briefly, in a supplemental
2 report. But if an interview with someone was made part
3 of a GPR and it was not referenced and I couldn't
4 discern that it must have happened where is -- where is
5 the GPR or where is the -- the RD report, then I would
6 not know in that scenario.
7 Q. Okay. Okay. And so you're not claiming that,
8 as a prosecutor, you can always tell whether you've
9 received all of the GPRs?
10 A. I think I can tell from, again, reviewing the
11 entire -- reading the GPRs and the RD files in tandem, I
12 can get a good handle on that I've got everything. I'm
13 not claiming in the -- the scenario -- the hypothetical
14 you -- hypothetical you created, which seems very
15 speculative to me. In that scenario, I would not know.
16 But I think from reading the RD and the investigative
17 files and in -- you know, in conjunction with my review
18 of all the materials, I'd have a safe predictor of that
19 I -- whether -- whether I had all the GPRs that were
20 probably created.
21 Q. And that's because your assumption is that if
22 there were interviews that were taking place, they were
23 always being documented in a supplementary report,
24 right?
25 MS. CARNEY: Objection. Form. Misstates his

Page 140

1 testimony. You can answer.
2 THE WITNESS: You -- you could have a
3 reference to we interviewed in a -- in a -- in a --
4 in a -- in an RD a supplementary report, we
5 interviewed these three people, they knew nothing.
6 And that would make me say, "well, what did they
7 say? Is" - "is our GPR related to that?" And the
8 officer might say, "no, that was it." We didn't --
9 we didn't have a GPR because they -- they knew
10 nothing. So that's an example of me trying to
11 discern whether a GPR existed on -- on a witness.
12 Also, the -- the -- the canvas report would be
13 another report where it could be a brief mention.
14 We conducted a canvas and knocked on ten doors and
15 here are the ten people and no one knew nothing.
16 There may not be a GPR report related to that. But
17 nevertheless, it would cause me to ask, "was a GPR
18 created?"
19 BY MR. SWAMINATHAN:
20 Q. Yeah. And your expect -- in other words, part
21 of what you're identifying is your expectation was that
22 if the police officers were interviewing witnesses as
23 part of their investigation, they were creating some
24 documentation of the fact that they conducted those
25 interviews, correct?

Page 141

1 A. Yes.
2 Q. And your assumption is that if they conducted
3 interviews with individuals as part of the
4 investigation, you'd see evidence of that in their
5 supplementary reports, even if it's just a brief note
6 about interviewing somebody, correct?
7 A. I -- I would say that the majority of the
8 time, there would be some reference in the supplementary
9 report. But there -- there may be -- there may be an
10 interview of someone who they thought was a pertinent
11 witness, but knew nothing. That might be in a GPR and
12 not in a supplementary report. So it'd be the converse
13 of what you're asking. There might be a -- a one
14 paragraph or maybe a -- like, a document they received
15 where they thought they might have a lead and then they
16 quickly realized that it was insignificant, and then
17 maybe did not mention it in the RD, the typed report.
18 Q. Okay. And if they didn't mention it in the
19 typed RD report, you wouldn't know if they created a GPR
20 of that report, correct? Related to that interview,
21 correct?
22 MS. CARNEY: Objection. Form. Misstates his
23 testimony.
24 THE WITNESS: Well, I -- I -- I -- I'm -- I
25 think even one of the cases we have here, there's a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 142

1    -- a lease and a name of somebody that was -- and -
2    - and a GPR report, and -- and it was quickly
3    dropped because the actual perpetrator confessed.
4    So that case, there was evidence in the GPRs of --
5    of that information, but certainly not detailed in
6    the supplemental report.
7    BY MR. SWAMINATHAN:
8        Q.   Okay.  So ultimately, is it your opinion that
9    if the police department failed to give you all the
10   documents related to an investigation, you'd always be
11   able to catch that?
12       A.   I -- I think with the -- the -- reading the RD
13   and the supplement and the investigative file in tandem,
14   I -- I think I can discern whether I've received all the
15   reports or certainly lead me to ask, have I received all
16   the reports?  And --
17       Q.   Okay.  And even investigative steps --
18           MS. CARNEY:  Hold on.  Hold on.  Hold on. Hold
19   on.  He was still talking.
20           THE WITNESS:  And -- and as I've said, the --
21   it -- it is possible that we -- even though I think
22   a GPR should have been created, and when I reach
23   out to the -- police officer, the detective,
24   he'll say, "no, we didn't do a GPR on that" because
25   of whatever reason.  Now, if -- if -- if -- if your

Page 143

1    hypothetical is an interview was conducted or notes
2    were made on a GPR and they were wholly irrelevant
3    to the case and they were not recorded, then, in
4    the RD or -- and then that sub -- that note was not
5    included in the investigative file, then I would've
6    no way of knowing about that.
7    BY MR. SWAMINATHAN:
8        Q.   And maybe just a related question is, when you
9    are reviewing the file, if the police -- if the --
10   strike that.  If the police detectives on the case don't
11   create a supplementary report for investigative steps
12   that they took during the course of the investigation,
13   you have no way of knowing if there were GPRs for that
14   work, correct?
15           MS. GOLDEN:  Object to foundation.
16           MS. CARNEY:  Incomplete hypothetical.  You can
17   answer.
18           THE WITNESS:  Well, if I -- if I've received
19   the investigative file and there's a GPR in there
20   and it's not referenced in the -- in a
21   supplementary report, the reason probably was that
22   it was a -- dead end or a lead that they realized
23   quickly was a dead end.  And that's why there was
24   no supplemental report on that.  But obviously,
25   they would've preserved the -- the investigative

Page 144

1    material, the lease, or the whatever, or the note
2    they took, whatever it might be.
3    BY MR. SWAMINATHAN:
4        Q.   Okay.  And if they pursued a lead that proved
5    to ultimately be a dead end, in that instance, you
6    acknowledged they may not decide to write any
7    supplementary reports about that dead end, correct?
8            MS. GOLDEN:  Object to form and foundation.
9            MS. CARNEY:  And incomplete hypothetical.
10           THE WITNESS:  Well -- well, I think the point
11   is that they're making investigative GPRs regarding
12   that, what ultimately is a dead lead, there's a GPR
13   that refers to that.
14   BY MR. SWAMINATHAN:
15       Q.   Okay.  And if it isn't -- and you're
16   acknowledging in that scenario, it may not be documented
17   in any supplementary report, but there should be a GPR
18   for it, correct?
19       A.   Yeah.  And -- and in that situation, you know,
20   as I've said a few times, we read the investigative
21   file, the GPRs, and any material collected there, with
22   the same level of -- of significance placed on it as the
23   final typed up supplementary reports.
24       Q.   And if you had an instance where they pursued
25   a dead end and they didn't write up typed reports about

Page 145

1    it, unless you received the GPR, you would have no way
2    to know whether there were GPRs about that angle; is
3    that fair?
4            MS. GOLDEN:  Object to form and foundation.
5            THE WITNESS:  Well, I'd have to add on to your
6    hypothetical whether there was any other
7    indications in the supplementary reports that the -
8    - that was followed up on in some form,
9    whether they listed it as a dead end or not.  If --
10   but if -- if it's completely -- if it's -- I said
11   this earlier, if it's a -- if they took notes of an
12   interview with somebody and they realized
13   immediately it was a dead end and there's
14   absolutely no reference to it in the -- in the
15   supplementary reports and they did not put that GPR
16   in the investigative file, there's no way I would
17   know of it.
18   BY MR. SWAMINATHAN:
19       Q.   Okay.  If detectives conducted interviews and
20   investigation that they never documented at all, you
21   wouldn't have any way of catching that either, correct?
22           MS. GOLDEN:  Object to --
23           MS. CARNEY:  Form.  Foundation.  Incomplete
24   hypothetical.
25           THE WITNESS:  Well, I -- I think I answered a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 40 of 104 PageID #:65977
The Deposition of Dr. BERNARD HARCOURT, conducted on February 8, 2022
146..149

Page 146

1  few questions ago, but I'll -- I'll -- I'll -- I'll
2  -- I'll say what I'm trying to convey to you, that
3  if -- if detectives are conducting an investigation
4  on an open case and they're pursuing a -- a -- a
5  part of an investigation that leads nowhere, and
6  pretty quickly it leads nowhere, but they don't
7  submit that GPR into the file and it's not
8  referenced in any other way in their or other typed
9  supplementary reports, I would not know about it.
10 BY MR. SWAMINATHAN:
11    Q.   Okay.  That ultimately -- well, strike that.
12 If the detectives pursued investigative -- well, strike
13 that.  Strike that.  Ultimately the process required
14 prosecutors to trust the Chicago Police detectives to be
15 documenting everything into their investigative file or
16 typed reports, correct?
17       MS. CARNEY:  Objection.  Form.  Foundation.
18    Incomplete hypothetical.
19       THE WITNESS:  I -- I -- I think the special
20    order says, "Relevant information obtained by any
21    detective during the course of their
22    investigation." But with that caveat, I think that
23    we are relying upon them to collect and preserve
24    relevant investigative material.
25 BY MR. SWAMINATHAN:

Page 147

1     Q.   Okay.  And the process requires prosecutors to
2  trust the Chicago Police detectives to disclose to them
3  all of that relevant and pertinent information, correct?
4        MS. GOLDEN:  Object to form.
5        THE WITNESS:  We --
6        MR. SWAMINATHAN:  Carrie, I -- let me -- let
7     me strike that question and re-ask it.  I think
8     Carrie's right.  That was a poorly formed question.
9  BY MR. SWAMINATHAN:
10    Q.   Ultimately, the process required prosecutors
11 to trust Chicago Police detectives to be disclosing
12 everything to them, correct?
13       MS. GOLDEN:  Object to form.
14       THE WITNESS:  We -- maybe the best way to word
15    it is we trust but verify.  We issue the subpoenas
16    and we trust that we'll receive everything.  But
17    for whatever reason where we can tell we're not
18    receiving everything, whether are timing issues,
19    whether -- whatever it is, you know, that's when we
20    verify.
21 BY MR. SWAMINATHAN:
22    Q.   Okay.  And -- but ultimately, even that
23 verification process, you can't guarantee that the
24 Chicago Police Department has given you everything. You
25 have to have some faith that they're following through

Page 148

1  in doing that for you, correct?
2        MS. GOLDEN:  Object to form and foundation.
3        THE WITNESS:  Well, again, I've -- I've gone
4     through how I've read all the reports and tried to
5     determine that -- from my knowledge that I've
6     received everything.  And then if I think something
7     missing, I will try to find if something's missing.
8     So to the level that I depend upon them to produce
9     what they've collected during the course of the
10    investigation, the relevant information in the
11    investigative file and the typed reports, yeah, I'm
12    trusting them to provide that material to me.
13 BY MR. SWAMINATHAN:
14    Q.   Does Cook County State's Attorney's office,
15 did it conduct any audits of Chicago Police Department
16 files to ensure that it was getting everything?
17       MS. CARNEY:  Objection.  Form.
18       MS. GOLDEN:  Foundation.
19       THE WITNESS:  I'm not sure I understand what
20    you mean by audit.
21 BY MR. SWAMINATHAN:
22    Q.   Yeah.  Did the Cook County State's Attorney's
23 Office ever review specific files from the Chicago
24 Police Department and say, all right, we're auditing to
25 make sure that when we make subpoena requests or

Page 149

1  informal requests, you actually provide us with all of
2  the police files?
3        MS. CARNEY:  Objection.  Foundation.
4        THE WITNESS:  I -- I'm not aware of -- that
5     sounds like some sort of formal audit.  I think
6     I've already described how an individual prosecutor
7     might say, "I don't think I've got everything.
8     Please give me what I need."
9  BY MR. SWAMINATHAN:
10    Q.   So are you aware of any formal audits in which
11 the CC -- with the Cook -- in which the Cook County
12 State's Attorney's Office audited the Chicago Police
13 Department's files, investigative files, to ensure that
14 they were getting everything?
15    A.   No.
16       MS. CARNEY:  Objection.  Form.  Foundation.
17    Asked and answered.  You can answer.
18       THE WITNESS:  Not that I'm aware of.
19 BY MR. SWAMINATHAN:
20    Q.   Did anyone in the state's attorney's office
21 ever go in and review homicide investigations to make
22 sure the investigations were being thoroughly documented
23 and disclosed?
24       MS. CARNEY:  Objection.
25       MS. GOLDEN:  Object to foundation.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 150

1    THE WITNESS: Well, no, I'm not aware of that.
2  BY MR. SWAMINATHAN:
3    Q.  Did anyone from the State's Attorney's Office
4  ever go in and review Chicago Police Department files to
5  make sure documents were being pulled from all of the
6  necessary repositories related to that case?
7    MS. CARNEY: Objection. Form. Foundation.
8    THE WITNESS: Is that a -- are you saying on a
9    case-by-case basis?
10 BY MR. SWAMINATHAN:
11   Q.  No, I'm saying as a matter -- strike that. Was
12 there any formal audit or monitoring done to ensure that
13 CPD files were being pulled from all of the necessary
14 repositories within the police department for a given
15 case?
16   MS. CARNEY: Objection. Foundation.
17   THE WITNESS: It was not an office-wide audit
18   that I'm aware of. As I've said before, each
19   prosecutor would look at what he's received and
20   where he should have received it from. If they
21   didn't get the rap sheet, they knew the Bureau of
22   Identification didn't provide it, so they would
23   make phone calls and reach out to them on why they
24   didn't get it. So not a formal office audit, but
25   each prosecutor would audit his own files.

Page 151

1  BY MR. SWAMINATHAN:
2    Q.  Other than individual prosecutors trying to
3  check and see if they think they got everything from the
4  police department, was there anything else that was done
5  within the prosecutor's office to ensure that they were
6  getting everything from the Chicago Police Department?
7    A.  And you -- again, you're -- you're referring
8  to, like, an office-wide audit?
9    Q.  Any office-wide audit or review or spot check,
10 any of those things?
11   A.  Well, the prosecutors would self-audit their
12 files. That's why I was asking, do you mean office-
13 wide or -- or not?
14   Q.  That's what I said. Any office-wide audit.
15   A.  No.
16   Q.  Or spot check or monitoring.
17   MS. GOLDEN: Object to form.
18   THE WITNESS: Not that I'm aware of.
19 BY MR. SWAMINATHAN:
20   Q.  Okay. And did the state attorney's office
21 ever conduct any trainings for the Chicago Police
22 Department about what specific processes or expectations
23 they had about how Chicago Police Department was pulling
24 files in response to its subpoena request and informal
25 request?

Page 152

1    MS. CARNEY: Object --
2    MS. GOLDEN: Object to foundation.
3    THE WITNESS: Well, I -- I'm not quite sure I
4  understand. The -- did -- did the Cook County
5  State Attorney's office ever train the Chicago
6  Police Department on how they should gather up the
7  -- the discovery materials? No, we did not do that
8  type of training.
9    MR. SWAMINATHAN: Okay.
10   MS. GOLDEN: So, Anand, when you're at a good
11 spot, I could use a break.
12   MR. SWAMINATHAN: Yep, let's do it right now.
13   MS. GOLDEN: Okay.
14   THE REPORTER: Okay.
15   MR. SWAMINATHAN: Should we -- why don't we --
16 can we do a lunch? It's 1:20, so I -- I'm trying -
17 - I want to try to be done before he has to go at
18 5:00 p.m., and so we're not bringing him back. I
19 think we've got a good chance of doing that, you
20 know? Don't hold me to it, but I'm -- but I think
21 we're on -- in good shape. But -- and I think we
22 can do that, even if we take a break until 2:00 for
23 lunch. So -- but we are going to go long enough
24 that we can't -- I don't think we can just power
25 through without saying to the witness we should

Page 153

1  take a lunch break.
2    MS. GOLDEN: Yeah, that's fine. Do you want
3  to go off the record?
4    MR. SWAMINATHAN: Yeah, let's go off the
5  record. Thank you.
6    THE REPORTER: Okay. Going off the record.
7    The time is 1:21 p.m.
8    (OFF THE RECORD)
9    THE REPORTER: We're back on the record. The
10 time is 2:05 p.m.
11   MR. SWAMINATHAN: Sorry.
12 BY MR. SWAMINATHAN:
13   Q.  All right. Good afternoon, Mr. Murray. Did
14 you get a chance to get some lunch?
15   A.  I did.
16   Q.  And are you prepared to keep going forward
17 here today?
18   A.  I am.
19   Q.  Okay. You did not review any of the
20 depositions of the numerous witnesses in this case,
21 correct?
22   MS. CARNEY: Objection. Form. You can
23   answer.
24   THE WITNESS: The deposition of the expert,
25   that was it.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 42 of 104 PageID #:65979
The Deposition of RICHARD ZULEY, taken on February 1, 2023
154..157

Page 154

1  BY MR. SWAMINATHAN:
2      Q.  Did you review any depositions of any of the
3  witnesses to the -- involved in the Soto homicide
4  investigation?
5      A.  I did not.
6      Q.  Did you review the depositions of Mr. Reyes or
7  Mr. Solache or anyone else who was a subject of the
8  investigation?
9      A.  I did not.
10     Q.  Okay.  You say you reviewed Mr. Tiderington's
11 expert report, correct?
12     A.  Yes.
13     Q.  And you saw his materials reviewed, correct?
14     A.  Yes.
15     Q.  And Mr. Tiderington, you agree, did review
16 numerous depositions related to the underlying Soto
17 homicide investigation, correct?
18     A.  Yes.
19     Q.  One of the things he identified in his report
20 is that the depositions revealed various investigative
21 steps that were taken, but were not documented anywhere
22 in the investigative file?
23         MS. CARNEY:  Objection.  Form.  Foundation.
24     You can answer.
25         THE WITNESS:  Referring to the Solache-Reyes

Page 155

1  case?
2  BY MR. SWAMINATHAN:
3      Q.  Yes.
4      A.  Yes.
5      Q.  Okay.
6      A.  You said that.
7      Q.  I'm sorry.  Go ahead.
8      A.  You said that.
9      Q.  Yeah.  And including interviews that were done
10 as part of the Soto investigation that were not
11 documented in any supplementary reports or GPRs,
12 correct?
13     A.  I don't know if I focused on that.  That was
14 not my concern.  But if it's in his report, then it's
15 true.
16     Q.  Okay.  And you're not offering any opinions
17 about those issues, correct?
18     A.  I'm not.
19     Q.  Okay.  With regard to the individual Soto
20 homicide investigation that you focused on just those
21 four Polaroid photos, correct?
22     A.  Yeah.  The collection of photograph Polaroids,
23 yes.
24     Q.  Okay.  And you understood that there were four
25 Polaroid photos that Mr. Tiderington focused on as being

Page 156

1  related to the Brady evidence and Brady obligations,
2  correct?
3      A.  Those four people, but maybe five photographs.
4  Does that sound right?
5      Q.  Okay.  That sounds about right.  And
6  basically, we're talking about Felicia Soto, Rosa
7  Aronda, Jorge Mejia, and Guadalupe Mejia, correct?
8      A.  I'm just it up now.  I am sorry, what -- so
9  what did you say?  I -- I -- I -- I have my report now.
10     Q.  Yeah, I'll read the names.  I'll say the names
11 again.  Mr. Tiderington focused on four Polaroid photos
12 contained in the investigative file of Felicia Soto,
13 Rosa Aronda, Jorge Mejia, and Guadalupe Mejia, correct?
14     A.  Yes.
15     Q.  Okay.  And he identified that those Polaroid
16 photos were contained in the investigative file; is that
17 right?
18     A.  I am looking at my -- I'm trying to look at my
19 capture, but I think that's what he said, yes.
20     Q.  Okay.  And you had a copy of the investigative
21 file from the Soto homicide investigation and you saw
22 that those Polaroid photos were in the investigative
23 file, correct?
24     A.  Yes.
25     Q.  Okay.  And you agree that those Polaroid

Page 157

1  photos were not contained in the public defender file,
2  correct, for those four individuals?
3          MS. CARNEY:  Objection.  Form.  You can
4      answer.
5          THE WITNESS:  Well, it's -- it's -- it's hard
6      for me to answer that because I think I testified
7      earlier today that physical evidence may be, you
8      know, clothing, a weapon, and even photographs that
9      were collected during the investigation, the
10     prosecutors, maybe instead of Xeroxing them or
11     copying them, would say, we'll make them available
12     to you for you to look at them, so --
13 BY MR. SWAMINATHAN:
14     Q.  You have -- sorry, you -- let me break that up
15 here.  First of all, you are not claiming that you found
16 copies of those four Polaroids in any public defender
17 file; is that right?
18     A.  I am not saying that.
19     Q.  Okay.  And are you saying that you found
20 copies of those four Polaroid photos in the prosecutor
21 file from the state's attorney's office produced in the
22 -- in this case?
23     A.  What I'm saying is that the photographs that
24 are -- are maybe --
25     Q.  Nope, you cut -- you --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 43 of 104 PageID #:65980
The Deposition of BERNARD MURRAY, October 25, 2023 Taken on behalf of Plaintiff
158..161

Kentuckiana Reporters
30 South Wackiner Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 158

1    A.   -- utilized during that investigation --
2    Q.   Sorry.  Sorry.  You cut out entirely there for
3  a second and froze in the middle.  Can we -- can you
4  start over again?  Or maybe I need -- can you read back
5  the question, sorry, and then let him answer again?
6        THE REPORTER:  Yeah.
7        THE WITNESS:  You froze.
8        MS. CARNEY:  Did you freeze?  We -- did we
9  lose somebody off of the -- no.  Okay.
10       MR. SWAMINATHAN:  I don't think so.  Your
11  screen just froze for, like, two seconds, then he
12  came back on.
13       THE WITNESS:  Okay.
14       THE REPORTER:  Give me one sec.
15       (REPORTER PLAYS BACK REQUESTED QUESTION)
16       THE WITNESS:  What I'm -- what I'm saying is
17  that when investigators use Polaroid photographs
18  during the course of investigation, it's common for
19  them to put them into a -- folder, like a -- a
20  mailing photograph -- not -- mailing folder, which
21  they then place into the investigative file, either
22  for use at trial or production later on to the
23  prosecutor.  Often, we -- we don't receive a Xerox
24  of the photographs, we tell the defense attorney,
25  hey, there was photographs that were used during

Page 159

1  the investigation, they're available for you to
2  review.  Much like we would save other pieces of
3  physical evidence, and -- and frankly other
4  photographs, too.
5  BY MR. SWAMINATHAN:
6    Q.   Did you see any evidence that any of those
7  four Polaroid photos were contained in the prosecutor
8  file?
9    A.   I -- I did not.
10   Q.   And you didn't find a copy of those four
11  Polaroid photos in the prosecutor file, correct?
12   A.   I'm just reviewing my notes.  I don't think I
13  did, though.  No.  I -- I discussed the other
14  photographs, which were impounded with the court.
15   Q.   Okay.  And so you agree that the four photos
16  that were contained in the investigative file that Mr.
17  Tiderington focused on, none of those were contained in
18  the state's attorney filed that you received for the
19  Soto homicide investigation, correct?
20   A.   They were not, but -- but then again, they
21  were -- we would not expect a Xerox copy of them in the
22  state's attorney file.  We would have them produced for
23  use at trial or motions, and we would tell defense
24  counsel, as we always did, that physical evidence,
25  including photographs, they can view them at any time

Page 160

1  they want prior to or during trial.  So I wouldn't
2  necessarily expect to find a Xerox of the photographs,
3  or even the original photographs, if they weren't used
4  at trial.
5    Q.   Okay.  So let me break that down.  So first
6  step, you did not find a copy of those four Polaroid
7  photos, either originals or copies, in the prosecutor
8  file for the Soto homicide, correct?
9        MS. GOLDEN:  Objection.  Asked and answered.
10  BY MR. SWAMINATHAN:
11   Q.   Go ahead.
12   A.   I said I did not, and -- and -- and -- and --
13  and nor would I necessarily expect to find them.
14   Q.   Okay.  And then did you find any notations or
15  documentation of any kind that indicated that those
16  Polaroid photos had been made available to the defense
17  attorney in the Soto homicide investigation?
18   A.   Those specifically, no, but only by
19  implication that there are other photographs, Polaroid
20  photographs, that were used during the investigation
21  were later on impounded and obviously therefore used at
22  trial.
23   Q.   There were other Polaroid photographs that
24  were impounded in evidence, but the -- not those four
25  Polaroid photographs, correct?

Page 161

1    A.   Not those four.
2    Q.   And then there were Polaroid photos that were
3  actually produced to the criminal defense attorney that
4  were in -- from the investigative file, but not those
5  four photos, correct?
6        MS. CARNEY:  Objection.  Form.  Foundation.
7        THE WITNESS:  I don't know that these
8  photographs were not made available to the criminal
9  defense attorneys.
10  BY MR. SWAMINATHAN:
11   Q.   I'm asking a different question.  There were
12  -- other than these four Polaroid photos, there were a
13  number of other Polaroid photos contained in the
14  investigative file, correct?
15   A.   Are you referring to the ones that were
16  eventually inventory -- I mean, in -- that were
17  impounded with the court?
18   Q.   Yes.  Some of the other Polaroid photos
19  contained in the investigative file, other than these
20  four, were impounded with the Court, correct?
21   A.   Yes.
22   Q.   And those were photos of four suspects in the
23  case, Arturo Reyes, Gabriel Solache, Adriana Mejia,
24  Rosauro Mejia, and then Guadalupe Mejia as well,
25  correct?

Page 162

```
1              MS. CARNEY:  Objection.  Form.  Foundation.
2              THE WITNESS:  Well, I don't know if all four
3    of them were suspects.
4    BY MR. SWAMINATHAN:
5         Q.   When you say you don't know that all four of
6    them were suspects, you're saying that because you just
7    don't know the investigation that well; is that fair?
8         A.   That's fair.  But also, I -- I mean, I know
9    who the three charged defendants were.
10        Q.   Okay.  So let's -- let me just try to do it a
11   little more clearly.
12             MS. GOLDEN:  Well, I have a belated objection
13   to form.
14   BY MR. SWAMINATHAN:
15        Q.   Okay.  You -- the Polaroid photos that were
16   contained in the investigative file, other than the four
17   photos that Mr. Tiderington is focused on, you found
18   some of those in the impounded exhibits, correct?
19             MS. GOLDEN:  Form.
20             THE WITNESS:  Excuse me.  Impounded with the
21   clerk of the court.
22   BY MR. SWAMINATHAN:
23        Q.   Yes.  And then you -- some of those photos,
24   other than the four Polaroid photos Mr. Tiderington
25   focused on, were found in the state's attorney's office
```

Page 163

```
1    file, correct?
2              MS. CARNEY:  Objection.  Form.  Foundation.
3              THE WITNESS:  I -- I -- I'm not absolutely
4    sure about that.
5    BY MR. SWAMINATHAN:
6         Q.   And some of those Polaroid photos, other than
7    the ones that Mr. Tiderington focused on, were found in
8    the public defender file from the Soto homicide
9    investigation, correct?
10             MS. CARNEY:  Objection.  Form.  Foundation.
11             THE WITNESS:  Well, I -- I'm focusing on the
12   four that Mr. -- that the plaintiff's expert was
13   discussing, the four people in the five
14   photographs.
15   BY MR. SWAMINATHAN:
16        Q.   And those four photos that Mr. Tiderington is
17   focusing on, were not contained -- that were in the
18   investigative file, were not contained in the public
19   defender file or the prosecutor file produced in this
20   litigation, correct?
21             MS. CARNEY:  Objection.  Form.  Foundation.
22   You can answer.
23             THE WITNESS:  As I've said before, photographs
24   that were used in this process would not
25   necessarily be tendered in formal discovery in
```

Page 164

```
1    court.  You would tell counsel that the -- in the
2    police investigative file, there's more Polaroid
3    photographs that are available for you to review at
4    any time.  So you wouldn't necessarily find Xeroxes
5    or -- or -- or -- or Xerox -- yeah, Xerox copies of
6    those photographs in either file.
7    BY MR. SWAMINATHAN:
8         Q.   I understand, but I would like you to start by
9    answering my question, which is whether those documents
10   were contained in the public defender or state's
11   attorney file, those four Polaroid photos?
12             MS. CARNEY:  Objection.  Form.  Foundation.
13   Asked and answered.
14             THE WITNESS:  I did not find them, nor would I
15   expect to find them.
16   BY MR. SWAMINATHAN:
17        Q.   Okay.  And then those -- in the public
18   defender file and prosecutor file, did you see any
19   notation anywhere in either of those files that
20   indicated that the criminal defense attorney or -- had
21   been given access to those pictures?  Or strike that.
22   Let me --
23             MS. CARNEY:  Objection.
24   BY MR. SWAMINATHAN:
25        Q.   Let me ask you a better question.  Sorry.  Did
```

Page 165

```
1    you see any indication in the prosecutor file that the
2    prosecutor had been made aware of those four Polaroid
3    photos?
4              MS. CARNEY:  Objection.  Form.  Foundation.
5              THE WITNESS:  Well, I did not review the
6    prosecutor and the defense file in this case.
7    BY MR. SWAMINATHAN:
8         Q.   Okay.  And you did not find --
9              MS. CARNEY:  Hold on.  Hold on.  He was still
10   talking.
11             THE WITNESS:  I only --
12   BY MR. SWAMINATHAN:
13        Q.   I'm sorry.  Go ahead.
14        A.   I only focused on the allegations that
15   Plaintiff's expert made regarding the photographs.
16        Q.   Okay.  And did you find any notation anywhere
17   in the prosecutor file indicating that they were aware
18   of the existence of those four Polaroid photos?
19             MS. CARNEY:  Objection.  Form.  Foundation.
20             THE WITNESS:  As I said, I did not review the
21   prosecutor's file specifically for that.  I can
22   only discuss the fact that other Polaroid
23   photographs were presented in court and impounded
24   with the clerk, so it certainly seems logical to me
25   that all those photographs were available for
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 166

1    review at trial or even before trial.
2  BY MR. SWAMINATHAN:
3       Q.   It would be logical to share them, but do you
4  know if that actually happened?
5            MS. CARNEY:  Objection.  Form.  Foundation.
6            THE WITNESS:  I -- I know that that was the --
7       what I've said a few times now, the common practice
8       was to say, there are photographs, there are
9       physical exhibits, that are available for you to
10      review prior to or during trial.  So in this case,
11      we've got evidence that -- that some of these
12      photographs were used, so I -- I do find it hard to
13      believe that the other photographs weren't made
14      available for defense counsel to review.
15  BY MR. SWAMINATHAN:
16      Q.   What -- you said that there were some Polaroid
17  photos, not these four, that were in the impounded
18  evidence in the clerk's office, correct?
19      A.   Yes.
20      Q.   Were there -- were any of these four photos
21  found in any impounded evidence at the clerk's Office?
22      A.   They were not.
23      Q.   Okay.  And were any of the --
24      A.   Well, one --
25      Q.   Did you find any note -- go ahead.

Page 167

1       A.   Sorry.  One of the people, but a different
2  photograph.
3       Q.   Okay.  And so did you find any -- let's focus
4  on Rosa Aronda and Felicia Soto for a moment.  There
5  were Polaroid photos taken by detectives at Area 5 of
6  those two individuals found in the investigative file,
7  correct?
8       A.   Yes.
9       Q.   Okay.  You didn't find any copies of those
10  Polaroid photos of Rosa Aronda and Felicia Soto in any
11  impounded evidence at the -- in the court, correct?
12      A.   I did not.
13      Q.   And you didn't find any copies of those
14  Polaroid photos of Rosa Aronda and Felicia Soto in any
15  prosecutor file, correct?
16           MS. CARNEY:  Object to foundation.
17           THE WITNESS:  I did not examine -- I did not
18      find them in -- in the prosecutor file, but I did
19      not examine the prosecutor file at length, so I
20      presume they were not there based upon the
21      allegation of the plaintiff's expert.
22  BY MR. SWAMINATHAN:
23      Q.   Did you find any notation in the prosecutor
24  file that indicated that the Felicia Soto or Rosa Aronda
25  Polaroid photos had been provided or shared with the

Page 168

1  prosecutor's office?
2            MS. CARNEY:  Form.
3            THE WITNESS:  By -- specifically by name, no.
4       But as I've said a few times now, the investigative
5       file has a folder in there where all these -- where
6       Polaroid photographs and -- other photographs
7       could be -- were contained in those envelopes, and
8       prosecutors would review them prior to going to
9       trial.  And the evidence of that is the other
10      photographs that were impounded.  They obviously
11      had access to them and used them.
12  BY MR. SWAMINATHAN:
13      Q.   Is it your testimony that these four photos
14  were contained in the same envelope as the other photos
15  of Mr. Reyes, Ms. Adriana Mejia, and Mr. Solache?
16           MS. CARNEY:  Objection.  Form.  Foundation.
17           THE WITNESS:  The -- there's -- for example,
18      the impounded photographs could have been in -- in
19      two places.  They could have been in that envelope
20      with -- as well as these other Polaroid
21      photographs, or if they were used in evidence
22      somehow, they could have been contained in an
23      inventory sheet with other evidence that's
24      inventoried.  So those are the two places that
25      Polaroid photographs I would expect to find.

Page 169

1  BY MR. SWAMINATHAN:
2       Q.   Okay.  And those are possibilities, but you
3  can't say either of those things is the case in this --
4  in the Soto homicide investigation, correct?
5            MS. CARNEY:  Objection.  Form.  You can
6       answer.
7            THE WITNESS:  I can't think of another
8       possibility.
9  BY MR. SWAMINATHAN:
10      Q.   Well, another possibility is they didn't get
11  turned over, correct?
12      A.   No.  The -- I mean, the possibility of where
13  they were stored, and then how they were uncovered
14  during the course of this litigation.
15      Q.   Are you claiming that you can say with
16  certainty that those four -- strike that.  Let's do it -
17  - let's focus on Aronda and Soto again.  Sir, are you
18  claiming that you can say with certainty that the Soto
19  and Aronda photos were disclosed to the prosecutor in
20  this case?
21           MS. GOLDEN:  Form.
22           MS. CARNEY:  Objection.  Form.  Foundation.
23           THE WITNESS:  Well, since I -- I've not talked
24      to the prosecutors in the case, I don't know that
25      to a certainty, but I'm telling you that the common

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 170

```
1      practice was for those photographs to be made
2      available to the prosecution from the investigatory
3      -- investigative file prior to trial.  And I'm
4      saying --
5  BY MR. SWAMINATHAN:
6      Q.   Well, the expectation of the prosecutors,
7  is --
8           MS. CARNEY:  Well --
9           MR. SWAMINATHAN:  -- that --
10          MS. CARNEY:  Well --
11          MS. GOLDEN:  Hold on.
12          MR. SWAMINATHAN:  Go ahead.
13          MS. CARNEY:  You interrupted him, Anand.
14          MR. SWAMINATHAN:  All right.
15          THE WITNESS:  Yeah.  And -- and -- and -- and
16     also -- the -- the -- then the sharing of that
17     information, which is done in every case with
18     defense counsels that there are photographs in the
19     investigative file, they're available for you to
20     review prior to trial or at trial.  And I'm saying
21     that the -- for lack of a better word, the
22     circumstantial evidence that these photos were made
23     available is the fact that other photos were used
24     at trial and impounded.
25  BY MR. SWAMINATHAN:
```

Page 171

```
1      Q.   And so the circumstantial evidence you're
2  aware of that these photos were shown to the prosecutors
3  is that other photos were shown to the prosecutors; is
4  that right?
5      A.   Other photos that in all likelihood were
6  contained in the investigative file in the envelope that
7  is commonly used for storing photographs.
8      Q.   Okay.  And are you aware -- strike that.  And
9  what evidence -- strike that.  Are you aware of any
10 evidence that proves that the Aronda and Soto Polaroid
11 photos were shared with the prosecutor?
12          MS. GOLDEN:  Objection.  Form.  And -- just
13     form.
14          THE WITNESS:  I -- I -- I don't have personal
15     knowledge that they were shared, but I'm -- I'm --
16     I'm opining on the common practice of how those
17     photographs would be stored and then shared with
18     the prosecution later on.
19  BY MR. SWAMINATHAN:
20      Q.   And if the common practice was followed, then
21 you would expect these photos to have been shared with
22 the prosecutor; is that right?
23      A.   Yes.
24      Q.   Okay.  And if the common practice was not
25 followed, then these photos would not have been shared
```

Page 172

```
1  with the prosecutors, correct?
2           MS. CARNEY:  Objection.  Form.  Foundation.
3      Misstates his testimony.
4           THE WITNESS:  I -- I -- what I'm telling you
5      is that all the -- all Polaroid photographs that
6      are stored in the investigative file are made
7      available to the prosecutor.
8  BY MR. SWAMINATHAN:
9      Q.   You know that for a fact that they're always
10 made available?
11      A.   I've never seen a case where they weren't.  How
12 about that?
13      Q.   Yeah, but you have no idea whether you got all
14 of them.  You can't say for sure, can you?
15          MS. GOLDEN:  Okay.  Now you're arguing with
16     the witness, so I object to the form.  And it's
17     becoming harassing.
18  BY MR. SWAMINATHAN:
19      Q.   Go ahead.
20          MS. CARNEY:  If you can answer his question,
21     you can.
22          THE WITNESS:  I can't answer your question.
23  BY MR. SWAMINATHAN:
24      Q.   Are you able, based on your experience, to
25 offer an opinion that all Polaroid photos are always
```

Page 173

```
1  shared with the defendants in all CPD cases?
2           MS. CARNEY:  Objection.  Form.
3           THE WITNESS:  All the photographs that -- that
4      are in the investigative file, the offer is made to
5      the defense attorney to view them and -- and -- and
6      -- and use them in any way they might want to use.
7  BY MR. SWAMINATHAN:
8      Q.   And you're able to say that you have the
9  ability to vouch for the fact that the Chicago Police
10 Department has always shared all Polaroid photos
11 contained in its investigative files?
12          MS. CARNEY:  Objection.
13          MS. GOLDEN:  Object to form.
14          MS. CARNEY:  Misstates his testimony.  You can
15     answer if you understand what he's saying.
16          THE WITNESS:  Well, I -- I -- the -- the --
17     the photographs -- well, the example is this case
18     right here.  There was photographs in the envelope
19     that were used at trial and impounded.
20  BY MR. SWAMINATHAN:
21      Q.   But not the Rosa Aronda and Felicia Soto
22 photos, correct?
23          MS. GOLDEN:  Object to form and foundation.
24          MS. CARNEY:  Also asked and answered.
25          THE WITNESS:  They were -- they were
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 47 of 104 PageID #:65984
The Deposition of BERNARD KMIECIK, Volume 1, on February 8, 2023
174..177

Page 174

1     apparently not shared.
2  BY MR. SWAMINATHAN:
3     Q.   Okay.  And if the --
4     A.   Let -- let me -- let me -- let me put a caveat
5  to that.  They were not shared according to Plaintiff's
6  expert.  I -- I don't know, in fact, they were viewed by
7  the defense and decided not to use them at trial.
8     Q.   Did you see -- did you review any of the
9  depositions in this matter discussing those Polaroid
10 photos?
11    A.   I did not.
12    Q.   Okay.  Do you know what the prosecutor said --
13 strike that.  Do you know if the prosecutor said that
14 they had copies of those Polaroid photos of Felicia Soto
15 and Rosa Aronda?
16    A.   I don't know what they said.
17    Q.   Do you know what the public defender said
18 about whether they had those copies of those Polaroid
19 photos?
20    A.   I do not.
21    Q.   And you agree with me that if those Polaroid
22 photos had been available to the prosecution, you would
23 have shared those with the defense attorneys, correct?
24    A.   I would have made them available.
25    Q.   Okay.  And you agree that it -- your

Page 175

1  expectation was that if prosecutors in your office had
2  been made aware of those photos, you -- of Felicia Soto
3  and Rosa Aronda, you would have made the public
4  defenders aware of those photos, or criminal defense
5  attorneys?
6        MS. GOLDEN:  Object to form.
7        THE WITNESS:  I would have made them aware
8     that there are photographs that were collected
9     during the investigation.
10 BY MR. SWAMINATHAN:
11    Q.   Okay.  Okay.  And then in your report you talk
12 about -- you spent some time talking about the fact that
13 the individuals depicted in these Polaroid photos, like
14 Felicia Soto and Rosa Aronda, are mentioned in other
15 police reports in the case, correct?
16    A.   Soto and Aronda are on the very first page of
17 the general case report.
18    Q.   And is it the fact that these individual's
19 names are mentioned in other places in the police
20 reports, is that a reason why you would choose not to
21 disclose those photos to the extent you knew of them?
22        MS. GOLDEN:  Object to foundation.
23        MS. CARNEY:  Form.  Incomplete hypothetical.
24        THE WITNESS:  I -- I -- I -- you have to re-
25     ask that question.

