# Exhibit OOO

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| GERALDO IGLESIAS, | ) | |
| | ) | Case No. 19-cv-6508 |
| *Plaintiff*, | ) | |
| | ) | Judge Franklin U. Valderrama |
| *v.* | ) | |
| | ) | Magistrate Judge Maria Valdez |
| REYNALDO GUEVARA, the ESTATE of | ) | |
| ERNEST HALVERSON, STEVE GAWRYS, | ) | |
| ANTHONY RICCIO, ROBERT BIEBEL, | ) | |
| and the CITY OF CHICAGO | ) | |
| | ) | JURY TRIAL DEMANDED |
| *Defendants*. | ) | |

# EXHIBIT 42

## Defendants' Combined Post-Trial Motion in *Fields*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATHSON E. FIELDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10 C 1168 |
| | ) | |
| CITY OF CHICAGO; former and current | ) | Judge Matthew F. Kennelly |
| Chicago Police Officers DAVID | ) | |
| O'CALLAGHAN, and JOSEPH MURPHY, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>DEFENDANTS' COMBINED POST-TRIAL MOTIONS</u>

Terrence M. Burns
Paul A. Michalik
Daniel M. Noland
Dykema Gossett PLLC
10 S. Wacker Dr., Suite 2300
Chicago, IL 60606
(312) 876-1100
(312) 627-2302 (fax)

Shelly B. Kulwin
Rachel A. Katz
Kulwin, Masciopinto & Kulwin, LLP
161 N. Clark St., Suite 2500
Chicago, IL 60601
(312) 641-0300
(312) 855-0350 (fax)

# TABLE OF CONTENTS

**Page**

I.    Plaintiff Failed to Prove His Due Process Claim with Respect to the 1986 Trial. ............. 1

    *Hammond Group., Ltd. v. Spalding & Evenflo Cos.*,
        69 F.3d 845 (7th Cir. 1995) ...........................................................................1

    *Newsome v. McCabe*,
        256 F.3d 747 (7th Cir. 2001) ....................................................................1, 2

    *Ienco v. City of Chicago*,
        286 F.3d 994 (7th Cir. 2002) .........................................................................1

    *Whitlock v. Brueggemann*,
        682 F.3d 567 (7th Cir. 2012) .........................................................................1

    *Brady v. Maryland*,
        373 U.S. 83 (1963)..........................................................................................1

    *Kyles v. Whitley*,
        514 U.S. 419 (1995)........................................................................................2

II.    Plaintiff Failed to Prove His Due Process Claim with Respect to the 1986 Trial. ............. 4

    *Carvajal v. Dominguez*,
        542 F.3d 561 (7th Cir. 2008) .........................................................................4

    *Bielanski v. Cty of Kane*,
        550 F.3d 632 (7th Cir. 2008) .........................................................................4

    *Mosley v. City of Chicago*,
        614 F.3d 391 (7th Cir. 2010) .........................................................................4

    *Armstrong v. Daily*,
        786 F.3d 529 (7th Cir. 2015) .........................................................................4

    *Benet v. Schwartz*,
        No. 93 C 7295, 1995 U.S. Dist. LEXIS 3273 (N.D. Ill. Mar. 9, 1995) ........................5

III.    Defendants' Motion Should Also be Granted Because Murphy and O'Callaghan
    Didn't Possess or Create the Working File And Because There Was No Due Process
    Violation in Connection with Plaintiff's Lineup or Murphy's May 14, 1985 GPR. .......... 6

    *United States v. Shields*,
        789 F.3d 733 (7th Cir. 2015) .........................................................................7

i

*Carvajal v. Dominguez*,
    542 F.3d 561 (7th Cir. 2008) ........................................................................7

*Harris v. Kuba*,
    486 F.3d 1010 (7th Cir. 2007) ......................................................................7

*United States v. Lee*,
    399 F.3d 864 (7th Cir. 2005) ........................................................................7

*Sornberger v. City of Knoxville*,
    434 F.3d 1006 (7th Cir. 2006) ......................................................................7

IV.    Plaintiff Failed to Prove His IIED Claim Against O'Callaghan. ....................................... 8

*Feltmeier v. Feltmeier*,
    207 Ill. 2d 263 (2003) ..................................................................................8

*Cooney v. Casaday*,
    746 F.Supp.2d 973 (N.D. Ill. 2010) ............................................................8

V.    There Was No Legally Sufficient Evidentiary Basis to Support the Jury's Verdict on the *Monell* Claim .............................................................................................................. 9

    A.    The City Does Not Have an Express Policy of Withholding Investigative Materials. .............................................................................................................. 10

    B.    Plaintiff Failed to Prove a Widespread Practice of Underproduction, and Certainly Not One That Violated Plaintiff's Constitutional Rights. ..................... 11

    C.    Plaintiff Failed to Prove His Constitutional Rights Were Violated by a Person With Final Policymaking Authority ......................................................................... 15

    D.    Plaintiff Failed to Prove Municipal Liability Based on the Alleged Failure to Train and/or Supervise. ..................................................................................... 16

        *Thompson v. Boggs*,
            33 F.3d 847 (7th Cir. 1994) ..................................................................10

        *Bd. of County Comm. of Bryan County, Oklahoma v. Brown*,
            520 U.S. 397 (1997) ....................................................................10, 11

        *City of Canton v. Harris*,
            489 U.S. 378 (1989) ....................................................................10, 17

        *McTigue v. City of Chicago*,
            60 F.3d 381 (7th Cir. 1995) ..................................................................10

        *McNabola v. CTA*,
            10 F.3d 501 (7th Cir. 1993) ............................................................11, 17

*Sims v. Mulcahy*,
902 F.2d 524 (7th Cir. 1990) ........................................................................11

*Monell v. Dep't of Social Services*,
436 U.S. 658 (1978)................................................................................11, 17

*Okla. City v. Tuttle*,
471 U.S. 808 (1985)................................................................................11, 12

*Connick v. Thompson*,
563 U.S. 51 (2011)........................................................................................11

*Estate of Novack v. County of Wood*,
226 F.3d 525 (7th Cir. 2000) ................................................................11, 12

*U.S. v. Agurs*,
427 U.S. 97 (1976)........................................................................................12

*Kyles v. Whitley*,
514 U.S. 419 (1995)......................................................................................12

*Whitaker v. Miami-Dade County*,
126 F. Supp. 3d 1313 (S.D. Fla. 2015) ........................................................12

*Porter v. Whitehall Laboratories, Inc.*,
9 F.3d 607 (7th Cir. 1993) ...........................................................................15

*Craft v. Flagg*,
2010 U.S. Dist. LEXIS 132982 (N.D. Ill. Dec. 13, 2010) ..............................16

*Mejia v. Cook County*,
650 F.3d 631 (7th Cir. 2011) ........................................................................17

I.  The Jury's Verdict on the *Monell* Claim was Against the Manifest Weight of the
Evidence.................................................................................................................. 18

*Monell v. Dep't of Social Services*,
436 U.S. 658 (1978)..........................................................................18, 19, 20

*Harris v. Kuba*,
486 F.3d 1010 (7th Cir. 2007) .....................................................................20

II. The Court's Rulings Regarding *Jones/Palmer* Severely Prejudiced the City. ................. 22

*Monell v. Dep't of Social Services*,
436 U.S. 658 (1978)................................................................................22, 24

*Palmer v. City of Chicago*,
806 F.2d 1316 (7th Cir. 1986) ...........................................................22, 23, 24

iii

*Shick v. Ill. Dep't of Human Servs.*,
307 F.3d 605 (7th Cir.2002) ........................................................................24

*Cerabio LLC v. Wright Med. Tech.*,
410 F.3d 981 (7th Cir.2005) ....................................................................24, 25

*Thompson v. City of Chi.*,
722 F.3d 963 (7th Cir.2013) ........................................................................25

*Whitlock v. Brueggemann*,
682 F.3d 567 (7th Cir. 2012) ......................................................................25

*Walden v. City*,
846 F. Supp. 2d 963 (N.D. Ill. 2012) ..........................................................25

*Frymire-Brinati v. KPMG Peat Marwick*,
2 F.3d 183 (7th Cir. 1993) ..........................................................................25

*U.S. v. Mendoza-Prado*,
314 F.3d 1099 (9th Cir. 2002) ....................................................................26

I.      The Wiretaps. .................................................................................................. 27

    A.      The Orders from Jeff Fort are Not Hearsay under Rule 801(a). ........................... 29

    B.      The Wiretaps Were Admissible Because Plaintiff Was a Co-Conspirator. ........... 30

    C.      The Wiretaps Are Also Admissible Under the Residual Hearsay Exception. ....... 32

    *U.S. v. White*,
    639 F.3d 331 (7th Cir.2011) ........................................................................29

    *Ruhl v. Hardy*,
    743 F.3d 1083 (7th Cir.2014) ................................................................29, 30

    *U.S. v. Bellomo*,
    176 F.3d 580 (2d Cir.1999) ..........................................................................29

    *U.S. v. Murphy*,
    193 F.3d 1 (1st Cir.1999) ..............................................................................30

    *Smith v. Bray*,
    681 F.3d 888 (7th Cir.2012) ........................................................................30

    *U.S. v. Williams*,
    44 F.3d 614 (7th Cir.1995) ..........................................................................30

    *Bourjaily v. U.S.*,
    483 U.S. 171 (1987) ....................................................................................30

        *U.S. v. Lomax*,
            2016 U.S. App. LEXIS 4334 (7th Cir. 2016) ................................................30

        *U.S. v. Redwine*,
            715 F.2d 315 (7th Cir. 1983) ...........................................................................30

        *U.S. v. Bryce*,
            208 F.3d 346 (2d Cir.1999)...............................................................................32

II.     Exclusion of ASA Randy Rueckert Testimony Regarding Plaintiff's Conduct After
        Waiving His Right to a Jury Demonstrating Knowledge of the Bribe. ............................ 32

        *Lipari v. U.S. Bancorp, N.A.*,
            2008 WL 2874374 (D. Kan.2008) ...................................................................34

        *Gustafson v. Am. Family Mutual Ins.. Co.*
            2012 WL 5904048 (D. Colo.2012) ...................................................................34

III.    Excluded Evidence Regarding Plaintiff's Credibility/Guilt. ............................................ 34

        A.      In a BPSN Killing, Fields Murdered Rival Gang Member Larry Watkins in
                    1971, Falsely Claimed the Police Coerced Him Into a Confession, Presented
                    a False Alibi at his Trial, and Continues to Lie About His Actions in that
                    Murder to This Day............................................................................... 35

        B.      Fields' Prison Visitor List And Visit from Accomplice Hank Andrews ............. 36

        C.      The Treddest Murray Incident/Fields April 29, 1985 Arrest. .............................. 37

        D.      Firearms Found at the African Hut on May 18, 1985.......................................... 39

        E.      Per the Wiretaps, Fields Was Complicit in the Bribe. ......................................... 40

        F.      Fields' Colluded to Incite a Riot at Cook County Jail in 2000............................ 40

        G.     Additional Evidence Relating to Fields' Credibility. .......................................... 40

            *Cobige v. City of Chi.*,
                651 F.3d 780 (7th Cir.2011) .......................................................................39

            *U.S. v. Mendoza-Prado*,
               314 F.3d 1099 (9th Cir. 2002) ................................................................39, 41

IV.    El Rukn Evidence. ......................................................................................................... 41

        *Parish v. City of Elkhart*,
            702 F.3d 997 ....................................................................................................46

V.     Plaintiff's 1972 Conviction for his 1971 Murder of Larry Watkins. ............................... 49

VI.    The Denial of Plaintiff's Petition for Certificate of Innocence.......................................... 50

     *Logan v. City of Chi.*,
        09 C 5471, Dkt. 423 (N.D. Ill.2012) (Ex. 62)...................................50, 52, 53

     *U.S. v. Dawson*,
        434 F.3d 956 (7th Cir. 2006) ......................................................................51

     *Kluppelberg v. Burge*,
        84 F. Supp. 3d 741 (N.D. Ill. 2015) ............................................................53

VII.   Cumulative Error as to the Alleged Fabrication of Eyewitness Identifications................ 53

     A.     The Improper Admission of the 2011 Affidavits of Gerald Morris...................... 53

          a.     Denial of Defendants' Motion to Depose Gerald Morris was
               Erroneous ............................................................................ 53

          b.     Denial of Defendants Motions to Bar Morris' 2011 Affidavits was
               Erroneous ............................................................................ 54

     B.     O'Callaghan's Credibility & Court's Improper Instruction Relating to Morris... 55

     C.     Admission of the Vaughn/White Evidence was Unduly Prejudicial Propensity
          Evidence that Should have been Excluded. ......................................................... 55

     D.     The Prejudicial Hallway Jury View. .................................................................... 57

         *Monell v. Dep't of Social Services*,
            436 U.S. 658 (1978)................................................................................54

         *Akrabawi v. Carnes Co.*,
            152 F.3d 688 (7th Cir.1998) ......................................................................54

         *Inaganti v. Columbia Prop. Harrisburg*,
            2010 WL 2471671 (E.D. Pa.2010) ............................................................57

         *Ruelas Aldaba v. Michelin N. Am., Inc.*,
            2005 WL 3560587 (N.D. Cal.2005) ..........................................................57

         *U.S. v. Crochiere*,
            129 F.3d 233 (1st Cir.1997).......................................................................57

VIII.  The *Monell* Evidence Tainted the Whole Trial................................................................ 57

     A.     Bad-Faith Questioning Implying Destruction of Evidence. ................................. 61

     B.     Bad-Faith Questions/Arguments Relating to CPD Reports & Cooperating El
          Rukns. .................................................................................................................. 61

C.      Bad-Faith Questioning Regarding Showing Photographs to Witnesses. .............. 64

D.      Bad-Faith/Misleading Questioning Regarding Photograph of Plaintiff. ............. 65

E.      Improper Questions Intended to Violate/Circumvent Pre-Trial Rulings and Orders. ......................................................................................................... 65

F.      Improper, Inflammatory Statements/Comments Made by Plaintiff's Counsel .... 66

G.      Repeating Questions After Court Sustained Defense Counsel's Objections. ........ 66

H.      Argumentative Questioning. .................................................................. 69

I.      Questions that Assumed Facts Not in Evidence. .................................. 70

J.      Improper Hypotheticals and Using O'Callaghan's Name in Questions. .............. 72

K.      Improper Impeachment. ....................................................................... 73

L.      Improper Closing Arguments. .............................................................. 73

*Monell v. Dep't of Social Services*,
    436 U.S. 658 (1978) ......................................................................57, 58

*Ojeda-Beltran v. Lucio*,
    2008 WL 2782815 (N.D. Ill.2008) (Aspen, J.) ..............................58

*Whiting v. Westray*,
    294 F.3d 943 (7th Cir.2002) ...........................................................58

*Venson v. Altamirano*,
    749 F.3d 641 (7th Cir. 2014) ..........................................................58

*Ty Inc. v. Softbelly's Inc.*,
    353 F.3d 528 (7th Cir. 2003) ....................................................58, 75

*Merix Pharm. Corp. v. Clinical Supplies Mgmt., Inc.*,
    106 F.Supp.3d 927 (N.D. Ill.2015) ................................................58

*Adams Lab., Inc. v. Jacobs Eng. Col, Inc.*,
    761 F2d 1218 (7th Cir.1985) ..........................................................59

*Walden v. City*,
    846 F. Supp. 2d 963 (N.D. Ill. 2012) .......................................59, 60

*Klotz v. Sears, Roebuck & Co.*,
    267 F.2d 53 (7th Cir.1959) .........................................................59, 74

*U.S. v. Riley*,
  621 F.3d 312 (3d Cir.2010)...................................................................59

*Taylor v. Amtrak*,
  920 F.2d 1372 (7th Cir.1990) ........................................................73

*Kiefler v. L.V. Hacienda, Inc.*,
  404 F.2d 1163 (7th Cir.1969) ........................................................73

*Probus v. K-Mart, Inc.*,
  794 F.2d 1207 (7th Cir.1986) ........................................................74

*Cerabio LLC v. Wright Med. Tech.*,
  410 F.3d 981 (7th Cir.2005) ..........................................................75

*Frymire-Brinati v. KPMG Peat Marwick*,
  2 F.3d 183 (7th Cir. 1993) .............................................................75

## DEFENDANTS' RULE 50(b) RENEWED MOTION

Plaintiff failed to present legally sufficient evidence for the jury to find in his favor on any of his claims. On December 5, 2016, defendants moved for a directed verdict pursuant to Rule 50(a) on all of plaintiff's claims. On December 15, 2016, the jury returned a verdict for plaintiff and against defendants O'Callaghan and Murphy on the due process claim, against O'Callaghan on the intentional infliction of emotional distress ("IIED") claim, against the City on the *Monell* claim, and for defendants on the remaining claims. Judgment was entered on December 16, 2016 while defendants' Rule 50(a) motions were pending. As a result, defendants renew their Rule 50(a) motions for judgment as a matter of law. A judgment can be entered as a matter of law if a party has been fully heard on an issue during a jury trial and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on an issue. The evidence must be viewed in the light most favorable to the non-moving party and the Court must determine whether the evidence is sufficient to sustain a verdict in favor of the non-moving party. *Hammond Group., Ltd. v. Spalding & Evenflo Cos.,* 69 F.3d 845, 848 (7th Cir. 1995).

## I. Plaintiff Failed to Prove His Due Process Claim with Respect to the 1986 Trial.

Defendants are entitled to judgment as a matter of law on the due process and *Monell* claims with respect to the 1986 trial because plaintiff presented no evidence to support his claim that any allegedly withheld or fabricated evidence was material to the outcome of that trial.[1] A plaintiff may bring a §1983 claim based on the denial of a fair trial where material exculpatory or impeachment evidence has been withheld in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

---

[1] Defendants maintain that a due process claim based on the fabrication of evidence is not a viable cause of action in this Circuit. Where a state remedy for malicious prosecution exists, as it does in Illinois, a plaintiff cannot sustain a denial of a fair trial claim absent a *Brady* violation. *Newsome v. McCabe*, 256 F.3d 747, 750-51 (7th Cir. 2001); *see also Ienco v. City of Chicago*, 286 F.3d 994, 998 (7th Cir. 2002). *But see Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012). Given the Court's prior rulings, the remainder of this motion assumes the viability of such a claim.

*Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001). "Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995).

Plaintiff's 1986 criminal trial was undisputedly corrupted due to the attempted bribe of Judge Maloney by the El Rukns and William Swano. The uncontested evidence established Maloney was not an arbiter of the facts at all, but was instead acting only in his own self-interest. Maloney returned the bribe money and found plaintiff guilty in an effort to protect himself because he believed the FBI suspected him of fixing cases. Plaintiff presented no evidence that Maloney had any other motivation or would have ruled in a manner inconsistent with his self-interest regardless of the evidence. Thus, there was no reasonable likelihood that Maloney would have found plaintiff not guilty if the subject file had been produced, or if the allegedly fabricated evidence had not been presented. Plaintiff simply could not and did not prove the materiality element of his due process claim with respect to the 1986 trial.

In its ruling on summary judgment, this Court left open the possibility Maloney based his decision to return the bribe and convict plaintiff on the strength of the State's case. (Dkt. 483 at 10). At trial, however, plaintiff presented no evidence that Maloney returned the bribe for this reason. To the contrary, the only evidence regarding Maloney's motive to return the bribe and convict plaintiff established he did so in an attempt to throw the authorities off his trail because he knew the FBI was watching him. (Ex. 16, 11/16/16 AM Tr. at 72-73, 94-95; Ex. 18, 11/17/16 Tr. at 53-55). And while the Court characterized an argument that Maloney might have kept the bribe and acquitted plaintiff if the prosecution's case was weaker as "a rather unpalatable backdrop for a due process claim" (Dkt. 483 at 10), plaintiff presented no evidence to support

such a theory, either. Indeed, plaintiff himself admitted it was his understanding Maloney gave the money back to protect himself. (Ex. 16, 11/16/16 AM Tr. at 73). Plaintiff also testified to his belief that his 1986 trial was corrupted by a bribe to Maloney and that as a result of that bribe he was denied a fair trial. (*Id*. at 72). Plaintiff specifically acknowledged he made the following admissions in his amended post-conviction petition:

> The initial acceptance of the bribe, its subsequent return, and the judge's knowledge of the FBI investigation created a conflict of interest for Judge Maloney. After he learned of the FBI's suspicions concerning the fix, Judge Maloney had a significant self-interest in finding Fields guilty, since he could then claim the case had never been fixed and could point to the guilty verdict as evidence of this. This conflict of interest denied Fields a fair trial.

