# Exhibit RRR

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| GERALDO IGLESIAS, | ) | |
| | ) | Case No. 19-cv-6508 |
| *Plaintiff*, | ) | |
| | ) | Judge Franklin U. Valderrama |
| *v.* | ) | |
| | ) | Magistrate Judge Maria Valdez |
| REYNALDO GUEVARA, the ESTATE of | ) | |
| ERNEST HALVERSON, STEVE GAWRYS, | ) | |
| ANTHONY RICCIO, ROBERT BIEBEL, | ) | |
| and the CITY OF CHICAGO | ) | |
| | ) | JURY TRIAL DEMANDED |
| *Defendants*. | ) | |

# EXHIBIT 47

## *Rivera* Plaintiff's Response to Defendants' Summary Judgment Motion

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |  |
|---|---|---|
| JACQUES RIVERA, | ) | |
| | ) | Case No. 12 C 4428 |
| *Plaintiff*, | ) | |
| | ) | Hon. Joan B. Gottschall, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | Hon. Mary M. Rowland, |
| | ) | Magistrate Judge |
| *Defendants*. | ) | |
| | ) | JURY TRIAL DEMANDED |

## PLAINTIFF'S CONSOLIDATED RESPONSE IN
## OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTIONS

Arthur Loevy
Jon Loevy
Russell Ainsworth
Anand Swaminathan
Steve Art
**LOEVY & LOEVY**
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

Locke E. Bowman
Sheila Bedi
David Shapiro
Alexa Van Brunt
**MACARTHUR JUSTICE CENTER**
Northwestern University School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
(312) 503-0844

J. Samuel Tenenbaum
**BLUHM LEGAL CLINIC**
Northwestern University School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
(312) 503-8576

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................................ iii

INTRODUCTION ........................................................................................................................... 1

SUMMARY OF DISPUTED FACTS ............................................................................................. 3

ARGUMENT .................................................................................................................................... 6

A.      SUMMARY JUDGMENT IS UNAVAILABLE TO GUEVARA IN LIGHT OF HIS INVOCATION OF THE FIFTH AMENDMENT ................................ 6

B.      A JURY MUST DECIDE RIVERA'S DUE PROCESS CLAIMS ................................. 9

      1.      A Reasonable Jury Could Conclude That Defendants Fabricated False Evidence ............................................................................................. 10

            (a)      Overwhelming Evidence Supports Rivera's Fabrication Claim ............................................................................................. 10

            (b)      Defendants' Arguments for Judgment on the Fabrication Theories Fail ...................................................................................... 15

      2.      Independently, A Reasonable Jury Could Conclude That Defendants Suppressed Material Exculpatory and Impeachment Evidence ......................................................................................................... 18

            (a)      Defendants Suppressed Exculpatory Evidence .......................... 20

            (b)      Defendants Suppressed Exculpatory Police Files ..................... 24

            (c)      Defendants' Reasonable Diligence Arguments Fail ................... 27

      3.      Independently, A Reasonable Jury Could Conclude That Defendants Utilized Unduly Suggestive Lineup Procedures That Tainted Rivera's Criminal Trial .................................................................... 33

            (a)      The Identification Procedures Were Unduly Suggestive ........... 34

            (b)      Lopez's Identifications of Rivera Were Not Reliable ................. 35

            (c)      The Identification Tainted Rivera's Criminal Proceedings ....... 36

            (d)      Defendants' Arguments for Summary Judgment on the Unduly Suggestive Lineup Theory Lack Merit .......................... 38

i

**TABLE OF CONTENTS (cont.)**

Page

C.      A JURY MUST DECIDE THE SECTION 1983 CONSPIRACY CLAIMS ..................38

D.      A JURY MUST DECIDE THE FAILURE-TO-INTERVENE CLAIMS ........................40

E.      DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ......................41

F.      A JURY MUST DECIDE RIVERA'S MALICIOUS PROSECUTION
        CLAIMS ............................................................................................................42

        1.      Defendants Commenced and Continued A Criminal Proceeding ..........................43

        2.      Defendants Lacked Probable Cause to Prosecute Rivera .....................................45

G.      A JURY MUST DECIDE RIVERA'S STATE-LAW CLAIM OF
        INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ......................................47

H.      A JURY MUST DECIDE RIVERA'S STATE-LAW CONSPIRACY
        CLAIMS ............................................................................................................48

I.      DEFENDANTS RINALDI, WEINGART, MINGEY, NOON, GUZMAN,
        SPARKS, ZACHARIAS, AND FALLON PARTICIPATED IN THE
        MISCONDUCT AND ARE NOT ENTITLED TO SUMMARY
        JUDGMENT .........................................................................................................48

J.      A JURY MUST DECIDE PLAINTIFFS' *MONELL* CLAIMS .......................................50

        1.      Defendants Do Not Argue for Judgment on All of Rivera's *Monell*
                Theories, and So A *Monell* Trial Is Necessary No Matter What ..........................51

        2.      The City Is Estopped From Re-Litigating the Street Files Theory ........................53

        3.      The City's Request for Judgment on the Street Files Theory Is
                Frivolous ..............................................................................................................54

        4.      The City's Request for Judgment on the Filler Lineup Theory
                Lacks Merit ...........................................................................................................59

        5.      A Trial Is Necessary on the Failure to Discipline Theory .....................................62

K.      THE DERIVATIVE CLAIMS SURVIVE SUMMARY JUDGMENT ............................69

CONCLUSION .................................................................................................................69

## TABLE OF AUTHORITIES

**Cases**                                                                           **Page(s)**

*Acceptance v. Bathalter*, 705 F.2d 924 (7th Cir. 1983) ...................................................8

*Alexander v. City of South Bend*, 433 F.3d 550 (7th Cir. 2006) .......................................33, 37, 46

*Allen v. Berger*, 784 N.E.2d 367 (Ill. App. Ct. 2002) ................................................... 45

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................6

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015) ...................................................... 42

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017) ............................................... 10, 17, 27

*Avery v. Milwaukee*, 2015 WL 247991 (E.D. Wis. Jan. 20, 2015) ..............................................59

*Baxter v. Palmigiano*, 425 U.S. 308 (1976) ..............................................................7

*Beck v. Pittsburg*, 89 F.3d 966 (3d. Cir. 1996) ..........................................................65

*Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984) ............................................. 39

*Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989) ................................................ 63

*Boss v. Pierce*, 263 F.3d 734 (7th Cir. 2001) .............................................................29, 30

*Boyd v. City of Chicago*, 225 F. Supp. 3d 708 (N.D. Ill. 2016) ..................................... 31

*Boyle v. Torres*, 756 F. Supp. 2d 983 (N.D. Ill. Dec. 21, 2010) ...............................................44, 45

*Branion v. Gramly*, 855 F.2d 1256 (7th Cir. 1988) .....................................................12

*Briscoe v. LaHue*, 460 U.S. 325 (1983) .................................................................17

*Brown v. Mississippi*, 297 U.S. 278 (1936) .............................................................42

*Bryant v. Whalen*, 759 F.Supp. 410 (N.D. Ill. 1991) ...................................................46

*Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972) ...........................................................40

*Calhoun v. Ramsey*, 408 F.3d 375 (7th Cir. 2005) .....................................................51

*Calusinski v. Kruger*, 24 F.3d 931 (7th Cir. 1994) ....................................................65

*Canton v. Harris*, 489 U.S. 378 (1989) .................................................................52, 62

*Carmichael v. Village of Palatine*, 605 F.3d 451 (7th Cir. 2010) ...............................................38, 47, 48, 52

Case: 1:1-2-cv-03429 Document #: 512-71 Filed: 09/25/24 Page 7 of 82 PageID #:26636

## TABLE OF AUTHORITIES (cont.)

**Cases**                                                                                          **Page(s)**

*Cathedral of Joy Baptist Church v. Village of Hazel Crest,*
    22 F.3d 713 (7th Cir. 1994) ........................................................................27

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................7

*Chicago Truck Drivers v. Century Motor Freight*, 125 F.3d 526 (7th Cir. 1997)........................54

*Collier v. City of Chicago*, 2015 WL 50814408 (N.D. Ill. Aug. 26, 2015) ..................................46

*Connick v. Thompson*, 563 U.S. 51 (2011) ..............................................................68

*Cooper v. Chicago Heights*, 2011 WL 2116394 (N.D. Ill. May 27, 2011) ..................................59

*Cosby v. Ward*, 843 F.2d 967 (7th Cir. 1988)........................................................68

*Costello v. Grundon*, 651 F.3d 614 (7th Cir. 2011)..........................................15, 47, 52

*Cottrell v. Clemons*, 2014 WL 3649185 (W.D. Ky. July 23, 2014) ....................................27

*Crivens v. Roth*, 172 F.3d 991 (7th Cir. 1999)........................................................31

*Daniel v. Cook Cty*, 833 F.3d 728 (7th Cir. 2016)....................................................55

*Davis v. Carter*, 452 F.3d 686 (7th Cir. 2006)........................................................52

*DiRico v. City of Quincy*, 404 F.3d 464 (1st Cir. 2005) ..............................................62

*Dixon v. Cook County*, 819 F.3d 343 (7th Cir. 2016)..................................................55

*Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008) ..........................................18, 41

*Engel v. Buchan*, 710 F.3d 698 (7th Cir. 2013) ......................................................42

*Estate of Moreland v. Dieter*, 395 F.3d 747 (7th Cir. 2005)....................................55, 68

*Evans v. City of Chicago*, 2006 WL 463041 (N.D. Ill. Jan. 6, 2006) ..............................52

*Ewing v. O'Brien*, 60 F. Supp. 2d 813 (N.D. Ill. 1999)..............................................44

*Fields v. City of Chicago*, 2014 WL 477394 (N.D. Ill. Feb. 6, 2014) ..............................24

*Fields v. City of Chicago*, 2017 WL 3987356 (N.D. Ill. Sep. 11, 2017) ..........................3, 53

# TABLE OF AUTHORITIES (cont.)

**Cases**                                                                     **Page(s)**

*Fields v. Wharrie*, 672 F.3d 505 (7th Cir. 2012) ...................................................19, 20

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ........................................10, 17, 41

*Foley v. Lowell*, 948 F.2d 10 (1st Cir. 1991) .........................................................65

*Fox v. Hayes*, 600 F.3d 819 (7th Cir. 2010) .........................................................47

*Fox v. Peters*, 2011 WL 6378826 (N.D. Ill. 2011) ................................................52

*Franks v. Delaware*, 438 U.S. 154 (1978)........................................................45, 46

*Freeman v. Brown*, 2012 WL 3777074 (N.D. Ill. Aug. 29, 2012)............................44

*Freides v. Sani-Mode Mfg. Co.*, 211 N.E.2d 286 (Ill. 1965) ..........................43

*Gable v. City of Chicago*, 296 F.3d 531 (7th Cir. 2002)...................................68

*Garcia v. City of Chicago*, 2003 WL 1715621 (N.D. Ill. Mar. 20, 2003) ...................68

*Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003).....................................22, 23, 41

*Giglio v. United States*, 405 U.S. 150 (1972) ................................................19, 20, 32

*Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372 (7th Cir. 2017)..........................50, 51, 55

*Grandstaff v. Borger*, 767 F.2d 161 (5th Cir. 1985) .........................................65

*Graves v. Thomas*, 450 F.3d 1215 (10th Cir. 2006) ........................................62

*Hampton v. City of Chicago*, 2017 WL 2985743 (N.D. Ill. July 13, 2017)............................30, 33

*Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979) ....................................39

*Hart v. Mannina*, 798 F.3d 578 (7th Cir. 2015)...............................................38

*Henry v. County of Shasta*, 132 F.3d 512 (9th Cir. 1997) ...........................63

*Henry v. Ramos*, 1997 WL 610781 (N.D. Ill. Sept., 28, 1997)......................47

*Hensley v. Carey*, 818 F.2d 646 (7th Cir. 1987).............................................42

*Holland v. City of Chicago*, 643 F.3d 248 (7th Cir. 2011) ...........................18

**TABLE OF AUTHORITIES (cont.)**

| Cases | Page(s) |
|---|---|
| *Hollins v. City of Milwaukee*, 574 F.3d 822 (7th Cir. 2009) ........................................................62 | |
| *J&J Sports Productions, Inc. v. Resendiz*, 2009 WL 1953154 (N.D. Ill. July 2, 2009) ...............41 | |
| *Jackson v. Marion County*, 66 F.3d 151 (7th Cir. 1995) .............................................................52 | |
| *Jenkins v. Bartlett*, 487 F.3d 482 (7th Cir. 2007) ......................................................................52 | |
| *Jimenez v. City of Chicago*, 830 F. Supp. 2d 432 (N.D. Ill. 2011)....................................27, 30, 32 | |
| *Johnson v. Dossey*, 878 F. Supp. 2d 905 (N.D. Ill. 2012) ...........................................................21 | |
| *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ....................................................... *passim* | |
| *Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013)...........................................................................17 | |
| *Kadia v. Gonzales*, 501 F.3d 817 (7th Cir. 2007) ......................................................................12 | |
| *Kindle v. City of Harvey*, 2002 WL 230779 (N.D. Ill. Feb. 15, 2002) ........................................69 | |
| *King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012) .........................................................................51 | |
| *Kluppelberg v. Burge*, 2017 WL 3381717 (N.D. Ill. Aug. 7, 2017)........................................3, 53 | |
| *Kotarski v. Binks Mfg. Co.*, 837 F. Supp. 247 (N.D. Ill. 1992) ..................................................12 | |
| *Kyles v. Whitley*, 514 U.S. 419 (1995)........................................................................18, 19, 27 | |
| *Larez v. Los Angeles*, 946 F.2d 630 (9th Cir. 1991) ...................................................................65 | |
| *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387 (7th Cir. 1995)............................................7, 8 | |
| *Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011).......................................................................46 | |
| *LiButti v. United States*, 178 F.3d 114 (2d Cir. 1999) ...................................................................7 | |
| *Logan v. Caterpillar*, 246 F.3d 912, (7th Cir. 2011) ........................................................42, 43, 44 | |
| *Logan v. City of Chicago*, 891 F. Supp. 2d 897 (N.D. Ill. 2012)...................................................9 | |
| *Lopez v. City of Chicago*, 464 F.3d 711 (7th Cir. 2006).............................................................47 | |
| *Manson v. Brathwaite*, 432 U.S. 98 (1977) ........................................................................33, 42 | |

**TABLE OF AUTHORITIES (cont.)**

| Cases | Page(s) |
|---|---|
| *Maxwell v. City of Indianapolis*, 998 F.2d 431 (7th Cir. 1993) | 46 |
| *Monaco v. City of Camden*, 2008 WL 8738213 (D. N.J. Apr. 14, 2008) | 63 |
| *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978) | 50 |
| *Mooney v. Holohan*, 294 U.S. 103 (1935) | 10, 41 |
| *Moore v. City of Chicago*, 2011 WL 1231318 (N.D. Ill. 2011) | 47 |
| *Myett v. Heerdt*, 2017 WL 75738 (N.D. Ill. Jan. 9, 2017) | 45 |
| *Napue v. Illinois*, 360 U.S. 264 (1959) | 19, 41 |
| *Neil v. Biggers*, 409 U.S. 188 (1972) | 42 |
| *Nelson v. LaCrosse Cty*, 301 F.3d 820 (7th Cir. 2002) | 52 |
| *Newsome v. James*, 2000 WL 528475 (N.D. Ill. Apr. 26, 2000) | 12 |
| *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001) | 18, 42 |
| *Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003) | 19, 20 |
| *Obrycka v. Chicago*, 2011 WL 2633783 (N.D. Ill. July 5, 2011) | 59, 67 |
| *Olson v. Tyler*, 771 F.2d 277 (7th Cir. 1985) | 46 |
| *Ott v. Milwaukee*, 2015 WL 1219587 (E.D. Wis. Mar. 17, 2015) | 59 |
| *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841 (7th Cir. 1998) | 40 |
| *Padilla v. City of Chicago*, 2009 WL 4891943 (N.D. Ill. Dec. 14, 2009) | 65 |
| *Padilla v. City of Chicago*, 2013 WL 1208567 (N.D. Ill. Mar. 26, 2013) | 44 |
| *Paine ex rel. Eilman v. Johnson*, 2010 WL 785398 (N.D. Ill. Feb. 26, 2010) | 59 |
| *People v. Arcos*, 228 Ill App. 3d 870 (1st Dist. 1996) | 65 |
| *Perez v. Thorntons*, 731 F.3d 699 (7th Cir. 2013) | 6 |
| *Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014) | 10 |

## TABLE OF AUTHORITIES (cont.)

**Cases**                                                                                      **Page(s)**

*Proffitt v. Ridgway*, 279 F.3d 503 (7th Cir. 2002) .......................................................................39

*Purghoraishi v. Flying J, Inc.*, 449 F.3d 751 (7th Cir. 2006) ......................................................15

*Pyle v. Kansas*, 317 U.S. 213 (1942) ............................................................................................41

*Rehberg v. Paulk*, 566 U.S. 356 (2012) ........................................................................................17

*Robinson v. City of Harvey*, 2001 WL 138901 (N.D. Ill. Feb. 16, 2001) ....................................69

*Salvato v. Miley*, 790 F.3d 1286 (11th Cir. 2015) ........................................................................65

*Sanders v. City of Chicago Heights*, 2016 WL 1730608 (N.D. Ill. May 2, 2016) ........................62

*SEC v. Graystone Nash, Inc.*, 25 F.3d 187 (3d Cir. 1994) ..............................................................8

*Sherrod v. Berry*, 827 F.2d 827 F.2d 195 (7th Cir 1987) ............................................................65

*Simon v. Northwestern Univ.*, 2016 WL 1237666 (N.D. Ill. Mar. 29, 2016) ...............................45

*Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) ...........................................40

*Sornberger*, 434 F.3d 1006, 1029-30 (7th Cir. 2006) ..................................................................52

*Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007) ...........................................................................49

*Steidl v. Gramley*, 151 F.3d 739 (7th Cir. 1998) ..........................................................................51

*Stichting Ter Behartiging Van de Belangen v. Schreiber*,
    407 F.3d 34 (2d Cir. 2005) .................................................................................................7, 8

*Stinson v. Gauger*, Nos. 13-3343, 13-3346 & 13-3347
    (7th Cir. Aug. 18, 2017) (*en banc*) .....................................................................................17

*Streckenbach v. Vandensen*, 2017 WL 3585074 (7th Cir. Aug. 21, 2017) ..................................53

*Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731 (7th Cir. 2006) ..........................................15, 52

*Thomas v. Cook County*, 604 F.3d 293 (7th Cir. 2010) ...........................................................55, 68

*Thompson v. Boggs*, 33 F.3d 847 (7th Cir. 1994) .........................................................................52

*Thompson v. City of Chicago*, 2009 WL 674353 (N.D. Ill. Mar. 12, 2009) ...................................9

*Titran v. Ackman*, 893 F.2d 145 (7th Cir. 1990) ..........................................................................52

## TABLE OF AUTHORITIES (cont.)

**Cases**                                                                                          **Page(s)**

*Turner v. City of Chicago*, 2013 WL 4052607 (N.D. Ill. 2013) ....................................................44

*United States v. 4003-4005 5th Ave.*, 55 F.3d 78 (2d Cir. 1995)....................................................8

*United States v. Agurs*, 427 U.S. 97 (1976) ...............................................................................19

*United States v. Bagley*, 473 U.S. 667 (1985) .............................................................................20

*United States v. Jackson*, 546 F.3d 801 (7th Cir. 2008) .................................................................40

*United States v. Morris*, 80 F.3d 1151 (7th Cir. 1996) ..................................................................31

*United States v. Rylander*, 460 U.S. 752 (1983)..............................................................................9

*United States v. Useni*, 516 F.3d 634 (7th Cir. 2008) ....................................................................47

*Valentino v. Village of S. Chicago Heights*, 575 F.3d 664 (7th Cir. 2009) ..................................50

*Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011) ..............................................................51

*Wallace v. City of Zion*, 2011 WL 3205495 (N.D. Ill. July 28, 2011)..........................................44

*Wearry v. Cain*, 136 S. Ct. 1002 (2016) ................................................................................18, 19

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012)...........................................10, 17, 18, 21

*Williams v. City of Chicago*, 733 F.3d 749 (7th Cir. 2013) .........................................................45

*Woodward v. CMS*, 368 F.3d 917 (7th Cir. 2004) ........................................................................68

*Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994)...............................................................................40

## INTRODUCTION

Jacques Rivera was wrongly convicted of the 1988 murder of Felix Valentin. His conviction was based entirely on false evidence fabricated by Defendants. For decades Rivera fought from prison to prove his innocence. In 2011, based on the revelation that false eyewitness evidence had been used against him, Rivera was granted post-conviction relief, and state prosecutors dropped the charges against him. The next year, Illinois courts awarded Rivera a certificate of innocence. Rivera has amassed overwhelming evidence that the Officer Defendants and the City of Chicago violated his rights protected by the U.S. Constitution and Illinois law.

