# Exhibit ZZZ

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JACQUES RIVERA,         )
          )    Case No. 12 C 4428
    *Plaintiff*,   )
          )    Hon. Joan B. Gottschall,
    *v.*        )    District Judge
          )
REYNALDO GUEVARA, *et al.*,  )
          )
    *Defendants*.   )

## PLAINTIFF'S RESPONSE TO DEFENDANTS' POST-TRIAL MOTION

Arthur Loevy
Jon Loevy
Anand Swaminathan
Steven Art
Rachel Brady
Sean Starr
LOEVY & LOEVY
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
(312) 243-5900
jon@loevy.com

Locke E. Bowman
David Shapiro
Alexa Van Brunt
RODERICK MACARTHUR JUSTICE CENTER
   Northwestern University School of Law
375 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-0844

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...............................................................................................v

**INTRODUCTION** ...........................................................................................................1

**I.     SUMMARY OF RELEVANT FACTS** ........................................................1

    A.  The Valentin Shooting .............................................................................1

    B.  The Initial Interview of Orlando Lopez ..................................................1

    C.  Defendants Guevara, Gawrys, and Mingey Investigate the Crime..............2

    D.  Rivera's Photo Is Shown to Lopez..........................................................2

    E.  The First Lineup......................................................................................4

    F.  Identifications By Valentin and Defendants False Reports ....................5

    G.  The Second Lineup .................................................................................6

    H.  The Purported Exclusion of Rodriguez...................................................7

    I.  Rivera's Criminal Trial ............................................................................7

    J.  Rivera's Exoneration, Certificate of Innocence, and Civil Suit................9

**II.    DEFENDANTS HAVE FORFEITED MANY OF THEIR ARGUMENTS**................9

    A.  Most of Defendants' Rule 50(b) Arguments Are Forfeited Because They Were
        Not Included In Their Respective Rule 50(a) Motions................................10

    B.  All Arguments Relating to the 9/16 Report Are Forfeited .........................11

    C.  Other Arguments Not Raised By Defendants Are Forfeited ......................11

**III.   DEFENDANTS' RULE 50(B) CHALLENGES LACK MERIT**...............................12

    A.  The Evidence Supports the Verdict on Rivera's Due Process Claims Against the
        Individual Defendants.................................................................................13

        1. Legal Standard ...................................................................................13

        2. The Record Amply Supports the Due Process Verdicts .........................14

            *a. The August 27 Photo Show Up with Orlando Lopez* .......................14

            *b. Valentin's Identification of Rodriguez* .........................................19

            *c. The First Lineup* .........................................................................20

            *d. Lopez Tells Guevara That Rivera Is the Wrong Guy*......................23

            *e. The 9/16 Report* ..........................................................................25

            *f. Suppressed Investigative Files* .....................................................29

        3. None of the Individual Defendants Can Escape Liability ......................31

    B.  The City's Argument That the Suppressed Investigative Files Were Insufficient
        to Prove A Due Process Violation Similarly Lacks Merit.............................34

        1. The City Has Forfeited Any Argument About Investigative Files..............34

        2. The Suppressed Files Were Exculpatory ..............................................35

        3. Wadas Could Not Have Discovered the Files By Asking Harder ..............36

## TABLE OF CONTENTS (Cont.)

C. Defendants' Arguments That There Is Insufficient Evidence to Support Plaintiff's
Other Claims Lack Merit ........................................................................37
D. Guevara Is Not Entitled to Qualified Immunity ...........................................39
E. The Jury's Verdict for McLaughlin Does Not Create An Inconsistent Verdict .........40
   1. Defendants Failed to Properly Raise These Arguments ...........................40
   2. The Jury's Verdicts Are Not Inconsistent....................................41

IV. **THE INDIVIDUAL DEFENDANTS' RULE 59 MOTION HAS NO MERIT** ..........42
A. The Court Did Not Abuse Its Discretion When It Permitted Rivera to Call
Defendants As Witnesses, Notwithstanding Their Intention to Assert Fifth
Amendment Privileges............................................................................43
   1. The Law Does Not Allow A New Trial On This Basis ...........................43
   2. This Court Did Not Abuse Its Discretion By Permitting Rivera to Call
   Guevara and Mingey to the Witness Stand.................................................44
   3. Other Courts Have Taken the Same Approach As This Court ..............47
      a. Courts in the Northern District..................................................47
      b. Courts Around the Country Have Required Defendants Asserting the
      Fifth to Take the Stand..........................................................48
B. The Objections That Defendants Did Make During the Guevara and Mingey
Examinations Were Properly Overruled...................................................49
   1. Defendants Misstate the Legal Standard Governing What Foundation Is
   Necessary Before Questions Are Asked At Trial .......................................49
   2. Defendants' Objections That Rivera Had No Foundation For His Questions
   About the Valentin Investigation Lacked Merit .........................................50
   3. Defendants' Objections That Rivera Had No Foundation For His Questions
   About Other Acts Lacked Merit ............................................................52
C. Defendants Failed to Raise Many of Their Objections About the Guevara and
Mingey Examinations, and They Cannot Satisfy the Plain Error Standard................55
D. Defendants' Other Arguments Relating to the Fifth Amendment Lack Merit ...........56
   1. Rivera Did Not Misstate Fifth Amendment Law....................................56
   2. Questions About An Investigation Into Guevara Were Proper ..............58
   3. Rivera's Extremely Brief and Accidental Display of Part of Gawrys's
   Deposition Transcript Does Not Warrant A New Trial, As This Court Has
   Already Concluded.............................................................................60
   4. Gawrys Was Not Unfairly Prejudiced by His Co-Defendants' Assertions
   of the Fifth Amendment........................................................................63
E. The Court Properly Exercised Its Discretion When It Excluded After-Acquired
Evidence Concerning Felipe Nieves.........................................................65
F. The Court Did Not Err When It Permitted Cross-Examination of Wixted.................68

## TABLE OF CONTENTS (Cont.)

G. The Court Properly Exercised Its Discretion In Limiting the Cumulative Opinion Testimony of Wasilewski ..................................................................73

H. The Verdict Was Not Against the Manifest Weight of the Evidence.........................77

V. **THE CITY'S CHALLENGES TO THE *MONELL* VERDICT FAIL**.......................78

A. The City Forfeited Many of Its Arguments for Judgment or A New Trial................78

B. Street Files *Monell* Theory ..........................................................................79

1. Summary of the Factual Record Related to Street Files *Monell* Claim ..............79

2. Street Files *Monell* Theories Not Challenges in Any of Defendants' Post-Trial Motions are Forfeited and Independently Support Liability.....................................85

3. Street Files Challenges Included in the City's Rule 50(a) and Rule 50(b) Motions ......................................................................................87

    a. *The Failure to Allege A Due Process Violation by Any Individual Defendant* ..................................................................87

    b. *Express Policy Theory* ....................................................................91

    c. *Widespread Practice Theory*.............................................................96

    d. *Failure to Train.*...........................................................................102

4. Street Files Challenges Included Only in the City's Rule 59(a) Motion ...............104

    a. *Argument that Special Order 86-3 Was Good Policy*.....................................105

    b. *City's Evidentiary Challenge to Ruling Allowing Questioning of Defendant Mingey Falls* .................................................................................106

C. Filler Lineup Monell Theory .......................................................................110

1. Summary of the Factual Record Related to Filler Lineup *Monell* Claim ..............110

2. Filler Lineup *Monell* Theory Was Presented to the Jury ...............................112

3. Filler Lineup Challenges Included in the City's Rule 50(a) and Rule 50(b) Motions ......................................................................................114

    a. *Forfeited Arguments* ......................................................................114

    b. *Express Policy*.............................................................................115

    c. *Widespread Practices* ....................................................................115

    d. *Causation*..................................................................................117

4. Filler Lineup Challenges Included Only in the City's Rule 59(a) Motion .........118

VI. **THE CITY'S CHALLENGES TO JURY INSTRUCTIONS FAIL** .........................119

A. The Court Properly Exercised Its Discretion to Reject the City's Additional Limiting Instruction Regarding "Speculative Evidence" ........................................................119

B. The Court Properly Exercised Its Discretion to Reject the City's Additional Instruction Regarding Invocation of the Fifth Amendment......................................121

C. The Jury Was Correctly Instructed on Municipal Liability ......................................122

**TABLE OF CONTENTS (Cont.)**

D.  The City's Sufficiency Arguments Repeated As Jury Instruction Arguments Should Be Rejected for the Reasons Discussed Already ......................................................124

**VII.  ARGUMENTS ABOUT COUNSEL'S PURPORTED "MISCONDUCT" FAIL** ...124
A.  Questioning and Arguments About ASA Rosner's Hair ..........................................126
B.  Discussion of the Defense Case During Closing ....................................................127
C.  Defense Counsel's Preamble Before Questioning Lopez ........................................129
D.  Cross-Examination of Jeffrey Noble ......................................................................130

**VIII.  DEFENDANTS' "CUMULATIVE ERROR" POSITION FAILS** ..........................132

**CONCLUSION** ...................................................................................................................133

**APPENDIX A—EXHIBIT LIST TO PLAINTIFF'S RESPONSE** ................................. App-1

**APPENDIX B—TABLE OF CONTENTS TO TRANSCRIPT** ....................................... App-4

# TABLE OF AUTHORITIES

**Cases**                                                                                       **Page(s)**

*Allen v. CTA*, 317 F.3d 696 (7th Cir.2003)..................................................................16

*Arlin-Golf v. Arlington Heights*, 631 F.3d 818 (7th Cir. 2011) ....................................11

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015)........................................................36

*Avery v. Milwaukee*, 847 F.3d 433 (7th Cir. 2017)....................................13, 18, 22, 26

*Battle v. City of Reading*, 1991 WL 208899 (E.D. Pa. Oct. 8, 1991) ..........................49

*Baxter v. Palmigiano*, 425 U.S. 308 (1976).....................................................44, 46, 47

*Berry v. Deloney*, 28 F.3d 604 (7th Cir. 1994) ............................................................63

*Board of County Commissioners v. Brown*, 520 U.S. 397 (1997)..................................85

*Bogan v. Chicago*, 644 F.3d 563 (7th Cir. 2011)..........................................................12

*Bonds v. City of Chicago,* 2018 WL 1316720 (N.D. Ill. Mar. 14, 2018)......................89

*Branion v. Gramly*, 855 F.2d 1256 (7th Cir. 1988) ......................................................22

*Bronston v. United States*, 409 U.S. 352 (1973).....................................................70, 72

*Byrd v. Blue Ridge Rural Elec.*, 356 U.S. 525 (1958) ...........................................77, 105

*Cage v. City of Chicago*, 2010 WL 3613981 (N.D. Ill. Sept. 8, 2010).........................89

*Calhoun v. Ramsey*, 408 F.3d 375 (7th Cir. 2005) .......................................................93

*Canton v. Harris*, 489 U.S. 378 (1989)...............................................................97, 116

*Carter v. Chicago Police Officers*, 165 F.3d 1071 (7th Cir. 1998) .......................40, 96

*City of Los Angeles v. Heller*, 475 U.S. 706 (1986)......................................................89

*Chlopek v. Federal Ins. Co.*, 499 F.3d 692 (7th Cir. 2007) .........................................63

*Christmas v. City of Chicago*, 682 F.3d 632 (7th Cir. 2012)................................43, 132

*Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300 (11th Cir. 2014)................................50

## TABLE OF AUTHORITIES (Cont.)

**Cases**        **Page(s)**

*Cruz v. Cicero,* 275 F.3d 579 (7th Cir. 2001) ........................................................13, 42

*Daniel v. Cook Cty.*, 833 F.3d 728 (7th Cir. 2016)........................................97, 116

*Daniels v. Pipefitters' Ass'n Local Union No. 597*, 983 F.2d 800 (7th Cir. 1993)......................64

*Davis v. Carter*, 452 F.3d 686 (7th Cir. 2006)........................................................96, 97

*Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556 (7th Cir. 1984) ...................70, 72

*Deloughery v. City of Chicago*, 422 F.3d 611 (7th Cir. 2005) ....................................41

*DeRance, Inc. v. PaineWebber Inc.,* 872 F.2d 1312 (7th Cir. 1989)........................126

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)........................................16, 31, 36

*Dixon v. Cook Cty*, 819 F.3d 343 (7th Cir. 2016)........................................................97

*Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258 (9th Cir. 2000)........................46

*Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008) ................................................13

*Emmel v. Coca-Cola*, 95 F.3d 627 (7th Cir. 1996) ....................................................15

*Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*,

831 F.3d 815 (7th Cir. 2016) ................................................10, 44, 45, 48

*Estate of Moreland v. Dieter*, 395 F.3d 747 (7th Cir. 2005)........................................97

*Evans v. Chicago*, 2010 WL 3075651 (N.D. Ill. Aug. 5, 2010) ................................89

*Fields v. Wharrie*, 672 F.3d at 517 (7th Circ. 2012)(*Fields I*)................................22, 27

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) (*Fields II*) ................................13, 40

*First Midwest Bank v. City of Chicago*, 2018 WL 4126570 (N.D. Ill. Aug. 29, 2018).........64, 107

*Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) ..............................................39, 40, 41

*Freeman v. Chicago Park Dist.*, 189 F.3d 613 (7th Cir.1999) ....................................41

## TABLE OF AUTHORITIES (Cont.)

**Cases**                                                                        **Page(s)**

*Fujisawa Pharm. Co. v. Kapoor*, 1999 WL 543166 (N.D. Ill. July 21, 1999) .............................64

*Glisson v. Indiana Dept. of Corrections*, 2017 WL 680350 (7th Cir. 2017)..................93, 97, 124

*Giglio v. United States*, 405 U.S. 150 (1972) ........................................................................ passim

*Goudy v. Basinger*, 604 F.3d 394 (7th Cir. 2010).........................................................................20

*Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010 (7th Cir. 2016)....................................................76

*Griffin v. Bell*, 694 F.3d 817 (7th Cir. 2012) ................................................................................68

*Griffin v. United States*, 502 U.S. 46 (1991)................................................................................14

*Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852 (7th Cir. 2005)..................................43, 110

*Harris v. City of Chicago*, 266 F.3d 750 (7th Cir. 2001).............................................................45

*Harvey v. Office of Banks*, 377 F.3d 698 (7th Cir. 2004) .......................................................15, 29

*Hillmann v. City of Chicago*, 834 F.3d 787 (7th Cir. 2016) ........................................................44

*Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322 (9th Cir. 1995).........................40

*Houskins v. Sheahan*, 549 F.3d 480 (7th Cir. 2008)..................................................................127

*In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651 (7th Cir. 2002) ...................57

*Jacobs Mfg. Co. v. Sam Brown Co.*, 19 F.3d 1259 (8th Cir.1994) ..............................................40

*Jenkins v. Bartlett*, 487 F.3d 482 (7th Cir. 2007) ......................................................................102

*Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) ................................................. passim

*Jimenez v. City of Chicago*, 877 F. Supp. 2d 649 (N.D. Ill. July 11, 2012) ................................47

*Jones v. City of Chicago,* 856 F.2d 985 (7th Cir. 1988) .............................................13, 19, 33, 35

*Kadia v. Gonzales*, 501 F.3d 817 (7th Cir. 2007) .......................................................................22

*Kelso v. Bayer*, 398 F.3d 640 (7th Cir. 2005).................................................11, 37, 53, 123

## TABLE OF AUTHORITIES (Cont.)

**Cases**                                                                          **Page(s)**

*King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012) ..........................................................86

*Kontos v. Kontos*, 968 F.Supp. 400 (S.D. Ind. 1997) ...............................................64

*Kosmynka v. Polaris Indus.*, 462 F.3d 74 (2d Cir. 2006) ........................................40

*Kossman v. Northeast Illinois R.R. Corp.*, 211 F.3d 1031 (7th Cir. 2000)............14, 79

*Kyles v. Whitley*, 514 U.S. 419 (1995).........................................................13, 19, 27, 35

*Latino v. Kaizer*, 58 F.3d 310 (7th Cir. 1995)......................................................77, 105

*LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997) ...............................................64

*Logan v. Burge*, No. 09 C 5471 (N.D. Ill.) ...................................................................48

*Malibu Media v. Tashiro*, 2015 WL 13639447 (S.D. Ind. Apr. 15, 2015)...................48

*Martinez v. Cook County*, 2011 WL 4686438 (N.D. Ill. Feb. 2, 2017) ........................89

*Mason v. Southern Ill. Univ.*, 233 F.3d 1036 (7th Cir. 2000)..........................43, 68, 76

*Maurer v. Speedway*, 774 F.3d 1132 (7th Cir. 2014) ............................................43, 63

*McNabola v. CTA*, 10 F.3d 501 (7th Cir. 1993) ...................................................77, 105

*Mejia v. Cook County*, 650 F.3d 631 (7th Cir. 2011) ...........................................77, 105

*Miksis v. Howard*, 106 F.3d 754 (7th Cir. 1997) .....................................................126

*Mooney v. Holohan*, 294 U.S. 103 (1935) .............................................................13, 40

*Moore v. Tuelja,* 546 F.3d 423 (7th Cir. 2008).........................................................125

*Naeem v. McKesson Drug Co.*, 444 F.3d 593 (7th Cir. 2006).....................................43

*Napue v. Illinois*, 360 U.S. 264 (1959) ..................................................................13, 40

*National Life Ins. Co. v. Hartford Acc. & Indem. Co.*, 615 F.2d 595 (3d Cir. 1980)...................48

*Nelson v. Napolitano*, 657 F.3d 586 (7th Cir. 2011) ...................................................X

Case: 1:12-cv-03042 Document #: 1735 Filed: 10/15/21 Page 11 of 158 PageID #:40596

## TABLE OF AUTHORITIES (Cont.)

**Cases**                                                                   **Page(s)**

*Newsome v. James*, 260 F.3d 824 (7th Cir. 2001) ........................................................39

*Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001) .......................................... passim

*Oja v. Howmedica, Inc.*, 111 F.3d 782 (10th Cir. 1997) .............................................40

*Oostendorp v. Khanna,* 937 F.2d 1177 (7th Cir. 1991) .........................................49, 54

*Opp v. Wheaton Van Lines*, 231 F.3d 1060 (7th Cir. 2000) .......................61, 63, 78, 93

*Palmquist v. Selvik*, 111 F.3d 1332 (7th Cir. 1997).....................................................42

*Passanati v. Cook County*, 689 F.3d 655 (7th Cir. 2013)........................................12, 29

*Pearson v. Welborn*, 471 F.3d 732 (7th Cir. 2006).................................................40, 41

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)...................................................86

*Phelps v. St. Catherine Hosp.*, 908 F.2d 975 (7th Cir. 1990) ......................................45

*Pickett v. Dart*, 2014 WL919673 (N.D. Ill. Mar. 10, 2014) ........................................89

*Pickett v. Sheridan Health Care*, 610 F.3d 434 (7th Cir. 2010) .................................125

*Pillsbury Co. v. Conboy*, 459 U.S. 248 (1983) ............................................................71

*Pyle v. Kansas*, 317 U.S. 213 (1942) ...........................................................................40

*Ramirez v. Chicago*, No. 05 C 317 (N.D. Ill.) ..............................................................48

*Reeves v. Sanderson Plumbing*, 530 U.S. 133 (2000) .................................................25

*Reynolds v. United States*, 98 U.S. 145 (1878)............................................................45

*Rivera v. Guevara*, 2018 WL 2183998 (N.D. Ill. May 11, 2018)................................11

*Robinson v. Harvey*, No. 99 C 3696 (N.D. Ill.) ...........................................................48

*Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509 (8th Cir. 1984) .....................48

*S.E.C. v. Graystone Nash*, 25 F.3d 187 (3rd Cir. 1994) ..............................................46

## TABLE OF AUTHORITIES (Cont.)

**Cases**                                                                 **Page(s)**

*Sanchez v. City of Chicago*, 700 F.3d 919 (7th Cir. 2012) ..............................59, 62, 131

*Smith v. Cain*, 565 U.S. 73 (2012) ..........................................................................20

*Smith v. Northeastern Ill. Univ.*, 388 F.3d 559 (7th Cir. 2004) ..............................61. 78

*Socha v. Richardson*, 874 F.3d 983 (7th Cir. 2017) .......................................................37

*Soltys v. Costello*, 520 F.3d 737 (7th Cir. 2008)...........................................................57

*Sornberger v. Knoxville*, 434 F.3d 1006 (7th Cir. 2006) .............................................103

*State Farm v. Abrams*, 2000 WL 574466 (N.D. Ill. May 11, 2000)......................64, 65

*Steidl v. Gramley*, 151 F.3d 739 (7th Cir. 1998)...........................................................86

*Stringel v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 415 (7th Cir. 1996)...................55

*Sunstar, Inc. v. Alberto-Culver Co., Inc.*, 2004 WL 1899927 (N.D. Ill. Aug. 23, 2004) ........64, 65

*Swanigan v. Chicago*, 775 F.3d 953 (7th Cir. 2015) ....................................................89

*Sylvester v. SOS Children's Villages Illinois*, 453 F.3d 900 (7th Cir. 2006)................18

*Taylor v. Bradley*, 448 F.3d 942 (7th Cir. 2006) ..........................................................16

*Thomas v. Cook County*, 604 F.3d 293 (7th Cir. 2010)....................................... passim

*Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528 (7th Cir. 2003)............................................132

*United States v. Abel*, 469 U.S. 45 (1984) .................................................................130

*United States v. Agurs*, 427 U.S. 97 (1976)..................................................................14

*United States v. Beck*, 625 F.3d 410 (7th Cir. 2010) ...............................................49, 54

*United States v. Bozovich*, 782 F.3d 814 (7th Cir. 2015)..........................................69, 72

*United States v. Curry*, 977 F.2d 1042 (7th Cir. 1992)................................................75

*United States v. District Council of New York City*, 832 F.Supp. 644 (S.D.N.Y. 1993)...............65

# TABLE OF AUTHORITIES (Cont.)

**Cases**                                                          **Page(s)**

*United States v. Dunkel*, 927 F.2d 955 (7th Cir. 1991)............................................11, 38, 44, 123

*United States v. Jimenez,* 1995 WL 135923 (7th Cir. 1995) ........................................................58

*United States v. Lawless*, 709 F.2d 485 (7th Cir. 1983) .............................................................46

*United States v. Mabrook*, 301 F.3d 503 (7th Cir. 2002).............................................................47

*United States v. Patterson*, 23 F.3d 1239 (7th Cir. 1994)............................................................18

*United States v. Powell*, 652 F.3d 702 (7th Cir. 2011) ..............................................................133

*United States v. Rylander*, 460 U.S. 752 (1983).........................................................................45

*United States v. Sampol*, 636 F.2d 621 (D.C. Cir. 1980)............................................................50

*United States v. Vandetti*, 623 F.2d 1144 (6th Cir. 1980)...........................................................47

*United States v. Walker*, 746 F.3d 300 (7th Cir. 2014)...............................................................37

*United States v. White*, 970 F.2d 328 (7th Cir. 1992).................................................................37

*United States v. White*, 443 F.3d 582, 587-88 (7th Cir. 2006)...................................................121

*Valentino v. Village of South Chicago Heights*, 575 F.3d 664 (7th Cir. 2009) ............................87

*Venson v. Altamirano*, 749 F.3d 641 (7th Cir. 2014)..........................................................125, 129

*Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011) .............................................................86

*Walden v. City of Chicago*, 846 F. Supp. 2d 963 (N.D. Ill. 2012)..............................................132

*Walden v. Illinois Central Gulf R.R.*, 975 F.2d 361 (7th Cir. 1992)....................................77, 105

*Walker v. Groot*, 867 F.3d 799 (7th Cir. 2017)..........................................................................55

*Wallace v. McGlothan*, 606 F.3d 410 (7th Cir. 2010) ................................................................10

*Wearry v. Cain*, 136 S. Ct. 1002 (2016) .................................................................13, 14, 20, 88

*Wells v. Coker*, 2014 WL 716518 (C.D. Ill. Feb. 25, 2014) .......................................................89

## TABLE OF AUTHORITIES (Cont.)

**Cases**                                                                                           **Page(s)**

*Whiting v. Westray*, 294 F.3d 943 (7th Cir. 2002)......................................................................132

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012) .............................................................13

*Wickens v. Shell Oil Co.*, 620 F.3d 747 (7th Cir. 2010)................................................................125

*Williams v. Dieball*, 724 F.3d 957 (7th Cir. 2013) .......................................................................10

*Williams v. Illinois*, 567 U.S. 50 (2012) ......................................................................................71

*Williams v. U.S. DEA*, 51 F.3d 732 (7th Cir. 1995)....................................................................125

*Willis v. Lepine*, 687 F.3d 826 (7th Cir. 2012) .............................................................................78

*Wilson v. City of Chicago*, 758 F.3d 875 (7th Cir. 2014) ..............................................................68

*Woodward v. CMS*, 368 F.3d 917 (7th Cir. 2004) ........................................................................97

*Young v. James Green Mgmt.*, 327 F.3d 616 (7th Cir. 2003) .......................................42, 110, 119

**Other Authorities**

FED. R. CIV. P. 59(a)(1)(A).................................................................................................. passim

FED. R. EVID. 103(e) ......................................................................................................................55

# INTRODUCTION

Considering that trial lasted nearly four weeks, during which the Court made countless rulings, it is remarkable how little Defendants could find to complain about. To the extent their arguments are not forfeited, the handful of rulings they now challenge were not erroneous, much less an abuse of discretion that caused prejudice justifying a new trial. There was sufficient evidence to support the jury's verdict in all respects. Defendants' motions should be denied.

## I.    SUMMARY OF RELEVANT FACTS

### A.    The Valentin Shooting

On August 27, 1988, 16 year-old Felix Valentin drove his brother to his girlfriend's apartment, waiting in the car in an alley next to the building. Ex. 31 (PX11).[1] As Valentin sat there, someone approached and shot him 11 times. Ex. 31 (PX11). Valentin told police that the assailant was between 16 and 18 years old. Ex. 38 (PX19C); Ex. 32 (PX12). He later told them that he had been shot by a member of the Imperial Gangsters street gang. Ex. 37 (PX19B); Ex. 2 (Tr. 6/5/18) at 136-37, 152-54. The shooting happened after Valentin drove into the territory of the Imperial Gangsters, rivals of his gang, the Campbell Boys. Ex. 8 (Tr. 6/14/18) at 1694-95.

None of this had anything to do with Rivera, who was 23 years old at the time, living with his girlfriend and children, and working a local community center. Ex. 2 at 193-98. Rivera had never been a member of the Imperial Gangsters or the Campbell Boys, did not know Valentin or have reason to execute him, and had nothing to do with the crime. Ex. 2 at 217-19. At trial, no one disputed Rivera was innocent. Ex. 2 at 112; Ex. 17 (Tr. 6/27/18) at 4149-4251.

### B.    The Initial Interview of Orlando Lopez

The Valentin shooting was initially classified as an aggravated battery and was assigned to Detective McLaughlin. She was told that a 12 year-old boy named Orlando Lopez might be a

---

[1] A complete list of exhibits is included as Appendix A. *See infra* at App-1.

witness, so she interviewed him. McLaughlin has no recollection of the interview, Ex. 4 (Tr. 6/8/18) at 924-27, but her General Progress Report (GPR) notes that Lopez told her he was "by store" when he saw the shooting, Ex. 32 (PX12); Ex. 3 (Tr. 6/7/18) at 589-91, a reference to the corner store almost 200 feet away from where the shooting occurred, Ex. 9 (Tr. 6/15/18) at 2142-44. Lopez told McLaughlin that from that vantage point he saw a man approach Valentin's car and fire a gun, but her GPR reflects that he was unable to provide any physical description of the shooter beyond that he was an 18 year old, with a black jacket, dark pants, and gym shoes. Ex. 32 (PX12); Ex. 3 at 585-89.

### C. Defendants Guevara, Gawrys, and Mingey Investigate the Crime

Neither McLaughlin nor any other detective was able to develop evidence implicating Rivera in the crime. Ex. 3 at 543-47, 643-44; Ex. 6 (Tr. 6/12/18) at 1278-79. Detectives like McLaughlin relied on members of the Gang Crimes unit to provide intelligence about suspected gang shootings. Ex. 3 at 575-76; Ex. 8 at 1694; Ex. 12 (Tr. 6/20/18) at 2721-22; Ex. 14 (Tr. 6/22/18) at 3327-28; Ex. 6 at 1275, Ex. 11 (Tr. 6/19/18) at 2483-84. Guevara refused to answer any questions during discovery or at trial about his role in the Valentin investigation, but contrary to Defendants' suggestion, the documents and testimony show without contradiction that Guevara took over the investigation right away; that he participated in all aspects of the case, with his partner Steve Gawrys's help at key moments; and that he and Gawrys closed the case, under Gang Crimes Sergeant Edward Mingey's supervision. Ex. 6 at 1276-79; Ex. 8 at 1695-96.

### D. Rivera's Photo Is Shown to Lopez

According to Guevara and Gawrys's September 16 report (hereafter the "9/16 report"), Lopez identified Rivera's photograph for the first time on August 29 at the police station. Ex. 22 (PX1A). The jury saw that every police report in the investigative file discussing the photo

identification of Rivera put that identification on August 29. Ex. 22 (PX1A); Ex 25 (PX5); Ex. 27 (PX7); Ex. 34 (PX16). Thus, the official version was always that Rivera was not a suspect in the crime until Lopez randomly selected him from a book of gang members on August 29, and that was the State's theory. Ex. 13 (Tr. 6/21/18) at 3107-08. It was undisputed that Lopez only participated in one photo identification procedure, and there would have been no reason to do it more than once. Ex. 22 (PX1A); Ex. 7 (Tr. 6/13/18) at 1650-57; Ex. 6 at 1279, 1296, 1324; Ex. 8 at 1749-50, 1763-64; Ex. 12 at 2760; Ex. 4 at 674-75; 699; Ex. 7 at 1648-1657.

The official version was false. A copy of Rivera's rap sheet was requested from the records division, and a copy of his mug shot was printed, on August 27, 1988, two days before the documented August 29 identification at which Lopez supposedly first brought Rivera into the case. There is no explanation in the file, and there was no explanation at trial, of why Defendants were focused on Rivera as a suspect two days before Lopez supposedly identified him randomly from among photos in gang books. Ex. 22 (PX1A); Ex. 24 (PX4); Ex. 32 (PX12); Ex. 52 (PX66); Ex. 4 at 576-77, 674-75; 681-99, 816-17, 931-35; Ex. 6 at 1278-79, 1296, 1324; Ex. 7 at 1648-1657; Ex. 8 at 1736-50, 1763-64; Ex. 11 (Tr. 6/19/18) at 2509; Ex. 12 at 2760.

According to the testimony at trial, a number of Gang Crimes officers went to Lopez's house on August 27, the night of the shooting. Ex 12 at 2760, 2719, 2765-66; Ex. 8 at 1758-59; Ex. 6 at 1298. No police report or paperwork associated with this event exists. Ex. 8 at 1757; Ex. 11 at 2508. No police officer was able to explain what actually happened at Lopez's house on August 27. Ex. 6 at 1248; Ex. 11 at 2687-88; Ex. 12 at 2760. Noon, Fallon, Zacharias, and Sparks each testified that, though they went to the Lopez residence on August 27, they were not personally present in the room when Lopez was shown photos. Ex. 12 at 2719, 2765-66; Ex. 8 at 1770. Guevara was the only officer at Lopez's house who could have obtained the photo

identification from Lopez.[2]  Sparks confirmed that Guevara was in another room with Lopez,

after which Guevara announced to other officers that Lopez had identified Rivera. Ex. 12 at

2765-70, 2780-85. Guevara pleaded the Fifth when asked whether he showed Lopez the mugshot

of Rivera prior to Lopez's mugbook identification. Ex. 6 at 1271-79, 1301-03.

### E.      The First Lineup

Lopez testified that shortly after making a photo identification he was shown a live

lineup. Ex. 21 (Designated Deposition Testimony of Orlando Lopez) at 18-19, 77, 81-82; Ex. 7

at 1651-52; Ex. 10 (Tr. 6/18/18) at 2449; Ex. 11 at 2463. Rivera confirmed that he was placed in

a lineup shortly after the August 27 shooting, and that he was released after the lineup, before

being brought back for another lineup a few weeks later. Ex. 2 at 202-213. Reports show Rivera

was originally arrested on August 30, and hold papers were submitted to keep him in custody so

that a lineup could be conducted. Ex. 25 (PX5); Ex. 36 (PX6). Similar papers were submitted for

Rodriguez. Ex. 28 (PX8); Ex. 29 (PX9). Guevara brought Lopez in for the lineup. Ex. 7 at

1651-53; Ex. 21 at 75-78. Police records reflect that the lineup took place on August 31. Ex. 33

(PX14); Ex. 50 (PX62); Ex. 3 at 529-35. Three other participants in the lineup testified that it in

fact took place. Ex. 5 (Tr. 6/11/18) at 1011-1019, 1057-1062; Ex. 15 (Tr. 6/25/18) at 3702-21.

Lopez picked someone at this first lineup. Ex. 7 at 1653; Ex. 10 at 2449; Ex. 11 at 2463;

Ex. 21 at 80-83. He believes that he picked Rivera. *Id.* But Lopez did not pick Rivera. There

would have been a police report created had Lopez selected Rivera, but there is no such report.

---

[2]  The jury heard that Gang Crimes officers, not detectives, were the ones interacting with Lopez.
Ex. 8 at 1798. The 9/16 report, written by Guevara and Gawrys, lists Noon, Guzman, Sparks, and
Zacharias as the other officers who located Lopez. Ex. 22 (PX1A). Of these officers, the parties stipulated
that Fallon and Zacharias did not obtain the photo identification from Lopez, Ex. 8 at 1770, and Gawrys,
Noon, and Sparks denied involvement on the stand. Ex. 8 at 1886; Ex. 12 at 2719; Ex. 12 at 2765. The
only Gang Crimes officer who did not deny involvement was Guevara.

Ex. 3 at 548-554, 629-630. And Rivera was released shortly after August 31 the lineup, which

would not have happened had he been selected. Ex. 2 at 207-08; Ex. 4 at 704-12; Ex. 27 (PX7).

### F. Identifications By Valentin and Defendants' False Reports

On August 31, Letrich interviewed Valentin in the hospital. Ex. 37 (PX19B); Ex. 2 at

132-36. Valentin told Letrich that the shooter was an Imperial Gangster. Ex. 2 at 136. The

problem was that Defendants had already obtained Lopez's "identification" of Rivera, and

Rivera was affiliated with the Latin Kings street gang. Ex. 2 at 190-91. Letrich asked Valentin

whether he was sure that it had been an Imperial Gangster rather than a Latin King, to which

Valentin responded that he was sure. Ex. 2 at 136-137. According to Letrich, Valentin was quite

confident that Rodriguez was the person who shot him. Ex. 2 at 136-41.

When Valentin died on September 14, the case became a homicide. Ex. 35 (PX19) at

26-28; Ex. 8 at 1800-01. The next day, Rivera was arrested and charged. Ex. 23 (PX3); Ex. 8 at

1800-01. Defendants' 9/16 report, which summarized Rivera's purported guilt, related that

Guevara and Gawrys had secured a photo identification of Rivera from Valentin on September

10, shortly before his death. Ex. 22 (PX1A); Ex. 8 at 1704-06. There was no previous report of

this identification. Ex. 35 (PX19); Ex. 8 at 1705-07. When Defendants created and signed the

9/16 report, the veracity of Valentin's purported September 10 identification could not be tested

given that Valentin was by that point dead. Ex. 22 (PX1A); Ex. 42 (PX31A) at 1.

The report of Valentin's identification of Rivera was false in at least two respects. First,

even according to Gawrys's own testimony at trial, Valentin had not in fact identified Rivera as

reported. Instead, Gawrys testified that Valentin had made an "unreliable" identification of

Rivera. Ex. 8 at 1707-16. Yet the written report reflects nothing unreliable or even equivocal

about the purported identification. Ex. 22 (PX1A); Ex. 8 at 1715-16.

Second, by September 10, Valentin was effectively in a coma. According to Dr. Sharkey, his treating physician, and contemporaneous medical records, Valentin was not responsive, his neurological functioning was ceasing, he had no reaction to painful stimuli and his pupils did not react to light, and was on heavy doses of drugs that induced paralysis so that he would not involuntarily kick the breathing machine that was keeping him alive. Ex. 42 (PX31A); Ex. 20 (Designated Deposition Testimony of Dr. Arthur Sharkey) at 27-45; Ex. 7 at 1680; Ex. 8 at 1687, 1707-09. He could not have identified anyone on September 10, and did not identify a photo of Rivera at all (unreliably or not) on that day. Ex. 20 at 55-56, 175-178.

In sum, Defendants falsely reported Valentin's identification of Rivera, without reporting the true circumstances of that purported identification, and without reporting that previously Valentin had emphatically denied that a Latin King had shot him. None of these true circumstances were revealed until after Rivera's post-conviction proceedings or until after his exoneration. Ex. 4 at 763-772; Ex. 10 at 2243-51; Ex. 56 (PX269).

### G. The Second Lineup

On September 15, a second lineup was conducted. Ex. 40 (PX19G); Ex. 3 at 417. According to their report, detectives Dorsch and Boyle, who had not been involved in the investigation previously, asked Guevara and Gawrys for "assistance in locating the offenders in this incident along with known witnesses." Ex. 35 (PX19) at 26-28; Ex. 12 at 2682; Ex. 15 at 3543-44. Guevara and Gawrys brought Rivera in for a second lineup to be viewed by Lopez. Ex. 35 (PX19) at 9-10, 26-28; Ex. 8 at 1802-06. The evidence suggested that Guevara brought Lopez in as well. Ex. 21 at 75-78.

