# Exhibit AAAA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JACQUES RIVERA,
    Plaintiff,
      v.
REYNALDO GUEVARA, et al.
    Defendants.

    Case No. 12 C 4428
    Judge Joan B. Gottschall
    Mag. Judge Mary M. Rowland
    JURY TRIAL DEMANDED

**DEFENDANT CITY OF CHICAGO'S COMBINED REPLY IN SUPPORT OF ITS
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND
<u>MOTION FOR A NEW TRIAL</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

I.   NO UNCONSTITUTIONAL POLICY DEPRIVED PLAINTIFF OF THE VALENTIN
     INVESTIGATIVE FILE ................................................................................................. 3

   A.   The City is Not Liable for the Valentin Investigative File Because Defendant
   McLaughlin is Not Liable. ........................................................................................... 3

   B.   Plaintiff's Failure to Obtain the Valentin Investigative File Did Not Amount to a
   Constitutional Violation. .............................................................................................. 6

   C.   Plaintiff Did Not Establish an Unconstitutional Investigative File Policy ...................... 9

   D.   A Finding in Plaintiff' Favor on His Investigative File Production Claim is  Against the
   Manifest Weight of the Evidence. ............................................................................... 23

II.  NO UNCONSTITUTIONAL POLICY DEPRIVED PLAINTIFF OF EVIDENCE OF A
     FILLER IDENTIFICATION FROM THE ALLEGED AUGUST 31 LINEUP. .................... 26

   A.   The City is Not Liable for the Failing to Disclose a Filler Identification Because
   Defendant McLaughlin is Not Liable. ......................................................................... 26

   B.   The City's Practice Regarding Documenting Lineups was Not a Policy to  Withhold
   Material Exculpatory or Impeachment Evidence. ........................................................ 27

III. NO GANG CRIMES POLICY DEPRIVED PLAINTIFF OF MATERIAL
     EXCULPATORY EVIDENCE. ...................................................................................... 30

IV.  REMAINING ISSUES WARRANTING A NEW TRIAL PURSUANT RULE 59 ............. 34

   A.   The Court Should Not Have Permitted Wells to Testify. ............................................. 34

   B.   The Court Should Not Have Permitted Plaintiff to Take Unfair Advantage of Mingey's
   Assertion of the Fifth Amendment. ............................................................................. 35

   C.   The Court Erred by Eliminating Certain Jury Instructions ............................................ 37

Case: 1:18-cv-03029 Document #: 511-80 Filed: 03/15/24 Page 4 of 45 PageID #:66816

# CASES

*Armstrong v. Daley*, 786 F.3d 529 (7th Cir. 2015) ........................................................ 11

*Beaman v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015) ...................................................... 7

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................................................... 7, 8

*City of Los Angeles v. Heller*, 475 U.S. 796 (1986) ..................................................... 25, 30

*Connick v. Thompson*, 563 U.S. 51 (2011) ............................................................... 26, 32

*Connick v. Thompson*, 563 U.S. 51 (2011) ............................................................... 13, 14

*Daniel v. Cook County*, 833 F.3d 728 (7th Cir. 2016) ....................................................... 20

*Davis v. Carter*, 452 F.3d 686 (7th Cir. 2006) ............................................................. 20

*Emerson v. Wembley U.S.A., Inc.*, 433 F.2d 1200 (D. Colo. 2006) ............................................. 42

*Estate of Moreland v. Dieter,* 395 F.3d 747 (7th Cir. 2005) ................................................ 20

*Glisson v. Indiana Dep't of Corr.,* 849 F.3d 372 (7th Cir. 2017) ........................................... 20

*Harris v. Kuba*, 486 F.3d 1010 (7th Cir. 2007) ............................................................. 27

*Hill v. City of Chicago*, 2009 WL 174994 (N.D. Ill. 2009) ........................................... 10, 34, 35

Jones v. City of Chicago, 856 F.2d 985 (7th Cir. 1988) ........................................... 14, 17, 19, 20

*Lapre v. City of Chicago*, 911 F.3d 424 (7th Cir. 2018) .............................................. passim

*Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754 (7th Cir. 2015) ............................................. 5

*Monell v. Dep't of Social Services*, 436 U.S. 658 (1978) ................................................... 13

*Moore v. Illinois*, 408 U.S. 786 (1972) .................................................................... 18

*Norfleet v. Webster*, 439 F.3d 392 (7th Cir. 2006) .......................................................... 8

*Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir. 1987) ......................................... 14, 17, 19

*Petit v. City of Chicago*, 239 F. Supp. 2d 761 (N.D. Ill. 2002) ............................................. 5

*Ruiz-Cortez v. City of Chicago*, 11 C 1420, 2016 WL 6270768 (J. Leinenweber) ......................... 25, 36

*Scott v. Edinburg*, 346 F.3d 752 (7th Cir. 2003) ........................................................... 18

*Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293 (7th Cir. 2010) ......................................... 20

*Thomas v. Cook County*, 604 F.3d 293 (7th Cir. 2010) ............................................................. 6, 8

*U.S. v. Warren*, 454 F.3d 752 (7th Cir. 2006)................................................................. 10, 34, 35

*United States v. Agurs*, 427 U.S. 97 (1976) .................................................................................. 7

*Woodward v. Corr. Med. Services of Illinois, Inc.*, 368 F.3d 917 (7th Cir. 2004) ...................... 20

Defendant City of Chicago (the "City"), by and through its undersigned attorneys, and in further support of its post-trial motions brought pursuant to Rule 50 and Rule 59, states:

**INTRODUCTION**

Defendant City of Chicago renewed its motion for judgment as a matter of law pursuant to Rule 50(b) (ECF 711) and, in the alternative, moved for a new trial pursuant to Rule 59 (ECF 708). In response, Plaintiff jumbles the issues, often tangling his response to the City's motion with his response to the Individual Defendants' motion and confusing the legal standards applicable to each rule. To reorient the Court, the City moved for judgment as a matter of law on Plaintiff's *Monell* claim because Plaintiff did not prove that any City policy caused him to suffer a constitutional violation, to which the City was deliberately indifferent. Not only do his detective-related theories fail because the jury found the sole Defendant Detective not liable, but Plaintiff did not prove that the City had an unconstitutional policy of withholding investigative files nor did he establish that the City's practices in documenting filler identifications were unconstitutional. Similarly, Plaintiff presented no evidence that the City's training was constitutionally deficient, nor did he establish that any constitutional violation resulted from the City's alleged policies pertaining to the Gang Crimes Unit.

Contrary to Plaintiff's assertion, none of these are new arguments. The City has argued consistently throughout the litigation in this case that Plaintiff did not, and could not, establish that any City policy caused him a constitutional violation. The City has consistently argued that Plaintiff failed to prove any underlying *Brady* violation and argued that his expert's opinions were unreliable and insufficient to establish liability. The City has also consistently argued that Plaintiff failed to establish a causal link between any policy and an alleged constitutional violation he

1

Case: 1:18-cv-03029 Document #: 574-67 Filed: 03/15/24 Page 7 of 45 PageID #:6681

suffered, and that he failed to establish the City's policymakers were on notice of the alleged deficiencies in the City's policies, such that their failure to act amounted to deliberate indifference.

Further, there is no rule that states a party must make precisely the same arguments in subsequent pleadings to preserve them. *Lawson v. Sun Microsystems, Inc*., 791 F.3d 754, 761 (7th Cir. 2015). To the contrary, once an argument is presented, a party is permitted to elaborate in further briefing. *Id.*; *see also Petit v. City of Chicago*, 239 F. Supp. 2d 761, 767 (N.D. Ill. 2002) (a party's failure to expressly state all grounds or expressly state a sufficient argument when the motion is presented at the close of the evidence will not result in waiver if previously presented arguments (in an earlier Rule 50(a) motion, in trial briefs, in motions in *limine*, on summary judgment, or otherwise) have made the moving party's position clear for the court and opposing party). In effect, the rule is one of fairness, and Plaintiff expresses no indication that he was in any way surprised by the arguments raised in the City's Rule 50(b) motion. Just the opposite, the parties have debated all of these same issues before, and so Plaintiff's argument regarding waiver should be disregarded.

If the Court denies the City's Rule 50(b) motion, and finds that a reasonable jury could return a verdict in favor of Plaintiff's *Monell* claim, a new trial is warranted pursuant to Rule 59. As the City argued in its motion, the evidence was so compelling in the City's favor, the jury must have been confused or led astray and based its verdict on some other factor rather than a fair weighing of the evidence. For the following reasons, the City requests the Court grant its Rule 50 motion, or in the alternative, grant its Rule 59 motion.

Case: 1:18-cv-03029 Document #: 511-80 Filed: 03/15/24 Page 8 of 45 PageID #:66821

# ARGUMENT

## I. NO UNCONSTITUTIONAL POLICY DEPRIVED PLAINTIFF OF THE VALENTIN INVESTIGATIVE FILE.

### A. The City is Not Liable for the Valentin Investigative File Because Defendant McLaughlin is Not Liable.

The City argued in its Rule 50 motion that the jury did not find *Monell* liability on any of the detective-related policies because the jury found the sole Defendant detective, Defendant McLaughlin, not liable. Plaintiff responds that (1) the City waived this argument by failing to raise it before the jury was discharged, and (2) that the jury's finding with respect to Defendant McLaughlin was not inconsistent with the jury's finding against the City. Neither argument is correct.

