# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

THOMAS SIERRA                    )
                                 )
*Plaintiff,*                     )
                                 )        Case No. 1:18-cv-03029
v.                               )
                                 )        Hon. John Robert Blakey
REYNALDO GUEVARA, et al,         )
                                 )
*Defendants.*                    )
                                 )
                                 )


**PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF CHICAGO'S *DAUBERT*
MOTION TO BAR OPINIONS OF THOMAS J. TIDERINGTON**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

   I.  Thomas Tiderington's Qualifications and Experience ............................................. 2

   II.  A Summary of Tiderington's Opinions and Analysis .............................................. 3

   III. Relationship Between Tiderington's Opinions Here and Mike Brasfield's Opinions in *Fields* and *Rivera* .......................................................................................... 6

ARGUMENT ...................................................................................................................... 9

   I.      Legal Standard ................................................................................................ 12

   II.     The City's "Foundation" Challenges ............................................................ 13

          a.   *Tiderington's discussion of Jones/Palmer is well supported* ...................... 13

          b.   *Tiderington reviewed underlying materials related to Fields, Rivera, and Kluppelberg, and has ample foundation from which to discuss those cases* ............. 17

          c.   *The City's claim that Tiderington lacked "a basic understanding" of his own opinions is baseless and ignores his report and many hours of deposition testimony about his opinions* ...................................................................................... 19

          d.   *Tiderington did not engage in "statistical analysis" per se, but instead engaged in a simple counting exercise to which he applied his knowledge and experience as a police practices expert to offer opinions* .................................. 22

          e.   *The City's challenge to the number of hours Tiderington spent reviewing materials and preparing his* Monell *opinions goes to the weight of his opinions, but is not a basis to bar them* ............................................................................. 27

   III.    The City's "Methodology" Challenges ........................................................ 30

          a.   *The redactions in the criminal defense files do not render Tiderington's opinions unreliable* .............................................................................................. 30

          b.   *Tiderington's opinion that CPD's policies were not being followed are based on the large dataset he reviewed, just as Brasfield did in Fields and Rivera* ...................... 33

   IV.    The City's Argument That Mr. Tiderington's Opinions Will Not Be Helpful to the Jury Are Meritless ............................................................................................ 36

   CONCLUSION ............................................................................................................ 38

# TABLE OF AUTHORITIES

## Cases

*Avery v. Milwaukee*, 2015 WL 247991 (E.D. Wis. Jan. 20, 2015)...................................................9

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988) ...................................................................12

*Blasius v. Angel Auto., Inc.*, 839 F.3d 639 (7th Cir. 2016)............................................................36

*Cent. States, Se. & Sw. Areas Pension Fund v. Transp. Serv. Co.*, No. 00 C 6181, 2009 WL

424145 (N.D. Ill. Feb. 17, 2009) ....................................................................................................35

*Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008 (7th Cir. 2000)...................................................35

*Cooper v. Chicago Heights*, 2011 WL 2116394 (N.D. Ill. May 27, 2011) ......................................9

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ................................................ *passim*

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002) ...................... *passim*

*Equal Emp. Opportunity Comm'n & Bailey v. DHL Express (USA), Inc.*, No. 10 C 6139 WL

5796890 (N.D. Ill. Sept. 30, 2016) .................................................................................................23

*Fields v. City of Chicago*, 2017 WL 3987356 (N.D. Ill. Sept. 11, 2017).................................13,14

*Fields v. City of Chicago,* 981 F.3d 534 (7th Cir. 2020) ..................................................................1

*G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534 (7th Cir. 2012) .........................................17

*Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771 (7th Cir. 2017) ......................................24,32

*Hood v. City of Chicago*, 16 Civ. 1893 (N.D. Ill.) ..........................................................................23

*Jones v. City of Chicago,* 610 F. Supp. 350 (N.D. Ill. 1984) ................................................. *passim*

*Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039 (7th Cir. 1999) .........................................17

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)....................................................................12

*LaPorta v. City of Chicago*, 277 F. Supp. 3d 969 (N.D. Ill. 2017) ................................................36

*Lapsley v. Xtec, Inc.*, 689 F.3d 802 (7th Cir. 2012).......................................................................12

*Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 372 F. Supp. 2d 1104 (N.D. Ill. 2005).................32

*Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796 (7th Cir. 2013)................................................13

*Matter of James Wilson Assocs.*, 965 F.2d 160 (7th Cir. 1992) ....................................................24

*Obrycka v. Chicago*, 2011 WL 2633783 (N.D. Ill. July 5, 2011) ....................................................9

*Ott v. Milwaukee*, 2015 WL 1219587 (E.D. Wis. Mar. 17, 2015)....................................................9

*Paine ex rel. Eilman v. Johnson*, 2010 WL 785398 (N.D. Ill. Feb. 26, 2010) ................................9

*Palmer v. City of Chicago*, 576 F. Supp. 252 (N.D. Ill. 1983)............................................... *passim*

*Richman v. Sheahan*, 415 F. Supp. 2d 929 (N.D. Ill. 2006) ........................................24

*Rivera v. City of Chicago,* 319 F. Supp. 3d 1004 (N.D. Ill. 2018) ........................................ *passim*

*Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000) ........................................ *passim*

*Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753 (7th Cir. 2013) ................................ *passim*

*United States v. Bramlet*, 820 F.2d 851 (7th Cir. 1987) ........................................23

*United States v. Janati,* 374 F.3d 263, 273 (4th Cir. 2004) ........................................25

*United States v. Lawson*, 653 F.2d 299 (7th Cir. 1981)................................................23

*Walker v. Soo Line R.R. Co.*, 208 F.3d 581 (7th Cir. 2000)........................................13

*Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708 (N.D. Ill. Sept. 30, 2022) ...18,32

*White Eagle Co-opinion Ass'n v. Conner*, 553 F.3d 467 (7th Cir. 2009)......................................17

*Zivitz v. Greenburg*, No. 98 C 5350, 1999 WL 1129605 (N.D. Ill. Dec. 3, 1999) ........................35

**Federal Rules**

Fed. R. Evid. 702 ........................................................................................................12

Fed. R. Evid. 703 ........................................................................................................24

Fed. R. Evid. 1006 ......................................................................................................25

Fed. R. Civ. P. 26(b)(4)(c)(iii) ....................................................................................24

**Statutes**

Weinstein & Berger, Weinstein's Federal Evidence §1006.05[4] (2d ed. 2007) ..........................35

# INTRODUCTION

Defendant City of Chicago has filed a 24-page *Daubert* motion seeking to bar the *Monell*-related expert opinions of Plaintiff's police practices expert, Thomas Tiderington, which remarkably does not once mention the decisions in *Fields v. City of Chicago* and *Rivera v. City of Chicago*, the other cases from this District in which the City filed nearly identical motions to bar the same expert opinions. In both of those cases, the City lost its *Daubert* challenges to the same expert opinions, and in each of those cases, the juries ultimately credited the same expert opinions offered here to enter *Monell* verdicts against the City of Chicago. The judges in those cases relied on those same expert opinions to deny post-trial motions, and in *Fields* the Seventh Circuit relied on the same expert opinions to affirm. *E.g.*, *Fields v. City of Chicago*, 981 F.3d 534, 561-63 (7th Cir. 2020).

Indeed, the *Monell* opinions in Mr. Tiderington's expert report—essentially, (1) that the Chicago Police Department's documentation and disclosure policies were contrary to accepted police practice and lacked the appropriate safeguards to ensure the disclosure of *Brady* material to prosecutors and criminal defendants, and (2) that a review of hundreds of homicide files and corresponding criminal defense files demonstrates that CPD had a widespread practice of failing to disclose investigative information—are the same expert opinions, based on the same analysis, of the same types of documents, as Mr. Fields and Mr. Rivera were allowed to present at trial in their own cases.

The only difference is that the police practices expert who conducted the analysis in those earlier cases, Mike Brasfield, has since retired. Sierra hired an equally qualified expert, Mr. Tiderington, and notably Defendants do not challenge his qualifications at all. Instead, they simply

re-hash the same failed arguments about the opinions and analysis, without acknowledging—let alone distinguishing—the prior rulings in *Fields* and *Rivera*.[1]

The City's arguments lack merit. The City presents a scattershot of arguments based primarily on cherry-picked "gotchas" from the dozens of hours of deposition testimony Tiderington has given in this case and other Guevara cases about his *Monell*-related opinions. In doing so, the City bypasses any attempt to address the actual analysis and evidence on which Tiderington's opinions are based, as set forth in great detail in Tiderington's 76-page report. Most of the City's criticisms of Tiderington's analysis are simply wrong. But even if the criticisms were all accepted, they would go to the weight that a jury should give his opinions, and they would not justify limitation of Tiderington's opinions. The City's arguments, in other words, are appropriately addressed through cross-examination, just as they were in *Fields* and *Rivera*. Finally, the City's criticisms of Tiderington go to only a subset of his opinions; many aspects of his report are not addressed, so regardless of the outcome of this motion the Court can rely on the many opinions that are not challenged at this stage of the case.

## BACKGROUND

### I. Thomas Tiderington's Qualifications and Experience

Thomas Tiderington worked for 44 years in law enforcement, 20 years of which were as a Chief of Police. He served as a full-time law enforcement officer with three different police departments, during which time he developed extensive practical experience in investigating and supervising complex criminal investigations, including violent crimes and homicide investigations. He worked as a Group Supervisor for the U.S. Drug Enforcement Administration's South Florida Regional Task Force. Over his law enforcement career, he frequently worked and

---

[1] *Rivera* was also a case involving Guevara, and the City was represented in that case by the same attorneys representing the City in this case, so they have familiarity with the issues and arguments in *Rivera*.

interacted with the Federal Bureau of Investigation (FBI), the Department of Homeland Security Investigations, and other federal law enforcement agencies. He also worked with numerous state and local police agencies, including the Chicago Police Department. As a result of his extensive history working with many federal, state and local agencies, he has a deep knowledge of the similarities of investigative methods and strategies, as well as nationally acceptable police practices and protocols. In addition, he has trained more than 10,000 federal, state, and local law enforcement officers on police practices and criminal investigations, and he has spent decades as an instructor at numerous regional, national, and international law enforcement training events. Dkt. 500-2 at 2-3.

