**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS SIERRA, | ) | |
| | ) | No. 18 C 3029 |
| *Plaintiff*, | ) | |
| | ) | Hon. John Robert Blakey, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | |
| | ) | JURY TRIAL DEMANDED |
| *Defendants*. | ) | |

**PLAINTIFF THOMAS SIERRA'S CONSOLIDATED RESPONSE
IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTIONS**

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Meg Gould
Wallace Hilke
Ruth Brown
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. vii

INTRODUCTION ............................................................................................................... 1

SUMMARY OF DISPUTED MATERIAL FACTS ............................................................ 2

    I.      SIERRA IS INNOCENT OF THE ANDUJAR MURDER ........................................... 3

    II.    WITNESSES MELENDEZ AND RODRIGUEZ DID NOT SEE AND COULD NOT IDENTIFY THE PERPETRATOR ......................................................... 3

    III.   DEFENDANTS INTERROGATE HECTOR MONTANEZ, EXTRACT A FALSE STORY, AND MAKE SIERRA A SUSPECT ........................ 4

    IV.   DEFENDANTS FRAME SIERRA IN A SINGLE SHIFT ON MAY 30 .................................................................................................................... 5

    V.    SIERRA IS PROSECUTED AND CONVICTED .......................................................... 6

    VI.   THE CITY OF CHICAGO'S OFFICIAL POLICIES CAUSED SIERRA'S WRONGFUL CONVICTION ................................................................. 7

    VII.   SIERRA FIGHTS TO PROVE HIS INNOCENCE AND IS EXONERATED ....................................................................................................... 8

    VIII.  DEFENDANTS AND RODRIGUEZ REFUSE TO TESTIFY IN THIS CIVIL CASE ...................................................................................................... 8

    IX.   TODAY, NO EVIDENCE SUPPORTS DEFENDANTS' ACCOUNT ....................... 9

ARGUMENT ....................................................................................................................... 10

    I.      DEFENDANTS CONCEDE AND DO NOT CHALLENGE THAT MANY OF SIERRA'S CLAIMS REQUIRE A TRIAL .............................................. 11

    II.    SEVENTH CIRCUIT LAW DICTATES THAT THIS COURT SHOULD NOT PARSE SUB-THEORIES OF LIABILITY AT SUMMARY JUDGMENT IN A FAIR TRIAL CASE ............................................. 14

    III.   SUMMARY JUDGMENT IS UNAVAILABLE TO GUEVARA AND HALVORSEN IN LIGHT OF THEIR INVOCATION OF THE FIFTH AMENDMENT ............................................................................................. 15

          A. Guevara and Halvorsen Cannot Meet Their Initial Burden of Production At Summary Judgment ........................................................................ 16

          B. Guevara and Halvorsen Cannot Meet Their Burden of Persuasion At Summary Judgment ........................................................................ 18

          C. Requiring More Evidence In Addition to the Assertion of Fifth Amendment Rights Before Denying Summary Judgment Is Contrary to Law ............................................................................................. 20

i

D. Guevara and Halvorsen Cannot Assert Their Fifth Amendment Rights and Then Obtain Summary Judgment Given Other Evidence in the Record ........................................................................ 21

IV. SUMMARY JUDGMENT IS UNAVAILABLE TO THE DEFENDANT OFFICERS ..................................................................... 22

A. Defendants Cannot Rely on Rodriguez's Past Testimony At Summary Judgment, Given Rodriguez's Refusal to Testify In This Civil Case ......................................................................... 24

B. A Reasonable Jury Could Conclude That Defendants Fabricated False Evidence ........................................................................ 26

1. Defendants Guevara, Halvorsen, Wojcik, McMurray, Biebel, and Mingey Fabricated Melendez's Identifications ..................... 29

2. Rodriguez's Identification of Sierra and the Car Were Fabricated ....................................................................... 31

3. Defendants' Fabrications Were Used to Deprive Sierra of His Liberty ...................................................................... 34

C. Independently, A Reasonable Jury Could Conclude That Defendants Suppressed Material Exculpatory and Impeachment Evidence ........................................................................ 39

1. Defendants Suppressed Their Own Fabrications ............................ 41

(a) Defendants' Position That Suppressions of Fabricated Evidence Cannot Violate Due Process Is Wrong ...................... 42

(b) *Gauger*'s Rule Regarding Suppressions Relating to False Confessions Cannot Apply To This Case ........................ 44

(c) Defendants' Suppressions of Their Fabrications Were Material to Sierra's Criminal Prosecution ............................. 47

2. Defendants Suppressed Exculpatory and Impeachment Evidence Independent of Their Fabrications .............................. 49

(a) Defendants Suppressed That the Eyewitnesses Did Not See the Shooter ............................................................. 49

(b) Defendants Suppressed That Sierra Was Their Suspect Before Any Identification .................................................. 50

(c) Defendants Suppressed Their Interactions with Melendez ..................................................................... 51

(d) Defendants Suppressed Their Interactions with Rodriguez ..................................................................... 51

**TABLE OF CONTENTS (cont.)**

Page

(e) Defendants Suppressed Montanez's Denials and the Tactics They Used to Obtain Montanez's False Statement ........................................................................52

(f) Defendants Suppressed Montalvo's Potential Alibi Evidence and That They Manufactured Her False Statement ........................................................................53

(g) Defendants Suppressed Exculpatory Police Documents ...........................55

(h) Defendants Suppressed Their Pattern of Misconduct ...............................56

3. Defendants' Remaining Arguments Regarding Suppression and Reasonable Diligence Fail ........................................................................57

(a) The Melendez Evidence Was Suppressed ...............................58

(b) The Rodriguez Evidence Was Suppressed and Not Discoverable Through the Exercise of Reasonable Diligence ........................................................................60

(c) The Montanez Evidence Was Not Discoverable Through the Exercise of Reasonable Diligence ...............................64

D. Independently, A Reasonable Jury Could Conclude That Defendants Utilized Unduly Suggestive Lineup Procedures That Tainted Sierra's Criminal Trial ........................................................................67

1. Unduly Suggestive Identification Procedures That Taint A Criminal Case Violate Due Process and Are Actionable Under § 1983 ........................................................................67

(a) The Seventh Circuit Recognizes This Type of § 1983 Claim ........................................................................67

(b) *Vega* Does Not Affect This Type of § 1983 Claim ...............................68

2. Defendants Used Unduly Suggestive Identification Procedures That Tainted Sierra's Criminal Case and Violated His Right to Due Process ........................................................................71

(a) The Identification Procedures Were Unduly Suggestive ...............................71

(b) Rodriguez's Identifications Were Not Reliable ...............................74

(c) The Identifications Tainted Sierra's Criminal Proceedings ........................................................................77

(d) Defendants' Arguments for Summary Judgment on the Unduly Suggestive Lineup Theory Lack Merit ...............................79

3. Defendants Are Not Entitled To Qualified Immunity on This Theory ........................................................................80

**TABLE OF CONTENTS (cont.)**

**Page**

    E.  A Jury Must Decide Sierra's Fourth Amendment Illegal Seizure and State Law Malicious Prosecution Claims ...................81

       1.  Defendants Lacked Probable Cause to Prosecute Sierra ...............82

       2.  Defendant Caused Sierra's Wrongful Prosecution and Conviction for Purposes of § 1983 ...................84

         (a) Defendants Misunderstand Federal Causation Rules ...................84

         (b) Defendants Commenced and Continued A Criminal Proceeding Under Illinois Law ...................89

    F.  Defendants Wojcik, Figueroa, Biebel, and Mingey Participated In the Misconduct and Are Not Entitled to Summary Judgment ...................90

    G.  A Jury Must Decide the Failure-To-Intervene Claims ...................94

    H.  A Jury Must Decide Sierra State-Law Claim of Intentional Infliction of Emotional Distress ...................96

    K.  A Jury Must Decide the Section 1983 Conspiracy Claims ...................96

    I.  A Jury Must Decide the State Law Negligence Claim ...................101

V.  SUMMARY JUDGMENT IS UNAVAILABLE TO THE CITY OF CHICAGO ...................102

    A.  The City Misstates the Legal Framework Governing *Monell* Claims ...................105

    B.  The City Does Not Move for Summary Judgment On A Number of Sierra's *Monell* Theories, and So A *Monell* Trial Will Occur No Matter What ...................106

    C.  The City Is Precluded from Relitigating Its Official Policy of Evidence Suppression ...................110

    D.  The City Does Not and Cannot Challenge Sierra's *Monell* Theory That City Policymakers Promulgated Policies That Were Deficient to Stop Evidence Suppression ...................110

    E.  A Jury Must Decide the *Monell* Theory Regarding the City's Widespread Practice of Evidence Suppression ...................111

       1.  The City's False Premise Regarding Expert Evidence ...................111

       2.  The City Invokes the Wrong Legal Standard for Widespread Practice Claims ...................111

       3.  The City Has Already Lost the Widespread Practice of Evidence Suppression Theory Multiple Times, Which Makes Its Argument for Summary Judgment Frivolous ...................113

**TABLE OF CONTENTS (cont.)**

**Page**

    4. Non-Expert Evidence Establishing the City's Evidence Suppression Practice ................................................................... 114

    5. Expert Evidence Demonstrating the City's Evidence Suppression Practice ................................................................... 119

    6. The City's Arguments for Summary Judgment on the File Suppression *Monell* Theory Lack Merit ............................................ 121

        (a) The City's Causation-Related Arguments Lack Merit ............................ 121

        (b) The City's Arguments Challenging Mr. Tiderington Lack Merit ................................................................... 123

F. A Jury Must Decide the *Monell* Theory Regarding the City's Failure to Train, Supervise, and Discipline Its Police Officers ............................ 126

    1. Non-Expert and Expert Evidence Supports the Failure to Train, Supervise, and Discipline Theory ........................................ 127

    2. The City's Arguments for Summary Judgment on the Failure to Train, Supervise, and Discipline *Monell* Theory Lack Merit ................................................................... 141

        (a) The City's Reiterated Arguments Regarding Mr. Finnell Lack Merit and Do Not Justify Summary Judgment ............................ 141

        (b) The City's Argument About Burge Evidence Lacks Merit ................................................................... 142

        (c) The City's Argument About Lawsuits Against Officers Lacks Merit ................................................................... 144

        (d) The City's Argument About Complaint Register Files Lacks Merit ................................................................... 145

G. A Jury Must Decide the *Monell* Theory Regarding the City's Widespread Practice of Fabricating Witness Identifications Using Suggestive Identification Procedures ........................................ 146

    1. Non-Expert Evidence Supporting the Widespread Practice of Fabricating Identifications ................................................ 147

    2. Expert Evidence Supporting the Widespread Practice of Fabricating Identifications ................................................ 150

    3. The City's Arguments for Summary Judgment on the Fabricated Identification *Monell* Theory Lack Merit ................................ 155

H. The City's Remaining Arguments for Summary Judgment on the *Monell* Claims Lack Merit ................................................................... 158

**TABLE OF CONTENTS (cont.)**

**Page**

    1. The City's Liability Does Not Necessarily Depend on Individual Liability .................................................................. 158

    2. The City's Causation Argument Is Meritless ............................... 159

I. The *Respondeat Superior* and Indemnification Claims Survive Summary Judgment ...................................................................... 161

CONCLUSION ........................................................................................... 161

## TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Adams v. City of Chicago,*
No. 06 C 4856, 2013 WL 12324659 (N.D. Ill. Sept. 5, 2013) ...............................................25

*Adickes v. S.H. Kress & Co.,*
398 U.S. 144 (1970) ...............................................................................................*passim*

*Alexander v. City of South Bend,*
433 F.3d 550 (2006) ......................................................................67, 70, 71, 78

*Alexander v. United States,*
721 F.3d 418 (7th Cir. 2013) ...............................................................82, 89

*Allen v. Berger,*
784 N.E.2d 367 (Ill. App. Ct. 2002) .......................................................89, 90

*Anderson v. City of Rockford,*
932 F.3d 494 (7th Cir. 2019) ..............................................................35, 53, 58

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ...........................................................................................10

*Armstrong v. Daily,*
786 F.3d 529 (7th Cir. 2015) ...............................................................56, 100

*Avery v. City of Milwaukee,*
847 F.3d 433 (7th Cir. 2017) ...............................................................*passim*

*Banks v. Dretke,*
540 U.S. 668 (2004) ..........................................................................58, 61, 65

*Barker v. Int'l Union of Operating Engineers Loc. 150,*
2011 WL 6338800 (N.D. Ill. Dec. 19, 2011) .........................................25

*Baxter v. Palmigiano,*
425 U.S. 308 (1976) ..........................................................................................18, 19

*Beam v. IPCO Corp.,*
838 F.2d 242 (7th Cir. 1988) ...............................................................114

*Beaman v. Freesmeyer,*
183 N.E.3d 767 (Ill. 2021)...............................................................89

# TABLE OF AUTHORITIES (cont.)

**Cases**                                                                                                  **Page(s)**

*Belangen v. Schreiber,*
    407 F.3d 34 (2d Cir. 2005) ........................................................................................18

*Bell v. City of Milwaukee,*
    746 F.2d 1205 (7th Cir. 1984) ...........................................................................97, 100

*Blackmon v. City of Chicago,*
    No. 19 CV 767, 2023 WL 7160639 (N.D. Ill. Oct. 31, 2023).................................68, 70, 72

*Blasius v. Angel Auto., Inc.,*
    839 F.3d 639 (7th Cir. 2016) .................................................................................123

*Board of Commissioners v. Brown,*
    520 U.S. 397(1997) .............................................................................................105

*Bolden v. Pesavento,*
    623 F. Supp. 3d 897 (N.D. Ill. 2022).................................................................68, 76

*Boss v. Pierce,*
    263 F.3d 734 (7th Cir. 2001) .......................................................................62, 63, 65

*Boyle v. Torres,*
    756 F. Supp. 2d 983 (N.D. Ill. Dec. 21, 2010) ......................................................89

*Brown v. City of Chicago,*
    633 F. Supp. 3d 1122 (N.D. Ill. 2022).................................................................37

*Brown v. Mississippi,*
    297 U.S. 278 (1936) .............................................................................................69

*Bryant v. Whalen,*
    759 F.Supp. 410 (N.D. Ill. 1991).........................................................................83

*Buckley v. Fitzsimmons,*
    509 U.S. 259 (1993) .............................................................................................36

*Byrd v. Brishke,*
    466 F.2d 6 (7th Cir. 1972).....................................................................................94

*Calhoun v. Ramsey,*
    408 F.3d 375 (7th Cir. 2005) .........................................................................106, 107

# TABLE OF AUTHORITIES (cont.)

**Cases**                                                                        **Page(s)**

*Camm v. Faith,*
937 F.3d 1096 (7th Cir. 2019) ...................................................... 14, 58

*Canton v. Harris,*
489 U.S. 378 (1989) ...................................................... 107, 108

*Carmichael v. Village of Palatine,*
605 F.3d 451 (7th Cir. 2010) .................................. 12, 96, 97, 108

*Cathedral of Joy Baptist Church v. Village of Hazel Crest,*
22 F.3d 713 (7th Cir. 1994) ...................................................... 61

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ...................................................... 12, 18

*Chavez v. Martinez,*
538 U.S. 760 (2003) ...................................................... 69, 70

*City of Chicago v. Reliable Truck Parts Co., Inc.,*
822 F.Supp. 1288 (N.D. Ill. 1993) ...................................................... 19

*City of Los Angeles v. Heller,*
475 U.S. 706 (1986) ...................................................... 159

*Coleman v. City of Peoria,*
925 F.3d 336 (7th Cir. 2019) ...................................................... 67, 79

*Collier v. City of Chicago,*
2015 WL 50814408, (N.D. Ill. Aug. 26, 2015) ...................................................... 83

*Costello v. Grundon,*
651 F.3d 614 (7th Cir. 2011) .................................. 13, 34, 96, 108

*Cottrell v. Clemons,*
2014 WL 3649185 (W.D. Ky. July 23, 2014) ...................................................... 60

*Crivens v. Roth,*
172 F.3d 991 (7th Cir. 1999) ...................................................... 64

*Daniel v. Cook County,*
833 F.3d 728 (7th Cir. 2016) ...................................................... 112, 122

# TABLE OF AUTHORITIES (cont.)

**Cases**                                       **Page(s)**

*Davis v. Carter,*
452 F.3d 686 (7th Cir. 2006) ................................................................. 105, 108, 113

*Dennis v. Pennsylvania Dep't of Corrections.,*
834 F.3d 263 (3d Cir. 2016) ............................................................................... 54

*Dixon v. Cook County,*
819 F.3d 343 (7th Cir. 2016) .............................................................................. 113

*Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors,*
593 F.3d 507 (7th Cir. 2010) .............................................................................. 102

*Dominguez v. Hendley,*
545 F.3d 585 (7th Cir. 2008) ............................................................................... 39

*Donald v. Outlaw,*
No. 2:17-CV-32-TLS, 2023 WL 2346270 (N.D. Ind. Mar. 3, 2023) ................... 68

*Doxtator v. O'Brien,*
39 F.4th 852 (7th Cir. 2022) ............................................................................... 95

*Engel v. Buchan,*
710 F.3d 698, 699 (7th Cir. 2013) ....................................................................... 42

*Escobedo v. Ram Shirdi,*
No. 10 C 6598, 2013 WL 1787819 (N.D. Ill. Apr. 25, 2013) ............................. 160

*Estate of Moreland v. Dieter,*
395 F.3d 747 (7th Cir. 2005) .............................................................................. 113

*Evans v. City of Chicago,*
2010 WL 3075651 (N.D. Ill. Aug. 5, 2010) ....................................................... 159

*Evans v. City of Chicago,*
2006 WL 463041 (N.D. Ill. Jan. 6, 2006) ........................................................... 108

*Ewing v. O'Brien,*
60 F. Supp. 2d 813 (N.D. Ill. 1999) ..................................................................... 89

*Exxon Co., U.S.A. v. Sofec, Inc.,*
517 U.S. 830 (1996) ............................................................................................ 86

**Cases**                                                                                      **Page(s)**

*Ezell v. City of Chicago,*
No. 18 C 1049, 2024 WL 278829 (N.D. Ill. Jan. 24, 2024) .............................................45, 68

*Fields v. Chicago,*
981 F.3d 534 (7th Cir. 2020) ...................................................................................102

*Fields v. Chicago,*
No. 10 C 1168, 2017 WL 4553411 (N.D. Ill. Oct. 12, 2017).....................................102, 103

*Fields v. City of Chicago,*
2014 WL 477394 (N.D. Ill. Feb. 6, 2014) ...................................................................55

*Fields v. Wharrie,*
672 F.3d 505 (7th Cir. 2012) .............................................................................40, 42

*Fields v. Wharrie,*
740 F.3d 1107 (7th Cir. 2014) ...........................................................................28, 87

*Fox v. Hayes,*
600 F.3d 819 (7th Cir. 2010) ...................................................................................96

*Fox v. Peters,*
2011 WL 6378826 (N.D. Ill. 2011) ...........................................................................108

*Franks v. Delaware,*
438 U.S. 154 (1978) ...............................................................................................82

*Freeman v. Brown,*
2012 WL 3777074 (N.D. Ill. Aug. 29, 2012) ...............................................................89

*Garcia v. City of Chicago,*
No. 01 C 8945, 2003 WL 1715621 (N.D. Ill. Mar. 20, 2003).......................................140

*City of Chicago, No. Gauger v. Hendle,*
349 F.3d 354 (7th Cir. 2003) ...................................................................................44

*Geinosky v. City of Chicago,*
675 F.3d 743 (7th Cir. 2012) ...................................................................................99

*Gerstein v. Pugh,*
420 U.S. 103 (1975) ...............................................................................................82

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                                                                                **Page(s)**

*Giglio v. United States,*
   405 U.S. 150 (1972) ................................................................40, 41, 47, 65, 66

*Glisson v. Ind. Dep't of Corrections,*
   849 F.3d 372 (2017) ......................................................................105, 106, 107

*Godinez v. City of Chicago,*
   No. 16-CV-07344, 2019 WL 5597190 (N.D. Ill. Oct. 30, 2019) ........................................160

*Goudy v. Cummings,*
   922 F.3d 834 (7th Cir. 2019) .......................................................................14, 40, 48

*Gray v. City of Chicago,*
   No. 18 C 2624, 2022 WL 910601 (N.D. Ill. Mar. 29, 2022)...........................................72

*Graystone Nash, Inc.,*
   25 F.3d 187 (3d Cir. 1994) .........................................................................19

*Hampton v. City of Chicago,*
   2017 WL 2985743 (N.D. Ill. July 13, 2017) ........................................63, 70, 71, 72

*Hampton v. Hanrahan,*
   600 F.2d 600 (7th Cir. 1979) ......................................................................97, 99

*Harris v. City of Chicago,*
   No. 20-CV-4521, 2020 WL 7059445 (N.D. Ill. Dec. 2, 2020) ............................................101

*Hart v. Mannina,*
   798 F.3d 578 (7th Cir. 2015) .......................................................................83

*Hemi Group, LLC v. City of New York,*
   559 U.S. 1 (2010) ..................................................................................85

*Henry v. Ramos,*
   1997 WL 610781 (N.D. Ill. Sept. 28, 1997) .........................................................96

*Hensley v. Carey,*
   818 F.2d 646 (7th Cir. 1987) .......................................................................69, 70, 81

*Holland v. City of Chicago,*
   643 F.3d 248 (7th Cir. 2011) .......................................................................39

**TABLE OF AUTHORITIES (cont.)**

**Cases**                                              **Page(s)**

*Hollins v. City of Milwaukee,*
574 F.3d 822 (7th Cir. 2009) ........................................................................ 127

*Holloway v. City of Milwaukee,*
43 F.4th 760 (7th Cir. 2022) ..................................................................... 67, 77

*Hudson v. City of Chicago,*
No. 16-CV-4452, 2019 WL 1112260 (N.D. Ill. Mar. 11, 2019) .......................... 160

*Hurt v. Wise,*
880 F.3d 831, 844 (7th Cir. 2018) .............................................................. 36, 38

In re Edmond,
934 F.2d 1304 (4th Cir. 1991) ........................................................................ 26

*J&J Sports Productions, Inc. v. Resendiz,*
2009 WL 1953154 (N.D. Ill. July 2, 2009) ....................................................... 80

*J.K.J. v. Polk County,*
960 F.3d 367 (7th Cir. 2020) ...................................................... 105, 155, 157

*Jackson v. Marion County,*
66 F.3d 151 (7th Cir. 1995) .......................................................................... 108

*Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors,*
973 N.E.2d 880 (Ill. 2012) ............................................................................ 101

*Jenkins v. Bartlett,*
487 F.3d 482 (7th Cir. 2007) ................................................ 106, 107, 108, 127

*Jimenez v. City of Chicago,*
830 F. Supp. 2d 432 (N.D. Ill. 2011) ........................................................ *passim*

*Johnson v. City of Chicago,*
No. 05 C 6545, 2009 WL 1657547 (N.D. Ill. June 9, 2009) .............................. 140

*Jones v. City of Chicago,*
856 F.2d 985 (7th Cir. 1988) ................................................................... *passim*

*Kailin v. Gurnee,*
77 F.4th 476 (7th Cir. 2023) ........................................................................... 79

**TABLE OF AUTHORITIES (cont.)**

| Cases | Page(s) |
|---|---|

*Kindle v. City of Harvey,*
No. 00 C 6886, 2002 WL 230779 (N.D. Ill. Feb. 15, 2002) ................................................ 140

*King v. Kramer,*
680 F.3d 1013 (7th Cir. 2012) ................................................................................................ 107

*Kluppelberg v. Burge, No. 13 C 3963,*
Dkt. 635 at 3 (N.D. Ill. Aug. 4, 2017) ..................................................................................... 66

*Kyles v. Whitley,*
514 U.S. 419 (1995) ................................................................................... 39, 40, 43, 52

*Laborers' Pension Fund v. Surface Dimensions, Inc.,*
No. 07 C 3860, 2011 WL 841515 (N.D. Ill. Mar. 8, 2011) ..................................................... 26

*LaPorta v. City of Chicago,*
277 F. Supp. 3d 969 (N.D. Ill. 2017) ............................................................................. 123, 160

*LaSalle Bank Lake View v. Seguban,*
54 F.3d 387 (7th Cir. 1995) ...................................................................................................... 18

*Lawson v. Veruchi,*
637 F.3d 699 (7th Cir. 2011) .................................................................................................... 82

*Lewis v. City of Chicago,*
914 F.3d 472 (7th Cir. 2019) ............................................................................................. 42, 43

*LiButti v. United States,*
178 F.3d 114 (2d Cir. 1999) ..................................................................................................... 18

*Liggins v. City of Chicago,*
2021 WL 2894167 (N.D. Ill. July 9, 2021) ............................................................................ 100

*Logan v. Caterpillar,*
246 F.3d 912 (7th Cir. 2011) ............................................................................................. 82, 89

*Logan v. City of Chicago,*
891 F. Supp. 2d 897 (N.D. Ill. 2012) ....................................................................................... 20

*Lopez v. City of Chicago,*
464 F.3d 711 (7th Cir. 2006) .................................................................................................... 96

**Cases**                                                                                                     **Page(s)**

*Lyons v. Johnson,*
  415 F.2d 540 (9th Cir. 1969) ...................................................................................20

*Malley v. Briggs*
  475 U.S. 335 (1986) ...............................................................................................86

*Manson v. Brathwaite,*
  432 U.S. 98 (1977) ............................................................................................69, 81

*Manuel v. Joliet,*
  580 U.S. 357 (2017) ..........................................................................................81, 86

*Marcinczyk v. Plewa,*
  No. 09 C 1997, 2012 WL 1429448 (N.D. Ill. Apr. 25, 2012) ......................................140, 141

*Martinez v. California,*
  444 U.S. 277 (1980) ...............................................................................................85

*Maxwell v. City of Indianapolis,*
  998 F.2d 431 (7th Cir. 1993) ...................................................................................83

*McDonough v. Smith,*
  139 S. Ct. 2149 (2019) .......................................................................................36, 86

*Miller v. Pate,*
  386 U.S. 1 (1967) ...................................................................................................47

*Milwaukee & St. P.R. Co. v. Kellogg,*
  94 U.S. 469 (1876) .................................................................................................85

*Monell v. Department of Social Services*,
  436 U.S. 658 (1978) ........................................................................................*passim*

*Monroe v. Pape,*
  365 U.S. 167 (1961) ...............................................................................................85

*Mooney v. Holohan,*
  294 U.S. 103, 112 (1935) ........................................................................................26

*Moore v. City of Chicago,*
  2011 WL 1231318 (N.D. Ill. 2011) ..........................................................................96

**Cases**                                                                     **Page(s)**

*Moore v. Pennsylvania Dep't of Corrections,*
457 F. App'x 170 (3d Cir. 2012) ................................................................54

Mwangangi v. Nielsen,
48 F.4th 816 (7th Cir. 2022) ..........................................................94, 95

*Myett v. Heerdt,*
2017 WL 75738 (N.D. Ill. Jan. 9, 2017) ................................................90

*Nanda v. Bd. of Trustees of Univ. of Illinois,*
219 F. Supp. 2d 911 (N.D. Ill. 2001) ......................................................68

*Napue v. Illinois,*
360 U.S. 264 (1959) ................................................................................40

*National Acceptance v. Bathalter,*
705 F.2d 924 (7th Cir. 1983) ..................................................................20

*Neil v. Biggers,*
409 U.S. 188 (1972) ........................................................................75, 81

*Nelson v. LaCrosse Cty,*
301 F.3d 820 (7th Cir. 2002) ................................................................108

*Newsome v. McCabe,*
256 F.3d 747 (7th Cir. 2001) ..................................................................39

*Newsome v. McCabe,*
319 F.3d 301 (7th Cir. 2003) ................................................41, 42, 53

*Obrycka v. City of Chicago,*
2012 WL 601810 (N.D. Ill. Feb. 23, 2012) ..........................................140

*Ocean Tomo, LLC v. Barney,*
133 F. Supp. 3d 1107 (N.D. Ill. 2015) ....................................................57

*Olson v. Tyler,*
771 F.2d 277 (7th Cir. 1985) ..................................................................82

*Otto v. Variable Annuity Life Ins. Co.,*
134 F.3d 841 (7th Cir. 1998) ..................................................................95

**Cases**                                                                     **Page(s)**

*Owen v. City of Independence,*
445 U.S. 622 (1980) ..................................................................85

*Padilla v. City of Chicago,*
2009 WL 4891943(N.D. Ill. Dec. 14, 2009) .........................144

*Padilla v. City of Chicago,*
2013 WL 1208567 (N.D. Ill. Mar. 26, 2013) .........................89

*Palmer v. City of Chicago,*
82 C 2349 (N.D. Ill.) ...........................................................*passim*

*Patrick v. City of Chicago,*
974 F.3d 824 (7th Cir. 2020) ..................................................35

*Pembaur v. City of Cincinnati,*
475 U.S. 469 (1986) ..............................................................105

*Pennington v. Flora Cmty. Unit Sch. Dist. No. 35,*
2023 WL 348320 (S.D. Ill. Jan. 20, 2023) ...........................101

*Petty v. City of Chicago,*
754 F.3d 416 (7th Cir. 2014) .............................................27, 28

*Pickett v. Dart,*
2014 WL919673 (N.D. Ill. Mar. 10, 2014) ..........................159

*Proffitt v. Ridgway,*
279 F.3d 503 (7th Cir. 2002) ..................................................97

*Purghoraishi v. Flying J, Inc.,*
449 F.3d 751 (7th Cir. 2006) ..................................................33

*Qatar Nat'l Navigation & Transp. Co. v. Citibank,*
1996 WL 596518 (S.D.N.Y. Oct. 16, 1996)...........................25

*Raugust v. Abbey,*
598 F. Supp. 3d 988 (D. Mont. 2022) .....................................54

*Reed v. Hathaway,*
596 F.Supp.2d 1200 (C.D. Ill. 2009)......................................25

**Cases**                                                                                                      **Page(s)**

*Reeves v. Jewel Food Stores,*
   759 F.3d 698 (7th Cir. 2014) ................................................................................. 102

*Rehberg v. Paulk,*
   566 U.S. 356 (2012) ...................................................................................... 37, 86, 87

*Reyes v. Nurse,*
   38 F.4th 636 (7th Cir. 2022) ................................................................................... 67

*Rivera v. Guevara,*
   319 F. Supp. 3d 1004 (N.D. Ill. 2018) ............................................... 102, 103, 151

*Rivera v. Guevara,*
   No. 12 C 4428, 2019 WL 13249674 (N.D. Ill. Sept. 20, 2019) ........................... 102

*Robinson v. City of Harvey,*
   No. 99 C 3696, 2001 WL 138901 (N.D. Ill. Feb. 16, 2001) ................................ 140

*S.E.C. v. Colello,*
   139 F.3d 674 (9th Cir. 1998) ................................................................................... 18

*Sanders v. City of Chicago Heights,*
   No. 13 C 0221, 2016 WL 2866097 (N.D. Ill. May 17, 2016) ........................... 76, 81

*Saunders-El v. Rohde,*
   778 F.3d 556 (7th Cir. 2015) ................................................................................... 44

Savory v. Cannon,
   947 F.3d 409 (7th Cir. 2020) ................................................................................... 68

*Sherrod v. Berry,*
   827 F.2d 195 (7th Cir 1987) ................................................................................... 144

*Simmons v. United States,*
   390 U.S. 377, 382-83 (1968) ............................................................................. 72, 81

*Simon v. Northwestern Univ.,*
   2016 WL 1237666 (N.D. Ill. Mar. 29, 2016) ........................................................ 90

*Smith v. Burge,*
   222 F. Supp. 3d 669 (N.D. Ill. 2016) ..................................................................... 45

**Cases**                                                                                                       **Page(s)**

*Smith v. Cain,*
    132 S. Ct. 627 (2012) ....................................................................................40

*Sornberger v. City of Knoxville,*
    434 F.3d 1006 (7th Cir. 2006) .....................................................106, 107, 127, 140

*Sosa v. Alvarez–Machain,*
    542 U.S. 692 (2004) ......................................................................................86

*Staub v. Proctor Hospital,*
    562 U.S. 411 (2011) ................................................................................85, 88

*Steidl v. Fermon,*
    494 F.3d 623 (7th Cir. 2007) ....................................................................87, 93

*Steidl v. Gramley,*
    151 F.3d 739 (7th Cir. 1998) ........................................................................107

*Sterk v. Redbox Automated Retail, LLC,*
    770 F.3d 6187 (7th Cir. 2014) .................................................................16, 17

*Stevenson v. City of Chicago,*
    No. 17 CV 4839, 2018 WL 1784142 (N.D. Ill. Apr. 13, 2018) ...................101, 102

*Stinson v. Gauger,*
    868 F.3d 516 (7th Cir. 2017) *(en banc)* .................................................35, 36, 42

*Stovall v. Denno,*
    388 U.S. 293 (1967) ......................................................................................69

*Streckenbach v. Vandensen,*
    868 F.3d 594 (7th Cir. 2017) ........................................................................109

*Strickler v. Greene,*
    527 U.S. 263 (1999) ......................................................................................65

*Sublett v. John Wiley & Sons, Inc.,*
    463 F.3d 731 (7th Cir. 2006) .................................................................13, 33, 108

*Swanigan v. Chicago,*
    775 F.3d 953 (7th Cir. 2015) ........................................................................158

**Cases**                                                                **Page(s)**

*Swanigan v. City of Chicago,*
881 F.3d 577 (7th Cir. 2018) ................................................................. 70

*Taylor v. City of Chicago,*
2021 WL 4401528 (N.D. Ill. Sept. 27, 2021) ........................................ 37

*Thomas v. Cook County,*
604 F.3d 293 (7th Cir. 2010) ............................................ 113, 158, 160

*Thompson v. Boggs,*
33 F.3d 847 (7th Cir. 1994) ................................................................ 108

*Thompson v. Briscoe v. LaHue,*
460 U.S. 325 (1983) ............................................................................. 81

*Thompson v. City of Chicago,*
2009 WL 674353 (N.D. Ill. Mar. 12, 2009) ............................. 20, 57, 124

*Thompson v. Clark,*
596 U.S. 36 (2022) ........................................................................ 81, 86

*Titran v. Ackman,*
893 F.2d 145 (7th Cir. 1990) ...................................................... 12, 108

*Tolan v. Cotton,*
572 U.S. 650 (2014) .................................................. 2, 10, 18, 26, 155

*United States v. Reed,*
227 F.3d 763 (7th Cir. 2000) ............................................................... 25

*United States v. $39,000.00 in U.S. Currency,*
951 F.3d 740 (6th Cir. 2020) ............................................................... 20

*United States v. 4003-4005 5th Ave.,*
55 F.3d 78 (2d Cir. 1995) .................................................................... 19

*United States v. Agurs,*
427 U.S. 97 (1976) ............................................................................... 40

*United States v. Bagley,*
473 U.S. 667 (1985) ...................................................... 41, 47, 52, 53

**Cases**                                                                                    **Page(s)**

*United States v. Burge,*
    2090 WL 1108488 (N.D. Ill. Apr. 23, 2009)...............................................25, 26

*United States v. Certain Real Prop. & Premises,*
    55 F.3d 78 (2d Cir. 1995) ..........................................................................17

*United States v. Holm,*
    326 F.3d 872 (7th Cir. 2003) ......................................................................13

*United States v. Jackson,*
    546 F.3d 801 (7th Cir. 2008) ......................................................................98

*United States v. Morris,*
    80 F.3d 1151 (7th Cir. 1996) ......................................................................64

*United States v. Rylander,*
    460 U.S. 752 (1983) ..................................................................................17

*United States v. Taylor,*
    975 F.2d 402 (7th Cir. 1992) ......................................................................17

*Vega v. Tekoh,*
    597 U.S. 134 (2022) ...............................................................67, 68, 69, 70, 71

*Velez v. City of Chicago,*
    No. 1:18-CV-08144, 2023 WL 6388231 (N.D. Ill. Sept. 30, 2023).............103, 140, 141, 146

*Vodak v. City of Chicago,*
    639 F.3d 738 (7th Cir. 2011) ....................................................................107

*Wallace v. City of Zion,*
    2011 WL 3205495 (N.D. Ill. July 28, 2011) ...................................................89

*Washington v. Boudreau,*
    No. 16-CV-01893, 2022 WL 4599708, (N.D. Ill. Sept. 30, 2022)................................*passim*

*Wearry v. Cain,*
    577 U.S. 385 (2016) ..................................................................................40

*Wehrs v. Wells,*
    688 F.3d 886 (7th Cir.2012) ..............................................................52, 53, 57

**TABLE OF AUTHORITIES (cont.)**

**Cases**      **Page(s)**

*Wells v. Coker,*
  2014 WL 716518 (C.D. Ill. Feb. 25, 2014) ........................................................159

*Whitlock v. Brueggemann,*
  682 F.3d 567 (7th Cir. 2012) ........................................................................*passim*

*Williams v. Bachler,*
  No. 16-CV-9222, 2018 WL 3022687 (N.D. Ill. June 18, 2018) .............................46

*Williams v. City of Chicago,*
  733 F.3d 749 (7th Cir. 2013) ...............................................................................82

*Williams v. Florida,*
  399 U.S. 78 (1970) ...............................................................................................17

*Woodward v. Corr. Med. Servs,*
  368 F.3d 917 (7th Cir. 2004) .....................................................................159, 160

*Yang v. Hardin,*
  37 F.3d 282 (7th Cir. 1994) ..................................................................................94

*Ziglar v. Abbasi,*
  137 S. Ct. 1843 (2017) ........................................................................................100


**Federal Rules**

Federal Rule of Evidence 804 ..................................................................................25


**Other Authorities**

Wright & Miller, Federal Practice & Procedure ..................................................16, 111

**INTRODUCTION**

Thomas Sierra was wrongly convicted of the 1995 murder of Noel Andujar based primarily on false identifications Defendants fabricated from two witnesses to the crime who had not seen the perpetrator. No real evidence ever implicated Sierra. To ensure his conviction, throughout Sierra's criminal proceedings Defendants suppressed evidence that would have shown he was innocent, and that Defendants had framed him.

Starting at age 19, Sierra served 21 years in prison for a crime he did not commit. Throughout, he maintained his innocence and fought to clear his name. In 2018, based on the revelation that false evidence had been used to obtain his conviction, a state court vacated Sierra's conviction, and state prosecutors dropped all charges against him. In 2022, the State of Illinois granted Sierra a certificate of innocence. There can be no dispute that Sierra is innocent, and Defendants do not contest that fact at summary judgment.

In 2018, Sierra brought this § 1983 lawsuit to hold the Defendants accountable for violating his constitutional rights and causing his wrongful conviction. Sierra's conviction is one of more than 44 obtained by notorious Chicago Police detective Reynaldo Guevara and his colleagues at the Chicago Police Department's Area Five Detective Division, whose misconduct has spawned dozens of civil rights cases in this District. But these Defendant Officers are not solely to blame. Sierra's ordeal was also caused by the City of Chicago's official policies, which caused the suppression of evidence in homicide investigations, permitted the fabrication of identifications using suggestive identification procedures, and encouraged untrained police officers to engage in misconduct with impunity.

None of the Defendants is entitled to summary judgment on any of Sierra's claims. On some of Sierra's claims against Guevara, it is Sierra who is entitled to summary judgment, as

1

explained in Sierra's cross-motion for partial summary judgment. Dkt. 510. The motions filed by Guevara and Halvorsen are frivolous, considering both have asserted their Fifth Amendment right not to incriminate themselves in response to all questions about their misconduct at issue in this case. For its part, the City moves for summary judgment on *Monell* theories that it has already lost repeatedly at trial and is therefore precluded from re-litigating here, and it cannot create a genuine dispute of fact on others, as Sierra explains in his cross-motion. *Id.* The Defendants' remaining arguments lack merit and are made in the face of overwhelming evidence that the Defendant Officers and the City violated Sierra's rights protected by the U.S. Constitution and Illinois law, and so summary judgment is inappropriate on those claims. This Court should deny Defendants' motions.

## SUMMARY OF DISPUTED MATERIAL FACTS

Defendants' motions depend on a factual account that impermissibly construes the evidence for the moving Defendants and improperly draws inferences for them. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014). Sierra has prepared an extensive account of the facts relevant to summary judgment in his Local Rule 56.1 statements.[1] Given space constraints, the number of Defendants' arguments, and the vast record, Sierra summarizes the material disputes here, rather than repeating all of the facts. Additional facts are discussed below within the argument sections. Properly viewing the record in Sierra's favor, the following facts cannot be disputed.

---

[1] Sierra's affirmative statement of facts in support of this response is cited as "PSOF ¶" (Dkt. 519), his response to the City's statement of facts as "RSOF-City ¶" (Dkt. 517), and his response to the Officer Defendants' statement of facts as "RSOF-Officers ¶" (Dkt. 518). The Defendant Officers' brief (Dkt. 502) is cited "OB," the City's (Dkt. 504) "CB," and Guevara's (Dkt. 505) "GB."

## I.  SIERRA IS INNOCENT OF THE ANDUJAR MURDER

Sierra is innocent of the Andujar shooting. PSOF ¶¶2-13. He had nothing to do with the crime. No evidence connects him to the crime. He has always maintained his innocence. The State of Illinois has certified that he is innocent. PSOF ¶¶2-13.

## II.  WITNESSES MELENDEZ AND RODRIGUEZ DID NOT SEE AND COULD NOT IDENTIFY THE PERPETRATOR

The two witnesses to the crime, Jose Melendez and Alberto Rodriguez, who were driving and riding in the passenger seat of the car in which Andujar was killed, respectively, did not see the perpetrator and could not identify him. PSOF ¶¶16; 24-35. Many circumstances of the shooting made it impossible for Melendez and Rodriguez to be able to see the shooter's face, let alone make an identification. The shooting occurred at night, in poor light, between two moving vehicles; they both ducked when the shooting began; the car from which the shooter shot had tinted windows that were never rolled down; the shooter had his hoodie up over his head; Melendez and Rodriguez had been smoking marijuana; and the incident lasted only moments before they sped away from the shooter. PSOF ¶¶24-35, 40, 255. At the scene right after the shooting, Melendez and Rodriguez could not provide any description of the shooter to responding officers who interviewed them thoroughly, beyond the fact that the shooter was male and Latino. PSOF ¶¶36-40. Beyond that, all Melendez and Rodriguez could say was the shooter had fired from a dark Buick Park Avenue with custom rims and tinted windows.

The fact that Sierra was not involved in the Andujar murder, PSOF ¶¶2-13 that neither witness could identify the perpetrator, PSOF ¶¶37-40, 46, 88-93, 101, 107-114, 143, 251 that Melendez has testified consistently that Defendants fabricated his identification, PSOF ¶¶92-93, 241-42, 251, 260, and that Guevara and Halvorsen have asserted the Fifth Amendment when asked if they fabricated the identifications, PSOF ¶¶100-04, 137-45, 192, has an important consequence

3

at the summary-judgment stage of this case: This Court must draw the inference from these facts alone that any identification that Melendez or Rodriguez made of Sierra was false and fabricated by Defendants. Put differently, with the facts construed for Sierra, Defendants identified an innocent person as their suspect, and then got two witnesses who had not seen the perpetrator to both identify that same innocent person. Construing the evidence for Sierra and drawing inferences in his favor, there is no explanation at summary judgment other than that Defendants fabricated these identifications.

## III. DEFENDANTS INTERROGATE HECTOR MONTANEZ, EXTRACT A FALSE STORY, AND MAKE SIERRA A SUSPECT

Shortly after Andujar was killed, based solely on the description of the car, Guevara decided a man named Hector Montanez was his suspect. PSOF ¶¶54. Guevara knew Montanez drove a similar car. Guevara shared his suspicion with the other Defendant Officers, and they set about implicating Montanez in the crime. PSOF ¶¶54-60, 174-76.

Guevara and Halvorsen interrogated Montanez at length, they threatened him and coerced him, and when he refused to implicate himself as the shooter, they forced him to implicate Sierra. PSOF ¶¶59-60. They promised him that he could go home if he adopted a story they knew was false: that Montanez had driven the car used in the Andujar shooting and that Thomas Sierra had been the shooter. PSOF ¶¶59-60, 64. Defendants ultimately forced Montanez to sign a statement reflecting the false story they had concocted. PSOF ¶¶61-65. They then kept their promise—they never arrested him or had him prosecuted for his supposed role in the crime. PSOF ¶¶65-66. Instead, Defendants suppressed their interactions with Montanez, except for the fabricated statement, throughout Sierra's criminal proceedings. PSOF ¶¶67.

## IV. DEFENDANTS FRAME SIERRA IN A SINGLE SHIFT ON MAY 30

On May 30, 1995, in a single shift, Defendants fabricated all of the evidence implicating Sierra in the murder and closed the case. PSOF ¶¶53-64, 84-87, 105-06, 177. On that day, they showed Melendez a photo array containing a picture of Sierra, and they instructed Melendez to pick Sierra as the shooter, even though Melendez told them he had not seen the shooter. PSOF ¶¶87-93. In addition, they showed Rodriguez a photo array, told him that the person they believed committed the crime was in the photos, and when Rodriguez could not make an identification—taking more than five minutes without identifying anyone—they told him to pick their suspect, Sierra. PSOF ¶¶105, 114-18, 138-39. The identification obtained from Rodriguez was false, and it was the result of an improperly suggestive identification procedure. PSOF ¶¶147-153. Defendants did not document the true circumstances of these photo identification procedures, reporting instead that the two witnesses independently selected Sierra without suggestion. PSOF ¶¶53, 86-87, 94.

To make the case appear authentic, Defendants also fabricated other evidence of investigative steps that never actually occurred: They fabricated a story that Melendez and Rodriguez each identified Sierra in a live lineup procedure, when neither were shown a live lineup. PSOF ¶¶99, 106, 130-136, 196. They falsely reported that Melendez and Rodriguez each identified Montanez's car in the Area Five parking lot as the one used in the shooting, when both witnesses provided information indicating to Defendants that this car was *not* the one used in the crime. PSOF ¶¶154-59. They made false witness statements, attributed to Melendez, Rodriguez, and Montanez, stating that they had all implicated and identified Sierra as the shooter. PSOF ¶¶59-64, 98-99, 13-36. They fabricated a similar statement for Sierra's girlfriend, Lucy Montalvo, a potential alibi witness, to undermine Sierra's alibi. PSOF ¶¶165-70.

To wrap the case up, Defendants Guevara, Halvorsen, McMurray, Wojcik, and Biebel fabricated a closing report that included an entirely false account of how they "solved" the crime. PSOF ¶¶84-86, 193-199. That report included a false story that Guevara and Halvorsen had seen Sierra riding the car used in the shooting three days before the crime, on May 20, 1995, which they said falsely was the reason they considered Sierra a suspect. PSOF ¶¶174-77, 185-88, 193-94. The report falsely said Rodriguez had identified Sierra as the shooter in a photo array on May 25, when no array had occurred on that date, the Defendants never documented that purported identification in any report, and they never attempted to arrest Sierra at any time between May 25 and May 30. PSOF ¶¶105, 118, 120-25. In addition, the report included the fabricated account of Melendez's photo array, lineup, and car identifications, Rodriguez's photo array, lineup and car identifications, and Melendez, Rodriguez, Montanez, and Montalvo's false statements, discussed above. PSOF ¶¶87, 97-99, 105-06, 135-36, 154-58, 228.

## V.     SIERRA IS PROSECUTED AND CONVICTED

Based on only their fabricated evidence, Sierra was charged, detained, and prosecuted for Andujar's murder. PSOF ¶¶1, 193-99, 228-30. Throughout the criminal proceedings, Defendants suppressed that they had fabricated the evidence just discussed, including that both eyewitnesses told them they had not seen the shooter and did not identify Sierra themselves, that there was no photo array shown to Rodriguez on May 25, that their photo array was suggestive, that they had told Melendez to pick Sierra, that there was no live lineup conducted with either witness, that both eyewitnesses had said Montanez's car was not the one used in the shooting, that Montanez had been interrogated and subjected to threats and promises to get him to falsely implicate Sierra, that Montalvo had given them an account that supported Sierra's alibi until Defendants altered that

6

account, and that Defendants Guevara and Halvorsen had never seen Sierra in a car at Esther Reyes's house. PSOF ¶¶67, 227, 231-253.

At Sierra's criminal trial, Melendez tried to come clean and tell the criminal court what the Defendants had done. But the Defendants took the stand as witnesses for the State and introduced each piece of fabricated evidence through their own testimony, including Melendez's purported identifications, using their authority as police officers on the stand to counteract Melendez's efforts to reveal the truth, and further suppressing their own investigative misconduct. PSOF ¶¶232-33, 235-38, 241-54. Because of Defendants' fabrication and suppression of evidence, Sierra was convicted and sentenced to decades in prison. PSOF ¶¶8, 269.

## VI. THE CITY OF CHICAGO'S OFFICIAL POLICIES CAUSED SIERRA'S WRONGFUL CONVICTION

The suppression of evidence during Sierra's case was the result of the official policies of the City of Chicago, which caused the widespread suppression of evidence in homicide cases, including Sierra's. PSOF ¶¶301-355, 358, 361-372, 376-377, 379-389, 513-526, 549-550. Moreover, the City's official policies let officers fabricate witness identifications using unduly suggestive identification techniques, which caused unreliable identifications to be used and to taint criminal proceedings like Sierra's criminal case. PSOF ¶¶392-415, 424-445, 457-461, 462-471, 503-512, 527-545, 546-550.

Finally, the City's official policies permitted police to conduct investigations untrained and without any oversight or discipline. PSOF ¶¶457-461, 474-511, 513-545. The City's policy of failing to train, supervise, and discipline its police officers led to historic corruption and police misconduct across the Chicago Police Department in the years leading up to the Andujar investigation, including at the Area Five Detective Division on the northwest side of Chicago. PSOF ¶¶451-461, 474-511, 513-545, 546-550. Because of this environment of lawlessness,

officers like Guevara and Halvorsen were free to fabricated evidence, manipulate witnesses, suppress investigative information, and to frame innocent individuals for crimes they had not committed with complete impunity. PSOF ¶¶498-512, 513-545, 546-550. A code of silence in the Chicago Police Department prevented anyone from blowing the whistle on their misconduct. PSOF ¶¶465, 501.

As a result, Guevara framed at least 44 innocent individuals for murder. In the past 15 years, at least 44 murder convictions engineered by Guevara have been overturned by Illinois courts, and Guevara has been widely recognized as a blight on the criminal legal system. PSOF ¶¶ 350-355, 468, 492-512, 545-550. Guevara was able to use his police powers to dismantle families and an entire community because the City did nothing to ensure its police officers conducted themselves according to law.

## VII. SIERRA FIGHTS TO PROVE HIS INNOCENCE AND IS EXONERATED

Defendants' misconduct ripped Sierra from his young daughter and family. PSOF ¶3. He spent decades of the most formative and important years of his life incarcerated for something he had not done. PSOF ¶¶1-2, 269. During his decades of wrongful incarceration, Sierra always maintained his innocence as he fought for his freedom. PSOF ¶¶4-7.

In 2018, based on proof that Defendants had introduced false evidence in his criminal case, Sierra's post-conviction petition was granted and his conviction was set aside. PSOF ¶¶8-9. Shortly after, the Cook County State's Attorney dropped all charges against him. PSOF ¶9. In 2022, following a hearing, a state court granted Sierra a certificate of innocence. PSOF ¶¶10-13.

## VIII. DEFENDANTS AND RODRIGUEZ REFUSE TO TESTIFY IN THIS CIVIL CASE

The only evidence that implicated Sierra in Andjuar's murder and that caused his wrongful prosecution and conviction was fabricated by Defendants. PSOF ¶¶231-53. At Sierra's criminal

trial, Defendants and Rodriguez testified consistent with that false story, helping to put Sierra behind bars. PSOF ¶¶231-40, 243-51, 253.

But after this civil case was filed, Defendants and Rodriguez changed their tune dramatically. Guevara and Halvorsen asserted their Fifth Amendment right against self-incrimination in response to every question about every material disputed fact discussed above. PSOF ¶¶72, 100-04, 137-46, 160-61, 190-92. Rodriguez, who is now incarcerated for an unrelated federal crime, also refused to testify in this civil case. PSOF ¶¶270-71. He sought to avoid his deposition by saying that he, too, intended to assert his Fifth Amendment rights. PSOF ¶¶271. Sierra engaged in substantial litigation in this Court and the U.S. District Court for the Eastern District of Arkansas to compel Rodriguez to testify, which Defendants ultimately opposed. PSOF ¶272. Sierra prevailed, but when it came time for Rodriguez to testify, he refused, and even though the court in Arkansas held him in criminal contempt, he still would not testify. PSOF ¶271.

## IX. TODAY, NO EVIDENCE SUPPORTS DEFENDANTS' ACCOUNT

As a result, this case arrives at summary judgment in a posture where no one stands by Defendants' story. Today, *neither* of the two eyewitness confirms Defendants' fabricated account—Melendez testified in his deposition that Defendants fabricated his identifications, and Rodriguez refuses to testify. PSOF ¶¶54, 89-99, 270-71. Hector Montanez is adamant that his statement implicating himself and Sierra is false, and the product of Defendants' coercion. PSOF ¶¶54-64. Lucy Montalvo has testified that Defendants refused to accept the truth and instead took a false statement from her. PSOF ¶¶165-70. Even a former police officer has testified in this case that Guevara and Halvorsen "once-upon-a-time'd" him—Guevara and Halvorsen made up that this officer had given them information to bolster their false case. PSOF ¶189. By contrast, the only evidence that might support Defendants is their own testimony, but the two principal

investigators in the case, Guevara and Halvorsen, have pleaded the Fifth. PSOF ¶¶72, 100-04, 137-46, 160-61, 190-92. That means there is no evidence to support Defendants' version of events. Defendants are left moving for summary judgment citing the very fabricated evidence they manufactured for Sierra's criminal trial, ignoring that no one vouches for that evidence anymore.

## ARGUMENT

This is not a summary judgment case. The record properly construed unambiguously supports the conclusion that Defendants fabricated all of the evidence used to arrest, charge, prosecute, and to convict Sierra of Andujar's murder, that Defendants hid from prosecutors and from Sierra and his attorneys a large volume of exculpatory and impeachment evidence that would have halted Sierra's prosecution and shown his innocence, and that Defendants conducted suggestive identification procedures and fabricated identifications that fatally tainted Sierra's criminal case. A similar volume of evidence supports Sierra's claim that this misconduct occurred because of the official polices of the City of Chicago. All material facts are disputed, and Defendants' legal arguments lack merit. This Court should deny Defendants' motions.

Though Defendants ignore the legal standard throughout their motions, this Court must examine the evidence in the light most favorable to Sierra and draw all inferences in his favor. *Tolan*, 572 U.S. at 656-57. Summary judgment is warranted only if Defendants show that there is no genuine issue of fact on any of Sierra's claims such that they are entitled to judgment as a matter of law. *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

This brief proceeds in five parts. First, it outlines those claims and theories not challenged by Defendants, on which there will be a trial. Second, it explains that Seventh Circuit law holds

that this Court need not parse sub-theories of liability and items of evidence at summary judgment in a case like this one, where it is clear the case will proceed to trial on a fair trial claim against the Defendants. Third, it describes the reasons summary judgment is categorically unavailable to Guevara and Halvorsen, given their assertion of their Fifth Amendment rights. Fourth, it sets out why the Defendant Officers' legal arguments must be rejected and outlines the hotly disputed facts that preclude summary judgment for the Defendant Officers. And fifth, it explains why the City is precluded from re-litigating *Monell* claims the City has lost in recent trials, why Sierra is entitled to summary judgment on the theory that the City's express policies were deficient to stop the suppression of evidence in homicide cases, and why genuine disputes of fact preclude summary judgment on the remainder of Sierra's *Monell* claims.

## I. DEFENDANTS CONCEDE AND DO NOT CHALLENGE THAT MANY OF SIERRA'S CLAIMS REQUIRE A TRIAL

It is first important to note that Defendants concede a trial is necessary on certain theories of liability, and they do not move for summary judgment on other theories. In particular, Defendant Officers expressly concede the following:

- Guevara concedes that he cannot obtain summary judgment on Sierra's theory that he fabricated the story about seeing Sierra in the car used in the shooting three days before the shooting at Esther Reyes's house, GB-2-3, and Halvorsen concedes that there is evidence that he, too, was involved in that fabrication, OB-25 n.7, which is necessarily a concession that disputes of fact preclude summary judgment for Guevara and Halvorsen on all of Sierra's other claims, because the same facts support the federal suppression, suggestive identification, illegal seizure, failure to intervene, and conspiracy claims, as well as each of the state law claims;
- Guevara concedes that he cannot obtain summary judgment on Sierra's theory that he fabricated Melendez's identification of Sierra in a photo array, GB-2-3, which again necessarily concedes there are disputes of fact on the other claims against Guevara;
- Guevara concedes that he cannot obtain summary judgment on Sierra's theory that he fabricated Melendez's identification of Sierra in a live lineup, GB-2-3, which again necessarily concedes there are disputes of fact on the other claims against him; and
- Guevara concedes that he cannot obtain summary judgment on Sierra's theory that he fabricated Melendez's identification of the car used in the shooting, GB-2-3, which again necessarily concedes there are disputes of fact on the other claims against him.

In addition, Defendant Officers do not include any argument in their motions regarding the following material disputes of fact:

- No Defendant challenges that a jury must decide whether Melendez's identifications were fabricated (only a subset contend they were uninvolved in those identifications, OB-19-20, OB-47-49);
- No Defendant challenges that a jury must decide whether Defendants suppressed that they used illegal tactics to get Montanez to agree to a statement that they had fabricated, instead they argue only that this suppression was immaterial;
- No Defendant challenges that a jury must decide whether Defendants suppressed that they used illegal tactics to get Montalvo to agree to a statement that they had fabricated, instead they argue only that this suppression was immaterial; and
- No Defendant challenge's Sierra's theory that Defendants fabricated that police files reflected that Sierra was "Junito" and Montanez was "Lil Hector," nicknames that were used to implicate them in the crime.

In addition, the City of Chicago does not move for summary judgment on multiple of Sierra's *Monell* theories, as outlined at the start of Argument V(B) *infra*.

Because Defendants do not move for summary judgment on some of Sierra's theories that they violated his right to a fair trial, they are not entitled to summary judgment. Defendants *each* bear the burden of showing that there is no evidence on which a reasonable jury could find for Sierra on any of all of his claims against *each* of them. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331-32 (1986). The fact that Defendants have not moved for summary judgment on certain theories means those theories must be tried. *Id.* at 332 ("Plainly, a conclusory assertion that the nonmoving party has no evidence in insufficient….[A] part who moves from summary judgment . . . must affirmatively show the absence of evidence in the record."); *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("When a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on; the number of potential grounds for (and arguments against) summary judgment may be large, and litigation is costly enough without requiring parties to respond to issues that have not been raised[.]"); see also *Carmichael v. Village of Palatine*, 605

F.3d 451, 460 (7th Cir. 2010); *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006). Any arguments Defendants might have made for summary judgment on the above theories are now forfeited, and it will be too late for Defendants to raise them in reply. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (reversing summary judgment granted on issue raised in a reply).

Independent of these concessions and forfeitures, Guevara does not develop an argument that *he* is entitled to summary judgment at all. Instead, Guevara has filed a boilerplate motion to "join" the other Defendants' motions for summary judgment, which is devoid of substance or record citations. Dkt. 480. The problem for Guevara, among other things, is that the other Defendants do not make any argument that he is entitled to summary judgment. Guevara has failed to satisfy his burden of production at summary judgment, and his motion should be denied without the need for a response. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)); 10A Wright & Miller, Federal Practice & Procedure. In addition, his argument is too cursory to justify relief. *United States v. Holm*, 326 F.3d 872 (7th Cir. 2003) ("It is not the obligation of this court to research and construct the legal arguments open to parties," and "perfunctory and undeveloped arguments" are waived).

Moreover, by conceding that a trial is needed on several fabrication theories discussed above, and then "joining" a motion filed by other Defendants without additional discussion, Guevara necessarily concedes that a trial is necessary on all other claims that arise from those he concedes must be tried. For example, Guevara concedes he cannot obtain summary judgment on the fabrication theory that he fabricated Melendez's identification of Sierra in a photo array. That also means he cannot obtain summary judgment on the related suppression theory that he hid the evidence that Melendez could not make an identification and so he told Melendez who to pick during the photo array, which could have been used to impeach his own testimony at trial, among

other witnesses. The same logic applies regarding Guevara's liability on nearly every theory at issue. This Court should deny Guevara's motion summarily.

**II.    SEVENTH CIRCUIT LAW DICTATES THAT THIS COURT SHOULD NOT PARSE SUB-THEORIES OF LIABILITY AT SUMMARY JUDGMENT IN A FAIR TRIAL CASE**

Defendants' decision to concede and not to contest Sierra's theories set out above has an additional consequence. The Seventh Circuit has directed that courts at summary judgment should not weed through sub-theories and parse items of evidence giving rise to a fair trial due process claim, so long as it has been established that there is a material dispute of fact about whether a Defendant contributed to violating a plaintiff's right to a fair trial. See *Goudy v. Cummings*, 922 F.3d 834, 844 (7th Cir. 2019) (holding that once it is established at summary judgment that a trial is required on due process theories, the court "need not and do[es] not address [the plaintiff's] allegation that the alleged [additional theory of liability] independently constituted a basis for liability"); see also *Camm v. Faith*, 937 F.3d 1096, 1108–09 (7th Cir. 2019) ("It's worth noting that while the parties sometimes refer to three '*Brady* claims,' it's more accurate to say that [the plaintiff] has a single *Brady* claim alleging the suppression of three baskets of evidence."); *Goudy*, 922 F.3d at 838 (stating that "[i]t is important to clarify that although the parties occasionally refer to [the plaintiff's] '*Brady* claims' or 'identification procedure claim,' his allegations do not give rise to separate *claims* under section 1983. [The plaintiff] has presented a single claim: that the defendants are liable for causing him to receive an unfair trial in violation of his due process rights"); *id.* (holding that "all defendants who can be shown to have 'suppressed' evidence in violation of *Brady* . . . should be liable for the aggregate impact on the outcome of the trial [the plaintiff] ultimately received.")

As a result, once this Court decides Sierra has shown a genuine dispute of fact on any of his due process theories, it can move forward with a trial on Sierra's fair trial claim without exploring every argument made by Defendants in their motion, and it can deny summary judgment on that basis. This Court need not parse every due process theory addressed in Defendants' motion and below to conclude that a trial against each Defendant is necessary and deny summary judgment. Given that Defendants do not even raise an argument on some due process theories and concede others, this Court need not belabor the analysis of Sierra's different theories and their supporting evidence, given these Seventh Circuit precedents. It should simply deny the motions and proceed to trial.

## III. SUMMARY JUDGMENT IS UNAVAILABLE TO GUEVARA AND HALVORSEN IN LIGHT OF THEIR INVOCATION OF THE FIFTH AMENDMENT

Guevara's and Halvorsen's motions are frivolous for another reason. They cannot obtain summary judgment given their assertion of their Fifth Amendment right to remain silent in response to questions about the material facts at issue. This Court should independently deny their summary judgment motions based solely on their assertion of this privilege.

Guevara asserted his Fifth Amendment right not to incriminate himself in response to hundreds of questions about his specific misconduct during the Andujar investigation and Sierra's arrest, prosecution, and conviction. PSOF ¶142. For his part, Halvorsen first asserted his Fifth Amendment right not to incriminate himself in response to dozens of deposition questions about his misconduct in the Andujar investigation and Sierra's wrongful prosecution, and then he answered interrogatories with cursory and non-substantive responses that did not address a single instance of the misconduct alleged against him. PSOF ¶145. The two pleaded the Fifth in response to questions about making Sierra a suspect, concealing their knowledge that Melendez and Rodriguez had not seen the perpetrators of the crime, fabricating identifications during photo

identification procedures, suppressing evidence relating to Hector Montanez, fabricating an identification of the car, and fabricating other evidence, police reports, and false testimony. PSOF ¶¶72, 100-04, 137-46, 160-61, 190-92.

Because Guevara and Halvorsen exercised their right to remain silent in response to every question regarding disputed material facts, they cannot seek summary judgment. They cannot meet their initial burden of production, and they cannot meet their ultimate burden of persuasion, at this stage of the case. It is critical that this Court send a clear message that police officers cannot assert their Fifth Amendment right to avoid self-incrimination in civil cases, refuse to participate in discovery, and then ask the Court to take the issue of their liability away from a jury before trial.

### A. Guevara and Halvorsen Cannot Meet Their Initial Burden of Production At Summary Judgment

At summary judgment, the moving party bears the initial burden of establishing the absence of genuine disputes of material fact for trial. *Adickes*, 398 U.S. at 157; 10A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE §2727, at 455-56 (3d ed. 1998) ("The movant is held to a stringent standard."). That initial burden is satisfied either when the moving party affirmatively produces evidence negating an essential element of the non-moving party's claim, or when the movant establishes that the record demonstrates the non-moving party will be unable to meet its burden at trial. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The movant "cannot sustain its burden merely by denying the allegations in the opponent's pleadings, or merely by asserting that the nonmovant lacks evidence to support its claim." 10A Wright & Miller, Federal Practice & Procedure §2727.1, at 455-56 (4th ed. 2016). If the moving party neither offers evidence to negate an element of the nonmovant's claim, nor points to evidence establishing that the nonmovant cannot satisfy its trial burden, then the moving party fails to satisfy its initial burden, the burden does not shift to the non-moving party, and summary judgment must be denied,

even without a responsive brief. *Adickes*, 398 U.S. at 160 ("Because respondent did not meet its initial burden of establishing the absence of a policeman in the store, petitioner here was not required to come forward with suitable opposing affidavits."); *Sterk*, 770 F.3d at 627.

A moving party who asserts their Fifth Amendment right to remain silent in response to questions about every material fact cannot satisfy the initial burden of production at summary judgment, because that party can neither point to evidence negating an essential element of the claim nor establish that proof will be lacking on material facts at trial. The Seventh Circuit has emphasized that an assertion of the Fifth Amendment does not "relieve a litigant in civil litigation of the need to establish elements on which he bears a burden of production or persuasion." *United States v. Taylor*, 975 F.2d 402, 404 (7th Cir. 1992); see also *United States v. Rylander*, 460 U.S. 752, 758 (1983) ("But while the assertion of the Fifth Amendment privilege against compulsory self-incrimination may be a valid ground upon which a witness . . . declines to answer questions, it has never been thought to be in itself a substitute for evidence that would assist in meeting a burden of production."). "A party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence. . . . If this be seen as a 'price' on the assertion of the privilege, so be it." *Taylor*, 975 F.2d at 404; see also *Williams v. Florida*, 399 U.S. 78, 83-84, (1970) (explaining that forcing a litigant to choose "between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination"). And "the claim of privilege will not prevent an adverse finding even at summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation." *United States v. Certain Real Prop. & Premises*, 55 F.3d 78, 83 (2d Cir. 1995).

While there may be cases in which a party asserts the Fifth Amendment on a peripheral issue unimportant to the material facts at summary judgment, here Guevara and Halvorsen, the

two principal Defendants, asserted the privilege as to all material aspects of their illegal conduct in this case. "[A] district court has discretion in its response to a party's invocation of the Fifth," *S.E.C. v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998), and it is a sound exercise of that discretion in this situation to hold that the party invoking the Fifth Amendment cannot satisfy its burden of production at summary judgment.

**B.      Guevara and Halvorsen Cannot Meet Their Burden of Persuasion At Summary Judgment**

Even assuming Guevara and Halvorsen could meet their burden of production, they certainly cannot satisfy their burden of persuasion at this stage: They must show that no material fact is disputed. *Celotex*, 477 U.S. at 323. The Supreme Court holds that jurors must be expressly instructed that they can draw adverse inferences against a party asserting the Fifth Amendment in civil litigation. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387 (7th Cir. 1995); see also *LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999) (An "adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader"). As Rule 56 requires, a court at summary judgment must draw an inference like this one in favor of the non-moving party, here Sierra, and against the movants, Guevara and Halvorsen. *Tolan*, 572 U.S. at 656-57.

Accordingly, where a Defendant asserts his Fifth Amendment rights to avoid answering questions about material facts, then moves for summary judgment, the Court must draw an inference against that Defendant on those material facts. *Belangen v. Schreiber*, 407 F.3d 34, 55 (2d Cir. 2005) (noting that while a jury may decide whether to draw an inference from the assertion of privilege, the court is "required at summary judgment to draw all reasonable inferences in favor of the non-moving party"); see also *Seguban*, 54 F.3d at 390 (holding that this inference based on an assertion of the privilege may be drawn against even the *non*-moving party at summary

18

judgment). Applied to this case, this Court must draw the adverse inference at summary judgment against Guevara and Halvorsen on those material facts where they have asserted their Fifth Amendment rights, and so Guevara and Halvorsen cannot satisfy their burden of showing there are no disputes of material fact at this stage.

The prospect of losing a claim on the merits in the future because of an assertion of the Fifth Amendment is certainly not the type of cost of invoking the privilege that is prohibited—in fact, this prospect of losing on the merits is considered a wholly permissible consequence of asserting the privilege in non-criminal cases. *E.g.*, *Kimm v. Rosenberg*, 363 U.S. 405, 408 (1960) (*per curiam*) (imposing adverse immigration consequences where burden could not be met under a federal statute because of an assertion of the privilege); *Baxter*, 425 U.S. at 318-20 (declining to extend the *Griffin* rule to civil cases and expressly permitting inferences against the asserting party in a civil action); *Graystone Nash, Inc.*, 25 F.3d 187, 191 (3d Cir. 1994) ("The principle that the invocation of the privilege may be too 'costly' does not mean that it must be 'costless.'"). A party who invokes the privilege deprives the opponent of an essential source of information, obstructs discovery and proceedings, and hinders the search for truth. *Seguban*, 54 F.3d at 390 n.4; *United States v. 4003-4005 5th Ave.*, 55 F.3d 78, 84 (2d Cir. 1995). Moreover, a party cannot use the privilege as a shield to avoid self-incrimination and then as a sword to obtain a litigation advantage. *City of Chicago v. Reliable Truck Parts Co., Inc.*, 822 F.Supp. 1288, 1293 (N.D. Ill. 1993). Sierra is not asking at this stage for entry of judgment in his favor based on Guevara's and Halvorsen's assertion of privilege. On the contrary, he contends only that those Defendants cannot themselves ask for judgment before trial after asserting their Fifth Amendment rights. This Court should deny Guevara's and Halvorsen's motions because of their assertions of the Fifth Amendment.

**C. Requiring More Evidence In Addition to the Assertion of Fifth Amendment Rights Before Denying Summary Judgment Is Contrary to Law**

Based on a misunderstanding of the law, some district courts have required an examination of additional evidence before denying summary judgment to a moving party who has asserted the Fifth Amendment privilege. See *Rivera*, 319 F. Supp. 3d at 1039-40; *Logan v. City of Chicago*, 891 F. Supp. 2d 897, 901 (N.D. Ill. 2012); *Thompson v. City of Chicago*, 2009 WL 674353, at *3 (N.D. Ill. Mar. 12, 2009). These courts have held that there must be "some evidence" in the record apart from the moving party's assertion of the Fifth Amendment to deny the motion for summary judgment. These cases are incorrectly decided and depart from established law.

In some situations, courts have said that judgment should not be entered on the pleadings against a party merely because that party asserts the Fifth Amendment privilege. *National Acceptance v. Bathalter*, 705 F.2d 924, 932 (7th Cir. 1983). In other cases, courts have refused to grant summary judgment to a *moving* party merely because the *non-moving party* asserted the Fifth Amendment. *Seguban*, 54 F.3d at 391. Unfortunately, District courts have read these cases incorrectly to say that summary judgment cannot be *denied* based the *moving* party's assertion of the Fifth Amendment. *Rivera*, 319 F. Supp. 3d at 1039-40. But the cases cited do not support such a proposition, and there is nothing in the law that would justify such a logical leap.

Consider the question this way: Suppose there were a blanket rule that judgment cannot be entered against a party merely because that party has asserted the Fifth Amendment privilege.[2] That rule would not justify the conclusion that a summary judgment motion filed by a party asserting the privilege cannot be denied on that basis. Entering a judgment against a party who

---

[2] And the rule is not so simple in the case law. In some circumstances parties *are* granted judgment merely because the opposing party has asserted their Fifth Amendment rights. *Lyons v. Johnson*, 415 F.2d 540, 541 (9th Cir. 1969) (holding that a plaintiff who asserted the Fifth could not sustain a burden of proof and that judgment for the defendants was appropriate); *see also United States v. $39,000.00 in U.S. Currency*, 951 F.3d 740, 742 (6th Cir. 2020).

asserts the Fifth is much different than denying a motion for summary judgment filed by a moving party who asserting the Fifth. The former situation imposes a high cost for asserting the Fifth Amendment and ends the litigation; the latter merely requires the party asserting the Fifth to face a trial.

District courts have cited *Seguban*, 54 F.3d at 391, in support of the incorrect "more evidence" rule. But that case undermines rather than supports this rule. There, a motion for summary judgment was denied on the logic that the *non-moving party's* assertion of privilege could not justify a grant of judgment to the moving party, without consideration of other evidence. That situation is doubly different than this case: First, here the *moving* party is asking for summary judgment *and* asserting the Fifth. Second, the consequence for the moving party here of asserting the privilege is not a judgment in the nonmovants favor, but instead is the mere denial of the moving party's motion. Courts who have held that summary judgment cannot be denied based on an assertion of the Fifth Amendment privilege alone get the law wrong.

### D. Guevara and Halvorsen Cannot Assert Their Fifth Amendment Rights and Then Obtain Summary Judgment Given Other Evidence in the Record

Regardless, even if the erroneous "some evidence" standard were applied here, requiring Sierra to point to evidence beyond Guevara's and Halvorsen's assertion of the Fifth to defeat summary judgment, their motion for summary judgment remains frivolous. There is ample additional evidence. Indeed, when one considers the record evidence below in the light most favorable to Sierra and the misconduct it establishes, along with Guevara and Halvorsen's assertion of their Fifth Amendment rights when asked about that same misconduct, plainly Guevara and Halvorsen are not entitled to summary judgment.

\*  \*  \*

The discussion above illustrates many independent reasons that it makes little sense for Defendants to have filed summary judgment motions in this case. Parties do not have an absolute right to move for summary judgment in every case, and the Federal Rules establish a preference for speedy resolution of claims. It is a waste of this Court's and the parties' time and resources to litigate hundreds of pages of summary judgment motions in a case where summary judgment is plainly not warranted and a trial is sure to occur. Particularly so when Sierra made proposals to narrow the case and eliminate otherwise meritorious claims to move directly to trial. Dkt. 452.

## IV.    SUMMARY JUDGMENT IS UNAVAILABLE TO THE DEFENDANT OFFICERS

Examining the record in the light most favorable to Sierra and drawing inferences in his favor, this Court should deny summary judgment on all claims and theories on which Defendants have moved. No material factual issues are undisputed. Instead, the facts are hotly contested and must be resolved by a jury. Moreover, Defendants' purely legal arguments lack merit and contradict deeply established Supreme Court and Seventh Circuit cases.

Defendants move for summary judgment on portions of Sierra's due process fair trial claim. But the evidence in the record supports Sierra's due process claim on each of three, independent theories of liability—fabrication of evidence, suppression of evidence, and fabricated identifications using suggestive identification procedures. On fabrication, Defendants deny they fabricated Rodriguez's identifications; some deny they were involved in fabricating Melendez's identifications, without disputing that those identifications were fabricated; and all assert they are not liable for their fabrications because they were not all admitted as evidence at Sierra's criminal trial. These arguments fail in the face of disputed facts and get the law completely wrong.

22

On suppression, Defendants do not address the disputes of fact that preclude summary judgment. Instead, they assert the law permitted them to suppress their fabrications of evidence with impunity, a position contrary to Supreme Court and Seventh Circuit precedents. In addition, they argue that the evidence relating to Melendez that they suppressed was revealed by Melendez at trial, which is disputed and skips over the fact that their suppressions of Melendez evidence deprived Sierra not only of evidence to impeach Melendez but also evidence that he could have used to impeach all of the other State's witnesses at trial, including Defendants who testified. Finally, Defendants argue Sierra's attorney should have discovered the evidence they were hiding by exercising more diligence, a view that is disputed and is incompatible with controlling law.

With respect to Sierra's unduly suggestive identification theory, Defendants incorrectly argue contrary to Seventh Circuit precedents that such a claim is not cognizable under § 1983. In addition, they contend there is no evidence the used suggestive identification procedures with Rodriguez. But even accepting the *Defendants'* own version of the facts, they are liable for using improper identification techniques, resulting in a false identification of Sierra, which tainted Sierra's criminal trial. The law prohibiting Defendants' illegal tactics was clearly established long before 1995.

Finally, Defendants' other arguments on Sierra's Fourth Amendment legal seizure claim, Illinois malicious prosecution claim, federal failure to intervene claim, federal and state conspiracy claims, and Illinois negligence claims lack merit and depend on reviewing the factual record in the light most favorable to Defendants, which this Court cannot do at this stage. So, too, for the separate argument from Wojcik, Figueroa, Biebel, and Mingey that they were not involved in the misconduct at issue (which begs the question why the other Defendant Officers have moved for

23

summary judgment). Sierra's claims must go to trial against the Defendant Officers on all theories, except those on which Sierra is entitled to summary judgment. Dkt. 510.

### A. Defendants Cannot Rely on Rodriguez's Past Testimony At Summary Judgment, Given Rodriguez's Refusal to Testify In This Civil Case

In support of their arguments, Defendant Officers cite past testimony from Rodriguez, in a circular and self-serving fashion, relying on Rodriguez's testimony from the criminal trial, which Sierra contends was fabricated, and proceeding as though that testimony is uncontroverted. *E.g.*, OB-21; GB-3-4. As explained below, Rodriguez's testimony is disputed: his criminal case testimony is contradicted by the testimony of other witnesses and evidence; that testimony is itself inconsistent; it is contradicted by his own later 2009 deposition in *Juan Johnson*; and it is contradicted by Defendants' assertions of the Fifth and the inferences drawn from that assertion.

Regardless, Defendants cannot rely on Rodriguez's past testimony at all, and certainly not at summary judgment, given Rodriguez's refusal to testify here. Though the issue need not be resolved conclusively now, given the many material disputes of fact that preclude summary judgment for each of Defendants, Sierra briefly explains why Defendants cannot rely on Rodriguez's past testimony.

Rodriguez refused to testify in this civil case, despite being ordered repeatedly to testify in response to Sierra's motion and multiple attempts to take his testimony. Rodriguez stated he wished to assert his Fifth Amendment rights instead of testifying repeatedly. When he was hauled in for a hearing in Arkansas and ordered to testify, Rodriguez refused, even under threat and after being held in criminal contempt. During the Arkansas proceedings, Defendants opposed Sierra's motions to compel Rodriguez's testimony (and they supported Rodriguez's motion for a protective order that would have prevented his testimony). PSOF ¶¶270-272.

24

Plainly, Rodriguez cannot be called by Defendants at trial given his refusal to provide testimony during discovery, *Barker v. Int'l Union of Operating Engineers Loc. 150*, 2011 WL 6338800, at *2 (N.D. Ill. Dec. 19, 2011) (a party who does not sit for a deposition is disqualified from testifying at trial); *Adams v. City of Chicago*, No. 06 C 4856, 2013 WL 12324659, at *9 (N.D. Ill. Sept. 5, 2013) ("[D]efendants cannot present at trial any information not previously disclosed in discovery."), and Defendants will not be able to offer his past testimony for its truth because it is hearsay not meeting any exception.[3] These rules exist to prevent exactly this type of situation, where a witness tells a lie in past proceedings, refuses to be confronted about that lie during discovery in civil proceedings, and a party attempts to introduce the past lie as veracious evidence.

---

[3] Although Defendants might argue at trial that Rodriguez is unavailable under Federal Rule of Evidence 804(a), that does not mean they get to use Rodriguez's past testimony. First, the proponent of hearsay evidence must show and good faith and reasonable effort to procure the witness's testimony before resorting to hearsay, *Reed v. Hathaway*, 596 F.Supp.2d 1200, 1206 (C.D. Ill. 2009) (citing *U.S. v. Reed*, 227 F.3d 763, 767 (7th Cir. 2000)), but here the Defendants took the position at the eleventh hour in the Arkansas proceedings that Sierra's motion to compel Rodriguez's testimony should be denied, and that Rodriguez should not have to sit for another deposition. PSOF ¶¶270-272.

Second, even if Rodriguez were deemed unavailable, Federal Rule of Evidence 804(b)(1)(B) permits former testimony to be offered only against a party who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop the testimony. Though Sierra had the motive to develop Rodriguez's testimony at his criminal trial and suppression hearing, he did not have the opportunity to do so that he would have at Rodriguez's deposition in this case 30 years later, because today the evidence of Defendants' fabrication of Rodriguez's identifications has been fully developed, such that Rodriguez would at minimum have been impeached in his deposition, in a way that was not possible in the 1990s. See *United States v. Burge*, 2090 WL 1108488, at *9 (N.D. Ill. Apr. 23, 2009) (citing *Qatar Nat'l Navigation & Transp. Co. v. Citibank*, 1996 WL 596518, at *2 (S.D.N.Y. Oct. 16, 1996) ("If for any reason … the defendant in this federal action was denied the opportunity to fully develop [the witness's] testimony on relevant issues, the deposition fails to pass muster under Rule 804(b)(1), and would not be admissible at trial."). Moreover, Sierra neither had the opportunity (for similar reasons) nor the motive to question Rodriguez during the 2009 deposition in the *Juan Johnson* matter, a case to which Sierra was not a party, which occurred while Sierra was still incarcerated, and which took place long before the civil discovery in this case revealed Defendants' misconduct regarding Rodriguez. See *United States v. Feldman*, 761 F.2d 380, 385 (7th Cir. 1985) (finding that interests in and opportunity to cross-examination at a criminal trial are meaningfully different from a civil proceeding stemming from the same underlying facts); *United States v. Pizarro*, 717 F.2d 336, 349 (7th Cir. 1983) (noting that former testimony should only be admitted if statements were "subject to the scrutiny of a part interested in thoroughly testing its validity). At trial, Sierra will develop this argument for total exclusion of Rodriguez's past testimony.

Regardless, at summary judgment, Defendants certainly cannot use Rodriguez's past testimony. Just as this "[C]ourt may strike an affidavit (or paragraphs thereof) in support of or in opposition to a motion for summary judgment when the affidavit seeks to establish facts about which the affiant refused to testify," *Laborers' Pension Fund v. Surface Dimensions, Inc.*, No. 07 C 3860, 2011 WL 841515, at *5 (N.D. Ill. Mar. 8, 2011), it can strike references to Rodriguez's prior testimony being used to establish facts about which Rodriguez refused to testify in this case, *In re Edmond*, 934 F.2d 1304, 1308 (4th Cir. 1991) (holding that "the propriety in denying summary judgment is not debatable," where the evidence submitted at summary judgment were hearsay statements from a party who refused to testify at a deposition). This Court should disregard Rodriguez's past fabricated testimony and reject Defendants' arguments that depend on that testimony.[4]

### B. A Reasonable Jury Could Conclude That Defendants Fabricated False Evidence

The Supreme Court and Seventh Circuit "'have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'" *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (citing *Mooney v. Hollohan*, 294 U.S. 103, 112 (1935); *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). This due process theory is entirely distinct from

---

[4]Obviously, the Court cannot, given the circumstances, credit Rodriguez's past fabricated testimony as true and consider it uncontested. To do so would construe the record for Defendants and against Sierra and draw a determination about credibility that is beyond the Court's role. *Tolan*, 572 U.S. at 656-57. Moreover, even if Defendants were allowed ultimately at trial to introduce some portion of Rodriguez's past testimony, the jury certainly will hear about Rodriguez's refusal to testify, his claim that he would assert the Fifth if he testified, and his refusal to give testimony even after being held in criminal contempt. FED. R. EVID. 806. Accordingly, there is no way for the Defendants to rely, consistent with the summary judgment standard, on part of Rodriguez's past testimony and to pretend it is uncontroverted.

the due process theory based on suppression of evidence, which is discussed below. *Petty v. City of Chicago*, 754 F.3d 416, 421-24 (7th Cir. 2014).

There are multiple fabrication theories, each of which would independently justify denying summary judgment:

1. Defendants Guevara, Halvorsen, Wojcik, McMurray, and Biebel conducted a photo identification procedure with Jose Melendez, in which they knowingly fabricated a false identification of Sierra, PSOF ¶¶24-40, 43, 86-93, 100-104, 195;

2. Defendants Guevara, Halvorsen, Wojcik, McMurray, Mingey, and Biebel fabricated entirely that Melendez identified Sierra in a live lineup procedure, when no live lineup procedure occurred, PSOF ¶¶94-97, 100-104;

3. Defendants Guevara, Halvorsen, Wojcik, McMurray and Biebel fabricated that Melendez identified Montanez's car as the one used in the shooting, when he told them that it was not the car used in the shooting, PSOF ¶¶42, 154-156, 159-161, 248;

4. Defendants Guevara, Halvorsen, Wojcik, McMurray, and Biebel conducted a photo identification procedure with Rodriguez, in which they knowingly fabricated a false identification of Sierra, PSOF ¶¶24-40, 105-129, 137-153, 195;

5. Defendants Guevara, Halvorsen, Wojcik, McMurray, and Biebel fabricated entirely that Rodriguez identified Sierra in a photo identification procedure on May 25, when no photo identification procedure occurred on that date, PSOF ¶¶120-129, 137-144, 195;

6. Defendants Guevara, Halvorsen, Wojcik, McMurray, Mingey, and Biebel fabricated entirely that Rodriguez identified Sierra in a live lineup procedure, when no live lineup procedure occurred, PSOF ¶¶130-133, 139-142;

7. Defendants Guevara, Halvorsen, Wojcik, McMurray and Biebel fabricated that Rodriguez identified Montanez's car as the one used in the shooting, when he told them that it was not the car used in the shooting, PSOF ¶¶42, 154, 157, 159-161, 199, 248.

8. Defendant Guevara, in conspiracy with the other Defendants, fabricated a witness statement for Melendez that they knew to be false, which they forced him to sign, PSOF ¶¶98-99;

9. Defendant Guevara, in conspiracy with the other Defendants, fabricated a witness statement for Rodriguez that they knew to be false, which they forced him to sign, PSOF ¶¶135-136;

10. Defendant Guevara, in conspiracy with the other Defendants, fabricated a witness statement for Montanez that they knew to be false, which they forced him to sign, PSOF ¶¶54-72, 127;

11. Defendant Guevara, in conspiracy with the other Defendants, fabricated a witness statement for Montalvo that they knew to be false, which they forced her to sign, PSOF ¶¶162-170;

12. Defendants Guevara, Halvorsen, Wojcik, McMurray, and Biebel fabricated a closing report for their investigation, which included a summary of the evidence that they had fabricated implicating Sierra, PSOF ¶¶56, 68, 84-89, 94, 105-106, 130, 154, 162-165, 193-199;

13. Defendants Guevara, Halvorsen, Mingey, and Biebel fabricated a lineup report and crime scene processing report for their investigation, stating falsely that Melendez and Rodriguez had identified Sierra in a live identification procedure, PSOF ¶¶95-96, 131, 293;

14. Defendants Guevara and Halvorsen fabricated a story that they had seen Montanez driving and Sierra riding in the passenger seat of the car used in the shooting at Esther Reyes's house three days before the shooting had occurred, and that Esther Reyes had identified Sierra as "Junito" and Montanez as "Lil Hector," PSOF ¶¶173-177, 185-189, 193-194, 235-238, 247, 253.

15. Defendants Guevara, Halvorsen and Figueroa fabricated the claim that Sierra was "Junito" and Montanez was "Lil Hector," PSOF ¶¶175, 178, 187-188, 194, 237.

Where a due process violation concerns witness statements, the Seventh Circuit has been careful to distinguish between coerced evidence and fabricated evidence. Police coercion of witnesses that produces truthful testimony does not by itself violate due process, absent a violation of the *Brady* duty to disclose facts about the police coercion that was used to obtain the testimony. *Avery*, 847 F.3d at 439 (citing *Fields v. Wharrie*, 740 F.3d 1107, 1123 (7th Cir. 2014) (*Fields II*)). Police fabrication of witness testimony that the officers know to be false, however, violates due process without need for further analysis. *Id.* at 439-40 (citing *Petty*, 754 F.3d at 423.

Contrary to Defendants' argument, OB-20-21, all of the fabrication theories in the case concern the creation of evidence that Defendants knew was false, and not an assertion that Defendants coerced truthful testimony. The facts construed in the light most favorable to Sierra demonstrate that the Defendants Officers obtained identifications that they knew were false from

28

witnesses who had not seen the perpetrators and who told the Defendants they had not seen the perpetrators. Any other conclusion requires construing facts for the Defendants, at minimum, which is inappropriate at this stage.

The Defendant Officers other than Guevara argue that they were not involved in the fabrications of Melendez's identifications (items 1, 2, 3, and 8, above). OB-18-20. Guevara concedes he cannot move for summary judgment on these theories. GB-2-3. All Defendant Officers contend Rodriguez's identifications were not fabricated (items 4, 5, 6, and 9, above), OB-20-21, though Guevara does not make an independent argument on this point, GB-3; see also Argument I *supra*. Finally, Defendant Officers other than Guevara assert that they cannot be liable for fabricating police reports, Montanez's false statement, or the Reyes story (items 10-14, above) because, in their view, those fabrications did not cause a violation of Sierra's due process right to a fair trial. OB-21-25. Guevara joins that argument, except that he concedes that he is not entitled to summary judgment on his fabrication of the Reyes story (items 13 and 14, above). GB-2-3. All these arguments depend on viewing the facts strictly in Defendants' favor, an approach that is wholly inappropriate at this stage, and their legal arguments lack merit.

1. **Defendants Guevara, Halvorsen, Wojcik, McMurray, Biebel, and Mingey Fabricated Melendez's Identifications**

Defendants' argument that they were not involved in fabricating Melendez's identifications and that it was Guevara alone go well beyond construing the facts in Defendants' own favor. In making this argument, Defendants ask the Court to disbelieve facts in the record. Consider that Guevara, Halvorsen, Wojcik, and McMurray are listed as reporting detectives, and Biebel is listed as the supervising and approving officer, on the closing report that documents that they, the "R/Dets," conducted a photo array with Melendez on May 30 in which he picked Sierra (on page 4), that right after that a lineup was conducted "at Area Five Detectives" in which Sierra was

29

selected (page 4), and that the "R/Dets" asked Melendez to view cars in the parking lot, at which point he identified the car as the one used in shooting (page 5). PSOF ¶¶24-40, 42-43, 86-104, 154-156, 159-161, 195-196, 248. For these Defendants to claim in the face of this evidence that they are entitled to a view of the facts where they were uninvolved in the very things that they themselves reported being involved in does not pass the straight face test.

But there is even more evidence they were involved in Melendez's fabricated identifications. Halvorsen asserts that the only reasonable inference to be drawn from the reports is that Halvorsen lacked first-hand knowledge of the identification procedures, OB-19, but he wrote and signed not only the closing report just discussed, but also the live lineup report, in which he lists himself as a "person conducting line-up"; and he wrote the crime scene processing report, approved and signed by Mingey, claiming that Sierra had been identified in a lineup and that photos of that purported lineup had been taken. PSOF ¶¶95, 131, 132, 195-196, 243, 249. Indeed, Guevara testified at trial that these reports were written by Halvorsen based on facts known to Halvorsen. PSOF ¶249. Halvorsen is also the one who placed his initials on the back of the photos used in the photo array shown to Melendez. PSOF ¶119.

Defendants contend that Melendez testified that only Guevara was present for the photo and car identifications, OB-19, but again the closing report documents that the Reporting Detectives—Guevara, Halvorsen, Wojcik and McMurray—conducted these steps. PSOF ¶¶130, 154, 195-196, 199. Moreover, it was Wojcik and McMurray who brought to Area Five the car used in the fabricated car identification procedure. PSOF ¶75.

Of course, in addition to this evidence, under oath Defendant Halvorsen did not deny that he had any involvement in the fabricated identifications of Melendez and the car; rather, he pleaded the Fifth about his involvement in those fabrications. PSOF ¶161.

In light of this record evidence, Defendants cannot assert at summary judgment that they were uninvolved as a factual matter in fabricating Melendez's identifications. Defendants participated in the identification procedures. They had knowledge of the false identifications. They reported them. And the identifications were a central part of their conspiracy to frame Sierra. A trial is required against Guevara, Halvorsen, Wojcik, McMurray, Biebel, and Mingey on the fabrication of Melendez's identifications. And again, once the Court makes the determination that these Defendants will proceed to trial on the due process claim, it need not address every other sub-theory and item of evidence. See Argument II *supra*.

**2. Rodriguez's Identification of Sierra and the Car Were Fabricated**

Defendants next contend that Rodriguez's identification of Sierra and the car were not fabricated. OB-20-21. In this argument, they do not argue that they were uninvolved in the identifications, but instead contend Rodriguez's identification of Sierra was accurate. *Id.* Moreover, the argument is based exclusively on Rodriguez's past testimony, including the testimony that Sierra contends was fabricated by Defendants, which Defendants treat as unrebutted. OB-21. For the reasons explained above, Defendants may not rely on this testimony this way. See Argument IV(A) *supra*.

Regardless, Defendants' reliance on fabricated testimony to disprove their own fabrication of evidence at summary judgment obviously does not faithfully apply Rule 56. Properly construing the record for Sierra and drawing inferences for him, as this Court must, Rodriguez did not see the perpetrator of the shooting. He could not describe the shooter at the scene, because he was on the wrong side of the car and had a worse view than Melendez, who is adamant he could not see the shooter. Rodriguez, too, did not see his face. In addition, Sierra is innocent, as this Court must infer at summary judgment based on the evidence. Despite that, Defendants selected Sierra as their

suspect before Rodriguez made any identification, and then obtained an identification from Rodriguez of their suspect, an innocent man. PSOF ¶¶1-2, 10, 107-113, 173-179, 185-189, 193-194, 235-238, 247, 253. Based on those facts alone, Sierra is entitled to the inference that Defendants fabricated Rodriguez's identification of Sierra to frame him and knew that it was false.

But there is so much more. There is record evidence that Melendez's identifications of Sierra and the car were fabricated, which no Defendant challenges (some just contend they were uninvolved). Melendez describes how he told the Defendants he could not identify the shooter, that he was instructed to select Sierra, that Defendants made up the live lineup, and that he told them the car in the parking lot was not the one used in the shooting, after which Defendants reported that Melendez had identified Sierra in a photo array and live lineup freely and without suggestion, and that he had positively identified the car as well. PSOF ¶¶24-40, 43-47, 89-97, 100-104, 154-156, 159-161, 195, 248. This unchallenged evidence that Defendants knowingly fabricated Melendez's identifications firmly supports the inference at this stage that they did the same thing with Rodriguez.

Moreover, Defendants entirely fabricated a story that Rodriguez's identification of Sierra took place during a photo array on May 25 at Rodriguez's house. That story is refuted by Rodriguez himself, by the fact that Defendants did not document that purported identification, did not inventory any photo array for Rodriguez until May 30, and did nothing to arrest Sierra for five days after he was purportedly identified on May 25 as a murderer. PSOF ¶¶120-129, 138-140, 143-144.

Similarly, the Defendants fabricated that a lineup occurred in which Rodriguez identified Sierra on May 30, whereas the record evidence shows otherwise. Indeed, while Rodriguez described events surrounding his photo array identification, he did not participate in a second

identification procedure. PSOF ¶¶130-133. That the Defendants fabricated the entire story about the photo identification procedure on May 25 and the live lineup on May 30 further supports Sierra's view that they fabricated Rodriguez's identifications.

Moreover, it is undisputed in the record that Defendants fabricated Rodriguez's identification of the car used in the shooting. Defendants' report states that Rodriguez walked through the parking lot and identified Montanez's black Buick Park Avenue as the car from which Thomas Sierra fired his gun. According to Rodriguez's own testimony, he told Defendants that vehicle looked similar, but said that the car used in the shooting was different because it had tinted windows. PSOF ¶¶154, 157-159. The blatant fabrication of Rodriguez's identification of the car further supports the view of the evidence discussed already that Defendants fabricated Rodriguez's identification of Sierra.

Defendants do not address anywhere in their motion Sierra's contention that they selected him as a suspect based on their interactions with Montanez, before any witness had participated in an identification procedure, and then made up a story after the fact to suggest that they had a legitimate lead. And that false story about how Sierra became a suspect and Defendants' later fabrication of Rodriguez's identification are intimately related. PSOF ¶¶54-72, 173-179, 185-189, 193-194, 235-238, 247, 253. Defendants cannot hope for summary judgment on Sierra's fabrication claims having failed to even address the fabricated origin of their scheme. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("[I]f the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Purghoraishi v. Flying J*, 449 F.3d 751, 765 (7th Cir. 2006) (same). It will obviously

be too late for Defendants to raise these arguments in their reply. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (reversing summary judgment granted on issue first raised in a reply).

Add to all of this that Guevara took the Fifth when asked if Rodriguez's identifications were fabricated, PSOF ¶¶137-142, 160, that Halvorsen did the same, PSOF ¶¶143-145, 161, and that Rodriguez refused to testify and also said that he would invoke his Fifth Amendment privilege if he were called to testify, PSOF ¶¶270-272. Drawing the necessary inferences for Sierra from those refusals to testify, combined with the other evidence above, Defendants have no hope of winning the argument that Rodriguez's identifications were legitimate in this case. This Court should reject Defendants' argument that they are entitled to a judgment as a matter of law that Rodriguez's identifications were not fabricated.

### 3. Defendants' Fabrications Were Used to Deprive Sierra of His Liberty

Defendants' last argument for summary judgment on Sierra's fabrication theories is that they cannot be held liable because certain items of evidence they fabricated—their fabricated reports, OB-22-23, Montanez's and Montalvo's false statements, OB-23-24, and their fabricated Reyes story, OB24-25—were not admitted as evidence as Sierra's criminal trial. OB-22-25. The argument is wrong on the law and the facts. However, before turning to those issues, it is important to observe that Defendants do not contend that the fabricated Melendez and Rodriguez identifications were not introduced at Sierra's criminal trial. See *id.* Those fabrications were introduced, and they are alone enough for each of the Defendant Officers to be held liable on Sierra's fabrication due process theory. Again, the Court should not address sub-theories and items of evidence one by one when it is already clear there will be a trial. See Argument II *supra*.

On the law, Defendants' position that they cannot be liable for fabrication of evidence unless the particular item of evidence fabricated is admitted as evidence at the criminal trial, OB-

22., fundamentally misunderstands Seventh Circuit law governing fabrication due process claims. An officer who fabricates evidence violates due process if their fabrication causes any deprivation of liberty. This is true whatever form the initial fabricated evidence takes (*e.g.*, a false report, a manufactured statement, a fabricated identification, invented physical evidence, or planned testimony, etc.), regardless of the stage of the criminal case at which the fabrication causes a liberty deprivation (*e.g.*, issuance of a warrant, filing of charges, an indictment, a conviction, etc.), and however the evidence comes to impact the criminal proceedings (*e.g.*, introduced as an exhibit, offered as testimony, or used to preclude other evidence from being used in the criminal case).

The question is simply whether the fabrication caused a deprivation of liberty. As the Seventh Circuit put it in *Whitlock v. Brueggemann*, "We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty *in some way*." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) (emphasis added). The cases unanimously hold that due process is violated when fabricated evidence causes a liberty deprivation at any stage of the criminal proceedings, even when the initial fabrication is not admitted in its original form in those proceedings. See, *e.g.*, *Patrick v. City of Chicago*, 974 F.3d 824, 835-36 (7th Cir. 2020) (affirming a due process fabrication verdict against multiple defendants where a plaintiff's coerced confession and a fabricated lineup report were introduced at the criminal trial in the form of oral testimony); *Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019) (holding that summary judgment not available where police officer fabricated witness statements before trial and then instructed witnesses to testify consistent with those fabricated statements at trial); *Avery v. City of Milwaukee*, 847 F.3d 433, 441-42 (7th Cir. 2017) (due process violated when fabricated confession of the plaintiff was introduced at trial through police testimony); *Stinson v. Gauger*, 868 F.3d 516, 528

(7th Cir. 2017) (*en banc*) (due process violated when police collude with a witness to fabricate expert testimony before a criminal trial and the fabrication is later introduced as trial testimony); *Whitlock*, 682 F.3d at 582-84 (due process violated when witness testimony fabricated by police before trial is introduced at trial by an immune prosecutor).[5]

Fabricated evidence violates due process when it is admitted as evidence, when it comes in at trial through the testimony of police or witnesses, where it used to affect the outcome of the criminal case (including by preventing the criminal defendant from calling a witness at trial), or where it "furthered the prosecution" in any other way. *Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2018).[6] Accordingly, there is no support for Defendants' position that they can be liable only if a particular item of fabricated evidence was actually introduced at trial in its original form.

On the facts, there are numerous material disputes of fact about whether the items of evidence Defendants say were fabricated but not introduced were used to deprive Sierra of his liberty during the criminal proceedings. A trial is required to resolve these disputes. *Washington*, 2022 WL 4599708, at *21 (where arguments about the use of fabricated evidence involve disputes of fact about the effect of evidence on a criminal case, a trial is necessary). With respect to Defendants' police reports, the fabricated closing and lineup reports need not themselves have been exhibits at trial, because their contents were introduced through the testimony of the

---

[5] In addition, the Supreme Court implicitly rejected Defendants' myopic view of a fabricated evidence claim in both *Buckley v. Fitzsimmons*, which approved a fabrication claim where physical evidence of a boot print was fabricated before trial and then introduced through the testimony of a witness at trial. 509 U.S. 259, 262-64 (1993), and more recently in *McDonough v. Smith*, where the Court recognized that a claim that falsified affidavits, witness coaching, and a bogus DNA analysis fabricated before trial violated the Constitution when that evidence was later introduced though witness testimony. 139 S. Ct. 2149, 2154 (2019).

[6] Defendants cite *Avery*, OB-22, but that case supports Sierra's position: the Seventh Circuit there recognized that evidence often comes in at trial through oral testimony, and it rejected the proposition that witness testimonial immunity renders a state actor not liable for a pre-trial act of fabrication. 847 F.3d at 441. In so holding, *Avery* recognizes that the pre-trial act of fabrication still may violate due process rights if the fabricated evidence affects the criminal proceedings later in some other form.

Defendants and third-party witnesses. *Taylor v. City of Chicago*, 2021 WL 4401528, at *7 (N.D. Ill. Sept. 27, 2021) ("Although the report itself was not admitted into evidence, as the Court has previously noted, the contents of the fabricated report certainly were.").

Then at the criminal trial, Guevara's testimony covered all of the topics in the fabricated closing report, in the same order as the report, and Guevara testified about the report after being shown it on the stand. Guevara's criminal testimony follows the roadmap of his fabricated report. And Sierra is entitled to the inference that Guevara's testimony before the grand jury was the same. PSOF ¶¶84-86, 105-06, 130, 162-64, 173-77, 230, 235-38, 243-48. That alone is enough to dispose of Defendants' argument, without even considering the many other ways that Defendants' false reports led to a detention without any legal basis, false charges, and ultimately a wrongful conviction.[7] A jury must consider the claim that Defendants' pre-trial fabrication of false reports violated Sierra's due process rights when the fabrications outlined in those reports were used against Sierra during his criminal proceedings.[8]

---

[7] Defendants rightly do not raise any argument for testimonial immunity in their summary judgment briefs. Testimonial immunity does not extend to pre-trial acts of fabrication that are then presented by way of testimony at trial. *Rehberg*, 566 U.S. at 370 n.1; *Avery*, 847 F.3d at 441-42 (an officer cannot immunize himself simply by testifying about his false evidence at trial and noting that "[i]f an officer who fabricates evidence can immunize himself from liability by authenticating falsified documentary or physical evidence and then repeating the false 'facts' in his trial testimony, wrongful-conviction claims premised on evidence fabrication would be a dead letter."). Accordingly, Guevara is immune for the act of lying at the grand jury and trial, but he is liable for fabricating evidence before criminal proceedings that was later introduced through his testimony during criminal proceedings.

[8] Defendants rely on *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1159-60 (N.D. Ill. 2022), which is wrongly decided. There, police officers testified about evidence outlined in fabricated reports on the stand at trial, but the district court held that these fabrication claims could not proceed because the witnesses "testified to a version of evidence consistent with the reports" and were "entitled to absolute immunity" for that testimony. *Id.* That logic directly contradicts the binding Seventh Circuit law just discussed, which has repeatedly recognized that a pre-trial fabrication of evidence is actionable even though it is only introduced through witness testimony at trial. The Seventh Circuit has never approved a grant of summary judgment on the grounds discussed in *Brown*. Moreover, as discussed in the previous footnote, the Defendants here do not raise any claim to testimonial immunity in their summary judgment briefs, forfeiting the issue.

Second, although Defendants correctly observe that Defendants' fabricated statements attributed to Montanez and Montalvo were not introduced at Sierra's criminal trial, OB-23-24, those fabricated statements still caused Sierra's due process rights to be violated during the criminal proceedings. First, Montanez's fabricated statement was included in the sworn arrest report that was submitted to obtain murder charges against Sierra on May 31, 1995, PSOF ¶¶125, 127-129, which caused a deprivation of Sierra's liberty. *Hurt*, 880 F.3d at 844. Second, Defendants' fabricated incriminatory statements attributed to Montanez meant that Sierra could not call Montanez at trial to truthfully testify that neither he nor Sierra had been involved in the crime. Third, Defendants' false statement attributed to Montalvo prevented Sierra from calling the main witness to corroborate his alibi at trial. The false report thus provided the state with information that it could use to impeach a truthful story at trial that would have exonerated Sierra. That is a due process violation because the fabricated statements contributed to the unfair trial. *Washington*, 2022 WL 4599708, at *21. To be clear, Sierra need not depend on this particular due process sub-theory at this stage, and the Court need not even consider it, Argument II, *supra*, given that Sierra explains in detail below how Defendants' misconduct concerning Montanez and Montalvo requires a trial on an evidence suppression theory, Argument IV(C)(2) *infra*.

Third, Defendants advance the frivolous argument that they cannot be liable for their fabrication of a story that they had seen Sierra riding in the car used in the shooting three days before the shooting at Reyes's house. OB-24-25. Defendants contend this fabricated evidence was not used against Sierra, but it is a central feature of Guevara's testimony on the stand at the criminal trial, where Guevara testified falsely about seeing the car at Reyes's house, observing Sierra in it, asking Reyes who the car's occupants were, confirming that the car he had seen was the one identified by Melendez and Rodriguez as the one used in the shooting, and even identifying Sierra

in open court. PSOF ¶¶235-238, 247; *also* ¶¶173-177, 185-189, 193-194. Defendant Figueroa, too, testified about the fabricated Esther Reyes story, and the false nickname used to connect Sierra. PSOF ¶253. All of this was false, and it was all fabricated evidence the individual Defendants used throughout Plaintiff's criminal proceedings. Defendants' argument that this evidence was not used at trial is meritless.

Finally, in a single footnote, the Defendants assert without explanation that "[t]he only piece of allegedly fabricated evidence that was introduced at trial was Melendez's handwritten statement. OB-23 at 23 n.6. That is simply untrue. All of Defendants' fabricated evidence outlined at the start of this section was used to deprive Sierra of his liberty. Indeed, all of the evidence that implicated Sierra in the Andujar shooting was created by the Defendants. To the extent that the Defendants disagree, it is because there are genuine disputes of fact. Summary judgment on Sierra's fabrication theories should be denied.

C. **Independently, A Reasonable Jury Could Conclude That Defendants Suppressed Material Exculpatory and Impeachment Evidence**

This Court should also deny summary judgment on Sierra's evidence suppression due process theories. *Brady* requires that exculpatory and impeachment evidence material to the criminal case be disclosed to the prosecution and defense, "[a]nd police officers can be held liable under *Brady* and its progeny when they withhold exculpatory evidence from prosecutors[.]" *Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011); see also *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). The Seventh Circuit has long recognized that section 1983 due process claims may be brought against police who withhold evidence, causing wrongful convictions. *Whitlock*, 682 F.3d at 572; *Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001); *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988).

The Supreme Court holds that "[e]vidence qualifies as material when there is '"any reasonable likelihood"' it could have '"affected the judgment of the jury."'" *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Napue v. Illinois*, 360 U.S. 264, 271 (1959)). A litigant "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted. . . . He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* (citing *Smith v. Cain*, 132 S. Ct. 627, 629-31 (2012)); see also *Kyles*, 514 U.S. at 434.

The question whether suppressed evidence was material must be answered considering all of the suppressed evidence together in the aggregate, and not by assessing evidence piece by piece. *Wearry*, 577 U.S. at 394. Whether evidence is material also depends on the strength of other evidence used in the criminal proceedings—it might take only a little evidence to disturb an already-weak conviction. *United States v. Agurs*, 427 U.S. 97, 113 (1976).

A group of Defendants who each suppress different items of evidence that are collectively material are each liable for the resulting due process violation, even if one may have an argument that they item evidence they suppressed was not alone material. *Goudy*, 922 F.3d at 843 ("[A]ll defendants who can be shown to have suppressed evidence in violation of *Brady* . . . should be liable for the aggregate impact on the outcome of the trial [the plaintiff] ultimately received.") (internal quotations and citations omitted).

Importantly, it is firmly established that evidence that would impeach a key eyewitness is material. *Giglio*, 405 U.S. at 153-54; *see also Smith*, 565 U.S. at 75 (impeachment evidence regarding eyewitness material when eyewitness was the only evidence connecting defendant to the crime); *Fields v. Wharrie*, 672 F.3d 505, 517 (7th Cir. 2012) (*Fields I*) ("The constitutional violation occurs when the means by which the testimony was acquired are not disclosed at trial—

40

or when other information that impeach the testimony's reliability are not shared with the defense."); *Newsome v. McCabe*, 319 F.3d 301, 302-05 (7th Cir. 2003) (holding that "the details about how [the police] induced the witnesses to finger Newsome" was "information vital to probe whether manipulation occurred").

The case against Sierra could not have been thinner. There was no evidence implicating him other than the fabricated evidence discussed above. Any one of the pieces of exculpatory evidence suppressed by Defendants would have undermined confidence in his prosecution and conviction. Any piece of it would have impeached key witnesses at trial—the eyewitnesses and the Defendant Officers. When the suppressed evidence is considered collectively, there is no chance any Defendant is entitled to summary judgment on the suppression claim.

### 1. Defendants Suppressed Their Own Fabrications

At the outset, the Defendant Officers suppressed that they had fabricated the false evidence discussed in the previous section. Specifically, Defendants did not disclose to state prosecutors, to Sierra, or to his criminal defense attorneys that they had fabricated Melendez's and Rodriguez's photo identifications of Sierra, their identifications of the car used in the shooting, a live lineup in which both had purportedly selected Sierra, false witness statements from Melendez, Rodriguez, Montanez, Montalvo, police reports falsely documenting the investigation, and their story about seeing Sierra in the car before the shooting at Reyes's house. Argument IV(B) *supra*. Had the Defendants disclosed that they had fabricated this evidence incriminating Sierra, it would have immediately halted the criminal prosecution and conclusively shown Sierra's innocence. The suppression of the fact that items of incriminating evidence were invented by police is precisely the sort of impeachment evidence that is material as a matter of law, within the meaning of *United States v. Bagley*, 473 U.S. 667, 676 (1985), and *Giglio*, 405 U.S. at 154-55. It could have been

used to cross-examine literally every state's witness at trial in a manner that would have left the state without any evidence to prosecute or convict. *Smith*, 565 U.S. at 75; *Fields I*, 672 F.3d at 517; *Newsome*, 319 F.3d at 302-05. Defendants' suppression of their own fabrications is enough for Sierra's suppression claims to survive summary judgment.

### (a) Defendants' Position That Suppressions of Fabricated Evidence Cannot Violate Due Process Is Wrong

Defendants incorrectly assert that facts giving rise to a due process fabrication claim cannot also give rise to a due process suppression claim. OB-26-28. This made-up legal rule has no support in the law and Defendants cite none. Contrary to Defendants' position, the Seventh Circuit has recognized in many cases that the same facts may give rise to both a fabrication claim and a suppression claim. The *en banc* Seventh Circuit in *Stinson* endorsed due process claims brought against defendants who violated due process by "(1) fabricating the principal evidence of [the plaintiff]'s guilt (the opinions that his detention matched the bite marks on [the victim]), and (2) failing to disclose, as required by *Brady*, the defendants' agreement to fabricate this evidence." 868 F.3d at 524-25. Similarly, *Avery* explained that a claim regarding fabricated informant statements used in a criminal case gave rise not only to a fabrication due process theory but also a *Brady* theory because, although the plaintiff "knew that the informants' statements were false, . . . he did *not* know about the pressure tactics and inducements the detectives used to obtain them. . . . In other words, he did not have the evidence that could help him *prove* that the informants' statements were false." 847 F.3d at 443-44. In *Engel v. Buchan*, the Court recognized a *Bivens* claim where "[the plaintiff] claim[ed] that [the defendant] framed him by fabricating evidence and manipulating witnesses, then suppressed this evidence in violation of *Brady*." 710 F.3d 698, 699 (7th Cir. 2013). And in *Lewis v. City of Chicago*, the court said expressly that when fabricated evidence causes a conviction, it gives rise to liability for a due process violation for fabrication of

evidence, and that "misconduct of this type that results in a conviction might also violate the accused's right to due process under the rubric of *Brady* . . . , if government officials suppressed evidence of the fabrication." 914 F.3d 472, 480 (7th Cir. 2019).

Consider how illogical Defendants' proposed rule would be. According to Defendants, a police officer could pay a witness to provide a false manufactured statement implicating a criminal defendant, and though the fabricated statement might violate the criminal defendant's due process right, the police officer is under no *Brady* obligation to disclose that he paid the witness off. Or an officer could plant a criminal defendant's blood on an item of physical evidence found at the scene to connect the defendant falsely to a crime, violating due process, but the state would face no obligation under *Brady* to disclose that the item of evidence contained no blood at the time it was collected from the scene. Or an officer could even fabricate that he himself was a witness to a crime and saw the defendant do it, and provide that testimony on the stand at trial, without any due process obligation to disclose that he was off of work and out of the country on the day of the crime. The suggestion that such suppressions do not violate the Constitution is patently absurd. The *Brady* case line is not a hyper-technical system of disclosure rules. Instead, the Supreme Court has for decades made clear that *Brady* imposes an affirmative duty on the government "to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police," and then to disclose all of that exculpatory and impeachment evidence, even if it has not been requested, if the evidence considered collectively had a reasonable probability of impacting the criminal case. *Kyles*, 514 U.S. at 432-38. This Court should reject Defendants' novel new legal rule.

**(b)** *Gauger***'s Rule Regarding Suppressions Relating to False Confessions Cannot Apply To This Case**

Because the argument Defendants make has sown some confusion in cases decided by courts in this Circuit, it is worth explaining a bit more why the cases Defendants rely upon do not apply in the context presented by Sierra's case. In support of their argument, Defendants cite to *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015), part of the line of Seventh Circuit cases that started with *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003), which hold that police are not required under *Brady* to disclose the true circumstances of an interrogation of a criminal defendant that results in a false confession because, according to these cases, the criminal defendant was present for and knows the true circumstances of the interrogation and false confession. The logic of these decisions is that police are not required to turn over evidence already known to the criminal defendant because that evidence has not been "suppressed" within the meaning of *Brady*.

This is not a false confession case, and the Seventh Circuit has emphasized that *Gauger*'s logic does not extend to the type of evidence suppression claims presented here. In *Avery*, the Court held that *Gauger*'s rule does not apply where police are aware of exculpatory or impeachment evidence that the criminal defendant/civil plaintiff does not possess. 847 F.3d at 443-44. There, the Court confronted the situation where police fabricated witness statements to implicate a plaintiff at his criminal trial, causing his wrongful conviction. *Id.* Though the plaintiff all along knew those statements were false, the Court held that *Gauger* did not apply, and that the police had an obligation to disclose and could not remain silent about how they had manufactured the false witness statements and the tactics they had used to get the witnesses to adopt them. *Avery*, 847 F.3d at 443-44. Put simply, where the police know of evidence that the criminal defendant does not, including evidence that might impeach a third-party witness or police officer who

44

testifies falsely, that evidence must be turned over and *Gauger* does not apply, even though the criminal well knows that the evidence used against him is false. *Avery*, 847 F.3d at 443-44.

Applying this rule, courts have limited *Gauger* to the context of cases where police interrogate and coerce a confession from a criminal defendant, and the criminal defendant then contends that the police should have disclosed the circumstances of the interrogation and false confession, *Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829, at *22 (N.D. Ill. Jan. 24, 2024), and they have not applied the same rule in cases, like this one, where police have suppressed the true circumstances of their own conduct and their interactions with third-party witnesses who inculpate the suspect, *Smith v. Burge*, 222 F. Supp. 3d 669, 680 (N.D. Ill. 2016) ("Courts in this district have concluded that similar allegations state a *Brady* claim based on events that transpired outside of the interrogation room.").

The *Gauger* rule has no application to any of the claims or theories in this case. Defendants only overtly argue it applies to Sierra's theory that Defendants suppressed that they had not seen Sierra at the Reyes house in the car used in the shooting three days before the shooting, and that they had fabricated their reports and testimony about that encounter. OB-32. According to Defendants, Sierra knew that he had not been at Reyes's house, and therefore he had everything that he needed to impeach the Defendants' false story, without their need to disclose evidence. *Id.* This is wrong, and it is precisely the argument that was rejected in *Avery*. In *Avery*, the criminal defendant knew that the witnesses' statements were false, and the police suppressed information about how they had obtained those false statements, which the defendant could have used to impeach the witnesses at trial. Here, Sierra knew that Defendants were lying about Reyes's house, and the police suppressed the information about how they had invented that story after the fact, which Sierra could have used to impeach the Defendants when they delivered that false story on

the stand. The fact that police officers are being impeached instead of third parties does not change the constitutional rules that apply to these cases, and any suggestion otherwise should be rejected.

In this section of their brief, Defendants cite to this Court's decision in *Williams v. Bachler*, No. 16-CV-9222, 2018 WL 3022687, at \*3 (N.D. Ill. June 18, 2018), which concluded that a plaintiff could proceed with a claim that police officers had fabricated evidence that he had drugs and a gun in his car, but not with a *Brady* claim based on their suppression of the fact that they had fabricated that evidence. This Court concluded that, because the plaintiff knew that he did not have drugs or a gun in his car, the police officers had not withheld any evidence from him. For the reasons discussed above, this part of *Williams* is wrongly decided, it represents an unwarranted extension of *Gauger* into the non-confession context, and it contradicts Seventh Circuit and Supreme Court precedents. Again, *Avery* recognized that a police officer is liable under *Brady* for failing to disclose a fabrication of evidence when the officer knows of impeaching facts pertinent to that fabrication, 847 F.3d at 443-44, and a police officer's lie that drugs or a gun was found in a car is certainly a fact that can be used to impeach *the officer* at trial. Where there any doubt, the Seventh Circuit held recently in *Camm* that a police officer's lie about evidence in an investigation is itself actionable under *Brady*, regardless of the exculpatory value of the evidence being lied about, because "exposing the lie . . . would have eroded the jury's trust in both the prosecutor and the lead case investigator," and "it would have set up an argument that they were hiding crucial evidence because they thought it might undermine their case," both of which "can help create reasonable doubt." 937 F.3d at 1110. Given these cases, there is no argument that Defendants can escape liability on *Brady* claim that Defendants suppressed that their story implicating Sierra as a suspect before the crime occurred was a lie merely because Sierra knew it was a lie.

46

The *Gauger* rule should not be overread in a way that eliminates the meritorious *Brady* claims in this case in advance of trial. This Court should reject the application of the *Gauger* rule in this case, as *Avery* instructs.[9]

### (c) Defendants' Suppressions of Their Fabrications Were Material to Sierra's Criminal Prosecution

A jury must decide whether Defendants are liable for suppressing the material exculpatory and impeachment information relating to their fabrications of false evidence. The record construed for Sierra permits a reasonable person to decide that Defendants are liable for suppressing that no photo identification procedure took place on May 25, when according to Defendants' account of the investigation Rodriguez made his first identification of Sierra, which would have impeached

---

[9] Sierra preserves for appeal the argument that *Gauger* is wrongly decided because it conflicts with Supreme Court precedents. *Gauger* included dubious language that state actors are not required "to create truthful exculpatory evidence," 349 F.3d at 360, and *Saunders-El* parlayed that into an assertion that police are not required "to accurately disclose the circumstances of their investigations to the prosecution," 778 F.3d at 562. This legally incorrect language has not been embraced by the Seventh Circuit since, and it conflicts with the Supreme Court and Seventh Circuit cases just discussed.

The notion that police may remain silent after fabricating evidence, without disclosing what they have done, is incompatible with the Supreme Court's longstanding admonition that police officers may *not* remain silent when they fabricate evidence in criminal cases. *Miller v. Pate*, 386 U.S. 1, 7 (1967). It is also wrong because the premise that *Brady* does not require an officer to truthfully corroborate a criminal defendant's account of an interrogation resulting in a false confession cannot be squared with cases that require the government to disclose information known to the state that would impeach a government witness, including a police officer. *United States v. Bagley*, 473 U.S. 667, 677 (1985); *Giglio*, 405 U.S. 150. If *Gauger* were right and police did not have to disclose under *Brady* that they had coerced the criminal defendant to sign a fabricated confession, then the police could take the stand in the criminal case and testify falsely that the coercion and fabrication had not occurred, all the while withholding the truthful evidence that might be used to impeach their own testimony.

The problem with *Gauger* becomes clear when one considers a case where police officers videotape their coercion of a false confession from a criminal suspect. Under any reasonable understanding of *Brady*, the videotape plainly would have to be turned over in criminal discovery, because it exculpates the criminal defendant, corroborates the defendant's account that the confession is false and procured by police coercion, and impeaches a contrary account offered by the police. But *Gauger*'s logic suggests that evidence need not be turned over, because the criminal defendant already knows the true circumstances of the interrogation and false confession. Under *Gauger*, the police could also merely decide to stop the video recording when their interrogation begins, and thereby free themselves of the obligation of providing truthful evidence to prosecutors and criminal defendants. That is not a functional legal doctrine compatible with the Supreme Court's *Brady* cases. Sierra preserves these arguments here in the event *Gauger* is incorrectly applied here.

Rodriguez's identifications and Defendants' own testimony in the criminal case. PSOF ¶¶120-129, 140. Or for suppressing that Guevara had told Melendez who to pick from the photo array, which could have been used to impeach Guevara's false testimony at trial. PSOF ¶¶89, 91-93, 195, 233; 243-46. Or the fact that no live lineup occurred with Melendez or Rodriguez, which would have been highly exculpatory and would have impeached all of the police and witness testimony. PSOF ¶¶94-97; 130-33. Or for suppressing that no witness had told Defendants that the car from the Area Five parking lot was the one used in the shooting, which would have deprived the state of a key identification and Defendants of a main piece of evidence connecting Sierra to the crime. PSOF ¶¶155-58. Or the fact that they had never seen Sierra at Reyes's house, which would have impeached their story that they had seen Sierra in that car three days before the shooting, which was their proffered reason for suspecting Sierra in the first place. PSOF ¶¶185-86. Or that they had made up Sierra's connection to the nickname Junito. PSOF ¶¶187-88. Or that Montanez had implicated Sierra only after being forced to do so. PSOF ¶¶55-65. The list of ways that disclosing Defendants' fabrications would have been exculpatory and impeaching goes on and on.

The disclosure of any one party of this evidence would have been material to Sierra's criminal case, within the meaning of *Brady*, and collectively this evidence was certainly material. *Goudy*, 922 F.3d at 843. Just as none of Defendants is entitled to summary judgment on Sierra's fabrication theories, none is entitled to summary judgment on his suppression theories, without the need for further analysis.[10]

---

[10] Defendants other than Guevara incorporate their argument that they were uninvolved in Melendez's misconduct in the suppression section of their motion, OB-28, and Sierra incorporates his response here, see Argument IV(B)(1) *supra*.

## 2. Defendants Suppressed Exculpatory and Impeachment Evidence Independent of Their Fabrications

But Sierra's claim here is not based solely on the suppression of Defendants' fabrications, because Defendants suppressed other material exculpatory and impeachment evidence as well. Notably, unlike the fabrication claims, the Defendants do not argue that they were uninvolved in particular suppressions of evidence. Nor could they, given that Sierra is entitled to the inference at this stage, based on the short time frame of the investigation (one day) and the small investigating team (seven people), that Defendants each knew of the exculpatory and impeachment evidence that the team had uncovered. PSOF ¶¶84, 122-29, 281, 286-87, 292-93.

### (a) Defendants Suppressed That the Eyewitnesses Did Not See the Shooter

Defendants suppressed that both Melendez and Rodriguez informed them that they had not seen the shooter and could not identify him. Many facts in the record support the reasonable inference that both Melendez and Rodriguez could not identify the shooter and that the Defendants knew as much, beginning with the circumstances of the shooting—including that it was dark out at night and played out rapidly, involved two moving cars, the shooter's car had tinted windows that were rolled up the whole time, and more. PSOF ¶¶24-46, 88-89, 107-113. In addition, they could not provide any description of the shooter other than race and gender when they spoke to officers fresh after the shooting, and could not identify any distinguishing features of the shooter at all that night, PSOF ¶¶24-46, 88-89, 107-113; they have both expressly confirmed in testimony that they had not gotten a good look at the shooter, PSOF ¶¶29-35, 40, 89; Melendez told Defendants that he could not make an identification when he was presented with the photo array, PSOF ¶¶89-91; Melendez has testified repeatedly that he was told which photo to select, PSOF ¶¶92-93; Sierra is innocent and thus two witnesses both made false identifications of the same

49

person (who happened to be the police suspect), PSOF ¶¶1-13, and Guevara and Halvorsen have both pleaded the Fifth on these points, PSOF ¶¶100-104, 137-144.

A reasonable jury will conclude based on this evidence that both Melendez and Rodriguez told Defendants they did not see the perpetrator. It is hard to conceive of more powerful impeachment evidence in a case that turned entirely on identifications from two eyewitnesses than testimony that neither of them saw the shooter. Though Defendants may dispute these facts at trial, they cannot do so at this stage. This suppressed evidence was, without question, material. *Jones*, 856 F.2d 985 (affirming a due process verdict in a case with nearly the same fact pattern); *Whitlock*, 682 F.3d at 574 (affirming denial of summary judgment in similar circumstances).

### (b) Defendants Suppressed That Sierra Was Their Suspect Before Any Identification

Just as important, Defendants also suppressed the fact that Sierra was their suspect before any witness had identified him. This is another profound suppression in the case. Defendants arrested Sierra on the street on the afternoon of May 30 without any evidence at all implicating him. At that point, all they had was a suspicion, and a story that they had made up and attributed to Montanez by coercion. Only after they arrested Sierra did they obtain identifications and other evidence implicating Sierra. Then, after the fact, on May 30, they fabricated the Reyes story and the May 25 identification procedure, among other evidence, to make their investigation appear as if it had unfolded from the beginning in a legitimate manner. PSOF ¶¶54-72, 120-128 (Rodriguez never made identification on May 25), 140, 173-177 (Esther Reyes story documented for first time on May 30, after Sierra charged), 180-189. Sierra is entitled to the inference that this sequence shows that Defendants decided he was the suspect first and created evidence to implicate him second. If Sierra could have told the criminal court that Defendants had chosen him as their suspect

before any evidence existed, it would have exonerated him immediately, and it would have impeached the state's entire case.

**(c) Defendants Suppressed Their Interactions with Melendez**

Defendants also suppressed all of their interactions with Melendez leading to his supposed identifications. They suppressed that they presented a photo array to Melendez constructed around their suspect; that Melendez told them he could not identify anyone; that they singled out Sierra's photo and told Melendez to select that photo; that they told him that was who killed Andujar and encouraged him to do it to get justice for his friend; and that Melendez told them the car in the parking lot was not the one used in the shooting. PSOF ¶¶89-93, 147-51, 155-56. A jury could find Defendants liable on this suppression theory as well.

**(d) Defendants Suppressed Their Interactions with Rodriguez**

A jury could also find Defendants liable on the theory that they suppressed their interactions with Rodriguez in connection with his identifications. They suppressed that they told Rodriguez before any identification procedure that the person the police believed had killed his friend was in the photos he was being shown; that Rodriguez was unsure of any identification, as it took him 5-10 minutes to make a selection from the photo array; and that Rodriguez had told them that the car used in the shooting looked different. PSOF ¶¶114-18, 157-58, 250. These facts too, each independently support denying summary judgment, and Defendants do not anywhere in their motion contest Sierra's facts that they suppressed this information relating to Rodriguez, except by incorporating their argument that they did not fabricate Rodriguez's identification, see OB-29-30, forfeiting the issue, *Smith*, 388 F.3d at 569.

The evidence Defendants possessed about their interactions with Rodriguez and Melendez was both exculpatory because it exonerated Sierra, and it could have been used to impeach both

Melendez and Rodriguez, as well as Guevara, McMurray, and Figueroa's evidence and testimony about Sierra's guilt in the criminal case. See *Wearry*, 577 U.S. at 392-96 (holding that suppression of police and other records that could have been used to impeach a state's witness were material in a case that depended on the jury crediting "[the witness]'s account rather than [the defendant]'s alibi"); *Smith*, 565 U.S. at 74-75 (police records of statements by eyewitness that he could not see a perpetrator's face that contradicted that eyewitness's later identification of the defendant at trial were material); *Kyles*, 514 U.S. at 441-42 (contemporaneous eyewitness statement, in which he described the shooter as someone who was "about 5'4" or 5'5", 140 to 150 pounds, medium build" was material and exculpatory, where defendant was 6 feet tall and thin because "[i]f cross-examined on this description, [the witness] would have had trouble explaining how he could have described [the defendant] . . . as a man more than half a foot shorter with a medium build"); *Bagley*, 473 U.S. at 683-84 (evidence that could have been used to impeach the testimony of state law enforcement officers at trial is material).

### (e) Defendants Suppressed Montanez's Denials and the Tactics They Used to Obtain Montanez's False Statement

Defendants also suppressed that Montanez repeatedly denied any involvement in the Andujar shooting or knowledge of Sierra being involved, that he had made clear any statement implicating Sierra was false, and that they nevertheless obtained a statement from Montanez implicating himself and Sierra using abusive interrogation tactics and threats. PSOF ¶67;*also* ¶¶54-72. This is precisely the theory that the Seventh Circuit approved in *Avery*, 847 F.3d at 443-44.

As they did with the fabrication theories relating to Montanez, Defendants suggest that Defendants' suppression of Montanez's statements does not state a *Brady* violation because Montanez's statements were not introduced at trial. OB-28. This Court should reject that argument for the same reasons already discussed, including that Montanez's statement was used to initiate

the criminal proceedings. Argument IV(B)(3). Moreover, *Brady* naturally does not concern whether evidence was introduced—the inquiry concerns evidence that was suppressed—and the question is whether, along with other evidence, the suppressed evidence had a reasonable probability of affecting the criminal case. *Wearry*, 577 U.S. at 392-93. Here, the answer is of course. The truth that Sierra had been implicated in the case because Defendants invented a statement and coerced Montanez to accept it could have been used to impeach the Defendants' testimony about how their investigation came to implicate Sierra. *Bagley*, 473 U.S. at 683-84.

Moreover, if Defendants had disclosed this information, Sierra would have been exonerated without a trial—he could have called on Montanez to testify that neither he nor Sierra had participated in the shooting, that the Defendants' story putting Sierra in the case based on information from Esther Reyes was made up, and Sierra would have been able to present evidence that Montanez only said otherwise because Defendants had forced him through illegal coercion to accept their false statement. *Anderson v. City of Rockford*, 932 F.3d 494, 507 (7th Cir. 2019) ("Due process entitled the plaintiffs to learn before their trial" that witness's statement "was the product of police coercion or fabrication"); *Avery*, 847 F.3d at 439 (due process rights are implicated by "a violation of the *Brady* duty to disclose facts about the coercive tactics used to obtain" witness testimony); *Newsome v. McCabe*, 319 F.3d 301, 304 (7th Cir. 2003) (affirming judgment where police officers were held liable "under the due process clause because they concealed exculpatory evidence—the details of how they induced the witnesses to finger [plaintiff]").

**(f) Defendants Suppressed Montalvo's Potential Alibi Evidence and That They Manufactured Her False Statement**

Defendants also suppressed that Montalvo had provided exculpatory alibi evidence, and that they fabricated a false statement attributed to Montalvo to fatally undermine Sierra's alibi. This included evidence that Montalvo had told Defendants Sierra came over to her house regularly

53

and would always come over between 8:30-9:30 p.m. (and never after 10 p.m.), that he never went by the nickname "Junito" (further undercutting Defendants' story of how Sierra became a suspect in the first place), and that Defendants pressured and ultimately forced Montalvo to agree to a knowingly false timeline in order to deprive Sierra of an alibi. PSOF ¶¶162-170.

Again, Defendants' argument that this suppression was not material to the criminal case because Montalvo did not testify at trial gets the issue exactly backwards. OB-28, 31-32. Montalvo did not testify precisely because Defendants fabricated a false statement and then suppressed the exculpatory information that she had given the corroborating Sierra's alibi. Defendants knew Montalvo corroborated Sierra's alibi, and so they fabricated a statement attributed to her with the goal of stopping her from testifying in support of Sierra's alibi in the criminal case. Their gambit worked. With Montalvo's false statement in the record, Sierra's attorney could not call her in the criminal case to testify about Sierra's alibi without risking impeachment with the false statement. And with Defendants suppressing all of the evidence that would have explained that Montalvo's statement was false and had been signed only because of police misconduct, Sierra's attorney had no way to explain why Montalvo would have signed a statement undermining Sierra's alibi.

A suppression of evidence that confirms a defendant's alibi is *Brady* material, particularly so when it transforms a witness who might testify for the defense into a prosecution witness. *Dennis v. Pennsylvania Dep't of Corrections.*, 834 F.3d 263, 293 (3d Cir. 2016) ("The [state's] withholding of the receipt transformed a witness who would otherwise have been an alibi witness for [the defendant] into a witness for the prosecution or, at least, left [the defendant] powerless to impeach [the witness's] false testimony if offered by the prosecution."); *Moore v. Pennsylvania Dep't of Corrections*, 457 F. App'x 170, 181 (3d Cir. 2012) (calling this "hallmark *Brady* material"); *Raugust v. Abbey*, 598 F. Supp. 3d 988, 1004 (D. Mont. 2022). Defendants made up a

false story, attributed it to Sierra's alibi witness, and suppressed how they had obtained that statement, so that the state could impeach Montalvo with the false statement if she took the stand, and so that Sierra would have no way to impeach that false statement or the Defendants' account of how it was created, and would have no way to rehabilitate Montalvo after she was impeached. Moreover, disclosure of Defendants' fabrication of a false statement undermining Sierra's alibi would have allowed Sierra to impeach the Defendants' testimony about how he became a suspect, and about whether he had committed the crime. A jury must resolve this theory.[11]

### (g) Defendants Suppressed Exculpatory Police Documents

The summary judgment record also supports Sierra's claim that Defendants violated his right to due process by suppressing investigative documents generated during the course of the Andujar investigation. *Jones*, 856 F.2d 985 (noting that suppression of exculpatory evidence in clandestine police files violates due process); see also *Fields v. City of Chicago*, 2014 WL 477394, at *6-7 (N.D. Ill. Feb. 6, 2014) (denying summary judgment on a similar claims).

Defendant Officers make an argument that Sierra cannot succeed on a claim that they suppressed documents because, in their view, any documents they suppressed have since been destroyed, and so Sierra cannot prove that what was in those documents was exculpatory or impeaching. OB-33-34. This cynical and self-serving argument should be rejected. First, as just discussed, Sierra has pointed to particular exculpatory and impeaching information, and documents suppressing that information, from the Defendants police files that they did not disclose

---

[11] Defendants make an argument that Sierra and his attorney could have discovered Montalvo's true story through the exercise of reasonable diligence. OB-30. Sierra does not dispute that he knew Montalvo's true story, and so there is no need for the Court to address that argument. However, the fact that Sierra knew Montalvo's true story does not mean that he had no claim that Defendants suppressed the impeaching evidence that would have allowed Sierra to call Montalvo and impeach the false statement that Defendants had attributed to her, or to impeach the Defendants about their fabrication of evidence undermining his alibi.

in his case: a report in the Gonzalez case—just 30 minutes after the Andujar shooting—attempting to connect the Buick Park Avenue to the earlier Gonzalez shooting. PSOF ¶¶180-192. This report was both exculpatory—it made the suspects in the Gonzalez investigation alternate suspects in the Andujar shooting—and impeaching—because it so blatantly flew in the face of the prior statement of the responding officer in Gonzalez case, Officer Malczyk, that it could have been used to attack Guevara's credibility. PSOF ¶¶180-192.

Second, at this stage of the case Defendants are not entitled to the inference in their favor that notes and reports they made during the course of their investigation that no longer exist had no exculpatory or impeachment value. The opposite is true. Construing the record for Sierra, it would be reasonable for a jury to infer notes and documents that Defendants suppressed and later destroyed would have demonstrated, for example, that the eyewitnesses both told Defendants the truth—that they could not identify the perpetrator, that Sierra's name first arose during Defendants' interrogation of Montanez and not in a chance sighting at Esther Reyes's house, and that the Defendants did not meet with Rodriguez on May 25, among other things. Defendants position that they can avoid a trial on whether they suppressed exculpatory evidence because they destroyed that evidence "strains *Brady* to the point of absurdity." *Armstrong v. Daily*, 786 F.3d 529, 550 (7th Cir. 2015) ("*Brady* would mean nothing if, . . . a prosecutor could comply with its command by deliberately destroying exculpatory evidence and then disclosing the fact of destruction to the defense."). Defendants' arguments for summary judgment on Sierra's document-suppression theories should be rejected.

### (h) Defendants Suppressed Their Pattern of Misconduct

Last but not least, as described below in great detail, by the time of Sierra's criminal trial Guevara had been involved in a number of cases where they fabricated and suppressed evidence,

coerced false statements from witnesses and suspects, obtained false identifications using suggestive procedures, and wrote false police reports. See Argument V(F) *supra*. Defendants did not disclose any of this pattern of extreme police misconduct by the officers who investigated Sierra to prosecutors or defense attorneys. The suppression of this other misconduct, which could have been used to impeach Guevara and others on the stand, is also violation of *Brady*. *Thompson v. City of Chicago*, 722 F.3d 963, 972 (7th Cir. 2013).

### 3. Defendants' Remaining Arguments Regarding Suppression and Reasonable Diligence Fail

In response to all these theories, Defendants present a perfunctory and disorganized smorgasbord of contradictory reasons they think particular suppression theories cannot go forward, saying that, in their view, some of this exculpatory or impeachment evidence did not exist, or was disclosed, or should have been discovered by Sierra and his attorneys through the exercise of reasonable diligence. OB-29-32. As a preliminary matter, Defendants' arguments are fatally undeveloped, and this Court should be strict in not even entertaining these undeveloped arguments. *Wehrs v. Wells*, 688 F.3d 886, 891 n. 2 (7th Cir.2012).[12] In addition, many of these contentions would be *defenses* at trial, and Defendants in their one-sentence and short-paragraph arguments are far from meeting the heavy burden of establishing that all elements of the defenses are established by unrebutted evidence. *Ocean Tomo, LLC v. Barney*, 133 F. Supp. 3d 1107, 1114 (N.D. Ill. 2015). Moreover, in keeping with their other arguments, Defendants simply ignore that the facts underlying these arguments are hotly disputed. Finally, Defendants do not even address all of the suppression theories discussed above, and because a trial is necessary on those theories

---

[12] It is an extreme burden responding to a summary judgment motion where moving parties make hundreds of assertions in single sentences, without any analysis, and the nonmoving party has to expend multiple paragraphs responding to each. Sierra has done his best in this response to address all of Defendants contentions as efficiently as possible. But Defendants should not be permitted to create this amount of work for the Court and parties with bald assertions.

already discussed, it is not necessary to parse all of Defendants' different and undeveloped arguments about disputed evidence. See Argument II *supra*.

**(a) The Melendez Evidence Was Suppressed**

Defendants argue in a paragraph that Melendez's identifications were not suppressed because Melendez attempted at trial to disclose what Defendants had done. OB-29. There are several problems with this argument. At the outset, as a factual matter Defendants did not ever even attempt to disclose the Melendez suppressed evidence, PSOF ¶¶84-87, 94, 98-99, 200, 203-06, 210, 212, 223-24, 227, and they cannot claim that they did not violate *Brady* because a witness attempted to expose the misconduct in the midst of trial. Twice recently the Seventh Circuit has reversed grants of summary judgment in wrongful conviction cases, holding that where police actively suppress information about the circumstances of their efforts to obtain an inculpatory statement from a third-party witness, they violate due process. *Anderson v. Rockford*, 932 F.3d 494, 507-09 (7th Cir. 2019); *Avery*, 847 F.3d at 443.

Relatedly, Defendants did the opposite of disclose the exculpatory Melendez evidence—they wrote false reports to ensure that evidence was suppressed and then took the stand at trial to seal the deal, testifying that Melendez was lying when he attempted to come clean in his own testimony. PSOF ¶¶87, 94-96, 98-99, 195, 233-234; 244-249, 251, see *Banks v. Dretke*, 540 U.S. 668, 695 (2004) (holding that there is no requirement that a Defendant find materials that state actors are deliberately hiding: "A rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system of constitutionally bound to accord defendants due process"). Police officers who lie to perpetuate the suppression of evidence are liable under *Brady* solely on that basis as well. *Camm*, 937 F.3d at 1110 (holding that a *Brady* claim may be based on "exposing the lie" of a police officer, which would have "eroded the jury's trust in both the prosecutor and the

lead case investigator"). Here, Defendants suppressed exculpatory evidence they had learned from these witnesses, created false police reports to conceal the exculpatory information they had suppressed, and testified falsely in order to perfect the suppression, thereby combatting Melendez's efforts to come clean. As in *Camm*, that suppressed evidence was material because it could have been used to show Defendants were lying in their investigation.[13]

Relatedly, even if this were not the case, there are genuine disputes of material fact about how Defendants' suppressions of the Melendez evidence could have been used at trial. Before trial, Sierra's attorney, Bernard Sarley, did not know anything about the suppressed Melendez evidence, including the interactions with Melendez in which he told them he could not identify the shooter or that they told him who to pick. PSOF ¶¶223-227. At trial, he was therefore surprised by Melendez's testimony, in a way they would not have been had it been disclosed. And even supposing that Defendants are right that everything they suppressed came out in Melendez's testimony on the stand at trial, they took the stand to contradict that testimony. If they had not suppressed the Melendez evidence, it could have been used at trial to impeach the Defendants and to corroborate Melendez. These disputes of fact preclude summary judgment on the theory that they did not suppress the Melendez evidence. *Jimenez v. City of Chicago*, 830 F. Supp. 2d 432, 443-44 (N.D. Ill. 2011).[14]

---

[13] In this section of their brief, OB-29, Defendants again cite *Williams*, which does not apply for the reasons already discussed, see Argument IV(C)(1)(b).

[14] Defendants do not make a reasonable diligence argument as to these Melendez suppressions, OB-29, and forfeit any such argument, *Smith*, 388 F.3d at 569, which would fail for the same reasons that Defendants' other reasonable diligence arguments do, see Argument IV(C)(3)(b)-(c).

**(b) The Rodriguez Evidence Was Suppressed and Not Discoverable Through the Exercise of Reasonable Diligence**

With respect to Rodriguez, Defendants make two, one-sentence long, contradictory arguments. OB-29-30. First, they assert without explanation there was no suppression of information relating to Rodriguez because there was no evidence to suppress. OB-29. This argument is too undeveloped to sustain Defendants' burden at summary judgment. *Adickes*, 398 U.S. at 157. To the extent Defendants are referring here to the argument that they did not fabricate Rodriguez's identifications, which Sierra has addressed above, Argument IV(B)(2), Sierra has pointed to record evidence in this section that Defendants suppressed evidence relating to their interactions with Rodriguez that were material to his criminal case, Argument IV(C)(2)(d), and Defendants do not address that record evidence anywhere in their motion, forfeiting the issue.

Second, Defendants state in a second sentence that there is no *Brady* claim because Sierra's attorneys had access to Rodriguez and cross-examined him. OB-30. Their argument says nothing more, and so again this Court should not address it. However, to the extent Defendants are arguing that Sierra's attorney could have discovered their Rodriguez suppressions, obviously that argument contradicts the first one, and it can be rejected for that reason. Moreover, assuming Defendants had preserved a reasonable diligence argument here, that argument would fail because it is without legal support, and it once again depends on a version of the facts skewed impermissibly in Defendants' favor.[15]

As in *Jimenez*, "[w]hat was available through reasonable diligence . . . is very much in dispute." 830 F. Supp. 2d at 446; *see also Cottrell v. Clemons*, 2014 WL 3649185, at *2 (W.D. Ky. July 23, 2014) (whether defense counsel exercised reasonable diligence is a question for the

---

[15] Defendants' reasonable diligence arguments have no impact at all on Sierra's fabrication and unduly suggestive lineup due process theories, neither of which requires suppression as an element.

jury); *cf. Cathedral of Joy Baptist Church v. Village of Hazel Crest*, 22 F.3d 713, 719 (7th Cir. 1994) (issue of diligence in discovering an injury is a question of fact for the jury unless "the relevant facts are undisputed and only one conclusion may be drawn from them"). Defendants contend that if Sierra's attorney Sarley had worked harder, he might have uncovered all of the evidence they were covering up. Disputes of fact in the record categorically do not permit Defendants to establish that as a matter of law.

It is also important to note that each item of exculpatory evidence that Defendants contend was available through reasonable diligence they fabricated and actively took steps to cover up: Defendants fabricated an account of their investigation, including Melendez's and Rodriguez's identifications, that reads as though Defendants obtained a legitimate lead and then two eyewitnesses confirmed the Defendants' suspicion by identifying their suspect in a fair lineup free of suggestion, and Defendants told that same story throughout Sierra's criminal proceedings. Again, Defendants cannot contend that Sierra's attorneys could have discovered what Defendants intentionally hid. *Banks v. Dretke*, 540 U.S. 668, 695 (2004) ("A rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system of constitutionally bound to accord defendants due process."). If Defendants' version of events is believed by the jury, then it will find that they suppressed nothing. If Sierra's is believed, by contrast, then Defendants will have intentionally prevented him from finding out the truth about their investigation for decades.

Moreover, even ignoring Defendants' active suppression, Sarley made efforts to speak to Rodriguez, did in fact speak to him, and in that conversation was not told about the range of misconduct that had occurred, or that Rodriguez had any intention of doing anything but standing by the false story that Defendants had concocted during their interactions with him. PSOF ¶¶221-22, 224-25, 227; RSOF-Officers ¶¶56-57. Indeed, Rodriguez was asked at trial under oath for his

61

honest testimony, and he repeated Defendants' false story, and even now decades later, he has refused to testify. PSOF ¶¶239-40, 270-72.

Finally, disputes of fact preclude any suggestion that Sarley did not work hard enough to discover Defendants' suppressions. Sarley served discovery requests, issued subpoenas for police records, and filed motions to suppress the identifications, quash arrest, and suppress evidence during Sierra's criminal trial. PSOF ¶¶214-18; RSOF-Officers ¶¶52, 54-56, 65, 174, 175, 179. He also attempted to talk to witnesses, and he did talk to Rodriguez before the motion to suppress hearing, but he noted that often witnesses refused to speak to him. He received official and sworn reports documenting the police investigation in response to his discovery requests. Sarley had no reason to believe, based on his experience, that those records were incomplete, nor did the prosecutors. PSOF ¶¶212-13, 218-22, 224-27. It is implausible, based on the record construed in Sierra's favor, to suggest that Sarley should have responded to that file by assuming that the police reports were all lies and attempting to obtain unreported and undisclosed evidence that had not already been provided in response to his discovery and subpoena requests. These factual disputes preclude judgment as a matter of law without need for further analysis.

Separately, Defendants' "argument rests on far too expansive an understanding of what sort of evidence should be considered available to a defendant through the exercise of reasonable diligence." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). Reasonable diligence does not require defense attorneys to seek evidence they "had no reason to believe existed," and the Seventh Circuit regards "as untenable a broad rule that any information possessed by *a defense witness* must be considered available to the defense for *Brady* purposes." *Id.* at 740, 743 (emphasis added). The Court observed that such defense witnesses "may be uncooperative or reluctant," it can be difficult to "extract all the favorable evidence a defense witness possesses," and "the defense may

have forgotten or inadvertently omitted some important piece of evidence[.]" *Id.* Importantly, this is the view of the Seventh Circuit in the case of a witness *controlled by the defense*. "These concerns have even more weight in a case, like this one, involving information possessed by a *prosecution* witness." *Hampton v. Chicago*, 2017 WL 2985743, at *22 (N.D. Ill. July 13, 2017).

Not only was Rodriguez a prosecution witness, but he was also a witness for whom Defendants had fabricated identifications and an entirely false story—a story that Rodriguez stuck with in conversations with Sierra's attorney and throughout Sierra's trial. As Judge Kennelly observed in *Jimenez*, reasonable diligence would not be a tenable legal rule if courts determined that fabricated stories in the minds of prosecution witnesses were discoverable through the exercise of reasonable diligence:

> Defendants' argument seems to assume the existence of a Perry Mason-like world in which prosecution witnesses readily give up impeaching information when interviewed or questioned by defense counsel. Real life does not work that way, or at least the governing legal rule cannot realistically be premised on the assumption that it always works that way. Witnesses coerced or persuaded to testify in a particular way often tend to identify with, and to ally themselves with, their persuaders. A legal rule that assumes that such a witness will readily describe the circumstances of the coercion or persuasion simply because the other side's lawyer asks the witness the right question would defy common sense.

830 F. Supp. 2d at 444-45. And as Judge Dow observed in *Hampton*, in cases where "the evidence that was allegedly withheld was in the minds of the prosecution witnesses, . . . and there is some evidence that the prosecution witnesses provided misleading information about the detectives' use of suggestive identifications with them," summary judgment should not be granted on reasonable diligence grounds. 2017 WL 2985743, at *22.

More generally, the Seventh Circuit has said that the reasonable-diligence doctrine does not extend to information *in the heads of witnesses* the same way that it does to information in accessible documents. *Boss* observes that "[i]n the typical reasonable diligence case, the question is whether defense counsel had access to the documents containing the *Brady* material, through an

open file policy," and not "whether defense counsel had access to *Brady* material contained in a witness's head." 263 F.3d at 741. The Court continued: "In cases like the present one, the question is whether defense counsel had access to *Brady* material contained in a witness's head. . . . Because mind-reading is beyond the abilities of even the most diligent attorney, such material simply cannot be considered available in the same way as a document." *Id.* (citation omitted).

At the same time, the Court has concluded that information may be deemed unavailable if the defense has less of an opportunity to obtain it, *e.g.*, *United States v. Morris*, 80 F.3d 1151, 1168 (7th Cir. 1996) (focusing on whether "defendants had been given the same opportunity as the government to discover the identified documents"); or where there is evidence that a witness would have lied about it, *e.g.*, *Crivens v. Roth*, 172 F.3d 991, 996-97 (7th Cir. 1999) (holding that evidence in a prosecution witness's head not discoverable through the exercise of reasonable diligence where there was evidence that the witness would have lied about that evidence). Here there is no support in the record for a conclusion that Sierra's attorney could have discovered the truth from a lying prosecution witness conspiring with Defendants.

The combination of Defendant's control of Rodriguez, their fabrication of his false testimony, and his presentation of that false evidence at trial renders any argument that suppressed evidence was available to a diligent attorney utterly inconsistent with the law governing these claims. The law and disputes of fact preclude summary judgment on this basis.

### (c) The Montanez Evidence Was Not Discoverable Through the Exercise of Reasonable Diligence

Defendants also argue that Sierra and his attorney should have discovered the Montanez suppressions. OB-31. For the reasons just discussed, this reasonable diligence argument fails as well. Again, whether and what information could be obtained directly from Montanez is hotly disputed. RSOF-Officers ¶¶56-57. Montanez agreed, as the result of threats, to sign a false

statement implicating Sierra in murder, and Defendants reported the false statement and actively suppressed everything else. Defendants threatened Montanez with murder charges and threatened his family to force him to accept their false statement. PSOF ¶¶54-72. Given these circumstances, it is not at all apparent that Montanez would have told the truth, given Defendants' threats.

Again, Sarley was not required to find evidence that Defendants were hiding. *Banks*, 540 U.S. at 695. He was not required to assume the police were lying or to assume that evidence other than disclosed existed pertaining to Montanez. *Boss*, 263 F.3d at 740. Indeed, Defendants state in their motion that their "reports and statements fully disclosed Montanez's role." OB-31. Not true. But if Defendants assert that this Court should accept that representation today, then why would Sarley have been required to assume that was not true in 1995 and 1996? Moreover, Seventh Circuit cases recognizing that defense witnesses "may be uncooperative or reluctant," *Boss*, 263 F.3d at 743, apply with full force to this situation, even assuming for the sake of argument that Montanez could be considered a defense witness, where a witness has been threatened with serious penalties to adhere to the police officer's story. Reasonable diligence requires the attorney to diligently review the materials available, and not to read the minds of witnesses. *Jimenez*, 830 F. Supp. 2d at 445.

Defendants' position is also inconsistent with the Supreme Court's *Brady* line of cases. The Court in *Strickler v. Greene*, 527 U.S. 263 (1999), imposed a duty on the state to disclose material exculpatory or impeachment evidence, even when there has been no request for that evidence by the accused. Included in that is evidence that would impeach witnesses known by the state. *Giglio*, 405 U.S. 150. For these constitutional rules to have effect, any understanding of reasonable diligence along the lines of the one that Defendants advance in this case must be rejected. Defendants had an obligation under *Brady*, *Giglio*, and *Strickler* to disclose evidence

about Montanez even without an effort on the part of Sierra and his attorneys to obtain that evidence. That constitutional obligation is in irreconcilable tension with Defendants' proposed legal rule that they were not required to turn over suppressed evidence about their interactions with a witness because there was some remote chance that Sierra and his attorneys could have discovered it (a contention that is itself contested). As Judge Kennelly put it in *Jimenez*, adopting Defendants' position "would effectively render *Brady* and its progeny, including *Giglio* . . . , a dead letter: if the governing rule is predicated on the assumption that a prosecution witness will, if interviewed by the defense, disclose impeaching information, then the prosecution effectively is relieved of the legal responsibility under *Brady* and *Giglio* to disclose that information." *Jimenez*, 830 F. Supp. 2d at 445; *accord Kluppelberg v. Burge*, No. 13 C 3963, Dkt. 635 at 3 (N.D. Ill. Aug. 4, 2017) (rejecting reasonable diligence defense and concluding that "defense counsel's diligence is irrelevant if the suppressed information was material").

It is impossible to read the record evidence in a manner that would justify granting summary judgment to these Defendants on the grounds that Sarley should have discovered suppressed information about Defendants' interactions with Montanez. In addition, Defendants' diligence position is contradicted by law. This Court should reject Defendants' reasonable diligence argument regarding the Montanez suppressions as well.

The Defendants make no other argument with respect to the remainder of Sierra's *Brady* theories. Given the blatant *Brady* violations outlined above, Defendants' only possible defense is to deny they occurred. That defense must be mounted at trial and not in a motion at this stage.

**D. Independently, A Reasonable Jury Could Conclude That Defendants Utilized Unduly Suggestive Lineup Procedures That Tainted Sierra's Criminal Trial**

**1. Unduly Suggestive Identification Procedures That Taint A Criminal Case Violate Due Process and Are Actionable Under § 1983**

Defendants argue that, following the Supreme Court's decision in *Vega v. Tekoh*, 597 U.S. 134, 141 (2022), § 1983 does not render a state actor liable for using unduly suggestive identification procedures to obtain a false identification that taints a criminal case. OB-35-41. Defendants are wrong on the merits, but this Court should reject the argument before even reaching the merits, because it is not within this Court's prerogative to overrule Seventh Circuit precedents.

**(a) The Seventh Circuit Recognizes This Type of § 1983 Claim**

The Seventh Circuit held in *Alexander v. City of South Bend* that while "[t]he Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality," it does "guarantee the right to a fair trial . . . and that right is violated if unduly suggestive identification techniques are allowed to taint the trial," and so state actors are liable under § 1983 if they use identification techniques that make a criminal trial unfair. 433 F.3d 550, 555. Since then, the Seventh Circuit has recognized that this theory of § 1983 lability is viable repeatedly and recently. *Holloway v. City of Milwaukee*, 43 F.4th 760, 766 (7th Cir. 2022); *Coleman v. City of Peoria*, 925 F.3d 336, 347 (7th Cir. 2019); see also *Reyes v. Nurse*, 38 F.4th 636, 644 (7th Cir. 2022) (recognizing the same in the federal habeas context). In *Holloway*, the Seventh Circuit considered whether and what effect *Vega* might have on this line of cases, but it "conclude[d] that [the question] need not be resolved" and went on to address the suggestive identification § 1983 claim on the merits. 43 F.4th at 766-67. Accordingly, the Seventh Circuit currently recognizes this theory of § 1983 liability, having applied it in a recent case, and it will consider whether *Vega* affects it at an appropriate time.

Since *Holloway*, five district courts in this Circuit have considered Defendants' argument that *Vega* eliminated § 1983 suggestive identification claims, and all but one have followed Seventh Circuit precedent and have rejected the argument.[16] This Court is bound to follow existing precedent of the Seventh Circuit and cannot overrule it. *E.g.*, *Savory v. Cannon*, 947 F.3d 409, 421 (7th Cir. 2020) (en banc); *Nanda v. Bd. of Trustees of Univ. of Illinois*, 219 F. Supp. 2d 911, 914 (N.D. Ill. 2001). Defendants have preserved an argument, which they can present to the court of appeals at an appropriate time, and this Court should reject Defendants invitation to overrule Circuit precedents, without reaching the merits of Defendants' argument.

### (b) *Vega* Does Not Affect This Type of § 1983 Claim

On the merits, Defendants are wrong that *Vega* changes anything. In fact, quite contrary to Defendants' argument, the logic of *Vega* is *already applied* to § 1983 due process claims asserting that a police officer's improper identification techniques resulted in an unreliable identification that is used in and taints a criminal case. In both instances, a police officer's violation of a prophylactic rule does not by itself violate the Constitution and is not actionable under § 1983, but

---

[16] In *Bolden v. Pesavento*, 623 F. Supp. 3d 897, 908-09 (N.D. Ill. 2022), Judge Seeger rejected a Rule 50 challenge to a $25 million verdict on the theory. In *Donald v. Outlaw*, No. 2:17-CV-32-TLS, 2023 WL 2346270, at *11-12 (N.D. Ind. Mar. 3, 2023), Judge Springman rejected the argument and denied summary judgment. In *Blackmon v. City of Chicago*, No. 19 CV 767, 2023 WL 7160639, at *14 & n.19 (N.D. Ill. Oct. 31, 2023), Judge Jenkins also recognizing consistent with Seventh Circuit precedent that a § 1983 claim for improper identification procedures is viable when those procedures affected the criminal trial. Similarly, *Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *22-23 (N.D. Ill. Sept. 30, 2022), denied summary judgment on this theory (except as to two defendants, who were granted qualified immunity).

Only *Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829, at *23-24 (N.D. Ill. Jan. 24, 2024) (Ellis, J.), concluded that such an unduly suggestive identification claim is not viable under § 1983, without much legal analysis at all, and without considering whether it was within that court's power to overrule Seventh Circuit precedents. Indeed, in that case, the parties hardly briefed the issue: the defendants presented the argument that the district court should rely on *Vega* to overrule Seventh Circuit precedents in four sentences of their motion, 18 C 1049, Dkt. 462 at 33; the issue was not discussed in response, except to say that multiple courts recognize the claim as viable, 18 C 1049, Dkt. 475 at 29; and there was a limited discussion in reply, 18 C 1049, Dkt. 505 at 29-30.

where illegally obtained evidence is actually used in and taints a criminal case, there is a violation of core Constitution rights, and a corresponding claim under § 1983.

*Vega* holds that there is no § 1983 claim for a mere violation of *Miranda*'s prophylactic rules. 597 U.S. at 150. The Court reasoned that *Miranda* prophylactic rules exist to guard against Fifth Amendment violations in criminal cases. *Id.* at 149. But a police officer's violation of those rules does not automatically violate the Fifth Amendment. *Id.* at 149-50. As a result, the violation of *Miranda*'s prophylactic rules is not necessarily a violation of the Fifth Amendment actionable under § 1983. *Id.* However, the Court was careful to say that "[i]f a *Miranda* violation were tantamount to a violation of the Fifth Amendment, our answer would of course be different," *id.* at 141, and it said that because a long line of Supreme Court cases recognizes that statements that are illegally compelled by police interrogations and then are used in a criminal case violate the Fifth Amendment, *Brown v. Mississippi*, 297 U.S. 278 (1936), and are actionable under § 1983, *Chavez v. Martinez*, 538 U.S. 760, 766-67 (2003). As the Court emphasized throughout its opinion in *Vega*, it was not breaking any new ground. 597 U.S. at 142. Just as the Court has long held that compulsive questioning without *use of the resulting confession in the criminal case* does not violate the Fifth Amendment and is not actionable under § 1983, *Chavez*, 538 U.S. at 767, a mere violation of *Miranda*'s prophylactic rules without more does not violate the Fifth Amendment and is not actionable under § 1983, *Vega*, 597 U.S. at 149-50.

Precisely the same framework already applies to unduly suggestive identification claims. As the Seventh Circuit explained in *Hensley v. Carey*, "The rule [from *Stovall v. Denno*, 388 U.S. 293 (1967), and *Manson v. Brathwaite*, 432 U.S. 98 (1977)] against admission of evidence from unnecessarily suggestive lineups is a prophylactic rule designed to protect a core right, that is the right to a fair trial, and it is only the violation of the core right and not the prophylactic rule that

69

should be actionable under § 1983." *Hensley v. Carey*, 818 F.2d 646, 649 (7th Cir. 1987). As was the case in *Vega* for violations of *Miranda*'s prophylactic rules, a violation of the prophylactic rules prohibiting unnecessarily suggestive identification procedures does not by itself violate due process, and is not by itself actionable under § 1983. *Alexander*, 433 F.3d at 555. Instead, the plaintiff must show "how the flaws [in the defendants'] identification techniques made his trial unfair." *Id.*; see also *Swanigan v. City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018) (holding that there is no § 1983 claim regarding suggestive identification procedures if the identifications are never used in the criminal case). If the plaintiff can show that improper identification procedures resulted in an unreliable identification that tainted the criminal proceedings, then a violation of due process is established, and that violation is actionable under § 1983. *Blackmon*, No. 19 CV 767, 2023 WL 7160639, at *14; *Hampton*, 2017 WL 2985743, at *23.

*Vega*'s logic governing Fifth Amendment § 1983 claims is identical to the law that governs due process suggestive identification § 1983 claims. In *Vega* and *Chavez*, a violation of a prophylactic rule or the use of coercive interrogation techniques alone is not actionable under § 1983, but the use of an illegally obtained confession in the criminal case, in violation of the core Fifth Amendment right against self-incrimination, is actionable under § 1983. In the context of suggestive identification procedures, the use of improper identification procedures is not alone actionable under § 1983, but an unreliable identification obtained from such procedures that is used in and taints the criminal case, in violation of the core due process right to a fair trial, is actionable under § 1983. Because the law governing § 1983 suggestive identification claims is

70

already in harmony with *Vega*, this Court should reject Defendants argument that *Vega* eliminates this type of § 1983 claim.[17]

**2. Defendants Used Unduly Suggestive Identification Procedures That Tainted Sierra's Criminal Case and Violated His Right to Due Process**

Disputed facts preclude summary judgment on Sierra's claim that Defendants used improper identification techniques to obtain false identifications that were introduced in and tainted Sierra's criminal case. "A plaintiff with this kind of [section 1983] claim must demonstrate, by reference to the *Brathwaite* standard, that unduly suggestive identification procedures led to an unreliable identification that undermined the fairness of his trial." *Alexander*, 433 F.3d at 555-56. The assessment of whether identification procedures were so unduly suggestive that they gave rise to a misidentification turns on two questions, assessed considering the totality of circumstances: (1) whether the procedures were unnecessarily suggestive; and (2) whether there is evidence that the identifications were nonetheless reliable. *Hampton*, 2017 WL 2985743, at *23 (citing *Lee v. Foster*, 750 F.3d 687, 691 (7th Cir. 2014)). If the identification techniques were unduly suggestive, the question is whether they rendered the criminal proceeding unfair. *Id.* (citing *Alexander*, 433 F.3d at 555). Each of these questions must be resolved in Sierra's favor at summary judgment.

**(a) The Identification Procedures Were Unduly Suggestive**

As discussed above, viewing the facts for Sierra, Defendants decided on Sierra as their suspect at the outset despite that he had not been at the crime scene, placed him in a photo array intending to obtain an identification of him that they could use to prosecute, told Melendez and

---

[17] Interestingly, although Defendants go on for seven pages discussing *Vega* and Seventh Circuit law, they do not actually say anything different than what Sierra has said above. OB-35-40. Instead, they contend that violations of prophylactic rules alone do not give rise to § 1983 claims, which is apparent from the case law, but then they make no argument whatsoever about whether the introduction of a tainted identification in the criminal case is actionable as a due process claim. See OB-39-41. Instead, they fudge the end of the argument, note that Judge Ellis deemed these § 1983 not viable, and skip right to an argument about what Sierra can show factually. OB-40.

Rodriguez who to pick from the array even though they had not seen the shooter, fabricated a live lineup that never happened, and attributed to Melendez and Rodriguez identifications of the car in the Area Five parking lot, even though they said it was not the one used in the shooting. PSOF ¶¶88-93, 94-97, 107-113, 260, 265. This extreme misconduct is far more than enough at summary judgment to establish that the identification procedures were improperly suggestive. *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *12 (N.D. Ill. Mar. 29, 2022) (denying summary judgment where the police defendants convinced a witness to select a particular photo); see also *Blackmon v. City of Chicago*, No. 19 CV 767, 2023 WL 7160639, at *17 (N.D. Ill. Oct. 31, 2023) (holding that evidence that Defendants intended to obtain an identification of a suspect relevant to dispute of fact about whether the identification procedures were unduly suggestive); *Hampton*, 2017 WL 2985743, at *23 (denying summary judgment where the officer suggested who the witness should pick). Indeed, on this view of the facts, Defendants did all the things (and more) that the Supreme Court said in 1968 would make an identification procedure unduly suggestive in *Simmons v. United States*, 390 U.S. 377, 382-83 (1968).

Even pretending that this misconduct was not in the record—so, construing the facts in Defendants' favor, for purposes of this argument—there would still be sufficient evidence to show that the identification procedures Defendants used were unduly suggestive. The circumstances of the crime and the witness's minimal description meant that the witnesses did not have an opportunity to form an accurate eyewitness memory of the shooter, which increased the risk of identification of an innocent individual and the susceptibility of the witnesses to suggestive techniques, as discussed in detail in the next section. PSOF ¶¶254-268; Argument IV(D)(2)(b) *infra*. The photo array was based because it was conducted by non-blind administrators, risking steering toward the suspect by police who sought to obtain an identification of their suspect. PSOF

72

¶261. The instructions before or after the procedure were suggestive—Defendants told the witnesses that they had gotten the guy and that his picture appeared in the array, either before the array, after, or both, depending on what version of Defendants' facts is credited. PSOF ¶¶260-262. The photographs used in the array were suggestive: among other things they did not match the age description of the perpetrator provided by the witness. PSOF ¶¶259-261; see also PSOF ¶¶149-153. Police reports reflect that a witness told police that the shooter wore a light hoodie, and Sierra was the only person in the array in a light hoodie. PSOF ¶¶149-150. Rodriguez searched the photo array for 5-10 minutes before making a selection. PSOF ¶250. Following the arrays, Defendants informed the witnesses that they had selected Thomas Sierra as the shooter, and that post-identification feedback further corrupted their identifications. PSOF ¶268.

Still accepting Defendants' facts, after the photo array, Defendants showed the witnesses a live lineup, where Sierra was the only person in the lineup repeated from the photo array. PSOF ¶264. In addition, Sierra stuck out in the lineup as he did in the photo array. PSOF ¶264. Three fillers had facial hair, which was contrary to the witnesses' minimal description of the shooter; three were older than the age provided by the witnesses. PSOF ¶264. Analyzing these identifications, and applying eyewitness expert science, Sierra's unchallenged expert Dr. Dysart opined that "there was a very strong likelihood that the witnesses would select Mr. Sierra from the procedure. PSOF ¶¶263. After being selected from an unnecessarily suggestive photo array, the results from any subsequent procedure are relatively meaningless. PSOF ¶264. That is, the bias from the first suggestive procedure renders any second procedure's outcome irrelevant for the purposes of determining witness accuracy." PSOF ¶264. After these identification procedures, the risk of unconscious transference and commitment—the phenomenon where a witness believes that the suspect's face is familiar from the crime but it has merely been encoded as the result of repeated

73

identification procedures—was high, explaining Rodriguez's view that he had selected the right person. PSOF ¶264. Accordingly, the totality of circumstances reveals a robust dispute about whether the identification procedures used with Rodriguez and Melendez were unduly suggestive, even setting aside the evidence that Defendants fabricated the identifications out of whole cloth. PSOF ¶¶254-268.

### (b) Rodriguez's Identifications Were Not Reliable

Defendants argue that Rodriguez's identifications were sufficiently reliable that they could not have tainted Sierra's criminal proceedings. OB-45-47. They do not even attempt this argument with Melendez's identifications, which is telling because the same factors that make Melendez's identifications unreliable make Rodriguez's unreliable, and that inference is one the Court must draw at this stage. Regardless, Defendants' argument that Rodriguez's identifications were reliable depends on the same self-serving and slanted view of the facts that Defendants used to suggest that they did not fabricate Rodriguez's identification, and it should be rejected for the same reasons. Argument IV(B)(2) *supra*.

Rodriguez's identifications were undeniably unreliable. Most importantly, the record viewed in Sierra's favor shows that Rodriguez identified Sierra as the shooter even though Sierra had nothing to do with the crime and was not at the scene, and even though Rodriguez did not see the shooter. PSOF ¶¶1-7, 10, 13, 107-113, 255-258. Defendants let it slip in their recitation of the crime in this section of their motion that Rodriguez saw Sierra commit the crime, OB-46, which is obviously a disputed fact, given Sierra's innocence, that Defendants cannot resolve in their own favor. Rodriguez picked an innocent person, and so of course the identification of Sierra cannot be said to be reliable. PSOF ¶¶1-13. This factor of the suggestive identification analysis is meant to assess whether the suggestiveness of the identification procedure created a substantial likelihood

of *misidentification*. *Neil v. Biggers*, 409 U.S. 188, 198-201 (1972). In a case where the record reflects an actual misidentification of an innocent person, it is established that the identification was not reliable.

Nonetheless, even applying the *Biggers* factors—the opportunity of the witness to view the criminal during the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation, 409 U.S. at 199-200—there is ample evidence to support the view that the identifications were not reliable. The reported initial descriptions of the perpetrator that the shooter was a Latino male lacks any detail that might suggest that Sierra was one of the perpetrators. PSOF ¶¶37-39, 113. The initial descriptions are as vague as they possibly could be, and they are strong evidence that Rodriguez could not identify the perpetrator at all, let alone accurately identify Sierra. PSOF ¶¶254, 257, 284-85 (one of Defendants himself casting doubt on identifications based on how vague descriptions were).

In addition to the poor descriptions environmental circumstances confirm the identifications were unreliable, including: (1) the shooting occurred at nighttime, with poor lighting, PSOF ¶¶24, 255; (2) the shooting happened between moving cars, PSOF ¶¶27, 255; (3) the shooter car had tinted windows, and the shooter shot from around the door frame, PSOF ¶¶28-31, 112, 255, 258; (4) Melendez and Rodriguez were under the influence of drugs, PSOF ¶¶25-26; (5) Melendez, who was driving and close to the shooter car, admitted that he did not see the shooter, PSOF ¶¶89, 91, 107-09; (6) Rodriguez hit the floor as soon as the shooting started, PSOF ¶¶35, 110-11, 256, 258; (7) both Melendez and Rodriguez had exceedingly limited time to view the shooter, which dramatically reduced the chances of accurate identifications, PSOF ¶¶33, 255-

56; and (8) the incident was extremely stressful, which would have reduced accuracy, PSOF ¶¶31-35, 256, 258.

Moreover, Sierra's expert Dr. Dysart explains how these variables reduce the risk of accurate identifications, according to established, peer-reviewed eyewitness science. She opines that Melendez and Rodriguez viewed the perpetrator for such little time that the risk of false identification of an innocent person in identification procedures increased to 90%. PSOF ¶255 (at 11). That already high risk of inaccurate identification was increased by the well documented reduction in eyewitness accuracy caused by poor lighting, and stress and arousal. PSOF ¶256. Dr. Dysart opines that "[t]ogether, these estimator variables [environmental circumstances] likely created a scenario where it would have been difficult for either witness to have a strong memory for the perpetrator. . . . [T]here are significant concerns regarding eyewitness reliability in stranger identification cases where the witness has a weak memory for the perpetrator and suggestive identification procedures are employed." PSOF ¶258.

No evidence in the record suggests Melendez's or Rodriguez's identification of Sierra was reliable. *Washington*, 2022 WL 4599708, at *23 (holding that a witness's identifications of the plaintiffs at night from a distance was enough to create a genuine dispute of fact about whether the identification was reliable and procedures were suggestive); *Bolden*, 623 F. Supp. 3d at 915-19 (affirming jury verdict as supported by sufficient evidence when unreliability of the identification was supported by nearly the same factors present here). *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 2866097, at *9 (N.D. Ill. May 17, 2016) (noting that limited opportunity to view the crime, a lack of detail, and misidentification of the wrong person created a dispute of fact for trial).

In response to these arguments, Defendants suggest that the witnesses had a great opportunity to view the perpetrator. OB-46-47. That is a factual account they will have to present to a jury. In addition, they suggest that Rodriguez was 100% certain of his identification, OB-46-47, which is obviously disputed. PSOF ¶267. Not only is it disputed, but there is zero evidence in the record suggesting that Defendants obtained a confident identification from Rodriguez—they did not record his confidence, and even according to Defendants' facts he took up to 10 minutes to identify a photo. PSOF ¶266. Moreover, this contention about witness certainty is one the Seventh Circuit has discounted at summary judgment, saying it is "too much of a leap at the summary-judgment stage" to decide as a matter of law that a witness identification was reliable where the witness confidently identified a suspect and testified that the identification was not influenced, given the problems of unconscious transference. *Holloway*, 43 F.4th at 766-67; *see also* PSOF ¶¶266-267. Even accepting Defendants' view of Rodriguez's confidence, it would not entitle Defendants to summary judgment.

### (c) The Identifications Tainted Sierra's Criminal Proceedings

The final factor necessary to support this due process theory is whether the unduly suggestive and inaccurate identifications rendered Sierra's criminal case unfair. Based on this record, the question must be answered in the affirmative.

Under Seventh Circuit case law, whether unduly suggestive identifications made criminal proceedings unfair is answered by reference to the following questions: "What identification evidence was actually admitted at trial? What did the victims, eyewitnesses, and police officers say? Were they cross-examined? Were the circumstances surrounding the identification and the police procedures put before the jury? What exhibits were admitted on this issue? Was any

objection or motion to suppress the identification evidence made? What other evidence tended to link the defendant to the crime?" *Alexander*, 433 F.3d at 555.

At trial, Rodriguez, Guevara, and McMurray implicated Sierra as the perpetrator from the stand, explaining in detail the identifications of Sierra and the car, that were obtained by Defendants' suggestive identification procedures before trial. PSOF ¶¶239-240, 243-246. Rodriguez testified about a photo identification of Sierra, a live lineup identification, and the car identification. PSOF ¶¶239-240. Guevara testified about the Melendez photo identification, live lineup identification, and both Rodriguez and Melendez's car identifications. PSOF ¶244-246, 248. The photo arrays were introduced as evidence. PSOF ¶249. A photograph of the live lineup procedure was introduced as evidence, and Guevara marked Sierra on it, purporting to testify about the identification Melendez had made. PSOF ¶¶246, 249. Guevara even identified Sierra himself, as the person he had seen in the car identified by Melendez and Rodriguez. PSOF ¶247.

Though Sarley attempted to cross examine these witnesses, Defendants' suppression of the true circumstances of these identification procedures—of the fact that some of the procedures did not happen at all, of the fact that Sierra was a suspect before any identification, of the fact that Melendez and Rodriguez had not seen the shooter and told Defendants as much, of the fact that Defendants told Melendez and Rodriguez who to pick from the photo array, of the fact that Melendez and Rodriguez said the car was not the one used in the shooting—rendered cross examination effectively impossible. *See, e.g.*, PSOF ¶¶90-104, 112-146, 154-161, 193-99.

The identifications were used to convict Sierra at trial. Indeed, no other evidence—apart from Defendants' own fabricated accounts—even implied Sierra was guilty. The record shows conclusively that the unduly suggestive false identifications made Sierra's trial unfair. *Donald*,

2023 WL 2346270, at *11 (deciding in nearly identical circumstances that material disputes of fact required a jury to determine whether identifications tainted a criminal trial).

Defendants compare this case to *Coleman v. City of Peoria*, 925 F.3d 336 (7th Cir. 2019), but they are nothing alike. OB-42. In *Coleman*, the Seventh Circuit found that police officers used no improper identification procedures at all. *Id.* at 347-48. In addition, the witness had seen the suspect's fact for three minutes during the incident in question, and the witness recognized the suspect because they had lived in the same place for years. *Id.* During the happenstance meeting at the police station, the witness recognized the suspect, who was in a hallway, and pointed him out as the perpetrator. *Id.* Based on those facts, the Court determined that the witness's identifications did not clearly taint the suspect's trial. *Id.* at 349. It would be difficult to find a more different case.

### (d) Defendants' Arguments for Summary Judgment on the Unduly Suggestive Lineup Theory Lack Merit

Defendants' remaining arguments for summary judgment on this due process theory have been addressed already. Defendants argue that none of the identification procedures were suggestive, that Rodriguez was not told who to identify, that being told that the suspect was "probably in the pictures was not suggestive, and that the corrupted identifications did not affect Sierra's criminal trial. OB-40-41, 43. That account is based on Defendants' own view of the facts, depends on piles of inferences in their favor, and the resolution of credibility issues. "Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied. . . . A court's job on summary judgment is not to resolve swearing contests or decide which party's facts are more likely true. . . . These credibility disputes are for fact finders to resolve." *Kailin v. Gurnee*, 77 F.4th 476, 483 (7th Cir. 2023).

In addition, Defendants other than Guevara also repeat verbatim their argument that Guevara was the only officer involved in the identification procedures. Compare OB-47-48, with OB-19-20. Sierra has addressed already how that is an untenable reading of the record, particularly so if the record is construed for Sierra, and Sierra incorporates that argument here. Argument IV(B)(1) *supra*. The evidence that the other Defendants were involved is substantial, PSOF ¶¶3, 273-293; *also* 23-50, 54-56, 67-69, 74-83, 84-93, 94-97, 105-106, 113, 118-119. 120, 123, 127, 129, 131-132, 148, 154-159, 162-165, 173-179, 193-199, 200-202, 205-206, 250-251, 253, and Halvorsen in particular wades deeply into frivolity with his continuous arguments that he was not working with his partner on the investigative tasks that he reported and approved himself and about which he pleaded his Fifth Amendment right to remain silent.

### 3. Defendants Are Not Entitled To Qualified Immunity on This Theory

Finally, Defendants contend they are entitled to qualified immunity on this claim. OB-48-49.[18] Defendants argue only that the law was not clearly established in 1995 that they could not use a photo array prior to a live lineup or that they could not tell the witness that they had the guy. OB-49-50. That qualified immunity argument depends on a view of the facts where Defendants did not violate Sierra's at all, but as discussed already material disputes of fact foreclose such an argument.[19]

---

[18] Defendants do not argue they are entitled to qualified immunity on any of Sierra's other constitutional claims, and so they have now forfeited any argument for immunity on those claims. *J&J Sports Productions, Inc. v. Resendiz*, 2009 WL 1953154 (N.D. Ill. July 2, 2009).

[19] In fact, this whole section of Defendants' brief really repeats factual arguments addressed above about whether Defendants violated Sierra's rights, OB-49-50, but now Defendants have dressed them up as arguments about the contours of clearly established law.

For example, Defendants argue that the law was not clearly established that they could not say "the probably got the guy" before an identification procedure, OB-49, which is not an argument about the state of clearly established law, but instead is an argument that they did not engage in suggestive identification procedures in the first place.

To the extent Defendants are actually arguing that the law governing Sierra's claims was not clearly established in 1995 and 1996, that is plainly incorrect—the illegality of the Defendants' conduct was established long before the events at issue in this case. In 1968, the Supreme Court announced that identification procedures that highlight who the suspect is are unduly suggestive. *Simmons v. U.S.*, 390 U.S. 377, 383 (1968). Moreover, it has been the law since at least 1977 that subjecting a criminal defendant to unduly suggestive identification procedures that taint the criminal proceedings violates due process. *Manson v. Brathwaite*, 432 U.S. 98 (1977); *see also Neil v. Biggers*, 409 U.S. 188 (1972). It was clear in the Seventh Circuit that police officers could be held liable for this misconduct at latest in 1987, nearly a decade before Sierra's prosecution. *Hensley*, 818 F.2d at 648-50; see also *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 2866097, at *10 (N.D. Ill. May 17, 2016) (holding that it was clearly established in 1993 and January 1994 that police officers violated a criminal defendant's due process rights by conducting impermissibly suggestive identification procedures). Defendants are not entitled to qualified immunity on Sierra's due process claims.[20]

### E.     A Jury Must Decide Sierra's Fourth Amendment Illegal Seizure and State Law Malicious Prosecution Claims

Sierra also brings a § 1983 claim for illegal detention without probable cause, as well as a state-law claim for malicious prosecution. Defendant Officers treat these as though they were a single claim, OB-50-55, but they are not. The Supreme Court held in *Manuel v. Joliet*, 580 U.S. 357, 363-64 (2017), and *Thompson v. Clark*, 596 U.S. 36, 42 (2022), that it has long recognized a

---

[20] Sierra preserves the argument that qualified immunity does not apply to § 1983 claims. The Supreme Court's qualified-immunity precedent derives from the premise that there is "no evidence that Congress intended to abrogate the traditional common law" immunities in Section 1983 actions. *Briscoe v. LaHue*, 460 U.S. 325, 337 (1983). But that premise is wrong. Section 1983 as originally enacted in 1871 contained express language abrogating state common-law immunities. That text was mistakenly omitted during codification, and the Supreme Court has never addressed it.

Fourth Amendment claim for illegal seizure pursuant to legal process where the detention is without probable cause. That claim, like all other Fourth Amendment claims, requires proof of a (1) a seizure, (2) without probable cause. *Gerstein v. Pugh*, 420 U.S. 103, 114-16 (1975). By contrast, an Illinois malicious prosecution claim requires proof of (1) initiation or continuation of criminal proceedings, (2) without probable cause, (3) with malice, (4) terminating in the plaintiff's favor. *Logan v. Caterpillar*, 246 F.3d 912, 921-22 (7th Cir. 2011). On both claims, Defendants contend the claims are defeated by the presence of probable cause. OB-50-53, 55. Seemingly on both claims, Defendants assert Sierra cannot show causation, though they do not address Illinois law governing malicious prosecution claims in this section. OB-53-55. The arguments lack merit.

**1. Defendants Lacked Probable Cause to Prosecute Sierra**

Defendants first argue that there is no genuine dispute about whether there was probable cause to suspect that Sierra killed Andujar. OB-50-53. Defendants assert that they believed at the time that Rodriguez accurately and truthfully identified Sierra, and they cite cases that say that probable cause can be based on a single eyewitness identification. Again, Defendants' argument is founded on utterly disputed facts and inapplicable case law.

"In a malicious prosecution case, probable cause is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013). It is firmly established that knowingly fabricated evidence and false statements never support probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Alexander*, 721 F.3d at 423; *Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011) (reversing grant of summary judgment where false statements precluded finding probable cause); *Olson v. Tyler*, 771 F.2d 277, 281 & n.5 (7th Cir. 1985) (holding that when officer includes false facts or omits facts in the

82

probable cause analysis, "he cannot be said to have acted in an objectively reasonable manner"). Along the same lines, police cannot manufacture their own probable cause. *Collier v. City of Chicago*, 2015 WL 50814408, *4 (N.D. Ill. Aug. 26, 2015).

Moreover, probable cause is a quintessential question of fact. The Seventh Circuit holds that a court cannot decide the probable cause question "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993); *see also Bryant v. Whalen*, 759 F.Supp. 410, 417 (N.D. Ill. 1991). "Accordingly, a conclusion that probable cause existed as a matter of law is appropriate only when no reasonable jury could find that the officers did not have probable cause[.]" *Maxwell*, 998 F.2d at 434.

As discussed at length already, there is a huge difference of opinion about whether Defendants had any evidence whatsoever to entertain an "honest and sound" suspicion that Sierra had killed Andujar. Viewed in Sierra's favor, the record demonstrates that Defendants wholly fabricated all the evidence against Sierra, including each of Rodriguez's and Melendez's identifications, Argument IV(B) *supra*, on which Defendants' probable cause argument is based, OB-51-52. There is similarly strong evidence that Defendants hid evidence demonstrating that Sierra was innocent. *See id.* In other words, there is nothing that the Defendants can point to that establishes probable cause independent of their own misconduct.[21]

Putting a finer point on it, Defendants state that probable cause for Sierra's claim should be measured "at the time the legal process is initiated." OB-50. Assuming that is true, Defendants

---

[21] Defendants cite *Hart v. Mannina*, 798 F.3d 578 (7th Cir. 2015), for the proposition that an identification can establish probable cause so long as there is "no evidence of coaching." *Id.* at 588. To assert that there is no evidence of coaching in the record in this case is not a credible argument, and this Court should reject it.

submitted a sworn arrest report at the time that legal process was initiated in Sierra's criminal case, which had a field in which they were to record the evidence establishing probable cause of the murder charge. That field states: "The above subject was identified in a line-up by two eye-witnesses as the person who shot and killed Noel ANDUJAR. The arrestee was also identified by Hector MONTANEZ, who sat next to the arrestee in a car when the arrestee shot Noel ANDUJAR." PSOF ¶127. There is no other evidence identified. The evidence identified is all fabricated, viewing the facts in Sierra's favor. Argument IV(B) *supra*. A jury must decide whether there was probable cause to suspect Sierra of the Andujar murder.

### 2. Defendant Caused Sierra's Wrongful Prosecution and Conviction for Purposes of § 1983

Defendants next contend that they did not cause Sierra's wrongful prosecution and conviction. Instead, they assert, the prosecutor's decision to charge Sierra breaks the chain of causation between their misconduct and Sierra's injuries. OB-53-55. As a matter of federal and state law, this "no causation" argument is hogwash. On the federal claim, it misunderstands basic rules of causation, it is flatly contradicted by the text of § 1983 and by established Supreme Court and Seventh Circuit precedents, and it requires viewing the facts for Defendants. On the state claim, Defendants forfeit the argument by not discussing Illinois law, but the argument would be irreconcilable with binding Illinois Supreme Court decisions.

### (a) Defendants Misunderstand Federal Causation Rules

Section 1983 provides that a police officer is liable not only when the officer "subjects" an individual to constitutional violations, but also when that officer "causes [the individual] to be subjected" to constitutional violations. 42 U.S.C. § 1983. The statutory text acknowledges there may be separation between the tortfeasor and the ultimate constitutional violation. Indeed, reading this text, *Monell v. New York Department of Social Services* acknowledged, "Congress did

specifically provide that A's tort became B's liability if B 'caused' A to subject another to a tort." 436 U.S. 658, 692 (1978). That alone is enough to dispose of Defendants' arguments that a prosecutor's actions later in the chain of causation can insulate them from liability.

But there is more. The common-law causation principles the Supreme Court utilizes in section 1983 cases provide that if a police officer can reasonably foresee that their conduct will cause violations of constitutional rights, then § 1983 renders them liable. *Monroe v. Pape*, 365 U.S. 167, 187 (1961) holding that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions"); see also *Owen v. City of Independence*, 445 U.S. 622, 654 (1980) ("Elemental notions of fairness dictate that one who causes a loss should bear the loss."). Under established tort principles, if an injury is foreseeable, there may be liability. *Milwaukee & St. P.R. Co. v. Kellogg*, 94 U.S. 469, 475 (1876) (proximate cause requires "that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances"). If the injury was remote and unforeseeable, there may not be liability. *E.g.*, *Martinez v. California*, 444 U.S. 277, 285 (1980) (holding that parole officials are not responsible for injuries inflicted by a paroled prisoner that were not foreseeable).

The same rule applies when the chain of causation includes multiple actors. *Staub v. Proctor Hospital* explains that proximate cause "requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that [are] too remote, purely contingent, or indirect.'" 562 U.S. 411, 419 (2011) (citing *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010). When an "ultimate decisionmaker" exercises judgment between the initial actor and the injury, later in the chain of causation, the ultimate decisionmaker's exercise of judgment does not "automatically render[] the link to the [initial actor's alleged

misconduct] 'remote' or 'purely contingent.'" 562 U.S. at 419-20. Instead, the later "decisionmaker's exercise of judgment is also a proximate cause," and it is "*common for injuries to have multiple proximate causes*." *Id.* (citing *Sosa v. Alvarez–Machain*, 542 U.S. 692, 704 (2004)) (emphasis added). "Nor can the ultimate decisionmaker's judgment be deemed a superseding cause of the harm. A cause can be thought 'superseding' only if it is a 'cause of independent origin that was not foreseeable.'" 562 U.S. at 420 (quoting *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996)).

Applying these principles, the Supreme Court in *Malley v. Briggs* rejected the "no causation" argument that Defendants make here, holding that an officer who submits a false affidavit can be liable for violating the Constitution even though it is a judge who reviews the affidavit and issues the arrest warrant. 475 U.S. 335, 345 n.7 (1986). "It should be clear . . . that the District Court's 'no causation' rationale in this case is inconsistent with our interpretation of § 1983," the Court announced, "Since the common law recognized the causal link between the submission of a complaint and an ensuing arrest, we read § 1983 as recognizing the same causal link." *Id.* Since then the Supreme Court consistently has reaffirmed that police are liable where they manipulate criminal proceedings, even though prosecutors and judges participate in the chain of causation. Just as the judge in *Malley* did not break the chain of causation between the officer's affidavit and the illegal arrest, 475 U.S. at 344 n.7, 345, the officer who fabricated evidence and caused a pretrial seizure pursuant to legal process in *Manuel* was liable, even though it was a judge who ordered the defendant detained, 137 S. Ct. 911, 918-20 (2017). The Court reaffirmed this conclusion the term before last in *Thompson v. Clark*, 596 U.S. 36, 39-41 (2022), and two terms before that in immunized act and by immune witnesses, see *Rehberg v. Paulk*, 566 U.S. 356, 370 n.1 (2012); see also *McDonough v. Smith*, 139 S. Ct. 2149, 2153-54 (2019). In *Rehberg v. Paulk*,

86

566 U.S. 356, 370 n.1 (2012), the Court expressly recognized that an officer who fabricates evidence before criminal proceedings may be liable when the evidence is later used in a prosecution, even though the evidence is necessarily introduced via an immunized actor or by immune witnesses.[22]

The conclusion drawn from these cases is straightforward: "If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him." *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988). Or, as the Seventh Circuit put it in *Avery*, in cases where an absolutely immune prosecutor introduces fabricated evidence, the resulting constitutional violation is not only the foreseeable result of the police fabrication of that evidence, it is "the whole point." 847 F.3d at 443. The Seventh Circuit repeatedly has rejected the causation argument that Defendants make here—in addition to the cases above, see *Whitlock*, 682 F.3d at 582-84 (police liable when they fabricate evidence later used by prosecutors, even when the prosecutor's action of introducing the evidence completes the constitutional violation); *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014); *Steidl v. Fermon*, 494 F.3d 623, 631 (7th Cir. 2007). This Court should reject Defendants' argument based on these precedents.

Defendants' contention that they did not cause Sierra's criminal proceedings and their implication that a prosecutor exercised independent judgment in bringing the case cannot be reconciled with the record either. As discussed at length, the Defendant Officers fabricated false evidence and hid evidence from prosecutors. PSOF ¶¶200-213; see also PSOF ¶¶24-50, 54-72, 73-

---

[22] Defendants cite *Rehberg* in support of their argument, but they misread the case. OB-54. The Court in the pages cited by the Defendants agreed that witness immunity applied to a claim based only on grand jury witness testimony, but it made perfectly in the footnote cited above that its decision did not immunize acts of fabrication leading up to testimony. *Rehberg*, 566 U.S. at 370 n.1.

83, 84-99, 100-104, 105-122, 129, 130-136, 137-146, 147-153, 154-159, 160-161, 162-170, 173-177, 185-192, 193-199. They manufactured identifications and false witness accounts to be used in Sierra's criminal case. PSOF ¶¶34-50, 54-72, 73-199. Figueroa and Mingey signed an arrest report under oath that consisted of false evidence created by Defendants that they said supported probable cause to prosecute. PSOF ¶¶125-129, 286. The Defendant Officers wrote false reports regarding their fabrications and provided those false reports to prosecutors. PSOF ¶¶68, 84-89, 9596, 127, 131-132, 154-157, 162-170, 173-179, 193-199, 203-204, 228-229, 286. Guevara was the complaining witness at the grand jury. PSOF ¶230. Defendants testified consistent with their false statements at trial. PSOF ¶¶231-238, 243-251, 253. The record construed in Sierra's favor shows direct influence by Defendants over the decision to prosecute.[23]

As in all criminal cases, the state actor who used the Defendants' false evidence in the criminal case was a prosecutor, but the constitutional violations and injuries that Sierra suffered were the foreseeable—indeed, the intended—result of the Defendants Officers fabrication and suppression of evidence, and thus they are liable under § 1983. It makes no difference that state prosecutors were *also* a proximate cause of Sierra's injuries because it is common for injuries to have multiple proximate causes. *Staub*, 562 U.S. at 419-20. "[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision," as Defendants did here. *Jones*, 856 F.2d at 994.

---

[23] Defendants state that ASA Farrell independently reviewed evidence and made a charging decision. OB-55. But Farrell reviewed the evidence that Defendants had already fabricated, and he testified he had no knowledge of their fabrications. PSOF ¶¶203-208.

**(b) Defendants Commenced and Continued A Criminal Proceeding Under Illinois Law**

The argument above also demonstrates that summary judgment is inappropriate on grounds for Sierra's malicious prosecution claim under Illinois law. Indeed, the showing above is not even necessary under Illinois law. A defendant who is liable for malicious prosecution "must have initiated the criminal proceeding or his participation in it must have been of so active and positive a character as to amount to advice and cooperation." *Logan*, 246 F.3d at 922. The cases stress that this standard does not depend on who made the decision to prosecute (by definition the prosecutor, not the officer), who signed the criminal complaint, who testified at the grand jury, or who led the investigation. Instead, liability extends to all persons who played a significant role in causing the prosecution of plaintiff. *Beaman v. Freesmeyer*, 183 N.E.3d 767, 782 (Ill. 2021); *see also Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013) (noting that a defendant "causes" an action to be commenced "even if that person does not conduct the prosecution personally"). As discussed already, the Defendants each fabricated evidence that was presented to prosecutors and suppressed other evidence, causing Sierra's wrongful criminal prosecution and conviction. That alone is enough to demonstrate that they commenced and continued Sierra's criminal proceedings.

Moreover, police who engage together in misconduct to deceive other actors in the criminal justice system are routinely found to have commenced and continued criminal prosecutions. *E.g.*, *Padilla v. City of Chicago*, 2013 WL 1208567, at *16 (N.D. Ill. Mar. 26, 2013) (police who engage in misconduct cannot blame others involved in the prosecution); *Freeman v. Brown*, 2012 WL 3777074, at *6 (N.D. Ill. Aug. 29, 2012); *Ewing v. O'Brien*, 60 F. Supp. 2d 813, 818 (N.D. Ill. 1999). Indeed, a materially false statement to a prosecuting authority supports a finding that the commencement element is satisfied. *Wallace v. City of Zion*, 2011 WL 3205495, at *5 (N.D. Ill. July 28, 2011); *Boyle v. Torres*, 756 F. Supp. 2d 983, 1000 (N.D. Ill. Dec. 21, 2010); *Allen v.*

*Berger*, 784 N.E.2d 367, 370 (Ill. App. Ct. 2002) ("[W]hen a person makes a knowingly false report to a prosecuting officer, the resulting prosecution is attributable to that person."). In short, what prosecutors did and whether police interacted with them matters little when the police fabricate false evidence. *Myett v. Heerdt*, 2017 WL 75738, at *16 (N.D. Ill. Jan. 9, 2017) (deciding that where police provided prosecutors with false reports, they could not hide behind prosecutorial decisions to charge); *Simon v. Northwestern Univ.*, 2016 WL 1237666, at *7 (N.D. Ill. Mar. 29, 2016) (holding that investigators who supply false information to prosecutors may be liable for malicious prosecution even if prosecutors investigate independently). Defendants each commenced and continued the criminal case against Sierra, within the meaning of Illinois law.

> **F. Defendants Wojcik, Figueroa, Biebel, and Mingey Participated In the Misconduct and Are Not Entitled to Summary Judgment**

Defendants Officers Wojcik, Figueroa, Biebel, and Mingey separately assert they are entitled to summary judgment because, in their view, they had minimal involvement in the Andujar investigation. OB-56-59. But these Defendants were each intimately involved in the misconduct described above. None of them is entitled to summary judgment.

It is worth pausing to note how peculiar it is that a subset of Defendant Officers argues in a separate section of their motion that they are entitled to summary judgment on the ground that the record shows they were uninvolved in the misconduct. Of course, each of the Defendants must show that they undisputedly were not involved in misconduct to obtain summary judgment. The fact that a subset of Defendants argue separately that they were not involved in the constitutional violations and torts asserted is tantamount to an admission that there is no hope of summary judgment for the others—Guevara, Halvorsen, and McMurray.

Defendants argue that Biebel and Mingey were simply supervisors who signed reports and so cannot be liable. OB-56-58. There are a number of problems with this argument. First,

supervisors who approve police reports are not passive rubber stampers who sign whatever crosses their desks—they are in fact leaders of the team, responsible for oversight of investigative tasks and verification of results. They are kept fully abreast of the homicide investigation as it proceeds, including the results of any positive or negative lineup identification procedures, witness interviews and other developments. Indeed, tracking the day-to-day progress of the investigation was one of their "integral roles." PSOF ¶277; *see generally* PSOF ¶¶280-87 (Mingey); PSOF ¶¶288-293 (Biebel). The record supports the conclusion at summary judgment that these Defendants were involved in misconduct that occurred in the investigation they oversaw.

Biebel oversaw the Defendants' investigation throughout as their direct supervisor. PSOF ¶¶288-293. He approved the reports on May 24, the night of the crime; he approved the false police report of May 30, which Halvorsen, Guevara, McMurray, and Wojcik wrote; and he approved the lineup report on May 30. PSOF ¶¶291-293. The May 24 report purported to document the initial accounts of Melendez and Rodriguez, falsely leaving open the possibility that they had seen the shooter well enough to be able to make an identification if a suspect was identified. PSOF ¶¶24-40, 43-50. The false May 30 report outlined all of the evidence fabricated to implicate Sierra, such as the Esther Reyes identification story; the falsified connection through the nicknames Lil Hector and Junito; the May 25 Rodriguez identification procedure, including the fact that no photo array occurred on that date; the Rodriguez lineup identification; the Melendez photo identification; the Melendez lineup identification; the car identifications by Melendez and Rodriguez; the false statements attributed to those two; and the false statements of Montalvo and Montanez. The report also hid evidence that Melendez and Rodriguez could not and had not identified Sierra, that the witnesses had said the car in the Area Five lot was not the one used in the shooting, that Montanez had been coerced using illegal tactics until he gave the statement that Defendants provided him,

91

which they knew was false, that Montalvo's statement actually supported Sierra's alibi, and that there had been no live lineup on May 30. PSOF ¶¶56, 67-69, 84-87, 105-106, 115-117, 130, 162-165, 177, 193-199. In addition, Biebel signed off on the report documenting the fabricated May 30 live lineup. PSOF ¶293.

Biebel acknowledged that as a supervisor, he remained involved and informed of what was going on during the investigation, and he took steps to understand what had occurred during the investigation to ensure reports were accurate. PSOF ¶¶276-279, 288-293. Accordingly, Plaintiff is entitled to the inference that Biebel learned about the fabrication and suppression that had occurred during the course of the investigation, and nevertheless approved reports that he knew were fabricated, and that concealed exculpatory and impeaching evidence.

For his part, Mingey was the direct supervisor of the Defendant Officers earlier in the day on May 30, when Sierra was arrested at 3:30 p.m. PSOF ¶281. He signed off on an arrest report, sworn by Figueroa, which cited fabricated evidence as the basis of probable cause for arrest and prosecution for murder was: (1) the fabricated identifications of Sierra in a live lineup by Montanez and Rodriguez; and (2) the fabricated statement of Montanez implicating Sierra in the crime. PSOF ¶286. Mingey also approved and signed the crime scene process report of Defendant Halvorsen, creating fabricated evidence to bolster the false claim that Melendez and Rodriguez had identified Sierra. PSOF ¶287. Like Biebel, he took steps to ensure that he kept abreast of the investigation as it was ongoing, and what the detectives were learning, including by reviewing earlier reports such as the General Offense Case Report. He himself had concerns internally about the very limited descriptions of the shooters initially provided, and how that could have led to an identification. PSOF ¶¶276-285. Again, Plaintiff is entitled to the inference that through his active supervision

92

Mingey learned of the fabricated evidence developed by the detectives under his supervision, and nevertheless approved of police reports concealing that misconduct.

Moreover, as supervisors, these Defendants can be liable "for their subordinates' violation of others' constitutional rights when they 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Steidl v. Fermon*, 494 F.3d 623, 631-32 (7th Cir. 2007). Defendants Biebel and Mingey were the direct supervisors of the other Defendant Officers, had direct knowledge of their investigation, made assignments, and approved reports, thereby ratifying the misconduct contained in those reports. PSOF ¶¶276-279; 280-87 (Mingey); PSOF ¶¶288-293 (Biebel); RSOF-Officers ¶¶160-165. Their participation as supervisors was essential to the scheme. *Id.* They are liable on that basis as well.

Finally, the arguments of Wojcik and Figueroa ignore substantial disputes of fact. For example, both argue that they were "neither present for, nor involved in, any identification procedures, the interviews of any witness [other than Melendez and Rodriguez on the night of the crime] or Sierra, in the preparation of the various witness' handwritten statements, or any allegedly fabricated police report," OB-58, but that is an unsustainable view of the record. Wojcik worked on the Andujar investigation with McMurray, Guevara, and Halvorsen as a team, in conjunction with one another. He is one of the reporting detectives listed on the May 30 false closing report, described as participating in nearly every aspect of the fabrication with the exception of the Esther Reyes made-up story. He is identified as one of the arresting officers on Sierra's arrest report. And by Defendants' own admission, he and Defendant McMurray conducted the initial interviews of Melendez and Rodriguez on the night of the shooting, in which he and McMurray sought as detailed an account as they possibly could from Melendez and Rodriguez, but they ended up with no descriptive details or distinguishing features. PSOF ¶¶43-50, 55-56, 67, 75, 84-87, 94, 97, 105-

106, 123, 130, 133, 154-159, 194-199. Indeed, the two eyewitnesses made clear what common sense could have told them: that they could not possibly see the shooter's face and make an identification. Yet, Defendants Wojcik and McMurray omitted this information from their police report. PSOF ¶¶43-50. Wojcik also stopped the man who was in possession of Montanez's Buick Park Avenue, and they brought the vehicle to Area 5 for use in the fabricated car identification procedure. PSOF ¶75.

For his part, Figueroa swore the fabricated arrest report, which documents the fabricated identifications of Melendez and Sierra, and the fabricated statement taken from Montanez. PSOF ¶¶123, 127, 286. Figueroa fabricated that Sierra went by the nickname Junito to falsely connect Defendants Guevara and Halvorsen's fabricated Esther Reyes story to Sierra, and he provided the photos of Sierra and Montanez that the other Defendants used in unduly suggestive photo arrays and to obtain fabricated identifications of Sierra from Melendez and Rodriguez. PSOF ¶¶148, 178-179, 185-189, 194, 237, 253. None of these Defendants is entitled to summary judgment.

### G. A Jury Must Decide the Failure-To-Intervene Claims

The Defendant Officers also argue for summary judgment on Plaintiff's failure-to-intervene claim. First, they argue that such a claim is not viable under § 1983, a position they admit is incompatible with Seventh Circuit law. OB-59-60. As the Seventh Circuit reaffirmed in the very case Defendants cite for the proposition that a failure-to-intervene claim is not viable, defendant who has a realistic opportunity to step forward and prevent a fellow officer from violating the constitutional rights of another but who fails to do so is liable. *Mwangangi v. Nielsen*, 48 F.4th 816, 832 (7th Cir. 2022); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

94

Second, Defendant Officers argue that Sierra's failure-to-intervene claims fail because they are entitled to summary judgment on all of Sierra's other constitutional claims. OB-60. This Court should reject this argument because Defendants do not move for summary judgment on all of Sierra's other constitutional claims, and regardless material disputes of fact require a trial on those claims. Argument I *supra*.

Third, Defendants Mingey, Biebel, Figueroa, and Wojcik assert that they had no opportunity to intervene to prevent the violation of Sierra's rights. OB-60-61. This one-paragraph argument is not developed in a way that permits a response and is therefore forfeited. *Smith*, 388 F.3d at 569 (holding that an undeveloped argument is forfeited); *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998) (refusing to consider unsupported or cursory arguments). It also lacks merit. "Whether a bystander officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact[.]" *Mwangangi*, 48 F.4th at 832. The discussion of Sierra's due process claims above demonstrates that a reasonable jury could find that each of these Defendants had the opportunity to intervene to prevent the fabrication and suppression of evidence that caused Sierra's 20-year wrongful incarceration. Argument IV(B)-(D) *supra*. Indeed, Defendants had decades to so intervene while Sierra was languishing in and did not.[24] These Defendants arguments otherwise are plainly dependent on the Court drawing inferences—and many untenable inferences—in their favor, an approach the Court cannot take at this stage. Summary judgment is not appropriate on this claim.

---

[24] Defendants compare this case to *Doxtator v. O'Brien*, where the Seventh Circuit held that officers did not have time to intervene in a shooting that happened "instantaneously," 39 F.4th 852, 864-65 (7th Cir. 2022), which is plainly different than this case.

**H.**     **A Jury Must Decide Sierra State-Law Claim of Intentional Infliction of Emotional Distress**

In a single sentence, the Defendant Officers assert that Sierra's state-law claim of intentional infliction of emotional distress fails because Sierra's other claims fail. OB-61 (buried in a section on conspiracy). This bald assertion is insufficient to shift the burden at summary judgment. *Carmichael*, 605 F.3d at 460; *Useni*, 516 F.3d at 658 ("We have repeatedly warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived[.]"). Additional arguments on this point are now forfeited. *Costello*, 651 F.3d at 635 (7th Cir. 2011).

Even if they were not, Defendants manufactured evidence to prosecute and convict Sierra of a murder he did not commit, and they withheld other evidence that would have allowed him to defend himself against the false charges. Argument IV(B)-(D) *supra*. As a result, Sierra spent decades in prison. "For conduct to be extreme and outrageous it must go 'beyond all bounds of decency' and be 'considered intolerable in a civilized community.'" *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (quoting *Lopez v. City of Chicago*, 464 F.3d 711, 721 (7th Cir. 2006)). An important factor in deciding whether conduct is "extreme and outrageous" is whether "a defendant abused a position of authority." *Fox*, 600 F.3d at 842. Sierra's allegations fit this tort perfectly, and disputes of fact prevent summary judgment for Defendants on this claim. *See Henry v. Ramos*, 1997 WL 610781, at *2 (N.D. Ill. Sept. 28, 1997) ("An average member in the community would consider it outrageous for police officers to falsely frame, arrest and imprison an innocent citizen."); *Moore v. City of Chicago*, 2011 WL 1231318, at *4 (N.D. Ill. 2011).

**K.**     **A Jury Must Decide the Section 1983 Conspiracy Claims**

Defendants argue for summary judgment on Sierra's federal and state conspiracy claims in a single section. OB-61-63. First, on both federal and state claims, Defendants assert that Sierra's

conspiracy claims are derivative of his due process claims and unsupported by evidence. OB-61-62. To the extent that argument is based on a purported deficiency in Sierra's due process claims, that argument is rebutted by the discussion above of the reasons that the due process claims survive. Argument IV(B)-(D) *supra*. Moreover, Defendants' bald assertion that there is no evidence of conspiracy is insufficient to shift the summary judgment burden. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010) ("The defendants, the moving party on the summary judgment motion, never fulfilled the obligation of setting forth the basic facts and law which, in their view, warranted summary judgment on this claim."). Regardless, there is ample evidence supporting Sierra's conspiracy claims.

To prove a section 1983 or civil conspiracy, Sierra must point to evidence from which a jury could infer an agreement among two or more people acting in concert to commit an unlawful act, or a lawful act by unlawful means. *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979), *rev'd in part*, 446 U.S. 754. "To be liable as a conspirator you must be a voluntary participant in a common venture," the Seventh Circuit has explained, "although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Jones*, 856 F.2d at 992. Conspirators are liable "for the wrongful acts of the other conspirators committed within the scope of the conspiracy." *Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002). "Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire," and so "circumstantial evidence may provide adequate proof of conspiracy." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1256 (7th Cir. 1984).

There is ample evidence on which a jury could infer an agreement between the Defendant Officers, and Sierra's conspiracy claims against each of them should proceed to trial. The facts viewed in Sierra's favor show Defendants all worked together on the Andujar homicide investigation, deciding that Sierra was a suspect before he was ever identified, and working from there to fabricate evidence implicating him in the crime, even though there was no evidence to speak of otherwise. PSOF ¶¶3, 273-293; *also* 23-50, 54-56, 67-69, 74-83, 84-93, 94-97, 105-106, 113, 118-119. 120, 123, 127, 129, 131-132, 148, 154-159, 162-165, 173-179, 193-199, 200-202, 205-206, 250-251, 253. Where evidence contradicted Defendants' official version, it was hidden from sight. PSOF ¶¶50, 56, 67, 114-118, 200-227. As discussed, each Defendant participated in efforts to obtain fabricated identifications from Melendez and Rodriguez, and each contributed to the fabrications detailed in the closing reports. PSOF ¶¶3, 273-293; *also* 23-50, 54-56, 67-69, 74-83, 84-93, 94-97, 105-106, 113, 118-119. 120, 123, 127, 129, 131-132, 148, 154-159, 162-165, 173-179, 193-199, 200-202, 205-206, 250-251, 253; RSOF-Officers ¶¶151-170, 190-194. By the end of May 30, 1995, each of the Defendant Officers had engaged in a scheme to fabricate evidence to frame Sierra for a crime they had no evidence he committed. *Id.*; *see Jones*, 856 F.2d at 992 ("We cannot say that the jury acted unreasonably in finding that all of the individual defendants were voluntary participants in a common venture to railroad [the plaintiff].").

The conspiracy continued after Sierra was charged, but its object and scope remained the same. *See United States v. Jackson*, 546 F.3d 801, 815-16 (7th Cir. 2008) ("[C]o-schemers are jointly responsible for one another's acts in furtherance in the scheme," and a "participant in conspiracy is liable for foreseeable acts of his co-conspirators in furtherance of the conspiracy[.]"). Throughout, Defendants conspired with Alberto Rodriguez, who had not seen the perpetrator and could not identify him, to provide false statements and evidence starting on May 30 and continuing

98

through Sierra's criminal case. PSOF ¶¶43-45, 84-86, 105-128, 130-134, 135-136, 154, 157-158, 195-196, 199, 231-233, 239-240, 243-248, 250-251.

The Seventh Circuit has warned that "[t]he question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives." *Hampton*, 600 F.2d at 621; *Serrano*, 2020 WL 3000284, at *21 ("Who actually was in the conspiracy, if one existed, its aims, and its extent are for the jury to decide."); *Washington v. Boudreau*, 2022 WL 4599708, at *23 (denying officers summary judgment on conspiracy claim there was a material dispute of fact as to whether they fabricated or withheld evidence). The summary judgment record reveals a genuine dispute of fact about whether each of the Defendants reached an agreement with the others, and a reasonable jury could find for Sierra on his conspiracy claims.

Second, Defendant Officers argue they are entitled to qualified immunity on Sierra's § 1983 conspiracy claims because, in their view, it is unclear in 1995 whether officers working for the same police department could be liable for participating in a conspiracy. This argument follows from the incorrect contention that the law is unclear about whether the so-called intra-corporate conspiracy doctrine bars Sierra's conspiracy claims against the Defendant Officers. OB-62-63. The argument is wrong on a number of levels. For starters, the Supreme Court and Seventh Circuit long before the Andujar case held that § 1983 conspiracy claims can be pursued against members of a single law enforcement agency. See *Adickes*, 398 U.S. at 152; *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) (reinstating conspiracy claim against "several members of the same police unit [who] allegedly acted in the same inexplicable way against a plaintiff on many different occasions"); *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (conspiracy

among supervisory officers within the Chicago Police Department); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1253-61 (7th Cir. 1984) (upholding punitive damages for conspiracy among members of the  Milwaukee Police Department).

In addition, neither the Supreme Court nor the Seventh Circuit has ever applied the intra-corporate conspiracy doctrine to §1983 claims, and cases applying that doctrine in other contexts but not to §1983 claims do not unsettle established law. Moreover, the intra-corporate conspiracy doctrine has no place in § 1983 cases. The doctrine arose in the antitrust context and provides that "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). It arose because the presumption for a conspiracy among agents of a single corporate entity is that the actions of employees are attributed to the corporate principal. But for § 1983 claims that presumption cannot apply because *Monell* holds that actions of municipal employees can never be imputed to their municipal employer. So, applying the doctrine to §1983 claims does not make sense. This is why "district courts have overwhelmingly declined to dismiss conspiracy claims against police officers pursuant to the intracorporate conspiracy doctrine." *Liggins v. City of Chicago*, 2021 WL 2894167, at \*5-\*6 (N.D. Ill. July 9, 2021).

Moreover, qualified immunity considers whether state actors were on notice that their *conduct* was unlawful according to established law, which it was, not whether prior cases gave notice of a *defense* to a civil claim. *Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015) ("The issue is not whether issues concerning the availability of a *remedy* are settled. The qualified immunity defense focuses instead on whether the official defendant's *conduct* violated a clearly established constitutional right."). Accordingly, "[r]ecent uncertainty over the intra-corporate conspiracy doctrine's application to § 1983 cases does not create an opening for qualified

immigration on behalf of defendant officers." *Harris v. City of Chicago*, No. 20-CV-4521, 2020 WL 7059445, at *5 (N.D. Ill. Dec. 2, 2020).

Lastly, the intra-corporate conspiracy doctrine applies to conspiracy wholly among members of a single entity, and here Sierra's conspiracy claims include an agreement between Defendants and private individuals, including Rodriguez, and so the intra-corporate conspiracy doctrine would not apply in this case, even if there were some argument for its application more generally.

## I.     A Jury Must Decide the State Law Negligence Claim

In their final argument, Defendant Officers say Sierra's Illinois negligence claim that they breached a duty to him and acted willfully and wantonly in so doing must be dismissed because, Defendants say, there is no separate tort of willful and wanton misconduct in Illinois. OB-63. "This argument is a non-starter," courts in this Circuit have recognized, "While there is no independent tort of willful and wanton conduct in Illinois, it is regarded as an aggravated form of negligence and can be pleaded as such by alleging the basic elements of a negligence claim—duty, breach, and causation—as well as 'either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare.'" *Pennington v. Flora Cmty. Unit Sch. Dist. No. 35*, 2023 WL 348320, at *4 (S.D. Ill. Jan. 20, 2023) (quoting *Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 973 N.E.2d 880, 887 (Ill. 2012)); see also *Stevenson v. City of Chicago*, No. 17 CV 4839, 2018 WL 1784142, at *10 (N.D. Ill. Apr. 13, 2018). Similarly, the Seventh Circuit has held: "Under Illinois law, a plaintiff pleading willful and wanton misconduct must establish the same basic elements of a negligence claim, which are the existence of a duty, breach of that duty, and an injury proximately resulting from the breach. A willful and wanton claim has the additional requirement that the breach be not merely negligent, but with conscious disregard for the welfare of the

plaintiff." *Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 593 F.3d 507, 514 (7th Cir. 2010) (internal quotations and citations omitted). Sierra's claim has been recognized by the Illinois Supreme Court and the Seventh Circuit, and Defendant Officers' argument to the contrary should be rejected. Particularly so given that federal pleading rules only require Sierra to plead facts in his complaint, not legal theories. *Reeves v. Jewel Food Stores*, 759 F.3d 698, 701 (7th Cir. 2014).[25]

Defendants do not argue that Sierra has failed to create a genuine dispute of fact on any element of this claim. Nonetheless, to succeed on this claim at trial, Sierra must show that the Officer Defendants owed him duty of care, breached this duty, that this breach caused Sierra's injuries, and that Defendants either deliberately intended to harm Sierra or consciously disregarded his welfare. *Stevenson v. City of Chicago*, No. 17 CV 4839, 2018 WL 1784142, at *10 (N.D. Ill. Apr. 13, 2018). For all of the reasons set out above, there are genuine disputes of fact on all of these elements as to each Defendant. Argument IV(B)-(D).

**V.      SUMMARY JUDGMENT IS UNAVAILABLE TO THE CITY OF CHICAGO**

Though the City purports to move for summary judgment on all claims, it does not come close to making a showing that justifies that relief. The City moves for summary judgment on *Monell* claims whose theories are supported by evidence that multiple courts in this District have already determined survive summary judgment, on which federal juries have already found the City liable, after which multiple judges have denied the City's post-trial motions, and the Seventh Circuit in one case has affirmed. *Fields v. Chicago*, No. 10 C 1168, 2017 WL 4553411 (N.D. Ill. Oct. 12, 2017), *affirmed*, 981 F.3d 534 (7th Cir. 2020), *Rivera v. Guevara*, No. 12 C 4428, 2019 WL 13249674 (N.D. Ill. Sept. 20, 2019); *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1067 (N.D.

---

[25] Sierra pleaded the claim this way initially because Illinois law might provide a defense to public employees who act with negligence, requiring a heightened showing of "willful and wanton conduct." 745 ILCS 10/2-202.

Ill. 2018); *Washington*, 2022 WL 4599708, at *17. Like in those cases, the City fails to establish its entitlement to summary judgment on those same claims here.

Moreover, although Sierra's *Monell* claims are supported by extensive evidence separate from and alongside expert reports and testimony, the City's arguments for summary judgment depend nearly entirely on challenges to the experts that Sierra has disclosed. Yet the same types of challenges have already been rejected already by other courts in this District, which have held that juries may consider nearly the exact expert opinions the City seeks to exclude here. *E.g.*, *Fields v. Chicago*, 2017 WL 4553411, at *5; *Rivera*, 2019 WL 13249674, at *3; *Velez*, 2023 WL 6388231, at *24; *Washington*, 2022 WL 4599708, at *11

Indeed, Sierra's experts do better than what has been deemed admissible in past cases, and their examinations of the City's policies and practices are among the most comprehensive and careful analyses ever produced regarding the Chicago Police Department. The City asks this Court to depart from these sound past court opinions and robust evidence and instead grant the City judgment in advance of trial. This Court should decline that invitation.

The Court should deny the City's motion for summary judgment for at least seven reasons. First, the City does not move for summary judgment on all *Monell* theories against it. Second, as discussed in Sierra's partial motion for summary judgment, Dkt. 510 at 21-35, the City is precluded from re-litigating Sierra's *Monell* claim that the City had an official policy of evidence suppression. Third, also discussed in Sierra's motion, Dkt. 510 at 36-41, the City has no evidence to contest that City policymakers, who were on notice of the need for policies governing the recording and disclosure of investigative materials in homicide cases, promulgated facially deficient written policies, leading to the suppression of evidence.

Fourth, there is ample evidence, even ignoring expert opinions entirely, that would permit a reasonable jury to conclude that the City knew of and was indifferent to a widespread practice of suppressing evidence, which risked *Brady* violations in criminal cases. The central premise of the City's entire motion is that Sierra's *Monell* claims are based entirely on the reports of Sierra's retained experts, which is not true. Because the City raises challenges in its brief solely to Sierra's experts (and only partial challenges to those experts' opinions), it effectively does not challenge the large record of evidence supporting Sierra's *Monell* claims.

Fifth, the parties hotly dispute whether the City failed to train, supervise, and discipline its officers, and promoted a code of silence in the Chicago Police Department, risking violations of citizens' constitutional rights, including in the City's failure to training, supervise, and discipline Guevara, who is responsible for the wrongful convictions of at least 44 individuals.

Sixth, material disputes of fact preclude summary judgment on the City's widespread practice of fabricating witness identifications using unnecessarily suggestive and improperly documented identification procedures in homicide cases, which risked that unreliable identifications would be used in criminal cases.

Seventh, the City's arguments regarding the admissibility of the expert opinions are without merit and do not entitle the City to summary judgment on any theory. Sierra responds to the City's *Daubert* motions separately, see Dkt. 512 (Mr. Tiderington); Dkt. 513 (Mr. Finnell); Dkt. 515 (Dr. Steblay), and he incorporates those responses here. Many of the City's arguments in its summary judgment motion are copied from its *Daubert* motions.

Throughout its summary judgment motion, the City impermissibly ignores evidence, construes the record in the light favorable to the City, and draws inferences in its favor. When the record is construed for Sierra and inferences are drawn in his favor, it is obvious the City's official

policies and customs caused innocent civilians to be framed in homicide investigations where evidence was manufactured and suppressed, witness identifications were fabricated using suggestive identification procedures, and police officers worked untrained and never disciplined, leaving them to violate the rights of countless individuals. The City is responsible for violating Sierra's rights, and it should not be permitted to sit on the sidelines at trial.

A.      The City Misstates the Legal Framework Governing *Monell* Claims

The City ignores recent Seventh Circuit cases discussing *Monell* liability and provides an incomplete outline of the legal standard governing § 1983 claims against municipalities. CB-3-4 (stating incorrectly that there are three potential avenues to municipal liability).

The *en banc* Seventh Circuit has held recently that municipalities are liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), if the violation of a plaintiff's constitutional rights was caused by: (1) application of an express policy, including a deficient policy that reflects a municipal decision not to adopt or to omit needed policies, *J.K.J. v. Polk County*, 960 F.3d 367, 377-84 (7th Cir. 2020) (*en banc*) (holding a jury correctly found a municipality liable for gaps in a jail sexual assault policy when decisionmakers knew of the risk of sexual assault of detainees); *Glisson*, 849 F.3d at 379-81 ([I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable.); (2) a widespread custom or practice that pervades to an extent where acquiescence on the part of policymakers is apparent, *id.* at 379 (citing *Monell*, 436 U.S. 690-91); *Davis v. Carter*, 452 F.3d 686, 691-92 (7th Cir. 2006); (3) an action taken by an official who exercises final policymaking authority for the municipality, *Board of Commissioners v. Brown*, 520 U.S. 397, 403-04 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); or (4) a failure to train, supervise, or discipline officers that amounts to deliberate indifference to

the rights of individuals with whom they come into contact, *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007); *Sornberger v. Knoxville*, 434 F.3d 1006, 1029-30 (7th Cir. 2006).

"The central question is always whether an official policy, however expressed (and we have no reason to think that the list in *Monell* is exclusive), caused the constitutional deprivation," the Seventh Circuit has explained. *Glisson*, 849 F.3d at 379. "It does not matter if the policy was duly enacted or written down, nor does it matter if the policy counsels aggressive intervention into a particular matter or a hands-off approach." *Id.*

**B. The City Does Not Move for Summary Judgment On A Number of Sierra's *Monell* Theories, and So A *Monell* Trial Will Occur No Matter What**

The City's motion inexplicably asserts that Sierra is only pursuing three *Monell* theories, and the City goes on to address only three widespread practice theories regarding evidence suppression, identification procedures, and failure to discipline police officers. CB-1-5 (describing theories); CB-9 (Part II, addressing widespread practice regarding eyewitness identifications); CB-18 (Part III, addressing widespread practice of evidence suppression); CB-37 (Part IV, addressing widespread failure to discipline). The City makes no argument about any other *Monell* theory.

The City thus ignores *Monell* theories at issue in the case. In addition to the theories discussed by the City, Sierra's pursues the following theories, which the City has not addressed:

- The Chicago Police Department's express written policies governing the creation, maintenance, and production of investigative information were deficient (or non-existent) and caused the suppression of exculpatory investigative materials in homicide cases, including in this case. PSOF ¶¶300-355, 358, 361-365, 367, 370-71, 373-391 408;[26] see *Glisson*, 849 F.3d at 379-80 (holding that a conscious municipal decision not to adopt or to omit needed policies creates liability under the express policy framework of *Monell*); *Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005) (holding that a single application

---

[26] Among other things, the City's express policies authorized individual police investigators to subjectively determine what investigative materials to maintain and turn over; they mandated a system of parallel investigative files in homicide investigations; they were devoid of any requirements governing the CPD's transmission of investigative files to prosecutors and others in the criminal justice system; they did not cover gang crimes officers or other non-detective investigators; and they included no rules binding the CPD's subpoena service unit, which was charged with responding to requests for documents and subpoenas. PSOF ¶¶300, 315-16, 322, 325-330.

of a deficient express policy resulting in a constitutional violation is enough to establish liability). Sierra has moved for summary judgment on this theory. Dkt. 510 at 21-41.

- The City's final policymakers, who were on notice of the problem of systemic suppression of investigative materials, chose not to adopt needed policies to ensure transmission of police investigative information in homicide cases, and in so doing made a decision that caused suppression of exculpatory materials in Sierra's case. PSOF ¶¶300-339, 341-355; see *Vodak v. City of Chicago*, 639 F.3d 738, 747-48 (7th Cir. 2011) (policymakers' decision about how to implement policy gives rise to liability when it violates constitutional rights); *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction"); *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) (final policymaker who is aware of a systematic lapse in policy and who fails to correct it renders municipality liable). Sierra has moved for summary judgment on this theory as well. Dkt. 510 at 21-41.

- The City failed to adequately train, supervise, and discipline its police officers regarding documentation of investigative information, maintenance of investigative files, production of investigative materials to the criminal justice system, and the documentation of their investigations, PSOF ¶¶300, 355, 387, 514-527;[27] *e.g.*, *Canton v. Harris*, 489 U.S. 378, 390 (1989) (deliberate indifference exists if the "need for more or different training" was "obvious"); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (municipality liable "when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact").[28]

- The Chicago Police Department's express written policies governing the conduct and documentation of identification procedures were deficient (or non-existent) and caused the fabrication of false identifications, suggestive identification procedures, and inaccurate or non-documentation of eyewitness identification procedures. PSOF ¶¶300, 398-415, 528-547, 550; *e.g.*, *Glisson*, 849 F.3d at 379-80; *Calhoun*, 408 F.3d at 379-80.[29]

- The City's final policymakers, who were on notice of the problem of false identifications, suggestive identification procedures, and inaccurate documentation of eyewitness identification procedures, chose not to adopt needed policies to ensure that accurate identification procedures were conducted and fairly reported at the time of the Andujar investigation. PSOF ¶¶300, 392-415, 431, 441, 444-45; *e.g.*, *Vodak*, 639 F.3d at 747-48; *King*, 680 F.3d at 1021; *Steidl*, 151 F.3d at 741.

- The City is liable for its failure to adequately train, supervise, and discipline its officers to properly conduct identification procedures and to accurately record the results of those

---

[27] The City had no policies governing supervision of investigative file production; it did not audit its written policies governing the production of investigative materials, which were promulgated after *Jones* and *Palmer*; and it did not provide training on those policies, PSOF ¶¶300, 316, 321, 322, 325-330, 355, 387, 515-527; *Sornberger*, 434 F.3d 1006, 1029-30 (7th Cir. 2006) (holding that municipalities are liable if they knew more supervision was needed).

[28] The City moves for summary judgment on Sierra's *Monell* theory that the City failed to discipline police officers accused of misconduct generally, but it does not address the separate theories that the City did not provide adequate training, supervision, or discipline on particular subjects relating to homicide investigations.

[29] With respect to its official policies governing eyewitness identification procedures, the City moves on Sierra's widespread practice theory, CB-8-17, but it does not address his express policy/gap in policy theory, his theory regarding actions of final policymakers, or his theory that the City failed to train, supervise, or discipline on this subject.

identification procedures, PSOF ¶¶300, 355, 402–415, 528-546, 547]; *e.g.*, *Canton*, 489 U.S. at 390; *Jenkins*, 487 F.3d at 492.

- The City had notice of and was deliberately indifferent to a widespread practice among its police officers of fabricating false evidence used in criminal cases, and the City failed to train, supervise, and discipline officers who fabricated evidence, which resulted in violations of due process and numerous wrongful convictions. PSOF ¶¶300, 350-53, 431-432, 441, 444, 451-461, 462-471, 474-483, 485-513, 536-546, 547-551; *e.g.*, *Jackson v. Marion County*, 66 F.3d 151, 156 (7th Cir. 1995); *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006); *Evans v. City of Chicago*, 2006 WL 463041, at *13 (N.D. Ill. Jan. 6, 2006).

The fact that the City has not moved for summary judgment on these *Monell* theories means they must be tried. *Carmichael*, 605 F.3d at 460 ("The burden of defeating summary judgment did not shift to the plaintiffs on this issue simply because, without citation to relevant facts or authority . . . defendants sought summary judgment on all claims against all parties."); *Sublett*, 463 F.3d at 736 ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("When a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on; the number of potential grounds for (and arguments against) summary judgment may be large, and litigation is costly enough without requiring parties to respond to issues that have not been raised[.]"). Any argument the City might have made regarding these theories are now forfeited, *Thompson v. Boggs*, 33 F.3d 847, 854 (7th Cir. 1994); *Fox v. Peters*, 2011 WL 6378826, at *8 (N.D. Ill. 2011), and it will be too late for the City to raise arguments for the first time in reply, *Costello*, 651 F.3d at 635; *Nelson v. LaCrosse Cty*, 301 F.3d 820, 836 (7th Cir. 2002).

To the extent the City states at the start of its motion that Sierra is not pursuing the above *Monell* theories, *e.g.*, CB-4 ("Plaintiff does not identify any express unconstitutional policy and is not claiming that he was directly injured by a person with final policymaking authority."), or

implies that the City was not on notice of these theories, CB-1-2 (discussing allegations in Sierra's complaint), those contentions are without merit. First, these theories have been litigated exhaustively in this case, and Sierra has explained them in detail in response to discovery requests. PSOF ¶300.[30] Second, they are discussed at length in the parties' expert reports. PSOF ¶¶356-371, 416-445, 451-513.

Third, the City recently has faced multiple trials and cases involving these *Monell* claims, including in Guevara cases, in which it has briefed the theories and evidence just discussed, including *Fields*, No. 10 C 1168, Dkt. 1184 (response to post-trial motion) at 12-25 (explaining each of these theories); *Rivera*, No. 12 C 4428, Dkt. 735 (response to post-trial motion) at 78-118 (explaining each of these theories); *Rivera*, No. 12 C 4428, Dkt. 321 (response to summary judgment) at 50-53 (explaining each of these theories). The City cannot attempt to obtain summary judgment without addressing *Monell* theories that Sierra pursues merely by mischaracterizing the nature of Sierra's claims, and this Court should reject the City's attempt to do so. As the court decided in *Rivera*, 319 F. Supp. 3d at 1056-59, a trial is necessary on these *Monell* theories that the City does not challenge.[31] Given the City's forfeiture, Sierra does not address these theories further in this response.

---

[30] To the extent that the City cites Sierra's complaint in its motion, CB-1-2, the Court should disregard those citations. Not only were the claims explored in richer detail in discovery, as discussed, but the Seventh Circuit has repeatedly reminded that legal theories need not be spelled out in a complaint, and the limitation of theories in a complaint is not relevant at summary judgment. *Streckenbach v. Vandensen*, 868 F.3d 594, 596 (7th Cir. 2017) ("Complaints need not plead law or spell out theories of liability.").

[31] Remarkably, in its summary judgment brief in *Rivera*, filed seven years ago, the City made the same argument that Rivera there had not pursued the *Monell* theories that Sierra sets out above, and Rivera there responded, as Sierra does here, that he had pursued those theories in discovery. No. 12 C 4428, Dkt. 321 at 50-53. The Court then ruled that those theories were in play at trial in *Rivera*. 319 F. Supp. 3d at 1056-59. For the City to suggest seven years later that it is still not on notice of these theories in these closely related cases is incredible.

**C.** **The City Is Precluded from Relitigating Its Official Policy of Evidence Suppression**

As Sierra explains in detail in his cross-motion for partial summary judgment, this Court should grant summary judgment to Sierra because the City is precluded from relitigating Sierra's *Monell* theory that the City had an official policy of suppressing exculpatory evidence. Dkt. 510 at 21-35. Because Sierra's argument for summary judgment is fully developed in Sierra's cross-motion, he does not repeat the argument here, but he expressly incorporates the argument. *Id* Sierra's statement of facts filed in response to the City's motion for summary judgment includes the same relevant material facts that are included in his statement of facts in support of Sierra's cross-motion for summary judgment, to comply with Local Rule 56.1(b). PSOF ¶¶300-391.

**D.** **The City Does Not and Cannot Challenge Sierra's *Monell* Theory That City Policymakers Promulgated Policies That Were Deficient to Stop Evidence Suppression**

In addition, as Sierra also discusses in his cross-motion, the City cannot raise any material dispute of fact that its final policymakers put in place express policies that were facially deficient to stop the suppression of evidence in homicide investigations. Dkt. 510 at 36-41. Again, Sierra does not repeat the argument justifying the grant of summary judgment to Sierra on that theory here, but he expressly incorporates the argument. *Id.* Sierra's statement of facts filed in response to the City's motion for summary judgment includes the same relevant material facts. PSOF ¶¶300-391.

Moreover, as discussed above, the City does not move for summary judgment on Sierra's express policy and final policymaker *Monell* theories, because it has no evidence permitting it to do so, and thus the City has forfeited any argument for summary judgment on those theories. See Argument V(B) *supra*. Accordingly, when this Court disposes of the City's summary judgment motion, there is no need for this Court to address the theory that the City's final policymakers put

110

in place express policies that were facially deficient to stop the suppression of exculpatory evidence in homicide investigations.

**E.      A Jury Must Decide the *Monell* Theory Regarding the City's Widespread Practice of Evidence Suppression**

Turning to the arguments the City has preserved, the City first contends it is entitled to summary judgment on Sierra's theory that the Chicago Police Department had a widespread practice of suppressing evidence in homicide investigations. CB-18-37. The City has no hope of summary judgment on this theory.

**1.   The City's False Premise Regarding Expert Evidence**

A few preliminary points are important. First, the City's entire summary judgment motion starts from the premise that Sierra's *Monell* claims depend "entirely upon his expert witness disclosures." CB-1; CB-25-26. As a result, the City discusses only Sierra's experts' opinions relating to the *Monell* theories that the City addresses.[32] In so doing, the City simply ignores the huge volume of evidence supporting Sierra's *Monell* theories that are unrelated to expert testimony. The City's litigation decision to ignore evidence means it cannot meet its burden to show that there are no genuine disputes of material fact in the record. *Adickes*, 398 U.S. at 157; 10A Wright & Miller, Federal Practice & Procedure §2727. A party cannot assert that a claim is based entirely on a single item of evidence, ignore all other record evidence, and ask a court to grant it summary judgment by attacking the single item of evidence it has identified.

**2.   The City Invokes the Wrong Legal Standard for Widespread Practice Claims**

Second, it is important to clarify what sort of pattern must be shown in order to succeed on a *Monell* widespread practice theory. The City wrongly suggests in various places throughout its

---

[32] As discussed below, the City challenges only a small portion of Sierra's experts' opinions in its motion, and so even if its false premise were correct, the City would not be entitled to summary judgment.

motion and in its *Daubert* briefing that Sierra must present evidence of a pattern of repeating *constitutional violations* to succeed on this *Monell* theory. The Seventh Circuit rejected exactly this argument when it affirmed the verdict against the City on the evidence-suppression widespread practice theory in *Fields* saying, "We have rejected that narrow interpretation of *Monell* liability." 981 F.3d at 562. The *en banc* court of appeals in *Glisson* reiterated the long-standing rule that a *Monell* plaintiff need only show a repeated pattern of *behavior* that provides notice of a *risk of harm*, and not a repeated pattern of *actual harms* to others, to establish a widespread practice. 849 F.3d at 381-82.

Accordingly, to proceed with a widespread practice theory, Sierra need only establish a repeated pattern of behavior that provided notice of a risk of harm to which the City did not respond, and not a pattern of constitutional violations. *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) (custom and notice shown by "evidence tending to show a general pattern of repeated behavior," without "evidence that . . . systemic failings affected other[s]"). So, for example, Sierra can show a repeating pattern of evidence suppression in homicide cases that provided notice of the risk that exculpatory or impeachment evidence would be suppressed in criminal cases, and he need not show a repeating pattern of *Brady* due process violations. Or he may show a repeating pattern of fabricating identifications using suggestive identification procedures in homicide cases, which provided notice of the risk that unreliable identifications would taint criminal proceedings. Or he may show a repeating pattern of failing to train, supervise, and discipline police officers, which gave notice of the risk that officers would violate the rights of civilians. Ample Seventh Circuit precedents confirm that a plaintiff meets the burden of establishing a widespread practice "by offering competent evidence tending to show a general pattern of repeated *behavior* (*i.e.*, something greater than a mere isolated event)." *Daniel*, 833 F.3d

112

at 734 (7th Cir. 2016) (emphasis added); see also *Dixon v. Cook County*, 819 F.3d 343, 348-49 (7th Cir. 2016) (notice of a systemic deficiency and inaction establishes liability); *Thomas v. Cook County*, 604 F.3d 293, 303 (7th Cir. 2010) (policymakers "must have been aware of the risk created by the custom" of delayed responses to medical requests); *Davis*, 452 F.3d at 694-95 (rejecting the same argument the City makes here); *Estate of Moreland v. Dieter*, 395 F.3d 747, 760-61 (7th Cir. 2005) ("[T]he plaintiff need not show that the policy, practice, or custom resulted in past deprivations of rights."). Sierra proffers record evidence to establish each of these widespread practices.

In addition, the summary judgment record *also* includes evidence of repeating constitutional violations caused by the City's widespread practices of evidence suppression, fabricating identifications with suggestive procedures, and failing to train, supervise, and discipline officers. PSOF ¶¶344-354, 371, 373-391, 451-461, 474, 547-550. So even applying the City's incorrect legal standard, summary judgment would be inappropriate.

### 3. The City Has Already Lost the Widespread Practice of Evidence Suppression Theory Multiple Times, Which Makes Its Argument for Summary Judgment Frivolous

Third, before diving into the record evidence that precludes summary judgment, it is worth reiterating that the City lost the *Monell* theory regarding its widespread practice of evidence suppression at trial in *Fields* and *Rivera*, post-trial motions were denied, and the Seventh Circuit expressly found in affirming the *Fields* verdict that (1) the City's widespread practice of evidence suppression was well established, (2) City policymakers were on notice of the practice, and (3) there was sufficient evidence to support a verdict against the City on this theory. *Fields*, 981 F.3d at 563. For the City to argue after such rulings that there is insufficient evidence for a trial on the same theory is meritless. Worse yet, the City does not even reference the Seventh Circuit's *Fields*

decision in its motion for summary judgment, which is at odds with the City's duty of candor to

this Court. *Beam v. IPCO Corp.*, 838 F.2d 242, 249 (7th Cir. 1988). Even if the City were not

precluded from relitigating its policy of evidence suppression, see Argument V(C) *supra*, these

past verdicts affirmed by the Seventh Circuit make its argument for summary judgment frivolous.

### 4. Non-Expert Evidence Establishing the City's Evidence Suppression Practice

Setting aside Sierra's expert opinions for the moment, there is a huge volume of evidence

in the record supporting Sierra's claim that the City had a widespread practice of evidence

suppression, including:

- Starting in at least 1982, City policymakers, including the Chicago Police Superintendent, received notice in the lawsuits *Jones v. Chicago*, 87 C 2536 (N.D. Ill.) (see also *Jones*, 856 F.3d at 996), and *Palmer v. City of Chicago*, 82 C 2349 (N.D. Ill.), that the City had a citywide problem creating, maintaining, and producing investigative information in homicide investigations, which resulted in the suppression of investigative materials and violations of due process, PSOF ¶¶301-304, 307-309; *see also Fields*, 981 F.3d at 563 (concluding that *Palmer* and *Jones* establish the City was aware that the failure to ensure production of evidence in police investigations "presented a constitutional problem");[33]
- James Hickey, the City's designated Rule 30(b)(6) witness on this topic, testified, among other things, that (a) in light of *Palmer* and *Jones*, City policymakers knew that they had an evidence suppression problem, (b) he himself reviewed evidence disclosure practices across the department prior to 1983 and determined that the problem was citywide, (c) the problem stemmed from a citywide practice of using a "decentralized" file system for homicide investigations, whereby investigative steps were being documented in informal notes and internal to-from memoranda between investigators, all of which were treated as

---

[33] The City engages in a long, largely revisionist history regarding the *Jones* and *Palmer* litigation and the policies it promulgated in response. CB-19-23. This discussion is largely irrelevant to the fact disputes at summary judgment. Particularly so given that the Seventh Circuit has already concluded in *Fields* that *Jones* and *Palmer* provided the City notice of a widespread practice that risked constitutional harm, and that its practice of evidence suppression continued after that time. 981 F.3d at 563. Moreover, the City's discussion plainly does not construe the facts in the light most favorable to Sierra, which is required at this stage.

To the extent, however, that the City is suggesting that the *Jones* and *Palmer* cases are themselves ultimately not evidence of a widespread practice of evidence suppression, that is not correct. *Jones* involved the suppression of critical exculpatory information and resulted in a large damages verdict approved by the Seventh Circuit. 856 F.2d 985. *Palmer* caused numerous City policymakers to take notice of a widespread problem of evidence suppression, *according to the testimony of those City policymakers themselves*, PSOF ¶¶301, 307-312, and the City's pronouncement that none of the *Palmer* files revealed exculpatory information is undermined by the fact that those files were never analyzed in a systematic fashion, PSOF ¶304. As the Seventh Circuit noted in *Jones*, the *Palmer* litigation was resolved "without a formal ruling on the lawfulness of the practice," thought the Court in *Jones* concluded that the record supported that the practice was in place and that "[t]he City sensibly does not attempt to defend such behavior in this court." *Jones*, 856 F.3d at 995-96.

the personal property of the investigators and were stored in parallel files; and (d) entire branches of an investigation, including investigation into alternate suspects, were not getting documented in official reports, and were instead written in memos and notes that were not disclosed and were eventually destroyed, PSOF ¶¶305-309;

- City officials were aware of substantial resistance within the Police Department to any change in policies requiring disclosure of information or the practice of keeping parallel, "personal" files not available to the criminal justice system, and they were aware of the risk of wrongful prosecutions and convictions if the evidence suppression problem was not solved, PSOF ¶¶310-312;

- Detective Division Special Orders 83-1 (effective February 3, 1983), 83-2 (effective May 2, 1983), and 86-3 (effective May 29, 1986) were put in place in response to the problem and required that detectives keep notes and memoranda on a new official form called a "General Progress Report" and preserve them in a new "Investigative File" kept in the Detective Area. PSOF ¶¶319-320, 323-324, 326-27. But the written policies had facial deficiencies, including: (1) they left to the discretion of detectives what information to record in the Chicago Police Department's official files, based on detectives' own subjective determinations, PSOF ¶¶319-322, 324-325, 328-330, 338; (2) the policies did not include any instruction to disclose to prosecutors and criminal defendants investigative information, and they did not require the disclosure of the newly created "investigative files," PSOF ¶¶319-322, 324-325, 328-330, 334; (3) they allowed for the continued use of a decentralized, parallel file system in which investigative information was kept in different places, perpetuating the risk that material would not be gathered from all of those locations, PSOF ¶¶319-322, 324-325, 328-330, 335; (4) they failed to cover gang crimes officers and other non-detective investigators participating in homicide investigations, meaning there was no change in rules when it came to investigative information gathered by these individuals, PSOF ¶¶319-322, 324-325, 328-330, 337, 525; (5) they did nothing to ensure that the Chicago Police Department subpoena service unit (charged with responding to subpoenas from the criminal justice system for investigative information), the Detective Divisions, or anyone else in the Chicago Police Department actually produced to the criminal justice system all of the different investigative information created by the Chicago Police Department during an investigation, PSOF ¶¶319-322, 324-325, 328-330, 334-336, 339

- Judge Shadur in *Palmer* identified many of these specific problems in the paragraph above as problems in need of a solution, PSOF ¶¶318, 322, and despite those findings, City policymakers decided to leave these particular gaps in Chicago Police Department written policies. PSOF ¶¶331-340;

- City policymakers and designees in charge of this policy making concede that the Special Orders the City put in place did not address Judge Shadur's concerns, including the continued use of parallel files, the lack of any guidance as to what constituted relevant information that needed to be documented, the lack of any guidance to the subpoena service unit about what to gather in response to document requests from prosecutors and criminal defendants, and most fundamentally the lack of any directive to produce all investigative information contained in police investigative files, and they conceded that the policies they promulgated were insufficient to overcome a problem as entrenched as the Chicago Police Department's evidence suppression policy. PSOF ¶¶335-340;

115

- The City did not audit the effect of the new policies or take any steps to monitor compliance with the new policies. PSOF ¶331-333, 387;
- The City acknowledges that its continued system of having multiple files instead of a centralized file, coupled with the lack of instruction or directive ordering or ensuring that the entire contents of the investigative files be produced, left detectives and subpoena personnel confused about their disclosure obligations, PSOF ¶336;
- The Defendant officers in this case testified almost uniformly that they had no knowledge of the requirements of the post-*Palmer* Special Orders, received no training on the Special Orders or on the obligation to preserve notes or disclose exculpatory information, and continued to keep unofficial, personal notes that they destroyed, PSOF ¶355
- The Chicago Police Department suppressed evidence in the case of Nathson Fields, who was convicted of the 1984 double murder and eventually re-tried and acquitted in 2009, a case in which civil discovery revealed a street file—sitting among hundreds of other files in a file cabinet at Area Central—of over a hundred pages of handwritten notes, memos, and other documents identifying multiple alternate suspects and potential leads demonstrating that Fields was innocent, PSOF ¶344-348;
- Ample evidence from the 2016 *Fields* trial, in which a jury found that the failure to disclose evidence to Fields was the result of a pattern and practice of the Chicago Police Department and awarded Mr. Fields compensatory damages of $22 million, including (a) dozens of other street files in the Area Central basement, including the cases of Jon Fulton, Timothy Malone, and James Crockett, (b) the testimony of Defendant officers in that case about the continued use of informal notes and memoranda and a lack of training on the new Special Orders, and (c) the testimony of the City's defense experts, supporting the conclusion that the street files practice continued, PSOF ¶¶348, 375;
- The Chicago Police Department suppressed evidence in the case of James Kluppelberg, who was convicted for a 1984 fire that killed six people and later exonerated, a case in which civil discovery in 2014 revealed a newly-discovered file from the original investigation that contained numerous handwritten notes and memoranda, including a memo between detectives about an alternate suspect who had started a fire in a building nearby just hours before the fire for which Kluppelberg was convicted and was intoxicated at the time, PSOF ¶349;
- The Chicago Police Department suppressed evidence in the case of Jacques Rivera, another Guevara case, including an August 27 GPR containing the critical first memorialization of the sole eyewitness's account that put the witness further away from the scene of the crime than police reports documented; an August 27 GPR regarding the same witness that contradicted Defendants' story about an identification procedure that happened on that date; Guevara falsely claimed that the shooting victim had identified Rivera as the shooter before he died, but suppressed that the victim was in a medically induced coma at the supposed time of the identification. PSOF ¶¶350-353. The City's Rule 30(b)(6) designee Hickey admitted that all of these documents should have been disclosed. PSOF ¶350.
- Ample evidence from the 2018 *Rivera* trial, in which a jury found that the failure to disclose evidence to Mr. Rivera was the result of a pattern and practice of the Chicago Police Department and awarded Mr. Rivera compensatory damages of $17 million, supported that the City had a pattern and practice of evidence suppression. For instance:
  - Rivera's expert, Michael Brasfield, testified that the City's written policies were plainly deficient because they retained the decentralized record-keeping system that

116

perpetuated the system of multiple, unofficial parallel files that were at the heart of the *Jones* and *Palmer* litigation, did not cover gang crimes units and other investigators involved in homicide investigations, did not define what investigative information had to be documented in reports, and did not contain instructions to ensure that the investigative file and each of the various other parallel sources of police documents were searched for and produced in response to criminal court subpoenas. PSOF ¶352, 381-382.

o Brasfield conducted an analysis of 435 CPD Area Five homicide files for the years 1985 to 1991, and his analysis of the data revealed that, in 61% of the cases, the requirement to create GPRs was not being complied with, in 37% of the cases the rule requiring inventories was disregarded, and in 92% of the cases documents contained in the unofficial investigative files were not making it to the criminal justice system. A full 100% of the files contained evidence of failures to follow the post-Palmer policies. PSOF ¶383

o Defendants' expert, Bernard Murray, chose not to conduct his own corresponding review to see if the practices changed after the new policies were enacted, and so Brasfield's testimony on these issues was unrebutted. PSOF ¶383.

o Brasfield also testified that his review of the City's permanent retention files revealed that the problems identified in *Jones* and *Palmer* persisted, as the CPD permanent retention files he reviewed only told the single branch of the story that let from crime to charged suspect, in effect excluding alternate suspects, different witnesses, and other types of materials a criminal defendant would need to build a defense. Defendants' expert, Bernard Murray, failed to rebut this testimony. PSOF ¶384.

o Brasfield also compared investigative files to their corresponding criminal defense files and determined that materials from the investigative file were missing from more than 90% of the defense files, and 74% were missing police notes, the sort of crucial material that had been the subject of *Jones* and *Palmer*. Only 8% included the inventories that were supposed to be disclosed to defense attorneys under the new policies. Brasfield and Murray testified about multiple cases—*e.g.*, Nathson Fields, James Kluppelberg, Samuel Robinson, Demetrius Johnson, David Quinones, Miguel Borrotto, and Curtis Kirkland—in which the withheld materials were the type of important investigative material that by all accounts should have been turned over, and that a jury could deem material. Murray conceded that material missing from criminal defense attorney files was also missing from the prosecutor files, including many of the specific examples above of highly exculpatory material missing from criminal defense files. PSOF ¶385.

o Brasfield's testimony also revealed that Gang Crimes officers were fully involved in homicide investigations, as they were in the Valentin investigation. Gang Crimes officers should have been subject to the rules governing detectives with regard to documenting investigative steps and ensuring that such material was produced to the criminal justice system. But Gang Crimes officers were permitted to keep their own personal notes in their own set of parallel files. They were exempt from these rules despite the City designee Hickey's recommendation in the early 1980s that gang crimes be included in the new Special Orders. PSOF ¶386.

- o The City's own witness, James Hickey, confirmed in his trial testimony that the CPD was fully aware of its evidence suppression problem, yet did not implement any policy or formal training to ensure disclosure. He confirmed that there was no auditing of detectives following Special Orders, either. PSOF ¶387.
  - o Finally, there was testimony that, as a result of the practice of evidence suppression, Rivera and his criminal attorney never received a number of important documents from the investigative file during the criminal proceedings, although the police department was responsible for ensuring their production. PSOF ¶388.
- After Special Order 86-3 there was no further change in City policy of evidence suppression before the time that Sierra was wrongly convicted of the Andujar murder in 1995. PSOF ¶329, 331, 340-342;
- The City has admitted that its relevant policies were the same from 1983 all the way into the 2000s, PSOF ¶341.
- Consistent with the above, the City of Chicago's own Inspector General issued a report in 2020 finding that the Chicago Police Department's policies related to the documentation, storage/preservation, and disclosure of information learned during homicide investigations remained inadequate, stating, "CPD's records management and production processes are inadequate to meet its constitutional and legal obligations." PSOF ¶¶340.
- The Inspector General issued a follow-up report in 2021, following an inquiry into the status of corrective actions taken by the City of Chicago in response to its 2020 recommendations. In that report, the Inspector General concluded that "CPD has yet to implement most of the improvements to which it committed. Specifically, CPD has yet to conduct a comprehensive staffing and resource analysis, develop and implement standard operating procedures for the management and production of records, or develop necessary trainings."  In particular, it found that the CPD "cannot ensure that it identifies and produces all relevant records in its possession as required." Without making these improvements, the Inspector General's follow-up report concluded that "Not having made these improvements, CPD is now—just as it was when OIG published its 2020 report—unable to ensure that it can meet legal and constitutional *obligations* which are at the core of its function as a law enforcement agency. This is an area of very serious risk for CPD and for the City." PSOF ¶340.

Accordingly, even if this Court ignores the evidence relating to Sierra's retained experts, the summary judgment record establishes disputes of material fact that preclude summary judgment for the City on Sierra's *Monell* theory that the City had a widespread practice of evidence suppression. As a result, the Court need not even address the City's arguments or the City's *Daubert* motions on this theory to deny the City's summary judgment motion.

### 5. Expert Evidence Demonstrating the City's Evidence Suppression Practice

Expert opinion evidence also supports Sierra's widespread evidence suppression theory.

At trial, Sierra will present Mr. Tiderington's expert testimony in support of this *Monell* theory,[34]

including but not limited to opinions that:

- The City's written policies did not solve the evidence suppression problem because they: (a) allowed for the continued use of a decentralized, parallel file system in which investigative material was kept in different places, creating the risk that material would not be gathered from all of those locations; (b) failed to cover gang crimes officers, despite their significant role as investigators in homicide cases, like this one; (c) left too much discretion to detectives about what to document in police files; and (d) did nothing ensure that the subpoena service unit, detective division, or anyone else produced all of the parallel files created for an investigation, PSOF ¶358;
- The Chicago Police Department's efforts to implement the new Special Orders were woefully inadequate, including a failure to provide proper training and oversight to ensure compliance with the Special Orders, PSOF ¶358, 359-371;
- Mr. Tiderington's analysis and findings from the review of 475 homicide files from Area 5 for the period 1991-1995 (the five-year period prior to Sierra's wrongful prosecution), and 344 Area 5 investigative files from 1995-1998 revealed that approximately 50% (1991-1995) and approximately 46% (1995-1998) of investigative files he reviewed contained handwritten notes not taken on general progress reports—in addition to the fact that there were no handwritten notes or GPRs in the entire investigative file for the Andujar homicide, PSOF ¶361. Tiderington's analysis found many examples where the information on handwritten notes not transferred to official reports was "potentially exculpatory," including handwritten notes containing cryptic notations on a page without any context: a name, phone number, address, etc., where the relevance of the information and its potential inculpatory or exculpatory value is lost without being transcribed into an official report. PSOF ¶361;
- Mr. Tiderington's review of these investigative files revealed that approximately 10% (1991-1995) and approximately 28% (1995-1998) of the files he reviewed contained to-from memos not on official police forms, despite the Special Order's requirements and the City's knowledge of this deficiency, PSOF ¶¶362;
- Mr. Tiderington's review of these investigative files revealed that 24% (1991-1995) and 17% (1995-1998) of total investigative files contained no inventory sheet, which the Special Orders required as a means to ensure disclosure, PSOF ¶¶363;

---

[34] As discussed in Sierra's response to the City's motion to exclude Mr. Tiderington's opinions, Mr. Tiderington is a police practices expert with more than 40 years of experience in law enforcement, including experience as a Police Chief for more than 20 years. Mr. Tiderington has trained more than 10,000 federal, state, and local law enforcement officers on police practices and criminal investigations. Further, in two decades of experience as Police Chief, Tiderington reviewed and approved policy and procedures relating to every aspect of police operations, including criminal investigations, case development, report writing, maintenance and retention of police records, complaints against police officers, training, supervision, and employee discipline. PSOF ¶¶356-357

- Mr. Tiderington's subsequent review of corresponding permanent retention files during both of these time periods, as well as his comparison of the investigative files and corresponding criminal defense files for the years 1995-1998, which demonstrated that important investigative materials were regularly withheld from criminal defendants, as nearly all of the criminal defense files were missing documents contained in the corresponding Chicago Police Department homicide files, PSOF ¶¶365, 367, 368;
- Mr. Tiderington's review of opinions regarding police practices expert Michael Brasfield's analysis in *Fields* of 429 Chicago Police Department homicide files, summaries of which were introduced as substantive evidence, which was almost entirely unrebutted, and which showed that the policy of evidence suppression continued, at minimum, from 1983 to 1989, and from 1999 to 2009, across the City of Chicago, in Chicago Police Department Detective Areas One, Two, Three, and Four. PSOF ¶¶369, 346-47;
- Mr. Tiderington's review of opinions regarding Mr. Brasfield's findings in *Fields* that comparison of the Chicago Police Department homicide files to permanent retention files and criminal defense files demonstrated systematic underproduction of key categories of investigative information—approximately 80% of the criminal defense files were missing handwritten notes from the CPD files, 46% were missing general progress reports (on which detectives were to take notes), and 36% were missing inventories. PSOF ¶¶347;
- Mr. Tiderington's review of opinions regarding Mr. Brasfield's unrebutted analysis in *Rivera* of 435 Chicago Police Department homicide files from Area Five, for the years 1985 to 1991, which revealed that, in more than 90% of cases, information in Chicago Police Department files was not produced to prosecutors and criminal defense attorneys in the criminal justice system, and in 100% of cases the written policies promulgated by the City after *Palmer* were not followed. PSOF ¶¶383;
- Mr. Tiderington's review of the police homicide files from *Kluppelberg,* as well as the report of Mr. Brasfield in *Kluppelberg* appended to Mr. Tiderington's report, in which Brasfield found that, of the investigative files produced to him (from 1983-1991), there were (1) repeated instances of not using official forms to ensure file integrity, including that there was a widespread practice of disregarding the use of Major Crime Worksheets, Investigative Case File Controls, Supervisory (Chain of Command) Reviews, Detective Division Personnel Forms, and Case Assignment Slips; (2) Material information was repeatedly omitted from official police reports, including 100% of the case files reviewed being replete with examples of handwritten pages and informal memos between detectives containing potentially exculpatory information regarding leads for other avenues of investigation, as well as names or descriptions of possible alternative suspects, additional witnesses, and possible alibi witnesses; (3) incomplete investigative files; (4) permanent retention files containing limited information; and (5) incomplete inventories or no indication that inventories were sent to Records Divisions. PSOF ¶370;
- These assessments of the City's homicide files demonstrate that the evidence suppression practice as it existed prior to the 1980s Special Orders continued unabated. PSOF ¶¶360-371; and
- Mr. Tiderington also identified specific examples of files where investigative materials contained in the City's homicide files were missing from the criminal defense files, were potentially exculpatory information of significant investigative value, and should have been disclosed under standard police procedures, including: (1) Records Division #Z219872 (Defendants Linox Jackson and Tyrone Hammond); (2) RD #Z273605

120

(Defendants James Edwards, Damaine Billups, Cornell Guthrie, Alex Lane, N-Wata Mitchell, and Willie Johnson); (3) RD #A315294 (Defendant Jose Melendez); (4) RD # 687989 (Defendant Kim Mathis); (5) RD #475236 (Defendant Ardell Clemons); (6) RD #B442532 (Defendant Oscar Soto); (7) RD #A403252 (Defendant Guy Rainey); (8) RD #P272087 (Defendant Demetrius Johnson). For each of the eight cases, Tiderington reviewed corresponding State's Attorney's Office files. In each, the police documents were withheld, were of potential exculpatory value, and were not given to prosecutors, PSOF ¶¶367-68.

All of the record evidence above amply supports Sierra's *Monell* theory that the City was indifferent to a widespread practice of suppressing evidence in the relevant time frame, and summary judgment should be denied.

### 6. The City's Arguments for Summary Judgment on the File Suppression *Monell* Theory Lack Merit

The City's arguments for summary judgment on this theory lack merit. First, the City argues Sierra cannot show that its widespread practice of evidence suppression caused the suppressions of evidence that occurred in Sierra's criminal case. CB-24-25. Second, the City contends Sierra's *Monell* theory is based entirely on Mr. Tiderington's expert opinions, and that those opinions do not establish a practice of suppressing exculpatory evidence, largely repeating the arguments the City makes in its *Daubert* motion. CB-25-37. Neither argument has merit.

### (a) The City's Causation-Related Arguments Lack Merit

The City's first argument is difficult to follow. To the extent the City is suggesting Sierra has not shown a genuine dispute that material exculpatory or impeachment evidence was suppressed in Sierra's criminal case, that argument fails for the same reasons the Defendant Officers' arguments for summary judgment on the evidence suppression theories failed. See Argument IV(C) *supra*.

To the extent the City is arguing it did not have a widespread practice of suppressing the *particular kinds* of evidence in the *particular way* they were suppressed in Sierra's criminal case,

121

that argument depends on construing facts and inferences for the City, which is not permissible. Moreover, the argument understands Seventh Circuit case law governing widespread practice claims too narrowly, and it also construes Sierra's theory too narrowly.

Sierra's theory is that the Chicago Police Department had a widespread practice of suppressing evidence. Naturally, in any given homicide case, the types of evidence suppressed, and the mechanisms of evidence suppression, may vary.[35] Regardless of how any one suppression of evidence occurred, that evidence was suppressed across homicide cases establishes an actionable widespread practice. In other words, *Monell* liability does not require Sierra to show a widespread practice of suppressing the particular types of evidence that were ultimately suppressed in his case the precise way they were suppressed in his case. Instead, the Seventh Circuit has been clear that a plaintiff meets the burden of establishing a widespread practice "by offering competent evidence tending to show a general pattern of repeated behavior (*i.e.*, something greater than a mere isolated event)." *Daniel*, 833 F.3d at 734; see also *King*, 680 F.3d at 1020-21 (widespread practice of delaying medical care through different mechanisms sufficient to proceed on *Monell* claim where plaintiff was denied needed medication). Sierra has done that.

To the extent the City is arguing that Sierra cannot show that its widespread practice of evidence suppression caused the suppression of evidence in his particular case, that causation question must be resolved by a jury. "As long as the causal link is not too tenuous, the question

---

[35] A variety of overlapping mechanisms caused the suppression of investigative information in Chicago homicide cases including: detectives were permitted to decide subjectively what evidence was documented in reports and in official files; there were no policies requiring the disclosure of evidence, governing what had to be kept in official files, or dictating how to respond to requests for investigative files; there were no policies governing non-detectives; there was a decentralized file system, which allowed for parallel files; the written policies that did exist were not followed; notes were not retained or included in files; and officers intentionally did not turn over to the criminal justice system material evidence they learned during their investigations. Different combinations of these mechanisms caused the suppression of different items of evidence in different homicide investigations during the relevant time period. The fact that there were different mechanisms of suppression does not dilute that the City had a widespread practice of suppressing evidence in homicide investigations.

whether the municipal policy or custom proximately caused the constitutional infringement should

be left to the jury." *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017); see also

*Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 648 (7th Cir. 2016) (holding that at summary judgment

"a plaintiff need only produce evidence sufficient to *potentially* persuade *any* reasonable jury"). If

the jury believes that the evidence above establishes that the City had a widespread practice of

evidence suppression in homicide cases, it could easily decide that the practice caused the

suppression of evidence in Sierra's case.

### (b) The City's Arguments Challenging Mr. Tiderington Lack Merit

The City next argues that Sierra's widespread practice evidence suppression theory

depends entirely on Mr. Tiderington's expert opinions, and that those opinions do not establish a

widespread practice. CB-25-37. The argument suffers a number of flaws, each of which represents

an independently sufficient reason to reject it.

First, the City is simply wrong that the only thing supporting this *Monell* theory is expert

opinion evidence. The City ignores the volume of evidence, outlined above, that has nothing to do

with Mr. Tiderington and that by itself is sufficient to create genuine disputes of material fact for

trial. See Argument V(E)(4) *supra*. Sierra has pointed to hundreds of pages of documents, policies,

testimony from Rule 30(b)(6) witnesses, prior litigation of the same theory in federal cases,

testimony from Defendant Officers, suppressions of exculpatory evidence in other homicide cases

(including Guevara cases), and more. This evidence alone justifies denying summary judgment,

without any need for the Court to adjudicate Sierra's reliance on expert testimony. This Court

should so find, which will eliminate the need for the Court to weigh in on Defendants' *Daubert*

motion regarding Mr. Tiderington at this stage.

Second, even supposing Mr. Tiderington's report was the only evidence supporting this theory, the City's challenges to his opinions and methodology lack merit. CB-26-37. In its summary judgment motion, the City repeats arguments it makes in its *Daubert* motion. Compare CB-26-37, with Dkt. 500 at 9-12, 15-24. For the same reasons this Court should reject the City's motion to limit Mr. Tiderington's testimony, set forth in Sierra's response to that motion, Dkt. 512, this Court should reject the City's repeated arguments regarding Mr. Tiderington in its summary judgment motions. As set forth in Sierra's response to the City's *Daubert* motion, Mr. Tiderington's *Monell* opinions are laid out in detail over 38 pages of his report. They are amply supported by his review of thousands of pages of police files, policies, deposition testimony, and other records. The City does not challenge Mr. Tiderington's qualifications. Nor does it provide any meaningful methodological attack on his opinions. In particular, as discussed in detail in Sierra's *Daubert* response, Mr. Tiderington analyzes the deficiencies in the CPD's policies, Dkt. 512 at 3-6, 13-17, he appropriately relied on data provided by Sierra's counsel, which was mechanically coded based on objective criteria and properly spot-checked, and he conducted a robust analysis based on that data that consumed many hours, *id.* at 22-27, 33-35, his analysis is not statistical in nature but instead applies police expertise to observable data, *id.*, his analysis does not require intimate familiarity with each different homicide file, *id.*, and he has amply supported his opinions that the Chicago Police Department had a practice of failing to document information learned during homicide investigations, *id.* at 36-38.[36]

---

[36] The City also cites cases that generally stand for the proposition that an officer's violation of police policy is not always relevant to showing that the officer committed a constitutional violation in a particular case. CB-30-31 (citing *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006)). Those cases have no application here. Sierra is not arguing that an officer's violation of policy shows that his constitutional rights were violated. Instead, he will prove at trial that the Chicago Police Department's failure to implement its own policies in a way that would have stopped a widespread practice of evidence suppression, and the continued persistence of that widespread practice, caused the violation of Sierra's constitutional rights. That is the proof that *Monell* requires.

Moreover, the City argues in its motion for summary judgment, as it did in its *Daubert* motion, that Mr. Tiderington's opinions are not reliable because he compared what was in Area Five homicide files to the materials contained in criminal defense files for the same cases, rather than to materials contained in the Cook County State's Attorney's files. CB-32-35. Sierra has provided a response to that argument in his response to the *Daubert* motion. Dkt. 512 at 30-33. There are several problems with the City's argument. First, the City is simply raising a fact dispute about whether investigative information in the Area Five files was disclosed to prosecutors and criminal defendants, which is inappropriate at this stage of the case. To the extent the City believes that it has evidence that investigative information was disclosed to prosecutors, it can present that evidence, and it may defeat the theory at trial on that basis. But that does not mean that the absence of investigative information in the files of criminal defendants is irrelevant, such that Mr. Tiderington's opinions based on the file comparison can be disregarded. If the Area Five files contained investigative information that the criminal defendants did not receive, that is certainly probative of the City's widespread practice of evidence suppression. The parties' factual dispute is for a jury to resolve.

Second, the City's argument is entirely hypothetical. The City has not developed any evidence—and it points the Court to no evidence—that supports the conclusion that the State's Attorney's files contained any of the investigative information that Mr. Tiderington found in Area Five files but not in criminal defense files. The City cannot hypothesize that perhaps information was turned over without proof, and the City has not developed any of that proof. In other words, the City's factual dispute, which is already inappropriate, is based on raw supposition without evidence, which is doubly inappropriate. Moreover, the City's expert examined a small number of

State's Attorney's files and conceded that documents Mr. Tiderington identified as missing were also missing from those files, see PSOF ¶385, corroborating Sierra's evidence.

Third, the City nowhere in its brief or *Daubert* motion addresses the fact that the same opinions, based on the same analysis, of the same types of documents (only for a later time period), were admitted in two prior wrongful conviction cases against the City, *Fields* and *Rivera.* In those two cases, Judge Kennelly and Judge Gottschall, respectively, rejected the same arguments the City makes here and permitted police practices experts to offer these same opinions, juries returned verdicts against the City based on this evidence, and in *Fields* the Seventh Circuit affirmed. In those cases, the City's arguments about file comparisons and every other challenge raised to Mr. Tiderington were left for the juries to consider. The City offers no reason why this Court should not follow suit.

Finally, it is important to note that the City does not even challenge all of Mr. Tiderington's opinions. Many of his opinions would survive even if this Court granted the City's *Daubert* motion entirely. Dkt. 500 at 4, 9-10, 18-19, 21, 29 (identifying limited portions of Tiderington's opinions implicated by City's arguments). Accordingly, this Court need not resolve all of the City's challenges to Mr. Tiderington's opinions to deny summary judgment.

### F. A Jury Must Decide the *Monell* Theory Regarding the City's Failure to Train, Supervise, and Discipline Its Police Officers

A jury must also decide Sierra's *Monell* theory that the City is liable for failing to train, supervise, and discipline its police officers. CB-37-50. The City asserts again that this opinion is based "entirely on his disclosed disciplinary practices expert, Anthony Finnell," CB-38, which again is not correct. As explained below, there is ample record evidence that would permit a reasonable jury to decide that the City failed to train, supervise, and discipline its officers on a City-wide basis, condoned a code of silence that prevented police misconduct from coming to

126

light, and failed to supervise or discipline bad actors, resulting in repeated police misconduct on the part of officers like Guevara, who violated the rights of countless individuals and caused dozens of wrongful convictions for murder.

A failure to train, supervise, or discipline officers provides a basis for municipal liability when the failure amounts to deliberate indifference to the citizens whom the officers encounter. *Harris*, 489 U.S. at 388 (1989); *Hollins v. City of Milwaukee*, 574 F.3d 822, 827 (7th Cir. 2009); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). Deliberate indifference exists if the "need for more or different" training, supervision, or discipline was "obvious." *Harris*, 489 U.S. at 390. Proof "can take the form of [](1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers." *Sornberger v. Knoxville*, 434 F.3d 1006, 1029-30 (7th Cir. 2006).

Taking a step back, it is stunning that the City would allow officers like Guevara, Burge, and others to commit brutal misconduct in the Chicago Police Department for decades, without taking any corrective action, and then years later claim an entitlement to summary judgment on the theory that it adequately trained, supervised, and disciplined officers during the time period in which these—and other officers—operated with impunity. The City should not be able to escape accountability for some of the worst police misconduct in U.S. history, which was perpetuated because City policymakers turned a blind eye to its officers, causing the violation of Sierra's constitutional rights. A jury must resolve this claim.

### 1. Non-Expert and Expert Evidence Supports the Failure to Train, Supervise, and Discipline Theory

Ample evidence supports denying summary judgment on this theory. Sierra sets out all of that evidence below, but this Court could easily deny summary judgment based on just a few of these items of evidence. Indeed, Judge Kness recently took that approach when denying summary

judgment to the City on this theory in a similar case. *Washington*, 2022 WL 4599708, at \*16-17 (listing eight items of evidence).

The theory that the City failed to train, supervise, and discipline its police officers is supported by the following record evidence:

- Defendants' misconduct in this case, including their fabrication of witness statements and false evidence, and their failure to disclose evidence to prosecutors, Sierra, or his attorneys, PSOF ¶¶24-40, 42, 43, 54-72, 86-133, 135-156, 159-70, 195, 199-227, 248.
- The City has a long history of failing to discipline police officers in response to notice of serious misconduct, starting at latest in the Burge era, which predates Sierra's wrongful conviction:
  - Starting in 1972 and continuing until 1991, Jon Burge and others who worked for him tortured individuals and fabricated evidence in police investigations, PSOF ¶¶451;
  - Superintendent Brzeczek admitted during the Special Prosecutor's investigation that he was aware of that misconduct as early as 1982, PSOF ¶¶452;
  - In 1990, the Goldston Report found that command-level Chicago police employees were aware of Burge's and others' sustained police misconduct, identifying 26 OPS and IAD investigations and 50 victims of police misconduct, PSOF ¶¶456-457;
  - It is undisputed that the City did not discipline officers involved in the beatings and torture outlined in this report, PSOF ¶¶457, 459, 460;
  - The City did not even fire Burge until 1993, long after the City was aware of his misconduct, and more than a decade after Burge tortured Andrew Wilson, PSOF ¶¶459;
  - No other officers were fired for the dozens of cases of alleged torture during the Burge era, and only two others received any form of discipline, PSOF ¶¶460;
  - The City no longer disputes that Burge and others committed egregious acts of misconduct between 1972 and 1991, PSOF ¶¶453, 454;
- Unsurprisingly, given the lack of accountability, police misconduct continued without pause in homicide cases following the Burge era:
  - In 1987, the Illinois Appellate Court reversed the conviction of Melvin Jones for murder based on evidence that officers had fabricated an eyewitness identification against him. PSOF ¶¶462;
  - In 1988, the Seventh Circuit upheld a jury verdict in favor of George Jones, who was convicted after CPD detectives suppressed the victim's initial failure to identify him as the suspect and conducted a repeat photo identification procedure which was disclosed without indication that it had been performed before; CPD subsequently disciplined the police whistleblower who brought the misconduct to light, but declined to discipline any of the detectives involved in the investigation, PSOF ¶¶463;
  - In 1989, James Newsome, who had been wrongly convicted of murder, obtained a court order requiring the CPD to run unidentified fingerprints from the murder scene through its fingerprint identification system, and CPD officers hid the results

for five years—until in 1994, they revealed that the fingerprints matched another man convicted of murder. This led to the overturning of Newsome's conviction in 1994, and Newsome was subsequently granted a pardon based on innocence in 1995, PSOF ¶¶464;

- o In 1993, CPD's head of Internal Affairs Richard Risley learned of serious allegations of criminal misconduct (including hiding evidence related to a homicide) and, instead of pursuing discipline, directly communicated with Miedzianowski about the allegations against him and provided him copies of witness statements and other reports that Miedzianowski was not authorized to have, PSOF ¶465;
- o In 1993 and 1994, Chicago police officers obtained several purported identifications of Vincent Goldstein as the robber of four grocery stores and arrested him; those identifications were proven false after Mr. Goldstein's alibi was established by his employer and another man confessed, PSOF ¶¶466;
- o CPD sergeants, lieutenants, and commanders of detectives widely understood that false identifications could result if photo identification procedures weren't conducted properly, and understood that photo identification procedures could be abused if they were not done correctly, PSOF ¶¶392, 398;
- o From 1986-1998, the Chicago Police Department conducted no audits into the City's witness identification procedures or practices or patterns of misconduct involving such procedures, PSOF ¶¶470; and
- o The City's police officers engaged in a pattern of fabricating evidence starting at minimum in the early 1980s and continuing through the time of Sierra's conviction, PSOF ¶¶471.

- The evidence that the City failed to train, supervise and discipline its officers is also evidence in the City's complaint register files (CR files):
  - o Sierra's experts Finnell and Meza analyzed all of the allegations made in 323 CR files produced by the City, which are all of the CR files relating to detectives assigned to Area Five in time period between 1991 and 1995, PSOF ¶¶472-475;
  - o Those CR files contained 1,973 allegations of misconduct, PSOF ¶¶476;
  - o They found that 52% of allegations (1016 out of 1973) concerned misconduct similar to that in this case—i.e., fabricated statements or evidence, false arrest, improper inventory procedures, planted evidence, threats, verbal abuse, coerced confessions, and excessive force, PSOF ¶¶478;
  - o The sustained rate for citizen complaints in Chicago was well below the national average, compared to other departments, and reflected a "deeply flawed system of investigation and disciplining serious police misconduct, particularly forms of police misconduct that cause wrongful convictions," PSOF ¶¶488;
  - o The sustained rate for complaints of fabrication was 7.7% after investigation; 4.1% for false arrest; and 3% for excessive force, PSOF ¶¶479;
  - o Only 1.5% of the total allegations originating from outside of the Chicago Police Department (27 out of 1,838 allegations) were sustained, much less than other large American municipalities, PSOF ¶¶476;
  - o The small number of complaints that were sustained disproportionally reflected misconduct relating to procedural misconduct (e.g., inattention to duty, rule violations, improper inventory procedure) or domestic violence, as opposed to

129

- abuses against community members while on duty (e.g., fabricated statements, threats, excessive force, false arrest, warrantless search, verbal abuse), PSOF ¶¶486;
  - o Of the 1,016 allegations concerning the types of misconduct at issue in this case (*e.g.*, fabricated statements, false arrest, coerced confessions, threats, excessive force, improper inventory, and other misconduct), the Chicago Police Department sustained just 20 after investigation and 8 after final review, PSOF ¶¶480; and
  - o Even where allegations were sustained, officers did not face meaningful discipline, PSOF ¶¶474, 477, 481, 505, 508, 509, 510.
- Based on this evidence, Mr. Finnell reached various conclusions, including:
  - o Mr. Finnell opines that the City's police officers engaged in a pattern of fabricating evidence starting at minimum in the early 1980s and continuing through the time of Sierra's conviction, PSOF ¶¶471;
  - o He opines that the City had a de facto policy of failing to investigate officers accused of misconduct, and to supervise or discipline officers found to have committed misconduct, PSOF ¶¶474;
  - o He opines that the City's mechanisms and rules for investigating misconduct were not consistent with accepted practices as of 1995, PSOF ¶¶474, 487, 490-94, including for the following reasons:
    - ▪ General order 93-1 did not permit the investigation of anonymous complaints that were not criminal in nature, PSOF ¶¶490;
    - ▪ Officers were not interviewed during investigations, PSOF ¶¶491;
    - ▪ There was no mechanism to respond to officers with a high number of complaints (12.1% of officers were responsible for 46% of allegations of misconduct), PSOF ¶¶494; and
    - ▪ The Chicago Police Departments process for reviewing discipline delayed accountability, PSOF ¶¶492.
  - o He opines that the City of Chicago condoned a code of silence in its police department, where officers were permitted to lie without repercussion, PSOF ¶¶501, 465; and
  - o He opines that the City of Chicago encouraged abuses of power by failing to supervise and discipline officers, PSOF ¶¶502.
- Sierra has also identified CR files from the Defendants Officers' own disciplinary history in which it was alleged that misconduct similar to this case occurred, and to which the City did not respond:
  - o Guevara, Halvorsen, Wojcik, McMurray, and Figueroa were alleged to have engaged in numerous acts of misconduct that mirror those alleged by Sierra and that demonstrated a risk that they would violated constitutional rights and cause wrongful convictions, PSOF ¶¶498-500, 503-512;
  - o Guevara, Wojcik and McMurray were outliers among their colleagues at Area Five. Defendant Guevara received 30 CRs over his career, Defendant Wojcik received 64 CRs over his career, Defendant McMurray received 33 CRs over his career, and Defendant Figueroa received 54 CRs over his career, for a total of 181 CRs across all four officers, PSOF ¶¶494, 495, 503;
  - o The 30 citizen complaints against Defendant Guevara involved misconduct including false reports, false arrest, warrantless searches, verbal and physical

abuse/excessive force, and fabrication of evidence. In response to those 30 complaints, Guevara was disciplined just three times. Many of the complaints did not result in meaningful investigation. And in two of the three instances where the CRs resulted in a sustained finding, Guevara only received one-day and two-day suspensions. In the third occasion, his discipline was a 20-day suspension, which was imposed only because the complaint was made by a supervisor in the CPD. Further, in all three of the sustained findings, Guevara investigators concluded based on their investigations that Guevara had lied to them. However, Guevara received only (1) modest discipline for one sustained Rule 14 violation against him (CR # 152902) and (2) no Rule 14 violations at all in the other disciplinary investigations where it was found that he demonstrably lied. (e.g. CR #s 223928, 251502), PSOF ¶¶503-506, 510, 548;

o Despite having 54 CRs against him, only 2 were ever sustained against Defendant Figueroa, PSOF ¶¶503, 507;

o Out of 33 CRs against Defendant McMurray, only 2 were sustained against him, of which one resulted in a reprimand, and one resulted in no discipline, PSOF ¶¶503, 508;

o Out of 64 CRs against Defendant Wojcik, only 3 were sustained against him, of which one resulted in a reprimand, a second resulted in a five-day suspension for excessive force, and a third was related to unpaid parking tickets. PSOF ¶¶503, 509

o Defendants Guevara and Halvorsen received multiple CRs containing similarly themed allegations and patterns throughout their careers, and Guevara and Halvorsen were sued many times based on similarly themed allegations and patterns, including many allegations of fabricating evidence and abusing people, yet none of their supervisors acted as if they noticed a pattern or showed concern for such behavior, PSOF ¶510;

o Mr. Finnell opines that Guevara took advantage of the broken disciplinary system at the Chicago Police Department, PSOF ¶504;

o Mr. Finnell further opined that the City's delayed disciplinary practices meant that the Defendants had no reason to fear that they would ever be disciplined for misconduct, PSOF ¶¶511.

● The City's promulgation of a culture of impunity is reflected also in civil lawsuits filed against the Defendants for misconduct like that at issue here. At least 25 civil rights cases have been filed against Defendants Guevara, Wojcik, McMurray, Halvorsen, and Figueroa. At least 12 have resulted in verdicts and settlements. At least four of these cases were filed in or before 1991; at least one case was filed in 1996; and the remaining twenty cases were filed thereafter. PSOF ¶¶512 Since then, at least eleven other lawsuits have been filed against Defendants Guevara, Wojcik, McMurray, Halvorsen, and/or Figueroa. PSOF ¶¶512.

● The City also disregarded Guevara's own pattern of staggering misconduct, which demonstrates that Guevara is the single worst perpetrator of police misconduct in the history of the Chicago Police Department in terms of framing innocent people, even when compared to Jon Burge.

Between 1982 and 1998, the City had notice of the pattern of illegal misconduct of Guevara, who physically assaulted, threatened, and/or coerced witnesses, suspects, victims, and defendants, primarily in the process of obtaining false statements. Between

1982 and 1998, Guevara physically assaulted, threatened, and/or coerced individuals, primarily in the process of obtaining false statements, including Annie Turner, Almarie Lloyd, Leshurn Hunt, Graciela Flores, Daniel Pena, Victor Vera, Virgilio Muniz, Virgilio Calderon Muniz (unrelated to the Virgilio Muniz previously referenced), Wilfredo Rosario, David Rivera, Daniel Rodriguez, David Velazquez, Efrain and Ulio Sanchez, Jacqueline Montanez, Eliezar Cruzado, Adolfo Frias-Munoz, Adrian Duta, Santos Flores, Evelyn Diaz, Luis Figueroa, Gloria Ortiz Bordoy, Rodolfo Zaragoza, Maria Rivera, Robert Ruiz, Voytek Dembski, Rosauro Mejia, and Adriana Mejia, and in every case there is no evidence that he received *any* discipline for his misconduct. PSOF ¶¶546, 547

- In the few instances where allegations of misconduct were sustained, Guevara received disproportionately little—and clearly not meaningful—discipline for his misconduct:
  - In 1986, Guevara beat Rafael Garcia by grabbing him by the shirt and throwing him against a bar; handcuffing him and striking him in the face several times; throwing him to the floor and kicking him; and throwing him against the wall and hitting him in the head. After the incident was reported, Guevara then denied striking Garcia and throwing him onto the floor, into the wall, and handcuffing him to the wall. The City's disciplinary body found that Guevara had indeed lied about the incident and had given false information to investigators. For that behavior, Guevara was only suspended for two days, PSOF ¶¶546(f);
  - Also in 1986, Guevara called Melvin Warren a "n***** dog" and beat him, and the City's disciplinary body initially sustained Warren's allegations and recommended five-day suspension, only to later overturn the suspension and impose a reduced punishment of a reprimand for calling a citizen "n*****." PSOF ¶¶546(h);
  - In 1996, Defendant Guevara was accused of physically striking his stepdaughter in the face. Defendant Guevara again denied all allegations. Although the Command Channel Review and IAD concurred in a sustained finding and recommended three-day discipline in February 1996, Defendant Guevara only served a one-day suspension, and no Rule 14 violation was added despite finding that Guevara provided false information. PSOF ¶¶548(a)
  - Further, in 1999, Defendant Guevara stated "fuck you" to Sergeant David Oravetz; engaged Sergeant Oravetz in an unjustified verbal altercation when Guevara threatened to kick Sergeant Oravetz's ass and pushed and poked Sergeant Oravetz in the chest; and failed to comply with a direct order to leave the district station— all when observed by several on-duty members of CPD. Throughout the OPS investigation, Guevara still denied all allegations against him despite the presence of others and the statements supporting the allegations. The allegations were sustained. Yet, even after the disciplinary history described above and the allegations at hand, a Police Commander still recommended reducing his recommended 30-day suspension by ten days, "considering the circumstances and his complementary and disciplinary history." In 2000, Guevara's discipline was reduced to 20 days, and he was compensated for 10 days of back pay for the suspension he had already served. No Rule 14 violation was added or sustained, despite Guevara making false statements during the investigation. PSOF ¶¶548(b).

- In spite of these sustained incidents of flagrant misconduct, the City made no effort to meaningfully discipline or terminate Guevara in light of this repeated misconduct, despite notice of it. PSOF ¶¶548, 549.
- In yet other instances involving subsequent litigation and ultimately resulting in wrongful convictions, there is still no evidence that Guevara was disciplined for his egregious misconduct:
  - In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin, and falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Defendant Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. As a result of this misconduct, Rivera was convicted. In 2011, Rivera filed a post-conviction petition based on actual innocence and received an evidentiary hearing. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence. After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Steve Gawrys, and his supervisor Ed Mingey. PSOF ¶¶549(a).
  - In 1989, Guevara framed Juan Johnson for murder by showing Sam Perez a photo of Johnson before an identification procedure and by telling Perez that he wanted Johnson to take the blame for the murder. . Johnson filed his post-conviction petition in 1996, and appealed its denial in 2001—and in May 2002, the appellate court reversed the denial, vacated his convictions, and remanded for a new trial. At his new trial, Johnson was acquitted by a jury. He sued Guevara in *Johnson v. Guevara*, 05-C-1042, eventually obtaining a verdict against him for $21 million. (See Ex. 81, Jury Verdict in Johnson v. Guevara, 05 C 1042). Guevara has taken the Fifth in regard to all allegations regarding Juan Johnson. PSOF ¶549(b);
  - Johnny Flores was wrongfully convicted of a 1989 murder that he did not commit, a conviction attributable to the misconduct of Defendant Guevara, who fabricated an identification to inculpate Mr. Flores. In 2022, the State asked the Court to vacate his convictions and subsequently dismissed all charges against him.  Flores now seeks justice for the harm that Defendant Guevara and other officers caused him in a federal lawsuit. PSOF ¶549(c);
  - In 1989, Jaime Rios was wrongfully arrested, charged, and convicted for a murder that he did not commit—a conviction that was ultimately dismissed after evidence was presented showing that a witness had been threatened by Defendant Guevara into implicating Rios. In 2022, the Cook County State's Attorney's Office agreed to dismiss his conviction; within days, he had obtained a certificate of innocence; and he has now filed a federal lawsuit against Guevara and the City of Chicago. PSOF ¶549(d);
  - In approximately 1990, former Chicago police detective Bill Dorsch was present when Detective Guevara brought two juveniles to the police station who purported

133

to have witnessed a shooting and recorded the license plate of the shooter's car. While the first juvenile was viewing a photo array, and before he identified any of the photographs, Guevara pointed to the suspect's photo and told the juvenile "that's him." The juvenile then agreed with Guevara, saying that was the person who committed the shooting. (See Ex. 82, Testimony of William Dorsch, *People v. Serrano & Montanez*, 93 CR 1873 at JR-L 076819, JR-L 076824-48). Mr. Dorsch then directed Guevara to leave the room and had the other juvenile view the same photo array—that juvenile was unable to make any identification. (Id.) Subsequently, Dorsch spoke to the two juveniles without Guevara present. The juveniles admitted that they had been paid to falsely claim that the suspect was the shooter. (Id.) Dorsch's supervisors in the CPD knew about Guevara's misconduct in that case, but instead of disciplining Guevara, instead Guevara was promoted. (*Id.* at JR-L 076888-90, JR-L 076906-09, JR-L 076928-32). Guevara has taken the Fifth in regard to all allegations regarding Bill Dorsch's accusations. PSOF ¶546(m);

o   In 1990, Defendant Guevara repeatedly beat Jose Maysonet until he confessed to a double homicide that rested solely on that coerced confession. In 2016, Maysonet's double murder conviction was vacated and he was granted a new trial. Over a year later, the Cook County State's Attorney dropped charges against Jose after five retired Chicago police officers, including Defendants Guevara, Halvorsen, and Mingey, invoked their fifth amendment right and refused to testify. Another victim of this same string of misconduct as Maysonet, Alfredo Gonzalez's conviction for the same homicide was vacated in 2022, and both Maysonet and Gonzalez have filed lawsuits against the City of Chicago and Guevara seeking justice for their wrongful convictions. PSOF ¶549(e);

o   In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. In addition, to support his case against Johnson, Guevara manipulated and fabricated eyewitness identifications of Johnson as the shooter from witnesses Rosa Burgos, Ricardo Burgos, and Elba Burgos. Johnson was granted a certificate of innocence and has filed a lawsuit against Guevara and other officers for their misconduct. PSOF ¶549(f);

o   In 1991, David Lugo was just 20 years old when he was framed for murder by Defendant Guevara and his fellow officers. In 2022, his conviction was vacated. He has since filed a lawsuit against Guevara and other officers for their misconduct. PSOF ¶549(g)

o   Marilyn Mulero was wrongfully convicted of a 1992 double murder based on evidence fabricated by notoriously corrupt Chicago Police Defendants Guevara and Halvorsen. Marilyn was pressured to enter a guilty plea without a trial and was sentenced to death. In 2022, all charges against her were dropped. She has also filed suit against Defendants Guevara and Halvorsen. PSOF ¶549(h);

o   Madeline Mendoza was arrested in 1992, and convicted in 1993, for a crime she did not commit, based on false statements obtained by Defendants Guevara and

Halvorsen. In 2023, the prosecution agreed to vacate Mendoza's conviction and the case was dismissed. PSOF ¶549(i);

- o In 1993, Detective Guevara used physical violence and inducements to coerce Francisco Vicente into falsely testifying against Armando Serrano and Jose Montanez. In that same investigation, Detective Guevara beat Timothy Rankins with a flashlight, threw him out of his chair, and placed him in a chokehold to induce a statement implicating Serrano and Montanez, causing Rankins to testify falsely against the men in the Grand Jury. In 2004, Jose Montanez filed a post-conviction petition based on the recantation affidavit of the State's key witness Vicente, who provided a detailed statement describing how his false testimony was given as a result of threats, intimidation and physical abuse by Det. Reynaldo Guevara. Likewise, in 2005, Armando Serrano filed a post-conviction petition alleging actual innocence based on Vicente's affidavit and multitudes of other affidavits, transcripts, OPS complaints, and other supporting documentation, revealing that Guevara had engaged in a pattern and practice of coercing evidence through the use of threats, intimidation, lies, and physical abuse. The City of Chicago then determined that Montanez and Serrano were wrongfully convicted. In 2016, both men were exonerated and received certificates of innocence. Guevara has taken the Fifth in regard to all allegations regarding Vicente, Rankins, Montanez, and Serrano. PSOF ¶549(j)
- o In 1993, Detective Guevara manipulated the results of the line-up in which Mr. Bouto was identified. Specifically, Detective Guevara allowed witnesses to see Mr. Bouto in the police station prior to the line-up, allowed them to view photographs Mr. Bouto and confer with one another before the line-up, and threatened a witness that Guevara would "put a case" on him if he did not cooperate. Ultimately, the City of Chicago investigated Mr. Bouto's claims and concluded that Mr. Bouto is more likely than not innocent. Guevara has taken the Fifth in regard to all allegations regarding Bouto's case. PSOF ¶549(k);
- o In 1993, Geraldo Iglesias became yet another "victim of now-disgraced and former Detective Reynaldo Guevara's pattern and practice of misconduct and framing innocent persons" when he was wrongfully convicted of murder and sentenced to 35 years. The state finally dismissed charges against him in 2019, and Iglesias was granted a Certificate of Innocence in 2022. PSOF ¶549(l);
- o In 1993, Jose Cruz was arrested and ultimately wrongly convicted of a murder, based on fabricated and coerced statements caused by Defendant Guevara and other officers. In 2022, the prosecution agreed to vacate and dismiss his conviction. In 2023, he obtained a certificate of innocence, and filed a lawsuit against the City of Chicago, Defendant Guevara, and others for his wrongful conviction. PSOF ¶549(m);
- o In 1994, Guevara framed Roberto Almodovar and William Negron. In that case, Guevara framed Almodovar for a murder he did not commit by surreptitiously showing his photograph to witnesses before they viewed a lineup and then falsifying reports to make it seem as if the witnesses had picked Almodovar out of a lineup without any influence by Guevara. Almodovar, and his co-defendant Negron, have both since been exonerated. Guevara has taken the Fifth in regard to all allegations regarding the case against Almodovar and Negron, PSOF ¶549(n);

135

- Nelson Gonzalez was framed with a 1994 murder, resulting from a fabricated identification conducted by Defendant Guevara. In 2022, Gonzalez's convictions were vacated and the case dismissed, and in 2023, he was granted a certificate of innocence. He has also filed suit against Defendant Guevara, among others involved in his wrongful conviction.  PSOF ¶549(o);
- In 1994, Defendants Guevara and Halvorsen, among other officers, manufactured false identifications that resulted in the wrongful arrest and conviction of Carlos Andino. In 2021, Andino filed for post-conviction relief, and in 2022, the Cook County State's attorney's office agreed to vacate Andino's conviction. In 2023, he was awarded a certificate of innocence, and filed suit against Guevara and other officers to seek compensation for his wrongful conviction.  PSOF ¶549(p);
- In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder.  After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite that each of those witnesses previously told the police that they had not been able to see the shooter.  PSOF ¶549(q);
- In 1996, Gamalier Rivera was wrongfully arrested and convicted for murder resulting from fabricated confessions caused by Defendant Guevara and other officers. After years of seeking post-conviction relief, the state dismissed charges against him, and he was granted a certificate of innocence in 2022. As the Court stated, "No amount of money can make up for the lost time, the trauma of being wrongfully imprisoned, and the egregious experience of being wrongfully accused" as a victim of Defendant Guevara's misconduct. Rivera has filed a lawsuit against Guevara and other officers for their misconduct.  PSOF ¶549(r);
- Louis Robinson was wrongfully convicted of a 1996 drive-by shooting that killed Kelly Velez, based on coercive identification and fabricated evidence caused by Defendant Guevara. In 2023, his post-conviction petition was granted following an evidentiary hearing, and the State dismissed all charges.  PSOF ¶549(s);
- Juan and Rosendo Hernandez were wrongfully convicted of the 1997 shooting of Jorge Gonzalez and collectively spent decades for a crime they did not commit due to the misconduct of Defendant Guevara and other officers, including the disgraced Joseph Miedzianowski, and Halvorsen. In 2022, their convictions were vacated, and they received certificates of innocence in 2023. They have filed a lawsuit against Guevara and other officers for their misconduct.  PSOF ¶549(t);
- In 1997, Guevara falsely reported that witness Ruth Antonetty implicated Ariel Gomez in a murder, when she had not done so,  PSOF ¶546(bb);
- In 1998, Guevara repeatedly beat Gabriel Solache into giving a false confession, causing Solache to sustain permanent hearing loss. In the same investigation, Guevara repeatedly threatened and beat Arturo Reyes to coerce Reyes into falsely implicating himself. The City subsequently determined that Solache and Reyes were abused during their interrogations and that their convictions should not stand. Guevara has taken the Fifth in regard to all allegations regarding Solache and Reyes,  PSOF ¶354;
- John Martinez was wrongfully convicted of a 1998 homicide due to falsified evidence, including fabricated identifications and coercive interrogations, caused

by Defendant Guevara and other officers. In 2023, Martinez's conviction was vacated, and less than a month later, his case was dismissed. In 2024, two others involved in this case – Thomas Kelly and Jose Tinajero – also had their wrongful convictions resulting from the same homicide dismissed based on Guevara's misconduct. Martinez has filed a lawsuit against the City of Chicago and Defendant Guevara, seeking justice for his wrongful conviction. PSOF ¶549(u);

- o In 1999, David Gecht and Richard Kwil were both wrongfully convicted of a murder due to Defendants Guevara and Halvorsen's misconduct. During a single night, Defendants Guevara, Halvorsen, and other officers subjected both Gecht and Kwil to torturous investigations, breaking their wills and coercing them into signing false confessions. They also obtained a false confession from Ruben Hernandez, falsely implicating all three in the crime. In 2022, Gecht and Kwil's charges were dismissed, and both were granted certificates of innocence. The charges against Hernandez were also dismissed, and all three have pending lawsuits against Defendants Guevara and Halvorsen, among other officers. PSOF ¶549(v);

- o Eruby Abrego and Jeremiah Cain were wrongly convicted of the 1999 murder of Jose Garcia and aggravated battery of Julio Lugo, despite having nothing to do with the murder, due to the false identifications, falsified confessions obtained through torture, and other evidence manufactured by Defendants Guevara, Halvorsen, and others. In 2022, their wrongful convictions were vacated and the charges were dismissed. Both now seek justice for the harm that Defendant Guevara and other officers caused him in a federal lawsuit. PSOF ¶549(w);

- o On February 29, 2024, seven men – Jayson Aguiar, who served 20 years, David Kruger, who served 14 years, Juan Molina, who served 12.5 years, Edwin Ortiz, who served 25 years, Oscar Soto, who served 3 years, Victor Vera, who served 19 years, and Tyrece Williams, who served 20 years–filed petitions seeking to reverse their decades-old convictions tied to disgraced former Chicago Police Detective Reynaldo Guevara. The men—who have completed their sentences and are out of custody—all claim their innocence. PSOF ¶549(x);

- o Plaintiff's retained expert Jennifer Dysart opined on the similarities between the cases she has reviewed involving Detective Guevara, which include Rivera, Montanez v. Guevara, et al., Case No. 17-cv-4560, Armando Serrano v. Guevara, et al., Case No. 17-cv-2869, Sierra, Bouto, and Iglesias. She stated that "It seems that a common theme in the Guevara cases I have reviewed is [for Guevara to] manipulate witnesses who had poor opportunities to view the perpetrator. Most of the cases had several estimator variables factors: a limited opportunity to see the perpetrator, the presence of stress and arousal, the presence of a weapon, and issues with perpetrator descriptions. In summary, the witnesses in these cases were likely vulnerable to suggestion and influence due to the presence of multiple estimator variables that can lead to a weak memory for a perpetrator." PSOF ¶549(y).

- Finally, in 2001, the FBI authored a 302 report detailing the criminal activity of CPD Officer Joseph Miedzianowski and Guevara in the 1980s and 1990s. The report explains that Guevara would apprehend drug and gun dealers and then allow them to "buy their way out of trouble," and he would take bribes to alter the results of lineups. The FBI report also states that Guevara would receive cash in exchange for the dismissal of murder cases he investigated. The report contained no indication that Guevara was questioned or that the

IAD tried to find the people mentioned as having cases that were fixed by Guevara. Guevara has taken the Fifth in regard to all allegations regarding the topics covered in the 302 report. PSOF ¶¶548(c).

- That same year, in 2001, a perjury investigation was initiated by State Representative William Delgado in response to complaints received from his constituents. Mr. Delgado alleged that Defendants Guevara and Halvorsen gave false testimony in 17 homicide cases ranging from 1984 to 1997, and requested that the State's Attorney's office also investigate the matter to determine possible misconduct on the part of the detectives. The CPD Internal Affairs Division interviewed Delgado, who related that the 17 defendants convicted primarily on the false testimonies of Guevara and Halvorsen stated that "we're tired of busting you on petty crime and we're gonna get you. We'll bust you for murder." Delgado stated that in at least one case it was impossible for Guevara to obtain a detailed statement from the defendant due to Guevara's poor Spanish. Yet the State's Attorney's office closed its separate investigation without providing a report on the complaint, and without reviewing 3 of the 17 cases. However, based on the closure of the case by the State's Attorney's office (without actually seeing that report) and the alleged "fruitless" attempts to contact witnesses regarding the complaint, the CPD closed the case with a finding of "Not Sustained" in 2002. PSOF ¶548(d)
- Indeed, over the two decades the City was continually on notice of Guevara's misconduct as a result of citizen complaints, the perjury investigation, and the FBI's 302 report, the City did nothing to address Guevara's misconduct, even given the City's knowledge that individuals were still wrongfully incarcerated because of Guevara's misconduct, as was obvious from the steady stream of post-conviction innocence petitions filed and granted by victims of Guevara's misconduct. PSOF ¶546-549;
- It was not until 2013 that the City first investigated Guevara, hiring Sidley Austin to conduct a review of a portion of his cases, which found that Guevara had engaged in investigative misconduct including through improper identification procedures, falsifying reports, and physical abuse during interrogations. PSOF ¶550.
- Guevara's invocation of the Fifth Amendment in response to all questions about the City's failure to discipline him after he repeatedly violated individuals' constitutional rights provides additional support for the conclusion that City policymakers were on notice of and indifferent to Guevara's pattern of framing innocent individuals. Indeed, Detective Guevara has refused to testify about his interactions with many individuals, including Anna Flores, Graciela Flores, David Velazquez, Efrain Sanchez, Julio Sanchez, Adolfo Frias Munoz, Jose Melendez, Gabriel Solache, Arturo Reyes, Virgilio Muniz, Luis Figueroa, Angel Diaz, Wilfredo Rosario, Xavier Arcos, Gloria Ortiz Bordoy, Robert Ruiz, Leshurn Hunt, Adrian Duta, Voytek Dembski, Daniel Pena, Annie Turner, Juan Johnson, Francisco Vicente, Timothy Rankins, Jose Montanez, Armando Serrano, Robert Bouto, Roberto Almodovar, William Negron, Jacques Rivera, Jose Maysonet, and Sierra. PSOF ¶547, 549.
- Moreover, there is ample record evidence that the City failed to train, supervise and discipline its officers on a wide variety of particular topics important to investigations, including:
  - o Sierra's expert testimony that the City's homicide files reflect a widespread practice of evidence suppression, fabricated and false identifications, and other departure from policies, showing a lack of training, PSOF ¶¶358-371, 424, 431, 434, 438-441, 444-45, 471, 474, 517, 526, 527-545;

- o The City's 30(b)(6) representatives testified that there was no punishment for non-compliance with Special Orders; no auditing or surveying of the implementation of the policies, including no auditing to ensure that documents were produced in response to subpoenas; and that he had no personal knowledge of any training provided to commanders or supervisors to conduct such audits, PSOF ¶¶513, 514, 519-525;
- o The City's 30(b)(6) representative Winstrom testified that only a three-hour training took place after the initial S.O. 83-1, and that no other training like that occurred throughout the development of the Special Orders; PSOF ¶516, 518;
- o The City's 30(b)(6) representative Foster testified that detectives were not trained that there were any prohibitions on what they could say to a witness before a lineup procedure or a gang book showing, PSOF ¶532;
- o Foster testified that no training on identifications or their assistance in homicide investigations was provided to gang crime specialists, despite their involvement in the investigations and identification procedures; PSOF ¶527, 532;
- o Foster stated that the only training provided to detectives only trained on documenting positive identifications. PSOF ¶533;
- o Foster agreed that a gang specialist could interview a witness and learn information pertinent to the homicide investigation outside the presence of any detective, and there was no requirement that the specialist had to document that interview. Even if the gang specialist did document pertinent information the specialist acquired, there was no policy requiring that information to get to the Detective Division, or training on the issue. PSOF ¶414.

This evidence is far more than sufficient for a jury to conclude that the City failed to train, supervise, and discipline its officers, condoned a code of silence, and in so doing was deliberately indifferent to the risk that its officers would commit the types of misconduct at issue in this case. The City had notice of rampant misconduct starting with Burge, was indifferent to that misconduct in its non-response, and then continued to permit police officers to commit misconduct with impunity, as shown in the analysis of Chicago's disciplinary files and the repeated misconduct identified above, including Guevara specifically, through and long past the time of Sierra's wrongful conviction. This failure on the City's part created an environment of lawlessness where repeat bad actors in the Chicago Police Department could violate the rights of citizens, fabricate evidence, coerce witnesses, testify falsely, suppress evidence, and frame innocent individuals for crimes. A reasonable jury could find that the City's broken system encouraged Defendants to

139

repeatedly commit misconduct, and in the case of Guevara and Halvorsen to manufacture the wrongful convictions of dozens of individuals. Despite this misconduct, the City had no meaningful response.

The evidence set out above dramatically exceeds what many courts have decided requires a trial on this particular *Monell* theory. See, *e.g.*, *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1030 (7th Cir. 2006) (reversing grant of summary judgment to municipality based on evidence that municipality "had a policy of coercing confessions out of female suspects by threatening to have DCFS take away their children," which included experts' report that reviewed other complaints that it had been deliberately indifferent to coercive threats); *Washington*, 2022 WL 4599708, at *16-17.[37]

---

[37] See also, *e.g.*, *Velez v. City of Chicago*, No. 1:18-CV-08144, 2023 WL 6388231, at *25 (N.D. Ill. Sept. 30, 2023) ("A reasonable jury could find a widespread failure to investigate and to discipline caused the Chicago Officers to believe that their alleged misconduct would not be discovered and that, even if discovered, they would not face any effective disciplinary action resulting from such misconduct.") (cleaned up); *Obrycka v. City of Chicago*, 2012 WL 601810, at *8 (N.D. Ill. Feb. 23, 2012) (denying summary judgment on "code of silence" claim where plaintiff submitted police practices expert that opined a "code of silence" existed and a statistical expert report "showing that the Chicago Police Department has statistically significantly lower rates than the national average of sustained rates for police misconduct complaints"); *Marcinczyk v. Plewa*, No. 09 C 1997, 2012 WL 1429448, at *3 (N.D. Ill. Apr. 25, 2012) (denying summary judgment where plaintiff's evidence of City's failure to investigate and discipline officers accused of misconduct included "documentary evidence indicating that only a minuscule percentage of civil rights complaints are found to be meritorious after investigations and that officers who have complaints lodged successfully against them are subject to only minimal discipline"); *Johnson v. City of Chicago*, No. 05 C 6545, 2009 WL 1657547, at *10 (N.D. Ill. June 9, 2009) (denying summary judgment where plaintiff had evidence that City only paid lip service to known problem of failing to investigate and discipline rogue officers); *Garcia v. City of Chicago*, No. 01 C 8945, 2003 WL 1715621, at *6-7 (N.D. Ill. Mar. 20, 2003) (denying summary judgment to City given evidence of indifference to a pattern of abuse by its officers where plaintiff had expert testimony on the City's investigations of officers accused of misconduct, testimony from IAD investigator, as well as statistics on the sustain rates of investigations of misconduct from 1999 through 2001, concluding that "[a] reasonable jury could infer that the City knew about and acquiesced in a widespread custom tolerating the tacit use of excessive force by its police officers over a substantial period of time."); *Kindle v. City of Harvey*, No. 00 C 6886, 2002 WL 230779, at *4 (N.D. Ill. Feb. 15, 2002) (denying summary judgment on failure to discipline claim were "[p]laintiff's evidence consists of approximately thirty-five City of Harvey files where private citizens filed excessive force complaints and no corrective action was ever taken on any of them. No formal hearings were ever held on these complaints nor is there evidence of any type of independent investigation on the part of the City of Harvey. Some of the complaints lodged against the Harvey police officers involve similar types of brutality, and no evidence of notes being put in officer's personnel files is present."); *Robinson v. City of Harvey*, No. 99 C 3696, 2001 WL 138901, at *7 (N.D. Ill. Feb. 16, 2001) (denying summary judgment where evidence included complaints of officers' use of excessive force were frequently unreviewed and undocumented as well as an expert report that found that the municipality had systemic deficiencies in its administrative investigations of use of force and citizen complaints).

### 2. The City's Arguments for Summary Judgment on the Failure to Train, Supervise, and Discipline *Monell* Theory Lack Merit

#### (a) The City's Reiterated Arguments Regarding Mr. Finnell Lack Merit and Do Not Justify Summary Judgment

The City contends that summary judgment should be granted on this theory because of a smattering of challenges that the City mounts to Sierra's expert, Mr. Finnell. CB-38-50. Again, the City's argument departs from the false premise that the failure to train, supervise, and discipline *Monell* theory is based solely on expert opinions, which is not the case, as demonstrated by the record evidence above unrelated to Mr. Finnell's opinions. The City's criticisms of Mr. Finnell are meritless, but they are also not an argument for summary judgment.

Next, the City again uses its summary judgment motion to regurgitate arguments to exclude Mr. Finnell that the City has made in its *Daubert* motion. The City's criticisms of Mr. Finnell's methodology and opinions on pages 38-41 (arguments regarding methodology of review of CR files), and pages 41-44 (discussing opinions based on CR files) of its motion, CB-38-44, are addressed fully in Sierra's response to the City's motion to exclude Mr. Finnell. Dkt. 513 at 13-32 As discussed there, courts in this District have found Mr. Finnell's exact opinions criticized by the City here and similar expert opinions to be helpful to juries in cases concerning widespread practices of failing to discipline Chicago police officers. *Velez*, 2023 WL 6388231, at *24 (finding Mr. Finnell's opinions helpful to the jury and relevant to the claim based on failing to investigate and discipline police misconduct); *Washington*, 2022 WL 4599708 at *11 (concluding Plaintiff presented sufficient evidence for *Monell* claim based on expert opinion on deficiencies of investigations and discipline); *Marcinczyk*, 2012 WL 1429448, at *3-4 (concluding plaintiff presented sufficient evidence for Monell claim, including evidence indicating that "minuscule percentage of civil rights complaints are found to be meritorious after investigations and that

officers who have complaints lodged successfully against them are subject to only minimal discipline").

Moreover, the City's arguments that Mr. Finnell's opinions do not establish a widespread practice depend entirely on disputing the correctness of Mr. Finnell's opinions and ignoring all of the other record evidence set out above. Whether Mr. Finnell's opinions add evidence supporting a widespread practice, like any other dispute of fact, must be saved for trial.

### (b) The City's Argument About Burge Evidence Lacks Merit

The City asserts in a single paragraph that the evidence discussed above relating to Burge and his colleagues' pattern of misconduct and the City's lack of any response to that pattern is irrelevant to this *Monell* theory, suggesting that those things happened too early in time to be relevant. CB-44-45. A paragraph without factual or legal analysis is insufficient to wish away the Burge scandal. *Roe-Midgett v. CC Services*, 512 F.3d 865, 876 (7th Cir. 2008) (undeveloped arguments are forfeited).

Much like *Jones* and *Palmer* in the context of evidence suppression, the Burge evidence demonstrates that City policymakers had direct notice of the problem of systemic abuses of constitutional rights occurring at the hands of officers in the Chicago Police Department, investigated that problem, and received notice in the 1990 Goldston Report that the problem was widespread, that command-level officers knew of it, and that specific corrective action was essential. *Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999) (noting in 1999 that by then Burge's misconduct was an established pattern and practice); *Fields*, 981 F.3d at 562 (notice can be established in various ways, such as through proof of a prior pattern of similar constitutional violations).

In addition to being relevant to notice, the Burge evidence demonstrates the City's indifference to police misconduct. In response to the notice of Burge's misconduct, the City did nothing. It did not meaningfully investigate any of the cases of misconduct, including those identified in the 1990 Goldston Report, or discipline the officers involved, and it took no steps to implement new policies or remedial measures. In fact, it was not until 1993—more than a decade after Burge's torture of suspects began, three years after the Goldston report, and two years before Sierra's ordeal, that Burge was finally fired. In the preceding decade, at a time when Chicago Police Department command staff knew of Burge's misconduct, Burge was *promoted* to Commander. The ultimate firing of Burge was inconsequential, given that it was untimely and came after his promotion and celebration within the department, and it was the only step the City took. The City did not conduct any other investigation, implement policy changes, or impose discipline. The fact that the City was utterly indifferent to the most extremely abusive police misconduct in the ranks of the Chicago Police Department is highly probative of the City's indifference. *Smith v. City of Chicago*, 143 F. Supp. 3d 741, 753 (N.D. Ill. 2015) ("Proof of deliberate indifference in the context of a failure to train case 'can take the form of either (1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers.'"); PSOF ¶¶451-461.

The City's indifference toward Burge helped to establish the widespread practice of lax or non-existent discipline that continued in full force through the time of Sierra's wrongful prosecution and conviction. Indeed, had the City responded to Burge, perhaps there would have been no Guevara. It is understandable that the City wishes to ignore the Burge scandal. However, it is highly relevant to Sierra's claim that the City's failure to train, supervise, and discipline

143

officers spawned egregious patterns of police misconduct, like Guevara's, which caused the violations of Sierra's rights. PSOF ¶¶451-461, 474-512, 546-549.

### (c) The City's Argument About Lawsuits Against Officers Lacks Merit

The City also asserts that evidence of lawsuits against Chicago police officers is not relevant to Sierra's *Monell* claims because some lawsuits were filed after Sierra's wrongful conviction. CB-50. To the extent the City is making the narrow argument that lawsuits filed after Sierra's wrongful conviction did not provide the City *notice* of the misconduct at issue in those lawsuits before Sierra's wrongful conviction, Sierra agrees. But even excluding those lawsuits post-dating 1996, there is a tremendous amount of evidence that the City had notice of the problems created by failing to train, supervise, and discipline officers prior to Sierra's ordeal.

Regardless, putting notice to one side, all of the lawsuits discussed above concerning police misconduct and the City's response to them are highly relevant to the City's practices and its indifference. The Seventh Circuit has held that incidents postdating a particular case are probative of the policies and practices that were in place at the time of the case, and they are evidence of City policymakers' deliberate indifference. *Sherrod v. Berry*, 827 F.2d 195, 205 (7th Cir 1987) ("[S]ubsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy[.]"); see also *Padilla v. City of Chicago*, 2009 WL 4891943 at *7 (N.D. Ill. Dec. 14, 2009).[38]

---

[38] Similarly, the City argues that a U.S. Department of Justice report documenting the Chicago Police Department's failure to investigate, supervise, and discipline officers who use excessive force is irrelevant to the *Monell* issues in this case because it post-dates the events at issue here. CB-45-46. Again, Sierra agrees that the report post-dates the events at issue, but as discussed, this post-incident evidence is probative of the lack of disciplinary policies and indifference on the part of the City when it comes to training, supervising, and disciplining its police officers. The fact that the City's indifference, which was deeply entrenched at absolute latest at the start of the 1990s (being generous to the City), continues well into the 21st Century highlights the probative value of this evidence: The City has never cared about proper discipline of police officers, and its indifference continues today. Regardless, the Court need not resolve a question about the admissibility of a single Department of Justice Report at this stage, because the denial of summary judgment to the City in no way turns on that report.

144

**(d) The City's Argument About Complaint Register Files Lacks Merit**

Finally, the City argues that the Defendants CR files themselves and Mr. Finnell's opinions about them are not evidence supporting a widespread practice of failure to train, supervise, discipline. CB-46-50. First, the City's argument that Mr. Finnell did not appropriately analyze which CR files should have resulted in sustained findings, CB-47, is addressed fully in Sierra's response to the City's motion to exclude Mr. Finnell, Dkt. 513 at 22-25, 28, 30-32 (Parts III(A), III(C), and IV).[39] The same is true of the City's argument that Guevara, Wojcik, and McMurray were outliers. See CB-48; Dkt. 513 at 25-28, 30-32 (Parts III(B) and IV).

Second, the City arbitrarily limits the Defendants' CR files (saying that Guevara had only three, for example, when he had 30 in total) in an attempt to suggest that those CR files do not support Sierra's claim that the City failed to discipline officers. CB-47-48. The City's limitation and skewed view of the evidence is again inappropriate at summary judgment. The City will have to make arguments about what the Defendants' citizen complaints and the City's investigation of them show or do not show at trial.

Moreover, the City is wrong about what Defendants' CRs show. Guevara, Wojcik, and McMurray received many more complaints than the average officer—Guevara had 30 CRs during his career, Wojcik had 64, and McMurray had 33. PSOF ¶503. All Defendants were accused of fabricating evidence and abusing citizens multiple times. PSOF ¶503, 498-500, 510. They were never meaningfully disciplined for these accusations. PSOF ¶¶504-510. Critically, a small proportion (12.1%) of all accused officers in the Chicago Police Department were responsible for 46% of the allegations of misconduct in the files reviewed by Finnell, and Defendant Officers—

---

[39] The City cites to *Rivera* in support of this argument, CB-47, but in *Rivera* summary judgment was granted on this theory precisely because there was no expert like Mr. Finnell to opine about the City's failure to investigate and respond to complaints across the Chicago Police Department. 319 F. Supp. 3d at 1069-70.

due to the high number of allegations against them—each fell into the category of statistical outliers. PSOF ¶494, 495.

Finally, the City makes the nonsensical assertion that focusing too much on a particular officer's pattern of misconduct transforms the City's liability into *respondeat superior* liability. CB-49. It does no such thing. *Respondeat superior* would make the City vicariously liable for a particular tort that Guevara, for example, had committed. The argument here is different: Guevara engaged in a pattern of misconduct because the City had no functional disciplinary system and he could act with impunity. That is not *respondeat superior* liability.

In conjunction with all of the record evidence above, a showing that a particular Defendant repeatedly committed misconduct and received complaints without investigation by the City or consequences "*does* present sufficient evidence of *Monell* liability based on a failure to investigate and a failure to discipline specific officers." *Velez*, 2023 WL 6388231, at \*24. Again, the Defendants' CR file evidence is just part of the evidence in support of Sierra's failure to train, supervise, and discipline theory.

### G. A Jury Must Decide the *Monell* Theory Regarding the City's Widespread Practice of Fabricating Witness Identifications Using Suggestive Identification Procedures

Material disputes of fact also preclude summary judgment on Sierra's theory that the City was indifferent to a widespread practice of Chicago police officers fabricating witness identifications using suggestive identification procedures. In the five-year period leading up to the Andujar investigation, an examination of nearly 1,500 identification procedures performed at Area Five between 1991 and 1995 demonstrates that Chicago police officers obtained identifications of their suspects in a staggering and unprecedented 74% of identification procedures that they performed, and identifications of innocent fillers essentially never. These rates represent a

dramatic and statistically significant departure from other jurisdictions, and they can only be explained by Chicago police suggestion during identification procedures. In addition, Sierra has amassed evidence of dozens of individual cases in which Chicago police fabricated identifications for use in criminal proceedings using suggestive tactics. Moreover, City policymakers promulgated deficient written policies, provided no training on proper identification procedures, took no steps to assess whether police identification procedures resulted in false identifications, and never disciplined officers who fabricated identifications. The City was indifferent to this widespread practice of fabricating identifications and the risk it presented that false identifications would taint criminal proceedings, in violation of due process.

1. **Non-Expert Evidence Supporting the Widespread Practice of Fabricating Identifications**

Again, contrary to the City's suggestion, this theory is not based solely on expert testimony. Sierra offers evidence that long before the 1995 Andujar investigation it was common knowledge in law enforcement that a large portion of wrongful convictions were caused by improper eyewitness identification procedures. PSOF ¶¶392-398.[40] The City's Rule 30(b)(6) witness

---

[40] Even by 1992 and 1993, the International Association of Chiefs of Police Law Enforcement Policy Center was releasing papers and model policies that were premised on the inherent unreliability of eyewitness identification procedures. PSOF ¶¶393-394, 396-97. As the IACP papers in 1993 noted, "Police frequently rely on eyewitness identifications. Unfortunately, civilian eyewitnesses frequently prove to be unreliable observers, and erroneous identifications are often the result. Misidentifications by eyewitnesses are normally the result of a combination of factors." PSOF ¶393. The papers explained the primary reasons that eyewitness identifications were frequently unreliable: frailties of human memory and perception, especially under stress; and the ease with which eyewitnesses could be influenced by suggestion. PSOF ¶394. The 1993 White Paper accompanying the 1992 Model Policy quoted from the Supreme Court's 1967 decision in *United States v. Wade*, stating that "The influence of improper suggestions upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor. Perhaps it is responsible for more such errors than all other factors combined." PSOF ¶397. In fact, even in 1967, the IACP was releasing training material for law enforcement about the failures in witness perception, writing that "Eye-witness identification and description is regarded as a most unreliable form of evidence and causes more miscarriages of justice than any other method of proof. This weakness has long been recognized by the courts[.]" PSOF ¶¶397. Long before 1995, police departments have known about the problems with eyewitness identification procedures, and the need for rigorous safeguards to ensure such procedures were being conducted in appropriate cases, and in the appropriate ways. PSOF ¶¶393-397.

confirmed that the City had notice of these model policies and of the risk posed by suggestive procedures. PSOF ¶398.

Despite this notice, in 1995 and 1996 the City had no written policies whatsoever governing photo identification procedures. PSOF ¶¶402. With respect to live lineups, the City's written policy in effect required a report to be written for live lineups documenting the date, time, location of the lineup, police conducting, persons viewing, persons present, persons participating in lineup, all persons identified, the person photographing lineup, all comments of counsel for arrestee, and any additional information or unusual circumstance occurring during the lineup. PSOF ¶¶399, 403. The policy does not on its face explain what record must be made when suspects are *not* identified in a lineup. PSOF ¶¶405-06.[41] Nor does the policy on its face require reporting of what police conducting lineups said to witnesses or vice versa, or any other circumstances of the identification (other than what an officer considers relevant or unusual in their own discretion). PSOF ¶¶403, 408, 532. Documentation of exculpatory or impeachment information arising from identification procedures was not required by the policy. PSOF ¶408. The policies did not explain what was required before a supervisor approved a lineup report. PSOF ¶407. There was no training to fill these gaps in policy. PSOF ¶¶528-531.

In 1995 and 1996, there was no policy at all governing photo identification procedures. PSOF ¶402. No written policy required a report of photo identification procedures or required specific documentation about such a procedure. PSOF ¶402. No policy or training provided instruction on identifications made as part of gang book procedures—although both detectives and gang specialists used gang books during homicide investigations—and gang specialists were not

---

[41] The City's Rule 30(b)(6) witnesses have variously testified that filler identifications were not documented, and that filler identifications were documented as negative identifications. PSOF ¶¶406.

provided any training relative to their participation in homicide investigations in general. PSOF ¶¶531, 532. No policy prohibited showing a single photo of a suspect or suggesting to a witness who the suspect was during a photo array, or showing the witness a photo of the suspect prior to a live lineup, or repeating identification procedures with the same witnesses and suspects, or providing confirming statements about a suspect before or after an identification procedure. PSOF ¶¶408-410. The only training manuals the City has produced on identification procedures come from 1996, the year after the Andujar investigation. PSOF ¶528.

Moreover, the City had no system in place to audit the conduct and accuracy of identification procedures. It did not track misconduct during identification procedures in any way. It did not ensure that it received notice or took steps to learn of situations where motions to suppress identifications generated by the Chicago Police Department were granted. PSOF ¶¶534-543.

In this absence of policy, training, supervision, and review, Chicago police officers fabricated identifications using suggestive identification procedures that were not properly documented. There is ample evidence in the record that the practice of fabricating identifications using suggestive techniques persisted citywide at the relevant time period.

Sierra has identified multiple instances in which Guevara or his colleagues procured wrongful convictions and false charges using fabricated identifications, including but not limited to the cases of Robert Brown, Vincent Goldstein, James Newsome, Donald Reynolds, Billy Wardel, Reynaldo Munoz, Victor Vera, Daniel Rodriguez and David Velazquez, David Colon, Santos Flores, Edwin Davila, Luis Serrano, Angel Diaz, Ricardo Rodriguez, Angel Gaya, Freddy and Concepcion Santiago, Ariel Gomez, Jaime Rios, Demetrius Johnson, David Lugo (Colon), Robert Bouto, Roberto Almodovar, William Negron, Nelson Gonzalez, Carlos Anindo, Edwin

149

Davila, Gamalier Rivera, Louis Robinson, John Martinez, Eruby Abrego, and Jeremiah Cain. PSOF ¶¶546, 548, 549.

### 2. Expert Evidence Supporting the Widespread Practice of Fabricating Identifications

Sierra also presents compelling expert evidence in support of this widespread practice theory. First, Sierra's expert Mr. Finnell provides evidence of cases in which identifications were fabricated, including those of James Newsome, George Jones, Melvin Jones, John Willis, Donald Reynolds, Billy Wardell, Robert Brown, Vincent Goldstein, and the murder of Ruben Gonzalez (which, as Finnell notes, is directly intertwined with the investigation that led to Plaintiff's wrongful conviction). PSOF ¶¶462-468, 471. Moreover, the City never introduced accountability systems that would identify and correct incorrect or improper eyewitness identifications and manipulation of witnesses. PSOF ¶¶470, 527-545. In fact, the City's total failure to identify and correct such misconduct in the 1991-1995 complaints of Area Five police misconduct reviewed by Mr. Finnell "indicates that the City's disciplinary system did not provide any meaningful deterrent against misconduct by police officers who sought to fabricate and manipulate live lineup or photo array identifications." PSOF ¶544.

Second, Sierra's expert Dr. Nancy Steblay provides extremely strong evidence of the City's widespread practice of fabricating identifications using suggestive identification procedures. Dr. Steblay is a leading expert on eyewitness identification.[42] In this case (and other Guevara cases), Dr. Steblay conducted an exhaustive analysis of data obtained from 1,423 identification procedures (including live lineups and photo arrays) reported in 523 Area Five homicide files produced by the

---

[42] Dr. Nancy Steblay is an expert on topics of social influence, memory, decision-making, and jury decision processes, with specific expertise in eyewitness identification evidence collection procedures. She has authored over 45 publications, which involve a quantitative method called meta-analysis as well as the analysis of empirical data from the lab and from real witnesses to crime in the field. She has served on the editorial boards of four major scientific journals that publish research on eyewitness identification. PSOF ¶¶416-417.

City, which document all homicide investigations between 1991 and 1995, inclusive, in Area Five. PSOF ¶¶418-419. Each lineup was coded using objective criteria to reflect information about each lineup including: the number of witnesses participating, the number of suspects, whether multiple suspects were included, the number of fillers, the total number of individuals in the lineup or array, whether the witnesses were previously familiar with the perpetrator, the total number of possible positive identifications (the number of witnesses viewing the lineup multiplied by the number of suspects), and the number of reported positive, negative, and filler identifications in each procedure.[43] PSOF ¶420.

The data were assembled in a spreadsheet, which contains many tens of thousands of coded variables, across nearly 1,500 lineup procedures. PSOF ¶419. Dr. Steblay participated in the design of the data summary, ensured that the variables were objective and clearly defined, and verified the data.[44] The data was shared with all parties, and Defendants have not identified any error in any of the data coded.[45] PSOF ¶423. Indeed, Defendants' expert responding to Dr. Steblay concedes that he does challenge the data on which Dr. Steblay relies and has not identified any error in that data. PSOF ¶423.

Dr. Steblay observed that between 1991 and 1995, witnesses participating in Chicago procedures picked the police officer's suspect a whopping 78% of the time, made no identification

---

[43] The task of coding these data based on police reports "borders on the mechanical." *Rivera v. Guevara*, 319 F. Supp. 3d at 1067. Reading a police report and transferring to a spreadsheet what the report says about the criteria just mentioned does not call for any subjective decision making, as Dr. Steblay explains. PSOF ¶421.

[44] Dr. Steblay ensured that the coding team "was using objective and clear definitions for the coding variable." The coding was undertaken by at least two independent coders, who compared their work to catch discrepancies. The coding process did not call for any subject decision making. Dr. Steblay also conducted a robust reliability check, verifying approximately 200 lineups, randomly selected from the court-ordered homicide files produced in this case. She agreed with the coders in 98% of the instances, "strong interrater agreement" that gave her confidence in the quality of the underlying data. PSOF ¶¶420, 421.

[45] In Defendants' *Daubert* motion, Defendants make much of what they assert are errors in the coded data. Dkt. 499. As Sierra explains in his response, the asserted errors reflect the ongoing quality control measures between Dr. Steblay's analysis in this case and her analysis in the *Iglesias* Guevara case, and regardless are so few in number compared with the total set of coded data that they would have no effect on Dr. Steblay's analysis. Dkt. 515.

151

22% of the time, and selected a filler less than 1% of the time (in only 4 instances in the entire dataset). PSOF ¶424. Moreover, 26% of identification procedures included multiple suspects, and 18% concerned a repeat identification procedure with the same suspect and witness. PSOF ¶424. In 77% of identification procedures, the witness did not know the perpetrator prior to the crime, and in 23% the perpetrator was familiar to the witness. PSOF ¶424.

In addition to making these observations, Dr. Steblay compared the results of Chicago identification procedures to 11 major peer-reviewed field studies which report lineup outcome data for live and photo identification procedures conducted by police in actual cases across varied jurisdictions, including Northern California, San Diego, Houston, Tucson, Austin, Charlotte, and London, England. PSOF ¶425. The 11 field studies report the frequencies of lineup outcomes—suspect/positive identifications, filler identifications, and non-identifications—for a total of 6,734 field lineups. PSOF ¶427. The aggregated field studies revealed that witnesses selected a suspect 40.8% of the time, a known-innocent filler 23.7% of the time, and no one 35.5% of the time. [46] PSOF ¶428.

Dr. Steblay then compared the Chicago data to the field studies.[47] PSOF ¶¶429-431. She observed that while in the field studies revealed witnesses selected suspects 40.8% of the time, in Chicago suspects were identified in 74% of lineups. PSOF ¶431. In field studies, witnesses identified no one 35.5% of the time, while in Chicago there was no identification in 26% of cases.

---

[46] The outcomes of each study are collected in Table 1 of Dr. Steblay's report. PSOF ¶425.

[47] To compare the Chicago data to the field data, Dr. Steblay had to make the two datasets as similar as possible. She determined the field data did not have lineups in which witnesses were already familiar with the perpetrator, multiple-suspect lineups, or lineups with repeated procedures. This determination was "favorable to the defense case" as the presence of unreported multiple-suspect lineups, familiar-suspect identifications, or repeated identifications would potentially inflate suspect ID rates. AS. Therefore, for the comparison, Dr. Steblay screened out from the Chicago data lineups in which witnesses were already familiar with the perpetrator, multiple-suspect lineups, and lineups that were repeated procedures with the same witness viewing the same suspect. In addition, removing these lineups from the Chicago data eliminated lineups more likely to obtain a suspect identification, reducing the suspect identification rate, and therefore giving the City the benefit of the doubt. Dr. Steblay thus limited her comparison analysis to Chicago lineups from unfamiliar-perpetrator, first viewing, single-suspect lineups. PSOF ¶¶.

PSOF ¶431. And in the field studies, witnesses picked a filler 23.7% of the time, while in Chicago that occurred less than 1% of the time. PSOF ¶431. Dr. Steblay opined that the difference between the field studies and Chicago's high suspect identification rate and low filler identification rate was statistically significant, and that there was less than a 1 in 100,000 chance that the difference could be explained by chance.[48] PSOF ¶432.

Dr. Steblay then analyzed why Chicago has a dramatically higher suspect identification rate and lower filler identification rate than other jurisdictions. Her analysis shows that the only explanation is that suspect identifications are fabricated using suggestive identification procedures. PSOF ¶¶434-441. Dr. Steblay identified all possible explanations for the elevated suspect identification rate in Chicago: (a) familiar perpetrator identifications (where the witness knows the suspect) (b) multiple suspect lineups, including those with too few fillers; (c) repeated identification procedures with the same suspect and witness; (d) a failure to report filler identifications; (e) biased lineups where the suspect stands out; (f) police showing the witness the suspect, in a photo or show-up, prior to the identification procedure; and (g) steering and suggestion where police direct the witness toward the suspect, whether overtly or covertly. PSOF ¶434.

Dr. Steblay eliminated explanations (a), (b) and (c) from the Chicago data that she compared to the field studies, as discussed above, *supra* at 152 n.47, and so those could not be the explanation for Chicago's significantly higher suspect identification rate. PSOF ¶435. Explanation (d)—that the City does not report filler identifications—is denied by the City and would violate its

---

[48] These conclusions are consistent with Steblay's findings in other cases. After Dr. Steblay wrote her report in *Sierra*, the City produced additional homicide files in *Bouto*, *Rodriguez*, and *Iglesias*. In her report in *Iglesias*, which analyzes all lineups conducted at Area Five between 1989 and 1998, Dr. Steblay concluded that the Chicago suspect identification rate (70 %) was statistically significantly higher than the aggregate field studies (41%). PSOF ¶¶ 444, 445.

written policies, and so that explanation can be eliminated.[49] That leaves fabrication of identifications using the improper techniques identified in explanations (e), (f), and (g)—lineups where the suspect is highlighted, preparing a witness in advance to identify a suspect, and steering witnesses—as the only explanation for Chicago's radically high suspect identification rate. PSOF ¶436.

In sum, the Chicago Police Department's identification procedures between 1991 and 1995 resulted in suspect identifications approximately 78% of the time overall, and 74% of the time in Dr. Steblay's comparison dataset (and never filler identifications). PSOF ¶424, 431. This is a remarkably significant departure from the results of identification procedures everywhere else. PSOF ¶¶431-433, 441. The only possible explanation for the rate is that Chicago police systematically fabricated identifications using overtly and covertly suggestive procedures. This comprehensive analysis of all of the lineups conducted in all homicide investigations at Area Five in the relevant time period is confirmed by Sierra's evidence of dozens of cases in which Guevara and others fabricated identifications for use in criminal proceedings. PSOF ¶¶546, 548, 549. Moreover, these fabricated identifications using suggestive techniques all occurred against the backdrop of City policymakers having notice of a serious risk of false identifications in identification procedures, but responding with deficient policies, training, and supervision on the subject of identification procedures. PSOF ¶¶398, 400, 404-414, 527-545. The jury in this case should hear that a careful analysis of Chicago's homicide files reveals that eyewitnesses in Chicago

---

[49] The theory here is that a total failure to record filler identifications *might* elevate the suspect identification rate because the set of filler identifications that one would expect to exist based on field studies is simply absent from the Chicago data. However, the City has contended that its police officers recorded filler identifications as non-identifications. PSOF ¶406. That fact is disputed, both by the City's own Rule 30(b)(6) witness and by Dr. Steblay. PSOF ¶406, XX. Moreover, recording filler identifications as non-identifications would itself present a risk of constitutional violations. *Rivera*, 319 F. Supp. 3d at 1067. Regardless, accepting the City's position for purposes of summary judgment only, not recording filler identifications is not the explanation for Chicago's elevated suspect identification rate.

nearly always pick the police officer's suspect and never select an innocent filler, contrary to eyewitness science and eyewitness behavior everywhere else.

Sierra has offered far more than enough evidence to establish the City's widespread practice of fabricating identifications using suggestive identification procedures.[50] That widespread practice presented the acute risk that fabricated identifications would be used in and would taint criminal proceedings, in violation of due process. "A city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *J.K.J.*, 960 F.3d at 378 (cleaned up). And Sierra presents evidence that, in fact, that risk came to pass, not only in his case, but also in many other homicide cases that were prosecuted based on fabricated identifications.

### 3. The City's Arguments for Summary Judgment on the Fabricated Identification *Monell* Theory Lack Merit

The City's remaining arguments for summary judgment on this theory lack merit. First, the City incorporates the Defendant Officers' argument that § 1983 claims regarding suggestive identification procedures are not cognizable, CB-10, which the Court should reject for the reasons discussed already, see Argument IV(D)(1)(b).

Second, the City contends that its policies and training governing identification procedures were sufficient to stop fabricated identifications. CB-10-11. But that is a theory that depends on rejecting the evidence set out above in favor of a reading of the City's limited policies and training materials that draws unreasonable inferences for the City, which the Court cannot do. *Tolan*, 572 U.S. at 656. Moreover, the City's argument that its policies were sufficient to stop fabricated

---

[50] The City asserts in a footnote, without explanation, that Sierra has not put forward evidence that identification procedures were not accurately documented. CB-9 n.2. But Sierra has demonstrated that the City policies and training did not require accurate documentation of lineups, and City Rule 30(b)(6) witnesses have admitted as much. See Argument V(G)(1) *supra*.

identifications obtained in suggestive identification procedures runs headfirst into the evidence that those fabricated identifications occurred routinely across all cases, a finding that the City does not meaningfully challenge in this case.

Third, the City again deploys the argument that only expert opinions support this theory, CB-11, which again ignores the other record evidence discussed above. Then, the City goes on to attack Dr. Steblay's expert opinions in summary terms, contending that they do not establish a widespread practice, rely on data prepared by Sierra's attorneys, and do not identify particular cases in which identifications were fabricated. CB-11-12. These arguments are addressed in rich detail in Sierra's response to the City's *Daubert* motion to exclude Dr. Steblay, which Sierra incorporates here. Dkt. 515 at 11-23, 23-26, 32-43.

Fourth, in a long passage the City takes issue with Dr. Steblay's discussion of the possible mechanisms that could cause the City's remarkably high suspect identification rate and absence of filler identifications. CB-13-17. To the extent that the City is challenging the reliability of Dr. Steblay's opinions, Sierra has responded to these arguments in his *Daubert* response. Dkt. 515 Otherwise, the City is merely disagreeing in its summary judgment motion with conclusions that Dr. Steblay has reached, which is nothing more than an effort to contest the facts at summary judgment, which the City cannot do as the moving party.[51] The City's assertions about the

---

[51] The City's discussion misstates and mischaracterizes Dr. Steblay's opinions in every respect: The City complains that an expert presenting "possible explanations" for a phenomenon does not create a dispute of fact, CB-13, which is both an inaccurate statement of what experts do and a misapprehension of Dr. Steblay's analysis, which identifies *all* possible explanations for the City's high suspect identification rate, and then explains why some of them cannot explain the high rate. The City also asserts that Sierra cannot contend that factors such as familiar perpetrators, multiple suspect identifications, and repeated identification procedures with the same suspect and witness caused the City's high identification rate because Dr. Steblay excluded those factors from the lineup dataset. CB-13-14. But Sierra *agrees* that they were excluded, and the City does not seem to recognize that the exclusion of all of those lineups from the dataset reduced the City's suspect identification rate by only a couple of percentage points, and also eliminated the more benign explanations that the City might have offered to explain the data. In addition, the City says that Dr. Steblay cannot account for whether Chicago lineups were conducted by non-blind administrators, CB-14, leaving out that its policies never called for blind administration of lineups, PSOF ¶404, and leaving out that this factual dispute has no bearing on Dr. Steblay's testimony or conclusions. Finally, the City asserts that some of Dr.

relevance of Dr. Steblay's opinions sets out what appears to be a weak cross-examination of Dr. Steblay for trial. Indeed, the whole section highlights disputes of fact, and there is no argument that the City has thereby established an *absence* of genuine disputes of material fact about whether Dr. Steblay's opinions support Sierra's widespread practice theory.

Fifth, the City asserts in two paragraphs that Sierra cannot proceed on this *Monell* theory because his evidence does not create a genuine dispute of material fact about whether the City was on notice and indifferent. CB-16-17. Not so. A persistent widespread pattern of behavior risking constitutional harm is itself notice to the municipality, *e.g.*, *J.K.J.*, 960 F.3d at 383, and the City's Rule 30(b)(6) witness admitted the City was on notice that if proper policies were not followed, it could result in false identifications or misidentifications, and that unduly suggestive identification procedures presented a risk of unreliability and the "abuse" of these processes. PSOF ¶¶398, 400. Yet the City did nothing to institute policies for photographic lineups, gang books, or photo books before Sierra's prosecution, and did nothing at all to account for situations where identification procedures went wrong, or to address its high rate of suspect identifications, at any time, from long before Sierra's prosecution to long after his conviction. PSOF ¶¶402-415, 527-545. That is enough to create a dispute of fact about the City's indifference. *J.K.J.*, 960 F.3d at 383.

Finally, the City asserts that Sierra cannot proceed with a failure to train argument relating to this theory. CB-17. But the City's earliest training manuals produced in this case on the subject of identification procedures are from 1996, PSOF ¶528, which is the year *after* the investigation at issue in this case. The City may contend that it trained its officers before that, but the proof presents a dispute of fact for trial.

---

Steblay's proffered explanations for the high suspect identification rate are irrelevant to the case— for example the contention that Chicago did not record filler identifications. CB-15-16. As discussed above, Sierra accepts for purposes of summary judgment that this is not the explanation for the City's high suspect identification rate, but that has no effect on his widespread practice theory.

At the end of the day, all of the evidence in the record firmly supports Sierra's *Monell* theory that the City had a widespread practice of fabricating identifications using suggestive identification techniques. Disputes of fact preclude summary judgment for the City.

**H.     The City's Remaining Arguments for Summary Judgment on the *Monell* Claims Lack Merit**

None of the City's more general arguments for summary judgment have merit, and so Sierra addresses them only briefly. The City argues that it cannot be liable under *Monell* if summary judgment is granted to the Defendant Officers on Sierra's constitutional claims. CB-6-8. It also argues that there is no dispute of fact about whether the City's official policies caused the violations of Sierra's constitutional rights. OB-50-52. Both arguments fail.

**1.   The City's Liability Does Not Necessarily Depend on Individual Liability**

The Court can disregard the argument that the City is not liable if no Defendant Officer is liable because the Defendant Officers do not move for summary judgment on all of Sierra's constitutional claims, and they are not entitled to summary judgment on any claim, for the reasons explained above. See Argument IV *supra*. Accordingly, this Court need not decide at this stage whether the City's liability depends on a finding of Defendant Officer liability.

Still, the City is incorrect that it cannot be liable unless a Defendant Officer is found liable. The Seventh Circuit's rule, set forth in *Thomas*, is that "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." 604 F.3d at 305 (emphases in original); see also *Swanigan v. Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) ("In some civil-rights cases, . . . a verdict in favor of individual defendants would not necessarily be inconsistent with a plaintiff's verdict on a factually distinct *Monell* claim."). Numerous judges in this district have applied this rule that a municipal policy can cause a constitutional deprivation even if a jury finds the individual officers not liable. See *Bonds*, 2018

158

WL 1316720, at \*4-5 (N.D. Ill. Mar. 14, 2018); *Pickett v. Dart*, 2014 WL919673 (N.D. Ill. Mar. 10, 2014); *Wells v. Coker*, 2014 WL 716518 (C.D. Ill. Feb. 25, 2014); *Martinez*, 2011 WL 4686438, at \*1; *Cage*, 2010 WL 3613981, at \*1; *Evans v. Chicago*, 2010 WL 3075651 (N.D. Ill. Aug. 5, 2010).

In the case of a theory of municipal liability that depends entirely on a particular officer's act of misconduct—e.g., a municipal policy of using excessive force where there was no excessive force used by any officer, as in *City of Los Angeles v. Heller*, 475 U.S. 706 (1986)—a *Monell* claim will fail if an individual defendant did not violate the Constitution. But that is not the case here. For example, a jury might find that the City's official policy of evidence suppression caused investigative information not to reach prosecutors, Sierra, and his attorneys—particularly given the game of hot potato that the Defendant Officers play about who fabricated and suppressed what evidence. In that case, a verdict against the City but for the Defendant Officers would not be inconsistent as a matter of law. The City argues that this theory depends on a finding of individual liability, CB-8, but that argument assumes facts in the Defendants' favor, which is not permissible. This Court should reject the City's argument that its liability depends on the Defendant Officers.

### 2. The City's Causation Argument Is Meritless

The City's causation argument also fails. A municipality's official policy "must be the direct cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs*, 368 F.3d 917, 927 (7th Cir. 2004) (cleaned up). In a case like this, where a plaintiff has put forth evidence of municipal action (or inaction) and deliberate indifference—here in the form of express policies and gaps in policies, widespread practices, actions of final policymakers, and failures to train, supervise, and discipline—the question whether municipal policies and practices caused the plaintiff's constitutional injuries must be resolved by a jury, like most other causation questions.

See, *e.g.*, *Thomas*, 604 F.3d at 303 (holding that the jury must make a factual determination about whether the evidence establishes that a widespread practice caused the alleged constitutional harm); *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017) ("As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury.").

In this case, there is no distance between the risks of harm presented by the City's official policies and practices—evidence suppression, fabricated identifications, and untrained and unsupervised police officers—and the particular constitutional injuries that Sierra suffered. A reasonable jury could conclude that the City's policies caused the violations of Sierra's constitutional rights, as many other courts have concluded in analogous circumstances. See, *e.g.*, *Godinez v. City of Chicago*, No. 16-CV-07344, 2019 WL 5597190, at *6 (N.D. Ill. Oct. 30, 2019) ("Plaintiff has pointed to a variety of evidence, in the form of the DOJ and PATF Reports, public officials' statements, expert testimony, other lawsuits, and evidence about CPD training and accountability that create a genuine issue of fact about the causal link between Godinez's death and CPD practices and the City's *Monell* liability. That is enough to survive summary judgment."); see also *Washington*, 2022 WL 4599708, at *18; *Hudson v. City of Chicago*, No. 16-CV-4452, 2019 WL 1112260, at *7 (N.D. Ill. Mar. 11, 2019); *Thomas*, 604 F.3d at 303; *Woodward*, 368 F.3d at 927; *LaPorta*, 277 F. Supp. 3d at 991.The City's arguments to the contrary, like the Defendant Officers arguments throughout their motion, "reflect[] a kind of self-hypnosis that no lawyer can afforded to practice in the summary judgment context— a view of the evidence through the lens of the Rule 56 movant rather than, as the Rule expressly mandates, that of the nonmovant[.]" *Escobedo v. Ram Shirdi*, No. 10 C 6598, 2013 WL 1787819, at *4 (N.D. Ill. Apr. 25, 2013). This Court should reject the City's arguments that depend on viewing the facts in the City's own favor.

## I. The *Respondeat Superior* and Indemnification Claims Survive Summary Judgment

Finally, the City asserts that it is entitled to judgment on Sierra's *respondeat superior* and indemnification claims, arguing these claims are derivative of others. Sierra's underlying claims survive, and so, too, should these derivative claims.

## CONCLUSION

Construing the record in the light most favorable to Sierra and drawing inferences in his favor, none of Defendants is entitled to summary judgment on any of the theories on which they have moved for summary judgment. Sierra is entitled to a trial against the City and the Defendant Officers on all of his claims, except on those to which Sierra is entitled to summary judgment. For all of these reasons, Defendants' motions for summary judgment should be denied.

RESPECTFULLY SUBMITTED,

**THOMAS SIERRA**

By: /s/ Steve Art
*One of Plaintiff's Attorneys*

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Meg Gould
Wallace Hilke
Ruth Brown
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

**CERTIFICATE OF SERVICE**

I, Steve Art, an attorney, hereby certify that, on March 15, 2024, I filed the foregoing PLAINTIFF'S THOMAS SIERRA'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTIONS using the Court's CM/ECF system, which effected service on all counsel of record.

 /s/ Steve Art            
*One of Plaintiff's Attorneys*

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Meg Gould
Wallace Hilke
Ruth Brown
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com