THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS SIERRA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 18 CV 3029 |
| | ) | Judge John Robert Blakey |
| REYNALDO GUEVARA, et. al. | ) | |
| | ) | |
| *Defendants.* | ) | |

**DEFENDANT GUEVARA AND CITY OF CHICAGO'S RESPONSE TO PLAINTIFF'S
LOCAL RULE 56.1 STATEMENT OF FACTS IN SUPPORT OF HIS CROSS MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff filed a Cross-Motion for Partial Summary Judgment against Defendant Guevara

and the City of Chicago (Dkts. 509, 510) and a Local Rule 56.1 Statement of Facts in Support.

(Dkt. 511). Defendant Guevara and City of Chicago, by their undersigned attorneys, hereby

collectively respond to Plaintiff's Rule 56.1 Statement of Facts in Support of His Cross-Motion

for Partial Summary Judgment[1], and states as follows.

**PART I
THE SHOOTING OF NOEL ANDUJAR[2]**

1.      On May 23, 1995, Noel Andujar was shot and killed in the Logan Square

neighborhood of Chicago. Supporting Evidence: Ex. A — May 24, 1995, Supplementary Report

at RFC-Sierra 137; Ex. B — May 24, 1995, Supplementary Report at RFC-Sierra 144-45.

---

[1] Defendants filed a Local Rule 56.1 Statement of Facts in Support of their Motion for Summary Judgment
(Dkts. 503, 505 (Guevara Joins)). Plaintiffs filed a response to Defendants' Local Rule 56.1(a)(3) Statement
of Facts (Dkts. 517, 518) and "Plaintiff's Statement of Disputed Facts." (Dkt. 519) Nearly all the facts
proffered in the Defendants Local Rule 56.1 Statement of Facts in support of Plaintiff's Cross-Motion for
Partial Summary Judgment were proffered in defense filings or agreed to by the parties. As a result,
Defendants reference those previous positions in this filing. To the extent that there is a remaining dispute
as to a particular fact, Defendants identify that in this filing.
[2] Defendants have not responded to any of the headings in Plaintiff's Statement of Facts, but to the extent
any response is needed to the headings, they are denied.

**RESPONSE:** Admit. *See,* Dkt. 503, ¶8.

2.    The shooting occurred at night, at 10:30 p.m. Supporting Evidence: Ex. A — May 24, 1995, Supplementary Report at RFC-Sierra 137.

**RESPONSE:** Admit. *See,* Dkt. 503, ¶8.

3.    The shooting occurred as Andujar was riding in the back seat of a car with his friends Jose Melendez, who was driving, and Alberto Rodriguez, who was in the front passenger seat. Supporting Evidence: Ex. A — May 24, 1995, Supplementary Report at RFC-Sierra 142 ("MELENDEZ was driving the auto with RODRIGUEZ in the passenger front seat, and the victim in the driver's side rear seat.").

**RESPONSE:** Admit. *See,* Dkt. 503, ¶11.

4.    As the three drove around the Illinois Centennial Monument in Logan Square, shots were fired from another car. Supporting Evidence: Ex. B —May 24, 1995, Supplementary Report at RFC-Sierra 143 (describing the shooting).

**RESPONSE:** Admit. *See,* Dkt. 503, ¶11.

5.    The shooter opened the passenger front door of a car with tinted windows, which was travelling to his left, reached around the door frame with a handgun, and began firing into the car in which Melendez, Andujar and Rodriguez were passengers. Supporting Evidence: Ex. B — May 24, 1995, Supplementary Report at RFC-Sierra 143 (describing the shooting); Ex. C — Jose Melendez Dep at 11:9-12, 14:8-20, 17:17-20, 20:12-13.

**RESPONSE:** Admit. *See,* Dkt. 503, ¶11.

6.    Melendez and Rodriguez immediately ducked down, and Melendez sped away. Supporting Evidence: Ex. C — Jose Melendez Dep at 22:17-20, 23:10-23; Ex. D — Alberto

Rodriguez Criminal Trial Testimony at E-104, E-131; Ex. E — Alberto Rodriguez Deposition in

*Johnson* at 38:3-7, 39:25-40:1-3.

**RESPONSE: Disputed. No evidence supports the conclusion that "Melendez and Rodriguez immediately ducked down," from which Plaintiff seeks to argue that Melendez and Rodriguez had no opportunity to view the occupants of the shooting car. Rather, Melendez told the passengers to duck down while he continued to drive, and Rodriguez ducked down *after* hearing shots. *See,* Dkt. 503, Ex. 11- Melendez Dep. at 22:17-20 ("...I told them just to like duck... so I told them just to duck and let me drive..."); Ex. 3 – Rodriguez Trial Testimony, E-104, ("After the shots were fired, I ducked my head down..."); E-131 ("After the two shots that rang out, yes [I ducked down]"; Ex. 62 – Rodriguez Dep. at 38:3-7 ("...when the shooting started, I ducked down."); at 39:25-40:1-3 ("[after the shooting stopped]... I was basically on the bottom of the front seat taking cover.")**

**Plaintiff alleges for the first time that "Melendez and Rodriguez immediately ducked down." *See,* Dkt. 519 at ¶33 "When the shooting started, Melendez immediately sped away. He exited the traffic circle and fled from Wrightwood to Kimball Avenue, while the shooter's vehicle continued on Wrightwood." and ¶34 "Even before the shooting started, Melendez told the passengers in the car—including Rodriguez—to duck." *See also,* Dkt. 503, ¶97 ("After the first two shots, Rodriguez ducked...").**

      7.     They stopped a couple of blocks down the street, discovered that Andujar had been struck in the head, and flagged down a Chicago Police Department (CPD) patrol car. Supporting Evidence: Ex. A — May 24, 1995, Supplementary Report at RFC-Sierra 143.

**RESPONSE: Admit. *See* Dkt. 503, ¶8.**

      8.     Melendez and Rodriguez had been smoking marijuana. Supporting Evidence: Ex. F — Melendez Deposition in *Rivera* at 66:14-19.

**RESPONSE: Admit. *See,* Dkt. 503, ¶92.**

**THE INITIAL DESCRIPTIONS AT THE SCENE**

      9.     Ken Trempe, Star #17443, and Luis Ortiz, Star #18531, were the first responding officers at the scene. Supporting Evidence: Ex. G — General Offense Case Report at RFC-Sierra 5.

**RESPONSE: Admit. *See,* Dkt. 503, ¶8.**

10.     At that time, Melendez and Rodriguez could provide only the most cursory description of the perpetrator. Melendez and Rodriguez said the shooter was a Latino male, but they could not estimate his age, height, weight, eye color, hair color, complexion, or any other identifying features. Supporting Evidence: Ex. G — General Offense Case Report at RFC-Sierra 5 (describing offender's height, weight, eye color, hair color, complexion, and any identifying features such as marks or scars as "unknown," and "NFD" [No Further Description]; Ex. H at 69:1-70:18, 71:11-73:7, 97:23-98:4 ("In general about this report, is it fair to say that the general offense case report reflects the fact that the two eyewitnesses, Melendez and Rodriguez, could provide hardly any description of the shooter in this case? A Yes, sir.")).

**RESPONSE:  Dispute, in part. The evidence does not support the conclusion that "they could provide only a cursory description" as later both provided a more detailed description of the shooter. *See,* Dkt. 503, Ex. 6, RFC-Sierra000138 (described shooter as "M/WH/18-22, lighter complexion, black hair pushed back, wearing a white hoodie.") Admit all other alleged facts**

11.     The same was true for the driver of the shooter car, a male Latino, and the backseat passenger, a Black male. Other than their race, Melendez and Rodriguez could provide no description. Supporting Evidence: Ex. G — General Offense Case Report at RFC-Sierra 5 (same); Ex. H — Ken Trempe Dep at 69:10-16 ("The witnesses had no further description other than two male – two Hispanics and a male Black").

**RESPONSE:  Dispute, in part.  The evidence does not support the conclusion that Melendez and Rodriguez "could provide no description," rather it supports that Melendez and Rodriguez could not provide any further description *at that time*—as both later provided a more detailed description. *See,* Dkt. 503, Ex. 6, RFC-Sierra000138 (described shooter as "M/WH/18-22, lighter complexion, black hair pushed back, wearing a white hoodie."). Admit all other facts.**

12.     Officer Trempe, the responding officer, testified that he obtained all possible details about the perpetrators from Melendez and Rodriguez at the scene. Supporting Evidence: Ex. H — Ken Trempe Dep at 67: 5-19, 63:16-19, 73:23-24, 74:1-2.

**RESPONSE:** **Admit.** *See,* **Dkt. 503, ¶9; (admitting to statement in report but disputing inference that these statements reflect Melendez and Rodriguez's ability to provide additional descriptive information later because Trempe testified that he had only a short conversation with each individual,** *See,* **Dkt. 503, Ex. 1 (Trempe Deposition), at 104:0-24.**

13.    If Trempe had been given any descriptive information by Melendez or Rodriguez, he would have included it in his report. Supporting Evidence: Ex. H — Ken Trempe Dep at 63:16-19 (Q: "[D]id you make it a practice to record all the information you were able to learn from witnesses into that general offense case report?" A: "I did."), 73:23-24, 74:1-2 (Q: "And you would have recorded on this document any of the descriptive details that [Melendez and Rodriguez] told you; isn't that correct sir? A: "Yes, sir.").

**RESPONSE:** **Admit.** *See,* **¶12 response.**

14.    Likewise, Melendez has made clear that the reason he could not describe the perpetrator is because Melendez had not had the opportunity to see his face. Supporting Evidence: Ex. C — Jose Melendez Dep at 23:24-24:1-8) (Q: "Did you ever get a good look at that shooter that would have let you make an identification of him later?" A: "No." and "Q: Importantly, sir, at any time that you were next to the car, did you see the shooter's face?" A: "Nah. I wasn't trying to – I ain't trying to look at no one. I'm trying to get away, man."); 49:2-9 ("I ain't never seen the shooter's face. I never seen the dude that shot him. . . ."), 118:18-24, 132:2-8 (testifying that the dark tinted windows made it impossible to see anything other than shapes in the shooter's car); Ex. I — Melendez Criminal Trial Testimony at SIERRA E-237-238.

**RESPONSE:** **Admit, in part.** *See,* **Dkt. 503; ¶14, Dkt. 519, ¶40 (Plaintiff disputes an admitted to fact). However, Melendez's prior signed statement, affirmed by ASA Farrell and his identifications of Sierra belie this later claim.** *See,* **Dkt. 503, Ex. 21. Farrell Dep. at 49:6-53:16; 54:11-24; 55-58:1; Ex. 18 – Handwritten Statement of Melendez.**

15.     At the scene, Melendez described the shooter car as "a dark blue or black Park Avenue Buick (plates unknown), with spoke wheels and tinted windows." Supporting Evidence: Ex. G — General Offense Case Report at RFC-Sierra 5.

**RESPONSE: Admit.** *See,* **Dkt. 503, ¶11; Dkt. 519, ¶41 (Plaintiff includes this fact in its Statement of "Disputed" Facts).**

16.     By spoke wheels, Melendez meant that they were custom rims. Supporting Evidence: Ex. C — Jose Melendez Dep at 118:18-24.

**RESPONSE: Admit, in part. Defendant admits that Melendez later explained what he claims to have meant to say at the time, however, Defendants dispute any inference that Melendez told officers at the time that the wheels were 'custom' as opposed to 'spoke.'** *See,* **Dkt. 503, Ex. 1 (Trempe Deposition) at 101:23-102:1 (Q: did the witnesses tell you that the car had custom rims? A: No, they did not.")**

17.     He further explained that the dark tinted windows made it impossible to see anything other than shapes inside the car. Ex. C — Jose Melendez Dep at 132:2-8 (testifying that the dark tinted windows made it impossible to see anything other than shapes in the shooter's car).

**RESPONSE: Disputed. Melendez did not testify that the "dark tinted windows made it impossible to see anything other than shapes inside the car." Rather, Melendez testified after impeachment that the tint on the windows was "just enough for [him] to see that there was somebody in the car."** *See,* **Dkt. 511, Ex. C—Jose Melendez Dep. at 132:2-8, ("Q: But you could still see things inside the car, correct? A: Yeah. You could see shapes. I mean you could see the shape of somebody in the car.")** *c.f.* **133:24—134:3 ("A: "you get [tints] too dark, you get—got a ticket. You know what I mean? I mean, like I can't—like I say, there were just enough for me to see that there was somebody in the car. I noticed them.")**

## GUEVARA AND HALVORSEN FABRICATE EVIDENCE TO WRONGLY CONVICT THOMAS SIERRA OF MURDER

18.     On May 24, 1995, Defendants Guevara and Halvorsen were assigned to the case. Supporting Evidence: Ex. J — May 30, 1995, Closing Report at RFC-Sierra 24.

**RESPONSE:  Admit.**

19.     A week later, on May 31, 1995, Thomas Sierra was charged with the murder of Noel Andujar. Supporting Evidence: Ex. J — May 30, 1995, Closing Report at RFC-Sierra 23, 28, 29.

**RESPONSE: Admit.**

20.     Guevara and Halvorsen did not write any police reports of their investigation until the night of May 30, after Thomas Sierra was in custody and had been purportedly identified by Melendez and Rodriguez. Supporting Evidence: Ex. K — May 30, 1995, Lineup Report at RFCSierra 15; Ex. J — May 30, 1995, Closing Report at RFC-Sierra 22, 26.

**RESPONSE: Disputed. The cited evidence does not support the conclusion that Guevara and Halvorsen did not write *any* police reports of their investigation until the night of May 30, or that the writing of the reports occurred only after Thomas Sierra was in custody and had been identified by Melendez and Rodriguez. There is no evidence establishing that the dates/time on the report indicate the time the report was initiated, rather than the time the report was completed and approved.**

21.     According to Detective Guevara, Thomas Sierra became a suspect in the Andujar murder because while Guevara was investigating an earlier May 20 shooting, on that same day he went to the home of the victim's mother, Esther Reyes, where he observed a black Buick Park Avenue that matched the description of the vehicle used in the Andujar shooting. Supporting Evidence: Ex. L — Reynaldo Guevara Criminal Trial Testimony at F-88:22-24, F 89:1-24, F 90:1-18; Ex. J – May 30, 1995, Closing Report at RFC-Sierra 24.

**RESPONSE:  Admit. *See*, Dkt. 503, ¶111; Dkt. 519, ¶174.**

22.     Although the Andujar shooting involving a black Buick Park Avenue would not occur for another three days, Guevara claims to have asked Esther Reyes who the men in the black Buick Park Avenue were, and learned that one of the occupants was Thomas Sierra. Supporting Evidence: Ex. L — Reynaldo Guevara Criminal Trial Testimony at F-94:10-24, F-95:2-8, F-97:19-24, F-98:1-24, F-99:1-15; Ex. J – May 30, 1995, Closing Report at RFC-Sierra 24.

**RESPONSE:** **Admit, in part. In addition, an accurate reading of the relied upon evidence dictates that simultaneously, Guevara and Halvorsen learned the other occupant was "Lil Hector."** *See,* **Dkt. 503, Ex. 9, May 30 Closing Report at RFC-SIERRA 000122; Ex. 8, Feb. 7 Trial testimony of Guevara at F94:21-F95:8.**

23. According to Guevara and Halvorsen's closing report, Thomas Sierra was arrested at 3:30 p.m. on the afternoon of May 30, 1995. Supporting Evidence: Ex. J — May 30, 1995, Closing Report at RFC-Sierra 23.

**RESPONSE: Admit.**

24. The report states that they contacted Jose Melendez at 5 p.m. and that he arrived at Area Five at 5:30 p.m. Supporting Evidence: Ex. J — May 30, 1995, Closing Report at RFCSierra 25.

**RESPONSE: Admit.**

25. According to the report, Melendez stated that he would only be able to identify the shooter, then identified Thomas Sierra as the shooter in a photo array. Supporting Evidence: Ex. J — May 30, 1995, Closing Report at RFC-Sierra 25.

**RESPONSE: Admit.**

26. The report states that Melendez identified a car in the parking lot at Area Five, which had been obtained by Guevara and Halverson, as the one used in the shooting. Supporting Evidence: Ex. J — May 30, 1995, Closing Report at RFC-Sierra 26.

**RESPONSE: Disputed, in part. The evidence does not support this statement. The dark Buick Park Avenue was not obtained by Guevara and Halverson.** *See,* **Dkt. 503: Ex. 9, RFC-Sierra 000124, ("GCSP J. Rodriguez and E. Wiora observed Montanez driving down the street. They stopped this car and determined that the driver was Jose Melendez… Jose Melendez stated that he had just traded cars with Hector Montanez that day. It was explained to Jose Melendez that this car may be involved in a murder investigation. Jose Melendez agreed to drive this car to Area Five."); Ex. 8 – Trans. Of Proc., 02/07/97; McMurray testimony at F55-F57. And, Defendants object to the inference that only Melendez identified the car as the one used in the shooting. The report cited by Plaintiff,** *see* **Dkt. 511, Ex. J, RFC-Sierra 26, indicates that "R/Dets. asked eye-witness Jose Melendez and Alberto Rodriguez to walk through this parking lot to see if the car involved in the shooting**

of Noel Andujar was present. They both identified the Black Buick Park Ave. VIN# 1G4cw69B8G1404621, as the car from which Thomas Sierra fired his gun." *See,* Dkt. 503, ¶34.

**Admit. The report states that Melendez and Rodriguez identified a car in the parking lot at Area Five.**

27.     Guevara and Halvorsen wrote a report stating that Melendez then identified Thomas Sierra as the shooter in a live lineup. Supporting Evidence: Ex. K — May 30, 1995, Lineup Report at RFC-Sierra 16; Ex. J — May 30, 1995, Closing Report at RFC-Sierra 25.

**RESPONSE: Admit.**

## SIERRA IS WRONGLY CONVICTED

28.     Melendez's two reported identifications of Sierra and his identification of the car were used to secure charges against Sierra. Supporting Evidence: Ex. J — May 30, 1995, Closing Report at RFC-Sierra 29.

**RESPONSE:  Admit, in part. Defendant admits that Melendez's identifications were included in the evidence analyzed to support charges against Sierra. Defendants object to any inference that Melendez's identifications were the *only* evidence used to secure charges against Sierra. There was significant evidence in support of charging Sierra, including Rodriguez's consistent identification of Sierra in a photo array and live lineup. *See,* Dkt. 503, Ex. 9 – 05/30/95 Supp. Report at RFC-Sierra 000123, Ex. 40 –Photo Array, Ex. 67 – Live Lineup Photo; Ex. 9 – 05/30/95 Supp. Report at RFC-Sierra 000124; Ex. 19 – Handwritten Statement of Rodriguez. Rodriguez also identified the Black Buick Park Ave, in the parking lot of Area 5, as the vehicle involved in the Andujar shooting. *See,* Dkt. 503, Ex. 17 – CCSAO File docs re: Montanez Car; Ex. 69 – Vehicle Photo. Further, Melendez's handwritten statement, confirmed by ASA Farrell in which Melendez indicated that he had not been threatened or promised anything in exchange for his statement and that the statement was true in which he identified Sierra in a photo array and a live line-up. *See,* Dkt. 503, Ex. 18 – Handwritten Statement of Melendez, Ex. 9 - 05/30/95 Supp. Report at RFC-Sierra000124. The descriptions of the shooter provided by Rodriguez and Melendez match Sierra. *See,* Dkt. 503, Ex. 2 – General Case Report; Ex. 6 – 05/24/95 Area 5 Violent Crimes Progress Report at 6-7. The seized Buick Park Avenue, which matched the description given by Rodriguez and Melendez. *See,* Dkt. 503, Ex. 6 – 05/24/95 Area 5 Violent Crimes Progress Report at RFC 000137-000138. That the Buick Park Avenue was registered to Montanez and which officers were told by an uninvolved party was traded by Montanez a day earlier. *See,* Dkt. 503, Ex. 9 – 05/30/95 Supp. Report at RFC-Sierra 000121 & 000125; Ex. 17 – CCSAO File docs re: Montanez Car; Ex. 69 – Vehicle Photo; Ex. 20 – Felony Review Folder.**

29.     At Sierra's criminal trial, Defendant Guevara testified that Melendez had twice identified Sierra and had identified the car. Supporting Evidence: Ex. L — Reynaldo Guevara Criminal Trial Testimony at F-104:7-14, 23-24, F-105:1-10, F-106:14-24, F-107:1-4, F-108: 6-24, F-109:1-15, F-111:21-24.

**RESPONSE: Admit.**

30.     Sierra was convicted and sentenced to 55 years in prison. Supporting Evidence: Ex. M — Trial Court Sentencing Testimony at G-29.

**RESPONSE: Admit.**

### SIERRA IS EXONERATED OR CERTIFIED INNOCENT

31.     On August 1, 2017, Sierra filed a post-conviction petition. Supporting Evidence: Ex. N — Third Supplement to Amended Petition for Post-Conviction Relief (Sierra 005144).

**RESPONSE: Admit.**

32.     By mutual agreement of the parties, on January 9, 2018, a state-court judge vacated Sierra's conviction. Supporting Evidence: Ex. O — People v. Thomas Sierra, 95 CR 18602 Dismissal Order.

**RESPONSE: Admit.**

33.     On February 10, 2022, a state-court judge granted Sierra a certificate of innocence. Supporting Evidence: Ex. P — Order Granting Certificate of Innocence.

**RESPONSE: Admit.**

### MELENDEZ NEVER IDENTIFIED SIERRA OR THE CAR

34.     In truth, Melendez did not identify the car in the Area Five parking lot as the one used in the shooting. Instead, he told Guevara that the car was not the one used in the shooting. Supporting Evidence: Ex. C — Jose Melendez Dep at 56:14-20, 57:19-21(Q: "Did you tell

10

Detective Guevara that was not the car used in the shooting?" A: "Yeah. I told him 'this ain't the car.'"), 68:22-24 (Q: "What did you actually tell Guevara in the parking lot?" A: "I told him that wasn't the car."), 239:4-12 ("I mean, like I told him, this ain't the car man.").

**RESPONSE:** Disputed. **The fact which underlies the Plaintiff's claim that Melendez did not identify the Buick Park Avenue at Area Five is one of the core factual disputes in this matter. There is a significant factual dispute regarding Melendez's recantation. Here, the police reports, Guevara's prior testimony at Plaintiff's trial, and the surrounding corroboration of Guevara's account, contradict Melendez's allegation that he did not identify the Buick Park Ave. at Area Five.**

**First, the police reports contradict Melendez's claim that he did not identify the dark Buick Park Avenue at Area Five.** *See,* **Dkt. 503, Ex. 9 – Supp. Reports, RFC-Sierra 000124 ("The R/Det. asked eye-witness Jose Melendez and Alberto Rodriguez to walk through this parking lot and see if the car involved in the shooting of Noel Andujar was present. They both identified the Black Buick Park Ave. VIN# 1G4cw69B8G1404621); Ex. 17 – Car Reg. Docs.**

**In addition, Guevara testified at Plaintiff's criminal trial contrary to Melendez's claim that he did not identify the Buick at Area Five.** *See,* **Dkt. 503, Ex. 8 – Trans. Of Proc., 02/07/97, Guevara testimony at F109-111; F131-135. ("At that point I asked both Rodriquez and Melendez to go downstairs to the parking lot with me, the front parking lot and to look through the parking lot to see if they see the car that they saw the night of the shooting…They walked up and down the aisle and when they came to the car they said this is the car that was used in the murder.")**

**Finally, significant corroboration supports Guevara's testimony regarding his interactions with Melendez. Melendez's signed statement identifying Sierra as the shooter, as confirmed by Assistant States Attorney (ASA) Farrell, corroborates Guevara's account with respect to his interactions with Melendez.** *See,* **Dkt. 503, Ex. 18 – Handwritten Statement of Melendez; Ex. 21, Farrell Dep. at 68:1-12, 19-24; 72:20 – 76:5; 243:11-16. That the car at Area Five matched the description Melendez initially provided in make, model and color, that the wheels were abnormally noticeable, and that there was tinting that could have been removed, even according to Melendez.** *See,* **Dkt. 503, Ex. 9 – Supp. Rpts. RFC-Sierra 000123 ("86, Buick, 4Dr, Black"); Ex. 17 – Car Reg. Records CCSAO 0245 ("86, Buck, Park Ave. 4 DR, BLK"); Ex. 11-Melendez Deposition 134:14-135:2 ("Q: But you can take [the tinting] off yourself, too, correct? A: I mean, you can probably take them off yourself, yeah.") And, that the registered owner of the vehicle was Hector Montanez, Sierra's fellow gang member.** *See,* **Dkt. 503, Ex. 9 – 05/30/95 Supp. Report at RFC 000121 & 000125; Ex. 12 Sierra Dep. at 43:16-24 (Montanez is Sierra's daughter's godfather); 44:9-11; Dkt. 503-1, Ex. 60 at 77:20-24 (Montanez sends Sierra money while Sierra is in custody). This evidence corroborates Guevara's account and establishes the credibility of Guevara's trial testimony and the police records.**

35.     In fact, the entire basis for connecting Sierra to the car—Guevara's claim that on May 20, 1995, at Esther Reyes's house, he had seen Sierra in a black Buick Park Avenue that matched the description of the vehicle involved in the Andujar shooting—was made up. Neither Thomas Sierra nor the other person Guevara claims to have seen in the car with him, Hector Montanez, went to Esther Reyes' house that day. Supporting Evidence: Ex. Q — Hector Montanez Dep at 88:15-25, 89:2-7; Ex. R — Thomas Sierra Dep at 47:24-48:10.