Page 176

1  BY MR. SWAMINATHAN:
2     Q.   Yeah.  The fact that there were references to
3  these individuals in the police reports, Ms. Soto and
4  Ms. Aronda, is that a reason you would not have
5  disclosed to the defense the existence of these Polaroid
6  photos?
7        MS. GOLDEN:  Form and foundation.
8        THE WITNESS:  I -- I've -- I've already said
9     that I would tell counsel that photographs were
10    retained in the file for them to review.
11 BY MR. SWAMINATHAN:
12    Q.   And that's true even if their names appeared
13 in other police reports, correct?
14    A.   Yeah, that --
15        MS. GOLDEN:  Form.
16        THE WITNESS:  The -- the -- the point that I
17    think I -- made with the Soto and Aronda reports,
18    that I mentioned on the very first page of the
19    report, is, it -- it's not like the existence of
20    those two people were hidden from defense attorney.
21    They're mentioned throughout the reports.  Now, the
22    photograph I -- I say the common practice was to
23    make them available, but it wasn't like they -- the
24    two people's identities were hidden from defense
25    counsel.

Page 177

1  BY MR. SWAMINATHAN:
2     Q.   I -- I'm asking a different question.  The
3  fact that their names appear in the reports in other
4  places, are you saying on that basis you would have
5  chosen not to make that information available to the
6  defendants?  Strike that.
7        MS. GOLDEN:  Form and foundation.
8  BY MR. SWAMINATHAN:
9     Q.   Strike that.  Strike that.  Are you claiming
10 that you would not have informed the defendants about
11 the existence of those Polaroid photos if you knew that
12 their names appeared in other places in the reports?
13        MS. CARNEY:  Objection.
14        MS. GOLDEN:  Objection.  Go ahead, Theresa.
15        MS. CARNEY:  Incomplete hypothetical.
16        MS. GOLDEN:  Foundation.
17        THE WITNESS:  I think I said the exact
18    opposite, that I would make photographs available
19    that tell -- tell defense counsel early in
20    discovery that any photographs that are contained
21    in the investigative file, Polaroids, or scene
22    photographs, or any photographs, that will be made
23    available for inspection prior to or during trial.
24 BY MR. SWAMINATHAN:
25    Q.   Okay.  And that's even though their names

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

otherwise appear in the police report; is that correct?
A. Their -- yeah. Their names appearing in the report doesn't -- doesn't have any bearing on making photographs available.
Q. Okay. And then if we talk about these specific reports -- these specific Polaroid photos of Rosa Aronda and Felicia Soto, you say that the fact that there are Polaroid photos of these people doesn't necessarily mean that they were treated as suspects, correct?
A. That's correct.
Q. And Mr. Tiderington doesn't argue that every person for whom there is a Polaroid photo in a file is a suspect, does he?
A. He kind of argues a different variation on that. He says that if -- if -- if the defense -- defense counsel knew of the photographs, they would have pursued them in a different manner. So he -- he is essentially saying that he would view them as alternative suspects.
Q. Did you review the depositions of -- the deposition of Felicia Soto in this case?
A. I did not.
Q. Do you know what Felicia Soto said about how she was treated during the course of this investigation?

A. I do not. I -- I know what the plaintiff's expert says about the -- the significance of the photographs, though.
Q. Okay. And you're -- and you -- would you agree that sometimes Polaroid photos are taken of people who are suspects?
A. They use -- yes, that -- that's true.
Q. Okay. And in fact, in this case, there are a number of Polaroid photos of -- taken of people who we definitely know to have been suspects, correct?
A. They were charged.
Q. Yes. Is that a yes?
A. Yes.
Q. Okay. And so, in this case, the existence of Polaroid photos may be an indication that these four people were suspects or not, correct?
MS. GOLDEN: Foundation.
MS. CARNEY: Form. Foundation.
THE WITNESS: Well, that -- that ignores what the plaintiff's expert says in his report. He says that it -- they would have had additional reason to contact these witness and learn why they had been at the station and questioned and what information they had revealed. All that information, what they revealed, was contained in all the reports, so

irrespective of a photograph, they had reason they could pursue how they were -- how they were interviewed and the information contained in there. He -- he's -- he -- he's equating the -- the existence of a Polaroid photograph with the fact that somebody must be a suspect. And I -- I take issue with that.
BY MR. SWAMINATHAN:
Q. In this case, he relied on more than just the fact that there was a Polaroid photo of these individuals to conclude that there was -- that these people were treated as suspects, correct?
A. Well, his -- his -- his plain statement, I'm reading from my report, is, "Had defense counsel had these Polaroid photographs, he or she would have had additional reason to contact these witnesses and learn about what -- about why they had been at the station and questioned and what information they had revealed." Everything he says after the existence of the photographs was detailed to a certain extent in the police reports. It didn't preclude him, defense counsel, from going and -- and interviewing those witnesses further.
Q. And so --
A. So what I'm trying to say is, he is equating

Polaroid photographs with suspects.
Q. Okay. And when he offered his opinions, was it that he did so having had an opportunity to review Felicia Soto's deposition, correct?
MS. GOLDEN: Objection. Form. Foundation.
THE WITNESS: I -- I assume he did -- did.
BY MR. SWAMINATHAN:
Q. I'm sorry. Yeah. And let me ask a better question. When you reviewed the files and -- strike that. When you reviewed the investigative file in this case, did the police reports contain any indication that Felicia Soto or Rosa Aronda had been treated as suspects?
MS. GOLDEN: Object to form.
THE WITNESS: I -- I -- I did not review the extent of their interviews other than the fact that they were interviewed. And that was the point of my -- in my report that there was extensive material about those two people in the police reports.
BY MR. SWAMINATHAN:
Q. You said there was very extensive material about interviews with those two people?
A. Well, the -- like I said in my report, they're on the very first page of the general case report and

Page 182

1  their knowledge is discussed there and throughout the
2  file, and again in supplementary reports, starting on
3  Solache-Reyes 2363. So they're mentioned in the police
4  reports. They're certainly not -- their existence and
5  the fact that they're at a police station has certainly
6  not been concealed from defense counsel.
7      Q.    Did you view the -- did you -- were you aware
8  of any testimony from Rosa Aronda about being put in an
9  interrogation room for hours?
10     A.    I'm not.
11     Q.    Did you review any testimony from Rosa Aronda
12  about interrogating -- being interrogated harshly by
13  detectives?
14     A.    I think I said earlier I didn't review any of
15  the depositions, so I'm not -- I'm not aware of any of
16  that.
17     Q.    Did you see any indication in the police file
18  that she had been kept in an interrogation room for
19  hours and interrogated harshly by detectives?
20          MS. GOLDEN: Objection. Form.
21          THE WITNESS: I would submit the fact that she
22          is listed on the first page of the report and that
23          she was interviewed in some of those materials
24          included in supplemental report as well.
25  BY MR. SWAMINATHAN:

Page 183

1      Q.    Did you see any indication in the -- strike
2  that. Did you review any testimony about the fact that
3  she -- strike that. Did you review any testimony
4  indicating that she had been accused of having knowledge
5  about the crime by detectives?
6      A.    As I said to you before, I did not review any
7  of her depositions.
8      Q.    Did you see anything in the investigative file
9  that you reviewed that indicated that Rosa Aronda had
10  been accused of having knowledge about the crime during
11  the course of an interrogation?
12     A.    Well --
13          MS. CARNEY: Objection. Form.
14          THE WITNESS: In -- in -- in the -- in the way
15          you're paraphrasing it, I don't think it was worded
16          that way, but the fact that -- that they were
17          interviewed in -- and -- and there were interviews
18          referred to in the police reports, indicating the
19          investigators are trying to find out what happened.
20  BY MR. SWAMINATHAN:
21     Q.    As a prosecutor, would it matter to you if
22  somebody was simply interviewed or if that person was
23  subjected to an interrogation in which they were accused
24  of involvement or knowledge about a crime?
25          MS. CARNEY: Objection. Form. Incomplete

Page 184

1  hypothetical.
2          THE WITNESS: I -- I really have a hard time
3          understanding that question.
4  BY MR. SWAMINATHAN:
5      Q.    Yeah. As a prosecutor, if a person was simply
6  interviewed and provided information, as opposed to
7  being interrogated and accused of having knowledge or
8  involvement in the crime, would it matter to you the
9  difference between those two things, or are those just
10  one and the same to you?
11          MS. CARNEY: Form and foundation.
12          THE WITNESS: They're not one and the same,
13          but in the course of investigation, the officers
14          have to -- they don't know who the offenders are,
15          so they -- they may, to use your word, interrogate
16          rather than question. That may be a part of their
17          interviews that they're conducting to find out what
18          -- what they have in front of them, a suspect or a
19          -- a -- or defendant or a witness. They -- they --
20          I don't presume them to know on every single case,
21          the first time they meet someone, to know whether
22          they're an offender or not.
23  BY MR. SWAMINATHAN:
24     Q.    Do you say they are one and the same or not
25  one and the same?

Page 185

1      A.    I said they're not one and the same.
2      Q.    Okay. And then did you -- would you agree
3  with me that the investigative file in this case
4  contained interviews of many more people than the people
5  for whom there were Polaroid photos?
6          MS. CARNEY: Objection. Form. You can
7          answer.
8          THE WITNESS: I did not review the police
9          reports to that extent.
10  BY MR. SWAMINATHAN:
11     Q.    Okay. And would it be -- surprise you to hear
12  that there were interviews of many, many more people at
13  the police station than are -- than for whom there are
14  photos, Polaroid photos, in the investigative file?
15          MS. GOLDEN: Form.
16          THE WITNESS: Yeah, they -- all I know is the
17          photographs that we have in front of us.
18  BY MR. SWAMINATHAN:
19     Q.    Okay. And so you're not claiming that they
20  took Polaroid photos of everybody who was brought to the
21  police station and interviewed, are you?
22          MS. CARNEY: Objection. Form. Misstates his
23          testimony.
24          THE WITNESS: I don't know the -- the reason
25          for taking any photographs. I suggested some



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 50 of 104 PageID #:65987
The Deposition of JOHN BERNARD MADIGAN, Volume 2, taken on February 9, 2021
186..189

Page 186

1   reasons why they might have taken Polaroid
2   photographs.  Maybe one of the primary ones in
3   there is if you're handing an investigation off to
4   someone and you want to -- you want to verify who's
5   already been talked to and who's -- and the name
6   that the person provided.  So for the detectives
7   from one shift to another shift to understand who's
8   been interviewed and what their photograph was.
9   Now, did -- did -- they did -- they didn't take
10  other photographs of other people.  I -- I don't
11  know why they didn't.  Or -- or, frankly, I don't
12  know why they necessarily did with these people,
13  other than that they were, again, Aronda and -- and
14  Soto were the very first people they met.  Maybe
15  that's why they took those photographs.  But I'm --
16  I'm speculating on why they took those photographs.
17  BY MR. SWAMINATHAN:
18      Q.  All right.  You don't know why they took the
19  photos of Felicia Soto and Rosa Aronda?
20      A.  No.  My point is just the mere fact of taking
21  a Polaroid photograph doesn't make you a suspect.
22      Q.  I -- I'm not asking you about that.  I'm
23  simply asking you, did you find any indication in the
24  police file about why they took photos of Felicia Soto
25  and Rosa Aronda?

Page 187

1       A.  No.
2           MS. CARNEY:  Objection.
3           MS. GOLDEN:  Form.
4           MR. SWAMINATHAN:  Go ahead.
5           MS. CARNEY:  Form.  Foundation.  Asked and
6   answered.  You can answer.
7           THE WITNESS:  I -- I didn't review the police
8           reports to that extent to -- to look for that, but
9           from -- not from what I reviewed anyway.
10  BY MR. SWAMINATHAN:
11      Q.  Okay.  And do you -- did you find anything in
12  the police file to help you understand why, of all the
13  people who they interviewed at the police station in
14  this case, they took photos of these particular people?
15      A.  I didn't review the police reports for that
16  information.
17      Q.  Okay.  For Guadalupe Mejia and Jorge Mejia,
18  you didn't review their depositions either, correct?
19      A.  That's correct.
20      Q.  And do you know what they said about whether
21  Guadalupe Mejia had been treated as a suspect in this
22  case?
23          MS. GOLDEN:  Object to form.
24          MS. CARNEY:  Foundation.
25          THE WITNESS:  I did not review their

Page 188

1   deposition, so I do not know what they said.
2   BY MR. SWAMINATHAN:
3       Q.  And do you have -- did you review any
4   information in the course of your work on this matter
5   about what they said about how Ms. Guadalupe Mejia had
6   been treated when she was in an interrogation room?
7           MS. CARNEY:  Objection.  Form.  Foundation.
8           THE WITNESS:  Excuse me.  No.
9   BY MR. SWAMINATHAN:
10      Q.  And if -- Guadalupe Mejia, you understand that
11  she gave a statement incriminating Mr. Reyes and
12  Mr. Solache and Ms. Mejia in this case?
13      A.  My understanding is she gave a handwritten
14  statement.  I assumed it was pertinent to the course of
15  the investigation.  I don't know exactly what's
16  contained in it.
17      Q.  If a witness who gave a statement used against
18  the defendant had been themselves treated as a suspect
19  during the course of the investigation, is that
20  information you would've expected to be disclosed to
21  you?
22          MS. CARNEY:  Objection.  Form.  Foundation.
23          Incomplete hypothetical.
24          THE WITNESS:  I -- I don't know how to answer
25          the question.  It -- it's -- it -- it -- during a

Page 189

1   course of investigation, as you're interviewing
2   somebody, you're gaining information about their
3   involvement.  Does that mean they -- they -- they
4   were treated as a suspect or treated as a witness?
5   I don't think that's evident, even in the course of
6   an investigation.  Any investigation.
7   BY MR. SWAMINATHAN:
8       Q.  Well, if an individual had been treated as a
9   suspect, would you expect to be informed of that
10  information as a prosecutor?
11          MS. CARNEY:  Objection.  Form.  Incomplete
12          hypothetical.
13          THE WITNESS:  Well, the problem I have with --
14          with -- with your hypothetical is that they're
15          interviewing people and they -- they may not know
16          their involvement either way.  So as they're
17          interviewing them, they're trying to gather
18          information.  That doesn't mean they necessarily
19          treated them, "as a suspect."  They're interviewing
20          them and the people are providing information,
21          which later on turns into a handwritten statement.
22          That doesn't necessarily mean they were treated as
23          a suspect or not treated as a suspect.
24  BY MR. SWAMINATHAN:
25      Q.  Could it be important to the prosecution and



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 51 of 104 PageID #:65988
The Deposition of DR. BERNARD MELTZER, Volume II, taken on February 8, 2019

190..193

Page 190

1  defense to understand the potential motivations of a
2  person who gives a statement, a handwritten statement,
3  in an investigation?
4      A.   I don't understand what you mean by their
5  motivation.
6      Q.   Let's try -- let's move on.  In the work you
7  performed in this case, did you conduct any review of
8  the history of Brady violations within the Chicago
9  Police Department?
10         MS. CARNEY:  Objection.  Form.  Foundation.
11         THE WITNESS:  I did not.
12  BY MR. SWAMINATHAN:
13     Q.   Your materials review don't list any historic
14  study of instances of Brady violations in the Chicago
15  Police Department; is that true?
16         MS. CARNEY:  Objection.  Form.
17         THE WITNESS:  I did -- I did not include any
18  reports referring to an investigation of Brady
19  violations in the Chicago Police Department.
20  BY MR. SWAMINATHAN:
21     Q.   Okay.  And putting aside investigations of
22  Brady violations, did you go out and look for
23  information in -- just in internet searches or in any
24  other form for information about prior Brady violations
25  in the Chicago Police Department?

Page 191

1      A.   I did not.
2      Q.   Did -- in performing your work in this case,
3  did you conduct any legal research to see how many
4  findings there are of Brady violations against Chicago
5  police officers?
6      A.   I did not.
7      Q.   And in the CC -- strike that.  In the State's
8  Attorney's Office, did you keep any database or
9  compilation of instances of Brady violations by the
10  Chicago Police Department?
11         MS. CARNEY:  Objection.  Form.  Foundation.
12         And I'm just going to add a belated objection to
13         the previous questions as to foundation as to the
14         history of Brady violations.  Sorry, you're going
15         too fast, so I can't get them in.
16         MR. SWAMINATHAN:  Fair.
17  BY MR. SWAMINATHAN:
18     Q.   Go ahead.
19     A.   So I'm sorry, I forgot the question.
20     Q.   I'll ask it again.  Did the State's Attorney's
21  Office keep any database or compilation of Chicago
22  Police Department Brady violations?
23         MS. CARNEY:  Objection.  Form.  Foundation.
24         MS. GOLDEN:  And can you make sure that you're
25         talking about the Cook County State's Attorney's

Page 192

1  Office?  We're talking about that throughout,
2  right?
3          MR. SWAMINATHAN:  Yes.
4          THE WITNESS:  Not that I'm aware of.
5  BY MR. SWAMINATHAN:
6      Q.   Are you aware of any instances in your time as
7  a prosecutor in which there was a Brady violation that
8  resulted from a failure for documents to be produced by
9  the police department?
10         MS. CARNEY:  Objection.  Form.  Foundation.
11         Incomplete hypothetical.  I'll take that one back.
12         Just form.
13         THE WITNESS:  Let me understand that again.
14         When I was working for the Cook County State's
15         Attorney's Office?
16  BY MR. SWAMINATHAN:
17     Q.   Correct.
18     A.   Well, there -- there could be cases reversed
19  on appeal where there's a determination that maybe not
20  all reports were tendered or -- or information of that
21  nature.  I'm not sure if it'd be Brady.  It might just
22  be discovery obligations.  So I'm aware --
23     Q.   You mean you -- I'm sorry.  Go ahead.
24     A.   I'm aware of maybe appellate reversals, but I
25  don't know of any studies by the State's Attorney

Page 193

1  Office -- or -- or compilations by the State's
2  Attorney's office.
3      Q.   When you said there could be, I'm not asking
4  about a hypothetical.  You're aware of instances when
5  that did occur while you were in the Cook County State's
6  Attorney's Office, correct?
7          MS. GOLDEN:  Form.
8          THE WITNESS:  Well, I would say there's a
9          difference between a Brady reversal and maybe a
10         reversal for incomplete discovery, which is not
11         necessarily Brady.  It's, I don't know, another
12         report wasn't provided, which could cause a new
13         trial.  So I -- I -- I -- I don't know if I can
14         name one right now, but I'm -- I'm -- I'm sure
15         there are examples.
16  BY MR. SWAMINATHAN:
17     Q.   Okay.  And so you're aware, during the time
18  that you were in the State -- Cook County State's
19  Attorney's Office, that there were instances where the
20  appellate courts reversed convictions based on discovery
21  violation for the failure to disclose some police
22  document, fair?
23     A.   Yes.
24     Q.   Okay.  And how many instances like that are
25  you aware of?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 52 of 104 PageID #:65989
The Deposition of BERNARD MURRAY, Volume II, taken on February 9, 2021
194..197

Page 194

1    A.   I can't name one specifically.  I'm just aware
2    of the reversal.
3        Q.   Okay.  And it happened.  In other words, it
4    happened.  You can't put a specific finger on exactly
5    how many times it happened, but it happened?
6        A.   Yeah.  I mean, frankly, I can't think of a
7    case right now, but I'm -- I know it's happened.
8        Q.   Okay.  And in those instances where it
9    happened, was it a result of a failure to tender
10   materials by a prosecutor or by a Chicago police
11   officer?
12           MS. GOLDEN:  Foundation.
13           THE WITNESS:  I don't have that specific
14       information for you.
15   BY MR. SWAMINATHAN:
16       Q.   In the instances where there were reversals
17   based on discovery violations, are you aware of any
18   attempts to follow-up and find out whether it was a
19   result of the prosecutor failing to tender the material
20   or the police department failing to tender the material?
21           MS. CARNEY:  Objection.  Foundation.
22           THE WITNESS:  I -- I -- I don't -- I'm not
23       privy to that information.
24   BY MR. SWAMINATHAN:
25       Q.   Okay.  And so is it fair to say that you're

Page 195

1    not claiming to have conducted a review to determine if
2    there was a systemic problem with Brady violations in
3    the Chicago Police Department?
4            MS. CARNEY:  Objection.  Form.  Misstates the
5        testimony.  You can answer.
6            THE WITNESS:  I did not -- I did not, during
7        my time at the Cook County State's Attorney's
8        Office, conduct an investigation into Brady
9        violations.
10   BY MR. SWAMINATHAN:
11       Q.   Okay.  And in your work in this case, you're
12   not claiming that you've conducted a review to determine
13   if there were systemic problems with Brady violations
14   within the Chicago Police Department, correct?
15       A.   I did not study the Chicago Police Department
16   for a determination of systemic Brady violations.  I did
17   not do that.
18       Q.   Okay.  And you aren't disclosing opinions
19   about whether there were systemic Brady violations
20   within the Chicago Police Department in the 1990s,
21   correct?
22       A.   I'm not opining on that.
23       Q.   Okay.  If you were going to opine on that,
24   there's a lot more that you would have reviewed, suffice
25   to say, fair?

Page 196

1            MS. CARNEY:  Objection.  Form.  Foundation.
2            THE WITNESS:  I'm not sure what I would
3        review, but since I'm not offering an opinion on
4        it, I don't know what I would've done.
5    BY MR. SWAMINATHAN:
6        Q.   Okay.  How many instances of Brady violations
7    by the Chicago Police Department would it take to start
8    to get you concerned about a systemic problem?
9            MS. CARNEY:  Objection.  Form.  Foundation.
10           THE WITNESS:  We -- as prosecutors, we never
11       want to provide incomplete information to a
12       defendant ever.  His liberty is at stake, so we
13       never want to have any violations of Brady.  We --
14       that's why we are so vigorous in trying to make
15       sure we've obtained every report possible and
16       provide them to a defense attorney.
17   BY MR. SWAMINATHAN:
18       Q.   And despite those vigorous efforts, there were
19   instances when Chicago Police Department failed to
20   tender all of the materials it should have to
21   prosecutors.  Is that fair to say?
22       A.   Well, you know --
23           MS. CARNEY:  Objection.  Form.
24           THE WITNESS:  -- since again --
25           MS. CARNEY:  But you -- I'm sorry.  Go ahead.

Page 197

1            THE WITNESS:  I apologize.  Since I did not do
2        a study of that, I don't know if the -- the Brady -
3        - how many Brady violations there are.  Are they by
4        the Chicago Police Department?  Are -- are they by
5        the prosecutor for not tendering a report that they
6        had received?  I don't know if it's a report from a
7        hospital that should have been provided by the
8        prosecutors and were not provided.  So I don't have
9        a good handle on the extent of -- of the number of
10       Brady violations and if they were created by the
11       Chicago Police Department.
12   BY MR. SWAMINATHAN:
13       Q.   Okay.  Did you have instances from your --
14   from cases that you were the prosecutor on where the
15   cases were later reversed based on a discovery
16   violation?
17       A.   I've had reversals, but not based upon Brady.
18       Q.   And what about reversals based on discovery
19   violations?
20       A.   I don't think I've ever had a reversal on --
21   on a discovery violation.
22       Q.   Okay.
23       A.   I'm pretty confident.
24       Q.   I'm sorry.  You can go ahead.
25       A.   I'm pretty confident that I didn't.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 53 of 104 PageID #:65990
The Deposition of JOHN BYRNE, taken on 01/05/15 at Louisville, Kentucky #3
198..201

Page 198

1  Q.  Okay.  And let me ask you specifically about
2  your work as an expert.  As part of your expert work for
3  the city in recent years, you did learn about some Brady
4  violations, correct?
5  A.  The -- yes.  Allegations made in the -- in the
6  -- in the lawsuits, yes.
7  Q.  Okay.  And ultimately, you agree that in --
8  some of the evidence you reviewed caused you to find
9  that in fact there had been Brady violations in -- at
10  least in some cases that you reviewed as part of your
11  expert work, correct?
12  MS. GOLDEN:  Form.
13  MS. CARNEY:  Objection.  Form.
14  THE WITNESS:  I -- I don't know if I agree
15  that I found Brady violations in the files I
16  reviewed.  I don't know.  I don't think that's
17  accurate.
18  BY MR. SWAMINATHAN:
19  Q.  You offered opinions in the Nathson Fields
20  case, correct?
21  A.  Yes.
22  Q.  And in the Nathson Field [sic] case, the
23  Chicago Police Department admitted that it had an entire
24  file of investigative information that it did not
25  disclose to the prosecution or defense, correct?

Page 199

1  A.  Yeah.  I'm -- I'm aware of that, but in that
2  case, I was not reviewing the -- that file.  I'm aware
3  that that was part of that case.  But, again, I was
4  reviewing other files.
5  Q.  So in that case, you were aware that admission
6  -- that CPD had basically admitted that it failed to
7  turn over investigative information to the prosecution
8  and defense, correct?
9  MS. GOLDEN:  Object to form.
10  THE WITNESS:  And I -- I know there was
11  reports.  I -- I want to say the initial
12  supplemental reports were not turned over before
13  the first trial.  So I know that to be true.  But I
14  don't know the circumstances surrounding how they
15  were -- why -- how and why they were not tendered.
16  BY MR. SWAMINATHAN:
17  Q.  The file that was not tendered in that case by
18  the police department included things like alternate
19  suspects and alternate motives, correct?
20  MS. CARNEY:  Objection.  Form.  Foundation.
21  THE WITNESS:  Yeah.  Which I -- yes, I think
22  that's true.  I -- I know they were discounted by
23  the time they went to trial.
24  BY MR. SWAMINATHAN:
25  Q.  And when you say they were discounted by the

Page 200

1  time they went to trial, what do you mean?
2  A.  Well, the statements of witnesses to the
3  actual two shooters.
4  Q.  Can you say what you mean?  I'm not sure I
5  understand.
6  A.  Well, the -- the two defendants who were
7  eventually charged, my -- my understanding of that case
8  is there was a year gap, or something like that,
9  before those two defendants were charged.  So yes, the
10  alternative suspects or other people -- I'm not sure if
11  I'd call them alternative suspects, but other people
12  were interviewed in the days following the murder. Those
13  -- I believe that was the report that was not provided
14  to defense attorneys.
15  Q.  And in that, you recall, you testified at the
16  trial in the Fields case, correct?
17  A.  Yes.
18  Q.  And you remember Mr. Loevy was showing you a
19  number of different documents contained in the Street
20  Files from the Fields case that had never been disclosed
21  to prosecutors or the defense?
22  MS. GOLDEN:  Objection.  Form.  Foundation.
23  And I -- if you're going to -- form and foundation
24  right now.  Let's see if you can answer the
25  question.

Page 201

1  THE WITNESS:  It -- it's been quite a long
2  time since that trial, so I -- I remember being
3  crossed on the -- those reports.  And I think my
4  answer is what I said to you earlier today.  I did
5  not specifically review those files for my expert
6  report in that case.
7  BY MR. SWAMINATHAN:
8  Q.  Okay.  And you didn't ultimately dispute in
9  that case that there were documents that had not been
10  disclosed to the defense in that case, correct?
11  MS. GOLDEN:  Object to form.
12  THE WITNESS:  That was, again, not what I
13  focused on from my report.
14  BY MR. SWAMINATHAN:
15  Q.  And in that case, you did something you didn't
16  do in this case.  You conducted a comprehensive review
17  of all the investigative files compared to the
18  corresponding prosecutor files that were available,
19  correct?
20  MS. CARNEY:  Objection.  Asked and answered.
21  You can answer again.
22  THE WITNESS:  I -- I believe the field was
23  narrowed down somewhat, but it was far more files
24  than I reviewed in Rivera.
25  BY MR. SWAMINATHAN:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 54 of 104 PageID #:65991
The Deposition of DR. BERNARD FITZPATRICK, conducted on February 15, 2023
202..205

**Page 202**

1    Q.  Okay.  And in your review in the Fields case,
2 you found a number of instances in which documents that
3 were in the police file were not contained in the
4 prosecutor file, correct?
5        MS. CARNEY:  Objection.  Form.
6        THE WITNESS:  Well, the -- as is true with the
7    public defender's file, there was -- there was
8    never an -- there was never a claim that
9    prosecutor's files were complete either.  They were
10    pretty incomplete and there was plenty of missing
11    prosecutor files as well.  So there's a police
12    report in an investigative file or the RD file, and
13    it was not in the prosecutor's file.  It -- the --
14    there was -- was strong evidence in most of those
15    files, if not all of them, that the prosecutor's
16    file didn't exist or was incomplete in its own
17    right.
18 BY MR. SWAMINATHAN:
19    Q.  What evidence did you have that -- putting
20 aside instances when there was no prosecutor file
21 available, what evidence are you aware of that the
22 prosecutor files that were provided to you were
23 incomplete?
24    A.  Well, they didn't have all the supplemental
25 reports in them.  Didn't have basic case reports. Didn't

**Page 203**

1 have -- you can go on and on.  Didn't have the closing
2 supps.  Didn't have GPRs.  So it's pretty obvious that
3 the prosecutor files were incomplete, too.
4    Q.  In that case, you agree that in the prosecutor
5 files that you had, in every instance, you found
6 documents that were in the police file that were not in
7 the prosecutor file, correct?
8        MS. GOLDEN:  Object to form.
9        THE WITNESS:  I'm sorry.  Could you say again?
10 BY MR. SWAMINATHAN:
11    Q.  Yeah.  You acknowledged that in every
12 investigative file that you looked at, there were
13 documents from that police file that were not in the
14 prosecutor file for those corresponding cases, correct?
15        MS. GOLDEN:  Same objection.
16        THE WITNESS:  Yeah, but I would put the caveat
17    on that that I -- I was not claiming that the
18    prosecutor files were complete.
19 BY MR. SWAMINATHAN:
20    Q.  Okay.  And in that case, you found numerous
21 files in which there were documents that were missing
22 from both the -- strike that.  In that case, you found
23 numerous instances in which documents that were missing
24 from the public defender file were also missing from the
25 prosecutor file, correct?

**Page 204**

1        MS. CARNEY:  Objection.  Form.
2        THE WITNESS:  And -- and it would be based on
3    the same flawed premise that the -- the public
4    defender's files were complete.  They -- they were
5    not complete.
6 BY MR. SWAMINATHAN:
7    Q.  In each given instance, it could be that the
8 reason the document is missing from both the public
9 defender file and the state's attorney file is that both
10 those files are incomplete.  And another reason could be
11 that the document wasn't disclosed to the prosecution
12 and the defense, correct?
13        MS. GOLDEN:  Form.
14        THE WITNESS:  I don't agree with that.
15 BY MR. SWAMINATHAN:
16    Q.  So you're saying that in instances where a
17 document is missing from both the public defender file
18 and the state's attorney file, it's not possible that
19 the explanation is that that -- the police failed to
20 turn over that document.  Is that your testimony?
21    A.  No.
22        MS. GOLDEN:  Form.
23        MS. CARNEY:  Hold on.  Hold on.  Form.
24    Foundation.  You can answer.
25        THE WITNESS:  No.  My contention is that the

**Page 205**

1    files are so obviously incomplete that you -- you
2    cannot say, "gee, this form, because it's missing
3    from both files, that it therefore was never
4    tendered by the police."  The fact is both files in
5    many cases were wholly inadequate as to what -- the
6    universe of files and reports that would've been
7    tendered.  So it's --
8 BY MR. SWAMINATHAN:
9    Q.  How many prosecutor files --
10        MS. CARNEY:  Hold on.  Hold on.
11        MR. SWAMINATHAN:  Oh, I'm sorry.
12        MS. CARNEY:  He was still talking.
13 BY MR. SWAMINATHAN:
14    Q.  I'm sorry.  You can go ahead.
15    A.  No, I'm saying to you that the -- the -- the
16    -- the basic flawed interpretation by Brassfield and by
17 this expert is that these files years and years, 25 and
18 30 years later are complete as they were on the eve of
19 trial.  Most of the examples are -- they're -- they're
20 wholly inadequate.  They're not even close to what
21 would've been tendered -- expected to be tendered during
22 the discovery process.
23    Q.  During the course of your time as a
24 prosecutor, how often did you go into the packaged-up
25 trial files and pull materials -- pull police reports

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 206

1  out of those files?
2          MS. GOLDEN:  Form.
3          THE WITNESS:  I don't understand what you mean
4  by packaged-up police files.
5  BY MR. SWAMINATHAN:
6      Q.  You said that when you completed a trial that
7  ended in a conviction, you would close up -- you --
8  you'd close up the file and you'd package it up and send
9  it to storage, right?
10         MS. CARNEY:  Objection.  Misstates his
11  testimony.  You can answer.
12         THE WITNESS:  The -- when I finished -- my
13  practice was when I finished a file was to try to
14  clean up duplicates and send the file to the
15  warehouse.
16  BY MR. SWAMINATHAN:
17     Q.  Okay.  And after --
18     A.  I'm not --
19     Q.  -- how -- oh, go ahead.  Go ahead.
20     A.  I'm not saying it's everybody's practice.  I
21  -- I know the files were closed out and sent to the
22  warehouse.  But my practice was to do that right after
23  trial was complete.
24     Q.  And how often as a prosecutor did you go back
25  and request those files out of storage that you'd

Page 207

1  previously worked on and pull documents and police
2  reports out of those files?
3          MS. CARNEY:  Objection.  Form.
4          THE WITNESS:  I don't -- really don't
5  understand the -- the premise of the question.  If
6  -- if the case was reversed and it was back on --
7  on -- on appeal to be tried again, obviously I'd
8  order up the -- the -- the original trial file.  Or
9  if a new suspect who had not been charged before
10  was then charged, then I would order that file
11  back.  Those would be the instances where I would
12  ask for my file to be returned to me.
13  BY MR. SWAMINATHAN:
14     Q.  Okay.  So for the most part, once you'd pack
15  the file up and it went to storage, you wouldn't request
16  to get that file back, correct?
17         MS. CARNEY:  Objection.  Misstates his
18  testimony.
19         THE WITNESS:  There were -- there are -- would
20  be occasions when I would ask for it to come back.
21  And I just described those to you.  There's -- you
22  know, my -- my file -- my practices of -- of
23  packaging up and sending back is -- I think most
24  prosecutors would send their files to the
25  warehouse.  I -- I'm not saying they were sent back

Page 208

1  to the warehouse in the same format that I sent
2  mine back, but that -- other than the reasons I
3  gave to you before of reordering a file, I don't
4  think I would reorder a file just to look at a
5  police report.
6  BY MR. SWAMINATHAN:
7      Q.  Okay.  So in how many instances did you
8  request a file from storage and then pull out police
9  reports from that file before putting it back?
10         MS. CARNEY:  Objection.
11         MS. GOLDEN:  Object to form.
12         MS. CARNEY:  Form.
13         THE WITNESS:  I -- I -- I don't have enough
14  information to answer that.  If -- if a case was
15  back for a retrial, I'd pull all the reports out.
16  Or all the pertinent ones.  If it was a -- a -- a
17  newly charged co-defendant, the same thing.  How
18  many times?  I -- I couldn't tell you how many times
19  that happened.  Not -- I mean, retrials, sadly, I've
20  had a few cases reversed that I had go to trial --
21  had -- had a retry.  But it wasn't like I just said,
22  "hey, I'd love to read the police report on the
23  Jones case.  It's been a couple of years now.  I'm
24  going to go down memory lane."  I wouldn't be -- I
25  -- I personally wouldn't be doing that.