> Judge Maloney was not an impartial judge of the facts in this matter by reason of his agreement to take a bribe, his knowledge of the FBI investigation, and his subsequent return of the bribe.

(*Id*. at 94-96). Stainthorp's testimony confirmed that plaintiff was awarded a new trial solely because of the bribe. (Ex. 18, 11/17/16 Tr. at 54-55). Finally, plaintiff introduced no evidence that Maloney's decision to return the bribe and convict plaintiff was based on anything other than Maloney's own self-interest in covering up his illegal conduct.

At summary judgment, the Court also advanced the possibility plaintiff could present evidence suggesting that had the State's case been weaker, the bribe would not have been seen as necessary by Swano. (Dkt. 483 at 10). Plaintiff presented no such evidence at trial. To the contrary, plaintiff testified his attorney, Jack Smeeton, advised him to take a bench trial before Maloney because the prosecution's "case was so weak." (Ex. 15, 11/15/16 PM Tr. at 81-82).

This Court also stated in ruling on summary judgment that plaintiff's proximate cause argument would be stronger if the jury found the bribe was meant to buy only the acquittal of Hawkins and not Fields. (Dkt. 483 at 11). Again, no such evidence was presented at trial. While plaintiff denied knowledge of the bribe, he admitted in a legal brief it was paid for his

benefit, and he did not present any evidence to suggest the bribe was intended only for Hawkins. Plaintiff's brief to the Supreme Court admitted the bribe was for the acquittal of both him and Hawkins. It unequivocally stated: "Former Judge Thomas Maloney accepted a bribe of $10,000 from William Swano, the attorney for Earl Hawkins, to acquit Hawkins and his co-defendant Nathson Fields of murder." (Ex. 16, 11/16/16 AM Tr. at 99). Plaintiff presented no evidence to dispute or rebut this point. And even though plaintiff's attorney improperly argued in closing the bribe may not have been for plaintiff, the other evidence as discussed above demonstrates Maloney returned the money and found plaintiff guilty to cover up his own corruption. There is no evidence suggesting Maloney found Hawkins guilty to cover up the bribe, but separately found plaintiff guilty for some evidence-based reason. Accordingly, defendants are entitled to judgment as a matter of law relating to plaintiff's claim concerning his 1986 trial.

## II. Plaintiff Failed to Prove His Due Process Claim with Respect to the 1986 Trial.

Plaintiff's due process and *Monell* claim pertaining to the 2009 trial cannot succeed because he was acquitted.[2] The acquittal forecloses plaintiff's due process claim based on a *Brady* violation. As the Seventh Circuit stated, "we are doubtful . . . that an acquitted defendant can ever establish the requisite prejudice for a *Brady* violation." *Carvajal v. Dominguez*, 542 F.3d 561, 570 (7th Cir. 2008); s*ee Bielanski v. Cty of Kane*, 550 F.3d 632, 645 (7th Cir. 2008); *Mosley v. City of Chicago*, 614 F.3d 391, 397 (7th Cir. 2010); *Armstrong v. Daily*, 786 F.3d 529, 553-54 (7th Cir. 2015). The *Carvajal* court explained that "[t]he question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." 542 F.3d at 570, *citing Strickler v. Greene*, 527 U.S. 263,

---

[2] Defendants acknowledge the Court ruled on this issue and permitted plaintiff to proceed at trial on a due process claim related to the 2009 conviction, but re-raise it to preserve their objection.

289 (1999). Because the verdict at plaintiff's 2009 trial was "not guilty," he cannot plausibly argue that any favorable evidence, if disclosed, would undermine confidence in the verdict.

Even if the Seventh Circuit decided to recognize this "doubtful" cause of action, plaintiff's claim would fail with respect to the "materiality" element. Using language culled from *Carvajal*, *Bielanski*, and *Mosley*, this Court framed the issue as "whether the plaintiff could show that 'the decision to go to trial would have been altered by the desired disclosure.'" (Dkt. 483 at 13). The jury in this case was instructed that, "With regard to plaintiff's 2009 criminal trial, exculpatory or impeachment evidence, or fabricated evidence, is considered 'material' if there is a reasonable likelihood that it would have altered a reasonable prosecutors' decision to proceed to trial." (Dkt. 1169 at 10). Fatal to his claim, plaintiff did not introduce evidence that a reasonable prosecutor's decision to retry him in 2009 would have been altered by the production of the allegedly withheld *Brady* material.

The only evidence relating to materiality with respect to whether a prosecutor would have dismissed the case before 2009 was presented through ASA Brian Sexton. Sexton testified he reviewed the working file and there was nothing in it that would have altered his decision to proceed to trial in 2009. (Ex. 35, 12/2/16 PM Tr. at 42, 46-47, 54, 73-74). The unrebutted evidence in this case was that the prosecutor or any reasonable prosecutor would have continued the prosecution despite the street file or the allegedly fabricated evidence, of which he was aware. In order to defeat the evidence presented on this issue, plaintiff would, at a minimum, have to prove that Sexton's statement that he would have continued the case was unreasonable. The reasonableness of an attorney's actions within his or her practice entails specialized knowledge that the jury does not have. *See*, *e.g.*, *Benet v. Schwartz*, No. 93 C 7295, 1995 U.S. Dist. LEXIS 3273, at *14 (N.D. Ill. Mar. 9, 1995). Plaintiff would need to prove this proposition

through expert testimony, which he did not do. And Plaintiff did not otherwise present evidence to contradict Sexton's testimony he would have continued the case if he had the working file.

Plaintiff also attempted a "fabricated evidence" component in his due process claim. That claim was based on the alleged manipulation of witnesses Randy Langston, Gerald Morris, and Earl Hawkins. Plaintiff failed to meet his burden to support a finding that any allegedly "fabricated evidence" was withheld and/or material to the prosecutors' decision to proceed to the 2009. To begin, there is no evidence Murphy or O'Callaghan manipulated Hawkins with respect to the 2009 prosecution or that they had any contact with Hawkins for years prior to the 2009 trial. With respect to witnesses Randy Langston and Morris, the evidence established that their recantations, and issues regarding their identification of plaintiff as the perpetrator, were known to prosecutors long before the 2009 trial, either through testimony from the 1986 sentencing hearing or from affidavits. (*See e.g.*, Ex.35, 12/2/16 PM Tr. at 56; 147-48). The prosecutors knew about O'Callaghan's alleged manipulation of these witnesses, and they still decided to proceed to trial in 2009. (*Id*. at 103). In other words, the alleged manipulation/coercion of these witnesses did not alter the prosecutors' decision to proceed to the 2009 trial. The evidence also establishes that prosecutors met with both Randy Langston and Morris prior to presenting them as witnesses in the 2009 trial. (*Id*. at 12, 15, 102-103). As a result, defendants are entitled to judgment as a matter of law relating to plaintiff's due process and *Monell* claim concerning his 2009 trial.

**III.    Defendants' Motion Should Also be Granted Because Murphy and O'Callaghan Didn't Possess or Create the Working File And Because There Was No Due Process Violation in Connection with Plaintiff's Lineup or Murphy's May 14, 1985 GPR.**

No evidence was introduced at trial that Murphy or O'Callaghan ever possessed the working file or that they created any of the documents in the file. O'Callaghan did not become involved in the Smith/Hickman investigation until May 14, 1985 and the file does not contain

documents generated after June 1984. (Ex.37, 12/5/16 PM Tr. at 45-47). As for Murphy, the only document in the file with his name on it is a "request for identification photos" form he signed and returned to the requesting detective. (Ex. 46).

Plaintiff also presented no plausible evidence O'Callaghan manipulated his lineup. First, the 1986 criminal trial testimony of Torrence White, Carlos Willis, Cleveland Ball and Cornell Jefferson, which was read to the jury, does not support plaintiff's position as those witnesses didn't view a lineup of plaintiff or identify plaintiff as one of the perpetrators. Further, no reasonable jury could have found that O'Callaghan was present in the lineup room with plaintiff, picking up plaintiff's sleeve to reveal his tattoo, while Eric Langston, Randy Langston or Morris viewed the lineup. All of the evidence introduced at trial indicated that O'Callaghan was in the viewing room with the witness while plaintiff's lineup was being conducted. (Ex. 18, 11/17/16 Tr. at 150). Regardless, any evidence tending to show O'Callaghan engaged in suggestive techniques during plaintiff's lineup was not "withheld" or "suppressed" from plaintiff during his criminal trials, as plaintiff was present during his lineup and could have informed his attorney about the lineup prior to his 1986 trial. (Ex. 17, 11/16/16 PM Tr. at 55; *see also*, *United States v. Shields*, 789 F.3d 733, 746-47 (7th Cir. 2015); *Carvajal*, 542 F.3d at 566-67; *Harris v. Kuba*, 486 F.3d 1010, 1015 (7th Cir. 2007)(no *Brady* violation where plaintiff knew of his own alibi); *United States v. Lee*, 399 F.3d 864, 865 (7th Cir. 2005)(no *Brady* claim because plaintiff "was aware of his own pants"); *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1028-29 (7th Cir. 2006) (no *Brady* claim where plaintiff knew of her own allegedly-coerced confession).

The same principle applies to Murphy's May 14, 1985 General Progress Report ("GPR") of his interview of Anthony Sumner. (Ex. 47, 5/14/85 GPR). Plaintiff's defense attorney possessed the GPR prior to plaintiff's 1986 trial, the different dates on the GPR are apparent and

were known to plaintiff and the prosecution, and plaintiff's defense attorney chose not to inquire about the date of the statement of either Sumner or Murphy at the 1986 trial. (Ex. 32, 12/1/16 AM Tr. at 43-45; Ex. 33, 12/1/16 PM Tr. at 23). As such, the date discrepancy was not withheld, exculpatory, impeaching, or material.

## IV.    Plaintiff Failed to Prove His IIED Claim Against O'Callaghan.

Under Illinois law, three elements are necessary to state a claim for IIED: first, the conduct involved must be truly extreme and outrageous; second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct would cause severe emotional distress; and third, the conduct must in fact cause severe emotional distress. *Feltmeier v. Feltmeier*, 207 Ill. 2d 263 (2003). Because plaintiff failed to present evidence supporting a due process claim, he likewise failed to present evidence of extreme or outrageous conduct sufficient to support a claim against O'Callaghan for IIED. The IIED claim was based on the same conduct underlying plaintiff's due process claim. *Cooney v. Casaday*, 746 F.Supp.2d 973, 977-78 (N.D. Ill. 2010). As such, there is no evidence of intent or extreme and outrageous conduct, and judgment should be entered in O'Callaghan's favor on plaintiff's IIED claim.

Independent of the evidence supporting plaintiff's due process claim against O'Callaghan, there is still no evidence to support an IIED claim, specifically no evidence that O'Callaghan's conduct was "extreme and outrageous" and/or that O'Callaghan intended his conduct inflict severe emotional distress. Prior to 1985, O'Callaghan never knew nor even met plaintiff and therefore had no reason to have him placed in jail for the Smith/Hickman murders if the evidence did not support it. (Ex. 22, 11/21/16 PM Tr. at 55). Additionally, O'Callaghan had no authority to decide whether plaintiff should be charged with the murders, or whether the case should have been re-tried in 2009, as that was the role of the CCSAO. (*Id*. at 56). As such, there

is no evidence of intent or extreme and outrageous conduct, and judgment should be entered in
O'Callaghan's favor on plaintiff's IIED claim.

## V. There Was No Legally Sufficient Evidentiary Basis to Support the Jury's Verdict on the *Monell* Claim.

Plaintiff originally pled a policy or widespread practice within the City of "systematically
suppress[ing] *Brady* material by intentionally secreting discoverable information from so-called
'street files.'" (Dkt. 105, Third Amended Complaint, ¶65). In the 2014 trial, plaintiff was
unable to point to any other "street file" in which exculpatory or impeachment evidence (*i.e.*,
*Brady* material) was withheld, and the jury rendered a verdict for the City. Given a second
chance to present a *Monell* claim at the 2016 trial, plaintiff's new theory no longer required proof
of any other "street file" in which exculpatory or impeachment evidence allegedly was withheld.
Instead, plaintiff simply claimed a "systematic underproduction of records" by CPD that led to
the *Brady* violation in his case.[3] In other words, plaintiff abandoned his *Monell* claim based on
the alleged "systematic suppression" of *Brady* material. The only evidence plaintiff submitted in
support of this new claim was based on a simple comparison of the pages of documents found in
criminal defense files ("CDFs") with the pages of documents found in CPD's so-called Area
Central Basement investigatory files. If a document found in CPD's investigatory file was not
found in the corresponding CDF, it was deemed "withheld." Under plaintiff's theory, it no
longer mattered whether that missing document actually contained exculpatory or impeachment
information, nor whether the information in that document was duplicative of that contained in
other, disclosed documents. Not only was this novel *Monell* theory legally deficient, there was
insufficient evidence to support it. Plaintiff's comparison of the files was done with no

---

[3] Twice before the 2016 trial, the City unsuccessfully challenged the legal viability of plaintiff's
reconstituted *Monell* claim. (*See* Motion to Reinstate Jury Verdict on the *Monell* Claim, Dkt. #919;
*Monell* Motion in Limine No.1, Dkt. #1003). The City acknowledges the Court denied both of these
motions, but re-raises them here to preserve these objections for the record.

substantive analysis of the documents in question. Moreover, this evidence was presented to the jury without a reliable evidentiary foundation.

The first step a plaintiff must take in proving a *Monell* claim is to establish that he suffered a constitutional injury. *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994). Plaintiff then must show "deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Bd. of County Comm. of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 400 (1997). Next, plaintiff must show the requisite degree of culpability on the City's part - namely, that the municipal practices were carried out with "deliberate indifference" to their known or obvious consequences. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Finally, plaintiff must demonstrate a direct causal link between the municipal policy and the constitutional injury. *Bryan County*, 520 U.S. at 404.

A plaintiff seeking to hold a city liable under §1983 must show his alleged constitutional injury is attributable to the municipality itself in one of three ways. First, he may prove that "an express policy . . . when enforced, cause[d] a constitutional deprivation." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). Second, he may prove that his constitutional injury was caused by "a widespread practice that, although not authorized by written law or express municipal policy, [was] so permanent and well settled as to constitute a custom or usage with the force of law." *Id*. Finally, he may prove that his constitutional injury was caused by "the act of a person with final policymaking authority." *Id*. Plaintiff failed to present sufficient evidence to support a verdict on the *Monell* claim under any of these three methods.

## A. The City Does Not Have an Express Policy of Withholding Investigative Materials.

As James Hickey testified, Detective Division Special Order 83-1, adopted in 1983, requires the maintenance and retention of files, investigative documents, and personal notes generated by homicide detectives during an investigation. (Ex. 25, 11/23/16 PM Tr. at 41-43).

10

As such, CPD policy in 19845 was that all information obtained during a homicide investigation, including materials helpful to the defense, were to be preserved and made available to criminal defendants. *Id*. There was no other evidence on this issue. To the extent CPD failed to tender the file at issue in this case, that non-production was contrary to CPD's express policy.

**B.     Plaintiff Failed to Prove a Widespread Practice of Underproduction, and Certainly Not One That Violated Plaintiff's Constitutional Rights.**

To the extent plaintiff attempted to prove his *Monell* claim based on a "custom" - *i.e.*, a practice that has "not been formally approved by an appropriate decision-maker" but is "so widespread as to have the force of law" (*Bryan County*, 520 U.S. at 404), he likewise failed to present a sufficient evidentiary basis to support a verdict. Custom can be established through widespread, enduring practices that violate constitutional rights in a systematic manner. *See McNabola v. CTA*, 10 F.3d 501, 511 (7th Cir. 1993). Isolated acts committed by non-policymaking officials do not amount to a "custom," which "implies a habitual practice of a course of action that characteristically is repeated under like circumstances." *Sims v. Mulcahy*, 902 F.2d 524, 542 (7th Cir. 1990) (*quoting Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986)). Where a municipal policy itself is unconstitutional, even the single application of the policy to the plaintiff is sufficient to prove a *Monell* claim. *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978). Where, as here, there is no unconstitutional express policy, the plaintiff must show more than a single constitutional violation to establish municipal liability. *Okla. City v. Tuttle*, 471 U.S. 808 (1985). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policy maker." *Id*. at 823-24; *Connick v. Thompson*, 563 U.S. 51, 62-63 (2011); *Estate of Novack v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000) (where the municipal

policy would not itself be unconstitutional, a plaintiff must show "a series of constitutional violations from which deliberate indifference can be inferred").

As a preliminary matter, even accepting plaintiff's novel theory that the City had a practice of not producing every single piece of paper from a homicide investigation to prosecutors, nondisclosure of a document in and of itself is not a *Brady* violation. *U.S. v. Agurs*, 427 U.S. 97, 111 (1976); *Kyles*, 514 U.S. at 436-37 ("The Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense"). Thus, even aside that plaintiff failed to establish a sufficient foundation to prove some documents in the investigative files did not make it into the hands of the prosecutors, that fact alone would be insufficient to prove a widespread practice. The files plaintiff relied on needed to prove "a series of constitutional violations from which deliberate indifference can be inferred" (*Estate of Novack*, 226 F.3d at 531), which they plainly did not.

Plaintiff instead introduced a series of cases without any evidence CPD violated the Constitution or otherwise caused harm to the criminal defendants involved in those cases, and asked the jury to infer the City has a widespread unconstitutional practice. In other words, plaintiff attempted to establish a widespread unconstitutional practice through prior actions that did not violate the Constitution. Such a position is contrary to *Monell*. *Tuttle*, *supra*; *Estate of Novack*, *supra*. In an analogous situation, one court rejected a *Monell* claim based on an alleged policy and practice of using excessive force in shooting cases where the plaintiff alleged only one constitutional violation. *Whitaker v. Miami-Dade County*, 126 F. Supp. 3d 1313 (S.D. Fla. 2015). The *Whitaker* court explained: "A plaintiff certainly cannot establish a widespread unconstitutional practice through prior constitutional actions. Plaintiffs have not offered any description of a prior incident involving a relevant constitutional violation." *Id*. Here as well,

plaintiff failed to prove CPD's production (or alleged "underproduction") of documents in the cases he disclosed resulted in any unconstitutional deprivation in any of those cases. Because CPD's alleged practice in and of itself was not unlawful or unconstitutional, and plaintiff offered no evidence of a series of prior incidents involving a relevant constitutional violation, there was insufficient evidence to support a jury determination that the City was "deliberately indifferent" to an unconstitutional practice.

Plaintiff's police practices expert, Michael Brasfield, testified that the files reflected "violations" of DDSO 83-1. For example, he pointed to detectives' continued use of regular paper rather than the newly-created GPR form for note-taking, and their continued use of To/From memos. (Ex. 28, 11/29/16 AM Tr. at 122-25). Non-use of a GPR form or use of a To/From memo might reflect a detective's lack of compliance with 83-1, but it is not evidence of an unconstitutional practice, and it certainly doesn't suggest a *Brady* violation. For the same reason, Brasfield's testimony about the failure of supervisors to ensure better compliance with 83-1 (*Id*. at 125) is not evidence of an unconstitutional practice. Brasfield's testimony in this regard couldn't support a verdict against the City as the jury was instructed that non-compliance with CPD regulations did not equate to a constitutional violation. (Dkt. #1169, at 16).

Beyond the legal defects in plaintiff's *Monell* "underproduction" theory, the evidence at trial offered to support that theory was deficient and lacked sufficient foundation. The bulk of this evidence was summarized in Brasfield's table (PX1001). But, Brasfield conceded there were errors in the table, and he admitted he created the table by reviewing the pages in the CDFs that plaintiff's attorneys gave him and comparing them to pages in the Area Central basement files, without further qualitative analysis. (Ex. 29, 11/29/16 PM Tr. at 66-68; 112-13). While the

13

errors in the table might go only to the weight of Brasfield's testimony, his flawed methodology resulted in an insufficient evidentiary basis to support plaintiff's *Monell* practice claim.