Rivera had nothing to do with Valentin's shooting and Defendants knew it all along. In fact, shortly after the crime, while the victim was still alive, he identified two other men, Jose Rodriguez and Felipe Nieves, as the perpetrators. Instead of pursuing those suspects, Defendants determined on the first day of their investigation that they would frame Rivera, and they fabricated evidence to implicate him. That evidence included manufactured eyewitness identifications of Rivera from Valentin and from a 12-year-old boy named Orlando Lopez, who was the only other witness to the crime.

At the same time, Defendants suppressed highly exculpatory evidence that would have shown that their identifications were fabricated and that Rivera was innocent. For example, they covered up that Lopez viewed a first live lineup early in the investigation and picked a filler instead of Rivera. In addition, pursuant to the widespread practice among Chicago Police Department (CPD) employees at the time, they suppressed police documents that contradicted their official version of the investigation in a secret "street file," which they kept buried in the CPD's files for years after Rivera's wrongful conviction.

Rivera's wrongful conviction was orchestrated by Defendant Reynaldo Guevara, a notorious Chicago policeman who is responsible for sending numerous young men on Chicago's northwest side to prison for crimes they did not commit. Guevara moves for summary judgment despite the fact that he invoked his Fifth Amendment right not to incriminate himself in response to every question he was asked about his misconduct in this case. Given the foregoing, the Officer Defendants' summary judgment motion is plainly inappropriate.

The same is true for the City's motion. The misconduct at issue was undertaken pursuant to the City's official policies. Among other things, the City failed to discipline officers like Guevara, who engaged in egregious and repeated acts of misconduct that violated the rights of citizens. In addition, the City's written policies and practices caused routine false reporting of the results of lineup identification procedures, and systematic suppression of police investigative materials in clandestine street files. These policies and practices contributed to Rivera's wrongful conviction and the violation of his constitutional rights.

Reading Defendants' briefs, one would think that the undisputed record shows that Defendants were simply duped by Lopez's false identification of Rivera and did nothing wrong. But Defendants' skewed version is fully dependent on construing facts and drawing inferences in their own favor. As Defendants know full well, each of the facts they call undisputed in their briefs is in fact hotly disputed and contested by a substantial volume of evidence.

In fact, with respect to most material issues, it is Defendants who cannot point to anything in the record supporting their position. Guevara, for example, has no hope for summary judgment, considering that he has asserted his Fifth Amendment right to silence on all issues material to the case—on the grounds that if he told the truth, he risked subjecting himself to criminal liability. Similarly, the City asks the Court to grant it judgment on policy and practice

theories despite having lost a recent trial, *Fields v. City of Chicago*, 2017 WL 3987356, at \*3-4 (N.D. Ill. Sep. 11, 2017), on the very same theories on which they move for summary judgment. Not only did Judge Kennelly conclude in *Fields* that the existence of the City's street files practice was a proper issue to be decided by a jury, but the jury rejected the City's denials and evidence regarding that practice. Given the jury's verdict in *Fields*, Judge Lefkow recently concluded in *Kluppelberg v. Burge*, 2017 WL 3381717 (N.D. Ill. Aug. 7, 2017), that the City was estopped from denying the existence of the street files practice. This demonstrates the folly of the City's present attempt to win summary judgment on the ground that there is supposedly no evidence to support Rivera's claim. This Court should deny the motions in their entirety.

## SUMMARY OF DISPUTED FACTS

Rivera has prepared an extensive account of the facts relevant to summary judgment in his Local Rule 56.1 statements. Given space constraints, the number of Defendants' arguments, and the vast record, Rivera summarizes the factual disputes rather than repeating all of the facts here. Where appropriate, additional facts are discussed below within the argument.

Defendants' motions are based on a version of facts where Orlando Lopez supposedly made an unprompted identification of Rivera in a photo mugbook on the day Valentin was shot, confirmed that identification three weeks later in a legitimate live lineup procedure, and then testified consistent with those identifications at trial, leading to Rivera's conviction. Defendants now apparently concede that Lopez's identifications of Rivera were false, but they contend they did not know he was lying. Defendants' facts are contradicted by ample evidence.

Properly viewing the record in Rivera's favor, as the Court must at this stage, the Defendants caused Rivera to be arrested, charged, indicted, prosecuted, and convicted by knowingly fabricating false evidence and by suppressing material evidence, in violation of

Rivera's constitutional rights and Illinois law. AS ¶¶ 22-79, 80-85, 90-93.[1] Rivera had nothing to do with the murder whatsoever. AS ¶¶ 96-97. Evidence buried in a clandestine street file throughout Rivera's wrongful conviction now shows that Defendants selected Rivera as their suspect on August 27, 1988, the day Valentin was shot, *before* any identification procedure had taken place. AS ¶¶ 22-24. Two days later, on August 29, the Defendants instructed the 12-year-old eyewitness Lopez to identify Rivera in a book of mugshots, pointing out Rivera's photograph to Lopez, and fabricating a story for Lopez to tell about recognizing Rivera as someone he had seen playing baseball in Humboldt Park. AS ¶¶ 25-28.

Defendants then put Rivera in a live lineup on August 31. AS ¶¶ 29-38. To Rivera's knowledge at the time, he was simply acting as a filler in a line-up for an unknown crime. Plaintiff has since discovered that it was actually a lineup in the Valentin investigation, Lopez viewed it, failed to pick Rivera, and instead picked one of the non-suspect fillers. AS ¶¶ 39-41. Because Lopez's selection of a filler would have burned their eyewitness, the Defendants responded by suppressing all evidence that the lineup had ever occurred and by falsely reporting that Lopez had *not* viewed a lineup on August 31. AS ¶¶ 36, 43-44, 67-68, 76-77.[2]

Valentin succumbed to his wounds and died on September 14, and the next day the Defendants brought young Lopez in for a second live lineup. AS ¶¶ 7, 51. Before that second lineup, Lopez told Guevara and McLaughlin that Rivera was not the person he had seen shoot Valentin. AS ¶¶ 50-53. Defendants buried that statement as well. AS ¶¶ 57-60, 65. They instructed Lopez to continue with the second lineup, and they manipulated him into falsely identifying Rivera. AS ¶¶ 58-60.

---

[1] Rivera's affirmative statement of facts is cited as "AS ¶ XXX," his response to the City's statement as "RCS ¶ XXX," and his response to the Officer Defendants' statement as "ROS ¶ XXX."

[2] At every deposition in the case, Defendants strenuously denied this problematic lineup ever occurred, but for summary judgment purposes they have now properly conceded that it did. Officer Br. at 2 & n.3.

To seal the deal, Defendants then wrote a false report, saying for the first time that the victim Valentin, four days before his death, on September 10, had identified Rivera as the shooter in a photo identification procedure performed at his bedside in Cook County Hospital. AS ¶¶ 65-66. This identification was both impossible and a complete fabrication. AS ¶¶ 5-6, 45-47, 65-66. Valentin was in a medically-induced coma on September 10 and was totally unable to respond, let alone identify anyone. AS ¶¶ 4-5, 46. Defendants also reported falsely that, following the second lineup, Lopez had been shown photos of the alternative perpetrators Rodriguez and Nieves and had excluded them as suspects. AS ¶¶ 48-49, 65. Such an identification procedure never occurred. AS ¶¶ 48-49.

After their investigation was complete, Defendants took every document they had created during their investigation that could have been used to prove they had framed Rivera, and they suppressed those documents in a street file. AS ¶¶ 72-77. That street file was never shared with prosecutors, Rivera, or his attorneys. AS ¶¶ 86-88. It came to light during this litigation. AS ¶ 79.

Finally, to solidify Lopez's identification of Rivera as the shooter at trial, the Defendants fabricated an additional false story. They told Lopez to lie at trial and say that Valentin's shooter had worn a distinctive gold ponytail. AS ¶¶ 61-63. When Guevara took the stand at trial, he lied, too, saying that he noticed that Rivera had dyed gold hair at the time of his arrest. AS ¶¶ 64, 92. That was false—Rivera had never dyed his hair. AS ¶ 63.

The record construed in Rivera's favor unambiguously supports the conclusion that Defendants' fabricated evidence caused Rivera to be charged, prosecuted, and convicted of Valentin's murder, and that Defendants hid from Rivera and his attorneys all of the exculpatory evidence that would have avoided this gross injustice. A similar volume of evidence, discussed below, supports Rivera's claim that this misconduct occurred because of the policies and

practices of the City. All material facts are disputed and Defendants' legal arguments lack merit. This Court should deny their motions.[3]

**ARGUMENT**

This Court examines all evidence in the light most favorable to Rivera and draws all inferences in his favor. *Perez v. Thorntons*, 731 F.3d 699 (7th Cir. 2013). Summary judgment is warranted only if Defendants show that there is no genuine issue of fact on any of Rivera's claims and that they are entitled to judgment as a matter of law. *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.  SUMMARY JUDGMENT IS UNAVAILABLE TO GUEVARA IN LIGHT OF HIS INVOCATION OF THE FIFTH AMENDMENT**

At the outset, Guevara cannot shift the burden at summary judgment because he asserted his Fifth Amendment right not to incriminate himself in response to hundreds of questions about his misconduct during the Valentin investigation and Rivera's arrest, prosecution, and conviction. *See*, *e.g.*, AS ¶¶ 22, 26-27, 29, 40-41, 46, 49, 52, 61, 65. Guevara did the same in response to Rivera's written discovery requests. AS ¶¶ 46, 65, 79. In total, Guevara pleaded the Fifth in response to questions about making Rivera a suspect on the day of the crime (before any identification of Rivera had purportedly been made), fabricating Lopez's mugbook identification, suppressing the first lineup and Lopez's selection of a filler, fabricating Lopez's identification of Rivera at the second lineup, suppressing Lopez's statement that Rivera was not the perpetrator, fabricating Valentin's identification of Rivera, creating false police reports, providing false reports and information to prosecutors, falsely arresting Rivera, securing false charges against

---

[3] The Officer Defendants correctly point out that Rivera has never asserted a claim that he was compelled to involuntarily incriminate himself, in violation of the Fifth and Fourteenth Amendments. Officer Br. at 4. Rivera has never confessed involvement in the Valentin murder.

Rivera, testifying falsely, preparing Lopez's false testimony for Rivera's trial (including false testimony about Rivera's hair color), destroying and suppressing evidence of Rivera's innocence, maintaining street files in the case, and suppressing the investigation of Rodriguez and Nieves. AS ¶¶ 22, 26-27, 29, 40-41, 46, 49, 52, 59, 61, 65, 79, 85. Because Guevara exercised his right to remain silent on every question material to Rivera's claims, he cannot seek summary judgment.

Where a defendant moving for summary judgment asserts his Fifth Amendment rights rather than denying the alleged misconduct, summary judgment is almost never appropriate. This is because a party who seeks summary judgment bears the burden of showing that no material fact is disputed, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and a party who asserts the Fifth Amendment on material facts cannot meet that burden. That result is dictated by Rule 56 standards and Supreme Court precedent.

In a civil case, juries are expressly instructed that they may draw adverse inferences against the person asserting the Fifth Amendment, and the decision about whether or not to draw adverse inferences is by definition a question for the jury. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387 (7th Cir. 1995); *see also LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999) (An "adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader"). A court at summary judgment cannot resolve this factual question, but instead, as Rule 56 commands, must draw the inference in favor of the non-moving party. Accordingly, where a defendant asserts his Fifth Amendment rights on material facts and then moves for summary judgment, the Court must draw an inference against the defendant on those facts, the defendant cannot meet his Rule 56 burden, and summary judgment must be denied. *See Stichting Ter Behartiging Van de Belangen v. Schreiber*, 407 F.3d 34, 55 (2d Cir. 2005) (noting that while "a *jury* might draw" an

inference from the assertion of privilege, "*we* [the court] are required at summary judgment to draw all reasonable inference in favor of the non-moving party").

Rivera acknowledges that courts may not enter judgment based solely on an invocation of the Fifth Amendment, for the invocation alone is not an admission of guilt. Adhering to this rule, courts have refused to grant summary judgment where the *non-moving* party invoked the Fifth Amendment, *e.g.*, *Seguban*, 54 F.3d at 391, and they have refused to grant judgment on the pleadings where a complaint is answered with an invocation of the privilege, *National Acceptance v. Bathalter*, 705 F.2d 924, 932 (7th Cir. 1983). These cases stand for the proposition that automatic judgment for a plaintiff when a defendant asserts the Fifth Amendment is too high a cost for the invocation. They do not, however, undermine the proposition stated above that a party cannot both invoke the Fifth Amendment and win at summary judgment. The fact that a jury *may* draw an inference against a defendant who invokes the Fifth Amendment on material facts means that a court can neither grant that defendant summary judgment nor enter a judgment as a matter of law in favor of the plaintiff.

The law imposes costs on parties who invoke the Fifth Amendment in civil proceedings. *See Graystone Nash, Inc.*, 25 F.3d 187, 191 (3d Cir. 1994) ("The principle that the invocation of the privilege may be too 'costly' does not mean that it must be 'costless.'"). A party who invokes this privilege deprives the opponent of an essential source of information, obstructs discovery and proceedings, and hinders the search for the truth. *See Seguban*, 54 F.3d at 390 n.4 (7th Cir. 1995); *SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 190 (3d Cir. 1994); *United States v. 4003-4005 5th Ave.*, 55 F.3d 78, 84 (2d Cir. 1995). Consistent with the established notion that the Fifth Amendment cannot be wielded as a sword by the invoking party to free that party of its burdens in a proceeding, one of the costs to invoking the Fifth Amendment is that summary judgment is

not available. *See United States v. Rylander*, 460 U.S. 752, 758 (1983) (noting that the privilege "has never been thought to be in itself a substitute for evidence that would assist in meeting a burden of production" and that deciding otherwise would "convert the privilege from the shield against compulsory self-incrimination which it was intended to be into a sword whereby a claimant asserting the privilege would be freed from adducing proof in support of a burden which would otherwise have been his").

Properly construed, Supreme Court and Seventh Circuit precedents and Rule 56 dictate that Guevara cannot meet his summary judgment burden. Rivera acknowledges, however, that some district courts require more, and hold that where a moving party asserts the Fifth Amendment, the non-movant must still present "some evidence," independent of the invocation, to survive summary judgment. *Logan v. City of Chicago*, 891 F. Supp. 2d 897, 901 (N.D. Ill. 2012); *Thompson v. City of Chicago*, 2009 WL 674353, at *3 (N.D. Ill. Mar. 12, 2009). These courts regard this "some evidence" standard as something less than the normal summary judgment burden. *Logan*, 891 F. Supp. 2d at 903. Regardless whether this court applies Rivera's reasoning set out above, these courts' "some evidence" standard, or normal summary judgment principles (ignoring Guevara's Fifth Amendment invocation entirely), there is sufficient evidence to deny summary judgment to Guevara on each of Rivera's claims.

## B.     A JURY MUST DECIDE RIVERA'S DUE PROCESS CLAIMS

Defendants move for summary judgment on Rivera's due process claims. But the evidence in the record supports Rivera's due process claim on each of three, independent theories—fabrication of evidence, suppression of evidence, and unduly suggestive identification procedures. Rivera discusses each theory in turn.

### 1. A Reasonable Jury Could Conclude That Defendants Fabricated False Evidence

The Supreme Court and Seventh Circuit "'have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'" *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). This due process theory is entirely distinct from the due process theory based on suppression of evidence, which is discussed below. *Petty v. City of Chicago*, 754 F.3d 416, 421-24 (7th Cir. 2014). Applying this law, the Court need look no further than Defendants' fabrication of Lopez's identification of Rivera to deny summary judgment.

Where a due process violation concerns witness testimony, the Seventh Circuit has been careful to distinguish between coerced testimony and fabricated testimony. Police coercion of witnesses that produces truthful testimony does not by itself violate due process, absent a violation of the *Brady* duty to disclose facts about the police coercion that was used to obtain the testimony. *Avery*, 847 F.3d at 439 (citing *Fields v. Wharrie*, 740 F.3d 1107, 1123 (7th Cir. 2014) (*Fields II*)). Police fabrication of witness testimony that the officers know to be false, however, violates due process without need for further analysis. *Id.* at 439-40 (citing *Petty*, 754 F.3d at 423. There is no question this case concerns false witness testimony—Defendants concede that Lopez's identification was a lie, they just argue that they did not know that it was false.

#### (a) Overwhelming Evidence Supports Rivera's Fabrication Claim

Defendants' assertion that they did not knowingly fabricate Lopez's identification of Rivera is the most self-serving version of the factual record possible, and it is flatly contradicted by the evidence. AS ¶¶ 22-28, 52, 58-60. Viewed in Rivera's favor, the record shows that the

Defendants settled on Rivera as a suspect before any identification of him took place. AS ¶¶ 22-24. On August 27, Rivera's rap sheet was requested, it was stamped by central records, it was provided to Defendants, and it was placed in their investigative file. AS ¶¶ 22, 76-77. August 27 was two days before the August 29 mugbook identification procedure with Lopez. AS ¶¶ 22-24.[4] In short, rather than follow where the evidence led them, Defendants decided Rivera was their perpetrator first, and then made up evidence implicating him as their suspect. *Id.*

On August 29, according to Defendants' own police reports and testimony, Guevara, Gawrys, McLaughlin, Leonard, Noon, Guzman, Sparks, and Zacharias were all involved in the mugbook procedure with Lopez. AS ¶¶ 23-25.[5] During that mugbook procedure, according to Lopez, these Defendants "pointed him [Rivera] out," and Lopez selected the photo of Rivera, who, as stated, was already Defendants' suspect at the time. AS ¶¶ 22, 26.

After the photo selection, to make Lopez's identification of Rivera credible, these Defendants created a false story, suggesting to Lopez that he previously had seen Rivera playing baseball in Humboldt Park. AS ¶ 27. Lopez adopted this story to explain how he could have identified Rivera's photo from among hundreds of others, despite seeing the shooter only for a moment during the shooting. AS ¶¶ 19(g), 27, 69. These Defendants, along with Rinaldi and Mingey, then wrote and approved police reports, which stated falsely that Lopez had picked Rivera in the mugbook of his own accord. AS ¶ 69. This mugbook identification, as reported by Defendants, was used to procure Lopez's later false identification of Rivera, criminal charges against Rivera, a grand jury indictment, and Rivera's conviction. AS ¶¶ 59, 80-81, 84, 91-94.

---

[4] Defendants will likely dispute that this mugbook procedure took place on August 29 at trial, but they will have to explain why every one of their reports reflects that it in fact occurred on August 29. AS ¶¶ 23-25.

[5] Defendants argue that only Sparks, Zacharias, Guevara and Gawrys were involved in this identification procedure, Officer Br. at 12 n.4, but that fact is disputed by the Defendants' own reports, AS ¶¶ 25, 28, 69.

11

Over the next two days, Guevara, Zacharias, Sparks, Fallon, McLaughlin, Leonard, and Rinaldi arrested Rivera, held him overnight, and placed him in a live lineup, which Lopez viewed. AS ¶¶ 29-38. Lopez picked a filler from the lineup and Rivera was released. AS ¶¶ 33, 39-40.[6] In response, these Defendants worked to bury that the first lineup had ever occurred, writing false reports stating that they had attempted to perform a lineup, had not found Lopez, and had instead made a photo array that they tried to show to Valentin at Cook County Hospital. AS ¶¶ 36-37, 67-68. It is important to point out that Defendants' concession at summary judgment that the first lineup did in fact occur has a significant consequence: it means that Defendants' August 31 report covering up the first lineup is admittedly false.