Once at the station, Lopez testified that he told a woman and a Latino police officer with glasses, an afro, and a mustache that Rivera was not the shooter—he was the "wrong guy." Ex. 7

at 1655-1657; Ex. 21 at 93-94. He also told them the shooter had been an Imperial Gangster. Ex. 59 (DX103) at 17; Ex. 60 (DX115) at 3. The Latino officer he told was Guevara. Ex. 43 (PX33); Ex. 12 at 2722-27; Ex. 3 at 580; Ex. 4 at 734-36. According to Lopez, Guevara would not accept his denial that Rivera was the shooter, and he instead told Lopez that the police would protect him if he went through with identifying Rivera. Unable to get Guevara to listen to him, Lopez felt he had no choice but to proceed with the identification of Rivera. Ex. 21 at 93-94, 100-01; Ex. 7 at 1656; Ex. 59 (DX103) at 8-12.

Reflecting on his treatment years later, Lopez testified that he was taken advantage of because of his age. Ex. 7 at 1674; Ex. 8 at 1907-10; Ex. 54 (PX260); Ex. 21 at 97-98; Ex. 59 (DX103) 8-12. He twice let slip that Defendants had told him who he should identify. Ex. 7 at 1677:23-78:13; Ex. 21 at 73:10-15. And he said he "cursed the police." Ex. 21 at 137:17-138:7.

### H.   The Purported Exclusion of Rodriguez

At the conclusion of their 9/16 report, Guevara and Gawrys added a final paragraph written on a different typewriter, showing that it was added after the rest of the report had been typed. Ex. 8 at 1830-55. That paragraph said that Lopez had been shown a photo of Rodriguez and had excluded him as the shooter. Ex. 22 (PX1A). Defendants needed to add this fact because the victim Valentin had identified Rodriguez. Ex. 37 (PX19B); Ex. 2 at 140. In fact, Lopez never made any such exclusion. Ex. 8 at 1845-52; Ex. 16 at 3950; Ex. 21 at 177.

### I.   Rivera's Criminal Trial

Rivera was prosecuted for murder in 1990. All of the misconduct described above was suppressed. Ex. 44 (PX35); Ex. 8 at 1395-1412, 1609-10; Ex. 13 at 3099-3114; Ex. 10 at 2243-51; Ex. 56 (PX269); Ex. 5 at 964-69, 977-78; Ex. 2 at 228. Also suppressed were the Chicago Police Department's investigative files for the Valentin homicide. Both prosecutors and

the defense requested all of the investigative files. Ex. 8 at 1375-84; Ex. 45 (PX39); Ex. 46 (PX40); Ex. 48 (PX43A); Ex. 13 at 3103-05, 3109-17. Neither prosecutors nor the defense received the complete investigative files. Ex. 56 (PX269); Ex. 10 at 2243-51; Ex. 8 at 1395-1412; Ex. 13 at 3099-3114. Documents contained in the investigative file but not turned over were introduced as Plaintiff's Exhibit 269 during trial. Ex. 56 (PX269). In addition to these suppressed file, none of the gang crimes notes or reports were turned over, with the exception of the 9/16 report. Ex. 56 (PX269).

There was very little evidence of Rivera's guilt at trial—there was no murder weapon, no motive, no incriminating statements, and no physical evidence. Ex. 44 (PX35); Ex. 2 at 224-35; Ex. 6 at 1385-86; Ex. 13 at 3080-81. Aside from the identification by Lopez, the only other witness of substance at trial was Guevara. At trial, Guevara was called to bolster Lopez's identification, and he did so by falsely confirming a fact never before reported during the investigation: Lopez took the stand and said that the shooter had a gold ponytail; and Guevara followed that testimony by testifying falsely that he knew Rivera to have a gold ponytail at the time he arrested Rivera in 1988. Ex. 44 (PX35); Ex. 2 at 226-30; Ex. 49 (PX58B); Ex. 6 at 1402; Ex. 16 (Tr. 6/26/18) at 3944-45; Ex. 13 at 3085-87. This was false. Rivera never had a gold ponytail in his life. Ex. 2 at 231-32; Ex. 6 at 1240-43. But faced with this new allegation, which was never previously memorialized and was raised for the first time at trial, Rivera could not prove definitively what his hair looked like two years before. Ex. 2 at 229-34; Ex. 6 at 1402.

On the basis of Lopez's and Guevara's testimony, Rivera was convicted of Valentin's murder and was sentenced to 80 years in prison. Ex. 44 (PX35); Ex. 2 at 239; Ex. 6 at 1412. Rivera spent 21 years in maximum-security prisons, under truly horrific conditions. Ex. 2 at 248-94. He suffered terribly, in large part because his family was torn apart, and he missed the

entire childhoods of his young children, two of whom testified at trial. Ex. 2 at 294-302; Ex. 9 at 2145-56; Ex. 12 at 2791-2814.

**J.    Rivera's Exoneration, Certificate of Innocence, and Civil Suit**

Years after Rivera was sent to prison, Lopez told his pastor the role he had played in Rivera's wrongful conviction. Ex. 15 at 3736-38. In 2010, two investigators working with the Center on Wrongful Conviction at Northwestern University School of Law—Jennifer Linzer and Cynthia Estes—showed up at Lopez's door in Ohio and asked him open-ended questions about his identification of Rivera. Ex. 8 at 1901-05; Ex. 15 at 3646-48. Without prompting, Lopez broke down and explained that he had told the police that Rivera was not the shooter, but they would not listen to him. Ex. 8 at 1903-08, 1927-28.

With assistance of attorneys at the Center on Wrongful Convictions, Rivera's petition for post-conviction relief based on newly discovered evidence was granted. Ex. 8 at 1913; Ex. 15 at 320, 346. The state dropped the charges, and Rivera was released from prison. Ex. 8 at 1914; Ex. 3 at 320, 346-47. He was awarded a certificate of innocence. Ex. 3 at 352. He then filed this suit seeking redress for violations of his constitutional rights. Doc. 1. After a lengthy trial, a jury found the City of Chicago, Guevara, Gawrys, and Mingey liable, and awarded Rivera more than $17 million in damages. Doc. 678. Additional evidence introduced at trial relevant to Defendants' particular arguments is discussed below.

## II.    DEFENDANTS HAVE FORFEITED MANY OF THEIR ARGUMENTS

Before addressing the merits, it is important to stress that Defendants have forfeited many of the arguments they now present. These forfeitures are discussed in response to particular arguments below, while several categorically forfeited arguments are discussed here.

A.      **Most of Defendants' Rule 50(b) Arguments Are Forfeited Because They Were Not Included In Their Respective Rule 50(a) Motions**

Rule 50(b) motions are limited to factual and legal arguments developed in earlier Rule 50(a) motions. *Wallace v. McGlothan*, 606 F.3d 410, 418-19 (7th Cir. 2010); *Jimenez v. Chicago*, 877 F. Supp. 2d 649, 672 (N.D. Ill. 2012). A large number of Defendants' Rule 50(b) arguments are forfeited because they were absent from their Rule 50(a) motions.

Guevara and Mingey filed a two-paragraph Rule 50(a) motion, presenting a single, conclusory argument that the evidence could not support a verdict because the only evidence against them was their invocation of the Fifth Amendment. Doc. 665 at 1. They also purported to "adopt" their prior briefing and the briefs of other Defendants. *Id.* But references to earlier briefs are insufficient to preserve Rule 50 issues. *Empress Casino v. Balmoral Racing*, 831 F.3d 815, 823 (7th Cir. 2016). And as this Court ruled post-trial, Guevara and Mingey made no effort in their Rule 50(a) motion to discuss the factual record at trial *as it applied to them*, and thus they forfeited any argument set out in their co-Defendants' Rule 50(a) motion. Doc. 676 at 6 (citing *Williams v. Dieball*, 724 F.3d 957, 961 (7th Cir. 2013)).

Guevara and Mingey now attempt to avoid their forfeiture by joining with Gawrys in a combined Rule 50(b) motion. Doc. 711. But the following arguments presented in that combined Rule 50(b) motion were never presented by Guevara or Mingey in any Rule 50(a) motion and are forfeited: (1) all arguments advanced by Guevara and Mingey that the evidence was insufficient to support the due process verdict against them;[3] (2) their argument relating to the conspiracy and failure to intervene verdicts, Doc. 711 at 13; (3) Guevara's argument relating to the

---

[3] Including the arguments: that Mingey was not part of the investigation in August 1988, Doc. 711 at 6 & 10; that Guevara was not present for any identification on August 27, *id.* at 6-9; that Guevara did not order the Rivera rap sheet on August 27, *id.* at 9; that the first lineup on August 31 was not exculpatory, *id.* at 9-10; that Mingey was not present for the September 15 lineup or Lopez's statement that Rivera was not the shooter, *id.* at 10; and that Guevara did not understand what Lopez meant when he said Rivera was not the shooter, *id.* at 11-12.

10

intentional infliction of emotional distress verdict, *id.* at 14; and (4) Guevara's argument that he is entitled to qualified immunity, *id.* at 14-15.[4]

### B.      All Arguments Relating to the 9/16 Report Are Forfeited

All Defendants forfeited any argument relating to the 9/16 report. The only statement about that report is contained in a single-sentence footnote of the individual Defendants' Rule 50(b) motion. Doc. 711 at 5 n.1. To the extent this footnote is even an argument, the discussion is so undeveloped that the point is forfeited. *Arlin-Golf v. Arlington Heights*, 631 F.3d 818, 822 (7th Cir. 2011).[5] Compounding the forfeiture is the fact, noted by the Court post-trial, that all arguments that the 9/16 report should have been limited as evidence were forfeited when Defendants decided not to request a jury instruction on that subject. Doc. 676 at 6 & n.2. In sum, Defendants do not and cannot argue that the 9/16 report was insufficient to sustain the verdict against them, and they have therefore completely ignored important evidence that would independently justify denying their post-trial motions.

### C.      Other Arguments Not Raised By Defendants Are Forfeited

Finally, arguments not addressed by Defendants in their motions at all are now waived and cannot be raised for the first time in reply. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011); *Kelso v. Bayer*, 398 F.3d 640, 643 (7th Cir. 2005); *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). This rule is elementary, but it is important to highlight some of the items unaddressed by Defendants in their briefs: (1) Defendants do not preserve any challenge to the damages

---

[4] Guevara and Mingey also forfeited any argument that the due process verdict could not be based on their 9/16 report, *see* Ex. 22 (PX1A), by failing to discuss that report in their Rule 50(a) motion, *see* Doc. 665 at 1. But all Defendants have also forfeited any argument about the 9/16 report by failing to present any argument post-trial, as discussed next.

[5] Moreover, the footnote misstates the Court's summary judgment ruling, saying that the Court dismissed any due process theory based on the 9/16 report, 711 at 5 n.1, when in fact the Court merely dismissed any *fabrication* theory based on the *falsified Valentin identification* reflected in that report—an identification that was not admitted a Rivera's criminal trial, *see Rivera v. Guevara*, 2018 WL 2183998, at \*22-23, 46 (N.D. Ill. May 11, 2018); *accord* Doc. 528.

award; (2) the individual Defendants do not properly preserve any challenge to the jury

instructions;[6]  (3) the individual Defendants only address three due process theories presented at

trial in their motions,[7]  and they ignore the numerous additional theories discussed in this

response, forfeiting any argument about those additional theories entirely; (4) the individual

Defendants also limit any argument about the conspiracy, failure to intervene, and intentional

infliction of emotional distress verdicts to the bald assertion that those verdicts cannot stand if

the due process verdict is set aside, Doc. 711 at 13-14, and all other challenges they might have

raised relating to those claims are forfeited; (5) Guevara's claim of qualified immunity—again,

to the extent that it is even preserved—is limited exclusively to Lopez's statement to Guevara

that Rivera was not the shooter, Doc. 711 at 14-15; and (6) Defendants do not challenge the

Court's Rule 404(b) rulings. The Court should refuse to entertain new arguments raised in reply.[8]

## III.    DEFENDANTS' RULE 50(B) CHALLENGES LACK MERIT

Defendants seek judgment as a matter of law under Rule 50(b) and can prevail only if no

rational jury could have found for Rivera. *Bogan v. Chicago*, 644 F.3d 563, 572 (7th Cir. 2011).[9]

The Court construes the evidence strictly in Rivera's favor, it "does not make credibility

determinations or weigh the evidence," and it "must disregard all evidence favorable to the

moving party that the jury [was] not required to believe." *Passanati v. Cook County*, 689 F.3d

655, 659 (7th Cir. 2013). Such challenges face a "daunting task, given the deferential standard

---

[6]  Jury instruction issues raised by the City, and the individual Defendants' forfeiture of jury
instruction arguments, are discussed in Part VI, below. *See infra* at 119.

[7]  The individual Defendants' arguments are limited to the August 27 photo show up with Lopez,
the first lineup, and Lopez's September 15 statement that Rivera was the "wrong guy." Doc. 711 at 5-13.

[8]  Addition forfeitures by the City are discussed below. *See infra* at 78.

[9]  The City's Rule 50(b) and 59 motions substantially overlap when it comes to its discussion of
theories of municipal liability. *Compare* Doc. 707, *with* Doc. 708. Accordingly, the City's arguments
about the *Monell* claims are discussed collectively in Part V below. *See infra* at 78. Arguments in the
City's Rule 50(b) motion that do not pertain to municipal liability are discussed here in Part III.

that applies to such reviews." *Cruz v. Cicero,* 275 F.3d 579, 586 (7th Cir. 2001). Defendants

cannot satisfy this stringent standard on any of the claims.

> **A.      The Evidence Firmly Supports the Verdict on Rivera's Due Process Claims Against the Individual Defendants**

Much of the evidence supporting the jury's verdict for Rivera on his due process claims

against the individual Defendants is not even acknowledged, much less addressed, in their

post-trial motions. Consistent with the discussion of forfeiture above, there are whole categories

of evidence that independently support the jury's due process verdicts that Defendants ignore

entirely. Regardless, there is ample evidence supporting the jury's verdict.

> **1.      Legal Standard**

The Court properly instructed the jury on two ways in which Rivera could establish a

section 1983 due process violation. First, it violates due process to withhold exculpatory or

impeachment evidence that is material to the criminal case. *Kyles v. Whitley*, 514 U.S. 419, 438

(1995); *Whitlock v. Brueggemann*, 682 F.3d 567, 572 (7th Cir. 2012); *Dominguez v. Hendley*,

545 F.3d 585 (7th Cir. 2008); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001); *Jones v.

Chicago*, 856 F.2d 985 (7th Cir. 1988). Second, "'a police officer who manufactures false

evidence against a criminal defendant violates due process if that evidence is later used to

deprive the defendant of [his] liberty in some way.'" *Avery v. Milwaukee*, 847 F.3d 433, 439 (7th

Cir. 2017) (citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)); *Fields v. Wharrie*, 740 F.3d

1107, 1112 (7th Cir. 2014) (*Fields II*); *Whitlock*, 682 F.3d at 580.

The Supreme Court recently reaffirmed that "[e]vidence qualifies as material when there

is any reasonable likelihood it could have affected the judgment of the jury." *Wearry v. Cain*,

136 S. Ct. 1002, 1006 (2016) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Napue

v. Illinois*, 360 U.S. 264, 271 (1959)) (internal quotations omitted). Defendants here attack the

items of suppressed or fabricated evidence piece by piece, but the Supreme Court has stressed

that materiality must be assessed by considering all suppressed or fabricated evidence together in

the aggregate, and not piece by piece. *Wearry*, 136 S. Ct. at 1007. At the same time, whether

evidence is materials depends on the strength of other evidence used in the criminal case, so in

cases where there is scant evidence of guilt, as was the case at Rivera's trial, it takes less for the

suppressed or fabricated evidence to be deemed material. *United States v. Agurs*, 427 U.S. 97,

113 (1976). By limiting their argument to a subset of the evidence in Rivera's criminal case,

Defendants miss that the central thrust of Rivera's due process claim is that Defendants

fabricated an entire case against Rivera out of whole cloth.

### 2. The Record Amply Supports the Due Process Verdicts

Evidence supporting one of multiple theories of liability against Guevara, Gawrys, and

Mingey is sufficient to sustain the jury's due process verdict against them. *Thomas v. Cook*

*County*, 604 F.3d 293, 305 n. 4 (7th Cir. 2010) (citing *Griffin v. United States*, 502 U.S. 46, 60

(1991)); *Kossman v. Northeast Illinois R.R. Corp.*, 211 F.3d 1031, 1037 (7th Cir. 2000). The

evidence at trial established at least a dozen separate bases for the due process verdict, each one

of which would be independently sufficient. When these bases are considered together, and in

light of the relative weakness of the criminal case against Rivera, as the law requires, there is

overwhelming support in the record for the due process verdict.

*(a) The August 27 Photo Show Up with Orlando Lopez*. As discussed, all of the written

reports state that Lopez first identified Rivera by picking his photograph from among many

choices in a set of gang mugbooks on August 29. The state's theory of the case was always that

Rivera only became a suspect because Lopez stopped on his photograph and told the officers that

Rivera was the shooter. No one could explain, however, why Rivera's rap sheet and photo were

pulled on August 27, two days before the official gang book identification reported on August 29. Nor could Guevara explain what business he had showing Lopez a photo of Rivera in Lopez's kitchen on August 27, an event that is completely "off the paper." *See supra* at 2.

At trial, Defendants tried to avoid the problem of the August 27 photo show up both by denying that they had shown Lopez a photograph of Rivera on August 27, and by arguing that their August 29 gang mugbook identification had actually taken place on August 27. They argued that all of the written records showing that the mugbook identification had happened on August 29 were typographical errors, and that the various authors of those reports meant to write August 27, but mistyped the date. Ex. 4 at 689-90, 751-52, 820-24, 927-37; Ex. 8 at 1742-51. In order to accept that theory, the jury would have had to believe that there were three identical typos on the same subject in the reports—in the 9/16 report, Ex. 22 (PX1A), and on two separate pages of McLaughlin's August 29 report, Ex. 35 (PX19) at 29-30; that McLaughlin had omitted the discussion of the mugbook procedure from her report written August 27, Ex. 35 (PX19) at 31-33; and that Defendants had waited three days to arrest Rivera on August 30, Ex. 25 (PX5).

The jury was free to disbelieve that testimony. *Harvey v. Office of Banks*, 377 F.3d 698, 712 (7th Cir. 2004) ("[If there is] evidence from which the jury may reasonably infer that the proffered reasons are not truthful, the case turns on the credibility of the witnesses[, and courts] will not second-guess a jury on credibility issues."); *Emmel v. Coca-Cola*, 95 F.3d 627, 633-34 (7th Cir. 1996). Indeed, it was more than reasonable for the jury to conclude that Guevara had showed Lopez the mugshot of Rivera on August 27, two days before the official gang book identification on August 29, thereby putting the lie to Defendants' official story that Rivera was properly identified from among many photos in a mugbook.

To be sure, some of this conclusion relied on inferences that had to be proved with circumstantial evidence, but that is hardly unusual given the type of misconduct at issue. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."). The manipulation on August 27 occurred in a room outside the presence of Plaintiff or anyone affiliated with his side. And while Lopez's testimony might have provided some support for the version of the facts the Defendants now ask the Court to adopt, Lopez qualified that testimony by explaining that because he was a child when these events occurred more than 25 years before, he "can't really tell you" details, which he proceeded to try to do anyway in response to questioning. *See* Doc. 711 at 8 (quoting Doc. 580-1, at 72-73).

When faced with conflicting, or even inconsistent testimony, the jury is free to believe one side over another. *Thomas*, 604 F.3d at 302; *see also Taylor v. Bradley*, 448 F.3d 942, 951 (7th Cir. 2006); *Allen v. CTA*, 317 F.3d 696, 703 (7th Cir.2003). Lopez's account notwithstanding, there was ample circumstantial proof that would have permitted the jury to infer Lopez had been manipulated on August 27, when he was shown a mugshot of Rivera, and that this manipulation was the reason for the mugbook identification. This included: Lopez said that Defendants took advantage of his youth, Ex. 7 at 1674; Ex. 8 at 1907-10; Ex. 54 (PX260); Ex. 21 at 97-98; he said his youth rendered him vulnerable to manipulation, Ex. 59 (DX103) at 8-12; Ex. 7 at 1656, 1674; Ex. 8 at 1907-10; Ex. 54 (PX260); Ex. 21 at 93-101; Defendants had no explanation for why they pulled Rivera's rap sheet and photo on August 27, when there was no mention of Rivera in any of their police records until August 29, Ex. 22 (PX1A); Ex. 25 (PX4); Ex. 32 (PX12); Ex. 51 (PX66); Ex. 4 at 576-77, 674-75; 681-99, 816-17, 931-35; Ex. 6 at 1278-79, 1296, 1324; Ex. 7 at 1648-1657; Ex. 8 at 1736-50, 1763-64; Ex. 11 at 2509; Ex. 12 at

2760; contrary to procedure, Defendants took no notes and created no reports relating to any interaction with Lopez on August 27, Ex. 35 (PX19); Ex. 4 at 678-83, 932-33; Ex. 8 at 1731-33, 1756-68; no police officer even mentioned that any identification procedure had taken place on August 27, until the rap sheet with the August 27 dates stamp materialized during Rivera's post-conviction case, Ex. 35 (PX19) at 9-10, 29-30; Ex. 4 at 766, 771-72; Ex. 9 at 2202-04; Sparks's testimony put Guevara in the kitchen with Lopez on August 27 when an identification was supposedly made, Ex. 12 at 2765-70; four police witnesses present in the Lopez home on August 27 denied being in the room with Guevara and Lopez when the purported photo was shown, Ex. 8 at 1768-71; Ex. 11 at 2692; Ex. 12 at 2765-66; Lopez had been by the store, nearly 200 feet from the shooting, at the time he saw the shooter and thus could not legitimately have made any identification, Ex. 35 (PX19) at 53; all parties agreed that Rivera had nothing to do with the Valentin shooting, Ex. 17 at 4149-4150, 4251, making it highly coincidental that Lopez would have picked Defendants' suspect from the mugbook, Ex. 8 at 1746-47; Ex. 6 at 1301-02; Ex. 11 at 2482-83; the 9/16 report states that Defendants showed Lopez a single photo of another suspect, Rodriguez, in contravention of rules requiring that the witnesses identify suspect photos from among multiple pictures, Ex. 22 (PX1A); Ex. 5 at 1143-44, 1165-66; Gawrys, Sparks, Spratte, Wells, and Defendants' own expert Wixted testified that child witnesses can be steered toward a suspect's photograph without even realizing that they had not made the selection themselves, Ex. 8 at 1729-31; Ex. 5 at 1098-99, 1109-1110; Ex. 12 at 2767-2768; Ex. 14 at 3411-14; Ex. 16 at 4018; and, importantly in light of all of this evidence, Guevara declined to deny that he steered Lopez to the photo of his suspect, Ex. 6 at 1301-05, and both Guevara and Mingey pleaded the Fifth in response to all questions about what occurred on August 27 and 29, Ex. 6 at 1277-79; Ex. 11 at 2486-87, 2508-10.

This circumstantial evidence was more than sufficient to permit the conclusion that

Guevara fabricated the Lopez identification with a photo show up on August 27, and that all of

the Defendants suppressed that photo show up and the fact that Rivera's rap sheet and mugshot

were pulled on August 27—a suppression that was accomplished in part by creating the false

9/16 report covering up what had actually happened. *Avery*, 847 F.3d at 443-44 (finding

suppression and fabrication due process violations in these circumstances); *Newsome v. McCabe*,

319 F.3d at 302-05 (holding that "the details about how [the police] induced the witnesses to

finger Newsome" was "information vital to probe whether manipulation occurred"). If parties

were not permitted to disprove certain testimony with circumstantial evidence, it would be

impossible to win a point such as this one where the wrongdoing happened behind closed doors.

The law, however, puts indirect proof on equal footing, and trusts juries to draw reasonable

inferences. *Sylvester v. SOS Children's Villages Illinois*, 453 F.3d 900, 902-03 (7th Cir. 2006)

(explaining direct and circumstantial evidence have equal probative value).

Defendants' final argument is that Rivera cannot establish Guevara's involvement in the

August 27 show up and later cover up because, at trial, Sparks attempted to retract his prior

deposition testimony that Guevara had been alone with Lopez in another room of the house on

August 27 when an identification of Rivera supposedly occurred. Ex. 12 at 2765-70. According

to Sparks' trial testimony, his memory had improved since his deposition, and he came to believe

that his prior testimony was "mistaken." *See* Doc. 711 at 7 (citing Ex. 12 at 2768-70). Leaving

aside that Sparks could not explain what recently made his memory improve regarding a single

event more than 20 years before, Ex. 12 at 2760, 2769, the jury was not required to accept a

former-Defendant police officer's attempt to fall on the sword for his colleague, and the jury

could have instead credited his original testimony. *United States v. Patterson*, 23 F.3d 1239,

1244 (7th Cir. 1994) ("The jury is the final arbiter of questions pertaining to which witnesses to believe, and which part of those witnesses' testimony to believe.").

(b) *Valentin's Identification of Rodriguez*. On August 31—two days after Lopez supposedly identified Rivera in the August 29 mugbook procedure—the victim Valentin told Letrich that the person who shot from point-blank range was an Imperial Gangster, a gang with which Rivera was not affiliated. Ex. 37 (PX19B); Ex. 2 at 136-141; Ex. 2 at 217-219. Seeing the problem this would cause, Letrich testified that he asked Valentin whether he was sure it was not a Latin King, and Valentin confirmed that the shooter was not a Latin King, a street gang with which Rivera *was* affiliated. Ex. 2 at 136-37, 183-84. The victim's statement that the shooter was not a Latin King was never written in any report or disclosed in any other way. Ex. 2 at 145-46; Ex. 37 (PX19B); Ex. 35 (PX19) at 58-59. Evidence from the victim that the shooter was not affiliated with the gang of which Rivera was a part is alone exculpatory, and it could have been used to impeach Lopez. *See Kyles*, 514 U.S. at 445-50; *Jones*, 856 F.2d at 995.

What was disclosed from the August 31 interaction with Letrich is that Valentin identified an Imperial Gangster named Jose Rodriguez as his shooter. Ex. 37 (PX19B). Rodriguez was arrested. Ex. 35 (PX19) at 58-59. But documents suppressed in the investigative file noted that police were preparing to charge Rodriguez with the Valentin shooting. Ex. 35 (PX19) at 59. Those suppressed documents were also exculpatory. *Kyles*, 514 U.S. at 445-50.

Moreover, there are no reports or notes in the file memorializing interviews with Rodriguez about the crime. Ex. 35 (PX19); Ex. 2 at 177-78; Ex. 3 at 564-68. The testimony at trial was that detectives relied on Gang Crimes officers to conduct interviews of gang member suspects. Ex. 3 at 574-580, 916-17. In addition, as discussed in greater detail below, gang crimes officers considered themselves exempt from report-writing and note-taking requirements. Ex. 14

at 3349-54, 3360-64. The jury could also reasonably conclude that the interviews with alternative suspect Rodriguez, had they been memorialized, would have been exculpatory or at minimum could have been used to impeach Guevara and Lopez at trial. *Goudy v. Basinger*, 604 F.3d 394, 398-401 (7th Cir. 2010). Again, this is particularly so given that suppressed evidence is considered cumulatively. *Wearry*, 136 S. Ct. at 1007.

    *(c) The First Lineup*. It was undisputed at trial that Lopez viewed and Rivera stood in a lineup conducted in the Valentin investigation on September 15. Ex. 3 at 417; Ex. 8 at 1802-03, 1807. It was also undisputed that if there had been an earlier lineup, shortly after the shooting, at which Lopez had picked someone other than Rivera, then that was information that had to be disclosed to the criminal justice system. Ex. 8 at 1774-79; Ex. 5 at 978-84. Given that this was a "single finger" criminal case, the revelation that the lone eyewitness had picked someone other than Rivera at a first lineup would have ended the prosecution. Ex. 13 at 3100-02; *Giglio*, 405 U.S. at 153-54; *see also Smith v. Cain*, 565 U.S. 73, 75 (2012).

    Defendants denied that any such first lineup occurred, but there was strong evidence otherwise. Rivera testified that on August 31, the day after his arrest, he stood in a live lineup (he was asked to come forward, turn to the left and right, etc.). Ex. 2 at 205-06. Three of the fillers in that lineup—Ruiz, Villafane, and Olivero—confirmed the same thing, and Villafane and Olivero both testified that they recalled the event clearly because it was the only time in their lives that they were asked to participate in a lineup procedure by the police. Ex. 5 at 1011-19, 1057-61; Ex. 15 at 3711-21. Lopez himself confirmed that he participated in two lineups—not one—with the first occurring shortly after the shooting. Ex. 7 at 1651; Ex. 21 at 178. Hold papers for Rivera and Rodriguez were submitted, which stated that they were being held for a live lineup. Ex. 35 (PX19) at 57, 59. A GPR listed the names of all participants in the lineup and the August 31 date

of the lineup. Ex. 35 (PX19) at 64. Photographs depicted each of the participants in the lineup against the same background at the police station. Ex. 50 (PX62). A jury plainly could conclude that the lineup occurred, and that Defendants' contention that they had not conducted a lineup because they could not find the eyewitness Lopez was not credible and in fact was false.

Defendants' reports state that the first lineup never occurred because they were not able to locate Lopez. Ex. 39 (PX19F). The jury was entitled to disbelieve that explanation, given the evidence just discussed and because: (1) Lopez was a 12 year old living with his parents, Ex 4 at 631-32, 698; Ex. 6 at 1309; Ex. 10 at 2449; Ex. 11 at 2463; Ex. 21 at 28-29; (2) Guevara and Gawrys readily located Lopez for their September 15 lineup, Ex. 6 at 1304-16; Ex. 11 at 2540-41; and (3) police testified that they would not have gone to the trouble to set up a lineup and get fillers, as they did here, unless the eyewitness had been available, Ex. 3 at 623-28.

The fact that the first lineup occurred is also supported by the evidence at trial showing that documents memorializing the lineup were suppressed in an investigative file that was never turned over to the criminal justice system. Rivera knew he had stood in a first lineup, but the GPR and hold forms discussing that lineup were suppressed in the investigative file that was never turned over. Ex. 2 at 205-06; Ex. 6 at 1387-89; Ex. 56 (PX269). The only document in the official file was the police report asserting that the lineup could not be completed. Ex. 39 (PX19F). Without this additional evidence that Rivera stood in a first lineup during the Valentin investigation, neither prosecutors nor Wadas could determine whether there was a first lineup in the case. Ex. 6 at 1399, 1422-23; Ex. 13 at 3100-03, 3131-32.

Defendants contend that the first lineup (which they say did not happen) was not exculpatory because Lopez believes he selected Rivera in that lineup. Ex. 21 at 80; Ex. 7 at 1653. But as discussed above, there was ample evidence that, whomever Lopez picked, it was not

Rivera. *See supra* at 4. Moreover, as discussed below, as a matter of policy, the City did not

document the result of lineups where a filler was picked instead of a suspect. Ex. 5 at 966-1005,

1095-1111; Ex. 52 (PX150). In cases like this one, where a witness selected a filler, Chicago

police either reported that no identification had been made or, as here, made no report at all. Ex.

5 at 997-98, 1002-09; Ex. 52 (PX150). Lopez's selection of a filler in the first lineup, and the fact

that no report was made of the result of that lineup, was thus consistent with Chicago Police

policy. In sum, it was reasonable for the jury to believe Lopez that he had seen multiple lineups

in the Valentin investigation, but decline, based on other evidence, to accept his belief that the

person he had picked in the first lineup was Rivera. *Kadia v. Gonzales*, 501 F.3d 817, 821 (7th

Cir. 2007) (rejecting "the discredited doctrine of *falsus in uno, falsus in omnibus* (false in one

thing, false in all things)"); *Branion v. Gramly*, 855 F.2d 1256, 1263 (7th Cir. 1988) (noting that

"[s]elective disbelief, however, is an ordinary incident of trial").

     The fact that an undisclosed first lineup was viewed by Lopez in the Valentin

investigation that did not lead to Rivera being charged is exculpatory without the need for

additional information. *Giglio*, 405 U.S. at 153-54; *see also Smith*, 565 U.S. at 75. Separately,

due process was violated when Defendants suppressed the documents that would have allowed

Rivera to show the lineup had taken place. *Avery*, 847 F.3d at 443-44.[10] Finally, Lopez's

selection of a filler from the first live lineup is both exculpatory evidence, and a fact that could

have been used to fatally undermine Lopez's testimony at trial. *Fields*, 672 F.3d 505, 517 (7th

Cir. 2012) (*Fields I*) ("The constitutional violation occurs when the means by which the

---

[10]  For reasons similar to those discussed in *Avery*, Defendants' argument that *Brady* was not
implicated because Rivera and his attorney knew that Rivera had stood in an earlier lineup during the
Valentin investigation misses the point. The problem for Rivera is that he lacked the ability to prove the
lineup had taken place, and the Defendants had in their possession evidence showing that it had. *Avery*,
847 F.3d at 443-44.

testimony was acquired are not disclosed at trial—or when other information that impeach the testimony's reliability are not shared with the defense."); *Newsome*, 319 F.3d at 302-05.

*(d) Lopez Tells Guevara That Rivera Is the Wrong Guy.* Lopez originally told police that he was "by [the] store" when he saw the Valentin shooting. By all accounts, that would have been too far away to see the shooter, and Lopez could not provide any meaningful physical description of what the shooter looked like. *See supra* at 1. Yet, as of August 29, Lopez had supposedly identified Rivera—someone who was both an innocent person and Defendants' suspect—as the perpetrator. *See supra* at 2.

Following the first lineup, investigation ceased entirely until Valentin died on September 14. The next day, Guevara and Gawrys put together a second lineup. Ex. 22 (PX1A); Ex. 35 (PX19) at 26-28, 45, 48-51; Ex. 8 at 1699, 1802-06; Ex. 12 at 2672-73, 2689-93; Ex. 15 at 3536-37, 3567-68. Contrary to Gawrys's assertion that he was not involved in the second lineup, Gawrys appears on multiple police reports in connection with that lineup, and there was no real dispute at trial that Gawrys was actively participating in the investigation with Guevara and under Mingey's supervision on September 15.

Lopez was brought in for the lineup without his parents. Ex. 7 at 1652; Ex. 8 at 1927. Before the lineup, he told a female and a male Latino police officer with an afro, mustache, and glasses that Rivera was the "wrong guy," Ex. 7 at 1655-57; Ex. 21 at 93-96, he told them he did not want to identify Rivera, Ex. 7 at 1656; Ex. 59 (DX103) at 8-12, and he told them that the shooter had been an Imperial Gangster, Ex. 59 (DX103) at 17; Ex. 60 (DX115) at 3. According to Lopez, they would not hear it, and because he was 12 and feeling pressure to do something about a friend's murder, he did the lineup and "identified" Rivera. Ex. 21 at 100-01.

No one disputes that a statement from the sole eyewitness that Rivera was the "wrong guy" is exculpatory and impeachment evidence, and that suppression of that information would plainly violate due process. *Smith*, 565 U.S. at 75. In addition, Defendants properly concede that "there was inferential evidence the jury could believe that [Guevara] was the cop Lopez testified was present during the 'recant.'" Doc. 711 at 11.[11] That concession warrants denial of Guevara's post-trial motion, without any need to even consider his assertion of the Fifth Amendment.

Though Defendants refused to testify about this interaction with Lopez themselves, their lawyers now write on their behalf that, when Lopez told Guevara, "That's not the person. The wrong guy, wrong guy, wrong guy," it was not obvious to Guevara what Lopez meant. *See* Doc. R. 711 at 11 (citing Doc. 580-1 at 96-97) (Lopez testifying that he said "That's not the person. The wrong guy, wrong guy, wrong guy. . . . I just said it was the wrong guy, wrong guy."); *see also* Ex. 21 at 93-94 ("[I]t's the wrong guy. It's the wrong guy."). In fact, Defendants considerably overstate any rational view of the evidence, arguing, "Lopez's testimony was clear and unequivocal that neither the white haired lady nor the cop understood the import of what Lopez was trying to say." R. 711 at 12. There is no such clear and unequivocal evidence supporting Defendants' position. The testimony showed the exact opposite, and Guevara never contended that what Lopez had said was ambiguous because he refused to testify about the conversation in the first place. Ex. 6 at 1316, 1321; Ex. 9 at 2124-25; Ex. 11 at 2540-42.[12]

---

[11] At trial Defendants and every other police witness went to great lengths to keep the jury from seeing a photo of Guevara taken around the time of the Valentin investigation, and they all testified that they could not remember whether Guevara had an afro, mustache, or glasses at time. Ex. 4 at 734-36; Ex. 11 at 2472-76; Ex. 6 at 1320; Ex. 11 at 2498-99. Everyone could see that Guevara, who took the stand and sat in the courtroom throughout trial, fit the description. And Rivera was eventually able to establish through Noon that Guevara in fact had an afro, mustache, and glasses at the time of the Valentin investigation, and he introduced a photo of Guevara from the time. Ex. 12 at 2722-27; Ex. 43 (PX33).