As for waiver, Plaintiff misunderstands Defendants' argument. Defendants are not arguing that the verdict *was* inconsistent, such that a new trial is warranted. Rather, Plaintiff presented the jury with several options for which to find *Monell* liability, and the Court can be assured that the jury did not find against the City for any of the detective-related policies because the jury found that Defendant McLaughlin did not commit any constitutional violation. Put differently, the jury could not have found the City liable on any of the detective-related policies because such a verdict would be inconsistent with the jury's finding that the detective in the case was not liable. *See Thomas v. Cook County*, 604 F.3d 293, 305 (7th Cir. 2010). In any event, the Seventh Circuit has never endorsed the view the moving party must raise an inconsistent verdict argument before the jury is discharged.[1]

---

[1] *See Pearson v. Welborn*, 471 F.3d 732, 739 (7th Cir. 2006); *Carter v. Chicago Police Officers*, 165 F.3d 1071, 1079 (7th Cir. 1998); *Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 678 n. 6 (7th Cir.1985) (noting that the question of waiver with respect to inconsistent general verdicts remains open); *Timm v. Progressive Steel Treating, Inc.,* 137 F.3d 1008, 1010 (7th Cir.1998) (stating that "if the [inconsistent] verdicts cannot be reconciled, the whole case must be retried.... If inconsistency escapes notice until after the jury has disbanded, the proper thing to do is to hold a new trial."); *Gordon v. Degelmann,* 29 F.3d 295, 298–99 (7th Cir.1994) ("If the problem [of inconsistent

As for the inconsistency, the jury's finding that Detective McLaughlin did not violate Plaintiff's due process rights eliminates the possibility that the jury found the City liable on the City's alleged policies about Detective Division investigative files. All of the documents in the Valentin Investigative File that Plaintiff claims were withheld from him were in Defendant McLaughlin's possession.[2] If she had knowledge of the alleged exculpatory evidence contained within the documents, then she had a duty to disclose them. *See Beaman v. Freesmeyer*, 776 F.3d 500, 506, 509 (7th Cir. 2015) ("[P]olice officers must turn over materially exculpatory evidence"; a *Brady* violation occurs even if failure to disclose was inadvertent). Because the jury found that she did not knowingly withhold any material exculpatory evidence, Plaintiff did not establish that any constitutional violation occurred resulting from non-production of the Valentin Investigative File.

Plaintiff's argument that municipal liability can stand absent Defendant McLaughlin's liability misunderstands the standard for a due process violation pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Plaintiff argues the jury could have found that Defendant McLaughlin put the documents and reports "where she was supposed to", such that she innocently assumed the documents would be copied and produced by someone else. Good faith, however, is not a defense to a *Brady* violation. *Brady*, 373 U.S. at 87. A *Brady* violation occurs when material exculpatory evidence is suppressed *irrespective* of good or bad faith. *Id.* In fact, the constitutional violation turns on "the character of the evidence, not the character of the prosecutor". *United States v. Agurs*, 427 U.S. 97, 110 (1976).

---

verdicts] is not caught before the jury disbands (and no one noticed this conflict until post-trial motions), the proper thing to do is to hold a new trial with respect to all affected parties."). As such, the City has not waived this argument.
[2] *See* ECF 735, p. 29. As addressed below, the GPR documenting "by the store" was Defendant McLaughlin's GPR. The GPR Plaintiff claims documented the first lineup was Defendant Leonard's GPR, McLaughlin's partner. The remaining documents (PX 6, 9, 5) were generated on or before August 31 when Defendant McLaughlin was conducting the investigation with Detective Leonard. Finally, Plaintiff claims the investigative file inventory was exculpatory because it showed two GPRs missing. (PX 19A). The missing GPRs were Defendant McLaughlin's.

For that reason, Plaintiff's reliance on *Thomas v. Cook County* 604 F.3d 293 (7th Cir. 2010) and the analogy to the incarceration context is misplaced. In *Thomas*, the constitutional violation concerned a violation of the Eighth Amendment, specifically the defendants' deliberate indifference to the inmate's medical care. Unlike *Brady*, the Eighth Amendment includes a state of mind component. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). The test is a subjective one and requires proof that the official was aware of and disregarded an excessive serious harm to the inmate. *Id.* For that reason, the jury's verdict in *Thomas* was not inconsistent. The Court found that Cook County's policies left its employees ill equipped to respond to medical requests, so the inmate suffered an Eighth Amendment violation, even though the individual employees were not subjectively deliberately indifferent. *Thomas*, 604 F.3d at 305. It is not possible to draw such a line of demarcation in the *Brady* context. Because there is no comparable state of mind component, Defendant McLaughlin could not have succeeded on the claim because she put the alleged material exculpatory evidence "where she was supposed to". Importantly, Plaintiff cites no authority for his position that municipal liability can stand absent individual liability in the *Brady* context.

Instead, Plaintiff argues the jury could still have found for Defendant McLaughlin on the due process claim because she did not have any involvement in the investigation after August 31. That argument is easily disposed of considering *all* of the documents Plaintiff claims Defendants withheld from him in the Investigative File were either (1) Defendant McLaughlin's reports, or (2) generated on or before August 31. *See* Note 2. Again, if she was aware of the exculpatory evidence, she had a duty to disclose it. The jury found her not liable, and, therefore, did not find any constitutional violation as a result of non-disclosure of the Valentin Investigative File.

**B.**    **Plaintiff's Failure to Obtain the Valentin Investigative File Did Not Amount to a Constitutional Violation.**

Consistent with the jury's finding as to Defendant McLaughlin, Plaintiff did not establish that he suffered a constitutional violation resulting from non-production of the Valentin Investigative File.  Plaintiff did not establish that any of the documents contained in the file were exculpatory or material, and Plaintiff did not establish that the documents could not have been obtained through the exercise of due diligence.  Plaintiff responds that had he obtained the Investigative File, he could have established (1) that someone pulled Plaintiff's criminal history on August 27, (2) that Orlando Lopez said he was too far away to see the man who shot Felix Valentin, (3) that two general progress reports (GPRs) were missing and (4) that a so-called first lineup occurred on August 31.  None of these things are substantiated by the record.

With respect to the criminal history report, Plaintiff's response is cursory and fails to explain what material significance the date on the report had to his case.  (ECF 735, p. 35).  In fact, Plaintiff ignores the City's main point – that Lopez testified at trial that he identified Plaintiff on August 27.  (Ex. A, Lopez, 3933-3935).  Thus, if Plaintiff had the criminal history with the date on it, the most Plaintiff's attorney could do at trial would be confirm that Lopez made an identification of Plaintiff on that date.  That would be a pointless avenue of cross-examination, far from evidence that would have impacted the outcome of the case.  Plaintiff offers no explanation of why this report constitutes material exculpatory or impeachment evidence.

As for Orlando Lopez's account, Plaintiff claims he was missing Defendant McLaughlin's GPR that used the words "by the store" when referring to her interview with Lopez.  Plaintiff claims if Lopez was "by the store" when the shooting happened, he would have been too far away to see the face of the man who shot Felix Valentin.  (ECF 735, p. 35).  The phrase "by the store", however, is only exculpatory in the way Plaintiff claims it is if it provided proof that Lopez was,

6

in fact, too far away to see the shooter.  It does not.  It is simply a phrase, without any context, that is much too vague to draw the conclusion Lopez said he was literally at the store when the shooting happened.  (*See* Ex. B, DX 1.23, McLaughlin GPR).  Even if the jury could reasonably make that inference, Plaintiff ignores the fact that the typed report he did have admits that Lopez said he was "coming from the store".  (Ex. C, DX 1.11, supplementary report).  That is more than enough notice for Plaintiff to question where exactly Lopez was in relation to the store during his opportunity to view the shooter.  Plus, Plaintiff admits that the account Lopez provided at trial was already incredible.  (Ex. A, McLaughlin, 607:25-608:10).  Plaintiff offers no explanation how this would have done any more to discredit him.  Instead, Plaintiff claims that Plaintiff's attorney, Kenneth Wadas, did not find the note "unimportant."  (ECF 735, p. 35).  But "not unimportant" is not remotely close to materially exculpatory.  Thus, Plaintiff failed to establish how the note "by the store" constitutes material exculpatory or impeachment evidence.

Plaintiff also failed to establish how the investigative file inventory was materially exculpatory.  Plaintiff claims that it would have shown that two GPRs were missing, but that is not necessarily true.  (ECF 735, p. 35-36).  Plaintiff failed to establish that the GPRs were missing at the time of the criminal case.  More importantly, even if they were, Plaintiff did present evidence to establish what the GPRs said, much less that they reported something materially exculpatory.  It is axiomatic that if Plaintiff cannot identify any material exculpatory evidence recorded on the GPRs, then Plaintiff did not establish his inability to obtain them amounted to a *Brady* violation.  *See e.g. U.S. v. Warren*, 454 F.3d 752, 759 (7th Cir. 2006) (Without pointing to any specific exculpatory evidence, *Brady* claim does not "get off the ground"); *Hill v. City of Chicago*, 2009 WL 174994, at *4 (N.D. Ill. 2009) (Plaintiff's mere speculation that the alleged *Brady* material may have existed cannot be the basis for his *Brady* claim).  On this point, Plaintiff claims the City

misunderstands the law because *Armstrong v. Daley*, 786 F.3d 529 (7th Cir. 2015) explains that

destruction of exculpatory evidence can establish a *Brady* claim. Plaintiff misses the point. Absent

bad faith, destruction of exculpatory evidence can only cause a *Brady* violation if the evidence has

apparent exculpatory value. *Id*. at 556.[3] Plaintiff cannot get past step one; he did not establish

that the GPRs had any exculpatory value. Without that, he failed to establish a *Brady* violation.