As part of his two decades as a Police Chief, Tiderington has reviewed and approved policies and procedures relating to every aspect of police operations, including criminal investigations, case development, report writing, maintenance and retention of police records, complaints against police officers, training, supervision, and employee discipline. He is an active life-member of the International Association of Chiefs of Police (IACP), a member of the Police Executive Research Forum (PERF), and a life-member of the Michigan Association of Chiefs of Police (MACP). *Id.* A more detailed discussion of his extensive training and experience is contained in his Curriculum Vitae, which is Attachment D to his report. Ex. 1 (C.V.).

Importantly, Defendant City of Chicago does not challenge his qualifications or his expertise in the areas on which he opines.

## II. A Summary of Tiderington's Opinions and Analysis

Mr. Tiderington's *Monell* opinions fall generally into two categories. The first category consists of Mr. Tiderington's opinions concerning the failures in the Chicago Police Department's

polices regarding the documentation and disclosure of information learned during homicide investigations, Dkt. 500-2 at 38-55, including:

    a. Standard police practice in 1995 was for police departments to maintain a centralized repository to collect and store all investigative information learned during a homicide investigation, to facilitate the disclosure of all investigative material to the prosecution and defense in order to comply with the department's *Brady* obligations. Dkt. 500-2 at 40-42.

    b. The documentation and disclosure policies the City of Chicago put in place—Special Orders 83-1 and its progeny—to address the street files problem that was identified during the *Jones/Palmer* litigation in 1981 and 1982 were inadequate because the policies failed to address the specific problems identified by Judge Milton Shadur during extensive injunction hearings he presided over during the *Jones/Palmer* litigation. Dkt. 500-2 at 42-51.

    c. Special Orders 83-1 and its progeny were inadequate on their face because they (a) allowed for the continued use of a decentralized, parallel file system in which investigative material was kept in different places, creating the risk that material would not be gathered from all of those locations; (b) failed to cover gang crimes officers, despite their significant role as investigators in homicide cases, like this one; (c) left too much discretion to detectives about what to document and record in the CPD's investigative files; and (d) perhaps most notably, lacked any instruction or direction to the subpoena service unit, detective division, or anyone else *to disclose to the prosecution or defense all of the parallel files created for an investigation*. Dkt. 500-2 at 45-55.

    d. CPD's efforts to implement the new Special Orders were woefully inadequate, including a failure to provide proper training and oversight to ensure compliance with the Special Orders. Dkt. 500-2 at 54-55.

Notably, while much of the City's *Daubert* motion focuses on Mr. Tiderington's analysis of hundreds of investigative and permanent retention files from Area Five homicide cases, and the charts of homicide data related to those files, his policy opinions above are not based on such analysis. Instead, they are based on his extensive review of the City's written policies regarding documentation and disclosure, the history of those policies, the *Jones/Palmer* litigation from which those policies emanated, the testimony of CPD policymakers and designees regarding all of the above, and his knowledge and experience in police standards regarding file keeping and disclosure during the relevant timeframe. Dkt. 500-2 at 38-55 (extensive citation to all of the above); Dkt.

500-11 (Tiderington's list of materials reviewed at, for example, documents 46-53, 88-115, 121-122).

The second category consists of Mr. Tiderington's opinions concerning evidence of a widespread practice of failing to document and disclose investigative information, including exculpatory and impeachment evidence, Dkt. 500-2 at 55-73:

e. His analysis and findings from the review of (a) 344 CPD investigative files from Area 5 homicides for the period 1995-1998 (from *Reyes/Solache*) and 475 investigative files from Area 5 for the period from 1991-1995; (b) CPD permanent retention files corresponding to 341 of the homicide investigations from 1995-1998, and 477 of the homicide investigations from 1991-1995, Dkt. 500-2 at 55-64;

f. His findings from an assessment of the investigative files themselves, which showed that the specific requirements set forth in the new Special Orders to address the problems discovered in *Jones/Palmer* were not being followed. This included a finding that investigative information learned during the course of investigations was not being consistently documented (and thus disclosed), and that the investigative files themselves show that detectives were not complying with the specific requirements of the Special Orders: 50% (1991-1995) and 46% (1995-1998) of the time handwritten notes were not taken on general progress reports; 10% (1991-1995) and 28% (1995-1998) of investigative files contained to-from memos not on official police forms; 25% (1991-1995) and 17% (1995-1998) of investigative files did not have the inventory sheet that the Special Orders required as a means to ensure disclosure, Dkt. 500-2 at 56-57;

g. His findings from an assessment of permanent retention files themselves—intended to be a repository of all typed up, official police reports containing pertinent information—from which he concluded that there was a systemic failure to document information learned during homicide investigations: while in most police departments around the country the official reports contain multiple storylines, including leads that point to alternate suspects and to dead-ends, CPD official reports only tell one storyline, the evidence developed against the person ultimately charged, Dkt. 500-2 at 58-59;

h. His comparison of the investigative files to 64 corresponding criminal defense files from 1995-1998, showing the systemic under-disclosure of information contained in CPD's homicide files to criminal defendants: nearly all of the criminal defense files were missing documents contained in the corresponding homicide files, Dkt. 500-2 at 59-64;

i. His finding that in numerous specific cases, investigative material of potentially significant exculpatory value was withheld from criminal defendants, and that this same pattern persisted in many other Chicago Police Department cases he reviewed. Dkt. 500-2 at 64-73 (discussing the facts and circumstances of twelve other CPD homicide investigations); and

j. The deficiencies in CPD's documentation and disclosure practices discussed above were equally present in the Andujar homicide investigation at issue in this matter, and resulted in the withholding of documents and information that should have been disclosed to the prosecution and defense. Dkt. 500-2 at 73-76.

The opinions in this section are based on Mr. Tiderington's review of hundreds of homicide files produced to him from the discovery in this case, and in *Reyes/Solache*, another Guevara-related case filed shortly before this one. Because the Andujar homicide at issue in this case occurred in 1995, the Court granted Plaintiff discovery of all Area 5 homicide files from 1991-1995 for analysis here; and because the *Reyes/Solache* case involved a homicide that occurred in 1998, the court in that case granted Plaintiff discovery of all Area 5 homicide files from 1995-1998. This consisted primarily of CPD's investigative files and permanent retention files for those time periods. In addition to these files, Plaintiff obtained discovery of the Public Defender's files corresponding to these homicide files for the period from 1995-1998, in order to assess whether there was evidence that the investigative information contained in CPD's homicide files was being disclosed to criminal defendants.[2]

### III. Relationship Between Tiderington's Opinions Here and Michael Brasfield's Opinions in *Fields* and *Rivera*

*Fields* was a wrongful conviction case involving a 1984 homicide investigation conducted by Area One investigators. *Rivera* was a wrongful conviction case involving a 1988 homicide investigation conducted by Area Five investigators, including Defendant Guevara. In both cases—like this one—the primary evidence used in the criminal proceedings were eyewitness identifications obtained by Chicago Police detectives. Both Fields and Rivera—like Plaintiff Sierra—were innocent, that the identifications obtained from the eyewitnesses were false and the product of police manipulation, and that the officer defendants had failed to disclose exculpatory

---

[2] Given the burden on the Public Defender of producing these voluminous records, Plaintiff agreed to rely on the 1995-1998 Public Defender files produced in *Reyes/Solache* for his file comparison exercise in this case as well.

6

information learned during the course of their homicide investigations. And both Fields and Rivera pursued a *Monell* claim, as Sierra does here, that the City of Chicago had an official policy of suppressing exculpatory and impeachment evidence during homicide investigations, which was not turned over to prosecutors or criminal defendants. As here, one theory in support of this *Monell* claim in *Fields* and *Rivera* was that the City had a widespread practice of suppressing investigative information. To pursue this *Monell* claim, the district court in each case ordered the City to produce hundreds of homicide files from the years surrounding the underlying crimes and investigations at issue. Ex. 2 (Brasfield Report in *Fields*); Ex. 3 (Brasfield Report in *Rivera*). Those files were analyzed to produce evidence of repeated suppression of investigative information in homicide cases.

Mr. Tiderington's *Monell* opinions here are not intended to blaze a new trail. Rather, they represent a continuation of the analysis of CPD's evidence disclosure policies and practices that was started by police practices expert Mike Brasfield in *Fields* and *Rivera*. That is by design: the analysis, findings, and opinions in those cases were powerful, and they were admitted at trial and successfully supported *Monell* verdicts against the City. Plaintiff Sierra, therefore, sought to conduct the same analysis in his own case.