**RESPONSE:** **Objection. Admit, in part. Disputed, in part.**

**Objection. Guevara objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is argumentative ("In fact, the entire basis for connecting Sierra to the car..." *See Malec v. Sanford*, 191 F.R.D. 581, 583-84 (NDIL, March 8, 2000) (J. Castillo) ("Rule 56.1 filings should contain "only factual allegations;" "it is not the place for legal conclusions or "purely argumentative" responses). Further, Plaintiff's deposition does not support the claim that the encounter at Esther Reyes's house "was made up." In his deposition, Plaintiff only states that he has no memory of Hector Montanez having any vehicles other than a brown van. *See* Dkt. 511, Ex. R—Sierra Dep. at 47:24-48:10. This actually belies Sierra's credibility regarding this encounter because there is no dispute that Sierra and Montanez were friends and Montanez owned a dark Buick Park Avenue. *See,* Dkt. 503, Ex. 17 (Registration Records for dark Buick Park Avenue).**

**Admit, in part. Guevara admits that Montanez testified that he did not go to Esther Reyes' house.**

**Disputed. The encounter with Esther Reyes was not the only basis for connecting Sierra to the car. Officer McMurray, Gang Crime Specialists J. Rodriguez and E. Wiora seized a dark-blue Buick Park Avenue believed to be Hector Montanez's and matching the description provided by Rodriguez and Melendez, *See,* Dkt, 503, Ex. 9—Supp. Report, at RFC-Sierra 000124. The driver of the car, Jose Melendez stated that the car belonged to Hector Montanez and that Hector Montanez traded cars with him the day prior. *Id.* The car was, in fact, registered to Hector Montanez, *See,* Dkt. 503, Ex. 17, (Registration Records); Ex. 8 – Trans. of Proc., 02/07/97 McMurray Testimony at F55-F58; Ex. 9 – 05/30/95 Supp. Report RFC-Sierra 000121 & 000125. Sierra and Montanez were fellow gang members; *See,* Dkt. 503, Ex. 12 – Sierra Dep. at 43:16-24; 44:9-11; Ex. 60 – Montanez Dep. at 106:23-24; 107:3-5. Montanez told officers Sierra had shot Andujar, *See,* Dkt. 503, Ex. 9 – 05/30/95 Supp. Report; Ex. 8 – Trans. of Proc., 02/07/97; Guevara's testimony at F131-135; Ex. 21, Farrell Dep. at 68:1-12, 19-24; 72:20 – 76:5; 243:11-16; Ex. 20 – Felony Review Folder. And, Rodriguez had identified Sierra as the shooter, *See* Dkt. 503, Ex. 9 –Supp. Report at RFC-Sierra 000123. Ultimately, the jury will necessarily need to determine whether Sierra and Montanez claim that they never went to Esther Reyes's house is credible. The jury must also determine whether there is any "reasonable likelihood" that this evidence affected the**

**criminal trial jury's determination of Sierra's guilt. Evidence undercuts Sierra and Montanez's credibility and given all the other evidence presented—specifically the uncontested and consistent identification of Sierra by Rodriguez, a reasonable jury could find that the testimony did not have a "reasonable likelihood" of affecting the outcome of the criminal trial.**

36.     Melendez also did *not* identify Sierra as the perpetrator in a photo array. Supporting Evidence: Ex. S – Melendez Criminal Trial Testimony at SIERRA E-207("Q. And after [Guevara] showed you the photo array, did you point out a picture to that detective as to who shot Noel Andujar and you? A. I told [Guevara] I didn't see the person that shot."); Ex. C — Jose Melendez Dep at 45:8-13 (Q: "And after [Guevara] showed you the photo array, did you point out a picture to that detective as to who shot Noel Andujar and you?" A: "I told them that I didn't see the person that shot."), 67:3-4 ("I told [Guevara] I ain't seen nobody. I ain't seen the face of the shooter.").

**RESPONSE:  Disputed. That Melendez did not identify Sierra as the perpetrator in a photo array is in dispute. The police reports, corroborated by Melendez's handwritten statement and Guevara's testimony, and the other evidence connecting Sierra, as identified above in ¶35-36, will support a rational jury's determination that Melendez's recantation is not to be believed. *See,* Dkt. 503, Ex. 9 – Supp. Report; Ex. 20 – Felony Review Folder, Melendez's own statement as confirmed by ASA Farrell; *See,* Dkt. 503, Ex. 18 – Handwritten Statement of Melendez; Ex. 21 – Farrell Dep. at 49:6-53:16; 55-58:17, and Guevara's prior testimony contradict Melendez's claim. *See,* Dkt. 503, Ex. 8 – Trans. of Proc., 02/07/97 Guevara testimony at F131-132. Melendez's testimony at trial will be impeached by his prior sworn statement that he, in fact, identified Sierra in a photo array and failed to describe any undue influence by Guevara in that identification. *See,* Dkt. 503, Ex. 11 – Melendez Dep. at 41:18-42:7. Moreover, ASA Farrell will testify that Melendez identified Sierra and Melendez did not dispute the encounter and also affirmed that he was not coerced and no promises had been made. *See,* Dkt. 503, ¶36.  Finally, Melendez's testimony will be impeached by his admission at Plaintiff's criminal trial that he identified Sierra due to his own illicit motives and not because of Guevara. *See,* Dkt. 503, Ex. 3 – Trans. of Proc., 02/06/97 at E227. Finally, Guevara's trial testimony contradicts Melendez's later recantation. *See,* ¶36. Whether Melendez's testimony is to be believed regarding Guevara's influence on his identification of Sierra in a photo array is a matter for the trier of fact.**

37.     Instead, Guevara spoke alone with Melendez in an Area 5 interview room and showed Melendez a photo array in which he held Sierra's photo in his hand while the others were on the table. He instructed Melendez to select Sierra's photo, telling Melendez that Sierra was the

perpetrator. Supporting Evidence: Ex. T — Reynaldo Guevara Motion to Suppress Testimony at D-63 (Q: "When [Rodriguez and Melendez] arrived at Area 5, did you have an opportunity to speak with Mr. Jose Melendez alone?" A: "Yes, I did." Q: "Where did that occur?" A: "Interview room at Area 5." Q: "For what purpose?" A: "For the purpose of viewing a photo array and a lineup".); Ex. C — Jose Melendez Dep at 41:18-42:1 ("[Guevara] had some pictures on the table and also he had one in his hand."), 42:2-22 ("[H]e told me that—that he was the shooter, you know, he like "this guy shot your friend."), 43:18-44:1 ("He said 'this is the guy,' and that was it."); 44:24-46:7 (referencing criminal trial testimony: Q: "Did you point out a picture to the detective?" A: "I pointed a picture he told me to pick out."; and "[W]hen he showed me that picture, he said 'this is the shooter.'"); Ex. S – Melendez Criminal Trial Testimony at E207-208, 209, 210 ("I didn't identify the shooter. I picked the one he had in his hand. He told me he had reason to believe that was the one that did the shooting."), E-231.

**RESPONSE:** **Disputed, in part. Guevara does not dispute that he and Melendez were alone when Melendez was shown the photo array. However, Guevara disputes what Melendez claims happened during that encounter. *See,* Response to ¶34-36, incorporated herein.**

38.      Further, Melendez did not identify Sierra in a live lineup. In fact, he testified Guevara and Halvorsen never showed him a live lineup. Supporting Evidence: Ex. C — Jose Melendez Dep at 50:13-51:15 ("I ain't never looked at a—at an actual line-up. I looked at the photos that were there. He had some photos in front of me. I ain't never went in a station to point nobody out in no line-up or none of that stuff."), 235:11-14; Ex. S – Melendez Criminal Trial Testimony at E-212-213 ("I never went in front of a lineup").

**RESPONSE:** **Disputed. Melendez's later recantation that he did not view a live lineup is in dispute. Melendez's claim is contradicted by the police reports, his own handwritten statement as affirmed by ASA Farrell, Guevara's testimony and the corroboration surrounding Guevara's account. *See,* ¶¶34-36, incorporated herein.**

**DETECTIVES GUEVARA AND HALVORSEN DO NOT DENY THAT THEY**

## FABRICATED THE IDENTIFICATIONS

39.     When asked whether he framed Thomas Sierra, Detective Guevara invoked his Fifth Amendment right against self-incrimination. Supporting Evidence: Ex. U — Reynaldo Guevara Dep at 8:2-5.

**RESPONSE: Admit.**

40.     When asked whether he made up the claim that, several days before the crime, he had seen Thomas Sierra in a black Buick Park Avenue that matched the description of the car used in the Andujar shooting, Detective Guevara invoked his Fifth Amendment right against self-incrimination. Supporting Evidence: Ex. U — Reynaldo Guevara Dep at 43-46.

**RESPONSE:  Admit.**

41.     When asked whether he falsely claimed that Melendez had identified the car in the Area 5 parking lot as the one used in the shooting, when in fact Melendez had not, Detective Guevara invoked his Fifth Amendment right against self-incrimination. Supporting Evidence: Ex. U — Reynaldo Guevara Dep at 112:22-113:2, 113:18-114:1; 115:4-

**RESPONSE: Admit.**

42.     When asked whether, during the photo array, he pointed to Sierra's picture and told Melendez to pick Sierra, Detective Guevara invoked his Fifth Amendment right against self-incrimination. Supporting Evidence: Ex. U — Reynaldo Guevara Dep at 78:2-80:14; 82:1-7.

**RESPONSE: Admit.**

43.     When asked whether he made up the lineup identification of Sierra by Melendez, when in fact Melendez never viewed a lineup, Detective Guevara invoked his Fifth Amendment right against self-incrimination. Supporting Evidence: Ex. U — Reynaldo Guevara Dep at 94:19-95:18.

**RESPONSE:** Admit.

44. Detective Halvorsen, too, invoked his Fifth Amendment right against self-incrimination when asked whether he framed Thomas Sierra, whether they pointed out the photo of Sierra as the person Melendez should identify during the photo array, and whether they falsified the car identification when in fact Melendez had told them the car in the Area 5 parking lot was not the one the shooters were in. Supporting Evidence: Ex. V — Ernest Halvorsen Dep at 282:9-11, 283:1-2; 286:18-288:17.

**RESPONSE: Defendants admit that during his initial deposition in the matters of *Serrano/Montanez v. Guevara*, 17 cv 2869/4560 (N.D. Ill.), Defendant Halvorsen invoked his Fifth Amendment right in response to questions surrounding the Andujar homicide investigation, including whether he framed Thomas Sierra, whether he pointed out the photo of Sierra as the person Melendez should identify during the photo array and whether he falsified Melendez's car identification in the Area 5 parking lot.**

**Defendants further state Defendant Halvorsen later revoked his invocation of the Fifth Amendment, sat for a second deposition in the matters of *Serrano/Montanez v. Guevara*, 17 cv 2869/4560 (N.D. Ill.) and answered all questions asked of him but he was not asked any questions surrounding the Andujar homicide investigation or whether he had "made up" Rodriguez's photo array identification of Thomas Sierra. *See generally*, Dkt. 503, Ex. 65, Halvorsen Dep, 02/06/2019.**

**Defendants further state that Defendant Halvorsen has additionally denied all allegations of misconduct in his answers to Plaintiff's Complaint (Dkt. 78, Individual Defendants' Answer and Affirmative Defenses), Plaintiff's Amended Complaint (Dkt. 186, Individual Defendants' Answer and Affirmative Defenses to Plaintiff's Amended Complaint) and in his answers to Plaintiff's written interrogatories. (Dkt. 503, Ex. 66, Defendant Halvorsen's answers to Plaintiff's First Set of Interrogatories.) Defendant Halvorsen was not deposed in this matter prior to his death on January 26, 2020. (Dkt. 503, ¶¶5, 194.)**

## PART II
### *MONELL* THEORIES

45. One of Plaintiff's *Monell* theories in this case is that before, during, and after the events in this case, Defendant City of Chicago had an express policy of withholding or failing to disclose exculpatory or impeachment evidence. He contends that, during the Roman investigation, Defendants (among other things) suppressed evidence, including by refusing to document

investigative steps and by withholding documents and reports that would have shown that Plaintiff

was innocent and that could have been used to undermine the testimony of the State's witnesses.

He contends that the suppression and concealment of exculpatory evidence in his criminal case

was done pursuant to the City's official policy of suppressing investigative information in

homicide investigations. In support of this claim, Plaintiff relies on substantial evidence, including

the City's past litigation concerning this issue, written policies, testimony of the City's Rule

30(b)(6) designees, the homicide file in his case, the hundreds of additional Area 5 homicide files

produced in this case and in earlier litigation; the corresponding Cook County Public Defender

and Cook County State's Attorney's Office files in this case and in previous litigation; the City's

documentation, notetaking and file keeping policies, and lack thereof; and the qualitative and

quantitative findings in Plaintiff's expert report by Mr. Tiderington. Ex. W (Plaintiff's Supp. Resp.

to Def. City of Chicago's First Set of Interrog. to Plaintiff, Nos. 2 & 4) at 2-18; ECF No. 67 (First

Amend. Compl.) at ¶¶ 7, 148-49 (contending that Defendants deliberately withheld or suppressed

exculpatory evidence during their investigation that led to his wrongful conviction).

**RESPONSE:  Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) by including multiple allegations and to the extent it is argumentative.  *See Malec v. Sanford*, 191 F.R.D. 581, 583. ("[T]he numbered paragraphs should be short; they should contain only one or two individual allegations, thereby allowing easy response").**

**Subject to and without waiving these objections, Defendant City disputes it had an express or official policy of suppressing or withholding exculpatory or impeachment evidence.  *See,* City's Answer and Affirmative Defenses to Plaintiff's First Amended Complaint, Dkt. 187 at ¶¶82-92, 101-102, 161-172.  Responding further, Defendant City admits that Plaintiff has made the allegations contained within this paragraph, that Plaintiff's Supplemental Responses to Defendant City of Chicago's First Set of Interrogatories to Plaintiff repeats those claims, but without any evidentiary support (*see e.g.* Dkt. 519-5, Ex. 68 at Nos. 1 and 2) and that his expert makes "findings" in his report, which are contradicted by his deposition testimony (*See,* Defendant City of Chicago's *Daubert* Motion to Bar Opinions of Thomas J. Tiderington, at Dkt. 500 and Defendant's Statement of Fact Material Facts in Support of its Motion for Summary Judgment, at Dkt. 506 at ¶¶35-119) but denies any such policy existed, denies that Plaintiff has "evidence" to support this claim, and denies that the findings in Plaintiff's expert's report substantiate the**

claim. Plaintiff's expert has no idea whether any of the documents he claims were not turned over, were in fact given to the prosecutor by CPD, so his opinion that documents were systematically withheld lacks a valid basis. *See,* City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 33-35.

## NOTICE OF EVIDENCE SUPPRESSION

46.     In the early 1980s, City of Chicago final policymakers were made aware that police officers were engaged in an unconstitutional pattern of suppressing investigative materials through two cases: *Palmer v. City of Chicago* and *Jones v. City of Chicago.* In April 1982, Chicago officials, including Chicago Police Department Superintendent Richard Brzeczek, became aware of the circumstances of a 1981 homicide investigation that resulted in charges being brought against George Jones, and the unconstitutional evidence suppression practice that caused his wrongful prosecution. Ex. X (*Palmer v. City of Chicago*, 562 F. Supp. 1067, 1073 (N.D. Ill. 1983) (J. Shadur) (hereinafter "Shadur Order") (Brzeczek testified at hearing); Ex. Y (Hickey Dep. in *Rivera*) at 207:15-209:8, 83:21-84:4 (Brzeczek testified at injunction hearing); Ex. Z (2016 Hickey *Fields* Trial Testimony) at 11:9-23, 12:3-7 ("It is true that the City got put on notice that there was a problem with the way it was handling the topics I mentioned a minute ago, correct? A. Correct."); 19:13-22; Ex. AA (Winstrom Dep. in *Reyes*), at 159:5-23.

**RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record and is argumentative ("final policymakers," "unconstitutional pattern of suppressing investigative materials," "unconstitutional evidence suppression practice," "wrongful prosecution"). *See Malec*, 191 F.R.D. at 583. To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec*, 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")    The events described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by nearly fifteen years and describe events that pre-date the issuance of S.O. 83-1 which expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are**

preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved[]", as well as subsequent Special Orders and Standard Operating Procedures. *See* City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 21-23; City's 56.1(a)(3) SOF, Dkt. 506 at ¶¶ 13-18, 25-26. Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) by including multiple allegations. *See Malec,* 191 F.R.D. at 583 ("the numbered paragraphs should be short; they should contain only one or two individual allegations, thereby allowing easy response"). Defendant City further objects to the extent that this paragraph states a legal conclusion rather than a material fact. *See Tel-Lock, Inc. v. Thomson Consumer Electronics*, No. 03 C 320, 2005 WL 741930, at *2 (N.D. Ill Mar. 30, 2005). Finally, these facts are not supported by the record. *See Malec*, 191 F.R.D. at 583. Specifically, Plaintiff improperly relies on the March 31, 1983, Memorandum Opinion and Order issued by Judge Shadur in *Palmer v. City of Chicago,* No. 82 C 2349 (Dkt. 511-25, Ex. X) to establish "facts" recited in court opinions. Court opinions are hearsay. *See Taylor v. City of Chicago*, No. 09 C 5092, 2012 WL 669063, *1 (N.D. Ill. Feb. 29, 2012) (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)). Judge Shadur's order was vacated. *See Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983) *rev'd Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985) (*Palmer I*). Ultimately, the Seventh Circuit found that the class-plaintiffs failed to prove any systematic constitutional violations as a result of the City's street file practice and overruled the District Court's holdings. *Palmer v. City of Chicago,* 806 F.2d 1316, 1317, 1320-21 (7th Cir. 1986) (*Palmer II*) (emphasis added). Specifically, the Seventh Circuit found that the plaintiffs' claims "depends on there being exculpatory material in the street files – *and there isn't any*. The suit has been abandoned because it has been shown to have, in fact, no legal merit." *Id.* (emphasis added).

Subject to and without waiving these objections, this paragraph is disputed to the extent it lacks evidentiary support. Defendant City admits that Richard Brzeczek was the Superintendent for the Chicago Police Department from January 1980 – April 1983, and that he testified on or around April 20, 1982 at an injunction hearing in the *Palmer* litigation but denies that the cited testimony supports the assertion that 1) Brzeczek testified that he was a final policymaker for the City of Chicago, 2) he was made aware that police officers were engaged in an unconstitutional pattern of suppressing investigative materials, 3) he became aware of the circumstances of a 1981 homicide investigation that resulted in charges being brought against George Jones, and the unconstitutional evidence suppression or "street files" practice that caused his wrongful prosecution, and 4) that final policymakers for the City of Chicago were made aware of items 1), 2) and 3).

Responding further, Plaintiff accurately quotes James Hickey's testimony from the 2016 *Fields* trial, but Hickey's cited testimony does not support Plaintiff's propositions that 1) Brzeczek was a final policymaker for the City of Chicago, 2) Brzeczek was made aware that police officers were engaged in an unconstitutional pattern of suppressing investigative materials, 3) Brzeczek became aware of the circumstances of a 1981 homicide investigation that resulted in charges being brought against George Jones, and the unconstitutional street files practice that caused his wrongful prosecution, and 4) that final policymakers for the City of Chicago were made aware of items 1), 2) and 3).

Responding further, Winstrom's cited testimony does not support Plaintiff's propositions that 1) Brzeczek was a final policymaker for the City of Chicago, 2) Brzeczek was made aware that police officers were engaged in an unconstitutional pattern of suppressing investigative materials, 3) Brzeczek became aware of the circumstances of a 1981 homicide investigation that resulted in charges being brought against George Jones, and the unconstitutional street files practice that caused his wrongful prosecution, and 4) that final policymakers for the City of Chicago were made aware of items 1), 2) and 3).

In addition, the *Palmer* litigation, which Plaintiff cites as the basis for support of this "fact" was an unsuccessful class action lawsuit against the City of Chicago challenging the "constitutionality of the Chicago Police Department's alleged practice of concealing exculpatory material collected in criminal investigations and lodged in the department's informal 'street files.'" *Palmer v. City of Chicago,* 806 F.2d 1316, 1317 (7th Cir. 1986) (*Palmer II*). Ultimately, the Seventh Circuit found that the class-plaintiffs failed to prove any systematic constitutional violations as a result of the City's street file practice and overruled the District Court's holdings. *Id*. at 1320-21.

47. In *Jones*, a detective named Frank Laverty developed strong evidence that Jones could not have committed the murder. But, as stated by the Seventh Circuit, this evidence was placed "not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files." *Jones v. City of Chicago*, 856 F.2d 985, 995-96 (7th Cir. 1988). In the spring of 1982, Detective Laverty learned that Jones was on trial for the murder; he went to his Commander to tell him that an innocent person was being prosecuted, but his Commander took no action; and Laverty then informed Jones's criminal defense attorney about the information in the undisclosed file. The court declared a mistrial, and the State's Attorney dropped all charges against Jones. Jones then filed a civil lawsuit stemming from the withholding of important investigative information in an undisclosed file, resulting in his wrongful prosecution. His case resulted in a jury verdict finding a custom of maintaining documents with important investigative material that were withheld from the State's Attorney's Office and criminal defendants. *Jones*, 856 F.2d at 988; *see also* Ex. Y (Hickey Dep. in *Rivera*) at 61:3-23, 63:6-9, 67:9-68:3.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at**

the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") The events described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by nearly fifteen years and describe events that pre-date the issuance of S.O. 83-1 which expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved []", as well as subsequent Special Orders and Standard Operating Procedures. *See* City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 21-23; City's 56.1(a)(3) SOF, Dkt. 506, at ¶¶ 13-18, 25-26. Defendant City also objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) by including multiple allegations and because it is argumentative. *See Malec,* 191 F.R.D. at 583 ("the numbered paragraphs should be short; they should contain only one or two individual allegations, thereby allowing easy response"). Defendant City further objects to the extent that this paragraph states a legal conclusion rather than a material fact. *See Tel-Lock, Inc.,* 2005 WL 741930, at *2. Finally, this fact is not supported by the record. *See Malec*, 191 F.R.D. at 583. Specifically, Plaintiff's reliance on the Memorandum Opinion and Order issued in *Jones v. City of Chicago,* 856 F.2d 985, 995-96 (7th Cir. 1988) in support of a "fact" paragraph is improper as legal opinions are not "fact." Moreover, legal opinions and jury findings are hearsay. *See Taylor,* 2012 WL 669063, at *1 (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)); *Franklin v. Adkins*, No. 92-1765, 1993 WL 179221, at *5 (7th Cir. May 25, 1993) (finding that a jury's verdict is a hearsay statement); *Spinnenweber v. Laducer*, No. 2:14-CV-101-JEM, 2019 2019 WL 6649847 at *1 (N.D. Ind. Dec. 5, 2019) (finding a jury verdict makes the plaintiff whole and is not to send a message to the defendants or society at large).

Subject to and without waiving these objections, the City denies that the jury verdict in *Jones* was a "finding of a custom of maintaining documents with important investigative material that were withheld from the State's Attorney's Office and criminal defendants." Rather, the Seventh Circuit noted that, "Although the lawfulness of the street-files practice has never been adjudicated, the City, which has abandoned the practice, does not challenge the jury's implicit finding that it denied criminal defendants due process of law." *Jones v. Chicago,* 856 F.2d 985, 995 (7th Cir. 1988).

48.     In 1988, in *Jones v. City of Chicago*, 856 F. 2d 985 (7th Cir. 1988), the Seventh Circuit affirmed the jury verdict in favor of George Jones, including the finding that the City of Chicago had maintained an unconstitutional practice of evidence suppression, permitting detectives to keep important investigative information undisclosed to criminal defendants. The appellate decision included the following: (a) the case disclosed "frightening abuse of power by

21

members of the Chicago police force and unlawful conduct by the City itself"; (b) Laverty was

charged with a disciplinary infraction, "transferred out of the detective division, ostracized by his

fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police

recruits giving urine samples" while "none of the defendants has been disciplined for misconduct";

(c) there was "enough evidence to enable the jury to infer that [a Chicago Police Department

Commander, Lieutenant and Sergeant] had known . . . [and] had approved every false step"; and

(d) there was sufficient evidence against the City that the practice of evidence suppression existed,

caused Jones injuries, and was "consciously approved at the highest policymaking level." 856 F.

2d 985, at 988, 991, 993, 996.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") The events described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by nearly fifteen years and describe events that pre-date the issuance of S.O. 83-1 (the Jones prosecution occurred in 1982) which expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved." *See* City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 21-23; City's 56.1(a)(3) SOF, Dkt. 506 at ¶¶ 13-14. Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by admissible evidence, is argumentative and states a legal conclusion. *See Malec,* 191 F.R.D. at 583; *Tel-Lock, Inc.,* 2005 WL 741930, at \*2; *Taylor,* 2012 WL 669063, at \*1 (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)). Specifically, Plaintiff improperly relies on the jury's findings and the Seventh Circuit's opinion in *Jones v. City of Chicago,* to establish "facts". Court opinions and jury findings are hearsay. *Taylor,* 2012 WL 669063, at \*1; *Franklin v. Adkins*, No. 92-1765, 1993 WL 179221, at \*5 (7th Cir. May 25, 1993) (finding that a jury's verdict is a hearsay statement); *Spinnenweber v. Laducer,* No. 2:14-CV-101-JEM, 2019 2019 WL 6649847 at \*1 (N.D. Ind. Dec. 5, 2019) (finding a jury verdict makes the plaintiff whole and is not to send a message to the defendants or society at large).**

**Subject to and without waiving these objections, Defendant City admits in part and denies in part. The City admits that the Seventh Circuit affirmed the jury verdict in *Jones v. City of Chicago,* and that the Plaintiff has accurately included quotes from that opinion in this**

paragraph. **The City denies that the Seventh Circuit found that "the City of Chicago had maintained an unconstitutional practice of evidence suppression, permitting detectives to keep important investigative information undisclosed to criminal defendants." Rather, the Seventh Circuit noted that, "Although the lawfulness of the street-files practice has never been adjudicated, the City, which has abandoned the practice, does not challenge the jury's implicit finding that it denied criminal defendants due process of law." *Jones,* 856 F.2d at 995. Moreover, prior to the Seventh Circuit's decision in *Jones,* the Court had found that the class-plaintiffs in *Palmer v. City of Chicago,* failed to prove any systematic constitutional violations as a result of the City's street file practice. *Palmer II,* 806 F.2d at 1317, 1320-21. Specifically, the Seventh Circuit found that the class-plaintiffs' claims "depend[] on there being exculpatory material in the street files – *and there isn't any.* The suit has been abandoned because it has been shown to have, in fact, no legal merit." *Id.* (emphasis added).**

**Further answering, and for clarification, unlike *Jones v. City of Chicago,* Plaintiff has not produced evidence of any withheld file in this case.**

49.    In April 1982, shortly after the Laverty revelations about the non-disclosure of important investigative materials, a class action lawsuit called *Palmer v. City of Chicago* was filed to challenge the use of informal files to suppress investigative materials, and, days later, the Honorable Judge McMillen issued a temporary restraining order requiring the CPD to preserve all investigative materials not included in formal police files. Ex. X (Shadur Order) at 2. By September 1982, the action was transferred to the docket of the Honorable Milton Shadur, who thereafter granted a preliminary injunction on the matter. *Id.* at 1; Ex. Y (Hickey Dep. in *Rivera*) at 69:22-70:12; 79:21-80:6.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw,* 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") The events described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by nearly fifteen years and describe events that pre-date the issuance of S.O. 83-1 which expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved." (*See* City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 21-23; City's 56.1(a)(3) SOF, Dkt. 506 at ¶¶ 13-14).**

Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) by including multiple allegations and because it is argumentative. *See Malec*, 191 F.R.D. 581, 583 ("the numbered paragraphs should be short; they should contain only one or two individual allegations, thereby allowing easy response"). Defendant City further objects to the extent that this paragraph states a legal conclusion rather than a material fact. *See Tel-Lock, Inc.,* 2005 WL 741930, at *2. Further, this fact is not supported by the record. *See Malec*, 191 F.R.D. at 583. Specifically, Plaintiff improperly relies on the March 31, 1983, Memorandum Opinion and Order issued by Judge Shadur in *Palmer v. City of Chicago,* No. 82 C 2349 (Dkt. 511-25, Ex. X) to establish "facts" recited in court opinions. Court opinions are hearsay. *See Taylor,* 2012 WL 669063, at *1 (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)). Finally, Defendant City further objects to the extent that Plaintiff relies on depositions taken in unrelated litigation as they are not bates stamped with any of the bates stamp designations connected to this case. *See Johnson v. Obaisi*, No. 22-1620, 2023 WL 5950125, at *2, (7th Cir. Sept. 13, 2023) (Rule 56(c)(3) assigns the parties the duty to "cit[e] to particular parts of materials *in the record"* when asserting that genuine factual disputes foreclose summary judgment) (emphasis added).