Page 209

1  BY MR. SWAMINATHAN:
2      Q.  In cases that didn't involve somebody being
3  recharged or being retried, how many times did you pull
4  out -- did you call back the old file from storage?
5      A.  I'm -- I'm -- what I'm trying to say to you is
6  I don't have a reason to call back a file from storage.
7      Q.  So the answer is never.  You never called back
8  a file from storage unless it was going to be the
9  subject of a retrial or recharges, correct?
10         MS. CARNEY:  First of all, he wasn't done
11  answering.  I know.  I get it.  You're going fast,
12  but his cadence is significantly slower, so --
13  BY MR. SWAMINATHAN:
14     Q.  Go ahead.  Yeah.
15         MS. CARNEY:  -- object to that extent he
16  wasn't done, but also objection.  Misstates his
17  testimony.  Go ahead.
18         THE WITNESS:  Well, you're -- you're -- you
19  know, I guess hypothetically trying to provide is a
20  -- a -- a situation where I would grab an old
21  police report for -- for fun or something.  I don't
22  understand why I would -- why I --
23  BY MR. SWAMINATHAN:
24     Q.  Yeah.  Let me start over.  Yeah.  Let me --
25         MS. GOLDEN:  No.  No.  You're interrupting

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 56 of 104 PageID #:65993
The Deposition of DOE - BERNARD MURRAY, taken on 02/11/2019

210..213

Page 210

1    him.  You can't -- please don't interrupt him.
2         MR. SWAMINATHAN:  He just asked me.  That's
3    why I'm responding.
4         MS. GOLDEN:  No, he didn't ask you.  He said
5    he didn't understand why, and then you cut him off.
6         MR. SWAMINATHAN:  No, he said, "is that what
7    you're asking?"  He said --
8         MS. GOLDEN:  And then you went on and then you
9    cut him off.
10        MR. SWAMINATHAN:  -- not an answer.
11   BY MR. SWAMINATHAN:
12        Q.  All right.  Mr. Murray, you explained to me
13   that a scenario in which you would go back to get copies
14   of trial files that you've put into storage is where
15   there's going to be a retrial of that individual or
16   charges against another individual related to the same
17   case, correct?
18        A.  And I guess the more I think about it,
19   possibly if that defendant is -- there's a warrant out
20   and he's charged on a new case, then maybe I'd want that
21   file for background as well.  Those are possible
22   examples why I might reorder the file.  But if there's
23   not a legal process in court, a -- a motion with newly
24   discovered evidence perhaps, or -- I'm trying to think
25   of other reasons.  But that's -- I can't think of other

Page 211

1    reasons why I would reorder a file.
2         Q.  Okay.  And so how often was it the case
3    approximately that you were having -- and I'm talking
4    about as a percentage.  What percentage of the time
5    would you pack a case up for storage and then find that
6    you needed to request it back because there was some
7    retrial or new charges?
8         A.  Well, as I said, I've had a -- a few
9    reversals, so there'd be a handful of cases there.  A
10   -- some sort of newly discovered evidence or post-
11   conviction petition filed.  I've -- I've definitely had
12   a few of those.  Or a scenario where maybe the defendant
13   was implicated in another crime, I might order those up.
14   It's not a lot of times where I personally did that.
15        Q.  Something like -- so less than 10 percent; is
16   that fair?
17        MS. CARNEY:  Objection.  Form.
18        THE WITNESS:  I -- I -- I can't put a number
19   on it.
20   BY MR. SWAMINATHAN:
21        Q.  Is it possibly as much as 50 percent of the
22   time?
23        A.  I don't think it's that high.
24        Q.  Is it as high as 25 percent of the time?
25        A.  See, now -- now I'd have to go back and see

Page 212

1    how many cases I actually tried and then put the file
2    away.  And I -- and I -- I would have difficulty doing
3    that.
4         Q.  Do you think it could be less than 10 percent
5    of the time?
6         A.  I can't -- I can't answer your question.
7         Q.  Okay.  It could be more or less than
8    10 percent; is that fair?
9         A.  It could be more or less than 90 percent.  I
10   can't answer that question.
11        Q.  So you're saying it could be -- you know, from
12   your experience, it could be as much as 90 percent of
13   the time you had to reorder the file?
14        MS. GOLDEN:  Form.
15        MS. CARNEY:  Objection.  Form.  Misstates his
16   testimony.
17        THE WITNESS:  I guess I'm trying to impress
18   upon you that I don't know what the number would
19   be.
20   BY MR. SWAMINATHAN:
21        Q.  Okay.  Okay.  And you think it's possible
22   that, from your career, as often as -- strike that.  You
23   just told me -- the reason I'm confused is you told me a
24   moment ago you don't think it's as much as 50 percent of
25   the time, and then you just told me that it could be as

Page 213

1    much as 90 percent of the time.  That's why I'm
2    confused.
3         A.  Well, I was doing that to point out to you
4    that I don't have a number for you.
5         Q.  Okay.  So to be clear, you -- it's not
6    anywhere near 90 percent of the time, fair?
7         MS. CARNEY:  Objection.  Form.  Asked and
8    answered.
9         THE WITNESS:  I -- I don't think it's 90
10   percent.  But, again, I cannot put a percentage on
11   it for you.
12   BY MR. SWAMINATHAN:
13        Q.  Okay.  And in the cases where there is not
14   some retrial or new charges, you had -- you would not go
15   on your own to obtain copies of files from storage
16   unless there was some legal process that was going on in
17   that case, correct?
18        MS. GOLDEN:  Form.
19        THE WITNESS:  Going on with my prosecution of
20   the -- of the defendant in that case, those are the
21   reasons I stated to you.  But, you know, there's --
22   there's other reasons why a file could be
23   reordered.  There could be other witnesses on that
24   case who may be implicated in other crimes.  There
25   could be witnesses in that case who are now



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 57 of 104 PageID #:65994
The Deposition of DOE DEFENDANT FIRST, taken on February 9, 2023

214..217

Page 214

1    involved in other crimes. There could be other
2    reasons why, not me but other prosecutors, might've
3    sought that file as well.
4        Q.   When you would reorder --
5             MS. CARNEY:  Hold on.  He wasn't done.
6    BY MR. SWAMINATHAN:
7        Q.   Oh, I'm sorry.  Go ahead.
8        A.   I was going to say I'm giving you examples
9    where -- discussing with you when the instances that I
10   can think of why I personally would reorder a file.  But
11   there could be reasons why other prosecutors would be
12   seeking that original trial file for use in other -- you
13   know, unrelated to my defendant, unrelated to his case,
14   but possibly other people involved in the case.
15       Q.   When you would call a file back from storage
16   because there was some retrial or other legal
17   proceeding, would you pull police reports out of that
18   file so that there were no longer available as part of
19   that trial file?
20            MS. GOLDEN:  Objection.
21            MS. CARNEY:  Object to form.  Incomplete
22   hypothetical.
23            MS. GOLDEN:  Form.
24            THE WITNESS:  I would keep the file in my
25   office and use whatever reports from that file that

Page 215

1    I needed to use.
2    BY MR. SWAMINATHAN:
3        Q.   And would you tender -- if you tender
4    documents to the defense, would you make copies of those
5    police documents?
6             MS. CARNEY:  Objection.  Form.  Incomplete
7    hypothetical.
8             THE WITNESS:  If for some reason I called back
9    my file and had to make -- and had to provide new
10   discovery or old discovery to defense counsel, I
11   would make a copy for them.
12   BY MR. SWAMINATHAN:
13       Q.   And would you throw away or discard documents
14   from the police file that were not duplicates during
15   that retrial or retrial process?
16            MS. CARNEY:  Objection.  Form.  Incomplete
17   hypothetical.
18            THE WITNESS:  Well, I -- I'm trying to
19   maintain all the -- the -- the -- the reports that
20   I collected for use at trial or now in this new
21   legal process.  Personally, I -- I try to keep my
22   files complete, but I know from personal experience
23   that that wasn't necessarily true when a file went
24   to the warehouse.
25   BY MR. SWAMINATHAN:

Page 216

1        Q.   In your practice, when you had a case that you
2    called back -- strike that.  When you had a file that
3    you called back, did you follow the same practices you
4    followed when it -- when you first worked on the case,
5    which was to make sure you kept a copy of all the police
6    reports before you packed it back up and sent it back to
7    storage again?
8        A.   I certainly tried to include everything that I
9    then used in the new proceedings when I sent it back.
10   But as I've said to you before, what happens at the
11   warehouse is a completely different matter.  And I'm
12   certainly not speaking for other prosecutors' practices.
13   I know they try to package up their files too, but I've
14   had too many examples of files getting lost or even
15   decimated in the warehouse.  And, frankly, I don't know
16   how that happens.  But that warehouse is - - warehouses,
17   plural, is almost like the closing scene in Indiana
18   Jones in Raiders of the Lost Ark.  It's not good.
19       Q.   Putting aside the question of files that are
20   getting decimated or completely lost, are you aware of
21   instances in which individuals in the warehouse were
22   pulling specific police reports out of the files to
23   remove them from those trial files?
24            MS. CARNEY:  Objection.
25            MS. GOLDEN:  Form.

Page 217

1             MS. CARNEY:  Foundation.
2             THE WITNESS:  If -- if I go back to the first
3    part of your question, these files are getting
4    decimated for reasons that I don't know.  So if
5    you're asking me, "did a" -- "did a warehouse
6    employee pull files out and trash them?"  I don't
7    know.  But I don't know why the files were so
8    trashed.
9    BY MR. SWAMINATHAN:
10       Q.   Are you aware of any instances in which anyone
11   in the warehouse was ever disciplined for pulling
12   specific police reports out of files?
13            MS. CARNEY:  Objection.  Form.  Foundation.
14            THE WITNESS:  Not -- not that I'm aware of.
15   But, again, I -- I -- I don't know.  And I don't
16   think other people know necessarily with certainty
17   why the files were so -- kept so poorly at the
18   warehouse as well.  Maybe we should have been
19   routinely firing people.
20       Q.   Are you aware of instances in which
21   prosecutors went over to the trial files at the
22   warehouse and would pull out individual police reports
23   or other police documents from those files?
24            MS. GOLDEN:  Form.
25            MS. CARNEY:  Foundation.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 58 of 104 PageID #:65995
The Deposition of DR. BERNARD MINNICH, Volume II, taken on February 5, 2023
218..221

Page 218

```
1          THE WITNESS:  I know when prosecutors, myself
2     included, go to the warehouse to look for files, we
3     couldn't find them, or we saw somewhat infamous
4     trials in three or four different locations.
5  BY MR. SWAMINATHAN:
6     Q.   I -- I'm asking a different question.  Are you
7  aware of instances in which prosecutors went to the
8  warehouse and pulled documents, like police reports, out
9  of the trial files?
10         MS. GOLDEN:  Form.
11         MS. CARNEY:  Foundation.
12         THE WITNESS:  I -- I don't know what other
13    prosecutors did when they went to the warehouse.
14 BY MR. SWAMINATHAN:
15    Q.   Did you ever go to the warehouse and pull
16 specific police reports out of a trial file?
17         MS. GOLDEN:  Form.
18         THE WITNESS:  On the occasions that I went to
19    the warehouse, I was looking for a file.  And I was
20    looking for the complete file.  And sometimes I was
21    successful, sometimes I was not.  I was not looking
22    to take a document out of the file personally.
23    Personally, I was looking for a file for some other
24    reason.
25 BY MR. SWAMINATHAN:
```

Page 219

```
1     Q.   Okay.  And did you have instances where you
2  would ever obtain a file back from the warehouse that
3  had been in storage and then pull specific police
4  reports or other documents from the police department
5  out of those files before sending them back to storage?
6          MS. GOLDEN:  Form.
7          THE WITNESS:  I would -- I -- when -- when I
8     would take a file back in the warehouse on those
9     occasions, I would utilize the entire file, so I
10    would take reports out of it.  And to the best of
11    my ability, I would try to reconstitute the file
12    before I sent it back to the warehouse.
13 BY MR. SWAMINATHAN:
14    Q.   Okay.  And -- oh.  What percentage of the
15 files did you -- strike that.  In Fields, did you opine
16 on the percentage of prosecutor files that you deemed to
17 be incomplete?
18         MS. CARNEY:  Objection.  No, sorry.  Go ahead.
19         THE WITNESS:  You know, I -- I -- I -- I don't
20    remember.  I -- I know we were -- we were trying to
21    estimate that at one point, but I don't remember
22    what the number was.
23 BY MR. SWAMINATHAN:
24    Q.   You didn't disclose any opinion about a
25 percentage of prosecutor files you deemed incomplete in
```

Page 220

```
1  Fields, correct?
2     A.   No.
3     Q.   And you didn't offer any opinions in the
4  Rivera case about the percentage of prosecutor files you
5  deemed incomplete, correct?
6     A.   I don't think -- no, I did not.
7     Q.   And what -- and then did you disclose an
8  opinion in this case about the percentage of prosecutor
9  files you deemed incomplete?
10    A.   No.
11    Q.   And in fact, you didn't look at the majority
12 of prosecutor files in this case that were produced,
13 correct?
14    A.   As I said before, I focused on the eight cases
15 that the plaintiff's expert used, and then the Page 51
16 documents.  Those are the files that I focused on.
17    Q.   In the -- well, I was asking you about any
18 instances of known Brady violations.  In Fields, you
19 indicated that you were aware of what the Chicago Police
20 Department's position was about whether it had turned
21 over the documents in its street file to the prosecution
22 and defense, correct?
23         MS. CARNEY:  Objection.  Form.
24         THE WITNESS:  I -- I was aware of -- of -- of
25    the allegations that those reports were not
```

Page 221

```
1     tendered.
2  BY MR. SWAMINATHAN:
3     Q.   Okay.  And when you conducted your review --
4  strike that.  And in that case, you were not opining on
5  that issue, correct?
6     A.   I was not.
7     Q.   Okay.  And did it cause you any concern that
8  there had -- that, in fact, CPD was admitting that it
9  had a file in the Fields case that it had failed to
10 disclose?
11         MS. GOLDEN:  Form and foundation.
12         THE WITNESS:  My concern was not with that
13    file, it was with the other files, and to examine
14    those documents.
15 BY MR. SWAMINATHAN:
16    Q.   And do you know why it -- strike that.  Did
17 you do any investigation to understand why it was that
18 that file in the Fields case had not been disclosed?
19    A.   I --
20         MS. CARNEY:  Objection.  Form, foundation.
21         THE WITNESS:  I did not contain -- I did not
22    conduct an investigation into the Fields case.
23 BY MR. SWAMINATHAN:
24    Q.   And in the course of your work, did you
25 develop an understanding of how it came to be that CPD
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 59 of 104 PageID #:65996
The Deposition of DR. BERNARD HARCOURT, Volume 3, taken on February 8, 2022

222..225

Page 222

1  failed to turn over a file in the Fields case?
2      A.   I did not come to that understanding.
3      Q.   Okay.
4          MS. GOLDEN:  Belated objection to foundation
5      and form.
6  BY MR. SWAMINATHAN:
7      Q.   Okay.  And then in that case, you looked at,
8  not the Fields case, but a number of other files that
9  had been found in the same location as the Fields file
10 that had not been disclosed, correct?
11         MS. CARNEY:  Foundation and form.
12         THE WITNESS:  I -- I don't know exactly where
13     they were found, but I was refuting the
14     allegations, whether the defense counsel on those
15     cases received the proper discovery.
16 BY MR. SWAMINATHAN:
17     Q.   And you didn't -- when you offered those
18 opinions, did you know one way or the other whether
19 those other files that you were opining on had been
20 found in the same place as the Fields file?
21         MS. GOLDEN:  Objection.  Form, foundation.
22         THE WITNESS:  As I -- as I sit here now, I
23     don't recall where they were stored.
24 BY MR. SWAMINATHAN:
25     Q.   Okay.  And as you did your review of the other

Page 223

1  files from that case, not the Fields file, you found a
2  number of instances in which there were documents that
3  were -- from the police file that were missing from both
4  the prosecution and the defense files, correct?
5      A.   I'd have to review the report, but there was
6  times where the reports not found in a wholly incomplete
7  prosecutor file or wholly incomplete defense file, so
8  yeah.
9      Q.   Yeah.  And there were some time -- oh, I'm
10 sorry.  Go ahead.
11     A.   So it would not surprise me that there --
12 there's investigative materials that were not found in
13 those two files.
14     Q.   Are you saying now that your testimony in the
15 Fields case was that every single prosecutor filed was
16 wholly incomplete?
17     A.   No.
18         MS. GOLDEN:  Objection.  Form.  Misstates his
19     testimony.
20         THE WITNESS:  No, I -- I'm -- I'm not saying
21     that every file was wholly incomplete.  There was -
22     - but many, many files, both prosecution and
23     defense files, were obviously missing significant
24     amounts of police reports.
25 BY MR. SWAMINATHAN:

Page 224

1      Q.   Are you testifying that every public defender
2  file in the Fields case was wholly incomplete?
3          MS. CARNEY:  Objection.  Form, foundation.
4      Asked and answered.  Misstates his testimony.  And
5      at this point, if you're going to keep going down
6      his testimony or his specific opinions from Fields,
7      I'm going to ask you to put up his report or
8      testimony that you're referring to.  Obviously that
9      report was done years ago and I was not counsel on
10     that case.  So if you're not going to show him the
11     report, I'm not going to let him keep answering
12     questions about it.
13 BY MR. SWAMINATHAN:
14     Q.   I can show you the report.  It's helpful, but
15 I don't think this is an issue that's covered in your
16 report.  I think it's more a matter of the terminology
17 you're using now, but I'm -- if you -- if the report's
18 helpful to you, I can put it up.
19     A.   What I said to you that many of the
20 prosecutor's files and many of the public defender's
21 files were inadequate to -- it wasn't just missing one
22 or two pieces of paper.  They were obviously incomplete
23 files.  I'm not saying every one of those files were
24 wholly incomplete, but there were some that were wholly
25 incomplete.  So it's very difficult to draw a -- a

Page 225

1  conclusion that somehow law enforcement, Chicago Police
2  Department, withheld documents from both the prosecution
3  and the defense when the files were in such disarray.
4      Q.   Okay.  And the reason we're going down this
5  road is because I -- you introduced the idea of the
6  files all being wholly incomplete in response to a
7  question of mine.  So I had a quest -- I had to follow-
8  up about that.  So let me go back to my question.  In
9  that case, you found instances when there were documents
10 that were missing from both the public defender file and
11 the prosecutor file and are you claiming now that in
12 every one of those instances, it was because both the
13 homic -- the public defender file and the prosecutor
14 files were wholly incomplete?
15         MS. CARNEY:  Objection.  Form.  And I'm -- at
16     this -- again, going to ask if you're going to ask
17     him questions about the specific opinions from his
18     report, that you put up the report and give him a
19     chance to review it or take a look at it because --
20 BY MR. SWAMINATHAN:
21     Q.   I'm happy to put it up.  Would that be helpful
22 to you, Mr. Murray?
23     A.   Well -- well, I -- if you're getting any more
24 questions on this topic, yes, but I -- I'm not saying
25 just because -- I'm not -- you -- I -- I'm let me back

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 60 of 104 PageID #:65997
The Deposition of Doe Bernard Murray, Volume 1 on 02/20/2020
226..229

Page 226

1  off on wholly incomplete.  There was definitely files
2  that were wholly incomplete, but as I said a minute ago,
3  there were many files that were inadequate to a nature
4  where you could not say that the prosecution and the
5  plaintiff -- prosecution and the, I'm sorry, the defense
6  attorney never had the Chicago Police Department
7  reports.
8      Q.  What -- do you know what the ultimate outcome
9  at trial was of the Fields case in which you offered an
10  opinion?
11     A.  He recovered money from the city and -- and
12  other defendants.
13     Q.  And do you know if the jury reached a finding
14  on whether or not -- strike that.  Do you know whether
15  the jury reached a finding on claims against the City of
16  Chicago for maintaining unconstitutional policy and
17  practices?
18     A.  I don't know.
19         MS. GOLDEN:  Objection.  Foundation.
20         THE WITNESS:  I don't know.
21  BY MR. SWAMINATHAN:
22     Q.  All right.  So sitting here today, you're --
23  you don't -- you do -- strike that.  Sitting here today,
24  you're not aware of whether the jury found that the City
25  of Chicago had an unconstitutional policy or practice of

Page 227

1  Brady non-disclosure?
2      A.  I know that they re -- re -- recovered a
3  significant amount of money.  That's all I focused on.
4      Q.  Okay.  And in the Jacques Rivera case, you
5  offered an opinion in that case, correct?
6      A.  Yes, sir.
7      Q.  And do you know what the outcome of that case
8  was?
9      A.  Mr. Rivera also recovered money from the city.
10     Q.  And do you know if the jury found that a Brady
11  violation had occurred in Mr. Rivera's case?
12     A.  I do not, no.
13     Q.  And do you know if the jury found that the
14  City of Chicago had maintained unconstitutional policy
15  or practice of withholding Brady information?
16     A.  I do not know.  Other than the substantial
17  amount of money they rewarded to Mr. Rivera.
18     Q.  Okay.  Would it surprise you to learn that in
19  both of those cases the jury disagreed with you about
20  whether or not the City of Chicago had a systemic
21  problem with failing to disclose information in police
22  files to prosecutors and criminal defendants?
23         MS. CARNEY:  Objection.  Form, foundation.
24         THE WITNESS:  Well, are they disagreeing
25     specifically with me or -- I mean, do they say we

Page 228

1  disagree with Mr. Murray or was there other
2  reasons?
3  BY MR. SWAMINATHAN:
4      Q.  You tell me.  Did you do any information --
5  did you do any work to figure out what the reason was
6  for the jury's determination?
7          MS. CARNEY:  Objection.  Form, foundation.
8          THE WITNESS:  I did -- I did not conduct a --
9      a study into the jurors or ask them if it was why
10     they vote -- both the verdicts they voted.
11  BY MR. SWAMINATHAN:
12     Q.  Were you curious about what the evidence was
13  that resulted in the jury reaching the conclusions that
14  it did in light of your testimony in the case?
15     A.  I provided my expert report for their
16  consideration, what -- what other evidence they
17  considered both from the plaintiff's attorneys and also
18  from defense attorneys to come to their decision, I
19  don't know all that information.  So I -- I'm not going
20  to opine on why they voted one way or the other.
21     Q.  Were you curious at any point during the --
22  during -- after you learned about the result in the
23  Rivera case or the Fields case about what all that
24  underlying evidence was that resulted in the verdicts in
25  those cases?

Page 229

1          MS. CARNEY:  Objection.  Form, foundation.
2          THE WITNESS:  My curiosity didn't go to that
3      level.
4  BY MR. SWAMINATHAN:
5      Q.  Okay.  And when you learned that there had --
6  strike that.  When you found out that the City of
7  Chicago was admitting that it had a file that it had
8  failed to disclose to prosecutors or to the defense in
9  Mr. Fields's case, did that bother you as a prosecutor
10  that that had happened?
11         MS. CARNEY:  Objection.  Form, foundation.
12         THE WITNESS:  I -- I -- I didn't know all the
13     circumstances on -- on how they came to not tender
14     the report or admit they didn't tender the report.
15     So obviously I want all investigative material
16     provided to defense counsel in every case.
17  BY MR. SWAMINATHAN:
18     Q.  Your opinions in this case, you understand,
19  involved the case in which one of the defendants is
20  Reynaldo Guevara, correct?
21     A.  One of the detectives, yes.
22     Q.  And do you have any knowledge or information
23  about Mr. Reynaldo Guevara's history in the Chicago
24  Police Department?
25         MS. CARNEY:  Objection.  Form.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 230

1        THE WITNESS:  I don't know what you mean by
2    knowledge or information about him.
3  BY MR. SWAMINATHAN:
4        Q.    In other words, are you -- do you have any
5    knowledge about allegations of misconduct against
6    Reynaldo Guevara?
7        A.    From what I've read in the in -- in news media
8    reports.
9        Q.    And what have you learned -- what do you know
10   about Mr. Guevara from news media reports?
11       A.    Well, I -- I know that there are now
12   situations where he's exercising his Fifth Amendment
13   right not to answer questions.  And in cases where this
14   -- in a number of cases, the Cook County State's
15   Attorney's Office has decided not to proceed further
16   with the case.
17       MS. GOLDEN:  I'm sorry.
18       THE WITNESS:  Oh, I'm sorry.  Go ahead.
19       MS. GOLDEN:  I'm sorry.  My microphone was off
20   and I have a belated -- I'm sorry, a belated
21   objection to form of the last question.
22  BY MR. SWAMINATHAN:
23       Q.    And do you have an opinion about the
24   prosecutor's office's decision not to challenge some of
25   those cases?

Page 231

1        A.    Do I have an opinion about that?  Well, as
2    always, I -- I'd like to know what other evidence was
3    remaining.  Could the prosecution still go forward with
4    the case?
5        Q.    Did you do some work to find out the answer to
6    that question?
7        A.    I did not.
8        MS. CARNEY:  Objection.  Form.
9  BY MR. SWAMINATHAN:
10       Q.    Do you know whether -- you indicated that you
11   had some information from media reports that Mr. Guevara
12   was pleading the Fifth.  Do you know if he plead -- he
13   was pleading the Fifth with regard to his actions in the
14   Soto homicide investigation that's a subject of this
15   litigation?
16       A.    I'm not aware of whether it is or isn't.
17       Q.    Okay.  And do you have any knowledge about
18   whether how many of the investigative files that were
19   produced in this case and are the subject of your expert
20   report involved Detective Guevara?
21       A.    I do not know.
22       Q.    Did you do any analysis of the files to see
23   how often Detective Guevara was part of these underlying
24   homicide investigations that you reviewed?
25       A.    I did not.

Page 232

1        Q.    Do you have any knowledge about allegations
2    that Detective Guevara was withholding evidence of
3    innocence from criminal defendants as part of his
4    conduct in his homicide investigations?
5        A.    I don't --
6        MS. GOLDEN:  Form.
7        THE WITNESS:  I don't have knowledge of that.
8  BY MR. SWAMINATHAN:
9        Q.    In other words, do you have any knowledge
10   about what the allegations are against Detective Guevara
11   in this case and others?
12       A.    No.
13       Q.    Okay.  And if Detective Guevara has pled the
14   Fifth about whether or not he withheld Brady information
15   from prosecutors and defendants in this case in many
16   other cases, would that matter to you?
17       MS. CARNEY:  Objection.  Form, foundation.
18       THE WITNESS:  It doesn't matter to my analysis
19   of whether material was provided from the
20   prosecution to defense attorneys.
21  BY MR. SWAMINATHAN:
22       Q.    Does it have any impact on your opinions about
23   whether information is getting from the police
24   department to the prosecutors?
25       MS. CARNEY:  Object to form.

Page 233

1        MS. GOLDEN:  Form and foundation.
2        THE WITNESS:  Well, I can -- part of my
3    examination was to look at reports that the
4    prosecutors had in their file also to look at the
5    investigative reports and the other RD reports and
6    to the extent that there's a public defender file
7    to see if those documents are included in there.
8    So I'm concerned about that.
9  BY MR. SWAMINATHAN:
10       Q.    And if Detective Guevara has pleaded the Fifth
11   about whether he withheld information from prosecutors
12   and criminal defendants in numerous cases, would that
13   have any bearing on your opinions?
14       MS. CARNEY:  Objection.  Form.
15       MS. GOLDEN:  Foundation.  You can answer it.
16       THE WITNESS:  My -- my analysis whether other
17   of the -- of the compliance with discovery would
18   remain the same.
19  BY MR. SWAMINATHAN:
20       Q.    If Detective Guevara has pleaded the Fifth
21   with regard to whether he failed to even document
22   important exculpatory information that he learned, could
23   that have some bearing on your opinions in this case?
24       MS. CARNEY:  Objection.  Form, foundation.
25       THE WITNESS:  I -- the -- I don't know why he

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 62 of 104 PageID #:65999
The Deposition of DR. BERNARD H. LEVIN, Volume III, taken on February 6, 2023
234..237

Page 234

1    is taking the Fifth, so I don't know if it pertains
2    to that or not.  So it really would not have any
3    bearing on my case.
4    BY MR. SWAMINATHAN:
5        Q.   If Detective Guevara failed to document
6    exculpatory information that he learned during the
7    course of his investigation, that could result in Brady
8    violations that, as a prosecutor, you'd never know
9    about, correct?
10       MS. CARNEY:  Objection.  Form -- incomplete
11   hypothetical.  You can answer that.
12       THE WITNESS:  Well, I think I've said before
13   that, if -- if there's no way for me to discern
14   from the reports that part of invest -- an
15   interview was ever cur -- was ever conducted and
16   not submitted into the investigative file.  There's
17   no way I would know that that interview took place.
18   BY MR. SWAMINATHAN:
19       Q.   Michael Brassfield -- I'm changing topics
20   here.  Michael Brassfield looked at the investigative
21   file, standing alone to see whether the investigative
22   files complied with the Chicago Police Department's
23   special orders.  You recall that from his report,
24   correct?
25       A.   I do.

Page 235

1        Q.   Okay.  And in your work, you did not conduct
2    an audit or review of Mr. Tiderington -- strike that.
3    Mr. Tiderington did the same thing in this case,
4    correct?  I think it might've said Brassfield.  Mr. --
5    strike.  So let me ask it again.  Sorry.
6        MS. CARNEY:  Yeah.  You did say Brassfield.
7    BY MR. SWAMINATHAN:
8        Q.   Yeah.  Let me ask again.  Sorry.  Thanks for
9    that, Carrie.  Mr. Tiderington in this case is standing
10   alone to see if they --
11       THE REPORTER:  You're cutting out.  Everyone
12   cut out.
13       MS. CARNEY:  Yeah, I can hear you.
14       THE REPORTER:  Okay.
15       MR. SWAMINATHAN:  Oh, Emilia, can you hear me?
16       THE REPORTER:  Now I can hear you.  I didn't
17   hear your last question.
18   BY MR. SWAMINATHAN:
19       Q.   Okay.  No, I'll ask it again.  I think I was
20   asking a poor question.  You probably saved me from
21   myself.  Okay.  Mr. Murray, in this case, Mr.
22   Tiderington reviewed the investigative file -- files
23   standing alone to see if they contained evidence of
24   whether there's -- the general orders and special orders
25   are being followed, correct?

Page 236

1        A.   I think he did that.  I'm -- I'm trying to
2    understand your question.
3        Q.   And it was he did something very similar to
4    Mr. Brassfield, which is he looked at the investigative
5    file, standing alone, to see if the special orders and
6    general orders about inventories and GPRs and to/from
7    memos were being followed, correct?
8        A.   I'm sure he did that.  I didn't focus on that.
9        Q.   Okay.  And when you say you didn't focus on
10   that, you didn't offer any opinions on that same issue;
11   is that fair?
12       A.   Yes, it is fair.
13       Q.   Okay.  And so ultimately you didn't audit his
14   numbers around his findings about the percentage of time
15   that particular types of documents were missing from
16   those investigative files, correct?
17       A.   I did not.
18       Q.   Okay.  And did you conduct any kind of
19   comparison between permanent retention files and
20   investigative files?
21       A.   No.
22       Q.   Okay.  Okay.  I want to ask you what some of
23   the file comparisons you did.  Let me pull up your
24   report here.  All right.  I'm showing you a document I
25   have marked as Exhibit 1.  This is your expert report,

Page 237

1    correct?
2        A.   I see it, yes.
3        Q.   Okay.  Let's turn to -- toward the back of
4    your report, you discussed a case called People v. Oscar
5    Soto.  Do you see that?
6        A.   Give me one second.  I'll get to it.  Yeah, I
7    have it in front of me now.
8        Q.   Okay.  And so for the Soto case, we looked at
9    your materials reviewed before, but for that case, you
10   were provided with a copy of not only the police
11   investigative file and RD file, but you're also provided
12   with the State's attorney file and the public defender
13   file, correct?
14       A.   I think that's accurate, yes.
15       Q.   Okay.  Do you want to take a minute to look at
16   your materials reviewed?
17       A.   I am -- I'm looking at the -- what I wrote in
18   the report.
19       Q.   Okay.  Just -- tell me when you're ready for
20   the next question.  You can go ahead and read that whole
21   section and then just tell me when you're done so that
22   before I ask you my next question.
23       A.   Okay.  I will.  Okay.  I -- I'm -- I've
24   reviewed the four points I made.
25       Q.   Okay.  So having had a chance to review your

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 63 of 104 PageID #:66000
The Deposition of DR. BERNARD HARRIS, taken on 01/12/24, Volume 5

238..241

Page 238

1  report, do you agree with me you were provided a
2  copy of the police investigative file and RD file as
3  well as the prosecutor file and defense file for the
4  People v. Oscar Soto case?
5      A.   Yes, sir.  And reviewed it.
6      Q.   Okay.  And you conducted an analysis and
7  comparison of those files, correct?
8      A.   Yes, I did.
9      Q.   Okay.  And did you review the public defender
10  file as part of that analysis?
11      A.   I did.
12      Q.   And did you review the state's attorney file
13  as part of that analysis?
14      A.   I'm sure I did.
15      Q.   Okay.
16      A.   My report, I'm more focused on the public
17  defender's file, but yes, I'm sure I looked at all of
18  them.
19      Q.   Okay.  And when you looked at the public
20  defender file, you looked at the entirety of the file,
21  correct?
22      A.   Yes.
23      Q.   And when you looked at the state's attorney
24  file, you looked at the entirety of that file too,
25  correct?

Page 239

1      A.   I'm sure I did, but again, my -- in the
2  report, I'm focusing on -- on the public defender's
3  file.
4      Q.   Okay.  And when you conducted the review of
5  the file, did you reach any conclusions about whether
6  the investigative file was complete or incomplete?
7      A.   No, my -- my focus was on how incomplete the
8  public defender's file is.  So it'd be very difficult to
9  claim that police reports were not provided to the
10  public defenders when -- with the state of their
11  existing file.
12      Q.   Did you conduct -- strike that.  Did you form
13  any opinions about whether the state's attorney file was
14  complete or incomplete?
15      A.   Not that I noted in my report.
16      Q.   Okay.  And so when you reviewed the state's
17  attorney file, you didn't look at the file and go, "This
18  is obviously an incomplete file," correct?
19      A.   I -- I may have, but I didn't note it in my
20  report.
21      Q.   Did you note it somewhere?
22      A.   I not -- no, if I didn't note it in my report,
23  I didn't note it anywhere.
24      Q.   Okay.  All right.  So it is when -- it's not
25  like when you reviewed that file, you said, "a-ha, this

Page 240

1  public" - "this prosecutor file is clearly incomplete;"
2  is that fair?
3      A.   No, I -- again, the allegation is that the
4  public defender didn't receive these materials.  So my
5  initial focus was on their file.
6      Q.   Okay.  And when you looked at the public
7  defender file, you concluded that file -- strike that.
8  So you reviewed the public defender file in its entirety
9  and concluded that that file was incomplete, correct?
10      A.   Yeah.  I believe when you whittle down
11  redacted pages and -- and -- and photos and all that,
12  you get the 33 pages.  I mean, included in the -- in the
13  remaining pages are defense counsel subpoenas.  So it
14  leaves -- leaves about basically 25 pages of police
15  reports whereas the Chicago Police Department files
16  contain 158 pages, including the nine pages of GPRs that
17  the plaintiff's expert claims were missing from the
18  public defender's file.
19      Q.   And so I think the answer to my question is
20  yes, right?  When you reviewed the public defender file
21  in its entirety, you concluded that it was incomplete,
22  correct?
23      A.   Yes, it is incomplete.
24      Q.   Okay.  And when you reviewed the state
25  attorney file in its entirety, you didn't reach any

Page 241

1  conclusion that file was incomplete, correct?
2      A.   No, I did not.
3      Q.   Okay.  No, I did not, meaning that's correct;
4  is that right?
5      A.   It means I didn't reach a conclusion whether
6  it was complete or not.
7      Q.   Okay.  And when you --
8      A.   Let me answer him further.  I may have
9  observed that it was complete or not complete, but when
10  -- when I got to the public defender's file being so
11  lacking, my analysis kind of ended there.
12      Q.   Okay.  Now, when you looked at those files,
13  what did you find in terms of whether the investigative
14  file materials were contained in the state's attorney
15  file?
16      A.   As I just said, when I saw how poorly
17  maintained the public defender's file was, I reached a
18  conclusion that it would be impossible for us to
19  determine whether they had received all the police
20  depart -- department reports based upon the allegation
21  of Plaintiff's expert.
22      Q.   So and --
23      A.   So my -- my point is that the -- the
24  plaintiff's expert is claiming that these are documents
25  that weren't pro -- example of documents not provided to



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 64 of 104 PageID #:66001
The Deposition of DR. BERNARD YUDOWITZ, conducted on February 7, 2020
242..245

Page 242