Plaintiff's modified *Monell* theory rested on the incorrect assumption that the CDFs contained all the documents disclosed by CPD. However, the CDFs would not necessarily reflect what CPD turned over to the *prosecutors*, which is what *Brady* requires.

In an effort to salvage his reliance on the CDFs, plaintiff suggested through Brasfield that the prosecutor's files would not necessarily reflect CPD's compliance with a subpoena issued by a criminal defense attorney. Not only did plaintiff fail to provide evidence of the issuance of subpoenas to CPD for each of those files, this contention likewise succumbs to the fundamental foundational issue plaguing Brasfield's conclusions. Plaintiff presented no evidence to support his assumption that the CDFs as they exist today are complete or in the same state as when originally assembled. It therefore wouldn't matter if the contents of the original CDFs were assembled through discovery from the prosecutor, through a subpoena to CPD, or a combination of both. There was no evidence to establish the contents of those original defense files at the time of the underlying criminal proceedings. It follows that any conclusions and/or testimony concerning the contents of the original criminal defense file based on the contents of the current version of that file would be pure speculation.

Brasfield's testimony confirmed the lack of foundation for his conclusions. He admitted that an assessment of whether the criminal defense file was complete was not part of his review of the documents, and he did not do any independent investigation. (Ex. 29, 11/29/16 PM Tr. at 34). He testified that he accepted the CDFs received from plaintiff's attorneys "at face value." (*Id.*) He admitted he had no knowledge of any specific piece of paper from the 50 or so cases he relied upon that was actually "withheld" by CPD from anyone in the criminal process. (*Id.* at

77).  Brasfield further admitted each of the CDFs could have passed through many attorneys'
hands over the years.  (*Id*. at 35).  Just because a document was not found in the present version
of the CDF does not mean that document was never in there, and it certainly does not mean the
document was "withheld," "suppressed," or not otherwise made available by the prosecutors to
defense counsel, or by CPD to the prosecutors and/or defense counsel.  Neither Brasfield nor any
other witness accounted for the possibility that documents originally contained within the CDFs
were removed at some point, purged, or misplaced, or that documents were made available to
defense counsel but not copied, or that the file was inadequately maintained or transferred among
several different attorneys involved in different stages of the criminal process.  Rather, Brasfield
simply assumed one of the central facts on which his opinion rested; put simply, he offered the
very sort of inadmissible "subjective belief or unsupported speculation" dressed up as an
"expert" opinion that the Seventh Circuit has long held inadmissible.  *E.g.*, *Porter v. Whitehall
Laboratories, Inc.*, 9 F.3d 607, 614 (7th Cir. 1993).

Plaintiff's *Monell* theory thus required an unwarranted and speculative inferential leap by
the jury.  As the proponent of the evidence, plaintiff was required to present a foundation to
establish these CDFs were complete and in the same state as when originally assembled by
criminal defense counsel.  The lack of foundation for the completeness of the CDFs eliminates
the possibility that a valid, non-speculative jury verdict could be based on this theory.

## C.    Plaintiff Failed to Prove His Constitutional Rights Were Violated by a Person With Final Policymaking Authority.

Plaintiff failed to present sufficient evidence that the Superintendent (designated in the
jury instructions as the City's final policymaker) knew of and was deliberately indifferent to
a widespread practice by CPD of withholding *Brady* material.  CPD's alleged "underproduction"
of documents in and of itself was not unlawful or unconstitutional, and plaintiff presented no

evidence of any other case where the alleged "underproduction" led to the violation of a criminal defendant's constitutional rights. Thus, plaintiff adduced no evidence that would have put the Superintendent on notice that the alleged "underproduction" of documents was causing constitutional harm. To summarize, and as established by Sections V(A) and V(B), above, plaintiff presented no evidence of an unconstitutional policy decision by the Superintendent or an unlawful practice to which the Superintendent was deliberately indifferent. If the jury found liability against the City on this basis, it necessarily would have been based on pure speculation.

**D. Plaintiff Failed to Prove Municipal Liability Based on the Alleged Failure to Train and/or Supervise.**

The "policy" jury instruction provided by the Court included, over the City's objection, a section pertaining to "a practice of failing to train or supervise employees." At trial, plaintiff failed to present a sufficient evidentiary basis that would have supported a jury verdict on this failure to train/supervise theory or the submission of a failure to train/supervise jury instruction.

The issue of failure to train centered on CPD's implementation of DDSO 83-1 and the alleged "street file" problem. Hickey testified at trial that he personally conducted training on DDSO 83-1 to approximately 1000 individuals, 30 to 40 at a time, over several weeks in a classroom setting. (Ex. 25, 11/23/16 PM Tr. at 46-47). Rather than issue a directive regarding the new policy, CPD wanted to "deliver the new message" directly to each and every member of the Detective Division, including the supervisors, exempt commanders, and deputy chiefs. *Id*.

Plaintiff elicited testimony from Brasfield that, in his opinion, the three-hour training provided by Hickey was not sufficient for what he perceived to be an "ingrained cultural problem." (Ex. 29, 11/29/16 PM Tr. at 25). Brasfield's testimony in essence suggested the City should have had more or better training regarding DDSO 83-1. However, the need to do "more or better" is not itself sufficient to establish municipal liability. *See, e.g., Craft v. Flagg*, 2010

U.S. Dist. LEXIS 132982, *7-8 (N.D. Ill. Dec. 13, 2010) (evidence that a municipality "could have done something more or better is insufficient to establish causation in a §1983 claim"), *citing City of Canton*, 498 U.S. at 391-92.  As the United States Supreme Court has explained:

> To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under §1983.  In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a §1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident.  * * *  Thus, permitting cases against cities for their "failure to train" employees to go forward under §1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities -- a result we rejected in *Monell*, 436 U.S. at 693-694.  It would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs.  This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism.

*City of Canton*, 498 U.S. at 391-92.  Given Hickey's testimony, the City's training program on DDSO 83-1 cannot reasonably be deemed to be deliberately indifferent to the constitutional rights of criminal suspects, and Brasfield's criticisms fail to prove otherwise.  At most, his testimony amounts to a belief "more or better" training could have been implemented, which fails to establish a sufficient evidentiary basis for deliberate indifference on the part of CPD.

Finally, plaintiff presented no evidence that would support a widespread CPD practice based on an alleged failure to supervise.  With respect to the *Monell* claim,  plaintiff failed to present a sufficient evidentiary basis to establish deliberate indifference under such a theory.

### THE COURT SHOULD GRANT A NEW TRIAL ON PLAINTIFF'S MONELL CLAIM UNDER RULE 59

The district court should grant a new trial "if the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *McNabola*, 10 F.3d at 516.  After evaluating the evidence, if the district court concludes the verdict is against the manifest weight of the evidence, a new trial is appropriate.  *Mejia v. Cook County*, 650 F.3d 631, 633 (7th Cir. 2011).

## I.   The Jury's Verdict on the *Monell* Claim was Against the Manifest Weight of the Evidence

As set forth in its Rule 50(b) motion, plaintiff failed to provide a legally sufficient evidentiary basis to support a verdict on the *Monell* claim based on (1) an express municipal policy, (2) a widespread practice that was so permanent and well settled as to constitute a custom or usage with the force of law, (3) a constitutional injury caused by "the act of a person with final policymaking authority," or (4) a failure to train/supervise.  The inadequate evidentiary basis for plaintiff's *Monell* claim is discussed above in the Rule 50(b) portion, Section V, which is adopted herein by reference.  If this Court disagrees that the City is entitled to relief under Rule 50(b), the City should be granted relief under Rule 59 because the jury's verdict on the *Monell* claim was against the manifest weight of the evidence.

Plaintiff's *Monell* "underproduction" theory was based on a simple comparison of the pages found in CPD's investigatory files stored in the Area Central basement with the pages of documents in what was purported to be the corresponding files from the criminal defense attorneys.  If a document from CPD file was not found in the corresponding CDF, it was designated by plaintiff as a "withheld" document.  But as discussed above, plaintiff failed to present a sufficient foundation to establish the CDFs were complete and in the same state as when originally assembled by criminal defense counsel at the time of the underlying criminal proceedings.  The lack of foundation for the completeness of the CDFs eliminated the evidentiary basis for plaintiff's "underproduction" theory.

None of the other evidence supported a verdict against the City on the *Monell* claim.  As set forth above, Brasfield's testimony was insufficient in that regard.  Plaintiff attempted to demonstrate one of the CDF files (*People v. Fulton*) was missing documents found in CPD's corresponding investigatory file by calling Andrea Lyon to testify.  As post-conviction counsel,

18

Lyon could not provide the foundation to establish the contents of the CDF as originally constituted. And during cross-examination, she was presented with discovery receipts from the CCSAO trial file establishing that the documents she claimed were missing from her file were actually produced by prosecutors years earlier to the criminal defense attorney, except for one document with a different RD number. (Ex. 29, 11/29/16 PM Tr. at 137; Ex. 30, 11/30/16 AM Tr. at 31, 42-43, 51, 61). This evidence provided further proof that the CDFs relied upon by plaintiff through Brasfield were incomplete and lacked the adequate foundation to support the *Monell* claim.

As to the other *Monell* trial evidence, James Hickey, as discussed above, testified about the development of DDSO 83-1, the absence of any other similar policies in municipal police departments when it was developed, the intent behind the policy, and the training provided to approximately 1000 detectives, supervisors, and Deputy Chiefs. (Ex. 25, 11/23/16 PM Tr. at 36, 46-47). Hickey also described how CPD continued to tweak its written policy through regular communication with its own attorneys, the City's Law Department, plaintiffs' counsel, and outside counsel. (*Id*. at 34). The City's expert, Jeff Noble, testified DDSO 83-1 went above and beyond the generally accepted police practices of the time. He further noted Mr. Brasfield did not offer evidence of any similar written policies from any other municipalities. (Ex. 41, 12/8/16 AM Tr. at 93, 98-99). Any conclusion by the jury that the City had an express written policy that violated plaintiff's constitutional rights, or that the City was deliberately indifferent on the issue, would have been against the manifest weight of the evidence.

A jury conclusion that plaintiff sustained a constitutional injury due to a widespread CPD practice similarly would have been against the manifest weight of the evidence. As discussed above, plaintiff failed to prove CPD's alleged "underproduction" of documents in the cases for

19

which there are files from the Area Central basement resulted in an unconstitutional deprivation in any of those cases. Because CPD's alleged practice in and of itself was not unconstitutional, and plaintiff did not offer evidence of a series of prior incidents involving a relevant *Brady* violation, there was no non-speculative evidence to support the jury's determination that the City was "deliberately indifferent" to an unconstitutional practice. Additionally, the lack of foundation for the completeness of the CDFs required the jury to speculate as to whether CPD "withheld" anything in those cases, and even Brasfield had to concede he could not identify a single piece of paper that was actually "withheld" by CPD in any of the cases he was relying on.

Further undercutting the *Monell* practice claim, the evidence at trial confirmed the methodology used by plaintiff to identify documents that were allegedly "withheld" was fundamentally and critically flawed. Brasfield's testimony conceded numerous documents plaintiff claimed were improperly withheld by CPD were clearly possessed by the prosecution. There is no *Brady* claim available against the police when the material in question is in the possession of the prosecutors. *Harris*, 486 F.3d at 1014. As Brasfield agreed at trial, it was evident from the face of certain documents that they would have been in the possession of the State. (Ex. 29, 11/29/16 PM Tr. at 55-63) (ISP reports with a "cc" to the prosecutor; prosecutors' blue backs; written statements of witnesses and suspects taken by Felony Review assistants or other Assistant State's Attorneys). Other documents plaintiff claims were withheld from the criminal attorneys were not available or did not even exist at the time of the criminal trial. Brasfield explained he included these and the rest of the so-called "missing investigative documents" in his spreadsheet anyway, because what he tried to do was "to provide information that both sides can take a look at and you can weigh the value, you can evaluate what you want with it. I strictly looked at what was in the investigative file and what was in the criminal defense

file." (*Id.* at 75-76). In sum, this evidence proved the methodology used by plaintiff to identify documents that were allegedly "withheld" was fundamentally flawed.

In direct contrast to Brasfield's simple comparison of pages, the City presented evidence through its expert, Bernard Murray, who performed a detailed analysis of each file in which plaintiff claimed something had been withheld. Murray provided detailed trial testimony of his qualitative analysis of the allegedly withheld materials, and the information contained in those materials, to rebut the notion that CPD had a practice of suppressing or withholding *Brady* material in homicide cases. Murray testified he evaluated the 59 files Brasfield identified and did not find evidence of a widespread CPD practice of non-production of material in those cases. (Ex. 41, 12/8/16 AM Tr. at 60). He was critical of Brasfield for characterizing a document as "withheld" without any further evaluation. He also disagreed with Brasfield that the CDF was the best place to determine what CPD produced, as CPD's obligation under *Brady* was to provide the investigatory materials to the prosecutor. (Ex. 39, 12/7/16 AM Tr. at 64-65).

The City also presented evidence through expert statistician Judith Roberts that Brasfield's conclusion that the City had a pattern and practice of routinely failing to produce relevant documents was not based on any valid statistical or otherwise scientific evidence. According to Roberts, the primary evidence for Brasfield's conclusion was a flawed analysis of a small set of cherry-picked files specifically selected by plaintiff's counsel, which were not representative of any CPD patterns and practices. Roberts further testified Brasfield did not and could not measure whether the City turned over relevant documents ten to thirty years ago, such that his resulting conclusions were improper speculation. (Ex. 42, 12/8/16 PM Tr. at 35).

Based on all of the evidence presented at trial, a jury conclusion that plaintiff sustained a constitutional injury due to a widespread CPD practice would be against the manifest weight of

the evidence.  For this same reason, no jury verdict could properly be based on a claim that a final policymaker knew of and was deliberately indifferent to an unconstitutional practice that plaintiff failed to prove.  And for the reasons set forth in the Rule 50(b) portion of this brief, plaintiff failed to present a sufficient evidentiary basis to support his failure to train and supervise claim, such that a verdict rendered against the City on that basis necessarily would be against the manifest weight of the evidence.

## II.    The Court's Rulings Regarding *Jones/Palmer* Severely Prejudiced the City.

Prior to the 2016 trial, the City moved to bar evidence regarding the *Jones/Palmer* litigation.  (*Monell* Motion in *Limine* No. 3)(Dkt. #1003).  The Court barred that evidence in the 2014 trial, allowing plaintiff only to reference prior "litigation" as the impetus for the City to enact a policy regarding so-called "street files."  In ruling on Motion in *Limine* No. 3, the Court partially overturned its original decision and agreed plaintiff could present limited discussion of *Jones/Palmer* for the issue of notice to City policymakers.  (Dkt. 1076 at 6-11).

The City had expressed concern that plaintiff seemingly intended to present an incomplete and misleading version of the *Jones/Palmer* litigation.  Specifically, plaintiff was omitting the Seventh Circuit's decision in *Palmer II* (*Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir. 1986)), in which the Court of Appeals determined the "street files" claim ultimately had no merit.  (Dkt. 1003 at 25-26).  *Palmer II* observed the plaintiffs' attorneys inspected over 300 files "but found nothing on which they could base a claim that any member of the class had been convicted in violation of the Constitution."  806 F.2d at 1317.  "Upon reviewing the files the plaintiffs' counsel were unable to find anything worthwhile."  *Id.* at 1321.  "The claim depends on there being exculpatory material in the street files—and there isn't any.  The suit has been abandoned because it has been shown to have, in fact, no legal merit."  *Id*. at 1324.  As *Palmer II* established, any argument that the underlying litigation constituted evidence of an entrenched or

ingrained "street files" practice would not only be highly misleading, it would be flat out wrong. For that reason, the City contended that if plaintiff was allowed to introduce evidence from *Jones/Palmer* regarding the scope of the City's alleged "street file" practice, the City should be permitted to introduce the language from *Palmer II* establishing that the underlying claim was found to have no legal merit.

The Court precluded the City from introducing evidence of the Seventh Circuit's decision in *Palmer II* on the basis of relevance. (Dkt. 1076 at 10). However, the Court left open the possibility of limited questioning of what happened on appeal if "necessary to avoid leaving the jury with a possible misimpression about what ultimately happened in *Palmer*." (*Id*. at 10).

Just before Brasfield testified at trial, plaintiff submitted a proffer of additional issues he wished to introduce pertaining to *Jones/Palmer*. The City objected to portions of the proffer, including evidence relating to the *Palmer* class action lawsuit and early court rulings made in that case. (Ex. 28, 11/29/16 AM Tr. at 83-93). Specifically, the City argued the proposed proffer improperly suggested the City was on notice of an "epidemic of withholding street files," when in fact that wasn't the case, as *Palmer II* would establish. (*Id*. at 85, 88). The Court ultimately allowed plaintiff to introduce certain portions of the proffer, including the reference to the *Palmer* litigation, but it did not allow the City to introduce the findings of *Palmer II*. According to the Court, it was again ruling "that what happened on the appeals is not relevant because this all is being admitted for the purpose of showing notice. And there was no finding on appeal until 1986 besides." (*Id*. at 93).

Since plaintiff was permitted to introduce evidence of the *Jones* and *Palmer* litigation, defendants should have been permitted to introduce additional language from *Palmer II* to prevent the jury from being misled about the end result of those proceedings. Despite being

limited to the issue of notice, plaintiff used Brasfield's testimony about *Palmer* for much more substantive purposes. For example, plaintiff contended Brasfield's testimony about *Palmer* established the City's street files practice was entrenched. Brasfield relied on an incomplete and misleading interpretation of *Palmer* as evidence of a practice that was so "embedded" that Hickey's personal classroom training of 1,000 CPD personnel on Special Order 83-1 was insufficient. (Ex. 29, 11/29/16 PM Tr. at 25). Then, plaintiff argued this "entrenched" practice provided the basis for requesting a *Monell* jury instruction that included a failure to train component. Plaintiff used the City's inability to rely on *Palmer II* to gain an unfair advantage at trial. Without any evidence from *Palmer II*, the City was left with no effective way to rebut Brasfield's interpretation of *Palmer*. (Ex. 44, 12/9/16 PM Tr. at 11-12). In the end, the jury was left with the very "misimpression about what ultimately happened in *Palmer*" that caused this Court to express earlier concern. (Dkt. 1076 at 10).

## PREJUDICIAL EVIDENTIARY RULINGS (RULE 59)

Under Rule 59, a court should grant a new trial "if the improperly admitted evidence had a 'substantial influence over the jury,' and the result was 'inconsistent with substantial justice.'" *Shick v. Ill. Dep't of Human Servs*., 307 F.3d 605, 611 (7th Cir.2002); *Cerabio LLC v. Wright Med. Tech.,* 410 F.3d 981, 994 (7th Cir.2005)(A new trial may be ordered if the evidentiary error "has a substantial and injurious effect or influence on the determination of a jury."). Here, the improperly admitted/excluded evidence requires a new trial.[4]

---

[4] This conclusion is further supported by the fact that Fields lost his Certificate of Innocence (COI) hearing based in large part on evidence excluded here, including but not limited to the Federal wiretap evidence, (*see* Ex. 48, at 48-49) while, following a three week jury trial in this court, a jury found against him on all but one count against one defendant and awarded him $80,000, as opposed to $22 million, in part because it heard evidence excluded here (*e.g.,* the 1972 murder conviction) and because that trial was not marred by the multiple serious errors that occurred here and set forth below.