On September 15, again according to their own reports, Guevara and Gawrys arrested Rivera and conducted a second lineup. AS ¶¶ 51, 59. Lopez testified that before that lineup began he told Guevara and McLaughlin that Rivera was not the perpetrator he had seen shoot Valentin. Nonetheless, these Defendants instructed Lopez to proceed with his identification of Rivera. AS ¶¶ 50-60. When asked at his deposition, "Isn't it true that you coerced Orlando Lopez to identify Jacques Rivera in the second line-up even though he had just told you that Jacques

---

[6] Defendants argue that Rivera is attempting to draw selectively from Lopez's testimony, crediting some aspects and denying others. Officer Br. at 7-8. There is nothing wrong with that approach. With Defendants trying to dispose of the case on summary judgment, Rivera is entitled to the benefit of all doubts, and need not adopt all of any witness's testimony wholesale. *Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir. 2007) (noting that the judicial system could not function if it adopted the discredited doctrine that a witness who testifies incorrectly about one thing must be disbelieved on all things); *Branion v. Gramly*, 855 F.2d 1256 (7th Cir. 1988) ("Selective disbelief . . . is an ordinary incident of trial[.]"); *Kotarski v. Binks Mfg. Co.*, 837 F. Supp. 247, 252 (N.D. Ill. 1992) ("[F]or purposes of summary judgment, ambiguities in a witness' testimony must be resolved against the moving party."); *see also Newsome v. James*, 2000 WL 528475, at *2 (N.D. Ill. Apr. 26, 2000) ("Variations in the testimony of disinterested witnesses, as our court of appeals has noted, raise questions about credibility that must be answered by a jury, not by the Court."). A jury will be entitled to disbelieve witnesses' testimony to the extent that their testimony does not square with other facts. There is nothing about summary judgment that requires Rivera to accept all of a witness's testimony as correct if he accepts that some of that testimony is correct.

With respect to Lopez, Rivera accepts nearly everything that Lopez now says, with the exception of his testimony that it was Rivera who Lopez picked in the first lineup. Rivera has no doubt that Lopez was brought into the police station and made a selection from the first lineup, but it contradicts too much other evidence to credit that he picked Rivera from that first lineup. Lopez knows that he picked someone, and while he mistakenly believes (to this day) that it was Rivera, drawing inferences in Rivera's favor, it could not have been. Indeed, if he had picked Rivera, then Rivera would have been arrested right away, he would never have been released, and there would have been no need for a second lineup two weeks later. AS ¶ 33.

Rivera was not the perpetrator?" Guevara refused to answer, citing his constitutional privilege to avoid incriminating himself. AS ¶ 59. Defendants' position that they did not tell Lopez who to pick and that Lopez lied without their input is fatally contradicted by evidence that they conducted the lineup after being told by Lopez that Rivera was not the perpetrator. AS ¶¶ 50-52.[7] After the lineup, Guevara, Gawrys, Mingey, and Weingart (as well as Dorsch and Boyle, who are not Defendants) wrote and approved false reports saying that Lopez selected Rivera in a legitimate lineup. AS ¶ 60.

These identifications were not the only false evidence that the Defendants created. At midnight on September 15-16, Guevara and Gawrys wrote, and Mingey approved, a false report (the "September 16 report") saying that Valentin—who had died a day earlier—had identified Rivera from a mugbook on September 10. AS ¶¶ 65-66. Of course, there was no contemporaneous record of that identification, and it could not be verified, given that Valentin

---

[7] In attempt to avoid this result, Defendants argue there is not sufficient evidence to conclude that Guevara and McLaughlin are the officers with whom Lopez interacted during the second lineup. Officer Br. at 8-10. But there is ample evidence from which jury could reasonably conclude that Lopez was talking to Guevara and McLaughlin, and it is unclear what more evidence Rivera could muster short of Lopez remembering 20+ years later the name of the police officers with whom he interacted.

Among other things, reports reflect that Guevara and Gawrys conducted this lineup. AS ¶ 65. Lopez describes the officer to whom he spoke as one that was familiar to him with a "'fro, mustache, and glasses." AS ¶ 53. Guevara is the only officer on the investigative team fitting that description, as his photographs produced in this case show. AS ¶ 56.

For her part, McLaughlin was the detective in charge of the investigation. AS ¶¶ 9, 54. She was present at the photobook and first lineup with Lopez. AS ¶¶ 25, 32, 36, 67-69. In addition, she was the only woman on the investigative team and the only woman involved in a conversation or lineup procedure with Lopez on September 15. AS ¶¶ 54-55. Moreover, Lopez testified that the woman to whom he spoke before the lineup was a blonde or white-haired, older woman, and McLaughlin fits that description. AS ¶ 54. The only other woman present on the evening of September 15, ASA Rosner, had brown hair and did not arrive until after the lineup. AS ¶ 55. This evidence is more than sufficient at summary judgment to support the inference that Guevara and McLaughlin were the detectives to whom Lopez spoke.

Were there any doubt, Guevara had every opportunity to set the record straight. When he was asked at his deposition in this case, "Isn't it true that Orlando Lopez told you and Detective Gillian McLaughlin that Jacques Rivera was innocent before you conducted the second live line-up—the second live in-person line-up in this case?" Guevara answered by invoking the Fifth Amendment. AS ¶¶ 52-56 (citing Guevara Dep. at 23:3-11). Disputed facts prevent Guevara and McLaughlin from claiming they were not the officers with whom Lopez spoke.

Along the same lines, Defendants make a nonsensical argument that, even if they did speak with Lopez before the second lineup, they did not properly understand the significance of what Lopez was saying to them. Officer Br. at 10-11. The notion that Defendants are entitled to an inference that they misheard a statement from the sole eyewitness that their suspect Rivera was not the perpetrator is at best a weak defense for trial—it is not remotely an argument for summary judgment.

had just died. AS ¶¶ 45, 65-66. Nor did Guevara, Gawrys, or Mingey give any reason for why, if Valentin identified Rivera as the shooter on September 10, they waited days to arrest him. AS ¶¶ 47. Most importantly, it turned out that on September 10, Valentin was in a coma such that the fabricated identification would have been impossible. AS ¶¶ 5-6, 46. These Defendants have provided no explanation of how they extracted an identification from someone who was in a vegetative state. AS ¶¶ 46-47, 66. The boldness of this fabrication is staggering, and it puts to rest any argument Defendants make that their framing of Rivera was a mistake.

The fabrication in Guevara, Garwys, and Mingey's September 16 report did not stop there. They also reported falsely that after the manufactured identification of Rivera in the second lineup, Lopez viewed photos of Rodriguez and Nieves, and he said that they were not the perpetrators. AS ¶ 48. Again, this purported photo exclusion never occurred. AS ¶ 49.

Finally, in advance of trial, Guevara fabricated false witness testimony for Lopez to provide at trial. AS ¶¶ 61-64. Specifically, Guevara invented a story that the shooter had long hair dyed gold and that Rivera had a similar hairstyle at the time of the shooting. AS ¶ 1. There was not a single mention of gold hair in any of the police reports or witness descriptions. AS ¶ 62. Yet at trial, Lopez testified that he had told the police all along that the shooter had long gold hair. AS ¶ 91. After that, Guevara took the stand and stated falsely that Rivera had gold hair at the time of his arrest. AS ¶ 92. That, of course, was not true. AS ¶ 63. Asked at his deposition why he provided this false testimony, Guevara took the Fifth. AS ¶ 64. Given this evidence and the other fabrications described above, Rivera is entitled to the inference at summary judgment that before trial Guevara fabricated this false testimony about gold hair for him and Lopez to provide, in order to further bolster Lopez's false identification.

Through these sequential acts of fabrication, each and every one of the Defendants helped to construct an entirely false story, in which the eyewitness Lopez had purportedly seen a man he recognized from Humboldt Park shoot Valentin, after which he picked a photo of Rivera from a mugbook without any help, and then confirmed that identification of Rivera in a legitimate live lineup three weeks later. The false story continued that the victim, Valentin, who earlier in the investigation had identified Rodriguez and Nieves from a photobook, had later identified Rivera as the perpetrator as well. At the same time, Lopez excluded Rodriguez and Nieves after being shown photos of them. The criminal justice system could be sure that Lopez's identification was accurate, the false story concluded, because he had seen a shooter with a distinctive gold pony tail, and Guevara had noticed the same pony tail at the time of Rivera's arrest.

This false evidence was presented to prosecutors and others in the criminal justice system, and it caused Rivera to be charged, prosecuted, and convicted. AS ¶¶ 80-85, 90-93. A jury could find each Defendant liable on this theory, and summary judgment must be denied.

### (b) Defendants' Arguments for Judgment on the Fabrication Theories Fail

Defendants offer little in the way of argument for summary judgment on Rivera's fabrication theories.[8] Defendants assert that summary judgment is warranted because, in their view, their fabricated evidence—more specifically, their actual police report—was not used at Rivera's trial. Officer Br. at 14-16. This argument fails as a factual matter, because construing

---

[8] In fact, they provide no counterargument at all to Rivera's contention that Defendants fabricated Rivera as a suspect in the first place, before any identification, or to the theory that Defendants fabricated Lopez's initial mugbook identification. There is a direct causal link between these fabrications and Rivera's arrest, prosecution, and conviction, and the Defendants cannot hope for summary judgment on Rivera's fabrication claims having failed to even address those theories. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("[I]f the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Purghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006) (same). It will obviously be too late for Defendants to raise these arguments in their reply. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (reversing summary judgment granted on issue first raised in a reply).

the record in Rivera's favor, the evidence fabricated by Defendants was absolutely introduced at trial. AS ¶¶ 90-93. Indeed, it was the only thing that led to Rivera's conviction. AS ¶¶ 90-93, 95.

The in-court identifications provided by Lopez and Guevara at trial were precisely the fabricated story just discussed, which was manufactured by the Defendants and set out in their false reports. AS ¶¶ 60, 65-69, 91-92. The false story about having seen the shooter previously in Humboldt Park, the fabricated mugbook identification, the false identification of Rivera at the second lineup, and the invented story about the shooter and Rivera having gold hair were all explicitly introduced at trial through the testimony of Lopez, Leonard (by stipulation), and Guevara. AS ¶¶ 91-93. The photograph of the second lineup was introduced into evidence, it was authenticated by Guevara, and Lopez placed an "X" over Rivera's head on the exhibit during his testimony. AS ¶¶ 91, 92. Moreover, the testimony of Lopez and Guevara followed the script of pretending as though the first lineup had never occurred. *Id.*

Defendants' fabricated evidence was used before trial as well to deprive Rivera of his liberty—it was given to prosecutors to support charges and it formed the basis, through Guevara's testimony, for the indictment. AS ¶¶ 80-84. Rivera is entitled to the inference at summary judgment that, immediately following the second lineup, Guevara, Gawrys, and McLaughlin spoke with prosecutors and provided them the same false information included in their reports to bring about the charges. AS ¶¶ 81-82. At the grand jury, Guevara presented the false story that an "eyewitness"—either Lopez or Valentin—had implicated Rivera as the killer, and that was the only evidence presented during that proceeding. AS ¶ 84.

Defendants' argument that their police reports did not get introduced as evidence at the criminal trial fundamentally misunderstands the principles of causation that govern fabrication claims. When the police fabricate evidence, they are liable if that fabrication causes any

16

deprivation of liberty, whatever form the fabricated evidence takes, and whether it is presented at trial or is used to bring charges or to help indict. *See Avery*, 847 F.3d at 441-42 (due process violated when fabricated confession introduced at trial through police testimony); *Stinson v. Gauger*, Nos. 13-3343, 13-3346 & 13-3347 (7th Cir. Aug. 18, 2017) (*en banc*) (slip opinion attached as Ex. 150) (due process violated when fabricated expert opinion introduced at trial by testimony); *Whitlock*, 682 F.3d at 582-84 (due process violated when witness testimony fabricated by police introduced at trial by an immune prosecutor at trial); *Fields II*, 740 F.3d at 1112 (noting that a where a fabrication was used to support charges it "harmed the defendant before and not just during trial, because it was used to help indict him"); *Julian v. Hanna*, 732 F.3d 842, 847 (7th Cir. 2013) (fabrications of evidence affect liberty interests both before and after conviction). Thus there is no support for Defendants' position that they can be liable only if particular false police reports are actually introduced as evidence.

Finally, Guevara argues that he is not liable for his fabrications because witnesses are immune for the testimony they give at trial or to the grand jury. Guevara is correct that *Briscoe v. LaHue*, 460 U.S. 325, 332-33 (1983), and *Rehberg v. Paulk*, 566 U.S. 356, 368-69 (2012), respectively, establish that testimonial immunity. But as the Supreme Court and Seventh Circuit have said repeatedly, testimonial immunity does not extend to pre-trial acts of fabrication that are then presented by way of testimony at trial. *Rehberg*, 566 U.S. at 370 n.1; *Stinson*, Ex. 150, slip op. at 22-23 (pretrial acts of fabricating false testimony violate due process even if witness is immune for later testimony at trial); *Avery*, 847 F.3d at 441-42 (an officer cannot immunize himself simply by testifying about his false evidence at trial and noting that "[i]f an officer who fabricates evidence can immunize himself from liability by authenticating falsified documentary

or physical evidence and then repeating the false 'facts' in his trial testimony, wrongful-conviction claims premised on evidence fabrication would be a dead letter.").

Under this case law, Rivera does not seek to hold Guevara liable for his lies at the grand jury and trial. Instead, Guevara is liable for fabricating evidence before those proceedings—a false identification from Valentin and false identifications and testimony from Lopez—that was used to secure charges, obtain an indictment, and cause a conviction at trial, when the false evidence was introduced through testimony and exhibits. AS ¶¶ 90-93; *see also* 22-28, 29-41, 45-46, 48-49, 50-60, 61-64, 65-69. This is precisely the type of fabrication claim recently blessed by the Seventh Circuit in *Avery*, 847 F.3d at 441-42.

In summary, all of the evidence that implicated Rivera in the Valentin shooting was created by the Defendants. To the extent that the Defendants disagree, it is because there are genuine disputes of fact. Summary judgment on Rivera's fabrication theories should be denied.

## 2. Independently, A Reasonable Jury Could Conclude That Defendants Suppressed Material Exculpatory and Impeachment Evidence

*Brady* requires that exculpatory and impeachment evidence material to the criminal case be disclosed to the defense, "[a]nd police officers can be held liable under *Brady* and its progeny when they withhold exculpatory evidence from prosecutors[.]" *Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011); *see also Kyles v. Whitley*, 514 U.S. 419, 438 (1995). The Seventh Circuit has long recognized that section 1983 due process claims may be brought against police who withhold exculpatory and impeachment evidence, causing wrongful convictions. *Whitlock*, 682 F.3d at 572; *Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001); *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988).

The Supreme Court recently reaffirmed that "[e]vidence qualifies as material when there is '"any reasonable likelihood"' it could have '"affected the judgment of the jury."'" *Wearry v.*

18

*Cain*, 136 S. Ct. 1002, 1006 (2016) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972);

*Napue v. Illinois*, 360 U.S. 264, 271 (1959)). A litigant "need not show that he 'more likely than

not' would have been acquitted had the new evidence been admitted. . . . He must show only that

the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* (citing *Smith v.*

*Cain*, 132 S. Ct. 627, 629-31 (2012)); *see also Kyles*, 514 U.S. at 434.

The question as to whether suppressed evidence was material must be answered

considering all of the suppressed evidence together in the aggregate, and not by assessing

evidence piece by piece. *Wearry*, 136 S. Ct. at 1007. Whether evidence is material also depends

on the strength of other evidence used in the criminal proceedings—it might take only a little

evidence to disturb an already-weak conviction. *United States v. Agurs*, 427 U.S. 97, 113 (1976).

Importantly, it is firmly established that evidence that would impeach a key eyewitness is

material. *Giglio*, 405 U.S. at 153-54; *see also Smith*, 565 U.S. at 75 (impeachment evidence

regarding eyewitness material when eyewitness was the only evidence connecting defendant to

the crime); *Fields v. Wharrie*, 672 F.3d 505, 517 (7th Cir. 2012) (*Fields I*) ("The constitutional

violation occurs when the means by which the testimony was acquired are not disclosed at

trial—or when other information that impeach the testimony's reliability are not shared with the

defense."); *Newsome v. McCabe*, 319 F.3d 301, 302-05 (7th Cir. 2003) (holding that "the details

about how [the police] induced the witnesses to finger Newsome" was "information vital to

probe whether manipulation occurred").

The case against Rivera was exceedingly thin and based on fabricated evidence. Any one

of the pieces of exculpatory evidence suppressed by Defendants would have undermined

confidence in his conviction. When the suppressed evidence is considered as a whole, there is no

chance Defendants are entitled to summary judgment on the suppression claim.

### (a) Defendants Suppressed Exculpatory Evidence

1. *Defendants Suppressed Their Fabrications*. At the outset, it is worth noting that Defendants suppressed that they had fabricated the false evidence discussed above. Specifically, Defendants did not disclose to state prosecutors, to Rivera, or to his criminal defense attorney, now-Judge Kenneth Wadas that they had pointed out Rivera in the mugbook when they showed it to Lopez, or that they had fed Lopez a story about recognizing Rivera from the baseball fields in Humboldt Park. AS ¶¶ 25-28, 69, 87, 89. They also suppressed that they told Lopez to pick Rivera from the second lineup, that they invented an identification from Valentin at a time when he was in a coma, and that they had fabricated the story about the perpetrator having gold hair. AS ¶¶ 45-46, 57-60, 61-62, 65-69, 73-77. Had the Defendants disclosed any of this information, it would have immediately halted the criminal prosecution and conclusively shown Rivera's innocence. Even if it had not, this suppressed evidence is the sort of impeachment evidence that is conclusively material, within the meaning of *United States v. Bagley*, 473 U.S. 667, 676 (1985), and *Giglio*, 405 U.S. at 154-55. It could have been used to cross-examine Lopez and Guevara in a manner that would have left the state without good evidence. *Smith*, 565 U.S. at 75; *Fields I*, 672 F.3d at 517; *Newsome*, 319 F.3d at 302-05. As a result, Defendants' suppression of their own fabrications is enough for Rivera's suppression claims to survive summary judgment.

2. *Defendants Suppressed Lopez's Exculpatory Statement*. Rivera's claim here is not based solely on the suppression of Defendants' fabrications, because Defendants suppressed other material evidence as well. As discussed, before the second lineup, Lopez told Guevara and McLaughlin that Rivera was not the shooter. AS ¶¶ 50-56. It is hard to imagine more powerful impeaching evidence than a prior statement from the state's star eyewitness that the person he

identified in a mugbook, in a lineup, and at trial was in fact not the perpetrator he had seen.[9] This evidence was, without question, material. *Jones*, 856 F.2d 985 (affirming a due process verdict in a case with almost precisely the same fact pattern); *Whitlock*, 682 F.3d at 574 (affirming denial of summary judgment in the same circumstances).

3. *Defendants Suppressed the First Lineup*. The same is true of Defendants' suppression of the first lineup on August 31. Again, Defendants concede, as they must under Rule 56, that the lineup occurred. AS ¶¶ 29-38. If it did, Defendants also must concede that they *falsely reported* to prosecutors, Rivera, and his criminal defense attorneys that no such lineup ever occurred. AS ¶¶ 36, 43, 67-68. Rivera stood in that lineup, Lopez viewed it, and Lopez picked a filler. AS ¶¶ 39-40. Again, information that Lopez viewed a lineup and picked someone other than Rivera would have been powerful impeachment of his other identifications. AS ¶ 83. Indeed, proof that a first lineup with Lopez occurred would have been material evidence impeaching Lopez's trial identification, even if one construes the facts in Defendants' favor and assumes that Lopez did not pick a filler. AS ¶¶ 29-38. Rivera and his attorney could have impeached Lopez's and Guevara's testimony at trial that Lopez identified Rivera in an unbroken sequence of identification procedures—first the mugbook and then the September 15 lineup—with evidence that Lopez had viewed a lineup in which Rivera stood, after which Rivera was released without charge. AS ¶¶ 83, 90-93. In many scenarios the first lineup was material exculpatory evidence.

---

[9] Rivera has already explained the reasons that Defendants' factual arguments—that Lopez did not tell them this, or that if he did they did not understand—are inappropriate for summary judgment.

Defendants also argue they cannot be held accountable for failing to appreciate the ramifications of the evidence that they did not produce, and they cite to this Court's decision in *Johnson v. Dossey*, 878 F. Supp. 2d 905, 921 (N.D. Ill. 2012), in support. Officer Br. at 10-11. *Johnson* does not support Defendants. In *Johnson*, the record showed (at best) that the trial prosecutor and police conspired together to suppress evidence, and the issue was whether there was evidence that the police had failed to disclose a particular piece of exculpatory evidence to the prosecutor. *Id.* at 920-21. The Court concluded that there was no evidence in the record that the police had failed to do so. *Id. Johnson* has no application here, where the evidence shows that police learned from the eyewitness that their suspect was not the perpetrator, that the police never disclosed that information to prosecutors, and that they instead told prosecutors that the witness had identified their suspect. AS ¶¶ 52, 57, 60, 65, 80-83.