[12] Moreover, the conclusion that Guevara understood exactly what Lopez was saying is corroborated by Lopez's statements that Guevara would not accept what he had to say. Ex. 7 at 1656, 1674; Ex. 8 at 1907-10; Ex. 54 (PX260); Ex. 21 at 93-101; Ex. 59 (DX103) at 8-12. Because Linzer and

What Defendants are really arguing (in the absence of any evidence) is that, in their view,
Lopez's testimony could have permitted an inference that Guevara might not have understood
the words that Lopez said. The problem with that argument, of course, is that it depends on an
implausible inference drawn in the wrong direction. *Reeves v. Sanderson Plumbing*, 530 U.S.
133, 150-51 (2000). At this stage, the court does not look for some alternative inference that
might exonerate Guevara. The only question is whether, when Lopez testified that he told
Guevara that Rivera was the "wrong guy," a reasonable jury could have concluded that Guevara
understood Lopez to be saying that Rivera was not the perpetrator. The answer is easy: that was
really the only reasonable conclusion available to the jury.

*(e) The 9/16 Report*. As discussed, Defendants forfeited any argument that the 9/16 report
fails to support the due process verdicts by failing to address that report in their briefs. *See supra*
at 5. They are also incorrect in their assertion that the Court excluded that entire report as a basis
for the jury's verdict, and they failed to request a jury instruction on that issue regardless. *See
supra* at 11 & n.5. Though the Valentin "identification" of Rivera was never introduced in the
criminal case and therefore cannot itself be the basis of a fabrication theory, that "identification"
certainly can form the basis of a *Brady*-type due process theory. In addition, there is more in the
9/16 report—apart from the "identification"— that supports the due process verdict.

First, as the prosecutor Victorson acknowledged, evidence that Defendants lied in their
summary report of the investigation when they wrote that Valentin had identified Rivera on
September 10 is evidence that could have been used to impeach Guevara at trial, where Guevara
was one of the State's two substantive witnesses against Rivera. *Giglio*, 405 U.S. at 153-54; *see*

---

Estes obtained this information from Lopez years later and by asking only open-ended questions, it was
credible information that the jury could rely upon. In fact, Defendants' own expert Wixted testified that
Lopez's recollection of communicating that Rivera was the "wrong guy" had the hallmarks of a valid
memory. Ex. 16 at 4003-05, 4041, 4049.

*also Smith*, 565 U.S. at 75. Defendants claimed that they got an identification of Rivera from Valentin on a day that Valentin was essentially comatose. Ex. 42 (PX31A); Ex. 20 at 27-45, 55-56, 175-178. There were no contemporaneous notes or reports of this purported identification. Ex. 8 at 1704-07, 1714-17, 1799-1800. Nor was Rivera arrested after the victim supposedly identified him. Ex. 8 at 1799-1806, Ex. 22 (PX1A). Instead, the day after Valentin died, Defendants issued a report recounting the alleged identification for the first time. Ex. 22 (PX1A); Ex. 8 at 1800; Ex. 42 (PX31A) at 1. When asked at trial, Gawrys did not even deny that Valentin had been unconscious at the time of the purported identification, and instead claimed he did not recall either way. Ex. 8 at 1708; Ex. 9 at 2132. He also claimed multiple times that he must have mistyped the date of the visit with Valentin, Ex. 8 at 1706, 1710-11, before he later tried to walk that testimony back, Ex. 8 at 1712-13; Ex. 9 at 2130-31.

The jury was reasonable to conclude that the identification had not taken place, and that Defendants had fabricated a false police report in order to implicate Rivera in the crime. Evidence of this fabrication could have been used to impeach the testimony of Guevara at trial. *Avery*, 847 F.3d at 443-44. Indeed, the prosecutor Victorson acknowledged that, had he been told that the part of the 9/16 report about the Valentin "identification" was a fabrication, he would have had to disclose that to the criminal defendant. Ex. 13 at 3106-07.

Second, perhaps anticipating that the falsity of the Valentin "identification" was going to be obvious to the jury, Gawrys took the stand and changed his story from the official version in the 9/16 report. At trial, Gawrys admitted that Valentin had not made an identification of Rivera, and he contended that Valentin had instead made an "unreliable" identification of Rivera. Ex. 8 at 1707-08, 1714-16, 1799. But Defendants wrote a report that made no mention of the fact that Valentin could not make a reliable identification of Rivera. Ex. 22 (PX1A); Ex. 8 at 1715-16.

Guevara and Mingey, of course, denied none of this. Ex. 22 (PX1A); Ex. 6 at 1310-14; Ex. 11 at

2488-90. When asked, Gawrys had no explanation for why he misrepresented Valentin's

identification as a valid identification, when he knew it was not. Ex. 8 at 1709. He tried to justify

the lie in the report by saying, "It's just mistyped on my part." Ex. 9 at 2081. At no point did

Gawrys tell any of the detectives that Valentin's purported identification of Rivera was

unreliable. Ex. 9 at 2078-81. That fact would have been strong impeachment evidence as well.

*Fields I*, 672 F.3d at 517; *Newsome*, 319 F.3d at 302-05.[13]

Third, the 9/16 report contains multiple other pieces of information that are either false

and were used in Rivera's criminal case—giving rise to a fabrication theory—or that are false

and could have been used to impeach Guevara or Lopez—giving rise to a suppression theory.

For instance, the report states that Noon, Guzman, Sparks, and Zacharias located the witness

Lopez for the first time on August 29, Ex. 22 (PX1A), when in fact at trial everyone admitted

that Defendants had interacted with Lopez starting on August 27. Ex. 4 at 674-75; Ex. 8 at

1732-44; Ex. 11 at 2691-92; Ex. 12 at 2762-64. The report claims that Lopez was brought to

Gang Crimes North, Ex. 22 (PX1A), another fact that all at trial agreed was false, Ex. 8 at

1750-51, 1756-57; Ex. 12 at 2765-66. The report claims Rivera agreed voluntarily to come in for

a lineup on September 15 and was read his *Miranda* warnings, Ex. 22 (PX1A), even though

Rivera was arrested on the street and forced to stand in a lineup without any waiver of his rights,

Ex. 2 at 208-11. The report states that Rivera was placed in the September 15 lineup and

identified by Lopez, Ex. 22 (PX1A); Ex. 35 (PX19) at 26-28, when in fact Lopez said Rivera

was the wrong guy, Ex. 7 at 1655-1657; Ex. 21 at 93-96.

---

[13] If one credits Gawrys's story, then in addition to having impeachment value this evidence is
exculpatory on its face. Rivera could have used the evidence that the only other witness to the crime—one
much closer to the perpetrator than Lopez had been—could not reliably identified Rivera as the shooter.
*Kyles*, 514 U.S. at 445-50.

Finally, in its final paragraph, the report states that, after the September 15 lineup, Lopez looked at a photograph of Rodriguez, who had been identified by Valentin after the shooting, and excluded him as a perpetrator. Ex. 22 (PX1A). Gawrys admitted that showing isolated photos of suspects in the manner described was improper. Ex. 8 at 1852. Gawrys was also forced to admit on the stand, given the differences between the margins of that final paragraph of the report and the rest of the report, as well as the different typeface in the last paragraph, that the final paragraph appeared to have been added on a different typewriter after the fact. Ex. 22 (PX1A); Ex. 8 at 1830-55.[14] By Gawrys's own admission, this too was improper. Ex. 9 at 2084. But Defendants had to exclude a potential suspect who had been identified by Valentin. Ex. 4 at 717-20; Ex. 8 at 1833, 1844-52. Problematically for them, Lopez did not remember ever being shown these photos by Defendants. Ex. 8 at 1845-52; Ex. 16 at 3950; Ex. 21 at 177. Taken together, there is nothing of substance in the 9/16 report that is true.

Mingey signed off on the false 9/16 report. Ex. 22 (PX1A); Ex. 8 at 1853-56. When asked about false statements in the report, Defendants had no explanation, Ex. 8 at 1706-17, 1781-82, or refused to testify, Ex. 6 at 1310-14; Ex. 11 at 2488-90. The 9/16 report could have been used at trial to prove Rivera's innocence, to impeach Guevara, or to impeach Lopez. In addition, the report was a fabricated account of an entire investigation, which ended up repeated in the felony minutes approving the charges against Rivera, Ex. 41 (PX19I), and which state prosecutors relied upon to pursue the criminal case against Rivera, Ex. 11 at 2647-49; Ex. 13 at 3098. If prosecutors had learned that the investigation was a frame job, they would have dropped the charges. Ex. 11 at 2637-39, 2646, 2664-65, 2674-79; Ex. 13 at 3098-3102.

---

[14] This led to a strange exchange where Gawrys's own counsel then questioned him about "hypothetical" reasons he might have had to change typewriters while writing the report. Ex. 9 at 2038-39, 2054-56. Gawrys denied there would have been a good reason to do so. Ex. 9 at 2039.

(f) *Suppressed Investigative Files*. In 2010, during Rivera's post-conviction proceedings, a Valentin investigative file that had been withheld was disclosed for the first time. Ex. 9 at 2202-04; Ex. 14 at 3292-95; Ex. 6 at 1403-04. Rivera's criminal defense attorney, now-Judge Wadas, testified that he had carefully preserved his original Rivera case file over the years, because he knew that one day this case would "come back". Ex. 6 at 1366-67. A comparison of Wadas's file with the withheld investigative file revealed that Wadas never received a number of important documents from the latter. Ex. 55 (PX268); Ex. 56 (PX269).

Wadas had asked for the complete file in pre-trial criminal discovery, Ex. 45 (PX39); the prosecutor Victorson testified that he would have given Wadas everything that the Chicago Police Department provided to him, Ex. 13 at 3109-10; and both Wadas and Victorson testified that as a matter of practice they would ensure that they obtained all police files in discovery, and that they had no reason to think that they would have kept any police files from one another, Ex. 13 at 3103-15. There was no real dispute at trial that Wadas had not received the complete Valentin investigative file that had come to light in 2010.[15]

The documents in the investigative file that were not handed over to the criminal justice system at the time Rivera was convicted included: (1) a GPR reporting that Lopez said he was far away "by store" at the time of the shooting, Ex. 32 (PX12); (2) an August 31 GPR memorializing the first lineup, Ex. 33 (PX14); (3) a hold form for Jacques Rivera, showing that he had been held overnight to participate in a first lineup, Ex. 26 (PX6); (4) a hold form for Jose Rodriguez, which showed that he was held for the same lineup, that the lineup would be viewed by the eyewitness, and that Rodriguez would be charged with the crime, Ex. 29 (PX9); (5) the

---

[15] Defendants contended that Wadas might have misplaced parts of his file over the years, but there was no reliable evidence that was the case, and in fact Wadas's files contained precisely the police reports contained in the City's official permanent retention file. *See* Ex. 48 (PX43A); Ex. 58 (DX3). The jury was free to reject Defendants' speculation, *Harvey*, 377 D.3d at 712, and this Court must reject that speculation at this stage, *Passanati*, 689 F.3d at 659.

investigative file inventory, showing the materials that were not turned over, Ex. 36 (PX19A);

and (6) an August 30 arrest report showing that Guevara had arrested Rivera that day, Ex. 25

(PX5); *see also* Ex. 55 (PX268); Ex. 56 (PX269). Wadas testified that he did not receive these

materials. Ex. 6 at 4103-12. Each one of these documents independently supported the due

process theories discussed above.

In addition, the investigative file inventory in the suppressed file showed that there were

two additional GPRs—one from August 27 and one from August 28, the critical first days of the

investigation—which were not only suppressed at the time of Rivera's trial, but which are

missing to this day. Ex. 36 (PX19A); Ex. 35 (PX19). At some point they were removed from the

file, though no one could explain why they might be taken or where they had gone. Ex. 4 at

758-65; Ex. 15 at 3563-64. There was testimony that a missing police report is an extremely rare

event, which might not occur during an entire Chicago Police career. Ex. 4 at 756-58.

Finally, the files containing notes and reports written by Gang Crimes officers during the

Valentin investigation were also suppressed. Gang Crimes officers testified that they took notes

and wrote reports during investigations. Ex. 8 at 1732, 1796-99; Ex. 12 at 2735-41; Ex. 14 at

3333-40, 3349-54, 3362-64, 3425-29. Noon testified that he wrote a major incident report on the

Valentin shooting. Ex. 12 at 2735-41. Defendants interacted with Lopez on multiple occasions,

arrested Rivera twice, and interacted with Valentin, all of which would have generated notes and

reports. *See* Ex. 8 at 1732. The jury heard testimony that Gang Crimes officers were required to

fill out daily activity summaries, reporting pertinent investigative information on a form at the

conclusion of each shift. Ex. 14 at 3333-37, 3345; Ex. 14 at 3291-92. The mugbooks from which

Lopez purportedly made an identification were kept by Gang Crimes officers. Ex. 22 (PX1A);

Ex. 8 at 1885-86. Files were generated by Gang Crimes officers for each case, and there was

nothing to suggest that the Valentin case was an exception. Ex. 14 at 3421-23. After Rivera's conviction, the Gang Crimes files were moved from the station where Defendants were based to Maxwell Street, after which they disappeared. Ex. 14 at 3423-25.

The jury could reasonably infer from Defendants' suppression of exculpatory evidence discussed above that the same Defendants suppressed these Valentin investigative files, which contained key investigative documents contradicting their official theory of the case. As discussed, Defendants authored and approved a final report in the investigation that was crammed full of false information, and they placed that report in an investigative file that went missing for years. Ex. 22 (PX1A); Ex. 4 at 766, 771-72; Ex. 9 at 2202-04. In addition, Guevara and Gawrys were the main point of contact for prosecutors involved in the criminal case, and the prosecutors relied on police officers to provide complete files. Ex. 41 (PX19I); Ex. 12 at 2773-75; Ex. 8 at 1700; Ex. 53 (PX154I). Guevara testified at the grand jury and trial. Ex. 44 (PX35); Ex. 14 at 3384-85; Ex. 6 at 1337-40. Accordingly, it was perfectly reasonable to infer that these Defendants had possession of or access to the suppressed Valentin investigative files at the pertinent points in time. *Desert Palace*, 539 U.S. at 100.

In addition—and entirely consistent with this theory—the jury could also have reasonably concluded that the City's official policies prevented these Valentin investigative files from reaching the criminal justice system. Those theories are discussed in more detail below, in relation to the City's *Monell* arguments.

### 3. None of the Individual Defendants Can Escape Liability

In their Rule 50 motion, the three individual Defendants each assert repeatedly, and without support, that they were not sufficiently engaged in the Valentin investigation to be held liable, and that they were not involved in the particular events at issue. Doc. 711 at 4-13. Again,

Defendants' arguments are limited to the August 27 identification," the first lineup, and the September 15 Lopez statement that Rivera was the wrong guy—Defendants ignore their involvement in all of the other fabrications and suppressions discussed. But that aside, the trial record belies their argument that they were uninvolved.

It was Guevara who first showed Lopez the photo of Rivera on August 27, Ex. 35 (PX19) at 9-10; PX5; Ex. 12 at 2760-67; Ex. 6 at 1277-79, 1296, 1298; Ex. 11 at 2486-87; 2509-10; Ex. 8 at 1707-1704; 1766-72, two days before Rivera was picked from a mugbook on August 29, Ex. 22 (PX1A). At trial, when confronted with the fact that Lopez had been shown Rivera's photo on August 27 in his kitchen, two days before Rivera was picked form a mugbook on August 29, Gawrys tried to disavow the date and location of the mugbook identification written in his report, claiming that both were typos. Ex. 8 at 1739-43, 1751, 1756, 1782.

Guevara arrested Rivera on August 30, 1988, and submitted papers to hold Rivera for a lineup. Ex. 25 (PX5); Ex. 26 (PX6); Ex. 6 at 1305-06. The jury could infer that Gawrys participated in that arrest. Ex. 2 at 202; Ex. 8 at 1693. Guevara participated in the August 31 first lineup. Ex. 33 (PX14); Ex. 27 (PX7); Ex. 30 (PX10); Ex. 6 at 1306-10. Gawrys could not deny that he participated as well. Ex. 23 (PX3); Ex. 2 at 202-03; Ex. 8 at 1772, 1693.

Guevara and Gawrys obtained the unreliable "identification" of Rivera from Valentin at the hospital on September 10, and they misrepresented the nature of that identification to all involved in the criminal justice system. Ex. 22 (PX1A); Ex. 8 at 1704-16.

Guevara and Gawrys are listed as participating in the second lineup, in which Rivera was purportedly identified, on the evening of September 15. Ex. 40 (PX19G); Ex. 35 (PX19) at 26-28; Ex. 6 at 1314-21; Ex. 11 at 2540-42; Ex. 8 at 1699. Guevara and Gawrys authored, Gawrys typed, and Mingey signed and approved the summary 9/16 report, rife with false facts

about the investigation and making the case against Rivera. Ex. 22 (PX1A); Ex. 6 at 1311-13,
1326-29; Ex. 11 at 2501-11; Ex. 8 at 1699-1700.[16] They arrested Rivera on September 15, with
Guevara signing the arrest report. Ex. 23 (PX3); Ex. 35 (PX19) at 26-28; Ex. 8 at 1802-05.

Guevara and Gawrys's names and phone number appear as the first two prosecuting
witnesses on the felony minutes, which reiterate their 9/16 report. Ex. 41 (PX19I); Ex. 11 at
2647-52; Ex. 12 at 2698-2703; Ex 12 at 2773-75; Ex. 12 at 2726-33; Ex. 15 at 3564-66. Though
Gawrys could not recall speaking with the felony review attorneys who approved the charges
against Rivera, Ex. 9 at 2085, he and Guevara were the lead witnesses on the report, and no one
else admitted to being involved in the charging decision. Moreover, Guevara testified against
Rivera at the grand jury and at trial. Ex. 44 (PX35); Ex. 14 at 3384-85; Ex. 6 at 1337-40.

At all times, Gawrys was Guevara's partner during the investigation, and Mingey
supervised them both. Ex. 8 at 1693; Ex. 6 at 1276; Ex. 11 at 2485-86; 2491-92; Ex. 6 at
1328-29. Gawrys testified that he and Guevara, working together, "got the credit" for solving the
Valentin homicide and arresting Rivera. Ex. 8 at 1696. In addition, he testified that Mingey was
kept apprised of the steps in the investigation. Ex. 8 at 1853. According to Gawrys, it was
Mingey's job to keep an eye on everything, and he knew what was happening in the
investigation. Ex. 8 at 1853-54. There was ample evidence of the individual Defendants'
involvement in misconduct during the Valentin investigation. *See Jones*, 856 F.2d at 992-93 (a
supervisor in these circumstances who knows about misconduct and facilitates it, approves it,
condones it, or turns a blind eye has acted knowingly and is liable for due process violations).

In light of (and in addition to) all of this evidence, Guevara and Mingey asserted the Fifth
repeatedly in response to questions. The jury was instructed that their decision to decline to

---

[16] The 9/16 report was submitted just after midnight on September 15-16, 1988. Gawrys testified
they deviated from protocol when he dated and time-stamped Mingey's approval signature on the first
page, and when Mingey failed to date and time-stamp his signature on the second page. Ex. 8 at 1855-56.

answer questions on the ground that their answers would incriminate them could give rise to an inference that their answers would be bad for them, Doc. 671 at 21, and both refused to answer questions on a range of subjects central to their misconduct during the Valentin investigation, including direct questions about whether they framed Rivera, Ex. 6 at 1268, 1271-72, and whether they turned a blind eye to the fact that Rivera was being framed, Ex. 11 at 2484-85. It was certainly Guevara's and Mingey's prerogative to protect themselves against a potential prosecution by invoking the Fifth, but having done so they are in no position to ask this Court to second-guess the jury's decision based on evidence that they would not even testify about.

*   *   *

In sum, there was more than ample evidence to support the jury's due process verdict against Guevara, Gawrys, and Mingey. In fact, the evidence of their liability was overwhelming, and there was very little evidence on the other side.

### B. The City's Argument That the Suppressed Investigative Files Were Insufficient to Prove A Due Process Violation Similarly Lacks Merit

The City makes a two-page argument in its Rule 50(b) motion that the suppressed Valentin investigative files cannot support a due process verdict. Doc. 707 at 2-3. The City fails to even address what was in those investigative files, and their arguments otherwise lack merit.

### 1. The City Has Forfeited Any Argument About Investigative Files

The City has doubly forfeited the argument that suppressed Valentin files do not support a due process verdict. First, the argument was forfeited when the City failed to include it in its Rule 50(a) motion, as explained below. *See supra* at 78. But in addition to that, the City in its Rule 50(b) motion limits its discussion of suppressed Valentin investigative files to just three pieces of paper contained in one of the suppressed files: (1) the August 27 rap sheet; (2) the GPR reporting that Lopez was by the store; and (3) the investigative file inventory sheet. Doc. 707 at

2-3. The City ignores all other evidence suppressed in Valentin investigative files. Accordingly, the City has not sufficiently set out an argument that the Valentin investigative files were not exculpatory. Nonetheless, Rivera addresses the City's arguments here for completeness.

### 2. The Suppressed Files Were Exculpatory

The City contends that the August 27 rap sheet found in the suppressed investigative file is not exculpatory evidence because Lopez made his mugbook identification of Rivera that day. As discussed at length already, that is a theory that the jury certainly did not have to accept, given that it is contradicted by a great volume of evidence.

Citing testimony from Wadas, the City also argues that the suppressed GPR reporting that Lopez was by the store when he saw the shooting was not exculpatory because it would not have done much to undermine Lopez's testimony. But Wadas did not suggest that this evidence was unimportant. Ex. 6 at 1404-07; Ex. 7 at 1464-65, 1607. On the contrary, it was important, given that Lopez put himself just feet from the shooting at Rivera's criminal trial, staring the shooter directly in the face. Ex. 16 at 3930-31. The jury was free to conclude it would have materially undermined Lopez's testimony if the criminal court had been told that Lopez was in fact 200 feet away—a distance at which it is exceedingly difficult to make out facial features (as the jury observed personally during the hallway demonstration). Ex. 9 at 2142-44; Ex. 32 (PX12); Ex. 3 at 589-94; Ex. 9 at 2142-44; *see also Kyles*, 514 U.S. at 445-50; *Jones*, 856 F.2d at 995.

Focusing on the GPRs from August 27 and August 28 that have gone completely missing from the file, the City argues that these cannot form the basis of a due process claim because no one knows what those documents said. According to the City's theory, as long as investigative documents are completely destroyed, rather than suppressed in a file and later discovered, then there can be no constitutional claim for suppression of evidence. That is not the law. *See*, *e.g.*,

*Armstrong v. Daily*, 786 F.3d 529, 550 (7th Cir. 2015) ("Under [the defendant police officer's] argument, a reasonable police investigator could have believed in 1980 that if he possessed exculpatory evidence, he had an obligation to disclose it to the defense *unless he deliberately destroyed it first.* No reasonable police officer or prosecutor could have believed that in 1980."). Moreover, the jury was certainly permitted to draw inferences based on other evidence that reports describing the first two days of the investigation went missing because they contradicted the official story that Rivera was guilty. *Desert Palace*, 539 U.S. at 99.

### 3. Wadas Could Not Have Discovered the Files By Asking Harder

In a paragraph, the City contends it was Wadas's fault that he did not get the suppressed Valentin investigative files, and that Wadas was not reasonably diligent in his file collection. Doc. 707 at 3. In other words, the City contends that the files were never suppressed at all.

That argument falls apart completely in light of the evidence actually introduced at trial. Wadas filed a formal discovery request. Ex. 45 (PX39); Ex. 6 at 1375-78. That request was described as standard by Wadas, Victorson, and Defendants' own experts. Ex. 6 at 1375-76; Ex. 13 at 3104-5; Ex. 15 at 3682-4. Victorson testified further that his normal practice would have been to obtain all of the files from the Chicago Police Department that he could get and to give them to Wadas. Ex. 13 at 3103-15. Neither doubted for a second that Victorson would not have held anything back. Ex. 6 at 1388-89; Ex. 7 at 1602-05; Ex. 13 at 3104-05, 3109-10. Moreover, Wadas did receive files from the police in response to his request, which were kept in his file following a copy of the request he had sent. Ex. 46 (PX40); Ex. 47 (PX43). No one had reason to doubt that the file produced was incomplete, Ex. 6 at 1382-84; Ex. 13 at 3110, and no one had any reason to suspect that additional investigative materials were being suppressed in some clandestine file, Ex. 6 at 1389; Ex. 13 at 3103-04.

36

Considering the context more broadly, the jury also heard evidence from which they could reasonable conclude that Rivera was framed and that Defendants did not want Rivera to receive files contradicting the official story of the investigation. In such a circumstance, the argument that a defense attorney could have done something more to find the file is a fiction. Wadas had no ability to go into the Chicago Police Department to rummage around for secret files that he already asked for. Ex. 7 at 1601-05. In addition, the *Monell* evidence, discussed below, demonstrated that as a matter of policy the City had no mechanism in place to produce responsive files, which fatally undermines the City's argument that the files were readily available to Wadas if only he had asked differently. *See infra* at 78.

As briefed at length before trial, the reasonable diligence doctrine provides that evidence is not suppressed in the constitutional sense if it is evidence that the defendant or defense attorney could find on their own. *See, e.g.*, *Socha v. Richardson*, 874 F.3d 983, 988-89 (7th Cir. 2017); *United States v. Walker*, 746 F.3d 300, 307 (7th Cir. 2014); *United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992). The question is whether, as a factual matter, the defense missed something available to it. Given the evidence just discussed, the jury was more than reasonable to find that the suppressed investigative files were not available to Wadas or to Rivera.

### C. Defendants' Arguments That There Is Insufficient Evidence to Support Plaintiff's Other Claims Lack Merit

Defendants devote one paragraph each to the jury's verdict on Rivera's conspiracy, failure to intervene, and intentional infliction of emotional distress claims (IIED). Doc. 711 at 13-14. As discussed above, Guevara and Mingey forfeited any argument on these claims by failing to include them in their Rule 50(a) motion. *See supra* at 10. In addition, all Defendants have now forfeited any challenge to those claims other than the single argument asserted in their

Rule 50(b) motion—namely, that because there is no showing of a constitutional violation, they cannot be held liable for conspiracy, failure to intervene, or IIED. Doc. 711 at 13-14.

Rivera has discussed at length already the ways in which his constitutional rights were violated, and so Defendants' argument for setting aside the conspiracy and failure to intervene verdicts must be rejected as well. By failing to discuss conspiracy or failure to intervene in any meaningful way, Defendants have conceded the point that there was sufficient evidence to find that they joined a conspiracy concerning the constitutional violations already discussed, Doc. 671 at 24;[17] and they have conceded the point that they knew the violations were taking place and failed to act in order to stop them, Doc. 671 at 25.

With respect to the jury's verdict against Guevara on Rivera's IIED claim, Defendants' argument is even less developed—they simply state that because the claim is based on the same misconduct as the other claims, it cannot succeed if the other claims do not succeed. Doc. 711 at 14. Again, Defendants are wrong about the viability of Rivera's other claims, but their argument is also fatally undeveloped. There is no discussion of why an IIED claim under Illinois law is necessarily subject to the same fate as section 1983 claims. The argument is therefore additionally forfeited by Defendants' failure to develop it. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *Kelso v. Bayer*, 398 F.3d 640, 643 (7th Cir. 2005).

It also lacks merit. As discussed above, Guevara manufactured evidence to prosecute Rivera for a crime that Rivera did not commit, and he withheld other evidence that would have allowed Rivera to defend himself. As a result, Rivera was sent to die in prison, and he spent 21 years there fighting for his freedom. A tort that turns on the intentional infliction of a "high

---

[17] In its post-trial ruling, the Court discussed Gawrys's conspiracy liability. Doc. 676 at 6-9. Defendants do not dispute the Court's analysis whatsoever.

probability" of "severe emotional distress" is a perfect fit for that misconduct, and the evidence

was more than sufficient to support liability. *Fox v. Hayes*, 600 F.3d 819, 842-43 (7th Cir. 2010).

### D. Guevara Is Not Entitled to Qualified Immunity

Despite not denying any of his wrongdoing during the Valentin investigation, Guevara

contends in his Rule 50(b) motion that he is entitled to qualified immunity for suppressing

Lopez's September 15 statement that Rivera was the "wrong guy." Doc. 711 at 14-15. As

discussed, Guevara forfeited this argument by failing to raise it earlier. *See supra* at 10.

Regardless, Guevara's argument for immunity should be rejected. Guevara argues that

being told by the sole eyewitness that the criminal defendant was the "wrong guy" is the sort of

"tidbit" that can only be said to have assisted the criminal defendant with the benefit of

hindsight. Doc. 711 at 15 (citing *Newsome v. James*, 260 F.3d 824, 825 (7th Cir. 2001), which

denied qualified immunity on far less obviously exculpatory evidence).

First, the position is plainly untenable. Numerous cases decided long before Rivera's

prosecution made completely clear that police officers could not suppress information about the

conduct of an identification procedure or key information that could be used to impeach an

eyewitness. *Giglio*, 405 U.S. at 153-54 (deciding in 1972 that evidence must be disclosed when it

would impeach the only eyewitness connecting the defendant to the crime); *Newsome*, 256 F.3d

at 752-53 (concluding that it was clearly established in at least 1979 that police could not

suppress information about the conduct of a lineup, and noting that "[t]he *Brady* principle was

announced in 1963, and we applied it in *Jones* to affirm a hefty award of damages against

officers who withheld exculpatory information in 1981").

Second, Guevara fails to address all of the other fabrications and suppressions of

evidence discussed above, which themselves were clearly established as unconstitutional in

1988. *See id.*; *Fields II*, 740 F.3d at 1114 (concluding that it was "established law by 1984 (indeed long before)" that fabricating evidence for use against a criminal defendant violated due process) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Pyle v. Kansas*, 317 U.S. 213, 215–16 (1942); *Mooney v. Holohan*, 294 U.S. 103, 110, 112–13 (1935)). Given this record, not to mention his Fifth Amendment assertions, Guevara is plainly not entitled to good-faith immunity.

## E. The Jury's Verdict for McLaughlin Does Not Create An Inconsistent Verdict

Defendants argue for the first time in their Rule 50(b) motions that the jury's verdict for McLaughlin renders them not liable in two respects: (1) the individual Defendants argue that they cannot be liable for suppressing the first lineup given that verdict, Doc. 711 at 9-10; and (2) the City argues that it cannot be liable for suppressing Valentin investigative files because McLaughlin was not found liable, Doc. 707 at 4-5. These arguments are forfeited and lack merit.

### 1. Defendants Failed to Properly Raise These Arguments

Though the Seventh Circuit has not definitively ruled on the question, it has observed in numerous cases that nearly all federal courts dictate that a party's failure to lodge a contemporaneous objection to an inconsistent verdict before the jury is discharged constitutes forfeiture of the argument. *Fox v. Hayes*, 600 F.3d 819, 844 (7th Cir. 2010) (citing *Oja v. Howmedica, Inc.*, 111 F.3d 782, 790 (10th Cir. 1997); *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1331 (9th Cir. 1995)); *see also Kosmynka v. Polaris Indus.*, 462 F.3d 74, 83 (2d Cir. 2006) ("It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury.") (collecting cases); *Pearson v. Welborn*, 471 F.3d 732, 739 (7th Cir. 2006); *Carter v. Chicago Police Officers*, 165 F.3d 1071, 1079–80 (7th Cir. 1998) (citing *Jacobs Mfg. Co. v. Sam Brown Co.*, 19

F.3d 1259, 1266 (8th Cir.1994)). Defendants raised no objection regarding the consistency of the

jury's verdict before the jury was discharged, and so they cannot raise such arguments now.

### 2.     The Jury's Verdicts Are Not Inconsistent

Even if the Court chooses to address Defendants' inconsistency arguments, they do not

hold water. Inconsistency in verdicts only requires a new trial when no rational jury could have

returned the verdicts. *Pearson*, 471 F.3d at 739. The question is whether a verdict in favor of one

defendant *necessarily* makes a verdict against the others impossible. *Thomas*, 604 F.3d at 304-05

(citing *Los Angeles v. Heller*, 475 U.S. 796, 798-99 (1986)). "Any plausible explanation for the

verdict precludes reversal." *Fox v. Hayes*, 600 F.3d 819, 844 (7th Cir. 2010). "If possible, [the]

court must reconcile apparently inconsistent verdicts, rather than overturn them." *Deloughery v.*

*City of Chicago*, 422 F.3d 611, 617 (7th Cir. 2005); *see also Freeman v. Chicago Park Dist.*, 189

F.3d 613, 615 (7th Cir.1999) ("[J]ury verdicts must be interpreted so as to avoid inconsistency

whenever possible."). The verdict for McLaughlin is not remotely—let alone

*necessarily*—inconsistent with the jury's due process verdicts against the other Defendants.

With respect to the individual Defendants, their argument about inconsistency is limited

to whether they can be liable for suppressing the August 31 first lineup given the verdict

rendered for McLaughlin. But the jury's due process verdicts against Guevara, Gawrys, and

Mingey are firmly supported by a volume of evidence completely unrelated to the August 31

lineup, as discussed above, which means that there is no way that the verdicts could necessarily

be in conflict. *Thomas*, 604 F.3d at 305. Moreover, even focusing just on the August 31 lineup, a

verdict against Guevara, Gawrys, and Mingey, but for McLaughlin, is not necessarily irrational.

The jury could have found for McLaughlin for any of number of reasons, including: believing

her that if a lineup occurred on August 31, she was not part of it; that she was not engaged in the

conspiracy with Guevara, Gawrys, and Mingey; or that she was forced off of the investigation. Ex. 3 at 541-42, 571-75, 578-81.

Similarly baseless is the City's argument that it cannot be liable for documents suppressed in the Valentin investigative files because McLaughlin had knowledge of those documents and was found not liable for suppressing them. First, McLaughlin, a detective, had nothing to do with the suppression of the Gang Crimes reports and notes discussed above. Second, the jury could have believed McLaughlin that she was not involved in the investigation after August 31, Ex. 3 at 572-74; Ex. 32 (PX12); Ex. 35 (PX19) at 29-33, 68-69, that she had put her reports in a file where they belonged, Ex. 3 at 549-54, and that someone else—like Guevara or Gawrys—suppressed the investigative files.

Third and most importantly, the jury could have believed that the City's policies governing production of investigative files, which are discussed in more detail below, *see infra* at 78, were responsible for the suppression of the Valentin investigative files, without any fault on the part of McLaughlin. In other words, that a file properly kept by police officers was not transmitted to the criminal justice system because of the City's policies. Municipal liability may attach without any determination that a particular individual is at fault. *Thomas*, 604 F.3d at 293.

## IV.    THE INDIVIDUAL DEFENDANTS' RULE 59 MOTION HAS NO MERIT

Where Defendants challenge evidentiary rulings, the road is uphill. *Cruz*, 275 F.3d at 589. Such rulings receive "special deference," *Palmquist v. Selvik*, 111 F.3d 1332, 1339 (7th Cir. 1997), and there is no abuse of discretion "unless the court's decision was based on an erroneous conclusion of law or the record contains no evidence on which the court rationally could have based its decision," *Young v. James Green Mgmt.*, 327 F.3d 616, 621 (7th Cir. 2003). Even an erroneous ruling does not warrant relief, unless it "violated the objecting party's substantial

rights," *Maurer v. Speedway*, 774 F.3d 1132, 1135 (7th Cir. 2014), and "affected the outcome of

the case," *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 868 (7th Cir. 2005).

Without contemporaneous objections, challenges to such rulings are waived. *Christmas*,

682 F.3d 632, 640 (7th Cir. 2012); *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir.

2006). A complaint about the exclusion of evidence is preserved only if an offer of proof shows

the grounds of admissibility, what the evidence would prove, and why the evidence is

significant. *Mason v. Southern Ill. Univ.*, 233 F.3d 1036, 1043 (7th Cir. 2000).

### A. The Court Did Not Abuse Its Discretion When It Permitted Rivera to Call Defendants As Witnesses, Notwithstanding Their Intention To Assert Fifth Amendment Privileges

At bottom, Defendants are complaining about the fact that the Court allowed their

opponent to do something no more controversial than calling them to the witness stand and

asking them questions. Defendants believe this decision was reversible error because they had

previously advised the Court that they would assert privileges in response to questions that might

implicate them in criminal activities. Doc. 713 at 4-18. The law does not support their position.

### 1. The Law Does Not Allow A New Trial on This Basis

As Defendants correctly note, Rule 59 provides that "a new trial may be granted for any

reason for which a new trial has heretofore been granted in an action at law in federal court."

FED. R. CIV. P. 59(a)(1)(A). Unfortunately for Defendants, that language forecloses relief here.

No court has ever awarded a new trial in any civil case—ever—on the grounds that one side

called opposing parties to the witness stand to answer questions. That remains true even for

parties called to the witness stand who announce their intention to assert a privilege rather than

answering questions. While a reviewing court might have affirmed this Court's exercise of

discretion if the Court had handled that witness testimony differently, no court has ever held that

a trial court committed an error of law by declining to shield the privilege asserter from the need to take the stand. That is the reason that Defendants in their entire brief do not point to a single case where a court decided that it was a reversible legal error to permit a civil defendant asserting privileges to be questioned at trial. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (noting that it is the responsibility of parties, not the courts, to identify legal authority supporting their position). On that ground alone, Rule 59 relief is by its plain terms not available.

### 2. This Court Did Not Abuse Its Discretion By Permitting Rivera to Call Guevara and Mingey to the Witness Stand

Guevara secured a tremendous advantage for himself by sitting out discovery in this case. In so doing, he blocked Plaintiff from investigating facts to prove his case and meet his burden. The law permitted Guevara to do so because he has a constitutional right to avoid incriminating himself. However, having availed himself of that privilege, Guevara was not entitled to press his advantage even further and bar Plaintiff from even calling him to the witness stand.