Finally, Plaintiff also claims that several of the documents in the Investigative File would

have allowed him to establish that a first lineup occurred. (ECF 735, p. 29). None of the

documents are sufficient to establish that point. To the contrary, Defendant McLaughlin testified

that detectives scheduled a lineup to occur on August 31, but the detectives could not find Lopez

that night, so the lineup never occurred. (Ex A, McLaughlin, 706:17-707:14; Ex. D, DX 1.13,

supplementary report). The reports Plaintiff claims he did not obtain do not disprove that

explanation. The August 31 GPR lists the names of the individuals whose photos were taken after

detectives canceled the planned lineup; it does not state the live-lineup occurred. (PX 14).

Similarly, the hold forms for Jacques Rivera and Jose Rodriguez state that they were held for a

lineup (which the detectives acknowledged), not that it actually occurred. (PX 6, 9). The same is

true for Plaintiff's August 30 arrest report. (PX5).[4] Even if the reports did show that a lineup

occurred, the fact only has exculpatory value if Plaintiff identified someone other than Plaintiff in

the lineup. None of the reports are in any way probative of that point. For that reason, Plaintiff

---

[3] Plaintiff did not establish any evidence of bad faith. Plaintiff claims the jury could have found that Defendant Guevara took the GPRs out of the file and destroyed them. There are serious problems with that argument. Most fundamentally, there was no evidence that Guevara took out the GPRs, nor does Plaintiff point to evidence from which that fact can be inferred. There was not even evidence that Guevara had access to the Detective Division file because he was not a detective. Even so, if it were true that Guevara intentionally destroyed the GPRs, then certainly his misconduct was the cause in Plaintiff failing to obtain them, not the City's investigative production policy.

[4] Plaintiff also claims the "release of person in custody form" was withheld from him (P. Ex 55 at PX 268) and other documents (Ex. 56) were withheld from him, but he offers no explanation of how those documents would have led him to prove that a first lineup occurred. In fact, the release from custody form explicitly says that Plaintiff was released because the witness could not be located. Quite obviously, that information only confirms the so-called "official" version of events, and would have been no help to prove Plaintiff's theory.

failed to establish that any of the reports amounted to material exculpatory or impeachment evidence.

What's more, Plaintiff did not present evidence that Wadas exercised due diligence in obtaining the Valentin Investigative File. Instead, Plaintiff argues that it was sufficient for Wadas to rely on the representation from the prosecutor, Larry Victorson, that Victorson provided Wadas with everything he had. Plaintiff claims Wadas's reliance on Victorson was reasonable considering he knew Victorson personally and trusted him as a colleague. But, that argument misunderstands the issue. The City never argued Wadas was not diligent because he should have been distrusting of Victorson. Rather, Wadas was not diligent because there were types of documents he had reason to believe existed, and he did nothing to follow up to discover why they were not provided to him. For instance, Wadas knew what GPRs were. (Ex. A, Wadas, 1460:8-24). He claimed that sometimes detectives did not write GPRs, but he did not offer any explanation of why it was reasonable to assume the detectives did not do so in this case. Similarly, Wadas admitted that he knew what the investigative file inventory sheet was. (*Id.* at 1581:14-1584:4). Despite the fact that the file he received did not have the inventory sheet, he did nothing to follow up. Further, Plaintiff did not establish that if Wadas had done any of those things, he still would not have received the Valentin Investigative File. Without evidence that Wadas exercised due diligence, Plaintiff did not establish a *Brady* violation.

### C. Plaintiff Did Not Establish an Unconstitutional Investigative File Policy.

Even if Plaintiff established a constitutional violation resulting from non-production of the Valentin Investigative File, and even if such a policy claim could survive absent Defendant McLaughlin's liability, Plaintiff failed to establish that any City policy caused the Valentin Investigative File not to be produced to him or that the City was deliberately indifferent to that

outcome. In response, Plaintiff argues that the City could have done a number of things more, better, or differently regarding investigative files, so the City is liable for Plaintiff's failure to obtain the file. This reasoning is incorrect and severely distorts and misunderstands the legal standard for liability pursuant to *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978).

The first step in finding *Monell* liability is to identify the municipal policy that allegedly caused the constitutional violation at issue. *Lapre v. City of Chicago*, 911 F.3d 424, 430 (7th Cir. 2018). It is important to identify the relevant policy in order to attribute conduct to the municipality itself. *Id.* A municipal policy can be established directly by demonstrating a conscious decision by the policymakers to choose a course of action or implicitly with evidence a widespread practice or custom. *Id.* In some circumstances, the failure to adopt any procedures to address a known risk of serious harm may constitute a policy, as can the policymakers' decision not to provide any training to address an obvious potential harm. *Id.* at 430-31, 434-35. In this case, Plaintiff asked the jury to find the City had a policy to withhold material exculpatory or impeachment evidence. The instructions informed the jury that they could find a policy in one of four ways: (a) an explicit policy, (b) a widespread practice, (c) a decision or policy statement, (d) or a failure to train. (ECF 671, p. 26).

No matter the type of evidence used to establish the policy at issue, *Monell* also requires evidence that the municipality was deliberately indifferent to the constitutional rights impacted by the policy. *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011). In the *Monell* context, deliberate indifference requires proof that a policymaker ignored the known or obvious conduct of his or her actions. *Id.* It is important to show that the policymakers were on notice of any deficiencies in its policy to establish the requisite degree of culpability. *Id.* Indeed, deliberate indifference is a stringent standard. *Id.* It must be so because the government cannot be held vicariously liable for

the misconduct of its employees under Section 1983. *Id.* at 60. The municipality itself must be

culpable. *Id.* In this case, Plaintiff claims the City was deliberately indifferent to *Brady* violations

resulting from its investigative file production policy because the City litigated the issue of

document production in *Jones* and the subsequent class action litigation in *Palmer*.

Finally, to establish *Monell* liability, Plaintiff was obligated to present evidence that the

City's policy caused the constitutional violation in his case. *Lapre*, 911 F.3d at 430. Plaintiff's

strategy was to throw as much criticism of the City's policies and practices at the jury as possible

to make it seem the City's policies were so defunct that somehow the City's policies must have

caused Plaintiff to fail to obtain the Valentin Investigative File. That kind of speculation is not

sufficient to establish *Monell* liability. *Id.* at 431, 437-38. Rather, to establish the requisite degree

of culpability, Plaintiff must have presented evidence of a *direct* causal link to show the City's

policies were the moving force behind the alleged constitutional violation. *Id.*

For the following reasons, Plaintiff's response fails to show that he established the City

had a policy to withhold material exculpatory or impeachment evidence or that it was aware that

its policy would result in withholding of such evidence. Plaintiff's response also fails to explain

how any City policy caused the suppression of exculpatory evidence in his case.

      1.    *Plaintiff presented no evidence of an express policy to conceal material exculpatory or impeachment evidence*.

Plaintiff failed to prove an express policy caused a violation of his right to due process

rights because the written policy at issue stated just the opposite. Detective Division Special Order

86-3 (S.O. 86-3) states that the integrity of investigative files is to be maintained so as to not

compromise the due process rights of the accused, and that all information that may aid in the

defense of the accused should be preserved. (Ex. E, S.O. 86-3, CX 34). [5]  In response, Plaintiff

argues that the City's decision not to adopt certain aspects of investigative file production is

evidence an express policy. Plaintiff is incorrect. As stated, Plaintiff asked the jury to find the

City had a policy of withholding material exculpatory evidence or impeachment evidence. (ECF

672, p. 26). Without a doubt, Plaintiff did not present evidence that the City had an express policy

to withhold material exculpatory evidence. Rather, the aspects of file production Plaintiff alleges

the City should have implemented are more aptly labeled policy decisions, or gaps in policy. That

claim is covered by subsection 2(c) of the jury instruction for the *Monell* claim, not subsection

2(a). The City addresses Plaintiff's gap in policy claim in Section (I)(C)(3) below.

> 2.      *Plaintiff presented no evidence of widespread practice of concealing material exculpatory or impeachment evidence.*

With respect to Plaintiff's widespread practice theory, the City argued that Plaintiff's claim

failed because he did not provide evidence of any other instance where material exculpatory or

impeachment evidence was withheld from anyone after the institution of S.O. 86-3. In response,

Plaintiff argues the City did have such a widespread practice because his expert, Michael Brasfield,

conducted a file review, where he observed several instances of materials in detectives'

investigative files that "did not make it" into the criminal defense attorneys' files. The evidence

Plaintiff highlights in his response is completely untethered to the policy he asked the jury to find.

While evidence of a widespread practice or custom can be sufficient to establish implicit

policy, the policy at issue here was concealment of material exculpatory or impeachment evidence.

Thus, to succeed on this theory, Plaintiff had to establish a widespread practice of *Brady* violations.

He did not. Brasfield admitted that he did not place a value judgment on any particular document

---

[5] S.O. 86-3 is substantially similar to S.O. 83-1. S.O. 83-1 marked significant changes CPD put into place after the George Jones case, including codifying the use of investigative files and implementing the use of GPRs to standardize detective note-taking.

he deemed missing from the criminal defense attorneys' files. (Ex. A, Brasfield, 2271:24-2273:15). According to him, the documents he labeled "missing" could have been completely innocuous in the context of the criminal case. (*Id.* at 2245: 20-23). Nor did he determine that any particular document, or the information it contained, was, in fact, undisclosed because he did not evaluate any case in its larger context. (*Id.* at 2290:25-2291:11). For instance, he did not review any trial transcripts or conduct any interviews of criminal defendants, defense lawyers, or prosecutors. Even if he could say that any document was concealed, Brasfield could not attribute fault to the City because he did not review all of the corresponding prosecutors' files to see if the information he claimed was "missing" was in fact produced by the Chicago Police Department ("CPD") to the Cook County State's Attorney's office ("CCSAO"). He only reviewed six CCSAO files (out of the over 2000 CPD files he has reviewed during the course of his work for Plaintiff's counsel), and even with just those six, Brasfield did not offer testimony to establish a *Brady* violation occurred in any of them. In effect, the most Brasfield could do was speculate that random pieces of paper, which may or may not have been important, might not have been produced, with little or no detriment to any criminal defendant. Certainly, such testimony is not remotely close to establishing the suppression of any material exculpatory or impeachment evidence, much less a widespread practice of it.