In continuing the analysis, there were two ultimately inconsequential differences to be accounted for in this case. First, by the time Sierra's case was approaching the expert discovery phase, Mike Brasfield had retired, and so Sierra needed to hire a new expert. Tiderington has very similar qualifications to Mr. Brasfield, also boasting a multi-decade career in law enforcement, including many years as both an investigator, and as a police chief responsible for policymaking. *Compare* Ex. 1 (Tiderington C.V.) *with* Ex. 4 (Brasfield C.V. in *Rivera*). Tiderington is as qualified as Brasfield to offer the opinions contained in his report, a point the City does not dispute. Second,

7

because the homicide investigation at issue in *Fields* took place in the mid-1980s and the one in *Rivera* took place in 1988, and the homicide investigation at issue here occurred in 1995, Sierra wanted to ensure that Tiderington continued the analysis with additional homicide files for the period between the Rivera investigation and the one at issue in this case, which is why the Court ordered the production of homicide files for the years 1991 to 1995 (at the same time, in *Reyes/Solache*, another Guevara case involving a 1998 homicide, the judge ordered the production of homicide files for the years 1995-1998).[3]

Other than those two differences, the analysis Tiderington conducted is the same as that conducted in *Fields* and *Rivera*. Just as Brasfield considered the extensive record related to the *Jones/Palmer* litigation and the new Special Orders put in place after the *Jones/Palmer* litigation, Tiderington reviewed the same materials. They reached very similar opinions about the inadequacy of those policies on their face, and in light of the known street files problem, based on their knowledge and experience of police standards at the time. *Compare* Dkt. 500-2 at 38-55 *with* Exs. 2 (Brasfield Reports in *Fields*), at 8-14, 23-33 and 3 (Brasfield Report in *Rivera)* at 30-33, 49-59.

Likewise, just as Brasfield conducted an analysis of CPD investigative files, permanent retention files, and corresponding criminal defense files for the periods at issue in *Fields* and *Rivera*, Tiderington conducted an analysis of the same types of files for a slightly later period from 1991 through 1998. And just as Brasfield relied in part on a spreadsheet of data that had been coded by Field's and Rivera's counsel to assist in his analysis of the voluminous set of homicide files made available to him, Mr. Tiderington did the same. *E.g., Compare* Dkt. 500-5 (Tiderington's spreadsheet of homicide files from 1991-1995 in *Sierra*, at Attachment G to his report) *with* Ex. 5

---

[3] Notably, the homicide files produced in *Rivera* were for the period from 1985-1991, so the files produced here are a direct continuation of the years analyzed in *Rivera*, with one year of overlapping analysis. Ex. 3 (Brasfield Report in *Rivera*) at 41.

(Brasfield's spreadsheet of homicide files from 1985-1991 in *Rivera*, at Attachment G to his report). They reached very similar conclusions about the City's practices, finding that the Special Orders were not followed (and thus the practices that cause the problem of nondisclosure of evidence continued unabated), and that the practices resulted in the systemic under-disclosure of information learned during homicide investigations, including relevant information that should have been disclosed to prosecutors and criminal defendants. *Compare* Dkt. 500-2 at 38-55 *with* Ex. 2 (Brasfield Report in *Fields)* at 14-23, 33-39 and Ex. 3 (Brasfield Report in *Rivera)* at 40-49, 59-65.

That Brasfield's and Tiderington's findings and ultimate conclusions are nearly identical is not surprising. After all, by the City's own admission its policies had not changed in that time period. Ex. 6 (Deposition of Commander Eric Winstrom in *Reyes/Solache*) at 125:19-129:19. The same analysis of the same types of files produced the same results. The consistency and repeatability of the opinions is reflective of their reliability. There is no basis to bar opinions from Tiderington that were not barred from Brasfield in *Fields* and *Rivera*, and are the type routinely provided by police practices experts on both sides of cases in this District and others. *E.g.*, *Obrycka v. Chicago*, 2011 WL 2633783, at *4 (N.D. Ill. July 5, 2011); *Cooper v. Chicago Heights*, 2011 WL 2116394, at *6 (N.D. Ill. May 27, 2011); *Paine ex rel. Eilman v. Johnson*, 2010 WL 785398, at *4 (N.D. Ill. Feb. 26, 2010); *Ott v. Milwaukee*, 2015 WL 1219587, at *13 (E.D. Wis. Mar. 17, 2015); *Avery v. Milwaukee*, 2015 WL 247991, at *2 (E.D. Wis. Jan. 20, 2015).

## ARGUMENT

Before turning to the particular arguments in the City's motion, several points bear mentioning. First, although the City seeks to bar Mr. Tiderington's *Monell* opinions in their entirety, its motion does not contain any arguments challenging Mr. Tiderington's opinions

9

regarding the deficiencies in the City's polices (Opinions 1(a)-(d) in the Factual Background, *supra*). The closest the City comes is to challenging Tiderington's "foundation" for discussing the *Jones* and *Palmer* litigation. Dkt. 500-2 at 6-9. As set forth below, the City's challenge is baseless. But even assuming for the moment it were meritorious, that section of the City's brief does not contain any argument pertaining to his opinions about the facial deficiencies in the City's written polices in light of prevailing police standards for documenting, maintaining, and disclosing investigative information.

The rest of the City's challenges are to Tiderington's analysis of hundreds of Area Five homicide files, and his reliance on a spreadsheet produced by Sierra's counsel. Those are all challenges to Mr. Tiderington's widespread practices opinions (Opinions 2(e)-(j) in the Factual Background, *supra*), which are the only ones based on his review of a large set of homicide files.

Relatedly, it is difficult to decipher the distinction the City is intending to draw between its "foundational" challenges in Section I and its "methodology" challenges in Section II, or the sequencing of the challenges in each section. They are not organized to track the actual opinions offered in Tiderington's report, and in that way masks that the City does not meaningfully challenge many of the opinions in Tiderington's report.

Second, nearly all of the City's arguments were previously raised in *Rivera* and *Fields*, where they were rejected. Nowhere does the City grapple with those prior decisions, let alone explain why the Court should reach a different conclusion here. It does not, because it cannot: the documents relied on are the same; the methodology and analysis is the same; and the conclusions are the same. This Court's ruling, too, should be the same. Ex. 10 (J. Kennelly's MIL Order in *Fields*) at 1-12, 16-18; Ex. 11 at 83-88 (J. Gottschall's Order in *Rivera*)

Third, most of the City's challenges rely on citations not to Mr. Tiderington's report, or even to his deposition in this case, but instead to his deposition testimony in three other cases, to suggest incorrectly that Tiderington does not understand or cannot explain his own opinions. These "gotchas" must be placed in context. Tiderington has been disclosed to offer the same *Monell* opinions in many recent Guevara cases, and he has been deposed in each of them. In total, he has been deposed for over thirty hours across those cases. The deposition transcripts span 1,735 pages. Not surprisingly, given the amount of questioning, the City has managed to cherry-pick a few excerpts across those hundreds of pages that are inconsequential in context, but based on which the City asserts that Tiderington cannot defend his own opinions. But this handful of excerpts pales in comparison to Tiderington's exhaustive deposition testimony, in which he for hours discusses and explains his opinions in rich detail. Equally importantly, these excerpts do not impeach whatsoever Tiderington's lengthy expert report explaining the data he relied on, the methodology and analysis he applied, and his findings and opinions.

Fourth, the City's arguments—*e.g.*, the number of hours he spent reviewing material and preparing his report (Dkt. 500 at 12-14), the presence of redactions in some of the criminal defense files he reviewed (Dkt. 500 at 15-18), a single error found in the spreadsheet of data he relied on for part of his opinions (Dkt. 500 at 20), etc.—are not really challenges that justify exclusion of an expert at all, but instead are arguments that, at best, go to the weight of Tiderington's opinions. Ex. 7 (J. Kendall SJ Order in *Hood*) at 17 ("Although Defendants' critiques . . . may undermine the weight and credibility of [the expert's] testimony, those critiques are more appropriately addressed through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." (citing *Daubert*, 509 U.S. at 596; *Stollings*, 725 F.3d at 766)).

## I.  Legal Standard

The admission of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert*. The Supreme Court in *Daubert* made clear that an expert by "knowledge, skill, experience, training, or education" may offer opinions if the expert's "scientific, technical, or other specialized knowledge" would "help the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588-89 (1993). The Court emphasized the "'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to opinion testimony.'" *Id.* (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)) (internal quotation marks omitted).

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Under Rule 702, "the rejection of expert testimony is the exception rather than the rule," *Id.* (Advisory Note, 2000 amends.), and the Rule's inquiry is a "flexible one." *Daubert*, 509 U.S. at 594–95; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (*Daubert* analysis applies to non-scientific expert testimony).

Although courts should serve as gatekeepers to ensure experts' opinions are reliable and relevant, the threshold under *Daubert* is a permissive one: "the district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013); *see also Lapsley v. Xtec, Inc.*, 689 F.3d 802,

805 (7th Cir. 2012) ("A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy.").

"The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact," and the focus of the *Daubert* inquiry should remain on the principles and methodology, not on the ultimate opinions reached by the expert. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Reliability should additionally focus on the validity of the methodology, "not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013). If an opposing party intends to challenge the factual basis of the expert's opinion, the appropriate method is through cross- examination, not exclusion. *See Daubert*, 509 U.S. at 596; *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000).

## II.     The City's "Foundation" Challenges

### a.   *Tiderington's discussion of Jones/Palmer is well supported*

As an initial matter, the City sought to bar discussion of *Jones* and *Palmer* in *Fields* and *Rivera* and failed in both instances. The same result is appropriate here. Indeed, one of the City's arguments is that Tiderington fails to acknowledge later events, and a later appellate decision, in the *Palmer* litigation (referred to as "Palmer II). Dkt. 500 at 8. This is the exact same argument the City made in *Fields*, even citing to the exact same quotation. Ex. 8 (City's *MIL* in *Fields*) at 25-26 (quoting to same language: the *Palmer* plaintiffs "found nothing on which they could base a claim that any member of the class had been convicted in violation of the Constitution"); Ex. 9 (City's summary judgment motion, and *Daubert* arguments, in *Rivera*) at 8-9 (same arguments regarding Palmer II). Both Judge Kennelly and Judge Gottschall rejected the City's attempt to bar Brasfield's

13

opinions regarding *Jones* and *Palmer*. Ex. 10 (J. Kennelly's MIL Order in *Fields*) at 6-11; *Fields v. City of Chicago*, 2017 WL 3987356, at *4-5 (N.D. Ill. Sept. 11, 2017) (Order denying post-trial motion in *Fields*, summarizing Brasfield's testimony about *Jones/Palmer* at trial); Ex. 11 at 88 (J. Gottschall's Order in *Rivera*: "the City's Daubert challenge to his opinion fails").[4] This Court should reject the City's argument that was rejected in *Fields* and *Rivera*.