Further answering, and for clarification, the *Palmer* litigation, which Plaintiff cites as the basis for support of this "fact" was a class action litigation filed under 42 U.S.C. §1983 on behalf of two subclasses of persons arrested by the Chicago Police Department and charged with felonies under Illinois law: (1) those convicted of criminal offenses and (2) those awaiting trial for certain offenses. On April 20, 1982, the Honorable Thomas McMillen issued a TRO, which provided, in part "Defendants shall preserve all police department investigative office or working files, sometimes known as 'street files,' together with all contents of such files ..." The parties agreed to continue the TRO beyond the 10-day limitation, and it remained in full force and effect while Judge Milton Shadur held hearings in October 1982 and January 1983. Judge Shadur's order was vacated. *See Palmer v. City of Chicago,* 562 F. Supp. 1067 (N.D. Ill. 1983) *rev'd Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985) (*Palmer I*). Ultimately, the Seventh Circuit found that the class-plaintiffs failed to prove any systematic constitutional violations as a result of the use of "informal files" or "street files" and overruled the District Court's holdings. *Palmer II,* 806 F.2d at 1320. Finally, the Haas affidavit states that the "objective" of plaintiffs' counsel in that case was "to establish that detectives in the Chicago Police Department maintained parallel files, separate and apart from the official file, in which they kept documents such as memos, notes, and other documents which were kept out of the official files." (Dkt. 519-12. Ex. 152 ¶ 4).

50. James Hickey authored the policies regarding the file disclosure policies for homicide investigations for the City of Chicago in 1983. Ex. BB (Hickey Dep. in *Fields*) at 50:12-16 ("I was the primary drafter of this order [83-1] on behalf of the chief of detectives."); Ex. Y (Hickey Dep. in *Rivera*) at 116:22-23 ("When 83-2 was generated you wrote it? A. I drafted it, yes.").

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") The policies described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by over ten years.**

**Subject to and without waiving these objections, admit.**

51.     Hickey was designated by the City of Chicago under Rule 30(b)(6) in subsequent litigation, including *Fields v. Chicago*, and *Rivera v. Chicago*. *See* Ex. BB (Hickey Dep. In *Fields*); Ex. Y (Hickey Dep. in *Rivera*, 5/6/14) at 47:21-48:18.

**RESPONSE: Defendant City admits that Hickey has been designated as a Rule 30(b)(6) witness in *Fields v. Chicago,* and *Rivera v. Chicago,* but clarifies that Hickey was designated to discuss certain topics as agreed upon between the parties in those cases and as outlined in the 30(b)(6) notice for each case. Specifically, in *Fields v. Chicago,* Hickey was designated to discuss certain policies and procedures that were in existence in 1984 and 1985 related to investigative files and the taking and maintaining of investigative notes. (*See,* Dkt. 511-29, Ex. BB, at 8:4-18.). In *Rivera v. City of Chicago,* he was designated to discuss the City's written and unwritten policies, practices and customs in effect from 1980-1990 related to several topics, including "the documentation and preservation of information learned during a homicide investigation." (*See,* Def's Ex. E, 30(b)(6) Notice from *Rivera v. City of Chicago*.).**

52.     In his capacity as the City's Rule 30(b)(6) witness, Hickey testified that (a) in light of *Palmer* and *Jones*, and as early as 1982, City policymakers knew they had a problem with the practice of evidence suppression and non-disclosure; (b) that he reviewed file disclosure practices across the department prior to 1983 and determined that the problem as citywide; (c) that the problem stemmed from a citywide practice of using a "decentralized" file system for homicide investigations, whereby investigative steps were being documented in informal notes and internal to-from memoranda between investigators, all of which were treated as the personal property of the investigators and were stored in parallel files; and (d) entire branches of an investigation, including investigation into alternate suspects, were not getting documented in official reports, and were instead sitting in memos and notes that were not disclosed and eventually destroyed. Ex. CC

(April 10, 2014 Hickey Testimony, *Fields v. City of Chicago*) at 2043:22-2044:11, 2044-2045:7;

2048:2- 2052:9; Ex. Y (Hickey Dep. in *Rivera*) at 222:11-22, 228:9-229:3.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).** *See Outlaw*, **259 F.3d at 837; s*ee* *also Malec,* **191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") The policies described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by nearly fifteen years and describe events that pre-date the issuance of S.O. 83-1 which expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved [ ]", as well as subsequent Special Orders and Standard Operating Procedures.** *See* **City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 21-23; City's 56.1(a)(3) SOF, Dkt. 506 at ¶¶ 13-18, 25-26. Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) by including multiple allegations and because it is argumentative ("evidence suppression and non-disclosure," "resulting from").** *See Malec,* **191 F.R.D. at 583 ("the numbered paragraphs should be short; they should contain only one or two individual allegations, thereby allowing easy response"). Defendant further objects because this paragraph is not supported by the record.** *See id*. **Finally, Defendant City objects to this paragraph as it includes a legal conclusion in violation of Local Rule 56.1(d).** *See Tel-Lock, Inc.,* **2005 WL 741930, at \*2 (the court struck portions of party's 56.1 that contained legal conclusions).**

**Subject to and without waiving these objections, disputed. The testimony cited does not support the assertions set forth in this paragraph. Specifically, the pages cited do not support that (1) "City policymakers knew they had a … problem with the practice of evidence suppression and non-disclosure" (2) that the problem was "city-wide;" (3) that the "problem" resulted from using a "decentralized" file system: and (4) that "entire branches of an investigation, including investigation into alternate suspects" were "not disclosed."**

**Hickey testified that around 1982 it was "publicly learned" that detectives considered their investigative notes in homicide cases to be their own personal property, but that was not in violation of any department policy.** *See,* **Dkt. 511-30, Ex. CC at 2043:22-2044:11. Hickey further testified that any information that a Chicago Police Department member has that would be of an exculpatory nature, should be preserved.** *See,* **Dkt. 511-26, Ex. Y at 65:20-24. Hickey further testified that "the detective kept the notes until such time as they prepared the supplementary report, at which time they destroyed their notes."** *See,* **Dkt. 511-31, Ex. DD at 94:14-20. Finally, he testified that he assisted in the drafting of Detective Division Special Order 83-1, because Superintendent Brzeczek wanted the practice of notes being destroyed to stop.** *See,* **Dkt. 511-30, Ex. CC at 2044:5-23.**

53.     As a result of the developments in *Jones* and *Palmer*, Hickey conducted an internal review of Chicago Police Department practices related to evidence suppression, the results of which he shared with senior Department officials including Chief of Detectives, William Hanhardt. Ex. Y (Hickey Dep. in *Rivera*) at 200-201, 223:5-225:13; Ex. CC (2014 Hickey *Fields* Trial Testimony) at 2049-2051.

**RESPONSE:  To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).  *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")  The policies and actions described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by over ten years and describe events that pre-date the issuance of S.O. 83-1 which expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved [ ]" as well as subsequent Special Orders and Standard Operating Procedures.  *See* City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 21-23; City's 56.1(a)(3) SOF, Dkt. 506 at ¶¶ 13-18, 25-26. Defendant City objects because this paragraph is not supported by the records cited.  *See Malec*, 191 F.R.D. at 583.**

**Subject to and without waiving these objections, the City denies in part and admits in part. Defendant City denies that the cited testimony supports that James Hickey testified that his internal review was related to practices related to "evidence suppression."  Defendant City admits that the cited testimony indicates that James Hickey, at the direction of Superintendent Brzeczek, was part of a team that conducted a review of the CPD practices throughout different detective divisions and "found various practices" and that each area did things "a little differently." (Dkt. 511-30, Ex. CC at 2049-2050).  Hickey further testified S.O. 83-1 was subsequently drafted to "implement the superintendent's direction to maintain or establish institutional control over [the] investigative files[]" so that notes would be the "work product of the Chicago Police Department."  (*Id.* at 2051:6-20).**

54.     Hickey found that there was a citywide practice of using a "decentralized" file system for homicide investigations, whereby investigative steps were being documented in informal notes and internal to-from memoranda between investigators, all of which were treated as the personal property of the investigators and were stored in parallel files that were not subject

to disclosure. The information in the memos and notes was not making it into official reports. In addition, official reports often were not written right away, and instead were written only once they had settled on a suspect, at which point investigators might consider alternate suspects and other evidence to be non-pertinent. As a result, entire branches of an investigation, including investigation into alternate suspects, were not getting documented in official reports, and were instead sitting in memos and notes that were not disclosed and eventually destroyed once an investigation was complete. Ex. Y (Hickey Dep. in *Rivera*) at 58:10-13, 72:3-15, 95:14-96:20, 204:3-21, 215:10-16:15, 219:9-221:6; Ex. CC (April 10, 2014 Hickey Testimony, *Fields v. City of Chicago*) at 2043:22-25; 2044-45, 2050-51, 2051:2-5; Ex. DD (Hickey Dep. in *Kluppelberg* (pt. 1), at 85-89, 94:14-20 ("Q. Generally speaking, what happened to a detective's notes prior to 1983? A. The detective kept the notes until such time as they prepared the supplementary report, at which time they destroyed their notes, threw them in the garbage can or whatever, including myself.").

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).** *See Outlaw***, 259 F.3d at 837; s*ee also Malec,* **191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") The actions described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by over ten years and describe events that pre-date the issuance of S.O. 83-1 (Hickey was describing the practice before the issuance of S.O. 83-1) which expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved [ ]", as well as subsequent Special Orders and Standard Operating Procedures.** *See* **City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 21-23; City's 56.1(a)(3) SOF, Dkt. 506 at ¶¶ 13-18, 25-26. Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) by including multiple allegations and because it is argumentative ("information in the memos and notes were not making it into official reports," "only once they had settled on a suspect").** *See Malec***, 191 F.R.D. at 583 ("the numbered paragraphs should be short; they should contain only one or two individual allegations, thereby allowing easy response"). Defendant further objects because this paragraph is not supported by the record.** *See id.* **Finally, Defendant City objects to this paragraph as it includes a legal conclusion in violation of Local Rule 56.1(d).** *See also Tel-*

*Lock, Inc.,* 2005 WL 741930, at *2 (the court struck portions of party's 56.1 that contained legal conclusions).

Subject to and without waiving these objections, Defendant City denies this paragraph accurately summarizes all of the testimony cited, or that any of the statements contained in this paragraph were "findings" made by Hickey. The cited testimony of James Hickey establishes that in 1982 "as an investigative unit, that had a decentralized structure [CPD] wanted to make sure that all detective areas were operating under the same guidelines." (Dkt. 519-5, Ex. 71 at 58:10-13). Hickey testified that he did not believe that detectives were keeping "personal files" but rather than they would use a working file," which he clearly stated was not going home with them. (Dkt. 511-27, Ex. Y at 73:6-20). Further, Hickey testified that "too often tracks of the investigation were not documented" stating that the "story of elimination [of a suspect] was not included in the official reports and sometimes was included in a memo." (Dkt. 511-27, Ex. Y at 95:14-96:20). He explained that too often, in 1982, detectives were not memorializing "the first branch of the investigation." (Dkt. 511-27, Ex. Y at 204:12-21). He gave the example that in an investigation "It turns out that the real offender was the person in the red hood and that person was identified and prosecuted. But when the – the final or any of the supplementary reports were prepared that aspect of the story was not included in the investigation. So it isn't wrong but it's – it's not a complete retelling of the investigation." (Dkt. 511-27, Ex. Y at 204:12-21).

55.     City officials were aware of resistance within the Police Department to changing the practice of keeping parallel, "personal" files not available to the criminal justice system, and of the risk of wrongful prosecutions and convictions if the policy of evidence suppression was not solved. *See infra* SOF 12-13.

RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") The actions described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by over ten years and describe events that pre-date the issuance of S.O. 83-1 which expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved [ ]", as well as subsequent Special Orders and Standard Operating Procedures. *See* City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 21-23; City's 56.1(a)(3) SOF, Dkt. 506 at ¶¶ 13-18, 25-26. Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record, it is argumentative ("risk of wrongful prosecutions and convictions") and because it includes a legal conclusion ("policy of evidence suppression").

*See Malec,* 191 F.R.D. at 583*; see also Tel-Lock, Inc.,* 2005 WL 741930, at *2 (the court struck portions of party's 56.1 that contained legal conclusions). The City further objects because this paragraph generically references subsequent fact paragraphs, which is improper. *See Schlessinger v. Chicago Housing Authority,* 130 F. Supp. 3d 1226, 1228 (N.D. Ill. 2015).

Finally, Defendant City objects because this paragraph is not supported by the record. Specifically, Plaintiff's reliance on the Memorandum Opinion and Order issued in *Palmer v. City of Chicago,* 562 F. Supp. 1067 (N.D. Ill. 1983) in support of a "fact" paragraph as legal opinions are not "fact" but are hearsay. *See Taylor v. City of Chicago,* 2012 WL 669063, at *1 (N.D. Ill. Feb. 29, 2012) (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).

Subject to and without waiving these objections, Defendant City denies the statements in this paragraph. Specifically, James Hickey testified in his 2014 deposition in *Rivera v. Guevara, et. al.,* that in 1982, there was confusion regarding the implementation of the general orders because previously "notes of detectives were never kept" and that earlier policy directives, specifically, 82-2 and 83-1 were not clear enough regarding the maintenance of notes. (Dkt. 511-27, Ex. Y at 72:9-73:4; 76:9-24). Nothing in his testimony supports the statement that there was a "practice of keeping parallel, 'personal' files not available to the criminal justice system" as alleged by Plaintiff or that there was "resistance within the Chicago Police Department to changing the practice," or that "City officials were aware of" any such resistance.

56.     Judge Shadur's April 1982 Order was amended in September 1982 when it was learned that detectives were circumventing the court's order, and Detective Division Notice 82-2 was issued by the Superintendent to preserve all notes. In addition, on March 31, 1983, Judge Shadur issued an order in which he found (a) CPD personnel were applying Detective Division Notice 82-2 "in an improperly restrictive and grudging manner under which detectives could consider their investigative writings as their personal property (and thus not under Detective Division control)"; (b) two Area Commanders interpreted the new directive so that detectives were still free to destroy their own investigative writings under the guise of "personal property"; (c) official reports were sometimes "prepared from the perspective of what fits the preparer's concept of the crime," thereby omitting "highly relevant and sometimes exculpatory" information that "the

preparer does not deem 'pertinent.'" Ex. X (Shadur Order) at 5-6, 13; Ex. Y (Hickey Dep. in

*Rivera*) at 72:9-73:4, 76:9-24, 203:19-204:21, 214:18-24.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).** *See Outlaw*, **259 F.3d at 837; s***ee also Malec,* **191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") The policies and actions described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by over ten years and describe events that pre-date the issuance of S.O. 83-1 which expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved [ ]", as well as subsequent Special Orders and Standard Operating Procedures.** *See* **City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 21-23; City's 56.1(a)(3) SOF, Dkt. 506 at ¶¶ 13-18, 25-26. Defendant City further objects to this paragraph as it is argumentative and states a legal conclusion (*i.e.* detectives were "circumventing the court's order") in violation of ND. Ill. L.R. 56.1(d).** *See Malec,* **191 F.R.D. at 583***; Tel-Lock, Inc.***, 2005 WL 741930, at \*2 (The court struck portions of party's 56.1 that contained legal conclusions). Defendant City further objects because this paragraph is not supported by the record. Specifically, Plaintiff improperly relies on the March 31, 1983, Memorandum Opinion and Order issued by Judge Shadur in** *Palmer v. City of Chicago,* **No. 82 C 2349 (Dkt. 511-25, Ex. X) to establish "facts" recited in court opinions. Court opinions are hearsay.** *See Taylor,* **2012 WL 669063, at \*1 (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).**

**Subject to and without waiving these objections, admit it part and denied in part. Defendant City admits that Judge Shadur issued an Order on March 31, 1983 that included the above findings, his opinion was overturned by the Seventh Circuit, concluding that the class-plaintiffs failed to prove any systematic constitutional violations as a result of the City's street file practice.** *Palmer v. City of Chicago,* **806 F.2d 1316, 1320 (7th Cir. 1986) (***Palmer II***). The City denies that the testimony cited supports that the "detectives were circumventing the court's order." Rather, James Hickey's testified that the thrust of the Special Order was "preservation," and that was understood. (Dkt. 511-31, Ex. DD at 220:12-19). He further testified that while there were questions that came up, and follow up regarding a genuine misunderstanding of whether or not notes should be included, that the order was discussed at "all the coffee tables[,] [i]t was the subject of staff meetings[,] and it was the subject of roll call training." (***Id.*** at 221:8-10). Finally, Hickey testified that while he was sure "there were some who voiced their opinions" those opinions mattered not, as this was the decision of the Court." (***Id.*** at 221:10-13).**

57.     City officials were aware at the time that the practice of evidence suppression and non-disclosure documented above resulted in wrongful prosecutions and convictions. Ex. Y (Hickey Dep. in *Rivera*) at 102:2-23, 205:18-206:12; Ex. Z (Hickey 2016 *Fields* Trial Testimony) at 12:3-13:20; *Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983) (finding that the failure to retain documents with investigative information "creates a serious potential of deprivation of defendants' constitutional rights," and that "[s]uch deprivations have in fact occurred in the past.").)

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec*, 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") The policies and actions described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by over ten years and describe events that pre-date the issuance of S.O. 83-1 which expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved [ ]", as well as subsequent Special Orders and Standard Operating Procedures. *See* City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 21-23; City's 56.1(a)(3) SOF, Dkt. 506 at ¶¶ 13-18, 25-26. Defendant City further objects to this paragraph as it is argumentative and states a legal conclusion (*i.e.*, that "City officials were aware at the time that the street files practice documented above resulted in wrongful prosecutions and convictions") in violation of N.D. Ill. L.R. 56.1(d). *See Malec*, 191 F.R.D. at 583; *Tel-Lock, Inc.*, 2005 WL 741930, at *2 (the court struck portions of party's 56.1 that contained legal conclusions). Defendant City further objects because this paragraph is not supported by the record. Specifically, Plaintiff's reliance on the Memorandum Opinion and Order issued in *Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983) in support of a "fact" paragraph as legal opinions are not "fact" but rather, legal opinions are hearsay. *See Taylor*, 2012 WL 669063, at *1 (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)). Moreover, the cited testimony of James Hickey does not provide an evidentiary basis for the contentions in this paragraph. Rather, Hickey testified that he was aware that "people not responsible for crime[s] have been found guilty by the criminal justice system." He further acknowledged that after the *Jones* litigation, the City became aware that there was a problem where "sometimes" information developed in the course of an investigation was not transferred into a report. (Dkt. 511-26, Ex. Y at 206:4-6; Dkt. 511-27, Ex. Z at 2014:1-4; 16-19).**

Further answering, while Judge Shadur's opinion stated that "any failure to retain unofficial reports creates a serious potential of deprivation of defendants' constitutional rights," *Palmer*, 562 F. Supp. at 1070, his opinion was overturned by the Seventh Circuit, concluding that the class-plaintiffs failed to prove any systematic constitutional violations as a result of the City's street file practice. *Palmer II*, 806 F.2d at 1320.

## POLICY OF WITHHOLDING EXCULPATORY EVIDENCE

58.     In April 1982, after a Temporary Restraining Order was issued in the *Palmer* litigation, CPD issued a teletype to commanding officers informing them of the TRO, as well as Detective Division Notice 82-2.94. *See* Ex. EE (S.O. 82-2 and Memo) at 4; Ex. DD (Hickey Dep. in *Kluppelberg*) at 201.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")   Notice 82-2, described in this paragraph, pre-dates the criminal investigation and prosecution of Plaintiff by over ten years and describe events that pre-date the issuance of S.O. 83-1 which expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved [  ]", as well as subsequent Special Orders and Standard Operating Procedures.  *See* City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 21-23; City's 56.1(a)(3) SOF, Dkt. 506 at ¶¶ 13-18, 25-26.**

**Subject to and without waiving these objections, admit.**

59.     CPD Rule 30(b)(6) designee Hickey explained that Notice 82-2 was "a quick and dirty document" designed to implement the TRO but was "not very workable." Ex. DD (Hickey Dep. in *Kluppelberg*) at 221-22, 224-25.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")   Notice 82-2, described in this paragraph, pre-dates the criminal investigation and prosecution of Plaintiff by over ten years**

and describes events that pre-date the issuance of S.O. 83-1 which expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved [ ]" *See* City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 21-23; City's 56.1(a)(3) SOF, Dkt. 506 at ¶¶ 13-18, 25-26. Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record. *See Malec,* 191 F.R.D. at 583.

Subject to and without waiving these objections, Defendant City admits that Hickey was designated as a Rule 30(b)(6) witness in *Kluppelberg v. Burge,* but clarifies that Hickey was designated to discuss certain topics as agreed upon between the parties in that case subject to the specific 30(b)(6) Notice. (Dkt. 511-31, Ex. DD at 4:10-5:1). Specifically, the City's policies, procedures and practices as they existed in 1984 and 1985 with respect to the creation of, use of, submission of and access to investigative case files. (Def's Ex. D, *Kluppelberg* 30(b)(6) Notice). Responding further, the City admits that Hickey testified that 82-2 was designed to implement the Court order, and was a "quick and dirty document" that "came out quickly." And while 82-2 was "not very workable," the thrust of the Special Order was "preservation," and that was understood. (Dkt. 511-31, Ex. DD at 220:12-19). He further testified that while there were questions that came up, and follow up regarding a genuine misunderstanding of whether or not notes should be included, that the order was discussed at "all the coffee tables[,] [i]t was the subject of staff meetings[,] and it was the subject of roll call training." (*Id.* at 221:8-10). Finally, Hickey testified that while he was sure "there were some who voiced their opinions" those opinions mattered not, as this was the decision of the Court." (*Id.* at 221:10-13).

60.     Notice 82-2 and the corresponding teletype did not require detectives to put notes or memos into a central repository, and it did not require detectives to preserve notes or memos that had not already been turned into a police file. Ex. EE (S.O. 82-2 and Memo) at 7; Ex. DD (Hickey Dep. in *Kluppelberg* ) at 212-13.

RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") Notice 82-2, described in this paragraph, pre-dates the criminal investigation and prosecution of Plaintiff by over 10 years and describes events that pre-date the issuance of S.O. 83-1 which expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible

innocence or aid in his defense is preserved [ ]", as well as subsequent Special Orders and Standard Operating Procedures. *See* City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 21-23; City's 56.1(a)(3) SOF, Dkt. 506 at ¶¶ 13-18, 25-26.

Subject to and without waiving these objections, Defendant City admits that Notice 82-2 did not require detectives, at that time, to keep notes that were not in the "Unit Investigative File" or to submit their notes for inclusion in the unit files. (Dkt. 519-6, Ex. 76 Hickey Dep. at 212:19-213:3). The City denies that Notice 82-2 did not require a central repository for notes or memos. (Dkt. 511-31, Ex. DD, Hickey Dep. at 212:4-7 (82-2 created the Unit Investigative File); Dkt. 511-32, Ex. EE; *see also generally,* City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at §III).

61. Notice 82-2 lacked procedures to gather or inventory notes, memos, or other documents, and did not require that detectives put notes or memos into unit investigative files, or even whether they had to preserve such notes not in the file. Ex. EE (S.O. 82-2 and Memo); Ex. DD (Hickey Dep. in *Kluppelberg*) at 161, 212-13; *see also* Ex. FF (Tiderington Report) at 47.

RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to Plaintiff's cross-motion for summary judgment, nor do they warrant granting Plaintiff's cross-motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec*, 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") Defendant City further objects to Plaintiff's reliance on Plaintiff's expert report to support a purported fact and summary judgment. *See Sommerfield*, 254 F.R.D. at 329 (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24).

Moroever, Notice 82-2, described in this paragraph, pre-dates the criminal investigation and prosecution of Plaintiff by over 10 years and describes events that pre-date the issuance of S.O. 83-1 which expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved [ ]" as well as subsequent Special Orders and Standard Operating Procedures. *See,* City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 21-23; Def. City's 56.1(a)(3) SOF, Dkt. 506 at ¶¶ 13-18, 25-26.

**Subject to and without waiving these objections, Defendant City admits that Notice 82-2 did not require detectives, at that time, to keep notes that were not in the unit files or to submit their notes for inclusion in the unit files.** *See,* **Dkt. 511-31, Ex. DD at 212:19-213:3. The City denies that Notice 82-2 did not require a central repository for notes or memos.** *See,* **Dkt. 511-31, Ex. DD at 212:4-7 (82-2 created the Unit Investigative File);** *see also,* **Dkt. 511-32, Ex. EE.**

62. Six months after Notice 82-2 went into effect, Commander Stibich testified that detectives continued to believe that their notes and memos were personal property, for personal use, and that they were not required to turn them into a department file, or even preserve them at all. Ex. X (Shadur Order), at 12. Commander Stibich acknowledged that "[w]hat's pertinent to one [detective] might not be to another." *Id*. at 6-7.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to Plaintiff's cross-motion for summary judgment, nor do they warrant granting Plaintiff's cross-motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).** *See Outlaw*, **259 F.3d at 837; s***ee also Malec*, **191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") Notice 82-2, described in this paragraph, pre-dates the criminal investigation and prosecution of Plaintiff by over ten years. Moreover, the events described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by over ten years and describe events that pre-date the issuance of S.O. 83-1 which expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved [ ]", as well as subsequent Special Orders and Standard Operating Procedures.** *See,* **City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 21-23; City's 56.1(a)(3) SOF, Dkt. 506 at ¶¶ 13-18, 25-26. Defendant City further objects because this fact is not supported by the record.** *See, Malec*, **191 F.R.D. at 583. Specifically, Plaintiff improperly relies on the March 31, 1983, Memorandum Opinion and Order issued by Judge Shadur in** *Palmer v. City of Chicago*, **No. 82 C 2349 (Dkt. 511-25, Ex. X) to establish "facts" recited in court opinions. Court opinions are hearsay.** *See, Taylor v. City of Chicago*, **2012 WL 669063, at \*1 (N.D. Ill. Feb. 29, 2012) (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22). Specifically, the "facts" that Plaintiff has set forth are not Commander Stibich's actual testimony, but rather Judge Shadur's summary of his testimony.**

**Further answering, and for clarification, the** *Palmer* **litigation, which Plaintiff cites in support of this "fact" was an** *unsuccessful* **class action lawsuit against the City of Chicago challenging the "constitutionality of the Chicago Police Department's alleged practice of concealing exculpatory material collected in criminal investigations and lodged in the**

department's informal 'street files.'" *Palmer v. City of Chicago,* 806 F.2d 1316, 1317 (7th Cir. 1986) (*Palmer II*).  Ultimately, the Seventh Circuit found that the class-plaintiffs failed to prove any systematic constitutional violations as a result of the City's street file practice and overruled the District Court's holdings. *Id.* at 1320.  Further, on appeal, the Seventh Circuit reversed Judge Shadur's decision, holding it was CPD's responsibility, as public officials, to draft policies and internal guidelines that incorporate the constitutional standard of preservation and assure criminal defendants the due process safeguard of a fair trial, noting that the Federal Courts have "no business, whatsoever, meddling in or attempting to control the daily maintenance and administration of the CPD and the Cook County State's Attorney's office, absent a clear and defined constitutional violation." *Palmer v. Chicago,* 755 F.2d. 560, 578 (7th Cir. 1985) (*Palmer I*).