```
1    the defense counsel when we -- we can't tell that from
2    the 25 pages versus 158 pages of the police file.
3         Q.   Did you find that there was any
4    investigative --
5         A.   My focus --
6         Q.   Oh, I'm sorry, go ahead.
7         A.   I apologize.  My -- once I saw how incomplete
8    the public defender's file was, the -- the allegation
9    that the police or the prosecutors didn't provide
10   everything that was in the police file is -- is -- is
11   impossible to verify.  They've got 25 pages remaining
12   when the original -- I mean, the police reports are
13   158 pages.  It's impossible to determine whether the
14   prosecutor's file was complete back at the time of trial
15   and tendered everything or that the police tendered
16   everything when you can't verify what the public
17   defenders had during the time they're preparing for
18   trial.
19        Q.   Did you find that the investigative file
20   materials were all contained in the state's attorney
21   file?
22             MS. CARNEY:  Objection.  Asked and answered.
23             THE WITNESS:  Yeah.  And -- and again, I -- I
24   don't recall off the top of my head because I
25   stopped at point number one under Soto.
```

Page 243

```
1    BY MR. SWAMINATHAN:
2         Q.   Did you find any instances in which the
3    investigative file was information -- well, strike that.
4    Did you find any instances in which the investigative
5    file information was missing from the state's attorney
6    file in whatever level of review you did conduct of the
7    prosecutor file?
8             MS. CARNEY:  Objection.
9             THE WITNESS:  Yep.  You know --
10            MS. CARNEY:  Form.
11            THE WITNESS:  I -- the allegation here is that
12       the public defender was not provided these
13       documents either from the police or from the
14       prosecutor.  So when their file is so inadequate,
15       the analysis of -- of what was in a potentially
16       incomplete prosecutor's file is irrelevant.
17   BY MR. SWAMINATHAN:
18        Q.   Would it matter to you if the prosecution
19   didn't get a copy of a number of these documents in the
20   police file?
21            MS. CARNEY:  Objection.  Form, foundation,
22       incomplete hypothetical.
23            THE WITNESS:  Again, this is Plaintiff's
24       expert claiming that the public defender didn't get
25       these police reports.
```

Page 244

```
1    BY MR. SWAMINATHAN:
2         Q.   I'm asking you a different question, sir.
3         A.   But -- but --
4         Q.   Focus on my question, please.  Let me ask it
5    and then you can answer.
6             MS. CARNEY:  Hold on.  He wasn't done
7        answering so you can re-ask it, but just let him
8        finish answering what he was saying.  I know you
9        don't like -- I know you don't agree that he's
10       answering your question, but he --
11            MR. SWAMINATHAN:  Yeah.  Okay.  Go -- yeah.  Go
12       ahead.  Go ahead.
13            MS. CARNEY:  You can re-ask it.  Just let him
14       finish.  Were you done?
15            MR. SWAMINATHAN:  Go ahead.
16            MS. CARNEY:  After all that?
17            THE WITNESS:  No.  Go ahead and re-ask it.  Go
18       ahead.
19            MS. CARNEY:  Okay.  Try again, Anand.
20   BY MR. SWAMINATHAN:
21        Q.   Yeah.  If there were investigative file
22   documents that were not contained in the prosecutor
23   file, would you want to know that?
24        A.   If the prosecutor's file is incomplete today
25   as we look at it, I -- I don't know what they had back
```

Page 245

```
1    at the time that they received information from the
2    police.  But I think the focus is rightfully here is
3    what the plaintiff's expert is claiming.  He's saying
4    that the public defender did not receive these documents
5    from the police and we cannot make that determination
6    based upon the approximately 25 police page -- police
7    report pages in their file today.
8         Q.   Did you find -- did you disclose any findings
9    about what was contained in the prosecutor file?
10            MS. CARNEY:  Objection.  Asked and answered.
11   BY MR. SWAMINATHAN:
12        Q.   Sir?
13        A.   I -- I did not.
14        Q.   Did you disclose any findings about whether
15   the prosecutor file was complete or incomplete?
16        A.   As I just said, I did not.
17        Q.   Did you disclose that you had you had found
18   some evidence of any kind to indicate that the
19   prosecutor's file was incomplete?
20            MS. CARNEY:  Objection.  Form.  Asked and
21       answered.
22            THE WITNESS:  As I've said numerous times, I
23       stopped once I saw the public defender's was so
24       incomplete.
25   BY MR. SWAMINATHAN:
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 65 of 104 PageID #:66002
The Deposition of DOE BERNARD TIMOTHY, on 01/13/2024, Page 65 of 104 Page ID #:065

246..249

Page 246

1    Q.   Okay.  And you had the entire prosecutor file,
2  so if you wanted to, you could have compared the entire
3  police file to the prosecutor file to see if the
4  documents also ended up in the prosecutor file, correct?
5    A.   I -- I -- I don't know if I have the entire
6  prosecutor's file.  As -- as I've stated through this
7  report, there are many times where the prosecutor's
8  file, today, as we look at it, is incomplete.  What I
9  was struck by the Soto case was how the -- the public
10  defender's file was so incomplete as to be impossible to
11  claim that the prosecutor or the police didn't provide
12  these documents at the time of trial.
13    Q.   Did you -- when you reviewed the prosecutor
14  file in this case, as you indicated, did you find that
15  there was anything unusual about the information
16  contained in the state's attorney file?
17        MS. CARNEY: Objection.  Form.
18        THE WITNESS:  If I can say it again, I was
19        struck by the public defender's file being
20        incomplete.  So my analysis of the prosecutor's file
21        didn't need to be any more detailed than it was.
22  BY MR. SWAMINATHAN:
23    Q.   Okay.
24        MS. CARNEY:  Anand, now when you're at a good
25        spot, I need a break.

Page 247

1        MR. SWAMINATHAN:  Yeah, we can take a break
2        right now.
3        THE REPORTER:  Okay.  We're going off the
4        record.  The time is 3:39 p.m.
5            (OFF THE RECORD)
6        THE REPORTER:  We're back on the record.  The
7        time is 3:54 p.m.
8  BY MR. SWAMINATHAN:
9    Q.   Okay.  Mr. Murray, could you turn to Page 13
10  of your report?
11    A.   All right.
12    Q.   And this is the section where you begin to dis
13  -- at the very bottom is where you -- the section header
14  at the bottom says, "Comparison of eight attorney" -
15  "defense attorney files to investigative files."  Do you
16  see that?
17    A.   I see that.
18    Q.   Okay.  All right.  And I want to ask you what
19  a couple of these files here, and I'm going to -- I
20  think we're going to be wrapped up here pretty quickly
21  if I can stay on discipline here.  Let's go to Page 15.
22    A.   Hold on.  Okay.
23    Q.   Okay.  On Page 15, you talk about the People
24  v. Edwards case, correct?
25    A.   I see that.

Page 248

1    Q.   Okay.  And I just wanted to ask you about
2  entry number five in your -- in that list there we've
3  talked to about a hand-drawn map.  Do you see that?
4    A.   I do see that.
5    Q.   Okay.  Now the hand-drawn map that's
6  referenced there in numeral five of your par -- in your
7  paragraph, that document, you did not find in the
8  defense file or the prosecutor file, correct?
9    A.   That is correct.
10    Q.   Okay.  Now the document itself -- strike that.
11  You indicated that some of the information contained on
12  that hand-drawn map is contained in other places in the
13  file, correct?
14    A.   Yes.  On a -- a -- a series of pages in a -- a
15  supplementary report, I believe, or maybe it was --
16  yeah, I think it was a supplementary report.
17    Q.   Okay.  Now, if I understand your testimony
18  correctly, you agree that that hand-drawn map itself,
19  you would still expect the police to turn over to the
20  prosecutors to be tendered to the defense as well,
21  correct?
22    A.   I would.
23    Q.   Okay.  Now, let's take a look at People v. Kim
24  Mathis, number 17.
25    A.   Hold on.  Yes.

Page 249

1    Q.   Okay.  And in People v. Kim Mathis, there's a
2  note that appears to be on the back of a GPR, correct?
3    A.   No.
4    Q.   That Mr. Tiderington identified?
5    A.   Like one extra sentence or something like
6  that, yes.
7    Q.   Okay.  And you didn't find that information on
8  the back of a GPR in the prosecutor file or the defense
9  file, correct?
10    A.   Let me take a look.  I think that's correct,
11  but let me examine my notes.
12    Q.   Yep.  Yep.
13    A.   I -- I -- I -- I've not noted whether it was
14  in the prosecutor's file, so I assume I did not find it
15  in the prosecutor's file.
16    Q.   Okay.  And when you review and then the rest
17  of your analysis there in Paragraphs 3 through 4 talks
18  about some of the other evidence and documents in the
19  case that refer to these same individuals, Terry Mathis
20  and Kim Mathis, correct?
21    A.   And -- and specifically to the allegation that
22  the sister was present during the -- the whipping of the
23  victim.
24    Q.   Okay.  And ultimately, your testimony is that
25  regardless of what information is in the rest of the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 66 of 104 PageID #:66003
The Deposition of Joe BERNARD MURRAY, conducted on February 9, 2009
250..253

Page 250

1  file, to the extent there's information contained on
2  that GPR, you would expect it to have been tendered to
3  the prosecution and to the defense, correct?
4      A.   And -- but specifically that one sentence was
5  out of -- well, not out of context.  It was near the end
6  of that GPR.  What -- and it seemed to indicate that she
7  was -- that Terry, the sister, was present where that
8  the remainder of that GPR and all the other police
9  reports and all the conversations between defense
10 counsel and defendant as well as Terry, reveals that --
11 that Terry couldn't find parking and dropped Kim off in
12 front of the -- a building.  Then she went into the
13 building, whipped the victim.  So that one kind of
14 confusing statement that she was there, it -- it might
15 just refer to that she was there dropping her sister
16 off, but I'm -- I'm saying that -- that all the context
17 of the whole rest of the police report refutes that
18 Terry was up in the apartment.
19     Q.   Okay.  And so the information on that -- on
20 that one piece -- sorry.  The piece of information on
21 that report, that -- strike that.  The piece of
22 information on that GPR that you didn't find in the PD -
23 - in the public defender file or prosecution file is
24 different than the information that's contained in the
25 rest of the file; is that right?

Page 251

1      A.   Let -- let -- let me let me word that more --
2  more carefully.  The -- even that GPR, which I believe
3  was the interview of -- of Terry -- it could also be a
4  separate GPR, those interview of the defendant, Kim.  It
5  -- it's -- it's ambiguous about that one note that's --
6  that's not in the public defender's file.  It's, like,
7  one sentence at the end of that -- that -- that GPR, so
8  even the context of the GPR doesn't say that the sister
9  was in the apartment at the time of the assault.  And
10 then everything else in the -- in the file, including in
11 the public defender's file, indicates that she was not
12 upstairs, so what I'm trying to say is that one
13 sentence, which was a little -- not misleading, but a
14 little vague, could refer to being out in front of the
15 house as opposed to being in the apartment.
16     Q.   Okay.  And are you -- strike that.  Are you
17 saying that the information on that GPR that was not
18 found in the public defender file or the prosecutor
19 file, that because there are other references to the
20 interviews of that individual it's okay not -- for
21 police not to tender that to the prosecution and
22 defense?
23     A.   Well, I'm not --
24          MS. CARNEY:  Form.
25          THE WITNESS:  I -- I'm not saying that it's

Page 252

1  okay not to -- to tender it.  I'm saying that --
2  that -- is it really a sentence at the end of a --
3  of a full- page GPR or nearly full-page GPR?  That
4  was a little bit vague.  So yeah.  Did it not get
5  Xeroxed?  Was it -- was it likely on the backside
6  of a GPR and that's why it wasn't provided?  Yeah.
7  That should have been provided.  No doubt about
8  that.  But this is not a -- a denial of access to
9  information that -- that had any meaning in -- when
10 it's compared to the rest of the file interviews
11 with both Terry and with Kim.  That's what I'm
12 saying.
13 BY MR. SWAMINATHAN:
14     Q.   Okay.  And so when I read this section of your
15 report, you're -- you agree that the information,
16 whether it's on the back of the GPR or on the front of
17 the GPR, should be tendered to the prosecution, correct?
18     A.   Well, the front of the GPR was tendered.  It's
19 just that one sentence on the back of the GR that wasn't
20 tendered, and I agree that it's -- it's part of the
21 investigative file.  It should have been provided.  I'm
22 not disagreeing with that.
23     Q.   And that -- that's the only part that I wanted
24 to make sure.  I just want to make sure I'm
25 understanding that part of it.  And then --

Page 253

1          MS. GOLDEN:  Well, wait a second.  I know that
2  you want to understand that first part, but you cut
3  him off from what he was about to say.
4  BY MR. SWAMINATHAN:
5      Q.   Is there more you want to say about it,
6  Mr. Murray?
7      A.   Yes.  The -- the -- even -- even before that
8  one sentence, which I contend is kind of vague, even
9  before we get to that, even the context of the rest of
10 the GPR is that she was not up in the apartment.  She
11 was down in the street in the car.  And then the point
12 four is the public defender's file has extensive diary
13 of interviews by the public defender, who represented
14 Kim as well as Terry and other family members.  It was
15 open conversation regarding where she was, what she did,
16 and where she went, so I'm adding into that -- that if -
17 - if Terry was to say -- or Kim were to say, "no, Terry
18 was up in the apartment at the time of the attack,"
19 there was nothing precluding them from learning that
20 information from their client and their client's sister.
21     Q.   Okay.  And that's why I'm getting confused now
22 because now -- so is it your testimony that if a -- if
23 an attorney could ask the right questions to obtain the
24 same information, then the obligation to turn that over
25 from the police no longer exists?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 67 of 104 PageID #:66004
The Deposition of Doe - BERNARD MURRAY, on 03/15/24, Page 67 of February 9, 2022
254..257

Page 254

1    MS. CARNEY:  Form.
2    MS. GOLDEN:  Misstates his testimony.
3    THE WITNESS:  I -- I still haven't said that.
4    I said that all investigative material --
5  BY MR. SWAMINATHAN:
6    Q.  Okay.  So that I just wanted to make sure I'm
7  understanding it.
8    A.  I'm sorry.  All investigative material should
9  be provided, even that one sentence on the back of the
10 report, but I'm just trying to put it into the context
11 of how that -- number one, how that might've happened.
12 Maybe the back page was not Xeroxed, so that's issue
13 number one, I suppose.  But then the other part of it is
14 that there was extensive access to those two people, and
15 the -- the -- the public defender's running diary, which
16 probably should have been subject to redaction, clearly
17 shows open conversations with those two women and that
18 not being an issue.
19    Q.  I think you've totally lost me now, so I
20 anything I need to -- let me break it into pieces to
21 make sure I'm understanding, okay?  You say that there's
22 a bunch of information in this file that could otherwise
23 explain the information that's otherwise on the back of
24 that GPR, correct?
25    A.  Generally -- primarily that she was -- she,

Page 255

1  Terry, was driving around at -- at the location, but
2  didn't go into the location.
3    Q.  Okay.  And I think we've established -- let me
4  make sure.  So we've established, one, you agree that
5  the information on the GPR should be disclosed to the
6  prosecutors and the defense, regardless of whether it's
7  on the front of the page of the back of the page.  Are
8  we on the same page there?
9    A.  All investigative materials should be provided
10 to the police and to the defendant.
11    Q.  Okay.  And then --
12    A.  All relevant material.
13    Q.  Are we on the same -- okay.  Go ahead.  Sorry.
14 Sorry.
15    A.  All -- I meant to say all relevant
16 investigative material.
17    Q.  And then are we on the same page that the
18 information on the GPR, regardless of whether one could
19 later learn that same information through counsel or
20 through other witnesses, that information should still
21 be tendered to the prosecution, regardless of whether
22 there are other ways of learning that information?  Do
23 you agree with that?
24    A.  I -- I guess I'm trying to say is the material
25 -- investigative materials should have been provided,

Page 256

1  and -- and -- and by the way, the -- I don't know if the
2  public defender's file was complete at the time that we
3  now have it.  That page may have been provided, but I'm
4  saying in the rest of the material that we do have in
5  the public defender's file, it certainly shows that it
6  was not an issue.
7    Q.  Okay.  Can we just go back to my question? Let
8  me ask it again.  I'm just asking you if what your -- is
9  it your opinion that if information that's contained in
10 a police report can then be subsequently learned by the
11 attorney through other means that it's no longer the
12 case that that police report should be tendered to the
13 prosecution and defense?
14    A.  And for the --
15    MS. GOLDEN:  Object to form.
16    THE WITNESS:  For the third time, I'm not
17 saying that.
18 BY MR. SWAMINATHAN:
19    Q.  Okay.  That's all that -- I just wanted to
20 make sure I understood that.  Okay.  And then -- all
21 right.  Let's look at Ardell -- let's see.  Okay. Let's
22 go back to the number -- Page 1 of your report, all the
23 way back to Page 1.
24    A.  Yes.
25    Q.  Nah.  I guess I don't really need to look at

Page 257

1  that.  Okay.  Let's look at Page -- actually, let's go
2  to Page 9 of your report.
3    A.  Yes.
4    Q.  On Page 9 at EI1, do you see that sort of near
5  the bottom of the page?
6    A.  I'm there now.
7    Q.  "If he is referring to the manner," do you see
8  that paragraph that begins there?
9    A.  I -- I see that.
10    Q.  Okay.  It says, "Prosecutors and criminal
11 defense attorneys are aware of the manner and location
12 of how those reports are created and where they are
13 stored."  Do you see that?
14    A.  Yes.
15    Q.  You can read that whole paragraph there?
16    A.  I do see it.  I see it.
17    Q.  Okay.  What is your basis for saying that
18 criminal defense attorneys are aware of the manner and
19 location of how reports are created and stored?
20    A.  Well, I look at all the subpoenas that are in
21 all the public defender's files.  So they -- they send
22 subpoenas to the areas as well as to 11th and State or
23 35th and Michigan, and they list off the laundry list of
24 items, just like prosecutors do, that they wanted to
25 recover.  And they use the street files language:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 258

1    street files, running files, investigative files, area
2    files.  So they know that those -- that a possible
3    location for those reports or where they were created in
4    the area and they may be stored there as well as sending
5    those same subpoenas, like I said, to -- to what's
6    colloquially called headquarters to get whatever else
7    they want, the case report, the forensic reports. And so
8    you see that in case after case that both prosecutors
9    and public defenders are issuing the same style of
10   subpoena.
11        Q.   Okay.  And that's an indication that they are
12   asking for lots of different things, but in -- to what
13   extent does that reveal that they know actually where
14   that information is stored and how it's created?
15        A.   Well, because they often send those subpoenas
16   to the areas and they call them area files, that would
17   be an example of knowing where -- where investigative
18   files are created and stored.
19        Q.   Okay.  And some of that information is
20   sometimes not stored at the areas.  It's stored in ERPS
21   or the identification section or other locations as
22   well, correct?
23        A.   Yes.  And -- and that's why the those other
24   subpoenas are sent to 11th and State or 35th and
25   Michigan for dispersal to those other areas.

Page 259

1        Q.   Okay.  And are you saying that you're aware
2    that all the public -- the defense attorneys all know
3    all of those different areas where the materials are
4    stored?
5        A.   Yes.  I -- I would say that from my practice
6    and in the homicide cases, when they were requesting the
7    area files, the investigative files, they knew what area
8    is this.  They put it on there on a -- in -- in the --
9    in previous days, I guess.  You know, 51st and -- and
10   Wentworth, for example, for Area 1, they would put that
11   right on there, so yes.  They knew if it was an Area 1
12   case that the investigative file was in all likelihood
13   there and -- and that the -- the RD file was stored
14   elsewhere.
15        Q.   Okay.  And do you recall when you reviewed
16   Mr. Tiderington's expert report he referred to the
17   Office of the Inspector General report for the City of
18   Chicago?  Do you recall his report discussing that OIG
19   report?
20        A.   No.  I -- actually, I don't.
21        Q.   Okay.  Let's go to his report.  Do you have a
22   copy of it with you?
23        A.   Hold on.
24        Q.   Let me see.  I can pull it up on the screen
25   here, too.

Page 260

1        A.   I do.
2        Q.   You said you do have it?
3        A.   I have his report.
4        Q.   Okay.  Can you go to Page 34 of his report?
5        A.   Just give me one second.  Okay.  I'm there.
6        Q.   And on Page 34 of his report, he discusses
7    some findings of the Office of Inspector General of the
8    City of Chicago.  Do you see that?
9        A.   I'm sorry.  Say it again.
10        Q.   Yeah.  Look in the middle of his report where
11   there's a section --
12        A.   Okay.
13        Q.   -- that begins, "Remarkably."
14        A.   Yeah.  I'm there.
15        Q.   Okay.  And in that section, he summarizes
16   various findings from an Office of Inspector General
17   report from the City of Chicago from June of 2020.  Do
18   you see that?
19        A.   I see that.
20        Q.   Okay.  And you reviewed this as part of your
21   review of his report in advance of preparing your own
22   report, correct?
23        A.   That's true, but as -- as I've said before, I
24   was more focused on the Page 51 reports and the eight
25   cases and all that.  So I was not necessarily opining on

Page 261

1    this part of his report.
2        Q.   Okay.  But in your report, you wrote that
3    prosecutors and defense attorneys are aware, basically,
4    of the locations of where reports are created and where
5    they can be obtained, correct?
6        A.   Yes.
7        Q.   Okay.  And if you look at this OIG report that
8    he's described here, he quotes the findings of the OIG
9    report, which say, "CPD Subpoena Unit and Office of
10   Legal Affairs, the units responsible for responding to
11   subpoenas and record requests, cannot ensure that
12   they're identifying and locating all responsive records
13   for production.  The department lacks the means to
14   determine what records may exist for any case or
15   incident, making it impossible to know whether it has
16   identified and produced all relevant records."  Do you
17   see that?
18        A.   I just read that.  I just --
19        Q.   Okay.  Basically, what the OIG's finding was
20   that the Chicago Police Department itself doesn't know
21   where all of its documents are, fair?
22        MS. CARNEY:  Objection.  Form.  Foundation.
23   Misstates testimony.  Go ahead.
24        THE WITNESS:  Well, that's what the -- the
25   2020 OIG report findings included, so it's just



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 69 of 104 PageID #:66006
THE DEPOSITION OF BERNARD MURRAY, Volume I, taken on February 2, 2023
262..265

**Page 262**

1  amazing that prosecutors and public defenders
2  recovered all these reports back in the day.
3  Amazing.
4  BY MR. SWAMINATHAN:
5      Q.   And the finding of the OIG in 2020 about the
6  ability of seat of the Chicago Police Department itself
7  to find records, does it cause you to have any doubts or
8  concerns about your opinion that prosecutors and
9  criminal defense attorneys knew exactly where everything
10 was and how to get it?
11         MS. CARNEY:  Objection. Form. Foundation.
12         THE WITNESS:  I -- I would --
13         MS. CARNEY:  Argumentative.
14         THE WITNESS:  I -- I would say to you that we
15 issued those subpoenas and we got the reports, so
16 we must've been doing something right.
17 BY MR. SWAMINATHAN:
18     Q.   Okay.  And your testimony is when you got the
19 reports, you can say with confidence that you got all of
20 the reports?
21         MS. CARNEY:  Objection. Form. Misstates his
22 testimony.
23         THE WITNESS:  As -- as -- as I said before, we
24 gather all the reports, read them in tandem, and
25 determine if we received everything.  If we haven't

**Page 263**

1  received everything, we ask, where is other
2  reports? If there's a timing issue, we keep looking
3  for that. But we sent the subpoenas to those
4  locations, both prosecutors, public defenders, and
5  private attorneys, and by the time we got to being
6  ready for trial, we were fairly confident that we
7  had everything.
8  BY MR. SWAMINATHAN:
9      Q.   Okay.  And I think you acknowledged that the
10 process does require you ultimately to pay -- place some
11 trust that Chicago Police detectives and the department
12 are providing you with all of the documents that they
13 have in their files, correct?
14         MS. GOLDEN:  Object to the form of the
15 question.  Asked and answered --
16         THE WITNESS:  Yeah.  I -- I think I --
17         MS. GOLDEN:  -- about six hours ago.
18         THE WITNESS:  Thank you.  I think I did answer
19 that before, sir.
20 BY MR. SWAMINATHAN:
21     Q.   What's the answer?
22     A.   That the --
23         MS. GOLDEN:  Objection. Form.
24         THE WITNESS:  The -- the answer is that we --
25 we examine all those documents to -- to -- to

**Page 264**

1  determine whether we -- we believe we have
2  everything.  If we think something is missing, we
3  ask for them to turn in reports, but at the end of
4  the day, there is a level of trust.
5  BY MR. SWAMINATHAN:
6      Q.   Okay.  And when you read the findings of the
7  Office of Inspector General, does it cause you to have
8  any concerns that maybe that trust was misplaced?
9          MS. CARNEY:  Objection.
10         MS. GOLDEN:  Form and foundation.
11         MS. CARNEY:  Argumentative.
12         THE WITNESS:  As I said a minute ago, despite
13 those findings by OIG, we -- we, by being
14 prosecutors and defense attorneys, did acquire all
15 those reports with a certain level of certainty
16 back when we were getting ready for trial.  So it
17 doesn't cause me the concern that may -- it -- it
18 may exhibit to you.
19 BY MR. SWAMINATHAN:
20     Q.   Okay.  Did you -- when you saw that in
21 Mr. Tiderington's report, did you decide to review the
22 OIG report and understand why it -- the OIG had reached
23 those conclusions?
24         MS. CARNEY:  Objection.  Form.  Foundation.
25         MS. GOLDEN:  It also calls for privileged

**Page 265**

1  information.
2          MR. SWAMINATHAN:  No, it doesn't.
3  BY MR. SWAMINATHAN:
4      Q.   Go ahead.
5          MS. GOLDEN:  Actually, it does because it goes
6  to the drafting process.
7          MR. SWAMINATHAN:  It doesn't.
8  BY MR. SWAMINATHAN:
9      Q.   Go ahead.
10         MS. GOLDEN:  Actually, it does.
11         MS. CARNEY:  Hold on.  What is your question,
12 Anand?
13         MR. SWAMINATHAN:  Did you decide to review the
14 OIG findings cited in Mr. Tiderington's Report that
15 you reviewed?
16         MS. CARNEY:  Okay.  So to the extent that you
17 need to disclose any attorney-client communications
18 in order to answer that question about what or what
19 you didn't review, I would advise you not to
20 answer.
21         THE WITNESS:  I personally did not review the
22 OIG report.
23 BY MR. SWAMINATHAN:
24     Q.   Okay.  Did you request a copy of the OIG
25 report so you could review it yourself to see what

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 70 of 104 PageID #:66007
The Deposition of BERNARD HARRIS, on 02/08/2019, Page 70 of 104 PageID #:999

266..269

Page 266

1  caused the OIG to reach those findings?
2          MS. CARNEY: Objection. Form.
3          THE WITNESS: I did not review that report. As
4  I said to you before, I was more focused on the
5  Page 51 material, the page -- the eight cases, and
6  the Polaroid photographs.
7  BY MR. SWAMINATHAN:
8      Q.  Were you curious about why the OIG reached
9  those findings?
10         MS. GOLDEN: Form.
11         MS. CARNEY: Objection. Form. Calls for
12  speculation. Go ahead.
13         MS. GOLDEN: I think it's also asked and
14  answered, but --
15         THE WITNESS: Oh, I'm sorry. My -- my -- I
16  did not have any level of curiosity.
17  BY MR. SWAMINATHAN:
18     Q.  Okay. And did you do any assessment to
19  understand how far back the OIG had looked at material
20  to understand how pervasive this problem was?
21         MS. CARNEY: Objection. Form. Foundation.
22  Asked and answered. And assumes -- misstates the
23  evidence. Go ahead.
24         THE WITNESS: I did not examine the report.
25  BY MR. SWAMINATHAN:

Page 267

1      Q.  Okay. And to these -- going back to your --
2  we can put Tiderington's expert report to the side.
3  Going back to your report where you referenced defense
4  attorneys being aware of the manner and location of how
5  reports are created and so on, I just -- I want to ask
6  you a couple questions about the public defender's
7  policies. Did you have -- strike that. Did you ever
8  review any policies of the public defender's office with
9  regard to their process for obtaining records from the
10  police department?
11     A.  Did I review policy manuals or something like
12  that?
13     Q.  Any policies of the public defender's office.
14     A.  I -- I did not -- well, again, do you mean,
15  like, a policy manual? What do you mean?
16     Q.  Just policies. Just -- like, written
17  policies, just like the general orders or special orders
18  in a police department.
19     A.  I did not look at written policies of the
20  public defender's office.
21     Q.  Have you ever reviewed any written policies at
22  the public defender's office?
23     A.  No.
24     Q.  Do you know what the public defender's
25  office's policies were with regard to the maintenance of

Page 268

1  their homicide files or other files?
2          MS. GOLDEN: Object to form and foundation.
3          THE WITNESS: Could you ask the question
4  again, sir?
5  BY MR. SWAMINATHAN:
6      Q.  Yes. Do you have any knowledge about what the
7  public defender's policies were with regard to the
8  maintenance of their -- the files from the prosecution
9  and defense?
10         MS. GOLDEN: Sorry. Form. Foundation.
11         THE WITNESS: Well, I -- I -- I know what
12  Public Defender Karen Diamond said in her Velez v.
13  Dart Motion to Quash. The --
14  BY MR. SWAMINATHAN:
15     Q.  Did she provide the --
16         MS. GOLDEN: Well, excuse me. I think you
17  interrupted the witness, please.
18  BY MR. SWAMINATHAN:
19     Q.  Go ahead.
20     A.  She didn't believe that the files were
21  maintained in a manner that -- that they would be able
22  to be reviewed 30 years later for the benefit of civil
23  litigation. So I don't know if she's speaking to -- to
24  a policy that -- that was either had or -- or did not
25  -- did not exist, but she certainly weighs in on the --

Page 269

1  on -- on the fact that they were incomplete.
2      Q.  Okay. And so did she attach to her --
3  whatever it is that you reviewed of hers a copy of any
4  police -- Cook County Public Defender's Office policy?
5      A.  Did she -- she did not attach a policy
6  document to it.
7      Q.  Did she cite to any policy document?
8      A.  No, she did not.
9      Q.  Okay. And so had -- and I think you answered
10  the question by referring to Karen Diamond, so I got
11  confused. Did you review any public defender policy
12  document about how they maintain their files?
13         MS. CARNEY: Objection. Form. Foundation.
14         THE WITNESS: I think I answered this, but I
15  did not look at public defender policies.
16  BY MR. SWAMINATHAN:
17     Q.  Okay. And did you review any procedures
18  manuals for the public defender's office about how they
19  maintained their files?
20     A.  Is there a difference between policy and
21  procedure?
22     Q.  Yes. But you want me to ask a different
23  question or clarify?
24     A.  Yeah, please.
25     Q.  As opposed to written policies, did you review

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 71 of 104 PageID #:66008
The Deposition of Joe BERNARD TIERNEY, conducted on February 7, 2019
270..273

Page 270

1　any documents setting forth the procedures for
2　implementing or following those policies of the public
3　defender's office?
4　　　　　MS. CARNEY:  Object to form.
5　　　　　THE WITNESS:  Not a -- a -- a document issued
6　by their office, but as I've spoken to already, the
7　-- the routine use of subpoenas, which were very
8　descriptive and very similar to the subpoenas the
9　prosecutor sent out.  I don't know if it was a
10　policy or a procedure in their office, but on every
11　murder case that I handled a public defender, they
12　issued those subpoenas.
13　BY MR. SWAMINATHAN:
14　　　Q.　And did you review any internal --
15　　　　　MS. GOLDEN:  Well, hold on, Anand.
16　　　　　MR. SWAMINATHAN:  Oh, I'm sorry.
17　　　　　MS. GOLDEN:  I'm know you're trying to wrap it
18　up, but you're starting to cut him off a little
19　more frequently.
20　　　　　THE WITNESS:  So I -- I -- I -- I don't know
21　if they had a policy circulating in the public
22　defender's office that if you're in the murder task
23　force you must issue that subpoena.  I don't know
24　if it was a policy or a procedure the -- that they
25　had there, but they did it in every case.

Page 271

1　BY MR. SWAMINATHAN:
2　　　Q.　Did you review any procedures manuals
3　implementing policies about how the public defender's
4　office would keep its files at the conclusion of trials?
5　　　　　MS. CARNEY:  Objection.
6　　　　　MS. GOLDEN:  Form.
7　　　　　MS. CARNEY:  Foundation.
8　　　　　THE WITNESS:  I did not review any of their
9　policy manuals.
10　BY MR. SWAMINATHAN:
11　　　Q.　Did you interview anyone from the public
12　defender's office about what their practices were with
13　regard to their files at the conclusion of a case?
14　　　A.　I did not.
15　　　Q.　Did you ever work in the Cook County Public
16　Defender's Office in any role?
17　　　A.　No.
18　　　Q.　Have you ever worked as a public defender or
19　criminal defense attorney?
20　　　A.　You already asked those questions early on.  I
21　was a prosecutor from the very beginning of my career.
22　I've only been a prosecutor.
23　　　Q.　Okay.
24　　　A.　I did not work in any public defender office.
25　　　Q.　And do you claim to be an expert on the Cook

Page 272

1　County Public Defender's Offices file-keeping practices?
2　　　　　MS. CARNEY:  Objection.  Form.  Foundation.
3　Argumentative.  And misstates his report and
4　testimony.
5　　　　　THE WITNESS:  I don't -- I don't claim to be
6　an expert.  I'm just quoting to you what
7　Ms. Diamond said in a Motion to Quash -- a
8　subpoena.  A -- a -- an assumption adopted in the
9　case is that the -- if the report is not found in
10　their file, it must not have been given to them.
11　She refutes that in her filing.
12　BY MR. SWAMINATHAN:
13　　　Q.　Do you know what Karen Diamond's role was in
14　the public defender's office?
15　　　A.　I believe it was a supervisory role, but I'm
16　not exactly positive.
17　　　Q.　Okay.  And do you know what role she had with
18　regard to the maintenance of files herself?
19　　　A.　I -- I only know what she filed.
20　　　Q.　Do you know what -- so do -- does that mean
21　you do or you don't know what she -- what her role was
22　with regard to the maintenance of files at the
23　completion of a trial?
24　　　　　MS. CARNEY:  Object to form.
25　　　　　THE WITNESS:  I -- I do not know what her role

Page 273

1　was.
2　　　　　MR. SWAMINATHAN:  Okay.  Let's take a quick
3　break.  I think I might be done, so let me just
4　quickly see if I got anything else.
5　　　　　THE WITNESS:  Okay.
6　　　　　MS. GOLDEN:  Okay.  About how many minutes,
7　how long?
8　　　　　MR. SWAMINATHAN:  Let's go over three minutes
9　as a goal.
10　　　　　MS. GOLDEN:  Yeah.  All right.  I won't leave.
11　　　　　THE REPORTER:  Okay.  Going off the record.
12　The time is 4:22.
13　　　　　　(OFF THE RECORD)
14　　　　　THE REPORTER:  We're back on the record.  The
15　time is 4:26 p.m.
16　　　　　MR. SWAMINATHAN:  All right.  I have no
17　further questions.
18　　　　　MS. GOLDEN:  All right.
19　　　　　MS. CARNEY:  All right.  Any -- Jan, do you
20　have any?
21　　　　　MS. SUSLER:  I do not have any questions.
22　Thank you.
23　　　　　MS. CARNEY:  Anybody from the defense?
24　　　　　MR. SCHALKA:  Nothing from me.
25　　　　　MS. CARNEY:  No questions.  Thank you,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 72 of 104 PageID #:66009
The Deposition of BERNARD MURRAY, Volume 4, Taken on February 6, 2023
274..276

Page 274

1   Mr. Murray.
2       THE REPORTER:  Yes.  Thank you.  Mr. Murray,
3   would you like to read or waive?
4       MS. CARNEY:  We're going to reserve.
5       THE REPORTER:  You're going to waive?
6       MS. CARNEY:  No.  We're going to read.
7       MR. SCHALKA:  Reserve.
8       THE REPORTER:  Oh, read?  Okay.  Can I send it
9   to you then, Ms. Carney?
10      MS. CARNEY:  Yes.  You can send it directly to
11  me.
12      THE REPORTER:  Perfect.  And then I'll just
13  get orders real quick before everyone signs off.
14  Mr. Swaminathan, did you -- how do you like your
15  transcript, or do you need one right now?
16      MR. SWAMINATHAN:  No.  Don't need one right
17  now.  Thank you.
18      THE REPORTER:  Okay.
19      MR. SWAMINATHAN:  I don't need video.
20      THE REPORTER:  Okay.  Ms. Susler, do you need
21  a transcript right now?
22      MS. SUSLER:  No.  Thank you very much.
23      THE REPORTER:  Okay.  Ms. Carney, do you need
24  a copy of the transcript right now?
25      MS. CARNEY:  Not right now.