Moreover, while each of this Court's rulings barring evidence was independently prejudicial, the cumulative effect of those combined erroneous rulings was extremely so. "Cumulative prejudice occurs when '(1) multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, were so severe as to have rendered the trial fundamentally unfair.'" *Thompson v. City of Chi.*, 722 F.3d 963, 979 (7th Cir.2013), citing *Christmas,* 682 F.3d at 643 (quoting *U.S. v. Powell*, 652 F. 3d 702, 706 (7th Cir.2011). As described below, both elements are met here. The cumulative effect of the errors had a "substantial and injurious effect or influence on the determination of [the] jury." *Cerabio,* 410 F.3d at 994. In other words, a "significant chance exists that they affected the outcome of the trial." *Thompson*, 722 F.3d at 980; *Walden v. City*, 846 F. Supp. 2d 963 (N.D. Ill. 2012). The court, in conducting the cumulative error analysis, examines "the entire record, paying particular attention to the nature and number of alleged errors committed; their interrelationship, if any, and their combined effect; how the trial court dealt with the errors, including the efficacy of any remedial measures; and the strength of the prosecution's case." *Christmas*, 682 F.3d at 643 (quoting *Powell*, 652 F.3d at 706); *see also Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 188 (7th Cir. 1993) ("One or two of those errors might have been excused as harmless. Collectively, however, they presented the jury with such a skewed picture that the verdict is unreliable and must be set aside.").

Here, a review of the entire record shows that the Court's erroneous rulings allowed plaintiff to present a highly "skewed picture" of himself and in turn the entire case. Thus, at trial, plaintiff portrayed himself as a peaceful "landlord" for the violent El Rukn street gang, who had turned his life around, sworn off his unspecified past criminal activities, was wholly uninvolved in or even aware of the widespread violent mayhem the gang was inflicting on the south side of

Chicago as a result of its active drug dealing enterprise, and was completely uninvolved in or aware of the conspiracy to bribe the trial judge in relation to the murder prosecution and conviction that formed the basis of his complaint. Despite settled precedent making clear that a plaintiff's attempt to bolster his good character opens the door to evidence rebutting that character, *e.g., U.S. v. Mendoza-Prado*, 314 F.3d 1099, 1105 (9th Cir. 2002), this Court allowed plaintiff to paint this "skewed picture" by erroneously excluding evidence that, *inter alia*, plaintiff had been previously convicted of murder; was involved in stalking another gang member with other El Rukns months before his arrest in this case; the building for which he was serving as "landlord" had a large cache of weapons and thus plaintiff was actually guarding and facilitating other illicit El Rukn activities, not serving as a landlord for the friendly family building which the jury heard about at trial; plaintiff was observed laughing and joking with his codefendant and counsel on the first day of his double murder trial before one of the harshest judges in the courthouse shortly after he elected to take a bench trial in that case and the bribe had been delivered; and the wiretap evidence which showed plaintiff was involved in the bribe.

Meanwhile, the Court allowed plaintiff to simultaneously falsely portray the defendants, and in fact every prosecutor and other police officer who offered favorable evidence for the defense in this case, as having a propensity to frame people like him; of intentionally withholding and destroying evidence by not taking notes of interviews of people who implicated him in the murders in question and "whiting out" exculpatory evidence that appeared on notes which were taken; giving El Rukn cooperators significant cuts in their sentences to testify for the defendants in this civil trial and literally making up inculpatory testimony given at one of his criminal trials by, *inter alia,* allowing plaintiff's counsel to engage in pervasive and improperly argumentative, bad faith and otherwise objectionable questioning; failing to adequately instruct

the jury with respect to such improper questioning when objections were sustained; giving jury instructions that vitiated the credibility of key defense witnesses and defense counsel; allowing patently inadmissible propensity evidence regarding another double murder case in which other police officers allegedly ran rigged lineups or otherwise attempted to inculpate individuals *other than plaintiff* for those crimes; admitting two affidavits obtained by plaintiff's counsel in 2011 from a key eyewitness against plaintiff in both his 1986 and 2009 criminal trials for the murders here in which he not only recants his testimony but accuses O'Callaghan and others of telling him to lie and "rehearsing" those lies with him repeatedly, while denying defendants' request long before trial to depose that individual about the facts in those affidavits and the circumstances under which he gave them; excluding evidence that showed the El Rukn witnesses did not get "special deals" to testify in this case, and did not collude with one another.

In sum, these multiple errors, as well as others set forth below, predetermined the outcome in this case before the jury even had a chance to deliberate. Accordingly, defendants are entitled to a new trial.

## I.     The Wiretaps.

Plaintiff's denial of any knowledge of the bribe was a crucial issue. The wiretaps destroy plaintiff's credibility and prove his guilt of the Smith/Hickman murders because they show he knew about and was involved in the bribe scheme. (Ex. 49 at 261; 375; 384) (reflects Jeff Fort's orders to advise Fields and Hawkins of the bribe and that Fields was told about the bribe). Moreover, the wiretaps corroborate Hawkins' truthful testimony he told plaintiff about the bribe and the wiretaps prove that plaintiff's testimony about the bribe is non-credible. (Ex. 48 at 24-25, 49). The wiretaps were erroneously barred in 2014, and defendants' motion to reconsider that ruling here was denied. (Dkt. 549 at 11; Dkt. 1084 at 1-5). The Court's ruling allowed plaintiff to falsely assert he was unaware of the bribe scheme and for his counsel to argue it was

not for his benefit (Ex. 45, 12/12/16 Tr. at 245-46), while defendants were left without the most significant evidence to rebut that contention. (Ex. 49 at 187-88; Ex. 48 at 7-8).

The wiretaps were also critical to rebut plaintiff's argument that the witnesses against him at his criminal trials were improperly coerced by defendants. Plaintiff consistently argued that there was no evidence of El Rukn intimidation. (*See e.*g., Ex. 45, 12/12/16 Tr. at 77). The wiretaps, however, proved the opposite – that it was the El Rukns who were seeking to fabricate evidence by trying to threaten and coerce witnesses into change their testimony that implicated Fields and Hawkins. For example, the wiretaps establish that it was the El Rukns who brought Anthony Sumner's son into the courtroom while he testified in Fields' 1986 trial; clearly a tactic by the El Rukns to intimidate Sumner while he was testifying against the gang. (Ex. 49 at 357; Ex. 2, 6/20/86 Tr. at 443). The Court barred defendants from even contending the El Rukns brought Sumner's son into the courtroom, let alone that it was an example of witness intimidation. (Ex. 15, 11/15/16 PM Tr. at 187-88).

The wiretaps provide multiple other examples of El Rukn intimidation, coercion, or fabrication of evidence relating to the Smith/Hickman trial, or attempts at the same. (*See e.g.,* Ex. 49 at 54-55, 56, 59, 91, 97-98, 130, 162, 190-91, 308, 415) (documenting *inter alia:* use of Jean Ball by El Rukns to visit Langston brothers to get them to recant their eyewitness testimony and aver police misconduct regarding their testimony, and getting Cleveland Ball to do the same; El Rukn General, James Speights discussing going to see the Langston brothers about their testimony; El Rukns planning to find other witnesses to make up story that killers were wearing masks; El Rukns' contact with Fields about his "strong spirits"; El Rukn Michael Scott searching for witnesses in Milwaukee to help Fields/Hawkins; threats to Sumner and his fearful reaction; and El Rukn Jackie Clay looking for State witnesses with Swano)).

28

This case turned on the credibility of the witnesses. The wiretaps constitute contemporaneous, direct evidence from plaintiff's co-conspirators detailing the bribe, plaintiff's knowledge of the bribe, the fact the bribe was for Hawkins and Fields, the intimidation of witnesses, the fabrication of evidence, and the intensive role played by Fort and his men in corrupting the 1986 trial for plaintiff's benefit. Its exclusion allowed plaintiff to paint "a skewed picture" of the facts while depriving defendants of a fair opportunity to rebut plaintiff's claims.

## A.    The Orders from Jeff Fort are Not Hearsay under Rule 801(a).

The wiretaps, in large part, consist of Fort directing the subordinate members of the El Rukns to complete certain tasks, *e.g.*, tell Swano all three criminal must be acquitted (Ex. 49 at 187-189); tell plaintiff about the fix (*Id*. at 261-262; 375). Such orders from Fort are not "statements" within the meaning of Rule 801(a); that is, they are not "assertions" subject to verification. *See U.S. v. White*, 639 F.3d 331, 337 (7th Cir.2011); *Ruhl v. Hardy*, 743 F.3d 1083, 1099 (7th Cir.2014); *U.S. v. Bellomo*, 176 F.3d 580, 586 (2d Cir.1999) (out-of-court statements by the boss of the Columbo family such as "no killing of people without my okay" are offered as evidence of commands and are therefore not hearsay).   A statement that is incapable of verification, such as an order, is not hearsay and does not invoke a Rule 801(d)(2)(E) analysis. *See Ruhl*, 743 F.3d at 1099.  Thus, any portion of the wiretaps that consist of an order, direction, or suggestion should not have been excluded. *Id.*

The Court erred when it held the statements defendants sought to introduce on this basis "contain[ed] embedded factual statements – for example about the existence of the bribe scheme –that defendants are quite clearly offering for their truth." (Dkt. 1084 at 3). The existence of the bribe, however, was undisputed.  The point of defendants' argument is that Fort's order to tell plaintiff about the bribe (among other orders) is not hearsay. Moreover, the mere existence of some factual content in an order does not necessarily render that order inadmissible; such a view

would swallow the whole rule. *See U.S. v. Murphy*, 193 F.3d 1, 5-6 (1st Cir.1999)(Instructions which also include material facts not hearsay); *accord.*, *Ruhl*, 743 F.3d at 1099 (overheard instruction "that Ruhl knock on the car window and shoot Neubauer" was not hearsay at Ruhl's trial for shooting Neubaer). Fort's orders were thus not hearsay and should have been allowed regardless of whether the elements of Rule 801(d)(2)(E) were met.

**B.      The Wiretaps Were Admissible Because Plaintiff Was a Co-Conspirator.**

For a statement to be admissible under Rule 801(d)(2)(E), the proponent must prove by a preponderance of the evidence that (1) a conspiracy existed; (2) the party and the person making the statement were members of the conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy. *Smith v. Bray*, 681 F.3d 888, 904 (7th Cir.2012). Rule 801(d)(2)(E) encompasses a broad definition of conspiracy that goes well beyond the confined concept of criminal conspiracy. *Id*. The wiretapped statements themselves may be considered as evidence of the conspiracy and plaintiff's involvement therein. *U.S. v. Williams*, 44 F.3d 614, 617 (7th Cir.1995); *Bourjaily v. U.S.*, 483 U.S. 171, 181 (1987). "The Court must consider in addition [to the co-conspirator statements themselves] the circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement was made, or the evidence corroborating the contents of the statement." Rule 801 advisory committee's notes (1997 Amendment). The evidence showing the party's membership in a conspiracy may be direct or circumstantial.  *U.S. v. Lomax,* 2016 U.S. App. LEXIS 4334, *11 (7th Cir. 2016). "Because of the secretive character of conspiracies, direct evidence is elusive, and hence the existence and the defendants' participation can usually be established only by circumstantial evidence." *U.S. v. Redwine*, 715 F.2d 315, 319 (7th Cir. 1983).

The Court erroneously found there was insufficient evidence that plaintiff was a co-conspirator in the bribery scheme, which was not the case as the wiretaps showed. (*See* Ex. 49 at

186, 261, 373, 383-84) (El Rukn Generals/Fort discussion that bribe is for plaintiff, Carter,

Hawkins; Fort ordering note to be given to same three about the bribe scheme; corroborating that

multiple El Rukn members told plaintiff about the bribe scheme). Moreover, there is substantial

additional evidence beyond the wiretaps to prove plaintiff was part of the conspiracy for

purposes of the exception to apply.  On June 17, 1986, shortly after the El Rukns obtained the

money for the bribe, plaintiff waived a jury trial to proceed to a bench trial before Maloney, who

plaintiff understood was prosecution-minded. (Ex. 1, 6/17/86 Tr. at 77). Davis testified he

provided the $10,000 to Knox who gave it to Swano.  (Ex. 11, 4/23/14 PM Tr. at 2819-20). On

July 1, 1987, long before he made any deal, Hawkins told the FBI plaintiff knew of the bribe and

waived the jury because of the bribe. (Ex. 50, 7/6/87 FBI 302 Report). On January 10, 1990,

though plaintiff had a lawyer, he wrote instead to Swano.  Swano went to see plaintiff and

plaintiff admits Swano asked plaintiff if he saw him give a bribe to the judge. Yet, plaintiff did

not raise the issue until after Maloney was indicted. (Ex. 51. Dep. at 264-270; see also Ex. 48 at

8, 21, 50.)

The Court based its finding of insufficient evidence of plaintiff's participation in the

conspiracy, in large part, if not exclusively, on the "implausible" nature of Hawkins' testimony

about plaintiff's involvement. (Dkt. 549 at 5). The Court's finding, however, was rebutted by a

wealth of other evidence. (*See e.g.,* Dkt. 549 at 5, 8-10,12, Ex. 1, 6/17/86 Tr. 72-73)

(Hawkins/Fields in bullpen together 18 times, Carter was in bullpen on June 17, 1986 as

Hawkins averred). The last point the Court cited with respect to Hawkins' credibility was that he

"had a motive to fabricate at all relevant times." (Dkt. 549 at 11). But at the time Hawkins

provided testimony about plaintiff's complicity in the bribe - in 1993 – he had no motive to

implicate plaintiff because it was irrelevant to Maloney's guilt and plaintiff himself was not charged in that bribery case.

In sum, plaintiff's role in the bribery scheme is supported by a preponderance of the evidence; thus, the wiretaps were admissible under Rule 801(d)(2)(E).

## C.     The Wiretaps Are Also Admissible Under the Residual Hearsay Exception.

The wiretaps are also admissible under the residual hearsay exception. Rule 807 permits admission of hearsay if (i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party. All those requirements are met here. The wiretaps are particularly trustworthy because the El Rukns were not aware they were being recorded and spoke in code. *See U.S. v. Bryce*, 208 F.3d 346, 351 (2d Cir.1999)(statements obtained via a covert wiretap met the elements of Rule 807.) The wiretaps bear on a material fact because they show the bribe was arranged by the El Rukns for the benefit of plaintiff, and that he was aware of it. The wiretapped statements are probative on the facts relating to the bribe because they occurred contemporaneously with the scheme and are accurate recordings of the scheme. The final two elements of Rule 807 are met as well - the admission of the wiretaps meets the interests of justice and plaintiff had notice defendants intended to admit them. Because the standard is met, the wiretapped statements should have been admitted under the residual hearsay exception.

## II.     Exclusion of ASA Randy Rueckert Testimony Regarding Plaintiff's Conduct After Waiving His Right to a Jury Demonstrating Knowledge of the Bribe.

Compounding the ruling barring the wiretaps, the Court also improperly barred Randy Rueckert's testimony that would have further rebutted Fields' alleged lack of knowledge of the bribe. Specifically, Rueckert would have testified that Swano appeared late to Court the first day

32

of trial and announced that defendants were going to waive their right to a jury trial. Rueckert was shocked because criminal defendants rarely, if ever, took a bench trial before Maloney on a serious murder case due to his pro-prosecution reputation. Rueckert would have also testified to the demeanor of Fields, Hawkins and the defense attorneys that day, including that they were joking and laughing. (Ex. 42, 12/8/16 PM Tr. at 215). The Court barred Rueckert's observation testimony because: (1) defendants' Rule 26 disclosure, which listed Rueckert as having knowledge about, *inter alia*, the "criminal proceedings, trial and/or additional information regarding the… homicides … as well as the El Rukns organization," was insufficiently "specific" to include his observation testimony; and (2) that, even assuming it was sufficiently disclosed, Rueckert's observations of Fields and his attorney laughing and joking during the first day of Field's trial was "irrelevant" and also "unfairly prejudicial." (*Id*. at 218). The Court also barred Rueckert's reaction to the bench trial as undisclosed "opinion" evidence, and implied that the testimony lacked credence because it was "betting" Rueckert had never "memorialized [those observations] anywhere." (*Id.*).

Rueckert's testimony was relevant to rebut plaintiff's testimony that he was not involved in the bribe and that he and his counsel were unaware of it – it strains credulity to think that individual participants in such a case would exhibit such behavior unless they believed they were not at risk of conviction. The evidence was prejudicial to plaintiff but not unfairly so – he would have had ample opportunity to cross-examine Rueckert on it, could take the stand and/or call Jack Smeeton as a witness to rebut all of it. And, Rueckert's possible failure to memorialize his observations would have also gone to the weight of the evidence, not its admissibility. Barring Rueckert's reaction to the bench trial request as undisclosed opinion evidence was also erroneous. Rueckert's reaction was not opinion testimony but admissible testimony about the

present sense impressions and state of mind of an eyewitness observing an important event that rebutted plaintiff's contradictory story about his bench trial decision. Rule 803(1), (3). Finally, defendants' Rule 26 disclosure was broad enough to include this testimony. *Lipari* v. *U.S. Bancorp, N.A.,* 2008 WL 2874374 at \*2 (D. Kan.2008)(citing Rule 26(a)1 and its comments that disclosures under it need only indicat[e] briefly the general topics of witness "testimony" in a non-"burdensome" manner); *cf., Gustafson v. Am. Family Mutual Ins.. Co*. 2012 WL 5904048 at \*2 (D. Colo.2012)(a party is not required to provide a complete recitation of an individual's knowledge). And Rueckert was not a peripheral player included in the Rule 26 listing; he was the trial attorney in the murder case at issue.

Especially in light of the Court's ruling barring the wiretaps, excluding this powerful eyewitness testimony deprived defendants of a fair trial. Again, it allowed plaintiff to present himself in a false light as to his involvement in the bribe, the El Rukns and the Smith/Hickman murders, while barring credible relevant evidence that directly rebutted that portrayal.

## III.    Excluded Evidence Regarding Plaintiff's Credibility/Guilt.

The bribery related evidence was not the only crucial admissible evidence the Court barred. After the Court's rulings in 2014 and then before and during this trial, plaintiff was sanitized to the point where defendants had little left of the available mountain of evidence from his own conduct and statements to challenge his credibility and repeated claims that he was just a law-abiding "landlord" for the El Rukns.[5]   The excluded evidence includes but is not limited to: (1) his 1971 murder; (2) his visitor list closely tying him to the El Rukns while in prison and visit from Smith/Hickman accomplice Hank Andrews; (3) his stalking of El Rukn rival Treddest

---

[5] For landlord references, *see* Ex. 14, 11/15/16 AM (Opening) at 32, 35-37, 42, 44, 64, 76; Ex. 15, 11/15/16 AM (Fields) at 43-46; Ex. 19, 11/18/16 AM (O'Callaghan) at 46-47, 53; Ex. 26, 11/28/16 AM (Hawkins) at 118-19; Ex. 32, 12/1/16 AM (Wharrie) at 19; Ex. 33, 12/1/16 PM (Murphy) at 43; Ex. 45, 12/12/16 AM (Closing) at 49, 52, 107, 127).

Murray and his own ridiculous story about how he came to be arrested with a weapon that night; (4) the photograph of weapons found at the African Hut during the raid on May 18, 1985; (5) his complicity in the bribe; (6) his conspiracy to incite a riot at the jail in 2000; and, ultimately, (7) his diminishment of his involvement in the El Rukns and knowledge of El Rukn criminal activity. The jury verdict – both liability and excessive damages - is a result of the cumulative error in excluding this evidence.

**A.    In a BPSN Killing, Fields Murdered Rival Gang Member Larry Watkins in 1971, Falsely Claimed the Police Coerced Him Into a Confession, Presented a False Alibi at his Trial, and Continues to Lie About His Actions in that Murder to This Day.**

Plaintiff and his lawyers took advantage of this Court's rulings regarding his prior background and murder conviction (Dkt. 550 at 10-11), minimizing the nature and extent of his gang involvement prior to managing the African Hut for the El Rukns in 1983. (Ex. 45, 12/12/16 Tr. at 239-240: "Nate was not an assassin" or "high ranking El Rukn killer"). The skewed picture presented to the jury was misleading in many ways (*e.g.* plaintiff is a convicted murderer).

Plaintiff minimized his gang life prior to prison in 1971, testifying he joined a group of "kids" from Robbins and formed a "club" that did not have any meetings, and that he only joined a gang in prison for protection. (Ex. 15, 11/15/16 PM Tr. at 39-41). However, in 1971, plaintiff and another man killed rival gang member Larry Watkins. Further, plaintiff told multiple lies in connection with this murder, *e.g.*, police misconduct and coercion during his arrest. But, the exclusion of the nature of his 1972 conviction here precluded defendants from asking plaintiff about these lies since they were intertwined with the murder allegations. The exclusion also precluded defendants from letting the jury know that plaintiff's murder of a rival gang member was part of the "kids" gang in which he was a member at that time. (Ex. 48 at 9).