Defendants' argument that the first lineup was not suppressed because Rivera and his attorney, Wadas, knew about it is riddled with errors. Of course Rivera was always suspicious that the first lineup he stood in a couple of weeks before he was charged with Valentin's murder was related to the case—he told Wadas as much, and Wadas attempted to investigate it. AS ¶¶ 42, 87. But Rivera (and Wadas, and state prosecutors) had no way of proving that the first lineup Rivera stood in was related to the Valentin case. AS ¶¶ 42-43, 87. That is because Guevara told Rivera when he was arrested that he was going to be a filler in a lineup, Defendants wrote false reports stating that the lineup had not occurred, and they suppressed other reports that could have been used to show that in fact the lineup had occurred and was related to the Valentin case. AS ¶¶ 36-37, 42, 67-68, 76-77. Moreover, Rivera certainly had no way, standing in the lineup, to know that Lopez had viewed the lineup, much less that he had picked a filler. AS ¶¶ 42-44.

Defendants refer the Court to *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003), a case that stands generally for the proposition that evidence is not suppressed within the meaning of *Brady* if it is already known to the criminal defendant. Because Rivera was in the first lineup, Defendants' argument goes, exculpatory evidence was not suppressed. Precisely this misapplication of *Gauger* was expressly rejected by the Seventh Circuit earlier this year in *Avery*, 847 F.3d at 443-44.

*Avery* considered whether police officers could be liable for failing to disclose impeachment evidence regarding their interrogations of three jailhouse informants, who testified falsely at a criminal defendant's trial that the criminal defendant had confessed the murder to them. *Id.* at 436-37, 443-44. The district court, relying on *Gauger*, concluded that because the criminal defendant had himself participated in conversations with the jailhouse informants, he knew that they were lying when they implicated him, and therefore the police had no *Brady*

22

obligation to disclose information about the informants when the criminal defendant could have impeached the informants himself. *Id.* at 443-44. Rejecting the same argument Defendants raise here, the Seventh Circuit held that the district court "correctly stated the *Gauger* rule but misapplied it to this case," and it held that where the police have knowledge of impeaching facts that will help to prove that a witness's statements are false, they must disclosed that impeachment evidence under *Brady*. *Id.*

Rivera knew he was in a lineup and suspected it was related to this case, but he was deprived of all of the proof in Defendants' possession with which he could have impeached Lopez at trial—the fact that the lineup was tied to the Valentin investigation, the fact that Lopez viewed the lineup, and the fact that he picked a filler. AS ¶¶ 42-44. All of that would have been powerful impeachment evidence, and all of it was suppressed by Defendants. Worse yet, they replaced this impeachment evidence with false evidence. *Gauger* does not apply to this situation, *Avery* does. Defendants are not entitled to summary judgment.

4. *Defendants Suppressed That Rivera Was Their Suspect on Day One.* Last but certainly not least, Defendants suppressed the fact that Rivera was their suspect on the day the crime occurred, before any witness had identified him. AS ¶¶ 22-24. This is perhaps the most profound fact withheld in the case. Defendants requested Rivera's rap sheet on the day Valentin was shot, that rap sheet was produced by central records with an August 27 date stamp, and the Defendants put the rap sheet in their file. AS ¶¶ 22, 76-77. The rap sheet was therefore produced two days before Lopez made his August 29 mugbook identification of Rivera. AS ¶¶ 22-24. Rivera is fully entitled to the inference at this stage of the case that this sequence of events demonstrates that Defendants decided he was a suspect first and created evidence to implicate him second. That inference is strengthened by the fact that the rap sheet itself was hidden in the street file and was

never turned over to prosecutors, Rivera, or his defense attorneys. AS ¶¶ 76-77, 87. If it had been disclosed, it too would have been powerful impeachment evidence at trial.

### (b) Defendants Suppressed Exculpatory Police Files

The summary judgment record also amply supports Rivera's claim that Defendants violated his right to due process by suppressing investigative documents generated during the Valentin investigation in a street file—a clandestine parallel file that was not produced to prosecutors, to Rivera, or to his attorneys.[10] The documents Defendants suppressed in the street file were additional material exculpatory and impeachment evidence that were withheld from Rivera, in violation of his right to due process. *See Jones*, 856 F.2d 985 (noting that suppression of exculpatory evidence in clandestine street files violates due process); *see also Fields v. City of Chicago*, 2014 WL 477394, at *6-7 (N.D. Ill. Feb. 6, 2014) (denying summary judgment on a similar street files claims).

The City and Officer Defendants argue that there was no street file in this case. Their argument boils down to a word game—one that they lost in both *Fields* and *Kluppelberg*—where they define the many types of parallel investigative files kept within the Chicago Police Department, pronounce that the usual type of investigative files were kept during the Valentin investigation, and conclude that, as a result, there was no street file withheld from Rivera. To the extent that files were not turned over to Rivera, Defendants continue, that must have been the fault of state prosecutors or Rivera's attorneys. The Defendants' self-serving characterization of the types of files that they kept during the Valentin investigation and their conclusion that they

---

[10] Rivera explains the history of the street files practice in his Local Rule 56.1 statement, AS ¶¶ 98-109, and in greater detail below. What is important to bear in mind about the street files practice for present purposes is that investigative materials generated during police investigations were kept by officers in a series of parallel files. When an investigation concluded, certain reports were made part of the official file routinely produced to the criminal justice system and others were not. At the end of the day, information in the parallel investigative files was systematical suppressed and was not handed over to prosecutors or to criminal defendants. The parallel investigative files for any given case that were not turned over are referred to as street files throughout this brief.

did not cause the police file suppression in this case depend entirely on a version of the facts in which every inference is drawn *against* Rivera. That is impermissible at summary judgment, and Defendants' assertion that the record shows they did not suppress documents in a clandestine street file must be rejected.

To be clear, Defendants produced a street file in this litigation they had never produced before. AS ¶¶ 70(a), 79. That street file is attached as Exhibit 4 to Rivera's brief. AS ¶¶ 79, 76-77.[11] A number of the police reports in the street file were made part of the official permanent retention file kept by the Chicago Police Department at the time of Rivera's criminal prosecution. AS ¶¶ 70(b), 73-75. The permanent retention file is attached as Exhibit 42 to Rivera's brief. AS ¶¶ 70(b). Other police documents generated by Defendants during the Valentin investigation, however, were not put in the permanent retention file and instead were kept only in the street file. AS ¶¶ 70(a)-(b), 75-77.[12]

In response to requests from prosecutors and Rivera's attorneys in the lead-up to Rivera's criminal case, Defendants turned over the permanent retention file, but they did not turn over the street file. AS ¶ 75. The police documents that were produced by Defendants to the criminal justice system in Rivera's criminal case are in the case file of Rivera's criminal defense attorney, Wadas. AS ¶¶ 72-75. Wadas's file is attached as Exhibit 16 to Rivera's brief. AS ¶¶ 72-75.[13]

---

[11] Defendants argue that this file is a color copy of another file produced at the beginning of this civil litigation. City Br. at 2. That is not so. The police files produced by Defendants at the beginning of this case were an amalgamation of various police documents, from different sources, apparently assembled by defense counsel—they were not an actual copy of the street file. RCS ¶¶ 41-42, the key point here is not that the complete copy of the street file showed up for the first time after substantial discovery in this case, it is that the complete street file—whether in color or black and white—was never produced at all until this civil litigation. AS ¶ 79.

[12] Defendants argue that the fact that the file is in an 8.5 x 11" folder, has an index, and contains general progress reports shows that it is not a street file. City Br. at 11-12. This argument not only construes the evidence in the light most favorable to Defendants, it also does not make sense. The evidence that this is a street file is that it was never turned over to prosecutors or defense attorneys, not the size of the file folder. AS ¶¶ 72-77, 79, 87-88.

[13] Defendants spend significant space arguing that it is not clear what files prosecutors received from the CPD and which files Wadas received from prosecutors. City Br. at 12-14. These arguments depend on an incredible obfuscation of the record. Indeed, the City in its brief recognizes that there are disputes of fact on these questions. *See id.* at 13 ("[T]here is a dispute as to whether the documents Wadas disclosed . . . constitute his entire file[.]").

Contrary to the City's cursory argument otherwise, City Br. at 14, investigative documents included in the street file and not produced to the criminal justice system included plainly exculpatory evidence. For example, the rap sheet bearing the August 27 date stamp, showing that Rivera was a suspect before he was first "identified" by Lopez, was hidden in the street file. AS ¶¶ 76-77. While Defendants produced other rap sheets as part of criminal discovery, they suppressed the rap sheet with the date stamp. *Id.*

Perhaps more importantly, every scrap of paper from the investigation that suggested that a first lineup had been conducted in the Valentin investigation—every document that would have allowed Rivera or Wadas to connect the first lineup Rivera stood in to the Valentin shooting— was suppressed. AS ¶ 77. In other words, after writing their false report about the August 31 lineup, Defendants put all other documents suggesting that there had been an August 31 lineup in the street file, and those documents stayed hidden from Rivera during his entire wrongful conviction. AS ¶¶ 76-77, 79.[14]

---

Put simply, now-Judge Wadas testified that the file that he produced to the parties in this litigation was his complete file from the criminal case, which included all of the police documents that he received in discovery. AS ¶¶ 72-74. Further, Wadas testified that he always received all of the police reports in the State's Attorney's Office's possession on the cases that he defended. AS ¶¶ 74, 87. The trial Assistant State's Attorney Victorson, who prosecuted Rivera, similarly testified adamantly that he provided Wadas all of the police documents that he had received from the CPD. AS ¶ 74. Nothing in the record casts any doubt, particularly for purposes of summary judgment, on the conclusion that Wadas's file produced in this case accurate reflects what state prosecutors, Rivera, and Wadas had at the time of Rivera's criminal prosecution.

Moreover, Defendants' contention that Wadas never asked for the file is obviously contradicted by the record. City Br. at 12-13. Rivera's attorney sent a subpoena to the CPD's keeper of records asking for the investigative files before Rivera's trial, but they were not produced. AS ¶¶ 71, 76-77, 79. Wadas made normal discovery requests to prosecutors, and prosecutors provided all police materials they had in response. AS ¶¶ 73-74, 86. Those records appeared to be a complete record as far as Wadas and state prosecutors could tell. AS ¶¶ 87-88. Despite these efforts, the street file was not produced. AS ¶ 79. Defendants' arguments that there was no street file or that Rivera and his attorneys did not ask for it are at best fact disputes for trial.

[14] Defendants argue there is no evidence that they ever wrote an accurate report recording the August 31 lineup, and therefore that there is no report of that first lineup that was suppressed. Officer Br. at 13 & n.6. Rivera is not arguing about the suppression of some hypothetical report. He is arguing that the Defendants hid in the street file things like hold forms, release forms, and general progress reports that demonstrated that the Defendants had held a live lineup on August 31. AS ¶ 77.

These documents in the street file were documentary evidence Rivera and Wadas could have used to investigate the case, impeach witnesses, and prove Rivera's innocence, as discussed above. Defendants' suppression of the street file violated Rivera's right to due process.[15]

### (c) Defendants' Reasonable Diligence Arguments Fail

Defendants' arguments that the evidence they suppressed was available to Rivera through the exercise of reasonable diligence is without legal support, and it once again depends on a version of the facts skewed impermissibly in Defendants' favor. *See* Officer Br. at 11-13. This argument must be rejected at summary judgment.[16]

As in *Jimenez v. City of Chicago*, "[w]hat was available through reasonable diligence . . . is very much in dispute." 830 F. Supp. 2d 432 (N.D. Ill. 2011); *see also Cottrell v. Clemons*, 2014 WL 3649185, at *2 (W.D. Ky. July 23, 2014) (whether defense counsel exercised reasonable diligence is a question for the jury); *cf. Cathedral of Joy Baptist Church v. Village of Hazel Crest*, 22 F.3d 713, 719 (7th Cir. 1994) (issue of diligence in discovering an injury is a question of fact for the jury unless "the relevant facts are undisputed and only one conclusion may be drawn from them"). Defendants contend that if Rivera's attorney Wadas had worked harder, he might have uncovered the first lineup that they had covered up, Lopez's unreported statement before the fabricated second lineup that Rivera was not the perpetrator, and their secret street file. Officer Br. 6-7, 11-13. The record categorically does not permit Defendants to establish that the evidence they suppressed was available to Rivera and his attorneys.

---

[15] In a single sentence, the Officer Defendants argue that they were not responsible for transmitting their file to prosecutors. Officer Br. at 13-14. It is unclear what they mean. There can be no doubt that due process required the Officer Defendants to transmit the exculpatory reports in their file to prosecutors. *Kyles*, 514 U.S. at 438; *Avery*, 847 F.3d at 443-44. To the extent the Officer Defendants mean that they had no control over the process that the CPD uses to transmit investigative files to the criminal justice system, that is at best an argument that a jury should decide if the City's policies and practices are responsible for the due process violation (an issue discussed below), it is not an argument that undisputed facts justify summary judgment for the officers.

[16] Defendants' reasonable diligence argument has no impact at all on Rivera's fabrication and unduly suggestive lineup due process theories, neither of which requires suppression as an element.

It is important to note that each item of exculpatory evidence that Defendants contend was available through reasonable diligence is evidence they fabricated or actively took steps to cover up: After the first lineup, Defendants wrote a false report stating that it did not happen and hid documents discussing it in their street file, AS ¶¶ 36, 67-68, 77; at the second lineup, Defendants had Lopez identify Rivera after he said Rivera was not the perpetrator and falsely reported that the lineup was legitimate, AS ¶¶ 52, 57-60; and Defendants buried their street file so that neither police or prosecutors had access to it, AS ¶¶ 74-75, 79. Defendants cannot contend that Rivera's attorneys could have discovered what Defendants intentionally hid.

Moreover, the contention that Rivera could have learned Lopez's true story or the circumstances of the first lineup are themselves disputed facts. Wadas testified that he attempted to investigate the first lineup after Rivera told him that he thought one had occurred—Wadas made multiple requests to prosecutors for reports of the first lineup and also requested photographs—but he hit a dead end when he was told that there were no such documents and that there was no first lineup. AS ¶¶ 43-44, 86-87. The reason he hit a dead end is that Defendants hid the evidence, from Wadas and from the prosecutors. AS ¶¶ 43-44, 74-75, 86-87.

In addition, Wadas had no access to Lopez because he was controlled by Defendants, who were fabricating false evidence with him while preparing him for trial, and because he was a minor whom Wadas could not have talked to, even absent Defendants' misconduct. AS ¶¶ 85, 89. At summary judgment, Rivera is entitled to the inference, based on this evidence, that Lopez was not available to Wadas for an interview. At the same time, there is a vigorous dispute of fact about whether an interview of Lopez would have yielded anything but the false story that Defendants had concocted. AS ¶¶ 20(a), 21(a). Indeed, Lopez was asked under oath for his honest testimony, and he repeated Defendants' false story. AS ¶¶ 20(a)-(b), 21(c), 91.

Finally, disputes of fact preclude any suggestion that Wadas did not work hard enough to discover Defendants' street file. This was not an open file system. RCS ¶ 31; AS ¶ 73. By definition, a street file is a clandestine file not turned over to the criminal justice system. AS ¶ 103. Before Rivera's trial, one of his attorneys sent a subpoena to the Chicago Police Department keeper of records for the investigative files in the case, Wadas made discovery requests, and prosecutors provided everything in their possession. AS ¶ 71. Those records they received appeared to be complete per Wadas's experience and as far as prosecutors knew. AS ¶ 88; *see also id.* ¶ 74. The street file was not produced in response. AS ¶¶ 75-77. Indeed, even after his conviction Rivera made FOIA requests for the police files in the case without success. AS ¶¶ 78-79. It is implausible, based on the record construed in Rivera's favor, to suggest that reasonable diligence would have led to discovery of the street file. These factual disputes preclude judgment as a matter of law without need for further analysis.

It is also important to point out that Defendants' "argument rests on far too expansive an understanding of what sort of evidence should be considered available to a defendant through the exercise of reasonable diligence." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). Reasonable diligence does not require defense attorneys to seek evidence they "had no reason to believe existed," and the Seventh Circuit regards "as untenable a broad rule that any information possessed by *a defense witness* must be considered available to the defense for *Brady* purposes." *Id.* at 740, 743 (emphasis added). The Court observed that such defense witnesses "may be uncooperative or reluctant," it can be difficult to "extract all the favorable evidence a defense witness possesses," and "the defense may have forgotten or inadvertently omitted some important piece of evidence[.]" *Id.* Importantly, this is the view of the Seventh Circuit in the case of a witness *controlled by the defense*. "These concerns have even more weight in a case, like

this one, involving information possessed by a *prosecution* witness." *Hampton v. City of Chicago*, 2017 WL 2985743, at *22 (N.D. Ill. July 13, 2017).

Not only was Lopez a prosecution witness, he was a witness for whom Defendants had fabricated identifications and an entirely false story—a story that Lopez stuck with throughout Rivera's trial. As Judge Kennelly observed in *Jimenez*, reasonable diligence would not be a tenable legal rule if courts determined that fabricated stories in the minds of prosecution witnesses were discoverable through the exercise of reasonable diligence:

> Defendants' argument seems to assume the existence of a Perry Mason-like world in which prosecution witnesses readily give up impeaching information when interviewed or questioned by defense counsel. Real life does not work that way, or at least the governing legal rule cannot realistically be premised on the assumption that it always works that way. Witnesses coerced or persuaded to testify in a particular way often tend to identify with, and to ally themselves with, their persuaders. A legal rule that assumes that such a witness will readily describe the circumstances of the coercion or persuasion simply because the other side's lawyer asks the witness the right question would defy common sense.

830 F. Supp. 2d at 444-45. As Judge Dow observed recently in *Hampton*, in cases where "the evidence that was allegedly withheld was in the minds of the prosecution witnesses, . . . and there is some evidence that the prosecution witnesses provided misleading information about the detectives' use of suggestive identifications with them," summary judgment should not be granted on reasonable diligence grounds. 2017 WL 2985743, at *22.

More generally, the Seventh Circuit has made clear that the reasonable-diligence doctrine does not extend to information in the heads of witnesses the same way that it does to information in accessible documents. *Boss* observed that "[i]n the typical reasonable diligence case, the question is whether defense counsel had access to the documents containing the *Brady* material, through an open file policy," and not "whether defense counsel had access to *Brady* material contained in a witness's head." 263 F.3d at 741. The Court continued: "In cases like the present one, the question is whether defense counsel had access to *Brady* material contained in a

witness's head. . . . Because mind-reading is beyond the abilities of even the most diligent attorney, such material simply cannot be considered available in the same way as a document." *Id.* (citation omitted). At the same time, the Court has concluded that information may be deemed unavailable if the defense has less of an opportunity to obtain it, *e.g.*, *United States v. Morris*, 80 F.3d 1151, 1168 (7th Cir. 1996) (focusing on whether "defendants had been given the same opportunity as the government to discover the identified documents"); or where there is evidence that a witness would have lied about it, *e.g.*, *Crivens v. Roth*, 172 F.3d 991, 996-97 (7th Cir. 1999) (holding that evidence in a prosecution witness's head not discoverable through the exercise of reasonable diligence where there was evidence that the witness would have lied about that evidence). Here there is no support in the record for a conclusion that Rivera's attorney could have discovered the truth from a lying prosecution witness conspiring with Defendants.

Defendants contend that this case is similar to *Boyd v. City of Chicago*, 225 F. Supp. 3d 708 (N.D. Ill. 2016), but there are critical differences between the eyewitness discussed in *Boyd* and Lopez in this case: the eyewitness in *Boyd* (a woman named Bonanno) did not testify at the plaintiff's criminal trial, she was accessible to the plaintiff's defense attorneys, and there was no evidence whatsoever that she was provided a false story to tell by the police defendants in the case. *Id.* at 721-23. Specifically, Bonanno viewed a lineup and told the police that the plaintiff was not the perpetrator. *Id.* She was then disclosed as a witness, was not interviewed by the plaintiff's criminal defense attorneys, and was not called at the plaintiff's criminal trial. *Id.* at 713, 721-23. The court concluded that there was no basis in the record to conclude that Bonanno would not have simply told plaintiff's defense attorneys what she had told the police detectives if they had interviewed her, and therefore that the police defendants could not be held liable for suppressing evidence. *Id.* at 721-23.

Here, by contrast, the Defendants told Lopez to fabricate a false identification of Rivera directly after he told them Rivera was not the perpetrator, and they continued to control him and fabricated additional false testimony for him at all points between that moment and Lopez's ultimate false testimony at Rivera's criminal trial. AS ¶¶ 52, 58-60, 61-64, 91. Even if the record allowed an inference that Wadas had some opportunity to access and interview Lopez (which he did not for the reasons discussed already), there is nothing in record that entitles Defendants to the inference that Lopez, in the midst of Defendants' fabrication of evidence, would have suddenly come clean. AS ¶¶ 20(a), 21(a). That proof problem is fatal to Defendants' motion as movants—if it was undisputed that Lopez would have told Wadas the truth had he been asked, Defendants should have provided admissible testimony from Lopez to that effect. As it stands, Defendants seek an inference in their favor on this point, which is obviously improper.