The law does not allow that. Instead, unlike in criminal cases, the law provides that in civil cases adverse inferences may be drawn against a party asserting the Fifth. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify[.]"); *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 835 (7th Cir. 2016) ("The Fifth Amendment allows adverse inference instructions against parties in civil actions.").

In most circumstances, the party must testify at trial in order for the inference to be drawn. So, in *Hillmann v. City of Chicago*, a district court determined that a new trial was warranted because defendants were "wholly excused . . . from testifying based on blanket assertions of their Fifth Amendment privilege," and the Seventh Circuit affirmed saying, "That ruling correctly understands how the privilege works in this situation; in a civil case, the jury is

permitted to hear evidence of a witness's invocation of the privilege and may draw an adverse

inference from it." 834 F.3d 787, 793 (7th Cir. 2016); *see also Empress Casino*, 831 F.3d at 835

(holding that the jury could properly consider a witness's prior invocation of the Fifth

Amendment where credibility was at issue); *Harris v. City of Chicago*, 266 F.3d 750 (7th Cir.

2001) (reversible error where trial court refused to permit impeachment of a witness with prior

Fifth Amendment assertions).

      Moreover, a party must take the stand in a civil case, even if taking the Fifth, because

doing so is the only way for the jury to evaluate the party's demeanor when answering questions.

It is a deeply rooted concept that the manner of a witness while testifying "is oftentimes more

indicative of the real character of his opinion than his words." *Reynolds v. United States*, 98 U.S.

145, 157 (1878); *see also* Seventh Circuit Civil Pattern Jury Instruction 1.13 (instructing the jury

to consider "the manner of the witness while testifying") (given in this case, Doc. 671 at 12);

*Phelps v. St. Catherine Hosp.*, 908 F.2d 975 (7th Cir. 1990) (noting that non-responsive answers

to questions make a jury's evaluation of the witness's demeanor more important). There was no

good reason to shield Guevara and Mingey from this fundamental part of the trial process. The

fact that they were communicating that their answers could subject them to criminal liability is a

reason in favor of, not against, allowing jurors to observe their manner while testifying.

      If Guevara or Mingey thought a question was unduly damaging if not denied, then they

had the obvious option of denying the question. When asked if they framed Rivera, they could

have said, "No," if that was truthful. But they cannot have it both ways. Put another way, while

Guevara and Mingey had the constitutional right to protect themselves against self-incrimination

by remaining silent, that does not mean that should benefit unduly from doing so. *United States*

*v. Rylander*, 460 U.S. 752, 758 (1983) (rejecting attempt to "convert the privilege from the shield

against compulsory self-incrimination which it was intended to be into a sword"). It would be ironic and unfair if tortfeasors were permitted special protections from civil liability merely because their torts were sufficiently reprehensible that they could lead to criminal charges. *S.E.C. v. Graystone Nash*, 25 F.3d 187, 191 (3rd Cir. 1994) ("The principle that the invocation of the privilege may not be too 'costly' does not mean that it must be 'costless.'").

Nor should the opponent in a civil case be penalized even further—having already been denied the opportunity to take discovery—by the fact that these Defendants chose to protect their constitutional rights rather than answer questions about their alleged misconduct. And the Defendants asserting privileges should not be placed in a better position than other Defendants, all who must take the witness stand and provide their truthful testimony about the disputed issues at trial. Special accommodations that would permit a party to avoid participation in the civil case are not warranted. *Graystone Nash*, 25 F.3d at 191 ("In a civil trial, a party's invocation of the privilege may be proper, but it does not take place in a vacuum; the rights of the other litigant are entitled to consideration as well."); *Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000) (in a civil case, where "parties are on a somewhat equal footing, one party's assertion of his constitutional right should not obliterate another party's right to a fair proceeding").

If this were a criminal case, the analysis would be different, but in civil cases Fifth Amendment assertions from the stand are part of the protocol: it would be impossible for jurors to know what inferences the law permitted them to draw from an assertion of privilege if they could not hear any of the actual questions in response to which a privilege was asserted. *Baxter*, 425 U.S. at 318-19. And in any event, the law is well-settled that a "claim of privilege must be made and sustained on a question-by-question . . . basis." *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983). Mingey and Guevera were not entitled to a different application of that rule

46

just because they over-asserted the privilege in response to every question posed, including in response to plenty of questions for which an assertion of privilege was inappropriate.[18]

### 3. Other Courts Have Taken the Same Approach As This Court

*(a) Courts in the Northern District*. Any contention that the Court abused its discretion here is strongly undercut by the fact that other courts have also permitted parties to call witnesses to the stand in civil cases, even when those witnesses announced an intention to assert the Fifth across the board. For example, in *Jimenez v. City of Chicago*, 877 F. Supp. 2d 649 (N.D. Ill. July 11, 2012), another wrongful conviction case, which was tried before Judge Kennelly, the Court denied a post-trial objection on this very issue in terms equally persuasive here:

> Defendants also argue that [the plaintiff] should not have been allowed to call [a witness] to testify at trial. In this regard, they do not argue that testimony by [the witness] . . . was irrelevant . . . Instead, defendants take issue with the manner in which [the witness] was presented. Before trial, [the witness]'s criminal counsel made it clear that if called to testify, he would claim his privilege against self-incrimination. Defendants contend that for this reason, [the plaintiff] should have been required to stipulate to what [the witness] would say if called to testify and should not have been permitted to present his self-incrimination claim live at trial.

> Defendants have offered two cases to support their argument. *See United States v. Mabrook*, 301 F.3d 503, 507 (7th Cir. 2002) (witness should not be forced to take the stand, because the jury cannot draw any inference from exercise of Fifth Amendment privilege); *United States v. Vandetti*, 623 F.2d 1144, 1147 (6th Cir. 1980) (witness can be called even if he will assert Fifth Amendment privilege, but the potential for prejudice is very high). Both of these cases, however, are criminal cases in which it is impermissible to draw an inference from a witness's invocation of his Fifth Amendment privilege. *Mabrook*, 301 F.3d at 507. In a civil case, by contrast, the jury can draw a negative inference from a party's invocation of his Fifth Amendment privilege, and defendants do not suggest that the rule for witnesses in civil cases is any different. *Baxter v. Palmigiano*, 425 U.S. 308, 318-19 (1976) (recognizing general rule that parties in civil actions are subject to a negative inference if they refuse to testify). Thus the criminal cases that defendants cite are not controlling.

---

[18] Defendants also renew their criticism of the Court's decision not to require Rivera to preview his theory of the case by submitting the questions in advance of trial, but this argument is misplaced. As Rivera properly pointed out in response to Defendants' motion *in limine*, "[i]f Guevara agreed to submit his questions of Mr. Rivera in advance of trial for Plaintiff's review and prospective objections, that might be a fairer proposal. Short of that, however, there is no reason why Guevara deserves special treatment." Doc. 484 at 8. There was no error in declining to impose this asymmetrical advance-notice requirement.

> [Defendants] offer no authority to support the proposition that a party in a civil case is required to accept a stipulation in lieu of proving a point at trial. The Court also notes that defendants have not described any stipulation they proposed that would have conveyed the information that was conveyed by [the witness's] invocation of the Fifth Amendment.

*Id.* at 671-72.

Judge Shadur, too, permitted a plaintiff to call a defendant asserting the Fifth Amendment to the stand in a civil false arrest case involving Chicago Police officers. In *Ramirez v. Chicago*, No. 05 C 317 (N.D. Ill.), the defendant asserted the Fifth before the jury where appropriate. Notably, the defendant won that case. Similarly, in *Robinson v. Harvey*, No. 99 C 3696 (N.D. Ill.), Judge Lefkow allowed a plaintiff in a civil rights case to call a witness who had announced an intention to assert the Fifth. Judge Bucklo reached the same conclusion in *Logan v. Burge*, No. 09 C 5471 (N.D. Ill.). There, Judge Bucklo rejected a motion raising the same argument Defendants make here and ruled that Jon Burge could be called to the stand even though he intended to take the Fifth. No. 9 C 5471, Doc. 423, at 10-11.

*(b) Courts Around the Country Have Required Defendants Asserting the Fifth to Take the Stand.* In addition to courts in the Northern District, other courts around the country have adopted the same approach that this Court took in this case. *See, e.g.*, *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509, 522 (8th Cir. 1984) (concluding that parties "may call a witness to the stand even when that witness has made known an intention to invoke the Fifth Amendment"); *National Life Ins. Co. v. Hartford Acc. & Indem. Co.*, 615 F.2d 595, 599 (3d Cir. 1980) ("[T]he witness must appear and assert the [F]ifth [A]mendment privilege as specific questions are asked[.]"); *Malibu Media v. Tashiro*, 2015 WL 13639447, at *6 (S.D. Ind. Apr. 15, 2015) ("[A] witness in a civil case cannot invoke the 'blanket' protection of the Fifth Amendment which is available to a criminal defendant; the civil witness can only invoke the Fifth Amendment to avoid answering specific questions. The civil witness must therefore take

the stand before invoking the Fifth Amendment."); *Battle v. City of Reading*, 1991 WL 208899,

at *5 (E.D. Pa. Oct. 8, 1991) (same).

### B. The Objections That Defendants Did Make During the Guevara and Mingey Examinations Were Properly Overruled

Because the Court made the correct decision (and certainly did not abuse its discretion) in

permitting Rivera to call Guevera and Mingey to the witness stand, the real issue is whether there

was anything genuinely objectionable about the examinations. As discussed in the next section,

Defendants failed to preserve nearly all their objections to questions posed to Guevara and

Mingey because they failed to object contemporaneously at trial. *See infra* at 55. With respect to

the foundation objections that Defendants *did* contemporaneously raise, there was no error in the

Court's rulings—none of those objections should have been sustained but were not.

### 1. Defendants Misstate the Legal Standard Governing What Foundation Is Necessary Before Questions Are Asked At Trial

Before addressing Defendants' particular foundation arguments, it is important to note

that they significantly overstate the legal standard that applies in this context. Defendants assert

that, in addition to needing foundation or a good-faith basis for each question asked, the factual

predicate for each question had to be "*in the trial record.*" Doc. 713 at 4-5. That is incorrect.

The law requires a good faith basis before permitting questioning on a particular subject,

but there is no requirement that the basis be introduced as evidence in the trial record. *See*, *e.g.*,

*United States v. Beck*, 625 F.3d 410, 418 (7th Cir. 2010) ("No attorney may ask a question if he

doesn't have a good-faith basis to ask it," but "an attorney does not need definitive proof to have

a good-faith basis") (citations omitted); *Oostendorp v. Khanna*, 937 F.2d 1177, 1181 (7th Cir.

1991) ("Cross-examiners must have a good faith basis for their questions . . . but do not have an

affirmative duty to introduce the factual predicate for impeachment."); *see also United States v.*

*Sampol*, 636 F.2d 621, 658 (D.C. Cir. 1980) ("[C]ounsel need not proffer a factual foundation for all questions asked on cross-examination. A well-reasoned suspicion that a circumstance is true is sufficient."); *Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300 (11th Cir. 2014) (applying good-faith-basis rule to witnesses invoking Fifth Amendment). Defendants' contrary rule would require the factual predicate of every question to every witness to have been introduced into evidence before the witness on the stand could be asked a question about that subject, an impossible proposition that would prevent virtually all questioning of witnesses at trial and that would have caused the trial in this case to last for months.

### 2. Defendants' Objections That Rivera Had No Foundation For His Questions About the Valentin Investigation Lacked Merit

The foundation objections that Defendants did make at trial were without merit, and the examples cited by Defendants in their briefs only highlight the problem with their argument. For instance, Defendants assert there was no foundation to ask Guevara about the August 27 photo show up, Doc. 713 at 8-9, but Rivera has described the evidence supporting that theory—separate and apart from Guevara's assertion of the Fifth—in detail above, *see supra* at 2, 14. Defendants also assert that there was no evidence that Lopez was encouraged to pick Rivera from the September 15 lineup, Doc. 713 at 9, but there is strong evidence, from Lopez himself, that he told Guevara that Rivera was the wrong guy and was pressured to go through the identification regardless, *see supra* at 6, 23.

Defendants' unsuccessful motion for a mistrial after Mingey's examination also illustrates that the foundation objections at trial lacked merit. After Mingey left the stand, the Defendants, surmising the trial was not going well, moved for a mistrial. Doc. 621. Their motion highlighted nine questions they claimed lacked foundation. *Id.* at 2-3. But Defendants were wrong. The questions they highlighted were proved up by subsequent testimony.

For example, Defendants' mistrial motion complained about a question asking whether children can be steered without even realizing it. Wixted later corroborated that very point. Ex. 16 at 4018. Defendants next said it was objectionable to ask Mingey whether it would be suggestive if Lopez was shown Rivera's photo on August 27 and was then asked to pick him out. There was foundation for this question, too: Rivera proved that his photo had been pulled on August 27, and that Guevara had conducted an identification procedure in Lopez's kitchen on that date. *See supra* at 2, 14. In addition, Guevara's own 9/16 report admitted that he had showed Lopez a single photo of another suspect (Rodriguez) and asked Lopez for an up or down on whether he had been involved. *See supra* at 25. The next question quoted in Defendants' motion asked Mingey whether he knew of other instances where photos were shown to witnesses without employing proper identification procedures. Defendants again insist that there was no foundation for that question, but there was evidence on that point as well, including the testimony that showing Lopez a single photo of Rodriguez was improper, *see supra* at 25, and Dorsch's testimony, to which the door was opened by Defendants, Ex. 12 at 2735-51.

The next four quoted questions were supposed to highlight the lack of foundation for the notion that Gang Crimes officers were not covered by the rules governing the detective division. The questions asked whether gang crimes officers were permitted to keep personal investigative files; whether they created humper reports that never got disclosed; whether they maintained materials that were immune from criminal discovery; and whether they maintained a parallel set of files that never got disclosed. Doc. 621 at 3-4. Mingey did not deny any of this, but according to Defendants, the Court should have ordered a mistrial because there was no foundation for the questions. Defendants were proved wrong on these points, too. Their witnesses, Spratte, Hickey, Noble, and Murray, subsequently confirmed every single one of these points. Ex. 13 at 3221-22,

3250-51, 3290-92; Ex. 14 at 3388-9 1, 3355-62, 3425-28, 3475-78, 3482-84; Ex. 16 at 3900-6.

As the block quote in Defendants' own brief illustrates, Doc. 713 at 10-11, Defendants seriously undermined their credibility by objecting repeatedly that there was no foundation for questions posed to Mingey, only to be contradicted when Rivera's counsel played clips from Mingey's own deposition testifying to the very facts that his counsel claimed there was no foundation to ask about. As the Court properly observed (in language also block quoted in Defendants' motion): "Well, if you made 20 foundation objections, and two of them were good, which I would say is about the score, it's really difficult for me being—playing referee when every time you make—when 90% of the time when you make those objections, it turns out there is a foundation." Ex. 11 at 2528-29. There was foundation for the questions that Rivera asked about the Valentin investigation, and Defendants' objections at trial lacked merit.

### 3. Defendants Objections That Rivera Had No Foundation For His Questions About Other Acts Lacked Merit

Defendants make a very limited argument that Rivera lacked foundation to ask Guevara and Mingey questions about three of Guevara's other acts. Doc. 713 at 11-13. Specifically, they complain about: (1) eight questions to Guevara about the prosecution of Xavier Arcos, a case involving witness Wilfredo Rosario, Ex. 6 at 1289:13-1290:22; (2) ten questions about the prosecution of Luis Serrano, a case involving witness Evelyn Diaz, Ex. 6 at 1290:23-1291:14; and (3) a single question to Mingey about whether Guevara had steered child witnesses on other occasions under Mingey's supervision, Ex. 11 at 2496:16-18. Defendants argue that foundation was lacking because the Court barred Rosario and Diaz from testifying, and because there was no basis to suggest that Guevara had steered other witnesses. Doc. 713 at 11-13.[19]

---

[19] Similar to their objection to the question asked of Mingey, Defendants argue that Rivera improperly asked a single question of Guevara about whether he had manipulated identifications in investigations other than with Lopez. Ex. 6 at 1302:24-1303:2. As with the other questions, Defendants

Importantly, Defendants' arguments concern Rivera's good-faith basis for asking questions. They do not concern the admission of other-acts evidence in any respect. Indeed, Defendants do not preserve any challenge post-trial to the Court's extensive other-acts ruling prior to trial. Nor do they attack the Court's clarification of that ruling during trial. Nor do they make any argument about the Court's determination that Defendants opened the door to questioning about other acts by their own testimony on the stand. Defendants cannot expand the playing field in their reply. *Nelson*, 657 F.3d at 590; *Kelso*, 398 F.3d at 643.

The parties' pre-trial briefing addressed the admissibility of other acts evidence. Docs. 411, 479, 494. Rivera exhaustively set out all of the evidence that provided his good-faith basis for asking permissible questions about other acts, including the basis for questions relating to Chicago Police officer William Dorsch, Doc. 479 at 6-7, 23-38, the Arcos/Rosario case, Doc. 479 at 10-12, 23-38, and the Serrano/Diaz case, Doc. 479, at 14-15, 23-38.

The Court expressly barred cross-examination of Guevara in advance of trial on a number of other-act fact patterns, Doc. 540 at 3, 16, but it permitted cross-examination on Arcos/Rosario, Serrano/Diaz, and other cases, *id.* at 3, 16; and it ruled that Dorsch could testify about Guevara pointing out a photo a juvenile witness, *id.* at 14. Shortly after trial stated, Rivera filed a motion to clarify, in part seeking to ensure that he was permitted to cross-examine Guevara on seven other-acts cases, including the Arcos/Rosario and Serrano/Diaz cases, even though particular live witness had been barred, including Rosario and Diaz. Doc. 565 at 4. The court clarified that Rivera could cross-examine about these cases. Doc. 566.

When Guevara took the stand, he asserted that he was not testifying on the advice of his counsel, opening the door to questions about advice that his counsel had given him in other cases

---

did not object at trial, and they do not develop any argument about what was objectionable about this question. Rivera assumes for purposes of this response that the argument is the same as the foundation argument made about the question put to Mingey.

involving misconduct. *See infra* at 59. Again, after the Court made clear that Guevara was opening the door and gave Guevara the opportunity to reconsider his position, Guevara decided to continue invoking the advice of his counsel, and he acknowledged that he knew he was opening the door. *Id*. In this context, having been expressly permitted to cross-examine on other cases, and after Guevara affirmatively opened the door, Rivera asked the limited questions now in dispute. After that, Dorsch took the stand and provided his account of Guevara coaching the child witness. Ex. 12 at 2744-51.

Again, Defendants do not take issue (or even discuss) the Court's rulings. They also made almost no objections throughout the trial to other-acts evidence. Instead, they limit their argument to the foundation for these questions. But the foundation is fully set out in Rivera's pre-trial briefing on these other cases, Doc. 479 at 6-7, 10-12, 14-15, 23-38, and Dorsch testified about Guevara's coaching, Ex. 12 at 2744-51. As discussed above, Rivera needed a good faith basis to ask these questions, but he was not required to introduce that basis as evidence in the record. *Beck*, 625 F.3d at 418; *Oostendorp*, 937 F.2d at 1181.

Importantly, Defendants did not preserve a foundation objection to *any* of the questions they now complain lacked foundation. In fact, they only objected to one of the questions they identify. During the questions about the Arcos/Rosario case, Defendants objected once to a compound question. Ex. 6 at 1289:13-1290:22. During the questions about the Serrano/Diaz case, and the question to Mingey, Defendants did not object at all. Ex. 6 at 1290:23-1291:14; Ex. 11 at 2496:16-18. As explained in the next section, these objects are forfeited, and to the extent that this Court reviews these questions for plain error, there is none. In fact, Defendants do not even attempt to make a plain error argument in this section of their motion. *See* Doc. 713 at 11-13. Defendants' argument about other-acts questions should be rejected.

## C.       Defendants Failed to Raise Many of Their Objections About the Guevara and Mingey Examinations, and They Cannot Satisfy the Plain Error Standard

Defendants' objections lack merit, but compounding the problem is the fact that Defendants failed to object at trial to most questions posed to Guevara and Mingey, including questions they now object to in their post-trial motion. Defendants concede in their motion that they failed to object, Doc. 713 at 5-6, and the two sections above outline the lack of objections.

It is well settled that parties who wish to preserve an objection at trial must make contemporaneous objections, stating the specific basis for the objection. *Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013). If no objection is made, then a court may (but it not required to) review the ruling for plain error. *Walker v. Groot*, 867 F.3d 799, 805 (7th Cir. 2017) (citing Fed. R. Evid. 103(e)). "However, 'a showing of plain error requires extraordinary circumstances' that affect substantial rights and result in a miscarriage of justice. . . . Such instances in civil cases are rare." *Id.* (quoting *Stringel v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 415, 421 (7th Cir. 1996)). None of Defendants' complained of errors is even in that ballpark, and Defendants don't seriously develop any argument otherwise.[20]

To escape that result, Defendants try to suggest that the Court made a definite ruling that relieved Defendants of their obligation to continue to object at trial. Doc. 713 at 10-11.That is not the case. The Court in no way ruled that every question Plaintiff's counsel asked was going to be permitted. Quite the opposite, the Court continued to sustain objections wherever proper ones were raised. *See*, *e.g.*, Ex. 6 at 1273, 1276, 1279, 1308, 1309, 1314-15, 1318, 1321, 1322, 1329, 1331, 1338, 1340; Ex. 11 at 2488, 2494, 2512.

Defendants similarly claim that the Court put them in a "quandary" by heaping "ire"

---

[20]  Defendants contend that their Fifth Amendment rights were violated at trial, and that their right to a fair trial was infringed. Doc. 713 at 6. But Defendants do not develop at all how any question that was asked violated their constitutional rights. The argument is hyperbole.

upon them in a way that supposedly discouraged them from making objections in front of the jury. R. 713 at 6. There are a number of problems with this argument. Most importantly, the passages from the transcript on which they rely, Ex. 8 at 1818-19; Ex. 11 at 2455, Ex. 16 at 4043, all recount events *after* Guevara's and Mingey's examinations had been completed, and thus these passages could not have deterred Defendants objections during those earlier exams. Moreover, the first two examples occurred outside the jury's presence, Ex. 8 at 1819; Ex. 11 at 2455, and thus did not risk any juror ire. The third example occurred during Wixted's testimony, the final examination of the trial, and one during which Defendants were asserting too many objections, by any objective measure. *See infra* at 68. This was also an exam for which the Court had imposed "really strict time limits" by mutual agreement, Ex. 16 at 4032, and the Court came to believe that Defendants' objections had become improperly obstructionist. Ex. 16 at 4048 ("I think I'm going to overrule this objection. I think this is just using all of one party's time, and it's not fair."). In sum, contrary to Defendants' suggestion otherwise, there was nothing about any of these comments by the Court that could justify the forfeiture occasioned by their failure to object during Guevara's and Mingey's examinations much earlier in the trial.

### D. Defendants' Other Arguments Relating to the Fifth Amendment Lack Merit

#### 1. Rivera Did Not Misstate Fifth Amendment Law

Defendants also argue that when Rivera misstated the law when he asked Guevara and Mingey if they were asserting the Fifth because a truthful answer would implicate them in a crime. Doc. 713 at 13-14. This argument also lacks merit.

First, the Court correctly instructed the jury: "In response to questions here, defendants Guevara and Mingey have asserted their Fifth Amendment right not to incriminate themselves. You may draw an inference against defendants Guevara and Mingey as a result of their decision

to invoke their Fifth Amendment rights instead of testifying, and you may assume that any response that they might have given to the questions asked would have been unfavorable to them, but you may not find a defendant liable on the basis of silence alone." Doc. 671 at 21. Defendants do not challenge this instruction, and juries are presumed to follow their instructions. *Soltys v. Costello*, 520 F.3d 737, 744-45 (7th Cir. 2008).

Second, Rivera's questions put to Guevara and Mingey did not contradict the Court's instruction. Rivera asked whether a truthful response would incriminate them, and the Court's instruction notes that Guevara and Mingey asserted their right not to incriminate themselves in response to questions, and that their refusal to answer could justify an inference that a truthful answer would be unfavorable to them. Doc. 671 at 21. The law permits litigants in civil cases to avoid answering otherwise proper questions based on an assertion of the Fifth Amendment on one condition only: "The answer one would give if one did answer it, and answer it truthfully, must have some tendency to subject the person being asked the question to criminal liability." *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 663 (7th Cir. 2002). Thus, Guevara and Mingey's explanation—or rather, their counsel's explanation—that they had some other legitimate reason for asserting the Fifth is invalid and insufficient to avoid the proper questions asked of them about their reasons for asserting the Fifth.

Third, Defendants' argument falls apart when it is examined closely. Defendants are arguing that they might have some other reason—separate from a fear of incriminating themselves—to assert the Fifth and avoid testifying. But if they had some other reason for refusing to answer questions that did not incriminate them, then they presumably could have just testified about that reason without fear of incriminating themselves. In turn, they would not be allowed to assert the Fifth Amendment privilege to avoid testifying about those reasons.

Defendants' argument therefore makes little sense on its own terms.

Defendants also argue that Rivera's questions to Guevara about whether he feared prosecution for perjury were improper. Doc. 713 at 14. But Guevara himself made this an issue in the case by asserting repeatedly that he was asserting the Fifth Amendment on the advice of his counsel. Ex. 6 at 1267-1271. At the start of his examination, and outside the presence of the jury, Rivera noted that if Guevara continued to invoke the advice of his counsel, then Rivera would ask him questions about what crimes his counsel had advised him that he was exposed to. *Id.* The Court warned Guevara that he was making that line of questioning relevant. *Id.* After that, Guevara continued to assert that he was invoking the Fifth on advice from his counsel, and Rivera asked whether his counsel had advised him that he could be criminally liable for perjury if he answered questions truthfully.[21]

Finally, Defendants did not object at trial to many of the questions on this point that they cite on pages 13 and 14 of their brief. See Doc. 713 at 13-14, which cites the following questions that were not objected to: Ex. 6 at 1279:24-1280:3; Ex. 6 at 1295:17-24; Ex. 11 at 2482:4-6; Ex. 11 at 2542:25-2543:2. Nor did they object to the other instances where similar questions were asked. *E.g.*, Ex. 6 at 1273:9-15, 1274:4-11; Ex. 11 at 2481:1-7. Accordingly, Defendants forfeited the argument and cannot satisfy the plain error standard discussed above.

## 2. Questions About An Investigation Into Guevara Were Proper

Defendants next contend that Rivera's questioning of Guevara about whether he was the subject of a criminal investigation was improper. Doc. 713 at 14-15. For starters, one of the two

---

[21] Defendants cite the unpublished decision in *U.S. v. Jimenez*, 1995 WL 135923 (7th Cir. 1995), which involves a different situation. There the Seventh Circuit remarked that courts sometimes find it prejudicial when lawyers call witnesses liars or perjurers in closing arguments. Though such statements rarely require reversal, the problem discussed in that case line is with lawyers characterizing testimony given at trial as lies. Those cases have nothing to do with this circumstance, where a litigant's reason for asserting the privilege against self-incrimination has been put at issue.

questions Defendants complain about (*see* Doc. 713 at 15 (citing Tr. 1279:17-22)) was objected to and the objection was sustained. *Sanchez v. City of Chicago*, 700 F.3d 919, 932-33 (7th Cir. 2012) (we presume juries follow instructions when judges sustain objections). Sustained objections do not warrant a new trial.

In addition, Guevara opened the door to questions about whether he was being investigated, and before asking the questions that Guevara now complains about, Guevara had advance notice that he could either open the door to these questions or not. Specifically, when Guevara took the stand, he asserted that he was pleading the Fifth on the advice of his counsel, Rivera moved to strike discussion of the advice to counsel, and the Court noted that testifying about the advice of counsel opened that issue up for questioning. Ex. 6 at 1267-1268. Guevara persisted in invoking the advice of his counsel. *Id.* at 1268. At sidebar, Rivera made clear that if Guevara continued to rely on his attorney's advice from the stand, Rivera was going to ask, "Isn't it true your attorney told you if you testify you're putting yourself in criminal jeopardy for 18 people who say you could be prosecuted for." *Id.* at 1269. The Court agreed that such questioning would be appropriate if Guevara opened the door, and it said that Guevara's counsel should speak with him. *Id.* at 1269-1270. The Court sent the jury out, and Guevara's lawyers counseled him in the hallway for an extended period. *Id.* at 1270-1271. When Guevara returned, Rivera's attorney stated: "I'm informed that [Guevara]'s going to say, 'advice of counsel' and they're doing it knowing opening of the door. I intend to cross-examine him on why his attorney is advising him. You know, everybody understands the situation." *Id.* at 1271:11-15. Guevara's lawyer confirmed: "Yes, Judge, that's the situation." *Id.* at 1271:16. The questions that followed, to which Guevara now objects, were precisely the questions that Rivera said he was going to ask, to which Guevara acknowledged he had opened the door.

Third, there was ample foundation for asking Guevara questions about a criminal investigation against him, because Guevara's lawyer conceded that there was such an investigation. During a pretrial conference, Rivera raised the concern that Defendants intended to assert the Fifth as a reason not to testify, but that they would also suggest to the jury that the reason they were doing so had nothing to do with incriminating themselves. The Court responded that such an approach was not appropriate, saying that Defendants needed a well-grounded fear of prosecution to take the Fifth. Rivera then asked whether there was a pending investigation against Guevara, and he received no clear answer. Ex. 57 (May 24, 2018 Tr.) at 42:20-48:3. During the very part of Guevara's exam that Defendants now complain about, there was a sidebar during which Rivera's counsel said that, based on Guevara's lawyers previous comments, he understood that there was a grand jury convened concerning Guevara. Ex. 6 at 1280-1281. The Court said there needed to be foundation for the questions that Rivera was asking, and it asked, "So the question is, is there any foundation for this. Is there a grand jury? Is there a live investigation going or not?" *Id.* at 1280-1821. To which Guevara's counsel responded, "It's my understanding that there is, Judge." *Id.* at 1281. Accordingly, Guevara opened the door to these questions, he was warned they would be asked in advance, he acknowledged he was opening the door, and foundation was provided by Guevara's counsel.

### 3. Rivera's Extremely Brief and Accidental Display of Part of Gawrys's Deposition Transcript Does Not Warrant A New Trial, As This Court Has Already Concluded

In the midst of their discussion of Rivera's questions to Guevara about investigations, Defendants contend—in two sentences and a footnote—that their motion for a mistrial should have been granted when a portion of Gawrys's deposition transcript was briefly shown on the

screen while Gawrys was being impeached. Doc. 713 at 15 & n.4.[22]  The argument is so

undeveloped that it cannot justify a new trial. *Opp v. Wheaton Van Lines*, 231 F.3d 1060, 1066

(7th Cir. 2000); *see also Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 569-70 (7th Cir. 2004).

It also lacks merit. During his cross-examination of Gawrys, Rivera's counsel attempted

to impeach him on a certain point using Gawrys's video deposition. The protocol used at trial for

video impeachment was as follows: Rivera's counsel would call out the pages and line number

of the impeachment; after which Rivera's trial paralegal would pull up the video deposition and

type that range into the Trial Director program; after which the starting page and line of the

video would load and then show on the screen, along with the starting line and the two or three

following lines of the transcript, which are displayed below the video; after which Rivera's trial

paralegal would hit "play" upon counsel's direction.

In this instance, Rivera's counsel mistakenly called out the impeachment from page 90,

lines 7 through 21, of Gawrys's deposition. Ex. 8 at 1753:10.[23]  As usual, there was a delay while

Rivera's counsel called out the page and line, the trial paralegal called up the video, typed in the

page and line numbers of the clip, and waited for the computer to load the video. Once the video

loaded and an image appeared on the screen, and before the trial paralegal could even hit play,

Rivera's counsel could see that there was a mistake and he immediately asked for the image to

be taken off the screen. Ex. 8 at 1753:10-16. When Rivera's counsel saw that the page was

wrong and asked to take it down, it immediately came off of the screen—pressing one button on

the Trial Director program clears the screen.

As the Court noted for the record shortly thereafter, the entire period of time from when

---

[22]  This argument does not pertain to the Fifth Amendment, but Rivera addresses it here because it is buried in that section of Defendants' brief.

[23]  As the Court can see, the correct transcript portion for the impeachment was page 91, lines 7 through 21. Rivera's counsel was off by one page. Ex. 61 (Gawrys Deposition) at 91:7-21.

Rivera's counsel started to call out the line and page and line numbers, to the time that the trial paralegal switched the system to the deposition, typed the page and line, to the time that the computer loaded the clip and displayed it on the screen, to the time that Rivera's counsel saw the screen shot above and asked his trial paralegal to take the image down instead of playing the clip, took a total of at most 19 seconds. Ex. 9 at 1955-1959. There was a dispute at trial about how many of those 19 seconds the text above was actually visible on the jury's screens. Defendants' contended that it had been up on the screen for "at least 30 seconds," Ex. 8 at 1820-1823, which obviously could not be true given the foregoing. Rivera's counsel contemporaneously maintained—and continues to maintain here—that the image could not have been visible for more than about three seconds, because it took a substantial amount of the 19 seconds reflected on the transcript to get to the point where the video was even on the screen. *Id.* at 1821. Most importantly, the disputed clip was never even played for the jury—all that happened is that a couple lines of the transcript was shown momentarily on the screen.

There was a sidebar when this happened, at which the parties set out their positions, Rivera explained it had been a mistake, and the Court instructed the jury: "Ladies and gentleman, if something was just up on your screen page 90, that was a mistake and it is not evidence in this case and you should disregard it." *Id.* at 1753:22-1755:11. Any potential prejudice caused by this portion of the transcript being shown momentarily on the screen was cured by the Court's instruction. *Sanchez*, 700 F.3d at 932-33.[24] This mistake does not warrant a new trial.

---

[24]  Moreover, apart from the fact that the transcript was shown for a brief period of time, the argument that a mistrial was warranted is frivolous. There is no reason to believe anyone even knows who someone named Miedzianowski is, much less that the FBI was investigating him. Defendants are far from showing any real prejudice, even if the jury did see this portion of the transcript.

### 4. Gawrys Was Not Unfairly Prejudiced By His Co-Defendants' Assertions of the Fifth Amendment

In a single paragraph, Gawrys argues that his co-Defendants' assertions of the Fifth Amendment prejudiced him to an extent that he is entitled to a new trial. Again, the argument is far too undeveloped to warrant this Court's consideration post-trial, much less to justify a new trial for Gawrys. *Smith*, 388 F.3d at 569-70; *Opp*, 231 F.3d at 1066. Gawrys does not explain whatsoever how he was prejudiced by his co-Defendants' testimony, and it is difficult to guess how that testimony violated Gawrys's substantial rights, *Maurer*, 774 F.3d at 1135, or why the Court should presume that the jury declined to consider its instructions about how to consider the evidence, *Berry v. Deloney*, 28 F.3d 604 (7th Cir. 1994) (noting that even in extreme circumstances jury instructions avoid the need for separate trials). Moreover, it is important to note that Gawrys did not even move for a separate trial. Though a separate trial would not have been warranted, the fact that Gawrys did not ask for one forecloses any argument that he was prejudiced by his co-Defendants' assertions of the Fifth Amendment. *Chlopek v. Federal Ins. Co.*, 499 F.3d 692, 701 (7th Cir. 2007)

Regardless, this Court instructed the jury that a negative inference from the assertion for the Fifth Amendment could be drawn only against Guevara and Mingey, the Defendants asserting the Fifth. It did not instruct the jury that the same inference could be drawn against Gawrys, the City, or any other Defendant. Doc. 671 at 21. Again, juries are presumed to follow their instructions, *Chlopek*, 499 F.3d at 701-02, and there is no reason to think they failed to do so in this instance. In fact, the jury's verdict in favor of McLaughlin is evidence that Guevara's and Mingey's assertions of the Fifth did not confuse the jury about whether those assertions made other Defendants liable.

Moreover, even if the Court's instruction had allowed the jury to draw an inference

against Gawrys, the City, or any other Defendant—which it did not—there would still be no

error. As Judge Leinenweber recently explained in denying this same post-trial argument:

> One party's Fifth Amendment invocation may be imputed to another party when the two share certain allied interests sufficient to justify the inference's trustworthiness and advance the search for truth. *See* [*Kontos v. Kontos*, 968 F.Supp. 400, 406 (S.D. Ind. 1997)] (quoting *LiButti v. United States*, 107 F.3d 110, 124 (2d Cir. 1997)). Courts engaging in this inquiry have eschewed bright-line rules in favor of a case-by-case analysis demanding that the party urging the inference justify it. S*tate Farm Mut. Auto. Ins. Co. v. Abrams*, 2000 WL 574466, *6 (N.D. Ill. May 11, 2000) (collecting cases).

*First Midwest Bank v. City of Chicago*, 2018 WL 4126570, at *12 (N.D. Ill. Aug. 29, 2018); *see

also Fujisawa Pharm. Co. v. Kapoor*, 1999 WL 543166, at *9 (N.D. Ill. July 21, 1999) (citing

*Daniels v. Pipefitters' Ass'n Local Union No. 597*, 983 F.2d 800, 802 (7th Cir. 1993)).

"The *LiButti* court suggested four 'non-exclusive' factors to guide courts in making these

determinations: (1) the nature of the relationships at issue ('The closer the bond, whether by

reason of blood, friendship or business, the less likely the non-party witness would be to render

testimony in order to damage the relationship.'); (2) the degree of control the party has over the

non-party witness; (3) the compatibility of the interests of the party and non-party witnesses in

the outcome of the litigation; and (4) the role of the invoker in the litigation. *See LiButti*, 107

F.3d at 123-24." *State Farm v. Abrams*, 2000 WL 574466, at *6 (N.D. Ill. May 11, 2000). Here,

there is ample justification for imputing the assertion of the Fifth Amendment to Gawrys.