In response, Plaintiff claims that Brasfield's testimony, along with the testimony of the City's expert, Bernard Murray, did establish *Brady* violations occurred in certain cases. (ECF 735, p. 84). That is not true. The City's motion addressed each individual case Plaintiff highlighted at trial and explained how Plaintiff failed to establish the elements of a *Brady* violation in all of them. (ECF 707, p. 6-9). To be sure, Mr. Murray acknowledged that he would have expected certain documents to be produced and that those documents should have been produced, but that is not

the same as admitting that a *Brady* violation occurred. He never testified that any one document Plaintiff confronted him with constituted material exculpatory evidence that was not produced in any particular case. In any event, Plaintiff did not point to any specific evidence to substantiate his argument. That is quite telling. If Plaintiff truly offered evidence of any document that constituted material exculpatory or impeachment evidence that CPD concealed, the Court can be assured that Plaintiff would have identified it specifically and explained why it was sufficient to establish a *Brady* violation. He did not. Undoubtedly, Plaintiff did not present evidence of any other prior *Brady* violation, much less a widespread practice of them.

Plaintiff's response also seems to suggest that he could establish a widespread practice by piggybacking on the practice described in *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) and *Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir. 1987). That was not an available option. In *Jones* and *Palmer*, the issue was that files containing detectives' notes were not routinely disclosed in criminal discovery, even though CPD required detectives to memorialize pertinent information from their notes in typewritten reports. (Ex. A., Brasfield, 2183:14-2184:13; Hickey, 3212:14-17). That was *before* CPD overhauled its policies and *before* the policy in effect in during Plaintiff's case even existed. If that were not enough, Hickey provided unrebutted testimony that, despite class-action litigation on the issue, there was no evidence that any other constitutional violation occurred besides the one in the *Jones* case. (Ex. A, Hickey, 3232: 5-8). Thus, far from a widespread practice, Plaintiff did not establish that even the pre-*Jones* policy caused any constitutional harm to more than one individual.

Nor did Plaintiff present evidence that the practice at issue in *Jones* and *Palmer* "continued unabated", as he promised he would do on summary judgment. At the time of *Jones*, there was no uniformity regarding production of detective notes and memoranda, meaning the entire files

14

containing those types of documents were not produced. With the institution of S.O. 83-1, the City changed its policies to make clear that all documents pertinent to the investigation should be maintained and produced. (*Id.* at 3212; 3215; 3218). Plaintiff did not establish that the City had a widespread practice of failing to produce entire files. To the contrary, Brasfield admitted that in *all* of the files he compared, documents contained exclusively in the investigative file were produced. (*Id.* at 2175:2-5; 2214:9-11; 2296:12-20). Thus, there was no evidence to establish that the CPD's pre-1983 practice continued during Plaintiff's criminal case, let alone "continued unabated".

Finally, Plaintiff seems to argue that because Brasfield found so many instances of "underproduction" or "noncompliance" the evidence was sufficient to find a widespread practice for purposes of *Monell*. That argument is only worth considering if the policy at issue was whether the CPD produced every scrap of paper, regardless of its import, or whether CPD maintained pristine files that conformed to every rule. It was not. Plaintiff asked the jury to find the City had a policy of withholding material exculpatory evidence. (ECF 671, p. 26). Whether a GPR was not created in one instance, or whether the investigative file inventory was contained in one file or another, means nothing in terms of what material exculpatory or impeachment evidence was provided to the accused. Put simply, criminal defendants do not have a constitutional right to receive a detailed accounting of a police investigation. *Moore v. Illinois*, 408 U.S. 786, 795 (1972). Nor does nonconformity with department rules establish a violation of due process. *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) ("42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of…departmental regulations and police practices"). Because Plaintiff did not tie any of his claims of "underproduction" or "noncompliance" to

suppression of material exculpatory or impeachment evidence, that evidence falls well short of establishing the widespread practice Plaintiff alleged.

Even if Plaintiff established evidence a widespread practice, he still failed to present evidence that the City knew the practice existed and that it would cause material exculpatory or impeachment evidence to be withheld. Nor did Plaintiff establish that, in the face of that knowledge, the City's policymakers decided to do nothing.

Essentially, Plaintiff claims that the City was on notice that its maintenance of detectives' investigative material could result in a *Brady* violation because of the litigation in *Jones* and *Palmer*. Yet, as stated, after *Jones*, the City made dramatic changes to its investigative file production policy for the specific purposes of making clear that all investigative material should be produced. It was the new post-*Jones* policy that was in effect during the time of Plaintiff's prosecution. In an implied policy case like this one, *Connick v. Thompson* held that a series of prior *Brady* violations was necessary to prove the municipality was deliberately indifferent. 563 U.S. at 61–62. *Connick* further instructs that the previous constitutional violations must be similar to the one in Plaintiff's case. Without such evidence, the Court reasoned, the municipality does not have notice that its *Brady*-compliance practices are constitutionally deficient. *Id.* Because Plaintiff did not present evidence of any constitutional violations *after* CPD issued S.O. 86-3, Plaintiff failed to establish the City knew its practices were resulting in the concealment of material exculpatory or impeachment evidence, and, by extension, Plaintiff did not establish the City was deliberately indifferent to that outcome. Importantly, Plaintiff did not address *Connick* in his response or attempt to distinguish it.

Instead, Plaintiff claims he was not required to show evidence of prior constitutional violations because the City should have been aware that there was a serious risk its policies would

16

result in a *Brady* violation to someone. Yet, the cases he cites for that proposition are inapposite. For one, all of them concern circumstances of incarceration, where the right at issue was the institution's failure to provide constitutionally adequate health care pursuant to the Eighth Amendment. Not compliance with *Brady*. Therefore, they do not call in to question the applicability of *Connick*. Even so, in those cases, the Court found the evidence was sufficient to establish that the policymakers both knew of the deficiencies in their policies and chose to do nothing in response.[6] By contrast, Plaintiff presented no evidence the City's policymakers knew CPD's practices would cause *Brady* violations, much less that they specifically ignored the issue.

More fundamentally, Plaintiff failed to prove that the City had any reason to suspect such a risk of *Brady* violations existed. As explained, it was undisputed at trial that, despite class-action litigation on the issue, not more than one individual suffered a constitutional violation resulting from the City's pre-1983 policy. Despite the limited impact, the City still overhauled its policies after *Jones*, requiring, among other things, that all the investigative material generated and maintained in the investigative file should be produced to the criminal defendant. (Ex. E, S.O. 86-3, CX 34). Plaintiff did not provide any evidence that the City's policymakers had any reason to

---

[6] In *Glisson v. Indiana Dep't of Corr.,* 849 F.3d 372, 378 (7th Cir. 2017), the evidence showed that the institution knew it did not have any protocols in place for dealing with inmates with chronic illness, and specifically ignored recommendations to do so. The Court found the institution knew its policies would cause a violation of inmates' constitutional rights, and opted for a "policy of inaction" in the face of a "well-recognized risk". *Id.* In *Woodward v. Corr. Med. Services of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004), the Court found the entity did not provide *any* training regarding treatment of mentally ill inmates, and found that the policymakers knew that employees were *not* following protocol and that management permitted it. In *Daniel v. Cook County*, 833 F.3d 728, 735 (7th Cir. 2016), the Court found that officials knew about systematic gross deficiencies in the institution's policies and practices, yet took no action in response. In *Thomas v. Cook County Sheriff's Dept*, 604 F.3d 293, 304 (7th Cir. 2010), the Court found that evidence showed the policymakers knew that staff failed to review inmates' medical requests in a timely fashion and disregarded the "readily apparent risk" of a delayed response to medical care. Plaintiff also cites *Davis v. Carter*, 452 F.3d 686, 692 (7th Cir. 2006) and *Estate of Moreland v. Dieter*, 395 F.3d 747, 760–61 (7th Cir. 2005). *Davis* does not specifically address the issue of deliberate indifference, but states that there was an *absence* of policy or procedures to address the concern of managing an inmate's methadone treatment plan and *no* checks and balances were in place to treat inmates suffering from methadone withdrawal. Further *Estate of Moreland v. Dieter*, 395 F.3d 747 (7th Cir. 2015) is not helpful to Plaintiff. It states expressly that even if a plaintiff is not required to show more than one constitutional violation, it does not relieve the plaintiff from showing that the policy itself is unconstitutional.

believe that the new policy was ineffective, such that they should have known to do something about it. Nor did Plaintiff present evidence that the City was aware of the deficiencies that Plaintiff claims, much less that they would cause a *Brady* violation. Without any evidence to show that the City knew that its practices would cause the suppression of materially exculpatory or impeachment evidence or evidence that the City ignored that risk, Plaintiff failed to establish the requisite culpability necessary for a *Monell* claim.

Ultimately, Plaintiff rests on the fact that the City's production efforts were so bad that the City should have known there was a problem and did something about it. That is not sufficient to establish *Monell* liability. Not only does it ignore the Supreme Court's ruling in *Connick*, but the law is clear that even gross negligence is not enough to establish the requisite municipal culpability. *Lapre*, 911 F.3d at 430. Without any evidence of prior constitutional violations, Plaintiff did not prove the City was deliberately indifferent.