Tiderington reviewed and relied on the same underlying materials related to the *Jones/Palmer* litigation as Brasfield did—the judicial opinions in those cases, including the detailed discussion of Judge Shadur's factual findings during the injunction hearing, the iterations of written policies in the wake of Judge Shadur's orders, and the statements and testimony of James Hickey and other CPD officials involved in the litigation—and reached the same opinions. Compare Dkt. 500-11 (Tiderington list of materials reviewed) with Exs. 12 and 13 (Brasfield list of materials reviewed in *Fields* and *Rivera*, respectively). There is no reason to reach a different decision about the admissibility of those opinions at trial than *Fields* and *Rivera*.

The City cites to a handful of excerpts from Tiderington's depositions in other cases (Dkt. 500 at 7) to claim that Tiderington cannot effectively discuss or defend his opinions, and should thus be barred. These are not challenges to Tiderington's methodology, and do not provide a basis to bar his opinions. They are not, for example, a claim that reliance on the substantial underlying record from *Jones* and *Palmer* is somehow inappropriate, or that the factual findings and testimony of CPD officials in that matter are not the sort of evidence experts in Mr. Tiderington's field can

---

[4] The discussion in *Fields* is particular instructive. In direct contravention of the City's argument that Tiderington's opinions should be barred for failing to acknowledge later events in *Palmer*, Judge Kennelly excluded this later *Palmer* opinion from trial, concluding that it was not relevant to the primary purpose of admitting *Jones/Palmer*—as evidence of notice to the City of a systemic documentation and disclosure problem. 2017 WL 3987356 at *5. Judge Kennelly also affirmed his finding that the later *Palmer* opinion was inadmissible hearsay. *Id.* So, Defendants are seeking to exclude Tiderington because, according to them, he failed to acknowledge particular information that a previous judge ruled was not a basis to exclude expert opinions, was irrelevant, and was entirely inadmissible at trial.

rely on (for good reason—such arguments would be baseless, and contrary to the prior rulings in *Fields* and *Rivera*). Instead, they are gotchas from more than thirty hours of deposition testimony that are, at best, fodder for cross-examination. *Daubert*, 509 U.S. at 596; *Walker*, 208 F.3d at 586.

Moreover, the cited testimony does not support the claims the City is making, and is taken entirely out of context. For example, the City cites several excerpts from Tiderington's deposition in other cases to imply that he did not read the *Palmer* case, and that he is simply parroting Brasfield without actually having opinions of his own. But the testimony does not support the City's claims. As Tiderington made clear, he reviewed the Seventh Circuit's decisions in *Palmer*, and in fact discussed from memory the contents of an affidavit from one of the lawyers in the *Palmer* matter. Dkt. 500-12 at 292:9-292:19, 294:3-6, 294:24-295:8. When asked where the language in his report about the *Palmer* ruling came from, his recollection was that he "cut and pasted it from that ruling." Dkt. 500-3 at 448:6-10. That cannot possibly be improper. Was he supposed to type it out himself? Was it wrong to faithfully recite the language from the ruling, rather than paraphrasing it?[5]

The City also cites to Mr. Tiderington's testimony that he learned about the *Jones* and *Palmer* cases from Sierra's counsel (Dkt. 500 at 7), and indeed it should come as no surprise that Loevy & Loevy provided Mr. Tiderington with the underlying materials related to that litigation, just as he received all of the materials he reviewed from Sierra's counsel. In the routine course, retained experts receive the materials they reviewed from the counsel that retained them. This cannot be a basis to bar Mr. Tiderington's opinions. Of course, Defendants' experts, too, received

---

[5] The City's claim in its brief that "the summaries provided in his expert opinion were provided to him in a report drafted by" Brasfield (Dkt. 500 at 7) is simply not supported by the citation, in which Tiderington points out—correctly—that Brasfield's opinion also discusses the *Palmer* decision. In that same section, Tiderington makes clear that he reviewed the *Palmer* decision himself. Dkt. 500-12 at 294:24-295:2.

the materials they relied on from defense counsel. Ex. 14 (Deposition of Dr. John Wixted) at 75:2-23, Ex. 15 (Deposition of Bernard Murray) at 115:24-116:14. From this utterly benign fact, the City jumps to the unsupported conclusion that Tiderington's opinions are based on "blind reliance on the information provided to him by Plaintiff's counsel regarding the history of the *Jones* and *Palmer* litigation." Dkt. 500 at 8. There is no support cited for this assertion, and it is contrary to the substantial support for Mr. Tiderington's opinion discussed in his report and in his deposition testimony.[6]

Indeed, by emphasizing these picayune examples from Tiderington's depositions, the City not only avoids addressing the ample foundation for Tiderington's opinions, but it lays bare that it has no good argument to exclude Tiderington whatsoever. His report contains 14 pages of detailed discussion of the underlying materials he reviewed related to *Jones* and *Palmer*, supported by 61 footnotes citing to specific evidence, the bases for his opinions based on that material, and why the CPD Special Orders were inadequate to address the problems CPD policymakers were made aware of in *Jones* and *Palmer*. Dkt. 500-2 at 42-55. The City's attempted gotchas aside, throughout his depositions Tiderington displayed a thorough grasp of the materials related to *Jones* and *Palmer*, and the Special Orders put in place in their wake. *See, e.g.*, Dkt. 500-3 at 474:6-480:11, 482:1-485:10; Dkt. 500-8 at 299:21-303:23. At one point in his deposition in this case, from memory Tiderington corrected counsel's misunderstanding about what was stated in those Special

---

[6] As another example, the City cites a passage from a deposition in another case in which Tiderington is questioned about his understanding of citation formats for legal cases (like "F.2d," "Cir."), and could provide only a limited explanation of the role of the Seventh Circuit. Dkt. 500 at 7. That Tiderington could not provide an articulate discussion of federal appellate structure is hardly a basis to bar his opinions. Especially where, as here, his opinions are not actually about the court rulings themselves or their legal impact, but rather about the underlying factual findings summarized in those decisions that go to the issue of notice to CPD policymakers and the type of action that he, as a police practices expert with extensive policymaking experience, believed were necessary to address the problems those policymakers themselves acknowledged at the time. Dkt. 500-2 at 46, 50, 51 n66, 52, 54-55.

Orders. Dkt. 500-8 at 302:12-302:23, 351:15-355:20. There is simply no basis to bar Tiderington's

discussion of *Jones* and *Palmer* for a lack of "foundation."

> b. *Tiderington reviewed underlying materials related to Fields, Rivera, and*
> *Kluppelberg, and has ample foundation from which to discuss those cases*

The City's one-paragraph, four-sentence argument to bar Tiderington's discussion of the

civil trials in *Fields*, *Rivera* and *Kluppelberg* (Dkt. 500 at 9) is so cursory that it is unclear what

the City is arguing, and what it is seeking to bar. Its argument is so cursory it should be deemed

forfeited. *See White Eagle Co-opinion Ass'n v. Conner*, 553 F.3d 467, 476 n.6 (7th Cir. 2009)

("Skeletal and unsupported arguments will not be considered and the argument will be deemed

waived."); *see also G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012)

(quoting *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999)).

The section heading suggests the City seeks to bar Tiderington from referring to the

outcomes of the civil trials in those cases (there was not a civil trial in *Kluppelberg*). If that's the

case, that's not property addressed through *Daubert* motions, but through motions *in limine* at trial

(which Plaintiff may not even oppose, if it is about excluding the size of the jury awards).

If the City is seeking to bar Tiderington's discussion of the relationship between his

findings and analysis, and that of Brasfield on similar datasets in *Fields* and *Rivera*, there is no

basis to bar his opinions. As Tiderington's report details, he conducted the same analysis as

Brasfield, on the same types of documents, for a later time period; he then compared his findings

to the findings in Brasfield's reports—which are attached to Tiderington's report as Attachments

H and I, Dkt. 500-2 at 8—to see if their results were consistent. He found that they were, fully

documenting those comparisons as part of his own opinions. Dkt. 500-2 at 8, 39, 56 (finding

remarkable consistency between his findings and Brasfield's regarding the percentages of

homicide files with evidence of particular violations of CPD's written policies), at 58. The City

does not explain in what way this approach is improper or insufficient. Instead, it makes two cryptic references to Tiderington's deposition testimony in a different case, to imply that Tiderington could not explain Brasfield's analysis in those cases. But that is simply not the case. As Tiderington's report makes clear, he fully understood what Brasfield had done, noting that his own analysis "is the same one . . . that Michael Brasfield conducted in *Rivera* and *Fields*, and my findings are consistent with his." Dkt. 500-2 at 56. And the City's citation to Tiderington's deposition omits reference to the critical portion of his testimony, among those same pages of the transcript, in which he explained that at the outset he spent "a great deal of time trying to understand it and analyze" the spreadsheets Brasfield relied on. Dkt. 500-3 at 385:4-17. This is perfectly reasonable, and appropriate. *See, e.g., Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002); *Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *11 (N.D. Ill. Sept. 30, 2022) ("[T]here is nothing objectionable about an expert relying on the work of a colleague.")[7]

To the extent the City is seeking to bar Tiderington's reliance on *Fields*, *Rivera* and *Kluppelberg* as additional examples of the nondisclosure that resulted from the City's policies and practices, it makes no arguments that would justify such relief. Tiderington not only reviewed the detailed discussion of the evidence in those cases, as set forth in Brasfield's expert reports in *Fields* and *Rivera* (and expressly incorporated into Tiderington's report as Attachments H and I), but also reviewed numerous source documents related to those cases, including the underlying homicide files, criminal defense files and prosecution files. Dkt. 500-11 at 4-5 (items listed as nos. 69, 70

---

[7] The City also claims that Tiderington testified erroneously that he thought that he and Brasfield relied on the same spreadsheet. This is misleading. Brasfield and Tiderington *did* rely on the same spreadsheets, in that the columns and rows captured the same categories of data, in the same ways, from the same types of files; but of course they did so for homicide files from different time periods. This is all that Tiderington was trying to communicate in his testimony, consistent with the explanation set forth in his expert report. Dkt. 500-2 at 56.

and 73-86). He then summarized the evidence relevant to his own analysis in his report. Dkt. 500-2 at 68-71.