63.    Judge Shadur found that Notice 82-2 responded to the TRO in "an improperly restrictive and grudging manner, under which detectives could consider their investigative writings as their personal property (and thus not 'under Detective Division control') and therefore outside the preservation requirements of Notice 82-2." Ex. X (Shadur Order) at 12.

**RESPONSE:  To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).  *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")   Notice 82-2, described in this paragraph, pre-dates the criminal investigation and prosecution of Plaintiff by over ten years and describes events that pre-date the issuance of S.O. 83-1 which expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved [ ]", as well as subsequent Special Orders and Standard Operating Procedures.  *See* City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 21-23; Def. City's 56.1(a)(3) SOF, Dkt. 506 at ¶¶ 13-18, 25-26. Defendant City further objects because this fact is not supported by the record.  *See Malec*, 191 F.R.D. at 583.   Specifically, Plaintiff improperly relies on the March 31, 1983, Memorandum Opinion and Order issued by Judge Shadur in *Palmer v. City of Chicago,* No. 82 C 2349 (Dkt. 511-25, Ex. X) to establish "facts" recited in court opinions.  Court opinions are hearsay.  *See Taylor*, 2012 WL 669063, at *1 (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).**

**Subject to and without waiving this objection, Defendant City admits that Judge Shadur's March 31, 1983 Order contains the quoted conclusion.  Responding further, and for clarification, the *Palmer* litigation, which Plaintiff cites as the basis for of support of this "fact" was an *unsuccessful* class action lawsuit against the City of Chicago challenging the**

37

"constitutionality of the Chicago Police Department's alleged practice of concealing exculpatory material collected in criminal investigations and lodged in the department's informal 'street files.'" *Palmer II*, 806 F.2d at 1317. Ultimately, the Seventh Circuit found that the class-plaintiffs failed to prove any systematic constitutional violations as a result of the City's street file practice and overruled the District Court's holdings. *Id.* at 1320. Further, on appeal, the Seventh Circuit reversed Judge Shadur's decision, holding it was CPD's responsibility, as public officials, to draft policies and internal guidelines that incorporate the constitutional standard of preservation and assure criminal defendants the due process safeguard of a fair trial, noting that the Federal Courts have "no business, whatsoever, meddling in or attempting to control the daily maintenance and administration of the CPD and the Cook County State's Attorney's office, absent a clear and defined constitutional violation." *Palmer I*, 755 F.2d. at 578.

64.     In January 1983, Special Order 83-1 replaced Detective Division Notice 82-2. It applied only to detectives assigned to Violent Crimes. Special Order 83-1 defined the term "Investigative File" and created something called an Investigative File Case Folder to secure documents relating to a criminal investigation. Special Order 83-1 also created an "Investigative File inventory sheet," to catalog all the documents placed in the Investigative File, that was to be forwarded to the Records Division when felony charges were approved. Special Order 83-1 also created General Progress Reports ("GPRs"). The GPR forms were to be used by detectives for taking handwritten notes or writing "to-from memos" to their colleagues. Ex. GG (S.O. 83-1); Ex. DD (Hickey Dep. in *Kluppelberg*) at 170:7-9; Ex. Y (Hickey Dep. in *Rivera* ) at 227; Ex. FF (Tiderington Report) at 48.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec*, 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") Defendant City further objects to Plaintiff's reliance on Plaintiff's expert report to support a purported fact and summary judgment. *See Sommerfield*, 254 F.R.D. at 329 (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24). Moreover, S.O.**

**83-1 described in this paragraph, pre-dates the criminal investigation and prosecution of Plaintiff by over ten years and was replaced by Detective Division Special Order 83-2. Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record.** *See Malec,* **191 F.R.D. at 583.**

**Subject to and without waiving these objections, Defendant City admits that in January 1983 Special Order 83-1 ("S.O. 83-1") replaced Detective Division Notice 82-2, and that the GPR form for note taking was created as part of 83-1. (Dkt. 519-6, Ex. 76 Hickey Dep. at 170:7-9). Responding further, the City admits that this paragraph accurately reflects certain portions of Special Order 83-1, which was designed to "institutionalize the control of all violent crime field investigation documents and files," but does not fully and accurately set forth S.O. 83-1. (Dkt. 511-34, Ex. GG). S.O. 83-1 applied to all within the Bureau of Investigative Services, which included detectives, sergeants, lieutenants, commanding officers and youth officers. (Dkt. 511-5, Ex. 26 at 54:22-55:9; 56:2-7). In addition, S.O. 83-1 described General Progress Reports as "designed to standardize the recording of handwritten notes and memoranda (the investigative-work product) including: inter-watch memoranda (whether handwritten or typewritten), witness or suspect interview notes, on-scene canvass notes, and any other handwritten personal notes normally generated by investigative detectives during the course of a violent crimes field investigation." (Dkt. 511-34, Ex. GG, S.O. 83-1 at § IV E; Def. City's 56.1(a)(3) SOF, Dtk. 506, at ¶¶ 13-17) (discussing S.O. 83-1 and S.O. 83-2, issued to build upon S.O. 83-1).**

65.     Special Order 83-1 created a requirement for detectives to place handwritten GPRs and other investigative materials in the investigative file. It also required detectives to fill out CPD case report forms, such as supplementary reports, documenting relevant information previously recorded on a GPR or other miscellaneous documents. Ex. GG (S.O. 83-1); Ex. FF (Tiderington Report) at 48-49.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).** *See Outlaw,* **259 F.3d at 837; s***ee also Malec,* **191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion." Defendant City further objects to Plaintiff's reliance on Plaintiff's expert report to support a purported fact and summary judgment.** *See Sommerfield,* **254 F.R.D. at 329 (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24). Moreover, S.O. 83-**

**1, described in this paragraph, pre-dates the criminal investigation and prosecution of Plaintiff by over ten years and was replaced by Detective Division Special Order 83-2.**

**Subject to and without waiving this objection, Defendant City admits that Special Order 83-1 provided "guidelines for the proper retention of official Department reports, notes, memoranda and miscellaneous documents of potential evidentiary value accumulated during the course of a particular violent crime field investigation." (Dkt. 511-34, Ex. GG, S.O. 83-1 § II A. "Purpose"; *see also* Def. City's 56.1(a)(3) SOF, Dkt. 506, at ¶¶ 13-17 (discussing S.O. 83-1 and S.O. 83-2, issued to build upon S.O. 83-1)).**

66.     Hickey considered S.O. 83-1 a "major change in the way notes were considered within the police department," yet acknowledged there was never a survey or audit about how its implementation went. Ex. CC (April 10, 2014 Hickey Testimony, *Fields v. City of Chicago*) at 2053:24-2054:1; Ex. BB (Hickey Dep. in *Fields*) at 43:1-4 ("Q. Was there anything done after the implementation of 83-1 to survey or to audit how the process was going, the new process? A. Not to my knowledge.").

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec*, 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") S.O. 83-1, described in this paragraph, pre-dates the criminal investigation and prosecution of Plaintiff by over ten years and was replaced by Detective Division Special Order 83-2. *See* Def. City's 56.1(a)(3) SOF, Dkt. 506, at ¶¶ 13-17 (discussing S.O. 83-1 and S.O. 83-2, issued to build upon S.O. 83-1).**

**Subject to and without waiving this objection, admit. Responding further and for clarification, Defendant states that upon its issuance, all members of the Bureau of Investigative Services participated in mandated training with respect to the special orders related to investigative files. (Dkt. 511-26, Ex. Y at 54:12-55:12). In addition to training, the order related to investigative files was discussed at "all the coffee tables[,] [i]t was the subject of staff meetings[,] and it was the subject of roll call training." (Dkt. 511-31, Ex. DD at 221:8-10).**

67.     Judge Shadur found Special Order 83-1 to be deficient, including for the following reasons: (1) there was no obligation to create an investigative case file folder until someone was arrested and charges were approved, leaving the risk of selective retention/disclosure during the

investigation; (2) it offered no guidance on what information a detective should deem "relevant" information to include in official reports, leaving discretion for detectives to withhold information on their subjective assessment of its relevance; (3) it failed to ensure that any detective receiving information related to an investigation not assumed to him will forward the information to the assigned detective, so that information is included in the investigative file folder; and (4) it omits any provision defining how the CPD responds to a subpoena or request to produce information related to a criminal proceeding. Ex. X (Shadur Order) at 16-17; Ex. FF (Tiderington Report) at 48-49.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to Plaintiff's cross-motion for summary judgment, nor do they warrant granting Plaintiff's cross-motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837;** s**ee also Malec**, 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")  Defendant City further objects to Plaintiff's reliance on Plaintiff's expert report to support a purported fact and summary judgment.  *See Sommerfield*, 254 F.R.D. at 329 (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403).  Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed.  (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24). Moreover, S.O. 83-1, described in this paragraph, pre-dates the criminal investigation and prosecution of Plaintiff by over ten years and was replaced by Detective Division Special Order 83-2. *See* Def. City's 56.1(a)(3) SOF, Dkt. 506, at ¶¶ 13-17 (discussing S.O. 83-1 and S.O. 83-2, issued to build upon S.O. 83-1).  Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record.  *See Malec,* 191 F.R.D. at 583.  Defendant City further objects as it is not supported by admissible evidence. Specifically, Plaintiff improperly relies on the March 31, 1983, Memorandum Opinion and Order issued by Judge Shadur in *Palmer v. City of Chicago,* No. 82 C 2349 (Dkt. 511-25, Ex. X) to establish "facts" recited in court opinions.  Court opinions are hearsay.  *See, Taylor v. City of Chicago,* 2012 WL 669063, at \*1 (N.D. Ill. Feb. 29, 2012) (Shadur, J)(A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).**

**Subject to and without waiving these objections, Defendant City admits that Judge Shadur found 83-1 to be "deficient" in certain respects, but denies that this paragraph fully articulates Judge Shadur's findings. *See,* Dkt. 511-25, Ex. X.**

Responding further, and for clarification, the *Palmer* litigation, which Plaintiff cites as the basis for support of this "fact" was an *unsuccessful* class action lawsuit against the City of Chicago challenging the "constitutionality of the Chicago Police Department's alleged practice of concealing exculpatory material collected in criminal investigations and lodged in the department's informal 'street files.'" *Palmer v. City of Chicago,* 806 F.2d 1316, 1317 (7th Cir. 1986) (*Palmer II*) (emphasis added). Ultimately the Seventh Circuit found that the class-plaintiffs failed to prove any systematic constitutional violations as a result of the City's street file practice and overruled the District Court's holdings. *Id.* at 1320. In addition, the Seventh Circuit reversed Judge Shadur's decision, holding it was CPD's responsibility, as public officials, to draft policies and internal guidelines that incorporate the constitutional standard of preservation and assure criminal defendants the due process safeguard of a fair trial, noting that the Federal Courts have "no business, whatsoever, meddling in or attempting to control the daily maintenance and administration of the CPD and the Cook County State's Attorney's office, absent a clear and defined constitutional violation." *Palmer v. Chicago,* 755 F.2d. 560, 578 (7th Cir. 1985) (*Palmer I*).

68.     Special Order 83-1 was replaced by Special Order 83-2 in May 1983. Exs. EE, GG (Special Orders 83-1, 83-2); Ex. Y (Hickey Dep. in *Rivera*) at 225, 227:7-229:6.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).** *See Outlaw***, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")** The policies described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by over ten years and were replaced by Detective Division Special Order 86-3, ("S.O. 86-3") in May 1986.**

**Subject to and without waiting these objections, admit.**

69.     Special Order 83-2 made a few changes: (1) to require detectives to create records reflecting all relevant information; (2) to require detectives to pass along information they receive about another crime to the detective investigating that other crime; (3) to transmit a copy of the investigative file inventory sheet to either the Office of Legal Affairs or State's Attorney's Office for its proper disclosure to criminal defendants; and (4) to create an Investigative File Control Card.. Ex. EE (S.O. 83-2); Ex. FF (Tiderington Report) at 49.

**RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is argumentative ("made a few changes").** *See Malec***, 191 F.R.D. at 583. To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's**

arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") S.O. 83-2, described in this paragraph, pre-dates the criminal investigation and prosecution of Plaintiff by over ten years and was replaced by S.O. 86-6 in May 1986. *See* Def. City's 56.1 SOF, Dkt. 506, at ¶¶ 17-18.

Defendant City further objects to Plaintiff's reliance on Plaintiff's expert report to support a purported fact and summary judgment. *See Sommerfield*, 254 F.R.D. at 329 (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24).

Subject to and without waiving these objections, Defendant City admits that Special Order 83-2 ("S.O. 83-2") included additional "guidelines for the proper retention of official Department reports, notes, memoranda and miscellaneous documents of potential evidentiary value accumulated during the course of a particular violent crime field investigation[]" but denies that this paragraph fully or accurately summarizes those guidelines, as the Responsibilities and Procedures Section of the Special Order spans two pages and includes multiple subparts. (Dkt. 511-38, Ex. KK, S.O. 83-2 "Responsibilities and Procedures" at §§ V(A)(1-4),(B)(1-6), (C)(1-4)). Responding further, the City admits, as it relates to the transmission of the Investigative File Inventory Sheet, that SO 83-2 states that "[w]henever a subpoena or discovery motion is received in any case", two copies of the Investigative File Inventory sheet is to be transmitted to the Office of Legal Affairs or the Cook County State's Attorney's Office. (*Id.* at § V(B)(6)).

70.     S.O. 83-2 still: (1) did not require a single repository for all investigative information maintained by a lead investigator; (2) applied only to detectives, and explicitly excluded from its directives all other officers involved in investigative major crimes; (3) provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed relevant, (4) provided no guidance about how information should be communicated or documented among detectives; (5) provided no policy directive or procedure to ensure production of investigative files; (6) relied on inventory sheets instead of actual file disclosures; and (7) lacked an audit/oversight mechanism. Ex. KK (S.O. 83- 2); Ex. DD (Hickey

Dep. in *Kluppelberg*) at 236-38; Ex. FF (Tiderington Report) at 49. The order contained one

instruction that only one thing from the investigative file needed to be disclosed: the inventory log.

Ex. HH (*Rivera* Trial Tr. 6/18/18) at 2247-2248, Ex. II (*Rivera* Trial Tr. 6/21/18) at 3229-3231.

**RESPONSE:** **Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d)
because it is argumentative (i.e., "still ... did not," "applied only," "provided no guidance,"
"provided no policy," "lacked,"). *See Malec*, 191 F.R.D. at 583. To the extent Plaintiff is
relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995
these facts are not material to Plaintiff's cross-motion for summary judgment, nor do they
warrant granting Plaintiff's cross-motion for summary judgment, and therefore does not
comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec*, 191 F.R.D.
at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the
summary judgment motion.") Defendant City further objects to Plaintiff's reliance on
Plaintiff's expert report to support a purported fact and summary judgment. *See
Sommerfield*, 254 F.R.D. at 329 (the cases generally hold that expert reports may not be
received in evidence without violating the hearsay rule or Rule 403). Further, Tiderington's
report is hearsay despite Plaintiff filing a sworn declaration which should be stricken,
because his declaration was filed after the City filed for summary judgment which was long
after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed. (Dkt. 519-5,
PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24). S.O. 83-2, described in
this paragraph, pre-dates the criminal investigation and prosecution of Plaintiff by over ten
years and was replaced by Detective Division Special Order 86-3 ("S.O. 86-3") in May 1986.
(*See* Def. City's 56.1 SOF, Dkt. 506, at ¶¶ 17-18).**

**Subject to and without waiving these objections, Defendant City disputes that
Plaintiff has accurately summarized the entirety of S.O. 83-2, which is a five page Detective
Division Special Order that included six separate and distinct sections and was "designed to
institutionalize the control of all violent crimes field investigation documents and files, which
may have been previously referred to as street files, working files, running files, or detective's
personal files and notes." *See,* Ex. 79. The City admits that Hickey was asked "Does 83-2 say
anything about what's supposed to go into a supplementary report?" To which he responded
"No, it does not. It talks about placing it in the Investigative Case Folder." *See,* Dkt. 511-31,
Ex. DD at 238:5-12. Responding further, S.O. 83-2 specifically stated that it was the "policy
of the Chicago Police Department to conduct all criminal investigations in an impartial and
objective manner and to maintain the integrity of its investigative files to ensure that the due
process rights of the accused are not compromised during the subject investigation, initial
court hearing or any subsequent review." *See,* Dkt. 511-38, Ex. KK at § III.**

71.     Special Order 86-3 replaced S.O. 83-2 in May 1986. It was substantively identical

to S.O. 83-2, except for the addition of an auditing provision. *Compare* Ex. KK (Special Order 83-

2) *with*; Ex. JJ (Special Order 86-3); Ex. Y (Hickey Dep. in *Rivera*) at 100:9-101:12, 227, 245-47, 249.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") The policies described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by nine years. Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record. *See Malec*, 191 F.R.D. at 583.**

**Subject to and without waiving these objections, Defendant City admits that Special Order 86-3 replaced S.O. 83-2 in May 1986 but denies that the two were "substantively identical." (*Compare*, Dkt. 511-38, Ex. KK, *with* Dkt. 511-37, Ex. JJ). Specifically, Special Order 86-3 includes additional language in Section IV: Responsibilities and Procedures, which acknowledged that homicide investigations, by their nature, generated a significant amount of documentation, and that in order to further ensure the integrity and completeness of the files, certain steps would be taken, as well as additional language related to the Homicide File Retention Schedule, which required that in cleared/closed cases, upon a disposition of guilty, the Investigative File Case folder would be sent to the Records Division for "post-conviction" retention. *Id.*; *see also* Def. City's 56.1 SOF, Dkt. 506, at ¶¶ 17-18.**

72. The modifications in S.O. 86-3 eliminated the requirement that the inventory sheet be forwarded to defense attorneys when a criminal subpoena or discovery motion was received and eliminated the requirement that handwritten notes or other investigative materials be submitted "promptly (normally at the end of each tour of duty)." *Compare* Ex. KK (Special Order 83-2) at 4 *with* Ex. JJ (Special Order 86-3); Ex. AA (Winstrom Dep) at 106-07; Ex. FF (Tiderington Report) at 49-50.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") The policies described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by nine years. Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record or admissible evidence. *See Malec*, 191 F.R.D. at 583.**

**Defendant City further objects to Plaintiff's reliance on Plaintiff's expert report to support a purported fact and summary judgment.** *See Sommerfield*, **254 F.R.D. at 329 (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24).**

**Subject to and without waiving these objections, Defendant City admits that Special Order 86-3 ("S.O. 86-3") replaced Special Order 83-2, but denies that Plaintiff has accurately summarized the changes in this paragraph.** (*Compare,* **Dkt. 511-38, Ex. KK,** *with* **Dkt. 511-37, Ex. JJ Specifically, S.O. 86-3 maintained the requirement that "all notes, memoranda, and miscellaneous documents of potential evidentiary value" be retained in the files, and further required detectives to "record and preserve relevant information as fully and accurately as possible during the course of their investigation; transcribe relevant information which initially had been recorded upon General Progress Reports, Major Incident Worksheets, and other miscellaneous investigative documents, on official department Case Report form[s] (Supplementary, General Offense, etc.), consistent with their Detective Division Unit format; and submit all handwritten notes and investigative documents generated or received to the Unit Supervisor for review and inclusion in the Investigative File Case Folder whenever an Investigative File Case Folder has been initiated." (Dkt. 511-37, Ex. JJ, S.O. 86-3 at §V(B)(1)-(2);** *see also* **Def. City's 56.1 SOF, Dkt. 506, at ¶¶ 17-18).**

73.     S.O. 86-3 still (1) did not require a single repository for all investigative information maintained by a lead investigator; (2) permitted detectives to maintain handwritten notes as personal files for longer periods of time, by removing the requirement of "prompt" documentation; (3) still provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed relevant; (4) and left defense attorneys with no mechanisms to determine whether their materials were complete without an inventory sheet. Ex. JJ (S.O. 86-3); Ex. AA (Winstrom Dep. in *Reyes*) at 98-99; Ex. FF (Tiderington Report) at 50-51.

**RESPONSE:  To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to Plaintiff's cross-motion for summary judgment, nor do they warrant granting Plaintiff's cross-motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).** *See Outlaw*, **259 F.3d at 837; s***ee also Malec***, 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")  The policies described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by nine years.**

S.O. 86-3, described in this paragraph, was replaced by Chapter 18 of the Detective Division Standard Operating Procedures in 1988. *See,* Dkt. 506 at ¶25. Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record and is argumentative. *See Malec*, 191 F.R.D. at 583. Defendant City further objects to Plaintiff's reliance on Plaintiff's expert report to support a purported fact and summary judgment. *See Sommerfield*, 254 F.R.D. at 329 (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24).

Subject to and without waiving these objections, Defendant City disputes this paragraph and denies that Plaintiff has fully or accurately summarized S.O. 86-3. Special Order 86-3 clearly stated that it was "the policy of the Chicago Police Department to conduct all criminal investigations in an impartial and objective manner and to maintain the integrity of its investigative files *to ensure that the due process rights of the accused are not compromised during an investigation, initial court hearing or any subsequent review.* Additionally, it is the policy of the Chicago Police Department to record and preserve information obtained by any Department member during the course of an investigation. When assigned to an investigation, Division members will preserve and record information and materials obtained in the course of the investigation to ensure not only that the information and material incriminating the accused are preserved, but that information and material which might aid in the defense of the accused are preserved as well." *See,* Dkt. 511-37, Ex. JJ, S.O. 86-3 at "Policy" § II (emphasis added). Responding further, Commander Winstrom disagreed that S.O. 86-3 did not provide specific guidance about what information was to be included in supplementary reports, specifically pointing to Section (C)(1) of S.O. 86-3. *See,* Dkt. 511-28, Ex. AA at 98:13-24 Further, the City denies S.O. 86-3 "contained only one express instruction that only one thing from the investigative file needed to be disclosed: the inventory log" as the cited testimony does not support this assertion.

74.    In 1988, Standard Operating Procedures (SOP) were created to govern the work of detectives. Chapter 18 of the SOP, the relevant portion of the new SOPs dealing with the documentation and disclosure of investigative information, contains "no substantive changes of any kind" from S.O. 86-3. Ex. JJ (Hickey Dep. in *Rivera*) at 249:19-251:5; Ex. AA (Winstrom Dep) at 125:5-126:7 ("Q. And would you agree with me that looking at the [SOP] policy here, it is basically the same policy as what is contained in [S.O.] 86-3? A. I agree."), 208-210.

RESPONSE: Admit; *see also* Def. City's 56.1 SOF, Dkt. 506, at ¶¶ 25-26.

### THE CITY'S ADMISSIONS REGARDING POLICY DEFICIENCIES

75.     Despite an auditing requirement added to Special Order 86-3, the City's designated representatives were unaware of a single instance of such auditing ever taking place, or of any document in existence indicating that someone had done the type of inspection required by S.O. 86-3. Ex. Y (Hickey Dep. in *Rivera*) at 178:4-13, 244-45, 249:11-17; Ex. AA (Winstrom Dep.) at 208-210, 120-121; Ex. Z (Hickey *Fields* Testimony) at 43:1-4.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).** *See Outlaw,* **259 F.3d at 837; s*ee* *also Malec,* **191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")** **The policies described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by nine years. S.O. 86-3, described in this paragraph, was replaced by Chapter 18 of the Detective Division Standard Operating Procedures in 1988. (Dkt. 506 at ¶25). Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record and is argumentative ("despite an auditing requirement").** *See Malec***, 191 F.R.D. at 583; s*ee* *also Uncommon, LLC v. Spigen, Inc.,* **305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (Blakey, J.) (statements of fact should not contain legal argument),** *aff'd***, 926 F.3d 409 (7th Cir. 2019) (responses to the opposing party's statement of facts are not the place for "purely argumentative details" or "legal conclusions.")**

**Subject to and without waiving these objections, denied. James Hickey testified in his 2014 deposition in** *Rivera v. Guevara, et. al.,* **that in 1983 after the promulgation of 83-1, he did not know of a special audit procedure that was implemented, but "for every directive and even for things that we don't have directives, it's a function of a supervisor, it's a responsibility ever[y] supervisors to make sure the employees, the members of the Chicago Police Department are doing their job and following the department directives." (Dkt. 511-26, Ex. Y at 244:5-19). Though James Hickey testified that as a supervisor of the subpoena services unit he did not direct a special audit, retired Commander Philip Cline testified that he conducted multiple audits of the files when he was a Lieutenant at Area 2. (Dkt. 511-26, Ex. Y at 178:4-13; Def's Ex. G, Deposition of Philip Cline at 42:24-43:6).  Further answering, Commander Cline testified that "a supervisor would go through the file and make sure that the – the proper reports were in there, that the GPRs were approved, everything that – to get these files ready for court or continue the investigation of an unsolved crime." These audits were both "regular check-ins to make sure the files were as they were supposed to be** *and* **were specific to assessing compliance with the policy change. (***Id.* **at 43:16-20).**

76.     Detectives were not disciplined for failure to comply with the new Special Orders.

Ex. Y (Hickey Dep. in *Rivera*) at 178:15-179:2, 187:6-10; Ex. BB (Hickey *Fields* Dep) at 10:12-

22.  Hickey testified that he had no knowledge whether, after the implementation of S.O. 83-1, there was anything done to survey or audit the implementation of the policy. Ex. BB, Hickey *Fields* Dep. at 43:1-4.