Page 275

1       THE REPORTER:  Okay.  And then, Mr. Schalka,
2   do you need a copy of the --
3       MR. SCHALKA:  Yes.
4       THE REPORTER:  -- transcript?
5       MR. SCHALKA:  No, I don't.
6       THE REPORTER:  No?  Okay.  And then,
7   Ms. Golden, did you need a copy?
8       MS. GOLDEN:  No.  Thank you.
9       THE REPORTER:  Okay.  All righty.  And we're
10  off record --
11      MR. SWAMINATHAN:  Madam Court Reporter, can
12  you put your e-mail address in the -- typed in the
13  chat?  And then I'll e-mail you some exhibits.
14      THE REPORTER:  I will.  And then everyone stay
15  on.  I'm going to go off real quick.  The time is
16  4:28.
17          (DEPOSITION CONCLUDED AT 4:28 P.M.)
18
19
20
21
22
23
24
25

Page 276

1   CERTIFICATE OF DIGITAL REPORTER
2   STATE OF ILLINOIS
3
4   I do hereby certify that the witness in the foregoing
5   transcript was taken on the date, and at the time and
6   place set out on the Title page hereof by me after first
7   being duly sworn to testify the truth, the whole truth,
8   and nothing but the truth; and that the said matter was
9   recorded digitally by me and then reduced to typewritten
10  form under my direction, and constitutes a true record
11  of the transcript as taken, all to the best of my skills
12  and ability. I certify that I am not a relative or
13  employee of either counsel, and that I am in no way
14  interested financially, directly or indirectly, in this
15  action.
16
17
18
19
20
21
22  EMILIA LOPEZ,
23  DIGITAL REPORTER / NOTARY
24  COMMISSION EXPIRES ON: 02/03/2024
25  SUBMITTED ON: 12/21/2023

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 73 of 104 PageID #:66010
The Deposition of BERNARD MURRAY, VOLUME 1, taken on February 27, 2020
277

_____
**Exhibits**

**Exhibit1_ Bernard** 35:4, 7,15 36:17,20 37:11,16 63:5, 13 65:9,17 66:1 236:25

**Exhibit2_ Bernard** 67:23 68:3

**Exhibit3_ Bernard** 71:20, 23 103:20

**Exhibit4_ Bernard** 121:6, 8

_____
**$**

**$100,000** 29:20,21

**$200** 16:24 30:21

**$300** 16:25 30:22

_____
**1**

**1** 35:4,7,15 36:17,20,22 37:2,8,11,16 63:5,13 65:9,17 66:1 67:25 236:25 256:22, 23 259:10,11

**10** 71:6 211:15 212:4,8

**101** 7:7

**10:08** 7:9

**10:37** 34:23

**10:47** 35:1

**11** 123:1

**117-page** 65:13

**11:48** 88:8

**11th** 98:2,5 99:25 257:22 258:24

**12** 66:3

**12:06** 88:11

**13** 71:2 73:24 74:8 79:12 81:8 247:9

**14** 74:8 81:8

**144** 65:8

**145** 65:17

**15** 74:8 81:8 247:21,23

**158** 240:16 242:2,13

**16** 74:8 81:9

**16,000** 30:3

**167** 37:16 64:1 66:1

**167-page** 37:11

**17** 248:24

**17,000** 30:3

**18** 74:8 81:9

**19** 68:11 69:10 74:16,18 75:24 81:9

**1980s** 108:10, 22

**1981** 108:3

**1990s** 195:20

**1:18-CV-1028** 7:13

**1:18-CV-2312** 7:14

**1:20** 152:16

**1:21** 153:7

_____
**2**

**2** 67:23 68:3

**2009** 10:17

**2015** 38:2

**2016** 65:10

**2017** 66:3

**2020** 260:17 261:25 262:5

**2022** 16:12

**2023** 7:8

**22** 66:5

**23** 36:19,22 37:3,8

**2363** 182:3

**23rd** 35:22

**24** 63:6 65:10

**25** 63:7,13,17 205:17 211:24 240:14 242:2, 11 245:6

**26** 63:7,13,17

**27** 64:1

**28** 64:1

**2:00** 152:22

**2:05** 153:10

_____
**3**

**3** 71:20,23 103:20 122:15 123:15 249:17

**30** 205:18 268:22

**33** 240:12

**34** 260:4,6

**35th** 98:2,5 99:25 257:23 258:24

**3908** 117:24

**3:39** 247:4

**3:54** 247:7

_____
**4**

**4** 121:6,8,20 249:17

**40202** 7:8

**41** 20:5,7,14,20 23:14,18,19

**4:22** 273:12

**4:26** 273:15

**4:28** 275:16,17

_____
**5**

**5** 72:18 76:3 79:10 81:21 167:5

**50** 71:13 118:18 119:6,10,14 211:21 212:24

**51** 69:24 71:14, 16 82:3 83:14 220:15 260:24 266:5

**51st** 259:9

**5:00** 152:18

_____
**7**

**730** 7:6

**7th** 7:8

_____
**8**

**8-3** 106:12

**83-01** 43:18

**83-1** 22:15 41:6,11 96:20, 24 104:9,12 105:2,11,16 106:24 107:11 109:23 110:7, 15,17,22 111:6, 10,17,21 112:4, 7 113:3 114:6, 15,20,25 115:8 121:7,25

122:15

**83-1-1** 111:17

**83-2** 105:19,22 106:3

**8301** 22:7

**86-3** 106:17,19, 23 107:3,6,18

_____
**9**

**9** 257:2,4

**90** 212:9,12 213:1,6,9

**90,000** 29:23

**90,000s** 29:22

_____
**A**

**a-ha** 239:25

**a.m.** 7:9 34:23 35:1 88:8

**ability** 11:5 137:15 173:9 219:11 262:6

**absolutely** 145:14 163:3

**accepted** 16:3 94:15 101:11, 21 114:15,17

**accepting** 14:19 15:14,15

**access** 97:8 130:16 164:21 168:11 252:8 254:14

**accomplish** 112:18

**accurate** 23:17 29:18 30:19 31:5 37:20,23, 24 51:5 83:12 86:18 118:3,15 132:6 198:17 237:14

**accurately** 63:11,18



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 74 of 104 PageID #:66011
The Deposition of BERNARD MURRAY, VOLUME 1, taken February 17, 2021

278

**accused** 183:4,10,23 184:7

**acknowledged** 135:6,13 144:6 203:11 263:9

**acknowledging** 118:22 144:16

**acquire** 264:14

**acting** 117:1

**actions** 56:20 231:13

**actual** 142:3 200:3

**add** 26:17 145:5 191:12

**added** 116:3

**adding** 253:16

**addition** 23:18 35:24 64:10 72:4,25 73:16 74:5 81:7 129:9

**additional** 23:22 37:6 39:1,2 69:8 79:12 105:2 135:9 179:21 180:16

**address** 102:4 113:19 114:3 126:17 275:12

**addressed** 112:7 114:23

**addressing** 115:5

**admission** 199:5

**admit** 229:14

**admitted** 198:23 199:6

**admitting** 221:8 229:7

**adopted** 272:8

**Adriana** 161:23 168:15

**advance** 260:21

**advise** 265:19

**Affairs** 261:10

**affirm** 9:7

**afternoon** 153:13

**agencies** 40:11,23 48:13 57:25 60:23 62:15 101:24 103:18

**agencies'** 103:10

**agency** 47:3 60:16 103:15

**agree** 17:4 18:2 68:6 88:13 91:9 119:18 154:15 156:25 159:15 174:21, 25 179:5 185:2 198:7,14 203:4 204:14 238:1 244:9 248:18 252:15,20 255:4,23

**agreed** 15:23 16:22

**ahead** 8:3 18:8, 16 20:18 28:8 30:17 31:12,25 33:15 41:23 44:25 60:14 80:19 101:14 106:8 115:18 128:16 137:7,8 155:7 160:11 165:13 166:25 170:12 172:19 177:14 187:4 191:18 192:23 196:25 197:24 205:14 206:19 209:14,17 214:7 219:18 223:10 230:18 237:20 242:6 244:12,15,17, 18 255:13

**allegation** 167:21 240:3 241:20 242:8 243:11 249:21

**allegations** 113:8 165:14 198:5 220:25 222:14 230:5 232:1,10

**alternate** 199:18,19

**alternative** 178:20 200:10, 11

**amazing** 262:1,3

**ambiguous** 251:5

**amended** 96:13

**Amendment** 230:12

**amendments** 96:23 97:1,4,9

**amount** 29:15, 17,18 30:2 31:1 227:3,17

**amounts** 223:24

**analysis** 32:21 54:2 69:6 83:25 84:1,4 86:9 87:13,15,21 111:1 231:22 232:18 233:16 238:6,10,13 241:11 243:15 246:20 249:17

**Anand** 7:20 18:15 73:3 80:9 152:10 170:13 244:19 246:24 265:12 270:15

**angle** 145:2

**Annie** 8:6

**Annie's** 8:2

**answering** 12:11 19:5 80:16 95:4 114:10 134:15 164:9 209:11 224:11 244:7,8, 10

**answers** 24:14,18,20 26:6

**apartment** 250:18 251:9, 15 253:10,18

**apologies** 10:10 28:16 107:25

**apologize** 15:9 103:4 197:1 242:7

**apparently** 174:1

**appeal** 59:7 61:5,6,16,17 192:19 207:7

**appeals** 61:10, 22

**appearance** 7:17

**appeared** 176:12 177:12

**appearing** 7:22 8:6,7,9 178:2

**appears** 64:8, 25 73:10 79:3 249:2

**appellate** 38:2 40:15,21 61:11, 14 192:24 193:20

**apply** 17:16

**approximately** 20:5 21:7 23:4, 13 29:5 30:3,12 31:2,3,7 70:24

**79:4** 211:3 245:6

**approximating** 20:19

**approximation** 23:7

**Ardell** 256:21

**area** 98:2 167:5 258:1,4,16 259:7,10,11

**areas** 100:3,4 257:22 258:16, 20,25 259:3

**argue** 178:12

**argues** 178:15

**arguing** 172:15

**Argumentative** 262:13 264:11 272:3

**Ark** 216:18

**Aronda** 156:7, 13 167:4,10,14, 24 169:17,19 171:10 173:21 174:15 175:3, 14,16 176:4,17 178:7 181:12 182:8,11 183:9 186:13,19,25

**Arturo** 7:11,21 161:23

**assault** 251:9

**assess** 127:2

**assessing** 129:11

**assessment** 266:18

**assignment** 47:15

**assistant** 39:20

**associate** 73:8

**assume** 12:5 17:15 117:11 181:6 249:14



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

assumed 188:14

assumes 111:7 113:5 266:22

assumption 139:21 141:2 272:8

attach 269:2,5

attached 36:2

attachment 36:6,7 37:13 63:25 64:2,3,7, 21 65:17,21 86:8,11 87:8,14

attachments 36:12 86:4,7,14 87:5

attack 253:18

attempted 74:11

attempts 194:18

attending 7:18

attention 129:4

attorney 31:18 40:20 42:13 49:8 52:11 61:14,16 71:4 72:4,13 73:12, 17 74:6,10,15, 20 79:3 80:1 81:13,18 158:24 159:18, 22 160:17 161:3 164:11, 20 173:5 176:20 196:16 204:9,18 226:6 237:12 238:12, 23 239:13,17 240:25 241:14 242:20 243:5 246:16 247:14, 15 253:23 256:11 271:19

attorney's 10:12 14:18

15:14 38:5,6,7 39:12,15 40:2, 6,21 41:1,9,13, 18 42:2 44:14, 20 45:14 53:16 55:15,17 78:12 96:7,25 97:17, 21 117:2 123:20 124:23 148:14,22 149:12,20 150:3 151:20 152:5 157:21 162:25 191:8, 20,25 192:15, 25 193:2,6,19 195:7 230:15

attorney- 33:8

attorney-client 31:17 33:1,3,6 265:17

attorneys 31:23 42:18 43:1 46:4 52:16 55:16 56:3 58:10 62:23 92:13 122:22 161:9 174:23 175:5 200:14 228:17,18 232:20 257:11, 18 259:2 261:3 262:9 263:5 264:14 267:4

atypical 117:25

audio 33:20

audit 148:20 149:5 150:12, 17,24,25 151:8, 9,14 235:2 236:13

audited 149:12

auditing 102:16,25 148:24

audits 148:15 149:10

August 16:10

aware 41:5,6, 10 42:14,15,16, 20 62:13,19 66:14 82:12 96:4,19,23 97:1,22,24 98:8,9,15,19,24 99:4 105:8 114:22 115:15 116:1,5 149:4, 10,18 150:1,18 151:18 165:2, 17 171:2,8,9 175:2,4,7 182:7,15 192:4, 6,22,24 193:4, 17,25 194:1,17 199:1,2,5 202:21 216:20 217:10,14,20 218:7 220:19, 24 226:24 231:16 257:11, 18 259:1 261:3 267:4

---

**B**

---

B-E-R-N-A-R-D 9:16

back 34:25 44:13 47:15 63:4,5 67:21 70:20 71:11 75:9,11 78:25 88:10 90:2 134:23 152:18 153:9 158:4,12, 15 192:11 206:24 207:6, 11,16,20,23,25 208:2,9,15 209:4,6,7 210:13 211:6, 25 214:15 215:8 216:2,3, 6,9 217:2 219:2,5,8,12 225:8,25 237:3 242:14 244:25 247:6 249:2,8 252:16,19 254:9,12,23 255:7 256:7,22,

23 262:2 264:16 266:19 267:1,3 273:14

background 210:21

backside 252:5

backup 33:22, 25

ballpark 29:19, 23

based 14:2 47:18 89:24 111:17 120:21 137:3 167:20 172:24 193:20 194:17 197:15, 17,18 204:2 241:20 245:6

basic 202:25 205:16

basically 11:3 45:17 64:1,19 86:22 88:20 90:8 156:6 199:6 240:14 261:3,19

basis 90:11 150:9 177:4 257:17

bearing 178:3 233:13,23 234:3

begin 10:16 247:12

beginning 61:11 271:21

begins 63:25 257:8 260:13

behalf 7:23,25 8:7,8,15 17:14

belated 18:18 162:12 191:12 222:4 230:20

believed 87:2 138:10

benefit 49:12

268:22

Bernard 7:11 8:20 9:3,4,5,16

Bernardo 8:22

Biebel 8:14

bit 14:22 16:5 33:18 84:14 93:23 252:4

blue 87:14

body 77:16

bother 229:9

bottom 247:13, 14 257:5

Boy 67:15

Brady 88:22 101:3,7 102:4 103:5,10 156:1 190:8,14,18,22, 24 191:4,9,14, 22 192:7,21 193:9,11 195:2, 8,13,16,19 196:6,13 197:2, 3,10,17 198:3, 9,15 220:18 227:1,10,15 232:14 234:7

Brassfield 67:24 68:1,6,24 205:16 234:19, 20 235:4,6 236:4

Brassfield's 68:12

break 12:9,12 88:4 127:14 152:11,22 153:1 157:14 160:5 246:25 247:1 254:20 273:3

briefly 139:1

briefs 61:15

bring 48:21,25 49:18 50:6

bringing 152:18



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

broad 99:23

brought 34:1
185:20

brown 57:23

building
250:12,13

bulk 52:9

bunch 81:16
254:22

Bureau 150:21

**C**

C198126 75:15
76:6

C=counsel
123:20

cadence 80:12
209:12

call 33:6 50:1
135:2,14,16
200:11 209:4,6
214:15 258:16

called 39:21
43:20 45:24
71:5 132:9
209:7 215:8
216:2,3 237:4
258:6

calling 126:13
130:6

calls 13:25
18:6 19:14 51:2
59:9,19 60:14
61:9 62:18
150:23 264:25
266:11

canvas 140:12,
14

capacity 10:18

Cappitelli 8:14

capture 156:19

car 253:11

care 55:13

career 39:11

41:7,8 42:19
46:25 61:11
93:24 212:22
271:21

carefully 251:2

Carney 7:25
8:3,15 9:3 14:9
15:4 17:6 18:6,
21,24 19:14
20:16 21:10,23
24:8 27:23
28:21,24 30:15
31:14,22 32:24
33:4,21 34:6,11
36:8,11 39:18
44:5,11,23
45:7,20 46:13
49:21 50:14,17
56:9 57:1 58:19
59:8,18 60:13
61:8,25 62:17
66:18 67:5
75:6,8 77:2,13,
21 82:25 84:7
85:4 86:12
87:17,24 88:5,
16 89:19 90:10
91:12 92:21
93:5,18 95:8,17
96:14 100:12
101:14 103:8
104:18 107:8
108:4 109:24
110:8,19 111:7,
19 112:9,16
113:4,17 114:1,
7 115:3,10,17
117:16 118:5,
25 119:7 122:9
124:1,11 126:4
127:23 129:20
130:17,25
131:19 134:14
137:18 138:8
139:25 141:22
142:18 143:16
144:9 145:23
146:17 148:17
149:3,16,24
150:7,16 152:1
153:22 154:23
157:3 158:8
161:6 162:1
163:2,10,21
164:12,23

165:4,9,19
166:5 167:16
168:2,16 169:5,
22 170:8,10,13
172:2,20 173:2,
12,14,24
175:23 177:13,
15 179:18
183:13,25
184:11 185:6,
22 187:2,5,24
188:7,22
189:11 190:10,
16 191:11,23
192:10 194:21
195:4 196:1,9,
23,25 198:13
199:20 200:22
201:20 202:5
204:1,23
205:10,12
206:10 207:3,
17 208:10,12
209:10,15
211:17 212:15
213:7 214:5,21
215:6,16
216:24 217:1,
13,25 218:11
219:18 220:23
221:20 222:11
224:3 225:15
227:23 228:7
229:1,11,25
231:8 232:17,
25 233:14,24
234:10 235:6,
13 242:22
243:8,10,21
244:6,13,16,19
245:10,20
246:17,24
251:24 254:1
261:22 262:11,
13,21 264:9,11,
24 265:11,16
266:2,11,21
269:13 270:4
271:5,7 272:2,
24 273:19,23,
25 274:4,6,9,
10,23,25

Caroline 8:11

Carrie 147:6
235:9

Carrie's 147:8

case 7:12,14
13:10,15,16,17
14:5,8 15:12,
20,24 16:3,7,19
17:11,15 24:3
25:20 31:3
32:10,15,22
35:5 38:4 41:19
42:22 43:3,6,
11,15,23 44:2,
10 59:1,4,6
60:22,25 61:5
62:7,24 63:23
64:14,15,21
65:2,14 66:3,5,
9,14,22 67:1,14
68:23 69:4,19
70:11 71:12
73:10,17 74:25
75:25 76:4,15
82:9,12,21
83:9,15,19,23
84:1,4 87:1,4
88:14,20,24
89:4,15,16
90:7,19 91:20,
25 93:2,10,16
94:3,6,15,19,23
95:1,5,10
99:12,18
100:19 104:1,6,
16,23 105:10,
15,19 106:9,12,
14,15,16 109:6,
10,14,21 110:4,
13,17 114:14,
19,24 115:2
117:10 120:20
123:3,6,7
124:17 127:10
130:7 132:19
137:17,24
142:4 143:3,10
146:4 150:6,15
153:20 155:1
157:22 161:23
165:6 166:10
169:3,20,24
170:17 172:11
173:17 175:15,
17 178:22
179:8,14 180:9
181:11,25
184:20 185:3

187:14,22
188:12 190:7
191:2 194:7
195:11 198:20,
22 199:2,3,5,17
200:7,16,20
201:6,9,10,15,
16 202:1,25
203:4,20,22
207:6 208:14,
23 210:17,20
211:2,5 213:17,
20,24,25
214:13,14
216:1,4 220:4,
8,12 221:4,9,
18,22 222:1,7,8
223:1,15 224:2,
10 225:9 226:9
227:4,5,7,11
228:14,23
229:9,16,18,19
230:16 231:4,
19 232:11,15
233:23 234:3
235:3,9,21
237:4,8,9 238:4
246:9,14
247:24 249:19
256:12 258:7,8
259:12 261:14
270:11,25
271:13 272:9

case-by-case
65:7 150:9

cases 13:3,5,9,
15,20,23 18:20
19:11 30:20
31:23 32:20
66:23 68:19
71:10,12,13
73:8 76:3 79:5,
15 81:17,22,23
83:13,14,17
86:24 88:15
89:10,11,12
92:6,16 100:8
101:6 108:10,
21 118:18
119:11 131:24
141:25 173:1
192:18 197:14,
15 198:10
203:14 205:5
208:20 209:2



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

211:9 212:1
213:13 220:14
222:15 227:19
228:25 230:13,
14,25 232:16
233:12 259:6
260:25 266:5

**catch** 22:25
138:7,14
142:11

**catching** 15:3
145:21

**caused** 198:8
266:1

**caveat** 90:6
91:8 146:22
174:4 203:16

**CCSAO** 84:19

**ceiling** 15:4

**Central** 7:9

**certainty**
117:10 169:16,
18,25 217:16
264:15

**challenge**
34:17 230:24

**chance** 19:5
152:19 153:14
225:19 237:25

**change** 111:22

**changing**
234:19

**characterizati
on** 43:8

**charged** 30:20
162:9 179:11
200:7,9 207:9,
10 208:17
210:20

**charges** 39:22
123:11,17
210:16 211:7
213:14

**charts** 86:15

**chat** 275:13

**check** 20:5

151:3,9,16

**checked** 100:4

**checklists**
99:19,23

**Chicago** 7:14,
22,24 8:10,16
10:3 17:15 18:1
19:11 41:3 46:1
47:5,10 57:11
58:12 89:13
95:6,15 96:1,9
99:14 103:7,15,
21 104:4
109:17,22
111:5 113:1,15,
24 115:16
119:19,23
120:3,6 131:16
146:14 147:2,
11,24 148:15,
23 149:12
150:4 151:6,21,
23 152:5 173:9
190:8,14,19,25
191:4,10,21
194:10 195:3,
14,15,20 196:7,
19 197:4,11
198:23 220:19
225:1 226:6,16,
25 227:14,20
229:7,23
234:22 240:15
259:18 260:8,
17 261:20
262:6 263:11

**Chicago's**
124:7

**choose** 52:18,
22 175:20

**choosing** 56:7
133:1

**chose** 67:1

**chosen** 177:5

**chunk** 88:3

**circled** 100:4

**circling** 100:1

**circulating**
270:21

**circumstance
s** 50:10 199:14
229:13

**circumstantial**
170:22 171:1

**circumvent**
49:16

**cite** 269:7

**cited** 70:9
265:14

**city** 7:13 8:16
10:3 17:15 18:1
19:11 31:23
96:9 198:3
226:11,15,24
227:9,14,20
229:6 259:17
260:8,17

**civil** 268:22

**claim** 102:6,11,
15,22,24
113:18 202:8
239:9 246:11
271:25 272:5

**claimed** 70:14,
16 71:8

**claiming** 82:4
111:3 118:19
139:7,13
157:15 169:15,
18 177:9
185:19 195:1,
12 203:17
225:11 241:24
243:24 245:3

**claims** 226:15
240:17

**clarify** 75:14
91:4 269:23

**clean** 59:21
60:6 206:14

**clear** 44:12
54:22 55:6
213:5

**clerk** 162:21
165:24

**clerk's** 166:18,
21

**client** 33:8
253:20

**client's** 253:20

**close** 205:20
206:7,8

**closed** 62:20,
24 206:21

**closer** 15:2

**closing** 134:1
135:21 203:1
216:17

**clothing** 157:8

**co-defendant**
208:17

**colleague** 8:2

**collect** 146:23

**collected**
45:25 144:21
148:9 157:9
175:8 215:20

**collecting**
57:24 99:21
100:10

**collection**
155:22

**colloquially**
258:6

**columns**
87:14,22 123:1

**common**
118:23 119:2
130:14 158:18
166:7 169:25
171:16,20,24
176:22

**commonly**
171:7

**communicatio
n** 11:23 33:6,8

**communicatio
ns** 31:17,22
33:1,3 265:17

**comparator**
79:16 91:19

**compare**

80:23 82:1

**compared**
201:17 246:2
252:10

**comparing**
32:9 82:4

**comparison**
32:4,13 71:3
79:2 236:19
238:7 247:14

**comparisons**
66:10 84:13
236:23

**compensated**
14:6,7,11,17
16:2,6,9,23
17:3,19 18:4
19:12

**compensation**
15:14,18,20
16:1,20

**compilation**
107:14 191:9,
21

**compilations**
193:1

**compile** 58:6

**compiled**
61:16 134:8

**compiling**
107:1,10
122:12

**complete** 11:7
12:11 57:7
59:23 111:3,9
202:9 203:18
204:4,5 205:18
206:23 215:22
218:20 239:6,
14 241:6,9
242:14 245:15
256:2

**completed**
11:18 13:5
23:9,20 25:1
26:11 49:5 62:7
206:6

**completely**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

61:17 83:12
145:10 216:11,
20

**completeness**
92:24

**completion**
272:23

**compliance**
233:17

**complied**
234:22

**comply** 42:20

**component**
122:6

**comports**
114:15

**comprehensiv
e** 201:16

**concealed**
182:6

**conceive**
50:20

**concern**
155:14 221:7,
12 264:17

**concerned**
196:8 233:8

**concerns**
262:8 264:8

**conclude**
180:11

**concluded**
240:7,9,21
275:17

**conclusion**
13:14 83:18
88:25 89:5
120:24 225:1
241:1,5,18
271:4,13

**conclusions**
93:10 120:21
228:13 239:5
264:23

**conditions**
12:16

**conduct** 10:21
32:12 66:9
87:13,21 94:4
102:25 148:15
151:21 190:7
191:3 195:8
221:22 228:8
232:4 235:1
236:18 239:12
243:6

**conducted**
32:4,9 79:2
84:1 86:9
140:14,24
141:2 143:1
145:19 195:1,
12 201:16
221:3 234:15
238:6 239:4

**conducting**
84:13 94:10,11
146:3 184:17

**confessed**
142:3

**confidence**
262:19

**confident**
197:23,25
263:6

**confidential**
54:23 55:12

**confirm** 125:4

**confused**
212:23 213:2
253:21 269:11

**confusing**
250:14

**conjunction**
139:17

**consideration**
228:16

**considered**
87:5 228:17

**consistent**
92:9 93:2
114:20

**consisting**
71:21

**consists** 64:3
65:21

**constitute**
36:22

**constituted**
99:19 100:8

**consultant**
10:2

**consulted**
95:14

**consuming**
32:9

**contact** 179:22
180:16

**contained**
37:7 87:10
91:10 105:21
116:23 156:12,
16 157:1 159:7,
16,17 161:13,
19 162:16
163:17,18
164:10 168:7,
14,22 171:6
173:11 177:20
179:25 180:3
185:4 188:16
200:19 202:3
235:23 241:14
242:20 244:22
245:9 246:16
248:11,12
250:1,24 256:9

**contend** 253:8

**content** 90:5

**contention**
204:25

**contents** 45:13
109:4

**context** 41:18
42:12 104:13
125:20 138:1
250:5,16 251:8
253:9 254:10

**continue** 11:13

**continues**
123:9

**continuing**
33:23 65:6 97:6

**contrast** 82:1

**convened** 7:10

**conversation**
253:15

**conversations**
250:9 254:17

**converse**
141:12

**convey** 146:2

**conviction**
61:12 206:7
211:11

**convictions**
193:20

**Cook** 39:11
40:25 41:9,12,
17 42:1,13
44:13,20 45:14
46:18 55:19
96:7,24 97:16,
21 117:2
148:14,22
149:11 152:4
191:25 192:14
193:5,18 195:7
230:14 269:4
271:15,25

**copied** 78:16

**copies** 36:12
58:9,10,12
61:23 117:3
133:23 157:16,
20 160:7 164:5
167:9,13
174:14,18
210:13 213:15
215:4

**copy** 35:4,16
37:18,20 45:5
58:2 64:5 78:20
118:24 122:18,
20 123:10,15
130:14,21
134:1 137:2
156:20 159:10,
21 160:6
215:11 216:5

237:10 238:2
243:19 259:22
265:24 269:3
274:24 275:2,7

**copying**
157:11

**correct** 9:21
10:8,19,23
13:11,12,17
17:16,20 22:2
23:21 24:3
28:17 30:10,14,
23 32:10,13,17,
22 35:16,19,22,
25 36:6,20,24
37:8,21 38:10,
11,24,25 39:4,8
41:13,19 42:7,
13 45:6 48:2,7
49:19 50:7,13
51:21 53:16
54:3,7,11,23
55:2,5 57:9
64:24 65:4,11,
14,19,23 66:3,
6,12 67:4,14,
17,18 68:8,9,20
69:1,6,10,17,21
72:5,14,22
73:20,22 74:6,
10,20 75:1,22
76:1,4,7,25
78:5,21 79:6,17
80:1 81:9,13,19
82:17 83:23
84:2,6 86:5,24
88:22,23 89:2,
7,10,13 91:21
92:1,6,12,14,19
93:3,11,25
95:7,16 96:3,
21,22 98:11,12,
17,21 103:7,17,
23 104:1,7,13,
14,17 105:19
106:4,12,17,20
107:20,23,24
108:3 109:6,7,
10,14,18
110:18 112:4,8,
21 115:16
116:7,11,15
118:20,24
119:20 121:12,
17,25 123:7,25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

124:10,24
125:5,8,9,12,24
127:18 128:7
131:14,18,25
133:8,13,20,23
135:16 138:7,
15,23 140:25
141:6,20,21
143:14 144:7,
18 145:21
146:16 147:3,
12 148:1
153:21 154:11,
13,17 155:12,
17,21 156:2,7,
13,23 157:2
159:11,19
160:8,25 161:5,
14,20,25
162:18 163:1,9,
20 166:18
167:7,11,15
169:4,11 172:1
173:22 174:23
175:15 176:13
178:1,10,11
179:10,16
180:12 181:4
187:18,19
192:17 193:6
195:14,21
198:4,11,20,25
199:8,19
200:16 201:10,
19 202:4 203:7,
14,25 204:12
207:16 209:9
210:17 213:17
220:1,5,13,22
221:5 222:10
223:4 227:5
229:20 234:9,
24 235:4,25
236:7,16 237:1,
13 238:7,21,25
239:18 240:9,
22 241:1,3
246:4 247:24
248:8,9,13,21
249:2,9,10,20
250:3 252:17
254:24 258:22
260:22 261:5
263:13

**correctly**

20:13 90:3
248:18

**corresponded**
82:14

**counsel** 7:19
20:25 21:3,6
22:10 23:5
49:14 53:12,20
56:17 58:3 71:8
85:14,17 90:3
122:14 124:24
159:24 164:1
166:14 176:9,
25 177:19
178:17 180:14,
22 182:6
215:10 222:14
224:9 229:16
240:13 242:1
250:10 255:19

**Counsel's**
90:3

**counsels**
170:18

**country** 94:16,
20 101:3,12

**County** 10:12,
17 14:18 15:13,
20 17:16 38:4,6
39:11,15 40:1,
6,10 41:1,9,13,
17 42:2,13
44:14,20 45:14
46:18 55:19
96:7,25 97:16,
21 117:2
148:14,22
149:11 152:4
191:25 192:14
193:5,18 195:7
230:14 269:4
271:15 272:1

**couple** 39:2
81:4 208:23
247:19 267:6

**court** 7:5,6,15
11:5,8,21 14:22
17:1 43:6 47:1,
7 48:19,20
49:4,10 50:24
52:7 59:5 62:2
75:6 78:13

108:9,20 109:4,
9 128:25
134:21 136:22
137:10 159:14
161:17,20
162:21 164:1
165:23 167:11
210:23 275:11

**courtroom**
47:15 49:8

**courts** 123:20
124:23 193:20

**covered**
224:15

**CPD** 124:8
150:13 173:1
199:6 221:8,25
261:9

**CPD's** 112:3
123:23

**create** 113:9
124:21 143:11

**created** 20:5
42:23 43:18,19
54:2 61:6 86:16
126:8 136:9
138:5 139:14,
20 140:18
141:19 142:22
197:10 257:12,
19 258:3,14,18
261:4 267:5

**creating**
140:23

**creation** 44:3

**crime** 115:20
116:19 127:10
183:5,10,24
184:8 211:13

**crimes** 213:24
214:1

**criminal** 43:6
46:10,20,24
47:24 48:17
51:19,25 52:5,
16,19 53:2,9
56:3,7,15,22
57:6 58:9 68:15
75:25 89:1,7

101:23 122:21
161:3,8 164:20
175:4 227:22
232:3 233:12
257:10,18
262:9 271:19

**crossed** 201:3

**cur** 234:15

**curiosity**
229:2 266:16

**curious**
228:12,21
266:8

**Current** 10:9,
10

**cut** 11:11 16:4
22:24 54:18
58:5 76:13
89:15 109:1
157:25 158:2
210:5,9 235:12
253:2 270:18

**cutting** 14:15
235:11

**CV** 35:25 37:18,
20

---

**D**

**D.C.** 8:7

**dalliance** 63:7

**Dart** 268:13

**database**
191:8,21

**date** 16:16
49:10 50:24
65:9

**dated** 66:3

**dates** 49:4

**day** 7:8 130:10,
11,13 262:2
264:4

**day-to-day**
94:10

**days** 200:12
259:9

**dead** 143:22,23
144:5,7,12,25
145:9,13

**deals** 54:8

**decide** 53:1
144:6 264:21
265:13

**decided** 8:4
32:20 174:7
230:15

**decimated**
216:15,20
217:4

**decision**
228:18 230:24

**decision-
making** 33:11

**decline** 18:4

**deemed**
219:16,25
220:5,9

**defendant** 8:9
43:7 46:24 52:6
53:3 61:14
75:25 184:19
188:18 196:12
210:19 211:12
213:20 214:13
250:10 251:4
255:10

**defendants**
8:12 46:10,20
47:24 48:17
51:19,25 52:19
53:9 56:8,15,23
57:6 59:11
68:15 89:1,7
101:23 113:13
162:9 173:1
177:6,10 200:6,
9 226:12
227:22 229:19
232:3,15
233:12

**defender** 32:5
64:23 65:3
66:11,15 67:3
69:16 70:23
72:3,12,22
73:11,16 74:6,



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

9,14,19 77:25
79:3,6 80:4,22
81:1,7,12 82:8,
9,13,22 83:6,
10,22 84:18
86:10 87:10
157:1,16 163:8,
19 164:10,18
174:17 203:24
204:9,17 224:1
225:10,13
233:6 237:12
238:9,20 240:4,
7,8,20 243:12,
24 245:4
250:23 251:18
253:13 268:12
269:11,15
270:11 271:18,
24

**defender's**
92:18 202:7
204:4 224:20
238:17 239:2,8
240:18 241:10,
17 242:8
245:23 246:10,
19 251:6,11
253:12 254:15
256:2,5 257:21
267:6,8,13,20,
22,24 268:7
269:4,18 270:3,
22 271:3,12,16
272:1,14

**defenders**
175:4 239:10
242:17 258:9
262:1 263:4

**defense** 42:18
43:1 46:4 49:8,
14 52:11,16
53:11,20 56:3,
17 58:2,10
61:13,16 70:16,
18 71:3,8 81:18
92:13 122:13,
22 123:20
124:10,24
158:24 159:23
160:16 161:3,9
164:20 165:6
166:14 170:18
173:5 174:7,23

175:4 176:5,20,
24 177:19
178:16,17
180:14,21
182:6 190:1
196:16 198:25
199:8 200:14,
21 201:10
204:12 215:4,
10 220:22
222:14 223:4,7,
23 225:3 226:5
228:18 229:8,
16 232:20
238:3 240:13
242:1 247:15
248:8,20 249:8
250:3,9 251:22
255:6 256:13
257:11,18
259:2 261:3
262:9 264:14
267:3 268:9
271:19 273:23

**definitions**
121:20

**degree** 87:3
98:6

**Deleon-** 7:11

**Deleon-reyes**
7:21

**deliberately**
53:1

**denial** 252:8

**depart** 241:20

**department**
8:16 40:3,10
41:4 46:2 47:6,
10,13 48:11
50:13 51:21
52:1,4,15 53:1,
6,9 54:7 55:1,
10,24 56:25
57:8,12,16,19
58:13 59:17
60:4,11 62:9
75:20 89:13
95:7,16 96:11
97:9 98:14,16
99:1,14,21
100:15,23
103:6,7,22

104:5 109:22
111:5 113:11,
16,24 115:16
117:4,6 119:19,
24 120:3,7,17
122:21 131:9,
13,17 133:1,11
135:8 136:23
142:9 147:24
148:15,24
150:4,14 151:4,
6,22,23 152:6
173:10 190:9,
15,19,25
191:10,22
192:9 194:20
195:3,14,15,20
196:7,19 197:4,
11 198:23
199:18 219:4
225:2 226:6
229:24 232:24
240:15 241:20
261:13,20
262:6 263:11
267:10,18

**Department's**
96:1 103:15
149:13 220:20
234:22

**departments**
60:22 102:3,7,
12,16,23,25

**depend** 129:22
148:8

**depending**
127:25 128:22

**depicted**
175:13

**deposed** 9:24

**deposition**
7:10 11:3,6
16:25 20:22
21:4,22 22:5,7,
16,17,21,22
23:1,3,24 24:2,
6,7,13,16,21
25:21,22 26:1,
5,13,20 108:17
153:24 178:22
181:4 188:1
275:17