As to what plaintiff was doing when Watkins was killed, he now claims he just shot his gun in the air. (Ex. 48 at 8). Based on his confession, the truth is that he shot into the car.

Despite significant probative value of this evidence as to plaintiff's credibility, defendants were not allowed to cross plaintiff with this falsehood either, nor were defendants allowed to offer plaintiff's prior admission that it was a gang related murder, which would have undermined his credibility as to his prior gang life. Plaintiff was therefore able to minimize his gang life prior to his 1971 incarceration, while defendants were prevented from challenging that portrayal with the evidence of his 1971 conviction for aggravated assault for yet another shooting he committed.

Although the Court allowed the false alibi at his trial for the 1971 murder, it barred the other details that added weight to that evidence. Most importantly, this jury did not learn the false alibi was presented to corrupt the judicial process in a murder trial. Since the murder conviction was admissible anyway because it was introduced at his sentencing hearing in August 1986, it was error to bar this important evidence in 2016. The absence of this evidence tainted the liability and the damages verdict.

**B.     Fields' Prison Visitor List And Visit from Accomplice Hank Andrews**

At this trial, plaintiff testified he became involved with the El Rukns after he got out of prison in 1983 only because of the "opportunity" of a job and place to live. (Ex. 15, 11/15/16 PM Tr. at 42-43; Ex. 17, 11/16/16 PM at 102). Based on the Court's rulings, plaintiff strategically presented that story to the jury, yet defendants could not use reliable and admissible evidence - his Stateville visitor list - to rebut it. Plaintiff's visitor list includes a "who's who" of El Rukns, including many relevant to this case (Ex. 52). Contrary to the Court's ruling, the foundational requirements for the visitor list are satisfied. (Dkt. 550 at 11). Plaintiff was required to fill out the visitor list while he was in custody for the Watkins murder. Plaintiff admits the first 21 names and a few others were in his handwriting, and all the names on the list had to be approved by him. (Ex. 48 at 17). Plaintiff argued it was implausible he killed the victims with Hawkins or made admissions to Sumner, Clay, Davis, and others, and that he was

not close with those men. (Ex. 15, 11/15/16 PM Tr. at 46; Ex. 16, 11/16/16 AM Tr. at 83-87, and Ex. 17, 11/16/16 PM Tr. at 101-102; 123-125). The visitor list, like other excluded El Rukn related evidence, would have been it impossible for plaintiff to distance himself from the El Rukns in general and these El Rukns in particular.

This Court also barred the testimony of the Stateville Warden establishing that one of the four offenders in the Smith/Hickman case, Hank Andrews, went to visit plaintiff in prison in 1980. (Ex. 11, 4/23/14 PM Tr. at 2804-05). During the trial, plaintiff's repeated theory was Sumner falsely implicated plaintiff and "two guys from Evanston" to avoid punishment. (*See e.g.* Ex. 14, 11/15/16 AM Tr. at 42 and 44). It was crucial for defendants to be able to rebut that theory with this evidence that Andrews went to visit plaintiff in prison before the murders. (DeRobertis dep, Ex. 53 at 24-25; IDOC record, Ex. 54). Like the visitor list, this is another piece of admissible evidence under Rule 803(6)(8). It is irrelevant to admissibility whether Andrews actually saw plaintiff, which this court found. (Ex. 11, 4/23/14 PM Tr. 2804-05). The point is that Andrews drove to prison to visit plaintiff in 1980, connecting him to plaintiff before this murder.

## C. The Treddest Murray Incident/Fields April 29, 1985 Arrest.

Plaintiff's "arrest in 1985 is important in the assessment of his credibility" in this proceeding. (Ex. 48 at 19). This Court allowed the 1985 arrest (and some of the Treddest Murray stalking incident) at the 2014 trial for purposes of damages to rebut his claim he was just a peaceful landlord (Ex. 12, 4/29/14 Tr. at 3265-67), but reversed itself and barred it in its entirety in the 2016 trial. (Dkt. 1084 at 8-9; Dkt. 1095 at 1-3).

It is undisputed plaintiff was arrested on April 29, 1985 for possession of a small machine gun with 29 live rounds. (Ex. 55, 4/28/85 Arrest Report). Plaintiff admits some of the incident and denies other parts. Plaintiff claims he was getting a ride home with two fellow El Rukns

after helping to repair their building. On the way, the two men stopped at a tavern. Rather than join the men, plaintiff claims he sat in the car and waited for them to return. (Ex. 48 at 19; Ex. 4, Fields' 8/22/13 COI Tr. at 44-46). He claims he exited the car at some point, at which time the police stopped him, searched the car, and found the gun. (Ex. 4, Fields' COI Tr. at 205-208). According to plaintiff, he was in the wrong place at the wrong time.

Plaintiff's story is a lie; it undermines his credibility and is absurd on its face. The jury should have been allowed to hear about this incident and decide for themselves whether plaintiff was just a "landlord" as he and his lawyer repeatedly claimed throughout the trial, or whether he had an additional role in the El Rukns. Plaintiff squarely put his role in the El Rukns at issue; this evidence refutes the legitimized persona he presented to the jury.

Compounding this problem, the Court also excluded admissible evidence of what plaintiff was actually doing at the time of his arrest on April 29, 1985. The El Rukns (including plaintiff) were stalking Treddest Murray and other King Cobras in furtherance of their war with that gang. In fact, the war continued the next day when the El Rukns killed three people which caused AUSA Deady to send Brannigan to East Cleveland in search of General James Walker. The King Cobras were encroaching on El Rukn drug turf. The El Rukns, including plaintiff, discussed a plan to kill Murray. Several men, including plaintiff, tracked Murray to a club on 67th Street, but didn't engage. On a later mission, according to Kees, plaintiff chose a submachine gun. The El Rukns then went out looking for Murray once again, and found his car at 71st Street in front of another bar. At that time, Kees saw the police had surrounded the car plaintiff was near and had him in handcuffs. (Ex. 48 at 20). Plaintiff admits a firearm was recovered. (Ex. 12, 4/29/14 Tr. at 3271).

This Court excluded the entire incident. (Dkt. 1084 at 8-9 and Dkt. 1095 at 1-3). The incident, however, is crucial evidence of the lack of plaintiff's credibility, and for his damages. *See Cobige v. City of Chi.*, 651 F.3d 780 (7th Cir.2011). Plaintiff sold a false story that he was a peaceful El Rukn - just a landlord - and the jury awarded him $22 million in damages as a result. The jury should have been given the opportunity to compare plaintiff's story with Kees' testimony of the night's events. It is at least highly possible they would have had a different view on plaintiff's credibility as well as Kees' testimony and credibility. The 2014 jury certainly did, but we now have a dramatically different result because this evidence was barred.

**D.    Firearms Found at the African Hut on May 18, 1985.**

Plaintiff's description of his job as landlord of the African Hut gave him complete access to the interior and exterior of the building, which he described as having mostly legitimate tenants and two El Rukns (Hawkins and Sumner). (Ex. 15, 11/15/16 PM Tr. at 43-46). On May 18, 1985, the African Hut was raided in search of Fields, Hawkins, and other El Rukns. Hawkins was caught; Fields was not; and the police recovered a cache of weapons at the building, (See Ex. 56). The Court barred the evidence, finding a lack of foundation tying Fields to the weapons. (Ex. 5, 3/10/14 Tr. at 7-11). The Court's reasoning, however, goes to the weight of the evidence, not admissibility. This was not a criminal trial charging plaintiff with possession. It was a civil trial in which plaintiff described in detail his duties managing the African Hut, including his access to the entire building and the fact that the building was inhabited by mainly law abiding citizens. Plaintiff didn't have to inject his African Hut duties in the positive manner he did – but by doing so, he opened the door to evidence undermining his self-serving portrayal of his good character. *E.g., Mendoza-Prado*, 314 F.3d at 1105. It was for the jury to decide whether the existence of this cache of weaponry at the African Hut was consistent with, or undermined, plaintiff's testimony.

**E.     Per the Wiretaps, Fields Was Complicit in the Bribe.**

As described above, the Court barred direct evidence from his co-conspirators that plaintiff was informed of the bribe, that it was for his benefit, and of acts of intimidation, fabrication, and conspiracy committed by the El Rukns to corrupt the 1986 Smith/Hickman trial. The wiretaps should have been admitted relative to plaintiff's credibility, among other issues.

**F.     Fields' Colluded to Incite a Riot at Cook County Jail in 2000.**

Defendants sought to call Michael Nieto to the witness stand. (Ex. 57, Nieto's statement). Nieto would have testified that in 2000 he was approached by Luis Sanchez at Division 1 of the Cook County Jail about Fields' plot to instigate a fight with the guards who came to do the shakedown and then sue.  Plaintiff then spoke with Nieto and introduced himself as a high-ranking member of the Stones and that they had a "little demonstration" planned.  (Ex. 48 at 11). Nieto declined to participate. When the shakedown began the next day, plaintiff punched an officer in the face and a melee ensued. Later, plaintiff asked Nieto to submit a grievance for plaintiff, which plaintiff wrote. Plaintiff filed a lawsuit, which he lost.  *Fields v. Velasco, et al.*, 00 L 9339.  Plaintiff also threatened Nieto, and in a letter, threatened "snitches." (Ex. 58; see Dkt. 678 at 6). The Court barred Nieto's testimony and the incident. (Dkt. 557; Ex. 12, 4/29/14 Tr. at 3262-65). However, the conspiracy to incite a riot, filing of a fraudulent lawsuit, and statement that he was a high ranking member of the Stones, were admissible for purposes of credibility (including based on his pattern of corrupting the judicial process: *see* Dkt 517 at 23-24), and it was also relevant to damages to rebut his claim of distress for his time in jail.

**G.     Additional Evidence Relating to Fields' Credibility.**

The Court's rulings with respect to El Rukn related evidence limited defendants from rebutting plaintiff's testimony in many respects as summarized in this section, and in rebutting

plaintiff's challenges to the El Rukn cooperating witnesses, as discussed in the next section.  At a minimum, the cumulative effect was reversible error.

For instance, the Court allowed into evidence portions of Eugene Hunter's deposition where Hunter corroborated plaintiff's testimony that he was a building manager and that some building managers were charged with doing security "and some were not." (Ex. 42, 12/8/16 PM Tr. at 125, 158-59). The Court also allowed Hunter's testimony that a lot of people, including Kees, were assigned killers. (*Id*. at 142-43). Plaintiff testified at length about his role as a building manager, that he became an officer in the gang because he was a building manager, that he attended building manager related meetings, that he attended religious ceremonies Friday nights, and that his plans for the future were to get another job and become a family man.  (Ex. 15, 11/15/16 PM Tr. at 42-49; Ex. 17, 11/16/16 PM at 100-01).   On the other hand, the Court barred Hunter's testimony that plaintiff was an assigned killer for the El Rukns (Dkt. 1150; Ex. 59, Hunter dep at 66-67), barred Clay's testimony that the religious aspect of the El Rukns was a façade, and barred testimony by Clay and other cooperators that the role of an officer in the El Rukns was to commit acts of violence.  The Court also barred Clay's testimony that the duties of a building manager in the El Rukns was to provide armed security for the building and manage the drug trade at the building.  (Ex. 38, 12/6/16 AM Tr. at 10-11; Ex. 10, 4/23/14 AM Tr. at 2617-18).   Again, it was plaintiff's choice to bolster his character by claiming that he was a peaceful, law-abiding member of an otherwise-violent street gang – but by doing so, he threw the door wide open to evidence rebutting that characterization.  *E.g., Mendoza-Prado*, 314 F.3d at 1105.  It was significant error to allow the jury to hear such a one-sided account of events.

## IV.    El Rukn Evidence.

Plaintiff alleged law enforcement was improperly targeting the El Rukns and were trying to put an end to the gang by "lawless and illegal tactics." (Dkt. 105, ¶¶ 16, 46, 73). After making

the El Rukns a critical part of his case, plaintiff then filed a motion *in limine* asserting evidence concerning the El Rukns has little probative value. (Dkt. 507). Based in part on plaintiff's assertions he was no longer making such a claim, the Court excluded El Rukn evidence. (Dkt. 550 at 2-8). The Court's rulings excluding relevant El Rukn evidence were based on plaintiff's misrepresentations of the claims he intended to make at trial; specifically, plaintiff repeatedly asserted in the 2016 trial that defendants as part of the Task Force were: "making" false claims on the El Rukns; trying to "make as many cases, as many El Rukns as possible….", "They were solving every unsolved cold case on the south side on Anthony Sumner"; "They are letting serial killers out of jail." (Ex. 45, 12/12/16 Tr. at 48-50, 250). Defendants should have been allowed to rebut these claims with specific evidence explaining how plaintiff's case fit within the overall picture. This evidence was invited by plaintiff's position he was part of the peaceful aspect of the gang. Evidence regarding the criminal nature of the gang was also relevant to defendants' motives/malice. El Rukn evidence was admissible for other reasons, none of which dealt with making Fields appear guilty by association.

A major theme of plaintiff's case was that defendants improperly relied on Sumner's statements because they allegedly knew he was not credible. In particular, plaintiff pointed to the fact that Sumner falsely implicated him in the Vaughn/White murder and lied about the Barnett Hall murder. (Ex. 45, 12/12/16 Tr. at 48). Defendants should have been allowed to rebut these arguments with the information Sumner provided beyond Vaughn/White and Barnett Hall that was reliable and truthful, and defendants should have been permitted to identify the other cases and the fact there were convictions. Despite the significant challenge by plaintiff to the credibility of Sumner's information, the Court's rulings prevented defendants from meeting that challenge. (Dkt. 1095 at 5-6). The same rationale applies to other El Rukn cooperating witnesses.

Since plaintiff argued defendants should not have relied on these individuals, defendants should have been permitted to respond by explaining why their reliance was reasonable, including by identifying the specific other murders on which the cooperators provided information, the specific El Rukns they implicated, and the convictions obtained based on their testimony.

The error was compounded by the fact the Court permitted plaintiff to contend without evidence that Murphy "whited out" portions of his notes of his May 14, 1985 Sumner debriefing. (Ex. 32, 12/1/16 AM Tr. at 128-129; Ex. 33, 12/1/16 PM Tr. at 3-4). Plaintiff's counsel had the Murphy notes since 2011 and made no effort to investigate whether anything was redacted from his notes until trial. In fact, the first time plaintiff ever made that allegation was when Murphy was on the witness stand. Despite this unjustified prejudice caused by plaintiff's unsupported accusation and discovery violation, defendants were not allowed to show all the notes to the jury based on the Court's rulings; also, the Court declined to provide a curative instruction. (Dkt. 1161; Ex. 44, 12/9/16 PM Tr. at 1-15). The Court's incorrect rulings as to Sumner and Murphy's notes significantly added to the cumulative prejudice.

Defendants also should have been permitted to introduce prior consistent statements of the cooperators under both Rule 801(d)(1)(B)(i) and (ii). In several important respects, the Court barred defendants from doing so. For example, after initially allowing the evidence before the March 2014 trial, this Court barred Ted Poulos from testifying that in the very same conversation in which Hawkins told him for the first time that Fields didn't commit the Vaughn/White murders, Hawkins also told Poulos that Fields did kill Smith and Hickman. (Ex. 11, 4/23/14 PM Tr. at 2787-90). Similarly, this Court barred Hawkins' prior consistent statement to the FBI in 1987 that Fields was aware of the bribe. (*Id*. at 2726-2730; Ex. 28, 11/29/16 AM Tr. at 39-41). The prior consistent statements – to both the individual defendants and others - were also

admissible to prove defendants did not fabricate the cooperators' testimony that Fields was involved in the Smith/Hickman murders and to rebut malice. The Court's rulings prohibiting the rehabilitation of the cooperators with prior consistent statements added to the cumulative error.

Plaintiff repeatedly attacked the credibility of the cooperating El Rukn witnesses by arguing they testified against him only as a result of plea deals. Without specifics, plaintiff implied that the plea deals were entered in exchange for testimony against him in his civil trials. AUSA Hogan should have been permitted to explain the nature and scope of the El Rukn RICO indictment, the people charged, and the individuals convicted, to demonstrate the cooperators' credibility and to rebut plaintiff's attacks. For example, Davis got a good deal not because of statements against plaintiff concerning Smith/Hickman, but because of his significant role as a cooperating witness on a domestic terrorism case against the El Rukns. The Court allowed the jury to hear Davis was facing a 200-year sentence but ultimately only served 2 years without an explanation why he received such a deal. (Ex. 60, Davis Dep. at 168-170). The generalities allowed were insufficient to rebut plaintiff's accusations against the cooperators.

The Court allowed plaintiff to cross examine Kees and Hogan with a motion filed by the federal government in 1996 criticizing Kees' credibility, but barred Hogan from testifying to the November 2016 Rule 35 motion in which the government stated it filed the motion because Kees' testified truthfully as to Fields' involvement in the Smith/Hickman murders. (Ex. 42, 12/8/16 PM Tr. at 203-206). In addition to Hogan's testimony, the Court should have allowed the Rule 35 motion into evidence to rebut plaintiff's argument it was done for some improper purpose or to frame him, when the motion says quite the opposite. The Court also barred Hogan from explaining that Kees' sentence reduction per the Rule 35 was no different than what the Government recommended in 2014 based on its position of what his sentence should have been.

Similarly, the Court should have permitted the defense to explain that Hawkins was paroled in 2014 for reasons having nothing to do with Hawkins' testimony in this case in 2014. (Ex. 27, 11/28/16 PM Tr. at 152-154). All of this evidence was admissible to rebut plaintiff's allegations that the deals provided to the cooperators were improper. This evidence also rebutted plaintiff's constant accusation that "they" – meaning defendants - gave the El Rukn cooperators deals, when this evidence refuted plaintiff's sweeping characterization and constant refrain that defendants in this case provided any deals.

Like the Government motion criticizing Kees, the Court also improperly allowed plaintiff to violate its order barring evidence of the so called "pros memo." During post-trial proceedings in the mid-1990s, it was alleged that cooperating El Rukn witnesses obtained the government's prosecution memorandum that detailed the evidence from El Rukn cooperators which supported indicting dozens of El Rukns. Plaintiff questioned multiple witnesses about that incident, largely over defense objections, to establish that the El Rukn cooperating witnesses had colluded with each other to frame Fields for the Smith/Hawkins murders. (*See, e.g.,* Ex. 26, 11/28/16 AM Tr. at 147; Ex. 27, 11/28/16 PM Tr. at 32-33; Ex. 35, 12/2/16 PM Tr. at 28; Ex. 44, 12/9/16 PM Tr. at 72-75). To rebut plaintiff's claims, defendants moved to admit the actual documents that were taken by the El Rukns, which clearly proved that (a) they were not the "pros memo" and (b) the documents post-dated the time at which the El Rukn cooperating witnesses were claimed to have used it to collude. (*See* Dkt. 1157; Ex. 43, 12/9/16 AM Tr. at 8-10). The Court improperly denied the motion. *Id.* As a result, and once again, the jury was left with a "skewed picture" of the evidence that the El Rukn cooperating witnesses actually had the pros memo and used it to collude regarding their testimony without actually being able to see the very documents at issue which directly rebutted that point. Worse, defendants were not allowed to corroborate Hogan's

oral testimony that the documents at issue were *not* the pros memo, which not only unfairly undermined Hogan's credibility, but that of the El Rukn cooperating witnesses.