The combination of Defendant's control of Lopez, their fabrication of his false testimony, and his presentation of that false evidence at trial renders any argument that suppressed evidence was available to a diligent attorney utterly inconsistent with the law governing these claims.[17] Adopting Defendants' position "would effectively render *Brady* and its progeny, including *Giglio v. United States*, 405 U.S. 150 (1972), a dead letter: if the governing rule is predicated on the assumption that a prosecution witness will, if interviewed by the defense, disclose impeaching information, then the prosecution effectively is relieved of the legal responsibility under *Brady* and *Giglio* to disclose that information." *Jimenez*, 830 F. Supp. 2d at 445. The law and disputes of fact preclude summary judgment on this basis.

---

[17] These factors also distinguish this case from *Patrick v. City of Chicago*, 103 F. Supp. 3d 907, 915 (N.D. Ill. 2015), in which the suppressed evidence was known to co-defendants to whom defense attorneys had access, and from *Mosley v. City of Chicago*, 2009 WL 3097211, at *5-7 (N.D. Ill. Sep. 22, 2009), in which the police defendants never suggested that the eyewitness had identified the plaintiff in a lineup, the eyewitness testified at the grand jury that he did not see the plaintiff commit the crime, and the defense attorney had access to the witness and the grand jury testimony.

Given the blatant *Brady* violations above, Defendants' only defense is to deny they ever occurred. That defense must be mounted at trial and not in a motion for summary judgment.

### 3. Independently, A Reasonable Jury Could Conclude That Defendants Utilized Unduly Suggestive Lineup Procedures That Tainted Rivera's Criminal Trial

Disputed facts also preclude summary judgment on Rivera's claim that Defendants conducted unduly suggestive identification techniques that violated Rivera's right to due process when the identifications were used in his criminal proceedings. Police violate due process when they employ unduly suggestive lineup techniques that taint a criminal case. *Manson v. Brathwaite*, 432 U.S. 98 (1977); *Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006); *Hensley v. Carey*, 818 F.2d 646, 648-50 (7th Cir. 1987). Section 1983 liability does not attach simply because an unduly suggestive lineup procedure is employed. Instead, the improper lineup must have had a prejudicial impact on the criminal proceedings. *Alexander*, 433 F.3d at 555-56 ("A plaintiff with this kind of [section 1983] claim must demonstrate, by reference to the *Brathwaite* standard, that unduly suggestive identification procedures led to an unreliable identification that undermined the fairness of his trial."). The assessment of whether identification procedures were so unduly suggestive that they gave rise to a misidentification turns on two questions: (1) whether the procedures were unnecessarily suggestive; and (2) whether there is evidence that the identifications were nonetheless reliable. *Hampton*, 2017 WL 2985743, at *23 (citing *Lee v. Foster*, 750 F.3d 687, 691 (7th Cir. 2014)). If the identification techniques were unduly suggestive, the question is whether they rendered the criminal proceeding unfair. *Id.* (citing *Alexander*, 433 F.3d at 555). Each of these questions must be resolved in Rivera's favor at summary judgment.

### (a) The Identification Procedures Were Unduly Suggestive

As discussed above, Defendants decided on Rivera as their suspect at the outset, directed Lopez to pick him from the photobook, and then told Lopez (who, remember, was just 12 years old) to select him again at the second lineup, after Lopez had told the Defendants that Rivera was not the perpetrator. That is enough at summary judgment to demonstrate that the identification procedures were unduly suggestive.

But even if that misconduct were not in the record, there is still sufficient evidence to show that the lineup procedures Defendants used were unduly suggestive. Rivera's expert, Dr. Jennifer Dysart, explains in detail the peer-reviewed research on eyewitness identifications that supports Rivera's contention that the identification procedures in this case were unduly suggestive and resulted in an unreliable identification. Ex. 21.

For starters, Dr. Dysart opines that the fact that Lopez was just 12 rendered him especially susceptible to police suggestion and influence. *Id.* at 9. Dr. Dysart also points to various "system variables"—investigative circumstances in the Defendants' control—that rendered the identification procedures used on Lopez unduly suggestive, including: (1) requiring Lopez to search through hundreds of mug shots in photobooks, which increased the risk of false identifications because of commitment effects and unconscious transference effects produced by mugbook searching, *id.* at 9-10; (2) only two of fillers in the first lineup and two of the fillers in the second lineup had the ponytail that Lopez later testified was worn by the perpetrator, meaning that the fillers did not all match the witness's description of the suspect, which in turn increased the chances that Rivera would be wrongly selected, *id.* at 10; (3) Lopez was told before the identification procedures that he was looking at photo and live lineups that included the suspect, which dramatically increased the chance of false identifications, *id.* at 11; (4) the use of

non-blind simultaneous lineups (where Defendants knew the identity of their suspect and all lineup subjects were viewed together), instead double-blind sequential lineups (where the administrator does not know the identity of the suspect and subjects are viewed one at a time), increased the probability that Lopez's selection would be influenced, *id.* at 13; (5) post-identification confirmation from Defendants that Lopez had selected the "right" person from the lineup increased the chances of erroneous identifications, *id.* at 15; (6) repeated identification procedures in which Rivera was the only common subject increased the chances of Lopez selecting Rivera incorrectly, *id.* at 15-16.

At minimum, this evidence shows a robust dispute about whether the identification procedures used with Lopez were unduly suggestive, even setting aside the evidence that Defendants fabricated the identifications out of whole cloth. A reasonable jury could find Dr. Dysart's opinions credible, thereby rendering summary judgment inappropriate.

### (b) Lopez's Identifications of Rivera Were Not Reliable

Lopez's identification was also undeniably unreliable. Most importantly, the record viewed in Rivera's favor shows that Lopez identified Rivera as the Valentin shooter even though Rivera had nothing to do with the crime and was not at the scene. AS ¶¶ 20(d), 21(e), 50, 52, 96-97. Indeed, there is nothing in the Defendants' summary judgment filing that even hints that Lopez accurately identified Rivera as the shooter—their story is that he lied. Moreover (and not to beat a dead horse), the Defendants' instruction to Lopez that he should pick Rivera, even after Lopez had picked a filler and told the Defendants that Rivera was the wrong guy, conclusively renders the identification unreliable for purposes of summary judgment.

Again, additional evidence supports this view. The reported initial descriptions of the perpetrators—whether from Valentin or Lopez—lack any detail that might suggest that Rivera

was one of the perpetrators. AS ¶¶ 8, 10-11. Valentin for example described a 16- to 18-year-old

boy as the shooter, but Rivera at the time was 23 years old. AS ¶ 8. As Dr. Dysart notes, the

initial descriptions are devoid of details about the distinctive long hair, dyed gold, which Lopez

and Guevara later attributed to Rivera at trial. Ex. 21 at 8-9. These emergent details suggest the

invention of new and inaccurate memories. *Id.* In short, the initial descriptions on their face

provide strong proof that Lopez could not identify the perpetrator at all, let alone accurately

identify Rivera. AS ¶¶ 8, 10-11. This conclusion is strengthened by the considerable variation in

Lopez's stories about the shooting, which suggest he did not see anything with sufficient clarity

to make an identification. AS ¶¶ 17-19(a)-(h), 21(b), 61-62.

In addition, Dr. Dysart identifies various "estimator variables"—environmental

circumstances not in Defendants' control—that demonstrate that Lopez's identifications were

unreliable, including: (1) Lopez's limited exposure to the shooter, which reduced the chances of

an accurate identifications, Ex. 21 at 6-8; (2) Lopez's focus on the weapon, which drew attention

from the perpetrator's face and reduced accuracy, *id.* at 8; and (3) the stress caused by the

incident, which would have had a similar effect, *id.* at 8. Finally, Dr. Dysart opines that Lopez's

non-identification of Rivera in the first lineup is strongly indicative of Rivera's innocence. *Id.* at

16. No evidence in the record suggests Lopez's identifications of Rivera were reliable.

### (c) The Identification Tainted Rivera's Criminal Proceedings

The final factor necessary to support this due process theory is whether the unduly

suggestive and inaccurate identifications rendered Rivera's criminal case unfair. Based on this

record, the question must be answered in the affirmative.

Under Seventh Circuit case law, whether unduly suggestive identifications made criminal

proceedings unfair is answered by reference to the following questions: "What identification

evidence was actually admitted at trial? What did the victims, eyewitnesses, and police officers say? Were they cross-examined? Were the circumstances surrounding the identification and the police procedures put before the jury? What exhibits were admitted on this issue? Was any objection or motion to suppress the identification evidence made? What other evidence tended to link the defendant to the crime?" *Alexander*, 433 F.3d at 555.

At trial, Lopez and Guevara implicated Rivera as the perpetrator from the stand—based on the identification procedures that Defendants utilized before trial. AS ¶¶ 91-92. Lopez and Leonard testified about the mugbook identification Lopez made of Rivera. AS ¶¶ 91, 93. Both Lopez and Guevara testified about the identification of Rivera at the second live lineup. AS ¶¶ 91-92. And a photograph of the second lineup was introduced as evidence at trial, at which time Lopez placed an "X" above Rivera's head on the photo. *Id.*

Though Wadas attempted to cross examine these witnesses, Defendants' suppression of the true circumstances of these identification procedures—the fact that Rivera was a suspect before any identification, the fact that they told Lopez who to pick from the mugbook, the fact that Lopez picked a filler from the first lineup, and the fact that Lopez said before the second lineup that Rivera was not the perpetrator—rendered cross examination effectively impossible.[18]

The identifications were used to convict Rivera at trial. Other than the evidence fabricated by the Defendants discussed above, nothing else even implied Rivera was guilty. The record shows that the unduly suggestive false identifications made Rivera's trial unfair.

---

[18] Defendants argue that Wadas should have done a better job cross examining at trial or should have filed a motion to suppress Lopez's identifications. Officer Br. at 18. But they tied Wadas's hands behind his back, hiding the evidence that would have allowed Wadas to undermine the identifications.

### (d) Defendants' Arguments for Summary Judgment on the Unduly Suggestive Lineup Theory Lack Merit

Defendants' remaining arguments for summary judgment on this due process theory have been addressed already. Defendants again argue that Lopez's identification of Rivera at trial was "his own intentional lie, not the result of police manipulation." Officer Br. at 16-18. But there is ample evidence that, after selecting Rivera as the suspect, Defendants told Lopez who to pick in multiple lineups, including after Lopez said Rivera was not the perpetrator, *supra* at 9-18, as well as the evidence just discussed that Defendants' identification procedures were unnecessarily suggestive, even ignoring the fabrication, *supra* at 33-37. Defendants' citation to *Hart v. Mannina*, 798 F.3d 578, 587-88 (7th Cir. 2015), a case involving four eyewitness identifications and no evidence of manipulation, does not help Defendants given the facts of this case. Rivera's evidence of manipulation is not thin or speculative. On the contrary, it is largely uncontroverted. This Court should deny summary judgment on the unduly suggestive lineup due process theory.

### C.    A JURY MUST DECIDE THE SECTION 1983 CONSPIRACY CLAIMS

In cursory fashion, Defendants argue for summary judgment on Rivera's section 1983 conspiracy claims, asserting that these claims are derivative of his due process claims and unsupported by evidence. Officer Br. at 18-19. To the extent Defendants' argument is based on a purported deficiency in Rivera's due process claims, that argument is rebutted by the discussion above of the reasons that the due process claims survive. *Supra* at 9-33. Moreover, Defendants' bald assertion that there is no evidence of conspiracy is insufficient to shift the summary judgment burden. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010) ("The defendants, the moving party on the summary judgment motion, never fulfilled the obligation of setting forth the basic facts and law which, in their view, warranted summary judgment on this claim."). Regardless, there is ample evidence supporting Rivera's conspiracy claims.

To prove a section 1983 or civil conspiracy, Rivera must point to evidence from which a jury could infer an agreement among two or more people acting in concert to commit an unlawful act, or a lawful act by unlawful means. *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979), *rev'd in part*, 446 U.S. 754. The Seventh Circuit has explained that

> [t]o be liable as a conspirator you must be a voluntary participant in a common venture, although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them.

*Jones*, 856 F.2d at 992. Conspirators are liable "for the wrongful acts of the other conspirators committed within the scope of the conspiracy." *Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002). "Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire," and so "circumstantial evidence may provide adequate proof of conspiracy." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1256 (7th Cir. 1984); *see also Hampton*, 600 F.2d at 621 ("The question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives.").

There is ample evidence of agreement between the Defendants, and Rivera's conspiracy claims against each of them should proceed to trial. The facts viewed in Rivera's favor show Defendants settling on Rivera as a suspect before he was ever identified, and working from there to fabricate evidence implicating him in the crime, because there was no evidence to speak of otherwise. AS ¶¶ 22-24, 90-93. Where evidence contradicted Defendants' official version, it was hidden from sight. AS ¶¶ 36-37, 40, 57-60, 76-77. As discussed above, each of Defendants participated in fabricating Lopez's mugbook identification, arresting Rivera, and orchestrating and then covering up the first lineup. AS ¶¶ 22, 25, 32, 36, 40; ROS ¶¶ 65-72. Even before the

39

second lineup and the fabricated identifications from Lopez and Valentin, which no doubt

involved fewer of the Defendants directly, each of them had engaged in a scheme to fabricate

evidence and Rivera for a crime that they had no evidence he had committed. *Id.*; *see Jones*, 856

F.2d at 992 ("We cannot say that the jury acted unreasonably in finding that all of the individual

defendants were voluntary participants in a common venture to railroad [the plaintiff].").

The conspiracy continued after Valentin's death, but its object and scope remained the

same. *See United States v. Jackson*, 546 F.3d 801, 815-16 (7th Cir. 2008) ("[C]o-schemers are

jointly responsible for one another's acts in furtherance in the scheme," and a "participant in

conspiracy is liable for foreseeable acts of his co-conspirators in furtherance of the

conspiracy[.]"). A reasonable jury could find for Rivera on his conspiracy claims.

### D. A JURY MUST DECIDE THE FAILURE-TO-INTERVENE CLAIMS

The Officer Defendants also state in a sentence of their brief that there is no evidence

supporting Rivera's failure-to-intervene claim because there is no evidence that any of them

knew of unconstitutional conduct by any other. This argument, too, is not developed in a way

that permits a response and is therefore forfeited. *See Smith v. Northeastern Ill. Univ.*, 388 F.3d

559, 569 (7th Cir. 2004) (holding that an undeveloped argument is forfeited); *Otto v. Variable

Annuity Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998) (refusing to consider unsupported or

cursory arguments).

It also lacks merit. A defendant who has a realistic opportunity to step forward and

prevent a fellow officer from violating the constitutional rights of another but who fails to do so

is liable. *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972); *Yang v. Hardin*, 37 F.3d 282, 285 (7th

Cir. 1994). The discussion of Rivera's conspiracy and due process claims, above, demonstrates

that a reasonable jury could find that each of Defendants had the opportunity to intervene to

prevent the fabrication and suppression of evidence that caused Rivera's 20-year wrongful incarceration. *See supra* at 9-33. Indeed, Defendants had decades to so intervene and did not. Summary judgment is not appropriate on this claim either.

## E.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

The Officer Defendants assert as an afterthought that they are entitled to qualified immunity on Rivera's due process claims. Officer Br. at 21-22.[19] To the extent that Defendants are arguing in this section that they did not violate Rivera's constitutional rights, material disputes of fact foreclose those arguments, as discussed above.[20] To the extent Defendants are actually arguing that the law governing Rivera's claims was not clearly established in 1988, that is plainly incorrect—the illegality of the Defendants' conduct was established long before the events at issue in this case.

With respect to fabrication, "it was established law by 1985 (indeed long before)" that fabricating evidence for use against a criminal defendant violated due process. *Fields II*, 740 F.3d at 1114 (citing *Napue*, 360 U.S. at 269, *Pyle v. Kansas*, 317 U.S. 213, 215-16 (1942), and *Mooney*, 294 U.S. at 110-13); *see also Dominguez*, 545 F.3d at 589 ("There was and is no disputing that such conduct [fabricating evidence in 1989] violates clearly established

---

[19] Defendants do not argue they are entitled to qualified immunity on Rivera's other constitutional claims, and so they have now forfeited any argument for immunity on those claims, *J&J Sports Productions, Inc. v. Resendiz*, 2009 WL 1953154 (N.D. Ill. July 2, 2009).

[20] In fact, most of this section of Defendants' brief in fact repeats arguments already addressed above about whether Defendants violated Rivera's rights, but here Defendants have dressed them up as arguments about the contours of clearly established law.

For example, Defendants argue that the law was not clearly established that they had to disclose evidence about a first lineup that Rivera knew about. Officer Br. at 21. That is not an argument about the state of clearly established law, it is an argument that they did not suppress evidence because, in their view, Rivera knew about it. That misplaced *Gauger* argument about Rivera's *Brady* claims is disposed of above—Rivera did not know the facts impeachment evidence about the first lineup hidden from him.

Defendants similarly state that the law did not require them to disclose every "tidbit" of evidence helpful to Rivera. Officer Br. at 21-22. Whether that is correct or not, that argument, too, is disposed of above—the suppressed evidence was profoundly material and easily would have shown Rivera's innocence.

Finally, Defendants' argument that the law was not clearly established that fabricated evidence violates the Constitution when it is not used in criminal proceedings is nothing more than a reassertion of the flawed factual argument that evidence fabricated by Defendants was not used in criminal proceedings.

constitutional rights"). Indeed, more than 80 years ago, the Supreme Court held in *Brown v. Mississippi* that the use of fabricated witness statements in criminal proceedings violated due process, even where the police actually disclosed all of the circumstances of their coercion of those witnesses. 297 U.S. 278, 283-86 (1936).

The *Brady* obligation and the application of those due process principles to police were equally well established before the Valentin investigation. *See Newsome*, 256 F.3d at 752-53 (concluding that it was clearly established in 1979 that police could not suppress information about the conduct of a lineup, and noting that "[t]he *Brady* principle was announced in 1963, and we applied it in *Jones* to affirm a hefty award of damages against officers who withheld exculpatory information in 1981"); *see Engel v. Buchan*, 710 F.3d 698, 708-09 (7th Cir. 2013) ("It is beyond dispute that the *Brady* right was well established [by 1984]"); *Armstrong v. Daily*, 786 F.3d 529, 549-50 (7th Cir. 2015) (holding that it was clearly established by 1980 that police could not destroy exculpatory evidence).

Finally, it has been the law since at least 1977 that subjecting a criminal defendant to unduly suggestive identification procedures that taint a criminal proceedings violates due process. *Manson v. Brathwaite*, 432 U.S. 98 (1977); *see also Neil v. Biggers*, 409 U.S. 188 (1972). It was clear in the Seventh Circuit that police officers could be held liable for this misconduct at latest the year before the Valentin investigation. *Hensley*, 818 F.2d at 648-50. Defendants are not entitled to qualified immunity on Rivera's due process claims.

## F.     A JURY MUST DECIDE RIVERA'S MALICIOUS PROSECUTION CLAIM

Rivera also brings a state-law claim for malicious prosecution. To succeed, Rivera must show (1) initiation or continuation of criminal proceedings, (2) without probable cause, (3) with malice, (4) terminating in the plaintiff's favor. *Logan v. Caterpillar*, 246 F.3d 912, 921-22 (7th

Cir. 2011). Defendants claim they are entitled to summary judgment on the first two of these elements. Officer Br. at 22-24. Neither argument has merit.

### 1. Defendants Commenced and Continued A Criminal Proceeding

Defendants' argument that they did not commence or continue criminal proceedings against Rivera is based entirely on the assertion that they did not talk with prosecutors, sign the criminal complaint against Rivera, or influence the grand jury. Those are all disputed facts. Rivera is entitled to the inference at summary judgment that at least Guevara, Gawrys, and McLaughlin provided the fabricated September 15 Lopez identification directly to ASA Rosner, who immediately approved charges. AS ¶¶ 51-56, 65, 80-82. These Defendants were present for the lineup, Rosner was called in immediately to approve charges, and she talked with Lopez about the identification procedure that these Defendants performed. *Id.*

While Guevara did not sign the criminal complaint on September 15, he signed an arrest report under oath that day supporting the charges, which falsely reported the results of the lineup and noted that ASA Rosner was approving the charges. AS ¶ 80. Consistent with Guevara's sworn report, the felony minute sheet by which ASA Rosner approved charges lists Guevara and Gawrys as "prosecuting witnesses." AS ¶ 81. Finally, Guevara lied to the grand jury when he testified that an eyewitness had seen Rivera kill Valentin, consistent with his fabricated evidence that Lopez and Valentin had both identified Rivera. AS ¶ 84 (JR 1932).[21] The record construed in Rivera's favor shows direct influence by Defendants over the decision to prosecute Rivera.