For starters, Gawrys's interests in this litigation, and those of Guevara and Mingey, are

entirely congruent. Indeed, Gawrys's testimony on the stand was largely focused on continuing

to deny that he or any of his colleagues had engaged in misconduct. Ex. 8 at 1785-90; Ex. 11 at

2453-71. The three were all parties and they prepared the defense together, with the same

attorneys for the vast majority of the litigation. And, as described above, those invoking the Fifth

Amendment were central investigators in the Valentin investigation, along with Gawrys, and all

played a central role in the case. District courts have concluded in similar circumstances that "an adverse inference could be drawn against a party from an alleged co-conspirator's invocation of the Fifth Amendment privilege against self-incrimination." *Abrams*, 2000 WL 574466, at *6-7 (discussing *United States v. District Council*, 832 F.Supp. 644, 652 (S.D.N.Y. 1993)).

Any way the Court views the issue, there was no unfair prejudice to Gawrys as a result of his co-Defendants' assertion of the Fifth Amendment. A new trial as to him is unwarranted.

### E. The Court Properly Exercised Its Discretion When It Excluded After-Acquired Evidence Concerning Felipe Nieves

Defendants next contend that they should have been allowed to present after-acquired evidence about where Felipe Nieves was at the time of the Valentin shooting. Doc. 713 at 18-21. The Court's ruling *in limine* on this issue was sound, Defendants presented no justification during trial for revisiting that ruling, and there is nothing new in their post-trial motion.

To review, weeks before he died at the hospital, Valentin told Letrich that an Imperial Gangster had shot him, and he identified Rodriguez as that Imperial Gangster in a mugbook. *See supra* at 5. There was no dispute at trial that Valentin told Letrich with confidence that Rodriguez was the person who shot him eleven times from a very short distance away. Ex. 2 at 137-38. Valentin, who was in a rival gang, had driven into Imperial Gangster territory at the time of the shooting, which occurred about a mile from where Rodriguez lived. Ex. 2 at 141-42. Whatever else is true, those facts should have made Rodriguez a suspect in the Valentin shooting. The problem was, days before the victim identified Rodriguez as the killer, the Defendants had already pulled Rivera's rap sheet and photo and obtained Lopez's identification of Rivera. *See supra* at 2.

To support the inference that Defendants had "tunnel vision" in their effort to frame Rivera for the Valentin shooting, Rivera established at trial that no police officer had ever truly

investigated whether Rodriguez, not Rivera, might have been the shooter. According to their police reports and testimony, no investigator even interviewed Rodriguez about his involvement, much less whether he knew Valentin, had a reason to kill him, or could provide an alibi. Ex. 35 (PX19); Ex. 2 at 177-78; Ex. 3 at 564-68.

Those facts were undoubtedly relevant to this trial, and Defendants do not contend otherwise. Instead, Defendants say that the Court erred in excluding other evidence, unknown to the Defendants at the time of their investigation, that another person who Valentin identified as the driver of the getaway car, Felipe Nieves, was out of town on the day of the Valentin shooting. Doc. 421 (motion *in limine* on Nieves); 526 (Court's *in limine* ruling on Nieves).

The Court exercised its discretion correctly. As Defendants' post-trial motion makes clear, they sought to introduce the Nieves evidence to show that Valentin's identification of Rodriguez was purportedly unreliable. Doc. 713 at 18-21. A threshold problem with the argument is its faulty premise. Valentin's inability to correctly identify the getaway driver who was sitting in a car a distance away from the shooting (and who Valentin, like Lopez, may not have even seen at all) does not undermine the accuracy of his identification of the person who approached his car and shot him eleven times, from a distance of less than five feet, in a face-to-face encounter. In that sense, Valentin's identification of Rodriguez is not "intertwined" with that of Nieves. *See id.* at 18.

But even leaving that aside, Defendants continue to miss the point. The Rodriguez evidence was never offered at trial to prove that Rodriguez committed the crime. It was admitted for the limited purpose of showing that the Defendants ignored an important lead, one they presumably would have investigated if they were genuinely interested in exploring the guilt of anyone but Rivera. In that context, the fact that Nieves—unbeknownst to the Defendants at the

time of their investigation or at any point before the start of this civil litigation—was apparently

out of town at the time was not only irrelevant, but it would have risked extreme jury confusion

by providing an *ex post* excuse for having failed to conduct an investigation that no one even

suggested they had undertaken.[25]

Importantly, Rivera's counsel was at all times clear about the purpose for which the

Rodriguez evidence was introduced. In opening, he explained the first time Rodriguez was

mentioned that "we're not here to retry Jose Rodriguez's guilt or innocence. That's not what the

case is about. We're just talking about the police investigation. And you're not detectives, I'm

not a detective, but that probably strikes you as a clue, a clue, a good clue, the victim saying, I

got shot by this kid, Jose Rodriguez." Ex. 2 at 62. In closing, he reinforced the same point: "Now

we don't know if Jose Rodriguez did it. Let's be clear. There's been a lot of objections. We're

not here to decide who killed Felix Valentin. It's not a murder case. It's not a criminal case.

Nothing like that. All we're saying is, I'm not a detective, you're not a detective, [but] that's a

clue, that's a good clue. When the victim says 'Jose Rodriguez shot me,' that's the kind of the

thing you got to investigate." Ex. 17 at 4158-59.

Defendants claim that Rivera nonetheless misused the evidence to prove that Rodriguez

was in fact guilty. The problem for the argument is that there is no support in the record.

Defendants' motion lists every reference to Rodriguez from the trial, Doc. 713 at 19-20, but they

fail to point to single one of them that establishes what Defendants are trying to establish. On the

contrary, all of those citations show that Plaintiff properly used the Rodriguez evidence for the

limited purpose for which it was admitted: to show that the Defendants inexplicably ignored

---

[25] To be clear, nothing stopped Defendants from arguing at trial that they had not pursued Nieves because he was nowhere to be found. Nor did anything stop them from relying on their memories or investigative records to provide other testimony about the investigation undertaken into this person who the victim had identified. It appears that the reason that Defendants did not offer any of this testimony is because they never even tried to investigate Nieves at all.

good information suggesting that someone other than Rivera had committed the crime. *E.g.*, Ex. 2 at 183 (asking whose job it was to follow-up on investigative leads during an investigation); Ex. 3 at 563-65 (asking McLaughlin whether she took steps to talk to Rodriguez); Ex. 6 at 1324 (asking Guevara the same questions); Ex. 8 at 1810 (asking Gawrys the same questions).[26]

Finally, at no time during trial did Defendants make any offer of proof about how they would show, through admissible evidence, that the Nieves referenced in Letrich's report was a person who was not in Chicago at the time of the Valentin shooting, and they do not now contend that they were prevented from making an offer of proof on the point. As a result, their argument about Nieves is forfeited. *Mason*, 233 F.3d at 1046-47 (proffer must detail what witnesses would say, otherwise "we do not know whether [witness] was in fact prepared to so testify," and the court "cannot assess whether the exclusion was 'prejudiciously erroneous.'"); *Wilson v. City of Chicago*, 758 F.3d 875, 885 (7th Cir. 2014) (party must make offer of proof at trial to preserve issue for post-trial motion or appeal).

In sum, the Court did not err in excluding evidence that Nieves was out of town, and Defendants have not properly presented an argument otherwise. Regardless, that evidence was certainly not sufficiently important to have affected the outcome of the trial, and so no new trial is justified. *Griffin v. Bell*, 694 F.3d 817, 827 (7th Cir. 2012).

**F.      The Court Did Not Err When It Permitted Cross-Examination of Wixted**

Defendants made a terrible strategic decision to call a "memory expert" as part of their case. Wixted's direct examination explained at length how phenomena such as retrospective bias can distort a person's recollection of past events. The themes elicited by Defendant on Wixted's

---

[26] Defendants point out that the Court's ruling on the motion *in limine* provided that if Plaintiff argues or implies that Nieves was involved in the murder, Plaintiff may open the door, in which case the Court would revisit the ruling. Doc. 526. As it turned out, however, Rivera never suggested Nieves was guilty. It was the Defendants who kept bringing up Nieves, in effect trying to open their own door. *See* Ex. 16 at 3973:16-18 (Court noting that it was Defendants who kept raising Nieves).

direct were that memory can be unreliable, that witnesses are susceptible to steering and leading questions, and that the most important data point is the witness' first recorded memory. In Wixted's words, he was a "broken record" on that point: it is the first recorded memory that is most accurate, and subsequent memories are more vulnerable to suggestion and manipulation. Ex. 16 at 3999; *see also* Ex. 16 at 3991 (defense counsel asking general questions, such as "Under what conditions is eyewitness memory reliable, and under what conditions is it unreliable?"); Ex. 16 at 3993 (explaining the literature of memory science dating from the 1970s and 1980s about how memory is malleable); Ex. 16 at 3994 (Q: "And could you explain to the jury what false memory consists of?"); Ex. 16 at 3997 (testimony about leading questions can "accidently implant false memories," particularly in children).

Defendants' goal in all this was to call into question Lopez's 2010 statement to the Northwestern investigators, Linzer and Estes, in which Lopez said he told the police they had the wrong guy but no one would listen to him. It somehow never occurred to Defendants, however, that the same insights Wixted provided about the science of memory and applied by Defendants to the 2010 statement also called into question Lopez's earlier statements, including those given at Rivera criminal trial in 1990, which was two years after his first recorded memory. As Wixted conceded at his deposition and again on the witness stand, the same problems with human memory that might have infected Lopez's 2010 statement (the one that Defendants were attacking) also applied to Lopez's 1988 and 1990 statements and testimony (the one Defendants did not want to attack). Ex. 16 at 4037-39.

Defendants' suggestion that it was somehow improper to ask Wixted questions on that point was, and remains, ridiculous. Doc. 713 at 25-26. Parties are permitted to cross-examine experts about the subject of an expert's direct examination. *United States v. Bozovich*, 782 F.3d

814, 816 (7th Cir. 2015) (discussing Rule 611(b)); *see also Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 562 (7th Cir. 1984) (remarking that expert cross-examination should not be limited because "[c]ross-examination is a fundamental right that a court should abridge only to curb abuse"); *Bronston v. United States*, 409 U.S. 352, 358-59 (1973) ("It is the responsibility of the lawyer to probe; testimonial interrogation, and cross-examination in particular, is a probing, prying, pressing form of inquiry. If a witness evades, it is the lawyer's responsibility to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination."). The entire focus of Wixted's direct examination was his theory about how human memory interplayed with the Lopez fact pattern.

The gist of Defendants' complaint is that Wixted apparently had not recently reviewed the 1988 and 1990 Lopez statements to get ready for his testimony at trial, and so it was Defendants' preference that Rivera only be allowed to ask Wixted about how his theory applied to the 2010 Lopez statement they were trying to discredit. That argument is nonsensical. In preparing his opinions in this case, Wixted reviewed the entire factual record, including each of the various Lopez statements about which Rivera's counsel asked him. Ex. 62 (Wixted Report) at 11-12; Ex. 63 (Wixted Dep.) at 15-17, 171-172, 330, 335. In addition, Defendants themselves asked Wixted to opine on the stand that certain parts of Lopez's 1990 criminal trial testimony concerning the lineups incorporated purportedly false memories. Ex. 16 at 4008. Moreover, Defendants themselves questioned Wixted about Lopez's post-conviction and deposition testimony. Ex. 16 at 4007. Defendants cannot complain that Plaintiff covered the very same statements on cross-examination.

This conclusion is even more unavoidable when the Court considers that the main theme of Defendants' direct examination of Wixted was that "the most important thing I can say today

is focus on the *initial* memory test. It's my constant message to the legal system." Ex. 16 at 4015 (emphasis added). Given that testimony, Defendants' suggestion that the cross-examination should have been limited to the 2010 Lopez statement, and that the initial memory tests in 1988 and 1990 were somehow out of bounds, is beyond frivolous. Defendants have not, and cannot, articulate any valid reason why Rivera should have been barred from asking about how Wixted's memory theories impacted all of Lopez's various statements, as opposed to just the one statement that Defendants were trying to undermine.

Taking a step back, Defendants' argument rests on a missing foundation. There is no rule that experts are immune from questions about critical but inconvenient facts in the record. On the contrary, when experts try to ignore facts in the record that cut against their side's positions, it is common to ask them whether their opinions might change if they assumed the new facts. *Williams v. Illinois*, 567 U.S. 50, 69 (2012) ("Modern rules of evidence continue to permit experts to express opinions based on facts about which they lack personal knowledge[.]"); *Pillsbury Co. v. Conboy*, 459 U.S. 248, 259-60 (1983) (cross examination is intended to and often will produce information not elicited on direct).

Defendants also complain that the Court supposedly ruled that certain subjects were out of bounds when it barred Rivera's eyewitness expert Dr. Dysart and dismissed the suggestive identification claim. The argument made no sense when it was raised at trial, Ex. 16 at 4109-20 (arguing incorrectly that the Court had ruled that these issues were "out of the case"), and it still makes no sense. As the Court said several times, if the Defendants had an earlier ruling that they thought applied to prevent Rivera's questioning, they were obligated to present it to the Court. They could not present such a ruling at trial, and they still have not. *See* Ex. 16 at 4020 (Court repeating its admonition, " I just told you if you're going to rely on a ruling [that a subject was

supposedly barred], I need to see the ruling"). Cutting to the chase, Defendants have conspicuously failed to explain how the Court erred. They are unable to cite a single case from any jurisdiction suggesting in any way that cross-examination should or could have been limited in the manner they suggest. That is because the law is the opposite. *Bozovich*, 782 F.3d at 816; *Deitchman*, 740 F.2d at 562; *Bronston*, 409 U.S. at 358-59.

In addition, Defendants cannot identify a single objection anywhere in the Wixted transcript that should have been sustained but was not. There are none. Indeed, a large portion of Rivera's cross-examination proceeded without objection—because the questions were not objectionable. Ex. 16 at 4037-39. (Wixted admitting, without objection, that "the same emerging memory theory that you talked about with Mr. Given with [in connection with Lopez's 2010 statement], that would also apply in 1990, right?"); Ex. 16 at 4018 (Wixted conceding, without objection, that children are more vulnerable to manipulation, and explaining why); Ex. 16 at 4021 (Wixted admitting, without objection, that he had reviewed Lopez's 1988 statement and acknowledging that this first account was important to Wixted's memory theories); Ex. 16 at 4029 (Wixted answering questions without objection about how his memory theories apply to Lopez' 1990 statement); *see also* Ex. 16 at 4079 (defense counsel eliciting from Wixted on redirect that the "first properly conducted memory test," *e.g.*, the 1988 and 1990 Lopez statements, are more important than subsequent ones, *e.g.*, 2010 Lopez statement). Again, Defendants cannot now object to questions they let pass without objection at trial, and they cannot surmount the high bar of the plain-error standard. *Jimenez*, 732 F.3d at 720.

As for the questions to which Defendants did object, the Court quite properly overruled them. Ex. 16 at 4019 (court properly overruled scope objection to questions about "retrospective bias," which was a subject defense counsel had elicited at length on direct); Ex. 16 at 4026 (court

overruling Defendants' scope objections to questions about the lineups where that topic was covered on direct, noting "I sat here listening to that. Overruled"); *see also* Ex. 16 at 4033 (the court responding to a speaking objection: "Well, I told you to make an objection, and I'll sustain it. I'm sitting here, and no one's objecting."). Because Defendants cannot point to any objection that should have been sustained but was not, they cannot show the Court committed error.[27]

### G. The Court Properly Exercised Its Discretion In Limiting the Cumulative Opinion Testimony of Wasilewski

Defendants next contend that the testimony of Wasilewski was unfairly limited. Doc. 713 at 21-25. To say this issue was carefully considered by the Court would be an understatement. There was extensive briefing and argument on a motion *in limine* regarding reasonable diligence, a motion *in limine* regarding Wasilewski, a renewed motion to bar, a motion to reconsider, and a final motion to bar. The parties collectively filed 10 briefs, and the Court wrote three opinions and explained its reasoning on the record. Docs. 413, 449, 506, 531; Docs. 418, 457, 506, 550; Docs. 607 ; Docs. 609, 618, 619, 638; Doc. 641, 647; Ex. 3 at 334-36; Ex. 6 at 1352-58; Ex. 14 at 3368. The Court's conclusion that Wasilewski's testimony should be limited was sound and Defendants present no new reason to revisit it.

There was another important factor justifying the Court's decision to limit Wasilewski's testimony: the issue became moot given how the testimony payed out at trial. As the Court's order of June 22 explained, Defendants elicited the bulk of their Wasilewski opinions through the prosecutor Victorson at trial, such that Wasilewski's testimony would have been "cumulative

---

[27] If anything, the Court was overly solicitous to Defendants' position, sustaining objections in order to keep things moving along for the very last witness in this lengthy trial. The parties were trying to finish the evidence on June 26, and Wixted testified late in the final afternoon of trial. By agreement, the cross-examination was on the clock with a time limit, and the Court in fact sustained objections limiting this cross-examination in a way that, in Plaintiff's view, would have been appeal issues for Plaintiff had the verdict gone the other way. Ex. 16 at 4032-34 (Court remarking that everyone was on time limits, and then sustaining objections). Overruling objections that should have been sustained, as Defendants contend, was not a real problem for Rivera's cross-examination of Wixted.

and likely to waste the jury's time." Doc. 638 at 8 n.4.

 This conclusion was correct. Defendants' counsel examined Victorson, a former Cook County Prosecutor, about the very same subjects about which their motion complains Wasilewski should have been allowed to opine. For instance, Wasilewski would have testified that Wadas should have interviewed witnesses disclosed by the State, Doc. 713 at 23-24, but Defendants instead solicited Victorson's opinion on that very subject, Ex. 13 at 3129; *see also* Ex. 13 at 3133 (Victorson confirming that "if Mr. Wadas thought it was important enough to follow up on the information in that [police] report, in light of his client having told him that he was in a lineup, he could have interviewed the police officers who were listed in the report").

 Defendants also wanted Wasilewski to testify that Wadas could have interviewed the eyewitness, Lopez, or at least had an investigator do so. Doc. 713 at 23-24. Again, Defendants had already elicited that very same opinion from Victorson, who explained that prosecutors would not have blocked those attempts. Ex. 13 at 3133-34. Victorson added that nothing would have prevented Wadas from going out to talk with the owner of the store where Lopez claimed to be in order to impeach Lopez, Ex. 13 at 3142-43, and he testified that Wadas had other impeachment material on Lopez available to him prior to trial. Ex. 13 at 3147-48.

 Victorson also opined that "when the [police] report disclosed that there were photos that had been inventoried of the people in the photo array, that was also something that Mr. Wadas could have gotten rather easily." Ex. 13 at 3138-39 (state would have given them voluntarily, or he could have subpoenaed them). Victorson explained that it was "common" for defense lawyers to have to make multiple attempts to get all the information. Ex. 13 at 3130. These are points that Defendants wanted to bring out a second time through Wasilweski. Another Wasilewski point that Victorson covered was that if Wadas had filed a motion to suppress the identification of

Rivera, then Wadas could have obtained more information about Rivera's then-theory that there had been a first lineup. Ex. at 3139-41. Victorson confirmed that there was "nothing that would have prevented Mr. Wadas from filing such a motion if he felt that was worth pursuing." *Id.*

Reviewing Wasilewski's report and Defendants' motion, there are barely any opinions that Defendants' counsel wanted to present but neglected to solicit from Victorson. If anything, counsel basically used the Wasilewski report as a template for his Victorson examination. For that reason alone, it was proper to bar Wasilewski from repeating the same opinions, as the law in the Seventh Circuit is clear that only one expert per subject matter is permitted. *Sunstar, Inc. v. Alberto-Culver Co., Inc.*, 2004 WL 1899927, at *25 (N.D. Ill. Aug. 23, 2004) ("[T]his district generally prohibits a party from offering multiple experts to express the same opinions on a subject") (citing form Final Pretrial Order, stating "Only one expert witness on each subject for each party will be permitted to testify absent good cause shown"). Moreover, the Court has wide discretion to bar evidence as cumulative, and it certainly did not abuse its discretion by doing so in this case. *United States v. Curry*, 977 F.2d 1042, 1050-51 (7th Cir. 1992) (district courts have broad discretion to exclude relevant expert testimony if it is redundant).

It is also very much worth noting that the Court did permit Wasilewski to testify at trial, and some of his testimony covered the very subjects identified in Defendants' motion. Ex. 15 at 3668-3701. For example, Defendants' motion argues that Wasilewski should have been able to testify that Wadas "could easily have gotten copies of the documents he claimed he did not receive," Doc. 713 at 23, but Wasilewski did testify about how the criminal courts were organized and how discovery works in Illinois, including the obligations of prosecutors to furnish evidence requested by defense attorneys. Ex. 15 at 3674-75, 3692-94. Similarly, Wasilewski specifically testified that criminal defense attorneys had the ability to file motions

seeking additional discovery, serve subpoenas for investigative files, and make requests to prosecutors that detectives should be required to bring their files to court. Ex. 15 at 3680-83.[28]

Just about the only subjects left that Defendants are complaining Wasilewski was barred from talking about—namely, that Wadas should have checked hospital reports and taken scene measurements, Doc. 713 at 24—were not actually in Wasilewski's report, Ex. 64 (Wasilewski Report), and they were never proffered at any point during trial. Defendants cannot now claim error for not being allowed to call Wasilewski to testify about things that they never disclosed or asked the Court to allow. Moreover, the Court's original ruling on the Wasilewski motion *in limine* ordered that Defendants should make an offer of proof if they thought Wasilewski had relevant opinions that had been excluded. Doc. 550 at 3 n.2. Although Defendants asked the Court to *voir dire* Wasilewski on his qualifications, they never made any proffer along the lines specified by the Court setting out his potentially relevant opinions. That, too, dooms their argument. *Mason*, 233 F.3d at 1043; *Wilson*, 758 F.3d at 885; *see also Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1026 (7th Cir. 2016) (district court did not abuse its discretion when excluding a witness as cumulative, particularly where no proffer was made).

Defendants argument about Wasilewski also fails on the merits for all of the reasons the Court has already expressed in its prior opinions. Docs. 531, 550, 638. Despite never having been one, Wasilewski sought to opine on what criminal defense attorneys should or should not have done in certain circumstances, which was not appropriate. The Court also correctly identified problems with his methodology and opinions not disclosed in his report. There was no abuse of discretion and, regardless, Defendants have completely failed to demonstrate sort of prejudice that could justify a new trial.

---

[28] Vindicating the Court's concerns about cumulativeness, the Wasilewski examination on other subjects—those that were permitted by the Court—were numbingly repetitive of Defendants' examinations of Wadas, Victorson, and Murray.

### H.     The Verdict Was Not Against the Manifest Weight of the Evidence

Lastly, the individual Defendants incorporate their Rule 50(b) motion, arguing that the

verdict was against the manifest weight of the evidence, such that they should be granted a new

trial. Doc. 713 at 26-30; *Walden v. Illinois Central*, 975 F.2d 361, 365 (7th Cir. 1992) (verdict set

aside only if against manifest weight of evidence, damages are excessive, or trial was not fair).

The Court has broad discretion to determine whether to grant a new trial. *McNabola v. CTA*, 10

F.3d 501, 516 (7th Cir. 1993). In deciding whether a verdict is against the manifest weight of the

evidence, this Court can weigh the evidence, assess credibility, and compare facts introduced at

trial. *Byrd v. Blue Ridge Rural Elec.*, 356 U.S. 525, 540 (1958). The power to grant a new trial

"is not unlimited: a certain deference to the jury's conclusions is appropriate." *Mejia v. Cook

County*, 650 F.3d 631, 633 n.1 (7th Cir. 2011). "This deference is encompassed within the

manifest weight standard, which balances a decent respect for the collective wisdom of the jury

against a duty not to approve miscarriages of justice." *Id.* Jury verdicts deserve "great deference"

in cases with "simple issues but highly disputed facts." *Latino v. Kaizer*, 58 F.3d 310, 314 (7th

Cir. 1995). "In weighing the facts, the district court is bound to the same evidence the jury

considered, and can strike a piece of evidence from its weighing process only if reasonable

persons could not believe it because it contradicts indisputable physical facts or laws." *Mejia*,

650 F.3d at 633. On this standard, Defendants' weight-of-the-evidence argument fails for the

forfeiture and merits reasons discussed above.

*     *     *

To the extent the individual Defendants' objections to the handful of rulings discussed

were preserved, the Court's rulings were not even erroneous, much less an abuse of discretion,

much less the source of prejudice that would justify a new trial. Their motion should be denied.

## V.    THE CITY'S CHALLENGES TO THE *MONELL* VERDICT FAIL

### A.    The City Forfeited Many of Its Arguments for Judgment or A New Trial

The City begins its Rule 50(b) motion by arguing that Rivera failed to prove at trial that evidence in the Valentin investigative files were suppressed and exculpatory. Doc. 707 at 2-3. But these arguments were not developed at all in the City's Rule 50(a) motion, which asserted without elaboration that the evidence Rivera contended was suppressed was not exculpatory and incorporated other briefs by reference. Doc. 629 at 3-4. This Court ruled post-trial that the City had failed to adequately preserve this argument, Doc. 676 at 6 n.1, and the City's more-expansive new arguments are certainly forfeited.

The City also forfeited the following arguments now included in its Rule 50(b) motion: (1) that the evidence does not support a verdict against it on a theory that it allowed gaps in policy to exist, see Doc. 707 at 9-10; and (2) that the evidence does not support a verdict based on the City's policies and practices (or lack thereof) governing Gang Crimes officers, see id. at 14-15. Neither of these arguments is even mentioned in the City's Rule 50(a) motion. Doc. 629. The City cannot pursue them now. *Empress Casino*, 831 F.3d at 823-24.

Moreover, there are additional arguments in the City's Rule 50 motions that are so undeveloped that they cannot justify judgment or a new trial and need not be addressed. *Opp v. Wheaton Van Lines*, 231 F.3d 1060, 1066 (7th Cir. 2000); *see also Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 569-70 (7th Cir. 2004). They are identified with specificity below.

In addition to Rule 50 arguments, the City regurgitates its *Monell* arguments under Rule 59. Doc. 708. But its failure to assert them prior to judgment also forfeits them under Rule 59 and dooms its request for a new trial. *Willis v. Lepine*, 687 F.3d 826, 838 (7th Cir. 2012); *Jimenez v. City of Chicago*, 732 F.3d 710, 719-20 (7th Cir. 2013).

78

Given the City's failure to preserve challenges to multiple *Monell* theories on which the jury was instructed, the City has forfeited or waived any argument that it is entitled to judgment or a new trial. *Thomas*, 604 F.3d at 305 n.4 (evidence supporting one of multiple theories of liability sufficient to sustain *Monell* verdict); *Kossman v. Northeast Illinois R.R. Corp.*, 211 F.3d 1031, 1037 (7th Cir. 2000). Such forfeitures are strictly enforced, and there is no reason to look past them here. The Court should start and end its analysis of the *Monell* verdict with the City's failure to properly preserve arguments. Forfeiture aside, the evidence supports the jury's verdicts on all theories of *Monell* liability, and Defendants' motion should be denied on that basis as well.

### B.    Street Files *Monell* Theory

#### 1.    Summary of the Factual Record Related to Street Files *Monell* Claim

In 2010, the Area investigative file for the Valentin file was produced for the first time. Ex. 9 at 2202. Rivera's criminal defense attorney, now-Judge Wadas, had preserved his original file, thereby permitting a comparison. Ex. 6 at 1366. It turned out that Wadas never received a number of important documents from the investigative file during the criminal proceedings, including all of the GPRs. Ex. 6 at 1404, Ex. 10 at 2244-2248. The previously undisclosed documents included the August 27 GPR containing the critical first memorialization of Lopez's account that put him "by the store" (instead of coming from the store, as was recorded in the police report); an August 27 GPR regarding Lopez that contradicted Defendants' story that the gang book identification happened on that date; an August 31 GPR, a Rivera arrest report, and related hold and arrest reports, which together suggested that Rodriguez was at one point going to be charged with the shooting, that the police were preparing to put Rivera and Rodriguez in a lineup, and cumulatively that in fact the First Lineup occurred. Ex. 6 at 1385-88, 1403-12, Ex. 10 at 2244-51, PX268, PX269. In addition, the investigative file contained Rivera's rap sheet

requested on August 27, two days before the police claim Rivera was selected from a gangbook and became a suspect. *See supra* at 3, 14. Wadas testified that he never received these materials. Ex. 6 at 1388-1389. He further testified that if he had, the documents would have provided powerful evidence of his client's innocence, and the trial prosecutor Victorson admitted as much as well. Ex. 6 at 1387-1388, Ex. 13 at 3108. The City's designee Hickey admitted that all of these documents should have been disclosed. Ex. 6 at 3292-95.

Moreover, the original investigative file contained an index of the GPRs, two of which are missing to this day from the CPD's original version of the file. Ex. 4 at 757-763, Ex. 7 at 1605-06. The missing GPRs are from the critical first two days of the investigation, August 27 and 28. *Id.* Someone at some point apparently undid the metal fasteners on this original file and removed them, though no one could explain why the originals were taken out of the file, where they went, or what they said, or where they are now. *See, e.g.*, Ex. 4 at 762-66, Ex. 15 at 3564. Witnesses testified that a lost or destroyed police report is a rare and unusual event. Ex. 4 at 756-58, Ex. 6 at 3910-11.

One of the *Monell* claims at trial turned on whether the failure to provide the investigative file during Rivera's prosecution was an aberration or, as Rivera alleged, a matter of both policy and practice. Rivera's expert, Michael Brasfield, as well as the City's own witness, James Hickey, testified that the CPD was fully aware that it had a "street file" problem in 1982 and 1983, after a whistleblower disclosed the existence of the problem in the George Jones case. In that case, highly exculpatory information was buried in a street file—in essence, a parallel set of police files kept by the homicide detectives at the Area containing investigative notes and documents that never made it into the official file produced to criminal defendants, Ex. 9 at 2182-2184—and resulted in the wrongful prosecution of Mr. Jones. Based on the revelations in

*Jones*, a class action called *Palmer v. City of Chicago* was filed, and in federal hearings in that related litigation the City was put on notice that it had a systemic problem. Ex. 9 at 2182-93, Ex. 13 at 3210-15; 3240-46, Ex. 14 at 3275-76. Those problems included: (a) allowing documents created during homicide investigations to be placed in unofficial parallel files kept by the detectives, commonly referred to as street files, (b) failing to document pertinent investigative leads and other information in police reports, in essence concealing whole branches of the investigation, and (c) failing to disclose exculpatory and impeaching material contained in street files to prosecutors and criminal defendants.

The question in this trial was whether the so-called reforms the City put in place, in the form of Detective Division Special Order 83-2 and its subsequent revision 86-3, were facially and obviously deficient, and whether the problems revealed during *Jones* and *Palmer* persisted through the time frame that Rivera was prosecuted. The jury found against the City on these claims, with respect to both the City's official policies as well as its practices.

Regarding the former, Riveras expert, Michael Brasfield, testified that the City's written policies were plainly deficient. Among other things, he opined that the new policy: (a) retained the decentralized record-keeping system that perpetuated the system of multiple, unofficial parallel files at the heart of the *Jones* and *Palmer* litigation; (b) did not cover gang crimes units and other investigators involved in homicide investigations; (c) did not define what constitutes relevant information that must be documented in reports; and (d) did not contain instructions to ensure that the investigative file and each of the various other parallel sources of police documents were searched for and produced in response to criminal court subpoenas. Ex. 9 at 2186-2193. Most critically, the new Special Order instructed City employees to disclose inventory sheets contained in investigative files, but did not direct City employees to actually

disclose the investigative files themselves, nor were clerks provided any written guidelines in that regard, much less any training. Ex. 9 at 2189-2190. And making the policy deficiencies all the more egregious, the federal judge overseeing the *Palmer* hearings issued orders expressly identifying many of the problems above, placing the City's policymakers on full notice that these were failures that needed to be corrected to prevent additional constitutional violations like the one George Jones experienced. Ex. 9 at 2185-2186.

Both Brasfield and the City's designee Hickey testified that the City was well aware that there was substantial resistance from CPD officers to changing their documentation and file-keeping practices, yet there was a single, three-hour training for detectives on the new policy, and no monitoring or auditing to ensure that the new policy was actually followed. Brasfield opined, and Hickey all but conceded, that these efforts were insufficient to overcome a problem as entrenched as this one was. Ex. 9 at 2186-2187, Ex. 14 at 3315. The only person at trial who thought that made sense was the City's expert, Jeffrey Noble, who has made more than $400,000 defending City policies and practices in more than 20 other cases. Ex. 14 at 2186-2187.

It was no surprise then that, when it came to the City's practices, the problems identified during *Jones* and *Palmer* continued unabated. Brasfield conducted a comprehensive audit of the street files problem, examining an agreed-upon representative sample of files from other homicide investigations. Ex. 9 at 2200-28. Analysis of that data revealed that in 61% of the cases, the requirement to create GPRs was not being complied with, in 37% of the cases the rule requiring inventories was disregarded, and in 92% of the cases documents contained in the unofficial investigative files were not making it to the criminal justice system; and overall. Ex. 9 at 2210-15, 2248. A full 100% of the files contained evidence of failures to follow the post-*Palmer* policies. *Id.* at 2214-15. Defendants' expert, Bernard Murray, chose not to conduct

his own corresponding review to see if the practices changed after the new policies were enacted, and so Brasfield's testimony on these issues was unrebutted. Ex. 16. at 3912-3919.

Brasfield also testified that his review of the City's official permanent retention files revealed that the problems identified in *Jones* and *Palmer* continued in additional ways. For example, he found that the permanent retention files were unlike the homicide files he saw in other municipalities, in that they contained only single chapter in a story, as he put it. Ex. 9 at 2174-2179. In other words, homicide investigations typically have branches that produce leads, and others that end up being dead-ends; but the CPD permanent retention files he reviewed only told the single branch of the story that let from crime to charged suspect, in effect excluding alternate suspects, different witnesses, and other types of materials a criminal defendant would need to build a defense. Ex. 9 at 2218-20. Defendants' expert, Bernard Murray, failed to rebut this testimony. Ex. 16 at 3912-19.

Finally, Brasfield also compared criminal defense files to their corresponding investigative files in order to determine whether, at the end of the day, materials from the unofficial investigative files was getting to criminal defense attorneys. His findings were troubling. Materials from the investigative file were missing from more than 90% of the defense files, and 74% were missing police notes, the sort of crucial street file material that had been the subject of *Jones* and *Palmer*. Only 8% included the inventories that were supposed to be disclosed to defense attorneys under the new policies. Ex. 9 at 2226. Brasfield and Murray testified about multiple cases—*e.g.*, Nathson Fields, James Kluppelberg, Samuel Robinson, Demetrius Johnson, David Quinones, Miguel Borrotto, and Curtis Kirkland—in which the withheld materials were the type of important investigative material that by all accounts should have been turned over, and that a jury could deem material. PX 145A (James Kluppelberg), PX

146A-C (Nathson Fields), PX 154 (Samuel Robinson), PX 154J (Demetrius Johnson); PX 154K (Curtis Kirkland), PX 154N (David Quinones), PX 154Q (Miguel Borrotto); Ex. 10 at 2252-2271; Ex. 16 at 3846-54 (Defense expert Murray), 3857-61, 3870-71 (Murray re: Robinson), 3872-83 (Murray re: Johnson, Quinones, Borrotto, Kirkland), 3884-85 (Murray re: Pacheco), 3886 (Murray re: Fields). Of the multiple analyses of practices that Brasfield conducted, *supra*, this was the only one on which Defendants' expert Murray conducted his own analysis, focused on the corresponding State's Attorney's Office files. Defendants' argument was that the State's Attorney files would contain the information missing from the criminal defense file, purportedly absolving CPD of responsibility. The problem is that the evidence ended up being to the contrary. As Murray was forced to admit, he consistently found that material missing from criminal defense attorney files was also missing from the prosecutor files, including many of the specific examples above of highly exculpatory material missing from criminal defense files. Ex. 16 at 3846-54, 3857-61, 3870-71, 3872-83, 3884-85, 3886, 3912-19.

Perhaps the biggest problem with the City's policies and practices was the Gang Crimes hole. Gang Crimes officers were out on the street solving crimes, and were fully involved in homicide investigations, as they were in Valentin. Ex. 14 at 3347-51, 3386-88, 3397, Ex. 8 at 1694; 1702; 1766-1767. As such, they should have been subject to the rules governing detectives with regard to documenting investigative steps and ensuring that such material was produced to the criminal justice system. Ex. 9 at 2191. It did little good to make rules requiring detectives to preserve notes and disclose information if the Gang Crimes officers were all going to remain exempt from those rules. But this is exactly what happened. Ex. 14 at 3290-92, 3347-53, 3355, 3359-63, 3386-91, 3397, 3411, 3415, 3425-29. This despite that the City designee James Hickey recommended, in the early 1980s when the City was discussing policy changes, that gang crimes

be included in the new Special Orders. *Id.* at 3290-91; Ex. 9 at 2195, Ex. 14 at 3481. His

proposal was rejected, and as the City's designee James Spratte testified, rather than being

subject to rules, the Gang Crimes officers were given free reign. They were permitted to operate

almost entirely outside the system and to keep their own personal notes in their own set of

parallel files, all without being subject to the training or the Special Orders applicable to the

detectives they worked with on investigations. *Id.* at 3347-53, 3355, 3359-63, 3386-91, 3397,

3411, 3415, 3425-29. They even created additional documents like daily activity sheets (or

"humpers") that were full of investigative details that would be highly relevant to mounting a

defense (*e.g.*, whether a witness was spoken to on, say, August 27 or 29, or whether there were

efforts to locate a witness on, say, August 31). Ex. 9 at 2198-2200, Ex. 10 at 2420, Ex. 14

at 3347-51, 3386-88, 3397, Ex. 16 at 3902-06, PX 177. In fact, the daily activity sheets were

expressly intended to "***not*** include information normally contained on Official Department

reporting documents." PX 177, *i.e.*, an "official but unofficial report." In essence, the City

allowed the Gang Crimes officers to maintain completely off-the-books files, despite the known

and obvious constitutional harms that could result.