Finally, even if Plaintiff presented evidence of a widespread practice and even if he presented evidence that the City was deliberately indifferent to that practice, Plaintiff failed to present evidence that the alleged widespread practice caused him to fail to obtain the investigative file in his case. Plaintiff's only argument on this point is that the CPD's investigative file production practice could have been better, so had it been improved, Plaintiff would have obtained the Valentin Investigative File. (ECF 735, p. 102). That argument is so over-generalized it is meaningless. It is also pure speculation, which is insufficient to sustain liability. *See Lapre*, 911 F.3d at 435, 437-38. Moreover, Plaintiff claimed CPD withheld the entire Valentin Investigative File from him. He did not present evidence that entire investigative files were withheld from

anyone else.[7]  Thus, Plaintiff failed to establish the necessary link to prove that his failure to obtain

the Valentin Investigative File was anything more than a random event.

> 3. *Plaintiff presented no evidence that any failure to implement any aspect of file production amounted to a policy to withhold material exculpatory impeachment evidence.*

Plaintiff claims the City is also liable because it did not implement various aspects of

investigative file production that Brasfield claims the City should have.  Specifically, Plaintiff

claims the City should have (1) maintained one file (as opposed to one investigative file and one

Records Division file for each case), (2) should have defined the term "relevant", so as not to leave

too much discretion to detectives about what they should document, and (3) should have expressly

stated that all documents listed in the investigative file inventory should be produced.[8]  Plaintiff

fails to explain how not adopting any of the above listed recommendations amounted to a policy

to withhold exculpatory or impeachment evidence.

First, whether CPD maintained a Records Division file, along with a detectives'

investigative file, says nothing about whether all material exculpatory or impeachment evidence

for any particular case is produced.  The unrebutted evidence at trial established that the City

intended to produce both files.  And, despite Plaintiff's criticisms, Brasfield found documents

contained exclusively in the investigative file were provided to criminal defendants in every case

he reviewed.  (Ex. A at 2175:2-5; 2214:9-11; 2296:12-20).  Further, Plaintiff did not present any

evidence that the City should have been concerned that both files would not be produced.  As

---

[7] On this point, Plaintiff's argument regarding "unofficial files" is misleading.  Plaintiff never established evidence of "unofficial files".  Brasfield reviewed CPD investigative files and Records Division files.  While Brasfield labeled (without any evidence or support) Records Division files as the "official files", he admitted that he found documents contained exclusively in the investigative file (by extension the "unofficial file") in every criminal defense attorney file he reviewed.
[8] Plaintiff also alleges the City should have included the Gang Crimes Unit in his investigative file policy pertaining to the Detective Division.  This argument is addressed in the Gang Crimes section of the reply below.

stated, Plaintiff presented no instance of any other constitutional violations to put the City on notice of that problem.

Similarly, whether CPD provided a definition for the term "relevant" or gave detectives discretion in what to document says nothing about the disclosure of material exculpatory and impeachment evidence. Plaintiff did not establish that CPD detectives misunderstood what evidence was relevant to a particular case or their obligation to collect and preserve material exculpatory or impeachment evidence. Even so, Plaintiff did not prove that Defendants in this case failed to disclose exculpatory evidence because the City instructed them they did not have to do so. To the contrary, the jury found detective McLaughlin not liable. Therefore, even if Plaintiff could establish such a policy, it bears no rational connection to this case or Plaintiff's ability to obtain the Valentin Investigative File.

Finally, Plaintiff's claim regarding the investigative file inventory is not supported by the record. The written order states that the inventory sheet should list all the documents in the investigative file like an index. (Ex. E, S.O. 86-3, CX 34). It further stated that a copy of the inventory sheet should also be placed in the Records Division file. *Id.* Hickey testified that the inventory sheet was designed to serve as an integrity check on the file, specifically to keep track of the documents it contained. (Ex. A, Hickey, p. 3229:15-25). Plaintiff offered no evidence to draw the conclusion that the City only required the production of inventory sheet and not the investigative file itself. Further, whether CPD expressly stated that all documents in the investigative file should be produced, says nothing about whether material exculpatory or impeachment evidence was produced. Nor does it undercut the express terms of the written order that state all investigatory material should be preserved, specifically, so as *not to compromise the due process rights of the accused*. (*See* Ex. E., S.O. 86-3, CX34). Plaintiff's response offers no

explanation as to why the lack of more explicit terms in the order amounts to a policy to withhold material exculpatory or impeachment evidence.

### 4. Plaintiff failed to present lack of training amounted to a policy to withhold material exculpatory or impeachment evidence.

Plaintiff did not present evidence that a lack of training caused the nonproduction of Valentin Investigative File. As the Court initially remarked during the jury instruction conference, "I don't think failure to train has been made out. So let's get rid of that." (Ex. A, at 4110). Plaintiff's argument in response is premised on an inaccurate reading of the record. Contrary to Plaintiff's assertion, the evidence did not establish that the detective training regarding investigative files was a single three-hour training. Hickey testified that he could not recall how long it was, only that it was completed in one day. (Ex. A, Hickey, 3314:22-3315:2). Further, Hickey did not testify that there was "substantial resistance" from the detectives to follow. (*Id.* at 3228). He testified that there was some initial confusion about how to prepare GPRs, but that within a few weeks, detectives understood. *Id.* Also, contrary to Plaintiff's representations, Hickey *did* testify that the training was adequate. (*Id.* at 3315:13-20). And, he testified that he and others conducted informal audits to endure compliance. (*Id*. at 3318:8-19). Finally, the sole defendant detective in the case, Defendant McLaughlin, testified that she remembered the training, and, even thirty years later, recalled it as stringent. (Ex. A, McLaughlin, p. 876:13-877:6).

Plaintiff offered no evidence to rebut the evidence that detective training was sufficient. Despite Plaintiff's assertion on summary judgment, Brasfield did not substantiate his claim that the training was inadequate at trial. Nor did he present evidence of foreseeable consequences or prior complaints showing more training was needed. In fact, he did not explain how the detective training was deficient at all. Thus, Plaintiff did not establish that the City's detective training was in any way lacking. *See Ruiz-Cortez v. City of Chicago*, 11 C 1420, 2016 WL 6270768 (J.

Leinenweber) (Plaintiff's failure to provide benchmark from which to measure CPD's training and discipline fatal to *Monell* claim).

Even so, to establish *Monell* liability, Plaintiff was obligated to prove that the City was deliberately indifferent to training its officers about disclosing exculpatory evidence. Plaintiff offered no evidence on this point. Indeed, for all the reasons stated above, Plaintiff failed to establish the City was aware of any risk of *Brady* violations following the institution of S.O. 86-3. He certainly did not present any evidence that the City had reason to believe more or better training was needed to prevent them. In fact, the jury's verdict proves that no additional training was necessary because Defendant McLaughlin did not commit a constitutional violation.

Finally, Plaintiff's argument regarding training of the subpoena unit is a red herring. Plaintiff did not offer any evidence that a subpoena was issued in his case, so the City's policies regarding the subpoena unit are "quite beside the point". *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (*per curium*) (holding that absent a constitutional violation for use of excessive force, the fact that a policy authorized such force is irrelevant). Even so, Plaintiff did not offer evidence to establish the subpoena unit training was inadequate. Plaintiff's only response is that it must have been difficult for the individuals in the subpoena unit to find and copy all relevant documents if they were not in a single repository. But Plaintiff did not establish evidence of that. The unrebutted evidence at trial showed that the subpoena unit routinely collected documents from more than one file, and even from more than one division. Put simply, Plaintiff did not present evidence that the subpoena unit did not have an understanding of their responsibility or how to do their job. Even if they did, again, Plaintiff failed to provide any evidence that the City's policymakers knew that the training was deficient and decided to ignore the problem. Plaintiff's response argues that the jury was free to find that the training was

22

obviously "woefully inadequate" is no response at all. This is especially so, considering a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

**D. A Finding in Plaintiff' Favor on His Investigative File Production Claim is Against the Manifest Weight of the Evidence.**

If the Court is not persuaded by any of the above and finds some evidence to establish Plaintiff's investigative file production claim, a new trial is warranted because a verdict in favor of Plaintiff on this claim is against the manifest weight of the evidence.

As explained in the City's opening Rule 59(a) brief, for the jury to infer that Brasfield's file comparison fairly showed what CPD produced to criminal defense attorneys, the jury would have to find the files are in the same condition now as they were 30 years prior during the criminal proceedings. Yet, Brasfield could not vouch for the integrity of any file. (Ex. A, Brasfield, 2290:25-2291:11). Nor could he say one way or another whether a particular document was definitively withheld from the criminal defendant. On the other side of the scale, however, the City presented unrebutted evidence that many of the files Brasfield reviewed were not complete. (Ex. A, Murray, 3798:14-24). For that reason, the jury could not accept Plaintiff's fundamental premise that any document Brasfield identified as missing constituted evidence that the CPD did not disclose it. Naturally, if there was no basis to accept Plaintiff's argument that the City failed to produce documents, then the jury could not have found in favor of Plaintiff on this claim.

Plaintiff's only response to this argument is to suggest that the City did not object at trial. That is not true. The City moved in *limine* to bar Brasfield's testimony entirely because of the lack of foundation and unreliability of his opinions. (*See* ECF 424, p. 4, 8). The Court denied the motion as to Brasfield's opinions concerning his file comparison analysis.