Finally, the City sought this same relief in *Fields* and *Rivera*, to prevent those plaintiffs from introducing evidence regarding the non-production of investigative information in other wrongful conviction cases, including *Kluppelberg*, and respectively, *Rivera* and *Fields*. In both *Fields* and *Rivera*, the City's attempts to bar plaintiff's expert from discussing those cases was denied. Ex. 16 (Brasfield testimony at *Rivera* civil trial) at 2258-2267 (Brasfield testifying about undisclosed documents in *Fields, Kluppelberg*); Ex. 10 (Order on MILs in *Fields*) at 11-12.

> ### c. The City's claim that Tiderington lacked "a basic understanding" of his own opinions is baseless and ignores his report and many hours of deposition testimony about his opinions

The City next argues that Tiderington's opinions should be barred because he "shows a complete lack of familiarity with the subject matters discussed." Dkt. 500 at 9-10. Given this bold and acerbic assertion in support of such sweeping relief—barring all of his opinions—one would anticipate that the legal and evidentiary support would be robust. That is not the case. The City's argument consists of three paragraphs, citing once again to a few cherry-picked excerpts from his deposition in another case. The City's argument is as baseless as it is conclusory.

As an initial matter, it bears noting that despite the sweeping relief it requests, the City only references a sliver of Mr. Tiderington's opinions related to CPD's widespread practices (Opinions 2(e) and (f) in the Factual Background, *supra*)—only those on page 57 of his report in this case. Dkt. 500-2 at 57. The City's brief makes no effort to explain why this extremely narrow criticism of one aspect of his opinion would justify barring his many other opinions.

Second, the City again ignores the vast majority of Tiderington's report and testimony explaining his *Monell* opinions at length and in detail. Contrary to the City's claim that Tiderington "shows a complete lack of familiarity" with the subject matters discussed, his report contains more

than 35 pages explaining his *Monell* opinions, with more than 70 footnotes citing to the record,
along with a detailed walkthrough of the charts and other data used to form his opinions about the
failure to follow CPD's policies. Dkt. 500-2 at 38-75. Those opinions are buttressed by hundreds
of pages of deposition testimony in which Tiderington further explained his analysis and opinions.
Indeed, in the pages directly surrounding the deposition excerpts from *Reyes/Solache* that the City
cherry-picked to undermine his opinions, Tiderington thoroughly demonstrates his command of
the subject matter:

- He explained CPD's practice of using investigative files and permanent retention files, and the types of documents kept in each. Dkt. 500-3 at 406:19-407:23, 438:21-441:2, 509:23-510:9, 515:12-516:13.
- He spent pages discussing his understanding of how permanent retention files were kept pursuant to CPD policies and practices, and explaining his analysis and conclusions related to those files, and the similarities between those findings and the issues he observed in the underlying homicide file at issue in that case. Dkt. 500-3 at 509:23-521:21.
- He provided a detailed summary of his widespread practice opinions, and examples of particular evidence in support of those theories. Dkt. 500-3 at 415:10-424:20, 435:5-438:8, 490:2-491:494:24, 532:7-534:2.
- He explained that he reviewed all of the investigative files and homicide files he received, spending more time with some and less time with others, and using them to compare against the charts in attachments F and G to his report to verify the information in the charts was accurate, to make sure he understood the coding in the charts. Dkt. 500-3 at 401:10-402:7, 404:3-20, 406:1-18, 514:2-11.
- He explained that he also personally compared investigative files to Public Defender files to see if everything was included in the defense file, and conducted spot-checking to ensure he understood the data in the chart and that it was accurate. Dkt. 500-3 at 601:11-603:8.
- He spent pages and pages explaining the columns of the *Sierra* and *Reyes/Solache* spreadsheets (Attachments F and G) he relied on to assist in forming his opinions. Dkt. 500-3 at 429:21-432:21, 436:7-438:8; Dkt. 500-8 at 282:8-293:2.
- He explained the role of specific categories of CPD documents within the homicide files, such as the investigative file inventories, and how they were supposed to be used under the new written policies after *Jones* and *Palmer*. Dkt. 500-3 at 435:5-15, 503:7-505:10.

In the face of all of this, the City once again mischaracterizes a few excerpts from Tiderington's deposition to make grandiose claims about Tiderington's inability to defend his opinions.[8] Again, these are picayune points that are appropriately addressed through cross-examination, at best. But beyond that, they are baseless.

Buried in this section is an argument that Tiderington fails to provide any support for his opinion that CPD had a practice of failing to document information learned during homicide investigations (Dkt. 500 at 9-10), but that is again not the case. As one example, Tiderington explained in his report that based on his decades of experience, working for and with numerous agencies, the files for police investigations typically contain twists and turns, with multiple leads and various dead-ends, before ever getting to a perpetrator; but CPD's files were different in kind, typically providing only the information that led to the arrest and charging of the suspect, without documenting the other investigative avenues that were pursued (and might have led to dead ends). Dkt. 500-2 at 58. At his deposition, Tiderington discussed additional specific examples, and specific evidence, that he reviewed that supported his conclusion that investigative information was not being documented. Dkt. 500-3 at 423:3-424-20, 427:15-428:11, 511:23-513:1, 532:7-534:2 (examples include lack of contemporaneous notes of witness interviews and other typical investigate steps, presence of cryptic notes listing phone numbers or addresses, without documentation in notes or reports of the importance/context, etc.). He also identified the specific columns in *Sierra* and *Reyes/Solache* charts, Attachments F and G, which identify whether the homicide file contained any detectives' handwritten notes, something he would expect to see in nearly all homicide files, but were regularly missing from CPD's homicide files. Dkt. 500-3 at

---

[8]  It is notable that Defendants' deposition gotchas are from pages 428 and 503 of a very long deposition. While these isolated instances in which Tiderington may have been less effective in answering counsel's questions about specific aspects of his opinions, they are rare examples in an otherwise exceedingly detailed deposition.

428:12-432:22, 436:7-438:8 (discussing specific column that identifies complete absence of handwritten notes in file, and his spot-checking of the files to confirm his understanding and his findings). Put simply, Tiderington provided ample support for his opinions about the failure to document investigative information. The City does not challenge those opinions, or the basis for them; it just ignores them. That is not a basis to bar Tiderington's opinions.[9]

> ### d. Tiderington did not engage in "statistical analysis" per se, but instead engaged in a simple counting exercise to which he applied his knowledge and experience as a police practices expert to offer opinions

The City next argues that Tiderington lacks foundation for the "statistical analysis" in his report (Dkt. 500 at 11-12). Once again, several qualifications are necessary at the outset.

First, this section again lodges criticisms of only the limited portion of Tiderington's opinions discussed on pages 56-57 of his report (Opinions 2(e) and (f) in the Factual Background, *supra*) that the investigative files from 1991-1995 in *Sierra* and from 1995-1998 in *Reyes/Solache* demonstrate that there was a widespread failure to implement the documentation and disclosure Special Orders that were put in place to address the problems found in *Jones* and *Palmer* (Opinions 2(e) and (f) in the Factual Background, *supra*). The City does not explain how this limited criticism could justify the sweeping relief it seeks, nor could it.

Second, based on the title of this section, one would think this section was an argument that Tiderington is not qualified to offer his opinions because he lacks expertise in statistics.[10] But

---

[9]  The City also asserts that Tiderington could not defend his analysis about inventory sheets routinely being incomplete. This is simply not true. Tiderington explained that his finding is supported by his own analysis of the homicide files, in which he found that investigative files contained police reports and other documents that were not listed on the inventories, and in which police reports were all added to the inventories on the same date, by the same person, indicating they had been kept somewhere outside the file up to that point. Dkt. 500-3 at 503:7-505:10.

[10]  In any event, such an argument would not provide a basis to bar his opinions, but go to the weight they should be given by the jury. *See Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016) ("The fact that an expert may not be a specialist in the field that concerns [his] opinion typically goes to the weight to be placed on that opinion, not its admissibility.").

that is not the argument at all. Instead, the City argues that there was something improper about Tiderington's reliance on charts of homicide file data from 1991-1995 and 1995-1998 provided by Sierra's counsel, and that it "strains credulity" that he was able to use the data to reach his conclusions. These arguments are baseless.