**RESPONSE:  To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).  *See Outlaw,* 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")  Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record.  *See Malec*, 191 F.R.D. at 583.**

**Subject to and without waiving these objections, Defendant City denies.  James Hickey testified as 30(b)(6) witnesses in *Rivera v. City of Chicago* and *Fields v. City of Chicago* and was designated to discuss "the documentation and preservation of information learned during a homicide investigation."  (Def's Ex. E, 30(b)(6) Notice from *Rivera v. City of Chicago;* Def's Ex. F 30(b)(6) Notice from *Fields v. City of Chicago*).  He was not disclosed to provide 30(b)(6) testimony addressing discipline.  *Id.*  Rather, at his deposition Hickey was asked whether any "clerk or sergeant within the subpoena services unit" or "anyone in the police department" had ever been subject to "discipline of any kind for negligence or other failure to provide all responsive documents in response to subpoenas or other requests for information."  To which he responded that he was not aware of any discipline regarding "these personnel."  (Dkt. 511-26, Ex. Y at 178:15-179:2, 187:6-10).  He further testified that the punishment for failure to follow special orders could be "reprimand, all the way up to a worst-case scenario, a Complaint Register number."  (Dkt. 511-29, Ex. BB at 10:21-11:3). Denying further, James Hickey testified in his 2014 deposition in *Rivera v. Guevara, et. al.,* that in 1983 after the promulgation of 83-1, he did not know of a special audit procedure that was implemented, but "for every directive and even for things that we don't have directives, it's a function of a supervisor, it's a responsibility ever[y] supervisors to make sure the employees, the members of the Chicago Police Department are doing their job and following the department directives."  (Dkt. 511-26, Ex. Y at 244:5-19).  Although James Hickey testified that as a supervisor of the subpoena services unit that he did not direct a special audit, retired Commander Philip Cline testified that he conducted multiple audits of the files when he was a Lieutenant at Area 2.  (Dkt. 511-26, Ex. Y at 178:4-13; Def's Ex. G, Deposition of Philip Cline at 42:24-43:6).  Further answering, Commander Cline testified that "a supervisor would go through the file and make sure that the – the proper reports were in there, that the GPRs were approved, everything that – to get these files ready for court or continue the investigation of an unsolved crime."  These audits were both "regular check-ins to make sure the files were as they were supposed to be *and* were specific to assessing compliance with the policy change.  (*Id.* at 43:16-20).**

77.     Hickey admitted that he did not know if every detective followed S.O. 86-3. Ex. Z

(Hickey *Fields* Testimony) at 37:13-20.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).  *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")  The policies described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by nine years. S.O. 86-3, described in this paragraph, was replaced by Chapter 18 of the Detective Division Standard Operating Procedures in 1988.  (Dkt. 506 at ¶25).  Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record.  *See Malec*, 191 F.R.D. at 583.**

**Subject to and without waiving these objections, the City admits that Hickey testified as to his personal knowledge on whether he knew if every detective immediately followed S.O. 86-3.  Responding further, and for clarification, in *Fields v. Chicago,* Hickey was designated to discuss certain policies and procedures that were in existence in 1984 and 1985 related to investigative files and the taking and maintaining of investigative notes.  (Dkt. 511-29, Ex. BB at 8:4-18).  He was asked "Although that was the policy you wrote and it was on the books, you don't have a foundation to say that every detective immediately changed their practices, do you."  To which he responded, "Of course, I don't know if every detective followed it."  (Dkt. 511-27, Ex. Z at 37:37:13-20).**

78.     Despite Judge Shadur's guidance regarding the deficiencies in the CPD policies, CPD never included a statement or directive in its policy to produce the entire contents of the investigative files, including the newly created General Progress Reports. Instead, the Special Orders contained only an instruction to forward a copy of the inventory sheet to the CPD's Record Division, without ever stating that the actual police reports in the files must be disclosed to prosecutors and criminal defendants. *See, e.g.*, Ex. JJ (S.O. 86-3) (lacking any instruction to disclose entire investigative file and/or all supplementary reports and general progress reports to prosecutors and/or criminal defendants); Ex. GG (S.O. 83-1) (same); Ex. AA (Winstrom Dep.) at 106:7-14, 20-24 ("Q. Is there some document that -- is there some other policy document that says,

copy the entire investigative file and distribute this file in response to subpoenas? A. Policy

document? Not that I'm aware of, no."), 107:21-24; Ex. FF (Tiderington Report) at 47.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).** *See Outlaw*, **259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record and is argumentative ("Despite Judge Shadur's guidance regarding the deficiencies in the CPD policies, CPD never," "Instead, the Special Orders contained only").** *See Malec,* **191 F.R.D. at 583; *see also Uncommon, LLC v. Spigen, Inc.,* 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (Blakey, J.),** *aff'd,* **926 F.3d 409 (7th Cir. 2019) (statements of fact should not contain legal argument and responses to the opposing party's statement of facts are not the place for "purely argumentative details" or "legal conclusions.") Defendant City further objects to Plaintiff's reliance on Plaintiff's expert report to support a purported fact and summary judgment.** *See Sommerfield*, **254 F.R.D. at 329 (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24). Defendant City further objects as it is not supported by admissible evidence. Specifically, Plaintiff's reliance on the Memorandum Opinion and Order issued in** *Palmer v. City of Chicago,* **562 F. Supp. 1067 (N.D. Ill. 1983) in support of a "fact" paragraph is improper as legal opinions are not "fact" but rather are hearsay.** *See Taylor v. City of Chicago,* **2012 WL 669063, at \*1 (N.D. Ill. Feb. 29, 2012) (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).**

**To the extent that Plaintiff is stating as a matter of fact that the City violated Judge Shadur's order or "guidance," the City denies that CPD's policy was in violation of Judge Shadur's order or "guidance," or that Judge Shadur's order was binding on CPD. The** *Palmer* **litigation, which Plaintiff cites as the basis for support of this "fact" was an** *unsuccessful* **class action lawsuit against the City of Chicago challenging the "constitutionality of the Chicago Police Department's alleged practice of concealing exculpatory material collected in criminal investigations and lodged in the department's informal 'street files.'"** *Palmer v. City of Chicago,* **806 F.2d 1316, 1317 (7th Cir. 1986) (***Palmer II***). Judge Shadur's order was vacated.** *See Palmer v. City of Chicago,* **562 F. Supp. 1067 (N.D. Ill. 1983)** *rev'd Palmer v. City of Chicago*, **755 F.2d 560 (7th Cir. 1985) (***Palmer I***). The Seventh Circuit held it was CPD's responsibility, as public officials, to draft policies and internal guidelines that incorporate the constitutional standard of preservation and assure criminal defendants the due process safeguard of a fair trial, noting that the Federal Courts have "no business, whatsoever, meddling in or attempting to control the daily maintenance and administration of the CPD and the Cook County State's Attorney's office, absent a clear and defined constitutional**

violation." *Palmer v. Chicago,* 755 F.2d. 560, 578 (7th Cir. 1985) (*Palmer I*). Still, to address the class plaintiffs' accusation that they could not establish a constitutional violation if the evidence was in the hands of CPD, the *Palmer I* Court granted the plaintiffs' request to preserve all "street files" for the subclass A plaintiffs. *Palmer I,* 755 F.2d, at 572. Those plaintiffs were permitted to inspect over 300 "street files" for exculpatory evidence. *Palmer II,* 806 F.2d at 1317. Notwithstanding their search of each file, the *Palmer* plaintiffs failed to uncover even one piece of undisclosed exculpatory evidence. *Id.* at 1324 ("their claim depends on there being exculpatory material in the 'street files' – and there isn't any"). Ultimately, the Seventh Circuit found that the class plaintiffs failed to prove any systematic constitutional violations as a result of the City's street file practice and overruled the District Court's holdings. *Palmer II,* 806 F.2d at 1320.

79. Despite Judge Shadur's express guidance regarding the deficiencies in CPD's policies, CPD never updated its policy to stop permitting a system of multiple, parallel files rather than a single centralized file. Ex. JJ (S.O. 86-3); Ex. LL (Noble Testimony) at 4832, 4818-19 ("[T]he Chicago Police Department has . . . essentially, three separate filing systems"—the investigative file, permanent retention file, and "working file"); Ex. Y (Hickey Dep. in *Rivera*) at 192-94; Ex. DD (Hickey Dep. in *Kluppelberg*) at 295:20-296:4; Ex. AA (Winstrom Dep.) at 110-115.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).** *See Outlaw,* **259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record and is argumentative ("Despite Judge Shadur's express guidance regarding the deficiencies in CPD's policies, CPD never...")** *See Malec,* **191 F.R.D. at 583;** *see also Uncommon, LLC v. Spigen, Inc.,* **305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (Blakey, J.),** *aff'd,* **926 F.3d 409 (7th Cir. 2019) (statements of fact should not contain legal argument and responses to the opposing party's statement of facts are not the place for "purely argumentative details" or "legal conclusions.")**

**Subject to and without waiving these objections, Defendant City admits in part and denies in part. The City admits that Noble testified, as an expert at trial in *Rivera v. Guevara,* in 2018, that CPD maintained "permanent retention files, which contain[] the original case report and supplemental reports, those formal reports. [A]n investigative file, which would contain what [83-1 was] talking about, which are the investigative notes, to/from memorandums, notes that are taken by detectives. And then [CPD had] this third thing**

called a working file, and a working file is nothing more than copies of documents that may be in one of those first two permanent files." (Dkt. 511-35, Ex. HH at 4818:14-4819:1).

To the extent that Plaintiff is stating as a matter of fact that the City violated Judge Shadur's order or "guidance," Defendant City denies that CPD's policy was in violation of Judge Shadur's order or "guidance," or that Judge Shadur's order was binding on CPD. The *Palmer* litigation, which Plaintiff cites as the basis for support of this "fact" was an *unsuccessful* class action lawsuit against the City of Chicago challenging the "constitutionality of the Chicago Police Department's alleged practice of concealing exculpatory material collected in criminal investigations and lodged in the department's informal 'street files.'" *Palmer v. City of Chicago*, 806 F.2d 1316, 1317 (7th Cir. 1986) (*Palmer II*). Judge Shadur's order was vacated. *See Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983) *rev'd Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985) (*Palmer I*). The Seventh Circuit held it was CPD's responsibility, as public officials, to draft policies and internal guidelines that incorporate the constitutional standard of preservation and assure criminal defendants the due process safeguard of a fair trial, noting that the Federal Courts have "no business, whatsoever, meddling in or attempting to control the daily maintenance and administration of the CPD and the Cook County State's Attorney's office, absent a clear and defined constitutional violation." *Palmer I*, 755 F.2d. at 578. Still, to address the class plaintiffs' accusation that they could not establish a constitutional violation if the evidence was in the hands of CPD, the *Palmer I* Court granted the plaintiffs' request to preserve all "street files" for the subclass A plaintiffs. *Palmer I*, 755 F.2d at 572. Those plaintiffs were permitted to inspect over 300 "street files" for exculpatory evidence. *Palmer II*, 806 F.2d, at 1317. Notwithstanding their search of each file, the *Palmer* plaintiffs failed to uncover even one piece of undisclosed exculpatory evidence. *Id.* at 1324 ("their claim depends on there being exculpatory material in the 'street files' – and there isn't any"). Ultimately, the Seventh Circuit found that the class-plaintiffs failed to prove any systematic constitutional violations as a result of the City's street file practice and overruled the District Court's holdings. *Palmer II*, 806 F.2d at 1320.

80. The City acknowledges that its continued system of having multiple files of a centralized file, coupled with the lack of instruction or directive ordering or ensuring that the entire contents of the investigative files be produced, left detectives and subpoena personnel confused about their disclosure obligations. Ex. Y (Hickey Dep. in *Rivera*) at 36-37, 162-64, 253-54 (testifying to subpoena clerks and detectives questioning what they were required to produce in response to subpoenas, including whether investigative files had to be produced); Ex. MM (Hickey/Spratte Trial Testimony in *Rivera*) at 3285:5-8; Ex. AA (Winstrom Dep.) at 106-107, 189, 192-94, 209; Ex. 12 (S.O. 86-3); Ex. X (Shadur Order) at 9-10.

**RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record.  *See Malec*, 191 F.R.D. at 583.  Defendant City further objects as it is not supported by admissible evidence.  Specifically, Plaintiff improperly relies on the March 31, 1983, Memorandum Opinion and Order issued by Judge Shadur in *Palmer v. City of Chicago*, No. 82 C 2349 (Pl. Ex. 70) to establish "facts" recited in court opinions.  Court opinions are hearsay.  *See Taylor*, 2012 WL 669063, at \*1 (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).**

**Subject to and without waiving these objections, denied.  In 2021, Commander Winstrom testified, as a 30(b)(6) witness in the consolidated cases of *Solache v. City of Chicago*, and *Reyes v. Guevara, et. al.*, where he was designated to discuss the City's policies, practices, training and customs in effect from 1986-1998 related to the documentation and preservation of information learned during a homicide investigation, including the storage, location and movement of homicide files and responding to subpoenas.  (Dkt. 511-28, Ex. AA at 159:5-17; Def's Ex. H, *Solache/Reyes*, Rule 30(b)(6) Deposition Notice).  He testified that the process once a member of the subpoena unit received a subpoena would be for "the individual to read the subpoena and make a determination by the contents of the subpoena of where the subpoena should be delivered … to obtain the records needed."  (Dkt. 511-28, Ex. AA at 189:8-12).  Subpoena clerks also had the resources of a sergeant to ask for direction when they were confused or unable to understand a subpoena request.  (Dkt. 511-26, Ex. Y at 163:7-9).  Responding further, and for clarification purposes, the testimony from James Hickey pertained to when he was working in the Records Division in the early 2000s, almost ten years *after* the events of this lawsuit took place and not when he was assigned to the subpoena service unit or the detective division.  (Dkt. 511-26, Ex. Y at 253:21-24).  In further response, the conversations Hickey recalled, were whether the investigative file needed to be turned over if it was not specifically requested.  *Id*.**

81.     Despite Judge Shadur's express guidance regarding the deficiencies in CPD's policies, the policy applied only to the Detective Division, and not investigators in other divisions and special units, including patrol officers and gang crimes officers. Ex. JJ (S.O. 86-3); Ex. Y (Hickey Dep. in *Rivera*) at 54-55, 86-88; Ex. MM (Hickey/Spratte Trial Testimony in *Rivera*) at 3388:9-3389:5.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).  *See Outlaw*, 259 F.3d at 837; s*ee also Malec*, 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")  Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record and is argumentative ("Despite Judge Shadur's express guidance the deficiencies in CPD's**

policies, the policy applied only to"). *See Malec*, 191 F.R.D. at 583; *see also Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (Blakey, J.), *aff'd*, 926 F.3d 409 (7th Cir. 2019) (statements of fact should not contain legal argument and responses to the opposing party's statement of facts are not the place for "purely argumentative details" or "legal conclusions.")

Subject to and without waiving these objections, denied. Defendant City states that the policies related to investigative files, and the training that stemmed from those policies, applied to all within the Bureau of Investigative Services. (Dkt. 511-26, Ex. Y at 54:22-55:9). However, members of the Chicago Police Department who were gang crimes specialists, were part of the Patrol Division, and were therefore subject to Patrol Division orders.

To the extent that Plaintiff is stating as a matter of fact that the City violated Judge Shadur's order or "guidance," the City denies that CPD's policy violated Judge Shadur's order or "guidance," or that Judge Shadur's order was binding on CPD. The *Palmer* litigation, which Plaintiff cites as the basis for support of this "fact" was an *unsuccessful* class action lawsuit against the City of Chicago challenging the "constitutionality of the Chicago Police Department's alleged practice of concealing exculpatory material collected in criminal investigations and lodged in the department's informal 'street files.'" *Palmer II*, 806 F.2d at 1317. Judge Shadur's order was vacated. *See Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983) *rev'd Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985) (*Palmer I*). The Seventh Circuit held it was CPD's responsibility, as public officials, to draft policies and internal guidelines that incorporate the constitutional standard of preservation and assure criminal defendants the due process safeguard of a fair trial, noting that the Federal Courts have "no business, whatsoever, meddling in or attempting to control the daily maintenance and administration of the CPD and the Cook County State's Attorney's office, absent a clear and defined constitutional violation." *Palmer I*, 755 F.2d at 578. Still, to address the class plaintiffs' accusation that they could not establish a constitutional violation if the evidence was in the hands of CPD, the *Palmer I* Court granted the plaintiffs' request to preserve all "street files" for the subclass A plaintiffs. *Id.* at 572. Those plaintiffs were permitted to inspect over 300 "street files" for exculpatory evidence. *Palmer II*, 806 F.2d at 1317. Notwithstanding their search of each file, the *Palmer* plaintiffs failed to uncover even one piece of undisclosed exculpatory evidence. *Id.* at 1324 ("their claim depends on there being exculpatory material in the 'street files' – and there isn't any"). Ultimately, the Seventh Circuit found that the class-plaintiffs failed to prove any systematic constitutional violations as a result of the City's street file practice and overruled the District Court's holdings. *Id.* at 1320.

82.     Despite Judge Shadur's express guidance regarding the deficiencies in CPD's policies, the policy failed to provide any definition of what was "relevant" or "pertinent" information that needed to be documented, thus permitting detectives to make subjective decisions about what was relevant, and could do so based on subsequent information learned during the

investigation. The City's designees acknowledged that given this lack of instruction, detectives could reach different decisions about what needed to be documented. Detectives could, for example, determine that leads and investigative efforts into an alternate suspect could be deemed not pertinent or irrelevant, and thus would not need to be documented or disclosed. Ex. JJ (S.O. 86-3); Ex. X (Shadur Order) at 5-6; Ex. DD (Hickey Dep. in *Kluppelberg*) at 237-38, 339; Ex. AA (Winstrom Dep.) at 64-66, 89-90, 99:6-10 ("Q. Does this policy provide any guidance about what information is to be treated as relevant and not relevant? A. This policy just says relevant information, no.").

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record and it is argumentative ("Despite Judge Shadur's express guidance regarding the deficiencies in CPD's policies, the policy failed to," "thus permitting detectives to make subjective decisions," "given this lack of instruction, detectives could.") *See Malec,* 191 F.R.D. at 583; *see also Uncommon, LLC v. Spigen, Inc.,* 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (Blakey, J.), *aff'd,* 926 F.3d 409 (7th Cir. 2019) (statements of fact should not contain legal argument and responses to the opposing party's statement of facts are not the place for "purely argumentative details" or "legal conclusions.") Defendant City further objects as it is not supported by admissible evidence. Specifically, Plaintiff improperly relies on the March 31, 1983, Memorandum Opinion and Order issued by Judge Shadur in *Palmer v. City of Chicago,* No. 82 C 2349 (Dkt. 511-25, Ex. X) to establish "facts" recited in court opinions. Court opinions are hearsay. *See Taylor,* 2012 WL 669063, at *1 (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).**

**Subject to and without waiving these objections, denied. In 2021, Commander Winstrom testified, as a 30(b)(6) witness in the consolidated cases of *Solache v. City of Chicago*, and *Reyes v. Guevara, et. al.,* where he was designated to discuss the City's policies, practices, training and customs in effect from 1986-1998 related to the documentation and preservation of information learned during a homicide investigation, including the storage, location and movement of homicide files and responding to subpoenas. (Dkt. 511-28, Ex. AA at 159:5-17; Def's Ex. H, *Solache/Reyes* Rule 30(b)(6) Deposition Notice). Commander Winstrom testified consistently that Detectives were required to include relevant information in supplementary reports, and whether information was determined to be relevant was done on a case-by-case basis by the detectives working the case. (Dkt. 511-28,**

Ex. AA at 64-67). He further testified that Plaintiff's description of the policy, as described in this paragraph, was a "cynical way of changing what [he] said[,]" and reiterated that detectives were required to include relevant information." (*Id.* at 63). Moreover, in 2014, James Hickey testified as a 30(b)(6) witness in *Kluppelberg v. Burge,* and expressly disagreed with Plaintiff's example and testified that "if a suspect was seriously considered and was ruled out through investigative activity, there should be some mention of it[]" in a supplementary report. (Dkt. 511-31, Ex. DD at 237:17-238:7).

To the extent that Plaintiff is stating as a matter of fact that the City violated Judge Shadur's order or "guidance," the City denies that CPD's policy was in violation of Judge Shadur's order or "guidance," or that Judge Shadur's order was binding on CPD. The *Palmer* litigation, which Plaintiff cites as the basis for support of this "fact" was an *unsuccessful* class action lawsuit against the City of Chicago challenging the "constitutionality of the Chicago Police Department's alleged practice of concealing exculpatory material collected in criminal investigations and lodged in the department's informal 'street files.'" *Palmer II*, 806 F.2d at 1317. Judge Shadur's order was vacated. *See Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983) *rev'd Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985) (*Palmer I*). The Seventh Circuit held it was CPD's responsibility, as public officials, to draft policies and internal guidelines that incorporate the constitutional standard of preservation and assure criminal defendants the due process safeguard of a fair trial, noting that the Federal Courts have "no business, whatsoever, meddling in or attempting to control the daily maintenance and administration of the CPD and the Cook County State's Attorney's office, absent a clear and defined constitutional violation." *Palmer I*, 755 F.2d at 578. Still, to address the class plaintiffs' accusation that they could not establish a constitutional violation if the evidence was in the hands of CPD, the *Palmer I* Court granted the plaintiffs' request to preserve all "street files" for the subclass A plaintiffs. *Id.* at 572. Those plaintiffs were permitted to inspect over 300 "street files" for exculpatory evidence. *Palmer II*, 806 F.2d at 1317. Notwithstanding their search of each file, the *Palmer* plaintiffs failed to uncover even one piece of undisclosed exculpatory evidence. *Id.* at 1324 ("their claim depends on there being exculpatory material in the 'street files' – and there isn't any"). Ultimately, the Seventh Circuit found that the class-plaintiffs failed to prove any systematic constitutional violations as a result of the City's street file practice and overruled the District Court's holdings. *Id.* at 1320.

83. The Subpoena Service Unit in the Records Division handled requests for discovery from prosecutors and criminal defendants, but CPD had no policies, procedures, checklists, or other documents requiring, or explaining, how the Subpoena Service Unit staff were supposed to gather all responsive documents, or providing guidance to assist them in requesting material from all the right repositories. As a result, the process of responding to requests for police files was more of an "art," and whether prosecutors and criminal defendants received all of the documents and

investigative material associated with a case was primarily a question of luck. Ex. MM (Hickey

Trial Testimony in *Rivera*) at 3284:17-19; Ex. DD (Hickey Dep. in *Kluppelberg*) at 362-63; Ex. Y

(Hickey Dep. in *Rivera*) at 36:11-37:4, 43-46, 185-87; Ex. NN (City of Chicago's Amended

Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago)

at 2-3; Ex. AA (Winstrom Dep.) at 192-94.

**RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record (specifically, Plaintiff's citation to the City's Response to Plaintiff's Seventeenth Set of Requests to Produce to the City of Chicago). *See* Ex. 83 at 2-3) and is argumentative ("primarily a question of luck.") *See Malec*, 191 F.R.D. at 583; *see also Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (Blakey, J.), *aff'd*, 926 F.3d 409 (7th Cir. 2019) (statements of fact should not contain legal argument and responses to the opposing party's statement of facts are not the place for "purely argumentative details" or "legal conclusions.")**

**Subject to and without waiving these objections, Defendant City admits in part and denies in part. The City admits that there was not a specific directive that governed the Subpoena Service Unit within CPD, and that James Hickey testified that when he had command over the unit in the early 2000s, the process of responding to subpoenas was "both technical and an art form." (Dkt. 511-26, Ex. Y, at 161:18-162:12). Specifically, James Hickey testified that the "personnel assigned to the subpoena processing unit, received on-the-job training. For the time period in question certainly the topic of investigative files had become common – common terminology." (Dkt. 511-26, Ex. Y, at 161:18-162:12). The City denies that CPD did not provide any guidance to assist the Subpoena Service Unit Staff and that whether prosecutors and criminal defendants received all the documents and investigative material was a "question of luck." Rather, James Hickey testified that members of the Subpoena Services unit would get a request, and use their best experience and judgment to direct the responsive units to cause a search for their individual records. (Dkt. 511-40, Ex. MM Hickey Trial Testimony at 3284:7-12). He further testified that the staff at the Subpoena Services Unit had a "working relationship[] with the file clerks in all the units" and also "kept a record of the place or units" that requests were being sent to. (Dkt. 511-31, Ex. DD Hickey Dep in *Kluppelberg* at 362:8-20).**

84.    In 2020, the City of Chicago's Office of Inspector General issued a report regarding

the CPD's practices concerning the disclosure of police records to criminal defendants and civil

plaintiffs, which included a review of case studies from 2010-2013, information regarding nine

instances in which the City was sanctioned by federal judges from May 2011 through February

2018, and interviews with more than a dozen CPD employees. The OIG found that "CPD's records

management and production processes are inadequate to meet its constitutional and legal obligations." Ex. OO (June 2020 OIG Report) at 4-5 (finding that the units responsible for responding to subpoenas and records requests "cannot ensure that they are identifying and locating all responsive records for production" and that "members [of the Subpoena Unit] routinely do not attempt to identify paper records, as they cannot determine which of the CPD's units may hold such records"); *see also* Ex. PP (Sept. 2021 OIG Follow-Up Report) at 2; Ex. FF (Tiderington Report) at 41.

**RESPONSE:** Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by admissible evidence and is argumentative. *See Malec,* 191 F.R.D. at 583; *see also Uncommon, LLC v. Spigen, Inc.,* 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (Blakey, J.) (statements of fact should not contain legal argument). Defendant City further objects to Plaintiff's reliance on Plaintiff's expert report to support a purported fact and summary judgment. *See Sommerfield*, 254 F.R.D. at 329 (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24). To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to Plaintiff's cross-motion for summary judgment, nor do they warrant granting Plaintiff's cross-motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") Specifically, the June 2020 and September 2021 OIG reports, cited in this paragraph reviewed the processes and directives from 2017 through 2019, twenty-four (24) years *after* arrest and prosecution of Plaintiff Sierra. Defendant City further objects to Plaintiff's reliance on Plaintiff's expert report to support a purported fact and summary judgment. *See Sommerfield*, 254 F.R.D. at 329 (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403).

Subject to and without waiving these objections, Defendant City admits in part and denies in part. The City admits that the OIG released a report in June 2020 and September 2021, but denies that the reports "adequately reflect[ed] the current discovery and records processes within the Department" CPD noted that the OIG failed to take into account the volume of subpoenas and document requests handled by CPD in criminal and civil cases per year without mistake. *See* Dkt. 511-42, Ex. OO at Appendix B: CPD's Response. Rather, CPD flatly rejected the OIG's conclusions, which were reached from citing a handful of

discovery sanctions. *Id.* Further answering, each case cited by the OIG has led to a "material improvement in CPD's document production and management systems." *Id*.

## POLICIES DID NOT MEANINGFULLY CHANGE OVER TIME

85.     The City of Chicago has admitted that its written policies regarding the documentation and disclosure of investigative information did not change between 1983 and 2012. Ex. QQ (Loughran Dep. in Taylor) at 40:12-16 (testifying that the CPD policy regarding homicide files did not change from 1992 to 2012); Ex. AA (Winstrom Dep.) at 43:7-46:2 (agreeing that the policies applying to documentation in homicide investigations from 1986 to 1998 were "nearly identical," and despite some "difference[s] in wording," the "overall policy is the same"); see also id. at 46:19-23 ("Q. Okay. So in the period from 1986 through 1998, is it correct that the policies with regard to documentation of homicide investigations were the same across all detective areas? A. Correct."); Ex. Y (Hickey Dep. in Rivera) at 119:7-9 (testifying that the policy regarding records retention was consistent from 1983 to 2011); see also id. at 123:11-17 (same); Ex. BB (Hickey Dep. In Fields) at 43:1-7 (noting that nothing was done after S.O. 83-1, effective in 1983, to review the document retention process, nor was there any new directive as to documentation in investigative or other informal files); see also Exhibit RR (City's Responses to Request for Production and Requests to Admit in Iglesias litigation (Apr. 7, 2022)) (admitting no changes in 1980s and 90s, and providing no documentation to the contrary).

**RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record and is argumentative. *See Malec,* 191 F.R.D. at 583; *see also Uncommon, LLC v. Spigen, Inc.,* 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (Blakey, J.), *aff'd,* 926 F.3d 409 (7th Cir. 2019) (statements of fact should not contain legal argument and responses to the opposing party's statement of facts are not the place for "purely argumentative details" or "legal conclusions.") Specifically, the cited testimony from Kathleen Loughran discusses the retention of homicide files from 1992-2012, not documentation and disclosure policies. (Dkt. 511-44, Ex. QQ Loughran Dep at 40:12-16). Further, the cited deposition testimony from James Hickey in *Rivera v. Guevara,* discusses the fact that cleared open and open homicide files should stay at the area indefinitely. (Dkt. 711-26, Ex. Y Hickey Dep. at 123:11-17). Finally, James Hickey's testimony from the *Fields***

**v. City of Chicago,** deposition discussed auditing of the implementation of 83-1. (*See* Dkt. 511-29, Ex. BB Hickey Dep. at 43:1-4).

**Subject to and without waiving these objections, denied. Commander Winstrom testified that Detective Division Standard Operating Procedures went into place in 1988 and were in effect through 1998. When asked about substantive changes between S.O. 86-3 and the 1988 Detective SOPs, he stated "there is a difference in wording. There may be something substantive procedurally that I didn't pick up on, the overall *policy theme* is the same." (*See,* Dkt. 511-AA, Ex. 28, Winstrom Dep. at 44:21-45:5) (emphasis added). Commander Winstrom went on to discuss how orders, such as S.O. 86-3 would have applied to the entire detective division across the entire department, and that from 1986-1998, policies with regard to documentation of homicide investigations were the same *across all detective division areas.* (*Id.* at 46:3-23). Finally, Plaintiff's reliance on the City's responses to Plaintiff's Request for Production and Requests to Admit do not admit to *no* changes in the 1980s and 90s, but rather deny there were no changes and direct Plaintiff to updated policies as necessary. (*See e.g.,* Dkt. 511-45, Ex. RR at Responses to Requests No. 1, 2, 5, 6, 11, 12, 14, 15, 16, 18, 19, 20, 24, 25 (each denying Plaintiff's Request to Admit)). Further answering, the evolution of the various Special Orders related to file maintenance are discussed in depth in the City's Memorandum of Law in Support of Summary Judgement, Dkt. 504 at §III; *see also* Def. City's 56.1(a)(3) SOF, Dkt. 506, at ¶¶ 13-18, 25-26.**

86.    Even though S.O. 83-1 was considered a "major change" in policy, no auditing or other steps were ever taken to ensure that the "major change" required by the Special Order were actually being implemented and followed. Ex. CC (April 10, 2014 Hickey Testimony, Fields v. City of Chicago) at 2053:24-2054:1; Ex. Y (Hickey Dep. in Rivera) at 244, 247, 249; Ex. Z (Hickey Testimony from 2016 Fields Trial) at 35:11-25.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") The policies described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by twelve years. Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record and it is argumentative ("Even though," "no auditing or other steps were taken to ensure." *See Malec,* 191 F.R.D. at 583; *see also Uncommon, LLC v. Spigen, Inc.,* 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (Blakey, J.), *aff'd,* 926 F.3d 409 (7th Cir. 2019) (statements of fact should not contain legal argument and responses to the opposing party's statement of facts are not the place for "purely argumentative details" or "legal conclusions.")**

61

Subject to and without waiving these objections, admit in part and denied in part.  The City admits that James Hickey was asked during direct examination in his 2014 testimony in *Fields v. City of Chicago,* if it was "fair to say that 83-1 was ... 83-1 was a major change in the way notes were considered within the police department?" and that he responded, "It was."  (Dkt. 511-30, Ex. CC, Hickey Testimony at 2053:24-2054:1).  The City denies the remainder of this paragraph.  James Hickey testified that while he did not know of a special audit procedure that was implemented, it was the "function of a supervisor, it's a responsibility [of] ever[y] supervisor[] to make sure that the employees, the members of the Chicago Police Department are doing their job and following the department directives." (*See,* Dkt. 511-26, Ex. Y, Hickey Dep. at 244:5-19).  James Hickey also testified in *Fields v. City of Chicago,* that in 1986, a section was added to the policy regarding investigative files to have commanding officers "conduct random inspections" of investigative files.  (*See,* Dkt. 511-27, Ex. Z, Hickey Testimony at 35: 11-17).

Finally, retired Commander Philip Cline testified that he conducted multiple audits of the files when he was a Lieutenant at Area 2.  (*See* Def's Ex. G, Deposition of Philip Cline at 42:24-43:6).  Further answering, Commander Cline testified that "a supervisor would go through the file and make sure that the – the proper reports were in there, that the GPRs were approved, everything that – to get these files ready for court or continue the investigation of an unsolved crime."  These audits were both "regular check-ins to make sure the files were as they were supposed to be *and* were specific to assessing compliance with the policy change.  (*Id.* at 43:16-20).

87.     Rather than checking out the investigative file, where all memos and notes were supposed to be stored and preserved (on general progress reports), detectives reverted back to keeping personal files with their own copies of investigative material. Ex. DD (Hickey Dep. In Kluppelberg) at 327-29.

RESPONSE:  To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).  *See Outlaw,* 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")  The events described in this paragraph pre-date the criminal investigation and prosecution of Plaintiff by twelve years.  Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record, and it is argumentative ("Rather than checking," "reverted back.") *See Malec,* 191 F.R.D. at 583; *see also Uncommon, LLC v. Spigen, Inc.,* 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (Blakey, J.), *aff'd,* 926 F.3d 409 (7th Cir. 2019) (statements of fact should not contain legal argument and responses to the opposing party's statement of facts are not the place for "purely argumentative details" or "legal conclusions.")

Subject to and without waiving these objections, denied. Specifically, Hickey testified that after 83-1 was implemented, department members were aware that "sometimes some detectives [were] not signing out the investigative files **and** [had] personal copies of some documents." (*See*, Dkt. 511-31, Ex. DD, Hickey Dep at 327:4-7) (emphasis added). He further testified that supervisors were responsible for making sure that the information amassed by the detectives, including their own copies, were getting turned in and made part of the investigative file, and that he believed that it was happening. (*Id.* at 328:3-15).

Finally, retired Commander Philip Cline testified that he conducted multiple audits of the files when he was a Lieutenant at Area 2. (*See* Def's Ex. G, Deposition of Philip Cline at 42:24-43:6). Further answering, Commander Cline testified that "a supervisor would go through the file and make sure that the – the proper reports were in there, that the GPRs were approved, everything that – to get these files ready for court or continue the investigation of an unsolved crime." These audits were both "regular check-ins to make sure the files were as they were supposed to be *and* were specific to assessing compliance with the policy change. (*Id.* at 43:16-20).

88. The substantively unchanged documentation policy resulted in other wrongful prosecutions and convictions in which relevant investigative information was withheld from criminal defendants, including for example, Nathson Fields, James Kluppelberg, and Jacques Rivera. Ex. Y (Hickey Dep. in Rivera) at 250:2-251:5 (testifying to unchanged nature of policy); Ex. SS (Fields Street File); Ex. TT (Rivera Street File); Ex. UU (Rivera Permanent Retention File); Ex. VV (Order on Kluppelberg Certificate of Innocence); Ex. WW (Brasfield Report) Attachment I at 11, Attachment H at 40-45; Fields v. City of Chicago, No. 10 C 1168, 2017 WL 4553411, at *3 (N.D. Ill. Oct. 12, 2017), aff'd, 981 F.3d 534 (7th Cir. 2020); Ex. FF (Tiderington Report) at 67-71.

RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record, and it is argumentative ("substantively unchanged documentation policy," "other wrongful prosecutions and convictions," "withheld.") *See Malec,* 191 F.R.D. at 583; *see also Uncommon, LLC v. Spigen, Inc.,* 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (Blakey, J.) (statements of fact should not contain legal argument); *see also Judson Atkinson Candies v. Latini-Hohberger Dhimantec,* 529 F.3d 371, 382 n. 2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts"). Defendant City further objects as it is not supported by admissible evidence, specifically, the citations to an expert report from previous and current litigation, and plaintiff Kluppelberg's certificate of innocence, which are hearsay. *See Sommerfield v. City of Chicago,* 254 F.R.D. 317, 329 (N.D. Ill. 2008) (the cases generally hold that expert reports may not be received in

evidence without violating the hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24). S*ee also Taylor v. City of Chicago,* **2012 WL 669063, at \*1 (N.D. Ill. Feb. 29, 2012) (Shadur, J)(A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)). Finally, Defendant City objects to the extent that this paragraph states a legal conclusion rather than a material fact. *See Tel-Lock, Inc. v. Thomson Consumer Electronics,* 2005 WL 741930, at \* 2 (N.D. Ill Mar. 30 2005).**

**Subject to and without waiving these objections, denied. There is no record support for the assertion that Dkt. 511-46, Ex. SS is the "Fields Street File," that Dkt. 511-47, Ex. TT is the "Rivera Street File," that Dkt. 511-48, Ex. UU is the "Rivera Permanent Retention File," or that the documents comprising those exhibits, whatever they are, establish that the City had a "substantively unchanged documentation policy" or that any City policy "resulted in other wrongful prosecutions and convictions in which relevant investigative information was withheld from criminal defendants." Similarly, Kluppelberg's certificate of innocence order, Brasfield's report, and Judge Kennelly's order denying the City's post-trial motions in *Fields v. City of Chicago,* do not establish that the City's "substantively unchanged documentation policy resulted in other wrongful prosecutions and convictions in which relevant investigative information was withheld from criminal defendants." Rather these are hearsay. Specifically, Plaintiff's reliance on *exhibits* to an expert report from an unrelated litigation is quintessentially hearsay, given that it is being used for the truth of the matter asserted. *See Sommerfield v. City of Chicago,* 254 F.R.D. 317, 329 (N.D. Ill. 2008) (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403). Plaintiff has no foundation to rely on the exhibits attached to an expert report from a previous litigation where the expert was not retained or deposed in this litigation. *See Ideal Mfg. & Sales Corp. v. Pase Grp., Inc.,* 2008 WL 11463582, at \*9 (E.D. Wis. Nov. 24, 2008) ("'[W]hile an unsworn expert report, standing alone, does not constitute admissible evidence that can be considered at the summary judgment stage of proceedings, and will not defeat a motion for summary judgment, an unsworn expert report may be considered where the opinions therein are otherwise adopted or reaffirmed in an *admissible affidavit or deposition testimony* by the expert.'" (quoting *Maytag Corp. v. Electrolux Home Products, Inc.,* 448 F.Supp.2d 1034, 1065 (N.D. Iowa 2006)(emphasis added)).**

**Similarly, legal opinions are also hearsay. *See Taylor,* 2012 WL 669063, at \*1 (Shadur, J)(A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).**

89.     In *Fields*, Fields's police practices expert, Michael Brasfield, conducted a comprehensive analysis of 429 Chicago Police Department homicide files, summaries of which were introduced as substantive evidence, which was almost entirely unrebutted, and which showed

that the policy of evidence suppression continued, at minimum, from 1983 to 1989, and from 1999

to 2009, across the City of Chicago, in Chicago Police Department Detective Areas 1, 2, 3, and 4.

Ex. XX (Brasfield Summary of Voluminous Records—Comparing Basement, Criminal Defense

and Permanent Retention Files).

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec*, 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record or admissible evidence, is argumentative ("comprehensive analysis") and fails to cite to any "specific evidentiary material." *See Malec*, 191 F.R.D. at 583. Specifically, Plaintiff's reliance on an exhibit that he states are "summaries" he claims "were introduced as substantive evidence" somewhere, which he also claims "was almost entirely unrebutted," prepared by an unidentified source are hearsay. Plaintiff has provided no foundation for the "summaries." The City further objects to reliance on "summaries" of unknown origin without any identifying information or explaining any context for the citations in violation of Federal Rules of Evidence 1006. *See* Fed. R. Evid. 1006. Finally, Defendant City objects to the extent that this paragraph states a legal conclusion rather than a material fact ("policy of evidence suppression.") *See Tel-Lock, Inc.,* 2005 WL 741930, at \*2.**

**Subject to and without waiving these objections, denied. Further answering and for clarification, the City denies that plaintiff Fields proved a policy of evidence suppression that continued, from 1983-1989, and 1999-2009, and denies that the jury found that a "failure to disclose the street file to Mr. Fields was the result of a pattern and practice of the Chicago Police Department." Plaintiff fails to substantiate this assertion with record evidence. Responding further, the verdict entered against the City was a general verdict and did not specify the policy for which it found the City liable was a "pattern and practice." (Def's Ex, N, *Fields* Jury Verdict). To the contrary, the plaintiff in *Fields* argued four different "policies" for which the jury could find the City liable. (Def's Ex. I, *Fields v. City of Chicago,* Trial Transcripts, closing arguments, p. 136-137) ("That brings you to the policy claim …We win if we can show any of them. If we can show an express policy, if we can show there was a practice or we can show training or notice to a policymaker. Actually, there's four ways we can win.")**

90.    Brasfield testified that approximately 80% of the criminal defense files were

missing handwritten notes from the CPD files, 46% were missing general progress reports (on

which detectives take notes), and 36% were missing inventories. Ex. YY (Fields Trial Tr.

11/29/16) at 3:6-4:13 (PM Transcript), 7:7-8:8 (PM Transcript), 126:4-130:19 (AM Transcript, regarding missing documents in permanent retention files).

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec*, 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record. *See Malec*, 191 F.R.D. at 583. Specifically, the cited testimony at 3:6-4:13 and 7:7-8:8 does not support the calculations and statistics provided in this paragraph. Finally, Defendant City objects to the extent that this paragraph states a legal conclusion rather than a material fact. *See Tel-Lock, Inc.,* 2005 WL 741930, at \*1.**

**Subject to and without waiving these objections, the City admits that Brasfield testified to those calculations and statistics but clarifies that he testified that those calculations were based upon his comparison of 23 criminal defense files from the 1983 to 1989 time period and 27 criminal defense files from the 1999 to 2009 time period to the "basement files." (Dkt. 511-52, Ex. YY at 6:9-23, 7:7-8:8).**

91.    In December 2016, the jury in Fields found that the failure to disclose the file of investigative information to Mr. Fields was the result of a pattern and practice of the Chicago Police Department, and awarded Mr. Fields compensatory damages of $22 million. Discovery in Fields revealed dozens of other undisclosed files in the Area Central basement. Ex. XX (Brasfield Summary of Voluminous Records—Comparing Basement, Criminal Defense and Permanent Retention Files). At the trial in Mr. Fields's case, additional evidence in support of the conclusion that the City had a practice of evidence suppression was presented, including the following:

a.    Defendants and other CPD employees testified that there were frequently widespread departures from written policies; that they did not even know new written policies had been put in place in the 1980s; that they considered investigative materials their personal property, and would not transcribe all investigative leads into official reports; and that there was no mechanism for

66

reporting missing investigative materials. *See* Ex. ZZ (*Fields* Trial Tr. 11/23/16) at 78:8-25, 79:1-8; Ex. AAA (*Fields* Trial Tr. 12/1/16) at 124:25-125:23; Ex. BBB (*Fields* Trial Tr. 11/17/16) at 103:5-8, 112:3-9; Ex. CCC (*Fields* Trial Tr. 11/28/16) at 30:23-31:22, 31:23- 25, 32:14-24, 52:5-112; Ex. DDD (*Fields* Trial Tr. 12/6/16) at 85:8-86:7, 95:22-96:5, 97:2-19; Ex. EEE (*Fields* Trial Tr. 12/5/16) at 137:5-22.

b.  Files of important investigative information were kept and suppressed in violation of Brady in the cases of Jon Fulton, Timothy Malone, and James Crockett. Ex. ZZ (*Fields* Trial Tr. 11/23/16) at 12:3-14:15, 17:1-21:12, 18:10-17; Ex. YY (*Fields* Trial Tr. 11/29/16) at 133-136 (PM Transcript); 111:2-115:18 (AM Transcript); Ex. FFF (Fields Trial Tr. 12/8/16) at 29:13-31:8, 31:9-34:5, Ex. GGG (Fields Trial Tr. 12/7/16) at 69:8-21; Ex. VVV (Fields Trial Tr. 11/30/16) at 31:2-15, 32:11-33:20, 41:8-42:8; 58:1-61:1.

**RESPONSE:  Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) by including multiple allegations, s*ee Malec*, 191 F.R.D. at 583 ("the numbered paragraphs should be short; they should contain only one or two individual allegations, thereby allowing easy response"), and it is argumentative ("dozens of undisclosed files," "frequently widespread departures," "they did not even know," "they considered," "important investigative materials.")  *See Malec*, 191 F.R.D. at 583; *see also Uncommon, LLC v. Spigen, Inc.,* 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (Blakey, J.), *aff'd*, 926 F.3d 409 (7th Cir. 2019) (statements of fact should not contain legal argument and responses to the opposing party's statement of facts are not the place for "purely argumentative details" or "legal conclusions"); *see also Judson Atkinson Candies v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n. 2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts.")  Further objecting, the records cited do not support the contentions in this paragraph, in violation of N.D. Ill. L.R. 56.1(d).  Specifically, none of the cited testimony supports Plaintiff's contention that the file of investigative information were not disclosed, that exculpatory information was systematically withheld pursuant to a pattern or practice, or that any investigative materials were suppressed.**

**Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported admissible evidence and fails to cite to any "specific evidentiary material." *See Malec,* 191 F.R.D. at 583.  Specifically, Plaintiff's reliance on an exhibit that he states are "summaries" he claims revealed undisclosed files in discovery prepared by an unidentified source are hearsay.  Plaintiff has provided no foundation for the "summaries."  The City**

further objects to reliance on "summaries" of unknown origin without any identifying information or explaining any context for the citations in violation of Federal Rules of Evidence 1006.  *See* Fed. R. Evid. 1006.  Finally, Defendant City objects to the extent that this paragraph states a legal conclusion rather than a material fact.  *See Tel-Lock, Inc.,* 2005 WL 741930, at *2.

Subject to and without waiving these objections, admit in part and denied in part.  The City admits that the jury in *Fields* found in favor of the plaintiff and awarded him $22 million dollars.  The City denies that the jury found that a "failure to disclose the file of investigative information to Mr. Fields was the result of a pattern and practice of the Chicago Police Department."  Rather, the verdict entered against the City was a general verdict and did not specify the policy for which it found the City liable was a "pattern and practice." (Def's Ex. N, *Fields* Jury Verdict).  To the contrary, the plaintiff in Fields argued four different "policies" for which the jury could find the City liable.  (Def's Ex. I, *Fields v. City of Chicago,* Trial Transcripts, closing arguments, p. 136-137) ("That brings you to the policy claim …We win if we can show any of them.  If we can show an express policy, if we can show there was a practice or we can show training or notice to a policymaker.  Actually, there's four ways we can win.")

92.     Police practices expert Thomas Tiderington, as discussed further *infra* at ¶¶ 93-102, confirms that his findings—that the CPD's policies related to the documentation, storage/preservation, and disclosure of information learned during homicide investigations was contrary to generally accepted police practices—are consistent with the findings of the City of Chicago's own Office of Inspector General, whose 2020 report stated that "CPD's records management and production processes are inadequate to meet its constitutional and legal obligations." Ex. FF (Tiderington Report) at 41; Ex. OO (June 2020 OIG Report) at 4-5 (finding that the units responsible for responding to subpoenas and records requests "cannot ensure that they are identifying and locating all responsive records for production" and that "members [of the Subpoena Unit] routinely do not attempt to identify paper records, as they cannot determine which of the CPD's units may hold such records"); *see also* Ex. PP (Sept. 2021 OIG Follow-Up Report) at 2.

RESPONSE: Defendant City objects to this paragraph as it is not supported by admissible evidence.  *See Sommerfield v. City of Chicago,* 254 F.R.D. 317, 329 (N.D. Ill. 2008) (the cases generally hold that expert reports may not be received in evidence without violating the

hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24).

To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") Specifically, the June 2020 and September 2021 OIG reports, cited in this paragraph reviewed the processes and directives from 2017 through 2019, twenty-four (24) years *after* arrest and prosecution of Plaintiff Sierra. To the extent Plaintiff is relying on these facts to establish "standard police procedures" at the time of Plaintiff's arrest in 1995 these facts are also not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") A violation of standard police procedures does not constitute a constitutional violation. *Damiani v. Allen*, No. 4:16-cv-00053-RLY-DML, 2018 WL 4095080, at *6 (S.D. Ind. Aug. 28, 2018) (stating "[w]hether the officers violated accepted police practices does not determine the outcome of Plaintiff's constitutional claims").

Subject to and without waiving these objections, Defendant City admits in part and denies in part. The City admits that the OIG released a report in June 2020 and September 2021, but denies that the reports "adequately reflect[ed] the current discovery and records production processes within the Department" noted that the OIG failed to account for the volume of subpoenas and document requests handled by CPD in criminal and civil cases per year without mistake. (Dkt. 511-42, Ex. OO at Appendix B: CPD's Response). Rather, CPD flatly rejected the OIG's conclusions, which were reached from citing a handful of discovery sanctions. *Id*. Further answering, each case cited by the OIG has led to a "material improvement in CPD's document production and management systems." *Id*.

Further, Defendant City admits that Thomas Tiderington makes "findings" in his report, but denies that Tiderington has the foundation to compare his "findings" to the OIG report. (*See* Defendant City of Chicago's *Daubert* Motion to Bar Opinions of Thomas J. Tiderington, at Dkt. 500; Defendant's Statement of Fact Material Facts in Support of its Motion for Summary Judgment, at Dkt. 506 at ¶¶35-119).

## POLICY DEFICIENCIES

93. As part of his review, Tiderington reviewed and analyzed the 475 Area 5 investigative files from 1991-1995 that were provided to him for analysis, as well as the 344 Area

5 investigative files from 1995-1998 that were provided to him for analysis, and compared them to available permanent retention files for those time periods. Ex. FF (Tiderington Report) at 55-61; *see also* Attachment B to Tiderington Report (materials reviewed). In addition, he compared corresponding criminal defense files to investigative files and permanent retention files from Area 5 homicide investigations for the period from 1995-1998. Id. at 60. The case-by-case comparison of all of these file types is contained in Attachments F and G to Tiderington's Report. Ex. FF (Tiderington Report) at 61-62; see Attachments F and G. Tiderington reached a number of conclusions, including that none of the Special Orders implemented after Jones/Palmer rectified the problems with filekeeping, documentation, and disclosure within the CPD uncovered during Jones/Palmer. Id. at 56-61.

**RESPONSE: Defendant City objects to this paragraph as it is not supported by admissible evidence.  *See Sommerfield v. City of Chicago,* 254 F.R.D. 317, 329 (N.D. Ill. 2008) (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed.  (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24).**

**Subject to and without waiving these objections, admit in part and denied in part.  The City admits that according to Tiderington's report he was provided with various files from 1991-98, but denies that he "reviewed and analyzed" the thousands of pages of records division contained in files produced.  (*See* Defendant City of Chicago's *Daubert* Motion to Bar Opinions of Thomas J. Tiderington, at Dkt. 500 at 12-14).  Tiderington admits that of the 475 investigative files he was provided, he "did spot checks on probably 30 or 40 cases."  (Dkt. 500-8, Ex. G, Tiderington Deposition from *Sierra* dated 12/8/22, 285:16-19; *see also* Dkt. 519-11, Ex. 126 Tiderington Dep from *Solache/Reyes* dated 10/6/22, 401:10-402:7).  The City denies that Tiderington did the case-by-case comparison reflected in Attachments F and G of his report.  Rather, Plaintiff's legal team created spreadsheets, Attachments F and G, and provided the spreadsheets to Tiderington based upon 475 investigative files and 496 records division files ranging from 1991-1995, (Attachment F), and 344 investigative files and 341 records division files ranging from 1995-1998, (Attachment G).  The City denies that Tiderington has the proper foundation to render opinions based upon these spreadsheets.  Tiderington testified that he did not create the spreadsheets, rather they were created by Plaintiff's counsel's office, Loevy & Loevy, he was not involved in the decision making or creation of either of the spreadsheets and does not know who or how many people were involved in their preparation.**

(Dkt. 519-11, Ex. 126, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 388:20-389:23, 401:10-402:7; Dkt. 500-7, Ex. F, Tiderington Dep from *Johnson* dated 9/20/23, 230:9-21; Dkt. 500-8, Ex. G, Tiderington Deposition from *Sierra* dated 12/8/22, 285:2-19 ("I did not do my own calculations")). Finally, the City denies Tiderington has any foundation to provide opinion testimony related to CPD's policies and further states that many of the conclusions drawn in his report are contradicted by his deposition testimony. (*See* Defendant City of Chicago's *Daubert* Motion to Bar Opinions of Thomas J. Tiderington, at Dkt. 500; *see also* Defendant's Statement of Fact Material Facts in Support of its Motion for Summary Judgment, at Dkt. 506 at ¶¶35-119).

94.     Tiderington also reviewed the expert reports of Michael Brasfield in *Fields v. City of Chicago* and *Rivera v. City of Chicago*, which involve a similar review of hundreds more homicide files and corresponding files, as well as the police homicide files in *Sierra*, *Reyes/Solache, Rivera, Fields* and *Kluppelberg.* Ex. FF (Tiderington Report) at 40-42.

RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record or admissible evidence. *See Malec*, 191 F.R.D. at 583; *Sommerfield*, 254 F.R.D. at 329 (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24).

Subject to and without waiving these objections, admit in part and denied in part. The City admits that according to Tiderington's report he was provided with the expert reports of Michael Brasfield in the *Fields v. City of Chicago* civil litigation, related to a 1984 double homicide investigation and the *Rivera v. City of Chicago* civil litigation, related to the 1988 homicide investigation, but denies that he conducted any analysis of the files purportedly reviewed in those reports. (Dkt. 519-11, Ex. 126, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 385:4-17). Specifically, when asked whether he analyzed the spreadsheets attached to the reports authored by Michael Brasfield in any way, Tiderington testified that he did not, and in fact could not recall whether he saw a specific spreadsheet attached to Mr. Brasfield's report which involved the review of the files in question, rather he assumed that the spreadsheet Mr. Brasfield reviewed was the same one he reviewed (which it was not). (Dkt. 519-11, Ex. 126, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 385:222-386:4). Further answering, Tiderington testified that he "spot-checked" police files and criminal defense files for the time period from 1991-1995 and 1995-1998, but relied largely on the accuracy of the spreadsheets created by and provided to him by Plaintiff's counsel at Loevy & Loevy based on information gathered from investigative files and records division files (sometimes referred to as "RD Files" or "permanent retention files") (also collectively referred to as "homicide files") from homicides that were investigated by Area 5 detectives

of CPD from 1991-1998. (Dkt. 519-11, Ex. 126, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 388:20-24; 401:10-402:7; Dkt. 500-7, Ex. F, Tiderington Dep from *Johnson* dated 9/20/23, 230:9-21; Dkt. 500-8, Ex. G, Tiderington Deposition from *Sierra* dated 12/8/22, 285:11-19).