**depositions**
9:20 10:5 30:7,
10 90:13
153:20 154:2,6,
16,20 174:9
178:21 182:15
183:7 187:18

**describing**
47:21 49:15
126:24

**descriptive**
270:8

**desk** 50:23
130:9

**detail** 76:25
77:10,19

**detailed**
125:19,23
126:6 128:2,23
129:17,23
134:21,25
142:5 180:20
246:21

**details** 90:1

**detective**
49:18 50:6 51:8
115:21 124:17
130:6 133:23
134:8,12
142:23 146:21
231:20,23
232:2,10,13
233:10,20
234:5

**detectives**
126:13 137:14
143:10 145:19
146:3,12,14
147:2,11 167:5
182:13,19
183:5 186:6
229:21 263:11

**determination**
192:19 195:16
228:6 245:5

**determine**
39:22 129:7
148:5 195:1,12
241:19 242:13
261:14 262:25

264:1

**develop**
221:25

**Diamond**
268:12 269:10
272:7

**Diamond's**
272:13

**diary** 253:12
254:15

**Dickinson**
8:12

**difference**
184:9 193:9
269:20

**differently**
55:5

**difficult** 33:23
224:25 239:8

**difficulty** 212:2

**direct** 9:12
110:22

**directly** 39:7,
20 49:1,18 50:7
51:7,14 274:10

**dis** 247:12

**disagree** 228:1

**disagreed**
227:19

**disagreeing**
227:24 252:22

**disarray** 225:3

**discard** 215:13

**discarded**
60:6

**discern** 139:4
140:11 142:14
234:13

**discipline**
247:21

**disciplined**
49:11 217:11

**disclose**
52:14,19 88:22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 81 of 104 PageID #:66018
The Deposition of BERNARD MURRAY, VOLUME I, taken February 7, 2019

285

89:1,6 92:8
122:21 147:2
175:21 193:21
198:25 219:24
220:7 221:10
227:21 229:8
245:8,14,17
265:17

**disclosed** 17:5
18:1 20:8,10
23:20 30:9
36:23 37:2,21,
22 46:10,20,23
56:2 64:2 66:16
68:15 69:17
78:4 84:23
86:22 90:6,19
91:8,11 105:7
149:23 169:19
176:5 188:20
200:20 201:10
204:11 221:18
222:10 255:5

**disclosing**
47:24 53:8
55:23 147:11
195:18

**disclosure**
19:10 48:20
56:14 82:17
92:11,13
101:12,22
102:4,8,13,17
103:2,16,22,23
104:6 114:21

**disclosures**
101:3,7

**discounted**
199:22,25

**discovered**
210:24 211:10

**discovery**
42:18 48:22
49:5,13 52:8
58:7 66:16
67:10 69:17
82:15 83:11,23
119:13 152:7
163:25 177:20
192:22 193:10,
20 194:17
197:15,18,21

205:22 215:10
222:15 233:17

**discuss** 72:2
120:7 165:22

**discussed**
76:3 110:5
119:24 120:4
121:24 159:13
182:1 237:4

**discusses**
260:6

**discussing**
68:12 163:13
174:9 214:9
259:18

**discussion**
64:14,22 65:1
68:18 76:19

**discussions**
65:7

**dispersal**
258:25

**dispute** 201:8

**District** 7:15

**Division** 7:16
123:11,16
125:17,18
133:6

**document**
20:5,14 35:4
37:11 45:12
67:23 71:17,21
85:3 98:1
116:11 120:10
121:1,6,11,15,
19 123:2
127:20,22
141:14 193:22
204:8,11,17,20
218:22 233:21
234:5 236:24
248:7,10 269:6,
7,12 270:5

**documentatio
n** 96:2,12 102:8,
13,17 103:2,16,
23 104:5
114:21 140:24
160:15

**documented**
55:9 138:21
139:1,23
144:16 145:20
149:22 154:21
155:11

**documenting**
138:20 146:15

**documents**
23:5 48:8
52:14,18,20
54:6 56:24
58:4,8 59:17
62:14 63:18,21
69:24 70:14,15
72:7 84:12
85:17 86:9
87:10 92:8
99:12,16,18
100:16,20
103:25 104:3
105:5 108:2
109:20 110:5,9,
13,14 116:3,23
123:6,12,18
124:22 127:4,
13,17 129:10
131:6,8,17
133:4,8,14
134:12 135:9
142:10 150:5
164:9 192:8
200:19 201:9
202:2 203:6,13,
21,23 207:1
215:4,5,13
217:23 218:8
219:4 220:16,
21 221:14
223:2 225:2,9
233:7 236:15
241:24,25
243:13,19
244:22 245:4
246:4,12
249:18 261:21
263:12,25
270:1

**doors** 140:14

**double** 75:16

**doubt** 252:7

**doubts** 262:7

**dozens** 32:10

**drabs** 130:23

**draft** 134:1

**drafting** 31:10,
19 33:12 89:22
90:2,15,18
265:6

**draw** 224:25

**drips** 130:23

**driving** 255:1

**dropped** 142:3
250:11

**dropping**
250:15

**Dupage** 10:12,
17 14:18 15:13,
20 17:15 38:6
39:15 40:1,3

**duplicate**
59:20 60:5

**duplicates**
62:10,16 63:1
206:14 215:14

_____

**E**

_____

**e-mail** 275:12,
13

**earlier** 97:14
128:2,23 130:5
145:11 157:7
182:14 201:4

**early** 46:25
108:10,21
177:19 271:20

**ease** 71:18

**Eastern** 7:16

**Edwards**
247:24

**effective**
110:18 114:25

**effort** 60:6

**efforts** 51:20
196:18

**El1** 257:4

**emanated**
44:21

**Emilia** 7:4
235:15

**emphasizing**
111:11

**employed** 16:7

**employee**
217:6

**employment**
14:18,19 15:13
38:1,9,16

**end** 48:3,4
76:19 143:22,
23 144:5,7,25
145:9,13 250:5
251:7 252:2
264:3

**ended** 206:7
241:11 246:4

**enforcement**
40:10,23 46:1
47:3,9 48:21
57:24 225:1

**ensuing** 69:10

**ensure** 51:24
56:21 103:1
123:12,17
124:9,16,22
148:16 149:13
150:12 151:5
261:11

**entire** 39:11
64:25 70:12
76:25 77:11
78:20 85:10,13,
18,20 93:24
129:7 130:23
132:5,14,16
133:12 139:11
198:23 219:9
246:1,2,5

**entirety** 65:10
84:19,20 85:1
238:20,24
240:8,21,25

**entries** 86:18

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

entry 72:19
248:2

envelope
168:14,19
171:6 173:18

envelopes
168:7

equaled 70:9

equating
180:4,25

ERPS 258:20

err 53:7

erring 56:14,18

essentially
178:19

established
255:3,4

estimate 30:4
138:17 219:21

estimating
118:17

et al 7:12,14

eve 205:18

event 44:22
120:9

eventually
161:16 200:7

everybody's
206:20

evidence 52:9
77:16,17,18
86:13 87:18,25
88:21,22,25
89:5 100:6
111:8 113:5
115:21,22
116:16,18
141:4 142:4
156:1 157:7
159:3,6,24
160:24 166:11,
18,21 167:11
168:9,21,23
170:22 171:1,9,
10 198:8
202:14,19,21
210:24 211:10

228:12,16,24
231:2 232:2
235:23 245:18
249:18 266:23

evident 111:10
189:5

exact 60:5
177:17

examination
9:12 66:24
84:24 138:18
233:3

examine 61:15
70:25 72:7 81:3
87:5 104:8
167:17,19
221:13 249:11
263:25 266:24

examined
32:14,16 66:20
67:7 71:13,14
81:24 82:7
100:5 110:24

examining
72:15

examples
66:23 67:8,9,13
68:19,25 69:3,
5,20,22,25 71:5
80:21,24,25
81:1 83:13
86:21 193:15
205:19 210:22
214:8 216:14

exculpatory
77:17 233:22
234:6

excuse 70:15
121:21 162:20
188:8 268:16

exercising
230:12

exhibit 35:4,7,
15 36:17,20
37:11,13,16
63:5,13 65:9,17
66:1 67:23 68:3
71:19,20,23
78:11,15
103:20 121:6,8

236:25 264:18

exhibits
162:18 166:9
275:13

exist 134:24
137:24 202:16
261:14 268:25

existed 41:14
140:11

existence 42:3
43:11,22 45:17
165:18 176:5,
19 177:11
179:14 180:5,
19 182:4

existing
123:12,18
124:22 239:11

exists 253:25

expect 125:19,
24 126:7 127:4,
14,17,22 128:3,
5,19 129:1,10
140:20 159:21
160:2,13
164:15 168:25
171:21 189:9
248:19 250:2

expectation
55:22 62:22
132:14,23
133:7,12
140:21 170:6
175:1

expectations
151:22

expected 16:6
129:5 188:20
205:21

expecting 49:5
136:5

expedite 48:22

experience
10:23 38:10,23
39:2 56:1,4,13
93:23 117:24
118:4 172:24
212:12 215:22

experiences
47:19

expert 10:2
12:25 13:9,16,
20,23 15:23
16:3 17:14 18:4
21:14 22:1,14
23:9 25:19
35:5,16,18,21
36:18,23 41:19
42:7 65:11,18,
22,25 66:21
67:12,24,25
68:7 89:11
94:3,6,15,18,
23,25 99:11,17
100:8,18 101:5,
19 102:3,6,11,
15,22,24
153:24 154:11
163:12 165:15
167:21 174:6
179:2,20 198:2,
11 201:5
205:17 220:15
228:15 231:19
236:25 240:17
241:21,24
243:24 245:3
259:16 267:2
271:25 272:6

expert's 82:3
85:25 110:25

experts 67:9
90:14

explain 52:21
70:5 94:7
254:23

explained
210:12

explains
122:25

explanation
204:19

explanations
136:6

extensive 99:8
181:18,22
253:12 254:14

extent 31:16

32:25 76:8,11,
15 78:15 89:21
97:4 107:12
113:22 175:21
180:20 181:16
185:9 187:8
197:9 209:15
233:6 250:1
258:13 265:16

extra 101:1
249:5

———————

**F**

———————

fact 8:22 67:21,
24 125:4,11
131:11 136:8
137:23 140:24
165:22 170:23
172:9 173:9
174:6 175:12,
18 176:2 177:3
178:7 179:8
180:5,10
181:16 182:5,
21 183:2,16
186:20 198:9
205:4 220:11
221:8 269:1

facts 18:2
111:7 113:5

failed 142:9
196:19 199:6
204:19 221:9
222:1 229:8
233:21 234:5

failing 89:6
194:19,20
227:21

failure 88:21
89:1 92:7 192:8
193:21 194:9

fair 11:9,19
12:6 19:13
23:6,16 26:2
29:24 30:5 31:4
37:3 39:10
45:16,18 46:17
48:12 51:4,8,15
53:6 59:3 60:11
61:23 64:7
76:23 83:11



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 83 of 104 PageID #:66020
The Deposition of BERNARD MURRAY - VOLUME I, taken on February 7, 2020
287

90:6 107:5
109:3 112:15
117:13 120:13
131:9 136:7
145:3 162:7,8
191:16 193:22
194:25 195:25
196:21 211:16
212:8 213:6
236:11,12
240:2 261:21

**fairly** 39:23
263:6

**faith** 147:25

**false** 24:18
25:5,8 26:6,14
27:5 28:4

**familiar** 17:11
64:15,17 98:22
116:9,11
119:21 120:1,5,
23 121:11

**family** 253:14

**fashion** 50:3,6

**fast** 191:15
209:11

**father** 75:17

**February** 7:8

**federal** 43:6
112:3,8,11,14

**feed** 19:3

**feel** 56:11

**Felicia** 156:6,
12 167:4,10,14,
24 173:21
174:14 175:2,
14 178:7,22,24
181:4,12
186:19,24

**felony** 123:11,
16

**felt** 17:10 56:6

**fewer** 32:1,2,3,
14,16,19,21
84:5

**field** 65:8,21
198:22 201:22

**Fields** 13:10
25:15,18 26:1,
5,12,21 27:1,
14,21 28:2,11
29:8,13,16,19,
24 30:7,9,14
31:7 32:10,16
41:19 42:7
64:8,15,20,23
65:10,14 67:24
68:1,8,23 84:2,
6 88:15,20 90:9
91:6,11,20 92:1
93:3,11,17
95:11,15,25
96:10 99:12,18
100:19 104:13
105:24 107:13
108:25 135:6
198:19 200:16,
20 202:1
219:15 220:1,
18 221:9,18,22
222:1,8,9,20
223:1,15 224:2,
6 226:9 228:23

**Fields's** 229:9

**figure** 34:16
228:5

**file** 16:24 17:8
32:13 49:18
51:3 53:19,20
55:23 56:2,25
57:7,12,13,20,
22 58:17,18,21,
23,25 59:10,11,
15,17,21,22,23
60:3,6,8,23
61:6,15,19,23
62:8,20,24,25
63:3 65:2,3
66:10 70:4,8,9,
16,18,19,22,23
72:3,4,5,11,12,
13,21,22,24
73:2,11,12,15,
16,17 74:5,6,9,
10,12,14,15,17,
19,20,25 75:16,
20,25 76:7,14,
21,23,24 77:4,
9,10,25 78:3,9,
12,16,19,21,22
79:2,3,5,6,16,

17,25 80:1,3,5,
22,23,24,25
81:2,6,7,8,12,
13,17,18,19
82:5,8,10 85:3,
11,15,18,20,21,
23 86:10 87:11
96:2,13 97:2
116:4,7,14,24
121:21 122:5
123:3,7 124:5,
6,21 125:5,20,
23 126:12
127:5,6,9,18
128:6,10,11,13,
19 129:7
130:15,22,23,
24 131:25
132:3,4,5,8,15,
24 133:6,8,11,
13 134:13
135:8,23 138:2,
6,18 142:13
143:5,9,19
144:21 145:16
146:7,15
148:11 154:22
156:12,16,21,
23 157:1,17,21
158:21 159:8,
11,16,22 160:8
161:4,14,19
162:16 163:1,8,
18,19 164:2,6,
11,18 165:1,6,
17,21 167:6,15,
18,19,24 168:5
170:3,19 171:6
172:6 173:4
176:10 177:21
178:13 181:10
182:2,17 183:8
185:3,14
186:24 187:12
198:24 199:2,
17 202:3,4,7,
12,13,16,20
203:6,7,12,13,
24,25 204:9,17,
18 206:8,13,14
207:8,10,12,15,
16,22 208:3,4,
8,9 209:4,6,8
210:21,22
211:1 212:1,13
213:22 214:3,

10,12,15,18,19,
24,25 215:9,14,
23 216:2
218:16,19,20,
22,23 219:2,8,
9,11 220:21
221:9,13,18
222:1,9,20
223:1,3,7,21
224:2 225:10,
11,13 229:7
233:4,6 234:16,
21 235:22
236:5,23
237:11,12,13
238:2,3,10,12,
17,20,24 239:3,
5,6,8,11,13,17,
18,25 240:1,5,
7,8,9,18,20,25
241:1,10,14,15,
17 242:2,8,10,
14,19,21 243:3,
5,6,7,14,16,20
244:21,23,24
245:7,9,15,19
246:1,3,4,6,8,
10,14,16,19,20
248:8,13 249:8,
9,14,15 250:1,
23,25 251:6,10,
11,18,19
252:10,21
253:12 254:22
256:2,5 259:12,
13 272:10

**file-keeping**
272:1

**filed** 97:2
159:18 211:11
223:15 272:19

**files** 32:1,2,3,4,
5,9,10,13,14,
16,20,21 39:22
42:22,24 43:3,
7,11,20,23
44:2,10 48:21
50:12,13 53:5
64:22,23 66:11,
13,15,16,20
67:2,3,7 68:19,
25 69:8,16
70:10,12,13,22
71:4,7 72:6,13

74:19 76:19
79:8,10,12,14
81:11 82:13,14,
22,23 83:6,7,
10,21,22 84:5,
18,19,20,21
85:1,10,13,16,
18 87:23 91:20,
24,25 92:17,18
93:9 101:13,22
102:9 103:2,17
107:14 111:12,
24 113:7 116:2
118:23 127:2,
22 129:12
130:8 132:9,10
133:16,17
136:5 139:11,
17 148:16,23
149:2,13 150:4,
13,25 151:12,
24 164:19
173:11 181:9
198:15 199:4
200:20 201:5,
17,18,23 202:9,
11,15,22 203:3,
5,14,18,21
204:4,10 205:1,
3,4,6,9,17,25
206:1,4,21,25
207:2,24
210:14 213:15
215:22 216:13,
14,19,22,23
217:3,6,7,12,
17,21,23 218:2,
9 219:5,15,16,
25 220:4,9,12,
16 221:13
222:8,19 223:1,
4,13,22,23
224:20,21,23
225:3,6,14
226:1,3 227:22
231:18,22
234:22 235:22
236:16,19,20
238:7 240:15
241:12 247:15,
19 257:21,25
258:1,2,16,18
259:7 263:13
268:1,8,20
269:12,19
271:4,13



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 84 of 104 PageID #:66021
The Deposition of BERNARD MURRAY - VOLUME I, taken February 7, 2019
288

272:18,22

**filing** 16:25
61:17 272:11

**final** 90:19
91:4,6,8,11
134:1,2 144:23

**finally** 136:22

**find** 24:6,13,17
26:5 126:11
133:19 138:11
148:7 159:10
160:2,6,13,14
164:4,14,15
165:8,16
166:12,25
167:3,9,13,18,
23 168:25
183:19 184:17
186:23 187:11
194:18 198:8
211:5 218:3
231:5 241:13
242:3,19 243:2,
4 245:8 246:14
248:7 249:7,14
250:11,22
262:7

**finding** 226:13,
15 261:19
262:5

**findings** 191:4
236:14 245:8,
14 260:7,16
261:8,25 264:6,
13 265:14
266:1,9

**fine** 91:12
153:2

**finger** 194:4

**fingertips**
79:13

**finish** 58:6
244:8,14

**finished** 11:12
206:12,13

**firing** 217:19

**five-** 88:3

**five-page**

121:14

**fixed** 113:2

**flawed** 204:3
205:16

**flying** 80:11

**focus** 84:20,24
85:23,24
117:20 167:3
169:17 236:8,9
239:7 240:5
242:5 244:4
245:2

**focused** 66:13,
22,23 77:4
84:22 122:15
155:13,20,25
156:11 159:17
162:17,25
163:7 165:14
201:13 220:14,
16 227:3
238:16 260:24
266:4

**focusing** 73:14
76:21 163:11,
17 239:2

**folder** 57:15
58:1 123:3,7
158:19,20
168:5

**folders** 57:23
59:22

**follow** 129:6
134:11 216:3

**follow-** 225:7

**follow-up**
126:3 129:18
130:15 135:11
137:3 194:18

**force** 270:23

**forensic**
115:20 258:7

**forgot** 33:16
191:19

**form** 14:9 17:6
18:5,6,18 19:14
20:16 24:8
26:17,22 27:7,

23 28:12 32:24
39:18 44:5,11
45:7,19,20
46:13 49:20,21,
24 50:14 56:9
57:1 58:19
59:8,18 60:13
61:8,25 62:17
66:18 67:5
77:2,13,21
79:18 82:25
84:7 85:4 88:16
90:10 92:20
93:18 95:8,17
96:14 100:2,12
101:14 103:8
104:18 107:8
108:4 109:24
110:8,19 111:7,
19 112:9,16
113:4,17 114:1,
7 115:3,10,16
116:5,6 117:6,
8,11,16,19
118:5,16,25
119:7,12,25
120:20 122:9,
11 123:6,10,15
124:1,11
127:23 128:8
130:17 131:1,
19 135:17
137:6,18 138:8,
16 139:25
141:22 144:8
145:4,8,23
146:17 147:4,
13 148:2,17
149:16 150:7
151:17 153:22
154:23 157:3
161:6 162:1,13,
19 163:2,10,21
164:12 165:4,
19 166:5 168:2,
16 169:5,21,22
171:12,13
172:2,16 173:2,
13,23 175:6,23
176:7,15 177:7
179:18 181:5,
14 182:20
183:13,25
184:11 185:6,
15,22 187:3,5,
23 188:7,22

189:11 190:10,
16,24 191:11,
23 192:10,12
193:7 195:4
196:1,9,23
198:12,13
199:9,20
200:22,23
201:11 202:5
203:8 204:1,13,
22,23 205:2
206:2 207:3
208:11,12
211:17 212:14,
15 213:7,18
214:21,23
215:6,16
216:25 217:13,
24 218:10,17
219:6 220:23
221:11,20
222:5,11,21
223:18 224:3
225:15 227:23
228:7 229:1,11,
25 230:21
231:8 232:6,17,
25 233:1,14,24
234:10 239:12
243:10,21
245:20 246:17
251:24 254:1
256:15 261:22
262:11,21
263:14,23
264:10,24
266:2,10,11,21
268:2,10
269:13 270:4
271:6 272:2,24

**formal** 149:5,
10 150:12,24
163:25

**format** 208:1

**formed** 147:8

**forming**
120:12

**forms** 47:5
48:8 50:19 98:2
100:15 117:3
120:4,7,12,16
131:12 133:3

**formulating**
33:12

**forward** 118:9
153:16 231:3

**forwarded**
38:17 123:10,
16

**found** 78:16
133:16 157:15,
19 162:17,25
163:7 166:21
167:6 198:15
202:2 203:5,20,
22 222:9,13,20
223:1,6,12
225:9 226:24
227:10,13
229:6 245:17
251:18 272:9

**foundation**
17:23 26:8
27:17 28:5
32:24 44:23
45:20 50:16
56:9 58:19
59:8,18 60:13
61:8 62:17
66:18 82:25
97:11 106:6,13
107:7 110:19
113:17 124:1,
11 128:8
129:19 131:19
136:17 143:15
144:8 145:4,23
146:17 148:2,
18 149:3,16,25
150:7,16 152:2
154:23 161:6
162:1 163:2,10,
21 164:12
165:4,19 166:5
167:16 168:16
169:22 172:2
173:23 175:22
176:7 177:7,16
179:17,18
181:5 184:11
187:5,24 188:7,
22 190:10
191:11,13,23
192:10 194:12,
21 196:1,9
199:20 200:22,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 85 of 104 PageID #:66022
The Deposition of BERNARD MOTRON - VOLUME 1, taken February 7, 2019
289

23 204:24
217:1,13,25
218:11 221:11,
20 222:4,11,21
224:3 226:19
227:23 228:7
229:1,11
232:17 233:1,
15,24 243:21
261:22 262:11
264:10,24
266:21 268:2,
10 269:13
271:7 272:2

**frankly** 25:22
49:11 109:2
159:3 186:11
194:6 216:15

**free** 14:8 15:12

**freeze** 158:8

**frequently**
270:19

**front** 35:5,10
64:5 97:6
184:18 185:17
237:7 250:12
251:14 252:16,
18 255:7

**froze** 158:3,7,
11

**full** 8:18

**full-** 252:3

**full-page** 252:3

**fully** 37:22

**fun** 209:21

**functions**
123:6

**future** 17:15,
19,25 18:20
19:11

---

**G**

**Gabriel** 7:13,
24 161:23

**gaining** 189:2

**gap** 200:8

**gather** 47:11
48:1,7 152:6
189:17 262:24

**gathered**
57:19 58:9
59:24

**gathering**
57:10

**gave** 24:2,20,
24 25:4,8,11
27:3,20,21 28:2
30:7,9 53:2
188:11,13,17
208:3

**gee** 205:2

**general** 41:5
43:18,22 44:21
45:4,5,24 87:15
95:16,20,21
96:12 99:9
128:20 175:17
181:25 235:24
236:6 259:17
260:7,16 264:7
267:17

**generally** 34:5
45:17 94:15
101:11,21
114:15,17
254:25

**generated**
101:24

**George** 108:2
115:2,4

**get all** 132:18

**give** 9:7 18:25
27:22 53:19
56:7 57:6
133:7,12 135:2
142:9 149:8
158:14 225:18
237:6 260:5

**giving** 27:13
126:15 132:24
214:8

**gleaned** 82:3

**goal** 273:9

**Golden** 8:11

13:25 17:23
18:5,15,17
19:2,8,22 26:8,
15,17,22 27:17
28:5,12 31:9
32:23 33:11
41:20,24 45:19
49:20 50:16
54:14,17 67:6
73:1,3 75:4,12
79:18 80:9,11,
16 92:20 93:4,
12 97:11 106:6,
13 107:7 128:8
129:19 131:1
135:17 136:17
137:6,8,25
138:16 143:15
144:8 145:4,22
147:4,13 148:2,
18 149:25
151:17 152:2,
10,13 153:2
160:9 162:12,
19 169:21
170:11 171:12
172:15 173:13,
23 175:6,22
176:7,15 177:7,
14,16 179:17
181:5,14
182:20 185:15
187:3,23
191:24 193:7
194:12 198:12
199:9 201:11
203:8,15
204:13,22
206:2 208:11
209:25 210:4,8
212:14 213:18
214:20,23
216:25 217:24
218:10,17
219:6 221:11
222:4,21
223:18 226:19
230:17,19
232:6 233:1,15
253:1 254:2
256:15 263:14,
17,23 264:10,
25 265:5,10
266:10,13
268:2,10,16
270:15,17

271:6 273:6,10,
18 275:7,8

**good** 7:20 9:14
23:7 88:3 114:6
115:8 139:12
152:10,19,21
153:13 197:9
216:18 246:24

**GPR** 125:20,24
126:1,7,14
128:3 129:1,18
135:22 136:8,9,
10,14 137:1,2
138:5 139:3,5
140:7,9,11,16,
17 141:11,19
142:2,22,24
143:2,19
144:12,17
145:1,15 146:7
249:2,8 250:2,
6,8,22 251:2,4,
7,8,17 252:3,6,
16,17,18
253:10 254:24
255:5,18

**GPRS** 43:20
127:14,21
129:16 130:1,
12,16 132:8,20
133:19,25
134:2,24
135:14 136:4,
20 137:15,16,
17,23,24
138:15,20,23
139:9,11,19
142:4 143:13
144:11,21
145:2 155:11
203:2 236:6
240:16

**GR** 252:19

**grab** 209:20

**graduated**
39:6

**great** 76:8,11,
15 88:5

**ground** 11:1

**grounds** 33:5

**growing** 43:17

**Guadalupe**
156:7,13
161:24 187:17,
21 188:5,10

**guarantee**
147:23

**guess** 13:8
81:2 116:8
209:19 210:18
212:17 255:24
256:25 259:9

**guessing**
25:24

**Guevara** 7:12
8:9 229:20
230:6,10
231:11,20,23
232:2,10,13
233:10,20
234:5

**Guevara's**
229:23

**guidance**
98:20 99:13
100:9

**guide** 99:20

**guidelines**
99:19

**guys** 34:13

---

**H**

**half** 14:15 21:7,
22 23:4,15,23
117:13,18
118:2 123:1

**Halvorsen**
8:12

**hand** 9:6

**hand-drawn**
248:3,5,12,18

**handful** 211:9

**handing** 186:3

**handle** 139:12
197:9



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**handled** 60:25 270:11

**handwritten** 127:21 128:20, 25 134:23 188:13 189:21 190:2

**happen** 39:24 59:6 134:10 136:7

**happened** 108:18 109:18 136:14 137:4 139:4 166:4 183:19 194:3,4, 5,7,9 208:19 229:10 254:11

**happy** 225:21

**harassing** 172:17

**hard** 36:12 64:6 157:5 166:12 184:2

**harshly** 182:12,19

**Harvey** 8:13

**he'll** 142:24

**head** 11:23 73:7 81:24 105:23 109:1 242:24

**header** 247:13

**headquarters** 258:6

**hear** 34:21 76:12 185:11 235:13,15,16, 17

**heard** 15:11 31:20 33:2

**hearing** 108:13 109:13

**held** 38:9 41:2

**helpful** 49:3 224:14,18 225:21

**hey** 135:15 158:25 208:22

**Hickey** 108:18 109:17

**hidden** 176:20, 24

**high** 211:23,24

**highlighted** 67:13 69:5,9,13

**hired** 68:7

**historic** 190:13

**history** 12:15 190:8 191:14 229:23

**hold** 89:19 134:14 142:18 152:20 165:9 170:11 204:23 205:10 214:5 244:6 247:22 248:25 259:23 265:11 270:15

**holding** 94:2,5, 14,18,22,25

**homic** 225:13

**homicide** 74:24 75:21 76:23 77:10 78:1,5,21 108:3 149:21 154:3, 17 155:20 156:21 159:19 160:8,17 163:8 169:4 231:14, 24 232:4 259:6 268:1

**hoping** 132:16

**hospital** 197:7

**hour** 16:24,25 21:23 30:21,23 90:23

**hourly** 16:21 29:14 30:21

**hours** 16:18 20:1,3,4,6,7,13, 14,20,21,23,24 21:7 22:23,24

23:4,13,14,15, 18,19,23 29:5,9 30:25 31:2 182:9,19 263:17

**house** 251:15

**huge** 86:8

**hypothetical** 126:4,15,23 127:24 129:20 130:18 138:9 139:13,14 143:1,16 144:9 145:6,24 146:18 175:23 177:15 184:1 188:23 189:12, 14 192:11 193:4 214:22 215:7,17 234:11 243:22

**hypothetically** 209:19

_____

**I**

**idea** 46:8 50:2 138:22 172:13 225:5

**identical** 90:8 91:10,15

**identification** 35:7 68:3 71:23 121:8 150:22 258:21

**identified** 36:17 39:2 67:13 78:23,25 85:11 111:5 112:3,8 113:1, 16,24 115:1 154:19 156:15 249:4 261:16

**identifies** 121:20

**identify** 72:2, 10,13 123:2

**identifying** 90:3 124:4 140:21 261:12

**identities** 176:24

**ignores** 179:19

**Illinois** 7:16 38:2 40:15,18, 19,20

**immediately** 145:13

**impact** 232:22

**impede** 31:17

**implementing** 270:2 271:3

**implicated** 211:13 213:24

**implication** 160:19

**importance** 120:4 123:24

**important** 68:14 122:7 189:25 233:22

**impossible** 241:18 242:11, 13 246:10 261:15

**impounded** 78:13 159:14 160:21,24 161:17,20 162:18,20 165:23 166:17, 21 167:11 168:10,18 170:24 173:19

**impress** 212:17

**inaccurate** 24:14 25:5,9 26:7,14 27:5 28:4

**inadequate** 81:2 205:5,20 224:21 226:3 243:14

**Inaudible** 14:12

**incident** 261:15

**include** 35:25 52:8 60:9 103:21 105:1 190:17 216:8

**included** 23:1 65:1 69:24 70:17 104:9 124:5 125:18 143:5 182:24 199:18 218:2 233:7 240:12 261:25

**includes** 33:1 64:14 65:9,18

**including** 38:16 51:19 155:9 159:25 240:16 251:10

**incomplete** 126:4 127:23 129:20 130:17 138:8 143:16 144:9 145:23 146:18 175:23 177:15 183:25 188:23 189:11 192:11 193:10 196:11 202:10, 16,23 203:3 204:10 205:1 214:21 215:6, 16 219:17,25 220:5,9 223:6, 7,16,21 224:2, 22,24,25 225:6, 14 226:1,2 234:10 239:6,7, 14,18 240:1,9, 21,23 241:1 242:7 243:16, 22 244:24 245:15,19,24 246:8,10,20 269:1

**incorrect** 24:7, 14

**incriminating** 77:17 188:11

**index** 117:25 123:6



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 87 of 104 PageID #:66024
The Deposition of BERNARD MURRAY - VOLUME II, taken February 7, 2019

291

**Indiana** 216:17

**indicating**
131:5 165:17
183:4,18

**indication**
165:1 179:15
181:11 182:17
183:1 186:23
258:11

**indications**
145:7

**individual** 8:12
59:1 149:6
151:2 155:19
189:8 210:15,
16 217:22
251:20

**individual's**
175:18

**individuals**
98:25 99:20
141:3 157:2
167:6 175:13
176:3 180:11
216:21 249:19

**infamous**
218:3

**informal** 149:1
151:24

**informant**
53:23 54:9

**informants**
54:23 55:12

**information**
26:14 28:4
43:14 44:2
45:12 46:9,20
47:3,4 48:2,7,
12 51:2 52:8
68:13,14 89:1,6
101:12,22
102:8 109:12
120:11,16
129:12 131:13,
23 142:5
146:20 147:3
148:10 170:17
177:5 179:23,
24 180:3,18
184:6 187:16

188:4,20 189:2,
10,18,20
190:23,24
192:20 194:14,
23 196:11
198:24 199:7
208:14 227:15,
21 228:4,19
229:22 230:2
231:11 232:14,
23 233:11,22
234:6 243:3,5
245:1 246:15
248:11 249:7,
25 250:1,19,20,
22,24 251:17
252:9,15
253:20,24
254:22,23
255:5,18,19,20,
22 256:9
258:14,19
265:1

**informed**
177:10 189:9

**informing**
109:14 120:15

**initial** 199:11
240:5

**initially** 129:24

**innocence**
43:9 232:3

**inside** 59:22

**insignificant**
141:16

**inspection**
177:23

**Inspector**
259:17 260:7,
16 264:7

**instance** 72:20
83:8 136:3
144:5,24 203:5
204:7

**instances**
9:19,23 12:25
56:5 72:11
73:15 74:4,8
78:24 79:1 81:6
83:7 122:19

130:3 133:22
138:7 190:14
191:9 192:6
193:4,19,24
194:8,16 196:6,
19 197:13
202:2,20
203:23 204:16
207:11 208:7
214:9 216:21
217:10,20
218:7 219:1
220:18 223:2
225:9,12 243:2,
4

**instruct** 33:9
89:23 90:11

**instruction**
98:9

**instructions**
34:20 60:17

**intend** 18:2
37:9

**intended**
110:16 111:17

**intending**
37:1,5 110:16

**intention** 37:4

**inter-office**
49:24 98:1

**internal** 100:9
270:14

**internet** 190:23

**interoffice**
47:5

**interpretation**
205:16

**interrogate**
184:15

**interrogated**
182:12,19
184:7

**interrogating**
182:12

**interrogation**
182:9,18
183:11,23

188:6

**interrupt** 19:3
210:1

**interrupted**
73:3 170:13
268:17

**interrupting**
209:25

**interview**
125:19,23,24
126:1,6,9
128:2,24
129:17,23
134:21 138:23,
25 139:2
141:10,20
143:1 145:12
234:15,17
251:3,4 271:11

**interviewed**
140:3,5 180:3
181:17 182:23
183:17,22
184:6 185:21
186:8 187:13
200:12

**interviewing**
140:22 141:6
180:22 189:1,
15,17,19

**interviews**
77:18 138:21
139:22 140:25
141:3 145:19
155:9 181:16,
23 183:17
184:17 185:4,
12 251:20
252:10 253:13

**introduced**
225:5

**invasion** 13:25

**inventoried**
168:24

**inventories**
119:20 120:22
236:6

**inventory**
115:16,24

116:7,13,14,21,
22 117:3
118:20,24
119:24 120:4,7,
12,16 121:21,
24 122:6,19,20,
25 123:24
124:8 125:2
161:16 168:23

**invest** 234:14

**investigate**
101:10

**investigating**
124:17

**investigation**
46:2 51:8,15
58:1 59:24
75:21 76:25
77:11 87:9 94:4
108:3 123:13,
19 128:1,23
131:7 140:23
141:4 142:10
143:12 145:20
146:3,5,22
148:10 154:4,8,
17 155:10,20
156:21 157:9
158:1,18 159:1,
19 160:17,20
162:7 163:9
169:4 175:9
178:25 184:13
186:3 188:15,
19 189:1,6
190:3,18 195:8
221:17,22
231:14 234:7

**investigations**
39:17,21 94:11
96:3 113:11
131:18 149:21,
22 190:21
231:24 232:4

**investigative**
43:19 45:25
46:19 71:4
74:12,17 75:16,
20,24 76:7,14,
23 77:10 80:3,
22,24 82:5,14
84:18 95:22
97:2 107:14



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 88 of 104 PageID #:66025
The Deposition of BERNARD MURRAY, VOLUME I, taken on February 27, 2019
292

110:23 111:11, 23 113:10 116:2,4,7,14, 23,24 117:12, 21 121:21 122:13 123:2,3, 7 124:5,15 125:5 127:5,8 128:11,13,19 130:8,15,22,24 131:25 132:3,4, 5,8,12,15 133:11,13,16, 17 134:12 135:8,23 136:5 138:6 139:16 142:13,17 143:5,11,19,25 144:11,20 145:16 146:12, 15,24 148:11 149:13 154:20, 22 156:12,16, 20,22 158:21 159:16 161:4, 14,19 162:16 163:18 164:2 167:6 168:4 170:3,19 171:6 172:6 173:4,11 177:21 181:10 183:8 185:3,14 198:24 199:7 201:17 202:12 203:12 223:12 229:15 231:18 233:5 234:16, 20,21 235:22 236:4,16,20 237:11 238:2 239:6 241:13 242:4,19 243:3, 4 244:21 247:15 252:21 254:4,8 255:9, 16,25 258:1,17 259:7,12