Similarly, the Court limited defendant's ability to cross-examine Carter, the one El Rukn witness plaintiff called who supported plaintiff's case with relevant evidence that he kills people. Plaintiff didn't have to call Carter as a witness, but he did so to present testimony that one of his accomplices in the Smith/Hickman murders was denying involvement too. In other words, to support his claim he was innocent. While Carter is now an elderly man who presented as a sympathetic figure when he walked to the witness stand with assistance, defendants had admissible evidence from the time of the murders relevant to Carter's role in the El Rukns then. Specifically, Carter was captured in a confidential overhear on January 22, 1985 warning a Government informant that he kills people. (Ex. 7, 3/12/14 Tr. at 645-49; Ex. 61, 1/22/85 overhear Tr. at 9). The Court barred the evidence, finding that plaintiff's guilt is not an element of the legal claim, that probable cause as to Carter had little probative value, and that if it is relevant, it is "unfairly prejudicial and far exceeds its probative value." (Ex. 7 at 657). The issue of plaintiff's guilt was, of course, a crucial issue at trial for many reasons, including whether defendants fabricated evidence, whether they withheld material evidence, and damages. *See Parish v. City of Elkhart*, 702 F.3d 997. Carter's "I kill people" statements were also admissible to corroborate Sumner's statements that Carter was Fields' co-shooter, rather than just "a guy from Evanston" as plaintiff told the jury. Defendants should have been able to introduce Carter's statements even if Carter didn't testify. The fact plaintiff was allowed to call Carter, present him as an innocent old man who like Fields didn't kill people, and then to bar defendants from cross examining Carter with these admissions, added to the cumulative error as it allowed plaintiff to mislead the jury as to who his accomplice/witness was at the time of the murders.

Plaintiff also argued witnesses against him were not credible due to the CCSAO's relocation and living expenses. Defendants should have been able to explain why it was necessary to relocate these witnesses, including that the El Rukns regularly engaged in witness intimidation. Defendants should have been able to present evidence that the relocation was necessary to protect witnesses from realistic fears of El Rukn retaliation. The El Rukns' history of intimidation also explains why the cooperating El Rukn witnesses were so important to prosecutors and why prosecutors were willing to make deals with them. Plaintiff's witness Herschella Conyers asserted it was "unusual" for Hawkins to receive access to phone calls and financial assistance for his family members in exchange for his cooperation (Ex. 36, 12/5/16 AM Tr. at 63-64), but barred defendants from providing specifics why that was necessary, including that the El Rukns had shot Sumner's mother, shot at Davis's sisters, shot up Henry Harris' parents' restaurant, and committed other specific acts of witness intimidation. (Ex. 37, 12/5/16 PM Tr. at 55-58). Allowing defendants to elicit that these benefits to Hawkins were for "safety" reasons was insufficient.

And unfortunately, in one of the only instances when the Court did admit evidence of El Rukn criminal activity, its prejudicial instructions to the jury served to undermine not only the evidence, but also the credibility of defense attorneys, and more importantly, the credibility of crucial witness Brian Sexton. Specifically, during Sexton's testimony, he recounted testimony at the 2009 criminal trial by gang crimes expert Thomas Richardson that the only way to rise up in the El Rukn organization was through violence. (Ex. 35, 12/2/16 PM at 85). On plaintiff's objection, the Court asked to see Richardson's 2009 testimony, which read as follows:

Q. Now when you say promoted, to your knowledge, how does one get promoted to the El Rukn street gang.

A. By Jeff Fort.

47

Q. And what is that based on?

A. Based on how he's running these different narcotic locations. He's not letting the location get pushed around by any outside gangs and by violence.

(*Id*. at 89-90). After the Court concluded that Richardson's testimony was "not even close" to what Sexton had testified, O'Callaghan's counsel proposed a curative instruction advising the jury that Sexton's testimony on that point was "inaccurate" and requested that he be allowed to show Richardson's actual testimony so the jury could see the degree of the inaccuracy – which was minimal. (*Id*. at 92). The Court instead gave the following instruction:

THE COURT: Immediately before the break, the witness gave testimony that their gang crimes expert testified that the only way you rise up is through violence. The testimony was incorrect. There was no such testimony at Mr. Fields' 2009 trial. I have read it myself. Okay? Move on to another topic, Mr. Kulwin.

(*Id*. at 98). To be sure, Sexton's testimony was that the "only" way to be promoted was through violence, while Richardson's testimony linked violence with running a good narcotics location and protecting it from other gangs. That minimal difference, however, did not support the Court's characterization and instruction. Further, the effect of the Court's instruction was to leave the jury with the inaccurate belief that Sexton had lied and that O'Callaghan's counsel had elicited testimony that did not exist. Subsequently, the Court allowed defense counsel to read Richardson's actual testimony during testimony by Conyers, one of Fields' prior attorneys. But the Court (a) would not allow him to show the jury the transcript so the jury could see it and that it actually occurred, and (b) over defense objections, reinstructed the jury that Sexton's testimony that you rise up only through violence was inaccurate and that there "was no such testimony." (Ex. 36, 12/5/16 AM Tr. at 91). In so doing, the Court reinforced the impression that Sexton lied and that the testimony about "rising up" "by violence" never occurred, and that defense counsel was attempting to put misleading evidence in front of them. This incident alone, and when combined with the other errors discussed herein, precluded defendants from obtaining

a fair trial, especially given the centrality of Sexton's importance in the case. Moreover, the Court's instructions improperly gave the impression that it wasn't true that the only way to rise up through the El Rukns was through violence, when there is evidence it is true.

Finally, as noted above, evidence of El Rukn criminal activity was also relevant to refute plaintiff's claim that he participated only in the peaceful activities of the gang rather than criminal activities like the Smith/Hickman murders. Plaintiff is an admitted Officer in the El Rukns and there was evidence presented he was a General. Plaintiff's denial of knowledge and participation of El Rukn criminal activity is not credible in light of the overwhelming evidence of El Rukn violence to which plaintiff was undoubtedly aware in light of his position in the gang. The Court's rulings and instructions barring necessary evidence of El Rukn criminal activity cannot be considered harmless in light of the skewed picture of plaintiff, defendants, and the prosecutors presented to the jury caused by this cumulative error.

## V.    Plaintiff's 1972 Conviction for his 1971 Murder of Larry Watkins.

With respect to Fields' 1972 murder conviction, the Court initially ruled on March 9, 2014 that it was inadmissible to impeach his credibility. However, the Court deferred ruling on whether the conviction was admissible to rebut plaintiff's claim he suffered significant emotional distress until the damages portion of the trial, and on whether the conviction was admissible for purposes of materiality because it was offered in aggravation at the penalty phase of Fields' 1986 trial. (Dkt. 550 at 10-12). On March 11, 2014, the Court permitted defendants to introduce Fields' 1972 conviction. (*See* Ex. 6, 3/11/14 Tr. at 424-42). However, the Court allowed plaintiff's attorneys' to confer with Fields one more time to confirm he still wanted to seek damages based on the death penalty and proceed with his claims relating to the Vaughn/White murders in light of his ruling regarding the admissibility of the murder conviction. *Id*. at 427-28. After conferring with Fields, his counsel advised he did not want to change the case in any way

and agreed the 1972 murder conviction came into evidence. (*Id*. at 430; Dkt. 685 at 1-2). Prior to

the 2016 trial, plaintiff's counsel incorrectly suggested Candace Gorman negligently allowed the

1972 murder conviction into evidence. Exactly as he did at the 2014 trial, plaintiff at the 2016

trial made a calculated decision to pursue the death penalty and the malicious prosecution claim

with respect to the Vaughn/White murders knowing that in so doing defendants should be

permitted to introduce Fields' 1972 conviction.  This time the Court reversed itself and allowed

plaintiff to have it both ways: he could seek damages for the death penalty and argue

Vaughn/White, but the murder conviction was now barred. (Dkt. 1084 at 9-13). The Court

incorrectly accepted plaintiff's argument that the 1972 murder conviction should be barred

because plaintiff was eligible for the death penalty solely by virtue of the fact he was convicted

of killing Smith and Hickman. *Id*. Eligibility, however, is not the point; materiality is the point,

and the Watkins murder conviction was introduced into evidence at the sentencing phase.

Moreover, at other points of the trial, this Court decisively ruled that all evidence

introduced at the penalty phase was admissible for purposes of materiality. (Ex. 36, 12/5/16 AM

Tr. at 139-40).  It is unclear why the Court ever ruled differently as to the 1972 murder

conviction.  In addition to reasons of credibility discussed above, the Watkins murder was

admissible with respect to materiality and damages.

**VI.      The Denial of Plaintiff's Petition for Certificate of Innocence.**

The denial of plaintiff's COI was relevant to plaintiff's due process claim, IIED claim,

credibility, damages and other issues.  *See Logan v. City of Chi.*, 09 C 5471, Dkt. 423 at 1-3

(N.D. Ill.2012) (COI admissible to plaintiff's malicious prosecution claim and damages and not

unfairly prejudicial) (Ex. 62). As for the due process claim, the denial of the COI supported

defendants' position at trial that a reasonable prosecutor would not have dismissed plaintiff's

criminal case before 2009 if he had the working file; the CCSAO opposed the COI while in

possession of the working file. Likewise, the denial of the COI supports defendants' argument that they did not fabricate evidence. If plaintiff is guilty, the eyewitness identifications and cooperators testimony were truthful.

The denial of the COI is also relevant to defendants' reliance on the cooperating El Rukns and to rebut plaintiff's IIED claim. (*See* Ex. 48 at 32: Judge Biebel Ruling, "these El Rukn witnesses were believable"). This rebuts plaintiff's claims regarding the reasonableness of defendants' reliance on these witnesses, which was an important issue at trial as to defendants' conduct. Indeed, plaintiff's attorney argued throughout his closing that: "They doubled down, tripled down trying to [convince] you [he] did it. They are letting serial killers out of prison." (*See* Ex. 45, 12/12/16 Tr. at 250; *see also id.* at 44, 109, 253). As such, it is clearly relevant and admissible rebut at least one of the themes of plaintiff's case.

In denying plaintiff's COI, Judge Biebel also made findings that plaintiff had provided "unbelievable" and "misleading" testimony during that proceeding, that plaintiff had "history of fabricating stories for legal gain," he "generally shows a disregard for the truth-finding function of our courts of law," a "history of deception," and he "has a history of being untruthful in courts of law." (Ex. 48 at 7-8, 11, 21, 48-49). This evidence should have been admitted on plaintiff's credibility; at a minimum, defendants should have been permitted to question Fields about these findings, similar to the Court's allowance of plaintiff's attorney's questioning of Clay regarding Judge Conlon's opinion. (Ex. 38, 12/6/16 AM Tr. at 82-85; *see U.S. v. Dawson*, 434 F.3d 956, 959 (7th Cir. 2006).

The Court also barred the denial of the COI for the liability phase of the trial based on its finding that issue preclusion does not apply, that the COI does not bear on whether the criminal proceedings were terminated in plaintiff's favor, and because judicial notice does not apply.

First, issue preclusion is a separate concept from the admissibility of evidence. Second, the denial of a COI is relevant to whether *People v. Fields* terminated in a manner indicative of his innocence, since Judge Biebel's ruling contradicts that conclusion. And third, as Judge Bucklo found, judicial notice does apply to the issuance of an order on a petition for COI. (Ex. 62 at 2).

At a minimum, the COI should also have been admitted to clear up the confusion intentionally caused (and then improperly argued) by plaintiff's counsel regarding the deals "they" afforded to Hawkins and Kees in 2013 in connection with the COI. (*See* Ex. __, 11/28/16 AM Tr. at 150-51; Ex. 27, 11/28/16 PM Tr. at 58; Ex. 28, 11/29/16 AM Tr. at 60; Ex. 31, 11/30/16 PM Tr. at 24; Ex. 45, 12/12/16 Tr. at 44, 250, 253). Plaintiff's counsel was permitted to ask questions regarding Hawkins' and Kees' testimony at "joint depositions" in the COI and this case pursuant to their deals with the CCSAO (Ex. 29, 11/29/16 PM Tr. at 69-72; Ex. 30, 11/30/16 AM Tr. at 5-7), leaving the impression that the deals were for their testimony in this case in 2014. During the 2014 trial, this Court instructed the jury that the COI proceeding was unrelated to this trial, that defendants herein were not parties to that proceeding, and that defendants weren't involved in the deals the State made with Hawkins and Kees in that proceeding (Ex. 9, 4/22/14 Tr. at 2487), but refused to give a similar instruction at this trial. (Ex. 27, 11/28/16 PM Tr. at 71). The Court's order barring reference to the COI proceeding, or at a minimum giving an instruction similar to the 2014 instruction, was cumulative prejudicial error.

Finally, the denial of the COI was relevant to compensatory and punitive damages, as plaintiff's guilt and defendants' malice were central issues to those claims. This Court held it would be "inappropriate, unfairly prejudicial, and unduly confusing to admit the finding of another judge that was based on a different body of evidence." (Dkt. 685 at 8).[6] The Court also

---

[6] Reliance on the perceived prejudice and confusion of admitting evidence of the denial of a COI cannot be squared with rulings in this district admitting evidence when a COI is granted. *E.g., Logan*, 09 C 5471,

found the prejudice and confusion caused by the COI would "far outweigh the probative value in this case of the state court judge's findings…." *Id*. Regardless of the evidence adduced, plaintiff had every incentive to litigate that issue fully, and Judge Biebel's finding is evidence relating to Fields' guilt or innocence, as Judge Bucklo held in *Logan*, and it is directly relevant to whether defendants' improperly "tripled down" in this proceeding to prove plaintiff guilty as this Court allowed plaintiff to argue. Based on plaintiff's arguments throughout the trial as to the outrageous nature of defendants' conduct, it would not have been unfairly prejudicial to admit the denial of the COI into evidence.

## VII. Cumulative Error as to the Alleged Fabrication of Eyewitness Identifications.

### A. The Improper Admission of the 2011 Affidavits of Gerald Morris

Plaintiff's main contention against O'Callaghan was that he fabricated eyewitness identifications by manipulating Randy, Eric and Morris to identify plaintiff as one of the shooters. To vitiate Morris' damning evidence, plaintiff's lawyers and private investigator obtained affidavits from him in 2011 in which he recanted his prior sworn testimony and alleged that O'Callaghan fabricated that testimony. (*See* PX 24A). During the second trial in this case, the Court admitted the 2011 affidavits over defendants' objection. (*See* Dkt. 604, 607; Ex. 11, 4/23/14 PM Tr. at 2832). Prior to this trial, O'Callaghan moved to depose Morris (Dkt. 887) while all defendants moved to reconsider the Court's ruling on the admissibility of the affidavits (Dkt. 962). Both motions were improperly denied.

#### a. Denial of Defendants' Motion to Depose Gerald Morris was Erroneous

Morris was one of the most important non-party "witnesses" given the nature of his actual testimony and contrary, subsequent affidavits. Over a year prior to the start of the third

---

Dkt. 423 at 1-3 (N.D. Ill. 2012); *Kluppelberg v. Burge*, 84 F. Supp. 3d 741, 745-46 (N.D. Ill. 2015). Moreover, this court's concerns about issue preclusion and judicial notice are equally applicable to both the denial and the grant of a COI.

trial, O'Callaghan moved to depose Morris. (Dkt. 887). At the time, the Court had already entered a protective order, which precluded defense counsel from interviewing Morris regarding the contents and creation of the 2011 affidavits, and it was apparent that Morris was not going to appear at trial as he lives out of state. (Dkt. 887). The Court denied O'Callaghan's motion based on "untimeliness" and the notion of "finality," as plaintiff could point to no prejudice he would suffer from a deposition. (Ex. 13, 10/29/15 Tr. at 11-12). The denial of defendants' motion to depose Morris about the facts contained in those highly prejudicial affidavits deprived O'Callaghan of a fair trial as he had no meaningful opportunity to confront Morris about his purported recantation of his trial testimony. This ruling, based on finality, was particularly unfair in comparison to the Court's ruling to extend *Monell* discovery. (*See e.g.*, Dkt. 872, 911).

      b.    <u>Denial of Defendants Motions to Bar Morris' 2011 Affidavits was Erroneous</u>

On May 15, 2016, defendants again moved to bar plaintiff from introducing the 2011 affidavits because they were barred by Rules 806, 807 and/or 403, which the Court denied. (Dkt. 962). This was particularly harsh and unjust given that: (a) the affidavits read like a summary of plaintiff's theory of the case against O'Callaghan: and (b) in 1999, Morris executed an affidavit essentially to the same effect – albeit a mere shadow of the detailed nature of the 2011 affidavits – obtained by plaintiff's counsel and then, at plaintiff's 2009 criminal trial, recanted it in open court. In sum, these affidavits had all of the badges of inherent unreliability that led to hearsay historically being banned from trials in the first instance and thus should have been barred under, at a minimum, Rule 403. *See Akrabawi v. Carnes Co*., 152 F.3d 688, 697 (7th Cir.1998)

In closing argument, plaintiff's counsel contended that the affidavits were the ultimate proof of O'Callaghan's fabrication of evidence. (Ex. 45, 12/12/16 AM Tr. at 72-77). That took unfair advantage of the affidavits' admission. When combined with all of the other errors that

similarly painted a "skewed picture" of the evidence and in particular as to both Morris' actual testimony and O'Callaghan's conduct in investigating the Smith/Hickman murders, this was reversible error.

### B. O'Callaghan's Credibility & Court's Improper Instruction Relating to Morris.

Plaintiff embellished O'Callaghan's alleged improper conduct concerning Morris by falsely implying that O'Callaghan tried to interview Morris after Morris executed those affidavits. O'Callaghan denied it, stating: "I did not because your side hired an attorney and barred anybody from going back to get an honest assessment of what Gerald had told. That's a fabricated affidavit." (Ex. 20, 11/18/16 PM Tr. at 183). The Court struck O'Callaghan's answer and instructed the jury as follows:

> So there was a statement that your side in reference to Mr. Loevy's side, your side hired an attorney and barred anybody from going back to [get] an honest assessment of what Gerald had told him, that's in error. Mr. Morris had an attorney that obtained an order barring anybody from contacting him. It wasn't Mr. Loevy's side. It wasn't Mr. Fields' side. (*Id.* at 187).

Contrary to the instruction, the record shows O'Callaghan had a factual basis for his testimony. (Dkt. 1120 at p. 9-10).[7] This instruction unfairly made it appear that O'Callaghan was not only misrepresenting the facts but also being untruthful about his conduct in trying to get Morris to improperly recant those affidavits. The end result was to unfairly damage O'Callaghan's credibility on the central issue of his conduct with respect to Morris, as well as to make him appear guilty of the very conduct of which plaintiff was accusing him - improperly influencing Morris.

### C. Admission of the Vaughn/White Evidence was Unduly Prejudicial Propensity Evidence that Should have been Excluded.

An additional error with respect to eyewitness identification evidence compounded the Morris problems and, collectively, caused the trial to be unfair.

---

[7] As the record shows, plaintiff's counsel "found" an attorney for Morris after producing the affidavits, who then moved for the Protective Order that barred anyone from interviewing him. *Id.*

At the second trial, the Court's ruling allowed plaintiff to introduce evidence concerning the Vaughn/White investigation to establish it was improperly used to obtain the death penalty. Here, plaintiff abandoned the argument that any alleged wrongdoing in the Vaugh/White investigation led to receiving the death penalty. Nevertheless, the Court, over objection that the Vaughn/White evidence was improper propensity evidence (Dkt. 1092), ruled that evidence relating to the Vaughn/White investigation was admissible. Specifically, the Court held that the Smith/Hickman and Vaughn/White investigations were "closely linked," and thus "if Fields [could] show that an individual defendant deliberately took steps to fabricate or conceal evidence in connection with Vaughn/White, it tend[ed] to make it more likely that the same defendant acted deliberately—*i.e.,* with malice—in connection with Smith/Hickman." (Dkt. 1092 at 9).[8] The Court erred in rejecting defendants' propensity argument. Specifically defendants argued that the evidence plaintiff sought to introduce about the Vaughn/White investigation involved actions, almost exclusively by others who were not defendants in this case, to charge individuals, *other than Fields*, for the Vaughn/White crime. Accordingly, defendants argued such evidence was inadmissible propensity evidence offered to show that because defendants tried to allegedly frame people *other than Fields* for the Vaughn/White murders, it is more likely that defendants framed Fields for the Smith/Hickman murders. *Id*. Worse still, it was inadmissible prejudicial evidence almost exclusively about individuals who were *not* defendants in this case.