---

[21] Guevara's contention that he did not lie to the grand jury when he testified that an eyewitness identified Rivera ignores one of the most fundamental factual disputes in the case—Rivera contends that Guevara's testimony about fabricated eyewitness identifications was all lies. Indeed, when asked at his deposition whether he lied under oath during Rivera's criminal case, Guevara invoked the Fifth. AS ¶ 85.

So while Defendants are correct that a grand jury indictment can break the chain of causation or establish a *prima facie* case of probable cause in some malicious prosecution cases, those effects are "rebutted by other evidence such as proof that the indictment was obtained by false or fraudulent testimony before the grand jury, or by failing to make a full or complete statement of facts, or by other improper or fraudulent means." *Freides v. Sani-Mode Mfg. Co.*, 211 N.E.2d 286, 289 (Ill. 1965); *see also Jones*, 856 F.2d at 994 ("[A] prosecutor's decision to

But such a showing is not even necessary under Illinois law. A defendant who is liable

for malicious prosecution "must have initiated the criminal proceeding or his participation in it

must have been of so active and positive a character as to amount to advice and cooperation."

*Logan*, 246 F.3d at 922. The cases stress that this standard does not depend on who made the

decision to prosecute (by definition the prosecutor, not the officer), who signed the criminal

complaint, who testified at the grand jury, or who led the investigation. Instead, "liability extends

to all persons who played a significant role in causing the prosecution of plaintiff." *Turner v.

City of Chicago*, 2013 WL 4052607 (N.D. Ill. 2013); *see also Alexander v. United States*, 721

F.3d 418, 423 (7th Cir. 2013) (noting that a defendant "causes" an action to be commenced

"even if that person does not conduct the prosecution personally"). As discussed already, the

Defendants each fabricated evidence that was presented to prosecutors and suppressed other

evidence, causing Rivera's wrongful criminal prosecution and conviction. That alone is enough

to demonstrate that they commenced and continued Rivera's criminal proceedings.

Moreover, police who engage together in misconduct to deceive other actors in the

criminal justice system are routinely found to have commenced and continued criminal

prosecutions. *E.g.*, *Padilla v. City of Chicago*, 2013 WL 1208567, at *16 (N.D. Ill. Mar. 26,

2013) (police who engage in misconduct cannot blame others involved in the prosecution);

*Freeman v. Brown*, 2012 WL 3777074, at *6 (N.D. Ill. Aug. 29, 2012); *Ewing v. O'Brien*, 60 F.

Supp. 2d 813, 818 (N.D. Ill. 1999). Indeed, a material false statement to a prosecuting authority

supports a finding that the commencement element is satisfied. *Wallace v. City of Zion*, 2011 WL

3205495, at *5 (N.D. Ill. July 28, 2011); *Boyle v. Torres*, 756 F. Supp. 2d 983, 1000 (N.D. Ill.

---

charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of
these decisions will shield a police officer who deliberately supplied misleading information that influenced the
decision[.]"). That is precisely what the evidence, construed in Rivera's favor, shows here. The grand jury
indictment therefore has no effect on the analysis.

Dec. 21, 2010); *Allen v. Berger*, 784 N.E.2d 367, 370 (Ill. App. Ct. 2002) ("[W]hen a person

makes a knowingly false report to a prosecuting officer, the resulting prosecution is attributable

to that person."). In short, what prosecutors did and whether police interacted with them matters

little when the police fabricate false evidence. *Myett v. Heerdt*, 2017 WL 75738, at *16 (N.D. Ill.

Jan. 9, 2017) (deciding that where police provided prosecutors with false reports, they could not

hide behind prosecutorial decisions to charge); *Simon v. Northwestern Univ.*, 2016 WL 1237666,

at *7 (N.D. Ill. Mar. 29, 2016) (holding that investigators who supply false information to

prosecutors may be liable for malicious prosecution even if prosecutors investigate

independently). Defendants each commenced and continued the criminal case against Rivera,

within the meaning of Illinois law.

### 2. Defendants Lacked Probable Cause to Prosecute Rivera

Defendants also argue that there is no genuine dispute about whether there was probable

cause to suspect that Rivera killed Valentin. Officer Br. at 23-24.[22] Defendants assert that they

believed at the time that Lopez accurately and truthfully identified Rivera, and they cite a case

that says that probable cause can be based on a single eyewitness identification. Again,

Defendants' argument is founded on utterly disputed facts and inapplicable case law.

"In a malicious prosecution case, probable cause is defined as a state of facts that would

lead a person of ordinary care and prudence to believe or to entertain an honest and sound

suspicion that the accused committed the offense charged." *Williams v. City of Chicago*, 733

F.3d 749, 759 (7th Cir. 2013). It is established that knowingly fabricated evidence and false

statements never support probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978);

---

[22] Defendants suggest in this section of their argument that Rivera bears the burden at this stage to demonstrate a lack of probable cause. That is not the case. While Plaintiff can and will be required to prove an absence of probable cause at trial, he is only required at this stage to show that there is a dispute of fact over whether Defendants had probable cause to commence or continue his prosecution.

*Alexander*, 721 F.3d at 423; *Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011) (reversing grant of summary judgment where false statements precluded finding probable cause); *Olson v. Tyler*, 771 F.2d 277, 281 & n.5 (7th Cir. 1985) (holding that when officer includes false facts or omits facts in the probable cause analysis, "he cannot be said to have acted in an objectively reasonable manner"). Along the same lines, police cannot manufacture their own probable cause. *Collier v. City of Chicago*, 2015 WL 50814408, *4 (N.D. Ill. Aug. 26, 2015).

Moreover, probable cause is a quintessential question of fact. The Seventh Circuit holds that a court cannot decide the probable cause question "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993); *see also Bryant v. Whalen*, 759 F.Supp. 410, 417 (N.D. Ill. 1991). "Accordingly, a conclusion that probable cause existed as a matter of law is appropriate only when no reasonable jury could find that the officers did not have probable cause[.]" *Maxwell*, 998 F.2d at 434.

As discussed at length already, there is a huge difference of opinion about whether Defendants had any evidence whatsoever to entertain an "honest and sound" suspicion that Rivera had killed Valentin. Viewed in Rivera's favor, the record demonstrates that Defendants wholly fabricated the evidence against Rivera, including Lopez's and Valentin's identifications. *See supra* at 9-33. There is similarly strong evidence that Defendants hid evidence demonstrating that Rivera was innocent. *See id.* There is nothing that the Defendants can point to that establishes probable cause. *See*, *e.g.*, AS ¶ 83. This dispute of fact precludes summary judgment on the malicious prosecution claim.

### G.    A JURY MUST DECIDE RIVERA'S STATE-LAW CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In a one-sentence argument, Defendants assert that Rivera's state-law claim of intentional infliction of emotional distress fails because there is no genuine dispute of fact about whether Defendants engaged in extreme or outrageous conduct. Officer Br. at 24. This bald assertion is insufficient to shift the burden at summary judgment. *Carmichael*, 605 F.3d at 460; *United States v. Useni*, 516 F.3d 634, 658 (7th Cir. 2008) ("We have repeatedly warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived[.]"). Additional arguments on this point are now forfeited. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (reversing summary judgment granted on issue first raised in a reply).

Even if they were not, Defendants manufactured evidence to prosecute and convict Rivera of a murder he did not commit, and they withheld other evidence that would have allowed Rivera to defend himself against the false charges. *See supra* at 9-33. As a result, Rivera spent more than 20 years in prison. "For conduct to be extreme and outrageous it must go 'beyond all bounds of decency' and be 'considered intolerable in a civilized community.'" *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (quoting *Lopez v. City of Chicago*, 464 F.3d 711, 721 (7th Cir. 2006)). An important factor in deciding whether conduct is "extreme and outrageous" is whether "a defendant abused a position of authority." *Fox*, 600 F.3d at 842. Rivera's allegations fit this tort perfectly, and disputes of fact prevent summary judgment for Defendants on this claim. *See Henry v. Ramos*, 1997 WL 610781, at *2 (N.D. Ill. Sept., 28, 1997) ("An average member in the community would consider it outrageous for police officers to falsely frame, arrest and imprison an innocent citizen."); *Moore v. City of Chicago*, 2011 WL 1231318, at *4 (N.D. Ill. 2011).

## H.     A JURY MUST DECIDE RIVERA'S STATE-LAW CONSPIRACY CLAIM

The Officer Defendants make an additional perfunctory argument for summary judgment
on Rivera's state-law conspiracy claims. Officer Br. at 24. Again, these arguments are
insufficient to require a response at summary judgment. *Carmichael*, 605 F.3d at 460; *Useni*, 516
F.3d at 658. Regardless, Defendants' argument that they are entitled to summary judgment on
the state-law conspiracy claims fails for the same reasons that their argument for summary
judgment on the section 1983 conspiracy claim failed. *See supra* at 38-40. Their argument that
there is no evidence of any tortious activity by Defendants is put to rest by the ample evidence in
the record of the federal and state torts discussed above. Finally, Defendants' argument that the
Illinois Tort Immunity Act renders them immune for the misconduct of others is inapposite given
that they are being sued for the own misconduct and not anyone else's.

## I.     DEFENDANTS RINALDI, WEINGART, MINGEY, NOON, GUZMAN, SPARKS, ZACHARIAS, AND FALLON PARTICIPATED IN THE MISCONDUCT AND ARE NOT ENTITLED TO SUMMARY JUDGMENT

All of the Officer Defendants but Guevara, Gawrys, McLaughlin, and Leonard separately
assert that they are entitled to summary judgment because, in their view, they had minimal
personal involvement in the Valentin investigation. Officer Br. at 19-20. But these Defendants
were each intimately involved in the misconduct described above. None of them is entitled to
summary judgment due to lack of personal involvement.[23]

Defendants argue that Rinaldi, Weingart, and Mingey were simply supervisors who
signed reports. There are a number of problems with this argument. First, supervisors who
approve police reports are not passive rubber stampers who sign whatever crosses their desks—

---

[23] It is strange that a subset of Defendants argue in a separate section of their brief that they are entitled to
summary judgment on the ground that the records show they were not involved in misconduct. Of course, each of
the Defendants must show that they undisputedly were not involved in misconduct to achieve summary judgment.
The fact that a subset of the Officer Defendants argue separately that they were not involved in the constitutional
violations and torts asserted is tantamount to an admission that there is no hope of summary judgment for Guevara,
Gawrys, McLaughlin, and Leonard.

they are in fact leaders of the team, responsible for oversight of investigative tasks and verification of results. The record supports the conclusion at summary judgment that these Defendants were involved in misconduct that occurred in the investigation they oversaw.

Rinaldi oversaw Defendants' suppression of the first lineup and approved the false police reports of August 29, regarding the fabricated mugbook identification, and the false September 1 report, concealing the first lineup. ROS ¶ 65. Weingart was Guevara's supervising sergeant and at summary judgment Rivera is entitled to an inference that Weingart was told by Guevara that Lopez had said Rivera was not the shooter before the second lineup. ROS ¶¶ 66. In addition, Weingart signed off on the false police report dated September 15, which reported Lopez's fabricated identification of Rivera in the second lineup. *Id.* Mingey approved Guevara and Gawrys's false report of September 16, which falsely reported that Lopez had selected Rivera from the second lineup, that Valentin had selected Rivera from a photo identification procedure on September 10, and that Lopez had excluded Rodriguez and Nieves as suspects. ROS ¶ 72.

Moreover, as supervisors, these Defendants can be liable "for their subordinates' violation of others' constitutional rights when they 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Steidl v. Fermon*, 494 F.3d 623, 631-32 (7th Cir. 2007). Defendants Rinaldi, Weingart, and Mingey were the direct supervisors of the other Officer Defendants, had direct knowledge of their investigation, made assignments, and approved reports, thereby ratifying the misconduct contained in those reports. ROS ¶¶ 65-66, 72. Their participation as supervisors was essential to the scheme. *Id.* They are liable on that basis as well.

Finally, the arguments of Noon, Guzman, Sparks, Zacharias, and Fallon ignore substantial disputes of fact. Noon argues that he got a copy of the first police report and

"perhaps" looked for Lopez; Guzman says that he searched for Rivera and Lopez; Sparks

suggests that he performed a legitimate mugbook identification with Lopez; and Fallon submits

that he does not recall the case. When the record is construed in Rivera's favor, however, there is

evidence that Noon, Sparks, Zacharias, and Guzman participated in fabricating Lopez's

mugbook identification of Rivera, and in feeding Lopez the false story about seeing the shooter

previously in Humboldt Park. AS ¶¶ 25, 28; ROS ¶¶ 67-71. In addition, Sparks, Zacharias and

Fallon, along with McLaughlin, Leonard, and Guevara, participated in the first lineup and the

suppression of that lineup. AS ¶¶ 32. They are not entitled to summary judgment.

## J.    A JURY MUST DECIDE PLAINTIFFS' *MONELL* CLAIMS

Under familiar principles, the City can be liable under section 1983 for constitutional

violations caused by (1) an express policy, (2) a widespread custom or practice, or (3) a decision

made by a final policymaker. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); *Glisson

v. Indiana Dep't of Corrections*, 849 F.3d 372, 379 (7th Cir. 2017) (*en banc*); *Valentino v.

Village of S. Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009).

The City seeks judgment on three widespread practice *Monell* theories: (1) the City's

practice of systemically suppressing investigative materials in street files (the "street files"

theory); (2) its practice of suppressing lineup identification procedures where fillers are selected

(the "filler lineup" theory), and its failure to discipline police officers. The City does not address

any of Rivera's other *Monell* theories in the case, and so a *Monell* trial against the City will be

necessary no matter how the Court resolves the City's motion. Moreover, as explained below,

the City is estopped from re-litigating the street files theory, given the recent verdict in *Fields v.

City of Chicago*, No. 10 C 1168 (N.D. Ill.), in which a jury found against the City on precisely

that theory. Overwhelming evidence supports Rivera's *Monell* theories, and the City's motion

should be denied as well.

### 1. Defendants Do Not Argue for Judgment on All of Rivera's *Monell* Theories, and So A *Monell* Trial Is Necessary No Matter What

The City's brief states without explanation that the only *Monell* theories Rivera is

pursuing relate to the City's widespread practices regarding street files, filler lineups, and failure

to discipline officers. City Br. at 1. That is not so. Rivera's additional *Monell* theories are not

addressed by the City. These include but are not limited to:

(1) the theory that the Chicago Police Department's express written policies governing the creation, maintenance, and production of investigative files were deficient (or non-existent) and caused the suppression of exculpatory investigative materials in this case, AS ¶¶ 98-131,[24] *e.g.*, *Glisson*, 849 F.3d at 379-80 (holding that a conscious municipal decision not to adopt or to omit needed policies creates liability under the express policy framework of *Monell*); *Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005) (holding that a single application of a deficient express policy resulting in a constitutional violation is enough to establish liability);

(2) the theory that the City's final policymakers, who admittedly were on notice of the problem of systemic suppression of investigative materials, chose not to adopt obviously needed policies to ensure transmission of police files, and in so doing made a decision that caused suppression of exculpatory materials in Rivera's case, AS ¶¶ 98-131, *e.g.*, *Vodak v. City of Chicago*, 639 F.3d 738, 747-48 (7th Cir. 2011) (policymakers' decision about how to implement policy gives rise to liability when it violates constitutional right); *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction"); *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) (final policymaker who is aware of a systematic lapse in policy and who fails to correct it renders municipality liable);

(3) the theory that the City is liable for its failure to adequately train its officers: (a) to retain investigative materials, maintain investigative files, and produce those materials to the criminal justice system; (b) to properly conduct identification procedures and to accurately record the results of those identification procedures; and (c) to write accurate police reports documenting their investigation regardless of the path the investigation takes, AS ¶¶ 98-131, *e.g.*, *Canton v. Harris*, 489 U.S. 378, 390 (1989) (deliberate indifference exists if the "need for more or different training" was "obvious"); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (municipality liable "when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact");

---

[24] Among other things, the City's express policies authorized individual police investigators to subjectively determine what materials to maintain and turn over, they mandated a system of parallel investigative files in homicide investigations, they were devoid of any requirements governing the CPD's transmission of investigative files to prosecutors and others in the criminal justice system, and they included no rules binding the CPD's subpoena service unit, which was charged with responding to requests for documents and subpoenas.

(4) the theory that the City is liable for failing to adequately supervise or discipline employees to ensure disclosure of investigative files, given: (a) the lack of policies on supervision of file production; (b) the lack of any effort to audit the City's file-production procedures promulgated after *Jones* and *Palmer*; and (c) the lack of any training or policies governing the subpoena service unit, among other things, AS ¶¶ 98-131, *Sornberger*, 434 F.3d 1006, 1029-30 (7th Cir. 2006) (holding that municipalities are liable if they knew more supervision was needed); and

(5) the theory that the City had notice of and was deliberately indifferent to a widespread practice among its police officers of fabricating false evidence, primarily through witness coercion and corrupt identification procedures, for use in criminal cases, which resulted in violations of due process and numerous wrongful convictions, AS ¶¶ 98-131, *e.g.*, *Jackson v. Marion County*, 66 F.3d 151, 156 (7th Cir. 1995); *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006); *Evans v. City of Chicago*, 2006 WL 463041, at *13 (N.D. Ill. Jan. 6, 2006).[25]

The fact that the City has not moved for summary judgment on these *Monell* theories means that they must be tried. *See*, *e.g.*, *Carmichael*, 605 F.3d at 460 ("The burden of defeating summary judgment did not shift to the plaintiffs on this issue simply because, without citation to relevant facts or authority . . . defendants sought summary judgment on all claims against all parties."); *Sublett*, 463 F.3d at 736 ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("When a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on; the number of potential grounds for (and arguments against) summary judgment may be large, and litigation is costly enough without requiring parties to respond to issues that have not been raised[.]"). Any arguments that the City might have made regarding these theories are now forfeited, *Thompson v. Boggs*, 33 F.3d 847, 854 (7th Cir. 1994); *Fox v. Peters*, 2011 WL 6378826, at *8 (N.D. Ill. 2011), and it will be too late for the City to raise them for the first time in reply, *Costello*, 651 F.3d at 635; *Nelson v. LaCrosse Cty*, 301 F.3d 820, 836 (7th Cir. 2002).

---

[25] Part of the extensive evidence supporting this theory is set out in the discussion of the City's failure to Guevara, below. But this theory is distinct from that one, and it is not addressed by the City.

To the extent the City tries to suggest in reply that it was not on notice of these *Monell* theories, that contention is without merit. These theories have been litigated exhaustively throughout this case, Rivera has explained them in detail in response to discovery requests, RCS ¶¶ 13, 15, they are discussed in the parties' expert reports, AS ¶¶ 119-131, and the City just had an extensive trial that involved Rivera's counsel on all of these theories and it briefed them post-trial in *Fields v. City of Chicago*, No. 10 C 1168, Ex. 66, Doc. No. 1184 (Post-Trial Motion) at 12-25 (explaining each of these theories). The City cites to Rivera's complaint in its brief, but the Seventh Circuit has repeatedly reminded that legal theories need not be spelled out in a complaint, and the limitation of theories in a complaint is not relevant at summary judgment. *Streckenbach v. Vandensen*, 2017 WL 3585074, at *1 (7th Cir. Aug. 21, 2017). A trial is necessary on these *Monell* theories.

### 2.    The City Is Estopped From Re-Litigating the Street Files Theory

With respect to the street files theory, the City is estopped from re-litigating that issue in this case, given that it just lost a jury trial on the issue in *Fields v. City of Chicago*, 2017 WL 3987356 (N.D. Ill. Sep. 11, 2017) (denying the City's post-trial motion); *see also Kluppelberg v. Burge*, 2017 WL 3381717, at *1 (N.D. Ill. Aug. 7, 2017) (concluding in another street files case that the *Fields* jury verdict estops the City from "arguing that it did not have a policy of concealing material exculpatory and/or impeachment evidence contained in so-called 'street files' in the late 1980s"); *see also* Ex. 151 (*Kluppelberg*, No. 13 C 3963, Doc. No. 586, Motion to Apply Collateral Estoppel), which Rivera incorporates here by reference.