### 2. Street Files *Monell* Theories Not Challenged in Any of Defendant's Post-Trial Motions are Forfeited and Independently Support Liability

The City has not challenged *Monell* liability based on actions of policymakers. The City's

forfeiture on that theory means the *Monell* verdict is sufficiently supported, and no further

analysis is required. Nevertheless, out of an abundance of caution, Rivera explains the evidence

at trial that fully supports liability on this theory.

The City is liable for the deliberate conduct of officials whose acts may fairly be said to

be those of the municipality. *Board of County Commissioners v. Brown*, 520 U.S. 397, 403-04

(1997). If the jury could reasonably conclude based on the evidence that authorized decision

makers made a decision that violated Fields's constitutional rights, the City is liable. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).

The jury's verdict on the policymaker theory is supported by evidence discussed above in connection with the express policy theory—policymakers admittedly on notice of a problem took patently inadequate action, consciously choosing not to adopt obviously needed policies and creating a risk that investigative materials would be suppressed, which is exactly what came to pass in Rivera's case.[29] The decision to intentionally omit policies necessary to solve a problem is intentional conduct by policymakers sufficient to sustain the *Monell* verdict on this theory. *Vodak v. City of Chicago*, 639 F.3d 738, 747-48 (7th Cir. 2011) (actions of policymakers about how to implement policy gives rise to liability). These actions at minimum demonstrate deliberate indifference by policymakers, creating a risk of harm to which Rivera was exposed. *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction"); *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) (policymaker aware of a systematic lapse in policy who fails to correct renders municipality liable).

Given that the City advanced no argument in support of a new trial on the final policymaker theory, and that it is the City's burden to demonstrate the jury was irrational, there was also sufficient evidence for the jury to conclude that the City delegated policymaking authority to the individual line employees of the subpoena service unit by giving them no

---

[29] The jury instructions and the law justify a jury's reasonable conclusion that the policymaker could have been the Superintendent, who the evidence shows was on notice of the street files problem and explicitly participated in formulating the City's policy response, Ex. 9 at 2184-85, 2200, Ex. 13 at 3214-15, 3244, but also could have been the City's designee Hickey, who actually wrote the policies on which the CPD signed off. Ex. 13 at 3214-18, 3222. Hickey was exercising delegated authority to make policy in this area, which gives rise to municipal liability. Jury Instructions, Doc. 671 ("This includes the Superintendent's approval of a decision or policy made by someone else."); *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 675-78 (7th Cir. 2009)).

policies, training, or oversight. Ex. 14 at 3277-80 (no training or instruction), 3283-85 (responding to requests is an "art form"), Ex. 9 at 2178-79, 2188-91; *Valentino*, 575 F.3d at 675-78. Without any guidelines, constraint, or review, these employees made policy through their actions as they responded to subpoenas and file requests. Rivera's counsel made multiple requests for the police files in the Valentin case but never received the investigative file. Municipal liability against the City is fully established based on this unchallenged theory alone

### 3. Street Files Challenges Included in the City's Rule 50(a) and Rule 50(b) Motions

The City's Rule 50(a) and Rule 50(b) motions challenge the sufficiency of evidence supporting the express policy, widespread practice, and failure to train *Monell* theories. The City's arguments fail.

#### (a) The Failure to Allege A Due Process Violation by Any Individual Defendant

The City argues that Rivera cannot sustain a *Monell* verdict based on the street files theory because Rivera failed to prove an underlying *Brady* violation occurred in his case. Doc. 707 at 2-3. This argument is forfeited, and otherwise without merit.

*The City's Arguments are Forfeited.* As an initial matter, the City's arguments that particular items of evidence are not material are largely forfeited because the City's Rule 50(a) motion made only a cursory argument that two specific withheld documents were not material—the August 27 "by the store" GPR and the August 27 rap sheet. Doc. 629 at 3-4. The City newly argues in its Rule 50(b) motion that the inventory sheet indicating that two additional GPRs were missing was not material. This argument has been forfeited. So too are its arguments with regard to the rest of the withheld material that are not discussed in either its Rule 50(a) or Rule 50(b) motions, including all of the GPRs, arrest reports and hold/release reports providing

evidence of a first lineup, the August 27 GPR undermining the claim that the Lopez gangbook identification occurred on that date.

For the remaining two documents for which the City did not forfeit its argument, the City's argument is contrary to the evidence. Rivera presented ample evidence that evidence related to *each* of these two documents could have severely undermined the prosecution, Ex. 6 at 1403-1412, Ex. 13 at 3149-3151, Ex. 10 at 2249-2251, *supra at* 14, 29, especially when considered in the aggregate as they must. *Wearry*, 136 S. Ct. at 1007. The August 27 rap sheet undermined the entire theory by which Rivera became a suspect, strongly suggesting a frame-up calling into question Lopez's initial gangbook identification. Likewise, the "by the store" GPR would have eviscerated the credibility of the sole eyewitness, Lopez, and the reliability of his purported identification.

Also forfeited is the City's reasonable diligence argument, raised for the first time in its Rule 50(b) motion. Even if not, Rivera presented ample evidence of defense attorney Wadas' diligence. He issued discovery and requested additional documents from prosecutors several times, and they confirmed that he had everything they had (further evidence that the *Brady* material was in fact withheld from the defense *and the prosecution*). Ex. 6 at 1377-1380. Both Wadas and the prosecutor Victorson testified that Wadas knew the prosecutors for a long time and it was appropriate for him to trust them that they had given him everything they had, and Victorson went even further, stating that Wadas' entire effort as defense counsel was diligent. Ex. 13 at 3093, 3113-3114. The jurors were certainly entitled to credit all of this evidence and reject the City's reasonable diligence argument, as they did.

*The City's Arguments are Without Merit.* In any event, for all of reasons discussed above, *see supra* at 29, 35, Rivera submitted ample evidence to support the jury's finding of a *Brady*

violation, based on any one of the numerous documents in the investigative file withheld from
defense attorney Wadas. And even if there was some gap in the evidence of the individual
defendants' liability for the *Brady* violation, the City would still be liable. This is because the
Seventh Circuit's rule, set forth in *Thomas v. Cook County*, is that "a municipality can be held
liable under *Monell*, even when its officers are not, unless such a finding would create an
*inconsistent* verdict." 604 F.3d 293, 305 (7th Cir. 2010); *see also Swanigan v. Chicago*, 775 F.3d
953, 962 (7th Cir. 2015) ("In some civil-rights cases, . . . a verdict in favor of individual
defendants would not necessarily be inconsistent with a plaintiff's verdict on a factually distinct
*Monell* claim."). Numerous judges in this district have applied this rule that a municipal policy
can cause a constitutional deprivation even if a jury finds the individual officers not liable. *See
Bonds*, 2018 WL 1316720, at *4-5 (N.D. Ill. Mar. 14, 2018); *Pickett v. Dart*, 2014 WL919673
(N.D. Ill. Mar. 10, 2014); *Wells v. Coker*, 2014 WL 716518 (C.D. Ill. Feb. 25, 2014); *Martinez*,
2011 WL 4686438, at *1; *Cage*, 2010 WL 3613981, at *1; *Evans v. Chicago*, 2010 WL 3075651
(N.D. Ill. Aug. 5, 2010).[30]

    And the same would be true in this case. A verdict for Rivera on his *Monell* theory that
the City's file-keeping system prevented transmission of exculpatory information to the criminal
justice system would be entirely consistent with a verdict that each individual defendant was not
personally responsible for the suppression of evidence. Put simply, the jury could have easily
found that the individuals put items of evidence where they were supposed to in Chicago Police
Department files, but that the City had no mechanism for ensuring those files got turned over to

---

[30]    Cases like this one, where a jury could find a policy caused a constitutional deprivation
without finding misconduct by a particular officer, are different in kind from cases where municipal
liability is premised on a particular officer's use of force, such as *City of Los Angeles v. Heller*, 475 U.S.
706 (1986).

Rivera or attorneys involved in his criminal prosecution.[31]

That issue is moot, however, because in this case the jury found Defendants Guevara, Gawrys, and Mingey all liable on Rivera's due process theory. The City, however, now argues that the fact that defendant McLaughlin was not found liable renders the City not liable because that would supposedly create an inconsistent verdict. Doc. 707 at 4-5. This argument, too is forfeited because it was not ever raised previously.

Even considering the merits, the City's argument is unsupported by law. Indeed, it attempts to turn the doctrine of *Thomas v. Cook County* (and the many cases that follow it) on its head. As discussed above, *Thomas* holds that a municipality can be liable even if no individual defendant is found liable; yet the City argues that even if an individual defendant (or three, in this case) is found liable, municipal liability is prohibited unless *all* of the defendants at trial are found liable. There is no legal support for this novel proposition.

For good reason, as this case exemplifies. After all, there are numerous ways a jury could have reached a verdict against the City on Rivera's street files *Monell* theory, without finding McLaughlin individually liable. First and foremost, the jury could have done so without finding any individual defendant liable, as set forth above. Second, that the jury found the three gang crimes defendants liable, but not detective McLaughlin, makes the argument even stronger. Those three defendants—Guevara, Gawrys and Mingey—are the ones who Rivera alleges

---

[31] Plaintiff presented evidence demonstrating a number of ways City policies prevented investigative information from reaching the criminal justice system, but one example was the City's response to subpoenas for documents from criminal defense attorneys through the so-called Subpoena Service Unit, which sometimes would—but sometimes would not—gather investigative materials from the detective division Areas and other units of the Police Department where investigative files relating to cases were kept. There were no written policies that governed the subpoena service unit and civilian personnel responding to subpoenas received no training. As a result, a systemic problem at the relevant time was that the City's response to subpoenas sent for records would exclude material exculpatory and impeachment records in the investigative files. The jury could find that this policy of the City prevented Rivera from receiving investigative materials, even if the individual Defendants are not liable for that suppression.

engaged in a frame-up starting from the first day of the investigation when they pulled Rivera's rap sheet and photo without any investigative basis to do so. At trial, Rivera made clear that it was Guevara who requested the rap sheet, with the purpose of framing Rivera, in conjunction with his partner Gawrys and supervisor Mingey. *See supra* at 31. The jury was entitled to credit the testimony of detective McLaughlin that she did not know about it, but that the three gang crimes Defendants did.

If the jury reasonably concluded that the three gang crimes officers were part of the frame-up but McLaughlin was not, as it certainly appears they did, then the obvious implication is that it was these conspiring defendants that concealed exculpatory evidence that would have thwarted their intended prosecution and conviction. Indeed, the jury could have concluded that it was the three gang crimes officers who removed two pages of GPRs from the investigative file, or concealed the GPRs and first lineup documents until after trial.

Likewise, the jury could have also found that the three gang crimes defendants took notes of their investigative activities and prepared daily activity worksheets as required, but suppressed these records to deprive Rivera of evidence of his innocence (*e.g.*, that they were able to locate Lopez on August 31, that they interviewed Nieves and Rodriguez as suspects). This, too, would independently support a liability finding against the gang crimes defendants and against the City on the street files claim, even without a finding against defendant McLaughlin. These and myriad other possibilities render the verdict entirely consistent

### (b) Express Policy Theory

The City asserts that the express policy theory fails because Rivera failed to present evidence that the policy was unconstitutional as written, rather than simply containing minor deficiencies. Doc. 707 at 5. This argument misconstrues the policy claim in this case, and ignores the ample evidence of an express policy presented at trial.

*The City's Arguments are Forfeited.* As discussed above, Rivera's express policy theory is based on the plain failures of the City's policies, which the City knew would produce constitutional violations. These include the express policies in Special Orders 83-2 and 86-3[32] that: (a) require the continued the use of a parallel file system in which notes and other investigative materials were kept in unofficial files in the Areas, and other locations scattered throughout the City, and deliberately segregated from typed police reports kept in the "official" secured permanent retention files; (b) leave it up to detectives to define and determine what constitutes relevant information that must be documented in reports, without instruction or guidance; (c) explicitly require that an inventory log (basically a log of the documents in the investigative file) be produced to prosecutors and defense attorneys, but not the actual documents contained in the investigative file or in each of the various other parallel sources of police documents; and (d) deliberately excluded Gang Crimes units and other investigators involved in homicide investigations from the new Orders' documentation and filekeeping requirements. At trial, Rivera also presented evidence that (e) Gang Crimes units followed an express policy of documenting what they did each day, including on homicide investigations, in off-the-books daily activity worksheets (or "humpers") that were not disclosed to anyone outside of their unit, but on which they were explicitly instructed by policy to document things they were not documenting in "Official Department reporting documents."

Of these theories, the City only challenged theories (a), (b) and (c) in their Rule 50(a) motion, (Doc. 629 at 8), and in each case with only one sentence of explanation. Theory (d) was challenged for the first time in Defendants' Rule 50(b) motion, Doc. 707 at 9-10, 14-15, and theory (e) is not challenged in any of the City's motions. Accordingly, all of these arguments are

---

[32] It is undisputed that Special Order 83-2 and 86-3 are very similar. Special Order 86-3 was operative at the time of the events at issue. Doc. 707 at 5.

forfeited, including (a)-(c) which are so cursory and undeveloped as to be deemed forfeited. *See Opp*, 231 F.3d at 1066; *Smith*, 388 F.3d at 569-70; *supra* at 11.

*The City's Arguments are Without Merit.* Turning to the merits, the City's Rule 50(b) motion makes a single express policy argument: that Special Order 86-3 does not explicitly "call for the concealment of exculpatory evidence," Doc. 707 at 5, and so it cannot be an unconstitutional policy. This is an erroneously cramped view of what constitutes an express policy. *Monell* liability attaches when municipal action, in the form of policy statements, ordinances, regulations, or other decisions officially adopted, causes a violation of constitutional rights. *Glisson*, 2017 WL 680350, at *5. A single application of a deficient express policy resulting in a constitutional violation is enough to establish liability. *Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005). A conscious municipal decision not to adopt or to omit needed policies creates liability under this framework. *Glisson*, 2017 WL 680350, at *5-6.

In that light, the City's attempt to tackle theories (a)-(e) above in sections on "gaps" in the City's investigative file policy and elsewhere, and then treat them as widespread practice claims, Doc. 707 at 9-11, 14-16, are therefore misplaced (and forefeited). The policies the City put in place, including the omission of policies that City officials knew were needed based on specific guidance being provided by a federal judge during injunction hearings, are all part of Rivera's express policy claim.[33] The jury reasonably concluded that the City's express policies

---

[33] The City relies on *Calhoun v. Ramsey*, 408 F.3d 375 (7th Cir. 2005), to argue that the gap in policy should be analyzed as a widespread practice. Dky. 708 at 8-9. But that case does not so hold, and in fact supports Plaintiff's theory. First, *Calhoun* affirms the principle that another way "of complaining about an express policy is to object to omissions in the policy." *Id.* at 380 (emphasis added). Second, *Calhoun* reiterates that the relevant inquiry is whether there is a "true municipal policy at issue, not a random event." *Id.* Here, the evidence clearly shows that there is a true municipal policy at issue: Special Order 83-2 and 86-3. And those policies contained a series of express instructions about what was required and who had to follow them; instructions that the City knew from *Jones* and *Palmer* created serious constitutional risks, but nevertheless chose to enact. In any event, even if the Court were to analyze any of these policies as "gaps" in policy, and in turn as widespread practice claims, the City was

violated Rivera's constitutional rights.

The jury heard the City was firmly on notice in the years preceding the Valentin homicide that it had a citywide problem creating, maintaining, and producing investigative material in police files. Specifically, the City knew that police kept street files containing investigative materials that were not produced to the criminal justice system. Ex. 9 at 2193-2195, Ex. 10 at 2379-2380; 2440-2442, Ex. 13 at 3247-3252, Ex. 14 at 3480-3486, Ex. 16 at 3900-3902. City policymakers responded by promulgating facially deficient written policies, Special Orders 83-2 and 86-3. Ex. 3250-51, Ex. 14 at 3286-3288; 3490, Ex. 10 at 2323-2328.

Beginning with the most obvious and clearly express, written policy (*i.e.*, not a gap in policy), the Special Orders contained an express instruction that only one thing from the investigative file needed to be disclosed: the inventory log. Ex. 10 at 2247-2248, Ex. 13 at 3229-3231; 3247-3248. That is, the policies governing the CPD's transmission of investigative files to prosecutors and others in the criminal justice system expressly instructed personnel to disclose the inventory log, but not the full contents of the file. This clearly express policy alone is sufficient to uphold the *Monell* verdict.

In addition, the policies dictated that police investigators could choose what documentation to create based on a subjective evaluation of what they deemed "relevant," Ex. 9 at 2178-2179, Ex. 10 at 2438, and expressly approved parallel investigative files for homicide investigations, Ex. 10 at 2247-48; 2274; 2437-2439. Even though the City was purportedly responding to the street files problem, the policies contained no command that street files should not be kept. Ex. 13 at 3247-3252. They also omitted written directives to the subpoena service unit, which responded to prosecutors and to subpoenas. Ex. 14 at 3277-3280.

---

clearly on notice of the problem with the policy and moreover, Plaintiff has provided numerous other examples of *Brady* violations stemming from the municipal policy at work.

The jury also heard evidence that the new policies intentionally did not apply to any CPD employees except for detectives, such that special investigation units participating in homicide investigations, like gang crimes, were exempted from the rules, even over the recommendation of City designee Hickey. Ex. 14 at 3290-91. Finally, the jury also heard evidence that in addition to being exempt from the Special Order applicable to the other investigators involved in homicide investigations (detectives), Gang Crimes officers created off-the-books daily activity worksheets that by express policy were used to document investigative information not placed into official reports. Ex. 16 at, 3902-06. Each of these express policies represents a conscious decision on the part of the municipality, and each independently justifies liability on the express policy theory.

The City does not contest causation in their Rule 50(b) motion on the express policy theory, and accordingly the argument is forfeited. To the extent the City raises such an argument, it does so in its discussion of a gap in policy, and in just three sentences. And it does so despite, at worst, failing to raise the argument in its Rule 50(a) motion, and at best, raising it in a single sentence in its Rule 50(a) motion. Doc. 629 at 12 ("[W]ith all of Brasfield's criticisms of CPD's record keeping policies and practices, he never identified one that caused any documents to be withheld from Rivera in this case."). These arguments are cursory and undeveloped (*e.g.*, Brasfield could not possibly have opined that the policies and practices caused the suppression in this case, because he would have been impermissibly opining on an ultimate issue for the jury), and therefore forfeited.

And on the merits, the jury reasonably found that the application of the express policies above plainly caused the violations of Rivera's constitutional rights. Consistent with the express policy, the City maintained a series of parallel files in the Valentin investigation, including an

official permanent retention file at the Records Division, a separate investigative file in the Detective Area, and a set of Gang Crimes notes and other documents they maintained in their own unit, among others. Consistent with the express policy, the permanent retention file contained official police reports, but did not include many of the notes and other documents kept in the parallel files. Consistent with the policy, the investigators exercised their discretion to record only certain relevant details in police reports placed in the official file, excluding evidence of innocence like the initial description that Lopez was "by the store," and Valentin's statement at the hospital that he was confident the shooter was an Imperial Gangster. Ex. 6 at 1385-88; 1403-12, Ex. 10 at 2244-51, PX268, PX269.Consistent with the policy, the parallel investigative file was not produced to Rivera before his trial and instead was hidden until after Rivera's exoneration during civil discovery in this case; the file contained a number of investigative notes and other documents that, as repeatedly discussed above, were powerful evidence of a frame-up and an unreliable and manipulated sole eyewitness. *Id.* Also consistent with the policy, the Gang Crimes officers kept another parallel file with their own notes and daily activity worksheets that were exempt from the Special Order, and the jury could reasonably conclude from the evidence that the off-the-books Gang Crimes documents would have contained additional evidence of innocence, such as successful efforts to find Lopez on August 31, interviews with Jose Rodriguez and Felipe Nieves, and so on. Ex. 16 at 3902-06. Put simply, the express policies at issue have a direct causal link to the withheld *Brady* material in this this case

### (c) Widespread Practice Theory

A municipal custom not formally approved gives rise to liability when a practice pervades to an extent where acquiescence on the part of policymakers can be inferred. *Glisson*, 2017 WL 680350 at *5 (citing *Monell*, 436 U.S. at 690-91); *Davis v. Carter*, 452 F.3d 686, 691-92 (7th Cir. 2006). At this stage, the verdict should stand if it was rational for a jury to

conclude based on the evidence that municipal officials knew of the widespread practice and failed to correct it. *Daniel v. Cook Cty.*, 833 F.3d 728, 735 (7th Cir. 2016).

The City's primary argument is that Rivera must show a pattern of repeated constitutional violations. Doc. 707 at 6-8, 9. Rivera presented more than sufficient evidence that City policymakers were indifferent to a pattern of constitutional harms, so he wins either way, but even before turning to that evidence the City is wrong on the law. A municipality is liable if its degree of fault rises to deliberate indifference—where policymakers choose a course of action among alternatives that presents a known or obvious risk of constitutional harm. *Canton v. Harris*, 489 U.S. 378, 388 (1989). As far as widespread practices are concerned, there must be evidence that policymakers were on notice of the risk presented by the practice and disregarded it. To be clear, it is knowledge and disregard of a risk of harm that is key. *Glisson*, 2017 WL 680350 at *8. That clarified the cases are replete with statements that a *Monell* plaintiff need only show a repeated pattern of behavior that provides notice *of the risk of harm*, and not a repeated pattern of *actual harms* to others. *Daniel*, 833 F.3d at 734 (custom and notice shown by "evidence tending to show a general pattern of repeated behavior," without "evidence that . . . systemic failings affected other[s]").[34]

Here, the jury was eminently reasonable to conclude, based on evidence related to the *Jones* and *Palmer* litigation and its aftermath, that City policymakers had notice of the risk of the constitutional harm that Rivera suffered, and disregarded it. As discussed above, the record contains overwhelming evidence that policymakers were on notice of that risk, but failed to

---

[34] *Dixon v. Cook Cty*, 819 F.3d 343, 348-49 (7th Cir. 2016) (notice of a systemic deficiency and inaction establishes liability); *Thomas*, 604 F.3d at 303 (policymakers "must have been aware of the risk created by the custom" of delayed responses to medical requests); *Davis*, 452 F.3d at 694-95 (rejecting same arguments City makes here); *Estate of Moreland v. Dieter*, 395 F.3d 747, 760-61 (7th Cir. 2005) ("[T]he plaintiff need not show that the policy, practice, or custom resulted in past deprivations of rights."); *Woodward v. CMS*, 368 F.3d 917, 929 (7th Cir. 2004) (no "one free suicide" pass).

remediate it sufficiently. *See supra* at 80.

Moreover, even assuming that the City were correct that municipal notice is confined to evidence of actual constitutional violations, the verdict must nonetheless stand because the jury was presented with ample evidence of such harms. Again, the jury heard direct evidence that, prior to Rivera's wrongful conviction, City policymakers, including the Superintendent, had notice of *Brady* violations in *Jones* and *Palmer. Id.* They also heard evidence that *Brady* violations based on investigative material suppressed in unofficial street files occurred in a number of other cases, including the prosecutions of, among others, Nathson Fields, James Kluppelberg, Samuel Robinson, Demetrius Johnson, David Quinones, Miguel Borrotto, and Curtis Kirkland; that highly relevant information was contained in the parallel investigative files and street files in each of those cases, but was not contained in criminal defense files; that in each one of those cases the investigative file records were also missing from prosecutor files; and that both Rivera's and the City's experts agreed that these were all documents that should have been disclosed to criminal defendants. PX 145A (James Kluppelberg), PX 146A-C (Nathson Fields), PX 154 (Samuel Robinson), PX 154J (Demetrius Johnson); PX 154K (Curtis Kirkland), PX 154N (David Quinones), PX 154Q (Miguel Borrotto); Ex. 10 at 2252-2271, Ex. 16 at 3846-54, 3857-61, 3870-71, 3872-83, 3884-85, 3886, 3912-19.

Despite the evidence at trial of numerous cases in which specific police documents containing, alternate suspects, lineup shenanigans, and witness statements undercutting the police version of events were not found in defense attorney or prosecutor files, *id.*, the City presses the argument in its Rule 50(b) motion that Rivera failed to prove a *Brady* violation in each of the cases. Doc. 707 at 7-8. But these arguments challenging Rivera's examples of specific harms in specific cases were not raised in the City's Rule 50(a) motion and are forfeited.

Even turning to the merits, the City's arguments are simply a re-hash of the arguments they made at trial, and that the jury reasonably rejected. In addition, the premise of Defendants' argument—that for each example from another homicide file to support Rivera's claim, it must present a perfect and complete chain of custody and the entire criminal transcript must be presented to the jury to assess materiality, Doc. 707 at 7-8—is unsupported, and simply wrong. Especially where, as here, both parties had access to all of the same files, and their experts were given an opportunity to debate all of these points. The jury ultimately sided with Rivera's expert Brasfield, who reviewed hundreds of thousands of pages of relevant documents, including investigative files, criminal defense files, prosecutor files and criminal trial materials, and offered testimony that based on his review the particular examples of withheld police records were not disclosed to criminal defense attorneys and should have been under generally accepted police practices. It was particularly appropriate for the jury to accept this conclusion where Defendants' expert Murray reviewed the same files and largely admitted that the *Brady* examples should have been disclosed but were not (indeed, were missing from both defense attorney and prosecutor files). Ex. 16 at 3846-54, 3857-61, 3870-71, 3872-83, 3884-85, 3886, 3912-19. The jury had everything it needed in the evidentiary record to reasonably find that Rivera presented ample evidence of constitutional harms resulting from the City's widespread practices.

In addition to the above, the jury heard an overwhelming case that policymakers had notice of a custom of suppressing and failing to produce investigative materials, including:

1. Hickey's testimony that (a) prior to the Rivera investigation, he did an audit of investigative files throughout the CPD and determined that file production problems were present Citywide, a finding he reported to the CPD Superintendent, *supra* at 80; and (b) immediate policymaking action was necessary to bring the practice to a halt, *id.* at 80.

2. The jury heard that the system put in place by the City was structurally deficient. Among other things, multiple parallel file systems persisted; inventories were not transmitted to the criminal justice system; and subpoenas were serviced by a unit with untrained employees, unbound by policy, and with no mechanism to search for responsive files, *supra* at 80-84.

3. Brasfield testified that the policies promulgated could not solve the problem because they left too much discretion to detectives about what to record in the official files; they did not solve the problem of multiple, decentralized files; and they did nothing ensure the subpoena service unit disclosed to criminal defendants all of the parallel files created for an investigation. *supra* at 81, 94.

4. The only comprehensive analysis of hundreds of investigative files, summaries of which were introduced as substantive evidence, was almost entirely unrebutted, and showed that the practice continued from 1983 through the time of Rivera's arrest and prosecution. *supra* at 82 (Brasfield opining on analysis of investigative files).

5. Comparison of the basement files to permanent retention files and criminal defense files demonstrate systematic underproduction of key categories of investigative documents. For example, Brasfield testified that in 61% of the cases, the requirement to create GPRs was not being complied with, in 37% of the cases the rule requiring inventories was disregarded, and in 92% of the cases documents contained in the unofficial investigative files were not making it to the criminal justice system; and overall more than 90% of criminal defense files were missing investigative material and 100% of investigative files contained evidence of failures to follow the new Special Orders. *supra* at 83.

6. In addition, all of the evidence discussed above and below—regarding express policies, actions of final policymakers, and failure to train—was also probative of the widespread practice theory.

In response, the City mounted many of the same attacks on Rivera's evidence that now appear in its Rule 50(b) motion, but the jury was free not to credit those arguments, and was instead correct to conclude that City policymakers had notice of, and were deliberately indifferent to, a custom that caused the violation of Rivera's right to due process. There is no basis to set aside the verdict.

The City's remaining arguments on the widespread practice theory are unpreserved and lack merit. For example, the City insists that Brasfield allegedly lacked foundation and employed a flawed methodology to conclude that the City withheld investigative files. But the City made no contemporaneous objections along these lines during Brasfield's examination, Ex. 9 at 2169-71, 2200-2226, 2247-48, and the City's attempt to rehash the argument that the contents of the criminal defense files were not probative evidence of what police materials the criminal defense lawyers received continues to defy logic. Ultimately, the jury heard the City's evidence that certain criminal defense files may have been incomplete, and reasonably chose not to credit

the City's argument about what inference to draw from that. For good reason: the jury heard that in every one of the other examples of *Brady* presented to the jury (Nathson Fields, James Kluppelberg, Samuel Robinson, Demetrius Johnson, David Quinones, Miguel Borrotto, and Curtis Kirkland), the City could not present evidence that the missing material was contained in the prosecutor's files, which is what really matters. Ex. 10 at 2252-2271, Ex. 16 at 3846-54, 3857-61, 3870-71, 3872-83, 3884-85, 3886, 3912-19. Rather than adopt the far-fetched theory that the prosecutor and criminal defendant both happened to lose the exact same document containing what happened to be exculpatory information, the jury was entitled to credit the common sense conclusion that the material had been suppressed in the parallel investigative files. Ex. 14 at 3292-3295(acknowledging what didn't get turned over to Wadas).

For this same reason, the jury reasonably rejected the City's argument that documents in the investigative files were handed over by the CPD to prosecutors. The City did not actually put on a page-by-page analysis of the files through Murray at trial to rebut Brasfield's page-by-page analysis; instead, it largely had Murray attack Brasfield's methodology, to little effect given the massive scope of Brasfield's file review. Ex. 9 at 2200-2226; Ex. 16 at 3897-99, 3912-19. And on cross, Murray admitted that his own review of prosecutor files showed CPD investigative materials were missing from all of those files, and that numerous specific files bore this out. Ex. 16 at 3846-54, 3897-99; *see also id.* at 3857-60, 3873-83, 3885-86.

In its Rule 50(a) motion the City makes variations of the argument that there is no link between the widespread practice Rivera proved and the facts of this case. First, they argue that there is a mismatch between the widespread problem the City was on notice of from *Jones* and *Palmer*, and the widespread practice proven in this case, Doc. 629 at 10; and second, that there was no evidence that the widespread practice Rivera proved—a failure to comply with the

Special Orders—had any causal relationship to the facts of this case because there was no
evidence of a failure to follow the Special Orders in the Valentin case. Doc. 629 at 8-9. This
argument was abandoned in the City's Rule 50(b) motion, and therefore need not be considered.
But to the extent it is, for all of the reasons discussed above, this argument totally misses the
mark. Indeed, the widespread practice, at its core, is that information in investigative files was
not being disclosed to defense attorneys, and of course there was evidence of that same practice
in this case, since defense attorney Wadas' file and his testimony demonstrated that there were
numerous documents in the investigative file that he did not receive, *supra* at 29, 35, 79. Beyond
that, Rivera argued that the City's policymakers were on notice since *Jones* and *Palmer* of a
practice of keeping investigative material in unofficial files not disclosed to defense attorneys,
and that the practice continued unabated through the time of the Valentin investigation because
the Special Orders simply were not followed. There is thus a direct link from that unabated
practice to the Valentin investigation, where exactly such materials were not produced.[35]

### (d)  Failure to Train

The evidence supported this theory as well. A municipality is liable "when the
inadequacy in training amounts to deliberate indifference to the rights of the individuals with
whom the officers come into contact." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007).
Deliberate indifference exists if the "need for more or different training" was "obvious." *Harris*,
489 U.S. at 390. Proof "can take the form of [](1) failure to provide adequate training in light of

---

[35]  Another argument abandoned in the City's Rule 50(b) motion, but contained in the City's Rule
50(a) motion, attacks Brasfield for a "faulty premise" that as a matter of practice only the permanent
retention file was disclosed to criminal defense attorneys. (Doc. 629 at 9.) But this misstates his
testimony. Brasfield's point was that *only* the permanent retention file, the repository of official police
reports, was *certain* to be disclosed to criminal defendants. Ex. 9 at 2174-2179; 2193-2195; 2214-2218;
2433-2434.. Beyond that, it was a crapshoot, because of the City's *ad hoc* system in which investigative
material sat in a number of different places without any clear guidance on what all those locations were or
on what steps should be taken to ensure that all such material was produced. The evidence on this point is
ample, *see supra* at 86, 94, and the jury was entitled to credit these arguments.

foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers." *Sornberger*, 434 F.3d at 1029-30 (7th Cir. 2006).

Notice of the need for more or different training was established by all the evidence discussed in the previous section. Indeed, after *Jones* and *Palmer*, Hickey audited the CPD and found an entrenched citywide practice that needed to be dislodged. Ex. 13 at 3240-3248. The City, however, gave no training at all to subpoena service unit employees, Ex. 9 at 2189-2190; Ex. 14 at 3486-3489, even though the training need was pronounced given the choice to retain a parallel decentralized file system with multiple files in multiple placed (rather than a single repository). Ex. 14 at 3440-3441; 3485-3486. And to the extent the City argues that all of this is insufficient, and that Rivera failed to show a "pattern of similar constitutional violations" to establish deliberate indifference, Rivera presented evidence of numerous specific examples of *Brady* violations discussed above. The jury could easily conclude this constituted a failure to train, and one that caused the suppression of Rivera's street file.[36]

The City contends a one-time, three-hour training of all detectives necessitates judgment as a matter of law. Not so. First, training detectives had no effect on the staff of the subpoena unit, which was responsible for responding to subpoenas and disclosing materials to the criminal justice system. Ex. 13 at 3233-3235. Regardless, the jury could conclude that a single training was obviously insufficient to fix the engrained detective culture that the City's own witnesses conceded, Ex. 13 at 3242-3243, particularly given Brasfield's comprehensive analysis discussed above that customs continued unabated after the training took place. Even the City's own designee could not say this training was sufficient to change the culture, Ex. 14 at 3314-3315, and the jury could conclude the training was deficient based on testimony of Defendants and

---

[36] The City did not make a causation argument in its 50(a) or 50(b) motions relating to the failure to train theory.

other CPD staff showing an utter lack of understanding of the new policies. Ex. 14 at

3292-3295(acknowledging what didn't get turned over to Wadas); Ex. 14 at 3363-3369;

3379-3381 (Spratte testifying that the policy prevented him from taking notes); Ex. 4 at 917-921;

979 (McLaughlin acknowledging policy and practice do not conform); Ex. 8 at 1758-1760;

1776-1779(Gawrys testifying that he wasn't sure what the lineup policy was and whether it

conformed to practice).

Related to all of this, the City's undisputed failure to conduct audits to ensure the policies

were being followed, Ex. 9 at 2196; Ex. 14 at 3318-3319, further reinforces that the lack of

training was obvious. The City tries to rely on the notion of "on-the-job training," but the jury

was entitled to discredit this argument about amorphous informal instruction that the City

provide no details or specifics to support, Ex. 13 at 3233; Ex. 14 at 3279-3280, especially since

the City failed to conduct audits to determine the extent to which the policies were being

followed and what additional informal training was even needed.

Finally, it was undisputed the City offered no training to Gang Crimes officers

*whatsoever*, let alone on the new policies even though they were routinely participating in

homicide investigations and developing evidence (as in this case). Ex. 14 at 3347-50, 3355,

3388-91, 3394 ("Q: In Chicago, there was no training for Gang Crimes specialists, correct? A.

Correct."), 3395, 3397. Given the evidence in the record that the Gang Crimes officers were

effectively serving detective functions, the notion that they received no training whatsoever is

alone sufficient to support a failure to train verdict

### 4. Street Files Challenges Included Only in the City's Rule 59(a) Motion

The City also argues the *Monell* verdict is against the manifest weight of the evidence,

such that they should be granted a new trial. *Walden*, 975 F.2d at 365. The Court has extremely

broad discretion to determine whether to grant a new trial. *McNabola*, 10 F.3d at 516. In

deciding whether a verdict is against the manifest weight of the evidence, this Court can weigh

the evidence, assess credibility, and compare facts introduced at trial. *Byrd v. Blue Ridge Rural*

*Elec.*, 356 U.S. 525, 540 (1958). The power to grant a new trial "is not unlimited: a certain

deference to the jury's conclusions is appropriate." *Mejia v. Cook County*, 650 F.3d 631, 633 n.1

(7th Cir. 2011). "This deference is encompassed within the manifest weight standard, which

balances a decent respect for the collective wisdom of the jury against a duty not to approve

miscarriages of justice." *Id.* Jury verdicts deserve "great deference" in cases with "simple issues

but highly disputed facts." *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995). "In weighing the

facts, the district court is bound to the same evidence the jury considered, and can strike a piece

of evidence from its weighing process only if reasonable persons could not believe it because it

contradicts indisputable physical facts or laws." *Mejia*, 650 F.3d at 633.