Even if Brasfield could say that documents were not produced, he could not attribute fault to CPD without knowing what was disclosed to the CCSAO. *See Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007) (police duty to disclose exculpatory evidence discharged if evidence disclosed to prosecution). In this case, Brasfield only reviewed six CCSAO files. Thus, the vast majority of his file comparison analysis is meaningless. On the other side of the scale, the City produced unrebutted evidence that documents Brasfield labeled as missing were, in fact, found in the CCSAO files. Plaintiff's only response to this is that, for some of the files Brasfield reviewed, the same document was missing from both the prosecutor's file and the defense file, which Plaintiff claims is too coincidental. Yet, Plaintiff did not elicit that evidence.

For the Kluppelberg case, Plaintiff did not establish what documents were in the prosecutor's file or the defense attorney's file. (*Id.* at 21-25). For Fields, Plaintiff did not establish what documents were in the prosecutor's file. (Ex. A, Brasfield, p. 2304:1-3). And, for the Johnson, Quinones, and Borrotto cases, the City presented unrebutted evidence that significant evidence indicated those files were incomplete. (Ex. A, Murray, p. 3832:9-3834:12, 3824:12-3825:19, 3813:23-3817:22). For that reason, the jury could not have accepted Plaintiff's assertion that CPD was to blame for all documents Brasfield identified as missing.

What's more, Brasfield reviewed over 2000 CPD files (collectively in his work for this case and two others), but only six prosecutor files (total). The Seventh Circuit has explained that it is not necessarily the number of harmful occurrences that matters in attributing fault to the municipality it is the *rate*. *Lapre*, 911 F.3d at 432. In this case, even accepting that Plaintiff presented evidence of six instances where CPD did not produce documents to prosecutors, those six instances represent only 0.3% of the total files Brasfield reviewed. Accordingly, the weight of

the evidence weighs heavily in the City's favor that the alleged document production problem was not a regular occurrence.

The balance also weighs in favor of the City on the element of deliberate indifference. Whereas Plaintiff presented no direct evidence of deliberate indifference, the City presented unrebutted evidence concerning the efforts the City undertook in response to the George Jones case, including overhauling's its policies, researching practices in other jurisdictions to see where CPD could improve, and communicating with City attorneys, plaintiffs' attorneys, and other outside counsel. (Ex. A, Hickey, p. 3217-3218). In contrast, Plaintiff did not point to any jurisdiction whose *Brady*-compliance policies were better than CPD's. Plaintiff did not even address any particular system or protocol the City should have implemented, such that, had the City known to implement it, would have improved their *Brady* compliance. The most Plaintiff could say is that the City should have maintained one file, instead of two, for each case. Yet, Mr. Hickey provided unrebutted testimony that was not a practical option for a department as large as CPD. (Ex. A, Hickey, 3283: 6-11). Further, the City's expert, Jeffrey Noble, explained that Brasfield's assertion that a one-file system was the "best practice" was incorrect. He explained that decentralized file systems are standard and that CPD's policy went above and beyond generally accepted practices, even by today's standards. (Ex. A, Noble, p. 3441-3442). Plaintiff's only response is that the jury was free find the City was deliberately indifferent because Brasfield demonstrated that CPD's practices were deficient. But, for the reasons explained above, as well as throughout the briefing in this case, Brasfield's conclusions were fundamentally flawed and unreliable. Therefore, the weight of the evidence weighs in the City's favor on this claim.

## II. NO UNCONSTITUTIONAL POLICY DEPRIVED PLAINTIFF OF EVIDENCE OF A FILLER IDENTIFICATION FROM THE ALLEGED AUGUST 31 LINEUP.

### A. The City is Not Liable for the Failing to Disclose a Filler Identification Because Defendant McLaughlin is Not Liable.

The fact that a jury determined Defendant McLaughlin did not violate Plaintiff's due process rights also eliminates the City's liability on Plaintiff's second detective-related *Monell* claim: the alleged failure to document a filler identification in a lineup. Plaintiff alleged that, despite reports indicating that Lopez could not be located to view a lineup as planned on August 31, he did view a lineup, and, contrary to his testimony, he identified a filler in the lineup as the offender, not Plaintiff. Plaintiff claimed he was denied that exculpatory evidence because of the individual Defendants' deceit in hiding the fact from him, but also because the City had a *de facto* policy where detectives did not document when a witness identified a filler as the perpetrator in a lineup. As addressed in the City's opening brief, and explained again below, the Court has already disposed of Plaintiff's lineup claim, finding that the practice Plaintiff's expert described, (which was Plaintiff's only source of evidence to establish the policy at issue) did not amount to a practice of withholding exculpatory evidence, as the jury instructions required. (ECF 676, p. 9-10). Nevertheless, just like the detective files claim, *Monell* liability cannot stand absent Defendant McLaughlin's liability.

Most obviously, Plaintiff's filler claim cannot succeed absent Defendant McLaughlin's unlawful conduct because she is the one Plaintiff alleged conducted the lineup. (Ex. A, McLaughlin, 625:16-627:19; 4160:7-4161:22). Plaintiff claimed that a lineup occurred on August 31, and that McLaughlin's report explaining the lineup was canceled because the detectives could not find Orlando Lopez was a lie. *Id.* Plaintiff alleged that Detective McLaughlin made up that excuse to cover up the fact that Lopez identified a filler in the lineup, and not Plaintiff, the suspect.

*Id.* In fact, the report that Plaintiff alleges provides evidence that the August 31 lineup occurred is Defendant Leonard's GPR, McLaughlin's partner. (PX 14; Ex. A, McLaughlin, 666:20-667:9). As for the other reports that Plaintiff claims show the lineup occurred that day, those, too, were generated on or before August 31, when Defendant McLaughlin and her partner were handling the investigation. *See* Note 2. By finding Defendant McLaughlin did not violate Plaintiff's right to due process, the jury found no constitutional violation resulted from the so-called first lineup. If no constitutional violation resulted, then Plaintiff's policy claim about lineups goes by the wayside. *See City of Los Angeles v. Heller*, 475 U.S. at 799. Importantly, Plaintiff offers no response to this argument, thereby conceding it.

### B. The City's Practice Regarding Documenting Lineups was Not a Policy to Withhold Material Exculpatory or Impeachment Evidence.

Even though the Court already disposed of Plaintiff's lineup policy claim, and the jury dismissed it by finding Defendant McLaughlin not liable. The City addresses Plaintiff's arguments for purposes of completeness.

First, Plaintiff misunderstands the Court's reasoning in disposing of this claim. The Court found that the practice Plaintiff's expert, Dr. Wells, described did not encompass concealing material and/or impeachment exculpatory evidence. (ECF 676, p. 10). Plaintiff's only response to this is to tout Dr. Wells' testimony about the potential exculpatory value of a filler identifications. But, Plaintiff misses the point. Whether a filler identification *might* have exculpatory value in some instance is not the same as whether the policy *was* to conceal material exculpatory or impeachment evidence. On that subject, Wells never identified a single case in which material exculpatory or impeachment evidence was withheld from anyone resulting from a failure to document a filler identification. He only spoke in the abstract about how filler identifications could have *potential* exculpatory value. (*See e.g.* Ex. A, Wells, 980:25-981:25).

Put differently, Wells did not identify any individual case where a filler identification should have been documented, but was not, much less explain why the filler identification in that particular case had any material impact. For that reason, there was no basis for the jury to conclude that the practice Wells described – failure to document a filler identification – resulted in any material exculpatory evidence being withheld from anyone. Quite simply, even if the jury accepted the practice Wells described as evidence of the City's practices, Plaintiff did not show that it had any impact on any case, much less that it resulted in a policy of *Brady* violations.

Despite the Court's ruling, Plaintiff claims he did establish a widespread practice because Wells testified that the files he reviewed should have contained 235 filler identifications, so according to Plaintiff that is evidence of 235 instances of *Brady* violations. (ECF 735, p. 116). That is definitively false. As explained above, Wells only spoke about percentages of filler identifications he *expected* to see. He did not identify any single case where a filler should have been documented but was not. Without identifying a specific case, there is no way for the jury to evaluate what impact the evidence of a filler identification had, if any. What's more, the City admitted that when a witness identified a filler in a lineup, detectives would document the lineup as negative (meaning no identification of the suspect), which Wells acknowledged is also exculpatory. (Ex. A, Wells, p. 980:25-981:14). Thus, even accepting Wells' contention that filler identifications are exculpatory, Plaintiff did not present any evidence that the failure to document them specifically (as opposed to labeling them as negative) materially impacted the outcome of any case. Therefore, Plaintiff's evidence fell well short of establishing a series of *Brady* violations necessary to prove an unconstitutional policy.

Plaintiff also failed to prove an express policy. Plaintiff's response argues that because the City admitted that detectives would document filler identifications as negative, as opposed to

specifically labeling them "filler identification," then the City disregarded the substantial risk that material exculpatory evidence would be withheld from someone. Plaintiff did not present that evidence. Wells explained that if a witness identifies no one in the lineup, the witness's credibility is still intact; the witness may be correct that the offender is not in the lineup. (Ex. A, Wells, p. 982:16-983:6). But, if a witness identifies a filler, then the witness's credibility is damaged; the identification is a known mistake because the witness identified someone who detectives know did not commit the crime. *Id.* Nevertheless, Mr. Hickey testified that, if a witness identified a filler, detectives would likely not use the witness again in another lineup. (Ex. A, Hickey, p. 3316:7-21). If the witness played no further role in the investigation or prosecution, then that witness's credibility would be a non-issue. Thus, Plaintiff presented no evidence that the City had any reason to suspect that the circumstances Wells described (where the witness's credibility would be an issue) were expected to occur. Accordingly, there was no basis for the jury to find that the City's practice of labeling filler identifications as negative amounted to policy to withhold material exculpatory evidence.