Once again, the City fails to grapple with an incontrovertible fact: this same analysis, based on the same types of homicide file data, compiled in the same way into the same types of charts of homicide file data, was all done by Brasfield and admitted at trial in both *Fields* and *Rivera*. In both those cases, Brasfield relied on charts of homicide data provided by Plaintiff's counsel. Ex. 2 (Brasfield Report in *Fields*) at 16; Ex. 3 (Brasfield Report in *Rivera*) at 41. In both cases, this did not provide a basis to bar Brasfield's opinions based on such data. Ex. 17 (Brasfield Testimony in *Fields*) at 2485-2665 (explaining reliance on chart from Plaintiff's counsel); Ex. 16 (Brasfield Trial Testimony in *Rivera*), at 2159-2449. That is because there is nothing improper about an expert relying on coders or assistants to engage in the mechanical exercise of coding data fields. *See, e.g., Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612–13 (7th Cir. 2002) ("An expert witness is permitted to use assistants in formulating his expert opinion.") (citing *United States v. Bramlet*, 820 F.2d 851, 855–56 (7th Cir. 1987); *Equal Emp. Opportunity Comm'n & Bailey v. DHL Express (USA), Inc.*, No. 10 C 6139, 2016 WL 5796890, at *5 (N.D. Ill. Sept. 30, 2016) (expert relying on data gathering conducted by others permissible because it did not involve "a substantial degree of technical judgment critically relevant to the central contested issues in the case"); *United States v. Lawson*, 653 F.2d 299, 301–02 (7th Cir. 1981)); *id.* at 613. In *Hood v. City of Chicago*, Judge Kness considered the City's challenge to a *Monell* expert who relied on a chart of data—in that case, information pulled from CPD disciplinary files—that was also provided by the plaintiff's counsel to the expert to use in forming his opinions. The Court rejected the City's challenge,

23

finding that Hood's legal team served as "prototypical data gatherers upon whose work reliance is straightforwardly permissible." Ex. 7 (J. Kendall SJ Order in *Hood*) at 23 (citing to *Dura Auto. Sys. of Ind., Inc.*, 285 F.3d at 613) (internal quotations omitted).

Likewise, even assuming Tiderington had not taken steps to verify the accuracy of the chart (he did, as discussed below), Tiderington's reliance on the chart would still be permissible because the Federal Rules contemplate that experts can rely on facts or assumptions provided to them by counsel, and that is all the chart is. *See* Fed. R. Civ. P. 26(b)(4)(c)(iii) (requiring party to disclose the "assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed"). Experts "routinely base their opinions on assumptions," even those that "are necessarily at odds with their adversary's view of the evidence." *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006); *Matter of James Wilson Assocs.*, 965 F.2d 160, 172 (7th Cir. 1992) ("An expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him—information of which he lacks first-hand knowledge and which might not be admissible in evidence no matter by whom presented.") (citing Fed. R. Evid. 703)). If Defendants can muster evidence to show that the chart is unsupported or inapplicable (they have not), the jury will not give weight to the opinions based on those assumptions. Ex. 11 (J. Gottschall Order in *Rivera*) ("Experts frequently opine on a hypothetical set of facts. An expert might, for instance, assume, as one set of witnesses testified, that a stoplight was green and offer an opinion in that scenario. So long as a reasonable jury could believe the witnesses who say the light was green (a genuine dispute exists), that is not a methodology problem.") (citing *Gopalratnam*, 877 F.3d at 780; *Smith*, 215 F.3d at 718).

And last, not only was Brasfield allowed to opine based on the charts provided to him, in both cases the charts were themselves admitted into evidence as a summary of voluminous data.

24

Ex. 16 (Brasfield Testimony in *Fields*) at 2512; Ex. 17(Brasfield Testimony in *Rivera*) at 2207-2208. The Rules of Evidence allow summary evidence that accurately summarizes those documents. *See United States v. Janati,* 374 F.3d 263, 273 (4th Cir. 2004); Fed. R. Evid. 1006 (only requiring that the underlying evidence be "available for examination or copying, or both, by other parties at a reasonable time and place," or be subject to production in court upon order). The City does not explain why this legal support, and its application in *Fields* and *Rivera*, does not apply equally here.

From there, it hardly strains credulity to understand the basic counting exercise at issue in Tiderington's (and Brasfield's) opinions. In the analysis at issue, Tiderington assessed whether the hundreds of 1991-1995 and 1995-1998 homicide files contained objective markers of whether the Special Orders CPD put in place after *Jones* and *Palmer* were being followed, or if instead the prior widespread practice of evidence suppression continued unabated.

For example, the new Special Orders required CPD to place an inventory sheet in the investigative files listing all of the documents created during the course of the police investigation, which theoretically would then be disclosed to the prosecution and defense so they could confirm whether everything the police had produced during investigations had been turned over to them. Dkt. 500-2 at 50. So, if an investigative file did not have an inventory sheet, this would be contrary to the CPD policy. Deciphering whether a file has an inventory is an objective, mechanical exercise: look at an investigative file to see if it contains the inventory sheet. This rote exercise was thus conducted by Sierra's counsel, and coded as either "Yes" or "No" in a column in the spreadsheet entitled "Includes Investigative File Inventory?" Dkt. 500-5. Tiderington's analysis of this data, finding that 115 investigative files from 1991-1995, or 24%, and 57 investigative files

from 1995-1998, or 17%, contained no inventory sheet, Dkt. 500-2 at 57, was a simple counting exercise: add up the number of "No" in Attachments F and G. *E.g.*, Dkt. 500-5.

Each of the other percentages Tiderington identifies in his report followed a similar, objective process of coding conducted by Sierra's counsel. For example, the new Special Orders required handwritten notes taken as an investigation progressed to be written on official CPD forms called General Progress Reports, because historically detectives took notes on their own notepads and then refused to maintain or disclose them because they were "personal." Dkt. 500-2 at 42, 46. Trifling as it may seem, this was a critical requirement to address a historical problem of evidence suppression. Dkt. 500-2 at 46 (detectives responded to Judge Shadur's orders in *Palmer* regarding evidence suppression in an "improperly restrictive and grudging manner" where detectives continued to "consider their investigative writings as their personal property . . . and therefore outside the preservation requirements"). Again, it was a simple, mechanical exercise to answer "Yes" or "No" to the question whether the investigative files contained handwritten notes (column entitled "Are there any handwritten notes?"), and if so whether they were taken on the proper CPD forms, the general progress reports (column entitled "Are there handwritten notes in the file not on GPRs?"). Dkt. 500-65. The same is true of Tiderington's analysis of whether detectives continued to send each other "to-from memos" in unofficial ways, rather than on the CPD General Progress Report forms required by the new policies, Dkt. 500-2 at 46-47 (explaining why it was critical): it was based on the objective, mechanical, "Yes"-"No" exercise reflected in the chart of homicide file data (in column entitled, "Are there to-from memos in the file not on GPRs?"). Dkt. 500-5.

The City's breathlessness about Tiderington's reliance on a chart provided by Sierra's counsel, and about how Tiderington could have possibly obtained the percentages used on pages 56-57 of his report, is misplaced. *See* Ex. 11 (J. Gottschall Order in *Rivera*) (rejecting City's effort

to bar another of Rivera's *Monell* experts for relying on a chart provided by counsel where the data being coded—the results of lineups—"borders on the mechanical"). All that was left, then, was for Tiderington to apply his knowledge and experience as a police practices expert to offer opinions based on the results from the data in the charts, which he did. That his conclusions were consistent with the findings of Brasfield, based on the same exercise, lends further support for the foundation and reliability of Tiderington's methodology.

Finally, the City points to the fact that Tiderington spot-checked the information in the chart provided to him by Plaintiff's counsel. Dkt. 500 at 11-12. But this is not a basis to bar his opinions; rather, it supports their admissibility. The City cites to a passage in which Tiderington states that he spot-checked 30 to 40 cases, which itself is sufficient evidence that he was not blindly relying on data provided by Plaintiff. But the City's citation selectively ignores that Tiderington reviewed far more of the files as part of a robust process of understanding and verifying the accuracy of the information in the charts. Dkt. 500-3 at 401:10-402:7, 404:3-20, 406:1-18, 514:2-11, 601:11-603:8; *cf.* id. at 385:4-17. These efforts by Tiderington make this case distinguishable from the cases the City cites, because by the City's own admission they involved cases in which the expert "did not independently verify" the data or offered opinions "without verifying or reviewing the underlying information." Dkt. 500 at 12.

e. *The City's challenge to the number of hours Tiderington spent reviewing materials and preparing his* Monell *opinions goes to the weight of his opinions, but is not a basis to bar them*

The City claims that Tiderington did not bill enough hours for there to be sufficient foundation for his opinions. Dkt. 500 at 12-14. On its face, this is classic cross-examination. It is not a basis to disregard the ample evidentiary record Tiderington relied on to form his opinions, and his detailed discussion in his report and depositions about how that evidentiary record supports his conclusions.

27

For context, the first case in which Tiderington offered his *Monell* opinions about the City's policies and practices related to the documentation and disclosure of investigative information was *Reyes/Solache*. Dkt. 500-4. He then offered that same *Monell* opinions in this case, based on the analysis of additional files from 1991-1995, and he has repeated that analysis based on the same data in subsequent cases involving Defendant Guevara. So, his *Monell* opinions in this case were based on the hours he spent reviewing materials in both *Reyes/Solache*, and then in this case. The City is intimately familiar with this history, and so its focus on exclusively the hours billed in this case is deliberately misleading.

In fact, in addition to the 65.75 hours Tiderington billed in this case, he had already billed an additional 78 hours in *Reyes/Solache*, while also working an additional 40 to 50 hours in that case that he did not bill for. Dkt. 500-3 at 362:11-363:2. So, in total, Tiderington's report in this case is based on 143.75 billed hours, *and closer to 200 total hours of review*. The City's argument apparently is that, rather than allow a jury to decide what weight to give Tiderington's opinions based on this line of attack, the Court should simply wave a wand and conclude that this is not enough hours and exclude his opinions entirely. Such a request is nonsensical, it is unsupported in any caselaw, and it should be rejected. In fact, Tiderington's hours are entirely consistent with Brasfield, who billed 60 total hours to reviewing materials and preparing his report in *Fields*. Ex. 18 (Brasfield invoice in *Fields*).