95.     Tiderington's review of hundreds of files from 1991-1998 confirmed that CPD's

policies were not sufficiently addressing the problems with file keeping and documentation of

which the City of Chicago was aware. Ex. FF (Tiderington Report) at 56-60.

**RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record or admissible evidence and is argumentative. *See Malec*, 191 F.R.D. at 583; *Sommerfield*, 254 F.R.D. at 329 (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24). Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is argumentative ("not sufficiently addressing"). *See Malec,* 191 F.R.D. at 583; *see also Uncommon, LLC v. Spigen, Inc.,* 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (Blakey, J.) (statements of fact should not contain legal argument); *see also Judson Atkinson Candies v. Latini-Hohberger Dhimantec,* 529 F.3d 371, 382 n. 2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts").**

**        Subject to and without waiving these objections, Defendant City admits in part and denies in part.  The City admits that Plaintiff's expert made these conclusions within his expert report, however, the City denies that Tiderington has the proper foundation to support his conclusions included in this paragraph.  (*See,* Defendant City of Chicago's *Daubert* Motion to Bar Opinions of Thomas J. Tiderington, Dkt. 500, at §I, and Def. City's 56.1(a)(3) SOF, Dkt 506, at ¶¶35-119).  Tiderington testified that he "spot-checked" police files and criminal defense files for the time period from 1991-1995 and 1995-1998, but relied largely on the accuracy of the spreadsheets created by and provided to him by Plaintiff's counsel at Loevy & Loevy based on information gathered from investigative files and records division files (sometimes referred to as "RD Files" or "permanent retention files") (also collectively referred to as "homicide files") from homicides that were investigated by Area 5 detectives of CPD from 1991-1998.  *See,* Dkt. 519-11, Ex. 126, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 388:20-24; 401:10-402:7; Dkt. 500-7, Ex. F, Tiderington Dep from *Johnson* dated 9/20/23, 230:9-21; Dkt 500-8, Ex. G, Tiderington Deposition from *Sierra* dated 12/8/22, 285:2-19 ("I did not do my own calculations").**

96.     Detectives consistently used handwritten notes not on GPRs, although Judge

Shadur had found the practice of keeping investigative information outside of official reports

deficient. Ex. X (Shadur Order) at 4-6; Ex. FF (Tiderington Report) at 55-56.

**RESPONSE:** Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record or admissible evidence and is argumentative. *See Malec*, 191 F.R.D. at 583; *Sommerfield*, 254 F.R.D. at 329 (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24). Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it states a legal conclusion ("ie. "Shadur had found" "consistently used"). *See Malec*, 191 F.R.D. at 583; *Tel-Lock, Inc.*, 2005 WL 741930, at *2; *Taylor*, 2012 WL 669063, at *1 (Shadur, J)(A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).

Finally, the City denies Tiderington has any foundation to provide opinion testimony related to CPD's policies and further states that many of the conclusions drawn in his report are contradicted by his deposition testimony. (*See* Defendant City of Chicago's *Daubert* Motion to Bar Opinions of Thomas J. Tiderington, at Dkt. 500; *see also* Defendant's Statement of Fact Material Facts in Support of its Motion for Summary Judgment, at Dkt. 506 at ¶¶35-119).

97.     Handwritten notes not on GPRs were found in approximately 50% of the investigative files that Tiderington reviewed from 1991-1995, and approximately 46% of the investigative files reviewed from 1995-1998—consistent with Brasfield's findings in Rivera (61%) and Fields (82%). Ex. FF (Tiderington Report) at 56; see also Ex. FF (Attachments H and I to Tiderington's report) at 8.

**RESPONSE:** Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record or admissible evidence and is argumentative. *See Malec*, 191 F.R.D. at 583; *Sommerfield*, 254 F.R.D. at 329 (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24).

Finally, the City denies Tiderington has any foundation to provide opinion testimony related to CPD's policies and further states that many of the conclusions drawn in his report are contradicted by his deposition testimony. (*See* Defendant City of Chicago's *Daubert* Motion to Bar Opinions of Thomas J. Tiderington, at Dkt. 500; *see also* Defendant's Statement of Fact Material Facts in Support of its Motion for Summary Judgment, at Dkt. 506 at ¶¶35-119).

98.     Similarly, detectives continued using to-from memos, which were also not included in official forms–despite the City's knowledge of this deficiency. Ex. X (Shadur Order) at 4-6; Ex. FF (Tiderington Report) at 56. To-from memos (not on official police forms) were found in approximately 10% of the files reviewed from 1991-1995 and approximately 28% from 1995-1998—consistent with Brasfield's findings in Rivera (20%) and Fields (43%). Ex. FF (Tiderington Report) at 57.

**RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record or admissible evidence and is argumentative.  *See Malec*, 191 F.R.D. at 583; *Sommerfield*, 254 F.R.D. at 329 (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed.  (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24). Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it states a legal conclusion ("ie. "City's knowledge of this deficiency").  *See Malec*, 191 F.R.D. at 583; *Tel-Lock, Inc.*, 2005 WL 741930, at *2; *Taylor*, 2012 WL 669063, at *1 (Shadur, J)(A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).**

**Finally, the City denies Tiderington has any foundation to provide opinion testimony related to CPD's policies and further states that many of the conclusions drawn in his report are contradicted by his deposition testimony.  (*See* Defendant City of Chicago's *Daubert* Motion to Bar Opinions of Thomas J. Tiderington, at Dkt. 500; *see also* Defendant's Statement of Fact Material Facts in Support of its Motion for Summary Judgment, at Dkt. 506 at ¶¶35-119).**

99.     Further, inventory sheets were not consistently included in the investigative files (and when they were included, the majority of them were incomplete). From 1991-1995, 24% of total investigative files contained no inventory sheet, and 88% of total investigative files contained incomplete inventory sheets; from 1995-1998, 17% of total investigative files contained no

inventory sheet, and 81% contained incomplete inventory sheets. Ex. FF (Tiderington Report) at

56-57.

**RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d)
because it is not supported by the record or admissible evidence and is argumentative. *See
Malec*, 191 F.R.D. at 583; *Sommerfield*, 254 F.R.D. at 329 (the cases generally hold that expert
reports may not be received in evidence without violating the hearsay rule or Rule 403).
Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which
should be stricken, because his declaration was filed after the City filed for summary
judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was
deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24).**

**Subject to and without waiving these objections, Defendant City admits in part and denies in
part. The City admits that Plaintiff's expert included these statistics within his expert report,
however, the City denies that Tiderington has the proper foundation to support the statistics
included in this paragraph. (*See* Defendant City of Chicago's *Daubert* Motion to Bar
Opinions of Thomas J. Tiderington, Dkt. 500, at §I, and Def. City's 56.1(a)(3) SOF, Dkt 506,
at ¶¶35-119). Tiderington testified that he "spot-checked" police files and criminal defense
files for the time period from 1991-1995 and 1995-1998, but relied largely on the accuracy of
the spreadsheets created by and provided to him by Plaintiff's counsel at Loevy & Loevy
based on information gathered from investigative files and records division files (sometimes
referred to as "RD Files" or "permanent retention files") (also collectively referred to as
"homicide files") from homicides that were investigated by Area 5 detectives of CPD from
1991-1998. (*See* Dkt. 519-11, Ex. 126, Tiderington Dep from *Solache/Reyes* dated 10/6/22,
388:20-24, 401:10-402:7; Dkt. 500-7, Ex. F, Tiderington Dep from *Johnson* dated 9/20/23,
230:9-21; Dkt. 500-8, Ex. G, Tiderington Deposition from *Sierra* dated 12/8/22, 285:2-19 ("I
did not do my own calculations")).**

     100. Second, Tiderington reviewed the permanent retention files, which contain only

official reports, standing alone. Not all relevant information in unofficial documents—including

potentially exculpatory information contained on handwritten notes—was transcribed in official

reports, despite the City's continued awareness of this deficiency. Ex. X (Shadur Order) at 17; Ex.

FF (Tiderington Report) at 58-60.

**RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d)
because it is not supported by the record or admissible evidence and is argumentative. *See
Malec*, 191 F.R.D. at 583; *Sommerfield*, 254 F.R.D. at 329 (the cases generally hold that expert
reports may not be received in evidence without violating the hearsay rule or Rule 403).
Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which
should be stricken, because his declaration was filed after the City filed for summary
judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was**

deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24). **Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it states a legal conclusion ("ie. "potentially exculpatory information"). *See Malec*, 191 F.R.D. at 583; *Tel-Lock, Inc.*, 2005 WL 741930, at \*2; *Taylor*, 2012 WL 669063, at \*1 (Shadur, J)(A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).**

101. Third, Tiderington compared the investigative files to 64 corresponding criminal defense files for the years 1995-1998. Tiderington concluded that important investigative materials were regularly withheld from the criminal defense files for criminal defendants, despite the City's notice of this issue. Ex. X (Shadur Order) at 17; Ex. FF (Tiderington Report) at 59-64.

**RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by the record or admissible evidence and is argumentative. *See Malec*, 191 F.R.D. at 583; *Sommerfield*, 254 F.R.D. at 329 (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24). Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it states a legal conclusion ("ie. "withheld from criminal defense files" "City's notice of this issue"). *See Malec*, 191 F.R.D. at 583; *Tel-Lock, Inc.*, 2005 WL 741930, at \*2; *Taylor*, 2012 WL 669063, at \*1 (Shadur, J)(A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).**

**Subject to and without waiving these objections, Defendant City admits in part and denies in part. The City denies that there were 64 criminal defense compared to the corresponding investigative files for the years 1995-1998, but admits there were 63. (Dkt. 519-11, Ex. 126 (Tiderington Deposition in Reyes) at 602:8-11). The City admits that Plaintiff has retained Thomas Tiderington but denies that Tiderington has the proper foundation to support these conclusions. (*See* Defendant City of Chicago's *Daubert* Motion to Bar Opinions of Thomas J. Tiderington, at Dkt. 500; Defendant's Statement of Fact Material Facts in Support of its Motion for Summary Judgment, at Dkt. 506 at ¶¶35-119). The City further denies that "Tiderington compared the investigative files to 64 corresponding criminal files for the years 1995-1998." Tiderington testified that he did not personally compare the 63 investigative files to the corresponding criminal defense files and only personally compared under ten files and while he "spot-checked" police files and criminal defense files for the time period from 1991-1995 and 1995-1998, but relied largely on the accuracy of the spreadsheets created by and provided to him by Plaintiff's counsel at Loevy & Loevy. (*See* Dkt. 519-11, Ex. 126, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 388:20-24, 401:10-402:7, 601:11-603:8; Dkt. 500-7, Ex. F, Tiderington Dep from *Johnson* dated 9/20/23, 230:9-21; Dkt. 500-8, Ex. G, Tiderington Deposition from *Sierra* dated 12/8/22, 285:2-19 ("I did not do my own calculations")).**

102.    The analysis that Tiderington conducted in this case is the same one he conducted in *Johnson, Iglesias,* and *Reyes/Solache,* and the one Michael Brasfield conducted in *Rivera* and *Fields,* and his findings are entirely consistent with Brasfield's. In *Fields,* Brasfield testified that approximately 80% of the criminal defense files were missing handwritten notes from the CPD files, 46% were missing general progress reports (on which detectives take notes), and 36% were missing inventories. Ex. YY (Fields Trial Tr. 11/29/16) at 3:6-4:13 (PM Transcript), 7:7-8:8 (PM Transcript), 126:4-130:19 (AM Transcript, regarding missing documents in permanent retention files). In particular, Tiderington's finding that the 1991-1995 Area 5 investigative files demonstrate that the City's problems with filekeeping, documentation, and disclosure of investigative information first identified in *Jones/Palmer* persisted under the policies of the CPD is the same conclusion that he reached with regard to the 1995-1998 Area 5 investigative files, and that Brasfield reached with regard to 1985-1991 Area 5 investigative files, and 1984-1989 Area 1 (primarily) investigative files. Ex. FF (Tiderington Report) at 56; Ex. WW (Brasfield Report in *Rivera*) at 43-45; Ex. HHH (Brasfield Report in *Fields*) at 15-19.

**RESPONSE: Defendant City objects to this paragraph as it is not supported by admissible evidence.  *See Sommerfield v. City of Chicago,* 254 F.R.D. 317, 329 (N.D. Ill. 2008) (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403).  Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed.  (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24).  Plaintiff also has no foundation to rely on an expert report from a previous litigation where the expert was not retained or deposed in this litigation.  *See Ideal Mfg. & Sales Corp. v. Pase Grp., Inc.,* 2008 WL 11463582, at \*9 (E.D. Wis. Nov. 24, 2008) ("'while an unsworn expert report, standing alone, does not constitute admissible evidence that can be considered at the summary judgment stage of the proceedings, and will not defeat a motion for summary judgment, an unsworn expert report may be considered at summary judgment where the opinions therein are otherwise adopted or reaffirmed in an *admissible affidavit or deposition testimony* by the expert'") (emphasis added) (quoting *Maytag Corp. v. Electrolux Home Products, Inc.,* 448 F. Supp. 2d 1034, 1065 (N.D. Iowa 2006)).  Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not**

supported by the record (none of the cited record supports that Tiderington's "analysis" is the same as Brasfield's), and it is argumentative ("entirely consistent"). *See Malec,* 191 F.R.D. at 583; *see also Uncommon, LLC v. Spigen, Inc.,* 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (Blakey, J.), *aff'd,* 926 F.3d 409 (7th Cir. 2019) (statements of fact should not contain legal argument and responses to the opposing party's statement of facts are not the place for "purely argumentative details" or "legal conclusions"); *see also Judson Atkinson Candies v. Latini-Hohberger Dhimantec,* 529 F.3d 371, 382 n. 2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts").

Subject to and without waiving these objections, Defendant City admits in part and denies in part. The City admits that plaintiff Rivera's expert testified to the statistics included in this paragraph, but denies that he had the proper foundation to provide said testimony. The statistics in this paragraph relate only to 50 "basement files." (Dkt. 511-52, Ex. YY, Fields Trial Tr. 11/29/16 at 3:6-23 (PM Transcript), 7:7-8:8 (PM Transcript)). Further, Mr. Brasfield admitted during trial that he only reviewed six State's Attorney's files, specifically, ones provided to him by plaintiff Rivera's counsel. (*See* Def's Ex. L, *Rivera* Trial Transcripts, June 18, 2018 at 2303:7-17).

Further, Defendant City admits that Thomas Tiderington makes "findings" in his report but denies that Tiderington has the proper foundation to compare the analysis done in any of the reports. (*See* Defendant City of Chicago's *Daubert* Motion to Bar Opinions of Thomas J. Tiderington, at Dkt. 500; Defendant's Statement of Fact Material Facts in Support of its Motion for Summary Judgment, at Dkt. 506 at ¶¶35-119). Tiderington testified that he "spot-checked" police files and criminal defense files for the time period from 1991-1995 and 1995-1998, but relied largely on the accuracy of the spreadsheets created by and provided to him by Plaintiff's counsel at Loevy & Loevy based on information gathered from investigative files and records division files (sometimes referred to as "RD Files" or "permanent retention files") (also collectively referred to as "homicide files") from homicides that were investigated by Area 5 detectives of CPD from 1991-1998. (*See* Dkt. 519-11, Ex. 126, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 388:20-24, 401:10-402:7; Dkt. 500-7, Ex. F, Tiderington Dep from *Johnson* dated 9/20/23, 230:9-21; Dkt. 500-8, Ex. G, Tiderington Deposition from *Sierra* dated 12/8/22, 285:11-19).

Finally, the City denies Tiderington had the proper foundation to opine on any purported comparisons drawn between his opinions and Brasfield's opinions in *Jones/Palmer, Rivera,* or *Fields.* Tiderington testified that the only information he had regarding *Rivera* and *Fields* came from Brasfield's reports. (*See* Dkt. 519-11, Ex. 126, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 384:7-14). Tiderington also admitted that he learned the information regarding *Jones* and *Palmer* from Plaintiff's counsel, and that he did not read the *Palmer* case he cites to in any "specific detail." (*Id.* at 447:4-15). Thus, any information he learned about the *Jones* and *Palmer* cases discussed in Brasfield's report could only come from reading that report (whether Tiderington read Brasfield's 300 pages of reports himself or whether it was summarized for him by someone else). Further, Tiderington was unable to answer any questions regarding what Brasfield reviewed with specificity and even testified he believed he and Brasfield worked off the same spreadsheet. (*Id.,* at 387:1-388:19).

103.     During expert discovery, the Defendants disclosed four retained experts. Among them, they disclosed one former law enforcement practitioner to opine about the underlying investigation in this matter and whether it comported with generally accepted police practices, Nelson Andreu. He is not offering any opinions whatsoever about whether CPD's policies regarding documentation and disclosure generally, and Special Orders 83-1 and its progeny specifically is an adequate or sound policy. In addition, the City also disclosed a former prosecutor, Bernard Murray, to opine about criminal discovery in Cook County; Mr. Murray has never worked in a police department, does not consider himself an expert in police policymaking, and is not offering any opinions about whether the documentation and disclosure policies at issue are adequate or sound policies. Ex. III (Defendants' Rule 26(a)(2) Disclosures); Ex. JJJ (Andreu Report) (no opinions regarding Monell claims, including the policies at issue or their adequacy to address problems identified during *Jones/Palmer*); Ex. KKK, Nelson Andreu Dep. in *Sierra*, at 126:12-16; Ex. LLL (Murray Deposition in *Sierra*) at 16:14-18 (agreeing his opinions regarding CPD policies and practices remain the same from Reyes to Sierra and Iglesias); Ex. MMM (Murray Dep. in *Reyes*) at 94:2-95:2, 114:12-17 ("Q. . . are you offering an opinion in this case that Special Order 83-1 comports with generally accepted police practices? A. I don't know what generally accepted police practices are."), 114:19-115:12.

**RESPONSE: To the extent Plaintiff is relying on these facts to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") Specifically, whether the City disclosed any experts to opine on "whether CPD's policies regarding documentation and disclosure generally, and Special Orders 83-1 and its progeny specifically is an adequate or sound policy" is not material. *Damiani v. Allen*, No. 4:16-cv-00053-RLY-DML, 2018 WL 4095080, at \*6 (S.D. Ind. Aug. 28, 2018) (stating "[w]hether the officers violated accepted police practices does not determine the outcome of Plaintiff's constitutional claims").**

Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) by including multiple allegations, and because it is argumentative. *See Malec*, 191 F.R.D. at 583.

Defendant City further objects because the record citations do not support the assertions. *See Malec*, 191 F.R.D. at 583. Specifically, Plaintiff cherry-picks Mr. Murray's deposition testimony rather than citing to his report to present a distorted picture of his opinions.

Subject to and without waiving these objections, Defendant City admits in part and denies in part. The City admits that it retained Nelson Andreu to opine on various aspects of the police investigation which led to Plaintiff's criminal conviction and not about the policies and practices of the Chicago Police Department. The City further admits that it hired Bernard Murray, but denies that his opinions were limited to criminal discovery in Cook County. (*See* Def's Ex. T, Murray's Expert Report, at §II, Discovery Obligations, and §V Comparison of Permanent Retention/RD Files). Mr. Murray further opined that Tidergton's opinions were deficient for a variety of reasons, including but not limited to Tiderington's assumption that documents that were missing from criminal defense files today establishes that the documents were withheld from criminal defendants, his failure to review the prosecutors' files, and his failure to account for the significant redactions to the criminal defense files. (*Id.* at pp. 1-3). Mr. Murray further opined on the interactions between prosecutors in Cook County and CPD to ensure that the prosecutor's discovery obligations were fulfilled, including the effect of S.O. 83-1 and its progeny on that process. (*Id.* at pp. 3-9). Mr. Murray further opined about the deficiencies in Tiderington's opinions about CPD's use of a decentralized file keeping system. (*Id.* at pp. 10-11). Mr. Murray also analyzed some of the same files highlighted in Tiderington's report and opined on the deficiencies of Mr. Tiderington's analysis, including but not limited to explaining that certain documents Tiderington claims was missing from the criminal defense file were for cases where no charges were filed and that certain documents that Tiderington claims were withheld were identified in on a signed discovery receipt retained in the prosecutor's file. (*Id.* at pp. 11-24).

## ADJUDICATION OF ISSUE IN PAST CASES

104.    The existence of the City of Chicago's official policy of suppressing exculpatory and/or impeaching investigative information was established in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.); *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.); Palmer v. City of Chicago, 562 F. Supp. 1067 (N.D. Ill.); and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

**RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by admissible evidence, is argumentative and states a legal conclusion ("official policy of suppressing exculpatory and/or impeaching investigative information was established"). *See Malec*, 191 F.R.D. at 583; *Tel-Lock, Inc.*, 2005 WL 741930, at \*2; *Taylor,* 2012 WL 669063 at \*1 (Shadur, J) (A Judge's finding does not qualify**

as a hearsay exception under Rule 803(8) or Rule 803(22)). The events described in this paragraph related to *Jones* and *Palmer* pre-date the criminal investigation and prosecution of Plaintiff by over twelve years and describes events that pre-date the issuance of S.O. 83-1 which expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved." (*See* City's Memorandum of Law in Support of Summary Judgment, Dkt. 504 at 21-23; City's 56.1(a)(3) SOF, Dkt. 506 at ¶¶ 13-14).

Subject to and without waiving these objections, denied. Responding further, the *Palmer* litigation, which Plaintiff cites as the basis for support of this "fact" was an *unsuccessful* class action lawsuit against the City of Chicago challenging the "constitutionality of the Chicago Police Department's alleged practice of concealing exculpatory material collected in criminal investigations and lodged in the department's informal 'street files.'" *Palmer II*, 806 F.2d at 1317. Judge Shadur's order was vacated. *See Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983) *rev'd Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985) (*Palmer I*). The Seventh Circuit held it was CPD's responsibility, as public officials, to draft policies and internal guidelines that incorporate the constitutional standard of preservation and assure criminal defendants the due process safeguard of a fair trial, noting that the Federal Courts have "no business, whatsoever, meddling in or attempting to control the daily maintenance and administration of the CPD and the Cook County State's Attorney's office, absent a clear and defined constitutional violation." *Palmer I*, 755 F.2d at 578. Still, to address the class plaintiffs' accusation that they could not establish a constitutional violation if the evidence was in the hands of CPD, the *Palmer I* Court granted the plaintiffs' request to preserve all "street files" for the subclass A plaintiffs. *Palmer I*, 755 F.2d at 572. Those plaintiffs were permitted to inspect over 300 "street files" for exculpatory evidence. *Palmer II*, 806 F.2d at 1317. Notwithstanding their search of each file, the *Palmer* plaintiffs failed to uncover even one piece of undisclosed exculpatory evidence. *Id.* at 1324 ("their claim depends on there being exculpatory material in the 'street files' – and there isn't any"). Ultimately, the Seventh Circuit found that the class-plaintiffs failed to prove any systematic constitutional violations as a result of the City's street file practice and overruled the District Court's holdings. *Id.* at 1320.

The City further denies that the jury verdict in *Jones* was a "finding of a custom of maintaining 'street files' that were withheld from the State's Attorney's Office and criminal defendants. Rather, the Seventh Circuit noted that, "Although the lawfulness of the street-files practice has never been adjudicated, the City, which has abandoned the practice, does not challenge the jury's implicit finding that it denied criminal defendants due process of law." *Jones v. Chicago*, 856 F.2d 985, 995 (7th Cir. 1988).

The City further denies that the jury found that an "official policy of suppressing exculpatory and/or impeaching investigative information" in the *Fields v. City of Chicago*, case. Rather, the verdict entered against the City was a general verdict and did not specify the policy for which it found the City liable was a "pattern and practice." To the contrary, the plaintiff in Fields argued four different "policies" for which the jury could find the City

liable. (*See* Def's Ex. I, *Fields v. City of Chicago,* Trial Transcripts, closing arguments, p. 136-137 ("That brings you to the policy claim …We win if we can show any of them. If we can show an express policy, if we can show there was a practice or we can show training or notice to a policymaker. Actually, there's four ways we can win.")

Finally, the City denies that the jury found an "official policy of suppressing exculpatory and/or impeaching investigative information" in *Rivera v. Guevara*. Rather, the verdict entered against the City was a general verdict and did not specify the policy for which it found the City liable was a "pattern or practice." Again, the plaintiff in *Rivera* argued multiple policies for which the jury could find the City liable. (*See* Def's Ex. L, *Rivera v. Guevara,* Trial Transcripts, closing arguments, p. 4201:6-8 ("We win any which way, all we have to show is one way.") Responding further, City Defendants appealed the judgment in *Rivera v. Guevara,* (*see* Def's Ex. U, Notice of Appeal, *Rivera v. Guevara*, No. 12 C 4428, Dkt. 783, (N.D. Ill. Oct. 16, 2019)), and the parties then engaged in a successful mediation in the Seventh Circuit Court of Appeals wherein the parties reached an agreement to resolve the case for a sum total from the City in turn for, among other things, the defendants dismissing the appeal. (*See* Def's Ex. V, Notice of Cir. Rule 33 Mediation, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Oct. 24, 2019)). The parties executed a Release, Satisfaction of Judgment, and Settlement Agreement (herein the "*Rivera* Agreement") on March 25, 2020, memorializing the terms. (*See* Def's Ex. W, *Rivera* Agreement). The *Rivera* Agreement stated: "[t]he parties and their respective attorneys acknowledge that the settlement of this case is not an admission of liability, or of unconstitutional or illegal conduct by or on the part of any Defendant, and/or the City of Chicago's future, current or former officers, agents and employees, and shall not serve as evidence of *any wrongdoing* by or on the part of any Defendant, and/or the City of Chicago's future, current or former officers, agents and employees. The parties and their respective attorneys further acknowledge that settlement is made to avoid the uncertainty of the outcome of litigation and the expense in time and money of further litigation and for the purpose of judicial economy." (Ex. W, *Rivera* Agreement, at ¶ 5) (emphasis added). The *Rivera* Agreement further provided that Defendants agreed to dismiss the appeal within fourteen (14) days of the execution of the Rivera Agreement. (*See* Ex. W, at ¶ 8). The City Defendants timely filed an agreed motion to dismiss the appeal under Federal Rule of Appellate Procedure 42(b), which the Seventh Circuit granted, and issued the mandate. (*See* Def's Ex. X, Agreed Mtn. Vol. Dismissal, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Apr. 6, 2020); *see* Def's Ex. Y, Notice of Issuance of Mandate, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Apr. 7, 2020)).

105.    In *Fields*, the jury was instructed that, to find against the City of Chicago on the

plaintiff's policy claim, Fields had to prove:

1.  Material exculpatory and/or impeachment evidence in the possession of the Chicago Police Department was concealed from the prosecutor, and the evidence was not otherwise available to the plaintiff through the exercise of reasonable diligence. . . . .

2.  At the time of the concealment, it was the policy of the City of Chicago to conceal

material exculpatory and/or impeachment evidence. The term policy means: (a) an express policy, (b) A widespread practice that is so permanent and well-settled that it constitutes a custom. . . ., (c) A decision or policy statement made by the Superintendent of Police. This includes the Superintendent's approval of a decision or policy made by someone else, or (d) A practice of failing to train or supervise employees. . . .