**investigator** 115:20

**investigators** 158:17 183:19

**investigatory** 71:7 170:2

**invoices** 16:14,17

**involve** 131:7 209:2

**involved** 51:8, 15 57:25 84:5 154:3 214:1,14 229:19 231:20

**involvement** 13:15 26:2 39:16 183:24 184:8 189:3,16

**involving** 75:25

**irrelevant** 143:2 243:16

**irrespective** 180:1

**issue** 54:10 97:10 113:15, 19 133:25 134:5,7 136:20 147:15 180:7 221:5 224:15 236:10 254:12, 18 256:6 263:2 270:23

**issued** 262:15 270:5,12

**issues** 67:10 110:10 147:18 155:17

**issuing** 258:9

**item** 105:2

**items** 39:2 48:9 49:25 50:3 52:9,12 79:23, 24 100:1 111:25 257:24

**J**

**Jacques** 13:10 24:2,6 66:2 227:4

**James** 108:17 109:16

**Jan** 7:23 273:19

**January** 10:17

**join** 8:4

**Jones** 108:2, 10,14,18,21 109:5,9,13,18 115:2 208:23 216:18

**Jorge** 156:7,13 187:17

**judge** 49:11 112:11,14

**judges** 49:5 112:3,8

**jumps** 113:20

**June** 65:10 260:17

**jurisdiction** 40:11

**jurisdictions** 100:21,24 101:3

**jurors** 228:9

**jury** 37:6 60:16 226:13,15,24 227:10,13,19 228:13

**jury's** 228:6

**juvenile** 47:1,7

**K**

**Kane** 38:4 40:6,9

**Karalow** 8:13

**Karen** 268:12 269:10 272:13

**keeping** 90:12 95:21,22

**Kentuckiana** 7:6

**Kentucky** 7:7

**Kim** 248:23

249:1,20 250:11 251:4 252:11 253:14, 17

**kind** 14:21 64:5 99:23 100:9 160:15 178:15 236:18 241:11 245:18 250:13 253:8

**kinds** 50:10

**knew** 41:14 42:2,17,18 45:17,22 78:14 107:13 110:21, 24 124:10 140:5,9,15 141:11 150:21 175:21 177:11 178:17 259:7, 11 262:9

**knocked** 140:14

**knowing** 18:3 111:22 131:12 143:6,13 258:17

**knowledge** 43:2 63:2 96:10 111:15,16 148:5 171:15 182:1 183:4,10, 24 184:7 229:22 230:2,5 231:17 232:1,7, 9 268:6

**L**

**lab** 115:22

**label** 132:11

**lack** 53:18 170:21

**lacking** 241:11

**lacks** 261:13

**lag** 19:3

**laid** 87:14

**land** 130:9

**lane** 208:24

**language** 257:25

**laundry** 257:23

**law** 39:6 40:10, 23 45:25 47:2,9 48:20 57:24 225:1

**lawsuits** 198:6

**lead** 141:15 142:15 143:22 144:4,12

**leading** 113:2

**leads** 146:5,6

**leaf** 65:6

**leafing** 64:10

**learn** 16:8 43:14 44:9 48:5 179:22 180:16 198:3 227:18 255:19

**learned** 43:10, 15,21 45:3 228:22 229:5 230:9 233:22 234:6 256:10

**learning** 16:22 47:18 253:19 255:22

**lease** 142:1 144:1

**leave** 53:1 273:10

**leaves** 240:14

**legal** 14:19 15:15 91:16 191:3 210:23 213:16 214:16 215:21 261:10

**length** 126:8 129:2 167:19

**letter** 65:18

**level** 144:22 148:8 229:3 243:6 264:4,15 266:16



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 89 of 104 PageID #:66026
The Deposition of BERNARD MURRAY, VOLUME I, taken February 7, 2020

293

liberty 196:12

light 114:13
228:14

likelihood
171:5 259:12

likewise 11:15

lined 87:4

list 63:13 72:1,
9,21 73:9 78:23
81:5 103:20
116:1,22
124:18,21
190:13 248:2
257:23

listed 38:9 39:3
67:8 70:11
72:7,16 73:6
79:7 81:10,14,
15 85:16 87:9
105:1 145:9
182:22

listen 18:24

listing 80:2

lists 80:3,4
86:8 116:3

litigation 13:1
75:22 76:7 78:4
82:15 163:20
169:14 231:15
268:23

located 7:6

locating
261:12

location 7:18
222:9 255:1,2
257:11,19
258:3 267:4

locations
218:4 258:21
261:4 263:4

lodged 90:13

Loevy 200:18

logical 165:24
166:3

long 21:6
22:12,19 34:5

116:16 152:23
201:1 273:7

longer 22:22
214:18 253:25
256:11

longtime 10:8

looked 22:6,7
32:1,2 44:1
68:24 69:4,8,
12,19,25 70:12,
14,15,16 72:3,
24 73:11,15
74:14,17 76:22
79:9,13,19
83:9,12,18
86:21 91:19,20,
23,25 93:8
95:19 103:18
104:11,12
105:24 128:18
203:12 222:7
234:20 236:4
237:8 238:17,
19,20,23,24
240:6 241:12
266:19

Lopez 7:4

lose 158:9

lost 216:14,18,
20 254:19

lot 10:22
195:24 211:14

lots 258:12

Louisville 7:7

love 208:22

lunch 152:16,
23 153:1,14

_____

M

M-U-R-R-A-Y
9:17

Madam 14:22
62:2 137:10
275:11

made 27:15
29:21 50:22,23
58:9 63:6 77:16

110:25 123:19
132:22 133:5,
10 135:16
139:2 143:2
160:16 161:8
165:2,15
166:13 170:1,
22 172:6,10
173:4 174:24
175:2,3,7
176:17 177:22
198:5 237:24

mail 47:5

mailing 158:20

Main 7:7

maintain
215:19 269:12

maintained
227:14 241:17
268:21 269:19

maintaining
226:16

maintenance
267:25 268:8
272:18,22

majority 141:7
220:11

make 11:6,18
42:23 46:9,19,
23 47:8,22,23
48:16 51:2,18
52:12 54:21
56:23 79:21
110:23 111:13,
23,24 127:7
129:25 140:6
148:25 149:21
150:5,23
157:11 176:23
177:5,18
186:21 191:24
196:14 215:4,9,
11 216:5 245:5
252:24 254:6,
21 255:4
256:20

making 48:11
57:5,7 60:21
125:16 144:11
178:3 261:15

manila 57:15,
22 59:21

manner 48:19
50:21 76:18
107:16 134:19
135:1 178:18
257:7,11,18
267:4 268:21

manners
97:13

manual 99:9
100:5 267:15

manuals
98:19,22 99:20,
24 104:10
267:11 269:18
271:2,9

map 248:3,5,
12,18

mark 35:4

marked 35:7
68:3 71:23
121:6,8 236:25

marking 67:23

match 90:22

material 45:25
47:24 82:2
100:10 117:12,
21 122:13
124:15,16
144:1,21
146:24 148:12
181:19,22
194:19,20
229:15 232:19
254:4,8 255:12,
16,24 256:4
266:5,19

materials
20:25 21:16,24,
25 30:22 36:2,3
42:24 44:17
47:12 51:20,25
52:1,3,5 53:8
55:1,9 57:8,18
60:10 62:8,25
63:8,12,14
70:11 71:19,21
72:1,10,14,20
73:9 78:24

79:1,22,23
80:20 81:5
84:17 85:16
95:22 99:21
103:19,21
104:25 105:7
106:10 110:23
111:23 113:10,
12 117:5
120:19 121:3
129:5 130:8
132:12 134:7,
18 139:18
152:7 154:13
182:23 190:13
194:10 196:20
205:25 223:12
237:9,16 240:4
241:14 242:20
255:9,25 259:3

math 30:18
79:11 81:22
82:9

Mathis 248:24
249:1,19,20

matter 7:11
16:14,17 17:4,5
20:3 23:10
24:17 26:2 27:1
29:4,6,8,10,13
30:2,5,7,8,9,13,
14 35:16 36:23
37:2,21 42:7
49:6 63:15,19
64:2,8,15,24
65:19,23,25
66:17 67:12
68:8 69:12
70:21 71:22
76:6 82:24 86:3
91:9 95:15,25
96:10 101:2,10
103:20 107:20
108:1,12,16
117:23 120:15
121:17 131:24
150:11 174:9
183:21 184:8
188:4 216:11
224:16 232:16,
18 243:18

matters 10:1
101:20 111:12


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**meaning** 241:3
252:9

**means** 241:5
256:11 261:13

**meant** 255:15

**mechanism**
124:9,13 125:1

**media** 42:21
43:12,16,23
44:8,18 230:7,
10 231:11

**medical** 12:15,
16

**medications**
12:20

**meet** 184:21

**meeting** 20:25
21:6,8,13,19,23
23:5

**meetings** 21:3

**Mejia** 156:7,13
161:23,24
168:15 187:17,
21 188:5,10,12

**members**
253:14

**memory**
208:24

**memos** 236:7

**mention**
107:11 140:13
141:17,18

**mentioned**
135:20 175:14,
19 176:18,21
182:3

**mere** 186:20

**met** 9:18
186:14

**mic** 15:2

**Michael** 8:8
68:1,6 234:19,
20

**Michigan** 98:3,
5 100:1 257:23

**258:25

**microphone**
230:19

**middle** 101:17
158:3 260:10

**might've** 70:7
83:15 214:2
235:4 254:11

**mine** 33:22
208:2 225:7

**Mingey** 8:14

**minimal** 99:8

**minus** 23:15

**minute** 34:2,9
37:15 88:4
226:2 237:15
264:12

**minutes** 81:20
273:6,8

**misconduct**
230:5

**misleading**
251:13

**misplaced**
264:8

**missed** 48:3
57:2

**missing** 68:13
84:23 86:1 87:2
126:2,14
127:11 130:1
134:9,18 135:2,
24 138:5,11,12,
15 148:7
202:10 203:21,
23,24 204:8,17
205:2 223:3,23
224:21 225:10
236:15 240:17
243:5 264:2

**misstates**
41:20 45:21
46:14 49:21
50:14 86:12
87:17,24 95:8
104:18 111:19
118:25 119:7
122:9 139:25

141:22 172:3
173:14 185:22
195:4 206:10
207:17 209:16
212:15 223:18
224:4 254:2
261:23 262:21
266:22 272:3

**mistake** 27:15

**moment** 27:14
46:7 167:4
212:24

**monetary**
14:19

**money** 226:11
227:3,9,17

**monitor**
102:18

**monitoring**
102:16,25
150:12 151:16

**months** 38:4

**morning** 7:20
9:14 20:11,12,
20 23:10

**mother** 75:17

**motion** 113:12
210:23 268:13
272:7

**motions** 58:15,
22 59:25 60:17
159:23

**motivation**
190:5

**motivations**
190:1

**motives**
199:19

**move** 15:2,5
29:1 190:6

**multi-line**
122:25

**multiple** 136:2,
6,11

**murder** 75:17
200:12 270:11,

22

**Murray** 7:11
8:17,20,21,23
9:14,16 19:2
33:15 35:3
75:14 118:13
153:13 210:12
225:22 228:1
235:21 247:9
253:6 274:1,2

**must've**
262:16

_____

**N**

**Nah** 256:25

**named** 76:1

**names** 72:16,
17 156:10
175:19 176:12
177:3,12,25
178:2

**narrow** 95:18

**narrowed**
201:23

**Nathson** 13:10
25:15 68:1
198:19,22

**national** 94:19
114:20

**nature** 192:21
226:3

**Naujokas** 8:13

**necessarily**
47:10 56:18
61:18 70:2,3
116:8 117:11,
20 118:16
132:7 160:2,13
163:25 164:4
178:9 186:12
189:18,22
193:11 215:23
217:16 260:25

**needed** 47:12
86:16 113:2,16,
25 129:6
136:21 211:6
215:1

**nevermind**
115:17

**newly** 208:17
210:23 211:10

**news** 42:21
43:12,16,23
44:8,18 230:7,
10

**newspapers**
113:8

**Nice** 9:19

**nods** 11:23

**non-
disclosure**
227:1

**non-verbal**
11:22

**Northern** 7:15

**notation**
164:19 165:16
167:23

**notations**
160:14

**note** 141:5
143:4 144:1
166:25 239:19,
21,22,23 249:2
251:5

**noted** 239:15
249:13

**notes** 42:24
43:20 45:23
71:7 95:21
109:2 127:21
128:21 143:1
145:11 159:12
249:11

**notice** 123:12,
18 124:22
129:17

**nowadays**
134:22

**number** 7:12,
14 20:3 66:10
69:2,23 70:22
71:12 72:19
73:6,7,10,17,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

18,20,24,25
74:1,2,11,16,
18,24 75:15,19,
24 76:6 80:8
82:15 83:14
86:4 137:23
161:13 179:9
197:9 200:19
202:2 211:18
212:18 213:4
219:22 222:8
223:2 230:14
242:25 243:19
248:2,24
254:11,13
256:22

**numbers** 72:3
81:8 236:14

**numeral** 248:6

**numerous**
136:19 153:20
154:16 203:20,
23 233:12
245:22

———————

**O**

**oath** 10:23

**object** 17:23
18:25 19:5 26:8
31:16 77:2,13,
21 89:23 90:10
91:1 101:14
128:8 129:19
135:17 136:17
143:15 144:8
145:4,22 147:4,
13 148:2
149:25 151:17
152:1,2 167:16
172:16 173:13,
23 175:6,22
181:14 187:23
199:9 201:11
203:8 208:11
209:15 214:21
232:25 256:15
263:14 268:2
270:4 272:24

**objecting** 33:4

**objection**
13:25 14:9

18:18 19:14,22
20:16 24:8
26:15 27:23
28:21 30:15
31:9 32:23,24
39:18 41:20
45:7,20 46:13
50:14 56:9 57:1
58:19 59:8,18
60:13 61:8,25
62:17 66:18
67:5 82:25 84:7
85:4 86:12
87:17,24 88:16
93:4 95:8,17
96:14 100:12
103:8 104:18
106:13 108:4
109:24 110:8,
19 111:7,19
112:9,16 113:4,
17 114:1,7
115:3,10,17
117:16 118:5,
25 119:7 122:9
124:1,11
127:23 130:17,
25 131:19
137:18,25
138:8 139:25
141:22 146:17
148:17 149:3,
16,24 150:7,16
153:22 154:23
157:3 160:9
161:6 162:1,12
163:2,10,21
164:12,23
165:4,19 166:5
168:16 169:5,
22 171:12
172:2 173:2,12
177:13,14
181:5 182:20
183:13,25
185:6,22 187:2
188:7,22
189:11 190:10,
16 191:11,12,
23 192:10
194:21 195:4
196:1,9,23
198:13 199:20
200:22 201:20
202:5 203:15
204:1 206:10

207:3,17
208:10 209:16
211:17 212:15
213:7 214:20
215:6,16
216:24 217:13
219:18 220:23
221:20 222:4,
21 223:18
224:3 225:15
226:19 227:23
228:7 229:1,11,
25 230:21
231:8 232:17
233:14,24
234:10 242:22
243:8,21
245:10,20
246:17 261:22
262:11,21
263:23 264:9,
24 266:2,11,21
269:13 271:5
272:2

**objections**
90:13 93:12

**obligation**
253:24

**obligations**
42:18 92:11
102:4,13 156:1
192:22

**observations**
118:4

**observed**
241:9

**obtain** 43:1
48:9 97:5 98:6
213:15 219:2
253:23

**obtained** 47:8
146:20 196:15
261:5

**obtaining**
53:10 267:9

**obvious** 99:24
133:25 203:2

**occasions**
133:18 207:20
218:18 219:9

**occur** 193:5

**occurred**
227:11

**offender** 43:5
184:22

**offenders**
72:16,18
184:14

**offer** 15:23
18:1 19:10 37:1
93:17 106:3
107:6,19
110:16 172:25
173:4 220:3
236:10

**offered** 17:5
93:3 181:2
198:19 222:17
226:9 227:5

**offering** 93:2,
16 109:9
114:14,19,24
155:16 196:3

**office** 10:12
14:18,20 15:14,
15 38:3,5,6,7
39:7,12,15
40:2,7,13,21,22
41:1,9,13,18
42:2 44:14,20
50:23 53:16,17,
19 54:2 55:15,
17 56:2,6,14
57:18 61:18
92:11,18 96:7,
25 97:17,21
117:2 123:20
124:23 129:3
148:14,23
149:12,20
150:3,24 151:5,
20 152:5
157:21 162:25
166:18,21
168:1 175:1
191:8,21 192:1,
15 193:1,2,6,19
195:8 214:25
230:15 259:17
260:7,16 261:9
264:7 267:8,13,

20,22 269:4,18
270:3,6,10,22
271:4,12,16,24
272:14

**office's** 230:24
267:25

**office-** 151:12

**office-wide**
150:17 151:8,9,
14

**officer** 8:12
51:14 130:6
140:8 142:23
194:11

**officers** 43:19
46:1 48:21,25
51:11 94:9
102:12 109:17
140:22 184:13
191:5

**offices** 39:12
93:25 272:1

**officials** 113:2

**OIG** 259:18
261:7,8,25
262:5 264:13,
22 265:14,22,
24 266:1,8,19

**OIG's** 261:19

**omitted** 38:12

**one-to-one**
83:16

**online** 7:4

**ooh** 27:15

**open** 53:19
146:4 253:15
254:17

**opening** 71:17

**opine** 115:8
195:23 219:15
228:20

**opined** 88:21
89:9 112:11,15

**opining** 171:16
195:22 221:4
222:19 260:25

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 92 of 104 PageID #:66029
The Deposition of BERNARD MURRAY, VOLUME I, taken on February 7, 2019
296

opinion 90:19
92:8 114:14,19,
24 120:20
142:8 172:25
196:3 219:24
220:8 226:10
227:5 230:23
231:1 256:9
262:8

opinions 15:24
17:5 18:1 19:11
30:9 33:13
37:1,6,7 88:14
89:15,16 92:5,
10,12,16 93:1,
3,15 105:15,19
106:3 107:6,19
108:9,20 109:4,
9,10,14 110:17
120:13,15
155:16 181:2
195:18 198:19
220:3 222:18
224:6 225:17
229:18 232:22
233:13,23
236:10 239:13

opportunity
25:14 26:25
28:19 181:3

opposed
128:10 184:6
251:15 269:25

opposite
177:18

order 22:6,15,
20 23:2 41:5,11
42:22,23 43:18,
22 44:3 45:5,6,
13,23 70:21
95:11 96:20,24
99:9,10 104:9,
12 105:2,11,15,
18,22 106:3,11,
17,19,22 107:2,
6 109:23 110:6,
15 111:6 112:4,
6,18,20 113:3
114:6,15,20,25
115:8 121:7,25
124:3 146:20
207:8,10
211:13 265:18

orders 44:21
45:4 87:15,16
95:16,20,21
96:1,12 105:9,
13 106:25
107:11,13
234:23 235:24
236:5,6 267:17
274:13

original 42:21
43:3,11,23
44:2,10 160:3
207:8 214:12
242:12

originally
136:12

originals
160:7

Oscar 76:1
237:4 238:4

outcome 226:8
227:7

overlapped
71:12 79:11
81:23 82:9

_____

P

_____

p.m. 88:11
152:18 153:7,
10 247:4,7
273:15 275:17

pace 54:17

pack 61:1
207:14 211:5

package 206:8
216:13

packaged-up
205:24 206:4

packaging
207:23

packed 59:11,
15 60:8,24
216:6

packets 85:2

packing 62:7,
24

pages 36:3,22
37:2,8,16
63:13,17 64:1
66:5 68:13
69:9,10,23
70:2,8,13 71:13
72:8 81:4
83:14,16,17
87:1,3 113:20
240:11,12,13,
14,16 242:2,11,
13 245:7
248:14

paid 14:4
29:12,15,19,24
30:2,6,12,13
31:2

Palmer 108:10,
14,18,21 109:5,
9,13,18

paper 64:5
123:1 224:22

par 248:6

paragraph
86:23 141:14
248:7 257:8,15

paragraphs
90:8,9,22
91:10,14,15
249:17

paraphrasing
183:15

parking 250:11

part 51:3 54:2
57:5 60:3 61:18
64:20 65:17
76:20 82:4
85:20 101:17
113:10 136:5
139:2 140:20,
23 141:3 146:5
155:10 184:16
198:2,10 199:3
207:14 214:18
217:3 231:23
232:3 233:2
234:14 238:10,
13 252:20,23,
25 253:2
254:13 260:20
261:1

parties 8:21

parts 22:7,15,
20

past 9:21 122:3

paste 89:16

pause 19:4

pay 263:10

paying 129:4

PD 79:17,25
91:25 250:22

pending 7:14
12:11

people 11:9
18:25 57:22,25
140:5,15 156:3
163:13 167:1
176:20 178:8
179:5,9,16
180:12 181:19,
23 185:4,12
186:10,12,14
187:13,14
189:15,20
200:10,11
214:14 217:16,
19 237:4 238:4
247:23 248:23
249:1 254:14

people's
176:24

percent 118:18
119:6,10,15
211:15,21,24
212:4,8,9,12,24
213:1,6,10

percentage
211:4 213:10
219:14,16,25
220:4,8 236:14

Perfect 274:12

perform 17:13,
14,25 18:4 86:2

performed
190:7

performing
191:2

period 23:8
45:9 97:3,25
98:4

permanent
87:22 236:19

perpetrator
142:3

person 50:2
123:12,17
178:13 183:22
184:5 186:6
190:2

personal
171:14 215:22

personally
120:1 208:25
211:14 214:10
215:21 218:22,
23 265:21

perspective
115:9,12

pertaining
123:13,18

pertains 78:6,9
234:1

pertinent
141:10 147:3
188:14 208:16

pervasive
266:20

petition 211:11

phone 50:1
150:23

photo 178:13
180:10

photograph
155:22 158:20
167:2 176:22
180:1,5 186:8,
21

photographs
52:10 60:16
77:1,4,5 78:6
83:19 156:3
157:8,23
158:17,24,25
159:4,14,25
160:2,3,19,20,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 93 of 104 PageID #:66030
The Deposition of BERNARD MURRAY - VOLUME I, taken February 17, 2021
297

23,25 161:8
163:14,23
164:3,6 165:15,
23,25 166:8,12,
13 168:6,10,18,
21,25 170:1,18
171:7,17 172:5
173:3,17,18
175:8 176:9
177:18,20,22
178:4,17 179:3
180:15,20
181:1 185:17,
25 186:2,10,15,
16 266:6

**photos** 76:20
78:9 83:18
155:21,25
156:11,16,22
157:1,20 159:7,
11,15 160:7,16
161:2,5,12,13,
18,22 162:15,
17,23,24 163:6,
16 164:11
165:3,18
166:17,20
167:5,10,14,25
168:13,14
169:19 170:22,
23 171:2,3,5,
11,21,25
172:25 173:10,
22 174:10,14,
19,22 175:2,4,
13,21 176:6
177:11 178:6,8
179:5,9,15
185:5,14,20
186:19,24
187:14 240:11

**phrase** 53:19
67:9

**physical** 52:9
157:7 159:3,24
166:9

**pick** 52:18,22

**picking** 56:7
133:1

**pictures**
164:21

**piece** 250:20,

21

**pieces** 132:4,
15 159:2
224:22 254:20

**place** 139:22
158:21 222:20
234:17 263:10

**places** 70:17
131:8 168:19,
24 175:19
177:4,12
248:12

**plain** 180:13

**plaintiff** 7:21,
24 8:24 9:1
67:12 68:7
226:5

**plaintiff's** 7:19
66:21 85:25
110:25 163:12
165:15 167:21
174:5 179:1,20
220:15 228:17
240:17 241:21,
24 243:23
245:3

**PLAYS** 75:11
158:15

**plea** 58:22

**plead** 231:12

**pleaded**
233:10,20

**pleading**
231:12,13

**pled** 232:13

**plenty** 202:10

**plural** 216:17

**point** 16:13
18:3 20:8,14
23:14,19 24:23
25:1,3 26:4,11,
12,25 27:3,20
34:1 35:12
41:12 42:11
87:6 96:13
97:20 98:3
135:23 144:10
176:16 181:17

186:20 213:3
219:21 224:5
228:21 241:23
242:25 253:11

**points** 114:14
237:24

**Polaroid** 77:5
78:6,9 83:19
155:21,25
156:11,15,22,
25 157:20
158:17 159:7,
11 160:6,16,19,
23,25 161:2,12,
13,18 162:15,
24 163:6 164:2,
11 165:2,18,22
166:16 167:5,
10,14,25 168:6,
20,25 171:10
172:5,25
173:10 174:9,
14,18,21
175:13 176:5
177:11 178:6,8,
13 179:5,9,15
180:5,10,15
181:1 185:5,14,
20 186:1,21
266:6

**Polaroids**
155:22 157:16
177:21

**police** 22:6
23:2 32:4 39:16
40:2 41:3 43:19
46:1 47:5,10,12
48:11,24 49:9
50:12,20 51:3,
20 52:1,3,15,
19,24,25 53:6,
9,11 54:7 55:1,
10,24 56:17,24
57:8,11,15,16,
19,24 58:12
59:16,17 60:2,
4,9,10,22 62:9,
14,15,20 63:3
64:22 65:3
66:11 67:3
70:22 72:4,11,
21,24 73:15
74:5,18 75:20
76:6 79:2,6,16,

25 81:6,12,17
82:23 83:21
89:6,13 91:24
94:3,6,9,15,19,
23 95:1,6,15
96:1,11 97:5,8,
9,12 98:14,16,
20 99:1,14,20
100:14,15,20,
23 101:10,11,
13,21,22,24
102:3,6,9,11,
15,22,24 103:2,
6,7,14,15,17,21
104:4 109:17,
22 111:5 113:1,
11,16,24
114:16,17
115:9,11,16
117:3,6 118:23
119:19,24
120:3,6,17
122:20 126:5,
12 127:2,18
128:6,24 130:6,
9 131:7,8,13,
16,17 133:1,11
135:8 136:20,
23 140:22
142:9,23 143:9,
10 146:14
147:2,11,24
148:15,24
149:2,12 150:4,
14 151:4,6,21,
23 152:6 164:2
173:9 175:15,
19 176:3,13
178:1 180:21
181:11,19
182:3,5,17
183:18 185:8,
13,21 186:24
187:7,12,13,15
190:9,15,19,25
191:5,10,22
192:9 193:21
194:10,20
195:3,14,15,20
196:7,19 197:4,
11 198:23
199:18 202:3,
11 203:6,13
204:19 205:4,
25 206:4 207:1
208:5,8,22

209:21 214:17
215:5,14 216:5,
22 217:12,22,
23 218:8,16
219:3,4 220:19
223:3,24 225:1
226:6 227:21
229:24 232:23
234:22 237:10
238:2 239:9
240:14,15
241:19 242:2,9,
10,12,15
243:13,20,25
245:2,5,6
246:3,11
248:19 250:8,
17 251:21
253:25 255:10
256:10,12
261:20 262:6
263:11 267:10,
18 269:4

**policies** 40:3,
9,22 41:4,8
95:7 97:9,18,
22,24 98:15,18
99:13 100:24
102:4,17,23
103:1,6,10,16,
22 104:5 112:3
119:24 120:3,7,
10,21,23
123:23 124:8
267:7,8,13,16,
17,19,21,25
268:7 269:15,
25 270:2 271:3

**policing**
114:20

**policy** 41:12
42:6,12 45:18
53:15,18 94:23
95:3 98:22
99:16,24 100:5,
23 104:10
107:19 111:23
112:14 115:9
119:19,22
122:7,16
124:14,20
125:7 226:16,
25 227:14
267:11,15



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

268:24 269:4,5,
7,11,20 270:10,
21,24 271:9

**poor** 77:7
127:15 131:4
235:20

**poorly** 147:8
217:17 241:16

**portion** 83:6,
21 132:3

**portions** 84:21
85:2,11 89:16
90:7,15

**position** 39:14,
19 220:20

**positions** 38:9

**positive**
272:16

**possibilities**
169:2

**possibility**
169:8,10,12

**possibly** 100:6
210:19 211:21
214:14

**post-** 211:10

**potential** 190:1

**potentially**
14:1 33:20,22
78:18 243:15

**power** 152:24

**practice** 53:7,
13 55:22 57:17
62:6 100:6
127:1,12 129:3
130:4 131:24
166:7 170:1
171:16,20,24
176:22 206:13,
20,22 216:1
226:25 227:15
259:5

**practices** 94:3,
16,19 97:6,7
100:20 101:11,
21 102:7,23
114:16,18

126:25 127:16
207:22 216:3,
12 226:17
271:12 272:1

**pre-motions**
52:12

**pre-trial** 52:12

**preclude**
19:19 130:7
180:21

**precludes**
14:19 15:14

**precluding**
253:19

**predictor**
139:18

**preface** 84:15

**prefer** 118:12,
13

**premise** 204:3
207:5

**preparation**
21:3 23:3,16,23
25:17 58:15
63:12 105:6
119:13 120:20

**prepare** 21:21
22:4

**prepared**
153:16

**preparing**
20:22 22:17
23:13 25:19,22
29:5,9 49:13
63:14,19,22
104:1,6,16,23
105:6,10,14,19
106:12,16,20
108:1,6,12,16
109:20 110:4,
12 242:17
260:21

**presence** 22:9

**present** 21:8
37:5 249:22
250:7

**presented**

165:23

**preserve**
115:22 146:23

**preserved**
42:25 143:25

**presume**
167:20 184:20

**pretty** 47:6
146:6 197:23,
25 202:10
203:2 247:20

**prevent** 12:16,
21

**previous** 22:7
90:12 191:13
259:9

**previously**
93:24 104:12
115:14 129:24
135:6 207:1

**primarily**
42:21 43:24
254:25

**primary** 186:2

**prior** 9:18 13:3,
9 16:22 43:6
46:5 50:23 71:6
89:17 90:9
95:10,11 96:9
105:24 106:9,
14,15 107:1,10,
12 108:24
160:1 166:10
168:8 170:3,20
177:23 190:24

**private** 263:5

**privilege** 14:1
32:23 67:6 90:4

**privileged**
264:25

**privy** 194:23

**pro** 241:25

**problem** 89:6
189:13 195:2
196:8 227:21
266:20

**problems**
109:21 110:6,
15,18 111:4,16
112:2,7,14
113:1,23,24
114:3,6,9,11
115:1 195:13

**procedure**
94:8 98:19
99:19 269:21
270:10,24

**procedures**
94:6 102:19
269:17 270:1
271:2

**proceed**
230:15

**proceeding**
214:17

**proceedings**
7:1 216:9

**process** 31:10,
19 32:9 33:11
48:22 49:17
59:2 69:17
88:18 90:2,18
91:5 98:13
146:13 147:1,
10,23 163:24
205:22 210:23
213:16 215:15,
21 263:10
265:6 267:9

**processes**
151:22

**processing**
116:19

**produce** 148:8

**produced**
77:25 118:1
157:21 159:22
161:3 163:19
192:8 220:12
231:19 261:16

**product** 33:8
54:1,6,11,22,25
55:7,9 90:12

**production**
158:22 261:13

**products**
53:22

**professional**
38:10,22

**progress**
45:24 128:20

**proper** 123:12,
17 124:22
222:15

**properly** 77:9

**prosecution**
59:1 124:9
170:2 171:18
174:22 189:25
198:25 199:7
204:11 213:19
220:21 223:4,
22 225:2 226:4,
5 231:3 232:20
243:18 250:3,
23 251:21
252:17 255:21
256:13 268:8

**prosecutor**
10:8,9,10,11,19
32:5 38:23
39:4,12 41:2,3,
7 46:18,24
48:15 49:8
50:11 56:21
60:25 64:23
65:2 66:10,15
67:2 69:16
70:18,23 72:22
73:2 78:3,8,21
79:5,17 80:23
81:7,18 82:13,
22 83:6,10,21
91:24 98:10
117:1 118:1,4
125:11 126:19
137:15,22
139:8 149:6
150:19,25
157:20 158:23
159:7,11 160:7
163:19 164:18
165:1,2,6,17
167:15,18,19,
23 169:19
171:11,22
172:7 174:12,
13 183:21

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 95 of 104 PageID #:66032
The Deposition of BERNARD MURRAY - VOLUME I, taken February 7, 2019
299

184:5 189:10
192:7 194:10,
19 197:5,14
201:18 202:4,
11,20,22 203:3,
4,7,14,18,25
205:9,24
206:24 219:16,
25 220:4,8,12
223:7,15
225:11,13
229:9 234:8
238:3 240:1
243:7,14
244:22 245:9,
15 246:1,3,4,
11,13 248:8
249:8 251:18
270:9 271:21,
22

**prosecutor's**
38:3 39:7
40:13,21 48:1
78:16,19 80:5
92:11 151:5
165:21 168:1
202:9,13,15
224:20 230:24
242:14 243:16
244:24 245:19
246:6,7,20
249:14,15

**prosecutors**
40:16 42:25
46:4 47:2,4,16
48:6 56:1,6,13
61:11 62:13
78:14 101:22
113:13 125:3
146:14 147:1,
10 151:2,11
157:10 168:8
169:24 170:6
171:2,3 172:1
175:1 196:10,
21 197:8
200:21 207:24
214:2,11
217:21 218:1,7,
13 227:22
229:8 232:15,
24 233:4,11
242:9 248:20
255:6 257:10,
24 258:8 261:3

262:1,8 263:4
264:14

**prosecutors'**
93:25 216:12

**Prossnitz** 8:6

**proved** 43:9
144:4

**proves** 171:10

**provide** 52:7
85:17 148:12
149:1 150:22
196:11,16
209:19 215:9
242:9 246:11
268:15

**provided**
26:13 28:3 44:1
45:11 52:25
58:9 69:20
70:13 71:8 83:8
85:2,9,10,19,21
92:17 98:20,25
99:13 118:24
135:10 136:6,
16 137:2
167:25 184:6
186:6 193:12
197:7,8 200:13
202:22 228:15
229:16 232:19
237:10,11
238:1 239:9
241:25 243:12
252:6,7,21
254:9 255:9,25
256:3

**providing**
49:14 107:15
189:20 263:12

**public** 32:5
64:23 65:3
66:11,15 67:3
69:16 70:23
72:3,12,22
73:11,16 74:6,
9,14,19 77:24
79:2,6 80:4,22
81:1,7,12 82:8,
9,13,22 83:6,
10,22 84:18
86:10 87:10
92:17 157:1,16

163:8,18
164:10,17
174:17 175:3
202:7 203:24
204:3,8,17
224:1,20
225:10,13
233:6 237:12
238:9,16,19
239:2,8,10
240:1,4,6,8,18,
20 241:10,17
242:8,16
243:12,24
245:4,23 246:9,
19 250:23
251:6,11,18
253:12,13
254:15 256:2,5
257:21 258:9
259:2 262:1
263:4 267:6,8,
13,20,22,24
268:7,12 269:4,
11,15,18 270:2,
11,21 271:3,11,
15,18,24 272:1,
14

**pull** 67:22
118:12,14
205:25 207:1
208:8,15 209:3
214:17 217:6,
22 218:15
219:3 236:23
259:24

**pulled** 150:5,
13 218:8

**pulling** 151:23
216:22 217:11

**purple** 87:22

**purports**
124:18

**purpose** 53:10
76:5

**purposes**
32:21 82:16
120:12

**pursuant**
123:23

**pursue** 97:12

180:2

**pursued**
144:4,24
146:12 178:18

**pursuing**
146:4

**put** 31:3 35:11,
13 36:8,14 49:7
57:15 58:1
71:18 78:25
90:20 145:15
158:19 174:4
182:8 194:4
203:16 210:14
211:18 212:1
213:10 224:7,
18 225:18,21
254:10 259:8,
10 267:2
275:12

**putting** 53:25
54:15 56:23
63:5 116:18
190:21 202:19
208:9 216:19

———

**Q**

**qualified** 115:7

**Quash** 268:13
272:7

**quest** 225:7

**question** 11:3,
7,8,12,16,17,
18,25 12:2,4,5,
6,11,14 15:9
24:12 27:7,13
28:15 31:15
33:5,7,16 42:5
44:6 46:8,17
48:3 52:2,23
57:3 75:4,9,11
77:7,8 80:17
85:7 86:20
90:25 91:4,22
94:21 95:3,5,13
96:17 110:2
127:15 130:21
137:20 143:8
147:7,8 158:5,
15 161:11

164:9,25
172:20,22
175:25 177:2
181:9 184:3,16
188:25 191:19
200:25 207:5
212:6,10
216:19 217:3
218:6 225:7,8
230:21 231:6
235:17,20
236:2 237:20,
22 240:19
244:2,4,10
256:7 263:15
265:11,18
268:3 269:10,
23

**questioned**
179:23 180:18

**questioning**
10:23 108:1
116:21

**questions**
11:4 12:17,22
80:12 84:16
89:22 131:5
146:1 191:13
224:12 225:17,
24 230:13
253:23 267:6
271:20 273:17,
21,25

**quick** 88:3
273:2 274:13
275:15

**quicker** 50:3,6

**quickly** 11:2
30:18 141:16
142:2 143:23
146:6 247:20
273:4

**quotes** 261:8

**quoting** 272:6

——— R ———

**Raiders**
216:18

**raise** 9:6



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 96 of 104 PageID #:66033
The Deposition of BERNARD MURRAY, VOLUME II, taken February 17, 2021