At trial, this is exactly how Plaintiff used the evidence relating to Vaughn/White. O'Callaghan, former ASA, now Judge Jack Hynes, and others, were questioned about the methods used to investigate the Vaughn/White murders to the effect that the police and the CCSAO rigged line-ups, ignored leads implicating individuals other than those identified by

---

[8] It was a surprising ruling given the Court itself had questioned the relevancy of the Vaughn/White investigation after plaintiff abandoned his death penalty argument regarding it. (Dkt 1084, fn. 4)

witnesses, and otherwise acted improperly to frame someone, but *not Fields*, for being responsible for those murders. (*See e.g.*, Ex. 19, 11/18/16 AM Tr. at 31, 37; Ex. 24, 11/23/16 AM Tr. at 110). Accordingly, the actual Vaughn/White investigation evidence was nothing more than unduly prejudicial propensity evidence that deprived defendants, and in particular, O'Callaghan, of a fair trial, especially when viewed in connection with the other errors referred herein.

## D. The Prejudicial Hallway Jury View.

In addition to the Morris affidavits and the Vaughn/White propensity evidence, the improper hallway jury view contributed to cause the trial to be fundamentally unfair with respect to the eyewitness identification issues. Jury views are "highly unusual," (*Inaganti v. Columbia Prop. Harrisburg,* 2010 WL 2471671 at *3 (E.D. Pa.2010)), and rarely appropriate (*Ruelas Aldaba v. Michelin N. Am., Inc.*, 2005 WL 3560587 at *7 (N.D. Cal.2005)). Among the factors for the court to consider are the availability of other sources of documentary evidence or witness testimony to the jury, whether the jury would be confused or misled, and whether cross-examination had been permitted regarding the details of the scene. *U.S. v. Crochiere*, 129 F.3d 233, 236 (1st Cir.1997). Here, the hallway view served only to mislead the jury. (Ex. 17, 11/16/16 PM Tr. at 144). The murders occurred at about 10:00 a.m. on a sunny day. The hallway is dark by comparison and did not replicate the conditions at the scene; in fact, the jury view distorted what the witnesses saw. Since there was no fact at issue that the hallway viewing could assist, the only result was to prejudice defendants, which plaintiff compounded in closing arguments. (Ex. 45, 12/12/16 Tr. at 63).

## VIII. The *Monell* Evidence Tainted the Whole Trial.

As discussed above, a variety of inadmissible *Monell* related evidence was introduced, including plaintiff's underproduction theory, Brasfield's testimony, and the *Jones*/*Palmer*

litigation. None of this evidence should have been allowed, and its admission caused the trial to be fundamentally unfair. Murphy and O'Callaghan were forced to defend themselves on plaintiff's specific claims against them – with the backdrop of an allegedly "entrenched" culture at the CPD of withholding exculpatory material in street files, and then the introduction of evidence that the CPD underproduced miscellaneous documents in 50 plus other cases, and further that the CPD failed to adhere to DDSO 83-1 in about 400 other cases. *See Ojeda-Beltran v. Lucio*, 2008 WL 2782815, at *3 (N.D. Ill.2008) (Aspen, J.) ("We believe that there is a real "danger that evidence admissible on the issues relating to conduct by the City … will contaminate the mind of the finder of fact in its consideration of the liability of the other defendant[s].'") This evidence should not have been admitted on the *Monell* claim as discussed above, and its introduction unfairly prejudiced Murphy and O'Callaghan.

## PLAINTIFF'S COUNSEL'S MISCONDUCT
## PRECLUDED DEFENDANTS FROM RECEIVING A FAIR TRIAL

"To obtain a new trial based on attorney misconduct, a party must show that such misconduct either prejudiced its case, *Whiting v. Westray*, 294 F.3d 943, 944 (7th Cir.2002) (applying Rule 59(a)), or undermined its ability to "fully and fairly present" its case on the merits, *Venson v. Altamirano,* 749 F.3d 641, 651 (7th Cir. 2014)(applying Rule 60(b)(3)); *accord Ty Inc. v. Softbelly's Inc*., 353 F.3d 528, 536 (7th Cir. 2003)("[U]nder Rule 60(b)(3) the victim of the . . . misconduct need show only that it affected his ability to present his case, not that he would have won had the . . . misconduct not occurred.").[9] The cumulative effect of a lawyer's misconduct in a jury trial is grounds for a new trial even where no one inappropriate act is

---

[9] As this Court has recognized, separate motions for a new trial under Rule 59(a) and Rule 60(b)(3) may be considered jointly, because of the similarity of the applicable standards. *Merix Pharm. Corp. v. Clinical Supplies Mgmt*., *Inc*., 106 F.Supp.3d 927, 933 (N.D. Ill.2015). Accordingly, and in order to avoid unnecessarily duplicative filings, defendants request relief under both Rule 59 and Rule 60(b)(3) according to the appropriate standards.

sufficient to warrant such a result. *See Adams Lab., Inc. v. Jacobs Eng. Col, Inc.,* 761 F2d 1218, 1227 (7th Cir.1985); *accord,* *Walden,* 846 F. Supp. 2d at 979-80. Further, a new trial can be warranted when such actions occur in the face of "numerous inappropriate statements, questions, and arguments" throughout the trial – regardless of whether the district court sustained objections to such conduct, instructed the jury to disregard the improper evidence and/or argument, instructed the jury that lawyer's questions and argument are not evidence and admonished the offending attorney in front of the jury – where the trial judge's actions could not sufficiently minimize the resulting harm. *Walden, supra; Klotz v. Sears, Roebuck & Co.,* 267 F.2d 53, 55 (7th Cir.1959).

Here, plaintiff's lead counsel ("Counsel") engaged in an intentional pattern of highly prejudicial conduct, from opening through closing, and deprived defendants of a fair trial. The Court itself acknowledged that Counsel engaged in improper, argumentative and highly prejudicial questioning of witnesses throughout the trial. The Court's admonishments, however, did not cure the prejudice or even stop the misconduct. While the Court ultimately began sustaining many of defendants' objections, the questions themselves were prejudicial. This is especially so given the amount of times plaintiff asked improper questions throughout the trial. Indeed, during one of the many sidebars, defense counsel specifically raised this issue with the Court. (*See e.g.*, Ex. 35, 12/2/16 PM Tr. at 151-52). Moreover, in light of the constant improper questioning by Counsel, defense counsel was required to continually make objections, thereby alienating the jury. This point was also brought to the Court's attention. (Ex. 33, 12/1/16 PM Tr. at 6-7). And while it is clear that the Court understood defense counsel's concern (*id.*), there was nothing done to eliminate the prejudicial effect of Counsel's pattern of highly prejudicial litigation tactics and a new trial is therefore warranted. *See U.S. v. Riley*, 621 F.3d 312, 339 (3d

Cir.2010) ("[R]epeated conduct that permeates the trial" is "[t]he type of conduct that warrants granting a new trial.").

By way of example, the Court reprimanded and/or admonished Counsel at least eleven times during his examination of O'Callaghan *alone*. (*See* Ex. 19, 11/18/16 AM Tr. at 69 (COURT: The comment is stricken. The jury is directed to disregard it. Mr. Loevy, we have had this conversation. Don't do this.); Ex. 22, 11/21/16 PM Tr. at 29 (COURT: Mr. Loevy, I'm telling you for God's sake don't go plowing into this stuff. How many times do we have to go through this whole exercise when I tell people raise this stuff with me at a sidebar. Come on? It's not my job is to save you from yourself.); *see also* Ex. 19, 11/18/16 AM Tr. at 61; Ex. 20, 11/18/16 PM Tr. at 30-31, 88 ,188-89; Ex. 21, 11/21/16 AM Tr. at 79, 83; Ex. 24, 11/23/16 AM Tr. at 61-62, 69, 109). Counsel was undeterred by the Court's admonishment. Indeed, Counsel asked O'Callaghan a minimum of 126 improper questions.[10] The sheer number of sustained objections is enough to indicate that Counsel's conduct was egregious. *Walden*, 846 F. Supp.2d at 977. While the Court noted "questions are not evidence" (Ex. 20, 11/18/16 PM Tr. at 188-89), there was nothing that could have undone the unfairly prejudicial effect of the barrage of improper, argumentative, foundationless questions. Indeed, on one occasion, the Court recognized the particularly highly prejudicial and improper conduct of Counsel after he posed the following inflammatory question to Kees: "Your testimony with Mr. Kulwin was literally a review of a transcript of prior questions and answers, wasn't it?" (Ex. 31, 11/30/16 PM Tr. at 102). The Court sustained defense counsel's objection and admonished Counsel at sidebar:

---

[10] This represents the number of times the Court sustained defense counsel's objections to questions posed to O'Callaghan. Defendants respectfully submit there were dozens more that were improperly overruled and or not objected to for fear of alienating the jury or implying that O'Callaghan had something to hide.

> THE COURT: You're standing over there because I don't want the jury to see how mad I am. []You know goddamn it full well why he did that and it's because I told him that he had to be careful, so you're not allowed to take a ruling that I made and twist it, twist it to your advantage. That's outrageous. That's outrageous. No, you don't get to respond. That's outrageous. I'll think about the sanction later.

(*Id.* at 103). The Court, later on that day, again recognized the seriousness of Counsel's egregious misconduct. (*Id.* at 160-61). Given the context, it seems clear that the improper questioning was intended to inflame the jury and unfairly prejudice the defendants and deny them a right to a fair trial. This all-too-successful litigation strategy entitles defendants to a new trial.[11]

## A.    Bad-Faith Questioning Implying Destruction of Evidence.

Throughout trial, Counsel asked argumentative questions that implied, without basis, that Murphy deleted, rewrote and/or "whited out" handwritten notes.  (*See* Ex. 32, 12/1/16 AM Tr. at 128-29 The questioning became so prejudicial that defense counsel asked for a sidebar and made an oral motion for a mistrial. (Ex. 33, 12/1/16 PM Tr. at 2). As noted above, in an effort to alleviate the prejudicial effect of Counsel's baseless questions, unfounded accusations and arguments, defendants proposed two jury instructions aimed at alleviating that misconduct. (Dkt 1161, proposed additional jury instruction Nos. 1 & 2). The instructions were improperly refused (Ex. 44, 12/9/16 PM Tr. at 1-15) and the ensuing prejudice was therefore not alleviated.

## B.    Bad-Faith Questions/Arguments Relating to CPD Reports & Cooperating El Rukns.

Plaintiff obtained a *limine* order precluding defendants from introducing into evidence any of their handwritten notes/reports that were created from interviews they conducted with cooperating El Rukns, such as Hawkins, while on the Federal Task Force in the late 1980s. (*See* Dkt. 550; Dkt. 561; Ex. 8, 3/17/14 Tr. at 1479-80 (barring DX 171 and 172, notes from interview

---

[11] Defendants have attempted to include as many illustrative examples of Loevy's misconduct as possible. However, there were far too many improper questions throughout the trial to include them all here.

with Kees). Plaintiff also obtained a ruling that precluded defendants from going into the details of any El Rukn criminal activity that did not relate to the Vaughn/White or Smith/Hickman murders. (*See e.g.*, Dkt 550). These rulings specifically prohibited defendants from testifying to any of the details of their investigation into the El Rukns' criminal activities that were reflected in the many notes and reports prepared during their time on the Federal El Rukn Task Force.

Counsel improperly exploited these rulings by asking Murphy and O'Callaghan numerous questions they could not answer completely for fear of violating the pretrial orders. Thus, plaintiff argued to the jury that Murphy and O'Callaghan purposely withheld and/or failed to document information they obtained from cooperating El Rukns during the late 1980s that was relevant to plaintiff's 2009 criminal prosecution. (Ex. 20, 11/18/16 PM Tr. at 144-46).

Despite defense counsel's objection and O'Callaghan's expressed concern that he may violate a pretrial ruling, Counsel was allowed to ask O'Callaghan questions that he knew O'Callaghan could not answer without violating a pretrial ruling, thereby preventing O'Callaghan from explaining the reason there was no CPD report relating to his interview of Hawkins. This improperly left the jury with the false impression that: (1) O'Callaghan never documented his interview with Hawkins; (2) O'Callaghan was required to prepare a CPD report regarding the interview (even though the interview was taken in connection with the Federal Task Force); and/or (3) that O'Callaghan did create a CPD report but withheld it. Further, defendants were prohibited from effectively rebutting plaintiff's improper argument as they were barred from introducing the very evidence that indicated such reports and/or notes existed. Indeed, this is exactly what plaintiff argued at closing: "You've heard a month of testimony. You have to document that stuff. Why didn't O'Callaghan-- he came to court and told you Hawkins told him this and that. Why didn't he write it down?" (Ex. 45, 12/12/16 Tr. at 90).

Even more problematic is the fact that Counsel used this line of questioning to improperly suggest to the jury that the defendants were required to turn over reports and/or notes of El Rukn cooperators to plaintiff who were **not** called as witnesses during plaintiff's criminal trials. For example, during closing arguments, Counsel argued as follows:

> There's not one police report about Derrick Kees. Remember Derrick Kees tells a goofy story. Derrick Kees says Sumner was part of the hit team…Why didn't O'Callaghan create a police report saying that when Kees told the story, Nate Fields wasn't on the hit team? That was withheld and it's gone and it's exculpatory. All of O'Callaghan's witness notes are gone.

(*Id.*) Immediately after Counsel made this argument, defense counsel objected, (*id.*), and at a sidebar, alerted the Court to Counsel's highly improper and prejudicial argument (*id.* at 93-97).

The fact defendants were precluded from rebutting this very evidence is clear from Counsel's own argument to the Court: "I am going to object if Mr. Kulwin starts saying, well, that's a federal task force report[]. There's no such evidence in the record. This is a state prosecution. He has -- he believes that the federal jurisdiction gives O'Callaghan a right not to have created Chicago police reports. We dispute that. The jury hasn't heard any evidence either way." (*Id.* at 98). Stated differently, plaintiff argued that there were no such CPD reports and therefore defendants violated plaintiff's due process rights while simultaneously arguing that defendants were barred from offering into evidence anything created by the Federal Task Force. In other words, plaintiff got his cake and ate it too. In the end, despite the above-mentioned improper arguments, the Court refused to strike any argument as misstating the evidence. (*Id.*)

Counsel continued to take advantage of the pretrial rulings, arguing to the jury that the defendants "cannot get up here and credibly say to you each of these guys [the El Rukn cooperators] told their stories at different locations, because there is no proof of that" (*id.* at 119) and "if it's true that Derrick Kees said that Sumner was on the hit team. Then when Nate went to trial in 2009, why didn't O'Callaghan create a police report for that trial saying Derrick Kees said

63

that the hit team was actually four different guys" (*id*. at 114). These are classic examples of plaintiff unfairly exploiting an *in limine* ruling that he himself obtained.

**C.      Bad-Faith Questioning Regarding Showing Photographs to Witnesses.**

Counsel purposely and repeatedly represented to the jury that Carlos Willis specifically testified during the 1986 criminal trial that O'Callaghan showed him photographs. Counsel had no good-faith basis to ask such questions. Specifically, there were absolutely no documents or prior testimony that even suggested that O'Callaghan ever showed photographs of plaintiff (and others) to Carlos Willis, Torrence White or Cleveland Ball. This misconduct is reflected in the following questions to O'Callaghan:

Q. Okay. So was Mr. Willis able to pick out Mr. Fields' photograph before the lineup?

A. I didn't do a photo array with Willis that I can recall.

Q. All right.  If he had picked out that photo, would you have wrote [*sic*] it down, right?

A. If he had. (Ex. 20 11/18/16 PM Tr. at 47).

Q. Yea.  So it's possible he didn't pick out the photo, right?

A. I don't believe [there] was ever a photo array with Mr. Willis. That's my answer. *Id*. at 48.

Q. *And do you deny the testimony [Willis] gave yesterday that you showed him photos and coached him who to pick? You deny that?*

\*\*\*
A. Absolutely, yes, yes. (*Id*. at 51)

Despite Counsel's admission of a mistake *i.e.,* Willis never gave such testimony, Counsel made the same argument during closing: "You heard testimony from Carlos Willis… He's showing us the photos…". (Ex. 45, 12/12/16 Tr. at 62). Again, this left the jury with the false impression that O'Callaghan showed photographs to certain witnesses when in fact, as Counsel acknowledged, there was no evidence to support it. (Ex. 21, 11/21/16 AM Tr. at 30-31).

### D.  Bad-Faith/Misleading Questioning Regarding Photograph of Plaintiff.

Counsel also improperly published a photograph of Fields' June 14, 1985 lineup alongside a photograph of just Fields' head (which was cropped from the lineup photo) and asked the jury to improperly infer that the smaller photograph was the photo O'Callaghan showed the witnesses prior to having them a view a lineup and suggested that showing the witnesses that photograph immediately before viewing a lineup (which O'Callaghan did not) would make it more likely than not that the witness would pick plaintiff out of the lineup. (*See e.g.,* Ex. 20, 11/18/16 PM Tr. 51-53 (examination of O'Callaghan while improperly displaying photographs side by side)).

### E.  Improper Questions Intended to Violate/Circumvent Pre-Trial Rulings and Orders.

On multiple occasions during the trial, Counsel asked questions that were intended to elicit testimony that was expressly barred prior to trial by the Court's rulings, and/or otherwise not admissible, including but not limited to:

- During the second trial, the Court specifically ruled that plaintiff was precluded from mentioning allegations that Kees took a "pros memo" from Hogan back to the MCC to review with other El Rukn cooperators. (Ex. 9, 4/22/14 Tr. at 2456-58). Nevertheless, Counsel asked Hawkins (and others) about the pros memo at this trial. (Ex. 26, 11/28/16 AM Tr. at 147; Ex. 27, 11/28/16 PM Tr. at 32-33).

- Also during the second trial, the Court ruled, pursuant to Rule 404(b), that plaintiff was prohibited from attributing to O'Callaghan or Hogan a "side deal" and/or promise made to Kees that he would do less than 99 years of his sentence. (Ex. 9, 4/22/14 Tr. at 2424-25, 2461-65). Despite the ruling, Counsel asked Kees about an alleged side agreement he had with Hogan and O'Callaghan and improperly tried to impeach Kees with testimony he gave in 1994. (Ex. 30, 11/30/16 AM Tr. at 99, 103, 109-110; Ex. 31, 11/30/16 PM Tr. at 90-92). Counsel similarly asked Hogan about the alleged side deal with Kees. (Ex. 44, 12/9/16 PM Tr. at 93).

- Attempting to elicit from Hogan inadmissible testimony having to do with pretrial discovery matters. (*Id*. at 121).

- Prior to trial, the Court granted defendants' motion to bar reference to any unrelated cases of police misconduct and John Burge. (Dkt. 549 at 13.) In violation of this ruling, Counsel asked the following highly prejudicial and inflammatory question:

Q. And isn't it true that literally dozens of men have been granted new trials based on *Brady* violations committed by the Chicago Police Department? (Ex. 40, 12/7/16 PM Tr. at 78).

While the Court appropriately sustained defense counsel's objection, Counsel, in simply asking the question, already rung the bell.

## F.    Improper, Inflammatory Statements/Comments Made by Plaintiff's Counsel

Throughout trial, Counsel made seemingly offhand statements while examining witnesses for the purpose of injecting his own theories into the case and/or inflaming the jury. For example,

- During the examination of Randy Langston, Counsel improperly asked the witness why he was looking over there, *i.e.* looking at the defense attorneys, before answering questions to make it look as if the defendants were colluding with him (Ex. 23, 11/22/16 AM Tr. at 73);

- During the examination of Hawkins (Ex. 26, 11/28/16 AM Tr. at 112 (Q. That was lucky for them, correct?); Ex. 28, 11/29/16 AM Tr. at 80-81 (Q. You were gesturing that way [towards Defendants] when you said who you made the commitment to?...these are the gentleman you were cooperating with?));

- During the examination of Kees, after which Kees stated that he did not know his exact parole date, Counsel replied "I bet you do." (Ex. 30, 11/30/16 AM Tr. at 117);

- During the examination of Hogan (Ex. 44, 12/9/16 PM Tr. at 101 (Q. You should not say no idea, right?); *id*. at 117 (Q. Well, you implied it, didn't you?)); and

- During the examination of O'Callaghan (Ex. 19, 11/18/16 AM Tr. at 60 (Q. You shouldn't have to guess, should you, sir?); Ex. 20, 11/18/16 PM Tr. at 35 (Q. We should not have to rely on your memory 30 years later, right?); *id*. at 76 (Q. And you probably should have wrote it down, don't you think?); *id.* at 103-04 (Q. That's your best answer?); *id.* at 130 (Q. Is that the best answer you can give as to the question I asked? ); Ex. 24, 11/23/16 AM Tr. at 113 (Q. But really what the accurate thing to say is that is just a wild guess on your part, correct?)).