*Fields* concerned the suppression of exculpatory police documents in a street file during a 1984-1985 investigation of a double homicide, which resulted in the wrongful conviction and decades-long incarceration of Nathson Fields. *See* 2017 WL 3987356. Like Rivera, Fields

claimed that the files were suppressed pursuant to the City's widespread practice of suppressing street files. *Id.* at *3-4. The case was tried in late 2016, and a jury found for Fields on his *Monell* claim and awarded more than $22 million in damages. *Id.* at *1.

As Judge Lefkow later found in *Kluppelberg*, 2017 WL 3381717, the elements of collateral estoppel (issue preclusion), *see generally Chicago Truck Drivers v. Century Motor Freight*, 125 F.3d 526, 530 (7th Cir. 1997), are all satisfied here as far as the street files *Monell* theory is concerned: (1) the issue the City seeks to litigate here is the same as that in *Fields*;[26] (2) that issue was actually litigated in *Fields*;[27] (3) the determination of the issue was essential to the final judgment in *Fields*;[28] and (4) the City had a full and fair opportunity to litigate the issue in the *Fields*.[29] The City should not be able to litigate this issue again in this case.[30]

### 3. The City's Request for Judgment on the Street Files Theory Is Frivolous

Even if the City were not precluded from re-litigating the street files issue, it has no colorable argument for summary judgment. A jury just entered a verdict against the City on precisely this theory—a verdict that has been upheld on post-trial motions, *Fields*, 2017 WL 3987356—after considering much of the same evidence that the jury in this case will hear. The only difference is that here Rivera, building on the prior cases, has marshalled even more

---

[26] The issue in the cases is precisely the same. Though *Fields* involved a homicide investigation in 1984 and 1985 and a wrongful conviction lasting until 2009, and this case involves a homicide investigation in 1988 and a wrongful conviction lasting until 2011, both cases were governed by the same written policies, and the City concedes there was no change it its policies and procedures in that time frame. AS ¶¶ 135-136.

[27] A full trial on the merits is the "situation most clearly contemplated by the 'actually litigated' standard." *In re Tapper*, 123 B.R. 594, 601 (Bankr. N.D. Ill. 1991).

[28] The jury in *Fields* was instructed that, to find against the City on the policy claim, Fields had to prove, among other things, that "[a]t the time of the concealment, it was the policy of the City of Chicago to conceal material exculpatory and/or impeachment evidence." No. 10 C 1168, Doc. No. 1169 (Jury Instructions) at 14.

[29] In the five-week trial in *Fields*, the City presented testimony from its experts Jeffrey Noble and Bernard Murray, who contested Fields's expert Brasfield, and from James Hickey, its Rule 30(b)(6) designee. Precisely the same witnesses are offered by the City in the present case, and they evaluate precisely the same evidence. RCS ¶¶ 20-26, 57-60, 76.

[30] Rivera acknowledges that the City will still be able at trial to argue that its policies were not the cause of Rivera's injuries, by attempting to demonstrate that there was no file withheld from Rivera or that it had no exculpatory value, theories on which Defendants not entitled to summary judgment, as discussed above.

evidence in support of his claim than was presented in *Fields*. Under these circumstances, the City's position that undisputed facts support judgment in its favor is a nonstarter.

The City is liable for widespread practices to the extent that City policymakers were on notice of the risk of harm presented by those practices and disregarded that risk. *Glisson* 849 F.3d at 381-82 (reminding that it is the *risk of harm* that policymakers must be on notice of and ignore). To prove such a claim, Rivera can show that either a repeating pattern of constitutional violations or a repeated pattern of behavior gave the City notice of a risk of harm to which the City did not respond. *Daniel v. Cook Cty*, 833 F.3d 728, 734 (7th Cir. 2016) (custom and notice shown by "evidence tending to show a general pattern of repeated behavior," without "evidence that . . . systemic failings affected other[s]").[31] The City's argument that Rivera has "adduced no evidence of a 'street file' practice," City Br. at 14-17, depends on two assertions: (1) that Michael Brasfield's expert report is the *only* evidence supporting Rivera's *Monell* theory, and (2) that Mr. Brasfield's methodology is deficient. Both premises are wrong.

Ignoring Mr. Brasfield's report completely, there is a huge volume of evidence in the record supporting Rivera's street files theory, including but not limited to:

- The litigation in *Palmer* and *Jones*, which demonstrate that City policymakers had notice in the early 1980s that police officers were engaging in an unconstitutional pattern of suppressing investigative materials in street files, AS ¶¶ 98-100;[32]

---

[31] *Dixon v. Cook County*, 819 F.3d 343, 348-49 (7th Cir. 2016) (notice of a systemic deficiency and inaction establishes liability); *Thomas v. Cook County*, 604 F.3d 293, 303 (7th Cir. 2010) (policymakers "must have been aware of the risk created by the custom" of delayed responses to medical requests); *Davis*, 452 F.3d at 694-95 (rejecting same arguments City makes here); *Estate of Moreland v. Dieter*, 395 F.3d 747, 760-61 (7th Cir. 2005) ("[T]he plaintiff need not show that the policy, practice, or custom resulted in past deprivations of rights.").

The City asserts that Rivera must identify a pattern of constitutional violations caused by the City's street files practice and has failed to do so. City Br. at 17. The same argument was made and rejected in *Fields*, where Judge Kennelly correctly observed that evidence of widespread underproduction of police documents is sufficient proof of a systemic failing to support a *Monell* verdict under the established law just cited. 2017 WL 3987356, at *3-4. That said, the City is wrong on the facts as well—Rivera does have evidence of repeating constitutional violations caused by the street files practice, as outlined below.

[32] The City engages in a long, largely revisionist history regarding the *Jones* and *Palmer* litigation. City Br. at 6-9. This discussion is largely irrelevant to the disputes between the parties at summary judgment. To the extent, however, that the City is suggesting that the *Jones* and *Palmer* cases are themselves ultimately not evidence of a widespread practice of file suppression, that is not correct. *Jones* involved the suppression of critical exculpatory

- James Hickey, the City's designated Rule 30(b)(6) witness on this topic, who testified, among other things, that (a) in light of *Palmer* and *Jones*, City policymakers knew that they had a street file problem, (b) that he reviewed file disclosure practices across the department prior to 1983 and determined that the problem as citywide, (c) that the problem stemmed from a citywide practice of using a "decentralized" file system for homicide investigations, whereby investigative steps were being documented in informal notes and internal to-from memoranda between investigators, all of which were treated as the personal property of the investigators and were stored in parallel files; and (d) entire branches of an investigation, including investigation into alternate suspects, were not getting documented in official reports, and were instead sitting in memos and notes that were not disclosed and eventually destroyed, AS ¶¶ 102-103;

- City officials were aware both of substantial resistance within the Police Department to changing the street files practice of keeping parallel, "personal" files not available to the criminal justice system, and of the risk of wrongful prosecutions and convictions if the street file problem was not solved, AS ¶¶ 101, 104;

- Special Orders 83-1, 83-2, and 86-3, put in place in an attempt to solve the problem, required that notes and memoranda were to be taken in a new official form called a "General Progress Report" and preserved (rather than destroyed) in a new "Investigative File" kept in the Detective Area, but the new policies had obvious, facial deficiencies, including (a) the absence of any express instruction to disclose to prosecutors and criminal defendants all police documents in newly-created "Investigative Files"; and (b) a lack of training, instructions or directives to subpoena service unit staff responsible for producing records to prosecutors and criminal defendants to ensure the production of all General Progress Reports and other documents kept in the Investigative Files at the Area, AS ¶¶ 105-109;

- A total absence of auditing, or any other efforts to monitor compliance to the new policies, AS ¶ 111;

- The Defendant officers in this case testified almost uniformly to having no knowledge of the requirements in the new Special Orders, to receiving no training on the Special Orders, or the obligation to preserve notes or disclose exculpatory information, and further testified to continuing to keep unofficial, personal notes that they destroyed, AS ¶¶ 113, 114;

- The street file kept and suppressed in this case, which contained exculpatory evidence, as discussed above, *supra* at 9-18; AS ¶¶ 70-79;

- The street file kept and suppressed from Nathson Fields, who was convicted of the 1984 double murder and eventually re-tried and acquitted in 2009, a case in which civil discovery revealed a street file—sitting among hundreds of other files in a file cabinet at Area Central—of over a hundred pages of handwritten notes, memos, and other documents identifying multiple alternate suspects and potential leads demonstrating that Fields was innocent, AS ¶ 115, 117, 118;

- The ample evidence presented during the December 2016 Fields trial, in which a jury found that the failure to disclose the street file to Fields was the result of a pattern and practice of the Chicago Police Department and awarded Mr. Fields compensatory damages of $22 million, including (a) dozens of other street files in the Area Central basement, including the cases of Jon Fulton, Timothy Malone, and James Crockett, (b) the testimony of Defendant officers in that case about the continued use of informal notes and memoranda and a lack of training on the new Special Orders, and (c) the testimony of the City's defense experts, the same ones here, supporting the conclusion that the street files practice continued, AS ¶¶ 118(a)-(b); and

---

information and resulted in a large damages verdict approved by the Seventh Circuit. 856 F.2d 985. *Palmer* caused numerous City policymakers to take notice of a widespread problem of file suppression, *according to the testimony of those City policymakers themselves*, AS ¶¶ 98-104, and the City's pronouncement that none of the *Palmer* files revealed exculpatory information is undermined by the fact that those files were never analyzed in a systematic fashion, Ex. 155 (affidavit of Haas). As the Seventh Circuit noted in *Jones*, the *Palmer* litigation was resolved "without a formal ruling on the lawfulness of the practice," thought the Court in *Jones* concluded that the record supported that the practice was in place and that "[t]he City sensibly does not attempt to defend such behavior in this court." *Jones*, 856 F.3d at 995-96.

- The street file kept and suppressed from James Kluppelberg, who was convicted for a 1984 fire that killed six people and later exonerated, a case in which civil discovery in 2014 revealed a newly-discovered file from the original investigation that contained numerous handwritten notes and memoranda, including a memo between detectives about an alternate suspect who had started a fire in a building nearby just hours before the fire for which Kluppelberg was convicted and was intoxicated at the time, AS ¶ 115, 116.

In addition to this evidence, Rivera will present Mr. Brasfield's expert testimony in support of the street files theory. Mr. Brasfield, who testified over the City's objection in *Fields*, provides an abundance of evidence supporting the street file theory, including but not limited to:

- The written policies put in place were deficient on their face to solve the street files problem because the policies (a) allowed for the continued use of a decentralized, parallel file system in which investigative material was kept in different places, creating the risk that material would not be gathered from all of those locations; (b) failed to cover gang crimes officers, despite their significant role as investigators in homicide cases, like this one; (c) left too much discretion to detectives about what to record in the official files; and (d) did nothing ensure that the subpoena service unit, detective division, or anyone else produced all of the parallel files created for an investigation, AS ¶ 121;
- The Chicago Police Department's efforts to implement the new Special Orders were woefully inadequate, including a failure to provide proper training and oversight to ensure compliance with the Special Orders, AS ¶ 122;
- His analysis and findings from the review of 190 homicide files from Area 5 for the period 1985-1991 (the three-year period surrounding the Valentin homicide), as well as criminal defense files corresponding to 44 of the homicide files, and Chicago Police Department permanent retention files corresponding to 132 of the homicide files were also obtained in discovery in this case, AS ¶ 123-24;
- Those findings included an assessment of the homicide files themselves, which showed that the street files practice as it existed prior to the new Special Orders continued unabated, and more specifically, that 61% of homicide files contained notes not taken on general progress reports; and 20% of files contained to-from memos not on official police forms, overall 100% of the homicide files contained evidence that the Special Orders were not being followed, AS ¶ 125;
- His assessment of permanent retention files themselves, which are intended to be a repository of all typed up, official police reports containing pertinent information, from which he concluded that, while in most police departments around the country the official reports contain multiple storylines, CPD official reports only tell one storyline, leading to the suspect charged, AS ¶ 126;
- His comparison of the homicide files to criminal defense files , showing that over 90% of the criminal defense files were missing documents contained in the corresponding homicide files, AS ¶ 128;
- And his finding that in a number of specific cases investigative material of potentially significant exculpatory value withheld from criminal defendants was also missing from State's Attorneys' Office files, including in the cases of (a) criminal defendants David Quinones, Bruce Andras, Marc Johnson); (2) Miguel Borrotto; (3) Samuel Slack, (4) Jesse Swanigan, (5) Curtis Kirkland, and (6) Tomas Nieves, AS ¶ 129; and
- Finally, in further support of his conclusions, he relied on and incorporated his findings from the review of hundreds of homicide files in the cases of James Kluppelberg and Nathson Fields, AS ¶¶ 130-31.

The record supports the street files *Monell* theory and summary judgment should be denied.

Moreover, even if Mr. Brasfield's report was the only evidence supporting the theory (which is hardly the case), the argument that his methodology is flawed lacks merit. City Br. at 15-16. The City contends that Mr. Brasfield's file-comparison was so unreliable that his opinions should all be excluded.[33] Judge Kennelly persuasively rejected this exact argument in *Fields*, concluding that the City's criticisms went to the weight of the evidence and not to its admissibility. 2017 WL 3987356, at \*3 n.8; *see also* Ex. 152 (*Fields*, Doc. No. 1076) at 1-6.

Among many other pieces of evidence, Mr. Brasfield reviewed hundreds of police investigative files in this case, and in *Fields* and *Kluppelberg*, and he compared those files to criminal defense files in order to see what police documents criminal defendants received in their cases. AS ¶¶ 121-131. That permitted him to draw the conclusion that the CPD systematically suppressed police files. AS ¶¶ 125-131. The City contends that Mr. Brasfield conducted too few comparisons of police investigative files to their corresponding criminal defense files;[34] that the criminal defense files that Mr. Brasfield reviewed might have been incomplete;[35] and that Mr. Brasfield should have looked at a greater number of corresponding files from the Cook County State's Attorney's Office (CCSAO), to determine whether the State's Attorney was responsible for the suppression of police files that he observed.[36] Those views have little merit given the evidence, but at best they are points to be made on cross or at trial. Ex. 152 at 3.

---

[33] The City's argument is not sufficiently developed to require a response. For example, the City does not identify any errors in Brasfield's analysis. Nor does it explain why if Brasfield's file-comparison methodology is flawed (which it is not), every one of Brasfield's opinions unrelated to that comparison should be excluded.

[34] The argument is factually incorrect, considering that Brasfield relied on analyses and comparisons of hundreds of case files in arriving at his opinions. AS ¶ 125 (190 files). Moreover, the City stipulated that the file set Brasfield reviewed in this case was representative of its policies and practices for *Monell* purposes. AS ¶¶ 135-36.

[35] This is raw speculation, and it is another argument rejected by the *Fields* jury. There is no evidence that the City points to that shows any criminal defense file reviewed by Brasfield to be incomplete. It is undisputed at summary judgment that the criminal defense files are the best evidence of what the criminal defendant in a particular case had at the time of trial. RCS ¶ 59.

[36] It is notable on this point that the City's brief states only that analysis of the CCSAO files *might* have shown that the fault for non-production of police files lay with the CCSAO and not the CPD. City The City does not cite to a single piece of evidence supporting that hypothesis. That is because there is no such evidence.

Mr. Brasfield's opinions are the type routinely provided by police practices experts on both sides of cases in this District and others. *E.g.*, *Obrycka v. Chicago*, 2011 WL 2633783, at *4 (N.D. Ill. July 5, 2011); *Cooper v. Chicago Heights*, 2011 WL 2116394, at *6 (N.D. Ill. May 27, 2011); *Paine ex rel. Eilman v. Johnson*, 2010 WL 785398, at *4 (N.D. Ill. Feb. 26, 2010); *Ott v. Milwaukee*, 2015 WL 1219587, at *13 (E.D. Wis. Mar. 17, 2015); *Avery v. Milwaukee*, 2015 WL 247991, at *2 (E.D. Wis. Jan. 20, 2015). There is no reason to exclude Mr. Brasfield's testimony.[37] Summary judgment on the street files theory must be denied.

### 4.     The City's Request for Judgment on the Filler Lineup Theory Lacks Merit

The City also argues there is no evidence supporting Rivera's *Monell* theory that the City systemically suppressed the results of lineups in which witnesses identified fillers. City Br. at 18-21. On the contrary, there is no evidence supporting the City's view of the facts. If anything, it is Rivera who should be moving for summary judgment on this claim. In response to Rivera's overwhelming evidence that the City engaged in this practice, the City has not produced a single item of evidence contradicting the theory. In fact, the City has not identified a single instance ever where a member of the CPD recorded in a lineup report that a witness selected a filler from a lineup. The City's arguments that the undisputed facts show that it did not engage in such a practice is meritless and summary judgment should be denied.

Rivera's evidence of the practice is comprehensive and unrebutted. After discovering that he in fact had been placed in a first lineup, in which Lopez selected a filler,[38] Rivera asked the City to produce a sample of homicide files for the five years surrounding the Valentin investigation, so that the parties could determine whether police officers routinely failed to

---

[37] Given space constraints, it is difficult to provide a detailed response here to the City's perfunctory motion to exclude Brasfield under Rule 702. Because the record precludes summary judgment on this *Monell* theory with or without Brasfield's testimony, this Court need not decide the expert admissibility issue in this context. To the extent that the Court is interested in additional briefing on that question, Rivera would of course provide it.

[38] The disputes on the questions of whether Rivera stood in a first lineup (now conceded by Defendants) and whether Lopez selected a filler from that lineup (still disputed) have been addressed exhaustively already.

document filler identifications.[39] The City stipulated that the files were reflective of its policies and practices citywide during the relevant timeframe. AS ¶¶ 135-136.

Of the files produced by the City, 138 involved either live or photo lineup procedures. Official lineup reports and ancillary police reports in those files reported a total of 386 different lineup procedures, and in many of these lineup procedures, multiple witnesses viewed multiple suspects, so that there were a total of 980 "possible identifications" (the number of witnesses viewing each lineup multiplied by number of suspects in each lineup) reflected in these files. AS ¶¶ 141, 147, 149. Rivera's counsel reviewed the entirety of every file involving a lineup and coded each lineup report, noting for each possible identification whether it was reported that the witness made a positive identification, a tentative positive identification, no identification, or a filler identification. AS ¶¶ 139, 145, 147, 149. Remarkably, there was not a single example in the set of files where a police officer reported the identification of a filler. AS ¶¶ 140, 147, 149. The stipulated data thus show an absence of filler identifications in the reports of the CPD.

Needless to say, that is statistically impossible. People who do not recognize an offender but nonetheless guess have a strong chance of selecting a filler. There had to be at least some unrecorded filler identifications.

To demonstrate that this was so, and that the City's non-recording of filler identifications was the result of policy, Rivera retained the services of renowned eyewitness identification expert Dr. Gary Wells to perform statistical analysis of the data and compare the findings in the CPD's files to those reported in existing field studies. AS ¶ 138. Dr. Wells opines that published

---

[39] A filler is a non-suspect participant who is placed in the lineup with the suspect. The selection of a filler by a witness during a lineup has obviously detrimental effect on the prosecution's ability to use that witness in a criminal proceeding. AS ¶ 132. In short, a witness who has picked a filler cannot later come to trial and testify credibly that the suspect was the perpetrator, at least not without facing the damning impeachment that the witness viewed a lineup before trial and concluded that a random filler looked more like the perpetrator than the suspect did. *Id.* Accordingly, a filler selection in a lineup is tremendously exculpatory evidence. *Id.* In cases where the police have an interest in ensuring that witnesses can later testify at trial and that suspects are inculpated, there is a strong incentive against recording filler identifications. *Id.*

peer-reviewed field studies examining the rates at which witnesses identify suspects, fillers, or no one in lineups demonstrate that fillers are identified in lineups approximately 24% of the time. AS ¶¶ 144-145. Considering all of the field studies, Dr. Wells concluded that one would expect to see between 232 and 321 instances of filler identifications in the 980 lineup procedures reported in the files produced by the City. AS ¶ 151. Instead there were zero. AS ¶¶ 140, 147, 149. Applying commonly-accepted statistical analysis, Dr. Wells concluded that this could not be explained by chance, and further, that the only possible explanation was that the City had a practice of not reporting filler identifications. AS ¶¶ 148, 150. In response, the City disclosed its own eyewitness identification expert, who did not review the files and produced no evidence to rebut Dr. Wells's data.[40] Even if there were a battle of the experts, it would be a battle for trial.