The City's Rule 59(a) motion repeats all of its Rule 50(a) and Rule 50(b) arguments

challenging *Monell* liability on the street files theory. But all of the City's re-hashed

weight-of-the-evidence arguments fail for the forfeiture and merits reasons discussed above

### (a) Argument that Special Order 86-3 Was Good Policy

The City argues that Rivera's express policy theory is against the manifest weight of the

evidence because the City's own Rule 30(b)(6) witness (Hickey) and defense expert (Noble) said

that it was a good policy, and that there was no "model policy" that prohibited the decentralized,

parallel file system maintained by the City. Doc. 708 at 5. For all of the reasons above, the jury

was entitled to reject this argument.

As an initial matter, Rivera's argument at trial was not that the City had to have a

centralized file system or else its policy was automatically unconstitutional; rather, Brasfield

explained that departments around the country were using a centralized file system to ensure the

production of police investigative material in satisfaction of their *Brady* obligations. A police department that chose instead to have a decentralized file system dramatically increased the risk of failing to disclose *Brady* material, and so heightened safeguards would be necessary, including detailed written instructions and monitoring to ensure that material was gathered from all of the repositories of investigative material. Ex. 9 at 2178-2179; 2185-2195; 2323-2325. The consensus among both parties' witnesses on this point was that there were no instructions, guidelines, or checklists of any kind to guide this process, and that the training and monitoring was minimal to non-existent. On these facts, a reasonable jury could easily conclude that the decentralized file system was woefully inadequate, particularly against the backdrop of the set of unconstitutional practices in *Jones* and *Palmer* that the City was ordered to correct.

Moreover, putting aside whether a decentralized file system was acceptable, two of the central failures of the policy are that it (1) contained no explicit instruction to disclose the investigative file to prosecutors and criminal defendants, and (2) omitted Gang Crimes officers routinely involved in homicide investigations. Even if a jury were to accept Hickey and Noble's view that a parallel file system is acceptable, they could find the express policy inadequate on these separate grounds

### (b) City's Evidentiary Challenge to Ruling Allowing Questioning of Defendant Mingey Fails

Just as Gawrys argued that his co-Defendants' assertion of the Fifth prejudiced him, the City contends that Mingey's assertion of the Fifth unfairly allowed Rivera to create a new *Monell* theory. Doc. 708 at 14. As discussed, this Court's instruction to the jury permitted inferences to be drawn against Guevara and Mingey, not against other parties, and the jury is presumed to have followed those instructions. *See supra* at 63. Moreover, as discussed in connection with Gawrys, even if the Court had permitted the jury to draw an inference against

the City, such an inference would have been permissible considering the relationship between Mingey and the City in this case. *See supra* at 64 (discussing *First Midwest Bank*, 2018 WL 4126570, at *12, among other cases). Mingey is an agent of the City, and their interests are perfectly aligned. Accordingly, the City's argument that it was *unfairly* prejudiced fails.

The City also implies that the Court erred in allowing Rivera to impeach Mingey with his own deposition testimony given earlier in this litigation, before he decided to assert a privilege. According to the City, the impeachment at Ex. 11 at 2515:5-14 was supposedly problematic because the deposition answer with which Mingey was confronted (concerning personal files maintained by Gang Crimes officers) was allegedly misleading. Rivera has three responses: (1) there was nothing misleading, since the deposition testimony was an appropriate fit to perfect the impeachment, *see* Ex. 73 (Mingey Dep.) at 135:3-12, 90:19-91:1, 147:2-20, 158:21-160:3 (all played at trial); (2) if the City thought there was other testimony that could illuminate the quoted portion, there was nothing stopping the City from clarifying by eliciting the proposed additional testimony during its own examination of the witness (and indeed, the Court encouraged defense counsel to do that when the objections became abusive); and (3) Defendants did not raise this objection and said nothing about a rule of completeness issue at the time. Ex. 11 at 2515.

Second, the City complains generally about a purported lack of foundation for Rivera's questions. Notably, however, its brief conspicuously fails to identify any actual examples. It is unfair to Rivera to not identify particular questions supposedly lacking foundation so that Rivera can defend them on the merits, and it is unfair to the Court to not identify specific objections that were purportedly erroneous.

The reason the City is unable to identify any questions that should not have been asked, or any foundation objections that should have been sustained, is because there are none. As the

Court observed at the time during a sidebar: "[A]ll I heard was foundation objection after foundation objection. In 90% of the time, there was deposition testimony that supported the answer that you were raising foundation objections to." Ex. 11 at 2528. *See also* 2529 ("Well, if you made 20 foundation objections and 2 of them were good, which I would say is about the score, it's really difficult for me being - playing a referee when every time you make - when 90% of the time when you make those objections, it turns out there is a foundation.").

Third, the City relies on the testimony of its 30(b)(6) designees Hickey and Spratte, but they are hardly helpful to the City's position. On the contrary, they demonstrate the ample foundation for Rivera's questioning of Mingey. And, to the extent the City contends that Rivera's *Monell* claim based on the deliberate exclusion of Gang Crimes officers from the Special Orders was based on improper questioning of Mingey, it is wrong. The claim was based on much more than questions posed to Mingey, as Hickey and Spratte (and others) demonstrate.

This evidence includes the following: the *Jones-Palmer* revelation about investigators keeping personal notes and files not subject to retention and disclosure was well-documented; the policy itself, plainly excluding a whole class of investigators, *i.e.*, Gang Crimes officers, was admitted into evidence; Hickey admitted that he raised the issue of excluding Gang Crimes officers from the policy but nothing was done, Ex. 14 at 3290-3291; and Brasfield, Hickey and the City's experts Noble and Murray admitted that Gang Crimes was omitted from the policy. Ex. 9 at 2186-2192, Ex. 14 at 3221-3222; 3250-3251, Ex. 14 at 3475-3476, Ex. 16 at 3900-3902. As a matter of practice, defense expert Murray admitted that in eight years as a gang crimes prosecutor he never saw the notes or daily activity worksheets that Gang Crimes officers created. Ex. 16 at 3900-3902. And while Hickey and the City tried to tell the jury that Gang Crimes officers were properly exempted because they supposedly never investigated homicides, that

suggestion was a nonstarter in light of the evidence at trial that Guevara, Gawrys, and Mingey were all quite active in the Valentin investigation.

In addition, the City's Gang Crimes designee, James Spratte, conceded everything needed to establish Rivera's *Monell* claim, including everything Mingey was questioned about that the City now complains lacked foundation, including the following:

- Gang Crimes officers participated in investigations to solve crimes, *e.g.*, talking to witnesses, locating witnesses, and helping to develop leads. Ex. 14 at 3347-51, 3386-88, 3397.
- Yet Gang Crimes officers were not subject to the rules applicable to the rules applicable to other crime investigators, detectives; they did not have the same report writing and paperwork requirements that detectives had; and they had no specific rules that governed them. *Id.* at 3347-50, 3355, 3388-91
- Gang Crimes officers took notes and passed written information to their colleagues as part of their job, but were not required to memorialize information in reports or to preserve their notes. *Id.* at 3349, 3351-55, 3360-63, 3388-90, 3425-28.
- Gang Crimes officers were permitted to keep their own personal notes and files that they kept at home, in personal lockers, etc., and were not turned over to the police department for disclosure. *Id.* at 3362, 3388-89, 3415, 3425-29.
- Gang Crimes officers kept additional "Incident Folders" in file cabinets located at the Gang Crimes offices, which were never turned over to the criminal justice system. One day, all of these file cabinets were lost. When various Gang Crimes units combined, the file cabinets were apparently moved to Maxwell Street, and have not been seen since. *Id.* at 3415, 3422-24.
- They also received no Gang Crimes training, and no training relating to Brady obligations. And the *Jones* and *Palmer* revelations led to no changes in how the Gang Crimes officers conducted their jobs. *Id.* at 3359, 3388-91, 3394-98.

The City tries to explain all of this away by citing Spratte's refrain that Gang Crimes officers were "intelligence-driven," but the jury was entitled to reject Spratte's testimony on this point as both unsatisfactory and farcical. *See, e.g., id.* at 3362-64, 3379, 3382-83. Especially combined with Spratte's evasive responses on cross-examination. *See, e.g., id.* at 3350-51, 3356-57, 3360-61, 3385.

Ultimately, two clear points emerge: (1) the evidence above provided ample foundation

for the questions posed to Mingey; and (2) the City's evidentiary objections to the Court's ruling

regarding Mingey's testimony cannot satisfy the high burden of demonstrating that the Court's

decision "was based on an erroneous conclusion of law" or relied on a record that "contains no

evidence on which the court rationally could have based its decision." *Young v. James Green*

*Mgmt.*, 327 F.3d 616, 621 (7th Cir. 2003). Likewise, given the ample other evidence on the

*Monell* theory at issue, from Spratte and many others, the City cannot show that the Court's

evidentiary ruling "affected the outcome of the case," *Hammel v. Eau Galle Cheese Factory*, 407

F.3d 852, 868 (7th Cir. 2005).

### C. Filler Lineup *Monell* Theory

#### 1. Summary of the Factual Record Related to Filler Lineup *Monell* Claim

When Rivera developed evidence that he had been in a first lineup in which Lopez

selected a filler, but the existence of that lineup was not documented, the City agreed to produce

a sample of homicide files for the five years surrounding the Valentin investigation so that the

parties could determine whether police officers routinely failed to document filler identifications.

The City and the Rivera stipulated that the files were reflective of its policies and practices

citywide during the relevant timeframe. Ex. 5 at 963-964.

Of the files produced by the City, 138 involved either live or photo lineup procedures.

Official lineup reports and ancillary police reports in those files reported a total of 386 different

lineup procedures, and in many of these lineup procedures, multiple witnesses viewed multiple

suspects, so that there were a total of 980 "possible identifications" (the number of witnesses

viewing each lineup multiplied by number of suspects in each lineup) reflected in these files. Ex.

5 at 966-67, 984-97, PX 150. The entirety of every file involving a lineup was reviewed, and

each lineup report was coded, noting for each possible identification whether it was reported that

the witness made a positive identification, a tentative positive identification, no identification, or a filler identification. *Id.*

Of nearly one thousand possible lineup identifications, there was not a single example in the set of files where a police officer reported the identification of a filler. *Id.* at 967, 1002. The stipulated data thus show a total absence of filler identifications in the reports of the CPD.

Rivera retained the services of renowned eyewitness identification expert Dr. Gary Wells, who performed a statistical analysis of the data and compared the findings in the CPD's files to those reported in existing field studies. *Id.* at 967, 984-90, 1002-03. Dr. Wells opined that the City's rate of filler identifications was statistically impossible, and could only be explained by a policy of not documenting the selection of a filler. *Id.* at 967.

More specifically, Dr. Wells opined that published peer-reviewed field studies, based on a large sample size across multiple police departments demonstrate that suspects are selected approximately 41% of the time, no one is identified approximately 35% of the time, and fillers are identified approximately 24% of the time. *Id.* at 967, 998-1002. In the City of Chicago, however, the rate of filler identifications was zero. *Id.* at 966-67, 1002. Applying commonly-accepted statistical analysis, Dr. Wells testified that this could not be explained by chance, and further, that the only possible explanation was that the City had a practice of either not reporting lineups in which a filler was selected, or falsely reporting the lineups as "negative IDs" or "no IDs" (*i.e.*, no one identified in the lineup). *Id.* at 967, 1095-1111.

From a police practices and criminal justice perspective (which he was well qualified to provide), Dr. Wells also explained the importance of accurately reporting when a filler was selected by a suspect, and the difference in kind between a filler identification and a no identification: in the case of a filler identification, the witness made an identification and *got it*

*wrong*, meaning the witness's credibility is all but shot and rendering unreliable any subsequent suspect identification. *Id.* at 979-83. Dr. Wells explained that the identification of a filler was therefore uniquely exculpatory. *Id.*, *see also id.* at 3272-73, 3316-17 (Hickey).

Dr. Wells' conclusions are consistent with the City's policies and practices. Under the City's policy, General Order 83-5, if a suspect was identified in the lineup ("positive" identification) documentation was required to identify the person selected, but if a filler was selected there was not a requirement to identify the person identified in the lineup. Ex. 4 at 920, Ex 13 at 3238-39, Ex. 14 at 3265-75; City Exhibit 11. In addition, multiple witnesses at trial admitted that the custom at the time of the Valentin investigation was to not document lineups in which a filler was selected, or to falsely document them as negative identifications. Ex. 3 at 628-30 (Defendant McLaughlin), Ex. 5 at 1104-05 (Wells), Ex. 8 at 1773-75 (Defendant Gawrys), Ex. 13 at 3238-39, 3265-70 (City Designee Hickey), Ex. 15 at 3579-80 (Officer Boyle). Finally, Dr. Wells also presented specific examples of files in which the evidence showed that a witness had selected a filler, but the filler identification was not documented in the Chicago Police Department's file. Ex. 5 at 1102-04.

### 2. Filler Lineup *Monell* Theory Was Presented to the Jury

Rivera presented his *Monell* theory that the City's filler identification policies caused the systematic withholding of exculpatory information to the jury, and the jury had an opportunity to consider this theory and find for Rivera on this *Monell* theory. Respectfully, the Court got it wrong when it stated in its ruling on Defendants' Rule 50(a) motions that the jury instructions did not cover this theory. Doc. 676 at 9-10.

Throughout this case, from summary judgment through trial, Rivera has presented his *Monell* theory as a form of systematic withholding of exculpatory information. At summary

judgment, Rivera presented the filler lineup theory as one about the suppression of evidence. Doc. 321 at 59. And at trial, Rivera presented testimony and argued that the failure to document filler identifications constituted the suppression of exculpatory information that was not only evidence of innocence (eyewitness did not pick criminal defendant), but also powerful impeachment evidence against the witness who viewed the lineup. Ex. 5 at 980-983; 1109-1111 (Wells detailing why fillers are exculpatory) Ex. 13 at 3272-3274 (Hickey acknowledging filler IDs can be exculpatory), Ex. 17 at 4199.

The jury instructions also allowed for the jury to find on this theory. The instructions stated that the jury could find for Rivera if it found that the City "had a policy of concealing material exculpatory and/or impeachment evidence." Doc. 671. That is exactly what Rivera proved: that the City's policy and practice of not documenting filler identifications as exactly that resulted in the systematic withholding of exculpatory and impeaching evidence. And finally, the City's post-trial motions acknowledge that the filler lineup evidence was presented in support of a theory of systematic suppression of exculpatory information. Doc. 707 at 13.

Put simply, Rivera's filler lineup theory—presented throughout this case and at trial—was that when a filler was identified in a lineup, officers did not document that fact (either by not documenting the lineup at all, or by documenting it as a negative identification). This is a clear form of suppression, since it severely undermines the credibility of the witness, particularly relevant in a sole eyewitness case like this one where the eyewitness who (without any documentation being created) originally picked a filler went on to implicate Rivera in a subsequent lineup. The jury instruction comfortably covered this theory. And as discussed below, Rivera presented more than enough evidence for a jury to find for Rivera on this theory.

### 3. Filler Lineup Challenges Included in the City's Rule 50(a) and Rule 50(b) Motions

#### (a) Forfeited Arguments

The City argues that Rivera failed to prove an underlying constitutional violation, Doc. 707, but that argument is forfeited as it was presented for the first time in the City's Rule 50(b) motion. The argument also fails on the merits. As discussed above, Rivera presented ample evidence from which a jury could conclude that Lopez viewed a first lineup in which a filler was selected instead of Rivera, and that this initial filler identification by Lopez was suppressed. *See supra* at 20. There is thus clearly sufficient evidence of an underlying constitutional violation caused by the policy and practice at issue.

In its Rule 50(a) motion, the City also challenges the reliability of the data Dr. Wells relied upon to reach his conclusions, arguing that he did not personally prepare the underlying data and so "could not vouch for its reliability" or "verify the accuracy of the spreadsheet." Doc. 629 at 5. But the City abandoned this argument in its Rule 50(b) motion, and as such it is forfeited. Doc. 707 at 12-14 (containing only a single sentence referring to summary judgment and motion *in limine* briefing and stating "his methodology did not satisfy the *Daubert* standard"). On the merits, the argument also fails. Dr. Wells' opinions are clearly admissible. He walked the jury through his impeccable credentials and his process in detail; and he was clear that he relied on data Rivera provided, but that he had taken steps to make sure he was comfortable with the data and its accuracy. Ex. 5 at 969-975; 984-994; 1234-1235. The City spent time attacking Dr. Wells' opinions on the reliability grounds it raised in its Rule 50(a) motion, but the jury rejected the City's position. For good reason—(1) after attacking Dr. Wells for relying on data Rivera extracted from underlying spreadsheets, the City's expert Bernard Murray admitted that he too relied on data counsel provided and that to do so was perfectly

appropriate, Ex. 16 at 3896-3899, and (2) despite having access to all of the same data, the City

failed to present evidence of actual errors in the data Dr. Wells relied on, let alone numerous or

systematic enough to explain a finding of *zero* filler identifications. Dr. Wells' analysis was

sound, and provided more than sufficient evidence to support the filler lineup theory at trial.

### (b) Express Policy

The City incorrectly argues that Rivera has not pursued a theory that there was any

failure in policy, Doc. 707 at 13, Doc. 708 at 12-13, but that is not the case. Rivera presented

evidence that the policy itself was unconstitutional. The City's own designee on policies, Hickey,

testified that the policy was to *not* document that a filler was selected, and that this was the

proper interpretation of the language of the Special Order. Ex. 14 at 3269-3270. In this way,

Defendants are also liable under an express policy theory based on a gap in policy, *see supra* at

93 since the City's policy directed investigators to document positive identifications, but

deliberately excluded filler identifications from those documentation requirements.

Whichever way it is characterized, the express policy was unconstitutional, since it

resulted in the systematic suppression of filler identifications of the sort that occurred in this

case. Rivera's expert Dr. Wells, as well as City designee Hickey, both testified that a witness's

selection of a filler is uniquely exculpatory because of its impact on the witness's credibility. Ex.

5 at 980-983; 1109-1111; Ex. 13 at 3272-3274. Accordingly, a jury finding that the City's lineup

policy was unconstitutional is well supported by the record

### (c) Widespread Practice

The City would like the Court to consider Rivera's filler lineup claim as a widespread

practices theory, because under that framework, they argue, Rivera must show other instances of

constitutional violations. As an initial matter, as discussed above the City misstates the law. *See*

*supra* at 97. Under the proper standard, Rivera clearly demonstrated that policymakers choose a

course of action among alternatives that presented an obvious risk of constitutional harm. *Canton v. Harris*, 489 U.S. 378, 388 (1989); *Daniel v. Cook Cty.*, 833 F.3d 728, 735 (7th Cir. 2016). Nothing more is required. There can be no dispute that a widespread practice of universally suppressing every filler identification made by eyewitnesses presents an obvious risk of withholding exculpatory evidence.

Even if Rivera had to present other instances of actual suppression, Rivera has presented substantial evidence that the violation in this case was a reflection of City policy rather than a "random event." Dr. Wells testified about multiple instances in his review of files in which a filler identification was not documented as such. And in addition to those specific examples, Dr. Wells identified numerous additional instances in which the policy resulted in *Brady* violations. Indeed, he testified that rigorous field studies indicated that there should have been approximately 24% filler identifications out of 980 total identification procedures, or approximately 235documented filler identifications, as compared to zero in the Chicago data. These 235 cases are evidence of numerous additional *Brady* violations. Moreover, Dr. Wells testified that while some of the filler identifications were falsely documented as negative identifications, the comparison of Chicago data to field studies provided strong evidence that there were approximately 100 filler identifications that were not documented at all (as was true in this case). Ex. 5 at 1105-1108. That is, to bring Chicago's figures in line with field studies around the country, there would have been about 100 additional instances in which fillers were identified but the lineup was not documented at all. Those approximately 100 instances in which a filler was selected but no lineup was documented are also evidence of *Brady* violations sufficient to support the jury's verdict on a widespread practices theory.

The City contends that this evidence was speculative, and that the opinion was not

disclosed, but neither of these arguments has merit, in particular under the standards applicable at this stage. The City attacked Dr. Wells' theory as speculative at trial, but the jury was entitled to reject that argument after considering Dr. Wells' thorough review of hundreds of files and lineups, the fact that the City's expert chose not to conduct his own review of the data, and Dr. Wells' qualifications and expertise. He offered an opinion based on his analysis of hard data, and he is supremely qualified to perform that mathematical and statistical analysis. His conclusion about not only what was in the data, but what was missing from the data (100 undocumented lineups) was entirely credible. The argument that he had not disclosed his opinion is also not a valid grounds for granting Defendants' post-trial motion, and in any event a non-starter. The entire gist of Dr. Wells' disclosed opinion was that field studies show that fillers get picked almost 25% of the time, but in Chicago it was miraculously zero, meaning that the City had a policy of not documenting filler identifications. This took one of two forms: not documenting the lineup at all, or falsely documenting it as a lineup in which no one was selected

### (d) Causation

Whether Rivera's filler lineup *Monell* theory is evaluated as an express policy claim or a widespread practice claim, there is clear evidence that the policy or practice is causally linked to the misconduct in this case. The City's argument to the contrary tries to cloud the picture, but in doing so ignores the straightforward and direct causal link.

Put simply, Rivera has presented a *Monell* theory that when a witness picks a filler in a lineup, the erroneous selection of a verifiable    nonparticipant is not documented. The misconduct Rivera presented in this case, which the jury had ample basis to accept, was that eyewitness Lopez picked a filler in a first lineup, and that his erroneous selection of an innocent nonparticipant was not documented. The link between the municipal custom and the conduct could not be more direct or clear.

Assessing it at a more granular level does not change the result. Dr. Wells opined that the policy and practice was that the identification of the filler was not documented, and that this took one of two forms: (1) not documenting the lineup at all, or (2) documenting it as a no identification. Ex. 5 at 1100-01, 1105-09, 1111. The evidence at this trial is that the same thing happened here, in the first form.

The City contends that what takes this case outside custom is that here the Defendants *did* create documentation, and that the documentation indicated that no lineup occurred. Doc. 707 at 14. The argument is hard to follow, but it seems to be a claim that neither of the two forms above occurred, and so there is no causal link. But that is all wrong. First, even under the City's characterization, they did exactly what Wells said the custom was: not document the lineup at all. Second, that the Defendants additionally created documentation expressly stating that a first lineup did not occur changes nothing; it simply furthers the purpose of erasing from history a lineup in which a filler was selected, consistent with the established policy and practice. In other words, this still falls squarely within the first form above. Ultimately, that the Defendants created a supplemental report falsely stating that they did not conduct a first lineup, when in fact they did, simply creates an additional claim for fabrication. That fabrication, however, does not render meaningless the parallel suppression of an exculpatory first lineup. The City's causation argument must be rejected.

### 4. Filler Lineup Challenges Included Only in the City's Rule 59(a) Motion

The City's Rule 59(a) motion repeats most of the arguments contained in its Rule 50(a) and Rule 50(b) motions, and should be rejected for the same reasons set forth above. In addition, the City argues that the Court's ruling permitting Dr. Wells to testify was in error, Doc. 708 at 18-19, but this is also addressed above. The filler lineup theory was well supported by evidence

at trial and was one of the claims on which the jury was instructed. The City's further attacks on

Dr. Wells' data were reasonably rejected by the jury. *See supra* at 114. The City cannot satisfy

the high burden of demonstrating that the Court's decision "was based on an erroneous

conclusion of law" or relied on a record that "contains no evidence on which the court rationally

could have based its decision." *Young v. James Green*, 327 F.3d 616, 621 (7th Cir. 2003).

## VI.    THE CITY'S CHALLENGES TO JURY INSTRUCTIONS FAIL

The City makes four arguments relating to the Court's instructions to the jury. Doc. 708

at 20-27.[37]  If jury instructions are an accurate statement of the law, review of those instructions

is limited. *Knox v. Indiana*, 93 F.3d at 1327, 1332 (7th Cir. 1996). If jury instructions were

incorrect, the question is whether the jury was confused or misled. *Gile v. United Airlines*, 213

F.3d 365, 374-75 (7th Cir. 2000). "Even if we believe that the jury was confused or misled, we

would need to find that the defendants were prejudiced before ordering a new trial." *Jimenez*,

732 F.3d at 717. The City fails to show that a new trial is warranted.

### A.    The Court Properly Exercised Its Discretion to Reject the City's Additional Limiting Instruction Regarding "Speculative Evidence"

As was the case in *Jimenez*, "[t]he defendants do not argue that the due process

instruction given by the district court was an incorrect statement of the law." 732 F.3d at 717.

Instead, they argue that instruction was too broad because the Court did not also give the City's

proposed limiting instruction. *Id*. Just as the Seventh Circuit rejected a similar argument in

*Jimenez*, this Court should reject the City's argument here. *See id.* at 717-18.

---

[37]  The individual Defendants mention two jury instructions in passing, but they do not develop any argument about either of them being erroneous. First, they mention that the Court rejected a limiting instruction on Rodriguez. Second, they mention that the Court rejected their erroneous additional definition of reasonable diligence. These statements do not warrant a response, and the Court's prior rulings on both instructions were correct.

The City contends the jury should have been instructed that "[s]peculation as to the existence of other documents is not sufficient to support a claim that an officer deliberately withheld exculpatory or impeachment evidence that is material." Doc. 433-2 at 41 (Defendant's Proposed Instruction No. 37). Before trial, the Court asked what purpose such an instruction would serve, and the City responded:

> The speculation about whether or not documents—I mean, it goes right to a lot of what plaintiff's expert, Brasfield, talks about being—missing documents, when he doesn't know that they are missing.
>
> So, we can't bootstrap his conclusion that when he compares one file to another, a page isn't there; therefore, it is missing and withheld, to, "It must have been—"

Ex. 57 at 93:19-25. The Court observed that the instruction did not address any problem relating to Brasfield's purported assumptions, *id.* at 94:1-2, and it refused the instruction, *id.* at 94:13-14.

Defendants now argue that the instruction was necessary to stop the jury from giving weight to what they call speculative evidence from Brasfield, Mingey, and missing GPRs. Rivera has already discussed why the evidence in each of these categories was not speculative at all, *see supra* at 82, 100 (Brasfield), 106 (Mingey/5[th]), and 30 (GPRs), and for those reasons the City's proposed instruction was unnecessary and likely to confuse the jury. But in addition to that, it was not an error—let alone an abuse of discretion, let alone a prejudicial abuse—for the Court to refuse the instruction. First, the City does not contend that the due process instruction was incorrect. Nor could it. The instruction follows the Seventh Circuit pattern, *see* 7th Cir. Pattern 7.14, and it is legally the same as the instruction approved by the Seventh Circuit in *Jimenez*, 732 F.3d at 717 n.3. The jury was told that it had to find that Defendants knowingly concealed or fabricated evidence that was material, defined as evidence that would have a reasonable likelihood of affecting the outcome of the criminal case. Doc. 671 at 23. Not only is that statement of the law correct, *see supra* at 14, it also prevented the jury from engaging in exactly

the type of speculation that the City is apparently concerned about. If there were any doubt, the Court also instructed the jury about what is and is not evidence, Doc. 671 at 4, 6; it instructed the jury that, while it could draw inferences, they had to be "reasonable and . . . based on the evidence in the case," *id.* at 10; and it told the jury how to interpret circumstantial evidence. *Id.* at 11.[38] These instructions avoided concerns about speculation.

More generally, "a judge need not deliver instructions describing all valid legal principles. . . . Rather than describing each possible inference of the evidence, the judge may and usually should leave the subject of the interpretation of the evidence to the argument of counsel." *E.E.O.C. v. AutoZone, Inc.*, 809 F.3d 916, 923 (7th Cir. 2016) (citations omitted). There is nothing in the law that required the Court to give this instruction, and it was plainly not an abuse of discretion for the Court to refuse it.

The City also makes zero effort to establish that it was prejudiced by the refusal to give this instruction—its argument ends without any analysis of prejudice whatsoever. Doc. 708 at 21. In order to justify a new trial, the City must show that the instructional error, considered in light of "the instructions as a whole, along with all of the evidence and arguments," caused the jury to be "misinformed about the applicable law." *United States v. White*, 443 F.3d 582, 587-88 (7th Cir. 2006). The City comes nowhere near such a showing.

### B. The Court Properly Exercised Its Discretion to Reject the City's Additional Instruction Regarding Invocation of the Fifth Amendment

The City regurgitates its argument that Mingey's assertion of the Fifth was prejudicial in the guise of its argument that the Court should have given a limiting instruction on the Fifth Amendment. Doc. 708 at 21-23 (citing Doc. 433-2 at 12) (Defendants' Proposed Instruction No.

---

[38] Because the City's proposed instruction is impossibly vague, there is at least a plausible reading of that instruction that puts it in direct tension with the instruction that the jury could draw inferences from circumstantial evidence. To that extent, the City's instruction is a misstatement of the law that this Court definitely should not have given.

10). Rivera has discussed all of these arguments at length already, and he reiterates them here only briefly. The Court's Fifth Amendment instruction let the jury know exactly who it could draw a negative inference against—Guevara and Mingey, *see supra* at 56, 63; to the extent that there was even room for the jury to draw an inference against another Defendant based on Guevara's or Mingey's assertion, that inference was legally permissible, *see supra* at 64; and the argument that Rivera had no foundation for his questions to Guevara and Mingey cannot withstand scrutiny when the extensive factual record is considered, *see supra* at 1-34, 106.

Moreover, as the Court recognized in rejecting the City's proposed instruction, the City never proposed to instruct the jury on the legal factors governing whether an assertion of the Fifth can be imputed to another party; the issue was not raised at the motion *in limine* stage; nothing in the cases cited by the City required a limiting instruction; and the Court sustained objections that the Defendants made at trial to questions put to Guevara and Mingey that lacked foundation. Doc. 653 at 1-2. The City does not say anything to contradict the Court's prior ruling. The jury was properly instructed on the Fifth Amendment, there was no legal error, the Court did not abuse its discretion, and, again, the City does not identify any prejudice.

### C. The Jury Was Correctly Instructed on Municipal Liability

The City next argues in two paragraphs that the Court's *Monell* instruction "essentially allowed the jury to find the City liable on a *respondeat superior* theory[.]" Doc. 708 at 23-24 (citing Doc. 433-2 at 37) (Defendants' Proposed Instruction No. 34). The City does not actually explain how it thinks the Court's instruction permitted such a result, how the instruction given was legally erroneous, how the instruction given deviates in any legally material way from the instruction proposed by the City, or how the City was prejudiced as a result of the instruction.

Such a bare-bones argument in a post-trial motion is insufficient, and this Court should deem the point forfeited for that reason. *Dunkel*, 927 F.2d at 956; *Kelso*, 398 F.3d at 643.

Independently, the City failed to assert the objection it now makes before the jury was instructed, and so the argument is forfeited for that reason as well:

> Rule 51 provides . . . that any party wishing to contest a jury instruction must distinctly state the matter objected to and the ground of the objection. The objection must be specific enough that the nature of the error is brought into focus. . . . The party must also explain what is wrong with the proposed instruction; it is not enough simply to submit an alternative instruction. . . . There are no formal requirements, but pragmatically speaking the district court must be made aware of the error prior to instructing the jury, so that the judge can fix the problem before the case goes to the jury.

*Schobert v. Illinois Dep't of Transp.*, 304 F.3d 725, 729-30 (7th Cir. 2002).

Here, both sides proposed *Monell* instructions. *See* 433-1 at 37-38 (Plaintiff's Proposed Instruction No. 34); Doc. 433-2 at 37 (Defendants' Proposed Instruction No. 34). At the pretrial conference, the Court discussed them at length, forging an agreement between the parties on acceptable language. *See* Ex. 57 at 74-85. At the conclusion of that discussion, both sides had agreed to Plaintiff's proposed instruction, with the following caveats: (1) the City did not agree that the evidence was going to support the instruction; (2) the City did not agree about what types of constitutional theories (suppression and/or fabrication) should be listed immediately following the numeral 2 in the instruction; and (3) the City did not agree to the language encompassed in element 2(c) of the instruction. *Id.* At the end of trial, Plaintiff submitted that the constitutional theories following the numeral 2 should be limited to a policy of concealing material exculpatory or impeachment evidence. 652 at 1. The Court noted in its ruling that the parties were at issue on that second element, and it adopted the instruction with the revision proposed by Plaintiff. Doc. 653 at 4.

At the instruction conference, the Court and parties reviewed the Court's ruling, and the City stated it was reserving "whatever objections we had before." Ex. 16 at 4106-09. The City raised arguments about why particular *Monell* theories were not supported by the evidence, but it otherwise made no objection that the instruction misstated the law—at any point. Ex. 16 at 4106-4111. It certainly did not contend the instruction allowed a finding of municipal liability on a *respondeat superior* theory. Accordingly, the City did not preserve the argument it now makes because it failed to raise the issue before the jury was instructed. *Schobert*, 304 F.3d at 729-30.

To the extent the City's argument is entertained, the Court's instruction is absolutely a correct statement of the law. The Court need look no further that the Seventh Circuit's decision in *Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 378-80 (7th Cir. 2017), to see that its instructions to the jury on municipal liability theories were correct. The City has not demonstrated any legal error, and it again has not explained how it has been prejudiced.

### D. The City's Sufficiency Arguments Repeated As Jury Instruction Arguments Should Be Rejected for the Reasons Discussed Already

At the end of its motion, the City contends that certain *Monell* instructions should not have been given because they were not supported by the evidence. Doc. 708 at 24-27. These arguments are indistinguishable from the City's argument that the evidence was insufficient to support various theories of *Monell* liability, which Rivera has addressed above. For all of the reasons discussed, the jury was properly instructed on all *Monell* theories, and the City's argument should be rejected.

## VII. ARGUMENTS ABOUT COUNSEL'S PURPORTED "MISCONDUCT" FAIL

It is one thing to respectfully disagree that a given line of questioning or inquiry is objectionable, but quite another to claim that an opponent engaged in intentional "attorney misconduct" and displayed a "complete and callous disregard for this Court's authority [and] a

contempt for the integrity of the judicial process." Doc. 713 at 30-33. This accusation is completely inappropriate, inaccurate, and unfair. This Court observed the proceedings for more than three weeks, and Rivera's lawyers are confident that the Court was satisfied that the case was tried professionally and ethically by all sides.

The real reason that Defendants are stretching to try to identify "attorney misconduct" is because they need a hook for a new trial. They cannot get relief through the front door because they never objected to most of what they presently complain about, forfeiting or waiving their current position. *Pickett v. Sheridan Health Care*, 610 F.3d 434, 445 (7th Cir. 2010); *Moore v. Tuelja*, 546 F.3d 423, 430 (7th Cir. 2008) (noting plain error review is "rarely applied in civil cases" and only in "exceptional circumstances" where "substantial rights are affected" and a "miscarriage of justice" might occur). Had Defendants preserved objections, they would not now be trying to squeeze their arguments into the Rule 60 "misconduct" rubric. Defendants did not object to most of what they now call "misconduct" because, in the context of the trial, they did not see a basis to object. Having lost, they are now scrutinizing transcripts to manufacture issues.

But waiver rules apply here, too. Arguments in a Rule 60(b)(3) motion must have been preserved at trial, *Venson v. Altamirano*, 749 F.3d 641, 653-54 (7th Cir. 2014), so Defendants' unpreserved arguments raised in this section are forfeited. Even if they were not, Rule 60(b)(3) is an extraordinary remedy, granted only in exceptional circumstances, and entrusted to this Court's discretion. *Wickens v. Shell Oil Co.*, 620 F.3d 747, 758-59 (7th Cir. 2010).

Defendants must show by clear and convincing evidence that they were barred from fully and fairly presenting their claim because of Rivera's fraud, misrepresentation, or misconduct. *Id.*; *see also Williams v. U.S. DEA*, 51 F.3d 732, 736 (7th Cir. 1995) (Rule 60(b)(3) not a mechanism to re-litigate merits of case). "[I]mproper comments during closing argument rarely rise to the

level of reversible error." *Miksis v. Howard*, 106 F.3d 754, 764 (7th Cir. 1997). And in determining whether "there is a reasonable probability that the verdict of a jury has been influenced" by improper conduct of a magnitude that justifies setting aside a judgment, a court "must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (*e.g.*, whether it is a close case), and the verdict itself." *DeRance, Inc. v. PaineWebber Inc.*, 872 F.2d 1312, 1326-27 (7th Cir. 1989). Applied here, all of these factors support Rivera.

### A.    Questioning and Argument About ASA Rosner's Hair

Again, Lopez testified that he told a person matching Guevara's description and a female that Rivera was the wrong guy. The female had either white or yellow hair. Ex. 7 at 1655-56, 1668-69; Ex. 21 at 95:1-22. At trial, Rivera argued, and Defendants denied, that McLaughlin was the likely possibility. However, ASA Julie Rosner testified that she also had interacted with Lopez on September 15, Ex. 11 at 2662-63, and the jury could observe from the witness stand that she had light-colored hair. Rather than leave the subject unaddressed and permit the jury to speculate, Rivera's counsel elicited from Rosner that she did not have light-colored hair back in 1988, and that in fact the first time she ever had light hair was when she dyed it shortly before her civil trial. Ex. 11 at 2637-38. Rivera also elicited from Rosner that, at the time she had dyed her hair, she was aware that the woman who received Lopez's information had light-colored hair, and that this was an issue being discussed in this litigation. Ex. 11 at 2682-83.

Rivera's counsel did not accuse anyone of anything. Instead, he merely elicited facts about Rosner's hair color, without objection. During closing, when Rivera's counsel reviewed the facts, defense counsel interrupted and made a speaking objection, saying that "[n]obody tried

to say she [Rosner] was anybody that [Lopez] recanted to. Nobody's ever made that suggestion." Ex. 17 at 4212. But it was not for Defendants to decide whether Rivera should have to take the risk that the jury might draw the inference that Rosner was the person Lopez talked to—Rivera was perfectly entitled to rule that theory out by establishing the facts in Rosner's direct examination and by arguing in closing that she could not have been the person because her hair had not been light back then.