Even if there was a basis for the jury to accept the practice Wells' described as a policy to withhold material exculpatory or impeachment evidence, Plaintiff failed to present evidence that the City's policymakers were deliberately indifferent to the potential due process violations it would cause. Again, if the City had an implicit policy to withhold material exculpatory evidence, then Plaintiff had to present evidence of other similar *Brady* violations to show the City had notice of the problem and consciously disregarded it. *See Connick v. Thompson*, 563 U.S. at 61–62. For the reasons stated above, Plaintiff presented no such evidence. Nor did Plaintiff present any other evidence to show that the City knew due process violations would occur as a result of its policy.

29

Finally, even if the jury accepted the practice Wells described, Plaintiff did not link the practice to a *Brady* violation in his case. As explained in the City's motion, Wells testified that the City either mislabeled filler identifications or did not create a report of the lineup at all. In this case, there is a report of the so-called first lineup. It is the report explaining the lineup was canceled because Lopez could not be found, that Plaintiff claimed Defendant McLaughlin fabricated. (Ex. D, supplementary report, DX1.13). Plaintiff offered no testimony to show that, in other cases where detectives did not document a filler identification, they also made up an excuse to conceal the fact that the lineup happened. Therefore, Plaintiff failed to establish that Defendant McLaughlin failed to document Lopez allegedly identified a filler because of the City policy, or whether she did so for her own desire to cover up the fact that the lineup occurred. As a result, Plaintiff did not establish that a true policy was at issue, as opposed to a random event. *See Lapre v. City of Chicago*, 911 F.3d at 435, 437-38 (evidence of causation must be specific and direct).

Assuming there was a basis for the jury to find in favor of Plaintiff on this claim, such a conclusion is also against the weight of the evidence. For reasons stated above, Plaintiff did not prove any other constitutional violations resulting from failure to document filler identifications, nor did Plaintiff identify a policy decision that amounted to a choice to withhold such evidence. What's more, Plaintiff does not address failure to train, thereby abandoning that portion of his claim. For these reasons, the jury could not have found in favor of Plaintiff on this theory of *Monell* liability.

## III. NO GANG CRIMES POLICY DEPRIVED PLAINTIFF OF MATERIAL EXCULPATORY EVIDENCE.

In support of his gang crimes theory, Plaintiff relies on two avenues of liability: (1) that the City had a policy of withholding material exculpatory or impeachment evidence because it did not require Gang Crimes Officers to preserve their handwritten notes or maintain detective-like

investigative files, and (2) that the City failed to adequately train gang crimes officers regarding the duty to disclose material exculpatory or impeachment evidence. Plaintiff's response offers no evidence to substantiate either of these claims.

As for his theory regarding Gang Crimes documents, Plaintiff's claim fails at the outset because he did not present any evidence of any gang crimes document that was withheld from him in violation of *Brady*. Indeed, he did not point to one single gang crimes document that contained material exculpatory evidence that he did not receive. Instead, he asked the jury to speculate that (1) some gang crimes officer wrote something down pertaining to the Valentin investigation, (2) that the note or report contained exculpatory evidence, (3) the evidence would have affected the outcome of Plaintiff's criminal trial, and (4) that the exculpatory information was not contained in any other disclosed report or otherwise communicated to the prosecutor. Quite obviously, there was no evidence of any of that. For that reason, the City's policies are irrelevant. The City cannot be held liable for an alleged unconstitutional policy, if Plaintiff cannot tie it to a constitutional violation. *See U.S. v. Warren*, 454 F.3d at 759); (speculation insufficient to support a *Brady* claim); *Hill v. City of Chicago*, 2009 WL 174994, at *4 (same).

To get around this, Plaintiff claims that the Gang Crimes Daily Activity Sheets for the Defendants in this case must have contained material exculpatory evidence because, at a minimum, they would have listed the officers' daily activity and may have included investigative details. That too is speculation. The City explained the Daily Activity Sheets (also referred to as "humper" reports) were administrative documents officers used to simply log their activity from day to day to manage their productivity. (Ex. A, Hickey, 3291:13-22, 3309:23-3310:13; Spratte, 3335:8-3336:14). They were not intended to be produced in criminal discovery because they were not used to document investigative material. (*Id.*). Rather, if Gang Crimes Officers learned of any

information relevant to an investigation, they were directed to memorialize the information in a supplementary report, which was then provided to the detectives investigating the case and maintained in the Detective Division investigative file. (Ex. A, Spratte, p. 3339:10-3341:3; 3363:4-13). Plaintiff's argument that evidence of an officer's daily activity could constitute exculpatory evidence is speculation. There is no evidence that any Daily Activity Report in this case, or any other, reported information that constituted material exculpatory evidence. Nor did Plaintiff present evidence of a single Daily Activity Report that included investigative details. More importantly, even if there were, Plaintiff did not show that those investigative details were not also memorialized in a supplementary report and provided to detectives, as CPD directed. Thus, Plaintiff did not offer any more on this point besides speculation. *See U.S. v. Warren*, 454 F.3d at 759); (speculation insufficient to support a *Brady* claim); *Hill v. City of Chicago*, 2009 WL 174994, at *4 (same).

Finally, Plaintiff's argument that, as a matter of policy, Gang Crimes officers should have been subject to the same report writing rules as the Detective Division because Gang Crimes officers did the same job as Detectives is unsupported by the record. The unrebutted evidence established that, to the City's expectation, Gang Crimes officers were intelligence driven, and did not investigate individual crimes, like Detectives did. And, if they happened upon information that may be relevant to a particular case, they were directed to provide that information to the Detective Division in a formal supplementary report. Plaintiff did not establish that, even if Gang Crimes officers took "notes" or had "personal files", that they contained material exculpatory evidence or were not memorialized on a supplementary report and provided to the Detective Division. Thus, Plaintiff did not establish that the City had any reason to believe its policies pertaining to Gang Crimes were in any way deficient as to *Brady* compliance. Even so, the City's

policy is irrelevant because Plaintiff did not establish the existence of any material exculpatory Gang Crimes report that was withheld from him or anyone else.

As for Gang Crimes training, Plaintiff argues that Mr. Spratte, the City's Rule 30(b)(6) witness, testified that the City did not provide training to Gang Crimes Officers, and so that one line of testimony, alone, is sufficient to establish *Monell* liability. (*See* ECF 735, p. 104). Certainly, Plaintiff is missing a few things. One, Mr. Spratte explained that Gang Crimes officers did not receive training specific to Gang Crimes. Yet, he explained Gang Crimes officers were police officers in the Patrol Division, and so they received Patrol Division Training. (Ex. A, Spratte, 3358:20-3359:1; 3396:15-20). Two, Plaintiff did not connect the alleged lack of training to the policy at issue in this case, namely the duty to disclose material exculpatory evidence. Plaintiff did not even establish what training the Patrol Division provided regarding *Brady* compliance, much less that is was deficient.[9] Indeed, Plaintiff did not compare the City's training to any other jurisdiction or provide some rubric or benchmark from which the jury could evaluate its sufficiency. *See Ruiz-Cortez v. City of Chicago*, 11 C 1420, 2016 WL 6270768 (J. Leinenweber) (bald criticism of CPD policy insufficient to establish liability). Three, Plaintiff did not establish that the City was deliberately indifferent to Gang Crimes training. As explained, failure to train is the most legally tenuous theory of *Monell* liability, and in order to prove deliberate indifference for an implicit policy claim, Plaintiff must have present evidence of other similar constitutional violations to show the City had notice of the issue and failed to remedy it. Plaintiff did not establish one constitutional violation that could be attributed to Gang Crimes training, must less a pattern of them. Finally, Plaintiff did not offer evidence to connect any constitutional violation he suffered due to gang crimes training. In other words, Plaintiff did not establish that

---

[9] Spratte testified that he was aware of the concept of criminal discovery and that criminal defendants are entitled to information that would show they are innocent. (Ex. A, Spratte, 3396:7-14).

had the training been in any way different, that he would not have suffered a violation of due process. *See Lapre v. City of Chicago*, 911 F.3d at 437 (explaining deficiency in training must be closely related to ultimate injury; plaintiff failed to prove lack of training was actual cause of injury; speculation that training could be better is insufficient). Plaintiff's response is silent on all these points, demonstrating that there was no evidence from which to find the City liable on a failure to train theory.

## IV.    REMAINING ISSUES WARRANTING A NEW TRIAL PURSUANT RULE 59

### A.    The Court Should Not Have Permitted Wells to Testify.

As explained several times throughout briefing in this case, Wells' testimony was fundamentally flawed. He conducted a statistical analysis to show that CPD did not document filler identifications, when the City admitted that it did not specifically document filler identifications. The City explained that Wells' testimony was unnecessary because CPD documented filler identifications as negative identifications. For that reason, Wells' testimony was unreliable, and the City argued it would only confuse the jury on the real issues. The Court rejected the City's arguments and allowed him to testify. Then, at trial, Wells offered an entirely new opinion. In addition to his claim that CPD did not create a report when a witness identified a filler, he then hedged and claimed that some of the filler identifications may have been "mislabeled" as nonidentifications. As to the new opinion, he estimated that about 100 reports were simply missing. That conclusion is nowhere to be found in Wells' report. (Ex. F, Wells Report). Nor is there any explanation of the analysis he used to get to that conclusion. As a result, the City was taken off guard and forced to defend against a claim of which it did not have notice in violation of Rule 26. Plaintiff offers no response to this argument, which, of course, is a tacit admission to the gamesmanship. Plaintiff has thereby conceded that argument.