The City's argument is also highly hypocritical. The City hired an expert, Bernard Murray, to rebut Mr. Tiderington's *Monell* opinions in this case. *Mr. Murray billed 32 total hours*. Ex. 19 (Murray invoice in *Sierra*); Ex. 15 (Deposition of Bernard Murray) at 102.[11] The City's expert thus spent a fraction of the hours that Sierra's expert spent arriving at opinions on the same subjects.

---

[11] In *Reyes/Solache*, Murray billed 41 total hours up to the time of his deposition, which included not only his time reviewing materials and drafting his report, but also preparing for his deposition. Ex. 20

The City also claims that given the volume of material, Tiderington must not have looked at every document completely. Tiderington openly concedes he did not review every page of every document, but that does not impugn his opinions in any way. Tiderington acknowledges that for many of the 1991-1995 and 1995-1998 homicide files, his purpose was to spot check them and verify the accuracy of the information in Attachments F and G, not to master every file.[12] The goal of Tiderington's study was draw conclusions based on a broad set of data drawn from files, not to understand the narrative in each and every file. And just as an experienced lawyer can skim a deposition transcript to find relevant excerpts, and an experienced doctor can quickly review a long medical chart for pertinent information, so too can an expert work efficiently to identify the information within police files and other material that is relevant to his opinions. Indeed, the City's own experts *openly admit they, too, did not review every document in their materials reviewed, or read every page of the documents they received*. Ex. 14 (Deposition of John Wixted) at 43 (he did not read "every page of everything he was given" and that he was just reading for important information), 260-63 (regarding Dr. Steblay's *Monell* opinions based on lineup data from same investigative files, admitting that as part of his rebuttal he did not look at any of the homicide files underlying the opinions at issue); Ex. 15 (Deposition of Bernard Murray) at 40 (admitting he did not "read every single page" of even the critical file in this case, the Andujar homicide file), 59 (he did not review Special Order 83-1, one of the documents in his materials reviewed, and the very documentation and disclosure policy he was retained to opine about), 112-13 (asserting that he could reliably offer opinions about CPD's disclosure practices without having reviewed all of the

---

(Murray Deposition in *Reyes/Solache)*, at 20-21. This is also substantially less than the total hours Tiderington spent in that case.

[12]    The City makes much of Tiderington's unremarkable admission that it would have been "humanly impossible" to master all of the homicide files he reviewed. Dkt. 500 at 14. But that was not his purpose, nor was it necessary in order to offer the opinion that he does about certain documentation and disclosure practices of CPD.

available materials). This is not some gotcha Sierra intends to exploit to bar Defendants' experts at the motion *in limine* stage, because to do so would defy common sense, and promote a standard for expert review that would be a tremendous financial burden to every attorney retaining an expert, especially in cases involving voluminous records. Instead, Sierra uses this illustration to outline the frivolous nature of the City's objection: Experts in litigation, as in any field, can and should work efficiently through the material provided to identify the key information they need to form their opinions.

Ultimately, the City's argument is not actually a methodological challenge to Tiderington's opinions, and it is certainly not one that justifies barring his opinions. It is again the stuff of cross-examination. If the City thinks it can persuade a jury that Tiderington's opinions are not based on a sufficient investment of effort (despite that several of its experts billed in the same range or less), it can confront him with those arguments on the stand and the jury will assess what weight to give his opinions.

## III.     The City's "Methodology" Challenges

The City next turns to what it calls "methodology" challenges to Tiderington's opinions, but it is not clear in what way they are different from the "foundation" challenges above. Regardless, they suffer from the same flaws, are equally meritless, and should be rejected.

### a.  *The redactions in the criminal defense files do not render Tiderington's opinions unreliable*

The City takes issue with Tiderington's opinions on pages 64-68 of his report, related to his comparison of investigative files to criminal defense files for the 1995-1998 period.[13] Its argument is two-fold: (1) that Mr. Tiderington's reliance on criminal defense files is fatally flawed

---

[13] By its own admission, the City's argument does not apply to the additional examples of nondisclosure Mr. Tiderington discusses on pages 69-73 of his report.

because such files are not a reliable indicator of what was contained in the criminal defense files at the time of trial; and (2) Mr. Tiderington should have looked at the Cook County Attorney's Office ("CCSAO") files instead.

Once again, these are the exact same arguments the City tried in *Fields* and *Rivera*. Ex. 8 (City's MIL in *Fields*) at 4-5 (arguing, among other things, that Brasfield's reliance on criminal defense files was flawed because they could not reliably be used for comparison), 5-10, 11-15 (Brasfield improperly relied on criminal defense files, instead of CCSAO files); Ex. 9 (City's SJ Motion in *Rivera*) at 15-17 (*Daubert* challenge to Brasfield's Opinions, based on same arguments). Both courts rejected the City's arguments and permitted Brasfield to testify about his comparison of investigative files and criminal defense files. Ex. 10 (J. Kennelly's MIL Order in *Fields*) at 2 (rejecting both of the City's arguments as "sufficiency of the evidence" best addressed through "cross-examination, presentation of contrary evidence, and argument"), 3-4; Ex. 11 (J. Gottschall's SJ Order in *Rivera*) at 87 (same: possibility that criminal defense files incomplete, or that they could be found in CCSAO files, "provide ammunition on cross-examination").

 Judge Kennelly's decision in *Fields* Ex. 10 (J. Kennelly's MIL Order in *Fields)* at 3 succinctly explained why the City's argument here should be rejected:

> Defendant's first argument is . . . that it is inappropriate or insufficient for purposes of plaintiff's *Monell* claim to compare documents in the possession of police department with documents in the files of criminal defense counsel. Though defendants couch this argument as a challenge to the reliability of Brasfield's methodology, it is actually a challenge to the sufficiency of Brasfield's testimony to prove plaintiff's *Monell* claim. There is nothing deficient about Brasfield's methodology; he has compared what the police had to what is found in criminal defense counsels' files and has identified what is missing from the latter. Brasfield's testimony does not purport to be, and does not need to be, the entirety of the evidence plaintiff is offering on his *Monell* claim. . . . In addition, the fact that there may be multiple explanations for why documents are missing from defense attorneys' files is not a basis to exclude Brasfield's testimony on this topic. Rather, it is a basis for cross-examination and presentation of contrary, explanatory, or clarifying evidence.

The City offers no basis to reach a different conclusion here. In fact, it does not even provide the Court a citation to this decision.

The City's arguments about redactions in the Public Defender files are just another flavor of the same arguments made in *Fields* and *Rivera* about the sufficiency of those files for comparison purposes, appropriately addressed through cross-examination.[14] At the end of the day, Plaintiff's argument is simple: the best evidence of what was in the criminal defense files at the time of trial is what is in the criminal defense files today. Combined with the ample other evidence of nondisclosure Plaintiff will present at trial (both through Tiderington, and through many other means including underlying police files themselves, the testimony of the City's 30(b)(6) designees, and others), there is more than enough evidence from which a jury can conclude that the City had a widespread practice of failing to disclose investigative information to criminal defendants. *See Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 372 F. Supp. 2d 1104, 1119 (N.D. Ill. 2005) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect only the weight to be assigned that opinion rather than its admissibility."); *Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *10 (N.D. Ill. Sept. 30, 2022).

---

[14]  The redactions in the Public Defender files are, of course, redactions to remove attorney work product. There is no evidence that the Public Defender redacted police reports or any other investigative information from CPD documents it received. Furthermore, as Mr. Tiderington testified, Plaintiff's counsel directed him to assume for purposes of his opinions that the redactions were limited to work product privilege. Dkt. 500-3 at 611:11-612:1. An expert may rely on such assumptions consistent with Rule 26(b)(4)(iii). See, e.g., Ex. 11 (J. Gottschall SJ Order in *Rivera*) at 76-77 (citing *See Gopalratnam*, 877 F.3d at 780; *Smith*, 215 F.3d at 718 (citing *Daubert*, 509 U.S. at 595 and *Walker*, 208 F.3d at 587, 589. If the City developed evidence undermining the assumption Mr. Tiderington relied on—and it has not identified any in its depositions of Mr. Tiderington or in the report of its rebuttal expert, Bernard Murray—it can cross-examine Mr. Tiderington on such evidence and convince the jury that his file comparison opinions should be disregarded.

For its part, the City has its own expert, Bernard Murray, through whom it intends to introduce all of its criticisms of Tiderington's file comparison analysis. To the extent those criticisms are admissible, the jury will ultimately decide which expert to credit. To that end, at the trials in *Fields* and *Rivera*, Brasfield was permitted to present his findings from the comparison of inventory files to available Public Defender files. Ex. 17 (Brasfield Testimony in *Fields*) at 2509-2511; Ex. 16 (Brasfield Testimony in *Rivera*) at 2223-2226. The City was permitted to vigorously cross-examine Brasfield on its view that the criminal defense files he used for comparison were incomplete, and that he should have analyzed prosecutor files instead, *id.* at 2276-2309, and it was permitted to present its own expert— in fact, the same expert, Mr. Murray—to buttress those arguments. The same thing should happen here. Like *Fields* and *Rivera*, none of the City's arguments justifies barring Tiderington's file comparison opinions.