3. The policy as described in paragraph 2 caused the concealment of material exculpatory or impeachment evidence in the plaintiff's criminal case.

4. The plaintiff was damaged as a result.

Ex. NNN (Fields Final Jury Instructions) at 14-15.

**RESPONSE:** **To the extent that Plaintiff is relying on these "facts" to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to Plaintiff's cross-motion for summary judgment, nor do they warrant granting Plaintiff's cross-motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; *see also Malec*, 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")**

**Answering further, the verdict entered against the City was a general verdict and did not specify the reasons or specific basis for which it found the City liable and did not expressly find a "pattern and practice." To the contrary, the plaintiff in Fields argued four different "policies" for which the jury could find the City liable. (*See* Def's Ex. I, *Fields v. City of Chicago*, Trial Transcripts, closing arguments, p. 136-137) ("That brings you to the policy claim …We win if we can show any of them. If we can show an express policy, if we can show there was a practice or we can show training or notice to a policymaker. Actually, there's four ways we can win.")**

106. During trial, both sides presented extensive Monell evidence, which is collected in the parties' post-trial submissions in *Fields*. Ex. OOO (Defs.' Combined Post-Trial Mot. in Fields) at 9-16, 18-24; Ex. PPP (Pl.'s Resp. to Defs.' Post-Trial Mot. in Fields) at 12-25; Ex. QQQ (Defs.' Reply in Support of Post-Trial Mot.) at 5-10.

**RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by admissible evidence, is argumentative and states a legal conclusion. *See Malec*, 191 F.R.D. at 583; *Tel-Lock, Inc.*, 2005 WL 741930, at *2; *Taylor*, 2012 WL 669063, at *1 (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).**

**Subject to and without waiving these objections, Defendant City admits in part and denies in part. The City admits that Plaintiff has cited to various pleadings filed in the *Fields* litigation, but denies that those pleadings contain all of the evidence collected and presented at trial, and further denies that these pleadings are material to the City's motion for**

summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")

107.    The City lost the jury trial in Fields. Ex. WWW (Fields Verdict Summary). A judgment was entered against the City on the jury's verdict. Ex. XXX (Fields Judgment). After fully briefing the issues, the City's post-trial motion was denied. *Fields v. City of Chicago*, 2017 WL 3987356 (N.D. Ill. Sep. 11, 2017); Ex. OOO (Defs.' Combined Post-Trial Mot. in *Fields*) at 9-16, 18-24; Ex. PPP (Pl.'s Resp. to Defs.' Post-Trial Mot. in *Fields*) at 12-25; Ex. QQQ (Defs.' Reply in Support of Post-Trial Mot.) at 5-10.

**RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by admissible evidence, is argumentative and states a legal conclusion. *See Malec*, 191 F.R.D. at 583; *Tel-Lock, Inc.*, 2005 WL 741930, at \*2; *Taylor*, 2012 WL 669063, at \*1 (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)); *Franklin v. Adkins*, No. 92-1765, 1993 WL 179221, at \*5 (7th Cir. May 25, 1993) (finding that a jury's verdict is a hearsay statement); *Spinnenweber v. Laducer*, No. 2:14-CV-101-JEM, 2019 2019 WL 6649847 at \*1 (N.D. Ind. Dec. 5, 2019) (finding a jury verdict makes the plaintiff whole and is not to send a message to the defendants or society at large).**

**The City admits that the jury in *Fields* found in favor of the plaintiff and awarded him $22 million dollars. The City denies that the jury found that a "failure to disclose the street file to Mr. Fields was the result of a pattern and practice of the Chicago Police Department." Rather, the verdict entered against the City was a general verdict and did not specify the policy for which it found the City liable and did not specifically find there was a "pattern and practice." (*See* Ex. N, *Fields,* Jury Verdict). To the contrary, the plaintiff in Fields argued four different "policies" for which the jury could find the City liable. (*See* Def's Ex. I, *Fields v. City of Chicago,* Trial Transcripts, closing arguments, p. 136-137) ("That brings you to the policy claim …We win if we can show any of them.  If we can show an express policy, if we can show there was a practice or we can show training or notice to a policymaker. Actually, there's four ways we can win.")  Responding further, the City denies that citations to various pleadings from the *Fields* litigation are material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")**

108.    The denial of the City's post-trial motion was affirmed on direct appeal, where the U.S. Court of Appeals for the Seventh Circuit concluded that the City had notice of deficient policies with respect to withholding/disclosure of evidence "as a result of prior litigation that the use of street files and the failure to ensure the production of the evidence within those files presented a constitutional problem," and that in Fields, the evidence presented sufficiently allowed the jury "to conclude that the City had failed to take the necessary steps to address that unconstitutional practice." *Fields v. City of Chicago*, 981 F.3d 534, 563 (7th Cir. 2020).

**RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by admissible evidence, is argumentative and states a legal conclusion.  *See Malec*, 191 F.R.D. at 583; *Tel-Lock, Inc.*, 2005 WL 741930, at \*2; *Taylor*, 2012 WL 669063, at \*1 (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).**

109.    In Rivera, the plaintiff made an underdeveloped preclusion argument based on *Fields* which was limited to three paragraphs in the plaintiff's summary judgment response. Ex. RRR (Rivera Plaintiff's Resp. to Defendant's Summ. J. Mot.) at 3-5, 53-54. Similarly, the Court's analysis of the issue consisted of two paragraphs. *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1062-63 (N.D. Ill. 2018), *opinion clarified*, No. 12-CV-04428, 2018 WL 11469072 (N.D. Ill. May 17, 2018).

**RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by admissible evidence, is argumentative ("underdeveloped") and states a legal conclusion.  *See Malec*, 191 F.R.D. at 583; *Tel-Lock, Inc.*, 2005 WL 741930, at \*2; *Taylor*, 2012 WL 669063, at \*1 (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).**

**Subject to and without waiving these objections, Defendant City admits in part and denies in part.  The City admits that Plaintiff has cited plaintiff Rivera's response to summary judgment as well as the Court's ruling on summary judgment in the *Rivera* litigation, but denies that citations to various pleadings from the *Rivera* litigation are material or support the denying of Defendant City's summary judgment motion in this case.  The City further denies that plaintiff Rivera's preclusion argument was underdeveloped in any way. Responding further, City Defendants appealed the judgment in *Rivera v. Guevara*, (*see* Def's Ex. U, Notice of Appeal, *Rivera v. Guevara*, No. 12 C 4428, Dkt. 783, (N.D. Ill. Oct. 16, 2019)),**

and the parties then engaged in a successful mediation in the Seventh Circuit Court of Appeals wherein the parties reached an agreement to resolve the case for a sum total from the City in turn for, among other things, the defendants dismissing the appeal. (*See* Def's Ex. V, Notice of Cir. Rule 33 Mediation, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Oct. 24, 2019). The parties executed a Release, Satisfaction of Judgment, and Settlement Agreement (herein the "*Rivera* Agreement") on March 25, 2020, memorializing the terms. (*See* Def's Ex. W, *Rivera* Agreement). The *Rivera* Agreement stated: "[t]he parties and their respective attorneys acknowledge that the settlement of this case is not an admission of liability, or of unconstitutional or illegal conduct by or on the part of any Defendant, and/or the City of Chicago's future, current or former officers, agents and employees, and shall not serve as evidence of *any wrongdoing* by or on the part of any Defendant, and/or the City of Chicago's future, current or former officers, agents and employees. The parties and their respective attorneys further acknowledge that settlement is made to avoid the uncertainty of the outcome of litigation and the expense in time and money of further litigation and for the purpose of judicial economy." (Ex. W, *Rivera* Agreement, at ¶ 5) (emphasis added). The *Rivera* Agreement further provided that Defendants agreed to dismiss the appeal within fourteen (14) days of the execution of the Rivera Agreement. (*See* Ex. W, at ¶ 8). The City Defendants timely filed an agreed motion to dismiss the appeal under Federal Rule of Appellate Procedure 42(b), which the Seventh Circuit granted, and issued the mandate. (*See* Def's Ex. X, Agreed Mtn. Vol. Dismissal, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Apr. 6, 2020); *See* Def's Ex. Y, Notice of Issuance of Mandate, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Apr. 7, 2020).

110.    In Rivera, the jury was instructed that to find against the City of Chicago on the

policy claim, Rivera had to prove:

1. The plaintiff's constitutional rights were violated as defined in these instructions;

2. The City of Chicago has a policy of concealing material exculpatory and/or impeachment evidence. The term policy means: (a) An express policy; or (b) A widespread practice that is so permanent and well-settled that it constitutes a custom. . . . .; or (c) A decision or policy statement, including a decision not to adopt a needed policy, made by the City of Chicago; or (d) A practice of failing to train employees of the City of Chicago or the Chicago Police Department.

3. The policy as described in paragraph 2 caused the violation of the plaintiff's constitutional rights.

Ex. SSS (Rivera Final Jury Instructions) at 26.

**RESPONSE:** **To the extent that Plaintiff is relying on these "facts" to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to Plaintiff's cross-motion for summary judgment, nor do they warrant granting Plaintiff's cross-motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).** *See Outlaw,*

259 F.3d at 837; *see also Malec*, 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")

Answering further, the verdict entered against the City was a general verdict and did not specify the policy for which it found the City liable was a "pattern or practice." Again, the plaintiff in *Rivera* argued multiple policies for which the jury could find the City liable, including a failure to train. (*See* Def's Ex. L, *Rivera v. Guevara,* Trial Transcripts, closing arguments, p. 4201:6-8) ("We win any which way, all we have to show is one way.")

Responding further, City Defendants appealed the judgment in *Rivera v. Guevara*, (*see* Def's Ex. U, Notice of Appeal, *Rivera v. Guevara*, No. 12 C 4428, Dkt. 783, (N.D. Ill. Oct. 16, 2019)), and the parties then engaged in a successful mediation in the Seventh Circuit Court of Appeals wherein the parties reached an agreement to resolve the case for a sum total from the City in turn for, among other things, the defendants dismissing the appeal. (*See* Ex. V, Notice of Cir. Rule 33 Mediation, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Oct. 24, 2019). The parties executed a Release, Satisfaction of Judgment, and Settlement Agreement (herein the "*Rivera* Agreement") on March 25, 2020, memorializing the terms. (*See* Ex. W, *Rivera* Agreement). The *Rivera* Agreement stated: "[t]he parties and their respective attorneys acknowledge that the settlement of this case is not an admission of liability, or of unconstitutional or illegal conduct by or on the part of any Defendant, and/or the City of Chicago's future, current or former officers, agents and employees, and shall not serve as evidence of *any wrongdoing* by or on the part of any Defendant, and/or the City of Chicago's future, current or former officers, agents and employees. The parties and their respective attorneys further acknowledge that settlement is made to avoid the uncertainty of the outcome of litigation and the expense in time and money of further litigation and for the purpose of judicial economy." (Ex. W, *Rivera* Agreement, at ¶ 5) (emphasis added). The *Rivera* Agreement further provided that Defendants agreed to dismiss the appeal within fourteen (14) days of the execution of the Rivera Agreement. (*See* Ex. W, at ¶ 8). The City Defendants timely filed an agreed motion to dismiss the appeal under Federal Rule of Appellate Procedure 42(b), which the Seventh Circuit granted, and issued the mandate. (*See* Ex. X, Agreed Mtn. Vol. Dismissal, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Apr. 6, 2020); s*ee* Ex. Y; Notice of Issuance of Mandate, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Apr. 7, 2020)).

111.    Based on that jury instruction, in June 2018, a federal jury entered a verdict for

Rivera and against the City, and a judgment was entered against the City on the jury's verdict. Ex.

TTT (Rivera Judgment); Ex. UUU (Rivera Verdict).

RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by admissible evidence, is argumentative and states a legal conclusion. *See Malec*, 191 F.R.D. at 583; *Tel-Lock, Inc.*, 2005 WL 741930, at \*2; *Taylor*, 2012 WL 669063, at \*1 (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)); *Franklin v. Adkins*, No. 92-1765, 1993 WL 179221, at \*5 (7th Cir. May 25, 1993) (finding that a jury's verdict is a hearsay statement); *Spinnenweber*

*v. Laducer*, No. 2:14-CV-101-JEM, 2019 2019 WL 6649847 at *1 (N.D. Ind. Dec. 5, 2019) (finding a jury verdict makes the plaintiff whole and is not to send a message to the defendants or society at large).

Subject to and without waiving these objections, the City admits that a federal jury entered a verdict for Rivera and against the City in *Rivera v. Guevara*. Responding further, the City states that the verdict entered was a general verdict and did not specify the policy for which it found the City liable was a "pattern or practice." Again, the plaintiff in *Rivera* argued multiple policies for which the jury could find the City liable, including a failure to train. (*See* Def's Ex. L, *Rivera v. Guevara*, Trial Transcripts, closing arguments, p. 4201:6-8) ("We win any which way, all we have to show is one way.") Responding further, City Defendants appealed the judgment in *Rivera v. Guevara*, (*see* Def's Ex. U, Notice of Appeal, *Rivera v. Guevara*, No. 12 C 4428, Dkt. 783, (N.D. Ill. Oct. 16, 2019)), and the parties then engaged in a successful mediation in the Seventh Circuit Court of Appeals wherein the parties reached an agreement to resolve the case for a sum total from the City in turn for, among other things, the defendants dismissing the appeal. (*See* Def's Ex. V, Notice of Cir. Rule 33 Mediation, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Oct. 24, 2019)). The parties executed a Release, Satisfaction of Judgment, and Settlement Agreement (herein the "*Rivera* Agreement") on March 25, 2020, memorializing the terms. (*See* Def's Ex. W, *Rivera* Agreement). The *Rivera* Agreement stated: "[t]he parties and their respective attorneys acknowledge that the settlement of this case is not an admission of liability, or of unconstitutional or illegal conduct by or on the part of any Defendant, and/or the City of Chicago's future, current or former officers, agents and employees, and shall not serve as evidence of *any wrongdoing* by or on the part of any Defendant, and/or the City of Chicago's future, current or former officers, agents and employees. The parties and their respective attorneys further acknowledge that settlement is made to avoid the uncertainty of the outcome of litigation and the expense in time and money of further litigation and for the purpose of judicial economy." (Ex. W, *Rivera* Agreement, at ¶ 5) (emphasis added). The *Rivera* Agreement further provided that Defendants agreed to dismiss the appeal within fourteen (14) days of the execution of the Rivera Agreement. (*See* Ex. W, at ¶ 8). The City Defendants timely filed an agreed motion to dismiss the appeal under Federal Rule of Appellate Procedure 42(b), which the Seventh Circuit granted, and issued the mandate. (*See* Ex. X, Agreed Mtn. Vol. Dismissal, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Apr. 6, 2020); *see* Ex. Y, Notice of Issuance of Mandate, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Apr. 7, 2020)).

112.    During trial, both sides presented extensive Monell evidence, which is collected in the parties' post-trial submissions in Rivera. Ex. YYY (City's Mot. for New Trial) at 2-11; Ex. ZZZ (Pl.'s Resp. to City's Mot. for New Trial) at 78-109; Ex. AAAA (City's Reply In Support of Mot. for New Trial) at 3-23, 30-34.

RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by admissible evidence, is argumentative and states a legal

conclusion. *See Malec*, 191 F.R.D. at 583; *Tel-Lock, Inc.*, 2005 WL 741930, at *2; *Taylor*, 2012 WL 669063, at *1 (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).

Subject to and without waiving these objections, Defendant City admits in part and denies in part. The City admits that Plaintiff has referred to various pleadings filed in the *Rivera* litigation, but denies that the pleadings contain all of the evidence collected and presented at trial, and further denies that these citations to various pleadings from the *Rivera v. Guevara* litigation are material to the City's motion for summary judgment, nor do they warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec,* 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")

Responding further, City Defendants appealed the judgment in *Rivera v. Guevara*, (*see* Def's Ex. U, Notice of Appeal, *Rivera v. Guevara*, No. 12 C 4428, Dkt. 783, (N.D. Ill. Oct. 16, 2019)), and the parties then engaged in a successful mediation in the Seventh *Circuit* Court of Appeals wherein the parties reached an agreement to resolve the case for a sum total from the City in turn for, among other things, the Defendants dismissing the appeal. (*See* Def's Ex. V, Notice of Cir. Rule 33 Mediation, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Oct. 24, 2019). The parties executed a Release, Satisfaction of Judgment, and Settlement Agreement (herein the "*Rivera* Agreement") on March 25, 2020, memorializing the terms. (*See* Ex. W, *Rivera* Agreement). The *Rivera* Agreement stated: "[t]he parties and their respective attorneys acknowledge that the settlement of this case is not an admission of liability, or of unconstitutional or illegal conduct by or on the part of any Defendant, and/or the City of Chicago's future, current or former officers, agents and employees, and shall not serve as evidence of *any wrongdoing* by or on the part of any Defendant, and/or the City of Chicago's future, current or former officers, agents and employees. The parties and their respective attorneys further acknowledge that settlement is made to avoid the uncertainty of the outcome of litigation and the expense in time and money of further litigation and for the purpose of judicial economy." (Def's Ex. W, *Rivera* Agreement, at ¶ 5) (emphasis added). The *Rivera* Agreement further provided that Defendants agreed to dismiss the appeal within fourteen (14) days of the execution of the Rivera Agreement. (*See* Ex. W, at ¶ 8). The City Defendants timely filed an agreed motion to dismiss the appeal under Federal Rule of Appellate Procedure 42(b), which the Seventh Circuit granted, and issued the mandate. (*See* Def's Ex. X, Agreed Mtn. Vol. Dismissal, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Apr. 6, 2020); *see* Def's Ex. Y, Notice of Issuance of Mandate, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Apr. 7, 2020).

113.    The City's post-trial motion was denied. *Rivera v. Guevara*, No. 12-CV-4428, 2019

WL 13249674, at *4 (N.D. Ill. Sept. 20, 2019).

RESPONSE: Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by admissible evidence, is argumentative and states a legal conclusion. *See Malec*, 191 F.R.D. at 583; *Tel-Lock, Inc.*, 2005 WL 741930, at *2; *Taylor*, 2012

WL 669063, at *1 (Shadur, J) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).

Subject to and without waiving these objections, Defendant City admits in part and denies in part. The City admits that the post-trial motions filed in *Rivera v. Guevara* were denied, but denies that the citation to the ruling on the post trial motions are material to the City's motion for summary judgment, nor does it warrant denial of the City's motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; s*ee also Malec*, 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.")

Responding further, City Defendants appealed the judgment in *Rivera v. Guevara*, (*see* Def's Ex. U, Notice of Appeal, *Rivera v. Guevara*, No. 12 C 4428, Dkt. 783, (N.D. Ill. Oct. 16, 2019)), and the parties then engaged in a successful mediation in the Seventh *Circuit* Court of Appeals wherein the parties reached an agreement to resolve the case for a sum total from the City in turn for, among other things, the defendants dismissing the appeal. (*See* Def's Ex. V, Notice of Cir. Rule 33 Mediation, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Oct. 24, 2019)). The parties executed a Release, Satisfaction of Judgment, and Settlement Agreement (herein the "*Rivera* Agreement") on March 25, 2020, memorializing the terms. (*See* Def's Ex. W, *Rivera* Agreement). The *Rivera* Agreement stated: "[t]he parties and their respective attorneys acknowledge that the settlement of this case is not an admission of liability, or of unconstitutional or illegal conduct by or on the part of any Defendant, and/or the City of Chicago's future, current or former officers, agents and employees, and shall not serve as evidence of *any wrongdoing* by or on the part of any Defendant, and/or the City of Chicago's future, current or former officers, agents and employees. The parties and their respective attorneys further acknowledge that settlement is made to avoid the uncertainty of the outcome of litigation and the expense in time and money of further litigation and for the purpose of judicial economy." (Ex. W, *Rivera* Agreement, at ¶ 5) (emphasis added). The *Rivera* Agreement further provided that Defendants agreed to dismiss the appeal within fourteen (14) days of the execution of the Rivera Agreement. (*See* Ex. W, at ¶ 8). The City Defendants timely filed an agreed motion to dismiss the appeal under Federal Rule of Appellate Procedure 42(b), which the Seventh Circuit granted, and issued the mandate. (*See* Def's Ex. X, Agreed Mtn. Vol. Dismissal, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Apr. 6, 2020); *See* Ex. Y, Notice of Issuance of Mandate, *Rivera v. Guevara*, No. 19-3045 (7th Cir. Apr. 7, 2020).

114. Rivera's expert, Michael Brasfield, conducted an analysis of 435 Chicago Police

Department homicide files, this time from Area Five for the years 1985 to 1991, which revealed

that in more than 90% of cases information in Chicago Police Department files were not produced

to prosecutors and criminal defense attorneys in the criminal justice system, and in a full 100% of

cases the written policies promulgated by the City after Palmer were not followed. Ex. BBBB

(Rivera Trial Tr. 6/15/18) at 2210-15, 2226; Ex. CCCC (Rivera Trial Tr. 6/26/18) at 3912-3919.

**RESPONSE:** **To the extent that Plaintiff is relying on these "facts" to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to Plaintiff's cross-motion for summary judgment, nor do they warrant granting Plaintiff's cross-motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2). *See Outlaw*, 259 F.3d at 837; *see also Malec*, 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") Specifically, this paragraph references analysis of files "for the years 1985 to 1991" four years before the arrest of Plaintiff in this matter.**

**Defendant City further objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is not supported by admissible evidence, is argumentative and states a legal conclusion. *See Malec*, 191 F.R.D. at 583; *Tel-Lock, Inc.*, 2005 WL 741930, at \*2. Plaintiff also has no foundation to rely on an expert report from a previous litigation where the expert was not retained or deposed in this litigation. *See Ideal Mfg. & Sales Corp. v. Pase Grp., Inc.*, 2008 WL 11463582, at \*9 (E.D. Wis. Nov. 24, 2008) ("'while an unsworn expert report, standing alone, does not constitute admissible evidence that can be considered at the summary judgment stage of the proceedings, and will not defeat a motion for summary judgment, an unsworn expert report may be considered at summary judgment where the opinions therein are otherwise adopted or reaffirmed in an *admissible affidavit or deposition testimony* by the expert'") (emphasis added) (quoting *Maytag Corp. v. Electrolux Home Products, Inc.*, 448 F. Supp. 2d 1034, 1065 (N.D. Iowa 2006))**

**Subject to and without waiving these objections, Defendant City admits in part and denies in part. The City admits that plaintiff Rivera's expert testified to the statistics included in this paragraph, but denies that he had the proper foundation to provide said testimony.**

115.    In *Kluppelberg v. Burge*, 276 F. Supp. 3d 773, 776 (N.D. Ill. 2017), where

Kluppelberg advanced his theory that the City of Chicago had a policy of suppressing exculpatory

evidence resulting in the suppression of investigative information that led to his conviction,

including with an expert analysis of additional homicide files by Brasfield, *see* Ex. FF (Tiderington

Report) at 70, 391 (Brasfield's Report in *Kluppelberg*), the district court granted Kluppelberg's

motion to apply collateral estoppel, stating that:

> To establish that the issues are the same and were necessarily decided, Kluppelberg must
>
> show that the jury in *Fields*, in order to have reached its verdict, had to have found that the

City had a policy or practice of withholding material exculpatory and/or impeachment evidence, specifically street files…. The court finds that Kluppelberg has met that burden. That the jury must have found a policy or practice of withholding evidence is clear from the jury instructions in *Fields*, which stated that, to succeed on his *Monell* claim, Fields must prove by a preponderance of the evidence that 'it was the policy of the City of Chicago to conceal material exculpatory and/or impeachment evidence.'…. Kluppelberg's motion to apply collateral estoppel barring the City from arguing that it did not have a policy or practice of withholding material exculpatory and/or impeachment evidence contained in street files is granted."

*Kluppelberg*, 276 F. Supp. at 776-79.

**RESPONSE:** **To the extent that Plaintiff is relying on these "facts" to establish the City's policies at the time of Plaintiff's arrest in 1995 these facts are not material to Plaintiff's cross-motion for summary judgment, nor do they warrant granting Plaintiff's cross-motion for summary judgment, and therefore does not comply with Local Rule 56.1(a)(2).** ***See Outlaw***, **259 F.3d at 837;** *see also Malec*, **191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion.") Defendant City objects to this paragraph as it violates N.D. Ill. L.R. 56.1(d) because it is argumentative and states a legal conclusion.** ***See Malec***, **191 F.R.D. at 583;** ***Tel-Lock, Inc.***, **2005 WL 741930, at *2;** ***Taylor***, **2012 WL 669063, at *1 (Shadur, J)(A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)).**

**Defendant City further objects to this paragraph as it is not supported by admissible evidence.** ***See***, *Sommerfield v. City of Chicago*, **254 F.R.D. 317, 329 (N.D. Ill. 2008) (the cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403). Further, Tiderington's report is hearsay despite Plaintiff filing a sworn declaration which should be stricken, because his declaration was filed after the City filed for summary judgment which was long after Plaintiff's 26(a)(2) disclosures were due and Tiderington was deposed. (Dkt. 519-5, PSODF, Ex. 69, Declaration of Thomas Tiderington signed 3/1/24). Moreover, Plaintiff has no foundation to rely on an expert report from a previous litigation where the expert was not retained or deposed in this litigation.** ***See Ideal Mfg. & Sales Corp. v. Pase Grp., Inc.,* 2008 WL 11463582, at *9 (E.D. Wis. Nov. 24, 2008) ("'[W]hile an unsworn expert report, standing alone, does not constitute admissible evidence that can be considered at the summary judgment stage of proceedings, and will not defeat a motion for summary judgment, an unsworn expert report may be considered where the opinions therein are otherwise adopted or reaffirmed in an** ***admissible affidavit or deposition***

*testimony* **by the expert.'" (quoting *Maytag Corp. v. Electrolux Home Products, Inc.,* 448 F.Supp.2d 1034, 1065 (N.D. Iowa 2006)(emphasis added)).**


Dated: May 28, 2024                                    Respectfully Submitted,

By: /s/ *Gabrielle R. Sansonetti*                      By: /s/ *Eileen E. Rosen*
Special Assistant Corporation Counsel                  Eileen E. Rosen
                                                       Special Assistant Corporation Counsel
*One of the Attorneys for Reynaldo Guevara*            *One of the Attorneys for City of Chicago*

Thomas M. Leinenweber                                  Eileen E. Rosen
James Daffada                                          Theresa Berousek Carney
Gabrielle R. Sansonetti                                Catherine M. Barber
LEINENWEBER,DAFFADA&                                   Austin G. Rahe
SANSONETTI                                             Lauren M. Ferrise
120 N LaSalle Street, Suite 2000                       Rock Fusco & Connelly, LLC
Chicago, IL 60602                                      333 W. Wacker, 19th Floor
(773) 716-6117                                         Chicago, Illinois 60606
gabrielle@ilesq.com                                    (312) 494-1000
                                                       erosen@rfclaw.com