300

**rap** 150:21

**rare** 39:23

**rate** 16:21
29:14 30:21

**re-** 175:24

**re-ask** 55:6
77:8 147:7
244:7,13,17

**reach** 48:20
51:7 133:22
135:24 138:11
142:22 150:23
239:5 240:25
241:5 266:1

**reached** 88:24
89:4 92:5 93:9
226:13,15
241:17 264:22
266:8

**reaching**
228:13

**read** 21:24 64:6
75:9 96:20
108:23 109:1
112:22 123:14
125:20 127:6
129:7 144:20
148:4 156:10
158:4 208:22
230:7 237:20
252:14 257:15
261:18 262:24
264:6 274:3,6,8

**reading** 42:1
86:17 110:22
111:17,21
125:16 126:5
139:11,16
142:12 180:14

**ready** 17:8
134:3 237:19
263:6 264:16

**real** 34:17
274:13 275:15

**realize** 122:4
125:21

**realized** 38:19
122:2,3 141:16
143:22 145:12

**reason** 11:11
15:18 25:7
38:12 66:8
132:21 135:2
142:25 143:21
147:17 175:20
176:4 179:21
180:1,16
185:24 204:8,
10 209:6
212:23 215:8
218:24 225:4
228:5

**reasons**
135:19 136:2,
12 186:1 208:2
210:25 211:1
213:21,22
214:2,11 217:4
228:2

**recall** 25:23,25
29:4,7,8,11,12,
17 41:14,25
42:11 44:17
45:1,8,15 46:10
66:21 67:15,17,
19 68:24 81:24
86:11 105:25
108:25 109:1
118:2 119:10,
14 200:15
222:23 234:23
242:24 259:15,
18

**receive** 15:25
49:9 53:5 60:15
61:12,13
104:15 117:6,7,
8 118:23
125:15 132:20
147:16 158:23
240:4 245:4

**received** 16:20
17:8 47:15
48:19 52:15
53:8 56:24
57:16 58:11,12
60:4,10,23
62:9,15 84:17
98:15 99:4,7
117:10,12
119:3,16,21
122:18,20,23
125:21 129:13

130:11,21
133:15,17
137:23 138:6
139:9 141:14
142:14,15
143:18 145:1
148:6 150:19,
20 159:18
197:6 222:15
241:19 245:1
262:25 263:1

**receiving**
15:19 57:8
118:2 119:10,
15 147:18

**recent** 198:3

**recently** 16:8

**recharged**
209:3

**recharges**
209:9

**recollection**
26:3 29:25 30:1
43:13 65:5
120:8

**reconstitute**
219:11

**record** 7:3 8:19
9:3,15 34:8,14,
16,22,24,25
54:22 61:15
88:7,9,10
153:3,5,6,8,9
247:4,5,6
261:11 273:11,
13,14 275:10

**recorded**
128:25 129:24
134:21,25
143:3

**records** 52:20,
25 123:10,16
125:17,18
133:6 261:12,
14,16 262:7
267:9

**recover** 115:21
257:25

**recovered**

226:11 227:2,9
262:2

**recovery**
116:17

**redacted**
240:11

**redaction**
254:16

**refer** 86:16
98:7 116:13
249:19 250:15
251:14

**reference**
74:25 75:19
106:22 140:3
141:8 145:14

**referenced**
139:3 143:20
146:8 248:6
267:3

**references**
176:2 251:19

**referred** 41:6
45:23 111:12,
24 115:23
116:6 183:18
259:16

**referring** 21:25
43:4 44:13
54:23 55:1,7,9,
11 57:14 77:1
110:21 116:15,
21,22 125:10
151:7 154:25
161:15 190:18
224:8 257:7
269:10

**refers** 144:13

**reflect** 63:11,
18

**reflecting**
65:10

**refutes** 250:17
272:11

**refuting**
222:13

**regard** 101:12
102:7 103:1

155:19 231:13
233:21 267:9,
25 268:7
271:13 272:18,
22

**regulated**
107:14

**related** 47:9
75:16 77:25
102:17 103:5
108:2,9,13,21
109:4,13
120:21 125:20
131:6,17
138:23 140:7,
16 141:20
142:10 143:8
150:6 154:16
156:1 210:16

**relationship**
83:17

**released** 62:15

**relevant** 47:12
68:13,14 85:11
146:20,24
147:3 148:10
255:12,15
261:16

**relied** 63:19
105:14 180:9

**rely** 61:18
104:3,4 106:19
109:8,12,16

**relying** 70:19
120:11,16
146:23

**remain** 233:18

**remainder**
250:8

**remaining**
231:3 240:13
242:11

**Remarkably**
260:13

**remember**
42:8 43:5 69:2,
3 78:12 109:4
200:18 201:2
219:20,21


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 97 of 104 PageID #:66034
The Deposition of BERNARD MURRAY, VOLUME I, taken February 27, 2019
301

remotely 8:9

remove 59:16
60:7 62:8,14
216:23

removing
62:19

reorder 208:4
210:22 211:1
212:13 214:4,
10

reordered
213:23

reordering
208:3

repeat 75:4

rephrase 12:1
101:4,15 131:2

report 16:25
20:8,10 21:14,
17 22:1,14,23
23:9,14,20
25:19 29:6,9
30:22 35:5,16,
18,21,24 36:18,
23 37:3,8,18
38:18 39:3
50:20 63:4,8,
14,19,22 64:2,
8,20,21,25
65:1,8,11,13,
18,22 66:1,2,5,
8 67:24 68:1,
11,12 69:5,10,
13 70:25 71:3,
6,16 72:18
76:3,20 81:21
82:2,3 85:25
86:3,4,22,25
89:22 90:5,7,15
91:5,6,7,9,17,
24 104:1,6,16,
23 105:6,10
106:4,12,16,20,
23 107:1,6,10,
20 108:1,7,12,
16 109:6,21
110:4,12,25
115:24 116:21
121:17 125:18
126:6 127:10,
11 128:24
130:12 132:19

134:2,3 139:2,
5,23 140:4,12,
13,16 141:9,12,
17,19,20 142:2,
6 143:11,21,24
144:17 154:11,
19 155:14
156:9 175:11,
17 176:19
178:1,3 179:20
180:14 181:18,
24,25 182:22,
24 193:12
196:15 197:5,6
200:13 201:6,
13 202:12
208:5,22
209:21 223:5
224:7,9,11,14,
16 225:18
228:15 229:14
231:20 234:23
236:24,25
237:4,18 238:1,
16 239:2,15,20,
22 245:7 246:7
247:10 248:15,
16 250:17,21
252:15 254:10
256:10,12,22
257:2 258:7
259:16,17,18,
19,21 260:3,4,
6,10,17,21,22
261:1,2,7,9,25
264:21,22
265:14,22,25
266:3,24 267:2,
3 272:3,9

report's
224:17

reported
128:25 134:22

reporter 7:3,5
8:17,21 9:5,11
11:5,8,21
14:23,25 31:20
33:2 34:10,13,
18,22,25 62:2,3
75:6,10,11
88:7,10 137:10
152:14 153:6,9
158:6,14,15
235:11,14,16

247:3,6 273:11,
14 274:2,5,8,
12,18,20,23
275:1,4,6,9,11,
14

Reporters 7:6

reports 33:12
43:18 45:24
47:8,9 48:19,24
49:9,12 52:15,
24 53:11 56:17
57:11,16,24
59:16,20,24
60:3,7,10,15,16
62:14,20 63:3
71:7 79:8 81:4
89:7,17 90:9
91:11 97:5,8,13
98:6 116:18,19
124:4 125:15,
17 127:6 128:6,
9,20 130:9
132:17,18
136:20 138:22
141:5 142:15,
16 144:7,23,25
145:7,15 146:9,
16 148:4,11
155:11 175:15,
20 176:3,13,17,
21 177:3,12
178:6 179:25
180:21 181:11,
20 182:2,4
183:18 185:9
187:8,15
190:18 192:20
199:11,12
201:3 202:25
205:6,25 207:2
208:9,15
214:17,25
215:19 216:6,
22 217:12,22
218:8,16 219:4,
10 220:25
223:6,24 226:7
230:8,10
231:11 233:3,5
234:14 239:9
240:15 241:20
242:12 243:25
250:9 257:12,
19 258:3,7
260:24 261:4

262:2,15,19,20,
24 263:2 264:3,
15 267:5

repositories
131:18,23
150:6,14

represent
75:15

representation
118:3,15

represented
253:13

representing
7:5

request 50:18,
20 100:2
131:24 132:3,4,
23 133:5,10
151:24,25
206:25 207:15
208:8 211:6
265:24

requested
75:11 99:21
132:2 158:15

requesting
61:22 117:20
132:17 259:6

requests
48:11 49:25
50:22 51:2
98:1,5,11,14,
17,21,23 99:2,
15 131:6
132:13 133:3
148:25 149:1
261:11

require 263:10

required
146:13 147:10

requirement
12:10

requirements
14:11 17:16

requires 147:1

research
101:2,7,8 191:3

reserve 274:4,
7

resolution
59:4

resolve 113:9

resolved 49:6
59:11

respond 98:21
99:1

responded
98:16

responding
99:14 210:3
261:10

response 44:3
100:10 151:24
225:6

responsible
261:10

responsive
261:12

rest 249:16,25
250:17,25
252:10 253:9
256:4

restate 110:2

restraints 49:7

result 42:22
194:9,19
228:22 234:7

resulted 91:6
110:6 111:6
192:8 228:13,
24

resume 38:13,
16,17,19,21

retain 43:19
111:13

retained 13:22
17:4 95:5,25
110:24 111:25
124:16 176:10

retaining
45:23 124:14

retention
87:22 96:2,9,13



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

97:3 107:15
111:11 113:9
236:19

**retrial** 208:15
209:9 210:15
211:7 213:14
214:16 215:15

**retrials** 208:19

**retried** 209:3

**retry** 208:21

**returned** 38:5
50:1 207:12

**returning** 38:7

**reveal** 258:13

**revealed**
154:20 179:24,
25 180:18

**revealing** 33:7

**reveals** 250:10

**reversal** 193:9,
10 194:2
197:20

**reversals**
192:24 194:16
197:17,18
211:9

**reversed**
192:18 193:20
197:15 207:6
208:20

**review** 21:13,
16 25:14,17,18
27:1 28:19
30:22 32:21
39:22 40:22
41:3,8 45:5
52:11 67:2
71:11 76:9
77:24 78:3,22
84:5,17,19
97:17 99:12,18,
24 100:7,20,23
101:2,20
103:25 104:16
105:18 106:11,
17,25 107:10,
16 108:2,9,13,
17 109:20

110:5,9,13,14
120:19 121:16
139:17 148:23
149:21 150:4
151:9 153:19
154:2,6,15
159:2 164:3
165:5,20 166:1,
10,14 168:8
170:20 174:8
176:10 178:21
181:3,15
182:11,14
183:2,3,6 185:8
187:7,15,18,25
188:3 190:7,13
195:1,12 196:3
201:5,16 202:1
221:3 222:25
223:5 225:19
235:2 237:25
238:9,12 239:4
243:6 249:16
260:21 264:21
265:13,19,21,
25 266:3 267:8,
11 269:11,17,
25 270:14
271:2,8

**reviewed**
21:18 22:13,18
24:1,5,12,16,23
25:21 26:4
32:25 36:3
40:2,9 44:1,9,
19 63:8,12,14,
18,22 66:17
70:11 71:19,21
72:2,10,11,14,
20,21 73:9
74:5,9,18 76:6,
14 78:8,18,24
79:1,22,24
80:21 81:6
82:16,23 83:5
84:6,13 85:16
95:6,11,15,25
96:4 103:5,14,
20,21 104:20
105:1,5,7,10
106:10 107:12
108:20 120:6,
11 121:3 122:5,
15 125:22
134:4 154:10,

13 181:9,10
183:9 187:9
195:24 198:8,
10,16 201:24
231:24 235:22
237:9,16,24
238:5 239:16,
25 240:8,20,24
246:13 259:15
260:20 265:15
267:21 268:22
269:3

**reviewing**
20:24 22:12,19,
22 23:5 25:25
42:1 44:17 45:8
127:2 138:2
139:10 143:9
159:12 199:2,4

**revolved**
136:21

**rewarded**
227:17

**Reyes** 7:12
8:7,25 13:16
154:6 161:23
168:15 188:11

**Reyes-**
**solache** 75:16
76:5

**Reynaldo** 7:12
229:20,23
230:6

**rightfully**
245:2

**righty** 275:9

**Rivera** 13:10
22:8,16,20
24:3,6,13,17,
21,24 25:2,4,8,
12,20,22 26:2
28:17,20,22
29:4 30:2,5,6,8,
13 31:8,18
32:1,3,12
65:19,22,25
66:3,9,14 67:1
68:8 69:12
82:12,18 88:15,
24 90:9 91:7,
11,21 92:1

93:3,10,17
99:12,18
100:19 104:13
117:23 135:6
201:24 220:4
227:4,9,17
228:23

**Rivera's**
227:11

**road** 225:5

**role** 38:23 39:4,
16 40:15 41:1
271:16 272:13,
15,17,21,25

**roles** 10:20
41:2

**room** 182:9,18
188:6

**Rosa** 156:6,13
167:4,10,14,24
173:21 174:15
175:3,14 178:7
181:12 182:8,
11 183:9
186:19,25

**Rosauro**
161:24

**routine** 270:7

**routinely**
217:19

**rows** 87:8

**rules** 11:1
53:24

**running**
254:15 258:1

**Rutherford**
8:13

---

**S**

---

**sadly** 208:19

**safe** 139:18

**sanctioned**
49:11

**save** 159:2

**saved** 235:20

**scenario**
129:23 139:6,
13,15 144:16
210:13 211:12

**scene** 115:20
116:19 177:21
216:17

**Schalka** 8:8
273:24 274:7
275:1,3,5

**school** 39:7

**screen** 35:11,
13 36:19 63:6
64:4,20 71:19
121:1 158:11
259:24

**scrolling**
68:21

**searches**
190:23

**seat** 262:6

**sec** 120:25
158:14

**seconds**
158:11

**section** 68:12
72:18 76:3
79:10 81:21
82:2 121:20,21
122:15,24
123:14 237:21
247:12,13
252:14 258:21
260:11,15

**seeking**
214:12

**self-audit**
151:11

**seminars** 47:1

**send** 97:25
98:4 137:14
206:8,14
207:24 257:21
258:15 274:8,
10

**sending** 49:24
100:2 207:23
219:5 258:4



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 99 of 104 PageID #:66036
The Deposition of BERNARD MURRAY - VOLUME 2, taken February 17, 2021

303

senior 47:1,16

sense 34:4 37:24

sentence 249:5 250:4 251:7,13 252:2, 19 253:8 254:9

separate 54:10 61:6 85:18,20 251:4

September 16:10

sergeant 134:3 135:21

series 72:2 248:14

serve 13:22 55:14

served 12:25 13:9,16

service 97:18, 22 98:7 99:5

serving 10:2 13:19 42:6 126:19

session 11:3

set 31:23 34:7 59:23 66:13 68:25 91:23 102:3,7,23

sets 52:10 93:9

setting 270:1

shape 152:21

share 166:3

shared 125:3 167:25 171:11, 15,17,21,25 173:1,10 174:1, 5,23

sharing 170:16

sheet 121:22 122:5,6,20,25 123:1,24 124:9 125:2 150:21 168:23

Sheriff's 40:3, 10

shift 186:7

shooters 200:3

short 49:6

shorter 66:9

show 35:3 37:13 118:7,11 224:10,14

showing 36:16 37:16 64:20 67:23 121:4,5 200:18 236:24

shown 171:2,3

shows 254:17 256:5

sic 8:23 198:22

side 53:7 56:14,18 267:2

signature 36:20 65:9 66:2

signed 35:18, 22 37:17 135:21

significance 124:4 144:22 179:2

significant 76:24 119:12 122:12 138:25 223:23 227:3

significantly 209:12

signs 274:13

similar 88:14 91:15 236:3 270:8

similarly 32:15

simply 183:22 184:5 186:23

single 184:20 223:15

sir 9:5,20 12:20 15:11 36:20

37:25 63:9 71:22 85:6 88:13 115:7 169:17 227:6 238:5 244:2 245:12 263:19 268:4

sister 249:22 250:7,15 251:8 253:20

sit 222:22

sitting 136:13 226:22,23

situation 18:11,13 45:4 144:19 209:20

situations 230:12

slow 80:14,15

slower 80:12 209:12

smaller 66:13

Solache 7:13, 24 9:2 13:17 154:7 161:23 168:15 188:12

Solache-reyes 83:19 154:25 182:3

solemnly 9:6

solution 110:18 114:6, 25

solve 110:16 111:17

solved 109:23 112:14 113:16, 25

Somebody's 18:22

something's 148:7

sort 28:16 33:18 64:10 84:15 116:1 128:3 129:1 149:5 211:10

257:4

sorts 130:8

Soto 74:24 75:17 76:1,23 77:10,25 78:4, 21 154:3,16 155:10,19 156:6,12,21 159:19 160:8, 17 163:8 167:4, 10,14,24 169:4, 17,18 171:10 173:21 174:14 175:2,14,16 176:3,17 178:7, 22,24 181:12 186:14,19,24 231:14 237:5,8 238:4 242:25 246:9

Soto's 181:4

sought 214:3

sound 33:19 156:4

sounds 23:7 30:18,19 42:8,9 67:17,18 118:15 149:5 156:5

sources 47:2

speaking 216:12 268:23

special 22:15, 20 41:11 44:3, 21 45:5 87:15 95:11,16 96:1, 12,20,24 99:10 104:8,11 105:2, 9,11,13,15,18, 21 106:3,11,17, 19,22 107:2,5 109:23 110:6, 15 111:6 112:4, 6 113:2 114:5, 15,20,25 115:8 121:6,25 146:19 234:23 235:24 236:5 267:17

specific 68:24

85:17 87:9 112:2 129:12 148:23 151:22 178:6 194:4,13 216:22 217:12 218:16 219:3 224:6 225:17

specifically 41:8 45:22 55:19 79:9 106:25 107:16 112:25 113:1 160:18 165:21 168:3 194:1 198:1 201:5 227:25 249:21 250:4

speculating 186:16

speculation 18:6 19:15 59:9,19 60:14 61:9 62:18 266:12

speculative 139:15

spell 9:15

spend 20:21 22:12,19 31:6 68:23 77:9 86:17 87:7 90:23

spent 23:4,13, 15,22 29:5,9 39:10 40:5 93:24 175:12

spoken 270:6

spot 151:9,16 152:11 246:25

spreadsheet 86:8

staff 98:20

staffed 99:5

stage 13:6

stake 196:12

stand 24:20 25:11 26:20 28:10 89:20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-03029 Document #: 511-66 Filed: 03/15/24 Page 100 of 104 PageID #:66037
The Deposition of BERNARD MORRILL, VOLUME II, taken on February 04, 2021

304

standards
91:16 94:19
114:21,22

standing
234:21 235:9,
23 236:5

Stankus 8:13

start 9:19
126:13 130:5
136:4 158:4
164:8 196:7
209:24

started 10:17
84:11

starting 7:18
71:2,6 182:2
270:18

state 7:17 8:18
9:15 38:2 40:15
45:14 98:2,5
99:25 151:20
152:5 193:18
239:10 240:24
257:22 258:24

state's 10:12
14:18 15:13
38:5,6,7 39:11,
15 40:2,6,20
41:1,9,13,17
42:2,13 44:14,
20 53:16 55:15,
16 62:23 72:4,
12 73:11,16
74:6,10,14,19
78:12 79:3 80:1
81:12,18 96:7,
25 97:17,21
117:2 123:19
124:23 148:14,
22 149:12,20
150:3 157:21
159:18,22
162:25 164:10
191:7,20,25
192:14,25
193:1,5,18
195:7 204:9,18
230:14 237:12
238:12,23
239:13,16
241:14 242:20
243:5 246:16

stated 213:21
246:6

statement
134:22,23
180:13 188:11,
14,17 189:21
190:2 250:14

statements
200:2

stating 82:7

station 179:23
180:17 182:5
185:13,21
187:13

stay 247:21
275:14

stayed 17:11

step 60:20
70:20 160:6

stepped 34:9

steps 47:11
51:23 52:4
142:17 143:11
154:21

stipulate 8:22

stipulated
8:24 9:1

stopped
242:25 245:23

storage 59:12,
15 60:7,9 61:2,
23 62:8 206:9,
25 207:15
208:8 209:4,6,8
210:14 211:5
213:15 214:15
216:7 219:3,5

stored 169:13
171:17 172:6
222:23 257:13,
19 258:4,14,18,
20 259:4,13

storing 171:7

strategy 54:3

street 7:7
42:22,24 43:3,
7,11,23 44:2,10

111:12,24
113:7 132:9
200:19 220:21
253:11 257:25
258:1

stressed 98:4

strike 13:14
17:2,13 20:2
21:2 22:13
24:11 25:3,17
26:11 28:1
30:6,8 37:10
45:3 50:10 53:6
55:8,13,15
59:14 63:12
64:19 66:1
74:17 76:5 83:8
84:16 85:15
86:2 93:21,22
96:8 98:24
102:24 104:4
106:2,11
110:14 112:25
113:23 115:15
117:8 119:18
120:9,10 121:1
122:19 124:8
125:2 126:25
127:21 130:20
131:22 133:17
136:3 143:10
146:11,12,13
147:7 150:11
164:21 169:16
171:8,9 174:13
177:6,9 181:9
183:1,3 191:7
203:22 212:22
216:2 219:15
221:4,16
226:14,23
229:6 235:2,5
239:12 240:7
243:3 248:10
250:21 251:16
267:7

strong 202:14

struck 246:9,
19

struggle 33:18

studies 101:2,
7,8 192:25

study 106:2
107:5,18
190:14 195:15
197:2 228:9

style 258:9

subject 75:21
90:4 123:13,19
154:7 209:9
231:14,19
254:16

subjected
183:23

submit 98:10
131:12 146:7
182:21

submitted
16:13,16 65:14,
19 132:13
134:1 135:22
136:12,15
137:16 234:16

subpoena
49:16,17 97:18,
22 98:7,14,17,
21,23 99:1,5,15
100:2,3,11
134:6 148:25
151:24 258:10
261:9 270:23
272:8

subpoenaing
117:5

subpoenas
47:8 48:9 49:23
50:19 98:1,11
99:22,25 132:6
133:3 147:15
240:13 257:20,
22 258:5,15,24
261:11 262:15
263:3 270:7,8,
12

subsequent
36:5

subsequently
65:18 256:10

subset 67:2
83:9

subsets 85:22

substantial
227:16

successful
114:10 218:21

suffice 10:22
195:24

sufficient
70:19

sufficiently
112:7

suggested
129:12 185:25

Suite 7:7

summarized
45:12

summarizes
260:15

summary
72:17

supervise
55:16

supervising
62:12

supervisor
55:14,21 62:23

supervisory
10:20 272:15

supp 135:21

supplement
142:13

supplemental
128:9 134:2,3
139:1 142:6
143:24 182:24
199:12 202:24

supplementar
y 128:6 138:22
139:23 140:4
141:5,8,12
143:11,21
144:7,17,23
145:7,15 146:9
155:11 182:2
248:15,16

suppose
254:13



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**supposed**
34:7 120:17
125:2

**supps** 203:2

**surprise**
185:11 223:11
227:18

**surrounding**
199:14

**Susler** 7:23 9:1
273:21 274:20,
22

**suspect**
178:14 180:6
184:18 186:21
187:21 188:18
189:4,9,19,23
207:9

**suspects**
161:22 162:3,6
178:9,20 179:6,
10,16 180:12
181:1,13
199:19 200:10,
11

**Swaminathan**
7:20,21 8:1,4,
24 9:13 14:3,
13,21 15:1,7
17:12,24 18:7,
16,19,22 19:9,
17,25 20:17
24:10 26:10,19,
24 27:19,25
28:7,14,22,25
29:3 30:16
31:11,24 33:14,
17 34:4,8,12,
15,19 35:2,9
36:13,15 39:25
41:22 42:4
44:7,15,24
45:10 46:6,15
50:4,25 54:16,
19,20 56:12
57:4 58:24
59:13 60:1,18
61:20 62:1,4,5,
21 66:25 67:11
68:5 71:25
73:13 75:5,7,13
77:3,15,23

79:20 80:10,14,
18 83:4 84:10
85:8 86:19
87:20 88:2,6,
12,19 89:25
90:16 91:3,18
92:25 93:7,14,
20 95:12,23
96:18 97:15
100:17 101:18
103:11 104:22
106:7 107:17
108:8 110:3,11
111:2,14 112:1,
12,19 113:14,
21 114:4 115:6,
13,25 117:22
118:10 119:4,
17 121:10
122:17 124:6,
19 126:10
128:4,12 130:2,
19 131:3,21
134:16 135:4,
25 136:24
137:7,9,12,21
138:3,13,19
140:19 142:7
143:7 144:3,14
145:18 146:10,
25 147:6,9,21
148:13,21
149:9,19 150:2,
10 151:1,19
152:9,12,15
153:4,11,12
154:1 155:2
157:13 158:10
159:5 160:10
161:10 162:4,
14,22 163:5,15
164:7,16,24
165:7,12 166:2,
15 167:22
168:12 169:1,9
170:5,9,12,14,
25 171:19
172:8,18,23
173:7,20 174:2
175:10 176:1,
11 177:1,8,24
180:8 181:7,21
182:25 183:20
184:4,23
185:10,18
186:17 187:4,

10 188:2,9
189:7,24
190:12,20
191:16,17
192:3,5,16
193:16 194:15,
24 195:10
196:5,17
197:12 198:18
199:16,24
201:7,14,25
202:18 203:10,
19 204:6,15
205:8,11,13
206:5,16
207:13 208:6
209:1,13,23
210:2,6,10,11
211:20 212:20
213:12 214:6
215:2,12,25
217:9 218:5,14,
25 219:13,23
221:2,15,23
222:6,16,24
223:25 224:13
225:20 226:21
228:3,11 229:4,
17 230:3,22
231:9 232:8,21
233:9,19 234:4,
18 235:7,15,18
243:1,17 244:1,
11,15,20
245:11,25
246:22 247:1,8
252:13 253:4
254:5 256:18
262:4,17 263:8,
20 264:5,19
265:2,3,7,8,13,
23 266:7,17,25
268:5,14,18
269:16 270:13,
16 271:1,10
272:12 273:2,8,
16 274:14,16,
19 275:11

**swear** 9:6

**switch** 33:20

**system** 33:24
34:7

**systemic**
88:21,25 89:5

92:7 195:2,13,
16,19 196:8
227:20

---

**T**

**taking** 12:20
47:11 62:25
63:2 139:22
185:25 186:20
234:1

**talk** 54:5 90:14
175:11 178:5
247:23

**talked** 109:21
169:23 186:5
248:3

**talking** 14:15
54:6 55:7,8
142:19 156:6
165:10 175:12
191:25 192:1
205:12 211:3

**talks** 249:17

**tandem** 139:11
142:13 262:24

**task** 270:22

**taught** 94:10,
13

**technician** 7:5

**tediousness**
28:16

**telling** 47:2,4
169:25 172:4

**ten** 79:5 81:11
140:14,15

**tender** 43:1
53:11,24 58:2
136:22 194:9,
19,20 196:20
215:3 229:13,
14 251:21
252:1

**tendered**
76:18 82:15
83:11,22 87:2
163:25 192:20
199:15,17

205:4,7,21
221:1 242:15
248:20 250:2
252:17,18,20
255:21 256:12

**tendering**
56:17 197:5

**term** 99:23

**terminology**
224:16

**terms** 33:12
53:2 56:20
57:18 85:14
93:21 98:13
126:25 136:25
241:13

**Terry** 249:19
250:7,10,11,18
251:3 252:11
253:14,17
255:1

**testified** 28:17
30:10 135:5
157:6 200:15

**testifying** 46:7
224:1

**testimony** 9:7
17:1 24:1,5,12,
24 25:2,4,8,11,
15,18 26:1,5,20
27:1,4,9,11,13,
20,22 28:2,10,
20 30:23 41:21
45:21 46:14
49:21 50:15
95:9 104:19
108:17 109:16
111:20 114:13
117:23 118:7,
15 119:1,8
122:10 140:1
141:23 168:13
172:3 173:14
182:8,11 183:2,
3 185:23 195:5
204:20 206:11
207:18 209:17
212:16 223:14,
19 224:4,6,8
228:14 248:17
249:24 253:22
254:2 261:23



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

testing 115:22

that'd 88:5

there'd 128:3
133:18 211:9

there'll 11:16

Theresa 7:25
8:1,15 28:23
33:19 34:9 91:1
177:14

thing 14:24
31:20 33:2
47:25 121:5
130:10 134:17
208:17 235:3

things 47:16,
21 48:5,15,24
49:16 51:6,18
54:1 82:1 99:10
100:4 116:19
138:24 151:10
154:19 169:3
184:9 199:18
258:12

Thirteen 79:14

thought 11:12
16:2 27:15
38:18 134:7
141:10,15

throw 60:2
215:13

tiderington
22:1,15 69:20,
23 83:7 84:23
85:12 86:21
154:15 155:25
156:11 159:17
162:17,24
163:7,16
178:12 235:2,3,
9,22 249:4

Tiderington's
21:17 84:22
86:3 154:10
259:16 264:21
265:14 267:2

time 7:9 10:14
11:9 12:8 15:3

20:8 23:1,9
34:22 35:1
39:21 40:6,25
41:15,17,18
42:5 45:2,9
46:17 47:6
48:18 49:7
61:21 62:12
64:13 68:23
74:13 77:9
86:17 87:7
88:8,11 96:6,24
97:3,16,25 98:3
109:5 117:14,
18 118:2,3
119:6,15,20
126:8 127:7
128:25 132:18,
19,21,25
134:10,11
141:8 153:7,10
159:25 164:4
175:12 184:2,
21 192:6
193:17 195:7
199:23 200:1
201:2 205:23
211:4,22,24
212:5,13,25
213:1,6 223:9
236:14 242:14,
17 245:1
246:12 247:4,7
251:9 253:18
256:2,16 263:5
273:12,15
275:15

time- 32:8

timely 48:19
50:21

times 11:15,17
30:13 31:2,3,7
135:7,13
136:19 144:20
166:7 168:4
194:5 208:18
209:3 211:14
223:6 245:22
246:7

timing 130:10
133:25 134:4,5,
7 135:19
136:21 147:18
263:2

title 116:9,10

to-date 38:19

to/from 236:6

today 7:5,8
12:18,22 122:4
136:13,19
153:17 157:7
201:4 226:22,
23 244:24
245:7 246:8

today's 20:22
21:3,22 22:5

told 53:18
212:23,25

top 73:7 81:24
105:23 121:7
123:15 242:24

topic 97:3
225:24

topics 234:19

total 20:1,3
23:12 29:15
30:25 31:1,2
32:3 37:11,16
67:2 70:21 83:9
121:14 138:18

totaled 16:18
20:13

totally 254:19

train 152:5

trained 47:25
48:6 131:11

training 47:14
95:1,4 98:25
99:4,6 102:12
152:8

trainings
151:21

transcript
24:7,16,21
274:15,21,24
275:4

transcripts
108:13 109:13

trash 217:6

trashed 217:8

treated 178:9,
25 180:12
181:12 187:21
188:6,18 189:4,
8,19,22,23

Trevino 8:14

trial 10:18
24:24 25:2,5,8,
12,15,18 27:1,
14,21 28:2,4,
11,17,20,22
30:10 46:5
49:6,7,13
58:16,17,22
59:2,4,5,25
61:19,23 62:7,
20,24 77:6
78:15 115:23
117:23 119:13
122:14 158:22
159:23 160:1,4,
22 166:1,10
168:9 170:3,20,
24 173:19
174:7 177:23
193:13 199:13,
23 200:1,16
201:2 205:19,
25 206:6,23
207:8 208:20
210:14 214:12,
19 215:20
216:23 217:21
218:9,16 226:9
242:14,18
246:12 263:6
264:16 272:23

trials 10:21
113:13 218:4
271:4

true 155:15
176:12 179:7
190:15 199:13,
22 202:6
215:23 260:23

trust 29:1
146:14 147:2,
11,15,16
263:11 264:4,8

trusting
148:12

trashed 217:8

truth 9:8,9

truthfully
12:18,22

turn 56:22
135:9,16 199:7
204:20 222:1
237:3 247:9
248:19 253:24
264:3

turned 169:11
199:12 220:20

turning 48:16
51:18

turns 189:21

two-page
71:20 72:17

type 42:24
57:20,21
127:21 152:8

typed 141:17,
19 144:23,25
146:8,16
148:11 275:12

types 116:19
127:3,13,17,20
129:5,10
236:15

typical 117:25
125:16

typically 61:22
116:2 127:4,14
129:5

———— U ————

U.S. 7:15

uh-huhs 11:23

ultimate 226:8

ultimately 83:5
93:1 107:18
115:7 142:8
144:5,12
146:11,13
147:10,22
198:7 201:8
236:13 249:24
263:10


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

unclear 102:22

unconstitutional 226:16,25 227:14

uncovered 169:13

underlying 75:21 79:16 91:23 93:9 110:6,10 154:16 228:24 231:23

understand 12:1,13,17,21 20:13 23:12 27:6 44:6 48:4 52:2 57:3 70:6 75:17,18 76:25 77:11 79:22 82:21 85:7 91:22 96:15,16 103:9 116:22, 25 131:5 137:19 148:19 152:4 164:8 173:15 186:7 187:12 188:10 190:1,4 192:13 200:5 206:3 207:5 209:22 210:5 221:17 229:18 236:2 248:17 253:2 264:22 266:19, 20

understanding 15:25 83:24 111:4,9 184:3 188:13 200:7 221:25 222:2 252:25 254:7, 21

understood 12:5 79:21 82:6,11 83:20 90:17 112:24 155:24 256:20

unit 49:17 97:18,23 99:5 261:9

units 261:10

universe 205:6

unrelated 214:13

unusual 246:15

up- 38:18

upstairs 251:12

utilize 219:9

utilized 158:1

---

**V**

vague 251:14 252:4 253:8

variation 178:15

Velez 268:12

venture 13:8

veracity 92:18, 23

verdicts 228:10,24

verification 147:23

verify 147:15, 20 186:4 242:11,16

version 91:5,6, 8

versus 242:2

victim 249:23 250:13

video 7:4 19:3 128:24 134:22 274:19

videoconference 7:10

view 84:5 159:25 173:5 178:19 182:7

viewed 79:14 174:6

vigorous 196:14,18

violation 192:7 193:21 197:16, 21 227:11

violations 190:8,14,19,22, 24 191:4,9,14, 22 194:17 195:2,9,13,16, 19 196:6,13 197:3,10,19 198:4,9,15 220:18 234:8

voice 15:6

vote 228:10

voted 228:10, 20

vouch 173:9

---

**W**

wait 253:1

waiting 130:12

waive 274:3,5

wander 116:16

wanted 48:25 49:12 246:2 248:1 252:23 254:6 256:19 257:24

warehouse 59:12 206:15, 22 207:25 208:1 215:24 216:11,15,16, 21 217:5,11,18, 22 218:2,8,13, 15,19 219:2,8, 12

warehouses 216:16

warrant 210:19

Washington 8:7

waste 64:13

ways 48:10 50:5 255:22

weapon 157:8

week 20:23

weekend 38:19 122:4

weighs 268:25

Wentworth 259:10

West 7:6

whipped 250:13

whipping 249:22

whittle 240:10

wholly 81:2 143:2 205:5,20 223:6,7,16,21 224:2,24 225:6, 14 226:1,2

wide 151:13

withdraw 14:2

withheld 43:8 225:2 232:14 233:11

withholding 227:15 232:2

witnesses 10:23 140:22 153:20 154:3 180:16,23 200:2 213:23, 25 255:20

women 254:17

word 66:22 67:8 92:23 147:14 170:21 184:15 251:1

worded 183:15

words 17:18 25:25 31:1 32:8 38:8 48:10,23 57:5 60:20 64:18 85:9 93:8 94:9 125:1 129:9,16 138:4

140:20 194:3 230:4 232:9

work 14:5,11 15:15,20 16:1 17:4,8,14,18, 19,20,25 18:2,4 25:19 33:8,21 39:20 40:1,5,18 41:19 42:12 50:11 53:22,25 54:1,6,11,22,25 55:7,8 86:2 87:21 90:12 94:10 96:10 99:11,17 100:8, 18 101:1,5,9,19 104:13 143:14 188:4 190:6 191:2 195:11 198:2,11 221:24 228:5 231:5 235:1 271:15,24

worked 16:19 20:3 38:2,4 40:14 41:17 61:7,10 207:1 216:4 271:18

working 16:24 39:11 40:6,25 41:12 44:13,20 45:14 46:25 56:6 61:21 93:25 96:6,24 97:16,20 192:14

works 15:8

worthy 38:16

would've 17:11 78:18 108:24 143:5, 25 188:20 196:4 205:6,21

wrap 270:17

wrapped 247:20

write 11:22 144:6,25

writing 30:22 94:23 95:3



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

308

109:5

**written** 53:17
97:18,22 125:7
267:16,19,21
269:25

**wrong** 121:4
123:14

**wrote** 86:23
237:17 261:2

_____
**X**
_____

**Xerox** 158:23
159:21 160:2
164:5

**Xeroxed** 100:3
252:5 254:12

**Xeroxes** 164:4

**Xeroxing**
157:10

_____
**Y**
_____

**year** 38:3 200:8

**years** 95:20
198:3 205:17,
18 208:23
224:9 268:22

**yesterday**
21:24

**you-all** 133:7
142:9

**young** 47:4

_____
**Z**
_____

**Zoom** 7:22,24

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com