Counsel engaged in the same improper conduct in making speaking objections that advanced plaintiff's theory of the case, despite the Court's repeated admonishment directing the parties to refrain from making such objections.  (*See e.g.,* Ex. 45, 12/12/16 Tr. at 109, 164-65, 183).

## G.    Repeating Questions After Court Sustained Defense Counsel's Objections.

Further misconduct is Counsel's repeated questions despite a sustained objection. For example, in questioning defense witness Daniel Brannigan, Counsel asked the same improper question, which assumed facts that were not in evidence, four times within a span of seconds, although the Court sustained defense counsel's objection the first time the question was asked. (Ex. 37, 12/5/16 PM Tr. at 118-20). Counsel's conduct here was not inadvertent but the result of his continued, deliberate efforts to obtain an advantage with the jury by playing fast and loose with procedure and the Court's orders. The improper questioning was designed to present evidence to the jury that was not in evidence, which was highly prejudicial and improper.

Certainly, this was not the only time that Counsel intentionally repeated improper questions despite prior sustained objections. (*See* Ex. 34, 12/2/16 AM Tr. at 136-37 (asked Sexton same argumentative question three times that misstated evidence); Ex. 26, 11/28/16 AM Tr. at 141 (asked Hawkins same argumentative question twice after sustained objection); Ex. 31, 11/30/16 PM Tr. at 93 (asked Kees same questions after Court told counsel to "move on"); *id.* at 105-06 (asked Kees same question about "lying under oath" after sustained objection); Ex. 21, 11/21/16 AM Tr. at 75 (asked O'Callaghan same question immediately after sustained objection); Ex. 26, 11/28/16 AM Tr. at 93 (asked Bogdalek same argumentative question despite sustained objection); Ex. 32, 12/1/16 AM Tr. at 77 (same with respect to Larry Wharrie)).

Similarly, despite admonishment from the Court about using the word "they" when questioning witnesses (*see* Ex. 31, 11/30/16 PM Tr. at 24), Counsel continued to use the term (*see e.g.*, Ex. 26, 11/28/16 AM Tr. at 150 (asking Hawkins: And in 2009, you made a deal to testify against Nate Fields if ***they*** cut your time even further, right?); *id.* at 151; Ex. 28, 11/29/16 AM Tr. at 60 (same)). This made it appear that defendants were involved in the State and

Federal Governments' decisions to cut El Rukn Cooperators' jail time in exchange for their testimony against plaintiff when it fact they were not.

The same thing happened when Counsel used the highly argumentative and loaded word "story." The Court repeatedly directed Counsel to refrain from using the word "story." (*See* Ex. 34, 12/2/16 AM Tr. at 99-100; Ex. 35, 12/2/16 PM Tr. at 31; Ex. 32, 12/1/16 AM Tr. at 68). Counsel's improper use of the word "story" continued unabated. (*Id*. at 99; Ex. 35, 12/2/16 PM Tr. at 31, 32, 146; Ex. 32, 12/1/16 AM Tr. at 68; Ex. 37, 12/5/16 PM Tr. at 144).

Particularly egregious was counsel's disregard of the sustained objections to referring to an incident that occurred at the MCC involving Kees as the "orange crush incident." Counsel was well aware that there was no such thing as an "orange crush" team at the MCC, yet he repeatedly used that term to inflame the jury, which had previously seen a video of plaintiff being subdued and anally searched by an "orange crush" team while on death row. Counsel wanted the jury to believe that defense witness Hogan ordered the MCC to use the "orange crush" team to drag defense witness Kees out of jail cell at the MCC in order to suggest that Hogan improperly influenced Kees' testimony against plaintiff by "roughing him up." Specifically, the following transpired while Counsel was questioning Kees:

Q. The warden was instructing you go talk to Hogan before your testimony, right?

A. Well, it didn't start because of Hogan. It started because of something else.

Q. All right.

A. Hogan ended up getting involved.

Q. And then the ***orange crush*** came and got you out of the cell?

MR. KULWIN: Objection as to ***orange crush***, Judge.

THE COURT: Rephrase the question. (Ex. 39, 11/30/16 AM Tr. at 107).

Counsel ignored the Court's direction and continued:

Q. The testimony that Mr. Kulwin elicited from you about when you said that, that was literally the testimony when the *orange crush* had to get you out of the cell, wasn't it?

MR. KULWIN: Objection to *orange crush*.

THE COURT: That's not what it it's called. (Ex. 31, 11/30/16 PM Tr. at 95).

Undeterred by a second admonishment, Counsel continued:

Q. That was the testimony in which you didn't want to come out of your cell to be briefed by Hogan and they sent the six or seven riot police in helmet and gear to come drag you out, right?

THE COURT: Rephrase the question.

Q. The men were dressed in full riot gear with helmets, batons, and the other things that the *orange crush* wear and there were six or seven of them?

MR. KULWIN: Objection, Judge.

MR. LOEVY: I'm sorry, your Honor. May I ask the question?

THE COURT: Not if you use the words *orange crush*. It's not the state institution. It's a federal institution. (*Id*. at 96).

## H.    Argumentative Questioning.

On numerous occasions, the Court specifically admonished Counsel for continuing to ask

argumentative questions:

THE COURT: I do think the question is *argumentative*, and so save it for argument. (Ex. 20, 11/18/16 PM Tr. at 188-89).

THE COURT: So I can't control how you ask questions, but I can sustain objections to form of the question as *argumentative*. And my standard just changed for that. So you're going to get those objections sustained a lot more often. So you change how you ask questions. (Ex. 31, 11/30/16 PM Tr. at 17).

THE COURT: Look, I understand that it's part of the way you do things because I've seen you try cases before. You basically try to put your whole theory of the case in through the defendants. You know, you ask a*rgumentative* questions, you get argumentative answers and I'm putting an end to it at this point. Seriously, I don't care what you've basically done. I said that before that if you have five more minutes, you can do anything you

please. You cannot do your closing argument through these questions. (Ex. 33, 12/1/16 PM Tr. at 50)

THE COURT: That's an *argumentative* question. I am not going to let you ask it. My strong advice to you is that you be really careful. (Ex. 35, 12/2/16 PM Tr. at 35).

Despite admonishments from the Court, Counsel repeatedly engaged in highly argumentative questions. (*See e.g.*, Ex. 18, 11/17/16 Tr. at 191-92, 195, 203 (Q. Yeah. Would you be happy to testify at a trial about somebody you didn't see?); Ex. 20, 11/18/16 AM Tr. at 60, 67; Ex. _, 11/18/16 PM Tr. at 35, 50, 57, 62-63, 74, 76, 92 (Q. Okay. How could someone 13 months later say it could be this guy, I'm not sure, it could be this guy I saw 13 months from a hundred and whatever feet but not say it couldn't be that guy, what sense does that even make?); 93 (Q. Isn't it true what happened, sir, was you showed him a picture of Mr. Fields, Mr. Langston and you said could this be him, and he said, could it be him, and then he picked him out of a lineup because you already showed him the photo. That's what happened, isn't it, sir?); 103-04, 117, 130, 204; Ex. 21, 11/21/16 AM Tr. at 71, 74, 104, 117; Ex. 28, 11/29/16 AM Tr. at 49 (Q. You're just making this up as you go along?) Ex. 31, 11/30/16 PM Tr. at 12 (Q. Well, you do know that you were supposed to say that Hank's blue car turned into a white car because it got painted, right?); 13, 16 (Q. You have since been told that your answer at the deposition didn't work because he was in jail early in '83 isn't that true?); 17; Ex. 34, 12/2/16 AM Tr. at 136-37; Ex. 35, 12/2/16 PM Tr. at 19-20; Ex. 44, 12/9/16 PM Tr. at 111 (Q. No, no, it's a false statement?)).

## I. Questions that Assumed Facts Not in Evidence.

Throughout the entirety of the trial, Counsel asked numerous questions that referred to facts not in evidence and misstated prior testimony and/or evidence. Defendants could not undo the damage from the widespread misrepresentations that were injected into the trial in this way.

For example, Counsel claimed, through improper questions, that Eric Langston, and other eyewitnesses, were unable to provide a description of the offenders (*see e.g.*, Ex. 18, 11/17/16 Tr. at 191-92) or that descriptions were provided, but O'Callaghan intentionally did not write them down (*Id.* at 195); Ex. 24, 11/23/16 AM Tr. at 89 (Q. Then why did you put Willis in a lineup if he couldn't give you a description?); *id.* (Q. Why did you put Cleveland Ball in – Eric Benson in a lineup if he couldn't give you any description?)). Counsel further falsely stated and/or implied, where absolutely no evidence existed to support it, that O'Callaghan showed certain witnesses photographs of plaintiff (when he did not), those witnesses were unable to make photo identifications, O'Callaghan did not document such evidence, and that certain witnesses specifically told O'Callaghan that they did not see anything on the day of the murders. (*See e.g.*, Ex. 20, 11/18/16 PM Tr. at 48 (Q. And do you deny the testimony he gave yesterday that you showed him photos and coached him who to pick? You deny that?); *id* at 57 (Q. Do you deny that you showed Cornell Jefferson photographs of Mr. Fields, Mr. Hawkins, Mr. Carter, Mr. Andrews?)). Counsel ignored O'Callaghan's denials and proceeded with the same outrageous questions. (*See e.g.*, *id*. at 51 (Q. If he told you I can't give you any description, I didn't see anybody, I was too far away, why did you put him in a lineup?); Ex. 24, 11/23/16 AM Tr. at 80).

Similarly, Counsel misstated the evidence when he asked O'Callaghan "what is the reason you showed Randy the photo but didn't show Gerald the photo" when O'Callaghan specifically testified that he showed Randy, Eric and Morris the photographs on May 16th when they were brought down to 26th and California. (Ex. 20, 11/18/16 PM Tr. at 130). He made the same misstatement a few questions later: "the question is why did you show Randy a photograph but not Gerald?" (*Id.* at 130-31). Again, despite O'Callaghan's testimony that he did not

interview Richard Buckles, show him photographs, or bring him in to view a lineup, Counsel

misstated the evidence and asked "All right. How about Mr. Fields, when Mr. Buckles looked at

Mr. Fields and four other similar looking men, who did Buckles pick?" (Ex. 21, 11/21/16 AM

Tr. at 81; *see also, id.* at 82. The Court recognized Counsel's improper questioning, which

assumed facts not in evidence, immediately thereafter:

> THE COURT: It does assume a fact not in evidence. And to the extent that you've got a
> viable argument that he must have shown him a photo, it's an argument, it's not a question
> for the witness. (*Id.* at 83).

Furthermore, throughout Counsel's questioning of O'Callaghan, he repeatedly stated that

there was evidence the eyewitnesses specifically told O'Callaghan that they were unable to make

an identification. (*See e.g.*, Ex. 20, 11/18/16 PM Tr. at 188-89 (Q. Isn't it true that the reason you

arranged for this meeting in Milwaukee was because in 2000 … Gerald told you it has been 16

years and I am not going to do it, I am not coming to court?); Ex. 21, 11/21/16 AM Tr. at 74 (Q.

No other witness in the case claimed that as these masked men were running away to make good

on their escape they raised their masks, did they?); *id.* (Q. Randy Langston never told you that as

the men were making their escape, they lifted their masks while they were running, did he?)).

This was the entire theory of plaintiff's case against O'Callaghan and there was not one piece of

evidence that would give Counsel a good faith belief that he could ask such questions. These

inadmissible innuendos plagued the trial and severely prejudiced defendants.

**J.      Improper Hypotheticals and Using O'Callaghan's Name in Questions.**

Counsel improperly posed hypothetical questions, not supported by the facts, using

O'Callaghan's name in order to prejudice the jury against O'Callaghan and to put in evidence

that was otherwise inadmissible or not supported by the facts. For example:

- Q. Under the hypothetical I just gave you where it was an issue where ***O'Callaghan***
  denied that he had seen – (Ex. 40, 12/7/16 PM Tr. at 145).

- Q. How about just like a piece of paper that says the name of a detective and a year. Let's say it said *O'Callaghan* '84, would you turn that over? (*Id*. at 139).

- Q. Isn't it true that in certain cases it might be very, very relevant if we could prove that for example *O'Callaghan* checked out this file before he did his reinvestigation, why couldn't that be potentially investigate [and highly] relevant? (*Id*. at 145).

## K.    Improper Impeachment.

The Seventh Circuit has long "recognized that impeachment should not be used as a mere subterfuge to get before the jury evidence not otherwise admissible." *Taylor v. Amtrak*, 920 F.2d 1372, 1376 (7th Cir.1990). This is precisely what Counsel did to confuse the issues and prejudice the jury. Additionally, many of the attempted impeachments were based on irrelevancies, not a substantive or material matter, and thus merely confused the jury. Perhaps the clearest example is Counsel's effort to introduce, through Hogan, the government's 1994 response to Kees' Rule 35 motion. The response, which was not otherwise admissible, included statements that the government did not believe Kees was credible. Counsel read portions of the response, under the guise of impeachment even though Hogan didn't draft the response or have involvement in filing the brief. Hogan, instead, was simply required to answer "yes or no" in reply to whether Counsel read the response properly. (*See e.g*., Ex. 44, 12/9/16 PM Tr. at 95-96). The statements in the response, which were read to the jury, were not shown to be true. Although presented as evidence to impeach Hogan, the questioning was clearly a subterfuge to get into evidence what was barred otherwise, because it was irrelevant, inflammatory, prejudicial, and did not show Hogan to have a character for untruthfulness. This type of subterfuge to elicit irrelevant evidence warrants a new trial. *Kiefler v. L.V. Hacienda, Inc*., 404 F.2d 1163, 1169 (7th Cir.1969).

## L.    Improper Closing Arguments.

Lastly, during closing arguments, Counsel improperly and deliberately appealed to the jury to substitute sympathy for judgment, inserted his own personal opinions about witness

credibility and misstated the evidence and testimony. When the jury is flooded with improper and false arguments, a new trial is appropriate. *See e.g., Klotz,* 267 F.2d at 55; *Probus v. K-Mart, Inc.,* 794 F.2d 1207, 1211 (7th Cir.1986) (improper for counsel to express his beliefs regarding the honesty of the opposing party's witnesses). For example, Counsel misstated the evidence and made arguments that were not supported by the evidence introduced at trial when he:

- Falsely argued that Hogan filed the government's Rule 35 motion for Kees (Ex. 45, 12/12/16 Tr. at 112);

- Falsely argued that defendants were "letting serial killers out of prison" (*id*. at 118, 250, 253);

- Falsely argued that there was no evidence that the El Rukn cooperators told their stories to the defendants while they were at different locations when plaintiff successfully obtained a ruling precluding defendants from offering into evidence those very documents, *i.e.*, plaintiff prevented defendants from introducing those documents and then exploited the ruling by arguing that no such documents existed (*id*. at 119);

- Misstated Hogan's testimony that he drafted witnesses' grand jury statements before ever talking to them (*id.* at 101); and

- Misstated the evidence that Hogan included information regarding the Vaughn/White murders in Hawkins' grand jury statement because he heard about it from O'Callaghan (*id*.).

Counsel improperly asserted his own personal opinions regarding the honesty and credibility of defense witness to the jury. For example:

MR. LOEVY: [Hogan] is not a truth teller. That's why I got so upset with him. He told those ridiculous lies. Like when he said, oh, when Derrick Kees accused me of making a secret deal with him, I never even read the government's response. If you were saying to yourself this guy was full of it, you weren't the only one. That's why I got a little angry with them because he was not a truth teller. (Ex. 45, 12/12/16 Tr. at 120).

Finally, Counsel also spent the better part of closing arguments appealing to the jury to substitute sympathy for judgment by, for example:

- Arguing that it should "offend the jury" that the only reason Hawkins is no longer in prison is because "he came to court and told [defendants'] story" (*id*. at 109-10);

- Arguing the jury should "keep [] in consideration as [they] decide this case" that defendants,"[i]nstead of acknowledging that they screwed up, they are freeing serial killers…to tell their story so that you won't hold them accountable (*id*. at 117);

- Arguing to the jury that the defendants should be "ashamed" of themselves for "letting" Hawkins get out of jail (*id*. at 118), that the jury should be "bothered by the overreaching" of defendants (*id*. at 234-35), and that defendants' arguments were "offensive" (*id*.);

- Arguing by finding for the defendants, they would be accepting "dangerous arguments" (*id*.);

- Asking the jury to send a message: "What signal you're going to send, what deterrence you're going to send, what measure of outrage to the community about what you've seen. You are going to have to decide both those questions" (*id*. at 141-42).[12]

In sum, Counsel's systematic misconduct throughout this trial had a "substantial and injurious effect or influence on the determination of [the] jury," *Cerabio*, 410 F.3d at 994, warranting a new trial under Rule 59(a). But even setting aside the question of prejudice – which, again, is irrelevant when the fundamental fairness of a proceeding has been called into question, *see Ty Inc*., 353 F.3d at 536 – a new trial is still necessary under Rule 60(b)(3) because Counsel's misconduct prevented defendants from being able to fairly and adequately present their case. *See Frymire–Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 188 (7th Cir.1993). Defendants are entitled to a new trial on the claims that they lost and also on damages.

WHEREFORE, Defendants City, O'Callaghan, and Murphy request that this Court enter judgment as a matter of law against plaintiff as discussed in defendants' Renewed Rule 50(b) motion discussed above or, in the alternative, grant a new trial on the claims they lost and also on damages for the reasons discussed above, and for any other relief this Court deems appropriate.

---

[12] What makes this particularly prejudicial is the fact that the Court, *sua sponte*, cut defense counsel off, admonished him in front of the jury for making an argument – in which he was responding to Counsel's improper arguments – that improperly appealed to the sympathy of the jury and gave a curative instruction. (Ex. 45, 12/12/16 Tr. at 207-08). In contrast to the Court's decision to refrain from admonishing Counsel, this signaled to the jury that Counsel's comments were proper and the jury was entitled to consider plaintiff's emotional appeals in rendering a verdict.

Respectfully submitted,

By:   s/ Daniel M. Noland             By:   s/ Shelly B. Kulwin

Attorneys for Defendants, City of Chicago      Attorneys for Defendant, David O'Callaghan
and Joseph Murphy

Terrence M. Burns                  Shelly B. Kulwin
Paul A. Michalik                   Rachel A. Katz
Daniel M. Noland                  Kulwin, Masciopinto & Kulwin, LLP
Molly E. Thompson                161 N. Clark Street
Dykema Gossett PLLC            Suite 2500
10 South Wacker, Suite 2300       Chicago, IL 60601
Chicago, Illinois 60606

## CERTIFICATE OF SERVICE

I hereby certify that on **January 13, 2017**, I electronically filed the foregoing

**Defendants' Combined Post-Trial Motions** with the Clerk of the Court using the ECF system,

which sent electronic notification of the filing on the same day to:

H. Candace Gorman
Andrew D. Finke
Law Office of H. Candace Gorman
220 S. Halsted
Suite 200
Chicago, IL 60661
312.427.2313
hcgorman1@gmail.com
andrew.finke@gmail.com

Jon Loevy
Steve Art
Anand Swaminathan
Sarah Grusin
D. Samuel Heppell
Anthony Balkissoon
Loevy & Loevy
311 North Aberdeen, Suite 3rd Floor
Chicago, IL 60607
(312) 243-5900
jon@loevy.com
steve@loevy.com
anand@loevy.com
grusin@loevy.com
sam@loevy.com
tony@loevy.com

Shelly B. Kulwin
Rachel A. Katz
Kulwin, Masciopinto & Kulwin, LLP
161 N. Clark Street
Suite 2500
Chicago, IL 60601
312.641.0300
312.855.0350 (fax)
skulwin@kmklawllp.com
rkatz@kmklawllp.com

s/ Daniel M. Noland