Dr. Wells's conclusions are consistent with the raw data discussed above and with other evidence in this case. The City was asked to identify a single file—from anywhere at any time—in which a lineup report reflected the identification of a filler. AS ¶ 137. The City responded that it would identify such a file if it found it, and it never updated that response with reference to any such file. *Id.* Contrary to the City's representation, its written policy governing lineup procedures during the relevant time period provided zero guidance on what had to be reported when a filler was selected during lineup procedures. AS ¶ 133. Moreover, the City's own Rule 30(b)(6) witness, James Hickey, testified in his deposition that if a filler was identified in a lineup, there would be no documentation of the fact that the witness had identified anyone. AS ¶¶ 134.

---

[40] The City asserts in its brief that these statistics are explained by the fact that filler lineups were being recorded as non-identifications. It suggests that there is no difference between these results in a lineup. First, there is a difference. The situation where a witness does not make an identification at a lineup can be explained away if that witness later identifies the suspect in court, but the situation where the witness is recorded as having positively identified a *different person* from a lineup that included the suspect is exculpatory evidence of a different kind. AS ¶ 132. Second, contrary to the City's argument, the records do not support a conclusion that filler identifications were recorded as non-identifications. There are two few reported non-identifications for that to be the explanation for zero filler identifications. In any event, the City's argument is at best one for the jury.

The City makes a half-hearted attempt to suggest Dr. Wells's methodology is unsound. Leaving aside that the record is amply sufficient without his testimony, Dr. Wells's statistical analysis is very sound—indeed it is straightforward. The fact that Rivera's counsel's law firm analyzed all of the data in the files—a method that experts and litigants, including the City, routinely use in litigation—does not undermine any of the conclusions above. *Sanders v. City of Chicago Heights*, 2016 WL 1730608, at *6 (N.D. Ill. May 2, 2016 ("[A]n expert may rely on his client's version of the facts when forming his opinions."). Indeed, the City in its brief does not point to a single error in that data analysis. Any complaint that the City has about Dr. Wells's methodology is an argument about the weight of the evidence for trial.

At the end of the day, all of the evidence in the record supports Rivera's filler lineup *Monell* theory. The City has nothing to offer in response. Summary judgment should be denied.

**5. A Trial Is Necessary on the Failure to Discipline Theory**

Independently, the record also amply supports Rivera's theory that the City is liable for failing to discipline officers. The City's motion focuses solely on Rivera's contention that it failed to discipline Guevara, permitted him to engage in repeated acts of misconduct, including Rivera's wrongful conviction, City Br. at 21-24, and so that is the only failure-to-discipline theory Rivera will addresses in this brief. A failure to discipline officers provides a basis for municipal liability when the failure amounts to deliberate indifference to the citizens whom the officers encounter. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Hollins v. City of Milwaukee*, 574 F.3d 822, 827 (7th Cir. 2009); *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006); *DiRico v. City of Quincy*, 404 F.3d 464, 469 n.12 (1st Cir. 2005). Factual disputes preclude judgment for the City on the theory that it was deliberately indifferent in its failure to discipline Guevara.

First, Guevara's misconduct in this case is strong evidence supporting this *Monell* theory. The City repeats the assertion that Rivera's rights were not violated, City Br. at 22, but for the reasons discussed exhaustively already there is no question the evidence supports that Guevara fabricated and suppressed evidence, in violation of Rivera's rights. What happened in this case and the City's failure to impose any discipline as a result can itself "shed some light on what policies existed in the city on the date of an alleged deprivation of a constitutional right." *Bordanaro v. McLeod*, 871 F.2d 1151, 1166-67 (1st Cir. 1989). As the Ninth Circuit has put it, such "evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry." *Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997). As such, "a jury could look to the City's inaction in the face of Rivera's own allegations of serious police misconduct as evidence of the custom that existed prior to the . . . incident." *Monaco v. City of Camden*, 2008 WL 8738213, at *8 (D. N.J. Apr. 14, 2008).

Guevara's invocation of the Fifth Amendment in response to all questions about the City's failure to discipline him after he repeatedly violated individuals' constitutional rights provides additional support for the conclusion that City policymakers were on notice of and indifferent to Guevara's pattern of framing innocent individuals. *See* Exhibit 24 (Guevara Dep.) at 36:1-5 (pleading Fifth when asked whether he "framed Jacques Rivera pursuant to an official policy or practice whereby members of the Chicago Police Department were never disciplined for this type of misconduct, creating an environment of lawlessness"); *id.* at 37-38 (same when asked whether he engaged in misconduct repeatedly because he was never disciplined); *id.* at 397 (same when asked whether he was promoted despite misconduct); *id.* at 530 (same when asked whether the City refused to discipline him in the face of admitted misconduct).

Moreover, there is substantial evidence of incidents of Guevara's misconduct before

Rivera's wrongful conviction for which the City imposed no discipline, including:

- In 1982, Guevara physically assaulted Annie Turner by hitting her across the face with a metal bracelet and called her a "n**** bitch," among other misconduct. AS ¶ 160. Although Ms. Turner complained using the City's disciplinary mechanisms, no discipline was imposed, *id.*;
- In 1982, Guevara broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. AS ¶ 160. Ms. Lloyd complained using the City's disciplinary mechanisms, but again no discipline was imposed on Guevara, *id.*;
- In 1983, Guevara and others beat Leshurn Hunt until he confessed to murder. AS ¶ 160. Mr. Hunt complained using the City's disciplinary mechanisms and sued Guevara, but no discipline was imposed, AS ¶ 160;
- In 1984, Guevara physically assaulted Graciela Flores, AS ¶ 160;
- In 1985, Guevara used threats and violence to attempt to coerce a false identification from Reynaldo Munoz, AS ¶ 160;
- In 1986, Guevara beat Rafael Garcia, and the City's disciplinary body found that Guevara had lied about the incident and recommended that Guevara be suspended for two days, AS ¶ 160;
- In 1986, Guevara coerced a confession from Daniel Pena by beating him, AS ¶ 160;
- In 1986, Guevara called Melvin Warren a "n***** dog" and beat him, and the City's disciplinary body initially sustained Warren's allegations and recommended five-day suspension, only to later overturn the suspension and impose a reprimand for calling a citizen "n*****," AS ¶ 160;
- In 1989, Guevara coerced a false confession from Victor Vera, AS ¶ 160;
- In 1989, Guevara coerced Virgilio Muniz into falsely implicating Manuel Rivera, AS ¶ 160;
- In 1989, Guevara threatened Virgilio Calderon Muniz (unrelated to the Virgilio Muniz referenced above) into making a false identification, AS ¶ 160;
- According to Dorsch, a few months before Guevara was promoted in 1990, Dorsch witnessed Guevara tell a witness to select a particular suspect from a photo array. Although Guevara's superiors knew about that misconduct, Guevara was promoted rather than disciplined, AS ¶ 154; and
- In 1989, Guevara framed Juan Johnson for murder by showing Sam Perez a photo of Johnson before an identification procedure and by telling Perez that he wanted Johnson to take the blame for the murder. Johnson was exonerated and sued Guevara in *Johnson v. Guevara*, No. 05 C 1042 (N.D. Ill.), eventually obtaining a $21 million verdict against him, AS ¶ 153.

A reasonable jury could easily conclude based on the evidence referenced about that Guevara

engaged in repeated police misconduct prior to Rivera's wrongful conviction and that the City

did next to nothing in response.

There is additional evidence of the City's indifference. Incidents of Guevara's

misconduct post-dating Rivera's conviction went undisciplined by the City as well and are

evidence of the City's policies and its indifference. To be sure, firing Guevara for misconduct

that occurred after Rivera was wrongly convicted likely would not have undone the harm to

Rivera, *see* City. Br. at 24, but that does not render this evidence irrelevant. As the Seventh

Circuit and numerous courts have recognized, incidents that post-date a particular case are

probative of the policies and practices that were in place at the time of the case, and they are

evidence of City policymakers' deliberate indifference. *Sherrod v. Berry*, 827 F.2d 827 F.2d 195,

205 (7th Cir 1987), *vacated on other grounds*, 835 F.2d 1222 (7th Cir. 1988) ("[S]ubsequent

conduct by a municipal policymaker may be used to prove preexisting disposition and

policy[.]"); *Padilla v. City of Chicago*, 2009 WL 4891943 at *7 (N.D. Ill. Dec. 14, 2009).[41]

Guevara's pattern of wrongful misconduct is truly staggering. It may be no exaggeration

to say that he is the single worst offender in the history of the Chicago Police Department in

terms of framing innocent people, even considering Jon Burge.[42] There is a pervasive pattern of

Guevara's misconduct and the City's indifference to that misconduct continuing after Rivera's

conviction, including but not limited to:

- In 1991, Guevara coerced Wilfredo Rosario into falsely identifying Xavier Arcos, AS ¶ 160;[43]
- In 1991, Guevara coerced David Rivera into falsely confessing to murder, AS ¶ 160;
- In 1991, Guevara coerced a false confession from Daniel Rodriguez, AS ¶ 160;
- In 1991, Guevara physically coerced sixteen year-old David Velazquez into falsely implicating Daniel Rodriguez in a murder, AS ¶ 160;
- In 1991, Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup, AS ¶ 160;
- In 1992, Guevara obtained an involuntary confession from 15 year-old Jacqueline Montanez, AS ¶ 160;
- In 1993, Guevara coerced Francisco Vicente to falsely implicate Armando Serrano and Jose Montanez in a murder. The City of Chicago has since determined that Montanez and Serrano were wrongfully convicted. In 2016, both men were exonerated and received certificates of innocence. Guevara has taken the Fifth in regard to all allegations regarding Montanez and Serrano, AS ¶ 160;
- In 1993, Guevara tried to coerce 15 year-old Eliezar Cruzado into implicating himself in a murder, AS ¶ 160;

---

[41] *See also Salvato v. Miley*, 790 F.3d 1286, 1297 (11th Cir. 2015); *Beck v. Pittsburg*, 89 F.3d 966, 972 (3d. Cir. 1996); *Foley v. Lowell*, 948 F.2d 10, 14 (1st Cir. 1991); *Larez v. Los Angeles*, 946 F.2d 630, 644 (9th Cir. 1991); *Grandstaff v. Borger*, 767 F.2d 161, 171 (5th Cir. 1985). The City's contrary position (*see* City. Br. at 24) is not supported by its citation to a *dictum* in *Calusinski v. Kruger*, 24 F.3d 931, 936 (7th Cir. 1994), in which the Court concluded that a lower court had properly excluded a *single instance* of later alleged misconduct. *See Padilla*, 2009 WL 4891943, at *7.

[42] Additional background information on Guevara is available here: https://www.buzzfeed.com/melissasegura/detective-guevaras-witnesses?utm_term=.ma2n6JRBn#.uvpVZAv0V

[43] Mr. Arcos was convicted based on the false evidence, but the appellate court overturned his conviction based on a lack of evidence. *See People v. Arcos*, 228 Ill App. 3d 870, 876 (1st Dist. 1996).

- In 1993, Detective Guevara manipulated the results of the line-up in which Mr. Bouto was identified. Ultimately, the City of Chicago concluded that Mr. Bouto is more likely than not innocent. Guevara has taken the Fifth in regard to all allegations regarding Bouto's case, AS ¶ 160;
- In 1993, Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz, AS ¶ 160;
- In 1994, Guevara framed Roberto Almodovar and William Negron. The City of Chicago has determined that Almodovar was wrongfully convicted. In that case, Guevara framed Almodovar for a murder he did not commit by surreptitiously showing his photograph to witnesses before they viewed a lineup and then falsifying reports to make it seem as if the witnesses had picked Almodovar out of a lineup without any influence by Guevara. Almodovar, and his co-defendant Negron, have both since been exonerated. Guevara has taken the Fifth in regard to all allegations regarding the case against Almodovar and Negron, AS ¶ 157;
- In 1994, Guevara used violence to coerce a confession from Adrian Duta, AS ¶ 160;
- In 1995, Guevara and others coerced an involuntary confession from Santos Flores, AS ¶ 160;
- In 1995, Guevara coerced Evelyn Diaz into falsely identifying Luis Serrano,  AS ¶ 160;
- In 1995, Guevara told Luis Figueroa to falsely identify Angel Diaz, AS ¶ 160;
- In 1995, Guevara coerced Gloria Ortiz Bordoy into falsely implicating Santos Flores, AS ¶ 160;
- In 1995, Guevara coerced Rodolfo Zaragoza into falsely identifying Ricardo Rodriguez,  AS ¶ 160;
- In 1995, Guevara told Jose Melendez to falsely identify Thomas Sierra, framing him for murder, AS ¶ 160;
- In 1996, Guevara coerced Maria Rivera into falsely identifying Angel Gaya and all charges were later dropped in the case, AS ¶ 160;
- In 1997, Guevara coerced Robert Ruiz into falsely identifying Freddy and Concepcion Santiago as the murders of Guevara's nephew, AS ¶ 160;
- In 1997, Guevara falsely reported that witness Ruth Antonetty implicated Ariel Gomez in a murder, when she had not, AS ¶ 160;
- In 1997, Guevara coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room, AS ¶ 160;
- In 1998, Guevara used violence against Rosauro Mejia in an attempt to coerce a confession from him, AS ¶ 160;
- In 1998, Guevara used violence against Adriana Mejia during her interrogation, AS ¶ 160;
- In 1998, Guevara repeatedly beat Gabriel Solache into giving a false confession, causing Solache to sustain permanent hearing loss. In the same investigation, Guevara repeatedly threatened and beat Arturo Reyes to coerce Reyes into falsely implicating himself. The City subsequently determined that Solache and Reyes were abused during their interrogations and that their convictions should not stand. Guevara has taken the Fifth in regard to all allegations regarding Solache and Reyes, AS ¶ 158; and
- Finally, the FBI authored a 302 report detailing the criminal activity of CPD Officer Joseph Miedzianowski and Guevara in the 1980s and 1990s. The report explains that Guevara would apprehend drug and gun dealers and then allow them to "buy their way out of trouble," that and he would take bribes to alter the results of lineups. The FBI report also states that Guevara would receive cash in exchange for the dismissal of murder cases he investigated. Guevara has taken the Fifth in regard to all allegations regarding the topics covered in the 302, AS ¶ 159.[44]

---

[44] All of the above incidents in which Guevara framed innocent men for crimes they did not commit and committed other misconduct are evidence Rivera will use in support of his other widespread practice theories, discussed above, which the City does not challenge in its motion for summary judgment..

That the City made no effort to investigate, discipline, or terminate Guevara in light of this repeated misconduct is far more than sufficient evidence to survive summary judgment. Indeed, it was not until after this civil lawsuit was filed, when the City hired Sidley Austin to review Guevara cases that it took any steps to investigate him. The City has been utterly indifferent to Guevara's misconduct and has failed to discipline him at all relevant times.

Finally, Mr. Brasfield provides additional support for the *Monell* theory that the City failed to discipline Guevara. He explains professional standards when it comes to supervision and discipline of police officer misconduct, and the cultural issues that develop when there is lax oversight on the part of police administrators. Ex. 12 (Brasfield Report) at 23-24. Mr. Brasfield concludes based on his review of Guevara cases that for years internal affairs and direct supervisors failed to meaningfully investigate and discipline a pattern of gross misconduct. *Id.* at 24. Reviewing the City's designated Rule 30(b)(6) testimony, Mr. Brasfield notes that the sustained complaint rate in the Chicago police department is extremely low. *Id.* at 25 n.3. Mr. Brasfield also opines that Guevara's multiple confirmed cases of framing innocence civilians represents "a complete failure of supervision and that fellow officers turned a blind eye or condoned the misconduct." *Id.* at 27. Finally, as Mr. Brasfield notes, *id.* at 29, a federal jury found that the Chicago had a code of silence and a culture of turning a blind eye to officer misconduct as of 2007, *Obrycka v. City of Chicago*, 913 F. Supp. 2d 598, 603-04 (N.D. Ill. 2012). The persistent pattern of Guevara's misconduct is evidence that this lack of oversight was continuous between 1988 and 2007. Ex. 12 (Brasfield Report) at 29.

None of the City's remaining arguments for summary judgment have any merit, and so Rivera addresses them only briefly. The City argues, without citing authority supporting its position, that it cannot be liable because of the misconduct of a single officer, City Br. at 22-23,

but what the cases actually say is that municipal liability is rarely based on a single *incident* of misconduct, not that it cannot be based on an single officer who engages in a long pattern of misconduct, especially one as extraordinary and obvious as Guevara's.[45] The City's citation to cases that refuse to impose *Monell* liability based on a single incident of misconduct are inapposite given the pattern just discussed. *See* City Br. at 21-22.[46] Finally, the City's contention that Brasfield's opinion is the only evidence Rivera has of the City's failure to discipline Guevara is obviously not accurate, given the evidence above. *Id.*

In *Thomas v. Cook County*, the Seventh Circuit concluded, "We do not adopt any bright-line rules defining 'widespread custom or practice,'" and "there is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, 'except that it must be more than one instance,' . . . or even three[.]" 604 F.3d 293, 303 (7th Cir. 2010) (quoting *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988); *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002)); *but see Estate of Moreland v. Dieter*, 395 F.3d 747, 760-61 (7th Cir. 2005) ("[T]he plaintiff need not show that the policy, practice, or custom resulted in past deprivations of rights."); *Woodward v. CMS*, 368 F.3d 917, 929 (7th Cir. 2004) (no "one free suicide" pass). Rivera must identify evidence that the City's failure to discipline was a policy and not a random event. *Thomas*, 604 F.3d at 303. There is ample evidence to support that conclusion, and the Court should deny summary judgment. *Garcia v. City of Chicago*, 2003 WL 1715621, *6-7 (N.D. Ill. Mar. 20, 2003) (denying summary judgment to City given evidence of indifference to a pattern of abuse

---

[45] Indeed, to the extent that a single officer engaged in repeated acts of misconduct that go unanswered by City officials, that evidence is perhaps even more powerful evidence than a general failure of disciplinary systems across a wider group of officers—it shows a failure to discipline the most prolific and frequent offenders.

[46] For example, the City's citation to *Connick v. Thompson*, 563 U.S. 51, 61 (2011), does not support its position. Instead, that case holds that liability for a failure-to-train *Monell* claim cannot be "based on a single Brady violation." *Id.* at 54. In *Thompson*, the plaintiff conceded that he had put no evidence in the record of any other instances of misconduct. The case has nothing to say about whether the repeated misconduct used to prove a *Monell* claim must be committed by a single officer, multiple officers, or either.

by its officers); *Kindle v. City of Harvey*, 2002 WL 230779, *4-5 (N.D. Ill. Feb. 15, 2002) (same); *Robinson v. City of Harvey*, 2001 WL 138901, at *7 (N.D. Ill. Feb. 16, 2001) (same).

## K.   THE DERIVATIVE CLAIMS SURVIVE SUMMARY JUDGMENT

Finally, the City asserts they it is entitled to judgment on Rivera's *respondeat superior* and indemnification claims, arguing these claims are derivative of others. Rivera's underlying claims survive, and so should these derivate claims.

## CONCLUSION

For all of these reasons, Defendants' motions for summary judgment should be denied.

RESPECTFULLY SUBMITTED,

**JACQUES RIVERA**

By:  /s/ Steve Art
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Russell Ainsworth
Anand Swaminathan
Steve Art
**LOEVY & LOEVY**
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

Locke E. Bowman
Sheila Bedi
David Shapiro
Alexa Van Brunt
**MACARTHUR JUSTICE CENTER**
Northwestern University School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
(312) 503-0844

J. Samuel Tenenbaum
BLUHM LEGAL CLINIC
Northwestern University School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
(312) 503-8576

## CERTIFICATE OF SERVICE

I, Steve Art, an attorney, hereby certify that, on September 22, 2017, I filed the

foregoing PLAINTIFF'S CONSOLIDATED RESPONSE IN OPPOSITION TO

DEFENDANTS' SUMMARY JUDGMENT MOTIONS using the Court's CM/ECF system,

which effected service on all counsel of record.

         /s/ Steve Art
         *One of Plaintiff's Attorneys*

| | |
|---|---|
| Arthur Loevy | Locke E. Bowman |
| Jon Loevy | Sheila Bedi |
| Russell Ainsworth | David Shapiro |
| Anand Swaminathan | Alexa Van Brunt |
| Steve Art | **MACARTHUR JUSTICE CENTER** |
| **LOEVY & LOEVY** | Northwestern University School of Law |
| 311 N. Aberdeen St., Third Floor | 375 E. Chicago Ave., 8th Floor |
| Chicago, IL 60607 | Chicago, IL 60611 |
| (312) 243-5900 | (312) 503-0844 |
| steve@loevy.com | |

J. Samuel Tenenbaum
BLUHM LEGAL CLINIC
Northwestern University School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
(312) 503-8576