The specific portion of transcript cited by Defendants in support of their "misconduct" contention is Rivera's counsel's rebuttal, during which he stated, "Mr. Sotos said that he didn't tell Ms. Rosner to dye her hair. And let's be clear. Mr. Sotos is—has integrity. Nobody is saying he told her to do that. I absolutely take his word. All I'm saying is the state's attorneys seem to be aligned against Jacques. They seem to align themselves with the police." Ex. 17 at 4350:19-24. This argument was not improper at all. The reason that Rivera's counsel said this was that in their closing argument, Defendants themselves said that they had not told Rosner to dye her hair and that any suggestion otherwise was not true. Ex. 17 at 4256. Rivera's rebuttal was simply responding to that argument. Moreover, Defendants did not object, and so the issue is forfeited. *Houskins v. Sheahan*, 549 F.3d 480, 495 (7th Cir. 2008). This was not misconduct.

### B. Discussion of the Defense Case During Closing

Defendants next take issue with Rivera's argument during closing that Defendants' witnesses were either hired guns or more helpful to Rivera than they had been to Defendants, and "that perhaps [the Defendants] wanted to put distance between what you heard and this day of reckoning. They wanted you to hopefully forget Jacques Rivera [who testified weeks earlier] and how powerful he was." Ex. 17 at 4204. There was no objection to this argument; nor should there have been. Rivera's counsel spoke the truth.

The argument actually continued for several more pages of transcript, wherein Rivera's counsel proceeded to explain why Defendants' case was worse than pointless, explaining that the defense had called: (1) Northwestern investigator Cynthia Estes by deposition, who further corroborated Rivera's version of the Lopez statement that he was the wrong guy; (2) Pastor Thomas Bryant by deposition, who confirmed that long before the Northwestern investigators arrived at Lopez's door, Lopez told him during counselling sessions that he had been manipulated by the police when he was a boy; (3) John Boyle, who participated only in the September 15 lineup, had no memory of the events, added nothing helpful to the Defendants, and contradicted the Defendants' testimony on a number of points; and (4) Wixted, who confirmed, among other things, Plaintiff's theories that children can be steered by investigators without their even being aware of it, and that unfavorable testimony given by Lopez at the criminal trial had the hallmarks of false memories. Ex. 17 at 4204-08.

Upon hearing Defendants' case, loaded up as it was with witnesses who added nothing helpful to the Defendants and long deposition transcripts that should have been stipulations, the argument that the Defendants were doing nothing but stalling was hardly unreasonable. At one point, outside the presence of the jury, the Court remarked: "So why when you're trying to get this case to the jury before the 4th of July do we hear from a witness that has no recollection of anything? I mean, tell me what that is about? I know Mr. Loevy made some points, but I don't even know I heard from the witness in the first place. What was he supposed to establish?" Ex. 15 at 3593:14-20. When Defendants responded, the Court expressed dissatisfaction with their answer, saying, "Did he establish that for you? Because I just heard him say, 'I don't remember,' 'I don't remember.'" Ex. 15 at 3594:6-7. The Court concluded, "I would have liked to think we should've done that in 5 minutes." Ex. 15 at 3594: 21-22.

In sum, Plaintiff's counsel's argument was reasonable, which is presumably why there was no contemporaneous objection to this argument during closing, forfeiting the argument. *Venson*, 749 F.3d at 653-54. The reference to Defendants' case in closings was not misconduct.

### C. Defense Counsel's Preamble Before Questioning Lopez

The centerpiece of Defendants' case was their counsel's examination of Lopez at the very end of his deposition testimony, during which essentially the only thing Lopez said was the word "correct" dozens of times in response to a string of leading questions that told Defendants' story. Ex. 17 at 4362; Ex. 21 at 169-182. To put Lopez's testimony in context, Rivera pointed out that immediately prior to this line of questioning from Defendants, their counsel, Mr. Given, had said: "I have a few questions for you. Some of them may sound like questions you've been asked earlier, and I apologize, but I tried to pare them down *so we will not be here any longer than I hope we need to be*. Okay?" Ex. 17 at 4364 (emphasis added) ; Ex. 21 at 169:3-14.

All Rivera's counsel did during closing was point out that the Lopez testimony on which Defendants relied so heavily was given in response to leading questions, after the witness had been instructed that the questioning session would finally come to an end if things went smoothly. For a witness whose alleged manipulation was at the center of the case, it was certainly worth taking into consideration that he seemed willing to say whatever the particular person questioning him wanted to hear, even at the risk of contradicting earlier testimony, if it meant getting out of the room faster. That was an argument about the evidence in the record, and it was not improper, much less misconduct. Moreover, the jury in all of these instances was instructed that the comments of attorneys are not evidence, Doc. 671 at 6, and the court at this stage presumes that the jury followed that instruction, *Soltys*, 520 F.3d at 744.[39]

---

[39] The only objection Defendants made to this argument was itself improper. Defense counsel interrupted and stated, "Objection, you Honor. They told him to get out of here? What it that?" Ex. 17 at

## D.    Cross-Examination of Jeffrey Noble

In order to give the impression that he harbored no bias in favor of the City, Defendants' police practices expert Jeffrey Noble told the jury that he worked for plaintiff's in civil rights cases routinely, including in extremely high-profile police misconduct cases, such as Tamir Rice (the 12-year-old boy shot by Cleveland police while carrying a BB-gun), and Philando Casitile (the Minnesota man who was pulled from his car and shot by the police). Ex. 14 at 3435-36. Both are well-known cases, which have received national media attention, with highly sympathetic plaintiffs. Without impeaching that testimony, the jury would have been left with the incorrect impression that Noble was a sympathetic expert who considered both sides of this case and came to an even-handed conclusion.

To counter the sympathetic impression Noble had created, Rivera's counsel sought to establish that Noble worked on unsympathetic cases too, many for the City of Chicago. Rivera explored the fact that Noble was a "frequent flier" with the City, for which he had testified in more than 20 cases, earning a total of more than $400,000. Ex. 14 at 3437. In addition, he demonstrated that Noble had never reached an opinion adverse to the City, regardless of the facts of the case. Ex. 14 at 3463. Moreover, he established that Noble was conflicted out of reaching an opinion adverse to the City. Ex. 14 at 3464. Such bias is relevant, particularly for an expert who has provided extensive and uniformly positive opinions for the City in every different type of case. *United States v. Abel*, 469 U.S. 45, 52, 1 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.").

---

4363. In fact, Rivera's counsel had not actually said those words at all. *Id.* But, to clear up an ambiguity, Rivera's counsel proceeded to read verbatim Mr. Given's exact words set out above. Ex. 17 at 4363. Once he did so, there were no further objections, and properly so.

Nor did Rivera's counsel commit any misconduct. Defendants complain that Rivera brought up the *LaPorta* case and described it as involving the City's policies regarding an "off-duty police shooting." Ex. 14 at 3460. That is hardly the "inflammatory" reference that Defendants' motion describes it as. Plaintiff's counsel next asked about Noble's approval of the City's policies in the *Manzarra* case, which he described as an examination of "administrative investigations." Ex. 14 at 3460-61. In response to an objection, the Court provided guidance: "we're not going into the substance of the cases and that question did not. Overruled." Ex. at 14 at 3461. Hearing that guidance, Plaintiff's counsel reasonably understood he was permitted to ask Noble about a "description" of the cases he had worked on for the City, without getting into the "substance" of each case. When Plaintiff asked about his approval of the City's policies in the *Giles* case which "involved police shootings," the Court overruled the objection. Ex. 14 at 3462. Rivera' counsel asked another question after that, at which point the Court sustained an objection, and he started on a different line of questioning. Ex. 14 at 3462-63. If a given question was improperly argumentative, and if Defendants objected, the Court promptly fixed the problem by sustaining. There can be no error where the jury was told to disregard attorney questions to which objections were sustained. *Sanchez*, 700 F.3d at 932-33.

The trial transcript exceeds 4,000 pages, and this passage is the only place Defendants identify where Rivera's counsel misunderstood the court's rulings. In fairness, these were not *in limine* orders that Rivera's counsel could become familiar with. On the contrary, in light of contemporaneous objections, the Court had to try to set the ground rules for questioning on the fly, in front of the jury, and Rivera's counsel thought he was permitted to go into the "description" of the case—*e.g.*, bar beating or police shooting—but not the "substance" of the case. With the benefit of hindsight and review of the transcript, Rivera's counsel believes he

misunderstood what the Court was ordering, and he apologizes. But given the professional manner in which the case was tried, coupled with the fact that this was the only time during a very lengthy trial that Rivera's counsel had any such misunderstanding about the Court's rulings, Rivera urges the Court to give him the benefit of the doubt. The harsh accusation of "intentional misconduct" is inaccurate and unfair.

*   *   *

In sum, there is no cause for relief on the grounds of attorney misconduct. The cases relied upon by the Defendants in support of a new trial dealt with entirely different types of trial practices, namely, blatant intentional misconduct. *Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 536-37 (7th Cir. 2003) ("[W]itness tampering is extremely serious misconduct"); *Walden v. City of Chicago*, 846 F. Supp. 2d 963, 976–80 (N.D. Ill. 2012) (holding that the City's lawyers repeatedly crossed "the bright line between aggressive advocacy and 'win-at-all costs' unethical conduct," and that the City's lawyers' "improper conduct tainted the trial from opening statements through closing arguments, and the Court is not confident that the sustained objections, admonishing of counsel, and jury instructions sufficiently minimized the harm[.]"); *Whiting v. Westray*, 294 F.3d 943, 943–44 (7th Cir. 2002) (declining to reverse jury verdict despite genuinely inappropriate conduct). Defendants' misconduct argument should be rejected.

## VIII.  DEFENDANTS' "CUMULATIVE ERROR" POSITION FAILS

Unable to identify any error remotely sufficient to justify a new trial, Defendants instead urge the Court to add up their arguments, the sheer volume of which they say requires a new trial. Doc. 713 at 33. To prevail on a cumulative error argument, Defendants must show "(1) that multiple errors occurred at trial; and (2) those errors, in the context of the entire trial were so severe as to have rendered [their] trial fundamentally unfair." *Christmas*, 682 F.3d at 643.

Defendants cannot show either. None of Defendants' issues has merit, and Defendants must not

be rewarded for creating an illusion that the record is supposedly loaded with dubious rulings, an

impression that is really nothing but a function of the generous page limit on post-trial briefs.

*U.S. v. Powell*, 652 F.3d 702, 706 (7th Cir. 2011) ("Only rarely will multiple insignificant errors

result in sufficient prejudice to justify reversal; we take particular care not to magnify the

significance of errors which had little importance in the trial merely because more than one such

error occurred."). Defendants' cumulative error argument should be rejected.

## CONCLUSION

Defendants are understandably unhappy with the jury's decision, but their attempt to

place the blame on supposedly erroneous rulings by this Court or purported attorney misconduct

is unpersuasive. The evidence against Defendants was strong. They have fallen well short of

justifying another trial, and their motion should be denied in all respects.

RESPECTFULLY SUBMITTED,

**JACQUES RIVERA**

By:     /s/ Jon Loevy
        Jon Loevy
        *One of Plaintiff's Attorneys*

Arthur Loevy                          Locke E. Bowman
Jon Loevy                             David Shapiro
Anand Swaminathan                     Alexa Van Brunt
Steven Art                            RODERICK MACARTHUR JUSTICE CENTER
Rachel Brady                              Northwestern University School of Law
Sean Starr                            375 E. Chicago Avenue
LOEVY & LOEVY                         Chicago, Illinois 60611
311 N. Aberdeen St., Third Floor      (312) 503-0844
Chicago, IL 60607
(312) 243-5900
jon@loevy.com

## APPENDIX A—EXHIBIT LIST TO PLAINTIFF'S RESPONSE

| Response Exhibit | Description |
|---|---|
| 1 | June 5, 2018 Transcript of Proceedings |
| 2 | June 6, 2018 Transcript of Proceedings |
| 3 | June 7, 2018 Transcript of Proceedings |
| 4 | June 8, 2018 Transcript of Proceedings |
| 5 | June 11, 2018 Transcript of Proceedings |
| 6 | June 12, 2018 Transcript of Proceedings |
| 7 | June 13, 2018 Transcript of Proceedings |
| 8 | June 14, 2018 Transcript of Proceedings |
| 9 | June 15, 2018 Transcript of Proceedings |
| 10 | June 18, 2018 Transcript of Proceedings |
| 11 | June 19, 2018 Transcript of Proceedings |
| 12 | June 20, 2018 Transcript of Proceedings |
| 13 | June 21, 2018 Transcript of Proceedings |
| 14 | June 22, 2018 Transcript of Proceedings |
| 15 | June 25, 2018 Transcript of Proceedings |
| 16 | June 26, 2018 Transcript of Proceedings |
| 17 | June 27, 2018 Transcript of Proceedings |
| 18 | June 28, 2018 Transcript of Proceedings |
| 19 | June 29, 2018 Transcript of Proceedings |
| 20 | Designated Deposition Testimony of Dr. Arthur Sharkey (Video played during 6/13/18 and 6/14/18 proceedings, see Ex. 7 at 1680, Ex. 8 at 1687) *Designated Testimony Is Highlighted* |
| 21 | Designated Deposition Testimony of Orlando Lopez (Video played during 6/18/18 and 6/19/18 proceedings, see Ex. 10 at 2449, Ex. 11 at 2463) *Designated Testimony Is Marked by Blue and Red Boxes* |
| 22 | PX1A – 9/16/88 Report |

| 23 | PX3 – 9/15/88 Arrest Report |
|----|------------------------------|
| 24 | PX4 – Rivera Rap Sheet Issued on Inquiry 8/27/88 |
| 25 | PX5 – Guevara 8/30/88 Arrest Report for Jacques Rivera |
| 26 | PX6 – 8/30/88 Hold Report for Jacques Rivera |
| 27 | PX7 – 8/31/88 Release from Custody Report for Jacques Rivera |
| 28 | PX8 – Letrich 8/30/88 Arrest Report for Jose Rodriguez |
| 29 | PX9 – 8/31/88 Hold Report for Jose Rodriguez |
| 30 | PX10 – 8/31/88 Release from Custody Report for Jose Rodriguez |
| 31 | PX11 – General Offense Case Report with Fax Stamp |
| 32 | PX12 – 8/??/88 General Progress Report |
| 33 | PX14 – 8/31/88 General Progress Report |
| 34 | PX16 – 8/27/88 General Progress Report |
| 35 | PX19 – Valentin Investigative Street File |
| 36 | PX19A – Investigative File Inventory |
| 37 | PX19B - 8/31/88 Supplementary Report Regarding Valentin Identification of Rodriguez |
| 38 | PX19C - General Offense Report Missing Lopez Name and Other Information |
| 39 | PX19F – 9/1/88 Report, First Lineup |
| 40 | PX19G - 9/15/88 Line-Up Report |
| 41 | PX19I - Felony 101 Minute Sheet |
| 42 | PX31A - Felix Valentin Medical Records Discussed by Dr. Sharkey |
| 43 | PX33 - Photo of Reynaldo Guevara |
| 44 | PX35 – 1990 Criminal Trial Transcript |
| 45 | PX39 – Wadas Motion for Discovery |
| 46 | PX40 – State's Answer to Discovery |
| 47 | PX43 - Judge Kenneth Wadas's Criminal Defense File for Jacques Rivera's Case |
| 48 | PX43A - Police Records in Judge Kenneth Wadas's Criminal Defense File |
| 49 | PX58B – Photos of Second Lineup |
| 50 | PX62 – Photos of First Lineup |

| 51 | PX66 – Jacques Rivera Photograph |
|----|----------------------------------|
| 52 | PX150 - Dr. Wells Chart of Filler Identification Analysis |
| 53 | PX154I - Felony 101 Minute Sheet with Gang Crimes North Phone Number |
| 54 | PX260 - Linzer Note On Conversation with Orlando Lopez—"I was coached" |
| 55 | PX268 - Key Documents That Are In Valentin Investigative Street File But Not In Judge Wadas's Criminal Defense File |
| 56 | PX269 - Documents That Are In Valentin Investigative Street File But Not In Judge Wadas's Criminal Defense File |
| 57 | May 24, 2018 Transcript of Pretrial Conference |
| 58 | DX3 – Permanent Retention File |
| 59 | DX103 – Cynthia Estes' Report of Lopez Interview |
| 60 | DX115 – Affidavit Signed by Orlando Lopez |
| 61 | Deposition of Steve Gawrys (Excerpts) |
| 62 | Expert Report of John Wixted |
| 63 | Deposition of John Wixted (Excerpts) |
| 64 | Expert Report of John Wasilewski |
| 65 | PX145A – James Kluppelberg Investigative File Handwritten Notes |
| 66 | PX146A-C – Nathson Fields Investigative File Documents |
| 67 | PX154 – Samuel Robinson Investigative File Handwritten Note |
| 68 | PX154J - Lineup Report (negative ID) from Demetrius Johnson case |
| 69 | PX154K – Curtis Kirkland Investigative File Document |
| 69 | PX154N – David Quinones Investigative File Document |
| 70 | PX154Q – Miguel Borrotto Investigative File Document |
| 71 | PX154J - Lineup Report (negative ID) from Demetrius Johnson case |
| 72 | PX177 – Daily Activity Summary Report |
| 73 | Deposition of Edward Mingey (Excerpts) |

## APPENDIX B—TABLE OF CONTENTS TO TRANSCRIPT

| WITNESS | EXAM | EXHIBIT | DATE | PAGE(S) |
|---|---|---|---|---|
| Loevy Opening | | 2 | 6-6-2018 | 54-92 |
| Polick Opening | | 2 | 6-6-2018 | 95-109 |
| Leinenweber Opening | | 2 | 6-6-2018 | 109-114 |
| Rosen Opening | | 2 | 6-6-2018 | 114-129 |
| Craig Letrich | Direct by Loevy | 2 | 6-6-2018 | 130-165 |
| Craig Letrich | Cross by Polick | 2 | 6-6-2018 | 176-180 |
| Craig Letrich | Re-Direct by Loevy | 2 | 6-6-2018 | 180-184 |
| Craig Letrich | Re-Cross by Polick | 2 | 6-6-2018 | 184-185 |
| Jacques Rivera | Direct by Loevy | 2 | 6-6-2018 | 186-321 |
| Jacques Rivera | Direct by Loevy | 3 | 6-7-2018 | 343-373 |
| Jacques Rivera | Cross by Sotos | 3 | 6-7-2018 | 388-453 |
| Jacques Rivera | Cross by Sotos | 3 | 6-7-2018 | 474-484 |
| Jacques Rivera | Cross by Leinenweber | 3 | 6-7-2018 | 485-489 |
| Jacques Rivera | Re-Direct by Loevy | 3 | 6-7-2018 | 490-509 |
| Jacques Rivera | Re-Cross by Sotos | 3 | 6-7-2018 | 509-523 |
| Jacques Rivera | Re-Cross by Leinenweber | 3 | 6-7-2018 | 524-525 |
| Jacques Rivera | Re-Cross by Rosen | 3 | 6-7-2018 | 525-526 |
| Jacques Rivera | Re-Direct by Loevy | 3 | 6-7-2018 | 526-530 |
| Jacques Rivera | Re-Cross by Sotos | 3 | 6-7-2018 | 530-534 |
| Jacques Rivera | Re-Direct by Loevy | 3 | 6-7-2018 | 534-535 |
| Jacques Rivera | Re-Cross by Sotos | 3 | 6-7-2018 | 535-536 |
| Jacques Rivera | Re-Direct by Loevy | 3 | 6-7-2018 | 536-538 |
| Jacques Rivera | Re-Cross by Sotos | 3 | 6-7-2018 | 538-540 |
| Gillian McLaughlin | Direct by Loevy | 3 | 6-7-2018 | 541-644 |
| Gillian McLaughlin | Direct by Loevy | 4 | 6-8-2018 | 663-775 |
| Gillian McLaughlin | Cross by Polick | 4 | 6-8-2018 | 775-796 |
| Gillian McLaughlin | Cross by Polick | 4 | 6-8-2018 | 813-871 |

| WITNESS | EXAM | EXHIBIT | DATE | PAGE(S) |
|---|---|---|---|---|
| Gillian McLaughlin | Cross by Rosen | 4 | 6-8-2018 | 872-914 |
| Gillian McLaughlin | Cross by Leinenweber | 4 | 6-8-2018 | 914-917 |
| Gillian McLaughlin | Re-Direct by Loevy | 4 | 6-8-2018 | 917-950 |
| Gillian McLaughlin | Re-Cross by Polick | 5 | 6-11-2018 | 958-961 |
| Gillian McLaughlin | Re-Cross by Leinenweber | 5 | 6-11-2018 | 961-962 |
| Gillian McLaughlin | Re-Direct by Loevy | 5 | 6-11-2018 | 962-963 |
| Gary Wells | Direct by Art | 5 | 6-11-2018 | 964-1006 |
| Carlos Olivero | Direct by Swaminathan | 5 | 6-11-2018 | 1010-1021 |
| Carlos Olivero | Cross by Sotos | 5 | 6-11-2018 | 1021-1046 |
| Carlos Olivero | Re-Direct by Swaminathan | 5 | 6-11-2018 | 1046-1053 |
| Carlos Olivero | Re-Cross by Sotos | 5 | 6-11-2018 | 1053-1055 |
| Carlos Olivero | Re-Direct by Swaminathan | 5 | 6-11-2018 | 1055 |
| Angel Villafane | Direct by Swaminathan | 5 | 6-11-2018 | 1056-1062 |
| Angel Villafane | Cross by Sotos | 5 | 6-11-2018 | 1062-1078 |
| Angel Villafane | Re-Direct by Swaminathan | 5 | 6-11-2018 | 1078-1080 |
| Gary Wells | Direct by Art | 5 | 6-11-2018 | 1095-1111 |
| Gary Wells | Cross by Rosen | 5 | 6-11-2018 | 1111-1154 |
| Gary Wells | Cross by Rosen | 5 | 6-11-2018 | 1158-1181 |
| Gary Wells | Cross by Rosen | 6 | 6-12-2018 | 1195-1214 |
| Gary Wells | Cross by Given | 6 | 6-12-2018 | 1214-1217 |
| Gary Wells | Re-Direct by Art | 6 | 6-12-2018 | 1218-1231 |
| Gary Wells | Re-Cross by Rosen | 6 | 6-12-2018 | 1231-1235 |
| Gary Wells | Re-Direct by Art | 6 | 6-12-2018 | 1235-1236 |
| Gary Wells | Re-Cross by Rosen | 6 | 6-12-2018 | 1236 |
| David Osorio | Direct by Swaminathan | 6 | 6-12-2018 | 1237-1253 |
| David Osorio | Cross by Leinenweber | 6 | 6-12-2018 | 1253-1261 |
| David Osorio | Re-Direct by Swaminathan | 6 | 6-12-2018 | 1261-1262 |
| Reynaldo Guevara | Direct by Loevy | 6 | 6-12-2018 | 1265-1342 |

| WITNESS | EXAM | EXHIBIT | DATE | PAGE(S) |
|---|---|---|---|---|
| Kenneth Wadas | Direct by Bowman | 6 | 6-12-2018 | 1362-1418 |
| Kenneth Wadas | Cross by Sotos | 6 | 6-12-2018 | 1418-1448 |
| Kenneth Wadas | Cross by Sotos | 7 | 6-13-2018 | 1453-1546 |
| Kenneth Wadas | Voir Dire by Sotos | 7 | 6-13-2018 | 1569-1572 |
| Kenneth Wadas | Cross by Rosen | 7 | 6-13-2018 | 1574-1589 |
| Kenneth Wadas | Cross by Leinenweber | 7 | 6-13-2018 | 1589-1590 |
| Kenneth Wadas | Re-Direct by Bowman | 7 | 6-13-2018 | 1591-1616 |
| Kenneth Wadas | Re-Cross by Rosen | 7 | 6-13-2018 | 1616-1619 |
| Kenneth Wadas | Re-Cross by Sotos | 7 | 6-13-2018 | 1620-1627 |
| Kenneth Wadas | Re-Direct by Bowman | 7 | 6-13-2018 | 1628-1629 |
| Kenneth Wadas | Re-Cross by Sotos | 7 | 6-13-2018 | 1629-1630 |
| Orlando Lopez | Reading of Designated PC Hearing Testimony | 7 | 6-13-2018 | 1642-1680 |
| Arthur Sharkey | Playing of Designated Video Deposition (not transcribed) | 7 | 6-13-2018 | 1680 |
| Arthur Sharkey | Playing of Designated Video Deposition (not transcribed) | 8 | 6-14-2018 | 1687 |
| Steve Gawrys | Direct by Loevy | 8 | 6-14-2018 | 1692-1859 |
| Steve Gawrys | Cross by Given | 8 | 6-14-2018 | 1860-1892 |
| Jennifer Linzer | Direct by Bowman | 8 | 6-14-2018 | 1893-1917 |
| Jennifer Linzer | Cross by Leinenweber | 8 | 6-14-2018 | 1917-1951 |
| Jennifer Linzer | Cross by Leinenweber | 9 | 6-15-2018 | 1961-1972 |
| Jennifer Linzer | Cross by Sotos | 9 | 6-15-2018 | 1972-1980 |
| Jennifer Linzer | Cross by Barber | 9 | 6-15-2018 | 1980-1984 |
| Jennifer Linzer | Re-Direct by Bowman | 9 | 6-15-2018 | 1984-1989 |
| Jennifer Linzer | Re-Cross by Leinenweber | 9 | 6-15-2018 | 1989-1991 |
| Jennifer Linzer | Re-Cross by Sotos | 9 | 6-15-2018 | 1991-1996 |
| Steve Gawrys | Cross by Given | 9 | 6-15-2018 | 1996-2062 |
| Steve Gawrys | Re-Direct by Loevy | 9 | 6-15-2018 | 2062-2105 |
| Steve Gawrys | Re-Direct by Loevy | 9 | 6-15-2018 | 2122-2136 |

| WITNESS | EXAM | EXHIBIT | DATE | PAGE(S) |
|---|---|---|---|---|
| Steve Gawrys | Re-Cross by Given | 9 | 6-15-2018 | 2136-2140 |
| Steve Gawrys | Re-Direct by Loevy | 9 | 6-15-2018 | 2140-2141 |
| Jennifer Rivera | Direct by Bowman | 9 | 6-15-2018 | 2145-2156 |
| Jennifer Rivera | Cross by Golden | 9 | 6-15-2018 | 2157-2158 |
| Michael Brasfield | Direct by Loevy | 9 | 6-15-2018 | 2159-2227 |
| Michael Brasfield | Direct by Loevy | 10 | 6-18-2018 | 2234-2275 |
| Michael Brasfield | Cross by Rosen | 10 | 6-18-2018 | 2275-2343 |
| Michael Brasfield | Cross by Rosen | 10 | 6-18-2018 | 2349-2407 |
| Michael Brasfield | Re-Direct by Loevy | 10 | 6-18-2018 | 2407-2442 |
| Michael Brasfield | Re-Cross by Rosen | 10 | 6-18-2018 | 2442-2449 |
| Orlando Lopez | Playing of Designated Video Deposition (not transcribed) | 10 | 6-18-2018 | 2449 |
| Orlando Lopez | Playing of Designated Video Deposition (not transcribed) | 11 | 6-19-2018 | 2463 |
| Steve Gawrys | Re-Direct by Loevy | 11 | 6-19-2018 | 2463-2476 |
| Edward Mingey | Direct by Loevy | 11 | 6-19-2018 | 2477-2524 |
| Edward Mingey | Direct by Loevy | 11 | 6-19-2018 | 2536-2543 |
| Juan Rivera | Direct by Art | 11 | 6-19-2018 | 2543-2571 |
| Juan Rivera | Cross by Golden | 11 | 6-19-2018 | 2571-2576 |
| Darren O'Brien | Direct by Loevy | 11 | 6-19-2018 | 2577-2609 |
| Darren O'Brien | Cross by Polick | 11 | 6-19-2018 | 2609-2615 |
| Darren O'Brien | Re-Direct by Loevy | 11 | 6-19-2018 | 2615-2621 |
| Julie Rosner | Direct by Loevy | 11 | 6-19-2018 | 2622-2653 |
| Julie Rosner | Cross by Sotos | 11 | 6-19-2018 | 2653-2669 |
| Julie Rosner | Re-Direct by Loevy | 11 | 6-19-2018 | 2669-2674 |
| Julie Rosner | Re-Cross by Sotos | 11 | 6-19-2018 | 2674-2678 |
| Julie Rosner | Re-Direct by Loevy | 11 | 6-19-2018 | 2678-2679 |
| Julie Rosner | Re-Cross by Sotos | 11 | 6-19-2018 | 2679-2680 |
| John Guzman | Direct by Loevy | 11 | 6-19-2018 | 2681-2692 |

| WITNESS | EXAM | EXHIBIT | DATE | PAGE(S) |
|---|---|---|---|---|
| John Guzman | Direct by Loevy | 12 | 6-20-2018 | 2704-2712 |
| John Guzman | Cross by Polick | 12 | 6-20-2018 | 2712-2716 |
| John Guzman | Re-Direct by Loevy | 12 | 6-20-2018 | 2716 |
| Daniel Noon | Direct by Loevy | 12 | 6-20-2018 | 2717-2727 |
| Daniel Noon | Cross by Golden | 12 | 6-20-2018 | 2727-2737 |
| Daniel Noon | Re-Direct by Loevy | 12 | 6-20-2018 | 2737-2749 |
| Daniel Noon | Re-Cross by Golden | 12 | 6-20-2018 | 2749-2752 |
| Daniel Noon | Re-Direct by Loevy | 12 | 6-20-2018 | 2752 |
| Daniel Noon | Re-Cross by Golden | 12 | 6-20-2018 | 2753-2755 |
| Daniel Noon | Re-Direct by Loevy | 12 | 6-20-2018 | 2755-2756 |
| Joseph Sparks | Direct by Loevy | 12 | 6-20-2018 | 2756-2775 |
| Joseph Sparks | Cross by Polick | 12 | 6-20-2018 | 2775-2783 |
| Joseph Sparks | Re-Direct by Loevy | 12 | 6-20-2018 | 2783-2791 |
| Richard Rivera | Direct by Swaminathan | 12 | 6-20-2018 | 2791-2814 |
| Richard Rivera | Cross by Golden | 12 | 6-20-2018 | 2815-2818 |
| William Dorsch | Direct by Sotos | 12 | 6-20-2018 | 2665-2713 |
| William Dorsch | Cross by Bowman | 12 | 6-20-2018 | 2713-2751 |
| William Dorsch | Re-Direct by Sotos | 12 | 6-20-2018 | 2751-2799 |
| William Dorsch | Re-Direct by Leinenweber | 12 | 6-20-2018 | 2799-2806 |
| William Dorsch | Re-Direct by Leinenweber | 13 | 6-21-2018 | 2989-3023 |
| William Dorsch | Re-Cross by Bowman | 13 | 6-21-2018 | 3023-3040 |
| William Dorsch | Re-Direct by Sotos | 13 | 6-21-2018 | 3040-3078 |
| Larry Victorson | Direct by Loevy | 13 | 6-21-2018 | 3079-3117 |
| Larry Victorson | Cross by Sotos | 13 | 6-21-2018 | 3124-3155 |
| Larry Victorson | Cross by Leinenweber | 13 | 6-21-2018 | 3155-3157 |
| Larry Victorson | Re-Direct by Loevy | 13 | 6-21-2018 | 3157-3168 |
| Larry Victorson | Re-Cross by Sotos | 13 | 6-21-2018 | 3168-3169 |
| Larry Victorson | Re-Direct by Loevy | 13 | 6-21-2018 | 3169-3170 |

| WITNESS | EXAM | EXHIBIT | DATE | PAGE(S) |
|---|---|---|---|---|
| Ramon Lopez | Direct by Golden | 13 | 6-21-2018 | 3172-3179 |
| Ramon Lopez | Cross by Loevy | 13 | 6-21-2018 | 3179-3188 |
| Cathryn Crawford | Direct by Carney | 13 | 6-21-2018 | 3188-3202 |
| Cathryn Crawford | Cross by Bowman | 13 | 6-21-2018 | 3202-3203 |
| Cathryn Crawford | Re-Direct by Carney | 13 | 6-21-2018 | 3204-3208 |
| James Hickey | Direct by Rosen | 13 | 6-21-2018 | 3208-3239 |
| James Hickey | Cross by Bowman | 13 | 6-21-2018 | 3239-3251 |
| James Hickey | Cross by Bowman | 14 | 6-22-2018 | 3264-3295 |
| James Hickey | Re-Direct by Rosen | 14 | 6-22-2018 | 3295-3314 |
| James Hickey | Re-Cross by Bowman | 14 | 6-22-2018 | 3314-3326 |
| James Spratte | Direct by Rosen | 14 | 6-22-2018 | 3326-3346 |
| James Spratte | Cross by Loevy | 14 | 6-22-2018 | 3347-3364 |
| James Spratte | Cross by Loevy | 14 | 6-22-2018 | 3378-3429 |
| James Spratte | Re-Direct by Rosen | 14 | 6-22-2018 | 3430-3431 |
| James Spratte | Re-Cross by Loevy | 14 | 6-22-2018 | 3432-3433 |
| Jeffrey Noble | Direct by Rosen | 14 | 6-22-2018 | 3433-3455 |
| Jeffrey Noble | Cross by Loevy | 14 | 6-22-2018 | 3455-3497 |
| Stephen Machain | Reading of Designated Deposition Testimony | 14 | 6-22-2018 | 3497-3514 |
| Stephen Machain | Reading of Designated Deposition Testimony | 15 | 6-25-2018 | 3525-3530 |
| John Boyle | Direct by Golden | 15 | 6-25-2018 | 3533-3551 |
| John Boyle | Direct by Leinenweber | 15 | 6-25-2018 | 3552-3554 |
| John Boyle | Cross by Loevy | 15 | 6-25-2018 | 3554-3588 |
| John Boyle | Re-Direct by Leinenweber | 15 | 6-25-2018 | 3589-3590 |
| John Boyle | Re-Cross by Loevy | 15 | 6-25-2018 | 3590-3593 |
| Cynthia Estes | Reading of Designated Deposition Testimony | 15 | 6-25-2018 | 3597-3662 |
| John Wasilewski | Direct by Barber | 15 | 6-25-2018 | 3667-3697 |
| John Wasilewski | Cross by Art | 15 | 6-25-2018 | 3697-3701 |

| WITNESS | EXAM | EXHIBIT | DATE | PAGE(S) |
|---|---|---|---|---|
| George Luis Ruiz | Reading of Designated Deposition Testimony | 15 | 6-25-2018 | 3702-3726 |
| Thomas Bryant | Reading of Designated Deposition Testimony | 15 | 6-25-2018 | 3727-3780 |
| Bernard Murray | Direct by Rosen | 15 | 6-25-2018 | 3781-3799 |
| Bernard Murray | Direct by Rosen | 16 | 6-26-2018 | 3809-3844 |
| Bernard Murray | Cross by Loevy | 16 | 6-26-2018 | 3844-3920 |
| Bernard Murray | Re-Direct by Rosen | 16 | 6-26-2018 | 3920-3922 |
| Bernard Murray | Re-Cross by Loevy | 16 | 6-26-2018 | 3922 |
| Orlando Lopez | Reading of Designated Criminal Trial Testimony | 16 | 6-26-2018 | 3924-3952 |
| John Wixted | Direct by Barber | 16 | 6-26-2018 | 3976-3989 |
| John Wixted | Direct by Given | 16 | 6-26-2018 | 3989-4015 |
| John Wixted | Cross by Loevy | 16 | 6-26-2018 | 4015-4075 |
| John Wixted | Re-Direct by Given | 16 | 6-26-2018 | 4075-4080 |
| John Wixted | Re-Direct by Leinenweber | 16 | 6-26-2018 | 4080-4082 |
| John Wixted | Re-Cross by Loevy | 16 | 6-26-2018 | 4082-4085 |
| Loevy Closing | | 17 | 6-27-2018 | 4146-4228 |
| Bowman Closing | | 17 | 6-27-2018 | 4228-4243 |
| Sotos Closing | | 17 | 6-27-2018 | 4248-4312 |
| Leinenweber Closing | | 17 | 6-27-2018 | 4315-4331 |
| Rosen Closing | | 17 | 6-27-2018 | 4331-4351 |
| Loevy Rebuttal | | 17 | 6-27-2018 | 4352-4368 |

**CERTIFICATE OF SERVICE**

I, Jon Loevy, an attorney, hereby certify that on November 14, 2018, I filed the forgoing

PLAINTIFF'S RESPONSE TO DEFENDANTS' POST-TRIAL MOTION using the Court's

CM/ECF system, which effected service on all counsel of record.

/s/ Jon Loevy
Jon Loevy
*One of Plaintiff's Attorneys*

| | |
|---|---|
| Arthur Loevy | Locke E. Bowman |
| Jon Loevy | David Shapiro |
| Anand Swaminathan | Alexa Van Brunt |
| Steven Art | RODERICK MACARTHUR JUSTICE CENTER |
| Rachel Brady | Northwestern University School of Law |
| Sean Starr | 375 E. Chicago Avenue |
| LOEVY & LOEVY | Chicago, Illinois 60611 |
| 311 N. Aberdeen St., Third Floor | (312) 503-0844 |
| Chicago, IL 60607 | |
| (312) 243-5900 | |
| jon@loevy.com | |