34

Further, as this Court has already found, the policy Plaintiff asked the jury to find did not encompass the practice Wells described. Thus, Wells' testimony was irrelevant. If Wells' opinion was that disconnected from the actual issues in the case, the Court should not have permitted him to testify. Doing so only allowed for an opportunity for Plaintiff to present prejudicial evidence against the City without any probative value. Again, Plaintiff fails to address this argument, thereby conceding it.

**B.     The Court Should Not Have Permitted Plaintiff to Take Unfair Advantage of Mingey's Assertion of the Fifth Amendment**.

The Court erred in allowing Plaintiff to impeach Defendant Mingey's assertion of the Fifth Amendment with portions of his deposition testimony as evidence in support of Plaintiff's *Monell* claim. Plaintiff claims such testimony was not prejudicial to the City because the questions were supported by other evidence, and the jury likely did not draw an adverse inference against the City based on the jury instructions given. Plaintiff is incorrect on both points.

As for the foundation for Plaintiff's questioning of Mingey, Plaintiff claims the City's motion did not specifically identify any question that was lacking in foundation. That is not accurate. The City identified portions of Mingey's testimony where Plaintiff asked questions regarding the City's policies as to gang crimes notes and files. *See* ECF 708 p, 14-15 (highlighting Mingey testimony at 2515:5-14; 2516:7-20). More specifically, the City explained that Plaintiff asked Mingey, generally, about gang crimes officers keeping "personal files" and "personal notes", later calling them "street files", that were not routinely disclosed, in an effort to make it seem as if gang crimes officers maintained the types of documents that the detectives in the George Jones case did, so the jury could draw the conclusion that the gang crimes notes and files contained material exculpatory evidence that needed to be produced, but were not. Plaintiff claims such questions were permissible, since Mingey testified at his deposition about "notes" and "files." But,

Plaintiff never established at trial what notes, memos, or files Mingey was talking about. Mingey never testified about gang crimes "street files". And Plaintiff never established what information was recorded on the notes, memos, or files, so as to establish their relevance to the case. For these reasons, Plaintiff's questions lacked the proper foundation.[10]

More to the point, by using general terms like "notes" and "files", rather than referring to something specific, Plaintiff alluded to, but did not present evidence of, "notes" and "files" that contain material exculpatory evidence that is never produced. Without a doubt, Plaintiff did not produce *any* evidence of *any* gang crimes note or file that was in *any* way material, exculpatory, or not produced. Therefore, Plaintiff's questioning of Mingey on *Monell* issues lacked the appropriate foundation necessary for admissibility and were unfairly prejudicial.

To this, Plaintiff claims the City could have resolved the problem by designating their own portions of Mingey's deposition to read to the jury. That argument completely misses the point. Plaintiff did not have any evidence of a so-called gang crimes "street files" policy, yet he introduced hints of it, as if he did, through Mingey. That unjustly put the City on defense of that claim. Further, as explained, Plaintiff's questioning of Mingey at his deposition was intentionally vague and general. The City would have had to rehash considerable portions of his deposition in an attempt to put Plaintiff's questions into context but, as already explained, the deposition was left intentionally vague and general by Plaintiff's counsel's questioning. Furthermore, because Mingey asserted his Fifth Amendment rights at trial, the City could not simply rehabilitate him or have him explain his testimony.

---

[10] The City incorporates the Individual Officers' Rule 59 Reply at Section III explaining Plaintiff's inaccurate interpretation of the law regarding the Fifth Amendment.

Plaintiff then claims that he introduced additional evidence in the case to bolster his *Monell* questions to Mingey. For the reasons addressed above, Plaintiff's interpretation of the factual record is inaccurate.

Finally, Plaintiff claims the City failed to object at trial and suffered no prejudice. To the contrary, the City objected multiple times, as did other counsel, and even explained the issue at a sidebar. (Ex. A, Mingey, p. 2515:5-2524:17). As for prejudice, Plaintiff concedes that, based on the instruction given, the jury should not have drawn an adverse inference against the City for Mingey's assertion of the Fifth Amendment. (P. Ex. 57, p. 18:13-18). If that was the case, though, then there was no basis to ask Mingey *Monell* questions to which he would assert his Fifth Amendment right. As explained, the questions concerning gang crimes "notes" and "files" were general. None of them were specific as to Plaintiff or the Valentin investigation. That means there was no negative inference to draw against Mingey for those questions. Put differently, even if the jury did draw an adverse inference against him, it would be fruitless, considering none of those questions establish that Mingey withheld material exculpatory or impeachment evidence from Plaintiff in his case. Therefore, the only purpose the questions served was to prejudice the City and hamstring the City's ability to defend against it. For those reasons, the Court should not have permitted Plaintiff to use Mingey's assertion of the Fifth Amendment to unjustly support his *Monell* claim.

### C. The Court Erred by Eliminating Certain Jury Instructions.

As explained in Defendant City's motion, there are four instructions the Court should have provided the jury.

First, the Court should have instructed the jury that speculation as to the existence of certain documents is insufficient to support a claim that an officer withheld material exculpatory or

impeachment evidence. Such an instruction would have alleviated the confusion the jury must have experienced in determining *Monell* liability. As explained above, Plaintiff did not point to any material exculpatory evidence that was withheld as a result of any City policy, yet the jury still found the City liable, demonstrating that the jury lost its way in assessing the legal standard. Plaintiff responds that an instruction regarding speculation was unnecessary because the City takes no issue with the due process claim instruction given. Yet, Plaintiff misunderstands the extent to which Plaintiff argued his case against the City based only on speculation. For instance, Plaintiff argued that Brasfield's file comparison analysis showed that CPD did not produce certain documents to criminal defendants in violation of *Brady*, yet he offered nothing more than speculation that any particular document, or the information it contained, was not produced to any criminal defendant, and if it was not, that it had any material impact on any case. Plaintiff also argued that CPD's failure to document filler identifications amounted to repeated *Brady* violations, but Plaintiff did not point to a single case to show such a policy existed. Most brazenly, Plaintiff argued that gang crimes documents and reports were categorically withheld in violation of due process, but he did not point to a single gang crimes document that was exculpatory, material, or withheld. Put differently, Plaintiff capitalized on the lack of specificity in the instruction, so as to confuse the jury on what evidence was necessary to establish his claim. Had the Court been more specific, the jury could have understood that Plaintiff's speculation on this point should be disregarded.

The City also argued the Court should have instructed the jury more explicitly regarding drawing an adverse inference against Defendants who asserted the Fifth Amendment. At the jury instruction conference, Plaintiff conceded that the inference should only be asserted against the invoking party, but argued the instruction should be left intentionally vague. (P. Ex. 57, p. 18:13-

18). The Court accepted Plaintiff's suggestion, and, as result, the instruction was much too broad. As explained above, this was particularly problematic given that the questions Plaintiff asked of Defendant Mingey did not have any relevance to his individual liability, but only served the purpose of prejudicing the City. Just as in *Emerson v. Wembley U.S.A., Inc.*, 433 F.2d, 1200, 1213-14 (D. Colo. 2006), Plaintiff used Mingey's assertion of the Fifth to bootstrap his lack of evidence for his gang crimes claim. Indeed, because Plaintiff's evidence was so deficient on that point, he used Mingey's assertion of the Fifth Amendment to make it seem that the topic of gang crimes reports and files was somehow nefarious. What's more, by using Defendant Mingey as the conduit of this evidence, Plaintiff capitalized on the fact that City could not rehabilitate him or ask him to explain his testimony. If the Court was inclined to allow such testimony against the City, the jury should have been instructed more clearly about the permissibility of drawing an adverse inference.

The jury should have also been instructed that the City cannot be held liable simply because it employed the individual Defendants. Plaintiff's response it that the City did not properly lodge that objection. Not so. Defendant City's proposed jury instructions included that language and explained that it was also included in the Seventh Circuit pattern *Monell* instruction. (ECF 433-2, Def. Proposed Instruction No. 34, at p. 35). Plaintiff never specified an issue with the language at the jury instruction conference. Then, at the conclusion of the trial, the Court issued its ruling accepting Plaintiff's version of the instruction. At that time, the Court explained that there was too little time to argue any further regarding jury instructions, so counsel for the City stated it renewed all previously stated objections, which would include the argument that the Court should not veer from the pattern *Monell* instruction. (Ex. A, p. 4109: 8-13). Further, the City was prejudiced by the Court's declination to include language on vicarious liability. As explained many times, Plaintiff's evidence against the City was scant and speculative. Plus, the legal

39

standard for *Monell* is complicated and nuanced. As Plaintiff recognized in the jury instruction conference, the Seventh Circuit did not even provide a pattern *Monell* instruction until recently. (P. Ex. 57, p. 76:23-77:1). Thus, there was no reason for the Court to deviate from the pattern instruction in this case, particularly when Plaintiff never presented an issue or objection to the language.

Finally, the Court should have not have issued a *Monell* jury instruction that included different avenues or theories of liability not born out by the evidence. Plaintiff's response rests on his argument that the evidence in this case was sufficient to find *Monell* liability on each theory of liability. Because the City has already addressed each of those arguments, there is no purpose to repeat them here.

WHEREFORE, Defendant City of Chicago respectfully request this Court grant its Rule 50 motion and dismiss Plaintiff's claims as a matter of law, and, in the alternative, grant its Rule 59 motion and order a new trial.

Dated: January 24, 2018

Respectfully submitted,
CITY OF CHICAGO,


By: s/ *Eileen E. Rosen*
One of their Attorneys

Eileen E. Rosen, no. 06217428
Catherine M. Barber
Theresa B. Carney
Rock Fusco & Connelly, LLC
321 North Clark Street, Suite 2200
Chicago, Illinois 60654
(312) 494-1000
erosen@rfclaw.com