> b. *Tiderington's opinion that CPD's policies were not being followed are based on the large dataset he reviewed, just as Brasfield did in Fields and Rivera*

The City's argument in Part II.b is essentially a re-hash of the "foundation" arguments in Part I(d) of the City's Motion, criticizing Tiderington's opinions based on the percentage of homicide files that contain clear instances in which detectives failed to follow the Special Orders. *Compare* Dkt. 500 at 11-12 *with id.* at 18-21 (both criticizing use of percentages taken from homicide file charts in Attachment F and G). It should be rejected for the same reasons. *Supra* pp. 22-27.

Again, the analysis contained in this section of Tiderington's report is straightforward: after *Jones* and *Palmer*, to address the problems identified during that litigation, the City put in place new Special Orders with particular requirements. Dkt. 500-2 at 46-50, 56-57; *supra* at pp. 12-16. Whether these requirements were implemented in a way that addressed the historical failures in

CPD's practices can be readily ascertained by simply leafing through an investigative file to see, for example, if it contains an inventory sheet, and to see if handwritten notes and to-from memos are taken on GPRs. This rote exercise is captured in "Yes/No" columns in Attachments F and G, which Mr. Tiderington explained and discussed at length in his report and his deposition. *Supra* at pp. 22-27. The percentages cited in Mr. Tiderington's report do not require, as the City claims, "the tedious and time-consuming task" of sifting through "8,432 separate lines of data" in the Solache/Reyes chart and "9,722 lines of data" in the Sierra chart. Dkt. 500 at 19. It requires counting up the number of "Yes" versus "No" in three columns of each spreadsheet. It is not a complicated, subjective, or time-consuming task. As discussed already, there is nothing improper about Tiderington's reliance on charts provided by Plaintiff's counsel to assist in his analysis, especially given the objective, mechanical exercise of coding the information in the spreadsheets, and Tiderington's substantial review and spot-checking of files to verify their accuracy and value for use in his analysis. *Supra* at pp. 20, 21, 27.

The only new argument presented in this section of the City's brief is that the charts at Attachment F and G are "inconsistent and unverified." Dkt. 500 at 19-20. In support, the City identifies just a single inconsistency or error. In other words, for all its handwringing about the "foundational" and "methodology" problems in the charts Tiderington relied on, *it found a single error in a single cell of coding among thousands of cells for over 800 investigative files*. The City had all the same homicide files at its disposal; if the chart Tiderington relied on was rife with errors, the City and its experts could have easily pointed it out. That after more than two years with these files it can identify only a single issue with the coding across the two charts, is a testament to the veracity of the data Tiderington relied on and the lack of merit in the City's "foundation" attacks.

34

In any event, the single error the City cites—even if it had been several dozen more—provides no basis to bar Mr. Tiderington's opinions. Ex. 7 (J. Kendall SJ Order in *Hood*) (errors in "factual underpinnings" are properly "subject to counter-attack," not barring expert's opinions) (citing *Walker, 208 F.3d at 586; Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000)); *Zivitz v. Greenburg*, No. 98 C 5350, 1999 WL 1129605, at *2 (N.D. Ill. Dec. 3, 1999) (denying motion to bar expert testimony and spreadsheet summarizing trading reports where defendant "fail[ed] to demonstrate any fundamentally improper analytical methods upon which [plaintiff's expert] bases her report and testimony" and where competing expert had all the underlying data and found discrepancies in the data, concluding that "[e]rrors in data [plaintiff's expert] relied on in forming her opinion affect the weight of her testimony, not its admissibility"); *Cent. States, Se. & Sw. Areas Pension Fund v. Transp. Serv. Co.*, No. 00 C 6181, 2009 WL 424145, at *4 (N.D. Ill. Feb. 17, 2009) ("But plaintiffs' inadvertently omitting some data when merging hundreds of thousands of data fields is understandable. They have acted diligently to provide the court with the most accurate data possible. The possibility that a summary might be inaccurate affects the weight given to the evidence, not its admissibility.") (Citing Weinstein at § 1006.07[1]).

Put simply, the City's incredulity about Tiderington's analysis is misplaced. Just as in *Fields* and *Rivera*, Tiderington should be permitted to present his opinions at trial, subject to any criticisms the City seeks to present through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596; *see Stollings*, 725 F.3d at 766 (same). But the City's mischaracterization of Tiderington's analysis is certainly not a basis to bar his opinions.

### IV. The City's Argument That Mr. Tiderington's Opinions Will Not Be Helpful to the Jury Are Meritless

The City frames this section (Dkt. 500 at 21-24) as one about whether Mr. Tiderington's opinions will be helpful to the jury, but it simply repeats all the arguments made throughout the rest of its brief.[15] They should be rejected for all the same reasons.

In addition, the City's arguments that Plaintiff cannot show a causal connection between Tiderington's opinions and the misconduct that occurred in this case are the sort of causation issues that should be addressed by a jury based on the evidence presented, not by the Court at summary judgment. *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017) ("As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury."); see also *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 648 (7th Cir. 2016) (holding that at summary judgment "a plaintiff need only produce evidence sufficient to *potentially* persuade *any* reasonable jury"). And similarly, this argument can be easily dispensed with because it is not a *Daubert* challenge at all, but instead one based on Rule 403 (as Defendants concede, Dkt. 500 at 21, 23), and accordingly it is an argument for pre-trial motions *in limine*.

To the extent the Court considers the City's argument that there is no connection between Tiderington's opinions and the alleged misconduct in this case, nothing could be further from the truth. His opinions are all about the failure of City's policies to ensure that information learned during an investigation was properly documented and included in CPD's homicide files, and then disclosed to the criminal justice system, and its widespread practice of suppressive investigative

---

[15] It argues that his opinions about *Jones* and *Palmer* are erroneous and inadmissible (Dkt. 500 at 22), *see* response at Section II.2, *supra*; that his opinions about the failure to document and disclose documents contained in the homicide files is speculative and unsupported (Dkt. 500 at 22-23), *see* response at Sections II.c, II.d and III.a, *supra*; and that his comparison of investigative files to criminal defense files cannot provide evidence of any nondisclosure (Dkt. 500 at 23), *see* response at Section III.a, *supra*.

36

information learned during homicide investigations. *See* Section II.d at pp. 21-22, *supra* (discussion of bases for Tiderington's opinions about widespread practice of failing to document information learned during investigations). Plaintiff has developed substantial evidence that the City both failed to document investigative information learned during the Andujar investigation that would have been exculpatory for Sierra, and that particular documents that were created during the course of the investigation were not disclosed to the defense.

Examples from the Andujar investigation of information the Defendants learned but did not document in any police records and disclose to Sierra include, *inter alia*, the following:

- Melendez told Defendants he could not identify the shooter.
- Melendez told Defendants that Hector Montanez's car was *not* the one used in the shooting.
- Alberto Rodriguez told Defendants that there were differences between Hector's car and the one used in the shooting.
- Alberto Rodriguez took 5 to 10 minutes to make an identification.
- Hector Montanez denied any involvement in the crime, and any knowledge of Plaintiff being involved in the crime.
- Lucy Montalvo told Defendants that Plaintiff usually came over to her house at a time that was before the shooting occurred.

*See* Plaintiff's Affirmative Statement of Facts In Support of His Response to Defendants' Motions for Summary Judgment (PSOF) ¶¶46-50, 54-67, 114-117, 155-158, 202. As Tiderington discussed in his report, the Andujar investigation contained evidence of many of the same problems he observed in his review of CPD homicide files, including a complete lack of any handwritten notes taken by detectives, despite numerous substantive interviews of witnesses and suspects. In addition, many suspects were interviewed multiple times, but the homicide files do not contain documentation of many of those interviews. Dkt. 500-2 at 74-75.

In addition to these examples from the Andujar investigation that are directly connected to Tiderington's *Monell* opinions, Plaintiff has also adduced evidence that the CPD created and did not disclose documents that would have undermined the Defendant Officers' entire false theory of

how Sierra became a suspect in this case—his supposed connection to a car driven by Hector Montanez and seen at Esther Reyes's house.[16] That document was not disclosed to Sierra, and was found during this civil case in a file from another investigation. Dkt. 500-2 at 75-76; See Plaintiff's Affirmative Statement of Facts In Support of His Response to Defendants' Motions for Summary Judgment (PSOF) ¶¶180-184, 189. There is ample basis for a jury to conclude that the failure to document and disclose investigative information in the Andujar investigation that was critical to Sierra's defense at trial was caused by the City's official policy of evidence suppression analyzed in Tiderington's report.

Finally, the City's argument that Tiderington's opinions are unhelpful to the jury suffers from the same problem that permeates its entire *Daubert* motion: the same opinions were admitted in *Fields* and *Rivera*, two wrongful conviction cases also centered around the fabrication and suppression of evidence related to purported eyewitness identifications. Yet, the City makes no mention of those cases, and no effort to explain why a different result is appropriate here.

## CONCLUSION

For all of the reasons set forth above, the City's motion to bar the opinions of Thomas Tiderington should be denied.

Respectfully submitted,

/s/ Anand Swaminathan
*One of Plaintiff's Attorneys*

---

[16] The importance of the document is discussed at length in Tiderington's report. Dkt. 500-2 at 30-33, 75-76. In sum, the report was authored by Defendants Guevara and Halvorsen, and claimed that they spoke to an Officer Malczyk, who had spoken to witnesses at the scene of the Ruben Gonzalez shooting, which had occurred three days before the Andujar shooting. According to Guevara and Halvorsen's report, Officer Malczyk told them that when he spoke to the witnesses at the scene, they described a car matching Hector Montanez's car, thus connecting Sierra to the Gonzalez shooting, and the victim's mother, Esther Reyes. *Id.* But Officer Malczyk has testified that Defendant Guevara and Halvorsen's report is completely false, and contrary to the statement Officer Malczyk gave to the detectives immediately after that earlier shooting. *Id.*

38

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Meg Gould
**LOEVY & LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
anand@loevy.com